## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                 :

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| QUIKSILVER, INC., *et al.*, | : | Case No. 15-11880 (___) |
|  | : |  |
| Debtors.[1] | : | (Joint Administration Pending) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEBTORS' MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a) AND 363(b) AND BANKRUPTCY RULES 6003 AND 6004 AUTHORIZING THE DEBTORS TO (I) MAINTAIN CUSTOMER PROGRAMS AND (II) HONOR OR PAY RELATED PREPETITION OBLIGATIONS

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Quiksilver" or the "Company"), hereby move (this "Motion") the Court for entry of interim and final orders, under sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing but not directing the Debtors, in their sole discretion, to maintain and administer customer-related programs as described in the Motion (collectively, the "Customer Programs") and honor prepetition obligations to customers related thereto in the ordinary course of business and in a manner consistent with past practice (collectively, the "Customer Obligations"), (ii) authorizing the Debtors to continue, replace, implement, modify, and/or terminate any of the Customer Programs, in each case as the Debtors deem appropriate in their business judgment and in the ordinary course of business, without

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

further application to the Court, (iii) authorizing the Banks (as defined below) to honor and

process check and electronic transfer requests related to the foregoing, and (iv) granting related

relief.  In support of the Motion, the Debtors rely upon and incorporate by reference the

Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., in

Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration"),[2] filed

with the Court concurrently herewith.  In further support of the Motion, the Debtors, by and

through their undersigned proposed counsel, respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this

Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a)

and 363(b) of the Bankruptcy Code.  Such relief is also warranted under Bankruptcy Rules 6003

and 6004.

3.      Pursuant to Rule 9013-1(f) of the Local Rules for the United States

Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtors

consent to the entry of a final judgment or order with respect to this Motion if it is determined

that this Court would lack Article III jurisdiction to enter such final order or judgment absent the

consent of the parties.

## BACKGROUND

4.      On September 9, 2015 (the "Petition Date"), the Debtors each commenced

a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day
Declaration.

"Chapter 11 Cases").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

5.       The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.       To date, no creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "United States Trustee").  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

7.       Quiksilver is one of the world's leading outdoor sports lifestyle companies.  The Company designs, develops and distributes branded apparel, footwear, accessories and related products.  The Company began operations in 1976 making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, and motocross, among other activities. The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites.  The Debtors comprise each of the Company's U.S. entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc., and seven inactive entities.

8.      Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

**RELIEF REQUESTED**

9.      By this Motion, the Debtors request that the Court enter an order, pursuant to Bankruptcy Code sections 105 and 363(b) and Bankruptcy Rules 6003 and 6004, (i) authorizing the Debtors to maintain and administer the Customer Programs and honor prepetition Customer Obligations related thereto in their sole discretion, in the ordinary course of business, and in a manner consistent with past practice and (ii) authorizing the Debtors to continue, replace, implement, modify and/or terminate one or more of the Customer Programs, in each case as the Debtors deem appropriate in their business judgment and in the ordinary course of business, without further application to the Court.

10.     In addition, the Debtors request entry of orders (a) authorizing all applicable banks and other financial institutions (collectively, the "Banks"), when requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers, on account of the Customer Obligations, whether such checks or other requests were submitted before, on, or after the Petition Date; (b) authorizing the Banks to rely on the representations of the Debtors as to which checks are subject to this Motion, provided that any such Bank shall not have any liability to any party for relying on such direction and representations by the Debtors or for inadvertently honoring or dishonoring any check or fund transfer; (c) providing that the Banks shall, at the direction of the Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Customer Obligations that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover

4

such payments and that any such Bank shall not have any liability to any party for relying on such direction by the Debtors; and (d) authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts and other forms of payment which may be inadvertently dishonored or rejected.

