## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re: : Chapter 11
:
QUIKSILVER, INC., *et al.*, : Case No. 15-11880 (___)
:
Debtors.[1] : (Joint Administration Pending)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEBTORS' MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a) 363(b), 503(b), 506, 1107 AND 1108 AND BANKRUPTCY RULES 6003 AND 6004 AUTHORIZING PAYMENT OF CERTAIN PREPETITION SHIPPING CHARGES AND IMPORT/EXPORT CHARGES

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Quiksilver" or the "Company"), hereby move (this "Motion") the Court for entry of an order (the "Order"), pursuant to sections 105(a), 363(b), 503(b), 506, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing, but not directing, the Debtors to pay (i) certain prepetition shipping, warehousing and related charges and (ii) certain prepetition import and export obligations. In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., in Support of Chapter 11 Petitions and First Day Pleadings

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

(the "<u>First Day Declaration</u>"),[2] filed with the Court concurrently herewith.  In further support of the Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent as follows:

<strong>JURISDICTION AND VENUE</strong>

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363(b), 503(b), 506(b), 1107(a), and 1108.  Such relief is also warranted under Bankruptcy Rules 6003 and 6004.

3.      Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "<u>Local Bankruptcy Rules</u>"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

<strong>BACKGROUND</strong>

4.      On September 9, 2015 (the "<u>Petition Date</u>"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "<u>Chapter 11 Cases</u>").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

5. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. To date, no creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "United States Trustee"). No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

7. Quiksilver is one of the world's leading outdoor sports lifestyle companies. The Company designs, develops and distributes branded apparel, footwear, accessories and related products. The Company began operations in 1976 making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, and motocross, among other activities. The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites. The Debtors comprise each of the Company's U.S. entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc. and seven inactive entities.

8. Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

**RELIEF REQUESTED**

9.      By the Motion, the Debtors seek entry of an order authorizing, but not directing, the payment of prepetition shipping, warehousing and related charges (all such charges, the "Shipping Charges") that are owed, either directly or indirectly, to certain third party shippers, haulers, common carriers, truckers, other transporters, freight forwarders, related shipping services, and logistics management companies (collectively, the "Shippers"), and to certain third party warehousemen and warehousing services (the "Warehousemen," and collectively with the Shippers, the "Distribution Vendors"),[3] to the extent that the Debtors determine, in the exercise of their business judgment, are necessary and appropriate to (i) secure the delivery, distribution, and sale of the Debtors' goods to customers throughout the United States and abroad, (ii) ensure the delivery of goods, products, and related materials to the Debtors' facilities or (iii) satisfy the liens, if any, in respect of amounts owed to such parties. The Debtors seek authority, in their sole discretion, to pay the prepetition Shipping Charges in the aggregate amount of approximately $2 million.

10.     The Debtors also seek authority in this Motion to pay, either directly or through a third party administrator, all or part of the prepetition customs duties, detention and demurrage fees, tariffs and excise and related taxes, freight forwarding, or consolidation charges and other similar obligations (the "Import/Export Charges" and together with the Shipping Charges, the "Subject Charges") to the applicable governmental agencies and authorities (the "Import/Export Providers," and together with the Distribution Vendors, the "Subject Vendors"), to the extent the Debtors determine, in the exercise of their business judgment, that such payment

---

[3]     Due to the location of the Debtors' facilities, distribution centers, and customers, the Debtors utilize multiple Distribution Vendors to ensure the timely delivery of their products throughout the United States and abroad. In addition, the Debtors have very favorable payment terms with the Distribution Vendors, which results in large open accounts payable owed to the Distribution Vendors.

is necessary or appropriate to secure the import or export of such goods.  The Debtors seek

authority, in their sole discretion, to pay the prepetition Import/Export Charges in the aggregate

amount of approximately $1.5 million.

   11. The Debtors propose that any payments made to the Distribution Vendors

pursuant to the Motion be subject to the following conditions:

   (a) The Debtors, in their sole discretion, shall determine which parties, if any, are entitled to payment under the Order;

   (b) If a party accepts payment under the Order, such party is deemed to have agreed to (i) release any liens it may have on the Debtors' goods or property provided, however, that should such party fail promptly to release such lien and/or interest upon payment by the Debtors, any such lien and/or interest shall be deemed released and expunged, without necessity of further action, and an order on this Motion, together with proof of payment, shall be all that is required to evidence such release and expungement, and (ii) subject to subparagraph (d) below, continue to provide goods or services to the Debtors on Customary Trade Terms during the pendency of the Chapter 11 Cases, provided, however, that in the Debtors' business judgment, such Customary Trade Terms are no less favorable than those trade terms, if any, in effect between the Distribution Vendors and the Debtors during the 180 days preceding the Petition Date.  "Customary Trade Terms" means (i) the most favorable trade terms and conditions, including credit terms, in effect between the Distribution Vendor and the Debtors during the 180 days preceding the Petition Date[4] or (ii) such other trade terms as the Debtors and the Distribution Vendor may mutually agree upon;

