## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                          :     Chapter 11
:
QUIKSILVER, INC., *et al.*,        :     Case No. 15-11880 (___)
:
              Debtors.[1]    :     (Joint Administration Pending)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
## PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363(b), 1107(a), AND 1108
## AND BANKRUPTCY RULES 6003 AND 6004 AUTHORIZING
## PAYMENT OF CRITICAL VENDORS

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Quiksilver" or the "Company") hereby move (the "Motion") this Court for entry of an interim order (the "Interim Order") and a final order substantially similar to the Interim Order, but on a final basis (the "Final Order"), under sections 105(a), 363(b), 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing but not directing the Debtors (i) to pay, in the ordinary course of business, the prepetition claims of certain critical vendors and (ii) directing financial institutions to honor all related checks and electronic payment requests. In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., in Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration"),

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

filed with the Court concurrently herewith.  In further support of the Motion, the Debtors, by and through their proposed undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1.       This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.       The legal predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363(b), 1107(a), and 1108, and Bankruptcy Rules 6003 and 6004.

3.       Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware, the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

A.       **The Chapter 11 Cases**

4.       On September 9, 2015 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

5.       The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.       To date, no creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "United States Trustee").  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

2

7.      Quiksilver is one of the world's leading outdoor sports lifestyle companies.  The Company designs, develops and distributes branded apparel, footwear, accessories and related products.  The Company began operations in 1976 making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, and motocross, among other activities. The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites.  The Debtors comprise each of the Company's U.S. entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc., and seven inactive entities.

8.      Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

## RELIEF REQUESTED

9.      By this Motion, the Debtors seek entry of interim and final orders, pursuant to sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code, and Bankruptcy Rules 6003 and 6004, authorizing but not directing the Debtors to pay, in the ordinary course of business, the prepetition, fixed, liquidated, and undisputed claims (the "Critical Vendor Claims") of certain critical vendors and suppliers (collectively, the "Critical Vendors"), the vast majority of which are located overseas and which provide goods or services to the Debtors that the

3

Debtors deem, in the exercise of their business judgment, to be essential to maintaining the value of the Debtors' assets.

10.     The Debtors seek authorization to pay the Critical Vendor Claims in an aggregate amount not to exceed $30 million on an interim basis (the "Interim Cap Amount") and $52 million on a final basis (the "Final Cap Amount"), subject to the conditions set forth below. Of the Final Cap Amount above, the Debtors' estimate that approximately $20 million is subject to section 503(b)(9) administrative claim status.

11.     In addition, the Debtors request entry of orders (a) authorizing all applicable banks and other financial institutions (collectively, the "Banks"), when requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers, on account of the Critical Vendor Claims, whether such checks or other requests were submitted before, on, or after the Petition Date; (b) authorizing the Banks to rely on the representations of the Debtors as to which checks are subject to this Motion, provided that any such Bank shall not have any liability to any party for relying on such direction and representations by the Debtors or for inadvertently honoring or dishonoring any check or fund transfer; (c) providing that the Banks shall, at the direction of the Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Critical Vendor Claims that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and that any such Bank shall not have any liability to any party for relying on such direction by the Debtors; and (d) authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts and other forms of payment which may be inadvertently dishonored or rejected.

12.     The relief requested herein should not (a) be construed as a request to assume, or for authority to assume, any executory contract under section 365 of the Bankruptcy Code or otherwise, (b) waive, affect, or impair any of the Debtors' rights, claims, or defenses, including, but not limited to, those arising from section 365 of the Bankruptcy Code, other applicable law, or any agreement, (c) grant third-party beneficiary status or bestow any additional rights on any third party, (d) be otherwise enforceable by any third party other than the Banks, or (e) impair the Debtors' ability to contest or object to any claims, including the Critical Vendor Claims, asserted against the Debtors on any ground permitted by applicable law.

13.     The Debtors propose to serve a copy of any interim order granting this Motion within three (3) business days after entry thereof.  The Debtors further request that the Court (a) set a deadline for filing objections to the Motion and entry of the Final Order, (b) set a final hearing on the Motion, and (c) enter the Final Order on this Motion at or after such final hearing.

14.     For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders and other parties in interest, and therefore, should be granted.

**BASIS FOR RELIEF**

15.     The Debtors believe that many of their vendors will continue to do business with the Debtors after commencement of the Chapter 11 Cases because doing so simply makes good business sense.  The Debtors, however, anticipate that certain vendors that supply goods or services that are critical to their business, will: (a) refuse to deliver goods and services without payment of their prepetition claims; (b) refuse to deliver goods and services on reasonable credit terms absent payment of prepetition claims, thereby requiring the Debtors to

use even greater liquidity and increase their operating costs; or (c) suffer significant financial hardship, such that the Debtors' non-payment of their prepetition claims could have a significant negative impact on a Critical Vendor's business and therefore its ability to supply the Debtors with needed goods and services. Accordingly, the Debtors request the Court's authority to pay a portion of the prepetition Critical Vendor Claims because payment of such claims is necessary to an effective reorganization.

16.    The Debtors are highly mindful of their fiduciary obligations to preserve and maximize the value of their estates. Accordingly, the preservation and maximization of the going concern value of the Debtors' businesses, including the preservation of key business relationships, are among management's primary goals as the Debtors transition into chapter 11. Providing seamless service to the customers is key to meeting those goals. For these reasons, the Debtors seek to minimize the adverse business effects—as well as the cash flow impact—of their chapter 11 filing to the fullest extent possible by obtaining authority to pay certain vendors that are of paramount importance to their business operations.

## A.    The Critical Vendors

17.    In the ordinary course of operations, the Debtors rely on numerous suppliers, service providers, and vendors (the "Vendors") for the delivery of goods and/or services in support of the Debtors' operations. The Critical Vendors supply those essential goods and services without which the Debtors' businesses either could not operate or would operate at significantly reduced profitability (the "Critical Goods and Services") and whose Critical Goods and Services cannot be replaced without significant harm to the business.

18.    From 2013 through the Petition Date, the Debtors implemented a multi-year operational turnaround plan which was designed to streamline operations on a global basis. As part of that streamlining process, Vendors were consolidated between the U.S. and non-U.S.

