**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
In re:                                        :     Chapter 11
                                                              :
QUIKSILVER, INC., *et al.*,                   :     Case No. 15-11880 (___)
                                                              :
                          Debtors.[1]         :     (Joint Administration Pending)
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE
SECTIONS 105(a), 345(b), 363, AND 503(b), BANKRUPTCY RULES 6003 AND 6004,
AND LOCAL BANKRUPTCY RULE 2015-2 (I) AUTHORIZING CONTINUED
MAINTENANCE OF PREPETITION BANK ACCOUNTS AND PAYMENT OF
RELATED PREPETITION OBLIGATIONS, (II) AUTHORIZING CONTINUED USE
OF EXISTING CASH MANAGEMENT SYSTEM, (III) AUTHORIZING CONTINUED
USE OF EXISTING BUSINESS FORMS, AND (IV) AUTHORIZING THE
CONTINUATION OF, AND ACCORDANCE OF ADMINISTRATIVE EXPENSE
PRIORITY STATUS TO, INTERCOMPANY TRANSACTIONS**

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in

possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-

Debtor affiliates, "Quiksilver" or the "Company"), hereby move (the "Motion") this Court for

entry of an order, under sections 105(a), 345(b), 363, and 503(b) of title 11 of the United States

Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rule 2015-2 of the Local Rules for the United States

Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") (i) authorizing,

but not directing, the Debtors to continue to maintain existing bank accounts, authorizing a

waiver of certain operating guidelines relating to bank accounts, and authorizing, but not

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc.
(8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505),
Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors'
corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

directing, the payment of related prepetition obligations; (ii) authorizing, but not directing, the

Debtors to continue to use their existing cash management system; (iii) authorizing, but not

directing, the Debtors to continue to use existing Business Forms (as defined below); and (iv)

authorizing the continuation of certain Intercompany Transactions (as defined below), and

accordance of administrative expense priority status to related postpetition Intercompany Claims

(as defined below).  In support of the Motion, the Debtors rely upon and incorporate by reference

the Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., in

Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration"), filed with

the Court concurrently herewith.  In further support of the Motion, the Debtors, by and through

their proposed undersigned counsel, respectfully represent:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The legal predicates for the relief requested herein are Bankruptcy Code

sections 105(a), 345(b), 363, and 503(b), Bankruptcy Rules 6003 and 6004, and Local

Bankruptcy Rule 2015-2.

3.      Pursuant to Rule 9013-1(f) of the Local Bankruptcy Rules, the Debtors

consent to the entry of a final judgment or order with respect to this Motion if it is determined

that Court would lack Article III jurisdiction to enter such final order or judgment absent the

consent of the parties.

## BACKGROUND

4.       On September 9, 2015 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

5.       The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.       To date, no creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "United States Trustee").  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

7.       Quiksilver is one of the world's leading outdoor sports lifestyle companies.  The Company designs, develops and distributes branded apparel, footwear, accessories and related products.  The Company began operations in 1976 making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, and motocross, among other activities. The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites.  The Debtors comprise each of the Company's U.S.

entities, including parent, ZQK, as well as QS Wholesale, Inc. ("QS Wholesale"), QS Retail, Inc. ("QS Retail"), DC Shoes, Inc. ("DC Shoes"), and seven inactive entities.

8.      Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

## RELIEF REQUESTED

9.      By this Motion, the Debtors seek entry of an order, pursuant to Bankruptcy Code sections 105(a), 345(b), 363(c), and 503(b) (i) authorizing, but not directing, the Debtors to continue to maintain existing bank accounts, authorizing a waiver of certain operating guidelines relating to bank accounts set forth in the U.S. Department of Justice, Office of the United States Trustee: Guidelines for Debtors-in-Possession (the "U.S. Trustee Guidelines") as adopted by the U.S. Trustee, and authorizing, but not directing, the payment of related prepetition obligations; (ii) authorizing, but not directing, the Debtors to continue using their existing cash management system; (iii) authorizing, but not directing, the Debtors to continue using existing Business Forms; and (iv) authorizing, but not directing, the continuation of Intercompany Transactions and accordance of administrative expense priority status to postpetition Intercompany Claims.

10.      For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders, and other parties in interest, and therefore, should be granted.

## BASIS FOR RELIEF

### A.      Cash Management System and Bank Accounts

11.      Pursuant to Bankruptcy Code sections 105(a), 345(b), and 363(c), the Debtors seek authorization to maintain their existing bank accounts and continue using their

existing cash management system (the "Cash Management System").  The Debtors' Cash

Management System facilitates reporting, monitors collection and disbursement of funds,

reduces administrative expenses by facilitating the movement of funds and the development of

more timely and accurate balance and presentment information, and administers the various

Bank Accounts (as defined below) required to effect the collection, disbursement, and movement

of cash.  A flow chart that depicts the Debtors' Cash Management System is attached hereto as

Exhibit A.

12.      Prior to the commencement of these Chapter 11 Cases, and in the ordinary

course of their businesses, the Debtors maintained 14 bank accounts, out of which they managed

cash receipts and disbursements (the "Bank Accounts").  The Bank Accounts are in the name of

ZQK, QS Wholesale, QS Retail, or DC Shoes, and are maintained at Bank of America, N.A.

("BofA").  A list of the Bank Accounts is attached hereto as Exhibit B.

