## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :

In re:                          :     Chapter 11

                               :

QUIKSILVER, INC., *et al.*,     :     Case No. 15-11880 (___)

                               :

             Debtors.[1]     :     (Joint Administration Pending)

                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN  POSTPETITION FINANCING ON A SUPER-PRIORITY, SENIOR SECURED  BASIS AND (B) USE CASH COLLATERAL, (II) GRANTING (A) LIENS AND  SUPER-PRIORITY CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in

possession (collectively, the "Debtors" and, together with their non-Debtor affiliates,

"Quiksilver" or the "Company") in the above-captioned cases, hereby move the Court (the

"Motion") for entry of an interim order on an expedited basis (the "Interim Order") substantially

in the form annexed hereto, and following a final hearing to be set by the Court, entry of a final

order (the "Final Order," and together with the Interim Order, the "DIP Orders"), pursuant to

sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy

Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

"Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing the Debtors to obtain secured postpetition superpriority financing and use cash collateral on an interim and final basis pursuant to the terms and conditions of (i) that certain *Senior Secured Super-Priority Debtor-in-Possession Credit Agreement*, substantially in the form attached hereto as Exhibit A (the "DIP Term Loan Credit Agreement"), by and among QS Wholesale, Inc., as borrower (the "DIP Term Loan Borrower"), ZQK, as parent, the Debtors, as guarantors (the "DIP Term Loan Obligors"), Oaktree FIE, LLC (together with its affiliates, "Oaktree") as Administrative Agent (the "DIP Term Loan Agent"), and the lenders from time to time party thereto (the "DIP Term Loan Lenders"), and (ii) that certain *Second Amended and Restated and Senior Secured Super-Priority Debtor-in-Possession Credit Agreement*, substantially in the form attached hereto as Exhibit B[2] (the "DIP ABL Credit Agreement" and together with the DIP Term Loan Credit Agreement the "DIP Credit Agreements" and the financing provided thereby, the "DIP Financing"), by and among QS Wholesale, Inc., DC Shoes, Inc., Hawk Designs, Inc., QS Retail, Inc. (the "DIP ABL Domestic Borrowers," and together with the DIP Term Loan Borrower, the "DIP Borrowers"), Quiksilver Canada Corp., Ug Manufacturing Co. Pty Ltd, and Quiksilver Japan Co., Ltd. (collectively, the "DIP ABL Foreign Borrowers"), each of the Debtors, as guarantors (the "DIP ABL Obligors" and together with the DIP Term Loan Obligors, the "DIP Obligors"), Bank of America, N.A. ("BofA"), as Administrative Agent, Collateral Agent and L/C Issuer (the "DIP ABL Agent" and together with the DIP Term Loan Agent, the "DIP Agents") and as Lender (the

---

[2]    Filing of the DIP ABL Credit Agreement is not to be construed as a commitment to lend.  The final credit agreement will be filed with the Court when available.

"DIP ABL Lender" and together with the DIP Term Loan Lenders, the "DIP Lenders").[3]  In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., in Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration") and the Declaration of Durc A. Savini in Support of the Motion (the "Savini Declaration"), each filed concurrently herewith. In further support of the Motion, the Debtors, by and through their proposed undersigned counsel, respectfully represent as follows:

## OVERVIEW

1.      By this Motion, the Debtors seek entry of the Interim Order, which:

   a.      approves the DIP Term Loan Credit Agreement, pursuant to which the DIP Term Loan Lenders are providing a debtor-in-possession term loan credit facility (the "DIP Term Loan Facility") of up to $115,000,000.00, subject to an $70,000,000 borrowing limit on an interim basis pending entry of the Final Order;

   b.      approves the DIP ABL Credit Agreement, pursuant to which the DIP ABL Lender is providing a debtor-in-possession asset-based revolving loan credit facility (the "DIP ABL Facility" and together with the DIP Term Loan Facility, the "DIP Facilities") in an aggregate maximum principal amount of up to the lesser of $60,000,000 or the Borrowing Base (as defined below);

   c.      authorizes the Debtors to execute the DIP Credit Agreements and all other agreements, documents, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Agent and Lenders, including, without limitation, all Loan Documents (as defined in the DIP Credit Agreements) each as amended and in effect from time to time (collectively with the DIP Credit Agreements, the "DIP Term Documents" or the "DIP ABL Documents," as applicable, and together, the "DIP Documents"), and to perform such other acts as may be necessary or desirable in connection therewith;

   d.      grants to the DIP Term Loan Agent valid, automatically perfected, and enforceable priming liens upon substantially all of the Debtors' assets to

---

[3]      Capitalized terms not defined herein shall have the meanings ascribed to them in the DIP Credit Agreements and the DIP Orders, as applicable.

the extent set forth in the DIP Term Documents and the Interim Order (the "DIP Term Loan Liens") to secure the obligations owing under the DIP Term Loan Credit Agreement and the Interim Order (collectively, the "DIP Term Loan Obligations"), with the priority further set forth herein;

e.    grants the DIP ABL Agent valid, automatically perfected, and enforceable priming liens upon substantially all of the Debtors' assets to the extent set forth in the DIP ABL Documents and the Interim Order (the "DIP ABL Liens" and together with the DIP Term Loan Liens, the "DIP Liens") to secure the obligations of the DIP ABL Obligors owing under the DIP ABL Credit Agreement and the Interim Order (collectively, the "DIP ABL Obligations" and together with the DIP Term Loan Obligations, the "DIP Obligations"), including the guarantee of the DIP ABL Foreign Obligations (as defined below), with the priority further set forth herein;

f.    grants allowed superpriority administrative expense claims for all DIP Term Loan Obligations to the DIP Term Loan Lenders, subject to the Carve Out (as defined herein), to the extent set forth in the Interim Order;

g.    grants allowed superpriority administrative expense claims for all DIP ABL Obligations to the DIP ABL Lenders, subject to the Carve Out, to the extent set forth in the Interim Order;

h.    authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code ("Cash Collateral") in which the Prepetition Notes Secured Parties and the Prepetition ABL Secured Parties (each as defined below) assert an interest;

i.    grants the Prepetition Notes Secured Parties certain adequate protection for any decrease from and after the Petition Date in the value of their respective interests in the Debtors' property resulting from (i) the use, sale or lease of the Debtors' property (including the use of Cash Collateral), (ii) the subordination to the Carve Out and the DIP Liens, or (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, including, among other things, replacement claims and liens and superpriority administrative expense claims (with the priority set forth herein and in the Interim Order), all to the extent provided in the Interim Order;

j.    until any period for the challenge of the prepetition claims and liens under the Prepetition ABL Credit Agreement has expired and, if a challenge is filed,  such claims are determined to be fully secured claims, grants the Prepetition ABL Secured Parties certain adequate protection for any decrease from and after the Petition Date in the value of their respective interests in the Debtors' property resulting from (i) the use, sale or lease of the Debtors' property (including the use of Cash Collateral), (ii) the subordination to the Professional Fee Carve Out and the DIP Liens, or (iii)

the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, including, among other things including, as follows: replacement claims and liens, superpriority administrative expense claims (with the priority set forth herein and in the Interim Order), and a funded escrow account to secure any contingent indemnification obligations under the Prepetition ABL Credit Agreement, all to the extent provided in the Interim Order;

k.      grants authority for the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, the reasonable and documented fees and disbursements of the DIP Agents' and the DIP Lenders' attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the DIP Documents;

l.      modifies and grants relief from the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreements and the Interim Order;

m.      approval of the Milestones (as defined below);

n.      waives any applicable stays under the Bankruptcy Rules, including, without limitation, under Rule 6004(h) of the Bankruptcy Rules, and provide for the immediate effectiveness of the Interim Orders; and

o.      schedules a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, to consider entry of the Final Orders granting the relief requested in this Motion on a final basis.

## JURISDICTION

2.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, and 364 of title 11 of the Bankruptcy Code. Such relief is also warranted under Rules 2002, 4001 and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Rules.

4.      Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

5.      On September 9, 2015 (the "<u>Petition Date</u>"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "<u>Chapter 11 Cases</u>").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

6.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      To date, no creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "<u>United States Trustee</u>").  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

8.      Quiksilver is one of the world's leading outdoor sports lifestyle companies.  The Company designs, develops and distributes branded apparel, footwear, accessories and related products.  The Company began operations in 1976 making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, BMX, and motocross, among other activities. The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores),

Company-owned retail stores, and its e-commerce websites.  The Debtors comprise each of the Company's U.S. entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc., and seven inactive entities.

9.    Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

## PREPETITION SECURED INDEBTEDNESS

10.    As of the Petition Date, the Debtors had secured indebtedness pursuant to the Prepetition ABL Facility and the U.S. Secured Notes.

11.    The Prepetition ABL Credit Facility. On May 24, 2013, QS Wholesale entered into a secured $230 million asset-based revolving credit facility (the "Prepetition ABL Facility"), pursuant to that certain Amended and Restated Credit Agreement (as amended, amended and restated, modified, supplemented, or restated and in effect from time to time, the "ABL Credit Agreement")[4] among, inter alia, QS Wholesale, DC Shoes, QS Retail, and Hawk Designs, Inc. ("Hawk Designs"), as borrowers (together, the "Prepetition Domestic ABL Borrowers")[5], Quiksilver Canada Corp., Ug Manufacturing Co. Pty Ltd, and Quiksilver Japan Co., Ltd. (together, the "Prepetition Foreign ABL Borrowers")[6] and other borrowers from time to time party thereto, as borrowers; several banks and other financial institutions or entities from time to time party thereto as lenders (the "Prepetition ABL Lenders"); guarantors from time to time party thereto as guarantors; and BofA and General Electric Capital Corporation, as co-

---

[4]    Any summary of an agreement in this Declaration is qualified in its entirety by the terms of that agreement.

[5]    Aggregate commitments to the Prepetition Domestic ABL Borrowers under the Prepetition ABL Facility total $160 million.

[6]    Aggregate commitments to Prepetition Foreign ABL Borrowers under the Prepetition  ABL Facility total $70 million.

collateral agent (together with BofA, the "<u>Prepetition ABL Agents</u>" and together with the Prepetition ABL Lenders, the "<u>Prepetition ABL Secured Parties</u>").

12.    The Prepetition Domestic ABL Borrowers' obligations under the Prepetition ABL Credit Agreement (the "<u>Prepetition Domestic ABL Obligations</u>") are (i) guaranteed by certain of the Debtors (collectively, the "<u>Prepetition Domestic ABL Guarantors</u>"), (ii) secured by liens and security interests on substantially all of the assets of the Prepetition Domestic ABL Guarantors, and (iii) secured by (a) pledges in all shares of capital stock, limited liability company membership interests, and other equity interests held by ZQK, QS Wholesale, and DC Shoes, (b) dividends, cash, instruments, and other property from time to time received or distributed in respect of such interests, (c) rights and privileges with respect to such interests, and (d) proceeds of the foregoing (the security interests in clauses (ii) and (iii), the "<u>Prepetition ABL Liens</u>" and the collateral to which they attach, the "<u>Prepetition ABL Collateral</u>").

13.    The Prepetition Foreign ABL Borrowers' obligations under the Prepetition ABL Credit Agreement (the "<u>Prepetition Foreign ABL Obligations</u>") are (i) guaranteed by the Prepetition Domestic ABL Guarantors, along with Quiksilver Canada Corp., QS Retail Canada Corp., Ug Manufacturing Co. Pty Ltd, and Quiksilver Japan Co., Ltd. (collectively, the "<u>Prepetition Foreign ABL Guarantors</u>"), (ii) secured by (a) the same collateral as the Prepetition Domestic ABL Obligations and (b) substantially all of the assets of Prepetition Foreign ABL Borrowers.

14.    As of the Petition Date, Quiksilver had approximately $92 million outstanding under the Prepetition ABL Facility comprised of $68 million on account of Prepetition Domestic ABL Borrowers and Guarantors and $24 million on account of Prepetition Foreign ABL Borrowers and Guarantors.

15.     The Prepetition ABL Facility has been further amended and restated and will continue postpetition as the DIP ABL Facility in conjunction with the filing of these Chapter 11 Cases and the Debtors seek approval to continue such facility postpetition, as set forth herein, to provide working capital during the cases.  The terms of and the benefits to the Debtors from the DIP ABL Facility are set forth in detail below.

16.     The Prepetition Secured Notes. Pursuant to an Indenture (the "Prepetition Secured Notes Indenture") dated July 16, 2013, among, inter alia, U.S. Bank, N.A., as trustee and collateral agent (the "Prepetition Secured Notes Trustee and Collateral Agent"), and the Prepetition Secured Notes Obligors (as defined below), ZQK and QS Wholesale (together, the "Prepetition Secured Notes Issuers") issued $280 million aggregate principal amount of 7.875% senior secured notes with a maturity date of August 1, 2018 (the "Prepetition Secured Notes" and the holders thereof, the "Prepetition Secured Noteholders" and together with the Prepetition Secured Notes Trustee and Collateral Agent, the "Prepetition Notes Secured Parties").

17.     The Prepetition Secured Notes are guaranteed by DC Shoes, Hawk Designs, and QS Retail (the "Prepetition Secured Notes Guarantors" and together with the Prepetition Secured Notes Issuers, the "Prepetition Secured Notes Obligors"). In addition, the Prepetition Secured Notes are secured by liens, security interests, and/or pledges (the "Prepetition Secured Noteholder Liens" and the collateral to which they attach, the "Prepetition Secured Notes Collateral") in (i) substantially all of the assets of the Prepetition Secured Notes Obligors, (ii) all shares of capital stock, limited liability company membership interests, and other equity interests held by ZQK, QS Wholesale, and DC Shoes (the "Prepetition Secured Notes Pledgors") in each of the Debtors, other than ZQK, (iii) all non-voting equity interests and 65% of all voting equity interests of the Prepetition Secured Notes Pledgors in Mountain &

Wave S.a.r.l. ("Mountain and Wave"), a non-Debtor foreign subsidiary, and (iv) all dividends, cash, instruments, and other property from time to time received or distributed in respect of the interests described in (ii) and (iii), and (v) proceeds of the foregoing.  Mountain and Wave is a holding company which owns, directly or indirectly, all of the other Non-Debtor Affiliates.

18.     As of the Petition Date, the Prepetition Secured Notes had an outstanding principal balance of approximately $279 million.

19.     The Prepetition ABL Agent and the Prepetition Secured Notes Trustee and Collateral Agent entered into the Second Amended and Restated Intercreditor Agreement, dated as of July 16, 2013 (the "Prepetition Intercreditor Agreement").  Pursuant to the Intercreditor Agreement, to the extent that the collateral securing obligations under the Prepetition Secured Notes also secures the borrowers' obligations under the Prepetition ABL Facility, the Prepetition Secured Notes are secured by (i) a second-priority security interest, behind the ABL Lenders, in the current assets of the Prepetition Secured Notes Obligors (including cash, inventory and receivables), together with all general intangibles (excluding intellectual property rights) and other property related to such assets, including proceeds (the "ABL Priority Collateral"), and (ii) (a) a first-priority security interest, ahead of the Prepetition ABL Lenders, in substantially all other property (including intellectual property rights) of the Prepetition Secured Notes Obligors and (b) a pledge, ahead of the ABL Lenders, of 100% of the equity interests of certain subsidiaries directly owned by the Prepetition Secured Notes Obligors (but excluding the equity interests in certain foreign subsidiaries) and proceeds of the foregoing ((i) and (ii) collectively, the "Term Priority Collateral").

## EVENTS LEADING TO THE DIP FINANCING

20.     As detailed in its public filings, the Company has been in the midst of an operational turnaround since 2013.  Unfortunately, in the meantime, the Company has suffered

from a lack of adequate liquidity exacerbated by underperforming retail stores and substandard delivery of product to wholesale customers.  The Company's weakened performance during the turnaround period caused further contraction of trade liquidity, and the Company was required to hasten its efforts.  Since the spring, the Company explored a range of alternatives to loosen liquidity in order to allow the operational turnaround initiatives to take hold, but those efforts did not result in an actionable transaction.  As explained in more detail below, ultimately, Oaktree, a substantial holder of the Company's U.S. Secured Notes as well as a holder of the Company's Euro Notes, expressed interest in helping the Company de-lever the balance sheet and preserve value among its foreign subsidiaries through the pursuit of a chapter 11 plan.

