## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                 :

In re:                           :      Chapter 11
                 :

QUIKSILVER, INC., *et al.*,      :      Case No. 15-11880 (___)
                 :

            Debtors.[1]    :      Jointly Administered
                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING ON A SUPER-PRIORITY, SENIOR SECURED BASIS AND (B) USE CASH COLLATERAL, (II) GRANTING (A) LIENS AND SUPER-PRIORITY CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] [Docket No. __], dated September 9, 2015, of Quiksilver, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (each, a "Debtor" and, collectively, the "Debtors") pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d), 364(e), and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of an interim order (this "Interim Order") providing for, among other things:

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), QS Optics, Inc. (2493), Quiksilver Wetsuits, Inc. (9599), Mt. Waimea, Inc. (5846), Quiksilver Entertainment, Inc. (9667), DC Shoes, Inc. (0965), DC Direct, Inc. (8364), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), and QS Retail, Inc. (0505).  The address of the Debtors' corporate headquarters is 15202 Graham Street, Huntington Beach, California 92649.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

KE 37617594

(i)        authority for the Debtors to obtain senior secured postpetition financing on a super-priority basis pursuant to the terms and conditions of that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated September [•], 2015, by and among QS Wholesale, Inc., as borrower (the "DIP Term Borrower"), Quiksilver, Inc., as parent guarantor, the other Debtors that are party thereto as guarantors, OCM FIE, LLC, as administrative agent for the DIP Term Lenders (as defined below) (the "DIP Term Agent"), and the lenders party thereto from time to time (collectively, the "DIP Term Lenders"), substantially in the form attached hereto as **Exhibit 1** (as such agreement may be amended, restated, amended and restated, extended, modified, supplemented, or replaced from time to time in accordance with its terms, the "DIP Term Loan Agreement" and the financing made available pursuant to the DIP Term Loan Agreement and the other DIP Term Documents (as defined below), the "DIP Term Facility");

(ii)        authority for the Debtors to (a) execute, deliver, and perform under the DIP Term Loan Agreement and all other related or ancillary documents and agreements (including the Budget (as defined below)) (collectively with the DIP Term Loan Agreement, the "DIP Term Documents"), and (b) perform such other acts as may be necessary or desirable in connection with the DIP Term Documents;

(iii)        authority for the Debtors to obtain senior secured revolving postpetition financing on a super-priority basis pursuant to the terms and conditions of that certain Second Amended and Restated Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated September [•], 2015, by and between, among others, QS Wholesale, Inc., as lead borrower and debtor-in-possession, the other domestic borrowers

2

thereunder (collectively, the "<u>DIP ABL Borrowers</u>" and, together with the DIP Term Borrower, the "<u>Borrowers</u>"), including certain non-debtor foreign affiliates and subsidiaries of Quiksilver, Inc., as a guarantor and debtor-in-possession, and certain Debtors and non-debtor affiliates, as guarantors, and Bank of America, N.A., as sole administrative agent and collateral agent (in such capacities, the "<u>DIP ABL Agent</u>" and, together with the DIP Term Agent, the "<u>DIP Agents</u>") for the DIP ABL Lenders (as defined below), Bank of America, N.A., as the initial revolving lender (together with any other lenders party thereto and their respective affiliates, successors and assigns, the "<u>DIP ABL Lenders</u>" and, together with the DIP Term Lenders, the "<u>DIP Lenders</u>"), substantially in the form attached hereto as **<u>Exhibit 2</u>** (as such agreement may be amended, restated, amended and restated, extended, modified, supplemented, or replaced from time to time in accordance with its terms, the "<u>DIP ABL Credit Agreement</u>" and, together with the DIP Term Loan Agreement, the "<u>DIP Credit Agreements</u>," and the financing made available pursuant to the DIP ABL Credit Agreement and the other DIP ABL Documents (as defined below), the "<u>DIP ABL Facility</u>" and, together with the DIP Term Facility, the "<u>DIP Facilities</u>");

(iv)    authority for the Debtors to (a) execute, deliver, and perform under the DIP ABL Credit Agreement and all other related or ancillary documents and agreements (including the Budget) (collectively with the DIP ABL Term Sheet and the DIP ABL Credit Agreement, the "<u>DIP ABL Documents</u>" and, together with the DIP Term Documents, the "<u>DIP Documents</u>"), and (b) perform such other acts as may be necessary or desirable in connection with the DIP ABL Documents;

(v)        authority for the Debtors to (a) use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code and/or under the DIP Documents, as applicable (the "Cash Collateral"), subject to (x) the restrictions set forth in the DIP Documents and this Interim Order, and (y) the grant of adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral (each as defined herein), and (b) access and use the liquidity provided under the DIP Facilities on an interim basis, as follows (1-3 below being collectively defined as the "Interim DIP Financing"):

(1) access and use of the postpetition term loans made available from time to time under the DIP Term Facility in the amount of up to $70.0 million during the interim period to provide for ongoing debtor-in-possession working capital purposes, and general corporate and other entity purposes, in each case consistent with the Budget;

(2) pay fees and expenses (including original issue discount in respect of the total amount of committed financing under the DIP Term Facility); and

(3) access and use up to $60.0 million of the postpetition revolving loans made available under the DIP ABL Facility to (x) partially satisfy certain prior indebtedness, including certain prepetition borrowings under the ABL Facility, convert all letters of credit issued by any ABL Secured Party (as defined below) under the ABL Documents (as defined below) to letters of credit under the DIP ABL Documents, (y) fund the Debtors' chapter 11 cases and the continued operation of their businesses as Debtors, and (z) fund certain fees and expenses associated with the consummation of the transactions contemplated in the DIP Documents, each on the terms set forth herein and the DIP Documents;

(vi)        a grant of an automatically perfected, valid, enforceable, and unavoidable security interests and liens, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, on all DIP Collateral (as defined herein) and assets of the Borrowers and the other Debtors providing credit support under the DIP Facilities (the "Credit Parties"), including with respect to Avoidance Actions (as defined below) and the products and proceeds thereof, as more fully described herein;

(vii)        a grant, with respect to the obligations of the Borrowers and the other Credit Parties hereunder and under the other DIP Documents (and subject only to the Carve-Out described in paragraph 34 hereof), of an allowed super-priority administrative expense claim in each of the Debtors' bankruptcy cases (and against each of the Debtors' estates created pursuant to section 541 of the Bankruptcy Code) pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in or arising under any section of the Bankruptcy Code (including, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), or 726 thereof);

(viii)        authority for the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, the reasonable and documented fees and disbursements of the DIP Agents' and the DIP Lenders' attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the DIP Documents;

(ix)        a modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, as set forth herein;

(x)        approval of the Chapter 11 Case Milestones (as set forth in Section 8.1(u)

of the DIP Term Loan Agreement, the "Milestones") in respect of the Restructuring (as

defined in that certain Plan Sponsor Agreement entered into as of September 8, 2015, by

and among Quiksilver, Inc. and its subsidiaries and certain funds managed by affilates of

Oaktree Capital Management, L.P. (the "Plan Sponsor")); and

(xi)        scheduling of a final hearing (the "Final Hearing") to consider entry of an

order approving the relief requested in the Motion on a final basis (the "Final Order") and

approving the form of notice with respect to the Final Hearing;

and the Court having considered the Motion, the *Declaration of Andrew Bruenjes, Americas*

*Chief Financial Officer of Quiksilver, Inc., in Support of Debtors' Chapter 11 Petitions and First*

*Day Motions*, and the *Declaration of Durc A. Savini in Support of the Motion*, each filed

concurrently with the Motion, the DIP Documents, the evidence submitted or proffered at the

interim hearing to consider the relief requested in the Motion held on September [•], 2015 (the

"Interim Hearing"); and notice of the Interim Hearing having been given in accordance with

Bankruptcy Rules 4001(b), (c), and (d), and 9014; and the Interim Hearing having been held and

concluded; and all objections to the relief requested in the Motion having been withdrawn,

resolved, or overruled by the Court; and based on all pleadings filed with this Court, and all

proceedings held before the Court; and it appearing to the Court that granting the interim relief

requested in the Motion is fair and reasonable and in the best interests of the Debtors, their

estates, and their creditors and equity holders, and is essential for the continued operation of the

Debtors' businesses; and it further appearing that the Debtors are unable to obtain unsecured

credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the

Bankruptcy Code; and adequate protection being provided on account of the interests of certain

holders of liens on the property of the estates on which liens are to be granted; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.       *Petition Date*.  On September 9, 2015 (the "Petition Date"), each of the Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court") commencing these chapter 11 cases.

B.       *Debtors-in-Possession*.  The Debtors continue to operate their businesses and properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

C.       *Jurisdiction and Venue*.  This Court has jurisdiction over these proceedings and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for these chapter 11 cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.       *Committee Formation*.  As of the date hereof, the United States Trustee (the "U.S. Trustee" has not yet appointed an official committee of unsecured creditors (the "Committee") in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code.

