# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
In re: : Chapter 11
: 
QUIKSILVER, INC., *et al.*, : Case No. 15-11880 (___)
: 
Debtors.[1] : (Joint Administration Pending)
: 
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF DURC A. SAVINI IN SUPPORT OF
(A) DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014
(I) AUTHORIZING POSTPETITION FINANCING, (II) GRANTING PRIMING LIENS
AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) AUTHORIZING USE OF CASH COLLATERAL, (IV) PROVIDING FOR
ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, AND
(VI) SCHEDULING A FINAL HEARING; AND (B) DEBTORS' MOTION FOR ENTRY
OF AN ORDER AUTHORIZING AND APPROVING (I) THE DEBTORS'
ASSUMPTION OF THE PLAN SPONSOR AGREEMENT; AND (II) THE PAYMENT
OF THE BREAK-UP FEE AND RELATED TRANSACTION EXPENSES**

I, Durc A. Savini, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury as follows:

1. I submit this declaration (this "<u>Declaration</u>") in support of the (A) Debtors' Motion For Entry Of Interim And Final Orders Pursuant To Sections 105, 361, 362, 363 And 364 Of The Bankruptcy Code And Bankruptcy Rules 2002, 4001 And 9014 (I) Authorizing Postpetition Financing, (II) Granting Priming Liens And Providing Superpriority Administrative Expense Claims, (III) Authorizing Use Of Cash Collateral, (IV) Providing For

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

Adequate Protection, (V) Modifying The Automatic Stay, And (VI) Scheduling A Final Hearing (the "DIP Motion"), and (B) Debtors' Motion for Entry of an Order Authorizing and Approving (I) The Debtors' Assumption of the Plan Sponsor Agreement; and (II) The Payment of the Break-Up Fee and Related Transaction Expenses (the "PSA Motion"),[2] filed contemporaneously herewith by the above-captioned debtors and debtors in possession (collectively, the "Debtors"). The DIP Motion seeks approval of the DIP ABL Facility, the DIP Term Loan Facility, and the use of Cash Collateral, and the PSA Motion seeks approval of the Debtors' assumption of the Plan Support Agreement and the term sheets incorporated therein by reference.

2. The statements in this Declaration are, except where specifically noted, based on either my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors, or employees of Peter J. Solomon Company, L.P. and/or Peter J. Solomon Securities Company, LLC (collectively, "PJSC") working directly with me or under my supervision, direction, or control, or from the Debtors' records maintained in the ordinary course of their business. I am not being specifically compensated for this testimony other than through payments received by PJSC as a professional to be retained by the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

**Professional Background and Qualifications**

3. I received a Bachelor of Arts degree in Economics from Columbia University. I also received a Masters of Business Administration degree, with concentrations in finance and accounting, from the University of Chicago Graduate School of Business.

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the DIP Motion or the PSA Motion, as applicable.

4. I started my career in investment banking in the automotive and leveraged finance groups at CIBC Wood Gundy Securities. I then moved to Bear Stearns & Co., Inc. where I represented numerous companies in the automotive supplier, telecommunication, biopharmaceutical, food, consumer products, chemical, business outsourcing, and building products industries. In 1999, after leaving Bear Stearns, I joined the financial restructuring group of Wasserstein Perella, a predecessor of Miller Buckfire & Co., LLC. I was with Miller Buckfire for approximately 11 years where I advised clients, both debtors and creditors, across a wide range of industries.

5. Since 2010, I have been a Managing Director and head of the Restructuring and Recapitalization Group of PJSC, an investment banking firm and the proposed investment banker of the Debtors. I advise companies with respect to corporate restructurings, recapitalizations, sale transactions, obtaining credit facilities, refinancings, and negotiations with interested purchasers, credit providers, and creditors, among other constituents. I routinely assist my clients in addressing financial challenges inside and outside of the bankruptcy process. I am a member of the American Bankruptcy Institute and the Turnaround Management Association. I am also a member of the board of the Association of Insolvency & Restructuring Advisors.

