## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
In re:                                      :   Chapter 11
                                            :
QUIKSILVER, INC., *et al.*,                 :   Case No. 15-11880 (___)
                                            :
                        Debtors.[1]         :   (Joint Administration Pending)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF ANDREW BRUENJES, AMERICAS CHIEF FINANCIAL OFFICER OF QUIKSILVER, INC., IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Andrew Bruenjes, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

1.      I am the Chief Financial Officer of the Americas Division of Quiksilver, Inc. ("ZQK"), the ultimate parent of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") and certain other affiliates of the Debtors (the "Non-Debtor Affiliates" and, together with the Debtors, "Quiksilver" or the "Company"). To enable the Debtors to minimize the adverse effects of these Chapter 11 Cases (as defined below) on their business and on the Company, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings").[2]  I submit this declaration in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]   Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleading.

title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and (b) First Day Pleadings.  I am authorized to submit this declaration (the "<u>Declaration</u>") on behalf of the Debtors.

2.      I have been a member of the Quiksilver team for over 12 years, starting as controller for the Asia Pacific region ("<u>APAC</u>") region in 2002. I later served as Finance Director and then CFO of the APAC region.  Earlier this year, I was appointed CFO of the Americas region. As a result of my extensive tenure with the Company, my review of relevant documents, and my discussions with other members of the Debtors' management teams in the ordinary course of business, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.  Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and for my use in preparing this Declaration.

3.      This Declaration is divided into three parts.  Part I of this Declaration provides background information about the Debtors, their business operations, their corporate and capital structures, and the circumstances surrounding the commencement of these Chapter 11 Cases.  Part II supplies specific information regarding the Debtors' proposed postpetition DIP financing (the "<u>DIP Facilities</u>") and the Plan Sponsor Agreement (the "<u>PSA</u>"), dated as of September 8, 2015, among Quiksilver and certain funds managed by affiliates of Oaktree Capital

Management, L.P. (collectively, "Oaktree"), and describes the pathway by which the Debtors intend to exit chapter 11 with a substantially de-levered balance sheet and more broadly as a healthy company.  Part III sets forth the relevant facts in support of the balance of the First Day Pleadings.

# PART I
# BACKGROUND

## A.    Chapter 11 Filings

4.    On September 9, 2015 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

5.    The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.    To date, no creditors' committee has been appointed in these Chapter 11 Cases by the United States Trustee.  In addition, no trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

## B.    The Debtors' Business

7.    Quiksilver is one of the world's leading outdoor sports lifestyle companies.  The Company designs, develops and distributes branded apparel, footwear, accessories and related products.  ZQK began operations in 1976 as a California company making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. ZQK later reincorporated in Delaware and went public in 1986. Today, the Company's business is rooted in the strong heritage and authenticity of its core,

iconic brands, *Quiksilver, Roxy,* and *DC* (shown below), each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, and motocross, among other activities:

 

The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites.

        8.      Quiksilver's global corporate headquarters is currently located in Huntington Beach, California, and its global operational headquarters is in Saint-Jean-de-Luz, France. The Company has four operating segments: the Americas (consisting of United States, Mexico, Brazil, and Canada), EMEA (consisting of Europe, the Middle East, and Africa), APAC (consisting of Australia, New Zealand, and the Pacific Rim, and headquartered in Torquay, Australia), and Corporate Operations. The Debtors are corporations including the Company's ultimate parent, ZQK, as well as a number of its domestic subsidiaries, based solely in the United States and operating in the Americas segment. The Non-Debtor Affiliates are foreign direct and indirect subsidiaries of ZQK operating solely outside of the United States; however, the Company's operations as well as its supply chain are highly integrated across the four operating segments.

        9.      In fiscal year 2014 (ended October 31, 2014), 34% of the Company's revenue was generated by the Debtors, inside the United States. The remaining 66% is attributable to the Non-Debtor Affiliates located outside the United States. The Company

anticipates and intends that its business outside of the United States, conducted through the Non-Debtor Affiliates, will remain unaffected by these Chapter 11 Cases, and the Debtors are seeking certain relief from the Bankruptcy Court in order to support the ongoing operations of its entire global enterprise, which in turn will preserve value on a global basis for the benefit of the Debtors and their stakeholders.

10.    The Company's operations can be divided into three segments – product design and development, production, and distribution channels.

11.    <u>Product Design and Development</u>. Quiksilver's footwear is created by its design and merchandising teams based in Huntington Beach, California, and its apparel and accessories are created by design and merchandising teams based in Saint-Jean-De-Luz, France. The design centers monitor local, regional, and global fashion trends to develop specific product categories for each of the Company's brands. The design centers share inspiration, design concepts, merchandising themes, graphics, and style viewpoints that are globally consistent while reflecting local adaptations to account for differences in geography, culture, and taste.

12.    <u>Production</u>. Quiksilver uses a direct-sourcing model to import its products from a variety of suppliers principally located in China, South Korea, Indonesia, India, Vietnam, and other parts of Asia. Once the products are imported, some require embellishments such as screen printing, dyeing, washing or embroidery.

13.    The Company has developed solid working relationships over many years with vendors who understand its product quality and delivery standards.  There is a substantial overlap between those vendors who supply goods to the Debtors' U.S. operations, and those vendors who supply goods to the Company's global operations.  The Company generally does not enter into supply agreements with its vendors, and relies instead on individual purchase

orders.  Due to the long production and shipping lead times for products, the Company currently has product on order with its vendors through the spring 2016 selling season.

14.     In addition to its direct sourcing model, the Company retains independent buying agents and employs staff to assist in the sourcing and manufacturing process. The buying agents are located primarily in China and Vietnam and assist in selecting and overseeing the majority of the Company's independent third-party manufacturing and sourcing of finished goods, fabrics, and other products. The agents monitor trade regulations and perform some quality control functions. The Company's staff, located in China, Vietnam, Indonesia, and other countries, are involved in sourcing and quality control functions that aid the Company in monitoring and coordinating overseas production. The employees help to ensure compliance with Quiksilver's standards of manufacturing practices, including adherence with a code of conduct related to factory working conditions and the treatment of workers involved in the manufacturing process.

15.     <u>Distribution Channels</u>. Once produced, Quiksilver's products are sold in over 115 countries through wholesale customers, retail stores, and its e-commerce websites.

16.     *Wholesale customers*. Wholesale customers accounted for approximately 67% of the Company' net revenues in fiscal year 2014. Wholesale accounts include surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, online retailers, licensee shops, and select department stores. Quiksilver's products are distributed through active lifestyle specialty chains in the United States such as Zumiez, Tilly's, Famous Footwear, and Journeys, chains in Europe such as Go Sport, Intersport, and Sport 2000, and chains in the Asia/Pacific region such as City Beach and Murasaki Sports. Department stores such as Macy's

in the United States, Galeries Lafayette in France, and El Corte Ingles in Spain distribute limited collections of Quiksilver's products.

17.    In the wholesale channel, the Company's products are sold in major markets by over 300 independent sales representatives and an employee sales staff, and in smaller markets by over 150 local distributors. The Company also employs retail merchandise coordinators who travel between retail locations of wholesale customers to further improve the presentation of Quiksilver's product and build its brand image at the retail level.

18.    *Retail Stores.*  Sales at Company retail stores accounted for approximately 28% of Company revenue during fiscal year 2014. The Company's retail shops include full-price stores, factory outlet stores, and "shop-in-shops."[3] At the end of the fiscal year 2014, the Company had approximately 266 full-price core brand stores, of which 75 are located in the United States. These full-price stores include a combination of its proprietary, multi-brand Boardriders stores, as well as *Quiksilver*, *Roxy*, and *DC* brand stores that feature a broad selection of products from its core brands, and, at times, a limited selection of products from other brands. The proprietary design of the stores demonstrates the Company's history, authenticity, and commitment to surfing, skating and other board-riding sports. In addition to the core brand stores, Quiksilver operates factory outlet stores in which it offers products specifically designed for the factory outlets, along with products from prior seasons. As of the end of fiscal year 2014, Quiksilver had 147 factory outlet stores, of which 47 are located in the United States.

---

[3]    The Company operates "shop-in-shops" – *Quiksilver* and *Roxy* shops primarily within larger department stores. As compared to a typical retail store, the shop-in-shops require a much smaller initial investment and are typically smaller than a traditional retail store, though they have many of the same operational characteristics. As of the end of the fiscal year 2014, the Company had approximately 270 shop-in-shops, all of which are located outside of the United States.

19.     *E-Commerce Websites*. The Company operates several e-commerce websites that sell its products throughout the world and provide online content for its customers regarding its brands, athletes, events and the lifestyle associated with the Company's brands. Sales on e-commerce websites accounted for approximately 5% of Company net revenue in fiscal year 2014.

**C.     The Debtors' Corporate and Capital Structures**

**(a)     Corporate Structure.**

20.     A corporate organization chart depicting the ownership structure of the Debtors and their Non-Debtor Affiliates is attached hereto as <u>Exhibit A</u>.

21.     ZQK is the direct or indirect parent company of each of the other Debtors and Non-Debtor Affiliates.  ZQK, a Delaware corporation, is a holding company and the direct parent of QS Wholesale, Inc. ("<u>QS Wholesale</u>"), a California corporation, which is in turn the direct parent of each of the remaining Debtors.

22.     The majority of the Debtors' day-to-day operations are managed by QS Wholesale and QS Retail, Inc. ("<u>QS Retail</u>").  Specifically, QS Retail operates the various retail stores and factory outlet stores, QS Retail is party to nearly all of the Debtors' non-residential real property leases, and QS Retail also employs approximately 75% of the Debtors' U.S. employees.  QS Wholesale employs approximately 25% of the Debtors' U.S. employees, manages the Debtors' supply chain and production, and owns certain *Quiksilver*, *Roxy*, and related logos registered within the U.S. and Mexico.  DC Shoes, Inc. ("<u>DC Shoes</u>") owns the worldwide rights to the *DC* marks and logos, and licenses certain of those marks and logos to other entities within the Company.

**(b)** **Capital Structure.**

23.    As of the Petition Date, as further set forth below, Quiksilver had approximately $850 million of long term debt consisting of the following, each as further described below:

(a)    $92 million of debt under an asset-based revolving credit facility;

(b)    $279 million of U.S. secured notes due 2018;

(c)    $223 million of U.S. unsecured notes due 2020;

(d)    $32 million of European lines of credit[4] and other borrowing facilities; and

(e)    $224 million of European unsecured notes due 2017.

24.    The ABL Credit Facility. On May 24, 2013, QS Wholesale entered into a secured $230 million asset-based revolving credit facility (the "ABL Facility"), pursuant to that certain Amended and Restated Credit Agreement, dated as of May 24, 2013 (as amended, amended and restated, modified, supplemented, or restated and in effect from time to time, the "ABL Credit Agreement")[5] among, inter alia, QS Wholesale, DC Shoes, QS Retail, and Hawk Designs, Inc. ("Hawk Designs") as borrowers (together, the "Domestic ABL Borrowers")[6], Quiksilver Canada Corp., Ug Manufacturing Co. Pty Ltd, and Quiksilver Japan Co., Ltd. (together, the "Foreign ABL Borrowers")[7] and other borrowers from time to time party thereto, as borrowers; several banks and other financial institutions or entities from time to time party

---

[4]    Some of ZQK's non-Debtor subsidiaries are borrowers on unsecured lines of credit issued by various French banks.

[5]    Any summary of an agreement in this Declaration is qualified in its entirety by the terms of that agreement.

[6]    Aggregate commitments to the Domestic Borrowers under the ABL Facility total $160 million.

[7]    Aggregate commitments to Foreign ABL Borrowers under the ABL Facility total $70 million.

thereto as lenders (the "ABL Lenders"); guarantors from time to time party thereto as guarantors; and Bank of America, N.A., as administrative and co-collateral Agent ("BofA") and General Electric Capital Corporation, as co-collateral agent (together with BofA, the "ABL Agents").

25.     The Domestic Borrowers' obligations under the ABL Credit Agreement are (i) guaranteed by certain of the Debtors (collectively, the "Domestic ABL Guarantors"),[8] (ii) secured by liens and security interests on substantially all of the assets of the Domestic ABL Guarantors,[9] and (iii) secured by (a) pledges in all shares of capital stock, limited liability company membership interests, and other equity interests held by ZQK, QS Wholesale, and DC Shoes, (b) dividends, cash, instruments, and other property from time to time received or distributed in respect of such interests, (c) rights and privileges with respect to such interests, and (d) proceeds of the foregoing.

26.     The Foreign Borrowers' obligations under the ABL Credit Agreement (the "Foreign ABL Obligations") are (i) guaranteed by the Domestic ABL Guarantors, along with certain Non-Debtor Affiliates and (ii) secured by liens, security interests, and/or pledges in assets of certain Non-Debtor Affiliates and the Domestic ABL Guarantors.

---

[8]     Specifically, as of the Petition Date, the Domestic ABL Guarantors are ZQK, QS Wholesale, QS Retail, DC Shoes, and Hawk Designs.

[9]     Note that the ABL Lenders were not granted a security interest in, among other things, (a) any leasehold interest in real property; (b) any lease, license, contract or agreement to which any grantor is a party or property rights of the grantor if the grant of a security interest constitutes or results in the abandonment, invalidation or unenforceability of the right or a breach, termination or default under the lease, license, contract, agreement or property right; (c) any lease, license, contract or agreement to which any grantor is a party or property right of such grantor to the extent that any applicable law prohibits the creation of a security interest thereon; (d) any application for trademarks and service marks filed in the Patent and Trademark Office; (e) any motor vehicles owned or any other assets subject to certificates of title, to the extent that a security interest therein cannot be perfected by the filing of a financing statement; (f) letter-of-credit rights, to the extent that a security interest therein cannot be perfected by the filing of a financing statement; (g) commercial tort claims of a grantor where the amount of damages claimed by the grantor is less than $1,000,000; and (h) certain equity interests.

27.     The ABL Facility matures in May of 2018. As of the Petition Date, Quiksilver had approximately $92 million outstanding under the ABL Facility comprised of $68 million on account of Domestic ABL Borrowers and Guarantors and $24 million on account of Foreign ABL Borrowers and Guarantors.

28.     The U.S. Notes: Secured Notes Due 2018 and Unsecured Notes Due 2020. Pursuant to an Indenture dated July 16, 2013, among, inter alia, U.S. Bank National Association ("U.S. Bank") as trustee and collateral agent, and the U.S. Notes Obligors (as defined below), ZQK and QS Wholesale (together, the "U.S. Notes Issuers") issued $280 million aggregate principal amount of 7.875% senior secured notes with a maturity date of August 1, 2018 (the "U.S. Secured Notes") and $225 million aggregate principal amount of 10.000% senior unsecured notes with a maturity date of August 1, 2020 (the "U.S. Unsecured Notes," and together with the U.S. Secured Notes, the "U.S. Notes").

29.     The U.S. Notes were issued as part of an exchange offer, and the net proceeds of the offering were used to (a) redeem all of the then-outstanding 6.875% notes due April 15, 2015, (b) repay in full and terminate the Company's existing term loan, and (c) pay down a portion of the outstanding amounts owed under the ABL Facility.

