**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                               :    Chapter 11
:
QUIKSILVER, INC., *et al.*,            :    Case No. 15-11880 (___)
:
                Debtors.[1]      :    (Joint Administration Pending)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING AND
APPROVING (I) THE DEBTORS' ASSUMPTION OF THE PLAN SPONSOR
AGREEMENT; AND (II) THE PAYMENT OF THE BREAK-UP FEE AND RELATED
TRANSACTION EXPENSES**

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Quiksilver" or the "Company"), hereby move (this "Motion") this Court for entry of an order, pursuant to sections 105(a), 363, and 365(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing and approving, but not directing, the Debtors' (i) assumption of the PSA (as defined herein) between the Debtors and the Plan Sponsor (as defined herein), and (ii) payment of the Break-Up Fee (as defined herein) and related Transaction Expenses (as defined herein), as necessary, in accordance with the terms of the PSA. In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., in Support of Chapter 11

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

Petitions and First Day Pleadings (the "First Day Declaration"),[2] filed with the Court concurrently herewith. In further support of the Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent as follows:

## PRELIMINARY STATEMENT

1. In the period leading up to the Petition Date (defined herein), the Debtors worked diligently to maximize the value from the Debtors' business and assets. As a critical step toward that objective, the Debtors have now filed this Motion seeking assumption of the Plan Sponsor Agreement (together with all exhibits, the "PSA") dated September 8, 2015, by and among the Debtors and certain funds managed by affiliates of Oaktree Capital Management, L.P. which collectively hold 73% of the Debtors' outstanding U.S. Secured Notes (the "Plan Sponsor"), which provides a blueprint for the Debtors to navigate through the reorganization process. Among other things, the PSA will, if authorized, not only be a substantial step in furtherance of confirmation of a value maximizing plan of reorganization, but also result in the preservation of the going concern value of the Debtors' businesses for the benefit of the Debtors' constituents.

2. The PSA is premised upon the fact that the Debtors need a balance sheet restructuring; and a chapter 11 process, without a clear path forward, risks erosion of the value of the Debtors' estates and would reduce the recoveries available to creditors. Without a committed plan sponsorship combined with debtor-in-possession financing from the DIP Lenders (as defined herein), and the resulting capital infusion and backstop contemplated to be provided by the Plan Sponsor, the Debtors would have no clear exit path, and insufficient liquidity to run

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

anything other than an expedited sale process, potentially by way of an auction. Furthermore, absent a carefully constructed plan to exit the bankruptcy process, the Debtors also risk action by overseas creditors, including holders of certain notes issued by the Debtors' European affiliates (the "Euro Notes"),[3] which would further reduce value available to satisfy claims of the Debtors' U.S. creditors. To avoid this value-destructive scenario, the Debtors and the Plan Sponsor negotiated the PSA and debtor-in-possession financing arrangement.

3. The PSA represents the best available means under the present circumstances for effectuating a comprehensive restructuring and maximization of creditor recoveries. Under the PSA, the Plan Sponsor, which holds 73% of the Debtors' U.S. Secured Notes, is agreeing to vote the full value of its claims in favor of a restructuring which would impair and equitize its claim, and is committing to backstop two further rights offerings, of $122.5 million and €50 million, in order to provide liquidity to fund certain obligations of the Debtors upon emergence from these Chapter 11 Cases.

4. The proposed plan of reorganization contemplated in the PSA (the "Plan") will provide for the payment in full of all administrative expenses and allowed priority claims consistent with section 1129 of the Bankruptcy Code. Holders of allowed secured note claims shall receive new common stock in an amount to be set forth in the Plan, in a value which will fall short of the amount of such holder's allowed secured claim. Holders of allowed unsecured claims (which include both general unsecured claims and claims relating to the Debtors' unsecured notes) will receive an allocated portion of $7.5 million in cash proceeds, which shall be funded by the Debtors' exit rights offering (described in further detail herein). Finally,

