**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :    Chapter 11

In re:                          :

                            :    Case No. 15-11880 (BLS)

QUIKSILVER, INC., *et al.*,      :

                            :    (Joint Administration Pending)

                 Debtors.[1]   :

                            :    **Hearing Date:  TBD**

                            :    **Obj. Deadline:  TBD**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' APPLICATION FOR ORDER PURSUANT TO BANKRUPTCY CODE
SECTIONS 327(a) AND 329, BANKRUPTCY RULES 2014 AND 2016, AND LOCAL
BANKRUPTCY RULES 2014-1 AND 2016-1 AUTHORIZING EMPLOYMENT
AND RETENTION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AND
AFFILIATES AS BANKRUPTCY COUNSEL TO THE DEBTORS AND
DEBTORS IN POSSESSION EFFECTIVE AS OF THE PETITION DATE**

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in

possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-

Debtor affiliates, "Quiksilver" or the "Company") hereby apply (the "Application") to the Court

for entry of an order, under sections 327(a) and 329 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rules 2014-1 and 2016-1 of the Local Rules for the United States

Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), authorizing the

employment and retention of Skadden, Arps, Slate, Meagher & Flom LLP and its affiliated law

practice entities (collectively, "Skadden" or the "Firm") as bankruptcy counsel for the Debtors

effective as of the Petition Date (as defined below) under a general retainer.  In support of this

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc.
(8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505),
Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors'
corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

Application, the Debtors rely on the Declaration of Van C. Durrer, II in Support of Debtors'

Application for Order Under Bankruptcy Code Sections 327(a) and 329, Bankruptcy Rules 2014

and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing Employment and

Retention of Skadden, Arps, Slate, Meagher &  Flom LLP as Bankruptcy Counsel to the Debtors

and Debtors In Possession Effective as of the Petition Date (the "Durrer Declaration"), attached

hereto as Exhibit A, as well as the Declaration of Andrew Bruenjes, Americas Chief Financial

Officer of Quiksilver, Inc., in Support of Chapter 11 Petitions and First Day Pleadings (the "First

Day Declaration"),[2] filed with the Court concurrently herewith.  In further support of the

Application, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 327

and 328 of the Bankruptcy Code.  Such relief is also warranted under Bankruptcy Rules 2014

and 2016 and Local Bankruptcy Rules 2014-1 and 2016-2(g).

3.      Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors consent to the

entry of a final judgment or order with respect to this Motion if it is determined that this Court

would lack Article III jurisdiction to enter such final order or judgment absent the consent of the

parties.

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day
Declaration.

## BACKGROUND

4.       On September 9, 2015 (the "Petition Date"), the Debtors each commenced

a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the

"Chapter 11 Cases").  The Debtors have requested that the Chapter 11 Cases be jointly

administered.

5.       The Debtors continue to operate their businesses and manage their

properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

6.       To date, no creditors' committee has been appointed in these Chapter 11

Cases by the Office of the United States Trustee for the District of Delaware (the "United States

Trustee").  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

7.       Quiksilver is one of the world's leading outdoor sports lifestyle

companies.  The Company designs, develops and distributes branded apparel, footwear,

accessories and related products.  The Company began operations in 1976 making boardshorts

for surfers in the United States under a license agreement with the *Quiksilver* brand founders in

Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its

core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle

associated with surfing, skateboarding, snowboarding, and motocross, among other activities.

The Company's products are sold in over 115 countries through a wide range of distribution

points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores,

discount centers, specialty stores, select department stores, and licensed stores), Company-owned

retail stores, and its e-commerce websites.  The Debtors comprise each of the Company's U.S.

entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc.,

and seven inactive entities.

3

8.      Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

## RELIEF REQUESTED

9.      By this Application, the Debtors seek to employ and retain Skadden, effective as of the Petition Date, as the Debtors' bankruptcy counsel, under a general retainer, with regard to the filing and prosecution of these Chapter 11 Cases.  Accordingly, the Debtors respectfully request entry of an order, pursuant to sections 327(a) and 329 of the Bankruptcy Code, authorizing the Debtors to employ and retain Skadden as their bankruptcy counsel, effective as of the Petition Date, to perform the legal services that will be necessary during these Chapter 11 Cases, as more fully described below.

## BASIS FOR RELIEF

10.     Section 327(a) of the Bankruptcy Code provides that subject to court approval, a debtor, as a debtor in possession, "[m]ay employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist . . . in carrying out . . . duties under [the Bankruptcy Code]."  11 U.S.C. § 327(a).

11.     Under section 329 of the Bankruptcy Code, attorneys representing a debtor must "file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation."  11 U.S.C. § 329(a).  Bankruptcy Code section 328(a), in turn, provides that, subject to court approval, the employment of professional persons under section 327 of the Bankruptcy Code may be "on any reasonable terms and

4

conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis" subject to later re-evaluation by the Court.  11 U.S.C. § 328(a).

12.     Bankruptcy Rule 2014 requires that an application for retention include "specific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."  Fed. R. Bankr. P. 2014.

13.     The Debtors respectfully submit that they should be authorized to retain and employ Skadden in accordance with the terms and conditions of the Engagement Agreement. As discussed below and in the Durrer Declaration, Skadden satisfies the disinterestedness standard in section 327(a) of the Bankruptcy Code.  Moreover, during the course of its longstanding engagement with the Debtors, Skadden has become familiar with the Debtors' business operations, capital structure, financing documents, and other material information, and has already committed a significant amount of time and effort with respect to these Chapter 11 Cases.  Skadden's services are needed postpetition to continue to assist with these Chapter 11 Cases and to enable the Debtors to discharge their duties as debtors and debtors in possession. As discussed below and in the Durrer Declaration, Skadden has extensive experience and an excellent reputation for providing high-quality legal services to debtors and creditors in bankruptcy reorganizations and other restructurings.  Accordingly, the Debtors respectfully

submit that Skadden is well-qualified to provide its services to the Debtors in a cost-effective, efficient, and timely manner.

14.     In addition, as also set forth below and in the Durrer Declaration, the Debtors' proposed fee structure is market-based, fair, and reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.  The fee structure appropriately reflects the nature and scope of services to be provided by Skadden, the Firm's substantial experience with respect to providing corporate restructuring services, and the fee and expense structures typically used by Skadden and other leading firms that bill their clients on an hourly basis.

## SKADDEN'S QUALIFICATIONS

15.     Skadden's representation of ZQK, one of the Debtors and the ultimate parent of the other Debtors in these Chapter 11 Cases, dates back to November 2004 and initially involved representation of ZQK in connection with general corporate matters.  Skadden formalized the representation pursuant to an engagement letter dated November 2, 2004.  Thereafter, the representation expanded to include various general corporate governance, transactional, and regulatory matters.

16.     Skadden first began representing the Debtors in connection with potential restructuring matters and consideration of strategic alternatives in July 2015.  An amended and restated engagement letter was entered into as of July 27, 2015 (the "Engagement Agreement"), a copy of which is attached to the Durrer Declaration as Exhibit 1.  Pursuant thereto, the Company retained Skadden to represent the Company in its efforts to work out its present financial circumstances, including restructuring its financial affairs and capital structure.  To this end, at the Company's request, Skadden has assisted the Company in the exploration of various strategic alternatives.  Simultaneously, at the Debtors' request, Skadden has assisted the Debtors

in preparing for the possibility of commencing these Chapter 11 Cases to preserve and maximize value.

17.     Skadden has worked closely with the Debtors with respect to their restructuring efforts and exploration of various strategic alternatives to address their financial circumstances.  As a result of this work and the Firm's decade-long history with the Debtors, Skadden has become uniquely familiar with the Debtors' business affairs and many of the potential legal issues that may arise in the context of these Chapter 11 Cases.  Indeed, Skadden has provided advice and assisted the Debtors in all aspects of their restructuring efforts and the preparation of these Chapter 11 Cases, except for those issues which required the retention of Co-Counsel, Pachulski Stang Ziehl & Jones LLP ("Pachulski").  In particular, Skadden has assisted the Debtors in (i) negotiations with Oaktree, the proposed plan sponsor, with respect to the Plan Sponsor Agreement ("PSA"), (ii) negotiations with the DIP Lenders and other key constituencies, (iii) preparing for and drafting pleadings filed in these Chapter 11 Cases, and (iv) and drafting and negotiating the terms of the DIP Credit Agreement.

18.     The Debtors selected Skadden as their restructuring counsel because of the Debtors' longstanding prior experience with the Firm, Skadden's extensive knowledge of the Debtors' business and financial affairs, and its recognized expertise in the field of debtors' and creditors' rights and business reorganizations and asset sales under chapter 11 of the Bankruptcy Code.  The Debtors believe that Skadden has assembled a highly qualified team of professionals and paraprofessionals to provide services to the Debtors during these Chapter 11 Cases.  The Debtors further believe that Skadden has the knowledge and experience necessary to deal effectively with the issues that will arise in the Chapter 11 Cases and that Skadden's continued representation of the Debtors is critical to the success of the Debtors' reorganization efforts.  The

Durrer Declaration more fully sets forth additional information regarding Skadden's qualifications.

19.     The Debtors desire to employ Skadden under a general retainer because of the extensive legal services that will be required in connection with these Chapter 11 Cases and the Firm's familiarity with the business of the Debtors and their non-debtor affiliates.

## SERVICES TO BE RENDERED

20.     The services of legal counsel are necessary to enable the Debtors to execute faithfully their duties as debtors in possession and to preserve and enhance the value of the Debtors' estates.  Subject to further order of this Court, Skadden will render various services to the Debtors including, among others, the following:

(a)     advise the Debtors with respect to their powers and duties as debtors and debtors in possession in the continued management and operation of their businesses and properties;

(b)     attend meetings and negotiate with representatives of creditors and other parties in interest, and advise and consult on the conduct of the cases, including all of the legal and administrative requirements of operating in chapter 11;

(c)     take all necessary actions to protect and preserve the Debtors' estates, including the prosecution of actions on their behalf, the defense of any actions commenced against their estates, negotiations concerning litigation in which the Debtors may be involved, and objections to claims filed against the estates;

(d)     prepare on behalf of the Debtors all motions, applications, answers, orders, reports, and papers necessary to the administration of the estates;

(e)     advise the Debtors in connection with any sales of assets;

(f)     negotiate and prepare on the Debtors' behalf plan(s) of reorganization, disclosure statement(s), and all related agreements and/or documents, and take any necessary action on behalf of the Debtors to obtain confirmation of such plan(s);

(g)     appear before this Court, any appellate courts, and the United States Trustee, and protect the interests of the Debtors' estates before such courts and the United States Trustee; and

(h)     perform all other necessary legal services and provide all other necessary or appropriate legal advice to the Debtors in connection with these Chapter 11 Cases.

21.     It is necessary and essential that the Debtors, as debtors in possession, employ attorneys under a general retainer to render the foregoing professional services.  Skadden has indicated a willingness to act on behalf of, and render such services to, the Debtors.

