# **EXHIBIT 2**

*R&B Draft 9/9/15*

**SECOND AMENDED AND RESTATED AND SENIOR SECURED
SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of September _____, 2015

among

QS WHOLESALE, INC.
as the Lead Borrower,

QUIKSILVER, INC.
as Parent,

The Other Borrowers and Guarantors From Time to Time Party Hereto

BANK OF AMERICA, N.A. (including through its global branches and affiliates)
as Administrative Agent,

BANK OF AMERICA, NATIONAL ASSOCIATION
as Australian Security Trustee,

BANK OF AMERICA, N.A.
as Collateral Agent,

and

The Lenders Party Hereto

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,
as Lead Arranger

## TABLE OF CONTENTS

Section                                                                                               Page

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ............................................................... 4

1.01    Defined Terms ........................................................................................................ 4
1.02    Other Interpretive Provisions ............................................................................. 84
1.03    Accounting Terms ................................................................................................ 85
1.04    Rounding .............................................................................................................. 86
1.05    Times of Day ........................................................................................................ 86
1.06    Letter of Credit Amounts .................................................................................... 86
1.07    Certifications ....................................................................................................... 86
1.08    Exchange Rates; Currency Equivalents Generally ............................................. 86
1.09    Additional Alternative Currencies ...................................................................... 87
1.10    Change of Currency. ............................................................................................ 88
1.11    Québec Matters .................................................................................................... 88

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ................................................. 89

2.01    Committed Loans; Reserves. ............................................................................... 89
2.02    Committed Borrowings, Conversions and Continuations of Committed Loans ............... 90
2.03    Letters of Credit ................................................................................................... 93
2.04    [Reserved] .......................................................................................................... 102
2.05    Prepayments ....................................................................................................... 102
2.06    Termination or Reduction of Commitments; Reallocation of Commitments. ............... 105
2.07    Repayment of Loans. ......................................................................................... 106
2.08    Interest. .............................................................................................................. 106
2.09    Fees .................................................................................................................... 107
2.10    Computation of Interest and Fees ..................................................................... 107
2.11    Evidence of Debt. .............................................................................................. 108
2.12    Payments Generally; Administrative Agent's Clawback ................................. 109
2.13    Sharing of Payments by Lenders ...................................................................... 111
2.14    Settlement Amongst Lenders. ........................................................................... 112
2.15    [Reserved] .......................................................................................................... 112
2.16    [Reserved] .......................................................................................................... 112
2.17    Cash Collateral. ................................................................................................. 112
2.18    Certain Bankruptcy Matters. ............................................................................. 114
2.19    Defaulting Lenders. ........................................................................................... 115
2.20    CFC Payments .................................................................................................... 117

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT OF LEAD BORROWER ......... 118

3.01    Taxes. ................................................................................................................. 118
3.02    Illegality ............................................................................................................. 124
3.03    Inability to Determine Rates .............................................................................. 124
3.04    Increased Costs; Reserves on LIBO Rate Loans. .............................................. 125
3.05    Compensation for Losses ................................................................................... 127
3.06    Mitigation Obligations; Replacement of Lenders. ............................................ 127
3.07    Survival .............................................................................................................. 128

3.08    Designation of Lead Borrower as Borrowers' Agent.......................................................128

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ...........................................129

4.01    Conditions of Initial Credit Extension ...............................................................129
4.02    Conditions to all Credit Extensions .................................................................132

ARTICLE V REPRESENTATIONS AND WARRANTIES .............................................................134

5.01    Existence, Qualification and Power ..................................................................134
5.02    Authorization; No Contravention ....................................................................134
5.03    Governmental Authorization; Other Consents ...................................................134
5.04    Binding Effect............................................................................................135
5.05    Financial Statements; No Material Adverse Effect............................................135
5.06    Litigation..................................................................................................135
5.07    No Default ................................................................................................135
5.08    Ownership of Property; Liens.........................................................................136
5.09    Environmental Compliance. ...........................................................................136
5.10    Insurance .................................................................................................137
5.11    Taxes.......................................................................................................137
5.12    Plans. ......................................................................................................137
5.13    Subsidiaries; Equity Interests ........................................................................138
5.14    Margin Regulations; Investment Company Act...............................................139
5.15    Disclosure ................................................................................................140
5.16    Compliance with Laws .................................................................................140
5.17    Intellectual Property; Licenses, Etc. ...............................................................140
5.18    Labor Matters............................................................................................140
5.19    Security Documents.....................................................................................141
5.20    [Reserved].................................................................................................142
5.21    Deposit Accounts; Credit Card Arrangements...............................................142
5.22    Brokers.....................................................................................................143
5.23    Customer and Trade Relations .......................................................................143
5.24    Material Contracts.......................................................................................143
5.25    Casualty ...................................................................................................143
5.26    Anti-Social Forces .......................................................................................143
5.27    Tax Consolidation ......................................................................................145
5.28    Budget .....................................................................................................145
5.29    Commercial benefit .....................................................................................145
5.30    No Immunity ..............................................................................................145
5.31    Orders ......................................................................................................145

ARTICLE VI AFFIRMATIVE COVENANTS ...........................................................................145

6.01    Financial Statements ...................................................................................145
6.02    Certificates; Other Information ......................................................................147
6.03    Notices.....................................................................................................149
6.04    Payment of Obligations ...............................................................................151
6.05    Preservation of Existence, Etc. .....................................................................151
6.06    Maintenance of Properties............................................................................152
6.07    [Reserved]..................................................................................................152
6.08    Maintenance of Insurance.............................................................................152

6.09    Compliance with Laws ............................................................................... 153
6.10    Books and Records. .................................................................................. 153
6.11    Inspection Rights. ..................................................................................... 154
6.12    Use of Proceeds ....................................................................................... 155
6.13    Additional Loan Parties............................................................................ 155
6.14    Cash Management..................................................................................... 156
6.15    Information Regarding the Collateral........................................................ 158
6.16    Physical Inventories.................................................................................. 159
6.17    Environmental Laws. ................................................................................ 159
6.18    Further Assurances.................................................................................... 160
6.19    Maintenance of New York Process Agent. ............................................... 160
6.20    Material Contracts..................................................................................... 160
6.21    Canadian Pension Benefit Plans. .............................................................. 160
6.22    Use of Property; Rejection and Assumption of Contracts; Post-Filing Pleadings ........... 161
6.23    [Reserved]................................................................................................. 161
6.24    Additional Information Obligations........................................................... 161
6.25    Compliance with Terms of Leaseholds...................................................... 162
6.26    Plan of Reorganization. ............................................................................ 162

ARTICLE VII NEGATIVE COVENANTS.................................................................. 162

7.01    Liens; Retention of Title, Constructive Transfers . ................................... 163
7.02    Investments............................................................................................... 163
7.03    Indebtedness.............................................................................................. 163
7.04    Fundamental Changes................................................................................ 164
7.05    Dispositions .............................................................................................. 164
7.06    Restricted Payments.................................................................................. 164
7.07    Prepayments of Indebtedness.................................................................... 164
7.08    Change in Nature of Business.................................................................... 164
7.09    Transactions with Affiliates ...................................................................... 164
7.10    Burdensome Agreements........................................................................... 165
7.11    Use of Proceeds ........................................................................................ 165
7.12    Amendment of Material Documents. ........................................................ 165
7.13    Fiscal Year; Accounting Policies............................................................... 166
7.14    Deposit Accounts; Credit Card Processors. .............................................. 166
7.15    [Reserved]................................................................................................. 166
7.16    Limitation on the Creation of Subsidiaries ............................................... 166
7.17    Anti-Social Force...................................................................................... 166
7.18    Chapter 11 Claims..................................................................................... 167
7.19    Compliance with Budget ........................................................................... 167
7.20    Use of Collateral ....................................................................................... 167
7.21    Bankruptcy Related Negative Covenants. ................................................. 168

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES....................................... 169

8.01    Events of Default ...................................................................................... 169
8.02    Remedies Upon Event of Default .............................................................. 175
8.03    Application of Funds.................................................................................. 177
8.04    Waivers By Loan Parties ........................................................................... 180

ARTICLE IX AGENTS AND LENDERS......................................................................................181

9.01    Appointment and Authority. ..................................................................................181
9.02    Appointment of Australian Security Trustee by Foreign Credit Parties. .........182
9.03    Rights as a Lender................................................................................................187
9.04    Exculpatory Provisions.........................................................................................187
9.05    Reliance by Agents. .............................................................................................188
9.06    Delegation of Duties. ...........................................................................................189
9.07    Resignation of Agents..........................................................................................189
9.08    Non-Reliance on Agents and Other Lenders ......................................................190
9.09    No Other Duties, Etc............................................................................................190
9.10    Administrative Agent May File Proofs of Claim.................................................190
9.11    Collateral and Guaranty Matters..........................................................................191
9.12    Notice of Transfer.................................................................................................192
9.13    Reports and Financial Statements........................................................................192
9.14    Agency for Perfection. .........................................................................................193
9.15    Indemnification of Agents. ..................................................................................193
9.16    Relation among Lenders.......................................................................................194
9.17    Risk Participation. ................................................................................................194
9.18    Actions In Concert ...............................................................................................195
9.19    [Reserved]..............................................................................................................195

ARTICLE X MISCELLANEOUS ..............................................................................................195

10.01    Amendments, Etc. ..............................................................................................195
10.02    Notices; Effectiveness; Electronic Communications. ......................................197
10.03    No Waiver; Cumulative Remedies ....................................................................199
10.04    Expenses; Indemnity; Damage Waiver..............................................................199
10.05    Reinstatement; Payments Set Aside ..................................................................201
10.06    Successors and Assigns.......................................................................................202
10.07    [Reserved]...........................................................................................................206
10.08    Right of Setoff....................................................................................................206
10.09    Interest Rate Limitation ....................................................................................207
10.10    Counterparts; Integration; Effectiveness .........................................................207
10.11    Survival ..............................................................................................................207
10.12    Severability .........................................................................................................208
10.13    Replacement of Lenders.....................................................................................208
10.14    Governing Law; Jurisdiction; Etc......................................................................209
10.15    Waiver of Jury Trial ..........................................................................................210
10.16    No Advisory or Fiduciary Responsibility..........................................................210
10.17    USA PATRIOT Act Notice; Proceeds of Crime Act.........................................211
10.18    Foreign Asset Control Regulations ...................................................................211
10.19    [Reserved]...........................................................................................................212
10.20    Time of the Essence...........................................................................................212
10.21    Foreign Subsidiaries..........................................................................................212
10.22    Press Releases. ...................................................................................................212
10.23    Additional Waivers. ...........................................................................................212
10.24    Judgment Currency.............................................................................................215
10.25    No Strict Construction .......................................................................................215

10.26 Attachments ................................................................................................. 215
10.27 Conflict of Terms; Intercreditor Agreement................................................. 215
10.28 Electronic Execution of Assignments and Certain Other Documents ............................. 215
10.29 Obligations and Collateral of the Foreign Loan Parties.................................................. 216
10.30 Language......................................................................................................... 216
10.31 Keepwell. ....................................................................................................... 216
10.32 Amendment and Restatement....................................................................... 216
10.33 Money Lending Business Law......................................................................... 217

SIGNATURES......................................................................................S-Error! Bookmark not defined.

**SCHEDULES**

| | |
|---|---|
| 1.01 | Domestic Borrowers |
| 1.02(a) | Guarantors of Domestic Facilities |
| 1.02(b) | Guarantors of Foreign Facilities |
| 1.03 | Mandatory Cost Formulae |
| 1.04 | Existing Letters of Credit |
| 1.05 | Australasia Subsidiaries |
| 1.06 | Specified Account Debtors |
| 2.01 | Commitments and Applicable Percentages |
| 4.01(a)(x) | [Reserved] |
| 4.01(a)(xi) | [Reserved] |
| 5.01 | Loan Parties' Organizational Information |
| 5.05 | Material Indebtedness |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.10 | Insurance |
| 5.13 | Subsidiaries; Other Equity Investments |
| 5.18 | Collective Bargaining Agreements |
| 5.21(a) | Deposit Accounts |
| 5.21(b) | Credit Card Arrangements |
| 5.22 | Brokers |
| 5.24 | Material Contracts |
| 6.02 | Financial and Collateral Reporting |
| 6.14 | Japanese Loan Parties' Lessors |
| 7.01 | Existing Liens |

| 7.03 | Existing Indebtedness |
| 7.10 | Burdensome Agreements |
| 10.02 | Administrative Agent's Offices; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| A-1 | Domestic Committed Loan Notice |
| A-2 | Foreign Committed Loan Notice |
| B | [Reserved] |
| C | [Reserved] |
| D | [Reserved] |
| E-1 | Assignment and Assumption – Domestic Lenders |
| E-2 | Assignment and Assumption – Foreign Lenders |
| F-1 | Joinder Agreement – Domestic Loan Parties |
| F-2 | Joinder Agreement – Foreign Loan Parties |
| G-1 | Domestic Borrowing Base Certificate |
| G-2 | Canadian Borrowing Base Certificate |
| G-3 | Australian Borrowing Base Certificate |
| G-4 | Japanese Borrowing Base Certificate |
| H | [Reserved] |
| I | [Reserved] |
| J | [Reserved] |
| K | [Reserved] |
| L-1 | Domestic Guarantee |
| L-2 | Foreign Guarantee |
| M-1 – M-4 | U.S. Tax Compliance Certificates |

N       Initial Budget

O       [Reserved]

P       Interim Order

SECOND AMENDED AND RESTATED AND SENIOR SECURED
SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SECOND AMENDED AND RESTATED AND SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT is entered into as of September _____, 2015 among

QS WHOLESALE, INC., a California corporation (the "Lead Borrower");

the Persons named on Schedule 1.01 hereto (collectively, with the Lead Borrower and each other Person that from time to time becomes a "Domestic Borrower" hereunder, the "Domestic Borrowers");

QUIKSILVER CANADA CORP., a Nova Scotia unlimited liability company (the "Canadian Borrower");

UG MANUFACTURING CO. PTY LTD, a proprietary limited company organized under the laws of Australia (the "Australian Borrower");

QUIKSILVER JAPAN CO., LTD., a Japanese *Kabushiki Kaisha* (the "Japanese Borrower");

QUIKSILVER, INC., a Delaware corporation (the "Parent");

the Persons named on Schedules 1.02(a) and 1.02(b) hereto (collectively, with each other Person that from time to time becomes a "Guarantor" hereunder, the "Guarantors");

each lender from time to time party hereto;

BANK OF AMERICA, N.A., as Administrative Agent and L/C Issuer;

BANK OF AMERICA, NATIONAL ASSOCIATION, as Australian Security Trustee; and

BANK OF AMERICA, N.A., as Collateral Agent.

**PRELIMINARY STATEMENTS**

Certain of the Loan Parties, the Administrative Agent, the Collateral Agent and certain of the Lenders, among others, have entered into an Amended and Restated Credit Agreement dated as of May 24, 2013 (as amended from time to time and currently in effect immediately prior to the effectiveness of this Agreement, the "Existing ABL Credit Agreement").

On September [____], 2015 (the "Petition Date"), each of the Domestic Loan Parties (as defined herein, collectively, the "Debtors") filed a voluntary petition for relief (collectively, the "Cases") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are continuing in the possession of their assets and continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors and the other Loan Parties have requested that (a) the Lenders make available to the Domestic Borrowers, from and after the date of entry of the Interim Order (the "Interim Order

Date"), a senior secured, super-priority debtor-in-possession revolving credit facility and (b) that the terms of the Existing ABL Credit Agreement be amended and restated in their entirety, all on the terms and conditions set forth herein.

In furtherance of the foregoing, the Debtors and the other Loan Parties have also requested that (a) on the Interim Order Date (or within one Business Day thereafter), the Canadian Lenders and the Australian Lenders, respectively, shall make loans to each of the Canadian Borrower and the Australian Borrower in an amount equal to the principal balance of the Credit Extensions owed to General Electric Capital Corporation and Wells Fargo Bank, National Association and their respective Affiliates by each such Borrower as of the Petition Date, the proceeds of such loans shall be used to repay such lenders the aggregate amount of their respective Credit Extensions, in each case, upon the terms and subject to the conditions set forth herein.

To provide security for the repayment of all obligations of the Loan Parties hereunder and under the other Loan Documents, and in addition to all other all other property of any Loan Party that is subject to the Liens granted on the "Collateral" (as defined in the Existing ABL Credit Agreement) in favor of any Agent securing the Existing ABL Obligations (as defined herein) (such Liens, the "Existing ABL Liens"), each of the Debtors will provide to the Agent (for the benefit of the Credit Parties) the following (as more fully described herein):

(a)     pursuant to Section 364(c)(1) of the Bankruptcy Code and the Orders (as defined herein), as applicable, a DIP Superpriority Claim in the Cases and any Successor Cases (without the need to file a proof of claim) for all of the Obligations with priority over any and all administrative expense claims and unsecured claims of any entity against the Debtors or their estates, including, without limitation, any claims specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 or any other provisions of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative, subject only to Permitted Encumbrances (as defined herein) and the Carve-Out (as defined herein),

(b)     pursuant to Section 364(c)(2) of the Bankruptcy Code and the Orders, as applicable, an automatically perfected, valid, enforceable, unavoidable, and first-priority security interest and Lien on all Collateral and assets of the Borrower and the other Loan Parties of any kind (including, subject to the entry of the Final Order, the proceeds of Avoidance Actions), whether now existing or hereafter acquired that is not subject to a valid, perfected, and non-avoidable lien in existence on the Petition Date, which first-priority liens and security interests shall be perfected without necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents, subject only to Permitted Encumbrances and the Carve-Out,

(c)     pursuant to Section 364(c)(3) of the Bankruptcy Code and subject to clause (d) below, an automatically valid, enforceable, unavoidable and perfected Lien on the property of the Borrower and the other Loan Parties as more fully described herein subject to (i) unavoidable valid and perfected Liens in existence at the time of the commencement of the Cases, (ii) unavoidable valid Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (the Liens described in clause (i) above and this clause (ii), being "Existing Liens"), other than with respect to the Primed Liens (as defined herein), (iii) Permitted Encumbrances permitted to be entered into hereunder and (iv) the Carve-Out, and

(d)      pursuant to Section 364(d)(1) of the Bankruptcy Code and the Orders, as applicable, be secured by an automatically perfected, first priority, valid, enforceable, unavoidable and, senior, priming Lien on all the property of the Borrower and the other Loan Parties of any kind that secure obligations under the Existing Senior Secured Indenture and any Liens that are junior to such Liens, all of which existing Liens (the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first priority senior Liens to be granted to the Administrative Agent, which senior priming Liens in favor of the Administrative Agent shall also prime any Liens arising after the commencement of the Cases to provide adequate protection in respect of any Primed Liens, subject only to Priority Permitted Encumbrances and the Carve-Out.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby agree that the Existing ABL Credit Agreement shall be amended and restated in its entirety as follows (it being agreed that this Agreement shall not be deemed to evidence or result in a novation or repayment and reborrowing of the Obligations under, and as defined in, the Existing ABL Credit Agreement):

## ARTICLE I
### DEFINITIONS AND ACCOUNTING TERMS

**1.01**    **Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"7.875% Senior Secured Notes" means the 7-875% senior secured notes due 2018 issued by the Parent and guaranteed by certain of its Subsidiaries, pursuant to the Existing Senior Secured Indenture.

"Acceptable BOL" means with respect to In-Transit Inventory, a tangible, negotiable bill of lading that (i) is issued by a common carrier which is not an Affiliate of the applicable foreign vendor or North America Borrowing Base Party and which is in actual possession of such In-Transit Inventory or by an Eligible NVOCC; (ii) covers only such In-Transit Inventory; (iii) is issued to the order of a North America Borrowing Base Party or, while an Event of Default exists, if so requested by any Agent, to the order of the Administrative Agent; (iv) is subject to the first priority Lien of an Agent and no other Lien that is not a Permitted Encumbrance; and (v) an Agent has not notified the applicable North America Borrowing Base Party that such bill of lading is not in form and content reasonably acceptable to the applicable Agent.

"Acceptable Chief Restructuring Officer" means Stephen Coulombe of FTI Consulting or a replacement thereof acceptable to the Required Lenders.

"Accommodation Payment" has the meaning provided in Section 10.23(d).

"Account" means "accounts" as defined in the UCC, in the PPSA (or to the extent governed by the *Civil Code of Québec,* defined as "claims" for the purposes of the *Civil Code of Québec*) and in the Australian PPSA, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of

a credit or charge card or information contained on or for use with the card (including any claim against a credit card service provider), or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, province, territory, governmental unit of a state, province or territory, or person licensed or authorized to operate the game by a state, province, territory or governmental unit of a state, province or territory. The term "Account" includes health-care-insurance receivables.

"ACH" means automated clearing house transfers.

"Acquisition" means, with respect to any Person, (a) an Investment in, or a purchase of a Controlling interest in, the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, (c) any merger, amalgamation or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or a Controlling interest in the Equity Interests, of any Person, or (d) any acquisition of Store locations of any Person (which, for the avoidance of doubt, shall exclude leasehold improvements and Store buildouts) for which the aggregate consideration payable in connection with such acquisition is $500,000 or more in any single transaction or $1,000,000 or more in the aggregate during the Availability Period, in each case in any transaction or group of transactions which are part of a common plan.

"Adjusted LIBO Rate" means, with respect to any LIBO Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of one percent) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate. The Adjusted LIBO Rate will be adjusted automatically as to all LIBO Borrowings then outstanding as of the effective date of any change in the Statutory Reserve Rate.

"Administrative Agent" means Bank of America (including acting through its global branches and Affiliates, including, without limitation, its Canada branch and Hong Kong branch, as the context may require) in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means, with respect to any currency, the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02 with respect to such currency, or such other address or account with respect to such currency as the Administrative Agent may from time to time notify the Lead Borrower and the Lenders.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any other Person directly or indirectly holding 10% or more of any class of the Equity Interests of that Person, and (iii) any other Person 10% or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agent Parties" has the meaning specified in Section 10.02(c).

"Agent(s)" means, individually, the Administrative Agent, the Australian Security Trustee, or the Collateral Agent, and collectively means all of them.

"Aggregate Applicable Commitments" means, at any time of determination, the Aggregate Domestic Commitments, the Aggregate Australian Commitments, the Aggregate Canadian Commitments or the Aggregate Japanese Commitments, as the context may require.

"Aggregate Australian Commitments" means the Australian Commitments of all the Australian Lenders; provided that, after the initial Australian Loan to be made on the Effective Date, the Aggregate Australian Commitments shall be terminated.

"Aggregate Canadian Commitments" means the Canadian Commitments of all the Canadian Lenders; provided that, after the initial Canadian Loan to be made on the Effective Date, the Aggregate Canadian Commitments shall be terminated.

"Aggregate Domestic Commitments" means the Domestic Commitments of all the Domestic Lenders. As of the Effective Date, the Aggregate Domestic Commitments are $60,000,000.

"Aggregate Japanese Commitments" means the Japanese Commitments of all the Japanese Lenders; provided that, effective immediately on the Effective Date, the Aggregate Japanese Commitments shall be terminated.

"Aggregate Total Commitments" means, at any time of determination, the sum of the Aggregate Domestic Commitments, the Aggregate Australian Commitments, the Aggregate Canadian Commitments and the Aggregate Japanese Commitments; provided that, after the initial Canadian Loan to be made on the Effective Date, the Aggregate Total Commitments shall be equal to the Domestic Commitments at such time of determination.

"Agreement" means this Second Amended and Restated and Senior Secured Super-Priority Debtor-In-Possession Credit Agreement.

"Allocable Amount" has the meaning specified in Section 10.23(d).

"Alternative Currency" means each of Euro, Sterling, Yen, Canadian Dollars, Australian Dollars and each other currency (other than Dollars) that is approved in accordance with Section 1.09.

"Alternative Currency Equivalent" means, at any time, with respect to any amount denominated in Dollars, the equivalent amount thereof in the applicable Alternative Currency as determined by the Administrative Agent or the L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of such Alternative Currency with Dollars.

"Americas/Foreign Consolidated" means, when used to modify a financial term, test, statement, or report of the Parent, the application or preparation of such term, test, statement or report (as applicable) based upon the financial condition or operating results of the Americas/Foreign Subsidiaries, calculated or prepared (as the case may be) as if such entities were a consolidated group.

"Americas/Foreign Subsidiaries" means, collectively, the Americas Subsidiaries, the Australian Borrower and each Australasia Subsidiary and the Japanese Borrower and each Japanese Subsidiary.

"Americas Subsidiaries" means, collectively, (a) each direct or indirect Domestic Subsidiary of the Parent; (b) each Canadian Subsidiary; (c) Quiksilver Industria e Comercio de Artigos Esportivos Ltda.,

(d) Quiksilver Mexico, S. de R. L. de C.V. (e) Quiksilver Mexico Service, S. de R. L. de C.V., and (f) Consultoria en Ventas Gama, S. de R.L. de C.V.

"Anti-Social Force" has the meaning specified in Section 5.26.

"Applicable Commitment" means, as to any Lender, its Domestic Commitment, Australian Commitment, Canadian Commitment or Japanese Commitment, as the context may require.

"Applicable Foreign Borrowing Base" means, with respect to each Foreign Revolving Facility, the Canadian Borrowing Base, the Australian Borrowing Base, or the Japanese Borrowing Base applicable to such Foreign Revolving Facility.

"Applicable Foreign Loan Cap" means, with respect to each Foreign Revolving Facility, the Canadian Loan Cap, the Australian Loan Cap, or the Japanese Loan Cap applicable to such Foreign Revolving Facility.

"Applicable L/C Fee Rate" means, with respect to any Letters of Credit, at any time of calculation, a per annum rate equal to the Applicable Margin for Loans which are LIBO Rate Loans or BBR Rate Loans.

"Applicable Margin" means 3.50% per annum.

"Applicable Percentage" means (a) with respect to any Canadian Lender at any time, the percentage (carried out to the ninth decimal place) of the Canadian Loans of such Canadian Lender at such time, (b) with respect to any Domestic Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Domestic Commitments represented by the Domestic Commitment of such Domestic Lender at such time and the aggregate Domestic Loans of such Domestic Lender at such time, (c) with respect to any Australian Lender at any time, the percentage (carried out to the ninth decimal place) of the Australian Loans of such Australian Lender at such time, (d) with respect to any Japanese Lender at any time, the percentage (carried out to the ninth decimal place) of the Japanese Loans of such Japanese Lender at such time, and (e) where applicable to all Obligations (excluding Other Liabilities), for each Lender that percentage which the sum of its Commitments and Loans represents of the sum of the Aggregate Total Commitments and the total outstanding Loans at such time. As to each Lender, if the commitment of each Lender to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions has been terminated pursuant to Section 8.02 or if the Aggregate Total Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Time" means, with respect to any borrowings and payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be determined by the Administrative Agent or the L/C Issuer, as the case may be, to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"Appraisal Percentage" means (a) with respect to the Domestic Borrowers, seventy percent (70%), (b) with respect to the Canadian Borrower, ninety percent (90%) and (c) with respect to the Australian Borrower and the Japanese Borrower, eighty-five percent (85%).

"Appraised Value" means the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of the Borrowing Base Parties' Eligible Inventory as set forth in the Borrowing Base Parties' inventory stock ledger, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by any Agent.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) a Lender Affiliate of a Lender or (c) an entity or Lender Affiliate of an entity that administers or manages a Lender.

"Arranger" means Merrill Lynch, Pierce, Fenner & Smith Incorporated, in its capacity as lead arranger.

"Assignee Group" means two or more Eligible Assignees that are Lender Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit E-1 (Assignment and Assumption – Domestic Lenders) or Exhibit E-2 (Assignment and Assumption – Foreign Lenders), as applicable, or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, subject to the provisions of Section 1.03(a), (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation (other than any Capital Lease Obligation), the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Audited Financial Statements" means the audited Consolidated balance sheet of the Parent and its Subsidiaries for the Fiscal Year ended October 31, 2014, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year of the Parent and its Subsidiaries, including the notes thereto.

"Australasia Subsidiary" means the Subsidiaries of the Parent listed on Schedule 1.05 hereto and any other Subsidiary organized in Australia or New Zealand.

"Australian Availability" means, as of any date of determination thereof, the result, if a positive number, of:

(a)    the Australian Loan Cap,

minus

(b)    the Total Australian Outstandings on such date.

In calculating Australian Availability at any time and for any purpose under this Agreement any amount calculated or referenced in Dollars shall also refer to the Alternative Currency Equivalent (to the

extent such Alternative Currency is available to the Australian Borrower pursuant to Section 2.02(a)) for each such Alternative Currencies.

"Australian Bank Bill Rate" means, (a) the average bid rate (the "BBR Screen Rate") displayed at or about 10:30 a.m. (Melbourne time) on the first day of an Interest Period on the Reuters screen BBSY page for a term equivalent to the Interest Period, or (b) to the extent the BBR Screen Rate is not displayed for a term equivalent to such Interest Period, then the Australian Bank Bill Rate will be the rate determined by the Administrative Agent in good faith and notified by it to the Australian Borrower on or prior to the close of business on the first day of the relevant Interest Period to be the arithmetic mean (rounded upward to four decimal places) of the buying rates quoted by three reference banks at or about that time on that date and as notified by the Administrative Agent to the Australian Borrower at that time).

"Australian Base Rate" means the greater of (a) Australian "cash rate" as determined by the Australian Reserve Bank Board, being the rate at which Australian banks borrow from and lend to each other on an overnight, unsecured basis as reflected at : http://www.rba.gov.au/ or (b) the Australian Bank Bill Rate for an Interest Period of one month plus one percent (1.00%) per annum. Any change in the Australian Base Rate shall take effect at the opening of business on the day specified in the public announcement of such change.

"Australian Base Rate Loan" means a Loan that bears interest at the Australian Base Rate.

"Australian Borrower" has the meaning specified in the introductory paragraph hereto and shall include, as applicable, any Australian Subsidiary that becomes a Borrower after the Effective Date pursuant to Section 6.13(b).

"Australian Borrowing" means a Committed Australian Borrowing.

"Australian Borrowing Base" means, at any time of calculation, an amount in Australian Dollars (or the Dollar Equivalent thereof) equal to:

(a)     the face amount of Eligible Trade Receivables of the Australian Borrower (net of Receivables Reserves applicable thereto) multiplied by the Receivables Advance Rate;

plus

(b)     the Cost of Eligible Inventory (other than Eligible In-Transit Inventory) of the Australian Borrower, net of Inventory Reserves applicable thereto, multiplied by the Appraisal Percentage of the Appraised Value of Eligible Inventory (other than Eligible In-Transit Inventory) of the Australian Borrower;

minus

(c)     the then amount of all Availability Reserves applicable to the Australian Borrower.  In no event shall the amount of Availability Reserves subtracted in calculating the Australian Borrowing Base be duplicative of Availability Reserves subtracted in calculating any other Borrowing Base.

"Australian Commitments" means, as to each Australian Lender, its obligation to (a) to make a Committed Australian Loan to the Australian Borrower pursuant to Section 2.01(b), and (b) purchase participations in Australian L/C Obligations, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Australian Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Australian Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Australian Concentration Account" means the accounts maintained by the Australian Security Trustee in the name of the Australian Borrower at Bank of America, N.A. (Australia branch) into which cash receipts and collections of the Australian Loan Parties (including, without limitation, from the Collateral) are deposited to the extent required hereby or by any other Loan Document (it being understood that there are separate Australian Concentration Accounts for Australian Dollar deposits, New Zealand dollar deposits and Dollar deposits).

"Australian Credit Extensions" mean each of the following: (a) an Australian Borrowing and (b) an Australian L/C Credit Extension.

"Australian Credit Party" or "Australian Credit Parties" means (a) individually, (i) each Australian Lender and its Lender Affiliates, (ii) the Agents and their respective Lender Affiliates, (iii) each L/C Issuer of any Australian Letter of Credit, (iv) the Australian Security Trustee and its Lender Affiliates, and (v) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Australian Dollars" means the lawful currency of Australia.

"Australian Double Tax Treaty" means an 'international tax agreement' as defined in section 995-1 of the Income Tax Assessment Act 1997 (Cth).

"Australian Facility" means the revolving credit facility in favor of the Australian Borrower established pursuant to this Agreement.

"Australian L/C Borrowing" means an extension of credit resulting from a drawing under any Australian Letter of Credit which has not been reimbursed on or prior to the date required to be reimbursed by the Australian Borrower pursuant to Section 2.03(c)(i) or refinanced as a Committed Australian Borrowing.

"Australian L/C Obligations" means, as at any date of determination and without duplication, the aggregate Stated Amount of all outstanding Australian Letters of Credit plus the aggregate of all Unreimbursed Amounts under Australian Letters of Credit, including all Australian L/C Borrowings.

"Australian Lenders" means the Lenders having Australian Commitments from time to time or at any time.

"Australian Letter of Credit" means each Existing Letter of Credit issued for the account of the Australian Borrower.

"Australian Liabilities" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Australian Loan Party arising under any Loan Document or otherwise with respect to any Australian Loan or Australian

Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs and expenses that accrue after the commencement by or against any Australian Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, and (b) any Other Australian Liabilities.

"Australian Loan" means an extension of credit by a Australian Lender to the Australian Borrower under Article II in the form of a Committed Loan.

"Australian Loan Cap" means, at any time of determination, the lesser of (a) $_____$[1] reduced by any repayments of the Australian Liabilities, and (b) the Australian Borrowing Base.

"Australian Loan Parties" means, collectively, the Australian Borrower and each Australian Subsidiary that is a Guarantor of the Australian Liabilities.  "Australian Loan Party" means any one of such Persons.

"Australian Note" means a promissory note made by the Australian Borrower in favor of a Australian Lender evidencing Australian Loans made by such Australian Lender, in form and substance in satisfactory to the Administrative Agent and each applicable Lender.

"Australian Overadvance" means an Australian Credit Extension to the extent that, immediately after the making of such Australian Credit Extension, the aggregate principal balance of all Australian Credit Extensions then outstanding exceeds the Australian Loan Cap as then in effect.

"Australian Pension Plan" means a superannuation, retirement benefit or pension fund (whether established by deed or under any statute of Australia or any state or territory of Australia) contributed to by, or to which there is or may be an obligation to contribute by, any Loan Party in respect of its Australian employees and officers or former employees and officers.

"Australian PPS Law" means: (a) the Australian PPSA; (b) regulations made under the Australian PPSA as amended from time to time; or (c) any amendment made at any time to any other legislation as a consequence of an Australian PPSA Law referred to in clauses (a) and (b) of this definition, including, amendments to the Corporations Act.

"Australian PPSA" means the *Personal Property Securities Act 2009* (Cth) of Australia.

"Australian PPSR" has the meaning given to the term 'register' in the Australian PPSA.

