## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans and to issue Letters of Credit hereunder, each Loan Party and each applicable Subsidiary represents and warrants to the Administrative Agent, the L/C Issuer and the Lenders that:

**5.01    Existence, Qualification and Power.**  Each Loan Party (other than Q.S. Optics, Inc.) and each Subsidiary (a) is a corporation, limited liability company, unlimited liability company, *kabushiki kaisha*, partnership or limited partnership, duly organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or Final Order, as applicable, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or Final Order, as applicable, execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (a) (in the case of any Subsidiary that is not a Loan Party), (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.  Schedule 5.01 annexed hereto sets forth, in each case as of the Effective Date, each Loan Party's name as it appears in official filings in its state or province of incorporation or organization, its state or province of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization (in the case of each Domestic Loan Party), and its federal employer identification number (if any).

**5.02    Authorization; No Contravention.**  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or Final Order, as applicable, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries (other than any Loan Document) or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, except in each case where enforcement is stayed upon the commencement of the Cases; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Administrative Agent under the Security Documents and other than in accordance with the DIP Intercreditor Agreement); except, in the case of both clauses (b) and (c) hereof, where enforcement is stayed upon the commencement of the Cases or (d) violate any applicable Law in any material respect.

**5.03    Governmental Authorization; Other Consents.**  Subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or, following the entry of the Final Order, the Final Order, no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority, and no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or

any other Loan Document to which such Person is a party, except for (a) the perfection or maintenance of the Liens created under the Security Documents, (b) such as have been obtained or made and are in full force and effect, or (c) the Interim Order and the Final Order, as applicable.

**5.04    Binding Effect.**  Subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or, following the entry of the Final Order, the Final Order, this Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto. Subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or, following the entry of the Final Order, the Final Order, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against such Loan Party in accordance with its terms, subject (in the case of the Foreign Loan Parties only) to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05    Financial Statements; No Material Adverse Effect.**

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) to the extent required by GAAP show all Indebtedness and other liabilities, direct or contingent, of the Parent and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(b)    The unaudited Consolidated balance sheet of the Parent and its Subsidiaries dated April 30, 2015, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for the Fiscal Quarter ended on that date, in each case, (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all materials respects the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.    Schedule 5.05 sets forth all Material Indebtedness of the Parent and its Americas/Foreign Subsidiaries (other than any intercompany Indebtedness) outstanding as of the Effective Date (after giving effect to all the transactions occurring on the Effective Date).

**5.06    Litigation.**  Except for the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby to occur on the Effective Date, or (b) either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.07    No Default.**  Except where enforcement is stayed upon the commencement of the Cases, no Loan Party or any Subsidiary is in default in any material respect under or with respect to any Material Contract or any Material Indebtedness.  No Default has occurred and is continuing or would

result on the Effective Date from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

### 5.08    Ownership of Property; Liens.

(a)    Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title or failure to have such title or other interest as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each of the Loan Parties and each Subsidiary has good title to, valid leasehold interests in, or valid licenses or other rights to use all personal property and assets material to the ordinary conduct of its business, except where failure to have such title, interest, license or other right could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Schedule 5.08(b)(1) sets forth the address (including street address and state, province or territory and postal or zip code) of all Real Estate that is owned by the Loan Parties as of the Effective Date, together with a list of the holders of any mortgage thereon as of the Effective Date. Schedule 5.08(b)(2) sets forth the address (including street address and state or province or territory) of, and, with respect to the Australian Loan Parties, details of title relating to, all locations leased by the Loan Parties as of the Effective Date.

(c)    The property of each Loan Party and each of the Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(d)    No Japanese Loan Party has granted, or permitted to exist, any Liens pursuant to any constructive transfers (*joto tampo* by way of *senyu kaitei*) of any property, assets or revenue of such Japanese Loan Party, other than any such Liens in favor of the Administrative Agent under the Loan Documents.

### 5.09    Environmental Compliance.

(a)    No Loan Party or any Subsidiary (i) is in violation of any Environmental Law or has not obtained or, to its knowledge, has not complied with any Environmental Permit required under any Environmental Law, (ii) is subject to any Environmental Liability that remains outstanding, or (iii) has received written notice of any claim alleging Environmental Liability by any of them, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except, in each case, as would not reasonably be expected to have a Material Adverse Effect: (i) none of the properties currently owned by any Loan Party or any Subsidiary, or to the knowledge of any Loan Party, leased by any Loan Party or any Subsidiary, is listed or, to the knowledge of any Loan Party,  proposed for listing on the NPL or any analogous foreign, state, provincial, territorial, municipal or local list; (ii) there are no underground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being treated, stored or disposed of except in compliance with applicable Environmental Laws on any property currently owned by any Loan Party or any Subsidiary in violation of applicable Environmental Law and (iii) to the knowledge of the Loan Parties, Hazardous Materials have not been released, discharged or disposed on any property currently owned by any Loan Party or any Subsidiary in violation of applicable Environmental Law.

(c)    Except, in each case, as would not reasonably be expected to have a Material Adverse Effect, no Loan Party or any Subsidiary is undertaking, either individually or together with other "potentially responsible parties" (as that term is defined in CERCLA), any investigation, assessment, or remedial or response action to remove Hazardous Materials at any location, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law.

**5.10    Insurance.** The properties of the Loan Parties and their Americas/Foreign Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates. Each insurance policy is enforceable against the relevant insurer in accordance with its terms and is not void or voidable. Schedule 5.10 sets forth a summary of all insurance maintained by or on behalf of the Loan Parties as of the Effective Date. As of the Effective Date, each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.11    Taxes.** The Loan Parties and their Subsidiaries have filed all material federal, state, provincial, local and other material tax returns and reports required to be filed, and have paid all material federal, state, provincial, territorial, municipal, local and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings for which adequate reserves have been provided in accordance with GAAP, as to which taxes no Lien has been filed and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation and except to the extent failure to do so is permitted by the Bankruptcy Code or pursuant to the Orders. There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect. No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement, other than any tax sharing agreement between or among such Loan Party (or any Subsidiary thereof) and any Affiliate of such Loan Party (or any Subsidiary thereof).

**5.12    Plans.**

(a)    Except as would not be reasonably expected to have a Material Adverse Effect, with respect to the Domestic Loan Parties: each Plan is in compliance with the applicable provisions of ERISA, the Code and other Federal or state laws. Each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service and, to the best knowledge of the Lead Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b)    With respect to the Domestic Loan Parties: there are no pending or, to the best knowledge of the Lead Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)     (i) No ERISA Event has occurred, and neither the Lead Borrower nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan; (ii) each Domestic Loan Party and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 80% or higher and neither a Domestic Loan Party nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 80% as of the most recent valuation date; (iv) neither a Domestic Loan Party nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) neither the Lead Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; and (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

(d)     As of the Effective Date, no Canadian Pension Plan in respect of employees of any Canadian Loan Party or any of their Related Parties is a pension plan or subject to any pension benefits legislation. As of the Effective Date, no Canadian Loan Party has any Canadian Pension Plan.

(e)     With respect to any scheme or arrangement mandated by a government other than the United States and with respect to each employee benefit plan maintained or contributed to by any Loan Party or any Subsidiary of any Loan Party that is not subject to United States laws (such schemes, arrangements and employee benefit plans, collectively, "Foreign Plans"), none of the following events or conditions exists and is continuing that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect: (a) substantial non-compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders; (b) failure to be maintained, where required, in good standing with applicable regulatory authorities; (c) any obligation of any Loan Party or its Subsidiaries in connection with the termination or partial termination of, or withdrawal from, any such Foreign Plan; (d) any Lien on the property of any Loan Party or its Subsidiaries in favor of a Governmental Authority as a result of any action or inaction regarding such a Foreign Plan; (e) for each such foreign plan which is a funded or insured plan, failure to be funded or insured on an ongoing basis to the extent required by applicable non-U.S. law (using actuarial methods and assumptions which are consistent with the valuations last filed with the applicable Governmental Authorities); (f) any facts that, to the best knowledge of the Parent or any of its Subsidiaries, exist that would reasonably be expected to give rise to a dispute and any pending or threatened disputes that, to the best knowledge of the Parent or any of its Subsidiaries, would reasonably be expected to result in a material liability to the Parent or any of its Subsidiaries concerning the assets of any such foreign plan (other than individual claims for the payment of benefits); and (g) failure to make all contributions in a timely manner to the extent required by applicable non-U.S. law.

**5.13    Subsidiaries; Equity Interests.** As of the Effective Date, the Loan Parties have no direct Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth, in each case as of the Effective Date, the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests owned by a Loan Party in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens

except for Permitted Encumbrances.     As of the Effective Date, the Loan Parties have no equity investments in any other corporation or entity other than (i) Investments described in clause (g) and (h) of the definition of "Permitted Investments" and (ii) those specifically disclosed in Part (b) of <u>Schedule 5.13</u>. All of the outstanding Equity Interests in the Loan Parties (other than the Parent) have been validly issued, and are fully paid and non-assessable and, as of the Effective Date, are owned in the amounts specified on Part (c) of <u>Schedule 5.13</u> free and clear of all Liens except for Permitted Encumbrances.

**5.14     Margin Regulations; Investment Company Act.**

(a)     None of the proceeds of the Credit Extensions shall be used directly or indirectly for any purpose that would entail a violation of Regulations T, U, or X issued by the FRB.

(b)     None of the Loan Parties is, or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure.**  No financial statement, certificate or other factual written information (excluding projections, forward-looking information and information of a general economic or general industry nature, but including the Budget) furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished, and taken as a whole) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information (including the Budget), the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time (it being understood that such projected financial information is subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties, that no assurance is given that any particular projections will be realized, that actual results may differ and that such differences may be material).

**5.16    Compliance with Laws.**  Subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or the Final Order, as applicable, each of the Loan Parties and each Subsidiary is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.17    Intellectual Property; Licenses, Etc.**  Except, in each case, as would not reasonably be expected to have a Material Adverse Effect, the Loan Parties and their Americas/Foreign Subsidiaries own, or possess the right to use, all of the Intellectual Property that is reasonably necessary for the operation of their respective businesses as currently conducted, without violation of the rights of any other Person.  To the knowledge of the Lead Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, by any Loan Party infringes upon any rights held by any other Person, except, in each case, as would not reasonably be expected to have a Material Adverse Effect.  No claim or litigation against any Loan Party alleging any such infringement is pending or, to the knowledge of the Lead Borrower, threatened in writing, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

**5.18    Labor Matters.**

There are no strikes, lockouts, slowdowns or other labor disputes against any Loan Party or any Americas/Foreign Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened that, in any case, could reasonably be expected to have a Material Adverse Effect. The hours worked by, and payments made to employees of, the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, provincial, territorial, municipal, local or foreign Law dealing with such matters except to the extent that any such violation could not reasonably be expected to have a Material Adverse Effect.  No Loan Party or any of its Americas/Foreign Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Act or similar federal, state, provincial, local or foreign Law dealing with such matters that, in any case, could reasonably be expected to have a Material Adverse Effect.  All payments due from any Loan Party and its Americas/Foreign Subsidiaries, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly

accrued in accordance with GAAP as a liability on the books of such Loan Party except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Except as disclosed on Schedule 5.18, as of the Effective Date, no Loan Party or any Americas/Foreign Subsidiary is a party to or bound by any collective bargaining agreement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board or other applicable Governmental Authority, and no labor organization or group of employees of any Loan Party or any Americas/Foreign Subsidiary has made a pending demand for recognition that, in any case, could reasonably be expected to have a Material Adverse Effect. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Americas/Foreign Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Americas/Foreign Subsidiaries that, in any case, could reasonably be expected to have a Material Adverse Effect. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Americas/Foreign Subsidiaries is bound.

    **5.19    Security Documents.**

            (a)      With respect to all Loan Parties other than the Domestic Loan Parties, the Security Documents create in favor of the Administrative Agent (for the benefit of itself and the other applicable Credit Parties) or the Australian Security Trustee, as applicable, and, with respect to the Liens granted by the Japanese Loan Parties, each of the Japanese Secured Parties, as applicable, a legal, valid, continuing and enforceable security interest in the Collateral (with respect to (a) the security interests in bank accounts under Japanese Security Documents, upon the consent of the applicable account bank, (b) the security interests (*joto tampo*) in Accounts under the Japanese Security Documents, whereupon there is a contractual restriction on the grant of such security interest (*joto tampo*), upon the consent of the relevant Account debtor, and (c) the security interests in insurance claims under the Japanese Security Documents, whereupon there is a contractual restriction on the grant of such security interest, upon the consent of the relevant insurers, and the Security Documents constitute, or will upon the filing of financing statements or other requisite registrations and recordations or obtaining consents (including, with respect to IP Collateral, the filing and recordation of the Intellectual Property Security Agreement (or other appropriate documents) with the United States Patent and Trademark Office, United States Copyright Office, Canadian Intellectual Property Office, the Patent Office of Japan, the Agency for Cultural Affairs or the Software Information Center, and any substitute or successor agency) and/or the obtaining of "control", in each case with respect to the relevant Collateral as required under the applicable UCC or similar legislation of any jurisdiction, including, without limitation, the PPSA, the Civil Code of Quebec and the Australian PPSA, the creation of a perfected Lien on, and security interest in, all right, title and interest of the Loan Parties thereunder in such Collateral that may be perfected in the United States, Canada, Australia or Japan by filing, recording or registering a financing statement or analogous document (and, in the case of IP Collateral and any other Intellectual Property, the filing and recordation of the Intellectual Property Security Agreement (or other appropriate documents) with the United States Patent and Trademark Office and the United States Copyright Office, the Canadian Intellectual Property Office or the Patent Office of Japan, the Agency for Cultural Affairs or the Software Information Center) or, to the extent required by the Loan Documents (it being understood that subsequent recordings in the United States Patent and Trademark Office, United States Copyright Office, Canadian Intellectual Property Office, the Patent Office of Japan, the Agency for Cultural Affairs or the

Software Information Center, or a substitute or successor agency may be necessary to perfect a Lien on Intellectual Property acquired, register or applied for after the date hereof).  Notwithstanding anything to the contrary herein, the Loan Parties shall have no obligation to perfect Liens on any IP Collateral or other Intellectual Property in any jurisdiction outside the United States, Canada, Australia, or Japan.

(b)     With respect to the Domestic Loan Parties, the Security Documents, taken together with the Interim Order and/or the Final Order, are effective to create in favor of the Administrative Agent (for the benefit of itself and the other applicable Credit Parties) a legal, valid, continuing and enforceable security interest in the Collateral pledged hereunder or thereunder, in each case subject to no Liens other than Priority Permitted Encumbrances and the Carve-Out and subject to the DIP Intercreditor Agreement. Pursuant to the terms of the Interim Order and/or Final Order, no filing or other action will be necessary to perfect or protect such Liens and security interests. Pursuant to and to the extent provided in the Interim Order and/or the Final Order, the Obligations of the Loan Parties under this Agreement will constitute allowed super-priority administrative expense claims in the Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (including, for the avoidance of doubt, subject to the entry of the Final Order, the proceeds of Avoidance Actions), subject only to the Carve-Out.  Notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all Liens and claims (including administrative and superpriority claims) securing the Obligations, the Loan Parties' pre-petition obligations, adequate protection Liens, and all other Liens or claims (including administrative claims and DIP Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and DIP Superpriority Claims) securing the Obligations and pre-petition obligations granted or recognized as valid, including the Liens, security interests, and claims (including administrative claims and DIP Superpriority Claims) granted to the Administrative Agent and the other Credit Parties

**5.20    [Reserved]**.

**5.21    Deposit Accounts; Credit Card Arrangements.**

(a)     Annexed hereto as Schedule 5.21(a) is a list of all DDAs maintained by the Loan Parties as of the Effective Date, which Schedule includes, with respect to each DDA and in each case as of the Effective Date: (i) the name of the depository; (ii) the account number(s) maintained with such depository; and (iii) the identification of each Blocked Account Bank.

(b)     Annexed hereto as Schedule 5.21(b) is a list of all arrangements as of the Effective Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22    Brokers**.  Except as disclosed on Schedule 5.22 no broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.23    Customer and Trade Relations**.  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations except to the extent that any of the foregoing could not reasonably be expected to have a Material Adverse Effect or is a result of the commencement of the Cases.

**5.24    Material Contracts**.  Schedule 5.24 sets forth a list of all Material Contracts to which any Loan Party is a party as of the Effective Date (other than the Loan Documents and the DIP Term Loan Documents).  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Administrative Agent on or before the date hereof.  The Loan Parties are not in breach or in default in any material respect of or under any Material Contract  and have not received any notice of the intention of any other party thereto to terminate any Material Contract (other than the Parent or any Subsidiary in connection with any repayment of Material Indebtedness except, in each case, where enforcement is stayed upon the commencement of the Cases.

**5.25    Casualty**.  Neither the businesses nor the properties of any Loan Party or any of its Americas/Foreign Subsidiaries are affected by any fire, explosion, accident, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.26    Anti-Social Forces**.  No Loan Party or any of its directors, officers or employees are an Anti-Social Force. "Anti-Social Force" means a Person or group which threatens or is likely to threaten the order or safety of the civil society, and prevents or is likely to prevent the sound development of the economy or society, which specifically means the following Persons:

(a)      any organized crime group (meaning a group a member of which (including a member of a group constituting such group), in an organized or habitual way, is likely to encourage the committing of violent illegal acts or similar acts; the same applies hereinafter;

(b)      any organized crime group member (meaning a member of an organized crime group; the same applies hereinafter) or any Person with respect to whom a period of 5 years has not expired after such Person ceases to be an organized crime group member;

(c)      any organized crime group associated member (a Person other than an organized crime group member who has a relationship with the organized crime group and is likely to perform violent unlawful acts backed by the influence of the organized crime group, or cooperates in, or is involved in, maintaining or operating the organized crime group by supplying funds, weapons, or other items to the organized crime group or an organized crime group member);

(d)      any corporation related to the organized crime group (meaning a corporation the management of which an organized crime group member is substantially involved in, a

-143-

corporation which is operated by any organized crime group associated member or former organized crime group member and actively cooperates in, or is involved in, maintaining or operating the organized crime group by supplying funds or otherwise taking actions, or a corporation which actively uses the organized crime group and cooperates in maintaining or operating the organized crime group upon the performance of its business);

(e)     any corporate racketeer (*sokaiya*) or other Person (meaning a Person who is likely to perform a violent unlawful act in the pursuit of unjust profits against a corporation or other entity and threatens the safety of civil life, such as a corporate racketeer (*sokaiya*) or a corporate swindler (*kaisha goro*);

(f)     any corporate swindler acting in the name of a social movement (*shakai undo-to hyobo goro*) (meaning a Person who is likely to perform violent unlawful acts in the pursuit of unjust profits by pretending to represent or acting in the name of a social movement or political activity and threatens the safety of civil life);

(g)     any special intelligence violent group or other group (meaning a group or individual, other than those listed in (a) through (f) above, that plays a key part in structural injustice by using its powers or having a financial connection with a organized crime group backed by a relationship with a organized crime group);

(h)     other Persons similar to those listed in (a) through (g) above;

(i)     any Person who has a relationship in which a Person who is a Person or group listed in (i) through (h) (the "Organized Crime Group Member Etc.") is deemed to control its management;

(j)     any Person who has a relationship in which an Organized Crime Group Member Etc. is deemed to be substantially involved its management;

(k)     any Person who has a relationship in which the Person is deemed to be unlawfully using an Organized Crime Group Member Etc. for purposes of pursuing unjust profits for itself, its own company or a third party or causing damage to a third party, or for other similar purposes;

(l)     any Person who has a relationship in which he/she is deemed to be involved in an Organized Crime Group Member Etc. such as by supplying funds or other supplies or affording facilities; or

(m)     any Person whose officer or employee involved in management has a relationship with an Organized Crime Group Member Etc. that should be subject to social disapproval.

