UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|                              | .  | Chapter 11                        |
| ---------------------------- | -- | --------------------------------- |
| IN RE:                       | .  |                                   |
|                              | .  | Case No. 15-11880 (BLS)           |
| QUIKSILVER, INC., et al,     | .  |                                   |
|                              | .  |                                   |
|                              | .  | Courtroom No. 1                   |
|                              | .  | 824 Market Street                 |
| Debtors.                     | .  | Wilmington, Delaware 19801        |
|                              | .  |                                   |
| . . . . . . . . . . . . . . . . . | . | Thursday, September 10, 2015 |

TRANSCRIPT OF FIRST-DAY MOTIONS
BEFORE THE HONORABLE BRENDAN L. SHANNON
CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            Van C. Durrer, II, Esq.
                            SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM, LLP
                            300 South Grand Avenue, Suite 3400
                            Los Angeles, California 90071

                            Laura Davis Jones, Esq.
                            PACHULSKI, STANG, ZIEHL
                             & JONES, LLP
                            919 North Market Street, 17th Floor
                            Wilmington, Delaware 19801

(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Dana Moore, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES:   (Continued)

| | |
|---|---|
| For the U.S. Trustee: | Mark Kenney, Esq.<br>OFFICE OF THE U.S. TRUSTEE<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, Delaware 19801 |
| For Bank of America, NA: | Steven E. Fox, Esq.<br>RIEMER & BRAUNSTEIN, LLP<br>Times Square Tower, Suite 2506<br>Seven Times Square<br>New York, New York 10036 |
| For GGR, LP, et al: | Leslie Heilman, Esq.<br>BALLARD SPAHR, LLP<br>919 North Market Street<br>Wilmington, Delaware 19801 |
| For Regency Centers,<br>et al: | Gilbert R. Saydah, Jr., Esq.<br>KELLEY, DRYE & WARREN, LLP<br>101 Park Avenue<br>New York, New York 10178 |
| For a 3 Times Square<br>Associates: | Ilana Volkov, Esq.<br>COLE SCHOTZ, P.C.<br>Court Plaza North<br>25 Main Street<br>Hackensack, New Jersey 07601 |
| For the State of Maryland: | Steven M. Sakamoto-Wengel<br>OFFICE OF THE ATTORNEY GENERAL<br>200 St. Paul Place<br>Baltimore, Maryland 21202 |
| ALSO APPEARING: | Ian Fredericks, Esq.<br>HILCO TRADING, LLC |

(Appearances Continued)

APPEARANCES VIA TELEPHONE:

For GE Capital, et al:       Brian I. Swett, Esq.
                            MCGUIREWOODS


ALSO APPEARING VIA TELEPHONE:

                            Ronald M. Tucker
                            SIMON PROPERTY GROUP

INDEX

                                                                Page

JOINT ADMINISTRATION                                             18

MOTION TO ENFORCE PROTECTIONS OF BANKRUPTCY CODE                 20
SECTIONS 362 AND 365

CUSTOMER PROGRAMS                                                23

RETENTION MOTION RE:   KURTZMAN CARSON CONSULTANTS               25

WAGES AND BENEFITS                                               26

UTILITIES                                                        32

TAXES                                                            34

SHIPPING AND IMPORT/EXPORT                                       37

CRITICAL VENDORS                                                 40

CASH MANAGEMENT                                                  46

DIP FINANCING                                                    53

STORE-CLOSING MOTION                                             78


Exhibit                                                         Evid.

Bruenjes Declaration                                             19
Coulombe Declaration                                             19
Savini Declaration                                               19

1          (Proceedings commence at 2:17 p.m.)

2          THE COURT:  Please be seated.  Good afternoon.

3          Mr. Durrer, good to see you.

4          MR. DURRER:  Good afternoon, Your Honor.  It's been a

5     long time.  First of all, we are -- Van Durrer on behalf of

6     Quiksilver, Inc. and its U.S. affiliates.

7          Your Honor, first of all, let me say that we are very

8     grateful for Your Honor scheduling the time today.  We know

9     that you have some other things on your plate this morning and

10    today, and we dumped a lot of papers on you and your staff, and

11    we're very grateful.  I will say, also --

12         THE COURT:  Happy to oblige.

13         MR. DURRER:  Thank you, Your Honor.

14         There's also quite a few people, which I'll get to,

15    that also participated in the preparation for today, and we're

16    grateful for their time, as well.  It's taken a great effort to

17    get here from where we started.

18         Let me start.  I'm going to introduce a couple of our

19    key executives, Your Honor.  And first, I want to express the

20    thanks, as well, for some of our executives who could not be

21    here:  Pierre Agnes, the CEO of the company; Thomas Chambolle

22    the CFO of the company; and Greg Healy, the President.

23         There's two things going on.  Thomas' function, Mssr.

24    Chambolle's function in France requires him to be there.

25    Pierre Agnes is at the company; the company headquarters in

1    Huntington Beach --

2         THE COURT:  Huntington Beach.

3         MR. DURRER:  -- you know, trying to work with

4    employees, and make everyone comfortable with the process, and

5    help them understand the process.  Mr. Healy is at a very

6    important trade show, which is vital to our upcoming season.

7         And we have with us here today Andrew Bruenjes, who is

8    the CFO of the Americas Division.

9         THE COURT:  And he's your affiant today.

10        MR. DURRER:  Yes, Your Honor.  As well as Linnsey

11   Caya, who is in-house general counsel.

12        THE COURT:  Welcome.

13        MR. DURRER:  In addition, Your Honor, we have two

14   other of our declarants:  Durc Savini from Peter J. Solomon

15   Company.

16        THE COURT:  Mr. Savini, good to see you.

17        MR. DURRER:  And we have Steve Coulombe from FTI, who

18   also submitted a declaration with respect to our --

19        THE COURT:  Oh, Mr. Coulombe.

20        MR. DURRER:  -- closing stores motion.

21        THE COURT:  I saw it.

22        MR. DURRER:  Thank you, Your Honor.

23        I was actually a little depressed to learn that I'm

24   actually older than this public company that's before you

25   today.  But kidding aside, I don't think I need to advise the

1    Court of the -- Quiksilver's longstanding history as an iconic

2    brand in the lifestyle brand space.

3         Your Honor, given the shortness of time that I know

4    you have today, is it fair to say some familiarity with Mr.

5    Bruenjes' declaration.

6         THE COURT:  I have -- oh, yes.

7    (Laughter)

8         MR. DURRER:  Thank you, Your Honor.

9         THE COURT:  You may proceed.

10        MR. DURRER:  Thank you very much.

11        Where I'd like to start, Your Honor, is if I may

12   approach and hand up a more simplified organizational chart,

13   which I think helps us --

14        THE COURT:  It was --

15        MR. DURRER:  -- get to the nitty-gritty?

16        THE COURT:  -- quite an org chart.  Oh, and we have

17   colors.

18        MR. DURRER:  Yes, colors and a few copies.

19        THE COURT:  That will be helpful, please, yes.  Oh, so

20   these are extra copies?  That would be great.

21    (Pause in proceedings)

22        MR. DURRER:  So, before breaking into the agenda, Your

23   Honor, where I'd like to start is just with the global

24   organization of the company.

25        THE COURT:  Uh-huh.

1          MR. DURRER:  And you know, you may recall that one of

2     the strategic initiatives that the company implemented back in

3     2013 was a multi-year turnaround plan.

4          THE COURT:  I saw that.

5          MR. DURRER:  You know, candidly, no one could have

6     foreseen that, starting that long ago, wouldn't have gotten to

7     the finish line by today, but we are where we are.

8          But one of the key initiatives in that plan was to

9     globalize the company.  And I can report --

10         THE COURT:  Right.  Mr. Bruenjes' affidavit discusses

11    some of the challenges that the company faced because we sort

12    of fragmented in three different areas, right?

13         MR. DURRER:  Precisely right, Your Honor.  And the

14    globalization initiative was designed to fix those problems.

15    As a result, you know, that process has been largely

16    successful, but it led to some challenges with respect to this

17    process, and that's where -- I'm going to start with that

18    structure, the capital structure, in terms of our debt.  And

19    then I think that will blend in nicely to where we need to go

20    today.

21         THE COURT:  That would be fine.

22         MR. DURRER:  So on the color chart that you have

23    there, Your Honor, the debtors include the green boxes, for

24    simplicity.  And those green boxes are basically the U.S.

25    debtors.  These are the active companies.  There are more

1    debtors; I think there are seven more debtors, but those are

2    largely inactive.  These are the key, functioning actors here

3    for the debtor.

4         Then you'll see that Quiksilver, Inc. has a holding

5    company subsidiary, which is Mountain and Wave, over towards

6    the left of your chart.

7         THE COURT:  I see it.

8         MR. DURRER:  Mountain and Wave is basically the

9    parent, if you will, of the rest of the company overseas, for

10   the most part.

11        And then, finally, the blue boxes, along with the

12   green boxes, form the part of the company's existing global

13   asset-based loan facility, and that will become important as we

14   come back to it.

15        The -- one of the key features of the company's

16   capital structure is there is a Eurobond facility --

17        THE COURT:  I saw that.

18        MR. DURRER:  -- of 200 million Euro.  That captures

19   all of the yellow boxes; those are the primary obligors.  And

20   then there are also guarantees by the blue boxes and the green

21   boxes.  In addition --

22        THE COURT:  Which complicates immensely the

23   restructuring that you've been trying to do.

24        MR. DURRER:  Yes, yes, it does, Your Honor.  But I

25   think, candidly, with the assistance and cooperation of our

1    plan sponsor, I think we actually developed a pretty elegant

2    solution, which I'm going to get to in a few moments.

3            THE COURT:  Uh-huh.

4            MR. DURRER:  But just to round out the capital

5    structure, so that, in the U.S., we've got -- in terms of

6    issued debt, I'm not going to go into the details of other

7    creditor claims, but in terms of issued debt, we have $220

8    million of senior secured notes.  And then, with respect to the

9    existing ABL, as you would probably expect, the ABL has a first

10   lien on working capital assets.

11           THE COURT:  Uh-huh.

12           MR. DURRER:  And the U.S. secured notes have a first

13   lien in the IP of the company --

14           THE COURT:  Right.

15           MR. DURRER:  -- the brands.  And then, of course --

16           THE COURT:  And they flip.

17           MR. DURRER:  -- they flip-flop on the second liens.

18           THE COURT:  I understand.

19           MR. DURRER:  And then we have $220 million of

20   unsecured bonds.  The indenture trustee for that is U.S. Bank,

21   at present.

22           THE COURT:  Okay.

23           MR. DURRER:  So then that leads us to the transaction.

24   The company was -- had been exploring alternative ways -- you

25   know, as the company was implementing its multi-year turnaround

1    plan, in the early part of this year, the company began to face

2    increasing liquidity challenges within the U.S., primarily.

3    Europe and the rest of the world seemed to be functioning

4    pretty well.

5         At that time, in the spring, the company developed a

6    strategy review committee comprised of three members of the

7    board to really focus on these liquidity issues and challenges.

8    As a consequence of that, the SRC recommended the hiring of

9    Peter J. Solomon Companies to assist the company with raising

10   financing on a couple of different pathways.

11        One was to address the immediate liquidity need in the

12   U.S. by expanding the existing ABL, and the other was to

13   explore means to refinance the Eurobonds because Europe was

14   performing well, and it seemed that it would be a good idea to

15   try to take advantage of that good performance to expand that

16   financing, to again create some additional liquidity within the

17   U.S.

18        In the summer, as that effort continued, we faced sort

19   of a crossroads of sort, and that was the beginning of August.

20   The beginning of August, there was -- a significant payment was

21   due in connection with the U.S. secured notes, as well as the

22   unsecured notes.  And unlike where, if you have two unsecured

23   indentures that are, you know, senior and subordinated, the

24   failure to make one or a waiver would cause the second one not

25   to be due, we didn't have that flexibility --

1          THE COURT:  Right.

2          MR. DURRER:  -- because we had a secured tranche and a

3    completely unsecured tranche.  So that relationship didn't

4    exist.

5          THE COURT:  So then you have knock-on effects from a

6    failure to make the payment.

7          MR. DURRER:  Yes.  And the company had been

8    experiencing liquidity challenges.  But what it did was, you

9    know, it knuckled down, it got together with its advisors,

10   including FTI at this stage, and really kept focused on its

11   liquidity plan.  It was still marching down a road where they

12   anticipated a transaction with respect to a European financing.

13   They were still looking at ways to expand the ABL.

14          So considering those factors, we took it to our

15   lenders, the ABL lenders and said, look, we've got a twenty-

16   two-million-dollar interest payment coming up, we would -- you

17   know, we'd like to get feedback from, you know, the entire

18   community of interest, should we be making this payment.  We

19   reached out to other stakeholders.

20          Management expressed a view that there would be a

21   serious impact on the company, if the company went into a grace

22   period on either of those bonds, that that would even further

23   potentially impair liquidity.  And so the decision was made to

24   make that payment while continuing to pursue a transaction.

25          In the middle of August, it became apparent that a

1      transaction could not be accomplished unless we were able to

2      make available all of our global IP under one instrument.

3            THE COURT:  Which was already pledged.

4            MR. DURRER:  Which was pledged in part.  But also,

5      even where it was not pledged, there were negative covenants

6      effectively barring us from moving that collateral around.

7            THE COURT:  I understand.

8            MR. DURRER:  And so that's when the company decided,

9      okay, we need to engage in a Chapter 11 restructuring-type

10     transaction.  The company had already been pursuing it on a

11     contingency plan basis, you know, as a just-in-case.  But this

12     is where the effort really kicked up, was around the time that

13     interest payment was made; and then, in the middle of August,

14     picked up in August.  So that leads us to today.

15           So, over the course of that, one of the leading

16     parties that we have been engaged with since really the spring

17     was Oaktree, our plan sponsor.  And Oaktree, over the course of

18     developing the refinancing transaction that didn't occur with

19     respect to Europe, the company had spent a lot of time with

20     them, Oaktree had done a lot of due diligence and was very

21     familiar with the company.

22           We also came to learn over this time period that

23     Oaktree had a substantial position in the U.S. secured notes, a

24     blocking position at that time.  So we knew that, as a matter

25     of course, we would have to talk to them in connection --

1          THE COURT:  And they knew that, too.

2          MR. DURRER:  -- in connection with any contemplated

3    transaction.  So, as a consequence, we worked closely with

4    them.

5          PGSC continued its efforts.  And I'll just, you know,

6    get to the punch line, which is we arrived, very recently, on

7    the plan support agreement and the plan termsheet and backstop

8    termsheet that are in papers.

9          THE COURT:  Uh-huh.

10          MR. DURRER:  Now, to be clear, we're not seeking any

11    approval or authority whatsoever with respect to those

12    documents.  That will be for a second-day hearing --

13          THE COURT:  Presumably within -- according to your

14    milestones, within 30 days of today.

15          MR. DURRER:  Correct, Your Honor.

16          THE COURT:  I understand.

17          MR. DURRER:  So -- but just briefly, to summarize what

18    the plan termsheet does, primarily, the plan termsheet resolves

19    and allows to be converted into equity, because of, you know,

20    Oaktree's controlling vote, a hundred percent of our two-

21    hundred-and-eight-million-dollar secured bond.  So there's a

22    substantial delivering of the company upon the consummation of

23    a plan.

24          In addition, there's consideration offered to

25    unsecured creditors --

1          THE COURT:  Seventy million.

2          MR. DURRER:  7.5 million dollars, Your Honor.

3          THE COURT:  Seven million.

4          MR. DURRER:  And of course, there's going to be an

5     issue that folks will have to resolve with respect to the

6     eleven-million-dollar payment that the unsecured notes received

7     at the beginning of August.  So that will be, you know, part of

8     any plan discussion.  But notwithstanding that, there's a

9     seven-and-a-half-million-dollar form of consideration on the

10    table already.

11         There's -- as a result of that agreement, Oaktree was

12    willing to finance us, basically, to get to that plan process,

13    which we would envision rolling out over the balance of the

14    year.  And that financing is up to $175 million, and it has a

15    couple of components:

16         The Oaktree termsheet -- or the Oaktree term loan

17    aspect of it is $115 million, and that is in a collaboration

18    with Bank of America, who was our agent and one of our lenders

19    in the existing prepetition ABL, and that's $60 million.

20         THE COURT:  Okay.

21         MR. DURRER:  I didn't know if Your Honor had a

22    question --

23         THE COURT:  No, I --

24         MR. DURRER:  -- about that.

25         THE COURT:  I follow you.

1          MR. DURRER:  Thank you.  So that -- those are the

2     basic elements of the transaction.

3          Now Your Honor might ask yourself:  What about Europe

4     and Asia?  Here's the answer.  With respect to Europe and Asia,

5     the green boxes, as I've noted, and the blue boxes are

6     guarantors with respect to the global ABL and the Euro notes.

