**EXHIBIT A**
**<u>MOTION</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| QUIKSILVER, INC., *et al.*, | : | Case No. 15-11880 (___) |
|  | : |  |
| Debtors.[1] | : | (Joint Administration Pending) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO BANKRUPTCY**
**CODE SECTIONS 105, 363, 365, AND 554 AND BANKRUPTCY RULES 6003 AND 6004**
**(I) AUTHORIZING THE DEBTORS TO ASSUME THE AGREEMENTS;**
**(II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE CLOSING**
**OR SIMILAR THEMED SALES, WITH SUCH SALES TO BE FREE AND CLEAR**
**OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND (III) AUTHORIZING**
**CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING BUSINESS LOCATIONS**

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in

possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-

Debtor affiliates, "Quiksilver" or the "Company") hereby move (the "Motion") this Court for

entry of an interim order (the "Interim Order") and a final order (the "Final Order"), pursuant to

sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and

Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i)

authorizing the Debtors to assume[2] (a) the agreement dated as of September 4, 2015, by and

between QS Retail, Inc. ("QS Retail"), on the one hand, and Hilco Merchant Resources, LLC

and Gordon Brothers Retail Partners, LLC (the "Agent"), on the other hand (the "Store Closing

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc.
(8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505),
Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors'
corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]    Pursuant to this Motion, the Debtors seek, on an interim basis, an order that confirms that the Agreements are
operative and effective. On a final basis, the Debtors seek authority to assume the Agreements.

Agreement"), a copy of which is attached hereto as <u>Exhibit A</u> and (b) the agreement dated as of June 8, 2015 by and between QS Retail, on the one hand, and the Agent on the other hand (the "<u>Pop Up Store Agreement</u>," a copy of which is attached hereto as <u>Exhibit B</u>, and together with the Store Closing Agreement, the "<u>Agreements</u>"); (ii) authorizing the Debtors to conduct (a) store closing sales (collectively, the "<u>Store Closing Sales</u>") at the locations subject to the Store Closing Agreement (the "<u>Closing Locations</u>") in accordance with the terms of the sale guidelines (the "<u>Sale Guidelines</u>"[3]), with such sales to be free and clear of all liens, claims, encumbrances, and interests (collectively, the "<u>Encumbrances</u>") and (b) sales of certain merchandise (collectively, the "<u>Pop Up Sales</u>," and together with the Store Closing Sales, the "<u>Sales</u>") at the locations subject to the Pop Up Store Agreement (the "<u>Pop Up Stores</u>," and together with the Closing Locations, the "<u>Stores</u>"[4]), in accordance with the Sale Guidelines, with such sales to be free and clear of all Encumbrances; (iii) authorizing, but not directing, the Debtors to pay customary retention bonuses to the store-level and certain field employees at the Stores; (iv) authorizing the protections and dispute resolution procedures contained in the Interim and Final Orders; and (v) granting certain related relief.  In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., in Support of Chapter 11 Petitions and First Day Pleadings (the "<u>First Day Declaration</u>"),[5] filed with the Court concurrently herewith, and the Declaration of Stephen Coulombe attached hereto as <u>Exhibit C</u> (the "<u>Coulombe Declaration</u>" and, together with the First

---

[3]    The Sale Guidelines are attached to the Interim and Final Orders as <u>Exhibit 3</u>.

[4]    A list of Closing Locations is attached to the Store Closing Agency Agreement as <u>Exhibit A</u>. A list of Pop Up Stores is attached to the Interim and Final Orders as <u>Exhibit 4</u>.

[5]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

Day Declaration, the "<u>Declarations</u>").  In further support of the Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, 365, and 554 and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

3.      Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware, the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

4.      On September 9, 2015 (the "<u>Petition Date</u>"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "<u>Chapter 11 Cases</u>").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

5.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      To date, no creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "<u>United States Trustee</u>").  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

7.      Quiksilver is one of the world's leading outdoor sports lifestyle companies.  The Company designs, develops and distributes branded apparel, footwear, accessories and related products.  The Company began operations in 1976 making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, and motocross, among other activities. The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites.  The Debtors comprise each of the Company's U.S. entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc. and seven inactive entities.

8.      Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

## RELIEF REQUESTED

9.      By this Motion, the Debtors seek interim and final orders (i) authorizing the Debtors to assume the Agreements, (ii) authorizing the Debtors to conduct the Sales at the Stores in accordance with the Sale Guidelines, with such sales to be free and clear of all Encumbrances, (iii) authorizing the Debtors to pay customary retention bonuses to the store-level and certain field employees at the Stores; (iv) authorizing the protections and dispute resolution procedures contained in the Interim and Final Orders; and (v) granting certain related relief.

10.     In addition, the Debtors request entry of an interim order (a) authorizing all applicable banks and other financial institutions (collectively, the "Banks"), when requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers, on account of amounts owed under the Agreements to the Agent (the "Agent Claims"), whether such checks or other requests were submitted before, on, or after the Petition Date; (b) authorizing the Banks to rely on the representations of the Debtors as to which checks are subject to this Motion, provided that any such Bank shall not have any liability to any party for relying on such direction and representations by the Debtors; (c) providing that the Banks shall, at the direction of the Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Agent Claims that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and that any such Bank shall not have any liability to any party for relying on such direction by the Debtors; and (d) authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts and other forms of payment which may be inadvertently dishonored or rejected.

11.     The relief requested herein should not (a) be construed as a request to assume, or for authority to assume, any executory contract under section 365 of the Bankruptcy Code or otherwise, except with respect to the Agreements, (b) waive, affect, or impair any of the Debtors' rights, claims, or defenses, including, but not limited to, those arising from section 365 of the Bankruptcy Code, other applicable law, or any agreement, (c) grant third-party beneficiary status or bestow any additional rights on any third party, (d) be otherwise enforceable by any third party other than the Banks, or (e) impair the Debtors' ability to contest or object to any

claims, including Agent Claims, asserted against the Debtors on any ground permitted by applicable law.

12.     The Debtors propose to serve a copy of any interim order granting this Motion within three (3) business days after entry thereof.  The Debtors further request that the Court (a) set a deadline for filing objections to the Motion and entry of the Final Order, (b) set a final hearing on the Motion, and (c) enter the Final Order on this Motion at or after such final hearing.

13.     For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders and other parties in interest, and therefore, should be granted.

## BASIS FOR RELIEF

14.     Prior to the Petition Date, the Debtors undertook efforts to cut costs, streamline operations, and increase profitability. In particular, as part of the Company's multi-year turnaround plan (the "Multi-Year Turnaround Plan") that was first launched in 2013, management spent considerable time on a plan to rationalize the Company's retail store base, particularly in the United States.  The Debtors' management, with the assistance of their advisors, performed a comprehensive review of the performance of each store and the market in which the Debtors operate. As a culmination of those efforts, the Company developed a store closing plan (the "Store Closing Plan"), which it continued to refine from time to time. In particular, during the prepetition period, the Company started to close stores consistent with the Store Closing Plan as and when underperforming store leases came up for renewal or otherwise when there was an opportunity to exit a lease early, such as due to a landlord request. In addition, like many retail businesses, the Debtors determined that it was necessary to sell certain merchandise and excess, clearance, obsolete, or distressed inventory (the "Merchandise") as well as certain associated

furniture, fixtures, and equipment (the "FF&E," and together with the Merchandise, the "Store Closure Assets").

15.    After the Company determined that it was necessary to sell certain excess inventory, it began soliciting offers from potential liquidation firms to conduct sales of excess inventory through a "pop up" store program – i.e., temporary locations outside of Quiksilver's stores – with no fewer than 15 locations. The Company evaluated bids from liquidation firms. In June 2015, QS Retail entered into the Pop Up Store Agreement with the Agent. Pursuant to the Pop Up Store Agreement, the Pop Up Sales are conducted at Pop Up Stores. QS Retail has entered into several short-term license agreements that allow for the limited right to use a space to sell merchandise for a limited period – i.e., Pop Up Stores at which Pop Up Sales may take place.  The Agent began such sales in July of 2015. As of the Petition Date, the Debtors have opened 24 Pop Up Stores, with 23 stores still in operation. The Debtors have entered into six additional short-term license agreements for which Pop Up Stores have not opened.

16.    In connection with the Company's contingency planning efforts, management worked with FTI to accelerate and potentially expand the Store Closing Plan in the context of a chapter 11 filing.  In August 2015, the Company, in consultation with its advisors, concluded that it was necessary to close certain underperforming or unprofitable retail stores and began soliciting offers from potential liquidation firms to conduct store closing sales and liquidate the Store Closure Assets associated with such stores. To that end, the Company obtained five bids from national liquidation firms: Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC; Great American Group, LLC; Tiger Capital Group, LLC; SB Capital Group, LLC; and Yellen Partners, LLC. The Company then evaluated the bids and determined that proceeding with the Store Closing Sales according to the terms of the Store

Closing Agreement was in its best interest and the best interests of its stakeholders. The Agent's

bid was the highest or otherwise best bid, and given its involvement with the Pop Up Stores, the

Agent was already familiar with the Debtors' business. Accordingly, on September 4, 2015, the

Agent and the Company executed the Store Closing Agreement, and the Agent subsequently

began preparing for the Store Closing Sales. On September 6, 2015, the Agent officially began

the Store Closing Sales at the Store Closing Locations.

17.    Pursuant to the terms of the Pop Up Store Agreement, the Agent has been

acting as the exclusive, independent agent of the Debtors to conduct the currently ongoing Pop

Up Sales at the Pop Up Stores. A list of the Pop Up Stores that are currently open are set forth on

Exhibit 4 to the Interim and Final Orders. In addition, pursuant to the terms of the Store Closing

Agreement, the Agent has been acting as the exclusive, independent agent of the Debtors,

conducting the Store Closing Sales at Store Closing Locations, pursuant to the Sale Guidelines.

A list of the 27 Store Closing Locations are set forth on Exhibit A to the Store Closing

Agreement.

18.    Although the Debtors respectfully refer the Court to the Agreements in

their entireties, certain of the material terms are set forth below:[6]

| Term | Store Closing Agreement | Pop Up Store Agreement |
|------|------------------------|------------------------|
| **Assets** | Merchandise sold in the Merchant's Stores as of the Sale Commencement Date, plus other merchandise included in the Stores during the Sale Term | All excess, clearance, obsolete or distressed inventory |

---

[6]    Capitalized terms not otherwise defined in paragraph 18 herein shall have the meanings given to them in the Agreements or this Motion. Any summary of an agreement in this Motion is qualified in its entirety by the terms of that agreement.

| Term | Store Closing Agreement | Pop Up Store Agreement |
|---|---|---|
| **Sale Term** | The Sale Commencement Date is September 6, 2015, and the Sale shall conclude on respective dates to be mutually agreed upon by Debtor and Merchant but no later than December 31, 2015. | The Sale Commencement Date is July 1, 2015, and the Sale Termination Date is the earlier of (a) January 31, 2016 and (b) the date that the Sale is completed. |
| **Agent Undertaking** | Agent is to, among other things, (a) provide qualified supervisors to oversee management of the stores, (b) determine point-of-sale and internal and external advertising strategies, (c) determine appropriate discounts, (d) recommend staffing levels, (e) oversee display of Merchandise, and (f) evaluate sales of Merchandise and monitor expenses. At the conclusion of the Sale, Agent is to surrender the premises in broom clean condition and in accordance with lease requirements. | Agent is to, among other things, (a) assist in identifying suitable locations for Pop Up Stores, (b) provide qualified supervisors to oversee management of the stores, (c) determine point-of-sale and internal and external advertising strategies, (d) determine appropriate discounts, (e) recommend staffing levels, (f) oversee display of Merchandise, and (g) evaluate sales of Merchandise and monitor expenses. At the conclusion of the Sale, Agent is to surrender the premises in broom clean condition. |
| **Merchant's Undertaking** | The Merchant is to (at no cost or expense to the Agent), among other things: (a) be the employer of the Stores' employees (other than the Supervisors); (b) pay all taxes, costs, expenses, accounts payable, and other liabilities related to the Stores, (c) prepare and process all tax forms, and (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores. | The Merchant is to (at no cost or expense to the Agent), among other things: (a) be the employer of the Stores' employees (other than the Supervisors); (b) pay all taxes, costs, expenses, accounts payable, and other liabilities related to the Stores, (c) prepare and process all tax forms, and (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores. |

| Term | Store Closing Agreement | Pop Up Store Agreement |
|---|---|---|
| **Agent Fee/Commission** | Agent shall earn an "Incentive Fee" that consists of a certain percentage (between 1% and 5%) of Gross Proceeds. The fee is determined based upon the recovery percentage (i.e., Gross Proceeds divided by Cost Value of the Merchandise) of the Sales. In addition, the Agent is entitled to a commission from the sale of the FF&E equal to 20% of the Gross Proceeds (net of sales taxes, as applicable). | Agent shall earn a fee equal to 5% of the Gross Proceeds of Merchandise sold at the Pop Up Stores. In addition, the Agent is entitled to a commission from the sale of the FF&E equal to 20% of the Gross Proceeds (net of sales taxes, as applicable). |
| **Expenses** | Merchant is responsible for all expenses of the Sale, including all store-level operating expenses, all costs and expenses related to Merchant's other retail operations, and Agent's reasonable, documented, and preapproved out of pocket expenses. To control expenses of the Sale, Merchant and Agent have established a budget of certain delineated expenses. | Merchant is responsible for all expenses of the Sale, including all store-level operating expenses, all costs and expenses related to Merchant's other retail operations, and Agent's reasonable, documented, and preapproved out of pocket expenses. To control expenses of the Sale, Merchant and Agent have established a budget of certain delineated expenses. |
| **Merchant Indemnification** | The Merchant indemnifies Agent Indemnified Parties from liabilities (including reasonable attorney's fees) arising from or related to, the following, among other things: willful or negligent acts, material breach, product liability claims, and claims asserted by store employees. | The Merchant indemnifies Agent Indemnified Parties from liabilities (including reasonable attorney's fees) arising from or related, the following, among other things: willful or negligent acts, material breach, product liability claims, and claims asserted by store employees. |

| Term | Store Closing Agreement | Pop Up Store Agreement |
|---|---|---|
| **Agent Indemnification** | The Agent indemnifies the Merchant Indemnified Parties from liabilities (including reasonable attorney's fees) arising from or related to, the following, among other things: willful or negligent acts; willful breach; and liability claims made by any Agent Indemnified Parties against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale (except claims arising from the Merchant's negligence, willful misconduct, or unlawful behavior). | The Agent indemnifies the Merchant Indemnified Parties from liabilities (including reasonable attorney's fees) arising from or related to, the following, among other things: willful or negligent acts; willful breach; and liability claims made by any Agent Indemnified Parties against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale (except claims arising from the Merchant's negligence, willful misconduct, or unlawful behavior). |

19.     As the Sales are completed, the Debtors will reject their leases and short-term license agreements pursuant to the contemporaneously filed *Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105, 365(a) And 554 And Bankruptcy Rules 6006 And 9014, And Local Bankruptcy Rule 9013-1 Authorizing And Approving Procedures For Rejection Of Executory Contracts And Unexpired Leases* (the "Rejection Procedures Motion").

20.     In order for the Debtors to conclude the Sales as quickly and efficiently as possible, and thereby minimize any unnecessary administrative expenses, including rent and related costs, it is essential that the Debtors be permitted to continue performing pursuant to the Agreements and Sale Guidelines.

21.     Since June 2015, the Agent has been preparing for the Pop Up Sales and actively commenced such sales in July 2015. In addition, the Agent began the Store Closing Sales prior to the Petition Date. As a result, the Agent is familiar with the Debtors' operations, the Stores, and the Sales. Moreover, the Agent has overseen the Sales to date and best knows how to maximize the value to be obtained by the Debtors during the remainder of such Sales.

22.     Failure by the Debtors to continue performing pursuant to the Agreements at this point would in all likelihood lead only to unnecessary delay and expense that would in turn disrupt the Debtors' restructuring efforts and cause significant harm to all stakeholders. The estate will lose the benefit of the Agent's momentum, preparation for, and commencement of the Sales. Among other things, the Debtors and their advisors would be compelled to suspend the Sales and devote valuable time and effort, at considerable expense to the Debtors and their estates, to locating new agents and then recommencing the Sales. The resulting disruption and delay would lead to a material loss of value and increased administrative expense. This would inevitably result in tremendous disruption to the Debtors' operations at the Stores and in all likelihood materially increase the Debtors' expenses and decrease their revenues associated with the Sales.

23.     In contrast to the harm that any failure to perform under the Agreements would likely cause the Debtors and their estates, the Debtors believe that they will receive significant benefits from performing under the Agreements and allowing the Sales to proceed pursuant to the Sale Guidelines under the guidance of the Agent. In particular, the Merchandise and FF&E subject to the Sales will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm like the Agent. Further, many of the Stores fail to generate positive cash flow and therefore are a significant drain on liquidity. As such, the Debtors will realize an immediate benefit in terms of financial liquidity as the Sales continue pursuant to the Sale Guidelines and operations at the Stores are terminated. Further, allowing the Sales to continue will allow the Debtors to reject leases and short-term licensing agreements pursuant to the Rejection Procedures Motion, and therefore avoid the accrual of unnecessary administrative expenses.

24.     Moreover, pursuant to the Store Closing Agreement, the Debtors agreed to file a motion to assume the Agreements in connection with any chapter 11 filing.

25.     As a result of the foregoing, the relief requested herein is warranted.

## APPLICABLE AUTHORITY

### I.     Assumption of the Agreement is Warranted Under Bankruptcy Code Section 365.

26.     Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). A debtor's determination to assume or reject an executory contract is governed by the "business judgment" standard. See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating that debtor's rejection of executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice). In applying the "business judgment" standard, courts show great deference to the debtor's decision to assume or reject. See Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of debtor's decision to assume or reject executory contract "should be granted as a matter of course").

27.     In this instance, as set forth above, the Debtors have exercised their reasonable business judgment in seeking to assume the Agreements, as the Sales are an integral component of the Debtors' overall restructuring efforts.

28.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res.,

Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

29.     The business judgment rule applies in chapter 11 cases.  See Integrated Res., 147 B.R. at 656 (noting that "Delaware business judgment rule principles have 'vitality by analogy' in Chapter 11"); see also Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions.").

30.     The Debtors clearly have satisfied the "business judgment" standard for assumption of the Agreements. First, assumption of the Agreements will allow the Debtors to continue to close unprofitable stores and maximize their recovery on inventory, both of which directly benefit the Debtors' estates. In addition, unsecured creditors will not be adversely affected and, indeed, will receive direct benefits from assumption of the Agreements through the continuation of the Sales pursuant to the Sale Guidelines. Finally, the Store Closing Plans, in conjunction with the Agreements, are a significant component of the Debtors' restructuring efforts because they allow for the Debtors to continue the sale of excess inventory and the store-closing process and increase overall profitability.

31.     Accordingly, the Debtors submit that there is more than sufficient business justification for assumption of the Agreements.[7]

---

[7]     As noted above, pursuant to this Motion, the Debtors seek, on an interim basis, an order that confirms that the Agreements are operative and effective. On a final basis, the Debtors seek authority to assume the Agreements. Similar relief has been granted in this jurisdiction. See In re Radioshack Corporation, No. 15-10197 at 4 (BLS) (Bankr. D. Del. Feb 6, 2015) (ordering that the consulting agreement was "operative and effective on an interim basis during the interim period"); (In re Radioshack Corporation, No. 15-10197 (BLS) (Bankr. D. Del. Feb 20, 2015) (on a final basis, authorizing assumption of the consulting agreement).

II.     **Continuing the Sales Pursuant to the Sale Guidelines is Authorized Pursuant to Bankruptcy Code Sections 105(a) and 363(b).**

32.     Bankruptcy Code section 105(a) provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). In turn, Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease, estate property "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Courts have authorized relief under section 363(b) where a debtor demonstrates a sound business justification for such relief.  See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); Ionosphere Clubs, Inc., 98 B.R. at 175 ("[T]he debtor must articulate some business justification, other than mere appeasement of major creditors.")

33.     Once a debtor has articulated a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)); see, also, Stephens Indus., Inc. v.  McClung, 789 F.2d 386, 390 (6th Cir. 1986) (authorizing sale of debtor's assets pursuant to section 363 "when a sound business purpose dictates such action"); Myers v.  Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (stating that, with respect to sales pursuant to section 363, "under normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification"); Fulton State Bank v.  Schipper (In re Schipper), 933 F.2d 513, 515 (7th

Cir. 1991) (stating that "debtor in possession can sell property of the estate outside the ordinary

course of business if: he has an 'articulated business justification'"); see generally, Comm. of

Equity Sec.  Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983).

34.    The business judgment rule applies in chapter 11 cases.  See Integrated

Res., 147 B.R. at 656 (noting that "Delaware business judgment rule principles have 'vitality by

analogy' in Chapter 11"); see also Comm. of Asbestos-Related Litigants and/or Creditors v.

Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)

("[T]he Code favors the continued operation of a business by a debtor and a presumption of

reasonableness attaches to a Debtor's management decisions.").

35.    Disposition of a debtor's inventory by a liquidator acting as a debtor's

agent pursuant to store closing and liquidation procedures like those proposed herein is an

accepted method for the sale of assets in chapter 11 cases involving retail debtors. See, e.g., In re

Radioshack Corporation, No. 15-10197 (BLS) (Bankr. D. Del. Feb 20, 2015); In re Coldwater

Creek Inc., No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014); In re Namco, LLC, No. 13-

10610 (PJW) (Bankr. D. Del. Apr. 12, 2013); In re Borders Grp., Inc., No. 11-10614 (MG)

(Bankr. S.D.N.Y. July 21, 2011); In re Borders Grp., Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y.

Feb. 18, 2011); In re Goody's LLC, No. 09-10124 (Bankr. D. Del. Jan. 21, 2009); In re Circuit

City Stores, Inc., No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 10, 2008); In re Whitehall

Jewelers  Holdings, Inc., No. 08-11261 (KG) (Bankr D. Del. Aug. 8, 2008); In re Goody's

Family Clothing, Inc., No. 08-11133 (CSS) (Bankr D. Del. June 13, 2008); In re Linens Holding

Co., No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008); In re Sharper Image Corp., No. 08-

10322 (KG) (Bankr. D. Del. May 30, 2008).[8] In particular, the Sale Guidelines, protections, and

---

[8]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders, however, are available on request.

dispute resolution procedures proposed herein and contained in the Interim and Final Orders are consistent with those used in recent cases in this and other districts. See, e.g., In re Radioshack Corporation, No. 15-10197 (BLS) (Bankr. D. Del. Feb 20, 2015); In re dELiA*s, Inc., No. 14-23678 (RDD) (Bankr. S.D.N.Y. Dec. 24, 2014); In re Coldwater Creek Inc., No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014).[9]

36.    As discussed above, the Debtors have determined, in the sound exercise of their business judgment, that the continuation of the Sales pursuant to the Sale Guidelines is critical to their reorganization efforts.  Among other things, the failure to do so could have adverse impacts for the Debtors' recovery on the Store Closure Assets through the Sales and, by extension, their efforts to complete an expeditious restructuring that maximizes value for stakeholders. Accordingly, the maximization of returns on the Store Closure Assets provides a sufficient business justification for authorization to continue the Sales pursuant to the Sale Guidelines.

37.    The Debtors therefore seek authorization under section 363(b) to continue the Sales.

**III.    Sale of the Store Closure Assets Free and Clear of Liens, Claims and Encumbrances is Authorized Under Bankruptcy Code Section 363.**

38.    The Debtors request approval to sell the Store Closure Assets subject to the Agreements on a final "as is" basis, free and clear of any and all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code. A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

---

[9]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders, however, are available on request.

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is a *bona fide* dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R.

343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court

may approve a sale free and clear if any one subsection is met).

      39.      Although the term "any interest" is not defined in the Bankruptcy Code,

the Third Circuit has noted that the trend in modern cases is toward a "broader interpretation

which includes other obligations that may flow from ownership of the property." Folger Adam

Security, Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 258-59 (3d Cir. 2000). As the Fourth

Circuit held in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-82 (4th Cir. 1996) (cited with

approval by the Third Circuit in Folger Adam), the scope of section 363(f) is not limited to in

rem interests in a debtor's assets. Thus, a debtor can sell its assets under section 363(f) "free and

clear of successor liability that otherwise would have arisen under federal statute. Folger Adam,

209 F.3d at 258.

      40.      With respect to any party asserting a lien, claim, or encumbrance against

the Store Closure Assets, the Debtors anticipate that they will be able to satisfy one or more of

the conditions set forth in section 363(f). Moreover, the Debtors propose that any such liens,

claims, and encumbrances be transferred to and attach to the amounts payable to the Debtors

under the Agreements, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto.

41.     Accordingly, the Debtors submit that, to the extent applicable, the Court should authorize the Debtors to sell the Store Closure Assets free and clear of any liens, claims, encumbrances, or other interests that may exist, pursuant to Bankruptcy Cody section 363(f), with any of the same to be transferred and attached to the net proceeds of the sale, with the same validity and priority that such liens, claims, encumbrances, or interests had against the assets.

## IV.    Payment of the Agent Claims is Authorized Under Bankruptcy Code Sections 105(a), 363, 1107(a), 1108, and the Doctrine of Necessity

42.     The Debtors respectfully request authorization, on an interim basis, of payment of the Agent Claims.

## A.    Payment of the Agent Claims is Authorized Under Bankruptcy Code Sections 1107(a) and 1108

43.     The Debtors, operating their businesses as debtors in possession under Bankruptcy Code sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id.

44.     Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id.; see also In re Mirant Corp., 296 B.R. 427, 429-30 (Bankr. N.D. Tex. 2003) (allowing debtors to pay claims "reasonably believe[d]" to be authorized under the CoServ test or whose payment was necessary "in the exercise of their business judgment . . . in order for [the d]ebtors to continue their respective businesses").  The CoServ court specifically noted that preplan satisfaction of

prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is

the only means to effect a substantial enhancement of the estate." CoServ, 273 B.R. at 497.  The

court formulated a three-pronged test for determining whether a preplan payment on account of a

prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it
> deals with the claimant, the debtor risks the probability of harm, or, alternatively,
> loss of economic advantage to the estate or the debtor's going concern value,
> which is disproportionate to the amount of the claimant's prepetition claim.  Third,
> there is no practical or legal alternative by which the debtor can deal with the
> claimant other than by payment of the claim.

Id. at 498.

45.    Payment of the Agent Claims meets the CoServ test. An integral part of the

Debtors' reorganization plan, both prepetition and postpetition, is being able to sell excess

inventory, close its stores, and streamline operations. Without the aid of the Agent, the Debtors'

ability to continue such Sales will be severely limited, and any delay or disruption to the Sales in

the interim period will cause significant and unnecessary delay should the Debtors be unable to

pay their obligations. Accordingly, to meet their fiduciary duties as debtors in possession under

Bankruptcy Code sections 1107(a) and 1108, the Debtors must be authorized, but not directed, to

pay all Agent Claims.

**B.     Payment of the Agent Claims is Authorized Under Bankruptcy Code Section 363.**

46.    Under section 363 of the Bankruptcy Code, a bankruptcy court is empowered to

authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the

ordinary course of business.  See 11 U.S.C. § 363.  In order to obtain approval for the use of

estate assets outside the ordinary course of business, the debtor must articulate a valid business

justification for the requested use.  See In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr.

S.D.N.Y. 1985).  As discussed above, the Debtors have determined, in the sound exercise of their

business judgment, that they will receive significant benefits from performing under the

Agreements and allowing the Sales to proceed during the interim period pursuant under the

guidance of the Agent. In particular, the assets subject to the Sales will be monetized most

efficiently and quickly through an orderly process conducted in consultation with an experienced

liquidation firm like the Agent. Accordingly, this Court should grant the requested relief under

section 363 of the Bankruptcy Code.

**C.     Bankruptcy Code Section 105(a) and the Doctrine of Necessity Support Payment of
         the Agent Claims.**

47.     The Debtors' proposed payment of Agent Claims should be authorized pursuant

to section 105 of the Bankruptcy Code and under the "doctrine of necessity."

48.     Section 105(a) of the Bankruptcy Code authorizes a bankruptcy court to enter any

order "necessary or appropriate" to carry out the provisions of the Bankruptcy Code.  11 U.S.C.

§ 105(a).  For the reasons set forth herein, and in light of the Debtors' ongoing efforts to

effectuate a successful reorganization through, among other things, streamlining its operations

and selling excess inventory, payment of the Agent Claims as requested herein is proper in

accordance with section 105 of the Bankruptcy Code.

49.     Payment of the Agent Claims is further supported by the doctrine of necessity.

The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize

payment of certain prepetition claims prior to the completion of the reorganization process where

the payment of such claims is necessary to the reorganization.  See In re Just for Feet, Inc., 242

B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of

certain prepetition claims, the doctrine of necessity should be invoked to permit payment); see

also In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit the pre-

plan payment of a prepetition obligation when essential to the continued operation of the

debtor."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o

justify payment of a prepetition unsecured creditor, a debtor must show that the payment is

necessary to avert a serious threat to the chapter 11 process.").

50.     The United States Supreme Court first articulated the doctrine of necessity over a

century ago in Miltenberger v. Logansport Railway, 106 U.S. 286 (1882), in affirming the

authorization by the lower court of the use of receivership funds to pay pre-receivership debts

owed to employees, vendors and suppliers, among others, when such payments were necessary

to preserve the receivership property and the integrity of the business in receivership.  See id. at

309-14.  The doctrine, largely unchanged from the Court's reasoning in Miltenberger, is a widely

accepted component of modern bankruptcy jurisprudence.  See Just For Feet, 242 B.R. at 826

(approving payment of key inventory suppliers' prepetition claims when such suppliers could

destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales

season); In re Payless Cashways, Inc., 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001)

(authorizing payment of critical prepetition suppliers' claims when such suppliers agree to

provide postpetition trade credit); see also In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92

(Bankr. D. Del. 1994); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).

51.     The Debtors' ability to successfully organize depends in large part upon its ability

to continue using the experience and knowledge of the Agent – including its experience with and

knowledge of the Debtors' business – to continue the Sales. The Agent will be required to

commit significant energy and efforts to conduct the Sales. Any disruption to the Sales during

the interim period would cause significant and unnecessary delays to the process of selling

excess inventory and closing stores. For the overall benefit to the Debtors' reorganization efforts,

payment of the Agent Claims will ensure maximum value for all interested parties. The Debtors

believe that in order to avoid delays in its efforts to sell excess inventory and close stores, it is

critical that they be authorized, pending entry of a final order authorizing assumption of the

Agreements, to pay the Agent on account of the Agent Claims.

**V.    Authorization of Payment of Store Closing Bonuses is Warranted.**

52.    Through this Motion, the Debtors are requesting the authority, but not

direction, to pay store closing bonuses (the "Store Closing Bonuses") to store-level and certain

field employees who are employed by the Debtors during the Sales.  The Debtors believe that the

Store Closing Bonuses will motivate employees during the Sales and will enable the Debtors to

retain those employees necessary to successfully complete the Sales.  The amount of the Store

Closing Bonuses will vary depending upon a number of factors, including the employee's

position with the Debtors and length of service.  The total aggregate cost of the Store Closing

Bonus program, however, will not exceed 10% of the base payroll, including taxes and typical

benefits, for all employees working at the Stores.  The Debtors estimate that the aggregate cost of

the Store Closing Bonus program will not be more than $250,000, and approximately 350

employees will be covered by the program.

53.    This Court has the authority, pursuant to sections 105 and 363(b) of the

Bankruptcy Code, to authorize the Debtors to pay the Store Closing Bonuses.  Store Closing

Bonuses are a typical practice in many store liquidations, and courts in this jurisdiction have also

approved such payments when debtors choose to enter into Agreements with liquidators.  See In

re Radioshack Corporation, No. 15-10197 (BLS) (Bankr. D. Del. Feb 20, 2015); In re Ultimate

Acquisition Partners, LP, Case No. 11-10245 (MFW) (Bankr. D. Del. Feb. 11, 2011); In re KB

Toys, Case No. 08-13269 (KJC) (Bankr. D. Del. Dec. 18, 2008).  In addition, the bonuses are not

barred by section 503(c) of the Bankruptcy Code. The individuals who are receiving the bonuses

are not insiders as that term is defined in section 101(31) of the Bankruptcy Code, and the

bonuses are justified by the facts and circumstances of these cases.

54.     In this case, payment of the Store Closing Bonuses in connection with the

Sales will aid in maximizing the value of the Debtors' estates by inducing employees who are

needed to manage and complete the Sales to remain in the employ of the Debtors and to

maximize the returns from such Sales.  Should the Debtors be unable to pay the Store Closing

Bonuses, they would likely lose a number of their current employees at the Stores and would be

required to hire additional employees, resulting in additional expense and delay, and such

employees would not be as familiar with the Debtors' merchandise and operations, which may

reduce the overall success and profitability of the Sales.  Therefore, the bonuses are justified by a

sound business purpose and should be approved.

## VI.    Wavier of Contractual Restrictions Restricting Sales is Authorized, and Exemption from Laws Restricting Sales is Warranted.

55.     The Debtors respectfully request waiver of certain contractual or

applicable law restrictions that could otherwise inhibit the Debtors' ability to maximize

recoveries through the Sales, and which are customarily waived in sales such as these.

## A.    Wavier of Contractual Restrictions Restricting Sales is Authorized.

56.     Certain stores subject to the Sales are located on properties that are leased

or licensed by the Debtors. In certain cases, the contemplated Sales may be inconsistent with

certain provisions of any such lease, sublease, license or other agreement relative to occupancy,

including, but not limited to, those affecting or purporting to restrict the conduct of the Sales, the

rejection of leases or licenses, abandonment of assets, or "going dark" provisions (collectively,

the "Contractual Restrictions").

57.     The Debtors request that the Court override or invalidate any Contractual Restrictions that may impair the Debtors' ability to close stores and conduct the Sales. Store closing or liquidation sales are a routine part of chapter 11 cases involving retail debtors. Such sales are consistently approved by courts despite provisions of recorded documents or agreements purporting to forbid such sales. See In re R.H. Macy & Co., 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (holding restrictive lease provision unenforceable against debtor that sought to conduct going-out-of-business sale "because it conflicts with the Debtor's fiduciary duty to maximize estate assets"); Ames I, 136 B.R. at 359 (finding that "to enforce the anti-[going out-of-business] sale clause of the [l]ease would contravene overriding federal policy requiring Debtor[s] to maximize estate assets by imposing additional constraints never envisioned by Congress"); see also In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding anti-going-out-of-business sales clause in lease unenforceable).

58.     Other such restrictive provisions in contracts have been deemed unenforceable in other chapter 11 cases as impermissible restraints on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code. See In re Radioshack Corporation, No. 15-10197 (BLS) (Bankr. D. Del. Feb 20, 2015); In re Coldwater Creek Inc., No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014); In re Namco, LLC, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013); In re Borders Grp., Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011); In re  Blockbuster Inc., No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011); In re Finlay Enters., Inc., No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009); In re Goody's LLC, No. 09-10124 (Bankr. D. Del. Jan. 15, 2009); In re KB Toys Inc., No. 08-13269 (KJC) (Bankr. D. Del. Dec. 18, 2008); In re Steve & Barry's Manhattan LLC, No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008); In re Whitehall Jewelers Holdings, Inc., No. 08-11261 (KG) (Bankr. D.

Del. Aug. 8, 2008); In re Goody's Family Clothing, Inc., No. 08-11133 (CSS) (Bankr. D. Del.

June 13, 2008).[10]

**B.      Exemption from Laws Restricting Sales is Warranted.**

59.      Certain states in which the Stores are located have or may have permitting,

licensing, and other requirements governing the conduct of store closing, liquidation, or other

inventory clearance sales, including (but not limited to) state and local rules, laws, ordinances,

and regulations related to store closing and liquidation sales, establishing licensing, permitting,

or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation

limitations that would otherwise apply to the Sales, or consumer fraud laws, with the exception

of deceptive advertising laws (the "Liquidation Sale Laws"). Typical statutes and regulations

provide that if a liquidation or bankruptcy sale is court authorized, however, then a company

need not comply with these Liquidation Sale Laws.

60.      The Debtors request that the Court authorize the Debtors to conduct the

Sales without the necessity of, and the delay associated with, complying with the Liquidation

Sale Laws. Because the Debtors and their assets are subject to this Court's jurisdiction, see 28

U.S.C. § 1334, this Court will be able to supervise the Sales. The Sales are a legitimate method

by which the Debtors can maximize the return from the sale of the Merchandise and the FF&E

for the benefit of their estates, their creditors, and their stakeholders. Moreover, creditors and the

public interest are adequately protected by the jurisdiction and supervision of this Court.

61.      Even if a state or local law does not expressly except bankruptcy sales

from its ambit, the Debtors submit that, to the extent that such state or local law conflicts with

federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States

---

[10]      Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of
these orders, however, are available on request.

Constitution. To hold otherwise would severely impair the relief otherwise available under

section 363 of the Bankruptcy Code. In concert with this premise, bankruptcy courts have

consistently recognized that federal bankruptcy law preempts state and local laws that contravene

the underlying policies of the Bankruptcy Code. See, e.g., Aloe v. Shenango Inc. (In re Shenango

Grp., Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have

unique fiduciary and legal obligations pursuant to the bankruptcy code.... [A] state statute. . . .

cannot place burdens on them where the result would contradict the priorities established by the

federal bankruptcy code."), aff'd sub nom Belcufine v. Aloe, 112 F. 3d 633 (3d Cir. 1997).

      62.     While the Debtors recognize that preemption of state law is not always

appropriate, as when the protection of public health and safety is involved, see Baker & Drake,

Inc. v. Public Service Commission of Nevada (In re Baker & Drake, Inc.), 35 F.3d 1348, 1353-

54 (9th Cir. 1994) (finding no preemption of public safety measure), it is appropriate when, as

here, the implicated state laws concern economic regulation. Id. at 1353 (finding that "federal

bankruptcy preemption is more likely. . . where a state statute is concerned with economic

regulation rather than with protecting the public health and safety"). See also In re Anchor Blue

Retail Grp., No. 09-11770 (PJW) (Bankr. D. Del. June 18, 2009) (authorizing store closing sale

conducted in accordance with sale guidelines).

      63.     Here, section 363 of the Bankruptcy Code, which requires the Debtors to

operate their businesses in a way that maximizes recoveries for creditors, will be undermined if

the Court does not provide for the waiver of the Liquidation Sale Laws, because full compliance

with the Liquidation Sale Laws could constrain the Debtors' ability to marshal and maximize

assets for the benefit of creditors. The relief requested herein is commonly granted in this District

and other jurisdictions. See, e.g., In re Radioshack Corporation, No. 15-10197 (BLS) (Bankr. D.

Del. Feb 20, 2015); In re Coldwater Creek Inc., No. 14-10867 (BLS) (Bankr. D. Del. May 7,

2014); In re Namco, LLC, No. 13-10610 (PJW) (Bankr. D. Del. Apr. 12, 2013); In re Borders

Grp., Inc., No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011); In re Borders Grp.,  Inc., No.

11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011); In re Blockbuster Inc., No. 10-14997 (BRL)

(Bankr. S.D.N.Y. Jan. 20, 2011); In re Finlay Enters., Inc., No. 09¬14873 (JMP) (Bankr.

S.D.N.Y. Sept. 25, 2009); In re Goody's LLC, No. 09-10124 (Bankr. D. Del. Jan. 15, 2009); In

re Steve & Barry's Manhattan LLC, No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008); In

re Whitehall Jewelers Holdings, Inc., No. 08-11261 (KG) (Bankr. D. Del. Aug. 8, 2008); In re

Goody's Family Clothing, Inc., No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008); In re

Linens Holding Co., No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008); In re Sharper Image

Corp., No. 08-10322 (KG) (Bankr. D. Del. May 30, 2008).[11]

      64.     Importantly, given the supervision of this Court, the requested waiver will

not unduly undermine state and local requirements that would otherwise apply to the Sales. The

Debtors only request that this Court authorize the Debtors to conduct the Sales without the

necessity of, and the delay associated with, obtaining various state licenses or permits, observing

state and local waiting periods or time limits, and/or satisfying any additional requirements with

respect to advertising, conducting the Sales as store closings or similar type sales, or transferring

merchandise from the distribution centers to the Stores. The Debtors fully intend to be bound by

and comply with remaining statutes and regulations, such as health and safety laws.

      65.     The Debtors also request that no other person or entity, including (but not

limited to) any lessor or federal, state, or local agency, department, or governmental authority, be

---

[11]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of
these orders, however, are available on request.

allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the

Sales, or the advertising and promotion of Sales, in the manner set forth in the proposed orders.

**VII.    Abandonment of Certain Property in Connection with the Sales is Warranted Under Bankruptcy Code Section 554.**

66.    After notice and a hearing, a debtor "may abandon any property of the

estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."

11 U.S.C. §554(a); see also Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir.

1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he

deems less valuable than the cost of asserting that claim").

67.    The Debtors are seeking to sell all FF&E remaining in the Stores.

However, the Debtors may determine that the costs associated with holding or selling certain

property or FF&E exceeds the proceeds that will be realized upon its sale, or that such property

is not sellable at all.  In such event, the property is of inconsequential value and benefit to the

estates and/or may be burdensome to retain.

68.    To maximize the value of the Debtors' assets and to minimize the costs to

the estates, the Debtors respectfully request authority to abandon any of their remaining FF&E or

other property located at any of the Stores without incurring liability to any person or entity.  The

Debtors further request that the landlord of each Store with any abandoned FF&E or other

property be authorized to dispose of such property without liability to any third parties.

69.    Notwithstanding the foregoing, the Debtors will utilize all commercially

reasonable efforts to remove or cause to be removed any confidential or personal identifying

information (which means information which alone or in conjunction with other information

identifies an individual, including, but not limited to, an individual's name, social security

number, date of birth, government-issued identification number, account number, and credit or

debit card number) in any of the Debtors' hardware, software, computers or cash registers or
similar equipment that are to be sold or abandoned.

**VIII.    Appointment of a Consumer Privacy Ombudsman is not Required by Bankruptcy
Code Sections 363(b)(1) or Section 332.**

70.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not
sell or lease personally identifiable information unless such sale or lease is consistent with its
policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the
Bankruptcy Code. Pursuant to the Agreements, the Agent will *not* be purchasing the Debtors'
customer lists containing any personally identifiable information regarding the Debtors'
customers. Therefore, appointment of a consumer privacy ombudsman is unnecessary.

**IX.    Protection of the Agent Pursuant to Bankruptcy Code Section 363(m) is Warranted.**

71.    As described above, entry into the Agreements was the result of arm's-
length transactions between the Debtors and the Agent. Indeed, prepetition bid solicitation was
designed to and did ensure that all bidders had an equal and fair opportunity to bid on the
opportunity to sell the Debtors' inventory during the Sales. Thus, the Debtors respectfully
request that this Court find that the Agent acted in good faith within the meaning of Bankruptcy
Code section 363(m).

72.    Specifically, Bankruptcy Code section 363(m) provides that:

[t]he reversal or modification on appeal of an authorization under subsection (b)
or (c) of this section of a sale or lease of property does not affect the validity of a
sale or lease under such authorization to an entity that purchased or leased such
property in good faith, whether or not such entity knew of the pendency of the
appeal, unless such authorization and such sale or lease were stayed pending
appeal.

11 U.S.C. § 363(m).

73.    While the Bankruptcy Code does not define "good faith," the Third Circuit
Court of Appeals has "turned to traditional equitable principles, holding that the phrase

encompasses one who purchases in 'good faith' and for 'value'." In re Abbotts Diaries of

Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986).

       74.    Because of the manner in which the prepetition bid solicitation process

was conducted, the Agent was not be able to exert any undue influence over the Debtors. Under

the circumstances, this Court should find that (i) entry into the Agreements was the result of

good faith arm's-length transactions and (ii) the Agent is entitled to all of the protections of

Bankruptcy Code section 363(m).

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

       75.    Bankruptcy Rule 6003 provides that the relief requested in this Motion

may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R.

Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla.

2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid

irreparable harm). The Third Circuit has interpreted the language "immediate and irreparable

harm" in the context of preliminary injunctions. In that context, the court has instructed that

irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the

merits and for which money damages cannot provide adequate compensation. See, e.g., Norfolk

S. Ry. Co. v. City of Pittsburgh, 235 Fed. App'x 907, 910 (3d Cir. 2007) (citing Glasco v. Hills,

558 F.2d 179, 181 (3d Cir. 1977)). Furthermore, the harm must be shown to be actual and

imminent, not speculative or unsubstantiated. See, e.g., Acierno v. New Castle County, 40 F.3d

645, 653-55 (3d Cir. 1994). The Debtors submit that for the reasons already set forth herein, the

relief requested in this Motion is necessary to avoid immediate and irreparable harm to the

Debtors

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

76.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

77.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise to pay any claim; (d) except with respect to the Agreements, an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365; or (e) otherwise affect the Debtors' rights under Bankruptcy Code section 365 to assume or reject any executory contract with any party subject to this Motion.

## NOTICE

78.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' postpetition secured loan facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan facility; (d) the agent for the Debtors' prepetition senior secured notes; (e) the agent for the Debtors' prepetition senior unsecured notes; (f) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases; and (g) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).  The Debtors submit that no other or further notice need be provided.

**NO PRIOR REQUEST**

79.    No previous request for the relief sought herein has been made to this

Court or any other court.


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court enter interim and

final orders, substantially in the form annexed hereto, granting the relief sought herein on an

interim basis and final and granting such other and further relief as may be just and proper.


Dated:    Wilmington, Delaware
          September 9, 2015


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Z. Li (*pro hac vice admission pending*)
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

John K. Lyons (*pro hac vice admission pending*)
Jessica S. Kumar (*pro hac vice admission pending*)
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel for Debtors and Debtors in Possession*

## EXHIBIT A

**Store Closing Agreement**

 

September 4, 2015

***VIA EMAIL***
QS RETAIL, INC.
Attn: General Counsel
5600 Argosy Ave. Bldg 100
Huntington Beach, Ca 92649
Phone: (714) 889-2200

Re:    **Letter Agreement Governing Inventory Disposition**

Dear Steve:

This letter shall serve as an agreement ("Agreement") between Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, on the one hand (collectively, "Agent" or a "Party"), and QS RETAIL, Inc., on the other hand ("Merchant" or a "Party" and together with the Agent, the "Parties"), under which Agent shall act as the exclusive agent for the purpose of conducting a "store closing" or other mutually agreed upon sale at Merchant's retail stores identified on Exhibit A (each a "Store" and collectively, the "Stores") in the United States (the "Sale").

**A.    Intentionally Left Blank.**

**B.    Sale Term**

For each Store, the Sale shall commence on September 6, 2015 (the "Sale Commencement Date") and conclude on respective dates to be mutually agreed to by Agent and Merchant; provided however, that the Sale shall conclude at all Stores no later than December 31, 2015(the "Sale Termination Date"). The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "Sale Term."

**C.    Project Management**

(i)    Agent's Undertakings

Agent shall, in collaboration with Merchant, (a) provide qualified supervisors (the "Supervisors") engaged by Agent to oversee the management of the Stores; (b) determine appropriate point-of-sale and internal and external advertising strategies for the Stores, recommend and assist Merchant with advertising, and create signage for the Stores, all at Merchant's cost and expense and approved in advance by Merchant; (c) determine appropriate discounts of Merchandise (as defined below) approved in advance by Merchant; (d) recommend staffing levels for the Stores and appropriate bonus and incentive programs, if any, for the Stores' employees; (e) oversee display of Merchandise for the Stores; (f) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (g) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (h) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (i) provide support in

obtaining appropriate authorization and permits to conduct the Sale from state and local authorities (if applicable) by (i) advising Merchant of the applicable waiting period under such laws, and/or (ii) preparing (in Merchant's name and for Merchant's signature) all permitting paperwork as may be necessary under such laws, delivering all such paperwork to Merchant, and filing on behalf of Merchant, all such paperwork where necessary, and/or (iii) advising Merchant where permitting paperwork and/or waiting periods do not apply; (j) assist Merchant in creating a customer transition program to transition customers from the Stores to Merchant's other retail channels; and (k) provide such other related services deemed necessary or appropriate by Merchant and Agent.

At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant in broom clean condition; provided, however, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Agent and Merchant. At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

(ii)     Merchant's Undertakings

During the Sale Term, Merchant shall (at no cost or expense to Agent): (a) be the employer of the Stores' employees (other than the Supervisors) or, to the extent Merchant elects, utilize the services of a third party employment agency recommended by Agent, for purposes of engaging temporary staff for the Stores; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees (other than the Supervisors) and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Agent to be necessary or desirable for the operation of the Stores during the Sale; (g) provide, and arrange for the ordinary maintenance of, all point-of-sale and all other Store-level equipment required for the Stores; (h) ensure that Agent has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement; and (i) identify the Merchandise for the Sale, with Agent's assistance allocate and balance the Merchandise among the Stores, and ship and distribute the Merchandise to the Stores.

To assist with the Sale, Merchant shall provide throughout the Sale Term (at no cost or expense to Agent) central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Agent.

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

2

**D.      The Sale**

All sales of Merchandise shall be made on behalf of Merchant.  Agent does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, or credit card, and shall be "final" with no returns accepted or allowed, except as authorized by Merchant.

**E.      Agent Fee and Expenses in Connection with the Sale**

As used in this Agreement, the following terms shall have the following meanings:

(i)      "Gross Proceeds" shall mean the sum of (i) the gross proceeds of all sales of Merchandise made in the Store during the Sale Term, net only of sales taxes.

(ii)      "Merchandise" shall mean all merchandise sold in the Store during the Sale Term comprised of such merchandise in the Stores as of the Sale Commencement Date, plus such other merchandise included in the Stores during the Sale Term; subject in the case of such other merchandise to: (a) Agent's and Merchant's mutual agreement of the composition of such merchandise and the timing of receipt in the Stores, (b) compliance with applicable law, and (c) Agent's and Merchant's subsequent mutual agreement of such other adjustments (if any) to provisions of this Agreement as may be required to reflect the inclusion of such other merchandise in the Sale as Merchandise.

(iii)      "Recovery Percentage" shall mean the Gross Proceeds divided by the Cost Value of the Merchandise.

(iv)      "Cost Value" with respect to each item of Merchandise shall be determined with reference to the Merchant's books and records maintained in the ordinary course consistent with past periods and practices.

Merchant shall pay Agent an "Incentive Fee" of <u>one</u> of the following (e.g., back to first dollar) based upon the following "Recovery Performance hurdles/Incentive Fee" formulations:

| Recovery Percentage | Agent Incentive Fee |
|---------------------|----------------------|
| Less than 155.00% | 1.00% of Gross Proceeds |
| 155.00% - 159.99% | 1.50% of Gross Proceeds |
| 160.00% - 169.99% | 1.75% of Gross Proceeds |
| 170.00% and Above | 2.00% of Gross Proceeds |

On a weekly basis as part of the weekly reconciliations contemplated below, Merchant shall pay Agent an advance on account of the Incentive Fee in the amount of 1.00% of Gross Proceeds for the prior week (or partial week in the case of the first and last weeks).  The Recovery Percentage shall be determined in connection with the Final Reconciliation, and once determined, the parties (as part of the Final Reconciliation) shall determine the actual amount of the Incentive Fee. Merchant shall pay Agent any remaining balance due on account of the Incentive Fee (if any) in

connection with the Final Reconciliation, and, with Agent's consent, Merchant may offset against such remaining balance amounts (if any) Agent owes to Merchant.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's reasonable, documented and preapproved out of pocket expenses.  To control expenses of the Sale, Merchant and Agent have established a budget (the "Expense Budget") of certain delineated expenses within the control of Agent, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation), advertising costs, and Agent's legal and miscellaneous expenses.  The Expense Budget for the Sale shall be (i) $98,400 for the first week of the Sale (covering for example start-up expenses, initial signage and supervision travel); and (ii) $31,550 per week thereafter (covering for example weekly supervision compensation/deferred compensation and fees, advertising, and miscellaneous expenses, including without limitation Agent's reasonable and documented legal expenses associated with a bankruptcy filing).  The Expense Budget does not include costs, and instead reflects cost savings, associated with supervision because Agent and Merchant have agreed to utilize "Supervisors" (as defined in certain letter agreement dated June 4, 2015 by and among the Agent and Merchant (the "Pop Up Stores Agreement")) associated with the "pop up stores" as Supervisors for the Stores in addition to such Supervisors' responsibilities under the Pop Up Stores Agreement.  The Expense Budget shall be increased if the "Supervisors" under the Pop Stores Agreement are not utilized in connection with the Sale to take into account additional costs of supervision that will be necessary for Agent to perform its responsibilities under this Agreement and properly conduct the Sale.  The Expense Budget may only be modified by mutual agreement of Agent and Merchant.  Merchant shall have no responsibility for costs and expenses in excess of the Expense Budget, unless Agent has obtained Merchant's prior written (including email) consent pursuant to an amendment to the Expense Budget.

All accounting matters (including, without limitation, all fees, expenses, advances, or other amounts reimbursable or payable to Agent) shall be reconciled by mutual agreement of Agent and Merchant on every Wednesday for the prior week and, unless disputed by either Party, shall be paid within seven (7) days after each such weekly reconciliation. The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) ("Final Reconciliation") no later than forty five (45) days following the Sale Termination Date for the last Store.

**F.**     **Indemnification**

    (i)     Merchant's Indemnification

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,  principals, affiliates, and Supervisors (collectively, "Agent Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) product liability claims, except claims arising from Agent's negligence, willful misconduct or unlawful behavior, (d) claims asserted by any Store

employees employed by Merchant (under a collective bargaining agreement or otherwise), relating to such employment against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Merchant or any of the Merchant Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

(ii)    Agent's Indemnification

Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC shall, jointly and severally, indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by an Agent Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement.

**G.    Insurance**

(i)    Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause Agent to be named an additional insured with respect to all such policies. At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and that Agent is an additional insured thereunder. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

(ii)    Agent's Insurance Obligations

As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Stores. Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a

certificate or certificates evidencing the insurance coverage required hereunder.  In addition, Agent shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements.  Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

(iii)    <u>Certain Agreements</u>

Notwithstanding any other provision of this Agreement, Merchant and Agent agree that Agent shall not be deemed to be in possession or control of the Stores, or the Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores.

**H.    Representations, Warranties, Covenants and Agreements**

(i)    Merchant warrants, represents, covenants and agrees that (a) Merchant is a corporation duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein (other than as set forth in Section A), (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; and (d) to the extent within the control of Merchant, the Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

(ii)    Agent warrants, represents, covenants and agrees that (a) each entity comprising Agent is a limited liability company duly organized, validly existing and in good standing under the laws of state of the Delaware, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Stores will be conducted without Merchant's prior written consent, (e) Agent will not take any disciplinary action against any employee of Merchant.

**I.    Furniture, Fixtures and Equipment**

Agent shall sell the FF&E in each such Store from the Store themselves.  Agent shall dispose of any unsold FF&E at the conclusion of the Sale in a manner to be approved by Merchant; <u>provided however</u>, that at Agent's election, Agent shall have the right to abandon in-place in a neat

and orderly manner, all unsold FF&E (and all FF&E that Merchant requested that Agent not sell). Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale or other disposition of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties.

In consideration for providing the services set forth in this Section I, Agent shall be entitled to a commission from the sale of the FF&E equal to twenty percent (20%) of the gross proceeds (net only of sales taxes to the extent applicable) of the sale of the FF&E.

Agent shall remit to Merchant all such gross proceeds, and during each weekly reconciliation described in Section E above, Agent's FF&E fee shall be calculated, and Agent's calculated and agreed upon FF&E fee and all FF&E costs and expenses then incurred within an agreed upon budget shall paid within seven (7) days after each such weekly reconciliation.

**J.** **Termination**

The following shall constitute "Termination Events" hereunder:

(a)     Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured five (5) days after receipt of written notice thereof to the defaulting Party; or

(b)     The failure of any representation or warranty made by Merchant or Agent to be true in any material respect as of the date made or at any time and throughout the Sale Term, which failure shall continue uncured five (5) days after receipt of written notice thereof to the defaulting Party.

If a Termination Event occurs, the non-defaulting Party  may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in addition to terminating this Agreement, pursue any and all rights and remedies and damages resulting from such default; provided, that in no event shall either Party be liable to the other for any punitive, exemplary, consequential, incidental, indirect or special damages, including, without limitation, lost profits.  If this Agreement is terminated other than as a result of a default by Agent, Merchant shall be obligated to pay Agent all amounts due under this Agreement through and including the termination date.

**K.** **Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by fax or by recognized overnight delivery service as follows:  (a) To Merchant: Quiksilver, Inc., 5600 Argosy Circle, #100, Huntington Beach, CA 92649, Attn: Retail Department; with a copy to: Legal Department; (b) To Agent: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax:  847- 897-0859, Attn: Ian S. Fredericks; and c/o Gordon Brothers Retail Partners, LLC, 800 Boylston Street, 27th Floor, Boston, MA 02199, Fax: 617-531-7906, Attention, Michael Chartock; or (c) such other address as may be designated in writing by Merchant or Agent.

**L.**    **Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect.  No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement.  Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**M.**    **Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party; provided that either Party may assign this Agreement without the consent of the other Party in the event of a merger, reorganization, consolidation or other change in control transaction, or in connection with the sale of all or substantially all of such Party's assets.  No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

**N.**    **Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.  If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**O.**    **Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of California (without reference to the conflicts of laws provisions therein).  Any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Orange County, California courts and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.  If either Party commences any legal action, suit or proceeding to enforce or interpret this Agreement or any of the terms or provisions hereof, then in addition to any damages or remedies that may be awarded to the prevailing party therein, the prevailing party will be entitled to have and recover from the losing

party the prevailing party's reasonable outside attorneys' fees and costs incurred in connection therewith.

If Merchant commences a case under Chapter 11 of Bankruptcy Code with a bankruptcy court (the "Bankruptcy Court"), Merchant shall promptly file a motion to assume both this Agreement and the Pop Up Store Agreement under section 365 of the Bankruptcy Code, and utilize its best efforts to ensure that such motion is approved by an order, in form and substance reasonably acceptable to the Agent and Merchant, that provides, among other things, as follows: (i) the payment of all fees and reimbursement of expenses hereunder and under the Pop Up Store Agreement to Agent is approved without further order of the court and shall be free and clear of all liens, claims and encumbrances; (ii) all such payments of fees and reimbursement of expenses shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement and the Pop Up Store Agreement (as the case may be); (iii) approval of the transaction contemplated hereby and by the Pop Up Store Agreement; (iv) authorizing the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale; (v) authorizing the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; and (vi) take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement.  In such event, then notwithstanding the provisions of the second sentence of the first paragraph of this Section O, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over Merchant, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens.

**P.    Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, and, the Pop Up Stores Agreement, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement.  Except with respect to the Pop Up Stores Agreement, all prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**Q.    Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

*          *          *

If ███ Agreement is acceptable to ████ █████ execute a █████ in ███ █████ provided, ████ ███████ a countersigned version to ███ undersigned. █████ █████ █ █████ opportunity -- we ████ fo███ard to working ████ ████.

███ ████ █████

██████ MERCHANT ██████OURCES, ████

By: ███ S. ████redericks
Is: ██████ & ██████

GORDON BROTHERS RETAIL PARTNERS, ████

By: ████████ Gronbopf
████ Co-President

**AGREED ████ACCEPTED as of** ███ ███ ███ of September, ██████

QS RETAIL, ██████

By:
████

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: _____
Its:

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Its:

**AGREED AND ACCEPTED as of the** 4th **day of September, 2015:**

QS RETAIL, INC.

By: _____ Linsay Caya
Its: President

11



Exhibit A

| Store # | Brand | Store Name | City | State | Sq Ft | Property Management Co. |
|---|---|---|---|---|---|---|
| 27 | QS | QUIKSILVER- UNIVERSAL CITYWALK | Universal City | CA | 2493 | Universal City Walk |
| 29 | QS | QUIKSILVER - SOUTH COAST PLAZA | Costa Mesa | CA | 2167 | South Coast Plaza |
| 50 | QS | QUIKSILVER - TIMES SQUARE | New York | NY | 3033 | Rudin Management Company, Inc. |
| 58 | QS | QUIKSILVER - HOLLYWOOD, FL | Hollywood | FL | 3040 | Seminole Properties Retail |
| 103 | DC | DC - IRVINE SPECTRUM | Irvine | CA | 2305 | The Irvine Company |
| 111 | QS | QUIKSILVER – SEATTLE | Seattle | WA | 6187 | First & Lenora LLC |
| 114 | RX | ROXY - FASHION ISLAND | Newport Beach | CA | 1386 | The Irvine Company |
| 119 | TRI | QUIKSILVER - DEL AMO | Torrance | CA | 5,820 | |
| 120 | WA | WATERMAN - WAIKIKI BEACH WALK | Honolulu | HI | 1,261 | |
| 123 | TRI | QUIKSILVER GLENDALE | Glendale | CA | 2997 | |
| 124 | BR | BOARDRIDERS MEATPACKING | New York | NY | 4262 | |
| 125 | BR | BOARDRIDERS PASADENA | Pasadena | CA | 5000 | |
| 834 | QS | QUIKSILVER OUTLET – LAKEWOOD | Lakewood | CO | 2500 | Simon Property Group |
| 838 | DC | DC OUTLET - PISMO | Pismo Beach | CA | 2405 | Simon Property Group |
| 850 | DC | DC OUTLET - EL PASO | Canutillo | TX | 2625 | Horizon Group Properties |
| 852 | DC | DC OUTLET – GILROY | Gilroy | CA | 2722 | Simon Property Group |
| 859 | DC | DC OUTLET – LAUGHLIN | Laughlin | NV | 2624 | |
| 861 | DC | DC OUTLET - DOLPHIN MALL | Miami | FL | 3052 | Taubman |
| 865 | DC | DC OUTLET - KATY MILLS | Katy | TX | 2050 | Simon Property Group |
| 869 | TRI | QUIKSILVER OUTLET – MIROMAR | Estero | FL | 2270 | Miromar Outlets |
| 872 | TRI | QUIKSILVER OUTLET – CHICAGO | Rosemont | IL | 4000 | Macerich |
| 874 | TRI | QUIKSILVER OUTLET - SILVER SANDS | Destin | FL | 3000 | Silver Sands GL I, LLC |
| 876 | TRI | QUIKSILVER  OUTLET - GREAT LAKES | Auburn Hills | MI | 5576 | Taubman Management |
| 879 | QS | QUIKSILVER OUTLET – ANNAPOLIS | Annapolis | MD | 3500 | Westfield Shoppingtown-Annapolis Mall, Owner LLC |
| 883 | QS | QUIKSILVER OUTLET - CHARLOTTE | Charlotte | NC | 2944 | |
| 885 | TRI | QUIKSILVER OUTLET - WOODBURY COMMONS | Central Valley | NY | 5000 | |
| 887 | TRI | QUIKSILVER OUTLET - NORTH GEORGIA PREMIUM OUTLETS | Dawsonville | GA | 4262 | |

# **EXHIBIT B**

## **Pop Up Store Agreement**

 

June 8, 2015

*VIA EMAIL*
QS RETAIL, INC.
Attn:  Steve Finney
5600 Argosy Ave. Bldg 100
Huntington Beach, Ca 92649
Phone:  (714) 889-2336
Email: steve.finney@quiksilver.com

Re:    **Letter Agreement Governing Inventory Disposition**

Dear Steve:

This letter shall serve as an agreement ("Agreement") between Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, on the one hand (collectively, "Agent" or a "Party"), and QS RETAIL, Inc., on the other hand ("Merchant" or a "Party" and together with the Agent, the "Parties"), under which Agent shall act as the exclusive agent for the purpose of conducting a sale of certain Merchandise (as defined below) through a "pop up" store program (each a "Pop Up Store" and collectively, the "Pop Up Stores") in the United States utilizing sale handles agreed upon by the Parties (the "Sale").

**A.    Merchandise**

For purposes hereof, "Merchandise" shall mean all excess, clearance, obsolete, or distressed inventory described on Exhibit A attached hereto, but only to the extent that Merchant obtains the necessary approvals and clearances to import such inventory into the United States, and such other goods as Merchant and Agent may agree to include in the Sale from time to time.  "Merchandise" does not mean and shall not include: (1) goods that belong to sublessees, licensees or concessionaires of Merchant; (2) furnishings, trade fixtures, equipment and improvements to real property that are located in the Pop Up Stores (collectively, "FF&E"); or (3) damaged or defective merchandise that cannot be sold.

**B.    Sale Term**

For each Store, the Sale shall commence on July 1, 2015 (the "Sale Commencement Date") and conclude the earlier of (a) January 31, 2016 or (b) the date that the Sale is completed (the "Sale Termination Date"); provided, however, that the Parties may mutually agree in writing to extend or terminate the Sale at any Store prior to the Sale Termination Date.  The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "Sale Term."

**C.    Project Management**

(i)    Agent's Undertakings

Agent shall, in collaboration with Merchant, (a) together with Agent's affiliate, Hilco Real Estate, LLC, assist Merchant with identifying a minimum of fifteen suitable locations for the Pop

Up Stores; provided, that it is the Parties intent to operate approximately thirty Pop Up Stores; (b) provide qualified supervisors (the "Supervisors") engaged by Agent to oversee the management of the Pop Up Stores; (c) determine appropriate point-of-sale and internal and external advertising strategies for the Pop Up Stores and recommend and assist Merchant with advertising and signage for the Pop Up Stores, all at Merchant's cost and expense and approved in advance by Merchant; (d) determine appropriate discounts of Merchandise approved in advance by Merchant; (e) assist Merchant in procuring employees to be employed by Merchant or a third party staffing company recommended by Agent; (f) recommend staffing levels for the Pop Up Stores and appropriate bonus and incentive programs, if any, for the Pop Up Stores' employees; (g) oversee display of Merchandise for the Pop Up Stores; (h) assist in procuring FF&E for the Pop Up Stores; (i) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (j) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (k) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (l) provide support in obtaining appropriate authorization and permits to conduct the Sale from state and local authorities (if applicable); (m) assist Merchant in creating a customer transition program to transition customers from the Pop Up Stores to Merchant's other retail channels; (n) provide such other related services deemed necessary or appropriate by Merchant and Agent; and (o) at an agreed upon time prior to the end of the Sale Term at each Pop Up Store, conduct a "sale on everything", "everything on sale", "store closing" or similar themed sale event (but not a "going out of business" or similar event sale) and sell all Merchandise to the piece, and if Merchant requests, the FF&E pursuant to Section I.

At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant in broom clean condition and in accordance with the lease requirements for such premises; provided, however, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Agent and Merchant. At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

(ii)    Merchant's Undertakings

During the Sale Term, Merchant shall (a) be the employer of the Pop Up Stores' employees (other than the Supervisors) or, to the extent Merchant elects, utilize the services of a third party employment agency recommended by Agent, for purposes of engaging temporary staff for the Pop Up Stores; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Pop Up Stores, the Pop Up Stores' employees (other than the Supervisors) and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Pop Up Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Agent to be necessary or desirable for the operation of the Pop Up Stores during the Sale; provided, that Merchant shall have the right to approve the terms and conditions of each lease with respect to a Pop Up Store in its sole discretion;

(g) provide, and arrange for the ordinary maintenance of, all point-of-sale equipment required for the Pop Up Stores; (h) with Agent's assistance, and subject to the lease for each Pop Up Store, ensure that Agent has quiet use and enjoyment of the Pop Up Stores for the Sale Term in order to perform its obligations under this Agreement; (i) with Agent's assistance, provide or procure FF&E for the Pop Up Stores; (j) identify the Merchandise for the Sale, with Agent's assistance allocate and balance the Merchandise among the Stores, and ship and distribute the Merchandise to the Pop Up Stores; and (k) with Agent's assistance, obtain all interior and exterior signage (including exterior "QUIKSILVER" signage) and procure all advertising for the Pop Up Stores.

To assist with the Sale, Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Agent.

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

**D.      The Sale**

All sales of Merchandise shall be made on behalf of Merchant.  Agent does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, or credit card and, at Merchant's discretion, by check or otherwise in accordance with Merchant's policies, and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant.

**E.      Agent Fee and Expenses in Connection with the Sale**

In consideration of its services hereunder, Agent shall earn a fee equal to five (5.0%) of the Gross Proceeds of Merchandise sold at the Pop Up Stores.  For purposes of this Agreement, "Gross Proceeds" means gross receipts arising from sales of Merchandise, net of applicable sales taxes.  In addition, Agent shall be paid an amount equal to $5,000 per Pop Up Store lease that is negotiated by Hilco Real Estate, LLC on Merchant's behalf and approved and executed by Merchant, and Merchant shall fund all deposits with respect to such Pop Up Store leases and utilities associated therewith, if required by the applicable lease.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's reasonable, documented and preapproved out of pocket expenses.  To control expenses of the Sale, Merchant and Agent have established a budget (the "Expense Budget") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs.  The Expense Budget for the Sale is attached hereto as Exhibit B.  The Expense Budget may only be modified by mutual agreement of Agent and Merchant.  Merchant shall have no responsibility for costs and expenses in excess of the Expense Budget, unless Agent has obtained Merchant's prior written (including email) consent pursuant to an

amendment to the Expense Budget. The costs of supervision set forth on <u>Exhibit B</u> include, among other things, industry standard deferred compensation.

All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to Agent) shall be reconciled by mutual agreement of Agent and Merchant on every Wednesday for the prior week and, unless disputed by either Party, shall be paid within seven (7) days after each such weekly reconciliation. The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty five (45) days following the Sale Termination Date for the last Store.

## F.   <u>Indemnification</u>

(i)   <u>Merchant's Indemnification</u>

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates, and Supervisors (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) product liability claims, except claims arising from Agent's negligence, willful misconduct or unlawful behavior, (d) claims asserted by any Store employees employed by Merchant (under a collective bargaining agreement or otherwise), relating to such employment against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Merchant or any of the Merchant Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

(ii)   <u>Agent's Indemnification</u>

Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC shall, jointly and severally, indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "<u>Merchant Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by an Agent Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement.

4

## G.     Insurance

(i)     Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Pop Up Stores, and shall cause Agent to be named an additional insured with respect to all such policies.  At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and that Agent is an additional insured thereunder.   In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

(ii)     Agent's Insurance Obligations

As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Pop Up Stores.  Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder.  In addition, Agent shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements.  Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

## H.     Representations, Warranties, Covenants and Agreements

(i)     Merchant warrants, represents, covenants and agrees that (a) Merchant is a corporation duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein (other than as set forth in Section A), (c) all ticketing of Merchandise at the Pop Up Stores has been and will be done in accordance with Merchant's customary ticketing practices; and (d) to the extent within the control of Merchant, the Pop Up Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

(ii)     Agent warrants, represents, covenants and agrees that (a) each entity comprising Agent is a limited liability company duly organized, validly existing and in good standing under the

laws of state of the Delaware, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Pop Up Stores will be conducted without Merchant's prior written consent, (e) Agent will not take any disciplinary action against any employee of Merchant, and (f) Agent shall not knowingly, and no Agent Indemnified Party shall, knowingly take any action that would constitute a breach of the lease for any Pop Up Store.

## I.   **Furniture, Fixtures and Equipment**

If requested by Merchant at one or more Pop Up Stores, Agent shall sell the FF&E in each such Pop Up Store from the Pop Up Store themselves.  Agent shall dispose of any unsold FF&E at the conclusion of the Sale in a manner to be approved by Merchant. Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale or other disposition of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties.

In consideration for providing the services set forth in this Section I, Agent shall be entitled to a commission from the sale of the FF&E equal to twenty percent (20%) of the Gross Proceeds of the sale of the FF&E.

Agent shall remit to Merchant all Gross Proceeds from the sale of FF&E.  During each weekly reconciliation described in Section E above, Agent's FF&E fee shall be calculated, and Agent's calculated and agreed upon FF&E fee and all FF&E costs and expenses then incurred within an agreed upon budget shall paid within seven (7) days after each such weekly reconciliation.

## J.   **Termination**

The following shall constitute "Termination Events" hereunder:

(a)     Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured thirty (30) days after receipt of written notice thereof to the defaulting Party; or

(b)     The failure of any representation or warranty made by Merchant or Agent to be true in any material respect as of the date made or at any time and throughout the Sale Term, which failure shall continue uncured thirty (30) days after receipt of written notice thereof to the defaulting Party.

If a Termination Event occurs, the non-defaulting Party  may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in addition to terminating this Agreement, pursue any and all rights and remedies and

damages resulting from such default; provided, that in no event shall either Party be liable to the other for any punitive, exemplary, consequential, incidental, indirect or special damages, including, without limitation, lost profits.  If this Agreement is terminated other than as a result of a default by Agent, Merchant shall be obligated to pay Agent all amounts due under this Agreement through and including the termination date.

**K.      Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by fax or by recognized overnight delivery service as follows:  (a) To Merchant: Quiksilver, Inc., 5600 Argosy Circle, #100, Huntington Beach, CA 92649, Attn: Retail Department; with a copy to: Legal Department; (b) To Agent: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax:  847- 897-0859, Attn: Ian S. Fredericks; or (c) such other address as may be designated in writing by Merchant or Agent.

**L.      Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect.  No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement.  Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**M.      Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party; provided that either Party may assign this Agreement without the consent of the other Party in the event of a merger, reorganization, consolidation or other change in control transaction, or in connection with the sale of all or substantially all of such Party's assets.  No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

**N.      Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.  If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**O.      Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of California (without reference to the conflicts of laws provisions therein).  Any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Orange County, California courts and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.  If either Party commences any legal action, suit or proceeding to enforce or interpret this Agreement or any of the terms or provisions hereof, then in addition to any damages or remedies that may be awarded to the prevailing party therein, the prevailing party will be entitled to have and recover from the losing party the prevailing party's reasonable outside attorneys' fees and costs incurred in connection therewith.

**P.    Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement.  All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**Q.    Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

*          *          *

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By:  Ian Fredericks
Its:  VP & Assistant General Counsel, Managing Member

GORDON BROTHERS RETAIL PARTNERS, LLC

By:  Richard Edwards
Its:  Co-President

**AGREED AND ACCEPTED as of the** 12th **day of June ___, 2015:**

QS RETAIL, INC.

By:  STEPHEN M FINNEY
Its:  SENIOR VICE PRESIDENT

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchadise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_grou p_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 10-100-01 | Apparel | Quiksilver | QS Young Mens | S/S Tees | 53,578 | 200,290 | 4.4% |
| 10-100-02 | Apparel | Quiksilver | QS Young Mens | L/S Tees | 333 | 1,921 | 0.0% |
| 10-100-03 | Apparel | Quiksilver | QS Young Mens | Name Drop Tees | 13,922 | 52,268 | 1.1% |
| 10-100-04 | Apparel | Quiksilver | QS Young Mens | Knit Shirts | 9,053 | 48,237 | 1.1% |
| 10-100-05 | Apparel | Quiksilver | QS Young Mens | Woven Shirts | 6,661 | 65,666 | 1.4% |
| 10-100-06 | Apparel | Quiksilver | QS Young Mens | Fleece | 14,983 | 187,776 | 4.1% |
| 10-100-07 | Apparel | Quiksilver | QS Young Mens | Sweaters | 436 | 4,091 | 0.1% |
| 10-100-08 | Apparel | Quiksilver | QS Young Mens | Jackets | 2,830 | 56,110 | 1.2% |
| 10-100-09 | Apparel | Quiksilver | QS Young Mens | Boardshorts | 18,970 | 235,547 | 5.2% |
| 10-100-10 | Apparel | Quiksilver | QS Young Mens | Volleys | 11 | 94 | 0.0% |
| 10-100-11 | Apparel | Quiksilver | QS Young Mens | Walkshorts | 17,795 | 175,593 | 3.8% |
| 10-100-12 | Apparel | Quiksilver | QS Young Mens | Denim | 2,677 | 30,853 | 0.7% |
| 10-100-13 | Apparel | Quiksilver | QS Young Mens | Casual Pants | 1,325 | 16,188 | 0.4% |
| 10-100-14 | Apparel | Quiksilver | QS Young Mens | Name Drop Fleece | 276 | 3,378 | 0.1% |
| 10-100-15 | Apparel | Quiksilver | QS Young Mens | z_unidentified | 3,083 | 12,060 | 0.3% |
| 10-101-01 | Accessories | Quiksilver | QS Mens Accs | Beanies | 3,459 | 14,093 | 0.3% |
| 10-101-02 | Accessories | Quiksilver | QS Mens Accs | Hats | 14,044 | 78,501 | 1.7% |
| 10-101-03 | Accessories | Quiksilver | QS Mens Accs | Boxers | 1,280 | 5,389 | 0.1% |
| 10-101-04 | Accessories | Quiksilver | QS Mens Accs | Wallets | 3,268 | 13,833 | 0.3% |
| 10-101-05 | Accessories | Quiksilver | QS Mens Accs | Belts | 3,059 | 11,217 | 0.2% |
| 10-101-06 | Accessories | Quiksilver | QS Mens Accs | Socks | 104 | 229 | 0.0% |
| 10-101-07 | Accessories | Quiksilver | QS Mens Accs | Backpacks | 3,834 | 45,612 | 1.0% |
| 10-101-08 | Accessories | Quiksilver | QS Mens Accs | Luggage | 1,708 | 19,479 | 0.4% |
| 10-101-09 | Accessories | Quiksilver | QS Mens Accs | Watches | 298 | 6,520 | 0.1% |
| 10-101-10 | Accessories | Quiksilver | QS Mens Accs | Sunglasses | 161 | 2,705 | 0.1% |
| 10-101-11 | Accessories | Quiksilver | QS Mens Accs | Gift Packs | 2 | 14 | 0.0% |
| 10-101-12 | Accessories | Quiksilver | QS Mens Accs | Miscellaneous | 2,880 | 17,590 | 0.4% |
| 10-101-13 | Accessories | Quiksilver | QS Mens Accs | ND Accessories | 227 | 2,063 | 0.0% |
| 10-101-16 | Accessories | Quiksilver | QS Mens Accs | Electronics | 5,110 | 247,732 | 5.4% |
| 10-101-17 | Accessories | Quiksilver | QS Mens Accs | Stickers | 2,575 | 14,026 | 0.3% |
| 10-102-01 | Footwear | Quiksilver | QS Mens Footwear | Sandals | 47,456 | 197,504 | 4.3% |
| 10-102-02 | Footwear | Quiksilver | QS Mens Footwear | Athletic / Casual | 10,814 | 102,411 | 2.2% |
| 10-103-01 | Apparel | Quiksilver | QS Mens | Tees | 146 | 792 | 0.0% |
| 10-103-02 | Apparel | Quiksilver | QS Mens | Knits | 29 | 306 | 0.0% |
| 10-103-03 | Apparel | Quiksilver | QS Mens | Wovens | 136 | 2,209 | 0.0% |
| 10-103-04 | Apparel | Quiksilver | QS Mens | Fleece | 6 | 100 | 0.0% |
| 10-103-05 | Apparel | Quiksilver | QS Mens | Sweaters | 2 | 36 | 0.0% |
| 10-103-06 | Apparel | Quiksilver | QS Mens | Jackets | 6 | 134 | 0.0% |
| 10-103-07 | Apparel | Quiksilver | QS Mens | Boardshorts | 55 | 702 | 0.0% |
| 10-103-08 | Apparel | Quiksilver | QS Mens | Walkshorts | 50 | 590 | 0.0% |
| 10-103-09 | Apparel | Quiksilver | QS Mens | Pants | (3) | (89) | 0.0% |
| 10-104-02 | Accessories | Other | Mens Yesterday's | S/S Tees | 25 | 189 | 0.0% |
| 10-105-01 | Apparel | Quiksilver | QS Performance | Tees | 36 | 272 | 0.0% |
| 10-105-02 | Apparel | Quiksilver | QS Performance | Tops | 11 | 146 | 0.0% |
| 10-105-03 | Apparel | Quiksilver | QS Performance | Jackets | 1 | 33 | 0.0% |
| 10-105-04 | Apparel | Quiksilver | QS Performance | Shorts | 8 | 115 | 0.0% |
| 10-106-01 | Accessories | Quiksilver | QS Watermans Accs | Hats | 50 | 313 | 0.0% |
| 10-106-03 | Accessories | Quiksilver | QS Watermans Accs | Miscellaneous | 2 | 16 | 0.0% |
| 11-110-01 | Apparel | Quiksilver | QS Boys 8-20 | S/S Tees | 50,941 | 147,417 | 3.2% |
| 11-110-02 | Apparel | Quiksilver | QS Boys 8-20 | L/S Tees | 3,203 | 14,170 | 0.3% |
| 11-110-03 | Apparel | Quiksilver | QS Boys 8-20 | Name Drop Tees | 24 | 72 | 0.0% |
| 11-110-04 | Apparel | Quiksilver | QS Boys 8-20 | Knits | 2,267 | 14,569 | 0.3% |
| 11-110-05 | Apparel | Quiksilver | QS Boys 8-20 | Wovens | 3,292 | 28,566 | 0.6% |
| 11-110-06 | Apparel | Quiksilver | QS Boys 8-20 | Fleece | 5,457 | 54,981 | 1.2% |
| 11-110-07 | Apparel | Quiksilver | QS Boys 8-20 | Sweaters | 1 | 8 | 0.0% |
| 11-110-08 | Apparel | Quiksilver | QS Boys 8-20 | Jackets | 494 | 8,347 | 0.2% |
| 11-110-09 | Apparel | Quiksilver | QS Boys 8-20 | Boardshorts | 1,466 | 15,045 | 0.3% |
| 11-110-10 | Apparel | Quiksilver | QS Boys 8-20 | Walkshorts | 3,347 | 33,826 | 0.7% |
| 11-110-11 | Apparel | Quiksilver | QS Boys 8-20 | Pants | 2,222 | 26,363 | 0.6% |
| 11-111-01 | Apparel | Quiksilver | QS Kids / Toddler | S/S Tees | 9,842 | 28,201 | 0.6% |
| 11-111-02 | Apparel | Quiksilver | QS Kids / Toddler | L/S Tees | 854 | 3,189 | 0.1% |
| 11-111-03 | Apparel | Quiksilver | QS Kids / Toddler | Knits | 224 | 1,251 | 0.0% |
| 11-111-04 | Apparel | Quiksilver | QS Kids / Toddler | Wovens | 97 | 802 | 0.0% |

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchadise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_grou p_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 11-111-05 | Apparel | Quiksilver | QS Kids / Toddler | Fleece | 1,063 | 8,710 | 0.2% |
| 11-111-07 | Apparel | Quiksilver | QS Kids / Toddler | Jackets | 29 | 452 | 0.0% |
| 11-111-08 | Apparel | Quiksilver | QS Kids / Toddler | Boardshorts | 481 | 3,893 | 0.1% |
| 11-111-09 | Apparel | Quiksilver | QS Kids / Toddler | Walkshorts | 1,225 | 10,320 | 0.2% |
| 11-111-10 | Apparel | Quiksilver | QS Kids / Toddler | Pants | 81 | 779 | 0.0% |
| 11-112-01 | Apparel | Quiksilver | QS Infant | Tees / Fleece | 268 | 874 | 0.0% |
| 11-112-02 | Apparel | Quiksilver | QS Infant | Tops | 113 | 668 | 0.0% |
| 11-112-03 | Apparel | Quiksilver | QS Infant | Bottoms | 312 | 2,304 | 0.1% |
| 11-113-01 | Accessories | Quiksilver | QS Boys Accs | Beanies | 927 | 3,757 | 0.1% |
| 11-113-02 | Accessories | Quiksilver | QS Boys Accs | Hats | 201 | 844 | 0.0% |
| 11-113-03 | Accessories | Quiksilver | QS Boys Accs | Boxers | 37 | 115 | 0.0% |
| 11-113-04 | Accessories | Quiksilver | QS Boys Accs | Wallets | 8 | 27 | 0.0% |
| 11-113-05 | Accessories | Quiksilver | QS Boys Accs | Belts | 55 | 175 | 0.0% |
| 11-113-06 | Accessories | Quiksilver | QS Boys Accs | Socks | 17 | 38 | 0.0% |
| 11-113-07 | Accessories | Quiksilver | QS Boys Accs | Backpacks | 1 | 12 | 0.0% |
| 11-113-08 | Accessories | Quiksilver | QS Boys Accs | Watches | 7 | 44 | 0.0% |
| 11-113-09 | Accessories | Quiksilver | QS Boys Accs | Sunglasses | 2 | 10 | 0.0% |
| 11-113-10 | Accessories | Quiksilver | QS Boys Accs | Miscellaneous | 2 | 7 | 0.0% |
| 11-114-01 | Footwear | Quiksilver | QS Boys Footwear | Sandals | 15,095 | 48,219 | 1.1% |
| 11-114-02 | Footwear | Quiksilver | QS Boys Footwear | Athletic / Casual | 1 | 9 | 0.0% |
| 12-120-01 | Apparel | Quiksilver | QS Womens Apparel | Tees | 2 | 20 | 0.0% |
| 12-120-02 | Apparel | Quiksilver | QS Womens Apparel | Fleece | 2 | 24 | 0.0% |
| 12-120-03 | Apparel | Quiksilver | QS Womens Apparel | Tops | 9 | 30 | 0.0% |
| 12-120-04 | Apparel | Quiksilver | QS Womens Apparel | Sweaters | 3 | 66 | 0.0% |
| 12-120-05 | Apparel | Quiksilver | QS Womens Apparel | Jackets | 2 | 45 | 0.0% |
| 12-120-06 | Apparel | Quiksilver | QS Womens Apparel | Dresses | 27 | 370 | 0.0% |
| 12-120-07 | Apparel | Quiksilver | QS Womens Apparel | Skirts | 1 | 7 | 0.0% |
| 12-120-08 | Apparel | Quiksilver | QS Womens Apparel | Shorts | 2 | 32 | 0.0% |
| 12-120-09 | Apparel | Quiksilver | QS Womens Apparel | Denim | 7 | 138 | 0.0% |
| 12-120-10 | Apparel | Quiksilver | QS Womens Apparel | Casual Pants | (1) | (9) | 0.0% |
| 12-120-11 | Apparel | Quiksilver | QS Womens Apparel | Swim | 14 | 198 | 0.0% |
| 12-122-02 | Footwear | Quiksilver | QSW Footwear | Sandals | (11) | (135) | 0.0% |
| 12-123-01 | Apparel | Quiksilver | QS Girls Apparel | Tees | 91 | 484 | 0.0% |
| 12-123-02 | Apparel | Quiksilver | QS Girls Apparel | Fleece | 69 | 856 | 0.0% |
| 12-123-03 | Apparel | Quiksilver | QS Girls Apparel | Tops | 105 | 1,008 | 0.0% |
| 12-123-04 | Apparel | Quiksilver | QS Girls Apparel | Tanks | 46 | 284 | 0.0% |
| 12-123-05 | Apparel | Quiksilver | QS Girls Apparel | Sweaters | 18 | 374 | 0.0% |
| 12-123-06 | Apparel | Quiksilver | QS Girls Apparel | Jackets | 41 | 1,099 | 0.0% |
| 12-123-07 | Apparel | Quiksilver | QS Girls Apparel | Dresses | 141 | 1,633 | 0.0% |
| 12-123-08 | Apparel | Quiksilver | QS Girls Apparel | Skirts | 3 | 22 | 0.0% |
| 12-123-09 | Apparel | Quiksilver | QS Girls Apparel | Shorts | 44 | 389 | 0.0% |
| 12-123-10 | Apparel | Quiksilver | QS Girls Apparel | Denim | 674 | 7,880 | 0.2% |
| 12-123-11 | Apparel | Quiksilver | QS Girls Apparel | Casual Pants | 208 | 2,242 | 0.0% |
| 12-123-12 | Apparel | Quiksilver | QS Girls Apparel | Swim | 58 | 556 | 0.0% |
| 12-124-01 | Accessories | Quiksilver | QS Girls Accessories | Handbags | 10 | 85 | 0.0% |
| 12-124-02 | Accessories | Quiksilver | QS Girls Accessories | Winterwear | 3 | 20 | 0.0% |
| 20-200-01 | Apparel | Roxy | Roxy Apparel | S/S Tees | 11,798 | 56,722 | 1.2% |
| 20-200-02 | Apparel | Roxy | Roxy Apparel | L/S Tees | 2,678 | 16,096 | 0.4% |
| 20-200-03 | Apparel | Roxy | Roxy Apparel | Name Drop Tees | 6,980 | 28,591 | 0.6% |
| 20-200-04 | Apparel | Roxy | Roxy Apparel | Fleece | 19,513 | 210,677 | 4.6% |
| 20-200-05 | Apparel | Roxy | Roxy Apparel | Name Drop Fleece | 250 | 1,935 | 0.0% |
| 20-200-06 | Apparel | Roxy | Roxy Apparel | Tops | 5,002 | 42,099 | 0.9% |
| 20-200-07 | Apparel | Roxy | Roxy Apparel | Tanks | 1,923 | 11,205 | 0.2% |
| 20-200-08 | Apparel | Roxy | Roxy Apparel | Sweaters | 9,823 | 114,383 | 2.5% |
| 20-200-09 | Apparel | Roxy | Roxy Apparel | Jackets | 4,732 | 83,129 | 1.8% |
| 20-200-10 | Apparel | Roxy | Roxy Apparel | Dresses | 6,004 | 59,238 | 1.3% |
| 20-200-11 | Apparel | Roxy | Roxy Apparel | Skirts | 68 | 543 | 0.0% |
| 20-200-12 | Apparel | Roxy | Roxy Apparel | Shorts | 616 | 5,590 | 0.1% |
| 20-200-13 | Apparel | Roxy | Roxy Apparel | Boardshorts | 2,029 | 17,539 | 0.4% |
| 20-200-14 | Apparel | Roxy | Roxy Apparel | Denim | 4,523 | 53,601 | 1.2% |
| 20-200-15 | Apparel | Roxy | Roxy Apparel | Casual Pants | 1,666 | 18,839 | 0.4% |
| 20-201-01 | Apparel | Roxy | Jrs Swim | Roxy | 29,370 | 174,524 | 3.8% |
| 20-201-04 | Apparel | Roxy | Jrs Swim | Coverups | 67 | 520 | 0.0% |

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchadise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_group_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 20-201-05 | Apparel | Roxy | Jrs Swim | z_unidentified | 11 | 117 | 0.0% |
| 20-202-01 | Accessories | Roxy | Roxy Accs | Hats | 299 | 1,579 | 0.0% |
| 20-202-02 | Accessories | Roxy | Roxy Accs | Handbags | 3,500 | 31,180 | 0.7% |
| 20-202-03 | Accessories | Roxy | Roxy Accs | Jewelry | 22 | 115 | 0.0% |
| 20-202-04 | Accessories | Roxy | Roxy Accs | Wallets | 2,822 | 16,378 | 0.4% |
| 20-202-05 | Accessories | Roxy | Roxy Accs | Belts | 815 | 3,948 | 0.1% |
| 20-202-06 | Accessories | Roxy | Roxy Accs | Backpacks | 929 | 12,749 | 0.3% |
| 20-202-07 | Accessories | Roxy | Roxy Accs | Luggage | 1,143 | 11,393 | 0.2% |
| 20-202-08 | Accessories | Roxy | Roxy Accs | Watches | 261 | 3,062 | 0.1% |
| 20-202-09 | Accessories | Roxy | Roxy Accs | Sunglasses | 123 | 1,741 | 0.0% |
| 20-202-10 | Accessories | Roxy | Roxy Accs | Loungewear | 37 | 367 | 0.0% |
| 20-202-11 | Accessories | Roxy | Roxy Accs | Winterwear | 973 | 6,072 | 0.1% |
| 20-202-12 | Accessories | Roxy | Roxy Accs | Gifts | 172 | 1,788 | 0.0% |
| 20-202-13 | Accessories | Roxy | Roxy Accs | Fragrance | 446 | 5,972 | 0.1% |
| 20-202-14 | Accessories | Roxy | Roxy Accs | Miscellaneous | 1,156 | 5,442 | 0.1% |
| 20-202-15 | Accessories | Roxy | Roxy Accs | Home | 1 | 11 | 0.0% |
| 20-202-17 | Accessories | Roxy | Roxy Accs | Electronics | 8,284 | 421,259 | 9.2% |
| 20-202-18 | Accessories | Roxy | Roxy Accs | Stickers | 91 | 269 | 0.0% |
| 20-202-19 | Accessories | Roxy | Roxy Accs | z_unidentified | 232 | 347 | 0.0% |
| 20-203-01 | Footwear | Roxy | Roxy Footwear | Rubber Flip Flops | 15,229 | 52,679 | 1.2% |
| 20-203-02 | Footwear | Roxy | Roxy Footwear | Sandals | 1,799 | 12,121 | 0.3% |
| 20-203-03 | Footwear | Roxy | Roxy Footwear | Athletic / Casual | 5,011 | 48,094 | 1.1% |
| 20-203-04 | Footwear | Roxy | Roxy Footwear | Slippers | (5) | (57) | 0.0% |
| 20-204-01 | Apparel | Roxy | Roxy Outdoor Fitness | Sports Bras | 25 | 249 | 0.0% |
| 20-204-02 | Apparel | Roxy | Roxy Outdoor Fitness | Tanks | 11 | 176 | 0.0% |
| 20-204-03 | Apparel | Roxy | Roxy Outdoor Fitness | Tops | 44 | 444 | 0.0% |
| 20-204-04 | Apparel | Roxy | Roxy Outdoor Fitness | Slippers | 31 | 735 | 0.0% |
| 20-204-05 | Apparel | Roxy | Roxy Outdoor Fitness | Shorts | 128 | 1,185 | 0.0% |
| 20-204-06 | Apparel | Roxy | Roxy Outdoor Fitness | Pants | 795 | 11,104 | 0.2% |
| 20-204-07 | Apparel | Roxy | Roxy Outdoor Fitness | Accessories | 4 | 59 | 0.0% |
| 20-204-08 | Apparel | Roxy | Roxy Outdoor Fitness | Swim | 538 | 3,744 | 0.1% |
| 20-204-09 | Apparel | Roxy | Roxy Outdoor Fitness | Wetsuits | 2 | 138 | 0.0% |
| 21-210-01 | Apparel | Roxy | RG Apparel | S/S Tees | 1,154 | 4,475 | 0.1% |
| 21-210-02 | Apparel | Roxy | RG Apparel | L/S Tees | 64 | 336 | 0.0% |
| 21-210-03 | Apparel | Roxy | RG Apparel | Fleece | 2,397 | 20,987 | 0.5% |
| 21-210-04 | Apparel | Roxy | RG Apparel | Tops | 1,744 | 11,588 | 0.3% |
| 21-210-05 | Apparel | Roxy | RG Apparel | Sweaters | (17) | (232) | 0.0% |
| 21-210-06 | Apparel | Roxy | RG Apparel | Jackets | 19 | 223 | 0.0% |
| 21-210-07 | Apparel | Roxy | RG Apparel | Dresses | 54 | 446 | 0.0% |
| 21-210-08 | Apparel | Roxy | RG Apparel | Skirts | 2 | 14 | 0.0% |
| 21-210-09 | Apparel | Roxy | RG Apparel | Shorts | 37 | 260 | 0.0% |
| 21-210-10 | Apparel | Roxy | RG Apparel | Pants | 3,815 | 29,753 | 0.7% |
| 21-210-11 | Apparel | Roxy | RG Apparel | Swim | 476 | 4,049 | 0.1% |
| 21-210-12 | Apparel | Roxy | RG Apparel | Name Drop Tees | 51 | 192 | 0.0% |
| 21-211-01 | Apparel | Roxy | RG Teenie Wahine | Tees | 69 | 257 | 0.0% |
| 21-211-02 | Apparel | Roxy | RG Teenie Wahine | Fleece | 72 | 660 | 0.0% |
| 21-211-03 | Apparel | Roxy | RG Teenie Wahine | Tops | 47 | 361 | 0.0% |
| 21-211-04 | Apparel | Roxy | RG Teenie Wahine | Bottoms | 155 | 1,116 | 0.0% |
| 21-211-05 | Apparel | Roxy | RG Teenie Wahine | Dresses | 25 | 175 | 0.0% |
| 21-211-06 | Apparel | Roxy | RG Teenie Wahine | Swim | 96 | 720 | 0.0% |
| 21-212-01 | Apparel | Roxy | RG Infant | Tees / Fleece | 8 | 52 | 0.0% |
| 21-212-02 | Apparel | Roxy | RG Infant | Tops | 12 | 76 | 0.0% |
| 21-212-03 | Apparel | Roxy | RG Infant | Bottoms | 5 | 32 | 0.0% |
| 21-212-04 | Apparel | Roxy | RG Infant | Dresses | 5 | 31 | 0.0% |
| 21-213-01 | Accessories | Roxy | RG Accs | Hats | 10 | 49 | 0.0% |
| 21-213-02 | Accessories | Roxy | RG Accs | Handbags | 59 | 348 | 0.0% |
| 21-213-03 | Accessories | Roxy | RG Accs | Belts | 1 | 5 | 0.0% |
| 21-213-04 | Accessories | Roxy | RG Accs | Backpacks | 23 | 266 | 0.0% |
| 21-213-05 | Accessories | Roxy | RG Accs | Luggage | 5 | 43 | 0.0% |
| 21-213-06 | Accessories | Roxy | RG Accs | Watches | 1 | 7 | 0.0% |
| 21-213-07 | Accessories | Roxy | RG Accs | Sunglasses | 44 | 260 | 0.0% |
| 21-213-08 | Accessories | Roxy | RG Accs | Winterwear | 36 | 239 | 0.0% |
| 21-213-10 | Accessories | Roxy | RG Accs | Miscellaneous | 72 | 413 | 0.0% |

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchdaise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_group_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 21-214-01 | Footwear | Roxy | RG Footwear | Sandals | 1,560 | 5,782 | 0.1% |
| 21-214-02 | Footwear | Roxy | RG Footwear | Athletic / Casual | 188 | 1,528 | 0.0% |
| 21-215-03 | Accessories | Roxy | RG TW Accs | Backpacks | 2 | 13 | 0.0% |
| 21-216-01 | Accessories | Roxy | RG Infant Accs | Hats | 1 | 4 | 0.0% |
| 21-216-02 | Accessories | Roxy | RG Infant Accs | Miscellaneous | 2 | 18 | 0.0% |
| 21-217-01 | Footwear | Roxy | RG TW Footwear | Sandals | 880 | 3,041 | 0.1% |
| 21-217-02 | Footwear | Roxy | RG TW Footwear | Athletic / Casual | 170 | 1,391 | 0.0% |
| 30-300-01 | Technical Products | Quiksilver | Snow | QS Mens Snow | 117 | 3,849 | 0.1% |
| 30-300-02 | Technical Products | Roxy | Snow | Roxy Snow | 125 | 4,731 | 0.1% |
| 30-300-03 | Technical Products | Quiksilver | Snow | QS Boys Snow | 5 | 129 | 0.0% |
| 30-300-04 | Technical Products | Roxy | Snow | Roxy Girls Snow | 4 | 91 | 0.0% |
| 30-300-05 | Technical Products | Quiksilver | Snow | Snow Accessories | 147 | 2,899 | 0.1% |
| 30-300-05 | Technical Products | Roxy | Snow | Snow Accessories | 246 | 3,251 | 0.1% |
| 30-300-06 | Technical Products | Roxy | Snow | Teenie Wahine Snow | (2) | (48) | 0.0% |
| 40-400-01 | Technical Products | Quiksilver | Wetsuits | QS Mens Wetsuits | 549 | 19,673 | 0.4% |
| 40-400-02 | Technical Products | Roxy | Wetsuits | Roxy Wetsuits | 404 | 15,521 | 0.3% |
| 40-400-03 | Technical Products | Quiksilver | Wetsuits | QS Boys Wetsuits | 10 | 160 | 0.0% |
| 40-400-04 | Technical Products | Quiksilver | Wetsuits | QS Mens Lycra | 3,205 | 23,132 | 0.5% |
| 40-400-05 | Technical Products | Roxy | Wetsuits | Roxy Lycra | 2,197 | 14,490 | 0.3% |
| 40-400-06 | Technical Products | Quiksilver | Wetsuits | QS Boys Lycra | 3,435 | 22,561 | 0.5% |
| 40-400-07 | Technical Products | Roxy | Wetsuits | Roxy Girls Lycra | 1,286 | 8,376 | 0.2% |
| 40-400-08 | Technical Products | Roxy | Wetsuits | Roxy Girls Wetsuits | 11 | 232 | 0.0% |
| 40-400-09 | Technical Products | Roxy | Wetsuits | Teenie Wahine Wetsuits/Lycra | 521 | 3,504 | 0.1% |
| 40-400-10 | Technical Products | Quiksilver | Wetsuits | Watermans Lycra | 2,884 | 27,831 | 0.6% |
| 40-400-11 | Technical Products | Quiksilver | Wetsuits | z_unidentified | 295 | 1,974 | 0.0% |
| 50-500-02 | Accessories | Other | Other Vendor | Skate | 75 | 2,924 | 0.1% |
| 50-500-03 | Accessories | Other | Other Vendor | Snow | 427 | 50,260 | 1.1% |
| 50-500-04 | Accessories | Other | Other Vendor | Books / Magazines | 50 | 388 | 0.0% |
| 50-500-05 | Accessories | Other | Other Vendor | DVDs | 110 | 1,315 | 0.0% |
| 50-500-06 | Accessories | Other | Other Vendor | Miscellaneous | 6 | 447 | 0.0% |
| 50-500-07 | Accessories | Other | Other Vendor | Jewelry | 12 | 324 | 0.0% |
| 50-500-08 | Accessories | Other | Other Vendor | Electronics | 115 | 4,660 | 0.1% |
| 50-500-13 | Accessories | Other | Other Vendor | Makeup | 1,155 | 12,546 | 0.3% |
| 50-500-14 | Accessories | Other | Other Vendor | Moscova | 29 | 227 | 0.0% |
| 70-700-01 | Apparel | DC Shoes | DC Mens App | S/S Tees | 3,939 | 15,733 | 0.3% |
| 70-700-02 | Apparel | DC Shoes | DC Mens App | L/S Tees | 48 | 273 | 0.0% |
| 70-700-03 | Apparel | DC Shoes | DC Mens App | Knits | 149 | 978 | 0.0% |
| 70-700-04 | Apparel | DC Shoes | DC Mens App | Wovens | 420 | 4,911 | 0.1% |
| 70-700-05 | Apparel | DC Shoes | DC Mens App | Fleece | 1,455 | 16,123 | 0.4% |
| 70-700-06 | Apparel | DC Shoes | DC Mens App | Sweaters | 12 | 128 | 0.0% |
| 70-700-07 | Apparel | DC Shoes | DC Mens App | Jackets | 128 | 3,005 | 0.1% |
| 70-700-08 | Apparel | DC Shoes | DC Mens App | Shorts | 2,767 | 24,868 | 0.5% |
| 70-700-09 | Apparel | DC Shoes | DC Mens App | Denim | 248 | 3,790 | 0.1% |
| 70-700-10 | Apparel | DC Shoes | DC Mens App | Long Bottoms | 1,699 | 18,362 | 0.4% |
| 70-700-11 | Apparel | DC Shoes | DC Mens App | Boardshorts | 327 | 3,057 | 0.1% |
| 70-701-01 | Accessories | DC Shoes | DC Mens Accs | Beanies | 26 | 115 | 0.0% |
| 70-701-02 | Accessories | DC Shoes | DC Mens Accs | Hats | 944 | 5,149 | 0.1% |
| 70-701-03 | Accessories | DC Shoes | DC Mens Accs | Backpacks | 273 | 2,660 | 0.1% |
| 70-701-04 | Accessories | DC Shoes | DC Mens Accs | Wallets | 22 | 86 | 0.0% |
| 70-701-05 | Accessories | DC Shoes | DC Mens Accs | Belts | 103 | 348 | 0.0% |
| 70-701-06 | Accessories | DC Shoes | DC Mens Accs | Socks | 6,174 | 21,602 | 0.5% |
| 70-701-07 | Accessories | DC Shoes | DC Mens Accs | Miscellaneous | 533 | 2,354 | 0.1% |
| 70-701-08 | Accessories | DC Shoes | DC Mens Accs | Luggage | 24 | 733 | 0.0% |
| 70-702-01 | Footwear | DC Shoes | DC Mens Footwear | Skate | 7,700 | 134,759 | 2.9% |
| 70-702-02 | Footwear | DC Shoes | DC Mens Footwear | Sandals | 246 | 1,748 | 0.0% |
| 71-710-01 | Apparel | DC Shoes | DC Boys App | Tees | 308 | 974 | 0.0% |
| 71-710-02 | Apparel | DC Shoes | DC Boys App | Fleece | 364 | 3,921 | 0.1% |
| 71-710-03 | Apparel | DC Shoes | DC Boys App | Tops | 98 | 837 | 0.0% |
| 71-710-04 | Apparel | DC Shoes | DC Boys App | Outerwear | 7 | 62 | 0.0% |
| 71-710-05 | Apparel | DC Shoes | DC Boys App | Shorts | 35 | 392 | 0.0% |
| 71-710-06 | Apparel | DC Shoes | DC Boys App | Boardshorts | 32 | 298 | 0.0% |
| 71-710-07 | Apparel | DC Shoes | DC Boys App | Denim | 11 | 121 | 0.0% |
| 71-710-08 | Apparel | DC Shoes | DC Boys App | Long Bottoms | 2 | 19 | 0.0% |

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchandise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_group_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 71-711-01 | Accessories | DC Shoes | DC Boys Accs | Beanies | 3 | 13 | 0.0% |
| 71-711-02 | Accessories | DC Shoes | DC Boys Accs | Hats | 29 | 169 | 0.0% |
| 71-711-03 | Accessories | DC Shoes | DC Boys Accs | Belts | 2 | 6 | 0.0% |
| 71-711-04 | Accessories | DC Shoes | DC Boys Accs | Miscellaneous | 37 | 181 | 0.0% |
| 71-711-05 | Accessories | DC Shoes | DC Boys Accs | Backpacks | 362 | 934 | 0.0% |
| 71-712-01 | Footwear | DC Shoes | DC Boys Footwear | Skate | 340 | 4,238 | 0.1% |
| 71-712-02 | Footwear | DC Shoes | DC Boys Footwear | Sandals | 57 | 403 | 0.0% |
| 71-713-01 | Apparel | DC Shoes | DC Kids/Toddler App | Tees | 41 | 130 | 0.0% |
| 71-713-02 | Apparel | DC Shoes | DC Kids/Toddler App | Fleece | 77 | 939 | 0.0% |
| 71-713-03 | Apparel | DC Shoes | DC Kids/Toddler App | Tops | 14 | 123 | 0.0% |
| 71-713-04 | Apparel | DC Shoes | DC Kids/Toddler App | Bottoms | 18 | 172 | 0.0% |
| 71-714-01 | Footwear | DC Shoes | DC K/T Footwear | Skate | 5,531 | 57,947 | 1.3% |
| 80-800-01 | Apparel | DC Shoes | DC Jrs App | S/S Tees | 91 | 492 | 0.0% |
| 80-800-02 | Apparel | DC Shoes | DC Jrs App | L/S Tees | 5 | 34 | 0.0% |
| 80-800-03 | Apparel | DC Shoes | DC Jrs App | Tops | 41 | 359 | 0.0% |
| 80-800-04 | Apparel | DC Shoes | DC Jrs App | Fleece | 39 | 448 | 0.0% |
| 80-800-05 | Apparel | DC Shoes | DC Jrs App | Sweaters | 7 | 98 | 0.0% |
| 80-800-06 | Apparel | DC Shoes | DC Jrs App | Jackets | 7 | 143 | 0.0% |
| 80-800-07 | Apparel | DC Shoes | DC Jrs App | Shorts | 44 | 425 | 0.0% |
| 80-800-09 | Apparel | DC Shoes | DC Jrs App | Denim | 40 | 629 | 0.0% |
| 80-800-10 | Apparel | DC Shoes | DC Jrs App | Bottoms | 3 | 32 | 0.0% |
| 80-800-11 | Apparel | DC Shoes | DC Jrs App | Dresses | 16 | 150 | 0.0% |
| 80-801-01 | Accessories | DC Shoes | DC Jrs Accs | Beanies | 379 | 1,581 | 0.0% |
| 80-801-02 | Accessories | DC Shoes | DC Jrs Accs | Hats | 3 | 27 | 0.0% |
| 80-801-03 | Accessories | DC Shoes | DC Jrs Accs | Handbags | 2 | 22 | 0.0% |
| 80-801-04 | Accessories | DC Shoes | DC Jrs Accs | Wallets | 9 | 51 | 0.0% |
| 80-801-05 | Accessories | DC Shoes | DC Jrs Accs | Backpacks | 232 | 824 | 0.0% |
| 80-801-07 | Accessories | DC Shoes | DC Jrs Accs | Socks | 3 | 8 | 0.0% |
| 80-801-08 | Accessories | DC Shoes | DC Jrs Accs | Miscellaneous | 2 | 13 | 0.0% |
| 80-802-01 | Footwear | DC Shoes | DC Jrs Footwear | Skate | 201 | 2,745 | 0.1% |
| 80-802-02 | Footwear | DC Shoes | DC Jrs Footwear | Sandals | 57 | 294 | 0.0% |
| 81-812-01 | Footwear | DC Shoes | DC Girls Footwear | Skate | 2 | 22 | 0.0% |
| 90-900-01 | Technical Products | DC Shoes | DC Snow | Mens Snow | 128 | 5,469 | 0.1% |
| 90-900-02 | Technical Products | DC Shoes | DC Snow | Juniors Snow | 31 | 1,242 | 0.0% |
| 90-900-03 | Technical Products | DC Shoes | DC Snow | Boys Snow | (15) | (470) | 0.0% |
| 90-900-04 | Technical Products | DC Shoes | DC Snow | Girls Snow | (2) | (59) | 0.0% |
| 90-900-05 | Technical Products | DC Shoes | DC Snow | Snow Accessories | 841 | 4,781 | 0.1% |
| 90-900-06 | Technical Products | DC Shoes | DC Snow | Snow Boots | 40 | 2,852 | 0.1% |
| Grand Total | | | | | 571,540 | 4,569,625 | 100.0% |

**Quiksilver, Inc.**
**Exhibit B**

| Expense Budget | | | | |
|---|---|---|---|---|
| | Pre-Opening | Sale | Wind-Down | Total |
| **Advertising** | | | | |
| Media | | | | |
| Signs | | *To be determined & mutually agreed upon.* | | |
| Sign Walkers | | | | |
| Subtotal Advertising | - | - | - | - |
| | | | | |
| **Supervision** | | | | |
| Fees | 246,183 | 628,759 | 151,905 | 1,026,847 |
| Deferred Compensation | 115,682 | 277,753 | 67,973 | 461,407 |
| Expenses (1) | 87,675 | 164,534 | 43,658 | 295,868 |
| Subtotal Supervision | 449,540 | 1,071,046 | 263,536 | 1,784,121 |
| | | | | |
| Total Expenses | 449,540 | 1,071,046 | 263,536 | 1,784,121 |

Note(s):
1. Includes Insurance.

# Hilco Merchant Resources
## Quiksilver, Inc.
### Exhibit B

| Supervision Expense Budget- Pre-Opening | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

| Supervision with Payroll Costs Include | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | Total USD |
|---|---|---|---|---|---|---|---|---|
| Base Rate | 17,955 | - | 82,080 | 131,328 | - | - | - | 231,363 |
| Deferred Compensation | 8,978 | - | 41,040 | 65,664 | - | - | - | 115,682 |
| Rate Adjustments (1) | 2,850 | - | 11,970 | - | - | - | - | 14,820 |
| Total Rates | 29,783 | - | 135,090 | 196,992 | - | - | - | 361,865 |
| | | | | | | | | |
| Travel Charges | 4,275 | - | 24,150 | 46,800 | - | - | - | 75,225 |
| Other Expenses | 750 | - | 4,500 | 7,200 | - | - | - | 12,450 |
| General Liability Insurance | | | | | | | | |
| Total Expense | 34,808 | - | 163,740 | 250,992 | - | - | - | 449,540 |

Note: Supervision Expense will be managed in the aggregate.

| Supervision Supporting Detail | | | | | | | |
|---|---|---|---|---|---|---|---|

| | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor |
|---|---|---|---|---|---|---|---|
| Weekly Base Rate | 3,150 | 2,650 | 2,400 | 2,400 | 3,150 | 3,150 | 3,000 |
| Rate Adjustments | 500 | | 350 | | | | |
| Total Rates | 3,650 | 2,650 | 2,750 | 2,400 | 3,150 | 3,150 | 3,000 |
| % Deferred Compensation | 50% | 50% | 50% | 50% | 50% | 50% | 50% |
| Payroll Costs (Tico) | 14% | 14% | 14% | 14% | 14% | 14% | 14% |
| # of Supervisors | 1 | | 6 | 24 | | | |
| # of Weeks | 5.0 | 5.0 | 5.0 | 2.0 | 5.0 | 5.0 | 5.0 |

**Travel Charges and Other Expenses**

| | | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|---|
| Initial Airfare | Initial- Travel | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| | | | | | | | | | |
| Travel Rate (25% of Base Rate) | | 900 | 760 | 680 | 680 | 900 | 900 | 860 | Travel Days |
| # of Travel Days | | 3 | 7 | 3 | 1 | 1 | 1 | 1 | 153.0 |
| Pro-rated Travel Rates | Weekly- Travel | 390 | 760 | 290 | 100 | 130 | 130 | 120 | |
| Car rent | Weekly- Travel | 175 | 175 | 175 | 175 | 175 | 175 | 175 | |
| >50 Miles | Weekly- Travel | 50 | 150 | 100 | 100 | 100 | 100 | 100 | |
| | | 615 | 1,085 | 565 | 375 | 405 | 405 | 395 | |
| | | | | | | | | | |
| Cell phone / Internet | Weekly- Other | 50 | 50 | 50 | 50 | 50 | 50 | 50 | |
| Miscellaneous | Weekly- Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | |
| | | 150 | 150 | 150 | 150 | 150 | 150 | 150 | |

## Hilco Merchant Resources
## Quiksilver, Inc.
### Exhibit B
### Supervision Expense Budget-Sale

| Supervision with Payroll Costs Include | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | Total USD |
|---|---|---|---|---|---|---|---|---|
| Base Rate | 88,749 | 61,047 | 405,710 | - | - | - | - | 555,506 |
| Deferred Compensation | 44,375 | 30,524 | 202,855 | - | - | - | - | 277,753 |
| Rate Adjustments (1) | 14,087 | - | 59,166 | - | - | - | - | 73,253 |
| Total Rates | 147,211 | 91,571 | 667,731 | - | - | - | - | 906,512 |
| | | | | | | | | |
| Travel Charges | 16,399 | 26,250 | 105,810 | - | - | - | - | 148,459 |
| Other Expenses | 3,707 | - | - | - | - | - | - | 3,707 |
| General Liability Insurance | | | | | | | | 12,368 |
| Total Expense | 167,317 | 117,821 | 773,541 | - | - | - | - | 1,071,046 |

Note: Supervision Expense will be managed in the aggregate.

### Supervision Supporting Detail

| | | Lead Supervisor | Lead Supervisor-II | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|---|
| Weekly Base Rate | | 3,150 | 3,150 | 2,400 | 2,400 | 3,150 | 3,150 | 3,000 | |
| Rate Adjustments | | 500 | - | 350 | - | - | - | - | |
| Total Rates | | 3,650 | 3,150 | 2,750 | 2,400 | 3,150 | 3,150 | 3,000 | |
| % Deferred Compensation | | 50% | 50% | 50% | 0% | 50% | 50% | 50% | |
| Payroll Costs (Tico) | | 14% | 14% | 14% | 14% | 14% | 14% | 14% | |
| # of Supervisors | | 1 | 1 | 6 | | | | | |
| # of Weeks | | 24.7 | 17.0 | 24.7 | 1.0 | 24.7 | 24.7 | 24.7 | |
| | | | | | | | | | |
| **Travel Charges and Other Expenses** | | | | | | | | | |
| Initial Airfare | Initial- Travel | 1,200 | 5,000 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| | | | | | | | | | |
| Travel Rate (25% of Base Rate) | | 900 | 900 | 680 | 680 | 900 | 900 | 860 | Travel Days |
| # of Travel Days | | 3 | | 4 | 1 | 1 | 1 | 1 | 667.3 |
| Pro-rated Travel Rates | Weekly- Travel | 390 | 1,250 | 390 | 100 | 130 | 130 | 120 | |
| Car rent | Weekly- Travel | 175 | | 175 | 175 | 175 | 175 | 175 | |
| >50 Miles | Weekly- Travel | 50 | | 100 | 100 | 100 | 100 | 100 | |
| | | **615** | **1,250** | **665** | **375** | **405** | **405** | **395** | |
| | | | | | | | | | |
| Cell phone / Internet | Weekly- Other | 50 | | - | - | - | - | - | |
| Miscellaneous | Weekly- Other | 100 | | - | - | - | - | - | |
| | | **150** | **-** | **-** | **-** | **-** | **-** | **-** | |

## Hilco Merchant Resources
### Quiksilver, Inc.
#### Exhibit B

| Supervision Expense Budget-Wind-Down | | | | | | | |
|---|---|---|---|---|---|---|---|

| Supervision with Payroll Costs Include | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | Total USD |
|---|---|---|---|---|---|---|---|---|
| Base Rate | 25,137 | - | 82,080 | - | 28,728 | - | - | 135,945 |
| Deferred Compensation | 12,569 | - | 41,040 | - | 14,364 | - | - | 67,973 |
| Rate Adjustments (1) | 3,990 | - | 11,970 | - | - | - | - | 15,960 |
| Total Rates | 41,696 | - | 135,090 | - | 43,092 | - | - | 219,878 |
| | | | | | | | | |
| Travel Charges | 5,505 | - | 22,950 | - | 4,440 | - | - | 32,895 |
| Other Expenses | 1,050 | - | 4,500 | - | 1,200 | - | - | 6,750 |
| General Liability Insurance | | | | | | | | 4,013 |
| Total Expense | 48,251 | - | 162,540 | - | 48,732 | - | - | 263,536 |

Note: Supervision Expense will be managed in the aggregate.

| Supervision Supporting Detail | | | | | | | |
|---|---|---|---|---|---|---|---|

| | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|
| Weekly Base Rate | 3,150 | 2,650 | 2,400 | 2,400 | 3,150 | 3,150 | 3,000 | |
| Rate Adjustments | 500 | - | 350 | - | - | - | - | |
| Total Rates | 3,650 | 2,650 | 2,750 | 2,400 | 3,150 | 3,150 | 3,000 | |
| % Deferred Compensation | 50% | 50% | 50% | 0% | 50% | 50% | 50% | |
| Payroll Costs (Tico) | 14% | 14% | 14% | 14% | 14% | 14% | 14% | |
| # of Supervisors | 1 | | 5 | | 1 | | | |
| # of Weeks | 7.0 | 6.0 | 6.0 | 1.0 | 8.0 | 6.0 | 6.0 | |

**Travel Charges and Other Expenses**

| | | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|---|
| Initial Airfare | Initial- Travel | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| | | | | | | | | | |
| Travel Rate (25% of Base Rate) | | 900 | 760 | 680 | 680 | 900 | 900 | 860 | Travel Days |
| # of Travel Days | | 3 | 7 | 3 | 1 | 1 | 1 | 1 | 119.0 |
| Pro-rated Travel Rates | Weekly- Travel | 390 | 760 | 290 | 100 | 130 | 130 | 120 | |
| Car rent | Weekly- Travel | 175 | 175 | 175 | 175 | 175 | 175 | 175 | |
| >50 Miles | Weekly- Travel | 50 | 150 | 100 | 100 | 100 | 100 | 100 | |
| | | 615 | 1,085 | 565 | 375 | 405 | 405 | 395 | |
| | | | | | | | | | |
| Cell phone / Internet | Weekly- Other | 50 | 50 | 50 | 50 | 50 | 50 | 50 | |
| Miscellaneous | Weekly- Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | |
| | | 150 | 150 | 150 | 150 | 150 | 150 | 150 | |

# **EXHIBIT C**

## **Coulombe Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
QUIKSILVER, INC., *et al.*,                                 :    Case No. 15-11880 (___)
                                                            :
                                        Debtors.[1]         :    (Joint Administration Pending)
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF STEPHEN COULOMBE IN SUPPORT OF THE DEBTORS'**
**MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO BANKRUPTCY**
**CODE SECTIONS 105, 363, 365, AND 554 AND BANKRUPTCY RULES 6003 AND 6004**
**(I) AUTHORIZING THE DEBTORS TO ASSUME THE AGREEMENTS;**
**(II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE CLOSING**
**OR SIMILAR THEMED SALES, WITH SUCH SALES TO BE FREE AND CLEAR**
**OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND (III) AUTHORIZING**
**CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING STORE LOCATIONS**

I, Stephen Coulombe, hereby declare under penalty of perjury that the following

is true to the best of my knowledge, information and belief:

1.      I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"). As of

July 7, 2015, FTI was engaged by Quiksilver, Inc. ("ZQK"), one of the debtors and debtors in

possession in the above-captioned chapter 11 cases (the "Debtors"), to serve as financial advisor.

On September 1, 2015, I was appointed Chief Restructuring Officer of the Debtors. Over the

course of FTI's engagement with the Debtors, I have become familiar with the Debtors' day-to-

date operations, business and financial affairs, and books and records.

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
        Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc.
        (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505),
        Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors'
        corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

2.      Since joining FTI in 2002, I have been a Senior Managing Director in FTI's Corporate Finance/Restructuring practice. I have 18 years of experience serving as financial advisor and providing performance improvement services to corporations, various creditor classes, equity owners, and directors of underperforming companies.

3.      I submit this declaration ("Declaration") in support of the Debtors' *Motion For Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 363, 365, and 554 and Bankruptcy Rules 6003 and 6004 (I) Authorizing the Debtors to Assume the Agreements; (II) Authorizing and Approving the Conduct of Store Closing or Similar Themed Sales, With Such Sales to be Free and Clear of all Liens, Claims and Encumbrances; and (III) Authorizing Customary Bonuses to Employees of Closing Store Locations* (the "Motion").[2]

4.      Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions.  If called as a witness, I would testify to the facts set forth in this Declaration.  I am authorized by the Debtors to submit this Declaration.

**A.      The Proposed Pop Up Sales and Store Closing Sales**

5.      I understand that, prior to the Petition Date, the Debtors' management and advisors performed an in-depth analysis of the Debtors' financial performance to identify areas for improvement. I understand that the financial analysis included a comprehensive review of the performance of each store and the market in which the Debtors operate. I understand that, based on that analysis, the Debtors and their advisors determined that it would be in the best interests of

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

the Debtors sell certain merchandise and excess, clearance, obsolete, or distressed inventory (the "<u>Merchandise</u>") as well as certain associated furniture, fixtures, and equipment (the "<u>FF&E</u>," and together with the Merchandise, the "<u>Store Closure Assets</u>").

6.    I understand that in early 2015, the Company determined that it would be in the best interests of the Debtors to sell certain excess inventory. To that end, I understand that it began soliciting offers from potential liquidation firms to conduct the excess inventory sales (the "<u>Pop Up Sales</u>") through a "pop up" store program – <u>i.e.</u>, temporary locations outside of Quiksilver's stores (each a "<u>Pop Up Store</u>," and collectively, the "<u>Pop Up Stores</u>") – with no fewer than 15 locations. I understand that the Company evaluated bids from different liquidation firms as part of its selection process. I further understand that QS Retail, Inc. ("<u>QS Retail</u>") ultimately entered into the Letter Agreement Governing Inventory Disposition (the "<u>Pop Up Store Agreement</u>") dated June 8, 2015, with Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (collectively, the "<u>Agent</u>") to conduct the Pop Up Sales. I understand that QS Retail entered into a series of short-term license agreements that provided the limited right to use the space to sell merchandise for a limited period – <u>i.e.</u>, locations at which to conduct the Pop Up Sales. I understand that the Pop Up Sales at Pop Up Stores began on July 13, 2015. I further understand that since then, the Debtors have opened approximately 24 Pop Up Stores, of which 23 are still operating. I further understand that there are an additional six short-term license agreements for which Pop Up Stores have not opened.

7.    As part of its broader turnaround efforts, in August 2015, the Company, in consultation with its advisors, including FTI, determined that it was necessary to close certain underperforming or unprofitable retail stores.  In particular, I understand that as of the date hereof, the Debtors have decided to close 27 unprofitable stores (each a "<u>Store Closing</u>

Location" and collectively, the "Closing Locations") and liquidate the inventory and other assets (the "Store Closing Sales" and together with the Pop Up Sales, the "Sales") of such Closing Locations.

8.      On September 9, 2015, the Debtors commenced their Chapter 11 Cases.  I understand that, from and after the Petition Date, the Debtors seek to continue the Store Closing Sales at the Closing Locations. In addition, I understand that the Debtors seek to continue the Pop Up Sales at the Pop Up Stores.

**B.      The Debtors' Prepetition Marketing Efforts**

9.      To maximize the benefit to the Debtors' estates from the Store Closing Sales, the Debtors and FTI obtained five bids from national liquidation firms (the "Liquidation Firms") that specialize in, among other things, the large-scale liquidation of assets of the type and scale of that owned by the Debtors.[3] I understand that the proposals contemplate the Liquidation Firms acting as the Company's Agent in the store closing process and payment for services based on gross recovery (sales) on inventory. The Debtors, together with their advisors, have determined that the bid presented by the Agent represented the highest and best offer and that entering into the Letter Agreement Governing Inventory Disposition, dated September 4, 2015 between QS Retail and the Agent (the "Store Closing Agency Agreement") will minimize costs and maximize the value received from the Store Closure Assets. Accordingly, on September 4, 2015, the Agent and the Company executed the Store Closing Agency Agreement, and on September 6, 2015, the Agent began working with the Debtors on the Store Closing Sales.

---

[3]      The Debtors obtained five bids from Liquidation Firms, as follows: Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC; Great American Group, LLC; Tiger Capital Group, LLC; SB Capital Group, LLC; and Yellen Partners, LLC.

**C.      Assumption of the Agreements is in the Best Interests of the Debtors**

10.      The Debtors, in conjunction with FTI, have determined that entering into the Agreements would provide the greatest return to the Debtors' estates for the Store Closure Assets. The Debtors have already expended substantial efforts soliciting bids and negotiating with other national liquidation firms prepetition before selecting the Agent, and I believe that the terms set forth in the Agreements are the best alternative for the conduct of the Sales. The terms of the Agreements are the result of arm's length bargaining, and I believe them to be the best terms available to the Debtors, as tested through a reasonable diligence process.

11.      I understand that the Agent has extensive experience in conducting liquidation sales and can oversee and assist in the management and implementation of the Sales in an efficient and cost-effective manner. Moreover, I understand that the Agent is already familiar with the Debtors' business, given that it began conducting the Sales prior to the Petition Date.

12.      Under the terms of the of the Agreements, the Agent will continue assisting the Debtors to sell the Store Closure Assets and close no fewer than 27 Closing Locations. I understand that the Debtors intend to finish the Store Closure Sales by December 31, 2015.

13.      If the Agreements are not assumed, I believe there will be significant harm to all stakeholders. The estate will lose the benefit of the Agent's experience with the Debtors and its momentum with, preparation for, and commencement of the Sales. As such, the Debtors would need to suspend the Sales, conduct a process to find a new Agent, and then recommence the Sales. I believe that the resulting disruption and delay would lead to a material loss of value and increased administrative expense. I understand that losses in the Closing Locations were

5

approximately $5 million in the prior twelve months ending July 31, 2015.  FTI estimates that just the payroll of the Closing Locations costs approximately $100,000 per week.

**D.      Continuation of the Sales Should be Approved on an Interim Basis**

14.      FTI has determined that the Sales represent the best alternative to maximize recoveries to the Debtors' estates with respect to the Sales. I understand that there are meaningful amounts of Store Closure Assets, in the aggregate, that will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm. Further, I believe that delaying the Sales will diminish the recovery tied to monetization of the Store Closure Assets for several important reasons. I understand that many of the Closing Locations fail to generate positive cash flow and therefore are a significant drain on liquidity. As such, I believe that the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure Assets and the termination of operations at the Closing Locations. Further, I understand that allowing the Sales to continue will allow the Debtors to reject leases and short-term licensing agreements pursuant to the Rejection Procedures Motion, and therefore avoid the accrual of unnecessary administrative expenses.

15.      Further, I understand that the Sales are included in the Debtors' DIP financing budget against which financial covenants are measured.  I believe that any delay in the approval of the Sales could put pressure on the Debtors' ability to remain in compliance with its DIP financing covenants.

**E.      The Store Closing Bonus Program**

16.      FTI understands that the total aggregate cost of the Store Closing Bonus program will not exceed 10% of the base payroll, including taxes and typical benefits, for all employees working at the Stores. Under these factors, FTI has estimated that the aggregate cost of the Store Closing Bonus program will not be more than $250,000.

6

Dated:          September 9, 2015

                          By:      _/s/ Stephen Coulombe_____
                                   Name: Stephen Coulombe
                                   Title: Senior Managing Director

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :
In re:                                     :   Chapter 11
                                           :
QUIKSILVER, INC., *et al.*,                :   Case No. 15-11880 (___)
                                           :
                         Debtors.[1]       :   (Jointly Administered)
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   **Related Docket No. ___**

### INTERIM ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363 AND 554 AND BANKRUPTCY RULES 6003 AND 6004 (I) AUTHORIZING THE DEBTORS TO ASSUME THE AGREEMENTS; (II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE CLOSING OR SIMILAR THEMED SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND (III) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING BUSINESS LOCATIONS

Upon the motion (the "Motion")[2] of the Debtors for the entry of an interim order

(the "Interim Order") and a final order, pursuant to Bankruptcy Code sections 105, 363, 365, and

554 and Bankruptcy Rules 6003 and 6004; (i) authorizing the Debtors to assume (a) the

agreement dated as of September 4, 2015, by and between QS Retail, Inc. ("QS Retail"), on the

one hand, and Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the

"Agent"), on the other hand (the "Store Closing Agreement"), a copy of which is attached as

Exhibit 1 to this Interim Order and (b) the agreement dated as of June 8, 2015 by and between

QS Retail, on the one hand, and the Agent on the other hand (the "Pop Up Store Agreement," a

copy of which is attached as Exhibit 2 to this Interim Order, and together with the Store Closing

Agreement, the "Agreements"); (ii) authorizing the Debtors to conduct (a) store closing sales

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

(collectively, the "Store Closing Sales") at the locations subject to the Store Closing Agreement (the "Closing Locations")[3] in accordance with the terms or the sale guidelines (the "Sale Guidelines") attached as Exhibit 3 to this Interim Order, with such sales to be free and clear of all liens, claims, encumbrances, and interests (collectively, the "Encumbrances") and (b) sales of certain merchandise (collectively, the "Pop Up Sales," and together with the Store Closing Sales, the "Sales") at the locations subject to the Pop Up Store Agreement (the "Pop Up Stores,"[4] and together with the Closing Locations, the "Stores"), in accordance with the Sale Guidelines, with such sales to be free and clear of all Encumbrances; (iii) authorizing, but not directing, the Debtors to pay customary retention bonuses to the store-level and certain field employees at the Stores; (iv) authorizing the protections and dispute resolution procedures contained in the Interim and Final Orders; and (v) granting certain related relief, on an interim basis (collectively, the "Store Closing Relief"); and the Court having reviewed the Motion and the Declarations and having considered the statements of counsel and the evidence adduced with respect to the Motion at the hearing before the Court on _____, 2015 (the "Hearing"); the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, (ii) venue is proper in this District pursuant to 28 U.S.C. § 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) the notice of the Motion and the Hearing was sufficient under the circumstances, and (v) there is good cause to waive the stay of Bankruptcy Rule 6004(h); and due and sufficient notice of the Motion having been given under the particular circumstances and it appearing that no other or further notice is necessary; after due deliberation determined that the relief requested in the Motion is necessary on an interim basis and essential for the Debtors' reorganization and such relief is in the best interests of the Debtors, their estates,

---

[3]    A list of Closing Locations is attached as Exhibit A to the Store Closing Agency Agreement.

[4]    A list of Pop Up Stores is attached to as Exhibit 4 to this Interim Order.

their creditors, and other parties in interest; and upon the record herein; and after due deliberation thereon; and good and sufficient cause have been shown; it is hereby

**FOUND, CONCLUDED AND DETERMINED that:**[5]

A.      The Debtors have advanced sound business reasons for entering into the Agreements on an interim basis, subject to the Final Hearing, as set forth in the Motion and at the Hearing, and entering into the Agreements is a reasonable exercise of the Debtors' business judgment and in the best interests of the Debtors and their estates.

B.      The conduct of the Sales will provide an efficient means for the Debtors to dispose of the Store Closure Assets.

C.      The Agreements were negotiated, proposed, and entered into by the Agent and the Debtors without collusion, in good faith and from arm's length bargaining positions.

D.      The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

E.      The Sales are in the best interest of the Debtors' estates.

F.      The Debtors have represented that they are neither selling nor leasing personally identifiable information pursuant to the Motion, although the Agent will be authorized to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information.

---

[5]   The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

G.     The entry of this Interim Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is hereby.

**ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Motion, on an interim basis through and including _____, 2015 (the "Interim Period"), is GRANTED as provided herein.

2.     On _____, 2015, at __:__ __.m. (prevailing Eastern Time), a hearing (the "Final Hearing") will be held before this Court to consider the Store Closing Relief on a final basis.  All objections, if any, to the Motion shall be in writing and filed with this Court and served on counsel for the Debtors, any duly appointed committee, and the Agent, as to be received on or before _____, 2015, at __:__ __.m. (prevailing Eastern Time).  The Debtors shall file any reply(s) to such objections on or before _____, 2015, at __:__ __.m. (prevailing Eastern Time) and serve such replies on the objecting parties, any duly appointed committee and the Agent.

3.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Interim Order.  The failure to include specifically any particular provision of the Agreements in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agreements and all of their provisions, payments and transactions, be authorized and hereby are and approved as and to the extent provided for in this Interim Order.

4.     To the extent of any conflict between this Interim Order, the Sale Guidelines, and the Agreements, the terms of this Interim Order shall control over all other documents, and the Sale Guidelines shall control over the Agreements.

5.      Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall take effect immediately upon its entry.

6.      The (i) Store Closing Agreement, a copy of which is attached to this Interim Order as <u>Exhibit 1</u>, and (ii) Pop Up Store Agreement, a copy of which is attached to this Interim Order as <u>Exhibit 2</u>, are each operative and effective on an interim basis during the Interim Period.  The Debtors are authorized to act and perform in accordance with the terms of the Agreements, including, making payments required by the Agreements to the Agent without the need for any application of the Agent or a further order of the Court.

7.      Subject to the restrictions set forth in this Interim Order and the Sale Guidelines, the Debtors and the Agent hereby are authorized to take any and all actions as may be necessary or desirable to implement the Agreements and the Sales; and each of the transactions contemplated by the Agreements, and any actions taken by the Debtors and the Agent necessary or desirable to implement the Agreements and/or the Sales prior to the date of this Interim Order, hereby are approved and ratified.

**A.      Authority To Engage In Sales**

8.      The Debtors are authorized, on an interim basis pending the Final Hearing, pursuant to 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct the Sales at the Stores in accordance with this Interim Order, the Sale Guidelines, and the Agreements.

9.      The Sale Guidelines are approved in their entireties on an interim basis.

10.      The Debtors are authorized to discontinue operations at the Stores in accordance with this Interim Order and the Sale Guidelines.

11.      All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the

- 5 -

Agreements or this Interim hereby are directed to surrender possession of such Merchandise or FF&E to the Debtors or the Agent.

12.     Subject to the provisions herein in paragraphs 14, 15, 17, and 27,  neither the Debtors nor the Agent nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in Bankruptcy Code section 101(27)), landlord, or licensor, to conduct the Sales and to take the related actions authorized herein.

**B.      Conduct Of The Sales**

13.     All newspapers and other advertising media in which the Sales may be advertised and all landlords and licensors, as applicable, of the Stores are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Agent to conduct the Sales and the sale of Merchandise and FF&E pursuant to the Agreements, including, without limitation, to conduct and advertise the sale of the Merchandise and FF&E in the manner contemplated by and in accordance with this Interim Order, the Sale Guidelines, and the Agreements.

14.     Nothing in this Interim Order or the Agreements releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order or in the Agreements shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.  Nothing herein shall be construed to be a determination that the Agent is an operator with

respect to any environmental law or regulation.  Moreover, the sale of the Merchandise and

FF&E shall not be exempt from, and the Agent shall be required to comply with, laws of general

applicability, including, without limitation, public health and safety, criminal, tax, labor,

employment, environmental, antitrust, fair competition, traffic and consumer protection laws,

including consumer laws regulating deceptive practices and false advertising (collectively,

"General Laws").  Nothing in this Interim Order shall alter or affect the Debtors' and Agent's

obligations to comply with all applicable federal safety laws and regulations.  Nothing in this

Interim Order shall be deemed to bar any Governmental Unit from enforcing General Laws in

the applicable non-bankruptcy forum, subject to the Debtors' or the Agent's right to assert in that

forum or before this Court that any such laws are not in fact General Laws or that such

enforcement is impermissible under the Bankruptcy Code, this Interim Order, or otherwise,

pursuant to Paragraph 27 hereunder.  Notwithstanding any other provision in this Interim Order,

no party waives any rights to argue any position with respect to whether the conduct was in

compliance with this Interim Order and/or any applicable law, or that enforcement of such

applicable law is preempted by the Bankruptcy Code.  Nothing in this Interim Order shall be

deemed to have made any rulings on any such issues.

15.     Except to the extent of the reserved rights of Governmental Units

expressly granted elsewhere in this Interim Order, during the Interim Period, the Debtors and

Agent are hereby authorized to take such actions as may be necessary and appropriate to

implement the Agreements and to conduct the sale without necessity of further order of this

Court as provided in the Agreements or the Sale Guidelines, including, but not limited to,

advertising the sale as a "store closing sale", "sale on everything", "everything must go", or

similar-themed sales through the posting of signs (including the use of exterior banners at non-

enclosed mall Stores, and at enclosed mall Stores to the extent the applicable Store entrance does not require entry into the enclosed mall common area), use of signwalkers and street signage.

16.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise and FF&E, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners or other advertising and the Debtors and the Agent are unable to resolve the matter consensually with a Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions.  Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (i) the Final Hearing or (ii) within two (2) business days of such request.  This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

17.     Except as expressly provided in the Agreements, the sale of the Merchandise and FF&E shall be conducted by the Debtors and the Agent notwithstanding any restrictive provision of any lease, sublease, short-term license, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sales, the rejection of leases or licenses, abandonment of assets, or "going dark" provisions.  The Agent, along with landlords and licensors, as applicable, of the Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Agent and any such landlords or licensors, as applicable, of the Stores, provided that nothing in such Side Letters affects the provisions of Paragraphs 16, 17 and 27 of this Interim Order.  In the event of any conflict between the Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.

18.     Except as expressly provided for herein or in the Sale Guidelines, and except with respect to any Governmental Unit (as to which Paragraphs 14, 16, 17 and 27 of this Interim Order shall apply), no person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sales or the sale of Merchandise or FF&E, or the advertising and promotion (including the posting of signs and exterior banners or the use of signwalkers) of such sales, and all such parties and persons of every nature and description, including, but  not limited to, any landlord, licensor, service providers, utilities, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Sales and/or (ii) instituting any action or proceeding in any court (other than the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Agent, or the landlords or licensors, as applicable, at the Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales or sale of the Merchandise or FF&E or other liquidation sales at the Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

19.     In accordance with and subject to the terms and conditions of the Agreements, the Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Debtors for the purpose of conducting the Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Interim Order and subject to Paragraphs 14, 16, 17 and 27 of this Interim Order.

20.    The Agent shall accept the Debtors' validly-issued Gift Cards (as defined in the Customer Programs Motion[6]) that were issued by the Debtors prior to the applicable Sale Commencement Date (as defined in the Agreements) in accordance with the Debtors' Gift Card policies and procedures as they existed on the Petition Date, as described in the Customer Programs Motion, and accept returns of merchandise sold by the Debtors prior to the applicable Sale Commencement Date, provided that such return is otherwise in compliance with the Refund and Exchange Program (as defined in the Customer Programs Motion) as they existed on the Petition Date, as described in the Customer Programs Motion.

21.    All sales of Store Closure Assets shall be "as is" and final.  However, as to the Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."  Further, as to the Stores only, the Debtors and/or the Agent shall accept return of any goods purchased during the Sales that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within seven days of purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.  Signs stating that "[r]efunds may be made only for merchandise having a latent defect, when returned with a receipt within 7 days of purchase." will be posted at the cash register areas of the Stores. Returns, if permitted, related to the purchase of Store Closure Assets shall not be accepted at stores that are not participating in the Sales, except in the situation where a customer experiences a latent defect and returns the Merchandise within the seven day time period and provides

---

[6]    As used herein, the "Customer Programs Motion" shall mean the *Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and Bankruptcy Rules 6003 and 6004 Authorizing the Debtors to (I) Maintain Customer Programs and (II) Honor or Pay Related Prepetition Obligations*, filed concurrently herewith.

information that the point of purchase store has closed in the meantime. Information on stores remaining open will be maintained on the Debtors' website through the end of the Sales.

22.      The Agent shall not be liable for sales taxes except as expressly provided in the Agreements and the payment of any and all sales taxes is the responsibility of the Debtors. The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due, provided that in the case of a bona fide dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit. For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected. The Agent shall collect, remit to the Debtors and account for sales taxes as and to the extent provided in the Agreements. This Interim Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

23.      Pursuant to section 363(f) of the Bankruptcy Code, the Agent, on behalf of the Debtors, is authorized to sell and all sales of Merchandise or FF&E (each as defined in the Agreements) pursuant to the Sales, whether by the Agent or the Debtors, shall be free and clear of any and all Encumbrances; provided, however, that any such Encumbrances shall attach to the proceeds of the Sales with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Merchandise and FF&E, subject to any claims and defenses that the Debtors may possess with respect thereto and the Agent's fees and expenses (as provided in the Agreements).

24.     To the extent that the Debtors propose to sell or abandon FF&E which may contain personal and/or confidential information about the Debtors' employees and/or customers (the "Confidential Information"), the Debtors shall remove the Confidential Information from such items of FF&E before such sale or abandonment.

25.     The Debtors and/or the Agent (as the case may be) are authorized and empowered to transfer Merchandise and FF&E among the Stores.  The Agent is authorized to sell the Debtors' FF&E and abandon the same, in each case, as provided for and in accordance with the terms of the Agreements.

**C.      Dispute Resolution Procedures With Governmental Units**

26.     To the extent that the sale of Merchandise or FF&E is subject to any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws (each a "GOB Law," and collectively, the "GOB Laws"), including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of assets during the Interim Period (collectively, with the GOB Laws, the "Liquidation Sale Laws"), the dispute resolution procedures in this section shall apply.

27.     Provided that the Sales and the sale of Merchandise and FF&E are conducted in accordance with the terms of this Interim Order, the Agreements and the Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance with any Liquidation Sale Laws and, subject to Paragraphs 14, 16, 17 and 27 herein, are authorized to conduct the Sales in accordance with the terms of this Interim Order and the Sale

Guidelines without the necessity of further showing compliance with any such Liquidation Sale
Laws.

28.    Within three business days of entry of this Interim Order, the Debtors shall
serve copies of this Interim Order, the Agreements and the Sale Guidelines via e-mail, facsimile
or regular mail, on: (i) the Attorney General's office for each state where the Sales are being
held, (ii) the county consumer protection agency or similar agency for each county where the
Sales are being held, (iii) the division of consumer protection for each state where the Sales are
being held; (iv) the chief legal counsel for the local jurisdiction; (v) the Debtors' landlords of the
Closing Stores, and (vi) the licensors of the Pop Up Stores.

29.    To the extent that during between the Petition Date and the date of the
Final Hearing there is a dispute arising from or relating to the Sales, this Interim Order, the
Agreements, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a
"Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved
Dispute which such Reserved Dispute will be heard at the Final Hearing, absent a party obtaining
expedited relief.  Nothing in this Interim Order shall constitute a ruling with respect to any issues
to be raised with respect to a Reserved Dispute.   Any Governmental Unit may assert a Reserved
Dispute by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (i)
Skadden, Arps, Slate, Meagher & Flom LLP, 300 South Grand Avenue, Suite 3400, Los Angeles,
CA 90071 (Attn: Van Durrer, Esq.); and (ii) Skadden, Arps, Slate, Meagher & Flom LLP, 155 N.
Wacker Drive, Suite 2700, Chicago, IL 60606 (Attn: John K. Lyons, Esq.).

**D.    Store Closing Bonuses**

30.    On an interim basis and pending the Final Hearing, the Debtors shall have
the authority, but not the obligation, to pay store closing bonuses (the "Store Closing Bonuses")
to store-level and certain field employees who remain in the employ of the Debtors during the

- 13 -

Sales. The Debtors shall have the authority to determine the individual amounts of each Store

Closing Bonus, except that the total aggregate cost of the Store Closing Bonus program will not

exceed 10% of the base payroll, including taxes and typical benefits, for all employees working

at the Stores.

**E.    Section 363(m)**

31.    The Agent shall be afforded the protections of section 363(m) of the

Bankruptcy Code as to all aspects of the transactions under and pursuant to the Agreements if

this Interim Order or any authorization contained herein is reversed or modified on appeal.

**F.    Payments**

32.    All applicable banks and other financial institutions are hereby authorized,

when requested by the Debtors in their sole discretion, to receive, process, honor and pay all

prepetition and postpetition checks, drafts and other forms of payment, including fund transfers,

on account of the Agent Claims, whether such checks or other requests were submitted prior to

or after the Petition Date.

33.    The Debtors' banks and other financial institutions shall rely on the

direction and representations of the Debtors as to which checks and fund transfers should be

honored and paid pursuant to this Interim Order, and any such bank shall not have any liability to

any party for relying on such direction and representations by the Debtors as provided for in this

Interim Order or for inadvertently honoring or dishonoring any check or fund transfer.

34.    The Debtors' banks shall, at the direction of the Debtors, receive, process,

honor, and pay all prepetition and postpetition checks and fund transfers on account of the Agent

Claims that had not been honored and paid as of the Petition Date, provided that sufficient funds

are on deposit in the applicable accounts to cover such payments and any such bank shall not

have any liability to any party for relying on such direction by the Debtors as provided for in this

- 14 -

Interim Order or for inadvertently failing to follow such direction.

35.     To the extent the Debtors have not yet sought to remit payment on account of the Agent Claims, the Debtors are authorized, but not directed, to issue checks or provide for other means of payment of the Agent Claims.

36.     The Debtors shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account of the Agent Claims to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

## G.    Other Provisions

37.     Notwithstanding anything to the contrary contained herein, the relief granted in this Interim Order  and any payment to be made hereunder shall be subject to the terms of any orders approving entry into debtor-in-possession financing and authorizing the use of cash collateral approved by this Court in these Chapter 11 Cases (including with respect to any budgets or other covenants governing or relating to such debtor-in-possession financing and/or use of cash collateral), and to the extent there is any inconsistency between the terms of such orders and any action taken or proposed to be taken hereunder, the terms of such orders shall control.

38.     Nothing in this Interim Order or the Motion shall be deemed to constitute postpetition assumption or adoption of any agreement under Bankruptcy Code section 365.

39.     The Agent shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Agent, in each case, other than as expressly provided for in the Agreements.

40.     Except with respect to any Governmental Unit (as to which the provisions of Paragraphs 14, 16, 17 and 27 of this Interim Order shall apply), this Court shall retain exclusive jurisdiction with regard to all issues or disputes arising from or relating to the

implementation, interpretation, or enforcement of this Interim Order or the Agreements, including, but not limited to, (i) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and signwalker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtors, the landlords, the licensors and/or the Agent for protection from interference with the Sales, (iii) any other disputes related to the Sales, and (iv) to protect the Debtors and/or the Agent against any assertions of Encumbrances.  No such parties or person shall take any action against the Debtors, the Agent, the landlords, the licensors, or the Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: Wilmington, Delaware

_____, 2015

_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 1

**Store Closing Agreement**

 

September 4, 2015

*VIA EMAIL*
QS RETAIL, INC.
Attn:  General Counsel
5600 Argosy Ave. Bldg 100
Huntington Beach, Ca 92649
Phone:  (714) 889-2200

Re:    **Letter Agreement Governing Inventory Disposition**

Dear Steve:

This letter shall serve as an agreement ("Agreement") between Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, on the one hand (collectively, "Agent" or a "Party"), and QS RETAIL, Inc., on the other hand ("Merchant" or a "Party" and together with the Agent, the "Parties"), under which Agent shall act as the exclusive agent for the purpose of conducting a "store closing" or other mutually agreed upon sale at Merchant's retail stores identified on Exhibit A (each a "Store" and collectively, the "Stores") in the United States (the "Sale").

A.    **Intentionally Left Blank.**

B.    **Sale Term**

For each Store, the Sale shall commence on September 6, 2015 (the "Sale Commencement Date") and conclude on respective dates to be mutually agreed to by Agent and Merchant; provided however, that the Sale shall conclude at all Stores no later than December 31, 2015(the "Sale Termination Date").  The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "Sale Term."

C.    **Project Management**

(i)    Agent's Undertakings

Agent shall, in collaboration with Merchant, (a) provide qualified supervisors (the "Supervisors") engaged by Agent to oversee the management of the Stores; (b) determine appropriate point-of-sale and internal and external advertising strategies for the Stores,  recommend and assist Merchant with advertising, and create signage for the Stores, all at Merchant's cost and expense and approved in advance by Merchant; (c) determine appropriate discounts of Merchandise (as defined below) approved in advance by Merchant; (d) recommend staffing levels for the Stores and appropriate bonus and incentive programs, if any, for the Stores' employees; (e) oversee display of Merchandise for the Stores; (f) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (g) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (h) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (i) provide support in

obtaining appropriate authorization and permits to conduct the Sale from state and local authorities (if applicable) by (i) advising Merchant of the applicable waiting period under such laws, and/or (ii) preparing (in Merchant's name and for Merchant's signature) all permitting paperwork as may be necessary under such laws, delivering all such paperwork to Merchant, and filing on behalf of Merchant, all such paperwork where necessary, and/or (iii) advising Merchant where permitting paperwork and/or waiting periods do not apply; (j) assist Merchant in creating a customer transition program to transition customers from the Stores to Merchant's other retail channels; and (k) provide such other related services deemed necessary or appropriate by Merchant and Agent.

At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant in broom clean condition; provided, however, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Agent and Merchant. At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

(ii)     Merchant's Undertakings

During the Sale Term, Merchant shall (at no cost or expense to Agent): (a) be the employer of the Stores' employees (other than the Supervisors) or, to the extent Merchant elects, utilize the services of a third party employment agency recommended by Agent, for purposes of engaging temporary staff for the Stores; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees (other than the Supervisors) and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Agent to be necessary or desirable for the operation of the Stores during the Sale; (g) provide, and arrange for the ordinary maintenance of, all point-of-sale and all other Store-level equipment required for the Stores; (h) ensure that Agent has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement; and (i) identify the Merchandise for the Sale, with Agent's assistance allocate and balance the Merchandise among the Stores, and ship and distribute the Merchandise to the Stores.

To assist with the Sale, Merchant shall provide throughout the Sale Term (at no cost or expense to Agent) central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Agent.

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

**D.      The Sale**

All sales of Merchandise shall be made on behalf of Merchant.  Agent does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, or credit card, and shall be "final" with no returns accepted or allowed, except as authorized by Merchant.

**E.      Agent Fee and Expenses in Connection with the Sale**

As used in this Agreement, the following terms shall have the following meanings:

(i)      "Gross Proceeds" shall mean the sum of (i) the gross proceeds of all sales of Merchandise made in the Store during the Sale Term, net only of sales taxes.

(ii)      "Merchandise" shall mean all merchandise sold in the Store during the Sale Term comprised of such merchandise in the Stores as of the Sale Commencement Date, plus such other merchandise included in the Stores during the Sale Term; subject in the case of such other merchandise to: (a) Agent's and Merchant's mutual agreement of the composition of such merchandise and the timing of receipt in the Stores, (b) compliance with applicable law, and (c) Agent's and Merchant's subsequent mutual agreement of such other adjustments (if any) to provisions of this Agreement as may be required to reflect the inclusion of such other merchandise in the Sale as Merchandise.

(iii)      "Recovery Percentage" shall mean the Gross Proceeds divided by the Cost Value of the Merchandise.

(iv)      "Cost Value" with respect to each item of Merchandise shall be determined with reference to the Merchant's books and records maintained in the ordinary course consistent with past periods and practices.

Merchant shall pay Agent an "Incentive Fee" of <u>one</u> of the following (e.g., back to first dollar) based upon the following "Recovery Performance hurdles/Incentive Fee" formulations:

| Recovery Percentage | Agent Incentive Fee |
|---|---|
| Less than 155.00% | 1.00% of Gross Proceeds |
| 155.00% - 159.99% | 1.50% of Gross Proceeds |
| 160.00% - 169.99% | 1.75% of Gross Proceeds |
| 170.00% and Above | 2.00% of Gross Proceeds |

On a weekly basis as part of the weekly reconciliations contemplated below, Merchant shall pay Agent an advance on account of the Incentive Fee in the amount of 1.00% of Gross Proceeds for the prior week (or partial week in the case of the first and last weeks).  The Recovery Percentage shall be determined in connection with the Final Reconciliation, and once determined, the parties (as part of the Final Reconciliation) shall determine the actual amount of the Incentive Fee. Merchant shall pay Agent any remaining balance due on account of the Incentive Fee (if any) in

connection with the Final Reconciliation, and, with Agent's consent, Merchant may offset against such remaining balance amounts (if any) Agent owes to Merchant.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's reasonable, documented and preapproved out of pocket expenses.  To control expenses of the Sale, Merchant and Agent have established a budget (the "Expense Budget") of certain delineated expenses within the control of Agent, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation), advertising costs, and Agent's legal and miscellaneous expenses.  The Expense Budget for the Sale shall be (i) $98,400 for the first week of the Sale (covering for example start-up expenses, initial signage and supervision travel); and (ii) $31,550 per week thereafter (covering for example weekly supervision compensation/deferred compensation and fees, advertising, and miscellaneous expenses, including without limitation Agent's reasonable and documented legal expenses associated with a bankruptcy filing).  The Expense Budget does not include costs, and instead reflects cost savings, associated with supervision because Agent and Merchant have agreed to utilize "Supervisors" (as defined in certain letter agreement dated June 4, 2015 by and among the Agent and Merchant (the "Pop Up Stores Agreement")) associated with the "pop up stores" as Supervisors for the Stores in addition to such Supervisors' responsibilities under the Pop Up Stores Agreement.  The Expense Budget shall be increased if the "Supervisors" under the Pop Stores Agreement are not utilized in connection with the Sale to take into account additional costs of supervision that will be necessary for Agent to perform its responsibilities under this Agreement and properly conduct the Sale.  The Expense Budget may only be modified by mutual agreement of Agent and Merchant.  Merchant shall have no responsibility for costs and expenses in excess of the Expense Budget, unless Agent has obtained Merchant's prior written (including email) consent pursuant to an amendment to the Expense Budget.

All accounting matters (including, without limitation, all fees, expenses, advances, or other amounts reimbursable or payable to Agent) shall be reconciled by mutual agreement of Agent and Merchant on every Wednesday for the prior week and, unless disputed by either Party, shall be paid within seven (7) days after each such weekly reconciliation. The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) ("Final Reconciliation") no later than forty five (45) days following the Sale Termination Date for the last Store.

**F.**    **Indemnification**

(i)    Merchant's Indemnification

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates, and Supervisors (collectively, "Agent Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) product liability claims, except claims arising from Agent's negligence, willful misconduct or unlawful behavior, (d) claims asserted by any Store

employees employed by Merchant (under a collective bargaining agreement or otherwise), relating to such employment against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Merchant or any of the Merchant Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

(ii)    Agent's Indemnification

Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC shall, jointly and severally, indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,  principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by an Agent Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement.

**G.    Insurance**

(i)    Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause Agent to be named an additional insured with respect to all such policies.  At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and that Agent is an additional insured thereunder.  In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

(ii)    Agent's Insurance Obligations

As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Stores.  Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a

certificate or certificates evidencing the insurance coverage required hereunder.  In addition, Agent shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements.  Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

(iii)    Certain Agreements

Notwithstanding any other provision of this Agreement, Merchant and Agent agree that Agent shall not be deemed to be in possession or control of the Stores, or the Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores.

**H.    Representations, Warranties, Covenants and Agreements**

(i)    Merchant warrants, represents, covenants and agrees that (a) Merchant is a corporation duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein (other than as set forth in Section A), (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; and (d) to the extent within the control of Merchant, the Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

(ii)    Agent warrants, represents, covenants and agrees that (a) each entity comprising Agent is a limited liability company duly organized, validly existing and in good standing under the laws of state of the Delaware, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Stores will be conducted without Merchant's prior written consent, (e) Agent will not take any disciplinary action against any employee of Merchant.

**I.    Furniture, Fixtures and Equipment**

Agent shall sell the FF&E in each such Store from the Store themselves.  Agent shall dispose of any unsold FF&E at the conclusion of the Sale in a manner to be approved by Merchant; provided however, that at Agent's election, Agent shall have the right to abandon in-place in a neat

and orderly manner, all unsold FF&E (and all FF&E that Merchant requested that Agent not sell). Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale or other disposition of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties.

In consideration for providing the services set forth in this Section I, Agent shall be entitled to a commission from the sale of the FF&E equal to twenty percent (20%) of the gross proceeds (net only of sales taxes to the extent applicable) of the sale of the FF&E.

Agent shall remit to Merchant all such gross proceeds, and during each weekly reconciliation described in Section E above, Agent's FF&E fee shall be calculated, and Agent's calculated and agreed upon FF&E fee and all FF&E costs and expenses then incurred within an agreed upon budget shall paid within seven (7) days after each such weekly reconciliation.

**J.**    **Termination**

The following shall constitute "Termination Events" hereunder:

(a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured five (5) days after receipt of written notice thereof to the defaulting Party; or

(b)    The failure of any representation or warranty made by Merchant or Agent to be true in any material respect as of the date made or at any time and throughout the Sale Term, which failure shall continue uncured five (5) days after receipt of written notice thereof to the defaulting Party.

If a Termination Event occurs, the non-defaulting Party  may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in addition to terminating this Agreement, pursue any and all rights and remedies and damages resulting from such default; provided, that in no event shall either Party be liable to the other for any punitive, exemplary, consequential, incidental, indirect or special damages, including, without limitation, lost profits.  If this Agreement is terminated other than as a result of a default by Agent, Merchant shall be obligated to pay Agent all amounts due under this Agreement through and including the termination date.

**K.**    **Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by fax or by recognized overnight delivery service as follows:  (a) To Merchant: Quiksilver, Inc., 5600 Argosy Circle, #100, Huntington Beach, CA 92649, Attn: Retail Department; with a copy to: Legal Department; (b) To Agent: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax:  847- 897-0859, Attn: Ian S. Fredericks; and c/o Gordon Brothers Retail Partners, LLC, 800 Boylston Street, 27th Floor, Boston, MA 02199, Fax: 617-531-7906, Attention, Michael Chartock; or (c) such other address as may be designated in writing by Merchant or Agent.

**L.**    **Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect.  No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement.  Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**M.**    **Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party; provided that either Party may assign this Agreement without the consent of the other Party in the event of a merger, reorganization, consolidation or other change in control transaction, or in connection with the sale of all or substantially all of such Party's assets.  No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

**N.**    **Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.   If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**O.**    **Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of California (without reference to the conflicts of laws provisions therein).  Any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Orange County, California courts and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.  If either Party commences any legal action, suit or proceeding to enforce or interpret this Agreement or any of the terms or provisions hereof, then in addition to any damages or remedies that may be awarded to the prevailing party therein, the prevailing party will be entitled to have and recover from the losing

party the prevailing party's reasonable outside attorneys' fees and costs incurred in connection therewith.

If Merchant commences a case under Chapter 11 of Bankruptcy Code with a bankruptcy court (the "Bankruptcy Court"), Merchant shall promptly file a motion to assume both this Agreement and the Pop Up Store Agreement under section 365 of the Bankruptcy Code, and utilize its best efforts to ensure that such motion is approved by an order, in form and substance reasonably acceptable to the Agent and Merchant, that provides, among other things, as follows:  (i) the payment of all fees and reimbursement of expenses hereunder and under the Pop Up Store Agreement to Agent is approved without further order of the court and shall be free and clear of all liens, claims and encumbrances; (ii) all such payments of fees and reimbursement of expenses shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement and the Pop Up Store Agreement (as the case may be); (iii) approval of the transaction contemplated hereby and by the Pop Up Store Agreement; (iv) authorizing the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale; (v) authorizing the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; and (vi) take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement.  In such event, then notwithstanding the provisions of the second sentence of the first paragraph of this Section O, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over Merchant, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens.

**P.     Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, and, the Pop Up Stores Agreement, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof.   No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement.  Except with respect to the Pop Up Stores Agreement, all prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**Q.     Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

*          *          *

If ▮▮▮ Agreement is acceptable to ▮▮▮▮ ▮▮▮▮ execute a ▮▮▮ in ▮▮ ▮▮▮▮ provided, ▮▮▮ ▮▮▮▮ a countersigned version to ▮▮ undersigned. ▮▮▮▮ ▮▮▮ ▮ ▮ ▮ opportunity -- we ▮▮▮ fo▮▮▮ to working ▮▮▮ ▮▮▮.

▮▮▮ ▮▮▮ ▮▮▮,

▮▮▮ MERCHANT ▮▮OURCES, ▮▮▮

By: ▮ S. ▮redericks
▮s: ▮▮▮ & ▮▮▮

GORDON BROTHERS RETAIL PARTNERS, ▮▮▮

By: ▮▮▮▮ d Gro▮kopf
▮▮ Co-President

**AGREED** ▮▮▮▮**ACCEPTED as of** ▮▮ ▮▮ ▮
of September, ▮▮▮▮

QS RET▮IL, ▮▮▮▮

By: _____
▮▮

10

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: _____
Its:

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Its:

**AGREED AND ACCEPTED as of the** 4th **day of September, 2015:**

QS RETAIL, INC.

By: _____
Its:

Lindsay Caya
President

11



Exhibit A

| Store # | Brand | Store Name | City | State | Sq Ft | Property Management Co. |
|---|---|---|---|---|---|---|
| 27 | QS | QUIKSILVER- UNIVERSAL CITYWALK | Universal City | CA | 2493 | Universal City Walk |
| 29 | QS | QUIKSILVER - SOUTH COAST PLAZA | Costa Mesa | CA | 2167 | South Coast Plaza |
| 50 | QS | QUIKSILVER - TIMES SQUARE | New York | NY | 3033 | Rudin Management Company, Inc. |
| 58 | QS | QUIKSILVER - HOLLYWOOD, FL | Hollywood | FL | 3040 | Seminole Properties Retail |
| 103 | DC | DC - IRVINE SPECTRUM | Irvine | CA | 2305 | The Irvine Company |
| 111 | QS | QUIKSILVER — SEATTLE | Seattle | WA | 6187 | First & Lenora LLC |
| 114 | RX | ROXY - FASHION ISLAND | Newport Beach | CA | 1386 | The Irvine Company |
| 119 | TRI | QUIKSILVER - DEL AMO | Torrance | CA | 5,820 | |
| 120 | WA | WATERMAN - WAIKIKI BEACH WALK | Honolulu | HI | 1,261 | |
| 123 | TRI | QUIKSILVER GLENDALE | Glendale | CA | 2997 | |
| 124 | BR | BOARDRIDERS MEATPACKING | New York | NY | 4262 | |
| 125 | BR | BOARDRIDERS PASADENA | Pasadena | CA | 5000 | |
| 834 | QS | QUIKSILVER OUTLET — LAKEWOOD | Lakewood | CO | 2500 | Simon Property Group |
| 838 | DC | DC OUTLET - PISMO | Pismo Beach | CA | 2405 | Simon Property Group |
| 850 | DC | DC  OUTLET - EL PASO | Canutillo | TX | 2625 | Horizon Group Properties |
| 852 | DC | DC OUTLET — GILROY | Gilroy | CA | 2722 | Simon Property Group |
| 859 | DC | DC OUTLET — LAUGHLIN | Laughlin | NV | 2624 | |
| 861 | DC | DC OUTLET - DOLPHIN MALL | Miami | FL | 3052 | Taubman |
| 865 | DC | DC OUTLET - KATY MILLS | Katy | TX | 2050 | Simon Property Group |
| 869 | TRI | QUIKSILVER OUTLET — MIROMAR | Estero | FL | 2270 | Miromar Outlets |
| 872 | TRI | QUIKSILVER OUTLET — CHICAGO | Rosemont | IL | 4000 | Macerich |
| 874 | TRI | QUIKSILVER OUTLET - SILVER SANDS | Destin | FL | 3000 | Silver Sands GL I, LLC |
| 876 | TRI | QUIKSILVER  OUTLET - GREAT LAKES | Auburn Hills | MI | 5576 | Taubman Management |
| 879 | QS | QUIKSILVER OUTLET — ANNAPOLIS | Annapolis | MD | 3500 | Westfield Shoppingtown-Annapolis Mall, Owner LLC |
| 883 | QS | QUIKSILVER OUTLET - CHARLOTTE | Charlotte | NC | 2944 | |
| 885 | TRI | QUIKSILVER OUTLET - WOODBURY COMMONS | Central Valley | NY | 5000 | |
| 887 | TRI | QUIKSILVER OUTLET - NORTH GEORGIA PREMIUM OUTLETS | Dawsonville | GA | 4262 | |

# EXHIBIT 2

**Pop Up Store Agreement**

 

June 8, 2015

***VIA EMAIL***
QS RETAIL, INC.
Attn: Steve Finney
5600 Argosy Ave. Bldg 100
Huntington Beach, Ca 92649
Phone: (714) 889-2336
Email: steve.finney@quiksilver.com

Re:    **Letter Agreement Governing Inventory Disposition**

Dear Steve:

This letter shall serve as an agreement ("Agreement") between Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, on the one hand (collectively, "Agent" or a "Party"), and QS RETAIL, Inc., on the other hand ("Merchant" or a "Party" and together with the Agent, the "Parties"), under which Agent shall act as the exclusive agent for the purpose of conducting a sale of certain Merchandise (as defined below) through a "pop up" store program (each a "Pop Up Store" and collectively, the "Pop Up Stores") in the United States utilizing sale handles agreed upon by the Parties (the "Sale").

**A.    Merchandise**

For purposes hereof, "Merchandise" shall mean all excess, clearance, obsolete, or distressed inventory described on Exhibit A attached hereto, but only to the extent that Merchant obtains the necessary approvals and clearances to import such inventory into the United States, and such other goods as Merchant and Agent may agree to include in the Sale from time to time. "Merchandise" does not mean and shall not include: (1) goods that belong to sublessees, licensees or concessionaires of Merchant; (2) furnishings, trade fixtures, equipment and improvements to real property that are located in the Pop Up Stores (collectively, "FF&E"); or (3) damaged or defective merchandise that cannot be sold.

**B.    Sale Term**

For each Store, the Sale shall commence on July 1, 2015 (the "Sale Commencement Date") and conclude the earlier of (a) January 31, 2016 or (b) the date that the Sale is completed (the "Sale Termination Date"); provided, however, that the Parties may mutually agree in writing to extend or terminate the Sale at any Store prior to the Sale Termination Date. The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "Sale Term."

**C.    Project Management**

(i)    Agent's Undertakings

Agent shall, in collaboration with Merchant, (a) together with Agent's affiliate, Hilco Real Estate, LLC, assist Merchant with identifying a minimum of fifteen suitable locations for the Pop

Up Stores; provided, that it is the Parties intent to operate approximately thirty Pop Up Stores; (b) provide qualified supervisors (the "Supervisors") engaged by Agent to oversee the management of the Pop Up Stores; (c) determine appropriate point-of-sale and internal and external advertising strategies for the Pop Up Stores and recommend and assist Merchant with advertising and signage for the Pop Up Stores, all at Merchant's cost and expense and approved in advance by Merchant; (d) determine appropriate discounts of Merchandise approved in advance by Merchant; (e) assist Merchant in procuring employees to be employed by Merchant or a third party staffing company recommended by Agent; (f) recommend staffing levels for the Pop Up Stores and appropriate bonus and incentive programs, if any, for the Pop Up Stores' employees; (g) oversee display of Merchandise for the Pop Up Stores; (h) assist in procuring FF&E for the Pop Up Stores; (i) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (j) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (k) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (l) provide support in obtaining appropriate authorization and permits to conduct the Sale from state and local authorities (if applicable); (m) assist Merchant in creating a customer transition program to transition customers from the Pop Up Stores to Merchant's other retail channels; (n) provide such other related services deemed necessary or appropriate by Merchant and Agent; and (o) at an agreed upon time prior to the end of the Sale Term at each Pop Up Store, conduct a "sale on everything", "everything on sale", "store closing" or similar themed sale event (but not a "going out of business" or similar event sale) and sell all Merchandise to the piece, and if Merchant requests, the FF&E pursuant to Section I.

At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant in broom clean condition and in accordance with the lease requirements for such premises; provided, however, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Agent and Merchant. At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

(ii)    Merchant's Undertakings

During the Sale Term, Merchant shall (a) be the employer of the Pop Up Stores' employees (other than the Supervisors) or, to the extent Merchant elects, utilize the services of a third party employment agency recommended by Agent, for purposes of engaging temporary staff for the Pop Up Stores; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Pop Up Stores, the Pop Up Stores' employees (other than the Supervisors) and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Pop Up Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Agent to be necessary or desirable for the operation of the Pop Up Stores during the Sale; provided, that Merchant shall have the right to approve the terms and conditions of each lease with respect to a Pop Up Store in its sole discretion;

2

(g) provide, and arrange for the ordinary maintenance of, all point-of-sale equipment required for the Pop Up Stores; (h) with Agent's assistance, and subject to the lease for each Pop Up Store, ensure that Agent has quiet use and enjoyment of the Pop Up Stores for the Sale Term in order to perform its obligations under this Agreement; (i) with Agent's assistance, provide or procure FF&E for the Pop Up Stores; (j) identify the Merchandise for the Sale, with Agent's assistance allocate and balance the Merchandise among the Stores, and ship and distribute the Merchandise to the Pop Up Stores; and (k) with Agent's assistance, obtain all interior and exterior signage (including exterior "QUIKSILVER" signage) and procure all advertising for the Pop Up Stores.

To assist with the Sale, Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Agent.

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

**D.    The Sale**

All sales of Merchandise shall be made on behalf of Merchant.  Agent does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, or credit card and, at Merchant's discretion, by check or otherwise in accordance with Merchant's policies, and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant.

**E.    Agent Fee and Expenses in Connection with the Sale**

In consideration of its services hereunder, Agent shall earn a fee equal to five (5.0%) of the Gross Proceeds of Merchandise sold at the Pop Up Stores.  For purposes of this Agreement, "Gross Proceeds" means gross receipts arising from sales of Merchandise, net of applicable sales taxes.  In addition, Agent shall be paid an amount equal to $5,000 per Pop Up Store lease that is negotiated by Hilco Real Estate, LLC on Merchant's behalf and approved and executed by Merchant, and Merchant shall fund all deposits with respect to such Pop Up Store leases and utilities associated therewith, if required by the applicable lease.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's reasonable, documented and preapproved out of pocket expenses.  To control expenses of the Sale, Merchant and Agent have established a budget (the "Expense Budget") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs.  The Expense Budget for the Sale is attached hereto as Exhibit B.  The Expense Budget may only be modified by mutual agreement of Agent and Merchant. Merchant shall have no responsibility for costs and expenses in excess of the Expense Budget, unless Agent has obtained Merchant's prior written (including email) consent pursuant to an

3

amendment to the Expense Budget. The costs of supervision set forth on <u>Exhibit B</u> include, among other things, industry standard deferred compensation.

All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to Agent) shall be reconciled by mutual agreement of Agent and Merchant on every Wednesday for the prior week and, unless disputed by either Party, shall be paid within seven (7) days after each such weekly reconciliation. The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty five (45) days following the Sale Termination Date for the last Store.

**F.**     <u>**Indemnification**</u>

(i)     <u>Merchant's Indemnification</u>

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,  principals, affiliates, and Supervisors (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) product liability claims, except claims arising from Agent's negligence, willful misconduct or unlawful behavior, (d) claims asserted by any Store employees employed by Merchant (under a collective bargaining agreement or otherwise), relating to such employment against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Merchant or any of the Merchant Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

(ii)     <u>Agent's Indemnification</u>

Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC shall, jointly and severally, indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,  principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "<u>Merchant Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by an Agent Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement.

4

**G.**    **Insurance**

(i)    Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Pop Up Stores, and shall cause Agent to be named an additional insured with respect to all such policies. At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and that Agent is an additional insured thereunder. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

(ii)    Agent's Insurance Obligations

As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Pop Up Stores. Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder. In addition, Agent shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements. Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

**H.**    **Representations, Warranties, Covenants and Agreements**

(i)    Merchant warrants, represents, covenants and agrees that (a) Merchant is a corporation duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein (other than as set forth in Section A), (c) all ticketing of Merchandise at the Pop Up Stores has been and will be done in accordance with Merchant's customary ticketing practices; and (d) to the extent within the control of Merchant, the Pop Up Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

(ii)    Agent warrants, represents, covenants and agrees that (a) each entity comprising Agent is a limited liability company duly organized, validly existing and in good standing under the

laws of state of the Delaware, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Pop Up Stores will be conducted without Merchant's prior written consent, (e) Agent will not take any disciplinary action against any employee of Merchant, and (f) Agent shall not knowingly, and no Agent Indemnified Party shall, knowingly take any action that would constitute a breach of the lease for any Pop Up Store.

## I.  <u>Furniture, Fixtures and Equipment</u>

If requested by Merchant at one or more Pop Up Stores, Agent shall sell the FF&E in each such Pop Up Store from the Pop Up Store themselves.  Agent shall dispose of any unsold FF&E at the conclusion of the Sale in a manner to be approved by Merchant. Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale or other disposition of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties.

In consideration for providing the services set forth in this Section I, Agent shall be entitled to a commission from the sale of the FF&E equal to twenty percent (20%) of the Gross Proceeds of the sale of the FF&E.

Agent shall remit to Merchant all Gross Proceeds from the sale of FF&E.  During each weekly reconciliation described in Section E above, Agent's FF&E fee shall be calculated, and Agent's calculated and agreed upon FF&E fee and all FF&E costs and expenses then incurred within an agreed upon budget shall paid within seven (7) days after each such weekly reconciliation.

## J.  <u>Termination</u>

The following shall constitute "Termination Events" hereunder:

(a)  Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured thirty (30) days after receipt of written notice thereof to the defaulting Party; or

(b)  The failure of any representation or warranty made by Merchant or Agent to be true in any material respect as of the date made or at any time and throughout the Sale Term, which failure shall continue uncured thirty (30) days after receipt of written notice thereof to the defaulting Party.

If a Termination Event occurs, the non-defaulting Party  may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in addition to terminating this Agreement, pursue any and all rights and remedies and

damages resulting from such default; provided, that in no event shall either Party be liable to the other for any punitive, exemplary, consequential, incidental, indirect or special damages, including, without limitation, lost profits. If this Agreement is terminated other than as a result of a default by Agent, Merchant shall be obligated to pay Agent all amounts due under this Agreement through and including the termination date.

**K.**    **Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by fax or by recognized overnight delivery service as follows: (a) To Merchant: Quiksilver, Inc., 5600 Argosy Circle, #100, Huntington Beach, CA 92649, Attn: Retail Department; with a copy to: Legal Department; (b) To Agent: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax: 847- 897-0859, Attn: Ian S. Fredericks; or (c) such other address as may be designated in writing by Merchant or Agent.

**L.**    **Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect. No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement. Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**M.**    **Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party; provided that either Party may assign this Agreement without the consent of the other Party in the event of a merger, reorganization, consolidation or other change in control transaction, or in connection with the sale of all or substantially all of such Party's assets. No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

**N.**    **Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**O.**    **Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of California (without reference to the conflicts of laws provisions therein).   Any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Orange County, California courts and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.   If either Party commences any legal action, suit or proceeding to enforce or interpret this Agreement or any of the terms or provisions hereof, then in addition to any damages or remedies that may be awarded to the prevailing party therein, the prevailing party will be entitled to have and recover from the losing party the prevailing party's reasonable outside attorneys' fees and costs incurred in connection therewith.

**P.     Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof.   No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement.   All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**Q.     Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

*          *          *

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned. Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: Ian Fredericks

Its: VP & Assistant General Counsel, Managing Member

GORDON BROTHERS RETAIL PARTNERS, LLC

By: Richard Edwards

Its: Co-President

**AGREED AND ACCEPTED as of the** 12th **day of June ___, 2015:**

QS RETAIL, INC.

By: STEPHEN M FINNEY

Its: SENIOR VICE PRESIDENT

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchadise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_grou p_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 10-100-01 | Apparel | Quiksilver | QS Young Mens | S/S Tees | 53,578 | 200,290 | 4.4% |
| 10-100-02 | Apparel | Quiksilver | QS Young Mens | L/S Tees | 333 | 1,921 | 0.0% |
| 10-100-03 | Apparel | Quiksilver | QS Young Mens | Name Drop Tees | 13,922 | 52,268 | 1.1% |
| 10-100-04 | Apparel | Quiksilver | QS Young Mens | Knit Shirts | 9,053 | 48,237 | 1.1% |
| 10-100-05 | Apparel | Quiksilver | QS Young Mens | Woven Shirts | 6,661 | 65,666 | 1.4% |
| 10-100-06 | Apparel | Quiksilver | QS Young Mens | Fleece | 14,983 | 187,776 | 4.1% |
| 10-100-07 | Apparel | Quiksilver | QS Young Mens | Sweaters | 436 | 4,091 | 0.1% |
| 10-100-08 | Apparel | Quiksilver | QS Young Mens | Jackets | 2,830 | 56,110 | 1.2% |
| 10-100-09 | Apparel | Quiksilver | QS Young Mens | Boardshorts | 18,970 | 235,547 | 5.2% |
| 10-100-10 | Apparel | Quiksilver | QS Young Mens | Volleys | 11 | 94 | 0.0% |
| 10-100-11 | Apparel | Quiksilver | QS Young Mens | Walkshorts | 17,795 | 175,593 | 3.8% |
| 10-100-12 | Apparel | Quiksilver | QS Young Mens | Denim | 2,677 | 30,853 | 0.7% |
| 10-100-13 | Apparel | Quiksilver | QS Young Mens | Casual Pants | 1,325 | 16,188 | 0.4% |
| 10-100-14 | Apparel | Quiksilver | QS Young Mens | Name Drop Fleece | 276 | 3,378 | 0.1% |
| 10-100-15 | Apparel | Quiksilver | QS Young Mens | z_unidentified | 3,083 | 12,060 | 0.3% |
| 10-101-01 | Accessories | Quiksilver | QS Mens Accs | Beanies | 3,459 | 14,093 | 0.3% |
| 10-101-02 | Accessories | Quiksilver | QS Mens Accs | Hats | 14,044 | 78,501 | 1.7% |
| 10-101-03 | Accessories | Quiksilver | QS Mens Accs | Boxers | 1,280 | 5,389 | 0.1% |
| 10-101-04 | Accessories | Quiksilver | QS Mens Accs | Wallets | 3,268 | 13,833 | 0.3% |
| 10-101-05 | Accessories | Quiksilver | QS Mens Accs | Belts | 3,059 | 11,217 | 0.2% |
| 10-101-06 | Accessories | Quiksilver | QS Mens Accs | Socks | 104 | 229 | 0.0% |
| 10-101-07 | Accessories | Quiksilver | QS Mens Accs | Backpacks | 3,834 | 45,612 | 1.0% |
| 10-101-08 | Accessories | Quiksilver | QS Mens Accs | Luggage | 1,708 | 19,479 | 0.4% |
| 10-101-09 | Accessories | Quiksilver | QS Mens Accs | Watches | 298 | 6,520 | 0.1% |
| 10-101-10 | Accessories | Quiksilver | QS Mens Accs | Sunglasses | 161 | 2,705 | 0.1% |
| 10-101-11 | Accessories | Quiksilver | QS Mens Accs | Gift Packs | 2 | 14 | 0.0% |
| 10-101-12 | Accessories | Quiksilver | QS Mens Accs | Miscellaneous | 2,880 | 17,590 | 0.4% |
| 10-101-13 | Accessories | Quiksilver | QS Mens Accs | ND Accessories | 227 | 2,063 | 0.0% |
| 10-101-16 | Accessories | Quiksilver | QS Mens Accs | Electronics | 5,110 | 247,732 | 5.4% |
| 10-101-17 | Accessories | Quiksilver | QS Mens Accs | Stickers | 2,575 | 14,026 | 0.3% |
| 10-102-01 | Footwear | Quiksilver | QS Mens Footwear | Sandals | 47,456 | 197,504 | 4.3% |
| 10-102-02 | Footwear | Quiksilver | QS Mens Footwear | Athletic / Casual | 10,814 | 102,411 | 2.2% |
| 10-103-01 | Apparel | Quiksilver | QS Mens | Tees | 146 | 792 | 0.0% |
| 10-103-02 | Apparel | Quiksilver | QS Mens | Knits | 29 | 306 | 0.0% |
| 10-103-03 | Apparel | Quiksilver | QS Mens | Wovens | 136 | 2,209 | 0.0% |
| 10-103-04 | Apparel | Quiksilver | QS Mens | Fleece | 6 | 100 | 0.0% |
| 10-103-05 | Apparel | Quiksilver | QS Mens | Sweaters | 2 | 36 | 0.0% |
| 10-103-06 | Apparel | Quiksilver | QS Mens | Jackets | 6 | 134 | 0.0% |
| 10-103-07 | Apparel | Quiksilver | QS Mens | Boardshorts | 55 | 702 | 0.0% |
| 10-103-08 | Apparel | Quiksilver | QS Mens | Walkshorts | 50 | 590 | 0.0% |
| 10-103-09 | Apparel | Quiksilver | QS Mens | Pants | (3) | (89) | 0.0% |
| 10-104-02 | Accessories | Other | Mens Yesterday's | S/S Tees | 25 | 189 | 0.0% |
| 10-105-01 | Apparel | Quiksilver | QS Performance | Tees | 36 | 272 | 0.0% |
| 10-105-02 | Apparel | Quiksilver | QS Performance | Tops | 11 | 146 | 0.0% |
| 10-105-03 | Apparel | Quiksilver | QS Performance | Jackets | 1 | 33 | 0.0% |
| 10-105-04 | Apparel | Quiksilver | QS Performance | Shorts | 8 | 115 | 0.0% |
| 10-106-01 | Accessories | Quiksilver | QS Watermans Accs | Hats | 50 | 313 | 0.0% |
| 10-106-03 | Accessories | Quiksilver | QS Watermans Accs | Miscellaneous | 2 | 16 | 0.0% |
| 11-110-01 | Apparel | Quiksilver | QS Boys 8-20 | S/S Tees | 50,941 | 147,417 | 3.2% |
| 11-110-02 | Apparel | Quiksilver | QS Boys 8-20 | L/S Tees | 3,203 | 14,170 | 0.3% |
| 11-110-03 | Apparel | Quiksilver | QS Boys 8-20 | Name Drop Tees | 24 | 72 | 0.0% |
| 11-110-04 | Apparel | Quiksilver | QS Boys 8-20 | Knits | 2,267 | 14,569 | 0.3% |
| 11-110-05 | Apparel | Quiksilver | QS Boys 8-20 | Wovens | 3,292 | 28,566 | 0.6% |
| 11-110-06 | Apparel | Quiksilver | QS Boys 8-20 | Fleece | 5,457 | 54,981 | 1.2% |
| 11-110-07 | Apparel | Quiksilver | QS Boys 8-20 | Sweaters | 1 | 8 | 0.0% |
| 11-110-08 | Apparel | Quiksilver | QS Boys 8-20 | Jackets | 494 | 8,347 | 0.2% |
| 11-110-09 | Apparel | Quiksilver | QS Boys 8-20 | Boardshorts | 1,466 | 15,045 | 0.3% |
| 11-110-10 | Apparel | Quiksilver | QS Boys 8-20 | Walkshorts | 3,347 | 33,826 | 0.7% |
| 11-110-11 | Apparel | Quiksilver | QS Boys 8-20 | Pants | 2,222 | 26,363 | 0.6% |
| 11-111-01 | Apparel | Quiksilver | QS Kids / Toddler | S/S Tees | 9,842 | 28,201 | 0.6% |
| 11-111-02 | Apparel | Quiksilver | QS Kids / Toddler | L/S Tees | 854 | 3,189 | 0.1% |
| 11-111-03 | Apparel | Quiksilver | QS Kids / Toddler | Knits | 224 | 1,251 | 0.0% |
| 11-111-04 | Apparel | Quiksilver | QS Kids / Toddler | Wovens | 97 | 802 | 0.0% |

QuikSilver
**Exhibit A: Merchandise**
Note: Merchadise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_grou p_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 11-111-05 | Apparel | Quiksilver | QS Kids / Toddler | Fleece | 1,063 | 8,710 | 0.2% |
| 11-111-07 | Apparel | Quiksilver | QS Kids / Toddler | Jackets | 29 | 452 | 0.0% |
| 11-111-08 | Apparel | Quiksilver | QS Kids / Toddler | Boardshorts | 481 | 3,893 | 0.1% |
| 11-111-09 | Apparel | Quiksilver | QS Kids / Toddler | Walkshorts | 1,225 | 10,320 | 0.2% |
| 11-111-10 | Apparel | Quiksilver | QS Kids / Toddler | Pants | 81 | 779 | 0.0% |
| 11-112-01 | Apparel | Quiksilver | QS Infant | Tees / Fleece | 268 | 874 | 0.0% |
| 11-112-02 | Apparel | Quiksilver | QS Infant | Tops | 113 | 668 | 0.0% |
| 11-112-03 | Apparel | Quiksilver | QS Infant | Bottoms | 312 | 2,304 | 0.1% |
| 11-113-01 | Accessories | Quiksilver | QS Boys Accs | Beanies | 927 | 3,757 | 0.1% |
| 11-113-02 | Accessories | Quiksilver | QS Boys Accs | Hats | 201 | 844 | 0.0% |
| 11-113-03 | Accessories | Quiksilver | QS Boys Accs | Boxers | 37 | 115 | 0.0% |
| 11-113-04 | Accessories | Quiksilver | QS Boys Accs | Wallets | 8 | 27 | 0.0% |
| 11-113-05 | Accessories | Quiksilver | QS Boys Accs | Belts | 55 | 175 | 0.0% |
| 11-113-06 | Accessories | Quiksilver | QS Boys Accs | Socks | 17 | 38 | 0.0% |
| 11-113-07 | Accessories | Quiksilver | QS Boys Accs | Backpacks | 1 | 12 | 0.0% |
| 11-113-08 | Accessories | Quiksilver | QS Boys Accs | Watches | 7 | 44 | 0.0% |
| 11-113-09 | Accessories | Quiksilver | QS Boys Accs | Sunglasses | 2 | 10 | 0.0% |
| 11-113-10 | Accessories | Quiksilver | QS Boys Accs | Miscellaneous | 2 | 7 | 0.0% |
| 11-114-01 | Footwear | Quiksilver | QS Boys Footwear | Sandals | 15,095 | 48,219 | 1.1% |
| 11-114-02 | Footwear | Quiksilver | QS Boys Footwear | Athletic / Casual | 1 | 9 | 0.0% |
| 12-120-01 | Apparel | Quiksilver | QS Womens Apparel | Tees | 2 | 20 | 0.0% |
| 12-120-02 | Apparel | Quiksilver | QS Womens Apparel | Fleece | 2 | 24 | 0.0% |
| 12-120-03 | Apparel | Quiksilver | QS Womens Apparel | Tops | 9 | 30 | 0.0% |
| 12-120-04 | Apparel | Quiksilver | QS Womens Apparel | Sweaters | 3 | 66 | 0.0% |
| 12-120-05 | Apparel | Quiksilver | QS Womens Apparel | Jackets | 2 | 45 | 0.0% |
| 12-120-06 | Apparel | Quiksilver | QS Womens Apparel | Dresses | 27 | 370 | 0.0% |
| 12-120-07 | Apparel | Quiksilver | QS Womens Apparel | Skirts | 1 | 7 | 0.0% |
| 12-120-08 | Apparel | Quiksilver | QS Womens Apparel | Shorts | 2 | 32 | 0.0% |
| 12-120-09 | Apparel | Quiksilver | QS Womens Apparel | Denim | 7 | 138 | 0.0% |
| 12-120-10 | Apparel | Quiksilver | QS Womens Apparel | Casual Pants | (1) | (9) | 0.0% |
| 12-120-11 | Apparel | Quiksilver | QS Womens Apparel | Swim | 14 | 198 | 0.0% |
| 12-122-02 | Footwear | Quiksilver | QSW Footwear | Sandals | (11) | (135) | 0.0% |
| 12-123-01 | Apparel | Quiksilver | QS Girls Apparel | Tees | 91 | 484 | 0.0% |
| 12-123-02 | Apparel | Quiksilver | QS Girls Apparel | Fleece | 69 | 856 | 0.0% |
| 12-123-03 | Apparel | Quiksilver | QS Girls Apparel | Tops | 105 | 1,008 | 0.0% |
| 12-123-04 | Apparel | Quiksilver | QS Girls Apparel | Tanks | 46 | 284 | 0.0% |
| 12-123-05 | Apparel | Quiksilver | QS Girls Apparel | Sweaters | 18 | 374 | 0.0% |
| 12-123-06 | Apparel | Quiksilver | QS Girls Apparel | Jackets | 41 | 1,099 | 0.0% |
| 12-123-07 | Apparel | Quiksilver | QS Girls Apparel | Dresses | 141 | 1,633 | 0.0% |
| 12-123-08 | Apparel | Quiksilver | QS Girls Apparel | Skirts | 3 | 22 | 0.0% |
| 12-123-09 | Apparel | Quiksilver | QS Girls Apparel | Shorts | 44 | 389 | 0.0% |
| 12-123-10 | Apparel | Quiksilver | QS Girls Apparel | Denim | 674 | 7,880 | 0.2% |
| 12-123-11 | Apparel | Quiksilver | QS Girls Apparel | Casual Pants | 208 | 2,242 | 0.0% |
| 12-123-12 | Apparel | Quiksilver | QS Girls Apparel | Swim | 58 | 556 | 0.0% |
| 12-124-01 | Accessories | Quiksilver | QS Girls Accessories | Handbags | 10 | 85 | 0.0% |
| 12-124-02 | Accessories | Quiksilver | QS Girls Accessories | Winterwear | 3 | 20 | 0.0% |
| 20-200-01 | Apparel | Roxy | Roxy Apparel | S/S Tees | 11,798 | 56,722 | 1.2% |
| 20-200-02 | Apparel | Roxy | Roxy Apparel | L/S Tees | 2,678 | 16,096 | 0.4% |
| 20-200-03 | Apparel | Roxy | Roxy Apparel | Name Drop Tees | 6,980 | 28,591 | 0.6% |
| 20-200-04 | Apparel | Roxy | Roxy Apparel | Fleece | 19,513 | 210,677 | 4.6% |
| 20-200-05 | Apparel | Roxy | Roxy Apparel | Name Drop Fleece | 250 | 1,935 | 0.0% |
| 20-200-06 | Apparel | Roxy | Roxy Apparel | Tops | 5,002 | 42,099 | 0.9% |
| 20-200-07 | Apparel | Roxy | Roxy Apparel | Tanks | 1,923 | 11,205 | 0.2% |
| 20-200-08 | Apparel | Roxy | Roxy Apparel | Sweaters | 9,823 | 114,383 | 2.5% |
| 20-200-09 | Apparel | Roxy | Roxy Apparel | Jackets | 4,732 | 83,129 | 1.8% |
| 20-200-10 | Apparel | Roxy | Roxy Apparel | Dresses | 6,004 | 59,238 | 1.3% |
| 20-200-11 | Apparel | Roxy | Roxy Apparel | Skirts | 68 | 543 | 0.0% |
| 20-200-12 | Apparel | Roxy | Roxy Apparel | Shorts | 616 | 5,590 | 0.1% |
| 20-200-13 | Apparel | Roxy | Roxy Apparel | Boardshorts | 2,029 | 17,539 | 0.4% |
| 20-200-14 | Apparel | Roxy | Roxy Apparel | Denim | 4,523 | 53,601 | 1.2% |
| 20-200-15 | Apparel | Roxy | Roxy Apparel | Casual Pants | 1,666 | 18,839 | 0.4% |
| 20-201-01 | Apparel | Roxy | Jrs Swim | Roxy | 29,370 | 174,524 | 3.8% |
| 20-201-04 | Apparel | Roxy | Jrs Swim | Coverups | 67 | 520 | 0.0% |

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchdaise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_grou p_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 20-201-05 | Apparel | Roxy | Jrs Swim | z_unidentified | 11 | 117 | 0.0% |
| 20-202-01 | Accessories | Roxy | Roxy Accs | Hats | 299 | 1,579 | 0.0% |
| 20-202-02 | Accessories | Roxy | Roxy Accs | Handbags | 3,500 | 31,180 | 0.7% |
| 20-202-03 | Accessories | Roxy | Roxy Accs | Jewelry | 22 | 115 | 0.0% |
| 20-202-04 | Accessories | Roxy | Roxy Accs | Wallets | 2,822 | 16,378 | 0.4% |
| 20-202-05 | Accessories | Roxy | Roxy Accs | Belts | 815 | 3,948 | 0.1% |
| 20-202-06 | Accessories | Roxy | Roxy Accs | Backpacks | 929 | 12,749 | 0.3% |
| 20-202-07 | Accessories | Roxy | Roxy Accs | Luggage | 1,143 | 11,393 | 0.2% |
| 20-202-08 | Accessories | Roxy | Roxy Accs | Watches | 261 | 3,062 | 0.1% |
| 20-202-09 | Accessories | Roxy | Roxy Accs | Sunglasses | 123 | 1,741 | 0.0% |
| 20-202-10 | Accessories | Roxy | Roxy Accs | Loungewear | 37 | 367 | 0.0% |
| 20-202-11 | Accessories | Roxy | Roxy Accs | Winterwear | 973 | 6,072 | 0.1% |
| 20-202-12 | Accessories | Roxy | Roxy Accs | Gifts | 172 | 1,788 | 0.0% |
| 20-202-13 | Accessories | Roxy | Roxy Accs | Fragrance | 446 | 5,972 | 0.1% |
| 20-202-14 | Accessories | Roxy | Roxy Accs | Miscellaneous | 1,156 | 5,442 | 0.1% |
| 20-202-15 | Accessories | Roxy | Roxy Accs | Home | 1 | 11 | 0.0% |
| 20-202-17 | Accessories | Roxy | Roxy Accs | Electronics | 8,284 | 421,259 | 9.2% |
| 20-202-18 | Accessories | Roxy | Roxy Accs | Stickers | 91 | 269 | 0.0% |
| 20-202-19 | Accessories | Roxy | Roxy Accs | z_unidentified | 232 | 347 | 0.0% |
| 20-203-01 | Footwear | Roxy | Roxy Footwear | Rubber Flip Flops | 15,229 | 52,679 | 1.2% |
| 20-203-02 | Footwear | Roxy | Roxy Footwear | Sandals | 1,799 | 12,121 | 0.3% |
| 20-203-03 | Footwear | Roxy | Roxy Footwear | Athletic / Casual | 5,011 | 48,094 | 1.1% |
| 20-203-04 | Footwear | Roxy | Roxy Footwear | Slippers | (5) | (57) | 0.0% |
| 20-204-01 | Apparel | Roxy | Roxy Outdoor Fitness | Sports Bras | 25 | 249 | 0.0% |
| 20-204-02 | Apparel | Roxy | Roxy Outdoor Fitness | Tanks | 11 | 176 | 0.0% |
| 20-204-03 | Apparel | Roxy | Roxy Outdoor Fitness | Tops | 44 | 444 | 0.0% |
| 20-204-04 | Apparel | Roxy | Roxy Outdoor Fitness | Slippers | 31 | 735 | 0.0% |
| 20-204-05 | Apparel | Roxy | Roxy Outdoor Fitness | Shorts | 128 | 1,185 | 0.0% |
| 20-204-06 | Apparel | Roxy | Roxy Outdoor Fitness | Pants | 795 | 11,104 | 0.2% |
| 20-204-07 | Apparel | Roxy | Roxy Outdoor Fitness | Accessories | 4 | 59 | 0.0% |
| 20-204-08 | Apparel | Roxy | Roxy Outdoor Fitness | Swim | 538 | 3,744 | 0.1% |
| 20-204-09 | Apparel | Roxy | Roxy Outdoor Fitness | Wetsuits | 2 | 138 | 0.0% |
| 21-210-01 | Apparel | Roxy | RG Apparel | S/S Tees | 1,154 | 4,475 | 0.1% |
| 21-210-02 | Apparel | Roxy | RG Apparel | L/S Tees | 64 | 336 | 0.0% |
| 21-210-03 | Apparel | Roxy | RG Apparel | Fleece | 2,397 | 20,987 | 0.5% |
| 21-210-04 | Apparel | Roxy | RG Apparel | Tops | 1,744 | 11,588 | 0.3% |
| 21-210-05 | Apparel | Roxy | RG Apparel | Sweaters | (17) | (232) | 0.0% |
| 21-210-06 | Apparel | Roxy | RG Apparel | Jackets | 19 | 223 | 0.0% |
| 21-210-07 | Apparel | Roxy | RG Apparel | Dresses | 54 | 446 | 0.0% |
| 21-210-08 | Apparel | Roxy | RG Apparel | Skirts | 2 | 14 | 0.0% |
| 21-210-09 | Apparel | Roxy | RG Apparel | Shorts | 37 | 260 | 0.0% |
| 21-210-10 | Apparel | Roxy | RG Apparel | Pants | 3,815 | 29,753 | 0.7% |
| 21-210-11 | Apparel | Roxy | RG Apparel | Swim | 476 | 4,049 | 0.1% |
| 21-210-12 | Apparel | Roxy | RG Apparel | Name Drop Tees | 51 | 192 | 0.0% |
| 21-211-01 | Apparel | Roxy | RG Teenie Wahine | Tees | 69 | 257 | 0.0% |
| 21-211-02 | Apparel | Roxy | RG Teenie Wahine | Fleece | 72 | 660 | 0.0% |
| 21-211-03 | Apparel | Roxy | RG Teenie Wahine | Tops | 47 | 361 | 0.0% |
| 21-211-04 | Apparel | Roxy | RG Teenie Wahine | Bottoms | 155 | 1,116 | 0.0% |
| 21-211-05 | Apparel | Roxy | RG Teenie Wahine | Dresses | 25 | 175 | 0.0% |
| 21-211-06 | Apparel | Roxy | RG Teenie Wahine | Swim | 96 | 720 | 0.0% |
| 21-212-01 | Apparel | Roxy | RG Infant | Tees / Fleece | 8 | 52 | 0.0% |
| 21-212-02 | Apparel | Roxy | RG Infant | Tops | 12 | 76 | 0.0% |
| 21-212-03 | Apparel | Roxy | RG Infant | Bottoms | 5 | 32 | 0.0% |
| 21-212-04 | Apparel | Roxy | RG Infant | Dresses | 5 | 31 | 0.0% |
| 21-213-01 | Accessories | Roxy | RG Accs | Hats | 10 | 49 | 0.0% |
| 21-213-02 | Accessories | Roxy | RG Accs | Handbags | 59 | 348 | 0.0% |
| 21-213-03 | Accessories | Roxy | RG Accs | Belts | 1 | 5 | 0.0% |
| 21-213-04 | Accessories | Roxy | RG Accs | Backpacks | 23 | 266 | 0.0% |
| 21-213-05 | Accessories | Roxy | RG Accs | Luggage | 5 | 43 | 0.0% |
| 21-213-06 | Accessories | Roxy | RG Accs | Watches | 1 | 7 | 0.0% |
| 21-213-07 | Accessories | Roxy | RG Accs | Sunglasses | 44 | 260 | 0.0% |
| 21-213-08 | Accessories | Roxy | RG Accs | Winterwear | 36 | 239 | 0.0% |
| 21-213-10 | Accessories | Roxy | RG Accs | Miscellaneous | 72 | 413 | 0.0% |

QuikSilver
**Exhibit A: Merchandise**
Note: Merchadise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_group _code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 21-214-01 | Footwear | Roxy | RG Footwear | Sandals | 1,560 | 5,782 | 0.1% |
| 21-214-02 | Footwear | Roxy | RG Footwear | Athletic / Casual | 188 | 1,528 | 0.0% |
| 21-215-03 | Accessories | Roxy | RG TW Accs | Backpacks | 2 | 13 | 0.0% |
| 21-216-01 | Accessories | Roxy | RG Infant Accs | Hats | 1 | 4 | 0.0% |
| 21-216-02 | Accessories | Roxy | RG Infant Accs | Miscellaneous | 2 | 18 | 0.0% |
| 21-217-01 | Footwear | Roxy | RG TW Footwear | Sandals | 880 | 3,041 | 0.1% |
| 21-217-02 | Footwear | Roxy | RG TW Footwear | Athletic / Casual | 170 | 1,391 | 0.0% |
| 30-300-01 | Technical Products | Quiksilver | Snow | QS Mens Snow | 117 | 3,849 | 0.1% |
| 30-300-02 | Technical Products | Roxy | Snow | Roxy Snow | 125 | 4,731 | 0.1% |
| 30-300-03 | Technical Products | Quiksilver | Snow | QS Boys Snow | 5 | 129 | 0.0% |
| 30-300-04 | Technical Products | Roxy | Snow | Roxy Girls Snow | 4 | 91 | 0.0% |
| 30-300-05 | Technical Products | Quiksilver | Snow | Snow Accessories | 147 | 2,899 | 0.1% |
| 30-300-05 | Technical Products | Roxy | Snow | Snow Accessories | 246 | 3,251 | 0.1% |
| 30-300-06 | Technical Products | Roxy | Snow | Teenie Wahine Snow | (2) | (48) | 0.0% |
| 40-400-01 | Technical Products | Quiksilver | Wetsuits | QS Mens Wetsuits | 549 | 19,673 | 0.4% |
| 40-400-02 | Technical Products | Roxy | Wetsuits | Roxy Wetsuits | 404 | 15,521 | 0.3% |
| 40-400-03 | Technical Products | Quiksilver | Wetsuits | QS Boys Wetsuits | 10 | 160 | 0.0% |
| 40-400-04 | Technical Products | Quiksilver | Wetsuits | QS Mens Lycra | 3,205 | 23,132 | 0.5% |
| 40-400-05 | Technical Products | Roxy | Wetsuits | Roxy Lycra | 2,197 | 14,490 | 0.3% |
| 40-400-06 | Technical Products | Quiksilver | Wetsuits | QS Boys Lycra | 3,435 | 22,561 | 0.5% |
| 40-400-07 | Technical Products | Roxy | Wetsuits | Roxy Girls Lycra | 1,286 | 8,376 | 0.2% |
| 40-400-08 | Technical Products | Roxy | Wetsuits | Roxy Girls Wetsuits | 11 | 232 | 0.0% |
| 40-400-09 | Technical Products | Roxy | Wetsuits | Teenie Wahine Wetsuits/Lycra | 521 | 3,504 | 0.1% |
| 40-400-10 | Technical Products | Quiksilver | Wetsuits | Watermans Lycra | 2,884 | 27,831 | 0.6% |
| 40-400-11 | Technical Products | Quiksilver | Wetsuits | z_unidentified | 295 | 1,974 | 0.0% |
| 50-500-02 | Accessories | Other | Other Vendor | Skate | 75 | 2,924 | 0.1% |
| 50-500-03 | Accessories | Other | Other Vendor | Snow | 427 | 50,260 | 1.1% |
| 50-500-04 | Accessories | Other | Other Vendor | Books / Magazines | 50 | 388 | 0.0% |
| 50-500-05 | Accessories | Other | Other Vendor | DVDs | 110 | 1,315 | 0.0% |
| 50-500-06 | Accessories | Other | Other Vendor | Miscellaneous | 6 | 447 | 0.0% |
| 50-500-07 | Accessories | Other | Other Vendor | Jewelry | 12 | 324 | 0.0% |
| 50-500-08 | Accessories | Other | Other Vendor | Electronics | 115 | 4,660 | 0.1% |
| 50-500-13 | Accessories | Other | Other Vendor | Makeup | 1,155 | 12,546 | 0.3% |
| 50-500-14 | Accessories | Other | Other Vendor | Moscova | 29 | 227 | 0.0% |
| 70-700-01 | Apparel | DC Shoes | DC Mens App | S/S Tees | 3,939 | 15,733 | 0.3% |
| 70-700-02 | Apparel | DC Shoes | DC Mens App | L/S Tees | 48 | 273 | 0.0% |
| 70-700-03 | Apparel | DC Shoes | DC Mens App | Knits | 149 | 978 | 0.0% |
| 70-700-04 | Apparel | DC Shoes | DC Mens App | Wovens | 420 | 4,911 | 0.1% |
| 70-700-05 | Apparel | DC Shoes | DC Mens App | Fleece | 1,455 | 16,123 | 0.4% |
| 70-700-06 | Apparel | DC Shoes | DC Mens App | Sweaters | 12 | 128 | 0.0% |
| 70-700-07 | Apparel | DC Shoes | DC Mens App | Jackets | 128 | 3,005 | 0.1% |
| 70-700-08 | Apparel | DC Shoes | DC Mens App | Shorts | 2,767 | 24,868 | 0.5% |
| 70-700-09 | Apparel | DC Shoes | DC Mens App | Denim | 248 | 3,790 | 0.1% |
| 70-700-10 | Apparel | DC Shoes | DC Mens App | Long Bottoms | 1,699 | 18,362 | 0.4% |
| 70-700-11 | Apparel | DC Shoes | DC Mens App | Boardshorts | 327 | 3,057 | 0.1% |
| 70-701-01 | Accessories | DC Shoes | DC Mens Accs | Beanies | 26 | 115 | 0.0% |
| 70-701-02 | Accessories | DC Shoes | DC Mens Accs | Hats | 944 | 5,149 | 0.1% |
| 70-701-03 | Accessories | DC Shoes | DC Mens Accs | Backpacks | 273 | 2,660 | 0.1% |
| 70-701-04 | Accessories | DC Shoes | DC Mens Accs | Wallets | 22 | 86 | 0.0% |
| 70-701-05 | Accessories | DC Shoes | DC Mens Accs | Belts | 103 | 348 | 0.0% |
| 70-701-06 | Accessories | DC Shoes | DC Mens Accs | Socks | 6,174 | 21,602 | 0.5% |
| 70-701-07 | Accessories | DC Shoes | DC Mens Accs | Miscellaneous | 533 | 2,354 | 0.1% |
| 70-701-08 | Accessories | DC Shoes | DC Mens Accs | Luggage | 24 | 733 | 0.0% |
| 70-702-01 | Footwear | DC Shoes | DC Mens Footwear | Skate | 7,700 | 134,759 | 2.9% |
| 70-702-02 | Footwear | DC Shoes | DC Mens Footwear | Sandals | 246 | 1,748 | 0.0% |
| 71-710-01 | Apparel | DC Shoes | DC Boys App | Tees | 308 | 974 | 0.0% |
| 71-710-02 | Apparel | DC Shoes | DC Boys App | Fleece | 364 | 3,921 | 0.1% |
| 71-710-03 | Apparel | DC Shoes | DC Boys App | Tops | 98 | 837 | 0.0% |
| 71-710-04 | Apparel | DC Shoes | DC Boys App | Outerwear | 7 | 62 | 0.0% |
| 71-710-05 | Apparel | DC Shoes | DC Boys App | Shorts | 35 | 392 | 0.0% |
| 71-710-06 | Apparel | DC Shoes | DC Boys App | Boardshorts | 32 | 298 | 0.0% |
| 71-710-07 | Apparel | DC Shoes | DC Boys App | Denim | 11 | 121 | 0.0% |
| 71-710-08 | Apparel | DC Shoes | DC Boys App | Long Bottoms | 2 | 19 | 0.0% |

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchandise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_group_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 71-711-01 | Accessories | DC Shoes | DC Boys Accs | Beanies | 3 | 13 | 0.0% |
| 71-711-02 | Accessories | DC Shoes | DC Boys Accs | Hats | 29 | 169 | 0.0% |
| 71-711-03 | Accessories | DC Shoes | DC Boys Accs | Belts | 2 | 6 | 0.0% |
| 71-711-04 | Accessories | DC Shoes | DC Boys Accs | Miscellaneous | 37 | 181 | 0.0% |
| 71-711-05 | Accessories | DC Shoes | DC Boys Accs | Backpacks | 362 | 934 | 0.0% |
| 71-712-01 | Footwear | DC Shoes | DC Boys Footwear | Skate | 340 | 4,238 | 0.1% |
| 71-712-02 | Footwear | DC Shoes | DC Boys Footwear | Sandals | 57 | 403 | 0.0% |
| 71-713-01 | Apparel | DC Shoes | DC Kids/Toddler App | Tees | 41 | 130 | 0.0% |
| 71-713-02 | Apparel | DC Shoes | DC Kids/Toddler App | Fleece | 77 | 939 | 0.0% |
| 71-713-03 | Apparel | DC Shoes | DC Kids/Toddler App | Tops | 14 | 123 | 0.0% |
| 71-713-04 | Apparel | DC Shoes | DC Kids/Toddler App | Bottoms | 18 | 172 | 0.0% |
| 71-714-01 | Footwear | DC Shoes | DC K/T Footwear | Skate | 5,531 | 57,947 | 1.3% |
| 80-800-01 | Apparel | DC Shoes | DC Jrs App | S/S Tees | 91 | 492 | 0.0% |
| 80-800-02 | Apparel | DC Shoes | DC Jrs App | L/S Tees | 5 | 34 | 0.0% |
| 80-800-03 | Apparel | DC Shoes | DC Jrs App | Tops | 41 | 359 | 0.0% |
| 80-800-04 | Apparel | DC Shoes | DC Jrs App | Fleece | 39 | 448 | 0.0% |
| 80-800-05 | Apparel | DC Shoes | DC Jrs App | Sweaters | 7 | 98 | 0.0% |
| 80-800-06 | Apparel | DC Shoes | DC Jrs App | Jackets | 7 | 143 | 0.0% |
| 80-800-07 | Apparel | DC Shoes | DC Jrs App | Shorts | 44 | 425 | 0.0% |
| 80-800-09 | Apparel | DC Shoes | DC Jrs App | Denim | 40 | 629 | 0.0% |
| 80-800-10 | Apparel | DC Shoes | DC Jrs App | Bottoms | 3 | 32 | 0.0% |
| 80-800-11 | Apparel | DC Shoes | DC Jrs App | Dresses | 16 | 150 | 0.0% |
| 80-801-01 | Accessories | DC Shoes | DC Jrs Accs | Beanies | 379 | 1,581 | 0.0% |
| 80-801-02 | Accessories | DC Shoes | DC Jrs Accs | Hats | 3 | 27 | 0.0% |
| 80-801-03 | Accessories | DC Shoes | DC Jrs Accs | Handbags | 2 | 22 | 0.0% |
| 80-801-04 | Accessories | DC Shoes | DC Jrs Accs | Wallets | 9 | 51 | 0.0% |
| 80-801-05 | Accessories | DC Shoes | DC Jrs Accs | Backpacks | 232 | 824 | 0.0% |
| 80-801-07 | Accessories | DC Shoes | DC Jrs Accs | Socks | 3 | 8 | 0.0% |
| 80-801-08 | Accessories | DC Shoes | DC Jrs Accs | Miscellaneous | 2 | 13 | 0.0% |
| 80-802-01 | Footwear | DC Shoes | DC Jrs Footwear | Skate | 201 | 2,745 | 0.1% |
| 80-802-02 | Footwear | DC Shoes | DC Jrs Footwear | Sandals | 57 | 294 | 0.0% |
| 81-812-01 | Footwear | DC Shoes | DC Girls Footwear | Skate | 2 | 22 | 0.0% |
| 90-900-01 | Technical Products | DC Shoes | DC Snow | Mens Snow | 128 | 5,469 | 0.1% |
| 90-900-02 | Technical Products | DC Shoes | DC Snow | Juniors Snow | 31 | 1,242 | 0.0% |
| 90-900-03 | Technical Products | DC Shoes | DC Snow | Boys Snow | (15) | (470) | 0.0% |
| 90-900-04 | Technical Products | DC Shoes | DC Snow | Girls Snow | (2) | (59) | 0.0% |
| 90-900-05 | Technical Products | DC Shoes | DC Snow | Snow Accessories | 841 | 4,781 | 0.1% |
| 90-900-06 | Technical Products | DC Shoes | DC Snow | Snow Boots | 40 | 2,852 | 0.1% |
| Grand Total | | | | | 571,540 | 4,569,625 | 100.0% |

**Quiksilver, Inc.**
**Exhibit B**

| Expense Budget | | | |
|---|---|---|---|
| | Pre-Opening | Sale | Wind-Down | Total |
| **Advertising** | | | | |
| Media | | | | |
| Signs | *To be determined & mutually agreed upon.* | | | |
| Sign Walkers | | | | |
| Subtotal Advertising | - | - | - | - |
| | | | | |
| **Supervision** | | | | |
| Fees | 246,183 | 628,759 | 151,905 | 1,026,847 |
| Deferred Compensation | 115,682 | 277,753 | 67,973 | 461,407 |
| Expenses (1) | 87,675 | 164,534 | 43,658 | 295,868 |
| Subtotal Supervision | 449,540 | 1,071,046 | 263,536 | 1,784,121 |
| | | | | |
| Total Expenses | 449,540 | 1,071,046 | 263,536 | 1,784,121 |

Note(s):
1. Includes Insurance.

# Hilco Merchant Resources
## Quiksilver, Inc.
### Exhibit B

| Supervision Expense Budget- Pre-Opening |
|---|

| Supervision with Payroll Costs Include | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | Total USD |
|---|---|---|---|---|---|---|---|---|
| Base Rate | 17,955 | - | 82,080 | 131,328 | - | - | - | 231,363 |
| Deferred Compensation | 8,978 | - | 41,040 | 65,664 | - | - | - | 115,682 |
| Rate Adjustments (1) | 2,850 | - | 11,970 | - | - | - | - | 14,820 |
| Total Rates | 29,783 | - | 135,090 | 196,992 | - | - | - | 361,865 |
| | | | | | | | | |
| Travel Charges | 4,275 | - | 24,150 | 46,800 | - | - | - | 75,225 |
| Other Expenses | 750 | - | 4,500 | 7,200 | - | - | - | 12,450 |
| General Liability Insurance | | | | | | | | |
| Total Expense | 34,808 | - | 163,740 | 250,992 | - | - | - | 449,540 |

Note: Supervision Expense will be managed in the aggregate.

| Supervision Supporting Detail |
|---|

| | | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|---|
| Weekly Base Rate | | 3,150 | 2,650 | 2,400 | 2,400 | 3,150 | 3,150 | 3,000 | |
| Rate Adjustments | | 500 | | 350 | | | | | |
| Total Rates | | 3,650 | 2,650 | 2,750 | 2,400 | 3,150 | 3,150 | 3,000 | |
| % Deferred Compensation | | 50% | 50% | 50% | 50% | 50% | 50% | 50% | |
| Payroll Costs (Tico) | | 14% | 14% | 14% | 14% | 14% | 14% | 14% | |
| # of Supervisors | | 1 | | 6 | 24 | | | | |
| # of Weeks | | 5.0 | 5.0 | 5.0 | 2.0 | 5.0 | 5.0 | 5.0 | |
| | | | | | | | | | |
| **Travel Charges and Other Expenses** | | | | | | | | | |
| Initial Airfare | Initial- Travel | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| | | | | | | | | | |
| Travel Rate (25% of Base Rate) | | 900 | 760 | 680 | 680 | 900 | 900 | 860 | Travel Days |
| # of Travel Days | | 3 | 7 | 3 | 1 | 1 | 1 | 1 | 153.0 |
| Pro-rated Travel Rates | Weekly- Travel | 390 | 760 | 290 | 100 | 130 | 130 | 120 | |
| Car rent | Weekly- Travel | 175 | 175 | 175 | 175 | 175 | 175 | 175 | |
| >50 Miles | Weekly- Travel | 50 | 150 | 100 | 100 | 100 | 100 | 100 | |
| | | **615** | **1,085** | **565** | **375** | **405** | **405** | **395** | |
| | | | | | | | | | |
| Cell phone / Internet | Weekly- Other | 50 | 50 | 50 | 50 | 50 | 50 | 50 | |
| Miscellaneous | Weekly- Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | |
| | | **150** | **150** | **150** | **150** | **150** | **150** | **150** | |

## Hilco Merchant Resources
### Quiksilver, Inc.
### Exhibit B

| Supervision Expense Budget-Sale |
| --- |

| Supervision with Payroll Costs Include | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | Total USD |
|---|---|---|---|---|---|---|---|---|
| Base Rate | 88,749 | 61,047 | 405,710 | - | - | - | - | 555,506 |
| Deferred Compensation | 44,375 | 30,524 | 202,855 | - | - | - | - | 277,753 |
| Rate Adjustments (1) | 14,087 | - | 59,166 | - | - | - | - | 73,253 |
| Total Rates | 147,211 | 91,571 | 667,731 | - | - | - | - | 906,512 |
| | | | | | | | | |
| Travel Charges | 16,399 | 26,250 | 105,810 | - | - | - | - | 148,459 |
| Other Expenses | 3,707 | - | - | - | - | - | - | 3,707 |
| General Liability Insurance | | | | | | | | 12,368 |
| Total Expense | 167,317 | 117,821 | 773,541 | - | - | - | - | 1,071,046 |

Note: Supervision Expense will be managed in the aggregate.

| Supervision Supporting Detail |
| --- |

| | Lead Supervisor | Lead Supervisor-II | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|
| Weekly Base Rate | 3,150 | 3,150 | 2,400 | 2,400 | 3,150 | 3,150 | 3,000 | |
| Rate Adjustments | 500 | - | 350 | - | - | - | - | |
| Total Rates | 3,650 | 3,150 | 2,750 | 2,400 | 3,150 | 3,150 | 3,000 | |
| % Deferred Compensation | 50% | 50% | 50% | 0% | 50% | 50% | 50% | |
| Payroll Costs (Tico) | 14% | 14% | 14% | 14% | 14% | 14% | 14% | |
| # of Supervisors | 1 | 1 | 6 | | | | | |
| # of Weeks | 24.7 | 17.0 | 24.7 | 1.0 | 24.7 | 24.7 | 24.7 | |

**Travel Charges and Other Expenses**

| | | Lead Supervisor | Lead Supervisor-II | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|---|
| Initial Airfare | Initial- Travel | 1,200 | 5,000 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| | | | | | | | | | |
| Travel Rate (25% of Base Rate) | | 900 | 900 | 680 | 680 | 900 | 900 | 860 | Travel Days |
| # of Travel Days | | 3 | | 4 | 1 | 1 | 1 | 1 | 667.3 |
| Pro-rated Travel Rates | Weekly- Travel | 390 | 1,250 | 390 | 100 | 130 | 130 | 120 | |
| Car rent | Weekly- Travel | 175 | | 175 | 175 | 175 | 175 | 175 | |
| >50 Miles | Weekly- Travel | 50 | | 100 | 100 | 100 | 100 | 100 | |
| | | **615** | **1,250** | **665** | **375** | **405** | **405** | **395** | |
| | | | | | | | | | |
| Cell phone / Internet | Weekly- Other | 50 | | - | - | - | - | - | |
| Miscellaneous | Weekly- Other | 100 | | - | - | - | - | - | |
| | | **150** | **-** | **-** | **-** | **-** | **-** | **-** | |

# Hilco Merchant Resources
## Quiksilver, Inc.
### Exhibit B

| Supervision Expense Budget-Wind-Down |
|---|

| Supervision with Payroll Costs Include | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | Total USD |
|---|---|---|---|---|---|---|---|---|
| Base Rate | 25,137 | - | 82,080 | - | 28,728 | - | - | 135,945 |
| Deferred Compensation | 12,569 | - | 41,040 | - | 14,364 | - | - | 67,973 |
| Rate Adjustments (1) | 3,990 | - | 11,970 | - | - | - | - | 15,960 |
| Total Rates | 41,696 | - | 135,090 | - | 43,092 | - | - | 219,878 |
| | | | | | | | | |
| Travel Charges | 5,505 | - | 22,950 | - | 4,440 | - | - | 32,895 |
| Other Expenses | 1,050 | - | 4,500 | - | 1,200 | - | - | 6,750 |
| General Liability Insurance | | | | | | | | 4,013 |
| Total Expense | 48,251 | - | 162,540 | - | 48,732 | - | - | 263,536 |

Note: Supervision Expense will be managed in the aggregate.

| Supervision Supporting Detail |
|---|

| | | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|---|
| Weekly Base Rate | | 3,150 | 2,650 | 2,400 | 2,400 | 3,150 | 3,150 | 3,000 | |
| Rate Adjustments | | 500 | - | 350 | - | - | - | - | |
| Total Rates | | 3,650 | 2,650 | 2,750 | 2,400 | 3,150 | 3,150 | 3,000 | |
| % Deferred Compensation | | 50% | 50% | 50% | 0% | 50% | 50% | 50% | |
| Payroll Costs (Tico) | | 14% | 14% | 14% | 14% | 14% | 14% | 14% | |
| # of Supervisors | | 1 | | 5 | | 1 | | | |
| # of Weeks | | 7.0 | 6.0 | 6.0 | 1.0 | 8.0 | 6.0 | 6.0 | |
| | | | | | | | | | |
| **Travel Charges and Other Expenses** | | | | | | | | | |
| Initial Airfare | Initial- Travel | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| | | | | | | | | | |
| Travel Rate (25% of Base Rate) | | 900 | 760 | 680 | 680 | 900 | 900 | 860 | Travel Days |
| # of Travel Days | | 3 | 7 | 3 | 1 | 1 | 1 | 1 | 119.0 |
| Pro-rated Travel Rates | Weekly- Travel | 390 | 760 | 290 | 100 | 130 | 130 | 120 | |
| Car rent | Weekly- Travel | 175 | 175 | 175 | 175 | 175 | 175 | 175 | |
| >50 Miles | Weekly- Travel | 50 | 150 | 100 | 100 | 100 | 100 | 100 | |
| | | 615 | 1,085 | 565 | 375 | 405 | 405 | 395 | |
| | | | | | | | | | |
| Cell phone / Internet | Weekly- Other | 50 | 50 | 50 | 50 | 50 | 50 | 50 | |
| Miscellaneous | Weekly- Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | |
| | | 150 | 150 | 150 | 150 | 150 | 150 | 150 | |

# **EXHIBIT 3**

## **Sale Guidelines**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

In re:                           :     Chapter 11
                         :

QUIKSILVER, INC., *et al.*,     :     Case No. 15-11880 (___)
                         :

             Debtors.[1]     :     (Jointly Administered)
                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SALE GUIDELINES

The following procedures (the "Sale Guidelines") shall apply to the Sale[2] to be held at the locations (collectively the "Locations" and each, a "Location") subject to (1) the agreement (the "Store Closing Agreement") dated as of September 4, 2015, by and between QS Retail, Inc. (the "Merchant"), on the one hand, and Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Agent") and (2) the agreement (the "Pop Up Store Agreement," and together with the Store Closing Agreement, the "Agreements") dated as of June 8, 2015, by and between Merchant, on the one hand, and Agent, on the other hand:

1.      The Sale shall be conducted so that the Locations in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Locations.

2.      The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Location on a Sunday.

3.      On "shopping center" property, the Merchant or the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Location's premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Location is located; provided that the Merchant and the Agent may solicit customers in the Locations themselves. On "shopping center" property, the Merchant and the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Agreements (as defined herein).

4.      At the conclusion of the Sale, the Merchant shall vacate the Locations in broom clean condition, and shall leave the Locations in the same condition as on the applicable Sale Commencement Date, ordinary wear and tear excepted, <u>provided</u>, <u>however</u>, that the Agent and the Merchant hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Location.

5.      Subject to the entry of the final order granting the Motion[3]:  (i) the Agent and the Merchant may abandon any FF&E (as used in the Agreements) and Merchandise not sold in the Sale at the Locations at the earlier of the conclusion of the Sale or the applicable Sale Termination Date; (ii) any abandoned FF&E and Merchandise left in a Location after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.

6.      The Agent and the Merchant may advertise the sale as a "sale on everything", "everything must go", or similar themed sale.  The Agent and the Merchant may also advertise the sale as a "store closing" and have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.

7.      Agent and the Merchant shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; <u>provided</u>, <u>however</u>, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Agent and the Merchant shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Agent and the Merchant shall be permitted to utilize exterior banners at (i) non-enclosed mall Locations and (ii) enclosed mall Locations to the extent the entrance to the applicable Location does not require entry into the enclosed mall common area; <u>provided</u>, <u>however</u>, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Location, and shall not be wider than the storefront of the Location.  In addition, the Agent and the Merchant shall be permitted to utilize sign walkers in a safe and professional manner.  Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent and the Merchant any additional restrictions not contained in the applicable lease agreement.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Locations to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Agent and the Merchant shall not make any alterations to the storefront or exterior walls of any Locations.

---

[3]      As used herein, the "<u>Motion</u>" refers to the *Motion Pursuant to Bankruptcy Code Section 105, 363, and 365 and Bankruptcy Rules 6004 and 6006 (i) Authorizing the Debtors to assume the Agreements; (ii) Authorizing and Approving the Conduct of Store Closing or Similar Themed Sales, with Such Sales to be Free and Clear of all Liens, Claims and Encumbrances; (iii) Authorizing Customary Bonuses to Employees of Closing Business Locations; and (iv) Granting Related Relief*, filed in the above-captioned cases.

10.     The Agent and the Merchant shall not make any alterations to interior or exterior Location lighting.  No property of the landlord of a Location shall be removed or sold during the Sale.  The hanging of exterior banners or signage or banners in a Location shall not constitute an alteration to a Location.

11.     The Agent and the Merchant shall keep Location premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Store Closing Agreement, the Agent and the Merchant shall have the right to sell all FF&E.  The Agent and the Merchant may advertise the sale of the FF&E in a manner consistent with these guidelines at the Locations.  The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Location business hours.

13.     At the conclusion of the Sale at each Location, pending assumption or rejection of applicable leases, the landlords of the Locations shall have reasonable access to the Location's premises as set forth in the applicable leases.  The Agent, the Merchant and their agents and representatives shall continue to have exclusive and unfettered access to the Locations until the respective Locations are turned back to the landlord in a manner consistent with the rejection procedures approved by the Court.

14.     Postpetition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.

15.     The rights of landlords against Merchant for any damages to a Location shall be reserved in accordance with the provisions of the applicable lease.

16.     If and to the extent that the landlord of any Location affected hereby contends that the Agent or the Merchant are in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows: (i) Skadden, Arps, Slate, Meagher & Flom LLP, 300 South Grand Avenue, Suite 3400, Los Angeles, CA 90071 (Attn: Van Durrer, Esq.), van.durrer@skadden.com; (ii) Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Suite 2700, Chicago, IL 60606 (Attn: John K. Lyons, Esq.), john.lyons@skadden.com; and (ii) Hilco Merchant Resources, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062 (Attn: Ian Fredericks, Esq.), ifredericks@hilcoglobal.com.

## EXHIBIT 4

### Pop Up Stores

| Store # | Shopping Center | Address | City | ST | Zip Code | Space # |
|---|---|---|---|---|---|---|
| 510 | Westgate Center | 1600 Saratoga Ave | San Jose | CA | 95129 | 33 |
| 702 | Crow Canyon Commons | 3191M Crow Canyon Place | San Ramon | CA | 94583 | M |
| 703 | Ellisburg S/C | 1598 Kings Highway | Cherry Hill | NJ | 08034 | 24 |
| 704 | Crossroads S/C | 223 Skokie Valley Road | Highland Park | IL | 60035 | B003 |
| 705 | Finley Square S/C | 1524 Butterfield Road | Downers Grove | IL | 60515 | 12 |
| 706 | Lawrence Park S/C | 1991 Sproul Road | Broomall | PA | 19008 | 29 |
| 707 | Andorra S/C | 8500 Henry Ave | Philadelphia | PA | 19128 | 23 |
| 708 | Bristol Plaza | 622 Farmington Ave | Bristol | CT | 06010 | 5 |
| 709 | Pike 7 Plaza | 8397 Leesburg Pike | Vienna | VA | 22182 | 35 |
| 710 | Graham Park Plaza | 7285 Arlington Blvd. | Falls Church | VA | 22042 | 32B |
| 711 | Eastgate | 1800 East Franklin Street | Chapel Hill | NC | 27514 | 11B |
| 712 | 29th Place | 100 Shoppers World Court | Charlottesville | VA | 22901 | N020 |
| 714 | NewPark Mall | 2086 Newpark Mall | Newark | CA | 94560 | 2119 |
| 715 | Mt. Shasta Mall | 900 Dana Dr | Redding | CA | 96003 | A-52 |
| 716 | West Valley Mall | 3200 N Naglee Rd | Tracy | CA | 95304 | 100 |
| 717 | Spring Hill Mall | 1072 Spring Hill Mall | West Dundee | IL | 60118 | 1322 |
| 718 | Lakeland Square | 3800 US Hwy 98 N | Lakeland | FL | 33809 | 126 |
| 720 | Chesterfield Towne Center | 11500 Midlothian Turnpike | Chesterfield | VA | 23235 | 104 |

| Store # | Shopping Center | Address | City | ST | Zip Code | Space # |
|---|---|---|---|---|---|---|
| 721 | Clayton Valley Shopping Center | 5434 Ygnacio Valley Road | Concord | CA | 94521 | 30 |
| 722 | East Washington Place | 401 Kenilworth Drive | Petaluma | CA | 94952 | 310 |
| 723 | Bayhill Shopping Center | 851 Cherry Ave | San Bruno | CA | 94066 | 24 |
| 725 | El Cerrito Plaza | 3010 El Cerrito Plaza | El Cerrito | CA | 94530 | |
| 727 | Regency Square | 2526 W Brandon Blvd. | Brandon | FL | 33511 | 2526 |

2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                       :

In re:                       :     Chapter 11
                        :

QUIKSILVER, INC., *et al.*,       :     Case No. 15-11880 (\_\_\_)
                        :

         Debtors.[1]     :     (Jointly Administered)
                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   **Related Docket No. \_\_\_**

### FINAL ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 365, AND 554 AND BANKRUPTCY RULE 6004 (I) AUTHORIZING THE DEBTORS TO ASSUME THE AGREEMENTS; (II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE CLOSING OR SIMILAR THEMED SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND (III) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING BUSINESS LOCATIONS

Upon the motion (the "Motion")[2] of the Debtors for the entry of a final order (the "Final Order"), pursuant to Bankruptcy Code sections 105, 363, 365, and 554 and Bankruptcy Rule 6004; (i) authorizing the Debtors to assume (a) the agreement dated as of September 4, 2015, by and between QS Retail, Inc. ("QS Retail"), on the one hand, and Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Agent"), on the other hand (the "Store Closing Agreement"), a copy of which is attached as Exhibit 1 to this Final Order and (b) the agreement dated as of June 8, 2015 by and between QS Retail, on the one hand, and the Agent on the other hand (the "Pop Up Store Agreement," a copy of which is attached as Exhibit 2 to this Final Order, and together with the Store Closing Agreement, the "Agreements"); (ii) authorizing the Debtors to conduct (a) store closing sales (collectively, the "Store Closing Sales")

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

at the locations subject to the Store Closing Agreement (the "Closing Locations")[3] in accordance

with the terms or the sale guidelines (the "Sale Guidelines") attached as Exhibit 3 to this Final

Order, with such sales to be free and clear of all liens, claims, encumbrances, and interests

(collectively, the "Encumbrances") and (b) sales of certain merchandise (collectively, the "Pop

Up Sales," and together with the Store Closing Sales, the "Sales") at the locations subject to the

Pop Up Store Agreement (the "Pop Up Stores,"[4] and together with the Closing Locations, the

"Stores"), in accordance with the Sale Guidelines, with such sales to be free and clear of all

Encumbrances; (iii) authorizing, but not directing, the Debtors to pay customary retention

bonuses to the store-level and certain field employees at the Stores; (iv) authorizing the

protections and dispute resolution procedures contained in the Interim and Final Orders; and

(v) granting certain related relief; and the Court having reviewed the Motion and the

Declarations and having considered the statements of counsel and the evidence adduced with

respect to the Motion at the hearings before the Court on _____, 2015 and

_____, 2015 (the "Hearings"); the Court having found that (i) the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§  157(b) and 1334, (ii) venue is proper in

this District pursuant to 28 U.S.C. § 1409, (iii) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b), (iv) the notice of the Motion and the Hearings was sufficient under the circumstances,

and (v) there is good cause to waive the stay of Bankruptcy Rule 6004(h); and due and sufficient

notice of the Motion having been given under the particular circumstances and it appearing that

no other or further notice is necessary; after due deliberation determined that the relief requested

in the Motion is necessary and essential for the Debtors' reorganization and such relief is in the

best interests of the Debtors, their estates, their creditors, and other parties in interest; and upon

---

[3]    A list of Closing Locations is attached as Exhibit A to the Store Closing Agency Agreement.

[4]    A list of Pop Up Store is attached to as Exhibit 4 to this Final Order.

2

the record herein; and after due deliberation thereon; and good and sufficient cause have been shown; it is hereby:

**FOUND, CONCLUDED AND DETERMINED that:**[5]

A.    The Debtors have advanced sound business reasons for entering into the Agreements, as set forth in the Motion and at the Hearings, and entering into the Agreements is a reasonable exercise of the Debtors' business judgment and in the best interests of the Debtors and their estates.

B.    The conduct of the Sales will provide an efficient means for the Debtors to dispose of the Store Closure Assets.

C.    The Agreements were negotiated, proposed, and entered into by the Agent and the Debtors without collusion, in good faith and from arm's length bargaining positions.

D.    The assumption of the Agreements is a sound exercise of the Debtors' business judgment.

E.    The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

F.    The Sales are in the best interest of the Debtors' estates.

G.    The Debtors have represented that they are neither selling nor leasing personally identifiable information pursuant to the Motion, although the Agent will be authorized to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information.

---

[5]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

H.      The entry of this Final Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is hereby.

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED on a final basis as provided herein.

2.      The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.  The failure to include specifically any particular provision of the Agreements in this Final Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agreements and all of their provisions, payments and transactions, be and hereby are authorized and approved on a final basis.

3.      To the extent of any conflict between this Final Order, the Sale Guidelines, and the Agreements, the terms of this Final Order shall control over all other documents, and the Sale Guidelines shall control over the Agreements.

4.      Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall take effect immediately upon its entry.

**A.      Assumption Of The Agreements**

5.      The (i) Store Closing Agreement, a copy of which is attached to this Final Order as Exhibit 1, and (ii) Pop Up Store Agreement, a copy of which is attached to this Final Order as Exhibit 2, are hereby assumed pursuant to section 365 of the Bankruptcy Code.  Within five business days of entry of this Final Order, the Agent shall file a declaration of disinterestedness pursuant to Bankruptcy Rule 2014.  The Debtors are authorized to act and perform in accordance with the terms of the Agreements, including making payments required by the Agreements to the Agent without the need for any application of the Agent or a further order of the Court.  Within 30 days of the conclusion of the Sales process, the Debtors shall file a

summary report of such process that will include (a) total Stores closed, (b) gross revenue from Merchandise sold, (c) gross revenue from FF&E sold, (d) expenses reimbursed (including to the Agent), and (e) total amount of Store Closing Bonuses (as defined herein) paid to employees, provided that such disclosure will not include any confidential or personally identifiable information regarding any employees.  Notwithstanding this or any other provision of this Final Order, nothing shall prevent or be construed to prevent any of the Agent (individually, as part of a joint venture, or otherwise) or any of their affiliates from bidding on the Debtors' other assets pursuant to an agency agreement or otherwise, and Agent is hereby authorized to bid on and guarantee or otherwise acquire such assets notwithstanding anything to the contrary in the Bankruptcy Code or other applicable law, provided that such guarantee, transaction or acquisition is approved by separate order of this Court.

6.      Subject to the restrictions set forth in this Final Order and the Sale Guidelines, the Debtors and the Agent hereby are authorized to take any and all actions as may be necessary or desirable to implement the Agreements and the Sales; and each of the transactions contemplated by the Agreements, and any actions taken by the Debtors and the Agent necessary or desirable to implement the Agreements and/or the Sales prior to the date of this Final Order, hereby are approved and ratified.

**B.      Authority To Engage In Sales**

7.      The Debtors are authorized, pursuant to 105(a) and 363(b)(1) of the Bankruptcy Code, to continue and conduct Sales at the Stores in accordance with this Final Order, the Sale Guidelines and the Agreements.

8.      The Sale Guidelines are approved in their entireties.

9.      The Debtors are authorized to discontinue operations at the Stores in accordance with this Final Order and the Sale Guidelines.

10.     All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the Agreements or this Final Order hereby are directed to surrender possession of such Merchandise or FF&E to the Debtors or the Agent.

11.     Subject to the provisions herein in paragraphs 13, 15, 16, and 26, neither the Debtors nor the Agent nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in Bankruptcy Code section 101(27)), landlord, or licensor, to conduct the Sales and to take the related actions authorized herein.

## C.      Conduct Of The Sales

12.     All newspapers and other advertising media in which the Sales may be advertised and all landlords and licensors, as applicable, of the Stores are directed to accept this Final Order as binding authority so as to authorize the Debtors and the Agent to conduct the Sales and the sale of Merchandise and FF&E pursuant to the Agreements, including, without limitation, to conduct and advertise the sale of the Merchandise and FF&E in the manner contemplated by and in accordance with this Final Order, the Sale Guidelines, and the Agreements.

13.     Nothing in this Final Order or the Agreements releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Final Order.  Nothing contained in this Final Order or in the Agreements shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtors to comply with environmental laws consistent with

their rights and obligations as debtors in possession under the Bankruptcy Code. Nothing herein shall be construed to be a determination that the Agent is an operator with respect to any environmental law or regulation. Moreover, the sale of the Merchandise and FF&E shall not be exempt from, and the Agent shall be required to comply with, laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws"). Nothing in this Final Order shall alter or affect the Debtors' and Agent's obligations to comply with all applicable federal safety laws and regulations. Nothing in this Final Order shall be deemed to bar any Governmental Unit from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' or the Agent's right to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Final Order, or otherwise, pursuant to Paragraph 26 hereunder. Notwithstanding any other provision in this Final Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Final Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Final Order shall be deemed to have made any rulings on any such issues.

14.    Except to the extent of the reserved rights of Governmental Units expressly granted elsewhere in this Final Order, during the Sales, the Debtors and Agent are hereby authorized to take such actions as may be necessary and appropriate to implement the Agreements and to conduct the sale without necessity of further order of this Court as provided in the Agreements or the Sale Guidelines, including, but not limited to, advertising the sale as a

"store closing sale", "sale on everything", "everything must go", or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall Stores, and at enclosed mall Stores to the extent the applicable Stores entrance does not require entry into the enclosed mall common area), use of signwalkers and street signage.

15.    Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise and FF&E, to the extent that disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners or other advertising and the Debtors and the Agent are unable to resolve the matter consensually with a Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled no later than the earlier of two business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

16.    Except as expressly provided in the Agreements, the sale of the Merchandise and FF&E shall be conducted by the Debtors and the Agent notwithstanding any restrictive provision of any lease, sublease, license or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sales, the rejection of leases or licenses, abandonment of assets, or "going dark" provisions. The Agent, along with landlords and licensors, as applicable, of the Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Agent and any such landlords or licensors, as applicable, of the Stores, provided that nothing in such Side Letters affects the provisions of

Paragraphs 13, 15, 16 and 26 of this Final Order.  In the event of any conflict between the Sale

Guidelines and any Side Letter, the terms of such Side Letter shall control.

       17.    Except as expressly provided for herein or in the Sale Guidelines, and

except with respect to any Governmental Unit (as to which Paragraphs 13, 15, 16 and 26 of this

Final Order shall apply), no person or entity, including, but not limited to, any landlord, licensor,

service providers, utilities, and creditor, shall take any action to directly or indirectly prevent,

interfere with, or otherwise hinder consummation of the Sales or the sale of Merchandise or

FF&E, or the advertising and promotion (including the posting of signs and exterior banners or

the use of signwalkers) of such sales, and all such parties and persons of every nature and

description, including, but  not limited to, any landlord, licensor, service providers, utilities, and

creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (i)

interfering in any way with, obstructing, or otherwise impeding, the conduct of the Sales and/or

(ii) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or

administrative body seeking an order or judgment against, among others, the Debtors, the Agent,

or the landlords or licensors, as applicable, at the Stores that might in any way directly or

indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales or sale

of the Merchandise or FF&E or other liquidation sales at the Stores and/or seek to recover

damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract

based upon any relief authorized herein.

       18.    In accordance with and subject to the terms and conditions of the

Agreements, the Agent shall have the right to use the Stores and all related Store services,

furniture, fixtures, equipment and other assets of the Debtors for the purpose of conducting the

Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Final Order and subject to Paragraphs 13, 15, 16 and 26 of this Final Order.

19.    The Agent shall accept the Debtors' validly-issued Gift Cards (as defined in the Customer Programs Motion[6]) that were issued by the Debtors prior to the applicable Sale Commencement Date (as defined in the Agreements) in accordance with the Debtors' Gift Card policies and procedures as they existed on the Petition Date, as described in the Customer Programs Motion, and accept returns of merchandise sold by the Debtors prior to the applicable Sale Commencement Date, provided that such return is otherwise in compliance with the Refund and Exchange Program (as defined in the Customer Programs Motion) as they existed on the Petition Date, as described in the Customer Programs Motion.

20.    All sales of Store Closure Assets shall be "as is" and final.  However, as to the Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."  Further, as to the Stores only, the Debtors and/or the Agent shall accept return of any goods purchased during the Sales that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within seven days of purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.  Signs stating that "[r]efunds may be made only for merchandise having a latent defect, when returned with a receipt within 7 days of purchase" will be posted at the cash register areas of the Stores. Returns, if permitted, related to the purchase of Store Closure Assets shall not be accepted at

---

[6]    As used herein, the "Customer Programs Motion" shall mean the *Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and Bankruptcy Rules 6003 and 6004 Authorizing the Debtors to (I) Maintain Customer Programs and (II) Honor or Pay Related Prepetition Obligations*, filed concurrently herewith.

stores that are not participating in the Sales, except in the situation where a customer experiences a latent defect and returns the Merchandise within the seven day time period and provides information that the point of purchase store has closed in the meantime.  Information on stores remaining open will be maintained on the Debtors' website through the end of the Sales.

21.    The Agent shall not be liable for sales taxes except as expressly provided in the Agreements and the payment of any and all sales taxes is the responsibility of the Debtors. The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due, provided that in the case of a bona fide dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  The Agent shall collect, remit to the Debtors and account for sales taxes as and to the extent provided in the Agreements.  This Final Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

22.    Pursuant to section 363(f) of the Bankruptcy Code, the Agent, on behalf of the Debtors, is authorized to sell and all sales of Merchandise or FF&E (each as defined in the Agreements) pursuant to the Sales, whether by the Agent or the Debtors, shall be free and clear of any and all Encumbrances; provided, however, that any such Encumbrances shall attach to the proceeds of the Sales with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Merchandise

11

and FF&E, subject to any claims and defenses that the Debtors may possess with respect thereto and the Agent's fees and expenses (as provided in the Agreements).

23.     To the extent that the Debtors propose to sell or abandon FF&E which may contain personal and/or confidential information about the Debtors' employees and/or customers (the "Confidential Information"), the Debtors shall remove the Confidential Information from such items of FF&E before such sale or abandonment.

24.     The Debtors and/or the Agent (as the case may be) are authorized and empowered to transfer Merchandise and FF&E among the Stores.  The Agent is authorized to sell the Debtors' FF&E and abandon the same, in each case, as provided for and in accordance with the terms of the Agreements.

**D.     Dispute Resolution Procedures With Governmental Units**

25.     To the extent that the sale of Merchandise or FF&E is subject to any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws (each a "GOB Law," and collectively, the "GOB Laws"), including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of the Store Closure Assets (collectively, including the GOB Laws, the "Liquidation Sale Laws"), the dispute resolution procedures in this section shall apply.

26.     Provided that the Sales and the sale of Merchandise and FF&E are conducted in accordance with the terms of this Final Order, the Agreements and the Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance

12

with any Liquidation Sale Laws and, subject to Paragraphs 13, 15, 16 and 25 herein, are

authorized to conduct the Sales in accordance with the terms of this Final Order and the Sale

Guidelines without the necessity of further showing compliance with any such Liquidation Sale

Laws.  However, to the extent there is a dispute arising from or relating to the Sales, this Final

Order, the Agreements, or the Sale Guidelines, which dispute relates to any Liquidation Sale

Laws (a "Reserved Dispute"), the following procedures shall apply:

> a.  Except as otherwise provided in paragraph 15, the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.  Any time within 14 days following service of this Final Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute on the following parties so as to ensure delivery thereof within 1 business day thereafter:  (i) Skadden, Arps, Slate, Meagher & Flom LLP, 300 South Grand Avenue, Suite 3400, Los Angeles, CA 90071 (Attn: Van Durrer), van.durrer@skadden.com; (ii) Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Suite 2700, Chicago, IL 60606 (Attn: John K. Lyons), john.lyons@skadden.com; and (ii) Hilco Merchant Resources, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062 (Attn: Ian Fredericks), ifredericks@hilcoglobal.com.
>
> b.  If the Debtors, the Agent and the Governmental Unit are unable to resolve the Reserved Dispute within 14 days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "Dispute Resolution Motion").
>
> c.  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Final Order or to limit or interfere with the Debtors' or the Agent's ability to conduct or to continue to conduct the Sales pursuant to this Final Order and the Agreements, absent further order of this Court.

27.  Within three business days of entry of this Final Order, the Debtors shall

serve copies of this Final Order, the Agreements and the Sale Guidelines via e-mail, facsimile or

regular mail, on:  (i) the Attorney General's office for each state where the Sales are being held,

(ii)  the county consumer protection agency or similar agency for each county where the Sales

are being held, (iii) the division of consumer protection for each state where the Sales are being

held; (iv) the chief legal counsel for the local jurisdiction; (v) the Debtors' landlords of the

Closing Stores, and (vi) the licensors of the Pop Up Stores.

**E.      Store Closing Bonuses**

        28.      The Debtors shall have the authority, but not the obligation, to pay store

closing bonuses (the "Store Closing Bonuses") to store-level and certain field employees who

remain in the employ of the Debtors during the Sales. The Debtors shall have the authority to

determine the individual amounts of each Store Closing Bonus, except that the total aggregate

cost of the Store Closing Bonus program will not exceed 10% of the base payroll, including

taxes and typical benefits, for all employees working at the Stores.

**F.      Section 363(m)**

        29.      The Agent shall be afforded the protections of section 363(m) of the

Bankruptcy Code as to all aspects of the transactions under and pursuant to the Agreements if

this Final Order or any authorization contained herein is reversed or modified on appeal.

**G.      Other Provisions.**

        30.      Notwithstanding anything to the contrary contained herein, the relief

granted in this Final Order  and any payment to be made hereunder shall be subject to the terms

of any orders approving entry into debtor in possession financing and authorizing the use of cash

collateral approved by this Court in these Chapter 11 Cases (including with respect to any

budgets or other covenants governing or relating to such debtor in possession financing and/or

use of cash collateral), and to the extent there is any inconsistency between the terms of such

orders and any action taken or proposed to be taken hereunder, the terms of such orders shall

control.

31.    Except with respect to the Agreements, nothing in this Final Order or the Motion shall be deemed to constitute postpetition assumption or adoption of any agreement under Bankruptcy Code section 365.

32.    The Agreements and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court.

33.    The Agent shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Agent, in each case, other than as expressly provided for in the Agreements.

34.    Except with respect to any Governmental Unit (as to which the provisions of Paragraphs 13, 15, 16 and 26 of this Final Order shall apply), this Court shall retain exclusive jurisdiction with regard to all issues or disputes arising from or relating to the implementation, interpretation, or enforcement of this Final Order or the Agreements, including, but not limited to, (i) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and signwalker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtors, the landlords, the licensors and/or the Agent for protection from interference with the Sales, (iii) any other disputes related to the Sales, and (iv) to protect the Debtors and/or the Agent against any assertions of Encumbrances.  No such parties or person shall take any action against the Debtors, the Agent, the landlords, the licensors, or the Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated:  Wilmington, Delaware

       _____, 2015

                             _____

                             UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 1

**Store Closing Agreement**

 

September 4, 2015

*VIA EMAIL*
QS RETAIL, INC.
Attn: General Counsel
5600 Argosy Ave. Bldg 100
Huntington Beach, Ca 92649
Phone: (714) 889-2200

Re:    **<u>Letter Agreement Governing Inventory Disposition</u>**

Dear Steve:

      This letter shall serve as an agreement ("<u>Agreement</u>") between Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, on the one hand (collectively, "<u>Agent</u>" or a "<u>Party</u>"), and QS RETAIL, Inc., on the other hand ("<u>Merchant</u>" or a "<u>Party</u>" and together with the Agent, the "<u>Parties</u>"), under which Agent shall act as the exclusive agent for the purpose of conducting a "store closing" or other mutually agreed upon sale at Merchant's retail stores identified on <u>Exhibit A</u> (each a "<u>Store</u>" and collectively, the "<u>Stores</u>") in the United States (the "<u>Sale</u>").

**A.**      **Intentionally Left Blank.**

**B.**      **<u>Sale Term</u>**

      For each Store, the Sale shall commence on September 6, 2015 (the "<u>Sale Commencement Date</u>") and conclude on respective dates to be mutually agreed to by Agent and Merchant; <u>provided however</u>, that the Sale shall conclude at all Stores no later than December 31, 2015(the "<u>Sale Termination Date</u>"). The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "<u>Sale Term</u>."

**C.**      **<u>Project Management</u>**

      (i)      <u>Agent's Undertakings</u>

      Agent shall, in collaboration with Merchant, (a) provide qualified supervisors (the "<u>Supervisors</u>") engaged by Agent to oversee the management of the Stores; (b) determine appropriate point-of-sale and internal and external advertising strategies for the Stores, recommend and assist Merchant with advertising, and create signage for the Stores, all at Merchant's cost and expense and approved in advance by Merchant; (c) determine appropriate discounts of Merchandise (as defined below) approved in advance by Merchant; (d) recommend staffing levels for the Stores and appropriate bonus and incentive programs, if any, for the Stores' employees; (e) oversee display of Merchandise for the Stores; (f) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (g) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (h) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (i) provide support in

obtaining appropriate authorization and permits to conduct the Sale from state and local authorities (if applicable) by (i) advising Merchant of the applicable waiting period under such laws, and/or (ii) preparing (in Merchant's name and for Merchant's signature) all permitting paperwork as may be necessary under such laws, delivering all such paperwork to Merchant, and filing on behalf of Merchant, all such paperwork where necessary, and/or (iii) advising Merchant where permitting paperwork and/or waiting periods do not apply; (j) assist Merchant in creating a customer transition program to transition customers from the Stores to Merchant's other retail channels; and (k) provide such other related services deemed necessary or appropriate by Merchant and Agent.

At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant in broom clean condition; provided, however, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Agent and Merchant. At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

(ii)    Merchant's Undertakings

During the Sale Term, Merchant shall (at no cost or expense to Agent): (a) be the employer of the Stores' employees (other than the Supervisors) or, to the extent Merchant elects, utilize the services of a third party employment agency recommended by Agent, for purposes of engaging temporary staff for the Stores; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees (other than the Supervisors) and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Agent to be necessary or desirable for the operation of the Stores during the Sale; (g) provide, and arrange for the ordinary maintenance of, all point-of-sale and all other Store-level equipment required for the Stores; (h) ensure that Agent has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement; and (i) identify the Merchandise for the Sale, with Agent's assistance allocate and balance the Merchandise among the Stores, and ship and distribute the Merchandise to the Stores.

To assist with the Sale, Merchant shall provide throughout the Sale Term (at no cost or expense to Agent) central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Agent.

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

2

**D.**     **The Sale**

All sales of Merchandise shall be made on behalf of Merchant.  Agent does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, or credit card, and shall be "final" with no returns accepted or allowed, except as authorized by Merchant.

**E.**     **Agent Fee and Expenses in Connection with the Sale**

As used in this Agreement, the following terms shall have the following meanings:

(i)     "Gross Proceeds" shall mean the sum of (i) the gross proceeds of all sales of Merchandise made in the Store during the Sale Term, net only of sales taxes.

(ii)     "Merchandise" shall mean all merchandise sold in the Store during the Sale Term comprised of such merchandise in the Stores as of the Sale Commencement Date, plus such other merchandise included in the Stores during the Sale Term; subject in the case of such other merchandise to: (a) Agent's and Merchant's mutual agreement of the composition of such merchandise and the timing of receipt in the Stores, (b) compliance with applicable law, and (c) Agent's and Merchant's subsequent mutual agreement of such other adjustments (if any) to provisions of this Agreement as may be required to reflect the inclusion of such other merchandise in the Sale as Merchandise.

(iii)     "Recovery Percentage" shall mean the Gross Proceeds divided by the Cost Value of the Merchandise.

(iv)     "Cost Value" with respect to each item of Merchandise shall be determined with reference to the Merchant's books and records maintained in the ordinary course consistent with past periods and practices.

Merchant shall pay Agent an "Incentive Fee" of <u>one</u> of the following (e.g., back to first dollar) based upon the following "Recovery Performance hurdles/Incentive Fee" formulations:

| Recovery Percentage | Agent Incentive Fee |
|---------------------|---------------------|
| Less than 155.00%   | 1.00% of Gross Proceeds |
| 155.00% - 159.99%   | 1.50% of Gross Proceeds |
| 160.00% - 169.99%   | 1.75% of Gross Proceeds |
| 170.00% and Above   | 2.00% of Gross Proceeds |

On a weekly basis as part of the weekly reconciliations contemplated below, Merchant shall pay Agent an advance on account of the Incentive Fee in the amount of 1.00% of Gross Proceeds for the prior week (or partial week in the case of the first and last weeks).  The Recovery Percentage shall be determined in connection with the Final Reconciliation, and once determined, the parties (as part of the Final Reconciliation) shall determine the actual amount of the Incentive Fee.  Merchant shall pay Agent any remaining balance due on account of the Incentive Fee (if any) in

connection with the Final Reconciliation, and, with Agent's consent, Merchant may offset against such remaining balance amounts (if any) Agent owes to Merchant.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's reasonable, documented and preapproved out of pocket expenses.   To control expenses of the Sale, Merchant and Agent have established a budget (the "Expense Budget") of certain delineated expenses within the control of Agent, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation), advertising costs, and Agent's legal and miscellaneous expenses.   The Expense Budget for the Sale shall be (i) $98,400 for the first week of the Sale (covering for example start-up expenses, initial signage and supervision travel); and (ii) $31,550 per week thereafter (covering for example weekly supervision compensation/deferred compensation and fees, advertising, and miscellaneous expenses, including without limitation Agent's reasonable and documented legal expenses associated with a bankruptcy filing).   The Expense Budget does not include costs, and instead reflects cost savings, associated with supervision because Agent and Merchant have agreed to utilize "Supervisors" (as defined in certain letter agreement dated June 4, 2015 by and among the Agent and Merchant (the "Pop Up Stores Agreement")) associated with the "pop up stores" as Supervisors for the Stores in addition to such Supervisors' responsibilities under the Pop Up Stores Agreement.   The Expense Budget shall be increased if the "Supervisors" under the Pop Stores Agreement are not utilized in connection with the Sale to take into account additional costs of supervision that will be necessary for Agent to perform its responsibilities under this Agreement and properly conduct the Sale.   The Expense Budget may only be modified by mutual agreement of Agent and Merchant.   Merchant shall have no responsibility for costs and expenses in excess of the Expense Budget, unless Agent has obtained Merchant's prior written (including email) consent pursuant to an amendment to the Expense Budget.

All accounting matters (including, without limitation, all fees, expenses, advances, or other amounts reimbursable or payable to Agent) shall be reconciled by mutual agreement of Agent and Merchant on every Wednesday for the prior week and, unless disputed by either Party, shall be paid within seven (7) days after each such weekly reconciliation. The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) ("Final Reconciliation") no later than forty five (45) days following the Sale Termination Date for the last Store.

**F.**     **Indemnification**

   (i)     Merchant's Indemnification

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,   principals, affiliates, and Supervisors (collectively, "Agent Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) product liability claims, except claims arising from Agent's negligence, willful misconduct or unlawful behavior, (d) claims asserted by any Store

4

employees employed by Merchant (under a collective bargaining agreement or otherwise), relating to such employment against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Merchant or any of the Merchant Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

(ii)     Agent's Indemnification

Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC shall, jointly and severally, indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,  principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by an Agent Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement.

## G.     Insurance

(i)     Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause Agent to be named an additional insured with respect to all such policies.  At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and that Agent is an additional insured thereunder.  In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

(ii)     Agent's Insurance Obligations

As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Stores.  Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a

certificate or certificates evidencing the insurance coverage required hereunder.  In addition, Agent shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements.  Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

(iii)    Certain Agreements

Notwithstanding any other provision of this Agreement, Merchant and Agent agree that Agent shall not be deemed to be in possession or control of the Stores, or the Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores.

**H.    Representations, Warranties, Covenants and Agreements**

(i)    Merchant warrants, represents, covenants and agrees that (a) Merchant is a corporation duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein (other than as set forth in Section A), (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; and (d) to the extent within the control of Merchant, the Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

(ii)    Agent warrants, represents, covenants and agrees that (a) each entity comprising Agent is a limited liability company duly organized, validly existing and in good standing under the laws of state of the Delaware, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Stores will be conducted without Merchant's prior written consent, (e) Agent will not take any disciplinary action against any employee of Merchant.

**I.    Furniture, Fixtures and Equipment**

Agent shall sell the FF&E in each such Store from the Store themselves.  Agent shall dispose of any unsold FF&E at the conclusion of the Sale in a manner to be approved by Merchant; provided however, that at Agent's election, Agent shall have the right to abandon in-place in a neat

and orderly manner, all unsold FF&E (and all FF&E that Merchant requested that Agent not sell). Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale or other disposition of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties.

In consideration for providing the services set forth in this Section I, Agent shall be entitled to a commission from the sale of the FF&E equal to twenty percent (20%) of the gross proceeds (net only of sales taxes to the extent applicable) of the sale of the FF&E.

Agent shall remit to Merchant all such gross proceeds, and during each weekly reconciliation described in Section E above, Agent's FF&E fee shall be calculated, and Agent's calculated and agreed upon FF&E fee and all FF&E costs and expenses then incurred within an agreed upon budget shall paid within seven (7) days after each such weekly reconciliation.

**J.**     <u>Termination</u>

The following shall constitute "Termination Events" hereunder:

(a)     Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured five (5) days after receipt of written notice thereof to the defaulting Party; or

(b)     The failure of any representation or warranty made by Merchant or Agent to be true in any material respect as of the date made or at any time and throughout the Sale Term, which failure shall continue uncured five (5) days after receipt of written notice thereof to the defaulting Party.

If a Termination Event occurs, the non-defaulting Party may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in addition to terminating this Agreement, pursue any and all rights and remedies and damages resulting from such default; provided, that in no event shall either Party be liable to the other for any punitive, exemplary, consequential, incidental, indirect or special damages, including, without limitation, lost profits. If this Agreement is terminated other than as a result of a default by Agent, Merchant shall be obligated to pay Agent all amounts due under this Agreement through and including the termination date.

**K.**     <u>Notices</u>

All notices, certificates, approvals, and payments provided for herein shall be sent by fax or by recognized overnight delivery service as follows: (a) To Merchant: Quiksilver, Inc., 5600 Argosy Circle, #100, Huntington Beach, CA 92649, Attn: Retail Department; with a copy to: Legal Department; (b) To Agent: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax: 847- 897-0859, Attn: Ian S. Fredericks; and c/o Gordon Brothers Retail Partners, LLC, 800 Boylston Street, 27th Floor, Boston, MA 02199, Fax: 617-531-7906, Attention, Michael Chartock; or (c) such other address as may be designated in writing by Merchant or Agent.

**L.      Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect.  No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement.  Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**M.      Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party; provided that either Party may assign this Agreement without the consent of the other Party in the event of a merger, reorganization, consolidation or other change in control transaction, or in connection with the sale of all or substantially all of such Party's assets.  No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

**N.      Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.  If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**O.      Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of California (without reference to the conflicts of laws provisions therein).  Any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Orange County, California courts and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.  If either Party commences any legal action, suit or proceeding to enforce or interpret this Agreement or any of the terms or provisions hereof, then in addition to any damages or remedies that may be awarded to the prevailing party therein, the prevailing party will be entitled to have and recover from the losing

party the prevailing party's reasonable outside attorneys' fees and costs incurred in connection therewith.

If Merchant commences a case under Chapter 11 of Bankruptcy Code with a bankruptcy court (the "Bankruptcy Court"), Merchant shall promptly file a motion to assume both this Agreement and the Pop Up Store Agreement under section 365 of the Bankruptcy Code, and utilize its best efforts to ensure that such motion is approved by an order, in form and substance reasonably acceptable to the Agent and Merchant, that provides, among other things, as follows: (i) the payment of all fees and reimbursement of expenses hereunder and under the Pop Up Store Agreement to Agent is approved without further order of the court and shall be free and clear of all liens, claims and encumbrances; (ii) all such payments of fees and reimbursement of expenses shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement and the Pop Up Store Agreement (as the case may be); (iii) approval of the transaction contemplated hereby and by the Pop Up Store Agreement; (iv) authorizing the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale; (v) authorizing the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; and (vi) take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement. In such event, then notwithstanding the provisions of the second sentence of the first paragraph of this Section O, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over Merchant, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens.

**P.   Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, and, the Pop Up Stores Agreement, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof. No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement. Except with respect to the Pop Up Stores Agreement, all prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**Q.   Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

*          *          *

9

If ▨▨ Agreement is acceptable to ▨▨▨ ▨▨▨ execute a ▨▨▨ in ▨▨ ▨▨▨ provided, ▨▨ ▨▨▨▨ a countersigned version to ▨▨ undersigned. ▨▨▨ ▨▨ ▨▨▨ opportunity -- we ▨▨ forward to working ▨▨▨ ▨▨▨.

▨▨▨ ▨▨▨ ▨▨▨

▨▨▨ MERCHANT ▨▨OURCES, ▨▨▨

By: ▨ S. Fredericks
Its: ▨▨▨ & ▨▨▨

GORDON BROTHERS RETAIL PARTNERS, ▨▨▨

By: ▨▨▨ ▨ Gronkopf
▨▨ Co-President

**AGREED** ▨▨▨ **ACCEPTED as of** ▨▨ ▨▨ ▨▨
**of September,** ▨▨▨▨

QS RETAIL, ▨▨▨

By:
▨▨▨

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: _____
Its:

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Its:

**AGREED AND ACCEPTED as of the** 4th **day of September, 2015:**

QS RETAIL, INC.

By: _____   Lindsay Caya
Its:   President

11



Exhibit A

| Store # | Brand | Store Name | City | State | Sq Ft | Property Management Co. |
|---|---|---|---|---|---|---|
| 27 | QS | QUIKSILVER- UNIVERSAL CITYWALK | Universal City | CA | 2493 | Universal City Walk |
| 29 | QS | QUIKSILVER - SOUTH COAST PLAZA | Costa Mesa | CA | 2167 | South Coast Plaza |
| 50 | QS | QUIKSILVER - TIMES SQUARE | New York | NY | 3033 | Rudin Management Company, Inc. |
| 58 | QS | QUIKSILVER - HOLLYWOOD, FL | Hollywood | FL | 3040 | Seminole Properties Retail |
| 103 | DC | DC - IRVINE SPECTRUM | Irvine | CA | 2305 | The Irvine Company |
| 111 | QS | QUIKSILVER – SEATTLE | Seattle | WA | 6187 | First & Lenora LLC |
| 114 | RX | ROXY - FASHION ISLAND | Newport Beach | CA | 1386 | The Irvine Company |
| 119 | TRI | QUIKSILVER - DEL AMO | Torrance | CA | 5,820 | |
| 120 | WA | WATERMAN - WAIKIKI BEACH WALK | Honolulu | HI | 1,261 | |
| 123 | TRI | QUIKSILVER GLENDALE | Glendale | CA | 2997 | |
| 124 | BR | BOARDRIDERS MEATPACKING | New York | NY | 4262 | |
| 125 | BR | BOARDRIDERS PASADENA | Pasadena | CA | 5000 | |
| 834 | QS | QUIKSILVER OUTLET – LAKEWOOD | Lakewood | CO | 2500 | Simon Property Group |
| 838 | DC | DC OUTLET - PISMO | Pismo Beach | CA | 2405 | Simon Property Group |
| 850 | DC | DC OUTLET - EL PASO | Canutillo | TX | 2625 | Horizon Group Properties |
| 852 | DC | DC OUTLET – GILROY | Gilroy | CA | 2722 | Simon Property Group |
| 859 | DC | DC OUTLET – LAUGHLIN | Laughlin | NV | 2624 | |
| 861 | DC | DC OUTLET - DOLPHIN MALL | Miami | FL | 3052 | Taubman |
| 865 | DC | DC OUTLET - KATY MILLS | Katy | TX | 2050 | Simon Property Group |
| 869 | TRI | QUIKSILVER OUTLET – MIROMAR | Estero | FL | 2270 | Miromar Outlets |
| 872 | TRI | QUIKSILVER OUTLET – CHICAGO | Rosemont | IL | 4000 | Macerich |
| 874 | TRI | QUIKSILVER OUTLET - SILVER SANDS | Destin | FL | 3000 | Silver Sands GL I, LLC |
| 876 | TRI | QUIKSILVER OUTLET - GREAT LAKES | Auburn Hills | MI | 5576 | Taubman Management |
| 879 | QS | QUIKSILVER OUTLET – ANNAPOLIS | Annapolis | MD | 3500 | Westfield Shoppingtown-Annapolis Mall, Owner LLC |
| 883 | QS | QUIKSILVER OUTLET - CHARLOTTE | Charlotte | NC | 2944 | |
| 885 | TRI | QUIKSILVER OUTLET - WOODBURY COMMONS | Central Valley | NY | 5000 | |
| 887 | TRI | QUIKSILVER OUTLET - NORTH GEORGIA PREMIUM OUTLETS | Dawsonville | GA | 4262 | |

**EXHIBIT 2**

**Pop Up Store Agreement**

 

June 8, 2015

<u>***VIA EMAIL***</u>
QS RETAIL, INC.
Attn:  Steve Finney
5600 Argosy Ave. Bldg 100
Huntington Beach, Ca 92649
Phone:  (714) 889-2336
Email: steve.finney@quiksilver.com

Re:    **Letter Agreement Governing Inventory Disposition**

Dear Steve:

This letter shall serve as an agreement ("<u>Agreement</u>") between Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, on the one hand (collectively, "<u>Agent</u>" or a "<u>Party</u>"), and QS RETAIL, Inc., on the other hand ("<u>Merchant</u>" or a "<u>Party</u>" and together with the Agent, the "<u>Parties</u>"), under which Agent shall act as the exclusive agent for the purpose of conducting a sale of certain Merchandise (as defined below) through a "pop up" store program (each a "<u>Pop Up Store</u>" and collectively, the "<u>Pop Up Stores</u>") in the United States utilizing sale handles agreed upon by the Parties (the "<u>Sale</u>").

**A.    <u>Merchandise</u>**

For purposes hereof, "<u>Merchandise</u>" shall mean all excess, clearance, obsolete, or distressed inventory described on <u>Exhibit A</u> attached hereto, but only to the extent that Merchant obtains the necessary approvals and clearances to import such inventory into the United States, and such other goods as Merchant and Agent may agree to include in the Sale from time to time.  "Merchandise" does not mean and shall not include: (1) goods that belong to sublessees, licensees or concessionaires of Merchant; (2) furnishings, trade fixtures, equipment and improvements to real property that are located in the Pop Up Stores (collectively, "<u>FF&E</u>"); or (3) damaged or defective merchandise that cannot be sold.

**B.    <u>Sale Term</u>**

For each Store, the Sale shall commence on July 1, 2015 (the "<u>Sale Commencement Date</u>") and conclude the earlier of (a) January 31, 2016 or (b) the date that the Sale is completed (the "<u>Sale Termination Date</u>"); <u>provided</u>, <u>however,</u> that the Parties may mutually agree in writing to extend or terminate the Sale at any Store prior to the Sale Termination Date.  The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "<u>Sale Term</u>."

**C.    <u>Project Management</u>**

(i)    <u>Agent's Undertakings</u>

Agent shall, in collaboration with Merchant, (a) together with Agent's affiliate, Hilco Real Estate, LLC, assist Merchant with identifying a minimum of fifteen suitable locations for the Pop

Up Stores; provided, that it is the Parties intent to operate approximately thirty Pop Up Stores; (b) provide qualified supervisors (the "<u>Supervisors</u>") engaged by Agent to oversee the management of the Pop Up Stores; (c) determine appropriate point-of-sale and internal and external advertising strategies for the Pop Up Stores and recommend and assist Merchant with advertising and signage for the Pop Up Stores, all at Merchant's cost and expense and approved in advance by Merchant; (d) determine appropriate discounts of Merchandise approved in advance by Merchant; (e) assist Merchant in procuring employees to be employed by Merchant or a third party staffing company recommended by Agent; (f) recommend staffing levels for the Pop Up Stores and appropriate bonus and incentive programs, if any, for the Pop Up Stores' employees; (g) oversee display of Merchandise for the Pop Up Stores; (h) assist in procuring FF&E for the Pop Up Stores; (i) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (j) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (k) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (l) provide support in obtaining appropriate authorization and permits to conduct the Sale from state and local authorities (if applicable); (m) assist Merchant in creating a customer transition program to transition customers from the Pop Up Stores to Merchant's other retail channels; (n) provide such other related services deemed necessary or appropriate by Merchant and Agent; and (o) at an agreed upon time prior to the end of the Sale Term at each Pop Up Store, conduct a "sale on everything", "everything on sale", "store closing" or similar themed sale event (but not a "going out of business" or similar event sale) and sell all Merchandise to the piece, and if Merchant requests, the FF&E pursuant to Section I.

At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant in broom clean condition and in accordance with the lease requirements for such premises; provided, however, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Agent and Merchant.  At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

(ii)    <u>Merchant's Undertakings</u>

During the Sale Term, Merchant shall (a) be the employer of the Pop Up Stores' employees (other than the Supervisors) or, to the extent Merchant elects, utilize the services of a third party employment agency recommended by Agent, for purposes of engaging temporary staff for the Pop Up Stores; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Pop Up Stores, the Pop Up Stores' employees (other than the Supervisors) and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Pop Up Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Agent to be necessary or desirable for the operation of the Pop Up Stores during the Sale; provided, that Merchant shall have the right to approve the terms and conditions of each lease with respect to a Pop Up Store in its sole discretion;

2

(g) provide, and arrange for the ordinary maintenance of, all point-of-sale equipment required for the Pop Up Stores; (h) with Agent's assistance, and subject to the lease for each Pop Up Store, ensure that Agent has quiet use and enjoyment of the Pop Up Stores for the Sale Term in order to perform its obligations under this Agreement; (i) with Agent's assistance, provide or procure FF&E for the Pop Up Stores; (j) identify the Merchandise for the Sale, with Agent's assistance allocate and balance the Merchandise among the Stores, and ship and distribute the Merchandise to the Pop Up Stores; and (k) with Agent's assistance, obtain all interior and exterior signage (including exterior "QUIKSILVER" signage) and procure all advertising for the Pop Up Stores.

To assist with the Sale, Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Agent.

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

**D.**     **The Sale**

All sales of Merchandise shall be made on behalf of Merchant.  Agent does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, or credit card and, at Merchant's discretion, by check or otherwise in accordance with Merchant's policies, and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant.

**E.**     **Agent Fee and Expenses in Connection with the Sale**

In consideration of its services hereunder, Agent shall earn a fee equal to five (5.0%) of the Gross Proceeds of Merchandise sold at the Pop Up Stores.  For purposes of this Agreement, "Gross Proceeds" means gross receipts arising from sales of Merchandise, net of applicable sales taxes.  In addition, Agent shall be paid an amount equal to $5,000 per Pop Up Store lease that is negotiated by Hilco Real Estate, LLC on Merchant's behalf and approved and executed by Merchant, and Merchant shall fund all deposits with respect to such Pop Up Store leases and utilities associated therewith, if required by the applicable lease.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's reasonable, documented and preapproved out of pocket expenses.  To control expenses of the Sale, Merchant and Agent have established a budget (the "Expense Budget") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs.  The Expense Budget for the Sale is attached hereto as Exhibit B.  The Expense Budget may only be modified by mutual agreement of Agent and Merchant. Merchant shall have no responsibility for costs and expenses in excess of the Expense Budget, unless Agent has obtained Merchant's prior written (including email) consent pursuant to an

3

amendment to the Expense Budget. The costs of supervision set forth on Exhibit B include, among other things, industry standard deferred compensation.

All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to Agent) shall be reconciled by mutual agreement of Agent and Merchant on every Wednesday for the prior week and, unless disputed by either Party, shall be paid within seven (7) days after each such weekly reconciliation. The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty five (45) days following the Sale Termination Date for the last Store.

**F.**    **Indemnification**

(i)    Merchant's Indemnification

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates, and Supervisors (collectively, "Agent Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) product liability claims, except claims arising from Agent's negligence, willful misconduct or unlawful behavior, (d) claims asserted by any Store employees employed by Merchant (under a collective bargaining agreement or otherwise), relating to such employment against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Merchant or any of the Merchant Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

(ii)    Agent's Indemnification

Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC shall, jointly and severally, indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by an Agent Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement.

G.      **Insurance**

(i)      Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Pop Up Stores, and shall cause Agent to be named an additional insured with respect to all such policies.  At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and that Agent is an additional insured thereunder.   In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

(ii)      Agent's Insurance Obligations

As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Pop Up Stores.  Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder.  In addition, Agent shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements.  Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

H.      **Representations, Warranties, Covenants and Agreements**

(i)      Merchant warrants, represents, covenants and agrees that (a) Merchant is a corporation duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein (other than as set forth in Section A), (c) all ticketing of Merchandise at the Pop Up Stores has been and will be done in accordance with Merchant's customary ticketing practices; and (d) to the extent within the control of Merchant, the Pop Up Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

(ii)      Agent warrants, represents, covenants and agrees that (a) each entity comprising Agent is a limited liability company duly organized, validly existing and in good standing under the

laws of state of the Delaware, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Pop Up Stores will be conducted without Merchant's prior written consent, (e) Agent will not take any disciplinary action against any employee of Merchant, and (f) Agent shall not knowingly, and no Agent Indemnified Party shall, knowingly take any action that would constitute a breach of the lease for any Pop Up Store.

## I.    <u>Furniture, Fixtures and Equipment</u>

If requested by Merchant at one or more Pop Up Stores, Agent shall sell the FF&E in each such Pop Up Store from the Pop Up Store themselves. Agent shall dispose of any unsold FF&E at the conclusion of the Sale in a manner to be approved by Merchant. Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale or other disposition of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties.

In consideration for providing the services set forth in this Section I, Agent shall be entitled to a commission from the sale of the FF&E equal to twenty percent (20%) of the Gross Proceeds of the sale of the FF&E.

Agent shall remit to Merchant all Gross Proceeds from the sale of FF&E. During each weekly reconciliation described in Section E above, Agent's FF&E fee shall be calculated, and Agent's calculated and agreed upon FF&E fee and all FF&E costs and expenses then incurred within an agreed upon budget shall paid within seven (7) days after each such weekly reconciliation.

## J.    <u>Termination</u>

The following shall constitute "Termination Events" hereunder:

(a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured thirty (30) days after receipt of written notice thereof to the defaulting Party; or

(b)    The failure of any representation or warranty made by Merchant or Agent to be true in any material respect as of the date made or at any time and throughout the Sale Term, which failure shall continue uncured thirty (30) days after receipt of written notice thereof to the defaulting Party.

If a Termination Event occurs, the non-defaulting Party  may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in addition to terminating this Agreement, pursue any and all rights and remedies and

damages resulting from such default; provided, that in no event shall either Party be liable to the other for any punitive, exemplary, consequential, incidental, indirect or special damages, including, without limitation, lost profits. If this Agreement is terminated other than as a result of a default by Agent, Merchant shall be obligated to pay Agent all amounts due under this Agreement through and including the termination date.

**K.    Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by fax or by recognized overnight delivery service as follows: (a) To Merchant: Quiksilver, Inc., 5600 Argosy Circle, #100, Huntington Beach, CA 92649, Attn: Retail Department; with a copy to: Legal Department; (b) To Agent: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax: 847- 897-0859, Attn: Ian S. Fredericks; or (c) such other address as may be designated in writing by Merchant or Agent.

**L.    Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect. No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement. Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**M.    Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party; provided that either Party may assign this Agreement without the consent of the other Party in the event of a merger, reorganization, consolidation or other change in control transaction, or in connection with the sale of all or substantially all of such Party's assets. No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

**N.    Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**O.    Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of California (without reference to the conflicts of laws provisions therein).   Any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Orange County, California courts and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.   If either Party commences any legal action, suit or proceeding to enforce or interpret this Agreement or any of the terms or provisions hereof, then in addition to any damages or remedies that may be awarded to the prevailing party therein, the prevailing party will be entitled to have and recover from the losing party the prevailing party's reasonable outside attorneys' fees and costs incurred in connection therewith.

**P.    Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement.   All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**Q.    Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

*            *            *

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By:  Ian Fredericks
Its:  VP & Assistant General Counsel, Managing Member

GORDON BROTHERS RETAIL PARTNERS, LLC

By:  Richard Edwards
Its:  Co-President

**AGREED AND ACCEPTED as of the** 12th **day of June ___, 2015:**

QS RETAIL, INC.

By:  STEPHEN M FINNEY
Its:  SENIOR VICE PRESIDENT

9

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchadise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_group_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 10-100-01 | Apparel | Quiksilver | QS Young Mens | S/S Tees | 53,578 | 200,290 | 4.4% |
| 10-100-02 | Apparel | Quiksilver | QS Young Mens | L/S Tees | 333 | 1,921 | 0.0% |
| 10-100-03 | Apparel | Quiksilver | QS Young Mens | Name Drop Tees | 13,922 | 52,268 | 1.1% |
| 10-100-04 | Apparel | Quiksilver | QS Young Mens | Knit Shirts | 9,053 | 48,237 | 1.1% |
| 10-100-05 | Apparel | Quiksilver | QS Young Mens | Woven Shirts | 6,661 | 65,666 | 1.4% |
| 10-100-06 | Apparel | Quiksilver | QS Young Mens | Fleece | 14,983 | 187,776 | 4.1% |
| 10-100-07 | Apparel | Quiksilver | QS Young Mens | Sweaters | 436 | 4,091 | 0.1% |
| 10-100-08 | Apparel | Quiksilver | QS Young Mens | Jackets | 2,830 | 56,110 | 1.2% |
| 10-100-09 | Apparel | Quiksilver | QS Young Mens | Boardshorts | 18,970 | 235,547 | 5.2% |
| 10-100-10 | Apparel | Quiksilver | QS Young Mens | Volleys | 11 | 94 | 0.0% |
| 10-100-11 | Apparel | Quiksilver | QS Young Mens | Walkshorts | 17,795 | 175,593 | 3.8% |
| 10-100-12 | Apparel | Quiksilver | QS Young Mens | Denim | 2,677 | 30,853 | 0.7% |
| 10-100-13 | Apparel | Quiksilver | QS Young Mens | Casual Pants | 1,325 | 16,188 | 0.4% |
| 10-100-14 | Apparel | Quiksilver | QS Young Mens | Name Drop Fleece | 276 | 3,378 | 0.1% |
| 10-100-15 | Apparel | Quiksilver | QS Young Mens | z_unidentified | 3,083 | 12,060 | 0.3% |
| 10-101-01 | Accessories | Quiksilver | QS Mens Accs | Beanies | 3,459 | 14,093 | 0.3% |
| 10-101-02 | Accessories | Quiksilver | QS Mens Accs | Hats | 14,044 | 78,501 | 1.7% |
| 10-101-03 | Accessories | Quiksilver | QS Mens Accs | Boxers | 1,280 | 5,389 | 0.1% |
| 10-101-04 | Accessories | Quiksilver | QS Mens Accs | Wallets | 3,268 | 13,833 | 0.3% |
| 10-101-05 | Accessories | Quiksilver | QS Mens Accs | Belts | 3,059 | 11,217 | 0.2% |
| 10-101-06 | Accessories | Quiksilver | QS Mens Accs | Socks | 104 | 229 | 0.0% |
| 10-101-07 | Accessories | Quiksilver | QS Mens Accs | Backpacks | 3,834 | 45,612 | 1.0% |
| 10-101-08 | Accessories | Quiksilver | QS Mens Accs | Luggage | 1,708 | 19,479 | 0.4% |
| 10-101-09 | Accessories | Quiksilver | QS Mens Accs | Watches | 298 | 6,520 | 0.1% |
| 10-101-10 | Accessories | Quiksilver | QS Mens Accs | Sunglasses | 161 | 2,705 | 0.1% |
| 10-101-11 | Accessories | Quiksilver | QS Mens Accs | Gift Packs | 2 | 14 | 0.0% |
| 10-101-12 | Accessories | Quiksilver | QS Mens Accs | Miscellaneous | 2,880 | 17,590 | 0.4% |
| 10-101-13 | Accessories | Quiksilver | QS Mens Accs | ND Accessories | 227 | 2,063 | 0.0% |
| 10-101-16 | Accessories | Quiksilver | QS Mens Accs | Electronics | 5,110 | 247,732 | 5.4% |
| 10-101-17 | Accessories | Quiksilver | QS Mens Accs | Stickers | 2,575 | 14,026 | 0.3% |
| 10-102-01 | Footwear | Quiksilver | QS Mens Footwear | Sandals | 47,456 | 197,504 | 4.3% |
| 10-102-02 | Footwear | Quiksilver | QS Mens Footwear | Athletic / Casual | 10,814 | 102,411 | 2.2% |
| 10-103-01 | Apparel | Quiksilver | QS Mens | Tees | 146 | 792 | 0.0% |
| 10-103-02 | Apparel | Quiksilver | QS Mens | Knits | 29 | 306 | 0.0% |
| 10-103-03 | Apparel | Quiksilver | QS Mens | Wovens | 136 | 2,209 | 0.0% |
| 10-103-04 | Apparel | Quiksilver | QS Mens | Fleece | 6 | 100 | 0.0% |
| 10-103-05 | Apparel | Quiksilver | QS Mens | Sweaters | 2 | 36 | 0.0% |
| 10-103-06 | Apparel | Quiksilver | QS Mens | Jackets | 6 | 134 | 0.0% |
| 10-103-07 | Apparel | Quiksilver | QS Mens | Boardshorts | 55 | 702 | 0.0% |
| 10-103-08 | Apparel | Quiksilver | QS Mens | Walkshorts | 50 | 590 | 0.0% |
| 10-103-09 | Apparel | Quiksilver | QS Mens | Pants | (3) | (89) | 0.0% |
| 10-104-02 | Accessories | Other | Mens Yesterday's | S/S Tees | 25 | 189 | 0.0% |
| 10-105-01 | Apparel | Quiksilver | QS Performance | Tees | 36 | 272 | 0.0% |
| 10-105-02 | Apparel | Quiksilver | QS Performance | Tops | 11 | 146 | 0.0% |
| 10-105-03 | Apparel | Quiksilver | QS Performance | Jackets | 1 | 33 | 0.0% |
| 10-105-04 | Apparel | Quiksilver | QS Performance | Shorts | 8 | 115 | 0.0% |
| 10-106-01 | Accessories | Quiksilver | QS Watermans Accs | Hats | 50 | 313 | 0.0% |
| 10-106-03 | Accessories | Quiksilver | QS Watermans Accs | Miscellaneous | 2 | 16 | 0.0% |
| 11-110-01 | Apparel | Quiksilver | QS Boys 8-20 | S/S Tees | 50,941 | 147,417 | 3.2% |
| 11-110-02 | Apparel | Quiksilver | QS Boys 8-20 | L/S Tees | 3,203 | 14,170 | 0.3% |
| 11-110-03 | Apparel | Quiksilver | QS Boys 8-20 | Name Drop Tees | 24 | 72 | 0.0% |
| 11-110-04 | Apparel | Quiksilver | QS Boys 8-20 | Knits | 2,267 | 14,569 | 0.3% |
| 11-110-05 | Apparel | Quiksilver | QS Boys 8-20 | Wovens | 3,292 | 28,566 | 0.6% |
| 11-110-06 | Apparel | Quiksilver | QS Boys 8-20 | Fleece | 5,457 | 54,981 | 1.2% |
| 11-110-07 | Apparel | Quiksilver | QS Boys 8-20 | Sweaters | 1 | 8 | 0.0% |
| 11-110-08 | Apparel | Quiksilver | QS Boys 8-20 | Jackets | 494 | 8,347 | 0.2% |
| 11-110-09 | Apparel | Quiksilver | QS Boys 8-20 | Boardshorts | 1,466 | 15,045 | 0.3% |
| 11-110-10 | Apparel | Quiksilver | QS Boys 8-20 | Walkshorts | 3,347 | 33,826 | 0.7% |
| 11-110-11 | Apparel | Quiksilver | QS Boys 8-20 | Pants | 2,222 | 26,363 | 0.6% |
| 11-111-01 | Apparel | Quiksilver | QS Kids / Toddler | S/S Tees | 9,842 | 28,201 | 0.6% |
| 11-111-02 | Apparel | Quiksilver | QS Kids / Toddler | L/S Tees | 854 | 3,189 | 0.1% |
| 11-111-03 | Apparel | Quiksilver | QS Kids / Toddler | Knits | 224 | 1,251 | 0.0% |
| 11-111-04 | Apparel | Quiksilver | QS Kids / Toddler | Wovens | 97 | 802 | 0.0% |

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchadise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_grou p_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 11-111-05 | Apparel | Quiksilver | QS Kids / Toddler | Fleece | 1,063 | 8,710 | 0.2% |
| 11-111-07 | Apparel | Quiksilver | QS Kids / Toddler | Jackets | 29 | 452 | 0.0% |
| 11-111-08 | Apparel | Quiksilver | QS Kids / Toddler | Boardshorts | 481 | 3,893 | 0.1% |
| 11-111-09 | Apparel | Quiksilver | QS Kids / Toddler | Walkshorts | 1,225 | 10,320 | 0.2% |
| 11-111-10 | Apparel | Quiksilver | QS Kids / Toddler | Pants | 81 | 779 | 0.0% |
| 11-112-01 | Apparel | Quiksilver | QS Infant | Tees / Fleece | 268 | 874 | 0.0% |
| 11-112-02 | Apparel | Quiksilver | QS Infant | Tops | 113 | 668 | 0.0% |
| 11-112-03 | Apparel | Quiksilver | QS Infant | Bottoms | 312 | 2,304 | 0.1% |
| 11-113-01 | Accessories | Quiksilver | QS Boys Accs | Beanies | 927 | 3,757 | 0.1% |
| 11-113-02 | Accessories | Quiksilver | QS Boys Accs | Hats | 201 | 844 | 0.0% |
| 11-113-03 | Accessories | Quiksilver | QS Boys Accs | Boxers | 37 | 115 | 0.0% |
| 11-113-04 | Accessories | Quiksilver | QS Boys Accs | Wallets | 8 | 27 | 0.0% |
| 11-113-05 | Accessories | Quiksilver | QS Boys Accs | Belts | 55 | 175 | 0.0% |
| 11-113-06 | Accessories | Quiksilver | QS Boys Accs | Socks | 17 | 38 | 0.0% |
| 11-113-07 | Accessories | Quiksilver | QS Boys Accs | Backpacks | 1 | 12 | 0.0% |
| 11-113-08 | Accessories | Quiksilver | QS Boys Accs | Watches | 7 | 44 | 0.0% |
| 11-113-09 | Accessories | Quiksilver | QS Boys Accs | Sunglasses | 2 | 10 | 0.0% |
| 11-113-10 | Accessories | Quiksilver | QS Boys Accs | Miscellaneous | 2 | 7 | 0.0% |
| 11-114-01 | Footwear | Quiksilver | QS Boys Footwear | Sandals | 15,095 | 48,219 | 1.1% |
| 11-114-02 | Footwear | Quiksilver | QS Boys Footwear | Athletic / Casual | 1 | 9 | 0.0% |
| 12-120-01 | Apparel | Quiksilver | QS Womens Apparel | Tees | 2 | 20 | 0.0% |
| 12-120-02 | Apparel | Quiksilver | QS Womens Apparel | Fleece | 2 | 24 | 0.0% |
| 12-120-03 | Apparel | Quiksilver | QS Womens Apparel | Tops | 9 | 30 | 0.0% |
| 12-120-04 | Apparel | Quiksilver | QS Womens Apparel | Sweaters | 3 | 66 | 0.0% |
| 12-120-05 | Apparel | Quiksilver | QS Womens Apparel | Jackets | 2 | 45 | 0.0% |
| 12-120-06 | Apparel | Quiksilver | QS Womens Apparel | Dresses | 27 | 370 | 0.0% |
| 12-120-07 | Apparel | Quiksilver | QS Womens Apparel | Skirts | 1 | 7 | 0.0% |
| 12-120-08 | Apparel | Quiksilver | QS Womens Apparel | Shorts | 2 | 32 | 0.0% |
| 12-120-09 | Apparel | Quiksilver | QS Womens Apparel | Denim | 7 | 138 | 0.0% |
| 12-120-10 | Apparel | Quiksilver | QS Womens Apparel | Casual Pants | (1) | (9) | 0.0% |
| 12-120-11 | Apparel | Quiksilver | QS Womens Apparel | Swim | 14 | 198 | 0.0% |
| 12-122-02 | Footwear | Quiksilver | QSW Footwear | Sandals | (11) | (135) | 0.0% |
| 12-123-01 | Apparel | Quiksilver | QS Girls Apparel | Tees | 91 | 484 | 0.0% |
| 12-123-02 | Apparel | Quiksilver | QS Girls Apparel | Fleece | 69 | 856 | 0.0% |
| 12-123-03 | Apparel | Quiksilver | QS Girls Apparel | Tops | 105 | 1,008 | 0.0% |
| 12-123-04 | Apparel | Quiksilver | QS Girls Apparel | Tanks | 46 | 284 | 0.0% |
| 12-123-05 | Apparel | Quiksilver | QS Girls Apparel | Sweaters | 18 | 374 | 0.0% |
| 12-123-06 | Apparel | Quiksilver | QS Girls Apparel | Jackets | 41 | 1,099 | 0.0% |
| 12-123-07 | Apparel | Quiksilver | QS Girls Apparel | Dresses | 141 | 1,633 | 0.0% |
| 12-123-08 | Apparel | Quiksilver | QS Girls Apparel | Skirts | 3 | 22 | 0.0% |
| 12-123-09 | Apparel | Quiksilver | QS Girls Apparel | Shorts | 44 | 389 | 0.0% |
| 12-123-10 | Apparel | Quiksilver | QS Girls Apparel | Denim | 674 | 7,880 | 0.2% |
| 12-123-11 | Apparel | Quiksilver | QS Girls Apparel | Casual Pants | 208 | 2,242 | 0.0% |
| 12-123-12 | Apparel | Quiksilver | QS Girls Apparel | Swim | 58 | 556 | 0.0% |
| 12-124-01 | Accessories | Quiksilver | QS Girls Accessories | Handbags | 10 | 85 | 0.0% |
| 12-124-02 | Accessories | Quiksilver | QS Girls Accessories | Winterwear | 3 | 20 | 0.0% |
| 20-200-01 | Apparel | Roxy | Roxy Apparel | S/S Tees | 11,798 | 56,722 | 1.2% |
| 20-200-02 | Apparel | Roxy | Roxy Apparel | L/S Tees | 2,678 | 16,096 | 0.4% |
| 20-200-03 | Apparel | Roxy | Roxy Apparel | Name Drop Tees | 6,980 | 28,591 | 0.6% |
| 20-200-04 | Apparel | Roxy | Roxy Apparel | Fleece | 19,513 | 210,677 | 4.6% |
| 20-200-05 | Apparel | Roxy | Roxy Apparel | Name Drop Fleece | 250 | 1,935 | 0.0% |
| 20-200-06 | Apparel | Roxy | Roxy Apparel | Tops | 5,002 | 42,099 | 0.9% |
| 20-200-07 | Apparel | Roxy | Roxy Apparel | Tanks | 1,923 | 11,205 | 0.2% |
| 20-200-08 | Apparel | Roxy | Roxy Apparel | Sweaters | 9,823 | 114,383 | 2.5% |
| 20-200-09 | Apparel | Roxy | Roxy Apparel | Jackets | 4,732 | 83,129 | 1.8% |
| 20-200-10 | Apparel | Roxy | Roxy Apparel | Dresses | 6,004 | 59,238 | 1.3% |
| 20-200-11 | Apparel | Roxy | Roxy Apparel | Skirts | 68 | 543 | 0.0% |
| 20-200-12 | Apparel | Roxy | Roxy Apparel | Shorts | 616 | 5,590 | 0.1% |
| 20-200-13 | Apparel | Roxy | Roxy Apparel | Boardshorts | 2,029 | 17,539 | 0.4% |
| 20-200-14 | Apparel | Roxy | Roxy Apparel | Denim | 4,523 | 53,601 | 1.2% |
| 20-200-15 | Apparel | Roxy | Roxy Apparel | Casual Pants | 1,666 | 18,839 | 0.4% |
| 20-201-01 | Apparel | Roxy | Jrs Swim | Roxy | 29,370 | 174,524 | 3.8% |
| 20-201-04 | Apparel | Roxy | Jrs Swim | Coverups | 67 | 520 | 0.0% |

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchadise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_grou p_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 20-201-05 | Apparel | Roxy | Jrs Swim | z_unidentified | 11 | 117 | 0.0% |
| 20-202-01 | Accessories | Roxy | Roxy Accs | Hats | 299 | 1,579 | 0.0% |
| 20-202-02 | Accessories | Roxy | Roxy Accs | Handbags | 3,500 | 31,180 | 0.7% |
| 20-202-03 | Accessories | Roxy | Roxy Accs | Jewelry | 22 | 115 | 0.0% |
| 20-202-04 | Accessories | Roxy | Roxy Accs | Wallets | 2,822 | 16,378 | 0.4% |
| 20-202-05 | Accessories | Roxy | Roxy Accs | Belts | 815 | 3,948 | 0.1% |
| 20-202-06 | Accessories | Roxy | Roxy Accs | Backpacks | 929 | 12,749 | 0.3% |
| 20-202-07 | Accessories | Roxy | Roxy Accs | Luggage | 1,143 | 11,393 | 0.2% |
| 20-202-08 | Accessories | Roxy | Roxy Accs | Watches | 261 | 3,062 | 0.1% |
| 20-202-09 | Accessories | Roxy | Roxy Accs | Sunglasses | 123 | 1,741 | 0.0% |
| 20-202-10 | Accessories | Roxy | Roxy Accs | Loungewear | 37 | 367 | 0.0% |
| 20-202-11 | Accessories | Roxy | Roxy Accs | Winterwear | 973 | 6,072 | 0.1% |
| 20-202-12 | Accessories | Roxy | Roxy Accs | Gifts | 172 | 1,788 | 0.0% |
| 20-202-13 | Accessories | Roxy | Roxy Accs | Fragrance | 446 | 5,972 | 0.1% |
| 20-202-14 | Accessories | Roxy | Roxy Accs | Miscellaneous | 1,156 | 5,442 | 0.1% |
| 20-202-15 | Accessories | Roxy | Roxy Accs | Home | 1 | 11 | 0.0% |
| 20-202-17 | Accessories | Roxy | Roxy Accs | Electronics | 8,284 | 421,259 | 9.2% |
| 20-202-18 | Accessories | Roxy | Roxy Accs | Stickers | 91 | 269 | 0.0% |
| 20-202-19 | Accessories | Roxy | Roxy Accs | z_unidentified | 232 | 347 | 0.0% |
| 20-203-01 | Footwear | Roxy | Roxy Footwear | Rubber Flip Flops | 15,229 | 52,679 | 1.2% |
| 20-203-02 | Footwear | Roxy | Roxy Footwear | Sandals | 1,799 | 12,121 | 0.3% |
| 20-203-03 | Footwear | Roxy | Roxy Footwear | Athletic / Casual | 5,011 | 48,094 | 1.1% |
| 20-203-04 | Footwear | Roxy | Roxy Footwear | Slippers | (5) | (57) | 0.0% |
| 20-204-01 | Apparel | Roxy | Roxy Outdoor Fitness | Sports Bras | 25 | 249 | 0.0% |
| 20-204-02 | Apparel | Roxy | Roxy Outdoor Fitness | Tanks | 11 | 176 | 0.0% |
| 20-204-03 | Apparel | Roxy | Roxy Outdoor Fitness | Tops | 44 | 444 | 0.0% |
| 20-204-04 | Apparel | Roxy | Roxy Outdoor Fitness | Slippers | 31 | 735 | 0.0% |
| 20-204-05 | Apparel | Roxy | Roxy Outdoor Fitness | Shorts | 128 | 1,185 | 0.0% |
| 20-204-06 | Apparel | Roxy | Roxy Outdoor Fitness | Pants | 795 | 11,104 | 0.2% |
| 20-204-07 | Apparel | Roxy | Roxy Outdoor Fitness | Accessories | 4 | 59 | 0.0% |
| 20-204-08 | Apparel | Roxy | Roxy Outdoor Fitness | Swim | 538 | 3,744 | 0.1% |
| 20-204-09 | Apparel | Roxy | Roxy Outdoor Fitness | Wetsuits | 2 | 138 | 0.0% |
| 21-210-01 | Apparel | Roxy | RG Apparel | S/S Tees | 1,154 | 4,475 | 0.1% |
| 21-210-02 | Apparel | Roxy | RG Apparel | L/S Tees | 64 | 336 | 0.0% |
| 21-210-03 | Apparel | Roxy | RG Apparel | Fleece | 2,397 | 20,987 | 0.5% |
| 21-210-04 | Apparel | Roxy | RG Apparel | Tops | 1,744 | 11,588 | 0.3% |
| 21-210-05 | Apparel | Roxy | RG Apparel | Sweaters | (17) | (232) | 0.0% |
| 21-210-06 | Apparel | Roxy | RG Apparel | Jackets | 19 | 223 | 0.0% |
| 21-210-07 | Apparel | Roxy | RG Apparel | Dresses | 54 | 446 | 0.0% |
| 21-210-08 | Apparel | Roxy | RG Apparel | Skirts | 2 | 14 | 0.0% |
| 21-210-09 | Apparel | Roxy | RG Apparel | Shorts | 37 | 260 | 0.0% |
| 21-210-10 | Apparel | Roxy | RG Apparel | Pants | 3,815 | 29,753 | 0.7% |
| 21-210-11 | Apparel | Roxy | RG Apparel | Swim | 476 | 4,049 | 0.1% |
| 21-210-12 | Apparel | Roxy | RG Apparel | Name Drop Tees | 51 | 192 | 0.0% |
| 21-211-01 | Apparel | Roxy | RG Teenie Wahine | Tees | 69 | 257 | 0.0% |
| 21-211-02 | Apparel | Roxy | RG Teenie Wahine | Fleece | 72 | 660 | 0.0% |
| 21-211-03 | Apparel | Roxy | RG Teenie Wahine | Tops | 47 | 361 | 0.0% |
| 21-211-04 | Apparel | Roxy | RG Teenie Wahine | Bottoms | 155 | 1,116 | 0.0% |
| 21-211-05 | Apparel | Roxy | RG Teenie Wahine | Dresses | 25 | 175 | 0.0% |
| 21-211-06 | Apparel | Roxy | RG Teenie Wahine | Swim | 96 | 720 | 0.0% |
| 21-212-01 | Apparel | Roxy | RG Infant | Tees / Fleece | 8 | 52 | 0.0% |
| 21-212-02 | Apparel | Roxy | RG Infant | Tops | 12 | 76 | 0.0% |
| 21-212-03 | Apparel | Roxy | RG Infant | Bottoms | 5 | 32 | 0.0% |
| 21-212-04 | Apparel | Roxy | RG Infant | Dresses | 5 | 31 | 0.0% |
| 21-213-01 | Accessories | Roxy | RG Accs | Hats | 10 | 49 | 0.0% |
| 21-213-02 | Accessories | Roxy | RG Accs | Handbags | 59 | 348 | 0.0% |
| 21-213-03 | Accessories | Roxy | RG Accs | Belts | 1 | 5 | 0.0% |
| 21-213-04 | Accessories | Roxy | RG Accs | Backpacks | 23 | 266 | 0.0% |
| 21-213-05 | Accessories | Roxy | RG Accs | Luggage | 5 | 43 | 0.0% |
| 21-213-06 | Accessories | Roxy | RG Accs | Watches | 1 | 7 | 0.0% |
| 21-213-07 | Accessories | Roxy | RG Accs | Sunglasses | 44 | 260 | 0.0% |
| 21-213-08 | Accessories | Roxy | RG Accs | Winterwear | 36 | 239 | 0.0% |
| 21-213-10 | Accessories | Roxy | RG Accs | Miscellaneous | 72 | 413 | 0.0% |

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchdaise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_group_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 21-214-01 | Footwear | Roxy | RG Footwear | Sandals | 1,560 | 5,782 | 0.1% |
| 21-214-02 | Footwear | Roxy | RG Footwear | Athletic / Casual | 188 | 1,528 | 0.0% |
| 21-215-03 | Accessories | Roxy | RG TW Accs | Backpacks | 2 | 13 | 0.0% |
| 21-216-01 | Accessories | Roxy | RG Infant Accs | Hats | 1 | 4 | 0.0% |
| 21-216-02 | Accessories | Roxy | RG Infant Accs | Miscellaneous | 2 | 18 | 0.0% |
| 21-217-01 | Footwear | Roxy | RG TW Footwear | Sandals | 880 | 3,041 | 0.1% |
| 21-217-02 | Footwear | Roxy | RG TW Footwear | Athletic / Casual | 170 | 1,391 | 0.0% |
| 30-300-01 | Technical Products | Quiksilver | Snow | QS Mens Snow | 117 | 3,849 | 0.1% |
| 30-300-02 | Technical Products | Roxy | Snow | Roxy Snow | 125 | 4,731 | 0.1% |
| 30-300-03 | Technical Products | Quiksilver | Snow | QS Boys Snow | 5 | 129 | 0.0% |
| 30-300-04 | Technical Products | Roxy | Snow | Roxy Girls Snow | 4 | 91 | 0.0% |
| 30-300-05 | Technical Products | Quiksilver | Snow | Snow Accessories | 147 | 2,899 | 0.1% |
| 30-300-05 | Technical Products | Roxy | Snow | Snow Accessories | 246 | 3,251 | 0.1% |
| 30-300-06 | Technical Products | Roxy | Snow | Teenie Wahine Snow | (2) | (48) | 0.0% |
| 40-400-01 | Technical Products | Quiksilver | Wetsuits | QS Mens Wetsuits | 549 | 19,673 | 0.4% |
| 40-400-02 | Technical Products | Roxy | Wetsuits | Roxy Wetsuits | 404 | 15,521 | 0.3% |
| 40-400-03 | Technical Products | Quiksilver | Wetsuits | QS Boys Wetsuits | 10 | 160 | 0.0% |
| 40-400-04 | Technical Products | Quiksilver | Wetsuits | QS Mens Lycra | 3,205 | 23,132 | 0.5% |
| 40-400-05 | Technical Products | Roxy | Wetsuits | Roxy Lycra | 2,197 | 14,490 | 0.3% |
| 40-400-06 | Technical Products | Quiksilver | Wetsuits | QS Boys Lycra | 3,435 | 22,561 | 0.5% |
| 40-400-07 | Technical Products | Roxy | Wetsuits | Roxy Girls Lycra | 1,286 | 8,376 | 0.2% |
| 40-400-08 | Technical Products | Roxy | Wetsuits | Roxy Girls Wetsuits | 11 | 232 | 0.0% |
| 40-400-09 | Technical Products | Roxy | Wetsuits | Teenie Wahine Wetsuits/Lycra | 521 | 3,504 | 0.1% |
| 40-400-10 | Technical Products | Quiksilver | Wetsuits | Watermans Lycra | 2,884 | 27,831 | 0.6% |
| 40-400-11 | Technical Products | Quiksilver | Wetsuits | z_unidentified | 295 | 1,974 | 0.0% |
| 50-500-02 | Accessories | Other | Other Vendor | Skate | 75 | 2,924 | 0.1% |
| 50-500-03 | Accessories | Other | Other Vendor | Snow | 427 | 50,260 | 1.1% |
| 50-500-04 | Accessories | Other | Other Vendor | Books / Magazines | 50 | 388 | 0.0% |
| 50-500-05 | Accessories | Other | Other Vendor | DVDs | 110 | 1,315 | 0.0% |
| 50-500-06 | Accessories | Other | Other Vendor | Miscellaneous | 6 | 447 | 0.0% |
| 50-500-07 | Accessories | Other | Other Vendor | Jewelry | 12 | 324 | 0.0% |
| 50-500-08 | Accessories | Other | Other Vendor | Electronics | 115 | 4,660 | 0.1% |
| 50-500-13 | Accessories | Other | Other Vendor | Makeup | 1,155 | 12,546 | 0.3% |
| 50-500-14 | Accessories | Other | Other Vendor | Moscova | 29 | 227 | 0.0% |
| 70-700-01 | Apparel | DC Shoes | DC Mens App | S/S Tees | 3,939 | 15,733 | 0.3% |
| 70-700-02 | Apparel | DC Shoes | DC Mens App | L/S Tees | 48 | 273 | 0.0% |
| 70-700-03 | Apparel | DC Shoes | DC Mens App | Knits | 149 | 978 | 0.0% |
| 70-700-04 | Apparel | DC Shoes | DC Mens App | Wovens | 420 | 4,911 | 0.1% |
| 70-700-05 | Apparel | DC Shoes | DC Mens App | Fleece | 1,455 | 16,123 | 0.4% |
| 70-700-06 | Apparel | DC Shoes | DC Mens App | Sweaters | 12 | 128 | 0.0% |
| 70-700-07 | Apparel | DC Shoes | DC Mens App | Jackets | 128 | 3,005 | 0.1% |
| 70-700-08 | Apparel | DC Shoes | DC Mens App | Shorts | 2,767 | 24,868 | 0.5% |
| 70-700-09 | Apparel | DC Shoes | DC Mens App | Denim | 248 | 3,790 | 0.1% |
| 70-700-10 | Apparel | DC Shoes | DC Mens App | Long Bottoms | 1,699 | 18,362 | 0.4% |
| 70-700-11 | Apparel | DC Shoes | DC Mens App | Boardshorts | 327 | 3,057 | 0.1% |
| 70-701-01 | Accessories | DC Shoes | DC Mens Accs | Beanies | 26 | 115 | 0.0% |
| 70-701-02 | Accessories | DC Shoes | DC Mens Accs | Hats | 944 | 5,149 | 0.1% |
| 70-701-03 | Accessories | DC Shoes | DC Mens Accs | Backpacks | 273 | 2,660 | 0.1% |
| 70-701-04 | Accessories | DC Shoes | DC Mens Accs | Wallets | 22 | 86 | 0.0% |
| 70-701-05 | Accessories | DC Shoes | DC Mens Accs | Belts | 103 | 348 | 0.0% |
| 70-701-06 | Accessories | DC Shoes | DC Mens Accs | Socks | 6,174 | 21,602 | 0.5% |
| 70-701-07 | Accessories | DC Shoes | DC Mens Accs | Miscellaneous | 533 | 2,354 | 0.1% |
| 70-701-08 | Accessories | DC Shoes | DC Mens Accs | Luggage | 24 | 733 | 0.0% |
| 70-702-01 | Footwear | DC Shoes | DC Mens Footwear | Skate | 7,700 | 134,759 | 2.9% |
| 70-702-02 | Footwear | DC Shoes | DC Mens Footwear | Sandals | 246 | 1,748 | 0.0% |
| 71-710-01 | Apparel | DC Shoes | DC Boys App | Tees | 308 | 974 | 0.0% |
| 71-710-02 | Apparel | DC Shoes | DC Boys App | Fleece | 364 | 3,921 | 0.1% |
| 71-710-03 | Apparel | DC Shoes | DC Boys App | Tops | 98 | 837 | 0.0% |
| 71-710-04 | Apparel | DC Shoes | DC Boys App | Outerwear | 7 | 62 | 0.0% |
| 71-710-05 | Apparel | DC Shoes | DC Boys App | Shorts | 35 | 392 | 0.0% |
| 71-710-06 | Apparel | DC Shoes | DC Boys App | Boardshorts | 32 | 298 | 0.0% |
| 71-710-07 | Apparel | DC Shoes | DC Boys App | Denim | 11 | 121 | 0.0% |
| 71-710-08 | Apparel | DC Shoes | DC Boys App | Long Bottoms | 2 | 19 | 0.0% |

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchandise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_group_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 71-711-01 | Accessories | DC Shoes | DC Boys Accs | Beanies | 3 | 13 | 0.0% |
| 71-711-02 | Accessories | DC Shoes | DC Boys Accs | Hats | 29 | 169 | 0.0% |
| 71-711-03 | Accessories | DC Shoes | DC Boys Accs | Belts | 2 | 6 | 0.0% |
| 71-711-04 | Accessories | DC Shoes | DC Boys Accs | Miscellaneous | 37 | 181 | 0.0% |
| 71-711-05 | Accessories | DC Shoes | DC Boys Accs | Backpacks | 362 | 934 | 0.0% |
| 71-712-01 | Footwear | DC Shoes | DC Boys Footwear | Skate | 340 | 4,238 | 0.1% |
| 71-712-02 | Footwear | DC Shoes | DC Boys Footwear | Sandals | 57 | 403 | 0.0% |
| 71-713-01 | Apparel | DC Shoes | DC Kids/Toddler App | Tees | 41 | 130 | 0.0% |
| 71-713-02 | Apparel | DC Shoes | DC Kids/Toddler App | Fleece | 77 | 939 | 0.0% |
| 71-713-03 | Apparel | DC Shoes | DC Kids/Toddler App | Tops | 14 | 123 | 0.0% |
| 71-713-04 | Apparel | DC Shoes | DC Kids/Toddler App | Bottoms | 18 | 172 | 0.0% |
| 71-714-01 | Footwear | DC Shoes | DC K/T Footwear | Skate | 5,531 | 57,947 | 1.3% |
| 80-800-01 | Apparel | DC Shoes | DC Jrs App | S/S Tees | 91 | 492 | 0.0% |
| 80-800-02 | Apparel | DC Shoes | DC Jrs App | L/S Tees | 5 | 34 | 0.0% |
| 80-800-03 | Apparel | DC Shoes | DC Jrs App | Tops | 41 | 359 | 0.0% |
| 80-800-04 | Apparel | DC Shoes | DC Jrs App | Fleece | 39 | 448 | 0.0% |
| 80-800-05 | Apparel | DC Shoes | DC Jrs App | Sweaters | 7 | 98 | 0.0% |
| 80-800-06 | Apparel | DC Shoes | DC Jrs App | Jackets | 7 | 143 | 0.0% |
| 80-800-07 | Apparel | DC Shoes | DC Jrs App | Shorts | 44 | 425 | 0.0% |
| 80-800-09 | Apparel | DC Shoes | DC Jrs App | Denim | 40 | 629 | 0.0% |
| 80-800-10 | Apparel | DC Shoes | DC Jrs App | Bottoms | 3 | 32 | 0.0% |
| 80-800-11 | Apparel | DC Shoes | DC Jrs App | Dresses | 16 | 150 | 0.0% |
| 80-801-01 | Accessories | DC Shoes | DC Jrs Accs | Beanies | 379 | 1,581 | 0.0% |
| 80-801-02 | Accessories | DC Shoes | DC Jrs Accs | Hats | 3 | 27 | 0.0% |
| 80-801-03 | Accessories | DC Shoes | DC Jrs Accs | Handbags | 2 | 22 | 0.0% |
| 80-801-04 | Accessories | DC Shoes | DC Jrs Accs | Wallets | 9 | 51 | 0.0% |
| 80-801-05 | Accessories | DC Shoes | DC Jrs Accs | Backpacks | 232 | 824 | 0.0% |
| 80-801-07 | Accessories | DC Shoes | DC Jrs Accs | Socks | 3 | 8 | 0.0% |
| 80-801-08 | Accessories | DC Shoes | DC Jrs Accs | Miscellaneous | 2 | 13 | 0.0% |
| 80-802-01 | Footwear | DC Shoes | DC Jrs Footwear | Skate | 201 | 2,745 | 0.1% |
| 80-802-02 | Footwear | DC Shoes | DC Jrs Footwear | Sandals | 57 | 294 | 0.0% |
| 81-812-01 | Footwear | DC Shoes | DC Girls Footwear | Skate | 2 | 22 | 0.0% |
| 90-900-01 | Technical Products | DC Shoes | DC Snow | Mens Snow | 128 | 5,469 | 0.1% |
| 90-900-02 | Technical Products | DC Shoes | DC Snow | Juniors Snow | 31 | 1,242 | 0.0% |
| 90-900-03 | Technical Products | DC Shoes | DC Snow | Boys Snow | (15) | (470) | 0.0% |
| 90-900-04 | Technical Products | DC Shoes | DC Snow | Girls Snow | (2) | (59) | 0.0% |
| 90-900-05 | Technical Products | DC Shoes | DC Snow | Snow Accessories | 841 | 4,781 | 0.1% |
| 90-900-06 | Technical Products | DC Shoes | DC Snow | Snow Boots | 40 | 2,852 | 0.1% |
| Grand Total | | | | | 571,540 | 4,569,625 | 100.0% |

**Quiksilver, Inc.**
**Exhibit B**

| | | Expense Budget | | |
|---|---|---|---|---|
| | Pre-Opening | Sale | Wind-Down | Total |
| **Advertising** | | | | |
| Media | | | | |
| Signs | | *To be determined & mutually agreed upon.* | | |
| Sign Walkers | | | | |
| Subtotal Advertising | - | - | - | - |
| | | | | |
| **Supervision** | | | | |
| Fees | 246,183 | 628,759 | 151,905 | 1,026,847 |
| Deferred Compensation | 115,682 | 277,753 | 67,973 | 461,407 |
| Expenses (1) | 87,675 | 164,534 | 43,658 | 295,868 |
| Subtotal Supervision | 449,540 | 1,071,046 | 263,536 | 1,784,121 |
| | | | | |
| Total Expenses | 449,540 | 1,071,046 | 263,536 | 1,784,121 |

Note(s):
1. Includes Insurance.

## Hilco Merchant Resources
### Quiksilver, Inc.
#### Exhibit B

| Supervision Expense Budget- Pre-Opening |
|---|

| Supervision with Payroll Costs Include | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | Total USD |
|---|---|---|---|---|---|---|---|---|
| Base Rate | 17,955 | - | 82,080 | 131,328 | - | - | - | 231,363 |
| Deferred Compensation | 8,978 | - | 41,040 | 65,664 | - | - | - | 115,682 |
| Rate Adjustments (1) | 2,850 | - | 11,970 | - | - | - | - | 14,820 |
| Total Rates | 29,783 | - | 135,090 | 196,992 | - | - | - | 361,865 |
| | | | | | | | | |
| Travel Charges | 4,275 | - | 24,150 | 46,800 | - | - | - | 75,225 |
| Other Expenses | 750 | - | 4,500 | 7,200 | - | - | - | 12,450 |
| General Liability Insurance | | | | | | | | |
| Total Expense | 34,808 | - | 163,740 | 250,992 | - | - | - | 449,540 |

Note: Supervision Expense will be managed in the aggregate.

| Supervision Supporting Detail |
|---|

| | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|
| Weekly Base Rate | 3,150 | 2,650 | 2,400 | 2,400 | 3,150 | 3,150 | 3,000 | |
| Rate Adjustments | 500 | | 350 | | | | | |
| Total Rates | 3,650 | 2,650 | 2,750 | 2,400 | 3,150 | 3,150 | 3,000 | |
| % Deferred Compensation | 50% | 50% | 50% | 50% | 50% | 50% | 50% | |
| Payroll Costs (Tico) | 14% | 14% | 14% | 14% | 14% | 14% | 14% | |
| # of Supervisors | 1 | | 6 | 24 | | | | |
| # of Weeks | 5.0 | 5.0 | 5.0 | 2.0 | 5.0 | 5.0 | 5.0 | |
| | | | | | | | | |
| **Travel Charges and Other Expenses** | | | | | | | | |
| Initial Airfare          Initial- Travel | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| | | | | | | | | |
| Travel Rate (25% of Base Rate) | 900 | 760 | 680 | 680 | 900 | 900 | 860 | Travel Days |
| # of Travel Days | 3 | 7 | 3 | 1 | 1 | 1 | 1 | 153.0 |
| Pro-rated Travel Rates  Weekly- Travel | 390 | 760 | 290 | 100 | 130 | 130 | 120 | |
| Car rent               Weekly- Travel | 175 | 175 | 175 | 175 | 175 | 175 | 175 | |
| >50 Miles              Weekly- Travel | 50 | 150 | 100 | 100 | 100 | 100 | 100 | |
| | 615 | 1,085 | 565 | 375 | 405 | 405 | 395 | |
| | | | | | | | | |
| Cell phone / Internet  Weekly- Other | 50 | 50 | 50 | 50 | 50 | 50 | 50 | |
| Miscellaneous         Weekly- Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | |
| | 150 | 150 | 150 | 150 | 150 | 150 | 150 | |

**Hilco Merchant Resources**
**Quiksilver, Inc.**
**Exhibit B**

| Supervision Expense Budget-Sale |
|---|

| Supervision with Payroll Costs Include | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | Total USD |
|---|---|---|---|---|---|---|---|---|
| Base Rate | 88,749 | 61,047 | 405,710 | - | - | - | - | 555,506 |
| Deferred Compensation | 44,375 | 30,524 | 202,855 | - | - | - | - | 277,753 |
| Rate Adjustments (1) | 14,087 | - | 59,166 | - | - | - | - | 73,253 |
| Total Rates | 147,211 | 91,571 | 667,731 | - | - | - | - | 906,512 |
| | | | | | | | | |
| Travel Charges | 16,399 | 26,250 | 105,810 | - | - | - | - | 148,459 |
| Other Expenses | 3,707 | - | - | - | - | - | - | 3,707 |
| General Liability Insurance | | | | | | | | 12,368 |
| Total Expense | 167,317 | 117,821 | 773,541 | - | - | - | - | 1,071,046 |

Note: Supervision Expense will be managed in the aggregate.

| Supervision Supporting Detail |
|---|

| | Lead Supervisor | Lead Supervisor-II | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|
| Weekly Base Rate | 3,150 | 3,150 | 2,400 | 2,400 | 3,150 | 3,150 | 3,000 | |
| Rate Adjustments | 500 | - | 350 | - | - | - | - | |
| Total Rates | 3,650 | 3,150 | 2,750 | 2,400 | 3,150 | 3,150 | 3,000 | |
| % Deferred Compensation | 50% | 50% | 50% | 0% | 50% | 50% | 50% | |
| Payroll Costs (Tico) | 14% | 14% | 14% | 14% | 14% | 14% | 14% | |
| # of Supervisors | 1 | 1 | 6 | | | | | |
| # of Weeks | 24.7 | 17.0 | 24.7 | 1.0 | 24.7 | 24.7 | 24.7 | |

**Travel Charges and Other Expenses**

| | | Lead Supervisor | Lead Supervisor-II | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|---|
| Initial Airfare | Initial- Travel | 1,200 | 5,000 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| | | | | | | | | | |
| Travel Rate (25% of Base Rate) | | 900 | 900 | 680 | 680 | 900 | 900 | 860 | Travel Days |
| # of Travel Days | | 3 | | 4 | 1 | 1 | 1 | 1 | 667.3 |
| Pro-rated Travel Rates | Weekly- Travel | 390 | 1,250 | 390 | 100 | 130 | 130 | 120 | |
| Car rent | Weekly- Travel | 175 | | 175 | 175 | 175 | 175 | 175 | |
| >50 Miles | Weekly- Travel | 50 | | 100 | 100 | 100 | 100 | 100 | |
| | | 615 | 1,250 | 665 | 375 | 405 | 405 | 395 | |
| | | | | | | | | | |
| Cell phone / Internet | Weekly- Other | 50 | | - | - | - | - | - | |
| Miscellaneous | Weekly- Other | 100 | | - | - | - | - | - | |
| | | 150 | - | - | - | - | - | - | |

## Hilco Merchant Resources
### Quiksilver, Inc.
#### Exhibit B

| Supervision Expense Budget-Wind-Down |
| --- |

| Supervision with Payroll Costs Include | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | Total USD |
|---|---|---|---|---|---|---|---|---|
| Base Rate | 25,137 | - | 82,080 | - | 28,728 | - | - | 135,945 |
| Deferred Compensation | 12,569 | - | 41,040 | - | 14,364 | - | - | 67,973 |
| Rate Adjustments (1) | 3,990 | - | 11,970 | - | - | - | - | 15,960 |
| Total Rates | 41,696 | - | 135,090 | - | 43,092 | - | - | 219,878 |
| | | | | | | | | |
| Travel Charges | 5,505 | - | 22,950 | - | 4,440 | - | - | 32,895 |
| Other Expenses | 1,050 | - | 4,500 | - | 1,200 | - | - | 6,750 |
| General Liability Insurance | | | | | | | | 4,013 |
| Total Expense | 48,251 | - | 162,540 | - | 48,732 | - | - | 263,536 |

Note: Supervision Expense will be managed in the aggregate.

| Supervision Supporting Detail |
| --- |

| | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|
| Weekly Base Rate | 3,150 | 2,650 | 2,400 | 2,400 | 3,150 | 3,150 | 3,000 | |
| Rate Adjustments | 500 | - | 350 | - | - | - | - | |
| Total Rates | 3,650 | 2,650 | 2,750 | 2,400 | 3,150 | 3,150 | 3,000 | |
| % Deferred Compensation | 50% | 50% | 50% | 0% | 50% | 50% | 50% | |
| Payroll Costs (Tico) | 14% | 14% | 14% | 14% | 14% | 14% | 14% | |
| # of Supervisors | 1 | | 5 | | 1 | | | |
| # of Weeks | 7.0 | 6.0 | 6.0 | 1.0 | 8.0 | 6.0 | 6.0 | |

**Travel Charges and Other Expenses**

| | | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|---|
| Initial Airfare | Initial- Travel | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| | | | | | | | | | |
| Travel Rate (25% of Base Rate) | | 900 | 760 | 680 | 680 | 900 | 900 | 860 | Travel Days |
| # of Travel Days | | 3 | 7 | 3 | 1 | 1 | 1 | 1 | 119.0 |
| Pro-rated Travel Rates | Weekly- Travel | 390 | 760 | 290 | 100 | 130 | 130 | 120 | |
| Car rent | Weekly- Travel | 175 | 175 | 175 | 175 | 175 | 175 | 175 | |
| >50 Miles | Weekly- Travel | 50 | 150 | 100 | 100 | 100 | 100 | 100 | |
| | | **615** | **1,085** | **565** | **375** | **405** | **405** | **395** | |
| | | | | | | | | | |
| Cell phone / Internet | Weekly- Other | 50 | 50 | 50 | 50 | 50 | 50 | 50 | |
| Miscellaneous | Weekly- Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | |
| | | **150** | **150** | **150** | **150** | **150** | **150** | **150** | |

## **EXHIBIT 3**

**Sale Guidelines**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
In re:                              :    Chapter 11
                                    :
QUIKSILVER, INC., *et al.*,         :    Case No. 15-11880 (___)
                                    :
                 Debtors.[1]        :    (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### SALE GUIDELINES

        The following procedures (the "Sale Guidelines") shall apply to the Sale[2] to be held at the locations (collectively the "Locations" and each, a "Location") subject to (1) the agreement (the "Store Closing Agreement") dated as of September 4, 2015, by and between QS Retail, Inc. (the "Merchant"), on the one hand, and Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Agent") and (2) the agreement (the "Pop Up Store Agreement," and together with the Store Closing Agreement, the "Agreements") dated as of June 8, 2015, by and between Merchant, on the one hand, and Agent, on the other hand:

        1.      The Sale shall be conducted so that the Locations in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Locations.

        2.      The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Location on a Sunday.

        3.      On "shopping center" property, the Merchant or the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Location's premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Location is located; provided that the Merchant and the Agent may solicit customers in the Locations themselves.  On "shopping center" property, the Merchant and the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), QS Optics, Inc. (2493), Quiksilver Wetsuits, Inc. (9599), Mt. Waimea, Inc. (5846), Quiksilver Entertainment, Inc. (9667), DC Shoes, Inc. (0965), DC Direct, Inc. (8364), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), and QS Retail, Inc. (0505).  The address of the Debtors' corporate headquarters is 15202 Graham Street, Huntington Beach, California 92649.

[2]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Agreements (as defined herein).

4.      At the conclusion of the Sale, the Merchant shall vacate the Locations in broom clean condition, and shall leave the Locations in the same condition as on the applicable Sale Commencement Date, ordinary wear and tear excepted, <u>provided</u>, <u>however</u>, that the Agent and the Merchant hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Location.

5.      Subject to the entry of the final order granting the Motion[3]:  (i) the Agent and the Merchant may abandon any FF&E (as used in the Agreements) and Merchandise not sold in the Sale at the Locations at the earlier of the conclusion of the Sale or the applicable Sale Termination Date; (ii) any abandoned FF&E and Merchandise left in a Location after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.

6.      The Agent and the Merchant may advertise the sale as a "sale on everything", "everything must go", or similar themed sale.  The Agent and the Merchant may also advertise the sale as a "store closing" and have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.

7.      Agent and the Merchant shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; <u>provided</u>, <u>however</u>, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Agent and the Merchant shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Agent and the Merchant shall be permitted to utilize exterior banners at (i) non-enclosed mall Locations and (ii) enclosed mall Locations to the extent the entrance to the applicable Location does not require entry into the enclosed mall common area; <u>provided</u>, <u>however</u>, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Location, and shall not be wider than the storefront of the Location.  In addition, the Agent and the Merchant shall be permitted to utilize sign walkers in a safe and professional manner.  Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent and the Merchant any additional restrictions not contained in the applicable lease agreement.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Locations to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Agent and the Merchant shall not make any alterations to the storefront or exterior walls of any Locations.

---

[3]    As used herein, the "<u>Motion</u>" refers to the *Motion Pursuant to Bankruptcy Code Section 105, 363, and 365 and Bankruptcy Rules 6004 and 6006 (i) Authorizing the Debtors to assume the Agreements; (ii) Authorizing and Approving the Conduct of Store Closing or Similar Themed Sales, with Such Sales to be Free and Clear of all Liens, Claims and Encumbrances; (iii) Authorizing Customary Bonuses to Employees of Closing Business Locations; and (iv) Granting Related Relief*, filed in the above-captioned cases.

10.     The Agent and the Merchant shall not make any alterations to interior or exterior Location lighting.  No property of the landlord of a Location shall be removed or sold during the Sale.  The hanging of exterior banners or signage or banners in a Location shall not constitute an alteration to a Location.

11.     The Agent and the Merchant shall keep Location premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Store Closing Agreement, the Agent and the Merchant shall have the right to sell all FF&E.  The Agent and the Merchant may advertise the sale of the FF&E in a manner consistent with these guidelines at the Locations.  The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Location business hours.

13.     At the conclusion of the Sale at each Location, pending assumption or rejection of applicable leases, the landlords of the Locations shall have reasonable access to the Location's premises as set forth in the applicable leases.  The Agent, the Merchant and their agents and representatives shall continue to have exclusive and unfettered access to the Locations until the respective Locations are turned back to the landlord in a manner consistent with the rejection procedures approved by the Court.

14.     Postpetition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.

15.     The rights of landlords against Merchant for any damages to a Location shall be reserved in accordance with the provisions of the applicable lease. If and to the extent that the landlord of any Location affected hereby contends that the Agent or the Merchant are in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows: (i) Skadden, Arps, Slate, Meagher & Flom LLP, 300 South Grand Avenue, Suite 3400, Los Angeles, CA 90071 (Attn: Van Durrer, Esq.), van.durrer@skadden.com; (ii) Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Suite 2700, Chicago, IL 60606 (Attn: John K. Lyons, Esq.), john.lyons@skadden.com; and (ii) Hilco Merchant Resources, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062 (Attn: Ian Fredericks, Esq.), ifredericks@hilcoglobal.com.

**EXHIBIT 4**

**Pop Up Store Locations**

| Store # | Shopping Center | Address | City | ST | Zip Code | Space # |
|---|---|---|---|---|---|---|
| 510 | Westgate Center | 1600 Saratoga Ave | San Jose | CA | 95129 | 33 |
| 702 | Crow Canyon Commons | 3191M Crow Canyon Place | San Ramon | CA | 94583 | M |
| 703 | Ellisburg S/C | 1598 Kings Highway | Cherry Hill | NJ | 08034 | 24 |
| 704 | Crossroads S/C | 223 Skokie Valley Road | Highland Park | IL | 60035 | B003 |
| 705 | Finley Square S/C | 1524 Butterfield Road | Downers Grove | IL | 60515 | 12 |
| 706 | Lawrence Park S/C | 1991 Sproul Road | Broomall | PA | 19008 | 29 |
| 707 | Andorra S/C | 8500 Henry Ave | Philadelphia | PA | 19128 | 23 |
| 708 | Bristol Plaza | 622 Farmington Ave | Bristol | CT | 06010 | 5 |
| 709 | Pike 7 Plaza | 8397 Leesburg Pike | Vienna | VA | 22182 | 35 |
| 710 | Graham Park Plaza | 7285 Arlington Blvd. | Falls Church | VA | 22042 | 32B |
| 711 | Eastgate | 1800 East Franklin Street | Chapel Hill | NC | 27514 | 11B |
| 712 | 29th Place | 100 Shoppers World Court | Charlottesville | VA | 22901 | N020 |
| 714 | NewPark Mall | 2086 Newpark Mall | Newark | CA | 94560 | 2119 |
| 715 | Mt. Shasta Mall | 900 Dana Dr | Redding | CA | 96003 | A-52 |
| 716 | West Valley Mall | 3200 N Naglee Rd | Tracy | CA | 95304 | 100 |
| 717 | Spring Hill Mall | 1072 Spring Hill Mall | West Dundee | IL | 60118 | 1322 |
| 718 | Lakeland Square | 3800 US Hwy 98 N | Lakeland | FL | 33809 | 126 |
| 720 | Chesterfield Towne Center | 11500 Midlothian Turnpike | Chesterfield | VA | 23235 | 104 |

| Store # | Shopping Center | Address | City | ST | Zip Code | Space # |
|---|---|---|---|---|---|---|
| 721 | Clayton Valley Shopping Center | 5434 Ygnacio Valley Road | Concord | CA | 94521 | 30 |
| 722 | East Washington Place | 401 Kenilworth Drive | Petaluma | CA | 94952 | 310 |
| 723 | Bayhill Shopping Center | 851 Cherry Ave | San Bruno | CA | 94066 | 24 |
| 725 | El Cerrito Plaza | 3010 El Cerrito Plaza | El Cerrito | CA | 94530 | |
| 727 | Regency Square | 2526 W Brandon Blvd. | Brandon | FL | 33511 | 2526 |

2