**EXHIBIT B**
**SIGNED INTERIM ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| QUIKSILVER, INC., *et al.*, | : Case No. 15-11880 (BLS) |
| | : |
| Debtors.[1] | : (Jointly Administered) |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   **Related Docket No. 7**

**INTERIM ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363 AND 554 AND BANKRUPTCY RULES 6003 AND 6004 (I) AUTHORIZING THE DEBTORS TO ASSUME THE AGREEMENTS; (II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE CLOSING OR SIMILAR THEMED SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND (III) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING BUSINESS LOCATIONS**

Upon the motion (the "Motion")[2] of the Debtors for the entry of an interim order (the "Interim Order") and a final order, pursuant to Bankruptcy Code sections 105, 363, 365, and 554 and Bankruptcy Rules 6003 and 6004; (i) authorizing the Debtors to assume (a) the agreement dated as of September 4, 2015, by and between QS Retail, Inc. ("QS Retail"), on the one hand, and Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Agent"), on the other hand (the "Store Closing Agreement"), a copy of which is attached as Exhibit 1 to this Interim Order and (b) the agreement dated as of June 8, 2015 by and between QS Retail, on the one hand, and the Agent on the other hand (the "Pop Up Store Agreement," a copy of which is attached as Exhibit 2 to this Interim Order, and together with the Store Closing Agreement, the "Agreements"); (ii) authorizing the Debtors to conduct (a) store closing sales

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]   Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

(collectively, the "Store Closing Sales") at the locations subject to the Store Closing Agreement (the "Closing Locations")[3] in accordance with the terms or the sale guidelines (the "Sale Guidelines") attached as Exhibit 3 to this Interim Order, with such sales to be free and clear of all liens, claims, encumbrances, and interests (collectively, the "Encumbrances") and (b) sales of certain merchandise (collectively, the "Pop Up Sales," and together with the Store Closing Sales, the "Sales") at the locations subject to the Pop Up Store Agreement (the "Pop Up Stores," [4] and together with the Closing Locations, the "Stores"), in accordance with the Sale Guidelines, with such sales to be free and clear of all Encumbrances; (iii) authorizing, but not directing, the Debtors to pay customary retention bonuses to the store-level and certain field employees at the Stores; (iv) authorizing the protections and dispute resolution procedures contained in the Interim and Final Orders; and (v) granting certain related relief, on an interim basis (collectively, the "Store Closing Relief"); and the Court having reviewed the Motion and the Declarations and having considered the statements of counsel and the evidence adduced with respect to the Motion at the hearing before the Court on September 10, 2015 (the "Hearing"); the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, (ii) venue is proper in this District pursuant to 28 U.S.C. § 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) the notice of the Motion and the Hearing was sufficient under the circumstances, and (v) there is good cause to waive the stay of Bankruptcy Rule 6004(h); and due and sufficient notice of the Motion having been given under the particular circumstances and it appearing that no other or further notice is necessary; after due deliberation determined that the relief requested in the Motion is necessary on an interim basis and essential for the Debtors' reorganization and such relief is in the best interests of the Debtors, their estates,

---

[3]    A list of Closing Locations is attached as Exhibit A to the Store Closing Agency Agreement.

[4]    A list of Pop Up Stores is attached to as Exhibit 4 to this Interim Order.

their creditors, and other parties in interest; and upon the record herein; and after due deliberation

thereon; and good and sufficient cause have been shown; it is hereby

**FOUND, CONCLUDED AND DETERMINED that:**[5]

A.     The Debtors have advanced sound business reasons for entering into the

Agreements on an interim basis, subject to the Final Hearing, as set forth in the Motion and at the

Hearing, and entering into the Agreements is a reasonable exercise of the Debtors' business

judgment and in the best interests of the Debtors and their estates.

B.     The conduct of the Sales will provide an efficient means for the Debtors to

dispose of the Store Closure Assets.

C.     The Agreements were negotiated, proposed, and entered into by the Agent

and the Debtors without collusion, in good faith and from arm's length bargaining positions.

D.     The relief set forth herein is necessary to avoid immediate and irreparable

harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and

sound business purposes and justifications for the relief approved herein.

E.     The Sales are in the best interest of the Debtors' estates.

F.     The Debtors have represented that they are neither selling nor leasing

personally identifiable information pursuant to the Motion, although the Agent will be authorized

to distribute emails and promotional materials to the Debtors' customers consistent with the

Debtors' existing policies on the use of consumer information.

---

[5]  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To
the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the
extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

G.    The entry of this Interim Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is hereby.

### ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion, on an interim basis through and including __October 6__, 2015 (the "Interim Period"), is GRANTED as provided herein.

2.    On __October 6__, 2015, at 10:00 a.m. (prevailing Eastern Time), a hearing (the "Final Hearing") will be held before this Court to consider the Store Closing Relief on a final basis.  All objections, if any, to the Motion shall be in writing and filed with this Court and served on counsel for the Debtors, any duly appointed committee, and the Agent, as to be received on or before __September 29__, 2015, at 4:00 p.m. (prevailing Eastern Time).  The Debtors shall file any reply(s) to such objections on or before __October 1__, 2015, at 4:00 p.m. (prevailing Eastern Time) and serve such replies on the objecting parties, any duly appointed committee and the Agent.

3.    The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Interim Order.  The failure to include specifically any particular provision of the Agreements in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agreements and all of their provisions, payments and transactions, be authorized and hereby are and approved as and to the extent provided for in this Interim Order.

4.    To the extent of any conflict between this Interim Order, the Sale Guidelines, and the Agreements, the terms of this Interim Order shall control over all other documents, and the Sale Guidelines shall control over the Agreements.

5.      Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall take effect immediately upon its entry.

6.      The (i) Store Closing Agreement, a copy of which is attached to this Interim Order as Exhibit 1, and (ii) Pop Up Store Agreement, a copy of which is attached to this Interim Order as Exhibit 2, are each operative and effective on an interim basis during the Interim Period.  The Debtors are authorized to act and perform in accordance with the terms of the Agreements, including, making payments required by the Agreements to the Agent without the need for any application of the Agent or a further order of the Court.

7.      Subject to the restrictions set forth in this Interim Order and the Sale Guidelines, the Debtors and the Agent hereby are authorized to take any and all actions as may be necessary or desirable to implement the Agreements and the Sales; and each of the transactions contemplated by the Agreements, and any actions taken by the Debtors and the Agent necessary or desirable to implement the Agreements and/or the Sales prior to the date of this Interim Order, hereby are approved and ratified.

A.      **Authority To Engage In Sales**

8.      The Debtors are authorized, on an interim basis pending the Final Hearing, pursuant to 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct the Sales at the Stores in accordance with this Interim Order, the Sale Guidelines, and the Agreements.

9.      The Sale Guidelines are approved in their entireties on an interim basis.

10.      The Debtors are authorized to discontinue operations at the Stores in accordance with this Interim Order and the Sale Guidelines.

11.      All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the

- 5 -

Agreements or this Interim hereby are directed to surrender possession of such Merchandise or FF&E to the Debtors or the Agent.

12.     Subject to the provisions herein in paragraphs 14, 15, 17, and 27, neither the Debtors nor the Agent nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in Bankruptcy Code section 101(27)), landlord, or licensor, to conduct the Sales and to take the related actions authorized herein.

**B.     Conduct Of The Sales**

13.     All newspapers and other advertising media in which the Sales may be advertised and all landlords and licensors, as applicable, of the Stores are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Agent to conduct the Sales and the sale of Merchandise and FF&E pursuant to the Agreements, including, without limitation, to conduct and advertise the sale of the Merchandise and FF&E in the manner contemplated by and in accordance with this Interim Order, the Sale Guidelines, and the Agreements.

14.     Nothing in this Interim Order or the Agreements releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order. Nothing contained in this Interim Order or in the Agreements shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code. Nothing herein shall be construed to be a determination that the Agent is an operator with

- 6 -

respect to any environmental law or regulation. Moreover, the sale of the Merchandise and FF&E shall not be exempt from, and the Agent shall be required to comply with, laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws"). Nothing in this Interim Order shall alter or affect the Debtors' and Agent's obligations to comply with all applicable federal safety laws and regulations. Nothing in this Interim Order shall be deemed to bar any Governmental Unit from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' or the Agent's right to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Interim Order, or otherwise, pursuant to Paragraph 27 hereunder. Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

15. Except to the extent of the reserved rights of Governmental Units expressly granted elsewhere in this Interim Order, during the Interim Period, the Debtors and Agent are hereby authorized to take such actions as may be necessary and appropriate to implement the Agreements and to conduct the sale without necessity of further order of this Court as provided in the Agreements or the Sale Guidelines, including, but not limited to, advertising the sale as a "store closing sale", "sale on everything", "everything must go", or similar-themed sales through the posting of signs (including the use of exterior banners at non-

enclosed mall Stores, and at enclosed mall Stores to the extent the applicable Store entrance does not require entry into the enclosed mall common area), use of signwalkers and street signage.

16.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise and FF&E, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners or other advertising and the Debtors and the Agent are unable to resolve the matter consensually with a Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (i) the Final Hearing or (ii) within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

17.     Except as expressly provided in the Agreements, the sale of the Merchandise and FF&E shall be conducted by the Debtors and the Agent notwithstanding any restrictive provision of any lease, sublease, short-term license, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sales, the rejection of leases or licenses, abandonment of assets, or "going dark" provisions. The Agent, along with landlords and licensors, as applicable, of the Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Agent and any such landlords or licensors, as applicable, of the Stores, provided that nothing in such Side Letters affects the provisions of Paragraphs 16, 17 and 27 of this Interim Order. In the event of any conflict between the Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.

- 8 -

18.    Except as expressly provided for herein or in the Sale Guidelines, and except with respect to any Governmental Unit (as to which Paragraphs 14, 16, 17 and 27 of this Interim Order shall apply), no person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sales or the sale of Merchandise or FF&E, or the advertising and promotion (including the posting of signs and exterior banners or the use of signwalkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Sales and/or (ii) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Agent, or the landlords or licensors, as applicable, at the Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales or sale of the Merchandise or FF&E or other liquidation sales at the Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

19.    In accordance with and subject to the terms and conditions of the Agreements, the Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Debtors for the purpose of conducting the Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Interim Order and subject to Paragraphs 14, 16, 17 and 27 of this Interim Order.

20.     The Agent shall accept the Debtors' validly-issued Gift Cards (as defined in the Customer Programs Motion[6]) that were issued by the Debtors prior to the applicable Sale Commencement Date (as defined in the Agreements) in accordance with the Debtors' Gift Card policies and procedures as they existed on the Petition Date, as described in the Customer Programs Motion, and accept returns of merchandise sold by the Debtors prior to the applicable Sale Commencement Date, provided that such return is otherwise in compliance with the Refund and Exchange Program (as defined in the Customer Programs Motion) as they existed on the Petition Date, as described in the Customer Programs Motion.

21.     All sales of Store Closure Assets shall be "as is" and final.  However, as to the Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."  Further, as to the Stores only, the Debtors and/or the Agent shall accept return of any goods purchased during the Sales that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within seven days of purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.  Signs stating that "[r]efunds may be made only for merchandise having a latent defect, when returned with a receipt within 7 days of purchase." will be posted at the cash register areas of the Stores. Returns, if permitted, related to the purchase of Store Closure Assets shall not be accepted at stores that are not participating in the Sales, except in the situation where a customer experiences a latent defect and returns the Merchandise within the seven day time period and provides

---

[6]   As used herein, the "Customer Programs Motion" shall mean the *Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and Bankruptcy Rules 6003 and 6004 Authorizing the Debtors to (I) Maintain Customer Programs and (II) Honor or Pay Related Prepetition Obligations*, filed concurrently herewith.

information that the point of purchase store has closed in the meantime.  Information on stores remaining open will be maintained on the Debtors' website through the end of the Sales.

22.     The Agent shall not be liable for sales taxes except as expressly provided in the Agreements and the payment of any and all sales taxes is the responsibility of the Debtors. The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due, provided that in the case of a bona fide dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  The Agent shall collect, remit to the Debtors and account for sales taxes as and to the extent provided in the Agreements.  This Interim Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

23.     Pursuant to section 363(f) of the Bankruptcy Code, the Agent, on behalf of the Debtors, is authorized to sell and all sales of Merchandise or FF&E (each as defined in the Agreements) pursuant to the Sales, whether by the Agent or the Debtors, shall be free and clear of any and all Encumbrances; provided, however, that any such Encumbrances shall attach to the proceeds of the Sales with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Merchandise and FF&E, subject to any claims and defenses that the Debtors may possess with respect thereto and the Agent's fees and expenses (as provided in the Agreements).

24.     To the extent that the Debtors propose to sell or abandon FF&E which may contain personal and/or confidential information about the Debtors' employees and/or customers (the "Confidential Information"), the Debtors shall remove the Confidential Information from such items of FF&E before such sale or abandonment.

