## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| QUIKSILVER, INC., *et al.*, | : Case No. 15-11880 (BLS) |
| | : |
| Debtors.[1] | : Jointly Administered |
| | : |
| | : **Hearing Date: October 6, 2015 at 10:00 a.m. (EST)** |
| | **Obj. Deadline: Sept. 29, 2015 at 4:00 p.m. (EST)** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' APPLICATION PURSUANT TO BANKRUPTCY CODE SECTIONS
105(a) AND 363(b) (I) AUTHORIZING DEBTORS TO (A) RETAIN FTI CONSULTING,
INC. TO PROVIDE THE DEBTORS WITH STEPHEN COULOMBE AS THEIR
DESIGNATED CHIEF RESTRUCTURING OFFICER AND OTHER TEMPORARY
EMPLOYEES, EFFECTIVE AS OF THE PETITION DATE; AND (II) APPROVING
THE ENGAGEMENT AGREEMENT BETWEEN THE DEBTORS
<u>AND FTI CONSULTING, INC.</u>**

Quiksilver, Inc. ("<u>ZQK</u>") and certain of its affiliates, the debtors and debtors in

possession in the above-captioned cases (collectively, the "<u>Debtors</u>" and, together with their non-

Debtor affiliates, "<u>Quiksilver</u>" or the "<u>Company</u>") hereby apply (the "<u>Application</u>") to the Court

for entry of an order, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code

(the "<u>Bankruptcy Code</u>") (I) authorizing the Debtors to (A) retain FTI Consulting, Inc. ("<u>FTI</u>") to

provide the Debtors with Stephen Coulombe as their designated Chief Restructuring Officer

("<u>CRO</u>") and other temporary employees ("<u>Temporary Employees</u>") to provide restructuring

support services, effective as of the Petition Date (as defined herein), pursuant to the terms of the

engagement agreement between the Debtors and FTI (the "<u>Engagement Agreement</u>"), attached

as <u>Exhibit A</u> hereto, and (ii) approving the Engagement Agreement.   In support of this

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

Application, the Debtors rely upon and incorporate by reference the Declaration of Stephen Coulombe, a Senior Managing Director at FTI (the "Coulombe Declaration"), which is attached as Exhibit B hereto.  In further support of this Application, the Debtors respectfully represent as follows.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Application under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Application in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

3.      Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Application if it is determined that Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

4.      On September 9, 2015 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  These Chapter 11 Cases are jointly administered.

5.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      To date, no creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "United States Trustee").  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

7.      Quiksilver is one of the world's leading outdoor sports lifestyle companies.  The Company designs, develops and distributes branded apparel, footwear, accessories and related products.  The Company began operations in 1976 making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, BMX, and motocross, among other activities. The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites.  The Debtors comprise each of the Company's U.S. entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc. and seven inactive entities.

8.      Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., in Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration")[2] [Docket No. 20], filed with the Court in the above-captioned cases.

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration or the Engagement Agreement, as applicable.

**RELIEF REQUESTED**

9.      By this Application, the Debtors seek entry of an order, pursuant to

sections 105(a) and 363(b) of the Bankruptcy Code, (a) authorizing the Debtors to (i) retain FTI

to provide the Debtors with Mr. Coulombe as their designated CRO and other Temporary

Employees, effective as of the Petition Date; and (b) approving the Engagement Agreement

between the Debtors and FTI.

**BASIS FOR RELIEF**

10.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession "after notice and hearing, may use, sell or lease, other than in the ordinary

course of business, property of the estate."  11 U.S.C. § 363(b).  Under applicable case law in

this and other circuits, courts will approve a debtor's proposed use of its assets under section

363(b) if it represents a sound business purpose on the part of the debtor.  See, e.g., In re

Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999) ("In evaluating

whether a sound business purpose justifies the use, sale or lease of property under

Section 363(b), courts consider a variety of factors, which essentially represent a business

judgment test."); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (courts defer to a trustee's

judgment concerning use of property under § 363(b) when there is a legitimate business

justification); In re Delaware & Hudson R.R. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (courts

have applied the "sound business purpose" test to evaluate motions brought pursuant to section

363(b)).  Under the business judgment rule, a court will not interfere with the judgment of a

board of directors unless there is a showing of "gross and palpable overreaching." In re Marvel

Entm't Group, Inc., 273 B.R. 58, 78 (Bankr. D. Del. 2002) ("[U]nder the business judgment rule,

a board's 'decisions will not be disturbed if they can be attributed to any rational purpose' and a

court 'will not substitute its own notions of what is or is not sound business judgment.'") (citing Sinclair Oil Corp. v. Levien, 280 A.2d 717, 719-20 (Del. 1971)).

