relevant Alternative Currency Equivalent of such Dollar amount (rounded to the nearest unit of such Alternative Currency, with 0.5 of a unit being rounded upward), as determined by the Administrative Agent or the L/C Issuer, as the case may be.

**1.09    Additional Alternative Currencies.**

(a)    Each Borrower may from time to time request that Loans be made and/or Letters of Credit be issued in a currency other than those specifically listed in the definition of "Alternative Currency;" provided that such requested currency is a lawful currency (other than Dollars) that is readily available and freely transferable and convertible into Dollars. In the case of any such request with respect to the making of Loans, such request shall be subject to the approval of the Administrative Agent and the Lenders; and in the case of any such request with respect to the issuance of Letters of Credit, such request shall be subject to the approval of the Administrative Agent and the L/C Issuer.

(b)    Any such request shall be made to the Administrative Agent not later than 11:00 a.m., 20 Business Days prior to the date of the desired Credit Extension (or such other time or date as may be agreed by the Administrative Agent and, in the case of any such request pertaining to Letters of Credit, the L/C Issuer, in its or their sole discretion). In the case of any such request pertaining to Loans, the Administrative Agent shall promptly notify each Lender thereof; and in the case of any such request pertaining to Letters of Credit, the Administrative Agent shall promptly notify the L/C Issuer thereof. Each Lender (in the case of any such request pertaining to Loans) or the L/C Issuer (in the case of a request pertaining to Letters of Credit) shall notify the Administrative Agent, not later than 11:00 a.m., ten Business Days after receipt of such request whether it consents, in its sole discretion, to the making of Loans or the issuance of Letters of Credit, as the case may be, in such requested currency.

(c)    Any failure by a Lender or the L/C Issuer, as the case may be, to respond to such request within the time period specified in the preceding sentence shall be deemed to be a refusal by such Lender or the L/C Issuer, as the case may be, to permit Loans to be made or Letters of Credit to be issued in such requested currency. If the Administrative Agent and all the Lenders consent to making Loans in such requested currency, the Administrative Agent shall so notify the Lead Borrower and such currency shall thereupon be deemed for all purposes to be an Alternative Currency hereunder for purposes of any Committed Borrowings of Loans; and if the Administrative Agent and the L/C Issuer consent to the issuance of Letters of Credit in such requested currency, the Administrative Agent shall so notify the Lead Borrower and such currency shall thereupon be deemed for all purposes to be an Alternative Currency hereunder for purposes of any Letter of Credit issuances. If the Administrative Agent shall fail to obtain consent to any request for an additional currency under this Section 1.09, the Administrative Agent shall promptly so notify the Lead Borrower.

**1.10    Change of Currency.**

(a)    Each obligation of the Borrowers to make a payment denominated in the national currency unit of any Participating Member State of the European Union that adopts the Euro as its lawful currency after the date hereof shall be redenominated into Euro at the time of such adoption. If, in relation to the currency of any such Participating Member State, the basis of accrual of interest expressed in this Agreement in respect of that currency shall be

inconsistent with any convention or practice in the London interbank market for the basis of accrual of interest in respect of the Euro, such expressed basis shall be replaced by such convention or practice with effect from the date on which such Participating Member State adopts the Euro as its lawful currency; provided that if any Committed Borrowing in the currency of such Participating Member State is outstanding immediately prior to such date, such replacement shall take effect, with respect to such Committed Borrowing, at the end of the then current Interest Period.

(b)    Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the adoption of the Euro by any Participating Member State of the European Union and any relevant market conventions or practices relating to the Euro.

(c)    Each provision of this Agreement also shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

(d)    The Administrative Agent shall use commercially reasonable efforts to promptly advise the Lead Borrower of any changes of construction pursuant to clauses (b) and (c) hereof, but any failure to do so shall not limit the Administrative Agent's rights or any changes made under such clauses.

**1.11   Québec Matters.**  For purposes of any assets, liabilities or entities located in the Province of Québec and for all other purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Québec or a court or tribunal exercising jurisdiction in the Province of Québec, (a) "personal property" shall include "movable property", (b) "real property" or "real estate" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "security" shall include a "hypothec", "right of retention", "prior claim" and a resolutory clause, (f) all references to filing, perfection, priority, remedies, registering or recording under the UCC or a PPSA shall include publication under the *Civil Code of Québec*, (g) all references to "perfection" of or "perfected" security or security interest shall include a reference to an "opposable" or "set up" hypothec, security or security interest as against third parties, (h) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (i) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall include a "mandatary", (k) "construction security" shall include "legal hypothecs", (l) "joint and several" shall include "solidary", (m) "gross negligence or willful misconduct" shall be deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership on behalf of another as mandatary"; (o) "easement" shall include "servitude", (p) "priority" shall include "prior claim", (q) "survey" shall include "certificate of location and plan", (r) "state" shall include "province", (s) "fee simple title" shall include "absolute ownership", and (t) "accounts" shall include "claims".

### ARTICLE II
### THE COMMITMENTS AND CREDIT EXTENSIONS

### 2.01   Committed Loans; Reserves.

(a)   (a)   Subject to the terms and conditions set forth herein, the outstanding loans to Domestic Borrowers funded under the Existing ABL Credit Agreement by each Domestic Lender are hereby continued, amended and restated as a Committed Domestic Loan under this Agreement. Subject to the terms and conditions set forth herein, each Domestic Lender severally agrees to make Committed Domestic Loans to the Domestic Borrowers from time to time, on any Business Day during the Availability Period, in an aggregate principal amount not to exceed at any time outstanding the lesser of (x) the amount of the Domestic Commitment of such Domestic Lender, or (y) the Applicable Percentage of the Domestic Borrowing Base for such Domestic Lender; subject in each case to the following limitations:

(i)   after giving effect to any Committed Domestic Borrowing, the Total Domestic Outstandings shall not exceed the Domestic Loan Cap,

(ii)   after giving effect to any Committed Domestic Borrowing, the aggregate Outstanding Amount of the Committed Domestic Loans of any Domestic Lender, plus (without duplication) the Applicable Percentage of the Outstanding Amount of all Domestic L/C Obligations for such Domestic Lender shall not exceed the Domestic Commitment of such Domestic Lender, and

(iii)   the Outstanding Amount of all Domestic L/C Obligations shall not at any time exceed the Domestic Letter of Credit Sublimit.

Within the limits of the Domestic Commitment for each Domestic Lender, and subject to the other terms and conditions hereof, the Domestic Borrowers may borrow under this Section 2.01, prepay under Section 2.05, and reborrow under this Section 2.01. Committed Domestic Loans may be Domestic Prime Rate Loans or LIBO Rate Loans, as further provided herein.

(b)     Subject to the terms and conditions set forth herein, the outstanding loans to the Foreign Borrowers funded under the Existing ABL Credit Agreement immediately prior to the effectiveness hereof by each Foreign Lender are hereby continued, amended and restated as a Committed Foreign Loan under this Agreement. Subject to the terms and conditions set forth herein, each Foreign Lender severally agrees to make a single Committed Foreign Loan to the applicable Foreign Borrower (other than the Japanese Borrower) on the Effective Date, in an aggregate principal amount not to exceed at any time outstanding the lesser of (x) the amount of the applicable Foreign Commitment of such Foreign Lender to such Foreign Borrower or (y) the Applicable Percentage of the applicable Borrowing Base for such Foreign Borrower; subject in each case to the following limitations:

(i)     after giving effect to any Committed Foreign Borrowing, the Total Outstandings for any Foreign Borrower shall not exceed such Foreign Borrower's Foreign Loan Cap, and

(ii)     with respect to each Foreign Borrower, after giving effect to any Committed Foreign Borrowing made to such Foreign Borrower, the aggregate Outstanding Amount of the Committed Foreign Loans of any Foreign Lender to such Foreign Borrower, plus (without duplication) such Foreign Lender's Applicable Percentage of the Outstanding Amount of all Australian L/C Obligations for such Foreign Borrower, shall not exceed the applicable Foreign Commitment of such Foreign Lender,

After the making of the Committed Foreign Loans on the Effective Date, the Foreign Commitments shall be automatically terminated.

(c)     [Reserved].

(d)     The Inventory Reserves and Availability Reserves as of the Effective Date are set forth in the Borrowing Base Certificates delivered to the Administrative Agent pursuant to Section 4.01(c).

(e)     Any Agent shall have the right, at any time and from time to time after the Effective Date, in its Permitted Discretion to establish new, or modify or eliminate any existing Reserves without prior notice to any Loan Party. Availability Reserves will not be established or changed except upon one (1) Business Day's prior notice to the applicable Borrower (during which period the Agents shall be available to discuss any proposed Availability Reserve with the Borrowers and the Borrowers may take such action as may be required so that the event, condition or matter that is the basis for the Availability Reserve no longer exists); provided that no such prior notice shall be required (i) after the occurrence and during the continuance of an Event of Default or if an Event of Default would arise from the establishment or change of such Availability Reserve, (ii) for changes to any Availability Reserves resulting solely by virtue of mathematical calculations of the amount of the Availability Reserve in accordance with the methodology of calculation previously utilized, (iii) for the establishment of any Reserves in an amount equal to the unpaid balance relating to any Liens permitted under clauses (y) and

(z) of the definition of Permitted Encumbrances, or (iv) if a Material Adverse Effect is reasonably likely to arise by any delay in implementing such Availability Reserve.

      **2.02    Committed Borrowings, Conversions and Continuations of Committed Loans.**

          (a)    Committed Domestic Loans shall be made in Dollars and shall be either Domestic Prime Rate Loans or LIBO Rate Loans, as the Lead Borrower or the Parent, on behalf of the Domestic Borrowers, may request subject to and in accordance with this Section 2.02.   Committed Canadian Loans shall be made in Dollars or Canadian Dollars and shall be either Canadian Prime Rate Loans, Canadian Base Rate Loans, LIBO Rate Loans (if in Dollars only and not in an Alternative Currency) or Canadian BA Rate Loans, as the Canadian Borrower or the Parent, on behalf of the Canadian Borrower, may request subject to and in accordance with this Section 2.02.   Committed Australian Loans shall be made in Dollars or Australian Dollars and shall be either Australian Base Rate Loans, LIBO Rate Loans (if in Dollars) or BBR Rate Loans, as the Australian Borrower or the Parent, on behalf of the Australian Borrower, may request subject to and in accordance with this Section 2.02.   Committed Japanese Loans shall be made in Yen and shall be either Japanese Base Rate Loans or TIBOR Rate Loans, as the Japanese Borrower or the Parent, on behalf of the Japanese Borrower, may request subject to and in accordance with this Section 2.02.   Subject to the other provisions of this Section 2.02, Committed Borrowings of more than one Type may be incurred at the same time.

          (b)    Each Committed Borrowing, each conversion of a Committed Loan from one Type to the other, and each continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans and Canadian BA Rate Loans shall be made upon the irrevocable notice of the applicable Borrower or the Parent on behalf of the applicable Borrower to the Administrative Agent which may be given by electronic transmission. Each such notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three Business Days prior to the requested date of any Committed Borrowing of, conversion to or continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans, or Canadian BA Rate Loans or of any conversion of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans, or Canadian BA Rate Loans to Prime Rate Loans, (ii) four Business Days (or, without duplication of the time periods set forth in Section 1.09(b), five Business Days in the case of a Special Notice Currency) prior to the requested date of any Borrowing or continuation of LIBO Rate Loans, BBR Rate Loans, or TIBOR Rate Loans denominated in Alternative Currencies, and (iii) one Business Day prior to the requested date of any Committed Borrowing of any Prime Rate Loans.   Each electronic notice by the Parent or the applicable Borrower pursuant to this Section 2.02(b) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Parent or the applicable Borrower (and, with respect to the Japanese Borrower, a written Committed Loan Notice may be delivered to the Administrative Agent via facsimile). Each Committed Borrowing of, conversion to or continuation of LIBO Rate Loans, BBR Rate Loans or TIBOR Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof. Each Committed Borrowing of, conversion to or continuation of Canadian BA Rate Loans shall be in a principal amount of CD$500,000 or a whole multiple of CD$100,000 in excess thereof. Except as provided in Section 2.03(c), each Committed Borrowing of or conversion to Prime Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.   Each Committed Loan Notice (whether electronic or written) shall specify (i) whether the request is for a Committed Borrowing, a conversion of Committed Loans from one Type to the other, or a continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans, (ii) the requested date of the Committed Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Committed Loans to be borrowed, converted or continued,

(iv) the Type of Committed Loans to be borrowed or to which existing Committed Loans are to be converted, (v) [reserved], and (vi) the currency of the Committed Loans to be borrowed. If the request fails to specify a currency in a Committed Loan Notice requesting a Borrowing, then the Committed Loans so requested shall be made in Dollars (except that any Japanese Borrowing shall only be made in Yen). If the request fails to specify a Type of Committed Loan in a Committed Loan Notice or if the Parent or the applicable Borrower, as the case may be, fails to give a timely notice of a conversion or continuation of a LIBO Rate Loan, a BBR Rate Loan, a TIBOR Rate Loan or a Canadian BA Rate Loan, then the applicable Committed Loans shall be made as, or converted to, Prime Rate Loans; provided, however, that in the case of a failure to timely request a continuation of Committed Loans denominated in an Alternative Currency, such Loans shall be continued as BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans in their original currency with an Interest Period of one month. Any automatic conversion to Prime Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans. No Committed Loan may be converted into or continued as a Committed Loan denominated in a different currency, but instead must be prepaid in the original currency of such Committed Loan and reborrowed in the other currency.

(c)     Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount (and currency) of its Applicable Percentage of the applicable Committed Loans, and if no timely notice of a conversion or continuation is provided by a Borrower or the Parent, on behalf of a Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Prime Rate Loans or continuation of Committed Loans denominated in a currency other than Dollars, in each case as described in Section 2.02(b). Each applicable Lender shall make the amount of its Committed Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office for the applicable currency not later than 1:00 p.m., in the case of any Committed Loan denominated in Dollars, and not later than the Applicable Time specified by the Administrative Agent in the case of any Committed Loan in an Alternative Currency, in each case on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Committed Borrowing is the initial Credit Extension, Section 4.01), the Administrative Agent shall use reasonable efforts to make all funds so received available to the applicable Borrowers in like funds by no later than 4:00 p.m. on the day of receipt by the Administrative Agent either by (i) crediting either the account of the applicable Borrower on the books of Bank of America, with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent; provided, however, that if, on the date a Committed Loan Notice with respect to a Committed Borrowing denominated in Dollars is given by a Borrower or the Parent on behalf of a Borrower, there are L/C Borrowings outstanding, then the proceeds of such Committed Borrowing, first, shall be applied to the payment in full of any such L/C Borrowings, and second, shall be made available to the applicable Borrower as provided above.

(d)     In the event that any Borrower, after receipt of an invoice therefor, fails to pay any interest, fee, service charge, Credit Party Expenses, or other payment to which any Lender or any Agent is entitled from the Loan Parties pursuant hereto when due, or at any time after the Administrative Agent's reasonable determination that an Event of Default is likely to occur, the Administrative Agent, without the request of any Borrower, may advance such interest, fee, service charge, Credit Party Expenses, or other payment to which any Lender or any Agent is entitled from the applicable Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account with respect to such Credit Extensions, notwithstanding that an Overadvance may result

thereby. The Administrative Agent shall advise the applicable Borrower of any such advance or charge by the Administrative Agent promptly after the making thereof. Such action on the part of the Administrative Agent shall not constitute a waiver of the applicable Credit Party's rights and the applicable Borrowers' obligations under Section 2.05(c). Any amount which is added to the principal balance of the applicable Loan Account as provided in this Section 2.02(d) shall be deemed to be a Prime Rate Loan.

(e)    Except as otherwise provided herein, a LIBO Rate Loan, a BBR Rate Loan, a TIBOR Rate Loan or a Canadian BA Rate Loan may be continued or converted only on the last day of an Interest Period for such LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or Canadian BA Rate Loan. During the existence of an Event of Default, no Loans may be requested as, converted to or continued as LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans (whether in Dollars or any Alternative Currency) without the Consent of the Required Lenders, and the Required Lenders may demand that any or all of the then outstanding LIBO Rate Loans, BBR Rate Loans, Canadian BA Rate Loans, and TIBOR Rate Loans denominated in an Alternative Currency be prepaid, or redenominated into Dollars in the amount of the Dollar Equivalent thereof, on the last day of the then current Interest Period with respect thereto.

(f)    The Administrative Agent shall promptly notify the Lead Borrower and the applicable Lenders of the interest rate applicable to any Interest Period for LIBO Rate Loans, BBR Rate Loans, Canadian BA Rate Loans and TIBOR Rate Loans upon determination of such interest rate. At any time that Prime Rate Loans are outstanding, the Administrative Agent shall notify the Lead Borrower and the applicable Lenders of any change in Bank of America's (or its applicable branch's) prime rate used in determining the applicable prime rate promptly following the public announcement of such change.

(g)    After giving effect to all Committed Borrowings, all conversions of Committed Loans from one Type to the other, and all continuations of Committed Loans as the same Type, there shall not be more than eight (8) Interest Periods in effect with respect to Committed Loans.

(h)    Except as provided in Section 2.01(c), the Administrative Agent, the Lenders and the L/C Issuer shall have no obligation to make any Loan or to provide any Letter of Credit if an Overadvance would result. The Administrative Agent may, in its Permitted Discretion, make Permitted Overadvances without the consent of the Lenders, the L/C Issuer and each applicable Lender shall be bound thereby. A Permitted Overadvance is for the account of the applicable Borrower and shall constitute a Prime Rate Loan and an Obligation and shall be repaid by the applicable Borrowers in accordance with the provisions of Section 2.05(c). The making of any such Permitted Overadvance on any one occasion shall not obligate the Administrative Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The making by the Administrative Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of Section 2.03 regarding the Lenders' obligations to purchase participations with respect to Letters of Credit. The Administrative Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Administrative Agent with respect to "inadvertent Overadvances" (i.e. where an Overadvance results from changed circumstances beyond the control of the Administrative Agent (such as a reduction in the Collateral value)) regardless of the amount of any such Overadvance(s).

**2.03    Letters of Credit.**

    (a)    <u>The Letter of Credit Commitment</u>.

        Subject to the terms and conditions set forth herein, (A) the L/C Issuer agrees, in reliance upon the agreements of the Lenders set forth in this <u>Section 2.03</u>, (1) from time to time on any Business Day during the period from the Effective Date until the Letter of Credit Expiration Date, to issue Domestic Letters of Credit denominated in Dollars or in one or more Alternative Currencies] for the account of any Domestic Borrower but for the benefit of the Domestic Borrower, any Foreign Borrower or any of their respective Subsidiaries, and to amend or extend Letters of Credit previously issued by it, in accordance with <u>Section 2.03(b)</u> below, and (2) to honor drawings under the Letters of Credit; (B) each Domestic Lender severally agrees to participate in Domestic Letters of Credit and any drawings thereunder; <u>provided</u> that, after giving effect to any L/C Credit Extension with respect to any Domestic Letter of Credit, (x) the Total Domestic Outstandings shall not exceed the Domestic Loan Cap, (y) the aggregate Outstanding Amount of the Committed Domestic Loans of any Domestic Lender, <u>plus</u> (without duplication) such Domestic Lender's Applicable Percentage of the Outstanding Amount of all Domestic L/C Obligations shall not exceed such Domestic Lender's Domestic Commitment, and (z) the Outstanding Amount of the Domestic L/C Obligations shall not exceed the Domestic Letter of Credit Sublimit; and (C) each Foreign Lender severally agrees to participate in Australian Letters of Credit and any drawings thereunder; <u>provided</u> that, after giving effect to any Australian L/C Credit Extension, (x) the Total Outstandings of the Australian Borrower shall not exceed the Australian Borrower's Loan Cap, (y) with respect to the Australian Borrower, (i) the aggregate Outstanding Amount of the Committed Loans of such Foreign Lender to the Australian Borrower, <u>plus</u> (without duplication) (ii) such Foreign Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations of the Australian Borrower shall not exceed such Foreign Lender's Foreign Commitment with respect to the Australian Borrower, and (z) the Outstanding Amount of the L/C Obligations of the Australian Borrower shall not exceed the Letter of Credit Sublimit for the Australian Borrower. Each request by a Domestic Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by such Domestic Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof, each Domestic Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly such Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed. Notwithstanding anything herein to the contrary, from and after the Effective Date, no Foreign Letters of Credit shall be issued.

        (i)    The L/C Issuer shall not issue any Domestic Letter of Credit, if:

            (A)    subject to <u>Section 2.03(b)(iii)</u>, the expiry date of such requested Standby Letter of Credit would occur more than 365 days after the date of issuance or last extension, unless the Administrative Agent has approved such expiry date; or

            (B)    subject to <u>Section 2.03(b)(iii)</u>, the expiry date of such requested Commercial Letter of Credit would occur more than 180 days after the date of issuance or last extension, unless the Administrative Agent has approved such expiry date; or

            (C)    the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless either such Letter of Credit is Cash Collateralized on or prior to issuance of such Letter of Credit (or such other time as the

Administrative Agent may agree but in no event after the Letter of Credit Expiration Date) or all the Lenders have approved such expiry date.

