## <u>EXHIBIT 3</u>

**Changed Pages of DIP Term Loan Credit Agreement**

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of September [         ]10, 2015

among

QS WHOLESALE, INC.,

as the Borrower,

QUIKSILVER, INC.,

as Parent,

The Other Guarantors From Time to Time Party Hereto,

OCM FIE, LLC,

as Administrative Agent,

and

The Lenders Party Hereto

**The Loans hereunder have been issued with original issue discount for United States federal income tax purposes ("OID"). The issue price, the amount of OID, the issue date and the yield to maturity may be obtained by contacting the Chief Financial Officer of the Borrower at 5600 Argosy, Bldg. #100, Huntington Beach, CA 92649.**

### SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT is entered into as of September [——]10, 2015 by and among QS WHOLESALE, INC., a California corporation (the "Borrower"); QUIKSILVER, INC., a Delaware corporation ("Parent"); the other "Guarantors" party hereto; each lender from time to time party hereto (the "Lenders"); and OCM FIE, LLC, as Administrative Agent.

### PRELIMINARY STATEMENTS

On September [——]9, 2015 (the "Petition Date"), the Loan Parties (the "Debtors") filed a voluntary petition for relief (collectively, the "Cases") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

The Debtors are continuing in the possession of their assets and continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under Sections 1107(a) and 1108 of the Bankruptcy Code. The Borrower has requested, and the Lenders have agreed to make available to the Borrower, (a) on the date of entry of the Interim Order (the "Interim Order Date") or within one Business Day thereafter, a single term loan in order to provide the Borrower and the other Debtors with additional working capital and (b) an additional multi-draw term loan facility in order to fund (i) the continued operation of the Debtors' businesses as debtors and debtors in possession under the Bankruptcy Code, (ii) additional working capital for the Borrower and its subsidiaries (subject to the limitations set forth herein) and (iii) certain fees, costs and expenses associated with the consummation of the transactions contemplated hereby, in each case, upon the terms and subject to the conditions set forth herein.

To provide security for the repayment of all obligations of the Loan Parties hereunder and under the other Loan Documents, each of the Debtors will provide to the Agent (for the benefit of the Secured Parties) the following (as more fully described herein):

(a)     pursuant to Section 364(c)(1) of the Bankruptcy Code and the Orders (as defined herein), as applicable, a DIP Superpriority Claim in the Cases and any Successor Cases (without the need to file a proof of claim) for all of the Obligations with priority over any and all administrative expense claims and unsecured claims of any entity against the Debtors or their estates, including, without limitation, any claims specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 or any other provisions of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative, subject only to Permitted Encumbrances (as defined herein) and the Carve-Out (as defined herein),

(b)     pursuant to Section 364(c)(2) of the Bankruptcy Code and the Orders, as applicable, an automatically perfected, valid, enforceable, unavoidable, and first-priority security interest and Lien on all Collateral and assets of the Borrower and the other Loan Parties of any kind (including, subject to the

more in any single transaction or $1,000,000 or more in the aggregate during the Availability Period, in each case in any transaction or group of transactions which are part of a common plan.

"Administrative Agent" means OCM FIE, LLC, in its capacity as administrative agent and collateral agent under any of the Loan Documents, or any successor administrative agent or collateral agent.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.2, or such other address or account as the Administrative Agent may from time to time notify the Lead Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any other Person directly or indirectly holding 10% or more of any class of the Equity Interests of that Person, and (iii) any other Person 10% or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agent Parties" has the meaning specified in Section 10.2(c).

"Agent" means the Administrative Agent.

"Aggregate Commitments" means, with respect to any Lender, the aggregate Commitments of such Lender, and with respect to all Lenders, the aggregate Commitments of all Lenders. The Aggregate Commitments shall be automatically and permanently reduced without further action on a dollar for dollar basis by the aggregate principal amount of Term Loans advanced under this Agreement from time to time.  Once repaid, Term Loans may not be reborrowed. As of the Effective Date (and immediately prior to the making of the Interim Order Date Term Loan), the Aggregate Commitments are $115,000,000 (which amount includes, for the avoidance of doubt, $25,000,000 in aggregate principal amount of Commitments with respect to Supplemental Term Loans that shall be available to the Borrower only upon satisfaction of the Supplemental Term Loan Conditions).

"Agreement" means this Senior Secured Super-Priority Debtor-in-Possession Credit Agreement.

"Americas/Foreign Consolidated" means, when used to modify a financial term, test, statement, or report of the Parent, the application or preparation of such term, test, statement or report (as applicable) based upon the financial condition or operating results of the Americas/Foreign Subsidiaries, calculated or prepared (as the case may be) as if such entities were a consolidated group.

"Americas/Foreign Subsidiaries" means, collectively, the Americas Subsidiaries, each Australian Subsidiary and each Japanese Subsidiary.

"Americas Subsidiaries" means, collectively, (a) each direct or indirect Domestic Subsidiary of the Parent; (b) each Canadian Subsidiary; (c) Quiksilver Industria e Comercio de Artigos Esportivos Ltda., (d) Quiksilver Mexico, S. de R. L. de C.V.,; (e) Quiksilver Mexico Service, S. de R. L. de C.V.,; and (f) Consultoria en Ventas Gama, S. de R.L. de C.V.

