# **EXHIBIT 4**

**Changed Pages of DIP ABL Credit Agreement**

**SECOND AMENDED AND RESTATED AND SENIOR SECURED
SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of September ⎯⎯10, 2015

among

QS WHOLESALE, INC.
as the Lead Borrower,

QUIKSILVER, INC.
as Parent,

The Other Borrowers and Guarantors From Time to Time Party Hereto

BANK OF AMERICA, N.A. (including through its global branches and affiliates)
as Administrative Agent,

BANK OF AMERICA, NATIONAL ASSOCIATION
as Australian Security Trustee,

BANK OF AMERICA, N.A.
as Collateral Agent,

and

The Lenders Party Hereto

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,
as Lead Arranger

6.05  Preservation of Existence, Etc. ........................................................... 151
6.06  Maintenance of Properties ................................................................. 152
6.07  [Reserved]. .............................................................................. 152
6.08  Maintenance of Insurance. ................................................................ 152
6.09  Compliance with Laws .................................................................... 153
6.10  Books and Records. ...................................................................... 153
6.11  Inspection Rights. ....................................................................... 154
6.12  Use of Proceeds ......................................................................... 155
6.13  Additional Loan Parties. ................................................................. 155
6.14  Cash Management. ........................................................................ 156
6.15  Information Regarding the Collateral. .................................................... 158
6.16  Physical Inventories. .................................................................... 159
6.17  Environmental Laws. ..................................................................... 159
6.18  Further Assurances. ..................................................................... 160
6.19  Maintenance of New York Process Agent. .................................... ~~160~~161
6.20  Material Contracts ................................................................. ~~160~~161
6.21  Canadian Pension Benefit Plans. ................................................... ~~160~~161
6.22  Use of Property; Rejection and Assumption of Contracts; Post-Filing Pleadings ... ~~161~~162
6.23  [Reserved] .......................................................................... ~~161~~162
6.24  Additional Information Obligations. ............................................... ~~161~~162
6.25  Compliance with Terms of Leaseholds. .................................................... 162
6.26  Plan of Reorganization. ........................................................... ~~162~~163

ARTICLE VII NEGATIVE COVENANTS ................................................... ~~162~~163

7.01  Liens; Retention of Title, Constructive Transfers . ...................................... 163
7.02  Investments ............................................................................. 163
7.03  Indebtedness ...................................................................... ~~163~~164
7.04  Fundamental Changes ..................................................................... 164
7.05  Dispositions ............................................................................ 164
7.06  Restricted Payments ..................................................................... 164
7.07  Prepayments of Indebtedness ............................................................. 164
7.08  Change in Nature of Business ...................................................... ~~164~~165
7.09  Transactions with Affiliates ...................................................... ~~164~~165
7.10  Burdensome Agreements ................................................................... 165
7.11  Use of Proceeds ................................................................... ~~165~~166
7.12  Amendment of Material Documents. .................................................. ~~165~~166
7.13  Fiscal Year; Accounting Policies. ....................................................... 166
7.14  Deposit Accounts; Credit Card Processors. ............................................... 166
7.15  [Reserved]. ....................................................................... ~~166~~167
7.16  Limitation on the Creation of Subsidiaries ........................................ ~~166~~167
7.17  Anti-Social Force. ................................................................ ~~166~~167
7.18  Chapter 11 Claims ....................................................................... 167
7.19  Compliance with Budget .................................................................. 167
7.20  Use of Collateral ................................................................. ~~167~~168
7.21  Bankruptcy Related Negative Covenants. ............................................ ~~168~~169

Redline ABL DIP Credit Facility and FINAL -- Second AR _ DIP Credit Agreement --
Quiksilver (2) 9/21/2015 12:12:48 PM

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES ....................................... ~~169~~170

8.01   Events of Default ........................................................................ ~~169~~170
8.02   Remedies Upon Event of Default ................................................ ~~175~~176
8.03   Application of Funds. ................................................................. 177
8.04   Waivers By Loan Parties .............................................................. ~~180~~181

ARTICLE IX AGENTS AND LENDERS ............................................................... 181

9.01   Appointment and Authority. ...................................................... 181
9.02   Appointment of Australian Security Trustee by Foreign Credit Parties. .......... ~~182~~183
9.03   Rights as a Lender ...................................................................... ~~187~~188
9.04   Exculpatory Provisions ............................................................... ~~187~~188
9.05   Reliance by Agents. .................................................................... ~~188~~189
9.06   Delegation of Duties .................................................................. 189
9.07   Resignation of Agents ................................................................ ~~189~~190
9.08   Non-Reliance on Agents and Other Lenders ............................... 190
9.09   No Other Duties, Etc ................................................................... ~~190~~191
9.10   Administrative Agent May File Proofs of Claim ......................... ~~190~~191
9.11   Collateral and Guaranty Matters ............................................... ~~191~~192
9.12   Notice of Transfer. ..................................................................... ~~192~~193
9.13   Reports and Financial Statements. ............................................ ~~192~~193
9.14   Agency for Perfection. ............................................................... ~~193~~194
9.15   Indemnification of Agents. ........................................................ ~~193~~194
9.16   Relation among Lenders ............................................................ 194
9.17   Risk Participation. ...................................................................... 194
9.18   Actions In Concert ..................................................................... ~~195~~196
9.19   [Reserved] .................................................................................. ~~195~~196

ARTICLE X MISCELLANEOUS ......................................................................... ~~195~~196

10.01   Amendments, Etc. ...................................................................... ~~195~~196
10.02   Notices; Effectiveness; Electronic Communications. ................. ~~197~~198
10.03   No Waiver; Cumulative Remedies .............................................. ~~199~~200
10.04   Expenses; Indemnity; Damage Waiver. ...................................... ~~199~~200
10.05   Reinstatement; Payments Set Aside ........................................... ~~201~~202
10.06   Successors and Assigns. ............................................................. 202
10.07   [Reserved]. .................................................................................. ~~206~~207
10.08   Right of Setoff ........................................................................... ~~206~~207
10.09   Interest Rate Limitation ............................................................. 207
10.10   Counterparts; Integration; Effectiveness ................................... ~~207~~208
10.11   Survival ...................................................................................... ~~207~~208
10.12   Severability ................................................................................ 208
10.13   Replacement of Lenders ............................................................. ~~208~~209
10.14   Governing Law; Jurisdiction; Etc. ............................................. 209
10.15   Waiver of Jury Trial .................................................................... 210
10.16   No Advisory or Fiduciary Responsibility. .................................. ~~210~~211
10.17   USA PATRIOT Act Notice; Proceeds of Crime Act .................... 211

Redline ABL DIP Credit Facility and FINAL -- Second AR _ DIP Credit Agreement --
Quiksilver (2) 9/21/2015 12:12:48 PM

10.18  Foreign Asset Control Regulations .................................................... 211212

10.19  [Reserved]. ........................................................................................ 212

10.20  Time of the Essence .......................................................................... 212

10.21  Foreign Subsidiaries. ........................................................................ 212

10.22  Press Releases. .................................................................................. 212213

10.23  Additional Waivers. ........................................................................... 212213

10.24  Judgment Currency ........................................................................... 215214

10.25  No Strict Construction ...................................................................... 215

10.26  Attachments ...................................................................................... 215

10.27  Conflict of Terms; Intercreditor Agreement ................................... 215

10.28  Electronic Execution of Assignments and Certain Other Documents ...... 215

10.29  Obligations and Collateral of the Foreign Loan Parties. ................. 216

10.30  Language. ........................................................................................... 216

10.31  Keepwell. ........................................................................................... 216

10.32  Amendment and Restatement ......................................................... 216

10.33  Money Lending Business Law ........................................................... 217

SIGNATURES ................................................................................S-1

(v)

7.03            Existing Indebtedness

7.10            Burdensome Agreements

10.02           Administrative Agent's Offices; Certain Addresses for Notices

**EXHIBITS**

*Form of*

A-1     Domestic Committed Loan Notice

A-2     Foreign Committed Loan Notice

B       [Reserved]

C       [Reserved]

D       [Reserved]

E-1     Assignment and Assumption – Domestic Lenders

E-2     Assignment and Assumption – Foreign Lenders

F-1     Joinder Agreement – Domestic Loan Parties

F-2     Joinder Agreement – Foreign Loan Parties

G-1     Domestic Borrowing Base Certificate

G-2     Canadian Borrowing Base Certificate

G-3     Australian Borrowing Base Certificate

G-4     Japanese Borrowing Base Certificate

H       [Reserved]

I       [Reserved]

J       [Reserved]

K       [Reserved]

L-1L    ~~Domestic Guarantee~~[Reserved]

L-2     ~~Foreign Guarantee~~

M-1 – M-4       U.S. Tax Compliance Certificates

Redline ABL DIP Credit Facility and FINAL -- Second AR _ DIP Credit Agreement -- Quiksilver (2) 9/21/2015 12:12:48 PM

SECOND AMENDED AND RESTATED AND SENIOR SECURED
SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SECOND AMENDED AND RESTATED AND SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT is entered into as of September ——10, 2015 among

QS WHOLESALE, INC., a California corporation (the "Lead Borrower");

the Persons named on Schedule 1.01 hereto (collectively, with the Lead Borrower and each other Person that from time to time becomes a "Domestic Borrower" hereunder, the "Domestic Borrowers");

QUIKSILVER CANADA CORP., a Nova Scotia unlimited liability company (the "Canadian Borrower");

UG MANUFACTURING CO. PTY LTD, a proprietary limited company organized under the laws of Australia (the "Australian Borrower");

QUIKSILVER JAPAN CO., LTD., a Japanese *Kabushiki Kaisha* (the "Japanese Borrower");

QUIKSILVER, INC., a Delaware corporation (the "Parent");

the Persons named on Schedules 1.02(a) and 1.02(b)  hereto (collectively, with each other Person that from time to time becomes a "Guarantor" hereunder, the "Guarantors");

each lender from time to time party hereto;

BANK OF AMERICA, N.A., as Administrative Agent and L/C Issuer;

BANK OF AMERICA, NATIONAL ASSOCIATION, as Australian Security Trustee; and

BANK OF AMERICA, N.A., as Collateral Agent.

**PRELIMINARY STATEMENTS**

Certain of the Loan Parties, the Administrative Agent, the Collateral Agent and certain of the Lenders, among others, have entered into an Amended and Restated Credit Agreement dated as of May 24, 2013 (as amended from time to time and currently in effect immediately prior to the effectiveness of this Agreement, the "Existing ABL Credit Agreement").

On September [——]9, 2015 (the "Petition Date"), each of the Domestic Loan Parties (as defined herein, collectively, the "Debtors") filed a voluntary petition for relief (collectively, the "Cases") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are continuing in the possession of their assets and continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors and the other Loan Parties have requested that (a) the Lenders make available to the Domestic Borrowers, from and after the date of entry of the Interim Order (the "Interim Order

-1-

Date"), a senior secured, super-priority debtor-in-possession revolving credit facility and (b) that the terms of the Existing ABL Credit Agreement be amended and restated in their entirety, all on the terms and conditions set forth herein.

