IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
_____
                                        )
                                        )
In re:                                  ) Chapter 11
                                        )
QUIKSILVER, INC., et al.,               ) Case No. 15-11880 (BLS)
                                        )
            Debtors.                    ) (Jointly Administered)
                                        )
                                        ) Re:  Docket Nos. 12, 71
                                        )
                                        ) Obj. Deadline: 9/23/15, 4:00 p.m.
                                        ) Hearing Date: 10/6/15, 10:00 a.m.
_____ )
```

**OBJECTION OF CERTAIN UTILITY COMPANIES TO THE DEBTORS' MOTION
FOR INTERIM AND FINAL ORDERS PURSUANT TO BANKRUPTCY CODE SECTIONS
105(a) AND 366 (I) APPROVING DEBTORS' PROPOSED FORM OF ADEQUATE
ASSURANCE OF PAYMENT, (II) ESTABLISHING PROCEDURES FOR RESOLVING
OBJECTIONS BY UTILITY COMPANIES AND (III) PROHIBITING UTILITY
COMPANIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICE**

Florida Power and Light Company ("FPL"), San Diego Gas &
Electric Company ("SDG&E") and Southern California Edison Company
("SCE") (collectively, the "Utilities"), by counsel, hereby object
to the *Debtors' Motion For Interim and Final Orders Pursuant To
Bankruptcy Code Sections 105(a) and 366 (I) Approving Debtors'
Proposed Form of Adequate Assurance of Payment, (II) Establishing
Procedures For Resolving Objections By Utility Companies and (III)
Prohibiting Utility Companies From Altering, Refusing or
Discontinuing Service* (the "Utility Motion"), and set forth the
following:

## Introduction

The Debtors' Utility Motion improperly seeks to shift the Debtors' obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested by the Utilities under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. This Court should not permit the Debtors to shift their statutory burden.

With respect to Section 366(c) of the Bankruptcy Code, it specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated bank account. Despite the foregoing, the Debtors seek to have this Court approve their form of adequate assurance of payment, which is a bank account containing the Debtors' estimated aggregate cost for two-weeks' of utility charges (the "Bank Account"). The Debtors' also seek authority to not deposit any monies into the Bank Account in prepetition deposit amounts held by utility providers.

Even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment, the Court should reject it as an insufficient form of adequate assurance of payment for the following reasons:

(i) Unlike all of the identified and permissible forms of adequate assurance of payment listed in Section

2

366(c)(1)(A), the Bank Account is not something held by the Utilities, so the Utilities have no control over: (A) when the Bank Account will be terminated; or (B) If the Bank Account will remain in place if there is an event of a default by the Debtors on their use of DIP financing (this is in complete contrast to the $1 million Carve-Out received by the Debtors' professionals in the DIP Financing pleadings, which remains in place even if there is an event of default);

(ii) In order to access the Bank Account, the Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a disbursement request;

(iii) It is underfunded from the outset because the Utilities issue monthly bills;

(iv) The Debtors are not required to replenish the Bank Account following pay-outs.

The post-petition deposits sought by the Utilities in these jointly-administered cases are the following two-month deposits that the Utilities are authorized to obtain from all of the customers in their service territories pursuant to applicable state law:  (A) FPL - $19,610; (B) SDG&E - $9,612; and (C) SCE - $100,169.

Based on all the foregoing, this Court should deny the Utility Motion because the amounts of the post-petition deposit requests of

3

the Utilities are reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1.    On September 9, 2015 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.    The Debtors' chapter 11 bankruptcy cases are being jointly administered.

### The Utility Motion

3.    On the Petition Date, the Debtors filed the Utility Motion.

4.    Proper notice of the Utility Motion was not provided to the Utilities prior to the Court entering the *Interim Order Pursuant To Bankruptcy Code Sections 105(a) and 366 (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures For Resolving Objections By Utility Companies, (III) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service and (IV) Scheduling a Final Hearing* (the "Interim Utility Order") on September 10, 2015.

