1                       UNITED STATES BANKRUPTCY COURT
                             DISTRICT OF DELAWARE
2

3    IN RE:                          )  Case No. 15-11880 (BLS)
                                     )  Chapter 11
4    QUIKSILVER INC., *et al.,*      )
                                     )
5                 Debtors.           )  Courtroom No. 2
                                     )  824 Market Street
6                                    )  Wilmington, Delaware 19801
                                     )
7                                    )  October 6, 2015
                                     )  10:00 A.M.
8
                             TRANSCRIPT OF HEARING
9                BEFORE HONORABLE BRENDAN L. SHANNON
                    UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtors:          Skadden Arps
12                             By:  VAN DURRER, ESQUIRE
                               300 South Grand Avenue
13                             Los Angeles, California 90071

14                             Pachulski Stang Ziehl & Jones
                               By:  LAURA DAVIS JONES, ESQUIRE
15                             919 North Market Street
                               Wilmington, Delaware 19801
16
     For First & Lenora LLC:   Ballard Spahr
17                             By:  DAVID POLLACK, ESQUIRE
                               919 N. Market Street
18                             Wilmington, Delaware 19801

19   ECRO:                     DANA MOORE

20   Transcription Service:    Reliable
                               1007 N. Orange Street
21                             Wilmington, Delaware 19801
                               Telephone:  (302) 654-8080
22                             E-Mail:  gmatthews@reliable-co.com

23   Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
24

25

```
 1   For Nicholas Drake:        Lindemann Law Group
                                By:  BLAKE LINDENMANN, ESQUIRE
 2                              433 N. Camden Drive
                                Beverly Hills, California 90210
 3
     For Taubman Landlords:     The Taubman Company
 4                              By:  ANDREW CONWAY, ESQUIRE

 5   For Bank of America:       Riemer Braunstein
                                By:  STEVEN FOX, ESQUIRE
 6                              Seven Times Square
                                New York, New York 10036
 7
     For DIP Lender:            Kirkland & Ellis
 8                              By:  PATRICK NASH, ESQUIRE
                                6006 Ogontz Avenue
 9                              Philadelphia, Pennsylvania 19141

10   For Creditor, 3 Times
     Square Associates:         Cole Schotz Meisel Forman & Leonard
11                              By:  ILANA VOLKOV, ESQUIRE
                                500 Delaware Avenue
12                              Wilmington, Delaware 19801

13   For Creditors Committee:   Akin Gump
                                By:  MICHAEL STAMER, ESQUIRE
14                              One Bryant Park
                                Bank of America Tower
15                              New York, New York 10036

16   For ACE:                   Duane Morris LLP
                                By:  RICHARD RILEY, ESQUIRE
17                              222 Delaware Avenue, Suite 1600
                                Wilmington, Delaware 19801
18

19

20

21

22

23

24

25
```

1                                    INDEX

2                                                                      Page

3  NOTICE OF AGENDA MATTERS:
   For the Debtors, by Mr. Durrer                           4
4  For Creditors Committee, by Mr. Stamer                   6
   For First & Lenora, by Mr. Pollack                      11
5  For Nicholas Drake, by Mr. Lindemann                    17
   For Taubman Landlords, by Mr. Conway                    29
6  For Bank of America, by Mr. Fox                         37
   For the Debtors, by Ms. Davis-Jones                     46
7  For 3 Times Square Associates, by Mr. Volkov            55

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE CLERK:  All Rise

2        THE COURT:  Please be seated.  Mr. Durrer, good

3 morning.

4        MR. DURRER:  Good morning, Your Honor, van Durrer,

5 Skadden Arps Slate Meagher & Flom on behalf of the Quiksilver

6 Debtors. We know that you have a new younger girlfriend that

7 you're seeing later so we're going to try and keep to our

8 estimate.

9        THE COURT:  I don't know where to go with that.  If

10 we think about these as relationships sometimes it gets a

11 little rocky.  That may not be my best approach.

12        MR. DURRER:  Well we'll try and remain your favorite

13 girlfriend, how's that?

14        THE COURT:  There you go.

15        MR. DURRER:  So docket number 221, Your Honor, is

16 the amended notice of agenda.

17        THE COURT:   I have it; thankyou.

18        MR. DURRER:  Let me explain -- and by the way thank

19 you very much for accommodating us on October 14th.  Let me

20 explain to you how we got there and that will resolve many

21 matters off the agenda for today.

22        THE COURT:  Great.

23        MR. DURRER:  Your Honor, as I think Your Honor might

24 recall on September 21st the U.S. Trustee held a formation

25 meeting.  A committee was appointed at that time of five

1    members.  We immediately engaged with their advisors starting

2    with meetings almost immediately on the 23rd after a couple of

3    phone calls on the 22nd.  We walked through our DIP financing

4    with the advisors again on the 24th, covered a range of topics

5    later that afternoon.  And then on Friday we actually had a

6    meeting all by telephone with the entire Committee and its

7    advisors; the entire membership of five.

8         Later that day, the Committee in an abundance of

9    caution served some discovery on the Debtor in connection

10   with the DIP financing primarily, but also in connection with

11   the plan support agreement.  And then by the time we woke up

12   Monday morning, we had a new Committee which now had seven

13   members and they had changed their advisors.  So we started

14   over, had meetings again almost every day during the ensuring

15   week --

16        THE COURT:  Can you -- this is why I don't watch the

17   press releases.  Can you explain to me was it, I was aware

18   that there was a change or an addition to the positions.  Is

19   that all it was is that it went from five to seven or there

20   are significant changes to the --

21        MR. DURRER:  Well I would say the majority of the

22   Committee during the five membership was primarily trade.

23   And then when additional members were added, the additional

24   members were bondholders.  And so the makeup of the Committee

25   shifted and I think that was the reason for the shift in

1  advisors.  And Mr. Kenney, obviously, can explain the U.S.

2  Trustee's thought process there.  But --

3             THE COURT:  Hang on; Mr. Stamer --

4             MR. STAMER:  Your Honor, for the record Michael

5  Stamer from Akin Gump here with David Stratton, proposed

6  counsel for the official Creditors Committee.

7             THE COURT:  Welcome.

8             MR. STAMER:  Thank you, Your Honor; if you like I

9  can give you a little more color --

10             THE COURT:  We'll let Mr. Durrer get through all of

11  his.  I don't necessarily need a great deal of color.  If you

12  think I need it, you can give it to me later.

13             MR. STAMER:  Your Honor, I think that Mr. Durrer

14  omitted was we had, one of the members of the Committee

15  resigned.  Global Brands also resigned, so now it's a six

16  member committee: Four bondholder or bondholder

17  representatives and two trade, one trade, one landlord.

18             THE COURT:  I think that's about all I need to know.

19             MR. STAMER:  Thank you, Your Honor.

20             THE COURT:  All right.

21             MR. DURRER:  So the good news, Your Honor, and the

22  headline is that we've been able to resolve everything for

23  today.  We did agree with some of the more substantive

24  motions to accommodate the Committee's request for a little

25  bit more time given that they were getting up to speed.  And

1  so what we've agreed to continue, Your Honor, on the agenda

2  are matters one which is the plan support agreement motion;

3  two, the critical vendor motion; three the DIP financing

4  motion.  And then turning to the back, Your Honor, we have

5  also -- oh I apologize there's one more I don't want to miss;

6  interim compensation number 11, Your Honor, because that's,

7  in part, that's linked to the DIP budget.

8            THE COURT:  Sure.

9            MR. DURRER:  And then the last two, Your Honor, 17

10 and 18 which are the Peter J. Solomon retention and the FTI

11 retention.  Our understanding is the Committee wanted to

12 spend some time you know getting their arms around that.

13            In the meantime, Your Honor, we have, we made a data

14 room available to the Committee in addition to the discovery.

15 So far we've produced about 2,000 documents and about 25,000

16 pieces of paper.  But that process is ongoing and we're

17 hopeful that at such point when the Committee you know takes

18 a position with respect to those matters that are set for the

19 14th that we'll be able to continue to work with them.

20            THE COURT:  Okay let me make an observation.

21 Obviously, I have seen from the first agenda and then the

22 amended that there had been a number of adjournments that

23 were consensually achieved and I anticipate, without knowing

24 about the back and forth with the appointment of the

25 Committee, that that was basically giving the Committee and

1 stakeholders an opportunity to get their arms around the

2 case, so that's fine.  And I'm happy to accommodate you on

3 the 14th.

