## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- x

In re:

QUIKSILVER, INC., *et al.*,[1]

                            Debtors.

-------------------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 15-11880 (BLS)

Jointly Administered

## JOINT OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' (I) MOTION FOR AUTHORIZATION TO OBTAIN POSTPETITION FINANCING AND (II) MOTION FOR AUTHORITY TO ASSUME PLAN SPONSOR AGREEMENT AND PAY RELATED BREAK-UP FEE AND TRANSACTION EXPENSES

**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, New York  10036
Michael S. Stamer (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

*Proposed Co-Counsel to the Official Committee of Unsecured Creditors*

**PEPPER HAMILTON LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, Delaware  19899
David B. Stratton (DE No. 960)
David M. Fournier (DE No. 2812)
John H. Schanne II (DE No. 5260)
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390

*Proposed Co-Counsel to the Official Committee of Unsecured Creditors*

Date:  October 9, 2015
        Wilmington, Delaware

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................. i

PRELIMINARY STATEMENT...........................................................................1

BACKGROUND ..................................................................................................6

A.    The Debtors' Prepetition Debt Structure.................................................6

    1.    The Prepetition ABL Facility .........................................................6

    2.    The U.S. Notes................................................................................7

    3.    The Euro Notes ...............................................................................7

B.    Commencement of the Debtors' Chapter 11 Cases..................................8

C.    The Proposed DIP Term Facility and DIP ABL Facility.........................8

D.    The Proposed Adequate Protection to the Prepetition Secured Parties............................13

E.    The Plan Sponsor Agreement and the Sponsored Plan ..........................13

OBJECTION......................................................................................................15

A.    The Proposed Financing Should Not Be Approved................................15

    1.    The Legal Standard for Postpetition Financing ...........................15

    2.    The Superior DIP Proposal Is Significantly Better Than the Proposed Financing.......................................................................17

    3.    The Debtors' Access to the Proposed Financing and Approval of the PSA Are Improperly Linked and Constitute a *Sub Rosa* Plan ......................................20

    4.    The DIP Lenders Should Not Receive Liens on Previously Unencumbered Assets ....................................................................26

    5.    The Limitations on the Committee's Ability To Investigate and Pursue Lender Claims Are Unacceptable .............................31

    6.    The Bankruptcy Code Section 506(c) and 552(b) Waivers in the Proposed Financing Should Not Be Permitted as Proposed ...................................34

    7.    Additional Modifications Should Be Made with Respect to the Financial Terms and Covenants of the Proposed Financing..................36

B.    The PSA Motion Should Not Be Approved Without Modifying Certain Terms of the PSA ......................................................................38

    1.    The Circumstances of the PSA Do Not Warrant a Break-Up Fee, Much Less the Oversized Break-Up Fee Proposed........................39

i

2.    The Proposed Fiduciary "Out" Gives the Debtors Little Meaningful Opportunity To Consider Alternative Proposals ....................................................50

RESERVATION OF RIGHTS ...........................................................................................52

CONCLUSION..................................................................................................................53

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ames Dep't Stores, Inc.*,
115 B.R. 34 (S.D.N.Y. 1990)................................................................16

*Bland v. Farmworker Creditors*,
308 B.R. 109 (S.D. Ga. 2003)...........................................................16, 18

*Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*,
229 F.3d 245 (3d Cir. 2000)................................................................30

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*,
181 F.3d 527 (3d Cir. 1999)........................................39, 40, 41, 42

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
530 U.S. 1 (2000)..............................................................................35

*In re 155 Route 10 Assocs.*,
No. 12-24414 (NLW) (Bankr. D.N.J. June 29, 2012) ..........................31

*In re Ames Dep't Stores, Inc.*,
287 B.R. 112 (Bankr. S.D.N.Y. 2002).................................................28

*In re Belk Props., LLC*,
421 B.R. 221 (Bankr. N.D. Miss. 2009) ..............................................23

*In re Bidermann Indus. U.S.A., Inc.*,
203 B.R. 547 (Bankr. S.D.N.Y. 1996)............................................47, 48

*In re Buffets Rests. Holdings, Inc.*,
No. 12-10237 (MFW) 2012 WL 1141583 (Bankr. D. Del. Jan. 19, 2012) ...........................33

*In re Caribbean Petroleum Corp.*,
No. 10-12553 (KG) 2010 WL 6982178 (Bankr. D. Del. Aug. 12, 2010)..............................33

*In re Chemtura Corp.*,
No. 09-11233 (REG) (Bankr. S.D.N.Y. Apr. 29, 2009) .........................35

*In re Copy Crafters Quickprint, Inc.*,
92 B.R. 973 (Bankr. N.D.N.Y. 1988) ..................................................24

*In re Crouse Group, Inc.*,
71 B.R. 544 (Bankr. E.D. Pa. 1987) ...................................................15

*In re Crowthers McCall Pattern, Inc.*,
114 B.R. 877 (Bankr. S.D.N.Y. 1990).................................................23

i

*In re Delta Air Lines, Inc.*,
No. 05-17923 (CGM) (Bankr. S.D.N.Y. Oct. 6, 2005) ..........................................................33

*In re EWGS Intermediary, LLC,*
No. 13-12876 (MFW) (Bankr. D. Del. Nov. 20, 2013) ..........................................................32

*In re Excel Maritime Carriers, Ltd.*,
No. 13-23060 (RDD) (Bankr. S.D.N.Y. Aug. 6, 2013) ..........................................................30

*In re Exide Techs.*,
No. 13-11482 (KJC) (Bankr. D. Del. July 25, 2013) ..............................................................31

*In re Farmland Indus., Inc.*,
294 B.R. 855 (Bankr. W.D. Mo. 2003) ..................................................................................16

*In re Genco Shipping & Trading Ltd.*,
509 B.R. 455 (Bankr. S.D. N.Y. 2014) ......................................................................... passim

*In re Global Crossing Ltd.*,
295 B.R. 726 (Bankr. S.D.N.Y. 2003) ...................................................................................20

*In re iGPS Co. LLC*,
No. 13-11459 (KG) 2013 WL 4777667 (Bankr. D. Del. July 1, 2013) ...................................35

*In re Innkeepers USA Trust*,
442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...................................................................................20

*In re Integrated Res., Inc.*,
135 B.R. 746 (Bankr. S.D.N.Y. 1992) ..............................................................................47, 48

*In re Los Angeles Dodgers LLC*,
457 B.R. 308 (Bankr. D. Del. 2011) ......................................................................................15

*In re Namco, LLC*,
No. 13-10610 (PJW) 2013 WL 1332581 (Bankr. D. Del. Mar. 24, 2013) .............................35

*In re Old HB, Inc. (f/k/a Hostess Brands, Inc.)*,
No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012) ..........................................................30

*In re Old Razor Co., LLC (f/k/a American Safety Razor Co., LLC)*,
No. 10-12351 (MFW) (Bankr. D. Del. Aug. 27, 2010) ..........................................................32

*In re Ormet Corp.*,
No. 13-10334 (MFW) (Bankr. D. Del. Mar. 22, 2013) ..........................................................33

*In re Phoenix Payment Sys., Inc.*,
No. 14-11848 (MFW) (Bankr. D. Del. Sept. 3, 2014) ............................................................31

*In re Quality Beverage Co.*,
　181 B.R. 887 (Bankr. S.D. Tex. 1995) ................................................................23

*In re Reliant Energy Channelview L.P.*,
　No. 07-11160 (Bankr. D. Del. Mar. 18, 2008) ...................................................42

*In re Reliant Energy Channelview LP*,
　594 F.3d 200 (3d Cir. 2010) ...................................................................39, 40, 41

*In re RS Legacy Corp. (f/k/a RadioShack Corp.)*,
　No. 15-10197 (BLS) (Bankr. D. Del. Mar. 12, 2015) .........................................32

*In re Rural/Metro Corp.*,
　No. 13-11952 (KJC) 2013 WL 5594837 (Bankr. D. Del. Sept. 10, 2013) ...........33

*In re Seal123, Inc. (f/k/a The Wet Seal, Inc.)*,
　No. 15-10081 (CSS) (Bankr. D. Del. Mar. 19, 2015) ..........................................32

*In re Source Home Entm't, LLC*,
　No. 14-11553 (KG) 2014 WL 4655748 (Bankr. D. Del. July 22, 2014) ...............33

*In re Tenney Vill. Co.*,
　104 B.R. 562 (Bankr. D.N.H. 1989) ....................................................................16

*In re TOUSA, Inc.*,
　No. 08-10928 (Bankr. S.D. Fla. Jan. 9, 2009) ....................................................33

*In re Tribune Co.*,
　464 B.R. 126 (Bankr. D. Del. 2011) .....................................................................30

*In re Tropicana Entm't, LLC*,
　No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008) ...........................................33

*In re UBI Liquidating Corp. (f/k/a Urban Brands, Inc.)*,
　No. 10-13005 (KJC) (Bankr. D. Del. Oct. 13, 2010) ...........................................32

*In re W. Pac. Airlines*,
　223 B.R. 567 (Bankr. D. Colo. 1997) .............................................................16, 18

*Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*,
　780 F.2d 1223 (5th Cir. 1986) .............................................................................24

*Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.)*,
　222 B.R. 417 (Bankr. S.D.N.Y. 1998) .................................................................28

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*,
   147 B.R. 650 (S.D.N.Y. 1992)................................................................................44

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*,
   226 F.3d 237 (3d Cir. 2000)................................................................................30

*Official Comm. of Unsecured Creditors v. CIT Group/Business Credit Inc. (In re Jevic Holding Corp.)*,
   787 F.3d 173 (3d Cir. 2015)...........................................................................24, 25

*Official Comm. of Unsecured Creditors v. Forman (In re Forman Enters., Inc.)*,
   273 B.R. 408 (Bankr. W.D. Penn. 2002) ..............................................................28

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*,
   700 F.2d 935 (5th Cir. 1983) ........................................................................23, 24

*Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*,
   57 F.3d 321 (3d Cir. 1995)................................................................................34

*Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*,
   145 B.R. 312 (B.A.P. 9th Cir. 1992)....................................................................16

**STATUTES**

11 U.S.C.
   § 363.................................................................................11, 24, 41, 42, 43
   § 363(b).......................................................................................................24
   § 364(c).........................................................................................................9
   § 364(d)...............................................................................................9, 16, 17
   § 364(d)(1)..................................................................................................16
   § 502...........................................................................................................20
   § 502(d).......................................................................................................30
   § 503(b).......................................................................................................39
   § 506...........................................................................................................20
   § 506(c)...........................................................................................4, 19, 34, 35
   § 507(b).................................................................................................30, 31
   § 544...........................................................................................................30
   § 544(b).......................................................................................................30
   § 545...........................................................................................................30
   § 547...........................................................................................................30
   § 548...........................................................................................................30
   § 549...........................................................................................................30
   § 550...........................................................................................................30
   § 552(b)...........................................................................................4, 19, 34, 35
   § 553...........................................................................................................30

§ 1102....................................................................................................................................8

26 U.S.C. § 956 ...................................................................................................................29

**OTHER AUTHORITIES**

Ellen A. Friedman, *Buying a Distressed or Bankrupt Company*, American Law Institute
    (Feb. 28 - Mar. 1, 2002).................................................................................................20

The Official Committee of Unsecured Creditors (the "Committee") of Quiksilver, Inc. ("Quiksilver") and its affiliated debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby submits this objection (the "Objection") to the (i) *Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors To (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Dkt. No. 17] (the "DIP Motion") and (ii) *Debtors' Motion for Entry of an Order Authorizing and Approving (I) the Debtors' Assumption of the Plan Sponsor Agreement; and (II) the Payment of the Break-Up Fee and Related Transaction Expenses* [Dkt. No. 25] (the "PSA Motion" and, together with the DIP Motion, the "Motions").[2]  In support of this Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT[3]

1.       By the Motions, the Debtors seek approval of a comprehensive scheme designed to take value from unsecured creditors for the benefit of secured creditors on an expedited timeframe that effectively precludes the Debtors from running a competitive process to maximize value for all stakeholders.  Currently, this scheme is being implemented through two Motions:  (a) the DIP Motion, by which the Debtors seek approval of an above-market, short-term financing that contains, among other things, hair-trigger cross-defaults to an oppressively

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in, as applicable, the Motions, the Interim DIP Order, or any of the exhibits thereto.

[3] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in this Objection.

tight set of plan milestones and (b) the PSA Motion, by which the Debtors seek approval of,
among other things, the $20 million Break-Up Fee, designed to prevent a competitive sale
process and frustrate the Debtors' ability to exercise their fiduciary duties to pursue higher or
better offers.  As set forth in detail below, the Motions should be denied for two reasons:
(i) earlier this week, the Debtors received an executed, binding commitment letter for DIP
financing on significantly better economic and non-economic terms (the "Superior DIP
Proposal"), a copy of which is attached as Exhibit A hereto; and (ii) both Motions fail to comply
with applicable law.

2.      Pages 18-19 of this Objection contain a chart comparing the material economic
terms of the Proposed Financing and the Superior DIP Proposal.  The chart demonstrates that the
Superior DIP Proposal is, in fact, better than the Proposed Financing with respect to virtually
every substantive economic and non-economic term.  The Superior DIP Proposal is cheaper,
longer in duration and provides the Debtors with greater flexibility to prosecute these chapter 11
cases to maximize value.  In addition, while the Proposed Financing would grant the DIP
Lenders liens on all of the Debtors' assets, including the Unencumbered Foreign Stock and
avoidance action proceeds, the Superior DIP Proposal would not be secured by a lien on *any*
previously unencumbered assets—most importantly, the Unencumbered Foreign Stock and
proceeds of avoidance actions—and would leave such valuable assets unencumbered for the
benefit of unsecured creditors.  In light of the Superior DIP Proposal, the DIP Motion must be
denied.

