IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re:                                                           :    Chapter 11
                                                                 :
QUIKSILVER, INC., et al.,[1]                                     :    Case No. 15-11880 (BLS)
                                                                 :
                                      Debtors.                   :    Jointly Administered
                                                                 :
                                                                 :
---------------------------------------------------------------- x

**DECLARATION OF MICHAEL J. GENEREUX IN SUPPORT
OF JOINT OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO DEBTORS' (I) MOTION FOR
AUTHORIZATION TO OBTAIN POSTPETITION FINANCING AND
(II) MOTION FOR AUTHORITY TO ASSUME PLAN SPONSOR AGREEMENT
AND PAY RELATED BREAK-UP FEE AND TRANSACTION EXPENSES**

I, Michael J. Genereux, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1.      I am a Partner in the Restructuring and Special Situations Group at PJT Partners ("PJT"), a provider of financial advisory services listed on the New York Stock Exchange that maintains offices at 280 Park Avenue, New York, New York 10017.

2.      On September 28, 2015, Akin Gump Strauss Hauer & Feld LLP was retained, subject to Court approval, by the official committee of unsecured creditors (the "Committee") to represent them in connection with the chapter 11 cases of the Debtors.[2] Effective as of September 29, 2015 and also subject to Court approval, the Committee selected PJT as its financial advisor to assist in, among other things, analyzing the issues raised by the Proposed Financing and PSA.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2] Capitalized terms used but not defined in this declaration shall have the meanings ascribed to such terms in the Objection or the DIP Motion, as applicable.

Over the course of the past few weeks, PJT has become familiar with the Debtors' businesses, finances and capital structure, as well as their chapter 11 cases.

**Qualifications**

3. In 2015, I joined PJT, which is a spin-off of the financial, strategic, restructuring and reorganization advisory services of Blackstone Advisory Partners L.P. ("Blackstone"). As part of this spin-off, Blackstone combined with PJT Capital LP, a global independent financial advisory firm. Prior to joining PJT, I worked at Blackstone for 13 years, most recently as a Senior Managing Director. Prior to joining Blackstone, I was a Director at Credit Suisse First Boston in the media and telecom group, and before that, a Vice President at Merrill Lynch & Co. in the investment banking division.

4. I have 21 years of experience in financial advisory services, including financial transactions, valuation and restructuring transactions. I have led complex bankruptcies and reorganizations across a broad spectrum of industries in a variety of capacities. I have advised companies, equity sponsors and creditors in domestic and cross-border restructurings, capital raises, financings and merger and acquisition transactions. In particular, I have provided services to debtors and other constituencies in numerous chapter 11 cases, including, among others: *In re A123 Systems Inc.; In re Allen Systems Group, Inc., et al.; In re Allied Holdings, Inc., et al.; In re Bally Total Fitness of Greater New York, Inc., et al.; In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.; In re Caesars Entertainment Operating Co., Inc., et al.; In re Calpine Corporation, et al.; In re Delta Air Lines, Inc., et al.; In re Dynegy Holdings, LLC, et al.; In re Eastman Kodak Company, et al.,; In re Edison Mission Energy, et al.; In re Evergreen Solar, Inc.; In re Fleming Companies; In re Hawkeye Renewables, LLC, et al.; In re Harry & David Holdings, Inc., et al.; In re Hawker Beechcraft, Inc., et al.; In re Hostess Brands, Inc.; In re Interstate Bakeries Corp., et al.; In re Legend Parent, Inc., et al.; In re Molycorp, Inc., et al.; In re*

*R.H. Donnelley Corp., et al.; In re Spansion, Inc., et al.; In re Station Casinos Inc., et al.; In re Smurfit-Stone Container Corporation, et al.;* and *In re Vitro America, LLC, et al.* I have provided expert witness testimony regarding valuation, financial and restructuring matters on numerous occasions.

## Background

5. I submit this declaration in support of the *Joint Objection of the Official Committee of Unsecured Creditors to Debtors' (I) Motion for Authorization To Obtain Postpetition Financing and (II) Motion for Authority To Assume Plan Sponsor Agreement and Pay Related Break-Up Fee and Transaction Expenses* (the "Objection").

