IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:
:
QUIKSILVER, INC., *et al.*,
:
Debtors.[1]
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Chapter 11

Case No. 15-11880 (BLS)

Jointly Administered

Hrg. Date: 10/14/15 at 10:00 a.m. (Eastern)
Related Docket No.: 17, 25, 269

# DEBTORS' OMNIBUS REPLY TO JOINT OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' (I) MOTION FOR AUTHORIZATION TO OBTAIN POSTPETITION FINANCING AND (II) MOTION FOR AUTHORITY TO ASSUME PLAN SPONSOR AGREEMENT AND PAY RELATED BREAK-UP FEE AND TRANSACTION EXPENSES

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Quiksilver" or the "Company"), by and through their undersigned counsel, hereby submit this omnibus reply (the "Reply") in support of (a) Debtors' Motion for an Order Authorizing and Approving (I) the Debtors' Assumption of the Plan Sponsor Agreement and (II) the Payment of the Break-Up Fee and Related Transaction Expenses [Docket No. 25] (the "PSA Motion") and (b) Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief [Docket No. 17] (the "DIP Motion" and, together with the PSA Motion, the "Motions").[2]  In support of this Reply, the Debtors, by and through their undersigned proposed counsel, respectfully represent as follows:

## PRELIMINARY STATEMENT

1.  Although the Debtors quietly acquiesced in the Committee's request for an adjournment of a final hearing on the DIP Motion in order to share information and ideas and negotiate a consensual path forward in these chapter 11 cases, Committee counsel was prescient in advising the Court that the final hearing on the DIP Motion would be a "substantial hearing."[3] Although the Committee purports to present a better financing proposal for time served in chapter 11, the Objection[4] is utterly devoid of any detail as to how to exit chapter 11.  Rather, the Objection relies, almost entirely, on the straw man of an alternative financing proposal (the "Alternative Proposal") which is fundamentally flawed for two reasons, neither of which are addressed in the Objection:  First, while the Alternative Proposal is conditioned on the continued availability of the Boardriders Waiver, no holder of Euro Notes has offered a comparable waiver for the amorphous section 363 liquidation approach which the Committee espouses.  Absent such a waiver, the Euro Notes would be in default, and the Debtors' European operations would be threatened with liquidation.  Second, the Alternative Proposal presumes that the Debtors are able to prime their Prepetition Secured Noteholders (holding $279 million in aggregate principal

---

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the applicable Motion.

[3]   Oct. 6, 2015 Hr'g Tr. 8:15.

[4]   "Objection" means that certain Joint Objection of the Official Committee of Unsecured Creditors to Debtors' (I) Motion for Authorization to Obtain Postpetition Financing and (II) Motion for Authority to Assume Plan Sponsor Agreement and Pay Related Break-Up Fee and Transaction Expenses [Docket No. 269], filed by the Official Committee of Unsecured Creditors (the "Committee").

2

amount of Prepetition Secured Notes) with the mere offer of the payment of current non-default interest for six months. There is no authority (nor is any cited in the Objection) for such a priming of the Debtors' Senior Secured Notes absent consent, which is not present for the Alternative Proposal.

2. Even assuming such flaws away, the supposed economic benefits of the Alternative Proposal are illusory. As a matter of fact, the proposal would require, among other things, that: (a) the Debtors replace their $60 million DIP ABL Facility, with no guarantee the Debtors could obtain the same 4% pricing that they enjoy for such facility; (b) the Debtors pay more than $11 million in incremental adequate protection payments to the Prepetition Secured Noteholders; and (c) the Debtors incur between $15-20 million in incremental working capital losses inside chapter 11. What is more, the Committee disingenuously encourages the Debtors to undertake such additional "benefits" in the context of an undefined and ill-advised sale process without the benefit of any stalking horse transaction.