11.    The relief requested herein should not (a) be construed as a request to assume, or for authority to assume, any executory contract under section 365 of the Bankruptcy Code or otherwise, (b) waive, affect, or impair any of the Debtors' rights, claims, or defenses, including, but not limited to, those arising from section 365 of the Bankruptcy Code, other applicable law, or any agreement, (c) grant third-party beneficiary status or bestow any additional rights on any third party, (d) be otherwise enforceable by any third party other than the Banks, or (e) impair the Debtors' ability to contest or object to any claims, including the Customer Obligations, asserted against the Debtors on any ground permitted by applicable law.

12.    The Debtors propose to serve a copy of any interim order granting this Motion within three (3) business days after entry thereof.  The Debtors further request that the Court (a) set a deadline for filing objections to the Motion and entry of the Final Order, (b) set a final hearing on the Motion, and (c) enter the Final Order on this Motion at or after such final hearing.

13.    For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders and other parties in interest, and therefore, should be granted.

**BASIS FOR RELIEF**

14.    The Debtors' Customer Programs are composed of a variety of prepetition customer incentives and protections provided to the Debtors' retail and wholesale customers in the ordinary course of business.  The Debtors' Customer Programs engender goodwill, maintain

loyalty, increase the Debtors' sales opportunities, and provide the Debtors a comparative advantage over their competition.  As further described below, the Customer Programs refer to the programs by which the Debtors offer gift cards, refunds and exchanges, warranties, and promotional offers to their customers, as well as process customer purchases through the use of credit cards and other payment methods.  The Debtors believe that their ability to continue the Customer Programs and to honor their Customer Obligations thereunder in the ordinary course of business is critical to the Debtors' reorganization efforts.  The Customer Programs described below are necessary to (i) retain the Debtors' reputation for reliability, (ii) meet competitive market pressures, (iii) maintain positive customer relationships, and (iv) ensure customer satisfaction, thereby retaining current customers, attracting new ones, and, ultimately, enhancing revenue and profitability for the benefit of all the Debtors' stakeholders.

A.     **Gift Cards**

15.     In the ordinary course of business, the Debtors sell Quiksilver Gift Cards and Quiksilver E-Gift Cards (collectively, "Gift Cards") to customers in amounts ranging from $5 to $500.  Customers can purchase Gift Cards in the Debtors' Quiksilver, Roxy, and DC Shoes retail stores as well as through their online stores, which can be accessed at www.quiksilver.com, www.roxy.com, and www.dcshoes.com.  Additionally, customers may be issued Gift Cards in lieu of a refund if returns are processed outside the normal return policy, such as for customer returns without a receipt.  Quiksilver Gift Cards can be used for in-store purchases and online purchases, while Quiksilver E-Gift Cards can be used only for online purchases.  Gift card programs of this nature are commonplace and popular in the retail industry, and the Debtors' competitors offer similar programs to their customers.  Accordingly, the inability to honor existing gift cards or continue the gift card program would put the Debtors at a material disadvantage as compared to their competitors.

16.     The Debtors utilize the services of a third party, Ceridian Stored Value Solutions, Inc. ("Ceridian"), to process the Gift Cards and provide other Gift Card related services, such as handling all customers' Gift Card balance inquiries.  Ceridian remits to the Debtors the customer payments on account of customer-purchased Gift Cards, and the Debtors pay Ceridian certain processing and service fees per Gift Card transaction.  As of the Petition Date, the Debtors estimate that approximately $3,750 in such fees remain outstanding with respect to prepetition processing and servicing of Gift Cards by Ceridian.

17.     Between August 2014 and July 2015, the Company issued approximately $300,500 in Gift Cards on account of customer purchases and approximately $126,000 in Gift Cards as store credit in lieu of refunds for customer returns made outside the normal return policy.  During the same period, approximately $766,600 in Gift Cards were redeemed at Quiksilver retail and e-commerce stores.  Based on historical trends, the Debtors anticipate that in 2016, they will issue approximately $351,000 and redeem approximately $707,000 in Gift Cards.  At the Petition Date, the Debtors estimate that they will have approximately $1.0 million of Gift Card obligations outstanding.