   (c) Subject to subparagraph (d), if a party accepts payment under the Order and thereafter does not continue to provide goods or services to the Debtors on the Customary Trade Terms during the pendency of these Chapter 11 Cases, then (i) any payment on a prepetition claim received by such party shall be deemed to be an unauthorized voidable postpetition transfer under Bankruptcy Code Section 549 and, therefore, recoverable by the Debtors in cash

---

[4] In the event the relationship between the party accepting payment under the Order and the Debtors does not extend to 180 days preceding the Petition Date, the Customary Trade Terms shall mean the terms that the party generally extends to its customers or such terms as are acceptable to the Debtors in the reasonable exercise of their business judgment.

upon written request and (ii) subject to subparagraph (f) below, upon recovery by the Debtors, any such prepetition claim shall be reinstated as if the payment had not been made, less the Debtors' reasonable costs in recovering such amounts;

(d)     In the event of the assertion of a possessory lien against the Debtors' property that prevents the Debtors from accessing their property without payment of the prepetition claim giving rise to the lien, the Debtors may, in their absolute discretion, determine to pay the claim without regard to subparagraphs (b)(ii) and (c) above;

(e)     Prior to making a payment to a party under the Order, the Debtors may, in their absolute discretion, settle all or part of the prepetition claims of such party for less than their face amount, without further notice or hearing. In any event, the Debtors may elect to only pay part of a prepetition claim under the authorization requested, leaving the remainder of the claim to be addressed pursuant to their plan of reorganization; and

(f)     If the Debtors seek to recover payments under subparagraph (c) above, nothing shall preclude a party from contesting such treatment by making a written request (the "Request") to the Debtors to schedule a hearing before this Court. If such a Request is made, the hearing on the Request will be the next scheduled hearing date not less than thirty (30) days after the Debtors received the Request, of which hearing the Debtors will provide notice to the requesting party and other interested parties in accordance with the Bankruptcy Code and the orders of this Court.

12.     Moreover, the Debtors request entry of orders (a) authorizing all applicable banks and other financial institutions (collectively, the "Banks"), when requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers, on account of the Subject Charges, whether such checks or other requests were submitted before, on, or after the Petition Date; (b) authorizing the Banks to rely on the representations of the Debtors as to which checks are subject to this Motion, provided that any such Bank shall not have any liability to any party for relying on such direction and representations by the Debtors or for inadvertently honoring or dishonoring any check or fund transfer; (c) providing that the Banks shall, at the direction of the

Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Subject Charges that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and that any such Bank shall not have any liability to any party for relying on such direction by the Debtors; and (d) authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts and other forms of payment which may be inadvertently dishonored or rejected.

13.     The relief requested herein should not (a) be construed as a request to assume, or for authority to assume, any executory contract under section 365 of the Bankruptcy Code or otherwise, (b) waive, affect, or impair any of the Debtors' rights, claims, or defenses, including, but not limited to, those arising from section 365 of the Bankruptcy Code, other applicable law, or any agreement, (c) grant third-party beneficiary status or bestow any additional rights on any third party, (d) be otherwise enforceable by any third party other than the Banks, or (e) impair the Debtors' ability to contest or object to any claims, including the Shipping Changes and Import/Export Charges, asserted against the Debtors on any ground permitted by applicable law.

14.     For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders and other parties in interest, and therefore, should be granted.

## BASIS FOR RELIEF

### A.     Payment of Shipping Charges

15.     The Debtors' business depends on the daily process of importing and/or shipping its goods, products, and related materials to stock the Debtors' various retail stores and wholesale accounts.  In connection, the Debtors have a reputation for reliability and

dependability among their customers.  Indeed, many of the Debtors' pricing policies and

marketing strategies revolve around these attributes.  The Debtors' reputation depends on the

timely delivery of product to the Debtors' stores, wholesale accounts and customers.

16.    In the ordinary course of their businesses, the Debtors rely extensively on

a vast network of Shippers, including freight forwarders, rail, maritime and air shipping services,

air freight carriers, Warehousemen, and trucking companies  (i) from the Debtors' global

vendors to the Debtors' global freight forwarders, (ii) between the Debtors' global freight

forwarders and the Debtors' international maritime and air freight carriers, (iii) between the

Debtors' international maritime and air freight carriers and the Debtors' Warehousemen, and (iv)

from the Debtors' Warehousemen to the Debtors' retail stores, wholesale customers, and other

licensed sellers via domestic air freight and trucking carriers.  The Debtors also rely on their

Shippers to return goods, merchandise, and products from the Debtors' customers and/or to the

Debtors' vendors.

17.    Additionally, in the ordinary course of the Debtors' businesses, the

Debtors rely on certain Warehousemen, among other things, to store goods, products, and related

materials and coordinate with Shippers, during the distribution process.  The Debtors are

dependent upon the Warehousemen to access the property held in their warehouses.