6

entities, significantly reducing the overall number of Vendors, to improve supply chain efficiency.  Prior to the Petition Date, the Debtors and their advisors conducted a thorough review of their remaining Vendors with possible outstanding prepetition claims to determine how to minimize the disruption of their ongoing business from the commencement of these Chapter 11 Cases.  The Debtors considered numerous factors to determine which Vendors are Critical Vendors, including whether the Vendor is: (i) essential to the continued smooth operation of the Debtors' business, including because the Vendor is in the midst of producing footwear or apparel necessary to maintaining required inventory levels in the Debtors' wholesale and retail channels; (ii) contractually obligated to provide the Debtors with the Critical Goods and Services; (iii) replaceable without significant disruption to the Debtors' postpetition operations; and/or (iv) likely to continue doing business with the Debtors notwithstanding nonpayment of prepetition claims or to recognize the authority of this Court with respect to continuing services.  Thus, the Debtors seek authority to pay as Critical Vendors those Vendors that the Debtors conclude meet the criteria described above.

19.     Here,  the Debtors do not have supply contracts with most of their Vendors, instead relying on purchase orders.  The Debtors' analysis further focused on "sole-source" providers, which most of the Critical Vendors can be classified as. The nature of the goods and services provided by the Critical Vendors are such that they provide a proprietary good or service or represent the only practicable option available to the Debtors to obtain the good or service in question, given the Debtors' relationship with the Vendor, including whether the Debtors are receiving advantageous pricing, credit or other terms, the universe of potential replacement vendors, including the quality and reputation of any replacement vendor(s), the likelihood the Debtors could obtain a replacement vendor given their current financial situation,

the Debtors' historical dealings with vendors in that industry, and the practical feasibility of replacing the current Vendor without significant delay.

20.     Given the location of their Vendors and the nature of the Debtors' business, delay is a material concern.  The Debtors are part of a global enterprise that designs, develops, markets, and distribute apparel, footwear, accessories and other products through retail and wholesale stores and other channels throughout the world.  While the Debtors and their non-Debtor affiliates design and sell their proprietary goods, most of the manufacturing processes are undertaken by third party Vendors, the vast majority of which – approximately 95%  – are entities incorporated and operating outside of the United States.

21.     Due to the length of time required for production and shipping, there is a significant lag between the time when the Debtors order goods from their Vendors and the time when those goods are delivered and available for sale through retail or wholesale channels. Typically, the Debtors begin places orders for goods from their Vendors at least seven months prior to the start of a "selling season".  Vendors then start shipping goods approximately three months prior to the time those goods are scheduled to be delivered and available for sale, and Vendors receive payment for those goods on a variety of terms as described in this Motion.

22.     The first "selling season" of 2016 begins on December 25, 2015, and ends on March 31, 2016.  Product orders have already been placed by the Debtors for the upcoming selling season.  Those products will be placed "on board" vessels for shipment beginning in late September and early October, and as the first batches of products arrive in the United States, they are distributed through retail and wholesale channels to fill orders for the start of the selling season.  If the first scheduled shipments in late September are missed, there will simply not be time for another vendor to produce such goods.  This would jeopardize the Debtors' ability to

service their customers during this critical sales period, and would likely result in reduced customer goodwill and loss of market share.  Not only would the Debtors be unable to supply their retail stores, the Debtors' relationships with its wholesalers may be jeopardized, as the wholesalers may choose to work with other suppliers for the remainder of the season. Accordingly, a failure to pay the Critical Vendors on amounts outstanding as of the Petition Date will have ramifications on existing production orders earmarked for the spring 2016 season.

23.     In addition, many of the Critical Vendors are using their own working capital to fund the Debtors' current production orders. Failure to pay Critical Vendors amounts due as of the Petition Date would result in tremendous detriment to the Debtors' relationships with its already-limited Vendor base, and, as a result, the Debtors could be left with few, if any, alternative sources of supply  to meet its near term production requirements both in the U.S. and abroad.

24.     A further important consideration is that many of the Critical Vendors may lack minimum contacts with the United States and, thus, may not be subject to the jurisdiction of this Court or the provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business operations.  Based on the knowledge of the Debtors' personnel regarding the foreign Critical Vendors, the Debtors believe there is a material risk that such Critical Vendors may consider themselves to be beyond the jurisdiction of this Court, disregard the automatic stay, and engage in conduct that disrupts the Debtors' and their non-Debtor affiliates' domestic and international operations, or may simply be confused by the chapter 11 process, particularly those in countries with liquidation-oriented insolvency procedures. Notably, Critical Vendors that believe the automatic stay does not govern their actions may

exercise self-help (if permitted under local law), which could include ceasing production of, or refusing to deliver, the Debtors' products which are, essentially, the lifeblood of their business.

25.    Critical Vendors may also sue one or all of the Debtors in a foreign court to recover prepetition amounts owed to them.  If they are successful in obtaining a judgment against the Debtors, the Critical Vendors may exercise post-judgment remedies.  They may seek to attach the Debtors' foreign assets or withhold vital supplies and services from the Debtors, threatening the Debtors' ability to operate.  Since the Debtors would have limited, if any, effective and timely recourse and no practical ability to remedy this situation (absent payment of amounts sought), their businesses could be irreparably harmed by any such action to the detriment of their estates and their creditors.

26.    In addition, almost all of these foreign Critical Vendors provide services not only to the Debtors but also to their non-Debtor affiliates as part of a global supply chain (such Critical Vendors, the "Common Critical Vendors").  Indeed, shipments to the Debtors account for only approximately 38% of total shipped value to all Quiksilver entities by the Common Critical Vendors .  This is the result of global supply chain consolidation efforts over the past three years geared toward reducing purchasing costs and improving product quality and consistency.  Maintaining this supply chain absolutely essential to the continued success of the Company's worldwide operations.  While the Debtors' non-Debtor affiliates have been, and intend to continue, paying all amounts owing to their vendors as they come due, the Critical Vendors may nonetheless refuse to do business with such non-Debtor affiliates unless the Debtors pay the Critical Vendor Claims. Moreover, the Critical Vendors may seek to exercise the remedies discussed above – including suing or exercising self-help remedies – not only against

the Debtors but against their non-Debtor affiliates, thereby disrupting and harming Quiksilver's otherwise healthy and valuable non-U.S. operations.