13.      The Receipts Accounts.  ZQK, QS Wholesale, QS Retail, and DC Shoes

each maintain a receipts account (the "ZQK Receipts Account," the "QS Wholesale Receipts

Account"), the "QS Retail Receipts Account" and the "DC Shoes Receipts Account,"

respectively, and, together, the "Receipts Accounts"), into which the Debtors receive electronic

payment receipts from trade customers and other parties, and from which they make electronic

payments to trade vendors and other parties.  Each of the Debtors' Receipts Accounts are swept

periodically under the cash dominion arrangement in connection with the Debtors' postpetition

revolving loan facility (the "DIP ABL Facility"), under which BofA is administrative and

collateral agent (the "DIP ABL Agent").  As such, these accounts only carry a cash balance at

the end of each business day in the event a payment was received following the final sweep of

the day.  The Receipts Accounts are funded as needed by the Debtors' Operating Account (as

defined below), based upon known disbursements scheduled from each of the accounts.

14.     More specifically, the QS Retail Receipts Account receives receipts from

the Debtors' retail stores.  In particular, the cash management process at retail locations is

structured as follows:

(a)     Retail locations receive payments in the form of cash, credit cards, and in rare occasions, checks.

(b)     On a predetermined schedule, and typically two to three times per week, a third-party armored car service, will collect cash and check receipts from the retail locations, and to the extent needed, provide cash utilized at the register.

(c)     The cash and check receipts collected by armored car are deposited at a number of strategically located vaults.  Those receipts are then processed by BofA and deposited directly into the QS Retail Receipts Account.

(d)     Each retail location utilizes a unique 4-digit reference, which is utilized by the Debtors' to reconcile all related cash activity.

(e)     Credit card transactions at the retail locations are processed by Bank of America Merchant Services ("BAMS") and are typically cleared and posted approximately two to three days after the transaction occurred, directly into the QS Retail Receipts Account.

15.     In addition, checks received into the QS Wholesale Lockbox (as defined

below) are directly deposited into the QS Retail Receipts Account.

16.      The QS Wholesale Receipts Account receives receipts from various

sources associated with the Debtors' wholesale business, including the following:

(a)     Credit card payments related to QS Wholesale are directly deposited into the QS Wholesale Receipts Account, after being processed by Elavon.

(b)     All electronic payment receipts of QS Wholesale from trade customers and other parties are made into the QS Wholesale Receipts Account.

17.     Finally, in the event that trade customers or other parties transacting with

DC Shoes remit payment via credit card, such charges are processed by Elavon, Inc. ("Elavaon")

6

and are typically cleared and posted approximately two to three days after the transaction occurred, directly into the DC Shoes Receipts Account.

18.     <u>The Lockboxes</u>.    The Debtors maintain two lockboxes, in the names of QS Wholesale (the "<u>QS Wholesale Lockbox</u>") and DC Shoes (the "<u>DC Shoes Lockbox</u>"),  which receive check payments made to QS Wholesale or DC Shoes, respectively, from trade customers and other parties.  Checks received into the QS Wholesale Lockbox are directly deposited into the QS Retail Receipts Account, while checks received into the DC Shoes Lockbox are directly deposited into the DC Shoes Receipts Account.  Both Lockboxes are located in Los Angeles, CA.

19.     <u>The Check Disbursement Accounts</u>.  ZQK, QS Wholesale, QS Retail, and DC Shoes each maintain Check Disbursement Accounts (the "<u>ZQK Check Disbursement Account</u>," the "<u>QS Wholesale Check Disbursement Account</u>," the "<u>QS Retail Check Disbursement Account</u>," and the "<u>DC Shoes Check Disbursement Account</u>," respectively, and, together, the "<u>Check Disbursement Accounts</u>"), which are utilized for the purpose of making check payments to trade vendors and other parties.  The Check Disbursement Accounts are funded, based on known daily check clearings, by the Operating Account.  Therefore, the Check Disbursement Accounts do not maintain an ending cash balance at the end of each business day.

20.     <u>The Payroll Accounts</u>.  ZQK, QS Wholesale, and QS Retail each maintain Payroll Accounts (the "<u>Quiksilver Inc. Payroll Account</u>," the "<u>QS Wholesale Payroll Account</u>" and the "<u>QS Retail Payroll Account</u>," respectively, and, together, the "<u>Payroll Accounts</u>"), which are utilized to make payments to employees.  The Payroll Accounts are funded, based on known daily direct deposit or check clearings, in addition to payroll-related withholding tax payments, by the Operating Account.  Therefore, the Payroll Accounts do not maintain an ending cash

balance at the end of each business day.  The Debtors transfer the required payroll-related tax withholding amounts into the Payroll Accounts one day prior to each payroll cycle.  Such funds are subsequently drawn from the Payroll Accounts by the Debtors' third party payroll processor, ADP, and remitted to the appropriate taxing authorities.

21.    The Operating Account.  ZQK has an Operating Account (the "Operating Account"), which funds each of the Debtors' disbursement accounts and makes electronic payments to third parties.  In particular, under the cash dominion arrangements with the DIP ABL Agent, the Operating Account is funded on an as needed basis from the DIP ABL Facility (subject to the terms and conditions thereof).  The Operating Account, in turn, funds (a) the Check Disbursement Accounts, as needed, based upon known check clearings, (b) the Payroll Accounts, as needed, based upon known payroll (direct debit or check) clearings, (c) electronic payments to trade vendors and other parties, and (d) certain Intercompany Transactions, as further discussed below.

22.    The Inactive Accounts.  The Debtors have two accounts which are considered part of the Debtors' Cash Management System, but which are idle, and do not actively receive or disburse funds to any of the Debtors' other Bank Accounts or maintain a cash balance (the "Inactive Accounts").[2]

**B.    The Business Forms**

23.    In the ordinary course of business, the Debtors use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "Business Forms").  Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in

---

[2]    Because they are not an active part of the Debtors' Cash Management System, the Inactive Accounts are not shown on the flow chart attached as Exhibit A.

possession.  Most parties doing business with the Debtors undoubtedly will be aware of the

Debtors' status as debtors in possession as a result of the publicity surrounding these Chapter 11

Cases, including a press release issued by the Debtors and the notice of commencement of the

Chapter 11 Cases that has been or will be provided to parties in interest.  As with the existing

Cash Management System, requiring the Debtors to change existing Business Forms would

unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses

on the estates.