21.     In May of 2013, the Company announced a multi-year profit improvement plan (the "Multi-Year Turnaround Plan") designed to accelerate the Company's three fundamental strategies of strengthening its brands, growing sales, and improving operational efficiencies. The new strategy was designed to focus the Company on its three core brands, globalize key functions, and reduce cost structure. The Company's previous organizational structure, which was decentralized with each of its Americas segment, Europe, Middle East and Africa ("EMEA") segment and Asia/Pacific ("APAC") segment operating primarily independently, created a fragmented enterprise with regional brand inconsistencies, suboptimal coordination and limited the Company's ability to take advantage of its global scale. In response to these challenges, the senior management team, with assistance from outside consultants, completed a thorough review of the Company's global operations to determine the best path for sustainable cost savings and profitable growth.

22.     Notwithstanding these efforts, in the first fiscal quarter of 2015, the Company reported a net loss, following softer revenue results, year over year from 2014,

although gross margin remained largely flat.  Specifically, the Company, like many others with a major distribution center located in the western US, suffered the impact of the Los Angeles port labor dispute during the early months of 2015.  In addition, although the Company's EMEA operation performed relatively consistently over the same period, the Company's overall results did not reflect this favorable performance due to the impact of currency exchange rates between the euro and the US dollar (in which currency the Company's results are reported).

23.    While management continued to execute and refine the Multi-Year Turnaround Plan, the Company continued to face liquidity challenges, particularly in the U.S.  In order to support management's efforts to address liquidity issues, the board of directors formed the Strategy Review Committee (the "SRC"), a subcommittee of the board.  Among other things, the SRC recommended that the Company retain Peter J. Solomon Company ("PJSC") as investment banker to explore and advise the SRC and the Company with respect to all range of strategic alternatives.

24.    Among other things, following preliminary due diligence, and given our deep background with the Company in connection with prior engagements, we recommended that the Company explore a global refinancing of existing indebtedness at the Company's full board meeting on June 13, 2015.  The purpose of the global refinancing was to supplement the Company's liquidity and address the €200 Euro Notes December 15, 2017 maturity. PJSC initiated contact with parties interested in refinancing the Euro Notes and supplemented the process with outreach to well-recognized second lien lenders to explore the possibility of providing further advances under the borrowing base collateral within the existing ABL credit facility.

25.     With respect to refinancing the Euro Notes,[7] PJSC identified 19 potential sources of financing, of which eight executed confidentiality agreements.  Of those, PJSC engaged in more advanced discussions with two.  Ultimately, as negotiations evolved, Oaktree committed a significant level of resources to the process and engaged in a deep level of due diligence with management in multiple Company offices worldwide.

26.     With respect to expanding the Prepetition ABL Facility, PJSC evaluated structures to provide the Company with incremental liquidity under the existing borrowing base. The alternatives included seeking a first-in-last-out ("FILO") loan structure as well as a second or subordinated lien on the existing borrowing base.  PJSC engaged in more detailed discussions and negotiations with two leading FILO lenders who executed confidentiality agreements. Ultimately, the two lenders declined to continue in the process due to their view of the insufficient loan to value ration.  PJSC continued efforts to develop this liquidity source up to and including a potential structure of the proposed DIP Facilities.

27.     In mid-August, Oaktree advised the Company that it was prepared to execute a refinancing transaction but only if all of the Company's global intellectual property and brands (the "IP") was among the collateral securing such financing.  Unfortunately, the Company's existing indebtedness made such a refinancing impossible, absent the ability to restructure such indebtedness available in chapter 11.  At this point, PJSC had reached out to a number of parties to solicit interest in the global refinancing and Oaktree was the only investment firm to come forth with a viable term sheet.  Due to a lack of viable out of court

---

[7]     "Euro Notes"  means the 8.875% senior notes issued pursuant to that certain Indenture dated December 10, 2010, among, inter alia,  Boardriders S.A., a non-Debtor foreign affiliate, as issuer, Deutsche Trustee Company Limited, as trustee, Deutsche Bank Luxembourg S.A., as registrar and transfer agent, Deutsche Bank AG, London Branch, as principal paying agent and common depositary, and certain of the Debtors and their non-Debtor affiliates as guarantors.

alternatives and given the Company's estimated liquidity runway, the Company and its advisors immediately engaged with Oaktree regarding the possibility of executing the refinancing and restructuring transaction in the context of a chapter 11 case, as a continuation of the parallel contingency planning efforts that the Company had begun in July 2015.  Those negotiations culminated in the DIP Financing and the Plan Sponsor Agreement (the "PSA"), dated as of September 8, 2015 among ZQK, on behalf of the Debtors, and Oaktree.

28.    The PSA.  The foundation for the Debtors' proposed reorganization is the proposed conversion of the Prepetition Secured Notes into equity of the reorganized Debtors pursuant to the PSA executed with Oaktree and related transactions that will result in a significant de-levering of the Debtors' balance sheet.  More specifically, the PSA contemplates that Oaktree will provide the Debtors with up to $175 million in postpetition financing, as described in more detail below.  In the next few weeks, the Debtors and Oaktree will finalize the terms of a plan of reorganization (a "Sponsored Plan") and accompanying disclosure statement to implement the PSA.

29.    In the early stages of negotiations with Oaktree, Oaktree confirmed that it would be willing to provide postpetition financing sufficient to support a plan process.  The Company, working with their financial advisor, developed a chapter 11 budget to delineate the Company's financing needs for such a process.

30.    The DIP Financing.  After it became clear that Oaktree and the Debtors would be unable to execute a refinancing transaction out of court, the Debtors explored the potential for an in-court transaction.  PJSC contacted multiple potentially interested parties, but Oaktree was an obvious party with whom to negotiate because (a) Oaktree held a large position in the Debtors' U.S. Secured Notes; (b) Oaktree had already performed a substantial level of due

14

diligence; and (c) Oaktree was sophisticated in the context of the chapter 11 process and could therefore be responsive to the Debtors' need to execute on a transaction promptly.

31.     In the early stages of negotiations with Oaktree, Oaktree confirmed that it would be willing to provide postpetition financing sufficient to support a plan process.  The Company, working with their financial advisor, developed a chapter 11 budget to delineate the Company's financing needs for such a process.

32.     As a part of its contingency planning process, the Debtors, through its investment bankers at PJSC, solicited proposals for bankruptcy financing from a number of parties, including the Prepetition ABL Lenders, Oaktree and other parties that had participated in discussions with the Debtors in potential refinancing of the Euro Notes, and other financial institutions.  An important consideration for the Debtors for any postpetition financing was to have sufficient funding for a plan of reorganization, as the Debtors had determined that preserving its EMEA operations (and the Euro Notes) would maximize the value of its global enterprise.  While PJSC reached out to a number of parties to solicit interest in leading or participating in debtor in possession financing, no parties provided a term sheet or indication of interest for such a financing given the complexity of the collateral structure and the need to commit to debtor in possession financing in the short term given the Company's liquidity position.

33.     The Prepetition ABL Facility is comparable to a traditional asset-based revolver where borrowings are subject to a borrowing base, limited by specific advance rates which vary by collateral type.  Given the Debtors' liquidity profile, however, it quickly became evident that a postpetition ABL would be insufficient for its needs for financing to support an entire chapter 11 plan process.

34. As noted above, Oaktree was willing to provide sufficient financing for the plan process, but the initial pricing offered by Oaktree was near the high end of the range of market for comparable DIP proposals, as explained in the Savini Declaration. Accordingly, PJSC and the Debtors negotiated with Oaktree and other market participants to develop a more competitive DIP proposal.

35. After much dialogue, the Debtors and PJSC were successful in forging a collaborative DIP proposal by both Bank of America, one of the ABL Lenders, and Oaktree, in a transaction whereby the Debtors would enjoy a lower blended cost of funds.

36. As further set forth below and in the Savini Declaration, the Debtors believe that the DIP Facilities presented by the DIP Lenders represents the best option for the Debtors to maximize the value of their estates under the circumstances. Absent these arrangements, the Debtors are expected to run out of cash within a matter of weeks, would not be able to pay critical vendors, and would likely be required to liquidate.

## NEED FOR THE DIP FACILITIES
## AND CONTINUED USE OF CASH COLLATERAL

37. The Debtors have an urgent and immediate need to obtain postpetition financing. The Debtors do not have sufficient funds on hand or generated from their business to fund operations. Without the postpetition financing and the use of cash collateral that will be provided under the DIP Credit Agreements and the proposed DIP Orders, the Debtors would not be able to maintain operations pending confirmation of a plan of reorganization that will maximize value for all constituents. The proposed DIP Facilities not only satisfy the Debtors' postpetition financing needs, but also ensure financing for the Debtors' businesses upon emergence from chapter 11 through a backstopped rights offering upon confirmation of a Plan.

38.     Without the proposed DIP Credit Facilities and access to Cash Collateral, the Debtors will not have sufficient liquidity to operate their business, fund their ordinary course expenditures, including paying their over 1500 employees, or pay the expenses necessary to administer the Chapter 11 Cases.   The Debtors also require post-petition letters of credit. The Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on the operation of their business without additional financing.   The Debtors also require post-petition letters of credit. In sum, the Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on the operation of their business without additional financing.

39.     Absent adequate funding, the Debtors may be required to close their stores prematurely, lose valuable wholesale accounts, otherwise cease operations, and liquidate on a piecemeal basis, causing irreparable harm to the Debtors and their estates. Accordingly, the Debtors have an urgent and immediate need for the DIP FacilitIES and entry of the Interim Order.

40.     As set forth above and in the Savini Declaration, the Debtors have sought and were unable to obtain financing from other sources on terms preferable to the proposed DIP FacilitIES.

41.     Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the DIP Credit Agreement and hereby request authority to obtain such financing in compliance with the proposed DIP Orders.

## CONCISE STATEMENT OF RELIEF REQUESTED

42.     In accordance with Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-2, below are summaries of the terms of the DIP Term Loan Credit Agreement and the DIP ABL Credit Agreement.

## A.     DIP Term Loan Facility[8]

| (a) | DIP Term Loan Borrower: | QS Wholesale, Inc.<br><br>(*See* Preamble of the DIP Term Loan Credit Agreement; Introduction to the Interim Order) |
|---|---|---|
| (b) | DIP Term Loan Guarantors: | Each of the Debtors other than the DIP Term Loan Borrower<br><br>(*See* Preamble of the DIP Term Loan Credit Agreement; Introduction to the Interim Order) |
| (c) | DIP Term Loan Agent | OCM FIE, LLC<br><br>(*See* Preamble of the DIP Term Loan Credit Agreement; Introduction to the Interim Order) |
| (d) | DIP Term Loan Lender: | OCM Big Wave, LLC and such other entities as may be party from time to time as lenders<br><br>(*See* signature pages of the DIP Term Loan Credit Agreement) |
| (e) | Type and Amount of DIP Facility: | A superpriority, priming term loan in an aggregate principal amount of up to $115,000,000.<br><br>(*See* § 1.1 (definitions of "Aggregate Commitments") of the DIP Term Loan Credit Agreement) |
| (f) | Interim Availability | Upon or within one Business Day after entry of the Interim Order, the DIP Term Loan Lenders shall make loans in the amount of $60,000,000 (the "Interim Order Date Term Loan").<br><br>During the Period from the date of the Interim Order Date Term Loan until entry of the Final Order, an additional $10,000,000 shall be available upon request.<br><br>(*See* §§ 1.1 (definitions of "Interim Order Period Cap Amount," "Interim Order Date Term Loan Amount"), 2.1 of the DIP Term Loan Credit |

---

[8]     The summaries of the terms and conditions of the DIP Term Loan Credit Agreement and the DIP Orders set forth in this Motion are intended solely for informational purposes and are qualified in their entirety by the DIP Term Loan Credit Agreement and the DIP Orders. In the event there is any conflict between this Motion and the DIP Orders, the DIP Orders will control in all respects. Capitalized terms used in the following chars but not defined therein have the meanings set forth in the DIP Term Loan Credit Agreement or the Interim Order, as applicable.

| | | |
|---|---|---|
| | | Agreement; Introduction to the Interim Order) |
| (g) | Full Availability | An additional up to $25,000,000 (the "Supplemental Term Loans") shall be available upon request for purposes not contemplated by the Budget with the consent of the Required Lenders.<br><br>(*See* § 1.1 (definitions of "Supplemental Term Loan" and "Supplemental Term Loan Conditions") of the DIP Term Loan Credit Agreement) |
| (h) | Use of Proceeds & Cash Collateral | The DIP Term Loan Facility shall be used to provide for: (i) to finance transaction fees, costs and expenses related hereto, (ii) to finance ongoing debtor-in-possession working capital purposes consistent with the Budget[9] (within Permitted Variances), (iii) for the purposes of making any adequate protection payments, (iv) to make intercompany loans to, and other Investments in, the Guarantors and, other Subsidiaries, solely to the extent permitted hereunder, and (v) in accordance with the terms of the Orders, for other general corporate purposes of the Loan Parties and their Subsidiaries, in each case to the extent not prohibited under applicable Law and the DIP Term Documents (including without limitation Bankruptcy Court-approved professional fees and other administrative fees arising in the Cases).<br><br>(*See* § 6.12 of the DIP Term Loan Credit Agreement) |
| (i) | DIP Liens | To provide security for the repayment of all obligations of the Debtors under the DIP Term Documents, each of the Debtors will provide to the DIP Term Loan Agent (for the benefit of the DIP Term Loan Lenders) the following (as more fully described in the DIP Term Loan Credit Agreement):<br><br>(i)  pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in all assets of the Debtors, now or hereafter acquired and all proceeds thereof, other than Excluded Assets (as defined in the DIP Term Loan Credit Agreement) and assets constituting ABL Priority Collateral;<br><br>(ii)  pursuant to section 364(c)(3) of the Bankruptcy Code, junior liens on and security interests in the ABL Priority Collateral (now or hereafter acquired and all proceeds thereof); provided, that such liens on the ABL Priority Collateral shall be junior in priority and subordinate to the DIP ABL Liens, and senior in priority to any other lien on the ABL Priority Collateral (including, without limitation, the Prepetition Secured Noteholder Liens) securing any other indebtedness of the Debtors; and<br><br>(iii)  **pursuant to section 364(d) of the Bankruptcy Code, first priority priming liens on and security interests in the Term Priority Collateral (now or hereafter acquired and all proceeds thereof); provided, that such liens on the Term Priority Collateral shall be senior in priority to the Prepetition Secured** |

---

[9]  The Budget is attached hereto as Exhibit C.