E.     _Debtors' Stipulations_.  Subject only to the rights of parties in interest as set forth in paragraph 37 hereof, after consultation with their attorneys and financial advisors, the Debtors (on behalf of, and for themselves) admit, stipulate, acknowledge, and agree to the following:

(i)     _ABL Facility_.  QS Wholesale, Inc., as borrower representative, the other borrowers, certain other parties designated as "Credit Parties" thereto, the financial institutions from time to time party thereto (collectively, the "ABL Lenders"), and Bank of America, N.A., as administrative agent and collateral agent (in such capacities, the "ABL Agent" and, together with the ABL Lenders, the "ABL Secured Parties"), are parties to that certain Amended and Restated Credit Agreement, dated as of May 24, 2013 (as may be amended, restated, modified, supplemented, or replaced from time to time, the "ABL Credit Agreement").  The ABL Credit Agreement provides the Debtors with an asset-based credit facility (the "ABL Facility") with $230.0 million maximum aggregate availability to both the domestic and foreign borrowers thereunder, subject to a borrowing base (and as reduced by reserves), all set forth in the ABL Credit Agreement. As of the Petition Date, approximately $92.0 million was outstanding under the ABL Facility, approximately $62.0 million of which comprised "Revolving Loans" (as defined under the ABL Credit Agreement), plus letters of credit in the approximate stated amount of not less than approximately $30.0 million, plus interest accrued and accruing at the rates set forth in the ABL Credit Agreement (together with any other amounts outstanding under the ABL Facility as provided in the ABL Credit Agreement, including obligations in respect of the cash management system, cash collateral for letters of credit, purchase charge cards, purchase card services, fees, expenses, and indemnity, the "ABL Obligations").  The ABL Facility is secured by (1) first priority security interests and

liens on certain of the Debtors' property, including, without limitation, the Debtors' accounts receivables, inventory, cash deposit and securities accounts and such other assets related to or arising out of, evidencing or governing any of the foregoing, including, without limitation, all cash, money and cash equivalents and proceeds thereof (collectively, and in any case as more fully described in the definition of ABL Priority Collateral in the Prepetition Intercreditor Agreement, the "ABL Priority Collateral" and the "ABL Liens," as applicable), (2) second priority security interests and liens on the Secured Notes Priority Collateral (collectively, and in any case as more fully described in the definition of Secured Notes Priority Collateral in the Prepetition Intercreditor Agreement, the "Secured Notes Priority Collateral"), and (3) certain guaranties of the Foreign Liabilities by certain of the Debtors, and the cross-guaranty of Foreign Liabilities by the Foreign Entities (each as defined in the ABL Credit Agreement) ((1), (2), and (3) being collectively defined herein as the "ABL Collateral") pursuant to the "Security Documents" (as such term is defined and as set forth in the ABL Credit Agreement) (the "ABL Collateral Documents," and, together with the ABL Credit Agreement, the "ABL Documents").

(ii)        *Senior Secured Notes.*  Pursuant to that certain Indenture, dated as of July 16, 2013 (as amended, modified, waived, and/or supplemented from time to time, the "Secured Notes Indenture"), between Quiksilver, Inc. and QS Wholesale, Inc., as issuers, the guarantors party thereto, and U.S. Bank National Association, as indenture trustee and collateral agent (the "Secured Notes Agent" and, together with the ABL Agent, the "Prepetition Agents"), 7.875% senior secured notes due 2018 (the "Senior Secured Notes") were issued in an original principal amount of $280.0 million.  As used herein,

the "Secured Noteholders" means the holders under the Indenture (together with the Secured Notes Agent, the "Secured Notes Parties" and, together with the ABL Secured Parties, the "Prepetition Secured Parties").  As of the Petition Date, approximately $279.0 million, plus interest accrued and accruing at the rates set forth in the Secured Notes Indenture, was outstanding in respect of the Senior Secured Notes (together with any other amounts outstanding under the Secured Notes Documents, including obligations in respect of fees, expenses and indemnity, and any obligations created pursuant to this Interim Order, including the adequate protection provided in paragraph 12 hereof the "Secured Notes Obligations" and, together with the ABL Obligations, the "Prepetition Obligations").  The Secured Notes Obligations are secured by (1) first priority security interests and liens on certain of the Debtors' property, including without limitation intellectual property, real estate, fixtures, furniture and equipment, and capital stock of the Debtors' subsidiaries, subject to certain exceptions set forth in the Secured Notes Collateral Documents (as defined below) (the "Secured Notes Priority Collateral"), and (2) second priority security interests and liens on the ABL Priority Collateral (collectively, the "Secured Notes Liens" and the "Secured Notes Collateral," as applicable, and, together with the ABL Collateral, the "Prepetition Collateral"), pursuant to "Security Documents" (as such term is defined and as set forth in the Indenture) (the "Secured Notes Collateral Documents," and together with the Indenture, the "Secured Notes Documents" and the Secured Notes Documents, together with the ABL Documents and the Prepetition Intercreditor Agreement (as defined below), the "Prepetition Financing Documents").

(iii)        *Prepetition Intercreditor Agreement.*  On July 16, 2013, the ABL Agent and the Secured Notes Agent entered into that certain Second Amended and Restated Intercreditor Agreement that, among other things, assigned relative priorities to certain claims and liens arising under the ABL Documents and the Secured Notes Documents (the "Prepetition Intercreditor Agreement").

(iv)        *Validity and Priority of Prepetition Indebtedness and Liens.*  After consultation with their attorneys and financial advisors, the Debtors, the ABL Agent, and the Required Secured Noteholders (as defined below) acknowledge and agree that (a) the liens on the Secured Notes Collateral granted pursuant to the Secured Notes Documents, respectively, are valid, binding, enforceable, non-avoidable, and perfected liens, and are not subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement, counterclaim, surcharge, recharacterization, or subordination, pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except as expressly set forth in the Secured Notes Documents); (b) the liens granted pursuant to the Secured Notes Documents are senior to all security interests and liens in the Secured Notes Collateral, subject only to the senior liens of the ABL Agent in certain of the ABL Priority Collateral in accordance with the Prepetition Intercreditor Agreement; (c) the liens on the ABL Collateral granted pursuant to the ABL Documents are valid, binding, enforceable, non-avoidable, and perfected liens, and are not subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement, counterclaim, surcharge, recharacterization, or subordination, pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except as expressly set forth in the ABL Documents); (d) the liens granted pursuant to

the ABL Documents are senior to all security interests and liens in the ABL Collateral, subject only to the senior liens of the Secured Notes Agent in certain Secured Notes Priority Collateral in accordance with the Prepetition Intercreditor Agreement; (e) the ABL Documents are valid and enforceable by the ABL Agent and ABL Lenders against each of the Debtors party to such agreements; (f) the Secured Notes Documents are valid and enforceable by the Secured Notes Agent and the Secured Noteholders against each of the Debtors party to such agreements; (g) the obligations under the ABL Facility and the obligations under the Senior Secured Notes constitute legal, valid, binding, and unavoidable obligations of the Debtors, enforceable in accordance with the terms and conditions of the ABL Documents and the Secured Notes Documents; (h) no offsets, challenges, defenses, claims, or counterclaims of any kind or any nature to any of the obligations under the ABL Facility or to any of the obligations under the Senior Secured Notes exist, and no portion of such obligations (including, as applicable, the Secured Notes Obligations) is subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law, except as expressly set forth in the Prepetition Financing Documents; (i) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the ABL Agent, the Secured Notes Agent, the ABL Lenders, the Secured Noteholders, and/or any of such parties' respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors, or employees whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims

12

arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the ABL Documents or the Secured Notes Documents (or the transactions contemplated thereunder), the obligations under the ABL Facility and the Senior Secured Notes, or the security interests and liens in the ABL Collateral and the Secured Notes Collateral; (j) as of the Petition Date, the Prepetition Obligations constitute allowed, secured claims within the meaning of sections 506(a) and 502 of the Bankruptcy Code, together with accrued and unpaid interest, fees, including, attorneys' fees and related expenses, costs, expenses, and other charges of whatever nature owing in respect thereof; (k) the Debtors have waived, discharged, and released any right to challenge any of the obligations under the ABL Facility and the Senior Secured Notes, the priority of the Debtors' obligations thereunder, and the security for (and the priority of the liens securing) such obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action against the ABL Agent, ABL Lenders, Secured Notes Agent, and Secured Noteholders, and/or any of their respective officers, directors, or employees; and (l) any payments made on account of the obligations under the ABL Facility and the obligations in respect of the Senior Secured Notes (including, as applicable, the ABL Obligations and the Secured Notes Obligations) to or for the benefit of the ABL Agent, ABL Lenders, Secured Notes Agent, or Secured Noteholders prior to the Petition Date were payments out of the Prepetition Collateral in accordance with the Prepetition Intercreditor Agreement, as applicable, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

(v)     *Cash Collateral*.    The Debtors acknowledge and stipulate that substantially all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) of the Prepetition Secured Parties, as and to the extent applicable.

(vi)     *Default by the Debtors*.    The Debtors acknowledge and stipulate that the Debtors are in default of their debts and obligations under the ABL Documents and the Secured Notes Documents.    Furthermore, the Debtors acknowledge and stipulate that by filing petitions for relief under chapter 11 of the Bankruptcy Code and commencing these chapter 11 cases, all of their debts and obligations under the ABL Documents and the Secured Notes Documents (including, without limitation, any premiums payable thereunder) are immediately due and payable.

F.     *Consent to Adequate Protection*.    The ABL Agent and the holders of a majority of the Senior Secured Notes (the "Required Secured Noteholders") each have provided consent to the adequate protection provided in paragraph 12 of this Interim Order.