6. In addition to working with the Debtors in the above-captioned cases, my restructuring and financing advisory engagements have included engagements with the following companies: Allied Holdings; Bluewater Automotive Systems; Breed Technologies; Cambridge Industries; Citation Corporation; Dana Corporation; Dura Automotive Systems, Inc.; EaglePicher Holdings; JL French Automotive Castings, Inc.; Oxford Automotive; The Dolan Company; Radioshack Corporation; Avado Brands; IMPATH Inc.; Burlington Industries;

CenterPoint Energy; Sunbeam Corporation; Polaroid Corporation; Railworks Corporation; and Favorite Brands International.

7. In connection with the above-referenced restructuring engagements, I have advised distressed companies with respect to obtaining financing, including assisting such companies in determining financing needs, identifying potential sources of financing, and negotiating the terms of such financing.

8. I closely follow developments in the financial markets and, in particular, the credit markets, and keep abreast of the terms of current financing transactions in distressed and bankruptcy situations.

9. Since PSJC's engagement in June 2015, I, along with other members of the team at PSJC, have worked closely with the Debtors' senior management team and subsequently with FTI and developed substantial knowledge regarding the Debtors' business, finances, operations and systems that allows us to provide an assessment of, and demonstrate the need for, the proposed DIP Facilities.

## PJSC Engagement

10. As detailed in its public filings, the Company has been in the midst of an operational turnaround since 2013.  Unfortunately, in the meantime, the Company has suffered from a lack of adequate liquidity exacerbated by underperforming retail stores and substandard delivery of product to wholesale customers.  The Company's weakened performance during the turnaround period caused further contraction of trade liquidity, and the Company was required to hasten its efforts.  Since the Spring, the Company explored a range of alternatives to loosen liquidity in order to allow the operational turnaround initiatives to take hold, but those efforts did not result in an actionable transaction.  As explained in more detail below, ultimately, certain funds managed by affiliates of Oaktree Capital Management L.P. (collectively, "<u>Oaktree</u>"), a

substantial holder of the Company's Prepetition Secured Notes as well as a holder of the Company's Euro Notes, expressed interest in helping the Company de-lever the balance sheet and preserve value among its foreign subsidiaries through the pursuit of a chapter 11 plan.

11.     In May of 2013, the Company announced a multi-year profit improvement plan (the "Multi-Year Turnaround Plan") designed to accelerate the Company's three fundamental strategies of strengthening its brands, growing sales, and improving operational efficiencies. The new strategy was designed to focus the Company on its three core brands, globalize key functions, and reduce cost structure. The Company's previous organizational structure, which was decentralized with each of its Americas segment, Europe, Middle East and Africa ("EMEA") segment and Asia/Pacific ("APAC") segment operating primarily independently, created a fragmented enterprise with regional brand inconsistencies, suboptimal coordination and limited the Company's ability to take advantage of its global scale. In response to these challenges, the senior management team, with assistance from outside consultants, completed a thorough review of the Company's global operations to determine the best path for sustainable cost savings and profitable growth.

12.     Notwithstanding these efforts, in the first fiscal quarter of 2015, the Company reported a net loss, following softer revenue results, year over year from 2014, although gross margin remained largely flat.  Specifically, the Company, like many others with a major distribution center located in the western US, suffered the impact of the Los Angeles port labor dispute during the early months of 2015.  In addition, although the Company's EMEA operation performed relatively consistently over the same period, the Company's overall results did not reflect this favorable performance due to the impact of currency exchange rates between the euro and the US dollar (in which currency the Company's results are reported).

13. As discussed in the Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., in Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration"), while management continued to execute and refine the Multi-Year Turnaround Plan, the Company continued to face liquidity challenges, particularly in the U.S. In order to support management's efforts to address liquidity issues, the board of directors formed the Strategy Review Committee (the "SRC"), a subcommittee of the board.