30.     The U.S. Notes are guaranteed by DC Shoes, Hawk Designs, and QS Retail (the "U.S. Notes Guarantors" and together with the U.S. Notes Issuers, the "U.S. Notes Obligors"). In addition, the U.S. Secured Notes are secured by liens, security interests, and/or pledges in (i) substantially all of the assets of the U.S. Notes Obligors,[10] (ii) all shares of capital

---

[10]     The collateral securing the outstanding obligations under the U.S. Secured Notes does not include property listed in parts (a) through (h) of *supra* note 9. In addition, the collateral securing obligations under the U.S. Secured Notes does not include (i) any asset for which the costs of providing a security interest in such asset or perfection thereof is excessive in view of the benefits to be obtained and (j) assets located outside of the United

*(cont'd)*

stock, limited liability company membership interests, and other equity interests held by ZQK, QS Wholesale, and DC Shoes (the "Secured Notes Pledgors") in each of the Debtors, other than ZQK, (iii) all non-voting equity interests and 65% of all voting equity interests of the Secured Notes Pledgors in Mountain & Wave S.a.r.l. ("Mountain and Wave"), a non-Debtor foreign subsidiary, and (iv) all dividends, cash, instruments, and other property from time to time received or distributed in respect of the interests described in (ii) and (iii), and (v) proceeds of the foregoing.[11]  Mountain and Wave is a holding company which owns, directly or indirectly, all of the other Non-Debtor Affiliates.

31.    BofA, as an ABL Agent, together with U.S. Bank, as collateral agent for the U.S. Secured Notes, entered into the Second Amended and Restated Intercreditor Agreement, dated as of July 16, 2013 (the "Intercreditor Agreement").  Pursuant to the Intercreditor Agreement, to the extent that the collateral securing obligations under the U.S. Secured Notes also secures the borrowers' obligations under the ABL Facility, the U.S. Secured Notes are secured by (i) a second-priority security interest, behind the ABL Lenders, in the current assets of the U.S. Notes Obligors, together with all general intangibles (excluding intellectual property rights) and other property related to such assets, including proceeds, and (ii) (a) a first-priority security interest, ahead of the ABL Lenders, in substantially all other property (including intellectual property rights) of the U.S. Notes Obligors and (b) a pledge, ahead of the ABL Lenders, of 100% of the equity interests of certain subsidiaries directly owned by the U.S. Notes

---

*(cont'd from previous page)*
         States to the extent  a lien on such assets cannot be perfected by the filing of UCC financing statements in the jurisdiction of organization of the applicable grantor.

[11]    The collateral pledged in favor of the holders of the U.S. Secured Notes does not include certain equity interests in foreign subsidiaries.

Obligors (but excluding the equity interests in certain foreign subsidiaries) and proceeds of the foregoing.

32.    As of the Petition Date, the U.S. Secured Notes had an outstanding principal balance of approximately $279 million and the U.S. Unsecured Notes had an outstanding principal balance of approximately $223 million.

33.    European Line of Credit.  On October 31, 2013, non-Debtor foreign subsidiaries of ZQK, Na Pali S.A.S. ("Na Pali"), Emerald Coast S.A.S., Kauai GmBH, Lanai Ltd., and Sumbawa SL (collectively, the "EMEA Subsidiaries") entered into a €60 million agreement with Eurofactor, a French financial institution (the "Eurofactor Agreement"), pursuant to which Eurofactor agreed to provide financing secured by the EMEA Subsidiaries' trade receivables that meet certain eligibility criteria. In addition, Na Pali agreed to transfer certain existing credit insurance policies to Eurofactor. Na Pali is jointly and severally liable for the obligations of the other EMEA Subsidiaries' obligations under the Eurofactor Agreement. The EMEA Subsidiaries (other than Na Pali) are jointly and severally liable, up to an aggregate amount of €20 million, for the obligations of the other EMEA Subsidiaries. The Eurofactor Agreement does not contain any financial covenants. The Eurofactor Agreement has an initial term of three years and is automatically extended for an indefinite period of time until terminated by either party. Na Pali may terminate the Eurofactor Agreement at any time during the initial three year term.

34.    The Eurofactor Agreement matures in October of 2015. As of the Petition Date, the EMEA Subsidiaries had approximately $30 million outstanding under the Eurofactor Agreement.

35.    <u>The Euro Notes: Unsecured Notes Due 2017</u>. Pursuant to an Indenture dated December 10, 2010, among, <u>inter alia</u>, the Euro Notes Guarantors (as defined below), Deutsche Trustee Company Limited, as trustee, Deutsche Bank Luxembourg S.A., as registrar and transfer agent, and Deutsche Bank AG, London Branch, as principal paying agent and common depositary, Boardriders S.A., a non-Debtor foreign affiliate, issued €200 million aggregate principal amount of 8.875% senior notes with a maturity date of December 15, 2017 (the "<u>Euro Notes</u>"). The proceeds from the notes offering were used to refinance approximately €190 million of existing European term debt and to pay related fees and expenses. The obligations of Boardriders S.A. under the Euro Notes are guaranteed by Debtors ZQK, Hawk Designs, QS Retail, DC Shoes, QS Wholesale, and certain Non-Debtor Affiliates (the "<u>Euro Notes Guarantors</u>").

36.    As of the Petition Date, the Euro Notes had an outstanding principal balance of approximately $221 million.

**D.    Events Leading to the Chapter 11 Cases**

37.    As detailed in its public filings, the Company has been in the midst of an operational turnaround since 2013.  Unfortunately, in the meantime, the Company has suffered from a lack of adequate liquidity exacerbated by underperforming retail stores and late deliveries of product to wholesale customers.  The Company's weakened performance during the turnaround period caused further contraction of trade liquidity, and the Company was required to hasten its efforts.  Since the spring, the Company explored a range of alternatives to loosen liquidity in order to allow the operational turnaround initiatives to take hold, but those efforts did not result in an actionable transaction.  As explained in more detail below, ultimately, Oaktree, a holder of 73% of the Company's U.S. Secured Notes and also a holder of the Company's Euro

Notes, expressed interest in helping the Company de-lever the balance sheet and preserve value among its foreign subsidiaries through the pursuit of a chapter 11 plan.

      (a)    <u>2013 Turnaround Plan</u>

      38.    In May of 2013, the Company announced a multi-year profit improvement plan (the "<u>Multi-Year Turnaround Plan</u>") designed to accelerate the Company's three fundamental strategies of strengthening its brands, growing sales, and improving operational efficiencies. The new strategy was designed to focus the Company on its three core brands, globalize key functions, and reduce cost structure. The Company's previous organizational structure was decentralized with each of its three geographic segments: Americas, EMEA, and APAC, operating primarily independently.  This framework created a fragmented enterprise with regional brand inconsistencies, suboptimal coordination and limited the Company's ability to take advantage of its global scale. In response to these challenges, the senior management team, with assistance from outside consultants, completed a thorough review of the Company's global operations to determine the best path for sustainable cost savings and profitable growth. The resulting Multi-Year Turnaround Plan was implemented with a focus on the following:

      (a)    <u>Brand Strength</u>: (1) clarifying the positioning of the Company's three flagship brands (*Quiksilver, Roxy, and DC*); (2) divesting certain non-core brands; (3) globalizing product design and merchandising; and (4) licensing of secondary or peripheral product categories;

      (b)    <u>Sales Growth</u>: (1) reprioritizing marketing investments to emphasize in-store and print marketing along with digital and social media; (2) continued investment in emerging markets and e-commerce; and (3) improving sales execution; and

(c)   Operational Efficiencies: (1) optimizing the Company's supply chain; (2) reducing product styles by over 30%; (3) improving, selling, general and administrative expense by at least 300 basis points; (4) centralizing global responsibility for key functions, including product design, supply chain, marketing, retail stores, licensing and administrative functions; and (5) closing underperforming retail stores.

39.    As one component of the Multi-Year Turnaround Plan, in November 2013, the Company completed the sale of Mervin Manufacturing, Inc. ("Mervin"), a manufacturer of snowboards and related products, for $58 million. As a continuation of the Multi-Year Turnaround Plan, in 2014, the Company continued to divest certain non-core businesses in order to improve its focus on the operations of its three core brands (*Quiksilver*, *Roxy*, and *DC*).  In January 2014, it completed the sale of substantially all of the assets of Hawk Designs, its subsidiary that owned and operated the "*Hawk*" brand, for $19 million. Lastly, in December 2014, at the completion of the sale of the Company's 51% ownership stake in Surfdome Shop Ltd., a multi-brand e-commerce business, the Company received net proceeds of approximately $16 million.

40.    Notwithstanding these efforts, in the first fiscal quarter of 2015, the Company reported a net loss, following softer revenue results, year over year from 2014, although gross margin remained largely flat.  Specifically, the Company, like many others with a major distribution center located in the western U.S., suffered the impact of the Los Angeles port labor dispute during the early months of 2015.[12]  In addition, although the Company's EMEA

---

[12]   See, e.g., Courtney Reagan, *West Coast Ports: Retail's $7 Billion Problem*, CNBC, Feb. 9, 2015 (estimating the potential costs to retailers of a port shutdown as high as $7 billion for 2015); Laura Stevens, Suzanne Kapner, and Leslie Josephs, *Port Delays Starting to Damage Businesses*, WALL STREET JOURNAL, Feb. 16, 2015 (describing the nine-month contract dispute between port workers and port employers, and stating that retailers are "feeling the impact" negatively).

operation performed relatively consistently over the same period,[13] the Company's overall results did not reflect this favorable performance due to the impact of currency exchange rates between the euro and the U.S. dollar (in which currency the Company's results are reported).[14]

41.    At the end of March 2015, the Company announced management changes in several key areas.  First, Pierre Agnes, formerly President, was promoted to Chief Executive Officer and appointed to the board of directors.   With over twenty-seven years at the Company, Pierre was (and remains) well positioned to lead the future of the Company.  Second, Greg Healy was promoted to President. Greg has been with the Company since 1998 and has held several management positions within the Company, including CEO of the Australasia region and CFO, COO, and President of the APAC region.  Third, Thomas Chambolle, formerly the regional CFO of EMEA, was promoted to global CFO.  Mr. Chambolle's experience includes working with French government agencies during the global financial crisis as well as serving as CFO of other large companies.

(b)    The Strategy Review Committee

42.    As new management continued to execute and refine the Multi-Year Turnaround Plan, the Company continued to face liquidity challenges, particularly in the U.S.  In order to support management's efforts to address liquidity issues, the board of directors formed the Strategy Review Committee (the "SRC"), a subcommittee of the board.

---

[13]    The Company's Q1 FY 2015 net revenues for the EMEA region totaled approximately $125.8 million, while the company's Q1 FY 2014 constant currency continuing category net revenues totaled approximately $129.1 million.  See Company Press Release, dated Mar. 17, 2015 (announcing Q1 FY 2015 financial results).

[14]    See, e.g., Chuck Mikolajczak and Sinead Carew, U.S. Multinationals Hit Hard by Strong Dollar, To Bleed Further Into 2015, REUTERS, Jan. 27, 2015 (stating that "[a] slew of U.S. multinational companies… showed that a strong U.S. dollar hurt their earnings," and noting that "[t]he pain is hitting multiple sectors … which … garner a large portion of their sales from outside the United States").

43.     The members of the SRC include Joseph Berardino (Chairman) of Alvarez & Marsal, Michael Clarke, Andrew Sweet, and William M. Barnum, Jr.[15]  Mr. Berardino is a managing director in charge of the East region of Alvarez & Marsal's business consulting practice, and has served on the full board of directors of the Company since 2011.  Mr. Clarke has held a number of executive management positions in some of the most recognized companies in the world, including Kraft Foods Europe and The Coca-Cola Company, among others, currently serves as the CEO of Treasury Wine Estates, and has served on the full board of directors of the Company since 2013.  Mr. Sweet has extensive experience in private equity and investment banking, is currently a managing director of private equity firm Rhône Group, and has served on the full board of directors of the Company since 2009.  Finally, Mr. Barnum serves as a director of several private companies, has been a managing member of venture capital and private equity investment firm Brentwood Associates since 1986, and has served on the full board of directors of the Company since 1991.

44.     Initially, the SRC recommended engaging financial professionals from Alix Partners ("Alix") to support management's efforts to develop the Company's general business plan, liquidity forecast and restore supply chain efficiencies.  In addition, the SRC recommended that the Company retain Peter J. Solomon Company ("PJSC") as investment banker to explore and advise the SRC and the Company with respect to all range of strategic alternatives.

45.     Following preliminary due diligence, and given its deep background with the Company in connection with prior engagements, PJSC recommended that the Company explore a global refinancing of existing indebtedness at the Company's full board meeting in

---

[15]     Mr. Barnum was added to the SRC in late August 2015.

June 13, 2015.  The purpose of the global refinancing was to supplement the Company's

liquidity and address the maturity of the €200 Euro Notes due December 15, 2017. PJSC

initiated contact with parties interested in refinancing the Euro Notes and supplemented the

process with outreach to well-recognized second lien lenders to explore the possibility of

providing further advances under the borrowing base collateral within the existing ABL credit

facility.

46.     With respect to refinancing the Euro Notes, PJSC identified 19 potential

sources of financing, of which eight executed confidentiality agreements.  Of those, PJSC

engaged in more advanced discussions with two.  Ultimately, as negotiations evolved, Oaktree

committed a significant level of internal and external professional resources to the process and

engaged in a deep level of due diligence with management in multiple Company offices

worldwide, as discussed in more detail below.

47.     With respect to expanding the ABL Facility, PJSC evaluated structures to

provide the Company with incremental liquidity under the existing borrowing base.  The

alternatives included seeking a first-in-last-out ("FILO") loan structure as well as a second or

subordinated lien on the existing borrowing base.  PJSC engaged in more detailed discussions

and negotiations with 2 leading FILO lenders who executed confidentiality agreements.

Ultimately, the two lenders declined to continue in the process due to their view of the

insufficient loan to value ratio.  PJSC continued efforts to develop this liquidity source up to and

including incorporating such a potential structure into the proposed DIP Facilities.

48.     Beginning in July 2015, the SRC engaged with management and PJSC

with respect to these strategic alternatives on a more frequent basis, as the due date for semi-

annual payments on the U.S. Secured Bonds and U.S. Unsecured Bonds was approaching on

August 3, 2015. PJSC provided regular updates on potential refinancing opportunities, and management provided similar updates regarding liquidity forecasts. Also in July, the Company retained FTI Consulting ("FTI") to provide support for management with respect to liquidity enhancement and forecasting, and to assist the Company in working with the existing ABL Lenders with respect to borrowing base adjustments and reserve negotiations. Finally, in July, the SRC requested that the firm's longstanding counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), advise the Company, including the SRC and the full board, with respect to contingency planning.

49.     At the end of July, management and certain of the Company's advisors met with the ABL Lenders regarding liquidity, the status of refinancing efforts and the Company's upcoming August 3, 2015 interest payment obligations, including the availability of a 30-day grace period with respect to those obligations. The ABL Lenders confirmed that sufficient liquidity was available to make the required interest payments, and management, believed that it would have sufficient liquidity to allow PJSC to continue its efforts to seek adequate refinancing for the Company in the near term. The Company had also identified other sources of potential liquidity, in the form of unencumbered assets in EMEA, that might be available to support limited new financing.

50.     The Company's management and advisors reported the outcome of such meeting to the SRC, and provided an update on refinancing efforts. Management reported its view that while failure to make the August interest payments would preserve short-term liquidity, the market impact of the announcement of the missed payment would have a significant negative impact on vendor and customer confidence during a critical period of building the Company's 2016 spring wholesale order book. In addition, PJSC and the Company believed that such an

announcement would impair the Company's ability to execute on its ongoing refinancing efforts. After careful consideration of these and related factors, including evaluation of other strategic alternative possibilities that existed, management and the SRC recommended that the Company make the interest payments due on August 3, 2015, and the board approved that recommendation unanimously.