---

[3] As set forth in greater detail in the First Day Declaration, certain of the Debtors are guarantors of the outstanding obligations under the Euro Notes.

holders of guaranty claims based upon certain Debtors' guarantees of the Euro Note obligations shall have such claims reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.[4]

5.    Assumption of the PSA affords the Plan Sponsor a measure of protections, by affording administrative priority expense status for the Debtors' limited financial obligations to the Plan Sponsor under the PSA and by making the PSA a contractual obligation of the estates.  In turn, assumption of the PSA marks an important step in the Debtors' rehabilitative efforts, as noted above.  Absent assumption of the PSA by October 9, 2015, the Plan Sponsor may terminate the PSA pursuant to its terms.  The Debtors seek to assume the PSA in accordance with its terms to ensure that the agreement will continue to be valid and enforceable against the Plan Sponsor as these Chapter 11 Cases (as defined herein) move swiftly towards plan solicitation and confirmation.  Under the PSA and subject to its terms, just as the Plan Sponsor is committed to proceed toward confirmation of the Plan, the Debtors are as well – albeit subject to a robust "fiduciary out" ensuring that the Debtors can exercise their fiduciary duties to terminate the PSA, if necessary.  If the Debtors terminate the PSA under these circumstances, the Plan Sponsor is entitled to a break-up fee and any unpaid expense reimbursement.

6.    In view of the foregoing, approving and authorizing the Debtors to assume the PSA is integral to the Debtors' pursuit of the Plan, which the Debtors intend to file (along with a related Disclosure Statement) in the near term in accordance with the milestones contained in the PSA.  The Debtors also intend to file a separate motion in the near term requesting approval of a backstop commitment (the "Backstop Commitment") from the Plan

---

[4] In each case, the proposed treatment outlined herein and in the PSA remains subject to each claim holder's ability to agree to less favorable treatment.

Sponsor, on terms substantially similar to those terms set forth in the PSA. Notably, consummation of the transactions contemplated in the PSA is contingent upon confirmation and effectiveness of the Plan. Accordingly, approval of this Motion does not require the Court to pre-approve any plan of reorganization in these Cases.

7. The Debtors' entry into the PSA is an exercise of sound business judgment as in the best interests of the Debtors, their estates and all parties in interest.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

9. The legal predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, and 365(a). Such relief is also warranted under Bankruptcy Rules 6004 and 6006.

10. Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

**BACKGROUND**

11. On September 9, 2015 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors have requested that the Chapter 11 Cases be jointly administered.

12. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13. To date, no creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "United States Trustee"). No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

14. Quiksilver is one of the world's leading outdoor sports lifestyle companies. The Company designs, develops and distributes branded apparel, footwear, accessories and related products. The Company began operations in 1976 making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, and motocross, among other activities. The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites. The Debtors comprise each of the Company's U.S. entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc. and seven inactive entities.

15. Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

6

**RELIEF REQUESTED**

16. By this motion, the Debtors respectfully request the entry of an order authorizing and approving, but not directing, (i) the Debtors' assumption of the PSA between the Debtors and the Plan Sponsor, and (ii) the payment of the Break-Up Fee (as defined herein) and related Transaction Expenses (as defined herein), as necessary, in accordance with the terms of the PSA.

**OVERVIEW OF AGREEMENTS**

**A.    The PSA**

17. By this motion, the Debtors seek authority to assume the PSA, including the term sheets incorporated therein by reference (the "PSA"), attached hereto as Exhibit A.

18. The PSA is the product of extensive, arm's-length negotiations between the Debtors and the Plan Sponsor. Pursuant to the PSA, the Plan Sponsor has committed to facilitating the Debtors' path to confirmation of a value maximizing plan, and provided necessary capital commitments, including (i) funding the Debtors' DIP Term Facility, and (ii) backstopping the DIP Rights Offering and the Euro Notes Offering (the "Backstop Commitment") pursuant to the terms of a forthcoming Backstop Commitment Agreement, which shall substantially reflect the terms and conditions set forth in the Backstop Term Sheet (the "Backstop Term Sheet") attached to the PSA as Exhibit C thereto.