## SKADDEN'S DISINTERESTEDNESS

22.     To the best of the Debtors' knowledge, and except as otherwise set forth herein and in the Durrer Declaration, the members, counsel, and associates of Skadden (i) do not have any connection with any of the Debtors, their affiliates, their creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee for the District of Delaware, any person employed in the office of the same, any judge in the Bankruptcy Court for the District of Delaware, or any person employed in the offices of the United States Trustee; (ii) are "disinterested persons," as such term is defined in Bankruptcy Code section 101(14), as modified by Bankruptcy Code section 1107(b); and (iii) do not hold or represent any interest adverse to the Debtors' estates.

23.     As set forth in the Durrer Declaration, Skadden has in the past represented, currently represents, and likely in the future will represent certain parties in interest in these cases in matters unrelated to the Debtors, these Chapter 11 Cases, or such entities' claims against or interests in the Debtors.

24.     The Debtors understand that except as otherwise set forth in the Durrer Declaration:

(a)     Neither Skadden nor any attorney at the Firm holds or represents an interest adverse to the Debtors' estates;

(b)     Neither Skadden nor any attorney at the Firm is or was a creditor or an insider of the Debtors, except that Skadden previously has rendered legal services to the Debtors for which it has been compensated as disclosed below;

(c)     Neither Skadden nor any attorney at the Firm is or was, within two years before the Petition Date, a director, officer, or employee of the Debtors; and

(d)     Skadden does not have an interest materially adverse to the interest of the estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the Debtors, or for any other reason.

25.     In view of the foregoing, the Debtors believe that Skadden is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

26.     Skadden has informed the Debtors that throughout the Chapter 11 Cases, Skadden will continue to conduct periodic conflicts analyses to determine whether it is performing or has performed services for any significant parties in interest in these cases and that Skadden will promptly update the Durrer Declaration to disclose any material developments regarding the Debtors or any other pertinent relationships that come to Skadden's attention.

## PROFESSIONAL FEES AND EXPENSES

27.     Skadden has provided and will be providing professional services to the Debtors under its standard rate structure and pursuant to the terms of the Engagement Agreement.  A description of the Firm's standard rate structure is included within the Engagement Agreement.  For 2015, the hourly rates under the Firm's standard rate structure range from $895 to $1,350 for partners, $885 to $995 for counsel, $380 to $870 for associates, and $200 to $350 for legal assistants.  The Firm has informed the Debtors that it will continue to

honor its courtesy discount, which the Firm has historically made to the Debtors, of 10% off the foregoing rates.  The Firm has also informed the Debtors that it will bill non-working travel time at half of the otherwise applicable hourly rate.  Skadden has advised the Debtors that the hourly rates set forth above are subject to periodic increases in the normal course of the Firm's business, often due to the increased experience of a particular professional.  Skadden will provide notice of any rate increases to the Debtors, the United States Trustee, and the Court.

28.     Consistent with the Firm's policy with respect to its other clients, Skadden will continue to charge the Debtors for all other services provided and for other charges and disbursements incurred in the rendition of services.  These charges and disbursements include, among other things, costs for telephone charges, photocopying, travel, business meals, computerized research, messengers, couriers, postage, witness fees, and other fees related to trials and hearings.  Charges and disbursements are invoiced pursuant to the Firm's Policy Statement Concerning Charges and Disbursements Under Standard Bundled Rate Structure, which is attached as Annex A-II to the Engagement Agreement.

29.     In connection with entry into the Engagement Agreement, the Debtors agreed that a retainer (the "Retainer") would be applied to Skadden's professional fees, charges, and disbursements.  The initial Retainer amount was $121,906.

30.     Except as otherwise noted herein, since July 2015, the Firm provided the Debtors with (i) weekly invoices for professional fees and expenses, (ii) a reconciliation of the professional fees, charges, and disbursements that had accrued against the Retainer, (iii) the amount of any unapplied Retainer funds, and (iv) an estimate of the future week's fees, which would take the form of a further Retainer request.  In the event that the Firm's actual professional

11

fees, charges, and disbursements exceeded its original estimate, the Firm's weekly invoice included a request for payment of such excess amount.

31.      As agreed to under the Engagement Agreement, the Firm began invoicing the Debtors twice per week once the Firm and Debtors identified a secure target filing date for these Chapter 11 Cases.  The Firm's final, pre-filing invoice included its best estimate for all professional fees, charges, and disbursements to the Petition Date, as well as a request for a retainer covering that amount.

32.      At the commencement of this engagement, Skadden wrote off $352,155.86 in pre-existing invoices owed by the Debtors.  Since beginning this engagement in July 27, 2015, the total aggregate amount of fees earned and expenses incurred by Skadden on behalf of the Debtors, as identified and accounted for by Skadden as of the date hereof, was $1,847,663.44.  However, the Firm wrote off $80,790.44.  During the same period, the Debtors paid Skadden an aggregate amount of $1,766,873.  As of September 7, 2015, the remaining Retainer amount was $0, subject to reconciliation of the final prepetition invoice, as described below.  The Debtors understand that Skadden's prepetition fees and expenses for the billing period immediately preceding the Petition Date may not have been fully accounted for as of the date hereof.  Skadden anticipates that any such balance or deficiency remaining after application of the Retainer to such accrued and unpaid fees and expenses will be fairly minimal.  Skadden has informed the Debtors that as promptly as practicable after all fees and charges accrued prior to the Petition Date have finally been posted within the Firm's computerized billing system, Skadden will issue a final detailed billing statement for any unpaid fees, charges and disbursements for the period prior to the Petition Date (the "Final Prepetition Bill Amount").  Subject to any orders of the Court, Skadden will reconcile the Final Prepetition Bill Amount with

the remaining Retainer to pay its prepetition invoices, which will consist primarily of fees and expenses incurred from the period immediately preceding the Petition Date.

33.    To the extent that reconciliation of the amount of the prepetition invoices (the "Reconciliation Amount") is less than the remaining Retainer, the Debtors and Skadden have agreed that Skadden will refund any unused portion or hold the full amount of the difference as a postpetition retainer to be applied against postpetition filing fees, at the Debtors' request.  In the event that the Final Prepetition Bill Amount exceeds the remaining Retainer, Skadden has agreed to waive any resulting prepetition claim against the Debtors for payment with respect to the amount by which the Reconciliation Amount exceeds the Retainer.

34.    Skadden intends to apply to this Court for allowance of compensation for professional services rendered and reimbursement of expenses incurred in the Chapter 11 Cases in accordance with Bankruptcy Code sections 330 and 331, with the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules, and with any other applicable procedures and orders of the Court.  Skadden will seek compensation for the services of each attorney and paraprofessional acting on behalf of the Debtors in these cases at the then-current standard hourly rate charged for such services on a non-bankruptcy matter.

35.    Skadden also intends to make every reasonable effort to comply with the United States Trustee's requests for additional information and disclosures as set forth in Appendix B—Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Large Chapter 11 Cases, effective as of November 1, 2013 (the "Revised U.S. Trustee Fee Guidelines"), in connection with this Application and subsequent applications for compensation and reimbursement of expenses in these Chapter 11 Cases.

36.     Skadden has agreed to accept as compensation such sums as may be allowed by the Court on the basis of the professional time spent, the rates charged for such services, the necessity of such services to the administration of the estate, the reasonableness of the time within which the services were performed in relation to the results achieved, and the complexity, importance and nature of the problems, issues, and tasks addressed in these cases.

37.     Other than as set forth above and in the Durrer Declaration, no arrangement is proposed between the Debtors and Skadden for compensation to be paid in these cases.  Skadden has not shared or agreed to share any of its compensation from the Debtors with any other entity, except as permitted under section 504(b)(1) of the Bankruptcy Code.

38.     Additionally, by this Application, the Debtors request approval of the retention and employment of Skadden *nunc pro tunc* to the Petition Date.  Such relief is warranted by the extraordinary circumstances presented by these cases.  The Third Circuit has identified "time pressure to begin service" and absence of prejudice as factors favoring *nunc pro tunc* retention.  See Matter of Arkansas Co., 798 F.2d 645, 650 (3d Cir. 1986); see also In re Indian River Homes, Inc., 108 B.R. 46, 52 (D. Del. 1989).  The complexity, intense activity, and speed that have characterized these cases has necessitated that Skadden focus its immediate attention on time-sensitive matters and promptly devote substantial resources to the affairs of the Debtors pending submission and approval of this Application.

39.     Skadden's Engagement Agreement includes an indemnification provision requiring that the Debtors reimburse the Firm for costs spent in defending its fees and other possible litigation, so long as such costs and fees remain reasonable.  This Application likewise requests that such indemnification be approved pursuant to section 328(a) of the Bankruptcy Code.  Many courts have upheld similar indemnification provisions under section 328(a).  See,

14

e.g., In re Geneva Steel Co., 258 B.R. 799, 803 (Bankr. D. Utah 2001); In re Borders Grp., Inc.,

456 B.R. 195, 213 (Bankr. S.D.N.Y. 2011). Also, such a provision was approved in In re

Boomerang Tube, LLC, Case No. 15-11247 (MFW) (Bankr. D. Del. June 9, 2015) for Lazard

Freres & Co., LLC, the debtors' investment banker. The Debtors are well aware that such

indemnification provisions are the subject of a dispute pending in multiple cases in this

jurisdiction. See, e.g., In re F-Squared Investment Management, LLC, Case No. 15-11469

(Bankr. D. Del. July 8, 2015); In re Northshore Mainland Services, Inc., Case. No. 15-11402

(KJC) (Bankr. D. Del. June 29, 2015); In re Boomerang Tube, LLC, Case No. 15-11247 (MFW)

(Bankr. D. Del. June 9, 2015). Accordingly, after consultation with the Office of the United

States Trustee, in the event that the Court otherwise approves the retention of Skadden, the

Debtors have agreed to include a provision in the proposed form of order reserving this issue

pending rulings in those multiple cases. Both the Debtors and the Office of the United States

Trustee would reserve all rights and arguments regarding the indemnification issue, and, once

there is an opinion on the issue in this jurisdiction, both parties would meet and confer regarding

the impact of such an opinion on this Application, including whether and how to raise the issue

with the Court for final resolution here.

       40.     The Debtors submit that the employment and retention of Skadden, as of

the Petition Date and on the terms and conditions set forth herein and in the Engagement

Agreement, is in the best interest of the Debtors, their estates, creditors, stakeholders and other

parties in interest, and therefore, should be approved.

## NOTICE

       41.     Notice of this Motion shall be given to (a) the Office of the United States

Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' postpetition

secured loan facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan

facility; (d) the agent for the Debtors' prepetition senior secured notes; (e) the agent for the Debtors' prepetition senior unsecured notes; (f) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases; and (g) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1.  The Debtors submit that no other or further notice need be provided.