"Australian Priority Payables Reserve" means, on any date of determination, a Reserve in such amount as any Agent from time to time determines in its Permitted Discretion as reflecting amounts

---

[1] To be inserted on the Effective Date by the Administrative Agent, reflecting the amount of Australian Liabilities outstanding on the Petition Date.

secured by any Liens, choate or inchoate, or any rights, whether imposed by applicable Law in Australia or elsewhere (and including rights to the payment or reimbursement of any costs, charges or other amounts in connection with any proceeding of the type described in Section 8.01(f)), which rank or are capable of ranking in priority to the Liens in favor of the Administrative Agent or the Australian Security Trustee of and/or for amounts which may represent costs relating to the enforcement of Administrative Agent's and/or the Australian Security Trustee's Liens including, without limitation, to the extent applicable by operation of law, any such amounts due or which may become due and not paid for wages, long service leave, retrenchment, payment in lieu of notice, or vacation pay (including in all respects amounts protected by or payable pursuant to the Fair Work Act 2009 (Cth)), any preferential claims as set out in the Corporations Act, amounts due or which may become due and not paid under any legislation relating to workers' compensation or to employment insurance, all amounts deducted or withheld and not paid and remitted when due under the Taxation Administration Act 1953 (Cth) (but excluding Pay as You Go income withholding tax) and amounts in the future, currently or past due and not contributed, remitted or paid in respect of any Australian Pension Plan, together with any charges which may be levied by a Governmental Authority as a result of any default in payment obligations in respect of any Australian Pension Plan.

"Australian Security Documents" means (a) the general security agreement dated on or about the date of this Agreement between the Australian Security Trustee and each Australian Loan Party; (b) each Blocked Account Agreement between the Australian Security Trustee, the Australian Borrower and a Blocked Account Bank; (c) the security trust deed dated on or prior to the date of this Agreement by and between, among others, the Australian Loan Parties and the Australian Security Trustee, (d) any other documents, incidental, collateral or supplementary to the security documents referred to in clauses (a) through and including (c) required by an Agent, including for purposes of payment of stamp duty and registration and any accession deed to the security trust deed referred to in clause (c), and (e) each other security agreement or other instrument or document executed and delivered by any Australian Loan Party to the Australian Security Trustee pursuant to this Agreement or any other Loan Document granting a Lien on assets of any Australian Loan Party for the benefit of the Credit Parties (other than the Domestic Credit Parties), as security for the Foreign Liabilities.

"Australian Security Trustee" means Bank of America, National Association or any successor security trustee appointed in accordance with this Agreement.

"Australian Subsidiary" means any Subsidiary that is organized under the laws of Australia or any province or territory thereof.

"Australian Treaty State" means a jurisdiction having an Australian Double Tax Treaty with Australia.

"Auto-Extension Letter of Credit" has the meaning specified in Section 2.03(b)(iii).

"Availability" means, at any time of determination, the Domestic Availability.

"Availability Period" means the period from and including the Effective Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Total Commitments pursuant to Section 2.06, and (c) the date of termination of the commitment of each Lender to make Loans and of the obligation of the L/C Issuer to make L/C Credit Extensions pursuant to Section 8.02.

"Availability Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as any Agent from time to time determines in its Permitted Discretion as reflecting (a) any impediments to any Agent's ability to realize upon the Collateral included in any Borrowing Base, (b) claims and liabilities that any Agent determines in its Permitted Discretion will need to be satisfied in connection with the realization upon the Collateral included in any Borrowing Base, (c) criteria, events, conditions, contingencies or risks which adversely affect any component of any Borrowing Base, or the assets, business, financial performance or financial condition of any Borrowing Base Party, or (d) that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, by way of example and not limitation, Availability Reserves may include (but are not limited to), in any Agent's Permitted Discretion, reserves based on, without duplication: (i) rent; (ii) customs duties, freight charges, taxes, tariffs insurance charges and other charges that may reasonably be expected to come due with respect to any Eligible In-Transit Inventory or any Inventory associated with any Eligible Letter of Credit and other costs associated with Inventory of any Borrowing Base Party which is being imported into the United States or Canada; (iii) outstanding Taxes and other governmental charges due and owing by any Borrowing Base Party but unpaid, including, without limitation, ad valorem, real estate, personal property, sales, goods and services, harmonized sales, claims of PBGC and other Governmental Authorities in respect of Plans and other Taxes due and owing by any Borrowing Base Party which may be subject to Liens that have priority over or are *pari passu* with the Liens of any Agent in the Collateral; (iv) salaries, wages, vacation pay and benefits due and owing to employees of any Loan Party but unpaid; (v) any Agent's estimate of Canadian Priority Payable Reserves; (vi) Customer Credit Liabilities; (vii) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals; (viii) unpaid warehousemen's or bailee's charges due and owing by any Borrowing Base Party relating to Inventory of any Borrowing Base Party and other Permitted Encumbrances which may have priority over or are *pari passu* with the Liens of any Agent in the Collateral; (ix) amounts due to vendors on account of consigned goods of any Borrowing Base Party; (x) Cash Management Reserves; (xi) Bank Products Reserves; (xii) Dilution Reserves, (xiii) any Agent's estimate of  the Australian Priority Payables Reserve, (xiv) any Agent's estimate of the Japanese Priority Payable Reserve, and (xv) any Agent's estimate of amounts owed with respect to an asset which is the subject of a conditional sale or hire purchase arrangement, Lien or retention of title arrangement.

"Avoidance Actions" means any causes of action under chapter 5 of the Bankruptcy Code.

"Bank of America" means Bank of America, N.A., a national banking association, its global branches and Affiliates, and its successors.

"Bank of Canada Overnight Rate" means, on any date of determination, the rate of interest charged by the Bank of Canada on one-day Canadian dollar loans to financial institutions, for such date.

"Bank Products" means any services or facilities provided to any Loan Party by the Administrative Agent, any Lender or any of their respective Lender Affiliates, excluding Credit Extensions and Cash Management Services but including, without limitation, on account of (a) Swap Contracts, (b) leasing, and (c) supply chain finance services, (including those described in a letter between Bank of America and the Loan Parties of even date but otherwise only to the extent that the applicable Loan Party and the Credit Party furnishing such services or facilities notify the Administrative Agent in writing that such services or facilities are to be deemed Bank Products hereunder).

"Bank Product Reserves" means such reserves as the Administrative Agent from time to time determines in its Permitted Discretion as being appropriate to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"Bankruptcy Code" means the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. § 101, et seq.), as amended.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Basel III" means:(a) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated; and (b) the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated.

"BBR Rate Loan" means a Committed Loan that bears interest at a rate based on the Australian Bank Bill Rate. BBR Rate Loans may be denominated in Dollars or in an Alternative Currency.

"Big Wave" means OCM Big Wave LLC, a Delaware limited liability company.

"Blocked Account" has the meaning provided in Section 6.14(a)(ii).

"Blocked Account Agreement" means, with respect to a Blocked Account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the applicable Agent, establishing control (as defined in the UCC, in the PPSA or in the Australian PPSA, as applicable) of such Blocked Account by the applicable Agent (for the benefit of itself and the other applicable Credit Parties) and whereby the bank maintaining such account agrees to comply only with the instructions originated by the applicable Agent without the further consent of any Loan Party.

"Blocked Account Bank" means Bank of America, N.A., Bank of America, N.A. (acting through its Canada branch), Commonwealth Bank of Australia, and each other bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Boardriders Notes" means the 8.875% senior unsecured notes due December 15, 2017 issued pursuant to the Boardriders Notes Indenture.

"Boardriders Notes Indenture" means that certain indenture dated December 15, 2010 among Boardriders S.A., a company incorporated pursuant to the laws of the Grand Duchy of Luxembourg, as issuer, the Borrower, as a guarantor thereunder, Deutsche Trustee Company Limited as trustee (or any successor trustee thereof) and certain other parties.

"Boardriders Notes Trustee" means Deutsche Trustee Company Limited (or any successor trustee).

"Boardriders Waiver" means the waiver and support agreements executed by certain holders of the Boardriders Notes.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowers" means, collectively, the Domestic Borrowers, the Australian Borrower, the Japanese Borrower and the Canadian Borrower.

"Borrowing" means a Committed Borrowing.

"Borrowing Base" means, as the context may require, the Domestic Borrowing Base or the Applicable Foreign Borrowing Base.

"Borrowing Notice" has the meaning set forth in Section 2.02(a).

"Budget" means the cash flow forecast attached hereto as Exhibit N, with such adjustments thereto as are approved in writing by the Required Lenders in their sole discretion (including, without limitation, the approval, if and when so granted, of a revised Budget proposed pursuant to Section 6.01(f)); provided, that in the event that the Borrower requests a Supplemental Term Loan (as defined in the DIP Term Agreement), the Budget shall be deemed to have been adjusted to incorporate the borrowing of such Supplemental Term Loan and the use of proceeds thereof

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibits G-1 through G-4 hereto (with such changes therein as may be required by any Agent to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as being accurate and complete in accordance with the terms of the Borrowing Base Certificate, by a Responsible Officer of the Lead Borrower or the Parent (with respect to the Domestic Borrowing Base) and the applicable Foreign Loan Party or the Parent (with respect to any Foreign Borrowing Base) which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested in advance by any Agent.

"Borrowing Base Parties" means, collectively, the Domestic Borrowers, the Australian Borrower, the Japanese Borrower and the Canadian Loan Parties, and, in the singular, any one of them.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office with respect to Obligations denominated in Dollars is located and:

(a)    if such day relates to any interest rate settings as to a LIBO Rate Loan denominated in Dollars, any fundings, disbursements, settlements and payments in Dollars in respect of any such LIBO Rate Loan, or any other dealings in Dollars to be carried out pursuant to this Agreement in respect of any such LIBO Rate Loan, means any such day that is also a London Banking Day;

(b)    if such day relates to any interest rate settings as to a LIBO Rate Loan denominated in Euro, any fundings, disbursements, settlements and payments in Euro in respect of any such LIBO Rate Loan, or any other dealings in Euro to be carried out pursuant to this Agreement in respect of any such LIBO Rate Loan, means a TARGET Day;

(c)    if such day relates to any interest rate settings as to a TIBOR Rate Loan, means any such day on which banks are open for business in Tokyo, Japan and Hong Kong;

(d)    if such day relates to any interest rate settings as to a LIBO Rate Loan denominated in a currency other than Dollars or Euro, means any such day on which dealings in deposits in the relevant currency are conducted by and between banks in the London or other applicable offshore interbank market for such currency; and

(e)    if such day relates to any fundings, disbursements, settlements and payments in a currency other than Dollars or Euro in respect of a LIBO Rate Loan denominated in a currency other than Dollars or Euro, or any other dealings in any currency other than Dollars or Euro to be carried out pursuant to this Agreement in respect of any such LIBO Rate Loan (other than any interest rate settings), means any such day on which banks are open for foreign exchange business in the principal financial center of the country of such currency.

When used in connection with any Loan to or Letter of Credit issued for the account of the Canadian Borrower, the term "Business Day" shall also exclude any day on which banks are authorized or required to be closed in Toronto, Ontario, Canada or New York, New York. When used in connection with any Loan to or Letter of Credit issued for the account of the Australian Borrower, the term "Business Day" shall also exclude any day on which banks are authorized or required to be closed in any of Sydney or Melbourne, Australia or Hong Kong. When used in connection with any Loan to or Letter of Credit issued for the account of the Japanese Borrower, the term "Business Day" shall also exclude any day on which banks are authorized or required to be closed in either Tokyo, Japan or Hong Kong.

For purposes of Section 6.14, "Business Day" shall be determined by the location where the DDAs and Blocked Account Banks are located.

"Canadian Availability" means, as of any date of determination thereof, the result, if a positive number, of:

(a)    the Canadian Loan Cap

minus

(b)    the Total Canadian Outstandings on such date.

In calculating Canadian Availability at any time and for any purpose under this Agreement any amount calculated or referenced in Dollars shall also refer to the Alternative Currency Equivalent in CD$.

"Canadian BA Rate" means, with respect to each Interest Period for a Canadian BA Rate Loan, the rate of interest per annum equal to the average rate applicable to Canadian Dollar bankers' acceptances having an identical or comparable term as the proposed Canadian BA Rate Loan displayed and identified as such on the display referred to as the "CDOR Page" (or any display substituted therefor) of Reuters Monitor Money Rates Service as at approximately 10:00 a.m. Toronto time on such day (or, if such day is not a Business Day, as of 10:00 a.m. Toronto time on the immediately preceding Business Day); provided that if such rate does not appear on the CDOR Page at such time on such date, the rate for such date will be the annual discount rate (rounded upward to the nearest whole multiple of 1/100 of 1%) as of 10:00 a.m. Toronto time on such day at which a Canadian chartered bank listed on Schedule 1 of the Bank Act (Canada) as selected by Administrative Agent is then offering to purchase

Canadian Dollar bankers' acceptances accepted by it having such specified term (or a term as closely as possible comparable to such specified term).

"Canadian BA Rate Loan" means any Canadian Loan in CD$ bearing interest at a rate determined by reference to the Canadian BA Rate in accordance with the provisions of Article II.

"Canadian Base Rate" means, for any day, a floating rate equal to the annual rate of interest determined by the Administrative Agent which is equal to the greatest of (a) the annual rate of interest announced from time to time by the Administrative Agent (acting through its Canada branch), as being its reference rate or "base rate" in effect on such date (or if such date is not a Business Day, on the Business Day immediately preceding such date) for determining interest rates on Dollar denominated commercial loans made by it in Canada, in each case regardless of whether such bank actually charges such rate of interest in connection with extensions of credit in Dollars to debtors, (b) the Federal Funds Rate for such day plus one-half of one percent (0.50%) and (c) the LIBOR Rate for a thirty (30) day interest period as determined on such day, plus 1.0%. Each change in any interest rate provided for in the Agreement based upon the Canadian Base Rate shall take effect at the time of such change in the Canadian Base Rate.

"Canadian Base Rate Loan" means a Loan or portion thereof made to the Canadian Borrower denominated in Dollars bearing interest at a rate based on the Canadian Base Rate.

"Canadian Borrower" has the meaning specified in the introductory paragraph hereto.

"Canadian Borrowing" means a Committed Canadian Borrowing.

"Canadian Borrowing Base" means, at any time of calculation, an amount in CD$ (or the Dollar Equivalent thereof, if applicable) equal to:

(a)     the face amount of Eligible Credit Card Receivables of the Canadian Loan Parties multiplied by the Credit Card Advance Rate;

plus

(b)     the face amount of Eligible Trade Receivables of the Canadian Loan Parties (net of Receivables Reserves applicable thereto) multiplied by the Receivables Advance Rate;

plus

(c)     the Cost of Eligible Inventory (other than Eligible In-Transit Inventory) of the Canadian Loan Parties, net of Inventory Reserves applicable thereto, multiplied by the Appraisal Percentage of the Appraised Value of Eligible Inventory (other than Eligible In-Transit Inventory) of the Canadian Loan Parties;

plus

(d)     the lesser of (i) $2,250,000 and (ii) the sum of (x) the Cost of Eligible In-Transit Inventory of the Canadian Loan Parties, net of Inventory Reserves applicable thereto, multiplied by the Appraisal Percentage of the Appraised Value of Eligible In-Transit Inventory of the Canadian Loan Parties, and (y) with respect to any Eligible Letter of Credit, the Appraisal

-17-

Percentage of the Appraised Value of the Inventory of the Canadian Loan Parties supported by such Eligible Letter of Credit, multiplied by the Cost of such Inventory of the Canadian Loan Parties when completed, net of applicable Reserves;

minus

(e)    the then amount of all Availability Reserves applicable to the Canadian Loan Parties. In no event shall the amount of Availability Reserves subtracted in calculating the Canadian Borrowing Base be duplicative of Availability Reserves subtracted in calculating any other Borrowing Base.

"Canadian Commitments" means, as to each Canadian Lender, its obligation to make a Committed Canadian Loan to the Canadian Borrower pursuant to Section 2.01(b), on or about the Effective Date, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Canadian Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Canadian Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Canadian Concentration Account" means the account maintained by the Administrative Agent at Bank of America (acting through its Canada branch) into which cash receipts and collections of the Canadian Loan Parties (including, without limitation, from the Collateral) are deposited to the extent required hereby or by any other Loan Document.

"Canadian Credit Extensions" means a Canadian Borrowing.

"Canadian Credit Party" or "Canadian Credit Parties" means (a) individually, (i) each Canadian Lender and its Lender Affiliates, (ii) the Agents and their respective Lender Affiliates and (iii) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Canadian Facility" means the revolving credit facility in favor of the Canadian Borrower established pursuant to this Agreement.

"Canadian Lenders" means the Lenders having Canadian Commitments from time to time or at any time (or if the Canadian Commitments have been terminated, the Lenders holding any Canadian Liabilities from time to time or at any time). Any Person may be a Canadian Lender only if it is a financial institution that is listed on Schedule I, II or III of the *Bank Act* (Canada) or is not a foreign bank for purposes of the *Bank Act* (Canada), and if such financial institution is not resident in Canada and is not deemed to be resident in Canada for purposes of the *Income Tax Act* (Canada), then such financial institution deals at arm's length with each Canadian Loan Party for purposes of the *Income Tax Act* (Canada).

"Canadian Liabilities" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Canadian Loan Party arising under any Loan Document or otherwise with respect to any Canadian Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs and expenses that accrue after the commencement by or against any Canadian Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, and (b) any Other Canadian Liabilities.

-18-

"Canadian Loan" means an extension of credit by a Canadian Lender to the Canadian Borrower under Article II in the form of a Committed Loan.

"Canadian Loan Cap" means, at any time of determination, the lesser of (a) $[____][2], reduced by any repayments of the Canadian Liabilities and (b) the Canadian Borrowing Base.

"Canadian Loan Parties" means, collectively, the Canadian Borrower and each Canadian Subsidiary that is a Guarantor of the Canadian Liabilities. "Canadian Loan Party" means any one of such Persons.

"Canadian Note" means a promissory note made by the Canadian Borrower in favor of a Canadian Lender evidencing Canadian Loans made by such Canadian Lender, in form and substance in satisfactory to the Administrative Agent and each applicable Lender in form and substance in satisfactory to the Administrative Agent and each applicable Lender.

"Canadian Overadvance" means a Canadian Credit Extension to the extent that, immediately after the making of such Canadian Credit Extension, the aggregate principal balance of all Canadian Credit Extensions then outstanding exceeds the Canadian Loan Cap as then in effect.

"Canadian Pension Plan" means an employee pension benefit plan or pension plan that is covered by the Laws of any jurisdiction in Canada including the *Pension Benefits Act* (Ontario) and the *Income Tax Act* (Canada) or subject to minimum funding standards and that is either (a) maintained or sponsored by any Canadian Loan Party or any Canadian Subsidiary for employees, (b) maintained pursuant to a collective bargaining agreement, or other arrangement under which more than one employer makes contributions and to which any Canadian Loan Party or any Canadian Subsidiary is making or accruing an obligation to make contributions or has within the preceding five years made or accrued such contributions or (c) any other plan with respect to which any Canadian Loan Party has incurred or may incur liability, including contingent liability either to such plan or to any Person, administration or Governmental Authority, including the FSCO. "Canadian Pension Plan" shall not include the group registered retirement savings plan in which the employees of any Canadian Loan Party or any Canadian Subsidiary participate and which is not subject to any pension benefits standards legislation or the registered pension plan provisions of the *Income Tax Act* (Canada).

"Canadian Prime Rate" means the per annum rate of interest equal to the greatest of (a) the rate of interest in effect for such day or so designated from time to time by Bank of America (acting through its Canada branch) as its "prime rate" for commercial loans made by it in Canada in Canadian Dollars, such rate being a reference rate and not necessarily representing the lowest or best rate being charged to any customer; (b) the Bank of Canada Overnight Rate for such day, plus 0.50%; or (c) the Canadian BA Rate for a 30-day interest period as determined on such day plus 1.00%. Any change in such rate announced by Bank of America (acting through its Canada branch) shall take effect at the opening of business on the day specified in the public announcement thereof. Each interest rate based

---

[2] To be inserted on the Effective Date by the Administrative Agent, reflecting the amount of Canadian Liabilities outstanding on the Petition Date.

on the Canadian Prime Rate hereunder, shall be adjusted simultaneously with any change in the Canadian Prime Rate.

"Canadian Prime Rate Loan" means a Loan that bears interest based on the Canadian Prime Rate.

"Canadian Priority Payable Reserves" means, without duplication of any other Reserves with respect to the Canadian Loan Parties, such reserves as the Collateral Agent or the Administrative Agent from time to time determines in its Permitted Discretion as being appropriate to reflect any obligations, liabilities and indebtedness at such time which have, or would in any proceeding have, a trust, deemed trust, right of garnishment, right of distress, charge or statutory Lien imposed to provide for payment or Liens ranking or capable of ranking senior to or *pari passu* with Liens securing the Canadian Liabilities on any of the Collateral under federal, provincial, state, county, territorial, municipal, or local law including, to the extent that there is such a trust, statutory Liens or Liens in respect of the specified item that has or is capable of having such rank, claims for unremitted and accelerated rents, utilities, taxes (including goods and services tax, provincial sales taxes, and harmonized sales taxes ("HST"), value added taxes, amounts deducted or withheld or not paid and remitted when due under the *Income Tax Act* (Canada), excise taxes, and taxes payable pursuant to Part IX of the *Excise Tax Act* (Canada) or similar provincial or territorial Law), the claims of a clerk, servant, travelling salesperson, labourer or worker (whether full-time or part-time) who is owed wages (including any amounts protected by the *Wage Earner Protection Program Act* (Canada)), salaries, commissions, disbursements, compensation or other amounts (such as union dues payable on behalf of employees) by the Canadian Loan Parties (but only to the extent that the claims of such parties may rank or be capable of ranking senior to or pari passu with Liens securing the Foreign Liabilities on any of the Collateral), vacation pay, severance pay, employee source deductions, workers' compensation obligations, government royalties or pension fund obligations (including claims of the FSCO and all amounts currently or past due and not contributed, remitted or paid to any Canadian Pension Plan, the Canada Pension Plan or under the *Pension Benefits Act* (Ontario) or any similar Law) (but only to the extent ranking or capable of ranking senior to or *pari passu* with Liens securing the Foreign Liabilities on any of the Collateral), together with the aggregate value, determined in accordance with GAAP, of all Eligible Inventory which may be or may become subject to a right of a supplier to recover possession thereof or to exercise rights of revendication with respect thereto under any federal, provincial, state, county, municipal, territorial or local law, where such supplier's right may have priority over Liens securing the Foreign Liabilities including Eligible Inventory subject to a right of a supplier to repossess goods pursuant to Section 81.1 of the *Bankruptcy and Insolvency Act* (Canada) or the Civil Code of Quebec, and amounts currently or past due and owing by any Canadian Loan Party and not paid for realty, municipal or similar Taxes (to the extent impacting personal property).

"Canadian Security Documents" means each General Security Agreement, Deed of Hypothec and each other security agreement or other instrument or document executed and delivered by any Canadian Loan Party to the Administrative Agent pursuant to this Agreement or any other Loan Document granting a Lien on assets of any Canadian Loan Party for the benefit of the Canadian Credit Parties, as security for the Foreign Liabilities.

"Canadian Subsidiary" means any Subsidiary that is organized under the laws of Canada or any province or territory thereof.

"Capital Expenditures" means, without duplication and with respect to any Person for any period, all expenditures made (whether made in the form of cash or other property) or costs incurred for the acquisition or improvement of fixed or capital assets of such Person (excluding normal replacements and maintenance which are properly charged to current operations), in each case that are (or should be) capitalized on the balance sheet of such Person under GAAP, but excluding Capital Lease Obligations incurred by a Person during such period.  For purposes of this definition, the purchase price of Equipment that is purchased substantially contemporaneously with the trade-in or sale of similar Equipment or with insurance proceeds therefrom shall be included in Capital Expenditures only to the extent of the gross amount by which such purchase price exceeds the credit granted to such Person for the Equipment being traded in by the seller of such new Equipment, the proceeds of such sale or the amount of the insurance proceeds, as the case may be.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Collateral Account" means an account established by one or more of the Loan Parties with the Administrative Agent, for its own benefit and the benefit of the other Credit Parties, at Bank of America under the sole and exclusive dominion and control of the Administrative Agent, in the name of the Administrative Agent or as the Administrative Agent shall otherwise direct, in which deposits are required to be made by the applicable Borrowers in respect of the L/C Obligations in accordance with Section 2.17 or Section 8.02(c).

"Cash Collateralize" means to deposit in a Cash Collateral Account or to pledge and deposit with or deliver to the Administrative Agent, for the benefit of one or more of the Administrative Agent, the L/C Issuer or any applicable Lenders, as collateral for any applicable L/C Obligations or obligations of the Lenders to fund participations in respect thereof (as the context may require), cash or deposit account balances or, if the Administrative Agent and the L/C Issuer shall agree in their sole discretion, other credit support, in each case pursuant to documentation in form and substance satisfactory to the Administrative Agent and the L/C Issuer. "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"Carve-Out" means, collectively:  (i) all unpaid fees required to be paid by the debtors to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (ii) all reasonable and documented fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iii) to the extent allowed at any time (whether by interim order, procedural order, or otherwise), all accrued and unpaid fees, disbursements, costs, and expenses incurred by any professionals or professional firms retained by the Domestic Borrowers or the Committee at any time before or on the first business day following delivery by the Administrative Agent (or the Required Lenders, where applicable) or the DIP Term Agent of a Carve-Out Trigger Notice, whether such fees, disbursements, costs, and expenses are allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) after the first business day following delivery by the Administrative Agent (or the Required Lenders, where applicable) or the DIP Term Agent of a Carve-Out Trigger Notice, to the extent allowed at any time (whether by interim order, procedural order, or otherwise), all unpaid fees,

disbursements, costs, and expenses incurred by professionals or professional firms retained by any Domestic Borrower or any Committee in an aggregate amount not to exceed the Post-Carve-Out Trigger Notice Cap.

"Carve-Out Reserve" means, at any time of determination, a Reserve equal to the most recently delivered Reported Fee Accruals plus $1,000,000.

"Carve-Out Trigger Notice" means a written notice delivered by the Administrative Agent or the Required Lenders (which delivery may be made by any electronic method of transmission) to the Borrower and its counsel, the United States Trustee, and lead counsel to any Committee, which notice may be delivered following the occurrence and continuance of an Event of Default, and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

"Cash Equivalent" means an Investment of any type specified in clauses (a) through (h) in the definition below of the term "Permitted Investment".

"Cash Management Order" means an order of the Bankruptcy Court, in form and substance acceptable to the Required Lenders, (i) approving and authorizing the Loan Parties to use existing cash management system, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing continued use of intercompany transactions, (iv) waiving requirements of Section 345(b) of the Bankruptcy Code and (v) authorizing the Loan Parties to use existing bank accounts and existing business forms.

"Cash Management Reserves " means such reserves as the Administrative Agent, from time to time, determines in its Permitted Discretion as being appropriate to reflect the reasonably anticipated liabilities of the Loan Parties with respect to Cash Management Services then provided or outstanding.

"Cash Management Services" means any cash management services or facilities provided to any Loan Party by the Administrative Agent or any Lender or any of their respective Lender Affiliates, including, without limitation: (a) ACH transactions, (b) controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) foreign exchange facilities, (d) credit card processing services, (e) purchase cards and (f) credit or debit card products.

"CD$" or "Canadian Dollars" means lawful money of Canada.

"Cases" has the meaning set forth in the recitals to this Agreement.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CFC" means (a) a Subsidiary that is a controlled foreign corporation under Section 957 of the Code, (b) a Subsidiary substantially all of whose assets consist of Equity Interests in Subsidiaries described in clause (a) of this definition, or (c) a Subsidiary treated as disregarded for United States federal income tax purposes that owns more than 65% of the voting Equity Interests of a Subsidiary described in clauses (a) or (b) of this definition.

"Champs-Élysées Lease" means the lease agreement for the Store located at 30-32 Av. des Champs-Élysées, 75008 Paris.

"Change in Law" means the occurrence, after the date of this Agreement, (or with respect to any Lender, if later, the date upon which such Person becomes a Lender) of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority, requiring compliance by any Credit Party (or any lending office of such Credit Party or by such Credit Party's holding company, if any); provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.  A Change in Law shall not include the application or effect of any regulations promulgated and any interpretation or other guidance issued in connection with Sections 1471 or 1472 of the Code.

"Change of Control" means an event or series of events by which:

(a)     any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding (i) any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan and (ii) Rhône Capital L.P. and its Affiliates) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of 35% or more of the Equity Interests of the Parent entitled to vote for members of the board of directors or equivalent governing body of the Parent on a fully-diluted basis (and taking into account all such Equity Interests that such "person" or "group" has the right to acquire pursuant to any option right); or

(b)     during any period of twelve (12) consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Parent cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or

(c)     any "change in control" as defined in any document governing Material Indebtedness of any Loan Party; or

(d)     the Parent fails at any time to own, directly or indirectly, 100% of the Equity Interests of each other Loan Party free and clear of all Liens (other than (i) the Liens in favor of any Agent under the Security Documents, and (ii) the DIP Term Agent and the DIP Term Lender under the DIP Term Documents to the extent permitted pursuant to clause (n) of the definition

of "Permitted Encumbrances" and (iii) the Existing Senior Secured Note Liens to the extent permitted pursuant to clause (p) of the definition of "Permitted Encumbrances").

"Collateral Agent" means Bank of America, acting in its capacity as collateral agent, for its own benefit and the benefit of the other Credit Parties, or any successor collateral agent.

"Chief Restructuring Officer" has the meaning set forth in Section 4.01(b).

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, each as amended from time to time.

"Collateral" means any and all "Collateral" as defined in any applicable Security Document and all other property of any Loan Party that is or is intended under the terms of the Security Documents to be subject to Liens in favor of any Agent (for the benefit of itself and the other Credit Parties).

"Collateral Access Agreement" means an agreement in form and substance in satisfactory to the Agents, executed by (a) a bailee or other Person in possession of Collateral, or (b) a landlord of Real Estate leased by any Loan Party, in each case, pursuant to which such landlord, bailee or other Person (i) other than with respect to the Australian Loan Parties, acknowledges the Lien granted to the applicable Agent on the Collateral, (ii) other than with respect to the Australian Loan Parties and the Japanese Loan Parties, releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) provides the applicable Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, and (iv) as to any landlord (x) provides the applicable Agent with access to the Collateral located in or on such Real Estate and a reasonable time to sell and dispose of the Collateral from such Real Estate, and (y) other than with respect to the Australian Loan Parties and the Japanese Loan Parties, agrees to give the applicable Agent reasonable prior notice before terminating the lease covering such Real Estate and an opportunity to cure any default of the applicable tenant if the applicable Agent so elects.

"Commercial Letter of Credit" means any letter of credit or similar instrument (including, without limitation, bankers' acceptances) issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Loan Party in the ordinary course of business of such Loan Party.

"Commitment" means, as to each Lender, its Domestic Commitment, its Canadian Commitment, its Australian Commitment and its Japanese Commitment.

"Commitment Fee" has the meaning set forth in Section 2.09.

"Committed Australian Borrowing" means a borrowing consisting of simultaneous Committed Australian Loans of the same Type, in the same currency and, in the case of BBR Rate Loans or LIBO Rate Loans, having the same Interest Period made by each of the Australian Lenders pursuant to Section 2.01.

"Committed Australian Loan" means any loan at any time made by any Australian Lender pursuant to Section 2.01.

"Committed Borrowing" means, as the context may require, each Committed Canadian Borrowing, each Committed Domestic Borrowing, each Committed Australian Borrowing and each Committed Japanese Borrowing.

"Committed Canadian Borrowing" means a borrowing consisting of simultaneous Committed Canadian Loans of the same Type, in the same currency and, in the case of Canadian BA Rate Loans or LIBO Rate Loans, having the same Interest Period made by each of the Australian Lenders pursuant to Section 2.01. having the same Interest Period made by each of the Canadian Lenders pursuant to Section 2.01.

"Committed Canadian Loan" means any loan at any time made by any Canadian Lender pursuant to Section 2.01.

"Committed Domestic Borrowing" means a borrowing consisting of simultaneous Committed Domestic Loans of the same Type, in the same currency and, in the case of LIBO Rate Loans, having the same Interest Period made by each of the Domestic Lenders pursuant to Section 2.01.

"Committed Domestic Loan" means any loan at any time made by any Domestic Lender pursuant to Section 2.01.

"Committed Japanese Borrowing" means a borrowing consisting of simultaneous Committed Japanese Loans of the same Type, in the same currency and, in the case of TIBOR Rate Loans or LIBO Rate Loans, having the same Interest Period made by each of the Japanese Lenders pursuant to Section 2.01.

"Committed Japanese Loan" means any loan at any time made by any Japanese Lender pursuant to Section 2.01.

"Committed Loan" means, as the context may require, any Committed Domestic Loan, any Committed Canadian Loan, any Committed Australian Loan and any Committed Japanese Loan.

"Committed Loan Notice" means a notice of (a) a Committed Borrowing, (b) a conversion of a Committed Loan from one Type to the other, or (c) a continuation of a LIBO Rate Loan, a Canadian BA Rate Loan, a BBR Rate Loan or a TIBOR Rate Loan, as applicable, pursuant to Section 2.02(b), which, if in writing, shall be substantially in the form of Exhibit A-1 (Domestic Committed Loan Notice) or Exhibit A-2 (Foreign Committed Loan Notice), as applicable.

"Committee" means an official committee of unsecured creditors appointed in the Cases pursuant to section 1102 of the Bankruptcy Code.

"Committee Investigation Budget" has the meaning given such term in Section 7.20(b).

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended from time to time and any successor Law.

"Concentration Account" means (a) individually, each North American Concentration Account and each Foreign Concentration Account, and (b) collectively, all of the foregoing.

"Connection Income Tax" means Other Connection Taxes that are imposed or measured by income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consent" means (a) actual written consent given by a Lender from whom such consent is sought; or (b) the passage of ten (10) Business Days from receipt of written notice to a Lender from the

Administrative Agent of a proposed course of action to be followed by the Administrative Agent without such Lender's giving the Administrative Agent written notice that such Lender objects to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means (a) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and (b) in respect of the Australian Loan Parties, "control" as defined in section 50AA of the Corporations Act.  "Controlling" and "Controlled" have meanings correlative thereto.

"Controller" has the meaning given to it in section 9 of the Corporations Act.

"Corporations Act" means the *Corporations Act 2001* (Cth) of Australia as, (a) amended or re-enacted, (b) any statute, regulation or provision enacted in replacement of that Law, (c) another regulation or other statutory instrument made or issued under that Law, and (d) any amendment made to a statute, regulation or provision referred to in clauses (a) through (c) of this definition as a consequence of another statute, regulation or provision.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrowers' accounting practices, known to the Administrative Agent, which practices are in effect on the Effective Date as such calculated cost is determined from invoices received by the Borrowing Base Parties, the Borrowing Base Parties' purchase journals or the Borrowing Base Parties' stock ledger. "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrowing Base Parties' calculation of cost of goods sold.