**5.27    Tax Consolidation.**  Each Australian Loan Party is a member of a Tax Consolidated Group for which the Head Company (as defined in the Income Tax Assessment Act 1997 (Cth) of Australia) is Quiksilver Australia Pty Limited.

**5.28    Budget**.  A true and complete copy of the Budget is attached as Exhibit N hereto.

**5.29    Commercial benefit**.  The entry into this document is for each Loan Party's commercial benefit.

**5.30    No Immunity**.  Each Loan Party has no right of immunity from set-off, legal action, suit or proceeding, attachment or execution or the jurisdiction of any court with respect to the Collateral or its obligations under the Loan Documents.

**5.31    Orders.**  The Loan Parties are in compliance with the terms and conditions of the Orders. Each of the Interim Order (to the extent necessary during the Interim Order Period) or the Final Order (from after the date the Final Order is entered) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and each Lender, no change, amendment or modification or any application or motion for any change, amendment or modification to any of the Orders shall be made, in each case, that is adverse to the interests of the Lenders.

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification Obligations for which a claim has not then been asserted), or any Letter of Credit shall remain outstanding, the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03), cause each applicable Subsidiary to:

**6.01    Financial Statements.**  Deliver to the Administrative Agent (for distribution to each Lender):

(a)    within ninety (90) days after the end of each Fiscal Year of the Parent, (i) a Consolidated balance sheet of the Parent and its Subsidiaries as at the end of such Fiscal Year, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all prepared in accordance with GAAP, such Consolidated statements to be audited and accompanied by a report and opinion of a Registered Public Accounting Firm of nationally recognized standing or otherwise reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall state that such Consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years, and (ii) an Americas/Foreign Consolidated balance sheet of the Parent and its Americas/Foreign Subsidiaries as at the end of such Fiscal Year, and the related Americas/Foreign Consolidated statements of income or operations of the Parent and its Americas/Foreign Subsidiaries and Americas/Foreign Consolidated cash flows for such

Fiscal Year, setting forth in each case (in the case of clause (ii), to the extent practicable) in comparative form the figures for the previous Fiscal Year;

(b)     within forty-five (45) days after the end of each of the first three Fiscal Quarters of each Fiscal Year of the Parent, (i) a Consolidated balance sheet of the Parent and its Subsidiaries as at the end of such Fiscal Quarter, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Quarter and for the portion of the Parent's Fiscal Year then ended, and (ii) an Americas/Foreign Consolidated balance sheet of the Parent and its Americas/Foreign Subsidiaries as at the end of such Fiscal Quarter, and the related Americas/Foreign Consolidated statements of income or operations and Shareholders' Equity of the Parent and its Americas/Foreign Subsidiaries and Americas/Foreign Consolidated cash flows for such Fiscal Quarter, setting forth in each case (to the extent practicable) in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(f) hereof, (B) the corresponding Fiscal Quarter of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, such Americas/Foreign Consolidated statements to be certified by a Responsible Officer of the Lead Borrower or the Parent as fairly presenting in all material respects the financial condition, results of operations, Shareholders' Equity and cash flows of the Parent and its Americas/Foreign Subsidiaries as of the end of such Fiscal Quarter in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)     within forty-five (45) days after the end of each of the first three Fiscal Quarters of each Fiscal Year of the Parent, (i) a balance sheet of each Foreign Borrower and its Subsidiaries as at the end of such Fiscal Quarter, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Quarter and for the portion of the Parent's Fiscal Year then ended, setting forth in each case (to the extent practicable) in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(f) hereof, (B) the corresponding Fiscal Quarter of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, to be certified by a Responsible Officer of the Lead Borrower or the Parent as fairly presenting in all material respects the financial condition, results of operations, Shareholders' Equity and cash flows of each Foreign Borrower and its Subsidiaries as of the end of such Fiscal Quarter in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(d)     within thirty (30) days after the end of each of the Fiscal Months of each Fiscal Year of the Parent, an Americas/Foreign Consolidated balance sheet of the Parent and its Americas/Foreign Subsidiaries as at the end of such Fiscal Month, and the related Americas/Foreign Consolidated statements of income or operations, Shareholders' Equity and Americas/Foreign Consolidated cash flows for such Fiscal Month, and (to the extent practicable) for the portion of the Parent's Fiscal Year then ended, setting forth in each case (to the extent practicable) in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(f) hereof, (B) the corresponding Fiscal Month of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, to the extent applicable, subject to normal year end audit adjustments and in the absence of footnotes, and in any event, in a manner consistent with the Parent's accounting practices, such Americas/Foreign Consolidated statements to be

certified by a Responsible Officer of the Lead Borrower or the Parent as fairly presenting in all material respects the financial condition, results of operations, Shareholders' Equity and cash flows of the Parent and its Americas/Foreign Subsidiaries as of the end of such Fiscal Month;

(e)    within thirty (30) days after the end of each of the Fiscal Months of each Fiscal Year of the Parent, (i) a balance sheet of each Foreign Borrower and its Subsidiaries as at the end of such Fiscal Month, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Month and for the portion of the Parent's Fiscal Year then ended, setting forth in each case (to the extent practicable) in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(f) hereof, (B) the corresponding Fiscal Month of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, to be certified by a Responsible Officer of the Lead Borrower or the Parent as fairly presenting in all material respects the financial condition, results of operations, Shareholders' Equity and cash flows of each Foreign Borrower and its Subsidiaries as of the end of such Fiscal Month in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(f)    within thirty (30) days after the Petition Date, a proposed revised Budget inclusive of periods through the Maturity Date, which shall be subject to the sole discretion approval of Required Lenders, it being further agreed that, if such proposal (or any further revision thereof) does not receive such approval, the Lead Borrower shall use its commercially reasonable efforts to revise and resubmit such proposal in response to comments received thereon from the Administrative Agent or Required Lenders.

6.02    **Certificates; Other Information.** Deliver to the Administrative Agent (for distribution to each Lender):

(a)    [reserved];

(b)    concurrently with the delivery of the financial statements referred to in Sections 6.01(a), (b), (c), (d) and (e), a copy of management's discussion and analysis with respect to such financial statements. In the event of any change in GAAP used in the preparation of such financial statements, the Lead Borrower or the Parent shall also provide a statement of reconciliation conforming such financial statements to GAAP;

(c)    on Wednesday of each week (or, if any Wednesday is not a Business Day, on the next succeeding Business Day), Borrowing Base Certificates showing each Borrowing Base, as of the close of business on the immediately preceding Saturday; *provided* that supporting documentation for each Borrowing Base Certificate may be delivered no later than five (5) days after delivery of each such Borrowing Base Certificate;

(d)    promptly upon receipt, copies of the final versions of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

(e)     promptly after the same are available, copies of each annual report, proxy or financial statement or other report which any Loan Party files with the SEC and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party files with the SEC under Sections 13 or 15(d) of the Securities Exchange Act of 1934 or with any national or foreign securities exchange or applicable Governmental Authority, and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(f)     the financial and collateral reports described on Schedule 6.02 hereto, no later than the times set forth in such Schedule, provided that certain of the reports listed on Schedule 6.02 may not be required if such delivery is not required by the Administrative Agent;

(g)     promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party pursuant to the terms of any document, agreement or indenture relating to Material Indebtedness and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02; provided that such statements or reports need to delivered to the Credit Parties only to the extent that they relate to the failure of any Loan Party to comply with the terms of any document, agreement or indenture relating to such Material Indebtedness or which relate to matters which would cause a Default or have an adverse effect on the Credit Parties;

(h)     within sixty (60) days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier), including all renewal certificates and, with respect to the Australian Loan Parties, certificates of currency in effect for each Loan Party and its Americas/Foreign Subsidiaries and containing such additional information as the Administrative Agent, the Collateral Agent, or any Lender through the Administrative Agent, may reasonably specify;

(i)     every Wednesday during the Cases, (i) commencing on the Wednesday following the first full calendar week after the Effective Date, a weekly cash flow forecast for the subsequent 13-week period, and (ii) commencing on the second Wednesday following the first full calendar week after the Effective Date, a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of the Loan Parties for the preceding one calendar week period and setting forth all the variances (including Variances), on a line-item and aggregate basis, from the amount set forth for such calendar week as compared to (1) the Budget on a weekly and cumulative basis, and (2) the most recent weekly cash flow forecast delivered by the Loan Parties, in each case, on a weekly and cumulative basis (and each such Variance Report shall include reasonably detailed explanations for all material variances (including Permitted Variances) and shall be certified by the chief financial officer of the Lead Borrower;

(j)     substantially concurrently with the delivery of the weekly cash flow forecast pursuant to Section 6.02(i), a "flash" cash report detailing all cash and Cash Equivalents on-hand of each of the Borrower and its Subsidiaries (broken out by entity) as of the close of business on such date;

(k)     promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or

comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which could reasonably be expected to have a Material Adverse Effect;

(l)    promptly, written notice of any actions, suits, proceedings, claims or disputes (other than the Cases) pending or, to the knowledge of the Loan Parties threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby to occur on the Effective Date, or (b) either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(m)    contemporaneously with the delivery of the first Borrowing Base Certificate in any calendar month, a summary of the then Reported Fee Accruals as of the end of the previous calendar month; and

(n)    promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Americas/Foreign Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent, the Collateral Agent, or any Lender (through the Administrative Agent) may from time to time reasonably request.

The Loan Parties hereby acknowledge that (a) the Administrative Agent and/or MLPFS may, at its sole discretion, make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on Debt Domain, IntraLinks, Syndtrak or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender"). The Loan Parties hereby agree that so long as any Loan Party is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) the Lead Borrower shall use commercially reasonable efforts to provide that such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Administrative Agent, MLPFS, the L/C Issuer and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of all applicable securities Laws; (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Administrative Agent and MLPFS shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

**6.03    Notices.** Promptly, and in any event within five (5) Business Days (except with respect to clauses (a), (b), (h) or (m) below, one (1) Business Day) after any Responsible Officer of any Loan Party obtains knowledge thereof, notify the Administrative Agent of:

(a)    the occurrence of any Default or Event of Default;

(b)    any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)    the occurrence of any ERISA Event or any similar events under any other applicable Law;

(d)    any material change in accounting policies or financial reporting practices by any Loan Party;

(e)    any change in the Parent's senior executive officers;

(f)    the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

(g)    any collective bargaining agreement to which a Loan Party becomes a party;

(h)    after the Petition Date, the filing of any Lien for unpaid Taxes against any Loan Party in excess of $1,000,000;

(i)    any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(j)    any failure by any Loan Party to pay rent at (i) five (5%) or more of such Loan Party's locations, (ii) any location which is a distribution center or warehouse, or (iii) any of such Loan Party's locations if such failure continues for more than ten (10) days following the day on which such rent first came due and, in any such case, such failure would be reasonably likely to result in a Material Adverse Effect;

(k)    any Permitted Disposition (other than sales of Inventory in the ordinary course of business), casualty or condemnation, in each case involving assets of a Loan Party included in the applicable Borrowing Base with a Cost of more than $1,000,000 in any single transaction or series of related transactions;

(l)    in the case of any Australian Loan Party or Japanese Loan Party, any retention of title, hire purchase,  constructive transfer, conditional sale or other similar arrangements with respect to any trade supply contract; and

(m)    (i) of any negative pledge included in any lease contract, or (ii) any restriction on assignment with respect to an Account or Inventory, in each case, to the extent such negative pledge or restriction on assignment prevents the Agents from obtaining a Lien on any Inventory or Account of any Loan Party.

(n)    promptly (but, in any event, within two days) after (i) entering into or receiving thereof, a copy of (A) any notice of any kind pertaining to or relating to, (B) any document, agreement or instrument entered into or received in connection with, and (C) any amendment, waiver, consent, extension, supplement, restatement or other modification of, any Boardriders Notes  or (ii) any holder of any Boardriders Notes (or any agent or representative thereof

including the Boardriders Notes Trustee) exercises (or threatens to exercise) any rights or remedies under the Boardriders Notes or the Boardriders Notes Indenture;

(o)    any notices delivered by or received from to the DIP Term Agent or the DIP Term Lender pursuant to the DIP Term Facility, and provide the Administrative Agent with copies thereof.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Lead Borrower or the Parent setting forth details of the occurrence referred to therein and stating what action the Lead Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with reasonable particularity the provisions of this Agreement and any other Loan Document that have been breached.

6.04    **Payment of Obligations.**  Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness and the other provisions of Section 7.07, to the extent applicable, except, in each case, where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, and (iv) no Lien has been filed with respect thereto or (b) the failure to pay or discharge the same could not reasonably be expected to result in a Material Adverse Effect; provided that, with respect to the Domestic Loan Parties, their obligations hereunder are subject to the provisions of the Bankruptcy Code and  any required approvals by an applicable order of the Bankruptcy Court; and further provided that the Domestic Loan Parties shall be obligated only to pay all of the foregoing to the extent constituting post-petition obligations that constitute administrative expenses under Section 503(b) of the Bankruptcy Code in the Cases and to perform all material obligations arising from Contractual Obligations entered into after the Petition Date or from Contractual Obligations entered into prior to the Petition Date and assumed. Nothing contained herein shall be deemed to limit the rights of the Agents with respect to establishing or modifying Reserves in manner permitted by this Agreement.

6.05    **Preservation of Existence, Etc.**

(a)    Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except (i) in a transaction permitted by Section 7.04 or 7.05 or (ii) in the case of any Subsidiary that is not a Loan Party, to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)    Take all reasonable action to maintain all material rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except (i) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) pursuant to a transaction permitted by Section 7.04 or 7.05.

(c)     Preserve or renew all of its Intellectual Property, except (i) to the extent such Intellectual Property is no longer used or useful in the conduct of the business of such Loan Party, (ii) pursuant to a transaction permitted by Section 7.04 or 7.05 or (iii) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.06     Maintenance of Properties.**  Maintain, preserve and protect all of its material properties and Equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear and casualty or condemnation events excepted, and make all necessary repairs thereto and renewals and replacements thereof, except in each case where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07     [Reserved].**

**6.08     Maintenance of Insurance.**

(a)     Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agents (which insurance companies are not Affiliates of the Loan Parties), insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agents.

(b)     Fire and extended coverage policies maintained with respect to any Collateral shall name the Administrative Agent and/or, as applicable, the Australian Security Trustee as a lender's loss payee and shall be endorsed or otherwise amended to include (i) a lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Agents, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies jointly to Loan Parties and the Administrative Agent and/or, to the extent applicable, the Australian Security Trustee, provided that after the occurrence of an Event of Default, such proceeds shall be payable only to the Administrative Agent and/or, to the extent applicable, the Australian Security Trustee, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agents may reasonably require from time to time to protect the interests of the Credit Parties. Commercial general liability policies with respect to the Loan Parties shall be endorsed to name the Administrative Agent or, as applicable, the Australian Security Trustee as an additional insured. Business interruption policies with respect to the Loan Parties shall name the Administrative Agent and/or, as applicable, the Australian Security Trustee as a lender's loss payee and shall be endorsed or amended to include (i) a provision that, from and after the Effective Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies jointly to the Loan Parties and the Administrative Agent and, if applicable, the Australian Security Trustee (subject to the rights of (x) the Existing Senior Secured Note Agent as described in the Intercreditor Agreement and (y) the DIP Term  Agent as described in the DIP Intercreditor Agreement), provided that after the occurrence of an Event of Default, such proceeds shall be payable only to the Administrative Agent and/or, to the extent applicable, the Australian Security Trustee, (ii) a provision to the effect that none of the Loan Parties, the Agents or any other party shall be a co-insurer and (iii) such other provisions as the Agents may reasonably require from time to time to protect the interests of the Credit Parties. Notwithstanding the foregoing, the Japanese Loan Parties shall deliver insurance security agreements by and between the applicable Japanese Loan Parties and the Japanese Secured Parties and

shall use commercially reasonable efforts to comply with the covenants set forth above with respect to fire and extended coverage and business interruption policies. Each such policy referred to in this Section 6.08(a) shall also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days prior written notice thereof by the insurer to the Administrative Agent and, to the extent applicable, the Australian Security Trustee (giving such Person the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days prior written notice thereof by the insurer to the Administrative Agent and, to the extent applicable, the Australian Security Trustee. The Lead Borrower shall deliver to the Agents, on or prior to (or with respect to the Japanese Loan Parties, as soon as practicably possible after) the date of the cancellation or expiration of any such policy of insurance, or modification materially reducing the scope or amount of coverage of such policies of insurance, a copy of any applicable renewal or replacement insurance certificate. Further, the Japanese Loan Parties shall take such actions as may be required under the Japanese Security Documents to continue the perfection of the Administrative Agent's Lien in any such renewal policy.

(c)     None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.08. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by the any Credit Party under this Section 6.08 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

(d)     Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy with responsible companies in such amounts as are customarily and covering such risks carried by business entities engaged in similar businesses similarly situated, and will upon request by any Agent, furnish the Administrative Agent certificates evidencing renewal of each such policy.

**6.09     Compliance with Laws.**  Comply, and cause each Subsidiary to comply, with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a)(i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP;  and (ii) such contest effectively suspends enforcement of the contested Laws, or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.  Nothing contained herein shall be deemed to limit the rights of the Agents with respect to establishing or modifying Reserves in a manner permitted by this Agreement.

**6.10     Books and Records.**

(i) Maintain proper books of record and account, in which entries full, true and correct in all material respects and in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all

applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

### 6.11    Inspection Rights.

(a)     Permit representatives and independent contractors of the Collateral Agent (acting in consultation with the Administrative Agent) to visit and inspect any of its properties, to examine its corporate, financial and operating records, and insurance policies, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and (in the presence of a Responsible Officer of the Parent or the Lead Borrower) Registered Public Accounting Firm, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Lead Borrower; provided, however, that when an Event of Default exists the Collateral Agent (acting in consultation with the Administrative Agent) (or any of their representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

(b)     Upon the request of any Agent, after reasonable prior notice (which notice need not be furnished if an Event of Default is then continuing), permit the Administrative or professionals (including investment bankers, consultants, accountants, lawyers and appraisers) retained by the Administrative Agent to conduct appraisals, commercial finance examinations and other evaluations, including, without limitation, of (i) any Borrower's practices in the computation of its Borrowing Base, and (ii) the assets included in the each Borrowing Base, respectively, and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves; provided that appraisals shall be limited to assets of the Borrowing Base Parties.  Subject to the following sentence, the Loan Parties shall pay the reasonable and documented out-of-pocket fees and expenses of any Agent and such professionals with respect to such evaluations and appraisals.  Without limiting the foregoing, the Loan Parties acknowledge that the Agents may undertake one (1) inventory appraisal and one (1) commercial finance examination in each twelve (12) month period for each of the Borrowing Base Parties at the Loan Parties' expense,  Notwithstanding the foregoing, any Agent may cause additional appraisals and commercial finance examinations to be undertaken (i) as it in its discretion deems necessary or appropriate, at its own expense or, (ii) if required by applicable Law or if an Event of Default shall have occurred and be continuing, at the expense of the Loan Parties.  In all events, any professional engaged to perform any evaluations, appraisals, commercial finance examinations or other services pursuant to this clause (b) shall be retained by the Administrative Agent and no other Person. For clarity, any commercial finance examinations and inventory appraisals undertaken prior to the Effective Date shall not be considered in determining the number of commercial finance examinations and inventory appraisals which may be undertaken at the Loan Parties' expense under this Section 6.11(b).