7          THE COURT:  Right.

8          MR. DURRER:  With respect to the global ABL, we're

9     satisfying the global ABL, so that's how we're addressing that

10    issue.

11         With respect to the Euro notes, the plan termsheet

12    contemplated one of two avenues, and possibly both, as a belt-

13    and-suspenders approach.  Where we landed, again, with the

14    cooperation of Oaktree, who holds some of those Eurobonds, was

15    that we were able to negotiate waivers of the technical default

16    --

17         THE COURT:  That are --

18         MR. DURRER:  -- that are --

19         THE COURT:  That are -- that attend to this

20    proceeding.

21         MR. DURRER:  Precisely, Your Honor.  It's temporary;

22    in other words, we need to meet our milestones, which is a fair

23    ask on behalf of our Euro noteholders.  And then we have to

24    deliver what we propose, which is reinstatement of those

25    guarantees.

1           And obviously, our view is that the guarantees will

2    even be more valuable because the balance sheet of those

3    guarantors --

4           THE COURT:  Because the company has improved.

5           MR. DURRER:  Will be improved.

6           THE COURT:  Yeah.

7           MR. DURRER:  Precisely right.  So I'm happy to sit

8    down, and you can come down here and ...

9           THE COURT:  No, no.

10    (Laughter)

11           MR. DURRER:  So I think, Your Honor, that that leads

12    us to the agenda --

13           THE COURT:  I think so.

14           MR. DURRER:  -- with those statements.  Great.

15           THE COURT:  Okay.

16           MR. DURRER:  So the agenda I'm referring to, just for

17    the record, is Docket Number 48.

18           THE COURT:  I'm there.

19           MR. DURRER:  And this is the second amended notice of

20    agenda.

21           THE COURT:  Actually, no.  I walked out without it.

22    Do you have another copy of it?

23           MR. DURRER:  I do, Your Honor.

24           THE COURT:  I'm probably going to page through the

25    binder, but I want to make sure we're on the same page.

1          MR. DURRER:  May I approach, Your Honor?

2          THE COURT:  Sure.

3          MR. DURRER:  So Item Number 2, Your Honor, is the

4    first matter requiring your attention, and that is our motion

5    for joint administration.

6          THE COURT:  Sure.  I regard that as routine, and I

7    would ask if anyone wishes to be heard with respect to the

8    relief that's requested, which is for joint administration of

9    these affiliated Chapter 11 debtors.

10    (No verbal response)

11          THE COURT:  Very well.  As noted, I -- this is a

12    common feature of every case, it's administrative in nature,

13    and I believe it is obviously warranted, for purposes of

14    managing the case on a go-forward basis, frankly, from the

15    parties' point of view, as well as from the Court's point of

16    view.  So, based upon the record before me, and in

17    consideration of Mr. Bruenjes' declaration, I will approve and

18    authorize that relief.

19          Before we turn to the next motion, I believe that it

20    would be appropriate to discuss admission of Mr. Bruenjes'

21    declaration, as well as Mr. Coulombe and Mr. Savini's

22    declarations.

23          And I think the way that I would propose or suggest,

24    which is typically how I've done it, is there may be issues

25    with respect to some of these motions, and there may be issues

1    with respect to some of the factual predicates for it.  And

2    then there will be many motions that I presume have no issues,

3    but require, frankly, the evidentiary predicate that's

4    identified and included in those declarations.  So, consistent

5    with my practice, I'm going to ask you to move them.  And I

6    would make the following observation:

7          That, to the extent that they're being admitted at

8    this point, they are being admitted for purposes of the first-

9    day hearing, and specifically, with a full reservation for any

10   party that wishes to cross-examine any of the declarants at the

11   appropriate time.  But that's sort of -- at this point, I see

12   it as a mechanical step, and I would ask for that motion.

13         MR. DURRER:  Certainly, Your Honor.  I move the

14   admission of the declarations of Mr. Bruenjes, Mr. Coulombe,

15   and Mr. Savini, subject to Your Honor's stipulation on the

16   record.

17         THE COURT:  Right.  And again, and subject to my

18   comments a moment ago, and with a full opportunity for any

19   party that wishes to cross-examine, are there any objections to

20   admission of those declarations?

21   (No verbal response)

22         THE COURT:  Very well.  They're admitted.

23   (Bruenjes Declaration Received into Evidence)

24   (Coulombe Declaration Received into Evidence)

25   (Savini Declaration Received into Evidence)

1        THE COURT:  I think you moved to Number 2?  I'll take

2    the orders --

3        MR. DURRER:  Actually --

4        THE COURT:  I'll take the orders at the end.

5        MR. DURRER:  That's fine, Your Honor.  Thank you very

6    much for that.

7        With -- I'm actually going to turn to Item Number 3.

8    And Your Honor, I'd like to -- I'm actually tardy, and I

9    apologize for failing to introduce my co-counsel Laura Davis

10   Jones --

11       THE COURT:  I'm familiar with Ms. Jones.

12       MR. DURRER:  -- at the Pachulski firm.  And I'm going

13   to cede the podium to Ms. Jones to present this motion.

14       THE COURT:  Sure.

15       MS. JONES:  Good afternoon, Your Honor.  For the

16   record, Laura Davis Jones of Pachulski, Stang, Ziehl & Jones,

17   on behalf of the debtors.

18       THE COURT:  Welcome.

19       MS. JONES:  Thank you, Your Honor.

20   *     Your Honor, Matter 3 is our motion to extend the

21   enforcement of Sections 362 and 365.

22       THE COURT:  You're going to make it all the way

23   through this without saying the words "comfort order," right?

24       MS. JONES:  I'm going to try.

25       THE COURT:  All right.

1          MS. JONES:  I'm going to try.

2          THE COURT:  Proceed.

3          MS. JONES:  Your Honor, due to the global nature of

4     the debtors' business and their dealing with the non-U.S.

5     contract counter-parties, we need to have an order that

6     reflects that which we all already know.  And we want to avoid

7     a situation where the parties take action against the debtors'

8     assets in violation of Section 362 or try to terminate counter-

9     contracts or leases in violation of Section 365.

10          Your Honor, we do submit that the proposed order that

11    we've sent to the Court does follow the language of 362 and

12    365, and doesn't do anything further than that, and I we would

13    ask that it be approved.

14          THE COURT:  All right.  Mr. Kenney, good afternoon,

15    sir.

16          MR. KENNEY:  Good afternoon, Your Honor.

17          THE COURT:  Welcome.  Always happy to see the Office

18    of the United States Trustee, and as always, I appreciate the

19    review I know you've put into these pleadings.

20          Does your office have any position with respect to

21    this motion?

22          MR. KENNEY:  Good afternoon, Your Honor.  For the

23    record, Mark Kenney for the United States Trustee.

24          Your Honor, given the circumstances with a global

25    enterprise, no, we don't have any issues.  And I'll --

1          THE COURT:  Very good.

2          MR. KENNEY:  I'll avoid using that phrase, too.

3          THE COURT:  Thank you.

4          All right.  Does anyone else wish to be heard?

5     (No verbal response)

6          THE COURT:  All right.  Based upon the record before

7     me, I will approve and authorize the relief requested.

8     Specifically, I will rely upon Mr. Bruenjes' declaration, and

9     frankly, the Court's experience with these matters.

10          I think counsel has correctly identified this as an

11     order that provides what the law is.  But I think that

12     experience teaches that having a piece of paper or a form of

13     order to share with, particularly, foreign entities is valuable

14     and helpful in the -- especially at the very early stages of

15     the case.  And so, based upon the record before me, I will

16     approve and authorize that relief, and that order will issue.

17          MS. JONES:  Thank you very much, Your Honor.

18          THE COURT:  Sure.

19          MR. DURRER:  Van Durrer again for the debtors, Your

20     Honor.  Thank you.

21          I'm going to -- with Your Honor's permission, I'd like

22     to pass Number 4, the store-closing because --

23          THE COURT:  That makes sense.

24          MR. DURRER:  -- my understanding is that we're not the

25     only retailer in the building today, and our ...

1        (Laughter)

2        MR. DURRER:  Our partners with respect to this

3    particular relief are not back from Hagen yet.  So thank you,

4    Your Honor.

5        THE COURT:  I'm the Chief Judge, though.  They should

6    be here.

7        (Laughter)

8        MR. DURRER:  Well, maybe -- maybe --

9        THE COURT:  I don't care -- I don't care what Judge

10   Gross is doing.

11       MR. DURRER:  I was going to say, we can get Judge

12   Gross in here and just have a big party.

13       THE COURT:  This is all about me.

14       (Laughter)

15       MR. DURRER:  So, turning to Number 5, Your Honor.

16   Number 5 is, I think, also, to use Your Honor's words, a

17   relatively routine motion to continue customer programs.

18       This also includes, for instance, processing programs,

19   credit card receipts.  And we have a giftcard partner that

20   helps us process giftcards.

21       So there are items in there.  And I believe that Mr.

22   Kenney, likewise, did not have any specific comments on this

23   one.  I will, just for the record, also thank Mr. Kenney for

24   his time and assistance over a holiday weekend, which was very

25   much appreciated.

1        THE COURT:  Okay.  Let me ask if anyone wishes to be

2    heard with respect to the customer programs and related

3    obligations.

4        (No verbal response)

5        THE COURT:  Okay.  As I think counsel noted, this is

6    not an unusual feature of a retail bankruptcy.

7        The relief requested contemplates the payment of

8    prepetition obligations, though, within the first 20 days of

9    the case, and therefore, implicates Bankruptcy Rule 6003.  I'm

10   satisfied from Mr. Bruenjes' declaration, and more

11   specifically, again, from the Court's experience in other

12   retail cases, that, in the absence of the relief requested, the

13   debtors' reorganization effort will suffer the risk of

14   immediate and irreparable harm.

15       Much of the purpose of this exercise is to preserve

16   the value of the retail and operating entities that we have,

17   and again, those are customer relationships.  These are the

18   sorts of the things that, again, long experience teaches us

19   are, in terms of economic exposure, not necessarily that

20   significant.  But in the event of a failure to honor these

21   sorts of customer expectations, the damage done to the business

22   is often many, many multiples of whatever the economic savings

23   or the economic cost would be.

24       So I am satisfied that the debtors have carried their

25   burden with respect to the relief requested, and I will approve

1    and authorize that relief.

2            In addition, I don't necessarily always see the credit

3    card payments being built into here, but it's built into

4    different orders in different cases.  And again, I find that

5    the goal there is to minimize and avoid disruption to the

6    debtors' business operations, and these are routine

7    obligations.  And in the absence of opposition and

8    understanding the context in which the relief was requested, I

9    will approve and authorize that relief.  That order will issue.

10            MR. DURRER:  Thank you, Your Honor.

11            The next item, Number 6 on the agenda, Your Honor, is

12    the debtors' application to retain Kurtzman Carson Consultants.

13    Again, I think this is a routine --

14            THE COURT:  Yeah, I regard this one as routine, and

15    it's required under our local rules.

16            I'd start with Mr. Kenney.  Have you had an

17    opportunity to review the application and engagement, and is it

18    satisfactory?

19            MR. KENNEY:  We have, Your Honor.  It's acceptable.

20            THE COURT:  So it's fine with -- these forms have

21    finally gotten okay.

22            MR. KENNEY:  As to Kurtzman Carson.

23            THE COURT:  All right.

24        (Laughter)

25            THE COURT:  One at a time.

1          Okay.  I would ask if anyone else wishes to be heard.

2      (No verbal response)

3          THE COURT:  Clearly, the Code requires, or the -- our

4      local rules require that a case of a particular size -- and

5      this case fits that category -- is required to engage a claims

6      and noticing agent.  28 U.S.C., Section 156(c) contemplates

7      that the Clerk of Court may direct the services to be provided.

8          This is routine and standard, and the Court is

9      certainly familiar with KCC.  That order will issue, and the

10     relief is granted.

11         MR. DURRER:  Thank you, Your Honor.

12         THE COURT:  Sure.

13         MR. DURRER:  Item 7, Your Honor, is the debtors'

14     motion for interim and final approval of the payment of

15     prepetition wages and satisfaction of other employee

16     obligations.

17         The details regarding the amounts that we estimate,

18     cash amounts, are contained in Mr. Bruenjes' declaration.

19         THE COURT:  And they're in the motion, as well.  And

20     obviously, from your own experience, the focus, at least from

21     the Office of the United States Trustee and from the Court, on

22     a first-day is typically going to be built around the 507 caps

23     and who's exceeding and who's within.  And as I understand it,

24     most of the obligations fall well within the caps.

25         And then we had a reference to -- in the -- in a

1    footnote, a number of --

2            MR. DURRER:  To sales commissions, Your Honor?

3            THE COURT:  -- sales commissions.  So I've dealt with

4    these folks before, but I'd like a little bit of clarity on

5    them.  I think I have a pretty good idea of how their

6    compensation structure works, and it's not typically

7    controversial.  But since it's outside of the parameters we

8    typically discuss, I'd like some context.

9            MR. DURRER:  Yeah, understood, Your Honor.  And again,

10   you're stealing my thunder.  So, yes, we have commissions --

11           THE COURT:  Sorry.

12      (Laughter)

13           MR. DURRER:  For certain of these commissions --

14           THE COURT:  I'm just making you work for it.

15      (Laughter)

16           MR. DURRER:  Exactly.  Well, I consider it thunder, so

17   ...

18           With respect to certain members of the sales force,

19   there's obviously a lag time that is unusual with respect to

20   the typical employee or contractor of the company.  Employees

21   are paid on a regular schedule, and it's pretty predictable.

22           With respect to these commissions, there's always a

23   bit of a lag time; when they're calculated, when they're

24   earned.  And so we, obviously, need -- because one thing that's

25   unique --

1          THE COURT:  Are these commissions -- the main thing I

2     want to know is these are sales guys.  They may be substantial

3     numbers, but these are not C suite [sic] kind of people, these

4     are not CEOs, CFO, et cetera.  They're directors of marketing;

5     important people, terribly important, frankly, to the

6     operations.

7          MR. DURRER:  Yeah, these folks would not fall within

8     the definition of "insiders" under the Bankruptcy Code, for

9     certain --

10         THE COURT:  Okay.

11         MR. DURRER:  -- for certain.

12         THE COURT:  And then the second question is -- and if

13    you don't have this, you're welcome to confer with the client -

14    - the mechanics of their payments.  Because sometimes, we've

15    seen these issues, where these guys get paid at year-end, and

16    their commissions accumulate.  And often, they have, frankly,

17    nominal salaries with giant commission accrued.  Sometimes

18    we've seen it where the commissions are on a rolling basis,

19    depending on what you bid last month or what monies are coming

20    in.  Can you give me the mechanic that the company has used?

21         MR. DURRER:  My understanding is that these are more

22    on a rolling basis --

23         THE COURT:  Okay.

24         MR. DURRER:  -- periodic.  This is not one big lump

25    sum at this particular time of year.  And as I think Your Honor

1   is -- where Your Honor is heading, we have not asked for

2   permission to exceed the cap for any of those commissions on

3   the interim order.  Those would only be on a final order basis.

4         THE COURT:  Okay.  All right.  And then there was a --

5   there was a provision, I -- and I'm not finding it right yet.

6   Were there bonus programs; standard, routine, non-503,

7   prepetition --

8         MR. DURRER:  I --

9         THE COURT:  -- employee bonus programs that are part

10   of the mix here?

11         MR. DURRER:  I don't believe there are.  I have asked

12   my colleague -- there are a couple of changes to the order,

13   since Your Honor received it, so I want to ask my colleague to

14   walk through that.  And maybe I'll have her address that

15   question for you, as well.

16         THE COURT:  Yeah.  The issue is -- and I'm looking at

17   Paragraph 21 through 23 and 24.  I don't necessarily regard

18   these issues as being very controversial, but there's

19   discussions about commission employees and some bonuses, all of

20   which sound relatively modest, at the store and management

21   levels.  And I guess I want to know where they fit in.

22         Again, it looks like, from Paragraph 23 of the motion,

23   we're talking about, you know, $10,000.  I'm not really going

24   to --

25         MR. DURRER:  Yeah, it's --

1          THE COURT:  -- arm-wrestle anybody about that.

2          MR. DURRER:  Right.  I think that -- I mean, that's

3   correct, Your Honor.  This is consistent with historical

4   practice, and these are sort of, you know, rank-and-file

5   members --

6          THE COURT:  Uh-huh.

7          MR. DURRER:  -- that are actually driving sales in the

8   stores.

9          THE COURT:  Yep.

10         MR. DURRER:  And it's important to keep them

11  incentivized.

12         THE COURT:  Okay.  I don't think I have any other

13  questions.  I think you've given me sufficient context.  I

14  would ask if anyone else wishes to be heard with respect to the

15  relief requested.