25.     The Debtors and/or the Agent (as the case may be) are authorized and empowered to transfer Merchandise and FF&E among the Stores. The Agent is authorized to sell the Debtors' FF&E and abandon the same, in each case, as provided for and in accordance with the terms of the Agreements.

C.     **Dispute Resolution Procedures With Governmental Units**

26.     To the extent that the sale of Merchandise or FF&E is subject to any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws (each a "GOB Law," and collectively, the "GOB Laws"), including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of assets during the Interim Period (collectively, with the GOB Laws, the "Liquidation Sale Laws"), the dispute resolution procedures in this section shall apply.

27.     Provided that the Sales and the sale of Merchandise and FF&E are conducted in accordance with the terms of this Interim Order, the Agreements and the Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance with any Liquidation Sale Laws and, subject to Paragraphs 14, 16, 17 and 27 herein, are authorized to conduct the Sales in accordance with the terms of this Interim Order and the Sale

- 12 -

Guidelines without the necessity of further showing compliance with any such Liquidation Sale Laws.

28.    Within three business days of entry of this Interim Order, the Debtors shall serve copies of this Interim Order, the Agreements and the Sale Guidelines via e-mail, facsimile or regular mail, on: (i) the Attorney General's office for each state where the Sales are being held, (ii) the county consumer protection agency or similar agency for each county where the Sales are being held, (iii) the division of consumer protection for each state where the Sales are being held; (iv) the chief legal counsel for the local jurisdiction; (v) the Debtors' landlords of the Closing Stores, and (vi) the licensors of the Pop Up Stores.

29.    To the extent that during between the Petition Date and the date of the Final Hearing there is a dispute arising from or relating to the Sales, this Interim Order, the Agreements, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute which such Reserved Dispute will be heard at the Final Hearing, absent a party obtaining expedited relief.  Nothing in this Interim Order shall constitute a ruling with respect to any issues to be raised with respect to a Reserved Dispute.  Any Governmental Unit may assert a Reserved Dispute by sending a notice (the "Dispute Notice") explaining the nature of the dispute to:  (i) Skadden, Arps, Slate, Meagher & Flom LLP, 300 South Grand Avenue, Suite 3400, Los Angeles, CA 90071 (Attn: Van Durrer, Esq.); and (ii) Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Suite 2700, Chicago, IL 60606 (Attn: John K. Lyons, Esq.).

**D.    Store Closing Bonuses**

30.    On an interim basis and pending the Final Hearing, the Debtors shall have the authority, but not the obligation, to pay store closing bonuses (the "Store Closing Bonuses") to store-level and certain field employees who remain in the employ of the Debtors during the

- 13 -

Sales. The Debtors shall have the authority to determine the individual amounts of each Store

Closing Bonus, except that the total aggregate cost of the Store Closing Bonus program will not

exceed 10% of the base payroll, including taxes and typical benefits, for all employees working

at the Stores.

**E.      Section 363(m)**

          31.    The Agent shall be afforded the protections of section 363(m) of the

Bankruptcy Code as to all aspects of the transactions under and pursuant to the Agreements if

this Interim Order or any authorization contained herein is reversed or modified on appeal.

**F.      Payments**

          32.    All applicable banks and other financial institutions are hereby authorized,

when requested by the Debtors in their sole discretion, to receive, process, honor and pay all

prepetition and postpetition checks, drafts and other forms of payment, including fund transfers,

on account of the Agent Claims, whether such checks or other requests were submitted prior to

or after the Petition Date.

          33.    The Debtors' banks and other financial institutions shall rely on the

direction and representations of the Debtors as to which checks and fund transfers should be

honored and paid pursuant to this Interim Order, and any such bank shall not have any liability to

any party for relying on such direction and representations by the Debtors as provided for in this

Interim Order or for inadvertently honoring or dishonoring any check or fund transfer.

          34.    The Debtors' banks shall, at the direction of the Debtors, receive, process,

honor, and pay all prepetition and postpetition checks and fund transfers on account of the Agent

Claims that had not been honored and paid as of the Petition Date, provided that sufficient funds

are on deposit in the applicable accounts to cover such payments and any such bank shall not

have any liability to any party for relying on such direction by the Debtors as provided for in this

Interim Order or for inadvertently failing to follow such direction.

35.     To the extent the Debtors have not yet sought to remit payment on account of the Agent Claims, the Debtors are authorized, but not directed, to issue checks or provide for other means of payment of the Agent Claims.

36.     The Debtors shall be and hereby are authorized to issue new postpetition checks or effect new postpetition fund transfers on account of the Agent Claims to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

**G.     Other Provisions**

37.     Notwithstanding anything to the contrary contained herein, the relief granted in this Interim Order and any payment to be made hereunder shall be subject to the terms of any orders approving entry into debtor-in-possession financing and authorizing the use of cash collateral approved by this Court in these Chapter 11 Cases (including with respect to any budgets or other covenants governing or relating to such debtor-in-possession financing and/or use of cash collateral), and to the extent there is any inconsistency between the terms of such orders and any action taken or proposed to be taken hereunder, the terms of such orders shall control.

38.     Nothing in this Interim Order or the Motion shall be deemed to constitute postpetition assumption or adoption of any agreement under Bankruptcy Code section 365.

39.     The Agent shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Agent, in each case, other than as expressly provided for in the Agreements.

40.     Except with respect to any Governmental Unit (as to which the provisions of Paragraphs 14, 16, 17 and 27 of this Interim Order shall apply), this Court shall retain exclusive jurisdiction with regard to all issues or disputes arising from or relating to the

- 15 -

implementation, interpretation, or enforcement of this Interim Order or the Agreements, including, but not limited to, (i) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and signwalker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtors, the landlords, the licensors and/or the Agent for protection from interference with the Sales, (iii) any other disputes related to the Sales, and (iv) to protect the Debtors and/or the Agent against any assertions of Encumbrances.  No such parties or person shall take any action against the Debtors, the Agent, the landlords, the licensors, or the Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: Wilmington, Delaware

Sept 10      , 2015

HONORABLE BRENDAN L. SHANNON
CHIEF UNITED STATES BANKRUPTCY JUDGE

- 16 -

## **EXHIBIT 1**

**Store Closing Agreement**

 

September 4, 2015

*VIA EMAIL*
QS RETAIL, INC.
Attn:  General Counsel
5600 Argosy Ave. Bldg 100
Huntington Beach, Ca 92649
Phone:  (714) 889-2200

Re:    **Letter Agreement Governing Inventory Disposition**

Dear Steve:

This letter shall serve as an agreement ("Agreement") between Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, on the one hand (collectively, "Agent" or a "Party"), and QS RETAIL, Inc., on the other hand ("Merchant" or a "Party" and together with the Agent, the "Parties"), under which Agent shall act as the exclusive agent for the purpose of conducting a "store closing" or other mutually agreed upon sale at Merchant's retail stores identified on Exhibit A (each a "Store" and collectively, the "Stores") in the United States (the "Sale").

**A.      Intentionally Left Blank.**

**B.      Sale Term**

For each Store, the Sale shall commence on September 6, 2015 (the "Sale Commencement Date") and conclude on respective dates to be mutually agreed to by Agent and Merchant; provided however, that the Sale shall conclude at all Stores no later than December 31, 2015(the "Sale Termination Date").  The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "Sale Term."

**C.      Project Management**

(i)      Agent's Undertakings

Agent shall, in collaboration with Merchant, (a) provide qualified supervisors (the "Supervisors") engaged by Agent to oversee the management of the Stores; (b) determine appropriate point-of-sale and internal and external advertising strategies for the Stores, recommend and assist Merchant with advertising, and create signage for the Stores, all at Merchant's cost and expense and approved in advance by Merchant; (c) determine appropriate discounts of Merchandise (as defined below) approved in advance by Merchant; (d) recommend staffing levels for the Stores and appropriate bonus and incentive programs, if any, for the Stores' employees; (e) oversee display of Merchandise for the Stores; (f) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (g) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (h) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (i) provide support in

obtaining appropriate authorization and permits to conduct the Sale from state and local authorities (if applicable) by (i) advising Merchant of the applicable waiting period under such laws, and/or (ii) preparing (in Merchant's name and for Merchant's signature) all permitting paperwork as may be necessary under such laws, delivering all such paperwork to Merchant, and filing on behalf of Merchant, all such paperwork where necessary, and/or (iii) advising Merchant where permitting paperwork and/or waiting periods do not apply; (j) assist Merchant in creating a customer transition program to transition customers from the Stores to Merchant's other retail channels; and (k) provide such other related services deemed necessary or appropriate by Merchant and Agent.

At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant in broom clean condition; provided, however, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Agent and Merchant. At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

    (ii)    <u>Merchant's Undertakings</u>

During the Sale Term, Merchant shall (at no cost or expense to Agent): (a) be the employer of the Stores' employees (other than the Supervisors) or, to the extent Merchant elects, utilize the services of a third party employment agency recommended by Agent, for purposes of engaging temporary staff for the Stores; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees (other than the Supervisors) and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Agent to be necessary or desirable for the operation of the Stores during the Sale; (g) provide, and arrange for the ordinary maintenance of, all point-of-sale and all other Store-level equipment required for the Stores; (h) ensure that Agent has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement; and (i) identify the Merchandise for the Sale, with Agent's assistance allocate and balance the Merchandise among the Stores, and ship and distribute the Merchandise to the Stores.

To assist with the Sale, Merchant shall provide throughout the Sale Term (at no cost or expense to Agent) central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Agent.

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

**D.**     **The Sale**

All sales of Merchandise shall be made on behalf of Merchant.  Agent does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, or credit card, and shall be "final" with no returns accepted or allowed, except as authorized by Merchant.

**E.**     **Agent Fee and Expenses in Connection with the Sale**

As used in this Agreement, the following terms shall have the following meanings:

(i)     "Gross Proceeds" shall mean the sum of (i) the gross proceeds of all sales of Merchandise made in the Store during the Sale Term, net only of sales taxes.

(ii)    "Merchandise" shall mean all merchandise sold in the Store during the Sale Term comprised of such merchandise in the Stores as of the Sale Commencement Date, plus such other merchandise included in the Stores during the Sale Term; subject in the case of such other merchandise to: (a) Agent's and Merchant's mutual agreement of the composition of such merchandise and the timing of receipt in the Stores, (b) compliance with applicable law, and (c) Agent's and Merchant's subsequent mutual agreement of such other adjustments (if any) to provisions of this Agreement as may be required to reflect the inclusion of such other merchandise in the Sale as Merchandise.

(iii)   "Recovery Percentage" shall mean the Gross Proceeds divided by the Cost Value of the Merchandise.

(iv)    "Cost Value" with respect to each item of Merchandise shall be determined with reference to the Merchant's books and records maintained in the ordinary course consistent with past periods and practices.

Merchant shall pay Agent an "Incentive Fee" of <u>one</u> of the following (e.g., back to first dollar) based upon the following "Recovery Performance hurdles/Incentive Fee" formulations:

| Recovery Percentage | Agent Incentive Fee |
| --- | --- |
| Less than 155.00% | 1.00% of Gross Proceeds |
| 155.00% - 159.99% | 1.50% of Gross Proceeds |
| 160.00% - 169.99% | 1.75% of Gross Proceeds |
| 170.00% and Above | 2.00% of Gross Proceeds |

On a weekly basis as part of the weekly reconciliations contemplated below, Merchant shall pay Agent an advance on account of the Incentive Fee in the amount of 1.00% of Gross Proceeds for the prior week (or partial week in the case of the first and last weeks).  The Recovery Percentage shall be determined in connection with the Final Reconciliation, and once determined, the parties (as part of the Final Reconciliation) shall determine the actual amount of the Incentive Fee. Merchant shall pay Agent any remaining balance due on account of the Incentive Fee (if any) in

3

connection with the Final Reconciliation, and, with Agent's consent, Merchant may offset against such remaining balance amounts (if any) Agent owes to Merchant.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's reasonable, documented and preapproved out of pocket expenses. To control expenses of the Sale, Merchant and Agent have established a budget (the "Expense Budget") of certain delineated expenses within the control of Agent, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation), advertising costs, and Agent's legal and miscellaneous expenses. The Expense Budget for the Sale shall be (i) $98,400 for the first week of the Sale (covering for example start-up expenses, initial signage and supervision travel); and (ii) $31,550 per week thereafter (covering for example weekly supervision compensation/deferred compensation and fees, advertising, and miscellaneous expenses, including without limitation Agent's reasonable and documented legal expenses associated with a bankruptcy filing). The Expense Budget does not include costs, and instead reflects cost savings, associated with supervision because Agent and Merchant have agreed to utilize "Supervisors" (as defined in certain letter agreement dated June 4, 2015 by and among the Agent and Merchant (the "Pop Up Stores Agreement")) associated with the "pop up stores" as Supervisors for the Stores in addition to such Supervisors' responsibilities under the Pop Up Stores Agreement. The Expense Budget shall be increased if the "Supervisors" under the Pop Stores Agreement are not utilized in connection with the Sale to take into account additional costs of supervision that will be necessary for Agent to perform its responsibilities under this Agreement and properly conduct the Sale. The Expense Budget may only be modified by mutual agreement of Agent and Merchant. Merchant shall have no responsibility for costs and expenses in excess of the Expense Budget, unless Agent has obtained Merchant's prior written (including email) consent pursuant to an amendment to the Expense Budget.