11.    Bankruptcy courts have analyzed the propriety of a debtor's employment of corporate restructuring officers, restructuring advisors, and restructuring professionals under section 363(b) on numerous occasions and have determined that it is an appropriate exercise of business judgment to employ a restructuring or other type of professional in this manner.  See, e.g., In re Green Field Energy Services, Inc., Case No. 13-12783 (KG) (Bankr. D. Del. Nov. 26, 2013); In re Synagro Techs., Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. June 5, 2013); In re School Specialty, Inc., Case No. 13-10125 (KJC) (Bankr. D. Del. Feb. 25, 2013); In re Vertis Holdings, Inc., Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 20, 2012); In re Filene's Basement, LLC, Case No. 11-13511 (KJC) (Bankr. D. Del. Jan. 24, 2012); In re Harry & David Holdings, Inc., Case No. 11-10884 (MFW) (Bankr. D. Del. April 27, 2011).[3]

12.    The Debtors submit that the employment of FTI and Mr. Coulombe is a sound exercise of their business judgment and satisfies section 363(b) of the Bankruptcy Code as FTI and Mr. Coulombe's services are necessary and essential to the overall prosecution of these Chapter 11 Cases.  In addition to the specific knowledge they have acquired regarding the Debtors' business, FTI and Mr. Coulombe have extensive experience providing management services to distressed companies.

### FTI'S QUALIFICATIONS

13.    FTI was founded in 1982 as a global business advisory firm dedicated to helping organizations protect and enhance enterprise value.  It employs approximately 3,500 professionals located worldwide.  FTI and their professionals work closely with clients on a daily

---

[3]    Because of the voluminous nature of the orders cited herein, they are not attached to this Application.  Copies of these orders, however, are available on request.

basis to anticipate, illuminate, and overcome complex business challenges in areas such as

investigations, litigation, mergers and acquisitions, regulatory issues, reputation management and

restructuring.  FTI's vast network of professionals, which includes, but is not limited to, forensic

accountants, certified public accountants, former chief executives, and certified turnaround

professionals, enables FTI to guide clients through the complex business challenges in area such

as investigations, litigation, mergers and acquisitions and restructuring.

14.    FTI has extensive experience in providing restructuring services in and out

of chapter 11 proceedings and has an excellent reputation for the services it has rendered on

behalf of debtors and creditors throughout the United States.  Among many other examples, FTI

has provided restructuring and turnaround advisory services to clients including NewPage

Corporation, Chrysler Financial Services Americas LLC, Digital Domain Media Group, Inc.,

Cadence Innovation LLC, Performance Transportation, Inc., and Chrysler Motors LLC, and FTI

has provided financial advisory services to the lenders or unsecured creditors of such companies

as General Motors Corporation, Coach America Holdings Inc., and Swift Transportation Inc.

15.    Furthermore, FTI has provided a Chief Restructuring Officer (CRO) and

other temporary employees to numerous other chapter 11 debtors in this district.  See, e.g., In re

RadioShack Corp., Case No. 15-10197 (BLS) (Bankr. D. Del. Mar. 12, 2015); In re Caché, Inc.,

Case No. 15-10172 (MFW) (Bankr. D. Del. Mar. 3, 2015); In re Mineral Park, Inc., Case No. 14-

11996 (KJC) (Bankr. D. Del. Sept. 23, 2014); In re Quantum Foods, LLC, Case No. 14-10318

(KJC) (Bankr. D. Del. Mar. 12, 2014); In re Allen Family Foods, Inc., Case No. 11-11764 (KJC)

(Bankr. D. Del. July 13, 2011).

16.    The Debtors retained FTI to provide certain advisory and interim

management services on September 1, 2015 pursuant to  the Engagement Agreement, attached as

Exhibit A hereto.[4]  Since its engagement, FTI developed substantial institutional knowledge with respect to the Debtors' operations and financial condition.  The Debtors believe that such institutional knowledge will further enable FTI perform its duties in the most cost-effective and efficient manner.  Accordingly, the Debtors believe that it is in the estates' best interest to retain FTI for the purpose of providing the Debtors with Mr. Coulombe as their CRO and other Temporary Employees to perform restructuring support services in these Chapter 11 Cases.