(ii)     The L/C Issuer shall not issue any Letter of Credit without the prior consent of the Administrative Agent if:

(A)     any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the L/C Issuer from issuing such Letter of Credit, or any Law applicable to the L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit, or request that the L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the L/C Issuer is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon the L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which the L/C Issuer in good faith deems material to it;

(B)     the issuance of such Letter of Credit would violate one or more policies of the L/C Issuer applicable to letters of credit generally;

(C)     such Letter of Credit is to be denominated in a currency other than Dollars or an Alternative Currency; provided that if the L/C Issuer, in its discretion, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the applicable Borrowers of the honoring of any drawing under such Letter of Credit shall be paid in the currency in which such Letter of Credit was denominated;

(D)     the L/C Issuer does not as of the issuance date of the requested Letter of Credit issue Letters of Credit in the requested currency;

(E)     such Letter of Credit contains any provisions for automatic reinstatement of the Stated Amount after any drawing thereunder; or

(F)     any Lender is at that time a Defaulting Lender, unless the L/C Issuer has entered into arrangements, including the delivery of Cash Collateral, satisfactory to the L/C Issuer (in its sole discretion) with the applicable Borrower or such Lender to eliminate the L/C Issuer's actual or potential Fronting Exposure (after giving effect to Section 2.18(a)(iv)) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or that Letter of Credit and all other L/C Obligations as to which the L/C Issuer has actual or potential Fronting Exposure, as it may elect in its sole discretion.

(iii)     The L/C Issuer shall not amend any Letter of Credit if the L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof or if the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(iv)     The L/C Issuer shall act on behalf of the applicable Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article IX with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit

issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in <u>Article IX</u> included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

(b)     <u>Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit</u>.

(i)     Each Letter of Credit shall be issued or amended, as the case may be, upon the request of a Domestic Borrower or the Parent on behalf of a Domestic Borrower, Foreign Borrower or any of their respective Subsidiaries, delivered to the L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the applicable Borrower or the Parent. Such Letter of Credit Application may be sent by facsimile, by overnight courier, by electronic transmission using the system provided by the L/C Issuer, by personal delivery or by any other means acceptable to the L/C Issuer. Such Letter of Credit Application must be received by the L/C Issuer and the Administrative Agent, not later than 11:00 a.m. at least two (2) Business Days (or such later date and time as the Administrative Agent and the L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Domestic Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount and currency thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (G) the identity of the Domestic Borrower for the account of which such Letter of Credit is requested to be issued; and (H) such other matters as the L/C Issuer may reasonably require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the L/C Issuer: (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the L/C Issuer may require. Additionally, the applicable Domestic Borrower shall furnish to the L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the L/C Issuer or the Administrative Agent may require.

(ii)     Promptly after receipt of any Letter of Credit Application, the L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the applicable Domestic Borrower and, if not, the L/C Issuer will provide the Administrative Agent with a copy thereof. Unless the L/C Issuer has received written notice from any Lender, the Administrative Agent, or any Loan Party, at least one (1) Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in <u>Article IV</u> shall not then be satisfied or unless the L/C Issuer would have no obligation, at such time to issue such Letter of Credit under the terms hereof (by reason of the provisions of <u>Section 2.03(a)(i)</u> or otherwise), then, subject to the terms and conditions hereof, the L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the applicable Domestic Borrower or enter into the applicable amendment, as the case may be, in each case in accordance with the L/C Issuer's usual and customary business practices. Immediately upon the issuance or amendment of each Letter of Credit, each applicable Lender shall be deemed to (without any further action), and hereby irrevocably and unconditionally severally agrees to, purchase from the L/C Issuer, without recourse or warranty, a risk participation in such Letter of Credit in an amount equal

to the product of such Lender's Applicable Percentage <u>times</u> the Stated Amount of such Letter of Credit. Upon any change in any Commitments under this Agreement, it is hereby agreed that with respect to all L/C Obligations, there shall be an automatic adjustment to the participations hereby created to reflect the new Applicable Percentages of the assigning and assignee Lenders.

(iii)       If a Domestic Borrower so requests in any applicable Letter of Credit Application, the L/C Issuer may, in its sole and absolute discretion, agree to issue a Standby Letter of Credit that has automatic extension provisions (each, an "<u>Auto-Extension Letter of Credit</u>"); provided that any such Auto-Extension Letter of Credit must permit the L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Standby Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "<u>Non-Extension Notice Date</u>") in each such twelve-month period to be agreed upon at the time such Standby Letter of Credit is issued.  Unless otherwise directed by the L/C Issuer or the applicable Domestic Borrower shall not be required to make a specific request to the L/C Issuer for any such extension.  Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the L/C Issuer to permit the extension of such Standby Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; <u>provided</u>, <u>however</u>, that the L/C Issuer shall not permit any such extension if (A) the L/C Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Standby Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of clauses (ii) or (iii) of <u>Section 2.03(a)</u> or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is fifteen (15) Business Days before the Non-Extension Notice Date (1) from the Administrative Agent that the Required Lenders have elected not to permit such extension or (2) from the Administrative Agent, any Lender or the Lead Borrower that one or more of the applicable conditions specified in <u>Section 4.02</u> is not then satisfied, and in each such case directing the L/C Issuer not to permit such extension.

(iv)       Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the L/C Issuer will also deliver to the Lead Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)       <u>Drawings and Reimbursements; Funding of Participations.</u>

(i)       Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the L/C Issuer shall notify the Domestic Borrower or Australian Borrower, as applicable, and the Administrative Agent thereof; <u>provided</u>, <u>however</u>, that any failure to give or delay in giving such notice shall not relieve the Domestic Borrower or Australian Borrower, as applicable, of its obligation to reimburse the L/C Issuer and the applicable Lenders with respect to any such payment. In the case of a Letter of Credit denominated in an Alternative Currency, the Domestic Borrower or Australian Borrower, as applicable, shall reimburse the L/C Issuer in such Alternative Currency, unless (A) the L/C Issuer (at its option) shall have specified in such notice that it will require reimbursement in Dollars, or (B) in the absence of any such requirement for reimbursement in Dollars, the Domestic Borrower or Australian Borrower, as applicable, shall have notified the L/C Issuer promptly following receipt of the notice of drawing that the Domestic Borrower or Australian Borrower, as applicable, will reimburse the L/C Issuer in Dollars. In the case of any such reimbursement in Dollars of a drawing under a Letter of Credit denominated in an Alternative Currency, the L/C Issuer shall notify the Lead Borrower of the Dollar Equivalent of the amount of the drawing promptly following the

determination thereof.  Not later than 11:00 a.m. on the first (1st) Business Day after the date of any payment by the L/C Issuer under a Letter of Credit to be reimbursed in Dollars, or the Applicable Time on the date of any payment by the L/C Issuer under a Letter of Credit to be reimbursed in an Alternative Currency (each such date, an "Honor Date"), the Domestic Borrower or Australian Borrower, as applicable, shall reimburse the L/C Issuer through the Administrative Agent in an aggregate principal amount equal to the amount of such drawing and in the applicable currency.  In the event that (A) a drawing denominated in an Alternative Currency is to be reimbursed in Dollars pursuant to the second sentence in this Section 2.03(c)(i) and (B) the Dollar amount paid by the Domestic Borrower or Australian Borrower, as applicable,, whether on or after the Honor Date, shall not be adequate on the date of that payment to purchase in accordance with normal banking procedures a sum denominated in the Alternative Currency equal to the drawing, the Domestic Borrower or Australian Borrower, as applicable, agrees, as a separate and independent obligation, to indemnify the L/C Issuer for the loss resulting from its inability on that date to purchase the Alternative Currency in the full amount of the drawing.  If the Domestic Borrower or Australian Borrower, as applicable, fails to timely reimburse the L/C Issuer by the Honor Date, the Administrative Agent shall promptly notify each applicable Lender of the Honor Date, the amount of the unreimbursed drawing (expressed in Dollars in the amount of the Dollar Equivalent thereof in the case of a Letter of Credit denominated in an Alternative Currency) (the "Unreimbursed Amount"), and the amount of such Lender's Applicable Percentage thereof.  In such event, the Domestic Borrower shall be deemed to have requested a Committed Borrowing of Prime Rate Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in Section 2.02 for the principal amount of Prime Rate Loans, but subject to the amount of the unutilized portion of the Aggregate Applicable Commitments and the conditions set forth in Section 4.02 (other than the delivery of a Committed Loan Notice).  Any notice given by the L/C Issuer or the Administrative Agent pursuant to this Section 2.03(c)(i) may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)    Each Lender shall upon any notice delivered pursuant to Section 2.03(c)(i) make funds available to the Administrative Agent for the account of the L/C Issuer, in Dollars, at the Administrative Agent's Office for Dollar-denominated payments in an amount equal to its Applicable Percentage of the Unreimbursed Amount not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent whereupon, subject to the provisions of Section 2.03(c)(iii), each Lender that so makes funds available shall be deemed to have made a Prime Rate Loan to the Domestic Borrower in such amount.  The Administrative Agent shall remit the funds so received to the L/C Issuer in Dollars.

(iii)    With respect to any Unreimbursed Amount that is not fully refinanced by a Committed Borrowing of Prime Rate Loans because the conditions set forth in Section 4.02 cannot be satisfied or for any other reason, the Domestic Borrower or Australian Borrower, as applicable, shall be deemed to have incurred from the L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate for Prime Rate Loans.  In such event, each Lender's payment to the Administrative Agent for the account of the L/C Issuer pursuant to Section 2.03(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this Section 2.03.

(iv)     Until each applicable Lender funds its Committed Loan or L/C Advance pursuant to this Section 2.03(c) to reimburse the L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Lender's Applicable Percentage of such amount shall be solely for the account of the L/C Issuer.

(v)     Each Lender's obligation to make Committed Loans or L/C Advances to reimburse the L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the L/C Issuer, any Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that each Lender's obligation to make Committed Loans pursuant to this Section 2.03(c) is subject to the conditions set forth in Section 4.02 (other than delivery of a Committed Loan Notice).  No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Domestic Borrower or Australian Borrower, as applicable, to reimburse the L/C Issuer for the amount of any payment made by the L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)     If any Lender fails to make available to the Administrative Agent for the account of the L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.03(c) by the time specified in Section 2.03(c)(ii), the L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the L/C Issuer at a rate per annum equal to the applicable Overnight Rate from time to time in effect, plus any administrative, processing or similar fees customarily charged by the L/C Issuer in connection with the foregoing.  If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Committed Loan included in the relevant Committed Borrowing or L/C Advance in respect of the relevant L/C Borrowing, as the case may be.  A certificate of the L/C Issuer submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this clause (vi) shall be conclusive absent manifest error.

(d)     Repayment of Participations.

(i)     At any time after the L/C Issuer has made a payment under any Letter of Credit and has received from any Lender such Lender's L/C Advance in respect of such payment in accordance with Section 2.03(c), if the L/C Issuer or the Administrative Agent receives for the account of the L/C Issuer, receives any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Domestic Borrower or Australian Borrower, as applicable, or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the L/C Issuer shall distribute any payment it receives to the Administrative Agent and the Administrative Agent will distribute to such Lender its Applicable Percentage thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's L/C Advance was outstanding), in Dollars and in the same funds as those received by the Administrative Agent.

(ii)     If any payment received by the L/C Issuer by the Administrative Agent for the account of the L/C Issuer pursuant to Section 2.03(c)(i) is required to be returned under any of the circumstances described in Section 10.05 (including pursuant to any settlement entered into by the

L/C Issuer in its discretion), each applicable Lender shall pay to the Administrative Agent for the account of the L/C Issuer its Applicable Percentage thereof on demand of the Administrative Agent plus interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the applicable Overnight Rate from time to time in effect. The obligations of the Lenders under this clause shall survive Payment in Full and the termination of this Agreement.

(e)     Obligations Absolute.  The obligation of each Domestic Borrower or Australian Borrower, as applicable, to reimburse the L/C Issuer for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)     any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)     the existence of any claim, counterclaim, setoff, defense or other right that any Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)     any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)     waiver by the L/C Issuer of any requirement that exists for the L/C Issuer's protection and not the protection of the Borrowers or any waiver by the L/C Issuer which does not in fact materially prejudice the Borrowers;

(v)     honor of a demand for payment presented electronically even if such Letter of Credit requires that demand be in the form of a draft;

(vi)     any payment made by the L/C Issuer in respect of an otherwise complying item presented after the date specified as the expiration date of, or the date by which documents must be received under such Letter of Credit if presentation after such date is authorized by the UCC, the ISP or the UCP, as applicable;

(vii)     any payment by the L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(viii)     any adverse change in the relevant exchange rates or in the availability of the relevant Alternative Currency to any Borrower or in the relevant currency markets generally; or

(ix)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Borrower or any of their respective Subsidiaries (other than reimbursement in full of such drawing or L/C Borrowing); or

(x)     the fact that any Event of Default shall have occurred and be continuing.

The Domestic Borrower or Australian Borrower, as applicable, shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to such Person and, in the event of any claim of noncompliance with such Borrower's instructions or other irregularity, such Borrower will promptly notify the L/C Issuer.  The Borrowers shall be conclusively deemed to have waived any such claim against the L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)     Role of L/C Issuer.  Each Lender and the Borrowers agree that, in paying any drawing under a Letter of Credit, the L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; (iii) any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit or any error in interpretation of technical terms; (iv) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document; or (v) for any action, neglect or omission under or in connection with any Letter of Credit or Issuer Documents, including, without limitation, the issuance or amendment of any Letter of Credit, the failure to issue or amend any Letter of Credit, or the honoring or dishonoring of any demand under any Letter of Credit, and such action or neglect or omission will be binding upon the Loan Parties and the Lenders; provided that the Borrowers may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to punitive, consequential or exemplary, damages suffered by the Borrowers which the Borrowers prove were caused by the L/C Issuer's willful misconduct or gross negligence.  The Borrowers hereby assume all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrowers' pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (x) of Section 2.03(e); provided, however, that anything in such clauses to the contrary notwithstanding, the Borrowers may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrowers which the Borrowers prove were caused by the L/C Issuer's willful misconduct or gross negligence or the L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit.  In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary (or the L/C Issuer may refuse to accept and make payment upon such documents if such

documents are not in strict compliance with the terms of such Letter of Credit), and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason. The L/C Issuer may send a Letter of Credit or conduct any communication to or from the beneficiary via the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") message or overnight courier, or any other commercially reasonable means of communicating with a beneficiary.

(g)    Applicability of ISP and UCP.  Unless otherwise expressly agreed by the L/C Issuer and the applicable Borrower when a Letter of Credit is issued, (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance shall apply to each Commercial Letter of Credit. Notwithstanding the foregoing, the L/C Issuer shall not be responsible to the Borrowers for, and the L/C Issuer's rights and remedies against the Borrowers shall not be impaired by, any action or inaction of the L/C Issuer required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the Law or any order of a jurisdiction where the L/C Issuer or the beneficiary is located, the practice stated in the ISP or UCP, as applicable, or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade - International Financial Services Association (BAFT-IFSA), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

(h)    Letter of Credit Fees.  The applicable Borrower shall pay to the Administrative Agent for the account of the applicable Lenders, each in accordance with its Applicable Percentage, in Dollars, a Letter of Credit fee (the "Letter of Credit Fee") equal to the Applicable L/C Fee Rate multiplied by the Dollar Equivalent of the daily Stated Amount under each such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit). For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06. Letter of Credit Fees shall be (i) due and payable on the first Business Day of each calendar quarter, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand, and (ii) computed on a quarterly basis in arrears. If there is any change in the Applicable L/C Fee Rate during any quarter, the daily amount available to be drawn under each Letter of Credit shall be computed and multiplied by the Applicable L/C Fee Rate separately for each period during such quarter that such Applicable L/C Fee Rate was in effect. Notwithstanding anything to the contrary contained herein, while any Event of Default exists, Administrative Agent may, and upon the request of the Required Lenders shall, notify the Lead Borrower that all Letter of Credit Fees shall accrue at the Default Rate and thereafter such Letter of Credit Fees shall accrue at the Default Rate to the fullest extent permitted by applicable Law so long as such Event of Default is continuing.

(i)    Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer. The applicable Borrower shall pay directly to the L/C Issuer for its own account, in Dollars, a fronting fee (the "Fronting Fee") with respect to each Letter of Credit, at a rate equal to 0.125% per annum, computed on the Dollar Equivalent of the outstanding amount of such Letter of Credit, and payable on a quarterly basis in arrears. Such Fronting Fees shall be due and payable on the first Business Day of each calendar quarter, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit

shall be determined in accordance with Section 1.06. In addition, the applicable Borrower shall pay directly to the L/C Issuer for its own account, in Dollars, the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the L/C Issuer relating to Letters of Credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(j)     Existing Letters of Credit.  Each Existing Letter of Credit shall for all purposes hereunder and under the other Loan Documents, be deemed to be a Letter of Credit issued under this Agreement and shall be subject to all of the terms of this Agreement with respect to Letters of Credit. Without limiting the foregoing, Existing Letters of Credit which are Australian Letters of Credit are the direct obligation of the Australian Borrower, the payment and performance of which obligation is guaranteed by the Domestic Loan Parties.

(k)     Conflict with Issuer Documents.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

2.04     [Reserved].

2.05     Prepayments.

(a)     Each Borrower may, upon irrevocable notice to the Administrative Agent, at any time or from time to time voluntarily prepay Committed Loans in whole or in part without premium or penalty; provided that (i) such notice must be received by the Administrative Agent not later than 11:00 a.m. (A) three Business Days prior to any date of prepayment of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans denominated in Dollars, (B) four Business Days (or five, in the case of prepayment of Loans denominated in Special Notice Currencies) prior to any date of prepayment of LIBO Rate Loans denominated in Alternative Currencies, and (C) on the date of prepayment of Prime Rate Loans; (ii) any voluntary prepayment of LIBO Rate Loans denominated in Dollars shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof; and (iii) any voluntary prepayment of BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans shall be in a principal amount of $500,000 (or the Alternative Currency Equivalent thereof) or a whole multiple of $100,000 (or the Applicable Currency Equivalent thereof) in excess thereof; and (iv) any voluntary prepayment of Prime Rate Loans shall be in a principal amount of $500,000 (or the Applicable Currency Equivalent thereof) or a whole multiple of $100,000 (or the Applicable Currency Equivalent thereof) in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans, the Interest Period(s) of such Loans. The Administrative Agent will promptly notify each applicable Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by a Borrower, the applicable Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a LIBO Rate Loan, a BBR Rate Loan, a TIBOR Rate Loan or a Canadian BA Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05.  Subject to Section 2.18, each such prepayment shall be applied to the Committed Loans of the Lenders in accordance with their respective Applicable Percentages.

(b)     [Reserved].

-103-

(c)     If for any reason the Total Domestic Outstandings at any time exceed the Domestic Loan Cap as then in effect, the Domestic Borrowers shall immediately prepay Committed Domestic Loans and Domestic L/C Borrowings and/or Cash Collateralize the Domestic L/C Obligations (other than Domestic L/C Borrowings) and/or (subject to the DIP Intercreditor Agreement) prepay Foreign Loans or Cash Collateralize Australian L/C Obligations, in an aggregate amount equal to such excess; provided, however, that the Domestic Borrowers shall not be required to Cash Collateralize the Domestic L/C Obligations pursuant to this Section 2.05(c) unless after the prepayment in full of the Domestic Loans the Total Domestic Outstandings exceed the lesser of the Aggregate Domestic Commitments or the Domestic Borrowing Base, each as then in effect.  The Administrative Agent may, at any time and from time to time after the initial deposit of such Cash Collateral, request that additional Cash Collateral be provided in order to protect against the results of exchange rate fluctuations.

(d)     If for any reason the Total Canadian Outstandings at any time exceed the Canadian Loan Cap as then in effect, the Canadian Borrower shall immediately prepay Committed Canadian Loans in an aggregate amount equal to such excess; provided, however, that notwithstanding the foregoing, to the extent that the Canadian Borrower is required to prepay loans solely as a result of a Currency Recalculation, such payments shall be due and payable two (2) Business Days after the Canadian Borrower receives notice of such Currency Recalculation.

(e)     If for any reason the Total Australian Outstandings at any time exceed the Australian Loan Cap as then in effect, the Australian Borrower shall immediately prepay Committed Australian Loans, and Australian L/C Borrowings and/or Cash Collateralize the Australian L/C Obligations (other than Australian L/C Borrowings) in an aggregate amount equal to such excess; provided, however, that the Australian Borrower shall not be required to Cash Collateralize the Australian L/C Obligations pursuant to this Section 2.05(e) unless after the prepayment in full of the Australian Loans the Total Australian Outstandings exceed the Australian Borrowing Base, each as then in effect; and further provided that notwithstanding the foregoing, to the extent that the Australian Borrower is required to prepay loans and cash collateralize Letters of Credit solely as a result of a Currency Recalculation, such payments and cash collateral shall be due and payable two (2) Business Days after such Borrower receives notice of such Currency Recalculation.

(f)     If for any reason the Total Japanese Outstandings at any time exceed the Japanese Loan Cap as then in effect, the Japanese Borrower shall immediately prepay Committed Japanese Loans in an aggregate amount equal to such excess; provided, however, that notwithstanding the foregoing, to the extent that the Japanese Borrower is required to prepay loans solely as a result of a Currency Recalculation, such payments shall be due and payable two (2) Business Days after such Borrower receives notice of such Currency Recalculation.

(g)     The Borrowers shall prepay the Loans in accordance with the provisions of Section 6.14 hereof.

(h)     Reserved.

(i)     Prepayments made pursuant to (i) Section 2.05(c), and (ii) to the extent representing funds on deposit in the Domestic Concentration Account, Section 2.05(g), first, shall be applied ratably to the Domestic L/C Borrowings, second, shall be applied ratably to the outstanding Committed Domestic Loans, and third, the amount remaining, if any, after the prepayment in full of all

Domestic L/C Borrowings, and Committed Domestic Loans outstanding at such time may be retained by (or shall be returned to) the Domestic Borrowers for use in a manner not prohibited by this Agreement.

(j)      Prepayments made pursuant to Sections 2.05(d), 2.05(e) or 2.05(f), to the extent representing funds on deposit in a Foreign Concentration Account, Section 2.05(g), first, shall be applied ratably to the L/C Borrowings, second, shall be applied ratably to the outstanding Committed Loans made to such Borrower, and third the amount remaining, if any, after the prepayment in full of all L/C Borrowings, and Committed Loans outstanding at such time made to a Foreign Borrower may be retained by (or shall be returned to) such Foreign Borrower for use in a manner not prohibited by this Agreement.