Extensions and Cash Management Services but including, without limitation, on account of (a) Swap Contracts, (b) leasing, and (c) supply chain finance services.

"Bankruptcy Code" means the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. § 101, et seq.), as amended.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Basel III" means: (a) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;, and (b) the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated.

"Big Wave" means OCM Big Wave LLC, a Delaware limited liability company.

"Boardriders Waiver" means the waiver and support agreements executed by certain holders of the Boardriders Notes.

"Boardriders Notes" means the 8.875% senior unsecured notes due December 15, 2017 issued pursuant to the Boardriders Notes Indenture.

"Boardriders Notes Indenture" means that certain indenture dated December 15, 2010 among Boardriders S.A., a company incorporated pursuant to the laws of the Grand Duchy of Luxembourg, as issuer, the Borrower, as a guarantor thereunder, Deutsche Trustee Company Limited as trustee (or any successor trustee thereof) and certain other parties.

"Boardriders Notes Trustee" means Deutsche Trustee Company Limited (or any successor trustee).

"Borrower Materials" has the meaning specified in Section 6.2.

"Borrower" has the meaning set forth in the preamble hereto.

"Borrowing" means any borrowing hereunder consisting of Term Loans made to or for the benefit of the Borrower.

"Borrowing Notice" has the meaning set forth in Section 2.2(a).

"Budget" means the cash flow forecast attached hereto as Exhibit C, with such adjustments thereto as are approved in writing by the Required Lenders in their sole discretion (including without limitation the approval, if and when so granted, of a revised Budget proposed pursuant to Section 6.1(e)); provided, that in the event that the Borrower requests a Supplemental Term Loan and the Supplemental Term Loan Conditions have been met, the Budget shall be deemed to have been adjusted to incorporate the borrowing of such Supplemental Term Loan and the use of proceeds thereof.

12

the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Extension" means a Term Loan.

"DDA" means any checking, savings or other deposit account maintained by any of the Loan Parties. All funds in each DDA shall be conclusively presumed to be Collateral or the proceeds of Collateral and the Secured Parties shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"Debtors" has the meaning set forth in the recitals hereto.

"Debtor Relief Laws" means each of (i) the Bankruptcy Code of the United States and (ii) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal the Applicable Rate plus two percent (2%) per annum.

"DIP ABL Agent" means Bank of America, in its capacity as administrative agent and collateral agent under the DIP ABL Facility or any successor administrative agent or collateral agent.

"DIP ABL Claims" means those Obligations pursuant to the DIP ABL Facility.

"DIP ABL Documents" means the "Loan Documents" as defined in the DIP ABL Facility.

"DIP ABL Facility" means that certain Second Amended and Restated Senior Secured Super-Priority Debtor-in-Possession Credit Agreement by and among Parent, QS Wholesale, Inc., as lead borrower, the other "Borrowers" party thereto, the "Guarantors" party thereto, the DIP ABL Lenders and the DIP ABL Agent.

"DIP ABL Lenders" means the lenders under the DIP ABL Facility.

"DIP ABL Liens" means those Liens granted to the DIP ABL Agent pursuant to the DIP ABL Facility to secure the DIP ABL Claims.

"DIP ABL Priority Collateral" has the meaning given to "Revolving Credit Priority Collateral" in the Intercreditor Agreement.

16

"Dollars" and "$" mean the lawful currency of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

"E-Commerce Agreement" means that certain Amended and Restated E-Commerce Agreement dated as of September 6, 2011 by and between QS Retail, Inc. and GSI.

"Effective Date" means the first date on which the conditions set forth in Sections 4.1 and 4.2 have been satisfied or waived by the Lenders.

"Eligible Assignee" means (a) a Lender or any of its Lender Affiliates; (b) a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Lender Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; and (d) any other Person (other than a natural person) approved by the Required Lenders (each such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include the Parent or any of its Subsidiaries or other Affiliates.

"Embargoed Person" means any party that (i) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") or (ii) resides, is organized or chartered, or has a place of business in a country or territory that is the subject of OFAC sanctions programs.

 "Environmental Laws" means any and all federal, state, provincial, territorial, municipal, local, and foreign statutes, laws, regulations, ordinances, final and enforceable rules, judgments, orders, decrees or governmental restrictions governing pollution and the protection of the environment or the release of any materials into the environment, including those governing Hazardous Materials, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement imposing liability under Environmental Law or for Hazardous Materials.

"Environmental Permit" means any permit, approval, license or other authorization required under any Environmental Law.

"Equipment" shall mean "equipment", as defined in the UCC, and shall also mean all furniture, store fixtures, motor vehicles, rolling stock, machinery, office equipment, plant equipment, tools, dies, molds, and other goods, property, and assets which are used and/or were purchased for use in the operation or furtherance of a Loan Party's (or any applicable Subsidiary's) business, and any and all accessions or additions thereto, and substitutions therefor.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, and all of the warrants or options for the purchase or

18

Section 3.1(e), and (d) any withholding Taxes imposed pursuant to FATCA. For the avoidance of doubt, any Participant that is entitled to the benefits of Section 3.1(a) shall be treated as a Lender for purposes of this defined term.