In furtherance of the foregoing, the Debtors and the other Loan Parties have also requested that (a) on the Interim Order Date (or within one Business Day thereafter), the Canadian Lenders and the Australian Lenders, respectively, shall make loans to each of the Canadian Borrower and the Australian Borrower, respectively, in an amount equal to the principal balance of the Credit Extensions owed to General Electric Capital Corporation and Wells Fargo Bank, National Association and their respective Affiliates by each such Borrower as of the Petition Date, the proceeds of such loans shall be used to repay such lenders the aggregate amount of their respective Credit Extensions, in each case, upon the terms and subject to the conditions set forth herein.

To provide security for the repayment of all obligations of the Loan Parties hereunder and under the other Loan Documents, and in addition to all other all other property of any Loan Party that is subject to the Liens granted on the "Collateral" (as defined in the Existing ABL Credit Agreement) in favor of any Agent securing the Existing ABL Obligations (as defined herein) (such Liens, the "Existing ABL Liens"), each of the Debtors will provide to the Agent (for the benefit of the Credit Parties) the following (as more fully described herein):

(a)    pursuant to Section 364(c)(1) of the Bankruptcy Code and the Orders (as defined herein), as applicable, a DIP Superpriority Claim in the Cases and any Successor Cases (without the need to file a proof of claim) for all of the Obligations with priority over any and all administrative expense claims and unsecured claims of any entity against the Debtors or their estates, including, without limitation, any claims specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 or any other provisions of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative, subject only to Permitted Encumbrances (as defined herein) and the Carve-Out (as defined herein),

(b)    pursuant to Section 364(c)(2) of the Bankruptcy Code and the Orders, as applicable, an automatically perfected, valid, enforceable, unavoidable, and first-priority security interest and Lien on all Collateral and assets of the Borrower and the other Loan Parties of any kind (including, subject to the entry of the Final Order, the proceeds of Avoidance Actions), whether now existing or hereafter acquired that is not subject to a valid, perfected, and non-avoidable lien in existence on the Petition Date, which first-priority liens and security interests shall be perfected without necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents, subject only to Permitted Encumbrances and the Carve-Out,

(c)    pursuant to Section 364(c)(3) of the Bankruptcy Code and subject to clause (d) below, an automatically valid, enforceable, unavoidable and perfected Lien on the property of the Borrower and the other Loan Parties as more fully described herein subject to (i) unavoidable valid and perfected Liens in existence at the time of the commencement of the Cases, (ii) unavoidable valid Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (the Liens described in clause (i) above and this clause (ii), being "Existing Liens"), other than with respect to the Primed Liens (as

"Agent Parties" has the meaning specified in Section 10.02(c).

"Agent(s)" means, individually, the Administrative Agent, the Australian Security Trustee, or the Collateral Agent, and collectively means all of them.

"Aggregate Applicable Commitments" means, at any time of determination, the Aggregate Domestic Commitments, the Aggregate Australian Commitments, the Aggregate Canadian Commitments or the Aggregate Japanese Commitments, as the context may require.

"Aggregate Australian Commitments" means the Australian Commitments of all the Australian Lenders; provided that, after the initial Australian Loan to be made on the Effective Date, the Aggregate Australian Commitments shall be terminated.

"Aggregate Canadian Commitments" means the Canadian Commitments of all the Canadian Lenders; provided that, after the initial Canadian Loan to be made on the Effective Date, the Aggregate Canadian Commitments shall be terminated.

"Aggregate Domestic Commitments" means the Domestic Commitments of all the Domestic Lenders.  As of the Effective Date, the Aggregate Domestic Commitments are $60,000,000.

"Aggregate Japanese Commitments" means the Japanese Commitments of all the Japanese Lenders; provided that, effective immediately on the Effective Date, the Aggregate Japanese Commitments shall be terminated.

"Aggregate Total Commitments" means, at any time of determination, the sum of the Aggregate Domestic Commitments, the Aggregate Australian Commitments, the Aggregate Canadian Commitments and the Aggregate Japanese Commitments; provided that, after the initial Canadian Loan and the initial Australian Loan to be made on the Effective Date, the Aggregate Total Commitments shall be equal to the Domestic Commitments at such time of determination.

"Agreement" means this Second Amended and Restated and Senior Secured Super-Priority Debtor-In-Possession Credit Agreement.

"Allocable Amount" has the meaning specified in Section 10.23(d).

"Alternative Currency" means each of Euro, Sterling, Yen, Canadian Dollars, Australian Dollars and each other currency (other than Dollars) that is approved in accordance with Section 1.09.

"Alternative Currency Equivalent" means, at any time, with respect to any amount denominated in Dollars, the equivalent amount thereof in the applicable Alternative Currency as determined by the Administrative Agent or the L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of such Alternative Currency with Dollars.

"Americas/Foreign Consolidated" means, when used to modify a financial term, test, statement, or report of the Parent, the application or preparation of such term, test, statement or report (as applicable) based upon the financial condition or operating results of the Americas/Foreign

"Australian L/C Borrowing" means an extension of credit resulting from a drawing under any Australian Letter of Credit which has not been reimbursed on or prior to the date required to be reimbursed by the Australian Borrower pursuant to Section 2.03(c)(i) or refinanced as a Committed Australian Borrowing.

"Australian L/C Obligations" means, as at any date of determination and without duplication, the aggregate Stated Amount of all outstanding Australian Letters of Credit plus the aggregate of all Unreimbursed Amounts under Australian Letters of Credit, including all Australian L/C Borrowings.

"Australian Lenders" means the Lenders having Australian Commitments from time to time or at any time.

"Australian Letter of Credit" means each Existing Letter of Credit issued for the account of the Australian Borrower.

"Australian Liabilities" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Australian Loan Party arising under any Loan Document or otherwise with respect to any Australian Loan or Australian Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs and expenses that accrue after the commencement by or against any Australian Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, and (b) any Other Australian Liabilities.

"Australian Loan" means an extension of credit by ~~a~~an Australian Lender to the Australian Borrower under Article II in the form of a Committed Loan.

"Australian Loan Cap" means, at any time of determination, the lesser of (a) $~~_____~~¹ 11,500,000 reduced by any repayments of the Australian Liabilities, and (b) the Australian Borrowing Base.

"Australian Loan Parties" means, collectively, the Australian Borrower and each Australian Subsidiary that is a Guarantor of the Australian Liabilities.  "Australian Loan Party" means any one of such Persons.

"Australian Note" means a promissory note made by the Australian Borrower in favor of ~~a~~an Australian Lender evidencing Australian Loans made by such Australian Lender, in form and substance in satisfactory to the Administrative Agent and each applicable Lender.

---

¹ To be inserted on the Effective Date by the Administrative Agent, reflecting the amount of Australian Liabilities outstanding on the Petition Date.

"Blocked Account" has the meaning provided in Section 6.14(a)(ii).

"Blocked Account Agreement" means, with respect to a Blocked Account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the applicable Agent, establishing control (as defined in the UCC, in the PPSA or in the Australian PPSA, as applicable) of such Blocked Account by the applicable Agent (for the benefit of itself and the other applicable Credit Parties) and whereby the bank maintaining such account agrees to comply only with the instructions originated by the applicable Agent without the further consent of any Loan Party.

"Blocked Account Bank" means Bank of America, N.A., Bank of America, N.A. (acting through its Canada branch), Commonwealth Bank of Australia, and each other bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Boardriders Notes" means the 8.875% senior unsecured notes due December 15, 2017 issued pursuant to the Boardriders Notes Indenture.

"Boardriders Notes Indenture" means that certain indenture dated December 15, 2010 among Boardriders S.A., a company incorporated pursuant to the laws of the Grand Duchy of Luxembourg, as issuer, the Borrower, as a guarantor thereunder, Deutsche Trustee Company Limited as trustee (or any successor trustee thereof) and certain other parties.

"Boardriders Notes Trustee" means Deutsche Trustee Company Limited (or any successor trustee).

"Boardriders Waiver" means the waiver and support agreements executed by certain holders of the Boardriders Notes.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowers" means, collectively, the Domestic Borrowers, the Australian Borrower, the Japanese Borrower and the Canadian Borrower.

"Borrowing" means a Committed Borrowing.

"Borrowing Base" means, as the context may require, the Domestic Borrowing Base or the Applicable Foreign Borrowing Base.

"Borrowing Notice" has the meaning set forth in Section 2.02(a).

"Budget" means the cash flow forecast attached hereto as Exhibit N, with such adjustments thereto as are approved in writing by the Required Lenders in their sole discretion (including, without limitation, the approval, if and when so granted, of a revised Budget proposed pursuant to Section 6.01(f)); provided, that in the event that the Borrower requests a Supplemental Term Loan (as defined in the DIP Term Agreement), the Budget shall be deemed to have been adjusted to incorporate the borrowing of such Supplemental Term Loan and the use of proceeds thereof.

-14-

Assumption pursuant to which such Canadian Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Canadian Concentration Account" means the account maintained by the Administrative Agent at Bank of America (acting through its Canada branch) into which cash receipts and collections of the Canadian Loan Parties (including, without limitation, from the Collateral) are deposited to the extent required hereby or by any other Loan Document.

"Canadian Credit Extensions" means a Canadian Borrowing.

"Canadian Credit Party" or "Canadian Credit Parties" means (a) individually, (i) each Canadian Lender and its Lender Affiliates, (ii) the Agents and their respective Lender Affiliates and (iii) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Canadian Facility" means the revolving credit facility in favor of the Canadian Borrower established pursuant to this Agreement.

"Canadian Lenders" means the Lenders having Canadian Commitments from time to time or at any time (or if the Canadian Commitments have been terminated, the Lenders holding any Canadian Liabilities from time to time or at any time).  Any Person may be a Canadian Lender only if it is a financial institution that is listed on Schedule I, II or III of the *Bank Act* (Canada) or is not a foreign bank for purposes of the *Bank Act* (Canada), and if such financial institution is not resident in Canada and is not deemed to be resident in Canada for purposes of the *Income Tax Act* (Canada), then such financial institution deals at arm's length with each Canadian Loan Party for purposes of the *Income Tax Act* (Canada).

"Canadian Liabilities" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Canadian Loan Party arising under any Loan Document or otherwise with respect to any Canadian Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs and expenses that accrue after the commencement by or against any Canadian Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, and (b) any Other Canadian Liabilities.

"Canadian Loan" means an extension of credit by a Canadian Lender to the Canadian Borrower under Article II in the form of a Committed Loan.

"Canadian Loan Cap" means, at any time of determination, the lesser of (a) $[_____][2] 10,100,000, reduced by any repayments of the Canadian Liabilities and (b) the Canadian Borrowing Base.