4

5.    Because the Utilities were not properly or timely served with the Utility Motion and the Debtors never attempted to contact the Utilities regarding their adequate assurance requests prior to the filing of the Utility Motion, the Utilities had no opportunity to respond to the Utility Motion or otherwise be heard at the *ex parte* hearing on the Utility Motion that took place on September 10, 2015, despite the fact that Section 366(c)(3) (presuming this was the statutory basis for the relief sought by the Debtors) requires that there be "notice and a hearing" to the Utilities.

6.    In the Utility Motion, the Debtors seek to avoid the applicable legal standards under Sections 366(c)(2) and (3) by seeking Court approval for their own form of adequate assurance of payment, which is the Bank Account containing approximately $165,000 that supposedly reflects two-weeks of the Debtors' estimated aggregate utility charges, less prepetition deposit amounts held by utility providers.  Utility Motion at ¶¶ 17-19. The foregoing proposal is unacceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by the Utilities under Section 366(c)(2).  Additionally, Section

5

366(c)(4) expressly providers that utilities can recoup
prepetition deposits against prepetition debt without notice or
Court order.  As such, the Debtors' request for authority to
reduce the monies contained in the Bank Account in prepetition
deposit amounts held by utility providers does not make sense.

7.    The Interim Utility Order and proposed Final Utility
Order provide that any payment to be made therein would be
subject to the requirements imposed on the Debtors under any
approved order regarding post-petition financing or use of cash
collateral, including any budgets relating to post-petition
financing or use of cash collateral.  Interim Utility Order at ¶
21; proposed Final Utility Order at ¶ 17.  It is not clear if the
Debtors and their secured lenders are trying to subordinate all
of the post-petition payments made to the Utilities to the
secured lenders' liens or just the proposed amount contained in
the Bank Account. At a minimum, all post-petition payments made
by the Debtors to the Utilities, including any post-petition
security, should not be subordinated to the lenders' liens or
subject to subsequent disgorgement by the secured lenders.  If
the Debtors want the Utilities to provide post-petition utility
goods/services, any and all post-petition payments made to the
Utilities should be free and clear of any and all liens,
otherwise all of the relief sought in the Utility Motion is
nothing more than a subterfuge.

6

8.   The Utility Motion does not address why the Bank Account would be undercapitalized at only a supposed two-week deposit amount when the Debtors know that the Utilities are required by applicable state laws, regulations or tariffs to bill the Debtors monthly. Moreover, the Utilities presume that the Debtors want the Utilities to continue to bill them monthly in arrears pursuant to the billing cycles established by applicable state law.

9.   Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests pursuant to Section 366(c)(2).  Rather, without providing any specifics, the Utility Motion merely states that the Bank Account "coupled with the Debtors' anticipated financial ability to pay for post-petition services provided by the Utility Companies, constitutes adequate assurance to the Utility Companies." Utility Motion at ¶ 20.

## Facts Regarding the Debtors

10.   The Debtors, and certain other affiliates of the Debtors (the "Non-Debtor Affiliates", and together with the Debtors, "Quiksilver" or the "Company")) are one of the world's leading outdoor sports lifestyle companies.  The Company designs, develops and distributes branded apparel, footwear, accessories and related products. *Declaration of Andrew Bruenjes, American Chief Financial Officer of Quiksilver, Inc., In Support of*

7

*Chapter 11 Petitions and First Day Pleadings* ("First Day Declaration") at ¶ 7.

11.   In fiscal year 2014 (ended October 31, 2014), 34% of the Company's revenue was generated by the Debtors, inside the United States.   The remaining 66% is attributable to the Non-Debtor Affiliates located outside the United States.   The Company anticipates and intends that its business outside of the United States, conducted through the Non-Debtor Affiliates, will remain unaffected by these Chapter 11 Cases, and the Debtors are seeking certain relief from the Court in order to support the ongoing operations of its entire global enterprise.   First Day Declaration at ¶ 9.

## The Company's Capital Structure

12.   As of the Petition Date, the Company had approximately $850 million of long term debt consisting of the following:

(a)   $92 million of debt under an asset-based revolving credit facility;

(b)   $279 million of U.S. secured notes due 2018;

(c)   $223 million of U.S. unsecured notes due 2020;

(d)   $32 million of European lines of credit and other borrowing facilities; and

(e)   $224 million of European unsecured notes due 2017. First Day Declaration at ¶ 23.