4          I would ask, and you guys are good about this, but

5 I've got you set for 1:00 and the main thing I would ask is

6 if you see that that's a substantial hearing and Columbus Day

7 is beforehand. But if you see that that's a substantial

8 hearing I'd like to know, because if we're dealing with

9 witnesses and the whole dog and pony show on some or all of

10 these issues, I'm probably going to move you a little earlier

11 in the day to ensure.  Because I know folks are traveling

12 and, again, it's my practice to try not to burden parties

13 with hearing that carry over and over.  Mr. Stamer?

14          Mr. STAMER:  Your Honor, in all likelihood it will

15 be a substantial hearing.  Our objection deadline is Thursday

16 of this week.  We have been talking to the company getting

17 due diligence, discovery.  I don't want to talk in terms of

18 substance as to what we're anticipating filing on Thursday,

19 but the Committee has significant issues with a number of

20 things in the DIP and a number of things with respect to the

21 motion to approve the plan support agreement.

22          THE COURT:  Then before we conclude today if you

23 guys want to confer that's fine.  But if not before we

24 conclude today I'd like to talk about moving that hearing up

25 a little earlier in the day.  Again, just because you know

1   1:00 but I may actually need a break because I've got matters

2   before then and I'd have to get a handle on what they are and

3   move them, but I'd probably wind up moving you guys up a

4   little bit, okay.

5           MR. STAMER:  Sure.

6           THE COURT:  So before we conclude do me a favor if

7   you'd be kind enough to remind me of that, that would be

8   great.

9           MR. STAMER:  Be happy to do that, Your Honor.

10          THE COURT:  Sure.

11          MR. DURRER:  So then taking the matters going

12  forward just in order then, Your Honor, we're up to matter

13  number four. This is our rejection procedures motion.  And we

14  have made several modifications to the form of order to

15  attempt to garner consensus that as I understand it there's

16  one remaining issue.  And that is with respect to the

17  effective date of rejection.

18          What we had proposed was the later of the date of

19  the notice and delivery of keys.  And I believe the objection

20  that has been raised is that if there's some objection raised

21  to the rejection notice itself that you know landlords were

22  concerned that they wouldn't be clear to go ahead and re-rent

23  the space because there would be some unknown controversy

24  with respect to rejection.  We cited a number of examples in

25  Delaware where the precedent is clearly is under you know

1  RadioShack, Wet Seal, and I can go on.

2      THE COURT:  All the way back to Namco.  The issue is

3  it's a little bit complicated because this is a procedures

4  than simply a motion to reject *nunc pro tunc* to a particular

5  date.  But effectively the relief is *nunc pro tunc*.  You give

6  the notice, the Debtors' point would be if they satisfy what

7  we've always called the Namco factors, right, you're going to

8  give them the keys.  It will be an unequivocal statement, but

9  you're not going to change your mind.  You are departing the

10 property, never to darken my door again.  And abandoning or

11 acknowledging that the landlord can take possession of the

12 premises at that point.

13      I think our case law has been that's an effective

14 date for the rejection looking back.  And then the issue is

15 often so are we talking about concern and I'll hear from Mr.

16 Pollack and others in a moment, but are we talking about an

17 issue about whether or not somebody might lodge in an

18 objection either a Committee or other party about the

19 propriety of the rejection itself and then we'll deal with

20 it, right?

21      MR. DURRER:  Yeah I mean going back to Namco, you

22 know we consider it to be our responsibility to visit with

23 the Committee before we shoot off rejection notices anyway.

24 So we would, of course do that. So other than the Committee

25 the only other person I can imagine and I don't believe that

1  this is the case with respect to any of these stores, but

2  it's hypothetically possible is that if there's a subtenant

3  in the space.  But in the case of a subtenant, you know, the

4  subtenant might object.  But obviously the landlord is not

5  free to relet the space anyway because there's a subtenant in

6  it and they would have to go through state law eviction

7  procedures anyway.  So those are the only two examples that I

8  could think of Committee or a subtenant.  And we're obviously

9  going to work with the Committee and the subtenant issue is

10 an issue that we can't fix for them.

11        THE COURT:  All right let me hear from -- I think I

12 understand the bid and the ask.  Let me hear from the

13 objectors.  Mr. Pollack, good morning; good to see you.

14        MR. POLLACK:  Good morning, Your Honor, David

15 Pollack for Federal Realty, General Growth and a number of

16 other landlords listed.  Your Honor, the issue isn't quite as

17 simple as has been indicated.

18        THE COURT:  Okay.

19        MR. POLLACK:  Starting with Namco and I have copies

20 of that part of the transcript if anybody wants it; case 98-

21 173 in front of Judge Walsh.  And Judge Walsh goes through --

22        THE COURT:  I'll take a copy.  I had them in the

23 right hand corner of my desk for about 10 years.

24        MR. POLLACK:  On page 35 of the transcript, Judge

25 Walsh enumerates the four provisions that you have to meet.

1   Number one the filing of the motion the key surrender here:

2   It's the notice, the premise is being surrendered and an

3   unequivocal statement; we have that here; b) the motion to

4   serve and filed on the landlord.  I assume that that will be

5   done or the rejection notice will be done.  The motion states

6   that the Committee agrees it's not in there, but I'm assuming

7   that Mr. Durrer will make that representation.  When we get

8   to d) and that's the real problem here.

9         d) says that the Debtor acknowledges it will not

10  have the right to withdraw the motion prior to the hearing.

11  Well, if Your Honor looks at the proposed order itself at

12  page 4, subsection (d).

13        THE COURT:  At the order?

14        MR. POLLACK:  At the proposed order, yes; page 4,

15  subsection (d) at the bottom.  About halfway through it says

16  in the event that the Debtors withdraw the rejection notice

17  prior to the rejection date the rejection notice should be

18  void *ab initio* provided, however, that such withdrawal shall

19  be without prejudice to the counterparty including with

20  respect to any actions taken by the counterparty in reliance

21  to the rejection notice.

22        Now what we have here is that the Debtor is going to

23  file a notice, but they're going to reserve the right to

24  withdraw it.  Maybe they get a buyer; maybe there's some

25  other issue.  If you look at the four attachments,

1  RadioShack, etcetera that were attached to the response, none

2  of them had a right to withdraw.

3          THE COURT:  Mr. Durrer, where are we going with

4  this?  This is actually a new one on me.

5          MR. DURRER:  Your Honor, Van Durrer.  We wanted to

6  reserve this possibility and for exactly the reasons that Mr.

7  Pollack mentioned.  If they bring someone and they or you

8  know if Gordon Brothers and Hilco bring someone to the table

9  at the 11th hour and there could be value to the estate, we

10  wanted that optionality.  But we put in the language that it

11  would be without prejudice. So if they want to say I get a

12  [indiscernible] of rent, but we're happy to strike the entire

13  withdrawal concept.

14          THE COURT:  Make the withdrawal concept as we go.

15          MR. DURRER:  That's fine.

16          THE COURT:  And I understand -- I mean I understand

17  the desire for optionality and actually one of the -- as I

18  read Namco and the way that the process plays out part of the

19  bargain that the Debtor gets for getting out of the site,

20  frankly, prior to and getting out of the liability prior to

21  entry of the order is, frankly, forgoing that optionality.

22          And what we've sort of imposed on landlords

23  whether they liked it or not is this thought that you know

24  even in advance of that order you get your property back

25  because that was always the effective opposition to trying to

1  cut off [indiscernible] rent.  From a landlord I can't, I

2  have stay issues.  I can't walk through the property.  I

3  can't take people through until and unless I'm confident. And

4  I think that Judge Walsh and then obviously later and later

5  the issues got formalized.  But I think that that mechanic is

6  a necessary element.  I mean it's not just adherence to the

7  Namco procedures but I think that's part of the fairness of

8  the split.

9       So let me ask you then, Mr. Pollack, if that issue

10  is resolved does that address the concerns that you had?

11       MR. POLLACK:  It addresses it in light of the

12  decisions in this District that waiting until the actual

13  rejection date is not going to be acceptable, so yes it does

14  address --

15       THE COURT:  Well we can litigate that in the next

16  case.  Well actually I know that there are a number of other

17  objectors, but I didn't know if you had any other issues?

18       MR. POLLACK:  No I do not.

19       THE COURT:  And usually you stand here as an

20  ambassador for pretty much all of the landlords.  We've often

21  said that if you didn't exist we'd need to invent you.  But

22  I'd hear from any of the other landlords that wish to be

23  heard if there are other issues that have not been captured

24  by the Court's ruling and the argument.  Okay so I think that

25  that captures it.  I don't know do you need to --

1           MR. DURRER:  Yeah we'll revise the order and submit

2    it under certificate.  Yeah that's fine.  Thank you, Your

3    Honor.

4           THE COURT:  Sure.

5           MR. DURRER:  So with respect to number five, Your

6    Honor, this is the Debtors'' first omnibus rejection motion.

7    Primarily, this motion related to employees who had been

8    severed some time ago but there was a lingering severance

9    obligation under various contracts.  And candidly this was

10   filed both for disclosure and just out of an abundance of

11   caution.  We didn't want there to be any mistake that the

12   Debtors were not paying post-petition severance for people

13   that had been severed long ago.