3.      Even if the Debtors had not received the Superior DIP Proposal, the DIP Motion
must be denied because the terms of the Proposed Financing violate applicable law in numerous
respects.  First, the DIP Credit Agreements cross-default with the plan milestones set forth in the

2

PSA and inappropriately restrict the Debtors' ability to operate as fiduciaries in these chapter 11

cases.  Each of the DIP milestones relating to the PSA is set forth in the chart on pages 18-19 of

this Objection.  Additionally, Section 5.01(a) of the PSA provides that if the Debtors default

under the DIP Credit Agreements, such default would also constitute an event of default entitling

the Plan Sponsor to terminate the PSA.  The DIP Credit Agreements also contain numerous other

events of default designed to prevent the Debtors from pursuing any transaction other than the

Sponsored Plan.   Taken as a whole, this integrated structure, if approved, impermissibly dictates

the terms of a plan—and the fate of unsecured creditors—just weeks after the Petition Date.

Accordingly, by agreeing to the terms of the DIP Credit Agreements, the Debtors propose to

cede control over these cases to their largest secured creditor—effectively destroying the delicate

system of checks and balances that otherwise ensures the proper and equitable operation of a

chapter 11 process.

4.     Second, the Proposed Financing would, if approved, grant the DIP Lenders

unnecessary liens on previously unencumbered assets, including a pledge of a valuable

unencumbered asset that would otherwise be available to satisfy unsecured claims—the

unencumbered equity in each of the Debtors' direct foreign subsidiaries.  Neither the Debtors nor

the DIP Lenders, however, have produced any evidence indicating that (a) the grant of a lien on

the Unencumbered Foreign Stock was necessary to secure the DIP Lenders' commitment to fund

the Proposed Financing, or (b) the value of the remaining DIP Collateral is insufficient to protect

the DIP Lenders' exposure under the Proposed Financing.  Moreover, the Debtors have not

addressed whether and to what extent the grant of a lien on the Unencumbered Foreign Stock

would trigger adverse and potentially material tax consequences in the form of a "deemed

dividend" liability.  In light of the fact that the Debtors received a committed financing proposal

3

in the same amount of financing on substantially better terms without taking a lien on the

Unencumbered Foreign Stock, the Debtors cannot meet their burden to prove that the grant of a

lien on the Unencumbered Foreign Stock is a necessary inducement to secure adequate

postpetition financing.  If the Court is nevertheless willing to approve the Debtors' grant of a lien

on the Unencumbered Foreign Stock, such lien should be granted on a conditional or springing

basis and should arise only if (i) the DIP Lenders convince this Court that the existing collateral

package (minus the Unencumbered Foreign Stock) is insufficient to satisfy outstanding

obligations under the Proposed Financing at the conclusion of these cases and (ii) the Debtors

secure and file an opinion letter from counsel opining that such lien will not trigger adverse tax

consequences for the Debtors, their subsidiaries or their estates.

5.    In addition, the Proposed Financing suffers from multiple additional infirmities

that (together with the issues addressed above) should cause this Court to deny the DIP Motion,

including the following:

- restricting the Committee's ability to investigate and, if appropriate, challenge the Prepetition Secured Parties' liens and claims through an unreasonably tight 60-day Challenge Period and an Investigation Cap of just $50,000;

- imposing indemnity obligations on the Debtors and their estates before the Committee has had an opportunity to conduct any investigation of Oaktree or its claims;

- waiving the Debtors' rights under Bankruptcy Code sections 506(c) and 552(b) as to all secured debt (both prepetition and postpetition) without due consideration for the impact of such broad waivers on all creditors;

- charging interest for new money lent under the DIP Term Facility at the above-market rate of 12% per annum;

- requiring the payment of excessive and unwarranted fees, including (i) a $2.3 termination fee, (ii) an original issue discount of $3.45 million that was paid in full on the first day of funding rather than as funds are drawn over time and (iii) fees paid in connection with $25 million of the $115 million DIP Term Loan, which amount is wholly uncommitted and to be funded at the sole discretion of the DIP Lenders;

4

- imposing an unnecessarily early maturity date with no extension mechanism in place;

- limiting the borrowing base under the DIP ABL Credit Agreement to a calculation based upon, among other things, the face amount of certain credit card receivables multiplied by a below-market advance rate of only 70%;

- providing the DIP ABL Agent with the right to establish reserves on the borrowing base in its sole discretion pursuant to the DIP Motion, contradicting the terms of the DIP ABL Credit Agreement, which appropriately provides that the DIP ABL Agent's judgment in this respect must be commercially reasonable from the standpoint of an asset-based lender;

- requiring the Debtors to find a replacement chief restructuring officer within just five business days of such officer's resignation;

- neglecting to provide the Committee with all notices and reports, including, but not limited to, any financial updates and analyses to be provided by the Debtors to the DIP Agents and the DIP Lenders;

- imposing inappropriate constraints on the Committee's professionals through the adoption of unrealistic and disproportionately low budgeted line-items for the Committee's counsel and financial advisor; and

- implementing unrealistic budget variance tests with respect to receipts and disbursements that are overly restrictive and serve to penalize the Debtors.

6.    The PSA Motion presents additional concerns for the Committee, most important among them the fact that the Debtors have effectively transferred control over these cases to their secured lenders by, among other things, negotiating away their ability to utilize a fiduciary out and pursue a superior transaction.  The Debtors have done so by, among other things, agreeing to the $20 million Break-Up Fee for Oaktree, which effectively prevents a competitive process and hamstrings the Debtors' ability to engage meaningfully with other potential purchasers or exit financing sources.  Moreover, the Debtors have not shown (and indeed, cannot show) that the Break-Up Fee is a necessary inducement to keep Oaktree—a creditor that holds in excess of $200 million in principal amount of the U.S. Secured Notes and approximately 6% of the Euro Notes—at the bargaining table.  The Break-Up Fee also greatly exceeds the range of break-up fees held to be acceptable by courts in this jurisdiction and is based upon an overly inflated

calculation of "new value" that Oaktree is purporting to provide.  Any break-up fee—let alone the $20 million Break-Up Fee—is wholly inappropriate under the facts and circumstances of these cases.

7.      For the reasons set forth above and in the balance of this Objection, the Motions should be denied.

## BACKGROUND

### A.      The Debtors' Prepetition Debt Structure

8.      The Debtors assert that, as of September 9, 2015 (the "Petition Date"), they had funded debt outstanding of approximately $850 million, consisting of the following:  (i) $92 million outstanding under a $230 million asset-based revolving credit facility maturing in May of 2018 (the "Prepetition ABL Facility"); (ii) $279 million outstanding under certain 7.875% senior secured notes due August 1, 2018 (the "U.S. Secured Notes"); (iii) $223 million outstanding under certain 10.000% senior unsecured notes due August 1, 2020 (the "U.S. Unsecured Notes" and, together with the U.S. Secured Notes, the "U.S. Notes"); (iv) $32 million of European lines of credit due in October of 2015; and (v) $224 million of 8.875% senior unsecured notes due December 15, 2017 (the "Euro Notes").  *See Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., in Support of Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 20] (the "First Day Declaration") ¶ 23.

### 1.      The Prepetition ABL Facility

9.      The Debtors are party to that certain Amended and Restated Credit Agreement, dated May 24, 2012 (as amended, amended and restated, modified, supplemented, or restated and in effect from time to time, the "Prepetition ABL Credit Agreement"), among QS Wholesale, Inc. ("QS Wholesale"), DC Shoes, Inc. ("DC Shoes"), QS Retail, Inc. ("QS Retail") and Hawk Designs, Inc. ("Hawk Designs") as U.S. borrowers, certain foreign affiliates of Quiksilver as

foreign borrowers, certain of the Debtors as domestic and foreign guarantors, Bank of America, N.A. ("Bank of America"), as administrative and co-collateral agent (the "Prepetition ABL Agent"), General Electric Capital Corporation, as co-collateral agent, and the lenders party thereto (the "Prepetition ABL Lenders").  The Debtors state that, as of the Petition Date, approximately $92 million was outstanding under the Prepetition ABL Facility, comprised of $68 million on account of domestic borrowers and guarantors and $24 million on account of foreign borrowers and guarantors.  *See* DIP Motion ¶ 14.

### 2.    The U.S. Notes

10.    Quiksilver issued $280 million aggregate principal amount of the U.S. Secured Notes and $225 million aggregate principal amount of the U.S. Unsecured Notes under an indenture dated July 16, 2013, among Quiksilver and QS Wholesale as issuers, DC Shoes, Hawk Designs, and QS Retail as guarantors, and U.S. Bank National Association as trustee and collateral agent.  The U.S. Notes were issued as part of an exchange offer, and the proceeds of the U.S. Notes were used to (a) redeem all of the then-outstanding 6.875% notes due April 15, 2015, (b) repay in full Quiksilver's existing term loan, and (c) pay down a portion of the outstanding amounts under the Prepetition ABL Facility.  The U.S. Secured Notes mature on August 1, 2018 and bear interest at a rate of 7.875% per year, and the U.S. Unsecured Notes mature on August 1, 2020 and bear interest at a rate of 10.000% per year.  As of the Petition Date, approximately $279 million aggregate principal amount of the U.S. Secured Notes and approximately $223 million aggregate principal amount of the U.S. Unsecured Notes were outstanding.  *See* DIP Motion ¶ 18; First Day Declaration ¶ 32.

### 3.    The Euro Notes

11.    Boardriders S.A., a non-Debtor foreign affiliate, issued €200 million aggregate principal amount of 8.875% senior notes with a maturity date of December 15, 2017, under an

indenture dated December 10, 2010 (the "Euro Notes Indenture").  The proceeds of the issuance

of the Euro Notes were used to refinance approximately €190 million of then-existing European

debt.  As of the Petition Date, approximately $221 million of the Euro Notes was outstanding.

*See* First Day Declaration ¶ 36.

**B.     Commencement of the Debtors' Chapter 11 Cases**

12.     On the Petition Date, the Debtors each commenced a case (collectively, the

"Chapter 11 Cases") by filing a petition for relief under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code").  The Chapter 11 Cases are jointly administered.

13.     On September 21, 2015, pursuant to Bankruptcy Code section 1102, the United

States Trustee for the District of Delaware (the "U.S. Trustee") appointed the initial Committee

[Dkt. No. 129].[4]  On September 28, 2015, the U.S. Trustee filed the *Amended Notice of*

*Appointment of Committee of Unsecured Creditors* [Dkt. No. 163], appointing two additional

creditors to the Committee.[5]

**C.     The Proposed DIP Term Facility and DIP ABL Facility**

14.     On the Petition Date, the Debtors filed the DIP Motion seeking interim and final

authorization for the Debtors to obtain postpetition financing in the aggregate principal amount

of up to $175 million (the "Proposed Financing"), comprised of (i) a super-priority secured term

facility of $115 million (the "DIP Term Facility") funded by OCM Big Wave, LLC (together

with its affiliates, "Oaktree") and (ii) a roll-up of all of the outstanding obligations under the

Prepetition ABL Facility into a super-priority secured asset-based revolving credit facility of $60

---

[4] The initial Committee was comprised of the following entities:  (i) U.S. Bank National Association; (ii) New
Generation Advisors, LLC; (iii) Samil Tong Sang, Co.; (iv) Simon Property Group, Inc.; and (v) Global Brands
Group.
[5] The U.S. Trustee appointed T. Rowe Price Credit Opportunities Fund and Wilfrid Global Opportunity Fund to the
Committee on September 28, 2015.  Also on September 28, 2015, Global Brands Group resigned from the
Committee.

million (the "DIP ABL Facility") funded by certain of the Debtors' existing secured lenders (collectively and together with Oaktree, the "DIP Lenders").  *See* DIP Motion ¶ 42.

15.     As set forth in the DIP Motion, the Debtors propose to use the proceeds of the Proposed Financing and the Debtors' prepetition cash collateral to fund, among other things, ordinary working capital, and other general corporate purposes as set forth in the DIP Budget, including costs of administration of the Chapter 11 Cases, subject to the Carve-Out.  *See* DIP Term Loan Credit Agreement § 6.12; DIP ABL Credit Agreement § 6.12.  With respect to the DIP Term Facility, proceeds will also be used to fund intercompany financing transactions among the Debtors and their non-Debtor affiliates.  *See* DIP Term Loan Credit Agreement § 6.12.  The Debtors used a portion of the first draw on the DIP ABL Facility to repay the obligations of certain non-Debtor foreign borrowers under the Prepetition ABL Facility, and as a result of such repayment, Bank of America is now the sole lender under the DIP ABL Facility. *See* DIP ABL Credit Agreement § 6.12.  Additionally, the Debtors used certain proceeds of the DIP Term Facility to pay down certain outstanding obligations of the domestic borrowers under the Prepetition ABL Facility.  *See* DIP Term Loan Credit Agreement § 6.12.

16.     By the DIP Motion, the Debtors seek final approval of the Proposed Financing pursuant to Bankruptcy Code sections 364(c) and 364(d) in order to provide the DIP Lenders with a senior first-priority priming lien on and security interest in any and all owned and hereafter acquired assets and real and personal property of the Debtors (the "DIP Collateral"). The DIP Lenders received, on an interim basis, first-priority liens on the DIP Collateral that are subject only to certain permitted prior liens and the Carve-Out.  *See* Interim DIP Order ¶¶ 6(a)- (b).  Importantly, the DIP Credit Agreements provide the DIP Lenders with first-priority liens on all previously unencumbered assets of the Debtors including, but not limited to, a pledge of 35%

of the equity in each direct foreign subsidiary of the Debtors (the "<u>Unencumbered Foreign Stock</u>"), as well as a lien on the proceeds of claims or causes of action under chapter 5 of the Bankruptcy Code and similar laws.  *See id.*

17.     Both DIP Credit Agreements contain milestones that the Debtors must satisfy to prevent an event of default from occurring under the Proposed Financing.  Among other things, the Debtors are required to take the following actions related to the PSA and the Sponsored Plan:

- file the Sponsored Plan, accompanying Disclosure Statement and plan solicitation materials within 30 days of the Petition Date;

- file a motion seeking approval of the Backstop Agreement within 30 days of the Petition Date;

- obtain entry of an order approving the Plan Sponsor Protections and the PSA[6] within 30 days of the Petition Date;

- obtain entry of an order approving the Disclosure Statement within 75 days after the Petition Date;

- obtain entry of an order approving the Backstop Agreement within 75 days after the Petition Date;

- obtain entry of a Confirmation Order with respect to the Sponsored Plan within 115 days of the Petition Date; and

- consummate the transactions contemplated by a Sponsored Plan within 120 days of the date the Confirmation Order is entered.