6. The statements in this declaration are, except where specifically noted, based on my personal knowledge, on information that I have received from the Debtors' employees or advisors and/or employees of PJT working directly with me or under my supervision, direction or control, or from the Debtors' records maintained in the ordinary course of their business. I am not being compensated specifically for this testimony other than through payments to be received by PJT as a professional retained by the Committee. If I were called upon to testify, I could and would testify competently to the subject set forth herein. I am authorized to submit this declaration on behalf of the Committee.

7. The Objection contains a full and complete recitation of the relevant background facts. In summary, the Debtors' DIP Motion seeks authority to obtain postpetition financing in the aggregate principal amount of up to $175 million (the "Proposed Financing"), comprised of (i) a super-priority secured term facility of $115 million funded by Oaktree, and (ii) a partial paydown and roll-up of all of the outstanding obligations under the Prepetition ABL Facility into a super-priority secured asset-based revolving credit facility of $60 million funded by certain of the

Debtors' existing secured lenders (collectively with Oaktree, the "DIP Lenders"). *See* DIP Motion ¶ 42.

8. The Debtors' PSA Motion seeks authority to assume the PSA executed by and between the Debtors, on their own behalf and on behalf of each of their non-Debtor foreign subsidiaries, and certain funds managed by Oaktree (in such capacity, the "Plan Sponsor"). The PSA Motion states that the Plan Sponsor will, among other things, provide the Debtors with the Proposed Financing, which will ultimately be refinanced into an exit facility, and the Debtors will prosecute a plan of reorganization on terms acceptable to the Plan Sponsor. *See* PSA Motion ¶ 18.

9. In our role as financial advisor to the Committee, PJT performed preliminary due diligence on, among other things, the terms of the Proposed Financing and the Debtors' projected future financial performance and cash needs. PJT also evaluated the prepetition negotiations between the Debtors and the DIP Lenders, and the Debtors' prepetition marketing efforts to obtain competing offers on more favorable terms than those offered by the DIP Lenders under the Proposed Financing. In addition, PJT has performed preliminary diligence regarding the Unencumbered Foreign Stock and the potential ramifications of a lien on such assets.

10. On October 7, 2015, certain holders of U.S. Unsecured Notes provided the Debtors with a fully-committed alternative postpetition financing proposal (the "Superior DIP Proposal"). I have reviewed the terms of the Proposed Financing and the Superior DIP Proposal, and I believe that the Superior DIP Proposal is more favorable to the Debtors and their creditors than the Proposed Financing, and is in the best interests of the Debtors' estates.

11. Notwithstanding the existence of the Superior DIP Proposal, I have identified additional issues relating to the Proposed Financing. *First*, the Debtors failed to seek out alternative postpetition financing from obvious potential sources, including the holders of the U.S. Unsecured Notes, prior to agreeing to pursue the Proposed Financing funded by Oaktree. In

4

addition, the Debtors did not adequately market their assets to potential strategic purchasers prior to agreeing to pursue the transaction with Oaktree contemplated by the PSA and Sponsored Plan, which are integrally linked to the Proposed Financing. *Second*, the Proposed Financing contains milestones relating to approval of the PSA and the Sponsored Plan. The milestones set forth an aggressive timeline that serves to chill bidding with respect to the Debtors' assets as it does not allow potential buyers adequate opportunity to perform sufficient due diligence on the Debtors' assets and formulate a proposed price. *Third*, I believe that the DIP Lenders would be more than adequately secured by a priming lien on already-unencumbered prepetition collateral, and that the grant of a lien on the Unencumbered Foreign Stock and avoidance action proceeds is both unnecessary and extremely prejudicial to the interests of unsecured creditors. *Fourth*, when considered as a whole, the interest rate and original issue discount ("OID") in respect of the Proposed Financing would provide the DIP Lenders with an excessively high blended rate of return.