3. In a post-2005 environment which is hostile to retail reorganizations, the Debtors developed a confirmable, funded and feasible plan of reorganization with their single largest and highest priority creditor. Contrary to the contentions of the Committee, the proposed post-petition financing is not a *sub rosa* plan for the simple reason that the proposed plan of reorganization remains subject to approval of a disclosure statement and solicitation of the votes of impaired creditors. Moreover, rather than simply pursue confirmation of the plan, a pathway well within the Debtors' rights within the exclusive periods of section 1121, the Debtors are soliciting and evaluating superior transactions in cooperation with the Committee. While the Committee may dispute the value of a transaction that preserves the Debtors' operations as going concerns, de-levers the Debtors' capital structure by not less than half a billion dollars and

3

delivers a recovery to unsecured creditors, the best way to prove the point is to work with the Debtors to identify and execute a better transaction. Denying approval of the proposed financing does not accomplish that result; it makes it impossible. The Objection should be overruled.

### REPLY

4. After receiving the Alternative Proposal from the Committee, the Debtors and their advisors conducted a thorough review and analysis of the Alternative Proposal, including interviews with certain key constituents such as the DIP ABL Lender, the DIP Term Loan Lender, and certain holders of Euro Notes (as defined below). Taking this review and analysis into consideration, and for the reasons set forth in greater detail below, the Debtors' board of directors ultimately determined that the Alternative Proposal offers no benefit, and indeed would likely be detrimental, to the Debtors' ability to execute a timely restructuring. Accordingly, in the exercise of their business judgment, the Debtors have determined to pursue the DIP ABL Facility and the DIP Term Loan Facility which are before this Court for final approval.

**I.    The DIP Financing Proposed by the Debtors Remains the Best Proposal**

    (a)    <u>The DIP Financing Proposal Is a Foundation for Emergence from Chapter 11</u>

5. The Objection does not quarrel with the Debtors' business judgment in any of the following areas: (a) the preservation of the Debtors' global operations as a going concern is critical to maximization of value for the benefit of all of the Debtors' stakeholders; (b) the amount of the DIP financing proposed by the Debtors is adequate to preserve such value and to execute on a plan of reorganization process; (c) the plan described in the PSA is confirmable; (d) the Debtors were required to negotiate with the Plan Sponsor, which holds a supermajority of its senior-most secured debt, in order to develop a plan; and (e) the Debtors and the Plan Sponsor negotiated the DIP Term Loan Facility and the PSA at arm's length and in good faith. Neither the Committee's Objection, nor its Alternative Proposal, offer an alternative restructuring

transaction, a defined sale transaction or a plan. Rather, the Objection merely invites the Debtors to stumble into a free-fall chapter 11 in a restructuring market which has proven to be particularly challenging for retail businesses.[5] Based on these uncontested facts alone, the Court is well within its power to approve the proposed DIP financing and PSA. DIP Motion, ¶¶ 34-36, 64; PSA Motion, ¶¶ 18, 25; First Day Declaration, ¶¶ 9, 37, 55.

        (b)    <u>The Alternative Proposal Relies on Fundamentally Flawed Assumptions and Jeopardizes the Debtors' European Operations</u>

6.    As this Court is well aware, the Debtors' operations and assets span the globe, including operating segments in the Americas, Europe, and Asia. First Day Declaration, ¶ 8. One of the non-Debtor subsidiaries of ZQK within the Debtors' European segment, Boardriders, S.A. ("<u>Boardriders</u>"), issued €200 million of unsecured senior notes, which are guaranteed by a number of the Debtors and their non-Debtor affiliates (the "<u>Euro Notes</u>"). Id., ¶ 35. As set forth in greater detail in the Debtors' Motion for Entry of an Order Providing for Limited Relief from the Automatic Stay *Nunc Pro Tunc* to the Petition Date for the Sole Purpose of Permitting Boardriders, S.A. to Decelerate Its Obligations Under the Notes [Docket No. 223] (the "<u>Stay Relief Motion</u>"), the commencement of these Chapter 11 Cases triggered an automatic acceleration of the Euro Notes under the terms of their governing indenture. The Debtors and Boardriders obtained waivers from holders of over 50% of the aggregate outstanding principal amount of the Euro Notes which rescind the automatic acceleration and waive certain related defaults.[6]

7.    The waivers demonstrate the support of these holders of Euro Notes for the

---

[5] Since the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, we are unaware of a successful freefall retail chapter 11 case.