18.     By this Motion, the Debtors request authority, in their sole discretion, (i) to honor all Gift Cards purchased, and store credit issued through Gift Cards, prior to the Petition Date, (ii) to pay any prepetition processing and service fees incurred on account of the Gift Cards, and (iii) to continue selling and honoring customer-purchased Gift Cards, and issuing and honoring store credit Gift Cards, in the ordinary course of business.

**B.     Refund, Exchange, and Return Programs**

19.     The Debtors allow their retail customers to return or exchange certain purchased merchandise within 30 days from the date of purchase under the following conditions: (i) the merchandise was purchased at Quiksilver-owned retail or outlet stores or at Quiksilver

official e-commerce sites; (ii) the customer returns the merchandise either in store or via U.S. mail; (iii) the merchandise is unworn, unwashed, and in its original condition and packaging (if any); (iv) all tags are still attached to the merchandise; and (v) the return is presented with an original sales receipt or gift receipt (the "Refund and Exchange Program").  Under the Refund and Exchange Program, customers receive a refund in the same form of payment used at the time of purchase.  If merchandise is not returned within 30 days of original purchase, the Debtors generally do not offer a refund, exchange, or store credit.  Programs similar to the Refund and Exchange Program are common in the retail industry, and similar programs are used by the Debtors' competitors.

20.     As a result of the inherently uncertain nature of the Refund and Exchange Program, the Debtors are unable to estimate the value of their Customer Obligations related thereto with precise accuracy as of the Petition Date.  The Debtors, however, do not expect the commencement of these Chapter 11 Cases to result in a significant deviation in the volume of monthly returns and exchanges from that which they experienced prepetition, which averages $318,000 to $582,000 per month.

21.     In addition, the Debtors offer a return program to their wholesale customers through which wholesale customers are permitted to return merchandise to address missed shipments, product defects, and slow sell through, and when needed, the Debtors replace the products at issue with new product (the "Wholesale Returns Program").  The Wholesale Returns Program is critical to maintaining the Debtors' relationships with their wholesale customers.  Product returned pursuant to the Wholesale Returns Program represented 2.32% of gross sales, or $8.6 million of wholesale sales, for the previous twelve months.  While the Debtors are unable to estimate the value of their Customer Obligations related to the Wholesale

Returns Program with precise accuracy as of the Petition Date, the Debtors do not expect a

significant deviation from historical levels.

22.     Accordingly, the Debtors request authority, in their sole discretion, to

honor prepetition Customer Obligations associated with the Refund and Exchange Program and

Wholesale Returns Program and to maintain and continue honoring such programs postpetition

in the ordinary course of business.

**C.     Warranty Programs**

23.     The Debtors offer their retail customers warranties, akin to manufacturers'

warranties, on several categories of merchandise.  The warranties offered include an Apparel &

Accessories Warranty, Baggage Warranty, Eyewear Warranty, Footwear Warranty, Snow

Warranty, Watch Warranty, and Wetsuit Warranty (collectively, the "Quiksilver Warranty

Programs").  The Quiksilver Warranty Programs warrant the Debtors' products to be free of

defects in material or workmanship[3] for the following periods from the original date of purchase:

(i) ninety days for apparel, accessories, and footwear; (ii) one year for baggage, bags, luggage,

snowboards, snow-specific outerwear, snowboard boots, and glued and blind-stitched wetsuits;

(iii) two years for eyewear and watches; and (iv) both a limited lifetime warranty on

workmanship and limited one year warranty on materials for stitched wetsuits.