18.    Prior to commencing the Chapter 11 Cases, with the assistance of their

advisors, the Debtors spent a significant amount of time reviewing and analyzing their books and

records, consulting operations management, reviewing contracts and service agreements, and

analyzing applicable laws, regulations, and historical practice to identify certain critical business

relationships and/or suppliers of services – the loss of which could materially harm the Debtors'

business.  Based upon this review, the Debtors estimate that having authority to pay the

prepetition Shipping Charges requested herein is necessary to ensure that the Debtors can continue to perform their customer commitments and keep their distribution and supply chain intact.  With respect to these Shipping Charges, the Debtors and their advisors determined that the value of the goods, products, and related materials in the possession of the Distribution Vendors was significantly more than the prepetition Shipping Charges owed to such Distribution Vendors.

19.     The services provided by the Debtors' Distribution Vendors, including their Shippers and Warehousemen, are critical to the day-to-day operations of the Debtors' businesses.  For example, unless the Debtors continue to receive delivery of goods, products, and related materials on a timely and uninterrupted basis, their operations may be significantly disrupted, thereby causing irreparable damage to the Debtors' business and the value of their estate.  Similarly, if the Debtors are unable to provide goods to customers on a timely basis, the Debtors could suffer a significant loss of credibility and customer goodwill, thereby causing substantial harm to the Debtors' businesses and reorganization efforts.

20.     Typically, the Debtors' agreements with the Distribution Vendors set forth agreed-upon rates for the services.  The Distribution Vendors are generally not paid in advance, but rather invoice the Debtors for shipping and storing services previously rendered, providing the Debtors with viable trade terms and, consequently, liquidity.   For instance, the Debtors have a continuing relationship with, and rely upon, the services of Port Logistics Group, Inc. ("PLG") in connection with the shipment, receipt, and storage Debtors' products.  Pursuant to the Debtors arrangement with PLG, the Debtors are generally invoiced for services based upon a favorable, agreed-upon pricing schedule.   If the Debtors were required to switch to another Distribution Vendor, they would incur significant operational disruption and likely increased costs.

21.    <u>Basis for Paying Shipping Charges</u>.    The Debtors seek to pay the

prepetition Shipping Charges for several reasons.  <u>First</u>, delays in payment of Shipping Charges

with respect to goods that are in the possession of the Distribution Vendors as of the Petition

Date will likely result in the assertion, under applicable law, of possessory liens upon the

Debtors' property in the possession of such parties.[5]  For instance, state statutes in which the

Debtors operate their businesses provide that any common carrier engaged in the shipment of

goods covered by a bill of lading is entitled to a lien on such goods for charges and expenses

incurred thereupon.  <u>See, e.g.</u>, N.J. Stat. Ann. § 12A:7-307 (West 2004); <u>see also</u>, U.C.C. §§ 7-

307(a) (lien of shipper), 7-209(a) (lien of warehouseman).  The perfection and maintenance of

liens is, in most cases, dependent upon possession, so the Distribution Vendors may refuse to

deliver or release such goods until their claims have been satisfied and the liens released.  The

value of these goods generally exceed the amount of the outstanding Shipping Charges and thus,

the Debtors believe that the Distribution Vendors will ultimately be entitled to be paid in full for

the Shipping Charges.  Indeed, as noted above, the Debtors, with their advisors, conducted an

assessment of the value of goods, products, and related materials in transit through rigorous

calculation and concluded that the total inventory currently being held by Shippers is valued at

approximately $15 million.  Irrespective of the amount and validity of their liens, the mere

assertion of possessory or other liens will delay delivery of goods both to the Debtors' stores and

to the Debtors' customers, thereby severely, if not irreparably, damaging the Debtors' businesses

and prospects for successful reorganization.

---

[5]    The Debtors expressly reserve all rights and remedies with respect to any possessory liens asserted against their
property and nothing herein shall be deemed to be an admission with respect to any aspect of any such claim.

22.     <u>Second</u>, if the prepetition Shipping Charges are not paid, many of the Distribution Vendors may refuse to perform future services for the Debtors and withhold the shipment or release of essential goods currently in transit.  In such event, the Debtors will incur additional expenses (such as premium shipping costs) to replace the Distribution Vendors or the goods being withheld, which amounts will likely exceed the amount of unpaid prepetition Shipping Charges that the Debtors request permission to pay hereunder.  More importantly, locating entities to replace the Distribution Vendors will be difficult, if not impossible.  If the Debtors  were unable to find new Distribution Vendors, they would incur significant operational disruption and increased costs.

23.     At the very least, replacing a Distribution Vendor, in most cases, will delay the transport and delivery of goods to the Debtors.  Such delays could cause a material disruption in the Debtors' receipt of goods from suppliers and the delivery of products to customers and retail stores and, thus, their ability to continue operating their business successfully.