27.     Thus, the Debtors have determined, in the exercise of their business judgment, for the reasons set forth above, that paying the Critical Vendor Claims is essential to their continuing business operations and is in the best interests of their estates and stakeholders. The Debtors' management and employees have exercised high levels of care in reviewing the facts and circumstances and identifying, to the extent possible at this stage, those Critical Vendors, in the absence of which, the value of the Debtors' assets and operations could suffer material damage and which the Debtors believe present a material risk of future non-performance absent payment of prepetition claims.  Because of the essential nature of the Critical Goods and Services provided by the Critical Vendors and the difficulty associated with finding alternate sources for those goods and services, the potential harm and economic disadvantage that would stem from the failure of any of the Critical Vendors to perform is grossly disproportionate to the amount of any Critical Vendor Claim sought to be paid.

28.     In addition,  failure to pay the Critical Vendor Claims would significantly impact the Debtors' trade terms which, in turn, could disastrously affect the Debtors' cash flows. On the other hand, payment of the Critical Vendor Claims subject to the conditions set forth herein increases the likelihood that such Critical Vendors will continue to offer existing trade terms or even improve trade terms for the Debtors, thereby facilitating the Debtors' reorganization.

29.     While the Debtors seek authorization to pay the Critical Vendor Claims in amounts up to the Interim Cap Amount and the Final Cap Amount, the Debtors have not committed payment to any pre-authorized list of Vendor claims to be paid; rather, consistent

with the requirements of the Bankruptcy Code and applicable case law, the Debtors will make payments to each Critical Vendor only upon determining that such payments are actually necessary to preserve the value of the Debtors' estates. Thus, in each case, the Debtors will have examined other legal options short of payment of such Critical Vendor Claims and determined that there exists no practical or legal alternative to payment of the Critical Vendor Claims.

30. Accordingly, the Debtors seek authority, but not direction, to pay the prepetition claims of these Critical Vendors in order to induce the continued support of these Critical Vendors for the Debtors' reorganization.

**B.     The Critical Vendor Claims**

31. Based on their books and records and past experience, the Debtors estimate that they have outstanding trade payables (on a consolidated basis) totaling approximately $85 million as of the Petition Date. The Debtors' estimate of outstanding prepetition trade payables includes accounts payable to merchandise Vendors totaling approximately $67 million as of the Petition Date, of which approximately $15 million is subject to satisfaction through outstanding commercial letters-of-credit, leaving a balance of approximately $52 million of outstanding merchandise Vendor trade payables on the Petition Date.

32. The Debtors seek authority, in their sole discretion, to pay the Critical Vendor Claims, up to the Interim Cap Amount on an interim basis, and up to the Final Cap Amount, in the aggregate, on a final basis. Given the nature of the Debtors' business, the demonstrated benefits of paying the Critical Vendor Claims and the risks associated with non-payment, the Debtors submit that this is a reasonable and appropriate cap on the expenditure of estate funds.

**C.      Proposed Conditions to Payment of Critical Vendor Claims**

33.      The Debtors propose to demand that all Critical Vendors whose Critical Vendor Claims are satisfied pursuant to this Motion agree (i) to continue providing goods and services to the Debtors on Temporary Trade Terms and (ii) to continue providing goods and services to the Debtors' non-Debtor affiliates on Existing Trade Terms for at least one hundred twenty (120) days following the date of the agreement or until the date that a plan of reorganization or sale pursuant to section 363 of the Bankruptcy Code is substantially consummated, whichever is earlier.  "Temporary Trade Terms" means the more favorable to the Debtors of (i) the most favorable trade terms and practices, including rebates, discounts, and payment terms, in effect between the Critical Vendor and the Debtors during the 180 days preceding the Petition Date or (ii) net 75 day terms, FOB vendor shipping point. "Existing Trade Terms" means those trade terms in place on the Petition Date between the Critical Vendor and the applicable non-Debtor affiliate(s).

34.      To ensure that the Critical Vendors comply with the foregoing requirements, the Debtors propose that a letter substantially in the form annexed hereto as Exhibit A be sent to the Critical Vendors along with a copy of the order granting this Motion.

35.      The Debtors propose that the letter (once executed, a "Trade Agreement") sent to Critical Vendors include, without limitation, the following terms:

(a)      The amount of each Critical Vendor's estimated Critical Vendor Claim, accounting for any setoffs, other credits, and discounts thereto, will be as mutually determined in good faith by the Critical Vendor and the Debtors;

(b)      The Temporary Trade Terms between such Critical Vendor and the Debtors, or such other favorable terms as the Critical Vendor and the Debtors may agree, and the Critical Vendor's agreement to provide goods and services in accordance with such terms;

(c)     The Critical Vendor's agreement to provide goods and services to the Debtors' non-Debtor affiliates on Existing Trade Terms;

(d)     The Critical Vendor's agreement not to file or otherwise assert against any or all of the Debtors, their estates, or any other person or entity or any of their respective assets or property any lien (a "Lien"), regardless of the statute or other legal authority upon which such Lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors, and, to the extent the Critical Vendor has already obtained or otherwise asserted such a Lien, the Critical Vendor must take whatever actions are necessary to remove such Lien;

(e)     The Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the Order and consents to be bound thereby; and

(f)     Unless the Debtors and the Critical Vendor agree otherwise, the Critical Vendor's agreement that payment of its Critical Vendor Claim in the amount agreed is in complete settlement and release of any prepetition claims and, upon payment of its Critical Vendor Claim, it will not separately seek payment for any prepetition claims, including any reclamation claims or claims pursuant to section 503(b)(9) of the Bankruptcy Code.

(g)     Unless the Debtors and the Critical Vendor agree otherwise, any payments received pursuant to the Trade Agreement shall be applied to outstanding prepetition invoices in reverse order, such that payments are first applied to the most recent outstanding invoices.

36.     Prior to making a payment to a party under the Order, the Debtors may, in their absolute discretion, settle all or part of the prepetition claims of such party for less than their face amount, without further notice or hearing.

37.     If a Critical Vendor refuses to supply goods or services to the Debtors on Temporary Trade Terms following receipt of payment on its Critical Vendor Claim, or fails to comply with the Trade Agreement, the Debtors seek authorization, but not direction, to, without further order of the Court, declare (i) that the Trade Agreement is terminated and (ii) that any payments made to the Critical Vendor on account of its Critical Vendor Claim be deemed to

14

have been made on account of then-outstanding postpetition claims of such Critical Vendor.  In

such event, the Debtors propose that a Critical Vendor be required immediately to repay to the

Debtors any payment made to it on account of its Critical Vendor Claim to the extent that

payments on account of such Critical Vendor Claim exceeds the then-outstanding postpetition

claims of such Critical Vendor without giving effect to any rights of setoff, claims, provision for

payment of reclamation or section 503(b)(9) claims, or otherwise.