24.    The Debtors do not maintain pre-printed check stock; rather, the name of

the payor entity is printed when the check is written.  The Debtors will make reasonable best

efforts to ensure that, within a reasonable period of time after the Petition Date, subsequently

written checks bear the designation "Debtor in Possession" and their joint case number.

However, configuring the Debtors' software such that checks written on behalf of all Debtor

entities bear such designation, without printing such designation on checks of non-Debtor

entities, may involve significant additional effort.  Accordingly, the Debtors request relief from

compliance with such requirement for thirty (30) days and request that any order be without

prejudice to their right to seek additional relief from, or time to comply with, such requirement.

## C.    The Intercompany Transactions

25.    In the ordinary course of business, the Debtors engage in various

transactions relating to the business relationship between and among themselves and their non-

Debtor affiliates (the "Intercompany Transactions").

26.    In particular, the Debtors and their non-Debtor affiliates operate as a

global enterprise, and many functions essential to the Debtors' day-to-day operations are

conducted overseas by their foreign affiliates.  For example, responsibility for design of virtually

all of the apparel, footwear, accessories and other products sold in the Debtors' retail and

wholesale stores is conducted by the Debtors' foreign non-Debtor affiliates. Similarly, many of

the administrative functions and marketing activities occur overseas. In addition, a non-Debtor

affiliate is responsible for sourcing the production of all of the apparel sold in the Debtors'

stores, including identifying, developing relationships with, and negotiating agreements with

such vendors. As a general matter, the Intercompany Transactions are intended to reduce

administrative costs and ensure the orderly and efficient operation of the Debtors' enterprise.

27.     In connection with the Intercompany Transactions, funds are transferred

between or among the Debtors' Bank Accounts to non-Debtor affiliates as noted below:

(a)     Non-Debtor affiliates issue payments on a quarterly basis to the
Debtors on account of royalty payments due from the sale of *DC Shoes* merchandise by non-
Debtor affiliates . Such payments are received into the DC Shoes Receipts Account.

(b)     The Debtors issue payments on a quarterly basis to the non-Debtor
affiliates on account of royalty payments due from the sale of *Quiksilver* and *Roxy* merchandise
by the Debtors. Such payments are made from the Operating Account to the non-Debtor
affiliate's bank account.

(c)     Periodically, the Debtors pay a fee to the non-Debtor affiliate
responsible for sourcing the Debtors' apparel. The fee is calculated on a cost-plus basis and
payments are made from the Operating Account to the non-Debtor affiliate's bank account. The
amount of the payments is typically approximately $3 million per quarter (although such
payments are made throughout the quarter, in varying amounts).

(d)     From time to time, other cash transfers may occur between the
Debtors and non-Debtor affiliates for various shared service costs and expenses (i.e. management
and/or service fees) that are allocated amongst the global business. To the extent an actual cash
transfer between the related entities would result in unfavorable liquidity constraints, the transfer
would be settled via an intercompany accounting entry in lieu of actual cash.

(e)     As needed, ZQK may make cash transfers to certain non-Debtor
affiliates, including, in particular its Asia and Pacific Rim subsidiaries, to support such entities'
operations.

28.     As between the Debtors, intercompany payables and receivables are

typically settled via accounting entries for the Debtor entities; therefore, actual cash transfers

generally do not occur between the Debtor entities.

29.     The Debtors anticipate that the Intercompany Transactions will continue postpetition in the ordinary course of business.  Such transactions are essential to Quiksilver's operations as a global enterprise and if the Company were prohibited from continuing such transactions in the ordinary course, the disruption to the Company's operations and the harm to the Company as a whole, including the Debtors, would be irreparable.  As set forth above, the non-Debtor affiliates provide services, including administrative services, marketing, product design, and product sourcing, without which the Debtors could not function. The Debtors believe that replacing these services with services from an unaffiliated third party would be extremely detrimental and disruptive to their operations and reorganization efforts and that such services could only be obtained, if at all, on a much more costly basis.

30.     In addition, the Intercompany Transactions are necessary to support the operations of the Debtors' non-Debtor affiliates.  For example, the Australian subsidiaries are subject to strict laws regarding trading while insolvent.  Absent the ability to receive support from ZQK, there is a risk that such entities may be forced to liquidate.  Any harm, disruption in operation, or loss in value to the non-Debtor affiliates would represent a similar loss in value to the Debtors' estates, as the non-Debtor affiliates comprise a majority of the Company's total revenues and contribute substantial value to the Company.  As such, the Debtors believe that the benefit of the Company's periodic intercompany loans will exceed the cost.  Finally, any intercompany loans will be made in accordance with the budget under the Debtors' postpetition debtor-in-possession financing and are effectively the sole manner for those entities to access liquidity.

31.     Because the Debtors engaged in the Intercompany Transactions on a regular basis prepetition and such transactions are common for enterprises like the Debtors, the

Debtors believe that they may continue the Intercompany Transactions in the ordinary course, as

contemplated by section 363(c)(1) of the Bankruptcy Code, without court approval.

Nonetheless, out of an abundance of caution, the Debtors seek express authority to continue

engaging in the Intercompany Transactions.  Consistent with their prepetition practice, the

Debtors maintain records of all transfers and can ascertain, trace and account for all

Intercompany Transactions.