| | | |
|---|---|---|
| | | **Noteholder Liens and the DIP ABL Liens on the Term Priority Collateral**;<br><br>provided, further, that, **upon entry of the Final Order, the DIP Term Liens shall attach to and encumber the proceeds from the claims and causes of action under chapter 5 of the Bankruptcy Code and similar laws (collectively, the "<u>Avoidance Actions</u>"), including property received by judgment, settlement or otherwise**. The collateral to which such DIP Term Liens attach is referred to herein as the , the "DIP Term Collateral"; provided, that (i) the DIP Term Liens in respect of any Avoidance Actions shall rank equally in priority and share on a pro rata basis with the DIP ABL Liens.<br><br>(*See* Preamble of the DIP Term Loan Credit Agreement; ¶ 6(a) of the Interim Order) |
| (j) | Superpriority Claim | In addition to the liens and security interests granted to the DIP Term Agent on its behalf and on behalf of the DIP Term Lenders pursuant to the Interim Order, subject and subordinate to the Carve-Out and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the DIP Term Obligations shall constitute allowed superpriority administrative expense claims (the "<u>DIP Superpriority Claims</u>") with priority over any and all administrative expenses of the Debtors, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code; provided, that (i) the DIP Superpriority Claims in respect of the DIP Term Facility and the DIP Superpriority Claims in respect of the DIP ABL Credit Facility shall rank equally in priority and share on a pro rata basis (based on the outstanding principal amount of the DIP Term Loan Facility on the one hand, and the DIP ABL Facility on the other hand) with respect to all amounts payable in respect of such superpriority administrative expense claims, and (ii) upon the entry of the Final Order, the DIP Superpriority Claims shall attach to the proceeds of the Avoidance Actions.<br><br>(*See* Preamble of the DIP Term Loan Credit Agreement; ¶ 8 of the Interim Order) |
| (k) | Conditions Precedent to Interim Term Loan Lending: | The making of the Interim Order Date Term Loan is subject to the satisfaction of the following conditions precedent:<br><br>(i)   The execution and/or delivery (as applicable) of customary definitive documentation (including, without limitation, the DIP Term Documents),  opinions, closing certificates, lien and other searches, Budget and other customary documents with respect to the DIP Term Loan Facility, in each case, satisfactory to DIP Term Loan Agent;<br><br>(ii)   The appointment and continued employment of a chief restructuring officer (the "<u>CRO</u>") acceptable to DIP Lender (it being agreed that FTI Consulting, Inc. is acceptable);<br><br>(iii)   The Boardriders Waiver shall be in full force and effect;<br><br>(iv)   The Debtors shall have paid all reasonable and documented costs, |

|  |  | fees, disbursements and expenses of the DIP ABL Agent; |
|---|---|---|
|  |  | (v) The DIP Term Loan Lenders shall have received confirmation of the outstanding balances in respect of the Prepetition ABL Facility and evidence satisfactory to the DIP ABL Agent confirming that all indebtedness under the Prepetition ABL Facility will be repaid in full from the proceeds of the Interim Order Date Term Loan and the DIP ABL Facility and all liens upon any of the Debtors' or their subsidiaries' property in favor of the Prepetition ABL Secured Parties shall become DIP ABL Liens; |
|  |  | (vi) All "first day" motions and proposed orders shall be acceptable to the Required Lenders; |
|  |  | (vii) The Interim Order shall provide for the DIP Term Loan Liens as set forth herein; |
|  |  | (viii) The DIP Term Loan Lenders shall have received the Budget, which shall be in form and substance satisfactory to the Required Lenders; |
|  |  | (ix) The Petition Date shall have occurred on or before a specified date; |
|  |  | (x) The Interim Order shall have been filed on or before a specified date; |
|  |  | (xi) The Prepetition Notes Secured Parties shall have received adequate protection in respect of the liens securing their prepetition obligations; and |
|  |  | (xii) such other conditions as are usual and customary for debtor-in-possession credit facilities of this type. |
|  |  | (*See* § 4.1(n) of the DIP Term Loan Credit Agreement) |
| (l) | Milestones | The Debtors will be required to meet the following milestones in connection with the bankruptcy cases: |
|  |  | (i) On the Petition Date, the Debtors shall file a motion seeking approval of the Court for the expense reimbursement set forth in the PSA (the "Plan Sponsor Protections"); |
|  |  | (ii) The Interim Order shall have been entered within 2 Business Days of the Petition Date; |
|  |  | (iii) The Debtors shall file a Sponsored Plan together with the accompanying disclosure statement (the "Disclosure Statement"), plan solicitation materials and motion seeking Court approval of the Disclosure Statement within 30 days after the Petition Date; |
|  |  | (iv) The Debtors shall file a motion seeking approval of the Bankruptcy Court to the backstop agreement term sheet described in the PSA (the "Backstop Agreement") within 30 days after the Petition Date; |
|  |  | (v) The Final Order shall have been entered on or before the date that is 30 days after the Petition Date; |
|  |  | (vi) An order approving the Plan Sponsor Protections and Backstop |

<table>
<tr><td></td><td></td><td>Agreement shall have be on or before the date that is 30 days after the Petition Date;</td></tr>
<tr><td></td><td></td><td>(vii)  An order approving the Disclosure Statement as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code shall be entered within 75 days after the Petition Date;</td></tr>
<tr><td></td><td></td><td>(viii)  An order approving the Backstop Agreement within 75 days after the Petition Date;</td></tr>
<tr><td></td><td></td><td>(ix)  An order confirming a Sponsored Plan (the "<u>Confirmation Order</u>") shall be entered within 115 days of the Petition Date, in form and substance acceptable to OCM Big Wave, LLC, together with all exhibits, appendices, plan supplement documents and any related documents; and</td></tr>
<tr><td></td><td></td><td>(x)  The effective date of a Sponsored Plan shall occur within 120 days following the date of the Confirmation Order</td></tr>
<tr><td></td><td></td><td>(collectively, the "<u>DIP Term Loan Milestones</u>").</td></tr>
<tr><td></td><td></td><td>(<i>See</i> § 8.1(u) of the DIP Term Loan Credit Agreement)</td></tr>
<tr><td>(m)</td><td><u>DIP Term Loan Maturity Date and Termination Date:</u></td><td>The DIP Term Loan Facility matures on the date that is 150 days after the Petition Date (the "<u>DIP Term Loan Maturity Date</u>").<br><br>Availability under the DIP Term Loan Credit Agreement shall terminate on the earliest of (a) the DIP Term Loan Maturity Date, (b) acceleration of the obligations under the DIP Term Loan Facility due to the occurrence of an Event of Default, (c) conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (d) dismissal of any of the Chapter 11 Cases, (e) the effective date of any Obligor's plan of reorganization confirmed in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, and (f) repayment in full of the DIP Term Loan Facility and the termination of the commitments thereunder (the "<u>Termination Date</u>").<br><br>On the Termination Date, the Debtors shall repay the aggregate principal amount of the DIP Term Loans made to the Debtors and outstanding on such date, together with all interest and fees related thereto.<br><br>(<i>See</i> §§ 1.1 (definition of "Maturity Date", "Availability Period", "Termination Date"), 2.7 of the DIP Term Loan Credit Agreement)</td></tr>
<tr><td>(n)</td><td><u>Termination Fee:</u></td><td>The Debtors shall pay to the DIP Term Loan Agent on the Termination Date, for distribution to the DIP Term Loan Lenders, a fee (the "<u>Termination Fee</u>") equal to $2,300,000; provided that the Termination Fee shall not be payable if (x) the Termination Date occurs due to the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (y) the Termination Date occurs on or after the effective date of a Sponsored Plan.<br><br>(<i>See</i> §§ 1.1 (definition of "Termination Amount"), 2.9 of the DIP Term Loan Credit Agreement)</td></tr>
</table>

| (o) | Interest Rate: | 12% per annum<br><br>(*See* §§ 1.1 (definition of "Applicable Rate"), 2.8 of the DIP Term Loan Credit Agreement) |
|---|---|---|
| (p) | Default Interest Rate | During the continuance of an Event of Default, DIP Term Loans will bear interest at an additional 2% per annum.<br><br>(*See* §§ 1.1 (definition of "Default Rate"), 2.8 of the DIP Term Loan Credit Agreement) |
| (q) | Prepayments | The Debtors may, upon irrevocable notice to the DIP Term Loan Agent, at any time or from time to time voluntarily prepay DIP Term Loans in whole or in part without premium or penalty (other than, as applicable, the Termination Fee). In addition, the Debtors shall prepay the DIP Term Loans made to each of them in an amount equal to the Net Proceeds received by a Loan Party on account of a Prepayment Event. In each case, amounts prepaid may not be reborrowed.<br><br>"Prepayment Event" means<br><br>(i)    any Disposition of property or assets of a Debtor other than Permitted Dispositions;<br><br>(ii)    any casualty, expropriation or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of a Loan Party generating Net Proceeds in excess of $1,000,000, unless the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the applicable Agent; or<br><br>(iii)    the incurrence by a Debtor of any Indebtedness for borrowed money other than Permitted Indebtedness.<br><br>(*See* §§ 1.1 (definition of "Prepayment Event"), 2.5 of the DIP Term Loan Credit Agreement) |
| (r) | Events of Default | Events of default under the DIP Term Loan Credit Agreement (each an "Event of Default") include, without limitation, the following:<br><br>(i)    failure to pay interest, principal or fees when due under the DIP Term Loan Facility;<br><br>(ii)    failure to perform or observe any term, covenant or agreement contained in any of section 6.1 (Financial Statement), 6.2 (Certificates; Other Information), 6.3 (Notices), 6.5(a) (Preservation of Existence), 6.11 (Inspection Rights), 6.12 (Use of Proceeds), 6.13 (Additional Loan Parties), 6.19 (Use of Property; Rejection and Assumption of Contracts; Post-Filing Pleadings), 6.21 (Additional Information Obligations), or Article VII (Negative Covenants);<br><br>(iii)    failure to perform or observe any other covenant or agreement in the DIP Term Documents and such failure continues for 30 days |

after notice thereof;

(iv)    any representation or warranty found to be materially incorrect;

(v)    (a) (1) failure to make any payment when due in respect of any Material Indebtedness incurred after the Petition Date or (2) failure to perform or observe any other covenant or agreement in respect of such Material Indebtedness, the effect of which is to cause or to permit the holders of such Material Indebtedness to cause such Indebtedness to be demanded or to become due if such failure is unremedied and is not waived, or (b) (1) failure to make any payment when due respect of the Euro Notes or (2) failure to perform or observe any other covenant or agreement in respect of the Euro Notes, the effect of which is to cause or to permit the holders of such Euro Notes to cause the Euro Notes to be demanded or to become due prior to their stated maturity, (c) (1) failure to make any payment when due in respect of the DIP ABL Facility or (2) failure to perform or observe any other covenant or agreement in respect of the DIP ABL Facility, the effect of which is to cause or to permit the holders or the agent of the DIP ABL Facility (x) to cause the DIP ABL Facility to be demanded or become due prior to its stated maturity or (y) to terminate the commitments under the DIP ABL Facility, or (d) there occurs under any Swap Contract an Early Termination Date (as defined thereunder) resulting from an event of default by any Debtor or its subsidiaries or a Termination Event (as defined under the applicable Swap Contract) for which a Debtor or its subsidiary is the Affected Party (as defined under the applicable Swap Contract) and the Swap Termination Value is greater than $1,000,000 and such failure is unremedied and is not waived by the counterparty to the Swap Contract;

(vi)    the occurrence of any of the following: (a) the Debtors file a plan of reorganization other than a Sponsored Plan, (b) the Debtors file a motion or pleading that is inconsistent with the prosecution of a Sponsored Plan, (c)  the Debtors file a pleading seeking to vacate or modify any of the DIP Orders in a manner adverse to the DIP Term Loan Agent or the DIP Term Loan Agent, (d) entry of an order without the prior consent of the required Lenders amending, supplementing or otherwise modifying any DIP Order in a manner adverse to  the DIP Term Loan Agent or the DIP Term Loan Agent, (e) reversal, vacation or stay of the effectiveness of any Order, (f) any violation of the terms of any Order, (g) dismissal of any of the Cases or conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (h) appointment of a chapter 11 trustee or an examiner with expanded powers (i) the consummation of any sale of all or substantially all assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code, (j) granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on, or any right or remedy with respect to, assets of any Debtor in excess of $1,000,000 in the aggregate, (k) the Debtors' filing of (or supporting another party in

the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated in the DIP Term Loan Credit Agreement) that is senior to or pari passu with the DIP Term Loan Lenders' claims under the DIP Term Documents and the transactions contemplated thereby, except for the Priority Permitted Encumbrances, (l) payment of or granting adequate protection with respect to prepetition debt, other than as expressly set forth in the DIP Orders or the Budget, (m) except (A) as otherwise provided in the Interim Order or the Final Order or (B) as expressly permitted by the PSA or a Sponsored Plan, any of the Debtors seek or if there is entered, an order under section 365 of the Bankruptcy Code rejecting a material lease (i) to which any Debtor is a party, and (ii) that is part of (or whose premises contain any of) the Collateral; or (n) any of the DIP Term Loan Liens or the DIP Term Loan Superpriority Claims cease to be valid, perfected and enforceable in any respect (other than with respect to any Liens granted by any Foreign Subsidiary to any Secured Party under the Loan Documents to the extent that such Liens were permitted to be perfected after the Effective Date);

(vii)   the occurrence of any Variance under the Budget, other than a Permitted Variance;

(viii)  failure of an Acceptable Chief Restructuring Officer to be employed by ZQK at any time; provided that the ZQK shall have five Business Days to engage a replacement;

(ix)    the assertion by any of the Debtors (other than for purposes of disclosure) of any right of subrogation or contribution against any other Debtor prior to the payment in full of the DIP Term Loan Obligations, the DIP ABL Obligations and the Preptition Secured Noteholder Obligations;

(x)     the incurrence of postpetition liabilities by the Debtors or any subsidiary as a result of judgments or decrees (a) in excess of 10,000,000 (to the extent not covered by insurance) or (b) that have or be reasonably expected to have a material adverse effect;

(xi)    the occurrence of certain events or conditions related to ERISA;

(xii)   any provision of any material DIP Term Documents, for any reason other than as expressly permitted or satisfaction in full of all the DIP Term Loan Obligations, ceases to be in full force and effect; or any Debtor contests in any manner the validity or enforceability of any provision of any DIP Term Loan Financing Agreement; or any Debtor denies that it has any or further liability or obligation under any provision of any DIP Term Loan Financing Agreement, or purports to revoke, terminate, repudiate or rescind any provision of any DIP Term Documents or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created thereunder; or (ii) any DIP Term Loan Lien purported to be created under any DIP Term Loan Financing Agreement shall cease to be, or shall be asserted by any Debtor or any subsidiary not to be, a valid and (to the extent required by the DIP Term Loan Financing

Agreement) perfected Lien on any Collateral (other than an immaterial portion of the Collateral), with the priority required by the applicable DIP Term Loan Financing Agreement;

(xiii) the occurrence of a Change of Control;

(xiv) any Debtor shall take any action to suspend the operation of the business of the Debtors, taken as a whole, or liquidate all or a material portion of the assets of the Debtors, taken as a whole;

(xv) any criminal indictment against any Debtor or any subsidiary thereof remains unquashed or undismissed for a period of ninety (90) days or more, unless the DIP Term Loan Agent, in its reasonable discretion, determines that the indictment is not material;

(xvi) the termination, revocation or attempted termination or revocation by any Debtor of its guaranty of the DIP Term Loan Facility except as expressly permitted under the DIP Term Documents;

(xvii) failure to meet any of the Milestones;

(xviii) the exercise of any rights or remedies by any holder of the Euro Notes (or any trustee, agent or representative on behalf of such holder or holders) with respect to any event of default thereunder, or the Boardriders Waiver ceases to be in full force and effect other than pursuant to its terms;

(xix) the restriction, injunction, or prevention by court order of a Debtor or any of its subsidiaries from continuing to conduct all or any material part of their business affairs;

(xx) (a) any challenge by or with the support of any of the Debtors to the validity, perfection, priority, extent or enforceability of any of the Prepetition Secured Note Obligations or the Liens securing the such obligations or (b) any investigation or assertion of any claims or causes of action (or directly or indirectly support assertion of the same) by any of the Debtors against the DIP Term Loan Agent, the DIP Term Loan Lenders, the Prepetition Secured Notes Collateral Trustee and Agent or the Prepetition Secured Noteholders;

(xxi) from and after entry of the Final Order, entry of a Section 506(a) judgment or similar determination with respect to the Prepetition Secured Note Obligations that is unacceptable to the Prepetition Secured Note Trustee and Collateral Agent and the required Prepetition Secured Noteholders; and

(xxii) from and after entry of the Final Order, entry of an order by the Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral

(collectively, the "DIP Term Loan Events of Default").