G.     *Findings Regarding the Postpetition Financing*.

(i)     *Request for Postpetition Financing*.    The Debtors seek authority on an interim basis to:  (a) use Cash Collateral on the terms described herein, and (b) access and use the liquidity provided under the DIP Term Facility to:  (i) finance ongoing debtor-in-possession working capital purposes, as provided for in the Budget, and other general corporate purposes; (ii) finance transaction fees, costs and expenses related to the DIP Credit Agreements; and (iii) make intercompany loans to, and other investments in, certain Debtor and non-Debtor affiliates, solely to the extent permitted under the DIP

14

Documents and as provided for in the Budget.  The Debtors seek authority to use the proceeds of the DIP ABL Facility and, to the extent necessary, the DIP Term Facility for partial satisfaction of the ABL Obligations under the ABL Documents and the conversion of all letters of credit issued by any ABL Secured Party under the ABL Documents to letters of credit under the DIP ABL Documents.

(ii)        *Priming of Certain Prepetition Liens.*  The priming of the liens of the Prepetition Secured Parties on the Prepetition Collateral, as contemplated by the DIP Facilities and as further described below, will enable the Debtors to obtain the DIP Facilities and to continue to operate their businesses for the benefit of their estates and creditors.  However, the Prepetition Secured Parties are each entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for and to the extent of any postpetition diminution in the value of each of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from the Debtors' use, sale, or lease of such collateral, the imposition of the automatic stay, the priming of the prepetition liens granted on the Prepetition Collateral, and the subordination to the Carve-Out described in paragraph 34 hereof and the DIP Liens (as defined herein) (collectively, the "Diminution in Value").  As adequate protection, the Prepetition Secured Parties will receive the adequate protection described in paragraph 12 of this Interim Order.  For the avoidance of doubt, the Required Secured Noteholders consent to the priming of the Secured Notes Liens to the extent and as set forth in this Interim Order and the DIP Documents.

(iii)        *Need for Postpetition Financing and Use of Cash Collateral.*  The Debtors' need to use Cash Collateral and to obtain credit pursuant to the DIP Facilities as

15

provided for herein is necessary to enable the Debtors to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise to finance their operations requires the availability of working capital from the DIP Facilities and the use of Cash Collateral. Without the ability to access the DIP Facilities or Cash Collateral, the Debtors, their estates, their creditors, and the possibility for a successful reorganization would suffer immediate and irreparable harm.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facilities and authorized use of Cash Collateral.

(iv)     *No Credit Available on More Favorable Terms.*   Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facilities.   The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Agents, for the benefit of themselves and the DIP Lenders, (a) perfected security interests in and liens on (each as provided herein)

16

all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (b) superpriority claims and priming liens, and (c) the other protections set forth in this Interim Order.

(v)        *Adequacy of the Budget*.  As set forth in the DIP Documents, the Debtors have prepared and delivered to the DIP Agents and the DIP Lenders a budget, a copy of which is annexed as **<u>Exhibit C</u>** to the DIP Term Loan Agreement (as may be modified, amended, restated or supplemented with the consent of each of the DIP Agents in their respective sole discretion on the terms set forth in the DIP Documents and paragraph 15 hereof, the "<u>Budget</u>").[3]  The Budget has been thoroughly reviewed by the Debtors, their management, and their advisors.   The Debtors, their management, and their advisors believe the Budget and the estimate of administrative expenses due or accruing during the period covered by the Budget were developed using reasonable assumptions, and based on those assumptions the Debtors believe there should be sufficient available assets to pay all administrative expenses due or accruing during the period covered by the Budget.

H.        *Section 506(c)*.  In exchange for (i) the DIP Agents' and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and (ii) the Prepetition Secured Parties' agreement to subordinate their liens and claims to the Carve-Out and the DIP Liens, the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties shall, only upon entry of the Final Order, each receive a waiver of the provisions of section 506(c) of the Bankruptcy Code.

I.        *Section 552*.  In exchange for (i) the DIP Agents' and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and (ii) the Prepetition

---

[3]    For the avoidance of doubt, the Budget is one of the DIP Documents.

Secured Parties' agreement to subordinate their liens and claims to the Carve-Out and the DIP Liens, the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties are each entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply; provided, that subpart (ii) of the foregoing shall be subject to entry of the Final Order with respect to parties in interest other than the Debtors.

J.      *Good Faith of the DIP Agents and the DIP Lenders*.

(i)      *Willingness to Provide Financing*.  The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to:  (a) the entry by this Court of this Interim Order; (b) approval by this Court of the terms and conditions of the DIP Facilities and the DIP Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Agents and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agents' and DIP Lenders' claims, superpriority claims, security interests, and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order, or any other order.

(ii)      *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms and conditions of this Interim Order, the DIP Facilities, and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent and sound business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP Facilities and the use of Cash Collateral

18

were negotiated in good faith and at arms' length among the Debtors, the DIP Agents, the DIP Lenders, and certain of the Prepetition Secured Parties. The use of Cash Collateral and credit to be extended under the DIP Facilities shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agents and the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

K.      *Notice*. Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties-in-interest, including: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Required Secured Noteholders; (iii) counsel to the ABL Agent; (iv) counsel to the DIP Term Agent; (v) counsel to the Debtors' prepetition unsecured noteholders; (vi) counsel to the DIP ABL Agent; (vii) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in the Chapter 11 Cases; (viii) all parties holding security interests in any of the Debtors' assets; and (ix) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m) (collectively, the "Notice Parties"). The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      <u>Interim DIP Financing Approved</u>.  The Interim DIP Financing is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order and the DIP Documents (including the Budget).

2.      <u>Objections Overruled</u>.  All objections to the Interim DIP Financing and/or entry of this Interim Order to the extent not withdrawn or resolved are hereby overruled.

**<u>DIP Facility Authorization</u>**

3.      <u>Authorization of the Interim DIP Financing and Entry into the DIP Documents; Application of DIP Proceeds</u>.  The DIP Facilities and the DIP Documents are hereby approved for the Interim DIP Financing.  The Debtors are expressly and immediately authorized and empowered to incur and to perform the DIP Obligations (as defined herein) in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments and documents that may be necessary or required for the performance by the Debtors under the DIP Facilities and the creation and perfection of the DIP Liens provided for by this Interim Order and the DIP Documents.  The DIP Documents evidence valid and binding obligations of the Debtors, which shall be enforceable against the Debtors, their estates, and their creditors in accordance with the terms and conditions of the DIP Documents and this Interim Order.  The Debtors are hereby authorized to pay, in accordance with this Interim Order, the principal, interest, fees (including original issue discount), expenses, and other amounts described in the DIP Documents and all other documents comprising the DIP Facilities as such become due and without need to obtain further Court approval, all to the extent provided in the DIP Documents.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be

deposited and applied as required by this Interim Order and the DIP Documents.  All of the obligations described in the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with the terms of the DIP Documents.  Without limiting the rights of the DIP ABL Agent to impose reserves against the Borrowing Base (as defined in the DIP ABL Credit Agreement), the DIP ABL Agent is expressly authorized to impose reserves against the Borrowing Base in an amount equal to the aggregate amount of Foreign Liabilities (as defined in the DIP ABL Credit Agreement).  The proceeds of the DIP Facilities (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreements) shall be used for:  (a) the payment of fees, expenses and costs incurred in connection with the Chapter 11 Cases; (b) repayment of certain of the ABL Obligations under the ABL Documents; provided, that any and all borrowings of the Foreign Loan Parties (as defined below) shall remain outstanding and unaffected by this Interim Order (and all prior collateral and security grants and interests shall likewise remain unaltered and unaffected by this Interim Order, and the Debtors' guaranty of such Foreign Liabilities is hereby reaffirmed in accordance with the DIP ABL Documents);[4] provided, further, that the Debtors shall be authorized to make an Interim Order Intercompany Loan to the Japanese Lenders for the repayment of the certain outstanding ABL Obligations owing to certain ABL Lenders in accordance with the DIP ABL Credit Agreement; (c) conversion of all letters of credit issued by any ABL Lender under the ABL Documents to letters of credit under the DIP ABL Facility; (d) the payment of transaction expenses; (e) working capital, capital expenditures, and other

---

[4]     For the avoidance of any doubt, such Debtor guarantees of Foreign Liabilities of the Foreign Loan Parties are a DIP ABL Document.

general corporate purposes of the Debtors; and (f) the funding of the ABL Indemnity Account (as defined below).

4.　　　　Authorization to Access the Interim DIP Financing.  During the period that this Interim Order is effective, and subject to the terms and conditions set forth in the DIP Documents, the DIP Facilities, and this Interim Order, and to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to access the Interim DIP Financing pursuant to the terms herein and the terms of the DIP Documents.

5.　　　　DIP Obligations.  Upon entry of this Interim Order, the DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' obligations under the DIP Facilities, the other DIP Documents, and this Interim Order (the "DIP Obligations"), which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including, any trustee appointed in these cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these chapter 11 cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agents or to any of the DIP Lenders, under the DIP Documents, or this Interim Order, including all principal, accrued interest, costs, fees, expenses, and other amounts under the DIP Documents.  The DIP Obligations shall be due and payable as provided for herein and in the DIP Documents.