14. In June 2015, upon the recommendation of the SRC, the Company retained PJSC as investment banker to explore and advise the SRC and the Company with respect to all range of strategic alternatives. Since our engagement, PJSC has rendered investment banking services to the Debtors in connection with the evaluation of a range of strategic alternatives, including restructuring their debt obligations, strategic sale transactions, and improving their liquidity and overall financial condition. Additionally, PJSC has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to these chapter 11 cases and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

15. Among other things, following preliminary due diligence, and given our deep background with the Company in connection with prior engagements, we recommended that the Company explore a global refinancing of existing indebtedness at the Company's full board meeting on June 13, 2015. The purpose of the global refinancing was to supplement the Company's liquidity and address the €200 Euro NotesDecember 15, 2017 maturity. PJSC initiated contact with parties interested in refinancing the Euro Notes and supplemented the process with outreach to well-recognized second lien lenders to explore the possibility of

providing further advances under the borrowing base collateral within the existing ABL credit facility.

16. With respect to refinancing the Euro Notes,[3] PJSC identified 19 potential sources of financing, of which 8 executed confidentiality agreements. Of those, PJSC engaged in more advanced discussions with 2. Ultimately, as negotiations evolved, Oaktree committed a significant level of resources to the process and engaged in a deep level of due diligence with management in multiple Company offices worldwide.

17. With respect to expanding the Prepetition ABL Facility, PJSC evaluated structures to provide the Company with incremental liquidity under the existing borrowing base. The alternatives included seeking a first-in-last-out ("FILO") loan structure as well as a second or subordinated lien on the existing borrowing base. PJSC engaged in more detailed discussions and negotiations with 2 leading FILO lenders who executed confidentiality agreements. Ultimately, the two lenders declined to continue in the process due to their view of the insufficient loan to value ratio. PJSC continued efforts to develop this liquidity source up to and including incorporating such a potential structure in the proposed DIP Facilities.

18. In mid-August, Oaktree advised the Company that it was prepared to execute a refinancing transaction but only if all of the Company's global intellectual property and brands (the "IP") was among the collateral securing such financing. Unfortunately, the covenants underlying Company's existing indebtedness made such a refinancing impracticable, absent the ability to restructure such indebtedness available in chapter 11. At this point, PJSC

---

[3] "Euro Notes" means the 8.875% senior notes issued pursuant to that certain Indenture dated December 10, 2010, among, inter alia, Boardriders S.A., a non-Debtor foreign affiliate, as issuer, Deutsche Trustee Company Limited, as trustee, Deutsche Bank Luxembourg S.A., as registrar and transfer agent, Deutsche Bank AG, London Branch, as principal paying agent and common depositary, and certain of the Debtors and their non-Debtor affiliates as guarantors.

had reached out to a number of parties to solicit interest in the refinancing, and Oaktree was the only investment firm to come forth with a viable term sheet. Due to a lack of viable out-of-court alternatives and given the Company's declining liquidity runway, the Company and its advisors immediately engaged with Oaktree regarding the possibility of executing the refinancing and restructuring transaction in the context of a chapter 11 case, as a continuation of the parallel contingency planning efforts that the Company had begun in July 2015. Those negotiations culminated in the DIP Financing and the Plan Support Agreement (the "PSA"), dated as of September 8, 2015, among Quiksilver and Oaktree, holder of 73% of the Debtors' Prepetition Secured Notes.

19.    The PSA. The foundation for the Debtors' proposed reorganization is the proposed conversion of the Prepetition Secured Notes into equity of the reorganized Debtors pursuant to the PSA executed with Oaktree and related transactions that will result in a significant de-levering of the Debtors' balance sheet. More specifically, the PSA contemplates that Oaktree and Bank of America will provide the Debtors with up to $175 million in postpetition financing, as described in more detail below, and that if the Debtors consummate an alternative transaction (and under certain specified circumstances as denoted in the PSA), Oaktree will be paid a cash Break-Up Fee in the amount of $20 million. In the next few weeks, the Debtors and Oaktree will finalize the terms of a plan of reorganization (a "Sponsored Plan") and accompanying disclosure statement to implement the PSA.