51.    In mid-August, Oaktree advised the Company that it was prepared to execute a refinancing transaction but only if all of the Company's global intellectual property and brands (the "IP") was among the collateral securing such financing.  Unfortunately, the covenants underlying the Company's existing indebtedness made such a refinancing impracticable, absent the ability to restructure such indebtedness available in chapter 11.  As a consequence, the Company immediately engaged with Oaktree regarding the possibility of executing the refinancing and restructuring transaction in the context of a chapter 11 case, as a continuation of the parallel contingency planning efforts that the Company had begun in July 2015.  Those negotiations culminated in the DIP Financing and PSA described below.

52.    On September 9, 2015, the Debtors commenced these Chapter 11 Cases to execute those transactions.

## PART II

## PLAN SPONSOR AGREEMENT, DIP FACILITIES, AND STORE CLOSING SALES

53.    The foundation for the Debtors' reorganization is the proposed conversion of the Debtors' U.S. Secured Notes into equity of the reorganized Debtors pursuant to the PSA executed with Oaktree and related transactions that will result in a significant de-levering of the Debtors' balance sheet.  More specifically, the PSA contemplates that Oaktree and the lender group will provide the Debtors with up to $175 million in postpetition financing, as described in more detail below.  In the next few weeks, the Debtors and Oaktree will finalize the terms of a

21

plan of reorganization (the "Sponsored Plan") and accompanying disclosure statement to implement the PSA.  As set forth in the term sheet attached to the PSA, the Sponsored Plan will provide for, among other things: (a) the conversion of the U.S. Secured Notes into equity, (b) a substantial payment on account of general unsecured claims, and (c) the issuance of new debt on exit in order to satisfy the postpetition financing and others costs of emergence.  The DIP Financing and PSA are described in more detail below.

### A.    Plan Sponsor Agreement (Item 13)

54.    As noted above, in connection with the Debtors' primary refinancing efforts during the spring and summer of this year, Oaktree devoted substantial resources, including legal and other advisors, to the due diligence regarding a potential transaction with the Debtors.  Over the course of that due diligence, Oaktree representatives attended multiple meetings with management and its advisors, and developed a deep understanding of the Debtors' business.

55.    After it became clear that Oaktree and the Debtors would be unable to execute a refinancing transaction out of court, the Debtors explored the potential for an in-court transaction.  PJSC contacted multiple potentially interested parties, but Oaktree was an obvious party with whom to negotiate because (a) Oaktree held a large position in the Debtors' U.S. Secured Notes; (b) Oaktree had already performed a substantial level of due diligence; and (c) Oaktree was sophisticated in the context of the chapter 11 process and could therefore be responsive to the Debtors' need to execute on a transaction promptly.

56.    While considering alternative transactions, management and the Company's advisors explored the relative benefits and burdens of a sale of assets under the Bankruptcy Code versus the development and prosecution of a plan of reorganization under the Bankruptcy Code.  Among those factors, the Company and the SRC focused on the impact of

chapter 11 on its foreign subsidiaries.  Specifically, it is my understanding that foreign

insolvency laws generally do not afford the same level of protection and certainty as do

insolvency laws in the United States.  Accordingly, the Company's advisors emphasized

strategies that would enable the foreign subsidiaries to operate in the ordinary course of business

to the greatest extent possible.

57.    Because many of the Debtors are guarantors of the Company's Euro Notes,

any chapter 11 process would give rise to an acceleration of the Euro Notes.  Moreover, a

bankruptcy sale process would likely violate many of the covenants in the Euro Notes indenture.

One of the key assets of the Debtors is the residual equity value of its foreign subsidiaries, which

would be placed in substantial jeopardy and impairment upon a default of the Euro Notes.

58.    On the other hand, reinstatement of the Euro Notes guaranties under the

Bankruptcy Code, which is only available under a plan of reorganization, mitigates the risks to

the foreign subsidiaries of a chapter 11 filing.  In addition, a chapter 11 plan process would be a

comprehensive solution to the Debtors' balance sheet issues in the United States, as compared

with a sale process.  Accordingly, after evaluating potential alternatives, and with the advice of

PJSC, management and the SRC recommended to the board of directors that the Company

pursue a plan of reorganization as an optimal solution.

59.    In the early stages of negotiations with Oaktree, Oaktree confirmed that it

would be willing to provide postpetition financing sufficient to support a plan process.  The

Company, working with FTI, developed a chapter 11 budget to delineate the Company's

financing needs for such a process.

60.     During late August and early September, the Company and Oaktree, through their respective advisors, negotiated the terms of a potential plan of reorganization.  The features of the proposed plan are set forth in the PSA, and are summarized below:

   (a)   The Debtors' ABL Facility will be replaced with postpetition financing, and ultimately refinanced through an exit facility;

   (b)   The U.S. Secured Notes, over 70% of which are controlled by Oaktree, will be converted into equity;

   (c)   Additional consideration valued at not less than $7,500,000.00 will be offered to the Debtors' unsecured creditors, subject to settlement of any intercreditor disputes;

   (d)   The Debtors' guaranties of the Euro Notes will be reinstated;

   (e)   Existing equity will be cancelled; and

   (f)   Oaktree has agreed to backstop the Debtors' cash and working capital needs upon emergence, including through a rights offering to existing holders of U.S. Secured Notes which will be accomplished through the plan.

61.     Under the PSA, the Debtors remain free to continue to pursue alternative transactions, and intend to do so, working in cooperation with creditors and their representatives. In the event that the Debtors terminate the PSA in favor of such an alternative, Oaktree will be entitled to a breakup fee in the amount of $20 million.  Oaktree would not have entered into the PSA without the commitment of the breakup fee.  The Debtors believe that entering chapter 11 with a plan commitment is vital to maximizing and preserving value because it demonstrates to vendors and customers that the Debtors are likely to successfully execute their chapter 11 reorganization.

62.     Oaktree also cooperated with the Debtors in negotiating and obtaining consents from a majority of its Euro Notes holders (including Oaktree itself) to waive certain defaults that would otherwise arise from the Debtors' Chapter 11 Cases.  Such waiver is an

important component of the Debtors' efforts to preserve value in EMEA and APAC for the benefit of United States creditors during this chapter 11 process.

**B.      DIP Facilities and Access to Cash Collateral (Item 12)**

63.      The Debtors are requesting authorization to enter into (i) that certain *Senior Secured Super-Priority Debtor-in-Possession Credit Agreement* (the "DIP Term Loan Credit Agreement"), by and among QS Wholesale, Inc., as borrower, ZQK, as parent, the Debtors, as guarantors,  Oaktree FIE, LLC, as Administrative Agent (the "DIP Term Loan Agent"), and the lenders from time to time party thereto (the "DIP Term Loan Lenders") and (ii) that certain *Second Amended and Restated and Senior Secured Super-Priority Debtor-in-Possession Credit Agreement* (the "DIP ABL Credit Agreement" and together with the DIP Term Loan Credit Agreement the "DIP Credit Agreements" and the financing provided thereby, the "DIP Financing"), by and among QS Wholesale, Inc., DC Shoes, Inc., Hawk Designs, Inc., QS Retail, Inc., Quiksilver Canada Corp., Ug Manufacturing Co. Pty Ltd, and Quiksilver Japan Co., Ltd., each of the Debtors, as guarantors, Bank of America, N.A. ("BofA"), as Administrative Agent, Collateral Agent and L/C Issuer (the "DIP ABL Agent" and together with the DIP Term Loan Agent, the "DIP Agents") and as Lender (the "DIP ABL Lender" and together with the DIP Term Loan Lenders, the "DIP Lenders").

64.      As set forth below, following a process whereby the Debtors explored various alternatives to the DIP Credit Agreements, the Debtors determined that the DIP Financing represented the best available option for the Company to obtain essential postpetition financing.

65.      As a part of its contingency planning process, the Debtors, through its investment bankers at PJSC, solicited proposals for bankruptcy financing from a number of

parties, including the ABL Lenders, Oaktree and other parties that had participated in discussions with the Debtors in potential refinancing of the Euro Notes, and other financial institutions.  An important consideration for the Debtors for any postpetition financing was to have sufficient funding for a plan of reorganization, as the Debtors had determined that preserving its EMEA operations  (and the Euro Notes) would maximize the value of its global enterprise.

66.    The Debtors' existing ABL Facility is comparable to a traditional asset-based revolver where borrowings are subject to a borrowing base, limited by specific advance rates which vary by collateral type.  Given the Debtors' liquidity profile, however, it quickly became evident that a postpetition ABL would be insufficient for its needs for financing to support an entire chapter 11 plan process.

67.    As noted above, Oaktree was willing to provide sufficient financing for the plan process, but the initial pricing offered by Oaktree was near the high end of the range of market for comparable DIP proposals, as explained in the Declaration of Durc A. Savini of PJSC in support of the DIP Motion, filed concurrently herewith (the "Savini Declaration"). Accordingly, PJSC and the Debtors negotiated with Oaktree and other market participants to develop a more competitive cost of financing under the DIP.

68.    After much dialogue, the Debtors and PJSC were successful in forging a collaborative DIP proposal by both Bank of America, one of the ABL Lenders, and Oaktree, in a transaction whereby the Debtors would enjoy a lower blended cost of funds.  The particulars of that DIP financing package are described in more detail in the Savini Declaration.

69.    In connection with the DIP Facilities the Debtors seek, among other things, and order which:

(a)    approves the DIP Term Loan Credit Agreement, pursuant to which the DIP Term Loan Lenders is providing a debtor-in-possession term loan credit facility (the

"DIP Term Loan Facility") of up to $115,000,000.00, subject to an $70,000,000 borrowing limit on an interim basis pending entry of the Final Order;

(b)    approves the DIP ABL Credit Agreement, pursuant to which the DIP ABL Lender is providing a debtor-in-possession asset-based revolving loan credit facility (the "DIP ABL Facility") in an aggregate maximum principal amount of up to the lesser of $60,000,000 or the Borrowing Base;

(c)    authorizes the Debtors to execute the DIP Credit Agreements and all other agreements, documents, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Agent and Lenders, including, without limitation, all Loan Documents (as defined in the DIP Credit Agreements) each as amended and in effect from time to time, and to perform such other acts as may be necessary or desirable in connection therewith;

(d)    grants to the DIP Term Loan Agent valid, automatically perfected, and enforceable consensual priming liens upon substantially all of the Debtors' assets to the extent set forth in the DIP Term Documents and the Interim Order (the "DIP Term Loan Liens") to secure the obligations owing under the DIP Term Loan Credit Agreement and the Interim Order (collectively, the "DIP Term Loan Obligations"), with the priority further set forth herein;

(e)    grants the DIP ABL Agent valid, automatically perfected, and enforceable consensual priming liens upon substantially all of the Debtors' assets to the extent set forth in the DIP ABL Documents and the Interim Order (the "DIP ABL Liens" and together with the DIP Term Loan Liens, the "DIP Liens") to secure the obligations of the DIP ABL Obligors owing under the DIP ABL Credit Agreement and the Interim Order (collectively, the "DIP ABL Obligations" and together with the DIP Term Loan Obligations, the "DIP Obligations"), including the guarantee of the DIP ABL Foreign Obligations (as defined below), with the priority further set forth herein;

(f)    grants allowed superpriority administrative expense claims for all DIP Term Loan Obligations to the DIP Term Loan Lenders, subject to the Carve Out, to the extent set forth in the Interim Order;

(g)    grants allowed superpriority administrative expense claims for all DIP ABL Obligations to the DIP ABL Lenders, subject to the Carve Out, to the extent set forth in the Interim Order;

(h)    authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code ("Cash Collateral") in which the Prepetition Notes Secured Parties and the Prepetition ABL Secured Parties (each as defined below) assert an interest;

(i)    grants certain adequate protection to the holders of the U.S. Secured Notes and the ABL Lenders for any decrease from and after the Petition Date in the value of their respective interests in the Debtors' property resulting from (i) the use, sale or lease of the Debtors' property (including the use of Cash Collateral), (ii) the subordination to the Carve Out and the DIP Liens, or (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

(j)    grants authority for the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, the reasonable and documented fees and disbursements of the DIP Agents' and the DIP Lenders' attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the DIP Documents;

(k)    modifies and grants relief from the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreements and the Interim Order;

(l)    approval of certain milestones in the Debtors' Chapter 11 Cases (the "Milestones");

(m)    waives any applicable stays under the Bankruptcy Rules, including, without limitation, under Rule 6004(h) of the Bankruptcy Rules, and provide for the immediate effectiveness of the Interim Orders; and

(n)    schedules a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, to consider entry of the Final Orders granting the relief requested in this Motion on a final basis.

70.    The Debtors have an immediate need for adequate postpetition financing to continue operating their business in the ordinary course and preserve the value of their assets. The Debtors were unable to obtain adequate unsecured credit allowable as an unsecured claim or superpriority administrative expense because nearly all of the Debtors' assets remain subject to prepetition liens.  The DIP Facilities reflects the most favorable terms on which lenders were willing to offer financing, particularly after consideration of the costs associated with obtaining DIP financing on a non-consensual priming basis.  The proceeds from the DIP Facilities will allow the Debtors to continue their operations in the ordinary course, maintain prudent cash balances, satisfy working capital requirements, fund restructuring costs, and otherwise meet their liquidity needs.  Finally, I believe, after consultation with the Debtors' advisors, that the terms of the DIP Credit Agreement and other credit documents are fair and reasonable.

71.    Without the proposed DIP Credit Facilities and access to Cash Collateral, the Debtors will not have sufficient liquidity to operate their business, fund their ordinary course

expenditures, including paying their over 1500 employees, or pay the expenses necessary to administer the Chapter 11 Cases.   The Debtors also require post-petition letters of credit. The Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on the operation of their business without additional financing.   The Debtors also require post-petition letters of credit. In sum, the Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on the operation of their business without additional financing.

72.     The DIP Financing package, as described above, is comprised of a term loan facility from Oaktree and an amended and restated ABL facility from BofA.  Certain of the proceeds of the DIP Term Loan Facility will be used to repay the prepetition ABL Facility. Pursuant to the DIP ABL Credit Agreement, the Foreign ABL Obligations and the Domestic ABL Obligations will continue to exist postpetition and will become DIP ABL Obligations under the DIP ABL Credit Agreement.  However, as set forth above, the Debtors shall utilize a portion of the first draw to repay the Foreign ABL Obligations held by two of the ABL Lenders through an intercompany loan to one of the Foreign ABL Borrowers.  Following such repayment, BofA will be the only ABL DIP Lender.  In addition, in order to allow availability to issue required letters of credit and stay within the borrowing base under the DIP ABL Credit Agreement, proceeds of the DIP Term Loan Facility will be used to pay down some or all of the Prepetition Domestic ABL Obligations.  The Debtors submit that this arrangement is both appropriate and, indeed, desirable for several reasons.