19. Accordingly, the PSA compliments the Debtors' goals of accomplishing a value maximizing balance-sheet restructuring, and provides a much needed capital commitment through which the Debtors may maximize the value of the estates for the benefit of all creditors and other parties in interest.

20. The following is a summary of the key terms of the PSA:[5]

| **Commitments Regarding Restructuring Transactions** | Mutual Obligations:<br><br>Each of the Parties covenants and agrees (a) to negotiate definitive documentation in good faith, and to execute and otherwise support such documentation, (b) to support consummation of the proposed restructuring transaction as set forth in the PSA, (c) not to impede the proposed restructuring transaction, and (d) not to object to the DIP Agreement.<br><br>Obligations of the Plan Sponsor:<br><br>The Plan Sponsor covenants and agrees to vote in favor of the Plan, not to change or withdraw such favorable vote, not to vote to reject the Plan, and not to object to or oppose the Plan.<br><br>Debtors' Obligations:<br><br>Debtors covenant and agree to (a) cooperate with the Plan Sponsor, (b) provide the Plan Sponsor and its counsel with draft pleadings, (c) operate their business and dispose of assets in the ordinary course, (d) object to certain relief which may be sought by third parties, including the appointment of a trustee or examiner and the modification or termination of the Debtors' exclusivity period, (e) notify the Plan Sponsor of potential breaches under the PSA or related documents.<br><br>See PSA, §§ 3.01(c), (d). |
|---|---|
| **Fees Related to Restructuring Transactions** | The Debtors shall pay, when due and payable, all reasonable and documented outstanding expenses (the "Transaction Expenses") incurred by the Plan Sponsor and its financial and legal advisors, whether incurred pre- or post-petition.<br><br>If the Debtors consummate any transaction other than as contemplated by the PSA within a year following the termination of the PSA, the Debtors shall pay the Plan Sponsor a $20 million cash breakup fee (the "Break-Up Fee"), which shall be entitled to administrative expense priority status and shall be paid from the proceeds of any such transaction at the closing of such transaction. Any payment of a |

---

[5] Capitalized terms used in this paragraph shall have the meaning ascribed to them in the PSA. The summary contained herein is subject in its entirety to the terms and provisions in the PSA or other documents referenced therein, and in the event of any inconsistency between this summary and the terms and provisions in the PSA, the terms and provisions in the PSA shall control.

8

| | |
|---|---|
| | Termination Fee (as defined in the DIP Agreement) shall be credited on a dollar-for-dollar basis towards the Break-Up Fee.<br><br>See PSA, §§ 3.01(a), 3.02. |
| **Termination Events** | Plan Sponsor Termination Events:<br><br>Plan Sponsor may terminate if: (a) milestone events do not occur by required dates, (b) a Termination Date as defined in the DIP Agreement occurs, (c) the Euro Noteholders exercise rights and remedies under the Euro Notes Indenture, (d) the Boardriders Waiver terminates, (e) the Debtors breach the PSA, (f) the Debtors file a motion, pleading, or related document inconsistent with the PSA, (g) DIP financing other than the financing provided by the DIP Lender is approved by the court, (h) definitive documents cease to be in full force and effect, (i) ruling or order is issued enjoining the consummation of the restructuring transaction, (j) the court appoints an examiner or a trustee or converting the cases to chapter 7 cases, (k) the court enters an order terminating the Debtors' exclusivity period, and (l) Debtors exercise their fiduciary out.<br><br>Debtor Termination Events:<br><br>Debtor may terminate upon: (a) material breach of the PSA by the Plan Sponsor, (b) issuance of any ruling or order that would have a material adverse impact on the consummation of the proposed restructuring; or (c) if Debtors determine that proceeding with the transaction would be inconsistent with the continued exercise of their fiduciary duties.<br><br>Mutual Termination:<br><br>The Debtors and Plan Sponsor may terminate the PSA, and the obligations thereunder, by mutual, written agreement. The PSA shall terminate automatically without any further required action or notice on, as applicable, the Plan Effective Date.<br><br>See PSA, §§ 5.01, 5.02, 5.04. |
| **Milestones** | The Debtors shall:<br><br>-- commence their chapter 11 cases not later than September 9, 2015 (such commencement date, the "Petition Date");<br><br>-- (A) file a motion on the Petition Date seeking assumption of the PSA, including the Expense Reimbursement and the Breakup Fee, (B) file a motion on within 30 days of the Petition Date seeking approval of the |