**NO PRIOR REQUEST**

42.    No prior request for the relief sought in this Application has been made to this Court or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form annexed hereto, authorizing the employment and retention of Skadden, effective as of the Petition Date, on the terms described above and granting such other and further relief as may be just and proper.

Dated:    September 9, 2015
          New York, New York

QUIKSILVER, INC.

(on behalf of itself and the other Debtors)

By:    /s/ Andrew Bruenjes
Name: Andrew Bruenjes
Title:   Americas Chief Financial Officer

**<u>EXHIBIT A</u>**

**Durrer Declaration**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
    :
In re:    :    Chapter 11
    :
QUIKSILVER, INC., *et al.*,    :    Case No. 15-11880 (BLS)
    :
    Debtors.[1]    :    (Joint Administration Pending)
    :
    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF VAN C. DURRER, II IN SUPPORT OF DEBTORS' APPLICATION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 327(a) AND 329, BANKRUPTCY RULES 2014 AND 2016, AND LOCAL BANKRUPTCY RULES 2014-1 AND 2016-1 AUTHORIZING EMPLOYMENT AND RETENTION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AND AFFILIATES AS BANKRUPTCY COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION EFFECTIVE AS OF THE PETITION DATE

I, Van C. Durrer, II, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am a partner of the firm of Skadden, Arps, Slate, Meagher & Flom LLP (collectively with its affiliated law practice entities, "Skadden" or the "Firm"), which maintains offices for the practice of law at, among other places, One Rodney Square, 10th and King Streets, Wilmington, Delaware 19899. I am admitted in, practicing in, and a member in good standing of the bars of the States of California, Delaware, Maryland, New York, Virginia, and of the District of Columbia.

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

2.        I submit this declaration pursuant to sections 327(a) and 329 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") in support of the Debtors' Application for Order Under Bankruptcy Code Sections 327(a) and 329, Bankruptcy Rules 2014 and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing Employment and Retention of Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates as Bankruptcy Counsel to the Debtors and Debtors in Possession Effective as of the Petition Date  (the "Application"),[2] filed contemporaneously herewith by Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or the "Company").  Except as otherwise indicated herein, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.[3]

## QUALIFICATION OF SKADDEN

3.        Skadden's representation of ZQK, one of the Debtors and the ultimate parent of the other Debtors in these Chapter 11 Cases, dates back to November 2004 and initially involved representation of ZQK in connection with general corporate matters.  Skadden formalized the representation pursuant to an engagement letter dated November 2, 2004. Thereafter, the representation expanded to include various general corporate governance, transactional, and regulatory matters.

---

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application or the First Day Declaration.

[3]   Certain of the disclosures herein relate to matters within the knowledge of other attorneys of Skadden and are based on information provided by them.

4.      Skadden first began representing the Debtors in connection with potential restructuring matters and consideration of strategic alternatives in July 2015.  An amended and restated engagement letter was entered into as of July 27, 2015 (the "Engagement Agreement") and is attached hereto as Exhibit 1.  Pursuant thereto, the Debtors confirmed their retention of Skadden to represent the Company in its efforts to work out its financial circumstances, including, restructuring its financial affairs and capital structure.  To this end, at the Company's request, Skadden has assisted the Company in its exploration of various strategic alternatives while simultaneously assisting the Debtors in preparing for the possibility of commencing these Chapter 11 Cases to preserve and maximize value.

5.      Skadden has worked closely with the Debtors with respect to their restructuring efforts and exploration of various strategic alternatives to address their financial circumstances.  As a result of this work and the Firm's decade-long history with the Debtors, Skadden has become uniquely familiar with the Debtors' business affairs and many of the potential legal issues that may arise in the context of these Chapter 11 Cases.  Indeed, Skadden has provided advice and assisted the Debtors in all aspects of their restructuring efforts and the preparation of these Chapter 11 Cases, except for those issues which required the retention of Co-Counsel, Pachulski Stang Ziehl & Jones LLP ("Pachulski").  For instance, Skadden has assisted the Debtors in (i) negotiations with Oaktree, the proposed plan sponsor, with respect to the Plan Sponsor Agreement ("PSA"), (ii) negotiations with the DIP Lenders and other key constituencies, (iii) preparing for and drafting pleadings filed in these Chapter 11 Cases, and (iv) drafting and negotiating the terms of the DIP Credit Agreement.

6.      Skadden has done so through a highly qualified team of professionals and paraprofessionals.  The core Skadden team has included (i) John K. Lyons and myself, both of us

3

partners in the Firm's corporate restructuring department, (ii) Brian J. McCarthy and Jonathan Ko, both partners in the Firm's M&A department, and (iii) K. Kristine Dunn and David Kitchen, both partners in the Firm's Banking department. The Skadden team has extensive experience in corporate restructuring, M&A, and related matters. We have been responsible for leading this engagement since its inception.

7.    Other professionals and paraprofessionals in the Firm's corporate restructuring, banking, M&A, and tax departments, many of whom also have extensive experience in corporate restructuring generally and debtor representations in reorganization cases specifically, have participated and will continue to participate in the representation of the Debtors in these Chapter 11 Cases. Due to the Firm's experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, and due to the Firm's working history with the Debtors, Skadden believes that it is well qualified and uniquely able to act on the Debtors' behalf and to guide them through these reorganization cases. Accordingly, subject to this Court's approval of the Application, Skadden is willing to perform the services requested by the Company, as set forth herein and in the Engagement Agreement.

## SERVICES TO BE RENDERED

8.    Pursuant to Appendix B—Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Large Chapter 11 Cases, effective as of November 1, 2013 (the "Revised U.S. Trustee Fee Guidelines"), the Firm makes certain disclosures herein.

9.    The professional services that Skadden will provide include the following, without limitation:

4

(a)     advising the Debtors with respect to their powers and duties as debtors and debtors in possession in the continued management and operation of their businesses and properties;

(b)     attending meetings and negotiating with representatives of creditors and other parties in interest and advise and consult on the conduct of the cases, including all of the legal and administrative requirements of operating in chapter 11;

(c)     taking all necessary actions to protect and preserve the Debtors' estates, including the prosecution of actions on their behalf, the defense of actions commenced against their estates, negotiations concerning litigation in which the Debtors may be involved, and objections to claims filed against the estates;

(d)     preparing on behalf of the Debtors all motions, applications, answers, orders, reports, and papers necessary to the administration of the estates;

(e)     advising the Debtors in connection with the sale of its assets;

(f)     negotiating and preparing on the Debtors' behalf plan(s) of reorganization, disclosure statement(s), and all related agreements and/or documents, and taking any necessary action on behalf of the Debtors to obtain confirmation of such plan(s);

(g)     appearing before this Court, any appellate courts, and the United States Trustee, and protecting the interests of the Debtors' estates before such courts and the United States Trustee; and

(h)     performing all other necessary legal services and providing all other necessary or appropriate legal advice to the Debtors in connection with these chapter 11 cases.

10.     Skadden understands that the Debtors are planning to file retention applications for other professionals in the Chapter 11 Cases.  In particular, the Debtors have informed Skadden that the Debtors are seeking Court approval for the retention of (i) FTI Consulting, Inc. as financial advisor, including the Chief Restructuring Officer, (ii) Peter J. Solomon Company as investment banker, (iii) Kurtzman Carson Consultants LLC as claims agent and administrative advisor, and (iv) Pachulski as bankruptcy co-counsel to the Debtors. The Firm has discussed the division of responsibilities with the Debtors and the other professionals the Debtors seek to retain, and Skadden has informed the Debtors that it will take

5

all appropriate steps to avoid unnecessary and wasteful duplication of efforts by any other professionals retained in these Chapter 11 Cases.

## DISINTERESTEDNESS OF PROFESSIONALS

11.    To the best of my knowledge, and except as otherwise set forth herein, the partners, counsel and associates of Skadden (i) do not have any connection with any of the Debtors, their creditors or any other parties in interest, or their respective attorneys and accountants, the United States Trustee for Region 3 or any person employed in the office of the same, or any judge in the United States Bankruptcy Court for the District of Delaware or any person employed in the office of the same; (ii) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code, as modified by Bankruptcy Code section 1107(b); and (iii) do not hold or represent any interest adverse to the estates.

12.    Skadden may have in the past represented, may currently represent, and likely in the future will represent parties in interest in these Chapter 11 Cases (or their affiliates or beneficial owners) in connection with matters unrelated to the Debtors and the Chapter 11 Cases.  Accordingly, prior to the commencement of these Chapter 11 Cases, Skadden conducted a disclosure review with respect to the Debtors and the significant parties in interest in the Debtors' cases.

13.    As set forth in more detail in the subsequent paragraphs of this Declaration, Skadden has reviewed its connections with (i) the Debtors and their non-debtor affiliates, (ii) the Debtors' current and former officers and directors, (iii) the Debtors' equityholders (holding stake of 5% or more), (iv) the Debtors' noteholders, (v) the Debtors' lenders and financial institutions, including the postpetition debtor-in-possession financing lenders, (vi) the Debtors' hedge counterparties, (vii) the issuer and holders of letters of credit issued on behalf of the Debtors, (viii) the Debtors' or their non-debtor affiliates' indenture

trustees, (ix) the Debtors' cash management banks, (x) the Debtors' thirty (30) largest unsecured

creditors, (xi) the Debtors' largest vendors, (xii) the Debtors' utility providers, (xiii) the Debtors'

insurance providers, (xiv) the Debtors' landlords, (xv) professionals representing the Debtors,

their lenders, the proposed plan sponsor, or other key parties in these Chapter 11 Cases, (xvi) the

Debtors' joint venture counterparties; (xvii) parties to litigation involving the Debtors; (xviii)

certain local, state, or federal authorities, (xix) the Office of the United States Trustee for Region

3, Judges for the United States Bankruptcy Court for the District of Delaware, Judges for the

United States District Court for the District of Delaware, and Judges for the United States Court

of Appeals for the Third Circuit, and (xx) other potential parties in interest.

14.     Based on this examination, Skadden has determined that it currently

represents, or has represented, the following entities (or their affiliates) (collectively, the

"Significant Parties in Interest") in matters *unrelated* to the Debtors, the Debtors' cases, or such

entities' claims against and interests in the Debtors:

15.     **Related Entities.**  The Debtors have 68 non-debtor affiliates.  Skadden

has represented these entities during the prepetition period and will continue to represent them

during the Chapter 11 Cases.

16.     **Current and Former Officers and Directors.**  Skadden currently

represents or has represented (or, as indicated, their affiliates) in unrelated matters: the Walt

Disney Company and certain of its affiliates, with which a former officer is associated; and

Brentwood Associates, with which a current director is associated.

17.     **Equityholders.**  Skadden currently represents or has represented the

following entities (or, as indicated, their affiliates) listed among the equityholders of the Debtors

in matters unrelated to the Debtors or the Chapter 11 Cases: Invesco Ltd. and certain of its

7

affiliates; certain affiliates of Primecap Management Company; and T. Rowe Price Associates and certain of its affiliates.