"Credit Card Advance Rate" means (a) with respect to the Domestic Borrowers, seventy percent (70%), and (b) with respect to the Canadian Borrower, ninety percent (90%).

"Credit Card Issuer" shall mean any person (other than a Borrower or other Loan Party or any Affiliate thereof) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Agents (such approval not to be unreasonably withheld).

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrowing Base Party's sales transactions involving

credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning provided in Section 6.14(a)(i).

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a North America Borrowing Base Party resulting from charges by a customer of a North America Borrowing Base Party on credit or debit cards issued by such Credit Card Issuer in connection with the sale of goods by a North America Borrowing Base Party, or services performed by a North America Borrowing Base Party, in each case in the ordinary course of its business.

"Credit Extension" means each of (a) a Foreign Credit Extension and (b) a Domestic Credit Extension.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Foreign Credit Party, (ii) each Domestic Credit Party, (iii) the Arranger, (iv) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (v) each Lender Affiliate of any Lender or the Administrative Agent providing Cash Management Services or Bank Products to a Loan Party, and (vi) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means: (a) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Australian Security Trustee, MLPFS and their respective Lender Affiliates, in connection with this Agreement and the other Loan Documents, including, without limitation (but in any event subject to the limitations described below), (i) the reasonable and documented fees, charges and disbursements of (A) counsel for the Administrative Agent, the Australian Security Trustee, and MLPFS (limited to not more than one primary counsel and necessary local counsel (limited to one local counsel per jurisdiction, (B) outside consultants for the Administrative Agent, (C) appraisers, (D) commercial finance examinations, and (E) all such out-of-pocket expenses incurred during any workout or restructuring negotiations in respect of the Obligations, (ii) all reasonable and documented out-of-pocket expenses incurred in connection with (A) the syndication of the credit facility provided for herein, (B) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the enforcement or protection of their rights in connection with this Agreement or the other Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral or in connection with any proceeding under any Debtor Relief Laws, or (D) any workout or restructuring negotiations in respect of any Obligations, and (iii) all customary fees and charges (as adjusted from time to time) of the Administrative Agent with respect to the disbursement of funds (or the receipt of funds) to or for the account of Borrowers (whether by wire transfer or otherwise), together with any reasonable out-of-pocket costs and expenses incurred in connection therewith; and (b) with respect to the L/C Issuer and its Lender Affiliates, all reasonable and documented out-of-pocket expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder; and (c) all reasonable and documented out-of-pocket expenses incurred by the Credit Parties who are not the Administrative Agent, MLPFS, the L/C Issuer or any Lender Affiliate of any of them in connection with the enforcement of the Credit Parties' rights and remedies under any of the Loan Documents or applicable Law including in the course of any work-out or restructuring of the Loans or other Obligations during the pendency of any Event of Default, provided

that such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"Currency Recalculation" has the meaning set forth in Section 2.05(k).

"Customer Credit Liabilities" means, at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrowing Base Parties entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, and (b) outstanding merchandise credits and customer deposits (including, without limitation, on account of layaway transactions) of the Borrowing Base Parties.

"Customs Broker Agreement" means an agreement in form and substance satisfactory to the Agents and (if a party thereto) the Administrative Agent, among a North America Borrowing Base Party, a customs broker, NVOCC or carrier, and the Administrative Agent, in which the customs broker, NVOCC or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory or other property for the benefit of the Administrative Agent, and agrees, upon notice from the Administrative Agent to hold and dispose of the subject Inventory and other property solely as directed by the Administrative Agent.

"DDA" means any checking, savings or other deposit account maintained by any of the Loan Parties. All funds in each DDA shall be conclusively presumed to be Collateral or the proceeds of Collateral and the Credit Parties shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"Debtors" has the meaning set forth in the recitals hereto.

"Debtor Relief Laws" means each of (i) the Bankruptcy Code, (ii) the *Bankruptcy and Insolvency Act* (Canada), the *Companies' Creditors Arrangement Act* (Canada) and the *Winding-up and Restructuring Act* (Canada), (iii) with respect to Japan, the Bankruptcy Act (Japan), the Civil Rehabilitation Act (Japan) and the Corporate Reorganization Act (Japan), (iv) with respect to Australia, the Corporations Act, and (v) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States, Canada, Australia, Japan or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means (a) when used with respect to Obligations other than Letter of Credit Fees, or Foreign Liabilities, an interest rate equal to (i) the Prime Rate plus (ii) the Applicable Margin, if any, applicable to Domestic Prime Rate Loans, plus (iii) two percent (2%) per annum; provided, however, that with respect to a LIBO Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Margin and any Mandatory Cost) otherwise applicable to such LIBO Rate Loan plus two percent (2%) per annum; (b) when used with respect to Foreign Liabilities other than Letter of Credit Fees, an interest rate equal to (i) the Canadian Prime Rate plus (ii) the Applicable Margin, if any, applicable to Canadian Prime Rate Loans, plus (iii) two percent (2%) per annum; provided, however, that with respect to a (A) LIBO Rate Loan, the Default Rate shall be an interest rate equal to the interest rate

(including any Applicable Margin and any Mandatory Cost) otherwise applicable to such LIBO Rate Loan plus two percent (2%) per annum, and (B) Canadian Base Rate Loan, Canadian BA Rate Loan, BBR Rate Loan, Australian Base Rate Loan, Japanese Base Rate Loan, or TIBOR Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Margin and any Mandatory Cost) otherwise applicable to such Canadian BA Rate Loan, BBR Rate Loan, Australian Base Rate Loan, Japanese Base Rate Loan, or TIBOR Rate Loan, plus two percent (2%) per annum; and (c) when used with respect to Letter of Credit Fees, a rate equal to the Applicable L/C Fee Rate plus two percent (2%) per annum.

"Defaulting Lender" means, subject to Section 2.18(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within one Business Day of the date such Loans were required to be funded hereunder, or (ii) pay to the Administrative Agent, the L/C Issuer, or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit) within one Business Day of the date when due, (b) has notified the Lead Borrower, the Administrative Agent or the L/C Issuer in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three Business Days after written request by the Administrative Agent or the Lead Borrower, to confirm in writing to the Administrative Agent and the Lead Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Lead Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, interim receiver and manager, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state, provincial, federal or foreign regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.18(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Lead Borrower, the L/C Issuer and each other Lender promptly following such determination.

"Determination Date" shall mean the date upon which each of the following has occurred:

(a)    The Commitments have been terminated by the Required Lenders (or are deemed terminated) upon the occurrence of an Event of Default; or

(b)    The Obligations and/or any of the Foreign Liabilities have been declared to be due and payable (or have become automatically due and payable) pursuant to Section 8.02 and have not been paid in accordance with the terms of this Agreement.

"Dilution Percent" means, for any period, that percentage reasonably determined by the Agents in their Permitted Discretion by dividing (a) the amount of charge-offs, returns of goods purchased from the Borrowing Base Parties and any other non-cash reductions to trade receivables during such period which had, at the time of sale, resulted in the creation of a trade receivable, by (b) the amount of sales (exclusive of sales and other similar taxes) of the Borrowing Base Parties during such period.

"Dilution Reserve" means a Reserve in amounts established by any Agent from time to time in its Permitted Discretion as being appropriate to reflect that the Dilution Percent is or is reasonably anticipated to be greater than five percent (5%).

"DIP Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of the Effective Date, between the Administrative Agent and the DIP Term Agent.

"DIP Term Agent" means OCM FIE, LLC, in its capacity as agent under the DIP Term Facility.

"DIP Term Claims" means those Obligations pursuant to the DIP Term Facility.

"DIP Term Documents" means the "Loan Documents" as defined in the DIP Term Facility.

"DIP Term Facility" means that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement initially by and among Parent, QS Wholesale, Inc., as borrower, the "Guarantors" party thereto, the DIP Term Agent and the DIP Term Lender, the terms of which shall be reasonably satisfactory to the Administrative Agent.

"DIP Term Lender" means Big Wave.

"DIP Term Liens" means those Liens granted to the DIP Term Agent pursuant to the DIP Term Facility to secure the DIP Term Claims.

"DIP Term Priority Collateral" has the meaning given to "Term Loan Priority Collateral" in the DIP Intercreditor Agreement.

"DIP Term Termination Date" has the meaning given to "Termination Date" in the DIP Term Facility.

"DIP Superpriority Claim" means the allowed superpriority administrative expense claim granted to the Secured Parties in each of the Cases and any Successor Cases pursuant to Section 364(c)(1) of the Bankruptcy Code for all of the Obligations with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of these Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative; provided, however, that the DIP Superpriority Claim shall attach to the proceeds of Avoidance Actions; provided, further, that the DIP Superpriority Claim shall be subject to Permitted Encumbrances and the Carve-Out.

"Disclosure Statement" has the meaning set forth in 8.01(z)(iv).

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests) by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Equity Interests that do not constitute Disqualified Stock), pursuant to a sinking fund obligation or otherwise, or redeemable (other than solely for Equity Interests that do not constitute Disqualified Stock) at the option of the holder thereof, in whole or in part, on or prior to the date that is 91 days after the Maturity Date; provided, however, that (i) only the portion of such Equity Interests which so matures or is so mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (ii) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Parent or its Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Parent or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the any Loan Party may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollar Equivalent" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any Alternative Currency, the equivalent amount thereof in Dollars as determined by the Administrative Agent or the L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of Dollars with such Alternative Currency.

"Dollars" and "$" mean the lawful currency of the United States.

"Domestic Availability" means, as of any date of determination thereof, the result, if a positive number, of:

> (a)    the Domestic Loan Cap
>
> minus
>
> (b)    the Total Domestic Outstandings on such date.

"Domestic Borrowers" has the meaning specified in the introductory paragraph hereto.

"Domestic Borrowing" means a Committed Domestic Borrowing made to the Domestic Borrowers.

"Domestic Borrowing Base" means, at any time of calculation, an amount equal to:

(a) the face amount of Eligible Credit Card Receivables of the Domestic Borrowers multiplied by the Credit Card Advance Rate;

plus

(b) the face amount of Eligible Trade Receivables of the Domestic Borrowers (net of Receivables Reserves applicable thereto) multiplied by the Receivables Advance Rate;

plus

(c) the Cost of Eligible Inventory (other than Eligible In-Transit Inventory) of the Domestic Borrowers, net of Inventory Reserves applicable thereto, multiplied by the Appraisal Percentage of the Appraised Value of Eligible Inventory (other than Eligible In-Transit Inventory) of the Domestic Borrowers;

plus

(d) the lesser of (i) $27,750,000 and (ii) the sum of (x) the Cost of Eligible In-Transit Inventory of the Domestic Borrowers, net of Inventory Reserves applicable thereto, multiplied by the Appraisal Percentage of the Appraised Value of Eligible In-Transit Inventory of the Domestic Borrowers, and (y) with respect to any Eligible Letter of Credit, the Appraisal Percentage of the Appraised Value of the Inventory of the Domestic Borrowers supported by such Eligible Letter of Credit, multiplied by the Cost of such Inventory of the Domestic Borrowers when completed, net of applicable Reserves;

minus

(e) the aggregate of (i) the Foreign Liability Reserve, (ii) the Carve-Out Reserve and (iii) the then amount of all other Availability Reserves (without duplication) applicable to any of the Loan Parties. In no event shall the amount of Availability Reserves subtracted in calculating the Domestic Borrowing Base be duplicative of Availability Reserves subtracted in calculating any other Borrowing Base.

"Domestic Commitments" means, as to each Domestic Lender, its obligation to (a) make Committed Domestic Loans to the Domestic Borrowers pursuant to Section 2.01, and (b) purchase participations in Domestic L/C Obligations, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Domestic Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Domestic Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Domestic Concentration Account" means the account maintained by the Administrative Agent at Bank of America into which cash receipts and collections of the Domestic Loan Parties (including,

without limitation, from the Collateral) are deposited to the extent required hereby or by any other Loan Document.

"Domestic Credit Extensions" mean each of the following: (a) a Domestic Borrowing and (b) a Domestic L/C Credit Extension.

"Domestic Credit Party" or "Domestic Credit Parties" means (a) individually, (i) each Domestic Lender and its Lender Affiliates, (ii) the Agents and their respective Lender Affiliates, (iii) each L/C Issuer of any Domestic Letter of Credit and (iv) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Domestic Facility" means the revolving credit facility in favor of the Domestic Borrowers established pursuant to this Agreement.

"Domestic L/C Borrowing" means an extension of credit resulting from a drawing under any Domestic Letter of Credit which has not been reimbursed on or prior to the date required to be reimbursed by the Domestic Borrowers pursuant to Section 2.03(c)(i) or refinanced as a Committed Domestic Borrowing.

"Domestic L/C Credit Extension" means, with respect to any Domestic Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"Domestic L/C Obligations" means, as at any date of determination and without duplication, the aggregate Stated Amount of all outstanding Domestic Letters of Credit plus the aggregate of all Unreimbursed Amounts under Domestic Letters of Credit, including all Domestic L/C Borrowings.

"Domestic Lenders" means the Lenders having Domestic Commitments from time to time or at any time.

"Domestic Letter of Credit" means each Letter of Credit issued hereunder for the account of the Domestic Borrowers.

"Domestic Letter of Credit Sublimit" means an amount equal to $40,000,000. The Domestic Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Domestic Commitments. A permanent reduction of the Aggregate Domestic Commitments shall not require a corresponding pro rata reduction in the Domestic Letter of Credit Sublimit; provided, however, that if the Aggregate Domestic Commitments are reduced to an amount less than the Domestic Letter of Credit Sublimit, then the Domestic Letter of Credit Sublimit shall be reduced to an amount equal to (or, at Lead Borrower's option, less than) the Aggregate Domestic Commitments.

"Domestic Loan" means an extension of credit by a Domestic Lender to the Domestic Borrowers under Article II in the form of a Committed Loan.

"Domestic Loan Cap" means, at any time of determination, the lesser of (a) the Aggregate Domestic Commitments and (b) the Domestic Borrowing Base.

"Domestic Loan Parties" means, collectively, the Parent, the Domestic Borrowers and each Domestic Subsidiary that is a Guarantor of the Obligations. "Domestic Loan Party" means any one of such Persons.

"Domestic Note" means a promissory note made by the Domestic Borrowers in favor of a Domestic Lender evidencing Domestic Loans made by such Domestic Lender, in form and substance in satisfactory to the Administrative Agent and each applicable Lender.

"Domestic Overadvance" means a Domestic Credit Extension to the extent that, immediately after the making of such Domestic Credit Extension, the aggregate principal balance of all Domestic Credit Extensions then outstanding exceeds the Domestic Loan Cap as then in effect.

"Domestic Prime Rate Loan" means a Loan that bears interest based on the Prime Rate.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

"E-Commerce Agreement" means that certain Amended and Restated E-Commerce Agreement dated as of September 6, 2011 by and between QS Retail, Inc. and GSI.

"Effective Date" means the first date on which the conditions set forth in Sections 4.01 and 4.02 have been satisfied or waived by the Agent and the Lenders.

"Eligible Assignee" means (a) a Lender or any of its Lender Affiliates; (b) a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Lender Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; (d) any Person to whom a Lender assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Lender's rights in and to a material portion of such Lender's portfolio of asset based credit facilities, and (e) any other Person (other than a natural person) approved by (i) the Administrative Agent and the L/C Issuer (each such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include the Parent or any of its Subsidiaries or other Affiliates.

"Eligible Credit Card Receivables" means, at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to a North America Borrowing Base Party from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of such North America Borrowing Base Party, and (ii) in each case is acceptable to the Agents in their Permitted Discretion, and is not ineligible for inclusion in the calculation of the Canadian Borrowing Base or the Domestic Borrowing Base, as applicable, pursuant to any of clauses (a) through (k) below. Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, an Account shall indicate no Person other than a North America Borrowing Base Party as payee or remittance party. In determining the amount to be so included, the face amount of an Account shall be reduced by, without duplication of any Reserve or any of clauses (a) through (k) below or otherwise, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a North America Borrowing Base Party may be obligated to rebate to a customer, a Credit Card Processor, or Credit Card Issuer pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the applicable North America Borrowing Base Party to reduce the amount of such Credit Card Receivable. Any Credit Card Receivable meeting the foregoing

criteria shall be deemed to be an Eligible Credit Card Receivable but only as long as such Credit Card Receivable is not included within any of the following categories, in which case such Credit Card Receivable shall not constitute an Eligible Credit Card Receivable, unless otherwise agreed by the Agents:

(a)     Credit Card Receivables which do not constitute an "Account" (as defined in the UCC or the PPSA, as applicable);

(b)     Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale;

(c)     Credit Card Receivables with respect to which a North America Borrowing Base Party does not have good and valid title, free and clear of any Lien (other than Liens granted to the Administrative Agent pursuant to the Security Documents and other Permitted Encumbrances not having priority over, or that are *pari passu* with, the Lien of the Administrative Agent under applicable Law);

(d)     Credit Card Receivables that are not subject to a first priority Lien in favor of the Administrative Agent pursuant to the Security Documents (other than Permitted Encumbrances not having priority over, or that are *pari passu* with, the Lien of the Administrative Agent under applicable Law) (it being the intent that chargebacks in the ordinary course by such processors shall not be deemed violative of this clause);

(e)     Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (but only to the extent of such disputed amount, claim, counterclaim, offset or chargeback);

(f)     Credit Card Receivables as to which the Credit Card Processor or Credit Card Issuer has the right under certain circumstances to require a North America Borrowing Base Party to repurchase the Accounts from such Credit Card Processor or Credit Card Issuer;

(g)     Credit Card Receivables due from a Credit Card Issuer or Credit Card Processor of the applicable credit card which is the subject of any proceeding under any Debtor Relief Law;

(h)     Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

(i)     Credit Card Receivables which do not conform in all material respects to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables or which are not payable in Dollars (with respect to Credit Card Receivables of a Domestic Borrower) or in Dollars or CD$ (with respect to Credit Card Receivables of a Canadian Loan Party);

(j)     Credit Card Receivables which are evidenced by chattel paper or an instrument of any kind unless such chattel paper or instrument is in the possession of the Administrative Agent, and to the extent necessary or appropriate, endorsed to the Administrative Agent; or

(k)     Credit Card Receivables which any Agent determines in its Permitted Discretion to be uncertain of collection.

Subject to Section 2.01(e) and Section 9.19, the Agents shall have the right to establish or modify or eliminate Reserves against Eligible Credit Card Receivables from time to time in their Permitted Discretion.

"Eligible GSI Consignment Inventory" means Inventory of QS Retail, Inc. held on consignment by GSI in its capacity as e-commerce fulfillment service provider, in accordance with the terms of the E-Commerce Agreement, which Inventory satisfies each of the following conditions:

(a)      possession of such Inventory is maintained by GSI until such time as GSI shall ship Specified Inventory to customers of a Domestic Borrower upon purchase thereof through e-commerce transactions fulfilled by GSI in accordance with the E-Commerce Agreement;

(b)      but for the application of clause (b) of the definition of Eligible Inventory, such Inventory constitutes Eligible Inventory;

(c)      QS Retail, Inc., as consignor, has a first-priority perfected Lien in such Inventory, which Lien has been effectively assigned to the Administrative Agent to secure the Obligations; and

(d)      such Inventory is subject to the terms of that certain Warehouse Bailment Agreement dated as of September 6, 2011 among, *inter alia*, the Administrative Agent, QS Retail, Inc. and GSI, or such other Collateral Access Agreement reasonably acceptable to the Administrative Agent.

"Eligible In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, In-Transit Inventory:

(a)      Which satisfies all of the requirements for Eligible Inventory other than the requirement that it be located in the United States (with respect to In-Transit Inventory of a Domestic Borrower) or Canada (with respect to In-Transit Inventory of a Canadian Loan Party);

(b)      Which has been fully paid for by the applicable North America Borrowing Base Party, or, alternatively, for which the full purchase price thereof is secured by a Commercial Letter of Credit issued under this Agreement;

(c)      For which title to such In-Transit Inventory has passed to such North America Borrowing Base Party;

(d)      For which the purchase order is in the name of such North America Borrowing Base Party;

(e)      Which is scheduled for delivery within 45 days or less from the date of shipment;

(f)      For which an Acceptable BOL has been issued and in each case as to which the Administrative Agent has possession of the Acceptable BOL which evidences ownership of the subject In-Transit Inventory (which possession requirement can be satisfied by the delivery of a Customs Broker Agreement from any third party with possession over such Acceptable BOL);

-36-

(g)     Which is in the possession of a common carrier or Eligible NVOCC which issued the Acceptable BOL in respect of such In-Transit Inventory;

(h)     The common carrier (to the extent an NVOCC has not engaged such common carrier), NVOCC and customs broker (as applicable) with respect to such In-Transit Inventory has entered into a Customs Broker Agreement which is then in effect; and

(i)     Which is fully insured by marine cargo and other insurance in accordance with Section 5.10 and Section 6.08.

Subject to Section 2.01(e) and Section 9.19, the Agents shall have the right to establish or modify or eliminate Reserves against Eligible In-Transit Inventory from time to time in their Permitted Discretion.

"Eligible Inventory" means, as of the date of determination thereof, without duplication of Eligible In-Transit Inventory, items of Inventory of a Borrowing Base Party that are raw materials (consisting solely of blank t-shirts) or finished goods, merchantable and readily saleable to the public in the ordinary course deemed by the Agents in their Permitted Discretion, to be eligible for inclusion in the calculation of any Borrowing Base (including blank t-shirts which otherwise satisfy the requirements set forth in this definition), in each case that, except as otherwise agreed by the Agents, complies in all material respects with each of the representations and warranties respecting Inventory made by a Borrowing Base Party in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the criteria set forth below. Except as otherwise agreed by the Agents, the following items of Inventory shall not be included in Eligible Inventory:

(a)     Inventory that is not solely owned by a Borrowing Base Party or a Borrowing Base Party does not have good and valid title thereto (including, without limitation, as a result of retention of title to such Inventory by the supplier thereof);

(b)     Inventory that is leased by or is on consignment to a Borrowing Base Party or, other than Eligible GSI Consignment Inventory, that is consigned by a Borrowing Base Party to (or is subject to retention of title in favor of a Borrowing Base Party with respect to) a Person which is not a Loan Party;

(c)     Inventory (other than Eligible In-Transit Inventory) that (i) is not located in the United States in the case of Inventory of a Domestic Borrower (excluding territories or possessions thereof) or Canada (in the case of Inventory of the Canadian Borrower), Australia (in the case of Inventory of the Australian Borrower) or Japan (in the case of Inventory of the Japanese Borrower) (excluding territories or possessions thereof), (ii) is in transit, (iii) is located at a location that is not owned or leased by a Borrowing Base Party, except either (x) with respect to the North America Borrowing Base Parties, to the extent that a Collateral Access Agreement executed by the Person owning any such location is delivered to the Administrative Agent, or (y) with respect to any Borrowing Base Party, the Agents have established an Availability Reserve or an Inventory Reserve with respect thereto (it being understood that notwithstanding the delivery of a Collateral Access Agreement by a North America Borrowing Base Party, the Agents may establish an Availability Reserve or an Inventory Reserve for any location at which, pursuant to such Collateral Access Agreement or otherwise, the Agents may

be responsible for any charges for any period of time other than during the actual occupancy of the premises by the Agents), or (iv) is in the possession of any Person who is a processor;

(d)    Inventory that is located in a distribution center leased by a Borrowing Base Party except either (x) with respect to the North America Borrowing Base Parties, to the extent that a Collateral Access Agreement executed by the applicable lessor is delivered to the Administrative Agent, or (y) with respect to any Borrowing Base Party, the Agents have established an Availability Reserve or an Inventory Reserve with respect thereto (it being understood that notwithstanding the delivery of a Collateral Access Agreement by a North America Borrowing Base Party, the Agents may establish an Availability Reserve or an Inventory Reserve for any location at which, pursuant to such Collateral Access Agreement or otherwise, the Agents may be responsible for any charges for any period of time other than during the actual occupancy of the premises by the Agents);

(e)    Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or custom items, work-in-process, raw materials (but excluding blank t-shirts), or that constitute spare parts, display, promotional, marketing, packaging and shipping materials or supplies used or consumed in a Borrowing Base Party's business, (iv) are seasonal in nature and which have been packed away for sale in a subsequent season, (v) are not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, (vi) are bill and hold goods, or (vii) are of a type which is not held for sale by the Borrowing Base Parties in the ordinary course of their business;

(f)    Inventory that is not subject to a perfected first-priority security interest in favor of the applicable Agent (and with respect to Inventory of the Japanese Borrower, each of the Japanese Secured Parties) pursuant to the Security Documents (other than Permitted Encumbrances not having priority over, or that are *pari passu* with, the Lien of such Agent (and with respect to Inventory of the Japanese Borrower, each of the Japanese Secured Parties) under applicable Law, or having priority but acceptable to the Collateral Agent in their Permitted Discretion);

(g)    Inventory that consists of samples, labels, bags, and other similar non-merchandise categories;

(h)    Inventory that is not insured in compliance with the provisions of Section 5.10 and Section 6.08 hereof;

(i)    Inventory that has been sold but not yet delivered or as to which a Borrowing Base Party has accepted a deposit;

(j)    Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party which any Borrowing Base Party or any of their Subsidiaries has received notice of a dispute in respect of any such agreement or which would require the payment of fees or royalties to or the consent of the licensor under such agreement for any sale or other disposition of such Inventory by the Agents, unless the Agents have reviewed the underlying agreements and determined the terms to be acceptable, and subject to the imposition of a Reserve for the payment of any such fees or royalties;

-38-

(k)     Inventory, the assignment or pledge of which is prohibited under agreements between any Loan Party and lessors of any leased premises or other third party locations if, unless otherwise agreed by the Agents in their Permitted Discretion, consent from such lessor has not been obtained to the reasonable satisfaction of the Administrative Agent; or

(l)     [reserved].

Subject to Section 2.01(e) and Section 9.19, the Agents and, if applicable, the Administrative Agent shall have the right to establish or modify or eliminate Reserves against Eligible Inventory from time to time in their Permitted Discretion.

"Eligible Letter of Credit" means, as of any date of determination thereof, a Commercial Letter of Credit issued for the account of a North America Borrowing Base Party which supports the full purchase price of Inventory (other than In-Transit Inventory), (a) which Inventory does not constitute Eligible In-Transit Inventory and for which no Acceptable BOL or other documents of title have then been issued; (b) which Commercial Letter of Credit (i) has an expiry within 45 days of the date of determination, and (ii) provides that such Commercial Letter of Credit may be drawn only after the Inventory is completed and after an Acceptable BOL has been issued for such Inventory; and (c) with respect to the Inventory to be purchased with such Commercial Letter of Credit, such Inventory satisfies all of the requirements for Eligible In-Transit Inventory other than the requirement set forth in clause (e) of the definition of the term herein.

"Eligible NVOCC" means, with respect to any In-Transit Inventory, an NVOCC for such In-Transit Inventory that (i) is not an Affiliate of a Borrowing Base Party or the applicable foreign vendor and is otherwise acceptable to the Agents; (ii) is engaged by a Domestic Borrower or a Canadian Loan Party as freight forwarder with respect to such In-Transit Inventory; (iii) has received from the carrier a tangible bill of lading with respect to such In-Transit Inventory that names such NVOCC as consignee; (iv) has issued an Acceptable BOL to the order of a North America Borrowing Base Party in respect of such In-Transit Inventory; and (v) has entered into a Customs Broker Agreement which is then in effect.

"Eligible Trade Receivables" means Accounts arising from the sale of a Borrowing Base Party's Inventory (other than those consisting of Credit Card Receivables) that satisfy the following criteria at the time of creation and continue to meet the same at the time of such determination: such Account (i) has been earned by performance and represents the bona fide amounts due to a Borrowing Base Party from an account debtor, and in each case originated in the ordinary course of business of such Borrowing Base Party, and (ii) in each case is acceptable to the Agents in their Permitted Discretion, and is not ineligible for inclusion in the calculation of any Borrowing Base pursuant to any of clauses (a) through (v) below. Without limiting the foregoing, to qualify as an Eligible Trade Receivable, an Account shall indicate no Person other than a Borrowing Base Party as payee or remittance party. In determining the amount to be so included, the face amount of an Account shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrowing Base Party may be obligated to rebate to a customer pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the applicable Borrowing Base Party to reduce the amount of such Eligible Trade Receivable. Any Account meeting the foregoing criteria shall be deemed to be an Eligible Trade Receivable but only as long as such Account is

not included within any of the following categories, in which case such Account shall not constitute an Eligible Trade Receivable, unless otherwise agreed by the Agents:

        (a)      Accounts that are not evidenced by an invoice;

        (b)      Accounts (i) that have been outstanding for more than ninety (90) days from the original invoice date (or, (x) with respect to Accounts of the Domestic Borrowers and/or the Australian Borrower having an aggregate face amount not in excess of $10,000,000, more than one hundred twenty (120) days from the original invoice date, and (y) with respect to Accounts of the Domestic Borrowers and/or the Australian Borrower, without duplication of the Accounts described in clause (x), Accounts having an aggregate face amount not in excess of $1,000,000, more than one hundred eighty (180) days from the original invoice date) or (ii) that are more than sixty (60) days past the due date;

        (c)      Accounts due from any account debtor if fifty percent (50%) or more of Accounts due from account debtor are ineligible under the provisions of clause (b) above;

        (d)      Accounts with respect to which a Borrowing Base Party does not have good and valid title thereto, free and clear of any Lien (other than Liens granted to the Agents pursuant to the Security Documents and other Permitted Encumbrances not having priority over, or that are *pari passu* with, the Lien of the Agents under applicable Law);

        (e)      Accounts that are not subject to a first priority security interest in favor of the applicable Agent (and with respect to Accounts of the Japanese Borrower, each of the Japanese Secured Parties) pursuant to the Security Documents (other than Permitted Encumbrances not having priority over, or that are *pari passu* with, the Lien of such Agent (and with respect to Accounts of the Japanese Borrower, each of the Japanese Secured Parties) under applicable Law);

        (f)      Accounts which are disputed or with respect to which a claim, counterclaim, offset or chargeback has been asserted, but only to the extent of such dispute, counterclaim, offset or chargeback;

        (g)      Accounts which arise out of any sale made not in the ordinary course of business, made on a basis other than upon credit terms usual to the business of a Borrowing Base Party;

        (h)      Accounts which are owed by any account debtor whose principal place of business is not within (i) the United States (with respect to the Domestic Borrowers), (ii) Canada (with respect to the Canadian Loan Parties), (iii) Australia (with respect to the Australian Borrower), or (iv) Japan (with respect to the Japanese Borrower);

        (i)      Accounts which are owed by any Affiliate or any employee of a Loan Party;

        (j)      Accounts for which all consents, approvals or authorizations of, or registrations or declarations with any Governmental Authority required to be obtained, effected or given in connection with the performance of such Account by the account debtor or in connection with the enforcement of such Account by the Agents have not been duly obtained, effected or given and are not in full force and effect;

(k)     Accounts due from an account debtor which is the subject of any bankruptcy or insolvency proceeding, has had a trustee or receiver appointed for all or a substantial part of its property, has made an assignment for the benefit of creditors or has suspended its business;

(l)     Accounts due from (i) the federal government of the United States of America unless such Accounts have been assigned by the applicable Borrowing Base Party to the Administrative Agent in accordance with the Federal Assignment of Claims Act of 1940 or (ii) the federal government of Canada or a political subdivision thereof, or any province or territory, or any municipality or department or agency or instrumentality thereof unless the provisions of the *Financial Administration Act* (Canada) or any applicable provincial, territorial or municipal law of similar purpose and effect restricting the assignment thereof, as the case may be, have been complied with, or any other Governmental Authority except to the extent reasonably acceptable to the Collateral Agent and, if applicable, the Administrative Agent; and in any event such Accounts described in this subsection shall not exceed $6,000,000 at any time outstanding;

(m)     Accounts (i) owing from any Person that is also a supplier to or creditor of a Loan Party or any of its Subsidiaries unless such Person has waived any right of setoff in a manner reasonably acceptable to the Agents, or (ii) representing any manufacturer's or supplier's credits, discounts, incentive plans or similar arrangements entitling a Loan Party or any of its Subsidiaries to discounts on future purchase therefrom;

(n)     Accounts arising out of sales on a bill-and-hold, guaranteed sale, sale-or-return, sale on approval or consignment basis (other than Accounts due from GSI arising in connection with the Disposition of Eligible GSI Consignment Inventory) or subject to any right of return;

(o)     Accounts arising out of sales to account debtors outside (i) the United States (with respect to Accounts of a Domestic Borrower), (ii) Canada (with respect to Accounts of a Canadian Loan Party), (iii) Australia (with respect to Accounts of the Australian Borrower), or (iv) Japan (with respect to Accounts of the Japanese Borrower), unless, in each case, such Accounts are fully backed by an irrevocable letter of credit on terms, and issued by a financial institution, reasonably acceptable to the Agents;

(p)     Accounts payable other than (i) in Dollars (with respect to Accounts of a Domestic Borrower), (ii) in Dollars or CD$ (with respect to Accounts of a Canadian Loan Party), (iii) in Australian Dollars (with respect to Accounts of the Australian Borrower), or (iv) Yen (with respect to Accounts of the Japanese Borrower);

(q)     Accounts evidenced by a judgment, chattel paper, promissory note or other instrument;

(r)     Accounts consisting of amounts due from vendors as rebates or allowances, or as finance or interest charges;

(s)     Accounts which are in excess of the credit limit for such account debtor established by a Borrowing Base Party in the ordinary course of business and consistent with past practices;

(t)     Accounts which include extended payment terms (datings) beyond those generally furnished to other account debtors in the ordinary course of business;

(u)      Accounts due from an account debtor and its Affiliates, where the aggregate amount due on such Accounts to the Borrowing Base Parties at any time exceeds fifteen percent (15%) of the total Eligible Trade Receivables then due to such Borrowing Base Parties, only to the extent of such amount in excess of fifteen percent (15%) of the total Eligible Trade Receivables due to such Borrowing Base Parties; provided that the foregoing shall not apply to the account debtors listed on Schedule 1.06 (who shall rather be subject to the percentages set forth therein);

(v)      Accounts owing from any Embargoed Person or from any Person located in a jurisdiction other than that in which the applicable Borrower is organized, which, in either case, a Lender notifies the Loan Parties in writing shall be ineligible;

(w)      Accounts, the assignment or pledge of which is prohibited under agreements between any Loan Party and lessors of any leased premises or with any Account debtor, if, unless otherwise agreed by the Agents in their Permitted Discretion, consent from such lessor or Account debtor has not been obtained to the reasonable satisfaction of the Administrative Agent; or

(x)      Accounts which any Agent determines in its Permitted Discretion to be unacceptable for borrowing.