(c)     Notwithstanding anything to the contrary in this Section 6.11, none of the Parent or any of its Subsidiaries will be required to disclose, permit the inspection, examination or making of extracts, or discussion of, any documents, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Agents or any Lender (or any of their respective representatives) is then prohibited by Law or any agreement binding on the Parent or any of its Subsidiaries or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

**6.12**    **Use of Proceeds.**  Use the proceeds of the Credit Extensions only (i) to finance: (i) the repayment of certain indebtedness under the Existing ABL Credit Agreement (other than the Japanese Liabilities, and it being agreed that any letters of credit issued for the account of the Domestic Borrowers under the Existing ABL Credit Agreement shall be deemed issued hereunder), including, without limitation, the Foreign Liabilities owed to General Electric Capital Corporation and Wells Fargo Bank, National Association and their respective affiliates, (ii) the payment of transaction expenses, (iii) the payment of fees, expenses and costs incurred in connection with the Cases, (iv) the payment of any adequate protection payments approved in the Orders, and (v) in accordance with the terms of the Orders, for working capital, capital expenditures, and other general corporate purposes of the Domestic Loan Parties, in each case to the extent not prohibited under applicable Law and the Loan Documents (including without limitation Bankruptcy Court-approved professional fees and other administrative fees arising in the Cases).

**6.13**    **Additional Loan Parties.**

(a)    Notify the Administrative Agent promptly after any Person becomes a Domestic Subsidiary that is a direct Wholly Owned Subsidiary of any Domestic Loan Party (other than any CFC or Subsidiary of a CFC), and promptly thereafter (and in any event within thirty (30) days or such longer period as the Administrative Agent may agree), (a) cause any such Domestic Subsidiary that is a direct Wholly Owned Subsidiary (other than any CFC or Subsidiary of a CFC) to (i) become a Borrower or Guarantor by executing and delivering to the Administrative Agent a Joinder Agreement, and, in the case of a Guarantor, a Facility Guaranty (or a counterpart or supplement thereto), (ii) grant a Lien to the Administrative Agent on such Person's assets to the extent required by the Security Documents, and (iii) deliver to the Administrative Agent documents of the types referred to in clauses (iv), (v), (v) and (xvi) of Section 4.01(a)  and, if requested by the Administrative Agent, customary opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by any Domestic Loan Party, such Domestic Loan Party shall pledge such Equity Interests and promissory notes evidencing such Indebtedness (if any) (except that, if such Subsidiary is a CFC or a Subsidiary of a CFC, the Equity Interests of such Subsidiary will not be required to be pledged), in the manner and format required by the Pledge Agreement; provided that, no Equity Interests of any Foreign Subsidiary which is not a Foreign Loan Party shall be required to be pledged.

(b)    Notify the Administrative Agent promptly after any Person becomes a Subsidiary that is a direct Wholly Owned Subsidiary of any Foreign Loan Party (other than any Subsidiary that is not organized under the Laws of Canada or any province thereof, Australia or Japan), and promptly thereafter (and in any event within thirty (30) days or such longer period as the Administrative Agent may agree), (a) cause any such Subsidiary that is a direct Wholly Owned Subsidiary (other than any Subsidiary that is not organized under the Laws of Canada or any province thereof, Australia or Japan)) to (i) become a Foreign Borrower or a Guarantor of the Foreign Liabilities by executing and delivering to the Administrative Agent a Joinder Agreement and, in the case of a Guarantor, a Facility Guaranty (or a counterpart or supplement thereto), (ii) grant a Lien to the Administrative Agent on such Person's assets (to the extent required by the Security Documents) to secure the Foreign Liabilities by executing and delivering to the Administrative Agent, appropriate Security Documents, and (iii) deliver to the Administrative Agent documents of the types referred to in clauses (iv) and (v) of Section 4.01(a) and, if requested by the Administrative Agent, customary opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person

are owned by any Foreign Loan Party, such Foreign Loan Party shall pledge such Equity Interests and promissory notes evidencing such Indebtedness (if any), in the manner and format required by the Pledge Agreement, the Canadian Security Documents, the Australian Security Documents or the Japanese Security Documents, as applicable; provided that, no Equity Interests of any Foreign Subsidiary which is not a Foreign Loan Party, and no Equity Interests of any unlimited company incorporated or amalgamated and existing under the laws of the Province of Nova Scotia, shall be required to be pledged.

(c)    In no event shall compliance with this Section 6.13 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.13 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrowing Base Party or permit the inclusion of any acquired assets in the computation of any Borrowing Base.

**6.14    Cash Management.**

(a)    On or prior to the Effective Date (to the extent not previously delivered and to the extent requested by the Administrative Agent,):

(i)    deliver to the Administrative Agent copies of notifications (each, a "Credit Card Notification") in form and substance satisfactory to the Administrative Agent which have been executed on behalf of such Loan Party and delivered to such Loan Party's Credit Card Issuers and Credit Card Processors listed on Schedule 5.21(b) (or with respect to the Japanese Loan Parties, to JMS Co., Ltd., as its collection agent for proceeds from its Credit Card Issuers and Credit Card Processors);

(ii)    enter into a Blocked Account Agreement with each Blocked Account Bank maintained by the Loan Parties as of the Effective Date with respect to each DDA specified by the Agents (other than the Term Loan Priority Accounts, Existing ABL Credit Agreement Collateral Account and payroll and other specific DDAs as may be acceptable to the Agents) established or maintained by any Loan Party as of the Effective Date with such Blocked Account Bank (collectively, the "Blocked Accounts"); and

(iii)    deliver to the Administrative Agent copies of notifications (each, a "Lessor Notification") in form and substance satisfactory to the Administrative Agent which have been executed on behalf of each Japanese Loan Party and delivered to such Japanese Loan Party's lessors listed on Schedule 6.14 and any other lessor which collects receipts from any portion of the Collateral of the Japanese Loan Parties and subsequently remits such payments to the Japanese Loan Parties.

(b)    The Loan Parties shall ACH or wire transfer no less frequently than once each Business Day (and whether or not there are then any outstanding Obligations) to a Blocked Account all amounts on deposit in each such DDA (net of such minimum balance consistent with past practices, but not to exceed (i) $200,000 in the aggregate for all DDAs of the Domestic Loan Parties and Canadian Loan Parties, (ii) $100,000 in the aggregate for all Australian Loan Parties, (iii) $100,000 in the aggregate for all Japanese Loan Parties, and (iv) $400,000 in the aggregate for all DDAs of all Loan Parties and with respect to the Japanese Loan Parties only, exclusive of amounts on deposit in any segregated sales and

other tax accounts) and all payments received by any Loan Party from Credit Card Issuers and Credit Card Processors.

(c)    The Loan Parties shall cause each Blocked Account Bank and each Japanese Depository Bank to ACH or wire transfer no less frequently than once each Business Day (and whether or not there are then any outstanding Obligations) to a Concentration Account all cash receipts and collections by the Loan Parties including, without limitation, the following (in each case, other than Cash Equivalents being held in accordance with the terms of the proviso at the end of the definition of "Permitted Investments", cash maintained in the cash registers in the Stores in the normal course of business and consistent with past practices, and with respect to the Japanese Loan Parties only, amounts on deposit in any segregated sales and other tax accounts and cash proceeds held by any lessor of a Store in a mall and any minimum balance required to be maintained in any DDA (not to exceed (i) $200,000 in the aggregate for all DDAs of the Domestic Loan Parties and Canadian Loan Parties, (ii) $100,000 in the aggregate for all Australian Loan Parties, (iii) $100,000 in the aggregate for all Japanese Loan Parties, and (iv) $400,000 in the aggregate for all DDAs of all Loan Parties)):

(i)    all available cash receipts of the Loan Parties from the sale of Inventory and other assets (other than cash maintained in the cash registers in the Stores in the normal course of business and consistent with past practices);

(ii)    all proceeds of collections of Accounts and Credit Card Receivables of the Loan Parties;

(iii)    all other cash payments received by a Loan Party from any Person or from any source or on account of any sale or other transaction or event;

(iv)    except for the Term Loan Priority Accounts, Existing ABL Credit Agreement Collateral Account and except as provided in this clause (c), the then cash balance of each DDA;

(v)    the then entire ledger balance of each Blocked Account; and

(vi)    the cash proceeds of all credit card charges received by any Loan Party;

(d)    The Concentration Accounts shall at all times be under the sole dominion and control of the Administrative Agent or the Australian Security Trustee, as the case may be. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Accounts, unless the Administrative Agent, in its discretion, agrees to permit collected funds in such Concentration Account to be disbursed to, or for the account of, the applicable Loan Parties, (ii) the funds on deposit in each Concentration Account maintained for the account of the Domestic Loan Parties shall at all times be collateral security for the Secured Obligations (as defined in the Security Agreement), (iii) the funds on deposit in each Foreign Concentration Account shall at all times be collateral security for all of the Foreign Liabilities and (iv) the funds on deposit in the Concentration Accounts shall be applied as provided in Section 2.05 or Section 8.03 of this Agreement, as applicable. With respect to the Australian Facility and the Japanese Facility and cash receipts and collections of any Australian Loan Party and any Japanese Loan Party, the Administrative Agent shall furnish the applicable Foreign Borrower with three (3) Business Days' notice prior to such application (unless an Event of Default then exists, in which case no such notice shall be required).

(e)     In the event that, notwithstanding the provisions of this Section 6.14, any Loan Party receives or otherwise has dominion and control of any such proceeds or collections (other than the minimum balances for all DDAs to the extent permitted under this Section 6.14, Cash Equivalents being held in accordance with the terms of the proviso at the end of the definition of "Permitted Investments" and cash maintained in the cash registers in the Stores in the normal course of business and consistent with past practices), such proceeds and collections shall be held in trust by such Loan Party for the Administrative Agent or the Australian Security Trustee, as applicable, and shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the applicable Concentration Account, or dealt with in such other fashion as such Loan Party may be instructed by the Administrative Agent or the Australian Security Trustee, as applicable;

(f)     Upon the request of the Administrative Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Administrative Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account and each Japanese Depository Bank to ensure the proper transfer of funds as set forth above.    Subject to Section 8.02, the Foreign Loan Parties may direct, and shall have sole control over, the manner of disposition of funds in the Blocked Accounts maintained by each of them.  Any amounts held or received in any Concentration Account maintained for any Foreign Loan Party at any time (except as provided in Section 8.02) shall be promptly remitted to an account of such Foreign Borrower or as such Foreign Borrower may otherwise direct.

(g)     Notwithstanding anything to the contrary herein contained, no Foreign Loan Party shall enter into any cash pooling arrangement.

(h)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the obligation of the Domestic Loan Parties to enter into Blocked Account Agreements or other control agreements with any Agent or otherwise grant any Agent control, in each case with respect to any DDA, securities account or commodities account, shall not apply to any Term Loan Priority Accounts, Existing ABL Credit Agreement Collateral Account.

## 6.15    Information Regarding the Collateral.

Furnish to the Administrative Agent at least fifteen (15) days' (or such shorter period as the Administrative Agent shall agree) prior written notice of any change in: (i) any Loan Party's legal name; (ii) the location of any Loan Party's chief executive office or its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility), but only with respect to Canadian Loan Parties and Japanese Loan Parties and only if, (A) the Collateral at such new location is in excess of $250,000 and (B) as a result of such change, any further action is required for the Administrative Agent (and with respect to the security interest under the Japanese Security Documents, each of the Japanese Secured Parties), to have a valid, legal and perfected security interest in the Collateral at such changed or new location; (iii) any Loan Party's organizational type or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its jurisdiction of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC, PPSA, Australian PPSA or otherwise that are required in order for the Administrative Agent or the Australian Security Trustee, as applicable (and with respect to the security

interest under the Japanese Security Documents, each of the Japanese Secured Parties), to continue, following such change, to have a valid, legal and perfected security interest in the Collateral for its own benefit and the benefit of the other applicable Credit Parties (to the extent a security interest in such Collateral can be perfected by the filing of a financing statement under the UCC or a filing under the PPSA or a financing statement under the Australian PPSA or as required under applicable Laws of Japan).

### 6.16   Physical Inventories.

(a)     Cause cycle counts of the Inventory of the Loan Parties to be undertaken, at the expense of the Loan Parties, in each case, consistent with past practices, which physical inventories and cycle counts shall be conducted by a Loan Party or such other inventory takers as are reasonably satisfactory to the Collateral Agent and shall follow such methodology as is consistent with the methodology used in the immediately preceding physical inventory or cycle count, as applicable, or as otherwise may be reasonably satisfactory to the Collateral Agent. The Collateral Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical inventory or cycle count of Inventory which is undertaken on behalf of any Loan Party.  At the request of the Administrative Agent, the Lead Borrower shall, as soon as reasonably practicable, provide the Administrative Agent with a summary of the results of any such physical inventory or cycle count.

(b)     Any Agent, in its discretion, if any Event of Default exists, may cause additional physical inventories or cycle counts of the Loan Parties to be taken as such Agent determines (each, at the expense of the Loan Parties).

### 6.17   Environmental Laws.

(a)     Conduct, and cause each Subsidiary to conduct, its operations in compliance with all Environmental Laws, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; (b) obtain and renew, and cause each Subsidiary to obtain and renew, all Environmental Permits required for its operations, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; (c) implement, and cause each Subsidiary to implement, any and all investigation, remediation, removal and response actions that are required under applicable Environmental Laws to prevent the release of any Hazardous Materials on, at, or from any of its Real Estate; provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such investigation, cleanup, removal, remedial or other action to the extent that (i) its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP or (ii) failure to undertake any investigation, clean up, removal, remedial or other action would not reasonably be expected to have a Material Adverse Effect;  and (d) promptly notify the Administrative Agent of: (i) any claim, proceeding or investigation in relation to any Environmental Law which is current, pending or threatened against a Loan Party, where such claim, proceeding or investigation could reasonably be expected to have a Material Adverse Effect; or (ii) any facts or circumstances that may result in any claim being commenced or threatened against a Loan Party where that claim could reasonably be expected to have a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agents with respect to establishing or modifying Reserves in a manner permitted by this Agreement.

**6.18    Further Assurances.**

(a)    Execute any and all further documents, financing statements, filings, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, amendments to financing statements or other documents under the UCC, the PPSA, the Australian PPSA or any other similar legislation), that may be required under any applicable Law, or which any Agent may reasonably request, to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties and to the extent required by, and subject to the limitations set forth in, the Security Documents and this Agreement.

(b)    If any assets, whether personal property or real property, are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Security Documents that become subject to the Lien of the Security Documents upon acquisition thereof), notify the Agents thereof (in the case of Intellectual Property, solely with respect to Intellectual Property which is the subject of a registration or application with the PTO, Copyright Office, CIPO or other applicable Governmental Authority and within the time frames set forth in Schedule 6.02), and the Loan Parties will cause such assets to be subjected to a perfected Lien securing the Secured Obligations (as defined in the Security Agreement) of the Domestic Loan Parties (in the case of a Domestic Loan Party) or the Foreign Liabilities (in the case of a Foreign Loan Party), as applicable, and will take such actions as shall be necessary (including updating all registrations pursuant to the Japanese Security Documents to the extent required in respect of new types of Inventory and new types of goods sold creating any Accounts) or shall be requested by any Agent to grant and perfect such Liens, in each case to the extent required by, and subject to the limitations set forth in, the Security Documents and this Agreement, including actions described in paragraph (a) of this Section 6.18, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.18(b) waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.18(b) if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute Consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c)    [reserved].

**6.19    Maintenance of New York Process Agent.** In the case of a Foreign Loan Party, maintain in New York, New York or at such other location in the United States as may be reasonably satisfactory to the Administrative Agent a Person acting as agent to receive on its behalf and on behalf of its property service of process.

**6.20    Material Contracts.** In each case, exclusive of the Existing Senior Secured Note Loan Documents or any other Material Contract relating to Material Indebtedness, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in full force and effect (other than expirations pursuant to the terms thereof and any replacements thereof), and enforce each such Material Contract in accordance with its terms.

**6.21    Canadian Pension Benefit Plans.**

Each Canadian Loan Party shall cause each of its Canadian Pension Plans to be duly qualified and administered in all respects in compliance with, as applicable, the *Supplemental Pension Plans Act* (Quebec) and the *Pension Benefits Act* (Ontario) and all other applicable laws (including regulations,

-160-

orders and directives), and the terms of the Canadian Pension Plans and any agreements relating thereto. Each Canadian Loan Party shall ensure:

(a)     it has no unfunded, solvency, or deficiency on windup liability and no accumulated funding deficiency (whether or not waived), or any amount of unfunded benefit liabilities in respect of any Canadian Pension Plan, including any Canadian Pension Plan to be established and administered by it or them;

(b)     all amounts required to be paid by it or them are paid when due;

(c)     no liability upon it or them or Lien on any of its or their asset property arises or exists in respect of any Canadian Pension Plan;

(d)     it makes all required contributions to any Canadian Pension Plan when due;

(e)     it does not engage in a prohibited transaction or violation of the fiduciary responsibility rules with respect to any Canadian Pension Plan that could reasonably be expected to result in liability; and

(f)     it does not maintain, contribute or have any liability with respect to a Canadian Pension Plan which provides benefits on a defined benefit basis.

**6.22     Use of Property; Rejection and Assumption of Contracts; Post-Filing Pleadings.** On or after the Petition Date, each Loan Party agrees that it shall not, without the Required Lenders' prior written consent, file any motions or pleadings with the Bankruptcy Court (a) seeking authority for any Loan Party to (i) use any of the material properties or assets of the Loan Parties outside the ordinary course of business, (ii) satisfy material prepetition claims of the Loan Parties or (iii) incur material administrative costs, in each case, to the extent such relief is inconsistent with this Agreement (including the Budget), (b) seeking to reject or assume any material contract, agreement, lease or other agreement to which any Loan Party is a party, or (c) seeking relief that is otherwise inconsistent with this Agreement, the Orders, or the Plan Sponsor Agreement or Sponsored Plan.

**6.23     [Reserved].**

**6.24     Additional Information Obligations.**

(a)     <u>Case Documents and Motions</u>. As soon as practicable in advance of filing with the Bankruptcy Court of all documents, motions and pleadings, including with respect to the Orders, the Lead Borrower shall deliver to Administrative Agent and the Lenders all such documents to be filed and provide the Lenders with a reasonable opportunity to review and comment on all such documents.

(b)     <u>Progress Calls</u>. The Lead Borrower shall hold weekly progress conference calls for the Lenders, starting on the Thursday after the first day of the second week following the Effective Date and continuing on each Thursday thereafter, until the Termination Date. During such conference calls a Responsible Officer of the Lead Borrower shall provide the participating Lenders with a reasonably comprehensive update on the Cases, variances with respect to the Budget and any other material information relating to the business, condition (financial or

otherwise), operation, performance, properties or prospects of any of the Loan Parties and any other information that may be reasonably requested by the Administrative Agent or any Lender.

(c)     Other Information.     Deliver to the Lenders promptly after the same are available, copies of all applications, judicial information, financial information and other documents filed on behalf of any Debtor or any other Loan Party with the Bankruptcy Court in any of the Cases, or distributed by or on behalf of any Debtor or any other Loan Party to any official committee appointed in any of the Cases.

(d)     Access to Advisors.  The Loan Parties shall allow the Administrative Agent and the Lenders access to, upon reasonable notice during normal business hours, all financial professionals (including the Acceptable Chief Restructuring Officer) engaged by the Loan Parties (which engagement, with respect to any financial professionals engaged after the Effective Date, shall be on terms and conditions reasonably satisfactory to the Required Lenders).

**6.25     Compliance with Terms of Leaseholds.**

(a)     Except in each case as would not reasonably be expected to have a Material Adverse Effect or except as contemplated by the Budget or to the extent required under the Bankruptcy Code or the Orders, (a) make all payments and otherwise perform all obligations in respect of all Leases to which any Loan Party is a party, (b) keep such Leases in full force and effect, (c) not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, and (d) cause each of its Subsidiaries to do the foregoing.  Notify the Administrative Agent of any default by any Loan Party with respect to any Leases to which such Loan Party is a party if such default would reasonably be expected to have a Material Adverse Effect and cooperate with the Administrative Agent in all respects to cure any such default.

(b)     [reserved].