16     (No verbal response)

17         THE COURT:  Okay.  The relief requested, which is the

18  payment of wages and benefits to employees, implicates

19  Bankruptcy Rule 6003; in that, it contemplates the payment of

20  prepetition obligations within the first 20 days of the case.

21         I am satisfied, again, from Mr. Bruenjes' declaration,

22  but frankly, more specifically from the Court's long experience

23  with this, that, in the absence of the relief requested, the

24  debtors' reorganization effort would suffer immediate and

25  irreparable harm.

1          It is, frankly, inconceivable in this or most business

2    contexts to imagine that a debtor could try to proceed with a

3    reorganization without paying its employees.  Retail cases

4    teach us that nothing good happens if the employees are not

5    focused and incentivized to maintain operations on a go-forward

6    basis.  So, again, I'm satisfied that the debtors have carried

7    their burden with respect to the relief requested.

8          And I would further note -- and I've said this many,

9    many times -- I -- at the outset of a case, I view few things

10   more -- to be more significant than insuring that the rank-and-

11   file, particularly, employees, many, many of them -- this

12   company has got a lot of employees -- are, right now, in a

13   period of uncertainty and stress; a process that I'm certainly

14   familiar with from my time on that side of the podium.

15         And to the extent that the company is able to ensure

16   that they are -- that the -- those employees are advised that

17   there will be -- their wages, salaries, benefits will be

18   continued without interruption, there is a significant and

19   important benefit that comes from that.

20         So I am satisfied that the debtors have carried their

21   burden with respect to that relief.  I will enter the interim

22   order, and we'll talk later about scheduling of a final

23   hearing.

24         MR. DURRER:  Of course, Your Honor.

25         THE COURT:  Okay.

1          MR. DURRER:  And Your Honor, we're very grateful for

2     those comments.  And candidly, that is precisely why our CEO

3     made the determination that he should stay on the ground, so

4     that he could look those employees in the eye and give them the

5     comfort that the company is going to continue to support them.

6     As Your Honor noted, this motion is very important for that

7     purpose.

8          In addition, the debtors do intend to come back at a

9     future date and ask for employee -- you know, typical market --

10         THE COURT:  Uh-huh.

11         MR. DURRER:  -- employee retention and incentive

12    programs, to make sure that people are -- continue to have

13    their eye on the ball with respect to all of the work that we

14    need to accomplish in the next three or four months.

15         THE COURT:  Okay.  I understand.  We'll deal with that

16    when it comes.  Okay.

17         MR. DURRER:  With respect to number -- Matter Number

18    8, Your Honor, on the agenda, this is a motion for adequate

19    assurance with respect to utilities.  We did receive from

20    comments from Mr. Kenney on this; those are reflected --

21         THE COURT:  Okay.

22         MR. DURRER:  Oh, I apologize, Your Honor.  With

23    respect to Number 7, the only change to that form of order,

24    just for Your Honor's information, was to make triple-sure that

25    it was consistent with the DIP budget.

1          THE COURT:  Great.

2          MR. DURRER:  And to add Your Honor's name.  But

3    there's -- otherwise, there were no substantive changes to

4    that.

5          So I'm sorry.  With respect to Number 8, adequate

6    assurance, yeah, the proposal is consistent with Delaware

7    Practice, which is to --

8          THE COURT:  Two weeks.

9          MR. DURRER:  -- set up a two-week account, interest-

10   bearing, and utilities maintain the right to come back and ask

11   for more.  And you know, we will do our level best to resolve

12   any such request without Your Honor's attention.  But if we

13   need to, we'll come back.

14         THE COURT:  I'll be here.

15         The number reflected in the motion is $165,000 for the

16   -- for that two-week deposit.  Is that still what the number

17   is?  Sometimes, that's a bogey.

18         MR. DURRER:  That is our assessment of the number.  We

19   actually --

20         THE COURT:  Okay.

21         MR. DURRER:  You know, we have been getting some

22   inbound calls, even today, so ...

23         THE COURT:  I see -- and I see that in your papers, as

24   well.

25         MR. DURRER:  Yeah.  We will resolve it.

1        THE COURT:  Okay.  All right.  Does anyone else wish

2    to be heard with respect to the utilities motion?

3        (No verbal response)

4        THE COURT:  All right.  I am satisfied that the

5    motion, as presented, is certainly consistent with local

6    practice.  And again, I think, as I said before, that that

7    local practice embodies, I think, an appropriate balance of the

8    rights under 366 of a utility company to be entitled to

9    adequate assurance; and that need for an operating debtor,

10   particularly, to ensure that they have access to uninterrupted

11   utility service.

12        And so, with the comments from counsel with respect to

13   the rights of utility service providers to come to court and

14   seek additional or alternative treatment, which rights are

15   fully reserved, I'm satisfied that the debtors have carried

16   their burden with respect to this relief, and that order will

17   issue.

18        MR. DURRER:  Thank you, Your Honor.

19        Number 9 on the agenda, Your Honor, is debtors' motion

20   for an order authorizing the payment of prepetition taxes and

21   related customs, duties, et cetera, et cetera.  So that, again,

22   is relatively routine.

23        You know, this is one of those things where Congress'

24   vision of the way a company goes from the prepetition period to

25   the post-petition period is not quite consistent with how

1   businesses --

2           THE COURT:  With the reality.

3           MR. DURRER:  -- operate.

4           THE COURT:  With the reality.

5           MR. DURRER:  So this is, again, our request for

6   permission to pay those amounts.  And we've worked with the

7   United States Trustee and their comments, and it's otherwise

8   consistent with our DIP budget.

9           THE COURT:  Is there interplay here between -- because

10  we have the shippers motion coming up, that's got customs and

11  other issues.

12          MR. DURRER:  Yeah, I apologize.

13          THE COURT:  Is --

14          MR. DURRER:  I misspoke, Your Honor.  The import and

15  export charges are in the shippers motion, and not in this.

16  And we actually did a good job, I think, of --

17          THE COURT:  Of parsing --

18          MR. DURRER:  -- making sure --

19          THE COURT:  -- out those two?

20          MR. DURRER:  -- that we didn't double-count, yes.

21          THE COURT:  Okay.  And that was really what I was

22  asking.  I don't really have an issue with them.  I just wanted

23  to find out which bucks -- which bucket fits --

24          MR. DURRER:  Understood.

25          THE COURT:  -- within which motion.  Okay.  I

1    understand the nature of the relief requested.

2          I would ask if anyone wishes to be heard with respect

3    to the debtors' motion for authority to pay certain obligations

4    relating to taxes and other prepetition obligations.

5        (No verbal response)

6          THE COURT:  Very well.  Based upon the record before

7    me, and again, considering Mr. Bruenjes' declaration, I will

8    approve and authorize the relief requested.

9          As a threshold matter, I note that the debtor has

10   identified a number of different categories of obligations

11   relating to taxes, fees, and other charges.  Many of those, and

12   perhaps the majority, in terms of economics, are likely falling

13   in the category of trust fund obligations.  And case law

14   teaches that those monies, while in the possession of the

15   debtor, are likely not property of the estate.  And again, I

16   think long experience teaches that, in the absence of timely

17   payment of those obligations and others, there is the very,

18   very real risk of audit and disruptive collection effort by

19   revenue authorities; state, local, and federal.

20         And so, based upon the record before me, I will

21   approve and authorize that relief, and that order will issue.

22         MR. DURRER:  Thank you, Your Honor.

23         Number 10 on the agenda is the debtors' motion to pay

24   certain prepetition shipping charges and import/export --

25         THE COURT:  Actually, I apologize, but I don't think

1    that my record is complete.

2           The prior motion contemplates the payment of

3    prepetition obligations.  To the extent it's trust funds, I

4    don't think, actually, that that's an issue.  That's a transfer

5    of non-estate property.  But to the extent that it's not, I

6    believe I'm obliged to make the necessary finding under Rule

7    6003.

8           MR. DURRER:  Uh-huh.

9           THE COURT:  And I'm prepared to make that finding,

10   again, based upon Mr. Bruenjes' declaration, and more

11   specifically, the Court's experience with these issues; that

12   the risk of the audits and collection and suspension behavior

13   that is likely to happen does pose a risk of immediate and

14   irreparable harm to the debtor; and, therefore, that order will

15   issue, and the debtor has carried its burden.

16          I apologize for the interruption.

17          MR. DURRER:  Certainly, Your Honor.

18          We were on Number 10, Your Honor, which is the

19   debtors' motion for payment of prepetition shipping charges and

20   import/export charges.

21          You know, consistent -- one of the features that's

22   unique about Quiksilver is that, in addition to being a

23   retailer, it is also a wholesaler, and that is actually a large

24   segment of its business.  And it's vital that we be able to

25   deliver goods through to our customers, so that they can stock

1    their shelves, so they will continue to stock their shelves

2    with Quiksilver goods.

3         And so this -- the shipping motion is actually very

4    important because we need to send a signal to our partners that

5    operate in our logistics area and get goods over the water.  As

6    we mentioned with respect to the motion that Ms. Jones

7    presented, many of our vendors are overseas, and it's vital

8    that we get the goods.

9         The caps, there are caps in this motion.  Again,

10   working with the U.S. Trustee on their comments, there is a

11   two-million-dollar cap with respect to the shipping charges,

12   and a one-and-a-half-million-dollar cap with respect to the

13   export/import charges.  And we believe that we can operate

14   within that, and that that is also within the DIP budget that

15   we've entered into.

16        THE COURT:  Okay.  And this -- shippers, as a

17   category, I see from your motion, includes warehousemen, as

18   well.  And again, this -- precisely the same principles apply,

19   as it relates to shippers, as it does to warehousemen.  And

20   obviously, we have the export/import guys and customs.

21        I would ask if anyone wishes to be heard with respect

22   to the motion for authority to pay certain shipping and related

23   charges.

24        (No verbal response)

25        THE COURT:  Very well.  Based upon the record before

1    me, and specifically considering Mr. Bruenjes' declaration, I

2    will approve and authorize the relief requested.

3         This relief does contemplate the payment of

4    prepetition obligations within the first 20 days of the case.

5    But again, I find that the debtors' reorganization effort will

6    suffer the risk of immediate and irreparable harm in the

7    absence of the relief requested.

8         Specifically, the debtor needs to stock its shelves

9    and needs to ensure, on a post-filing basis, that those shelves

10   are stocked and maintained, in order to maintain customer

11   satisfaction and the health of the business.  And disruption to

12   what, again, experience teaches is a very precisely tuned

13   distribution chain threatens significant disruption.

14        In addition, personal experience teaches that the

15   shippers aren't going to give you your stuff, unless you pay.

16   And the warehousemen definitely aren't going give your stuff if

17   you pay [sic], irrespective of nuanced lawyers' arguments about

18   the Code.  So you're not getting your stuff if you don't pay.

19   And so I think reality teaches that we have to do that.

20        And similar principles apply with respect to

21   export/import obligations.  And again, experience teaches that,

22   in a retail business, in particular, but in any business, the

23   amounts that are at issue, for purposes of shippers and the

24   export/import charges, are dwarfed by the amounts or the value

25   of the product that is in transit, and again, by the impact of

1    any disruption in the operation of the debtors' business.

2         So, based upon the record before me, I'm satisfied the

3    debtors have carried their burden, and that order will issue.

4         MR. DURRER:  Thank you, Your Honor.

5         The next item on the agenda is Number 11, which is the

6    debtors' motion for authority to pay critical vendors on an

7    interim and final basis.

8         In the months leading up to the bankruptcy case, Your

9    Honor, in order to manage liquidity, the debtors --

10        THE COURT:  Stretched.

11        MR. DURRER:  -- stretched -- I was trying to find a

12   better word, but yes, you hit the nail on the head once again.

13   (Laughter)

14        MR. DURRER:  The debtors were required to stretch

15   their vendors beyond the terms that are typically available.

16   And you know, historically, the company has enjoyed pretty

17   favorable terms from its vendors; about 75 days, for the most

18   part, and we have taken them beyond that.

19        Now, at this juncture, and obviously, in the course of

20   the company's other efforts to develop alternative transactions

21   to being here, and obviously, in finalizing this transaction

22   for presentation through a plan process, you know, the debtors

23   are out of line with vendors' expectations.

24        And important to note here -- and this is going to

25   come up in a couple of places, and this is in Mr. Bruenjes'

1    declaration, specifically -- as part of the multi-year

2    turnaround plan, the debtors, recognizing that their business

3    was a little bit fragmented, consolidated the use of vendors

4    from several hundred, many hundreds, down to, you know, around

5    a hundred -- you know, between 100 and 200.

6            THE COURT:  And Mr. Bruenjes' declaration reflects

7    that those vendors are supplying both to the U.S. operations

8    and to non-U.S. operations.  And the concern would be that they

9    are not going to, necessarily, draw, again, the nuanced

10   distinction of who it is that's not paying them.

11           MR. DURRER:  That's precisely right.  And the problem

12   is that, while we're asking -- and we've gotten waivers from

13   our creditors to press the pause button -- in Europe, we need

14   to, obviously, continue to satisfy our obligations.  And making

15   vendors, on a global basis, happy with the company is really

16   important.

17           In addition, it's -- we need to be able to face our

18   customers and say that goods will flow.  We're basically just a

19   little bit more than two-thirds through our order book for the

20   coming season.  And in order to be able to get in front of

21   customers and say that, yes, we can deliver, to fill that

22   remaining third or so, we have to have vendor confidence.

23           THE COURT:  Can you clarify for me -- because I read

24   Mr. Bruenjes' declaration pretty carefully, and I'm familiar

25   with the company -- what is your high season?  Is it -- it

1    doesn't seem, to me, it's necessarily a Christmas thing.

2            MR. DURRER:  It is not a Christmas thing, at all.

3            THE COURT:  It's a spring and summer.

4            MR. DURRER:  Yeah.  And this particular season, I'm

5    not sure if it's the highest, but it certainly is one of the

6    most important seasons because it -- we're -- the order book

7    I'm talking about is spring.  And you know, we're loading up

8    those orders right now.

9            THE COURT:  Uh-huh.

10           MR. DURRER:  And it will be over the coming weeks and

11   months that we'll need vendors to be behind us.

12           And one of the -- one of the consequences of focusing

13   in on a smaller number of vendors is that those vendors, in

14   turn, do a tremendous amount of volume just for us.  And so

15   they have been stretched to the breaking point, where they're

16   having difficulties paying their own employees and their other

17   obligations, which are necessary to get the goods to us.

18           And so we need to honor that partnership with them,

19   and get some of these prepetition claims paid because, really,

20   we would have to start over, and it would really imperil the

21   plan process.

22           THE COURT:  I understand.

23           MR. DURRER:  So, as --

24           THE COURT:  Now what are the amounts that we're

25   talking about?

1          MR. DURRER:  Yeah, the --

2          THE COURT:  I know that they're identified in the

3     motion.  I guess I'd like clarity on precisely what the debtor

4     is looking for today --

5          MR. DURRER:  Yeah, that's --

6          THE COURT:  -- and then ultimately.

7          MR. DURRER:  Sorry, Your Honor, I didn't mean to

8     interrupt.

9          THE COURT:  Sure.

10         MR. DURRER:  So, yes, the interim authority that we're

11    asking for today is $30 million.  And I'll -- you know, Mr.

12    Kenney can speak for himself.  But we did consult with the U.S.

13    Trustee, and I don't believe that the U.S. Trustee has any

14    objections to this.

15         THE COURT:  Uh-huh.

16         MR. DURRER:  And then the final authority would be $52

17    million, Your Honor.

18         THE COURT:  And that would be on a final order basis.

19         MR. DURRER:  Only on a final order basis, Your Honor.

20         THE COURT:  Okay.  I think I understand.

21         Mr. Kenney.

22         MR. KENNEY:  Again, for the record, Mark Kenney.

23         Your Honor, we discussed it.  I mean, while the

24    numbers are high, it's like it is coming into the high season.

25    And looking at the scope of the business -- and I -- clearly,

1    it's going to wind up favoring trade creditors over certain

2    other creditors.  But they need to take trade creditors into

3    the company's future.

4            THE COURT:  Uh-huh.  Okay.  Let me ask if anyone else

5    wishes to be heard with respect to the request for leave to pay

6    critical vendors.

7        (No verbal response)

8            THE COURT:  Okay.  I'm prepared to approve and

9    authorize the relief requested.  And specifically, I would

10   start with Mr. Bruenjes' declaration and the description of the

11   business.  It's no secret we've dealt with many, many different

12   retail enterprises.  So I would like to think that we have some

13   insight, as a general proposition, into the business.  But

14   every business is different, and every business is particular.

15   And again, I'm satisfied with the clarity, and frankly, the

16   coherence of Mr. Bruenjes' declaration and the concerns that

17   have been articulated.