All accounting matters (including, without limitation, all fees, expenses, advances, or other amounts reimbursable or payable to Agent) shall be reconciled by mutual agreement of Agent and Merchant on every Wednesday for the prior week and, unless disputed by either Party, shall be paid within seven (7) days after each such weekly reconciliation. The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) ("Final Reconciliation") no later than forty five (45) days following the Sale Termination Date for the last Store.

## F.   **Indemnification**

### (i)   Merchant's Indemnification

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates, and Supervisors (collectively, "Agent Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) product liability claims, except claims arising from Agent's negligence, willful misconduct or unlawful behavior, (d) claims asserted by any Store

4

employees employed by Merchant (under a collective bargaining agreement or otherwise), relating to such employment against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Merchant or any of the Merchant Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

      (ii)      Agent's Indemnification

Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC shall, jointly and severally, indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by an Agent Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement.

**G.**    **Insurance**

      (i)      Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause Agent to be named an additional insured with respect to all such policies. At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and that Agent is an additional insured thereunder. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

      (ii)      Agent's Insurance Obligations

As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Stores. Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a

certificate or certificates evidencing the insurance coverage required hereunder. In addition, Agent shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements. Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

      (iii)    <u>Certain Agreements</u>

Notwithstanding any other provision of this Agreement, Merchant and Agent agree that Agent shall not be deemed to be in possession or control of the Stores, or the Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores.

## H.    <u>Representations, Warranties, Covenants and Agreements</u>

      (i)    Merchant warrants, represents, covenants and agrees that (a) Merchant is a corporation duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein (other than as set forth in Section A), (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; and (d) to the extent within the control of Merchant, the Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

      (ii)    Agent warrants, represents, covenants and agrees that (a) each entity comprising Agent is a limited liability company duly organized, validly existing and in good standing under the laws of state of the Delaware, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Stores will be conducted without Merchant's prior written consent, (e) Agent will not take any disciplinary action against any employee of Merchant.

## I.    <u>Furniture, Fixtures and Equipment</u>

Agent shall sell the FF&E in each such Store from the Store themselves. Agent shall dispose of any unsold FF&E at the conclusion of the Sale in a manner to be approved by Merchant; <u>provided however</u>, that at Agent's election, Agent shall have the right to abandon in-place in a neat

and orderly manner, all unsold FF&E (and all FF&E that Merchant requested that Agent not sell). Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale or other disposition of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties.

In consideration for providing the services set forth in this Section I, Agent shall be entitled to a commission from the sale of the FF&E equal to twenty percent (20%) of the gross proceeds (net only of sales taxes to the extent applicable) of the sale of the FF&E.

Agent shall remit to Merchant all such gross proceeds, and during each weekly reconciliation described in Section E above, Agent's FF&E fee shall be calculated, and Agent's calculated and agreed upon FF&E fee and all FF&E costs and expenses then incurred within an agreed upon budget shall paid within seven (7) days after each such weekly reconciliation.

## J.   Termination

The following shall constitute "Termination Events" hereunder:

(a)   Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured five (5) days after receipt of written notice thereof to the defaulting Party; or

(b)   The failure of any representation or warranty made by Merchant or Agent to be true in any material respect as of the date made or at any time and throughout the Sale Term, which failure shall continue uncured five (5) days after receipt of written notice thereof to the defaulting Party.

If a Termination Event occurs, the non-defaulting Party  may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in addition to terminating this Agreement, pursue any and all rights and remedies and damages resulting from such default; provided, that in no event shall either Party be liable to the other for any punitive, exemplary, consequential, incidental, indirect or special damages, including, without limitation, lost profits.  If this Agreement is terminated other than as a result of a default by Agent, Merchant shall be obligated to pay Agent all amounts due under this Agreement through and including the termination date.

## K.   Notices

All notices, certificates, approvals, and payments provided for herein shall be sent by fax or by recognized overnight delivery service as follows:  (a) To Merchant: Quiksilver, Inc., 5600 Argosy Circle, #100, Huntington Beach, CA 92649, Attn: Retail Department; with a copy to: Legal Department; (b) To Agent: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax:  847- 897-0859, Attn: Ian S. Fredericks; and c/o Gordon Brothers Retail Partners, LLC, 800 Boylston Street, 27th Floor, Boston, MA 02199, Fax: 617-531-7906, Attention, Michael Chartock; or (c) such other address as may be designated in writing by Merchant or Agent.

7

**L.      Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect.  No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement.  Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**M.      Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party; provided that either Party may assign this Agreement without the consent of the other Party in the event of a merger, reorganization, consolidation or other change in control transaction, or in connection with the sale of all or substantially all of such Party's assets.  No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

**N.      Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.    If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**O.      Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of California (without reference to the conflicts of laws provisions therein).   Any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Orange County, California courts and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.   If either Party commences any legal action, suit or proceeding to enforce or interpret this Agreement or any of the terms or provisions hereof, then in addition to any damages or remedies that may be awarded to the prevailing party therein, the prevailing party will be entitled to have and recover from the losing

8

party the prevailing party's reasonable outside attorneys' fees and costs incurred in connection therewith.

If Merchant commences a case under Chapter 11 of Bankruptcy Code with a bankruptcy court (the "Bankruptcy Court"), Merchant shall promptly file a motion to assume both this Agreement and the Pop Up Store Agreement under section 365 of the Bankruptcy Code, and utilize its best efforts to ensure that such motion is approved by an order, in form and substance reasonably acceptable to the Agent and Merchant, that provides, among other things, as follows: (i) the payment of all fees and reimbursement of expenses hereunder and under the Pop Up Store Agreement to Agent is approved without further order of the court and shall be free and clear of all liens, claims and encumbrances; (ii) all such payments of fees and reimbursement of expenses shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement and the Pop Up Store Agreement (as the case may be); (iii) approval of the transaction contemplated hereby and by the Pop Up Store Agreement; (iv) authorizing the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale; (v) authorizing the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; and (vi) take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement. In such event, then notwithstanding the provisions of the second sentence of the first paragraph of this Section O, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over Merchant, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens.

**P.    Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, and, the Pop Up Stores Agreement, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof. No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement. Except with respect to the Pop Up Stores Agreement, all prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**Q.    Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

\*          \*          \*

9

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned. Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: Ian S. Fredericks
Its: SVP & CLO

GORDON BROTHERS RETAIL PARTNERS, LLC

By: Robert Grosskopf
Its: Co-President

**AGREED AND ACCEPTED as of the 4th day of September, 2015:**

QS RETAIL, INC.

By:
Its:

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned. Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: _____
Its:

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Its:

**AGREED AND ACCEPTED as of the** 4th **day of September, 2015:**

QS RETAIL, INC.

By: _____
      Lindsay Caya
Its: President

11

Gordon Brothers Group
— EST. 1903 —

Exhibit A

| Store # | Brand | Store Name | City | State | Sq Ft | Property Management Co. |
|---------|-------|------------|------|-------|-------|-------------------------|
| 27 | QS | QUIKSILVER- UNIVERSAL CITYWALK | Universal City | CA | 2493 | Universal City Walk |
| 29 | QS | QUIKSILVER - SOUTH COAST PLAZA | Costa Mesa | CA | 2167 | South Coast Plaza |
| 50 | QS | QUIKSILVER - TIMES SQUARE | New York | NY | 3033 | Rudin Management Company, Inc. |
| 58 | QS | QUIKSILVER - HOLLYWOOD, FL | Hollywood | FL | 3040 | Seminole Properties Retail |
| 103 | DC | DC - IRVINE SPECTRUM | Irvine | CA | 2305 | The Irvine Company |
| 111 | QS | QUIKSILVER – SEATTLE | Seattle | WA | 6187 | First & Lenora LLC |
| 114 | RX | ROXY - FASHION ISLAND | Newport Beach | CA | 1386 | The Irvine Company |
| 119 | TRI | QUIKSILVER - DEL AMO | Torrance | CA | 5,820 | |
| 120 | WA | WATERMAN - WAIKIKI BEACH WALK | Honolulu | HI | 1,261 | |
| 123 | TRI | QUIKSILVER GLENDALE | Glendale | CA | 2997 | |
| 124 | BR | BOARDRIDERS MEATPACKING | New York | NY | 4262 | |
| 125 | BR | BOARDRIDERS PASADENA | Pasadena | CA | 5000 | |
| 834 | QS | QUIKSILVER OUTLET – LAKEWOOD | Lakewood | CO | 2500 | Simon Property Group |
| 838 | DC | DC OUTLET - PISMO | Pismo Beach | CA | 2405 | Simon Property Group |
| 850 | DC | DC OUTLET - EL PASO | Canutillo | TX | 2625 | Horizon Group Properties |
| 852 | DC | DC OUTLET – GILROY | Gilroy | CA | 2722 | Simon Property Group |
| 859 | DC | DC OUTLET – LAUGHLIN | Laughlin | NV | 2624 | |
| 861 | DC | DC OUTLET - DOLPHIN MALL | Miami | FL | 3052 | Taubman |
| 865 | DC | DC OUTLET - KATY MILLS | Katy | TX | 2050 | Simon Property Group |
| 869 | TRI | QUIKSILVER OUTLET – MIROMAR | Estero | FL | 2270 | Miromar Outlets |
| 872 | TRI | QUIKSILVER OUTLET – CHICAGO | Rosemont | IL | 4000 | Macerich |
| 874 | TRI | QUIKSILVER OUTLET - SILVER SANDS | Destin | FL | 3000 | Silver Sands GL I, LLC |
| 876 | TRI | QUIKSILVER  OUTLET - GREAT LAKES | Auburn Hills | MI | 5576 | Taubman Management |
| 879 | QS | QUIKSILVER OUTLET – ANNAPOLIS | Annapolis | MD | 3500 | Westfield Shoppingtown-Annapolis Mall, Owner LLC |
| 883 | QS | QUIKSILVER OUTLET - CHARLOTTE | Charlotte | NC | 2944 | |
| 885 | TRI | QUIKSILVER OUTLET - WOODBURY COMMONS | Central Valley | NY | 5000 | |
| 887 | TRI | QUIKSILVER OUTLET - NORTH GEORGIA PREMIUM OUTLETS | Dawsonville | GA | 4262 | |

## EXHIBIT 2

**Pop Up Store Agreement**

 

June 8, 2015

*VIA EMAIL*
QS RETAIL, INC.
Attn:  Steve Finney
5600 Argosy Ave. Bldg 100
Huntington Beach, Ca 92649
Phone:  (714) 889-2336
Email: steve.finney@quiksilver.com

Re:    **Letter Agreement Governing Inventory Disposition**

Dear Steve:

This letter shall serve as an agreement ("Agreement") between Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, on the one hand (collectively, "Agent" or a "Party"), and QS RETAIL, Inc., on the other hand ("Merchant" or a "Party" and together with the Agent, the "Parties"), under which Agent shall act as the exclusive agent for the purpose of conducting a sale of certain Merchandise (as defined below) through a "pop up" store program (each a "Pop Up Store" and collectively, the "Pop Up Stores") in the United States utilizing sale handles agreed upon by the Parties (the "Sale").

**A.    Merchandise**

For purposes hereof, "Merchandise" shall mean all excess, clearance, obsolete, or distressed inventory described on Exhibit A attached hereto, but only to the extent that Merchant obtains the necessary approvals and clearances to import such inventory into the United States, and such other goods as Merchant and Agent may agree to include in the Sale from time to time.  "Merchandise" does not mean and shall not include: (1) goods that belong to sublessees, licensees or concessionaires of Merchant; (2) furnishings, trade fixtures, equipment and improvements to real property that are located in the Pop Up Stores (collectively, "FF&E"); or (3) damaged or defective merchandise that cannot be sold.

**B.    Sale Term**

For each Store, the Sale shall commence on July 1, 2015 (the "Sale Commencement Date") and conclude the earlier of (a) January 31, 2016 or (b) the date that the Sale is completed (the "Sale Termination Date"); provided, however, that the Parties may mutually agree in writing to extend or terminate the Sale at any Store prior to the Sale Termination Date.  The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "Sale Term."