### SERVICES TO BE PROVIDED[5]

17.    As set forth more fully in the Engagement Agreement, FTI will provide such restructuring, interim management, and advisory services as FTI and the Company deem appropriate and feasible in order to advise the Company, including but not limited to the following:

(a)    Interim Management

(i)    Mr. Coulombe will serve as the Debtors' CRO;

(ii)    Mr. Coulombe will not be a member of the board of directors, but may participate in board meetings; and

(iii)    Mr. Coulombe will perform the typical duties of a CRO, and other services as mutually agreed to by FTI and the Company; and

---

[4]    The Debtors originally entered into an engagement agreement with FTI on July 7, 2015 pursuant to which FTI was to provide certain financial advisory and consulting services to the Debtors.  The Debtors subsequently amended the retention such that FTI would be providing a CRO to the Debtors and executed the Engagment Agreement.

[5]    This summary is provided solely for convenience purposes.  The terms of the engagement shall be governed by the Engagement Agreement.  To the extent that this summary conflicts with the Engagement Agreement, the Engagement Agreement shall govern.

(b)    <u>Advisory Services</u>:  Mr. Coulombe and other FTI professionals will, collectively, lead efforts to implement both short-term and long-term liquidity generation and profit improvement, including the following:

(i)    assisting the Company with information and analyses required pursuant to the postpetition financing;

(ii)    assisting with the identification and implementation of short-term cash management procedures;

(iii)    assisting in the preparation of financial information for distribution to creditors and others, including, but not limited to, cash receipts and disbursement analysis, analysis of various asset and liability accounts, and analysis of proposed transactions;

(iv)    assisting in developing accounting and operating procedures to segregate prepetition and postpetition business transactions;

(v)    assisting the Company in developing and implementing strategies with suppliers;

(vi)    assisting the Company with communication to key stakeholders including customers, suppliers, and others;

(vii)    assisting the Company in the identification of executory contracts and unexpired leases and performing of cost/benefit evaluations with respect to the assumption or rejection of each;

(viii)    assisting the Company in the preparation of required financial related disclosures, including the Schedules of Assets and Liabilities, the Statements of Financial Affairs, and Monthly Operating Reports;

(ix)     providing assistance with implementation of court orders;

(x)     assisting in the evaluation and analysis of avoidance actions, including fraudulent conveyances and preferential transfers;

(xi)     participating in meetings and providing support to the Company and their other professional advisors in negotiations with potential investors, banks and other secured lenders, the creditors' committee appointed, the United States Trustee, other parties in interest, and professionals hired by the same, as requested;

(xii)     rendering such other restructuring and general business consulting or such other assistance for the Company management or counsel may request, that are not duplicative of services provided by other professionals engaged by the Company.

FTI has and will continue working closely with other advisors engaged by the Company to ensure that the services provided by each firm are complementary and not duplicative

18.     The services listed above are vital to the success of these Chapter 11 Cases, and the Debtors require knowledgeable management to render such services. Accordingly, the Debtors believe that FTI and Mr. Coulombe are well qualified to perform these services in the Chapter 11 Cases.

19.     In the event the Debtors or FTI seek to have FTI personnel assume executive officer positions that are different than the positions disclosed in the Application, or to materially change the terms of the engagement by either (i) modifying the functions of personnel, (ii) adding new personnel, or (iii) altering or expanding the scope of the engagement, a motion to modify the retention shall be filed.

9

## COMPENSATION

20.     <u>Monthly Fee</u>.  For services provided by Mr. Coulombe, the Company will pay FTI a monthly, non-refundable advisory fee of $125,000.