(k)      In the case of Loans and Letters of Credit denominated in Alternative Currencies, the Administrative Agent shall with the delivery of each Borrowing Base Certificate, and may, at its discretion, at other times, recalculate the aggregate exposure under such Loans and Letters of Credit denominated in Alternative Currencies at any time to account for fluctuations in exchange rates affecting the Alternative Currencies in which any such non-Dollar Loans and Letters of Credit are denominated (a "Currency Recalculation"). Following written notice from the Administrative Agent, the applicable Borrowers shall promptly make payments in accordance with the provisions of Sections 2.05(c), (d), (e) and (f) hereof, to the extent necessary as a result of any such recalculation.

**2.06    Termination or Reduction of Commitments; Reallocation of Commitments.**

(a)      The Domestic Borrowers may, upon irrevocable notice from the Lead Borrower to the Administrative Agent, terminate the Aggregate Domestic Commitments, the Domestic Letter of Credit Sublimit or from time to time permanently reduce in part the Aggregate Domestic Commitments, the Domestic Letter of Credit Sublimit; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. three (3) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof and (iii) the Domestic Borrowers shall not reduce (A) the Aggregate Domestic Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Domestic Outstandings would exceed the Aggregate Domestic Commitments and (B) the Domestic Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of Domestic L/C Obligations (other than Domestic L/C Borrowings) not fully Cash Collateralized hereunder would exceed the Domestic Letter of Credit Sublimit.

(b)      If, after giving effect to any reduction of the Aggregate Domestic Commitments, the Domestic Letter of Credit Sublimit exceeds the amount of the Aggregate Domestic Commitments, such Domestic Letter of Credit Sublimit shall be automatically reduced by the amount of such excess.

(c)      If, after giving effect to any reduction of the Commitments in favor of any Foreign Borrower, the Letter of Credit Sublimit for such Foreign exceeds the amount of the Aggregate Applicable Commitments in favor of such Foreign Borrower, the Letter of Credit Sublimit for such Foreign Borrower shall be automatically reduced by the amount of such excess.

(d)      The Foreign Commitments, the Letter of Credit Sublimit for each Foreign Borrower shall be automatically terminated without any further action of any Loan Party or any Credit Party upon the Effective Date (after making of Committed Loans to the Australian Borrower and the Canadian Borrower on such date).

(e)    The Administrative Agent will promptly notify the applicable Lenders of any termination or reduction made pursuant to this Section 2.06.  Upon any reduction of any Commitments, the applicable Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount.  All fees (including, without limitation, Commitment Fees and Letter of Credit Fees) and interest in respect of the Aggregate Total Commitments accrued until the effective date of any termination of the Aggregate Total Commitments shall be paid on the effective date of such termination.

(f)    Reserved.

(g)    Notwithstanding anything to the contrary contained herein, any notice of prepayment, reduction or termination, as the case may be, delivered by the Lead Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other event or condition, in which case such notice may be revoked by the Lead Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

**2.07    Repayment of Loans.**

Each Borrower shall repay to the Administrative Agent, for the account of the applicable Lenders, on the Termination Date the aggregate principal amount of Committed Loans made to such Borrower and outstanding on such date.

**2.08    Interest.**

(a)    Subject to the provisions of Section 2.08(b) below, (i) each LIBO Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Adjusted LIBO Rate for such Interest Period plus the Applicable Margin plus (in the case of a LIBO Rate Loan of any Lender which is lent from a Lending Office in the United Kingdom or a Participating Member State) the Mandatory Cost; (ii) each Canadian BA Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Canadian BA Rate for such Interest Period plus the Applicable Margin; (iii) each BBR Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Australian Bank Bill Rate for such Interest Period plus the Applicable Margin; (iv) each TIBOR Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the TIBOR Rate for such Interest Period plus the Applicable Margin; (v) each Domestic Prime Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Prime Rate plus the Applicable Margin; (vi) each Canadian Prime Rate Loan and Canadian Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Canadian Prime Rate, or Canadian Base Rate, as applicable, plus the Applicable Margin; (vii) each Australian Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Australian Base Rate plus the Applicable Margin; and (viii) each Japanese Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Japanese Base Rate plus the Applicable Margin.

(b)    (i)    If any amount payable under any Loan Document is not paid when due (after giving effect to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    If any Event of Default exists, then the Administrative Agent, upon the request of the Required Lenders shall, notify the Lead Borrower that all outstanding Obligations under the Loan Documents shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such Loans and L/C Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws for so long as such Event of Default is continuing; provided that the Default Rate shall automatically apply to all such Obligations immediately and without notice upon the occurrence of any Event of Default pursuant to Section 8.01(a) or Section 8.01(f).

(iii)    Accrued and unpaid interest on past due amounts (including interest on past due interest to the fullest extent permitted by applicable Laws) shall be due and payable upon demand (or automatically and immediately without any demand upon the occurrence of any Event of Default pursuant to Section 8.01(a) or Section 8.01(f)).

(c)    Interest on each Loan shall be due and payable in arrears in cash on each Interest Payment Date applicable thereto and at such other times as may be specified herein at the Applicable Rate (or, as applicable, the Default Rate). All accrued and unpaid interest shall be paid in cash on the Termination Date and shall also be paid in cash on any date a prepayment or payment of principal of Loans is made for any interest applicable to such principal being prepaid or paid.

2.09    Fees. In addition to certain fees described in subsections (h) and (i) of Section 2.03:

(a)    Commitment Fee.  The Domestic Borrowers shall pay to the Administrative Agent, for the account of each Domestic Lender in accordance with its Applicable Percentage of such Domestic Facility, a commitment fee (the "Commitment Fee"), based upon the average daily unused portion of the Domestic Revolving Facility equal to 0.50% per annum times the actual daily amount by which the Domestic Commitments exceed the sum of (i) the Outstanding Amount of the Loans under the Domestic Revolving Facility, and (ii) the Outstanding Amount of L/C Obligations under the Domestic Revolving Facility. The Commitment Fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on the first Business Day of each calendar quarter, commencing with the first such date to occur after the Effective Date, and on the last day of the Availability Period. Commitment Fees shall be paid by the Domestic Borrowers in Dollars.

(b)    Other Fees.  The Borrowers shall pay to the Administrative Agent and MLPFS for their own respective accounts, in Dollars, fees in the amounts and at the times specified in the Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.10    Computation of Interest and Fees.**

(a)    All computations of interest for Prime Rate Loans shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All computations of interest for Canadian BA Rate Loans and TIBOR Rate Loans shall be made on the basis of a year of 365 days and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year), or, in the case of interest in respect of Committed Loans denominated in Alternative Currencies as to which market practice differs from the foregoing, in accordance with such market practice. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(b)    For the purposes of this Agreement, whenever interest to be paid hereunder is to be calculated on the basis of a year of three hundred and sixty (360) days or any other period of time that is less than a calendar year, the yearly rate of interest which the rate determined pursuant to such calculation is equivalent is the rate so determined multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by either three hundred and sixty (360) or such other period of time, as the case may be.

(c)    For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever any interest or any fee to be paid hereunder or in connection herewith is to be calculated on the basis of a 360-day or any other period of time that is less than a calendar year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by three hundred and sixty (360) or the number of days in such period, as applicable. The rates of interest under this Agreement are nominal rates, and not effective rates or yields. The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

(d)    If any provision of this Agreement or of any of the other Loan Documents would obligate a Canadian Loan Party to make any payment of interest or other amount payable to the Administrative Agent or any Lender under this Agreement or any other Loan Document in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by the Administrative Agent or any Lender of interest at a criminal rate (as such terms are construed under the *Criminal Code* (Canada)) then, notwithstanding such provisions, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or so result in a receipt by the Administrative Agent or any Lender of interest at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: (1) firstly, by reducing the amount or rate of interest required to be paid to the Administrative Agent, the Administrative Agent or any Lender under this Section 2.10, and (2) thereafter, by reducing any fees, commissions, premiums and other amounts required to be paid to the Administrative Agent, the Administrative Agent or any Lender which would constitute "interest" for purposes of Section 347 of the *Criminal Code* (Canada). Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if the Administrative Agent or any Lender shall have received an amount in excess of the maximum permitted by that Section of the *Criminal Code* (Canada), the Canadian Loan Parties shall be entitled, by notice in writing to the Administrative Agent or the applicable Lender, to

-108-

obtain reimbursement from such party in an amount equal to such excess and, pending such reimbursement, such amount shall be deemed to be an amount payable by the Administrative Agent or applicable Lender to the Canadian Borrower. Any amount or rate of interest referred to in this <u>Section 2.10</u> shall be determined in accordance with generally accepted actuarial practices and principles as an effective annual rate of interest over the term that the applicable loan remains outstanding with the assumption that any charges, fees or expenses that fall within the meaning of "interest" (as defined in the *Criminal Code* (Canada)) shall be included in the calculation of such effective rate and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by the Administrative Agent shall be conclusive for the purposes of such determination.

(e)     All calculations of interest payable by the Loan Parties under this Agreement or any other Loan Document are to be made on the basis of the nominal interest rate described herein and therein and not on the basis of effective yearly rates or on any other basis which gives effect to the principle of deemed reinvestment of interest which principle does not apply to any interest calculated under this Agreement or any Loan Document. The parties hereto acknowledge that there is a material difference between the stated nominal interest rates and the effective yearly rates of interest and that they are capable of making the calculations required to determine such effective yearly rates of interest.

**2.11    Evidence of Debt.**

(a)     The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Administrative Agent (each, the "<u>Loan Account</u>") in the ordinary course of business. In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent (who shall notify the applicable Borrowers), the applicable Borrowers (other than the Japanese Borrower) shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount, currency and maturity of its Loans and payments with respect thereto. Any failure to so attach or endorse, or any error in doing so, shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations or the Foreign Liabilities, as applicable. Upon receipt of an affidavit and indemnity of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the applicable Borrowers (other than the Japanese Borrower) will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor (subject to adjustment in the case of any assignments of such Lender's Commitments).

(b)     In addition to the accounts and records referred to in <u>Section 2.11(a)</u>, each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or

records evidencing the purchases and sales by such Lender of participations in Letters of Credit. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

**2.12    Payments Generally; Administrative Agent's Clawback.**

(a)    <u>General</u>. All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein and except with respect to principal of and interest on Loans denominated in an Alternative Currency, all payments by the Borrowers hereunder shall be made, as applicable, to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars, in each case, in Same Day Funds not later than 2:00 p.m. on the date specified herein. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder with respect to principal and interest on Loans denominated in an Alternative Currency shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in such Alternative Currency and in Same Day Funds not later than the Applicable Time specified by the Administrative Agent on the dates specified herein. Without limiting the generality of the foregoing, the Administrative Agent may require that any payments due under this Agreement be made in the United States. If, for any reason, any Borrower is prohibited by any Law from making any required payment hereunder in an Alternative Currency, such Borrower shall make such payment in Dollars in the Dollar Equivalent of the Alternative Currency payment amount. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office in accordance with the provisions of Section 2.14. All payments received by the Administrative Agent (i) after 2:00 p.m., in the case of payments in Dollars, or (ii) after the Applicable Time specified by the Administrative Agent in the case of payments in an Alternative Currency, shall in each case solely for the purpose of calculating interest and fees accruing hereunder, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment (other than with respect to payment of a LIBO Rate Loan, a BBR Rate Loan, a TIBOR Rate Loan or a Canadian BA Rate Loan) to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    <u>Currency</u>. Except as otherwise set forth herein, (i) Loans shall be funded and payments shall be made in respect of Alternative Currencies in the applicable Alternative Currency, and (ii) Letters of Credit denominated in an Alternative Currency shall be reimbursed by the applicable Borrower in that Alternative Currency. All obligations of the Lenders with respect to Letters of Credit will be immediately due and payable in Dollars, provided that the amount of any amounts denominated in an Alternative Currency will be redenominated into Dollars.

(c)    (i)    <u>Funding by Lenders; Presumption by Administrative Agent</u>. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Committed Borrowing of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans, as applicable (or in the case of any Committed Borrowing of Prime Rate Loans, prior to 1:00 p.m. on the date of such Committed Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Committed Borrowing, the Administrative Agent may

assume that such Lender has made such share available on such date in accordance with Section 2.02 (or in the case of a Committed Borrowing of Prime Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the applicable Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Committed Borrowing available to the Administrative Agent, then the applicable Lender and the applicable Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in Same Day Funds with interest thereon, for each day from and including the date such amount is made available to such Borrowers to but excluding the date of payment to the Administrative Agent at (A) in the case of a payment to be made by a Lender, the Overnight Rate, plus any administrative processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by any Borrowers, the interest rate applicable to Prime Rate Loans. If the applicable Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to such Borrowers the amount of such interest paid by such Borrowers for such period. If such Lender pays its share of the applicable Committed Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Committed Loan included in such Committed Borrowing. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    Payments by Borrowers; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from a Borrower prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders or the L/C Issuer hereunder that such Borrower will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the L/C Issuer, as the case may be, the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the L/C Issuer, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or the L/C Issuer, in Same Day Funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent at the applicable Overnight Rate.

A notice of the Administrative Agent to any Lender or the Lead Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d)    Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of Section 4.02 hereof), the Administrative Agent shall promptly return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)    Obligations of Lenders Several. The obligations of the Lenders hereunder to make Committed Loans, to fund participations in Letters of Credit and to make payments pursuant to Section 10.04(c) are several and not joint. The failure of any Lender to make any Committed Loan, to fund any such participation or to make any payment under Section 10.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and

-111-

no Lender shall be responsible for the failure of any other Lender to so make its Committed Loan, to purchase its participation or to make its payment under Section 10.04(c).

      (f)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

      **2.13**    **Sharing of Payments by Lenders.**  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest, or other amounts with respect to, any of the Obligations resulting in such Credit Party's receiving payment of a proportion of the aggregate amount of such Obligations or participations and accrued interest thereon greater than its pro rata share thereof as provided herein (including as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other applicable Credit Parties, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

      (a)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

      (b)     the provisions of this Section shall not be construed to apply to (x) any payment made by any Loan Party pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Committed Loans or sub-participations in L/C Obligations to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section shall apply).

      Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

      **2.14**    **Settlement Amongst Lenders.**

      (a)     The amount of each Lender's Applicable Percentage of outstanding Loans shall be computed weekly (or more frequently in the Administrative Agent's discretion) and shall be adjusted upward or downward based on all Loans and repayments of Loans received by the Administrative Agent  as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Administrative Agent.

      (b)     The Administrative Agent shall deliver to each of the Lenders, promptly after a Settlement Date a summary statement of the amount of outstanding Committed Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Administrative Agent shall transfer to each Lender its Applicable Percentage of repayments, and (ii) each Lender shall transfer to the Administrative Agent or the Administrative Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving

effect to all such transfers, the amount of Committed Loans made by each Lender shall be equal to such Lender's Applicable Percentage of all applicable Committed Loans outstanding as of such Settlement Date. If the summary statement requires transfers to be made to the Administrative Agent by the Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in Same Day Funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Administrative Agent. If and to the extent any Lender shall not have so made its transfer to the Administrative Agent, such Lender agrees to pay to the Administrative Agent forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Administrative Agent equal to the applicable Overnight Rate, plus any administrative processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing.

**2.15**     [Reserved].

**2.16**     [Reserved].

**2.17**     Cash Collateral.

(a)     Certain Credit Support Events. If (i) the L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Borrowing, (ii) as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, (iii) the Borrowers shall be required to provide Cash Collateral pursuant to Section 8.02(c), or (iv) there shall exist a Defaulting Lender, the applicable Borrowers shall immediately (in the case of clause (iii) above) or within one Business Day (in all other cases) following any request by the Administrative Agent or the L/C Issuer, provide Cash Collateral in an amount not less than the applicable Minimum Collateral Amount (determined in the case of Cash Collateral provided pursuant to clause (iv) above, after giving effect to Section 2.18(a)(iv) and any Cash Collateral provided by the Defaulting Lender). Additionally, if the Administrative Agent notifies the Lead Borrower at any time that the Outstanding Amount of all L/C Obligations at such time exceeds 103% of the Letter of Credit Sublimit then in effect, then, within two Business Days after receipt of such notice, the applicable Borrowers shall provide Cash Collateral for the Outstanding Amount of the L/C Obligations in an amount not less than the amount by which the Outstanding Amount of all L/C Obligations exceeds the Letter of Credit Sublimit.

(b)     Grant of Security Interest. Each applicable Loan Party, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to (and subjects to the control of) the Administrative Agent or the Australian Security Trustee, as applicable, for the benefit of the Administrative Agent, the L/C Issuer and the applicable Lenders, and agrees to maintain, a first priority security interest in all such cash, deposit accounts and all balances therein, and all other property so provided as collateral pursuant hereto, and in all proceeds of the foregoing, all as security for the Obligations to which such Cash Collateral may be applied pursuant to Section 2.17(c). If at any time the Administrative Agent reasonably determines that Cash Collateral is subject to any right or claim of any Person (other than the Administrative Agent (for the benefit of itself and the other applicable Credit Parties) and the DIP Term Agent (subject to the DIP Intercreditor Agreement)) or that the total amount of such Cash Collateral is less than the Minimum Collateral Amount, the applicable Loan Parties will, promptly upon demand by the Administrative Agent or the Australian Security Trustee, as applicable, pay or provide to the Administrative Agent or the Australian Security Trustee, as applicable, additional

Cash Collateral in an amount sufficient to eliminate such deficiency. All Cash Collateral (other than credit support not constituting funds subject to deposit) shall be maintained in one or more blocked, non-interest bearing deposit accounts at Bank of America. The applicable Loan Parties shall pay on demand therefor from time to time all customary account opening, activity and other administrative fees and charges in connection with the maintenance and disbursement of Cash Collateral.

(c)     Application.   Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under any of this Section 2.17 or Sections 2.03, 2.05, 2.18 or 8.02 in respect of Letters of Credit shall be held and applied to the satisfaction of the specific L/C Obligations, obligations to fund participations therein (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) and other Obligations for which the Cash Collateral was so provided, prior to any other application of such property as may otherwise be provided for herein.

(d)     Release.   Cash Collateral (or the appropriate portion thereof) provided to reduce Fronting Exposure or to secure other Obligations shall be released promptly following (i) the elimination of the applicable Fronting Exposure or other Obligations giving rise thereto (including by the termination of Defaulting Lender status of the applicable Lender (or, as appropriate, its assignee following compliance with Section 10.06(b)(iv))) or (ii) the determination by the Administrative Agent and the L/C Issuer that there exists excess Cash Collateral; provided, however, (x) any such release shall be without prejudice to, and any disbursement or other transfer of Cash Collateral shall be and remain subject to, any other Lien conferred under the Loan Documents and the other applicable provisions of the Loan Documents, and (y) the Person providing Cash Collateral and the L/C Issuer may agree that Cash Collateral shall not be released but instead held to support future anticipated Fronting Exposure or other obligations.

## 2.18   Certain Bankruptcy Matters.

(a)     Except to the extent expressly provided otherwise in an Order, the Loan Parties hereby agree that, subject only to Priority Permitted Encumbrances and the Carve-Out, the Obligations shall (i) constitute DIP Superpriority Claims over all administrative expense claims and claims against the Debtors now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and, to the extent provided in any of the Orders.

(b)     In the event of a conflict between, or inconsistency among, the Interim Order or the Final Order, on the one hand, and any other Loan Document, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c)     Notwithstanding anything to the contrary contained herein or elsewhere:

(i)     the Credit Parties shall not be required to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect

the Liens on the Collateral granted by or pursuant to this Agreement, the Orders or any other Loan Document. If the Administrative Agent (at the Required Lenders' direction, which shall be in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Administrative Agent's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 2.16(c) or of the perfection of any other Liens in favor of the Administrative Agent, for the benefit of the Lenders and the other Credit Parties, on the Collateral. Notwithstanding anything to the contrary herein, neither the Administrative Agent nor any Credit Party shall require the filing of a Mortgage with respect to any Real Property of the Loan Parties unless an Event of Default resulting from a breach of Section 8.01(a) has occurred and is continuing.

(ii)     Except as otherwise agreed to by the Lenders, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to the Credit Parties pursuant to this Agreement, the Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Borrower or any other Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of any of the Cases, or by any other act or omission whatsoever.

(d)     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(e)     subject only to Priority Permitted Encumbrances and the Carve-Out and to the extent provided in any of the Orders and subject to the Orders, no costs or expenses of administration which have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or the Administrative Agent against the Debtors in respect of any Obligations;

(f)     other than as provided in the Orders or the Loan Documents, the Administrative Agent's Liens on the Collateral shall constitute valid, enforceable and perfected first priority Liens, and shall be prior to all other Liens (except for Priority Permitted Encumbrances), now existing or hereafter arising, in favor of any other creditor or other Person; and

(g)     the Administrative Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Administrative Agent or any Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Administrative Agent's Liens under applicable non-bankruptcy law.

(h)     In connection with any sale or Disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of

restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by Agent, in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, each Borrower and each other Loan Party hereby gives the Administrative Agent (at the direction of the Required Lenders) the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

    **2.19**    **Defaulting Lenders.**

        (a)    <u>Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

            (i)    <u>Waivers and Amendments</u>. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and <u>Section 10.01</u>.

            (ii)    <u>Defaulting Lender Waterfall</u>. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article VIII</u> or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to <u>Section 10.08</u> shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the L/C Issuer; *third*, to Cash Collateralize the L/C Issuer's Fronting Exposure with respect to such Defaulting Lender in accordance with <u>Section 2.17</u>; *fourth*, as the Lead Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Lead Borrower, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) Cash Collateralize the L/C Issuer's future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with <u>Section 2.17</u>; *sixth*, to the payment of any amounts owing to the Lenders, the L/C Issuer as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the L/C Issuer against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Loan Parties as a result of any judgment of a court of competent jurisdiction obtained by the Loan Parties against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if (x) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in <u>Section 4.02</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Obligations owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Obligations owed to, such Defaulting Lender until such time as all Loans and funded and

unfunded participations in L/C Obligations are held by the Lenders pro rata in accordance with the Commitments hereunder without giving effect to Section 2.18(a)(iv).  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.18(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees.