"Executive Order" has the meaning set forth in Section 10.18.

"Existing ABL Agent" means Bank of America, N.A., as agent pursuant to the Existing ABL Credit Agreement, and any successor thereto.

"Existing ABL Credit Agreement" means that certain Amended and Restated Credit Agreement dated as of May 24, 2013 by and among Parent, QS Wholesale, Inc., certain other domestic, Canadian, Australian, and Japanese subsidiaries of Parent, and Bank of America, N.A., as agent.

"Existing ABL Credit Agreement Collateral Account" means a funded escrow account in the sum of $250,000 established under the Orders to secure any contingent indemnification obligations under the Existing ABL Credit Agreement.

"Existing ABL Lenders" means the lenders under the Existing ABL Credit Agreement.

"Existing ABL Liens" means the Liens granted on the "Collateral" (as defined in the Existing ABL Credit Agreement) in favor of the Existing ABL Agent securing the Existing ABL Obligations.

"Existing ABL Obligations" means all outstanding amounts of the loans provided under the Existing ABL Credit Agreement as of the Petition Date.

"Existing Liens" shall have the meaning set forth in the recitals hereto.

"Existing Senior Secured Indenture" means that certain Indenture dated July 16, 2013, pursuant to which Parent, as issuer, issued $~~280 million~~280,000,000 in aggregate initial principal amount of 7.875% senior secured notes due 2018, with U.S. Bank National Association, as trustee and collateral agent.

"Existing Senior Secured Note Collateral Agent" means U.S. Bank National Association.

"Existing Senior Secured Note Documents" means the "Notes Documents" as defined in the Existing Senior Secured Indenture.

"Existing Senior Secured Note Liens" means the "Note Liens" in favor of the Existing Senior Secured Note Collateral Agent, as defined in the Existing Senior Secured Indenture.

"Existing Senior Secured Note Obligations" means all "Note Obligations" as defined in the Existing Senior Secured Indenture.

"Existing Senior Secured Noteholders" means the holders of the 7.875% Senior Secured Notes.

"Facility Guaranty" means a Guarantee of the Obligations made by a Guarantor which is a in favor of the Administrative Agent, in substantially the form attached hereto as Exhibit F or otherwise in form reasonably satisfactory to the Administrative Agent.

code, data and databases; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intellectual Property Security Agreement" means, as applicable, the Intellectual Property Security Agreement dated as of the Effective Date among the applicable Loan Parties and the Administrative Agent.

"Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of the Effective Date, between the Administrative Agent and the DIP ABL Agent.

"Interest Payment Date" means the last Business Day of each calendar month.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Parent's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"Interim Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of Exhibit H hereto and otherwise acceptable to the Required Lenders and Administrative Agent, approving, inter alia, this Agreement and the other Loan Documents, and (a) authorizing the incurrence by the Loan Parties of interim secured indebtedness in accordance with this Agreement, (b) approving the indefeasible repayment of the Prior Indebtedness as described herein, (c) approving the payment by the Loan Parties of the fees and other amounts contemplated by this Agreement, and (d) providing adequate protection to the Existing Senior Secured Noteholders in a manner satisfactory to the Required Lenders, which order shall not have been vacated, reversed, modified, amended or stayed.

"Interim Order Intercompany Loans" means the intercompany loans advanced by the Borrower to the Japanese Borrower ~~and the Australian Borrower (in each case~~(as defined in the DIP ABL Documents) on the Interim Order Date in the original principal amounts sufficient to pay off loans outstanding under the Existing ABL Credit Agreement that are not held by the DIP ABL Lenders. Each Interim Order Intercompany Loan shall (i) be secured (pursuant to documentation to be delivered after the Effective Date pursuant to Section 6.18(c)) by substantially all of the assets of the borrower and any guarantor thereof (it being understood, that any guarantor of Japanese Loans (as defined in the Existing ABL Credit Agreement) shall guarantee any secured intercompany loan made to the Japanese Borrower (as defined in the Existing ABL Credit Agreement) ~~and any guarantor of Australian Loans (as defined in the Existing ABL Credit Agreement) shall guarantee any secured intercompany loan made to the Australian Borrower (as defined in the DIP ABL Facility)~~), (ii) not include any scheduled or mandatory payments prior to the maturity or acceleration thereof, (iii) accrue interest at 5% per annum, all paid-in-kind on quarterly (and compounding) basis, (iv) have a maturity of not less than one (1) year from the Interim Order Date, (v) have no covenants other than the agreement to repay the loan on the maturity date and grant the security, on a post-closing basis, contemplated by clause (i), (vi) be cross-defaulted to an event of default under this Agreement; (vii) provide that the exercise of any rights or remedies of the secured lender shall be subject to the consent of the Administrative Agent; (viii) be pledged as security for the Obligations in a manner satisfactory to the Administrative Agent; and (ix) not be amended, modified or or accelerated without the consent of the Administrative Agent.