---

[2] To be inserted on the Effective Date by the Administrative Agent, reflecting the amount of Canadian Liabilities outstanding on the Petition Date.

Redline ABL DIP Credit Facility and FINAL -- Second AR _ DIP Credit Agreement -- Quiksilver (2) 9/21/2015 12:12:48 PM

or LIBO Rate Loans, having the same Interest Period made by each of the Australian Lenders pursuant to Section 2.01. having the same Interest Period made by each of the Canadian Lenders pursuant to Section 2.01.

"Committed Canadian Loan" means any loan at any time made by any Canadian Lender pursuant to Section 2.01.

"Committed Domestic Borrowing" means a borrowing consisting of simultaneous Committed Domestic Loans of the same Type, in the same currency and, in the case of LIBO Rate Loans, having the same Interest Period made by each of the Domestic Lenders pursuant to Section 2.01.

"Committed Domestic Loan" means any loan at any time made by any Domestic Lender pursuant to Section 2.01.

"Committed Foreign Loan" means, as the context may require, any Committed Canadian Loan, any Committed Australian Loan and any Committed Japanese Loan.

"Committed Japanese Borrowing" means a borrowing consisting of simultaneous Committed Japanese Loans of the same Type, in the same currency and, in the case of TIBOR Rate Loans or LIBO Rate Loans, having the same Interest Period made by each of the Japanese Lenders pursuant to Section 2.01.

"Committed Japanese Loan" means any loan at any time made by any Japanese Lender pursuant to Section 2.01.

"Committed Loan" means, as the context may require, any Committed Domestic Loan, any Committed Canadian Loan, any Committed Australian Loan and any Committed Japanese Loan.

"Committed Loan Notice" means a notice of (a) a Committed Borrowing, (b) a conversion of a Committed Loan from one Type to the other, or (c) a continuation of a LIBO Rate Loan, a Canadian BA Rate Loan, a BBR Rate Loan or a TIBOR Rate Loan, as applicable, pursuant to Section 2.02(b), which, if in writing, shall be substantially in the form of Exhibit A-1 (Domestic Committed Loan Notice) or Exhibit A-2 (Foreign Committed Loan Notice), as applicable.

"Committee" means an official committee of unsecured creditors appointed in the Cases pursuant to section 1102 of the Bankruptcy Code.

"Committee Investigation Budget" has the meaning given such term in Section 7.20(b).

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended from time to time and any successor Law.

"Concentration Account" means (a) individually, each North American Concentration Account and each Foreign Concentration Account, and (b) collectively, all of the foregoing.

"Connection Income Tax" means Other Connection Taxes that are imposed or measured by income (however denominated) or that are franchise Taxes or branch profits Taxes.

Parties who are not the Administrative Agent, MLPFS, the L/C Issuer or any Lender Affiliate of any of them in connection with the enforcement of the Credit Parties' rights and remedies under any of the Loan Documents or applicable Law including in the course of any work-out or restructuring of the Loans or other Obligations during the pendency of any Event of Default, provided that such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"Currency Recalculation" has the meaning set forth in Section 2.05(k).

"Customer Credit Liabilities" means, at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrowing Base Parties entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, and (b) outstanding merchandise credits and customer deposits (including, without limitation, on account of layaway transactions) of the Borrowing Base Parties.

"Customs Broker Agreement" means an agreement in form and substance satisfactory to the Agents and (if a party thereto) the Administrative Agent, among a North America Borrowing Base Party, a customs broker, NVOCC or carrier, and the Administrative Agent, in which the customs broker, NVOCC or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory or other property for the benefit of the Administrative Agent, and agrees, upon notice from the Administrative Agent to hold and dispose of the subject Inventory and other property solely as directed by the Administrative Agent.

"DDA" means any checking, savings or other deposit account maintained by any of the Loan Parties.  All funds in each DDA shall be conclusively presumed to be Collateral or the proceeds of Collateral and the Credit Parties shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

<"Debtors" has the meaning set forth in the recitals hereto.>

"Debtor Relief Laws" means each of (i) the Bankruptcy Code, (ii) the *Bankruptcy and Insolvency Act* (Canada), the *Companies' Creditors Arrangement Act* (Canada) and the *Winding-up and Restructuring Act* (Canada), (iii) with respect to Japan, the Bankruptcy Act (Japan), the Civil Rehabilitation Act (Japan) and the Corporate Reorganization Act (Japan), (iv) with respect to Australia, the Corporations Act,  and (v) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States, Canada, Australia, Japan or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

>"Debtors" has the meaning set forth in the recitals hereto.<

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means (a) when used with respect to Obligations other than Letter of Credit Fees, or Foreign Liabilities, an interest rate equal to (i) the Prime Rate plus (ii) the Applicable Margin, if any, applicable to Domestic Prime Rate Loans, plus (iii) two percent (2%) per annum; *provided*,

rata reduction in the Domestic Letter of Credit Sublimit; provided, however, that if the Aggregate Domestic Commitments are reduced to an amount less than the Domestic Letter of Credit Sublimit, then the Domestic Letter of Credit Sublimit shall be reduced to an amount equal to (or, at Lead Borrower's option, less than) the Aggregate Domestic Commitments.

"Domestic Loan" means an extension of credit by a Domestic Lender to the Domestic Borrowers under Article II  in the form of a Committed Loan.

"Domestic Loan Cap" means, at any time of determination, the lesser of (a) the Aggregate Domestic Commitments minus the Foreign Liability Reserve and (b) the Domestic Borrowing Base.

"Domestic Loan Parties" means, collectively, the Parent, the Domestic Borrowers and each Domestic Subsidiary that is a Guarantor of the Obligations.  "Domestic Loan Party" means any one of such Persons.

"Domestic Note" means a promissory note made by the Domestic Borrowers in favor of a Domestic Lender evidencing Domestic Loans made by such Domestic Lender, in form and substance in satisfactory to the Administrative Agent and each applicable Lender.

"Domestic Overadvance" means a Domestic Credit Extension to the extent that, immediately after the making of such Domestic Credit Extension, the aggregate principal balance of all Domestic Credit Extensions then outstanding exceeds the Domestic Loan Cap as then in effect.

"Domestic Prime Rate Loan" means a Loan that bears interest based on the Prime Rate.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

"E-Commerce Agreement" means that certain Amended and Restated E-Commerce Agreement dated as of September 6, 2011 by and between QS Retail, Inc. and GSI.

"Effective Date" means the first date on which the conditions set forth in Sections 4.01 and 4.02 have been satisfied or waived by the Agent and the Lenders.

"Eligible Assignee" means (a) a Lender or any of its Lender Affiliates; (b) a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Lender Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; (d) any Person to whom a Lender assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Lender's rights in and to a material portion of such Lender's portfolio of asset based credit facilities, and (e) any other Person (other than a natural person) approved by (i) the Administrative Agent and the L/C Issuer (each such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include the Parent or any of its Subsidiaries or other Affiliates.

"Eligible Credit Card Receivables" means, at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to a North America Borrowing Base Party

Redline ABL DIP Credit Facility and FINAL -- Second AR _ DIP Credit Agreement -- Quiksilver (2) 9/21/2015 12:12:48 PM

"<u>Existing ABL Credit Agreement Collateral Account</u>" means a funded escrow account in the sum of $250,000 established under the Orders to secure any contingent indemnification obligations under the Existing ABL Credit Agreement.

"<u>Existing Letters of Credit</u>" means the letters of credit outstanding on the Effective Date issued under the Existing ABL Credit Agreement and described on <u>Schedule 1.04</u> hereto.

"<u>Existing Liens</u>" shall have the meaning set forth in the recitals hereto.

"<u>Existing Notes Intercreditor Agreement</u>" means that certain Second Amended and Restated Intercreditor Agreement, dated as of July 16, 2013, between the Administrative Agent and the Existing Senior Secured Note Agent.

"<u>Existing Senior Secured Indenture</u>" means that certain Indenture dated July 16, 2013, pursuant to which Parent, as issuer, issued $280 million in aggregate initial principal amount of 7.875% senior secured notes due 2018, with U.S. Bank National Association (successor in interest to Wells Fargo Bank, National Association), as trustee and collateral agent.

"<u>Existing Senior Secured Note Collateral Agent</u>" means U.S. Bank National Association.

"<u>Existing Senior Secured Note Documents</u>" means the "Notes Documents" as defined in the Existing Senior Secured Indenture.

"<u>Existing Senior Secured Note Liens</u>" means the "Note Liens" in favor of the Existing Senior Secured Note Collateral Agent, as defined in the Existing Senior Secured Indenture.

"<u>Existing Senior Secured Note Obligations</u>" means all "Note Obligations" as defined in the Existing Senior Secured Indenture.

"<u>Existing Senior Secured Noteholders</u>" means the holders of the 7.875% Senior Secured Notes.

"<u>Facility Guaranty</u>" means (a) that certain Amended and Restated Guarantee of the Obligations made by each Guarantor that is a Domestic Loan Party in favor of the Administrative Agent and the other Credit Parties, dated as of May 24, 2013, and (b) that certain Guarantee of the Australian Liabilities, the Canadian Liabilities and the Japanese Liabilities made by each Guarantor that is a Foreign Loan Party in favor of the Administrative Agent and the other Foreign Credit Parties, dated as of May 24, 2013, as each has been ratified and confirmed pursuant to the ~~Confirmation~~<u>Reaffirmation</u> Agreement.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any intergovernmental agreements related thereto, and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"<u>Federal Funds Rate</u>" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New

to pay off loans outstanding under the Existing ABL Credit Agreement that are not held by the Lenders.  Each Interim Order Intercompany Loan shall, (i) secured to the extent required by the DIP Term Loan Agreement, (ii) not include any scheduled or mandatory payments prior to the maturity or acceleration thereof, (iii) accrue interest at 5% per annum, all paid-in-kind on quarterly (and compounding) basis, (iv) have a maturity of not less than one (1) year from the Interim Order Date, (v) have no covenants other than the agreement to repay the loan on the maturity date and grant the security, on a post-closing basis, contemplated by clause (i), (vi) be cross-defaulted to an Event of Default under this Agreement; (vii) provide that the exercise of any rights or remedies of the secured lender shall be subject to the consent of the Administrative Agent; (viii) be pledged as security for the Obligations in a manner satisfactory to the Administrative Agent; and (ix) not be amended, modified or accelerated without the consent of the Administrative Agent.

"Interim Order Date" has the meaning set forth in the recitals hereto.

"Interim Order Period" means the period of time from the time at which the Bankruptcy Court enters the Interim Order until the time at which the Bankruptcy Court enters the Final Order.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Parent's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"In-Transit Inventory" means Inventory of a North America Borrowing Base Party that is in the possession of a common carrier and is in transit from a foreign location to either (a) with respect to Inventory of a Domestic Borrower, a location of such Domestic Borrower (or a location designated by such Domestic Borrower) that is in the United States or (b) with respect to Inventory of a Canadian Loan Party, a location of such Canadian Loan Party (or a location designated by such Canadian Loan Party) that is in Canada.