8

## Events Leading to the Debtors' Chapter 11 Cases

13.    The Company has been in the midst of an operational turnaround since 2013.  In the meantime, the Company has suffered from a lack of adequate liquidity exacerbated by underperforming retail stores and late deliveries of product to wholesale customers.  The Company's weakened performance during the turnaround period caused further contraction of trade liquidity, and the Company was required to hasten its efforts.  Oaktree Capital Management, L.P. ("Oaktree"), a holder of 73% of the Company's U.S. Secured Notes and also a holder of the Company's Euro Notes, express interest in helping the Company de-lever the balance sheet and preserve value among its foreign subsidiaries through the pursuit of a Chapter 11 Plan.  First Day Declaration at ¶ 37.

14.    The foundation for the Debtors' reorganization is the proposed conversion of the Debtors' U.S. Secured Notes into equity of the reorganized Debtors pursuant to the Plan Sponsor Agreement (the "PSA") with Oaktree and related transactions that will result in a de-levering of the Debtors' balance sheet.  The PSA contemplates that Oaktree and the lender group will provide the Debtors with up to $175 million post-petition financing.  The Debtors and Oaktree will finalize the terms of a plan of reorganization (the "Sponsored Plan") and accompanying disclosure statement to implement the PSA.  The Sponsored Plan will provide

9

for, among other things:  (a) the conversion of the U.S. Secured
Notes into equity; (b) a substantial payment on account of
general unsecured claims; and (c) the issuance of new debt on
exit in order to satisfy the post-petition financing and other
costs of emergence.  First Day Declaration at ¶ 53.

### The Debtors' Post-Petition Financing

15.  On the Petition Date, the Debtors filed the *Debtors'
Motion For Entry of Interim and Final Orders Pursuant To Sections
105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy
Rules 2002, 4001 and 9014 (I) Authorizing the Debtors To (A)
Obtain Postpetition Financing on a Super-Priority, Senior Secured
Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and
Super-Priority Claims and (B) Adequate Protection To Certain
Prepetition Lenders, (III) Modifying the Automatic Stay, (IV)
Scheduling a Final Hearing, and (V) Granting Related Relief* (the
"Financing Motion").

16.  Through the Financing Motion, the Debtors are seeking
approval of (i) the DIP Loan Credit Agreement pursuant to which
the DIP Term Lenders are providing a DIP term loan credit
facility of up to $115 million, subject to a $70 million
borrowing limit on an interim basis, and (ii) the DIP ABL Credit
Agreement pursuant to which the DIP ABL Lender is providing a DIP
asset-based revolving loan credit facility (the "DIP ABL
Facility" and together with the DIP Term Loan Facility, the "DIP

10

Facilities") in an aggregate maximum principal amount of up to the lesser of $60 million or the Borrowing Base. Financing Motion at p. 3.

17.    Through the Financing Motion, the Debtors also seek authority to borrow up to an additional $25 million which shall be available upon request for purposes not contemplated by the Budget with the consent of the Required Lenders. Financing Motion at p. 19.

18.    The DIP Term Loan Facility also provides that the Debtors will be required to meet the following milestones in connection with their Bankruptcy Cases:

> (i) File a Sponsored Plan, together with the accompanying Disclosure Statement, within 30 days after the Petition Date;
>
> (ii) An Order approving the Disclosure Statement entered within 75 days after the Petition Date;
>
> (iii) An order confirming a Sponsored Plan entered within 115 days of the Petition Date; and
>
> (iv) The effective date of a Sponsored Plan shall occur within 120 days following the date of the Confirmation order.

Financing Motion at pages 21-22.

19.    The Debtors also sought a $1 million carve-out for the payment of fees and expenses of the Debtor's professionals.

11

Financing Motion at p. 28.