14          We did receive a number of objections.  And, Your

15   Honor, there was an objection filed, a joinder, I believe.  I

16   don't know if it got to Your Honor yet, but I'm happy to hand

17   up a copy.

18          THE COURT:  Can I see it?

19          MR. DURRER:  May I approach, Your Honor?

20          THE COURT:  Sure.  I believe that's on Mr. Drake's

21   objection.

22          MR. DURRER:  Yeah this is just, so 35 employees were

23   affected by the motion itself.  When you add the joinder 20

24   souls have objected.  One as far as we could tell from the

25   company's books and records Roberta Churchey [*phonetic*] never

1  had a severance obligation or payment to her, so that seems

2  moot to us.  But with respect to the remaining basically what

3  we're asking for, Your Honor, and we have modified the form

4  of order we're asking to reject the severance agreements to

5  the extent that they're executory.  We recognized that the

6  law isn't a model of clarity and where an executory contract

7  is, but we just wanted people to be clear that we were not

8  going to be paying these obligations.  And also to the extent

9  that there would be any potential administrative exposure we

10  wanted to cut that off at the earliest possible time.  So

11  that was the basis for the motion, Your Honor, and I presume

12  that counsel will want to speak on behalf of the employees.

13          THE COURT:  Before I hear from the employees or the

14  objectors, I'd ask if the Committee has any position with

15  respect to the motion?  I realize it's early and I realize

16  it's been evolving, so if you do, you do and if you don't,

17  you don't.

18          MR. STAMER:  Your Honor, here's our position and

19  this is kind of a common theme through today; again, for the

20  record Mike Stamer from Akin Gump for the Committee.   We

21  have provided the company with our comments to the proposed

22  order.  The proposed order is including the one that is

23  before you right now.  The Committee has no objection to any

24  of the relief that's being sought today.  The things that

25  were more controversial to the credit of the company and the

1  other parties we pushed off to the 14th.  So we have no

2  objection.

3          THE COURT:  Very good.  All right I believe I have

4  an objection by Mr. Drake and then a joinder filed in

5  connection with a number of other parties.  And I guess we

6  have the issue is one of the relief that's being sought today

7  I'd like to see the proposed form of order that you have, Mr.

8  Durrer, if you'd hand that up.  And I'd hear from parties in

9  response.  Anyone present in the Courtroom today on behalf of

10 Mr. Drake or others?  Anyone on the phone?

11         MR. LINDEMANN:  Yes, good morning, Your Honor, Blake

12 Lindemann appearing on behalf of Nicholas Drake and other

13 class claimants in objection to the motion.

14         THE COURT:  Okay.

15         MR. LINDEMANN:  Your Honor, we looked at the

16 Debtors'' argument that these were executory contracts and

17 this argument flies in contrast to the Court's ruling in L.G.

18 Philips Display which looked at whether a confidentiality

19 provision would cause the contract to arise to a level of

20 executoriness under the countrymen test.  And this Court

21 ruled that the confidentiality provision in that contract in

22 that case would not arise to level of executoriness that

23 would make an executory contract.

24         And this is the same logic that was applied in the

25 Kintex case, the Nine Circuit case we cited, which like Xi

1    Tech of the Third Circuit looks at the countryman test.  So

2    the gist of this is you know I know the Debtor, what the

3    Debtor is trying to do.  The problem is the code and the case

4    law just doesn't permit it.  There's no material performance

5    existing on both sides of the contract and there's no

6    material performance existing on any of the contracts that

7    are subject to this motion.  And, thus, the contracts cannot

8    be rejected pursuant to 365.

9           Now the order is clear that administrative claims

10   can be brought later, paragraph 5 so we wanted to make sure

11   that was a part of it and remained a cornerstone.  And we

12   also believe that 60 days should be permitted to bring that

13   claim instead of 30 days pursuant to paragraph three of the

14   proposed order.  But I do believe that the main issue and

15   really the only issue to be decided here is whether the

16   contract should be rejected.

17          And I think one other factual matter that bears on

18   this case is paragraph 5(b) the separation agreement provides

19   for an expiration of the non-disclosure provisions and the

20   non-solicitation provisions.  And that was attached to the

21   declaration of Mr. Drake.  And it says that the non-

22   solicitation provision will expire one year after the

23   separation date.  The separation date on many of these

24   contracts was 9/30/14.  So effectively, the non-disclosure no

25   longer sort of binds Mr. Drake as of now.  And that was the

1  same reason the Court looked at in <u>L.G. Philips Display</u> that

2  the confidentiality was sort of not in effect or was not

3  relevant at the time the bankruptcy was commenced.

4        So with that said you know we think the contract

5  should not be rejected and these issues can be taken up at

6  the time the claims administrative unless it's

7  [indiscernible] the Court's decision.  I won't go into why I

8  believe the claims administrative, but we have several

9  arguments as to that point.

10       THE COURT:  It does not seem to me that for purposes

11  of what we're doing today that the Court needs to make the

12  determination of whether or not these claims give rise to

13  administrative or priority or general unsecured obligations.

14  A couple of things and I'd like guidance from you, sir, and

15  also from counsel for the Debtor.

16       I recall generally my ruling in <u>L.G. Philips</u>, but I

17  also recall that that was at the conclusion of a fairly

18  substantial briefing and submissions and required the Court's

19  inquiry not only into the terms of the agreement.  And I know

20  that Mr. Drake's agreement I think is attached and I've seen

21  it, but it's a factual determination.  I think Courts have

22  determined that whether or not a contract is executory

23  requires an analysis of the terms of the agreement.  What the

24  parties contracted for and what obligations remain due and

25  owing.  And the crux of the countryman definition is

1   determination of materiality which is obviously to me a

2   factual determination as well.

3          And it seems to me that I understand my ruling and

4   I'm certainly not going back on it or modifying it until and

5   unless somebody tells me that I should.  But my understanding

6   of what the Debtor is asking for today is a ruling that says

7   that without prejudice to any party's rights to argue and

8   present to the Court that the agreement is not executory,

9   that to the extent that the Court were to find it as

10  executory it is rejected as of the date of the order which

11  would be today or the date of the filing of the motion.  I'm

12  not sure.

13         And I'd like your position on that because I have to

14  say just to be candid that I'm reluctant to make a

15  dispositive finding one way or the other that these contracts

16  are executory and then second about what the potential claims

17  would be.  So it seems to me that there are proceedings to

18  come and I think I'd like to know what would be appropriate

19  or what you believe would be appropriate for purposes of

20  today recognizing that we'll be dealing with these issues.

21         In addition, I presume that there will be additional

22  procedural steps that may come.  If I read your papers

23  correctly you couched this as Mr. Drake on behalf of himself

24  and similarly situated parties and I'm not aware of anything

25  in the record and parties can correct me, but I'm not aware

1   that a class has been filed or certified.  And, again, that

2   would affect the scope of the relief that's being requested

3   today and in the future.

4          So I'll hear first from counsel for Mr. Drake on

5   that, and then, Mr. Durrer, you may respond.  Counsel.

6          MR. LINDEMANN:  Your Honor, all good points. We

7   would like to invoke 702(3).  I think there just wasn't

8   enough time with two weeks and we didn't want to burden the

9   Court with more emergency motions with the length of the

10  agenda.  And I believe some discovery will be necessary prior

11  to that continued date.  And I had discussed with Debtors'

12  counsel agreeing to the procedures of the Court outline

13  whereby the executoriness will be decided at later date.  I

14  thought I had an agreement and then I got an email that the

15  Debtor was going to go forward with this motion.

16         So I'm of the belief that this should be decided

17  later.  If it's later determined to be executory contract

18  then it can be done under the equities as permitted

19  retroactively, but I don't think that issue can be decided on

20  the record today.

21         THE COURT:  Mr. Durrer.

22         MR. DURRER:  Your Honor, I think Your Honor is

23  perfectly capable of deciding that to the extent that there

24  are administrative obligations the Debtor is seeking to cut

25  those off.  With respect to the request on the filing of a

1  claim we have no problem with 60 days versus the 30 days.

2  The 30 days is simply typical for rejection claim, but we

3  don't mind accommodating more time.