*See* DIP Term Loan Credit Agreement § 8.1(u); DIP ABL Credit Agreement § 8.01(z).

18.     If the Debtors fail to meet any of the foregoing milestones, such failure would constitute an event of default under the DIP Credit Agreements.  An event of default under the DIP Credit Agreements would also occur if, among other things, the Debtors file (a) a plan of

---

[6] The DIP Motion and the DIP Term Loan Credit Agreement provide that the Debtors will be required to obtain "[a]n order approving the Plan Sponsor Protections and ***Backstop Agreement*** . . . on or before the date that is ***30 days after the Petition Date***." DIP Motion ¶ 42; DIP Term Loan Credit Agreement § 8.1(u)(vi) (emphasis added).  The DIP Motion and DIP Term Loan Credit Agreement also provide that the Debtors are required to obtain entry of an order approving the Backstop Agreement ***within 75 days after the Petition Date***.  *See* DIP Motion ¶ 42; DIP Term Loan Credit Agreement § 8.1(u)(ix) (emphasis added).  Upon information and belief, the milestone in Section 8.1(u)(vi) of the DIP Term Loan Credit Agreement is intended to reference an order approving the Plan Sponsor Protections and ***the PSA*** within 30 days after the Petition Date.

reorganization other than a Sponsored Plan, (b) a pleading that is inconsistent with the

prosecution of a Sponsored Plan, or (c) a motion to sell some or all of their assets pursuant to

Bankruptcy Code section 363.  *See* DIP Term Loan Credit Agreement § 8.1(f); DIP ABL Credit

Agreement § 8.01(j).

19.     The DIP Term Loan Credit Agreement also contains, among other things, the

following terms:

- New money lent under the DIP Term Facility bears interest at a rate of 12% per annum.  *See* DIP Term Loan Credit Agreement §§ 1.1 (definition of "Applicable Rate"), 2.8.

- The DIP Term Facility matures on the date that is 150 days after the Petition Date, with no extension mechanism in place.  *See id.* §§ 1.1 (definition of "Maturity Date"), 2.7.

- Cumulative total operating receipts, tested on a weekly basis, cannot vary more than 10% from the amounts set forth in the DIP Budget.  *See id.* §§ 1.1 (definition of "Permitted Variance"), 7.19(a).

- Any variance from the DIP Budget, tested on a weekly basis, cannot be more than 10% more than the cumulative Total Disbursements in the DIP Budget. *See id.* §§ 1.1 (definition of "Permitted Variance"), 7.19(a).

- An event of default occurs under the DIP Term Loan Credit Agreement if the Debtors' chief restructuring officer resigns and the Debtors fail to employ a replacement officer within five business days of such resignation.  *See id.* § 8.1(h).

20.     The DIP ABL Credit Agreement also contains, among other things, the following

terms:

- New money lent under the DIP ABL Facility bears interest at a rate of, at the Debtors' option, (i) (a) LIBOR plus (b) 3.50% or (ii) (a) the Base Rate plus (b) 2.50%.  *See* DIP ABL Credit Agreement § 2.08.

- The DIP ABL Facility matures on the date that is 150 days after the Petition Date, with no extension mechanism in place.  *See id.* § 1.01 (definition of "Maturity Date").

- The domestic borrowing base for the DIP ABL Facility is calculated based upon, among other things, the face amount of receivables from Credit Card Issuers or Credit Card Processors (each as defined in the DIP ABL Credit

Agreement), *multiplied by* an advance rate of 70%.  Further, the DIP ABL Agent may establish reserves on the borrowing base from time to time.  *See id.* (definition of "Domestic Borrowing Base").

21.    The Debtors received interim authorization to borrow $130 million of the Proposed Financing, comprised of the $60 million DIP ABL Facility and $70 million under the DIP Term Facility, pursuant to an order entered by the Bankruptcy Court on September 11, 2015 [Dkt. No. 76] (the "Interim DIP Order").  The Debtors also received interim authority to pay certain fees in connection with the Proposed Financing including, but not limited to, the following:

- an original issue discount of $3.45 million in respect of the total amount of financing under the DIP Term Facility, including in respect of $25 million to be funded in the DIP Lenders' sole discretion;

- a termination fee of $2.3 million, unless the Proposed Financing is terminated on or after the effective date of a Sponsored Plan or the Debtors' Chapter 11 Cases are converted to a chapter 7 proceeding;

- an unused line fee of 0.5% per annum charged on the average unused portion of the DIP ABL Facility;

- a $250,000 funded escrow to secure any contingent indemnification obligations under the Prepetition ABL Facility;

- certain letter of credit fees in connection with the DIP ABL Facility; and

- other fees specified in the confidential fee letter.

22.    Pursuant to the Interim DIP Order, the Debtors have stipulated as to the aggregate amount of prepetition debt and the validity, enforceability and priority of the liens and security interests securing the obligations of the Prepetition ABL Secured Parties and the Prepetition Notes Secured Parties (collectively, the "Prepetition Secured Parties"), subject to any contested matter or adversary proceeding brought during the Challenge Period.  The Interim DIP Order provides the Committee with an investigation budget of $50,000 (the "Investigation Cap") and a

60-day Challenge Period[7] during which the Committee must obtain standing and commence any challenge to the validity of the liens and security interests held by the Prepetition Secured Parties.

**D.    The Proposed Adequate Protection to the Prepetition Secured Parties**

23.    As adequate protection, the Prepetition Secured Parties will receive, solely to the extent of any diminution in value of the Prepetition Secured Parties' collateral, (i) postpetition additional and replacement liens on and security interests in the DIP Collateral and (ii) an allowed superpriority administrative expense claim against the Debtors' estates on behalf of the Prepetition Agents.[8]  *See* Interim DIP Order ¶ 12.

**E.    The Plan Sponsor Agreement and the Sponsored Plan**

24.    On the Petition Date, the Debtors also filed the PSA Motion seeking authority to assume the PSA executed by and between the Debtors, on behalf of themselves and their non-Debtor foreign subsidiaries, and certain funds managed by Oaktree (in such capacity, the "Plan Sponsor").  The PSA Motion states that the Plan Sponsor will, among other things, provide the Debtors with the Proposed Financing, which will ultimately be refinanced into an exit facility, and the Debtors will prosecute a plan of reorganization on terms acceptable to the Plan Sponsor (the "Sponsored Plan").  *See* PSA Motion ¶ 18.

---

[7] The Challenge Period is 75 days after entry of a final order approving the Proposed Financing (the "Final DIP Order") for parties other than the Committee.

[8] Section 4.1(n) of the DIP Term Loan Credit Agreement states that the U.S. Secured Note holders will receive adequate protection in respect of the liens securing the U.S. Secured Note obligations including, among other things, "current cash pay of all interest due under the [U.S. Secured Notes] (including, for the avoidance of doubt, any accrued pre- and post-petition interest) at the non-default rate set forth in the [U.S. Secured Notes]."  DIP Term Loan Credit Agreement § 4.1(n).  However, the DIP Motion and the Interim DIP Order fail to mention the cash payment of interest as a form of adequate protection for the U.S. Secured Note holders.  See DIP Motion ¶ 42; Interim DIP Order ¶ 12.

25.     As set forth in the Plan Sponsor Term Sheet attached to the PSA, the Sponsored

Plan contemplates, among other things, that:

- the DIP ABL Facility will be refinanced through an exit facility;

- the U.S. Secured Notes will be converted into 100% of the equity of the reorganized Debtors;

- $7.5 million will be paid to the Debtors' unsecured creditors in satisfaction of their claims;

- the Debtors will commence an exchange offer resulting in a partial paydown of the Euro Notes and the Debtors' guaranties of the Euro Notes will be reinstated;

- existing equity will be cancelled; and

- the Plan Sponsor will backstop two further rights offerings to fund certain obligations of the reorganized Debtors to be accomplished through the Sponsored Plan and will receive a $6.125 million exit rights backstop fee and a €2.5 million euro notes rights backstop fee.

See Plan Sponsor Term Sheet.

26.     The PSA also provides that the Plan Sponsor is entitled to terminate the PSA if

the Debtors, among other things:

- fail to meet any of the milestones contained in the PSA (which milestones mirror those contained in the DIP Credit Agreements described above);

- default under either of the DIP Credit Agreements;

- obtain entry of an order approving postpetition financing or exit financing other than with the consent of the Plan Sponsor;

- file any pleading that is inconsistent with the PSA or the Sponsored Plan;

- breach any of the obligations, representations, warranties or covenants set forth in the PSA and fail to cure such breach within five business days of the Debtors receiving written notice of such breach; or

- exercise their "fiduciary out" and seek approval of a Superior Proposal than that contemplated by the PSA or the Sponsored Plan.

See PSA § 5.01(a).

27.     The Debtors are permitted to solicit and select a "Superior Proposal"—which is

limited to a proposal that is "more favorable, from a financial point of view, to the Debtors'

stakeholders than the transactions contemplated by the [Sponsored] Plan"—until the entry of an

order approving the Disclosure Statement, or 75 days from the Petition Date assuming no

modifications to the current schedule.  *See* PSA § 3.01(d).  Additionally, the PSA provides that

the Plan Sponsor will be entitled to a $20 million cash Break-Up Fee if, within a year following

termination of the PSA, the Debtors consummate any transaction other than as contemplated by

the PSA.[9]  If approved, the Break-Up Fee would be entitled to administrative expense priority

status and would be payable from the proceeds of any such transaction.  *See id.*

## OBJECTION

### A.    The Proposed Financing Should Not Be Approved

#### 1.    The Legal Standard for Postpetition Financing

28.    The standards that must be satisfied for this Court to approve the Proposed

Financing have not been met.  Among other things, a court must consider whether the terms of

the proposed financing are fair, reasonable and adequate.  *In re Los Angeles Dodgers LLC*, 457

B.R. 308, 312-13 (Bankr. D. Del. 2011) (citing *In re Crouse Group, Inc.*, 71 B.R. 544, 546

(Bankr. E.D. Pa. 1987)).  In so doing, courts routinely consider the following factors:  (i) whether

the proposed facility is an exercise of the debtor's reasonable business judgment; (ii) whether the

proposed facility is in the best interests of both the estate and its creditors; (iii) whether the

transaction is both (a) necessary to preserve estate assets and (b) necessary and essential for the

continued operation of the debtor's business; (iv) whether the terms of the proposed transaction

are fair and reasonable given the circumstances; and (v) whether the proposed facility was

---

[9] The PSA provides that such a "transaction" consists of "an alternative restructuring of the Debtors' capital structure including, without limitation, pursuant to a chapter 7 or chapter 11 case, through an out-of-court restructuring, or otherwise, or a sale of a material portion of the Debtors' assets or equity interests, whether by sale, merger, consolidation, reorganization, or otherwise" within a year following termination of the PSA.  *See* PSA § 3.01(d).

negotiated in good faith and at arm's length. *In re Farmland Indus., Inc.*, 294 B.R. 855, 881

(Bankr. W.D. Mo. 2003) (*appeal dismissed*, No. 03-00472 (DW) (W.D. Mo. Jan. 9, 2004)).

29.     Courts routinely recognize that "[d]ebtors in possession generally enjoy little

negotiating power with a proposed lender, particularly when the lender has a prepetition lien on

cash collateral." *Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender*

*Drug Stores, Inc.)*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992).  Thus, bankruptcy courts have not

approved financing arrangements that convert the bankruptcy process from one designed to

benefit all creditors to one designed for the sole (or primary) benefit of a single lender. *See Ames*

*Dep't Stores, Inc.*, 115 B.R. 34 38 (Bankr. S.D.N.Y. 1990) (citing *In re Tenney Vill. Co.,* 104

B.R. 562, 568 (Bankr. D.N.H. 1989)) (holding that the terms of a postpetition financing facility

must not "pervert the reorganizational process from one designed to accommodate all classes of

creditors . . . to one specially crafted for the benefit" of one creditor).

30.     Postpetition financing should also only be approved under Bankruptcy Code

section 364(d) if the debtor establishes that no competing offers ***on more favorable terms*** are

currently available to the debtor.  *See* 11 U.S.C. § 364(d)(1) (stating that the court may authorize

a debtor to obtain postpetition financing secured by a senior or equal lien on property of the

estate that is subject to a lien only if "the trustee is unable to obtain such credit otherwise"); *see*

*also In re W. Pac. Airlines*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997) (finding that debtor has

burden of proving "that no alternative financing is available on any other basis" and "that no

better offers, bids, or timely proposals are before the Court"); *Bland v. Farmworker Creditors*,

308 B.R. 109, 113-14 (S.D. Ga. 2003) (in establishing that postpetition financing under section

364(d) is necessary, courts may require the debtor to show whether alternative financing is

available on any other basis and whether competing offers on more favorable terms are before

the court).

31.     The terms of the Proposed Financing violate applicable law in several respects.

*First*, Section A.2, *infra*, describes the term sheet presented to the Debtors by certain holders of

U.S. Unsecured Notes on October 7, 2015 for a fully-committed alternative financing proposal

that is superior to the Proposed Financing with respect to virtually every substantive economic

and non-economic term.  *Second*, as set forth in Section A.3, *infra*, the cross-default provisions

in the DIP Credit Agreements and the PSA improperly constrain the Debtors' ability to exercise

their fiduciary duties by relinquishing control of these cases to their largest secured creditor.

Moreover, the integration of the DIP Credit Agreements with the PSA inappropriately locks in

the terms of the Debtors' restructuring and therefore constitutes an impermissible *sub rosa* plan.