12.   *Finally*, the PSA provides for a $20 million Break-Up Fee payable to Oaktree in the event the PSA is terminated for any reason and the Debtors consummate a restructuring transaction (via a plan or sale process) within 12 months thereafter. It is my understanding that the Debtors have calculated the Break-Up Fee based on the implied transaction value of the Sponsored Plan. In the present circumstances, I believe that the appropriate assessment of the reasonableness of the Break-Up Fee is the actual value of the consideration to be provided by Oaktree for which Oaktree is not otherwise expected to receive a fee, rather than an implied transaction value, and that the Break-Up Fee is unreasonable and excessive when assessed on this basis.

**The Superior DIP Proposal Is Better for the Estates than the Proposed Financing**

13.   As stated above, on October 7, 2015, certain holders of U.S. Unsecured Notes provided the Debtors with the Superior DIP Proposal, which is more favorable than the Proposed

5

Financing with respect to virtually every substantive economic and non-economic term. A copy of the executed, binding commitment letter in respect of the Superior DIP Proposal is attached to the Objection as <u>Exhibit A</u>. The chart below compares the material terms of the Superior DIP Proposal to the Proposed Financing.

|  | **Proposed Financing** | **Superior DIP Proposal** | **Anticipated Savings to Estates** |
|---|---|---|---|
| **DIP Agent** | Oaktree | Wilmington Trust, National Association | N/A |
| **Facilities** | $115 million comprised of (a) $90 million, fully committed and (b) $25 million to be funded at Oaktree's discretion | $115 million term loan, fully committed | *Eliminates risk of non-funding relating to uncommitted funds* |
| **Interest Rate** | 12.0% | 10.5% | $720,000-$900,000 |
| **Maturity** | February 6, 2016 | March 15, 2016 | N/A |
| **Break-Up Fee** | $20 million[3] | None | *up to $20 million* |
| **DIP Liens** | First-priority liens on DIP Collateral subject only to certain permitted prior liens and Carve-Out. DIP collateral *includes* lien on Unencumbered Foreign Stock and avoidance action proceeds. | First-priority liens on DIP Collateral subject only to certain permitted prior liens and Carve-Out. DIP Collateral *does not include* lien on Unencumbered Foreign Stock or avoidance action proceeds. | *Undetermined value of previously unencumbered stock* |
| **Adequate Protection** | Solely to the extent of any diminution in value of the Prepetition Secured Parties' collateral (i) postpetition additional and replacement liens on and security interests in DIP Collateral and (ii) allowed superpriority administrative expense claim against Debtors' estates. | Same, plus payments made in respect of interest due under the U.S. Secured Notes, which may be subject to recharacterization if it is determined that the Prepetition Secured Parties are undersecured. | N/A |
| **Milestones** | *Milestones with respect to the PSA*: (i) Within 30 days of the Petition Date (a) file Sponsored Plan and related documents, (b) file motion to approve the Backstop Agreement and (c) obtain entry of order approving PSA; (ii) within 75 days of Petition Date, obtain entry of order approving (a) Disclosure Statement and (b) Backstop Agreement; (iii) obtain entry of the Confirmation Order within 115 days of Petition Date; and (iv) consummate transactions contemplated by Sponsored Plan | *Sale Milestones*: (i) File a motion to approve bid procedures for the sale of substantially all of the Debtors' assets by October 30, 2015; (ii) obtain entry of order approving the bid procedures by November 24, 2015; (iii) conduct auction by March 4, 2016; (iv) obtain entry of order approving the sale by March 7, 2016; and (v) close the sale by March 14, 2016; provided, however, that the DIP financing will also permit reasonable milestones for a plan process substantially consistent with the sale milestones. | N/A |

---

[3] This Break-Up Fee is provided for in the PSA, which is inextricably linked to the Proposed Financing.