[6] Copies of the waivers have been produced to the Committee, subject to a highly confidential designation.

5

transaction structure embedded in the PSA and related term sheets, and these holders provided the waivers specifically in order to achieve this very transaction. To that end, the waivers will automatically terminate upon the termination of the PSA, accelerating the payment obligations under the Euro Notes and, upon nonpayment of such obligations, permitting the holders of Euro Notes to direct the indenture trustee to exercise any and all remedies available to such holders. The Debtors' European operations would therefore be placed in direct jeopardy, and the Debtors would be forced to either seek new waivers or to commence litigation in an attempt to prevent the holders of Euro Notes from exercising their remedies. It is the Debtors' understanding that two waiver parties have indicated that they will not waive the automatic acceleration and related defaults if the Debtors pursue the proposed 363 sale pathway championed by the Committee. The Committee's chosen framework merely invites the Debtors to engage in a costly injunction litigation, for which the Alternative Proposal provides no additional financing.

  (c) <u>The Alternative Proposal Subjects the Debtors to a Costly and Uncertain Priming Litigation</u>

  8. In addition, the Prepetition Secured Noteholders have not consented, and have indicated to the Debtors that they will not consent,[7] to be primed by the facility described in the Alternative Proposal based upon the adequate assurance package offered therein to the Prepetition Secured Noteholders. Absent such consent, the Debtors would need to litigate the priming issue with the Prepetition Secured Noteholders—again, litigation for which no additional funds are available under the Alternative Proposal.

  9. The Prepetition Secured Noteholders have consented to be primed by the DIP Term Loan Facility based in part upon an adequate protection package which offers, among

---

[7] It is the Debtors' understanding that the Committee has not discussed the priming aspects of the Alternative Proposal directly with the Prepetition Secured Noteholders.

other things, replacement liens upon DIP Collateral, including the collateral which the Objection terms the "Unencumbered Foreign Stock." The Alternative Proposal includes an adequate protection package which offers the same replacement liens upon DIP collateral; however, the proposed DIP collateral under the Alternative Proposal would exclude the "Unencumbered Foreign Stock." Objection, ¶ 34. In addition, the Alternative Proposal also purports to include payment of postpetition non-default interest. Id.

10. The Objection fails to address the critical issue of how the Debtors are expected to offer a sufficient adequate protection package to the Prepetition Secured Noteholders, and similarly sidesteps the larger priming issue, by simply declaring that "the evidence will show that there is adequate value in the prepetition collateral package to fully protect a DIP lender, even *without* the grant of a lien on the Unencumbered Foreign Stock." Id., ¶ 46 (emphasis in original). However, the only "evidence" apparently referenced in the Objection is the "Debtors' receipt of the Superior DIP Proposal"—which, as noted above, is a proposal for a priming DIP. Id. The central issue is that the Committee has provided no evidence (and, after receiving multiple document productions totaling over 25,000 pages and conducting four depositions of the Company and its advisors, can produce no evidence) to support the assertion that there is sufficient value in the prepetition collateral package to both fully collateralize DIP lenders and provide adequate protection to the Prepetition Secured Noteholders. The Committee does not even attempt to make such a showing.

(d)    The Alternative Proposal Represents an Economic Detriment to the Debtors

11. The Alternative Proposal imposes significant incremental costs on the Debtors, and fails to provide sufficient liquidity to fund the Debtors' operations through the proposed sale process timeline. Although the Committee presents misleading assertions that the Alternative Proposal represents an improvement over the DIP Term Loan in "virtually every substantive

term," both economic and non-economic, the reality presents a starkly different picture. Objection, ¶ 33.