24.     Warranty coverage under the Quiksilver Warranty Programs is limited to

customers who present an original purchase receipt from an authorized dealer of the Debtors'

products.  The Debtors' customers do not purchase coverage under the Quiksilver Warranty

Programs separately, as the cost is included in the products' purchase price.  If a product covered

by a Quiksilver Warranty Program is found to be defective after inspection by one of the

---

[3]     The Quiksilver Warranties do not cover damage caused by accident, improper care, negligence, normal wear
and tear, or the natural breakdown of colors and material through time, exposure, or extensive use.

Debtors' warranty technicians, the product is repaired or replaced with an existing comparable model at the technician's discretion.

25.    The Quiksilver Warranty Programs are directly associated with how customers perceive the quality of the Debtors' products.  Therefore, the Debtors' failure to honor their Customer Obligations under the Quiksilver Warranty Programs would harm customer confidence in the Debtors and their products.  As a result, the Debtors request authority, in their sole discretion, to honor prepetition Customer Obligations related to the Quiksilver Warranty Programs and to maintain such programs postpetition in the ordinary course of business.

**D.    Sales Promotions, In-Line Discounts, and Related Programs**

26.    The Debtors offer various promotional offers to retail and, in some cases, wholesale customers throughout the year (collectively, the "Sales Promotions").  The Sales Promotions are aimed at driving sales and maintaining market competitiveness.  The Debtors offer various in-store and online promotions that provide discounts to customers, such as "percentage off," "buy-one-get-one-free," and "gift with purchase" promotions.  The Sales Promotions are similar to those routinely offered in the retail and wholesale industry.  Accordingly, the Debtors seek authority, in their sole discretion, to honor prepetition obligations associated with these Sales Promotions and to continue offering Sales Promotions postpetition in the ordinary course of business.

27.    In addition, in connection with the Debtors' wholesale business, the Debtors offer certain in-line discounts, which include standard discounts, seasonal pre-book discounts, and closeout discounts (collectively, the "In-Line Discounts").  The Debtors negotiate the In-Line Discounts with each wholesale customer so that they will support the Debtors' business and make their required margins.  In the previous twelve months, the Debtors applied approximately $83.3 million in In-Line Discounts for their wholesale customers.  Absent

authorization to continue offering the In-Line Discounts, the Debtors would likely lose many of their key wholesale customers, to the severe detriment of the Debtors' reorganization efforts.

28.     Similarly, the Debtors offer their wholesale customers certain mark-down allowances ("MDAs") as additional discounts at the end of the season to help them clear out old inventory while maintaining a minimum margin threshold of product.  On average, the Debtors provide approximately $9.1 million in MDAs to wholesale customers each year.  Failure to honor or to continue to offer these MDAs would cause wholesale customers to cease doing business with the Debtors or greatly reduce the volume of such business.

29.     The Debtors also offer Non-Merch Credit discounts (the "Non-Merch Credits"), above and beyond the standard In-Line Discounts applied for wholesale customers, to resolve invoice disputes and other issues with merchandise orders, such as late deliveries and order changes, after invoices have been generated.  On average, the Debtors apply approximately $5.4 million in Non-Merch Credits per year.  Such Non-Merch Credits ensure that wholesale customers accept product delayed by supply chain or other logistical issues and incentivize them to continue doing business with the Debtors.  As of August 31, 2015, the Debtors estimate that they have approximately $3.35 million in outstanding Customer Obligations on account of Non-Merch Credits and MDAs provided to their wholesale customers.

30.     Lastly, the Debtors provide wholesale customers with cash payments equaling a pre-agreed percentage of the gross sales of each customer, which the wholesale customer can use at their discretion to support the business (the "COOP Investments").  These dollars are typically used to drive retail customers to the stores, such as for e-mail blasts, catalogs, or in-store promotions.  In the previous twelve months, the Debtors provided approximately $686,000 in COOP Investments.  The COOP Investments increase sales for the

11

Debtors' wholesale customers, thereby increasing the volume of the Debtors' business and enhancing overall value for the Debtors' estates and creditors.  Absent the COOP Investments, wholesale customers may decrease their promotions of the Debtors' merchandise or cease to do business with the Debtors, thus negatively impacting the Debtors' business volume.