24.     Further, the Debtors propose that if any Distribution Vendor accepts payment and thereafter does not continue to provide services to the Debtors on Customary Trade Terms, then any payment of the Shipping Charges made under the Motion to such Distribution Vendor would be deemed an unauthorized postpetition transfer under Bankruptcy Code Section 549 and, therefore, would be avoidable and recoverable by the Debtors in cash upon written request, subject to a Distribution Vendor's right to contest such treatment and request that the Debtors schedule a hearing on such matter. Upon any recovery by the Debtors, the Distribution Vendor's claim would be reinstated as a prepetition claim in the amount so recovered, less the Debtors' reasonable costs in recovering such amounts.

25.    Notwithstanding the authority requested, the Debtors expect that they will pay prepetition claims to the Distribution Vendors only where they believe, in their business judgment, the benefits to their estates from making such payments would exceed (a) the costs that their estates would incur by bringing an action to compel the turnover of such goods and (b) the delays associated with such actions.  The Debtors submit that the total amount the Debtors seek to pay the Distribution Vendors is appropriate and reasonable in light of the importance and necessity of timely receipt of the goods in the possession of the Distribution Vendors and the losses the Debtors might suffer if their operations are disrupted.

**B.    Payment of Import/Export Claims**

26.    In the ordinary course of their businesses, the Debtors receive a variety of goods, products, and related materials (collectively, the "Imported Goods") from a number of foreign countries.  In the ordinary course, the Debtors also export various goods abroad (collectively, the "Exported Goods").  Timely receipt of the Imported Goods and ensuring timely receipt by the Debtors' customers of the Exported Goods is critical to the Debtors' business operations.  Any disruption or delay in receipt of the Imported Goods and Exported Goods would adversely affect the Debtors' business operations.

27.    In connection with the import and export of goods, the Debtors may be required to pay various Import/Export Charges, including, but not limited to, customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding and other similar obligations.  The Debtors pay approximately $30 million annually in Import/Export Charges. The estimated outstanding prepetition Import/Export Charges for goods currently in transit is approximately $2 million.

28.    The Debtors seek authority to pay any and all necessary and appropriate Import/Export Charges incurred on account of prepetition transactions, including payment of the

US Customs & Border Protection.  Payment of the Import/Export Charges is critical to ensure

the uninterrupted flow of Imported Goods and Exported Goods.  Absent such payment, parties to

whom Import/Export Charges are owed may have the ability to interfere with the transportation

of such Imported Goods or Exported Goods.  If the flow of Imported Goods were to be

interrupted, the Debtors would be deprived of the products and/or materials necessary to

complete orders already placed by their customers, which orders are worth far more to the

Debtors (both in terms of future receipts and the maintenance of valuable good will) than the

aggregate amount of incurred, but unpaid, Import/Export Charges.

   29. For the foregoing reasons, the Debtors submit that payment of the

Import/Export Charges is necessary to preserve and enhance the value of the Debtors' business

for the benefit of all parties in interest.

## APPLICABLE AUTHORITY

### A. Payment of the Subject Charges Is Appropriate Under Bankruptcy Code Sections 363(b) and 364

   30. Bankruptcy Code section 363(b) provides, in relevant part, that "[t]he

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  Under this section, a court may

authorize debtors to pay certain prepetition claims.  See In re Ionosphere Clubs, Inc., 98 B.R.

174, 175 (Bankr. S.D.N.Y. 1989); see also In re FV Steel and Wire Co., Case No. 04-22421

(Bankr. E.D. Wis. Feb. 26, 2004); In re UAL Corp., Case No. 02-48191 (Bankr. N.D. Ill. Dec.

11, 2002).  To do so, "the debtor must articulate some business justification, other than mere

appeasement of major creditors . . . ."  Ionosphere Clubs, 98 B.R. at 175.

   31. Where the debtors have articulated a valid business justification for a

proposed transaction, courts generally apply the business judgment rule in evaluating such

transaction.  See Lange v. Schropp (In re Brook Valley VII, Joint Venture), 496 F.3d 892, 900

(8th Cir. 2007) ("In general, courts do not second-guess business decisions made in good

faith."); In re ALH  Holdings LLC, 675 F. Supp. 2d 462, 477 (D. Del. 2009) ("a court will not

disturb the business decisions of loyal and informed directors 'if they can be attributed to any

rational business purpose.'") (citing Sinclair Oil Corp. v. Levien, 280 A. 2d 717, 720 (Del.

1971)); In re  Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) ("In

evaluating whether a sound business purpose justifies the use, sale or lease of property under

Section 363(b), courts consider a variety of factors, which essentially represent a 'business

judgment test'"); Official  Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re

Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) ("The business judgment rule 'is a

presumption that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action was in the best interests of

the company.'") (quoting Smith v.  Van Gorkom, 488 A.2d 858, 872 (Del. 1985)); see also

Comm. of Asbestos-Related Litigants  and/or Creditors v. Johns-Manville Corp. (In re Johns-

Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued

operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's

management decisions.").