   38. The Debtors further propose that any Trade Agreement terminated as a

result of a Critical Vendor's refusal to comply with the terms thereof may be reinstated if (i) such

determination is subsequently reversed by this Court after notice and a hearing following a

motion by the Critical Vendor, for good cause shown, that the determination was materially

incorrect; (ii) the underlying default under the Trade Agreement was fully cured by the Critical

Vendor not later than five (5) business days following the Debtors' notification to the Critical

Vendor that a default had occurred; or (iii) the Debtors, in their discretion, reach a favorable

alternative agreement with the Critical Vendor.

## APPLICABLE AUTHORITY

**A. Paying Critical Vendor Claims is in Furtherance of the Debtors' Duties under Sections 1107(a) and 1108 of the Bankruptcy Code.**

   39. As debtors in possession under sections 1107(a) and 1108 of the

Bankruptcy Code, the Debtors have duties to protect and preserve their estates, including

maintaining the going-concern value of their business.  See, e.g., In re CoServ, L.L.C., 273 B.R.

487, 497 (Bankr. N.D. Tex. 2002).  At least one court has acknowledged that there are

circumstances under which a debtor in possession can only fulfill such duties "by the preplan

satisfaction of a prepetition claim."  Id.

40.     Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." <u>Id.</u>  The <u>CoServ</u> court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," <u>id.</u> at 479, and also when the payment was to "sole suppliers of a given product."  <u>Id.</u> at 498.  The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

<u>Id.</u>

41.     Payment of the Critical Vendor Claims undeniably meets each element of the <u>CoServ</u> court's standard.  First, as described above, the Debtors have narrowly tailored the definition of "Critical Vendors" to encompass only those suppliers that are the sole source of a particular good or service without which the Debtors' would be severely impacted, or those suppliers or service providers who are critical because the time and expense that would be involved in transitioning to a new supplier would be prohibitive and would significantly disrupt the Debtors' business.  Second, because of the essential nature of the Critical Goods and Services provided by the Critical Vendors and the difficulty associated with finding alternate sources for those goods and services, the potential harm and economic disadvantage that would stem from the failure of any of the Critical Vendors to perform, as further described above, is grossly disproportionate to the amount of any Critical Vendor Claim sought to be paid.  Third, with respect to each of the Critical Vendor Claims, the Debtors have examined other legal options

short of payment of such Critical Vendor Claims and have determined that there exists no practical or legal alternative to payment of the Critical Vendor Claims.

42.    Therefore, the Debtors can only meet their fiduciary obligations as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of the Critical Vendor Claims.

**B.    The Doctrine of Necessity and Section 105(a) of the Bankruptcy Code Further Support Payment of Critical Vendor Claims.**

43.    The Debtors' proposed payment of prepetition Critical Vendor Claims should be authorized pursuant to section 105 of the Bankruptcy Code and under the "doctrine of necessity."

44.    Section 105(a) of the Bankruptcy Code authorizes a bankruptcy court to enter any order "necessary or appropriate" to carry out the provisions of the Bankruptcy Code. 11 U.S.C. § 105(a).  For the reasons set forth herein, and in light of the critical need for the Debtors to preserve the going concern value of their businesses in order to effect a successful reorganization through, among other things, preserving the Debtors' supply chain, payment of the Critical Vendor Claims as requested herein is proper in accordance with section 105 of the Bankruptcy Code.

45.    Payment of the Critical Vendor Claims is further supported by the doctrine of necessity.  The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization.  See In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment.); see also In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he

court can permit the pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a prepetition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the chapter 11 process.").

46.     The United States Supreme Court first articulated the doctrine of necessity over a century ago in Miltenberger v. Logansport Railway, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  See id. at 309-14.  The doctrine, largely unchanged from the Court's reasoning in Miltenberger, is a widely accepted component of modern bankruptcy jurisprudence.  See Just For Feet, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); In re Payless Cashways, Inc., 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agree to provide postpetition trade credit); see also In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).

47.     For the reasons discussed herein, payment of the Critical Vendor Claims is necessary to the Debtors' effective reorganization.  In particular, and as further set forth above, without payment of the Critical Vendor Claims, the Debtors' businesses and operations will be detrimentally impacted because the Debtors will not be able to obtain the Critical Goods and Services provided by the Critical Vendors.  As a result, the Debtors will be forced to incur exorbitant costs in order to find alternative sources of the Critical Goods and Services or may

lose favorable trade terms which are essential to their operations and may lose key customers due to interruptions in their supply chain.  In addition, certain of the Critical Vendors might have valid reclamation claims under section 546(c) of the Bankruptcy Code for goods delivered during the 45 days prior to the Petition Date and/or may have valid claims under section 503(b)(9) of the Bankruptcy Code for the value of goods received within 20 days prior to the Petition Date.

48.      Finally, as noted above, the Debtors have determined that the Critical Vendors – most of whom are foreign – may take drastic action if the Critical Vendor Claims are not paid.  Indeed, non-U.S. entities have occasionally asserted that they are not subject to the jurisdiction of a United States bankruptcy court and, as such, not subject to the automatic stay provisions of Bankruptcy Code section 362(a).  Although the Debtors vigorously dispute any such contentions, the foreign Critical Vendors may stop shipping goods or providing services to the Debtors on a timely basis, and foreign governmental and other entities may take action to seize assets of the Debtors or refuse to release shipments of goods to the Debtors, on the basis of such assertions.  Irrespective of the accuracy of any foreign Critical Vendor's belief that the automatic stay does not apply to these actions, the consequences of such actions would be severe and irreparable.  Simply put, absent the goods and services of the Critical Vendors, the operations of the Debtors would be thrown into disarray because Debtors would be unable to bring their branded clothing, footwear and accessories to market.  Therefore, even if the Foreign Vendors' legal arguments are completely without merit, it is unlikely that the Debtors could seek and obtain orders from all the appropriate foreign courts forcing such Critical Vendors to discontinue the offending activities within the time frame necessary to avoid irreparable harm to

the Debtors' businesses – particularly since injunctive relief may not be available in all jurisdictions.

49.     Therefore, payment of the Critical Vendor Claims should be authorized pursuant to section 105(a) of the Bankruptcy Code and the doctrine of necessity.