## APPLICABLE AUTHORITY

**A.      The Court Should Authorize the Debtors to Maintain Their Existing Bank Accounts
and Use Their Existing Cash Management System and a Waiver of any
Requirement to Close Existing Accounts.**

32.      Although the Debtors maintain the Bank Accounts as part of an

established Cash Management System, the U.S. Trustee Guidelines require that the Debtors, as

debtors in possession, take certain actions with respect to their prepetition Bank Accounts in

order for the U.S. Trustee to supervise the administration of the Debtors' Chapter 11 Cases.  As

described in the U.S. Trustee Guidelines, the requirements are designed to draw a clear line of

demarcation between prepetition and postpetition transactions and operations and prevent the

inadvertent postpetition payment of prepetition claims.  The Debtors submit, however, that a

waiver of certain requirements is warranted.

33.      Specifically, all of the Bank Accounts are with BofA, a financially stable

banking institution with FDIC insurance.  Moreover, the U.S. Trustee has identified BofA as

approved an depositories for cases pending in this District.  To protect against the unauthorized

payment of prepetition obligations, the Debtors represent that, if they are authorized to continue

to use the Bank Accounts, they will not pay, and BofA will be directed not to pay, any debts

incurred before the Petition Date, other than as authorized by this Court.

34.     Moreover, any new account that the Debtors open will be (a) with a bank that is (x) organized under the laws of the United States of America or any state therein, (y) is insured by the FDIC, and (z) has executed, or is willing to immediately execute, a Uniform Depository Agreement with the U.S. Trustee; and (b) designated a "Debtor in Possession" account by the relevant bank (any such bank, collectively with BofA, the "<u>Banks</u>"). Additionally, the Debtors will provide the U.S. Trustee with notice of any new accounts that are opened.

35.     Enforcement of the U.S. Trustee's requirements here would cause enormous disruption in the Debtors' business and would impair the Debtors' efforts to maximize the value of their estates.  Indeed, as explained in more detail above, the Bank Accounts comprise an established cash management system that the Debtors must maintain to ensure collections and disbursements occur.

36.     The Debtors' Cash Management System is highly automated and computerized.  This allows the Debtors to centrally manage all of their cash flow needs and includes the necessary accounting controls to enable the Debtors, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  While the Debtors' cases are pending, the Debtors will continue to maintain detailed records reflecting all transfers of funds.

37.     Accordingly, in order to avoid delays in payments to administrative creditors, to ensure as smooth a transition into chapter 11 as possible, and to maximize the value of their estates, (a) the Debtors must be permitted to continue to maintain their existing Bank Accounts and open new and close existing accounts as needed; and (b) the requested relief must

extend to any new accounts by providing that the new accounts are deemed to be Bank Accounts and are similarly subject to the rights, obligations, and relief granted by this Court.

38.     Further, the Debtors request that the Banks be permitted to debit the Debtors' accounts in the ordinary course of business without the need for further order of this Court for: (a) all checks drawn on the Bank Accounts which are cashed at the Banks' counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; and (b) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to the Banks as service charges for the maintenance of the Debtors' Cash Management System.  The Debtors further request that the Banks be restrained from honoring any check, draft, wire, or electronic funds transfer presented, issued, or drawn on the Bank Accounts on account of a prepetition claim unless (a) authorized in an order of this Court, as represented to the Banks by the Debtors as set forth below; (b) not otherwise prohibited by a "stop payment" request received by the Banks from the Debtors; and (c) supported by sufficient funds in the Bank Account in question.

39.     Both as part of this Motion and in other motions that have been concurrently filed, the Debtors are requesting authority to pay, in their sole discretion, certain prepetition obligations.  With respect to some of this debt, the Debtors issued checks prior to the Petition Date that have yet to clear the banking system.  In other instances, the Debtors will issue the relevant check once the Court enters an order permitting the Debtors to do so.  The Debtors intend to inform BofA which such checks should be so honored.  Therefore, the Debtors request that BofA be authorized and directed to rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored.  The Debtors further request that the Order specify that BofA shall not have any liability to any party for relying on such representations.  This relief is reasonable and

14

appropriate because BofA is not in a position to independently verify or audit whether a particular prepetition check may be honored in accordance with an order by the Court or otherwise.

40.     Allowing the Debtors to utilize their prepetition Cash Management System and engage in related "routine transactions" is entirely consistent with applicable provisions of the Bankruptcy Code.  In particular, Bankruptcy Code section 363(c)(1) authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).  The authority granted by section 363(c)(1) extends to a debtor in possession's continued use of its customary cash management system and, thus, supports the relief requested.  See, e.g., Charter Co. v. Prudential Ins. Co. Am. (In re Charter Co.), 778 F.2d 617, 621 (11th Cir. 1985) (indicating that an order authorizing the debtor to employ a cash management system that was "usual and customary in the past" was "entirely consistent" with section 363(c)(1)) (internal quotation omitted).

41.     To the extent that use of the existing Cash Management System is beyond the ordinary course of the Debtors' business, such use is permitted by sections 363(b)(1) and 105(a) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code further provides that the Court may "issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).

42.     Where there is a valid business justification for using property outside the ordinary course of business, the law presumes that, "in making a business decision the directors of a corporation acted on an informed basis, in good faith[,] and in the honest belief that the

action taken was in the best interests of the company." <u>Official Comm. of Subordinated</u>

<u>Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)</u>, 147 B.R. 650, 656 (S.D.N.Y.

1992) (internal quotation marks omitted) (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872

(Del. 1985)).