(See § 8.1 of the DIP Term Loan Credit Agreement)

| (s) | Remedies Upon Event of Default | Notwithstanding anything in section 362 of the Bankruptcy Code, but subject to the DIP Orders, upon the occurrence and during the continuance of any Event of Default, the DIP Term Loan Agent shall, at the request of the Required Lenders, take any or all of the following actions, at the same time or different times, in each case without further order of or application to the Bankruptcy Court (provided, that with respect to the enforcement of Liens or other remedies with respect to the Collateral under clause (d) below, the DIP Term Loan Agent shall provide the Debtors with five Business Days' written notice (with a copy to counsel for any Committee and to the United States Trustee for the District of Delaware) prior to taking the action contemplated thereby: |
|---|---|---|
| | | (i) declare the Commitments of each DIP Term Loan Lender to make any Loans to be terminated, whereupon such Commitments and obligation shall be terminated; |
| | | (ii) declare the unpaid principal amount of all outstanding DIP Term Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtors; |
| | | (iii) whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the DIP Term Loan Agent Lenders under the DIP Term Documents. |
| | | Neither the Debtors, the Committee, nor any other party-in-interest shall have the right to contest the enforcement of such remedies on any basis other than an assertion that an Event of Default has not occurred or has been timely cured. The Debtors waive any right to seek relief under the Bankruptcy Code. |
| | | (*See* § 8.2 of the DIP Term Loan Credit Agreement) |
| (t) | Expenses, Indemnification: | The Debtors shall pay all costs and expenses incurred by the DIP Term Loan Agent and Lenders and their respective Lender affiliates, in connection with this Agreement and the other Loan Documents and the transactions contemplated hereby. |
| | | The Debtors shall indemnify the DIP Term Loan Agent (and any of their sub-agents), each other Secured Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after-tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs and related expenses incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Debtors arising out of, in connection with, or as a result of (among other things): |
| | | (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the |

| | | transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any of their sub-agents) and their Related Parties only, the administration of this Agreement and the other Loan Documents, |
|---|---|---|
| | | (ii)    any Loan or the use or proposed use of the proceeds therefrom, and |
| | | (iii)   any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, |
| | | except where resulting from the Indemnitee's gross negligence or willful misconduct or bad faith.<br><br>(See § 10.4 of the DIP Term Loan Credit Agreement) |
| (u) | Representations and Warranties | The DIP Term Loan Credit Facility shall include representations usual and customary for similar debtor-in-possession financings of this type, with such additions and modifications as the DIP Term Loan Agent may deem necessary as a result of the filing of the Chapter 11 Cases.<br><br>(See Article 5 of the DIP Term Loan Credit Agreement) |
| (v) | Covenants: | The DIP Term Documents contain affirmative and negative covenants customary and appropriate for similar debtor-in-possession financings of this type and other negative covenants reasonably deemed by the DIP Term Loan Agent to be appropriate to the specific transaction and where appropriate, subject to agreed materiality thresholds, carve-outs and exceptions.<br><br>(See Articles 6-7 of the DIP Term Loan Credit Agreement) |
| (w) | Compliance with Budget | Except as otherwise provided or approved by the Required Lenders, directly or indirectly (i) use any cash or the proceeds of any DIP Term Loans in a manner or for a purpose other than those consistent with the DIP Term Loan Agreement, the DIP Orders and the Budget (within Permitted Variances related thereto), (ii) permit a disbursement causing any variance other than Permitted Variances without the prior written consent of the Required Lenders or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments authorized by the Bankruptcy Court.<br><br>"Permitted Variance" means a Variance from the Budget on a cumulative basis tested on a weekly basis (the "Testing Period") commencing with the Petition Date, which Variance (i) is not more than 10% with respect to cumulative total operating receipts to the Budget for such Testing Period and (ii) is not more than 10% more than the cumulative Total Disbursements in the Budget for such Testing Period (without giving effect to the making of DIP Term Loans or DIP ABL Loans or the repayments or prepayments of DIP Term Loans or DIP ABL Loans) on a cumulative basis to the Budget; provided, however, that the first such Variance with respect to clauses (i) and (ii) will be tested after the end of the third full calendar week after the Petition Date.<br><br>Prior to the occurrence of an Event of Default, the Debtors shall be permitted |

| | | |
|---|---|---|
| | | to pay compensation and reimbursement of fees and expenses solely to the extent that such fees and expenses are in accordance with the Budget (within Permitted Variances) and authorized to be paid under Sections 330 and 331 of the Bankruptcy Code pursuant to an order of the Bankruptcy Court, as the same may be due and payable. Upon receipt of the Carve-Out Trigger Notice, the right of the Debtors to pay professional fees outside the Carve-Out shall terminate, and the Debtors shall provide immediate notice to all professionals informing them that such notice was delivered and further advising them that the Debtors' ability to pay such professionals is subject to and limited by the Carve-Out.<br><br>(*See* §§ 1.1 (definition of "Permitted Variance"), 7.19 of the DIP Term Loan Credit Agreement) |
| (x) | Voting: | "Required Lenders" means, as of any date of determination, the DIP Term Loan Lenders holding more than fifty percent (50%) of the Aggregate Commitments then in effect and the aggregate unpaid principal amount of Term Loans then outstanding or, if the Commitment of each DIP Term Loan Lender to make Loans have been terminated pursuant to Section 8.2, the DIP Term Loan Lenders holding in the aggregate more than 50% of the aggregate unpaid principal amount of the Loans then outstanding.<br><br>(*See* § 1.1 (definition of "Required Lenders") of the DIP Term Loan Credit Agreement) |

## B.    DIP ABL Facility[10]

| | | |
|---|---|---|
| (a) | DIP ABL Borrowers: | QS Wholesale, Inc., DC Shoes, Inc., Hawk Designs, Inc., and QS Retail, Inc. (collectively, the "US Borrowers")<br><br>(*See* Preamble of DIP ABL Credit Agreement; Introduction to the Interim Order) |
| (b) | DIP ABL Foreign Borrowers: | Quiksilver Canada Corp., Ug Manufacturing Co. Pty Ltd, and Quiksilver Japan Co., Ltd.<br><br>(*See* p. Preamble of the DIP ABL Credit Agreement; Introduction to the Interim Order) |
| (c) | DIP ABL Guarantors: | Each of the Debtors<br><br>(*See* Preamble of the DIP ABL Credit Agreement; Introduction to the Interim Order) |
| (d) | DIP ABL Agent | Bank of America, N.A., as Administrative Agent and Collateral Agent.<br><br>(*See* Preamble of the DIP ABL Credit Agreement; Introduction to the Interim Order) |

---

[10]    The summaries of the terms and conditions of the DIP ABL Credit Agreement and the DIP Orders set forth in this Motion are intended solely for informational purposes and are qualified in their entirety by the DIP ABL Credit Agreement and the DIP Orders.  Capitalized terms used in the following chars but not defined therein have the meanings set forth in the DIP ABL Credit Agreement or the Interim Order, as applicable.

| (e) | DIP ABL Lender: | Bank of America, N.A. <br><br> (See Preamble of the DIP ABL Credit Agreement; Introduction to the Interim Order) |
|-----|-----------------|---------------------------------------------------------------|
| (f) | Letter of Credit Issuer: | Bank of America, N.A. and any of its branches or affiliates <br><br> (See Preamble of the DIP ABL Credit Agreement; Introduction to the Interim Order) |
| (g) | Type and Amount of DIP Facility: | The DIP Credit Facility shall consist of a $60,000,000 senior secured superpriority revolving credit facility (the commitments thereunder, the "Revolving Commitments" and the loans thereunder, the "Revolving Loans"), which will include a $40,000,000 sublimit for the issuance of standby and documentary letters of credit (each a "Letter of Credit"). All letters of credit issued and outstanding under the Prepetition ABL Credit Agreement shall be deemed issued under the DIP ABL Facility. <br><br> (See § 1.01 (Definitions of "Aggregate Domestic Commitments" and "Domestic Letter of Credit Sublimit") of the DIP ABL Credit Agreement; Introduction to the Interim Order) |
| (h) | Availability: | Revolving Loans and Letters of Credit (subject to the Letter of Credit sublimit set forth above) under the DIP ABL Facility may be made from time to time from the Closing Date through the Maturity Date on a revolving basis up to the lesser of (i) $60,000,000 (as such amount may be reduced as provided in the DIP ABL Credit Agreement) minus the Foreign Liability Reserve, and (ii) the Borrowing Base (the lesser of (i) and (ii) being hereafter referred to as the "Loan Cap"). <br><br> The "Borrowing Base" shall be equal to the sum, at the time of calculation of (a) 70% of the face amount of Eligible Credit Card Receivables of the US Borrowers; plus (b) 70% of the appraised net orderly liquidation value at cost of Eligible Inventory (other than Eligible In-transit Inventory) of the US Borrowers multiplied by the cost of such inventory; plus (c) 70% of the face amount of Eligible Trade Receivables owned by the US Borrowers (net of Receivable Reserves applicable thereto); plus (d) the lesser of (i) $27,750,000 and (ii) the sum of (x) 70% of the appraised net orderly liquidation value at cost of Eligible In-transit Inventory of the US Borrowers multiplied by the cost of such inventory, and (y) with respect to any Eligible Letter of Credit, 70% of the appraised net orderly liquidation value at cost of the Inventory of the US Borrowers supported by such Eligible Letter of Credit multiplied by the cost of such inventory when completed (net of applicable reserves), minus (e) a reserve equal to the Professional Expense Carve Out (defined below); minus (f) the aggregate of (i) the Foreign Liability Reserve, minus (g) other reserves established by the Agent from time to time in its sole discretion. <br><br> The definitions of "Eligible Trade Receivables," "Eligible Inventory," "Eligible In-transit Inventory", "Eligible Credit Card Receivables", "Eligible GSI Consignment Inventory", and "Eligible Letter of Credit" shall be substantially the same as those definitions set forth in the Prepetition ABL Credit Agreement, except as otherwise provided. <br><br> "Foreign Liability Reserve" shall mean an amount equal to the sum of the |

| | | |
|---|---|---|
| | | outstanding loans and outstanding letters of credit issued for the Japanese Borrower, the Canadian Borrower and the Australian Borrower (each as defined in the Prepetition ABL Credit Agreement) under the Prepetition ABL Credit Agreement and the DIP ABL Credit Facility.<br><br>(*See* § 1.01 (Definitions of "Domestic Borrowing Base" and "Foreign Liability Reserve") of DIP Term Loan Credit Agreement) |
| (i) | Use of Proceeds | The proceeds of the Revolving Loans shall be used to finance: (i) the repayment of certain indebtedness under the Prepetition ABL Credit Agreement (other than the Japanese Liabilities and it being agreed that any letters of credit issued for the account of the Prepetition Domestic ABL Obligations shall be deemed issued under the DIP ABL Credit Facility), including, without limitation, the Prepetition Foreign ABL Obligations owed to General Electric Capital Corporation and its affiliates ("<u>GE Capital</u>") and Wells Fargo Bank, National Association and its affiliates ("<u>Wells Fargo</u>"), (ii) the payment of transaction expenses, (iii) the payment of fees, expenses and costs incurred in connection with the Chapter 11 Cases, (iv) the payment of any adequate protection payments approved in the Interim Order or Final Order, and (v) working capital, capital expenditures, and other general corporate purposes of the Debtors.<br><br>(*See* § 6.12 of the DIP ABL Credit Agreement)<br><br>In particular, the payment to GE Capital and Wells Fargo shall be made by means of an intercompany loan of the proceeds of the DIP ABL Credit Agreement (the "<u>Interim Order Intercompany Loan</u>") to Quiksilver Japan Co., Ltd., a DIP ABL Foreign Borrower, which Interim Order Intercompany Loan shall be used to repay in full the Prepetition DIP ABL Obligations of Wells Fargo and GE Capital.<br><br>(*See* § 1.01 (Definitions of "Interim Order Intercompany Loan"); ¶ 3 of the Interim Order) |
| (j) | DIP ABL Foreign Obligations | Following the Interim Order Intercompany Loan, only the Prepetition DIP ABL Obligations of BofA shall remain outstanding.  These obligations shall become obligations under the DIP ABL Credit Agreement (the "<u>DIP ABL Foreign Obligations</u>").<br><br>(*See* ¶ 3 of the Interim Order) |
| (k) | DIP Liens | To provide security for the repayment of all obligations of the Debtors under the DIP ABL Documents, including the guarantee of the DIP ABL Foreign Obligations, each of the Debtors will provide to the DIP ABL Agent (for the benefit of the DIP ABL Lender) the following (as more fully described in the DIP ABL Credit Agreement):<br><br>(i)   pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in all assets of the Debtors, now or hereafter acquired and all proceeds thereof, other than Excluded Assets (as defined in the DIP ABL Credit Agreement) and assets constituting Term Priority Collateral;<br><br>(ii)   pursuant to section 364(c)(3) of the Bankruptcy Code, junior liens |

<table>
<tr>
<td colspan="2"></td>
<td>

on and security interests in the Term Priority Collateral (now or hereafter acquired and all proceeds thereof); provided, that such liens on the Term Priority Collateral shall be junior in priority and subordinate to the DIP Term Liens, and senior in priority to any other lien on the Term Priority Collateral (including, without limitation, the Secured Notes Liens) securing any other indebtedness of the Debtors, including the Prepetition Secured Noteholder Liens; and

(iii)   **pursuant to section 364(d) of the Bankruptcy Code, first priority priming liens on and security interests in the ABL Priority Collateral (now or hereafter acquired and all proceeds thereof); provided, that such liens on the ABL Priority Collateral shall be senior in priority to the DIP Term Liens and the Secured Notes Liens on the ABL Priority Collateral**;

provided, further, that, **upon entry of the Final Order, the DIP ABL Liens shall attach to and encumber the proceeds of Avoidance Actions, including property received by judgment, settlement or otherwise**; provided, further, that (i) the DIP ABL Liens in respect of any Avoidance Actions shall rank equally in priority and share on a pro rata basis with the DIP Term Liens.  The collateral to which the DIP ABL Liens attach is referred to herein as the "<u>DIP ABL Collateral</u>" (together with the DIP Term Collateral, the "<u>DIP Collateral</u>"), and in all instances shall be subject to the terms of the Postpetition Intercreditor Agreement.

(S*ee* Preliminary Statements of DIP ABL Credit Agreement; ¶ 6(b) of the Interim Order)

</td>
</tr>
<tr>
<td>(l)</td>
<td><u>Foreign Liens</u></td>
<td>

The DIP ABL Foreign Obligations shall be secured by the DIP ABL Liens and shall continue to be secured by the liens on the collateral of the Prepetition Foreign ABL Borrowers securing  the Prepetition Foreign ABL Obligations.

(S*ee* ¶ 3 of the Interim Order)

</td>
</tr>
<tr>
<td>(m)</td>
<td><u>Superpriority Claims</u></td>
<td>

In addition to the liens and security interests granted to the DIP ABL Agent on behalf of the DIP ABL Lenders pursuant to the Interim Order, subject and subordinate to the Carve-Out and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the DIP Term Obligations and the DIP ABL Obligations shall constitute allowed DIP Superpriority Claims with priority over any and all administrative expenses of the Debtors, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726 (to the extent permitted by law), 1113, 1114 or any other provisions of the Bankruptcy Code; provided, that (i) the DIP Superpriority Claims in respect of the DIP Term Facility and the DIP Superpriority Claims in respect of the DIP ABL Credit Facility shall rank equally in priority and share on a pro rata basis (based on the outstanding principal amount of the DIP Term Facility on the one hand, and the DIP ABL Facility on the other hand) with respect to all amounts payable in respect of such superpriority administrative expense claims, and (ii) upon the entry of the Final Order, the DIP Superpriority Claims shall attach to the proceeds of the Avoidance Actions.

</td>
</tr>
</table>

| | | |
|---|---|---|
| | | (*See* Preliminary Statements of DIP ABL Credit Agreement; ¶ 8 of the Interim Order) |
| (n) | <u>Conditions Precedent to Closing and Initial Extension of Credit</u>: | The closing and the initial extension of credit under the DIP ABL Credit Facility will be subject to satisfaction of the conditions precedent deemed appropriate by the Agent in its reasonable discretion, including, but not limited to, the following: |

(i)     The negotiation, execution and delivery of definitive documentation with respect to the DIP ABL Credit Facility satisfactory to the DIP ABL Agent, including, without limitation, the DIP Intercreditor Agreement.