6.        DIP Liens and Collateral.

(a)        As more fully set forth in the DIP Term Documents, as security for the full and timely payment of the DIP Term Obligations, the DIP Term Agent on its behalf and on behalf of the DIP Term Lenders is hereby granted:

i.        pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in all unencumbered assets of the Debtors other than assets constituting ABL Priority Collateral (now or hereafter acquired and all proceeds thereof);

ii.        pursuant to section 364(c)(3) of the Bankruptcy Code, junior liens on and security interests in the ABL Priority Collateral (now or hereafter acquired and all proceeds thereof); provided, that such liens on the ABL Priority Collateral shall be junior in priority and subordinate to the DIP ABL Liens (defined below), and senior in priority to any other lien on the ABL Priority Collateral (including, without limitation, the liens of the Secured Notes Agent and the ABL Agent) securing any other indebtedness of the Debtors; and

iii.        pursuant to section 364(d) of the Bankruptcy Code, first priority priming liens on and security interests in the ABL Priority Collateral and the Secured Notes Priority Collateral (now or hereafter acquired and all proceeds thereof); provided, that such liens on the Secured Notes Priority Collateral shall be senior in priority to the liens of the Secured Notes Agent, the liens of the ABL Agent and  and the DIP ABL Liens on the Secured Notes Priority Collateral; and provided, further that such liens on the ABL Priority Collateral shall be junior in priority and subordinate to the DIP ABL Liens (as defined below), and senior in priority to any other lien on the ABL Priority Collateral

(including, without limitation, the liens of the Secured Notes Agent and the ABL Agent) securing any other indebtedness of the Debtors;

provided, further, that, upon entry of the Final Order, the DIP Term Liens (as defined below) shall attach to and encumber the proceeds from the claims and causes of action under chapter 5 of the Bankruptcy Code and similar laws (collectively, the "Avoidance Actions"), including property received by judgment, settlement or otherwise.  The liens and security interests identified in this paragraph are referred to herein as the "DIP Term Liens" and the collateral to which such DIP Term Liens attach, the "DIP Term Collateral"; provided, that the DIP Term Liens in respect of any Avoidance Actions shall rank equally in priority and share on a pro rata basis (based on the outstanding principal amount of the DIP Term Facility on the one hand, and the DIP ABL Facility on the other hand, with respect to all amounts payable under the DIP ABL Facility and DIP Term Facility, respectively).

(b)     As more fully set forth in the DIP ABL Documents, as security for the full and timely payment of the DIP ABL Obligations, the DIP ABL Agent on its behalf and on behalf of the DIP ABL Lenders is hereby granted:

i.     pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in all unencumbered assets of the Debtors other than  assets constituting Secured Notes Priority Collateral (now or hereafter acquired and all proceeds thereof); and

ii.     pursuant to section 364(c)(3) of the Bankruptcy Code, junior liens on and security interests in the Secured Notes Priority Collateral (now or hereafter acquired and all proceeds thereof); provided, that such liens on the Secured Notes Priority Collateral shall be junior in priority and subordinate to the DIP Term Liens (defined below), and

senior in priority to any other lien on the Secured Notes Priority Collateral (including, without limitation, the liens of the Secured Notes Agent and the ABL Agent) securing any other indebtedness of the Debtors;

iii.    pursuant to section 364(d) of the Bankruptcy Code, first priority priming liens on and security interests in the ABL Priority Collateral and Secured Notes Priority Collateral (in each case, now or hereafter acquired and all proceeds thereof); provided, that such liens on the ABL Priority Collateral shall be senior in priority to the DIP Term Liens and the Secured Notes Liens on the ABL Priority Collateral, and (ii) the Secured Notes Priority Collateral shall be junior in priority and subordinate to the DIP Term Liens in and upon such Secured Notes Priority Collateral but senior in priority to the Secured Notes Liens on the Secured Notes Priority Collateral;

provided, further, that, upon entry of the Final Order, the DIP ABL Liens (as defined below) shall attach to and encumber the proceeds of Avoidance Actions, including property received by judgment, settlement or otherwise; provided, further, that (i) the DIP ABL Liens in respect of any Avoidance Actions shall rank equally in priority and share on a pro rata basis (based on the outstanding principal amount of the DIP Term Facility on the one hand, and the DIP ABL Facility on the other hand, with respect to all amounts payable under the DIP ABL Facility and DIP Term Facility, respectively).  The liens and security interests identified in this paragraph are referred to herein as the "DIP ABL Liens" (together with the DIP Term Liens, the "DIP Liens") and the collateral to which such DIP ABL Liens attach, the "DIP ABL Collateral" (together with the DIP Term Collateral, the "DIP Collateral"), and in all instances shall be subject to the terms of the Postpetition Intercreditor Agreement.

7.      DIP Lien Priority.  The DIP Liens to be created and granted to the DIP Agents and the DIP Lenders, as provided herein, (a) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and (b) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the DIP Collateral, and are subject only to: (x)(i) the DIP Credit Agreements, and (ii) the terms and provisions of that certain Postpetition Intercreditor Agreement, dated as of September [•], 2015 (the "Postpetition Intercreditor Agreement", and, together with the Prepetition Intercreditor Agreement the "Intercreditor Agreements")), and (y)(i) the Carve-Out, and (ii) solely in the case of the DIP Term Obligations and DIP Term Liens, respectively, any Priority Permitted Encumbrances (as defined in the DIP Credit Agreements).  The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the order and priority set forth in the DIP Credit Agreements and this Interim Order, subject to the Postpetition Intercreditor Agreement.  Except as otherwise provided herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon any Successor Case(s), and/or upon the dismissal of any of the Chapter 11 Cases.  The DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code, the "equities of the case" exception of section 552 of the Bankruptcy Code (subject to entry of the Final Order with respect to parties in interest other than the Debtors), or if approved in the Final Order, section 506(c) of the Bankruptcy Code.

8.      DIP Superpriority Claims.  In addition to the liens and security interests granted to the DIP Term Agent on its behalf and on behalf of the DIP Term Lenders and the DIP ABL Agent on behalf of the DIP ABL Lenders pursuant to this Interim Order, subject and

subordinate to the Carve-Out and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the DIP Term Obligations and the DIP ABL Obligations shall constitute allowed superpriority administrative expense claims (the "DIP Superpriority Claims") with priority over any and all administrative expenses of the Debtors, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code; provided, that (i) the DIP Superpriority Claims in respect of the DIP Term Facility and the DIP Superpriority Claims in respect of the DIP ABL Credit Facility shall rank equally in priority and share on a pro rata basis (based on the outstanding principal amount of the DIP Term Facility on the one hand, and the DIP ABL Facility on the other hand) with respect to all amounts payable in respect of such superpriority administrative expense claims, and (ii) upon the entry of the Final Order, the DIP Superpriority Claims shall attach to the proceeds of the Avoidance Actions.

9.    Extension of Credit.  The DIP Agents and the DIP Lenders shall have no obligation to make any loan or advance unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the applicable DIP Agent(s) in such agent's sole discretion.

10.    Use of DIP Facilities Proceeds.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facilities only pursuant to the terms herein and the terms of the DIP Documents, including as contemplated and limited by the Budget (including any variance therefrom as may be permitted under the DIP Documents).

**Authorization to Use Cash Collateral and Adequate Protection**

11.     Authorization to Use Cash Collateral.  Subject to the terms and conditions set forth in, and in accordance with, this Interim Order, the DIP Facilities, and the DIP Documents, the Debtors are authorized to use Cash Collateral.  Except as expressly permitted in this Interim Order, the DIP Facilities, and the DIP Documents, nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any Cash Collateral or other proceeds resulting therefrom.  Upon the occurrence of an Event of Default (as defined herein and in the DIP Documents), the Debtors' consensual use of Cash Collateral shall terminate.

12.     Adequate Protection.  As adequate protection for the interest of the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral) on account of the granting of the DIP Liens, subordination to the Carve-Out, the Debtors' use of Cash Collateral and other decline in value arising out of the automatic stay and/or the Debtors' use, sale, depreciation, or disposition of the Prepetition Collateral, the Prepetition Secured Parties shall receive the following adequate protection:

(a)     *Secured Notes Replacement Liens.*  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, solely to the extent of the diminution of the value of the interest of the Secured Notes Parties in the Secured Notes Collateral, the Secured Notes Parties shall have, subject to the terms and conditions set forth below, additional and replacement security interests and liens in the DIP Collateral (including, for the avoidance of doubt, pledges of 100% of the equity in each direct subsidiary of any Debtor) (the "Secured Notes Replacement Liens"), which shall be junior only to the DIP Liens, the DIP Superiority Claims, and the Carve-Out, and shall, in each case, be

28

subject to the terms of the Prepetition Intercreditor Agreement.

(b)      *Secured Notes Superpriority Claim.*  Solely to the extent of the diminution of the value of the interests of the Secured Notes Parties in the Secured Notes Collateral, and subject to the Prepetition Intercreditor Agreement, the Secured Notes Parties shall have an allowed superpriority administrative expense claim (the "Secured Notes Superpriority Claims") which shall have priority, except with respect to (i) the DIP Liens, (ii) the DIP Superpriority Claims, and (iii) the Carve-Out, in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Other than the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on a parity with the Secured Notes Superpriority Claims.

(c)      *Milestones.*  The Milestones are approved as adequate protection for the benefit of the Prepetition Secured Parties.

29

(d)     *ABL Indemnity Account.*  Incidental to the payment in full in cash of the ABL Obligations in accordance with the terms of this Interim Order and the DIP Documents, the Debtors shall establish an account in the "control" (as defined in the UCC (as defined in the DIP Credit Agreements)) of the ABL Agent (the "ABL Indemnity Account"), into which the sum of $250,000.00 shall be deposited as security for any reimbursement, indemnification or similar continuing obligations of the Debtors in favor of the ABL Secured Parties under the ABL Documents, including, without limitation, any obligations arising under Section 10.4 and Section 10.5 of the ABL Credit Agreement (the "ABL Indemnity Obligations").