20.    As noted above, in connection with the Debtors' primary refinancing efforts during the summer of this year, Oaktree devoted substantial resources, including legal and other advisors, to the due diligence regarding a potential transaction with the Debtors. The

Debtors were able to leverage that preliminary work during the negotiations regarding the PSA and the DIP Financing.

21.   The DIP Financing.  After it became clear that Oaktree and the Debtors would be unable to execute a refinancing transaction out of court, the Debtors explored the potential for an in-court transaction with Oaktree.  Oaktree was an obvious party with whom to negotiate because (a) Oaktree held a large position in the Debtors' Prepetition Secured Notes; (b) Oaktree had already performed a substantial level of due diligence; and (c) Oaktree was sophisticated in the context of the chapter 11 process and could therefore be responsive to the Debtors' need to execute on a transaction promptly.

22.   In the early stages of negotiations with Oaktree, Oaktree confirmed that it would be willing to provide postpetition financing sufficient to support a plan process.  The Company, working with their financial advisor, developed a chapter 11 budget to delineate the Company's financing needs for such a process.

23.   As a part of its contingency planning process, the Debtors, through its investment bankers at PJSC, solicited proposals for bankruptcy financing from a number of parties, including the Prepetition ABL Lenders, Oaktree and other parties that had participated in discussions with the Debtors in potential refinancing of the Euro Notes, and other financial institutions.  An important consideration for the Debtors for any postpetition financing was to have sufficient funding for a plan of reorganization, as the Debtors had determined that preserving its EMEA operations (and the Euro Notes) would maximize the value of its global enterprise.

24.   The Prepetition ABL Facility is comparable to a traditional asset-based revolver where borrowings are subject to a borrowing base, limited by specific advance rates

which vary by collateral type. Given the Debtors' liquidity profile, however, it quickly became evident that a postpetition ABL would be insufficient for its needs for financing to support an entire chapter 11 plan process.

25. As noted herein, Oaktree was willing to provide sufficient financing for the plan process, but the initial pricing offered by Oaktree was near the high end of the range of market for comparable DIP proposals. Accordingly, PJSC and the Debtors negotiated with Oaktree and other market participants to develop a more competitive DIP proposal.

26. After much dialogue, the Debtors and PJSC were successful in forging a collaborative DIP proposal by both Bank of America, one of the Prepetition ABL Lenders, and Oaktree, in a transaction whereby the Debtors would enjoy a lower blended cost of funds.

27. As explained in more detail below, I believe that the DIP Facilities presented by the DIP Lenders represents the best option for the Debtors to maximize the value of their estates under the circumstances. Absent these arrangements, the Debtors are expected to run out of cash within a matter of weeks, would not be able to pay critical vendors, and would likely be required to liquidate.

### The Debtors' Liquidity Needs

28. The Debtors have an urgent and immediate need to obtain post-petition financing. The Debtors do not have sufficient funds on hand or generated from their business to fund operations. Without the post-petition financing and the use of cash collateral that will be provided under the DIP Credit Agreements and the proposed DIP Orders, the Debtors would not be able to maintain operations pending confirmation of a plan of reorganization that will maximize value for all constituents.

29. Without the proposed DIP Facilities and access to Cash Collateral, the Debtors will not have sufficient liquidity to operate their business, fund their ordinary course

expenditures, including paying their over 1500 employees, or pay the expenses necessary to administer the Chapter 11 Cases. The Debtors also require post-petition letters of credit. The Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on the operation of their business without additional financing.