73.     First, as further set forth in the Savini Declaration and above, inclusion of the DIP ABL Facility in the DIP Financing package has enabled the Debtors to materially decrease the overall cost of the DIP Financing to the estate while still providing sufficient

liquidity.  As previously discussed, the Debtors had the option of obtaining an adequate DIP

facility exclusively from Oaktree.  However, such a facility would have come at significantly

higher cost to the estates.  I believe that the reduction in interest expense (from 12% to 8%) by

incorporating the DIP ABL Facility as part of the Debtors' DIP Financing is a huge benefit to the

estate

74.    Second, as noted above, the ABL Facility included not only loans to

certain of the Debtors but also the approximately $24 million of Foreign ABL Obligations on

account of certain of the Debtors' non-Debtor affiliates, which obligations are secured by the

collateral of the Debtors and such non-Debtor affiliates.  I understand that the foreign collateral

is subject to complicated perfection rules in each of the applicable jurisdictions, which

jurisdictions may be beyond the reach of this Court.  In the absence of the continuation of such

obligations as guaranty obligations of the DIP ABL Obligors, I understand that the filing would

be a breach of the Debtors' guaranty obligations under the ABL Facility and the Foreign ABL

Borrowers would be in default and would be required to provide additional collateral to replace

that of the Debtors.  Doing so in multiple foreign jurisdictions in a timely matter would be

difficult, if not impossible.  As such, amending and restating the Prepetition ABL Facility allows

the Prepetition Foreign ABL Obligations to essentially remain in place and continue to be

guaranteed and secured by the U.S. entities' collateral, greatly reducing the cost  and

complication associated with providing and perfecting replacement collateral for such

obligations.

75.    The DIP Financing also has the advantage of avoiding an otherwise

potentially very contentious and costly priming fight with both the ABL Lenders and the holders

of the U.S. Secured Notes.  Finally, although the DIP ABL Facility does repay existing

prepetition indebtedness, importantly, the Debtors' DIP Financing package is essentially provided by a new lending group – only one of the prepetition ABL Lenders will remain postpetition. Thus, there is little overlap of identity between prepetition and postpetition lenders.

76.    In addition, I believe that the Debtors are unable to find financing on more favorable terms. In the present circumstances, the Debtors cannot meet their liquidity needs by obtaining financing on an unsecured, administrative expense basis. Given the troubles generally facing specialty retailers, as evidenced by the liquidations within recent months of Body Central Corp., Deb Stores, dELiA*s, Inc., and Wet Seal, combined with the Debtors' continued projected losses, PJSC quickly found that most of the potential third-party lenders and equity investors were not interested in providing financing to the Debtors.

77.    In addition to these challenges, the Prepetition ABL Lenders were unwilling to advance additional funding, even through a postpetition financing structure, to the Prepetition Foreign ABL Borrowers, and the borrowing base of the Prepetition Foreign ABL Borrowers prevents them from borrowing independently from the Company. So, the proposed DIP Term Loan Facility is effectively the only avenue available to the Prepetition Foreign ABL Borrowers to access liquidity, and the DIP Term Loan Lenders are not qualified to make loans directly to those Foreign ABL Borrowers. Therefore, the only mechanic available to fund the Foreign ABL Borrowers is through the secured intercompany loan, utilizing funds provided by the DIP Term Loan Facility.

78.    I believe that the DIP Facilities will provide the Debtors with adequate financing to fund the Chapter 11 Cases through confirmation of a Sponsored Plan. Lastly, I believe that the terms of the DIP Facilities are fair and reasonable, and appropriate. In particular the terms of the DIP Credit Agreements and the proposed DIP Orders were negotiated in good

faith and at arm's-length between the Debtors and the DIP Lenders, resulting in agreements designed to permit the Debtors to obtain the needed liquidity to maximize the value of their assets.

79.     For these reasons, I believe that DIP Financing, including the DIP ABL Facility and the partial repayment of the Prepetition ABL Facility, are appropriate and in the best interests of the Debtors, their estates, and creditors.

**C.     Store Closings (Item 3)**

80.     As part of the Multi-Year Turnaround Plan initiatives, management spent considerable time on a plan to rationalize the Company's retail store base, particularly in the United States.  As a culmination of those efforts, the Company developed a store closing plan (the "Store Closing Plan"), which it continued to refine from time to time.  In particular, during the prepetition period, the Company started to close stores consistent with the Store Closing Plan as and when underperforming store leases came up for renewal or otherwise when there was an opportunity to exit a lease early, such as due to a landlord request.  In connection with the Company's contingency planning efforts, management worked with FTI to accelerate and potentially expand the Store Closing Plan in the context of a chapter 11 filing.  As a consequence, the Debtors are seeking permission to continue the execution of the Store Closing Plan, as described in more detail in the *Declaration of Stephen Coulombe* (the "Coulombe Declaration") in support of the *Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 363, 365, and 554 and Bankruptcy Rules 6003 and 6004 (I) Authorizing the Debtors to Assume the Agreements; (II) Authorizing and Approving the Conduct of Store Closing or Similar Themed Sales, With Such Sales to be Free and Clear of all Liens, Claims, and Encumbrances, (III) Authorizing Customary Bonuses to Employees of Closing Store Locations*

(the "Store Closing Motion"). The Coulombe Declaration is attached as Exhibit C to the Store Closing Motion.

<div align="center">

**PART III**

**FIRST DAY PLEADINGS**

</div>

81.    In furtherance of the Company's restructuring efforts, the Debtors intend to file the First Day Pleadings,[16] each as listed on the attached Exhibit B, concurrently with this Declaration and respectfully request that the Court consider entering the proposed orders granting such First Day Pleadings.  I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in maximizing value during these Chapter 11 Cases.

**A.    Procedural Pleadings (Items 1, 2 and 5)**

82.    The Debtors have filed three "procedural" pleadings that seek to (1) jointly administer the Debtors' chapter 11 cases for procedural purposes only, (2) retain Kurtzman Carson Consultants LLC ("KCC") as claims and noticing agent, and (3) enforce the automatic stay.  The Debtors' attorneys have explained to me the customary practices with regard to the requested relief in chapter 11 business reorganization cases and the rationale for these pleadings.

---

[16]    Any term not defined herein has the meaning ascribed to it in the specific First Day Pleading being described.

Joint Administration (Item 1)

83.     The Debtors are requesting that their Chapter 11 Cases be jointly administered only for procedural purposes.  As set forth above, ZQK is the direct or indirect parent company of each of the other Debtors.  I believe that joint administration of these Chapter 11 Cases will avoid the unnecessary time and expense of duplicative motions, applications, other pleadings, orders, and related notices, which would otherwise need to be filed in each separate case absent joint administration.  Moreover, joint administration will relieve this Court of the burden of entering duplicative orders and maintaining duplicative files.  Joint administration will also ease the burden on the Office of the United States Trustee in supervising these Chapter 11 Cases.  Accordingly, I believe that joint administration will save considerable time and expense for the Debtors, the Clerk of the Court, the United States Trustee, and other parties in interest, which will, in turn, result in substantial savings for the Debtors' estates.

Enforcement of the Automatic Stay (Item 2)

84.     The Debtors have filed a Motion seeking entry of an order enforcing the Bankruptcy Code's automatic stay provisions and bankruptcy termination provisions, and the protections thereunder.  The Debtors have developed valuable business relationships with numerous entities located outside of the United States, including from China, South Korea, India, Taiwan, Indonesia, and Australia, among several other countries.  These non-U.S. entities include vendors and other counterparties to contracts with the Debtors and are critical to the manufacturing, distribution, and sale of the Debtors' sportswear, footwear, accessories, and other products, and to the overall success of the Debtors' business operations.   I believe that many of these foreign creditors and contract counterparties are unfamiliar with the provisions of the Bankruptcy Code, and in particular, the self-executing nature of the automatic stay provisions under Bankruptcy Code section 362 and the protections afforded chapter 11 debtors under

34

Bankruptcy Code section 365.  I firmly believe that absent an order enforcing the automatic stay

protections of Bankruptcy Code section 362 and the bankruptcy termination provisions of

Bankruptcy Code section 365, such non-U.S. contract counterparties may take precipitous action

against the Debtors and/or the property of the estates that would be in direct contravention of

Bankruptcy Code section 365.  I also believe that the order requested in this Motion will benefit

the Debtors and their stakeholders to ensure that such non-U.S. contract counterparties will not

try to unilaterally terminate their contracts with the Debtors, and the order will also likely

increase the chance that such contract counterparties will continue to perform under their

respective executory contracts and unexpired leases

### Application to Retain KCC as Claims and Noticing Agent (Item 5)

85.     The Debtors seek authority to retain KCC as claims and noticing agent in

these Chapter 11 Cases.  The Debtors obtained, reviewed, and undertook a competitive

comparison of proposals from three claims and noticing agents, including KCC.  I understand

that such appointment is required by the rules of this Court.  Moreover, such relief is prudent in

light of the thousands of creditors, potential creditors, and parties in interest to whom certain

notices will be sent.  I believe that KCC's  retention is the most effective and efficient manner of

noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and other

developments in the Chapter 11 Cases.  In addition, KCC will transmit, receive, docket and

maintain proofs of claim filed in connection with the Chapter 11 Cases.  Accordingly, I believe

that retention of KCC, an independent third party with significant experience in this role, to act

as an agent of the Court, is in the best interests of the Debtors and their estates and creditors.[17]

---

[17]     The Debtors also intend to file an application to retain KCC to perform certain administrative services pursuant to section 327 of the Bankruptcy Code.

B.      **Customer Programs (Item 4)**

86.     The Debtors have filed a motion (the "Customer Programs Motion") requesting relief authorizing, but not directing, the Debtors (i) to maintain and administer customer-related programs by which the Debtors offer gift cards, refunds and exchanges, warranties, and promotional offers to their customers, as well as process customer purchases through the use of credit cards and other payment methods (collectively, the "Customer Programs"), (ii) to honor prepetition obligations to customers related thereto, and (iii) to continue, replace, implement, modify, and/or terminate any of the Customer Programs as the Debtors deem appropriate in their business judgment and in the ordinary course of business.  In addition, the Customer Programs Motion requests entry of an order authorizing all applicable banks and other financial institutions, when requested by the Debtors in their sole discretion, to honor, process, and pay any and all checks, drafts, electronic fund transfers, and other forms of payment on account of the Debtors' prepetition and postpetition obligations under the Customer Programs.

87.     Gift Cards.  In the ordinary course of business, the Debtors sell gift cards to retail customers and also issue gift cards for store credit in lieu of refunds for returns processed outside the Debtors' normal return policy.  I understand that as of the Petition Date, the Debtors estimate that they will have approximately $1.0 million of gift card obligations outstanding.  Additionally, the Debtors use a third party vendor to process and service these gift cards, for which the Debtors pay certain processing and service fees per transaction.  I understand that as of September 7, 2015, approximately $3,750 in such processing and servicing fees remain outstanding.

88.     Refund, Exchange and Return Programs.  The Debtors allow their retail customers to return or exchange merchandise within 30 days of original purchase if the customers present the original sales receipt and the merchandise is unworn, unwashed,

undamaged, in its original condition and packaging (if any), and has tags still attached (the "Refund and Exchange Program").  If merchandise is not returned within 30 days of original purchase, the Debtors generally do not offer a refund, exchange, or store credit.  Additionally, the Debtors offer a return program to their wholesale customers through which wholesale customers are permitted to return merchandise to address missed shipments, product defects, and slow sell through, and through which the Debtors replace the products at issue with new product when needed (the "Wholesale Returns Program").  I understand that because of the inherently uncertain nature of the Refund and Exchange Program and the Wholesale Returns Program, the Debtors are unable to estimate the value of their prepetition obligations related thereto with precise accuracy.  The Debtors, however, do not expect the commencement of these Chapter 11 Cases to result in a significant deviation in the volume of monthly returns, exchanges and/or refunds from that which they experienced prepetition.

89.    Warranty Programs.  The Debtors offer their customers the following warranties, which are akin to manufacturers' warranties: an Apparel & Accessories Warranty, Baggage Warranty, Eyewear Warranty, Footwear Warranty, Snow Warranty, Watch Warranty, and Wetsuit Warranty.  Under their warranties, the Debtors warrant their products to be free of defects in material or workmanship for the following periods from the date of purchase: (i) ninety days for apparel, accessories, and footwear; (ii) one year for baggage, bags, luggage, snowboards, snow-specific outerwear, snowboard boots, and glued and blind-stitched wetsuits; (iii) two years for eyewear and watches; and (iv) both a limited lifetime warranty on workmanship and limited one year warranty on materials for stitched wetsuits.  The cost of the warranties provided by the Debtors is included in the products' purchase price.  If a product covered by a warranty is found to be defective after inspection by one of the Debtors' warranty

technicians, the product is repaired or replaced with an existing comparable model at the technician's discretion.

90.     <u>Sales Promotions, Discounts, and Related Programs</u>.  The Debtors offer various promotional offers (collectively, the "<u>Sales Promotions</u>") to their retail and, in some cases, wholesale customers throughout the year, such as "percentage off," "buy-one-get-one-free," and "gift with purchase" promotions.  In connection with the Debtors' wholesale business, the Debtors offer various discounts: (i) in-line discounts, which include standard discounts, seasonal pre-book discounts, and closeout discounts, (ii) mark-down allowances ("<u>MDAs</u>") as additional discounts at the end of the season to help wholesale customers clear out old inventory while maintaining a minimum margin threshold of product, and (iii) non-merch credits (the "<u>Non-Merch Credits</u>"), which are discounts applied after invoices have been generated to resolve invoice disputes and other issues with merchandise orders, such as late deliveries and order changes.  I understand that as of August 31, 2015, the Debtors estimate that they have approximately $3.35 million in outstanding prepetition obligations on account of Non-Merch Credits and MDAs.  Lastly, the Debtors also provide wholesale customers with cash payments equaling a pre-agreed percentage of the gross sales of each customer, and those payments are used at the customer's discretion to support the business (the "<u>COOP Investments</u>"), such as for e-mail blasts, catalogs, or in-store promotions.  I strongly believe that the Debtors must continue the sales and discount programs described above to retain their customers' business.

91.     <u>Credit Card and Other Payment Processors</u>.  In addition to cash, the Debtors accept several other methods of payment from retail customers at their point of sale: (i) Visa, MasterCard, Discover, or American Express credit cards; (ii) PayPal; (iii) purchases through Amazon.com; and (iv) checks.  Retail credit card transactions are processed by Bank of

America Merchant Services.  Debtors QS Wholesale, Inc. and DC Shoes, Inc. also accept credit cards from their wholesale customers, and such transactions are processed by Elavon, Inc.  For all methods of payment (other than a cash transaction), the Debtors receive the net customer purchase price less any chargebacks, returns, or processing fees charged.  The processing fees charged are in the range of 1.5% to 3%, with a weighted average of 2.5%.  The fees that are owing to these companies are set off from the daily net proceeds remitted to the Debtors on account of sales transactions.  I firmly believe that maintaining the non-cash payment mechanisms is essential to the continuing operation of the Debtors' business because the vast majority of the Debtors' sales are made using these payment methods.

92.     The Debtors' Customer Programs described above are standard in the retail industry.  I believe that the Debtors' ability to continue their Customer Programs and honor their prepetition and pospetition obligations thereunder, in the ordinary course of business, is necessary to (i) retain the Debtors' reputation for reliability and quality, (ii) meet competitive market pressures, (iii) maintain positive retail and wholesale customer relationships, and (iv) ensure customer satisfaction, thereby retaining customers, attracting new ones, and, ultimately, enhancing revenue and value for the benefit of all the Debtors' stakeholders.

93.     For the foregoing reasons, I believe that the relief sought in the Customer Programs Motion is necessary and in the best interests of the Debtors and their estates.