9

|  | |
|---|---|
|  | backstop agreement as contemplated by the Backstop Term Sheet, and (C) obtain an order approving the assumption of the PSA, including the Plan Sponsor Protections, within 30 days of the Petition Date;<br><br>-- obtain the Boardriders Waiver (as defined in the DIP Agreement);<br><br>-- obtain entry of an order approving on (A) an interim basis the DIP Facility within 2 business days of the Petition Date and (B) a final basis the DIP Facility within 30 days of the Petition Date;<br><br>-- file the Agreed Restructuring Plan, the Disclosure Statement, the Plan Solicitation Materials, and the motion to approve the Disclosure Statement, on or before 30 days following the Petition Date;<br><br>-- obtain entry of an orders approving the Disclosure Statement and the Backstop Agreement within 75 days of the Petition Date;<br><br>-- obtain entry of the Confirmation Order, in form and substance acceptable to the Plan Sponsor, with all exhibits, appendices, Plan Supplement documents, and any related documents within 115 days of the Petition Date;<br><br>-- cause the Plan Effective Date to occur within 120 days of the Petition Date.<br><br><u>See</u> PSA, §§ 3.02(b). |

**B.      Overview of the Backstop Commitment**

21.      The Debtors and the Plan Sponsor have negotiated key terms of the proposed Backstop Commitment, which are reflected in the Backstop Term Sheet attached to the PSA. The parties continue to negotiate a final form of Backstop Commitment Agreement, and are not seeking any relief with respect to the Backstop Commitment at this time. The Debtors will submit a separate motion seeking this Court's approval of the Backstop Commitment Agreement in the near term.

**APPLICABLE AUTHORITY**

A.     **Assumption of the PSA is Authorized by Section 365(a) of the Bankruptcy Code.**

22.     The Debtors' assumption of the PSA is an exercise of sound business judgment and the Debtors respectfully submit that this Court should authorize such assumption. Bankruptcy Code section 365(a) provides, in relevant part, that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.), 973 F.2d 1065, 1075 (3d Cir. 1992). The decision to assume an executory contract or unexpired lease is a matter within the "business judgment" of the debtor. See In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (the "resolution of [the] issue of assumption or rejection will be a matter of business judgment by the bankruptcy court"); Nat'l Labor Relations Bd. v. Bildisco & Bildisco (In re Bildisco), 682 F.2d 72, 79 (3d Cir. 1982), aff'd, 465 U.S. 573 (1984); see also In re Trans World Airlines, Inc., 261 B.R. 103, 120-21 (Bankr. D. Del. 2001).

23.     Assumption of an executory contract is appropriate where such assumption would benefit a debtor's estate. See In re Rickel Home Ctrs., Inc., 209 F.3d 291, 298 (3d Cir. 2000) ("Section 365 enables the [debtor] to maximize the value of the debtor's estate by assuming executory contracts and unexpired leases that benefit the estate and rejecting those that do not."); Burtch v. Masiz (In re Vaso Active Pharms., Inc.), 500 B.R. 384, 397-98 (Bankr. D. Del. 2013) (same); Show Grp. v. Bechtel Jacobs Co. (In re IT Grp., Inc.), 350 B.R. 166, 177 (Bankr. D. Del. 2006) (same).