18.    **Plan Sponsor:**  Skadden currently represents or has represented Oaktree Capital, the plan sponsor under the proposed Plan Sponsor Agreement.

19.    **Noteholders.**  Skadden currently represents or has represented the following institutions (or, as indicated, their affiliates) listed among the Debtors' noteholders (collectively, the "Noteholders") in matters unrelated to the Debtors or their Chapter 11 Cases: Alliance Bernstein L.P., and certain of its affiliates; certain affiliates of Allianz Global Investment of America LP; certain affiliates of Allianz SE; certain affiliates of Alps Advisors; certain affiliates of AXA; Bank of Montreal and certain of its affiliates; Deustche Bank and certain of its affiliates; INV Groep NV and certain of its affiliates; certain affiliates of Janus Capital Management; certain affiliates of Manulife Asset Management; Morgan Stanley Dean Witter Advisors, Inc., and its parent and certain of its affiliates; Permal Asset Management; certain affiliates of PIMCO Canada Corporation; the parent and certain affiliates of Prudential Retirement Insurance and Annuity; certain affiliates of SCOR Global Investments SE; Skandia Investment Management and certain of its affiliates; the parent and certain affiliates of Smith Barney Consulting Group; certain affiliates of Sun America Asset Management; certain affiliates of TD Asset Management; certain affiliates of Union Investment GMBH; and U.S. Bank, N.A.

20.    **Lenders.**  Skadden currently represents or has represented the following institutions (or, as indicated, their affiliates) listed among the Debtors' ABL lenders (collectively, the "Lenders") in matters unrelated to the Debtors or the Chapter 11 Cases: Bank of America, N.A. and certain of its affiliates; GE Capital Markets and certain of its affiliates;

General Electric Capital Corporation and certain of its affiliates; and Wells Fargo Bank, N.A. and certain of its affiliates.

21.    **Cash Management Bank.**  Skadden currently represents or has represented the following bank (or, as indicated, its affiliates) listed among the Debtors' financial institutions in matters unrelated to the Debtors or the Chapter 11 Cases: Bank of America, N.A. and certain of its affiliates.

22.    **Top Thirty Creditors.**  Skadden currently represents or has represented the following creditors (or, as indicated, their affiliates) listed among the Debtors' top thirty (30) creditors in matters unrelated to the Debtors or the Chapter 11 Cases: U.S. Bank, N.A.; the parent of CPG Partners, LP; and The Walt Disney Company, with which a former officer is affiliated.

23.    **Major Customers.**  Skadden currently represents or has represented the following entities (or, as indicated, their affiliates) listed among the Debtors' major customers in matters unrelated to the Debtors or the Chapter 11 Cases: Amazon; the parent and affiliate of Genesco; Macys; Ross Stores, Inc.; and a parent and affiliate of Shoe Carnival.

24.    **Major Vendors.**  Skadden currently represents or has represented the following entities (or, as indicated, their affiliates) listed among the Debtors' major vendors in matters unrelated to the Debtors or the Chapter 11 Cases: an affiliate of Adrem; an affiliate of Carmichael International Service; Federal Express Corporation; O'Melveny & Myers; certain affiliates of United States Customs and Border Protection; an affiliate of CCH Incorporated; Corporation Service Company and certain of its affiliates; Deloitte Tax LLP and certain of its affiliates; Duff & Phelps; and Thomson Reuters and certain of its affiliates.

25.     **Utility Providers.**  Skadden currently represents or has represented the following entities (or, as indicated, their affiliates) listed among the Debtors' major utility providers in matters unrelated to the Debtors or the Chapter 11 Cases: AT&T; certain affiliates of Brighthouse Network; an affiliate of Central Hudson Gas & Electric Corp; an affiliate of Consolidated Communications; certain affiliates of Consolidated Edison, Inc.; the parent of Constellation Energy Inc.; Duke Energy Corporation and certain of its affiliates; Florida Power & Light Company; NextEra Energy; certain affiliates of Gulf Power Company; Hawaiian Electric Industries and certain of its affiliates; certain affiliates of IESI NY Corporation; certain affiliates of Jersey Central Power & Light; Level 3 Communications; Los Angeles Department of Water; Nevada Power Company; New Jersey Natural Gas Company; an affiliate of Northwest Natural Gas Company; Orange & Rockland Utilities, Inc.; Orlando Utilities Commission; Pacific Gas & Electric Company and certain of its affiliates; PacifiCorp and certain of its affiliates; Paetec (Windstream Corporation) and certain of its affiliates; PG&E and its board of directors; certain affiliates of Premiere Global Services, Inc. (PGI); PSE&G and certain of its affiliates; certain affiliates of Questar Gas; certain affiliates of Republic Silver State Disposal Services; certain affiliates of Southern California Edison Co.; certain affiliates of Southwest Gas Corporation; Sprint; certain affiliates of Telecheck Services, Inc.; Time Warner Cable; T-Mobile; Verizon Communications and certain of its affiliates; Verizon New York and certain of its affiliates; and the parent and certain of its affiliates of Waste Management Inc. of Florida, Waste Management of California, and Waste Management of NW Florida.

26.     **Insurance Providers.**  Skadden currently represents or has represented the following entities (or, as indicated, their affiliates) listed among the Debtors' insurance providers in matters unrelated to the Debtors or the Chapter 11 Cases: affiliates of Ace American

10

Insurance Company; the parent and certain affiliates of Arthur J. Gallagher & Co. Insurance;

Computershare Technology Services; certain affiliates of Continental Casualty Company; certain

affiliates of Expeditors International; certain affiliates of Federal Insurance Company; certain

affiliates of Great Northern Insurance Company; certain affiliates of Lloyd's of London;

National Union Fire Insurance Company of Pittsburgh and certain of its affiliates; certain

affiliates of RSUI Indemnity Company; Starr and certain of its affiliates; certain affiliates of U.S.

Specialty Insurance Company; certain affiliates of Willis Insurance services and Willis of New

York; and certain affiliates of XL Insurance America, Inc.

27.    **Landlords.**  Skadden currently represents or has represented the following

creditors (or, as indicted, their affiliates) listed among the Debtors' landlords in matters unrelated

to the Debtors or the Chapter 11 Cases: the parent of CPG Partners, LP; the parent and certain

affiliates of Disneyland Resort; the parent of El Paso Outlet Center; certain affiliates of Florida

Mall Association Ltd.; the parent of Hilco Real Estate LLC; Ivanhoe Cambridge Inc. and certain

of its affiliates; Tanger Properties L.P. and certain of its affiliates; Taubman Realty Group LP;

The Irvine Company LLC; and the parent and certain affiliates of Universal Studios LLC.

28.    **Debtors' and Others' Professionals.**  Skadden currently represents or has

represented the following entities (or, as indicated, their affiliates) listed among the Debtors'

professionals or professionals retained in matters unrelated to the Debtors or the Chapter 11

Cases: certain affiliates of FTI Consulting; certain affiliates of Houlihan Lokey; Kirkland &

Ellis; Kurtzman Carson Consultants LLC ("KCC"); and Peter J. Solomon.  In addition, my

spouse is employed by KCC, which the Debtors have retained to perform chapter 11

administrative and noticing services in this case.  The Company's General Counsel office

negotiated KCC's services agreement directly with KCC and reviewed alternative proposals.

11

29.     **Possible Purchasers, Investors or Liquidators.**  Skadden currently represents or has represented the following potential purchasers, investors or liquidators: certain affiliates of Hilco Merchant Resources LLC; and certain affiliates of Gordon Brothers Retail Partners, LLC.

30.     **Litigation Parties.**  Skadden currently represents or has represented the following parties to or professionals or insurance companies engaged in litigation involving the Debtors (or, as indicated, their affiliates) in matters unrelated to the Debtors or the Chapter 11 Cases: certain affiliates of World Marketing Inc; certain affiliates of Live Nation Merchandise, Inc..

31.     **Local, State or Federal Authorities.**  Skadden currently represents or has represented the following local, state or federal authorities (or, as indicated, their affiliates) which tax or regulate the Debtors' operations or with which the Debtors are otherwise involved in matters unrelated to the Debtors or the Chapter 11 Cases: certain affiliates of California State Board of Equalization; certain affiliates of the City of Philadelphia; certain affiliates of the Colorado Department of Revenue; certain affiliates of the Comptroller of Maryland; City of Santa Monica; County of Santa Clara; certain affiliates of the Internal Revenue Service; certain affiliates of the State of California; certain affiliates of the New York State Comptroller; certain affiliates of the New York City Department of Finance; and certain affiliates of the State of New Jersey.

32.     **Judges and United States Trustees.**  I am not related, and, to the best of my knowledge, no attorney at the Firm is related, to any United States Bankruptcy Judge in the District of Delaware or to the United States Trustee for Region 3 or any person employed in the offices of the same.  I have served and am serving on committees of various insolvency

organizations with Judge Kevin J. Carey.  I have also served with Judge Mary F. Walrath on the Education Planning Committee for the 2015 National Conference of Bankruptcy Judges.  Certain Skadden attorneys have clerked for United States Bankruptcy Judges in the District of Delaware. Dain A. De Souza is an associate currently employed by the Firm in its Wilmington office, and he clerked for the Honorable Christopher S. Sontchi in 2011 – 2012.  In addition, Jane Leamy, a former associate in the Firm's corporate restructuring department, is currently a trial attorney at the U.S. Trustee's Office in Wilmington, Delaware (Region 3).

33.     **Prior Representations by Current Skadden Attorneys.**  Certain Skadden attorneys have in the past, prior to their employment by Skadden represented, or been employed by, certain parties in interest identified to date in these bankruptcy cases on matters unrelated to the Debtors and the Chapter 11 Cases.

34.     In addition, some of the Firm's professionals have assets managed by financial advisors or hold mutual funds which are managed by third party fund managers. Neither the Firm nor its professionals have any control over the investments in such funds, including investment purchases, sales and the timing of such activities.  Securities of the Debtors or potential parties in interest may be held through the foregoing investments.  In addition, certain professionals may hold securities of potential parties in interest or their affiliates in the ordinary course.  No employee of the Firm working directly on this engagement holds securities of the Debtors.

35.     Many of the Firm's representations of the above clients consist of representations in episodic transactional matters.  Skadden's representation of the above entities will not affect the Firm's representation of the Debtors in these cases.  Skadden does not presently represent the above entities in any matters adverse and/or related to the Debtors.

36.     For the twelve (12) month period ending August 31, 2015, no client of the Firm has accounted for more than 2.1% of the Firm's revenue.  During that same time period, no Firm client with any known connection to the Debtors has accounted for more than 1.5% of the Firm's revenue, and the Plan Sponsor accounted for less than 0.3% of such revenue.

37.     Except as otherwise set forth herein:

(a)     Neither Skadden nor any attorney at the Firm holds or represents an interest adverse to the Debtors' estates.