Subject to Section 2.01(e) and Section 9.19, the Agents and, if applicable, the Administrative Agent, shall have the right to establish or modify or eliminate Reserves against Eligible Trade Receivables from time to time in their Permitted Discretion.

"Embargoed Person" means any party that (i) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") or (ii) resides, is organized or chartered, or has a place of business in a country or territory that is the subject of OFAC sanctions programs.

"Environmental Laws" means any and all federal, state, provincial, territorial, municipal, local, and foreign statutes, laws, regulations, ordinances, final and enforceable rules, judgments, orders, decrees or governmental restrictions governing pollution and the protection of the environment or the release of any materials into the environment, including those governing Hazardous Materials, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement imposing liability under Environmental Law or for Hazardous Materials.

"Environmental Permit" means any permit, approval, license or other authorization required under any Environmental Law.

"Equipment" shall mean "equipment", as defined in the UCC or in the PPSA, and shall also mean all furniture, store fixtures, motor vehicles, rolling stock, machinery, office equipment, plant equipment, tools, dies, molds, and other goods, property, and assets which are used and/or were purchased for use in the operation or furtherance of a Loan Party's (or any applicable Subsidiary's) business, and any and all accessions or additions thereto, and substitutions therefor.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, and all of the warrants or options for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person.

"Equivalent Amount" means, with respect to any Alternative Currency, the equivalent amount thereof determined by the Administrative Agent at such time on the basis of the Spot Rate.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with a Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of any Domestic Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Domestic Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any ERISA Affiliate.

"Euro" and "€" mean the single currency of the Participating Member States.

"Eurocurrency Interbank Market" means any lawful recognized market in which deposits of Dollars and the relevant Alternative Currencies are offered by international banking units of United States banking institutions and by foreign banking institutions to each other and in which foreign currency and exchange operations are customarily conducted.

"European Subsidiary" means any Subsidiary of the Parent organized under the laws of any European Governmental Authority.

"Event of Default" has the meaning specified in Section 8.01.

"Excluded Swap Obligation" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Loan Party of, or the grant under a Loan

Document by such Loan Party of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act (or the application or official interpretation thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Guarantee of such Loan Party, or grant by such Loan Party of a security interest, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Contracts for which such Guarantee or security interest becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, branch profits Taxes or similar Taxes, in each case, (i) imposed by the jurisdiction (or any political subdivision thereof) in which such Recipient is organized, has its principal office, or in which it is otherwise doing business or, in the case of any Lender, the jurisdiction (or any political subdivision thereof) in which its Lending Office is located, or (ii) that are Other Connection Taxes, (b) in the case of (A) a Lender, withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or, if such Lender is an intermediary, partnership, or other flow-through entity for Japanese tax purposes, the later of the date on which such Lender acquires such interest in the Loan or Commitment and the date on which the relevant beneficiary, partner or member of such Lender becomes such a beneficiary, partner or member (other than pursuant to an assignment request by the Borrower under Section 10.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new Lending Office (or assignment) to receive additional amounts from the Loan Parties with respect to such withholding, pursuant to Section 3.01(a)(ii), (B) any Agent, L/C Issuer or other Recipient of a payment by or on account of any obligation or any Loan Party under any Loan Document, any withholding tax that is imposed on amounts payable to such Person at the time such Person becomes a party to this Agreement (or changes its Lending Office), (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (d) Taxes attributable to such Recipient's failure to comply with Section 3.01(e), (e) any withholding Taxes imposed pursuant to FATCA, and (f) in the case of a Non-Qualifying Japanese Lender, any Japanese withholding Tax that is imposed on amounts payable hereunder to such Non-Qualifying Japanese Lender or its designee. For the avoidance of doubt, any Participant that is entitled to the benefits of Section 3.01(a) shall be treated as a Lender for purposes of this defined term.

"Executive Order" has the meaning set forth in Section 10.18.

"Existing ABL Agent" means Bank of America, N.A., as agent pursuant to the Existing ABL Credit Agreement, and any successor thereto.

"Existing ABL Lenders" means the lenders under the Existing ABL Credit Agreement.

"Existing ABL Liens" has the meaning set forth in the recitals hereto.

"Existing ABL Obligations" means all outstanding amounts of the Credit Extensions provided under the Existing ABL Credit Agreement as of the Petition Date.

"Existing ABL Credit Agreement" has the meaning set forth in the recitals hereto.

"Existing ABL Credit Agreement Collateral Account" means a funded escrow account in the sum of $250,000 established under the Orders to secure any contingent indemnification obligations under the Existing ABL Credit Agreement.

"Existing Letters of Credit" means the letters of credit outstanding on the Effective Date issued under the Existing ABL Credit Agreement and described on Schedule 1.04 hereto.

"Existing Liens" shall have the meaning set forth in the recitals hereto.

"Existing Notes Intercreditor Agreement" means that certain Second Amended and Restated Intercreditor Agreement, dated as of July 16, 2013, between the Administrative Agent and the Existing Senior Secured Note Agent.

"Existing Senior Secured Indenture" means that certain Indenture dated July 16, 2013, pursuant to which Parent, as issuer, issued $280 million in aggregate initial principal amount of 7.875% senior secured notes due 2018, with U.S. Bank National Association (successor in interest to Wells Fargo Bank, National Association), as trustee and collateral agent.

"Existing Senior Secured Note Collateral Agent" means U.S. Bank National Association.

"Existing Senior Secured Note Documents" means the "Notes Documents" as defined in the Existing Senior Secured Indenture.

"Existing Senior Secured Note Liens" means the "Note Liens" in favor of the Existing Senior Secured Note Collateral Agent, as defined in the Existing Senior Secured Indenture.

"Existing Senior Secured Note Obligations" means all "Note Obligations" as defined in the Existing Senior Secured Indenture.

"Existing Senior Secured Noteholders" means the holders of the 7.875% Senior Secured Notes.

"Facility Guaranty" means (a) that certain Amended and Restated Guarantee of the Obligations made by each Guarantor that is a Domestic Loan Party in favor of the Administrative Agent and the other Credit Parties, dated as of May 24, 2013, and (b) that certain Guarantee of the Australian Liabilities, the Canadian Liabilities and the Japanese Liabilities made by each Guarantor that is a Foreign Loan Party in favor of the Administrative Agent and the other Foreign Credit Parties, dated as of May 24, 2013, as each has been ratified and confirmed pursuant to the Confirmation Agreement.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any intergovernmental agreements related thereto, and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York

on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Administrative Agent.

"Fee Letter" means the amended and restated letter agreement, dated as of the Effective Date, among the Parent, the Administrative Agent, and MLPFS.

"Final Order" means an order or judgment as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of the Interim Order, with only such modifications as are satisfactory in form and substance to the Required Lenders, which order shall (x) have been entered on such prior notice to such parties as may be satisfactory to the Required Lenders and (y) not have been vacated, reversed, modified, amended or stayed.

"Final Order Date" means the date of the entry of the Final Order.

"Fiscal Month" means any fiscal month of any Fiscal Year, which month shall generally end on the last day of each calendar month in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarters shall generally end on the last day of each April, July, October and January of such Fiscal Year in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Year" means any period of twelve (12) consecutive months ending on October 31st of any calendar year.

"Foreign Assets Control Regulations" has the meaning set forth in Section 10.18.

"Foreign Borrower" means (a) individually, the Australian Borrower, the Canadian Borrower and the Japanese Borrower, and (b) collectively, all of the foregoing.

"Foreign Commitment" means (a) individually, the Commitment of a Foreign Lender to make Australian Credit Extensions, the Commitment of a Foreign Lender to make Canadian Credit Extensions or the Commitment of a Foreign Lender to make Japanese Credit Extensions, as the context may require, and (b) collectively, all of the foregoing.

"Foreign Concentration Account" means (a) individually, each Australian Concentration Account, each Canadian Concentration Account, and each Japanese Concentration Account, and (b) collectively, all of the foregoing.

"Foreign Credit Party" or "Foreign Credit Parties" means (a) individually, each Australian Credit Party, each Canadian Credit Party and each Japanese Credit Party, and (b) collectively, all of the foregoing.

"Foreign Credit Extension" means (a) individually, each Australian Credit Extension, each Canadian Credit Extension and each Japanese Credit Extension, and (b) collectively, all of the foregoing.

-46-

"Foreign Guarantors" means (a) individually, each Foreign Loan Party which is a Guarantor of the Australian Liabilities, the Canadian Liabilities and the Japanese Liabilities, and (b) collectively, all of the foregoing.

"Foreign Lenders" means the Lenders having Foreign Commitments from time to time or at any time.

"Foreign Liability" or "Foreign Liabilities" means (a) individually, each Australian Liability, each Canadian Liability and each Japanese Liability as the context may require, and (b) collectively, all of the foregoing.

"Foreign Liability Reserve" shall mean an amount equal to the sum of the outstanding Foreign Liabilities.

"Foreign Loan" means (a) individually, each Australian Loan, each Canadian Loan and each Japanese Loan, and (b) collectively, all of the foregoing.

"Foreign Loan Cap" means (a) individually, the Australian Loan Cap, the Canadian Loan Cap and the Japanese Loan Cap as the context may require and (b) collectively, all of the foregoing.

"Foreign Loan Party" or "Foreign Loan Parties" means (a) individually, each of the Australian Loan Parties, each of the Canadian Loan Parties and each of the Japanese Loan Parties, and (b) collectively, all of them.

"Foreign Note" means (a) individually, each Australian Note and each Canadian Note, and (b) collectively, all of the foregoing.

"Foreign Overadvance" means (a) individually, each Australian Overadvance, each Canadian Overadvance and each Japanese Overadvance, and (b) collectively, all of the foregoing.

"Foreign Plans" has the meaning set forth in Section 5.12(e).

"Foreign Facilities" means (a) individually, the Australian Facility, the Canadian Facility and the Japanese Facility, and (b) collectively, all of the foregoing.

"Foreign Subsidiary" means each Subsidiary other than a Domestic Subsidiary.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Exposure" means, at any time there is a Defaulting Lender, with respect to the L/C Issuer, such Defaulting Lender's Applicable Percentage of the Outstanding Amount of all outstanding L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"Fronting Fee" has the meaning specified in Section 2.03(i).

"FSCO" means the Financial Services Commission of Ontario and any Person succeeding to the functions thereof and includes the Superintendent under such statute and any other Governmental Authority empowered or created by the *Supplemental Pension Plans Act* (Quebec) or the *Pension*

-47-

*Benefits Act* (Ontario) or any Governmental Authority of any other Canadian jurisdiction exercising similar functions in respect of any Canadian Pension Plan of any Canadian Loan Party and any Governmental Authority succeeding to the functions thereof.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied; provided that, (a) with respect to Foreign Subsidiaries of Parent organized under the laws of Canada, or any province or territory thereof, unless GAAP is being applied, "GAAP" shall mean principles which are consistent with those promulgated or adopted by the Canadian Institute of Chartered Accountants and its predecessors (or successors) in effect and applicable to the accounting period in respect of which reference to GAAP is being made, (b) with respect to the Australian Loan Parties and other Foreign Subsidiaries of the Parent incorporated in Australia, unless GAAP is being applied, "GAAP" shall mean the generally accepted accounting principles, standards and practices in Australia, and (c) with respect to the Japanese Loan Parties and other Foreign Subsidiaries of the Parent incorporated in Japan, unless GAAP is being applied, "GAAP" shall mean the generally accepted accounting principles, standards and practices in Japan.

"General Security Agreements" means each General Security Agreement dated as of the Effective Date among the respective Canadian Loan Parties and the Administrative Agent for the benefit of the Foreign Credit Parties.

"Governmental Authority" means the government of the United States, Canada, Australia, Japan, or any other nation, or any political subdivision thereof, whether state, local, provincial, territorial or municipal and any agency, authority, instrumentality, regulatory body, court, tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"GSI" means GSI Commerce Solutions, Inc.

"GST" means any goods or services tax, value added tax, consumption tax or similar tax including as that term is defined in the GST Act.

"GST Act" means *A New Tax System (Goods and Services Tax) Act 1999* (Cth) of Australia as, (a) amended or re-enacted, (b) any statute, regulation or provision enacted in replacement of that Law, (c) another regulation or other statutory instrument made or issued under that Law, and (d) any amendment made to a statute, regulation or provision as a consequence of another statute, regulation or provision.

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other

obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements of checks, drafts and other items for the payment of money for collection or deposit, in either case in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means (a) with respect to the Obligations (including, without limitation, the Foreign Liabilities), the Parent and each Domestic Subsidiary of any Domestic Loan Party that shall be required to execute and deliver a Facility Guaranty or Facility Guaranty supplement pursuant to Section 6.13(a) and (b) with respect to the Foreign Liabilities, each Foreign Borrower and each Foreign Subsidiary of any Foreign Loan Party (but only to the extent that such Foreign Subsidiary is organized under the Laws of Canada or a province thereof, Japan or Australia) that shall be required to execute and deliver a Facility Guaranty or Facility Guaranty supplement pursuant to Section 6.13(b), and (c) with respect to any Swap Obligation of a Specified Loan Party (determined before giving effect to Section 10.31, but subject in all respects to Section 10.29) under the Facility Guaranty, the Borrowers.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes regulated pursuant to any Environmental Law.

"Honor Date" has the meaning specified in Section 2.03(c)(i).

"Immaterial Subsidiary" means Q. S. Optics, Inc., a California corporation.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)      net obligations of such Person under any Swap Contract;

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      all Attributable Indebtedness of such Person;

(g)      all obligations of such Person in respect of Disqualified Stock; and

(h)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person and except to the extent such Person's liability for such Indebtedness is otherwise limited under applicable Law or otherwise.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"Indemnitee" has the meaning specified in Section 10.04(b).

"Intellectual Property" means all: trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, designs, logos, slogans, indicia of origin and other source identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications (including copyrights for computer programs), unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; any Loan Party's rights in any license agreements related to any of the foregoing and income therefrom; intellectual property rights in books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data and databases; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intellectual Property Security Agreement" means, as applicable, the Intellectual Property Security Agreement dated as of the Effective Date among the applicable Domestic Loan Parties and the Administrative Agent.

"Interest Payment Date" means, (a) as to any LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan, Canadian BA Rate Loan, or any Prime Rate Loan, the first day of each calendar month and the Maturity Date.

"Interest Period" means, as to each Committed Borrowing, the period commencing on the date such Loan is disbursed or automatically continued and ending on the date one month thereafter; provided that:

(i)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(ii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period;

(iii)    no Interest Period shall extend beyond the Maturity Date; and

(iv)    notwithstanding the provisions of clause (iii), no Interest Period shall have a duration of less than one (1) month, and if any Interest Period applicable to any LIBO Borrowing, BBR Rate Loan, TIBOR Rate Loan, or a Canadian BA Rate Loan, as applicable, would be for a shorter period, such Interest Period shall not be available hereunder.

For purposes hereof, the date of a Committed Borrowing initially shall be the date on which such Committed Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Committed Borrowing.

"Interim Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of Exhibit P hereto and otherwise acceptable to the Lenders and Administrative Agent, approving, inter alia, this Agreement and the other Loan Documents, and (a) authorizing the incurrence by the Loan Parties of interim secured indebtedness in accordance with this Agreement, (b) approving the indefeasible repayment of the Existing ABL Obligations as described herein, (c) approving the payment by the Loan Parties of the fees and other amounts contemplated by this Agreement, and (d) providing adequate protection to the Existing Senior Secured Noteholders in a manner satisfactory to the Required Lenders, which order shall not have been vacated, reversed, modified, amended or stayed.

"Interim Order Intercompany Loans" means the intercompany loans advanced by the Lead Borrower to the Japanese Borrower on the Interim Order Date in original principal amounts sufficient to pay off loans outstanding under the Existing Credit Agreement that are not held by the Lenders. Each Interim Order Intercompany Loan shall, (i) secured to the extent required by the DIP Term Loan Agreement, (ii) not include any scheduled or mandatory payments prior to the maturity or acceleration thereof, (iii) accrue interest at 5% per annum, all paid-in-kind on quarterly (and compounding) basis, (iv) have a maturity of not less than one (1) year from the Interim Order Date, (v) have no covenants other than the agreement to repay the loan on the maturity date and grant the security, on a post-closing basis, contemplated by clause (i), (vi) be cross-defaulted to an Event of Default under this Agreement; (vii) provide that the exercise of any rights or remedies of the secured lender shall be subject to the consent of the Administrative Agent; (viii) be pledged as security for the Obligations in a manner satisfactory to the Administrative Agent; and (ix) not be amended, modified or accelerated without the consent of the Administrative Agent.

"Interim Order Date" has the meaning set forth in the recitals hereto.

"Interim Order Period" means the period of time from the time at which the Bankruptcy Court enters the Interim Order until the time at which the Bankruptcy Court enters the Final Order.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Parent's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"In-Transit Inventory" means Inventory of a North America Borrowing Base Party that is in the possession of a common carrier and is in transit from a foreign location to either (a) with respect to Inventory of a Domestic Borrower, a location of such Domestic Borrower (or a location designated by such Domestic Borrower) that is in the United States or (b) with respect to Inventory of a Canadian Loan Party, a location of such Canadian Loan Party (or a location designated by such Canadian Loan Party) that is in Canada.

"Inventory" means all "inventory" as defined in the UCC, the PPSA or the Australian PPSA, as applicable, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as may be established from time to time by any Agent in its Permitted Discretion with respect to the determination of the saleability, at retail or wholesale, of the Eligible Inventory or which reflect such other factors as affect the market value of the Eligible Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Permitted Discretion of any Agent, include (but are not limited to) reserves based on:

        (a)    obsolescence;

        (b)    seasonality;

        (c)    Shrink;

        (d)    imbalance;

        (e)    change in Inventory character;

        (f)    change in Inventory composition;

        (g)    change in Inventory mix;

        (h)    mark-downs (both permanent and point of sale);

        (i)        retail mark-ons and mark-ups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events;

        (j)        out-of-date and/or expired Inventory; and

        (k)        seller's reclamation or repossession rights under any Debtor Relief Laws.

Upon the determination by any Agent, in its Permitted Discretion, that an Inventory Reserve should be established or modified, such Agent shall notify the Administrative Agent in writing and the Administrative Agent shall thereupon establish or modify such Inventory Reserve.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or Equity Interest in, another Person, or (c) any Acquisition. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IP Collateral" means "IP Collateral", as such term is defined in the Intellectual Property Security Agreement, any Intellectual Property rights subject to the Australian Security Documents, and any Intellectual Property rights subject to the Japanese Law governed Japanese Security Documents.

"IP Rights Agreement" means that certain letter agreement dated as of the Effective Date among QS Holdings, S.à.r.l. and 54th Street Holdings S.à.r.l. and the Administrative Agent regarding certain license agreements between QS Holdings, S.à.r.l. and 54th Street Holdings S.à.r.l. and the Australian Borrower and the Japanese Borrower, respectively.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" means, with respect to any Letter of Credit, the Letter Credit Application, and any other document, agreement and instrument entered into by the L/C Issuer and any Borrower (or any Subsidiary) or in favor the L/C Issuer and relating to any such Letter of Credit.

"Japanese Availability" means, as of any date of determination thereof, the result, if a positive number, of:

        (a)        the Japanese Loan Cap,

minus

        (b)        the Total Japanese Outstandings on such date.

In calculating Japanese Availability at any time and for any purpose under this Agreement any amount calculated or referenced in Dollars shall also refer to the Alternative Currency Equivalent in Yen.

"Japanese Base Rate" means the greater of (a) the "basic loan rate" established by the Bank of Japan from time to time as reflected at : http://www.boj.or.jp/en/statistics/boj/other/discount/discount.htm/, or (b) the TIBOR Rate for an Interest Period of one month plus one percent (1.00%) per annum.

"Japanese Base Rate Loan" means a Loan that bears interest at the Japanese Base Rate.

"Japanese Borrower" has the meaning specified in the introductory paragraph hereto and shall include, as applicable, any Japanese Subsidiary that becomes a Borrower after the Effective Date pursuant to Section 6.13(b).

"Japanese Borrowing" means a Committed Japanese Borrowing.

"Japanese Borrowing Base" means, at any time of calculation, an amount in Yen (or the Dollar Equivalent thereof) equal to:

(a)    the face amount of Eligible Trade Receivables of the Japanese Borrower (net of Receivables Reserves applicable thereto) multiplied by the Receivables Advance Rate;

plus

(b)    the Cost of Eligible Inventory (other than Eligible In-Transit Inventory) of the Japanese Borrower, net of Inventory Reserves applicable thereto, multiplied by the Appraisal Percentage of the Appraised Value of Eligible Inventory (other than Eligible In-Transit Inventory) of the Japanese Borrower;

minus

(c)    the then amount of all Availability Reserves applicable to the Japanese Borrower. In no event shall the amount of Availability Reserves subtracted in calculating the Japanese Borrowing Base be duplicative of Availability Reserves subtracted in calculating any other Borrowing Base.

"Japanese Commitments" means, as to each Japanese Lender, its obligation to make Committed Japanese Loans to the Japanese Borrower pursuant to Section 2.01, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Japanese Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Japanese Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Japanese Concentration Account" means the account maintained by the Administrative Agent at Bank of America, N.A. (Japan branch) into which cash receipts and collections of the Japanese Loan Parties (including, without limitation, from the Collateral) are deposited to the extent required hereby or by any other Loan Document.

"<u>Japanese Credit Party</u>" or "<u>Japanese Credit Parties</u>" means (a) individually, (i) each Japanese Lender and its Lender Affiliates, (ii) the Agents and their respective Lender Affiliates, and (iii) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"<u>Japanese Depository Banks</u>" means each of The Bank of Tokyo – Mitsubishi UFJ Ltd., Mizuho Bank Ltd., Sumitomo Mitsui Banking Corporation, Tokyo Tomin Bank, The Bank of Yokohama, Ltd. and Resona Bank, Limited.

"<u>Japanese Facility</u>" means the revolving credit facility in favor of the Japanese Borrower established pursuant to this Agreement.

"<u>Japanese Lenders</u>" means the Lenders having Japanese Commitments from time to time or at any time.

"<u>Japanese Liabilities</u>" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Japanese Loan Party arising under any Loan Document or otherwise with respect to any Japanese Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs and expenses that accrue after the commencement by or against any Japanese Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, and (b) any Other Japanese Liabilities.

"<u>Japanese Loan</u>" means an extension of credit by a Japanese Lender to the Japanese Borrower under <u>Article II</u> in the form of a Committed Loan.

"<u>Japanese Loan Cap</u>" means, at any time of determination, the lesser of (a) $_____,[3] and (b) the Japanese Borrowing Base.

"<u>Japanese Loan Parties</u>" means, collectively, the Japanese Borrower and each Japanese Subsidiary that is a Guarantor of the Japanese Liabilities. "Japanese Loan Party" means any one of such Persons.

"<u>Japanese Overadvance</u>" means a Japanese Credit Extension to the extent that, immediately after the making of such Japanese Credit Extension, the aggregate principal balance of all Japanese Credit Extensions then outstanding exceeds the Japanese Loan Cap as then in effect.

"<u>Japanese Priority Payable Reserve</u>" means, on any date of determination, a reserve in such amount as the Administrative Agent may determine in its Permitted Discretion which reflects amounts secured by any Liens, choate or inchoate, which rank or are capable of ranking in priority to the Administrative Agent's and/or the Japanese Secured Parties' Liens and/or for amounts which may

---

[3] To be inserted on the Effective Date by the Administrative Agent, reflecting the amount of Japanese Liabilities owing to Bank of America and outstanding on the Petition Date.

represent costs relating to the enforcement of the Administrative Agent's or the Japanese Secured Parties' Liens.

"Japanese Secured Parties" means "Secured Parties" as such term is defined in each of the Japanese Security Documents.

"Japanese Security Documents" means each (a) movable assets security agreement (with respect to Equipment and Inventory), (b) account receivables security agreement, (c) trademark security agreement, (d) bank account pledge agreement, (e) insurance claims pledge agreement, and (f) each other security agreement or other instrument or document executed and delivered by any Japanese Loan Party to an Agent and/or each of the Japanese Secured Parties pursuant to this Agreement or any other Loan Document granting a Lien on assets of any Japanese Loan Party for the benefit of the Japanese Secured Parties, as security for the Foreign Liabilities.

"Japanese Subsidiary" means any Subsidiary that is organized under the laws of Japan.

"Joinder Agreement" means an agreement, in the form attached hereto as Exhibit F-1 (Joinder Agreement – Domestic Loan Parties), Exhibit F-2 (Joinder Agreement – Foreign Loan Parties), or such other form as is reasonably satisfactory to the Agents, pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as applicable.

"Landlord Lien State" means (a) Pennsylvania, Virginia, Washington and such other state(s) determined by the Agents in their Permitted Discretion in which a landlord's claim for rent may have priority over the Liens of the Administrative Agent in any of the Eligible Inventory of the Domestic Borrowers, under the Security Documents and (b) Ontario, Nova Scotia, Alberta, Manitoba and British Columbia and such other province(s) determined by the Agents in their Permitted Discretion in which a landlord's claim for rent may have priority over the Liens of the Administrative Agent on any of the Eligible Inventory of the Canadian Loan Parties under the Security Documents.

"Laws" means each international, foreign, federal, state, provincial, territorial, municipal and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"L/C Advance" means, with respect to each Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Applicable Percentage. All L/C Advances shall be denominated in Dollars.

"L/C Borrowing" means (a) individually, each of a Domestic L/C Borrowing and an Australian L/C Borrowing, and (b) collectively, all of the foregoing. All L/C Borrowings shall be denominated in Dollars.

"L/C Credit Extension" means (a) each of a Domestic L/C Credit Extension and an Australian L/C Credit Extension and (b) collectively, means all of the foregoing.

"L/C Issuer" means Bank of America in its capacity as issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder (which successor may only be a Lender selected by

the Administrative Agent in its discretion and reasonably acceptable to the Lead Borrower).  The L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Lender Affiliates of the L/C Issuer, in which case the term "L/C Issuer" shall include any such Lender Affiliate with respect to Letters of Credit issued by such Lender Affiliate.

"L/C Obligations" means, collectively, the Australian L/C Obligations and the Domestic L/C Obligations.  For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06.  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Lead Borrower" has the meaning specified in the introductory paragraph hereto.

"Lease" means any written agreement pursuant to which a Loan Party is entitled to the use or occupancy of any real property for any period of time.

"Lender" means each Domestic Lender, each Canadian Lender, each Australian Lender and each Japanese Lender.

"Lender Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Lending Office" means, as to any Lender, the office or offices of such Lender provided in writing to the Administrative Agent, or such other office or offices as a Lender may from time to time notify the Administrative Agent.

"Lessor Notification" has the meaning specified in Section 6.14(a)(iii).

"Letter of Credit" means each Standby Letter of Credit, each Commercial Letter of Credit, each Existing Letter of Credit, each documentary banker's acceptance and, to the extent applicable, each foreign guarantee issued hereunder.  Letters of Credit may be issued in Dollars or in an Alternative Currency.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"Letter of Credit Expiration Date" means the day that is seven days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Fee" has the meaning specified in Section 2.03(h).

"LIBO Borrowing" means a Committed Borrowing comprised of LIBO Rate Loans.

"LIBO Rate" means,

(a)    for any Interest Period with respect to a LIBO Rate Loan, the rate per annum rate which appears on the Reuters Screen LIBOR01 page as of 11:00 a.m., London time, on the second London

Business Day preceding the first day of such Interest Period (or if such rate does not appear on the Reuters Screen LIBOR01 Page, then the rate as determined by the Administrative Agent from another recognized source or interbank quotation), for a term, and in an amount, comparable to the Interest Period and the amount of the LIBO Rate Loan requested (whether as an initial LIBO Rate Loan or as a continuation of a LIBO Rate Loan or as a conversion of a Base Rate Loan to a LIBO Rate Loan) by the applicable Borrowers in accordance with this Agreement (and, if any such rate is below zero, the LIBO Rate shall be deemed to be zero), which determination shall be made by administrative Agent and shall be conclusive in the absence of manifest error. If such rate is not available at such time for any reason, then the "LIBO Rate" for such Interest Period shall be the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBO Rate Loan being made, continued or converted by Bank of America and with a term equivalent to such Interest Period would be offered to Bank of America by major banks in the London interbank eurodollar market in which Bank of America participates at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period, and

(b)      for any interest calculation with respect to a Domestic Prime Rate Loan or a Canadian Base Rate Loan on any date, the rate per annum equal to (i) LIBOR, at approximately 11:00 a.m., London time determined two London Banking Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the date of determination in same day funds in the approximate amount of the Domestic Prime Rate Loan or Canadian Base Rate Loan being made or maintained and with a term equal to one month would be offered by Bank of America's London Branch to major banks in the London interbank Eurodollar market at their request at the date and time of determination.

"LIBO Rate Loan" means a Committed Loan that bears interest at a rate based on the Adjusted LIBO Rate. LIBO Rate Loans may be denominated in Dollars or in an Alternative Currency.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, pledge, hypothecation, assignment in the nature of a security interest, deposit arrangement in the nature of a security interest, encumbrance, lien (statutory or other), charge or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing relating to such asset) and, with respect to the Canadian Loan Parties, also includes any deemed trust or prior claim in, on or of such asset, and, with respect to the Australian Loan Parties, also includes any 'security interest' as defined in sections 12 (1) and 12(2) of the Australian PPSA and, with respect to the Japanese Loan Parties, includes any constructive transfers (*joto tampo* by way of *senyu kaitei*), and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidation" means the exercise by the Administrative Agent, the Australian Security Trustee, or the Collateral Agent, as applicable, of those rights and remedies accorded to such Persons under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agents, of any public, private or "going-out-

of-business", "store closing" or other similar sale or any other disposition of the Collateral for the purpose of liquidating the Collateral as well as the collection or other disposition of any of the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Liquidation Percentage" shall mean, for any Lender, a fraction, the numerator of which is the sum of such Lender's and its Lender Affiliates' Commitments immediately prior to the Determination Date and the denominator of which is the Aggregate Total Commitments immediately prior to the Determination Date.

"Loan" means a Domestic Loan and an extension of credit to a Foreign Borrower pursuant to Article II in the form of a Committed Loan.

"Loan Account" has the meaning assigned to such term in Section 2.11(a).

"Loan Documents" means this Agreement, each Note, each Issuer Document, the Fee Letter, all Borrowing Base Certificates, the Security Documents, each Facility Guaranty, the Reaffirmation Agreement, any agreement creating or perfecting rights in Cash Collateral pursuant to the provisions of Section 2.17, and any other instrument or agreement now or hereafter executed and delivered by any Loan Party in connection herewith.

"Loan Parties" means, collectively, the Domestic Loan Parties and the Foreign Loan Parties. "Loan Party" means any one of such Persons.

"London Banking Day" means any day on which dealings in Dollar deposits are conducted by and between banks in the London Eurodollar Interbank Market.

"Mandatory Cost" means, with respect to any period, the percentage rate per annum determined in accordance with Schedule 1.03.

"Master Agreement" has the meaning set forth in the definition of "Swap Contract."

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or financial condition  of the Parent and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material impairment of the rights and remedies of any Agent or the Lenders under the Loan Documents or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of the Loan Documents to which it is a party.  In determining whether any individual event would result in a Material Adverse Effect for the purposes of determining compliance with any representation, warranty, covenant or event of default under this Agreement, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then existing events subject to such representation, warranty, covenant or event of default would result in a a Material Adverse Effect. Notwithstanding anything herein to the contrary, the act of filing the Cases shall not in itself constitute Material Adverse Effect.

"Material Contract" means, with respect to any Person, each contract to which such Person is a party, the breach or termination of which would (or would be reasonably likely to) result in a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $10,000,000 (including, for purposes of calculating such amount, undrawn committed or available amounts and amounts owing to all creditors under any combined or syndicated credit arrangement).    Without limitation of the foregoing, the Indebtedness under the DIP Term Loan Agreement, the Boardriders Notes and any credit facility in favor of any European Subsidiary in an aggregate principal amount exceeding $10,000,000 (if any Loan Party is an obligor thereunder, whether as a guarantor or otherwise) shall be deemed Material Indebtedness. For purposes of determining the amount of Material Indebtedness at any time, the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof.

"Maturity Date" means [_____].[4]

"Maximum Rate" has the meaning provided in Section 10.09.

"Minimum Collateral Amount" means, at any time, (i) with respect to Cash Collateral consisting of cash or deposit account balances provided to reduce or eliminate Fronting Exposure during the existence of a Defaulting Lender, an amount equal to 103% of the Fronting Exposure of the L/C Issuer with respect to Letters of Credit issued and outstanding at such time, (ii) with respect to Cash Collateral consisting of cash or deposit account balances provided in accordance with the provisions of Section 2.17(a)(i), (a)(ii) or (a)(iii), an amount equal to 103% of the Outstanding Amount of all L/C Obligations, and (iii) otherwise, an amount determined by the Administrative Agent and the L/C Issuer in their sole discretion.

"MLPFS" means Merrill Lynch, Pierce, Fenner & Smith Incorporated and its successors.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including a Loan Party or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Non-Consenting Lender" has the meaning provided therefor in Section 10.01.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Qualifying Japanese Lender" means a Japanese Lender other than:

---

[4] 150 days after the Petition Date

(a)     a Japanese Lender that exists, is created or organized under the Laws of Japan and is either lending from an office in Japan or a branch office outside of Japan;

(b)     a Japanese Lender that is not created or organized under the Laws of Japan but is acting through a branch or other permanent establishment located in Japan and holds a valid Certificate of Exemption for Withholding Tax for Foreign Corporations issued by the relevant Tax authorities in Japan; and

(c)     a Japanese Lender which is treated as an eligible resident of a jurisdiction having entered into a double taxation treaty with Japan which double taxation treaty is in effect and which provides for exemption from Japanese withholding tax imposed on all interest and other payments hereunder and under the other Loan Documents.

"Non-U.S. Lender" means any Lender that is organized under the laws of a jurisdiction other than the United States, each State thereof and the District of Columbia.

"North America Borrowing Base Party" means (a) individually, each of the Domestic Borrowers and the Canadian Loan Parties, and (b) collectively, all of the foregoing.

"North American Concentration Account" means (a) individually, each Canadian Concentration Account and each Domestic Concentration Account, and (b) collectively, all of the foregoing.

"Note" means either a Domestic Note or a Foreign Note, as the context may require.

"Novation Deed" means the Novation Deed by and among DC Shoes Australia Pty Ltd, DC Shoes, Inc., Ug Manufacturing Co. Pty Ltd and the Australian Security Trustee dated as of May 24, 2013 regarding that certain Amended and Restated DC Shoes, Inc. License and Services Agreement dated November 1, 2011.