**6.26     Plan of Reorganization.**

Within 30 days after the Petition Date, the Domestic Loan Parties shall file a Plan of Reorganization and Disclosure Statement, which plan and disclosure statement shall provide for payment in full of the Obligations on the consummation of the plan and shall otherwise be reasonably acceptable to the Administrative Agent, which plan shall have become effective no later than the Maturity Date.

**ARTICLE VII
NEGATIVE COVENANTS**

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification Obligations for which a claim has not then been asserted), or any Letter of Credit shall remain outstanding, no Loan Party shall, nor shall it permit any applicable Subsidiary to, directly or indirectly:

**7.01    Liens; Retention of Title, Constructive Transfers .**

(a)    Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file (or authorize the filing) under the UCC, the PPSA, the Australian PPSA or any similar Law or statute of any jurisdiction a financing statement or similar document that names any Loan Party or any Americas/Foreign Subsidiary as debtor; or sign or authorize any security agreement authorizing any Person thereunder to file such financing statement or similar document other than, as to all of the above, Permitted Encumbrances.

(b)    Permit, in the case of any Australian Loan Party or any Japanese Loan Party, any retention of title or conditional sale arrangements with respect to any trade supply contract with respect to Inventory permitted under clauses (y) and (z) of the definition of Permitted Encumbrances, unless the applicable Loan Party shall have furnished written notice to the Administrative Agent pursuant to Section 6.03(l) and an Availability Reserve in an amount equal to the balance of the purchase price due to such vendor has been established in the applicable Borrowing Base. In connection with the foregoing, the Loan Parties acknowledge that any Agent may undertake an updated PPSR search with respect to the Australian Loan Parties no more often than once in any three month period, at the Australian Loan Parties' expense.

**7.02    Investments.** Make any Investments, except Permitted Investments. For purposes of Section 7.02, notwithstanding anything contrary set forth herein, (i) in the event the Parent or any Subsidiary (an "Initial Investing Person") transfers an amount of cash or other property (the "Invested Amount") for purposes of permitting the Parent or one or more other Subsidiaries to ultimately make an Investment of the Invested Amount in any Subsidiary or any Person in which such Investment is ultimately made, the "Subject Person") through a series of substantially concurrent intermediate transfers of the Invested Amount to one or more other Subsidiaries other than the Subject Person (each an "Intermediate Investing Person"), including through the incurrence or repayment of intercompany Indebtedness, capital contributions or redemptions of Equity Interests, then, for all purposes of Section 7.02, any transfers of the Invested Amount to Intermediate Investing Persons in connection therewith shall be disregarded and such transaction, taken as a whole, shall be deemed to have been solely an Investment of the Invested Amount by the Initial Investing Person in the Subject Person and not an Investment in any Intermediate Investing Person; and (ii) if an Investment is denominated in a foreign currency, no fluctuation in currency shall result in a breach of any covenant in this Section 7.02.

**7.03    Indebtedness.** Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness. The accrual of interest and the accretion or amortization of original issue discount on Indebtedness and the payment of interest in the form of additional Indebtedness originally incurred in accordance with this Section 7.03 will not constitute an incurrence of Indebtedness. For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Alternative Currency Equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing,

renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness allocated to any such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

**7.04    Fundamental Changes.**  Merge, amalgamate, dissolve, liquidate, consolidate with or into another Person.

**7.05    Dispositions.**  Make any Disposition, except Permitted Dispositions.  To the extent any Collateral is Disposed of as permitted by this Section 7.05 to any Person other than any Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents.

**7.06    Restricted Payments.**  Declare or make, directly or indirectly, any Restricted Payment, except each Loan Party (other than Parent) and each Subsidiary thereof may make Restricted Payments to any Loan Party or any other Subsidiary (and in the case of a Restricted Payment by a non-Wholly Owned Subsidiary, to the Parent and any other Loan Party and to each other owner of Equity Interests of such Subsidiary based upon their relative ownership interests of the relevant class of Equity Interests); provided that no Loan Party may make any Restricted Payment to any non-Loan Party.

**7.07    Prepayments of Indebtedness.**  Except as required by this Agreement or the Orders (including with respect to adequate protection payments required in connection with the Existing Senior Secured Indenture and the Existing ABL Credit Agreement), prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Permitted Indebtedness (including without limitation any Subordinated Indebtedness prior to its scheduled maturity or set aside any funds for such purpose (other than any payments to critical vendors to the extent permitted by the Bankruptcy Court pursuant to any first or second day motion or as expressly set forth in the Budget), or (ii) agree to any amendment, restatement, supplement or other modifications to the Existing Senior Secured Note Documents or (iii) make any interest payment in respect of any Indebtedness (including without limitation any Subordinated Indebtedness) other than (a) payments of the Obligations, (b) as expressly permitted by the Orders, (c) payments required under the Boardriders Notes, (d) mandatory payments with respect to the DIP Term Facility, (e) prepayment of the Interim Order Intercompany Loans (f) payments with respect to the Existing ABL Obligations and (g) prepayment of intercompany Indebtedness owed by and between Domestic Loan Parties.

**7.08    Change in Nature of Business.**  Engage in any line of business substantially different from the lines of business conducted by such Loan Parties and their Subsidiaries on the date hereof or any business reasonably related or incidental thereto.

**7.09    Transactions with Affiliates.**  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties not prohibited hereunder; (b) transactions not otherwise prohibited hereunder between or among the Parent or any Subsidiary or Subsidiaries or any entity that becomes a Subsidiary as a result of such transaction; (c) Restricted Payments permitted under Section 7.06; (d) the transactions occurring on the Effective Date and the payment of fees and expenses related thereto; (e) [reserved]; (f) transactions, arrangements, reimbursements and indemnities permitted between or among such parties under this Agreement; (g) the payment of

reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Parent or any of its Subsidiaries, solely to the extent consistent with the Budget (within Permitted Variances); (h) [reserved]; (i) any transfers by or among any Affiliates to pay tax liabilities, or (j) transactions pursuant to and in connection with the Existing Senior Secured Note Documents or (k) Investments permitted pursuant to clauses (i), (k), (q) and (w) of the definition of "Permitted Investments".

### 7.10 Burdensome Agreements.

Enter into any Contractual Obligation (other than (w) this Agreement or any other Loan Document, (x) the DIP Term Facility, (y) the Existing Senior Secured Note Documents, or (z) the Boardriders Notes and the Boardriders Notes Indenture that limits the ability (i) of any Subsidiary that is not a Loan Party to make Restricted Payments to any Loan Party or (ii) of the Loan Parties to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Administrative Agent, or as applicable, the Australian Security Trustee, under the Loan Documents; provided, however, that none of the foregoing shall prohibit (A) any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) or (f) of the definition of "Permitted Indebtedness" solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; (B) customary anti-assignment provisions in contracts restricting the assignment thereof or in contracts for the Disposition of any assets or any Person, provided that the restrictions in any such contract shall apply only to the assets or Person that is to be Disposed of; (C) provisions in leases of real property that prohibit mortgages or pledges of the lessee's interest under such lease or restricting subletting or assignment of such lease; (D) customary provisions in joint venture agreements and other similar agreements applicable to joint ventures to the extent such joint ventures are not prohibited hereunder; (E) customary restrictions arising under licenses and other contracts entered into in the ordinary course of business; (F) customary restrictions arising under licenses and other contracts entered into in the ordinary course of business; (G) Contractual Obligations which are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary; or (H) Contractual Obligations which exist on the date hereof and (to the extent not otherwise permitted by this Section 7.10) are listed on Schedule 7.10 hereto.

### 7.11 Use of Proceeds .

Use the proceeds of any Credit Extension in a manner inconsistent with Section 6.12 or in any manner which violates Regulations T, U or X of the FRB.

### 7.12 Amendment of Material Documents.

Amend, modify or waive any of a Loan Party's rights under (a) its Organization Documents in a manner materially adverse to the Credit Parties, or (b) any Material Contract (other than any Loan Document) or Material Indebtedness including any DIP Term Documents (except in connection with an increase of the maximum commitments thereunder to the maximum amount allowed hereunder), the Existing Senior Secured Note Documents, or the Boardriders Notes and the Boardriders Notes Indenture, or (c) the E-Commerce Agreement in a manner that adversely affects the Lien of the Administrative Agent on the Collateral held on consignment by GSI, or that is otherwise materially adverse to the Lenders (provided that the foregoing shall not limit the right of the Loan Parties to terminate the E-Commerce Agreement), in each case, without the prior written consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed).

**7.13    Fiscal Year; Accounting Policies**.

Change the Fiscal Year of any Loan Party or change any accounting policies (including, without limitation, any change which materially affect the calculation of the Cost of Eligible Inventory included in the Borrowing Base, in each case, without the prior written consent of the Administrative Agent or as required by GAAP.

**7.14    Deposit Accounts; Credit Card Processors**.

(a)    In the case of any Loan Party (other than the Japanese Loan Parties, as to which clause (b) below shall apply), open new Blocked Accounts or engage any new Credit Card Issuers or Credit Card Processors unless such Loan Party shall have delivered to the Administrative Agent or the Australian Security Trustee, as applicable, appropriate Blocked Account Agreements or Credit Card Notifications, as applicable, consistent with the provisions of Section 6.14 or otherwise reasonably satisfactory to the Agents.

(b)    In the case of any Japanese Loan Party (i) open any new Blocked Accounts or other DDAs (other than with an existing Japanese Depository Bank) unless such Japanese Loan Party has provided the Administrative Agent with five (5) Business Days prior notice thereof (any such new depository with whom a new DDA is opened by any of the Japanese Loan Parties shall constitute a Japanese Depository Bank for all purposes of this Agreement and shall be subject to the provisions of Section 6.14 hereof) and has taken all such actions as may be required with respect to any such DDA pursuant to the Japanese Security Documents, or (ii) engage any new Credit Card Issuers or Credit Card Processors, or terminate, or permit the termination of,  the appointment of JMS Co., Ltd. as its collection agent with respect to any Credit Card Processors or Credit Card Issuers for the account of the Japanese Loan Parties, or engage any new collection agent, unless such Japanese Loan Party has provided the Administrative Agent with five (5) Business Days' prior written notice thereof and has delivered to the Administrative Agent copies of Credit Card Notifications, which have been executed on behalf of such Japanese Loan Party and delivered to the applicable Credit Card Processors, Credit Card Issuers and/or collection agent, in substantially the forms delivered by the Japanese Borrower on the Effective Date (or such other form as the Administrative Agent may reasonably request in light of the circumstances) and has taken all such actions as may be required with respect thereto pursuant to the Japanese Security Documents, and provided that, such Japanese Loan Party shall use commercially reasonable efforts to deliver to the Administrative Agent, within sixty (60) days following the date of each such Credit Card Notification, in form and substance reasonably satisfactory to the Administrative Agent, waivers and acknowledgments with respect to any such Credit Card Processors, Credit Card Issuers and/or collection agents.

**7.15    [Reserved]**.

**7.16    Limitation on the Creation of Subsidiaries**. Establish, create or acquire after the Effective Date any Domestic Subsidiary.

**7.17    Anti-Social Force**.

Become an Anti-Social Force.

**7.18**    **Chapter 11 Claims.** Until payment in full of the Obligations under this Agreement (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted), except for and to the extent permitted under the Carve-Out and the Priority Permitted Encumbrances, the Debtors shall not, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien which is pari passu with or senior to the claims or Liens, as the case may be, of the Administrative Agent and the other Secured Parties against the Debtors hereunder or under the Orders, or apply to the Bankruptcy Court for authority to do so.

**7.19**    **Compliance with Budget**.

(a)    Except as otherwise provided herein or approved by the Required Lenders, directly or indirectly (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the Orders and the Budget (and Permitted Variances related thereto), (ii) permit a disbursement causing any variance other than Permitted Variances without the prior written consent of the Required Lenders or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments authorized by the Bankruptcy Court.

(b)    Prior to the occurrence of an Event of Default, the Debtors shall be permitted to pay compensation and reimbursement of fees and expenses solely to the extent that such fees and expenses are in accordance with the Budget (within Permitted Variances) and authorized to be paid under Sections 330 and 331 of the Bankruptcy Code pursuant to an order of the Bankruptcy Court, as the same may be due and payable. Upon receipt of the Carve-Out Trigger Notice, the right of the Debtors to pay professional fees outside the Carve-Out shall terminate, and the Debtors shall provide immediate notice to all professionals informing them that such notice was delivered and further advising them that the Debtors' ability to pay such professionals is subject to and limited by the Carve-Out.

**7.20**    **Use of Collateral.** Use or permit the use of Collateral, proceeds of Loans, portion of the Carve-Out or any other amounts directly or indirectly by any of the Loan Parties, the Committee, if any, or any trustee or other estate representative appointed in the Cases (or any successor case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(a)    to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Loan Documents or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will pay the Lenders in "full" in cash; or

(b)    to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against Administrative Agent, the Lenders, the other Secured Parties or the Prepetition Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal

discovery proceedings in anticipation thereof), including, without limitation, (i) any Avoidance Actions; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims, the Liens granted under the Loan Documents, the Loan Documents, the DIP Term Claims, the DIP Term Documents, the DIP Term Documents, the Existing Senior Secured Note Documents, the Existing Senior Secured Note Obligations, the Existing Senior Secured Note Liens, the Existing ABL Credit Agreement, the Existing ABL Obligations or the Existing ABL Liens; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations, the DIP Term Claims or the Existing Senior Secured Note Obligations (including, for the avoidance doubt, any prepayment premium provided in the Existing Senior Secured Note Documents); or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the Administrative Agent or the Lenders hereunder or under any of the other Loan Documents, (B) the agent or the lenders under the DIP Term Documents or (C) the Existing Senior Secured Note Collateral Agent, the Existing Senior Secured Noteholders, the Existing ABL Agent, or the Existing ABL Lenders (in each case, as applicable, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their respective assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable Loan Documents and the Orders). Notwithstanding anything to the contrary herein, the Committee may use up to $50,000 in the aggregate amount of the Carve-Out, any cash-collateral, or proceeds of the Loan to investigate the Prepetition Parties (the "Committee Investigation Budget"). Any and all claims incurred by the Committee in excess of the Committee Investigation Budget (the "Unbudgeted Investigation Claims") shall not constitute any allowed administrative expense claim (including, without limitation, Section 1129(a)(9)(A) of the Bankruptcy Code), and the Unbudgeted Investigation Claims shall not be satisfied by the Carve-Out, any cash collateral or proceeds of the Loan, and shall be satisfied solely from the unencumbered assets of the Loan Parties (if any) (the "Unencumbered Assets"), thereby reducing recoveries to the holders of unsecured claims (other than any deficiency claim held by the Prepetition Parties); provided, however, that to the extent there are no Unencumbered Assets available to satisfy the Unbudgeted Investigation Claims, then such claims shall be automatically disallowed without further action by any party or Court order and shall not receive a recovery in the Cases and any Successor Cases.

### 7.21   Bankruptcy Related Negative Covenants.

The Domestic Loan Parties will not consent to or permit to exist any of the following:

(a)   Any order which authorizes the rejection or assumption of any Leases of any Domestic Loan Party without the Administrative Agent's prior consent, whose consent shall not be unreasonably withheld;

(b)   Any modification, stay, vacation or amendment to the Orders to which the Administrative Agent and the Required Lenders have not consented in writing;

(c)   A priority claim or administrative expense or unsecured claim against any Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c),

503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agents and the Lenders in respect of the Obligations and the Pre-Petition Liabilities, except with respect to Permitted Encumbrances and the Carve-Out, (i) statutory Liens and charges not capable of being subordinated by the entry of the Initial Order, (ii) the Directors' Charge, and (iii) the Administration Charge;

(d)     Any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(e)     Any order which authorizes the payment of any Indebtedness (other than the Existing ABL Credit Agreement, Indebtedness reflected in the approved Budget, and other Indebtedness approved by the Administrative Agent) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien (other than as expressly set forth in the Orders or the Budget); or

(f)     Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01    Events of Default.** Any of the following shall constitute an Event of Default:

(a)     Non-Payment. Any Borrower or any other Loan Party fails to pay when and as required to be paid herein, and in the currency required hereunder, (i) any amount of principal of any Loan or any L/C Obligation, or deposit any funds as Cash Collateral in respect of L/C Obligations, or (ii) any interest on any Loan or on any L/C Obligation, or any fee due hereunder, which failure continues for three (3) Business Days, or (iii) any other amount payable hereunder or under any other Loan Document which failure continues for five (5) Business Days; or

(b)     Specific Covenants. Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02 (exclusive of Section 6.02(f)), 6.03, 6.05(a)(as it relates to a Loan Party), 6.08, 6.11, 6.12, 6.13, 6.14, 6.15 or Article VII; or any Loan Party fails to deliver any one or more of the financial and collateral reports described on Schedule 6.02 hereto, no later than the times set forth in such Schedule, and such failure continues for three (3) Business Days after notice thereof by the Administrative Agent to the Lead Borrower, or

(c)     Other Defaults. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after notice thereof by the Administrative Agent to the Lead Borrower; or

(d)     Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein or in any other Loan Document, shall be incorrect or misleading in any material respect (or in the case of any representation or warranty qualified by materiality, in any respect) when made or deemed made; or

(e)     Cross-Default. (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due, after giving effect to any applicable grace period (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness, or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness (with respect to any Domestic Loan Party, to the extent such Material Indebtedness is incurred after the Petition Date) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, in each case, prior to its stated maturity; provided that any such failure is unremedied and is not waived by the holders of such Indebtedness; provided further that this clause (i)(B) shall not apply to (x) secured Indebtedness of a Loan Party or a Subsidiary that becomes due upon the sale or transfer by such Loan Party or Subsidiary of the property or assets securing such Indebtedness; or (y) scheduled payments, defeasances or redemptions of Indebtedness on the dates set forth in the instruments and agreements governing such Indebtedness; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Loan Party or such Subsidiary as a result thereof is greater than $15,000,000; provided that such failure is unremedied and is not waived by the applicable counterparty to such Swap Contract; or

(f)     Insolvency Proceedings, Etc. Any Loan Party (other than a Domestic Loan Party) or any of its Subsidiaries institutes or consents to the institution of any proceeding or makes any filing under any Debtor Relief Law (or, with respect to the Australian Loan Parties, any corporate action, legal proceedings or other procedure or step is taken in relation to the suspension of payments, a moratorium of any indebtedness, winding up, dissolution, administration or reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise) of any Australian Loan Party other than a solvent liquidation or reorganization of an Australian Subsidiary which is not a Loan Party), or makes a composition, an assignment or arrangement for the benefit of creditors; or applies for or consents to the appointment of any receiver, administrator, receiver and manager, Controller, interim receiver, trustee, monitor, custodian, conservator, liquidator (other than in respect of a solvent liquidation of a Subsidiary which is not a Loan Party), compulsory manager, rehabilitator or similar officer for it or for all or any material part of its property; or a proceeding shall be commenced or a petition filed, without the application or consent of such Person, seeking or requesting the appointment of any administrator, receiver, interim receiver, receiver and manager, trustee, monitor, custodian, conservator, liquidator, rehabilitator compulsory manager or similar officer and such administrator, receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, compulsory manager or similar officer is appointed and the appointment continues undischarged, undismissed or unstayed for 45 calendar days (other than with respect to the Australian Loan Parties, as to which the 45 calendar day period shall not apply and an Event of Default shall immediately arise); or any proceeding under any Debtor Relief Law

-170-

relating to any such Loan Party or Subsidiary thereof or to all or any material part of its property is instituted without the consent of such Loan Party or Subsidiary and continues undismissed or unstayed for 45 calendar days (other than with respect to the Australian Loan Parties, as to which the 45 calendar day period shall not apply and an Event of Default shall immediately arise), or an order for relief is entered in any such proceeding; or

(g)    Creditors' Process. Any expropriation, attachment, sequestration, distress or execution affects any asset or assets of an Australian Loan Party; or