18           The Court is, obviously, careful about approving and

19   authorizing critical vendors, both at a -- on a first-day

20   hearing, when the due process concerns are probably at their

21   highest, and then even later because, at that point, the fact

22   of the matter is that we are doing violence to the statutory

23   priority scheme that the Code embodies.

24           But the fact is that, again, the purpose of this

25   exercise, especially at the earliest stages, is to preserve the

1    value of the enterprise, to which all the different

2    stakeholders will look.  And when I look at a case like this,

3    again, it seems to me that a number of different significant

4    considerations play in support of the debtors' request for the

5    relief.

6           It is a large number, but the fact of the matter is,

7    it's a large company.  And in addition, my assumption was that

8    the debtor has been making -- or has been stretching those

9    vendors.  So that, actually, probably increases that nut.

10          To me, the other consideration that I think is really

11   significant -- I'm not sure how deeply it plays into this

12   exercise, for purposes of today -- but having the same vendor

13   team to all of the entities, not just in the U.S. family, which

14   is really my problem, but the others, portends the risk of a

15   carry-on effect that might have consequences for the

16   reorganization of the entity before me that I can't necessarily

17   predict.  And Mr. Bruenjes' declaration identifies that

18   concern, and specifically says we would prefer to avoid it.

19          And then, finally, retail, and this company in

20   particular, with the product that it has and the long history

21   that it has, many, many, I expect -- and Mr. Bruenjes'

22   declaration touches on this.  But resourcing for many of these

23   products is a practical impossibility, at least in the time

24   frame that you're talking about.

25          So I am satisfied that, again, I think the debtor is

1    obliged to come with a meaningful and robust presentation to

2    identify and authorize payments, particularly in the amounts

3    that have been described.  But I'm satisfied here that the

4    debtor has, frankly, carried that burden.

5         Obviously, this one, in particular, contemplates the

6    payment of prepetition obligations in the first 20 days of the

7    case.  But for the reasons that I've stated, and for the

8    reasons expressed in Mr. Bruenjes' declaration, I'm satisfied

9    that the debtor has carried its burden to demonstrate that, in

10   the absence of the relief requested, the reorganization effort

11   would, in fact, suffer the risk of immediate and irreparable

12   harm.  And therefore, the order will issue on an interim basis.

13   And again, we'll talk about a scheduling for a final hearing

14   later.  Okay?

15        MR. DURRER:  Thank you, Your Honor.

16        THE COURT:  Sure.

17        MR. DURRER:  With respect to Number 12, Your Honor,

18   this is the debtors' motion for approval of cash management.

19   There are a number of changes, which primarily relate to -- you

20   know, Bank of America tends to perform a lot of our bank

21   functions.  And there are clarifications, as the DIP got

22   finalized that found their way into the order, to make sure

23   that the cash management order proposed gelled up --

24        THE COURT:  Tracks the --

25        MR. DURRER:  -- and worked with --

1          THE COURT:  Tracks the provisions --

2          MR. DURRER:  -- the DIP --

3          THE COURT:  -- or the mechanics of the --

4          MR. DURRER:  -- order.

5          THE COURT:  -- of the DIP order.

6          MR. DURRER:  But the thing I really want to highlight

7     -- and this is an issue that the U.S. Trustee raised,

8     appropriately so, which is:  One of the -- one of the important

9     aspects of globalization of the company is that there are, from

10    time to time, intercompany loans that go from the U.S.

11    subsidiaries and parent into the foreign subsidiaries.

12          And if I can -- if you'll indulge me, Your Honor, I

13    want to take you back to the chart again.

14          THE COURT:  Okay.

15          MR. DURRER:  So, specifically -- and this -- I'm going

16    to try not to repeat myself with respect to the DIP financing,

17    but some of this discussion is also relevant to the DIP

18    financing.

19          THE COURT:  I expect it.

20          MR. DURRER:  So, in connection with the current

21    structure, Your Honor, there's an ABL loan that sits on top of

22    Quiksilver, Inc. and the blue boxes that we've talked about

23    before.  And unfortunately, because of the company's, you know,

24    constrained liquidity situation, particularly in Japan and in

25    Australia, there have been borrowing base issues.  It's been

1    hard to get money to those entities through the ABL.

2            As a consequence of that, and for other reasons, as

3    well, it was very difficult to get to a new DIP ABL that could

4    accommodate the cash needs of those entities without taking

5    advantage of intercompany borrowings, based upon the borrowing

6    basis available in the U.S.

7            That problem is exacerbated by the fact that there

8    really aren't viable alternatives.  These entities can't go out

9    on their own and get new liquidity for the same borrowing base

10   reason:  There are no alternatives other than to look to the

11   ultimate U.S. parent.

12           Now the good news is that we have a plan sponsor that

13   was willing to put a term loan to augment our ABL, in order to

14   help us fund those entities.  Again, problem:  The term loan

15   couldn't be directed to these entities for, again, a couple of

16   reasons.

17           Reason number one, there's not a functional ability to

18   get the kind of relief that Your Honor can order with respect

19   to those entities efficiently.  It's certainly more available

20   in Canada, for example, than it is in Australia.  But as a

21   practical matter, it would have been impossible in the time we

22   had to launch this restructuring to accomplish that.

23           In addition, our plan sponsor is not functionally

24   able, without those protections, or even under local regulatory

25   law, to lend to those entities directly.  So the only way it

1    really makes sense, as a practical matter, is for those funds

2    to flow --

3            THE COURT:  Parent support.

4            MR. DURRER:  -- through the U.S.

5            And because these are assets -- again, looking at the

6    chart -- you know, so the -- we basically think of Australia as

7    the gateway to our whole Asia Pacific operation.  And so that

8    entity is required -- that division of our overall global

9    business is required to be delivered in connection with the

10   reorganization plan, pursuant to our proposed plan support

11   agreement.

12           But even setting that aside, the value of everything

13   that sits underneath Mountain and Wave is available to

14   creditors today, and it needs to be preserved.  And this was

15   the only way, under the circumstances, that we could figure out

16   how to preserve that.  And it necessarily requires the in-flow

17   of intercompany loans.

18           There will be full reporting, there will be full

19   transparency on that.  There will be formal documentation, in

20   terms of the books and records that the company will keep with

21   respect to that, as well.  And so I don't think that there's

22   any issues there.  So that was what I wanted to emphasize and

23   highlight with respect to the cash management.  We did -- upon

24   hearing that explanation, I think the U.S. Trustee got

25   comfortable that this was appropriate, under the unique

1    circumstances of Quiksilver.

2            The one highlight that I'll make, in terms of changes

3    to the order is that this order is subject to the DIP order,

4    and that, although this order provides for certain

5    administrative expense obligations related to the cash

6    management system, that B of A's priority claims and

7    administrative claims are dealt within the DIP order.  And in

8    the event of a conflict, we're going to look at the DIP order

9    for how that is spelled out.

10           THE COURT:  I understand.  Okay.  I think I --

11           MR. DURRER:  And with that, Your Honor, we'd ask Your

12   Honor to consider approving this motion.

13           THE COURT:  Okay.  Mr. Fox, good to see you.

14           MR. FOX:  Your Honor, for the record, Steven Fox,

15   Riemer & Braunstein, on behalf of Bank of America, NA, the

16   administrative agent and collateral agent under the proposed

17   global ABL DIP.  Your Honor, I believe *pro hac vice* papers have

18   been filed on behalf of --

19           THE COURT:  They have, and I would -- I usually make

20   this point:  I'm not going to stand on ceremony; I will hear

21   from anybody, with or without a *pro hac*.

22           MR. FOX:  Well, thank you, Your Honor.  I rise, not to

23   raise a substantive point, but rather, to build on the point

24   that Mr. Durrer just mentioned with respect to the cash

25   management process being subject to the DIP.

1          THE COURT:  Uh-huh.

2          MR. FOX:  That relates to Bank of America.

3          Your Honor, with respect to Paragraph 10 of the order,

4   you will see a proviso that deals with this very issue, making

5   cash management subject to the DIP.  We didn't have an

6   opportunity to discuss this with Mr. Durrer before the hearing

7   began, but we would like this paragraph to be a separate

8   paragraph within the order.  The reason for this is just for --

9          THE COURT:  We don't normally fight over grammar.  Go

10  ahead.

11         MR. FOX:  Yeah, it's -- we're concerned, Your Honor,

12  that the proviso deals specifically with Paragraph 10, as

13  opposed to the order itself and the provisions.

14         And the reason we do this, Your Honor, is, as a result

15  of certain prepetition events, Bank of America, in its capacity

16  as administrative agent, instituted cash dominion under the

17  existing facility.  That will continue post-petition.  So we

18  just want to make sure that any provision within the order that

19  allows the debtor to use cash and move cash in and out remain

20  subject to the cash dominion provisions, which are embodied

21  within the DIP now.

22         So we think, for implementation and clarity purposes,

23  it makes more sense to have this proviso be a separate

24  paragraph within the order, so that it covers everything within

25  the order, and that there's no chance for confusion, and that

1   it only relates to Paragraph 10.

2          THE COURT:  Mr. Durrer?

3          MR. DURRER:  We don't have any objection with that,

4   Your Honor.

5          THE COURT:  Okay.

6          MR. FOX:  Thank you, Your Honor.

7          THE COURT:  All right.  I don't have any issue with

8   that.  I understand the point.  And again, I think the fact of

9   the matter is that many of these orders contemplate the use of

10  money or money going in one place or another.  And as a general

11  proposition, all of those steps are presuming that money is

12  available under an appropriate budget and a financing.

13         And to the extent that there's a conflict between

14  those two, something like, for example, the critical vendor

15  order doesn't create cash.  If I had that power, my job would

16  be a lot easier.

17         MR. FOX:  Play rock, paper, scissors.

18  (Participants confer)

19  (Laughter)

20         THE COURT:  Okay.  That's fine.  I understand.  So we

21  can make that modification to the order and deal with it.

22         But I would ask whether or not anyone else wishes to

23  be heard with respect to, I think what we'll call the "cash

24  management motion."

25  (No verbal response)

1          THE COURT:  All right.  I appreciate counsel's

2     extensive description, and it's also in the motion, as well, in

3     large -- in broad brush.

4          International operations often bring, in cases before

5     this Court, issues about consolidated cash management systems

6     and the movement of money back and forth, particularly out of

7     the United States, and more typically, from debtor to non-

8     debtor, often get the attention of both the Court, the U.S.

9     Trustee, and stakeholders.  And so I appreciate the additional

10    clarity on the issue.

11         I'm satisfied that the debtors have carried their

12    burden with respect to the relief requested.  I find that it is

13    appropriate and necessary, in order to minimize disruption to

14    their operations as they enter into the Chapter 11 process, and

15    I will grant that motion.  Okay?

16         MR. DURRER:  Thank you, Your Honor.

17         Item Number 12 on the ...

18    (Participants confer)

19         MR. DURRER:  Oh, no, 13, lucky 13 on the agenda, Your

20    Honor, is our motion for DIP financing.  You've already seen

21    the trailer for this one.  But basically, the DIP facility

22    involves two components.  And I think it's important to

23    understand how we got to this place.

24         We -- you know, Peter J. Solomon and FTI both worked

25    closely with the company and with our stakeholders, including

1    the plan sponsor, as well as B of A, on this process.  We did

2    explore, in addition, completely separate providers.  But as

3    Your Honor, I think, would recognize, it's natural and

4    appropriate to reach out to existing stakeholders, the main

5    reason being priming issues.

6         You know, no one would be willing to lend money to

7    this company at this stage behind the ABL, no one would be

8    willing to lend money at this stage behind $280 million of

9    secured debt.  So we, naturally, reached out to controlling

10   stakeholders and both of those constituencies to see if they

11   would be amenable to providing DIP financing.

12        The good news was that Oaktree was willing to provide

13   $175 million of that financing.  But candidly, the pricing was

14   pretty high.  It was within benchmarks established in other

15   similar cases that we've seen, you know, with retailers this

16   year:  Cache, Wet Seal, Delia's, et cetera.  But the company,

17   obviously, felt it was very important to pursue a better

18   alternative.

19        In addition, because of the global nature of the

20   business, and the fact that we had a global ABL that would sit

21   partly within and partly outside of a Chapter 11 filing, we

22   needed to accommodate that issue and develop a transaction that

23   allowed for critical funds to be able to flow to those

24   entities.

25        The B of A aspect of this is attractive from the

1    debtors' perspective for two reasons:

2          One, by having B of A remain in the transaction, we

3    were able to take advantage of B of A's existing lending

4    relationship to those foreign subsidiaries; not increase it,

5    but take advantage of that collateral that's already sitting

6    there, that could be accessed, that B of A is, as of today,

7    more or less comfortable with.

8          In addition, B of A, as a more traditional financial

9    institution, presented better pricing than Oaktree could or

10   would be willing to do.  And so, by having B of A in the

11   transaction, we were able to essentially lever down our

12   weighted interest rate from twelve percent to about eight

13   percent over the entire one-hundred-and-seventy-five-million-

14   dollar borrowing.  And that was, obviously, very attractive to

15   the company.  In addition, again, because of that foreign

16   collateral issue, we're able to take advantage of that.

17         As a consequence, though, you know, our other

18   stakeholders in the existing ABL were not willing to even

19   participate, let alone present an alternative; Wells Fargo and

20   GE.  And so, as a consequence, we needed -- this DIP not only

21   needed to provide for that structure --

22         THE COURT:  Uh-huh.

23         MR. DURRER:  -- but it needed to provide for taking

24   them out.  And as Your Honor might expect, that is not

25   something that GE and Wells, where this DIP is effectively

1    priming, would agree to hang around until a final hearing.

2    They want to be taken out right away.

3         And so, you know, I will acknowledge, Your Honor, for

4    the record, that the borrowings that are anticipated, you know,

5    for the interim approval are substantial.  I'm not going to

6    hide from that.  But that -- the debtors' belief -- and I think

7    that this is borne out in Mr. Bruenjes' declaration -- is that

8    those sums are critical.

9         To be specific, Your Honor, it's around $115 million,

10   give or take.  And it's almost half and half between B of A, in

11   terms of the ABL component, and Oaktree, in terms of the term

12   loan component.

13        And you know, the uses of those funds are retiring the

14   GE Capital exposure in the U.S., Canada, Australia, and Japan.

15   And in addition -- and that's about 19 and a half million

16   dollars, Your Honor.  And with respect to Wells Fargo, their

17   exposure in the U.S., Canada, and Australia, and that's about

18   $11.1 million.

19        And then there will be approximately $20 million,

20   again, in "lawyer math," as I like to say, that will be

21   available on the balance sheet of the debtor, and that is

22   consistent with the DIP budget's estimation of the debtors'

23   cash usage over the next three to four weeks.

24        I understand, we're going to have a conversation about

25   scheduling a final hearing.

1          THE COURT:  Uh-huh.

2          MR. DURRER:  But that is the need in the short term.

3          Now the next issue I want to highlight for Your Honor

4     with respect to the DIP facility is that, because Oaktree is

5     making a substantial investment in connection with this

6     facility of $115 million, their view, which is consistent with

7     terms that we've seen in other DIPs in this jurisdiction,

8     including very recently in Wet Seal, where I represented the

9     DIP lender, is that they want this DIP to be related to their

10    deal.

11         Specifically, they are not willing to lend that money

12    to us unless they are financing their deal, as opposed to some

13    other deal.  The debtors resisted that, argued, fought,

14    negotiated in good faith, and ultimately got to a place where

15    this was sort of a deal-breaker from the DIP lender's

16    perspective; they would not lend the money without those terms.

17         And there are -- in addition to the overall funding of

18    their deal, which, again, I think is fair -- and that's --

19    look, I made -- I'll concede that I made the same argument in

20    front of Judge Sontchi in Wet Seal.  And the bottom line is,

21    Your Honor, that, if there's a better deal to be had, then that

22    person or entity should come in and take out --

23         THE COURT:  Step into --

24         MR. DURRER:  -- the DIP financing --

25         THE COURT:  -- Oaktree's shoes.

1        MR. DURRER:  -- and deal with it that way.  And that

2    is a very market and fair request.

3        The milestones, Your Honor, that are set forth, I'll

4    just briefly hit them.  We need to have a final order within 30

5    days of today -- or of -- I'm sorry, of yesterday, Your Honor;

6    and also have the plan support agreement protections, the

7    breakup protections that are afforded in there, and the expense

8    reimbursement features approved within that same timing.

9        As I mentioned at the outset, we're not seeking any

10    such approval today; that's going to be on notice and after the

11    formation of a creditors' committee.  And then it would also be

12    our vision that we would file a plan and disclosure statement

13    at that same sort of thirty-day benchmark, and also have a

14    completed backstop agreement.