**C.    Project Management**

(i)    Agent's Undertakings

Agent shall, in collaboration with Merchant, (a) together with Agent's affiliate, Hilco Real Estate, LLC, assist Merchant with identifying a minimum of fifteen suitable locations for the Pop

Up Stores; provided, that it is the Parties intent to operate approximately thirty Pop Up Stores; (b) provide qualified supervisors (the "Supervisors") engaged by Agent to oversee the management of the Pop Up Stores; (c) determine appropriate point-of-sale and internal and external advertising strategies for the Pop Up Stores and recommend and assist Merchant with advertising and signage for the Pop Up Stores, all at Merchant's cost and expense and approved in advance by Merchant; (d) determine appropriate discounts of Merchandise approved in advance by Merchant; (e) assist Merchant in procuring employees to be employed by Merchant or a third party staffing company recommended by Agent; (f) recommend staffing levels for the Pop Up Stores and appropriate bonus and incentive programs, if any, for the Pop Up Stores' employees; (g) oversee display of Merchandise for the Pop Up Stores; (h) assist in procuring FF&E for the Pop Up Stores; (i) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (j) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (k) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (l) provide support in obtaining appropriate authorization and permits to conduct the Sale from state and local authorities (if applicable); (m) assist Merchant in creating a customer transition program to transition customers from the Pop Up Stores to Merchant's other retail channels; (n) provide such other related services deemed necessary or appropriate by Merchant and Agent; and (o) at an agreed upon time prior to the end of the Sale Term at each Pop Up Store, conduct a "sale on everything", "everything on sale", "store closing" or similar themed sale event (but not a "going out of business" or similar event sale) and sell all Merchandise to the piece, and if Merchant requests, the FF&E pursuant to Section I.

At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant in broom clean condition and in accordance with the lease requirements for such premises; provided, however, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Agent and Merchant. At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

(ii)    Merchant's Undertakings

During the Sale Term, Merchant shall (a) be the employer of the Pop Up Stores' employees (other than the Supervisors) or, to the extent Merchant elects, utilize the services of a third party employment agency recommended by Agent, for purposes of engaging temporary staff for the Pop Up Stores; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Pop Up Stores, the Pop Up Stores' employees (other than the Supervisors) and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Pop Up Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Agent to be necessary or desirable for the operation of the Pop Up Stores during the Sale; provided, that Merchant shall have the right to approve the terms and conditions of each lease with respect to a Pop Up Store in its sole discretion;

2

(g) provide, and arrange for the ordinary maintenance of, all point-of-sale equipment required for the Pop Up Stores; (h) with Agent's assistance, and subject to the lease for each Pop Up Store, ensure that Agent has quiet use and enjoyment of the Pop Up Stores for the Sale Term in order to perform its obligations under this Agreement; (i) with Agent's assistance, provide or procure FF&E for the Pop Up Stores; (j) identify the Merchandise for the Sale, with Agent's assistance allocate and balance the Merchandise among the Stores, and ship and distribute the Merchandise to the Pop Up Stores; and (k) with Agent's assistance, obtain all interior and exterior signage (including exterior "QUIKSILVER" signage) and procure all advertising for the Pop Up Stores.

To assist with the Sale, Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Agent.

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

**D.**     <u>**The Sale**</u>

All sales of Merchandise shall be made on behalf of Merchant.  Agent does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, or credit card and, at Merchant's discretion, by check or otherwise in accordance with Merchant's policies, and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant.

**E.**     <u>**Agent Fee and Expenses in Connection with the Sale**</u>

In consideration of its services hereunder, Agent shall earn a fee equal to five (5.0%) of the Gross Proceeds of Merchandise sold at the Pop Up Stores.  For purposes of this Agreement, "Gross Proceeds" means gross receipts arising from sales of Merchandise, net of applicable sales taxes.  In addition, Agent shall be paid an amount equal to $5,000 per Pop Up Store lease that is negotiated by Hilco Real Estate, LLC on Merchant's behalf and approved and executed by Merchant, and Merchant shall fund all deposits with respect to such Pop Up Store leases and utilities associated therewith, if required by the applicable lease.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's reasonable, documented and preapproved out of pocket expenses.  To control expenses of the Sale, Merchant and Agent have established a budget (the "<u>Expense Budget</u>") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs.  The Expense Budget for the Sale is attached hereto as <u>Exhibit B</u>.  The Expense Budget may only be modified by mutual agreement of Agent and Merchant. Merchant shall have no responsibility for costs and expenses in excess of the Expense Budget, unless Agent has obtained Merchant's prior written (including email) consent pursuant to an

3

amendment to the Expense Budget. The costs of supervision set forth on <u>Exhibit B</u> include, among other things, industry standard deferred compensation.

All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to Agent) shall be reconciled by mutual agreement of Agent and Merchant on every Wednesday for the prior week and, unless disputed by either Party, shall be paid within seven (7) days after each such weekly reconciliation.   The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty five (45) days following the Sale Termination Date for the last Store.

**F.**     **Indemnification**

(i)     Merchant's Indemnification

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,   principals, affiliates, and Supervisors (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) product liability claims, except claims arising from Agent's negligence, willful misconduct or unlawful behavior, (d) claims asserted by any Store employees employed by Merchant (under a collective bargaining agreement or otherwise), relating to such employment against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Merchant or any of the Merchant Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

(ii)     Agent's Indemnification

Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC shall, jointly and severally, indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors,   principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "<u>Merchant Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by an Agent Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement.

4

G.    **Insurance**

     (i)    Merchant's Insurance Obligations

     Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Pop Up Stores, and shall cause Agent to be named an additional insured with respect to all such policies. At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and that Agent is an additional insured thereunder. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

     (ii)    Agent's Insurance Obligations

     As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Pop Up Stores. Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder. In addition, Agent shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements. Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

H.    **Representations, Warranties, Covenants and Agreements**

     (i)    Merchant warrants, represents, covenants and agrees that (a) Merchant is a corporation duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein (other than as set forth in Section A), (c) all ticketing of Merchandise at the Pop Up Stores has been and will be done in accordance with Merchant's customary ticketing practices; and (d) to the extent within the control of Merchant, the Pop Up Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

     (ii)    Agent warrants, represents, covenants and agrees that (a) each entity comprising Agent is a limited liability company duly organized, validly existing and in good standing under the

5

laws of state of the Delaware, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Pop Up Stores will be conducted without Merchant's prior written consent, (e) Agent will not take any disciplinary action against any employee of Merchant, and (f) Agent shall not knowingly, and no Agent Indemnified Party shall, knowingly take any action that would constitute a breach of the lease for any Pop Up Store.

## I.     Furniture, Fixtures and Equipment

If requested by Merchant at one or more Pop Up Stores, Agent shall sell the FF&E in each such Pop Up Store from the Pop Up Store themselves. Agent shall dispose of any unsold FF&E at the conclusion of the Sale in a manner to be approved by Merchant. Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale or other disposition of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties.

In consideration for providing the services set forth in this Section I, Agent shall be entitled to a commission from the sale of the FF&E equal to twenty percent (20%) of the Gross Proceeds of the sale of the FF&E.

Agent shall remit to Merchant all Gross Proceeds from the sale of FF&E.  During each weekly reconciliation described in Section E above, Agent's FF&E fee shall be calculated, and Agent's calculated and agreed upon FF&E fee and all FF&E costs and expenses then incurred within an agreed upon budget shall paid within seven (7) days after each such weekly reconciliation.

## J.     Termination

The following shall constitute "Termination Events" hereunder:

(a)     Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured thirty (30) days after receipt of written notice thereof to the defaulting Party; or

(b)     The failure of any representation or warranty made by Merchant or Agent to be true in any material respect as of the date made or at any time and throughout the Sale Term, which failure shall continue uncured thirty (30) days after receipt of written notice thereof to the defaulting Party.

If a Termination Event occurs, the non-defaulting Party  may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in addition to terminating this Agreement, pursue any and all rights and remedies and

6

damages resulting from such default; provided, that in no event shall either Party be liable to the other for any punitive, exemplary, consequential, incidental, indirect or special damages, including, without limitation, lost profits. If this Agreement is terminated other than as a result of a default by Agent, Merchant shall be obligated to pay Agent all amounts due under this Agreement through and including the termination date.

**K.    Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by fax or by recognized overnight delivery service as follows: (a) To Merchant: Quiksilver, Inc., 5600 Argosy Circle, #100, Huntington Beach, CA 92649, Attn: Retail Department; with a copy to: Legal Department; (b) To Agent: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax: 847- 897-0859, Attn: Ian S. Fredericks; or (c) such other address as may be designated in writing by Merchant or Agent.

**L.    Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect. No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement. Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**M.    Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party; provided that either Party may assign this Agreement without the consent of the other Party in the event of a merger, reorganization, consolidation or other change in control transaction, or in connection with the sale of all or substantially all of such Party's assets. No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

**N.    Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**O.    Governing Law, Venue, Jurisdiction and Jury Waiver**

7

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of California (without reference to the conflicts of laws provisions therein). Any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Orange County, California courts and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect. If either Party commences any legal action, suit or proceeding to enforce or interpret this Agreement or any of the terms or provisions hereof, then in addition to any damages or remedies that may be awarded to the prevailing party therein, the prevailing party will be entitled to have and recover from the losing party the prevailing party's reasonable outside attorneys' fees and costs incurred in connection therewith.

**P.    Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof. No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement. All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**Q.    Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

*   *   *

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned. Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: Ian Fredericks
Its: VP & Assistant General Counsel, Managing Member

GORDON BROTHERS RETAIL PARTNERS, LLC

By: Richard Edwards
Its: Co-President

AGREED AND ACCEPTED as of the 12th day of June ___, 2015:

QS RETAIL, INC.