21.     <u>Hourly Rates</u>.  The normal hourly billing rates for the current, or any additional, professionals with the skills and experience needed for engagements of this kind, which are subject to periodic revision, are as follows:

| Position | Per Hour (USD) |
|---|---|
| Senior Managing Directors | $800-$975 |
| Directors/Managing Directors | $595-$795 |
| Consultants/Senior Consultants | $315- $570 |
| Administrative/Paraprofessionals | $125-$250 |

22.     <u>Completion Fee</u>.  If the Debtors succeed in obtaining a final judicial order approving a plan of reorganization under chapter 11 or a sale of substantially all of the Debtors' assets under section 363 of the Bankruptcy Code, then, upon the consummation of such restructuring or sale, the Debtors' will pay FTI a completion fee of $1,000,000 (the "<u>Completion Fee</u>").  The Completion Fee shall be subject to approval by the Court at the conclusion of Chapter 11 Cases based on a reasonableness standard.

23.     <u>Reimbursement of Expenses</u>.  In addition to the fees outlined above, FTI will bill for reasonable direct expenses be incurred on the Company's behalf during its engagement.  Direct expenses include reasonable and customary out-of-pocket expenses which are billed directly to the engagement such as certain telephone, overnight mail, messenger, travel, meals, accommodations and other expenses specifically related to the engagement.  Further, if FTI and/or any of its employees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to this matter, FTI will be

compensated by the Company at its regular hourly rates and reimbursed for reasonable allocated and direct expenses (including counsel fees) with respect thereto.

24.    Because the Debtors are seeking to retain FTI and an FTI professional as a CRO pursuant to section 363 of the Bankruptcy Code and not under section 327 of the Bankruptcy Code, FTI is not subject to the compensation requirements of sections 330 and 331 of the Bankruptcy Code.  Therefore, the Debtors request that fees and expenses of FTI incurred in the performance of the above-described services be treated as an administrative expense of the Debtors' chapter 11 estates and be paid by the Debtors in the ordinary course of business, without the need for FTI to file fee applications or otherwise seek Court approval for the compensation of its services and reimbursement of its expenses, other than as described herein.

25.    The Debtors shall pay to FTI the compensation set forth above based upon the submission of invoices by FTI to the Debtors.  Because neither Mr. Coulombe nor FTI is being employed as a professional under section 327 of the Bankruptcy Code Section, FTI will not be submitting fee applications pursuant to sections 330 and 331 of the Bankruptcy Code. Instead, on a monthly basis, FTI shall file with the Court, and provide notice to the United States Trustee, the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee"), and counsel to the agents for the Debtors' postpetition secured loan facilities (together with the United States Trustee and the Committee, the "Notice Parties") the following monthly reports (the "Monthly Reports"):

    (a)    a report of compensation earned and expenses incurred on a monthly basis; subject to the following:

        (i)    such report shall contain summary charts which describe the services provided, identify the compensation earned by each executive officer and staff employee provided, and itemize the expenses incurred;

(ii)    time records shall (A) be appended to the reports, (B) contain detailed time entries describing the task(s) performed, and (C) be organized by project category;

(iii)    where personnel are providing services at an hourly rate, the time entries shall identify the time spent completing each task in half-hour increments and the corresponding charge (time multiplied by hourly rate) for each task; where personnel are providing services at a "flat" rate, the time entries shall be kept in hourly increments; and

(iv)    all compensation shall be subject to review by the Court in the event an objection is filed; and

(b)    a report of staffing on the engagement for the previous month, subject to the following:

(i)    such report shall include the names and functions filled of individuals assigned;

(ii)    all staffing shall be subject to review by the Court in the event an objection is filed.

26.    FTI shall file the Monthly Reports on or before the twenty-first (21st) day of each month.  The first Monthly Reports shall be due on November 21, 2015 and shall cover the period up to and including October 31, 2015.

27.    The Notice Parties shall have fifteen (15) days from service to object to the Monthly Reports.  In the event that an objection is timely filed by the Notice Parties and said objection cannot be resolved, the matter shall be scheduled for a hearing before this Court at time mutually agreed upon by the parties.  If there is no objection to the Monthly Reports, the applicable invoice may be paid in the ordinary course of business by the Debtors.

28.    On or about September 4, 2015, FTI received $1,100,000 (the "Retainer") from the Debtors, which funds were to be held by FTI to be applied to FTI's professional fees, charges, and disbursements.  For the twenty-three days prior to the Petition Date, FTI was paid

$905,000[6] by the Debtors for fees and expenses incurred during the engagement.  As of the

Petition Date, the balance of the Retainer was $195,000.

29.    The Debtors believe that FTI's fees and compensation as set forth herein

are reasonable and justified under the circumstances.