(A)    No Defaulting Lender shall be entitled to receive any Commitment Fee payable under Section 2.09(a) for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)    Each Defaulting Lender shall be entitled to receive Letter of Credit Fees for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Applicable Percentage of the stated amount of Letters of Credit for which it has provided Cash Collateral pursuant to Section 2.17.

(C)    With respect to any Commitment Fee payable under Section 2.09(a) or any Letter of Credit Fee not required to be paid to any Defaulting Lender pursuant to clause (A) or (B) above, the Borrowers shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in L/C Obligations that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (y) pay to the L/C Issuer the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such L/C Issuer's Fronting Exposure to such Defaulting Lender, and (z) not be required to pay the remaining amount of any such fee.

(iv)    Reallocation of Applicable Percentages to Reduce Fronting Exposure.  All or any part of such Defaulting Lender's participation in L/C Obligations shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that (x) the conditions set forth in Section 4.02 are satisfied at the time of such reallocation (and, unless the Lead Borrower shall have otherwise notified the Administrative Agent at such time, the Lead Borrower shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (y) such reallocation does not cause the aggregate Outstanding Amount of Obligations of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Commitment. No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)    Cash Collateral.  If the reallocation described in clause (a)(iv) above cannot, or can only partially, be effected, the Borrowers shall, without prejudice to any right or remedy available to them hereunder or under applicable Law, to Cash Collateralize the L/C Issuers' Fronting Exposure in accordance with the procedures set forth in Section 2.17.

-117-

(b)     Defaulting Lender Cure. If the Lead Borrower, the Administrative Agent, and the L/C Issuer agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Committed Loans and funded and unfunded participations in Letters of Credit to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to Section 2.18(a)(iv)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

2.20    CFC Payments.   Any references to the Loan Parties (in the context of payments, proceeds, liabilities or Obligations), Commitments, Collateral, L/C Borrowings or Loans shall mean, in the case of and as applied to the foregoing, with respect to any Obligations of the Domestic Loan Parties, only the Domestic Loan Parties (or any of their Domestic Subsidiaries and only for their own account), the Collateral that is property of Domestic Loan Parties, or L/C Borrowings or Loans constituting Obligations of Domestic Loan Parties (or any of their Domestic Subsidiaries), so that collections received from any Foreign Loan Parties and proceeds of the Collateral that is property of such Foreign Loan Parties shall be applied solely and exclusively to the payment of the Foreign Liabilities. All provisions contained in any Loan Document or side letter shall be interpreted consistently with this Section 2.19 to the extent possible, and where such other provisions conflict with the provisions of this Section 2.19, the provisions of this Section 2.19 shall govern.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY;
## APPOINTMENT OF LEAD BORROWER

3.01    Taxes.

(a)     Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)     Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws. If any applicable Laws (as determined in the good faith discretion of the Administrative Agent or a Loan Party) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or a Loan Party, then the Administrative Agent or such Loan Party shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)    If any Loan Party or the Administrative Agent shall be required by the Code to withhold or deduct Taxes, including both United States Federal backup withholding and withholding taxes, from any payment, then, (A) the Administrative Agent or a Loan Party shall withhold or make such deductions as are determined by the

-118-

Administrative Agent or a Loan Party to be required taking into account the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent or a Loan Party, to the extent required by the Code, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code, (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made, and (D) reasonably promptly after paying such sum required by Law, the Loan Party making such payments (if it is required to make deduction or withholding) shall deliver to the Administrative Agent evidence reasonably satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant Governmental Authority (or if the payment, deduction or withholding is made by the Administrative Agent, the Administrative Agent shall furnish such evidence to the affected parties and the Lead Borrower).

(iii)     If any Loan Party or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment, then (A) such Loan Party or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) such Loan Party or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)     Payment of Other Taxes by the Loan Parties.  Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Law (without duplication of the provisions of subsection (a) above), or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     Tax Indemnifications.

(i)     Without duplication of the provisions of subsection (a) above, the Loan Parties shall, and each Loan Party does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with

respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount (and describing the basis) of such payment or liability delivered to the Lead Borrower by a Lender or the L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of any other Agent, a Lender or the L/C Issuer, shall be conclusive absent manifest error.

(ii)    Each Lender and the L/C Issuer shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, (x) the Administrative Agent against any Indemnified Taxes attributable to such Lender or the L/C Issuer (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (y) the Administrative Agent and the Loan Parties, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 10.06(e)</u> relating to the maintenance of a Participant Register and (z) the Administrative Agent and the Loan Parties, as applicable, against any Excluded Taxes attributable to such Lender or the L/C Issuer, in each case, that are payable or paid by the Administrative Agent or a Loan Party in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent or a Loan Party shall be conclusive absent manifest error.  Each Lender and the L/C Issuer hereby authorizes the Administrative Agent and the Loan Parties to set off and apply any and all amounts at any time owing to such Lender or the L/C Issuer, as the case may be, under this Agreement or any other Loan Document against any amount due to the Administrative Agent and the Loan Parties under this clause (ii).

(d)    <u>Evidence of Payments</u>.  Upon request by the Lead Borrower or the Administrative Agent, as the case may be, after any payment of Taxes by the Lead Borrower or by the Administrative Agent or a Recipient to a Governmental Authority as provided in this <u>Section 3.01</u>, the Lead Borrower shall deliver to the Administrative Agent or the Administrative Agent shall deliver to the Lead Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Lead Borrower or the Administrative Agent, as the case may be.

(e)    <u>Status of Lenders; Tax Documentation</u>.

(i)    Any Lender and Recipient that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Lead Borrower and the Administrative Agent, at the time or times prescribed by applicable Law or reasonably requested by the Lead Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Law or reasonably requested by the Lead Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  Such delivery shall be required on the Effective Date (or, in the case of an assignee, on the date of assignment) and on or before the date such

documentation expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent documentation so delivered or as may reasonably be requested by the Lead Borrower or the Administrative Agent. In addition, any Lender and Recipient, if reasonably requested by the Lead Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Lead Borrower or the Administrative Agent as will enable the Lead Borrower or the Administrative Agent to determine whether or not such Lender or Recipient is subject to any withholding (including backup withholding) or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(e)(ii)(A), (ii)(B) (ii)(D) and (ii)(E) below) shall not be required if in the Lender's reasonable judgment as a result of a Change in Law such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense (it being understood that the Borrowers shall be given a reasonable opportunity to reimburse such costs or expense) or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that any Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Lead Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax (or substantively comparable subsequent versions thereof or successors thereto);

(B)    any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Lead Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Administrative Agent), whichever of the following is applicable:

(I)    in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN (or substantively comparable subsequent versions thereof or successors thereto) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN (or substantively comparable subsequent versions thereof or successors thereto) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)    executed originals of IRS Form W-8ECI;

(III)    in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibits M-1, M-2, M-3 or M-4 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (each a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E (or substantively comparable subsequent versions thereof or successors thereto); or

(IV)    to the extent a Non-U.S. Lender is not the beneficial owner, executed originals of IRS Form W-8IMY (or substantively comparable subsequent versions thereof or successors thereto), accompanied by IRS Form W-8ECI (or substantively comparable subsequent versions thereof or successors thereto), IRS Form W-8BEN-E or IRS Form W-8BEN (or substantively comparable subsequent versions thereof or successors thereto), a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-2 or Exhibit M-3, IRS Form W-9 (or substantively comparable subsequent versions thereof or successors thereto), and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-4 on behalf of each such direct and indirect partner;

(C)    any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Lead Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Lead Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

(D)    the Administrative Agent shall deliver to the Lead Borrower on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter as required by applicable Law) two copies of IRS Form W-9 (or any substantively comparable subsequent versions thereof or successors thereto) certifying that the Administrative Agent is exempt from United States federal backup withholding tax and such other documentation as will enable the Borrowers to determine whether or not the Administrative Agent is subject to United States federal backup withholding tax or information reporting requirements; and

(E)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or other Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or other Recipient shall deliver to the Lead Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Lead Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Administrative Agent as may be necessary for the Lead Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's or other Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii)     In the event that a Lender or other Recipient will receive a payment under this Agreement in the course of carrying on a business or enterprise in Australia, that Lender or other Recipient is requested to deliver to the Lead Borrower and the Administrative Agent on or prior to the date on which such Lender or other Recipient becomes a Lender or other Recipient under this Agreement the following details of the Lender or other Recipient (A) its Australian tax file number, or (B) its Australian business number.

(iv)     In the event that an Australian Credit Party will receive a payment under this agreement, that Australian Credit Party shall indicate in writing to the Lead Borrower and the Administrative Agent on or prior to the date on which it becomes an Australian Credit Party under this agreement whether it (A) will receive such payments in the course of carrying on a business or enterprise in Australia at or through a permanent establishment in Australia, and (B) is a Qualifying Australian Treaty Party.

(v)     Each Lender or other Recipient agrees that if any form or certification it previously delivered pursuant to this Section 3.01 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Lead Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)     Treatment of Certain Refunds.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender or the L/C Issuer, or have any obligation to pay to any Lender or the L/C Issuer, any refund of Taxes withheld or deducted from funds paid for the account of such Lender or the L/C Issuer, as the case may be. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this Section 3.01, it shall pay to the Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by a Loan Party under this Section 3.01 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient in connection with such refund, and

without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Party, upon the request of the Recipient, agrees to repay the amount paid over to the Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to the Loan Party pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Loan Party or any other Person.

(g)    L/C Issuer. For the avoidance of doubt, for purposes of this Section 3.01, the term "Lender" shall include any L/C Issuer.

(h)    Survival. Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender or the L/C Issuer, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

(i)    GST.

(i)    Unless expressly specified otherwise, all payments to be made by the Australian Loan Parties under or in connection with any Loan Document have been calculated or determined without regard to GST.

(ii)    If all or part of any such payment is the consideration for a taxable supply for GST purposes then, when that Australian Loan Party makes that payment:

(A)    it must pay to the Credit Parties an additional amount equal to that payment or part payment multiplied by the appropriate rate of GST (currently 10%); and

(B)    the Credit Parties will promptly provide to that Australian Loan Party a tax invoice complying with the relevant GST legislation.

(j)    Where under any Loan Document an Australian Loan Party is required to reimburse or indemnify for an amount, that Australian Loan Party must pay the relevant amount (including any sum in respect to GST) less any GST input tax credit the Credit Parties determine that it is entitled to claim in respect of that amount.

3.02    Illegality. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBO Rate Loans, BBR Rate Loan, TIBOR Rate Loans or Canadian BA Rate Loans, as applicable (whether denominated in Dollars or an Alternative Currency), or to determine or charge interest rates based upon the LIBO Rate, the BA Rate, the BBR Rate or the TIBOR Rate, as applicable, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars or any Alternative Currency in the applicable

interbank market, then, on notice thereof by such Lender to the Lead Borrower through the Administrative Agent, any obligation of such Lender to make or continue LIBO Rate Loans, BBR Rate Loan, TIBOR Rate Loans or Canadian BA Rate Loans, as applicable, in the affected currency or currencies or, in the case of LIBO Rate Loans, Canadian BA Rate Loans, BBR Rate Loans or TIBOR Rate Loans in Dollars, to convert Prime Rate Loans to LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian Prime Rate Loans to Canadian BA Rate Loans, as applicable, shall be suspended until such Lender notifies the Administrative Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the applicable Borrowers shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable and such Loans are denominated in Dollars, convert all LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans of such Lender or Canadian BA Rate Loans of such Lender into Canadian Prime Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBO Rate Loans, Canadian BA Rate Loans, TIBOR Rate Loans, or Canadian BA Rate Loans, as applicable, to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBO Rate Loans, Canadian BA Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans. Upon any such prepayment or conversion, the applicable Borrowers shall also pay accrued interest on the amount so prepaid or converted.

3.03    **Inability to Determine Rates.** If the Required Lenders determine that for any reason in connection with any request for a LIBO Rate Loan, a BBR Rate Loan, a TIBOR Rate Loan or a Canadian BA Rate Loan, or a conversion to or continuation thereof that (a) deposits (whether in Dollars or an Alternative Currency) are not being offered to banks in the applicable offshore interbank market for such currency for the applicable amount and Interest Period of such LIBO Rate Loan, BBR Rate Loans or TIBOR Rate Loans, (b) with respect to Canadian BA Rate Loans only, there is no market for bankers acceptances, (c) adequate and reasonable means do not exist for determining the LIBO Rate, the BBR Rate, the TIBOR Rate or the BA Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or Canadian BA Rate Loan (whether denominated in Dollars or an Alternative Currency), or (d) the LIBO Rate, the BBR Rate, the TIBOR Rate or the BA Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or Canadian BA Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Lead Borrower and each applicable Lender. Thereafter, the obligation of the Lenders to make or maintain LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans, as applicable, in the affected currency or currencies shall be suspended until the Administrative Agent (but in any case upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Lead Borrower may revoke any pending request for a Committed Borrowing of, conversion to or continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans, as applicable, in the affected currency or currencies or, failing that, will be deemed to have converted such request into either a request for a Committed Borrowing of Prime Rate Loans in the amount specified therein.

3.04    **Increased Costs; Reserves on LIBO Rate Loans.**

    (a)    _Increased Costs Generally._ If any Change in Law shall:

        (i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except (A) any reserve requirement reflected in the LIBO Rate, and (B) the requirements of the Bank of England and the

Financial Services Authority or the European Central Bank reflected in the Mandatory Cost, other than as set forth below) or the L/C Issuer;

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(iii)     result in the failure of the Mandatory Cost, as calculated hereunder, to represent the cost to any Lender of complying with the requirements of the Bank of England and/or the Financial Services Authority or the European Central Bank in relation to its making, funding or maintaining LIBO Rate Loans; or

(iv)     impose on any Lender or the L/C Issuer or the London interbank market or the Canadian bankers' acceptance market any other condition, cost or expense affecting this Agreement or LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or Canadian BA Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or the L/C Issuer and delivery of the certificate contemplated by Section 3.04(c), the applicable Borrowers will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered. Notwithstanding the foregoing, no Lender shall claim any amounts pursuant to Section 3.04(a)(ii) unless such Lender is generally seeking similar compensation from borrowers under other similar credit agreements.

(b)     Capital Requirements.  If any Lender or the L/C Issuer determines that any Change in Law affecting such Lender or the L/C Issuer or any Lending Office of such Lender or such Lender's or the L/C Issuer's holding company, if any, regarding capital requirements has had, or would have, the effect of reducing the rate of return on such Lender's or the L/C Issuer's capital or on the capital of such Lender's or the L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the L/C Issuer's policies and the policies of such Lender's or the L/C Issuer's holding company with respect to capital adequacy), then from time to time upon delivery of the certificate contemplated by Section 3.04(c), the applicable Borrowers will pay to such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company, as the case may be, for any such reduction suffered.

(c)     Certificates for Reimbursement.  A certificate of a Lender or the L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or the L/C Issuer or its

holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Lead Borrower shall be conclusive absent manifest error.  The applicable Borrowers shall pay such Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's or the L/C Issuer's right to demand such compensation, provided that the applicable Borrower shall not be required to compensate a Lender or the L/C Issuer pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than six (6) months prior to the date that such Lender or the L/C Issuer, as the case may be, notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six (6)-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    Reserves on LIBO Rate Loans.  The applicable Borrowers shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each LIBO Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided that, the Lead Borrower shall have received at least ten (10) days' prior notice (with a copy to the Administrative Agent) of such additional interest from such Lender.  If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest shall be due and payable ten (10) days from receipt of such notice.

3.05    Compensation for Losses.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, each Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or Canadian BA Rate Loan made to such Borrower on a day other than the last day of the Interest Period for such LIBO Rate Loan, BBR Rate Loan, TIBOR Rate or Canadian BA Rate Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by such Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or any Canadian BA Rate Loan made to such Borrower on the date or in the amount notified by such Borrower;

(c)    any failure by any Borrower to make payment of any Loan or drawing under any Letter of Credit (or interest due thereon) denominated in an Alternative Currency on its scheduled due date or any payment thereof in a different currency; or

(d)    any assignment of a LIBO Rate Loan, BBR Rate Loan, TIBOR Rate Loan or Canadian BA Rate Loan made to such Borrower on a day other than the last day of the Interest Period therefor as a result of a request by the Lead Borrower pursuant to <u>Section 10.13</u>;

including any loss of anticipated profits, any foreign exchange losses and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained or from the performance of any foreign exchange contract.  The applicable Borrower shall also pay any customary and reasonable administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by a Borrower to the Lenders under this <u>Section 3.05</u>, each Lender shall be deemed to have funded each LIBO Rate Loan, BBR Rate Loan, or TIBOR Rate Loan made by it at the LIBO Rate, BBR Rate, or TIBOR Rate for such Loan by a matching deposit or other borrowing in the offshore interbank market for such currency for a comparable amount and for a comparable period, whether or not such LIBO Rate Loan, BBR Rate Loan or TIBOR Rate Loan was in fact so funded.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section and setting forth in reasonable detail the manner in which such amount or amounts was determined shall be delivered to the Lead Borrower.

3.06    **Mitigation Obligations; Replacement of Lenders.**

(a)    <u>Designation of a Different Lending Office</u>.  If any Lender or L/C Issuer requests compensation under <u>Section 3.04</u>, or the Borrowers are required to pay any additional amount to any Lender or L/C Issuer or any Governmental Authority for the account of any Lender or L/C Issuer pursuant to <u>Section 3.01</u>, or if any Lender or L/C Issuer gives a notice pursuant to <u>Section 3.02</u>, then such Lender or L/C Issuer shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender or L/C Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.01</u> or <u>Section 3.04</u>, as the case may be, in the future, or eliminate the need for the notice pursuant to <u>Section 3.02</u>, as applicable, and (ii) in each case, would not subject such Lender or L/C Issuer to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender or L/C Issuer.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender or L/C Issuer in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or if any Loan Party is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, the Borrowers may replace such Lender in accordance with <u>Section 10.13</u>.

3.07    **Survival.**  All of the obligations of each Loan Party under this <u>Article III</u> shall survive termination of the Aggregate Total Commitments and repayment of all other Obligations hereunder.

3.08    **Designation of Lead Borrower as Borrowers' Agent.**

(a)    Each Domestic Borrower hereby irrevocably designates and appoints each of the Parent and the Lead Borrower as such Domestic Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Domestic Borrower for such uses as are permitted under

this Agreement. As the disclosed principal for its agent, each Domestic Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Domestic Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Lead Borrower and of any other Domestic Borrower. In addition, each Domestic Loan Party other than the Domestic Borrowers hereby irrevocably designates and appoints each of the Parent and the Lead Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b)     Each Foreign Borrower hereby irrevocably designates and appoints the Parent as such Foreign Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to such Foreign Borrower for such uses as are permitted under this Agreement. In addition, each Foreign Loan Party other than the Foreign Borrowers hereby irrevocably designates and appoints each of the Parent and the applicable Foreign Borrower as such Foreign Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(c)     Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the applicable credit facility contemplated herein with all other applicable Borrowers. Consequently, subject to the terms and conditions of this Agreement, each Borrower hereby assumes, guarantees payment and performance of, and agrees to discharge all Obligations of each of the other Borrowers; provided that, notwithstanding anything herein or in any of the other Loan Documents to the contrary, the Foreign Loan Parties shall be liable only for the Foreign Liabilities.

(d)     The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested a Credit Extension. Neither the Administrative Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

## ARTICLE IV
### CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**4.01     Conditions of Initial Credit Extension.** The obligation of the L/C Issuer and each Lender to make its initial Credit Extension hereunder is subject to satisfaction (or waiver by the Required Lenders) of the following conditions precedent:

(a)     The Administrative Agent's receipt of the following, each of which shall be originals or telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, and each properly executed by a Responsible Officer of the signing Loan Party (if applicable):

(i)     executed counterparts of this Agreement;

(ii)    executed counterparts of the DIP Intercreditor Agreement

(iii)   a Note executed by each applicable Borrower (other than the Japanese Borrower) in favor of each Lender requesting a Note;

(iv)      such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party (A) evidencing the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party, (B) evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party, and (C) in respect of the Australian Loan Parties, certifying that each relevant Australian Loan Party is not in breach of Chapter 2E of the Corporations Act;

(v)      copies of each Loan Party's certificate or articles of incorporation and bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction, if any) and a certificate of good standing (where applicable, or such other customary functionally equivalent certificates, to the extent available in the applicable jurisdiction) from such Loan Party's jurisdiction of organization and from each jurisdiction where such Loan Party's ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(vi)      a favorable opinion of (A) Skadden, Arps, Slate, Meagher & Flom LLP, special counsel to the Domestic Loan Parties, addressed to the Administrative Agent and each Domestic Lender, as to customary matters concerning the Domestic Loan Parties and the Loan Documents; (B) Fasken Martineau DuMoulin LLP, McInnes Cooper LLP and other local counsel to the Canadian Loan Parties, addressed to the Administrative Agent and each Canadian Lender, as to customary matters concerning the Canadian Loan Parties and the Loan Documents; and (C) Nishimura & Asahi, special counsel to the Japanese Loan Parties, addressed to the Administrative Agent and each Japanese Lender, as to customary matters concerning the Japanese Loan Parties and the Loan Documents;

(vii)      a certificate signed by a Responsible Officer of the Borrower, satisfactory in form and substance to the Administrative Agent and the Required Lenders, certifying that the conditions in Sections 4.02(a) and 4.02(b) have been satisfied;

(viii)      with respect to each Loan Party organized under the laws of Japan, (a) a certified copy of corporate registration (*genzai jikou shoumei*) in respect of such Loan Party and a certificate of seal registration issued in respect of such Loan Party by the competent legal affairs bureau in Japan, in each case no earlier than three months prior to the date of the initial Credit Extension, and (b) such other documents as may be requested by the Administrative Agent in order to comply with the *Act on Prevention of Transfer of Criminal Proceeds*;

(ix)      [reserved];

(x)      instruments evidencing the Interim Order Intercompany Loans in form and substance reasonably satisfactory to the Administrative Agent;

(xi)     executed counterparts of the Reaffirmation Agreement;

(xii)    all other Loan Documents set forth, each duly executed by the applicable Loan Parties;

(xiii)   [reserved];

(xiv)    [reserved];

(xv)     [reserved];

(xvi)    (A) all UCC financing statements, PPSA financing statements and Australian PPSA financing statements, required by Law or reasonably requested by the Agents to be filed, registered or recorded to create, perfect or protect the Liens intended to be created under the Loan Documents and (B) all certificates of matters entered into the applicable registry in Japan to create, perfect or protect the Liens intended to be created under the Loan Documents or copies of applications for registration of such matters in form reasonably satisfactory to the Agents and, to the extent applicable with respect to any Liens intended to be created in any bank account, Account or insurance policy of a Loan Party in Japan, a consent letter from the account bank where such bank account is domiciled consenting to the creation of the Lien in respect of such bank account, Account debtor or insurer, as applicable; and

(xvii)   [reserved].