"Interim Order Period Cap Amount" means $70,000,000.

"Interim Order Date" has the meaning set forth in the recitals hereto.

24

principal amount exceeding $10,000,000 (if any Loan Party is an obligor thereunder, whether as a guarantor or otherwise) shall be deemed Material Indebtedness. For purposes of determining the amount of Material Indebtedness at any time, the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof.

"Maturity Date" means [——]¹February 8, 2016.

"Maximum Rate" has the meaning provided in Section 10.9.

"Measurement Period" means, at any date of determination, the twelve (12) Fiscal Months most recently ended for which financial statements are available.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including a Loan Party or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Proceeds" means:

      (a)     with respect to any Disposition by any Loan Party described in clause (b), (h) or (p) of the definition of "Permitted Disposition", the excess, if any, of (i) the sum of cash and cash equivalents received by any Loan Party in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than another Loan Party or an Affiliate of any Loan Party), (C) any taxes paid or amounts provided as a funded reserve to pay taxes not then due but reasonably estimated to be payable in connection therewith (including taxes imposed on the distribution or repatriation of any such Net Proceeds), and (D) any funded reserve for any amounts reasonably estimated to be payable for adjustments in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by any Loan Party or any Subsidiary after such Disposition, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with

---

¹  To be the date that is 150 days after the Petition Date.

such transaction; _provided_ that in the case of clauses (C) and (D) any amounts in the funded reserve accounts in excess of the amounts ultimately determined to be necessary to pay the obligations described therein shall constitute Net Proceeds; and

(b)     with respect to the incurrence or issuance of any Indebtedness by any Loan Party, the excess of (i) the sum of the cash and cash equivalents received by any Loan Party in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket fees and expenses, incurred by such Loan Party in connection therewith to third parties (other than another Loan Party or an Affiliate of any Loan Party).

"Non-U.S. Lender" means any Lender that is organized under the laws of a jurisdiction other than the United States, each State thereof and the District of Columbia.

"Note" means a Term Note.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants and indemnities of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs and expenses that accrue after the commencement by or against any Loan Party or any Subsidiary thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"Office Campus" means the real property located in Saint-Jean-de-Luz, France and owned in fee simple by a Foreign Subsidiary.

"Orders" means, collectively, the Interim Order and the Final Order.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity; (d) with respect to any unlimited liability company, the memorandum of association and articles of association (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); and (e) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests.

"Organized Crime Group Member Etc." has the meaning specified in Section 5.26.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its

28

foreign rating agencies and (iii) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments described in clauses (a) through (h) above;

(v)    promissory notes and other non-cash consideration that is received in connection with any Permitted Disposition; and

(w)    other Investments in an aggregate amount not to exceed $1,000,000 at any time outstanding (provided, that no Loan Party shall make any Investment pursuant to this clause (w) in any Immaterial Subsidiary);

provided, however, that notwithstanding the foregoing, (i) except as otherwise provided in any Security Document, no Investment of any Loan Party of a type specified in clauses (a) through (h) above (each, a "Cash Equivalent") shall constitute a Permitted Investment unless such Investment is pledged to the Administrative Agent as additional collateral for the applicable Obligations pursuant to such security and control agreements as may be reasonably required by any Agent and (ii) no Cash Equivalent of any Loan Party shall constitute a Permitted Investment while any Loans are outstanding.

"Permitted Variance" means a Variance from the Budget on a cumulative basis tested on a weekly basis (the "Testing Period") commencing with the Petition Date, which Variance (i) is not more than 10% with respect to cumulative total operating receipts to the Budget for such Testing Period and (ii) is not more than 10% more than the cumulative Total Disbursements in the Budget for such Testing Period (without giving effect to the making of Loans or DIP ABL Loans or the repayments or prepayments of Loans or DIP ABL Loans) on a cumulative basis to the Budget; provided, however, that the first such Variance with respect to clauses (i) and (ii) will be tested after the end of the third (3rd) full calendar week after the Petition Date.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan" means  any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of a Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate or any such Plan to which a Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Plan of Reorganization" means a plan filed in the Cases pursuant to Chapter 11 of the Bankruptcy Code.

"Plan Sponsor Agreement" means that certain plan sponsor agreement among Borrower, the other Debtors and Big Wave or one or more of its affiliates dated as of [_____]September 8, 2015, attached hereto as Exhibit O.

"Platform" has the meaning specified in Section 6.2.

"Pledge Agreement" means the Pledge Agreement dated as of the Effective Date among the Loan Parties party thereto and the Administrative Agent.

38

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" means the Administrative Agent and the Lenders; "Secured Party" means any of them individually.