"Inventory" means all "inventory" as defined in the UCC, the PPSA or the Australian PPSA, as applicable, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as may be established from time to time by any Agent in its Permitted Discretion with respect to the determination of the saleability, at retail or wholesale, of the Eligible Inventory or which reflect such other factors as affect the market value of the Eligible Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Permitted Discretion of any Agent, include (but are not limited to) reserves based on:

      (a)     obsolescence;

      (b)     seasonality;

Japanese Borrowing Base be duplicative of Availability Reserves subtracted in calculating any other Borrowing Base.

"Japanese Commitments" means, as to each Japanese Lender, its obligation to make Committed Japanese Loans to the Japanese Borrower pursuant to Section 2.01, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Japanese Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Japanese Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Japanese Concentration Account" means the account maintained by the Administrative Agent at Bank of America, N.A. (Japan branch) into which cash receipts and collections of the Japanese Loan Parties (including, without limitation, from the Collateral) are deposited to the extent required hereby or by any other Loan Document.

"Japanese Credit Party" or "Japanese Credit Parties" means (a) individually, (i) each Japanese Lender and its Lender Affiliates, (ii) the Agents and their respective Lender Affiliates, and (iii) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Japanese Depository Banks" means each of The Bank of Tokyo – Mitsubishi UFJ Ltd., Mizuho Bank Ltd., Sumitomo Mitsui Banking Corporation, Tokyo Tomin Bank, The Bank of Yokohama, Ltd. and Resona Bank, Limited.

"Japanese Facility" means the revolving credit facility in favor of the Japanese Borrower established pursuant to this Agreement.

"Japanese Lenders" means the Lenders having Japanese Commitments from time to time or at any time.

"Japanese Liabilities" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Japanese Loan Party arising under any Loan Document or otherwise with respect to any Japanese Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs and expenses that accrue after the commencement by or against any Japanese Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, and (b) any Other Japanese Liabilities.

"Japanese Loan" means an extension of credit by a Japanese Lender to the Japanese Borrower under Article II in the form of a Committed Loan.

---

[3] To be inserted on the Effective Date by the Administrative Agent, reflecting the amount of Japanese Liabilities owing to Bank of America and outstanding on the Petition Date.

-56-

"Japanese Loan Cap" means, at any time of determination, the lesser of (a) $—————³ 3,050,000 reduced by any repayments of the Japanese Liabilities and (b) the Japanese Borrowing Base.

"Japanese Loan Parties" means, collectively, the Japanese Borrower and each Japanese Subsidiary that is a Guarantor of the Japanese Liabilities.  "Japanese Loan Party" means any one of such Persons.

"Japanese Overadvance" means a Japanese Credit Extension to the extent that, immediately after the making of such Japanese Credit Extension, the aggregate principal balance of all Japanese Credit Extensions then outstanding exceeds the Japanese Loan Cap as then in effect.

"Japanese Priority Payable Reserve" means, on any date of determination, a reserve in such amount as the Administrative Agent may determine in its Permitted Discretion which reflects amounts secured by any Liens, choate or inchoate, which rank or are capable of ranking in priority to the Administrative Agent's and/or the Japanese Secured Parties' Liens and/or for amounts which may represent costs relating to the enforcement of the Administrative Agent's or the Japanese Secured Parties' Liens.

"Japanese Secured Parties" means "Secured Parties" as such term is defined in each of the Japanese Security Documents.

 "Japanese Security Documents" means each (a) movable assets security agreement (with respect to Equipment and Inventory), (b) account receivables security agreement, (c) trademark security agreement, (d) bank account pledge agreement, (e) insurance claims pledge agreement, and (f) each other security agreement or other instrument or document executed and delivered by any Japanese Loan Party to an Agent and/or each of the Japanese Secured Parties pursuant to this Agreement or any other Loan Document granting a Lien on assets of any Japanese Loan Party for the benefit of the Japanese Secured Parties, as security for the Foreign Liabilities.

"Japanese Subsidiary" means any Subsidiary that is organized under the laws of Japan.

"Joinder Agreement" means an agreement, in the form attached hereto as Exhibit F-1 (Joinder Agreement – Domestic Loan Parties), Exhibit F-2 (Joinder Agreement – Foreign Loan Parties), or such other form as is reasonably satisfactory to the Agents, pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as applicable.

---

³ To be inserted on the Effective Date by the Administrative Agent, reflecting the amount of Japanese Liabilities owing to Bank of America and outstanding on the Petition Date.

Redline ABL DIP Credit Facility and FINAL -- Second AR _ DIP Credit Agreement -- Quiksilver (2) 9/21/2015 12:12:48 PM

"Loan Documents" means this Agreement, each Note, each Issuer Document, the Fee Letter, all Borrowing Base Certificates, the Security Documents, each Facility Guaranty, the Reaffirmation Agreement, any agreement creating or perfecting rights in Cash Collateral pursuant to the provisions of Section 2.17, and any other instrument or agreement now or hereafter executed and delivered by any Loan Party in connection herewith.

"Loan Parties" means, collectively, the Domestic Loan Parties and the Foreign Loan Parties. "Loan Party" means any one of such Persons.

"London Banking Day" means any day on which dealings in Dollar deposits are conducted by and between banks in the London Eurodollar Interbank Market.

"Mandatory Cost" means, with respect to any period, the percentage rate per annum determined in accordance with Schedule 1.03.

"Master Agreement" has the meaning set forth in the definition of "Swap Contract."

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or financial condition  of the Parent and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material impairment of the rights and remedies of any Agent or the Lenders under the Loan Documents or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of the Loan Documents to which it is a party.  In determining whether any individual event would result in a Material Adverse Effect for the purposes of determining compliance with any representation, warranty, covenant or event of default under this Agreement, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then existing events subject to such representation, warranty, covenant or event of default would result in a ~~a~~ Material Adverse Effect. Notwithstanding anything herein to the contrary, the act of filing the Cases shall not in itself constitute Material Adverse Effect.

"Material Contract" means, with respect to any Person, each contract to which such Person is a party, the breach or termination of which would (or would be reasonably likely to) result in a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $10,000,000 (including, for purposes of calculating such amount, undrawn committed or available amounts and amounts owing to all creditors under any combined or syndicated credit arrangement).   Without limitation of the foregoing, the Indebtedness under the DIP Term Loan Agreement, the Boardriders Notes and any credit facility in favor of any European Subsidiary in an aggregate principal amount exceeding $10,000,000 (if any Loan Party is an obligor thereunder, whether as a guarantor or otherwise) shall be deemed Material Indebtedness. For purposes of determining the amount of Material Indebtedness at any time, the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof.

Redline ABL DIP Credit Facility and FINAL -- Second AR _ DIP Credit Agreement -- Quiksilver (2) 9/21/2015 12:12:48 PM

"Maturity Date" means [_____].⁴February 8, 2016.

"Maximum Rate" has the meaning provided in Section 10.09.

"Minimum Collateral Amount" means, at any time, (i) with respect to Cash Collateral consisting of cash or deposit account balances provided to reduce or eliminate Fronting Exposure during the existence of a Defaulting Lender, an amount equal to 103% of the Fronting Exposure of the L/C Issuer with respect to Letters of Credit issued and outstanding at such time, (ii) with respect to Cash Collateral consisting of cash or deposit account balances provided in accordance with the provisions of Section 2.17(a)(i), (a)(ii) or (a)(iii), an amount equal to 103% of the Outstanding Amount of all L/C Obligations, and (iii) otherwise, an amount determined by the Administrative Agent and the L/C Issuer in their sole discretion.

"MLPFS" means Merrill Lynch, Pierce, Fenner & Smith Incorporated and its successors.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including a Loan Party or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Non-Consenting Lender" has the meaning provided therefor in Section 10.01.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Qualifying Japanese Lender" means a Japanese Lender other than:

(a)    a Japanese Lender that exists, is created or organized under the Laws of Japan and is either lending from an office in Japan or a branch office outside of Japan;

(b)    a Japanese Lender that is not created or organized under the Laws of Japan but is acting through a branch or other permanent establishment located in Japan and holds a valid Certificate of Exemption for Withholding Tax for Foreign Corporations issued by the relevant Tax authorities in Japan; and

(c)    a Japanese Lender which is treated as an eligible resident of a jurisdiction having entered into a double taxation treaty with Japan which double taxation treaty is in

---

⁴ 150 days after the Petition Date

Redline ABL DIP Credit Facility and FINAL -- Second AR _ DIP Credit Agreement -- Quiksilver (2) 9/21/2015 12:12:48 PM

constitutive documents with respect to any non-U.S. jurisdiction); (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, (d) with respect to any unlimited liability company, the memorandum of association and articles of association (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); and (e) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests.

"Organized Crime Group Member Etc." has the meaning specified in Section 5.26.

"Other Australian Liabilities" means any obligation on account of: (a) any Cash Management Services furnished to any of the Australian Loan Parties or any of their Australian Subsidiaries and/or (b) any transaction which arises out of any Bank Product entered into with any Australian Loan Party or any of its Australian Subsidiaries.

"Other Canadian Liabilities" means any obligation on account of: (a) any Cash Management Services furnished to any of the Canadian Loan Parties or any of their Canadian Subsidiaries and/or (b) any transaction which arises out of any Bank Product entered into with any Canadian Loan Party or any of its Canadian Subsidiaries.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed solely as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, ~~oor~~or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Domestic Liabilities" means any obligation on account of: (a) any Cash Management Services furnished to any of the Domestic Loan Parties or any of their Domestic Subsidiaries and/or (b) any transaction which arises out of any Bank Product entered into with any Domestic Loan Party or any of its Domestic Subsidiaries.

"Other Japanese Liabilities" means any obligation on account of: (a) any Cash Management Services furnished to any of the Japanese Loan Parties or any of their Japanese Subsidiaries and/or (b) any transaction which arises out of any Bank Product entered into with any Japanese Loan Party or any of its Japanese Subsidiaries.

"Other Liabilities" means, collectively, all Other Canadian Liabilities, all Other Domestic Liabilities, all Other Australian Liabilities and all Other Japanese Liabilities.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other

Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.06) or with respect to a participation.

"Outstanding Amount" means (i) with respect to Committed Loans on any date, the Dollar Equivalent amount of the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Committed Loans occurring on such date; and (ii) with respect to any L/C Obligations on any date, the Dollar Equivalent amount of the aggregate outstanding amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by any Borrower of Unreimbursed Amounts, or the refinancing of such unreimbursed amounts as Committed Borrowings.

"Overadvance" means a Canadian Overadvance, a Domestic Overadvance, an Australian Overadvance or a Japanese Overadvance.