20.   Exhibit "C" to the Financing Motion is a 17-week budget through January 2, 2016 (the "Budget").   It is unclear from the Budget whether the Debtor has budgeted sufficient sums for the payment of their post-petition utility expenses.

21.   On September 10, 2015, the Court entered the *Interim Order (I) Authorizing the Debtors To (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection To Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*   (the "Interim Financing Order"). The Interim Financing Order approved the DIP Facilities and the $1 million Carve-Out.   Interim Financing Order at pages 20, 45-46.

### The Debtors' Critical Vendor Motion

22.   On the Petition Date, the Debtors filed the *Debtors' Motion For Interim and Final Orders Pursuant To Bankruptcy Code Sections 105(a), 363(b), 1107(a), and 1108 and Bankruptcy Rules 6003 and 6004 Authorizing Payment of Critical Vendors* (the "Critical Vendor Motion").   Through the Critical Vendor Motion, the Debtors sought authority to pay the claims of certain creditors that the Debtors deem to be "critical vendors" in the ordinary course of business in an aggregate amount not to exceed

$30 million on an interim basis and $52 million on a final basis. Critical Vendor Motion at ¶ 10. Despite the fact that the Debtors claim that utility services provided by the Debtors' utility companies "are critical to the conduct of the Debtors' business," the Debtors do not consider the Utilities and other utility companies to be "critical vendors."

23. On September 10, 2015, the Court entered the *Interim Order Granting Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105(a), 363(b), 1007(a), and 1108 and Bankruptcy Rules 6003 and 6004 Authorizing Payment of Critical Vendors* (the "Interim Critical Vendor Order"). The Interim Critical Vendor Order authorized the Debtors' to pay critical vendor claims in an amount not to exceed $30 million on an interim basis. Interim Critical Vendor Order at page 2.

**Facts Concerning the Utilities**

24. Each of the Utilities provided the Debtors with prepetition utility goods and/or services and have continued to provide the Debtors with utility goods and/or services since the Petition Date.

25. Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services before the Utility issues a bill for such charges. Once a bill is issued, the Debtors have approximately 20 to 30 days to pay the applicable bill. If the Debtors fail to timely pay the bill,

13

a past due notice is issued and, in most instances, a late fee may be subsequently imposed on the account. If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or its service will be disconnected. Accordingly, under the Utilities' billing cycles, the Debtors could receive at least two months of unpaid charges before the utility could cease the supply of goods and/or services for a post-petition payment default.

26.    In order to avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles. Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities' web site links to the tariffs and/or state laws, regulations and/or ordinances are as follows:

> FPL:
> http://www.fpl.com/customer/rates_and_bill/rules_tariffs.shtml
>
> SDG&E:
> http://www.sdge.com/rates-regulations/current-and-effective-tariffs/current-and-effective-tariffs
>
> SCE:
> http://www.sce.com/AboutSCE/Regulatory/tariffbooks/rules.htm

27.    Subject to a reservation of the Utilities' right to

SL1 1384480v1 018560.00198

supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified, the Utilities' post-petition deposit requests are as follows:

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
|---|---|---|---|
| FPL | 15 | n/a | $19,610 (2-month) |
| SDG&E | 3 | $4,015.29 | $9,612 (2-month) |
| SCE | 16 | $34,500 | $100,169 (2-month) |

28.  FPL held prepetition deposits totaling $5,408 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit remains after recoupment.

29.  SCE has an Irrevocable Standby Letter of Credit in an amount not to exceed $267,670 (the "SCE LOC") that it will make a claim upon for payment of the Debtors' prepetition debt owed to SCE.

## Discussion

A.    **THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

> (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. If a debtor believes the **amount** of

16

the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c) and deny the Utility Motion as to the Utilities.

> 1. **The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A). Moreover, even if the Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

17

(i)    Unlike the statutory approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities.  Accordingly, the Utilities have no control over how long the Bank Account will remain in place.

(ii)   In order to access the Bank Account, the Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a Disbursement Request.

(iii)  It is underfunded from the outset because the Utilities issue monthly bills and by the time a default notice is issued the Debtors will have used at least 45 to 60 days of commodity or service.