4         THE COURT:  You're dealing with a number of people

5  here; some of whom may or may not be more or less

6  sophisticated or represented.  The additional time is

7  probably is appropriate.

8         MR. DURRER:  Right. And I would certainly request

9  that we not burden the proceedings, the Court and this

10  company with 7023 issues for 35 people.  I just can't get my

11  head around how a class could possibly be compromised of 35

12  individuals.  So with that, Your Honor, we do have a revised

13  form of order which I'm happy to approach with. But I'm also

14  happy to circulate it to Mr. Drake's counsel.

15         THE COURT:  Yeah can I see the order?  Let me tell

16  you where, at least, I am.  It seems to me that the relief as

17  it's been described to me is appropriate.  The Debtor is

18  willing to leave open the question of whether or not these

19  are executory and I can make that determination on a full

20  record and in an appropriate context. But the Debtor, I

21  believe, also has an affirmative responsibility to husband

22  and manage resources until and to limit its exposure on

23  claims.

24         I make no comment on the merits of these claims, of

25  course, and whether or not their administrative or priority,

1  general unsecured or otherwise.  But it does seem to me that

2  entry of the order that's being proposed by the Debtor it's a

3  little bit precatory in nature but I think that that's

4  actually appropriate at this stage of the case and I don't

5  think it does harm or violence.

6          Counsel's suggestion that the matter be held in

7  abeyance and that I be able to perhaps enter an order

8  approving rejection at a later point if I find that they're

9  executory seems to be it's one way we could go, but it also

10 seems a little bit fraught because I can't anticipate when

11 that would be.  The Debtors' position is abundantly clear to

12 me and I get from the other side that they disagree and

13 they've got an argument and we'll look at the case law and I

14 think describing it as not a model of clarity is pretty

15 accurate.  But it also requires that I think I look at these

16 agreements on an agreement by agreement basis.

17          I make no comment about 7023 and we'll deal with

18 that as and when it comes.  But what I would ask is that you

19 confer with Mr. Lindemann.  I'm prepared to enter an order as

20 it's been generally described.  It seems like what's been

21 described on the record by counsel largely preserves and

22 protects the interest that are out there on both sides and it

23 makes good sense to me, but obviously I think you should have

24 an opportunity to look at this revised form of order.  And

25 I'd expect to see that under certification. If you can't come

1  to terms on it you can get me on the phone, but it seems to

2  me that with the Court's ruling that an order is likely

3  appropriate and that interests are preserved and reserved for

4  a later date, we should be able to move forward.

5        Okay, Mr. Lindemann, does that make sense to you,

6  sir?

7        MR. LINDEMANN:  Yes, just to clarify one point, Your

8  Honor.  So the contracts won't be deemed rejected but the

9  Debtor does not have to make payment which is something we're

10 okay with if that's the general gist of what's being ruled

11 here.

12       THE COURT:  Mr. Durrer.

13       MR. DURRER:  Van Durrer, Your Honor, I think the way

14 I interpreted the ruling is to the extent that the contract

15 is executory it is deemed rejected.  Just to be clear the

16 Debtor will not be making any payments on this contract.

17       MR. LINDEMANN:  To the extent if later determined to

18 be executory it will be rejected.  That would be fine with

19 me, Your Honor, as long as it's not being deemed rejected

20 today.  And that's fine also that no payments be made pending

21 the ruling on that issue.

22       MR. DURRER:  I think, the relief that we requested,

23 Your Honor, is that the contract be deemed rejected

24 consistent with the timing set forth in the motion which I

25 believe was as of the filing date.  To the extent it is

1 executory that doesn't change anything in the order.  We also

2 made a change in the order to clarify that the Debtors'

3 rights under the contract or whatever they are, if any, as a

4 consequence of any rejection.  And then the last change that

5 we would propose to make after we leave here today is the

6 change the 30 day time period for filing something to be 60.

7 THE COURT:  All right let me do this because I don't

8 want to get in the middle of you two humbling on the form of

9 order and you're going to have a chance to do so.  But it

10 would be, it is my understanding that where we are is that

11 the Debtor is requesting a rejection and that that rejection

12 is either today or the date of the filing of the motion.  And

13 you can talk about.

14 The more important point from my point of view and I

15 think this is consistent with my comment a moment ago is that

16 if these contracts are not executory then rejection is not

17 available and the order is what it is.  If it is later

18 determined a month, two months, six months from today that

19 the agreements are, in fact, executory then the rejection

20 would be effective as of whenever that order is signed and

21 whatever it provides.  But it would not be six months or

22 three months from now.

23 It is my intention that the Debtor is moving forward

24 with agreements that it asserts are executory. That issue

25 remains live.  And the entry of the order would not affect

1  the ruling on that question at the appropriate time.  But it

2  is not, I don't want any uncertainty.  It's not my

3  expectation that once that decision is made if I were to find

4  that they are executory in December that the rejection would

5  be effective in December because that would have an impact

6  that would be directly contrary to the intent of the Debtor

7  which would be to give rise to an argument that for months on

8  a post-petition basis administrative obligations have arisen.

9        Again, I want to be clear I make no comment about

10  that, but I understand the relief the Debtor is looking for.

11  I think I made my position at least relatively clear.  My

12  hope is you can finalize the order and if you can't I will

13  get on the phone with you this week.

14        MR. LINDEMANN:  Understood; thank you, Your Honor.

15        THE COURT:  Very good.  Here, actually, I will hand

16  this back to you so it doesn't get entered.

17        MR. DURRER:  Thank you, Your Honor.  Item number 6

18  on the agenda is the retention application for Skadden Arps.

19  We did address comments from the United States Trustee and we

20  also filed a supplemental declaration just to clarify certain

21  issues and questions that the U.S. Trustee had raised.

22        THE COURT:  All right, does anyone else wish to be

23  heard with respect to the Skadden Arps retention?  Very well,

24  I will enter it.

25        MR. DURRER:  Thank you, Your Honor.

1          THE COURT:  Sure.

2          MR. DURRER:  With respect to number 7, Your Honor,

3    this is the store closing motion.  The good news is that

4    there are no Attorney's General in the room, not that that is

5    objectively good news, but it means that they are happy with

6    the form of order we arrived at; that is good news.  In

7    addition, Your Honor, we were able to work out the

8    controversy with the U.S. Trustee or this approach to

9    engaging with the Hilco/Gordon Brothers joint venture.  In

10   essence, Your Honor, is to summarize the U.S. Trustee and

11   Hilco/Gordon Brothers worked out additional disclosures,

12   which have been made, as well as additional future

13   disclosures that will be made periodically.  I am not going

14   to use the word protocol because we agreed that this isn't

15   that.  This is sort of a one-off, but my understanding is

16   that those issues have been resolved.

17          There is one remaining controversy outstanding and

18   this is with respect to, Your Honor, this is dockets 186 and

19   209, whether we have the right to sell what we would call

20   FF&E, furniture, fixtures and equipment, the landlord views

21   it as trade fixtures.  Quite simply, Your Honor, there is no

22   doubt that there is a provision in the relevant lease that

23   says at the end of the term, the landlord gets trade

24   fixtures.  I don't think that there is any dispute and we

25   have colored, glossy photographs just like in Alice's

1   Restaurant --

2          THE COURT:  Circles and arrows, and a paragraph on

3   the back of each one.

4          MR. DURRER:  There you go.  I knew you would know

5   that.

6          THE COURT:  It's not Thanksgiving, but I'm here.

7          MR. DURRER:  You made my day.  If I won, my client

8   is actually going to listen to the song because it did not

9   come to her attention.  So there is no dispute with respect

10  to tables and freestanding racks that sit in the middle of

11  the store.  Apparently --

12         THE COURT:  Racking on the wall.

13         MR. DURRER:  There is controversy with respect to

14  the racking on the wall.  I am going to pass podium -- oh,

15  one other issue, with respect to percentage rent, and I think

16  we clarified this in our reply, there is no dispute that

17  whatever percentage rent obligations we have, we still have

18  and to the extent that we need to report information to the

19  landlord so that we can calculate percentage rent, we are

20  going to continue to do that.  So I will state that on the

21  record, but I don't think that that needs to be in dispute,

22  but it's really just our ability to sell the fixtures.

23         Our point of view is simply are some of these things

24  attached to the walls and floors?  Absolutely true, no

25  dispute about that, factually, but are they trade fixtures?

1  No because they are not used in a trade.  Selling, you know,

2  board shorts and t-shirts is not a trade.  A trade is, you

3  know, where there is actual craftsmanship involved.  We don't

4  have that here.  So we think that this pretty typical lease

5  provision was not intended to apply to, you know, hangers.