*Third*, the DIP Lenders have failed to show that they are entitled to an unconditional lien on the

Unencumbered Foreign Stock and avoidance action proceeds—assets that should inure to the

benefit of unsecured creditors.  *See* sections A.4.a.-b., *infra*.  *Finally*, Sections A.5.-A.7. describe

additional provisions of the Proposed Financing that are inappropriate and should be stricken or

modified.

> **2.     The Superior DIP Proposal Is Significantly Better Than the Proposed
> Financing**

32.     Although the Committee recognizes the Debtors' need for postpetition financing,

approval of the Proposed Financing is neither in the best interests of the Debtors' estates and

creditors nor an appropriate exercise of the Debtors' business judgment.  Bankruptcy Code

section 364(d) requires a debtor to establish that no competing offers are available on more

favorable terms before approving postpetition financing.  *See, e.g., Bland*, 308 B.R. at 113-14;

*W. Pac. Airlines*, 223 B.R. at 572.

33.    As shown below, the Superior DIP Proposal is an unequivocally superior financing to the Proposed Financing.  Importantly, the Superior DIP Proposal does not propose to grant the lenders thereunder a lien on previously unencumbered assets, either through a pledge of the Unencumbered Foreign Stock or a lien on avoidance actions. Indeed, virtually every substantive term of the Superior DIP Proposal—both economic and non-economic—is more advantageous to the Debtors, their estates and their creditor constituency than the Proposed Financing.

34.    The chart below compares the material terms of the Proposed Financing to the Superior DIP Proposal.

| | Proposed Financing | Superior DIP Proposal | Anticipated Savings to Estates |
|---|---|---|---|
| **DIP Agent** | Oaktree | Wilmington Trust, National Association | N/A |
| **Facilities** | $115 million, of which $25 million is to be funded at the DIP Lenders' discretion | $115 million term loan, fully committed | *Eliminates risk of non-funding relating to uncommitted funds* |
| **Interest Rate** | 12% | 10.5% | $720,000-$900,000 |
| **Maturity** | February 6, 2016 | March 15, 2016 | N/A |
| **Break-Up Fee** | $20 million | None | *up to* $20 million |
| **DIP Liens** | First-priority liens on DIP Collateral subject only to certain permitted prior liens and Carve-Out.  DIP collateral *includes* lien on Unencumbered Foreign Stock and avoidance action proceeds. | First-priority liens on DIP Collateral subject only to certain permitted prior liens and Carve-Out.  DIP Collateral *does not include* lien on Unencumbered Foreign Stock or avoidance action proceeds. | *Undetermined value of previously unencumbered stock* |
| **Adequate Protection** | Solely to the extent of any diminution in value of the Prepetition Secured Parties' collateral (i) postpetition additional and replacement liens on and security interests in DIP Collateral and (ii) allowed superpriority administrative expense claim against Debtors' estates. | Same, plus payments made in respect of interest due under the U.S. Secured Notes, which may be subject to recharacterization if it is determined that the Prepetition Secured Parties are undersecured. | N/A |
| **Milestones** | *Milestones with respect to the PSA*: (i) Within 30 days of the Petition Date | *Sale Milestones*:  (i) File a motion to approve bid procedures for the sale of substantially all | N/A |

18

|  | **Proposed Financing** | **Superior DIP Proposal** | **Anticipated Savings to Estates** |
|---|---|---|---|
|  | (a) file Sponsored Plan and related documents, (b) file motion to approve the Backstop Agreement and (c) obtain entry of order approving PSA; (ii) within 75 days of Petition Date, obtain entry of order approving (a) Disclosure Statement and (b) Backstop Agreement; (iii) obtain entry of the Confirmation Order within 115 days of Petition Date; and (iv) consummate transactions contemplated by Sponsored Plan within 120 days of Confirmation Order entry. | of the Debtors' assets by October 30, 2015; (ii) obtain entry of order approving the bid procedures by November 24, 2015; (iii) conduct auction by March 4, 2016; (iv) obtain entry of order approving the sale by March 7, 2016; and (v) close the sale by March 14, 2016; provided, however, that the DIP financing will permit reasonable milestones for a plan process substantially consistent with the sale milestones. |  |
| **Permitted Variances from DIP Budget** | Operating receipts cannot vary more than 10% from the DIP Budget, tested on a weekly basis.<br><br>Disbursements cannot be more than 10% more than set forth in the DIP Budget, tested on a weekly basis. | Operating receipts cannot vary more than 15% from the DIP Budget, tested on a weekly basis.<br><br>Disbursements cannot be more than 15% more than set forth in the DIP Budget, tested on a weekly basis. | N/A |
| **§§ 506 and 552 Rights** | Waived | Waived with respect to claims arising under the proposed DIP loans only | N/A |
| **Investigation Cap** | $50,000 | None | N/A |
| **Challenge Period** | 60 days | None | N/A |
| **OID** | $3.45 million (3%) on aggregate amount to be funded, including in respect of $25 million to be funded at the DIP Lenders' discretion | 1% | $2.3 million |
| **CRO** | Debtors required to replace CRO within five (5) business days after resignation | Debtors required to replace CRO within thirty (30) days after resignation | N/A |

35.     As evidenced by the chart above, the Superior DIP Proposal would provide the

Debtors with financing that provides more committed liquidity on less onerous terms than the

Proposed Financing, including: (i) ***reasonable*** milestones relating to a dual-track plan and sale

process; (ii) ***no*** liens on either the Unencumbered Foreign Stock or avoidance action proceeds;

(iii) ***fully*** committed term loan financing ; (iv) a ***lower*** original issue discount; (v) a ***lower***

interest rate; (vi) ***longer*** maturity; (vii) ***no*** Challenge Period; (vii) ***no*** Investigation Cap;

(ix) *__larger__* permitted variances from the DIP budget for receipts and disbursements; (x) *__more__*

time to engage a replacement CRO; and (xi) *__no__* waiver of rights under sections 506(c) or 552 (b)

with respect to the Prepetition Secured Parties.

36.     In light of the Superior DIP Proposal, the Debtors cannot demonstrate that the

Proposed Financing represents the best possible proposal.  The Debtors also cannot demonstrate

that pursuing the Proposed Financing would be consistent with their fiduciary duties to all

stakeholders—including unsecured creditors—when a fully committed proposal on materially

better economic terms is now before them and this Court.  *See, e.g., In re Innkeepers USA Trust*,

442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010) ("[I]t is "Bankruptcy 101" that a debtor and its board

of directors owe fiduciary duties to the debtor's creditors to maximize the value of the

estate . . . ."); *see also In re Global Crossing Ltd.*, 295 B.R. 726, 745-46 (Bankr. S.D.N.Y. 2003)

(finding that the "fiduciary out" in the proposed sale documents permitted the debtors to "make

an appropriate response if a superior offer is made that the [d]ebtors should consider by reason of

their fiduciary duties"); Ellen A. Friedman, *Buying a Distressed or Bankrupt Company*,

American Law Institute (Feb. 28 - Mar. 1, 2002) at 11 ("Generally, [a] debtor should seek, and

most courts will require, that [a] debtor . . . take a 'fiduciary out' if a materially better offer

presents itself.").  The DIP Motion must therefore be denied.

### 3.     The Debtors' Access to the Proposed Financing and Approval of the PSA Are Improperly Linked and Constitute a *Sub Rosa* Plan

#### a.  The Proposed Financing and Approval of the PSA Should Be Decoupled

37.     By the DIP Motion, the Debtors seek approval of proposed DIP financing that is

inextricably linked to a plan transaction that undervalues these estates and deprives unsecured

creditors of value to which they are otherwise entitled.  More specifically, the Debtors' access to

postpetition funding is conditioned upon the Debtors' ability to achieve overly restrictive plan-

related milestones that do not afford sufficient flexibility for the Debtors to pursue a meaningful

sale process or consider a competing plan proposal that would offer unsecured creditors more

than the paltry recovery that Oaktree seeks to lock in at the outset of these cases.  Accordingly,

the DIP Motion should be denied to the extent it seeks approval of events of default that (i) tie

the Debtors to the PSA and Sponsored Plan through plan-related milestones and (ii) otherwise

lock the Debtors in to a predetermined case outcome and prevent the Debtors from maximizing

the value of these estates in accordance with their fiduciary duties.  These problematic events of

default are addressed in greater detail below.

      38.     As currently drafted, the DIP Credit Agreements and PSA contain numerous

cross-default provisions intended lead to the swift prosecution of the Sponsored Plan.  Most

important, the Debtors must meet certain compressed milestones relating to the approval of the

PSA and prosecution of the Sponsored Plan to avoid a default under the DIP Credit

Agreements:[10]

| Event of Default | DIP Term Loan Credit Agreement | DIP ABL Credit Agreement |
|---|---|---|
| Filing a plan of reorganization other than the Sponsored Plan or any pleading that is inconsistent with the prosecution of the Sponsored Plan | § 8.1(f)(i)-(ii) | § 8.01(j)(i)-(ii) |
| Failure to file the PSA Motion on the Petition Date | § 8.1(u)(ii) | n/a |
| Failure to file the Sponsored Plan, Disclosure Statement, solicitation materials and motion seeking approval of such documents within 30 days of the Petition Date | § 8.1(u)(iv) | § 8.01(z)(iv) |
| Failure to file a motion seeking approval of the Backstop Agreement within 30 days of the Petition Date | § 8.1(u)(v) | n/a |
| Failure to obtain entry of an order approving the PSA[11] within 30 days after the Petition Date | § 8.1(u)(vi) | n/a |
| Failure to obtain entry of an order approving the Disclosure Statement within 75 days after the Petition Date | § 8.1(u)(viii) | § 8.01(z)(v) |
| Failure to obtain entry of an order approving the Backstop Agreement within 75 days after the Petition Date | § 8.1(u)(ix) | n/a |

---

[10] As described in further detail in Section B of this Objection, the Committee believes that the PSA is not in the best interests of the Debtors' estates and has requested that the Court deny the PSA Motion.  Whether or not the PSA is approved, however, any events of default in the DIP Credit Agreements relating to the PSA or the Sponsored Plan should be stricken from the Final DIP Order.

[11] *See supra* note 6.

| | | |
|---|---|---|
| Failure to obtain entry of the Confirmation Order within 115 days of the Petition Date, in form and substance acceptable to Oaktree | § 8.1(u)(x) | n/a |
| Failure to file a motion requesting within 30 days after the Petition Date an extension of the time period for the DIP Lenders to assume or reject leases to not less than 210 days from the Petition Date or to obtain entry of an order approving such extension within 75 days after the Petition Date | § 8.1(u)(xi) | § 8.01(z)(vi) |
| Failure of the effective date of the Sponsored Plan to occur within 120 days following the date the Confirmation Order is entered | § 8.1(u)(xii) | § 8.01(z)(vii) |

Additionally, the PSA provides that if, among other things, an event of default occurs under the DIP Credit Agreements or the Debtors obtain postpetition or exit financing other than that provided or agreed to by the Plan Sponsor, the Debtors will also be deemed in default under the PSA and the Plan Sponsor will be entitled to terminate the PSA. *See* PSA §§ 5.01(a)(ii), (vii). Should the Court approve the Superior DIP Proposal, the DIP Credit Agreements and PSA as currently drafted would permit Oaktree (as DIP Lender) to demand payment of the $2.3 million termination fee and, after declaring the PSA in default under Section 5.01(a)(vii), thereafter permit Oaktree (as Plan Sponsor) to demand payment of the Break-Up Fee, too, provided *only* that the Debtors consummate *any* other transaction (including piecemeal liquidation under chapter 7) within a year thereafter. This patently inequitable (and expensive) linkage between the Proposed Financing and the PSA must be severed to prevent such a costly windfall to Oaktree without any corresponding benefit to the Debtors, their estates, and creditors.

39.     By impermissibly intertwining the Proposed Financing and the PSA through, among other things, the foregoing Sponsored Plan-related milestones and integrated fees, the DIP Lenders are seeking to create and implement a *sub rosa* plan that benefits the DIP Lenders at the direct expense of unsecured creditors. It has long been recognized that a chapter 11 debtor cannot restructure its prepetition debt obligations through motion practice that does not comport with the Bankruptcy Code's solicitation and disclosure protections to creditors and parties-in-interest. Indeed, the Bankruptcy Code affords numerous critical protections to creditors and parties-in-interest with regard to the formulation and confirmation of a plan of reorganization,

22

including, without limitation, the opportunity to obtain sufficient information enabling informed

participation in the process and ability to vote to accept or reject a proposed plan.  *See In re*

*Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 881 (Bankr. S.D.N.Y. 1990) (Bankruptcy Code

provisions addressing disclosure and plan confirmation are "[a]mong the most significant

protections of Chapter 11").

40.     A motion that attempts an end run around plan disclosure and solicitation

requirements is a plan *sub rosa* and will not be countenanced by the law.  *In re Belk Props., LLC*,

421 B.R. 221, 225-26 (Bankr. N.D. Miss. 2009); *see also Pension Benefit Guar. Corp. v. Braniff*

*Airways, Inc. (In re Braniff Airways, Inc.*), 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and

the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for

confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in

connection with a sale of assets."); *In re Quality Beverage Co.*, 181 B.R. 887, 895 (Bankr. S.D.

Tex. 1995) (court denied motion for approval of proposed settlement agreement because

"[n]either the Committee nor the Chapter 11 Trustee should be permitted to bind those creditors

without the disclosure, claims allowance, and voting safeguards of plan confirmation in Chapter

11").

41.     In *Braniff Airways*, the Court of Appeals for the Fifth Circuit, articulating the *sub*

*rosa* plan doctrine, held that a proposed sale of all the assets of a debtor could not be authorized

under Bankruptcy Code section 363(b) because the transaction was at its essence a plan of

reorganization that, in effect, short circuited the chapter 11 process.  *See Braniff Airways*, 700

23

F.2d at 940.[12]  Since *Braniff Airways*, courts have cited several factors when analyzing whether a

transaction is actually a *sub rosa* plan of reorganization, including:  (1) whether the transaction

will dictate the terms of any plan of reorganization; (2) whether the transaction will alter the

rights of creditors with respect to the debtor's assets; and (3) whether the transaction will leave

the debtor with nothing left to reorganize.  *See, e.g.*, *Official Comm. of Unsecured Creditors v.*

*CIT Group/Business Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 188 (3d Cir. 2015)

(stating the "hallmark" of a *sub rosa* plan is "that it dictates the terms of a reorganization plan");

*Institutional Creditors of Cont'l AirLines, Inc. v. Cont'l AirLines, Inc. (In re Cont'l AirLines,*

*Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (emphasizing that a Section 363 sale must not dictate

the terms of a plan or alter the rights of creditors); *In re Copy Crafters Quickprint, Inc.*, 92 B.R.