|  | Proposed Financing | Superior DIP Proposal | Anticipated Savings to Estates |
|---|---|---|---|
|  | within 120 days of Confirmation Order entry. |  |  |
| **Permitted Variances from DIP Budget** | Operating receipts cannot vary more than 10% from the DIP Budget, tested on a weekly basis.<br><br>Disbursements cannot be more than 10% more than set forth in the DIP Budget, tested on a weekly basis. | Operating receipts cannot vary more than 15% from the DIP Budget, tested on a weekly basis.<br><br>Disbursements cannot be more than 15% more than set forth in the DIP Budget, tested on a weekly basis. | N/A |
| **§§ 506 and 552 Rights** | Waived | Waived with respect to claims arising under the proposed DIP loans only | N/A |
| **Investigation Cap** | $50,000 | None | N/A |
| **Challenge Period** | 60 days | None | N/A |
| **OID** | $3.45 million (3%) on aggregate amount to be funded, including in respect of $25 million to be funded at the DIP Lenders' discretion | 1% | $2.3 million |
| **CRO** | Debtors required to replace CRO within five (5) business days after resignation | Debtors required to replace CRO within thirty (30) days after resignation | N/A |

14. As evidenced by the chart above, the Superior DIP Proposal would provide the Debtors with postpetition financing that provides more committed liquidity on less onerous terms than the Proposed Financing. Specifically, I believe that the Superior DIP Proposal is superior to the Proposed Financing in the following material respects:

    (a)    the Debtors will have greater free cash flow because they will pay less interest and original issue discount;

    (b)    the Superior DIP Proposal will mature more than one month after the Proposed Financing, providing the Debtors with more time and flexibility;

    (c)    the Unencumbered Foreign Stock and avoidance action proceeds will remain unencumbered for the benefit of the Debtors' unsecured creditors, and the Debtors will avoid potentially value-destructive tax consequences with respect to a lien on the Unencumbered Foreign Stock;

    (d)    the relaxed milestones will provide the Debtors with time and flexibility to pursue a dual-track sale and plan process;

(e)      the Debtors will be less likely to trigger an event of default because they will have additional flexibility with respect to permitted variances from the DIP Budget for receipts and disbursements;

(f)      the Debtors will be less likely to trigger an event of default because the Superior DIP Proposal does not provide for cross-defaults with the PSA;

(g)      the Debtors will be less likely to trigger an event of default because they will be given more time to find a replacement CRO, should the CRO resign;

(h)      the section 506(c) and 552(b) waivers will be limited to claims against the lenders providing the DIP financing contemplated by the Superior DIP Proposal and will not extend to any of the Debtors' Prepetition Secured Parties; and

(i)      the Committee will be permitted to acquit its fiduciary duties to the Debtors' general unsecured creditors without being constrained by a Challenge Period or Investigation Cap.

15.     Therefore, it is my opinion that virtually every substantive term of the Superior DIP Proposal—both economic and non-economic—is more advantageous to the Debtors, their estates and their creditor constituencies than the Proposed Financing.

**Additional Issues With Respect to the Proposed Financing**

   **a) The Debtors Did Not Properly Shop the Proposed Financing or an Alternative Restructuring or Sale Transaction**

16.     Based on my discussions with the Debtors and their advisors, it is my understanding that the Debtors failed to explore properly their postpetition financing options. Specifically, I believe that the Debtors failed to seek out alternative postpetition financing from obvious potential sources, including the holders of the U.S. Unsecured Notes—certain holders of which have now provided the financing commitment evidenced by the Superior DIP Proposal.

17.     In addition, based on my discussions with the Debtors and their advisors, it is my opinion that the Debtors did not contact a sufficient number of potential sources to adequately market their assets prior to agreeing to the proposed PSA and Sponsored Plan transaction. For example, the Debtors reached out to only ▇ strategic buyers and ▇ financial sponsors prepetition. On October 1, 2015, PJT provided the Debtors' advisors with a list of 77 additional

parties (consisting of 38 strategic buyers and 39 financial sponsors) that, in my opinion, should have been contacted to evaluate a potential sale transaction. I also understand that, as of the date hereof, the Debtors have not prepared for distribution marketing materials that contain critical information such as an updated business plan and management presentation on key issues concerning the company. It is my understanding that the Debtors' final business plan will not be presented to the board for approval ███████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████