12.     First, and most critically, the Debtors understand from the DIP ABL Lender that it will not continue to participate as a postpetition lender if the Debtors pursue the Alternative Proposal, and that the DIP ABL Lender will seek termination and repayment of the DIP ABL Facility as promptly as possible under the applicable DIP ABL Credit Agreement. As this Court is aware, the DIP ABL Facility represents $60 million of available funds. The Alternative Proposal provides no additional funding to repay the DIP ABL Facility.

13.     Second, the Committee's graphic demonstrating the "anticipated savings to the estate" is inaccurate and misleading in several respects.[8] Objection, ¶ 34. The Committee lists the Break-up Fee as a $20 million "savings", which completely misses the point— the Committee fails to present a workable alternative deal and suggests that the Debtors and their estates would be somehow benefitted by abandoning the proverbial bird in hand in favor of a naked sale process with no stalking horse bidder. The Debtors would be "saving" the Break-up Fee while losing the carefully constructed transaction. In addition, the purported savings from the reduced interest rate, which the Committee estimates between $720,000 and $900,000 is also inaccurate. In fact, the more lengthy sale process would add nearly $2.4 million of incremental interest costs to the Debtors' postpetition term and ABL financing obligations. The purported OID savings cited in the Objection are also misleading. As the Objection itself notes, "the Debtors paid the [DIP Facility] OID in full upon the initial funding of the DIP Term Facility." Id. at ¶ 60. The Alternative Proposal's OID rate of 1% thus results in an additional incremental

---

[8]   The Debtors have concentrated on only a few inaccuracies in this Reply, but note that the Objection ignores numerous other sources of incremental costs if the Alternative Proposal is accepted and the 363 sale process is pursued. Those incremental costs total approximately $40 million, excluding the cost of replacing the DIP ABL Facility.

8

cost to the Debtors of $1.15 million.  Finally, the Committee ignores the additional operational costs required to operate the Debtors' businesses for the additional two month time period required to consummate a 363 sale under the proposed milestones in the Alternative Proposal.  The Debtors estimate the incremental operating costs to be between $15 and $20 million over the two month period, and the Alternative Proposal does not contain sufficient borrowing capacity to support these incremental operating costs.

14.    Indeed, the Alternative Proposal does not provide sufficient borrowing capacity to the Debtors to satisfy *any* of the incremental costs which the Debtors and their estates would bear in connection with the Alternative Proposal.  Notably, the Committee concedes the general notion that a *superior* transaction may be less "favorable from a financial point of view," but remain "more favorable on other grounds, such as reduced execution risk." Objection, ¶ 51.  Yet by its Objection, the Committee has asked the Debtors to accept the Alternative Proposal, which is *less* favorable from a financial point of view and contains *significantly more* execution risk.  Lacking a fully committed deal in hand, and without offering sufficient liquidity to sustain operations through the projected timeframe for a 363 sale process, it is clear that the Committee's proposal would irrevocably impair the Debtors' businesses, at the direct expense of the Debtors' estates and, by extension, their creditors.

## II.    The Debtors Have Negotiated Substantial Concessions In Connection With the DIP Facilities

15.    Prior to the Petition Date, the Debtors engaged in intensive negotiations with the DIP Lenders regarding the terms of the DIP Facilities.  In the course of these negotiations, the Debtors ultimately obtained a number of concessions, particularly from the DIP Term Lender, which are described in the chart below.

| Provision | Original Term Sheets (Kirkland & Ellis draft, dated August 27, 2015; Riemer & Braunstein draft, dated September 1, 2015) | Final Filing/Post-Filing Credit Agreement (Dated as of September 10, 2015; Docket No. 127) |
|---|---|---|
| Obligors | All of the Debtors and certain foreign subsidiaries which were obligors under the Debtors' prepetition revolver facility. | The Debtors only; no foreign obligors. |
| DIP Sizing | $150 million facility, comprised of:<br>a. $90 million interim term loan, and<br>b. $60 million delayed draw term loan. | $175 million facility, comprised of:<br>a. $115 million term loan facility, comprised of $90 million term loan facility plus $25 million supplemental term loan facility, and<br>b. $60 million revolver facility. |
| Interest Rate | LIBOR (1% floor) plus 11% per annum. | 8% blended rate based on: 12% per annum for DIP Term Loan Facility, ~ 4% per annum for DIP ABL Facility. |
| Termination Payment | 2% of total commitment, earned at closing date and payable upon termination (except for after confirmation of a sponsored plan). | 2% of total commitment, earned at closing date and payable upon termination (except for upon conversion of any of the Debtors' cases to chapter 7 or after confirmation of a sponsored plan); payment of the Termination Fee acts as a dollar-for-dollar credit toward the Breakup Fee under the PSA. |