31.    Accordingly, the Debtors request authority, in their sole discretion, to honor prepetition Customer Obligations associated with the Sales Promotions, In-Line Discounts, MDAs, Non-Merch Credits, and COOP Investments to maintain and continue honoring such programs postpetition in the ordinary course of business.

**E.    Credit Card and Other Payment Processors**

32.    In addition to cash, the Debtors accept several other methods of payment from retail customers at their point of sale: (i) Visa, MasterCard, Discover, or American Express credit cards; (ii) PayPal; (iii) purchases through Amazon.com; and (iv) checks.[4]  Retail credit card transactions are processed by Bank of America Merchant Services.  Debtors QS Wholesale, Inc. and DC Shoes, Inc. also accept credit cards from their wholesale customers, and such transactions are processed by Elavon, Inc.  For all methods of payment (other than a cash transaction), the Debtors receive the net customer purchase price less any chargebacks, returns, or processing fees charged.  The processing fees charged by each company vary but are in the range of 1.5% to 3%, with a weighted average of 2.5%.  The fees that are owing to these companies are set off from the daily net proceeds remitted to the Debtors on account of sales transactions.

33.    Maintaining use of the credit cards and other payment mechanisms like PayPal and processing purchases through Amazon.com is essential to the continuing operation of

---

[4]    Checks are accepted at the Debtors' Quiksilver, Roxy, and DC Shoes retail stores but are not accepted for online purchases.

the Debtors' business because the vast majority of the Debtors' sales are made using these

payment methods.  By this Motion, the Debtors request authority, in their sole discretion, to

allow the credit card companies, Amazon.com, and PayPal to continue to process the customer

payments, including deducting chargebacks, returns, and processing fees, in the ordinary course

of business.

## APPLICABLE AUTHORITY

**A.      Paying the Customer Obligations is in Furtherance of the Debtors' Duties Under
Sections 1107(a) and 1108 of the Bankruptcy Code.**

34.      As debtors in possession under sections 1107(a) and 1108 of the

Bankruptcy Code, the Debtors have duties to protect and preserve their estates, including

maintaining the going-concern value of their business.  See, e.g., In re CoServ, L.L.C., 273 B.R.

487, 497 (Bankr. N.D. Tex. 2002).  Courts have noted that there are instances in which a debtor

in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition

claim."  Id.  The CoServ court specifically noted that preplan satisfaction of prepetition claims

would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to

effect a substantial enhancement of the estate," id. at 479, and also when the payment was to

"sole suppliers of a given product."  Id. at 498.  The court provided a three-pronged test for

determining whether a pre-plan payment on account of a prepetition claim was a valid exercise

of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it
> deals with the claimant, the debtor risks the probability of harm, or, alternatively,
> loss of economic advantage to the estate or the debtor's going concern value,
> which is disproportionate to the amount of the claimant's prepetition claim.
> Third, there is no practical or legal alternative by which the debtor can deal with
> the claimant other than by payment of the claim.

Id.

35.     Payment of the Customer Obligations undeniably meets each element of the <u>CoServ</u> court's standard.  First, as described above, it is essential that the Debtors preserve their relationships with their customers during these Chapter 11 Cases.  Any disruption in service, or delay in satisfying Customer Obligations, could damage the Debtors' ability to retain existing customers and attract new ones, to the detriment of all stakeholders.  Second, the Debtors have carefully considered options other than the payment of the Customer Obligations Debtors have determined that there are no practical or legal alternatives to the payment such obligations in the ordinary course of business.

36.     Therefore, the Debtors can only meet their fiduciary obligations as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of the Customer Obligations.

**B.      The Doctrine of Necessity and Section 105(a) of the Bankruptcy Code Further Support Payment of Customer Obligations.**

37.     The Debtors' proposed payment of prepetition Customer Obligations should be authorized pursuant to section 105 of the Bankruptcy Code and under the "doctrine of necessity."