       32.     As discussed above, it is the Debtors' business judgment that the failure to

pay the Subject Charges could have a material adverse impact on the operations of their

businesses and, thus, their efforts to maximize the value of their estates.

       33.     Additionally, where, as here, the relief at issue involves a request

impacting the trade terms between the Debtors and the vendor, the relief may, where the

appropriate showing has been made, be approved pursuant to Bankruptcy Code Section 364.  See

In re UAL Corp., Case No. 02-48191 (Bankr. N.D. Ill. Dec. 11, 2002) (essential trade motion relying upon Bankruptcy Code Section 363 is "completely consistent with the Bankruptcy Code;" payments to critical trade vendors have further support when debtor seeks "the extension of credit under section 364 on different than usual terms, terms that might include the payment of a prepetition obligation").

**B.    Payment of the Subject Charges Will Allow the Debtors to Avoid the Imposition of Possessory Liens Under Bankruptcy Code Section 546(b)**

34.    In addition, the Debtors believe that their failure to pay the Subject Charges may result in the assertion of possessory liens by the respective Subject Vendors under applicable state law with respect to any goods in their possession (collectively, the "Liens"). Under Bankruptcy Code section 362(b)(3), the act of perfecting such Liens, to the extent consistent with Bankruptcy Code section 546(b),[6] is expressly excluded from the automatic stay otherwise imposed by Bankruptcy Code section 362(a).

35.    Moreover, to protect their asserted lien rights, the Subject Vendors may refuse to release goods in their possession unless and until their prepetition claims for services have been satisfied.  Therefore, notwithstanding the automatic stay imposed by Bankruptcy Code section 362, many of these parties: (a) may be entitled to assert and perfect Liens against the Debtors' property, which would entitle them to payment ahead of other general unsecured creditors in any event; and (b) may hold the property subject to the asserted Liens pending payment, to the direct detriment of the Debtors and their estates.

36.    Moreover, since the amount of Subject Charges that the Debtors are seeking authority to pay is less than the value of any property securing those claims, any party

---

[6]    Under Bankruptcy Code section 546(b), a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection . . . ."  11 U.S.C. § 546(b)(1)(A).

holding lien rights arguably are fully secured creditors.  For those Subject Charges that are

deemed secured claims, Bankruptcy Code section 1129(b)(2)(A) requires that they be satisfied

through deferred cash payments totaling at least the allowed amount of each such claim, of a

value as of the effective date of the plan equal to the value of the collateral securing the claim,

with a continuation of the Liens against the collateral; or if the collateral is to be sold, that the

Lien securing the claim attach to the proceeds of sale; or that the holder realize the indubitable

equivalent of the claim. 11 U.S.C. § 1129 (b)(2)(A).  Additionally, under Bankruptcy Code

section 506(b), fully secured creditors are entitled to receive: (a) payment in full of their

prepetition claims under any confirmed plan; and (b) the postpetition interest accruing on such

claims to the extent that such claims are oversecured.  Consequently, payment of the Subject

Charges will: (a) give the Subject Vendors no more than that to which they otherwise would be

entitled under a plan; and (b) save the Debtors the interest costs that otherwise may accrue on the

Subject Charges during the Chapter 11 Case – not to mention, keep the Debtors' operations from

experiencing serious disruption if goods, products, and related materials are not shipped on a

timely basis.

**C.      Payment of the Subject Charges is in Furtherance of the Debtors' Fiduciary Duties
        Under Bankruptcy Code Sections 1107(a) and 1108**

       37.      The Debtors, operating their businesses as debtors in possession under

Bankruptcy Code sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate and

operating the business for the benefit of its creditors and (if the value justifies) equity owners."

In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of

chapter 11 debtors in possession is the duty "to protect and preserve the estate, including an

operating business's going-concern value."  Id.

38.    Courts have noted that there are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim." Id. The CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," id., and also when the payment was to "sole suppliers of a given product," id. at 498.  The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id.

39.    Payment of the Subject Charges meets each element of the CoServ court's standard.  First, as described above, each of the Subject Vendors has possession of certain critical goods, products, and related materials, which the Debtors need to continue operations.  Second, the cost of replacing such goods, products, and materials in the Subject Vendors' possession would be significantly more than the prepetition claim that the Debtors would have to pay. Additionally, any disruption in the Debtors' network of Subject Vendors would significantly disrupt the Debtors' businesses and restructuring process, which would cost the Debtors' estate a substantial amount in lost revenue.  Accordingly, the harm and economic disadvantage that would stem from the failure to pay any of the Subject Vendors is grossly disproportionate to the amount of the prepetition claim that would have to be paid.  And, finally, with respect to each of the Subject Vendors, the Debtors have determined that, to avoid significant disruption of the

Debtors' business operations, there exists no practical or legal alternative to payment of the

Subject Charges.  Therefore, the Debtors can only meet their fiduciary duties as debtors in

possession under Bankruptcy Code sections 1107(a) and 1108 through payment of the Subject

Charges.