**C.     Payment of the Critical Vendor Claims is Appropriate under Section 363(b) of the Bankruptcy Code.**

50.     Section 363(b) of the Bankruptcy Code permits a debtor to use estate property "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Courts have authorized relief under section 363(b) where a debtor demonstrates a sound business justification for such relief.  See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); Ionosphere Clubs, Inc., 98 B.R. at 175 ("[T]he debtor must articulate some business justification, other than mere appeasement of major creditors.")

51.     Once a debtor has articulated a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

52.     The business judgment rule applies in chapter 11 cases.  See Integrated Res., 147 B.R. at 656 (noting that "Delaware business judgment rule principles have 'vitality by analogy' in Chapter 11"); see also Comm. of Asbestos-Related Litigants and/or Creditors v.

Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)

("[T]he Code favors the continued operation of a business by a debtor and a presumption of

reasonableness attaches to a Debtor's management decisions.").

53.     As discussed above, the Debtors have determined, in the sound exercise of

their business judgment, that the goods and services provided by the Critical Vendors are vital to

the Debtors' continuing business operations.  As such, the failure to honor their obligations to the

Critical Vendors could have a material adverse impact on the Debtors' continued operation and,

thus, their efforts to pursue restructuring alternatives.  Accordingly, the preservation and

protection of the Debtors' business through ongoing relationships with the Debtors' Critical

Vendors provides a sufficient business justification for payment of Critical Vendor Claims, even

if such payment were deemed to be outside the ordinary course of business.  See Ionosphere

Clubs, Inc., 98 B.R. at 175.

54.     The Debtors therefore seek authorization under section 363(b) of the

Bankruptcy Code to pay the Critical Vendor Claims.

55.     This and other courts have granted similar critical vendor relief in other

cases.  See, e.g., In re Dendreon Corp., Case No. 14-12515 (LSS) (Bankr. D. Del. Nov. 10,

2014); In re Exide Techs., Case No. 13-11482 (KJC) (Bankr. D. Del. June 10, 2013); In re

Synagro Techs., Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. Apr. 24, 2013); In re WP Steel

Venture LLC, Case No. 12-11661 (KJC) (Bankr. D. Del. June 1, 2012); In re Trident

Microsystems, Inc., Case No. 12-10069 (CSS) (Bankr. D. Del. Jan. 5, 2012); In re Delta

Petroleum Corp., Case No. 11-14006 (KJC) (Bankr. D. Del. Dec. 19, 2011); In re Solyndra LLC,

Case No. 11-12799 (PJW) (Bankr. D. Del. Sept. 7, 2011); In re DSI Holdings, Inc., Case No. 11-

11941 (KJC) (Bankr. D. Del. June 28, 2011); see also In re Chemtura Corp., Case No. 09-11233

(REG) (Bankr. S.D.N.Y April 13, 2009) (granting the debtors authority to pay up to $10,000,000 in critical vendor claims, representing approximately 10% of the debtors' total trade-related liabilities as of the petition date); In re Lyondell Chem. Co., Case No. 09-10023 (REG) (Bankr. S.D.N.Y Jan. 23, 2009) (granting the debtor authority to pay $30,000,000 in critical vendor claims); In re UAL Corp., Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002) (approving similar motion seeking to pay up to approximately $34,900,000 or 13.7% of the total trade debt); In re U.S. Airways Group, Case No. 02-83984 (SSM) (Bankr. E.D. Va. Aug. 12, 2002) (approving $10,000,000 in critical vendor claims for the 14th largest carrier in the world); In re Exide Techs, Case No. 02-11125 (JCA) (Bankr. D. Del. Apr. 18, 2002) (approving essential trade amount was 20% of the debtors total trade debt).[2]

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

56.    Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm). The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the court has instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh, 235 Fed. App'x 907, 910 (3d Cir. 2007) (citing Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977)). Furthermore, the harm must be shown to be actual and

---

[2]    Because of the voluminous nature of the orders cited herein, they are not attached to the Motion. Copies of these orders, however, are available on request.

imminent, not speculative or unsubstantiated.  See, e.g., Acierno v. New Castle County, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

57.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### RESERVATION OF RIGHTS

58.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365; or (e) otherwise affect the Debtors' rights under Bankruptcy Code section 365 to assume or reject any executory contract with any party subject to this Motion.

### NOTICE

59.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Debtors' prepetition secured noteholders; (c) counsel to the Debtors' prepetition unsecured noteholders; (d) counsel to the Debtors'

postpetition secured lenders; (e) the parties listed in the consolidated list of thirty (30) largest

unsecured creditors filed by the Debtors in these Chapter 11 Cases; and (f) any such other party

entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).  The Debtors submit that no

other or further notice need be provided.

## NO PRIOR REQUEST

60.    No previous request for the relief sought herein has been made to this

Court or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter orders, substantially in the forms annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:    Wilmington, Delaware
          September 9, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Li (*pro hac vice admission pending*)
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

John K. Lyons (*pro hac vice admission pending*)
Jessica Kumar (*pro hac vice admission pending*)
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel for Debtors and Debtors in Possession*

## EXHIBIT A

**Form of Trade Agreement**

_____, 2015

TO:     **[Critical Vendor/Service Provider]**
        **[Name]**
        **[Address]**

Dear Valued Supplier/Service Provider:

As you are aware, Quiksilver, Inc. and certain of its subsidiaries (collectively, the "Debtors")[1] filed voluntary petitions (the "Chapter 11 Cases") for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") on  September 9, 2015 (the "Petition Date").  On the Petition Date, in recognition of the importance of their relationship with vendors and suppliers and their desire that the Chapter 11 Cases have as little effect on such parties as possible, the Debtors requested the Bankruptcy Court's approval to pay the prepetition claims of certain critical vendors and suppliers.  On [●], 2015, the Bankruptcy Court entered an interim order (the "Order") authorizing the Debtors, under certain conditions, to pay the prepetition claims, in accordance with the terms of the Order, of certain trade creditors that agree to the terms set forth below and agree to be bound by the terms of the Order.  A copy of the Order is enclosed for your reference.  The Debtors have asked the Bankruptcy Court to schedule a final hearing and thereafter grant the relief provided in the Order on a final basis.

Under the Order, in order to receive payment of its prepetition claim, each selected trade creditor must agree to continue to supply goods and/or services to the Debtors based on "Temporary Trade Terms."  In the Order, Temporary Trade Terms are defined as the more favorable to the Debtors of (i) normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs), which were most favorable to the Debtors and in effect between such trade creditor and the Debtors on a historical basis for the period within one-hundred eighty (180) days of the Petition Date, or (ii) net 75 days FOB shipping point.