43.     Indeed, bankruptcy courts routinely permit chapter 11 debtors to continue

using their existing cash management system, generally treating requests for such relief as a

relatively simple matter.  <u>See</u> <u>In re Baldwin-United Corp.</u>, 79 B.R. 321, 327 (Bankr. S.D. Ohio

1987); <u>see also</u> <u>In re Columbia Gas Sys., Inc.</u>, 136 B.R. 930, 934 (Bankr. D. Del. 1992)

(recognizing that an integrated cash management system "allows efficient utilization of cash

resources and recognizes the impracticalities of maintaining separate cash accounts for the many

different purposes that require cash"), <u>aff'd in part, rev'd in part</u>, 1992 U.S. Dist. LEXIS 9460

(D. Del. July 6, 1992), <u>aff'd in part, rev'd in part</u>, 997 F.2d 1039 (3d Cir. 1993), <u>cert. denied sub</u>

<u>nom.</u> <u>Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.</u>, 510 U.S.

1110 (1994).

44.     This Court and other courts have routinely granted the same or similar

relief as requested in this Motion to chapter 11 debtors.  <u>See, e.g.,</u>  <u>In re Dendreon Corp.</u>, Case

No. 14-12515 (LSS) (Bankr. D. Del. Dec. 9, 2014); <u>In re Exide Techs.</u>, Case No. 13-11482

(KJC) (Bankr. D. Del. July 24, 2013); <u>In re Synagro Techs., Inc.</u>, Case No. 13-11041 (BLS)

(Bankr. D. Del. Apr. 25, 2013).[3]  The Debtors respectfully submit that such relief should be

granted here.

---

[3]     Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of
these orders, however, are available on request.

**B.     The Court Should Authorize the Debtors to Honor Certain Prepetition Obligations Related to the Cash Management System.**

45.     In connection with the Cash Management System, the Debtors may incur fees and other charges  (collectively, all such fees and charges, the "Cash Management Claims") in connection with (a) Bank services (the "Service Charges"), (b) checks deposited with BofA which have been dishonored or returned for insufficient funds in the applicable amount, (c) any reimbursement or other payment obligations, such as overdrafts, arising under any agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements (the "Bank Account Agreements"), and (d) the collection and deposit of cash and check receipts by armored car services.  The Debtors estimate that outstanding Cash Management Claims total less than $30,000 as of the Petition Date.

46.     As with the Cash Management System, payment of the Cash Management Claims will minimize disruption to the Debtors' operations and is therefore in the best interests of the estates.  Absent payment of the Cash Management Claims, the Banks might assert setoff rights against the funds in the Bank Accounts on account of the Cash Management Claims or freeze the Bank Accounts, and the Banks or armored car services may refuse to provide services to the Debtors.  The payment of Cash Management Claims will not prejudice unsecured creditors given that, as noted above, the Banks may have setoff rights with respect to the Cash Management Claims.

47.     Accordingly, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors seek authority, in their sole discretion, to pay and/or reimburse the Banks and service providers in the ordinary course of business for any Cash Management Claims arising prior to or after the Petition Date.  The Debtors further request that the Cash Management Claims

be granted administrative expense priority status pursuant to section 503(b) of the Bankruptcy

Code.

48.     This Court and other courts have routinely granted the same or similar

relief as requested in this Motion to chapter 11 debtors.  See, e.g., In re Synagro Techs., Inc.,

Case No. 13-11041 (BLS) (Bankr. D. Del. Apr. 24, 2013); In re Friendly Ice Cream Corp., No.

11-13167 (KG) (Bankr. D. Del. Oct. 6, 2011); see also In re LightSquared Inc., No. 12-12080

(SCC) (Bankr. S.D.N.Y. Jun. 11, 2012).[4]  The Debtors respectfully submit that such relief should

be granted here.

**C.     The Court Should Authorize the Debtors to Continue to Use Existing Business
Forms and Checks.**

49.     Local Bankruptcy Rule 2015-2(a) provides:

> Where the debtor uses pre-printed checks, upon motion of the debtor, the Court
> may, without notice and hearing, permit the debtor to use its existing checks
> without the designation "Debtor-in-Possession" and use its existing bank
> accounts.  However, once the debtor's existing checks have been used, the debtor
> shall, when reordering checks, require the designation "Debtor-in-Possession" and
> the corresponding bankruptcy number on all such checks.

Del. Bankr. L.R. 2015-2(a).

50.     In order to minimize expenses to their estates, the Debtors also seek

authorization to continue using Business Forms existing immediately prior to the Petition Date,

without reference to the Debtors' status as debtors in possession.

51.     As noted above, most parties doing business with the Debtors undoubtedly

will be aware of the Debtors' status as debtors in possession as a result of the press releases

issued by the Debtors and other press coverage.  Each of the Debtors' known creditors will

receive direct notice of the commencement of these Chapter 11 Cases.

---

[4]     Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of
these orders, however, are available on request.

52.     Finally, changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtors' estates and would not confer any benefit upon those dealing with the Debtors.  For these reasons, the Debtors request that they be authorized to use their existing Business Forms without being required to place the label "Debtor in Possession" (or any similar label) on each.  As noted above, the Debtors will make reasonable best efforts to ensure that, within a reasonable period of time after the Petition Date, subsequently issued checks bear the designation "Debtor in Possession" and their joint case number.  However, printing such designation may involve significant technical difficulties.  Accordingly, the Debtors request relief from compliance with such requirement for thirty (30) days and request that any order be without prejudice to their right to seek additional relief from, or time to comply with, such requirement.