(ii)    The appointment and continued employment of a CRO acceptable to DIP ABL Lenders (it being agreed that FTI Consulting, Inc. is acceptable);

(iii)   The Boardriders Waiver shall be in full force and effect;

(iv)    All accrued fees and expenses of the DIP ABL Agent (including the fees and expenses of counsel (including any local counsel) for the Agent) shall have been paid;

(v)     The DIP ABL Agent shall have received a Borrowing Base Certificate from each DIP ABL Borrower;

(vi)    Entry of the Interim Order approving the DIP ABL Facility and the DIP Term Loan Facility and the Debtors shall have received proceeds from a borrowing under the DIP Term Loan Facility of $60,000,000;

(vii)   The Interim Order will provide that the DIP ABL Agent for the DIP ABL Lenders has valid and perfected Lien on the DIP ABL Collateral as set forth herein;

(viii)  The DIP ABL Agent shall have received a Budget reasonably acceptable to the DIP ABL Agent;

(ix)    All "first day" motions and proposed orders shall be reasonably acceptable to the Agent;

(xiii)  The Petition Date shall have occurred on or before a specified date;

(xiv)   The Interim Order shall have been filed on or before a specified date;

(xv)    The Prepetition ABL Secured Parties, shall have received adequate protection in respect of the Liens securing the Prepetition ABL Obligations and ABL Indemnity Obligations (as defined in the Orders), including among other things (i) replacement claims and liens, and (ii) a superpriority administrative expense claim against all Debtors, in each case junior only to the Liens and superpriority administrative expense claims under this Agreement granted and approved under the Orders; and

(x)     The Prepetition Secured Noteholders shall have each received adequate protection in respect of the liens securing the Prepetition

| | | |
|---|---|---|
| | | Secured Note Obligations, as applicable, including among other things (i) replacement claims and liens, and (ii) a superpriority administrative expense claim against all Debtors junior only to superpriority administrative expense claims under this Agreement.<br><br>(*See* § 4.02 of the DIP ABL Credit Agreement) |
| (o) | <u>Conditions Precedent to Extensions of Credit After the Closing Date</u> | Additional extensions of credit under the DIP ABL Credit Facility will be subject to satisfaction of the conditions precedent usual and customary for transactions of this type.<br><br>(*See* § 4.02 of the DIP ABL Credit Agreement) |
| (p) | <u>Milestones</u> | The Debtors will be required to meet the following milestones in connection with the bankruptcy cases:<br><br>(i)    The Interim Order shall have been entered within 2 Business Days of the Petition Date;<br><br>(ii)    The Final Order shall have been entered on or before the date that is 30 days after the Petition Date;<br><br>(iii)    A Sponsored Plan together with the accompanying disclosure statement pursuant to section 1125 of the Bankruptcy Code, plan solicitation materials and motion seeking approval of the Bankruptcy Court to the Disclosure Statement shall have been filed within 30 days of the Petition Date;<br><br>(iv)    An order approving the Disclosure Statement as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code shall be entered within 75 days after the Petition Date;<br><br>(v)    within 30 days after the Petition Date, the Domestic Loan Parties shall have filed a motion requesting, and within 75 days after the commencement of Chapter 11 Cases, shall have obtained, an order of the Bankruptcy Court extending the time period of the Domestic Loan Parties to assume or reject leases to not less than 210 days from the Petition Date;<br><br>(vi)    The effective date of a Sponsored Plan shall occur within 120 days following the date of the Confirmation Order<br><br>(collectively, the "<u>DIP ABL Milestones</u>" and together with the DIP Term Loan Milestones, the "<u>Milestones</u>").<br><br>(*See*  § 8.01(z) of the DIP ABL Credit Agreement) |
| (q) | <u>DIP ABL Maturity Date and Termination</u>: | The DIP ABL Facility matures on the date that is 150 days after the Petition Date (the "<u>DIP ABL Maturity Date</u>").<br><br>All obligations under the DIP ABL Credit Facility, accrued or otherwise, shall be due and payable in full on the earliest of (i) 150 days after the Petition Date, (ii) the date on which the maturity of the obligations under the DIP ABL Facility is accelerated (or deemed accelerated ) and the commitments irrevocably  terminated (or deemed terminated) following the occurrence of |

|     |     | an Event of Default, (iii) the date of the occurrence of a bankruptcy event of default with respect to a DIP ABL Foreign Borrower, (iv) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (v) dismissal of any of the Chapter 11 Cases, (vi) the occurrence of the "Termination Date" under the DIP Term Loan Facility, (vii) the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code, (viii) repayment in full of the obligations and termination of the commitments under the DIP ABL Facility or (ix) emergence from Chapter 11 (the earliest of the foregoing events being referred to as the "DIP ABL Maturity Date"). <br><br> (*See* § 1.01 (definitions of "Maturity Date," and "Termination Date") of the DIP ABL Credit Agreement; Interim Order ¶ 27) |
| --- | --- | --- |
| (r) | Interest Rate: | The interest rates per annum applicable to the loans under the DIP ABL Credit Facility will be (i) (a) LIBOR plus (b) 3.50% or, at the option of the Borrower, or (ii) (a) the Base Rate (to be defined as the highest of (x) the Bank of America's prime rate, (y) the Federal Funds rate plus 0.50%, or (z) LIBOR for an interest period of one month plus 1.00%) plus (b) 2.50%. <br><br> The Debtors may select interest periods of only one month for LIBOR loans. Interest on LIBOR loans shall be payable at the end of the selected interest period. Interest on Base Rate loans shall be payable on the first day of each calendar month. <br><br> (*See* § 2.08 of the DIP ABL Credit Agreement) |
| (s) | Default Interest Rate | At the option of the DIP ABL Agent or at the written direction of the Required Lenders during the continuance of any Event of Default under the loan documentation, the applicable margin on obligations owing under the loan documentation shall increase by 2% per annum. <br><br> (*See* §§ 1.01 (definitions of "Default Rate"), 2.08 of the DIP ABL Credit Agreement) |
| (t) | Facility Fees: | Commitment Fee.  Commencing on the Closing Date, an unused line fee of 0.50% per annum shall be payable on the actual daily unused portions of the DIP ABL Credit Facility.  Such fee shall be payable monthly in arrears, commencing on the first monthly payment date to occur after the Closing Date. <br><br> Letter of Credit Fees.  Letter of Credit fees shall be payable on the maximum amount available to be drawn under each Letter of Credit at a rate per annum equal to 3.50% per annum.  Such fees will be payable monthly in arrears, commencing on the first monthly payment date to occur after the Closing Date.  In addition, a fronting fee shall be payable to the L/C Issuer for its own account with respect to each Letter of Credit issued by the L/C Issuer, in an amount to be mutually agreed. <br><br> Closing Fee.  On the Closing Date, the US Borrowers shall pay the Lenders a closing fee in an amount equal to 1.50% of its Revolving Commitment for the DIP Credit Facility.  The closing fee shall be fully earned on the Closing Date and shall not be subject to refund or rebate under any circumstances. |

|  |  | Agent's Fee.  The DIP ABL Agent shall be paid an agent's fee at the times and in the amounts set forth in the Fee Letter relating to the Prepetition ABL Credit Agreement.<br><br>(*See* § 2.09 of DIP ABL Credit Agreement) |
|---|---|---|
| (u) | Mandatory Prepayments | If at any time the sum of the aggregate amount of the Revolving Loans and the aggregate amount of Letters of Credit outstanding exceeds the Loan Cap, the Debtors will immediately repay (without a commitment reduction) outstanding Revolving Loans, and, if necessary thereafter, cash collateralize Letters of Credit in an aggregate amount equal to such excess.<br><br>No mandatory prepayment of the Revolving Loans shall reduce the Revolving Commitments and such loans may be repaid and reborrowed as provided herein.<br><br>(*See* § 2.05 of DIP ABL Credit Agreement) |
| (v) | Optional Prepayments: | The Debtors may prepay the Revolving Loans under DIP ABL Credit Facility in whole or in part at any time without premium or penalty, subject to reimbursement of the Lenders' breakage and redeployment costs in the case of prepayment of LIBOR borrowings in minimum principal amounts and with customary notice requirements to be mutually agreed upon by the Debtors and the DIP ABL Agent.<br><br>The unutilized portion of the Revolving Commitments under the DIP ABL Credit Facility may be irrevocably reduced or terminated by the Debtors (in minimum amounts to be agreed) at any time without penalty, subject to customary notice requirements to be mutually agreed upon by the Debtors and the DIP ABL Agent.<br><br>(*See* § 2.05 of DIP ABL Credit Agreement) |
| (w) | Events of Default | Events of default under the DIP ABL Credit Agreement  (each an "Event of Default") include, without limitation, the following:<br><br>(i)    failure to pay interest, principal or fees when due under the DIP ABL Facility;<br><br>(ii)    failure to perform or observe any term, covenant or agreement contained in any of section 6.01 (Financial Statement), 6.02 (Certificates; Other Information), 6.03 (Notices), 6.05(a) (Preservation of Existence), 6.08, 6.11 (Inspection Rights), 6.12 (Use of Proceeds), 6.13 (Additional Loan Parties), 6.19 (Use of Property; Rejection and Assumption of Contracts; Post-Filing Pleadings), 6.21 (Additional Information Obligations), or Article VII (Negative Covenants);<br><br>(iii)    failure to perform or observe any other covenant or agreement in the DIP ABL Documents and such failure continues for 30 days after notice thereof;<br><br>(iv)    any representation or warranty found to be materially incorrect; |

(v)    (a) (1) failure to make any payment when due in respect of any Material Indebtedness incurred after the Petition Date or (2) failure to perform or observe any other covenant or agreement in respect of such Material Indebtedness, the effect of which is to cause or to permit the holders of such Material Indebtedness to cause such Indebtedness to be demanded or to become due if such failure is unremedied and is not waived, or (ii) there occurs under any Swap Contract an Early Termination Date (as defined thereunder) resulting from an event of default by any Debtor or its subsidiaries or a Termination Event (as defined under the applicable Swap Contract) for which a Debtor or its subsidiary is the Affected Party (as defined under the applicable Swap Contract) and the Swap Termination Value is greater than $15,000,000 and such failure is unremedied and is not waived by the counterparty to the Swap Contract;

(vi)   any insolvency proceeding, creditors process in relation to or inability to pay debts by the DIP ABL Foreign Borrowers;

(vii)  the occurrence of any of the following: (a) the Debtors file a plan of reorganization other than a Sponsored Plan, (b) the Debtors file a motion or pleading that is inconsistent with the prosecution of a Sponsored Plan, (c)  the Debtors file a pleading seeking to vacate or modify any of the DIP Orders in a manner adverse to the DIP ABL Agent or the DIP Term Loan Agent, (d) entry of an order without the prior consent of the required Lenders amending, supplementing or otherwise modifying any DIP Order in a manner adverse to  the DIP ABL Agent or the DIP Term Loan Agent, (e) reversal, vacation or stay of the effectiveness of any Order, (f) any violation of the terms of any Order, (g) dismissal of any of the Cases or conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (h) appointment of a chapter 11 trustee or an examiner with expanded powers (i) the consummation of any sale of all or substantially all assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code, (j) granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on, or any right or remedy with respect to, assets of any Debtor in excess of $1,000,000 in the aggregate, (k) the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated in the DIP ABL Credit Agreement) that is senior to or pari passu with the DIP ABL Lenders' claims under the DIP ABL Documents and the transactions contemplated thereby, except for the Priority Permitted Encumbrances, (l) payment of or granting adequate protection with respect to prepetition debt, other than as expressly set forth in the DIP Orders or the Budget, (m) except (A) as otherwise provided in the Interim Order or the Final Order or (B) as expressly permitted by the PSA or a Sponsored Plan, any of the Debtors seek or if there is entered, an order under section 365 of the Bankruptcy Code rejecting a material lease (i) to which any Debtor is a party, and (ii) that is part of (or whose premises contain

any of) the Collateral; or (n) any of the DIP ABL Liens or the DIP ABL Superpriority Claims cease to be valid, perfected and enforceable in any respect (other than with respect to any Liens granted by any Foreign Subsidiary to any Secured Party under the Loan Documents to the extent that such Liens were permitted to be perfected after the Effective Date);

(viii)   the occurrence of any Variance under the Budget, other than a Permitted Variance;

(ix)   failure of an Acceptable Chief Restructuring Officer to be employed by ZQK at any time; provided that the ZQK shall have five Business Days to engage a replacement;

(x)   the assertion by any of the Debtors (other than for purposes of disclosure) of any right of subrogation or contribution against any other Debtor prior to the payment in full of the DIP ABL Obligations, the DIP ABL Obligations and the Preptition Secured Noteholder Obligations;

(xi)   the incurrence of postpetition liabilities by the Debtors or any subsidiary as a result of judgments or decrees (a) in excess of 10,000,000 (to the extent not covered by insurance) or (b) that have or be reasonably expected to have a material adverse effect;

(xii)   the occurrence of certain events or conditions related to ERISA and certain Canadian pension plans;

(xiii)   any provision of any material DIP Term Documents, for any reason other than as expressly permitted or satisfaction in full of all the DIP ABL Obligations, ceases to be in full force and effect; or any Debtor contests in any manner the validity or enforceability of any provision of any DIP ABL Financing Agreement; or any Debtor denies that it has any or further liability or obligation under any provision of any DIP ABL Financing Agreement, or purports to revoke, terminate, repudiate or rescind any provision of any DIP Term Documents or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created thereunder; or (ii) any DIP ABL Lien purported to be created under any DIP ABL Financing Agreement shall cease to be, or shall be asserted by any Debtor or any subsidiary not to be, a valid and (to the extent required by the DIP ABL Financing Agreement) perfected Lien on any Collateral (other than an immaterial portion of the Collateral), with the priority required by the applicable DIP ABL Financing Agreement;

(xiv)   the occurrence of a Change of Control;

(xv)   any Debtor shall take any action to suspend the operation of the business of the Debtors, taken as a whole, or liquidate all or a material portion of the assets of the Debtors, taken as a whole;