(i)     Upon the expiration of the Challenge Period (as defined below) if, as of such date, no party has filed (x) an adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in Paragraph 7 hereof, or (y) an adversary proceeding, cause of action, objection, claim, defense, or other challenge against any ABL Secured Party related to the ABL Facility, whether in the Chapter 11 Cases or independently in another forum, court, or venue (the last such date being the "ABL Indemnity Account Termination Date"), all amounts then remaining and being held in the ABL Indemnity Account (net of any unreimbursed obligations owing to the ABL Agent and/or ABL Lenders on such date) shall be released to the Debtors.

(ii)     The ABL Indemnity Obligations shall be secured by a first priority lien on the ABL Indemnity Account in favor of the ABL Secured Parties.

(iii)     The ABL Secured Parties may apply amounts in the ABL Indemnity Account against the ABL Indemnity Obligations as and when they

arise, without further notice to or consent from the Debtors, the Committee, or any other parties in interest and without further order of this Court, upon compliance with the provisions of paragraph 29 below.

(iv)    In addition to the establishment and maintenance of the ABL Indemnity Account, until the ABL Indemnity Account Termination Date the ABL Agent, for itself and on behalf of the ABL Lenders, shall retain and maintain the ABL Liens as security for any the amount of any ABL Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the ABL Indemnity Account; provided, that the ABL Liens shall be (x) junior in priority to the DIP Liens on the DIP Collateral, the ABL Priority Collateral, and the Secured Notes Priority Collateral, (y) junior in priority to the Secured Notes Liens on the Secured Notes Priority Collateral, and (z) senior in priority to the Secured Notes Liens on the ABL Priority Collateral;

(e)    *ABL Secured Replacement Liens.*  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, solely to the extent of the diminution of the value of the interest of the ABL Secured Parties in the ABL Collateral, the ABL Secured Parties shall have, subject to the terms and conditions set forth below, additional and replacement security interests and liens in the DIP Collateral (including, for the avoidance of doubt, pledges of 100% of the equity in each direct subsidiary of any Debtor) (the "ABL Secured Parties Replacement Liens"; and together with the Secured Notes Replacement Liens the "Replacement Liens"), which shall be junior only to the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, and shall, in each case, be subject to the terms of the Prepetition Intercreditor Agreement.

31

(f)      *ABL Secured Parties Superpriority Claim.*    Solely to the extent of the diminution of the value of the interests of the ABL Secured Parties in the ABL Collateral on account of the ABL Indemnity Obligations, and subject to the Prepetition Intercreditor Agreement, the ABL Secured Parties shall have an allowed superpriority administrative expense claim (the "ABL Secured Parties Superpriority Claims"; and together with the Secured Notes Superpriority Claims the "Prepetition Superpriority Claims") which shall have priority, except with respect to (i) the DIP Liens, (ii) the DIP Superpriority Claims, and (iii) the Carve-Out, in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Other than the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on a parity with the Prepetition Superpriority Claims.

(g)      *Adequate Protection upon Sale of Prepetition Collateral.*    Except as otherwise provided in the Prepetition Intercreditor Agreement, upon the sale of any

Prepetition Collateral pursuant to section 363 of the Bankruptcy Code, any such Prepetition Collateral shall be sold free and clear of the Prepetition Liens and the Replacement Liens; provided, however, that such Prepetition Liens and Replacement Liens shall attach to the proceeds of any such sale in the order and priority as set forth in this Interim Order and the Prepetition Intercreditor Agreement.

14.     Section 507(b) Reservation.  Subject only to the Carve-Out described in paragraph 34 hereof, nothing contained herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided in this Interim Order is insufficient to compensate for any diminution in value of the respective interests of the Prepetition Secured Parties in the Prepetition Collateral during these chapter 11 cases or any Successor Cases.

**Provisions Common to DIP Financing and Use of Cash Collateral Authorizations**

15.     Amendment of the DIP Documents.  The DIP Documents may, from time to time, be amended, amended and restated, modified, or supplemented by the parties thereto without notice or a hearing if the amendment, amendment and restatement, modification, or supplement is (a) in accordance with the DIP Documents and (b) not prejudicial in any material respect to the rights of third parties; provided, however, that notwithstanding the foregoing, except for actions expressly permitted to be taken by the DIP Agents or the DIP Lenders as provided in the DIP Documents, including the Postpetition Intercreditor Agreement, no amendment, modification, supplement, termination, or waiver of any provision of the DIP Documents, or any consent to any departure by any of the Borrowers or the Credit Parties therefrom, shall in any event be effective unless the consents required under the terms of the DIP Documents and the Postpetition Intercreditor Agreement have first been obtained (it being

understood that any necessary signatures may be on a document consenting to such amendment, modification, termination, or waiver).

16.    <u>Budget Compliance</u>.  The Borrowers and the Credit Parties shall not, and shall not permit any subsidiary, directly or indirectly, use any cash or the proceeds of the DIP Facilities in a manner or for a purpose other than those consistent with the DIP Documents and this Interim Order.  The Budget annexed to the DIP Term Loan Agreement is hereby approved, and any modification to, or amendment or update of, the Budget shall be in form and substance acceptable to and approved in writing by each of the DIP Agents in their respective sole discretion.

17.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agents may request in their sole discretion to assure the perfection and priority of the DIP Liens, (b) the Debtors to take all appropriate action to grant the Replacement Liens, and to take all appropriate action to ensure that the Replacement Liens granted thereunder are perfected and maintain the priority set forth herein, (c) the Debtors to incur all liabilities and obligations to the DIP Agents as contemplated under the DIP Documents, (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Interim Order and the DIP Documents, and (e) the implementation of the terms of this Interim Order.

18.    <u>Perfection of DIP Liens and Replacement Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein including the DIP Liens and the Replacement Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may

otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, real property mortgage or aircraft security agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, the Replacement Liens, or to entitle the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agents and the Prepetition Agents each are authorized to file, as it in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and the Replacement Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Replacement Liens.  The Debtors are authorized to execute and promptly deliver to the DIP Agents and the Prepetition Agents all such financing statements, mortgages, notices, and other documents as the DIP Agents and the Prepetition Agents may reasonably request.  The DIP Agents and the Prepetition Agents, in their respective sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

19.        After-Acquired Property.  Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including all DIP Collateral pledged or otherwise granted to the DIP Agents, on behalf of the DIP Lenders, pursuant to the DIP Documents and this Interim Order is

not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date that is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law.

20.    Proceeds of Subsequent Financing.    If the Debtors, any trustee, any examiner with enlarged powers, or any  responsible officer subsequently appointed in these chapter 11 cases or any Successor Cases, shall obtain credit or incur debt pursuant to section 364(b), (c), or (d) of the Bankruptcy Code in violation of the DIP Documents at any time prior to the indefeasible payment in full of all DIP Obligations, the cancellation, backing, or cash collateralization of the letters of credit provided for under the DIP Credit Agreement, the satisfaction of the DIP Superpriority Claims, and the termination of the DIP Agents' and DIP Lenders' obligations to extend credit under the DIP Facilities, then all of the cash proceeds derived from such credit or debt shall (a) immediately be turned over first to the applicable DIP Agent, subject to the Postpetition Intercreditor Agreement, to partially satisfy the DIP Obligations in accordance with the DIP Documents, and (b) thereafter, after the DIP Obligations have been satisfied in full and fully and indefeasibly paid, to the applicable Prepetition Agent, subject to the Prepetition Intercreditor Agreement, to satisfy the Secured Note Obligations and ABL Obligations, respectively, in accordance with the Secured Notes Documents and the ABL Documents.

21.    Maintenance of DIP Collateral.  Until the indefeasible payment in full of all DIP Obligations, all indebtedness outstanding in accordance with the Prepetition Financing Documents, and the termination of the DIP Agents' and the DIP Lenders' obligation to extend

36

credit under the DIP Facilities, the Debtors shall (a) insure the DIP Collateral as required under the DIP Facilities and the Prepetition Financing Documents, as applicable, and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order that may be entered by the Court in accordance with the DIP Documents.

22.      <u>Insurance Policies</u>.  Upon entry of this Interim Order, the DIP Agents and the DIP Lenders are, and are deemed to be, without any further action or notice (including endorsements), named as additional insureds and loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

23.      <u>Disposition of Collateral</u>.  Except as expressly provided for in the DIP Documents and subject to the Intercreditor Agreements, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or Prepetition Collateral (collectively, "<u>Collateral</u>") without the prior written consent of each of the DIP Agents and the Prepetition Agents (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agents or the Prepetition Agents or an order of this Court, except for sales, transfers, leases or uses of Debtors' inventory in the ordinary course of their businesses). Until such time as the DIP Obligations and the Prepetition Obligations have been paid in full in accordance with the terms of the applicable DIP Documents and Prepetition Financing Documents, the Debtors shall remit to the applicable DIP Agent and/or Prepetition Agent, or cause to be remitted to the applicable DIP Agent and/or Prepetition Agent, all proceeds of Collateral for application against the DIP ABL Obligations, the DIP Term Obligations and/or the Prepetition Obligations in accordance with the terms of the applicable DIP Documents, Prepetition Financing Documents, the Intercreditor Agreements, and this Interim Order.