30. Absent adequate funding, the Debtors may be required to close their stores prematurely, lose valuable wholesale accounts, otherwise cease operations, and liquidate on a piecemeal basis, causing irreparable harm to the Debtors and their estates. Moreover, the Debtors' ability to maintain their business pending confirmation of the Sponsored Plan is dependent on their ability to continue to operate, and the Debtors cannot operate unless they can fund payments for post-petition rent, payroll, goods, services and other operating expenses. The proposed DIP Facilities thus are essential to the Debtors' continued operational viability and will provide the Debtors with the opportunity to preserve their business through a plan of reorganization process.

31. Accordingly, the Debtors have an urgent and immediate need for the DIP Facilities and entry of the Interim Order.

**The Debtors' Efforts to Obtain Postpetition Financing**

32. I do not believe that alternative sources of financing are readily available to the Debtors—if at all. Additionally, I do not believe it would be prudent, or even possible, to administer the Debtors' chapter 11 estates on a "cash collateral" basis. While PJSC reached out to a number of parties to solicit interest in leading or participating in debtor in possession financing, no parties provided a term sheet or indication of interest for such a financing given the complexity of the collateral structure, the lack of material unsecured assets, Oaktree's dual role as DIP lender and Plan Sponsor, and the need to commit to debtor in possession financing in the short term given the Company's liquidity position.

33. The Debtors and PJSC solicited indications of interest and entertained several unsolicited indications of interest with respect to potential postpetition financing from various parties, including, among others, certain of the Debtors' existing lenders and noteholders. PJSC contacted approximately 13 potential sources of financing that routinely provide debtor-in-possession financing to gauge their interest in providing postpetition financing. Of the parties contacted, six signed NDAs and two term sheets were received. Ultimately, as previously described, Oaktree, a substantial holder of the Company's Prepetition Secured Notes and also a holder of the Company's Euro Notes, expressed interest in helping the Company de-lever the balance sheet and preserve value among its foreign subsidiaries through the pursuit of a chapter 11 plan.

34. Oaktree was the only party that emerged that was willing to provide sufficient financing for the plan process. The Debtors, with PJSC, negotiated terms of the DIP Facilities with Oaktree at arms' length and, ultimately, were successful in lowering the overall cost of financing whereby the DIP Facilities were tranched into an ABL, provided by Bank of America, and term loan, funded by Oaktree.

**The Debtors Select the Proposed DIP Financing**

35. Based on the foregoing, it is my belief that the DIP Facilities represents the best option available to address the Debtors' immediate liquidity needs, and that the terms and conditions of the DIP Documents are fair and reasonable. It is the product of extensive negotiations with Oaktree and Bank of America. Moreover, the DIP Facilities represent the only viable financing available that would not require the Debtors to seek to prime the liens of their Prepetition Secured Noteholders and Prepetition ABL Lenders on a nonconsensual basis.

36. The proposed DIP Facilities will provide the Debtors with immediate access to liquidity that is necessary to ensure that the Debtors' businesses are stabilized and

value is maximized. Accordingly, I believe that the DIP Facilities are in the best interests of the Debtors' estates and should be approved on the terms and conditions described in the DIP Motion.

37. I have reviewed the Debtors' DIP Motion, and the key terms of the DIP Facilities are as set forth therein.

**The Chapter 11 Cases And Additional Forces Requiring Proposed Financing Structure**

38. As noted in the DIP Motion and herein, the Debtors face severe liquidity constraints. The Debtors were forced to file the Chapter 11 Cases to preserve the value of their assets and reorganize. The Debtors are unable, in the present circumstances, to meet their liquidity needs by obtaining financing on an unsecured, administrative expense basis.[4]

39. Given the need for the Debtors' chapter 11 filings, the present debtor in possession financing structure was determined as a function of unique circumstances surrounding the filing of these Chapter 11 Cases. Because many of the Debtors are guarantors of the Company's Euro Notes, any chapter 11 process would give rise to an acceleration of the Euro Notes. Moreover, a bankruptcy sale process would likely violate many of the covenants in the Euro Notes indenture. One of the key assets of the Debtors is the residual equity value of its foreign subsidiaries, which would be placed in substantial jeopardy and impairment upon a default of the Euro Notes.