## C.     Payment of Employee and Payroll Obligations (Item 6)

94.     I believe that in order to minimize the personal hardship employees will suffer if prepetition obligations are not honored, as well as the significant harm which would result to the Debtors if employee morale is not maintained, it is of critical importance that the Debtors pay prepetition wages, compensation, and amounts associated with employee benefits programs and continue such programs in the ordinary course.  The Company currently employs

approximately 1554 employees (the "Employees") in their corporate offices, retail facilities, and other facilities. Additionally, the Debtors employ both contractors and temporary employees through contract staffing agencies or other outside firms, including an independent sales force of approximately 40 commissioned sales representatives. I understand that many of Company's Employees are employed on a full-time salaried basis, while others are employed on an hourly basis. The Employees perform a wide array of vital tasks relating to the management and day-to-day operations of the Company, including the general administrative functions, wholesale sales and design operations, product supply and shipment operations, and retail sales of the Company's products. I believe that retaining the Employees, whose skills and understanding of the Debtors' operations and infrastructure are essential to the effective operation and reorganization of the Debtors' businesses, is critical to the Debtors' ability to operate in chapter 11 and to consummate the transaction set forth in the PSA.

95.     I believe that the overwhelming majority of the Debtors' Employees are owed less than the priority cap and, I understand, may therefore have claims with respect to their accrued but unpaid prepetition wages or salaries that I am told are granted priority over other claims pursuant to the Bankruptcy Code.[18]

96.     Wages and Salaries. The Debtors' payroll obligations generally include base wages and salaries, commissions, and bonuses, as applicable. As of the Petition Date, the Debtors estimate that approximately $1,940,662.02, including wages, salaries, commissions and bonuses, and related payroll taxes and withholdings, is owed in respect of accrued but unpaid payroll for the Employees.

---

[18]     To my knowledge, there are presently approximately 8 independent sales representatives who are each owed in excess of $12,475 in prepetition compensation. The Debtors seek to pay these Employees their full compensation, in excess of the priority cap, solely on a final basis, pursuant to a final order, but do not seek to exceed the priority cap for any Employees during the Interim Period.

97.     <u>Incentive Plans</u>. In addition, in the ordinary course of business, the Debtors offer management bonuses to non-insiders based upon certain performance targets; however, no management bonuses have been incurred and are payable upon the Petition Date. The Debtors also offer retail incentive plans to provide selected retail Employees of the Company with compensation upon the achievement of specified performance goals of the Company.  In light of the Company's distressed situation, I believe that the retail bonuses are necessary to properly compensate and incentivize eligible Employees during the Chapter 11 Cases.

98.     <u>Other Compensation:  Vacation, Holiday, and Sick Time, Severance and Business Expenses</u>. The Debtors also offer their Employees other forms of compensation, including vacation time, paid holidays, sick time, severance payments and reimbursement of certain business expenses.

99.     The precise amount of paid vacation time, holiday time, and sick time depends on whether the Employee is full- or part-time and the Employee's position within the management structure.  The Debtors anticipate that their Employees will utilize any accrued Vacation Time, Holiday Time, or Sick Time in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.

100.     Finally, the Debtors routinely reimburse Employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, ground transportation, meals, supplies, and miscellaneous business expenses (collectively, the "<u>Reimbursable Expenses</u>").  Employees who make frequent and/or large purchases for business purposes are provided with corporate credit cards to pay for these expenses, and report their expenses by completing periodic expense reimbursement forms.  The Debtors currently have

41

corporate card programs through Bank of America. Employees who do not have corporate credit cards and incur out-of-pocket, non-corporate card Reimbursable Expenses also report these expenses by completing periodic expense reimbursement forms.   As of the Petition Date, the Debtors estimate that their accrued and unpaid obligations for Reimbursable Expenses, including amounts outstanding on the corporate credit cards, are approximately $175,000.

101.    These forms of compensation are usual, customary and necessary if the Debtors are to retain qualified employees during the reorganization process.

102.    <u>Employee Benefit Plans</u>.  The Debtors have established plans and policies to provide their Employees with (a) health benefits, including medical, dental, and vision benefits and (b) insurance benefits, including long-term disability, life insurance, supplemental life insurance, and accidental death and dismemberment insurance (collectively, the "<u>Employee Benefits</u>"). The Debtors fund the Medical and Insurance Benefits through Company contributions and Employee contributions. The Employee Benefits represent an important component of an Employee's compensation.

103.    The Debtors provide their full-time Employees with medical benefits pursuant to four different self-funded preferred provider medical plans (collectively, the "<u>Medical Plans</u>") through Aetna and Kaiser, offering varying levels of coverage.  In addition, the Debtors offer their Employees the use of flexible spending accounts for various medical claims not otherwise covered or payable by the Medical Plans.  The Medical Plans are funded through Employee contributions by participating Employees and by the Debtors.  As of the Petition Date, the Debtors estimate that the total unpaid premiums under the Medical Plans are approximately $131,000.

104.    The Debtors also offer their Employees dental benefits (the "Dental Plan") through Cigna, and vision benefits (the "Vision Plan") through Vision Service Plan.  Full-time Employees (depending on jurisdiction) are eligible to receive benefits under the Dental and Vision Plans.  The Dental Plan is funded through contributions by participating Employees and by the Debtors.  As of the Petition Date, approximately $31,000 of premiums remain outstanding under the Dental Plan.  The Vision Plan is funded solely through contributions by participating Employees.  The Debtors do not believe that there are any Employee contributions outstanding under the Vision Plan as of the Petition Date.

105.    The Debtors' Employees also have the option to purchase, and in some cases the Debtors provide, for Employees, life, supplemental life, accidental death and dismemberment, and long-term disability (collectively, the "Life Insurance Plans") pursuant to policies issued by Cigna.  The Life Insurance Plans are paid primarily through employer contributions.  As of the Petition Date, the Debtors have approximately $21,000 in obligations outstanding under the Life Insurance Plans, inclusive of amounts withheld from Employees.

106.    Savings and Retirement Plans.  The Debtors offer certain Employees a savings and retirement plan through which they can accumulate savings.  Specifically, eligible Employees each year may contribute pre-tax compensation, consistent with IRS regulations, for investment in a 401(k) plan (the "401(k) Plan").  The Debtors' annual 401(k) match is discretionary, and based on the Company's fiscal year performance.  The Debtors do not anticipate paying any matching contributions to the 401(k) Plan for the 2015 fiscal year.   As of the Petition Date, approximately $25,000 is outstanding under the 401(k) Plan.  The Debtors are seeking authority during the Interim Period to remit all amounts that are related to the 401(k) Plan, including any administration fees in connection with the 401(k) Plan, on a go-forward basis,

and to continue the 401(k) Plan in the ordinary course. The Debtors request authority pursuant to a final order to remit all amounts related to the 401(k) Plan that arose prior to the Petition Date in the ordinary course of the Debtors' business.

107.    Other Employee Benefits.  The Debtors provide workers' compensation benefits to all Employees.  These benefits are covered primarily under the Debtors' workers' compensation insurance program (the "Workers' Compensation Insurance") administered jointly by the Debtors and their insurance carrier, ACE USA ("ACE").

108.    Finally, the Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties.  Examples of such withholding include Social Security, FICA, federal and state income taxes, garnishments, charitable donations, health care payments, other insurance payments, 401(k) contributions, and certain other voluntary payroll deductions.

109.    Continuation of Employee Programs.  The Debtors seek to continue their ordinary course Employee compensation (including, without limitation, wages, salaries, commissions, and bonuses), paid time off, benefits (including, without limitation, insurance and retirement), expense reimbursement, corporate credit card, workers compensation, and related programs during the postpetition reorganization process.  I believe the continuation of these programs is essential to the success of the Debtors' reorganization and sale efforts.

110.    I firmly believe that continued payment, when due, of prepetition wages and salaries, and the continuation, without interruption, of compensation and benefit plans, policies, programs and practices described herein is necessary to ensure the ongoing services of the Debtors' Employees during the Chapter 11 Cases. It is my opinion that any significant deterioration in morale at this time will substantially and adversely impact the Debtors and their

ability to consummate a sale or otherwise reorganize, thereby resulting in immediate and irreparable harm to the Debtors and their estates.

**D.      Utilities Motion (Item 7)**

111.    In connection with the operation of their businesses and the management of their properties, the Debtors obtain electric, gas, water, sewer, waste, telecommunications and other similar services (collectively, the "Utility Services") from various utility companies (the "Utility Companies").[19] The Debtors have filed a motion requesting that the Court approve the Debtors' proposed form of adequate assurance of postpetition payment (the "Proposed Adequate Assurance") to the Utility Companies, as that term is used in Bankruptcy Code section 366, approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance and prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors.

112.    The Utility Services provided to the Debtors by the Utility Companies are critical to the conduct of the Debtors' business, including their ability to operate their retail and wholesale stores and related facilities, the Debtors' primary source of revenue. Accordingly, preserving the Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to preserving and maximizing the value of the estates. Thus, I believe it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases.

113.    I believe that any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations. Such a result could potentially jeopardize the Debtors' ability to operate their businesses and impair the Debtors' efforts to

---

[19]    The Debtors' average monthly expenditure for all Utility Services from the Utility Companies listed on the Utility Company List is approximately $350,000. As of the Petition Date, the Debtors estimate that approximately $420,000 in utility costs have accrued and remain outstanding on account of the Utility Company listed on the Utility Company List.

maximize the value of their estates and, ultimately, their ability to reorganize or sell their assets and business. In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases. I believe that the procedures the Debtors have proposed for the Utility Companies adequately protect the rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their businesses depend.

114.    Moreover, I believe that the Utility Deposit, coupled with the Debtors' anticipated financial ability to pay for postpetition services provided by the Utility Companies, constitutes adequate assurance to the Utility Companies.  Likewise, I believe that the Debtors' proposed Adequate Assurance Procedures provide the Utility Companies with a fair and orderly process for seeking modification of the Proposed Adequate Assurance while protecting the Debtors from being required to address additional assurance requests in a disorganized manner and at a time when the Debtors' efforts could be more productively focused on the seamless continuation of their operations in chapter 11.

E.    **Tax Motion (Item 8)**

115.    The Debtors have filed a motion (the "Tax Motion") seeking, among other things, an order (i) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, certain prepetition taxes and related obligations and (ii) authorizing and directing the Debtors' banks and financial institutions to receive, process, honor and pay all checks, drafts, transfers or other forms of payment drawn or issued on the Debtors' bank accounts prior to the Petition Date in respect of the foregoing.  As further set forth in the Tax Motion, the Debtors, in the ordinary course of their business, incur various tax liabilities, including sales and use taxes; income and franchise taxes; property taxes; gross receipts and business and occupation taxes; business license fees; annual report taxes and other taxes and fees; and all other similar

obligations, and have generally paid such tax liabilities as they become due.  The Debtors' books

and records reflect that, to the Debtors' knowledge, they are substantially current on all Taxes,

not otherwise subject to dispute, which were due and owing prior to the Petition Date.  However,

certain Taxes attributable to the prepetition period have accrued and are not yet due and owing.

Specifically, the Debtors estimate that certain Taxes relating to the prepetition period will

become due and owing to the Taxing Authorities in the ordinary course of business following the

Petition Date.  As of the Petition Date, the Debtors estimate that approximately $2,125,000[20] in

prepetition Taxes have accrued.[21]

116.    The Debtors are subject to the following Taxes:

(1)    Sales and Use Taxes. In the normal course of business, the Debtors
collect and remit to certain taxing authorities (the "Taxing
Authorities") a variety of sales, local gross receipts and other
similar taxes in connection with the sale of merchandise to their
customers (collectively, the "Sales Taxes").  As retailers, the
Debtors pay significant Sales Taxes in the ordinary course. The
Debtors also incur and pay a variety of use taxes (the "Use Taxes"
and, together with the Sales Taxes, the "Sales and Use Taxes").
The Debtors incur liability for Use Taxes when (i) the Debtors
purchase of taxable fixed assets without sales tax and (ii) the
Debtors purchase of taxable supplies or services without sales tax.
Purchases without sales tax often occur when property or services
are purchased from vendors that have no nexus to the resident state
of the Debtors. Such vendors are not obligated to charge or remit
sales taxes for sales to parties outside the state of the vendor's
operations. Nevertheless, purchasers, such as the Debtors, are
obligated to self-assess and pay Use Taxes, when applicable, to the
states in which the purchasers operate. Jurisdictions differ with
regard to frequency of payments of Use Taxes, with payments
ranging from monthly to quarterly to annually.  As of the Petition
Date, the Debtors estimate that the aggregate amount of accrued
Sales and Use Taxes is approximately $1,300,000.

---

[20]    As further set forth in the Shipping Motion, the Debtors also pay duties and Taxes in the ordinary course,
among other things, in connection with the import and export of goods (collectively, the "Import Taxes").

[21]    In addition to the estimated amounts set forth in the Tax Motion, certain Taxing Authorities have asserted
disputed Taxes of roughly €127,000.

(2)     <u>Income and Franchise Taxes</u>. The Debtors pay certain taxes based on their income (the "<u>Income Taxes</u>"). The Debtors typically pay Income Taxes annually in the ordinary course of business. The Debtors must also pay franchise taxes (the "<u>Franchise Taxes</u>" and, together with the Income Taxes, the "<u>Income and Franchise Taxes</u>") to certain of the Taxing Authorities so that the Debtors can operate their business in the applicable taxing jurisdiction. Some states assess a flat Franchise Tax on all businesses and other states assess a Franchise Tax based upon some measure of income, gross receipts, net worth or other measure of value. The Franchise Taxes are typically paid annually to the applicable Taxing Authorities. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued Income and Franchise Taxes is approximately $300,000.

(3)     <u>Property Taxes</u>. Various state and local governments in jurisdictions where the Debtors' operations are located have the authority to levy property taxes against the Debtors' leased and owned real and personal property (the "<u>Property Taxes</u>"). The timing of payment of the Property Taxes varies by jurisdiction, but in most jurisdictions the Debtors pay Property Taxes annually or bi-annually depending on how the relevant tax is assessed. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued Property Taxes is approximately $400,000.

(4)     <u>Gross Receipts and Business and Occupation Taxes</u>. Several Taxing Authorities require that the Debtors pay a tax on total gross revenues (the "<u>Gross Receipts Taxes</u>"). In certain jurisdictions in which the Debtors operate, this form of tax is referred to as a business and occupation tax (the "<u>Business and Occupation Taxes</u>"). The frequency of payments differs by jurisdiction. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued Business and Occupation Taxes is approximately $50,000.

(5)     <u>Business License Fees, Annual Report Taxes, and Other Taxes and Fees</u>. Some local governments require the Debtors to obtain a business license and pay fees associated with such license (the "<u>Business License Fees</u>"). The requirements for a company to obtain a business license and the manner in which the fees are computed vary according to the laws of the applicable jurisdiction. Various Taxing Authorities also require the Debtors to pay annual report taxes (the "<u>Annual Report Taxes</u>") in order to be in good standing for purposes of conducting business within the state. In addition to the Business License Fees and Annual Report Taxes, the Debtors also pay certain other taxes and fees, such as certain filing fees, in the ordinary course of business (the "<u>Other Taxes</u>

and Fees"). As of the Petition Date, the Debtors estimate that the aggregate amount of accrued Business License Fees, Annual Report Taxes, and Other Taxes and Fees is approximately $75,000.

117.    It is my belief that the continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for maximizing the value of their estates. If such obligations are not timely paid, it is my understanding that the Debtors will be required to expend time and money to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws. The Debtors desire to avoid unnecessary disputes with the Taxing Authorities – and expenditures of time and money resulting from such disputes – over a myriad of issues that are typically raised by such entities as they attempt to enforce their rights to collect taxes. Accordingly, I believe that the Debtors could suffer irreparable harm if the prepetition Taxes are not paid when they become due and payable.