24.     When applying the "business judgment" standard in connection with a decision under Bankruptcy Code section 365, courts show great deference to a debtor's business decisions. See e.g., In re Armstrong World Indus., Inc., 348 B.R. 136, 162 (Bankr. D. Del. 2006) ("Courts have uniformly deferred to the business judgment of the debtor to determine whether

11

the rejection of an executory contract or unexpired lease by the debtor is appropriate under section 365(a)."); Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburg Steel Corp.), 72 B.R. 845, 849 (Bankr. W.D. Penn. 1987) ("Ordinarily, courts accord the debtor's business judgment a great amount of deference since the decision to assume or reject an executory contract is an administrative not a judicial matter."). Application of the business judgment standard requires a court to approve a debtor's business decision unless the decision is the product of bad faith, whim or caprice. See Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985); see also In re Caribbean Petroleum Corp., 444 B.R. 263, 268 (Bankr. D. Del. 2010).

25. The Debtors' decision to assume the PSA is an exercise of their sound business judgment. The terms of the PSA are the result of extensive, arm's-length negotiations between the Debtors and the Plan Sponsor. Further, assumption of the PSA will ensure the continued support of the Debtors' key stakeholders throughout the ongoing restructuring process. Without the support of the Plan Sponsor, the Debtors undoubtedly would face a more complicated and expensive restructuring process, as well as an extended stay in bankruptcy, which would cause further harm to the Debtors' business. In addition, the Debtors' foreign operations would be exposed to potential creditor recovery actions in overseas jurisdictions, further reducing the value of the Debtors' assets to the detriment of creditors. Thus, the terms of the restructuring set forth in the PSA and the commitments of the parties thereto provide the Debtors with the best opportunity to maximize the value of the their estates.

26. In addition, as noted above, the terms of the PSA provide that nothing in the PSA shall prevent the Debtors from taking any action that it is obligated to take (or failing to take any action that it is obligated to fail to take) in the performance of any fiduciary duty or as

otherwise required by applicable law.  See PSA, § 3.01(a).  Thus, there is no risk that the Debtors' assumption of the PSA will adversely affect the Debtors' abilities or obligations to fulfill their fiduciary duties to maximize the value of their estates.

27. Similar relief has been granted by bankruptcy courts in this district. See, e.g., In re Wet Seal, Inc., Case No. 15-10081 (CSS) (Bankr. D. Del. Feb. 5, 2015); In re Exide Tech., Case No. 13-11482 (KJC) (Bankr. D. Del. Feb. 4, 2015); In re Dendreon Corp., Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014); In re Tuscany Int'l Holdings (U.S.A.) Ltd., Case No. 14-10193 (KG) (Bankr. D. Del. Mar. 21, 2014); In re Rural/Metro Corp., Case No. 13-11952 (KJC) (Bankr. D. Del. Sept. 5, 2013); In re William Lyons Homes, Case No. 11-14019 (CSS) (Bankr. D. Del. Dec. 29, 2011).

28. Accordingly, the Debtors submit that the assumption of the PSA is within their sound business judgment.

**B. Payment of the Break-Up Fee and Transaction Expenses Is Authorized by Section 363(b) of the Bankruptcy Code.**

29. The Debtors also seek the Court's approval to pay the Break-Up Fee and Transaction Expenses in connection with the PSA pursuant to Bankruptcy Code section 363, which authorizes a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A court can authorize a debtor to use property of the estate pursuant to Bankruptcy Code section 363(b)(1) when such use is an exercise of the debtor's sound business judgment and when the use of property is proposed in good faith. In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991). If a valid business justification exists, the law vests a debtor's decision to use property out of the ordinary course of business with the strong presumption that the debtor's decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official

Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).