(b)     Neither Skadden nor any attorney at the Firm is or was a creditor or an insider of the Debtors, except that Skadden previously has rendered legal services to the Debtors for which it has been compensated as disclosed below.

(c)     Neither Skadden nor any attorney at the Firm is or was, within two (2) years before the Petition Date, a director, officer or employee of the Debtors.

(d)     Skadden does not have an interest materially adverse to the interest of the estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the Debtors specified in the foregoing paragraphs or for any other reason.

38.     In view of the foregoing, I believe that Skadden is a "disinterested person" within the meaning of Bankruptcy Code section 101(14), as modified by Bankruptcy Code section 1107(b).

39.     Skadden has instituted and is currently engaged in extensive further inquiry regarding the Debtors' constituencies through further inquiries of its partners, counsel and associates with respect to the matters contained herein, including the circulation of a special disinterestedness questionnaire to each of the approximately 1,530 partners, counsel, and associates in the Firm's numerous domestic and international offices.  Accordingly, certain Skadden attorneys may be related to, or have relationships with or other interests in, parties in interest, or members, employees or directors of parties in interest of which I am not yet aware.

14

Skadden will promptly file a supplemental declaration should the results of this inquiry or any further inquiries reveal material facts not disclosed herein. Skadden will continue to comply with its ongoing duty under the Bankruptcy Code to notify this Court if any actual conflict arises, and, if necessary, arrange for an "ethical wall" with respect to the Skadden attorney who worked on such matter.

40.     Pursuant to the Engagement Agreement, the Debtors waived certain non-disqualifying conflicts and agreed that Skadden may represent other present and future clients of Skadden on a basis adverse to the Debtors, including litigation, legal or other proceedings, so long as Skadden was not then and had not previously been engaged by the Company in the matter. However, during the pendency of the Chapter 11 Cases, Skadden will not represent present or future clients of Skadden on matters adverse to the Debtors in the Chapter 11 Cases. Moreover, in connection with the Chapter 11 Cases, to the extent any causes of action are commenced by or against a present or future client of Skadden and a waiver letter is not obtained permitting Skadden to participate in such action, the Debtors will obtain conflicts counsel to represent them in such action.

## PROFESSIONAL COMPENSATION

41.     Skadden will accept as compensation for its work during the Chapter 11 Cases such sums as may be allowed by this Court on the basis of the professional time spent, the rates charged for such services, the necessity of such services to the administration of the estates, the reasonableness of the time within which the services were performed in relation to the results achieved, and the complexity, importance and nature of the problems, issues or tasks addressed in the Chapter 11 Cases. Additionally, Skadden will seek compensation for all time and expenses associated with its retention as a section 327(a) professional, including the preparation

15

of the Application, this Declaration, and related documents, as well as any monthly fee statements and/or interim and final fee applications.

42.    Skadden has provided and will be providing professional services to the Debtors under its standard rate structure and pursuant to the terms of the Engagement Agreement, attached hereto, which includes a description of the Firm's standard rate structure. For 2015, the hourly rates under the Firm's standard rate structure range from $895 to $1,350 for partners, $885 to $995 for counsel, $380 to $870 for associates, and $200 to $350 for legal assistants. Skadden has informed the Debtors that it will continue to honor its courtesy discount, which Skadden has historically made to the Debtors, of 10% off the foregoing rates. Skadden has also informed the Debtors that it shall bill non-working travel time at half of the otherwise applicable hourly rate. Skadden has also advised the Debtors that the hourly rates set forth above are subject to periodic increases in the normal course of the Firm's business, often due to the increased experience of a particular professional. Skadden will provide notice of any rate increases to the Debtors, the United States Trustee, and the Court.

43.    Consistent with the Firm's policy with respect to its other clients, Skadden will continue to charge the Debtors for all other services provided and for other charges and disbursements incurred in the rendition of services. These charges and disbursements include, among other things, costs for telephone charges, photocopying, travel, business meals, computerized research, messengers, couriers, postage, witness fees, and other fees related to trials and hearings. Charges and disbursements are invoiced pursuant to Skadden's Policy Statement Concerning Charges and Disbursements Under Standard Bundled Rate Structure, attached hereto as Annex A-II to the Engagement Agreement.

16

44.     In connection with entry into the Engagement Agreement, the Debtors agreed that a retainer (the "Retainer") would be applied to Skadden's professional fees, charges, and disbursements.  The initial Retainer amount was $121,906.

45.     Except as otherwise noted herein, since July 2015, the Firm has provided the Debtors with (i) weekly invoices for professional fees and expenses, (ii) a reconciliation of the professional fees, charges, and disbursements that had accrued against the Retainer, (iii) the amount of any unapplied Retainer funds, and (iv) an estimate of the future week's fees, which would take the form of a further Retainer request.  In the event that the Firm's actual professional fees, charges, and disbursements exceeded its original estimate, the Firm's weekly invoice included a request for payment of such excess amount.

46.     As agreed to under the Engagement Agreement, the Firm began invoicing the Debtors twice per week once the Firm and Debtors identified a secure target filing date for these Chapter 11 Cases.  The Firm has provided the Debtors with its final, pre-filing invoice, which  included its best estimate for all professional fees, charges, and disbursements to the Petition Date, as well as a request for a retainer covering that amount.

47.     Since beginning this engagement in July 27, 2015, the total aggregate amount of fees earned and expenses incurred by Skadden on behalf of the Debtors, as identified and accounted for by Skadden as of the date hereof, was $1,821,285.44.  However, the Firm wrote off $54,412.44 from the total amount incurred.  During the same period, the Debtors paid Skadden an aggregate amount of $1,766,873.  As of September 7, 2015, the remaining Retainer amount was $0, subject to reconciliation of the final prepetition invoice, as described below.  The Debtors understand that Skadden's prepetition fees and expenses for the billing period immediately preceding the Petition Date may not have been fully accounted for as of the date

17

hereof.  Skadden anticipates that any such balance or deficiency remaining after application of the Retainer to such accrued and unpaid fees and expenses will be fairly minimal.  Skadden has informed the Debtors that as promptly as practicable after all fees and charges accrued prior to the Petition Date have finally been posted within the Firm's computerized billing system, Skadden will issue a final detailed billing statement for any unpaid fees, charges and disbursements for the period prior to the Petition Date (the "Final Prepetition Bill Amount").  Subject to any orders of the Court, Skadden will reconcile the Final Prepetition Bill Amount with the remaining Retainer to pay its prepetition invoices, which will consist primarily of fees and expenses incurred from the period immediately preceding the Petition Date.

48.     To the extent that reconciliation of the amount of the prepetition invoices (the "Reconciliation Amount") is less than the remaining Retainer, the Debtors and Skadden have agreed that Skadden will refund any unused portion or hold the full amount of the difference as a postpetition retainer to be applied against postpetition filing fees, at the Debtors' request.  In the event that the Final Prepetition Bill Amount exceeds the remaining Retainer, Skadden has agreed to waive any resulting prepetition claim against the Debtors for payment with respect to the amount by which the Reconciliation Amount exceeds the Retainer.

49.     Skadden has informed the Debtors that it intends to apply to this Court for allowance of compensation for professional services rendered and reimbursement of expenses incurred in the Chapter 11 Cases in accordance with Bankruptcy Code sections 330 and 331, with the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules, and with any other applicable procedures and orders of the Court.  Skadden has further informed the Debtors that it will seek compensation for the services of each attorney and paraprofessional

acting on behalf of the Debtors in these cases at the then-current bundled rate charged for such services on a non-bankruptcy matter.

50.    Skadden also intends to make every reasonable effort to comply with the United States Trustee's requests for additional information and disclosures as set forth in the Revised U.S. Trustee Fee Guidelines, in connection with this Application and subsequent applications for compensation and reimbursement of expenses in these Chapter 11 Cases.

51.    The following is provided in response to the request for additional information set forth in Part D.1. of the Revised U.S. Trustee Fee Guidelines:

**Question**:    Did you agree to any variations from, or alternatives to, your standard or customary billing arrangements for this engagement?

Response:    Yes.  Skadden shall bill non-working travel time at half of the otherwise applicable hourly rate, and Skadden will not continue to charge for disbursements that are not otherwise compensable under sections 330 and 331 of the Bankruptcy Code.

**Question**:    Do any of the professionals included in this engagement vary their rate based on the geographic location of the bankruptcy case?

Response:    No.

**Question**:    If you represented the client in the 12 months prepetition, disclose your billing rates and material financial terms for the prepetition engagement, including any adjustments during the 12 months prepetition.  If your billing rates and material financial terms have changed postpetition, explain the difference and the reasons for the difference.

Response:    Skadden has represented ZQK, one of the Debtors, since 2004.  The billing rates for the 12 month prepetition period were comparable.  However, during the prepetition period, we did charge for disbursements that are not otherwise compensable under 330 and 331 of the Bankruptcy Code.

**Question**:    Has your client approved your prospective budget and staffing plan, and, if so, for what budget period?

Response:    A budget and staffing plan for Skadden's legal services for the first 4 months of these Chapter 11 Cases has been approved by the Debtors.  In accordance with the Revised U.S. Trustee Fee Guidelines, the budget may

19

be amended as necessary to reflect changed circumstances or unanticipated developments.

52.     Skadden has agreed to accept as compensation such sums as may be allowed by the Court on the basis of the professional time spent, the rates charged for such services, the necessity of such services to the administration of the estate, the reasonableness of the time within which the services were performed in relation to the results achieved, and the complexity, importance and nature of the problems, issues, and tasks addressed in these cases.

53.     Other than as set forth above, no arrangement has been proposed between the Debtors and Skadden for compensation to be paid in these cases.  Skadden has informed the Debtors that Skadden has no agreement with any other entity to share any compensation received from the Debtors, either prepetition or postpetition, with any other entity, except as permitted under section 504(b)(1) of the Bankruptcy Code.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, information, and belief, and after reasonable inquiry, the foregoing is true and correct.

Dated:  September 9, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Van C. Durrer, II*
Van C. Durrer, II
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

# **EXHIBIT 1**

**Engagement Agreement**

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522

—

TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

FIRM/AFFILIATE OFFICES
—
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO

<u>CONFIDENTIAL</u>

As of July 27, 2015

0900100/35

Quiksilver, Inc.
15202 Graham Street
Huntington Beach, California  92649
Attn:  Ms. Linnsey Caya,
General Counsel

Dear Ms. Caya:

We are pleased that Quiksilver, Inc. and its affiliates (collectively, the "<u>Company</u>") has requested Skadden, Arps, Slate, Meagher & Flom LLP ("<u>Skadden Arps</u>" or the "<u>Firm</u>") to continue to represent the Company in connection with the engagement described below (the "<u>Engagement</u>").