"NPL" means the National Priorities List under CERCLA.

"NVOCC" means with respect to any In-Transit Inventory, a non-vessel operating common carrier engaged as a freight forwarder or otherwise to assist in the importation of In-Transit Inventory.

"Obligations" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants and indemnities of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs and expenses that accrue after the commencement by or against any Loan Party or any Subsidiary thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, and (b) any Other Liabilities.  Without limiting the foregoing, for purposes of clarity, whenever used herein the term "Obligations" shall (i) include all Foreign Liabilities, and (ii) as to any Loan Party, exclude any Excluded Swap Obligations with respect to such Loan Party (but not Obligations of any other Loan Party with respect thereto).

"Office Campus" means the real property located in Saint-Jean-de-Luz, France and owned in fee simple by a Foreign Subsidiary

"Orders" means, collectively, the Interim Order and the Final Order.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, (d) with respect to any unlimited liability company, the memorandum of association and articles of association (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); and (e) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests.

"Organized Crime Group Member Etc." has the meaning specified in Section 5.26.

"Other Australian Liabilities" means any obligation on account of: (a) any Cash Management Services furnished to any of the Australian Loan Parties or any of their Australian Subsidiaries and/or (b) any transaction which arises out of any Bank Product entered into with any Australian Loan Party or any of its Australian Subsidiaries.

"Other Canadian Liabilities" means any obligation on account of: (a) any Cash Management Services furnished to any of the Canadian Loan Parties or any of their Canadian Subsidiaries and/or (b) any transaction which arises out of any Bank Product entered into with any Canadian Loan Party or any of its Canadian Subsidiaries.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed solely as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, oor enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Domestic Liabilities" means any obligation on account of: (a) any Cash Management Services furnished to any of the Domestic Loan Parties or any of their Domestic Subsidiaries and/or (b) any transaction which arises out of any Bank Product entered into with any Domestic Loan Party or any of its Domestic Subsidiaries.

"Other Japanese Liabilities" means any obligation on account of: (a) any Cash Management Services furnished to any of the Japanese Loan Parties or any of their Japanese Subsidiaries and/or (b) any transaction which arises out of any Bank Product entered into with any Japanese Loan Party or any of its Japanese Subsidiaries.

"<u>Other Liabilities</u>" means, collectively, all Other Canadian Liabilities, all Other Domestic Liabilities, all Other Australian Liabilities and all Other Japanese Liabilities.

"<u>Other Taxes</u>" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.06) or with respect to a participation.

"<u>Outstanding Amount</u>" means (i) with respect to Committed Loans on any date, the Dollar Equivalent amount of the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Committed Loans occurring on such date; and (ii) with respect to any L/C Obligations on any date, the Dollar Equivalent amount of the aggregate outstanding amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by any Borrower of Unreimbursed Amounts, or the refinancing of such unreimbursed amounts as Committed Borrowings.

"<u>Overadvance</u>" means a Canadian Overadvance, a Domestic Overadvance, an Australian Overadvance or a Japanese Overadvance.

"<u>Overnight Rate</u>" means, for any day, (a) with respect to any amount denominated in Dollars, the greater of (i) the Federal Funds Rate and (ii) an overnight rate determined by the Administrative Agent or the L/C Issuer in accordance with banking industry rules on interbank compensation, (b) with respect to any amount denominated in Canadian Dollars, the Bank of Canada Overnight Rate, and (c) with respect to any amount denominated in any other Alternative Currency, the rate of interest per annum at which overnight deposits in the applicable Alternative Currency, in an amount approximately equal to the amount with respect to which such rate is being determined, would be offered for such day by a branch or Affiliate of Bank of America in the applicable offshore interbank market for such currency to major banks in such interbank market.

"<u>Parent</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Participant</u>" has the meaning specified in <u>Section **Error! Reference source not found.**</u>.

"<u>Participating Member State</u>" means any member state of the European Union that has the Euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"<u>Patriot Act</u>" means USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"<u>Payment in Full</u>" means (a) the payment in full in cash of all Obligations (or with respect to the Foreign Borrowers, all Foreign Liabilities), including, without limitation, with respect to amounts available to be drawn under outstanding Letters of Credit, the cancellation of such Letters of Credit or the delivery or provision of money or backstop irrevocable letters of credit, in form, on terms, and issued by a financial institution reasonably acceptable to the Administrative Agent, in respect thereof in an amount equal to 103% of the L/C Obligations, and (b) the termination of all obligations of the L/C

Issuer to issue Letters of Credit and the termination of all Commitments hereunder. The term "Paid in Full" shall have a correlative meaning.

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by a Domestic Loan Party or any ERISA Affiliate or to which a Domestic Loan Party or any ERISA Affiliate has maintained, contributed to, or been obligated to make contributions during the preceding five plan years and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Permitted Discretion" means a determination made in good faith and in the exercise of commercially reasonable business judgment in accordance with customary business practices for comparable asset based lending transactions.

"Permitted Disposition" means each of the following:

(a)      Dispositions of Inventory in the ordinary course of business solely for cash consideration;

(b)      bulk sales or other Dispositions of the Inventory or any other asset of any Loan Party or any Subsidiary solely for cash consideration in connection with Store closings, at arm's length, provided, that, unless otherwise approved by Required Lenders, (1) (x) all such bulk sales or Dispositions shall be consistent with the Budget and (2) notwithstanding anything to the contrary contained herein, (y) there shall not be more than 30 Store closures during the term of this Agreement and (z) any such Store closures shall be in accordance with liquidation agreements and with professional liquidators reasonably acceptable to the Required Lenders;

(c)      licenses of Intellectual Property of a Loan Party or any of its Subsidiaries in the ordinary course of business, in each case, subject to any rights of the Administrative Agent to use such Intellectual Property pursuant to any Loan Document or agreement with any Affiliate of a Loan Party;

(d)      licenses for the conduct of licensed departments within any Loan Party's or Subsidiary's Stores in the ordinary course of business; provided that, in the case of any Loan Party, if requested by the Administrative Agent, the applicable Loan Party shall have used commercially reasonable efforts to cause the Person operating such licensed department to enter into an intercreditor agreement with the Administrative Agent, on terms and conditions reasonably satisfactory to the Administrative Agent;

(e)       Dispositions of Equipment and other assets (including abandonment of or other failures to maintain, preserve, renew, protect or keep in full force and effect Intellectual Property) in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary;

(f)       Dispositions among the Domestic Loan Parties (other than any Disposition to an Immaterial Subsidiary);

(g)       Dispositions by any Subsidiary which is not a Loan Party to any other Subsidiary which is not a Loan Party;

(h)       Dispositions of the Office Campus in connection with a sale-leaseback transaction on market terms, provided that the Indebtedness deemed to arise therefrom is permitted under clause (k) of the definition of "Permitted Indebtedness";

(i)       Dispositions consisting of the compromise, settlement or collection of Accounts receivable in the ordinary course of business, consistent with past practices;

(j)       leases, subleases, space leases, licenses or sublicenses of Real Estate (and terminations of any of the foregoing), in each case in the ordinary course of business and which do not materially interfere with the business of the Parent and its Subsidiaries, taken as a whole;

(k)       Dispositions of cash, cash equivalents and Permitted Investments described in clauses (a) through (h) of the definition of "Permitted Investments" contained in this Agreement, in each case on ordinary business terms and, to the extent constituting a Disposition, the making of Permitted Investments;

(l)       any Disposition of Real Estate to a Governmental Authority as a result of the condemnation of such Real Estate;

(m)       Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property that is promptly purchased or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property (which replacement property is actually promptly purchased);

(n)       to the extent constituting a Disposition, (i) transactions permitted by Section 7.04, (ii) Restricted Payments permitted by Section 7.06 and (iii) Liens permitted by Section 7.01;

(o)       Dispositions of the Champs-Élysées Lease for fair market cash consideration on market terms;

(p)       other Dispositions (other than Dispositions of Intellectual Property) at fair market value for consideration not exceeding $7,500,000 in the aggregate during the term of this Agreement so long as no Event of Default has occurred and is continuing or would immediately result therefrom;

(q)       early termination of leases or subleases consistent with the Budget;

-65-

(r)    Dispositions of assets related to the "Ampla" brand; and

(s)    Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property; provided that to the extent the property being transferred constitutes Collateral included in any Borrowing Base, such replacement property shall constitute Collateral included in a Borrowing Base.

"Permitted Domestic Overadvance" means a Domestic Overadvance made by the Administrative Agent, in its Permitted Discretion, which:

(a)    is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties; or

(b)    is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation; or

(c)    is made to pay any other amount chargeable to any Loan Party hereunder or any other Loan Document; and

(d)    together with all other Permitted Domestic Overadvances then outstanding, shall not (i) exceed at any time the lesser of $10,000,000 or ten percent (10%) of the Domestic Borrowing Base at any time or (ii) unless a Liquidation is occurring, remain outstanding for more than thirty (30) consecutive Business Days, unless in each case, the Required Lenders otherwise agree;

provided, that the foregoing shall not (i) modify or abrogate any of the provisions of Section 2.03 regarding each Domestic Lender's obligations with respect to Domestic Letters of Credit, or (ii) result in any claim or liability against the Administrative Agent (regardless of the amount of any Domestic Overadvance) for "inadvertent Domestic Overadvances" (i.e. where a Domestic Overadvance results from changed circumstances beyond the control of the Administrative Agent (such as a reduction in the value of Collateral)), and such "inadvertent Domestic Overadvances" shall not reduce the amount of Permitted Domestic Overadvances allowed hereunder, and provided further, that in no event shall the Administrative Agent make a Domestic Overadvance, if after giving effect thereto, the principal amount of the Domestic Credit Extensions would exceed the Aggregate Domestic Commitments (as in effect prior to any termination of the Domestic Commitments pursuant to Section 2.06 hereof).

"Permitted Encumbrances" means any of the following:

(a)    Liens imposed by law for Taxes that (i) with respect to the Foreign Loan Parties, are not yet due or are being contested in compliance with Section 6.04, or (ii) with respect to the Domestic Loan Parties, are not yet due or constitute prepetition claims;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlords', movables seller's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or (x) with respect to the Foreign Loan Parties, are being contested in compliance with Section 6.04, and (y) with respect to the Domestic Loan Parties, constitute prepetition claims;

(c)      pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security or similar laws or regulations, other than any Lien imposed by ERISA or any other applicable Law relating to Plans;

(d)      deposits to secure or relating to the performance of bids, trade contracts, government contracts and leases (other than Indebtedness), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)      Liens in respect of judgments that do not constitute an Event of Default hereunder;

(f)      easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Parent, the other Loan Parties and their Subsidiaries, taken as a whole, and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the ordinary conduct of business of the Parent and its Americas/Foreign Subsidiaries, taken as a whole;

(g)      Liens existing on the date hereof and listed on Schedule 7.01 and any renewals or extensions thereof, provided that (i) the property covered thereby is not changed other than after-acquired property affixed or incorporated thereto and proceeds or products thereof, (ii) the amount secured or benefited thereby is not increased except to the extent permitted hereunder, and (iii) any renewal or extension of the obligations secured or benefited thereby is permitted hereunder;

(h)      Liens on fixed or capital assets acquired by any Loan Party or any Subsidiary securing Indebtedness permitted under clause (c) of the definition of Permitted Indebtedness so long as (i) such Liens and the Indebtedness secured thereby are incurred prior to or within one hundred and eighty (180) days after such acquisition (other than refinancing thereof permitted hereunder), (ii) the Indebtedness secured thereby does not exceed the cost of acquisition of such fixed or capital assets and (iii) such Liens shall not extend to any other property or assets of the Loan Parties (other than replacements thereof and additions and accessions to such property and the proceeds and the products thereof; provided that individual financings of Equipment provided by one lender may be cross-collateralized with other financings of Equipment provided by such lender;

(i)      Liens in favor of the Agents under the Security Documents for its own benefit and the benefit of the other Credit Parties, as applicable;

(j)      landlords' and lessors' Liens in respect of rent not in default for more than any applicable grace period, not to exceed thirty (30) days;

(k)      possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the date hereof and other Permitted

Investments, provided that such Liens (i) attach only to such Investments or other Investments held by such broker or dealer and (ii) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(l)     Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)     Liens (if any) arising from precautionary UCC or PPSA filings or similar filings regarding "true" operating leases, or  the consignment of goods to a Loan Party or any Subsidiary;

(n)     DIP Term Liens in favor of the DIP Term Agent, provided that such DIP Term Liens are subject to the terms and conditions of the DIP Intercreditor Agreement;

(o)     Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations (i) that are not overdue by more than thirty (30) days, or (ii)(A) that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation;

(p)     Existing Senior Secured Note Liens provided that such Existing Senior Secured Note Liens are subordinate in priority to the Liens granted under the Loan Documents in all respects;

(q)     leases or subleases granted to others in the ordinary course of business which do not interfere in any material respect with the business of the Parent and its Subsidiaries, taken as a whole;

(r)     any interest or title of a licensor, sublicensor, lessor or sublessor under licenses, leases, sublicenses, or subleases entered into by the Parent or any of its Subsidiaries in the ordinary course of business provided such interest or title is limited to the property that is the subject of such transaction;

(s)     Liens in respect of the licensing and sublicensing of Intellectual Property in the ordinary course of business;

(t)     Liens that are contractual rights of set-off relating to purchase orders and other similar agreements entered into by the Parent or any of its Subsidiaries;

(u)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto incurred in the ordinary course of business;

(v)     Liens securing the Carve-Out;

(w)     Priority Permitted Encumbrances;

(x)     Liens securing Indebtedness of Foreign Subsidiaries in existence on the Petition Date or securing Indebtedness permitted pursuant to clause (k) of the definition of "Permitted Indebtedness"; provided that no such Liens encumber any assets of any Loan Party;

(y)     Liens on the Office Campus in connection with a sale-leaseback thereof, provided that the Indebtedness deemed to arise therefrom is permitted under clause (k) of the definition of "Permitted Indebtedness";

(z)     in respect of each Australian Loan Party, as long as no Event of Default exists at the time of incurrence thereof, any Lien arising prior to or after the Effective Date, which arises by the operation of the Australian PPSA in respect of an asset or in the proceeds of an asset which is the subject of a conditional sale or hire purchase arrangement or retention of title arrangement or any commingled product or mass of which it becomes part, where the obligation secured by that Lien is limited to the unpaid balance of purchase money for the original asset and that unpaid balance is not overdue by more than thirty (30) days or is being contested in compliance with Section 6.04;

(aa)    in respect of each Japanese Loan Party, as long as no Event of Default exists at the time of incurrence thereof, any Lien arising prior to or after the Effective Date, which is the subject of a retention of title arrangement or any commingled product or mass of which it becomes part, where the obligation secured by that Lien is limited to the unpaid balance of purchase money for the original asset and that unpaid balance is not overdue by more than thirty (30) days or is being contested in compliance with Section 6.04;

(bb)    other Liens securing obligations in an aggregate outstanding principal amount not to exceed $7,500,000 at any time outstanding; provided that (i) if such Lien secures Indebtedness in excess of $500,000 and is secured by any of the Collateral of the type included in any Borrowing Base, if reasonably requested by the Administrative Agent, the holder of such Indebtedness (or an agent or representative thereof) shall have entered into an intercreditor agreement on terms reasonably satisfactory to the Administrative Agent and (ii) post-petition Liens permitted hereby may not secure more than $500,000 aggregate principal amount of Indebtedness or other Obligations at any time outstanding and no such Lien shall have priority senior to, or be pari passu with, the Liens securing the Obligations or the Liens in favor of the Agents under the Security Documents; and

(bb)    Liens securing the Interim Order Intercompany Loans (in accordance with the definition thereof).

Provided that, if any Lien described in any of the clauses other than clause (i), is not permitted to be incurred or exist pursuant to the DIP Term Documents, then notwithstanding the inclusion of such Lien in the foregoing definition of "Permitted Encumbrances", such Lien shall not be permitted hereunder.

"Permitted Foreign Overadvance" means a Foreign Overadvance made by the Administrative Agent (including acting through its global branches and Lender Affiliates), in its Permitted Discretion, which:

(a)    is made to maintain, protect or preserve the Collateral of any of the Foreign Loan Parties and/or the Foreign Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties; or

(b)    is made to enhance the likelihood of, or maximize the amount of, repayment of any of the Foreign Liabilities; or

(c)    is made to pay any other amount chargeable to any Foreign Loan Party hereunder or under any other Loan Document; and

(d)    together with all other Permitted Foreign Overadvances to any particular Foreign Borrower then outstanding, shall not (i) exceed at any time the lesser of $1,000,000 or ten percent (10%) of the Borrowing Base of such Foreign Borrower at any time or (ii) unless a Liquidation is occurring, remain outstanding for more than thirty (30) consecutive Business Days, unless in each case, the Required Lenders otherwise agree;

provided, that advances under the foregoing clauses (a), (b) and (c) shall be made only to the extent such amounts are not paid for by the Loan Parties or by the DIP Term Agent; provided further, that, the foregoing shall not (i) modify or abrogate any of the provisions of Section 2.03 regarding each Foreign Lender's obligations with respect to Foreign Letters of Credit, or (ii) result in any claim or liability against the Administrative Agent or its branches or Lender Affiliates (regardless of the amount of any Foreign Overadvance) for "inadvertent Foreign Overadvances" (i.e. where a Foreign Overadvance results from changed circumstances beyond the control of the Administrative Agent (such as a reduction in the value of Collateral)), and such "inadvertent Foreign Overadvances" shall not reduce the amount of Permitted Foreign Overadvances allowed hereunder, and provided further, that in no event shall the Administrative Agent, its branches or Lender Affiliates make a Foreign Overadvance, if after giving effect thereto, the principal amount of the Foreign Credit Extensions to any Foreign Borrower would exceed the Aggregate Applicable Commitments for such Foreign Borrower (as in effect prior to any termination of the Commitments for such Foreign Borrower pursuant to Section 2.06 hereof).

"Permitted Indebtedness" means, without duplication, each of the following:

(a)    Indebtedness outstanding on the date hereof and listed on Schedule 7.03;

(b)    Indebtedness (i) of any Loan Party to any other Loan Party (other than an Immaterial Subsidiary); (ii) of any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party; and (iii) of any Subsidiary that is not a Loan Party to any Loan Party (other than an Immaterial Subsidiary);

(c)    purchase money Indebtedness of any Loan Party or any Subsidiary to finance the acquisition of any fixed or capital assets, including Capital Lease Obligations and Synthetic Lease Obligations, and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof; provided, however, that any such obligations that were not in existence as of the Petition Date shall not exceed $1,000,000 aggregate principal amount at any time outstanding;

(d)    the Boardriders Notes in the aggregate principal amount outstanding as of the Petition Date;

(e)     Indebtedness in respect of performance bonds, bid bonds, customs and appeal bonds, surety bonds, performance and completion guarantees and similar obligations related thereto, in each case provided in the ordinary course of business;

(f)     the DIP Term Claims in a maximum aggregate principal amount not to exceed $138,000,000;

(g)     [reserved];

(h)     the Existing Senior Secured Note Obligations;

(i)     the Obligations;

(j)     unsecured Guarantees by the Parent in connection with Indebtedness of any Foreign Subsidiaries of the Parent in existence as of the Petition Date;

(k)     other Indebtedness of all Foreign Subsidiaries in an aggregate principal amount not to exceed the sum of (x) €90,000,000 minus (y) Investments made pursuant to clause (q) of the definition of "Permitted Investments", in each case, incurred on market terms (as reasonably determined by the Borrower) at any time outstanding (provided however that no such Indebtedness may include any prepayment premium, back-end fee or similar item in excess of 1% of the principal amount of such Indebtedness);

(l)     (i) Indebtedness constituting indemnification obligations or obligations in respect of purchase price or other similar adjustments in connection with Permitted Dispositions; and (ii) Indebtedness consisting of obligations of any Loan Party or any Subsidiary under deferred compensation or other similar arrangements incurred by such Person in connection with any Permitted Investment;

(m)     Indebtedness consisting of the financing of insurance premiums incurred in the ordinary course of business of any Loan Party or any Subsidiary;

(n)     Guarantees (i) of any Indebtedness of any Loan Party or any Subsidiary thereof described in clause (a) hereof, (ii) by any Loan Party of any Indebtedness of another Loan Party permitted hereunder, (iii) by any Loan Party of Indebtedness otherwise permitted hereunder of any Subsidiary that is not a Loan Party to the extent such Guarantees are permitted pursuant to Section 7.02, and (iv) by any Subsidiary that is not a Loan Party of Indebtedness of another Subsidiary that is not a Loan Party;

(o)     the Interim Order Intercompany Loans in an aggregate principal amount not to exceed the amount specified in the definition of such term plus any interest paid-in-kind thereon;

(p)     Indebtedness consisting of obligations of any Loan Party or any Subsidiary under deferred compensation or other similar arrangements incurred by such Person in connection with any Investment to the extent permitted under Section 7.02;

(q)     obligations in respect of Bank Products and Cash Management Services and other Indebtedness in respect of netting services, automatic clearinghouse arrangements,

overdraft protections and similar arrangements , in each case, to the extent permitted by the Cash Management Order;

(r)     Indebtedness incurred by any Loan Party or any Subsidiary in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business consistent with past practice in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that any such Indebtedness of a Loan Party shall be unsecured;

(s)     without duplication of any Indebtedness described in clause (a) through (r) above, other Indebtedness in an aggregate principal amount not to exceed $1,000,000 at any time outstanding  (provided, that this clause (s) shall not be used by any Loan Party to extend any credit to any Immaterial Subsidiary);

(t)     [reserved]; and

(t)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (s) above.

Notwithstanding anything to the contrary contained in this Agreement, the aggregate amount of Indebtedness that is incurred under clause (k) above in any currency other than Euros shall be determined based on currency exchange rates as of the date of incurrence and the limit set forth in clause (k) above will not be deemed to have been exceeded solely as a result of fluctuations in currency exchange rates.

"Permitted Investments" means each of the following:

(a)     readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America (or with respect to a Foreign Subsidiary, any country (or province thereof, as applicable) in which such Foreign Subsidiary is incorporated or otherwise formed) (or by any agency or instrumentality of the United States of America or such other country, as applicable) having maturities of not more than one year from the date of acquisition thereof; provided that the full faith and credit of the United States of America or such other country, as applicable, is pledged in support thereof;

(b)     commercial paper issued by any Person organized under the laws of any state of the United States of America, (or with respect to a Foreign Subsidiary, any country (or province thereof, as applicable) in which such Foreign Subsidiary is incorporated or otherwise formed) and rated, at the time of acquisition thereof, at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than one year from the date of acquisition thereof;

(c)     time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia (or with respect to a Foreign Subsidiary, any country (or province thereof, as applicable) in which such Foreign Subsidiary is

incorporated or otherwise formed) or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated, at the time of acquisition thereof, as described in clause (b) of this definition and (iii) has combined capital and surplus of at least $500,000,000, in each case with maturities of not more than one year from the date of acquisition thereof;

(d)       fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above at the time of acquisition thereof or with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into;

(e)       securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America (or with respect to a Foreign Subsidiary, any country (or province thereof, as applicable) in which such Foreign Subsidiary is incorporated or otherwise formed), by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's;

(f)       securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (c) of this definition;

(g)       marketable short-term money market and similar securities or funds having, at the time of acquisition thereof, a rating of at least A-2 from S&P (or, if at any time S&P shall not be rating such obligations, an equivalent rating from another nationally recognized rating service);

(h)       Investments, classified in accordance with GAAP as current assets of the Loan Parties or any Subsidiary, in any money market fund, mutual fund, or other shares of investment companies that are registered under the Investment Company Act of 1940, and which invest primarily in one or more of the types of securities described in clauses (a) through (g) above;

(i)       Investments existing on the Petition Date, provided that the amount of any Investment permitted pursuant to this clause is not increased from the amount of such Investment on the Petition Date except as otherwise permitted by Section 7.02;

(j)       [reserved];

(k)       Investments (i) by any Domestic Loan Party in any other Domestic Loan Party (other than an Immaterial Subsidiary), (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party;

(l)       Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of

-73-

business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(m)     Guarantees constituting Permitted Indebtedness;

(n)     Investments by the Domestic Loan Parties in the Foreign Borrowers in the form of loans to the extent required to fund any prepayment required under Section 2.05(d), (e) or (f);

(o)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(p)     (i) advances of payroll payments to employees in the ordinary course of business and (ii) other loans and advances to officers, directors and employees of the Loan Parties and Subsidiaries in the ordinary course of business in an amount not to exceed $100,000 to any individual at any time or in an aggregate amount not to exceed $1,000,000 at any time outstanding; provided, however, that an individual's use of a cashless exercise procedure to pay the exercise price and required tax withholding (or either of them) in connection with such individual's exercise of a compensatory option to purchase stock issued by the Parent shall not give rise to a loan or advance for the purposes of this clause (ii) to the extent that all funds representing full payment of such option exercise price and required tax withholding are actually remitted to the Parent before the close of business on either (x) the date of exercise of the stock option or (y) the date of issuance of the stock pursuant to the option exercise;

(q)     Investments by the Domestic Loan Parties in Foreign Subsidiaries in the form of loans that are (x) made for the purpose of funding disbursements by Foreign Subsidiaries other than the Canadian Subsidiary, the Australian Subsidiary and the Japanese Subsidiaries, in each case, consistent with the Budget (within Permitted Variances) and (y) in an aggregate amount outstanding at any time not in excess of the amount by which the maximum principal amount of Indebtedness permitted under clause (k) of the definition of "Permitted Indebtedness" exceeds the aggregate outstanding principal amount of Indebtedness actually incurred in reliance thereon;;

(r)     Interim Order Intercompany Loans;

(s)     [reserved];

(t)     Guarantees of leases or other obligations of any Loan Party or any Subsidiary that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(u)     in the case of investments by any Foreign Subsidiary or investments made in a country outside of the United States, Permitted Investments shall also include (i) investments of the type described in clauses (a) through (h) above of foreign obligors, which investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments described in clauses (a) through (h) above;

-74-

(v)      promissory notes and other non-cash consideration that is received in connection with any Permitted Disposition; and

(w)      other Investments in an aggregate amount not to exceed $1,000,000 at any time outstanding (provided, that no Loan Party shall make any Investment pursuant to this clause (w) in any Immaterial Subsidiary);

provided, however, that notwithstanding the foregoing, (i) except as otherwise provided in any Security Document, no Investment of any Loan Party of a type specified in clauses (a) through (h) above (each, a "Cash Equivalent") shall constitute a Permitted Investment unless such Investment is pledged to the Administrative Agent (and, with respect to any Investment by a Japanese Loan Party, to each of the Japanese Secured Parties) as additional collateral for the applicable Obligations pursuant to such security and control agreements as may be reasonably required by any Agent and (ii) no Cash Equivalent of any Domestic Loan Party or Canadian Loan Party shall constitute a Permitted Investment while any Loans are outstanding.

"Permitted Variance" means a Variance from the Budget on a cumulative basis tested on a weekly basis (the "Testing Period") commencing with the Petition Date, which Variance (i) is not more than 15% with respect to cumulative total operating receipts to the Budget for such Testing Period and (ii) is not more than 15% more than the cumulative Total Disbursements in the Budget for such Testing Period (without giving effect to the making of Loans or DIP Term Loans or the repayments or prepayments of Loans or DIP Term Loans) on a cumulative basis to the Budget; provided, however, that the first such Variance with respect to clauses (i) and (ii) will be tested after the end of the third (3rd) full calendar week after the Petition Date.

"Permitted Overadvance" means either a Permitted Domestic Overadvance or a Permitted Foreign Overadvance.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan" means (a) in respect of the Domestic Loan Parties, any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of a Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate or any such Plan to which a Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, or any ERISA Affiliate is required to contribute on behalf of any of its employees, or (b) in respect of the Canadian Loan Parties, any Canadian Pension Plan or other pension benefit or retirement savings plan maintained by any of the Canadian Loan Parties for its employees or its former employees to which any of the Canadian Loan Parties contributes or are required to contribute with respect to which any of the Canadian Loan Parties have incurred or may incur liability, including contingent liability.

"Plan of Reorganization" means a plan filed in the Cases pursuant to Chapter 11 of the Bankruptcy Code.

"Plan Sponsor Agreement" means that certain plan sponsor agreement among Borrower, the other Debtors and Big Wave or one or more of its affiliates dated as of [_____], 2015.

"Platform" has the meaning specified in Section 6.02.

"Pledge Agreement" means the Pledge Agreement dated as of the Effective Date among the Domestic Loan Parties party thereto and the Administrative Agent.

"PPSA" means the *Personal Property Security Act* (Ontario) (or any successor statute) or similar legislation of any other Canadian jurisdiction, including, without limitation, the Civil Code of Quebec, the laws of which are required by such legislation to be applied in connection with the issue, perfection, enforcement, opposability, validity or effect of security interests or other applicable Liens.

"Post-Carve Out Trigger Notice Cap" means $1,000,000.

"Prepetition Parties" means, collectively, the Existing ABL Agent, the Existing ABL Lenders, the Existing Senior Secured Note Collateral Agent, and the Existing Senior Secured Noteholders.

"Prime Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate", (b) the Federal Funds Rate for such day plus one-half of one percent (0.50%) or (c) the Adjusted LIBO Rate for a one month interest period as determined on such day plus one percent (1.00%). The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.

"Prime Rate Loan" means a Canadian Prime Rate Loan, a Canadian Base Rate Loan, a Domestic Prime Rate Loan, a Japanese Base Rate Loan or an Australian Base Rate Loan, as the context may require.

"Primed Liens" has the meaning set forth in the recitals hereto.

"Priority Permitted Encumbrances" means, (x) subject to the Intercreditor Agreement, with respect to the DIP ABL Priority Collateral, the DIP ABL Lien of the DIP ABL Agent securing the DIP ABL Claims, (y) the Lien of the Existing ABL Agent on the Existing ABL Credit Agreement Collateral Account, and (z) any other valid, perfected, and non-avoidable Permitted Encumbrance in existence on the Petition Date (other than any Existing Senior Secured Note Liens and, except as set forth above, the Existing ABL Liens).

"Public Lender" has the meaning specified in Section 6.02.

"Qualified ECP Guarantor" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualifying Australian Treaty Party" means an Australian Credit Party which:

(a)     is treated as a resident of a Australian Treaty State for the purposes of the relevant Australian Double Tax Treaty;

(b)     does not perform its role as an Australian Credit Party at or through a permanent establishment in Australia; and

(c)     fulfills any other conditions which must be fulfilled under the relevant Australian Double Tax Treaty by residents of the Australian Treaty State for such residents to obtain a full exemption from taxation imposed in Australia in respect of the relevant payment.

"Reaffirmation Agreement" means that certain Joinder, Confirmation, Ratification and Amendment of Ancillary Loan Documents among each of the Loan Parties and the Administrative Agent dated as of the date hereof, reaffirming each of the Security Documents, the Facility Guaranties (as defined in the Existing ABL Credit Agreement), the Credit Card Notifications (as defined in the Existing ABL Credit Agreement), the Blocked Account Agreements (as defined in the Existing ABL Credit Agreement), the Lessor Notifications (as defined in the Existing ABL Credit Agreement), and the other Loan Documents (as defined in the Existing ABL Credit Agreement) referred to therein.

"Real Estate" means all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned or leased by any Loan Party or any Subsidiary, including all easements, rights-of-way, and similar rights relating thereto.

"Receivables Advance Rate" means (a) with respect to the Domestic Borrowers, seventy percent (70%), and (b) with respect to the Foreign Borrowers, eighty-five percent (85%).

"Receivables Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such Reserves as may be established from time to time by any Agent in its Permitted Discretion with respect to the determination of the collectability in the ordinary course of Eligible Trade Receivables. Upon the determination by any Agent in its Permitted Discretion that a Receivables Reserve should be established or modified, such Agent shall notify the Administrative Agent in writing and the Administrative Agent shall thereupon establish or modify such Receivables Reserve, in all cases subject to the provisions of Section 2.01(e) and Section 9.19.

"Recipient" means any Agent, any Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"Register" has the meaning specified in Section 10.06(d).

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Parent and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reported Fee Accruals" shall mean accrued and unpaid fees, disbursements, costs, and expenses incurred by any professionals or professional firms retained by the Domestic Borrowers or the Committee through and including the date of delivery by the Administrative Agent (or the Required Lenders, where applicable) the DIP Term Agent of a Carve Out Trigger Notice, which amounts shall be

reported in arrears by the Domestic Borrowers to the Administrative Agent on a monthly basis, less any amounts actually paid on account thereof."

"Reports" has the meaning provided in Section 9.13(b).

"Request for Credit Extension" means (a) with respect to a Committed Borrowing, conversion or continuation of Committed Loans, a Committed Loan Notice and (b) with respect to an L/C Credit Extension, a Letter of Credit Application.

"Required Lenders" means, as of any date of determination, at least two Lenders (excluding Affiliates) holding more than fifty percent (50%) of the Aggregate Total Commitments or, if the Commitment of each Lender to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, at least two Lenders (excluding Affiliates) holding in the aggregate more than 50% of the Total Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations being deemed "held" by such Lender for purposes of this definition); provided that the Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserves" means all (if any) Inventory Reserves, Availability Reserves and Receivables Reserves.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer, assistant treasurer, director or secretary of a Loan Party or any of the other individuals designated in writing to the Administrative Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Loan Party or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Loan Party or any Subsidiary shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Loan Party or such Subsidiary.

"Revaluation Date" means (a) with respect to any Loan, each of the following: (i) each date of a Borrowing of a LIBO Rate Loan denominated in an Alternative Currency, (ii) each date of a continuation of a LIBO Rate Loan denominated in an Alternative Currency pursuant to Section 2.02, and (iii) such additional dates as the Administrative Agent shall determine or the Required Lenders shall require; and (b) with respect to any Letter of Credit, each of the following: (i) each date of issuance of a Letter of Credit denominated in an Alternative Currency, (ii) each date of an amendment of any such Letter of Credit having the effect of increasing the amount thereof, (iii) each date of any payment by the L/C

Issuer under any Letter of Credit denominated in an Alternative Currency, and (iv) such additional dates as the Administrative Agent or the L/C Issuer shall determine or the Required Lenders shall require.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Same Day Funds" means (a) with respect to disbursements and payments in Dollars, immediately available funds, and (b) with respect to disbursements and payments in an Alternative Currency, same day or other funds as may be determined by the Administrative Agent or the L/C Issuer, as the case may be, to be customary in the place of disbursement or payment for the settlement of international banking transactions in the relevant Alternative Currency.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002, as amended and in effect from time to time.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means, collectively, the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB; and all applicable securities laws in each province and territory of Canada and the respective regulations, rules regulations, blanket orders and blanket rulings under such laws together with applicable published policy statements and notices of the securities regulator of each such province and territory.