(h)    Inability to Pay Debts; Attachment. (i) Any Loan Party (other than a Domestic Loan Party) or any Subsidiary thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due in the ordinary course of business, (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within thirty (30) days after its issuance or levy or (iii) any Loan Party (other than a Domestic Loan Party)is ordered by a clearinghouse to suspend transactions with banks and financial institutions; or

(i)    Reserved; or

(j)    Cases, Motions, Etc. Any of the following shall occur in any Case:

(i)    the filing by any Debtor of a plan of reorganization other than a Sponsored Plan;

(ii)    the filing by any Debtor of any motion or pleading that is inconsistent with the prosecution of a Sponsored Plan;

(iii)    any of the Debtors shall file a pleading seeking to vacate or modify any of the Orders in a manner adverse to the Lenders and/or the Administrative Agent;

(iv)    entry of an order without the prior consent of the Required Lenders amending, supplementing or otherwise modifying any Order in a manner adverse to the Lenders and/or the Administrative Agent;

(v)    reversal, vacation or stay of the effectiveness of any Order;

(vi)    any violation of the terms of any Order;

(vii)    dismissal of any of the Cases or conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code;

(viii)    appointment of a Chapter 11 trustee or an examiner with expanded powers;

(ix)    the consummation of any sale of all or substantially all assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code;

(x)     granting of relief from the automatic stay in the Cases to permit foreclosure or enforcement on, or any right or remedy with respect to, assets of any Debtor in excess of $1,000,000 in the aggregate;

(xi)     the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) that is senior to or pari passu with the Lenders' claims under the Loan Documents and the transactions contemplated thereby, except for the Priority Permitted Encumbrances;

(xii)     payment of or granting adequate protection with respect to prepetition debt, other than as expressly set forth in the Orders or the Budget;

(xiii)     except (A) as otherwise provided in the Interim Order or the Final Order or (B) as expressly permitted by the Plan Sponsor Agreement or a Sponsored Plan, any of the Loan Parties seek or if there is entered, an order under Section 365 of the Bankruptcy Code rejecting a material lease (i) to which any Loan Party is a party, and (ii) that is part of (or whose premises contain any of) the Collateral; and

(xiv)     any of the Liens or the DIP Superpriority Claims granted hereunder cease to be valid, perfected and enforceable in any respect; or

(k)     Budget. Any Variance shall occur, other than a Permitted Variance; or

(l)     Chief Restructuring Officer. The failure of an Acceptable Chief Restructuring Officer to be employed by the Parent at any time to assist the Loan Parties with preparation of the Budget (and updates thereto) and the other financial and collateral reporting required to be delivered to the Administrative Agent pursuant to this Agreement; provided that the Parent shall have five (5) Business Days to engage a replacement Acceptable Chief Restructuring Officer following the resignation of any Acceptable Chief Restructuring Officer; or

(m)     Subrogation. Any of the Loan Parties shall assert other than for purposes of disclosure) any right of subrogation or contribution against any other Loan Party prior to the payment in full of the Obligations, the DIP Term Claims and the Existing Senior Secured Note Obligations; or

(n)     Judgments. There is entered against any Loan Party or any Subsidiary thereof(with respect to any Domestic Loan Party, with respect to any post-petition liabilities) (i) one or more final judgments for the payment of money in an aggregate amount (as to all such final judgments) exceeding $10,000,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case such judgment is not, within 30 days after the entry thereof, satisfied, vacated, discharged or execution thereof stayed or bonded pending appeal, or such final judgment is not satisfied, vacated or discharged prior to the expiration of any such stay; or

(o)     ERISA.    (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $10,000,000 or which would reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $10,000,000 or which would reasonably be expected to result in a Material Adverse Effect; or

(p)     Canadian Pension Plan.  Any event or condition shall occur or exist with respect to a Canadian Pension Plan that could reasonably be expected to subject any Canadian Loan Party to any tax, penalty or other liabilities under the *Supplemental Pension Plans Act* (Quebec) and the *Pension Benefits Act* (Ontario) or any other applicable Laws, or if a Canadian Loan Party is in default with respect to required payments to a Canadian Pension Plan or any Lien arises (save for contribution amounts not yet due) in connection with any Canadian Pension Plan, and which could reasonably be expected to result in a Material Adverse Effect; or

(q)     Foreign Pension Plans; An event occurs with respect to a Pension Plan of the Australian Loan Parties or the Japanese Loan Parties which has resulted or could reasonably be expected to result in liability of any Australian Loan Party or Japanese Loan Party, as applicable, in an aggregate amount in excess of $10,000,000 or which would reasonably be expected to result in a Material Adverse Effect, or

(r)     Invalidity of Loan Documents.  (i)  Any provision of any material Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate, repudiate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any Subsidiary not to be, a valid and (to the extent required by the Security Documents and this Agreement) perfected Lien on any Collateral (other than an immaterial portion of the Collateral), with the priority required by the applicable Security Document; or

(s)     Change of Control.  There occurs any Change of Control; or

(t)     Cessation of Business.  Except as otherwise expressly permitted hereunder or pursuant to any Order, any Loan Party shall take any action to suspend the operation of the business of the Loan Parties, taken as a whole, or liquidate all or a material portion of the assets of the Loan Parties, taken as a whole; or

(u)     Loss of Collateral.  There occurs any uninsured loss to any material portion of the Collateral or any of the Japanese Loan Parties request a "fixing of the principal secured" (*ganpon no kautei*); or

-173-

(v)     Reserved; or

(w)     Indictment.  The indictment against any Loan Party or any Subsidiary thereof, under any federal, state, provincial, territorial, municipal, foreign or other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony and such indictment remains unquashed or undismissed for a period of ninety (90) days or more, unless the Administrative Agent, in its reasonable discretion, determines that the indictment is not material; or

(x)     Guaranty.  The termination, revocation or attempted termination or revocation by any Loan Party of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document; or

(y)     [Reserved].

(z)     Chapter 11 Cases Milestones.     The failure to meet any of the following milestones:

        (i)     file the Chapter 11 Cases on the Petition Date;

        (ii)     obtain entry of the Interim Order within 2 Business Days of the Petition Date;

        (iii)     obtain entry of the Final Order on or before the date that is 30 days after the Petition Date;

        (iv)     file a Sponsored Plan together with the accompanying disclosure statement pursuant to section 1125 of the Bankruptcy Code (the "Disclosure Statement"), plan solicitation materials and motion seeking approval of the Bankruptcy Court to the Disclosure Statement within 30 days of the Petition Date;

        (v)     obtain entry of an order approving the Disclosure Statement as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code within 75 days after the Petition Date;

        (vi)     within 30 days after the Petition Date, the Domestic Loan Parties shall have filed a motion requesting, and within 75 days after the commencement of Chapter 11 Cases, shall have obtained, an order of the Bankruptcy Court extending the time period of the Domestic Loan Parties to assume or reject leases to not less than 210 days from the Petition Date; and

        (vii)     the effective date of a Sponsored Plan shall occur within 120 days following the date of the Confirmation Order pursuant to clause (x) hereof.

(aa)     Boardriders Defaults.  The exercise of any rights or remedies by any holder of the Boardriders Notes (or any trustee, agent or representative on behalf of such holder or holders including the Boardriders Notes Trustee) with respect to any event of default thereunder , or the Boardriders Waiver ceases to be in full force and effect, other than pursuant to its terms;

(bb)    Restrainment. If a Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of the Loan Parties and their Subsidiaries, taken as a whole;

(cc)    Challenge. Any Loan Party engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Existing ABL Credit Agreement or the Liens securing the Existing ABL Credit Agreement, including without limitation seeking to equitably subordinate or avoid the Liens securing the Existing ABL Obligations; or (B) any Loan Party engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the Administrative Agent, the Lenders, the Existing ABL Agent (or other agent thereunder) or the Existing ABL Lenders; provided, however, that it shall not constitute an Event of Default if the Loan Parties provide information with respect to the Existing ABL Credit Agreement to a party in interest, or are compelled to provide information by an order of the Bankruptcy Court so long as the Loan Parties provide prior written notice to the Administrative Agent and the Lenders of any intention or requirement to do so;

(dd)    506(a). From and after entry of the Final Order, any Person shall obtain a Section 506(a) judgment or similar determination with respect to the Existing ABL Obligations that is unacceptable to the Existing ABL Agent; or

(ee)    506(c) and 552(b). From and after entry of the Final Order, entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral.

**8.02    Remedies Upon Event of Default.** Notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Orders, as applicable to the Domestic Loan Parties, upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall, at the request of the Required Lenders, take any or all of the following actions, at the same time or different times, in each case without further order of or application to the Bankruptcy Court (provided, that with respect to the enforcement of Liens or other remedies with respect to the Collateral under clause (d) below, the Administrative Agent shall provide the Borrower with five Business Days' written notice (with a copy to counsel for any Committee and to the United States Trustee for the District of Delaware) prior to taking the action contemplated thereby; in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing):

(a)    declare the Commitments of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such Commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)    require that the Domestic Borrowers Cash Collateralize the Domestic L/C Obligations (other than L/C Borrowings), and require that the Foreign Loan Parties Cash Collateralize the Australian L/C Obligations (other than L/C Borrowings); and

(d)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties;

provided, however, that upon the entry of an order for relief with respect to any Loan Party (other than a Domestic Loan Party) or any Subsidiary thereof under any Debtor Relief Law, the obligation of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Loan Parties to Cash Collateralize the L/C Obligations (other than L/C Borrowings) as aforesaid shall automatically become effective, in each case without further act of the Agents, the L/C Issuer, or any Lender.

Neither the Loan Parties, the Committee, nor any other party-in-interest shall have the right to contest the enforcement of remedies set forth in the Orders and the Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents. The Loan Parties shall cooperate fully with the Administrative Agent and the Lenders in their exercise of rights and remedies, whether against the Collateral or otherwise. The Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Administrative Agent and the Lenders set forth in the Orders and in the Loan Documents.

In case any one or more of the covenants and/or agreements set forth in this Agreement or any other Loan Document shall have been breached by any Loan Party, then the Administrative Agent or any Lender may proceed to protect and enforce the Lenders' rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other Loan Document. Without limitation of the foregoing, the Borrowers agree that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof. The Administrative Agent and any Lender acting pursuant to this paragraph shall be indemnified by the Borrowers against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with the terms hereof.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03    Application of Funds.**

(a)      After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), any amounts received from any Domestic Loan Party, from the liquidation of any Collateral of any Domestic Loan Party, or on account of the Obligations shall be applied by the Administrative Agent against the Obligations in the following order:

First, to payment of that portion of the Obligations (excluding the Other Liabilities and the Foreign Liabilities) constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and the Collateral Agent and amounts payable under Article III) payable to the Administrative Agent and the Collateral Agent, each in its capacity as such;

Second, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Domestic Lenders and the L/C Issuer (on account of Domestic Letters of Credit) (including fees, charges and disbursements of counsel to the respective Domestic Lenders and the L/C Issuer (on account of Domestic Letters of Credit) and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to the extent not previously reimbursed by the Domestic Lenders, to payment to the Domestic Lenders of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Domestic Overadvances, ratably among the Domestic Lenders in proportion to the amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Domestic Loans, Domestic L/C Borrowings and other Obligations (other than the Foreign Liabilities), and fees, ratably among the Domestic Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Fourth payable to them;

Fifth, to payment of that portion of the Obligations constituting unpaid principal of the Domestic Loans and Domestic L/C Borrowings, ratably among the Domestic Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Fifth held by them;

Sixth, to the Administrative Agent for the account of the L/C Issuer, to Cash Collateralize that portion of Domestic L/C Obligations comprised of the aggregate undrawn amount of Domestic Letters of Credit;

Seventh, subject to Section 8.03(c), to the Administrative Agent to be held by the Administrative Agent, for the ratable benefit of the Foreign Lenders as cash collateral to payment of that portion of the Foreign Liabilities (excluding the Other Liabilities) constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article III) payable to the Administrative Agent, in its capacity as such;

Eighth, subject to Section 8.03(c), to the Administrative Agent to be held by the Administrative Agent, for the ratable benefit of the Foreign Lenders and the L/C Issuer as cash collateral to payment of that portion of the Foreign Liabilities (excluding the Other Liabilities) constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Foreign Lenders and the L/C Issuer (on account of Foreign Letters of Credit) (including fees, charges and disbursements of counsel to the respective Foreign Lenders and the L/C Issuer (on account of Foreign Letters of Credit) and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Tenth payable to them;

Ninth, to the extent not previously reimbursed by the Foreign Lenders and subject to Section 8.03(c), to the Administrative Agent to be held by the Administrative Agent, for the ratable benefit of the Foreign Lenders as cash collateral to payment to the Foreign Lenders of that portion of the Foreign Liabilities constituting principal and accrued and unpaid interest on any Permitted Foreign Overadvances, ratably among the Foreign Lenders in proportion to the amounts described in this clause Ninth payable to them;

Tenth, subject to Section 8.03(c), to the Administrative Agent to be held by the Administrative Agent, for the ratable benefit of the Foreign Lenders and the L/C Issuer as cash collateral to payment of that portion of the Foreign Liabilities constituting accrued and unpaid interest on the Foreign Loans, Australian L/C Borrowings, and other Foreign Liabilities, and fees (including Letter of Credit Fees not paid pursuant to clause Fourth above), ratably among the Foreign Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Tenth payable to them;

Eleventh, subject to Section 8.03(c), to the Administrative Agent to be held by the Administrative Agent, for the ratable benefit of the Foreign Lenders and the L/C Issuer, to Cash Collateralize that portion of Australian L/C Obligations comprised of the aggregate undrawn amount of Foreign Letters of Credit;

Twelfth, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations for which a claim has been made as provided in Section 10.04), ratably among the Credit Parties in proportion to the respective amounts described in this clause Twelfth held by them;

Thirteenth, to payment of that portion of the Obligations arising from Cash Management Services to the extent secured under the Security Documents, ratably among the Credit Parties in proportion to the respective amounts described in this clause held by them;

Fourteenth, to payment of all other Obligations arising from Bank Products to the extent secured under the Security Documents, ratably among the Credit Parties in proportion to the respective amounts described in this clause Fourteenth held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Domestic Loan Parties or as otherwise required by Law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Domestic Letters of Credit pursuant to clause Sixth above shall be applied to satisfy drawings

under such Domestic Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Domestic Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

(b)     After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), any amounts received from any Foreign Loan Party, from the liquidation of any Collateral of any Foreign Loan Party, or on account of the Foreign Liabilities, shall be applied, subject to any applicable Laws to the contrary, by the Administrative Agent (or as directed by the Administrative Agent) against the Foreign Liabilities in the following order:

First, to payment of that portion of the Foreign Liabilities (excluding the Other Liabilities) constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article III) payable to the Administrative Agent, in its capacity as such;

Second, to payment of that portion of the Foreign Liabilities (excluding the Other Liabilities) constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Foreign Lenders and the L/C Issuer (on account of Foreign Letters of Credit) (including fees, charges and disbursements of counsel to the respective Domestic Lenders and the L/C Issuer (on account of Foreign Letters of Credit) and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to the extent not previously reimbursed by the Foreign Lenders, to the Administrative Agent to be held by the Administrative Agent, for the ratable benefit of the Foreign Lenders as cash collateral to payment to the Foreign Lenders of that portion of the Foreign Liabilities constituting principal and accrued and unpaid interest on any Permitted Foreign Overadvances, ratably among the Foreign Lenders in proportion to the amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Foreign Liabilities constituting accrued and unpaid interest on the Foreign Loans, Australian L/C Borrowings and other Foreign Liabilities, and fees (including Letter of Credit Fees due on account of Foreign Letters of Credit), ratably among the Foreign Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Fourth payable to them;

Fifth, to payment of that portion of the Foreign Liabilities constituting unpaid principal of the Foreign Loans and Australian L/C Borrowings, ratably among the Foreign Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Fifth held by them;

Sixth, to the Administrative Agent for the account of the L/C Issuer, to Cash Collateralize that portion of Australian L/C Obligations comprised of the aggregate undrawn amount of Foreign Letters of Credit;

Seventh, to payment of all other Foreign Liabilities (including without limitation the cash collateralization of unliquidated indemnification obligations as provided in Section 10.04, but

excluding any Other Liabilities), ratably among the Credit Parties in proportion to the respective amounts described in this clause Seventh held by them;

Eighth, to payment of that portion of the Foreign Liabilities arising from Cash Management Services to the extent secured under the Security Documents, ratably among the Credit Parties in proportion to the respective amounts described in this clause Eighth held by them;

Ninth, to payment of all other Foreign Liabilities arising from Bank Products to the extent secured under the Security Documents, ratably among the Credit Parties in proportion to the respective amounts described in this clause Ninth held by them; and

Last, the balance, if any, after all of the Foreign Liabilities have been indefeasibly paid in full, to the Foreign Loan Parties or as otherwise required by Law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Foreign Letters of Credit pursuant to clause Eighth above shall be applied to satisfy drawings under such Foreign Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Foreign Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Foreign Liabilities, if any, in the order set forth above.

Notwithstanding the foregoing, all amounts received from or on account of each Foreign Loan Party or its Collateral shall be first applied to the outstanding Loans and Letters of Credit of such Foreign Loan Party (i.e. proceeds from any Australian Loan Party shall be first applied to the Australian Liabilities, proceeds from any Canadian Loan Party shall first be applied to the Canadian Liabilities and proceeds from any Japanese Loan Party shall first be applied to the Japanese Liabilities, as applicable) prior to application to the Foreign Liabilities of any other Foreign Loan Party.

(c)     Any amounts received by the Administrative Agent pursuant to clauses Seventh through Fifteenth of Section 8.03(a) shall be held as cash collateral for the applicable Foreign Liabilities until the earlier of (i) the Substantial Liquidation of the Collateral granted by the Foreign Loan Parties to secure the Foreign Liabilities, or (ii) such date that the Administrative Agent shall otherwise determine.

(d)     Notwithstanding anything contained in this Section 8.03, Excluded Swap Obligations with respect to any Guarantor shall not be paid with amounts received from such Guarantor but appropriate adjustments shall be made with respect to payments from the other Loan Parties to preserve the allocation of the Obligations otherwise set forth above in this Section 8.03.

## 8.04    Waivers By Loan Parties

Except as otherwise provided for in this Agreement or by applicable Law, each Loan Party waives (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, and hereby ratifies and confirms whatever the Administrative Agent may do in this regard, (b) all rights to notice and a hearing prior to the Administrative Agent's taking possession or control of, or to the Administrative Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing the Administrative Agent to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption Laws.

## ARTICLE IX
## AGENTS AND LENDERS

### 9.01    Appointment and Authority.

(a)    Each of the Domestic Lenders and the L/C Issuer (with respect to Domestic Letters of Credit) hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX are for the benefit of the Agents, the Domestic Lenders and the L/C Issuer, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions (other than the provisions of Section 9.07).

(b)    Each of the Foreign Lenders and the L/C Issuer (with respect to Foreign Letters of Credit) hereby irrevocably appoints Bank of America acting through its branches and Affiliates to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX are for the benefit of the Administrative Agent, the Foreign Lenders and the L/C Issuer, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions (other than the provisions of Section 9.07).