15        As of right now, Your Honor, we have a backstop

16    termsheet, whereby Oaktree is agreeing to fund -- or to

17    backstop 122 and a half million dollars to take out the

18    portions of the DIP financing --

19        THE COURT:  Is that an exit facility backstop or ...

20        MR. DURRER:  There's --

21        THE COURT:  -- in the context of a plan, or is it --

22    it.

23        MR. DURRER:  There's actually -- so there's four

24    different items, and I'm happy to walk through them, Your

25    Honor.

1          So, on exit, we would anticipate having a new exit ABL

2    --

3          THE COURT:  Right.

4          MR. DURRER:  -- and the sizing on that is up to $120

5    million.  There's actually -- there was a late update to the

6    plan termsheet and the next time this gets filed, that will be

7    corrected, but that's the amount.

8          There is a separate exit term facility, which the

9    parties are going to work together on, as to the appropriate

10   sizing.  That work is still in process.

11         And then there's a rights offering that Oaktree will

12   backstop, of an additional incremental 122 and a half million

13   dollars, and that is designed to fund the administrative costs

14   of the case, take out a portion of DIP term loan facility, and

15   also fund some of the distributions under the plan.

16         And then, finally, one feature of the plan that is not

17   a condition to consummation of the plan, but it's something

18   that makes a lot of sense and the company and the plan sponsor

19   are going to work together to try to accomplish, is an exchange

20   offer with respect to the Euro notes, in exchange for a partial

21   pay down, which will be back stopped by Oaktree in the U.S. of

22   50 million Euro.  We're going to invite our Eurobonds holders

23   to extend their 2017 maturity for three years.

24         So that will enable the company --

25         THE COURT:  It gets, then, the company on an

1    international basis, more of a runway.

2            MR. DURRER:  -- will be completely sound.

3            THE COURT:  I understand.

4            MR. DURRER:  It would be a great result.

5            THE COURT:  Okay.

6            MR. DURRER:  It's not -- again, it's not necessary.

7    That's a 2017 maturity, but it's on the horizon, and if we can

8    accomplish it with the momentum that's behind this

9    restructuring already, it makes sense to do it and Oaktree has

10   agreed to backstop that component of it, as well.

11           But we're going to make those economics available to

12   our other senior secured noteholders that aren't Oaktree, so

13   that everybody has an opportunity to recover some value, with

14   respect to that.

15           THE COURT:  Okay.  I think I understand.

16           MR. DURRER:  The approval -- the milestone, with

17   respect to approval of a disclosure statement, Your Honor, is

18   75 days, so another 45 days hence from filing.  And then we're

19   required to get the confirmation within 115 days.  That's going

20   to fall around the holidays, Your Honor, the end-of-year

21   holidays.  And let me be clear about something, because this

22   was also negotiated and we're actually grateful that we were

23   able to get to these milestone dates, which we believe are

24   achievable.

25           However, because of the nature of the business, we're

1    going to do our level best to beat those deadlines, and we

2    think it's important to the overall health of the business that

3    we continue to make strides, deliberate strides, consistent

4    with our -- with this program.  And so if there's any

5    opportunity to get ahead of these deadlines, we're going to try

6    and do it.  Obviously, we're going to be respectful of Your

7    Honor's calendar and that's very important and our other

8    constituencies, but we need to move with all deliberate speed

9    to try and get this done.

10            With respect to the investigation periods, those

11   periods are pretty standard.

12            THE COURT:  Sixty and seventy-five.

13            MR. DURRER:  And the U.S. Trustee did provide

14   comments, with respect to the details surrounding the

15   investigation and impacts on third parties, other than the

16   committee, and I believe we have sorted out all of those

17   language issues.

18            THE COURT:  Do you have a black-line?

19            MR. DURRER:  We do have a -- well, I hope we do.

20            THE COURT:  You've got a lot of boxes.

21            MR. DURRER:  As of the time you came out, we didn't.

22            Your Honor, may I approach?

23            THE COURT:  Sure.  Thanks.

24            MR. DURRER:  Your Honor, this is literally hot off the

25   presses.  One -- two things I want to add while Your Honor is

1    looking at that.  Thing 1, I did not emphasize in the plan

2    termsheet that we did have a belt-and-suspenders approach, as I

3    mentioned at the outset.  We had considered pursuing an

4    injunction to extend the protection of the automatic stay to

5    the foreign subsidiaries in the event that we couldn't get the

6    waiver.

7         And the condition in our documentation was with bank

8    -- the plan termsheet frankly required that we go belt and

9    suspenders.  The good news is that we got the waiver and that

10   our plan sponsor was sufficiently satisfied with that waiver,

11   that they waived the requirement that we seek that injunction

12   at this time.

13        THE COURT:  That's good.

14        MR. DURRER:  To the extent that -- to the extent that

15   circumstances change, we reserve the right to come back on

16   that.

17        THE COURT:  I'll be here.

18        MR. DURRER:  We appreciate that, but that is not

19   something that we intend to pursue unless, as I said,

20   circumstances change.

21        THE COURT:  Okay.

22        MR. DURRER:  One -- there is an issue, and I believe

23   there may be an appearance on the phone -- with -- in the

24   existing credit agreement, I explain that part of the purpose

25   of the DIP is to take out GE and Wells.  There are other

1    relationships that the company has with GE.  There are

2    equipment leases, with respect to distribution center,

3    mechanical things, you know, bailing systems, et cetera, rack

4    flow systems for logistics that GE leases to us.  There are

5    also vehicle and other equipment leases all over the world in

6    France, Japan, and Australia, and New Zealand.

7            The way that the pre-petition credit agreement works

8    is that there's a reference in the documentation to bank

9    products, which, if you want to satisfy a lender in full, you

10   have to satisfy them with respect to the ABL, plus any bank

11   products.  We agree with GE that bank products includes some of

12   these equipment leases across the world, and rather than bog

13   down the closing of the interim DIP while we sort those leases

14   out, we've agreed to the following -- and I believe that Mr.

15   Brian Swett, from McGuireWoods, is on the phone for GE, and

16   I'll let him speak -- but my understanding of the agreement --

17   and we're going to finalize the language -- is basically that

18   with respect to France, we're going to work together to

19   determine what the appropriate resolution of those equipment

20   leases are; that the amount in Japan, the amount in controversy

21   is $10,000, and so we've already talked about it too much, just

22   going to agree to pay that, as part of the closing; in New

23   Zealand, the number is also reasonably small, but we're going

24   to work with them on, you know, how to resolve those equipment

25   leases; and then, finally, with respect to the Mira Loma

 1   distribution center, there is a dispute between the -- GE and

 2   the debtors over whether that particular lease comprises a bank

 3   product.

 4          The amount in controversy is a $1,957,000, and what

 5   we're going to try to do is to work that out between now and

 6   the final hearing, but the debtors have agreed that they would

 7   make a reasonable reserve in that amount.  So, in other words,

 8   at the time of the final hearing, we will have sufficient funds

 9   to pay that if we agree to pay it or if Your Honor says you've

10   got to pay it.

11          And so I believe, subject to hearing from Mr. Swett--

12          THE COURT:  Does the DIP order -- does the DIP budget,

13   then, contemplate that as a reserve or ...

14          MR. DURRER:  It's doesn't -- it's not a separate,

15   special formal reserve or escrow, Your Honor, but we -- the

16   company has sufficient funds to accommodate that kind of an

17   expense in connection with the final hearing.

18          THE COURT:  Okay.  Mr. Swett, are you on the line,

19   sir?

20          MR. SWETT:  (Via telephone)  Yes, Your Honor, it's

21   Brian Swett from McGuireWoods.  I represent the other two

22   lenders under the current ABL facility, GE Capital Corporation

23   and its affiliates; Wells Fargo Bank, and its affiliates;

24   including in both cases, its foreign affiliates that are

25   lenders under the current ABL facility.

1          Mr. Durrer has accurately described the situation

2     under the current credit agreement and accurately reflected on

3     the record our agreement, with respect to these bank product

4     obligations.  Essentially, Your Honor, the deal is that the

5     company can take the position, with respect to the equipment

6     leased at the California location, that it is not a bank

7     product and that our payoff figure is not correct.  And GE

8     reserves the right to take the position that it is, in fact, a

9     bank product and that the payoff figure is correct.

10         In addition, to the extent that there are obligations

11    that are quote, unquote, bank products, under the ABL facility

12    that are not being paid at this time, all of the applicable GE

13    entities reserve their rights, with respect to those

14    agreements.  For the most part, those agreements exist with

15    non-debtor entities outside of the United States, and it's our

16    intention to move forward under those agreements in accordance

17    with their terms outside of the bankruptcy proceeding.

18         But, again, as Mr. Durrer has correctly stated, we'll

19    work through those items over the course of the next couple of

20    weeks and make sure that we have them resolved.  In any event,

21    between now and then, our claims under the existing ABL

22    facility would not be satisfied in full unless and until we

23    resolve these items.  But I can say that in terms of our

24    exposure as a lender under the ABL facility, with respect to

25    advances under that facility, et cetera, we do expect those

1    will be paid in full, leaving the only open universe to be

2    these bank products.

3            THE COURT:  Okay.

4            MR. SWETT:  Thank you, Your Honor.  I appreciate the

5    opportunity to appear by phone today.

6            THE COURT:  Sure.  Happy to oblige, Mr. Swett.  Thank

7    you.

8            All right.  I think I understand.  And that issue,

9    obviously, will keep our powder dry for a later hearing.  And

10   this is the sort of thing that typically gets resolved as a

11   business matter anyway, but if not, then we'll be prepared to

12   deal with it.  It appears that the parties have appropriately

13   accounted for it in the event that we do have to fight about

14   it.

15           MR. DURRER:  Thank you, Your Honor.

16           So that is the company's presentation, with respect to

17   the DIP financing.  We would request that Your Honor consider

18   approving that form of order that you have.

19           THE COURT:  Okay.  I understand.

20           Mr. Kenney, I can recognize your hand in the black-

21   line.

22      (Laughter)

23           MR. KENNEY:  Thank you, Your Honor.  I hear that from

24   Your Honor frequently.

25           There was one issue we left open until the final

1    hearing.  It's a relatively minor one that I don't think we'll

2    have any difficulty with.

3              THE COURT:  Okay.

4              MR. KENNEY:  Everything else, our proposed changes

5    were accepted.

6              THE COURT:  Okay.  Let me ask if anyone else wishes to

7    be heard, with respect to the financing.

8              Mr. Fox?

9              MR. FOX:  Your Honor, again, Steven Fox, on behalf of

10   Bank of America.  We're actually quite gratified to hear that

11   the debtors and GE have been able to work out an interim

12   arrangement, with respect to the bank products and the timing

13   of their satisfaction.

14             What Mr. Swett did not indicate for the record, which

15   is critical to Bank of America, is that GE --

16             THE COURT:  Oh hope he's still on the line.

17        (Laughter)

18             MR. FOX:  I'm going to bet he is.

19             Is that GE and Wells Fargo actually consent to the

20   DIP, including the priming features associated with the

21   pre-petition facility.  As you -- as the record reflects, it

22   will be paid for all of the advances, both domestic and

23   international, but while this bank product --

24             THE COURT:  That -- the discrete issue.

25             MR. FOX:  -- treatment is out there, Bank of America,

1    as the agent under the pre-petition facility and as the agent

2    under the DIP, wants to be assured that both of its departing

3    participating lenders consent to the treatment contained in the

4    DIP.

5            THE COURT:  Mr. Swett, this is Judge Shannon.  I'm

6    getting the vibe that if you don't say yes, you're not going to

7    see any money very soon.

8            MR. SWETT:  That's more understanding, as well, Judge.

9        (Laughter)

10           MR. SWETT:  And, yes, we consent.  We understand that

11   our discussions, with respect to the bank products, will take

12   place in a slightly different environment, with respect to

13   priority, than what we have now, and that's really the

14   fundamental basis for our agreement with the company to set

15   aside in a reserve, as Mr. Durrer had indicated, the amount,

16   with respect to the California equipment lease.

17           THE COURT:  Okay.  I understand and I appreciate

18   that --

19           MR. SWETT:  The answer, Judge, to Mr. Fox's question

20   is yes.

21       (Laughter)

22           MR. FOX:  You had me at yes.  Thank you.

23           THE COURT:  All right.  I think Ms. Heilman wishes to

24   be heard.  Welcome.

25           MS. HEILMAN:  Good afternoon, Your Honor.  Leslie

1  Heilman, Ballard Spahr, on behalf of Federal Realty Investment

2  Trust, as well as GGP Limited Partnership.  I also appear

3  locally for the Macerich Company and the Miracle Mile Shops,

4  who my co-counsel is on the phone.

5           Your Honor, we raised an issue at the beginning of the

6  hearing when he did review the interim DIP order that was

7  attached to the motion.  We had not yet seen a black-line and

8  we were happy to see that it did provide the certain

9  provisions, with respect to access rights to the leasehold

10  premises.

11          THE COURT:  Uh-huh.

12          MS. HEILMAN:  However, what was unclear in the order

13  was whether or not there was -- they were taking any liens on

14  the leases or reserving just their liens to disposition of the

15  proceeds of liens.

16          THE COURT:  As to proceeds.

17          MS. HEILMAN:  Well, we did have discussions with

18  counsel for Bank of America and Oaktree at the beginning of the

19  hearing and we learned that it is the intent of Oaktree to take

20  liens directly on leases.  We're not really sure where those

21  discussions lie at this point, however, we do object to any

22  liens on the leases themselves.  It will conflict with

23  provisions in our leases, so we would like to know what

24  authority they stand that they can take lien on leases that are

25  third-party property.

1          THE COURT:  Well, I think the threshold question would

2     be to find out if that's a request for purposes of the interim

3     order or the final --

4          MS. HEILMAN:  Right.

5          THE COURT:  -- and then we'll figure out how we'll

6     deal with it.

7          MS. HEILMAN:  I believe, Your Honor, that they were

8     discussing whether they were going to reserve it to the final,

9     but we haven't had a chance to clarify that.

10          THE COURT:  All right.  I'll hear from either Mr.

11     Durrer or Mr. Nash.

12          MR. DURRER:  Your Honor, that issue will be reserved

13     for the final order.

14          THE COURT:  Okay.  Then I have no comment on that

15     issue.  I assume that -- or I'm confident, Ms. Heilman, your

16     clients and others, similarly situated, have their rights

17     reserved.  And, again, if we have to deal with this issue,

18     we'll deal with it.  And if it is resolved satisfactorily, then

19     fine.

20          But it is not an issue for purposes of the first day,

21     and I think that's pretty consistent with established practice

22     in this jurisdiction, okay?

23          MS. HEILMAN:  Thank you, Your Honor.

24          THE COURT:  Sure.

25          MS. HEILMAN:  With that statement on the record, I

1     think we're fine.

2            THE COURT:  Very good.

3            Does anyone else wish to be heard, with respect to the

4     financing?

5        (No verbal response)

6            THE COURT:  I have a couple issues, which I don't

7     really regard as material.  Well, I guess my observation is I

8     don't think that you'll regard them as material.

9        (Laughter)

10       (Participants confer)

11           THE COURT:  And, again, it's -- I have a couple

12    observations and you've heard me make these comments before.  I

13    see the milestones and I understand them and I respect the way

14    that -- the context, in which they are proposed.  There's been

15    a substantial investment by players that have a significant

16    stake in this and a debtor that's put an enormous amount of

17    effort into developing a program to move forward.

18    Obviously, today is the outset of that and I have no problem

19    with the parties trying to identify, where clarity, what their

20    intentions are and what the time line that they expect to

21    proceed with are.  So, I don't have an issue with the

22    milestones.  I'm going to give you the scheduling that you're

23    looking for, and I expect at some point, this case will have a

24    committee appointed.

25           Mr. Kenney, have you come up with a date, by which

1    you'll conduct a formation meeting?

2            MR. KENNEY:  We have, Your Honor.  It will be on the

3    21st of this month at 11:00.

4            THE COURT:  Okay.  All right.  The 21st.

5            So, again, consistent with my prior comments, the DIP

6    financing, I don't have a -- I understand the financing.  It is

7    a complicated structure and I appreciate, frankly, getting

8    walked through it.  And you answered a bunch of the questions

9    that I had in the presentation, so that's helpful.

10           Some of these elements, again, with respect to the

11   milestones, et cetera, when you're dealing with opposing

12   counsel or committee counsel, once they're appointed, they're

13   going to know that we'll deal with these issues and I expect

14   that there will be a dialogue between the parties leading up

15   to, and perhaps at a final hearing, but I'm not telling you

16   anything that you don't know.

17           There is a -- I see there's a -- there was a

18   fifty-thousand-dollar figure for a committee conducting an

19   investigation.  Is that the number still?  Okay.