By: STEPHEN M FINNEY
Its: SENIOR VICE PRESIDENT

9

QuikSilver
Exhibit A: Merchandise
Note: Merchadise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_group_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 10-100-01 | Apparel | Quiksilver | QS Young Mens | S/S Tees | 53,578 | 200,290 | 4.4% |
| 10-100-02 | Apparel | Quiksilver | QS Young Mens | L/S Tees | 333 | 1,921 | 0.0% |
| 10-100-03 | Apparel | Quiksilver | QS Young Mens | Name Drop Tees | 13,922 | 52,268 | 1.1% |
| 10-100-04 | Apparel | Quiksilver | QS Young Mens | Knit Shirts | 9,053 | 48,237 | 1.1% |
| 10-100-05 | Apparel | Quiksilver | QS Young Mens | Woven Shirts | 6,661 | 65,666 | 1.4% |
| 10-100-06 | Apparel | Quiksilver | QS Young Mens | Fleece | 14,983 | 187,776 | 4.1% |
| 10-100-07 | Apparel | Quiksilver | QS Young Mens | Sweaters | 436 | 4,091 | 0.1% |
| 10-100-08 | Apparel | Quiksilver | QS Young Mens | Jackets | 2,830 | 56,110 | 1.2% |
| 10-100-09 | Apparel | Quiksilver | QS Young Mens | Boardshorts | 18,970 | 235,547 | 5.2% |
| 10-100-10 | Apparel | Quiksilver | QS Young Mens | Volleys | 11 | 94 | 0.0% |
| 10-100-11 | Apparel | Quiksilver | QS Young Mens | Walkshorts | 17,795 | 175,593 | 3.8% |
| 10-100-12 | Apparel | Quiksilver | QS Young Mens | Denim | 2,677 | 30,853 | 0.7% |
| 10-100-13 | Apparel | Quiksilver | QS Young Mens | Casual Pants | 1,325 | 16,188 | 0.4% |
| 10-100-14 | Apparel | Quiksilver | QS Young Mens | Name Drop Fleece | 276 | 3,378 | 0.1% |
| 10-100-15 | Apparel | Quiksilver | QS Young Mens | z_unidentified | 3,083 | 12,060 | 0.3% |
| 10-101-01 | Accessories | Quiksilver | QS Mens Accs | Beanies | 3,459 | 14,093 | 0.3% |
| 10-101-02 | Accessories | Quiksilver | QS Mens Accs | Hats | 14,044 | 78,501 | 1.7% |
| 10-101-03 | Accessories | Quiksilver | QS Mens Accs | Boxers | 1,280 | 5,389 | 0.1% |
| 10-101-04 | Accessories | Quiksilver | QS Mens Accs | Wallets | 3,268 | 13,833 | 0.3% |
| 10-101-05 | Accessories | Quiksilver | QS Mens Accs | Belts | 3,059 | 11,217 | 0.2% |
| 10-101-06 | Accessories | Quiksilver | QS Mens Accs | Socks | 104 | 229 | 0.0% |
| 10-101-07 | Accessories | Quiksilver | QS Mens Accs | Backpacks | 3,834 | 45,612 | 1.0% |
| 10-101-08 | Accessories | Quiksilver | QS Mens Accs | Luggage | 1,708 | 19,479 | 0.4% |
| 10-101-09 | Accessories | Quiksilver | QS Mens Accs | Watches | 298 | 6,520 | 0.1% |
| 10-101-10 | Accessories | Quiksilver | QS Mens Accs | Sunglasses | 161 | 2,705 | 0.1% |
| 10-101-11 | Accessories | Quiksilver | QS Mens Accs | Gift Packs | 2 | 14 | 0.0% |
| 10-101-12 | Accessories | Quiksilver | QS Mens Accs | Miscellaneous | 2,880 | 17,590 | 0.4% |
| 10-101-13 | Accessories | Quiksilver | QS Mens Accs | ND Accessories | 227 | 2,063 | 0.0% |
| 10-101-16 | Accessories | Quiksilver | QS Mens Accs | Electronics | 5,110 | 247,732 | 5.4% |
| 10-101-17 | Accessories | Quiksilver | QS Mens Accs | Stickers | 2,575 | 14,026 | 0.3% |
| 10-102-01 | Footwear | Quiksilver | QS Mens Footwear | Sandals | 47,456 | 197,504 | 4.3% |
| 10-102-02 | Footwear | Quiksilver | QS Mens Footwear | Athletic / Casual | 10,814 | 102,411 | 2.2% |
| 10-103-01 | Apparel | Quiksilver | QS Mens | Tees | 146 | 792 | 0.0% |
| 10-103-02 | Apparel | Quiksilver | QS Mens | Knits | 29 | 306 | 0.0% |
| 10-103-03 | Apparel | Quiksilver | QS Mens | Wovens | 136 | 2,209 | 0.0% |
| 10-103-04 | Apparel | Quiksilver | QS Mens | Fleece | 6 | 100 | 0.0% |
| 10-103-05 | Apparel | Quiksilver | QS Mens | Sweaters | 2 | 36 | 0.0% |
| 10-103-06 | Apparel | Quiksilver | QS Mens | Jackets | 6 | 134 | 0.0% |
| 10-103-07 | Apparel | Quiksilver | QS Mens | Boardshorts | 55 | 702 | 0.0% |
| 10-103-08 | Apparel | Quiksilver | QS Mens | Walkshorts | 50 | 590 | 0.0% |
| 10-103-09 | Apparel | Quiksilver | QS Mens | Pants | (3) | (89) | 0.0% |
| 10-104-02 | Accessories | Other | Mens Yesterday's | S/S Tees | 25 | 189 | 0.0% |
| 10-105-01 | Apparel | Quiksilver | QS Performance | Tees | 36 | 272 | 0.0% |
| 10-105-02 | Apparel | Quiksilver | QS Performance | Tops | 11 | 146 | 0.0% |
| 10-105-03 | Apparel | Quiksilver | QS Performance | Jackets | 1 | 33 | 0.0% |
| 10-105-04 | Apparel | Quiksilver | QS Performance | Shorts | 8 | 115 | 0.0% |
| 10-106-01 | Accessories | Quiksilver | QS Watermans Accs | Hats | 50 | 313 | 0.0% |
| 10-106-03 | Accessories | Quiksilver | QS Watermans Accs | Miscellaneous | 2 | 16 | 0.0% |
| 11-110-01 | Apparel | Quiksilver | QS Boys 8-20 | S/S Tees | 50,941 | 147,417 | 3.2% |
| 11-110-02 | Apparel | Quiksilver | QS Boys 8-20 | L/S Tees | 3,203 | 14,170 | 0.3% |
| 11-110-03 | Apparel | Quiksilver | QS Boys 8-20 | Name Drop Tees | 24 | 72 | 0.0% |
| 11-110-04 | Apparel | Quiksilver | QS Boys 8-20 | Knits | 2,267 | 14,569 | 0.3% |
| 11-110-05 | Apparel | Quiksilver | QS Boys 8-20 | Wovens | 3,292 | 28,566 | 0.6% |
| 11-110-06 | Apparel | Quiksilver | QS Boys 8-20 | Fleece | 5,457 | 54,981 | 1.2% |
| 11-110-07 | Apparel | Quiksilver | QS Boys 8-20 | Sweaters | 1 | 8 | 0.0% |
| 11-110-08 | Apparel | Quiksilver | QS Boys 8-20 | Jackets | 494 | 8,347 | 0.2% |
| 11-110-09 | Apparel | Quiksilver | QS Boys 8-20 | Boardshorts | 1,466 | 15,045 | 0.3% |
| 11-110-10 | Apparel | Quiksilver | QS Boys 8-20 | Walkshorts | 3,347 | 33,826 | 0.7% |
| 11-110-11 | Apparel | Quiksilver | QS Boys 8-20 | Pants | 2,222 | 26,363 | 0.6% |
| 11-111-01 | Apparel | Quiksilver | QS Kids / Toddler | S/S Tees | 9,842 | 28,201 | 0.6% |
| 11-111-02 | Apparel | Quiksilver | QS Kids / Toddler | L/S Tees | 854 | 3,189 | 0.1% |
| 11-111-03 | Apparel | Quiksilver | QS Kids / Toddler | Knits | 224 | 1,251 | 0.0% |
| 11-111-04 | Apparel | Quiksilver | QS Kids / Toddler | Wovens | 97 | 802 | 0.0% |

QuikSilver
**Exhibit A: Merchandise**
Note: Merchandise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_group_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 11-111-05 | Apparel | Quiksilver | QS Kids / Toddler | Fleece | 1,063 | 8,710 | 0.2% |
| 11-111-07 | Apparel | Quiksilver | QS Kids / Toddler | Jackets | 29 | 452 | 0.0% |
| 11-111-08 | Apparel | Quiksilver | QS Kids / Toddler | Boardshorts | 481 | 3,893 | 0.1% |
| 11-111-09 | Apparel | Quiksilver | QS Kids / Toddler | Walkshorts | 1,225 | 10,320 | 0.2% |
| 11-111-10 | Apparel | Quiksilver | QS Kids / Toddler | Pants | 81 | 779 | 0.0% |
| 11-112-01 | Apparel | Quiksilver | QS Infant | Tees / Fleece | 268 | 874 | 0.0% |
| 11-112-02 | Apparel | Quiksilver | QS Infant | Tops | 113 | 668 | 0.0% |
| 11-112-03 | Apparel | Quiksilver | QS Infant | Bottoms | 312 | 2,304 | 0.1% |
| 11-113-01 | Accessories | Quiksilver | QS Boys Accs | Beanies | 927 | 3,757 | 0.1% |
| 11-113-02 | Accessories | Quiksilver | QS Boys Accs | Hats | 201 | 844 | 0.0% |
| 11-113-03 | Accessories | Quiksilver | QS Boys Accs | Boxers | 37 | 115 | 0.0% |
| 11-113-04 | Accessories | Quiksilver | QS Boys Accs | Wallets | 8 | 27 | 0.0% |
| 11-113-05 | Accessories | Quiksilver | QS Boys Accs | Belts | 55 | 175 | 0.0% |
| 11-113-06 | Accessories | Quiksilver | QS Boys Accs | Socks | 17 | 38 | 0.0% |
| 11-113-07 | Accessories | Quiksilver | QS Boys Accs | Backpacks | 1 | 12 | 0.0% |
| 11-113-08 | Accessories | Quiksilver | QS Boys Accs | Watches | 7 | 44 | 0.0% |
| 11-113-09 | Accessories | Quiksilver | QS Boys Accs | Sunglasses | 2 | 10 | 0.0% |
| 11-113-10 | Accessories | Quiksilver | QS Boys Accs | Miscellaneous | 2 | 7 | 0.0% |
| 11-114-01 | Footwear | Quiksilver | QS Boys Footwear | Sandals | 15,095 | 48,219 | 1.1% |
| 11-114-02 | Footwear | Quiksilver | QS Boys Footwear | Athletic / Casual | 1 | 9 | 0.0% |
| 12-120-01 | Apparel | Quiksilver | QS Womens Apparel | Tees | 2 | 20 | 0.0% |
| 12-120-02 | Apparel | Quiksilver | QS Womens Apparel | Fleece | 2 | 24 | 0.0% |
| 12-120-03 | Apparel | Quiksilver | QS Womens Apparel | Tops | 9 | 30 | 0.0% |
| 12-120-04 | Apparel | Quiksilver | QS Womens Apparel | Sweaters | 3 | 66 | 0.0% |
| 12-120-05 | Apparel | Quiksilver | QS Womens Apparel | Jackets | 2 | 45 | 0.0% |
| 12-120-06 | Apparel | Quiksilver | QS Womens Apparel | Dresses | 27 | 370 | 0.0% |
| 12-120-07 | Apparel | Quiksilver | QS Womens Apparel | Skirts | 1 | 7 | 0.0% |
| 12-120-08 | Apparel | Quiksilver | QS Womens Apparel | Shorts | 2 | 32 | 0.0% |
| 12-120-09 | Apparel | Quiksilver | QS Womens Apparel | Denim | 7 | 138 | 0.0% |
| 12-120-10 | Apparel | Quiksilver | QS Womens Apparel | Casual Pants | (1) | (9) | 0.0% |
| 12-120-11 | Apparel | Quiksilver | QS Womens Apparel | Swim | 14 | 198 | 0.0% |
| 12-122-02 | Footwear | Quiksilver | QSW Footwear | Sandals | (11) | (135) | 0.0% |
| 12-123-01 | Apparel | Quiksilver | QS Girls Apparel | Tees | 91 | 484 | 0.0% |
| 12-123-02 | Apparel | Quiksilver | QS Girls Apparel | Fleece | 69 | 856 | 0.0% |
| 12-123-03 | Apparel | Quiksilver | QS Girls Apparel | Tops | 105 | 1,008 | 0.0% |
| 12-123-04 | Apparel | Quiksilver | QS Girls Apparel | Tanks | 46 | 284 | 0.0% |
| 12-123-05 | Apparel | Quiksilver | QS Girls Apparel | Sweaters | 18 | 374 | 0.0% |
| 12-123-06 | Apparel | Quiksilver | QS Girls Apparel | Jackets | 41 | 1,099 | 0.0% |
| 12-123-07 | Apparel | Quiksilver | QS Girls Apparel | Dresses | 141 | 1,633 | 0.0% |
| 12-123-08 | Apparel | Quiksilver | QS Girls Apparel | Skirts | 3 | 22 | 0.0% |
| 12-123-09 | Apparel | Quiksilver | QS Girls Apparel | Shorts | 44 | 389 | 0.0% |
| 12-123-10 | Apparel | Quiksilver | QS Girls Apparel | Denim | 674 | 7,880 | 0.2% |
| 12-123-11 | Apparel | Quiksilver | QS Girls Apparel | Casual Pants | 208 | 2,242 | 0.0% |
| 12-123-12 | Apparel | Quiksilver | QS Girls Apparel | Swim | 58 | 556 | 0.0% |
| 12-124-01 | Accessories | Quiksilver | QS Girls Accessories | Handbags | 10 | 85 | 0.0% |
| 12-124-02 | Accessories | Quiksilver | QS Girls Accessories | Winterwear | 3 | 20 | 0.0% |
| 20-200-01 | Apparel | Roxy | Roxy Apparel | S/S Tees | 11,798 | 56,722 | 1.2% |
| 20-200-02 | Apparel | Roxy | Roxy Apparel | L/S Tees | 2,678 | 16,096 | 0.4% |
| 20-200-03 | Apparel | Roxy | Roxy Apparel | Name Drop Tees | 6,980 | 28,591 | 0.6% |
| 20-200-04 | Apparel | Roxy | Roxy Apparel | Fleece | 19,513 | 210,677 | 4.6% |
| 20-200-05 | Apparel | Roxy | Roxy Apparel | Name Drop Fleece | 250 | 1,935 | 0.0% |
| 20-200-06 | Apparel | Roxy | Roxy Apparel | Tops | 5,002 | 42,099 | 0.9% |
| 20-200-07 | Apparel | Roxy | Roxy Apparel | Tanks | 1,923 | 11,205 | 0.2% |
| 20-200-08 | Apparel | Roxy | Roxy Apparel | Sweaters | 9,823 | 114,383 | 2.5% |
| 20-200-09 | Apparel | Roxy | Roxy Apparel | Jackets | 4,732 | 83,129 | 1.8% |
| 20-200-10 | Apparel | Roxy | Roxy Apparel | Dresses | 6,004 | 59,238 | 1.3% |
| 20-200-11 | Apparel | Roxy | Roxy Apparel | Skirts | 68 | 543 | 0.0% |
| 20-200-12 | Apparel | Roxy | Roxy Apparel | Shorts | 616 | 5,590 | 0.1% |
| 20-200-13 | Apparel | Roxy | Roxy Apparel | Boardshorts | 2,029 | 17,539 | 0.4% |
| 20-200-14 | Apparel | Roxy | Roxy Apparel | Denim | 4,523 | 53,601 | 1.2% |
| 20-200-15 | Apparel | Roxy | Roxy Apparel | Casual Pants | 1,666 | 18,839 | 0.4% |
| 20-201-01 | Apparel | Roxy | Jrs Swim | Roxy | 29,370 | 174,524 | 3.8% |
| 20-201-04 | Apparel | Roxy | Jrs Swim | Coverups | 67 | 520 | 0.0% |