## INDEMNIFICATION

30.    Notwithstanding anything to the contrary in the Engagement Agreement

and consistent with the protocol established by the United States Trustee with respect to the

retention of critical management services (the "Protocol"), FTI agrees that those FTI employees

serving as officers of the Debtors, including Mr. Coulombe as CRO, will be entitled to receive

whatever indemnities are made available during the term of the engagement to other non-FTI

affiliated officers of the Debtors, whether under the by-laws, certificates of incorporation,

applicable corporate laws or contractual agreements of general applicability to officers of the

Debtors (the "FTI Indemnification").  Additionally, and consistent with the Protocol, FTI agrees

to waive the FTI Indemnification with respect to those Indemnified Parties (as defined in the

Engagement Agreement) and Indemnified Persons (as defined in the Engagement Agreement)

who do not serve as officers of the Debtors; provided, however, that FTI personnel who are not

officers of the Debtors shall be indemnified as may be approved by the boards of directors of the

Debtors.

31.    FTI agrees that there shall be no indemnification of FTI or its affiliates

but, notwithstanding the foregoing, FTI may apply for reimbursement of expenses to the extent it

is required to respond to a subpoena relating to the Debtors' cases during the engagement or after

---

6    In addition to the $905,000, FTI was paid $190,000 in August 2015 for financial advisory and consulting
services provided through August 7, 2015.

the engagement is terminated.  FTI agrees that the reasonableness of such expenses shall be evaluated under section 330 of the Bankruptcy Code.

32.    FTI agrees that FTI personnel serving as corporate officers of the Debtors shall be subject to the same fiduciary duties and obligations applicable to other persons serving in such capacity.

33.    For a period of three years after the conclusion of FTI's engagement, FTI and its affiliates shall not make any investments in the Debtors or reorganized Debtors where FTI or another affiliate has been engaged.

34.    The Debtors believe the indemnity provisions are a reasonable term and condition of FTI's engagement and were, along with all terms of the Engagement Agreement, negotiated by the Debtors and FTI at arm's-length and in good faith.  FTI and the Debtors believe that the indemnity provisions are comparable to those indemnification provisions generally obtained by crisis management firms of similar stature to FTI and for comparable engagements, both in and out of court.  The Debtors respectfully submit that the indemnification provisions contained in the Engagement Agreement, viewed in conjunction with the other terms of FTI's proposed retention, are reasonable and in the best interests of the Debtors, their estates, and creditors in light of the fact that the Debtors require FTI's services to successfully reorganize.

## FTI'S DISINTERESTEDNESS

35.    The Debtors do not believe that FTI is a "professional" whose retention is subject to approval under section 327 of the Bankruptcy Code.  However, FTI has conducted a conflicts check to determine its connection, if any, with parties in interest in these Chapter 11 Cases.  As set forth more fully in the Coulombe Declaration, FTI (a) has no connection with the Debtors, their creditors, or other parties in interest in these Chapter 11 Cases, (b) does not hold

any interest adverse to the Debtors' estates, and (c) believes that it is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code.  FTI will continue to review its records and will supplement the Coulombe Declaration, as necessary, with additional information or disclosures in the event that additional information is developed.

36.    FTI shall disclose any and all facts that may have a bearing on whether FTI, its affiliates, and/or any individuals working on the engagement have any interest materially adverse to the interest of the Debtors' estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.  Such obligation to disclose shall be a continuing obligation.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)**

37.    The Debtors also request that the Court waive the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  The relief that the Debtors seek in this Application is necessary for the Debtors to operate without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**NOTICE**

38.    Notice of this Application shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' postpetition secured loan facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan facility; (d) the agent for the Debtors' prepetition senior secured notes; (e) the agent for the

Debtors' prepetition senior unsecured notes; and (f) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases.  The Debtors submit that no other or further notice need be provided.

### NO PRIOR REQUEST

39.     No previous request for the relief sought herein has been made to this Court or any other court.

### CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form annexed hereto, granting the relief sought herein and granting such other and further relief as may be just and proper.

Dated:    September 17, 2015
          New York, New York

QUIKSILVER, INC.

(on behalf of itself and the other Debtors)

By:    */s/ Andrew Bruenjes*
Name: Andrew Bruenjes
Title:  Americas Chief Financial Officer