(b)     Chief Restructuring Officer.  A chief restructuring officer ("Chief Restructuring Officer") acceptable to the Lenders shall be appointed with respect to the Borrowers (it being understood and agreed that the Acceptable Chief Restructuring Officer shall be acceptable to the Lenders).

(c)     Legal Matters.  All legal matters incident to this Agreement and the Borrowings hereunder shall be satisfactory to the Administrative Agent and the Lenders.

(d)     Boardriders Waiver.  The Boardriders Waiver shall be in full force and effect.

(e)     Payment of Fees.  The Borrowers shall have paid on before the Effective Date, in cash (i) all reasonable and documented costs, fees, disbursements and expenses of the Administrative Agent (including fees, costs, disbursements and expenses of (A) their outside counsel, Riemer & Braunstein LLP, and their local counsel (including, for the avoidance of doubt, foreign counsel) and (B) any professional advisors retained by Bank of America (or any Affiliate thereof) or their counsel and (ii) all fees required to be paid by the Borrowers to any of the Agents or the Arranger on or before the Effective Date shall have been paid in full, and all fees required to be paid by the Borrowers to the Lenders on or before the Effective Date shall have been paid in full.

(f)     Borrowing Base Certificate.  The Administrative Agent shall have received a Borrowing Base Certificate  from each Borrower dated the Effective Date, relating to the month

ended immediately prior to the Petition Date, and executed by a Responsible Officer of the Lead Borrower or the Parent.

(g)     [Reserved]

(h)     DIP Term Facility.    An interim order approving the DIP Term on terms reasonably satisfactory to the Agent shall have been entered in the Cases, the DIP Term Facility shall be in full force and effect and the US Borrowers shall have received gross proceeds from the initial borrowing under the DIP Term Facility in the amount of $60,000,000 (from which certain costs, expenses, fees and original issue discount shall be deducted).

(i)     KYC.   The Administrative Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations including, without limitation, the Patriot Act.

(j)     Motions and Documents. All material motions and other material documents to be filed with and submitted to the Bankruptcy Court (including any "first day" motions and proposed orders) related to the commencement of the Cases or transactions contemplated hereby and the other Loan Documents and the approval thereof shall be in form and substance reasonably satisfactory to the Lenders.

(k)     Interim Order. The Interim Order shall provide that the Administrative Agent, for the benefit of the Credit Parties, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein.

(l)     Liens. Each Order shall provide that the Administrative Agent, for the benefit of the Credit Parties, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein, subject to the DIP Intercreditor Agreement.

(m)     Budget. The Agent shall have received the Budget reasonably acceptable to the Administrative Agent.

(n)     [reserved].

(o)     Petition Date. The Petition Date shall have occurred on or before September 9, 2015.

(p)     Interim Order Date. The Interim Order shall have been filed on or before September 11, 2015.

(q)     Adequate Protection.

(i)     The Collateral Agent, for the benefit of the Existing ABL Lenders, shall have received adequate protection in respect of the Liens securing the Existing ABL Obligations and ABL Indemnity Obligations (as defined in the Orders), including among other things (i) replacement claims and liens, and (ii) a superpriority administrative expense claim against all Debtors, in each case junior only to the Liens and superpriority

administrative expense claims under this Agreement granted and approved under the Orders; and

(ii)    The Existing Senior Secured Noteholders shall have each received adequate protection in respect of the liens securing the Existing Senior Secured Note Obligations, as applicable, including among other things (i) replacement claims and liens, and (ii) a superpriority administrative expense claim against all Debtors junior only to superpriority administrative expense claims under this Agreement and the DIP Term Loan Agreement.

Without limiting the generality of the provisions of Section 9.05, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender (other than an Agent or the Administrative Agent) that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

4.02    **Conditions to all Credit Extensions.** The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of a Committed Loan to another Type of Committed Loan, or a continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans) and of each L/C Issuer to issue each Letter of Credit is subject to the following conditions precedent:

(a)    The representations and warranties of the Borrowers and each other Loan Party contained in Article V or any other Loan Document, shall be true and correct in all material respects (or, in the case of any representation and warranty qualified by materiality, in all respects) on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (or in all respects, as applicable) as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in subsections (a), (b) and (f) of Section 5.05 shall be deemed to refer to the most recent statements, if any, furnished pursuant to clauses (a), (b) and (e), respectively, of Section 6.01;

(b)    No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof;

(c)    The DIP Term Facility shall be in full force and effect;

(d)    The Administrative Agent, and if applicable, the L/C Issuer, shall have received a Request for Credit Extension in accordance with the requirements hereof;

(e)    Since the Petition Date, no Material Adverse Effect shall have occurred;

(f)    The proposed Credit Extension complies with the Budget (within Permitted Variances);

(g)    After giving effect to the proposed Credit Extension, no Overadvance shall exist;

(h)    The Boardriders Waiver shall be in full force and effect; and

(i)    There shall not be pending any motion, complaint or other pleading challenging the pre-petition claims under, or the security interests and liens securing, the Existing ABL Credit Agreement or any other similar challenge under Chapter 5 of the Bankruptcy Code.

Each Request for a Credit Extension (other than a Committed Loan Notice requesting only a conversion of a Committed Loan to another Type of Committed Loan or a continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans) submitted any Borrower shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in this Section 4.02 have been satisfied on and as of the date of the applicable Credit Extension. The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but unless and until the Required Lenders otherwise direct the Administrative Agent (in accordance with the terms of this Agreement) to cease making Committed Loans, the Lenders will fund their Applicable Percentage of all Loans that are requested by the Borrowers of all L/C Advances required to be made hereunder and participate in all Letters of Credit whenever made or issued in accordance with the provisions of this Agreement, and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, are agreed to by the Administrative Agent, as applicable; provided that, the making of any such Loans or the issuance of any Letters of Credit in the event the provisions of this Article IV are not complied with shall not be deemed to be a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights of the Credit Parties as a result of any such failure to comply.

## ARTICLE V
### REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans and to issue Letters of Credit hereunder, each Loan Party and each applicable Subsidiary represents and warrants to the Administrative Agent, the L/C Issuer and the Lenders that:

**5.01    Existence, Qualification and Power.** Each Loan Party (other than Q.S. Optics, Inc.) and each Subsidiary (a) is a corporation, limited liability company, unlimited liability company, *kabushiki kaisha*, partnership or limited partnership, duly organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or Final Order, as applicable, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or Final Order, as applicable, execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (a) (in the case of any Subsidiary that is not a Loan Party), (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Schedule 5.01 annexed hereto sets forth, in each case as of the Effective Date, each Loan Party's name as it appears in official filings in its state or province of incorporation or organization, its state or province of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization (in the case of each Domestic Loan Party), and its federal employer identification number (if any).

**5.02    Authorization; No Contravention.** The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or Final Order, as applicable, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries (other than any Loan Document) or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, except in each case where enforcement is stayed upon the commencement of the Cases; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Administrative Agent under the Security Documents and other than in accordance with the DIP Intercreditor Agreement); except, in the case of both clauses (b) and (c) hereof, where enforcement is stayed upon the commencement of the Cases or (d) violate any applicable Law in any material respect.

**5.03    Governmental Authorization; Other Consents.** Subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or, following the entry of the Final Order, the Final Order, no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority, and no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document to which such Person is a party, except for (a) the perfection or maintenance of the Liens created under the Security Documents, (b) such as have been obtained or made and are in full force and effect, or (c) the Interim Order and the Final Order, as applicable.

**5.04    Binding Effect.** Subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or, following the entry of the Final Order, the Final Order, this Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each

-135-

Loan Party that is party thereto. Subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or, following the entry of the Final Order, the Final Order, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against such Loan Party in accordance with its terms, subject (in the case of the Foreign Loan Parties only) to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

      **5.05    Financial Statements; No Material Adverse Effect.**

          (a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) to the extent required by GAAP show all Indebtedness and other liabilities, direct or contingent, of the Parent and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

          (b)    The unaudited Consolidated balance sheet of the Parent and its Subsidiaries dated April 30, 2015, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for the Fiscal Quarter ended on that date, in each case, (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all materials respects the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.    Schedule 5.05 sets forth all Material Indebtedness of the Parent and its Americas/Foreign Subsidiaries (other than any intercompany Indebtedness) outstanding as of the Effective Date (after giving effect to all the transactions occurring on the Effective Date).

      **5.06    Litigation.**  Except for the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby to occur on the Effective Date, or (b) either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

      **5.07    No Default.**  Except where enforcement is stayed upon the commencement of the Cases, no Loan Party or any Subsidiary is in default in any material respect under or with respect to any Material Contract or any Material Indebtedness.  No Default has occurred and is continuing or would result on the Effective Date from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

      **5.08    Ownership of Property; Liens.**

          (a)    Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in, all real property necessary or used in the

ordinary conduct of its business, except for such defects in title or failure to have such title or other interest as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each of the Loan Parties and each Subsidiary has good title to, valid leasehold interests in, or valid licenses or other rights to use all personal property and assets material to the ordinary conduct of its business, except where failure to have such title, interest, license or other right could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Schedule 5.08(b)(1) sets forth the address (including street address and state, province or territory and postal or zip code) of all Real Estate that is owned by the Loan Parties as of the Effective Date, together with a list of the holders of any mortgage thereon as of the Effective Date. Schedule 5.08(b)(2) sets forth the address (including street address and state or province or territory) of, and, with respect to the Australian Loan Parties, details of title relating to, all locations leased by the Loan Parties as of the Effective Date.

(c)     The property of each Loan Party and each of the Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(d)     No Japanese Loan Party has granted, or permitted to exist, any Liens pursuant to any constructive transfers (*joto tampo* by way of *senyu kaitei*) of any property, assets or revenue of such Japanese Loan Party, other than any such Liens in favor of the Administrative Agent under the Loan Documents.

**5.09    Environmental Compliance.**

(a)     No Loan Party or any Subsidiary (i) is in violation of any Environmental Law or has not obtained or, to its knowledge, has not complied with any Environmental Permit required under any Environmental Law, (ii) is subject to any Environmental Liability that remains outstanding, or (iii) has received written notice of any claim alleging Environmental Liability by any of them, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     .  Except, in each case, as would not reasonably be expected to have a Material Adverse Effect: (i) none of the properties currently owned by any Loan Party or any Subsidiary, or to the knowledge of any Loan Party, leased by any Loan Party or any Subsidiary, is listed or, to the knowledge of any Loan Party, proposed for listing on the NPL or any analogous foreign, state, provincial, territorial, municipal or local list; (ii) there are no underground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being treated, stored or disposed of except in compliance with applicable Environmental Laws on any property currently owned by any Loan Party or any Subsidiary in violation of applicable Environmental Law and (iii) to the knowledge of the Loan Parties, Hazardous Materials have not been released, discharged or disposed on any property currently owned by any Loan Party or any Subsidiary in violation of applicable Environmental Law.

(c)     Except, in each case, as would not reasonably be expected to have a Material Adverse Effect, no Loan Party or any Subsidiary is undertaking, either individually or together with other "potentially responsible parties" (as that term is defined in CERCLA), any investigation, assessment, or remedial or response action to remove Hazardous Materials at any location, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law.

**5.10    Insurance.**  The properties of the Loan Parties and their Americas/Foreign Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates.  Each insurance policy is enforceable against the relevant insurer in accordance with its terms and is not void or voidable.  Schedule 5.10 sets forth a summary of all insurance maintained by or on behalf of the Loan Parties as of the Effective Date.  As of the Effective Date, each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.11    Taxes.**  The Loan Parties and their Subsidiaries have filed all material federal, state, provincial, local and other material tax returns and reports required to be filed, and have paid all material federal, state, provincial, territorial, municipal, local and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings for which adequate reserves have been provided in accordance with GAAP, as to which taxes no Lien has been filed and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation and except to the extent failure to do so is permitted by the Bankruptcy Code or pursuant to the Orders.  There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect.  No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement, other than any tax sharing agreement between or among such Loan Party (or any Subsidiary thereof) and any Affiliate of such Loan Party (or any Subsidiary thereof).

**5.12    Plans.**

(a)    Except as would not be reasonably expected to have a Material Adverse Effect, with respect to the Domestic Loan Parties: each Plan is in compliance with the applicable provisions of ERISA, the Code and other Federal or state laws.  Each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service and, to the best knowledge of the Lead Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b)    With respect to the Domestic Loan Parties: there are no pending or, to the best knowledge of the Lead Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred, and neither the Lead Borrower nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan; (ii) each Domestic Loan Party and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been

-138-

applied for or obtained; (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 80% or higher and neither a Domestic Loan Party nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 80% as of the most recent valuation date; (iv) neither a Domestic Loan Party nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) neither the Lead Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; and (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

(d)     As of the Effective Date, no Canadian Pension Plan in respect of employees of any Canadian Loan Party or any of their Related Parties is a pension plan or subject to any pension benefits legislation. As of the Effective Date, no Canadian Loan Party has any Canadian Pension Plan.

(e)     With respect to any scheme or arrangement mandated  by a government other than the United States and with respect to each employee benefit plan maintained or contributed to by any Loan Party or any Subsidiary of any Loan Party that is not subject to United States laws (such schemes, arrangements and employee benefit plans, collectively, "Foreign Plans"), none of the following events or conditions exists and is continuing that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect: (a) substantial non-compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders; (b) failure to be maintained, where required, in good standing with applicable regulatory authorities; (c) any obligation of any Loan Party or its Subsidiaries in connection with the termination or partial termination of, or withdrawal from, any such Foreign Plan; (d) any Lien on the property of any Loan Party or its Subsidiaries in favor of a Governmental Authority as a result of any action or inaction regarding such a Foreign Plan; (e) for each such foreign plan which is a funded or insured plan, failure to be funded or insured on an ongoing basis to the extent required by applicable non-U.S. law (using actuarial methods and assumptions which are consistent with the valuations last filed with the applicable Governmental Authorities); (f) any facts that, to the best knowledge of  the Parent or any of its Subsidiaries, exist that would reasonably be expected to give rise to a dispute and any pending or threatened disputes that, to the best knowledge of the Parent or any of its Subsidiaries, would reasonably be expected to result in a material liability to the Parent or any of its Subsidiaries concerning the assets of any such foreign plan (other than individual claims for the payment of benefits); and (g) failure to make all contributions in a timely manner to the extent required by applicable non-U.S. law.

5.13     **Subsidiaries; Equity Interests.** As of the Effective Date, the Loan Parties have no direct Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth, in each case as of the Effective Date, the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests owned by a Loan Party in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for Permitted Encumbrances.     As of the Effective Date, the Loan Parties have no equity investments in any other corporation or entity other than (i) Investments described in clause (g) and (h) of the definition of "Permitted Investments" and (ii) those specifically disclosed in Part (b) of Schedule 5.13. All of the outstanding Equity Interests in the Loan Parties (other than the Parent) have been validly

issued, and are fully paid and non-assessable and, as of the Effective Date, are owned in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except for Permitted Encumbrances.

     **5.14**    **Margin Regulations; Investment Company Act.**

     (a)    None of the proceeds of the Credit Extensions shall be used directly or indirectly for any purpose that would entail a violation of Regulations T, U, or X issued by the FRB.

     (b)    None of the Loan Parties is, or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure.**  No financial statement, certificate or other factual written information (excluding projections, forward-looking information and information of a general economic or general industry nature, but including the Budget) furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished, and taken as a whole) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information (including the Budget), the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time (it being understood that such projected financial information is subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties, that no assurance is given that any particular projections will be realized, that actual results may differ and that such differences may be material).

**5.16    Compliance with Laws.**  Subject (in the case of each Domestic Loan Party only) to the entry of the Interim Order or the Final Order, as applicable, each of the Loan Parties and each Subsidiary is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.17    Intellectual Property; Licenses, Etc.**  Except, in each case, as would not reasonably be expected to have a Material Adverse Effect, the Loan Parties and their Americas/Foreign Subsidiaries own, or possess the right to use, all of the Intellectual Property that is reasonably necessary for the operation of their respective businesses as currently conducted, without violation of the rights of any other Person.  To the knowledge of the Lead Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, by any Loan Party infringes upon any rights held by any other Person, except, in each case, as would not reasonably be expected to have a Material Adverse Effect.  No claim or litigation against any Loan Party alleging any such infringement is pending or, to the knowledge of the Lead Borrower, threatened in writing, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

**5.18    Labor Matters.**

There are no strikes, lockouts, slowdowns or other labor disputes against any Loan Party or any Americas/Foreign Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened that, in any case, could reasonably be expected to have a Material Adverse Effect. The hours worked by, and payments made to employees of, the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, provincial, territorial, municipal, local or foreign Law dealing with such matters except to the extent that any such violation could not reasonably be expected to have a Material Adverse Effect.  No Loan Party or any of its Americas/Foreign Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Act or similar federal, state, provincial, local or foreign Law dealing with such matters that, in any case, could reasonably be expected to have a Material Adverse Effect.  All payments due from any Loan Party and its Americas/Foreign Subsidiaries, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly

accrued in accordance with GAAP as a liability on the books of such Loan Party except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Except as disclosed on Schedule 5.18, as of the Effective Date, no Loan Party or any Americas/Foreign Subsidiary is a party to or bound by any collective bargaining agreement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board or other applicable Governmental Authority, and no labor organization or group of employees of any Loan Party or any Americas/Foreign Subsidiary has made a pending demand for recognition that, in any case, could reasonably be expected to have a Material Adverse Effect. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Americas/Foreign Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Americas/Foreign Subsidiaries that, in any case, could reasonably be expected to have a Material Adverse Effect. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Americas/Foreign Subsidiaries is bound.

### 5.19    Security Documents.

(a)    With respect to all Loan Parties other than the Domestic Loan Parties, the Security Documents create in favor of the Administrative Agent (for the benefit of itself and the other applicable Credit Parties) or the Australian Security Trustee, as applicable, and, with respect to the Liens granted by the Japanese Loan Parties, each of the Japanese Secured Parties, as applicable, a legal, valid, continuing and enforceable security interest in the Collateral (with respect to (a) the security interests in bank accounts under Japanese Security Documents, upon the consent of the applicable account bank, (b) the security interests (*joto tampo*) in Accounts under the Japanese Security Documents, whereupon there is a contractual restriction on the grant of such security interest (*joto tampo*), upon the consent of the relevant Account debtor, and (c) the security interests in insurance claims under the Japanese Security Documents, whereupon there is a contractual restriction on the grant of such security interest, upon the consent of the relevant insurers, and the Security Documents constitute, or will upon the filing of financing statements or other requisite registrations and recordations or obtaining consents (including, with respect to IP Collateral, the filing and recordation of the Intellectual Property Security Agreement (or other appropriate documents) with the United States Patent and Trademark Office, United States Copyright Office, Canadian Intellectual Property Office, the Patent Office of Japan, the Agency for Cultural Affairs or the Software Information Center, and any substitute or successor agency) and/or the obtaining of "control", in each case with respect to the relevant Collateral as required under the applicable UCC or similar legislation of any jurisdiction, including, without limitation, the PPSA, the Civil Code of Quebec and the Australian PPSA, the creation of a perfected Lien on, and security interest in, all right, title and interest of the Loan Parties thereunder in such Collateral that may be perfected in the United States, Canada, Australia or Japan by filing, recording or registering a financing statement or analogous document (and, in the case of IP Collateral and any other Intellectual Property, the filing and recordation of the Intellectual Property Security Agreement (or other appropriate documents) with the United States Patent and Trademark Office and the United States Copyright Office, the Canadian Intellectual Property Office or the Patent Office of Japan, the Agency for Cultural Affairs or the Software Information Center) or, to the extent required by the Loan Documents (it being understood that subsequent recordings in the United States Patent and Trademark Office, United States Copyright Office, Canadian Intellectual Property Office, the Patent Office of Japan, the Agency for Cultural Affairs or the

Software Information Center, or a substitute or successor agency may be necessary to perfect a Lien on Intellectual Property acquired, register or applied for after the date hereof). Notwithstanding anything to the contrary herein, the Loan Parties shall have no obligation to perfect Liens on any IP Collateral or other Intellectual Property in any jurisdiction outside the United States, Canada, Australia, or Japan.