"Secured Party Expenses" means: (a) all reasonable costs and expenses incurred by the Administrative Agent, Big Wave, the other Lenders and their respective Lender Affiliates, in connection with this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby, including, without limitation, (i) (but limited in the case of legal counsel to) the reasonable fees, charges and disbursements of (A) one (1) legal counsel, local counsel and foreign counsel in each relevant jurisdiction for the Administrative Agent, Big Wave and the other Lenders and their respective Lender Affiliates collectively, (B) consultants and tax, accounting and other professionals and advisors for the Administrative Agent, Big Wave and the other Lenders and their respective Lender Affiliates, (C) appraisers and appraisals, (D) audits (including per diems) and commercial finance examinations, and (E) the Administrative Agent, Big Wave and the other Lenders and their respective Lender Affiliates that are incurred during any workout or restructuring negotiations in respect of the Obligations, (ii) all reasonable costs and expenses incurred in connection with (A) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (B) due diligence, insurance, transportation, computer, duplication, insurance, consultant, search, filing and recording fees and expenses, (C) the monitoring, enforcement or protection of their rights in connection with this Agreement or the other Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral or in connection with any proceeding under any Debtor Relief Laws, or (D) any workout or restructuring negotiations in respect of any Obligations, including, without limitation, any negotiation and documentation of any restructuring support agreement (including the Plan Sponsor Agreement), plan of reorganization (including a Sponsored Plan), any disclosure statement and any other related agreements, and (iii) all reasonable and customary fees and charges (as adjusted from time to time) of the Administrative Agent, Big Wave and the other Lenders and their respective Lender Affiliates with respect to the disbursement of funds (or the receipt of funds) to or for the account of Parent and the other Loan Parties (whether by wire transfer or otherwise), together with any reasonable costs and expenses incurred in connection therewith; (b) with respect to the Administrative Agent, Big Wave and the other Lenders and their respective Affiliates, all reasonable costs expenses incurred in connection with the preparation and negotiation, execution and delivery of this Agreement and the other Loan Documents,; and (c) all other reasonable costs and expenses incurred by the Secured Parties and their respective Lender Affiliates, including, without limitation, in connection with the enforcement of the Secured Parties' rights and remedies under any of the Loan Documents or applicable Law including in the course of any work-out or restructuring of the Loans or other Obligations during the pendency of any Event of Default, in each case subject to the limitation on legal counsel in clause (a)(1)(A) above.

"Securities Laws" means, collectively, the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB; and all applicable securities laws in each province and territory of Canada and the respective regulations, rules regulations, blanket orders and blanket rulings under such laws together with applicable published policy statements and notices of the securities regulator of each such province and territory.

41

of the applicable conditions set forth in Section 4.1 and/or Section 4.2, as applicable, the Administrative Agent shall use reasonable efforts to make all funds so received available to the Borrower in like funds by no later than 4:00 p.m. on the day of receipt by the Administrative Agent by wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent.

2.3    **[Reserved]**.

2.4    **[Reserved]**.

2.5    **Prepayments**.

(a)    The Borrower may, upon irrevocable notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty (other than, as applicable, the Termination Fee); provided that (i) such notice must be received by the Administrative Agent not later than 11:00 a.m.  one Business Day prior to any date of prepayment of Loans; and (ii) any voluntary prepayment shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment.  All such prepayments shall be made in Dollars.  The Administrative Agent will promptly notify each applicable Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. The Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Each such prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.

(b)    The Loan Parties shall prepay the Loans made to each of them in an amount equal to the Net Proceeds received by a Loan Party on account of a Prepayment Event. Nothing in this Section 2.5(b) shall be construed to constitute the Administrative Agent's or any Lender's consent to any Prepayment Event that is not permitted by other provisions of this Agreement or the other Loan Documents.

(c)    Prepayments made pursuant to, to the extent the Net Proceeds received by a Loan Party from a Prepayment Event relating to a Loan Party, Section 2.5(b), first, shall be applied ratably to the outstanding Term Loans and second, the amount remaining, if any, after the prepayment in full of all Term Loans, to the Administrative Agent under the ABL DIP Facility, if and to the extent required by the terms of the Intercreditor Agreement, and third the amount remaining, if any, may be retained by (or shall be returned to) the Borrower for use in a manner not prohibited by this Agreement and in accordance with the Budget and the Orders.

2.6    **[Reserved]**.

2.7    **Repayment of Loans**. The Borrower shall repay in Dollars to the Administrative Agent, for the account of the applicable Lenders, on the Termination Date the aggregate principal amount of Loans made to the Borrower and outstanding on such date, together with all interest and fees related thereto.

2.8    **Interest**.

48

(a)      Subject to the provisions of Section 2.8(b) below, each Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to the Applicable Rate.

(b)      (i) If any amount payable under any Loan Document is not paid in cash when due (after giving effect to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)      If any other Event of Default exists, then the Administrative Agent, upon the request of the Required Lenders, shall notify the Borrower that all outstanding Obligations under the Loan Documents shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such Loans shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws for so long as such or any other Event of Default is continuing; provided that the Default Rate shall automatically apply to all such Obligations immediately and without notice upon the occurrence of any Event of Default pursuant to Section 8.1(a) or Section 8.1(f).

(iii)      Accrued and unpaid interest on past due amounts (including interest on past due interest to the fullest extent permitted by applicable Laws) shall be due and payable upon demand (or automatically and immediately without any demand upon the occurrence of any Event of Default pursuant to Section 8.1(a) or Section 8.1(f)).