"Overnight Rate" means, for any day, (a) with respect to any amount denominated in Dollars, the greater of (i) the Federal Funds Rate and (ii) an overnight rate determined by the Administrative Agent or the L/C Issuer in accordance with banking industry rules on interbank compensation, (b) with respect to any amount denominated in Canadian Dollars, the Bank of Canada Overnight Rate, and (c) with respect to any amount denominated in any other Alternative Currency, the rate of interest per annum at which overnight deposits in the applicable Alternative Currency, in an amount approximately equal to the amount with respect to which such rate is being determined, would be offered for such day by a branch or Affiliate of Bank of America in the applicable offshore interbank market for such currency to major banks in such interbank market.

"Parent" has the meaning specified in the introductory paragraph hereto.

"Participant" has the meaning specified in Section 10.06(e)(i).

"Participating Member State" means any member state of the European Union that has the Euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"Patriot Act" means USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"Payment in Full" means (a) the payment in full in cash of all Obligations (or with respect to the Foreign Borrowers, all Foreign Liabilities), including, without limitation, with respect to amounts available to be drawn under outstanding Letters of Credit, the cancellation of such Letters of Credit or the delivery or provision of money or backstop irrevocable letters of credit, in form, on terms, and issued by a financial institution reasonably acceptable to the Administrative Agent, in respect thereof in an amount equal to 103% of the L/C Obligations, and (b) the termination of all obligations of the L/C Issuer to issue Letters of Credit and the termination of all Commitments hereunder. The term "Paid in Full" shall have a correlative meaning.

"PBGC" means the Pension Benefit Guaranty Corporation.

Redline ABL DIP Credit Facility and FINAL -- Second AR _ DIP Credit Agreement -- Quiksilver (2) 9/21/2015 12:12:48 PM

provided, however, that the first such Variance with respect to clauses (i) and (ii) will be tested after the end of the third (3rd) full calendar week after the Petition Date.

"Permitted Overadvance" means either a Permitted Domestic Overadvance or a Permitted Foreign Overadvance.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the recitals hereto.

 "Plan" means (a) in respect of the Domestic Loan Parties, any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of a Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate or any such Plan to which a Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, or  any ERISA Affiliate is required to contribute on behalf of any of its employees, or (b) in respect of the Canadian Loan Parties, any Canadian Pension Plan or other pension benefit or retirement savings plan maintained by any of the Canadian Loan Parties for its employees or its former employees to which any of the Canadian Loan Parties contributes or are required to contribute with respect to which any of the Canadian Loan Parties have incurred or may incur liability, including contingent liability.

"Plan of Reorganization" means a plan filed in the Cases pursuant to Chapter 11 of the Bankruptcy Code.

"Plan Sponsor Agreement" means that certain plan sponsor agreement among Borrower, the other Debtors and Big Wave or one or more of its affiliates dated as of [⸺]September 8, 2015.

"Platform" has the meaning specified in Section 6.02.

"Pledge Agreement" means the Pledge Agreement dated as of the Effective Date among the Domestic Loan Parties party thereto and the Administrative Agent.

"PPSA" means the *Personal Property Security Act*  (Ontario) (or any successor statute) or similar legislation of any other Canadian jurisdiction, including, without limitation, the Civil Code of Quebec, the laws of which are required by such legislation to be applied in connection with the issue, perfection, enforcement, opposability, validity or effect of security interests or other applicable Liens.

"Post-Carve Out Trigger Notice Cap" means $1,000,000.

 "Prepetition Parties" means, collectively, the Existing ABL Agent, the Existing ABL Lenders, the Existing Senior Secured Note Collateral Agent, and the Existing Senior Secured Noteholders.

"Prime Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate", (b) the Federal Funds Rate for such day plus one-half of one percent (0.50%) or (c) the Adjusted LIBO Rate for a one month interest period as determined on such day plus one percent (1.00%).  The "prime rate" is a rate set by Bank of America based upon various factors including Bank

of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  Any change in such rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.

"Prime Rate Loan" means a Canadian Prime Rate Loan, a Canadian Base Rate Loan, a Domestic Prime Rate Loan, a Japanese Base Rate Loan or an Australian Base Rate Loan, as the context may require.

"Primed Liens" has the meaning set forth in the recitals hereto.

"Priority Permitted Encumbrances" means, (x) subject to the Intercreditor Agreement, with respect to the DIP ABL Priority Collateral, the DIP ABL Lien of the DIP ABL Agent securing the DIP ABL Claims, (y) the Lien of the Existing ABL Agent on the Existing ABL Credit Agreement Collateral Account, and (z) any other valid, perfected, and non-avoidable Permitted Encumbrance in existence on the Petition Date (other than any Existing Senior Secured Note Liens and, except as set forth above, the Existing ABL Liens).

"Public Lender" has the meaning specified in Section 6.02.

"Qualified ECP Guarantor" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualifying Australian Treaty Party" means an Australian Credit Party which:

(a)    is treated as a resident of ~~a~~an Australian Treaty State for the purposes of the relevant Australian Double Tax Treaty;

(b)    does not perform its role as an Australian Credit Party at or through a permanent establishment in Australia; and

(c)    fulfills any other conditions which must be fulfilled under the relevant Australian Double Tax Treaty by residents of the Australian Treaty State for such residents to obtain a full exemption from taxation imposed in Australia in respect of the relevant payment.

"Reaffirmation Agreement" means that certain Joinder, Confirmation, Ratification and Amendment of Ancillary Loan Documents among each of the Loan Parties and the Administrative Agent dated as of the date hereof, reaffirming each of the Security Documents, the Facility Guaranties (as defined in the Existing ABL Credit Agreement), the Credit Card Notifications (as defined in the Existing ABL Credit Agreement), the Blocked Account Agreements (as defined in the Existing ABL Credit Agreement), the Lessor Notifications (as defined in the Existing ABL Credit Agreement), and the other Loan Documents (as defined in the Existing ABL Credit Agreement) referred to therein.

"Real Estate" means all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned or leased by any Loan Party or any Subsidiary, including all easements, rights-of-way, and similar rights relating thereto.

"Receivables Advance Rate" means (a) with respect to the Domestic Borrowers, seventy percent (70%), and (b) with respect to the Foreign Borrowers, eighty-five percent (85%).

"Receivables Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such Reserves as may be established from time to time by any Agent in its Permitted Discretion with respect to the determination of the collectability in the ordinary course of Eligible Trade Receivables.  Upon the determination by any Agent in its Permitted Discretion that a Receivables Reserve should be established or modified, such Agent shall notify the Administrative Agent in writing and the Administrative Agent shall thereupon establish or modify such Receivables Reserve, in all cases subject to the provisions of Section 2.01(e) and Section 9.19.

"Recipient" means any Agent, any Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"Register" has the meaning specified in Section 10.06(d).

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Parent and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reported Fee Accruals" shall mean accrued and unpaid fees, disbursements, costs, and expenses incurred by any professionals or professional firms retained by the Domestic Borrowers or the Committee through and including the date of delivery by the Administrative Agent (or the Required Lenders, where applicable) or the DIP Term Agent of a Carve Out  Trigger Notice, which amounts shall be reported in arrears by the Domestic Borrowers to the Administrative Agent on a ~~monthly~~weekly basis, less any amounts actually paid on account thereof."

"Reports" has the meaning provided in Section 9.13(b).

"Request for Credit Extension" means (a) with respect to a Committed Borrowing, conversion or continuation of Committed Loans, a Committed Loan Notice and (b) with respect to an L/C Credit Extension, a Letter of Credit Application.

"Required Lenders" means, as of any date of determination, at least two Lenders (excluding Affiliates) holding more than fifty percent (50%) of the Aggregate Total Commitments or, if the Commitment of each Lender to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, at least two Lenders (excluding Affiliates)

Redline ABL DIP Credit Facility and FINAL -- Second AR _ DIP Credit Agreement -- Quiksilver (2) 9/21/2015 12:12:48 PM

Issuer, as the case may be, to be customary in the place of disbursement or payment for the settlement of international banking transactions in the relevant Alternative Currency.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002, as amended and in effect from time to time.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means, collectively, the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB; and all applicable securities laws in each province and territory of Canada and the respective regulations, rules regulations, blanket orders and blanket rulings under such laws together with applicable published policy statements and notices of the securities regulator of each such province and territory.

"Security Agreement" means the Security Agreement dated as of the Effective Date among the Domestic Loan Parties and the Administrative Agent.

"Security Documents" means the Security Agreement, the Canadian Security Documents, the Australian Security Documents, the Japanese Security Documents, the Pledge Agreement, the Intellectual Property Security Agreement, the Blocked Account Agreements, the Credit Card Notifications, the IP Rights Agreement, the Novation Deed, and each other security agreement or other instrument or document executed and delivered by or on behalf of any Loan Party to the applicable Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations or the Foreign Liabilities, as applicable, as each has been ratified and confirmed pursuant to the ~~Confirmation~~Reaffirmation Agreement.

"Settlement Date" has the meaning provided in Section 2.14(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Parent and its Subsidiaries or the Parent and its Americas/Foreign Subsidiaries, as applicable, as of that date determined in accordance with GAAP.

"Shrink" means Inventory of the Borrowing Base Parties which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Special Notice Currency" means at any time an Alternative Currency, other than the currency of a country that is a member of the Organization for Economic Cooperation and Development at such time located in North America or Europe.

"Specified Loan Party" means any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to Section 10.31).

"Sponsored Plan" means a plan of reorganization supported by Big Wave.

"Spot Rate" means the exchange rate, as determined by the Administrative Agent, that is applicable to conversion of one currency into another currency, which is (a) the exchange rate reported by Bloomberg (or other commercially available source designated by the Administrative

-82-

    **1.11**    **Québec Matters**.  For purposes of any assets, liabilities or entities located in the Province of Québec and for all other purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Québec or a court or tribunal exercising jurisdiction in the Province of Québec, (a) "personal property" shall include "movable property", (b) "real property" or "real estate" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "security" shall include a "hypothec", "right of retention", "prior claim" and a resolutory clause, (f) all references to filing, perfection, priority, remedies, registering or recording under the UCC or a PPSA shall include publication under the *Civil Code of Québec*, (g) all references to "perfection" of or "perfected" security or security interest shall include a reference to an "opposable" or "set up" hypothec, security or security interest as against third parties, (h) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (i) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall include a "mandatary", (k) "construction security" shall include "legal hypothecs", (l) "joint and several" shall include "solidary", (m) "gross negligence or willful misconduct" shall be deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership on behalf of another as mandatary"; (o) "easement" shall include "servitude", (p) "priority" shall include "prior claim", (q) "survey" shall include "certificate of location and plan", (r) "state" shall include "province", (s) "fee simple title" shall include "absolute ownership", and (t) "accounts" shall include "claims".