(iv)   The Debtors are not required to replenish the Bank Account following pay-outs.

(v)    The Bank Account, unlike the $1 million Professionals Carve Out, may be subject to the Lender's liens.

Accordingly, the Court should not approve the Bank Account as adequate assurance to the Utilities because the Bank Account is: (a) not the **form** of adequate assurance requested by the Utilities; (b) not a form recognized by Section 366(c)(1)(A); and (c) an otherwise unreliable form of adequate assurance.

> **2.    The Utility Motion Should Be Denied As To the Utilities Because the Debtors Have Not Set Forth Any Basis For Modifying the Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the amount of the Utilities' requests for adequate assurance of payment.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should

18

be modified.  *See In re Stagecoach Enterprises, Inc.*, 1 B.R.

732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as

the petitioning party at a Section 366 hearing, bears the

burden of proof).  However, the Debtors do not provide the

Court with any evidence or factually supported documentation to

explain why the amount of the Utilities' adequate assurance

requests should be modified.  Accordingly, the Court should

deny the relief requested by Debtors in the Utility Motion and

require the Debtors to comply with the requirements of Section

366(c) with respect to the Utilities.

**B.    THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as

*Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646

(2d Cir. 1997), that held that an administrative expense, without

more, could constitute adequate assurance of payment in certain

cases.  Section 366(c)(1)(A) specifically defines the forms that

assurance of payment may take as follows:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed
> upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a

debtor's need for utility services from a provider that holds a

19

monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990). The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

Although the billing cycles for each of the Utilities are slightly different, they all bill the Debtors on a monthly basis for the charges already incurred by the Debtors in the prior month. Each Utility then provides the Debtors with a certain period of time to pay the bill, the timing of which is set forth in applicable state laws, tariffs, and/or regulations.

Based on the foregoing state-mandated billing cycles, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months. Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of 45 to 60 days based on their billing cycles. Furthermore, the amounts of the Utilities'

20

deposit requests are the amounts that the applicable public service commission, which is a neutral third-party entity, or applicable contract, permits the Utilities to request from their customers.  The Utilities are not taking the position that the deposits that they are entitled to obtain under applicable state law are binding on this Court, but, instead are introducing those amounts as evidence of amounts that their regulatory entities permit them to request from their customers.

Finally, in contrast to the improper treatment proposed to the Debtors' Utilities, the Debtors have made certain that supposed "critical vendors" and post-petition professionals are favored creditors over the Utilities by ensuring (i) the payment of prepetition critical vendor claims of up to $52 million, and that (ii) the post-petition bills/expenses of Debtors' counsel are paid, even in the event of a post-petition DIP Financing default, by seeking and obtaining a $1 million professionals carve-out for the payment of their fees/expenses after a default.  Therefore, despite the fact that the Utilities continue to provide the Debtors with crucial post-petition utility goods/services on the same generous terms that were provided prepetition, with the possibility of non-payment, the Debtors are seeking to deprive the Utilities of adequate security for which they are entitled to for continuing to provide the Debtors with post-petition utility goods/services. Against this factual

background, it is reasonable for the Utilities to seek and be awarded the full security they have requested herein.

22

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.  Denying the Utility Motion as to the Utilities;

2.  Awarding the Utilities the post-petition adequate assurance of payment pursuant to Section 366 in the amount and form satisfactory to the Utilities, which are the form and amounts requested herein; and

3.  Providing such other and further relief as the Court deems just and appropriate.

Dated:  September 23, 2015          STEVENS & LEE, P.C.

/s/ John D. Demmy_____
John D. Demmy (Bar No. 2802)
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Telephone:  (302) 425-3308
E-mail:    jdd@stevenslee.com

and

Russell R. Johnson III
John M. Craig
Law Firm of Russell R. Johnson III, PLC
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
Facsimile: (804) 749-8862
E-mail:   russj4478@aol.com

*Counsel for Florida Power and Light Company, San Diego Gas & Electric Company and Southern California Edison Company*

SL1 1384480v1 018560.00198