6          THE COURT:  Okay.  Response?  Yes, sir.

7          MR. CONWAY:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. CONWAY:  Andrew Conway for the Taubman

10  Landlords.

11          THE COURT:  Welcome back, Mr. Conway.  Good to see

12  you.

13          MR. CONWAY:  Thank you, Judge Shannon.  It appears

14  we are the only ones at issue here and I suspect it has to do

15  with the language in the leases itself.

16          THE COURT:  How many stores are we talking about?

17          MR. CONWAY:  Just two.  One is located in Michigan

18  and one is located in Florida.  I would argue to Your Honor

19  that it's really a case of State Law as to a meaning of a

20  trade fixture, but I don't think this has to do with trade

21  fixtures at all.  I think it's broader than that.  I think it

22  has to do with contract obligations that the parties entered

23  into.

24          There is one sentence here that the Court needs to

25  hear because this is commented in both of the leases that we

1  are talking about.  It's Section 6.02.  It's titled removal

2  by tenant.  It states, all alterations, decorations,

3  additions, emphasis on the word additions, trade fixtures,

4  improvements, another emphasis on the word improvements, made

5  by tenant shall be deemed to have attached to the leasehold

6  and to become property of the landlord upon such attachment.

7  Upon expiration or earlier termination of the term of this

8  lease, tenant shall not remove any of such tenant

9  improvements.

10         Your Honor, rather than having a full evidentiary

11 hearing on this matter --

12         THE COURT:  About racks.

13         MR. CONWAY:  About racks, and removable tables and

14 what not, I would like to make an offer of proof, if I may.

15 You heard about the photographs.

16         THE COURT:  I haven't seen the photographs.

17         MR. CONWAY:  I too am a big fan of Arlo Guthrie, and

18 that song plays in our house.  So let me tell you what you

19 are looking at.  I provided copies of these photos to

20 Debtors' counsel last week, hoping to resolve this matter.

21 We weren't able to do so.  The first six pages show, what I

22 believe to, and I don't think there is a factual dispute,

23 improvements that are affixed to the wall.  They include the

24 wall racks, as the Court noted, they also include, what's

25 called in the trade, the cash rack, which is where the cash

1 register sits, affixed to the floor.  All of these things, if

2 removed, leave damages to the property.  That is not really

3 the issue here.  It's a *de minimis* amount.

4      You might ask yourself why does a landlord care

5 about this stuff, the obvious question.  The answer is it

6 allows the landlord the opportunity to put a temporary short-

7 term tenant in the space.

8           THE COURT:  Like Halloween stores.

9           MR. CONWAY:  Yes, although, I think they are

10 planning to run through the end of the year, but you put a

11 temporary tenant in for January, February, March, you work on

12 a long term deal, you get a new tenant in there.  It reduces

13 our claim against the estate.  It helps us, as I say, for the

14 opportunity to get that temporary tenant into the space

15 because they don't have to do all these repairs.  I would

16 submit to Your Honor that it's rather obvious to the naked

17 eye that the last three pages, which show tables and rolling

18 racks in the center of the floor, I am not contesting that.

19 They can remove those.  It's the items that are affixed that

20 should stay and they don't have the right to sell these

21 items.

22      I am told that the estate has worked out an

23 arrangement with Hilco, the Liquidator that they get 15

24 percent of whatever is sold from this stuff.  Used equipment

25 has very little value, on the street.  It's more valuable to

1  the estate to leave these in place with the hope of a reduced

2  claim then it is to try to sell this stuff, which they don't

3  have the right to sell.  That is the offer of proof, Your

4  Honor.

5          THE COURT:  Mr. Durrer.  I am going to figure out

6  what a grade fixture is.

7          MR. DURRER:  Your Honor, I actually agree with Mr.

8  Conway on one point; that this is a bigger issue.  It

9  directly addresses your question.  We have got about 50 to 60

10  more leases.  Don't expect that we are going to have this

11  issue with everyone, but we may have it with more and what we

12  don't what to have is we don't want to be litigating on a

13  lease by lease basis, whether we have the right to sell

14  furniture, fixtures and equipment.

15          I may have misspoke when we spoke earlier, he had it

16  wrong.  The Debtor gets 80 percent, that the fee is 20 to the

17  Liquidators for selling this.  If you look at the first color

18  glossy photograph, you will see one of the other issues, Your

19  Honor, which is there is a DC logo on the cash drawer.  The

20  way this works in the real world, as Mr. Conway knows, is

21  that we work with the Liquidator and try to figure out a way

22  that is efficient, from the estates' perspective, mindful of

23  the expenses involved, to leave the store, you know, in a

24  broom clean condition.

25          If we can't sell that cash drawer, we are going to

1  be working with Hilco to make sure that that logo doesn't

2  remain there and that, you know, other intellectual property

3  of the estate are not adversely impacted by the condition in

4  which we leave the store.  That is going to be done on a case

5  by case basis.  So the Debtor needs to have absolute

6  authority over the stuff that it brought into the space.

7          Now, Mr. Conway, and Taubman and all the other

8  landlords have the absolute right to come into Your Honor and

9  complain about --

10          THE COURT:  Question.  You have mentioned it a

11  couple times, this is not the only retail case that we have

12  had.  It's not the only retail case I have today.

13          MR. DURRER:  We're not the only one in the building

14  today.

15          THE COURT:  Yeah.  I don't want to go all Passover

16  on you, but why is this case different from all other cases?

17          MR. DURRER:  I didn't see that one coming.

18          THE COURT:  Yeah, well that's because it's

19  September.

20          MR. DURRER:  I think it's exactly like other cases.

21          THE COURT:  No, my point is not whether it's

22  different or otherwise.  I am not saying that you are asking

23  for a ruling, frankly, that's different from what I have

24  approved or authorized in other cases, but I don't know that

25  I have ever actually made a ruling on this.  I have got a

1  room full of bankruptcy lawyers, if I said what's FF&E, they

2  know, generally, until you start to get to the details, and

3  you start looking at these pictures, and which is this is

4  FF&E.  It's been a long time since I represented Hilco.

5       Here is what I am struggling with.  I appreciate

6  you, frankly, saying or answering a question in advance of my

7  asking it, which was what is the significance of this.  All

8  right, if I am talking two stores and a bunch of racks, it's

9  not a lot of money, okay.  All money is important and I get

10 it, the issue is I don't want to just go, you know something,

11 this one goes to the landlord or this one goes to you because

12 I sided with Mr. Pollack 10 minutes ago on the other issue.

13 That has consequences, you know, for this case, in a way that

14 I am reluctant, and, obviously, then, if I am being asked to

15 deal with something that could come up all the time, I doubt

16 that Judge Walsh had any expectation that 17 years later we

17 would be pulling out two paragraphs from a transcript he said

18 in 1998.

19      So I am not sure how to deal with this right now.  I

20 am not sure whether or not I can, you know, I have instincts

21 about what FF&E is and what fixtures are, but, you know, I'm

22 not a real estate guy.  I am not the Debtors' real estate

23 person.  What is the best way for me to proceed, I mean other

24 than a magic decision coin.

25      MR. DURRER:  Here is what I suggest.  I think the

1  best way to proceed, Your Honor, is for Your Honor to grant

2  the motion, overrule the objection --

3          THE COURT:  Well, I figured that.

4          MR. DURRER:  For two really good reasons.

5          THE COURT:  Okay.

6          MR. DURRER:  Good reason number one is that this is

7  no different than every time, and I'm going to have things

8  thrown at me, I'm sure, that every time a landlord tries to

9  use its lease to lever more value from an estate, the fact

10  that he picked this lease provision as opposed to a

11  surrender, you know, in the condition that the premises were

12  at the beginning of the lease is no different, right.  The

13  obligations of the Debtor are clear, I can run my store, I

14  can sell all my stuff and then I leave.  The landlord is

15  trying to --

16          THE COURT:  The word my stuff is the critical thing.

17          MR. DURRER:  Right, but we are rejecting the lease

18  in which the my stuff dynamic is changed.  So they have

19  rejection damages to the extent that they can't enforce that

20  lease against us.  So that, I think, is fundamental with

21  respect to the *jurisprudence* in this Court.

22          THE COURT:  But if it's not your stuff, you can't

23  sell it.

24          MR. DURRER:  But, Your Honor, the provision, Mr.

25  Conway read it and we can have the reporter read it back, but

1  the provision says at the end of the lease, it becomes the

2  landlords stuff.  So it isn't their stuff yet.  I am in

3  bankruptcy now.  So I have protections that you can afford

4  me.  So they can't jump into my stuff prematurely pursuant to

5  a contract that you are authorizing me to reject.