973, 983 (Bankr. N.D.N.Y. 1988) (refusing to authorize debtor to enter into lease of its assets,

where the lease "effectively put the Court's imprimatur on the sale and confirm[ed] the Plan long

before the hurdles of Chapter 11 [were] overcome").

42.    The transaction sought to be approved through the Motions fits squarely within

the case law confines of a "*sub rosa*" plan.  Approval of the DIP Motion would lock in a series

of increasingly tight milestones linked to a plan term sheet that expressly purports to "dictate[]

the terms of a reorganization plan."  *Jevic Holding Corp.*, 787 F.3d at 188.  Indeed, the Debtors'

only access to funding (prior to the submission of the Superior DIP Proposal) was expressly

conditioned upon the Debtors' ability to take deliberate steps to implement the Sponsored Plan

through which, among other things, Oaktree would equitize its debt in exchange for 100% of the

---

[12] In *Braniff Airways*, the debtor sought approval of an agreement providing the debtor's transfer of cash, airplanes and equipment, terminal leases and landing slots to a third-party in return for travel scrip, unsecured notes, and a profit participation in the third-party's operations.  *See* 700 F.2d at 939.  The agreement required significant restructuring of the rights of the debtor's creditors.  *Id.*  The Fifth Circuit found that the agreement "not only changed the composition of Braniff's assets, the contemplated result under § 363(b), it also had the practical effect of dictating some of the terms of any future reorganization plan."  *Id.* at 939-940.  Thus, the court held that the relief requested could not be granted outside of the plan process.

equity of the reorganized Debtors and leave just $7.5 million for distribution to an estimated $300 million in unsecured claims.[13]  This is exactly the result proscribed by courts in the cases cited above—a result that should thus not be countenanced by this Court.

43.    At the first-day hearing scheduled to consider, among other things, approval of the Proposed Financing on an interim basis, the Debtors alleged that there was no financing available to the Debtors other than financing (i.e., the Proposed Financing) linked to the consummation of the Sponsored Plan.  Specifically, the Debtors stated that "[Oaktree is] not willing to lend that money to us unless they are financing ***their deal***, as opposed to ***some other deal***.  The debtors resisted that, argued, fought, negotiated in good faith, and ultimately got to a place where this was sort of a deal-breaker from the DIP lender's perspective; they would not lend this money without those terms."  *See* Transcript of September 10, 2015 Hearing at 54:6-11; 57:11-16 (emphasis added).  The Debtors' statements are no longer accurate.  The Debtors have received the Superior DIP Proposal, which is a binding commitment on terms superior to the Proposed Financing.  Moreover, the Superior DIP Proposal includes a reasonable and achievable set of milestones with built-in flexibility regarding a dual-track sale and plan process.  As a result, the milestones in the Superior DIP Proposal—as opposed to the oppressive PSA-related milestones to be imposed by the Proposed Financing—would provide the Debtors with ample runway to pursue other strategic options in connection with a comprehensive marketing process.

44.    In light of the foregoing, the DIP Motion cannot be approved unless, among other things, the following provisions are stricken from the DIP Credit Agreements:

- *Sections 5.01(a)(ii) and (vii) of the PSA* which provide that if, among other things, an event of default occurs under the DIP Credit Agreements or the Debtors obtain postpetition or exit financing other than that provided or

---

[13] This $300 million in unsecured claims is comprised of approximately $225 million in outstanding U.S. Unsecured Notes and approximately $75 million of other unsecured claims estimated to be owed at the end of these cases.

agreed to by the Plan Sponsor, the Debtors will be deemed in default under the PSA and the Plan Sponsor will be entitled to terminate the PSA.

- *Sections 8.1(f)(i)-(ii) and Sections 8.1(u)(ii), (iv)-(vi), (viii)-(xii) of the DIP Term Loan Credit Agreement* which require the Debtors to file motions to obtain entry of orders granting approval of the PSA, the Backstop Agreement, the Sponsored Plan and consummation of the transactions contemplated therein, the failure of which will be deemed an event of default under the DIP Term Loan Credit Agreement.

- *Sections 8.01(j)(i)-(ii) and Section 8.01(z)(iv)-(vii) of the DIP ABL Credit Agreement* which require the Debtors to file motions seeking, and obtain entry of orders granting, approval of the PSA, the Sponsored Plan and consummation of the transactions contemplated therein, the failure of which will be deemed an event of default under the DIP ABL Credit Agreement.

**4.    The DIP Lenders Should Not Receive Liens on Previously Unencumbered Assets**

**a.  The DIP Lenders Are Not Entitled to a Lien on the Unencumbered Foreign Stock**

45.     The Debtors propose to grant liens in favor of the DIP Lenders[14] on all previously unencumbered assets including (i) the Unencumbered Foreign Stock and (ii) proceeds of avoidance actions,[15] notwithstanding the fact that there is no evidence in the record that a lien on *any* unencumbered assets is necessary to ensure the repayment of the postpetition financing. Indeed, as addressed below, the Committee will submit evidence prior to and at the hearing scheduled to consider this Objection to support findings that (a) there is more than sufficient value in already-encumbered assets to protect a postpetition creditor who sits at the top of the Debtors' capital structure and is secured by priming liens on prepetition collateral and a super-priority administrative claim, (b) the Debtors did not perform a valuation of or otherwise consider the substantial value inherent in the Unencumbered Foreign Stock that would unnecessarily be given to Oaktree at the expense of unsecured creditors, who are entitled to the

---

[14] As a preliminary matter, the Committee asserts that it would be inappropriate to grant *any* new liens to the DIP ABL Lenders given that the DIP ABL Facility does not provide the Debtors with any additional liquidity.

[15] Section A.4.b. *infra* addresses the propriety of granting liens on the proceeds of avoidance actions to the DIP Lenders in connection with the Proposed Financing.

benefit of the value of the Debtors' unencumbered assets, and (c) granting the DIP Lenders a lien

on the Unencumbered Foreign Stock could harm the estates by creating potential "deemed

dividend" liability for the Debtors under U.S. tax law or otherwise impairing potentially valuable

net operating losses.[16]

46.     *First*, the evidence will show that there is adequate value in the prepetition

collateral package to fully protect a DIP lender, even *without* the grant of a lien on the

Unencumbered Foreign Stock.  For example, the Debtors' receipt of the Superior DIP Proposal

shows that the DIP collateral package is sufficient even without a pledge of the Unencumbered

Foreign Stock.  As noted in the chart on pages 18-19, the Superior DIP Proposal does not

contemplate the grant of a lien on either the Unencumbered Foreign Stock or (as discussed

below) the proceeds of avoidance actions. The very existence of the Superior DIP Proposal thus

evidences the fact that the sophisticated, third-party lenders under the Superior DIP Proposal

believe that sufficient cushion exists in the prepetition collateral to protect an additional, new-

money loan of $115 million.

47.     *Second*, there is no evidence in the record that the Debtors ever considered the

value of the Unencumbered Foreign Stock before agreeing to grant a lien on such asset to the

proposed DIP Lenders at the expense of unsecured creditors.  *See, e.g.*, First Day Declaration

¶ 57 (noting that the Unencumbered Foreign Stock is "[o]ne of the key assets of the Debtors" but

without giving any further evidence regarding the value of such stock).  It is unclear, therefore,

how the Debtors could have determined, in the exercise of their fiduciary duty, that the grant of a

lien on unencumbered assets of uncertain—but clearly material—value was appropriate and in

the best interests of all stakeholders.  *See In re Ames Dep't Stores, Inc.*, 287 B.R. 112, 125-26

---

[16] The arguments set forth in this section apply with equal force to the adequate protection liens and claims granted in respect of the U.S. Secured Notes.

(Bankr. S.D.N.Y. 2002).  The Court should therefore decline to approve financing that unnecessarily bestows upon the DIP Lenders a lien on collateral that has not been appropriately valued and that would otherwise provide a meaningful source of recovery to unsecured creditors in these cases.

48.     *Third*, granting liens on the Unencumbered Foreign Stock could create additional tax liability or reduce favorable tax attributes that belong to the Debtors' estates, again to the detriment of unsecured creditors.  *See Official Comm. of Unsecured Creditors v. Forman (In re Forman Enters., Inc.)*, 273 B.R. 408, 415 (Bankr. W.D. Penn. 2002) (stating courts have "expressly held that an NOL is property of the bankruptcy estate of the corporation that generated it."); *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998) ("[i]t is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss corporation that generated them.") (citations omitted).  Under Section 956 of the Internal Revenue Code and Treasury Regulation § 1.956.2(c), if a loan to a U.S. company is secured by a pledge of at least 66-2/3% of the total voting power of all classes of stock of a controlled foreign corporation, such pledge may render the parent entity liable for a deemed dividend in an amount equal to the principal amount of the loan.  *See* 26 U.S.C. § 956.  If the Proposed Financing were approved, any potential deemed dividend liability could be offset with current year losses and net operating losses (collectively, "NOLs"), some of which might otherwise not be available to offset the Debtors' taxable income because they would be reduced due to cancellation of indebtedness ("COD") income that is realized but not recognized.  Moreover, to the extent that there are sufficient NOLs to offset the COD income, the Debtors will be required to reduce the tax basis of their assets.  The Debtors have not provided any evidence, however, with respect to the amount of NOLs that would be

28

needed to offset any deemed dividend liability or that the NOLs would not be available to the

Debtors to offset other liabilities in the absence of any deemed dividend liability.  If, for

example, it is ultimately established that the Debtors' pledge of the Unencumbered Foreign

Stock results in $50,000,000 of deemed dividend liability, the Debtors would need $50,000,000

of NOLs to offset this liability, thereby reducing the NOLs available to prevent a basis reduction

or to shelter against taxable income.  Without more information regarding the potential harm that

could be inflicted on these estates through the pledge of the Unencumbered Foreign Stock, the

Proposed Financing should not be approved.  Even if the Court is otherwise inclined to authorize

the grant of a lien on the Unencumbered Foreign Stock notwithstanding the foregoing, the

Debtors should also be required to secure an opinion letter from counsel opining that the

proposed lien will not trigger any adverse tax consequences for the Debtors, their subsidiaries or

the Debtors' estates.

49.    Moreover, any such lien granted should only be granted to Oaktree on a

conditional or springing basis.  More specifically, any Final DIP Order should grant a lien on the

Unencumbered Foreign Stock in favor of Oaktree *only* to the extent Oaktree can demonstrate,

either in connection with confirmation or otherwise at the end of these cases, that the value of the

Unencumbered Foreign Stock is necessary to satisfy the claims incurred by Oaktree pursuant to

the DIP Term Credit Agreement.  If Oaktree is unable to make that showing to this Court's

satisfaction, the lien should not attach, the Debtors will not suffer the negative tax consequences

associated therewith, and the value of the Unencumbered Foreign Stock would be available to

satisfy the claims of unsecured creditors.  Absent such modifications, the Committee requests

that the DIP Motion be denied.

### b. The DIP Lenders Are Not Entitled to a Lien on Avoidance Action Proceeds

50.     While the Interim DIP Order provides that the collateral securing the DIP

Financing excludes avoidance actions, the DIP Collateral *does* include the proceeds of the

Debtors' claims and causes of action arising under Bankruptcy Code sections 502(d), 544, 545,

547, 548, 549, 550 and 553, and any other avoidance or similar action under bankruptcy law

upon entry of a final order.  The grant of liens on the proceeds of avoidance actions, however, is

fundamentally at odds with the unique purposes served by avoidance actions.  Avoidance actions

and the proceeds thereof are uniquely designed to benefit all ***unsecured*** creditors.  *See Official

Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226

F.3d 237, 244 (3d Cir. 2000) (identifying underlying intent of avoidance powers to recover

valuable assets for estate's benefit); *Buncher Co. v. Official Comm. of Unsecured Creditors of

GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under

section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured

creditors"); *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law

permits all unsecured creditors to benefit from avoidance action recoveries").

51.     The Debtors have not provided any justification for the extraordinary grant of

liens on the proceeds of avoidance actions or for the potential payment of superpriority claims

with the proceeds of such actions.  To the contrary, there is no legal basis for this Court to grant

the DIP Lenders a lien on such proceeds.  *See, e.g., In re Excel Maritime Carriers, Ltd.*, No. 13-

23060 (RDD) [Dkt. No. 133] (Bankr. S.D.N.Y. Aug. 6, 2013) (excluding avoidance actions and

proceeds thereof from property that could be used to pay superpriority claims under Bankruptcy

Code section 507(b); excluding avoidance actions and proceeds from the scope of adequate

protection liens); *In re Old HB, Inc. (f/k/a Hostess Brands, Inc.)*, No. 12-22052 (RDD) [Dkt. No.

30

254] (Bankr. S.D.N.Y. Feb. 3, 2012) (same).  Notably, the Superior DIP Proposal does not take a

lien on or superpriority claim in the avoidance actions or their proceeds.  Accordingly, avoidance

action proceeds should be excluded from the DIP Collateral and reserved for the benefit of the

Debtors' unsecured creditors.  Moreover, given that the fundamental purpose of avoidance

actions is to recover valuable assets on behalf of the estate and its unsecured creditors—and not

its secured creditors—such proceeds should similarly be excluded from property used to pay any

superpriority claims arising under Bankruptcy Code section 507(b) in respect of the Proposed

Financing.