### b) The Milestones in the Proposed Financing Will Discourage Bidding

18. If approved, the Proposed Financing would require the Debtors to meet certain milestones related to approval of the PSA and the prosecution of the Sponsored Plan. It is my opinion that these milestones are inappropriately compressed and will discourage bids of any kind for the Debtors' assets. The timeline will not allow adequate time for potential buyers to perform due diligence and estimate a price they are willing to pay for the business. ████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████

███ In addition, as set forth above, I also believe that the Debtors did not adequately market their assets and have not yet prepared updated marketing materials, which further serves to chill the bidding and makes the proposed milestones all the more unreasonable.

---

█████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████

9

### c) The DIP Lenders Are Adequately Protected Without Receiving Liens on the Unencumbered Foreign Stock and Avoidance Action Proceeds

19. Based on my understanding of the DIP Collateral, I believe that the DIP Lenders would be more than adequately secured by a priming lien on already-unencumbered prepetition collateral and, therefore, granting a lien to the DIP Lenders on the Unencumbered Foreign Stock and avoidance action proceeds is both excessive and extremely prejudicial to the interests of unsecured creditors. The existence of the Superior DIP Proposal, which would provide the Debtors with $115 million in fully committed financing without a lien on any previously unencumbered assets, including the Unencumbered Foreign Stock and the avoidance action proceeds, evidences the fact that the DIP Lenders will be adequately protected without a lien on the Unencumbered Foreign Stock.

20. Based on my review of the documents filed in these cases and produced by the Debtors and preliminary diligence performed by PJT regarding the Unencumbered Foreign Stock,[7] and after further discussions with the Debtors and their advisors, it is my understanding that the Debtors agreed to the DIP Lenders' demand for liens on the Unencumbered Foreign Stock without first conducting a valuation of the Unencumbered Foreign Stock and the potential ramifications of a lien on such assets.[8] Moreover, it is my understanding that the granting of a lien on the Unencumbered Foreign Stock may trigger potentially adverse tax consequences in the form of a "deemed dividend" liability, █████████████████████████ █████████████████████████████.

---

[7] As of the date hereof, however, PJT still has material and substantial due diligence requests outstanding with respect to the Unencumbered Foreign Stock.

[8] ███████████████████████████████████████████████████████████

10

### d) The Interest Rate and OID of the Proposed Financing Provide the DIP Lenders with an Excessively High Rate of Return

21. Pursuant to Sections 1.1 and 2.8 of the DIP Term Loan Credit Agreement, new money loaned under the DIP Term Facility bears interest at a rate of 12% per annum. In addition, the DIP Credit Agreements contemplate OID in the amount of $3.45 million. The chart below shows the blended rate of return for the DIP Term Loan Lenders under the Proposed Financing as compared to the blended rate of return for the lenders under the Superior DIP Proposal.

**Proposed Financing**

| Week Ending | 09/12/15 | 10/03/15 | 10/17/15 | 10/31/15 | 12/05/15 | 01/02/16 | 02/06/16 |
|---|---|---|---|---|---|---|---|
| Funding[1] | (60.0) | (10.0) | (10.0) |  | (10.0) |  |  |
| Interest[2] |  | 0.4 |  | 0.8 | 0.8 | 0.9 | 1.1 |
| OID | 3.5 |  |  |  |  |  |  |
| Repayment |  |  |  |  |  |  | 90.0 |
| Total Cash Flow | ($56.6) | ($9.6) | ($10.0) | $0.8 | ($9.2) | $0.9 | $91.1 |
| Rate of Return | 26.4% |  |  |  |  |  |  |