| Milestones: | a. Motion to approve sponsored plan and accompanying disclosure statement within 21 days of Petition Date.<br>b. Approval of disclosure statement within 60 days of Petition Date.<br>c. Confirmation order within 100 days of Petition Date.<br>d. Effective date of plan within 120 days of Petition Date. | a. Motion to approve sponsored plan and accompanying disclosure statement within 30 days of Petition Date.<br>b. Approval of disclosure statement within 75 days of Petition Date.<br>c. Confirmation order within 115 days of Petition Date.<br>d. Effective date of plan within 120 days of Petition Date. |
|---|---|---|
| Adequate Protection | Included, among other things, current cash pay of all interest due under the Secured Notes, including any accrued pre- and postpetition interest. | No cash payment of interest under the Secured Notes. |

16. The Debtors also negotiated with the Plan Sponsor to implement a full go-shop provision into the PSA. The Plan Sponsor originally proposed a term sheet containing an implied fiduciary out (i.e., absence of a no-shop or a no-talk obligation). The Debtors ultimately negotiated for a full go-shop provision in the PSA which gives the Debtors needed flexibility to canvas the market, in consultation with the Committee, and attempt to garner a better deal for all of the Debtors' stakeholders, consistent with the Debtors' fiduciary duties. PSA, § 3.01(d).[9]

17. Moreover, in the interests of moving these Chapter 11 Cases forward for the benefit of the Debtors and their estates, the Debtors and the DIP Term Loan Lenders[10] have

---

[9] The Committee's complaints regarding the marketing process to date are a red herring. While the Debtors have invited the full participation of the Committee in the marketing process, the Committee's advisors have elected to remain on the sidelines and attack the process for strategic litigation purposes. If the Committee has suggestions regarding improvements to the process, the Debtors are all ears. Declaration of Michael J. Genereux in Support of Joint Objection of the Official Committee of Unsecured Creditors to Debtors' (I) Motion for Authorization to Obtain Postpetition Financing and (II) Motion for Authority to Assume Plan Sponsor Agreement and Pay Related Break-up Fee and Transaction Expenses [Docket No. 274], ¶¶ 16-17.

[10] The Debtors are continuing discussions with the DIP ABL Lenders regarding these concessions.

11

negotiated certain additional concessions from the DIP Term Loan Lenders which address many of the concerns raised in the Objection. Specifically, the Debtors have obtained the following adjustments to the DIP Term Loan Facility, which shall be reflected in the revised form of final order approving the DIP Financing to be submitted by the Debtors to this Court for approval and entry:

- Proceeds of avoidance actions are excluded from the DIP collateral. Objection, ¶¶ 50-51.

- The Committee will have a 75-day challenge period, and the Committee's investigations will be funded up to $75,000. Objection, ¶ 52-55.

- The Debtors will have ten business days to engage a replacement chief restructuring officer following the resignation of the current chief restructuring officer. Objection, ¶ 60.

- No cash payment will be made to holders of Senior Secured Notes on account of postpetition interest. Objection, fn.8.

- The Supplemental Term Loan will be subject to an objective condition to availability. Specifically, the Supplemental Term Loan Condition is revised to read: "(e) either (i) the proposed use of proceeds from the advance of Supplemental Term Loans is set forth in the Budget or (ii) the Required Lenders consent to the borrowing of Supplemental Term Loans (such consent not to be unreasonably withheld)." Objection, ¶ 60.