38.     Section 105(a) of the Bankruptcy Code authorizes a bankruptcy court to enter any order "necessary or appropriate" to carry out the provisions of the Bankruptcy Code. 11 U.S.C. § 105(a).  For the reasons set forth herein, and in light of the critical need for the Debtors to preserve the going concern value of their businesses in order to effect a successful reorganization through, among other things, continuing the orderly day-to-day performance of the Debtors' customer service contracts, payment of the Customer Obligations as requested herein is proper in accordance with section 105 of the Bankruptcy Code.

39.     Payment of the Customer Obligations is further supported by the doctrine of necessity.  The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization.  See In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment.); see also In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit the pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a prepetition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the chapter 11 process.").

40.     The United States Supreme Court first articulated the doctrine of necessity over a century ago in Miltenberger v. Logansport Railway, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  See id. at 309-14.  The doctrine, largely unchanged from the Court's reasoning in Miltenberger, is a widely accepted component of modern bankruptcy jurisprudence.  See Just For Feet, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); In re Payless Cashways, Inc., 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agree to

15

provide postpetition trade credit); see also In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92

(Bankr. D. Del. 1994); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).

      41.    For the reasons discussed herein, payment of the Customer Obligations is

necessary to the Debtors' effective reorganization.  In particular, and as further set forth above,

dishonoring the Customer Obligations could cause the Debtors' existing customers to seek to

cancel lucrative contracts and hamper the Debtors' efforts to compete for new business.

Moreover, the Debtors cannot assume their customer contracts without first curing any defaults.

See 11 U.S.C. § 365(b)(1)(A).  Because any unpaid Customer Obligations must be satisfied

eventually if the customer contracts are to be assumed, the payment of the Customer Obligations

in the ordinary course of business will not deplete the Debtors' estates.

      42.    Therefore, payment of the Customer Obligations should be authorized

pursuant to section 105(a) of the Bankruptcy Code and the doctrine of necessity.

## C.    Payment of the Customer Obligations is Appropriate under Section 363(b) of the Bankruptcy Code.

      43.    Section 363(b) of the Bankruptcy Code permits a debtor to use estate

property "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C.

§ 363(b)(1).  Courts have authorized relief under section 363(b) where a debtor demonstrates a

sound business justification for such relief.  See Comm. of Equity Sec. Holders v. Lionel Corp.

(In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a

judge determining a § 363(b) application expressly find from the evidence presented before him

at the hearing a good business reason to grant such an application."); Ionosphere Clubs, Inc., 98

B.R. at 175 ("[T]he debtor must articulate some business justification, other than mere

appeasement of major creditors.")

44.     Once a debtor has articulated a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

45.     The business judgment rule applies in chapter 11 cases. See Integrated Res., 147 B.R. at 656 (noting that "Delaware business judgment rule principles have 'vitality by analogy' in Chapter 11"); see also Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions.").

46.     As discussed above, the Debtors have determined, in the sound exercise of their business judgment the satisfaction of the Customer Obligations in the ordinary course of business is critical to their reorganization efforts.  The failure to honor these obligations could have a material adverse impact on the Debtors' continued operation and, by extension, their efforts to complete an expeditious restructuring that maximizes value for stakeholders. Accordingly, the preservation and protection of the Debtors' business through ongoing relationships with the Debtors' customers provides a sufficient business justification for payment of Customer Obligations, even if such payment were deemed to be outside the ordinary course of business.  See Ionosphere Clubs, Inc., 98 B.R. at 175.

47.     The Debtors therefore seek authorization under section 363(b) of the Bankruptcy Code to pay the Customer Obligations.