**D.      Granting the Motion Will Provide the Import/Export Providers No More Than They Are Supposed To Receive under the Bankruptcy Code**

40.      The Import/Export Charges would likely be paid in full under any plan of

reorganization pursuant to Bankruptcy Code section 507(a)(8), which provides eighth priority

status to the claims of a governmental unit based on a customs duty arising out of the importation

of certain merchandise. Thus, payment of the Import/Export Charges as proposed in the Motion

merely accelerates the distribution that the Import/Export providers would receive in any event

upon confirmation of a plan. Therefore, granting the Motion with respect to the Import/Export

Charges would have no substantial effect on the relative distribution of the estate's assets.

**E.      Bankruptcy Code Section 105(a) and the Doctrine of Necessity Further Support Payment of the Shipping Charges**

41.      The proposed payments of the Subject Charges should be authorized under

Bankruptcy Code section 105(a) and under the "doctrine of necessity."  This Court's power to

utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity

powers and its statutory authority to "issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  The United States

Supreme Court first articulated the doctrine of necessity over a century ago, in Miltenberger v.

Logansport  Ry. Co., 106 U.S. 286 (1882), in affirming the authorization by the lower court of

the use of receivership funds to pay pre-receivership debts owed to employees, vendors and

suppliers, among others, when such payments were necessary to preserve the receivership

property and the integrity of the business in receivership.  See id. at 310.  The modern

application of the doctrine of necessity is largely unchanged from the Court's reasoning in

Miltenberger.  See In re Lehigh & New England Ry. Co., 657 F.2d 570, 581-82 (3d Cir. 1981)

("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat

must exist that failure to pay will place the [debtor's] continued operation . . . in serious

jeopardy.").

   42. The doctrine of necessity "recognizes the existence of the judicial power

to authorize a debtor in a reorganization case to pay prepetition claims where such payment is

essential to the continued operation of the debtor."  In re Ionosphere Clubs, Inc., 98 B.R. at 176;

see also In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor

"cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should

be invoked to permit payment); In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992)

("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the

continued operation of the debtor."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023

(Bankr. S.D. Ohio 1991) ("[T]o justify payment of a pre-petition unsecured creditor, a debtor

must show that the payment is necessary to avert a serious threat to the chapter 11 process.").

   43. The doctrine of necessity is a widely accepted component of modern

bankruptcy jurisprudence.  See Just For Feet, 242 B.R. at 826 (approving payment of key

inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by

refusing to deliver new inventory on eve of debtor's key sales season); In re Payless Cashways,

Inc., 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition

suppliers' claims when such suppliers agree to provide postpetition trade credit); see also In re

Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994); In re Ionosphere Clubs,

Inc., 98 B.R. at 175.

44.     For the reasons set forth herein, and in light of the critical need for the

Debtors to preserve the going concern value of their businesses and successfully emerge from

chapter 11, payment of the Subject Charges as requested herein is proper in accordance with

Bankruptcy Code section 105(a) and the doctrine of necessity.

45.     The relief requested herein is commonly granted in this District.  See, e.g.,

In re The Wet Seal, Inc., Case No. 15-10081 (CSS) (Bankr. D. Del. Jan. 20, 2015); In re Exide

Techs., Case No. 13-11482 (KJC) (Bankr. D. Del. June 11, 2013); In re A123 Sys., Inc., Case

No. 12-82159 (KJC) (Bankr. D. Del. Oct. 18, 2012); In re Harry & David Holdings, Inc., Case

No. 11-10884 (MFW) (Bankr. D. Del. Mar. 29, 2011); In re Sportsman's Warehouse, Inc., Case

No. 09-10990 (CSS) (Bankr. D. Del. Mar. 23, 2009); In re Goody's Family Clothing, Inc., Case

No. 08-11133 (CSS) (Bankr. Del. Del. June 10, 2008); In re Tweeter Home Entm't Grp., Inc.,

Case No. 07-10787 (PJW) (Bankr. D. Del. June 12, 2007); In re Radnor Holdings Corp., Case

No. 06-10894 (PJW) (Bankr. D. Del. Aug. 23, 2006); In re Werner Holding Co. (DE), Inc., Case

No. 06-10578 (KJC) (Bankr. D. Del. June 13, 2006); In re Ultimate Elecs., Inc., Case No. 05-

10104 (PJW) (Bankr. D. Del. Jan. 13, 2005).[7]

46.     For these reasons, the Debtors submit that the relief requested herein is in

the best interest of the Debtors, their estates, creditors, stakeholders and other parties in interest

and, therefore, should be granted.

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

47.     Bankruptcy Rule 6003 provides that the relief requested in this Motion

may be granted if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R.

---

[7]     Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders, however, are available on request.

Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the court has instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh, 235 Fed. App'x 907, 910 (3d Cir. 2007) (citing Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977)).  Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated.  See, e.g., Acierno v. New Castle County, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

48.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

49.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any

claim on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365; or (e) otherwise affect the Debtors' rights under Bankruptcy Code section 365 to assume or reject any executory contract with any party subject to the Motion.  Further, the Debtors, nor their officers, directors, attorneys or agents will have any liability on account of any decision by the Debtors not to pay a Shipping Charge or an Import/Export Charge, and nothing contained in the Motion shall be deemed to increase, reclassify, elevate to an administrative expense status or otherwise affect a Shipping Charge or Import/Export Claim to the extent it is not paid.

50.     Additionally, nothing in the Motion is intended to modify or waive any of the Debtors' rights with respect to services performed by the Distribution Vendors, including the Debtors' rights to (a) cancel or contest any invoice on any grounds or (b) decline the acceptance of goods and services.

### NOTICE

51.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' postpetition secured loan facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan facility; (d) the agent for the Debtors' prepetition senior secured notes; (e) the agent for the Debtors' prepetition senior unsecured notes; (f) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases; and (g) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).  The Debtors submit that no other or further notice need be provided.

### NO PRIOR REQUEST

52.     No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form annexed hereto, granting the relief sought herein and granting such other and further relief as may be just and proper.

Dated:    Wilmington, Delaware
              September 9, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/        *Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Z. Li (*pro hac vice admission pending*)
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

John K. Lyons (*pro hac vice admission pending*)
Jessica S. Kumar (*pro hac vice admission pending*)
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
QUIKSILVER, INC., *et al.*,                                 :    Case No. 15-11880 (___)
                                                            :
                           Debtors.[1]                      :    (Jointly Administered)
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x    **Related Docket No. __**

### ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a) 363(b), 503(b), 506, 1107 AND 1108 AND BANKRUPTCY RULES 6003 AND 6004 AUTHORIZING PAYMENT OF CERTAIN PREPETITION SHIPPING CHARGES AND IMPORT/EXPORT CHARGES

Upon the motion (the "Motion")[2] of the Debtors for entry of an order, pursuant to Bankruptcy Code sections 105(a), 363(b), 503(b), 506, 1107 and 1108 and Bankruptcy Rules 6003 and 6004, authorizing, but not directing, the Debtors to pay (i) certain prepetition shipping, warehousing, and related charges (the "Shipping Charges") and (ii) certain prepetition customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding or consolidation charges and other similar obligations (the "Import/Export Charges"); and upon consideration of the First Day Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice is necessary; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the First Day Declaration.

estates, their creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

## ORDERED, ADJUDGED AND DECREED that:

1.        The Motion is GRANTED as set forth herein.

2.        Subject to paragraph 4, the Debtors are authorized, but not directed, to make such payments, either directly or indirectly, to the Distribution Vendors for the obligations owing in respect of the Shipping Charges as the Debtors determine, in the exercise of their business judgment, are necessary or appropriate to (a) the Debtors' operations, including the delivery, distribution or sale of the Debtors' goods to customers or vendors; or (b) satisfy liens, if any, in respect of amounts owed to such Distribution Vendors.  The Debtors are authorized, but not directed, to pay the Shipping Charges, in the ordinary course of business, in an aggregate amount of up to $2,000,000, without prejudice to seek additional relief on an emergency basis.

3.        The Debtors are authorized, but not directed, to make payments directly or indirectly to the Import/Export Providers for obligations owing in respect of the Import/Export Charges as the Debtors determine, in the exercise of their business judgment, are necessary or appropriate to the Debtors' operations, including the delivery, distribution or sale of the Debtors' goods to customers or vendors.   The Debtors are authorized, but not directed, to pay the Import/Export Charges, in the ordinary course of business, in an aggregate amount of up to $1,500,000, without prejudice to seek additional relief on an emergency basis.

4.        The Debtors are authorized, in their sole discretion to pay the Shipping Charges on the following terms and conditions:

(a)        The Debtors, in their sole discretion, shall determine which parties, if any, are entitled to payment under this Order subject to the limits imposed on the aggregate payments authorized to be made under this Order;

2

(b)    If a party accepts payment under this Order, such party is deemed to have agreed to (i) release any liens it may have on the Debtors' goods or property provided, however, that should such party fail promptly to release such lien and/or interest upon payment by the Debtors, any such lien and/or interest shall be deemed released and expunged, without necessity of further action, and this Order, together with proof of payment, shall be all that is required to evidence such release and expungement, and (ii) subject to subparagraph (d) below, continue to provide goods or services to the Debtors on Customary Trade Terms during the pendency of these Chapter 11 Cases, provided, however, that in the Debtors' business judgment, such Customary Trade Terms are no less favorable than those trade terms, if any, in effect between the Distribution Vendors and the Debtors during the 180 days preceding the Petition Date.  "Customary Trade Terms" means (i) the most favorable trade terms and conditions, including credit terms, in effect between the Distribution Vendor and the Debtors during the 180 days preceding the Petition Date[3] or (ii) such other trade terms as the Debtors and the Distribution Vendor may mutually agree upon;