In addition, under the Order,  in order to receive payment of its prepetition claim, each selected trade creditor must agree to continue to supply goods and/or services to the Debtors' non-Debtor affiliates based on "Existing Trade Terms."  In the Order, Existing Trade Terms are defined as those trade terms in place on the Petition Date between the you and the applicable non-Debtor affiliate(s).

---

[1]     The Debtors are as follows: Quiksilver, Inc., QS Wholesale, Inc., DC Direct, Inc., DC Shoes, Inc., Fidra, Inc., Hawk Designs, Inc., Mt. Waimea, Inc., Q.S. Optics, Inc., QS Retail, Inc., Quiksilver Entertainment, Inc., and Quiksilver Wetsuits, Inc.  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.  The Debtors' foreign affiliates have not filed voluntary petitions and are not part of the Chapter 11 Cases.

For purposes of administering this trade program (the "Trade Program"), as authorized by the Bankruptcy Court and in accordance with the terms of the Order, the Debtors and **[Name of Trade Vendor]** agree as follows (the "Agreement"):

(a)     Based on the Debtors' books and records, the estimated balance of the prepetition trade claim (net of any setoffs, credits or discounts) (the "Trade Claim") of **[Name of Trade Vendor]** is $_____.

(b)     The Debtors shall pay $_____ towards the Trade Claim (the "Payment").

(c)     **[Name of Trade Vendor]** agrees to supply goods/services to the Debtors in accordance with the Temporary Trade Terms, and the Debtors agrees to pay **[Name of Trade Vendor]** in accordance with such Temporary Trade Terms.

(d)     The Temporary Trade Terms that **[Name of Trade Vendor]** will extend to the Debtors for shipment of postpetition goods/services is net ____ days.

(e)     **[Name of Trade Vendor]** agrees to supply goods/services to the Debtors' non-Debtor affiliates in accordance with the Existing Trade Terms.

(f)     In consideration for the Payment, you agree not to file or otherwise assert against any or all of the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien  (a "Lien") or, except as otherwise agreed with the Debtors, any claim on account of your Trade Claim or related in any way to any remaining prepetition amounts allegedly owed to you by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date, including any claim for reclamation or claim under Bankruptcy Code section 503(b)(9), regardless of the statute or other legal authority upon which such Lien or claim may be asserted, and, to the extent you have already obtained or otherwise asserted such a Lien or claim, you shall take (at your own expense) whatever actions are necessary to remove such Lien or withdraw such claim.

(g)     Unless you and the Debtors agree otherwise, any payments received pursuant to this Trade Agreement shall be applied to outstanding prepetition invoices in reverse chronological order**,** such that payments are first applied to the most recent outstanding invoices.

Your execution of this Agreement and return of the same to the Debtors constitutes an agreement by **[Name of Trade Vendor]** and the Debtors:

1.      to be bound by the Temporary Trade Terms (as modified herein) and, subject to the reservations set forth in the Order, to the amount of the Payment set forth above;

2.      that **[Name of Trade Vendor]** will continue to supply the Debtors with goods and/or services pursuant to the Temporary Trade Terms (as may be modified herein) and that the Debtors will pay for such goods and/or services in accordance with the Temporary Trade Terms (as modified herein);

3.      that **[Name of Trade Vendor]** will continue to supply the Debtors' non-Debtor affiliates with goods and/or services pursuant to the Existing Trade Terms;

4.      that **[Name of Trade Vendor]** has reviewed the terms and provisions of the Order and that it consents to the bound by such terms, except as modified herein;

5.      that, except as otherwise agreed by the Debtors and **[Name of Trade Vendor]**, the Payment shall be in complete satisfaction and release of all prepetition claims of **[Name of Trade Vendor]** and **[Name of Trade Vendor]** will not separately file a proof of claim or seek payment on account of its Trade Claim or related in any way to any remaining prepetition amounts allegedly owed to **[Name of Trade Vendor]** by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date;

6.      that if either the Trade Payment Program or your participation therein terminates as provided in the Order, any payments received by you on account of your Trade Claim will be deemed to have been in payment of postpetition obligations owed to you and you will immediately repay to the Debtors any payments made to you on account of your Trade Claim to the extent that the aggregate amount of such payments exceeds such postpetition obligations, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or other defense; and

7.      that if the Debtors shall be in default under this Agreement, **[Name of Trade Vendor]** shall have no obligation to supply goods and/or services to the Debtors on Temporary Trade Terms (as modified herein) until the Debtors cure such default and **[Name of Trade Vendor]** shall have the right to terminate this Agreement upon written notice to the Debtors detailing the Debtors' defaults hereunder (which the Debtors shall have the right to dispute) and the Debtors' failure to cure such default within five (5) business days of such notice, in which event **[Name of Trade Vendor]** may retain all sums paid to it hereunder on account of its Trade Claim.

The Debtors and **[Name of Trade Vendor]** also hereby agree that any dispute with respect to this Agreement, the Order and/or **[Name of Trade Vendor]**'s participation in the Trade Payment Program shall be determined by the Bankruptcy Court.

3

If you have any questions about this Agreement or our financial restructuring, please do not hesitate to call **[Contact Person]** at (___) ___-____:

Very truly yours,

Quiksilver, Inc.

By:_____
      Name:
      Title:

Agreed and Accepted by:

**[Name of Trade Vendor]**

By:_____
    Name: **[Name]**
    Title: **[Title]**

Dated: _____, 2015

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                                    :        Chapter 11
:
QUIKSILVER, INC., *et al.*,                               :        Case No. 15-11880 (___)
:
Debtors.[1]      :        (Jointly Administered)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**INTERIM ORDER GRANTING DEBTORS' MOTION FOR ORDER
PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363(b), 1107(a), AND 1108
AND BANKRUPTCY RULES 6003 AND 6004 AUTHORIZING
PAYMENT OF CRITICAL VENDORS**

Upon the motion (the "Motion")[2] of the Debtors for interim and final orders,

pursuant to sections 105(a), 363(b), 1107(a), and 1108 of title 11 of the United States Code (the

"Bankruptcy Code"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") authorizing, but not directing, the Debtors (i) to pay, in the ordinary

course of business, the prepetition claims of certain critical vendors and (ii) directing financial

institutions to honor all related checks and electronic payment requests; and upon the First Day

Declaration; and due and sufficient notice of the Motion having been given under the particular

circumstances; and it appearing that no other or further notice need be provided; and it appearing

that the relief requested by the Motion is in the best interests of the Debtors, their estates, their

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
        Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc.
        (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505),
        Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors'
        corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

creditors, their stakeholders, and other parties in interest; and after due deliberation thereon, and

sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED that:**

1.      The Motion is GRANTED as set forth herein on an interim basis.

2.      The Debtors are hereby authorized but not required to pay, in their sole

discretion, without further order of the Court, the Critical Vendor Claims.  Notwithstanding the

foregoing, payments on account of Critical Vendor Claims shall not exceed $30 million without

further order of this Court.