53.     This Court and other courts have routinely granted the same or similar relief as requested in this Motion to chapter 11 debtors.  See, e.g., In re Dendreon Corp., Case No. 14-12515 (LSS) (Bankr. D. Del. Dec. 9, 2014); In re Exide Techs., Case No. 13-11482 (KJC) (Bankr. D. Del. July 24, 2013); In re Synagro Techs., Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. Apr. 25, 2013).[5]  The Debtors respectfully submit that such relief should be granted here.

**D.      The Court Should Authorize the Debtors to Continue Intercompany Transactions and Grant Administrative Expense Priority Status to the Related Intercompany Claims.**

54.     The Bankruptcy Code affords debtors in possession the freedom to obtain unsecured credit and incur unsecured debt in the ordinary course of business without notice and hearing.  See 11 U.S.C. § 364(a); see also Mulligan v. Sobiech, 131 B.R. 917, 921 (S.D.N.Y.

---

[5]     Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders, however, are available on request.

1991).  The Debtors therefore seek authority, to the extent necessary, to obtain unsecured credit and incur unsecured debt in the ordinary operation of their Cash Management System, including in connection with Intercompany Transactions.

55.    If the Debtors cannot continue the Intercompany Transactions, the Debtors' ordinary-course operations would be unnecessarily and severely hindered.  As described above, the cessation of the Intercompany Transactions would cause a debilitating disruption in the day-to-day operation of the Company's global operations, to the detriment of the Debtors and their estates and creditors.  Accordingly, if the Intercompany Transactions cannot continue, the likelihood of a successful reorganization would decrease dramatically.  Avoiding such potentially crippling hindrances by continuing the Intercompany Transactions is, therefore, in the best interests of the estates.

56.    Furthermore, the Debtors' failure to continue the Intercompany Transactions consistent with the Cash Management System and past practices may impair the ability of the Company's non-Debtor affiliates to meet their obligations, and the value of those non-Debtor affiliates, both generally and to the Debtors, may decline.

57.    Accordingly, the Debtors request that the Court authorize the Debtors to continue engaging in Intercompany Transactions in the ordinary course of business and in connection with their continued use of the Cash Management System.  As with the Cash Management System, authorizing the Debtors to continue the Intercompany Transactions is appropriate under sections 363(b) or 363(c) of the Bankruptcy Code and is an appropriate exercise of the Court's equitable powers under section 105(a) of the Bankruptcy Code.  See, e.g., In re Gen. Growth Props., 412 B.R. 609, 610 (Bankr. S.D.N.Y. 2009) (holding that debtors were authorized to continue prepetition cash management practices, including intercompany

transactions, pursuant to sections 105(a) and 363(c) of the Bankruptcy Code); Charter, 778 F.2d at 621 (indicating that order authorizing continued use of cash management system that involved funds transfers to non-debtor affiliates was "entirely consistent" with section 363(c)(1) because the practice was "usual and customary in the past").

58.    Additionally, pursuant to sections 105(a) and 503(b) of the Bankruptcy Code, the Debtors request that all intercompany claims against a Debtor by another Debtor or a non-Debtors subsidiary arising postpetition, in the ordinary course of business, as a result of an Intercompany Transaction (such postpetition claims, the "Intercompany Claims") be granted administrative expense priority status.  If the Intercompany Claims are accorded administrative expense priority status, each entity utilizing funds that flow through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby protecting the interests of the Debtors' creditors.

59.    Authorization to engage in, and accordance of administrative expense treatment to, intercompany transactions, similar to the relief requested here, is routinely granted in complex chapter 11 cases.  See, e.g., In re Synagro Techs., Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. Apr. 24, 2013); In re WP Steel Venture LLC, No. 12-11661 (KJC) (Bankr. D. Del. Jun. 1, 2012); In re Satelites Mexicanos, S.A. de C.V., No. 11-11035 (CSS) (Bankr. D. Del. Apr. 11, 2011).[6]

60.    For the reasons set forth above, the Debtors submit that the relief requested in this Motion is in the best interest of the Debtors, their estates, creditors, stakeholders and other parties in interest, and therefore, should be granted.

---

[6]    Because of the voluminous nature of the orders cited herein, they are not attached to the Motion.  Copies of these orders, however, are available on request.

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

61.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the court instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh, 235 F. App'x 907, 910 (3d Cir. 2007) (citing Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977)).  Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated.  See, e.g., Acierno v. New Castle County, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

62.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates.  Accordingly, the Debtors

respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

63.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365; or (e) otherwise affect the Debtors' rights under Bankruptcy Code section 365 to assume or reject any executory contract with any party subject to this Motion.

## NOTICE

64.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' postpetition secured loan facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan facility; (d) the agent for the Debtors' prepetition senior secured notes; (e) the agent for the Debtors' prepetition senior unsecured notes; (f) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases; and (g) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).  The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

65.     No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:   Wilmington, Delaware
         September 9, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Z. Li (*pro hac vice admission pending*)
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

John K. Lyons (*pro hac vice admission pending*)
Jessica S. Kumar (*pro hac vice admission pending*)
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel for Debtors and Debtors in Possession*