(xvi)   any criminal indictment against any Debtor or any subsidiary thereof remains unquashed or undismissed for a period of ninety (90) days or more, unless the DIP ABL Agent, in its reasonable discretion, determines that the indictment is not material;

|  |  | (xvii) the termination, revocation or attempted termination or revocation by any Debtor of its guaranty of the DIP ABL Facility except as expressly permitted under the DIP Term Documents;<br><br>(xviii) failure to meet any of the Milestones;<br><br>(xix) the exercise of any rights or remedies by any holder of the Euro Notes (or any trustee, agent or representative on behalf of such holder or holders) with respect to any event of default thereunder, or the Boardriders Waiver ceases to be in full force and effect other than pursuant to its terms;<br><br>(xx) the restriction, injunction, or prevention by court order of a Debtor or any of its subsidiaries from continuing to conduct all or any material part of their business affairs;<br><br>(xxi) (a) any challenge by or with the support of any of the Debtors to the validity, perfection, priority, extent or enforceability of any of the Prepetition ABL Obligations or the Liens securing the such obligations or (b) any investigation or assertion of any claims or causes of action (or directly or indirectly support assertion of the same) by any of the Debtors against the DIP ABL Agent, the DIP ABL Lenders, the Prepetition ABL Agent or the Prepetition ABL Lenders;<br><br>(xxii) from and after entry of the Final Order, entry of a Section 506(a) judgment or similar determination with respect to the Prepetition ABL Obligations that is unacceptable to the Prepetition ABL Agent and the required Prepetition ABL Lenders; and<br><br>(xxiii) from and after entry of the Final Order, entry of an order by the Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral<br><br>(collectively, the "<u>DIP ABL Events of Default</u>").<br><br>(*See* § 8.01 of the DIP ABL Credit Agreement) |
| (x) | Remedies Upon Event of Default: | Notwithstanding anything in section 362 of the Bankruptcy Code, but subject to the DIP Orders, upon the occurrence and during the continuance of any Event of Default, the DIP ABL Agent shall, at the request of the Required Lenders, take any or all of the following actions, at the same time or different times, in each case without further order of or application to the Bankruptcy Court (provided, that with respect to the enforcement of Liens or other remedies with respect to the Collateral under clause (d) below, the DIP ABL Agent shall provide the Debtors with five Business Days' written notice (with a copy to counsel for any Committee and to the United States Trustee for the District of Delaware) prior to taking the action contemplated thereby:<br><br>(i) declare the Commitments of each DIP ABL Lender to make any Loans and the obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such Commitments and obligation shall be terminated; |

|  |  | (ii) | declare the unpaid principal amount of all outstanding DIP Term Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtors; |
| --- | --- | --- | --- |
|  |  | (iii) | whether or not the maturity of the DIP ABL Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the DIP ABL Agent and Lender under the DIP ABL Documents. |
|  |  | | Neither the Debtors, the Committee, nor any other party-in-interest shall have the right to contest the enforcement of such remedies on any basis other than an assertion that an Event of Default has not occurred or has been timely cured. The Debtors waive any right to seek relief under the Bankruptcy Code. |
|  |  | | (See § 8.02 of the DIP ABL Credit Agreement) |
| (y) | Cash Dominion: | | The Debtors will implement cash management procedures customary for facilities of this type and reasonably satisfactory to the DIP ABL Agent, including, but not limited to, the establishment of customary lockbox arrangements and blocked account agreements, which will provide for the DIP ABL Agent to have control of certain deposit and securities accounts as required by the DIP ABL Agent. From and after the Closing Date, the Debtors will cause or direct all cash receipts and collections received by the Debtors from all sources, including all proceeds from the sale of inventory and other Collateral, collection of accounts, credit card charges, to be swept daily for application to reduce exposure (without any reduction in commitments) under the DIP ABL Credit Facility. Amounts swept will be available for withdrawal by the Debtors from time to time, provided that if an Event of Default has occurred and is continuing then the DIP ABL Agent may elect to apply such funds to outstanding Revolving Loans under the DIP ABL Credit Facility or to cash collateralize outstanding Letters of Credit.  The parties acknowledge that the cash management system in effect on the date of the commencement of the Chapter 11 Cases will be satisfactory. |
|  |  | | (See § 6.04 of the DIP ABL Credit Agreement) |
| (z) | Indemnification | | The Loan Parties shall indemnify the Agents (and any of their sub-agents), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after-tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee, but excluding Taxes which shall be governed by Section 3.01), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agents |

| | | |
|---|---|---|
| | | (and any of their sub-agents) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), any bank advising or confirming a Letter of Credit and any other Person seeking to enforce the rights of a Borrower, beneficiary, transferee, or assignee or Letter of Credit proceeds or the holder of an instrument or document related to any Letter of Credit, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Japanese Depository Bank or to Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by a Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Borrower or such Loan Party has obtained a final and non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction; provided that with respect to the Foreign Loan Parties, "Indemnitees" shall only refer to the Foreign Credit Parties and each Related Party of the Foreign Credit Parties.  Without limiting the provisions of Section 3.01(c), this Section 10.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.<br><br>(*See* § 10.04 of the DIP ABL Credit Agreement) |
| (aa) | Expenses | The Debtors will pay all reasonable documented out-of-pocket costs and expenses associated with the syndication, negotiation, preparation, due diligence, administration, and closing of all loan documentation, including, without limitation, the reasonable documented legal fees of one primary counsel to the Agent (and appropriate local counsel for each in applicable local jurisdictions but limited to one counsel in each such jurisdiction), regardless of whether or not the DIP ABL Credit Facility is closed.  The Debtors will also pay the reasonable documented out-of-pocket expenses of the DIP ABL Agent and each DIP ABL Lender in connection with the enforcement of any of the loan documentation.<br><br>(*See* § 10.04 of the DIP ABL Credit Agreement) |

| (bb) | Representations and Warranties | The DIP ABL Credit Facility shall include representations usual and customary for transactions of this type, based upon those contained in the Prepetition ABL Credit Agreement, with such additions and modifications as the DIP ABL Agent may deem necessary as a result of the filing of the Chapter 11 Cases.<br><br>(*See* Article 5 of the DIP ABL Credit Agreement) |
|---|---|---|
| (cc) | Covenants: | The DIP ABL Credit Facility shall include affirmative and negative covenants usual and customary for transactions of this type, with baskets and exceptions to be negotiated and agreed, based upon those contained in the Existing Credit Agreement, with such additions and modifications as the Agent may deem necessary as a result of the filing of the Chapter 11 Cases.  The covenants will include:<br><br>(i)    The Debtors shall retain a financial and restructuring consultant reasonably satisfactory to the DIP ABL Agent to act as chief restructuring officer and to provide services on terms reasonably satisfactory to the Agent until the obligations under the DIP ABL Credit Facility have been repaid in full and all Revolving Commitments thereunder terminated.  The DIP ABL Agent acknowledges that FTI Consulting, Inc. is satisfactory.<br><br>(ii)    Within 30 days after the Petition Date, the Debtors shall have filed a motion requesting, and shall have obtained within 75 days after the Petition Date, an order of the Bankruptcy Court extending the time period for the Debtors to assume or reject leases to not less than 210 days from the Petition Date.<br><br>(iii)    Within 30 days after the commencement of the Chapter 11 Cases, the Debtors shall file a plan of reorganization and disclosure statement, which plan and disclosure statement shall provide for payment in full of the obligations under the DIP ABL Credit Facility on the consummation of the plan and shall otherwise be reasonably acceptable to the DIP ABL Agent, which plan shall have become effective no later than the Maturity Date.<br><br>(*See* Article 6-7 of the DIP ABL Credit Agreement) |
| (dd) | Compliance with Budget | Except as otherwise provided herein or approved by the Required Lenders, directly or indirectly (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the Orders and the Budget (and Permitted Variances related thereto), (ii) permit a disbursement causing any variance other than Permitted Variances without the prior written consent of the Required Lenders or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments authorized by the Bankruptcy Court.<br><br>Prior to the occurrence of an Event of Default, the Debtors shall be permitted to pay compensation and reimbursement of fees and expenses solely to the extent that such fees and expenses are in accordance with the Budget (within Permitted Variances) and authorized to be paid under Sections 330 and 331 of |

|  |  | the Bankruptcy Code pursuant to an order of the Bankruptcy Court, as the same may be due and payable. Upon receipt of the Carve-Out Trigger Notice, the right of the Debtors to pay professional fees outside the Carve-Out shall terminate, and the Debtors shall provide immediate notice to all professionals informing them that such notice was delivered and further advising them that the Debtors' ability to pay such professionals is subject to and limited by the Carve-Out.<br><br>(*See* § 7.19 of the DIP ABL Credit Agreement) |

## C.    Common Provisions to DIP Facilities and Interim Order[11]

| (a) | Priority of DIP Liens | The DIP Liens to be created and granted to the DIP Agents and the DIP Lenders, as provided herein, (a) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and (b) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the DIP Collateral, and are subject only to: (x)(i) the DIP Credit Agreements, and (ii) the terms and provisions of that certain Postpetition Intercreditor Agreement, dated as of September [__], 2015 (the "Postpetition Intercreditor Agreement", and, together with the Prepetition Intercreditor Agreement the "Intercreditor Agreements"), and (y)(i) the Carve-Out, and (ii) solely in the case of the DIP Term Obligations and DIP Term Liens, respectively, any Priority Permitted Encumbrances.  The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the order and priority set forth in the DIP Credit Agreements and the Interim Order, subject to the Postpetition Intercreditor Agreement.  Except as otherwise provided in the Interim Order, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Cases.<br><br>(*See* ¶ 7 of the Interim Order) |
| (b) | Adequate Protection for Prepetition Notes Secured Parties | As adequate protection for the interest of the Prepetition Notes Secured Parties in the Prepetition Secured Notes Collateral (including Cash Collateral) on account of the granting of the DIP Liens, subordination to the Carve-Out, the Debtors' use of Cash Collateral and other decline in value arising out of the automatic stay and/or the Debtors' use, sale, depreciation, and/or disposition of the Prepetition Secured Notes Collateral, the Prepetition Notes Secured Parties shall receive the following adequate protection:<br><br>(i)    *Secured Notes Replacement Liens*.  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, solely to the extent of the diminution of the value of the interest of the Prepetition Notes Secured Parties in the Prepetition Secured Notes Collateral, the Secured Notes Parties shall have, subject to the terms and |

---

[11]    The summaries of the terms and conditions of the DIP ABL Credit Agreement and the DIP Orders set forth in this Motion are intended solely for informational purposes and are qualified in their entirety by such documents. Capitalized terms used in the following chart but not defined therein have the meanings set forth in the DIP Credit Agreements or the Interim Order.

conditions set forth below, additional and replacement security interests and liens in the DIP Collateral (including, for the avoidance of doubt, pledges of 100% of the equity in each direct subsidiary of any Debtor) (the "<u>Secured Notes Replacement Liens</u>"), which shall be junior only to the DIP Liens, the DIP Superpriority Claims and the Carve-Out, and shall, in each case, be subject to the terms of the Prepetition Intercreditor Agreement.

(ii)    *Secured Notes Superpriority Claim.* Solely to the extent of the diminution of the value of the interests of the Prepetition Notes Secured Parties in the Prepetition Secured Notes Collateral, and subject to the Prepetition Intercreditor Agreement, the Prepetition Notes Secured Parties shall have an allowed superpriority administrative expense claim (the "<u>Secured Notes Superpriority Claims</u>") which shall have priority, except with respect to (a) the DIP Liens, (b) the DIP Superpriority Claims, and (c) the Carve-Out, in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Other than the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on a parity with the Secured Notes Superpriority Claims.

(iii)    *Milestones.* The Milestones shall be adequate protection for the benefit of the Prepetition Notes Secured Parties.

(*See* ¶ 12 of the Interim Order)

| | | |
|---|---|---|
| (c) | <u>Adequate Protection for Prepetition ABL Secured Parties</u> | As adequate protection for the interest of the Prepetition ABL Secured Parties in the Prepetition ABL Collateral (including Cash Collateral) on account of the granting of the DIP Liens, subordination to the Carve-Out, the Debtors' use of Cash Collateral and other decline in value arising out of the automatic stay and/or the Debtors' use, sale, depreciation, or disposition of the Prepetition ABL Collateral, the Prepetition ABL Secured Parties shall receive the following adequate protection: |

(i)    *ABL Indemnity Account.* Incidental to the payment of the Prepetition ABL Obligations in accordance with the terms of the Interim Order and the DIP Documents, the Debtors shall establish an account in the "control" (as defined in the UCC (as defined in

the DIP Credit Agreements) of the Prepetition ABL Agent (the "ABL Indemnity Account"), into which the sum of $250,000.00 shall be deposited as security for any reimbursement, indemnification or similar continuing obligations of the Debtors in favor of the Prepetition ABL Secured Parties under the Prepetition ABL Credit Agreement and related documents, including, without limitation, any obligations arising under section 10.4 and 10.5 of the ABL Credit Agreement (the "Prepetition ABL Indemnity Obligations").

o    Upon the expiration of the Challenge Period (as defined below) if, as of such date, no party has filed (x) an adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in Paragraph 7 hereof, or (y) an adversary proceeding, cause of action, objection, claim, defense, or other challenge against any Prepetition ABL Secured Parties related to the Prepetition ABL Facility, whether in the Chapter 11 Cases or independently in another forum, court, or venue (the last such date being the "ABL Indemnity Account Termination Date"), all amounts then remaining and being held in the ABL Indemnity Account (net of any unreimbursed obligations owing to the Prepetition ABL Agent and/or Prepetition ABL Secured Parties on such date) shall be released to the Debtors.

o    The ABL Indemnity Obligations shall be secured by a first priority lien on the ABL Indemnity Account.

o    The Prepetition ABL Secured Parties may apply amounts in the ABL Indemnity Account against the ABL Indemnity Obligations as and when they arise, without further notice to or consent from the Debtors, the Committee, or any other parties in interest and without further order of this Court, upon compliance with the provisions of the Interim Order.

o    In addition to the establishment and maintenance of the ABL Indemnity Account, until the ABL Indemnity Account Termination Date the ABL Agent, for itself and on behalf of the ABL Lenders, shall retain and maintain the ABL Liens as security for any the amount of any ABL Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the ABL Indemnity Account; provided, that the ABL Liens and the ABL Indemnity Obligations shall, for such purposes, be treated the same (including, without limitation, with respect to lien priority) as the DIP ABL Liens securing the DIP ABL Obligations are treated under the Postpetition Intercreditor Agreement (including, with respect to the relative lien priority as compared to the DIP Term Liens securing the DIP Term Obligations).

(ii)    *ABL Secured Replacement Liens*.  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, solely to the extent of the

45

<table>
<tr><td></td><td></td><td>

diminution of the value of the interest of the Prepetition ABL Secured Parties in the Prepetition ABL Collateral, the Prepetition ABL Secured Parties shall have, subject to the terms and conditions set forth below, additional and replacement security interests and liens in the DIP Collateral (including, for the avoidance of doubt, pledges of 100% of the equity in each direct subsidiary of any Debtor) (the "ABL Replacement Liens"; and together with the Secured Notes Replacement Liens the "Replacement Liens"), which shall be junior only to the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, and shall, in each case, be subject to the terms of the Prepetition Intercreditor Agreement.

(iii)  *ABL Secured Parties Superpriority Claim*.  Solely to the extent of the diminution of the value of the interests of the Prepetition ABL Secured Parties in the ABL Collateral on account of the ABL Indemnity Obligations, and subject to the Prepetition Intercreditor Agreement, the ABL Secured Parties shall have an allowed superpriority administrative expense claim (the "ABL Superpriority Claims"; and together with the Secured Notes Superpriority Claims the "Prepetition Superpriority Claims") which shall have priority, except with respect to (a) the DIP Liens, (b) the DIP Superpriority Claims, and (c) the Carve-Out, in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Other than the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on a parity with the ABL Superpriority Claims.

(iv)  *Milestones*.  The Milestones shall be adequate protection for the benefit of the Prepetition ABL Secured Parties.

(*See* ¶ 12 of the Interim Order)

</td></tr>
<tr><td>(d)</td><td>Modification of the Automatic Stay</td><td>

The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agents may request in their sole discretion to assure the perfection and priority of the DIP Liens, (b) the Debtors to take all appropriate action to grant the Replacement Liens, and to take all appropriate action to ensure that the Replacement Liens

</td></tr>
</table>

| | | |
|---|---|---|
| | | granted thereunder are perfected and maintain the priority set forth herein, (c) the Debtors to incur all liabilities and obligations to the DIP Agents as contemplated under the DIP Documents, (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Interim Order and the DIP Documents, and (e) the implementation of the terms of this Interim Order<br><br>(*See* ¶ 17 of the Interim Order) |
| (e) | Carve-Out | Upon a DIP Agent's issuance of a Carve Out Trigger Notice (as defined below), all liens, claims and other security interests held by the DIP Lenders and the Prepetition Secured Parties shall be subject to the payment of the Carve-Out. For purposes of this Interim Order, "Carve-Out" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors or any Committee pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Estate Professionals") at any time before or on the first business day following delivery by a DIP Agent of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $1,000,000.00 incurred after the first business day following delivery by a DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post Carve-Out Trigger Notice Cap"). For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by a DIP Agent to the Debtors, their lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreements) and acceleration of the DIP Obligations under the DIP Facilities, stating that the Post Carve-Out Trigger Notice Cap has been invoked. Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been issued, the Debtors shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals to the extent set forth in the Budget and that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court and in form and substance reasonably acceptable to the Debtors and the DIP Agents, as the same may be due and payable, and the same shall not reduce the Post Carve-Out Trigger Notice Cap.<br><br>(*See* § 1.1 (definitions of "Carve-Out," "Carve-Out Trigger Notice") of DIP Term Loan Credit Agreement and DIP ABL Credit Agreement; ¶ 34 of the Interim Order) |

| (f) | Limitation on Investigation | No DIP Collateral, Cash Collateral, proceeds of the DIP Facilities, portion of the Carve-Out, or any other amounts may be used directly or indirectly by any of the Debtors, the Committee, if any, or any trustee or other estate representative appointed in these Chapter 11 Cases or any Successor Cases or any other person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) for any of the following actions or activities (the "Proscribed Actions"): |
|---|---|---|

<div style="padding-left:2em">

(i)    to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the liens granted under the DIP Documents, this Interim Order, or the Final Order (including, the DIP Superpriority Claims); or

(ii)   to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the DIP Agents, the DIP Lenders, or the Prepetition Notes Secured Parties, and each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any Avoidance Actions, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens granted under the DIP Documents, the Prepetition ABL Liens or the Prepetition Secured Noteholder Liens, (D) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the ABL Obligations, or the Prepetition Notes Obligations; or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (1) the DIP Agent or the DIP Lenders under this Interim Order or under any of the DIP Documents or (2) the Prepetition Notes Secured Parties (in each case, as applicable, including, claims, proceedings or actions that might prevent, hinder or delay any of their respective assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the DIP Documents, this Interim Order, and the Final Order).