24.     <u>Inventory</u>.  The Debtors shall not, without the consent of each of the DIP Agents, (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

25.     <u>Events of Default</u>.  The term "Event of Default" shall have the same meaning under this Interim Order as such term has under the DIP Documents and shall include, for the avoidance of doubt, failure to meet the Milestones.

26.     <u>Rights and Remedies upon Event of Default</u>.  Unless otherwise ordered by the Court in accordance with the terms hereof, as of 12:00 a.m. prevailing Eastern Time on the 5th business day after the date a DIP Agent files a notice of an Event of Default on the docket of the Debtors' chapter 11 cases (such period, the "<u>Default Notice Period</u>"), the automatic stay under section 362 of the Bankruptcy Code will be automatically lifted without further order of this Court to allow the applicable DIP Agent to take any and all actions permitted by law, as if no case were pending under the Bankruptcy Code, subject to the terms and conditions of the Postpetition Intercreditor Agreement.  Unless otherwise ordered by the Court, the sole basis on which the Debtors can contest the automatic lifting of the automatic stay pursuant to this paragraph is on the grounds that an Event of Default has not occurred, and the Debtors and other parties-in-interest may request an expedited hearing on any motion seeking such a finding, and the DIP ABL Lenders, the Required Lenders (as defined in the DIP Term Loan Agreement), the ABL Lenders, and the Required Secured Noteholders shall consent to such expedited hearing.  In the event the automatic stay is lifted in accordance with this paragraph, any further order of this

38

Court authorizing (a) the use of Cash Collateral, including accounts receivable, inventory, and the proceeds thereof, of the Debtors in which the DIP Agents or any of the DIP Lenders has an interest, or (b) under section 364 of the Bankruptcy Code, the obtaining of credit or the incurring of indebtedness secured by a lien or security interest that is equal or senior to a lien or security interest held by the DIP Agents or which is entitled to priority administrative status which is equal or superior to that granted to the DIP Agents for the benefit of the DIP Lenders or the Prepetition Secured Parties, as the case may be, shall be prohibited.  Upon a DIP Agent having delivered a notice of an Event of Default in accordance with the DIP Documents and this Interim Order, at any hearing with respect to whether an Event of Default has occurred, there shall be a presumption in favor the DIP Lenders and the DIP Agent that an Event of Default has occurred, which presumption may be rebutted by the Debtors and/or the Committee.  Subject to any applicable grace periods, upon the occurrence of any Event of Default, the DIP Agents may, without notice or demand, immediately suspend or terminate all or any portion of the DIP Lenders' obligations to make additional loans under the DIP Facilities.  Upon the occurrence of an Event of Default, all loans under the DIP Facilities shall become due and payable in accordance with the DIP Documents.  Nothing herein shall be construed to limit or otherwise restrict the availability of the rights and remedies provided for in the DIP Credit Agreements.

27.    <u>Termination of DIP Facilities and Use of Cash Collateral</u>.  The Debtors' right to use the DIP Facilities and Cash Collateral shall terminate immediately upon the earliest of (i) thirty (30) days after the Petition Date unless the Final Order, in a form acceptable to the Required Lenders (as defined in the DIP Term Loan Agreement) and the DIP ABL Agent, respectively, has been entered as of such date by the Court, (ii) delivery of written notice (the "<u>Default Notice</u>") via electronic mail or facsimile by either of the DIP Agents to counsel to the

39

Debtors and their lead restructuring counsel, counsel to the DIP Term Lenders, counsel to the DIP ABL Lenders, the U.S. Trustee, counsel to the Committee (if any), and any other official committee appointed in the Chapter 11 Cases, of the occurrence of an Event of Default, (iii) conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iv) the Termination Date (as defined in the DIP Term Loan Agreement), and (v) the Termination Date (as defined in the DIP ABL Credit Agreement) (collectively, the "Termination Date").

28.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order. Each of the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order, and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties are entitled to fullest extent to the protections provided in section 364(e) of the Bankruptcy Code. Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby. Any liens or claims granted to the DIP Agents, the DIP Lenders, and/or the Prepetition Secured Parties arising prior to the effective date of any such modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

29. DIP Fees and Other Expenses. The Debtors are authorized and directed to pay all fees and expenses of the DIP Agents and the DIP Lenders in connection with the DIP Facilities, as provided in the DIP Documents (and, (x) in the case of the DIP Term Facility, in accordance with and subject to the limitations set forth in Section 10.4 of the DIP Term Loan Agreement and (y) in the case of DIP ABL Facility, in accordance with and subject to the limitations set forth in Section 10.4 of the DIP ABL Credit Agreement, as applicable), whether or not the transactions contemplated hereby are consummated, whether or not incurred prepetition or postpetition, including, without limitation, agency fees, the professional fees and expenses of Kirkland & Ellis LLP (as counsel to the DIP Term Lenders), Morris, Nichols, Arsht & Tunnell LLP (as local counsel to the DIP Term Lenders), Houlihan Lokey (as financial advisor to the DIP Term Lenders), Riemer & Braunstein LLP (as counsel to the DIP ABL Lenders), Womble Carlyle Sandridge & Rice (as local counsel to the DIP ABL Lenders), and any financial advisor and/or other consultant to the DIP ABL Agent, in each case promptly upon receipt of summary form invoices which may be redacted for privileged, confidential, or proprietary information; provided, that the payment of any such invoices shall be subject to the notice and objection procedures set forth in this paragraph. For the avoidance of doubt, the fees and expenses described in the foregoing sentence shall include, to the extent set forth in Section 10.4 of the DIP Term Loan Agreement and Section 10.4 of the DIP ABL Credit Agreement, as applicable, all reasonable and documented out-of-pocket costs, fees, and expenses incurred in connection with the preparation, negotiation, execution, interpretation or administration of, any modification of any term of or termination of, any of the DIP Documents, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein. Payment of all such

fees and expenses shall not be subject to allowance by this Court, and parties entitled under the DIP Documents to receive such payment of fees and expenses shall not be required to comply with the U.S. Trustee fee guidelines; provided, however, that any time that such professionals seek payment of fees and expenses that are incurred from and after the Petition Date from the Debtors, each professional shall provide copies of its fee and expense statements (redacted to remove confidential or attorney-client privileged information) to the U.S. Trustee and counsel for the Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors.  To the extent that the U.S. Trustee or the Committee (if appointed) has an objection to the fees and expenses of any such professional, they shall be afforded 10 days after receipt of such fee and expense statement to raise a specific written objection, including quantification of the disputed amount, with the applicable professional (it being understood that the Debtors shall be authorized to pay all amounts that are not disputed in a timely received written objection), and such professional shall only be required to disgorge any amounts paid to such professional pursuant to such fee and expense statement upon being "so ordered" to do so pursuant to a final order of this Court.  Nothing herein shall limit, alter, or modify the ABL Secured Parties' rights to be reimbursed for ABL Indemnity Obligations from the ABL Indemnity Account as provided elsewhere herein.

   30. <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless the DIP Agents, the DIP Lenders, the Secured Notes Agent, the Secured Noteholders, the ABL Lenders, and the ABL Agent, and each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investor funds, advisors, attorneys, professionals, representatives, investment bankers, and consultants, each in their respective capacities as such, from and against

any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Documents, the Prepetition Financing Documents, and/or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Documents and the Prepetition Financing Documents, and as further described therein and herein, except to the extent resulting from such indemnified party's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction.    The indemnity includes indemnification for the DIP Agents', ABL Agent's, Secured Notes Agent's, and any of the DIP Lenders', ABL Lenders', and/or Secured Noteholders' exercise of discretionary rights granted under the DIP Documents and/or the Prepetition Financing Documents, as the context makes applicable.    In all such litigation, or the preparation therefor, the DIP Agents and the DIP Lenders, the ABL Agent and the ABL Lenders, and the Secured Notes Agent and the Secured Noteholders, respectively, shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel.

      31.    <u>Released Parties</u>.  Without limiting the rights of the parties in interest as set forth in paragraph 37 hereof, the Debtors hereby waive any and all actions related to, and hereby release, each of (a) the DIP Term Agent and the DIP Term Lenders, (b) the DIP ABL Agent and the DIP ABL Lenders, (c) the ABL Agent and the ABL Lenders, (d) the Secured Notes Agent and the Secured Noteholders, and (e) each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers,

principals, officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants, each in their respective capacity as such (each such person or entity identified in sub-clauses (a) through (e) of this paragraph 31, a "Released Party" and, collectively, the "Released Parties") from any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, or any Challenge (as defined herein), whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising prior to the Petition Date and to the extent related to the Prepetition Financing Documents, the DIP Credit Agreements, or this Interim Order, any documents related to the Prepetition Financing Documents, the DIP Credit Agreements, or this Interim Order, any aspect of the prepetition relationship with the Released Parties, any Debtor, or any other acts or omissions by the Released Parties in connection with the Prepetition Financing Documents, the DIP Credit Agreements, or this Interim Order, any documents related to the Prepetition Financing Documents, the DIP Credit Agreements, or this Interim Order, or any aspect of their prepetition relationship with any Debtor.

32.    Proofs of Claim.  The DIP Agents, the DIP Lenders, and the Prepetition Secured Parties shall not be required to file proofs of claim in any of these chapter 11 cases or Successor Cases for any claim allowed herein.  Any proof of claim filed by the DIP Agents and/or the Prepetition Agents shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the DIP Lenders, and/or Prepetition Secured Parties. Any order entered by this Court in relation to the establishment of a bar date in any of these cases or Successor Cases shall not apply to the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties.