40. On the other hand, we understand that reinstatement of the Euro Notes guaranties under the Bankruptcy Code, which is only available under a plan of reorganization, could serve to mitigate the risks to the foreign subsidiaries of a chapter 11 filing. In addition, a

---

[4] In fact, most of the Debtors' vendors have instituted cash on delivery payment terms or have required cash-collateralized letters of credit in order to continue providing goods or services, further constraining liquidity.

chapter 11 plan process would be a comprehensive solution to the Debtors' balance sheet issues in the United States, as compared with a sale process. Accordingly, after evaluating potential alternatives, and with the advice of PJSC, management and the SRC recommended to the board of directors that the Company pursue a plan of reorganization as an optimal solution.[5]

41.     In connection with the necessary, and value maximizing, plan process, the Company requires debtor in possession facilities that will provide sufficient liquidity throughout the chapter 11 plan process, including confirmation of a Plan. Absent Oaktree's funded capital commitment under the DIP Facilities, the availability of debtor in possession financing exclusively under the Company's U.S. borrowing base would not provide the Debtors with adequate liquidity to conduct a competitive plan process.

### The PSA Break-Up Fee

42.     In terms of value, the PSA transaction includes the following key elements: (a) the Plan Sponsor is required to satisfy the DIP financing, which is estimated to be at least $150 million on exit, not including administrative expenses which are budgeted at approximately $30 million per the Debtors' budget; (b) the Plan Sponsor, as a holder of 73% of the U.S. Secured Notes, is sufficiently large to cause the class of U.S. Secured Notes to convert $280 million of debt into equity and (c) by reinstating the Debtors' obligations to guaranty the Euro Notes, the Agreed Plan would effectively include the reinstatement of approximately $250 million of the structurally senior Euro Notes and other world-wide debt. Accordingly, the $20

---

[5] While considering alternative transactions, management and the Company's advisors explored the relative benefits and burdens of a sale of assets under the Bankruptcy Code versus the development and prosecution of a plan of reorganization under the Bankruptcy Code. Among those factors, the Company focused on the impact of chapter 11 on its foreign subsidiaries. Specifically, it is my understanding that foreign insolvency laws generally do not afford the same level of protection and certainty as do insolvency laws in the United States. Accordingly, the Company's advisors emphasized strategies that would enable the foreign subsidiaries to operate in the ordinary course of business to the greatest extent possible.

million Break-Up Fee plus reimbursement of the Plan Sponsor's expenses is less than the traditional Delaware convention of 3% when analyzed against these elements of value.

43. In the event that the Debtors determine that they need to terminate the PSA in the exercise of their fiduciary duties, the PSA expressly permits them to do so. The value a party wishing to propose an alternative transaction would have to provide to even match the Plan Sponsor easily dwarfs the amount of the Break-Up Fee, "making it highly unlikely that the fee would chill any other financial options." Id. at 467. Finally, any payment of a termination fee under the applicable DIP documentation shall be credited dollar-for-dollar against the payment of the Break-Up Fee under the PSA, ensuring that the Plan Sponsor will be fairly compensated for its efforts, and the Debtors will pay only a single fee if they terminate the PSA and related deal documentation in order to comply with their fiduciary obligations.

## Conclusion

44. I believe that given the circumstances, the process to obtain debtor in possession financing produced the best available financing option available. I also believe that the proposed DIP Facilities will provide the Debtors with the necessary capital to effectively run their chapter 11 process.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 9, 2015

/s/ Durc Savini
Durc Savini
Managing Director and Head of Restructuring and Recapitalization Group
Peter J. Solomon Company, L.P.
Peter J. Solomon Securities Company, LLC

*Proposed Investment Banker to the Debtors*