118.    Additionally, the Taxing Authorities may cause the Debtors to be audited if Taxes are not paid immediately. Such audits will unnecessarily divert the Debtors' attention away from their efforts to maximize value, including the conduct of their business and the sale process. If the Debtors do not pay such amounts in a timely manner, the Taxing Authorities may attempt to revoke the Debtors' licenses, suspend the Debtors' operations and pursue other remedies that will harm the estates. In all cases, the Debtors' failure to pay Taxes could have a material adverse impact on their ability to operate in the ordinary course of business.

119.    I have also been advised that the federal government and many states in which the Debtors operate have laws providing that the Debtors' officers, directors or other responsible employees could, under certain circumstances, be held personally liable for the payment of certain Taxes. In such event, collection efforts by the Taxing Authorities would be

extremely distracting for the Debtors and their directors and officers in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

**F.      Shipping Motion (Item 9)**

120.    The Debtors have filed a motion (the "Shipping Motion") requesting, among other things, relief authorizing, but not directing, the Debtors to pay (i) certain prepetition shipping, warehousing and related charges and (ii) certain prepetition import and export obligations.  The Debtors' business depends on the daily process of importing and/or shipping its goods, products, and related materials to stock the Debtors' various retail stores and wholesale accounts.  In connection, the Debtors have a reputation for reliability and dependability among their customers.  Indeed, many of the Debtors' pricing policies and marketing strategies revolve around these attributes.  The Debtors' reputation depends on the timely delivery of product to the Debtors' stores, wholesale accounts and customers.

121.    In the ordinary course of their businesses, the Debtors rely extensively on a vast network of Shippers, including freight forwarders, rail, maritime and air shipping services, air freight carriers, Warehousemen, and trucking companies  (i) from the Debtors' global vendors to the Debtors' global freight forwarders, (ii) between the Debtors' global freight forwarders and the Debtors' international maritime and air freight carriers, (iii) between the Debtors' international maritime and air freight carriers and the Debtors' Warehousemen, and (iv) from the Debtors' Warehousemen to the Debtors' retail stores, wholesale customers, and other licensed sellers via domestic air freight and trucking carriers.  The Debtors also rely on their Shippers to return goods, merchandise, and products from the Debtors' customers and/or to the Debtors' vendors.

122.    Additionally, in the ordinary course of the Debtors' businesses, the Debtors rely on certain Warehousemen, among other things, to store goods, products, and related

50

materials and coordinate with Shippers, during the distribution process.  The Debtors are

dependent upon the Warehousemen to access the property held in their warehouses.

123.    Prior to commencing the Chapter 11 Cases, with the assistance of their

advisors, the Debtors spent a significant amount of time reviewing and analyzing their books and

records, consulting operations management, reviewing contracts and service agreements, and

analyzing applicable laws, regulations, and historical practice to identify certain critical business

relationships and/or suppliers of services – the loss of which could materially harm the Debtors'

business.  Based upon this review, the Debtors estimate that having authority to pay the

prepetition Shipping Charges requested in the Shipping Motion is necessary to ensure that the

Debtors can continue to perform their customer commitments and keep their distribution and

supply chain intact.  With respect to these Shipping Charges, the Debtors and their advisors

determined that the value of the goods, products, and related materials in the possession of the

Distribution Vendors was significantly more than the prepetition Shipping Charges owed to such

Distribution Vendors.

124.    The services provided by the Debtors' Distribution Vendors, including

their Shippers and Warehousemen, are critical to the day-to-day operations of the Debtors'

businesses.  For example, unless the Debtors continue to receive delivery of goods, products, and

related materials on a timely and uninterrupted basis, their operations may be significantly

disrupted, thereby causing irreparable damage to the Debtors' business and the value of their

estate.  Similarly, if the Debtors are unable to provide goods to customers on a timely basis, the

Debtors could suffer a significant loss of credibility and customer goodwill, thereby causing

substantial harm to the Debtors' businesses and reorganization efforts.

125.    <u>Shipping Charges</u>.  The Debtors seek to pay the prepetition Shipping

Charges for several reasons.  <u>First</u>, delays in payment of Shipping Charges with respect to goods

that are in the possession of the Distribution Vendors as of the Petition Date will likely result in

the assertion, based on advice from counsel, under applicable law, of possessory liens upon the

Debtors' property in the possession of such parties.  For instance, state statutes in which the

Debtors operate their businesses provide that any common carrier engaged in the shipment of

goods covered by a bill of lading is entitled to a lien on such goods for charges and expenses

incurred thereupon.  The perfection and maintenance of liens is, in most cases, dependent upon

possession, so the Distribution Vendors may refuse to deliver or release such goods until their

claims have been satisfied and the liens released.  The value of these goods generally exceed the

amount of the outstanding Shipping Charges and thus, the Debtors believe that the Distribution

Vendors will ultimately be entitled to be paid in full for the Shipping Charges.  Indeed, as noted

above, the Debtors, with their advisors, conducted an assessment of the value of goods, products,

and related materials in transit through rigorous calculation and concluded that the total

inventory currently being held by Shippers is valued at approximately $15 million.  Irrespective

of the amount and validity of their liens, the mere assertion of possessory or other liens will

delay delivery of goods both to the Debtors' stores and to the Debtors' customers, thereby

severely, if not irreparably, damaging the Debtors' businesses and prospects for successful

reorganization.

126.    <u>Second</u>, if the prepetition Shipping Charges are not paid, many of the

Distribution Vendors may refuse to perform future services for the Debtors and withhold the

shipment or release of essential goods currently in transit.  In such event, the Debtors will incur

additional expenses (such as premium shipping costs) to replace the Distribution Vendors or the

goods being withheld, which amounts will likely exceed the amount of unpaid prepetition

Shipping Charges that the Debtors request permission to pay hereunder.  More importantly,

locating entities to replace the Distribution Vendors will be difficult, if not impossible.  If the

Debtors  were unable to find new Distribution Vendors, they would incur significant operational

disruption and increased costs.

127.    At the very least, replacing a Distribution Vendor, in most cases, will

delay the transport and delivery of goods to the Debtors.  Such delays could cause a material

disruption in the Debtors' receipt of goods from suppliers and the delivery of products to

customers and retail stores and, thus, their ability to continue operating their business

successfully.

128.    The Debtors submit that the total amount the Debtors seek to pay the

Distribution Vendors is appropriate and reasonable in light of the importance and necessity of

timely receipt of the goods in the possession of the Distribution Vendors and the losses the

Debtors might suffer if their operations are disrupted.[22]

129.    Import/Export Claims.  In the ordinary course of their businesses, the

Debtors receive a variety of goods, products, and related materials (collectively, the "Imported

Goods") from a number of foreign countries.  In the ordinary course, the Debtors also export

various goods abroad (collectively, the "Exported Goods").  Timely receipt of the Imported

Goods and ensuring timely receipt by the Debtors' customers of the Exported Goods is critical to

the Debtors' business operations.  Any disruption or delay in receipt of the Imported Goods and

Exported Goods would adversely affect the Debtors' business operations.

---

[22]    Notwithstanding the authority requested, the Debtors expect that they will pay prepetition claims to the
Distribution Vendors only where they believe, in their business judgment, the benefits to their estates from
making such payments would exceed (a) the costs that their estates would incur by bringing an action to
compel the turnover of such goods and (b) the delays associated with such actions.

130.    In connection with the import and export of goods, the Debtors may be required to pay various Import/Export Charges, including, but not limited to, customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding and other similar obligations.  The Debtors pay approximately $30 million annually in Import/Export Charges. The estimated outstanding prepetition Import/Export Charges for goods currently in transit is approximately $2 million.

131.    The Debtors seek authority to pay any and all necessary and appropriate Import/Export Charges incurred on account of prepetition transactions, including payment of the US Customs & Border Protection.  Payment of the Import/Export Charges is critical to ensure the uninterrupted flow of Imported Goods and Exported Goods.  Absent such payment, parties to whom Import/Export Charges are owed may have the ability to interfere with the transportation of such Imported Goods or Exported Goods.  If the flow of Imported Goods were to be interrupted, the Debtors would be deprived of the products and/or materials necessary to complete orders already placed by their customers, which orders are worth far more to the Debtors (both in terms of future receipts and the maintenance of valuable good will) than the aggregate amount of incurred, but unpaid, Import/Export Charges.

132.    For the foregoing reasons, I believe that payment of the Import/Export Charges is necessary to preserve and enhance the value of the Debtors' business for the benefit of all parties in interest.

## G.    Critical Vendors (Item 10)

133.    The Debtors have filed a motion (the "Critical Vendor Motion") requesting, among other things, relief authorizing, but not directing, the Debtors to pay  the Debtors to pay, in the ordinary course of business, the prepetition, fixed, liquidated, and undisputed claims (the "Critical Vendor Claims") of certain critical vendors and suppliers

(collectively, the "Critical Vendors"), the vast majority of which are located overseas and which provide goods or services to the Debtors that the Debtors deem, in the exercise of their business judgment, to be essential to maintaining the value of the Debtors' assets.

134.    The Debtors seek authorization to pay the Critical Vendor Claims in an aggregate amount not to exceed $30 million on an interim basis (the "Interim Cap Amount") and $52 million on a final basis (the "Final Cap Amount"), subject to the conditions set forth below. Of the Final Cap Amount above, the Debtors' estimate that approximately $20 million is subject to section 503(b)(9) administrative claim status.

135.    In the ordinary course of operations, the Debtors rely on numerous suppliers, service providers, and vendors (the "Vendors") for the delivery of goods and/or services in support of the Debtors' operations.  The Critical Vendors supply those essential goods and services without which the Debtors' businesses either could not operate or would operate at significantly reduced profitability (the "Critical Goods and Services") and whose Critical Goods and Services cannot be replaced without significant harm to the business.

136.    The Debtors' Multi-Year Turnaround Plan was designed to streamline operations on a global basis.  As part of that streamlining process, Vendors were consolidated between the U.S. and non-U.S. entities, significantly reducing the overall number of Vendors, to improve supply chain efficiency.  Prior to the Petition Date, the Debtors and their advisors conducted a thorough review, in which I participated, of their remaining Vendors with possible outstanding prepetition claims to determine how to minimize the disruption of their ongoing business from the commencement of these Chapter 11 Cases.  We considered numerous factors to determine which Vendors are Critical Vendors, including whether the Vendor is: (i) essential to the continued smooth operation of the Debtors' business, including because the Vendor is in

the midst of producing footwear or apparel necessary to maintaining required inventory levels in the Debtors' wholesale and retail channels; (ii) contractually obligated to provide the Debtors with the Critical Goods and Services; (iii) replaceable without significant disruption to the Debtors' postpetition operations; and/or (iv) likely to continue doing business with the Debtors notwithstanding nonpayment of prepetition claims or to recognize the authority of this Court with respect to continuing services. Thus, the Debtors seek authority to pay as Critical Vendors those Vendors that the Debtors conclude meet the criteria described above.

137.    The Debtors do not have supply contracts with most of their Vendors, instead relying on purchase orders. The Debtors' analysis further focused on "sole-source" providers, which most of the Critical Vendors can be classified as. The nature of the goods and services provided by the Critical Vendors are such that they provide a proprietary good or service or represent the only practicable option available to the Debtors to obtain the good or service in question, given the Debtors' relationship with the Vendor, including whether the Debtors are receiving advantageous pricing, credit or other terms, the universe of potential replacement vendors, including the quality and reputation of any replacement vendor(s), the likelihood the Debtors could obtain a replacement vendor given their current financial situation, the Debtors' historical dealings with vendors in that industry, and the practical feasibility of replacing the current vendor without significant delay.

138.    Given the location of their Vendors and the nature of the Debtors' business, delay is a material concern. The Debtors are part of a global enterprise that designs, develops, markets, and distribute apparel, footwear, accessories and other products through retail and wholesale stores and other channels throughout the world. While the Debtors and their non-Debtor affiliates design and sell their proprietary goods, most of the manufacturing processes are

undertaken by third party Vendors, the vast majority of which – approximately 95%  – are entities incorporated and operating outside of the United States.

139.    Due to the length of time required for production and shipping, there is a significant lag between the time when the Debtors order goods from their Vendors and the time when those goods are delivered and available for sale through retail or wholesale channels. Typically, the Debtors begin places orders for goods from their Vendors at least seven months prior to the start of a "selling season".  Vendors then start shipping goods approximately three months prior to the time those goods are scheduled to be delivered and available for sale, and Vendors receive payment for those goods on a variety of terms.

140.    The first "selling season" of 2016 begins on December 25, 2015, and ends on March 31, 2016.  Product orders have already been placed by the Debtors for the upcoming selling season.  Those products will be placed "on board" vessels for shipment beginning in late September and early October, and as the first batches of products arrive in the United States, they are distributed through retail and wholesale channels to fill orders for the start of the selling season.  If the first scheduled shipments in late September are missed, there will simply not be time for another vendor to produce such goods.  This would jeopardize the Debtors' ability to service their customers during this critical sales period, and would likely result in reduced customer goodwill and loss of market share.  Not only would the Debtors be unable to supply their retail stores, the Debtors' relationships with its wholesalers may be jeopardized, as the wholesalers may choose to work with other suppliers for the remainder of the season. Accordingly, a failure to pay the Critical Vendors on amounts outstanding as of the Petition Date will have ramifications on existing production orders earmarked for the spring 2016 season.

141.    In addition, many of the Critical Vendors are using their own working capital to fund the Debtors' current production orders. Failure to pay Critical Vendors amounts due as of the Petition Date would result in tremendous detriment to the Debtors' relationships with its already-limited vendor base, and, as a result, the Debtors could be left with few, if any, alternative sources of supply to meet its near term production requirements both in the U.S. and abroad.

142.    A further important consideration is that many of the Critical Vendors may lack minimum contacts with the United States and, thus, I understand that they may not be subject to the jurisdiction of this Court or the provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business operations.  Based on my knowledge of the foreign Critical Vendors, I believe there is a material risk that such Critical Vendors may consider themselves to be beyond the jurisdiction of this Court, disregard the automatic stay, and engage in conduct that disrupts the Debtors' and their non-Debtor affiliates' domestic and international operations, or may simply be confused by the chapter 11 process, particularly those in countries with liquidation-oriented insolvency procedures.  Notably, Critical Vendors that believe the automatic stay does not govern their actions may exercise self-help (if permitted under local law), which could include ceasing production of, or refusing to deliver, the Debtors' products which are, essentially, the lifeblood of their business.

143.    Critical Vendors may also sue one or all of the Debtors in a foreign court to recover prepetition amounts owed to them.  If they are successful in obtaining a judgment against the Debtors, the Critical Vendors may exercise post-judgment remedies.  They may seek to attach the Debtors' foreign assets or withhold vital supplies and services from the Debtors, threatening the Debtors' ability to operate.  Since the Debtors would have limited, if any,

effective and timely recourse and no practical ability to remedy this situation (absent payment of amounts sought), I believe that their businesses could be irreparably harmed by any such action to the detriment of their estates and their creditors.

144.    In addition, almost all of these foreign Critical Vendors provide services not only to the Debtors but also to their non-Debtor affiliates as part of a global supply chain (such Critical Vendors, the "Common Critical Vendors").  Indeed, shipments to the Debtors account for only approximately 38% of total shipped value to all Quiksilver entities by the Common Critical Vendors .  This is the result of global supply chain consolidation efforts over the past three years geared toward reducing purchasing costs and improving product quality and consistency.  I believe that maintaining this supply chain absolutely essential to the continued success of the Company's worldwide operations.  While the Debtors' non-Debtor affiliates have been, and intend to continue, paying all amounts owing to their vendors as they come due, the Critical Vendors may nonetheless refuse to do business with such non-Debtor affiliates unless the Debtors pay the Critical Vendor Claims. Moreover, I believe that the Critical Vendors may seek to exercise the remedies discussed above – including suing or exercising self-help remedies – not only against the Debtors but against their non-Debtor affiliates, thereby disrupting and harming Quiksilver's otherwise healthy and valuable non-U.S. operations.