30. The Debtors believe that the provisions of the PSA providing for the Break-Up Fee and reimbursement of the Transaction Expenses are fair and reasonable. The ongoing commitments of the Plan Sponsor under the PSA have been, and will be, of direct benefit to the Debtors, their estates and the success of these Chapter 11 Cases. The Plan Sponsor has been integrally involved in the negotiations and formulation of the restructuring, and absent their support of (and their obligation to continue to support) the restructuring, the Debtors' ability to achieve a successful sale or reorganization would be severely jeopardized. Therefore, the Debtors submit that payment of the Break-Up Fee and Transaction Expenses is an exercise of their sound business judgment.

C.  **The Break-Up Fee and Transaction Expenses Are Reasonable And Appropriate**

31. The Debtors further submit that Break-Up Fee and the Transaction Expenses payable to the Plan Sponsor under the PSA are reasonable and appropriate in light of the benefit that the Debtors and their estates would receive from consummation of the Plan. These fees and expenses represent an actual and necessary cost and expense of preserving the estates under section 503 of the Bankruptcy Code and should be allowed and paid as an administrative expense in the Chapter 11 Cases.

32. The Break-Up Fee and Transaction Expenses are an integral part of the transactions contemplated by the PSA, without which the Plan Sponsor would not have entered into the PSA. They are designed to compensate the Plan Sponsor for the efforts and resources expended and yet to be extended and, in the case of the Break-Up Fee, for the opportunities foregone and opportunities lost in the event the Debtors determine not to proceed with the Plan. Among other things, the Plan Sponsor is making a multi-million debtor-in-possession term loan

that it might not otherwise make and, pursuant to the PSA, is reserving multi-millions in cash to be contributed under the Plan which, absent the PSA, could be deployed elsewhere.

33.    Here, as in In re Genco Shipping & Trading Ltd., 509 B.R. 455 (Bankr. S.D.N.Y. 2014), "[t]he termination fee . . . is simply one component of a much larger negotiated transaction . . . that creates tremendous value for the estate. Considered in this light, it is clearly satisfies the business judgment test." Id. at 465. In Genco Shipping, the debtors had sought the assumption of a restructuring support agreement contemplating a restructuring under which over $1 billion in debt would be converted to equity. One component of the restructuring support agreement was a $26.5 million termination fee. The bankruptcy court authorized the assumption of the restructuring support agreement and approved the $26.5 million termination fee. Id. at 469. In particular, the bankruptcy court found that the amount of the termination fee would not "unduly hamper the Debtors' efforts to maximize the value for the estate given the fiduciary out, or that it is unreasonable when compared to the overall transaction . . . ." Id. at 465.

34.    The same is true here. In terms of value, the PSA transaction includes the following key elements: (a) the Plan Sponsor is required to satisfy the DIP financing, which is estimated to be at least $150 million on exit, not including administrative expenses which are budgeted at approximately $30 million per the Debtors' budget; (b) the Plan Sponsor holds 73% of the U.S. Secured Notes, a sufficiently large stake to cause the class of U.S. Secured Notes to convert $280 million of debt into equity and (c) by reinstating the Debtors' obligations to guaranty the Euro Notes, the Agreed Plan would effectively include the reinstatement of approximately $250 million of the structurally senior Euro Notes and other world-wide debt. Accordingly, the $20 million Break-Up Fee plus reimbursement of the Plan Sponsor's expenses is less than the traditional Delaware convention of 3% when analyzed against these elements of

15

value. In the event that the Debtors determine that they need to terminate the PSA in the exercise of their fiduciary duties, the PSA expressly permits them to do so. The value a party wishing to propose an alternative transaction would have to provide to even match the Plan Sponsor easily dwarfs the amount of the Break-Up Fee, "making it highly unlikely that the fee would chill any other financial options." Id. at 467. Finally, any payment of a termination fee under the applicable DIP documentation shall be credited dollar-for-dollar against the payment of the Break-Up Fee under the PSA, ensuring that the Plan Sponsor will be fairly compensated for its efforts, and the Debtors will pay only a single fee if they terminate the PSA and related deal documentation in order to comply with their fiduciary obligations.