### Scope of Engagement

As described to us, the Engagement involves representing the Company in its efforts to work out its present financial circumstances, which may include restructuring its financial affairs and capital structure through cases under title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), in addition to continuing to represent the Company on matters for which the Firm has been engaged by the Company not related to the Company's efforts to work out its present financial circumstances.  The services to be provided by the Firm in connection with the Engagement will encompass those legal services normally and reasonably associated with this type of engagement which the Firm has been requested and is able and has agreed to provide and which are consistent with its ethical obligations.

Ms. Linnsey Caya, General Counsel
As of July 27, 2015
Page 2

As usual, our Engagement is to represent the Company and not its individual directors, officers, employees or shareholders. However, we anticipate that in the course of the Engagement, we may provide information or advice to directors, officers or employees in their corporate capacities.

## Case Management and Coordination Between Co-Counsel

As we have discussed, it is likely that more than one law firm may be needed to assist in the services contemplated by the Engagement, particularly to represent the Company in connection with the numerous labor-intensive day-to-day tasks associated with, and the various potential contested matters or litigation in, a potential chapter 11 case. In addition to the retention of Skadden Arps, the Company will have discretion to allocate any aspect of the services contemplated by the Engagement to co-counsel, adjunct counsel, or special counsel (collectively, "Co-Counsel"), as the case may be. If court approval should not be available for all matters in a potential chapter 11 case that you wish us (and we agree) to undertake as your counsel, our representation would include as many of those matters as are approved. We are committed to working with the Company and in full cooperation with Co-Counsel to manage the contemplated services on a cost-efficient and productive basis. To the extent possible, given the nature and magnitude of this Engagement, steps have been taken and should continue to be taken by the Company to coordinate tasks and, when practical, to divide these tasks to avoid unnecessary duplication of effort between us and Co-Counsel.

## Engagement Personnel

Brian McCarthy and I will be responsible for and actively involved in the Engagement. Additional lawyers, including those in other practice areas such as Banking and Corporate, will be added to the Engagement on an as-needed basis. In this regard, we would anticipate using Kristine Dunn, David Kitchen, and Jonathan Ko.

## Fees and Expenses

Our fees will be based on the time involved in the Engagement and our internal time charges. The range of our current hourly time charges is $380 to $870 for associates, $885 to $995 for counsel, and $895 to $1,350 for partners. Our courtesy discount which we have historically made available to the Company of ten percent off those rates will continue to apply. Non-working travel time shall be billed at half of the otherwise applicable hourly rate. If they become involved in the Engagement, attorneys from other currency zones will charge time at their prevailing currency rate schedule. As part of the Firm's ordinary business practices, hourly time charges are periodically reviewed and revised.

As to billing, we will submit statements for services rendered for payment consistent with the procedures set forth below. In addition, our billing statements will include charges and disbursements incurred by us in the course of performing legal services. These

Ms. Linnsey Caya, General Counsel
As of July 27, 2015
Page 3

items will be billed in accordance with our standard practice as described in the attached
summary (see Annex A-II), which may be periodically updated.

During the course of this Engagement, we will bill you on a weekly basis.
Initially, we will request a retainer to be applied to our professional fees, charges and
disbursements. Every week, we will provide a reconciliation of the professional fees, charges
and disbursements that have accrued against such retainer, the amount of any unapplied retainer
as well as an estimate of the future week's fees which will take the form of a further retainer
request. To the extent necessary to comply with local laws, the retainer payment will be held in
an interest-bearing escrow account until it is applied against accrued fees, charges and
disbursements. In the event that our actual professional fees, charges and disbursements exceed
our original estimate, our weekly invoice will include a request for payment of such excess
amount. You have agreed to pay such weekly invoice promptly (*i.e.*, within a few days). Once
we have identified a secure target filing date for a chapter 11, we will invoice you twice per
week, and our final, pre-filing invoice will include an estimate and request for a retainer for all
professional fees, charges and disbursements to the filing date, to the best of our ability. To the
extent that any retainer amount exceeds our fees, charges and disbursements upon the filing of a
chapter 11 case, we will refund any unused portion or hold it for application against post-chapter
11 filing fees, at your request.

All references to fees, charges and disbursements are exclusive of any applicable
VAT, GST, sales, withholding or similar tax imposed by relevant tax authorities, and such VAT,
GST, sales, withholding or similar tax will be charged by us in addition to our fees, charges and
disbursements, as applicable, or paid directly by the Company where applicable.

If a dispute develops about our fees, you may be entitled under Part 137 of the
Rules of the Chief Administrator of the New York Courts to arbitration of that dispute if it
involves more than one thousand and less than fifty thousand dollars.

### Waivers and Related Matters

The Firm represents a broad base of clients on a variety of legal matters.
Accordingly, absent an effective conflicts waiver, conflicts of interest may arise that could
adversely affect your ability and the ability of other clients of the Firm to choose the Firm as its
counsel and preclude the Firm from representing you or other clients of our Firm in pending or
future matters. Given that possibility, we wish to be fair not only to you, but to our other clients
as well. Accordingly, this letter will confirm our mutual agreement that the Firm may represent
other present or future parties on matters other than those for which it had been or then is
engaged by the Company, whether or not on a basis adverse to the Company or any of its present
or future affiliates, including in litigation, legal or other proceedings or matters, which are
referred to as "Permitted Adverse Representation."

Ms. Linnsey Caya, General Counsel
As of July 27, 2015
Page 4

In furtherance of this mutual agreement, the Company agrees that it will not for itself or any other party assert the Firm's prior, current, or future representation of the Company or any of its present or future affiliates, either in its representation in the Engagement or in any other matter in which the Company retains the Firm, as a basis for disqualifying the Firm from representing another party in any Permitted Adverse Representation and agrees that any Permitted Adverse Representation does not constitute a breach of any duty owed by the Firm. Examples of Permitted Adverse Representation would include, without limitation, representing a client over which the Company might be seeking to acquire influence or control, or from which the Company may wish to buy assets, representing a client regarding its interest at the time in acquiring influence or control over an entity in which the Company then has a similar interest and representing a debtor or creditor client in a judicial proceeding under the Bankruptcy Code or similar legislation in a matter initiated by such client that is adverse to the Company. The waiver provided for in this and the preceding paragraph includes, without limitation, the Firm's ongoing representation of affiliates of Bank of America, Deutsche Bank, General Electric Capital Corporation, Oaktree Capital Management, and Wells Fargo in connection with various matters unrelated to the Engagement. The Company agrees that this paragraph and the preceding one do not expand the scope of the Engagement to encompass affiliates of the Company unless expressly agreed to by the Firm.

The Company and the Firm have reached the foregoing mutual agreements with knowledge of (i) the attached Rules of Professional Conduct (the "California Rules") (after full disclosure to the Company of the actual and reasonably foreseeable adverse effects) applicable to members of the State Bar of California and (ii) the Company's recognition that as a result of the Firm's representation of other present or future clients, one or more of the California Rules or other rules relating to the Firm's acting in these capacities may be applicable. It is the mutual agreement of the Firm and the Company that the Company consents to the Firm's representation of such other clients (subject to the limitation described above) and that it expressly waives any claim of conflict of interest or breach of duty on the part of the Firm arising from any such representation.

With respect to parties affiliated with the Company generally, including parties owned by the Company and parties that hold direct or indirect interests in the Company, it is our understanding that the Firm is not being asked to provide, and will not be providing, legal advice to, or establishing an attorney-client relationship with, any such affiliated party or person in their individual capacity and will not be expected to do so unless the Firm has been asked and has specifically agreed to do so. Further, it is our understanding that if the Firm acts as counsel for any other entity as to which the Company then owns completely, directly or indirectly, all of the common stock or similar voting interest (other than directors' qualifying shares, if any), the mutual agreement reflected in this letter, including the waivers, would apply to that entity as well. Upon our request, the Company will take any action the Firm concludes is needed to confirm the application of this letter to that entity or entities.

Ms. Linnsey Caya, General Counsel
As of July 27, 2015
Page 5

In the event the Company is acquired or is otherwise subject to a change in control (including by a person or group becoming a controlling affiliate of the Company) after the date hereof, the Firm will not be deemed (i) to represent, or provide or have provided legal advice to, the acquiring entity or such controlling affiliate (or, subject to clause (ii) below, to any affiliate of any such acquiring entity or controlling affiliate) or to establish an attorney-client relationship with such entities or affiliates and (ii) except as otherwise required by applicable law or at the election of the Firm, to continue to represent the Company or any of its controlled affiliates unless and until both the Company and the Firm reaffirm this letter. Notwithstanding any termination of the attorney-client relationship, the other provisions of this letter will continue in effect.

Our representation of the Company is premised on the Firm's adherence to its professional obligation not to disclose any confidential information or to use it for another party's benefit without the Company's consent. Such obligations are subject to certain exceptions, including the laws, rules and regulations of certain jurisdictions relating to money laundering and terrorist financing. Under relevant circumstances, the Firm may be under a duty to disclose information to relevant governmental authorities. The Firm may be prohibited from informing you that such a disclosure has been made or the reasons for such disclosure, and we may have to cease work for you for a period of time and not be able to inform you of the reason. Provided that the Firm acts in the manner set forth in the first sentence of this paragraph and subject to the exceptions noted above, the Company would not for itself or any other party assert that the Firm's possession of such confidential information, even though it may relate to a matter for which the Firm is representing another client or may be known to someone at the Firm working on the matter, (a) is a basis for disqualifying the Firm from representing another of its clients in any matter in which the Company or any other party has an interest; or (b) constitutes a breach of any duty owed by the Firm. In addition, the Firm's failure to share with the Company any confidential information received from another client will not be asserted by the Company as constituting a breach of any duty owed to the Company by the Firm, including any duty regarding information disclosure.

If the Firm receives from any person or entity a subpoena or request for information that is within our custody or control or the custody or control of our agents or representatives, we will, to the extent permitted by applicable law, advise the Company before responding so that the Company has the opportunity to intervene or interpose any objections. Should the Company object to the provision of such information, the Firm may thereafter provide such information only to the extent authorized by the Company or required by a court or other governmental body of competent jurisdiction. The Company agrees to pay the Firm for any services rendered and charges and disbursements incurred in responding to any such request at the Firm's customary billing rates and pursuant to the Firm's charges and disbursements policies.

Ms. Linnsey Caya, General Counsel
As of July 27, 2015
Page 6

The Company agrees that the Firm may disclose the fact of this Engagement and related general information to the extent that such disclosure does not convey any confidential or non-public information and it is not adverse to the Company's interests.

**Client Identification Procedures and Regulatory Compliance**

Many jurisdictions have adopted or are in the process of changing or creating anti-money laundering, counter-terrorist financing, embargo, trade sanctions or similar policies or laws. As part of the Firm's responsibility for compliance with such laws, rules, regulations or policies, the Firm is obliged to take detailed steps to verify the identity of our clients and sources of payment. Accordingly, prior to commencement of work on the Engagement we will have already requested, or will be requesting shortly, that you provide us with required identification documents. A delay or failure to provide information required for verification purposes may prevent us from commencing or require us to suspend work on the Engagement. It is also necessary for us to reserve the right to request additional information believed necessary, advisable or appropriate to verify identity and/or to ensure the Firm's compliance with applicable laws, rules, regulations, best practices and anti-money laundering matters from time to time.