"Security Agreement" means the Security Agreement dated as of the Effective Date among the Domestic Loan Parties and the Administrative Agent.

"Security Documents" means the Security Agreement, the Canadian Security Documents, the Australian Security Documents, the Japanese Security Documents, the Pledge Agreement, the Intellectual Property Security Agreement, the Blocked Account Agreements, the Credit Card Notifications, the IP Rights Agreement, the Novation Deed, and each other security agreement or other instrument or document executed and delivered by or on behalf of any Loan Party to the applicable Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations or the Foreign Liabilities, as applicable, as each has been ratified and confirmed pursuant to the Confirmation Agreement.

"Settlement Date" has the meaning provided in Section 2.14(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Parent and its Subsidiaries or the Parent and its Americas/Foreign Subsidiaries, as applicable, as of that date determined in accordance with GAAP.

"Shrink" means Inventory of the Borrowing Base Parties which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Special Notice Currency" means at any time an Alternative Currency, other than the currency of a country that is a member of the Organization for Economic Cooperation and Development at such time located in North America or Europe.

"Specified Loan Party" means any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to Section 10.31).

"Sponsored Plan" means a plan of reorganization supported by Big Wave.

"Spot Rate" means the exchange rate, as determined by the Administrative Agent, that is applicable to conversion of one currency into another currency, which is (a) the exchange rate reported by Bloomberg (or other commercially available source designated by the Administrative Agent) as of the end of the preceding business day in the financial market for the first currency; or (b) if such report is unavailable for any reason, the spot rate for the purchase of the first currency with the second currency as in effect during the preceding business day in Administrative Agent's principal foreign exchange trading office for the first currency.

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit.

"Stated Amount" means at any time, the maximum amount for which a Letter of Credit may be honored.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the FRB). Such reserve percentages shall include those imposed pursuant to such Regulation D. LIBO Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Sterling" and "£" mean the lawful currency of the United Kingdom.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party or, as applicable, any Subsidiary; provided that with respect to the provisos to clause (b) of the definition of "Permitted Disposition", "Store" does not include kiosks, temporary stores, seasonal stores, pop-up stores or "shops within a shop."

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior Payment in Full and which is in form and on terms approved in writing by the Administrative Agent.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company, unlimited liability company or other business entity of which a majority of the shares of Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise Controlled, directly, or indirectly through one or more intermediaries, or both, by such Person and, with respect to the Australian Subsidiaries means a subsidiary within the meaning given in Part 1.2 Division 6 of the Corporations Act.

Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"Substantial Liquidation" means either (a) the Liquidation of substantially all of the Collateral, or (b) the sale or other disposition of substantially all of the Collateral by the Loan Parties.

"Successor Cases" means any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of these Cases, or in any proceedings superseding or related to any of the foregoing.

"Supermajority Lenders" means, as of any date of determination, at least two (2) Lenders holding more than 66 2/3% of the Aggregate Total Commitments or, if the Commitment of each Lender to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, at least two (2) Lenders holding in the aggregate more than 66 2/3% of the Total Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations being deemed "held" by such Lender for purposes of this definition); provided that the Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Supermajority Lenders.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means with respect to any Loan Party any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Lender Affiliate of a Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"TARGET2" means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilizes a single shared platform and which was launched on November 19, 2007.

"TARGET Day" means any day on which TARGET2 (or, if such payment system ceases to be operative, such other payment system, if any, determined by the Administrative Agent to be a suitable replacement) is open for the settlement of payments in Euro.

"Tax Consolidated Group" means a Consolidated Group or an MEC Group as defined in (a) the *Income Tax Assessment Act 1997* (Cth) of Australia as amended or re-enacted, (b) any statute, regulation or provision enacted in replacement of that Law, (c) another regulation or other statutory instrument made or issued under that Law, and (d) any amendment made to a statute, regulation or provision referred to in clauses (a) through (c) of this definition as a consequence of another statute, regulation or provision.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitments are irrevocably terminated (or deemed terminated) in accordance with Article VIII, or (iii) the date of the occurrence of any Event of Default pursuant to Section 8.01(f) with respect to a Foreign Loan Party, or (iv) conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code, (v) dismissal of any of the Cases, (vi) the effective date of any Loan Party's plan of reorganization in the Cases that has been confirmed by an order of the Bankruptcy Court, (vii) repayment in full of the Obligations and the termination of the Commitments hereunder, (viii) the occurrence of the DIP Term Termination Date and (ix) a sale of all or substantially all of the assets of the Domestic Loan Parties under Section 363 of the Bankruptcy Code.

"Term Loan Priority Account" means the "Term Loan Priority Collateral Account" as such term is defined in the DIP Intercreditor Agreement.

"Testing Period" has the meaning set forth in the definition of "Permitted Variance".

"TIBOR Rate" means, in relation to any TIBOR Rate Loan or other sum and in relation to a particular Interest Period therefor:

(a)(i)    in relation to any Interest Period, the percentage rate of interest per annum offered for deposits in the relevant currency for period comparable to that Interest Period that appears on Reuters screen page DTIBOR01 (or such other screen display or service as may replace it for the purposes of displaying Tokyo interbank offered rates of prime banks for deposits in the relevant currency) at or about 11:00 a.m. two (2) Business Days prior to the first day of the relevant Interest Period therefor;

(ii)      in relation to an Interest Period of less than one month, the percentage rate of interest per annum offered for deposits in the relevant currency for a period of one month that appears on Reuters screen page DTIBOR01 (or such other screen display or service as may replace it for the purposes of displaying Tokyo interbank offered rates of prime banks for deposits in the relevant currency), in each case at or about 11:00 a.m. two (2) Business Days prior to the first day of the relevant Interest Period therefor.

(b)      If no such interest rate is available on Reuters screen page DTIBOR01 (or such replacement), the arithmetic mean (rounded upwards to 4 decimal places) of the rates per annum (as quoted to the Administrative Agent by three reference banks, at its request) at which each reference bank was offering deposits in the relevant currency in an amount comparable with that Loan or other sum, as the case may be, to leading banks in the Tokyo interbank market for a period equal to that Interest Period at or about 11:00 a.m. two (2) Business Days prior to the first day of the relevant Interest Period therefor.

"TIBOR Rate Loan" means a Committed Loan that bears interest at a rate based on the TIBOR Rate. TIBOR Rate Loans may be denominated in Yen or in another Alternative Currency.

"Total Australian Outstandings" means, without duplication, the aggregate Outstanding Amount of all Australian Loans and all Australian L/C Obligations.

"Total Canadian Outstandings" means, without duplication, the aggregate Outstanding Amount of all Canadian Loans.

"Total Disbursements" means the sum of total operating disbursements, total non-operating disbursements and total bankruptcy disbursements as provided in the Budget.

"Total Domestic Outstandings" means, without duplication, the aggregate Outstanding Amount of all Domestic Loans and all Domestic L/C Obligations.

"Total Japanese Outstandings" means, without duplication, the aggregate Outstanding Amount of all Japanese Loans.

"Total Outstandings" means (a) individually, all Total Canadian Outstandings, all Total Domestic Outstandings, all Total Australian Outstandings and all Total Japanese Outstandings, as the context may require, and (b) collectively, the aggregate of the foregoing.

"Trading with the Enemy Act" has the meaning set forth in Section 10.18.

"Type" means, with respect to a Committed Loan, its character as a Prime Rate Loan, a LIBO Rate Loan, a BBR Rate Loan, a TIBOR Rate Loan or a Canadian BA Rate Loan.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York and all terms used in this Agreement or any other Loan Document and not otherwise defined herein or therein shall have the respective meanings (if any) given such terms in the UCC; provided that, if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is

governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UFCA" has the meaning specified in Section 10.23(d).

"UFTA" has the meaning specified in Section 10.23(d).

"Unbudgeted Investigation Claims" has the meaning given to such term in Section 7.20.

"Unencumbered Assets" has the meaning given to such term in Section 7.20.

"United States" and "U.S." mean the United States of America.

"United States Trustee" means the Office of the United States Trustee.

"Unreimbursed Amount" has the meaning specified in Section 2.03(c)(i).

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(e)(ii)(B)(III).

"Variance" means a difference in the amount contained in the Budget with respect to cumulative operating receipts and cumulative Total Disbursements, in each case compared to the actual cumulative operating receipts and/or actual aggregate cumulative Total Disbursements, as applicable, on a cumulative basis.

"Variance Report" has the meaning set forth in Section 6.02.

"Wholly Owned Subsidiary" means, with respect to any Person, any corporation, partnership or other entity of which all of the Equity Interests (other than, in the case of a corporation, directors' qualifying shares) are directly or indirectly owned or controlled by such Person or one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

"Yen" and "¥" mean the lawful currency of Japan.

**1.02     Other Interpretive Provisions.** With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such

agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, amendment and restatements, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory rules, regulations, orders and provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)      In the computation of periods of time from a specified date to a later specified date, unless otherwise expressly provided, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)      Article and Section headings used herein and in the other Loan Documents are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement or any other Loan Document.

(d)      Any other undefined term contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meaning provided for such term in the Uniform Commercial Code as in effect in the State of New York, the PPSA or the Australian PPSA, as the context may require,  to the extent the same are used or defined therein.

(e)      Whenever any provision in any Loan Document refers to the knowledge (or an analogous phrase) of any Loan Party, such words are intended to signify that such Loan Party has actual knowledge or awareness of a particular fact or circumstance or that such Loan Party, if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance.

**1.03    Accounting Terms.**

(a)      Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein. Any obligation of a Person under a lease that is not (or would not be) required to be classified and accounted for as a Capital Lease Obligation or Attributable Indebtedness on a balance sheet of such Person under GAAP as in effect on the

Effective Date shall not be treated as a Capital Lease Obligation or Attributable Indebtedness as a result of the adoption of changes in GAAP or changes in the application of GAAP.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Administrative Agent for distribution to the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04    Rounding.**  Any financial ratios required to be maintained by the Loan Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05    Times of Day.**  Unless otherwise specified, all references herein to times of day shall be references (a) to Eastern time (daylight or standard, as applicable) with respect to the Domestic Loan Parties and the Canadian Loan Parties, (b) to Tokyo, Japan time with respect to the Japanese Loan Parties and (c) to Sydney, Australia time with respect to the Australian Loan Parties.

**1.06    Letter of Credit Amounts.**  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Dollar Equivalent of the Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the Dollar Equivalent of the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

**1.07    Certifications.**  All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such Person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

**1.08    Exchange Rates; Currency Equivalents Generally**.

(a)    The Administrative Agent or the L/C Issuer, as applicable, shall determine the Spot Rates as of each Revaluation Date to be used for calculating Dollar Equivalent amounts of Credit Extensions and Outstanding Amounts denominated in Alternative Currencies.  Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur.  Except for purposes of financial statements delivered by Loan Parties hereunder or calculating financial covenants hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be such

Dollar Equivalent amount as so determined by the Administrative Agent or the L/C Issuer, as applicable.

(b)  Wherever in this Agreement in connection with a Committed Borrowing, conversion, continuation or prepayment of a LIBO Rate Loan, BBR Rate Loan, Canadian BA Rate Loan or TIBOR Rate Loan or the issuance, amendment or extension of a Letter of Credit, an amount, such as a required minimum or multiple amount, is expressed in Dollars, but such Committed Borrowing, LIBO Rate Loan, BBR Rate Loan, Canadian BA Rate Loan or TIBOR Rate Loan or Letter of Credit is denominated in an Alternative Currency, such amount shall be the relevant Alternative Currency Equivalent of such Dollar amount (rounded to the nearest unit of such Alternative Currency, with 0.5 of a unit being rounded upward), as determined by the Administrative Agent or the L/C Issuer, as the case may be.

**1.09    Additional Alternative Currencies.**

(a)  Each Borrower may from time to time request that Loans be made and/or Letters of Credit be issued in a currency other than those specifically listed in the definition of "Alternative Currency;" provided that such requested currency is a lawful currency (other than Dollars) that is readily available and freely transferable and convertible into Dollars. In the case of any such request with respect to the making of Loans, such request shall be subject to the approval of the Administrative Agent and the Lenders; and in the case of any such request with respect to the issuance of Letters of Credit, such request shall be subject to the approval of the Administrative Agent and the L/C Issuer.

(b)  Any such request shall be made to the Administrative Agent not later than 11:00 a.m., 20 Business Days prior to the date of the desired Credit Extension (or such other time or date as may be agreed by the Administrative Agent and, in the case of any such request pertaining to Letters of Credit, the L/C Issuer, in its or their sole discretion). In the case of any such request pertaining to Loans, the Administrative Agent shall promptly notify each Lender thereof; and in the case of any such request pertaining to Letters of Credit, the Administrative Agent shall promptly notify the L/C Issuer thereof. Each Lender (in the case of any such request pertaining to Loans) or the L/C Issuer (in the case of a request pertaining to Letters of Credit) shall notify the Administrative Agent, not later than 11:00 a.m., ten Business Days after receipt of such request whether it consents, in its sole discretion, to the making of Loans or the issuance of Letters of Credit, as the case may be, in such requested currency.

(c)  Any failure by a Lender or the L/C Issuer, as the case may be, to respond to such request within the time period specified in the preceding sentence shall be deemed to be a refusal by such Lender or the L/C Issuer, as the case may be, to permit Loans to be made or Letters of Credit to be issued in such requested currency. If the Administrative Agent and all the Lenders consent to making Loans in such requested currency, the Administrative Agent shall so notify the Lead Borrower and such currency shall thereupon be deemed for all purposes to be an Alternative Currency hereunder for purposes of any Committed Borrowings of Loans; and if the Administrative Agent and the L/C Issuer consent to the issuance of Letters of Credit in such requested currency, the Administrative Agent shall so notify the Lead Borrower and such currency shall thereupon be deemed for all purposes to be an Alternative Currency hereunder for purposes of any Letter of Credit issuances. If the Administrative Agent shall fail to obtain

consent to any request for an additional currency under this Section 1.09, the Administrative Agent shall promptly so notify the Lead Borrower.

**1.10    Change of Currency.**

(a)    Each obligation of the Borrowers to make a payment denominated in the national currency unit of any Participating Member State of the European Union that adopts the Euro as its lawful currency after the date hereof shall be redenominated into Euro at the time of such adoption. If, in relation to the currency of any such Participating Member State, the basis of accrual of interest expressed in this Agreement in respect of that currency shall be inconsistent with any convention or practice in the London interbank market for the basis of accrual of interest in respect of the Euro, such expressed basis shall be replaced by such convention or practice with effect from the date on which such Participating Member State adopts the Euro as its lawful currency; provided that if any Committed Borrowing in the currency of such Participating Member State is outstanding immediately prior to such date, such replacement shall take effect, with respect to such Committed Borrowing, at the end of the then current Interest Period.

(b)    Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the adoption of the Euro by any Participating Member State of the European Union and any relevant market conventions or practices relating to the Euro.

(c)    Each provision of this Agreement also shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

(d)    The Administrative Agent shall use commercially reasonable efforts to promptly advise the Lead Borrower of any changes of construction pursuant to clauses (b) and (c) hereof, but any failure to do so shall not limit the Administrative Agent's rights or any changes made under such clauses.

**1.11    Québec Matters.** For purposes of any assets, liabilities or entities located in the Province of Québec and for all other purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Québec or a court or tribunal exercising jurisdiction in the Province of Québec, (a) "personal property" shall include "movable property", (b) "real property" or "real estate" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "security" shall include a "hypothec", "right of retention", "prior claim" and a resolutory clause, (f) all references to filing, perfection, priority, remedies, registering or recording under the UCC or a PPSA shall include publication under the *Civil Code of Québec*, (g) all references to "perfection" of or "perfected" security or security interest shall include a reference to an "opposable" or "set up" hypothec, security or security interest as against third parties, (h) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (i) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall include a "mandatary", (k) "construction security" shall include "legal hypothecs", (l) "joint and several" shall include "solidary", (m) "gross negligence or willful misconduct" shall be

deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership on behalf of another as mandatary"; (o) "easement" shall include "servitude", (p) "priority" shall include "prior claim", (q) "survey" shall include "certificate of location and plan", (r) "state" shall include "province", (s) "fee simple title" shall include "absolute ownership", and (t) "accounts" shall include "claims".

## ARTICLE II
### THE COMMITMENTS AND CREDIT EXTENSIONS

2.01   **Committed Loans; Reserves.**

(a)   (a)   Subject to the terms and conditions set forth herein, the outstanding loans to Domestic Borrowers funded under the Existing Credit Agreement by each Domestic Lender is hereby continued, amended and restated as a Committed Domestic Loan under this Agreement. Subject to the terms and conditions set forth herein, each Domestic Lender severally agrees to make Committed Domestic Loans to the Domestic Borrowers from time to time, on any Business Day during the Availability Period, in an aggregate principal amount not to exceed at any time outstanding the lesser of (x) the amount of the Domestic Commitment of such Domestic Lender, or (y) the Applicable Percentage of the Domestic Borrowing Base for such Domestic Lender; subject in each case to the following limitations:

(i)   after giving effect to any Committed Domestic Borrowing, the Total Domestic Outstandings shall not exceed the Domestic Loan Cap,

(ii)   after giving effect to any Committed Domestic Borrowing, the aggregate Outstanding Amount of the Committed Domestic Loans of any Domestic Lender, plus (without duplication) the Applicable Percentage of the Outstanding Amount of all Domestic L/C Obligations for such Domestic Lender shall not exceed the Domestic Commitment of such Domestic Lender, and

(iii)   the Outstanding Amount of all Domestic L/C Obligations shall not at any time exceed the Domestic Letter of Credit Sublimit.

Within the limits of the Domestic Commitment for each Domestic Lender, and subject to the other terms and conditions hereof, the Domestic Borrowers may borrow under this Section 2.01, prepay under Section 2.05, and reborrow under this Section 2.01. Committed Domestic Loans may be Domestic Prime Rate Loans or LIBO Rate Loans, as further provided herein.

(b)   Subject to the terms and conditions set forth herein, the outstanding loans to the Foreign Borrowers funded under the Existing Credit Agreement immediately prior to the effectiveness hereof by each Foreign Lender is hereby continued, amended and restated as a Committed Foreign Loan under this Agreement. Subject to the terms and conditions set forth herein, each Foreign Lender severally agrees to make a single Committed Foreign Loan to the applicable Foreign Borrower (other than the Japanese Borrower) on the Effective Date, in an aggregate principal amount not to exceed at any time outstanding the lesser of (x) the amount of the applicable Foreign Commitment of such Foreign Lender to such Foreign Borrower or (y) the Applicable Percentage of the applicable Borrowing Base for such Foreign Borrower; subject in each case to the following limitations:

(i)    after giving effect to any Committed Foreign Borrowing, the Total Outstandings for any Foreign Borrower shall not exceed such Foreign Borrower's Foreign Loan Cap, and

(ii)    with respect to each Foreign Borrower, after giving effect to any Committed Foreign Borrowing made to such Foreign Borrower, the aggregate Outstanding Amount of the Committed Foreign Loans of any Foreign Lender to such Foreign Borrower, plus (without duplication) such Foreign Lender's Applicable Percentage of the Outstanding Amount of all Australian L/C Obligations for such Foreign Borrower, shall not exceed the applicable Foreign Commitment of such Foreign Lender,

After the making of the Committed Foreign Loans on the Effective Date, the Foreign Commitments shall be automatically terminated.

(c)    [Reserved].

(d)    The Inventory Reserves and Availability Reserves as of the Effective Date are set forth in the Borrowing Base Certificates delivered to the Administrative Agent pursuant to <u>Section 4.01(c)</u>.

(e)    Any Agent shall have the right, at any time and from time to time after the Effective Date, in its Permitted Discretion to establish new, or modify or eliminate any existing Reserves without prior notice to any Loan Party. Availability Reserves will not be established or changed except upon one (1) Business Days' prior notice to the applicable Borrower (during which period the Agents shall be available to discuss any proposed Availability Reserve with the Borrowers and the Borrowers may take such action as may be required so that the event, condition or matter that is the basis for the Availability Reserve no longer exists); provided that no such prior notice shall be required (i) after the occurrence and during the continuance of an Event of Default or if an Event of Default would arise from the establishment or change of such Availability Reserve, (ii) for changes to any Availability Reserves resulting solely by virtue of mathematical calculations of the amount of the Availability Reserve in accordance with the methodology of calculation previously utilized, (iii) for the establishment of any Reserves in an amount equal to the unpaid balance relating to any Liens permitted under clauses (y) and (z) of the definition of Permitted Encumbrances, or (iv) if a Material Adverse Effect is reasonably likely to arise by any delay in implementing such Availability Reserve.

### 2.02    Committed Borrowings, Conversions and Continuations of Committed Loans.

(a)    Committed Domestic Loans shall be made in Dollars and shall be either Domestic Prime Rate Loans or LIBO Rate Loans, as the Lead Borrower or the Parent, on behalf of the Domestic Borrowers, may request subject to and in accordance with this <u>Section 2.02</u>. Committed Canadian Loans shall be made in Dollars or Canadian Dollars and shall be either Canadian Prime Rate Loans, Canadian Base Rate Loans, LIBO Rate Loans (if in Dollars only and not in an Alternative Currency) or Canadian BA Rate Loans, as the Canadian Borrower or the Parent, on behalf of the Canadian Borrower, may request subject to and in accordance with this <u>Section 2.02</u>.    Committed Australian Loans shall be made in Dollars or Australian Dollars and shall be either Australian Base Rate Loans, LIBO Rate Loans (if in Dollars) or BBR Rate Loans, as the Australian Borrower or the Parent, on behalf of the Australian Borrower, may request subject to and in accordance with this <u>Section 2.02</u>. Committed Japanese Loans shall be made in Yen and shall be either Japanese Base Rate Loans or TIBOR Rate Loans,

as the Japanese Borrower or the Parent, on behalf of the Japanese Borrower, may request subject to and in accordance with this Section 2.02. Subject to the other provisions of this Section 2.02, Committed Borrowings of more than one Type may be incurred at the same time.

(b)     Each Committed Borrowing, each conversion of a Committed Loan from one Type to the other, and each continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans and Canadian BA Rate Loans shall be made upon the irrevocable notice of the applicable Borrower or the Parent on behalf of the applicable Borrower to the Administrative Agent which may be given by electronic transmission. Each such notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three Business Days prior to the requested date of any Committed Borrowing of, conversion to or continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans, or Canadian BA Rate Loans or of any conversion of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans, or Canadian BA Rate Loans to Prime Rate Loans, (ii) four Business Days (or, without duplication of the time periods set forth in Section 1.09(b), five Business Days in the case of a Special Notice Currency) prior to the requested date of any Borrowing or continuation of LIBO Rate Loans, BBR Rate Loans, or TIBOR Rate Loans denominated in Alternative Currencies, and (iii) one Business Day prior to the requested date of any Committed Borrowing of any Prime Rate Loans.  Each electronic notice by the Parent or the applicable Borrower pursuant to this Section 2.02(b) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Parent or the applicable Borrower (and, with respect to the Japanese Borrower, a written Committed Loan Notice may be delivered to the Administrative Agent via facsimile). Each Committed Borrowing of, conversion to or continuation of LIBO Rate Loans, BBR Rate Loans or TIBOR Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof.  Each Committed Borrowing of, conversion to or continuation of Canadian BA Rate Loans shall be in a principal amount of CD$500,000 or a whole multiple of CD$100,000 in excess thereof. Except as provided in Sections 2.03(c) and Error! Reference source not found., each Committed Borrowing of or conversion to Prime Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each Committed Loan Notice (whether electronic or written) shall specify (i) whether the request is for a Committed Borrowing, a conversion of Committed Loans from one Type to the other, or a continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans, (ii) the requested date of the Committed Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Committed Loans to be borrowed, converted or continued, (iv) the Type of Committed Loans to be borrowed or to which existing Committed Loans are to be converted, (v) [reserved], and (vi) the currency of the Committed Loans to be borrowed.  If the request fails to specify a currency in a Committed Loan Notice requesting a Borrowing, then the Committed Loans so requested shall be made in Dollars (except that any Japanese Borrowing shall only be made in Yen).  If the request fails to specify a Type of Committed Loan in a Committed Loan Notice or if the Parent or the applicable Borrower, as the case may be, fails to give a timely notice of a conversion or continuation of a LIBO Rate Loan, a BBR Rate Loan, a TIBOR Rate Loan or a Canadian BA Rate Loan, then the applicable Committed Loans shall be made as, or converted to, Prime Rate Loans; provided, however, that in the case of a failure to timely request a continuation of Committed Loans denominated in an Alternative Currency, such Loans shall be continued as BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans in their original currency with an Interest Period of one month.  Any automatic conversion to Prime Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans.   No Committed Loan may be converted into or continued as a Committed Loan denominated in a different currency, but instead must be prepaid in the original currency of such Committed Loan and reborrowed in the other currency.

-91-

(c)     Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount (and currency) of its Applicable Percentage of the applicable Committed Loans, and if no timely notice of a conversion or continuation is provided by a Borrower or the Parent, on behalf of a Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Prime Rate Loans or continuation of Committed Loans denominated in a currency other than Dollars, in each case as described in Section 2.02(b). Each applicable Lender shall make the amount of its Committed Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office for the applicable currency not later than 1:00 p.m., in the case of any Committed Loan denominated in Dollars, and not later than the Applicable Time specified by the Administrative Agent in the case of any Committed Loan in an Alternative Currency, in each case on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Committed Borrowing is the initial Credit Extension, Section 4.01), the Administrative Agent shall use reasonable efforts to make all funds so received available to the applicable Borrowers in like funds by no later than 4:00 p.m. on the day of receipt by the Administrative Agent either by (i) crediting either the account of the applicable Borrower on the books of Bank of America, with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent; provided, however, that if, on the date a Committed Loan Notice with respect to a Committed Borrowing denominated in Dollars is given by a Borrower or the Parent on behalf of a Borrower, there are L/C Borrowings outstanding, then the proceeds of such Committed Borrowing, first, shall be applied to the payment in full of any such L/C Borrowings, and second, shall be made available to the applicable Borrower as provided above.

(d)     In the event that any Borrower, after receipt of an invoice therefor, fails to pay any interest, fee, service charge, Credit Party Expenses, or other payment to which any Lender or any Agent is entitled from the Loan Parties pursuant hereto when due, or at any time after the Administrative Agent's reasonable determination that an Event of Default is likely to occur, the Administrative Agent, without the request of any Borrower, may advance such interest, fee, service charge, Credit Party Expenses, or other payment to which any Lender or any Agent is entitled from the applicable Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account with respect to such Credit Extensions, notwithstanding that an Overadvance may result thereby. The Administrative Agent shall advise the applicable Borrower of any such advance or charge by the Administrative Agent promptly after the making thereof. Such action on the part of the Administrative Agent shall not constitute a waiver of the applicable Credit Party's rights and the applicable Borrowers' obligations under Section 2.05(c). Any amount which is added to the principal balance of the applicable Loan Account as provided in this Section 2.02(d) shall be deemed to be a Prime Rate Loan.

(e)     Except as otherwise provided herein, a LIBO Rate Loan, a BBR Rate Loan, a TIBOR Rate Loan or a Canadian BA Rate Loan may be continued or converted only on the last day of an Interest Period for such LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or Canadian BA Rate Loan. During the existence of an Event of Default, no Loans may be requested as, converted to or continued as LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans  or Canadian BA Rate Loans (whether in Dollars or any Alternative Currency) without the Consent of the Required Lenders, and the Required Lenders may demand that any or all of the then outstanding LIBO Rate Loans, BBR Rate Loans, Canadian BA Rate Loans, and TIBOR Rate Loans denominated in an Alternative Currency be prepaid, or redenominated into Dollars in the amount of the Dollar Equivalent thereof, on the last day of the then current Interest Period with respect thereto.

(f)      The Administrative Agent shall promptly notify the Lead Borrower and the applicable Lenders of the interest rate applicable to any Interest Period for LIBO Rate Loans, BBR Rate Loans, Canadian BA Rate Loans and TIBOR Rate Loans upon determination of such interest rate. At any time that Prime Rate Loans are outstanding, the Administrative Agent shall notify the Lead Borrower and the applicable Lenders of any change in Bank of America's (or its applicable branch's) prime rate used in determining the applicable prime rate promptly following the public announcement of such change.

(g)      After giving effect to all Committed Borrowings, all conversions of Committed Loans from one Type to the other, and all continuations of Committed Loans as the same Type, there shall not be more than eight (8) Interest Periods in effect with respect to Committed Loans.

(h)      Except as provided in Section 2.01(c), the Administrative Agent, the Lenders and the L/C Issuer shall have no obligation to make any Loan or to provide any Letter of Credit if an Overadvance would result. The Administrative Agent may, in its Permitted Discretion, make Permitted Overadvances without the consent of the Lenders, the L/C Issuer and each applicable Lender shall be bound thereby.  A Permitted Overadvance is for the account of the applicable Borrower and shall constitute a Prime Rate Loan and an Obligation and shall be repaid by the applicable Borrowers in accordance with the provisions of Section 2.05(c).  The making of any such Permitted Overadvance on any one occasion shall not obligate the Administrative Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The making by the Administrative Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of Section 2.03 regarding the Lenders' obligations to purchase participations with respect to Letters of Credit.  The Administrative Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Administrative Agent with respect to "inadvertent Overadvances" (i.e. where an Overadvance results from changed circumstances beyond the control of the Administrative Agent (such as a reduction in the Collateral value)) regardless of the amount of any such Overadvance(s).

### 2.03    Letters of Credit.

(a)      The Letter of Credit Commitment.

Subject to the terms and conditions set forth herein, (A) the L/C Issuer agrees, in reliance upon the agreements of the Lenders set forth in this Section 2.03, (1) from time to time on any Business Day during the period from the Effective Date until the Letter of Credit Expiration Date, to issue Domestic Letters of Credit denominated in Dollars or in one or more Alternative Currencies] for the account of any Domestic Borrower but for the benefit of the Domestic Borrower, any Foreign Borrower or any of their respective Subsidiaries, and to amend or extend Letters of Credit previously issued by it, in accordance with Section 2.03(b) below, and (2) to honor drawings under the Letters of Credit; (B) each Domestic Lender severally agrees to participate in Domestic Letters of Credit and any drawings thereunder; provided that, after giving effect to any L/C Credit Extension with respect to any Domestic Letter of Credit, (x) the Total Domestic Outstandings shall not exceed the Domestic Loan Cap, (y) the aggregate Outstanding Amount of the Committed Domestic Loans of any Domestic Lender, plus (without duplication) such Domestic Lender's Applicable Percentage of the Outstanding Amount of all Domestic L/C Obligations shall not exceed such Domestic Lender's Domestic Commitment, and (z) the Outstanding Amount of the Domestic L/C Obligations shall not exceed the Domestic Letter of Credit Sublimit; and (C) each Foreign Lender severally agrees to participate in Australian Letters of Credit and any drawings

thereunder; provided that, after giving effect to any Australian L/C Credit Extension, (x) the Total Outstandings of the Australian Borrower shall not exceed the Australian Borrower's Loan Cap, (y) with respect to the Australian Borrower, (i) the aggregate Outstanding Amount of the Committed Loans of such Foreign Lender to the Australian Borrower, plus (without duplication) (ii) such Foreign Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations of the Australian Borrower shall not exceed such Foreign Lender's Foreign Commitment with respect to the Australian Borrower, and (z) the Outstanding Amount of the L/C Obligations of the Australian Borrower shall not exceed the Letter of Credit Sublimit for the Australian Borrower. Each request by a Domestic Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by such Domestic Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof, each Domestic Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly such Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed. Notwithstanding anything herein to the contrary, from and after the Effective Date, no Foreign Letters of Credit shall be issued.

      (i)     The L/C Issuer shall not issue any Domestic Letter of Credit, if:

      (A)     subject to Section 2.03(b)(iii), the expiry date of such requested Standby Letter of Credit would occur more than 365 days after the date of issuance or last extension, unless the Administrative Agent has approved such expiry date; or

      (B)     subject to Section 2.03(b)(iii), the expiry date of such requested Commercial Letter of Credit would occur more than 180 days after the date of issuance or last extension, unless the Administrative Agent has approved such expiry date; or

      (C)     the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless either such Letter of Credit is Cash Collateralized on or prior to issuance of such Letter of Credit (or such other time as the Administrative Agent may agree but in no event after the Letter of Credit Expiration Date) or all the Lenders have approved such expiry date.

      (ii)     The L/C Issuer shall not issue any Letter of Credit without the prior consent of the Administrative Agent if:

      (A)     any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the L/C Issuer from issuing such Letter of Credit, or any Law applicable to the L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit, or request that the L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the L/C Issuer is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon the L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which the L/C Issuer in good faith deems material to it;

      (B)     the issuance of such Letter of Credit would violate one or more policies of the L/C Issuer applicable to letters of credit generally;

(C)     such Letter of Credit is to be denominated in a currency other than Dollars or an Alternative Currency; provided that if the L/C Issuer, in its discretion, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the applicable Borrowers of the honoring of any drawing under such Letter of Credit shall be paid in the currency in which such Letter of Credit was denominated;

(D)     the L/C Issuer does not as of the issuance date of the requested Letter of Credit issue Letters of Credit in the requested currency;

(E)     such Letter of Credit contains any provisions for automatic reinstatement of the Stated Amount after any drawing thereunder; or

(F)     any Lender is at that time a Defaulting Lender, unless the L/C Issuer has entered into arrangements, including the delivery of Cash Collateral, satisfactory to the L/C Issuer (in its sole discretion) with the applicable Borrower or such Lender to eliminate the L/C Issuer's actual or potential Fronting Exposure (after giving effect to Section 2.18(a)(iv)) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or that Letter of Credit and all other L/C Obligations as to which the L/C Issuer has actual or potential Fronting Exposure, as it may elect in its sole discretion.

(iii)     The L/C Issuer shall not amend any Letter of Credit if the L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof or if the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(iv)     The L/C Issuer shall act on behalf of the applicable Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent  in Article IX with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article IX included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

(b)     Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit.

(i)     Each Letter of Credit shall be issued or amended, as the case may be, upon the request of a Domestic Borrower or the Parent on behalf of a Domestic Borrower, Foreign Borrower or any of their respective Subsidiaries, delivered to the L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the applicable Borrower or the Parent. Such Letter of Credit Application may be sent by facsimile, by overnight courier, by electronic transmission using the system provided by the L/C Issuer, by personal delivery or by any other means acceptable to the L/C Issuer. Such Letter of Credit Application must be received by the L/C Issuer and the Administrative Agent, not later than 11:00 a.m. at least two (2) Business Days (or such later date and time as the Administrative Agent and the L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Domestic Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory

to the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount and currency thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (G) the identity of the Domestic Borrower for the account of which such Letter of Credit is requested to be issued; and (H) such other matters as the L/C Issuer may reasonably require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the L/C Issuer: (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the L/C Issuer may require. Additionally, the applicable Domestic Borrower shall furnish to the L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the L/C Issuer or the Administrative Agent may require.