(c)    It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(d)    Without limiting the generality of the foregoing Section 9.01(b), for the purposes of creating a solidarité active in accordance with article 1541 of the Civil Code of Québec between each Credit Party that is owed any Canadian Liabilities, taken individually, on the one hand, and the Administrative Agent, on the other hand, each Canadian Loan Party and each such Credit Party acknowledge and agree with the Administrative Agent that such Credit Party and the Administrative Agent are hereby conferred the legal status of solidary creditors of the Canadian Loan Parties in respect of all Canadian Liabilities, present and future, owed by any Canadian Loan Party to each such Credit Party and the Administrative Agent (collectively, for the purposes of this paragraph, the "solidary claim"). Accordingly, but subject (for the avoidance of doubt) to article 1542 of the Civil Code of Québec, the Canadian Loan Parties are irrevocably bound towards the Administrative Agent and each such Credit Party in respect of the entire solidary claim of the Administrative Agent and such Credit Party. As a result of the foregoing, the Canadian Loan Parties confirm and agree that subject to Section 9.01(b), above, the rights of the Administrative Agent and each of the Credit Parties who are owed Canadian Liabilities from time to time a party to this Agreement or any of the other Loan Documents by way of assignment or otherwise are solidary and, as regards the Canadian Liabilities owing from time to time to each such Credit Party, each of the Administrative Agent and such Credit Party is entitled, when permitted pursuant to Section 8.01, to: (i) demand payment of all outstanding amounts from time to time in respect of the Canadian Liabilities; (ii) exact the whole performance of such Canadian Liabilities

from the Canadian Loan Parties; (iii) benefit from the Administrative Agent's Liens in the Collateral in respect of such Canadian Liabilities; (iv) give a full acquittance of such Canadian Liabilities (each Credit Party that is owed Canadian Liabilities hereby agreeing to be bound by any such acquittance); and (v) exercise all rights and recourses under the Loan Documents with respect to those Canadian Liabilities. The Canadian Liabilities of the Canadian Loan Parties will be secured by the Administrative Agent's Liens in the Collateral and the Administrative Agent and the Credit Parties who are owed Canadian Liabilities will have a solidary interest therein. In its capacity as the Administrative Agent, for the purposes of holding any hypothec granted pursuant to the laws of the Province of Quebec, each Credit Party hereby irrevocably appoints and authorizes the Administrative Agent and, to the extent necessary, ratifies the appointment and authorization of the Administrative Agent, to act as the hypothecary representative of the applicable Credit Parties as contemplated under Article 2692 of the Civil Code of Quebec, and to enter into, to take and to hold on their behalf, and for their benefit, any hypothec, and to exercise such powers and duties that are conferred upon the Administrative Agent under any related deed of hypothec. The Administrative Agent shall have the sole and exclusive right and authority to exercise, except as may be otherwise specifically restricted by the terms hereof, all rights and remedies given to the Administrative Agent pursuant to any such deed of hypothec and applicable law. Any person who becomes a Credit Party shall, by its execution of an Assignment and Assumption, be deemed to have consented to and confirmed the Administrative Agent as the person acting as hypothecary representative holding the aforesaid hypothecs as aforesaid and to have ratified, as of the date it becomes a Credit Party, all actions taken by the Administrative Agent in such capacity. The substitution of the Administrative Agent pursuant to the provisions of this Article IX also constitute the substitution of the Administrative Agent as hypothecary representative as aforesaid.

(e)     Each of the Lenders (in its capacities as a Lender) and the L/C Issuer hereby authorizes the Administrative Agent, to the extent permitted by applicable Law, to act as the agent of such Lender and the L/C Issuer for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.

### 9.02    Appointment of Australian Security Trustee by Foreign Credit Parties.

(a)     The Australian Security Trustee is (a) appointed by the other Foreign Credit Parties to act as the Australian Security Trustee for the purpose of the Loan Documents; and (b) irrevocably authorized to enter into the Loan Documents in its capacity as Australian Security Trustee and to take the action and to exercise the rights that are expressly or by implication delegated to the Australian Security Trustee by a Loan Document and any other action or rights that are reasonably incidental.

(b)     A Foreign Lender must not assign, encumber, declare a trust over or otherwise deal with any of its rights or novate any of its rights and obligations under any of the Loan Documents to any person other than as permitted by this Agreement and the other Loan Documents.

(c)     A Foreign Credit Party must promptly notify the Administrative Agent of any assignment, encumbrance, declaration of trust over or other dealing with or novation of that Foreign Credit Party's rights, benefits or obligations under any Loan Document.

(d)     If at any time the Australian Security Trustee receives money under a Loan Document that is available for distribution, whether or not it represents the proceeds of recovery action taken under any Loan Document, then the Australian Security Trustee must, subject to any applicable Law to the contrary including section 140 of the Australian PPS Law, distribute that money in accordance with this Agreement.

(e)     Money referred to in Section 9.02(d) above includes money that is received by the Australian Security Trustee before enforcement proceedings are commenced under a Loan Document in relation to any Collateral but which has not been distributed by that time.

(f)     Subject to a contrary decision by the Administrative Agent (acting on the instructions of the relevant Required Lenders), the money referred to in Section 9.02(d) does not constitute recovered money (being the aggregate amount received in accordance with Section 8.03 that has not been distributed under this Agreement) if the money is deposited in an interest bearing suspense account under a Loan Document.

(g)     The Australian Security Trustee must: (i) promptly send to each Foreign Credit Party details of each communication and document received by it from the Administrative Agent or an Australian Lender in connection with the Loan Documents, unless the details are of a purely routine or administrative nature; (ii) subject to the other provisions of this Agreement, act in accordance with any instructions from the  Administrative Agent (acting on the instructions of the Required Lenders) or, if so instructed by the Administrative Agent, refrain from exercising rights vested in it under the Loan Documents; and (iii) promptly notify the Administrative Agent of any Event of Default of which the Australian Security Trustee, acting in its capacity as Australian Security Trustee, acquires actual knowledge and of which the Administrative Agent does not have actual knowledge.

(h)     Subject to the other provisions of this Section 9.02 and except in relation to amounts due to the Australian Security Trustee in its own right, the Australian Security Trustee agrees to act in accordance with the instructions of the Administrative Agent (acting on the instructions of the relevant Required Lenders) in exercising its rights under the Loan Documents.

(i)     The Australian Security Trustee in its capacity as Australian Security Trustee must not, without the prior written instructions of the Administrative Agent, (i) exercise rights delegated to or conferred on it under the Loan Documents; or (ii) waive any breach of or otherwise excuse performance of any obligation of any Australian Loan Party under any Loan Document.

(j)     Any instruction given to or action taken by the Australian Security Trustee in accordance with this Agreement or any other Loan Document is binding on all Foreign Credit Parties and each Foreign Credit Party authorizes the Australian Security Trustee to give any consent and do any other matter or thing necessary or appropriate to give effect to the instruction.

(k)     The instructions referred to in this Section 9.02(k) (and any other provisions in this Section 9.02 requiring the Administrative Agent to seek or act in accordance with the Required Lenders' consent, authority or instructions) are deemed to be given in accordance with this Agreement, if the Administrative Agent communicates such consent, authority or

-183-

instructions to the Australian Security Trustee and states that the consent, authority or instructions were given or obtained in accordance with this Agreement. In such event, the Australian Security Trustee need not enquire whether the Required Lenders have given the requisite consent, authority or instructions to the Administrative Agent.

(l)     If (in the reasonable opinion of the Administrative Agent) the Australian Security Trustee fails to act in accordance with any instructions given to it under this Agreement (and within a time deemed reasonable by the Administrative Agent), each Foreign Credit Party has a right to exercise the rights of the Australian Security Trustee to enable that instruction to be effected.

(m)     The Australian Security Trustee may (i) perform any of its duties, obligations and responsibilities under the Loan Documents by or through its agents and representatives; (ii) refrain from exercising any rights vested in it under the Loan Documents until it has received instructions from the Administrative Agent (acting on the instructions of the Required Lenders), as to whether (and, if it is to be exercised, the way in which) that right is to be exercised and in all cases will not incur any liability when (a) acting in accordance with those instructions or (b) refraining from acting, either in accordance with those instructions or in the absence of those instructions; (iii) refrain from doing anything that would or might in its opinion be contrary to any applicable Law or directive or otherwise render it liable to any Person and may do anything which is, in its opinion, necessary to comply with any applicable Law or directive; (iv) refrain from taking any step (or further step) to protect or enforce the rights of any Foreign Credit Party under the Loan Documents until it has been indemnified or secured to its reasonable satisfaction against any and all claims which it would or might sustain or incur as a result; (v) hold any of the Loan Documents and any other related documents with any financial institution or reputable Person whose business includes undertaking the safe custody of documents or any lawyer or firm of lawyers selected by the Australian Security Trustee, and the Australian Security Trustee is not responsible for any claims incurred in connection with the deposit of those documents and may pay all sums required to be paid on account or in respect of any deposit of those documents; (vi) in the conduct of any trust, instead of acting personally, employ and pay an agent, being a lawyer, or other professional person, to transact or conduct, or concur in doing all acts required to be done by the Australian Security Trustee (including the receipt and payment of money); and (viii) appoint further or additional trustees for the purpose of giving valid receipts without being liable for the actions of those trustees.

(n)     The Australian Security Trustee may at any time request (through the Administrative Agent or directly) a Foreign Credit Party to provide a statement setting out (i) as at the date of the statement or any other relevant date specified by the Australian Security Trustee, the Foreign Liabilities owing to such Foreign Credit Party; (ii) any other information (including documents) that the Australian Security Trustee may reasonably require in relation to the details and calculations of the amounts under this Section 9.02(n); (iii) if the Australian Security Trustee requests a Foreign Credit Party to provide a statement under this Section 9.02(n), the Foreign Credit Party must provide that statement within a reasonable time; (iv) the Australian Security Trustee, as between itself and the other Foreign Credit Parties, may rely on the statement referred to in this Section 9.02(n) as conclusive evidence of its contents, unless (A) the contrary is proved, or (B) the Australian Security Trustee determines it is not reasonably satisfied as to the correctness of those amounts.

(o)     If the Australian Security Trustee, in its sole discretion, considers that delegation is desirable in assisting the Australian Security Trustee to perform its functions under the Loan Documents, the Australian Security Trustee may delegate to any person or fluctuating body of persons all or any of the duties, trusts, powers, authorities and discretions vested in the Australian Security Trustee under or in connection with the Loan Documents; and (ii) any delegation under this Section 9.02(o) may be (a) by power of attorney or in any other manner as the Australian Security Trustee may think fit; and (b) made on the terms and conditions (including power to sub delegate) as the Australian Security Trustee may think fit (but the terms and conditions must not be inconsistent with any of the provision of the Loan Documents).

(p)     The Australian Security Trustee may (i) rely on any communication or document believed by it to be genuine; (ii) rely, as to any matter of fact that might reasonably be expected to be within the knowledge of a Loan Party, on a statement by or on their behalf; (iii) obtain and pay for legal or other expert advice or services that may to it seem necessary or desirable and rely on that advice; (iv) retain for its own benefit, and without liability to account, any fee or other sum receivable by it for its own account; and (v) accept deposits from, lend money to, provide any advisory or other services to or engage in any kind of banking or other business with any party to the Loan Documents and any Affiliates of any party (and, in each case, may do so without liability to account).

(q)     The Australian Security Trustee, in its capacity as a Foreign Credit Party (if applicable), has the same rights under this document as any other Foreign Credit Party and may exercise those rights as if it were not acting as Australian Security Trustee.

(r)     The Australian Security Trustee is not (i) responsible for the adequacy, accuracy or completeness of any representation, warranty, statement or information in the Loan Documents or any notice or other document delivered under or referred to in the Loan Documents; (ii) responsible for the execution, delivery, validity, legality, adequacy, enforceability or admissibility in evidence of the Loan Documents; (iii) required to (a) take any action with respect to the Australian PPS Law, other than as directed by the Administrative Agent; or (b) monitor the Australia PPSA Law or the implementation of it; (c) obliged to enquire as to the occurrence or continuation of an Event of Default or Default; (d) under any obligations other than those for which express provision is made in a Loan Document to which it is a party; (e) liable for anything done or not done by it under or in connection with the Loan Documents except in the case of fraud, gross negligence or willful misconduct by the Australian Security Trustee or any of its agents or representatives, as determined by a final and non-appealable judgment of a court of competent jurisdiction; or (f) liable for anything done or not done by any receiver or manager under or in connection with the Collateral.

(s)     This Agreement and the other Loan Documents only bind the Australian Security Trustee in its capacity as Australian Security Trustee and any obligation of the Australian Security Trustee under this Agreement or the other Loan Documents applies to the Australian Security Trustee in its capacity as Australian Security Trustee.

(t)     No Person to whom the Australian Security Trustee is liable under this Agreement or any other Loan Document is entitled to have recourse in satisfaction of such liability to any assets held by the Australian Security Trustee in its personal capacity or in its capacity as trustee of any trust other than the trust established under and pursuant to the

Security Trust Deed and clause (9) (Limitation of Liability) of the Security Trust Deed applies to this Agreement mutatis mutandis as if set forth in full herein. The Australian Security Trustee is not liable for any act (or omission) if it acts (or refrains from acting) in accordance with the instructions of Administrative Agent.

(u)    Neither the Australian Security Trustee nor any of its directors, officers, employees, agents, attorneys or Affiliates is responsible or liable to any person (i) because a Loan Party does not perform its obligations under the Loan Documents; (ii) for the financial condition of the Loan Parties; (iii) because any statement, representation or warranty in a Loan Document given by a party other than the Australian Security Trustee is incorrect or misleading; (iv) for the effectiveness, genuineness, validity, admissibility in evidence or sufficiency of the Loan Documents or any document signed or delivered in connection with the Loan Documents; (v) for the enforceability of the Loan Documents or any other document signed or delivered in connection with the Loan Documents against any person (other than the Australian Security Trustee); (vi) for any loss or damage occurring as a result of it exercising, failing to exercise or purporting to exercise any right or power under this Agreement or other Loan Documents; (vii) subject to this Agreement; (viii) for the default, negligence or fault of any directors, officers, employees, agents, delegates, attorneys or Affiliates of the Australian Security Trustee; (ix) for any mistake or omission made by it or any directors, officers, employees, agents, delegates, attorneys or Affiliates of the Australian Security Trustee; (x) for any other matter or thing done, or not done, in relation to the Loan Documents; (xi) for any absence of, or defect in title or for its inability to exercise any of its powers under the Loan Documents; (xii) for any failure by a Loan Party to perform its obligations under any Loan Document; (xiii) for acting in accordance with the provisions of any Loan Document to which it is a party; or (xiv) for the value, validity, effectiveness, genuineness, enforceability or sufficiency of any Loan Document or any certificate or document given under any of them; except to the extent that the act or omission amounts to fraud, gross negligence or willful misconduct by the Australian Security Trustee or any directors, officers, employees, agents, delegates, attorneys or Affiliates of the Australian Security Trustee or a gross or willful breach by it of its obligations under this Agreement, as determined by a final and non-appealable judgment of a court of competent jurisdiction. Without limiting this Section 9.02(u) or the terms of the Security Trust Deed, the Australian Security Trustee is not responsible or liable to any Person for anything done or not done in connection with this Agreement and the Security Trust Deed by the Australian Security Trustee or its directors, officers, employees, agents, attorneys or Affiliates except to the extent that the act or omission amounts to fraud, gross negligence or willful misconduct by the Australian Security Trustee or a gross or willful breach by it of its obligations under this Agreement and the Security Trust Deed, as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(v)    The Australian Security Trustee (i) subject to the appointment of a successor may, and must if the Administrative Agent requires, retire at any time from its position as Australian Security Trustee under the Loan Documents without assigning any reason, and (ii) must give notice of its intention to retire by giving to the other Foreign Credit Parties not less than 30 days' nor more than 60 days' notice.

(w)    The Administrative Agent may appoint a successor to the Australian Security Trustee, during the period of notice in Section 9.02(v). If no successor is appointed by the Administrative Agent, the Australian Security Trustee (after consulting with Administrative

Agent) may appoint its successor. The Foreign Credit Parties shall promptly enter into any agreements that the successor may reasonably require to effect its appointment.

(x)     From the date that the appointment of the successor is effected under Section 9.02(w) above, the retiring Australian Security Trustee must be discharged from any further obligations under the Loan Documents as Australian Security Trustee, and the successor to the Australian Security Trustee and each of the other Foreign Credit Parties have the same rights and obligations between themselves as they would have had if the successor had been a party to those Loan Documents.

(y)     To the extent that the Loan Parties do not do so on demand or are not obliged to do so, each Foreign Credit Party must on demand indemnify the Australian Security Trustee against any claims sustained or incurred by the Australian Security Trustee in (i) complying with any instructions from the Administrative Agent or the Foreign Credit Parties; (ii) otherwise sustained or incurred by it in connection with the Loan Documents or its duties, obligations and responsibilities under the Loan Documents; or (iii) as a result of appointing a receiver or manager under any of the Collateral, except to the extent that the claim is sustained or incurred as a result of the fraud, gross negligence or willful misconduct of the Australian Security Trustee or any of its representatives, as determined by a final and non-appealable judgment of a court of competent jurisdiction. When there are no Foreign Liabilities (including, anything that is reasonably foreseeable as falling within the definition of Foreign Liabilities) in relation to any Foreign Credit Party and the relevant Foreign Credit Party is not committed or obliged to make advances or provide any other financial accommodation to the Loan Parties, the relevant Foreign Credit Party ceases to be a Foreign Credit Party on notice in writing to that effect from the Administrative Agent and the Australian Security Trustee.

**9.03    Rights as a Lender.** The Persons serving as the Agents hereunder shall have the same rights and powers in their capacity as a Lender as any other Lender and may exercise the same as though they were not the Administrative Agent, Australian Security Trustee or the Collateral Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent, Australian Security Trustee or the Collateral Agent hereunder in its individual capacity. Such Person and its Lender Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent, Australian Security Trustee or the Collateral Agent hereunder and without any duty to account therefor to the Lenders.

**9.04    Exculpatory Provisions.** The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agents:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent or the Collateral Agent, as applicable, is required to exercise as directed in writing by the Required Lenders (or such other

number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that no Agent shall be required to take any action that, in its respective opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

      (c)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent, the Collateral Agent or any of its Lender Affiliates in any capacity.

No Agent shall be liable to any Credit Party for any action taken or not taken by it (i) with the Consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

No Agent shall be deemed to have knowledge of any Default unless and until notice describing such Default is given to such Agent by the Loan Parties, a Lender or the L/C Issuer. In the event that any Agent obtains such actual knowledge or receives such a notice, such Agent shall give prompt notice thereof to each of the other Agents and Lenders. Upon the occurrence of an Event of Default, the Agents shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders. Unless and until the Agents shall have received such direction, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as they shall deem advisable in the best interest of the Credit Parties. In no event shall the Agents be required to comply with any such directions to the extent that any Agent believes that its compliance with such directions would be unlawful.

The Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agents.

### 9.05   Reliance by Agents.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution)

believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or increase of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the L/C Issuer, each Agent may presume that such condition is satisfactory to such Lender or the L/C Issuer unless such Agent shall have received written notice to the contrary from such Lender or the L/C Issuer prior to the making of such Loan or the issuance, extension, renewal or increase of such Letter of Credit. Each Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

      **9.06**    **Delegation of Duties.**  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent. Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agents and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as such Agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

      **9.07**    **Resignation of Agents.**  Any Agent may at any time give written notice of its resignation to the Lenders, the L/C Issuer and the Lead Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Lead Borrower, to appoint a successor, which, in the case of any Agent (other than the Australian Security Trustee), shall be a bank with an office in the United States, or a Lender Affiliate of any such bank with an office in the United States and shall, unless an Event of Default has occurred and is continuing at the time of such appointment, be reasonably acceptable to the Lead Borrower (whose consent shall not be unreasonably withheld or delayed). If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the L/C Issuer, appoint a successor Agent, as applicable, meeting the qualifications set forth above; provided that if the retiring Agent shall notify the Lead Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by such Person on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) in the event of resignation of the Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the L/C Issuer directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section 9.07.  Upon the acceptance of a successor's appointment as an Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.07). The fees payable by the Borrowers to a successor Agent shall be the same as those

payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder.

Any resignation by Bank of America as Administrative Agent pursuant to this Section 9.07 shall also constitute its resignation as Security Trustee, Collateral Agent and L/C Issuer. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Security Trustee, Collateral Agent and L/C Issuer, (b) the retiring Security Trustee, Collateral Agent and L/C Issuer shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (c) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring L/C Issuer to effectively assume the obligations of the retiring L/C Issuer with respect to such Letters of Credit.