20           UNIDENTIFIED:  Yes, Your Honor.

21           THE COURT:  I've said this before.  Again, I view that

22   as a plug number.  Committee's not here.  I expect there will

23   be -- there may be a discussion with a committee and I make no

24   comment about which way it goes.  I'm not going to stand here

25   today and argue for a committee that doesn't exist; I'll just

1   simply share that, you know, I make no comment today in

2   entering this order that $50,000 is the right number or isn't.

3   And, again, the parties will have that discussion, but I view

4   that as a number that exists and it's plugged in there for

5   purposes of identifying the proposition that this Court has

6   always, I think, embraced, that there are certain costs

7   associated with participating in a bankruptcy proceeding and

8   that's one of them and you've got to deal with it.

9          So, I'll deal with that, again, on the merits in a

10   final, and I don't think anybody is under any allusions that I

11   blessed or endorsed that particular number.  The milestones are

12   what they are and the rights associated with them are what they

13   are.  But I'll hear from parties, with respect to the

14   appropriateness of the time line and the game plan that the

15   debtor has identified as those parties appear and are heard in

16   this case.

17          A couple, again, issues.  When I turn to Page 41 of

18   the black-line -- and I had it on the clean, but the pagination

19   will be off -- Page 26 -- or Paragraph 26, events of default

20   and then rights and remedies is Paragraph 26.  I guess you're

21   trying to get around me with the:

22          "Unless otherwise ordered by the Court, the sole basis

23           on which the parties can challenge a default is

24           whether it's occurred and nothing on the merits."

25          I'm otherwise ordering.  So I've said that before, and

1    I actually view it as a matter of, frankly, fairness to the

2    lender.  If they're -- it happens exceedingly rarely, but if

3    the -- if this goes off the rails and we have a lender that is

4    exercising its default remedies, especially in the early stages

5    of a bankruptcy case, I'm going to conduct a hearing.  And it's

6    not going to be about whether or not Paragraph 28, you know,

7    (vii) has occurred.

8         It's going to be about where we are and where we're

9    going, and I wouldn't want a lender to come in and believe that

10   the hearing is going to be so narrowly circumscribed that I

11   don't have the ability to administer the case before me.  And I

12   think it's a question of just responsibility in front of me.  I

13   have no problem with somebody that's lending money identifying

14   the defaults that they want to identify for their own

15   protection; that makes sense.  The consequences of those

16   defaults can be identified, but are subject to my disposition.

17        In addition, I don't know if this is still in there --

18   and I can't find it -- there was a presumption that if a notice

19   of default is given, there's a presumption that the default has

20   occurred.  That a new one on me.  Oh, here we go, Page 42,

21   about halfway down:

22        "Upon a DIP agent having delivered a notice of an

23        event of default, in accordance..." yadda yadda "...at

24        any hearing, with respect to whether an event of

25        default has occurred, there shall be a presumption in

1          favor of the DIP lenders and the DIP agent that an

2          event of default has occurred, which presumption may

3          be rebutted by the debtors and the committee."

4          Let's go ahead and take that out.  That was his idea?

5          UNIDENTIFIED:  I think that was Mr. Fox's idea.

6      (Laughter)

7          THE COURT:  I had not seen that.  I don't real embrace

8   it, and the proposition is the same as it applies to the scope

9   of the hearing.  This is a rare situation.  I can't predict

10  what the circumstances are, and in fairness, frankly, to a

11  lender, I don't want them to come in with an assumption that a

12  technical reading is going to be dispositive of where I go.

13          And that proposition applies with particular force in

14  a large operating case where we've got hundreds of stores and

15  thousands of employees.  If this thing goes off the rails --

16  and I have no reason to assume that it would -- I got to

17  conduct a hearing and I will.  So I'd like those -- I would

18  like both of those provisions stricken.

19          And I understand that the treatment and the structure,

20  as it relates to GE and to Wells, and I don't have an issue

21  with that.  I've been carefully over the budget and -- in the

22  time that I've had, and I understand that where the debtor

23  stands in the budgeting, I'd be prepared to talk about

24  scheduling and final hearing.

25          MR. DURRER:  Thank you, Your Honor.

1         It may make sense, with Your Honor's indulgence, to go

2    back now to Matter 4, because that will also involve scheduling

3    of a final hearing and sort out those issues and take the

4    scheduling altogether.  Does that make sense?

5         THE COURT:  Okay.

6         MR. DURRER:  So, with that, Your Honor, the last --

7         THE COURT:  Well, hang on then.  Hang --

8         MR. SWETT:  Mr. Durrer, this is Mr. Swett.  If I

9    could, before you move on to a new matter, request the

10   opportunity to review the black-line that you presented to the

11   Court.  I don't know if you plan on preparing a further black-

12   line that reflects the changes that the Court has requested,

13   but I'd like to be able to take a look at that black-line

14   before its submitted for entry.

15        THE COURT:  This is Judge Shannon.  I think somebody

16   ought to email him the black-line, because I'm thinking you're

17   going to want an order today.

18        MR. DURRER:  Yeah, but my understanding is that

19   hopefully Mr. Swett has that black-line by now; that's my

20   understanding.  I could be --

21        THE COURT:  And I would not -- and, again, there is

22   Judge Shannon, Mr. Swett -- I don't think -- I wouldn't expect

23   that the debtor would issue or prepare a further black-line to

24   reflect, I think the two limited provisions that I took out

25   from the order.  Again, they don't -- they don't directly

1   affect your clients.

2        So if you've got the black-line, great.  If you don't,

3   I'd ask that you sing out and I'm sure somebody in the

4   courtroom has the ability to forward the black-line on to you

5   or make that happen in a time line that is consistent with us

6   being able to dispose of this issue, consistent with the

7   debtor's expectations.

8        Mr. Swett, do you have the black-line?

9        MR. SWETT:  I do not, Judge, and would ask that

10  someone send it to me.  I will review it while Mr. Durrer

11  discusses Matter 4.

12       THE COURT:  All right.

13       MR. DURRER:  Very much appreciated.

14       And I will say this, Your Honor.  This DIP was not

15  easy to put together and a lot of people, including Oaktree's

16  counsel and Oaktree's representatives, not to mention B of A's

17  counsel and B of A's representatives, including representatives

18  all over the globe, spent a lot of time over, again, the

19  holiday weekend working on this.  The company appreciates it

20  and is grateful for the time and attention that people devoted.

21       THE COURT:  Before we, then, turn to agenda Item

22  Number 4, I would ask, finally, are there any other parties

23  that wish to be heard, with respect to the financing?

24  (No verbal response)

25       THE COURT:  Okay.  As I think I've indicated from my

1    comments, I am prepared to approve and authorize the financing.

2    In so ruling, I will rely upon the affidavit, both of Mr.

3    Savini and Mr. Bruenjes, with respect to the debtors' need for

4    the post-petition financing and to the propriety of the terms

5    of the financing, for purposes of the record that's been just

6    developed before me today, at the outset of these cases.

7         I'm satisfied, in the absence of opposition, that the

8    debtors have carried their burden under Bankruptcy Code Section

9    361, 363, 364, and Bankruptcy Rule 4001, for purposes of

10   obtaining the use of cash collateral and obtaining secured

11   post-petition financing on a post-petition basis.  And once the

12   order is finalized, I will enter that order, and, again, we'll

13   talk in a few moments about scheduling for a final hearing,

14   okay?

15        MR. DURRER:  Thank you, Your Honor.

16        So that takes us to the last item on the agenda, Your

17   Honor, before scheduling matters, and that is Item Number 4,

18   which is the debtors' motion for interim and final relief, with

19   respect to a store-closing process.

20        THE COURT:  Yeah.

21        MR. DURRER:  The details regarding the program that

22   the company developed are contained in Mr. Coulombe's

23   declaration.

24        THE COURT:  I've read it.

25        MR. DURRER:  In addition, Your Honor, in discussions

1    with the U.S. Trustee, and, again, I'll let Mr. Kenney speak to

2    himself -- speak for himself, but I believe that Mr. Kenney

3    will raise that he believes that this is appropriate to be

4    postured as a Rule 327 application.  The debtor disagrees.

5    This is a pretty routine manner of implementing a store-closing

6    process.

7            As Mr. Coulombe's declaration states, the company did

8    engage in a competitive process.  These liquidators are very

9    well accustomed to reacting quickly and coming up with bids

10   quickly, and they did and we're grateful for that, and we were

11   able to get, you know, what we view as the best price under the

12   circumstances.  Particularly --

13           THE COURT:  Can I ask a question?

14           MR. DURRER:  Yes, Your Honor.

15           THE COURT:  And I'll be happy to hear from the trustee

16   on this issue and the specifics of it.

17           Do I remember correctly that we had, precisely, this

18   issue, Mr. Nash -- I'm not trying to put you on the spot--

19           MR. NASH:  We did, Your Honor.

20           THE COURT:  -- but you were counsel for Hilco in the

21   RadioShack case.

22           MR. NASH:  RadioShack, yes.

23           THE COURT:  This is like old-home week.  Mr.

24   Fredericks is here for Hilco.

25           MR. FREDERICKS:  I made it.  I'm sorry.

1      (Laughter)

2          THE COURT:  And the only reason I interrupt is I

3   understand that issue.  I also think that we came up with a

4   mechanic to defer that issue, and, ultimately, I think

5   concluded that it wouldn't professional engagement.  It was

6   different than this.  I mean it's not the same structure, but

7   the concepts were the same.

8          And I'm trying to recall, whether or not the issue --

9   I don't recall ruling on the issue.  I believe that I was

10  resolved in the RadioShack matters, but it was just a few most

11  ago with a very similar structure at the outset of a case.  It

12  was primarily a consulting arrangement, right, not an agency

13  agreement?

14         MR. DURRER:  And so, Your Honor, this is similar to

15  that, in that this is not what is called in the biz, an "equity

16  deal," where the liquidator actually takes the inventory on

17  what's a balance sheet, and there's a guaranteed signature --

18  excuse me.  This is a fee deal, which is the more typical

19  consulting arrangement, consistent with Your Honor's

20  recollection from RadioShack.

21         And what we've done here -- just to get to the punch

22  line -- we have no problem, whatsoever, and neither does

23  Hilco/Gordon Brothers Joint Venture, in giving disclosure and

24  transparency.  And that's -- we have filed it, and it's noted

25  on the amended agenda, Dockets Number 45 and 47.  We did file

1    declarations, both, on behalf of Gordon Brothers and on behalf

2    of Hilco, giving disclosure about their connections to the

3    debtor.

4         It's -- we have no -- as I said, we have no issue with

5    disclosure.  What the issue is, disinterestedness and 327, fee

6    applications, which, candidly, if we force these liquidators to

7    file fee applications and otherwise comply with the rules

8    surrounding 327, they're going to charge us more and that's,

9    you know, not going to be helpful in connection with getting

10   these stores closed properly and getting the best price.  So, I

11   think that's that issue.

12        With respect to the timing of the relief, you know,

13   it's very important that we exit these closing stores.  These

14   stores lost approximately $5 million last year, and we need to

15   wrap them up as promptly as possible, for the benefit of

16   creditors and the estate.  We're not asking for final relief

17   today, but we do think it's vital to get this show on the road

18   and embark on these sales promptly and take advantage, you

19   know, of this weekend that we have coming up before us.

20        THE COURT:  Let me hear from the U.S. Trustee, please.

21        MR. DURRER:  Thank you, Your Honor.

22        THE COURT:  Mr. Kenney?

23        MR. KENNEY:  Good afternoon, Your Honor.  For the

24   record, Mark Kenney, for the United States Trustee.

25        Your Honor, let's start with the Section 327 issue.

1    It's true that this is not an equity deal, and I think because

2    it's not an equity deal -- you know, the equity deal is, you

3    know, they generally do it on a pure 363 basis, and I think

4    it's because it's recognized that in the equity deals, the

5    liquidators are, essentially, liquidating, at that point, their

6    own property --

7        THE COURT:  Uh-huh.  They purchased it.  The debtor

8    has the residual --

9        MR. KENNEY:  -- leaving some minimal outside benefits

10   to the debtor --

11       THE COURT:  -- the residual interests, according to a

12   schedule, yeah.

13       MR. KENNEY:  -- and that allows -- and that allows

14   them to use the hook of the debtor to conduct GOB sales, which,

15   otherwise, would be prohibited under state law, and which would

16   otherwise violate the landlord's rights on the leases.

17       So what they're looking to do here, Your Honor, is

18   they entered into an agreement last Friday.  Now, you know they

19   entered it specifically with the intention of assuming it in

20   bankruptcy, as soon as the petition got filed.  But in the

21   meantime, they actually started the store-closing sales, which

22   would get us into the other issue about why they think this

23   relief is so critical.

24       But as far as an engagement goes, Your Honor, if you

25   look at <u>First Merchants</u>, you look at the factors and things

1    that push somebody from the role of, you know, just some vendor

2    into the guise of a professional.  And if you look at this

3    particular engagement, Hilco brings in an enormous amount of

4    skill and an enormous amount of knowledge, okay.  And I doubt

5    they would stand behind me and deny that, okay.  And they have

6    an amazing amount of control over the GOB sale process, and

7    those are two things that, in First Merchants, the Court said,

8    those push you very heavily toward this is a professional.

9         THE COURT:  It does.  First Merchants wasn't a

10   liquidator issue, if I remember correctly.

11        MR. KENNEY:  It was an accounts receivable collector.

12        THE COURT:  Yeah.  Let me ask:  This is not the

13   typical -- usually well see -- often we'll see an equity deal,

14   but we've seen consulting deals and it's not unusual to see

15   something like this at the very first day of the case because

16   the debtor, particularly, the retail debtor, may be in some

17   distress before having started the process.  So, I don't want

18   to go all passover [sic] on you, but why is this case different

19   from all other cases?

20        MR. KENNEY:  Well, Your Honor, I don't know that it is

21   different from all other cases.  I do have another retail case,

22   Deb Stores; it's Ms. Jones' case.  And in Deb Stores, they did

23   bring in the liquidators post-petition.  They had a beauty

24   contest, post-petition, to close stores that were still

25   conducting business as usual on a petition date.

1          But pre-petition, a couple of months -- several

2    months, pre-petition, they had also engaged Great American

3    Group to conduct GOB sales in a number of stores.   In

4    post-petition, the debtors filed an application under Section

5    327(a), to retain Great American Group.  So I think they did it

6    right there.

7          THE COURT:  Okay.  Then let me ask a process question.

8    The debtors before me today, having identified stores that they

9    want to move forward with in a hurry, and there are a bunch of

10   reasons -- and we're not going to go into it -- but let's just

11   assume that in a hurry is okay.  Do I need to answer the

12   question today, as a practical matter, of whether or not this

13   needs to be a 327 application?

14         MR. KENNEY:  I think we can reserve that issue for the

15   future, Your Honor.  That's not a critical-today issue.

16         THE COURT:  Yeah, because if the debtor were saying,

17   this is a 327(a) application, Judge, and you need to hear it

18   today, your head would be exploding.

19         MR. KENNEY:  Yes, it would be, Your Honor.

20         THE COURT:  Right.

21      (Laughter)

22         MR. KENNEY:  Either way, my head is exploding and

23   probably turning in circles too.

24      (Laughter)

25         THE COURT:  Okay.  So, I think I want to know what

1    we're doing for purposes of today.  And this is really, you

2    know, for you and me, this is really in our wheelhouse.  This

3    is the balancing of the tension between what absolutely needs

4    to be done at the very earliest stages of the case to

5    facilitate the reorganization versus how do we hold matters off

6    that can wait.  How do we balance that, with respect to this

7    motion?

8              MR. KENNEY:  Your Honor, what they're trying to put on

9    today is they're trying to say we want to assume that contract

10   today on an interim basis and we want to proceed with the

11   sales, free of the restraints of state laws that we're able to

12   avoid when we get a GOB sale order and free of any limitations

13   imposed on us under leases; the ones that say you can't go

14   dark; the ones that you can't conduct a GOB sale; you can't put

15   up posters; you can't put up banners; you can't have sign

16   walkers on our property or on the sidewalks around our

17   property.  So what they're looking to do is to get themselves

18   freed of that today, so that they can continue to conduct

19   store-closing sales that they say they already started

20   conducting pre-petition.

21             And, Your Honor, I would posit to the Court that they

22   don't need to assume this today, if all they want to do is to

23   continue those sales.  See, they don't want to go with the

24   status quo ante, they want a little bit more.  They're saying

25   that we started the process pre-petition.  We gained momentum

1    in doing that, and if we had to stop and wait for three weeks

2    for a second-day hearing, we would lose that momentum.