QuikSilver
**Exhibit A: Merchandise**
Note: Merchandise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_group_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 20-201-05 | Apparel | Roxy | Jrs Swim | z_unidentified | 11 | 117 | 0.0% |
| 20-202-01 | Accessories | Roxy | Roxy Accs | Hats | 299 | 1,579 | 0.0% |
| 20-202-02 | Accessories | Roxy | Roxy Accs | Handbags | 3,500 | 31,180 | 0.7% |
| 20-202-03 | Accessories | Roxy | Roxy Accs | Jewelry | 22 | 115 | 0.0% |
| 20-202-04 | Accessories | Roxy | Roxy Accs | Wallets | 2,822 | 16,378 | 0.4% |
| 20-202-05 | Accessories | Roxy | Roxy Accs | Belts | 815 | 3,948 | 0.1% |
| 20-202-06 | Accessories | Roxy | Roxy Accs | Backpacks | 929 | 12,749 | 0.3% |
| 20-202-07 | Accessories | Roxy | Roxy Accs | Luggage | 1,143 | 11,393 | 0.2% |
| 20-202-08 | Accessories | Roxy | Roxy Accs | Watches | 261 | 3,062 | 0.1% |
| 20-202-09 | Accessories | Roxy | Roxy Accs | Sunglasses | 123 | 1,741 | 0.0% |
| 20-202-10 | Accessories | Roxy | Roxy Accs | Loungewear | 37 | 367 | 0.0% |
| 20-202-11 | Accessories | Roxy | Roxy Accs | Winterwear | 973 | 6,072 | 0.1% |
| 20-202-12 | Accessories | Roxy | Roxy Accs | Gifts | 172 | 1,788 | 0.0% |
| 20-202-13 | Accessories | Roxy | Roxy Accs | Fragrance | 446 | 5,972 | 0.1% |
| 20-202-14 | Accessories | Roxy | Roxy Accs | Miscellaneous | 1,156 | 5,442 | 0.1% |
| 20-202-15 | Accessories | Roxy | Roxy Accs | Home | 1 | 11 | 0.0% |
| 20-202-17 | Accessories | Roxy | Roxy Accs | Electronics | 8,284 | 421,259 | 9.2% |
| 20-202-18 | Accessories | Roxy | Roxy Accs | Stickers | 91 | 269 | 0.0% |
| 20-202-19 | Accessories | Roxy | Roxy Accs | z_unidentified | 232 | 347 | 0.0% |
| 20-203-01 | Footwear | Roxy | Roxy Footwear | Rubber Flip Flops | 15,229 | 52,679 | 1.2% |
| 20-203-02 | Footwear | Roxy | Roxy Footwear | Sandals | 1,799 | 12,121 | 0.3% |
| 20-203-03 | Footwear | Roxy | Roxy Footwear | Athletic / Casual | 5,011 | 48,094 | 1.1% |
| 20-203-04 | Footwear | Roxy | Roxy Footwear | Slippers | (5) | (57) | 0.0% |
| 20-204-01 | Apparel | Roxy | Roxy Outdoor Fitness | Sports Bras | 25 | 249 | 0.0% |
| 20-204-02 | Apparel | Roxy | Roxy Outdoor Fitness | Tanks | 11 | 176 | 0.0% |
| 20-204-03 | Apparel | Roxy | Roxy Outdoor Fitness | Tops | 44 | 444 | 0.0% |
| 20-204-04 | Apparel | Roxy | Roxy Outdoor Fitness | Slippers | 31 | 735 | 0.0% |
| 20-204-05 | Apparel | Roxy | Roxy Outdoor Fitness | Shorts | 128 | 1,185 | 0.0% |
| 20-204-06 | Apparel | Roxy | Roxy Outdoor Fitness | Pants | 795 | 11,104 | 0.2% |
| 20-204-07 | Apparel | Roxy | Roxy Outdoor Fitness | Accessories | 4 | 59 | 0.0% |
| 20-204-08 | Apparel | Roxy | Roxy Outdoor Fitness | Swim | 538 | 3,744 | 0.1% |
| 20-204-09 | Apparel | Roxy | Roxy Outdoor Fitness | Wetsuits | 2 | 138 | 0.0% |
| 21-210-01 | Apparel | Roxy | RG Apparel | S/S Tees | 1,154 | 4,475 | 0.1% |
| 21-210-02 | Apparel | Roxy | RG Apparel | L/S Tees | 64 | 336 | 0.0% |
| 21-210-03 | Apparel | Roxy | RG Apparel | Fleece | 2,397 | 20,987 | 0.5% |
| 21-210-04 | Apparel | Roxy | RG Apparel | Tops | 1,744 | 11,588 | 0.3% |
| 21-210-05 | Apparel | Roxy | RG Apparel | Sweaters | (17) | (232) | 0.0% |
| 21-210-06 | Apparel | Roxy | RG Apparel | Jackets | 19 | 223 | 0.0% |
| 21-210-07 | Apparel | Roxy | RG Apparel | Dresses | 54 | 446 | 0.0% |
| 21-210-08 | Apparel | Roxy | RG Apparel | Skirts | 2 | 14 | 0.0% |
| 21-210-09 | Apparel | Roxy | RG Apparel | Shorts | 37 | 260 | 0.0% |
| 21-210-10 | Apparel | Roxy | RG Apparel | Pants | 3,815 | 29,753 | 0.7% |
| 21-210-11 | Apparel | Roxy | RG Apparel | Swim | 476 | 4,049 | 0.1% |
| 21-210-12 | Apparel | Roxy | RG Apparel | Name Drop Tees | 51 | 192 | 0.0% |
| 21-211-01 | Apparel | Roxy | RG Teenie Wahine | Tees | 69 | 257 | 0.0% |
| 21-211-02 | Apparel | Roxy | RG Teenie Wahine | Fleece | 72 | 660 | 0.0% |
| 21-211-03 | Apparel | Roxy | RG Teenie Wahine | Tops | 47 | 361 | 0.0% |
| 21-211-04 | Apparel | Roxy | RG Teenie Wahine | Bottoms | 155 | 1,116 | 0.0% |
| 21-211-05 | Apparel | Roxy | RG Teenie Wahine | Dresses | 25 | 175 | 0.0% |
| 21-211-06 | Apparel | Roxy | RG Teenie Wahine | Swim | 96 | 720 | 0.0% |
| 21-212-01 | Apparel | Roxy | RG Infant | Tees / Fleece | 8 | 52 | 0.0% |
| 21-212-02 | Apparel | Roxy | RG Infant | Tops | 12 | 76 | 0.0% |
| 21-212-03 | Apparel | Roxy | RG Infant | Bottoms | 5 | 32 | 0.0% |
| 21-212-04 | Apparel | Roxy | RG Infant | Dresses | 5 | 31 | 0.0% |
| 21-213-01 | Accessories | Roxy | RG Accs | Hats | 10 | 49 | 0.0% |
| 21-213-02 | Accessories | Roxy | RG Accs | Handbags | 59 | 348 | 0.0% |
| 21-213-03 | Accessories | Roxy | RG Accs | Belts | 1 | 5 | 0.0% |
| 21-213-04 | Accessories | Roxy | RG Accs | Backpacks | 23 | 266 | 0.0% |
| 21-213-05 | Accessories | Roxy | RG Accs | Luggage | 5 | 43 | 0.0% |
| 21-213-06 | Accessories | Roxy | RG Accs | Watches | 1 | 7 | 0.0% |
| 21-213-07 | Accessories | Roxy | RG Accs | Sunglasses | 44 | 260 | 0.0% |
| 21-213-08 | Accessories | Roxy | RG Accs | Winterwear | 36 | 239 | 0.0% |
| 21-213-10 | Accessories | Roxy | RG Accs | Miscellaneous | 72 | 413 | 0.0% |

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchadise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_group_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 21-214-01 | Footwear | Roxy | RG Footwear | Sandals | 1,560 | 5,782 | 0.1% |
| 21-214-02 | Footwear | Roxy | RG Footwear | Athletic / Casual | 188 | 1,528 | 0.0% |
| 21-215-03 | Accessories | Roxy | RG TW Accs | Backpacks | 2 | 13 | 0.0% |
| 21-216-01 | Accessories | Roxy | RG Infant Accs | Hats | 1 | 4 | 0.0% |
| 21-216-02 | Accessories | Roxy | RG Infant Accs | Miscellaneous | 2 | 18 | 0.0% |
| 21-217-01 | Footwear | Roxy | RG TW Footwear | Sandals | 880 | 3,041 | 0.1% |
| 21-217-02 | Footwear | Roxy | RG TW Footwear | Athletic / Casual | 170 | 1,391 | 0.0% |
| 30-300-01 | Technical Products | Quiksilver | Snow | QS Mens Snow | 117 | 3,849 | 0.1% |
| 30-300-02 | Technical Products | Roxy | Snow | Roxy Snow | 125 | 4,731 | 0.1% |
| 30-300-03 | Technical Products | Quiksilver | Snow | QS Boys Snow | 5 | 129 | 0.0% |
| 30-300-04 | Technical Products | Roxy | Snow | Roxy Girls Snow | 4 | 91 | 0.0% |
| 30-300-05 | Technical Products | Quiksilver | Snow | Snow Accessories | 147 | 2,899 | 0.1% |
| 30-300-05 | Technical Products | Roxy | Snow | Snow Accessories | 246 | 3,251 | 0.1% |
| 30-300-06 | Technical Products | Roxy | Snow | Teenie Wahine Snow | (2) | (48) | 0.0% |
| 40-400-01 | Technical Products | Quiksilver | Wetsuits | QS Mens Wetsuits | 549 | 19,673 | 0.4% |
| 40-400-02 | Technical Products | Roxy | Wetsuits | Roxy Wetsuits | 404 | 15,521 | 0.3% |
| 40-400-03 | Technical Products | Quiksilver | Wetsuits | QS Boys Wetsuits | 10 | 160 | 0.0% |
| 40-400-04 | Technical Products | Quiksilver | Wetsuits | QS Mens Lycra | 3,205 | 23,132 | 0.5% |
| 40-400-05 | Technical Products | Roxy | Wetsuits | Roxy Lycra | 2,197 | 14,490 | 0.3% |
| 40-400-06 | Technical Products | Quiksilver | Wetsuits | QS Boys Lycra | 3,435 | 22,561 | 0.5% |
| 40-400-07 | Technical Products | Roxy | Wetsuits | Roxy Girls Lycra | 1,286 | 8,376 | 0.2% |
| 40-400-08 | Technical Products | Roxy | Wetsuits | Roxy Girls Wetsuits | 11 | 232 | 0.0% |
| 40-400-09 | Technical Products | Roxy | Wetsuits | Teenie Wahine Wetsuits/Lycra | 521 | 3,504 | 0.1% |
| 40-400-10 | Technical Products | Quiksilver | Wetsuits | Watermans Lycra | 2,884 | 27,831 | 0.6% |
| 40-400-11 | Technical Products | Quiksilver | Wetsuits | z_unidentified | 295 | 1,974 | 0.0% |
| 50-500-02 | Accessories | Other | Other Vendor | Skate | 75 | 2,924 | 0.1% |
| 50-500-03 | Accessories | Other | Other Vendor | Snow | 427 | 50,260 | 1.1% |
| 50-500-04 | Accessories | Other | Other Vendor | Books / Magazines | 50 | 388 | 0.0% |
| 50-500-05 | Accessories | Other | Other Vendor | DVDs | 110 | 1,315 | 0.0% |
| 50-500-06 | Accessories | Other | Other Vendor | Miscellaneous | 6 | 447 | 0.0% |
| 50-500-07 | Accessories | Other | Other Vendor | Jewelry | 12 | 324 | 0.0% |
| 50-500-08 | Accessories | Other | Other Vendor | Electronics | 115 | 4,660 | 0.1% |
| 50-500-13 | Accessories | Other | Other Vendor | Makeup | 1,155 | 12,546 | 0.3% |
| 50-500-14 | Accessories | Other | Other Vendor | Moscova | 29 | 227 | 0.0% |
| 70-700-01 | Apparel | DC Shoes | DC Mens App | S/S Tees | 3,939 | 15,733 | 0.3% |
| 70-700-02 | Apparel | DC Shoes | DC Mens App | L/S Tees | 48 | 273 | 0.0% |
| 70-700-03 | Apparel | DC Shoes | DC Mens App | Knits | 149 | 978 | 0.0% |
| 70-700-04 | Apparel | DC Shoes | DC Mens App | Wovens | 420 | 4,911 | 0.1% |
| 70-700-05 | Apparel | DC Shoes | DC Mens App | Fleece | 1,455 | 16,123 | 0.4% |
| 70-700-06 | Apparel | DC Shoes | DC Mens App | Sweaters | 12 | 128 | 0.0% |
| 70-700-07 | Apparel | DC Shoes | DC Mens App | Jackets | 128 | 3,005 | 0.1% |
| 70-700-08 | Apparel | DC Shoes | DC Mens App | Shorts | 2,767 | 24,868 | 0.5% |
| 70-700-09 | Apparel | DC Shoes | DC Mens App | Denim | 248 | 3,790 | 0.1% |
| 70-700-10 | Apparel | DC Shoes | DC Mens App | Long Bottoms | 1,699 | 18,362 | 0.4% |
| 70-700-11 | Apparel | DC Shoes | DC Mens App | Boardshorts | 327 | 3,057 | 0.1% |
| 70-701-01 | Accessories | DC Shoes | DC Mens Accs | Beanies | 26 | 115 | 0.0% |
| 70-701-02 | Accessories | DC Shoes | DC Mens Accs | Hats | 944 | 5,149 | 0.1% |
| 70-701-03 | Accessories | DC Shoes | DC Mens Accs | Backpacks | 273 | 2,660 | 0.1% |
| 70-701-04 | Accessories | DC Shoes | DC Mens Accs | Wallets | 22 | 86 | 0.0% |
| 70-701-05 | Accessories | DC Shoes | DC Mens Accs | Belts | 103 | 348 | 0.0% |
| 70-701-06 | Accessories | DC Shoes | DC Mens Accs | Socks | 6,174 | 21,602 | 0.5% |
| 70-701-07 | Accessories | DC Shoes | DC Mens Accs | Miscellaneous | 533 | 2,354 | 0.1% |
| 70-701-08 | Accessories | DC Shoes | DC Mens Accs | Luggage | 24 | 733 | 0.0% |
| 70-702-01 | Footwear | DC Shoes | DC Mens Footwear | Skate | 7,700 | 134,759 | 2.9% |
| 70-702-02 | Footwear | DC Shoes | DC Mens Footwear | Sandals | 246 | 1,748 | 0.0% |
| 71-710-01 | Apparel | DC Shoes | DC Boys App | Tees | 308 | 974 | 0.0% |
| 71-710-02 | Apparel | DC Shoes | DC Boys App | Fleece | 364 | 3,921 | 0.1% |
| 71-710-03 | Apparel | DC Shoes | DC Boys App | Tops | 98 | 837 | 0.0% |
| 71-710-04 | Apparel | DC Shoes | DC Boys App | Outerwear | 7 | 62 | 0.0% |
| 71-710-05 | Apparel | DC Shoes | DC Boys App | Shorts | 35 | 392 | 0.0% |
| 71-710-06 | Apparel | DC Shoes | DC Boys App | Boardshorts | 32 | 298 | 0.0% |
| 71-710-07 | Apparel | DC Shoes | DC Boys App | Denim | 11 | 121 | 0.0% |
| 71-710-08 | Apparel | DC Shoes | DC Boys App | Long Bottoms | 2 | 19 | 0.0% |