(b)     With respect to the Domestic Loan Parties, the Security Documents, taken together with the Interim Order and/or the Final Order, are effective to create in favor of the Administrative Agent (for the benefit of itself and the other applicable Credit Parties) a legal, valid, continuing and enforceable security interest in the Collateral pledged hereunder or thereunder, in each case subject to no Liens other than Priority Permitted Encumbrances and the Carve-Out and subject to the DIP Intercreditor Agreement. Pursuant to the terms of the Interim Order and/or Final Order, no filing or other action will be necessary to perfect or protect such Liens and security interests. Pursuant to and to the extent provided in the Interim Order and/or the Final Order, the Obligations of the Loan Parties under this Agreement will constitute allowed super-priority administrative expense claims in the Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (including, for the avoidance of doubt, subject to the entry of the Final Order, the proceeds of Avoidance Actions), subject only to the Carve-Out. Notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all Liens and claims (including administrative and superpriority claims) securing the Obligations, the Loan Parties' pre-petition obligations, adequate protection Liens, and all other Liens or claims (including administrative claims and DIP Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and DIP Superpriority Claims) securing the Obligations and pre-petition obligations granted or recognized as valid, including the Liens, security interests, and claims (including administrative claims and DIP Superpriority Claims) granted to the Administrative Agent and the other Credit Parties

5.20     [Reserved].

5.21     Deposit Accounts; Credit Card Arrangements.

(a)     Annexed hereto as <u>Schedule 5.21(a)</u> is a list of all DDAs maintained by the Loan Parties as of the Effective Date, which Schedule includes, with respect to each DDA and in each case as of the Effective Date: (i) the name of the depository; (ii) the account number(s) maintained with such depository; and (iii) the identification of each Blocked Account Bank.

(b)     Annexed hereto as <u>Schedule 5.21(b)</u> is a list of all arrangements as of the Effective Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22    Brokers.**  Except as disclosed on <u>Schedule 5.22</u> no broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.23    Customer and Trade Relations.**  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations except to the extent that any of the foregoing could not reasonably be expected to have a Material Adverse Effect or is a result of the commencement of the Cases.

**5.24    Material Contracts.**  <u>Schedule 5.24</u> sets forth a list of all Material Contracts to which any Loan Party is a party as of the Effective Date (other than the Loan Documents and the DIP Term Loan Documents).  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Administrative Agent on or before the date hereof.  The Loan Parties are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of the intention of any other party thereto to terminate any Material Contract (other than the Parent or any Subsidiary in connection with any repayment of Material Indebtedness except, in each case, where enforcement is stayed upon the commencement of the Cases.

**5.25    Casualty.**  Neither the businesses nor the properties of any Loan Party or any of its Americas/Foreign Subsidiaries are affected by any fire, explosion, accident, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.26    Anti-Social Forces.**  No Loan Party or any of its directors, officers or employees are an Anti-Social Force. "<u>Anti-Social Force</u>" means a Person or group which threatens or is likely to threaten the order or safety of the civil society, and prevents or is likely to prevent the sound development of the economy or society, which specifically means the following Persons:

(a)    any organized crime group (meaning a group a member of which (including a member of a group constituting such group), in an organized or habitual way, is likely to encourage the committing of violent illegal acts or similar acts; the same applies hereinafter;

(b)    any organized crime group member (meaning a member of an organized crime group; the same applies hereinafter) or any Person with respect to whom a period of 5 years has not expired after such Person ceases to be an organized crime group member;

(c)    any organized crime group associated member (a Person other than an organized crime group member who has a relationship with the organized crime group and is likely to perform violent unlawful acts backed by the influence of the organized crime group, or cooperates in, or is involved in, maintaining or operating the organized crime group by supplying funds, weapons, or other items to the organized crime group or an organized crime group member);

(d)    any corporation related to the organized crime group (meaning a corporation the management of which an organized crime group member is substantially involved in, a

corporation which is operated by any organized crime group associated member or former organized crime group member and actively cooperates in, or is involved in, maintaining or operating the organized crime group by supplying funds or otherwise taking actions, or a corporation which actively uses the organized crime group and cooperates in maintaining or operating the organized crime group upon the performance of its business);

(e)    any corporate racketeer (*sokaiya*) or other Person (meaning a Person who is likely to perform a violent unlawful act in the pursuit of unjust profits against a corporation or other entity and threatens the safety of civil life, such as a corporate racketeer (*sokaiya*) or a corporate swindler (*kaisha goro*);

(f)    any corporate swindler acting in the name of a social movement (*shakai undo-to hyobo goro*) (meaning a Person who is likely to perform violent unlawful acts in the pursuit of unjust profits by pretending to represent or acting in the name of a social movement or political activity and threatens the safety of civil life);

(g)    any special intelligence violent group or other group (meaning a group or individual, other than those listed in (a) through (f) above, that plays a key part in structural injustice by using its powers or having a financial connection with a organized crime group backed by a relationship with a organized crime group);

(h)    other Persons similar to those listed in (a) through (g) above;

(i)    any Person who has a relationship in which a Person who is a Person or group listed in (i) through (h) (the "Organized Crime Group Member Etc.") is deemed to control its management;

(j)    any Person who has a relationship in which an Organized Crime Group Member Etc. is deemed to be substantially involved its management;

(k)    any Person who has a relationship in which the Person is deemed to be unlawfully using an Organized Crime Group Member Etc. for purposes of pursuing unjust profits for itself, its own company or a third party or causing damage to a third party, or for other similar purposes;

(l)    any Person who has a relationship in which he/she is deemed to be involved in an Organized Crime Group Member Etc. such as by supplying funds or other supplies or affording facilities; or

(m)    any Person whose officer or employee involved in management has a relationship with an Organized Crime Group Member Etc. that should be subject to social disapproval.

**5.27    Tax Consolidation.** Each Australian Loan Party is a member of a Tax Consolidated Group for which the Head Company (as defined in the Income Tax Assessment Act 1997 (Cth) of Australia) is Quiksilver Australia Pty Limited.

**5.28    Budget.** A true and complete copy of the Budget is attached as Exhibit N hereto.

**5.29    Commercial benefit.** The entry into this document is for each Loan Party's commercial benefit.

**5.30    No Immunity.** Each Loan Party has no right of immunity from set-off, legal action, suit or proceeding, attachment or execution or the jurisdiction of any court with respect to the Collateral or its obligations under the Loan Documents.

**5.31    Orders.** The Loan Parties are in compliance with the terms and conditions of the Orders. Each of the Interim Order (to the extent necessary during the Interim Order Period) or the Final Order (from after the date the Final Order is entered) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and each Lender, no change, amendment or modification or any application or motion for any change, amendment or modification to any of the Orders shall be made, in each case, that is adverse to the interests of the Lenders.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification Obligations for which a claim has not then been asserted), or any Letter of Credit shall remain outstanding, the Loan Parties shall, and shall (except in the case of the covenants set forth in <u>Sections 6.01</u>, <u>6.02</u>, and <u>6.03</u>), cause each applicable Subsidiary to:

**6.01    Financial Statements.** Deliver to the Administrative Agent (for distribution to each Lender):

(a)      within ninety (90) days after the end of each Fiscal Year of the Parent, (i) a Consolidated balance sheet of the Parent and its Subsidiaries as at the end of such Fiscal Year, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all prepared in accordance with GAAP, such Consolidated statements to be audited and accompanied by a report and opinion of a Registered Public Accounting Firm of nationally recognized standing or otherwise reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall state that such Consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years, and (ii) an Americas/Foreign Consolidated balance sheet of the Parent and its Americas/Foreign Subsidiaries as at the end of such Fiscal Year, and the related Americas/Foreign Consolidated statements of income or operations of the Parent and its Americas/Foreign Subsidiaries and Americas/Foreign Consolidated cash flows for such

Fiscal Year, setting forth in each case (in the case of clause (ii), to the extent practicable) in comparative form the figures for the previous Fiscal Year;

(b)      within forty-five (45) days after the end of each of the first three Fiscal Quarters of each Fiscal Year of the Parent, (i) a Consolidated balance sheet of the Parent and its Subsidiaries as at the end of such Fiscal Quarter, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Quarter and for the portion of the Parent's Fiscal Year then ended, and (ii) an Americas/Foreign Consolidated balance sheet of the Parent and its Americas/Foreign Subsidiaries as at the end of such Fiscal Quarter, and the related Americas/Foreign Consolidated statements of income or operations and Shareholders' Equity of the Parent and its Americas/Foreign Subsidiaries and Americas/Foreign Consolidated cash flows for such Fiscal Quarter, setting forth in each case (to the extent practicable) in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(f) hereof, (B) the corresponding Fiscal Quarter of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, such Americas/Foreign Consolidated statements to be certified by a Responsible Officer of the Lead Borrower or the Parent as fairly presenting in all material respects the financial condition, results of operations, Shareholders' Equity and cash flows of the Parent and its Americas/Foreign Subsidiaries as of the end of such Fiscal Quarter in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)      within forty-five (45) days after the end of each of the first three Fiscal Quarters of each Fiscal Year of the Parent, (i) a balance sheet of each Foreign Borrower and its Subsidiaries as at the end of such Fiscal Quarter, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Quarter and for the portion of the Parent's Fiscal Year then ended, setting forth in each case (to the extent practicable) in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(f) hereof, (B) the corresponding Fiscal Quarter of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, to be certified by a Responsible Officer of the Lead Borrower or the Parent as fairly presenting in all material respects the financial condition, results of operations, Shareholders' Equity and cash flows of each Foreign Borrower and its Subsidiaries as of the end of such Fiscal Quarter in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(d)      within thirty (30) days after the end of each of the Fiscal Months of each Fiscal Year of the Parent, an Americas/Foreign Consolidated balance sheet of the Parent and its Americas/Foreign Subsidiaries as at the end of such Fiscal Month, and the related Americas/Foreign Consolidated statements of income or operations, Shareholders' Equity and Americas/Foreign Consolidated cash flows for such Fiscal Month, and (to the extent practicable) for the portion of the Parent's Fiscal Year then ended, setting forth in each case (to the extent practicable) in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(f) hereof, (B) the corresponding Fiscal Month of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, to the extent applicable, subject to normal year end audit adjustments and in the absence of footnotes, and in any event, in a manner consistent with the Parent's accounting practices, such Americas/Foreign Consolidated statements to be

-147-

certified by a Responsible Officer of the Lead Borrower or the Parent as fairly presenting in all material respects the financial condition, results of operations, Shareholders' Equity and cash flows of the Parent and its Americas/Foreign Subsidiaries as of the end of such Fiscal Month;

(e)     within thirty (30) days after the end of each of the Fiscal Months of each Fiscal Year of the Parent, (i) a balance sheet of each Foreign Borrower and its Subsidiaries as at the end of such Fiscal Month, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Month and for the portion of the Parent's Fiscal Year then ended, setting forth in each case (to the extent practicable) in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(f) hereof, (B) the corresponding Fiscal Month of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, to be certified by a Responsible Officer of the Lead Borrower or the Parent as fairly presenting in all material respects the financial condition, results of operations, Shareholders' Equity and cash flows of each Foreign Borrower and its Subsidiaries as of the end of such Fiscal Month in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(f)     within thirty (30) days after the Petition Date, a proposed revised Budget inclusive of periods through the Maturity Date, which shall be subject to the sole discretion approval of Required Lenders, it being further agreed that, if such proposal (or any further revision thereof) does not receive such approval, the Lead Borrower shall use its commercially reasonable efforts to revise and resubmit such proposal in response to comments received thereon from the Administrative Agent or Required Lenders.

**6.02     Certificates; Other Information.**  Deliver to the Administrative Agent (for distribution to each Lender):

(a)     [reserved];

(b)     concurrently with the delivery of the financial statements referred to in Sections 6.01(a), (b), (c), (d) and (e), a copy of management's discussion and analysis with respect to such financial statements. In the event of any change in GAAP used in the preparation of such financial statements, the Lead Borrower or the Parent shall also provide a statement of reconciliation conforming such financial statements to GAAP;

(c)     on Wednesday of each week (or, if any Wednesday is not a Business Day, on the next succeeding Business Day), Borrowing Base Certificates showing each Borrowing Base, as of the close of business on the immediately preceding Saturday; *provided* that supporting documentation for each Borrowing Base Certificate may be delivered no later than five (5) days after delivery of each such Borrowing Base Certificate;

(d)     promptly upon receipt, copies of the final versions of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

(e)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report which any Loan Party files with the SEC and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party files with the SEC under Sections 13 or 15(d) of the Securities Exchange Act of 1934 or with any national or foreign securities exchange or applicable Governmental Authority, and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(f)    the financial and collateral reports described on Schedule 6.02 hereto, no later than the times set forth in such Schedule, provided that certain of the reports listed on Schedule 6.02 may not be required if such delivery is not required by the Administrative Agent;

(g)    promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party pursuant to the terms of any document, agreement or indenture relating to Material Indebtedness and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02; provided that such statements or reports need to delivered to the Credit Parties only to the extent that they relate to the failure of any Loan Party to comply with the terms of any document, agreement or indenture relating to such Material Indebtedness or which relate to matters which would cause a Default or have an adverse effect on the Credit Parties;

(h)    within sixty (60) days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier), including all renewal certificates and, with respect to the Australian Loan Parties, certificates of currency in effect for each Loan Party and its Americas/Foreign Subsidiaries and containing such additional information as the Administrative Agent, the Collateral Agent, or any Lender through the Administrative Agent, may reasonably specify;

(i)    every Wednesday during the Cases, (i) commencing on the Wednesday following the first full calendar week after the Effective Date, a weekly cash flow forecast for the subsequent 13-week period, and (ii) commencing on the second Wednesday following the first full calendar week after the Effective Date, a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of the Loan Parties for the preceding one calendar week period and setting forth all the variances (including Variances), on a line-item and aggregate basis, from the amount set forth for such calendar week as compared to (1) the Budget on a weekly and cumulative basis, and (2) the most recent weekly cash flow forecast delivered by the Loan Parties, in each case, on a weekly and cumulative basis (and each such Variance Report shall include reasonably detailed explanations for all material variances (including Permitted Variances) and shall be certified by the chief financial officer of the Lead Borrower;

(j)    substantially concurrently with the delivery of the weekly cash flow forecast pursuant to Section 6.02(i), a "flash" cash report detailing all cash and Cash Equivalents on-hand of each of the Borrower and its Subsidiaries (broken out by entity) as of the close of business on such date;

(k)    promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or

comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which could reasonably be expected to have a Material Adverse Effect;

      (l)      promptly, written notice of any actions, suits, proceedings, claims or disputes (other than the Cases) pending or, to the knowledge of the Loan Parties threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby to occur on the Effective Date, or (b) either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

      (m)      contemporaneously with the delivery of each Borrowing Base Certificate in any calendar week, a summary of the then Reported Fee Accruals as of the end of the previous calendar week; and

      (n)      promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Americas/Foreign Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent, the Collateral Agent, or any Lender (through the Administrative Agent) may from time to time reasonably request.

The Loan Parties hereby acknowledge that (a) the Administrative Agent and/or MLPFS may, at its sole discretion, make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on Debt Domain, IntraLinks, Syndtrak or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender"). The Loan Parties hereby agree that so long as any Loan Party is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) the Lead Borrower shall use commercially reasonable efforts to provide that such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Administrative Agent, MLPFS, the L/C Issuer and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of all applicable securities Laws; (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Administrative Agent and MLPFS shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

      **6.03**    **Notices.** Promptly, and in any event within five (5) Business Days (except with respect to clauses (a), (b), (h) and (m) below, one (1) Business Day) after any Responsible Officer of any Loan Party obtains knowledge thereof, notify the Administrative Agent of:

      (a)      the occurrence of any Default or Event of Default;

-150-

(b)    any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)    the occurrence of any ERISA Event or any similar events under any other applicable Law;

(d)    any material change in accounting policies or financial reporting practices by any Loan Party;

(e)    any change in the Parent's senior executive officers;

(f)    the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

(g)    any collective bargaining agreement to which a Loan Party becomes a party;

(h)    after the Petition Date, the filing of any Lien for unpaid Taxes against any Loan Party in excess of $1,000,000;

(i)    any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(j)    any failure by any Loan Party to pay rent at (i) five (5%) or more of such Loan Party's locations, (ii) any location which is a distribution center or warehouse, or (iii) any of such Loan Party's locations if such failure continues for more than ten (10) days following the day on which such rent first came due and, in any such case, such failure would be reasonably likely to result in a Material Adverse Effect;

(k)    any Permitted Disposition (other than sales of Inventory in the ordinary course of business), casualty or condemnation, in each case involving assets of a Loan Party included in the applicable Borrowing Base with a Cost of more than $1,000,000 in any single transaction or series of related transactions;

(l)    in the case of any Australian Loan Party or Japanese Loan Party, any retention of title, hire purchase, constructive transfer, conditional sale or other similar arrangements with respect to any trade supply contract; and

(m)    (i) of any negative pledge included in any lease contract, or (ii) any restriction on assignment with respect to an Account or Inventory, in each case, to the extent such negative pledge or restriction on assignment prevents the Agents from obtaining a Lien on any Inventory or Account of any Loan Party.

(n)    promptly (but, in any event, within two days) after (i) entering into or receiving thereof, a copy of (A) any notice of any kind pertaining to or relating to, (B) any document, agreement or instrument entered into or received in connection with, and (C) any amendment, waiver, consent, extension, supplement, restatement or other modification of, any Boardriders Notes or (ii) any holder of any Boardriders Notes (or any agent or representative thereof

including the Boardriders Notes Trustee) exercises (or threatens to exercise) any rights or remedies under the Boardriders Notes or the Boardriders Notes Indenture;

(o)     any notices delivered by or received from to the DIP Term Agent or the DIP Term Lender pursuant to the DIP Term Facility, and provide the Administrative Agent with copies thereof.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Lead Borrower or the Parent setting forth details of the occurrence referred to therein and stating what action the Lead Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with reasonable particularity the provisions of this Agreement and any other Loan Document that have been breached.

6.04     **Payment of Obligations.** Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness and the other provisions of Section 7.07, to the extent applicable, except, in each case, where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, and (iv) no Lien has been filed with respect thereto or (b) the failure to pay or discharge the same could not reasonably be expected to result in a Material Adverse Effect; provided that, with respect to the Domestic Loan Parties, their obligations hereunder are subject to the provisions of the Bankruptcy Code and any required approvals by an applicable order of the Bankruptcy Court; and further provided that the Domestic Loan Parties shall be obligated only to pay all of the foregoing to the extent constituting post-petition obligations that constitute administrative expenses under Section 503(b) of the Bankruptcy Code in the Cases and to perform all material obligations arising from Contractual Obligations entered into after the Petition Date or from Contractual Obligations entered into prior to the Petition Date and assumed. Nothing contained herein shall be deemed to limit the rights of the Agents with respect to establishing or modifying Reserves in manner permitted by this Agreement.

6.05     **Preservation of Existence, Etc.**

(a)     Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except (i) in a transaction permitted by Section 7.04 or 7.05 or (ii) in the case of any Subsidiary that is not a Loan Party, to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)     Take all reasonable action to maintain all material rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except (i) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) pursuant to a transaction permitted by Section 7.04 or 7.05.

-152-

(c)      Preserve or renew all of its Intellectual Property, except (i) to the extent such Intellectual Property is no longer used or useful in the conduct of the business of such Loan Party, (ii) pursuant to a transaction permitted by Section 7.04 or 7.05 or (iii) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.06     **Maintenance of Properties.**  Maintain, preserve and protect all of its material properties and Equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear and casualty or condemnation events excepted, and make all necessary repairs thereto and renewals and replacements thereof, except in each case where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.07     **[Reserved].**

6.08     **Maintenance of Insurance.**

(a)      Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agents (which insurance companies are not Affiliates of the Loan Parties) insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agents.

(b)      Fire and extended coverage policies maintained with respect to any Collateral shall name the Administrative Agent and/or, as applicable, the Australian Security Trustee as a lender's loss payee and shall be endorsed or otherwise amended to include (i) a lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Agents, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies jointly to Loan Parties and the Administrative Agent and/or, to the extent applicable, the Australian Security Trustee, provided that after the occurrence of an Event of Default, such proceeds shall be payable only to the Administrative Agent and/or, to the extent applicable, the Australian Security Trustee, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agents may reasonably require from time to time to protect the interests of the Credit Parties. Commercial general liability policies with respect to the Loan Parties shall be endorsed to name the Administrative Agent or, as applicable, the Australian Security Trustee as an additional insured. Business interruption policies with respect to the Loan Parties shall name the Administrative Agent and/or, as applicable, the Australian Security Trustee as a lender's loss payee and shall be endorsed or amended to include (i) a provision that, from and after the Effective Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies jointly to the Loan Parties and the Administrative Agent and, if applicable, the Australian Security Trustee (subject to the rights of (x) the Existing Senior Secured Note Agent as described in the Intercreditor Agreement and (y) the DIP Term  Agent as described in the DIP Intercreditor Agreement), provided that after the occurrence of an Event of Default, such proceeds shall be payable only to the Administrative Agent and/or, to the extent applicable, the Australian Security Trustee, (ii) a provision to the effect that none of the Loan Parties, the Agents or any other party shall be a co-insurer and (iii) such other provisions as the Agents may reasonably require from time to time to protect the interests of the Credit Parties. Notwithstanding the foregoing, the Japanese Loan Parties shall deliver insurance security agreements by and between the applicable Japanese Loan Parties and the Japanese Secured Parties and

-153-

shall use commercially reasonable efforts to comply with the covenants set forth above with respect to fire and extended coverage and business interruption policies. Each such policy referred to in this Section 6.08(a) shall also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Administrative Agent and, to the extent applicable, the Australian Security Trustee (giving such Person the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Administrative Agent and, to the extent applicable, the Australian Security Trustee. The Lead Borrower shall deliver to the Agents, on or prior to (or with respect to the Japanese Loan Parties, as soon as practically possible after) the date of the cancellation or expiration of any such policy of insurance, or modification materially reducing the scope or amount of coverage of such policies of insurance, a copy of any applicable renewal or replacement insurance certificate. Further, the Japanese Loan Parties shall take such actions as may be required under the Japanese Security Documents to continue the perfection of the Administrative Agent's Lien in any such renewal policy.