(c)      Interest on each Loan shall be due and payable in arrears in cash on each Interest Payment Date applicable thereto and at such other times as may be specified herein at the Applicable Rate (or, as applicable, the Default Rate). All accrued and unpaid interest shall be paid in cash on the Termination Date and shall also be paid in cash on any date a prepayment or payment of principal of Loans is made for any interest applicable to such principal being prepaid or paid.

**2.9      Fees.**

(a)      Termination Fee. The Borrower shall pay to the Administrative Agent on the Termination Date, for distribution to the Lenders, a fee (the "Termination Fee") equal to $2,300,000; provided that the Termination Fee shall not be payable if (x) the Termination Date occurs due to the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code or (y) the Termination Date occurs on or after the effective date of a Sponsored Plan.

**2.10      Computation of Interest and Fees.**

(a)      All computations of fees, interest and other amounts shall be made on the basis of a 360 day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by Big Wave of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

49

and the DIP ABL Facility and all Liens upon any of the property of the Loan Parties or any of their Subsidiaries in favor of the Prior Lenders shall become DIP ABL Liens.

(g)    KYC.    The Administrative Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations including, without limitation, the Patriot Act.

(h)    Motions and Documents.    All material motions and other material documents to be filed with and submitted to the Bankruptcy Court (including any "first day" motions and proposed orders) related to the commencement of the Cases or transactions contemplated hereby and the other Loan Documents and the approval thereof shall be in form and substance satisfactory to the Required Lenders.

(i)    Interim Order.    The Interim Order shall provide that the Administrative Agent, for the benefit of the Secured Parties, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein.

(j)    Liens.    Each Order shall provide that the Administrative Agent, for the benefit of the Secured Parties, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein, subject to the Intercreditor Agreement.

(k)    Budget.    The Lenders shall have received the Budget (attached as Exhibit C), which shall be in form and substance satisfactory to the Required Lenders.

(l)    Petition Date.    The Petition Date shall have occurred on or before September 9, 2015.

(m)    Interim Order Date.    The Interim Order shall have been filed on or before September 11, 2015.

(n)    Adequate Protection.    The Existing Senior Secured Noteholders shall have received adequate protection in respect of the liens securing the Existing Senior Secured Note Obligations, including among other things (i) replacement claims and liens, (ii) current cash pay of all interest due under the Existing Senior Secured Notes (including, for the avoidance of doubt, any accrued pre- and post-petition interest) at the non-default rate set forth in the Existing Senior Secured Indenture and (iii) a superpriority administrative expense claim against all Debtors junior only to superpriority administrative expense claims under this Agreement.

Without limiting the generality of the provisions of Section 9.5, for purposes of determining compliance with the conditions specified in this Section 4.1, each Lender (other than the Administrative Agent) that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

**4.2    Conditions to all Credit Extensions**. The obligation of each Lender to honor any Request for Credit Extension is subject to the following conditions precedent:

64

of which disclosure to the Administrative Agent or any Lender (or any of their respective representatives) is then prohibited by Law or any agreement binding on the Parent or any of its Subsidiaries or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

**6.12** **Use of Proceeds.** Use the proceeds of the Credit Extensions only (i) to finance transaction fees, costs and expenses related hereto, (ii) to finance ongoing debtor-in-possession working capital purposes consistent with the Budget (within Permitted Variances), (iii) for the purposes of making any adequate protection payments, (iv) to make intercompany loans to, and other Investments in, the Guarantors and, other Subsidiaries, solely to the extent permitted hereunder, and (v) in accordance with the terms of the Orders, for other general corporate purposes of the Loan Parties and their Subsidiaries, in each case to the extent not prohibited under applicable Law and the Loan Documents (including without limitation Bankruptcy Court-approved professional fees and other administrative fees arising in the Cases).

**6.13** **Additional Loan Parties.**

(a)     Notify the Administrative Agent promptly after any Person becomes a Domestic Subsidiary that is a direct Wholly Owned Subsidiary of any Loan Party (other than any CFC or Subsidiary of a CFC), and promptly thereafter (and in any event within thirty (30) days or such longer period as the Administrative Agent may agree), (a) cause any such Domestic Subsidiary that is a direct Wholly Owned Subsidiary (other than any CFC or Subsidiary of a CFC) to (i) become a Borrower or Guarantor by executing and delivering to the Administrative Agent a Joinder Agreement, and, in the case of a Guarantor, a Facility Guaranty (or a counterpart or supplement thereto), (ii) grant a Lien to the Administrative Agent on such Person's assets to the extent required by the Security Documents, and (iii) deliver to the Administrative Agent documents of the types referred to in clauses (iv), (v) and (xii) of Section 4.1(a) and, if requested by the Administrative Agent, customary opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by any Loan Party, such Loan Party shall pledge such Equity Interests and promissory notes evidencing such Indebtedness (if any) (except that, if such Subsidiary is a CFC or a Subsidiary of a CFC, the Equity Interests of such Subsidiary will not be required to be pledged), in the manner and format required by the Pledge Agreement.