## ARTICLE II
### THE COMMITMENTS AND CREDIT EXTENSIONS

    **2.01**    **Committed Loans; Reserves.**

        (a)      (a)      Subject to the terms and conditions set forth herein, the outstanding loans to Domestic Borrowers funded under the Existing ABL Credit Agreement by each Domestic Lender isare hereby continued, amended and restated as a Committed Domestic Loan under this Agreement.  Subject to the terms and conditions set forth herein, each Domestic Lender severally agrees to make Committed Domestic Loans to the Domestic Borrowers from time to time, on any Business Day during the Availability Period, in an aggregate principal amount not to exceed at any time outstanding the lesser of (x) the amount of the Domestic Commitment of such Domestic Lender, or (y) the Applicable Percentage of the Domestic Borrowing Base for such Domestic Lender; subject in each case to the following limitations:

                (i)      after giving effect to any Committed Domestic Borrowing, the Total Domestic Outstandings shall not exceed the Domestic Loan Cap,

                (ii)      after giving effect to any Committed Domestic Borrowing, the aggregate Outstanding Amount of the Committed Domestic Loans of any Domestic Lender, plus (without duplication) the Applicable Percentage of the Outstanding Amount of all Domestic L/C Obligations for such Domestic Lender shall not exceed the Domestic Commitment of such Domestic Lender, and

                (iii)      the Outstanding Amount of all Domestic L/C Obligations shall not at any time exceed the Domestic Letter of Credit Sublimit.

Within the limits of the Domestic Commitment for each Domestic Lender, and subject to the other terms and conditions hereof, the Domestic Borrowers may borrow under this Section 2.01, prepay under Section 2.05, and reborrow under this Section 2.01.  Committed Domestic Loans may be Domestic Prime Rate Loans or LIBO Rate Loans, as further provided herein.

(b)    Subject to the terms and conditions set forth herein, the outstanding loans to the Foreign Borrowers funded under the Existing ABL Credit Agreement immediately prior to the effectiveness hereof by each Foreign Lender isare hereby continued, amended and restated as a Committed Foreign Loan under this Agreement.  Subject to the terms and conditions set forth herein, each Foreign Lender severally agrees to make a single Committed Foreign Loan to the applicable Foreign Borrower (other than the Japanese Borrower) on the Effective Date, in an aggregate principal amount not to exceed at any time outstanding the lesser of (x) the amount of the applicable Foreign Commitment of such Foreign Lender to such Foreign Borrower or (y) the Applicable Percentage of the applicable Borrowing Base for such Foreign Borrower; subject in each case to the following limitations:

(i)    after giving effect to any Committed Foreign Borrowing, the Total Outstandings for any Foreign Borrower shall not exceed such Foreign Borrower's Foreign Loan Cap, and

(ii)    with respect to each Foreign Borrower, after giving effect to any Committed Foreign Borrowing made to such Foreign Borrower, the aggregate Outstanding Amount of the Committed Foreign Loans of any Foreign Lender to such Foreign Borrower, plus (without duplication) such Foreign Lender's Applicable Percentage of the Outstanding Amount of all Australian L/C Obligations for such Foreign Borrower, shall not exceed the applicable Foreign Commitment of such Foreign Lender,

After the making of the Committed Foreign Loans on the Effective Date, the Foreign Commitments shall be automatically terminated.

(c)    [Reserved].

(d)    The Inventory Reserves and Availability Reserves as of the Effective Date are set forth in the Borrowing Base Certificates delivered to the Administrative Agent pursuant to Section 4.01(c).

(e)    Any Agent shall have the right, at any time and from time to time after the Effective Date, in its Permitted Discretion to establish new, or modify or eliminate any existing Reserves without prior notice to any Loan Party. Availability Reserves will not be established or changed except upon one (1) Business Days'Day's prior notice to the applicable Borrower (during which period the Agents shall be available to discuss any proposed Availability Reserve with the Borrowers and the Borrowers may take such action as may be required so that the event, condition or matter that is the basis for the Availability Reserve no longer exists); provided that no such prior notice shall be required (i) after the occurrence and during the continuance of an Event of Default or if an Event of Default would arise from the establishment or change of such Availability Reserve, (ii) for changes to any Availability Reserves resulting solely by virtue of mathematical calculations of the amount of the Availability Reserve in accordance with the methodology of calculation previously utilized, (iii) for the establishment of any Reserves in an amount equal to the unpaid balance relating

-93-

to any Liens permitted under clauses (y) and (z) of the definition of Permitted Encumbrances, or (iv) if a Material Adverse Effect is reasonably likely to arise by any delay in implementing such Availability Reserve.

> **2.02    Committed Borrowings, Conversions and Continuations of Committed Loans**.

(a)    Committed Domestic Loans shall be made in Dollars and shall be either Domestic Prime Rate Loans or LIBO Rate Loans, as the Lead Borrower or the Parent, on behalf of the Domestic Borrowers, may request subject to and in accordance with this <u>Section 2.02</u>.    Committed Canadian Loans shall be made in Dollars or Canadian Dollars and shall be either Canadian Prime Rate Loans, Canadian Base Rate Loans, LIBO Rate Loans (if in Dollars only and not in an Alternative Currency) or Canadian BA Rate Loans, as the Canadian Borrower or the Parent, on behalf of the Canadian Borrower, may request subject to and in accordance with this <u>Section 2.02</u>.    Committed Australian Loans shall be made in Dollars or Australian Dollars and shall be either Australian Base Rate Loans, LIBO Rate Loans (if in Dollars) or BBR Rate Loans, as the Australian Borrower or the Parent, on behalf of the Australian Borrower, may request subject to and in accordance with this <u>Section 2.02</u>.    Committed Japanese Loans shall be made in Yen and shall be either Japanese Base Rate Loans or TIBOR Rate Loans, as the Japanese Borrower or the Parent, on behalf of the Japanese Borrower, may request subject to and in accordance with this <u>Section 2.02</u>.    Subject to the other provisions of this <u>Section 2.02</u>, Committed Borrowings of more than one Type may be incurred at the same time.

(b)    Each Committed Borrowing, each conversion of a Committed Loan from one Type to the other, and each continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans and Canadian BA Rate Loans shall be made upon the irrevocable notice of the applicable Borrower or the Parent on behalf of the applicable Borrower to the Administrative Agent which may be given by electronic transmission.    Each such notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three Business Days prior to the requested date of any Committed Borrowing of, conversion to or continuation of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans, or Canadian BA Rate Loans or of any conversion of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans, or  Canadian BA Rate Loans to Prime Rate Loans, (ii) four Business Days (or, without duplication of the time periods set forth in Section 1.09(b), five Business Days in the case of a Special Notice Currency) prior to the requested date of any Borrowing or continuation of LIBO Rate Loans, BBR Rate Loans, or TIBOR Rate Loans denominated in Alternative Currencies, and (iii) one Business Day prior to the requested date of any Committed Borrowing of any Prime Rate Loans.    Each electronic notice by the Parent or the applicable Borrower pursuant to this <u>Section 2.02(b)</u> must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Parent or the applicable Borrower (and, with respect to the Japanese Borrower, a written Committed Loan Notice may be delivered to the Administrative Agent via facsimile).    Each Committed Borrowing of, conversion to or continuation of LIBO Rate Loans, BBR Rate Loans or TIBOR Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof.    Each Committed Borrowing of, conversion to or continuation of Canadian BA Rate Loans shall be in a principal amount of CD$500,000 or a whole multiple of CD$100,000 in excess thereof.    Except as provided in <u>~~Sections~~Section</u> 2.03~~(c) and  2.04~~(c), each Committed Borrowing of or conversion to Prime Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.    Each Committed Loan Notice (whether electronic or written) shall specify (i) whether the request is for a Committed Borrowing, a

**2.04**    **[Reserved]**.

**2.05**    **Prepayments**.

(a)    Each Borrower may, upon irrevocable notice to the Administrative Agent, at any time or from time to time voluntarily prepay Committed Loans in whole or in part without premium or penalty; provided that (i) such notice must be received by the Administrative Agent not later than 11:00 a.m. (A) three Business Days prior to any date of prepayment of LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans denominated in Dollars, (B) four Business Days (or five, in the case of prepayment of Loans denominated in Special Notice Currencies) prior to any date of prepayment of LIBO Rate Loans denominated in Alternative Currencies, and (C) on the date of prepayment of Prime Rate Loans; (ii) any voluntary prepayment of LIBO Rate Loans denominated in Dollars shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof; and (iii) any voluntary prepayment of BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans shall be in a principal amount of $500,000 (or the Alternative Currency Equivalent thereof) or a whole multiple of $100,000 (or the Applicable Currency Equivalent thereof) in excess thereof; and (iv) any voluntary prepayment of Prime Rate Loans shall be in a principal amount of $500,000 (or the Applicable Currency Equivalent thereof) or a whole multiple of $100,000 (or the Applicable Currency Equivalent thereof) in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if LIBO Rate Loans, BBR Rate Loans, TIBOR Rate Loans or Canadian BA Rate Loans, the Interest Period(s) of such Loans.  The Administrative Agent will promptly notify each applicable Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment.  If such notice is given by a Borrower, the applicable Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a LIBO Rate Loan, a BBR Rate Loan, a TIBOR Rate Loan or a Canadian BA Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05.  Subject to Section 2.18, each such prepayment shall be applied to the Committed Loans of the Lenders in accordance with their respective Applicable Percentages.

(b)    [Reserved].

(c)    If for any reason the Total Domestic Outstandings at any time exceed the Domestic Loan Cap as then in effect, the Domestic Borrowers shall immediately prepay Committed Domestic Loans and Domestic L/C Borrowings and/or Cash Collateralize the Domestic L/C Obligations (other than Domestic L/C Borrowings) and/or (subject tto the DIP Intercreditor Agreement) prepay Foreign Loans or Cash Collateralize Australian L/C Obligations, in an aggregate amount equal to such excess; provided, however, that the Domestic Borrowers shall not be required to Cash Collateralize the Domestic L/C Obligations pursuant to this Section 2.05(c) unless after the prepayment in full of the Domestic Loans the Total Domestic Outstandings exceed the lesser of the Aggregate Domestic Commitments or the Domestic Borrowing Base, each as then in effect.  The Administrative Agent may, at any time and from time to time after the initial deposit of such Cash Collateral, request that additional Cash Collateral be provided in order to protect against the results of exchange rate fluctuations.

(d)    If for any reason the Total Canadian Outstandings at any time exceed the Canadian Loan Cap as then in effect, the Canadian Borrower shall immediately prepay Committed

(g)     Notwithstanding anything to the contrary contained herein, any notice of prepayment, reduction or termination, as the case may be, delivered by the Lead Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other event or condition, in which case such notice may be revoked by the Lead Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

**2.07    Repayment of Loans.**

Each Borrower shall repay to the Administrative Agent, for the account of the applicable Lenders, on the Termination Date the aggregate principal amount of Committed Loans made to such Borrower and outstanding on such date.