6          THE COURT:  Okay.  Two reasons.

7          MR. DURRER:  The second reason is trust me.  If it

8  makes sense to leave the rack on the wall, Hilco/Gordon

9  Brothers, trust Hilco/Gordon Brothers, don't trust me, they

10  are going to leave the rack on the wall.  They are not going

11  to try and rip it off and sell it if it's worthless.  So I

12  think that there is a rule of reason that, I think, Your

13  Honor can presume in connection with ruling on this.

14          So, we can't have precedent that starts giving back

15  what we have gotten from landlords over, you know, the two

16  decades that you mentioned.  That is the most important thing

17  and the second thing is we are going to act as rational

18  commercial actors.

19          THE COURT:  Mr. Fox.

20          MR. FOX:  Let me complicate matters further, Your

21  Honor.

22          THE COURT:  This is your collateral.

23          MR. FOX:  Stephen Fox, Riemer & Braunstein on behalf

24  of Bank of America, the DIP ABL agent.  It is, Your Honor.

25  At least in the first instance we believe, given that as Mr.

1  Durrer indicated, this is a potentially broader issue in the

2  context of this case as well as others.  There is no question

3  that under both our prepetition ABL documents as well as our

4  DIP ABL documents, that this would serve as our collateral.

5  I'm sure that Mr. Nash, on behalf of the Term DIP Agent

6  would, likewise, stand up and echo our remarks because in the

7  first instance, given our intercreditor agreement, it would

8  be his client's collateral.

9        So at a minimum, what we have here is a potential

10 lien dispute between the landlord and the DIP lenders as to

11 who's got prior rights in this stuff.  That requires both a

12 factual inquiry as to when the respective lien rights would

13 arise.  I, frankly, don't recall when this lease began, but I

14 can tell you, under our prepetition documents, which roll

15 into the post-petition documents, we have been in this

16 financing for what, eight, ten years or so, so depending upon

17 when this lease was first entered into, as well as the

18 remaining 50 leases or if you include the 25 stores that are

19 not covered by Mr. Conway's clients leases, it's a broader

20 issue and one that would need to be examined at the

21 appropriate time.

22       I'm not sure today is it a debate what we should do

23 with some wall racking.  Your probably right that from an

24 economic value, relatively *de minimis* with respect to these

25 stores.  On a broader context, and given its precedential

1  value beyond this case, I think we need to be a little more

2  careful as to how we both characterize it and what law

3  applies, and then what lien priorities would apply.

4          THE COURT:  Well, I think the question in the lien

5  priorities may be a valid concern, certainly a concern for

6  your client.  I think that is a little bit more complicated

7  an inquiry then is before me today.  I understand the point,

8  but, at least, as a threshold matter this is a

9  Debtor/landlord issue.

10         MR. FOX:  Sure.

11         THE COURT:  And your concerns would flow through

12  whatever that ruling would be.  I don't want to frustrate or

13  disappoint anybody, I don't feel prepared to shoot from the

14  hip on this.  I know the Debtor needs a ruling.  I would do

15  one of two things.

16         MR. CONWAY:  Your Honor, if I may before you, I

17  heard you say you're not going to give a ruling, but before

18  you give a tenured ruling or set a course, if I could just

19  respond to a couple of points.  Good reason number one, I

20  believe counsel explained how until the lease is terminated,

21  he is protected by the bankruptcy code.  I would say that is

22  contrary to the lease language, which says that as soon as

23  it's deemed --

24         THE COURT:  Upon such attachment.

25         MR. CONWAY:  Exactly.  I think that effects the lien

1  question as well.  Let me just say, it's my understanding the

2  Liquidator should run this sale through the end of the year.

3  It gives us a little bit of time.  The Court doesn't need to

4  make a decision today.  They could say leave this stuff in

5  place until the Court does make a decision.

6        Let me go to your Passover reference, why is this

7  different than all other cases.  It's really not, from

8  Taubman's perspective, because we have this language in our

9  lease, all of our leases, it's always an issue for us.  You

10  have never heard it before because I have always worked it

11  out in side letter agreements with Liquidators and we have

12  always taken a very pragmatic, reasonable approach.  That

13  stuff, obviously, is not attached.  That has been the reason

14  why you have never heard it before.  This case is the

15  exception because of the Debtors' position in this particular

16  case.  You are not hearing from other landlords, either they

17  don't care or they don't have this language and they can't

18  rely on it.

19        In this case, today was the date for the objection

20  deadline.  You're not going to hear about it from any other

21  landlords in this case, perhaps in the future, I don't know.

22  You will hear about it from me in the future, but I don't

23  know about other litigants.

24        THE COURT:  Mr. Durrer, having heard that I am not

25  prepared to rule today, I am at your pleasure.  I mean, I

1  think I need more guidance from the parties.  I don't know

2  whether or not I need to hear from the secured creditors

3  about their respective positions. It does not, frankly, seem

4  to me that that bears on the issue.  If it's yours, then they

5  can fight over it.  If it's not, and it's the landlords, then

6  they can't fight over it.

7       I understand that they are interested in the answer,

8  but, again, this is one of those things where it's not so

9  much this, okay.  If this were a case and, I mean, I was

10  basically prepared to rule one way or the other, just because

11  it would seem to me unconscious able to send Skadden Arps and

12  another firm back for supplemental briefing on wall racking

13  in two stores.  A thousand stores, yeah, two stores no.

14       I'd ask that you confer with Mr. Conway and just let

15  me know what you want to do.  If you want to submit letters,

16  I am really not trying to burden the record here, but I agree

17  with you, this is important.  I am, again, reluctant to just

18  say, all right, you know, two stores, you win, your fine, who

19  cares because that comes up, then, in the next case with 600

20  stores.  It's significant and these are property right issues

21  that are not, you know, necessarily simple.

22       Again, experience teaches that most of the time

23  these issues are resolved.  So I don't want to attribute that

24  much significance to the fact that it's not often litigated.

25  I kind of anticipated that that was the issue and, again, you

1  know, my recent experience with this was that many, many

2  landlord issues, in the last retail case I had, were

3  presented and then promptly resolved.  And, you know, some of

4  these are factual issues, but I understand the Debtors'

5  concern and I would be prepared to deal with as you wish.

6         If the parties can resolve these issues, great, if

7  you can't, then I will take it in whatever format,

8  understanding that I will be, frankly, accommodating to

9  whatever process you think is appropriate to deal with this

10  discreet issue and kind of its not gone [indiscernible].  If

11  you want to confer with Mr. Conway and just let Chambers know

12  what we can expect or what you want to do, I'm at your

13  pleasure.  I believe that the order that you're looking for,

14  other than that discreet issue, does not seem to me to be in

15  controversy otherwise.  I believe the Debtor needs a measure

16  of relief today that will cover issues other than the racking

17  in a couple of stores.

18         MR. DURRER:  Right.  So I think, Your Honor, that

19  there certainly is no dispute that even within these two

20  stores that the Debtor does have FF&E that it is entitled to

21  sell.  So my suggestion is we will submit a form of order

22  that will grant the relief with respect to the Debtors' FF&E,

23  and I would be happy to discuss a side letter with Mr. Conway

24  about what that FF&E is not.  If we can't resolve that issue,

25  we will come back to Your Honor in a different procedural

1  posture.

2        THE COURT:  Mr. Conway, how does that sound?

3        MR. CONWAY:  I am totally agreeable with that, Your

4  Honor, with one exception, what I have represented to be the

5  tables or the photos.  I have shown you the tables and

6  rolling racks in the middle of the floor.  I prefer that

7  those be labeled personal property, which I believe they are,

8  in fact, rather than calling them FF&E, which is really what

9  is at issue here.

10        THE COURT:  Well, why don't we call them furniture?

11        MR. CONWAY:  Furniture and rolling racks, that's

12  exactly what they are.

13        THE COURT:  All right, I am not going to get in the

14  middle of this definitional discussion.  It seems to me that

15  the Debtor has carried its burden with respect to the relief

16  that's requested and I believe that an order can be entered

17  that preserves the concerns that have been expressed by Mr.

18  Conway and the Taubman Landlords; if not resolved, then those

19  issues could be presented for disposition.

20        MR. CONWAY:  Thank you, Your Honor.

21        THE COURT:  I will look for that order after it's

22  circulated to the parties.