> **5.      The Limitations on the Committee's Ability To Investigate and
> Pursue Lender Claims Are Unacceptable**

52.      The DIP Lenders attempt to constrict substantially the Committee's ability to

challenge the Prepetition Secured Parties' liens by providing the Committee ***only 60 days*** to both

(a) file a motion to obtain standing ***and*** (b) investigate and initiate an adversary proceeding

asserting claims against the Prepetition Secured Parties.[17]  As the Court is aware, the time

required to brief and argue a standing motion is significant.  In the interest of promoting the full

investigation of potential claims, courts have approved DIP orders providing creditors'

committees with automatic standing to commence an adversary proceeding without the need to

file a standing motion.  *See, e.g., In re Phoenix Payment Sys., Inc.*, No. 14-11848 (MFW) [Dkt.

No. 149] (Bankr. D. Del. Sept. 3, 2014) (providing creditors' committee with automatic standing

to commence an adversary proceeding); *In re Exide Techs.*, No. 13-11482 (KJC) [Dkt. No. 427]

(Bankr. D. Del. July 25, 2013) (same); *In re 155 Route 10 Assocs.*, No. 12-24414 (NLW) [Dkt.

No. 131] (Bankr. D.N.J. June 29, 2012) (same); *In re UBI Liquidating Corp. (f/k/a Urban*

---

[17] The Challenge Period may be extended (x) as to the Prepetition ABL Secured Parties, with the prior written consent of the Prepetition ABL Agent, (y) as to the Prepetition Notes Secured Parties, with the prior written consent of each of the Prepetition Secured Notes Trustee and Collateral Agent and the Required Secured Noteholders, or (z) by order of the Court.

*Brands, Inc.)*, No. 10-13005 (KJC) [Dkt. No. 188] (Bankr. D. Del. Oct. 13, 2010) (same); *In re*

*Old Razor Co., LLC (f/k/a American Safety Razor Co., LLC)*, No. 10-12351 (MFW) [Dkt. No.

174] (Bankr. D. Del. Aug. 27, 2010) (same).  DIP orders have also provided for the tolling of the

period in which an adversary proceeding must be commenced upon the filing of a standing

motion.  *See, e.g., In re Seal123, Inc. (f/k/a The Wet Seal, Inc.),* No. 15-10081 (CSS) [Dkt. No.

454] (Bankr. D. Del. Mar. 19, 2015) (providing challenge period tolled as to moving party until

earlier of (x) withdrawal of standing motion or (y) entry of dispositive order by the court with

respect to such motion); *In re RS Legacy Corp. (f/k/a RadioShack Corp.)*, No. 15-10197 (BLS)

[Dkt. No. 947] (Bankr. D. Del. Mar. 12, 2015) (same); *In re EWGS Intermediary, LLC,* No. 13-

12876 (MFW) [Dkt. No. 89] (Bankr. D. Del. Nov. 20, 2013) (same).

        53.      In light of the complexity of these cases, the Prepetition Secured Parties (in their

capacity as DIP Lenders) should not be permitted to unnecessarily impair the Committee's

ability to fully investigate potential claims by forcing the Committee to fulfill its statutory

obligations, properly investigate the Prepetition Secured Parties' liens and claims, request and

obtain standing to pursue any appropriate claims, and initiate the necessary litigation—all in a

mere 60 days.  Notably, the Superior DIP Proposal would provide the Debtors with the

postpetition financing they require with ***no*** Challenge Period (and, as discussed in Section A.2,

*supra*, no Investigation Cap), rendering the Superior DIP Proposal clearly more favorable to all

the Debtors' creditors (other than Oaktree). *See* Ex. A.  The Committee therefore submits that, if

the Court nevertheless determines to approve the Proposed Financing, the Proposed Financing

must first be modified to (i) grant the Committee automatic standing to commence an adversary

proceeding challenging the Prepetition Secured Parties' liens and claims and (ii) provide the

Committee with at least an additional 30 days (for a total Challenge Period of 90 days) to investigate and prosecute any such claims.

54.     The Proposed Financing also seeks to limit the funds available to the Committee for the investigation of claims against the Prepetition Secured Parties to $50,000.  This Investigation Cap seeks to shield the Prepetition Secured Parties from potential claims at the unacceptable expense of the Debtors' unsecured creditors and the adversary system at the core of the Bankruptcy Code.  In large chapter 11 cases such as these, it is not uncommon that no cap applies to the amount that a creditors' committee may expend to investigate potential claims against lenders.  *See, e.g., In re TOUSA, Inc.*, No. 08-10928 [Dkt. No. 2355] (Bankr. S.D. Fla. Jan. 9, 2009) (no cap on the use of cash collateral to investigate claims); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) [Dkt. No. 219] (Bankr. D. Del. May 30, 2008) (same); *In re Delta Air Lines, Inc.*, No. 05-17923 (CGM) [Dkt. No. 652] (Bankr. S.D.N.Y. Oct. 6, 2005) (same). Additionally, courts in this district routinely approve caps well above $50,000 for funds available to committees for the investigation of claims against prepetition lenders.  *See, e.g., In re Source Home Entm't, LLC*, No. 14-11553 (KG) 2014 WL 4655748 (Bankr. D. Del. July 22, 2014) ($100,000 cap); *In re Rural/Metro Corp.*, No. 13-11952 (KJC) 2013 WL 5594837 (Bankr. D. Del. Sept. 10, 2013) (same); *In re Ormet Corp.,* No. 13-10334 (MFW) [Dkt. No. 147] (Bankr. D. Del. Mar. 22, 2013) (same); *In re Buffets Rests. Holdings, Inc.*, No. 12-10237 (MFW) 2012 WL 1141583 (Bankr. D. Del. Jan. 19, 2012) (same); *In re Caribbean Petroleum Corp.*, No. 10-12553 (KG) 2010 WL 6982178 (Bankr. D. Del. Aug. 12, 2010) (same).

55.     The integrity of the bankruptcy process mandates that the Committee's professionals be permitted to advocate on behalf of unsecured creditors without being subject to the control of third parties whose interests are adverse to those of the Debtors' estates.  It is

33

wholly inappropriate for the DIP Lenders to obtain the benefits of the Debtors' reorganization

through chapter 11 while at the same time refusing to accept the costs.  Moreover, as stated

above, the Superior DIP Proposal would provide the Debtors with the necessary postpetition

financing to fund their operations and these Chapter 11 Cases with *no* Investigation Cap and *no*

Challenge Period. *See* Ex. A.  The Committee therefore requests that the Investigation Cap be

deleted in its entirety, if the Court elects to approve the Proposed Financing.  In the alternative,

the Committee requests that the Investigation Cap be increased by an additional $100,000, for a

total Investigation Cap of $150,000.

### 6.     The Bankruptcy Code Section 506(c) and 552(b) Waivers in the Proposed Financing Should Not Be Permitted as Proposed

56.     The Proposed Financing contemplates a waiver (a) by the Debtors of their right to

surcharge collateral pursuant to Bankruptcy Code section 506(c), absent the prior written consent

of the applicable Prepetition Secured Parties and (b) of the "equities of the case" exception under

Bankruptcy Code section 552(b), which would otherwise allow the Debtors, the Committee or

other parties in interest to assert that equitable considerations warrant the exclusion of

postpetition proceeds from the collateral securing the Debtors' prepetition debt.  *See* DIP Term

Loan Credit Agreement § 8.1(z); DIP ABL Credit Agreement § 8.01(ee); Interim DIP Order

¶ 42.  For the reasons set forth below, these broad waivers are inappropriate as they pertain to the

Prepetition Secured Parties.

57.     Bankruptcy Code section 506(c) is a rule of fundamental fairness,

"understandably shift[ing] to the secured party . . . the costs of preserving or disposing of the

secured party's collateral, which costs might otherwise be paid from the unencumbered assets of

the bankruptcy estate."  *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus.,*

*Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995).   In addition, the United States Supreme Court has ruled

34

that only the debtor is vested with standing to seek administrative surcharges under section 506(c); a waiver by the Debtors thus would cause all parties in interest to lose this valuable protection. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 12 (2000).

58.    With respect to the Debtors' proposed waiver of rights under section 552(b), given that recoveries for unsecured creditors are uncertain at this early juncture, a prospective finding that the "equities of the case" exception contained in section 552(b) is waived in its entirety is wholly inappropriate and should be stricken. *See, e.g., In re iGPS Co. LLC*, No. 13-11459 (KG) 2013 WL 4777667, at *5 (Bankr. D. Del. July 1, 2013) (no waiver of the "equities of the case" exception with respect to creditors' committee); *In re Namco, LLC*, No. 13-10610 (PJW) 2013 WL 1332581 (Bankr. D. Del. Mar. 24, 2013) (same); *In re Chemtura Corp.,* No. 09-11233 (REG) [Dkt. No. 281] (Bankr. S.D.N.Y. Apr. 29, 2009) (no waiver of the "equities of the case" exception).

59.    As set forth in the chart on pages 18-19, the Superior DIP Proposal contemplates narrowly-tailored section 506(c) and 552(b) waivers. Specifically, the Superior DIP Proposal proposes section 506(c) and 552(b) waivers solely with respect to claims arising under the DIP ABL Facility and the new DIP term facility to be provided pursuant to the Superior DIP Proposal, but the Prepetition Secured Parties would not be entitled to the benefit of such waivers. *See* Ex. A. Accordingly, the section 506(c) and 552(b) waivers in the Final DIP Order should be modified to mirror those in the Superior DIP Proposal, and provide that such waivers do not extend to the Prepetition Secured Parties.

### 7. Additional Modifications Should Be Made with Respect to the Financial Terms and Covenants of the Proposed Financing

60.     The Proposed Financing contains additional problematic provisions that should be

modified including, among other things, the following:

- *Interest Rate and OID*.  Pursuant to Sections 1.1 and 2.8 of the DIP Term Loan Credit Agreement, new money lent under the DIP Term Facility bears interest at a rate of 12% per annum.  In addition, the DIP Credit Agreements contemplate an original issue discount ("OID") in the amount of $3.45 million.  Taken together, the blended rate of return for the DIP Lenders is 26.4%, well above the 14.2% proposed in the Superior DIP Proposal.  In addition, upon information and belief, the Debtors paid the OID in full upon the initial funding of the DIP Term Facility.  If approved, OID should be deemed paid pro rata as the DIP Term Facility is funded, rather than immediately upon the initial funding of the DIP Term Facility.

- *Termination Fee*.  The DIP Term Loan Credit Agreement contemplates a termination fee of $2.3 million upon the maturity of the DIP Term Facility, unless a Sponsored Plan goes effective or the Debtors' Chapter 11 Cases are converted to a chapter 7 proceeding.  The termination fee is designed to prevent the Debtors from obtaining alternate financing.  This fee should be eliminated in its entirety, particularly in light of the Superior DIP Proposal.

- *Uncommitted Funds*.  Upon the Debtors' request, an additional $25 million will be available under the DIP Term Facility to be funded at the sole discretion of the DIP Lenders.  No fees should be paid with respect to such amount unless such amount is actually committed and available to the Debtors.

- *Maturity*.  The DIP Credit Agreements mature on the date that is 150 days after the Petition Date, with no provision for a potential extension.  A 150-day maturity is precipitously early, considering the Debtors and their affiliates have operations in multiple states and foreign countries involving both the Debtors and non-Debtor entities.  The Debtors need sufficient time to develop and navigate a successful reorganization.  Accordingly, in a case of this size and complexity, a 150-day maturity date without a commercially realistic provision for the Debtors to extend is arbitrary and premature.  This is simply too short a period for the Debtors to take all the steps necessary to complete a full operational and financial restructuring.

- *Borrowing Base*.  Pursuant to Section 1.01 of the DIP ABL Credit Agreement, the domestic borrowing base is calculated based upon, among other things, the face amount of Eligible Credit Card Receivables (as defined in the DIP ABL Credit Agreement) multiplied by an advance rate of 70%.  The proposed 70% is below market and should be increased to 85%.  In addition, the DIP Motion provides that the DIP ABL Agent has the right to establish reserves on the borrowing base in its sole discretion, yet the DIP ABL Credit Agreement

states that the DIP ABL Agent's judgment must be commercially reasonable from the standpoint of an asset-based lender. The provisions providing the DIP ABL Agent with sole discretion over establishing reserves on the borrowing base are inappropriate and should be stricken from the DIP ABL Credit Agreement.

- *Replacement CRO*. Pursuant to Section 8.1(h) of the DIP Term Loan Credit Agreement, upon the resignation of the chief restructuring officer, the Debtors have only five business days to engage a replacement officer to avoid an event of default. Five business days is an unreasonably short period of time in which to recruit a replacement chief restructuring officer. The Debtors should be afforded thirty days to replace the chief restructuring officer in the event of such officer's resignation.

- *Reporting Requirements*. All notices and reports, including, but not limited to, any financial updates and analyses required to be provided by the Debtors to the DIP Agents and the DIP Lenders should be contemporaneously provided to the Committee.

- *Professional Fees*. The amount provided in the DIP Budget for the payment of Committee professionals is inadequate given the complexity of these cases and the likelihood of extensive litigation in connection with prosecution of the Sponsored Plan (assuming the Proposed Financing is approved). Currently, the proposed amounts are $300,000 per month for the Committee's legal advisors and $200,000 per month for the Committee's financial advisors. Moreover, it is unclear whether the professional fees in the DIP Budget are intended to be considered on an aggregate basis, as reflected in the filed DIP Budget, or if professional fees would be tested against the even more restrictive limits set forth in the detailed DIP Budget negotiated by the DIP Lenders and the Debtors that includes a breakout of professional fees among the Debtors, the Committee, and the DIP Lenders. If the Proposed Financing is approved, the Final DIP Order should clarify that in determining compliance with the DIP Budget, professional fees will be considered on an aggregate basis.

61.     Moreover, the proposed DIP Financing contains certain covenants that should be stricken or modified to ensure that the Debtors have access to the liquidity they need and are not held hostage by the DIP Lenders:

- *Receipts Variance*. Sections 1.1 and 7.19(a) of the DIP Term Loan Credit Agreement state that cumulative total operating receipts shall not vary more than 10% from the amount set forth in the DIP Budget, tested on a weekly basis, commencing after the end of the third full week after the Petition Date. This variance test is overly restrictive and serves to penalize the Debtors if they collect receipts earlier than projected. Accordingly, this test should include a carry-forward provision.