**Superior DIP Proposal**

| Week Ending | 09/12/15 | 10/03/15 | 10/17/15 | 10/31/15 | 12/05/15 | 01/02/16 | 02/06/16 | 03/05/16 | 03/15/16 |
|---|---|---|---|---|---|---|---|---|---|
| Funding[1] | (60.0) | (10.0) | (10.0) |  | (10.0) |  |  |  |  |
| Interest[2] |  | 0.4 |  | 0.7 | 0.7 | 0.8 | 0.8 | 0.8 | 0.4 |
| OID | 1.2 |  |  |  |  |  |  |  |  |
| Repayment |  |  |  |  |  |  |  |  | 90.0 |
| Total Cash Flow | ($58.9) | ($9.6) | ($10.0) | $0.7 | ($9.3) | $0.8 | $0.8 | $0.8 | $90.4 |
| Rate of Return | 14.5% |  |  |  |  |  |  |  |  |

(1) Timing of funding per DIP budget. Assumes draw at the end of the week.
(2) Assumes interest paid at the end of the month.

Source: DIP Budget

22. As shown in the chart above, if the Proposed Financing is approved, Oaktree's blended rate of return for the DIP Term Facility would be 26.4%. By contrast, if the Superior DIP Proposal is approved, it would provide for an interest rate of 10.5%, OID of 1%, and a longer maturity, with a resulting blended rate of return for the lenders thereunder of 14.5%—11.9% lower than that of the DIP Term Facility.

11

23.  Another way to assess the reasonableness of the Proposed Financing's rate of return is to look at the yield to maturity of the U.S. Secured Notes, which are junior in priority to the Proposed Financing. The yield to maturity is the required rate of return on a security taking into account, among other things, its seniority in the capital structure and its collateral. As shown in the chart below, the yield to maturity for the U.S. Secured Notes ranged from 9.3% to 15.1% in the year prior to the Petition Date. Since the Petition Date, the yield has ranged from 13.8% to 15.1%. These yields imply that market participants have required a rate of return of up to 15.1%. As such, it is excessive to provide the DIP Term Loan Lenders, who are senior in priority to the U.S. Secured Notes and therefore in a less risky position, a yield of 26.4%—11.3% higher than the yield with respect to the holders of U.S. Secured Notes. Even on the date of filing, the yield to maturity was 20.3%—6.1% lower than the rate of return on the Proposed Financing.



Source: Bloomberg

### The PSA

24.  Based on my review of the PSA, it is my understanding that, if the Court determines to approve the PSA Motion and in the event that the PSA is terminated for any reason, the Break-Up Fee of $20 million will be immediately triggered and payable to the Plan Sponsor if

the Debtors consummate any transaction in the 12 months thereafter, including any alternative restructuring under chapter 7 or chapter 11 of the Bankruptcy Code or any sale of a material portion of the Debtors' assets.

25. Often, existing investors do not receive a break-up fee as part of a chapter 11 transaction because they are already properly incentivized to negotiate. The Debtors have not shown that the Break-Up Fee is necessary to induce Oaktree, who has invested in and owns 73% of the Debtors' U.S. Secured Notes in addition to investments in the Euro Notes and monies already advanced under the DIP Term Facility, to the bargaining table. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

26. The table below shows a list of pre-arranged and pre-packaged chapter 11 transactions from the past two years where there was no break-up fee.