- The milestones set forth in the DIP credit agreements are adjusted as follows: (a) the deadline to obtain an order confirming the proposed Plan is extended to January 15, 2016; (b) the deadline for the occurrence of the Effective Date is extended to January 22, 2016; and (c) relevant earlier timeline dates are extended between 7 and 14 days, as appropriate. Objection, ¶ 34.

Given these concessions,[11] the Debtors submit that the DIP Term Loan Facility should be approved by this Court, particularly in light of the numerous fatal deficiencies contained in the

---

[11] The Committee also takes issue with waivers of sections 506(c) and 552(b) of the Bankruptcy Code pursuant to the DIP Credit Agreements and the Interim DIP Order. In light of the multiple concessions outlined herein, and the overall funding for a plan process provided by the DIP Facilities, these waivers are non-economic provisions which provide the DIP Lenders with bargained-for protections. Under the circumstances, the Debtors submit that the benefits of providing such waivers far outweigh their costs, and further that the Debtors have been able to achieve other valuable concessions which directly address issues raised in the Committee's Objection.

Alternative Proposal.

### III. Proceeding with the PSA and the DIP Facilities Represents a Sound Exercise of the Debtors' Business Judgment

18. The transactions described in the PSA described a fully-funded, confirmable plan of reorganization with a non-insider. Under the circumstances, the Debtors are well within their rights to pursue confirmation of the plan described by the PSA even absent the ability to shop the transactions. This is particularly true where, as described in the Motions and the First Day Declaration, the Debtors and their advisors conducted a process to market the Company in the months leading up to the bankruptcy filing, and the Plan Sponsor is the largest and most senior creditor in the capital structure. It is not a surprise that the Plan Sponsor submitted a committed, comprehensive restructuring proposal for the Debtors. What is surprising is that the Committee, a group of creditors charged with fiduciary duties for all unsecured creditors, would attack the Debtors' ability to shop for a better transaction.

19. It is disingenuous for the Committee to suggest that the Alternative Proposal represents "a materially superior alternative" to the PSA. Objection, ¶ 67. The Alternative Proposal merely offers financing, which is inadequate to the meet the Debtors' borrowing needs, and no actual restructuring or sale proposal. The Committee also alleges that "the Debtors' own statements suggest that little, if any, marketing of the Debtors' businesses and assets has occurred—whether as a balance sheet restructuring or as a going-concern sale." Id. at ¶ 67. Nothing in the Motions, the First Day Declaration, or in the discovery produced to date supports—and indeed each clearly contradicts—this allegation, and the Committee does not specify any such "statements." The Debtors' advisors have provided interested party contact logs to the Committee, described the prepetition marketing efforts to the Committee and its advisors in detail, and even testified in depositions regarding those prepetition marketing efforts.

20.　　As the Committee is well aware, since the Petition Date the Debtors have been fully utilizing the go-shop provision by sending out a bid process letter (which was reviewed by the Committee's advisors) to 89 interested parties, including 44 parties suggested by the Committee's advisors.  The PSA permits the Debtors to exercise their fiduciary obligations and terminate in the event that a Superior Proposal is received, while protecting the going concern value of the Company.  The proposed plan, as set forth in the PSA, sends the critical message to the Debtors' vendors, customers, employees, and other operational constituencies that the Debtors are committed to continuing their operations and have the funding, resources, and exit strategy needed to successfully complete their restructuring and continue to supply their customers without interruption.  Forcing the Debtors into a section 363 sale process without a stalking horse bidder or other fallback transaction deprives these vendors, customers, and employees of certainty, which may have severe and far-reaching negative impacts upon the Debtors' businesses, to the detriment of the Debtors and their estates.