48.    Where retaining the loyalty of customers is critical to successful chapter 11 cases, courts in this district and elsewhere have authorized debtors to honor certain prepetition obligations to customers and to continue customer programs.  See, e.g., In re Caché, Inc., Case No. 15-10172 (MFW) (Bankr. D. Del. Feb. 4, 2015); In re The Wet Seal, Inc., Case No. 15-10081 (CSS) (Bankr. D. Del. Jan. 15, 2015); In re Coldwater Creek, Inc., Case No. 14-10867 (BLS) (Bankr. D. Del. Apr. 11, 2014); In re Old FENM Inc., Case No. 13-12569 (KJC) (Bankr. D. Del. Oct. 1, 2013); In re MSD Performance, Inc., Case No. 13-12286 (PJW) (Bankr. D. Del. Sept. 9, 2013); In re AFA Investment Inc., Case No. 12-11127 (MFW) (Bankr. D. Del. Apr. 3, 2012); In re Filene's Basement, LLC, No. 11-13511 (KJC) (Bankr. D. Del. Nov. 4, 2011).[5] Accordingly, based on the foregoing facts and authorities, the Debtors respectfully submit that the relief requested herein should be granted.

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

49.    Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the court has instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh, 235 Fed. App'x 907, 910 (3d Cir. 2007) (citing Glasco v. Hills,

---

[5]    Because of the voluminous nature of the orders cited herein, they are not attached to the Motion.  Copies of these orders, however, are available on request.

558 F.2d 179, 181 (3d Cir. 1977)).  Furthermore, the harm must be shown to be actual and

imminent, not speculative or unsubstantiated.  See, e.g., Acierno v. New Castle County, 40 F.3d

645, 653-55 (3d Cir. 1994).  The Debtors submit that for the reasons already set forth herein, the

relief requested in this Motion is necessary to avoid immediate and irreparable harm to the

Debtors.

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

50.     The Debtors also request that the Court waive the stay imposed by

Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of

property other than cash collateral is stayed until the expiration of 14 days after entry of the

order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the

relief that the Debtors seek in this Motion is necessary for the Debtors to operate without

interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request

that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent

nature of the relief sought herein justifies immediate relief.

### RESERVATION OF RIGHTS

51.     Nothing contained herein is or should be construed as: (a) an admission as

to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any

claim on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any

executory contract or unexpired lease pursuant to Bankruptcy Code section 365; or (e) otherwise

affect the Debtors' rights under Bankruptcy Code section 365 to assume or reject any executory

contract with any party subject to this Motion.

### NOTICE

52.     Notice of this Motion shall be given to (a) the Office of the United States

Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' postpetition

19

secured loan facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan facility; (d) the agent for the Debtors' prepetition senior secured notes; (e) the agent for the Debtors' prepetition senior unsecured notes; (f) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases; and (g) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).  The Debtors submit that no other or further notice need be provided.

### NO PRIOR REQUEST

53.    No previous request for the relief sought in this Motion has been made to this Court or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form annexed hereto, granting the relief sought herein on an interim basis and such other and further relief as may be just and proper.

Dated:    Wilmington, Delaware
          September 9**,** 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Z. Li (*pro hac vice admission pending*)
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

John K. Lyons (*pro hac vice admission pending*)
Jessica S. Kumar (*pro hac vice admission pending*)
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel for Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                                    :    Chapter 11
:
QUIKSILVER, INC., *et al.*,                               :    Case No. 15-11880 (___)
:
                      Debtors.[1]              :    (Jointly Administered)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x    **Related Docket No. __**

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a) AND 363(b) AND**
**BANKRUPTCY RULES 6003 AND 6004 AUTHORIZING THE DEBTORS TO**
**(I) MAINTAIN CUSTOMER PROGRAMS AND (II) HONOR OR**
**PAY RELATED PREPETITION OBLIGATIONS**

Upon the motion (the "<u>Motion</u>")[2] of the Debtors for entry of an order (this