(c)    Subject to subparagraph (d), if a party accepts payment under this Order and thereafter does not continue to provide goods or services to the Debtors on the Customary Trade Terms during the pendency of these Chapter 11 Cases, then (i) any payment on a prepetition claim received by such party shall be deemed to be an unauthorized voidable postpetition transfer under Bankruptcy Code Section 549 and, therefore, recoverable by the Debtors in cash upon written request and (ii) subject to subparagraph (f) below, upon recovery by the Debtors, any such prepetition claim shall be reinstated as if the payment had not been made, less the Debtors' reasonable costs in recovering such amounts;

(d)    In the event of the assertion of a possessory lien against the Debtors' property that prevents the Debtors from accessing their property without payment of the prepetition claim giving rise to the lien, the Debtors may pay the claim without regard to subparagraphs (b)(ii) and (c) above; and

(e)    Prior to paying a prepetition claim under this Order, the Debtors may, in their absolute discretion, settle all or part of such claim for

---

[3]    In the event the relationship between the party accepting payment under this Order and the Debtors does not extend to 180 days preceding the Petition Date, the Customary Trade Terms shall mean the terms that the party generally extends to its customers or such terms as are acceptable to the Debtors in the reasonable exercise of their business judgment.

less than its face amount without further notice or hearing. In any event, the Debtors may elect to only pay part of a prepetition claim under the authorization granted, leaving the remainder of the claim to be addressed pursuant to their plan of reorganization.

5.      Should the Debtors seek to recover payments under paragraph 4(c) of this Order, nothing in this Order shall preclude a party from contesting such treatment by making a written request (the "Request") to the Debtors to schedule a hearing before this Court. If such a Request is made, the hearing on the Request will be the next scheduled hearing date not less than thirty (30) days after the Debtors received the Request, of which hearing the Debtors will provide notice to the requesting party and other interested parties in accordance with the Bankruptcy Code and the orders of this Court.

6.      All applicable banks and other financial institutions are authorized to rely on the Debtors' direction to pay amounts in accordance with this Order provided that there are sufficient good funds standing to the Debtors' credit in the applicable accounts to make the payments and all applicable banks shall not have any liability to any party for relying on the Debtors' direction.

7.      All applicable banks and other financial institutions are hereby authorized, when requested by the Debtors in their sole discretion, to receive, process, honor and pay all prepetition and postpetition checks, drafts and other forms of payment, including fund transfers, on account of the Subject Charges, whether such checks or other requests were submitted prior to or after the Petition Date.

8.      The Debtors' banks and other financial institutions shall rely on the direction and representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this order, and any such bank shall not have any liability to any

party for relying on such direction and representations by the Debtors as provided for in this Order or for inadvertently honoring or dishonoring any check or fund transfer.

9.      The Debtors' banks shall, at the direction of the Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Subject Charges that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and any such bank shall not have any liability to any party for relying on such direction by the Debtors as provided for in this order or for inadvertently failing to follow such direction.

10.     To the extent the Debtors have not yet sought to remit payment on account of the Subject Charges, the Debtors are authorized, but not directed, to issue checks or provide for other means of payment of the Subject Charges and other payments contemplated by this Order.

11.     The Debtors shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account of the Subject Charges to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

12.     The authority granted by this Order to pay certain claims shall not be construed as: (a) an admission by the Debtors as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise by the Debtors to pay any claim; (d) an implication or admission by the Debtors that any particular claim would constitute a Subject Charge; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code Section 365; or (f) otherwise affect the Debtors' rights under Bankruptcy Code Section 365 to assume or reject any executory contract with any party subject to this Order.

13.    Neither the Debtors nor their officers, directors, attorneys or agents shall have any liability on account of any decision by the Debtors not to pay a Subject Charge, and nothing contained in this order shall be deemed to increase, reclassify, elevate to an administrative expense status or otherwise affect a Subject Charge to the extent it is not paid.

14.    Nothing in the Motion or this Order, nor the Debtors' implementation of the relief granted in this Order, shall be deemed to modify or waive any of the Debtors' rights with respect to goods and services requested or received from the Distribution Vendors or the Import/Export Providers, including the Debtors' rights to (a) cancel or contest any invoice on any grounds, or (b) decline the acceptance of goods and services.

15.    Notwithstanding anything to the contrary contained herein, the relief granted in this Order and any payment to be made hereunder shall be subject to the terms of any orders approving entry into debtor-in-possession financing and authorizing the use of cash collateral approved by this Court in these chapter 11 cases (including with respect to any budgets or other covenants governing or relating to such debtor-in-possession financing and/or use of cash collateral), and to the extent there is any inconsistency between the terms of such orders and any action taken or proposed to be taken hereunder, the terms of such orders shall control.

16.    This Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

17.    Notwithstanding Bankruptcy Rule 6004(h), this order shall be effective and enforceable immediately upon entry hereof.

18.    The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

19.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated:  Wilmington, Delaware

_____, 2015


_____

UNITED STATES BANKRUPTCY JUDGE