3.      The Debtors shall undertake appropriate efforts to cause the Critical

Vendors to enter into Trade Agreements with the Debtors substantially in the form of the letter

annexed as Exhibit A to the Motion as a condition to payment of their Critical Vendor Claims.

4.      The Debtors are authorized, in their sole discretion, to make payment on

account of Critical Vendor Claims in the absence of a Trade Agreement after the Debtors have

undertaken appropriate efforts to cause the Critical Vendor to execute a Trade Agreement and if

the Debtors determine, in their sole discretion, that failure to pay the Critical Vendor Claim

presents a material risk of irreparable harm to the Debtors' business and the Debtors and the

Critical Vendor mutually agree on trade terms.

5.      If a Critical Vendor refuses to supply goods and/or services to the Debtors

on Temporary Trade Terms following receipt of payment on its Critical Vendor Claim or fails to

comply with any Trade Agreement entered into by such Critical Vendor and the Debtors, the

Debtors may, in their sole discretion, and without further order of the Court, (i) declare that any

Trade Agreement between the Critical Vendor and the Debtors is terminated and (ii) declare that

payments made to the Critical Vendor on account of its Critical Vendor Claim be deemed to

have been made in payment of then-outstanding postpetition claims of such Critical Vendor

2

without further order of this Court or action by any person or entity.  In the event that such

events occur, a Critical Vendor shall then immediately repay to the Debtors any payment made

to it on account of its Critical Vendor Claim to the extent that payments on account of such

Critical Vendor Claim exceed the postpetition claims of such Critical Vendor then outstanding

without giving effect to any rights of setoff, claims, provision for payment of reclamation or

section 503(b)(9) claims, or otherwise.

6.       The Debtors may, in their sole discretion, reinstate a terminated Trade

Agreement if (i) such determination is subsequently reversed by this Court after notice and a

hearing following a motion by the Critical Vendor, for good cause shown, that the determination

was materially incorrect; (ii) the underlying default under the Trade Agreement was fully cured

by the Critical Vendor not later than five (5) business days following the Debtors' notification to

the Critical Vendor that a default had occurred; or (iii) the Debtors, in their discretion, reach a

favorable alternative agreement with the Critical Vendor.

7.       All applicable banks and other financial institutions are hereby authorized,

when requested by the Debtors in their sole discretion, to receive, process, honor and pay all

prepetition and postpetition checks, drafts and other forms of payment, including fund transfers,

on account of the Critical Vendor Claims, whether such checks or other requests were submitted

prior to or after the Petition Date.

8.       The Debtors' banks and other financial institutions shall rely on the

direction and representations of the Debtors as to which checks and fund transfers should be

honored and paid pursuant to this order, and any such bank shall not have any liability to any

party for relying on such direction and representations by the Debtors as provided for in this

Order or for inadvertently honoring or dishonoring any check or fund transfer.

9.      The Debtors' banks shall, at the direction of the Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Critical Vendor Claims that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and any such bank shall not have any liability to any party for relying on such direction by the Debtors as provided for in this order or for inadvertently failing to follow such direction.

10.      To the extent the Debtors have not yet sought to remit payment on account of the Critical Vendor Claims, the Debtors are authorized, but not directed, to issue checks or provide for other means of payment of the Critical Vendor Claims.

11.      The Debtors shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account of the Critical Vendor Claims to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

12.      Notwithstanding anything to the contrary contained herein, the relief granted in this Interim Order and any payment to be made hereunder shall be subject to the terms of any orders approving entry into debtor-in-possession financing and authorizing the use of cash collateral approved by this Court in these chapter 11 cases (including with respect to any budgets or other covenants governing or relating to such debtor-in-possession financing and/or use of cash collateral), and to the extent there is any inconsistency between the terms of such orders and any action taken or proposed to be taken hereunder, the terms of such orders shall control.

13.      The Final Hearing, if necessary, on the Motion is scheduled for _____, 2015 at _____ (prevailing Eastern time), and any objections or responses to the Motion (each, an "Objection") shall be filed and served upon the Notice Parties so that the

Objection is <u>actually</u> <u>received</u> by 4:00 p.m. (prevailing Eastern time) on the day that is fourteen (14) days following the Petition Date.

14.     If no Objections are filed to the Motion, the Court may enter the Final Order without further notice or hearing.

15.     The provisions contained herein shall not be construed to limit, or in any way affect, the Debtors' ability to contest any claims, including any Critical Vendor Claims, on any ground permitted by applicable law, and neither the provisions contained herein, nor any actions or payments made by the Debtors pursuant to this order, shall be deemed an admission as to the validity of the underlying obligation or a waiver of any rights the Debtors may have to subsequently dispute such obligation on any ground that applicable law permits.

16.     Nothing in this order supersedes or shall be deemed to supersede any limitations, restrictions, covenants, or other obligations of the Debtors under any interim or final order authorizing and approving any postpetition debtor-in-possession financing.

17.     Nothing in this order or the Motion shall be deemed to constitute postpetition assumption or adoption of any agreement under Bankruptcy Code section 365. Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any person.

18.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

19.     Notwithstanding Bankruptcy Rule 6004(h), this order shall be effective and enforceable immediately upon entry hereof.

5

20.     This Order, and all acts taken in furtherance of or reliance upon this Order, shall be effective notwithstanding the filing of an Objection, pending the entry of the Final Order by this Court.

21.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this order.