# EXHIBIT A

**Cash Management System Flow Chart**

Quiksilver, Inc., *et al.*
Cash Management Diagram for US Legal Entities



# **EXHIBIT B**

**List of Bank Accounts**

| DEBTOR | BANK | ACCOUNT TYPE | ACCOUNT NUMBER |
|---|---|---|---|
| Quiksilver, Inc. | Bank of America, N.A. | Operating Account | x7023 |
| Quiksilver, Inc. | Bank of America, N.A. | Receipts Account | x5012 |
| QS Retail, Inc. | Bank of America, N.A. | Receipts Account | x5074 |
| DC Shoes, Inc. | Bank of America, N.A. | Receipts Account | x5130 |
| QS Wholesale, Inc. | Bank of America, N.A. | Receipts Account | x5050 |
| Quiksilver, Inc. | Bank of America, N.A. | Check Disbursement Account | x5290 |
| QS Wholesale, Inc. | Bank of America, N.A. | Check Disbursement Account | x5308 |
| QS Retail, Inc. | Bank of America, N.A. | Check Disbursement Account | x5340 |
| DC Shoes, Inc. | Bank of America, N.A. | Check Disbursement Account | x5316 |
| Quiksilver, Inc. | Bank of America, N.A. | Payroll Account | x5017 |
| QS Wholesale, Inc. | Bank of America, N.A. | Payroll Account | x5055 |
| QS Retail, Inc. | Bank of America, N.A. | Payroll Account | x5079 |
| QS Wholesale, Inc. | N/A | Lockbox | P.O. Box 749340 |
| DC Shoes, Inc. | N/A | Lockbox | P.O. Box 749337 |
| QS Wholesale, Inc. | Bank of America, N.A. | Inactive Account | x2754 |
| DC Shoes, Inc. | Bank of America, N.A. | Inactive Account | x5135 |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                  :

In re:                           :    Chapter 11
                  :

QUIKSILVER, INC., *et al.*,       :    Case No. 15-11880 (___)
                  :

            Debtors.[1]    :    (Jointly Administered)
                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER GRANTING DEBTORS' MOTION FOR ORDER PURSUANT TO
BANKRUPTCY CODE SECTIONS 105(a), 345(b), 363, AND 503(b), BANKRUPTCY
RULES 6003 AND 6004 AND LOCAL BANKRUPTCY RULE 2015-2 (I) AUTHORIZING
CONTINUED MAINTENANCE OF PREPETITION BANK ACCOUNTS AND
PAYMENT OF RELATED PREPETITION OBLIGATIONS, (II) AUTHORIZING
CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (III)
AUTHORIZING CONTINUED USE OF EXISTING BUSINESS FORMS, AND
IV) AUTHORIZING THE CONTINUATION OF, AND ACCORDANCE OF
ADMINISTRATIVE EXPENSE PRIORITY STATUS TO,
<ins>INTERCOMPANY TRANSACTIONS</ins>**

Upon the motion (the "<u>Motion</u>")[2] of the Debtors for an order, pursuant to sections

105(a), 345(b), 363, and 503(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"),

Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"),

and Local Bankruptcy Rule 2015-2 (i) authorizing, but not directing, the Debtors to continue to

maintain existing bank accounts, authorizing a waiver of certain operating guidelines relating to

bank accounts, and authorizing, but not directing, the payment of related prepetition obligations;

(ii) authorizing, but not directing, the Debtors to continue to use their existing Cash Management

System; (iii) authorizing, but not directing, the Debtors to continue to use existing Business

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Forms; and (iv) authorizing the continuation of certain Intercompany Transactions, and

accordance of administrative expense priority status to related postpetition Intercompany Claims;

and upon the First Day Declaration; and due and sufficient notice of the Motion having been

given under the particular circumstances; and it appearing that no other or further notice need be

provided; and it appearing that the relief requested by the Motion is in the best interests of the

Debtors, their estates, their creditors, their stakeholders, and other parties in interest; and after

due deliberation thereon, and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED that:**

1.    The Motion is GRANTED as set forth herein.

2.    Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the

Debtors, in their discretion, are authorized, but not directed, to (i) designate, maintain, and

continue to use any and all of their Bank Accounts in existence as of the Petition Date, with the

same account numbers, including the accounts identified in <u>Exhibit B</u> annexed to the Motion,

and need not comply with certain operating guidelines relating to bank accounts set forth in the

U.S. Trustee Guidelines, including but not limited to section 2(a) of the U.S. Trustee Guidelines;

(ii) close existing accounts, including, without limitation, any inactive accounts; and (iii) treat the

Bank Accounts for all purposes as accounts of the Debtors in their capacity as debtors in

possession; <u>provided</u>, <u>however</u>, that the Debtors are only authorized to open new bank accounts

(a) after providing prompt notice to any official committee appointed in these Chapter 11 Cases

and the agents for the Debtors' postpetition secured financing facilities (the "<u>DIP Facilities</u>" and

such agents, the "<u>DIP Agents</u>"); (b) with a bank that (x) is organized under the laws of the

United States of America or any state therein, (y) is insured by the FDIC, and (z) has executed,

or is willing to immediately execute, a Uniform Depository Agreement with the Office of the

United States Trustee for the District of Delaware; (c) that are designated "Debtor in Possession" accounts by the relevant bank, and (d) in accordance with the DIP Facilities.

3.    The relief granted in this order is extended to any new bank account opened by the Debtors after the date hereof, which account shall be deemed a Bank Account, and to the bank at which such account is opened.  To the extent the Debtors open or close bank accounts, they shall provide notice within ten (10) business days of opening or closing such bank accounts to the United States Trustee, any official committee appointed in these Chapter 11 Cases, and DIP Agents.

4.    Within two (2) days from the date of entry of this order, the Debtors shall (a) contact the Banks; (b) provide the Banks with each of the Debtors' employer identification numbers; and (c) identify each of their accounts held at the Banks as being held by a debtor in possession.

5.    The requirements of the U.S. Trustee Guidelines that the Debtors close all existing bank accounts and open new debtor-in-possession accounts are hereby waived.  Further, the requirements of the U.S. Trustee Guidelines that the Debtors establish specific bank accounts for tax payments are hereby waived.