</div>

Notwithstanding anything to the contrary herein, the Committee may use up to $50,000.00 in the aggregate amount of the Carve-Out, any Cash Collateral, or proceeds of the DIP Facilities to investigate the Prepetition Notes Secured Parties (the "Committee Investigation Budget"). Any and all claims incurred

by the Committee related to or in connection with any Proscribed Activities other than up to the Committee Investigation Budget shall not constitute an allowed administrative expense claims (including, without limitation, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code) and shall not be satisfied by the Carve-Out, any Cash Collateral, or proceeds of the DIP Facilities, and shall be satisfied solely from the unencumbered assets of the Debtors (if any) (the "Unencumbered Assets"), thereby reducing recoveries to the holders of unsecured claims (other than any deficiency claim held by any of the Prepetition Notes Secured Parties); provided, however, that to the extent there are no Unencumbered Assets available to satisfy such claims, then such claims shall be automatically disallowed without further action by any party or Court order and shall not receive a recovery in these chapter 11 cases and any Successor Cases.

Challenge Period.

(i)     Subject only to the terms of this paragraph, the grant of adequate protection to the Prepetition Notes Secured Parties, and the various stipulations and waivers contained in the Interim Order shall be without prejudice to the rights of the Committee to seek to disallow the Prepetition Notes Secured Parties' claims in respect of the Prepetition Financing Documents, pursue any claims or seek appropriate remedies against Prepetition Notes Secured Parties in connection with the Prepetition Financing Documents or avoid all or substantially all of the security interests or liens in the Prepetition Notes Collateral or in any other asset or property of Debtors in which Prepetition Notes Secured Parties claim an interest, including any claim, action, or proceeding brought against the Prepetition Notes Secured Parties in accordance herewith that requires Prepetition Notes Secured Parties to give up adequate protection liens and superpriority claims, to disgorge adequate protection interest payments received or accruals credited, or to disgorge as repaid pursuant to this Interim Order as a result of any of the Prepetition Notes Secured Parties' claims against Debtors or liens upon and security interests in the assets and properties of Debtors (including the Prepetition Secured Notes Collateral) being invalidated, avoided, subordinated, impaired or compromised in any way, either by an order of this Court (or other court of competent jurisdiction) or by settlement. Any party (other than the Debtors, which have waived all such rights), including the Committee, must commence, as appropriate, a contested matter or adversary proceeding raising any objection, claim, defense, suit or other challenge (a "Challenge") with respect to any claim, security interest, or any other rights of the Prepetition Notes Secured Parties under the ABL Documents or the Secured Notes Documents, as applicable, including in the nature of a setoff, counterclaim, or defense on or before the earlier of the first to occur of (i) sixty (60) calendar days from the date the U.S. Trustee appoints the Committee and (ii) seventy-five (75) calendar days following the date of entry of the Final Order (the "Challenge Period"). The Challenge Period may only be extended (x) as to the Prepetition ABL Agent and/or the Prepetition ABL Lenders, with

the prior written consent of the Prepetition ABL Agent, (y) as to the Prepetition Secured Notes Trustee and Collateral Agent and the Prepetition Secured Noteholders, with the prior written consent of each of the Secured Notes Trustee and Collateral Agent and the Required Secured Noteholders (as defined in the Interim Order), or (z) by consent of the Court for good cause shown.  In the event of a timely and successful Challenge to the repayment of the Prepetition ABL Obligations, this Court shall fashion the appropriate remedy with respect to the Prepetition ABL Secured Parties after hearing from all parties in interest.

(ii)    Upon the expiration of the Challenge Period, to the extent not specifically included in a timely and properly filed pleading asserting a Challenge:  (i) any other possible Challenge, whether such Challenge is separately filed or otherwise asserted through an amendment of any timely and properly filed pleading asserting a Challenge, shall be deemed to be forever waived and barred; (ii) all of the Debtors' agreements, acknowledgments, stipulations, waivers, releases, and affirmations as to the priority, extent, and validity of the Prepetition Notes Secured Parties' claims, liens, and interests, of any nature, under the Prepetition Financing Documents, or otherwise incorporated or set forth in this Interim Order, shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties-in-interest in these Chapter 11 Cases and any Successor Cases without further action by any party or this Court, and any Committee and any other party in interest, and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto;  (iii) the liens and security interests granted pursuant to the Prepetition Financing Documents shall (to the extent not otherwise satisfied in full) be deemed to constitute valid, binding, enforceable, and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable bankruptcy law; and (iv) without further order of the Court, the claims and obligations under the Prepetition Financing Documents shall (to the extent not otherwise satisfied in full) be finally allowed as fully secured claims within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these chapter 11 cases and any Successor Cases and shall not be subject to challenge by any party in interest as to validity, priority, amount, or otherwise.

(iii)   Nothing in this Interim Order vests or confers on any person, including the Committee or any other statutory committee that may be appointed in these Chapter 11 Cases, standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates.  For the avoidance of doubt, entry of this Interim Order shall not grant standing or authority to the Committee to pursue any cause of action, claim, defense, or other right on behalf of the Debtors or their estates.

| | | |
|---|---|---|
| | | (iv)    Pending the expiration of the Challenge Period, and until such time as any Challenge is either dismissed, settled or the subject of a final, non-appealable order of the Court, the Prepetition ABL Agent, for itself and on behalf of the Prepetition ABL Lenders, shall retain and maintain the Prepetition ABL Liens as security for any the amount of any ABL Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the ABL Indemnity Account, which Lien retention shall be in addition to the establishment and maintenance of the ABL Indemnity Account. The Prepetition ABL Lien retention herein shall in all respects remain junior and subordinate to the DIP Liens and the repayment in full of the DIP Obligations, and otherwise be subject to the terms of the Prepetition Intercreditor Agreement.<br><br>(*See* ¶ 36-37 of the Interim Order) |
| (g) | Indemnification | In addition to the indemnification set forth above with respect to the DIP Term Loan Credit Agreement and the DIP ABL Credit Agreement:<br><br>The Debtors shall indemnify and hold harmless the DIP Agents, the DIP Lenders, the Prepetition Secured Notes Trustee and Collateral Agent, the Prepetition Secured Noteholders, the Prepetition ABL Lenders, and the Prepetition ABL Agent, and each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investor funds, advisors, attorneys, professionals, representatives, investment bankers, and consultants, each in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Documents, the Prepetition Financing Documents (as defined in the Interim Order), the ABL Documents (as defined in the Interim Order), and/or the transactions contemplated thereby and by the Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Documents, the Prepetition Financing Documents, and the ABL Documents, and as further described therein and herein, except to the extent resulting from such indemnified party's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction.  The indemnity includes indemnification for the DIP Agents', Prepetition ABL Agent's, Prepetition Secured Notes Agent's, and any of the DIP Lenders', Prepetition ABL Lenders', and/or Prepetition Secured Noteholder's exercise of discretionary rights granted under the DIP Documents, the ABL Documents, and/or the Prepetition Financing Documents, as the context makes applicable.  In all such litigation, or the preparation therefor, the DIP Agents and the DIP Lenders, the Prepetition ABL Agent and the Prepetition ABL Lenders, and the Prepetition Secured Notes Trustee and Collateral Agent and the Prepetition Secured Noteholders, respectively, shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel. |

| | | (*See* ¶ 30 of the Interim Order) |
|---|---|---|
| (h) | <u>Releases</u> | Without limiting the rights of the parties in interest as set forth in paragraph 37 of the Interim Order, the Debtors hereby waive any and all actions related to, and hereby release, each of (a) the DIP Term Loan Agent and the DIP Term Loan Lenders, (b) the DIP ABL Agent and the DIP ABL Lenders, (c) the Prepetition ABL Agent and the Prepetition ABL Lenders, (d) the Prepetition Secured Notes Trustee and Collateral Agent and the Prepetition Secured Noteholders, and (e) each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants, each in their respective capacity as such (each such person or entity identified in sub-clauses (a) through (e) of this paragraph], a "<u>Released Party</u>" and, collectively, the "<u>Released Parties</u>") from any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, or any Challenge (as defined herein), whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising prior to the Petition Date and to the extent related to the Prepetition Financing Documents, the DIP Credit Agreements, or this Interim Order, any documents related to the Prepetition Financing Documents, the DIP Credit Agreements, or this Interim Order, any aspect of the prepetition relationship with the Released Parties, any Debtor, or any other acts or omissions by the Released Parties in connection with the Prepetition Financing Documents, the DIP Credit Agreements, or this Interim Order, any documents related to the Prepetition Financing Documents, the DIP Credit Agreements, or this Interim Order, or any aspect of their prepetition relationship with any Debtor.<br><br>(*See* ¶ 31 of the Interim Order) |
| (i) | <u>Section 506(c)</u> | **Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these cases at any time shall be charged against the DIP Agents, the DIP Lenders, the ABL Secured Parties or the Prepetition Notes Secured Parties or any of their respective claims, the DIP Collateral, the ABL Collateral, or the Prepetition Notes Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Agents, the DIP Lenders, the ABL Secured Parties and the Prepetition Notes Secured Parties**, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.<br><br>(*See* § 8.1(z) of the DIP Term Loan Credit Agreement; § 8.01(ee) of the DIP ABL Credit Agreement; ¶¶ H, 39 of the Interim Order) |
| (j) | <u>Section 552</u> | In exchange for (i) the DIP Agents' and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and (ii) the Prepetition Secured Parties' agreement to subordinate their liens and claims to the Carve Out, **the DIP Liens, the DIP Agents, the DIP Lenders, the ABL Secured Parties, and the Prepetition Secured Parties are each entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code** |

| | | |
|---|---|---|
| | | and the **"equities of the case" exception shall not apply**; provided, that the foregoing shall be subject to entry of the Final Order with respect to parties in interest other than the Debtors.<br><br>(*See* ¶¶ I, 40 of the Interim Order) |
| (k) | <u>Supplemental Reporting Requirements</u> | In addition to any notice and/or reporting requirements contained in the DIP Documents, until the DIP ABL Obligations are paid in full, not later than 10 days after the end of each calendar month, the Debtors shall provide each of the DIP Agents with the following:  (i) a report listing all prepetition shipping charges paid by the Debtors in the prior month pursuant to any authorization provided Debtors under separate order of the Court, (ii) a report listing any prepetition shipping charge claim settled and/or paid in the prior month pursuant to any authorization provided Debtors under separate order of the Court, which report shall include the identity of the shipper whose claim has been settled and/or paid and a summary of the terms of any such settlement, and (iii) a report listing the amount and identity of any utility company as to which the Debtors increased the utility deposit escrow account.<br><br>(*See* ¶ 56 of the Interim Order) |

## COMPLIANCE WITH LOCAL RULE 4001-2

43.     Local Rule 4001-2(a)(1) requires that certain provisions contained in the financing documents and/or Interim Order be highlighted, and that the Debtors must provide justification for the inclusion of such provisions.  The Debtors believe that certain provisions of the DIP Facilities implicate Local Rule 4001-2, and that such provisions are justified and necessary in the context and circumstances of these cases.  The Debtors, therefore, are identifying here the provisions of the DIP Facilities that might fall within the ambit of Local Rule 4001-2.

44.     <u>Cross-Collateralization</u>.  Local Rule 4001-2(a)(i)(A) requires identification of provisions that grant cross-collateralization protection to prepetition secured creditors.  Here, as of the Petition Date, the Prepetition ABL Facility included outstanding loans of $24 million to the Prepetition Foreign ABL Borrowers (the "<u>Prepetition Foreign ABL Obligations</u>").  These obligations were secured by liens on the assets of certain of the Debtors and the Prepetition Foreign ABL Borrowers. Pursuant to the terms of the DIP ABL Facility, the

Prepetition Foreign ABL Obligations will be rolled over from the Prepetition ABL Facility, and the Prepetition Foreign ABL Obligations will be secured by the same liens as provided under the Prepetition ABL Facility, as well as liens on substantially all of the assets of those Debtors who were not party to the Prepetition ABL Facility.  These additional Debtors are all inactive entities with *de minimis* assets or value.  The inclusion of these inactive Debtors was simply a matter of simplicity and clarity, to provide that all of the Debtors are party to the DIP Facilities. As such, the Debtors believe that the concerns underlying the Local Rule are not applicable here.

        45.     <u>506(c) Waiver</u>.  Local Rule 4001-2(a)(i)(C) requires identification of provisions that seek to waive, without notice, the estate's rights under section 506(c) of the Bankruptcy Code.  The Credit Facilities provide that it is an event of default if, from and after entry of the Final Order, the Bankruptcy Court enters any order authorizing or directing payment of any claim or claims under section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral.  DIP Term Loan Credit Agreement § 8.1(z); DIP ABL Credit Agreement § 8.01(ee); <u>see also</u> Interim Order ¶¶ H, 39.  In the course of negotiations, the DIP Lenders have insisted upon this provision as a condition to funding.  This provision is reasonable because, most importantly, it does not take effect until after the Final Order is entered.  Accordingly, such waiver is not without notice and parties in interest will have an opportunity to object.  Moreover, the provision is justified in light of the Debtors' need the DIP Financing and the fact that DIP Facilities provide for a Carve Out that will fund certain administrative expenses and professional fees following an event of default under the DIP Credit Agreements.  Accordingly, the Debtors submit that the 506(c) waiver of the DIP Facilities is necessary and appropriate under the circumstances.

46.     <u>Deeming Prepetition Secured Debt to be Postpetition Debt and Repayment</u> <u>of Prepetition Debt with Postpetition Funds</u>.  Local Rule 4001-2(a)(i)(E) requires identification of provisions that seek to deem prepetition debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditors prepetition debt.  As described above, the DIP ABL Facility will be an amendment and restatement of and used to repay the Prepetition ABL Facility.  In particular, the Prepetition ABL Credit Agreement has been amended and restated as the DIP ABL Credit Agreement and the Debtors hereby seek approval thereof.  Pursuant to the DIP ABL Credit Agreement, the Prepetition Foreign ABL Obligations and the Prepetition Domestic ABL Obligations will continue to exist postpetition and will become DIP ABL Obligations under the DIP ABL Credit Agreement.  However, as set forth above, the Debtors shall utilize a portion of the first draw to repay Prepetition Foreign ABL Obligations through the Interim Order Interim Company Loan and, in order to allow availability to issue required letters of credit and stay within the borrowing base under the DIP ABL Credit Agreement, proceeds of the DIP Term Loan Facility will be used to pay down some or all of the Prepetition Domestic ABL Obligations.  The Debtors submit that this arrangement is both appropriate and, indeed, desirable for several reasons.

47.     First, as further set forth in the Savini Declaration, inclusion of the DIP ABL Facility in the DIP Financing package has enabled the Debtors to materially decrease the overall cost of the DIP Financing to the estate while still providing sufficient liquidity.  As previously discussed, the Debtors had the option of obtaining an adequate DIP facility exclusively from Oaktree.  However, such a facility would have come at significantly higher cost to the estates.  The Debtors submit that the reduction in interest expense (from 12% to 8%) by

incorporating the DIP ABL Facility as part of the Debtors' DIP Financing far outweighs any concerns related to rolling over the Prepetition ABL Facility.