33.     <u>Access to Collateral; No Landlord's Liens</u>.  Subject to applicable state law, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agents, for the benefit of the DIP Lenders, contained in this Interim Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents and this Interim Order, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Documents, the DIP Agents may, subject to any separate agreement by and between such landlord and the DIP Agents (a "<u>Separate Agreement</u>"), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and, subject to any Separate Agreement, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord; <u>provided</u>, <u>however</u>, that, subject to any such Separate Agreement, the DIP Agents shall only pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the Agent, calculated on a per diem basis.  Nothing herein shall require the DIP Agents to assume any lease as a condition to the rights afforded to the DIP Agents in this paragraph.

34.     <u>Carve-Out</u>.  Upon a DIP Agent's issuance of a Carve Out Trigger Notice (as defined below), all liens, claims and other security interests held by the DIP Lenders and the Prepetition Secured Parties shall be subject to the payment of the Carve-Out.  For purposes of this Interim Order, "<u>Carve-Out</u>" means the sum of:  (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below);

(iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors or any Committee pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Estate Professionals") at any time before or on the first business day following delivery by a DIP Agent of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $1,000,000.00 incurred after the first business day following delivery by a DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post Carve-Out Trigger Notice Cap").  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by a DIP Agent to the Debtors, their lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreements) and acceleration of the DIP Obligations under the DIP Facilities, stating that the Post Carve-Out Trigger Notice Cap has been invoked.  Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been issued, the Debtors shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals to the extent set forth in the Budget and that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court and in form and substance reasonably acceptable to the Debtors and the DIP Agents, as the same may be due and payable, and the same shall not reduce the Post Carve-Out Trigger Notice Cap.

35.     <u>Payment of Compensation</u>.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, or of any person, or shall affect the rights of the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget.

36.     <u>Limitation on Investigation</u>.

(a)     No DIP Collateral, Cash Collateral, proceeds of the DIP Facilities, portion of the Carve-Out, or any other amounts may be used directly or indirectly by any of the Borrowers or any other Credit Party, the Committee, if any, or any trustee or other estate representative appointed in these chapter 11 cases or any Successor Cases or any other person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) for any of the following actions or activities (the "<u>Proscribed Actions</u>"):

(i)     to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the liens granted under the DIP Documents, this Interim Order, or the Final Order (including, the DIP Superpriority Claims); or

(ii)     to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, and each of their respective    shareholders,    controlling    persons,    directors,    agents,    officers,

47

subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any Avoidance Actions, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens granted under the DIP Documents, or the claims or liens granted under the ABL Documents or the Secured Notes Documents, (D) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the DIP Obligations or the Prepetition Obligations; (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any of (1) the DIP Agents or the DIP Lenders under this Interim Order or under any of the DIP Documents, (2) the Secured Notes Parties, or (3) the ABL Secured Parties (in each case, as applicable, including, claims, proceedings or actions that might prevent, hinder or delay any of their respective assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the DIP Documents, this Interim Order, and the Final Order); or (F) objecting to, consenting, or interfering with, in any way, the DIP Agents' and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred (as set forth in the DIP Documents).

(b)     Notwithstanding anything to the contrary herein, the Committee may use up to $50,000.00 in the aggregate amount of the Carve-Out, any Cash Collateral, or proceeds of the DIP Facilities to investigate the Prepetition Secured Parties (the "Committee Investigation Budget").  Any and all claims incurred by the Committee related to or in connection with any Proscribed Activities other than up to the Committee Investigation Budget shall not constitute an allowed administrative expense claims (including, without limitation, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code) and shall not be satisfied by the Carve-Out, any Cash Collateral, or proceeds of the DIP Facilities, and shall be satisfied solely from the unencumbered assets of the Debtors (if any) (the "Unencumbered Assets"), thereby reducing recoveries to the holders of unsecured claims (other than any deficiency claim held by any of the Prepetition Secured Parties); provided, however, that to the extent there are no Unencumbered Assets available to satisfy such claims, then such claims shall be automatically disallowed without further action by any party or Court order and shall not receive a recovery in these chapter 11 cases and any Successor Cases.

37.     Challenge Period.

(a)     Subject only to the terms of this paragraph 37, the grant of adequate protection to the Prepetition Secured Parties, and the various stipulations and waivers contained in paragraph E hereof shall be without prejudice to the rights of the Committee to seek to disallow the Prepetition Secured Parties' claims in respect of the Prepetition Financing Documents, pursue any claims or seek appropriate remedies against Prepetition Secured Parties in connection with the Prepetition Financing Documents or avoid all or substantially all of the security interests or liens in the Prepetition Collateral

or in any other asset or property of Debtors in which Prepetition Secured Parties claim an interest, including any claim, action, or proceeding brought against the Prepetition Secured Parties in accordance with this paragraph 37 that requires Prepetition Secured Parties to give up adequate protection liens and superpriority claims, to disgorge adequate protection interest payments received or accruals credited, or to disgorge as repaid pursuant to this Interim Order as a result of any of the Prepetition Secured Parties' claims against Debtors or liens upon and security interests in the assets and properties of Debtors (including the Prepetition Collateral) being invalidated, avoided, subordinated, impaired or compromised in any way, either by an order of this Court (or other court of competent jurisdiction) or by settlement.  Any party (other than the Debtors, which have waived all such rights), including the Committee, must commence, as appropriate, a contested matter or adversary proceeding raising any objection, claim, defense, suit or other challenge (a "Challenge") with respect to any claim, security interest, or any other rights of the Prepetition Secured Parties under the ABL Documents or the Secured Notes Documents, as applicable, including in the nature of a setoff, counterclaim, or defense on or before the earlier of the first to occur of (i) sixty (60) calendar days from the date the U.S. Trustee appoints the Committee and (ii) seventy-five (75) calendar days following the date of entry of the Final Order (the "Challenge Period").  The Challenge Period may only be extended (x) as to the ABL Agent and/or the ABL Lenders, in consultation with each of the Prepetition Agents, the DIP Agents, and the Required Secured Noteholders, (y) as to the Secured Notes Agent and the Secured Noteholders, in consultation with each of the Prepetition Agents, the DIP Agents, and the prior written consent of the Required Secured Noteholders, or (z) by consent of the Court for good cause shown.  In the event

of a timely and successful Challenge to the repayment of the ABL Obligations, this Court shall fashion the appropriate remedy with respect to the ABL Lenders after hearing from all parties in interest.

(b)     Upon the expiration of the Challenge Period, to the extent not specifically included in a timely and properly filed pleading asserting a Challenge:  (i) any other possible Challenge, whether such Challenge is separately filed or otherwise asserted through an amendment of any timely and properly filed pleading asserting a Challenge, shall be deemed to be forever waived and barred; (ii) all of the Debtors' agreements, acknowledgments, stipulations, waivers, releases, and affirmations as to the priority, extent, and validity of the Prepetition Secured Parties' claims, liens, and interests, of any nature, under the Prepetition Financing Documents, or otherwise incorporated or set forth in this Interim Order, shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties-in-interest in these chapter 11 cases and any Successor Cases without further action by any party or this Court, and any Committee and any other party in interest, and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto; (iii) the liens and security interests granted pursuant to the Prepetition Financing Documents shall (to the extent not otherwise satisfied in full) be deemed to constitute valid, binding, enforceable, and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable bankruptcy law; and (iv) without further order of the Court, the claims and obligations under the Prepetition Financing Documents shall (to the extent not otherwise satisfied in full) be finally allowed as fully secured claims within the

51

meaning of section 506 of the Bankruptcy Code for all purposes in connection with these chapter 11 cases and any Successor Cases and shall not be subject to challenge by any party in interest as to validity, priority, amount, or otherwise.

(c)     Nothing in this Interim Order vests or confers on any person, including the Committee or any other statutory committee that may be appointed in these chapter 11 cases, standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates.   For the avoidance of doubt, entry of this Interim Order shall not grant standing or authority to the Committee to pursue any cause of action, claim, defense, or other right on behalf of the Debtors or their estates.

(d)     Pending the expiration of the Challenge Period, and until such time as any Challenge is either dismissed, settled or the subject of a final, non-appealable order of the Court, the ABL Agent, for itself and on behalf of the ABL Lenders, shall retain and maintain the ABL Liens as security for any amount of any ABL Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the ABL Indemnity Account, which Lien retention shall be in addition to the establishment and maintenance of the ABL Indemnity Account. The ABL Lien retention herein shall in all respects remain junior and subordinate to the DIP Liens and the repayment in full of the DIP Obligations, and otherwise be subject to the terms of the Prepetition Intercreditor Agreement.

38.     <u>No Third Party Rights</u>.   Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

39.    <u>Section 506(c) Claims</u>.  Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these cases at any time shall be charged against the DIP Agents, the DIP Lenders, the Prepetition Secured Parties or any of their respective claims, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

40.    <u>Section 552(b)</u>.  The Prepetition Agents shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Secured Notes Agent (on behalf of itself and the Secured Noteholders) or the ABL Agent (on behalf of itself and the ABL Lenders), with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral; <u>provided</u>, that the foregoing shall be subject to entry of the Final Order with respect to parties in interest other than the Debtors.