145.    Thus, the Debtors have determined, in the exercise of their business judgment, for the reasons set forth above, that paying the Critical Vendor Claims is essential to their continuing business operations and is in the best interests of their estates and stakeholders. I, together with other members of the Debtors' management and employees, have exercised high levels of care in reviewing the facts and circumstances and identifying, to the extent possible at this stage, those Critical Vendors, in the absence of which, the value of the Debtors' assets and

operations could suffer material damage and which the Debtors believe present a material risk of

future non-performance absent payment of prepetition claims.  Because of the essential nature of

the Critical Goods and Services provided by the Critical Vendors and the difficulty associated

with finding alternate sources for those goods and services, the potential harm and economic

disadvantage that would stem from the failure of any of the Critical Vendors to perform is

grossly disproportionate to the amount of any Critical Vendor Claim sought to be paid.

146.    While the Debtors seek authorization to pay the Critical Vendor Claims in

amounts up to the Interim Cap Amount and the Final Cap Amount, the Debtors have not

committed payment to any pre-authorized list of vendor Claims to be paid; rather, consistent

with the requirements of the Bankruptcy Code and applicable case law, the Debtors will make

payments to each Critical Vendor only upon determining that such payments are actually

necessary to preserve the value of the Debtors' estates.  Thus, in each case, the Debtors will have

examined other legal options short of payment of such Critical Vendor Claims and determined

that there exists no practical or legal alternative to payment of the Critical Vendor Claims.

147.    Finally, the Debtors propose to demand that all Critical Vendors whose

Critical Vendor Claims are satisfied pursuant to this Motion agree (i) to continue providing

goods and services to the Debtors on Temporary Trade Terms and (ii) to continue providing

goods and services to the Debtors' non-Debtor affiliates on Existing Trade Terms for at least one

hundred twenty (120) days following the date of the agreement or until the date that a plan of

reorganization or sale pursuant to section 363 of the Bankruptcy Code is substantially

consummated, whichever is earlier.  "Temporary Trade Terms" means the more favorable to the

Debtors of (i) the most favorable trade terms and practices, including rebates, discounts, and

payment terms, in effect between the Critical Vendor and the Debtors during the 180 days

preceding the Petition Date or (ii) net 75 day terms, FOB vendor shipping point. "Existing Trade Terms" means those trade terms in place on the Petition Date between the Critical Vendor and the applicable non-Debtor affiliate(s).

148.    I believe that payment of the Critical Vendor Claims subject to the conditions set forth in the Critical Vendor Motion increases the likelihood that such Critical Vendors will continue to offer existing trade terms or even improve trade terms for the Debtors, thereby facilitating the Debtors' reorganization.

149.    For the foregoing reasons, I believe that payment of the Critical Vendor Claims on the terms set forth in the Critical Vendor Motion is necessary to preserve and enhance the value of the Debtors' business for the benefit of all parties in interest.

## H.    Motion to Continue Cash Management System (Item 11)

150.    The Debtors have filed a motion to continue their ordinary course banking practices.  I understand that the Debtors maintain a highly automated cash management system (the "Cash Management System") consisting of fourteen (14) domestic bank accounts (the "Bank Accounts") maintained at Bank of America, N.A., a financially stable FDIC-insured bank, that facilitate the efficient flow and management of funds involved in the Debtors' operations.  I believe that the  Cash Management System is essential to enable the Debtors to control and monitor funds, ensure cash availability and liquidity, comply with the requirements of their financing arrangements, and reduce administrative expenses by facilitating the movement of funds and enhancing the development of accurate account balance information.

151.    Accordingly, the Debtors are requesting authorization to continue to maintain existing bank accounts and the existing Cash Management System and to pay related prepetition obligations.  The Debtors are also seeking authorization to continue using existing Business Forms.  Finally, the Debtors seek authorization for the continuation of Intercompany

Transactions and accordance of administrative expense priority status to postpetition Intercompany Claims. I believe such relief is necessary to the successful operations and, thus, restructuring efforts, of the Debtors postpetition.

152.    Receipts. ZQK, QS Wholesale, QS Retail, and DC Shoes each maintain a receipts account (collectively, the "Receipts Accounts"), into which the Debtors receive electronic payment receipts from trade customers and other parties, and from which they make electronic payments to trade vendors and other parties. Each of the Debtors' Receipts Accounts are swept periodically under the cash dominion arrangement in connection with the Debtors' DIP ABL Facility under which BofA is administrative and collateral agent. As such, these accounts only carry a cash balance at the end of each business day in the event a payment was received following the final sweep of the day. The Receipts Accounts are funded as needed by the Debtors' Operating Account (as described below), based upon known disbursements scheduled from each of the accounts.

153.    More specifically, the QS Retail Receipts Account receives receipts from the Debtors' retail stores. In particular, the cash management process at retail locations is structured as follows:

(a)    Retail locations receive payments in the form of cash, credit cards, and in rare occasions, checks.

(b)    On a predetermined schedule, and typically two to three times per week, a third-party armored car service, will collect cash and check receipts from the retail locations, and to the extent needed, provide cash utilized at the register.

(c)    The cash and check receipts collected by armored car are deposited at a number of strategically located vaults. Those receipts are then processed by BofA and deposited directly into the QS Retail Receipts Account.

(d)    Each retail location utilizes a unique 4-digit reference, which is utilized by the Debtors' to reconcile all related cash activity.

(e)   Credit card transactions at the retail locations are processed by Bank of America Merchant Services  and are typically cleared and posted approximately two to three days after the transaction occurred, directly into the QS Retail Receipts Account.

154.    In addition, checks received into the QS Wholesale Lockbox (as defined below) are directly deposited into the QS Retail Receipts Account.

155.    The QS Wholesale Receipts Account receives receipts from various sources associated with the Debtors' wholesale business, including the following:

(a)    Credit card payments related to QS Wholesale are directly deposited into the QS Wholesale Receipts Account, after being processed by Elavon, Inc. ("Elavon").

(b)    All electronic payment receipts of QS Wholesale from trade customers and other parties are made into the QS Wholesale Receipts Account.

156.    Finally, in the event that trade customers or other parties transacting with DC Shoes remit payment via credit card, such charges are processed by Elavon  and are typically cleared and posted approximately two to three days after the transaction occurred, directly into the DC Shoes Receipts Account.

157.    The Lockboxes.   The Debtors maintain two lockboxes, in the names of QS Wholesale and DC Shoes,  which receive check payments made to QS Wholesale or DC Shoes, respectively, from trade customers and other parties.  Checks received into the QS Wholesale Lockbox are directly deposited into the QS Retail Receipts Account, while checks received into the DC Shoes Lockbox are directly deposited into the DC Shoes Receipts Account. Both Lockboxes are located in Los Angeles, CA.

158.    The Check Disbursement Accounts.  ZQK, QS Wholesale, QS Retail, and DC Shoes each maintain Check Disbursement Accounts (collectively, the "Check Disbursement Accounts"), which are utilized for the purpose of making check payments to trade vendors and

other parties.  The Check Disbursement Accounts are funded, based on known daily check clearings, by the Operating Account.  Therefore, the Check Disbursement Accounts do not maintain an ending cash balance at the end of each business day.

159.    The Payroll Accounts.  ZQK, QS Wholesale, and QS Retail each maintain Payroll Accounts (collectively, the "Payroll Accounts"), which are utilized to make payments to employees.  The Payroll Accounts are funded, based on known daily direct deposit or check clearings, in addition to payroll-related withholding tax payments, by the Operating Account.  Therefore, the Payroll Accounts do not maintain an ending cash balance at the end of each business day.  The Debtors transfer the required payroll-related tax withholding amounts into the Payroll Accounts one day prior to each payroll cycle.  Such funds are subsequently drawn from the Payroll Accounts by the Debtors' third party payroll processor, ADP, and remitted to the appropriate taxing authorities.

160.    The Operating Account.  ZQK has an Operating Account (the "Operating Account"), which funds each of the Debtors' disbursement accounts and makes electronic payments to third parties.  In particular, under the cash dominion arrangements with the DIP ABL Agent, the Operating Account is funded on an as needed basis from the DIP ABL Facility (subject to the terms and conditions thereof).  The Operating Account, in turn, funds (a) the Check Disbursement Accounts, as needed, based upon known check clearings, (b) the Payroll Accounts, as needed, based upon known payroll (direct debit or check) clearings, (c) electronic payments to trade vendors and other parties, and (d) certain Intercompany Transactions, as further discussed below.

161.    The Inactive Accounts.  The Debtors have two accounts which are considered part of the Debtors' Cash Management System, but which are idle, and do not

actively receive or disburse funds to any of the Debtors' other Bank Accounts or maintain a cash balance .

162.    Business Forms.  In the ordinary course of business, the Debtors use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "Business Forms"). Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession.  Most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding these Chapter 11 Cases, including a press release issued by the Debtors and the notice of commencement of the Chapter 11 Cases that has been or will be provided to parties in interest. Requiring the Debtors to modify the Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates.

163.    Intercompany Transactions. In the ordinary course of business, the Debtors engage in various transactions relating to the business relationships between and among themselves (the "Intercompany Transactions").

164.    In particular, the Debtors and their non-Debtor affiliates operate as a global enterprise, and many functions essential to the Debtors' day-to-day operations are conducted overseas by their foreign affiliates.  For example, responsibility for design of virtually all of the apparel, accessories and other products sold in the Debtors' retail and wholesale stores is conducted by the Debtors' foreign non-Debtor affiliates.  Similarly, many of the administrative functions and marketing activities occur overseas.  In addition, a non-Debtor affiliate is responsible for sourcing the production of all of the apparel sold in the Debtors' stores, including identifying, developing relationships with, and negotiating agreements with such vendors.  As a

general matter, the Intercompany Transactions are intended to reduce administrative costs and

ensure the orderly and efficient operation of the Debtors' enterprise.

165.    In connection with the Intercompany Transactions, funds are transferred

between or among the Debtors' Bank Accounts to non-Debtor affiliates as noted below:

(a)    Non-Debtor affiliates issue payments on a quarterly basis to the Debtors on account of royalty payments due from the sale of *DC Shoes* merchandise by non-Debtor affiliates . Such payments are received into the DC Shoes Receipts Account.

(b)    The Debtors issue payments on a quarterly basis to the non-Debtor affiliates on account of royalty payments due from the sale of *Quiksilver* and *Roxy* merchandise by the Debtors. Such payments are made from the Operating Account to the non-Debtor affiliate's bank account.

(c)    Periodically, the Debtors pay a fee to the non-Debtor affiliate responsible for sourcing the Debtors' apparel. The fee is calculated on a cost-plus basis and payments are made from the Operating Account to the non-Debtor affiliate's bank account. The amount of the payments is typically approximately $3 million per quarter (although such payments are made throughout the quarter, in varying amounts).

(d)    From time to time, other cash transfers may occur between the Debtors and non-Debtor affiliates for various shared service costs and expenses (i.e. management and/or service fees) that are allocated amongst the global business. To the extent an actual cash transfer between the related entities would result in unfavorable liquidity constraints, the transfer would be settled via an intercompany accounting entry in lieu of actual cash.

(e)    As needed, ZQK may make cash transfers to certain non-Debtor affiliates, including, in particular its Asia and Pacific Rim subsidiaries, to support such entities' operations .

166.    As between the Debtors, intercompany payables and receivables are

typically settled via accounting entries for the Debtor entities; therefore, actual cash transfers

generally do not occur between the Debtor entities.

167.    The Debtors anticipate that the Intercompany Transactions will continue postpetition in the ordinary course of business.  I believe that such transactions are essential to Quiksilver's operations as a global enterprise, and if the Company were prohibited from continuing such transactions in the ordinary course, the disruption to the Company's operations and the harm to the Company as a whole, including the Debtors, would be irreparable.  As set forth above, the non-Debtor affiliates provide services, including administrative services, marketing, product design, and product sourcing, without which the Debtors could not function. I believe that replacing these services with services from an unaffiliated third party would be extremely detrimental and disruptive to the Debtor's operations and reorganization efforts and that such services could only be obtained, if at all, on a much more costly basis.

168.    In addition, I believe the Intercompany Transactions are necessary to support the operations of the Debtors' non-Debtor affiliates.  For example, I understand that the Australian subsidiaries are subject to strict laws regarding trading while insolvent.  I understand that absent the ability to receive support from ZQK, there is a risk that such entities may be forced to liquidate.  I believe that any harm, disruption in operation, or loss in value to the non-Debtor affiliates would represent a similar loss in value to the Debtors' estates, as the non-Debtor affiliates comprise a majority of the Company's total revenues and contribute substantial value to the Company.  As such, I believe that the benefit of the Company's periodic intercompany loans will exceed the cost.  Finally, any intercompany loans will be made in accordance with the budget under the Debtors' postpetition debtor-in-possession financing and are effectively the sole manner for those entities to access liquidity. Consistent with their prepetition practice, the Debtors maintain records of all transfers and can ascertain, trace and account for all Intercompany Transactions.

169.     Accordingly, the Debtors are requesting authorization to continue to maintain existing bank accounts and the existing Cash Management System and to pay related prepetition obligations.  The Debtors are also seeking authorization to continue using existing Business Forms.  Finally, the Debtors seek authorization for the continuation of Intercompany Transactions and accordance of administrative expense priority status to postpetition Intercompany Claims.  I believe such relief is necessary to the successful operations and, thus, restructuring efforts, of the Debtors postpetition.

## I.     Rejection Procedures Motion (Item 14)

170.     The Debtors have filed a motion (the "Rejection Procedures Motion") seeking, among other things, and order authorizing and approving procedures for the rejection of executory contracts (the "Contracts") and unexpired leases (the "Leases") throughout the course of these Chapter 11 Cases and granting authority to take all actions necessary to implement such procedures, including abandonment of the Remaining Property (defined in the Rejection Procedures Motion).  The Debtors are parties to hundreds of Contracts, which include supply agreements, customer contracts, service contracts and certain sponsorship and licensing agreements, and as part of their restructuring efforts, the Debtors are evaluating these Contracts to determine those which benefit the estate and support the Debtors' going-forward business plans and those that are burdensome or no longer integral to the Debtors' going-forward business plans.

171.     Likewise, the Debtors are parties to numerous  Leases, which include Real Property Leases for the premises occupied by the Debtors in connection with the operation of approximately 85 Company-owned retail stores as well as corporate headquarters and certain other facilities, and Personal Property Leases for the lease of equipment.  The Debtors are evaluating these Leases to determine those which benefit the estate and support the Debtors'

going-forward business plans and those that are burdensome or no longer integral to the Debtors'

going-forward business plans.  In particular, the Debtors have identified 27 U.S. retail store

locations which they intend to close during the Chapter 11 Cases.  In addition, the Debtors may

determine, in the exercise of their business judgment, to close additional stores or otherwise

eliminate operations at certain leased facilities.  Similarly, the Debtors may identify certain

Contracts and Personal Property Leases that are no longer needed for the Debtors' business and

the rejection of which would reduce administrative expenses.  In that event, absent the relief

requested in the Rejection Procedures Motion, the Debtors may continue to be obligated to pay

rent pursuant to the Leases with respect to closed stores even after they have ceased operations at

such stores and have no other productive uses for those premises or to pay amounts owing under

unnecessary and unprofitable Contracts.  Thus, in the event that the Debtors determine, in their

business judgment, that the continued maintenance of the obligations associated with certain

Leases or Contracts would no longer be desirable, the prompt elimination of such Lease or

Contract obligations would maximize the value of the Debtors' estates.