35. Under Calpine Corp. v. O'Brien Environmental Energy, Inc., 181 F.3d 527, 535 (3d Cir. 1999), of course, for a break-up fee to be approved there must be a demonstration that the break-up fee not only was agreed to in the exercise of the debtors' reasonable business judgment but that it also is actually necessary to preserve the value of the estate. Here, the Break-Up Fee is actually necessary to preserve the value of the Debtors' estates. Without it, the Plan Sponsor would not have agreed to be sponsor the proposed Plan, and without a plan sponsor and a clear path forward in these Chapter 11 Cases, the risk of erosion of the value of the estates is significant.

36. Similar relief has been granted by bankruptcy courts in this district. In re Wet Seal, Inc., Case No. 15-10081 (CSS) (Bankr. D. Del. Feb. 5, 2015); In re AbitibiBowater Inc., Case No. 09-11296 (KJC) (Bankr. D. Del. June 22, 2010); In re NextMedia Grp., Inc., Case

No. 09-14463 (PJW) (Bankr. D. Del. Jan. 22, 2010); In re Spansion Inc., Case No. 09-10690 (KJC) (Bankr. D. Del. Jan. 7, 2010).[6]

**D.     Assumption of the PSA and Payment of the Break-Up Fees and Transaction Expenses are also Supported by Section 105(a) of the Bankruptcy Code.**

37.     Section 105(a) provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code, providing, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105 power is proper. Nw. Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."); U.S. v. Pepperman, 976 F.2d 123, 131 (3d Cir. 1992). Pursuant to Bankruptcy Code section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process [where] . . . [s]ection 105(a) of the Code provides that '[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'"); Patrick v. Dell Fin. Servs. (In re Patrick), 344 B.R. 56, 58 (Bankr. M.D. Penn. 2005) ("There is no doubt that § 105(a) is a 'powerful [and] versatile tool' designed to empower bankruptcy courts to fashion orders in furtherance of the Bankruptcy Code." (alterations in original) (citations omitted)).

---

[6]  Because of the voluminous nature of the orders cited herein, they are not attached to the Motion. Copies of these orders, however, are available on request.

38. As described in detail herein, the support of the Plan Sponsor will be integral to a successful and expedient restructuring. The Debtors submit that it is well within the Court's broad authority to grant the relief requested herein as the provisions of the Bankruptcy Code support the Debtors' business judgment in these matters.

### E.    The Court Is Not Being Asked To Pre-Approve A Plan

39. This Court is not being asked to pre-approve the terms of the Plan itself. At this point, the Court is only being asked to evaluate whether assumption of the PSA pursuant to section 365 of the Bankruptcy Code is a valid exercise of the Debtors' business judgment. Assumption of the PSA by no means assures that the Plan will be confirmed. See Genco Shipping, 509 B.R. at 468 (citing Residential Capital, 2013 Bankr. LEXIS 2601, at *8). That issue will be addressed at the confirmation hearing in a distinct inquiry which examines whether the Plan satisfies the applicable standards under the Bankruptcy Code, at which parties in interest may object to the Plan on any number of grounds. Id. Without assumption of the PSA, the Plan Sponsor will terminate the PSA and there will be no plan for the Court to consider or parties to object to at all.

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

40. The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**NOTICE**

41. Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' postpetition secured loan facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan facility; (d) the agent for the Debtors' prepetition senior secured notes; (e) the agent for the Debtors' prepetition senior unsecured notes; (f) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases; and (g) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).  The Debtors submit that no other or further notice need be provided.

**NO PRIOR REQUEST**

42. No previous request for the relief sought herein has been made to this Court or any other court.


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the relief sought herein and such other and granting such other and further relief as may be just and proper.

Dated:   Wilmington, Delaware
         September 9, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/      Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Z. Li (*pro hac vice admission pending*)
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

John K. Lyons (*pro hac vice admission pending*)
Jessica S. Kumar (*pro hac vice admission pending*)
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel for Debtors and Debtors in Possession*