**Data Transfer Consent**

Due to legal obligations applicable to the Firm or our affiliated offices, and to efficiently maintain information provided to us, the Firm may transfer some or all of any personal or other data and information ("Data") that the Company provides to the Firm to one or more of our affiliated offices in other countries that may not be subject to data protection laws similar to those prevailing in the jurisdiction in which such Data is first received by us. By signing this letter, you give us specific consent to obtain and transfer such Data, and confirm that you have obtained and grant us all required consents to allow the Firm to do so.

**Client Files and Retention**

In the course of our representation of you with respect to a matter, we shall maintain a physical file relating to the matter. In the file we may place materials received from you with respect to the matter and other materials, including correspondence, memos, filings, drafts, closing sets, pleadings, deposition transcripts, exhibits, physical evidence, expert's reports, and other items reasonably necessary to your representation (the "Client File"). The Client File shall be and will remain your property. We may also place in the file documents containing our attorney work product, mental impressions or notes, and drafts of documents ("Work Product"). You agree that Work Product shall be and remain our property. In addition, electronic records (except those to be proffered to you at the conclusion of a matter as described below) such as e-mail and documents prepared on our word processing system shall not be considered part of your Client File unless it has been printed in hard copy and placed in your physical file, and does not constitute Work Product. You agree that we may adopt and implement reasonable retention policies for such electronic records and that we may store or delete such records in our discretion.

Ms. Linnsey Caya, General Counsel
As of July 27, 2015
Page 7

At the conclusion of a matter (which shall be defined as the time that our work on any matter subject to this letter has been completed), you shall have the right to take possession of the original of your Client File (but not including the Work Product). We will be entitled to make physical or electronic copies if we choose. You also agree, upon our proffer, at the conclusion of a matter (whether or not you take possession of the Client File), to take possession of any and all original contracts, stock certificates, deeds and other such important documents or instruments that may be in the Client File, without regard to format, and we shall have no further responsibility with regard to such documents or instruments.[1]

If you do not take possession of the Client File at the conclusion of a matter, we will store such file in accordance with our standard retention procedures for a period of at least seven (7) years (the "Retention Period"). Such retention (or maintenance of accounting or other records related to our representation) shall not constitute or be deemed to indicate the presence of a continuing attorney-client relationship. During the time that we store the Client File, you shall have the right to take possession of it at any time that you choose. Subject to the foregoing, we may dispose of the Client File without further notice or obligation to you.[2]

## Indemnification

In connection with this Engagement, in the event that the Firm becomes involved in any capacity in any claim, suit, action, proceeding, dispute, investigation, or inquiry, whether actual or threatened (including, without limitation, any shareholder or derivative action or arbitration proceeding) (collectively, a "Proceeding"), in connection with any matter in any way relating to or referred to in this agreement or arising out of the matters contemplated by this agreement, including, without limitation, with respect to the payment of the Firm's fees and expenses under this agreement, the Company agrees to indemnify, defend, and hold the Firm harmless from and against any losses, claims, damages, liabilities, and expenses in connection with any matter in any way relating to or referred to in this agreement or arising out of such matters, except to the extent that it shall be determined by a court of competent jurisdiction in a judgment that has become final in that it is no longer subject to appeal or other review (1) that such losses, claims, damages, liabilities, and expenses resulted from the negligence or willful misconduct of the Firm or (2) with respect to any Proceeding with respect to the payment of the

---

[1]  If the client does not take possession of the Client File or original or other important documents, the Firm nonetheless has an ongoing obligation to maintain documents that either (i) the lawyer or the client is by law required to maintain, or (ii) the client would foreseeably need to establish substantial personal or property rights. (Such documents include client originals, original documents of significance and those documents which have intrinsic value or which themselves create or extinguish personal, property or legal rights or obligations, such as stocks, bonds, notes or deeds, judgments, settlements or negotiable instruments. Such documents shall be referred to as "Documents in Need of Salvaging" or "DINS.")

[2]  Such disposition would be subject to the preservation of any documents determined to be DINS.

Ms. Linnsey Caya, General Counsel
As of July 27, 2015
Page 8

Firm's fees and expenses under this agreement, that such fees and expenses were not reasonable. In addition, in the event that the Firm becomes involved in any capacity in any Proceeding in connection with any matter in any way relating to or referred to in this agreement or arising out of the matters contemplated by this agreement, the Company shall reimburse the Firm for any legal and other expenses (including, without limitation, the cost of any investigation and preparation) as such expenses are incurred by the Firm in connection therewith.

The Company's obligations under this agreement, including the Company's indemnification obligations (collectively, the "Indemnification Obligations"), shall be the joint and several obligations of the entities constituting the Company.  For purposes of the Indemnification Obligations, the Firm shall include the Firm, the Firm's affiliates, and their respective partners, counsel, associates, controlling persons, managers, employees, and agents, and the successors and assigns of all of the foregoing persons.  The Company shall not settle any Proceeding in respect of which indemnity may be sought under this agreement, whether or not the Firm is an actual or potential party to such Proceeding, without the Firm's prior express written consent.  The Company shall cause its successors and assigns to assume and honor, jointly and severally with the Company, all of the Company's obligations and liabilities under this agreement.  The Indemnification Obligations shall be in addition to any rights that any indemnified party may have at common law or otherwise.  Without limiting the foregoing, the Indemnification Obligations, include the Company's obligation to reimburse the Firm for any and all fees and expenses incurred in pursuing, defending, or otherwise addressing any fee application or other request for payment or reimbursement of fees and expenses in connection with this agreement.

The Company agrees that neither the Firm nor any of its current and former partners, controlling persons, managers, employees, or agents shall have any liability to the Company or any person asserting claims on behalf of or in right of the Company in connection with or as a result of either Firm's engagement under this agreement or any matter referred to or contemplated in this agreement, including, without limitation, related services and activities provided prior to this agreement, except to the extent that it shall be determined by a court of competent jurisdiction in a judgment that has become final in that it is no longer subject to appeal or other review that any losses, claims, damages, liabilities, or expenses incurred by the Company resulted from the negligence or willful misconduct of the Firm  in performing the services that are the subject of this agreement.

The Indemnification Obligations shall remain in full force and effect, and shall survive the termination, expiration, or supersession of this agreement.

Whenever the Company becomes a debtor in a case under the Bankruptcy Code (a "Bankruptcy Case" and, the bankruptcy court therein, the "Bankruptcy Court"), the Company shall use reasonable efforts to obtain a Bankruptcy Court order, in form and substance acceptable to the Firm, pursuant to section 328(a) of the Bankruptcy Code, approving the Firm's retention in

Ms. Linnsey Caya, General Counsel
As of July 27, 2015
Page 9

the Bankruptcy Case on the terms and conditions set forth in this agreement, including without
limitation, expressly approving the compensation and expense-reimbursement obligations, and
the Indemnification Obligations, owing to the Firm and others entitled to indemnification under
this agreement.

For the avoidance of doubt, as part of the compensation payable to the Firm, and
among the Indemnification Obligations, the Company agrees that the Firm shall be indemnified
and be entitled to payment from the Company's bankruptcy estates in the Bankruptcy Case for
any and all fees, costs, or expenses arising out of the successful defense of any fee application or
request by the Firm in the Bankruptcy Case in response to any objection or response to its fees or
expenses in the Bankruptcy Case, pursuant to section 328(a) of the Bankruptcy Code.

With respect to the Indemnification Obligations, the Company acknowledges and
agrees as follows:

(1)     the Company negotiated this agreement with the Firm at arm's length, and
the Indemnification Obligations were a critical component of the overall
deal embodied in this agreement;

(2)     payment of the Company's Indemnification obligations to the Firm are
actual, necessary expenses that shall be entitled to priority as
administrative expenses under sections 503(b)(1)(A) and 507(a)(2) of the
Bankruptcy Code in any Bankruptcy Case of the Company; and

(3)     the Indemnification Obligations are reasonable terms and conditions of
employment for counsel such as the Firm in connection with in-court and
out-of-court restructuring activities, and obligations similar to the
Indemnification Obligations are customary in engagements of financial
advisors and investment bankers in similar circumstances.

*     *     *

The provisions of this letter will continue in effect, including if the Firm's
representation of the Company was ended at your election (which, of course, the Company
would be free to do at any time) or by the Firm (which would be subject to ethical requirements).
In addition, the provisions of this Engagement Letter will apply to future engagements of the
Firm by the Company unless we mutually agree otherwise.

This agreement and any claim, controversy or dispute arising under or relating to
this agreement, the relationship of the parties, and/or the interpretation and enforcement of the
rights and duties of the parties shall be governed by, and construed in accordance with, the laws
of the State of New York.  For purposes of this letter, references to Skadden Arps or the Firm
include our affiliated law practice entities.

Ms. Linnsey Caya, General Counsel
As of July 27, 2015
Page 10

This letter supersedes all prior agreements between you and the Firm with respect to the subject matter of this letter, but shall not affect any prior or existing waivers by the Company.  If this letter is satisfactory, please sign a copy and return it to me.

Again, we very much appreciate the opportunity to work with the Company and look forward to doing so.

With best regards.

Very truly yours,

Van C. Durrer, II

Quiksilver, Inc., on behalf of itself and its subsidiaries

By:
    Name:  Linnsey Caya
    Title:  General Counsel

Dated:  As of July 27, 2015

Enclosures

## SKADDEN ARPS, SLATE, MEAGHER & FLOM LLP AND AFFILIATES
### Policy Statement Concerning Charges and Disbursements
### Under Standard Bundled Rate Structure
### Effective April 1, 2010

*Skadden Arps bills clients for reasonable charges and disbursements incurred in connection with an engagement. Clients are billed for disbursements based on the actual cost billed by the vendor or in a few cases noted below, at rates derived from internal cost analyses or at rates below or approximating comparable outside vendor charges.*

---

**I. Research Services.** Charges for LexisNexis and Westlaw are billed at rates calculated from an aggregate discounted amount charged to and paid by the Firm to LexisNexis and Westlaw; accordingly, clients are billed at levels below that which would be charged for individual usage on a particular engagement. Thomson Research services are charged based on client usage allocated from actual vendor charges. Charges for other outside research services are billed at the actual amounts charged by vendors.

The State of Delaware Database provides computer access to a corporations database in Dover, Delaware. The charge for this service is $50 per transaction, which is the average amount charged by outside services.

**II. Travel-Related Expenses.** Out-of-town travel expenses are billed at actual cost and include air or rail travel, lodging, car rental, taxi or car service, tips and other reasonable miscellaneous costs associated with travel. Corporate and/or negotiated discounted rates are passed on to the client. Specific Firm policies for expenditures relating to out-of-town travel include:

*Air Travel.* Coach class is the standard on most U.S. domestic flights. However, for flights with scheduled flight times longer than 5 hours and international flights business class is generally used.