(ii)       Promptly after receipt of any Letter of Credit Application, the L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the applicable Domestic Borrower and, if not, the L/C Issuer will provide the Administrative Agent with a copy thereof. Unless the L/C Issuer has received written notice from any Lender, the Administrative Agent, or any Loan Party, at least one (1) Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article IV shall not then be satisfied or unless the L/C Issuer would have no obligation, at such time to issue such Letter of Credit under the terms hereof (by reason of the provisions of Section 2.03(a)(i) or otherwise), then, subject to the terms and conditions hereof, the L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the applicable Domestic Borrower or enter into the applicable amendment, as the case may be, in each case in accordance with the L/C Issuer's usual and customary business practices. Immediately upon the issuance or amendment of each Letter of Credit, each applicable Lender shall be deemed to (without any further action), and hereby irrevocably and unconditionally severally agrees to, purchase from the L/C Issuer, without recourse or warranty, a risk participation in such Letter of Credit in an amount equal to the product of such Lender's Applicable Percentage times the Stated Amount of such Letter of Credit. Upon any change in any Commitments under this Agreement, it is hereby agreed that with respect to all L/C Obligations, there shall be an automatic adjustment to the participations hereby created to reflect the new Applicable Percentages of the assigning and assignee Lenders.

(iii)      If a Domestic Borrower so requests in any applicable Letter of Credit Application, the L/C Issuer may, in its sole and absolute discretion, agree to issue a Standby Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that any such Auto-Extension Letter of Credit must permit the L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Standby Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such twelve-month period to be agreed upon at the time such Standby Letter of Credit is issued. Unless otherwise directed by the L/C Issuer or the applicable Domestic Borrower shall not be required to make a specific request to the L/C Issuer for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the L/C Issuer to permit the extension of such Standby Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; provided, however, that the L/C Issuer shall not permit any such extension if (A) the L/C Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Standby Letter of Credit in its revised form (as

extended) under the terms hereof (by reason of the provisions of clauses (ii) or (iii) of Section 2.03(a) or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is fifteen (15) Business Days before the Non-Extension Notice Date (1) from the Administrative Agent that the Required Lenders have elected not to permit such extension or (2) from the Administrative Agent, any Lender or the Lead Borrower that one or more of the applicable conditions specified in Section 4.02 is not then satisfied, and in each such case directing the L/C Issuer not to permit such extension.

(iv)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the L/C Issuer will also deliver to the Lead Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)    Drawings and Reimbursements; Funding of Participations.

(i)    Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the L/C Issuer shall notify the Domestic Borrower or Australian Borrower, as applicable, and the Administrative Agent thereof; provided, however, that any failure to give or delay in giving such notice shall not relieve the Domestic Borrower or Australian Borrower, as applicable, of its obligation to reimburse the L/C Issuer and the applicable Lenders with respect to any such payment. In the case of a Letter of Credit denominated in an Alternative Currency, the Domestic Borrower or Australian Borrower, as applicable, shall reimburse the L/C Issuer in such Alternative Currency, unless (A) the L/C Issuer (at its option) shall have specified in such notice that it will require reimbursement in Dollars, or (B) in the absence of any such requirement for reimbursement in Dollars, the Domestic Borrower or Australian Borrower, as applicable, shall have notified the L/C Issuer promptly following receipt of the notice of drawing that the Domestic Borrower or Australian Borrower, as applicable, will reimburse the L/C Issuer in Dollars. In the case of any such reimbursement in Dollars of a drawing under a Letter of Credit denominated in an Alternative Currency, the L/C Issuer shall notify the Lead Borrower of the Dollar Equivalent of the amount of the drawing promptly following the determination thereof. Not later than 11:00 a.m. on the first (1st) Business Day after the date of any payment by the L/C Issuer under a Letter of Credit to be reimbursed in Dollars, or the Applicable Time on the date of any payment by the L/C Issuer under a Letter of Credit to be reimbursed in an Alternative Currency (each such date, an "Honor Date"), the Domestic Borrower or Australian Borrower, as applicable, shall reimburse the L/C Issuer through the Administrative Agent in an aggregate principal amount equal to the amount of such drawing and in the applicable currency. In the event that (A) a drawing denominated in an Alternative Currency is to be reimbursed in Dollars pursuant to the second sentence in this Section 2.03(c)(i) and (B) the Dollar amount paid by the Domestic Borrower or Australian Borrower, as applicable,, whether on or after the Honor Date, shall not be adequate on the date of that payment to purchase in accordance with normal banking procedures a sum denominated in the Alternative Currency equal to the drawing, the Domestic Borrower or Australian Borrower, as applicable, agrees, as a separate and independent obligation, to indemnify the L/C Issuer for the loss resulting from its inability on that date to purchase the Alternative Currency in the full amount of the drawing. If the Domestic Borrower or Australian Borrower, as applicable, fails to timely reimburse the L/C Issuer by the Honor Date, the Administrative Agent shall promptly notify each applicable Lender of the Honor Date, the amount of the unreimbursed drawing (expressed in Dollars in the amount of the Dollar Equivalent thereof in the case of a Letter of Credit denominated in an Alternative Currency) (the "Unreimbursed Amount"), and the amount of such Lender's Applicable Percentage thereof. In such event, the Domestic Borrower shall be deemed to have requested a Committed Borrowing of Prime Rate

Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in Section 2.02 for the principal amount of Prime Rate Loans, but subject to the amount of the unutilized portion of the Aggregate Applicable Commitments and the conditions set forth in Section 4.02 (other than the delivery of a Committed Loan Notice). Any notice given by the L/C Issuer or the Administrative Agent pursuant to this Section 2.03(c)(i) may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)     Each Lender shall upon any notice delivered pursuant to Section 2.03(c)(i) make funds available to the Administrative Agent for the account of the L/C Issuer, in Dollars, at the Administrative Agent's Office for Dollar-denominated payments in an amount equal to its Applicable Percentage of the Unreimbursed Amount not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent whereupon, subject to the provisions of Section 2.03(c)(iii), each Lender that so makes funds available shall be deemed to have made a Prime Rate Loan to the Domestic Borrower in such amount. The Administrative Agent shall remit the funds so received to the L/C Issuer in Dollars.

(iii)     With respect to any Unreimbursed Amount that is not fully refinanced by a Committed Borrowing of Prime Rate Loans because the conditions set forth in Section 4.02 cannot be satisfied or for any other reason, the Domestic Borrower or Australian Borrower, as applicable, shall be deemed to have incurred from the L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate for Prime Rate Loans. In such event, each Lender's payment to the Administrative Agent for the account of the L/C Issuer pursuant to Section 2.03(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this Section 2.03.

(iv)     Until each applicable Lender funds its Committed Loan or L/C Advance pursuant to this Section 2.03(c) to reimburse the L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Lender's Applicable Percentage of such amount shall be solely for the account of the L/C Issuer.

(v)     Each Lender's obligation to make Committed Loans or L/C Advances to reimburse the L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the L/C Issuer, any Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that each Lender's obligation to make Committed Loans pursuant to this Section 2.03(c) is subject to the conditions set forth in Section 4.02 (other than delivery of a Committed Loan Notice). No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Domestic Borrower or Australian Borrower, as applicable, to reimburse the L/C Issuer for the amount of any payment made by the L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)     If any Lender fails to make available to the Administrative Agent for the account of the L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing

provisions of this Section 2.03(c) by the time specified in Section 2.03(c)(ii), the L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the L/C Issuer at a rate per annum equal to the applicable Overnight Rate from time to time in effect, plus any administrative, processing or similar fees customarily charged by the L/C Issuer in connection with the foregoing. If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Committed Loan included in the relevant Committed Borrowing or L/C Advance in respect of the relevant L/C Borrowing, as the case may be. A certificate of the L/C Issuer submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this clause (vi) shall be conclusive absent manifest error.

(d)     Repayment of Participations.

(i)     At any time after the L/C Issuer has made a payment under any Letter of Credit and has received from any Lender such Lender's L/C Advance in respect of such payment in accordance with Section 2.03(c), if the L/C Issuer or the Administrative Agent receives for the account of the L/C Issuer, receives any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Domestic Borrower or Australian Borrower, as applicable, or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the L/C Issuer shall distribute any payment it receives to the Administrative Agent and the Administrative Agent will distribute to such Lender its Applicable Percentage thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's L/C Advance was outstanding), in Dollars and in the same funds as those received by the Administrative Agent.

(ii)     If any payment received by the L/C Issuer by the Administrative Agent for the account of the L/C Issuer pursuant to Section 2.03(c)(i) is required to be returned under any of the circumstances described in Section 10.05 (including pursuant to any settlement entered into by the L/C Issuer in its discretion), each applicable Lender shall pay to the Administrative Agent for the account of the L/C Issuer its Applicable Percentage thereof on demand of the Administrative Agent plus interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the applicable Overnight Rate from time to time in effect. The obligations of the Lenders under this clause shall survive Payment in Full and the termination of this Agreement.

(e)     Obligations Absolute. The obligation of each Domestic Borrower or Australian Borrower, as applicable, to reimburse the L/C Issuer for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)     any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)     the existence of any claim, counterclaim, setoff, defense or other right that any Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)  any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)  waiver by the L/C Issuer of any requirement that exists for the L/C Issuer's protection and not the protection of the Borrowers or any waiver by the L/C Issuer which does not in fact materially prejudice the Borrowers;

(v)  honor of a demand for payment presented electronically even if such Letter of Credit requires that demand be in the form of a draft;

(vi)  any payment made by the L/C Issuer in respect of an otherwise complying item presented after the date specified as the expiration date of, or the date by which documents must be received under such Letter of Credit if presentation after such date is authorized by the UCC, the ISP or the UCP, as applicable;

(vii)  any payment by the L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(viii)  any adverse change in the relevant exchange rates or in the availability of the relevant Alternative Currency to any Borrower or in the relevant currency markets generally; or

(ix)  any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Borrower or any of their respective Subsidiaries (other than reimbursement in full of such drawing or L/C Borrowing); or

(x)  the fact that any Event of Default shall have occurred and be continuing.

The Domestic Borrower or Australian Borrower, as applicable, shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to such Person and, in the event of any claim of noncompliance with such Borrower's instructions or other irregularity, such Borrower will promptly notify the L/C Issuer. The Borrowers shall be conclusively deemed to have waived any such claim against the L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)  Role of L/C Issuer. Each Lender and the Borrowers agree that, in paying any drawing under a Letter of Credit, the L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; (iii) any error, omission, interruption, loss or delay in

transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit or any error in interpretation of technical terms; (iv) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document; or (v) for any action, neglect or omission under or in connection with any Letter of Credit or Issuer Documents, including, without limitation, the issuance or amendment of any Letter of Credit, the failure to issue or amend any Letter of Credit, or the honoring or dishonoring of any demand under any Letter of Credit, and such action or neglect or omission will be binding upon the Loan Parties and the Lenders; provided that the Borrowers may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to punitive, consequential or exemplary, damages suffered by the Borrowers which the Borrowers prove were caused by the L/C Issuer's willful misconduct or gross negligence. The Borrowers hereby assume all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrowers' pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (x) of Section 2.03(e); provided, however, that anything in such clauses to the contrary notwithstanding, the Borrowers may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrowers which the Borrowers prove were caused by the L/C Issuer's willful misconduct or gross negligence or the L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary (or the L/C Issuer may refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit), and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason. The L/C Issuer may send a Letter of Credit or conduct any communication to or from the beneficiary via the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") message or overnight courier, or any other commercially reasonable means of communicating with a beneficiary.

(g)      Applicability of ISP and UCP.  Unless otherwise expressly agreed by the L/C Issuer and the applicable Borrower when a Letter of Credit is issued, (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance shall apply to each Commercial Letter of Credit.  Notwithstanding the foregoing, the L/C Issuer shall not be responsible to the Borrowers for, and the L/C Issuer's rights and remedies against the Borrowers shall not be impaired by, any action or inaction of the L/C Issuer required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the Law or any order of a jurisdiction where the L/C Issuer or the beneficiary is located, the practice stated in the ISP or UCP, as applicable, or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade - International Financial Services Association (BAFT-IFSA), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

(h)     Letter of Credit Fees.  The applicable Borrower shall pay to the Administrative Agent for the account of the applicable Lenders, each in accordance with its Applicable Percentage, in Dollars, a Letter of Credit fee (the "Letter of Credit Fee") equal to the Applicable L/C Fee Rate multiplied by the Dollar Equivalent of the daily Stated Amount under each such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit).  For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06.  Letter of Credit Fees shall be (i) due and payable on the first Business Day of each calendar quarter, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand, and (ii) computed on a quarterly basis in arrears.  If there is any change in the Applicable L/C Fee Rate during any quarter, the daily amount available to be drawn under each Letter of Credit shall be computed and multiplied by the Applicable L/C Fee Rate separately for each period during such quarter that such Applicable L/C Fee Rate was in effect.  Notwithstanding anything to the contrary contained herein, while any Event of Default exists, Administrative Agent may, and upon the request of the Required Lenders shall, notify the Lead Borrower that all Letter of Credit Fees shall accrue at the Default Rate and thereafter such Letter of Credit Fees shall accrue at the Default Rate to the fullest extent permitted by applicable Law so long as such Event of Default is continuing.

(i)     Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer. The applicable Borrower shall pay directly to the L/C Issuer for its own account, in Dollars, a fronting fee (the "Fronting Fee") with respect to each Letter of Credit, at a rate equal to 0.125% per annum, computed on the Dollar Equivalent of the outstanding amount of such Letter of Credit, and payable on a quarterly basis in arrears.  Such Fronting Fees shall be due and payable on the first Business Day of each calendar quarter, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand.  For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06.  In addition, the applicable Borrower shall pay directly to the L/C Issuer for its own account, in Dollars, the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the L/C Issuer relating to Letters of Credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(j)     Existing Letters of Credit.  Each Existing Letter of Credit shall for all purposes hereunder and under the other Loan Documents, be deemed to be a Letter of Credit issued under this Agreement and shall be subject to all of the terms of this Agreement with respect to Letters of Credit. Without limiting the foregoing, Existing Letters of Credit which are Australian Letters of Credit are the direct obligation of the Australian Borrower, the payment and performance of which obligation is guaranteed by the Domestic Loan Parties.

(k)     Conflict with Issuer Documents.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

2.04    [Reserved].

2.05    Prepayments.

(a)     Each Borrower may, upon irrevocable notice to the Administrative Agent, at any time or from time to time voluntarily prepay Committed Loans in whole or in part without premium or

penalty; provided that (i) such notice must be received by the Administrative Agent not later than 11:00 a.m. (A) three Business Days prior to any date of prepayment of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans denominated in Dollars, (B) four Business Days (or five, in the case of prepayment of Loans denominated in Special Notice Currencies) prior to any date of prepayment of LIBO Rate Loans denominated in Alternative Currencies, and (C) on the date of prepayment of Prime Rate Loans; (ii) any voluntary prepayment of LIBO Rate Loans denominated in Dollars shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof; and (iii) any voluntary prepayment of BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans shall be in a principal amount of $500,000 (or the Alternative Currency Equivalent thereof) or a whole multiple of $100,000 (or the Applicable Currency Equivalent thereof) in excess thereof; and (iv) any voluntary prepayment of Prime Rate Loans shall be in a principal amount of $500,000 (or the Applicable Currency Equivalent thereof) or a whole multiple of $100,000 (or the Applicable Currency Equivalent thereof) in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans, the Interest Period(s) of such Loans. The Administrative Agent will promptly notify each applicable Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by a Borrower, the applicable Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a LIBO Rate Loan, a BBR Rate Loan, a TIBOR Rate Loan or a Canadian BA Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Subject to Section 2.18, each such prepayment shall be applied to the Committed Loans of the Lenders in accordance with their respective Applicable Percentages.

(b)     [Reserved].

(c)     If for any reason the Total Domestic Outstandings at any time exceed the Domestic Loan Cap as then in effect, the Domestic Borrowers shall immediately prepay Committed Domestic Loans and Domestic L/C Borrowings and/or Cash Collateralize the Domestic L/C Obligations (other than Domestic L/C Borrowings) and/or (subject t the DIP Intercreditor Agreement) prepay Foreign Loans or Cash Collateralize Australian L/C Obligations, in an aggregate amount equal to such excess; provided, however, that the Domestic Borrowers shall not be required to Cash Collateralize the Domestic L/C Obligations pursuant to this Section 2.05(c) unless after the prepayment in full of the Domestic Loans the Total Domestic Outstandings exceed the lesser of the Aggregate Domestic Commitments or the Domestic Borrowing Base, each as then in effect. The Administrative Agent may, at any time and from time to time after the initial deposit of such Cash Collateral, request that additional Cash Collateral be provided in order to protect against the results of exchange rate fluctuations.

(d)     If for any reason the Total Canadian Outstandings at any time exceed the Canadian Loan Cap as then in effect, the Canadian Borrower shall immediately prepay Committed Canadian Loans in an aggregate amount equal to such excess; provided, however, that notwithstanding the foregoing, to the extent that the Canadian Borrower is required to prepay loans solely as a result of a Currency Recalculation, such payments shall be due and payable two (2) Business Days after the Canadian Borrower receives notice of such Currency Recalculation.

(e)     If for any reason the Total Australian Outstandings at any time exceed the Australian Loan Cap as then in effect, the Australian Borrower shall immediately prepay Committed Australian Loans, and Australian L/C Borrowings and/or Cash Collateralize the Australian L/C Obligations (other than Australian L/C Borrowings) in an aggregate amount equal to such excess; provided, however, that the Australian Borrower shall not be required to Cash Collateralize the Australian L/C Obligations pursuant to this Section 2.05(e) unless after the prepayment in full of the Australian Loans the Total Australian Outstandings exceed the Australian Borrowing Base, each as then in effect; and further provided that notwithstanding the foregoing, to the extent that the Australian Borrower is required to prepay loans and cash collateralize Letters of Credit solely as a result of a Currency Recalculation, such payments and cash collateral shall be due and payable two (2) Business Days after such Borrower receives notice of such Currency Recalculation.

(f)     If for any reason the Total Japanese Outstandings at any time exceed the Japanese Loan Cap as then in effect, the Japanese Borrower shall immediately prepay Committed Japanese Loans in an aggregate amount equal to such excess; provided, however, that notwithstanding the foregoing, to the extent that the Japanese Borrower is required to prepay loans solely as a result of a Currency Recalculation, such payments shall be due and payable two (2) Business Days after such Borrower receives notice of such Currency Recalculation.

(g)     The Borrowers shall prepay the Loans in accordance with the provisions of Section 6.14 hereof.

(h)     Reserved.

(i)     Prepayments made pursuant to (i) Section 2.05(c), and (ii) to the extent representing funds on deposit in the Domestic Concentration Account, Section 2.05(g), first, shall be applied ratably to the Domestic L/C Borrowings, second, shall be applied ratably to the outstanding Committed Domestic Loans, and third, the amount remaining, if any, after the prepayment in full of all Domestic L/C Borrowings, and Committed Domestic Loans outstanding at such time may be retained by (or shall be returned to) the Domestic Borrowers for use in a manner not prohibited by this Agreement.

(j)     Prepayments made pursuant to Sections 2.05(d), 2.05(e) or 2.05(f), to the extent representing funds on deposit in a Foreign Concentration Account, Section 2.05(g), first, shall be applied ratably to the L/C Borrowings, second, shall be applied ratably to the outstanding Committed Loans made to such Borrower, and third the amount remaining, if any, after the prepayment in full of all L/C Borrowings, and Committed Loans outstanding at such time made to a Foreign Borrower may be retained by (or shall be returned to) such Foreign Borrower for use in a manner not prohibited by this Agreement.

(k)     In the case of Loans and Letters of Credit denominated in Alternative Currencies, the Administrative Agent shall with the delivery of each Borrowing Base Certificate, and may, at its discretion, at other times, recalculate the aggregate exposure under such Loans and Letters of Credit denominated in Alternative Currencies at any time to account for fluctuations in exchange rates affecting the Alternative Currencies in which any such non-Dollar Loans and Letters of Credit are denominated (a "Currency Recalculation"). Following written notice from the Administrative Agent, the applicable Borrowers shall promptly make payments in accordance with the provisions of Sections 2.05(c), (d), (e) and (f) hereof, to the extent necessary as a result of any such recalculation.

**2.06    Termination or Reduction of Commitments; Reallocation of Commitments.**

(a)    The Domestic Borrowers may, upon irrevocable notice from the Lead Borrower to the Administrative Agent, terminate the Aggregate Domestic Commitments, the Domestic Letter of Credit Sublimit or from time to time permanently reduce in part the Aggregate Domestic Commitments, the Domestic Letter of Credit Sublimit; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. three (3) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof and (iii) the Domestic Borrowers shall not reduce (A) the Aggregate Domestic Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Domestic Outstandings would exceed the Aggregate Domestic Commitments and (B) the Domestic Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of Domestic L/C Obligations (other than Domestic L/C Borrowings) not fully Cash Collateralized hereunder would exceed the Domestic Letter of Credit Sublimit.

(b)    If, after giving effect to any reduction of the Aggregate Domestic Commitments, the Domestic Letter of Credit Sublimit exceeds the amount of the Aggregate Domestic Commitments, such Domestic Letter of Credit Sublimit shall be automatically reduced by the amount of such excess.

(c)    If, after giving effect to any reduction of the Commitments in favor of any Foreign Borrower, the Letter of Credit Sublimit for such Foreign exceeds the amount of the Aggregate Applicable Commitments in favor of such Foreign Borrower, the Letter of Credit Sublimit for such Foreign Borrower shall be automatically reduced by the amount of such excess.

(d)    The Foreign Commitments, the Letter of Credit Sublimit for each Foreign Borrower shall be automatically terminated without any further action of any Loan Party or any Credit Party upon the Effective Date (after making of Committed Loans to the Australian Borrower and the Canadian Borrower on such date).

(e)    The Administrative Agent will promptly notify the applicable Lenders of any termination or reduction made pursuant to this Section 2.06. Upon any reduction of any Commitments, the applicable Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. All fees (including, without limitation, Commitment Fees and Letter of Credit Fees) and interest in respect of the Aggregate Total Commitments accrued until the effective date of any termination of the Aggregate Total Commitments shall be paid on the effective date of such termination.

(f)    Reserved.

(g)    Notwithstanding anything to the contrary contained herein, any notice of prepayment, reduction or termination, as the case may be, delivered by the Lead Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other event or condition, in which case such notice may be revoked by the Lead Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

**2.07    Repayment of Loans.**

Each Borrower shall repay to the Administrative Agent, for the account of the applicable Lenders, on the Termination Date the aggregate principal amount of Committed Loans made to such Borrower and outstanding on such date.

**2.08    Interest.**

(a)     Subject to the provisions of Section 2.08(b) below, (i) each LIBO Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Adjusted LIBO Rate for such Interest Period plus the Applicable Margin plus (in the case of a LIBO Rate Loan of any Lender which is lent from a Lending Office in the United Kingdom or a Participating Member State) the Mandatory Cost; (ii) each Canadian BA Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Canadian BA Rate for such Interest Period plus the Applicable Margin; (iii) each BBR Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Australian Bank Bill Rate for such Interest Period plus the Applicable Margin; (iv) each TIBOR Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the TIBOR Rate for such Interest Period plus the Applicable Margin; (v) each Domestic Prime Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Prime Rate plus the Applicable Margin; (vi) each Canadian Prime Rate Loan and Canadian Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Canadian Prime Rate, or Canadian Base Rate, as applicable, plus the Applicable Margin; (vii) each Australian Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Australian Base Rate plus the Applicable Margin; and (viii) each Japanese Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Japanese Base Rate plus the Applicable Margin.

(b)     (i)     If any amount payable under any Loan Document is not paid when due (after giving effect to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)     If any Event of Default exists, then the Administrative Agent, upon the request of the Required Lenders shall, notify the Lead Borrower that all outstanding Obligations under the Loan Documents shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such Loans and L/C Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws for so long as such Event of Default is continuing; ; provided that the Default Rate shall automatically apply to all such Obligations immediately and without notice upon the occurrence of any Event of Default pursuant to Section 8.01(a) or Section 8.01(f).

(iii)     Accrued and unpaid interest on past due amounts (including interest on past due interest to the fullest extent permitted by applicable Laws) shall be due and payable upon demand (or automatically and immediately without any demand upon the occurrence of any Event of Default pursuant to Section 8.01(a) or Section 8.01(f)).

(c)     Interest on each Loan shall be due and payable in arrears in cash on each Interest Payment Date applicable thereto and at such other times as may be specified herein at the Applicable Rate (or, as applicable, the Default Rate). All accrued and unpaid interest shall be paid in cash on the Termination Date and shall also be paid in cash on any date a prepayment or payment of principal of Loans is made for any interest applicable to such principal being prepaid or paid.

**2.09    Fees.** In addition to certain fees described in subsections (h) and (i) of Section 2.03:

(a)     Commitment Fee.  The Domestic Borrowers shall pay to the Administrative Agent, for the account of each Domestic Lender in accordance with its Applicable Percentage of such Domestic Facility, a commitment fee (the "Commitment Fee"), based upon the average daily unused portion of the Domestic Revolving Facility equal to 0.50% per annum times the actual daily amount by which the Domestic Commitments exceed the sum of (i) the Outstanding Amount of the Loans under the Domestic Revolving Facility, and (ii) the Outstanding Amount of L/C Obligations under the Domestic Revolving Facility. The Commitment Fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on the first Business Day of each calendar quarter, commencing with the first such date to occur after the Effective Date, and on the last day of the Availability Period. Commitment Fees shall be paid by the Domestic Borrowers in Dollars.

(b)     Other Fees.  The Borrowers shall pay to the Administrative Agent and MLPFS for their own respective accounts, in Dollars, fees in the amounts and at the times specified in the Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.10    Computation of Interest and Fees.**

(a)     All computations of interest for Prime Rate Loans shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All computations of interest for Canadian BA Rate Loans and TIBOR Rate Loans shall be made on the basis of a year of 365 days and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year), or, in the case of interest in respect of Committed Loans denominated in Alternative Currencies as to which market practice differs from the foregoing, in accordance with such market practice. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(b)     For the purposes of this Agreement, whenever interest to be paid hereunder is to be calculated on the basis of a year of three hundred and sixty (360) days or any other period of time that is less than a calendar year, the yearly rate of interest which the rate determined pursuant to such calculation is equivalent is the rate so determined multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by either three hundred and sixty (360) or such other period of time, as the case may be.

(c)     For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever any interest or any fee to be paid hereunder or in connection herewith is to be calculated on the basis of a 360-day or any other period of time that is less than a calendar year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by three hundred and sixty (360) or the number of days in such period, as applicable. The rates of interest under this Agreement are nominal rates, and not effective rates or yields. The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

(d)     If any provision of this Agreement or of any of the other Loan Documents would obligate a Canadian Loan Party to make any payment of interest or other amount payable to the Administrative Agent or any Lender under this Agreement or any other Loan Document in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by the Administrative Agent or any Lender of interest at a criminal rate (as such terms are construed under the *Criminal Code* (Canada)) then, notwithstanding such provisions, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or so result in a receipt by the Administrative Agent or any Lender of interest at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: (1) firstly, by reducing the amount or rate of interest required to be paid to the Administrative Agent, the Administrative Agent or any Lender under this <u>Section 2.10</u>, and (2) thereafter, by reducing any fees, commissions, premiums and other amounts required to be paid to the Administrative Agent, the Administrative Agent or any Lender which would constitute "interest" for purposes of Section 347 of the *Criminal Code* (Canada). Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if the Administrative Agent or any Lender shall have received an amount in excess of the maximum permitted by that Section of the *Criminal Code* (Canada), the Canadian Loan Parties shall be entitled, by notice in writing to the Administrative Agent or the applicable Lender, to obtain reimbursement from such party in an amount equal to such excess and, pending such reimbursement, such amount shall be deemed to be an amount payable by the Administrative Agent or applicable Lender to the Canadian Borrower. Any amount or rate of interest referred to in this <u>Section 2.10</u> shall be determined in accordance with generally accepted actuarial practices and principles as an effective annual rate of interest over the term that the applicable loan remains outstanding with the assumption that any charges, fees or expenses that fall within the meaning of "interest" (as defined in the *Criminal Code* (Canada)) shall be included in the calculation of such effective rate and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by the Administrative Agent shall be conclusive for the purposes of such determination.

(e)     All calculations of interest payable by the Loan Parties under this Agreement or any other Loan Document are to be made on the basis of the nominal interest rate described herein and therein and not on the basis of effective yearly rates or on any other basis which gives effect to the principle of deemed reinvestment of interest which principle does not apply to any interest calculated under this Agreement or any Loan Document. The parties hereto acknowledge that there is a material difference between the stated nominal interest rates and the effective yearly rates of interest and that they are capable of making the calculations required to determine such effective yearly rates of interest.

### 2.11    Evidence of Debt.

(a)     The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Administrative Agent (each, the "<u>Loan Account</u>") in the ordinary

course of business.   In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.   The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon.   Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.   In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.   Upon the request of any Lender made through the Administrative Agent (who shall notify the applicable Borrowers), the applicable Borrowers (other than the Japanese Borrower) shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.   Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount, currency and maturity of its Loans and payments with respect thereto.   Any failure to so attach or endorse, or any error in doing so, shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations or the Foreign Liabilities, as applicable.   Upon receipt of an affidavit and indemnity of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the applicable Borrowers (other than the Japanese Borrower) will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor (subject to adjustment in the case of any assignments of such Lender's Commitments).

(b)   In addition to the accounts and records referred to in Section 2.11(a), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Lender of participations in Letters of Credit.   In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

## 2.12   Payments Generally; Administrative Agent's Clawback.

(a)   General.   All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.   Except as otherwise expressly provided herein and except with respect to principal of and interest on Loans denominated in an Alternative Currency, all payments by the Borrowers hereunder shall be made, as applicable, to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars, in each case, in Same Day Funds not later than 2:00 p.m. on the date specified herein.   Except as otherwise expressly provided herein, all payments by the Borrowers hereunder with respect to principal and interest on Loans denominated in an Alternative Currency shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in such Alternative Currency and in Same Day Funds not later than the Applicable Time specified by the Administrative Agent on the dates specified herein. Without limiting the generality of the foregoing, the Administrative Agent may require that any payments due under this Agreement be made in the United States.   If, for any reason, any Borrower is prohibited by any Law from making any required payment hereunder in an Alternative Currency, such Borrower shall make such payment in Dollars in the Dollar Equivalent of the Alternative

Currency payment amount. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office in accordance with the provisions of Section 2.14. All payments received by the Administrative Agent (i) after 2:00 p.m., in the case of payments in Dollars, or (ii) after the Applicable Time specified by the Administrative Agent in the case of payments in an Alternative Currency, shall in each case solely for the purpose of calculating interest and fees accruing hereunder, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment (other than with respect to payment of a LIBO Rate Loan, a BBR Rate Loan, a TIBOR Rate Loan or a Canadian BA Rate Loan) to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)      Currency. Except as otherwise set forth herein, (i) Loans shall be funded and payments shall be made in respect of Alternative Currencies in the applicable Alternative Currency, and (ii) Letters of Credit denominated in an Alternative Currency shall be reimbursed by the applicable Borrower in that Alternative Currency. All obligations of the Lenders with respect to Letters of Credit will be immediately due and payable in Dollars, provided that the amount of any amounts denominated in an Alternative Currency will be redenominated into Dollars.

(c)      (i)      Funding by Lenders; Presumption by Administrative Agent. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Committed Borrowing of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans, as applicable (or in the case of any Committed Borrowing of Prime Rate Loans, prior to 1:00 p.m. on the date of such Committed Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Committed Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 (or in the case of a Committed Borrowing of Prime Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the applicable Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Committed Borrowing available to the Administrative Agent, then the applicable Lender and the applicable Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in Same Day Funds with interest thereon, for each day from and including the date such amount is made available to such Borrowers to but excluding the date of payment to the Administrative Agent at (A) in the case of a payment to be made by a Lender, the Overnight Rate, plus any administrative processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by any Borrowers, the interest rate applicable to Prime Rate Loans. If the applicable Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to such Borrowers the amount of such interest paid by such Borrowers for such period. If such Lender pays its share of the applicable Committed Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Committed Loan included in such Committed Borrowing. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)      Payments by Borrowers; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from a Borrower prior to the time at which any

payment is due to the Administrative Agent for the account of the Lenders or the L/C Issuer hereunder that such Borrower will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the L/C Issuer, as the case may be, the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the L/C Issuer, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or the L/C Issuer, in Same Day Funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent at the applicable Overnight Rate.

A notice of the Administrative Agent to any Lender or the Lead Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d)    Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of Section 4.02 hereof), the Administrative Agent shall promptly return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)    Obligations of Lenders Several. The obligations of the Lenders hereunder to make Committed Loans, to fund participations in Letters of Credit and to make payments pursuant to Section 10.04(c) are several and not joint. The failure of any Lender to make any Committed Loan, to fund any such participation or to make any payment under Section 10.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Committed Loan, to purchase its participation or to make its payment under Section 10.04(c).

(f)    Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

2.13    **Sharing of Payments by Lenders**. If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest, or other amounts with respect to, any of the Obligations resulting in such Credit Party's receiving payment of a proportion of the aggregate amount of such Obligations or participations and accrued interest thereon greater than its pro rata share thereof as provided herein (including as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other applicable Credit Parties, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

(a)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)      the provisions of this Section shall not be construed to apply to (x) any payment made by any Loan Party pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Committed Loans or sub-participations in L/C Obligations to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.14    Settlement Amongst Lenders.**

(a)      The amount of each Lender's Applicable Percentage of outstanding Loans shall be computed weekly (or more frequently in the Administrative Agent's discretion) and shall be adjusted upward or downward based on all Loans and repayments of Loans received by the Administrative Agent  as of 3:00 p.m. on the first Business Day (such date, the "<u>Settlement Date</u>") following the end of the period specified by the Administrative Agent.

(b)      The Administrative Agent shall deliver to each of the Lenders, promptly after a Settlement Date a summary statement of the amount of outstanding Committed Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Administrative Agent shall transfer to each Lender its Applicable Percentage of repayments, and (ii) each Lender shall transfer to the Administrative Agent or the Administrative Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Committed Loans made by each Lender shall be equal to such Lender's Applicable Percentage of all applicable Committed Loans outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Administrative Agent by the Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in Same Day Funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Administrative Agent.  If and to the extent any Lender shall not have so made its transfer to the Administrative Agent, such Lender agrees to pay to the Administrative Agent forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Administrative Agent equal to the applicable Overnight Rate, plus any administrative processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing.