**9.08    Non-Reliance on Agents and Other Lenders.**    Each Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Agents or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and the L/C Issuer also acknowledges that it will, independently and without reliance upon the Agents or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in Section 9.13, the Agents shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agents.

**9.09    No Other Duties, Etc.**    Notwithstanding anything to the contrary in this Agreement or any of the other Loan Documents, no Person who is or becomes an Arranger, a Bookrunner or a Syndication Agent shall have any powers, rights, duties, responsibilities or liabilities with respect to this Agreement and the other Loan Documents.

**9.10    Administrative Agent May File Proofs of Claim.**    In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuer, the Administrative Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuer, the Administrative Agent, such Credit Parties and their

-190-

respective agents and counsel and all other amounts due the Lenders, the L/C Issuer the Administrative Agent and such Credit Parties under Sections 2.03(h), 2.03(i), 2.09 and 10.04) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, receiver and manager, Controller, interim receiver, assignee, trustee, monitor, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the L/C Issuer to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuer, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or the L/C Issuer any plan of reorganization, arrangement, adjustment, compromise or composition or proposal affecting the Obligations or the rights of any Lender or the L/C Issuer or to authorize the Administrative Agent to vote in respect of the claim of any Lender or the L/C Issuer in any such proceeding.

9.11     **Collateral and Guaranty Matters.** The Credit Parties irrevocably authorize the Agents, and the Agents hereby agree:

(a)     to release any Lien on any property granted to or held by the Administrative Agent or the Australian Security Trustee, as applicable (and with respect to the Lien under the Japanese Security Documents, each of the Japanese Secured Parties) under any Loan Document (i) upon termination of the Aggregate Total Commitments and Payment in Full (other than contingent indemnification obligations for which no claim has been asserted) and the expiration or termination of all Letters of Credit, (ii) solely with respect to any Lien on any property of any of the Australian Loan Parties, upon termination of the Australian Commitments pursuant to Section 2.06 and Payment in Full of all Australian Liabilities (other than contingent indemnification obligations for which no claim has been asserted) and the expiration or termination of all applicable Australian Letters of Credit, (iii) solely with respect to any Lien on any property of any of the Japanese Loan Parties, upon termination of the Japanese Commitments pursuant to Section 2.06 and Payment in Full of all Japanese Liabilities (other than contingent indemnification obligations for which no claim has been asserted), (iv) solely with respect to any Lien on any property of any of the Canadian Loan Parties, upon termination of the Canadian Commitments pursuant to Section 2.06 and Payment in Full of all Canadian Liabilities (other than contingent indemnification obligations for which no claim has been asserted), (v) that is Disposed of or to be Disposed of as part of or in connection with any Disposition permitted hereunder or under any other Loan Document, or (vi) if approved, authorized or ratified in writing by the Required Lenders in accordance with Section 10.01;

(b)     Reserved;

(c)     to subordinate any Lien on any property granted to or held by the Administrative Agent or the Australian Security Trustee, as applicable (and with respect to the

Lien under the Japanese Security Documents, each of the Japanese Secured Parties) under any Loan Document to the holder of any Lien on such property that is permitted by clauses (h) or (x) of the definition of Permitted Encumbrances;

(d)     to release any Loan Party from its obligations under any Facility Guaranty and each other applicable Loan Document if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and

(e)     to release (i) the Australian Loan Parties upon termination of the Australian Commitments pursuant to Section 2.06 and Payment in Full of all Australian Liabilities (other than contingent indemnification obligations for which no claim has been asserted) and the expiration or termination of all applicable Australian Letters of Credit, (ii) the Japanese Loan Parties upon termination of the Japanese Commitments pursuant to Section 2.06 and Payment in Full of all Japanese Liabilities (other than contingent indemnification obligations for which no claim has been asserted), and (iii) the Canadian Loan Parties upon termination of the Canadian Commitments pursuant to Section 2.06 and Payment in Full of all Canadian Liabilities (other than contingent indemnification obligations for which no claim has been asserted).

Upon request by any Agent at any time, the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) will confirm in writing such Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty and each other applicable Loan Document pursuant to this Section 9.11. In each case as specified in this Section 9.11, the Agents will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and Lien granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.11.

### 9.12   Notice of Transfer.

The Agents may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Loans and Commitments for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 10.06.

### 9.13   Reports and Financial Statements.

By signing this Agreement, each Lender:

(a)     agrees to furnish the Administrative Agent (at such frequency as the Administrative Agent may reasonably request) with a summary of all Other Liabilities due or to become due to such Lender. In connection with any distributions to be made hereunder, the Administrative Agent shall be entitled to assume that no amounts are due to any Lender on account of Other Liabilities unless the Administrative Agent has received written notice thereof from such Lender and if such notice is received, the Administrative Agent shall be entitled to assume that the only amounts due to such Lender on account of Other Liabilities is the amount set forth in such notice;

(b)     is deemed to have requested that the Administrative Agent furnish such Lender, promptly after they become available, copies of all financial statements, notices or other written communications required to be delivered by any Loan Party hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agents (collectively, the "Reports") and the Administrative Agent hereby agrees to honor each such request;

(c)     expressly agrees and acknowledges that the Administrative Agent makes no representation or warranty as to the accuracy of the Borrowing Base Certificates, financial statements or Reports, and shall not be liable for any information contained in any Borrowing Base Certificate, financial statement or Report;

(d)     expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agents or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)     agrees to keep all Borrowing Base Certificates, financial statements and Reports confidential in accordance with the provisions of Section 10.07 hereof; and

(f)     without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agents and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agents and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agents and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.14    Agency for Perfection.**

Each Credit Party hereby appoints each other Credit Party as agent for the purpose of perfecting Liens for the benefit of the applicable Credit Parties, in assets which, in accordance with Article 9 of the UCC, the PPSA, the Australian PPSA or any other applicable Law of the United States, Canada or Australia can be perfected only by possession or control.  Should any Credit Party (other than the Agents) obtain possession or control of any such Collateral, such Credit Party shall notify the Agents thereof, and, promptly upon the Administrative Agent's request therefor, shall deliver such Collateral to the Administrative Agent or the Australian Security Trustee, as applicable, or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions or the Australian Security Trustee's instructions, as applicable.

**9.15    Indemnification of Agents.**

The Lenders shall indemnify the Agents (to the extent not reimbursed by the Loan Parties and without limiting the obligations of Loan Parties hereunder), ratably according to their Applicable

Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against any Agent, any sub-agent of the foregoing, the L/C Issuer and their respective Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by any Agent, any sub-agent of the foregoing, the L/C Issuer and their respective Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's, such sub-agent's, the L/C Issuer's or their respective Related Parties' gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

**9.16    Relation among Lenders.**  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agents) authorized to act for, any other Lender.

**9.17    Risk Participation.**

(a)    Upon the earlier of Substantial Liquidation or the Determination Date, if all Foreign Liabilities have not been repaid in full (other than the Other Liabilities of the Foreign Borrowers and their Subsidiaries), then each Domestic Lender (or its Lender Affiliates) shall purchase from the Foreign Lenders (on the date of Substantial Liquidation or the Determination Date, as applicable) such portion of such Foreign Liabilities (other than Other Liabilities relating to the Foreign Borrowers and their Subsidiaries) so that such Lender (and its applicable Lender Affiliates) shall, after giving effect to any such purchases, hold its Liquidation Percentage of all such outstanding Foreign Liabilities and all other Obligations.

(b)    Upon the earlier of Substantial Liquidation or the Determination Date, if all Obligations of the Domestic Borrowers (excluding those Obligations relating to the Foreign Liabilities or the Other Liabilities) have not been repaid in full, then each Foreign Lender (or its Lender Affiliates) shall purchase from the Domestic Lenders (on the date of Substantial Liquidation or the Determination Date, as applicable) such portion of such Obligations so that such Lender (and its Lender Affiliates) shall, after giving effect to any such purchases, hold its Liquidation Percentage of all outstanding Obligations of the Domestic Borrowers and the Foreign Liabilities.

(c)    All purchases of Obligations under this Section 9.17 shall be at par, for cash, with no premium, discount or reduction and each such purchase shall be evidenced by an appropriate Assignment and Assumption.

(d)    No Lender shall be responsible for any default of any other Lender in respect of any other Lender's obligations under this Section 9.17, nor shall the obligations of any Lender hereunder be increased as a result of such default of any other Lender.  Each Lender shall be obligated to the extent provided herein regardless of the failure of any other Lender to fulfill its obligations hereunder.

(e)    Each Lender shall execute such instruments, documents and agreements and do such other actions as may be necessary or proper in order to carry out more fully the provisions and purposes of this Section 9.16 and the purchase of Obligations or the Foreign Liabilities, as applicable, as provided herein.

(f)     The obligations of each Lender under this Section 9.17 are irrevocable and unconditional and shall not be subject to any qualification or exception whatsoever including, without limitation, lack of validity or enforceability of this Agreement or any of the Loan Documents or the existence of any claim, setoff, defense or other right which any Loan Party may have at any time against any of the Lenders.

(g)     No fees required to be paid on any assignment pursuant to Section 10.06 of this Agreement shall be payable in connection with any assignment under this Section 9.17.

(h)     Notwithstanding anything contained herein to the contrary, this Section 9.17 is solely between the Lenders and other Credit Parties, and the Loan Parties shall not be a third party beneficiary or have any rights or remedies in respect of this Section 9.17, including the right to enforce this Section 9.17.

**9.18     Actions In Concert.** Anything in this Agreement to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or any other Loan Document (including exercising any rights of setoff) without first obtaining the prior written consent of the Agents and the Required Lenders, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the other Loan Documents shall be taken in concert and at the direction or with the consent of the Agents or the Required Lenders.

**9.19     [Reserved].**

## ARTICLE X
### MISCELLANEOUS

**10.01     Amendments, Etc.** No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or the Administrative Agent, with the Consent of the Required Lenders or the Australian Security Trustee, acting on the instructions of the Administrative Agent), and the Lead Borrower or the applicable Loan Party, as the case may be, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)     extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written Consent of such Lender;

(b)     postpone any date fixed by this Agreement or any other Loan Document for any payment or mandatory prepayment of principal, interest or fees due to the applicable Lenders (or any of them) hereunder without the written Consent of each Lender entitled to such payment;

(c)     reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing, or any fees payable hereunder, without the written Consent of each Lender entitled to such amount; provided, however, that only the Consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest or Letter of Credit Fees at the Default Rate;

(d)     change Section 2.13, Section 8.03 or Section 9.17 in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of each Lender;

(e)     amend Section 1.09 or the definition of "Alternative Currency" without the written Consent of each Lender;

(f)     change any provision of this Section or change the definition of "Required Lenders", "Supermajority Lenders", or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender;

(g)     except as expressly permitted hereunder or under any other Loan Document, (i) release a material portion of the aggregate value of the Guarantees made by the Guarantors pursuant to the Facility Guaranty, or (ii) release or limit the liability of, any Borrower, in each case, without the written Consent of each Lender; provided, however, that no Consent of any Lender shall be required in connection with the release of any Foreign Loan Party pursuant to Section 9.11 hereof in connection with the termination of the Commitments to such Foreign Borrower pursuant to Section 2.06 (and notwithstanding that the Facility Guaranty from such Foreign Loan Party may also guarantee Foreign Liabilities of other Foreign Borrowers);

(h)     except for Permitted Dispositions and for releases authorized under Section 9.11, release all or substantially all of the Collateral from the Liens of the Security Documents without the written Consent of each Lender; provided, however, that no Consent of any Lender shall be required in connection with the release of any Collateral from any Foreign Loan Party pursuant to Section 9.11 hereof in connection with the termination of the Commitments to such Foreign Borrower pursuant to Section 2.06 (and notwithstanding that the Collateral from such Foreign Loan Party may also secure Foreign Liabilities of other Foreign Borrowers);

(i)     increase in the advance rates in any Borrowing Base, without the written Consent of each Lender;

(j)     otherwise change the definition of the term "Domestic Borrowing Base", any "Foreign Borrowing Base" or any component definition of either term, if as a result thereof the amount of credit available to the Borrowers hereunder would be increased without the written Consent of the Supermajority Lenders, provided that, subject to Section 2.01(e) and Section 9.19 hereof, the foregoing shall not limit the discretion of any Agent to change, establish or eliminate any Reserves with respect to any Borrowing Base, even if such change or elimination results in an increase in the amount of credit available to the Borrowers hereunder;

(k)     modify the definition of "Permitted Domestic Overadvance" or the definition of "Permitted Foreign Overadvance" so as to increase the amount thereof or, except as provided in such definitions, the time period for a Permitted Domestic Overadvance or any Permitted Foreign Overadvance without the written Consent of each Lender;

(l)     except as expressly permitted herein or in any other Loan Document, subordinate any of the Obligations hereunder or under the other Loan Documents, to any other Indebtedness without the written Consent of each Lender affected thereby; and

(m)     [reserved];

and, provided further, that (i) no amendment, waiver or Consent shall, unless in writing and signed by the L/C Issuer in addition to the Lenders required above, affect the rights or duties of the L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) [reserved]; (iii) no amendment, waiver or Consent shall, unless in writing and signed by the applicable Agent in addition to the Lenders required above, affect the rights or duties of the applicable Agent under this Agreement or any other Loan Document (other than the modification or revocation of the Agents' rights to make Permitted Overadvances under Section 10.01(k) which shall require the Consent solely of the Required Lenders); (iv) no amendment, waiver or Consent shall, unless in writing and signed by the Collateral Agent in addition to the Lenders required above, affect the rights or duties of the Collateral Agent under this Agreement or any other Loan Document; and (v) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or Consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, (x) no provider or holder of any Bank Products or Cash Management Services shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or any Loan Party, and (y) any Loan Document may be amended, supplemented and waived with the consent of the Administrative Agent at the request of the Lead Borrower without the need to obtain the consent of any other Lender if such amendment, supplement or waiver is delivered in order (i) to comply with any local requirement of Law or advice of local counsel, (ii) to cure ambiguities, mistakes or defects or (iii) to cause any Loan Document to be consistent with this Agreement and the other Loan Documents.

If any Lender does not Consent (a "Non-Consenting Lender") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the Consent of each or each affected Lender and that has been approved by the Required Lenders, the Lead Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Lead Borrower to be made pursuant to this paragraph).

**10.02   Notices; Effectiveness; Electronic Communications.**

(a)     Notices Generally.   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)      if to the Loan Parties, any of the Agents, or the L/C Issuer, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)     Electronic Communications. Notices and other communications to the Lenders and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent provided that the foregoing shall not apply to notices to any Lender or the L/C Issuer pursuant to Article II if such Lender or the L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Lead Borrower or any other Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii), if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)     The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Agents or any of their Related Parties (collectively, the "Agent Parties") have any liability to any Loan Party, any Lender, the L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties'  or the Agent Parties' transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the

gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Loan Party, any Lender, the L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    Change of Address, Etc. Each of the Loan Parties, the Agents, and the L/C Issuer may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Lead Borrower, the Agents, and the L/C Issuer. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)    Reliance by Agents, L/C Issuer and Lenders. The Agents, the L/C Issuer and the Lenders shall be entitled to rely and act upon any notices (including electronic Committed Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify the Agents, the L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties. All telephonic communications with the Agents may be recorded by the Agents, and each of the parties hereto hereby consents to such recording.

**10.03   No Waiver; Cumulative Remedies.** No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

**10.04   Expenses; Indemnity; Damage Waiver.**

(a)    Costs and Expenses. The Borrowers shall pay all Credit Party Expenses (provided that the Foreign Borrowers shall be obligated to pay only those Credit Party Expenses which constitute Credit Party Expenses incurred by the Administrative Agent, the Australian Security Trustee or the Foreign Lenders in connection with the Foreign Loans and Foreign Letters of Credit).

(b)    Indemnification by the Loan Parties. The Loan Parties shall indemnify the Agents (and any of their sub-agents), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after-tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs and related expenses (including the fees, charges and disbursements of any

-199-

counsel for any Indemnitee, but excluding Taxes which shall be governed by Section 3.01), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agents (and any of their sub-agents) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), any bank advising or confirming a Letter of Credit and any other Person seeking to enforce the rights of a Borrower, beneficiary, transferee, or assignee or Letter of Credit proceeds or the holder of an instrument or document related to any Letter of Credit, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Japanese Depository Bank or to Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by a Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Borrower or such Loan Party has obtained a final and non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction; provided that with respect to the Foreign Loan Parties, "Indemnitees" shall only refer to the Foreign Credit Parties and each Related Party of the Foreign Credit Parties. Without limiting the provisions of Section 3.01(c), this Section 10.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    Reimbursement by Lenders.  Without limiting their obligations under Section 9.15 hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Agents (and any of their sub-agents), the L/C Issuer or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agents (and any of their sub-agents) or the L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Agents (and any of their sub-agents) or L/C Issuer in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(e).

(d)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, the Loan Parties and Indemnitees shall not assert, and hereby waive, any claim against

any Indemnitee or any Loan Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)     Payments. All amounts due under this Section shall be payable on demand therefor.

(f)     Survival. The agreements in this Section shall survive the resignation of any Agent or the L/C Issuer, the assignment of any Commitment or Loan by any Lender, the replacement of any Lender, the termination of the Aggregate Total Commitments or the Commitments for any Revolving Facility and Payment in Full and the termination of this Agreement.

10.05    Reinstatement; Payments Set Aside. This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Loan Party for liquidation or reorganization or otherwise under any Debtor Relief Law, should any Loan Party become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver, interim receiver, receiver and manager, Controller, trustee, monitor, custodian, conservator, liquidator, rehabilitator or similar officer be appointed for all or any significant part of any Loan Party's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable Law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made. To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a receiver, interim receiver, receiver and manager, Controller, trustee, monitor, custodian, conservator, liquidator, rehabilitator or similar officer, or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, (b) each Domestic Lender and the L/C Issuer (with respect to Domestic Letters of Credit) severally agrees to pay to the Agents upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agents, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect, in the applicable currency of such recovery or payment, and (c) each Foreign Lender and the L/C Issuer (with respect to Foreign Letters of Credit) severally agrees to pay to the Administrative Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from to time in effect,

in the applicable currency of such recovery or payment. The obligations of the Lenders and the L/C Issuer under clause (b) and clause (c) of the preceding sentence shall survive Payment in Full and the termination of this Agreement.

### 10.06   Successors and Assigns.

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of Section 10.06(e), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(g) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection **Error! Reference source not found.** of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement. In connection with the assignment by any Lender of such Lender's Japanese Commitments pursuant hereto, each Japanese Loan Party hereby agrees to execute and deliver (at such Lender's cost, except that assignments pursuant to Section 10.13 hereof shall be at the Loan Parties' expense) such consent agreements or related documents as may be required by the Administrative Agent to enable such Lender to transfer such Lender's interest in any Japanese Security Documents concurrently with such assignment of Japanese Commitments. In connection with the assignment by any Lender of such Lender's Australian Commitments pursuant hereto, each Australian Loan Party hereby agrees to execute and deliver (at such Lender's cost, except that assignments pursuant to Section 10.13 hereof shall be at the Loan Parties' expense) such consent agreements or related documents as may be required by the Australian Security Trustee to enable such Lender to transfer such Lender's interest in any Australian Security Documents and for a new Lender to accede to the Security Trust Deed concurrently with such assignment of such Australian Commitments.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans (including for purposes of this Section 10.06(b), participations in L/C Obligations) at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitments and the Loans at the time owing to it or in the case of an assignment to a Lender or a Lender Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitments (which for this purpose includes Loans outstanding thereunder) or, if the Commitments are not then in effect, the principal outstanding balance of

the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Lead Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed or conditioned); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)     Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitments assigned;

(iii)     Required Consents. No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)     the consent of the Lead Borrower (such consent not to be unreasonably withheld or delayed or conditioned) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, a Lender Affiliate of a Lender or an Approved Fund; and

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed or conditioned) shall be required for assignments in respect of any Commitment if such assignment is to a Person that is not a Lender, a Lender Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)     the consent of the L/C Issuer (such consent not to be unreasonably withheld or delayed or conditioned) shall be required for any assignment in respect of the assignment of any Commitment if such assignment is to a Person that is not a Lender, a Lender Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(D)     [reserved].