3        And, Your Honor, I don't know if they need to

4    necessarily lose the momentum that they've gained.  The

5    difference is they started the process.  During that process,

6    pre-petition, they obviously have to comply with the terms of

7    their leases and they have to comply with the state consumer

8    protection laws, the ones that they typically get to escape,

9    the ones dealing with inventory augmentation, limits on length

10   of sale, limits on signs, limits on advertising.  And, Your

11   Honor, if they were already doing this pre-petition, they can

12   continue doing what they were doing.  You know, playing on that

13   momentum, I think you can give them the limited authority on a

14   363(b) to go ahead to whatever extent that they were doing it

15   pre-petition.

16       But they're not actually asking for the authority to

17   simply maintain the momentum that they've got.  What they want

18   to do is they want to turbo-charge that momentum.

19       THE COURT:  Okay.  I understand your point.  I think

20   I'd like to know -- and I'm not prepared to rule on this right

21   yet -- I'd like to know if other people wish to be heard with

22   respect to the store-closings.

23       MR. DURRER:  Oh, I think there will be some, Your

24   Honor.

25       THE COURT:  I expect.

1          Mr. Saydah, welcome.

2          MR. SAYDAH:  Good afternoon, Your Honor.  Gilbert

3     Saydah, of Kelley Drye, here on behalf of Regency Centers,

4     Rouse Properties, and Turnberry associates, Your Honor; three

5     landlords, two of which, Regency and Rouse, have locations that

6     are listed on the pop-up stores where they're contemplating GOB

7     sales.

8          Your Honor, we've reached out to Mr. Fredericks and

9     Mr. Chartock at the Hilco/Gordon Brothers Joint Venture.  We're

10    going to be able to resolve our issues, as with a side letter

11    that we customarily enter into.  There's a bit of ambiguity on

12    the order where it says the side letter can't trump the inner

13    mortar, but it can trump the sale guidelines, which are an

14    exhibit to the order, but it can't -- there's just a little bit

15    of wordsmithing on it that I think needs to be done so that

16    it's clear that we can enter into these side letters that do,

17    in fact, would provide additional protections beyond the kind

18    of vague signage and advertising provisions that are

19    customarily found in there.

20         We'll work with them on that.  We're not seeking to

21    delay the process.  They've been very proactive in working with

22    us, so we'll work with them on that little bit, but wanted to

23    make clear that we were just going to be resolving our issues,

24    with respect to signage through our side letters.

25         THE COURT:  All right.  I'll hear from other parties.

1        Mr. Fredericks?

2        MR. FREDERICKS:  Good afternoon, Your Honor.  I

3   apologize for not being here earlier.  I was at the Hagen

4   hearing before Judge Gross.

5        And I would be remiss if I did not disclose to you, I

6   feel that Judge Gross --

7        THE COURT:  Did a better job with it?

8      (Laughter)

9        MR. FREDERICKS:  No.  Well, it depends on who you ask,

10   right?

11      (Laughter)

12        MR. FREDERICKS:  Judge Gross, I guess, granted in part

13   and denied in part, for a limited period, the relief that --

14   similar relief that was being requested there.  The primary --

15        THE COURT:  The law evolves very quickly in this

16   jurisdiction, doesn't it?

17      (Laughter)

18        MR. FREDERICKS:  With that, you have a conflict, I

19   think, between Judge Gross, Judge Carey, sort of you, in

20   RadioShack with Judge Carey under the first one, and then

21   whatever you decide to do here.

22        THE COURT:  Well, here on the federal republic of the

23   sixth floor, we'll figure out what we'll do.

24      (Laughter)

25        MR. FREDERICKS:  Yes, exactly.

1          The -- what I would say is that I think that the

2     primary concern, and I thought I had alleviated it, was on

3     notice issues to the landlords and to the various governmental

4     units.  There, it was not as clear who or who was not served,

5     and so the issue got punted slightly.

6          Here, I think, and what I want to reinforce is that

7     what you see in this order -- and Mr. Saydah, you know, in

8     part, addressed this is, one, I want to make clear, we're not

9     seeking any interim assumption of an agreement.  And that issue

10    was actually put before Judge Carey in your absence in

11    RadioShack.  The language that was in there was stricken and

12    the language that Judge Carey introducing that interim order is

13    repeated here, which was basically that the agreement is sort

14    of operative during this interim period and the parties can

15    operate under it.

16          THE COURT:  I thought I did that.

17          MR. NASH:  I thought you did that.

18          MR. FREDERICKS:  Yeah, okay.  Maybe that was you.  I

19    thought that was Judge Carey who signed that.

20          THE COURT:  No, you know something?  This case got

21    assigned to Carey, as well --

22          MR. FREDERICKS:  I know.

23          THE COURT:  -- and I'm stuck with it.

24       (Laughter)

25          MR. FREDERICKS:  Well, no.  He, I think, did your

1    first-day hearing in RadioShack.

2          THE COURT:  No, I did the first day.

3          MR. FREDERICKS:  Oh, okay.  Then I am totally confused

4    and backwards, so I apologize.

5          THE COURT:  Maybe it was Judge Gross.  I don't know.

6          MR. FREDERICKS:  I apologize.  I wasn't here for the

7    first-day hearing in RadioShack.  So, anyway, the issue is,

8    then, what are we doing relative to the state AGs, governmental

9    units and the landlords?

10          And what you see in this order is exactly what is

11   entered in every single order on -- relating to these

12   store-closing sales.  In drafting them, and in working with

13   debtors' counsel to finalize them, I do not reinvent the wheel.

14   They are -- this order tracks in all the same ways that

15   RadioShack did, relative to the order -- relative to the AGs

16   and the landlords, due to the language that was in the

17   RadioShack order, that was in the Deb Shops order, that's in

18   all of the orders.  I don't view it as an opportunity to try to

19   gain some type of an advantage from one order to the next.

20   I've spent many years with attorney generals [sic] and

21   landlords, trying to come to an agreement on provisions that

22   everybody is comfortable with and used to seeing, and that's

23   what you see here.

24          In addition to that, there are mechanisms in here for

25   both, landlords and governmental units, to come back if they

1    have problems with the procedures that have been put in place

2    or there is a dispute relative to the relief that you've

3    granted here on an expedited basis.  I think the order provides

4    for a twenty-four-hour telephonic hearing.  There's also the

5    final hearing, at which people can challenge these particular

6    provisions.

7        And I would be remiss if I didn't say that in

8    RadioShack, I don't think a single AG showed up at the final

9    hearing with an issue.  There may have been some

10    wordsmithing --

11        THE COURT:  Not on real estate.  They were there on

12    everything else.

13    (Laughter)

14        MR. FREDERICKS:  I think so.  Not on store closings, I

15    think.

16        You know, Mr. Saydah, there's some wordsmithing that

17    may occur where people re-read something and, you know, have

18    some concerns.  We're happy to address those.  But I think the

19    relief you're granting here is very limited -- or you're being

20    asked to grant here -- is very limited in scope --

21        THE COURT:  Okay.

22        MR. FREDERICKS:  -- and, you know, basically allows

23    for these stores to be closed in much the same way all stores

24    are in bankruptcy.

25        THE COURT:  Okay.  All right.

1          MR. FREDERICKS:  Thank you.

2          THE COURT:  Ms. Volkov or Mr. Giattino?

3          Okay, Ms. Volkov?

4          MS. VOLKOV:  Your Honor, good afternoon.  For the

5    record, Ilana Volkov, Cole Schotz, on behalf of 3 Times Square

6    Associates --

7          THE COURT:  Okay.

8          MS. VOLKOV:  -- which is the landlord of the debtors'

9    Times Square location.  The store is literally located on the

10   corner of 7th Avenue and 42nd Street.  As Your Honor can

11   imagine, there are a lot of very strict and expressed

12   requirements on signage and design of signs and operations of

13   the store.

14          And Mr. Fredericks had been kind enough to agree to a

15   side letter with our client, which will address three specific

16   issues that I have raised for him, and that relates to

17   handbilling, signage, as well as the sale of FF&E.

18          THE COURT:  Okay.

19          MS. VOLKOV:  So, I just wanted to say that for the

20   record, and I appreciate Mr. Fredericks' cooperation.

21          THE COURT:  You know, you can get on your high horse

22   about all the specific provisions that are special to Times

23   Square, but as far as I can tell from the newspaper, it's

24   mostly topless women walking around all the time.

25          (Laughter)

1          MS. VOLKOV:  These days, yes, Your Honor.  It's not

2     much to be proud of, but ...

3          THE COURT:  You know, I think Mr. Fredericks would be

4     happy to line up people to hand out handbills out front.

5       (Laughter)

6          MS. VOLKOV:  I think that's why he agreed not to do

7     that.

8          THE COURT:  Okay.

9          MS. VOLKOV:  Thank you very much, Your Honor.

10          UNIDENTIFIED:  Our office is in Times Square and this

11     is going to be the only place you won't get handed a handbill.

12          MS. VOLKOV:  That's what Mr. Fredericks said.

13          THE COURT:  All right.

14          MS. VOLKOV:  Thank you.

15          THE COURT:  Here's what I want to do.  I'd like --

16     yes, sir?

17          MR. SAKAMOTO-WENGEL:  Thank you, Your Honor.  I'm

18     Steve Sakamoto-Wengel, on behalf of the Maryland Attorney

19     General's Office, and, potentially, other State Attorney

20     General's Offices.

21          THE COURT:  Great.  Welcome.

22          MR. SAKAMOTO-WENGEL:  Thank you.

23          And, frankly, we just got notice of this matter late

24     yesterday afternoon when we received a copy from Mr. Kenney.  I

25     do believe that there probably were copies served on the State

1   AGs, but who knows where in the process those are.

2           Now, we do have concerns, as -- that we do enforce the

3   state going-out-of-business-sale laws, and as Mr. Kenney noted,

4   these sales all started prior to the filing of this bankruptcy.

5   And it appears to us what the debtor is asking for is a

6   get-out-of-jail-free card to excuse them from any violations of

7   those state going-out-of-business-sale laws that occurred prior

8   to the filing.

9           Frankly, we have not had adequate time, among the

10  states, to review the proposed orders and this matter to be

11  able to come up with a position, as to whether this complies

12  with prior agreements with the debtors and we would like an

13  opportunity to be able to do that.

14          THE COURT:  Okay.  I think that's fine.  I understand.

15          MR. SAKAMOTO-WENGEL:  Okay.  Thank you, Your Honor.

16          THE COURT:  Certainly.

17          MR. TUCKER:  (Via telephone)  Your Honor, this is Ron

18  Tucker, with Simon Property Group, on the phone.

19          THE COURT:  Yes, sir?

20          MR. TUCKER:  May I be heard?

21          THE COURT:  Sure.  Yeah, why not.

22          MR. TUCKER:  Okay.  We had eight of the 27 locations,

23  the regular store locations that are part of this

24  going-out-of-business sale.  I have spoken to Mr. Fredericks

25  and he and I have exchanged some side letters and agreements,

1    with regard to the signage and the criteria used, that we've

2    used typically in the past with a number of other cases, and

3    I'm confident that we will be able to work that out.

4         If not, obviously, we welcome the opportunity to come

5    to you with any unresolved issues, but I am really confident

6    that we will be able to do that.

7         THE COURT:  Okay.  I appreciate it.  Thank you, sir.

8         MR. TUCKER:  Thank you.

9         MR. DURRER:  Your Honor, at the risk of letting the

10   horse out of the barn -- Van Durrer, for the debtors -- just

11   two things that I wanted to mention.

12        One, this agreement is a little bit unique, in that it

13   includes the assumption, and this is candidly why there's

14   assumption, of a pre-petition relationship, and not just from a

15   handful of days ago.

16        Early in the year -- and this is set out in Mr.

17   Coulombe's declaration and Mr. Bruenjes' -- the debtors engaged

18   Hilco/Gordon Brothers Joint Venture to leverage the

19   relationship that they had with RadioShack, frankly, to try and

20   sell some of the debtors' obsolete inventories through

21   RadioShack closing stores.  It's that relationship that may --

22   I won't give up the ghost today -- but it may create a

23   disinterest in this problem and, frankly, it's also the

24   relationship that made it important that the debtors continue

25   with a partner that was very familiar with their products,

1   their stores and their inventory.  And so while no one is

2   asking Your Honor to decide that issue today, I didn't want to

3   let the opportunity pass to say that this might not be the

4   right test case to address this sort of globally, or perhaps

5   even on the sixth floor.

6        The second thing I want to say is I just want to

7   emphasize something that Mr. Fredericks said.  You don't want

8   to know how much time I spent with Karen Cordry developing this

9   form of order 15 years ago, subject to the improvements that

10  Mr. Nash and Mr. Fredericks have made in the time in between,

11  and perhaps even Mr. -- he's gone -- Mr. Delardy (phonetic).

12  But, my former colleagues and I would submit to you, Your

13  Honor, I think, unanimously, that this is right down the middle

14  of the fairway in terms of the AG provisions.

15       THE COURT:  Okay.  Here's what I want to do.  I'd like

16  to take just a five-minute break, but I'd share with you, at

17  least, my observations.  This is not the first time that we've

18  dealt with an issue like this.  I am not going to rule today on

19  whether or not a retention application is required.

20       It seems to me, a reasonable question, and, again,

21  First Merchants identifies, generally, who is a professional

22  and what needs to be done.  That seems, to me, a significant

23  factual inquiry in this case and I'm aware of the concern about

24  whether or not that's consistent with established practice and

25  expectations, but if that's required, I will deal with that at

1   the appropriate time.

2         It seems to me appropriate and, frankly, necessary

3   from the debtors' representations, that a -- that the process

4   that has commenced just a few days ago or a little while ago,

5   as to store closings, continue, and continue as we get to a

6   weekend.  There's a measure of urgency, because there's just a

7   burn to the -- to this process and to keeping stores open.

8         So my expectation is that I would be prepared to

9   authorize relief today on an interim basis.  The discussion --

10  and, again, I'm not putting Mr. Nash on the spot, but he was in

11  the capacity I think of -- well, actually, Mr. Fredericks was

12  your client at the prior hearing.  The concern I expressed at a

13  prior hearing was I didn't know exactly what the concept of an

14  interim assumption meant, and what I shared with Mr. Nash at

15  that hearing, and what I would observe from Mr. Fredericks

16  today, would be that the primary consideration or concern for

17  Hilco/Gordon Brothers in this process, is there's expending

18  resources, time, effort, with an expectation, based upon their

19  contract.  And, again, it seems to me that I can provide a

20  measure of confidence that they're not doing it on the come or

21  at what I would regard as an inappropriate or unfair risk.  But

22  signing something that says an interim assumption, I'm not

23  exactly sure what that means and I'd need guidance from the

24  parties.

25        The relief requested is not really remarkable, as I

1    think reflected by the even just the comments from, you know,

2    the handful of landlords.  And I'm not putting any landlord

3    that hasn't appeared in a box, but those folks that have

4    stepped up are familiar to the Court and have, you know,

5    addressed or resolved their issues very rapidly with Mr. Hilco

6    [sic], and, again, to go with Mr. Durrer's comments, this is

7    not their first rodeo, and that makes this process a lot

8    easier.

9         So, I believe that we ought to be able to come up with

10   relief that can go forward, and the other offer that I would

11   make is that we will talk about final scheduling and we'll talk

12   about final scheduling before we break so parties can know.

13   But if there's a desire -- and I think we did this in

14   RadioShack -- not that that's really the model for how I want

15   retail to go, but I offered to make myself available -- and I

16   would -- at a hearing, at the parties' convenience, early next

17   week.

18        I think Monday is Rosh Hashanah, so I'm thinking we're

19   not having a hearing on Monday, but I would make myself

20   available Tuesday or later.  I want the process to move

21   forward.  I don't want a measure of uncertainty for landlords,

22   for the participants or for the estate, but it seems to me that

23   the process can move forward, and on an interim basis, if we

24   keep it on a short leash, we may be able to do that.

25        I'd offer that primarily, because we may -- you know,

```
 1    I get counsel from the Attorney General of Maryland appears and
 2    I think very fairly says, I'm not a hundred percent certain
 3    what is going on here and I'd like to know.  A number of phone
 4    calls, experience teaches, answers a lot of those questions.
 5    The other point that's being -- that would be made, and I don't
 6    think that this is what's being requested, but I would clarify
 7    that there's nothing in an order today that I would be entering
 8    on a go-forward basis, that would insulate, correct, get out of
 9    jail free, for anything that was inappropriate.  And, again, I
10    make no comment about whether or not anything that was done in
11    the lead-up to this case is not consistent with applicable
12    state laws.  That's not a today issue and that order, I
13    certainly don't have a record to insulate or exculpate anybody
14    for that.
15         So I'd like to take a few minutes of a break to see if
16    the parties can square this circle to allow the process to move
17    forward, resolve some of the issues, and perhaps confer with
18    Mr. Fredericks and then figure out where we go from there.
19         Mr. Durrer, before we talk about a final hearing?
20         MR. DURRER:  Your Honor, yes, thank you.  Van Durrer
21    for the debtors.
22         I might be missing something, but I think it is
23    crystal clear that no interim assumption is being sought today.
24    That's already reflected, I believe, unless I missed something.
25         So, in other words, this order is consistent with
```

1   whoever the judge was that entered the order in RadioShack,

2   this order is consistent with that, with respect it this

3   interim assumption notion.  There is no interim assumption.