**QuikSilver**
**Exhibit A: Merchandise**
Note: Merchadise to be sold will be similar in mix and balace or otherwise subject to the agreement of the parties.

| hierarchy_grou p_code2 | Material Group | Brand | Hierarchy | Class | Units | Cost | % Total Cost |
|---|---|---|---|---|---|---|---|
| 71-711-01 | Accessories | DC Shoes | DC Boys Accs | Beanies | 3 | 13 | 0.0% |
| 71-711-02 | Accessories | DC Shoes | DC Boys Accs | Hats | 29 | 169 | 0.0% |
| 71-711-03 | Accessories | DC Shoes | DC Boys Accs | Belts | 2 | 6 | 0.0% |
| 71-711-04 | Accessories | DC Shoes | DC Boys Accs | Miscellaneous | 37 | 181 | 0.0% |
| 71-711-05 | Accessories | DC Shoes | DC Boys Accs | Backpacks | 362 | 934 | 0.0% |
| 71-712-01 | Footwear | DC Shoes | DC Boys Footwear | Skate | 340 | 4,238 | 0.1% |
| 71-712-02 | Footwear | DC Shoes | DC Boys Footwear | Sandals | 57 | 403 | 0.0% |
| 71-713-01 | Apparel | DC Shoes | DC Kids/Toddler App | Tees | 41 | 130 | 0.0% |
| 71-713-02 | Apparel | DC Shoes | DC Kids/Toddler App | Fleece | 77 | 939 | 0.0% |
| 71-713-03 | Apparel | DC Shoes | DC Kids/Toddler App | Tops | 14 | 123 | 0.0% |
| 71-713-04 | Apparel | DC Shoes | DC Kids/Toddler App | Bottoms | 18 | 172 | 0.0% |
| 71-714-01 | Footwear | DC Shoes | DC K/T Footwear | Skate | 5,531 | 57,947 | 1.3% |
| 80-800-01 | Apparel | DC Shoes | DC Jrs App | S/S Tees | 91 | 492 | 0.0% |
| 80-800-02 | Apparel | DC Shoes | DC Jrs App | L/S Tees | 5 | 34 | 0.0% |
| 80-800-03 | Apparei | DC Shoes | DC Jrs App | Tops | 41 | 359 | 0.0% |
| 80-800-04 | Apparel | DC Shoes | DC Jrs App | Fleece | 39 | 448 | 0.0% |
| 80-800-05 | Apparel | DC Shoes | DC Jrs App | Sweaters | 7 | 98 | 0.0% |
| 80-800-06 | Apparel | DC Shoes | DC Jrs App | Jackets | 7 | 143 | 0.0% |
| 80-800-07 | Apparel | DC Shoes | DC Jrs App | Shorts | 44 | 425 | 0.0% |
| 80-800-09 | Apparel | DC Shoes | DC Jrs App | Denim | 40 | 629 | 0.0% |
| 80-800-10 | Apparel | DC Shoes | DC Jrs App | Bottoms | 3 | 32 | 0.0% |
| 80-800-11 | Apparel | DC Shoes | DC Jrs App | Dresses | 16 | 150 | 0.0% |
| 80-801-01 | Accessories | DC Shoes | DC Jrs Accs | Beanies | 379 | 1,581 | 0.0% |
| 80-801-02 | Accessories | DC Shoes | DC Jrs Accs | Hats | 3 | 27 | 0.0% |
| 80-801-03 | Accessories | DC Shoes | DC Jrs Accs | Handbags | 2 | 22 | 0.0% |
| 80-801-04 | Accessories | DC Shoes | DC Jrs Accs | Wallets | 9 | 51 | 0.0% |
| 80-801-05 | Accessories | DC Shoes | DC Jrs Accs | Backpacks | 232 | 824 | 0.0% |
| 80-801-07 | Accessories | DC Shoes | DC Jrs Accs | Socks | 3 | 8 | 0.0% |
| 80-801-08 | Accessories | DC Shoes | DC Jrs Accs | Miscellaneous | 2 | 13 | 0.0% |
| 80-802-01 | Footwear | DC Shoes | DC Jrs Footwear | Skate | 201 | 2,745 | 0.1% |
| 80-802-02 | Footwear | DC Shoes | DC Jrs Footwear | Sandals | 57 | 294 | 0.0% |
| 81-812-01 | Footwear | DC Shoes | DC Girls Footwear | Skate | 2 | 22 | 0.0% |
| 90-900-01 | Technical Products | DC Shoes | DC Snow | Mens Snow | 128 | 5,469 | 0.1% |
| 90-900-02 | Technical Products | DC Shoes | DC Snow | Juniors Snow | 31 | 1,242 | 0.0% |
| 90-900-03 | Technical Products | DC Shoes | DC Snow | Boys Snow | (15) | (470) | 0.0% |
| 90-900-04 | Technical Products | DC Shoes | DC Snow | Girls Snow | (2) | (59) | 0.0% |
| 90-900-05 | Technical Products | DC Shoes | DC Snow | Snow Accessories | 841 | 4,781 | 0.1% |
| 90-900-06 | Technical Products | DC Shoes | DC Snow | Snow Boots | 40 | 2,852 | 0.1% |
| Grand Total | | | | | 571,540 | 4,569,625 | 100.0% |

**Quiksilver, Inc.**
**Exhibit B**

| Expense Budget | Pre-Opening | Sale | Wind-Down | Total |
|---|---|---|---|---|
| **Advertising** | | | | |
| Media | | To be determined & mutually agreed upon. | | |
| Signs | | | | |
| Sign Walkers | | | | |
| Subtotal Advertising | - | - | - | - |
| **Supervision** | | | | |
| Fees | 246,183 | 628,759 | 151,905 | 1,026,847 |
| Deferred Compensation | 115,682 | 277,753 | 67,973 | 461,407 |
| Expenses (1) | 87,675 | 164,534 | 43,658 | 295,868 |
| Subtotal Supervision | 449,540 | 1,071,046 | 263,536 | 1,784,121 |
| | | | | |
| Total Expenses | 449,540 | 1,071,046 | 263,536 | 1,784,121 |

Note(s):
1. Includes Insurance.

Hilco Merchant Resources, LLC

6/5/2015

## Hilco Merchant Resources
### Quiksilver, Inc.
### Exhibit B

| Supervision Expense Budget- Pre-Opening |
|---|

| Supervision with Payroll Costs Include | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | Total USD |
|---|---|---|---|---|---|---|---|---|
| Base Rate | 17,955 | - | 82,080 | 131,328 | - | - | - | 231,363 |
| Deferred Compensation | 8,978 | - | 41,040 | 65,664 | - | - | - | 115,682 |
| Rate Adjustments (1) | 2,850 | - | 11,970 | - | - | - | - | 14,820 |
| Total Rates | 29,783 | - | 135,090 | 196,992 | - | - | - | 361,865 |
| | | | | | | | | |
| Travel Charges | 4,275 | - | 24,150 | 46,800 | - | - | - | 75,225 |
| Other Expenses | 750 | - | 4,500 | 7,200 | - | - | - | 12,450 |
| General Liability Insurance | | | | | | | | |
| Total Expense | 34,808 | - | 163,740 | 250,992 | - | - | - | 449,540 |

Note: Supervision Expense will be managed in the aggregate.

| Supervision Supporting Detail |
|---|

| | | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|---|
| Weekly Base Rate | | 3,150 | 2,650 | 2,400 | 2,400 | 3,150 | 3,150 | 3,000 | |
| Rate Adjustments | | 500 | | 350 | | | | | |
| Total Rates | | 3,650 | 2,650 | 2,750 | 2,400 | 3,150 | 3,150 | 3,000 | |
| % Deferred Compensation | | 50% | 50% | 50% | 50% | 50% | 50% | 50% | |
| Payroll Costs (Tico) | | 14% | 14% | 14% | 14% | 14% | 14% | 14% | |
| # of Supervisors | | 1 | | 6 | 24 | | | | |
| # of Weeks | | 5.0 | 5.0 | 5.0 | 2.0 | 5.0 | 5.0 | 5.0 | |
| | | | | | | | | | |
| **Travel Charges and Other Expenses** | | | | | | | | | |
| Initial Airfare | Initial- Travel | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| | | | | | | | | | |
| Travel Rate (25% of Base Rate) | | 900 | 760 | 680 | 680 | 900 | 900 | 860 | Travel Days |
| # of Travel Days | | 3 | 7 | 3 | 1 | 1 | 1 | 1 | 153.0 |
| Pro-rated Travel Rates | Weekly- Travel | 390 | 760 | 290 | 100 | 130 | 130 | 120 | |
| Car rent | Weekly- Travel | 175 | 175 | 175 | 175 | 175 | 175 | 175 | |
| >50 Miles | Weekly- Travel | 50 | 150 | 100 | 100 | 100 | 100 | 100 | |
| | | 615 | 1,085 | 565 | 375 | 405 | 405 | 395 | |
| | | | | | | | | | |
| Cell phone / Internet | Weekly- Other | 50 | 50 | 50 | 50 | 50 | 50 | 50 | |
| Miscellaneous | Weekly- Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | |
| | | 150 | 150 | 150 | 150 | 150 | 150 | 150 | |

## Hilco Merchant Resources
### Quiksilver, Inc.
### Exhibit B

| Supervision Expense Budget-Sale |
| --- |

| Supervision with Payroll Costs Include | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | Total USD |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Base Rate | 88,749 | 61,047 | 405,710 | - | - | - | - | 555,506 |
| Deferred Compensation | 44,375 | 30,524 | 202,855 | - | - | - | - | 277,753 |
| Rate Adjustments (1) | 14,087 | - | 59,166 | - | - | - | - | 73,253 |
| Total Rates | 147,211 | 91,571 | 667,731 | - | - | - | - | 906,512 |
| | | | | | | | | |
| Travel Charges | 16,399 | 26,250 | 105,810 | - | - | - | - | 148,459 |
| Other Expenses | 3,707 | - | - | - | - | - | - | 3,707 |
| General Liability Insurance | | | | | | | | 12,368 |
| Total Expense | 167,317 | 117,821 | 773,541 | - | - | - | - | 1,071,046 |