(c)    None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.08. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by the any Credit Party under this Section 6.08 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

(d)    Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy with responsible companies in such amounts as are customarily and covering such risks carried by business entities engaged in similar businesses similarly situated, and will upon request by any Agent, furnish the Administrative Agent certificates evidencing renewal of each such policy.

6.09    **Compliance with Laws.** Comply, and cause each Subsidiary to comply, with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a)(i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP;  and (ii) such contest effectively suspends enforcement of the contested Laws, or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agents with respect to establishing or modifying Reserves in a manner permitted by this Agreement.

6.10    **Books and Records.**

(i) Maintain proper books of record and account, in which entries full, true and correct in all material respects and in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all

applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

**6.11    Inspection Rights.**

(a)    Permit representatives and independent contractors of the Collateral Agent (acting in consultation with the Administrative Agent) to visit and inspect any of its properties, to examine its corporate, financial and operating records, and insurance policies, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and (in the presence of a Responsible Officer of the Parent or the Lead Borrower) Registered Public Accounting Firm, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Lead Borrower; provided, however, that when an Event of Default exists the Collateral Agent (acting in consultation with the Administrative Agent) (or any of their representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

(b)    Upon the request of any Agent, after reasonable prior notice (which notice need not be furnished if an Event of Default is then continuing), permit the Administrative or professionals (including investment bankers, consultants, accountants, lawyers and appraisers) retained by the Administrative Agent to conduct appraisals, commercial finance examinations and other evaluations, including, without limitation, of (i) any Borrower's practices in the computation of its Borrowing Base, and (ii) the assets included in the each Borrowing Base, respectively, and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves; provided that appraisals shall be limited to assets of the Borrowing Base Parties. Subject to the following sentence, the Loan Parties shall pay the reasonable and documented out-of-pocket fees and expenses of any Agent and such professionals with respect to such evaluations and appraisals. Without limiting the foregoing, the Loan Parties acknowledge that the Agents may undertake one (1) inventory appraisal and one (1) commercial finance examination in each twelve (12) month period for each of the Borrowing Base Parties at the Loan Parties' expense. Notwithstanding the foregoing, any Agent may cause additional appraisals and commercial finance examinations to be undertaken (i) as it in its discretion deems necessary or appropriate, at its own expense or, (ii) if required by applicable Law or if an Event of Default shall have occurred and be continuing, at the expense of the Loan Parties. In all events, any professional engaged to perform any evaluations, appraisals, commercial finance examinations or other services pursuant to this clause (b) shall be retained by the Administrative Agent and no other Person. For clarity, any commercial finance examinations and inventory appraisals undertaken prior to the Effective Date shall not be considered in determining the number of commercial finance examinations and inventory appraisals which may be undertaken at the Loan Parties' expense under this Section 6.11(b).

(c)    Notwithstanding anything to the contrary in this Section 6.11, none of the Parent or any of its Subsidiaries will be required to disclose, permit the inspection, examination or making of extracts, or discussion of, any documents, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Agents or any Lender (or any of their respective representatives) is then prohibited by Law or any agreement binding on the Parent or any of its Subsidiaries or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

**6.12    Use of Proceeds.** Use the proceeds of the Credit Extensions only (i) to finance: (i) the repayment of certain indebtedness under the Existing ABL Credit Agreement (other than the Japanese Liabilities, and it being agreed that any letters of credit issued for the account of the Domestic Borrowers under the Existing ABL Credit Agreement shall be deemed issued hereunder), including, without limitation, the Foreign Liabilities owed to General Electric Capital Corporation and Wells Fargo Bank, National Association and their respective affiliates, (ii) the payment of transaction expenses, (iii) the payment of fees, expenses and costs incurred in connection with the Cases, (iv) the payment of any adequate protection payments approved in the Orders, and (v) in accordance with the terms of the Orders, for working capital, capital expenditures, and other general corporate purposes of the Domestic Loan Parties, in each case to the extent not prohibited under applicable Law and the Loan Documents (including without limitation Bankruptcy Court-approved professional fees and other administrative fees arising in the Cases).

**6.13    Additional Loan Parties.**

(a)    Notify the Administrative Agent promptly after any Person becomes a Domestic Subsidiary that is a direct Wholly Owned Subsidiary of any Domestic Loan Party (other than any CFC or Subsidiary of a CFC), and promptly thereafter (and in any event within thirty (30) days or such longer period as the Administrative Agent may agree), (a) cause any such Domestic Subsidiary that is a direct Wholly Owned Subsidiary (other than any CFC or Subsidiary of a CFC) to (i) become a Borrower or Guarantor by executing and delivering to the Administrative Agent a Joinder Agreement, and, in the case of a Guarantor, a Facility Guaranty (or a counterpart or supplement thereto), (ii) grant a Lien to the Administrative Agent on such Person's assets to the extent required by the Security Documents, and (iii) deliver to the Administrative Agent documents of the types referred to in clauses (iv), (v), (v) and (xvi) of Section 4.01(a)  and, if requested by the Administrative Agent, customary opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by any Domestic Loan Party, such Domestic Loan Party shall pledge such Equity Interests and promissory notes evidencing such Indebtedness (if any) (except that, if such Subsidiary is a CFC or a Subsidiary of a CFC, the Equity Interests of such Subsidiary will not be required to be pledged), in the manner and format required by the Pledge Agreement; provided that, no Equity Interests of any Foreign Subsidiary which is not a Foreign Loan Party shall be required to be pledged.

(b)    Notify the Administrative Agent promptly after any Person becomes a Subsidiary that is a direct Wholly Owned Subsidiary of any Foreign Loan Party (other than any Subsidiary that is not organized under the Laws of Canada or any province thereof, Australia or Japan), and promptly thereafter (and in any event within thirty (30) days or such longer period as the Administrative Agent may agree), (a) cause any such Subsidiary that is a direct Wholly Owned Subsidiary (other than any Subsidiary that is not organized under the Laws of Canada or any province thereof, Australia or Japan)) to (i) become a Foreign Borrower or a Guarantor of the Foreign Liabilities by executing and delivering to the Administrative Agent a Joinder Agreement and, in the case of a Guarantor, a Facility Guaranty (or a counterpart or supplement thereto), (ii) grant a Lien to the Administrative Agent on such Person's assets (to the extent required by the Security Documents) to secure the Foreign Liabilities by executing and delivering to the Administrative Agent, appropriate Security Documents, and (iii) deliver to the Administrative Agent documents of the types referred to in clauses (iv) and (v) of Section 4.01(a) and, if requested by the Administrative Agent, customary opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person

are owned by any Foreign Loan Party, such Foreign Loan Party shall pledge such Equity Interests and promissory notes evidencing such Indebtedness (if any), in the manner and format required by the Pledge Agreement, the Canadian Security Documents, the Australian Security Documents or the Japanese Security Documents, as applicable; provided that, no Equity Interests of any Foreign Subsidiary which is not a Foreign Loan Party, and no Equity Interests of any unlimited company incorporated or amalgamated and existing under the laws of the Province of Nova Scotia, shall be required to be pledged.

(c)     In no event shall compliance with this Section 6.13 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.13 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrowing Base Party or permit the inclusion of any acquired assets in the computation of any Borrowing Base.

### 6.14   Cash Management.

(a)     On or prior to the Effective Date (to the extent not previously delivered and to the extent requested by the Administrative Agent,):

(i)     deliver to the Administrative Agent copies of notifications (each, a "Credit Card Notification") in form and substance satisfactory to the Administrative Agent which have been executed on behalf of such Loan Party and delivered to such Loan Party's Credit Card Issuers and Credit Card Processors listed on Schedule 5.21(b) (or with respect to the Japanese Loan Parties, to JMS Co., Ltd., as its collection agent for proceeds from its Credit Card Issuers and Credit Card Processors);

(ii)     enter into a Blocked Account Agreement with each Blocked Account Bank maintained by the Loan Parties as of the Effective Date with respect to each DDA specified by the Agents (other than the Term Loan Priority Accounts, Existing ABL Credit Agreement Collateral Account and payroll and other specific DDAs as may be acceptable to the Agents) established or maintained by any Loan Party as of the Effective Date with such Blocked Account Bank (collectively, the "Blocked Accounts"); and

(iii)     deliver to the Administrative Agent copies of notifications (each, a "Lessor Notification") in form and substance satisfactory to the Administrative Agent which have been executed on behalf of each Japanese Loan Party and delivered to such Japanese Loan Party's lessors listed on Schedule 6.14 and any other lessor which collects receipts from any portion of the Collateral of the Japanese Loan Parties and subsequently remits such payments to the Japanese Loan Parties.

(b)     The Loan Parties shall ACH or wire transfer no less frequently than once each Business Day (and whether or not there are then any outstanding Obligations) to a Blocked Account all amounts on deposit in each such DDA (net of such minimum balance consistent with past practices, but not to exceed (i) $200,000 in the aggregate for all DDAs of the Domestic Loan Parties and Canadian Loan Parties, (ii) $100,000 in the aggregate for all Australian Loan Parties, (iii) $100,000 in the aggregate for all Japanese Loan Parties, and (iv) $400,000 in the aggregate for all DDAs of all Loan Parties and with respect to the Japanese Loan Parties only, exclusive of amounts on deposit in any segregated sales and

other tax accounts) and all payments received by any Loan Party from Credit Card Issuers and Credit Card Processors.

(c)     The Loan Parties shall cause each Blocked Account Bank and each Japanese Depository Bank to ACH or wire transfer no less frequently than once each Business Day (and whether or not there are then any outstanding Obligations) to a Concentration Account all cash receipts and collections by the Loan Parties including, without limitation, the following (in each case, other than Cash Equivalents being held in accordance with the terms of the proviso at the end of the definition of "Permitted Investments", cash maintained in the cash registers in the Stores in the normal course of business and consistent with past practices, and with respect to the Japanese Loan Parties only, amounts on deposit in any segregated sales and other tax accounts and cash proceeds held by any lessor of a Store in a mall and any minimum balance required to be maintained in any DDA (not to exceed (i) $200,000 in the aggregate for all DDAs of the Domestic Loan Parties and Canadian Loan Parties, (ii) $100,000 in the aggregate for all Australian Loan Parties, (iii) $100,000 in the aggregate for all Japanese Loan Parties, and (iv) $400,000 in the aggregate for all DDAs of all Loan Parties)):

(i)     all available cash receipts of the Loan Parties from the sale of Inventory and other assets (other than cash maintained in the cash registers in the Stores in the normal course of business and consistent with past practices);

(ii)     all proceeds of collections of Accounts and Credit Card Receivables of the Loan Parties;

(iii)     all other cash payments received by a Loan Party from any Person or from any source or on account of any sale or other transaction or event;

(iv)     except for the Term Loan Priority Accounts, Existing ABL Credit Agreement Collateral Account and except as provided in this clause (c), the then cash balance of each DDA;

(v)     the then entire ledger balance of each Blocked Account; and

(vi)     the cash proceeds of all credit card charges received by any Loan Party;

(d)     The Concentration Accounts shall at all times be under the sole dominion and control of the Administrative Agent or the Australian Security Trustee, as the case may be.  The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Accounts, unless the Administrative Agent, in its discretion, agrees to permit collected funds in such Concentration Account to be disbursed to, or for the account of, the applicable Loan Parties, (ii) the funds on deposit in each Concentration Account maintained for the account of the Domestic Loan Parties shall at all times be collateral security for the Secured Obligations (as defined in the Security Agreement), (iii) the funds on deposit in each Foreign Concentration Account shall at all times be collateral security for all of the Foreign Liabilities and (iv) the funds on deposit in the Concentration Accounts shall be applied as provided in Section 2.05 or Section 8.03 of this Agreement, as applicable.  With respect to the Australian Facility and the Japanese Facility and cash receipts and collections of any Australian Loan Party and any Japanese Loan Party, the Administrative Agent shall furnish the applicable Foreign Borrower with three (3) Business Days' notice prior to such application (unless an Event of Default then exists, in which case no such notice shall be required).

(e)      In the event that, notwithstanding the provisions of this <u>Section 6.14</u>, any Loan Party receives or otherwise has dominion and control of any such proceeds or collections (other than the minimum balances for all DDAs to the extent permitted under this <u>Section 6.14</u>, Cash Equivalents being held in accordance with the terms of the proviso at the end of the definition of "Permitted Investments" and cash maintained in the cash registers in the Stores in the normal course of business and consistent with past practices), such proceeds and collections shall be held in trust by such Loan Party for the Administrative Agent or the Australian Security Trustee, as applicable, and shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the applicable Concentration Account, or dealt with in such other fashion as such Loan Party may be instructed by the Administrative Agent or the Australian Security Trustee, as applicable;

(f)      Upon the request of the Administrative Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Administrative Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account and each Japanese Depository Bank to ensure the proper transfer of funds as set forth above.    Subject to Section 8.02, the Foreign Loan Parties may direct, and shall have sole control over, the manner of disposition of funds in the Blocked Accounts maintained by each of them. Any amounts held or received in any Concentration Account maintained for any Foreign Loan Party at any time (except as provided in <u>Section 8.02</u>) shall be promptly remitted to an account of such Foreign Borrower or as such Foreign Borrower may otherwise direct.

(g)      Notwithstanding anything to the contrary herein contained, no Foreign Loan Party shall enter into any cash pooling arrangement.

(h)      Notwithstanding anything to the contrary contained herein or in any other Loan Document, the obligation of the Domestic Loan Parties to enter into Blocked Account Agreements or other control agreements with any Agent or otherwise grant any Agent control, in each case with respect to any DDA, securities account or commodities account, shall not apply to any Term Loan Priority Accounts, Existing ABL Credit Agreement Collateral Account.

(i)      The Australian Borrower agrees that the amounts paid to it in discharge of all Accounts and all proceeds of Collateral must be deposited into the Blocked Accounts held in the name of the Australian Borrower with the Australian Security Trustee and identified in the general security agreement between the Australian Borrower and the Australian Security Trustee dated 24 May 2013 or such other accounts which the Australian Security Trustee notifies the Australian Borrower from time to time.

6.15    Information Regarding the Collateral.

Furnish to the Administrative Agent at least fifteen (15) days' (or such shorter period as the Administrative Agent shall agree) prior written notice of any change in: (i) any Loan Party's legal name; (ii) the location of any Loan Party's chief executive office or its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility), but only with respect to Canadian Loan Parties and Japanese Loan Parties and only if, (A) the Collateral at such new location is in excess of $250,000 and (B) as a result of such change, any further action is required for the Administrative Agent (and with respect to the security interest under the Japanese Security

Documents, each of the Japanese Secured Parties), to have a valid, legal and perfected security interest in the Collateral at such changed or new location; (iii) any Loan Party's organizational type or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its jurisdiction of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC, PPSA, Australian PPSA or otherwise that are required in order for the Administrative Agent or the Australian Security Trustee, as applicable (and with respect to the security interest under the Japanese Security Documents, each of the Japanese Secured Parties), to continue, following such change, to have a valid, legal and perfected security interest in the Collateral for its own benefit and the benefit of the other applicable Credit Parties (to the extent a security interest in such Collateral can be perfected by the filing of a financing statement under the UCC or a filing under the PPSA or a financing statement under the Australian PPSA or as required under applicable Laws of Japan).

6.16    **Physical Inventories.**

(a)    Cause cycle counts of the Inventory of the Loan Parties to be undertaken, at the expense of the Loan Parties, in each case, consistent with past practices, which physical inventories and cycle counts shall be conducted by a Loan Party or such other inventory takers as are reasonably satisfactory to the Collateral Agent and shall follow such methodology as is consistent with the methodology used in the immediately preceding physical inventory or cycle count, as applicable, or as otherwise may be reasonably satisfactory to the Collateral Agent. The Collateral Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical inventory or cycle count of Inventory which is undertaken on behalf of any Loan Party.  At the request of the Administrative Agent, the Lead Borrower shall, as soon as reasonably practicable, provide the Administrative Agent with a summary of the results of any such physical inventory or cycle count.

(b)    Any Agent, in its discretion, if any Event of Default exists, may cause additional physical inventories or cycle counts of the Loan Parties to be taken as such Agent determines (each, at the expense of the Loan Parties).

6.17    **Environmental Laws.**

(a)    Conduct, and cause each Subsidiary to conduct, its operations in compliance with all Environmental Laws, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; (b) obtain and renew, and cause each Subsidiary to obtain and renew, all Environmental Permits required for its operations, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; (c) implement, and cause each Subsidiary to implement, any and all investigation, remediation, removal and response actions that are required under applicable Environmental Laws to prevent the release of any Hazardous Materials on, at, or from any of its Real Estate; provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such investigation, cleanup, removal, remedial or other action to the extent that (i) its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP or (ii) failure to undertake any investigation, clean up, removal, remedial or other action would not reasonably be expected to have a Material Adverse Effect;  and (d) promptly notify the Administrative Agent of: (i) any claim, proceeding or investigation in relation to any Environmental Law which is current, pending or threatened against a Loan Party, where such claim, proceeding or investigation could reasonably be expected to have a Material Adverse Effect; or (ii) any

facts or circumstances that may result in any claim being commenced or threatened against a Loan Party where that claim could reasonably be expected to have a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agents with respect to establishing or modifying Reserves in a manner permitted by this Agreement.

6.18    **Further Assurances.**

(a)    Execute any and all further documents, financing statements, filings, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, amendments to financing statements or other documents under the UCC, the PPSA, the Australian PPSA or any other similar legislation), that may be required under any applicable Law, or which any Agent may reasonably request, to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties and to the extent required by, and subject to the limitations set forth in, the Security Documents and this Agreement.

(b)    If any assets, whether personal property or real property, are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Security Documents that become subject to the Lien of the Security Documents upon acquisition thereof), notify the Agents thereof (in the case of Intellectual Property, solely with respect to Intellectual Property which is the subject of a registration or application with the PTO, Copyright Office, CIPO or other applicable Governmental Authority and within the time frames set forth in Schedule 6.02), and the Loan Parties will cause such assets to be subjected to a perfected Lien securing the Secured Obligations (as defined in the Security Agreement) of the Domestic Loan Parties (in the case of a Domestic Loan Party) or the Foreign Liabilities (in the case of a Foreign Loan Party), as applicable, and will take such actions as shall be necessary (including updating all registrations pursuant to the Japanese Security Documents to the extent required in respect of new types of Inventory and new types of goods sold creating any Accounts) or shall be requested by any Agent to grant and perfect such Liens, in each case to the extent required by, and subject to the limitations set forth in, the Security Documents and this Agreement, including actions described in paragraph (a) of this Section 6.18, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.18(b) waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.18(b) if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute Consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c)    [reserved].

**6.19     Maintenance of New York Process Agent.** In the case of a Foreign Loan Party, maintain in New York, New York or at such other location in the United States as may be reasonably satisfactory to the Administrative Agent a Person acting as agent to receive on its behalf and on behalf of its property service of process.

**6.20     Material Contracts.** In each case, exclusive of the Existing Senior Secured Note Loan Documents or any other Material Contract relating to Material Indebtedness, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each such Material Contract in full force and effect (other than expirations pursuant to the terms thereof and any replacements thereof), and enforce each such Material Contract in accordance with its terms.

**6.21     Canadian Pension Benefit Plans.**

Each Canadian Loan Party shall cause each of its Canadian Pension Plans to be duly qualified and administered in all respects in compliance with, as applicable, the *Supplemental Pension Plans Act* (Quebec) and the *Pension Benefits Act* (Ontario) and all other applicable laws (including regulations, orders and directives), and the terms of the Canadian Pension Plans and any agreements relating thereto. Each Canadian Loan Party shall ensure:

(a)     it has no unfunded, solvency, or deficiency on windup liability and no accumulated funding deficiency (whether or not waived), or any amount of unfunded benefit liabilities in respect of any Canadian Pension Plan, including any Canadian Pension Plan to be established and administered by it or them;

(b)     all amounts required to be paid by it or them are paid when due;

(c)     no liability upon it or them or Lien on any of its or their asset property arises or exists in respect of any Canadian Pension Plan;

(d)     it makes all required contributions to any Canadian Pension Plan when due;

(e)     it does not engage in a prohibited transaction or violation of the fiduciary responsibility rules with respect to any Canadian Pension Plan that could reasonably be expected to result in liability; and

(f)     it does not maintain, contribute or have any liability with respect to a Canadian Pension Plan which provides benefits on a defined benefit basis.

**6.22    Use of Property; Rejection and Assumption of Contracts; Post-Filing Pleadings.** On or after the Petition Date, each Loan Party agrees that it shall not, without the Required Lenders' prior written consent, file any motions or pleadings with the Bankruptcy Court (a) seeking authority for any Loan Party to (i) use any of the material properties or assets of the Loan Parties outside the ordinary course of business, (ii) satisfy material prepetition claims of the Loan Parties or (iii) incur material administrative costs, in each case, to the extent such relief is inconsistent with this Agreement (including the Budget), (b) seeking to reject or assume any material contract, agreement, lease or other agreement to which any Loan Party is a party, or (c) seeking relief that is otherwise inconsistent with this Agreement, the Orders, or the Plan Sponsor Agreement or Sponsored Plan.

**6.23    [Reserved].**

**6.24    Additional Information Obligations.**

(a)    <u>Case Documents and Motions</u>.  As soon as practicable in advance of filing with the Bankruptcy Court of all documents, motions and pleadings, including with respect to the Orders, the Lead Borrower shall deliver to Administrative Agent and the Lenders all such documents to be filed and provide the Lenders with a reasonable opportunity to review and comment on all such documents.

(b)    <u>Progress Calls</u>.  The Lead Borrower shall hold weekly progress conference calls for the Lenders, starting on the Thursday after the first day of the second week following the Effective Date and continuing on each Thursday thereafter, until the Termination Date. During such conference calls a Responsible Officer of the Lead Borrower shall provide the participating Lenders with a reasonably comprehensive update on the Cases, variances with respect to the Budget and any other material information relating to the business, condition (financial or otherwise), operation, performance, properties or prospects of any of the Loan Parties and any other information that may be reasonably requested by the Administrative Agent or any Lender.