(b)     [~~reserved~~Reserved].

(c)     In no event shall compliance with this Section 6.13 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.13 if such transaction was not otherwise expressly permitted by this Agreement.

**6.14** **Vendor Agreements.**

(a)     Furnish to the Administrative Agent and the Required Lenders on a weekly basis on Thursday of each week following the Petition Date a list of the Company's vendors, summarizing all payments made to such vendors pursuant to any first day order and identifying the vendor payee by name and spend.

(b)     The Loan Parties shall provide not less than two (2) Business Days prior written notice to the Required Lenders prior to Parent or any Subsidiary ~~prior to~~ making any payment to a vendor (A) that is (i) in excess of $50,000 and (ii) pursuant to a trade agreement that is on

82

terms that are less favorable to Parent or any Subsidiary than the trade terms in place with such vendor for the 12 months preceding the Petition Date or (B) that is (i) in excess of $50,000 and (ii) other than pursuant to a trade agreement.  Any such payment that meets the criteria of either clause (A) or clause (B) ~~are~~is permitted only if (1) the Required Lenders have provided prior written consent or (2) the Loan Parties have provided the required notice and the Required Lenders have not objected in writing to such payment within two (2) Business Days.

6.15    **Information Regarding the Collateral**. Furnish to the Administrative Agent at least fifteen (15) days' (or such shorter period as the Required Lenders shall agree in their sole discretion) prior written notice of any change in: (i) any Loan Party's legal name; (ii) the location of any Loan Party's chief executive office or its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility), only if (A) the Collateral at such new location is in excess of $250,000 and (B) as a result of such change, any further action is required for the Administrative Agent to have a valid, legal and perfected security interest in the Collateral at such changed or new location; (iii) any Loan Party's organizational type or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its jurisdiction of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Administrative Agent to continue, following such change, to have a valid, legal and perfected security interest in the Collateral for its own benefit and the benefit of the other applicable Secured Parties (to the extent a security interest in such Collateral can be perfected by the filing of a financing statement under the UCC).

6.16    **[Reserved]**.

6.17    **Environmental Laws**.

(a)    Conduct, and cause each Subsidiary to conduct, its operations in compliance with all Environmental Laws, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; (b) obtain and renew, and cause each Subsidiary to obtain and renew, all Environmental Permits required for its operations, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; (c) implement, and cause each Subsidiary to implement, any and all investigation, remediation, removal and response actions that are required under applicable Environmental Laws to prevent the release of any Hazardous Materials on, at, or from any of its Real Estate; provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such investigation, cleanup, removal, remedial or other action to the extent that (i) its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP or (ii) failure to undertake any investigation, clean up, removal, remedial or other action would not reasonably be expected to have a Material Adverse Effect; and (d) promptly notify the Administrative Agent of: (i) any claim, proceeding or investigation in relation to any Environmental Law which is current, pending or threatened against a Loan Party, where such claim, proceeding or investigation could reasonably be expected to have a Material Adverse Effect; or (ii) any facts or circumstances that may result in any claim being commenced or threatened against a Loan Party where that claim could reasonably be expected to have a Material Adverse Effect.

83

Subsidiaries other than the Subject Person (each an "Intermediate Investing Person"), including through the incurrence or repayment of intercompany Indebtedness, capital contributions or redemptions of Equity Interests, then, for all purposes of Section 7.2, any transfers of the Invested Amount to Intermediate Investing Persons in connection therewith shall be disregarded and such transaction, taken as a whole, shall be deemed to have been solely an Investment of the Invested Amount by the Initial Investing Person in the Subject Person and not an Investment in any Intermediate Investing Person; and (ii) if an Investment is denominated in a foreign currency, no fluctuation in currency shall result in a breach of any covenant in this Section 7.2.

7.3     **Indebtedness**. Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness. The accrual of interest and the accretion or amortization of original issue discount on Indebtedness and the payment of interest in the form of additional Indebtedness originally incurred in accordance with this Section 7.3 will not constitute an incurrence of Indebtedness.

7.4     **Fundamental Changes**. Merge, amalgamate, dissolve, liquidate, consolidate with or into another Person.

7.5     **Dispositions**. Make any Disposition, except Permitted Dispositions. To the extent any Collateral is Disposed of as permitted by this Section 7.5 to any Person other than any Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents.

7.6     **Restricted Payments**. Declare or make, directly or indirectly, any Restricted Payment, except each Loan Party (other than Parent) and each Subsidiary thereof may make Restricted Payments to any Loan Party or any other Subsidiary (and in the case of a Restricted Payment by a non-Wholly Owned Subsidiary, to the Parent and any other Loan Party and to each other owner of Equity Interests of such Subsidiary based upon their relative ownership interests of the relevant class of Equity Interests); provided that no Loan Party may make any Restricted Payment to any non-Loan Party.