**2.08    Interest.**

(a)     Subject to the provisions of <u>Section 2.08(b)</u> below, (i) each LIBO Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Adjusted LIBO Rate for such Interest Period <u>plus</u> the Applicable Margin <u>plus</u> (in the case of a LIBO Rate Loan of any Lender which is lent from a Lending Office in the United Kingdom or a Participating Member State) the Mandatory Cost; (ii) each Canadian BA Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Canadian BA Rate for such Interest Period <u>plus</u> the Applicable Margin; (iii) each BBR Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Australian Bank Bill  Rate for such Interest Period <u>plus</u> the Applicable Margin; (iv) each TIBOR Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the TIBOR Rate for such Interest Period <u>plus</u> the Applicable Margin; (v) each Domestic Prime Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Prime Rate <u>plus</u> the Applicable Margin; (vi) each Canadian Prime Rate Loan and Canadian Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Canadian Prime Rate, or Canadian Base Rate, as applicable, <u>plus</u> the Applicable Margin; (vii) each Australian Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Australian Base Rate <u>plus</u> the Applicable Margin; and (viii) each Japanese Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Japanese Base Rate <u>plus</u> the Applicable Margin.

(b)     (i)     If any amount payable under any Loan Document is not paid when due (after giving effect to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)     If any Event of Default exists, then the Administrative Agent, upon the request of the Required Lenders shall, notify the Lead Borrower that all outstanding Obligations under the Loan Documents shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such Loans and L/C Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws for so long as such Event of Default is continuing; ;-provided that the Default Rate shall automatically apply to all such Obligations

U.S. jurisdiction, if any) and a certificate of good standing (where applicable, or such other customary functionally equivalent certificates, to the extent available in the applicable jurisdiction) from such Loan Party's jurisdiction of organization and from each jurisdiction where such Loan Party's ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(vi)    a favorable opinion of (A) Skadden, Arps, Slate, Meagher & Flom LLP, special counsel to the Domestic Loan Parties, addressed to the Administrative Agent and each Domestic Lender, as to customary matters concerning the Domestic Loan Parties and the Loan Documents; (B) Fasken Martineau DuMoulin LLP, McInnes Cooper LLP, and other local counsel to the Canadian Loan Parties, addressed to the Administrative Agent and each Canadian Lender, as to customary matters concerning the Canadian Loan Parties and the Loan Documents; and (C) Nishimura & Asahi, special counsel to the Japanese Loan Parties, addressed to the Administrative Agent and each Japanese Lender, as to customary matters concerning the Japanese Loan Parties and the Loan Documents;

(vii)    a certificate signed by a Responsible Officer of the Borrower, satisfactory in form and substance to the Administrative Agent and the Required Lenders, certifying that the conditions in Sections 4.02(a) and 4.02(b) have been satisfied;

(viii)    with respect to each Loan Party organized under the laws of Japan, (a) a certified copy of corporate registration (*genzai jikou shoumei*) in respect of such Loan Party and a certificate of seal registration issued in respect of such Loan Party by the competent legal affairs bureau in Japan, in each case no earlier than three months prior to the date of the initial Credit Extension, and (b) such other documents as may be requested by the Administrative Agent in order to comply with the *Act on Prevention of Transfer of Criminal Proceeds*;

(ix)    [reserved];

(x)    instruments evidencing the Interim Order Intercompany Loans in form and substance reasonably satisfactory to the Administrative Agent;

(xi)    executed counterparts of the Reaffirmation Agreement;

(xii)    all other Loan Documents set forth, each duly executed by the applicable Loan Parties;

(xiii)    [reserved];

(xiv)    [reserved];

(xv)    [reserved];

Redline ABL DIP Credit Facility and FINAL -- Second AR _ DIP Credit Agreement -- Quiksilver (2) 9/21/2015 12:12:48 PM

(xvi)    (A) all UCC financing statements, PPSA financing statements and Australian PPSA financing statements, required by Law or reasonably requested by the Agents to be filed, registered or recorded to create, perfect or protect the Liens intended to be created under the Loan Documents and (B) all certificates of matters entered into the applicable registry in Japan to create, perfect or protect the Liens intended to be created under the Loan Documents or copies of applications for registration of such matters in form reasonably satisfactory to the Agents and, to the extent applicable with respect to any Liens intended to be created in any bank account, Account or insurance policy of a Loan Party in Japan, a consent letter from the account bank where such bank account is domiciled consenting to the creation of the Lien in respect of such bank account, Account debtor or insurer, as applicable; and

(xvii)    [reserved].

(b)    Chief Restructuring Officer.  A chief restructuring officer ("Chief Restructuring Officer") acceptable to the Lenders shall be appointed with respect to the Borrowers (it being understood and agreed that the Acceptable Chief Restructuring Officer shall be acceptable to the Lenders).

(c)    Legal Matters.  All legal matters incident to this Agreement and the Borrowings hereunder shall be satisfactory to the Administrative Agent and the Lenders.

(d)    Boardriders Waiver.  The Boardriders Waiver shall be in full force and effect.

(e)    Payment of Fees.  The Borrowers shall have paid on before the Effective Date, in cash (i) all reasonable and documented costs, fees, disbursements and expenses of the Administrative Agent (including fees, costs, disbursements and expenses of (A) their outside counsel, Riemer & Braunstein LLP, and their local counsel (including, for the avoidance of doubt, foreign counsel) and (B) any professional advisors retained by Bank of America (or any Affiliate thereof) or their counsel and (ii) All~~All~~all fees required to be paid by the Borrowers to any of the Agents or the Arranger on or before the Effective Date shall have been paid in full, and all fees required to be paid by the Borrowers to the Lenders on or before the Effective Date shall have been paid in full.

(f)    Borrowing Base Certificate.  The Administrative Agent shall have received a Borrowing Base Certificate  from each Borrower dated the Effective Date, relating to the month ended ~~on [_____]~~immediately prior to the Petition Date, and executed by a Responsible Officer of the Lead Borrower or the Parent.

(g)    [Reserved]

(h)    DIP Term Facility.  An interim order approving the DIP Term on terms reasonably satisfactory to the Agent shall have been entered in the Cases, the DIP Term Facility shall be in full force and effect and the US Borrowers shall have received gross proceeds from the initial borrowing under the DIP Term Facility in the amount of $60,000,000 (from which certain costs, expenses, fees and original issue discount shall be deducted).

(i)    KYC.  The Administrative Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations including, without limitation, the Patriot Act.

(j)    Motions and Documents.  All material motions and other material documents to be filed with and submitted to the Bankruptcy Court (including any "first day" motions and proposed orders) related to the commencement of the Cases or transactions contemplated hereby and the other Loan Documents and the approval thereof shall be in form and substance reasonably satisfactory to the Lenders.

(k)    Interim Order.  The Interim Order shall provide that the Administrative Agent, for the benefit of the Credit Parties, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein.

(l)    Liens.  Each Order shall provide that the Administrative Agent, for the benefit of the Credit Parties, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein, subject to the DIP Intercreditor Agreement.

(m)    Budget.  The Agent shall have received the Budget reasonably acceptable to the Administrative Agent.

(n)    [reserved].

(o)    Petition Date.  The Petition Date shall have occurred on or before [            ]September 9, 2015.

(p)    Interim Order Date.  The Interim Order shall have been filed on or before [       ]September 11, 2015.

(q)    Adequate Protection.

(i)    The Collateral Agent, for the benefit of the Existing ABL Lenders, shall have received adequate protection in respect of the Liens securing the Existing ABL Obligations and ABL Indemnity Obligations (as defined in the Orders), including among other things (i) replacement claims and liens, and (ii) a superpriority administrative expense claim against all Debtors, in each case junior only to the Liens and superpriority administrative expense claims under this Agreement granted and approved under the Orders; and

(ii)    The Existing Senior Secured Noteholders shall have each received adequate protection in respect of the liens securing the Existing Senior Secured Note Obligations, as applicable, including among other things (i) replacement claims and liens, and (ii) a superpriority administrative expense claim against all Debtors junior only to superpriority administrative expense claims under this Agreement and the DIP Term Loan Agreement.

hand of each of the Borrower and its Subsidiaries (broken out by entity) as of the close of business on such date;

(k)        promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which could reasonably be expected to have a Material Adverse Effect;

(l)        promptly, written notice of any actions, suits, proceedings, claims or disputes (other than the Cases) pending or, to the knowledge of the Loan Parties threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby to occur on the Effective Date, or (b) either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(m)        contemporaneously with the delivery of ~~the first~~each Borrowing Base Certificate in any calendar ~~month~~week, a summary of the then Reported Fee Accruals as of the end of the previous calendar ~~month~~week; and

(n)        promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Americas/Foreign Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent, the Collateral Agent, or any Lender (through the Administrative Agent) may from time to time reasonably request.

The Loan Parties hereby acknowledge that (a) the Administrative Agent and/or MLPFS may, at its sole discretion, make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on Debt Domain, IntraLinks, Syndtrak or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender").  The Loan Parties hereby agree that so long as any Loan Party is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) the Lead Borrower shall use commercially reasonable efforts to provide that such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Administrative Agent, MLPFS, the L/C Issuer and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of all applicable securities Laws; (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Administrative Agent and MLPFS shall be entitled to treat any Borrower Materials that are not

of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Administrative Agent and, to the extent applicable, the Australian Security Trustee (giving such Person the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Administrative Agent and, to the extent applicable, the Australian Security Trustee. The Lead Borrower shall deliver to the Agents, on or prior to (or with respect to the Japanese Loan Parties, as soon as practically possible after) the date of the cancellation or expiration of any such policy of insurance, or modification materially reducing the scope or amount of coverage of such policies of insurance, a copy of any applicable renewal or replacement insurance certificate. Further, the Japanese Loan Parties shall take such actions as may be required under the Japanese Security Documents to continue the perfection of the Administrative Agent's Lien in any such renewal policy.

(c)     None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.08. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees.  If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees.  The designation of any form, type or amount of insurance coverage by the any Credit Party under this Section 6.08 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

(d)     Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy with responsible companies in such amounts as are customarily and covering such risks carried by business entities engaged in similar businesses similarly situated, and will upon request by any Agent, furnish the Administrative Agent certificates evidencing renewal of each such policy.

**6.09    Compliance with Laws.**  Comply, and cause each Subsidiary to comply, with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a)(i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP;  and (ii) such contest effectively suspends enforcement of the contested Laws, or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.  Nothing contained herein shall be deemed to limit the rights of the Agents with respect to establishing or modifying Reserves in a manner permitted by this Agreement.

**6.10    Books and Records.**

(i) Maintain proper books of record and account, in which entries full, true and correct in all material respects and in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all

**6.12    Use of Proceeds.**  Use the proceeds of the Credit Extensions only (i) to finance: (i) the repayment of certain indebtedness under the Existing ABL Credit Agreement (other than the Japanese Liabilities, and it being agreed that any letters of credit issued for the account of the Domestic Borrowers under the Existing ABL Credit Agreement shall be deemed issued hereunder), including, without limitation, the Foreign Liabilities owed to General Electric Capital Corporation and Wells Fargo Bank, National Association and their respective affiliates, (ii) the payment of transaction expenses, (iii) the payment of fees, expenses and costs incurred in connection with the Cases, (iv) the payment of any adequate protection payments approved in the Orders, and (v) in accordance with the terms of the Orders, for working capital, capital expenditures, and other general corporate purposes of the Domestic Loan Parties, in each case to the extent not prohibited under applicable Law and the Loan Documents (including without limitation Bankruptcy Court-approved professional fees and other administrative fees arising in the Cases).