23        MR. DURRER:  The next item on the agenda, Your

24  Honor, is number 8.  This is the employee wage motion.  We

25  did work with the Committee with respect to this one.  Your

1  Honor might recall that the primary issues that were held

2  over from the interim relief dealt with bonuses.  There is

3  sort of two flavors of bonuses.  There are bonuses for sales

4  people at, you know, more of a rank and file level.  There is

5  no controversy with respect to those.  There is some regional

6  manager bonuses as well.

7         Then, finally, there are yearend bonuses and it was

8  never the Debtors' intention to seek payment of those under

9  this motion.  So we have reached an agreement, in principal,

10  and I believe we have an agreement on the language, but to

11  the extent we don't, we will submit it under certification,

12  Your Honor.  Basically, at our fiscal year end, which is

13  October 31st, we're going to figure out whether any bonuses

14  are due to be paid in that context and then we will come back

15  to Your Honor if we need to pay any.  Obviously, we will work

16  with the Committee on that as well.

17         THE COURT:  Mr. Stamer, anything to add?

18         MR. STAMER:  Your Honor, nothing to add.  We have no

19  objection.

20         THE COURT:  Very good.  I will take all these orders

21  at the end of the hearing.

22         MR. DURRER:  Thank you, Your Honor.

23         MR. RILEY:  Your Honor, Richard Riley from Duane

24  Morris on behalf of ACE.  We also, through an informal

25  objection, had some language added to this order to allow ACE

1  to administer Worker's Comp claims.

2         THE COURT:  Terrific.  That sounds fine.  All right,

3  I will look for that order.

4         MR. DURRER:  Your Honor, number 9 is our utilities

5  motion.  Again, this was granted interim relief at the

6  original September 10th hearing.  We worked with the Committee

7  and some of the other parties to deal with some of the

8  noticing issues in the order, but there is no substantive

9  changes and there is no objection to that order, Your Honor.

10        THE COURT:  Okay.  Does this mean that the objection

11  of Florida Power & Light, and some others has been resolved?

12        MR. DURRER:  Yes, Your Honor.

13        THE COURT:  I thought so.  Okay, great.

14        MR. DURRER:  Item number 10, Your Honor, is the

15  claims agent retention application.  We worked with the

16  United States Trustee to include some language changes with

17  respect to that as well. That is unopposed.

18        THE COURT:  Terrific.  I would ask if anyone else

19  wishes to be heard with respect to the KCC retention.  Very

20  well.  Based upon the record before me, I am satisfied that

21  the Debtors have carried their burden with respect to the

22  retention of KCC, the service, claims and noticing agent, and

23  administrative services *nunc pro tunc* to the [indiscernible,

24  coughing].  Very well, it will issue.

25        MR. DURRER:  Thank you, Your Honor.  We had moved

1  number 11 to October 14th.  Number 12 is the schedules and

2  statements extension motion, Your Honor.  There was no

3  opposition, no issues.  We are aiming to beat our extension

4  deadline, but that is a pretty non-controversial request.

5         THE COURT:  Okay.  That sounds fine.  I will extend

6  that in the absence of opposition.

7         MR. DURRER:  Thank you.  Consistent with that, Your

8  Honor, number 13 relates to the 2015.3 additional disclosures

9  for the non-Debtor subsidiaries and there was no opposition

10  to that either.

11         THE COURT:  Great.  Does anyone else wish to be

12  heard?  Very well, that motion is granted.

13         MR. DURRER:  With respect to number 14, Your Honor,

14  this is our ordinary course professional's motion.  We had

15  comments both from the U.S. Trustee and from the Committee

16  with respect to the dollar figure involved for the ordinary

17  course professionals.  As it turns out, there is really only

18  one professional that sits at the higher level, at

19  $100,000.00.  So what we agreed with both parties is just to

20  adopt a two tier approach.  So there will be one firm that

21  will sit up at that level and everybody else is around

22  $30,000.00.  With that, we were able to resolve any of those

23  informal issues that the parties had raised.

24         THE COURT:  Mr. Stamer, is the Committee satisfied

25  with that form of order?

1        MR. STAMER:  Your Honor, we are.

2        THE COURT:  Very well. Anyone else wish to be heard?

3   Okay.  I understand the modification a described by counsel

4   and its embodied in a revised form of order.  That motion is

5   granted.  The order will issue.

6        MR. DURRER:  Item number 15 on the agenda, Your

7   Honor, is the Pachulski retention application.  I want to

8   pass the podium to Ms. Jones.

9        THE COURT:  Sure.  Ms. Jones.

10        MS. JONES:  Good morning, Your Honor, Laura Davis

11   Jones, Pachulski Stang Ziehl & Jones.  Your Honor, with

12   respect to our retention, there were a couple of questions

13   that Mr. Kenney and I went back and forth on.  We resolved

14   those issues.  So, Your Honor, there is no objections pending

15   to that application.

16        THE COURT:  Very well.  Does anyone else wish to be

17   heard with respect to the Pachulski retention?  Okay.  I have

18   reviewed the retention.  I am satisfied the Debtors have

19   carried their burden with respect to the relief requested and

20   the Pachulski Firm is eligible and available.  So that order

21   will issue as well.

22        MS. JONES:  Thank you, Your Honor.  Your Honor,

23   while I am at the podium, I was asked to  let Your Honor know

24   that we did submit to Chambers, this morning, a copy of a

25   motion we filed last night, which was a motion to shorten

1  time with respect to a stay relief.

2      THE COURT:  Ms. Jones?

3      MS. JONES:  Yes, sir.

4      THE COURT:  When do you want that heard?

5      MS. JONES:  At the next hearing, Your Honor.

6      THE COURT:  At the end of the hearing?

7      MS. JONES:  At the next hearing, Your Honor.

8      THE COURT:  Sure.

9      MS. JONES:  I'll take the end of the hearing to.

10     THE COURT:  No.  Well, I would ask, has the

11 Committee seen the motion to expedite?

12     MR. STAMER:  Your Honor, I don't think we have spent

13 sufficient time.  I think the next hearing would be great.

14 We don't have an issue with respect to shortening time.

15     THE COURT:  Okay.  Does anyone else wish to be heard

16 with respect to the request for a reduction of time?  All

17 right, given the nature of the relief that is identified and

18 at least in the absence of opposition to the scheduling, I

19 will grant that and you can notice that up.

20     MS. JONES:  Thank you, Your Honor, I appreciate

21 that.

22     MR. DURRER:  Your Honor, number 16 is the bar date

23 motion.  Obviously, we have plan milestones that we are

24 trying to hit and the bar date is relevant to that.  We have

25 keyed the bar date request off of the anticipated filing and

1  the schedules.  So I don't think the U.S. Trustee has raised

2  any issues with respect to that.  We did soften some of the

3  language with respect to the consequences of not filing a

4  claim on time, as requested by the U.S. Trustee, and then

5  ACE, as well, had some language that Mr. Riley submitted that

6  was not controversial.  So there will be a revised form of

7  order, but that is unopposed.

8           THE COURT:  What is the proposed bar date, general

9  unsecured bar date?

10          MR. DURRER:  I think it is --

11          THE COURT:  It hasn't changed from what you

12 originally filed?

13          MR. DURRER:  No, that has not changed.  Yeah, 28

14 days after the service and the notice, Your Honor.

15          THE COURT:  Okay.

16          MR. DURRER:  That concludes the agenda.  The other

17 two matters, as I mentioned earlier, were continued to the

18 October 14th hearing.  We do need to discuss, Your Honor, both

19 the time of that hearing and we also wanted to make our

20 request for an omnibus hearing as well as a potential

21 disclosure statement hearing.  Your Honor might recall that

22 Friday is our deadline for getting a plan and disclosure

23 statement on file.  What we had envisioned for the disclosure

24 statement hearing was the week prior to the Thanksgiving

25 week, as an appropriate time to have that on calendar.

1    THE COURT:  Okay.  Well, let's talk about the timing

2  for the hearing on the 14th.  Again, I appreciate getting the

3  heads up.  I didn't say I was enthusiastic, but I appreciate

4  getting a heads up.  Why don't we schedule that for 10:00

5  a.m. on the 14th instead of 1:00 p.m.; I'm not going to

6  require that the Debtor re-notice, well, actually, you

7  haven't noticed the motions yet, have you, for the 14th?

8    MR. DURRER:  For the 14th, no, Your Honor.  I think

9  it's appropriate to send a notice.

10    THE COURT:  Yeah.  So the notice will reflect that

11  matters that are carried from today will be to a hearing at

12  10:00 a.m.  You may need to be a little bit flexible because

13  we have got other items on.  I am going to try to push them

14  all before 10:00 a.m.