37

- *Disbursements Variance*.  Sections 1.1 and 7.19(a) of the DIP Term Loan Credit Agreement state that any variance from the DIP Budget shall not be more than 10% more than the cumulative Total Disbursements in the DIP Budget, tested on a weekly basis, commencing after the end of the third full week after the Petition Date.  This variance test is overly restrictive and serves to penalize the Debtors if they make disbursements not contemplated by the DIP Budget, including those in connection with new business, which would entail increased disbursements.  Accordingly, this test should include a carry-forward provision.

**B.      The PSA Motion Should Not Be Approved Without Modifying Certain Terms of the PSA**

62.      The PSA Motion similarly violates applicable law and should not be approved for at least four reasons.  *First*, as demonstrated in Section B.1.a., the Debtors have not shown that the Break-Up Fee is warranted by the facts of the case, nor that it is necessary to induce the Plan Sponsor to support the Sponsored Plan.  *Second*, as set forth in Section B.1.b., the PSA leaves the Plan Sponsor with the ability to either cause a default under certain key milestones or to declare a default (even a nonmaterial one) and immediately terminate its obligations under the PSA—additional evidence that approval of the Break-Up Fee is not warranted under these facts. *Third*, as the Committee illustrates in section B.1.c., the Break-Up fee is grossly outsized relative to the value actually contributed by the Plan Sponsor to the transaction.  *Finally*, as explained in Section B.2., although the PSA purports to grant the flexibility to shop for a higher or better offer through the embedded fiduciary "out," unrealistic time limitations and restrictions on the Debtors' ability to exercise their reasonable business judgment in evaluating any such alternatives effectively render it a nullity.  In sum, the PSA requires the Debtors to hand over control of these cases to the Plan Sponsor to the detriment of all other creditors.  Accordingly, the Break-Up Fee should be stricken from the PSA or, if approved, materially reduced to reflect the actual value to the Debtors of the proposed transactions.

38

1.     **The Circumstances of the PSA Do Not Warrant a Break-Up Fee, Much Less the Oversized Break-Up Fee Proposed**

a.    **The Break-Up Fee in the PSA Is Unwarranted**

63.     While the Debtors rely heavily on a New York decision, *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455 (Bankr. S.D. N.Y. 2014), in support of their request for approval of the $20 million Break-Up Fee, the approval of such fees in this district is governed by the Third Circuit's own decision in *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) and its progeny. *See also In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010) (affirming and discussing *O'Brien*). As discussed below, *Genco* employs a distinct standard from that employed in the Third Circuit and is factually distinguishable on various levels.

64.     In *O'Brien*, the Third Circuit concluded that requests for approval of break-up fees should be treated no differently than other applications for administrative expenses under Bankruptcy Code section 503(b). *O'Brien*, 181 F.3d at 535. In other words, "the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate. Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context." *Id.* Rejecting various formulations and factor-based analyses, the Third Circuit focused instead on the underlying question of whether the proposed break-up fee was necessary to preserve the value of the debtor's estate. *Id.* at 536. Dissatisfied with the bidder's suggestion that its bid promoted competitive bidding by establishing a minimum bid, the Third Circuit agreed with the bankruptcy court that there must be some showing that the bid "served as a catalyst to higher bids." *Id.* at 537. Also significant to the *O'Brien* court's denial of the break-up fee was the fact that the bidder "had strong financial incentives to undertake the cost of submitting a bid . . . even

in the absence of any promise of reimbursement." *Id.* (noting that the evidence strongly suggested that "it was the prospect of purchasing [the debtor's] assets cheaply, rather than the prospect of break-up fees or expenses, that lured [the bidder] back into the bidding"); *see also Reliant Energy*, 594 F.3d at 206 ("We also indicated [in *O'Brien*] that a break-up fee is not 'necessary to preserve the value of the estate' when the bidder would have bid even without the break-up fee.").

65.    In the instant case, the Debtors have not shown that approval of the Break-Up Fee is necessary to induce the Plan Sponsor to submit the offer contained in the PSA, nor that the Plan Sponsor's offer is necessary to preserve the value of the Debtors' estates.  To the contrary, there is strong evidence to suggest that no such financial inducement is necessary.  *First*, and most importantly, the Plan Sponsor is already heavily invested in the capital structure, as it holds in excess of $200 million in principal amount of the U.S. Secured Notes and approximately 6% of the Euro Notes.  Short of attempting to exercise the traditional remedies of a secured creditor (e.g., foreclosure), the Plan Sponsor's best chance to preserve the value of its collateral and potentially capture upside in the form of stock in the reorganized Debtors is to maintain the Debtors' ongoing business operations through the implementation of a plan akin to the Sponsored Plan.  The Plan Sponsor is therefore strongly incentivized to step forward as an initial bidder and backstop lender to prevent a potentially disastrous fall into a chapter 7 liquidation. Stated differently, the PSA does not represent a new offer from an outside investor who could just as easily walk away if the terms prove unsatisfactory, but a strategic maneuver by Oaktree to protect its substantial investment while simultaneously sweeping up significant value from unsecured creditors in exchange for a paltry $7.5 million tip.

66.     *Second*, the proposed Break-Up Fee does not serve to defray the Plan Sponsor's

expenses incurred in connection with the PSA.  Section 3.01(c) of the PSA would explicitly

obligate the Debtors, independent of any Break-Up Fee, to pay "all reasonable and documented

prepetition and postpetition fees and expenses incurred by the Plan Sponsor [Oaktree] and its

advisors."  PSA § 3.01(c).  As the Plan Sponsor has inherent financial incentive to offer the

transactions contemplated in the PSA and is already reimbursed for any costs it incurs in doing

so, there is little reason to believe that an additional Break-Up Fee is actually necessary to induce

the Plan Sponsor to bid.

67.     *Third*, there is no evidence to suggest that the Plan Sponsor's bid has "served as a

catalyst to higher bids."  *O'Brien*, 181 F.3d at 537.  To the contrary, the Debtors' own statements

suggest that little, if any, marketing of the Debtors' businesses and assets has occurred—whether

as a balance sheet restructuring or as a going-concern sale.  Moreover, the compressed

milestones contained in the PSA (and, as described above, the DIP Credit Agreements) would, if

approved, actively *discourage* bids of any kind.  Against this backdrop, there is no basis for the

Court to conclude that a break-up fee in any amount is necessary to preserve the value of the

Debtors' estates.

68.     *Finally*, a break-up fee is wholly inappropriate where, as here, a competitive

process—indeed, a process that has already produced a materially superior alternative that does

not include a break-up fee—already exists.  This is a particularly critical point in the instant case,

as the linkage between the Debtors' Proposed Financing and the PSA as proposed means that the

Court's decision to approve more favorable postpetition financing (such as the Superior DIP

Proposal) would empower the Plan Sponsor to declare a PSA default and trigger their right to

payment of the proposed Break-Up Fee.  Where a competitive atmosphere already exists, a

break-up fee is unnecessary.  As the Third Circuit has stated in the context of asset sales under

Bankruptcy Code section 363, "break-up fees often are not needed when there are bidders for an

asset other than the initial bidder."  *Reliant Energy*, 594 F.3d at 204 n.5 (upholding bankruptcy

court's denial of break-up fee in the context of a section 363 sale where competing bid was on

the table and break-up fee would therefore have chilled bidding and provided no discernable

benefit to the estate); *In re Reliant Energy Channelview L.P.*, No. 07-11160 (Bankr. D. Del. Mar.

18, 2008) Hr'g Tr. 47:1–9 ("I've . . . approved [break-up fees] where the . . . parties have

convinced me that it is the only way to get other bidders, any bidder to the table.  But I'm not

convinced in this case that that is the case.  There are other bidders, at least one other bidder.

And I have in the past denied break-up fees in circumstances where another party had appeared

and expressed an intention to bid . . . ."); *O'Brien*, 181 F.3d at 537 (finding that a benefit to the

estate justifying a break-up fee may be found where "assurance of a break-up fee promoted more

competitive bidding, such as by inducing a bid that otherwise would not have been made").  In

contrast to the DIP Lenders, the lenders offering the Superior DIP Proposal propose to offer

standalone postpetition financing, uncoupled from any restructuring scenario, that would allow

the Debtors the freedom to seek out the most favorable, value-maximizing restructuring scenario

for the benefit of their estates and creditors.

### b.  The Break-Up Fee Is Particularly Offensive Given the Lack of Firm Commitment by the Plan Sponsor to the PSA

69.     Section 1 of the PSA reassures that "[t]his Agreement shall become effective and

binding upon each of the Parties immediately following the execution by each of the Quiksilver

Entities and the Plan Sponsor."  PSA, § 1.  Upon closer reading, however, the terms of the PSA

allow the Plan Sponsor to terminate the agreement essentially at its discretion.  In particular, the

Plan Sponsor's ability to cause the Debtors to miss key deadlines, paired with other default

triggers that lack any sort of basic materiality threshold, reveal that the Plan Sponsor is actually bound to the PSA only to the extent it *chooses* to remain so.

70.     For example, many of the deadlines imposed on the Debtors under Section 3.02(b) of the PSA are tied to the approval of certain documents and pleadings (such as the Backstop Agreement), which must be "in form and substance acceptable to the Plan Sponsor in its sole discretion."  Without binding agreements already in place, and with no assurance of the reasonableness of the Plan Sponsor's exercise of such discretion, the Debtors, the Committee, and this Court have no assurance that any Backstop Agreement will ever be approved.  The accelerated nature of these various deadlines and plan milestones similarly strip down the value of the Debtors' limited "fiduciary out" (discussed below) by preventing the Debtors, the Committee, and the Court from properly assessing the value of the Debtors and their assets, investigating the alleged liens securing the U.S. Secured Notes, evaluating the potential merits of a section 363 sale in lieu of a balance sheet recapitalization, or testing the market for possible "Superior Proposals."

71.     There is little to reassure the Court that approval of the Break-Up Fee would "buy" any certainty for the Debtors going forward.  Section 5.01(a)(v) of the PSA allows the Plan Sponsor to terminate for any breach of a representation, warranty, or covenant regardless of the materiality or immateriality of  the alleged breach, giving the Plan Sponsor broad, subjective discretion to declare a default and terminate the PSA for even the most technical or *de minimis* breach of the terms of the PSA.[18]  Elsewhere in the PSA, the Debtors are required to give the

---

[18] The inequity of this provision is particularly striking in comparison to its counterpart, Section 5.02, which permits the Debtors to terminate only upon "the material breach by the Plan Sponsor of any of the representations, warranties, or covenants set forth in this Agreement that would have a material adverse impact on the consummation of the Restructuring . . . ." PSA § 5.02(a) (emphasis added).  This "double materiality" qualifier, with no similar imposition on the Plan Sponsor's termination rights, reinforces the highly conditional nature of the Plan Sponsor's commitments under the PSA.

Plan Sponsor prompt written notice "if the Debtors know *or should know* of a breach by such Debtor with regard to any of the obligations, representations, warranties, or covenants set forth in this Agreement."  PSA § 3.02(g) (emphasis added).  This places an almost impossible standard on the Debtors to inform the Plan Sponsor, not only of any *known* breach (whether material or not), but any breach the debtors *should know of* (whether or not they *actually* know of it).  The net effect of these two provisions is to make it possible for the Plan Sponsor to declare a default after the fact and terminate the PSA based on the occurrence of any breach, whether material or not.  In that event, should the Plan Sponsor exercise any of its numerous "outs" under the PSA, the Break-Up Fee as proposed will be immediately triggered and payable based on any other transaction that may be consummated in the next 12 months thereafter, including any alternative restructuring "whether pursuant to a chapter 7 or chapter 11 case," or any "sale of material portion of the Debtors' assets or equity interests."  PSA § 3.01(d).  Under such conditions, the award of an additional Break-Up Fee is flatly inappropriate and unwarranted by the circumstances, and should be denied in its entirety.

### c.  The Break-Up Fee Represents an Inflated Assessment of the Plan Sponsor's Actual Contributions

72.     When evaluating the propriety of a break-up fee, courts consistently assess the reasonableness of the proposed amount in reference to the proposed purchase price to be paid by the debtor.  *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 662 (S.D.N.Y. 1992) ("A break-up fee should constitute a fair and reasonable percentage of the proposed purchase price..."); *see also In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 534-36 (noting the reasonableness of the fee "relative to the proposed purchase price" as among the relevant factors in determining whether to approve a break-up fee); *Genco Shipping*, 509 B.R. at 465 (citing *Integrated Resources*); *In re Metaldyne*

44

*Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("[T]he [break-up] fee amount is not unreasonable relative to the proposed purchase price.". . . This falls within the range of what courts in this jurisdiction have found to be acceptable break-up fees.").

73. In the instant case, however, the Debtors appear to have calculated the Break-Up Fee based on an implied transaction value, rather than based upon the purchase price that the Plan Sponsor proposes to pay. Before assessing whether, in the Debtors' words, a $20 million Break-Up Fee is reasonable and appropriate and "is less than the Delaware convention of 3% when analyzed against these elements of value" (PSA Motion ¶ 34), the Court must therefore first determine what, among the various "elements of value" described in the PSA Motion, actually constitutes the Plan Sponsor's "purchase price." According to the Debtors, the PSA transaction includes certain key elements, which are summarized in the table below.

| "Element of Value" | Amount[19] |
|---|---|
| Exit financing, plus administrative expenses | $180.0 |
| Conversion of U.S. Secured Notes | $280.0 |
| Reinstatement of Euro Note guaranties | $250.0 |
| **TOTAL** | $710.0 |
| **Proposed Break-Up Fee** | **$20.0** |
| **Break-Up Fee (as % of value)** | **~2.8%** |

Upon closer examination, however, those "elements of value"—or, more precisely, the Plan Sponsor's actual contributions to them—are grossly overinflated. As set forth below, the actual value of the consideration to be provided by the Plan Sponsor is far less than what is suggested in the PSA Motion.