13

| Filing Date | Debtor | Case Number | Industry | Filing Type | Break-Up Fee |
|---|---|---|---|---|---|
| 10/5/15 | American Apparel | 15-12055 (Del.) | Retail | Pre-Arranged | None |
| 7/30/15 | Relativity Media | 15-11989 (S.D.N.Y.) | Media | 363 Sale | None |
| 8/13/15 | Hercules Offshore | 15-11685 (Del.) | Oil and Gas | Pre-Packaged | None |
| 6/9/15 | Boomerang Tube | 15-11247 (Del.) | Steel | Pre-Arranged | None |
| 4/7/15 | EveryWare Global | 15-10743 (Del.) | Housewares | Pre-Packaged | None |
| 3/12/15 | Chassix Holdings | 15-10578 (S.D.N.Y.) | Auto-parts | Pre-Arranged | None |
| 3/12/15 | Standard Register Company | 15-10541 (Del.) | Printing | 363 Sale | None |
| 2/18/15 | Allen Systems Group, Inc. | 15-10332 (Del.) | Software | Pre-Packaged | None |
| 9/21/14 | ITR Concession Company | 14-34284 (N.D. Ill.) | Highways | Pre-Packaged | None |
| 8/4/14 | Entegra Power Group | 14-11859 (Del.) | Power | Pre-Packaged | None |
| 5/4/14 | GSE Environmental | 14-11126 (Del.) | Chemicals | Pre-Arranged | None |
| 3/23/14 | The Dolan Company | 14-10614 (Del.) | Research | Pre-Packaged | None |
| 3/14/14 | QCE Finance LLC | 14-10543 (Del.) | Restaurants | Pre-Packaged | None |
| 3/5/14 | USEC, Inc. | 14-10475 (Del.) | Consumable Fuels | Pre-Arranged | None |
| 3/3/14 | MACH Gen, LLC | 14-10461 (Del.) | Energy and Power | Pre-Packaged | None |
| 3/3/14 | Sorenson Communications | 14-10454 (Del.) | Communications | Pre-Packaged | None |
| 2/28/14 | Tuscany Drilling | 14-10193 (Del.) | Oil and Gas | 363 Sale | None |

Source: Company filings. CapIQ screen for pre-packaged and pre-arranged transactions combined with internal database of 363 sales. Limited to deals with transaction values above $100 million occurring from 2014 to the present.

27. Recent examples thus run contrary to the relief sought in the PSA Motion, and the Court should decline to conclude that a break-up fee is necessary under the circumstances of the Debtors' cases.

28. Even if there were to be a break-up fee attached to this transaction, the proposed $20 million Break-Up Fee is excessive and above market under these circumstances. In the present circumstances, any break-up fee, if is found by the Court to be necessary, should correspond to the actual consideration to be paid by the stalking horse bidder or plan sponsor, excluding contributions for which the stalking horse bidder or plan sponsor will receive fees on another basis. After adjusting the proposed purchase price to reflect only what is actually proposed to be contributed by Oaktree under the PSA and for which Oaktree is not expected to charge fees elsewhere in the structure, the *creditable* purchase price of the PSA transaction is zero.[12] Even if Oaktree were credited with the "value" of converting its portion of the U.S.

---

[12] See Objection ¶ 81.

14

Secured Notes ($204.4 million) into equity, applying the Debtors' suggested break-up fee of 2.8% to this measure of value implies a break-up fee of only approximately *$5.7 million*.[13]

29.     In addition, the PSA allows the Debtors until the entry of an order approving the Disclosure Statement to solicit and select a "Superior Proposal." I understand that pursuant to the terms of the PSA, that order must be entered within 75 days after the Petition Date (November 23, 2015) to avoid a termination event. I am of the opinion that this is an insufficient period of time for the Debtors to properly test the market and evaluate any potential offers or proposals given the Debtors' current preparedness. In the event the Court is inclined to approve the PSA Motion, at a minimum, I believe that the PSA should be amended to permit the Debtors to continue any marketing efforts through confirmation.

## Conclusion

30.     It is my opinion that had the Debtors and their advisors properly shopped the Proposed Financing and solicited other potential investors or buyers in an effort to obtain competing offers, they, as evidenced by the existence of the Superior DIP Proposal, would have been able to obtain postpetition financing on more favorable terms than those in the Proposed Financing. In stark contrast to the Proposed Financing, the Superior DIP Proposal provides the Debtors with a financing alternative that is in the best interests of the Debtors, their estates and their creditor constituency. In addition, based on the numerous issues identified herein with respect to the DIP Credit Agreements and the PSA, neither the DIP Motion nor the PSA Motion should be approved without substantial modification as detailed in the Objection.

---

[13] *See* Objection ¶ 82.

15

**Reservation of Rights**

31.  I reserve the right to rely upon any additional information that becomes available to me after the date of this declaration and to amend or modify this declaration to reflect or incorporate such new information or if further research or analysis warrants.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
        October 12, 2015

/s/ *Michael J. Genereux*
Michael J. Genereux