　　(a)　　<u>The Financing Does Not Implicate Any Material Tax or Other Consequences</u>

21.　　The Objection makes much of the DIP Liens which encumber formerly unencumbered equity in the Debtors' foreign subsidiaries, which totals 35% of the outstanding equity.[12]  Specifically, the Committee alleges that granting such liens "could create additional tax liability or reduce favorable tax attributes that belong to the Debtors' estates." Objection, ¶ 48.  The evidence will show that no material tax impact follows from the granting of these DIP Liens over the foreign entity equity.  While it is accurate that US tax laws impose a "deemed dividend" to a U.S.-based parent in the case of a 100% pledge of foreign subsidiary stock, such dividend

---

[12]　65% of such outstanding equity is already encumbered by the Debtors' obligations under the Senior Secured Notes.

only results in a tax where the subsidiary has positive earnings and profits during the periods in question.  The Debtors have performed an analysis, based on their current forecasts, and have determined that there will be largely negative earnings and profits among their foreign subsidiaries, with the exception of their Mexican subsidiaries where only a few million dollars in positive earnings and profits is anticipated.  Under the circumstances, the Debtors determined that the benefits of a fully-funded, confirmable plan of reorganization outweighed the de minimis tax consequences that would largely impact the Plan Sponsor in any event, particularly where the Plan Sponsor has agreed to backstop a guaranteed recovery to junior creditors.

22. Moreover, the pledge of the foreign subsidiary stock does not alter any arguments that the Committee may choose to make at confirmation regarding valuation and/or the best interests of creditors test.  Furthermore, the Plan Sponsor has confirmed that the subject equity will not be pledged as collateral or otherwise encumbered under any exit financing upon the Debtors' emergence from these Chapter 11 Cases, so there will be no lingering effects from this interim DIP financing.

(b)  The DIP Financing Is Not a *Sub Rosa* Plan

23. Contrary to the Objection's assertions, the Plan is not a *sub rosa* plan of reorganization: it is subject to a full solicitation process, a vote by impaired creditors, and confirmation by this Court pursuant to the applicable provisions of the Bankruptcy Code.  Courts in this jurisdiction have found proposed agreements to be distinguishable from *sub rosa* plans where "the entire [agreement] is contingent upon subsequent confirmation and consummation of the [plan of reorganization]" and "[a]ll parties will still have the opportunity to litigate the details of the reorganization plan, and to explain to the court why they believe the plan is not confirmable."  In re Marvel Entm't Grp., Inc., 222 B.R. 243, 251 (D. Del. 1998).  Stated differently, a *sub rosa* plan "has the effect of dictating the terms of a prospective chapter 11

15

plan," by "either (i) dispos[ing] of all claims against the estate or (ii) restrict[ing] creditors' rights to vote." In re Energy Future Holding Corp., 527 B.R. 157, 168 (D. Del. 2015).  The PSA clearly meets none of the criteria of a *sub rosa* plan: claims against the estate will be disposed of pursuant to a subsequent plan of reorganization, impaired creditors (including all unsecured creditors) will be able to vote upon the proposed plan of reorganization, and all parties will have an opportunity to fully litigate any plan confirmation issues before this Court.  The Debtors are not seeking to foreclose the ability of any creditor to exercise all of their rights and remedies pursuant to the Bankruptcy Code with respect to any plan of reorganization proposed in connection with the PSA.

24. Finally, the Debtors are entitled, in their business judgment, to pursue a certain transaction as proposed in the PSA, particularly given the multiple fatal deficiencies presented in Alternative Proposal.  The Debtors must not gamble creditor recoveries on inadequate financing in the face of an achievable transaction.  Rather, the Debtors, in a wholly justifiable and thoughtful exercise of their business judgment, must refuse to bet the Company's interests, and the interests of its stakeholders, on the economically inferior Alternative Proposal.

**[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court (i) overrule the Objection; (ii) grant the Motions and enter the proposed orders; and (iii) grant such further relief as is just and proper.

Dated: Wilmington, Delaware
October 13, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Li
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

Mark S. Chehi, Esq. (I.D. No. 2855)
Dain A. De Souza (I.D. No. 5737)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

John K. Lyons
Jessica Kumar
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*