"<u>Order</u>") (i) authorizing the Debtors to maintain and administer the Customer Programs and

honor the Customer Obligations in the ordinary course of business and in a manner consistent

with past practice, (ii) authorizing the Debtors to continue, replace, implement, modify and/or

terminate one or more of the Customer Programs, in each case as the Debtors deem appropriate

in their business judgment and in the ordinary course of business, without further application to

the Court, (iii) authorizing the Banks to honor and process check and electronic transfer requests

related to the foregoing, and (iv) granting related relief; and upon consideration of the First Day

Declaration; and due and sufficient notice of the Motion having been given under the particular

circumstances; and it appearing that no other or further notice is necessary; and it appearing that

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc.
(8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505),
Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors'
corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or
the First Day Declaration.

the relief requested in the Motion is in the best interests of the Debtors, their estates, their

creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient

cause appearing therefor; it is hereby,

**ORDERED, ADJUDGED, AND DECREED that:**

1.          The Motion is GRANTED as set forth herein.

2.          The Debtors are authorized, in their sole discretion, to maintain and

administer the Customer Programs and honor prepetition Customer Obligations related thereto in

the ordinary course of business and in a manner consistent with past practice.

3.          The Debtors are authorized to continue, replace, implement, modify,

and/or terminate any of the Customer Programs, in each case as the Debtors deem appropriate in

their business judgment and in the ordinary course of business, without further application to the

Court.

4.          The credit card companies, internet vendors, and check processors used by

the Debtors are authorized to offset chargebacks, returns, and processing fees on account of

customer purchases in the ordinary course of business, whether such purchases were made prior

to or after the Petition Date.

5.          All applicable banks and other financial institutions are hereby authorized,

when requested by the Debtors in their sole discretion, to receive, process, honor, and pay all

prepetition and postpetition checks, drafts, and other forms of payment, including fund transfers,

on account of the Customer Obligations, whether such checks or other requests were submitted

prior to or after the Petition Date.

6.          The Debtors' banks and other financial institutions shall rely on the

direction and representations of the Debtors as to which checks and fund transfers should be

honored and paid pursuant to this Order, and any such bank shall not have any liability to any

party for relying on such direction and representations by the Debtors as provided for in this Order or for inadvertently honoring or dishonoring any check or fund transfer.

7.    The Debtors' banks shall, at the direction of the Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Customer Obligations that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and any such bank shall not have any liability to any party for relying on such direction by the Debtors as provided for in this Order or for inadvertently failing to follow such direction.

8.    To the extent the Debtors have not yet sought to remit payment on account of the Customer Obligations, the Debtors are authorized, but not directed, to issue checks or provide for other means of payment of the Customer Obligations.

9.    The Debtors shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account of the Customer Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

10.    Nothing in the Motion or this Order, nor the Debtors' payment of claims pursuant to this Order, shall be deemed or construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds; (iii) a promise to pay any claim; (iv) an implication or admission that any particular claim would constitute a Customer Obligation; or (v) the assumption of any contract.

11.    Nothing contained in the Motion or this Order is intended or should be construed to create an administrative priority claim on account of any Customer Program or Customer Obligation.

3

12.     Notwithstanding anything to the contrary contained herein, the relief granted in this Order and any payment to be made hereunder shall be subject to the terms of any orders approving entry into debtor-in-possession financing and authorizing the use of cash collateral approved by this Court in these Chapter 11 Cases (including with respect to any budgets or other covenants governing or relating to such debtor-in-possession financing and/or use of cash collateral).  To the extent there is any inconsistency between the terms of such orders and any action taken or proposed to be taken hereunder, the terms of such orders shall control.

13.     The requirements of Bankruptcy Rule 6003(b) have been satisfied with respect to the relief requested in the Motion.

14.     This Order shall be immediately effective and enforceable upon its entry. To the extent that it may be applicable, the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is hereby waived.

15.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

16.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.


Dated: Wilmington, Delaware

_____, 2015


_____
UNITED STATES BANKRUPTCY JUDGE