Dated:  Wilmington, Delaware
_____, 2015


_____
UNITED STATES BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                          :        Chapter 11
:
QUIKSILVER, INC., *et al.*,                     :        Case No. 15-11880 (____)
:
Debtors.[1]                    :        (Jointly Administered)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**FINAL ORDER GRANTING DEBTORS' MOTION FOR ORDER
PURSUANT TO BANKRUPTCY CODE SECTION 105(a), 363(b), 1107(a), AND 1108
AND BANKRUPTCY RULES 6003 AND 6004 AUTHORIZING
PAYMENT OF CRITICAL VENDORS**

Upon the motion (the "Motion")[2] of the Debtors for interim and final orders,

pursuant to sections 105(a), 363(b), 1107(a), and 1108 of title 11 of the United States Code (the

"Bankruptcy Code"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") authorizing, but not directing, the Debtors (i) to pay, in the ordinary

course of business, the prepetition claims of certain critical vendors and (ii) directing financial

institutions to honor all related checks and electronic payment requests; and upon the First Day

Declaration; and due and sufficient notice of the Motion having been given under the particular

circumstances; and it appearing that no other or further notice need be provided; and it appearing

that the relief requested by the Motion is in the best interests of the Debtors, their estates, their

creditors, their stakeholders, and other parties in interest; and after due deliberation thereon, and

sufficient cause appearing therefor, it is hereby

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc.
(8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505),
Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors'
corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

**ORDERED, ADJUDGED AND DECREED that:**

1.        The Motion is GRANTED as set forth herein.

2.        The Debtors are hereby authorized but not required to pay, in their sole discretion, without further order of the Court, the Critical Vendor Claims in an amount not to exceed, in the aggregate, $52 million (inclusive of any amounts paid pursuant to the Interim Order) without further order of this Court.

3.        The Debtors shall undertake appropriate efforts to cause the Critical Vendors to enter into Trade Agreements with the Debtors substantially in the form of the letter annexed as Exhibit A to the Motion as a condition to payment of their Critical Vendor Claims.

4.        The Debtors are authorized, in their sole discretion, to make payment on account of Critical Vendor Claims in the absence of a Trade Agreement after the Debtors have undertaken appropriate efforts to cause the Critical Vendor to execute a Trade Agreement and if the Debtors determine, in their sole discretion, that failure to pay the Critical Vendor Claim presents a material risk of irreparable harm to the Debtors' business  and the Debtors and the Critical Vendor mutually agree on trade terms.

5.        If a Critical Vendor refuses to supply goods and/or services to the Debtors on Temporary Trade Terms following receipt of payment on its Critical Vendor Claim or fails to comply with any Trade Agreement entered into by such Critical Vendor and the Debtors, the Debtors may, in their sole discretion, and without further order of the Court, (i) declare that any Trade Agreement between the Critical Vendor and the Debtors is terminated and (ii) declare that payments made to the Critical Vendor on account of its Critical Vendor Claim be deemed to have been made in payment of then-outstanding postpetition claims of such Critical Vendor without further order of this Court or action by any person or entity.  In the event that such events occur, a Critical Vendor shall then immediately repay to the Debtors any payment made

2

to it on account of its Critical Vendor Claim to the extent that payments on account of such

Critical Vendor Claim exceed the postpetition claims of such Critical Vendor then outstanding

without giving effect to any rights of setoff, claims, provision for payment of reclamation or

section 503(b)(9) claims, or otherwise.

6. The Debtors may, in their sole discretion, reinstate a terminated Trade

Agreement if (i) such determination is subsequently reversed by this Court after notice and a

hearing following a motion by the Critical Vendor, for good cause shown, that the determination

was materially incorrect; (ii) the underlying default under the Trade Agreement was fully cured

by the Critical Vendor not later than five (5) business days following the Debtors' notification to

the Critical Vendor that a default had occurred; or (iii) the Debtors, in their discretion, reach a

favorable alternative agreement with the Critical Vendor.

7. All applicable banks and other financial institutions are hereby authorized,

when requested by the Debtors in their sole discretion, to receive, process, honor, and pay all

prepetition and postpetition checks, drafts and other forms of payment, including fund transfers,

on account of the Critical Vendor Claims, whether such checks or other requests were submitted

prior to or after the Petition Date.

8. The Debtors' banks and other financial institutions shall rely on the

direction and representations of the Debtors as to which checks and fund transfers should be

honored and paid pursuant to this order, and any such bank shall not have any liability to any

party for relying on such direction and representations by the Debtors as provided for in this

Order or for inadvertently honoring or dishonoring any check or fund transfer.

9. The Debtors' banks shall, at the direction of the Debtors, receive, process,

honor and pay all prepetition and postpetition checks and fund transfers on account of the

Critical Vendor Claims that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and any such bank shall not have any liability to any party for relying on such direction by the Debtors as provided for in this order or for inadvertently failing to follow such direction.

10.     To the extent the Debtors have not yet sought to remit payment on account of the Critical Vendor Claims, the Debtors are authorized, but not directed, to issue checks or provide for other means of payment of the Critical Vendor Claims.

11.     The Debtors shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account of the Critical Vendor Claims to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

12.     Notwithstanding anything to the contrary contained herein, the relief granted in this Final Order and any payment to be made hereunder shall be subject to the terms of any orders approving entry into debtor-in-possession financing and authorizing the use of cash collateral approved by this Court in these chapter 11 cases (including with respect to any budgets or other covenants governing or relating to such debtor-in-possession financing and/or use of cash collateral), and to the extent there is any inconsistency between the terms of such orders and any action taken or proposed to be taken hereunder, the terms of such orders shall control.

13.     The provisions contained herein shall not be construed to limit, or in any way affect, the Debtors' ability to contest any claims, including any Critical Vendor Claims, on any ground permitted by applicable law, and neither the provisions contained herein, nor any actions or payments made by the Debtors pursuant to this order, shall be deemed an admission as to the validity of the underlying obligation or a waiver of any rights the Debtors may have to subsequently dispute such obligation on any ground that applicable law permits.

4

14.     Nothing in this order supersedes or shall be deemed to supersede any limitations, restrictions, covenants, or other obligations of the Debtors under any interim or final order authorizing and approving any postpetition debtor-in-possession financing.

15.     Nothing in this order or the Motion shall be deemed to constitute postpetition assumption or adoption of any agreement under Bankruptcy Code section 365. Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any person.

16.     The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

17.     Notwithstanding Bankruptcy Rule 6004(h), this order shall be effective and enforceable immediately upon entry hereof.

18.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this order.

Dated:  Wilmington, Delaware
        _____, 2015


        _____
        UNITED STATES BANKRUPTCY JUDGE

1033922-CHISR02A - MSW