6.    The Bank Accounts are deemed debtor in possession accounts.  The Debtors are authorized, but not directed, to maintain and use the Bank Accounts in the same manner and with the same account numbers, styles, and document forms as those employed prior to the Petition Date, including, without limitation:  (a) to deposit funds in, and withdraw funds from, the Bank Accounts by all usual means, including checks, wire transfers, automated clearinghouse ("ACH") transfers, drafts, electronic fund transfers, and other debits or items presented issues or drawn on the Bank Accounts, (b) to pay postpetition ordinary course bank

fees and service fees in connection with the Bank Accounts, (c) to perform their obligations under the documents and agreements governing the Bank Accounts, including without limitation, any prepetition cash management agreements or treasury services agreements (d) to treat the Bank Accounts for all purposes as accounts of the Debtors in their capacities as debtors in possession.

7.        The Banks are authorized without the need for further order of this Court to:  (a) continue to administer, service, and maintain, the Bank Accounts as such accounts were administered, serviced, and maintained prior to the Petition Date, without interruption and in the ordinary course, (b) receive, process, honor, and pay any and all checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts (collectively, the "Disbursements") on account of a claim, and (c) debit the Bank Accounts for all undisputed prepetition bank and service fees outstanding as of the date hereof, if any, owed to the Banks; provided, however, that no checks, drafts, wires, or electronic fund transfers (excluding any electronic fund transfers that the Banks are obligated to settle), or other items presented, issued, or drawn on the Bank Accounts prior to the Petition Date shall be honored, unless (i) authorized by order of this Court; (ii) not otherwise prohibited by a "stop payment" request received by the Banks from the Debtors; and (iii) supported by sufficient funds in the Bank Account in question.

8.        Subject to the provisions of this Order, the Banks are authorized to and shall rely on the representations of the Debtors as to which Disbursements are authorized to be honored or dishonored, whether or not such Disbursements are dated prior to, on, or subsequent to the Petition Date, and whether or not the Banks believe the payment is authorized by an order of the Court.  The Banks shall not be deemed in violation of this Order and shall have no liability

for honoring any Disbursement that is subject to this Order either (a) at the direction of the

Debtors to honor such prepetition Disbursement, (b) in the good faith belief that the Court has

authorized such prepetition Disbursement to be honored, or (c) as a result of an innocent mistake.

To the extent that the Debtors direct that any Disbursement be dishonored or the Banks

inadvertently dishonor any Disbursements, the Debtors may issue replacement Disbursements

consistent with the orders of this Court.

9.      The Banks are further authorized to (a) honor the Debtors' directions with

respect to the opening or closing of any Bank Account and (b) accept and hold, or invest, the

Debtors' funds in accordance with the Debtors' instructions, and the Banks shall have no liability

to any party for relying on such representations or instructions.

10.      To the extent any other order is entered by this Court authorizing the

Banks to honor checks, drafts, automated clearing house transfers, or other electronic funds

transfers or any other withdrawals made, drawn, or issued in payment of prepetition claims, the

obligation to honor such items shall be subject to this Order, provided, however, that,

notwithstanding anything to the contrary contained herein, any payment to be made, or

authorization contained, hereunder shall be subject to the requirements imposed on the Debtors

under any approved order regarding the use of cash collateral or post-petition financing and any

budget in connection therewith.

11.      The Debtors shall serve a copy of this order on the Banks within two (2)

business days of the entry of this Order, and upon any bank at which the Debtors open a new

bank account, immediately upon the opening of such new account.

12.      The Debtors are authorized to continue to use their existing Cash

Management System.  The Debtors may transfer funds into, out of, and through the Cash

Management System, using ordinary transfer methods in accordance with the Debtors'

prepetition practice.  In connection with the ongoing utilization of their Cash Management

System, the Debtors shall continue to maintain records with respect to all transfers of cash so that

all transactions may be readily ascertained, traced, and recorded properly.  Except as otherwise

set forth herein, the Debtors are further authorized to implement any changes to the Cash

Management System that they deem appropriate in their sole discretion, including, without

limitation, closing Bank Accounts or opening new bank accounts as set forth herein.

13.    The Debtors are authorized, but not directed, to pay and/or reimburse their

Banks and service providers in the ordinary course of business for any Cash Management Claims

arising prior to or after the Petition Date.  The Cash Management Claims shall be granted

administrative expense priority status pursuant to section 503(b) of the Bankruptcy Code.

14.    The Debtors are authorized, but not directed, to continue to use their

existing Business Forms without alteration or change and without the designation "Debtor in

Possession" imprinted upon them; provided, however, that, within thirty (30) days following the

Petition Date, subsequently issued checks bear the designation "Debtor in Possession" and their

joint case number; provided further that the foregoing shall be without prejudice to the Debtors'

right to seek further relief from this requirement or additional time to comply.

15.    The Debtors are authorized to continue engaging in Intercompany

Transactions in the ordinary course of business, including transferring funds to non-Debtor

subsidiaries through the Cash Management System.  The Intercompany Claims arising

postpetition relating to the Intercompany Transactions shall have administrative expense priority

status pursuant to section 503(b) of the Bankruptcy Code (or such greater priority as may be

granted in connection with the DIP ABL Facility).

16.     Notwithstanding the Debtors' use of a consolidated cash management system, the Debtors shall calculate quarterly fees payable under 28 U.S.C. § 1930(a)(6) based on the disbursements of (or on behalf of) each Debtor regardless of which entity actually makes such disbursements.

17.     To the extent applicable, the Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

18.     Notwithstanding Bankruptcy Rule 6004(h), this order shall be effective and enforceable immediately upon entry hereof.

19.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this order.

Dated:  Wilmington, Delaware
          _____, 2015


_____
UNITED STATES BANKRUPTCY JUDGE