48.     Second, as noted above, the Prepetition ABL Facility included not only loans to certain of the Debtors but also the approximately $24 million of Prepetition Foreign ABL Obligations on account of certain of the Debtors' non-Debtor affiliates, which obligations are secured by the collateral of the Debtors and such non-Debtor affiliates.  This foreign collateral is subject to complicated perfection rules in each of the applicable jurisdictions, which such jurisdictions may be beyond the reach of this Court.  In the absence of the continuation of such obligations as guaranty obligations of the DIP ABL Obligors, the filing would be a breach of the Debtors' guaranty obligations under the Prepetition ABL Facility and the Prepetition Foreign ABL Borrowers would be in default and would be required to provide additional collateral to replace that of the Debtors.  Doing so in multiple foreign jurisdictions in a timely matter would be difficult, if not impossible.  As such, amending and restating the Prepetition ABL Facility allows the Prepetition Foreign ABL Obligations to essentially remain in place and continue to be guaranteed and secured by the U.S. entities' collateral, greatly reducing the cost and complication associated with providing and perfecting replacement collateral for such obligations.

49.     The DIP Financing also has the advantage of avoiding an otherwise potentially very contentious and costly priming fight with both the ABL Lenders and the holders of the U.S. Secured Notes.  Finally, although the DIP ABL Facility does repay existing prepetition indebtedness, the Debtors' DIP Financing package is essentially provided by a new lending group – only one of the prepetition ABL Lenders will remain postpetition.  Thus, there is little overlap of identity between prepetition and postpetition lenders.

50.    For these reasons, the Debtors submit that the DIP ABL Facility and the partial repayment of the Prepetition ABL Facility are appropriate and in the best interests of the Debtors, their estates, and creditors.

51.    <u>Equities of the Case under Section 552(b)</u>.  Local Rule 4001-2(a)(i)(H) requires identification of provisions that seek to affect the Court's power to consider the equities of the case under Bankruptcy Code section 552(b).  The Interim Order provides that "[i]n exchange for (i) the DIP Agents' and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and (ii) the Prepetition Secured Parties' agreement to subordinate their liens and claims to the Carve Out and the DIP Liens, the DIP Agents, the DIP Lenders, the ABL Secured Parties, and the Prepetition Secured Parties are each entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the 'equities of the case' exception shall not apply; provided, that the foregoing shall be subject to entry of the Final Order with respect to parties in interest other than the Debtors." Interim Order ¶¶ I, 40.  In the course of negotiations, the DIP Lenders have insisted upon this provision as a condition to funding.  This provision is justified in light of the Debtors' need the DIP Financing, (ii) the 552(b) provision will not be effective until entry of the Final Order after notice and a hearing and the fact that the DIP Facilities provides for a Carve Out that will fund certain administrative expenses and professional fees following an event of default under the DIP Credit Agreements.  Moreover, because this provision will only be effective upon entry of the Final Order and to the extent such order so provides, the Debtors respectfully submit that parties in interest will have an opportunity to be heard with respect to this provision.

## BASIS FOR RELIEF

**I.     THE DEBTORS SHOULD BE PERMITTED TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364(C) OF THE BANKRUPTCY CODE.**

52.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense . . . ." 11 U.S.C. § 364(c).

53.     In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

    a.     unencumbered credit or alternative financing without superpriority status is available to the debtor;

    b.     the credit transactions are necessary to preserve assets of the estate;

    c.     the terms of the credit agreement are fair, reasonable, and adequate;

    d.     the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

    e.     the proposed financing agreement adequately protects prepetition secured creditors.

See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the first three factors); In re Aqua Assoc., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); In re Crouse Group, Inc., 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

54. For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing on a secured superpriority lien basis under section 364(c) of the Bankruptcy Code.

**A.      The Debtors Were Unable to Obtain Financing on More Favorable Terms.**

55. Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest. See In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); In re Gen. Growth Props., Inc., 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009). The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. See, e.g., Bray v. Shenandoah Fed. Say. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

56. Here, as detailed in the First Day Declaration and the Savini Declaration, and as further set forth above, the Debtors face severe liquidity constraints. The Debtors do not have sufficient funds on hand or generated from their business to fund operations. The Debtors were forced to file the Chapter 11 Cases to preserve the value of their assets and reorganize. The Debtors are unable, in the present circumstances, to meet their liquidity needs by obtaining financing on an unsecured, administrative expense basis. Given the troubles generally facing specialty retailers, as evidenced by the liquidations within recent months of Body Central Corp., Deb Stores, dELiA*s, Inc., and Wet Seal, combined with the Debtors' continued projected losses, PJSC quickly found that most of the potential third-party lenders and equity investors

were not interested in providing financing to the Debtors.  Without the proposed DIP Facilities,

the Debtors would be assured of a piecemeal liquidation under chapter 7 of the Bankruptcy

Code, rather than a plan of reorganization that will maximize value.

57.     In addition to these challenges, the Prepetition ABL Lenders were

unwilling to advance additional funding, even through a postpetition financing structure, to the

Prepetition Foreign ABL Borrowers, and the borrowing base of the Prepetition Foreign ABL

Borrowers prevents them from borrowing independently from the Company.  Moreover,  the DIP

Term Loan Lenders are not qualified to make loans directly to those Foreign ABL Borrowers.

Thus, the proposed DIP Term Loan Facility, together with the Interim Order Intercompany Loan

is essentially the only avenue available to the Prepetition Foreign ABL Borrowers to access

liquidity.

58.     The Debtors respectfully submit that their efforts to obtain postpetition

financing therefore satisfy the standards required under section 364(c) of the Bankruptcy Code.

See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985)

(authorizing interim financing stipulation where debtor's best business judgment indicated

financing was necessary and reasonable for benefit of estates); In re Ames Dept. Stores, 115 B.R.

34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in

possession to exercise their basic business judgment consistent with their fiduciary duties"); In re

Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will

extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the

debtor] to conduct such an exhaustive search for financing").

**B.**     **The Proposed Financing Is Necessary to Preserve the Assets of the Debtors' Estates.**

59.     As described above, the Debtors have undergone a lengthy process to

evaluate and pursue out-of-court refinancing alternatives.  However, these efforts were

ultimately unsuccessful and the Debtors instead received a proposal from Oaktree to implement a

restructuring through a chapter 11 proceeding.  This proposal offers the Debtors their best chance

for a successful reorganization and the Debtors believe it maximizes value for all stakeholders.

As such, on September 8, 2015, the Debtors executed the PSA with Oaktree.  The PSA sets forth

Oaktree's agreement to fund and support, and the Debtors' agreement to propose and seek

confirmation of  the Plan outlined therein.  While the Debtors intend to act as expeditiously as

reasonably practicable, they anticipate that filing, soliciting and confirming the Sponsored Plan

will take several months.  Pending confirmation of the Sponsored Plan, the Debtors intend to

operate their business in the ordinary course and, thus, require immediate access to postpetition

financing and cash collateral.

   60. Cash is necessary for working capital, operating costs and expenses

incurred during the Chapter 11 Cases, including funding payroll to the Debtors' over 1500

employees. The Debtors also require postpetition letters of credit for certain vendors. The

Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on

the operation of their business without additional financing. The Debtors' ability to maintain

their business pending confirmation of the Sponsored Plan is dependent on their ability to

continue to operate without disruption, which requires payments for postpetition rent, payroll,

goods, services and other operating expenses. The proposed DIP Facilities thus are essential to

the Debtors' continued operational viability and will provide the Debtors with the opportunity to

preserve their business through a reorganization.

   61. The alternative in this case is "to force the debtors to close down their

operations and thus doom any effort at reorganization which will hopefully extract the maximum

value of the assets involved to the benefit of all classes of creditors and other constituencies

involved in this case." In re Dynaco Corp., 162 B.R. 389, 396 (Bankr. D. N.H. 1993). Because

this result would be fundamentally at odds to the rehabilitative purposes of chapter 11, approval

of this Motion is warranted. Id. at 394 (noting that "'it is apparent that the Congress intended

business under reorganization to proceed in as normal a fashion as possible' (quoting In re

Prime, Inc., 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981))).

      62.    As debtors in possession, the Debtors have a fiduciary duty to protect and

maximize their estates' assets. See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325,

339 (3d Cir. 2004). As noted above, the Debtors require postpetition financing and the use of

cash collateral under the terms of the DIP Credit Agreements to continue their operations

pending their reorganization through confirmation of the Sponsored Plan.

**C.**       **The Terms of the Proposed DIP Facilities Are Fair, Reasonable, and Appropriate.**

      63.    In considering whether the terms of postpetition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances and disparate

bargaining power of both the debtor and the potential lender. In re Farmland Indus., Inc., 294

B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp.

v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 n.7 (W.D.

Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

      64.    The terms of the DIP Credit Agreements and the proposed DIP Orders

were negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders,

resulting in agreements designed to permit the Debtors to obtain the needed liquidity to

maximize the value of their assets through confirmation of the Sponsored Plan.  Indeed, through

the course of the intensive negotiations, the Debtors were able to obtain material beneficial

revisions to the proposed financing terms, including, without limitation, the inclusion of the DIP

ABL Facility to reduce the size of the DIP Term Loan Facility.

65.     As further discussed in the First Day Declaration and the Savini Declaration and above, Oaktree was willing to provide sufficient financing for the plan process, but the initial pricing offered by Oaktree was near the high end of the range of market for comparable DIP proposals, as explained in the Savini Declaration.  Accordingly, PJSC and the Debtors negotiated with Oaktree and other market participants to develop a more competitive DIP proposal.  After much dialogue, the Debtors and PJSC were successful in forging a collaborative DIP proposal by both Bank of America, one of the Prepetition ABL Lenders, and Oaktree, in a transaction whereby the Debtors would enjoy a lower blended cost of funds.

**D.      Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment.**

66.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc., 115 B.R. at 38 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985).

67.     Here, the Debtors' sound business judgment clearly supports entry into the DIP Credit Agreement in order to gain access to needed funding and thereby maximize value for all constituents.

## II.     THE DIP LENDERS ARE ENTITLED TO THE PROTECTIONS UNDER SECTION 364(E) OF THE BANKRUPTCY CODE

68.     Bankruptcy Code section 364(e), which protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal, was designed to "encourage lenders to extend credit to debtors by eliminating the risk that any lien securing the loan will be modified on appeal." Keltic Fin. Partners, LP v. Foreside Mgmt. Co. (In re Foreside Mgmt. Co.), 402 B.R. 446, 451 (B.A.P. 1st Cir. 2009) (citing Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.), 963 F.2d 1490, 1493 (11th Cir. 1992)). See also White Rose Food v. General Trading (In re Clinton St. Food Corp., 170 B.R. 216, 220 (S.D.N.Y. 1994) (noting that section 364(e)'s purpose "is to overcome[s] parties' reluctance to lend to a bankrupt firm . . ."); Fleet Nat'l Bank v. Doorcrafters (In re N. Atl. Millwork Corp.), 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of Section 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankruptcy entities.").

69.     The Debtor believes that the terms and conditions of the DIP Facilities are fair and reasonable and are the best possible terms on which the Debtor could obtain postpetition financing.  Further, the terms and conditions of the DIP Documents were negotiated in good faith and at arm's length with all parties represented by experienced counsel.  Accordingly, the DIP Lenders should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facilities are later modified, vacated, stayed,

or terminated by subsequent order of this or any other Court, the DIP Lenders will be fully

protected with respect to any amounts previously disbursed.

## III.  SECTION 363 OF THE BANKRUPTCY CODE AUTHORIZES THE DEBTORS' USE OF CASH COLLATERAL.

70.  Section 363(c)(2) of the Bankruptcy Code provides that a debtor in

possession may not use cash collateral unless (i) each entity that has an interest in such cash

collateral provides consent, or (ii) the court approves the use of cash collateral after notice and a

hearing. *See* 11 U.S.C. § 363(c).

71.  Section 363(e) of the Bankruptcy Code provides that, "on request of an

entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in

possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide

adequate protection of such interest." 11 U.S.C. § 363(e).

72.  Section 361 of the Bankruptcy Code provides that:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by

(1)  requiring the [debtor in possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2)  providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3)  granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. "The determination of adequate protection is a fact-specific inquiry" to be

decided on a case-by-case basis. In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its

application is left to the vagaries of each case . . . but its focus is protection of the secured

creditor from diminution in the value of its collateral during the reorganization process."

(internal quotation marks omitted) (citation omitted)).

73.    Here, the interests of the Prepetition Notes Secured Parties and the

Prepetition ABL Secured Parties are adequately protected for purposes of section 363(e) of the

Bankruptcy Code for the following reasons.

74.    First, the Prepetition Notes Secured Parties and the Prepetition ABL Secured

Parties consent to the Debtors' use of cash collateral on the terms of the DIP Credit Agreements

and proposed DIP Orders.

75.    Second, the Debtors intend to preserve value by maintaining operations

pending their reorganization pursuant to the Plan.

76.    Third, pursuant to the DIP Orders, the Prepetition Notes Secured Parties

and the Prepetition ABL Secured Parties, among other things, will receive (i) replacement liens

and claims (including, for the avoidance of doubt, pledges of 100% of the equity in each direct

subsidiary of any Debtor) to the extent set forth therein to protect them from any diminution in

value of the their interest in the Debtors' assets and (ii) superpriority administrative expense

claims against all Debtors junior only to DIP Superpriority Administrative Claims.

77.    The Debtors believe that such protections are adequate under the

circumstances. Further, given the significant value that the Debtors stand to lose in the event they

are denied access to continued use of cash collateral, such protections are wholly appropriate and

justified.

## INTERIM ORDER AND FINAL HEARING

78.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

79.     The urgent need to preserve the Debtors' business, and avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain the liquidity provided by the DIP Facilities and use Cash Collateral as of the Petition Date, pending the Final Hearing, in order to continue their operations and administer the Cases. Without the ability to obtain access to such funding, the Debtors would be unable to meet their postpetition obligations, including payroll obligations to over 1500 employees, and otherwise would be unable to fund their working capital needs, thus causing irreparable harm to the value of the Debtors for all stakeholders.

80.     Accordingly, the Debtors respectfully request that, pending the hearing on the  Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Orders be approved in all respects and the terms and provisions of the Final Orders be implemented and be deemed binding.

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

81.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  The Third Circuit has interpreted the language "immediate and irreparable

harm" in the context of preliminary injunctions.  In that context, the court has instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh, 235 Fed. App'x 907, 910 (3d Cir. 2007) (citing Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977)).  Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated.  See, e.g., Acierno v. New Castle County, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

82.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

83.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the DIP Agents; (c) counsel to the Prepetition ABL Lender; (d) the Prepetition Secured Notes Trustee and Collateral Agent; (e) the agent for the Debtors' prepetition senior unsecured notes; (f) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases; and (g) any

1034298-CHISR02A - MSW

such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).  The Debtors submit that no other or further notice need be provided.

**NO PRIOR REQUEST**

84.     No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Interim Order,

substantially in the forms annexed hereto, and the Final Order granting the relief sought herein

on an interim and final basis and granting such other and further relief as may be just and proper.


Dated:    Wilmington, Delaware
          September 9, 2015


                              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                              */s/ Van C. Durrer, II*
                              Van C. Durrer, II (I.D. No. 3827)
                              Annie Z. Li (*pro hac vice admission pending*)
                              300 South Grand Avenue, Suite 3400
                              Los Angeles, California 90071
                              Telephone: (213) 687-5000
                              Fax: (213) 687-5600

                              - and -

                              John K. Lyons (*pro hac vice admission pending*)
                              Jessica S. Kumar (*pro hac vice admission pending*)
                              155 N. Wacker Dr.
                              Chicago, Illinois 60606
                              Telephone: (312) 407-0700
                              Fax: (312) 407-0411

                              *Proposed Counsel for Debtors and Debtors in Possession*