41.    <u>No Marshaling; Application of Proceeds</u>.  The DIP Agents, the DIP Lenders, and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral and/or the Prepetition Collateral, as the case may be, and all proceeds shall be received and applied in accordance with the DIP Documents, the Prepetition Financing Documents, and the Intercreditor Agreements and, without limitation, the DIP ABL Agent and the DIP Lenders can collect on any guaranty provided by any Foreign Entity and/or any collateral provided thereby in their respective discretion, and otherwise in accordance with the DIP ABL Documents.

42. <u>Joint and Several Liability</u>.   Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facilities and the DIP Documents.

43. <u>Limitation of Liability</u>.   Subject to the entry of the Final Order, in determining to make extensions of credit under the DIP Facilities, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order (or any Final Order), the DIP Documents, or the Prepetition Financing Documents, as applicable, none of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, or any successor of any of the foregoing, shall be deemed to be in control of the operations of the Debtors or any affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or any affiliate of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).   Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Financing Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, or any successor of any of the foregoing, of any liability for any claims arising from the prepetition or postpetition activities of the Debtors or any affiliate of the Debtors.

44. <u>Credit Bidding</u>.

(a)   Subject to and effective upon entry of the Final Order, and subject to the terms of the Postpetition Intercreditor Agreement, the DIP Term Agent, acting at the direction of

the Required Lenders (as defined in the DIP Term Loan Agreement), shall have the unqualified right to credit bid up to the full amount of the DIP Term Obligations in any sale of the DIP Term Collateral (or any part thereof), subject to the Postpetition Intercreditor Agreement, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise; and

(b)     Subject to and effective upon entry of the Final Order, and subject to the terms of the Postpetition Intercreditor Agreement, the DIP ABL Agent, acting at the direction of the DIP ABL Lenders, shall have the unqualified right to credit bid up to the full amount of the DIP ABL Obligations in any sale of the DIP ABL Collateral (or any part thereof), subject to the Postpetition Intercreditor Agreement, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

45.     <u>Intercreditor Issues</u>.  Except as expressly otherwise set forth herein, nothing in this Interim Order shall be construed to convey on any individual DIP Term Lender, DIP ABL Lender, Secured Noteholder, or ABL Lender any consent, voting or other rights beyond those (if any) set forth in the DIP Documents, the ABL Documents, the Secured Notes Documents, and the Intercreditor Agreements, as applicable.

46.     <u>Discharge Waiver</u>.  The DIP Obligations and the Secured Notes Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in these cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash (or, with respect to any letters of credit, such letters of credit have been treated in a manner satisfactory to the DIP Agents) on or before

the effective date of such confirmed plan of reorganization.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash (or, with respect to any letters of credit, such letters of credit have been treated in a manner satisfactory to the DIP Agents) on or prior to the earlier to occur of the effective date of such plan of reorganization or sale.

47.      <u>Rights Preserved</u>.  The entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the DIP Agents', the DIP Lenders', and/or the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the DIP Agents, the DIP Lenders, and/or the Prepetition Secured Parties under the Bankruptcy Code or under applicable non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of any of the DIP Agents, DIP Lenders, and/or the Prepetition Secured Parties.  The DIP Agents, DIP Lenders, the Prepetition Secured Parties and the Debtors hereby agree that the Prepetition Intercreditor Agreement remains in full force and effect.

48.      <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Agents, the DIP Lenders, the ABL Secured Parties, and/or the Secured Notes Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Financing Documents, or applicable law, as the case may be, shall not constitute a

waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agents, the DIP Lenders, the ABL Secured Parties, and/or the Secured Notes Parties.

49.     <u>Binding Effect of Interim Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Agents, the DIP Lenders, the ABL Secured Parties, the Secured Notes Parties, all other creditors of the Debtors, the Committee, any other statutory committee that may be appointed in these chapter 11 cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of these cases, any Successor Cases, or upon dismissal of any of these cases or Successor Cases.

50.     <u>Effect on Certain Prepetition Agreements</u>.  Except as expressly set forth in this Interim Order, the terms and conditions, validity, and enforceability of the Prepetition Financing Documents shall not be affected by this Interim Order.

51.     <u>Leases</u>.  Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, upon an Event of Default, the rights of the Prepetition Secured Parties, the DIP Agents, or the DIP Lenders to enter onto the Debtors' leased premises shall be limited to (i) any such rights agreed to in writing by the applicable landlord prior to entry onto the leased premises, (ii) any rights that the Prepetition Secured Parties, the DIP Agents, or the DIP Lenders have under applicable non-bankruptcy law, if any, and (iii) such rights as may be granted by the Court on a separate motion with notice to the applicable landlords of the leased premises and an opportunity for such landlords to respond and be heard.

52.     <u>No Right to Seek Modification</u>.  Unless requested by the DIP Agents, the Debtors irrevocably waive any right to seek any modification or extension of this Interim Order

(in whole or in part) without the prior consent of each of the DIP Agents, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Agents.

53.   <u>Survival</u>.

(a)   The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan of reorganization in any of these chapter 11 cases, (ii) converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any of these chapter 11 cases or any Successor Cases, or (iv) pursuant to which this Court abstains from hearing any of these chapter 11 cases or Successor Cases.

(b)   The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties, pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in these cases, in any Successor Cases, or following dismissal of these cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until, (i) in respect of the DIP Facilities, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full and all commitments to extend credit under the DIP Facilities are terminated, (ii) in respect of the ABL Facility, all of the ABL Obligations have been indefeasibly paid in full, and (iii) in respect of the Senior Secured Notes, all of the Secured Notes Obligations have been indefeasibly paid in full. The terms and provisions concerning the indemnification of the DIP Agents and the DIP Lenders shall continue in these chapter 11 cases, in any Successor Cases, following dismissal of these chapter 11 cases or any Successor Cases, termination of the DIP

Documents, and/or the indefeasible repayment of the DIP Obligations.

54.     <u>Interim Order Controls; Priority of Terms</u>.  To the extent of any conflict between or among the Motion, the DIP Documents, the Intercreditor Agreements, and this Interim Order, the terms and provisions of this Interim Order shall govern.

55.     <u>Waiver of Applicable Stay</u>.  Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

56.     <u>Supplemental Reporting Requirements</u>.  In addition to any notice and/or reporting requirements contained in the DIP Documents, until the DIP ABL Obligations are Paid in Full, not later than 10 days after the end of each calendar month, the Debtors shall provide each of the DIP Agents with the following:  (i) a report listing all prepetition shipping charges paid by the Debtors in the prior month pursuant to any authorization provided Debtors under separate order of the Court, (ii) a report listing any prepetition shipping charge claim settled and/or paid in the prior month pursuant to any authorization provided Debtors under separate order of the Court, which report shall include the identity of the shipper whose claim has been settled and/or paid and a summary of the terms of any such settlement, and (iii) a report listing the amount and identity of any utility company as to which the Debtors increased the utility deposit escrow account.

57.     <u>Foreign Loan Parties</u>.  This Interim Order shall not relate to, impact, or restrict any rights of the DIP ABL Agent against any non-Debtor foreign Loan Parties (collectively, the "<u>Foreign Loan Parties</u>"), or any collateral security granted by said Foreign Loan Parties; <u>provided</u>, that neither the ABL DIP Obligations nor the ABL Obligations shall be

deemed to have been Paid in Full unless and until all "Obligations" (as defined in the ABL DIP Credit Agreement) of the Foreign Loan Parties have been paid in full.

58.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for September [____], 2015, at [__]:00 a./p.m. before the Honorable [•], United States Bankruptcy Judge, in Courtroom [•] at the United States Bankruptcy Court for District of Delaware, 824 N. Market Street, Wilmington, Delaware 19801. On or before September [__], 2015, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order and the Motion, on (a) the parties having been given notice of the Interim Hearing, (b) any party which has filed prior to such date a request for notices with this Court, and (c) counsel for the Committee (if and when appointed). The Final Hearing Notice shall state that any party-in-interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on September [__], 2015, at 4:00 p.m. (prevailing Eastern time), which objections shall be served so as to be **actually** **received** on or before such date on: (a) proposed counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 300 South Grand Avenue, Suite 3400, Los Angeles, California 90071 Attn: Van C. Durrer, II, Esq., and Annie Z. Li, Esq., and 155 North Wacker Drive, Chicago, Illinois 60606, Attn: John K. Lyons, Esq., and Jessica S. Kumar, Esq.; [(b) counsel for the Committee, [•], Attn: [•];] (c) counsel for the DIP Term Agent and DIP Term Lenders, (i) Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Patrick J. Nash, Jr., Esq., Ross M. Kwasteniet, Esq., William A. Guerrieri, Esq., and W. Benjamin Winger, Esq., and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19899, Attn: Robert J. Dehney, Esq., and Andrew R.

Remming, Esq.; (d) counsel for the DIP ABL Lenders and ABL Agent, (i) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2056, New York, New York 10036, Attn: Steven E. Fox, Esq., Fax: (212) 789-3195, and (ii) Womble Carlyle Sandridge & Rice, LLP, 222 Delaware Avenue, Suite 1501, Wilmington, Delaware 19801, Attn:  Steven K. Kortanek, Esq., Fax:  (302) 661-7728; and (e)  the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Mark S. Kenney, Esq.

59. *Nunc Pro Tunc* Effect of this Interim Order.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.

60. Retention of Jurisdiction.  The Court has retained and will retain jurisdiction to implement, interpret, and enforce this Interim Order according to its terms.

SO ORDERED by the Court this _____day of _____, 2015.


_____
UNITED STATES BANKRUPTCY JUDGE