172.    Because of the volume of Contracts and Leases, the need to minimize the

postpetition expenses associated with Leases and Contracts that the Debtors deem to be

unnecessary for, or burdensome to, the Debtors' ongoing operations, and the costs attendant to

rejecting those Leases and Contracts on a piecemeal basis, the Debtors seek approval of the

Rejection Procedures with respect to all Contracts and Leases.

173.    I believe that the proposed Rejection Procedures are appropriate and

consistent with the deferential business judgment standard, as well as the notice requirements I

have been informed of under the Bankruptcy Code and Bankruptcy Rules applicable to

executory contract assumption or rejection.  Absent the relief requested in the motion, filing

individual motions for rejection would result in substantial costs to, and administrative burdens on, the Debtors' estate, in addition to the burden such approach would place on the Court's docket.  As such, I believe that the Rejection Procedures are appropriate and necessary to minimize the costs and administrative burden on the Debtors' estates and for purposes of judicial economy.

174.    I also believe that any Contract or Lease that the Debtors seek to reject pursuant to the Rejection Procedures will be a Contract or Lease that is financially burdensome and unnecessary to the Debtors' operations.  Moreover, prior to rejecting any of the Contracts and Leases, the Debtors will have ensured that the Contracts and Leases do not have any marketable value beneficial to the Debtors' estates.  Accordingly, the Debtors will have determined that continued performance under the Contracts and Leases constitutes an unnecessary depletion of value of the Debtors' estates and, therefore, rejection of the Contracts and Leases reflects the Debtors' exercise of sound business judgment.

175.    In the exercise of their sound business judgment, the Debtors may determine to leave certain personal property at the premises of a Real Property Lease rejected pursuant to the Rejection Procedures. To the extent that the Debtors leave any Remaining Property at the premises associated with a rejected Lease, the Debtors request that such Remaining Property be deemed abandoned under the Bankruptcy Code.  Prior to abandoning any Remaining Property at a rejected Real Property Lease pursuant to the Rejection Procedures, the Debtors will have determined that the Remaining Property to be abandoned by the Debtors is either: (i) burdensome to the estate to the extent that removal and storage of this property is likely to exceed any net proceeds from the property; or (ii) of inconsequential value and benefit to the estate.  Accordingly, abandonment of the Remaining Property reflects the Debtors'

exercise of sound business judgment and is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

176.    Given the substantial number of Contracts and Leases the Debtors may seek to reject, obtaining Court approval of each rejection would impose unnecessary burdens on the Debtors and the Court and result in costs to the Debtors' estates that would correspondingly decrease the economic benefit of rejection.  For similar reasons, obtaining Court approval of abandonment of Remaining Property at each rejected Lease would impose unnecessary burdens on the Debtors' estates and decrease the economic benefit of rejection.   Accordingly, the Debtors propose to streamline the process as set forth in the Rejection Procedures in order to minimize potential costs to the Debtors' estates and reduce the burden on the Court's docket, while protecting Counterparties and Landlords by providing such parties notice and an opportunity to object to the proposed rejection.

177.    The Counterparties will not be prejudiced by the Rejection Procedures because, prior to receipt of a Rejection Notice, such parties will have received advance notice of the Debtors' intent to possibly reject their Lease or Contract by notice of this Motion. Additionally, upon receipt of the Rejection Notice they will receive advance notice of the effective date of the rejection.  Accordingly, the Debtors submit that the proposed Rejection Procedures balance the need for an expeditious reduction of burdensome costs to the Debtors' estates while providing appropriate notice of the proposed rejection to the Counterparties.  The Rejection Procedures are tailored to minimize potential administrative expenses, maximize the recovery for creditors in these Chapter 11 Cases and, with respect to the Leases, return control of the affected premises to the Landlords in a quick and efficient manner.

**J.      Rejection of Executory Contracts (Item 15)**

178.    The Debtors have filed a motion (the "First Omnibus Rejection Motion")

for authorization to reject, effective as of the date of the filing of the First Omnibus Rejection

Motion, those certain executory contracts (the "Separation Agreements") set forth on Exhibit A

to the First Omnibus Rejection Motion.  In an effort to advance the Chapter 11 process for the

benefit of the estate and the orderly and the efficient administration of the Chapter 11 Cases, the

Debtors and their advisors have begun a detailed review and evaluation of executory contracts

and unexpired leases and subleases.  In connection with this process, and in an exercise of the

Debtors' business judgment, the Debtors have determined that it is in the best interest of their

estates, their creditors, and all parties in interest for the Debtors to reject the Separation

Agreements on Exhibit A to the First Omnibus Rejection Motion.  As more fully set forth below,

these Separation Agreements are executory contracts and are no longer of any utility to the

Debtors because the value derived from the Separation Agreements does not exceed the costs

and burdens associated with continued performance under them.

179.    The Debtors respectfully submit that rejection is proper.  Pursuant to the

Separation Agreements, the Debtors are subject to demands for the payment of severance or

other related benefits to the counterparties of the Separation Agreements.  Those counterparties,

in turn, agree to various provisions that were previously beneficial to the Debtors, including

releases as well as non-compete, non-solicitation and confidentiality clauses.

180.    Moreover, I believe that the Debtors have satisfied the "business

judgment" standard for rejecting the Separation Agreements.  As set forth in the motion, the

Separation Agreements are financially burdensome, no longer necessary for the Debtors'

business operations, and otherwise without value to the Debtors and their estates.  Based upon

these considerations – together with the Debtors' need and objective of maximizing and

conserving value for their estates for the benefit of all their stakeholders – the Debtors have determined in their business judgment that it is in the best interests of their estates and all parties in interest that the Debtors should limit and no longer be subject to any financial or other ongoing burdens and obligations associated with the Separation Agreements.

181.    By the First Omnibus Rejection Motion, the Debtors also request that the Rejection Date be authorized as of the Petition Date.  Without a retroactive date of rejection, the Debtors may be forced to incur unnecessary administrative charges or related costs in connection with Separation Agreements that do not provide a benefit to the estate that is equal to or greater than the cost to the estate.  Moreover, the counterparties to the Separation Agreements will not be unduly prejudiced if the rejection is deemed effective as of the Rejection Date because, as I understand, they will receive notice of the motion and have sufficient opportunity to act accordingly.  Accordingly, it is fair and equitable for the Court to find that the Separation Agreements are rejected as of the Rejection Date, particularly where, as here, retroactive rejection of the Separation Agreements relieves the estate of additional and unnecessary administrative expenses and other detrimental costs.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I declare under penalty of perjury that the foregoing is true and correct.

Dated:        September 9, 2015
New York City, New York


By:      */s/ Andrew Bruenjes*
Name: Andrew Bruenjes
Title:  Americas Chief Financial Officer

## **EXHIBIT A**

**Corporate Organizational Chart**



Quiksilver, Inc.
Delaware
100%
Mountain & Wave SARL
Luxembourg
QS Wholesale, Inc.
California
100%
Quiksilver Greater China Ltd.
Hong Kong
QS Holdings SARL
Luxembourg
Boardrider S.A.
Luxembourg
QS Holdings SARL
Swiss Financing Branch
QS Holdings SARL
Swiss Branc
QS Optics, Inc.
California
Quiksilver Wetsuits, Inc.
California
Mt. Waimea, Inc.
California
Quiksilver Ent., Inc.
California
DC Shoes, Inc.
California
Fidra, Inc.
California
Hawk Designs, Inc.
California
QS Retail, Inc.
California
Quiksilver Mexico, S. de R.L. de C.V.
Mexico
Con So Horin en Ventas Gama, S. de R.L. de C.V.
Mexico
Quiksilver Commercial S. de R.L. de C.V.
Mexico
DC Direct, Inc.
California
Biarritz Holdings SARL
Luxembourg
Biarritz Holdings SARL
Swiss Branch
54th Street Holdings SARL
Luxembourg
54th Street Holdings SARL
Swiss Branch
Quiksilver Aus. Pty. Ltd.
Australia
60%
Chloelys Investment Ltd.
Cyprus
Quiksilver Roxy Korea Ltd.
Korea
DC (Shanghai) Commercial Co. Ltd.
China
DC Shoes(Hong Kong) Ltd.
Hong Kong
QSBR Industria e Comercio de Artigos Esportivos Ltda.
Brazil
Quiksilver Deluxe SARL
Luxembourg
Quiksilver Canada Corp.
Canada
Quiksilver Singapore Ltd.
Singapore
QS Retail (Taiwan) Ltd.
Taiwan
QS Retail (Thailand) Ltd.
Thailand
Quiksilver Foundation Australia Pty. Ltd.
Australia
Quiksilver Intl. Pty. Ltd.
Australia
Pavilion Prod. Pty. Ltd.
Australia
QS Retail, Pty. Ltd.
Australia
QS Retail (NZ) Limited
New Zealand
UMTT Pty. Ltd.
Australia
50%
Quiksilver Japan K.K.
Japan
QSJ Holdings Pty. Ltd.
Australia
1%
99%
Ug Mfg. Co. Pty. Ltd.
Australia
Quiksilver Sourcing Aust.
Hong Kong
Caribbean Pty. Ltd.
Australia
Ug Mfg. Co. (NZ) Ltd.
New Zealand
99.9%
PT Quiksilver
Indonesia
DC Shoes Australia Pty. Ltd.
Australia
DC Shoes (NZ) Limited
New Zealand
Quiksilver Asia Sourcing Ltd.
Hong Kong
Quiksilver Asia Sourcing (Shanghai) Co. Ltd.
China
Quiksilver Glorious (Longmen) Ltd.
China
Quiksilver Glorious Sun JV Ltd.
Hong Kong
Main Bridge
Hong Kong
Quiksilver Glorious Sun Apparels (HZ) Ltd.
China
Quiksilver Glorious Sun Licensing Ltd.
Hong Kong
Quiksilver Glorious Sun Trading
China
Pilot SAS
France
Na Pali SAS
France
Meribel SAS
France
Na Pali Europe SARL
France
Cariboo SARL
France
Tavarua SCI
France
Kokolo SARL
France (KO)
Emerald Coast
France
Drop In SARL
France
Quiksilver Travel
France (QT)
10%
90%
1.Distribution s.r.o.
Czech Republic
Boardriders Club Bratislava s.r.o.
Slovakia
Santocha Ltd.
Russia (ST)
Kauai GmbH
Germany
Vanuatu GmbH
Austria
New Pier Trading Ltd.
South Africa (NP)
99.8%
Sumbawa SL
Spain
99%
Haapiti SRL
Italy
Tarawa Lda.
Portugal
Sunshine Diffusion SA
Switzerland
Lanai, Ltd.
United Kingdom
Molokai Ltd.
United Kingdom
Hanalei NV
Belgium
Rawaki sp. Zoo
Poland
Pukalani BV
Netherlands
Namotu, Ltd.
Ireland
Uluwatu Aps
Denmark
Fistral Oy
Finland
LEGEND
Debtor
Non-Debtor

## <u>EXHIBIT B</u>

### List of Motions Filed Concurrently with Petitions

1.      Debtors' Motion for Order (A) Directing Joint Administration of Cases Pursuant To Bankruptcy Rule 1015(b) And Local Bankruptcy Rule 1015-1 And (B) Waiving Requirements Of Bankruptcy Code Section 342(c)(1) And Bankruptcy Rules 1005 And 2002(n)

2.      Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105, 362, And 365 Enforcing Protections Of Bankruptcy Code Section 362 And Bankruptcy Termination Provisions Of Bankruptcy Code Section 365

3.      Debtors' Motion For Interim and Final Orders Pursuant To Bankruptcy Code Sections 105, 363, 365, And 554 And Bankruptcy Rules 6003 And 6004 (I) Authorizing The Debtors To Assume The Agreements; (II) Authorizing And Approving The Conduct Of Store Closing Or Similar Themed Sales, With Such Sales To Be Free And Clear Of All Liens, Claims, And Encumbrances, (III) Authorizing Customary Bonuses To Employees Of Closing Store Locations

4.      Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105(a) And 363(b) And Bankruptcy Rules 6003 and 6004 Authorizing The Debtors To (I) Maintain Customer Programs And (II) Honor Or Pay Related Prepetition Obligations

5.      Debtors' Application For Entry Of Order Pursuant To Section 156(c) Of Title 28 Of The United States Code, Bankruptcy Code Section 105(a), Bankruptcy Rule 2002, And Local Bankruptcy Rule 2002-1(f) Authorizing Debtors To Employ And Retain Kurtzman Carson Consultants LLC As Claims And Noticing Agent *Nunc Pro Tunc* To The Petition Date

6.      Debtors' Motion For Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 363, 507(a), 1107(a) and 1108 And Bankruptcy Rule 6003, Authorizing Debtors To Pay Prepetition Wages, Compensation, And Employee Benefits

7.      Debtors' Motion For Interim And Final Orders Pursuant To Bankruptcy Code Sections 105(a) And 366 (I) Approving Debtors' Proposed Form Of Adequate Assurance Of Payment, (II) Establishing Procedures For Resolving Objections By Utility Companies And (III) Prohibiting Utility Companies From Altering, Refusing Or Discontinuing Service

8.      Debtors' Motion For Order Authorizing The Debtors To Pay Certain Prepetition Taxes And Related Obligations Pursuant To Bankruptcy Code Sections 105(a), 363(b), 507(a), 541, 1107(a) And 1108, And Bankruptcy Rules 6003 And 6004

9.      Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105(a) 363(b), 503(b), 506, 1107 And 1108 And Bankruptcy Rules 6003 And 6004 Authorizing Payment Of Certain Prepetition Shipping Charges And Import/Export Charges

10.     Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 363(b), 1107(a), and 1108 and Bankruptcy Rules 6003 And 6004 Authorizing Payment of Critical Vendors

11.     Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 345(b), 363, and 503(b), Bankruptcy Rules 6003 and 6004, and Local Bankruptcy Rule 2015-2 (I) Authorizing Continued Maintenance of Prepetition Bank Accounts and Payment of Related Prepetition Obligations, (II) Authorizing Continued Use of Existing Cash Management System, (III) Authorizing Continued Use of Existing Business Forms, and (IV) Authorizing the Continuation of, and Accordance of Administrative Expense Priority Status to, Intercompany Transactions

12.     Debtors' Motion For Entry Of Interim And Final Orders Pursuant To Sections 105, 361, 362, 363 And 364 Of The Bankruptcy Code And Bankruptcy Rules 2002, 4001 And 9014: (I) Authorizing The Debtors To (A) Obtain Postpetition Financing On A Super-Priority, Senior Secured Basis And (B) Use Cash Collateral, (II) Granting (A) Liens And Super-Priority Claims And (B) Adequate Protection To Certain Prepetition Lenders, (III) Modifying The Automatic Stay, (IV) Scheduling A Final Hearing, And (V) Granting Related Relief

13.     Debtors' Motion For Entry Of An Order Authorizing And Approving (I) The Debtors' Assumption Of The Plan Sponsor Agreement; And (II) The Payment Of The Break-Up Fee And Related Transaction Expenses

14.     Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105, 365(a) And 554, Bankruptcy Rules 6006 And 9014, And Local Bankruptcy Rule 9013-1 Authorizing And Approving Procedures For Rejection Of Executory Contracts And Unexpired Leases

15.     Debtors' First Omnibus Motion For Order Pursuant To Bankruptcy Code Sections 105(a) And 365(a) And Bankruptcy Rules 6006 And 9014 Authorizing Rejection Of Certain Executory Contracts