*Lodging.* We strive to book overnight accommodations at hotels with which the Firm or the Client has preferred corporate rates.

Local travel charges include commercial transportation and, when a private car is used, mileage, tolls and parking. Specific policies govern how and when a client is charged for these expenses; these include:

Fares for commercial transportation (e.g., car service, taxi or rail) are charged at the actual vendor invoice amount. The charge for private car usage is the IRS rate allowance per mile (or the equivalent outside the United States) plus the actual cost of tolls and parking.

Round-trip transportation to the office is not charged separately for attorneys who work weekends or holidays, nor is transportation home on business days when an attorney works past a certain hour (typically 8:30 p.m.).

Local travel for support staff is not charged when a staff member works past a certain hour (typically 8:30 p.m).

**III. Word Processing and Secretarial and other Special Task-Related Services.** Routine secretarial tasks (correspondence, filing, travel and/or meeting arrangements, etc.) are not charged to clients. There is no separate charge for word processing and secretarial services associated with preparing legal documents.

Specialized tasks (such as EDGAR filings or legal assistant services) are recorded in the appropriate billing category (for example, legal assistant services are recorded as fees in "Legal Assistant Support" on bills).

**IV.  _Reproduction and Electronic Document Management._** *Photocopying services (including copying, collating, tabbing and velo binding) performed in-house are charged at 10 cents per page, which represents the average internal cost per page. Color photocopies are charged at 50 cents per page (based on outside vendor rates). Photocopying projects performed by outside vendors are billed at the actual invoice amount. Special arrangements can be made for unusually large projects.*

*Electronic Data Management services (e.g., scanning, OCR processing, data and image loading/exporting, CD/DVD creation, printing from scanned files, and conversions) performed by outside vendors are billed at the actual invoice amount and those performed in-house are billed at rates comparable to those charged by outside vendors.*

**V.  _Electronic Communications:_** *Clients are charged for communications services as follows:*

_Telephone Charges._ *There is no charge for local telephone calls or most long distance telephone calls. External telephone calls such as collect, cellular calls, credit card, hotel telephone charges and vendor-hosted conference calls are charged at the vendor rate plus applicable taxes and are assigned to the specific matter for which such charges were incurred.*
_Facsimile Charges._ *There is no charge for facsimile usage.*

**VI.  _Postage and Courier Services._** *Outside messenger and express carrier services are charged at the actual vendor invoice amount which frequently involves discounts negotiated by the Firm. Postage is charged at actual mail rates. On certain occasions, internal staff may be required to act as messengers in which case the staff's applicable hourly rate is charged.*

**VII . _UCC Filing and Searches._** *Charges for filings and searches, in most instances, are billed at the flat fee charged by the vendor. Unusual filings and searches will be charged based on vendor invoice.*

**VIII.  _Meals._** *Business meals are charged at actual cost. Luncheon and dinner meetings at the Firm are charged based on the costs developed by our food service vendor. Breakfast, beverage and snack services at the Firm's offices are not charged, except in unusual circumstances. Overtime meals are not charged separately to clients.*

**IX.  _Direct Payment by Clients of Other Disbursements._** *Other major disbursements incurred in connection with an engagement will be paid directly by the client. (Those which are incurred and paid by the Firm will be charged to the client at the actual vendor's invoice amount.) Examples of such major disbursements that clients will pay directly include:*

*Professional Fees (including disbursements for local counsel, accountants, witnesses, barristers and other professionals)*
*Filing/Court Fees (including disbursements for agency fees for filing documents, standard witness fees, juror fees)*
*Transcription Fees (including disbursements for outside transcribing agencies and courtroom stenographer transcripts)*
*Other Disbursements (including any other required out-of-pocket expenses incurred for the successful completion of a matter)*

\* \* \* \* \*

\*    *Fees incurred for attorney and Firm personnel in connection with the Engagement are not covered by this policy.*

ANNEX B

## *TO BE INCLUDED IN ENGAGEMENTS TO WHICH CALIFORNIA RULES APPLY*

Rule 3-310.   Avoiding the Representation of Adverse Interests

A.     . . .

B.     A member shall not accept or continue representation of a client without providing written disclosure to the client where:

(1)     The member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; or

(2)     The member knows or reasonably should know that:

(a)     the member previously had a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; and

(b)     the previous relationship would substantially affect the member's representation; or

(3)     The member has or had a legal, business, financial, professional, or personal relationship with another person or entity the member knows or reasonably should know would be affected substantially by resolution of the matter; or

(4)     The member has or had a legal, business, financial or professional interest in the subject matter of the representation.

C.     A member shall not, without the informed written consent of each client:

(1)     Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

(2)     Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

(3)     Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.

*D.*     . . .

E.     A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

F.    A member shall not accept compensation for representing a client from one other than the client unless:

(1)    There is no interference with the member's independence of professional judgment or with the client-lawyer relationship; and

(2)    Information relating to representation of the client is protected as required by Business and Professions Code section 6068, subdivision (e); and

(3)    The member obtains the client's informed written consent, provided that no disclosure or consent is required if:

(a) such nondisclosure is otherwise authorized by law, or

(b) the member is rendering legal services on behalf of any public agency which provides legal services to other public agencies or the public.

2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                              :    Chapter 11
                                                    :
QUIKSILVER, INC., *et al.*,                         :    Case No. 15-11880 (BLS)
                                                    :
                            Debtors.[1]             :    (Jointly Administered)
                                                    :
                                                    :
                                                    :    **Related Docket No. __**
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 327(a) AND 329,
BANKRUPTCY RULES 2014 AND 2016, AND LOCAL BANKRUPTCY RULES 2014-1
AND 2016-1 AUTHORIZING EMPLOYMENT AND RETENTION OF SKADDEN,
ARPS, SLATE, MEAGHER & FLOM LLP AND AFFILIATES AS BANKRUPTCY
COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION
EFFECTIVE AS OF THE PETITION DATE**

Upon the application (the "Application")[2] of the Debtors for entry of an order

(this "Order") authorizing the employment and retention of Skadden, Arps, Slate, Meagher &

Flom LLP and its affiliated law practice entities (collectively, "Skadden" or the "Firm") as the

Debtors' bankruptcy counsel, effective as of the Petition Date, under a general retainer; and upon

consideration of the Durrer Declaration; and the Court having reviewed the Application and the

Durrer Declaration; and the Court being satisfied with the representations made in the

Application and the Durrer Declaration that Skadden represents no interest adverse to the estates,

that it is a "disinterested person" as that term is defined under section 101(14) of the Bankruptcy

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
       Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc.
       (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505),
       Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors'
       corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]    Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the
       Application.

Code, and that its employment is necessary; and due and sufficient notice of the Application

having been given under the particular circumstances; and it appearing that no other or further

notice is necessary; and it appearing that the relief requested by the Application is in the best

interests of the Debtors, their estates, their creditors, and other parties in interest; and after due

deliberation thereon; and good and sufficient cause appearing therefor; it is hereby,

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Application is GRANTED as set forth herein.

2.      Pursuant to sections 327(a) and 329 of the Bankruptcy Code, the Debtors,

as debtors and debtors in possession, are authorized to employ and retain Skadden as their

bankruptcy counsel, effective as of the Petition Date, under a general retainer, in accordance with

the Application, the Engagement Agreement, the Durrer Declaration, and this Order, to perform

the services described therein.

3.      In connection with the Chapter 11 Cases, Skadden shall be compensated

for professional services rendered, and reimbursed for expenses incurred, in accordance with

Bankruptcy Code sections 330 and 331, the applicable provisions of the Bankruptcy Rules and

Local Bankruptcy Rules, and with any other applicable procedures and orders of this Court.

Skadden also intends to make a reasonable effort to comply with the U.S. Trustee's requests for

information and additional disclosures as set forth in Appendix B—Guidelines for Reviewing

Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by

Attorneys in Large Chapter 11 Cases, effective as of November 1, 2013 (the "Revised U.S.

Trustee Fee Guidelines"), both in connection with the Application and the interim and final fee

applications to be filed by Skadden in the Chapter 11 Cases.

4.      Skadden is authorized to apply any funds amounts presently held as a

retainer (the "Retainer") to pay any fees, charges, and disbursements relating to services

rendered to the Debtors prior to the Petition Date that remain unpaid as of such date (the "Final Prepetition Billed Amount").  Any Retainer remaining after such payment of the Final Prepetition Billed Amount shall be held by Skadden as a retainer to be applied against any postpetition filing fees in the Chapter 11 Cases or shall be returned to the Debtors, at the Debtors' request.  In the event that the remaining Retainer exceeds the unpaid portion of Skadden's Court-approved postpetition fees and expenses, Skadden shall remit such excess to the Debtors or their successors.

5.     Prior to any increases in Skadden's rates beyond the 2015 rates set forth in the Application, Skadden shall file a supplemental declaration with this Court and provide ten business days' notice to the Debtors, the United States Trustee, and any official committee appointed in these Chapter 11 Cases.  The supplemental declaration shall explain the basis for the requested rate increases in accordance with Bankruptcy Code section 330(a)(3)(F) and state whether the Debtors have consented to the rate increase.  The United States Trustee retains all rights to object to any rate increase on all grounds, including, but not limited to, the reasonableness standard provided for in Bankruptcy Code section 330, and this Court retains the right to review any rate increase, pursuant to Bankruptcy Code section 330.

6.     Notwithstanding anything to the contrary herein, the provisions of the Engagement Agreement regarding indemnification (see Engagement Agreement, p. 7—9) shall not be effective until further order of this Court, and the Debtors and the United States Trustee each reserve all rights and arguments regarding such provisions.  The Debtors may seek such further order following the completion of a meet-and-confer between the Debtors and the United States Trustee, which shall take place following the issuance of an opinion in any of the following bankruptcy cases pending in this jurisdiction: In re Boomerang Tube, LLC, Case No.

3

15-11247 (MFW) (Bankr. D. Del. June 9, 2015); In re F-Squared Investment Management, LLC,

Case No. 15-11469 (LSS) (Bankr. D. Del. July 8, 2015);  In re Northshore Mainland Services,

Inc., Case. No. 15-11402 (KJC) (Bankr. D. Del. June 29, 2015).

    7.  This Order shall be immediately effective and enforceable upon its entry.

To the extent that it may be applicable, the fourteen-day stay imposed by Bankruptcy Rule

6004(h) is hereby waived.

    8.  The Debtors are authorized and empowered to take all actions necessary to

implement the relief granted in this Order.

    9.  This Court shall retain jurisdiction with respect to all matters arising from

or related to the implementation, interpretation, or enforcement of this Order.


Dated: Wilmington, Delaware

   _____, 2015


      _____
      HONORABLE BRENDAN L. SHANNON
      CHIEF UNITED STATES BANKRUPTCY JUDGE