**2.15    [Reserved].**

**2.16    [Reserved].**

**2.17    <u>Cash Collateral</u>.**

(a)      <u>Certain Credit Support Events</u>.  If (i) the L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Borrowing, (ii) as of

the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, (iii) the Borrowers shall be required to provide Cash Collateral pursuant to Section 8.02(c), or (iv) there shall exist a Defaulting Lender, the applicable Borrowers shall immediately (in the case of clause (iii) above) or within one Business Day (in all other cases) following any request by the Administrative Agent or the L/C Issuer, provide Cash Collateral in an amount not less than the applicable Minimum Collateral Amount (determined in the case of Cash Collateral provided pursuant to clause (iv) above, after giving effect to Section 2.18(a)(iv) and any Cash Collateral provided by the Defaulting Lender). Additionally, if the Administrative Agent notifies the Lead Borrower at any time that the Outstanding Amount of all L/C Obligations at such time exceeds 103% of the Letter of Credit Sublimit then in effect, then, within two Business Days after receipt of such notice, the applicable Borrowers shall provide Cash Collateral for the Outstanding Amount of the L/C Obligations in an amount not less than the amount by which the Outstanding Amount of all L/C Obligations exceeds the Letter of Credit Sublimit.

(b)     Grant of Security Interest.    Each applicable Loan Party, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to (and subjects to the control of) the Administrative Agent or the Australian Security Trustee, as applicable, for the benefit of the Administrative Agent, the L/C Issuer and the applicable Lenders, and agrees to maintain, a first priority security interest in all such cash, deposit accounts and all balances therein, and all other property so provided as collateral pursuant hereto, and in all proceeds of the foregoing, all as security for the Obligations to which such Cash Collateral may be applied pursuant to Section 2.17(c). If at any time the Administrative Agent reasonably determines that Cash Collateral is subject to any right or claim of any Person (other than the Administrative Agent (for the benefit of itself and the other applicable Credit Parties) and the DIP Term Agent (subject to the DIP Intercreditor Agreement)) or that the total amount of such Cash Collateral is less than the Minimum Collateral Amount, the applicable Loan Parties will, promptly upon demand by the Administrative Agent or the Australian Security Trustee, as applicable, pay or provide to the Administrative Agent or the Australian Security Trustee, as applicable, additional Cash Collateral in an amount sufficient to eliminate such deficiency. All Cash Collateral (other than credit support not constituting funds subject to deposit) shall be maintained in one or more blocked, non-interest bearing deposit accounts at Bank of America. The applicable Loan Parties shall pay on demand therefor from time to time all customary account opening, activity and other administrative fees and charges in connection with the maintenance and disbursement of Cash Collateral.

(c)     Application.    Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under any of this Section 2.17 or Sections 2.03, 2.05, 2.18 or 8.02 in respect of Letters of Credit shall be held and applied to the satisfaction of the specific L/C Obligations, obligations to fund participations therein (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) and other Obligations for which the Cash Collateral was so provided, prior to any other application of such property as may otherwise be provided for herein.

(d)     Release.    Cash Collateral (or the appropriate portion thereof) provided to reduce Fronting Exposure or to secure other Obligations shall be released promptly following (i) the elimination of the applicable Fronting Exposure or other Obligations giving rise thereto (including by the termination of Defaulting Lender status of the applicable Lender (or, as appropriate, its assignee following compliance with Section 10.06(b)(iv))) or (ii) the determination by the Administrative Agent and the L/C Issuer that there exists excess Cash Collateral; provided, however, (x) any such release shall be without prejudice to, and any disbursement or other transfer of Cash Collateral shall be and remain subject to, any other Lien conferred under the Loan Documents and the other applicable provisions of the Loan Documents, and (y) the Person providing Cash Collateral and the L/C Issuer may agree that Cash

Collateral shall not be released but instead held to support future anticipated Fronting Exposure or other obligations.

### 2.18   Certain Bankruptcy Matters.

(a)      Except to the extent expressly provided otherwise in an Order, the Loan Parties hereby agree that, subject only to Priority Permitted Encumbrances and the Carve-Out, the Obligations shall (i) constitute DIP Superpriority Claims over all administrative expense claims and claims against the Debtors now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and, to the extent provided in any of the Orders.

(b)      In the event of a conflict between, or inconsistency among, the Interim Order or the Final Order, on the one hand, and any other Loan Document, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c)      Notwithstanding anything to the contrary contained herein or elsewhere:

(i)      the Credit Parties shall not be required to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the Orders or any other Loan Document. If the Administrative Agent (at the Required Lenders' direction, which shall be in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Administrative Agent's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 2.16(c) or of the perfection of any other Liens in favor of the Administrative Agent, for the benefit of the Lenders and the other Credit Parties, on the Collateral. Notwithstanding anything to the contrary herein, neither the Administrative Agent nor any Credit Party shall require the filing of a Mortgage with respect to any Real Property of the Loan Parties unless an Event of Default resulting from a breach of Section 8.01(a) has occurred and is continuing.

(ii)      Except as otherwise agreed to by the Lenders, the Liens, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to the Credit Parties pursuant to this Agreement, the Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Borrower or any other Loan Party (pursuant to Section 364 of the

Bankruptcy Code or otherwise), or by dismissal or conversion of any of the Cases, or by any other act or omission whatsoever.

(d)        Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(e)        subject only to Priority Permitted Encumbrances and the Carve-Out and to the extent provided in any of the Orders and subject to the Orders, no costs or expenses of administration which have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or the Administrative Agent against the Debtors in respect of any Obligations;

(f)        other than as provided in the Orders or the Loan Documents, the Administrative Agent's Liens on the Collateral shall constitute valid, enforceable and perfected first priority Liens, and shall be prior to all other Liens (except for Priority Permitted Encumbrances), now existing or hereafter arising, in favor of any other creditor or other Person; and

(g)        the Administrative Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Administrative Agent or any Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Administrative Agent's Liens under applicable non-bankruptcy law.

(h)        In connection with any sale or Disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by Agent, in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, each Borrower and each other Loan Party hereby gives the Administrative Agent (at the direction of the Required Lenders) the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

### 2.19    Defaulting Lenders.

(a)        <u>Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)        <u>Waivers and Amendments</u>. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and <u>Section 10.01</u>.

(ii)        <u>Defaulting Lender Waterfall</u>. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article VIII</u> or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to <u>Section 10.08</u> shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent

hereunder; *second*, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the L/C Issuer; *third*, to Cash Collateralize the L/C Issuer's Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.17; *fourth*, as the Lead Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Lead Borrower, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) Cash Collateralize the L/C Issuer's future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with Section 2.17; *sixth*, to the payment of any amounts owing to the Lenders, the L/C Issuer as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the L/C Issuer against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Loan Parties as a result of any judgment of a court of competent jurisdiction obtained by the Loan Parties against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Obligations owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Obligations owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in L/C Obligations are held by the Lenders pro rata in accordance with the Commitments hereunder without giving effect to Section 2.18(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.18(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)   Certain Fees.

(A)   No Defaulting Lender shall be entitled to receive any Commitment Fee payable under Section 2.09(a) for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)   Each Defaulting Lender shall be entitled to receive Letter of Credit Fees for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Applicable Percentage of the stated amount of Letters of Credit for which it has provided Cash Collateral pursuant to Section 2.17.

(C)   With respect to any Commitment Fee payable under Section 2.09(a) or any Letter of Credit Fee not required to be paid to any Defaulting Lender pursuant to clause (A) or (B) above, the Borrowers shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting

Lender's participation in L/C Obligations that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (y) pay to the L/C Issuer the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such L/C Issuer's Fronting Exposure to such Defaulting Lender, and (z) not be required to pay the remaining amount of any such fee.

(iv)     Reallocation of Applicable Percentages to Reduce Fronting Exposure. All or any part of such Defaulting Lender's participation in L/C Obligations shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that (x) the conditions set forth in Section 4.02 are satisfied at the time of such reallocation (and, unless the Lead Borrower shall have otherwise notified the Administrative Agent at such time, the Lead Borrower shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (y) such reallocation does not cause the aggregate Outstanding Amount of Obligations of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Commitment. No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)     Cash Collateral. If the reallocation described in clause (a)(iv) above cannot, or can only partially, be effected, the Borrowers shall, without prejudice to any right or remedy available to them hereunder or under applicable Law, to Cash Collateralize the L/C Issuers' Fronting Exposure in accordance with the procedures set forth in Section 2.17.

(b)     Defaulting Lender Cure. If the Lead Borrower, the Administrative Agent, and the L/C Issuer agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Committed Loans and funded and unfunded participations in Letters of Credit to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to Section 2.18(a)(iv)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**2.20     CFC Payments.** Any references to the Loan Parties (in the context of payments, proceeds, liabilities or Obligations), Commitments, Collateral, L/C Borrowings or Loans shall mean, in the case of and as applied to the foregoing, with respect to any Obligations of the Domestic Loan Parties, only the Domestic Loan Parties (or any of their Domestic Subsidiaries and only for their own account), the Collateral that is property of Domestic Loan Parties, or L/C Borrowings or Loans constituting Obligations of Domestic Loan Parties (or any of their Domestic Subsidiaries), so that collections received from any Foreign Loan Parties and proceeds of the Collateral that is property of such Foreign Loan Parties shall be applied solely and exclusively to the payment of the Foreign Liabilities. All provisions

contained in any Loan Document or side letter shall be interpreted consistently with this Section 2.19 to the extent possible, and where such other provisions conflict with the provisions of this Section 2.19, the provisions of this Section 2.19 shall govern.

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY;**
**APPOINTMENT OF LEAD BORROWER**

**3.01   Taxes.**

(a)   Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)   Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws. If any applicable Laws (as determined in the good faith discretion of the Administrative Agent or a Loan Party) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or a Loan Party, then the Administrative Agent or such Loan Party shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)   If any Loan Party or the Administrative Agent shall be required by the Code to withhold or deduct Taxes, including both United States Federal backup withholding and withholding taxes, from any payment, then, (A) the Administrative Agent or a Loan Party shall withhold or make such deductions as are determined by the Administrative Agent or a Loan Party to be required taking into account the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent or a Loan Party, to the extent required by the Code, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code, (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made, and (D) reasonably promptly after paying such sum required by Law, the Loan Party making such payments (if it is required to make deduction or withholding) shall deliver to the Administrative Agent evidence reasonably satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant Governmental Authority (or if the payment, deduction or withholding is made by the Administrative Agent, the Administrative Agent shall furnish such evidence to the affected parties and the Lead Borrower).

(iii)   If any Loan Party or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment, then (A) such Loan Party or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection

-118-

(e) below, (B) such Loan Party or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)     Payment of Other Taxes by the Loan Parties. Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Law (without duplication of the provisions of subsection (a) above), or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     Tax Indemnifications.

(i)     Without duplication of the provisions of subsection (a) above, the Loan Parties shall, and each Loan Party does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount (and describing the basis) of such payment or liability delivered to the Lead Borrower by a Lender or the L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of any other Agent, a Lender or the L/C Issuer, shall be conclusive absent manifest error.

(ii)     Each Lender and the L/C Issuer shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, (x) the Administrative Agent against any Indemnified Taxes attributable to such Lender or the L/C Issuer (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (y) the Administrative Agent and the Loan Parties, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.06(e) relating to the maintenance of a Participant Register and (z) the Administrative Agent and the Loan Parties, as applicable, against any Excluded Taxes attributable to such Lender or the L/C Issuer, in each case, that are payable or paid by the Administrative Agent or a Loan Party in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent or a Loan Party shall be conclusive absent manifest error.  Each Lender and the L/C Issuer hereby authorizes the

-119-

Administrative Agent and the Loan Parties to set off and apply any and all amounts at any time owing to such Lender or the L/C Issuer, as the case may be, under this Agreement or any other Loan Document against any amount due to the Administrative Agent and the Loan Parties under this clause (ii).

(d)    Evidence of Payments.    Upon request by the Lead Borrower or the Administrative Agent, as the case may be, after any payment of Taxes by the Lead Borrower or by the Administrative Agent or a Recipient to a Governmental Authority as provided in this Section 3.01, the Lead Borrower shall deliver to the Administrative Agent or the Administrative Agent shall deliver to the Lead Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Lead Borrower or the Administrative Agent, as the case may be.

(e)    Status of Lenders; Tax Documentation.

(i)    Any Lender and Recipient that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Lead Borrower and the Administrative Agent, at the time or times prescribed by applicable Law or reasonably requested by the Lead Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Law or reasonably requested by the Lead Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  Such delivery shall be required on the Effective Date (or, in the case of an assignee, on the date of assignment) and on or before the date such documentation expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent documentation so delivered or as may reasonably be requested by the Lead Borrower or the Administrative Agent. In addition, any Lender and Recipient, if reasonably requested by the Lead Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Lead Borrower or the Administrative Agent as will enable the Lead Borrower or the Administrative Agent to determine whether or not such Lender or Recipient  is subject to any withholding (including backup withholding) or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(e)(ii)(A), (ii)(B) (ii)(D) and (ii)(E) below) shall not be required if in the Lender's reasonable judgment as a result of a Change in Law such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense (it being understood that the Borrowers shall be given a reasonable opportunity to reimburse such costs or expense) or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that any Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Lead Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of

the Lead Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax (or substantively comparable subsequent versions thereof or successors thereto);

(B)     any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Lead Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Administrative Agent), whichever of the following is applicable:

(I)     in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN (or substantively comparable subsequent versions thereof or successors thereto) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN (or substantively comparable subsequent versions thereof or successors thereto) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)    executed originals of IRS Form W-8ECI;

(III)   in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibits M-1, M-2, M-3 or M-4 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (each a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E (or substantively comparable subsequent versions thereof or successors thereto); or

(IV)    to the extent a Non-U.S. Lender is not the beneficial owner, executed originals of IRS Form W-8IMY (or substantively comparable subsequent versions thereof or successors thereto), accompanied by IRS Form W-8ECI (or substantively comparable subsequent versions thereof or successors thereto), IRS Form W-8BEN-E or IRS Form W-8BEN (or substantively comparable subsequent versions thereof or successors thereto), a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-2 or Exhibit M-3, IRS Form W-9 (or substantively comparable subsequent versions thereof or successors thereto), and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a

partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-4 on behalf of each such direct and indirect partner;

(C)     any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Lead Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Lead Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

(D)     the Administrative Agent shall deliver to the Lead Borrower on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter as required by applicable Law) two copies of IRS Form W-9 (or any substantively comparable subsequent versions thereof or successors thereto) certifying that the Administrative Agent is exempt from United States federal backup withholding tax and such other documentation as will enable the Borrowers to determine whether or not the Administrative Agent is subject to United States federal backup withholding tax or information reporting requirements; and

(E)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or other Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or other Recipient shall deliver to the Lead Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Lead Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Administrative Agent as may be necessary for the Lead Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's or other Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii)     In the event that a Lender or other Recipient will receive a payment under this Agreement in the course of carrying on a business or enterprise in Australia, that Lender or other Recipient is requested to deliver to the Lead Borrower and the Administrative Agent on or prior to the date on which such Lender or other Recipient becomes a Lender or other Recipient under this Agreement the following details of the Lender or other Recipient (A) its Australian tax file number, or (B) its Australian business number.

(iv)    In the event that an Australian Credit Party will receive a payment under this agreement, that Australian Credit Party shall indicate in writing to the Lead Borrower and the Administrative Agent on or prior to the date on which it becomes an Australian Credit Party under this agreement whether it (A) will receive such payments in the course of carrying on a business or enterprise in Australia at or through a permanent establishment in Australia, and (B) is a Qualifying Australian Treaty Party.

(v)    Each Lender or other Recipient agrees that if any form or certification it previously delivered pursuant to this Section 3.01 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Lead Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)    Treatment of Certain Refunds. Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender or the L/C Issuer, or have any obligation to pay to any Lender or the L/C Issuer, any refund of Taxes withheld or deducted from funds paid for the account of such Lender or the L/C Issuer, as the case may be. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this Section 3.01, it shall pay to the Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by a Loan Party under this Section 3.01 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient in connection with such refund, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Party, upon the request of the Recipient, agrees to repay the amount paid over to the Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to the Loan Party pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Loan Party or any other Person.

(g)    L/C Issuer. For the avoidance of doubt, for purposes of this Section 3.01, the term "Lender" shall include any L/C Issuer.

(h)    Survival. Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender or the L/C Issuer, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

(i)    GST.

(i)    Unless expressly specified otherwise, all payments to be made by the Australian Loan Parties under or in connection with any Loan Document have been calculated or determined without regard to GST.

(ii)    If all or part of any such payment is the consideration for a taxable supply for GST purposes then, when that Australian Loan Party makes that payment:

(A)    it must pay to the Credit Parties an additional amount equal to that payment or part payment multiplied by the appropriate rate of GST (currently 10%); and

(B)    the Credit Parties will promptly provide to that Australian Loan Party a tax invoice complying with the relevant GST legislation.

(j)    Where under any Loan Document an Australian Loan Party is required to reimburse or indemnify for an amount, that Australian Loan Party must pay the relevant amount (including any sum in respect to GST) less any GST input tax credit the Credit Parties determine that it is entitled to claim in respect of that amount.

**3.02    Illegality.** If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBO Rate Loans, BBR Rate Loan, TIBOR Rate Loans or Canadian BA Rate Loans, as applicable (whether denominated in Dollars or an Alternative Currency), or to determine or charge interest rates based upon the LIBO Rate, the BA Rate, the BBR Rate or the TIBOR Rate, as applicable, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars or any Alternative Currency in the applicable interbank market, then, on notice thereof by such Lender to the Lead Borrower through the Administrative Agent, any obligation of such Lender to make or continue LIBO Rate Loans, BBR Rate Loan, TIBOR Rate Loans or Canadian BA Rate Loans, as applicable, in the affected currency or currencies or, in the case of LIBO Rate Loans, Canadian BA Rate Loans, BBR Rate Loans or TIBOR Rate Loans in Dollars, to convert Prime Rate Loans to LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian Prime Rate Loans to Canadian BA Rate Loans, as applicable, shall be suspended until such Lender notifies the Administrative Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the applicable Borrowers shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable and such Loans are denominated in Dollars, convert all LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans of such Lender or Canadian BA Rate Loans of such Lender into Canadian Prime Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBO Rate Loans, Canadian BA Rate Loans, TIBOR Rate Loans, or Canadian BA Rate Loans, as applicable, to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBO Rate Loans, Canadian BA Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans. Upon any such prepayment or conversion, the applicable Borrowers shall also pay accrued interest on the amount so prepaid or converted.

**3.03    Inability to Determine Rates.** If the Required Lenders determine that for any reason in connection with any request for a LIBO Rate Loan, a BBR Rate Loan, a TIBOR Rate Loan or a Canadian BA Rate Loan, or a conversion to or continuation thereof that (a) deposits (whether in Dollars or an

Alternative Currency) are not being offered to banks in the applicable offshore interbank market for such currency for the applicable amount and Interest Period of such LIBO Rate Loan, BBR Rate Loans or TIBOR Rate Loans, (b) with respect to Canadian BA Rate Loans only, there is no market for bankers acceptances, (c) adequate and reasonable means do not exist for determining the LIBO Rate, the BBR Rate, the TIBOR Rate or the BA Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or Canadian BA Rate Loan (whether denominated in Dollars or an Alternative Currency), or (d) the LIBO Rate, the BBR Rate, the TIBOR Rate or the BA Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or Canadian BA Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Lead Borrower and each applicable Lender. Thereafter, the obligation of the Lenders to make or maintain LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans, as applicable, in the affected currency or currencies shall be suspended until the Administrative Agent (but in any case upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Lead Borrower may revoke any pending request for a Committed Borrowing of, conversion to or continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans, as applicable, in the affected currency or currencies or, failing that, will be deemed to have converted such request into either a request for a Committed Borrowing of Prime Rate Loans in the amount specified therein.

   **3.04  Increased Costs; Reserves on LIBO Rate Loans**.

     (a)  <u>Increased Costs Generally</u>. If any Change in Law shall:

      (i)  impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except (A) any reserve requirement reflected in the LIBO Rate, and (B) the requirements of the Bank of England and the Financial Services Authority or the European Central Bank reflected in the Mandatory Cost, other than as set forth below) or the L/C Issuer;

      (ii)  subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

      (iii)  result in the failure of the Mandatory Cost, as calculated hereunder, to represent the cost to any Lender of complying with the requirements of the Bank of England and/or the Financial Services Authority or the European Central Bank in relation to its making, funding or maintaining LIBO Rate Loans; or

      (iv)  impose on any Lender or the L/C Issuer or the London interbank market or the Canadian bankers' acceptance market any other condition, cost or expense affecting this Agreement or LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or Canadian BA Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the L/C

Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or the L/C Issuer and delivery of the certificate contemplated by Section 3.04(c), the applicable Borrowers will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered. Notwithstanding the foregoing, no Lender shall claim any amounts pursuant to Section 3.04(a)(ii) unless such Lender is generally seeking similar compensation from borrowers under other similar credit agreements.

(b)    Capital Requirements.  If any Lender or the L/C Issuer determines that any Change in Law affecting such Lender or the L/C Issuer or any Lending Office of such Lender or such Lender's or the L/C Issuer's holding company, if any, regarding capital requirements has had, or would have, the effect of reducing the rate of return on such Lender's or the L/C Issuer's capital or on the capital of such Lender's or the L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the L/C Issuer's policies and the policies of such Lender's or the L/C Issuer's holding company with respect to capital adequacy), then from time to time upon delivery of the certificate contemplated by Section 3.04(c), the applicable Borrowers will pay to such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company, as the case may be, for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender or the L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or the L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Lead Borrower shall be conclusive absent manifest error.  The applicable Borrowers shall pay such Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's or the L/C Issuer's right to demand such compensation, provided that the applicable Borrower shall not be required to compensate a Lender or the L/C Issuer pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than six (6) months prior to the date that such Lender or the L/C Issuer, as the case may be, notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six (6)-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    Reserves on LIBO Rate Loans.  The applicable Borrowers shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each LIBO Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which

determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided that, the Lead Borrower shall have received at least ten (10) days' prior notice (with a copy to the Administrative Agent) of such additional interest from such Lender. If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest shall be due and payable ten (10) days from receipt of such notice.

      **3.05    Compensation for Losses.**   Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, each Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

      (a)    any continuation, conversion, payment or prepayment of any LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or Canadian BA Rate Loan made to such Borrower on a day other than the last day of the Interest Period for such LIBO Rate Loan, BBR Rate Loan, TIBOR Rate or Canadian BA Rate Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

      (b)    any failure by such Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or any Canadian BA Rate Loan made to such Borrower on the date or in the amount notified by such Borrower;

      (c)    any failure by any Borrower to make payment of any Loan or drawing under any Letter of Credit (or interest due thereon) denominated in an Alternative Currency on its scheduled due date or any payment thereof in a different currency; or

      (d)    any assignment of a LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or Canadian BA Rate Loan made to such Borrower on a day other than the last day of the Interest Period therefor as a result of a request by the Lead Borrower pursuant to Section 10.13;

including any loss of anticipated profits, any foreign exchange losses and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained or from the performance of any foreign exchange contract. The applicable Borrower shall also pay any customary and reasonable administrative fees charged by such Lender in connection with the foregoing.

      For purposes of calculating amounts payable by a Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each LIBO Rate Loan, BBR Rate Loan, or TIBOR Rate Loan made by it at the LIBO Rate, BBR Rate, or TIBOR Rate for such Loan by a matching deposit or other borrowing in the offshore interbank market for such currency for a comparable amount and for a comparable period, whether or not such LIBO Rate Loan, BBR Rate Loan or TIBOR Rate Loan was in fact so funded. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section and setting forth in reasonable detail the manner in which such amount or amounts was determined shall be delivered to the Lead Borrower.

      **3.06    Mitigation Obligations; Replacement of Lenders.**

      (a)    Designation of a Different Lending Office. If any Lender or L/C Issuer requests compensation under Section 3.04, or the Borrowers are required to pay any additional amount to any Lender or L/C Issuer or any Governmental Authority for the account of any Lender or L/C Issuer pursuant

to Section 3.01, or if any Lender or L/C Issuer gives a notice pursuant to Section 3.02, then such Lender or L/C Issuer shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender or L/C Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or Section 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender or L/C Issuer to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender or L/C Issuer.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender or L/C Issuer in connection with any such designation or assignment.

(b)     Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if any Loan Party is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrowers may replace such Lender in accordance with Section 10.13.

**3.07     Survival.** All of the obligations of each Loan Party under this Article III shall survive termination of the Aggregate Total Commitments and repayment of all other Obligations hereunder.

**3.08     Designation of Lead Borrower as Borrowers' Agent.**

(a)     Each Domestic Borrower hereby irrevocably designates and appoints each of the Parent and the Lead Borrower as such Domestic Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Domestic Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Domestic Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Domestic Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Lead Borrower and of any other Domestic Borrower.  In addition, each Domestic Loan Party other than the Domestic Borrowers hereby irrevocably designates and appoints each of the Parent and the Lead Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b)     Each Foreign Borrower hereby irrevocably designates and appoints the Parent as such Foreign Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to such Foreign Borrower for such uses as are permitted under this Agreement.  In addition, each Foreign Loan Party other than the Foreign Borrowers hereby irrevocably designates and appoints each of the Parent and the applicable Foreign Borrower as such Foreign Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(c)     Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the applicable credit facility contemplated herein with all other applicable Borrowers.  Consequently, subject to the terms and conditions of this Agreement, each Borrower hereby assumes, guarantees payment and performance of, and agrees to discharge all Obligations of each of the other Borrowers; provided that, notwithstanding anything herein or in any of the other Loan Documents to the contrary, the Foreign Loan Parties shall be liable only for the Foreign Liabilities.

(d)    The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested a Credit Extension. Neither the Administrative Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**4.01    Conditions of Initial Credit Extension.** The obligation of the L/C Issuer and each Lender to make its initial Credit Extension hereunder is subject to satisfaction (or waiver by the Required Lenders) of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each of which shall be originals or telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, and each properly executed by a Responsible Officer of the signing Loan Party (if applicable):

(i)    executed counterparts of this Agreement;

(ii)    executed counterparts of the DIP Intercreditor Agreement

(iii)    a Note executed by each applicable Borrower (other than the Japanese Borrower) in favor of each Lender requesting a Note;

(iv)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party (A) evidencing the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party, (B) evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party, and (C) in respect of the Australian Loan Parties, certifying that each relevant Australian Loan Party is not in breach of Chapter 2E of the Corporations Act;

(v)    copies of each Loan Party's certificate or articles of incorporation and bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction, if any) and a certificate of good standing (where applicable, or such other customary functionally equivalent certificates, to the extent available in the applicable jurisdiction) from such Loan Party's jurisdiction of organization and from each jurisdiction where such Loan Party's ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(vi)    a favorable opinion of (A) Skadden, Arps, Slate, Meagher & Flom LLP, special counsel to the Domestic Loan Parties, addressed to the Administrative Agent and each Domestic Lender, as to customary matters concerning the Domestic Loan Parties and the Loan Documents; (B) McInnes Cooper LLP, counsel to the Canadian Loan Parties, addressed to the Administrative Agent and each Canadian Lender, as to customary

matters concerning the Canadian Loan Parties and the Loan Documents; and (C) Nishimura & Asahi, special counsel to the Japanese Loan Parties, addressed to the Administrative Agent and each Japanese Lender, as to customary matters concerning the Japanese Loan Parties and the Loan Documents;

(vii)    a certificate signed by a Responsible Officer of the Borrower, satisfactory in form and substance to the Administrative Agent and the Required Lenders, certifying that the conditions in Sections 4.02(a) and 4.02(b) have been satisfied;

(viii)    with respect to each Loan Party organized under the laws of Japan, (a) a certified copy of corporate registration (*genzai jikou shoumei*) in respect of such Loan Party and a certificate of seal registration issued in respect of such Loan Party by the competent legal affairs bureau in Japan, in each case no earlier than three months prior to the date of the initial Credit Extension, and (b) such other documents as may be requested by the Administrative Agent in order to comply with the *Act on Prevention of Transfer of Criminal Proceeds*;

(ix)    [reserved];

(x)    instruments evidencing the Interim Order Intercompany Loans in form and substance reasonably satisfactory to the Administrative Agent;

(xi)    executed counterparts of the Reaffirmation Agreement;

(xii)    all other Loan Documents set forth, each duly executed by the applicable Loan Parties;

(xiii)    [reserved];

(xiv)    [reserved];

(xv)    [reserved];

(xvi)    (A) all UCC financing statements, PPSA financing statements and Australian PPSA financing statements, required by Law or reasonably requested by the Agents to be filed, registered or recorded to create, perfect or protect the Liens intended    to    be    created    under    the    Loan    Documents    and (B) all certificates of matters entered into the applicable registry in Japan to create, perfect or protect the Liens intended to be created under the Loan Documents or copies of applications for registration of such matters in form reasonably satisfactory to the Agents and, to the extent applicable with respect to any Liens intended to be created in any bank account, Account or insurance policy of a Loan Party in Japan, a consent letter from the account bank where such bank account is domiciled consenting to the creation of the Lien in respect of such bank account, Account debtor or insurer, as applicable; and

(xvii)    [reserved].

(b)      Chief Restructuring Officer. A chief restructuring officer ("Chief Restructuring Officer") acceptable to the Lenders shall be appointed with respect to the Borrowers (it being understood and agreed that the Acceptable Chief Restructuring Officer shall be acceptable to the Lenders).

(c)      Legal Matters. All legal matters incident to this Agreement and the Borrowings hereunder shall be satisfactory to the Administrative Agent and the Lenders.

(d)      Boardriders Waiver. The Boardriders Waiver shall be in full force and effect.

(e)      Payment of Fees. The Borrowers shall have paid on before the Effective Date, in cash (i) all reasonable and documented costs, fees, disbursements and expenses of the Administrative Agent (including fees, costs, disbursements and expenses of (A) their outside counsel, Riemer & Braunstein LLP, and their local counsel (including, for the avoidance of doubt, foreign counsel) and (B) any professional advisors retained by Bank of America (or any Affiliate thereof) or their counsel and (ii) All fees required to be paid by the Borrowers to any of the Agents or the Arranger on or before the Effective Date shall have been paid in full, and all fees required to be paid by the Borrowers to the Lenders on or before the Effective Date shall have been paid in full.

(f)      Borrowing Base Certificate. The Administrative Agent shall have received a Borrowing Base Certificate from each Borrower dated the Effective Date, relating to the month ended on [_____], and executed by a Responsible Officer of the Lead Borrower or the Parent.

(g)      [Reserved]

(h)      DIP Term Facility. An interim order approving the DIP Term on terms reasonably satisfactory to the Agent shall have been entered in the Cases, the DIP Term Facility shall be in full force and effect and the US Borrowers shall have received gross proceeds from the initial borrowing under the DIP Term Facility in the amount of $60,000,000 (from which certain costs, expenses, fees and original issue discount shall be deducted).

(i)      KYC. The Administrative Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations including, without limitation, the Patriot Act.

(j)      Motions and Documents. All material motions and other material documents to be filed with and submitted to the Bankruptcy Court (including any "first day" motions and proposed orders) related to the commencement of the Cases or transactions contemplated hereby and the other Loan Documents and the approval thereof shall be in form and substance reasonably satisfactory to the Lenders.

(k)      Interim Order. The Interim Order shall provide that the Administrative Agent, for the benefit of the Credit Parties, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein.

(l)      Liens.  Each Order shall provide that the Administrative Agent, for the benefit of the Credit Parties, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein, subject to the DIP Intercreditor Agreement.

(m)      Budget.  The Agent shall have received the Budget reasonably acceptable to the Administrative Agent.

(n)      [reserved].

(o)      Petition Date.  The Petition Date shall have occurred on or before [_____], 2015.

(p)      Interim Order Date.  The Interim Order shall have been filed on or before [____], 2015.

(q)      Adequate Protection.

(i)      The Collateral Agent, for the benefit of the Existing ABL Lenders, shall have received adequate protection in respect of the Liens securing the Existing ABL Obligations and ABL Indemnity Obligations (as defined in the Orders), including among other things (i) replacement claims and liens, and (ii) a superpriority administrative expense claim against all Debtors, in each case junior only to the Liens and superpriority administrative expense claims under this Agreement granted and approved under the Orders; and

(ii)      The Existing Senior Secured Noteholders shall have each received adequate protection in respect of the liens securing the Existing Senior Secured Note Obligations, as applicable, including among other things (i) replacement claims and liens, and (ii) a superpriority administrative expense claim against all Debtors junior only to superpriority administrative expense claims under this Agreement and the DIP Term Loan Agreement.

Without limiting the generality of the provisions of Section 9.05, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender (other than an Agent or the Administrative Agent) that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

4.02      Conditions to all Credit Extensions.  The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of a Committed Loan to another Type of Committed Loan, or a continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans) and of each L/C Issuer to issue each Letter of Credit is subject to the following conditions precedent:

(a)      The representations and warranties of the Borrowers and each other Loan Party contained in Article V or any other Loan Document, shall be true and correct in all material respects (or, in the case of any representation and warranty qualified by materiality, in all

-132-

respects) on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (or in all respects, as applicable) as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in subsections (a), (b) and (f) of Section 5.05 shall be deemed to refer to the most recent statements, if any, furnished pursuant to clauses (a), (b) and (e), respectively, of Section 6.01;

     (b)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof;

     (c)     The DIP Term Facility shall be in full force and effect;

     (d)     The Administrative Agent, and if applicable, the L/C Issuer, shall have received a Request for Credit Extension in accordance with the requirements hereof;

     (e)     Since the Petition Date, no Material Adverse Effect shall have occurred;

     (f)     The proposed Credit Extension complies with the Budget (within Permitted Variances);

     (g)     After giving effect to the proposed Credit Extension, no Overadvance shall exist;

     (h)     The Boardriders Waiver shall be in full force and effect; and

     (i)     There shall not be pending any motion, complaint or other pleading challenging the pre-petition claims under, or the security interests and liens securing, the Existing ABL Credit Agreement or any other similar challenge under Chapter 5 of the Bankruptcy Code.

Each Request for a Credit Extension (other than a Committed Loan Notice requesting only a conversion of a Committed Loan to another Type of Committed Loan or a continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans) submitted any Borrower shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in this Section 4.02 have been satisfied on and as of the date of the applicable Credit Extension.  The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but unless and until the Required Lenders otherwise direct the Administrative Agent (in accordance with the terms of this Agreement) to cease making Committed Loans, the Lenders will fund their Applicable Percentage of all Loans that are requested by the Borrowers of all L/C Advances required to be made hereunder and participate in all Letters of Credit whenever made or issued in accordance with the provisions of this Agreement, and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, are agreed to by the Administrative Agent, as applicable; provided that, the making of any such Loans or the issuance of any Letters of Credit in the event the provisions of this Article IV are not complied with shall not be deemed to be a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights of the Credit Parties as a result of any such failure to comply.