(iv)     Assignment and Assumption. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in form and substance satisfactory to the Administrative Agent.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (d) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an

Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Upon request, the applicable Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(e).

(c)    Certain Additional Payments. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Lead Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, the L/C Issuer or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under any applicable requirement of Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(d)    Register. The Administrative Agent, acting solely for this purpose as an agent of the Loan Parties (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Lead Borrower, any Foreign Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice. This Section 10.06(d) shall be construed so that the Obligations are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any regulations promulgated thereunder (and any other relevant or successor provisions of the Code or such regulations).

(e)    Participations.

(i)    Any Lender may at any time, without the consent of, or notice to, the Loan Parties or any Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or

-204-

a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitments and/or the Loans (including such Lender's participations in L/C Obligations) owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agents, the Lenders and the L/C Issuer shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

(ii)    Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a) through (d) of the first proviso to Section 10.01 that affects such Participant. Subject to subsection (f) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b), provided that such Participant's participation is recorded in the Register as set forth in Section 10.06(d) as though it were a Lender. To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender.

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall not have any responsibility for maintaining a Participant Register.

(f)    Limitations upon Participant Rights.    A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent. A Participant shall not be entitled to the benefits of Section 3.01 unless the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Section 3.01 as though it were a Lender.

(g)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure

obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)     Resignation as L/C Issuer after Assignment or Resignation as Administrative Agent.    Resignation as L/C Issuer after Assignment or Resignation as Administrative Agent. Notwithstanding anything to the contrary contained herein, if at any time Bank of America assigns all of its Commitments and Loans pursuant to subsection (b) above or resigns as Administrative Agent in accordance with the provisions of Section 9.07, Bank of America may, without duplication of any notice required under Section 9.07, upon 30 days' notice to the Lead Borrower and the Lenders, resign as L/C Issuer. In the event of any such resignation as L/C Issuer, the Lead Borrower shall be entitled to appoint from among the Lenders a successor L/C Issuer hereunder; provided, however, that no failure by the Lead Borrower to appoint any such successor shall affect the resignation of Bank of America as L/C Issuer. If Bank of America resigns as L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit issued by Bank of America or its Lender Affiliates outstanding as of the effective date of its resignation as L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to make Prime Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.03(c)). Upon the appointment of a successor L/C Issuer, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Bank of America (including its global branches and Affiliates, including, without limitation, its Canada branch, and Hong Kong branch, as applicable), to effectively assume the obligations of Bank of America (including its global branches and Affiliates, including, without limitation, its Canada branch and Hong Kong branch, as applicable), with respect to such Letters of Credit. Any resignation by Bank of America as Administrative Agent pursuant to this Section shall also constitute its resignation as L/C Issuer.

**10.07    [Reserved].**

**10.08    Right of Setoff.** If an Event of Default shall have occurred and be continuing, each Lender, the L/C Issuer and each of their respective Lender Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent or the Required Lenders, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, the L/C Issuer or any such Lender Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations existing under this Agreement or any other Loan Document then due and owing to such Lender or the L/C Issuer, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender or the L/C Issuer shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party are owed to a branch or office of such Lender or the L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.18 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the other Credit Parties, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the

Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender, the L/C Issuer and their respective Lender Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the L/C Issuer or their respective Lender Affiliates may have. Each Lender and the L/C Issuer agrees to notify the Lead Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application. Notwithstanding the foregoing, any amounts of the Foreign Loan Parties so offset shall be applied solely to the Foreign Liabilities.

 **10.09   Interest Rate Limitation.**  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans and other Obligations or, if it exceeds such unpaid principal, refunded to the applicable Borrowers. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

 **10.10   Counterparts; Integration; Effectiveness.**   This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous letters of intent, commitment letters, agreements and understandings, oral or written, relating to the subject matter hereof; provided that the Fee Letter shall survive the execution and delivery of this Agreement and shall continue to be a binding obligation of each of the parties thereto. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) shall be as effective as delivery of a manually executed counterpart of this Agreement.

 **10.11   Survival.**  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder (other than contingent indemnity obligations for which claims have not been asserted) shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding. Further, the provisions of Article III, Article IX and Section 10.04 all survive and remain in full force and effect after the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof and Payment in Full (including, without limitation, those arising under Article III, Article IX and Section 10.04) hereunder. In connection with the termination of this Agreement and the release and termination of

the security interests in the Collateral, any Agent may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, (y) any obligations that may thereafter arise with respect to the Other Liabilities, and (z) any Obligations that may thereafter arise under Section 10.04 thereof.

**10.12    Severability.** If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, the L/C Issuer then such provisions shall be deemed to be in effect only to the extent not so limited.

**10.13    Replacement of Lenders.** If any Lender requests compensation under Section 3.04, or if any Lender delivers a notice described in Section 3.02, the Loan Parties are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Lead Borrower may, at the Borrowers' (in the case of any Foreign Borrower, only in respect of any applicable Foreign Lender) sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights (other than its existing rights to payments pursuant to Sections 3.01 and 3.04) and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)    the applicable Borrowers or assignee shall have paid to the Administrative Agent the assignment fee specified in Section 10.06(b);

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and L/C Advances, accrued interest thereon, accrued fees in respect thereof and all other amounts payable to it hereunder and under the other Loan Documents in respect thereof (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(d)    such assignment does not conflict with applicable Laws;

(e)     in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent; and

(f)     the failure of any such Lender to execute an Assignment and Assumption shall not render such sale and purchase (and corresponding assignment) invalid and such assignment shall be recorded in the Register.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**10.14   Governing Law; Jurisdiction; Etc.**

(a)     GOVERNING LAW.    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)     SUBMISSION TO JURISDICTION.    EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION. NOTWITHSTANDING ANY OTHER PROVISION OF THIS SECTION 10.14, TO THE EXTENT APPLICABLE TO THE DOMESTIC LOAN PARTIES, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ACTION OR DISPUTE INVOLVING, RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

(c)     WAIVER OF VENUE.   EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     SERVICE OF PROCESS. EACH LOAN PARTY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS

AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR ANY FEDERAL COURT SITTING THEREIN AS THE ADMINISTRATIVE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15   Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

**10.16   No Advisory or Fiduciary Responsibility**.   In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Lender Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Lender Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each of the Loan Parties hereby

waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17   USA PATRIOT Act Notice; Proceeds of Crime Act.**   Each Lender that is subject to the Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act and all applicable "know your customer" rules, regulations and procedures applicable to such Lender in Canada, Australia and Japan), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Patriot Act and the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) (the "Proceeds of Crime Act").   If any Agent has ascertained the identity of the Canadian Borrower or any authorized signatories of the Canadian Borrower for the purposes of the Proceeds of Crime Act and other applicable anti-money laundering, anti-terrorist financing, economic or trade sanctions and "know your client" policies, regulations, laws or rules (the Proceeds of Crime Act and such other applicable policies, regulations, laws or rules, collectively, including any guidelines or orders thereunder, "AML Legislation"), then such Agent shall be deemed to have done so as an agent for each Canadian Lender, and this Agreement shall constitute a "written agreement" in such regard between each Canadian Lender and such Agent within the meaning of the applicable AML Legislation; and shall provide to each Canadian Lender copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness. Notwithstanding the preceding sentence and except as may otherwise be agreed in writing, each of the Canadian Lenders agrees that no Agent has any obligation to ascertain the identity of the Canadian Borrower or any authorized signatories of the Canadian Borrower on behalf of any Canadian Lender, or to confirm the completeness or accuracy of any information it obtains from the Canadian Borrower or any such authorized signatory in doing so. No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any purpose which would contravene or breach the Proceeds of Crime Act or for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.   The Loan Parties shall, promptly following a request in writing by the Administrative Agent or any Lender (through the Administrative Agent), provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

**10.18   Foreign Asset Control Regulations.**   Neither of the advance of the Loans, the issuance of the Letters of Credit, nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).   Furthermore, none of the Loan Parties or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or

transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.19    [Reserved].**

**10.20    Time of the Essence.** Time is of the essence of the Loan Documents.

**10.21    Foreign Subsidiaries.**

Notwithstanding any provision of any Loan Document to the contrary, (including any provision that would otherwise apply notwithstanding other provisions or that is the beneficiary of other overriding language), (i) no Foreign Subsidiary shall guarantee or support any Obligation of the Domestic Loan Parties or any Excluded Swap Obligations, and (ii) no security or similar interest shall be granted in the assets of any Foreign Subsidiary, which security or similar interest guarantees or supports any Obligation of the Domestic Loan Parties or any Excluded Swap Obligations. The parties agree that any pledge, guaranty or similar interest made or granted in contravention of this Section 10.21 shall be void ab initio. For purposes of this Section 10.21, a Foreign Subsidiary shall include a Domestic Subsidiary substantially all of the assets of which consist of Equity Interests in one or more Foreign Subsidiaries.

**10.22    Press Releases.**

(a)    Each Credit Party executing this Agreement agrees that neither it nor its Lender Affiliates will in the future issue any press releases or other public disclosure using the name of any Lender or any Agent or such Person's Lender Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to such Lender or such Agent and without the prior written consent of such Lender or such Agent unless (and only to the extent that) such Credit Party or Lender Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Lender Affiliate will consult with such Lender or such Agent  before issuing such press release or other public disclosure.

(b)    Each Credit Party agrees that neither it nor its Lender Affiliates will in the future issue any press releases or other public disclosure using the name of the Parent or its Subsidiaries without at least two (2) Business Days' prior notice to the Administrative Agent and without the prior written consent of the Administrative Agent unless (and only to the extent that) such Credit Party or Lender Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Lender Affiliate will consult with the Lead Borrower before issuing such press release or other public disclosure. Subject to the foregoing, each Loan Party consents to the publication by Administrative Agent or any Lender of advertising material relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo or trademark. The Administrative Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for review and comment prior to the publication thereof and reasonably cooperate with Lead Borrower in connection with any modifications requested by Lead Borrower. The Administrative Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

**10.23    Additional Waivers.**

(a)    Except as provided herein or in any other Loan Document or pursuant to any amendment or waiver executed pursuant to Section 10.01, the Obligations (including, for avoidance of

doubt, the Foreign Liabilities) are the joint and several obligation of each Loan Party; provided that the Foreign Loan Parties shall be liable only for the Foreign Liabilities.  To the fullest extent permitted by applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any release of any other Loan Party from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Administrative Agent, the Collateral Agent or any other Credit Party.

(b)     Except as provided herein or in any other Loan Document or pursuant to any amendment or waiver executed pursuant to Section 10.01, the Obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible Payment in Full), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the Obligations of each Loan Party shall not be discharged or impaired or otherwise affected by the failure of any Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible Payment in Full).

(c)     To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible Payment in Full. The Administrative Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly Paid in Full.  Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)     Each Domestic Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement.  Each Foreign Borrower is obligated to repay the Foreign Liabilities as joint and several obligors under this Agreement. Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible Payment in Full. Any Indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible Payment in Full but may be paid in the ordinary course of business or as permitted pursuant to Section 7.07 hereof.  If any amount shall be paid to any Loan Party erroneously

or in violation of the provisions of this Agreement on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such Indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall, subject to the terms of the DIP Intercreditor Agreement, forthwith be paid to the Administrative Agent to be credited against the payment of the applicable Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.

Without limiting the generality of the foregoing, or of any other waiver or other provision set forth in this Agreement, each Loan Party hereby absolutely, knowingly, unconditionally, and expressly waives any and all claim, defense or benefit arising directly or indirectly under any one or more of Sections 2787 to 2855 inclusive of the California Civil Code or any similar law of California.

**10.24    Judgment Currency**.  If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement or any other Loan Document, it becomes necessary to convert into a particular currency (the "Judgment Currency") any amount  due under this Agreement or under any other Loan Document in any currency other than the Judgment Currency (the "Currency Due"), then conversion shall be made at the rate of exchange prevailing on the Business Day before the day on which judgment is given.  For this purpose "rate of exchange" means the rate at which the applicable Agent is able, on the relevant date, to purchase the Currency Due with the Judgment Currency in accordance with its normal practice.  In the event that there is a change in the rate of exchange prevailing between the Business Day before the day on which the judgment is given and the date of receipt by the Administrative Agent of the amount due the Administrative Agent, the applicable Loan Party will, on the date of receipt by the Administrative Agent pay such additional amounts, if any, as may be necessary to ensure that the amount received by the Administrative Agent on such date, as applicable, is the amount in the Judgment Currency which when converted at the rate of exchange prevailing on the date of receipt by the Administrative Agent is the amount then due under this Agreement or such other Loan Document in the Currency Due. If the amount of the Currency Due which the applicable Agent is so able to purchase is less than the amount of the Currency Due originally due to it, the applicable Loan Party shall indemnify and save the Agents, the L/C Issuer and the Lenders harmless from and against all loss or damage arising as a result of such deficiency. This indemnity shall constitute an obligation separate and independent from the other obligations contained in this Agreement and the other Loan Documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Agent from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement or any other Loan Document or under any judgment or order.

**10.25    No Strict Construction.**  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.26    Attachments.**  The exhibits and schedules attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits (other than the Intercreditor Agreement or the DIP Intercreditor Agreement, as applicable) and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**10.27    Conflict of Terms; Intercreditor Agreement**

Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement conflicts with any provision in any of the other Loan Documents (other than the Intercreditor Agreement or the DIP Intercreditor Agreement, as applicable), the provision contained in this Agreement shall govern and control.  If any provision contained in this Agreement conflicts with any provision of the DIP Intercreditor Agreement, the provision contained in the DIP Intercreditor Agreement shall govern and control.

**10.28    Electronic Execution of Assignments and Certain Other Documents**.  The words "execute," "execution," "signed," "signature," and words of like import in any Assignment and

Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

### 10.29   Obligations and Collateral of the Foreign Loan Parties.

Notwithstanding anything contained herein or in the other Loan Documents to the contrary, none of the Foreign Loan Parties shall be liable or jointly and severally liable for any Excluded Swap Obligations of such Foreign Loan Party or of any Domestic Loan Party or for any Obligations (other than the Foreign Liabilities) of the Parent or any other Domestic Loan Party (collectively, the "Domestic Obligations"), and none of the Collateral pledged by the Foreign Loan Parties shall secure any Domestic Obligations (other than the Foreign Liabilities).  In addition, any insurance proceeds from any Collateral pledged by the Foreign Loan Parties shall not be available to pay any Domestic Obligations (other than the Foreign Liabilities).

### 10.30   Language.

The parties herein have expressly requested that this Agreement and all related documents be drawn up in the English language.  A la demande expresse des parties aux présentes, cette convention et tout document y afférent ont été rédigés en langue anglaise.

### 10.31   Keepwell.

Subject to the provisions of Section 10.29, each Loan Party that is a Qualified ECP Guarantor at the time its Guarantee or the grant of a security interest under the Loan Documents becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under this Article X voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations and undertakings of each Qualified ECP Guarantor under this Section 10.31 shall remain in full force and effect until Payment in Full. Each Loan Party intends this Section 10.31 to constitute, and this Section 10.31 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

**10.32   Amendment and Restatement.**  This Agreement is an amendment and restatement of the Existing ABL Credit Agreement, it being acknowledged and agreed that as of the Effective Date all obligations outstanding under or in connection with the Existing ABL Credit Agreement and any of the other Loan Documents (such obligations, collectively, the "Existing Obligations") constitute Obligations under this Agreement (unless paid on the Effective Date).  This Agreement is in no way intended to

constitute a novation of the Existing ABL Credit Agreement or the Existing Obligations. With respect to (i) any date or time period occurring and ending prior to the Effective Date, the Existing ABL Credit Agreement and the other Loan Documents shall govern the respective rights and obligations of any party or parties hereto also party thereto and shall for such purposes remain in full force and effect; and (ii) any date or time period occurring or ending on or after the Effective Date, the rights and obligations of the parties hereto shall be governed by this Agreement (including, without limitation, the exhibits and schedules hereto) and the other Loan Documents. From and after the Effective Date, any reference to the Existing ABL Credit Agreement in any of the other Loan Documents executed or issued by and/or delivered to any one or more parties hereto pursuant to or in connection therewith shall be deemed to be a reference to this Agreement, and the provisions of this Agreement shall prevail in the event of any conflict or inconsistency between such provisions and those of the Existing ABL Credit Agreement. The Credit Parties authorize the Agents to execute a Confirmation and Ratification of Ancillary Loan Documents and any amendments and/or amendments and restatements and/or supplements to the Existing ABL Credit Agreement, in each case as the Administrative Agent may deem appropriate in connection with such Loan Documents.

10.33   **Money Lending Business Law**. The Loan Parties hereby agree to the submission by each of the Japanese Lenders as a Money Lender (kashikin gyo-sha) under Money Lending Business Law of Japan to the Loan Parties of any writings under the Money Lending Business Law of Japan and other regulations related thereto, by electronic means in lieu of delivery of paper documents.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**QS WHOLESALE, INC.,**
as the Lead Borrower

By: _____

Name:
Title:

**DC SHOES, INC.,**
as a Domestic Borrower

By: _____

Name:
Title:

**HAWK DESIGNS, INC.,**
as a Domestic Borrower

By: _____

Name:
Title:

**QS RETAIL, INC.,**
as a Domestic Borrower

By: _____

Name:
Title:

**QUIKSILVER, INC.**,
as a Guarantor


By: _____

Name:
Title:


**Q. S. OPTICS, INC.**,
as a Guarantor


By: _____

Name:
Title:


**QUIKSILVER WETSUITS, INC.**,
as a Guarantor


By: _____

Name:
Title:


**MT. WAIMEA, INC.**,
as a Guarantor


By: _____

Name:
Title:


**QUIKSILVER ENTERTAINMENT, INC.**,
as a Guarantor


By: _____

Name:
Title:

**FIDRA, INC.,**
as a Guarantor


By: _____
Name:
Title:


**DC DIRECT, INC.,**
as a Guarantor


By: _____
Name:
Title:

**QUIKSILVER CANADA CORP.,**
as the Canadian Borrower

By: _____

Name:
Title:

**QUIKSILVER JAPAN CO., LTD.**
as the Japanese Borrower

By: _____

Name:
Title:

Executed by **Ug Manufacturing Co. Pty Ltd**
ACN 005 047 941 in accordance with
section 127 of the *Corporations Act 2001:*

| | |
|---|---|
| Director | Secretary |

| | |
|---|---|
| Name of Director | Name of Secretary |
| (BLOCK LETTERS) | (BLOCK LETTERS) |

**BANK OF AMERICA, N.A.**, as Administrative
Agent and as a Collateral Agent

By: _____

Name: Roger Malouf

Title: Vice President

**BANK OF AMERICA, N.A.,** (acting through its Hong Kong branch) as Administrative Agent and as a Collateral Agent

By: _____

Name:  Roger Malouf

Title:    Vice President

**BANK OF AMERICA, N.A.** (acting through its Australia branch) as an Australian Lender

By: _____

Name:

Title:

**BANK OF AMERICA, N.A.,** as a Domestic Lender, L/C Issuer

By: _____

Name:  Roger Malouf

Title:   Vice President

**BANK OF AMERICA, N.A.** (acting through its Canada branch), as a Canadian Lender,

By: _____

Name:  Medina Sales De Andrade

Title:   Vice President

**BANK OF AMERICA, N.A.** (acting through its Tokyo branch), as a Japanese Lender

By: _____

Name:

Title:

:

1883571.2