4         THE COURT:  Okay.  Well, I think that was being

5   requested in RadioShack, and, again, it is, you know -- I want

6   to be clear, because I'm not trying to say that RadioShack is

7   how it ought to be done.  And also, many of these things are

8   really, frankly, bespoke.  RadioShack was presented on an

9   emergency basis -- needed relief.  We fashioned a way to get

10  forward out of that hearing, so I'm not suggesting that parties

11  are bound by that.  I certainly approved that relief and that's

12  certainly not a bad thing for you to wave around, but I'd like

13  parties to have confidence about what's going on with this

14  relief.

15         I've told you that it's important that you're going to

16  get your relief today.  The contours of that, I would prefer to

17  be consensual, than ordered by the Court, because you all know

18  your business more than I do.  And so I'd like to take that

19  five-minute break, but you need a hearing -- you need a hearing

20  inside of 30 days, according to your milestones, and I'd be

21  prepared to hear you on the 5th of October or the 6th.

22         MR. DURRER:  Bear with me just a moment, Your Honor,

23  if you don't mind me pulling up a calendar?

24         THE COURT:  Sure.

25     (Pause in proceedings)

1          MR. DURRER:  Your Honor, with respect to my calendar,

2    I am available on the 6th.  That works.  I will actually be in

3    front of Judge Wiles, I believe, up in New York, on the 5th,

4    but the 6th shouldn't be a problem for the debtors.

5          THE COURT:  All right.  I'm not going to ask

6    everybody.  We'll schedule it for 10 a.m. on the 6th.  If, in

7    the colloquy that we're going to have, that will only be about

8    five minutes or so, right now, if that becomes a big issue, we

9    can move it, but I think it's helpful for the parties to have

10   that date just to look at, to work back from, and, again, I

11   think that's actually, in these kinds of cases, a meaningful

12   amount of time between appointment of the committee and the

13   next substantive hearing.

14         The other point I'd observe is that's without

15   prejudice, Mr. Durrer, to the debtor being able to obtain -- if

16   you need a hearing in between for more routine matters, it

17   would be kind of tight on scheduling, but depending on what

18   you've got coming down the pike, if you've got matters that are

19   going to get filed that would be on 14 days' notice or

20   something like that, I'd consider a hearing prior to that, but

21   that would be for really routine stuff and retentions, those

22   kinds of things, or they can all go on the 6th.  I'm really at

23   your pleasure there.

24         So that offer is out there.  We're going to take a

25   break for about five minutes, see if we can answer some of

1   these questions with respect to those issues, and I would ask

2   that you plug in the final hearing date into the proposed forms

3   of order and we'll go from there.

4          All right.  So we'll stand in recess.  Thank you.

5          MR. DURRER:  Thank you, Your Honor.

6   (Recess taken at 4:16 p.m.)

7   (Proceedings resume at 4:31 p.m.)

8          THE COURT:  Mr. Durrer and Mr. Fredericks, where are

9   we?  I realize I didn't give you a lot of time, but I'm trying

10  to move the ball forward.

11         MR. DURRER:  Your Honor, we appreciate the time that

12  Your Honor afforded.  My understanding, and I'll, obviously,

13  let others speak -- Van Durrer for the debtors, I apologize --

14  with respect to the store-closing relief, I think there is

15  general consensus --

16  (Phone dialing)

17         UNIDENTIFIED:  Hello?

18         THE COURT:  Okay.  You may proceed.

19         MR. DURRER:  Thank you, Your Honor.

20         I think there is general consensus that the order

21  before Your Honor, with respect to the store-closing motion can

22  be approved today.  We -- all rights are reserved, with respect

23  to 327 issues and assumption issues.

24         In addition, I know Mr. Fredericks and I know Mr.

25  Fredericks and the Gordon Brothers' folks will continue to work

1    with landlords --

2              THE COURT:  Uh-huh.

3              MR. DURRER:  -- whether or not they showed up today.

4    And I know, as I mentioned, Ms. Cordry, and I'm happy -- and

5    Mr. Fredericks is, as well, to get on the phone with the AGs

6    and work with the AGs on the language in this order on a final

7    basis.  And, you know, we've always been pretty cooperative in

8    the past.  So with those -- with that -- folks had asked us to

9    make those representations and we're happy to do so, so I think

10   that with that, there's general consensus on the entry of this

11   order, subject to those qualifications.

12             THE COURT:  Okay.  Mr. Kenney, anything to add?

13             MR. KENNEY:  Thank you for the time, Your Honor.  I

14   think we did use it productively.

15             We also discussed, basically, what happened on the

16   other side of the federal republic of the sixth floor.

17             THE COURT:  Well, he has no more than I do.  I haven't

18   had a chance to talk to him.  He's smarter than I am.  I

19   reserve the right to change my ruling tomorrow.

20        (Laughter)

21             MR. KENNEY:  I don't think I'm going to touch that,

22   Your Honor.

23             THE COURT:  Good thinking.

24             MR. KENNEY:  Your Honor, I think what we're generally

25   looking at is an order that essentially maintains the status

1    quo, but they can --

2            THE COURT:  They can perform.

3            MR. KENNEY:  It's going to give them some time to work

4    with the landlords and work with the state AGs and get people

5    comfortable with it.

6            THE COURT:  Uh-huh.

7            MR. KENNEY:  And I guess the one thing that's not

8    resolved right now is what they're going to do about hanging

9    signs.  I suspect they're going to be -- today's Thursday, so I

10   suspect, probably by close of business tomorrow, they'll, you

11   know, be right down the middle of the fairway with all of the

12   state AGs and have them comfortable, and then it's really a

13   question of the landlords.

14           Although it's 27 locations, I think it's actually a

15   much -- a significantly smaller number of landlords for them to

16   work with.  And, you know, short of having a more developed

17   record, I think it's left to basically let them work for a

18   couple of days with the landlords before we come back for

19   another hearing.

20           THE COURT:  Okay.  Two things.  First, with respect to

21   the 327 issue, as I said, I make no comment on that, and I

22   know, but I would just observe, that I think you should

23   probably, if as you consider this issue beyond today's hearing,

24   if that's an issue that your office is inclined to pursue, I

25   would encourage you to start to just explore it with Mr.

1    Fredericks, but the issue is an intensely factual one, and,

2    again, it's an interesting question.

3           I make no comment about the merits of it one way or

4    the other, and we definitely don't need to deal with it today,

5    but getting to the bottom of that issue, if we need to, is

6    something that I would deal with, again, at the convenience of

7    the parties.

8           So let me ask a question, and either to you, Mr.

9    Kenney or Mr. Durrer:  Is there a sense that there's a need for

10   an interim hearing next week or even a stand-by hearing?  I

11   think most of the issues, again, have been with the folks who

12   have circled up with the debtor or with Mr. Fredericks, their

13   issues have, I think, pretty promptly resolved.  I'm really at

14   your pleasure.  I don't want to burden the estate and the

15   parties with a hearing that's not necessary, and if the parties

16   discover tomorrow or Monday or over the weekend that a

17   hearing's necessary, you know you can get in front of me.  So

18   I'm not setting that right now, but I'll be available if you

19   need me.

20          MR. DURRER:  Yeah, I appreciate that, Your Honor.  One

21   thing I -- before I answer your question -- Van Durrer for the

22   debtors -- I did forget to mention, and that is to the extent

23   that there were any violations of any state laws in advance --

24   pre-petition, all of those rights are reserved, as well.  I

25   forgot to mention that.

1           THE COURT:  Sure.

2           MR. DURRER:  With respect to Your Honor's question, I

3    don't think that we need a stand-by hearing next week, because,

4    like I said, everybody's that's in this room that's involved in

5    this issue, including those who are not, like Karen Cordry and

6    the other AGs, have been doing this a long time.  I definitely

7    don't want to waste estate resources coming back and, you know,

8    having folks from the company come back from California.

9           Mr. Coulombe, for example, who has been front and

10   center on the store-closing program, is going to be working on

11   the debtors' business plan this week in Huntington Beach, and I

12   want his efforts to be focused on that, candidly.

13          THE COURT:  Okay.

14          MR. DURRER:  I would be surprised if we couldn't work

15   out an issue.

16          THE COURT:  Well, why don't we do this:  I will leave

17   this, as I think, consistent with my practice, which is I don't

18   think it makes sense to schedule that hearing.  If there are

19   issues, I regard them as matters that ought to be dealt with

20   promptly.  If there are landlords that are not happy with

21   what's happening or feel that they're not being treated fairly

22   or appropriately, counsel in the courtroom are aware that you

23   can get on the phone with me very, very quickly.

24          And so I don't think we need to separately schedule

25   that.  The offer is out there to parties, and if we need to

1  deal with it, then we will, but, again, I'm hopeful and,

2  frankly, confident, that the mechanics, as a business matter,

3  the mechanics of this will likely play itself out in a way that

4  does not require Court intervention, but I'll be here, and,

5  again, I'd be here telephonically, as well, if the parties

6  wish, okay?

7            MR. DURRER:  Thank you, Your Honor.

8            MR. KENNEY:  Thank you, Your Honor.

9            THE COURT:  Mr. Durrer?

10            MR. DURRER:  Your Honor, Van Durrer for the debtors.

11  There is -- there are a couple of clarifications to the DIP

12  order.

13            THE COURT:  Okay.

14            MR. DURRER:  If Your Honor doesn't mind walking

15  through them?

16            THE COURT:  Sure.

17            MR. DURRER:  And these are -- I'm going to try to

18  accurately reflect some questions or comments that Mr. Swett

19  had, while we took advantage of that during the break, as well,

20  Your Honor.  So, I'm in the clean, Your Honor.

21            Is that --

22            THE COURT:  Okay.  I'm in the clean.

23            MR. DURRER:  Okay.  So I'm on Page 4 of the clean,

24  Your Honor, Paragraph 3.  Oh, you know what?  I bet I'm in the

25  wrong Paragraph 3.

1          THE COURT:  Okay.  Well, I'm there.

2          MR. DURRER:  I apologize, Your Honor.  Page 22,

3     Paragraph 3.  The wrong order.

4          THE COURT:  Okay.

5          MR. DURRER:  There's a reference in the center of the

6     page, Your Honor, to a statement of satisfaction.  That's my

7     term.  Apparently, the banking orders call this an exit letter,

8     and so the folks asked us to clarify on the record that a

9     statement of satisfaction is an exit letter.

10          In Paragraph 28, Your Honor --

11          THE COURT:  Okay.

12          MR. DURRER:  -- I'm sorry.  Page 28 -- no, I'm sorry,

13     Paragraph 28.

14          THE COURT:  Yeah.  Okay.  Good faith?

15          MR. DURRER:  This may be an incorrect reference in Mr.

16     Swett's email, but the point is, Your Honor, that there's a

17     reference in the order -- and I'm going to try to find it -- to

18     bank products, and it references the DIP ABL agreement.  That

19     reference will also income the existing ABL credit agreement --

20          THE COURT:  Okay.

21          MR. DURRER:  -- by use of that cross-reference.

22          THE COURT:  I understand.

23          MR. DURRER:  And then, finally, Your Honor, at the end

24     of decretal paragraph five zero, fifty, this is just a

25     reservation of rights, with respect to the issues that we

1    discussed on the record that relate to GE.  And the language

2    will be, and this is under the heading of effect on certain

3    pre-petition agreements.

4            THE COURT:  I see it.

5            MR. DURRER:  A new last sentence will say:

6            "Without limiting the generality of the foregoing,

7            except to the extent that the payment hereunder of ABL

8            obligations includes the payment of Other Liabilities

9            as such term as defined in the ABL credit agreement,

10           all rights, claims and defenses of all parties, with

11           respect to the other liabilities are reserved and

12           should not be affected by this interim order."

13           THE COURT:  I understand.

14           MR. DURRER:  So my suggestion, Your Honor, with that

15   -- and I believe Your Honor said that Your Honor was willing to

16   enter the DIP order -- given the lateness of the hour, my

17   suggestion is that we -- we request that Your Honor so order

18   the record, with respect to the DIP.  We'll do our very best to

19   get it to you today, but in the event that we cannot, for

20   whatever reason, I think it would be fine to have the formal

21   one entered tomorrow, but we'll operate on the so-ordered

22   record.

23           THE COURT:  Okay.  Mr. Fredericks?

24           MR. FREDERICKS:  Yes, I was asked to make one

25   clarification, Your Honor, from landlords' counsel, relative to

1   that, a potential inconsistency in the order for side letters.

2          THE COURT:  Yeah.

3          MR. FREDERICKS:  If Your Honor is comfortable with it,

4   I'm certainly comfortable stipulating that the side letters can

5   override the provisions of the order, relative to signage and

6   all those things.

7          THE COURT:  That obviously makes sense.

8          MR. FREDERICKS:  Thank you, Your Honor.

9          MR. DURRER:  This issue has come up, again, many

10  times, Your Honor.  Van Durrer for the debtors.

11          I think what the issue is, is that the side letters

12  cannot expand our authority that you're giving us, but that the

13  side letters can restrict what Mr. Fredericks is doing, in a

14  manner that's inconsistent with the orders.  I think that's the

15  language missed, but we have no problem with Mr. Fredericks.

16          THE COURT:  And I understand -- yeah, I understand the

17  bid and to ask, and, again, to me, these issues are -- they're

18  obviously legal, because they're embodied in the order, but I

19  see them as business issues.  And, again, the able and

20  experienced parties seem to be addressing these issues.

21          With respect to the financing, as --

22          MR. SWETT:  Your Honor, this is -- Your Honor, it's

23  Brian Swett, on behalf of GE Capital.  I wanted to go back to

24  the modification to Paragraph 28 that Mr. Durrer described on

25  the record.  My request, with respect to the third sentence of

1   that paragraph, was to make it clear that payments of bank

2   products under the pre-petition ABL credit agreement, in the

3   way that payments of ABL obligations under the ABL credit

4   agreements are entitled to 364(e) protection.  I wasn't seeking

5   or meaning to suggest that those products should have any

6   status under the DIP credit agreement.  It's 364(e) question,

7   from my perspective.

8            THE COURT:  Mr. Durrer?

9            MR. DURRER:  Van Durrer for the debtors, no problem

10  with that, Your Honor.

11           THE COURT:  All right.  Does anyone else wish to be

12  heard?

13      (No verbal response)

14           THE COURT:  Very well.

15           As noted, I have previously approved and authorized

16  the relief requested by the debtors in their financing and cash

17  collateral motion.  For purposes of ensuring that the lenders

18  and the constituents in that exercise are comfortable, with

19  respect to moving forward with, I think the financing steps

20  that need to be put into place, it is possible that I will be

21  here when the order arrives.  It is also possible we'll get it

22  signed and docketed first thing in the morning.

23           The last thing that I want is any disruption to the

24  debtors' operations relating to the mechanics of getting an

25  order signed, and, therefore, I am prepared to so order the

1   record.  I have approved the financing.  The debtor is

2   authorized to enter into it and to move forward with the

3   transaction that have been identified thereunder.  I expect to

4   see an order under certification from the debtor, as it relates

5   to financing and cash collateral, either end of day today or

6   tomorrow morning, and I will address it and it will be docketed

7   promptly.

8        But the debtor is authorized, as of now, which is 4:45

9   in the afternoon on the 10th of September.  I believe you

10  should have a stack of other orders for me, Mr. Durrer.  Do

11  you?

12       MR. DURRER:  I do, Your Honor.

13       May I approach, Your Honor?

14       THE COURT:  Sure.  I will sign these and we will have

15  these on the docket this afternoon.

16       Mr. Durrer, do we have anything further today?

17       MR. DURRER:  Your Honor, just, again, thank you to the

18  Court and staff, and also thank you to the parties in the room

19  who have been constructive and have worked very hard to help us

20  get here.

21       THE COURT:  Happy to oblige.  We stand in recess.

22       (Proceedings concluded at 4:44 p.m.)

23                              *****

1                          <u>CERTIFICATION</u>

2            We certify that the foregoing is a correct transcript

3      from the electronic sound recording of the proceedings in the

4      above-entitled matter to the best of our knowledge and ability.

5

6

7

8      <u>/s/ Coleen Rand                    </u>       September 11, 2015

9      Coleen Rand, AAERT Cert. No. 341

10

11     <u>/s/ William J. Garling           </u>       September 11, 2015

12     William J. Garling, AAERT Cert. No. 543

13     Certified Court Transcriptionists

14     For Reliable

15

16