Note: Supervision Expense will be managed in the aggregate.

| Supervision Supporting Detail |
| --- |

| | Lead Supervisor | Lead Supervisor-II | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Weekly Base Rate | 3,150 | 3,150 | 2,400 | 2,400 | 3,150 | 3,150 | 3,000 | |
| Rate Adjustments | 500 | - | 350 | - | - | - | - | |
| Total Rates | 3,650 | 3,150 | 2,750 | 2,400 | 3,150 | 3,150 | 3,000 | |
| % Deferred Compensation | 50% | 50% | 50% | 0% | 50% | 50% | 50% | |
| Payroll Costs (Tico) | 14% | 14% | 14% | 14% | 14% | 14% | 14% | |
| # of Supervisors | 1 | 1 | 6 | | | | | |
| # of Weeks | 24.7 | 17.0 | 24.7 | 1.0 | 24.7 | 24.7 | 24.7 | |

**Travel Charges and Other Expenses**

| | | Lead Supervisor | Lead Supervisor-II | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Initial Airfare | Initial- Travel | 1,200 | 5,000 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| | | | | | | | | | |
| Travel Rate (25% of Base Rate) | | 900 | 900 | 680 | 680 | 900 | 900 | 860 | Travel Days |
| # of Travel Days | | 3 | | 4 | 1 | 1 | 1 | 1 | 667.3 |
| Pro-rated Travel Rates | Weekly- Travel | 390 | 1,250 | 390 | 100 | 130 | 130 | 120 | |
| Car rent | Weekly- Travel | 175 | | 175 | 175 | 175 | 175 | 175 | |
| >50 Miles | Weekly- Travel | 50 | | 100 | 100 | 100 | 100 | 100 | |
| | | 615 | 1,250 | 665 | 375 | 405 | 405 | 395 | |
| | | | | | | | | | |
| Cell phone / Internet | Weekly- Other | 50 | | - | - | - | - | - | |
| Miscellaneous | Weekly- Other | 100 | | - | - | - | - | - | |
| | | 150 | - | - | - | - | - | - | |

## Hilco Merchant Resources
## Quiksilver, Inc.
## Exhibit B

| Supervision Expense Budget-Wind-Down |
|---|

| Supervision with Payroll Costs Include | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | Total USD |
|---|---|---|---|---|---|---|---|---|
| Base Rate | 25,137 | - | 82,080 | - | 28,728 | - | - | 135,945 |
| Deferred Compensation | 12,569 | - | 41,040 | - | 14,364 | - | - | 67,973 |
| Rate Adjustments (1) | 3,990 | - | 11,970 | - | - | - | - | 15,960 |
| Total Rates | 41,696 | - | 135,090 | - | 43,092 | - | - | 219,878 |
| | | | | | | | | |
| Travel Charges | 5,505 | - | 22,950 | - | 4,440 | - | - | 32,895 |
| Other Expenses | 1,050 | - | 4,500 | - | 1,200 | - | - | 6,750 |
| General Liability Insurance | | | | | | | | 4,013 |
| Total Expense | 48,251 | - | 162,540 | - | 48,732 | - | - | 263,536 |

Note: Supervision Expense will be managed in the aggregate.

| Supervision Supporting Detail |
|---|

| | | Lead Supervisor | Regional | Field Supervisors (full-term) | Field Supervisors (part-term) | Project Controller | PC Staff | DC Supervisor | |
|---|---|---|---|---|---|---|---|---|---|
| Weekly Base Rate | | 3,150 | 2,650 | 2,400 | 2,400 | 3,150 | 3,150 | 3,000 | |
| Rate Adjustments | | 500 | - | 350 | - | - | - | - | |
| Total Rates | | 3,650 | 2,650 | 2,750 | 2,400 | 3,150 | 3,150 | 3,000 | |
| % Deferred Compensation | | 50% | 50% | 50% | 0% | 50% | 50% | 50% | |
| Payroll Costs (Tico) | | 14% | 14% | 14% | 14% | 14% | 14% | 14% | |
| # of Supervisors | | 1 | | 5 | | 1 | | | |
| # of Weeks | | 7.0 | 6.0 | 6.0 | 1.0 | 8.0 | 6.0 | 6.0 | |
| | | | | | | | | | |
| **Travel Charges and Other Expenses** | | | | | | | | | |
| Initial Airfare | Initial- Travel | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | |
| | | | | | | | | | |
| Travel Rate (25% of Base Rate) | | 900 | 760 | 680 | 680 | 900 | 900 | 860 | Travel Days |
| # of Travel Days | | 3 | 7 | 3 | 1 | 1 | 1 | 1 | 119.0 |
| Pro-rated Travel Rates | Weekly- Travel | 390 | 760 | 290 | 100 | 130 | 130 | 120 | |
| Car rent | Weekly- Travel | 175 | 175 | 175 | 175 | 175 | 175 | 175 | |
| >50 Miles | Weekly- Travel | 50 | 150 | 100 | 100 | 100 | 100 | 100 | |
| | | 615 | 1,085 | 565 | 375 | 405 | 405 | 395 | |
| | | | | | | | | | |
| Cell phone / Internet | Weekly- Other | 50 | 50 | 50 | 50 | 50 | 50 | 50 | |
| Miscellaneous | Weekly- Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | |
| | | 150 | 150 | 150 | 150 | 150 | 150 | 150 | |

**EXHIBIT 3**

**Sale Guidelines**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                     :
In re:                               :    Chapter 11
                                     :
QUIKSILVER, INC., et al.,            :    Case No. 15-11880 (___)
                                     :
                      Debtors.¹      :    (Jointly Administered)
                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**SALE GUIDELINES**

The following procedures (the "Sale Guidelines") shall apply to the Sale[2] to be held at the locations (collectively the "Locations" and each, a "Location") subject to (1) the agreement (the "Store Closing Agreement") dated as of September 4, 2015, by and between QS Retail, Inc. (the "Merchant"), on the one hand, and Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Agent") and (2) the agreement (the "Pop Up Store Agreement," and together with the Store Closing Agreement, the "Agreements") dated as of June 8, 2015, by and between Merchant, on the one hand, and Agent, on the other hand:

1.     The Sale shall be conducted so that the Locations in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Locations.

2.     The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Location on a Sunday.

3.     On "shopping center" property, the Merchant or the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Location's premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Location is located; provided that the Merchant and the Agent may solicit customers in the Locations themselves. On "shopping center" property, the Merchant and the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]   Capitalized terms not otherwise defined herein shall have the meanings given to them in the Agreements (as defined herein).

4.      At the conclusion of the Sale, the Merchant shall vacate the Locations in broom clean condition, and shall leave the Locations in the same condition as on the applicable Sale Commencement Date, ordinary wear and tear excepted, provided, however, that the Agent and the Merchant hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Location.

5.      Subject to the entry of the final order granting the Motion[3]: (i) the Agent and the Merchant may abandon any FF&E (as used in the Agreements) and Merchandise not sold in the Sale at the Locations at the earlier of the conclusion of the Sale or the applicable Sale Termination Date; (ii) any abandoned FF&E and Merchandise left in a Location after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.

6.      The Agent and the Merchant may advertise the sale as a "sale on everything", "everything must go", or similar themed sale. The Agent and the Merchant may also advertise the sale as a "store closing" and have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.

7.      Agent and the Merchant shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Agent and the Merchant shall not use neon or day-glo on its display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Agent and the Merchant shall be permitted to utilize exterior banners at (i) non-enclosed mall Locations and (ii) enclosed mall Locations to the extent the entrance to the applicable Location does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Location, and shall not be wider than the storefront of the Location. In addition, the Agent and the Merchant shall be permitted to utilize sign walkers in a safe and professional manner. Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent and the Merchant any additional restrictions not contained in the applicable lease agreement.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Locations to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Agent and the Merchant shall not make any alterations to the storefront or exterior walls of any Locations.

---

[3]    As used herein, the "Motion" refers to the *Motion Pursuant to Bankruptcy Code Section 105, 363, and 365 and Bankruptcy Rules 6004 and 6006 (i) Authorizing the Debtors to assume the Agreements; (ii) Authorizing and Approving the Conduct of Store Closing or Similar Themed Sales, with Such Sales to be Free and Clear of all Liens, Claims and Encumbrances; (iii) Authorizing Customary Bonuses to Employees of Closing Business Locations; and (iv) Granting Related Relief*, filed in the above-captioned cases.

2

10.     The Agent and the Merchant shall not make any alterations to interior or exterior Location lighting.  No property of the landlord of a Location shall be removed or sold during the Sale.  The hanging of exterior banners or signage or banners in a Location shall not constitute an alteration to a Location.

11.     The Agent and the Merchant shall keep Location premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Store Closing Agreement, the Agent and the Merchant shall have the right to sell all FF&E.  The Agent and the Merchant may advertise the sale of the FF&E in a manner consistent with these guidelines at the Locations.  The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Location business hours.

13.     At the conclusion of the Sale at each Location, pending assumption or rejection of applicable leases, the landlords of the Locations shall have reasonable access to the Location's premises as set forth in the applicable leases.  The Agent, the Merchant and their agents and representatives shall continue to have exclusive and unfettered access to the Locations until the respective Locations are turned back to the landlord in a manner consistent with the rejection procedures approved by the Court.

14.     Postpetition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.

15.     The rights of landlords against Merchant for any damages to a Location shall be reserved in accordance with the provisions of the applicable lease.

16.     If and to the extent that the landlord of any Location affected hereby contends that the Agent or the Merchant are in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows: (i) Skadden, Arps, Slate, Meagher & Flom LLP, 300 South Grand Avenue, Suite 3400, Los Angeles, CA 90071 (Attn: Van Durrer, Esq.), van.durrer@skadden.com; (ii) Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Suite 2700, Chicago, IL 60606 (Attn: John K. Lyons, Esq.), john.lyons@skadden.com; and (ii) Hilco Merchant Resources, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062 (Attn: Ian Fredericks, Esq.), ifredericks@hilcoglobal.com.

# EXHIBIT 4

## Pop Up Stores

| Store # | Shopping Center | Address | City | ST | Zip Code | Space # |
|---|---|---|---|---|---|---|
| 510 | Westgate Center | 1600 Saratoga Ave | San Jose | CA | 95129 | 33 |
| 702 | Crow Canyon Commons | 3191M Crow Canyon Place | San Ramon | CA | 94583 | M |
| 703 | Ellisburg S/C | 1598 Kings Highway | Cherry Hill | NJ | 08034 | 24 |
| 704 | Crossroads S/C | 223 Skokie Valley Road | Highland Park | IL | 60035 | B003 |
| 705 | Finley Square S/C | 1524 Butterfield Road | Downers Grove | IL | 60515 | 12 |
| 706 | Lawrence Park S/C | 1991 Sproul Road | Broomall | PA | 19008 | 29 |
| 707 | Andorra S/C | 8500 Henry Ave | Philadelphia | PA | 19128 | 23 |
| 708 | Bristol Plaza | 622 Farmington Ave | Bristol | CT | 06010 | 5 |
| 709 | Pike 7 Plaza | 8397 Leesburg Pike | Vienna | VA | 22182 | 35 |
| 710 | Graham Park Plaza | 7285 Arlington Blvd. | Falls Church | VA | 22042 | 32B |
| 711 | Eastgate | 1800 East Franklin Street | Chapel Hill | NC | 27514 | 11B |
| 712 | 29th Place | 100 Shoppers World Court | Charlottesville | VA | 22901 | N020 |
| 714 | NewPark Mall | 2086 Newpark Mall | Newark | CA | 94560 | 2119 |
| 715 | Mt. Shasta Mall | 900 Dana Dr | Redding | CA | 96003 | A-52 |
| 716 | West Valley Mall | 3200 N Naglee Rd | Tracy | CA | 95304 | 100 |
| 717 | Spring Hill Mall | 1072 Spring Hill Mall | West Dundee | IL | 60118 | 1322 |
| 718 | Lakeland Square | 3800 US Hwy 98 N | Lakeland | FL | 33809 | 126 |
| 720 | Chesterfield Towne Center | 11500 Midlothian Turnpike | Chesterfield | VA | 23235 | 104 |

| Store # | Shopping Center | Address | City | ST | Zip Code | Space # |
|---|---|---|---|---|---|---|
| 721 | Clayton Valley Shopping Center | 5434 Ygnacio Valley Road | Concord | CA | 94521 | 30 |
| 722 | East Washington Place | 401 Kenilworth Drive | Petaluma | CA | 94952 | 310 |
| 723 | Bayhill Shopping Center | 851 Cherry Ave | San Bruno | CA | 94066 | 24 |
| 725 | El Cerrito Plaza | 3010 El Cerrito Plaza | El Cerrito | CA | 94530 | |
| 727 | Regency Square | 2526 W Brandon Blvd. | Brandon | FL | 33511 | 2526 |

2