(c)    <u>Other Information</u>.    Deliver to the Lenders promptly after the same are available, copies of all applications, judicial information, financial information and other documents filed on behalf of any Debtor or any other Loan Party with the Bankruptcy Court in any of the Cases, or distributed by or on behalf of any Debtor or any other Loan Party to any official committee appointed in any of the Cases.

(d)    <u>Access to Advisors</u>.  The Loan Parties shall allow the Administrative Agent and the Lenders access to, upon reasonable notice during normal business hours, all financial professionals (including the Acceptable Chief Restructuring Officer) engaged by the Loan Parties (which engagement, with respect to any financial professionals engaged after the Effective Date, shall be on terms and conditions reasonably satisfactory to the Required Lenders).

**6.25    Compliance with Terms of Leaseholds.**

(a)    Except in each case as would not reasonably be expected to have a Material Adverse Effect or except as contemplated by the Budget or to the extent required under the Bankruptcy Code or the Orders, (a) make all payments and otherwise perform all obligations in respect of all Leases to which any Loan Party is a party, (b) keep such Leases in full force and effect, (c) not allow such Leases to lapse or be terminated or any rights to renew such Leases to

be forfeited or cancelled, and (d) cause each of its Subsidiaries to do the foregoing.  Notify the Administrative Agent of any default by any Loan Party with respect to any Leases to which such Loan Party is a party if such default would reasonably be expected to have a Material Adverse Effect and cooperate with the Administrative Agent in all respects to cure any such default.

(b)    [reserved].

**6.26    Plan of Reorganization.**

Within 30 days after the Petition Date, the Domestic Loan Parties shall file a Plan of Reorganization and Disclosure Statement, which plan and disclosure statement shall provide for payment in full of the Obligations on the consummation of the plan and shall otherwise be reasonably acceptable to the Administrative Agent, which plan shall have become effective no later than the Maturity Date.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification Obligations for which a claim has not then been asserted), or any Letter of Credit shall remain outstanding, no Loan Party shall, nor shall it permit any applicable Subsidiary to, directly or indirectly:

**7.01    Liens; Retention of Title, Constructive Transfers .**

(a)    Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file (or authorize the filing) under the UCC, the PPSA, the Australian PPSA or any similar Law or statute of any jurisdiction a financing statement or similar document that names any Loan Party or any Americas/Foreign Subsidiary as debtor; or sign or authorize any security agreement authorizing any Person thereunder to file such financing statement or similar document other than, as to all of the above, Permitted Encumbrances.

(b)    Permit, in the case of any Australian Loan Party or any Japanese Loan Party, any retention of title or conditional sale arrangements with respect to any trade supply contract with respect to Inventory permitted under clauses (y) and (z) of the definition of Permitted Encumbrances, unless the applicable Loan Party shall have furnished written notice to the Administrative Agent pursuant to Section 6.03(l) and an Availability Reserve in an amount equal to the balance of the purchase price due to such vendor has been established in the applicable Borrowing Base.  In connection with the foregoing, the Loan Parties acknowledge that any Agent may undertake an updated PPSR search with respect to the Australian Loan Parties no more often than once in any three month period, at the Australian Loan Parties' expense.

**7.02    Investments.**  Make any Investments, except Permitted Investments. For purposes of Section 7.02, notwithstanding anything contrary set forth herein, (i) in the event the Parent or any Subsidiary (an "Initial Investing Person") transfers an amount of cash or other property (the "Invested Amount") for purposes of permitting the Parent or one or more other Subsidiaries to ultimately make an Investment of the Invested Amount in any Subsidiary or any Person in which such Investment is

ultimately made, the "Subject Person") through a series of substantially concurrent intermediate transfers of the Invested Amount to one or more other Subsidiaries other than the Subject Person (each an "Intermediate Investing Person"), including through the incurrence or repayment of intercompany Indebtedness, capital contributions or redemptions of Equity Interests, then, for all purposes of Section 7.02, any transfers of the Invested Amount to Intermediate Investing Persons in connection therewith shall be disregarded and such transaction, taken as a whole, shall be deemed to have been solely an Investment of the Invested Amount by the Initial Investing Person in the Subject Person and not an Investment in any Intermediate Investing Person; and (ii) if an Investment is denominated in a foreign currency, no fluctuation in currency shall result in a breach of any covenant in this Section 7.02.

7.03    **Indebtedness.** Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness. The accrual of interest and the accretion or amortization of original issue discount on Indebtedness and the payment of interest in the form of additional Indebtedness originally incurred in accordance with this Section 7.03 will not constitute an incurrence of Indebtedness. For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Alternative Currency Equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness allocated to any such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

7.04    **Fundamental Changes.** Merge, amalgamate, dissolve, liquidate, consolidate with or into another Person.

7.05    **Dispositions.** Make any Disposition, except Permitted Dispositions. To the extent any Collateral is Disposed of as permitted by this Section 7.05 to any Person other than any Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents.

7.06    **Restricted Payments.** Declare or make, directly or indirectly, any Restricted Payment, except each Loan Party (other than Parent) and each Subsidiary thereof may make Restricted Payments to any Loan Party or any other Subsidiary (and in the case of a Restricted Payment by a non-Wholly Owned Subsidiary, to the Parent and any other Loan Party and to each other owner of Equity Interests of such Subsidiary based upon their relative ownership interests of the relevant class of Equity Interests); provided that no Loan Party may make any Restricted Payment to any non-Loan Party.

7.07    **Prepayments of Indebtedness.** Except as required by this Agreement or the Orders (including with respect to adequate protection payments required in connection with the Existing Senior Secured Indenture and the Existing ABL Credit Agreement), prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Permitted Indebtedness (including without limitation any Subordinated Indebtedness prior to its scheduled maturity or set aside any funds for such purpose (other than any payments to critical vendors to the extent permitted by the Bankruptcy Court pursuant to any first or second day motion or as expressly set forth in the Budget), or

(ii) agree to any amendment, restatement, supplement or other modifications to the Existing Senior Secured Note Documents or (iii) make any interest payment in respect of any Indebtedness (including without limitation any Subordinated Indebtedness) other than (a) payments of the Obligations, (b) as expressly permitted by the Orders, (c) payments required under the Boardriders Notes, (d) mandatory payments with respect to the DIP Term Facility, (e) prepayment of the Interim Order Intercompany Loans (f) payments with respect to the Existing ABL Obligations and (g) prepayment of intercompany Indebtedness owed by and between Domestic Loan Parties.

> **7.08    Change in Nature of Business.**  Engage in any line of business substantially different from the lines of business conducted by such Loan Parties and their Subsidiaries on the date hereof or any business reasonably related or incidental thereto.

> **7.09    Transactions with Affiliates.**  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, _provided_ that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties not prohibited hereunder; (b) transactions not otherwise prohibited hereunder between or among the Parent or any Subsidiary or Subsidiaries or any entity that becomes a Subsidiary as a result of such transaction; (c) Restricted Payments permitted under Section 7.06; (d) the transactions occurring on the Effective Date and the payment of fees and expenses related thereto; (e) [reserved]; (f) transactions, arrangements, reimbursements and indemnities permitted between or among such parties under this Agreement; (g) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Parent or any of its Subsidiaries, solely to the extent consistent with the Budget (within Permitted Variances); (h) [reserved]; (i) any transfers by or among any Affiliates to pay tax liabilities, or (j) transactions pursuant to and in connection with the Existing Senior Secured Note Documents or (k) Investments permitted pursuant to clauses (i), (k), (q) and (w) of the definition of "Permitted Investments".

> **7.10    Burdensome Agreements.**

> Enter into any Contractual Obligation (other than (w) this Agreement or any other Loan Document, (x) the DIP Term Facility, (y) the Existing Senior Secured Note Documents, or (z)  the Boardriders Notes and the Boardriders Notes Indenture that limits the ability (i) of any Subsidiary that is not a Loan Party to make Restricted Payments to any Loan Party or (ii) of the Loan Parties to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Administrative Agent, or as applicable, the Australian Security Trustee, under the Loan Documents; provided, however, that none of the foregoing shall prohibit (A) any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) or (f) of the definition of "Permitted Indebtedness" solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; (B) customary anti-assignment provisions in contracts restricting the assignment thereof or in contracts for the Disposition of any assets or any Person, provided that the restrictions in any such contract shall apply only to the assets or Person that is to be Disposed of; (C) provisions in leases of real property that prohibit mortgages or pledges of the lessee's interest under such lease or restricting subletting or assignment of such lease; (D) customary provisions in joint venture agreements and other similar agreements applicable to joint ventures to the extent such joint ventures are not prohibited

hereunder; (E) customary restrictions arising under licenses and other contracts entered into in the ordinary course of business; (F) customary restrictions arising under licenses and other contracts entered into in the ordinary course of business; (G) Contractual Obligations which are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary; or (H) Contractual Obligations which exist on the date hereof and (to the extent not otherwise permitted by this Section 7.10) are listed on Schedule 7.10 hereto.

    **7.11    Use of Proceeds .** Use the proceeds of any Credit Extension in a manner inconsistent with Section 6.12 or in any manner which violates Regulations T, U or X of the FRB.

    **7.12    Amendment of Material Documents.**

    Amend, modify or waive any of a Loan Party's rights under (a) its Organization Documents in a manner materially adverse to the Credit Parties, or (b) any Material Contract (other than any Loan Document) or Material Indebtedness including any DIP Term Documents (except in connection with an increase of the maximum commitments thereunder to the maximum amount allowed hereunder), the Existing Senior Secured Note Documents, or   the Boardriders Notes and the Boardriders Notes Indenture, or (c) the E-Commerce Agreement in a manner that adversely affects the Lien of the Administrative Agent on the Collateral held on consignment by GSI, or that is otherwise materially adverse to the Lenders (provided that the foregoing shall not limit the right of the Loan Parties to terminate the E-Commerce Agreement), in each case, without the prior written consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed).

    **7.13    Fiscal Year; Accounting Policies.**

    Change the Fiscal Year of any Loan Party or change any accounting policies (including, without limitation, any change which materially affect the calculation of the Cost of Eligible Inventory included in the Borrowing Base, in each case, without the prior written consent of the Administrative Agent or as required by GAAP.

    **7.14    Deposit Accounts; Credit Card Processors.**

        (a)    In the case of any Loan Party (other than the Japanese Loan Parties, as to which clause (b) below shall apply), open new Blocked Accounts or engage any new Credit Card Issuers or Credit Card Processors unless such Loan Party shall have delivered to the Administrative Agent or the Australian Security Trustee, as applicable, appropriate Blocked Account Agreements or Credit Card Notifications, as applicable, consistent with the provisions of Section 6.14 or otherwise reasonably satisfactory to the Agents.

        (b)    In the case of any Japanese Loan Party (i) open any new Blocked Accounts or other DDAs (other than with an existing Japanese Depository Bank) unless such Japanese Loan Party has provided the Administrative Agent with five (5) Business Days' prior notice thereof (any such new depository with whom a new DDA is opened by any of the Japanese Loan Parties shall constitute a Japanese Depository Bank for all purposes of this Agreement and shall be subject to the provisions of Section 6.14 hereof) and has taken all such actions as may be required with respect to any such DDA pursuant to the Japanese Security Documents, or (ii) engage any new Credit Card Issuers or Credit Card Processors, or terminate, or permit the

termination of, the appointment of JMS Co., Ltd. as its collection agent with respect to any Credit Card Processors or Credit Card Issuers for the account of the Japanese Loan Parties, or engage any new collection agent, unless such Japanese Loan Party has provided the Administrative Agent with five (5) Business Days' prior written notice thereof and has delivered to the Administrative Agent copies of Credit Card Notifications, which have been executed on behalf of such Japanese Loan Party and delivered to the applicable Credit Card Processors, Credit Card Issuers and/or collection agent, in substantially the forms delivered by the Japanese Borrower on the Effective Date (or such other form as the Administrative Agent may reasonably request in light of the circumstances) and has taken all such actions as may be required with respect thereto pursuant to the Japanese Security Documents, and provided that, such Japanese Loan Party shall use commercially reasonable efforts to deliver to the Administrative Agent, within sixty (60) days following the date of each such Credit Card Notification, in form and substance reasonably satisfactory to the Administrative Agent, waivers and acknowledgments with respect to any such Credit Card Processors, Credit Card Issuers and/or collection agents.

**7.15**    **[Reserved].**

**7.16**    **Limitation on the Creation of Subsidiaries.** Establish, create or acquire after the Effective Date any Domestic Subsidiary.

**7.17**    **Anti-Social Force.**

Become an Anti-Social Force.

**7.18**    **Chapter 11 Claims.** Until payment in full of the Obligations under this Agreement (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted), except for and to the extent permitted under the Carve-Out and the Priority Permitted Encumbrances, the Debtors shall not, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien which is pari passu with or senior to the claims or Liens, as the case may be, of the Administrative Agent and the other Secured Parties against the Debtors hereunder or under the Orders, or apply to the Bankruptcy Court for authority to do so.

**7.19**    **Compliance with Budget.**

(a)    Except as otherwise provided herein or approved by the Required Lenders, directly or indirectly (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the Orders and the Budget (and Permitted Variances related thereto), (ii) permit a disbursement causing any variance other than Permitted Variances without the prior written consent of the Required Lenders or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments authorized by the Bankruptcy Court.

(b)    Prior to the occurrence of an Event of Default, the Debtors shall be permitted to pay compensation and reimbursement of fees and expenses solely to the extent that such fees and expenses are in accordance with the Budget (within Permitted Variances) and authorized to be paid under Sections 330 and 331 of the Bankruptcy Code pursuant to an order of the Bankruptcy Court, as the same may be due and payable. Upon receipt of the Carve-Out Trigger

-168-

Notice, the right of the Debtors to pay professional fees outside the Carve-Out shall terminate, and the Debtors shall provide immediate notice to all professionals informing them that such notice was delivered and further advising them that the Debtors' ability to pay such professionals is subject to and limited by the Carve-Out.

7.20    **Use of Collateral.** Use or permit the use of Collateral, proceeds of Loans, portion of the Carve-Out or any other amounts directly or indirectly by any of the Loan Parties, the Committee, if any, or any trustee or other estate representative appointed in the Cases (or any successor case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(a)    to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Loan Documents or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will pay the Lenders in "full" in cash; or

(b)    to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against Administrative Agent, the Lenders, the other Secured Parties or the Prepetition Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Avoidance Actions; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims, the Liens granted under the Loan Documents, the Loan Documents, the DIP Term Claims, the DIP Term Documents, the DIP Term Documents, the Existing Senior Secured Note Documents, the Existing Senior Secured Note Obligations, the Existing Senior Secured Note Liens, the Existing ABL Credit Agreement, the Existing ABL Obligations or the Existing ABL Liens; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations, the DIP Term Claims or the Existing Senior Secured Note Obligations (including, for the avoidance doubt, any prepayment premium provided in the Existing Senior Secured Note Documents); or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the Administrative Agent or the Lenders hereunder or under any of the other Loan Documents,  (B) the agent or the lenders under the DIP Term Documents or (C) the Existing Senior Secured Note Collateral Agent, the Existing Senior Secured Noteholders, the Existing ABL Agent, or the Existing ABL Lenders (in each case, as applicable, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their respective assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable Loan Documents and the Orders).   Notwithstanding anything to the contrary herein, the Committee may use up to $50,000 in the aggregate amount of the Carve-Out, any cash-collateral, or proceeds of the Loan to investigate the Prepetition Parties (the "Committee Investigation Budget").   Any and all claims incurred by the Committee in excess of the Committee Investigation Budget (the "Unbudgeted Investigation Claims") shall not constitute any allowed administrative expense

claim (including, without limitation, Section 1129(a)(9)(A) of the Bankruptcy Code), and the Unbudgeted Investigation Claims shall not be satisfied by the Carve-Out, any cash collateral or proceeds of the Loan, and shall be satisfied solely from the unencumbered assets of the Loan Parties (if any) (the "Unencumbered Assets"), thereby reducing recoveries to the holders of unsecured claims (other than any deficiency claim held by the Prepetition Parties); provided, however, that to the extent there are no Unencumbered Assets available to satisfy the Unbudgeted Investigation Claims, then such claims shall be automatically disallowed without further action by any party or Court order and shall not receive a recovery in the Cases and any Successor Cases.

**7.21    Bankruptcy Related Negative Covenants.**

The Domestic Loan Parties will not consent to or permit to exist any of the following:

(a)    Any order which authorizes the rejection or assumption of any Leases of any Domestic Loan Party without the Administrative Agent's prior consent, whose consent shall not be unreasonably withheld;

(b)    Any modification, stay, vacation or amendment to the Orders to which the Administrative Agent and the Required Lenders have not consented in writing;

(c)    A priority claim or administrative expense or unsecured claim against any Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agents and the Lenders in respect of the Obligations and the Pre-Petition Liabilities, except with respect to Permitted Encumbrances and the Carve-Out, (i) statutory Liens and charges not capable of being subordinated by the entry of the Initial Order, (ii) the Directors' Charge, and (iii) the Administration Charge;

(d)    Any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(e)    Any order which authorizes the payment of any Indebtedness (other than the Existing ABL Credit Agreement, Indebtedness reflected in the approved Budget, and other Indebtedness approved by the Administrative Agent) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien (other than as expressly set forth in the Orders or the Budget); or

(f)    Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

## ARTICLE VIII
### EVENTS OF DEFAULT AND REMEDIES

**8.01**   Events of Default. Any of the following shall constitute an Event of Default:

(a)      Non-Payment. Any Borrower or any other Loan Party fails to pay when and as required to be paid herein, and in the currency required hereunder, (i) any amount of principal of any Loan or any L/C Obligation, or deposit any funds as Cash Collateral in respect of L/C Obligations, or (ii) any interest on any Loan or on any L/C Obligation, or any fee due hereunder, which failure continues for three (3) Business Days, or (iii) any other amount payable hereunder or under any other Loan Document which failure continues for five (5) Business Days; or

(b)      Specific Covenants. Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02 (exclusive of Section 6.02(f)), 6.03, 6.05(a)(as it relates to a Loan Party), 6.08, 6.11, 6.12, 6.13, 6.14, 6.15 or Article VII; or any Loan Party fails to deliver any one or more of the financial and collateral reports described on Schedule 6.02 hereto, no later than the times set forth in such Schedule, and such failure continues for three (3) Business Days after notice thereof by the Administrative Agent to the Lead Borrower, or

(c)      Other Defaults. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after notice thereof by the Administrative Agent to the Lead Borrower; or

(d)      Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein or in any other Loan Document, shall be incorrect or misleading in any material respect (or in the case of any representation or warranty qualified by materiality, in any respect) when made or deemed made; or

(e)      Cross-Default. (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due, after giving effect to any applicable grace period (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness, or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness (with respect to any Domestic Loan Party, to the extent such Material Indebtedness is incurred after the Petition Date) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, in each case, prior to its stated maturity; provided that any such failure is unremedied and is not waived by the holders of such Indebtedness; provided further that this clause (i)(B) shall not apply to (x) secured Indebtedness of a Loan Party or a Subsidiary that becomes due upon the sale or transfer by such Loan Party or Subsidiary of the property or assets securing such Indebtedness; or (y) scheduled payments, defeasances or redemptions of Indebtedness on the dates set forth in the

instruments and agreements governing such Indebtedness; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Loan Party or such Subsidiary as a result thereof is greater than $15,000,000; provided that such failure is unremedied and is not waived by the applicable counterparty to such Swap Contract; or

(f)    Insolvency Proceedings, Etc.  Any Loan Party (other than a Domestic Loan Party) or any of its Subsidiaries institutes or consents to the institution of any proceeding or makes any filing under any Debtor Relief Law (or, with respect to the Australian Loan Parties, any corporate action, legal proceedings or other procedure or step is taken in relation to the suspension of payments, a moratorium of any Indebtedness, winding up, dissolution, administration or reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise) of any Australian Loan Party other than a solvent liquidation or reorganization of an Australian Subsidiary which is not a Loan Party), or makes a composition, an assignment or arrangement for the benefit of creditors; or applies for or consents to the appointment of any receiver, administrator, receiver and manager, Controller, interim receiver, trustee, monitor, custodian, conservator, liquidator (other than in respect of a solvent liquidation of a Subsidiary which is not a Loan Party), compulsory manager, rehabilitator or similar officer for it or for all or any material part of its property; or a proceeding shall be commenced or a petition filed, without the application or consent of such Person, seeking or requesting the appointment of any administrator, receiver, interim receiver, receiver and manager, trustee, monitor, custodian, conservator, liquidator, rehabilitator compulsory manager or similar officer and such administrator, receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, compulsory manager or similar officer is appointed and the appointment continues undischarged, undismissed or unstayed for 45 calendar days (other than with respect to the Australian Loan Parties, as to which the 45 calendar day period shall not apply and an Event of Default shall immediately arise); or any proceeding under any Debtor Relief Law relating to any such Loan Party or Subsidiary thereof or to all or any material part of its property is instituted without the consent of such Loan Party or Subsidiary and continues undismissed or unstayed for 45 calendar days (other than with respect to the Australian Loan Parties, as to which the 45 calendar day period shall not apply and an Event of Default shall immediately arise), or an order for relief is entered in any such proceeding; or

(g)    Creditors' Process.  Any expropriation, attachment, sequestration, distress or execution affects any asset or assets of an Australian Loan Party; or

(h)    Inability to Pay Debts; Attachment.  (i) Any Loan Party (other than a Domestic Loan Party) or any Subsidiary thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due in the ordinary course of business, (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within thirty (30) days after its issuance or levy or (iii) any Loan Party (other than a Domestic Loan Party)is ordered by a clearinghouse to suspend transactions with banks and financial institutions; or

-172-