7.7     **Prepayments and Amendments with respect to other Indebtedness**. Except as required by this Agreement or the Orders (including with respect to adequate protection payments required in connection with the Existing Senior Secured Indenture), prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Permitted Indebtedness (including without limitation any Subordinated Indebtedness prior to its scheduled maturity or set aside any funds for such purpose (other than any payments to critical vendors to the extent permitted by the Bankruptcy Court pursuant to any first or second day motion or as expressly set forth in the Budget), or (ii) agree to any amendment, restatement, supplement or other modifications to the Existing Senior Secured Note Documents or (iii) make any interest payment in respect of any Indebtedness (including without limitation any Subordinated Indebtedness) other than (a) payments of the Obligations, (b) as expressly permitted by the Orders, (c) payments required under the Boardriders Notes, (d) payments with respect to Domestic Loans (as defined in the DIP ABL Facility) under the DIP ABL Facility, (e) payments with respect to any Foreign Loan (as defined in the DIP ABL Facility) under the DIP ABL Facility but only to the extent necessary (x) in connection with the issuance of a letter of credit under the DIP ABL Facility if the payment of such Foreign Loan is required to provide availability under a letter of credit sublimit contained in the DIP ABL Facility, (y) in order to comply with the "borrowing base" contained in the DIP ABL Facility or (z) in order to comply with the requirements of any Laws, orders, writs, injunctions or decrees applicable to it or to its properties; provided that any payments of any Foreign Loans must be made in the following order:  first, to the Japanese Loans (as defined in the DIP ABL Facility) until all such Japanese Loans have been paid in full, second, to the Australian Loans (as defined in the DIP ABL Facility) until all such Australian Loans have been paid in full, and third, to the Canadian Loans (as defined in the DIP ABL Facility) until all such Canadian Loans have been paid in full, and (f) prepayment of the Interim

86

Order Intercompany Loans and (g) prepayment of intercompany Indebtedness owed by and between  Domestic Loan Parties.

**7.8    Change in Nature of Business**. Engage in any line of business substantially different from the lines of business conducted by such Loan Parties and their Subsidiaries on the date hereof or any business reasonably related or incidental thereto.

**7.9    Transactions with Affiliates**. Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties not prohibited hereunder; (b) transactions not otherwise prohibited hereunder between or among the Parent or any Subsidiary or Subsidiaries or any entity that becomes a Subsidiary as a result of such transaction; (c) Restricted Payments permitted under Section 7.6; (d) the transactions occurring on the Effective Date and the payment of fees and expenses related thereto; (e) [reserved]; (f) transactions, arrangements, reimbursements and indemnities permitted between or among such parties under this Agreement; (g) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Parent or any of its Subsidiaries, solely to the extent consistent with the Budget (within Permitted Variances); (h) [reserved]; (i) any transfers by or among any Affiliates to pay tax liabilities~~, or~~; (j) transactions pursuant to and in connection with the Existing Senior Secured Note Documents; or (k) Investments permitted pursuant to clauses (i), (k), (q) and (w) of the definition of "Permitted Investments".

**7.10    Burdensome Agreements**. Enter into any Contractual Obligation (other than (w) this Agreement or any other Loan Document, (x) the DIP ABL Facility, (y) the Existing Senior Secured Note Documents, or (z)  the Boardriders Notes and the Boardriders Notes Indenture that limits the ability (i) of any Subsidiary that is not a Loan Party to make Restricted Payments to any Loan Party or (ii) of the Loan Parties to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Administrative Agent under the Loan Documents; provided, however, that none of the foregoing shall prohibit (A) any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) of the definition of "Permitted Indebtedness" solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; (B) customary anti-assignment provisions in contracts restricting the assignment thereof or in contracts for the Disposition of any assets or any Person, provided that the restrictions in any such contract shall apply only to the assets or Person that is to be Disposed of; (C) provisions in leases of real property that prohibit mortgages or pledges of the lessee's interest under such lease or restricting subletting or assignment of such lease; (D) customary provisions in joint venture agreements and other similar agreements applicable to joint ventures to the extent such joint ventures are not prohibited hereunder; (E) customary restrictions arising under licenses and other contracts entered into in the ordinary course of business; (F) customary restrictions arising under licenses and other contracts entered into in the ordinary course of business; (G) Contractual Obligations which became binding on a Subsidiary at the time such Subsidiary first became a Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary; or (H) Contractual Obligations which exist on the date hereof and (to the extent not otherwise permitted by this Section 7.10) are listed on Schedule 7.10 hereto.

**7.11    Use of Proceeds**. Use the proceeds of any Credit Extension in a manner inconsistent with Section 6.12 or in any manner which violates Regulations T, U or X of the FRB.

| Summary report: Litéra® Change-Pro TDC 7.5.0.155 Document comparison done on 9/21/2015 12:17:35 PM | |
|---|---|
| **Style name:** Option 3 Strikethrough Double Score | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Term DIP Credit Facility.docx | |
| **Modified filename:** FINAL - Quiksilver (DIP) - Term OCM - DIP Credit Agreement - Oaktree KE    (2).docx | |
| **Changes:** | |
| Add | 24 |
| Delete | 24 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 3 |
| **Total Changes:** | 51 |