**6.13    Additional Loan Parties.**

(a)    Notify the Administrative Agent promptly after any Person becomes a Domestic Subsidiary that is a direct Wholly Owned Subsidiary of any Domestic Loan Party (other than any CFC or Subsidiary of a CFC), and promptly thereafter (and in any event within thirty (30) days or such longer period as the Administrative Agent may agree), (a) cause any such Domestic Subsidiary that is a direct Wholly Owned Subsidiary (other than any CFC or Subsidiary of a CFC) to (i) become a Borrower or Guarantor by executing and delivering to the Administrative Agent a Joinder Agreement, and, in the case of a Guarantor, a Facility Guaranty (or a counterpart or supplement thereto), (ii) grant a Lien to the Administrative Agent on such Person's assets to the extent required by the Security Documents, and (iii) deliver to the Administrative Agent documents of the types referred to in clauses (iii), (iv), (v), (v) and (xvi) Section 4.01(a)  and, if requested by the Administrative Agent, customary opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by any Domestic Loan Party, such Domestic Loan Party shall pledge such Equity Interests and promissory notes evidencing such Indebtedness (if any) (except that, if such Subsidiary is a CFC or a Subsidiary of a CFC, the Equity Interests of such Subsidiary will not be required to be pledged), in the manner and format required by the Pledge Agreement; provided that, no Equity Interests of any Foreign Subsidiary which is not a Foreign Loan Party shall be required to be pledged.

(b)    Notify the Administrative Agent promptly after any Person becomes a Subsidiary that is a direct Wholly Owned Subsidiary of any Foreign Loan Party (other than any Subsidiary that is not organized under the Laws of Canada or any province thereof, Australia or Japan), and promptly thereafter (and in any event within thirty (30) days or such longer period as the Administrative Agent may agree), (a) cause any such Subsidiary that is a direct Wholly Owned Subsidiary (other than any Subsidiary that is not organized under the Laws of Canada or any province thereof, Australia or Japan)) to (i) become a Foreign Borrower or a Guarantor of the Foreign Liabilities by executing and delivering to the Administrative Agent a Joinder Agreement and, in the case of a Guarantor, a Facility Guaranty (or a counterpart or supplement thereto), (ii) grant a Lien to the Administrative Agent on such Person's assets (to the extent required by the Security Documents) to secure the Foreign Liabilities by executing and delivering to the Administrative Agent, appropriate Security Documents, and (iii) deliver to the Administrative Agent documents of the types referred to in clauses (iii) and (iv) and (v) of Section 4.01(a) and, if requested by the Administrative Agent,

receipts and collections of any Australian Loan Party and any Japanese Loan Party, the Administrative Agent shall furnish the applicable Foreign Borrower with three (3) Business Days' notice prior to such application (unless an Event of Default then exists, in which case no such notice shall be required).

(e)    In the event that, notwithstanding the provisions of this Section 6.14, any Loan Party receives or otherwise has dominion and control of any such proceeds or collections (other than the minimum balances for all DDAs to the extent permitted under this Section 6.14, Cash Equivalents being held in accordance with the terms of the proviso at the end of the definition of "Permitted Investments" and cash maintained in the cash registers in the Stores in the normal course of business and consistent with past practices), such proceeds and collections shall be held in trust by such Loan Party for the Administrative Agent or the Australian Security Trustee, as applicable, and shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the applicable Concentration Account, or dealt with in such other fashion as such Loan Party may be instructed by the Administrative Agent or the Australian Security Trustee, as applicable;

(f)    Upon the request of the Administrative Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Administrative Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account and each Japanese Depository Bank to ensure the proper transfer of funds as set forth above.    Subject to Section 8.02, the Foreign Loan Parties may direct, and shall have sole control over, the manner of disposition of funds in the Blocked Accounts maintained by each of them.  Any amounts held or received in any Concentration Account maintained for any Foreign Loan Party at any time (except as provided in Section 8.02) shall be promptly remitted to an account of such Foreign Borrower or as such Foreign Borrower may otherwise direct.

(g)    Notwithstanding anything to the contrary herein contained, no Foreign Loan Party shall enter into any cash pooling arrangement.

(h)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the obligation of the Domestic Loan Parties to enter into Blocked Account Agreements or other control agreements with any Agent or otherwise grant any Agent control, in each case with respect to any DDA, securities account or commodities account, shall not apply to any Term Loan Priority Accounts, Existing ABL Credit Agreement Collateral Account.

(i)    The Australian Borrower agrees that the amounts paid to it in discharge of all Accounts and all proceeds of Collateral must be deposited into the Blocked Accounts held in the name of the Australian Borrower with the Australian Security Trustee and identified in the general security agreement between the Australian Borrower and the Australian Security Trustee dated 24 May 2013 or such other accounts which the Australian Security Trustee notifies the Australian Borrower from time to time.

**6.15    Information Regarding the Collateral**.

Furnish to the Administrative Agent at least fifteen (15) days' (or such shorter period as the Administrative Agent shall agree) prior written notice of any change in: (i) any Loan Party's legal name; (ii)  the location of any Loan Party's chief executive office or its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility

included in the Borrowing Base, in each case, without the prior written consent of the Administrative Agent or as required by GAAP.

      **7.14    Deposit Accounts; Credit Card Processors**.

      (a)    In the case of any Loan Party (other than the Japanese Loan Parties, as to which clause (b) below shall apply), open new Blocked Accounts or engage any new Credit Card Issuers or Credit Card Processors unless such Loan Party shall have delivered to the Administrative Agent or the Australian Security Trustee, as applicable, appropriate Blocked Account Agreements or Credit Card Notifications, as applicable, consistent with the provisions of <u>Section 6.14</u> or otherwise reasonably satisfactory to the Agents.

      (b)    In the case of any Japanese Loan Party (i) open any new Blocked Accounts or other DDAs (other than with an existing Japanese Depository Bank) unless such Japanese Loan Party has provided the Administrative Agent with five (5) Business Days' prior notice thereof (any such new depository with whom a new DDA is opened by any of the Japanese Loan Parties shall constitute a Japanese Depository Bank for all purposes of this Agreement and shall be subject to the provisions of <u>Section 6.14</u> hereof) and has taken all such actions as may be required with respect to any such DDA pursuant to the Japanese Security Documents, or (ii) engage any new Credit Card Issuers or Credit Card Processors, or terminate, or permit the termination of,  the appointment of JMS Co., Ltd. as its collection agent with respect to any Credit Card Processors or Credit Card Issuers for the account of the Japanese Loan Parties, or engage any new collection agent, unless such Japanese Loan Party has provided the Administrative Agent with five (5) Business Days' prior written notice thereof and has delivered to the Administrative Agent copies of Credit Card Notifications, which have been executed on behalf of such Japanese Loan Party and delivered to the applicable Credit Card Processors, Credit Card Issuers and/or collection agent, in substantially the forms delivered by the Japanese Borrower on the Effective Date (or such other form as the Administrative Agent may reasonably request in light of the circumstances) and has taken all such actions as may be required with respect thereto pursuant to the Japanese Security Documents, and <u>provided that</u>, such Japanese Loan Party shall use commercially reasonable efforts to deliver to the Administrative Agent, within sixty (60) days following the date of each such Credit Card Notification, in form and substance reasonably satisfactory to the Administrative Agent, waivers and acknowledgments with respect to any such Credit Card Processors, Credit Card Issuers and/or collection agents.

      **7.15    [Reserved]**.

      **7.16    Limitation on the Creation of Subsidiaries**. Establish, create or acquire after the Effective Date any Domestic Subsidiary.

      **7.17    Anti-Social Force**.

Become an Anti-Social Force.

      **7.18    Chapter 11 Claims**.  Until payment in full of the Obligations under this Agreement (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted), except for and to the extent permitted under the Carve-Out and the Priority Permitted

**10.05   Reinstatement; Payments Set Aside.**   This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Loan Party for liquidation or reorganization or otherwise under any Debtor Relief Law, should any Loan Party become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver, interim receiver, receiver and manager, Controller, trustee, monitor, custodian, conservator, liquidator, rehabilitator or similar officer be appointed for all or any significant part of any Loan Party's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable Law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made.   To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a receiver, interim receiver, receiver and manager, Controller, trustee, monitor, custodian, conservator, liquidator, rehabilitator or similar officer, or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, (b) each Domestic Lender and the L/C Issuer (with respect to Domestic Letters of Credit) severally agrees to pay to the Agents upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agents, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect, in the applicable currency of such recovery or payment, and (c) each Foreign Lender and the L/C Issuer (with respect to Foreign Letters of Credit) severally agrees to pay to the Administrative Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect, in the applicable currency of such recovery or payment.   The obligations of the Lenders and the L/C Issuer under clause (b) and clause (c) of the preceding sentence shall survive Payment in Full and the termination of this Agreement.

**10.06   Successors and Assigns**.

(a)       <u>Successors and Assigns Generally</u>.   The provisions of this Agreement shall be binding and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of <u>Section 10.06(b)</u>, (ii) by way of participation in accordance with the provisions of <u>Section 10.06(e)</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 10.06(g)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (<u>i</u><u>e</u>) of this Section and, to the extent expressly contemplated

-214-

**BANK OF AMERICA, N.A.**, as
Administrative Agent~~and as a~~, as Collateral
Agent and as Australian Security Trustee

By: _____

Name:  Roger Malouf

Title:    Vice President

Signature Page to Second Amended and Restated and
~~and~~ Senior Secured Super-Priority Debtor-In-Possession Credit Agreement

:

1883571.21883571.8

Signature Page to Second Amended and Restated and
and Senior Secured Super-Priority Debtor-In-Possession Credit Agreement

Redline ABL DIP Credit Facility and FINAL -- Second AR _ DIP Credit Agreement --
Quiksilver (2) 9/21/2015 12:12:48 PM

| Summary report: | |
| :--: | :--: |
| **Litéra® Change-Pro TDC 7.5.0.155 Document comparison done on 9/21/2015 12:12:47 PM** | |
| **Style name:** Option 3 Strikethrough Double Score | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** ABL DIP Credit Facility.doc | |
| **Modified filename:** FINAL -- Second AR _ DIP Credit Agreement -- Quiksilver (2).doc | |
| **Changes:** | |
| Add | 102 |
| Delete | 103 |
| Move From | 1 |
| Move To | 1 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 5 |
| **Total Changes:** | 212 |