15    MR. DURRER:  Of course.

16    THE COURT:  But I think it just makes sense to have

17  that.  Again, it also affords a little time if you got a lot

18  of moving parts, if you want breaks during this, having a

19  little bit more time, I think, may be productive.  So we will

20  go with that.  I will leave the parties to determine dates

21  and deadlines.  The submission date, I think, for your

22  agenda, would be the 9th because of the holiday.  But if there

23  are replies, etc., my practice to leave that to counsel.  If

24  you can reach agreements on that process, that would be fine.

25  So then you are asking for other dates.  I think I would like

1    to hear what you have to ask for and then I would hear from

2    the Committee or any other party with respect to the discreet

3    schedule request.

4        MR. DURRER:  Certainly, so I think the main thing

5    that we would want, Your Honor, is a disclosure statement

6    hearing the week of the 16th of November.

7        THE COURT:  Okay.  I have time in that week if need

8    be, and you are looking for an omnibus date in between those

9    two, right?

10        MR. DURRER:  Correct, Your Honor.

11        THE COURT:  Let me hear from the Committee about,

12    this would be for the disclosure statement, correct?

13        MR. DURRER:  Correct, Your Honor.

14        THE COURT:  Understanding, of course, that the

15    scheduling doesn't bless anybody's timelines, etc., but I

16    have some guess about what is coming with the Committee

17    objections, etc. I would like to hear your thoughts on the

18    request for scheduling.  This is, as I understand it, the

19    Debtors' desire to comply with the milestone requested.

20        MR. DURRER:  Yeah, just to be clear, Your Honor, the

21    milestone is, I believe, November 23rd, which is the day

22    before Thanksgiving.  So in terms of, and then looking

23    forward, hitting the next deadline, plan confirmation with

24    taking into account the holidays, we basically want to be

25    mailing stuff Thanksgiving week.  So having a hearing that

1  prior week should be sufficient time.  Obviously, the earlier

2  in the week it is, the better it is, in terms of getting

3  things out the door.

4          THE COURT:  I understand.

5          MR. DURRER:  But, really any day that week we can

6  accommodate our schedule.  The Debtor would like to be in a

7  position to meet all of its milestones, of course.

8          THE COURT:  Okay.  Mr. Stamer.

9          MR. STAMER:  Your Honor, thank you.  The Committees'

10 view is we have no objection to a holding date the week of

11 the 17th.  Your Honor, again, without previewing what's going

12 to happen on the 14th, we will raise a number of issues with

13 respect to the PSA, the DIP, timing, the need for a more

14 comprehensive process, all that good stuff.  So with the

15 ability to reserve our rights to argue on the 14th, that date

16 doesn't work for a variety of reasons.  We have no objection

17 to a holding date and an omnibus date in between.  We,

18 obviously, have no objection to that as well.  That is our

19 position.

20         THE COURT:  Okay.  All right, I appreciate it.  Does

21 anyone else wish to be heard with respect to a scheduling

22 issue?  Mr. Nash, good morning.

23         MR. NASH:  Good morning, Judge, Pat Nash on behalf

24 of Oaktree.  Your Honor, I didn't know if I would get an

25 opportunity to rise and make this point, but I guess I can

1   now.  That is only that Mr. Stamer and Mr. Durrer would be

2   the first to admit that when it came to pushing off the plan

3   support agreement motion, and the DIP financing motion with

4   respect to Oaktree, Your Honor, they were pushing through an

5   open door.  I mean, we do understand and appreciate the fact

6   that Mr. Stamer was recently retained.

7          It doesn't surprise Your Honor to hear that I have

8   tremendous respect for Mr. Stamer and that I have worked with

9   him many times before.  We appreciate that here on the front

10  end, he does need an opportunity to get his arms around the

11  situation.  It won't also surprise Your Honor, I suspect to

12  hear that from our perspective we do think that the ultimate

13  case timeline is important.  We are dealing with a retailer,

14  Your Honor that is in bankruptcy.  It's not like fine wine,

15  as Your Honor knows from your many experiences.  We do think

16  it's important for this company to remain on an efficient and

17  expeditious timeline.

18         Your Honor, I think, frankly, our reasonableness

19  started prior to the filing date with what we think is,

20  frankly, a relatively reasonable schedule here from the

21  outset. We do think that we have enough time to get done what

22  needs to be done and I do appreciate, Your Honor, that we

23  will be dealing with this more next week.  With that, Your

24  Honor, thank you very much.

25         THE COURT:  Sure.  Okay.  Anyone else?  All right, I

1  am prepared to schedule the hearing that has been requested

2  by the Debtor for 10:30 a.m. on Tuesday, the 17th of November.

3  I guess to sort of balance my observations to the extent that

4  I need to make any, I understand the Debtors' point with

5  respect to the milestones and the timeline that's been

6  developed and negotiated prepetition and Mr. Nash just

7  discussed.  I would also observe that, from the Court's point

8  of view, I regard this as a holding date and we will deal

9  with these issues on the 14th as to the propriety of the

10  timing, etc.

11       I think it makes sense to schedule these matters,

12  just to ensure that there is time available on the calendar

13  for however the process plays out.  But I will deal with

14  these issues on the merits and the fact of scheduling doesn't

15  really tip the balance one way or the other.  Mr. Durrer, do

16  we have anything else?

17       MR. DURRER:  Did Your Honor have in mind an omnibus

18  date in between?

19       THE COURT:  Yeah, sure.  So today is the 6th.  I can

20  either give you the 19th or something in the week of the 26th?

21       MR. DURRER:  Of November, Your Honor?

22       THE COURT:  I thought you were looking for a date in

23  October.  You know, most of my retailers want a hearing about

24  every three days.  You are going to have a lot of credibility

25  if you are looking for November.  Do you want the end of

1   October, do you want early November?

2         MR. DURRER:  I think the end of October would be

3   great.

4         THE COURT:  Okay.  How about the 26th of October at

5   11:00 a.m.; that's a Monday.

6         MR. STAMER:  Your Honor, if there is a chance we can

7   do it later that week. I am actually scheduled to be out of

8   town that day.

9         THE COURT:  Okay.  I can do the 28th and I can do

10  that at 1:30 in the afternoon, but I would give you a head's

11  up.  I am treating this as an omnibus and I have about two

12  hours that day because I have a bunch of other items on.  So

13  if you would just keep that in mind, we will get a lot of

14  stuff done, but if we have other stuff, you are just going to

15  need to let me know and I can find another time, but I

16  actually have a number of commitments in October.

17        MR. DURRER:  Understood, Your Honor.

18        MS. VOLKOV:  Your Honor.

19        THE COURT:  Yes.

20        MS. VOLKOV:  Hi, this is Ilana Volkov from Cole

21  Schotz on the phone, how are you?

22        THE COURT:  Fine, how are you.

23        MS. VOLKOV:  Good, good. If you recall, I represent

24  the Time Square Landlord and it was my understanding that Mr.

25  Durrer was going to make a statement on the record regarding

1  the agreement that was reached by my client, the Debtors and

2  Hilco regarding our lease and our informal objection to the

3  store closing motion, which was item number 7 on the agenda.

4  Mr. Durrer, I am happy to say something if I am taking you

5  off guard here.

6           MR. DURRER:  No, no.  We have a letter agreement,

7  Your Honor that my understanding is we have reached agreement

8  on the terms of.  I think we are just waiting for signatures,

9  but our understanding is that the issues between Hilco,

10 Gordon Brothers, the Landlord and the Debtor are all

11 resolved.

12          THE COURT:  Terrific, I will look for that, well,

13 actually, I won't because the side agreement is between the

14 parties.  If there are issues, obviously, I will be here, but

15 I am pleased to hear that the issues that were identified at

16 the outset of the case, have been satisfactorily resolved as

17 a business matter and, I think, we will go from there.

18          MS. VOLKOV:  Yes, and it's our expectation that that

19 is all going to be signed today, Your Honor.

20          THE COURT:  Very good.  Does anyone else wish to be

21 heard with respect to matters?  So, Mr. Durrer, if you want

22 to give your orders to the Court reporter when we are

23 concluded, I will make sure that they are signed and they

24 will be entered on the docket today.

25          MR. DURRER:  Certainly, Your Honor.  Thank you.

1          THE COURT:  All right, we will stand in recess.

2    Thank you very much, counsel.

3        (Court Adjourned)

4

5

6

7

8

9                          CERTIFICATE

10

11   I certify that the foregoing is a correct transcript from the

12   electronic sound recording of the proceedings in the above-

13   entitled matter.

14
     /s/Mary Zajaczkowski                    October 7, 2015
15   Mary Zajaczkowski, CET**D-531                 Date

16

17

18

19

20

21

22

23

24

25