74. *First*, Oaktree cannot claim credit for the $180 million of proposed exit financing. According to the Plan Sponsor Term Sheet appended to the PSA, the Plan Sponsor will backstop only the proposed $122.5 million Exit Rights Offering, the proceeds of which will go to repay

---

[19] *See* PSA Motion ¶ 34. Amounts listed are in millions.

the DIP Term Facility.  *See* Plan Sponsor Term Sheet, at 6.  The balance of the proposed exit

financing, the Exit ABL Facility, is explicitly *not* proposed to be funded by the Plan Sponsor.  *Id.*

As such, only the amount of the Exit Term Loan actually backstopped by the Plan Sponsor, *up to

a maximum of $122.5 million* could conceivably be credited to the Plan Sponsor as new value.

The amounts contributed by separate lenders under the Exit ABL Facility—or other parties who

participate in the Exit Rights Offering and reduce the Plan Sponsor's contribution on a dollar-

for-dollar basis—cannot reasonably be considered as new value to be contributed by the Plan

Sponsor for purposes of assessing the reasonableness of the Break-Up Fee.

75.    As for that portion of the exit financing that the Plan Sponsor will backstop, while

it arguably constitutes additional value to be contributed by the Plan Sponsors as part of its

aggregate purchase price, the Committee expects that the Plan Sponsor will seek approval of

related transaction fees and other compensation under the accompanying Backstop Agreement.

To "credit" the Plan Sponsor's backstop of the proposed exit facility for purposes of the Break-

Up Fee, too, would inappropriately double-count that component of the transaction.   The exit

financing, therefore, should be excluded in its entirety.

76.    *Second*, the Committee submits that the Plan Sponsor should not be credited with

the "value" of the proposed exchange of U.S. Secured Notes for New Common Stock in

calculating the Break-Up Fee.  By including a cashless credit bid as part of its calculation, the

Debtors artificially inflate the "value" of the Plan Sponsor's "bid" and, by extension, the Break-

Up Fee.  Based on the Debtors' suggestion of a Break-Up Fee equal to approximately 2.8% of

the total "elements of value," this component alone adds over $7.8 million to the total proposed

Break-Up Fee.  Where, as here, the Plan Sponsor is effectively merely credit bidding to acquire

the Debtors' assets or equity, the "value" of the debt-for-equity swap should not be included in any calculation of a reasonable Break-Up Fee consistent with applicable law.

77.     At the very least, however, the Debtors overstate the extent of the Plan Sponsor's own contribution in the debt-for-equity swap.  Of the approximately $280 million in outstanding U.S. Secured Notes, the Plan Sponsor holds approximately 73%, or $204.4 million.  While the Plan Sponsor's consent as holder of a supermajority of U.S. Secured Notes may be sufficient to cause the balance of the U.S. Secured Notes holders to accept a debt-for-equity swap, the Plan Sponsor's own contribution cannot exceed the value of its own holdings.

78.     In *Genco Shipping*, the court considered a restructuring support agreement affirmatively supported by 98% of the holders of $1.069 billion in secured indebtedness, which holders had agreed to swap their debt for equity and to contribute an additional $100 million to fund additional distributions in the case.  *Genco Shipping*, 509 B.R. 455.  Although the court ultimately approved the breakup fee, it did so noting that the break-up fee represented approximately 2.2% of the "*committed* amount." *Id.* at 466 (emphasis added).  In particular, the restructuring support agreement in *Genco* offered up the affirmative consent of the overwhelming majority of stakeholders in the debtors' capital structure: 98% of the holders under the debtors' senior secured credit facility, 100% of the holders under two additional secured credit facilities, and 82% of the debtors' unsecured convertible notes.

79.     In the instant case, while the Plan Sponsor may have the leverage to cause other holders of U.S. Secured Notes to accept the proposed debt-for-equity swap, only the Plan Sponsor's 73% of the U.S. Secured Notes is actually committed under the PSA (to the extent the PSA represents a binding commitment).  While the Plan Sponsor's commitment may be sufficient to drag along the other holders of U.S. Secured Notes, the fact that such holders are not

signatories to the PSA means that their ability to oppose the PSA or the Sponsored Plan is entirely preserved.  In stark contrast to the widely-supported *Genco* restructuring support agreement, the PSA \offers the affirmative consent and support of a single creditor: Oaktree.

80.     The *third* component of the Debtors' claimed "elements of value," the reinstatement of the Debtors' own obligations to guaranty the Euro Notes, cannot be included, as it represents value generated from the Debtors' own assets.  *See In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 553 (Bankr. S.D.N.Y. 1996) (concluding that, in considering a proposed break-up fee in the context of a leveraged buyout, "it [is] appropriate to exclude from the value the monies which are to be generated from the Debtors' own assets").  Similarly, in *Integrated Resources*, "the court excluded from the calculation of value the debtor's cash on hand."  *Id.*; *see also In re Integrated Res., Inc.*, 135 B.R. 746 (Bankr. S.D.N.Y. 1992).  In the instant case, the reinstatement of the Debtors' guaranty of the Euro Notes represents value contributed to the PSA transactions by the Debtors themselves, not the Plan Sponsor.[20]  As in *Bidermann* and *Integrated Resources*, any value associated with the Debtors' reinstatement of such guaranties or the Euro Notes themselves must be excluded from the calculation.

81.     After adjusting the "elements of value" to reflect only what is actually proposed to be contributed by the Plan Sponsor under the PSA *and for which the Plan Sponsor is not expected to charge fees elsewhere in the structure*, it is immediately apparent that the *creditable* purchase price of the PSA transaction is *zero*.

---

[20] Moreover, the Plan Sponsor proposes to backstop a €50.0 million Euro Notes Rights Offering.  As with the proposed exit facility, to credit the Plan Sponsor with its backstop of the Euro Notes Rights Offering for these purposes, too, would inappropriately double-count that component of the transaction.

| "Element of Value" | Claimed Amount[21] | Adjustment | Correct Amount |
|---|---|---|---|
| Exit financing, plus administrative expenses | $180.0 | ($180.0) | $0.0 |
| Conversion of U.S. Secured Notes | $280.0 | ($280.0) | $0.0 |
| Reinstatement of Euro Note guaranties | $250.0 | ($250.0) | $0.0 |
| **TOTAL** | $710.0 | | $0.0 |
| **Break-Up Fee (as % of value)** | **~2.8%** | | **~2.8%** |
| **Proposed Break-Up Fee** | **$20.0** | | **$0.0** |

82.    Alternatively, even if the Plan Sponsor *were* credited with the "value" of its own debt-for-equity credit bid (but not the $75.6 million in U.S. Secured Notes to be exchanged by other holders), applying the same 2.8% calculation to the proposed purchase price actually being contributed by the Plan Sponsor would yield a "reasonable" Break-Up Fee of approximately $5.7 million (0.028 x $204.4 million).  Using the same 2.2% calculation that was approved in the *Genco* decision endorsed by the Debtors would yield a Break-Up Fee of only approximately $4.5 million.  In contrast, the proposed $20 million Break-Up Fee represents approximately *9.78%* of the value ($20 million ÷ $204.4 million) actually contributed by the Plan Sponsor under the PSA.

---

[21] *See* PSA Motion ¶ 34.  Amounts listed are in millions.

| "Element of Value" | Claimed Amount[22] | Adjustment | Correct Amount |
|---|---|---|---|
| Exit financing, plus administrative expenses | $180.0 | ($180.0) | $0.0 |
| Conversion of U.S. Secured Notes | $280.0 | ($75.6) | $204.4 |
| Reinstatement of Euro Note guaranties | $250.0 | ($250.0) | $0.0 |
| **TOTAL** | $710.0 | | $204.4 |
| **Break-Up Fee (as % of value)** | **~2.8%** | | **~2.8%** |
| **Proposed Break-Up Fee** | **$20.0** | | **$5.7** |

83.     Assuming the payment of *any* Break-Up Fee is appropriate in this case (and, as explained above, the Committee believes it is not), under either scenario the proposed Break-Up Fee of $20 million far exceeds what is appropriate under precedent in this Circuit.

### 2.     The Proposed Fiduciary "Out" Gives the Debtors Little Meaningful Opportunity To Consider Alternative Proposals

84.     Based on the statements made by the Debtors in their initial filings and on the record at the first day hearing, the extent to which the Debtors have actively marketed their assets and solicited potential investors or buyers is, at best, unclear.  Indeed, it appears that, to date, virtually no such shopping has occurred (other than with respect to the proposed postpetition financing arrangements).  The PSA thus includes a "fiduciary out," pursuant to which the Debtors "shall have the right to solicit any offer, proposal or inquiry relating to, or any third party indication of interest in, any transaction as an alternative to the [Sponsored] Plan." PSA § 3.01(d).  In the event that the Debtors determine that any such offer represents a "Superior Proposal," the Debtors may thereafter terminate the PSA pursuant to Section 5.02, subject to payment of the Break-Up Fee.  As a practical matter, however, this "fiduciary out" provides the Debtors little protection and allows them no meaningful ability to actually solicit alternative proposals.

---

[22] *See* PSA Motion ¶ 34.  Amounts listed are in millions.

85.     *First*, Section 3.01(d) only allows the Debtors until the entry of an order approving the Disclosure Statement to solicit and select a "Superior Proposal." Pursuant to Section 3.02(b)(vi), that order must be entered within 75 days after the Petition Date (November 23, 2015) to avoid a termination event—a woefully inadequate period of time for the Debtors to properly test the market and evaluate any potential offers or proposals that may arise.  At a minimum, Section 3.01(d) should permit the Debtors to continue any such effort through confirmation.

86.     *Second*, a "Superior Proposal" is defined in such a way as to limit it only to those proposals that are "more favorable, from a financial point of view, to the Debtors' stakeholders than the transactions contemplated by the [Sponsored] Plan." PSA § 3.01(d).  This is problematic on several levels.  The Debtors' stakeholders, including secured noteholders, ABL lenders, unsecured bondholders, and trade vendors, hold broadly disparate interests, and the Debtors and their board of directors should be afforded the flexibility to consider the interests of those stakeholders holistically.  Currently, a "Superior Proposal" would exclude any proposal that, while not necessarily more favorable from a financial point of view, might be considered more favorable on other grounds, such as reduced execution risk.  If the Debtors are to exercise properly their fiduciary duties to their respective stakeholders, they should not be subjected to such artificial restrictions on the exercise of their reasonable business judgment.  Accordingly, and assuming the Court is otherwise inclined to approved the PSA Motion, Section 3.01(d) should be modified to define a "Superior Proposal" to include any such bona fide written offer that the Debtors determine, in consultation with the Committee, to be more favorable to the Debtors' stakeholders, taking into account all relevant considerations in the exercise of their reasonable business judgment.

87.     *Finally*, in the event that a Superior Proposal is identified and the PSA terminated, Section 3.01(d) should be modified to clarify the circumstances (if any) in which the Break-Up Fee is to be paid.  For example, Section 3.01(d) directs payment of the Break-Up Fee "[i]n the event Debtors consummate any transaction other than as contemplated by the Restructuring and the Agreed Restructuring Plan . . . within a year following the termination of this Agreement," including event following "an alternate restructuring of the Debtors' capital structure . . . pursuant to a chapter 7."  PSA § 3.01(d).  It is unclear what a chapter 7 "restructuring" might entail, but at a minimum the PSA could be read such that, if the Sponsored Plan is ultimately determined to be unconfirmable for reasons beyond the Debtors' control and the cases are subsequently converted to chapter 7, the Plan Sponsor would be eligible for payment of the Break-Up Fee.  Similarly, Section 3.01(d) appears to authorize payment of the Break-Up Fee upon "a sale of a material portion of the Debtors' assets or equity interests," but fails to articulate what portion of the Debtors' assets is "material."  It would be unprecedented to allow the payment of such a fee in the situation where a debtor is liquidated, whether piecemeal or in chapter 7, following the outright failure of the stalking horse's original offer.  To the extent Section 3.01(d) permits such an outcome, it should be modified as a condition to approval of the PSA to allow the Debtors to freely consider all alternative proposals.

## RESERVATION OF RIGHTS

88.     Effective as of September 29, 2015 and subject to Court approval, the Committee selected PJT Partners ("PJT") as its financial advisor to assist in, among other things, analyzing the issues raised by the Proposed Financing and PSA.  The Debtors' document production has not yet been completed and crafting a deposition schedule that comports with the exceedingly compressed timeline established here has been predictably challenging.  Accordingly, as of the date of this Objection, both PJT and counsel are still performing diligence relevant to the

Proposed Financing and PSA, including the completion of ongoing depositions.  This Objection

therefore is submitted without prejudice to, and with a full reservation of, the Committee's rights

to supplement and amend this Objection, including by filing of a declaration in support thereof,

to introduce evidence at any hearing relating to this Objection, and to further object to the

Motions, on any grounds that may be appropriate.

## CONCLUSION

**WHEREFORE**, the Committee requests that the Court (i) deny the Motions absent the

Committee's requested modifications and (ii) provide the Committee such other and further relief

as the Court may deem just, proper and equitable.

Dated: October 9, 2015
       Wilmington, Delaware

PEPPER HAMILTON LLP

/s/ John H. Schanne, II
David B. Stratton (DE No. 960)
David M. Fournier (DE No. 2812)
John H. Schanne II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, Delaware  19899-1709
Telephone:　(302) 777-6500
Facsimile:　(302) 421-8390
E-mail:　strattod@pepperlaw.com
　　　　　fournierd@pepperlaw.com
　　　　　schannej@pepperlaw.com

-AND-

AKIN GUMP STRAUSS HAUER & FELD LLP
Michael S. Stamer (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
One Bryant Park
Bank of America Tower
New York, New York  10036-6745
Telephone:　(212) 872-1000
Facsimile:　(212) 872-1002
E-mail:　mstamer@akingump.com
　　　　　aqureshi@akingump.com
　　　　　mlahaie@akingump.com