IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x
In re:                                                       :  Chapter 11
                                                             :
QUIKSILVER, INC., *et al.*,[1]                               :  Case No. 15-11880 (BLS)
                                                             :
                          Debtors.                           :  Jointly Administered
                                                             :
                                                             :
------------------------------------------------------------ x

JOINT OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO (I) DEBTORS' MOTION FOR INTERIM AND
FINAL ORDERS AUTHORIZING PAYMENT OF CRITICAL VENDORS AND
(II) DEBTORS' APPLICATION TO RETAIN PETER J. SOLOMON COMPANY
AS INVESTMENT BANKER *NUNC PRO TUNC* TO THE PETITION DATE

| | |
|---|---|
| **AKIN GUMP STRAUSS HAUER & FELD LLP** | **PEPPER HAMILTON LLP** |
| One Bryant Park | Hercules Plaza, Suite 5100 |
| New York, New York 10036 | 1313 N. Market Street |
| Michael S. Stamer (admitted *pro hac vice*) | Wilmington, Delaware 19899 |
| Abid Qureshi (admitted *pro hac vice*) | David B. Stratton (DE No. 960) |
| Meredith A. Lahaie (admitted *pro hac vice*) | David M. Fournier (DE No. 2812) |
| Telephone: (212) 872-1000 | John H. Schanne II (DE No. 5260) |
| Facsimile: (212) 872-1002 | Telephone: (302) 777-6500 |
| | Facsimile: (302) 421-8390 |
| *Proposed Co-Counsel to the Official Committee of Unsecured Creditors* | *Proposed Co-Counsel to the Official Committee of Unsecured Creditors* |

Date: October 13, 2015
       Wilmington, Delaware

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

The Official Committee of Unsecured Creditors (the "Committee") of Quiksilver, Inc. ("Quiksilver") and its affiliated debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby submits this joint objection (the "Objection") to the (i) *Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105(a), 363(b), 1107(a), and 1108 and Bankruptcy Rules 6003 and 6004 Authorizing Payment of Critical Vendors* [Dkt. No. 15] (the "Critical Vendor Motion") and (ii) *Debtors' Application Pursuant to Bankruptcy Code Sections 105(a), 327(a), and 328(a), Bankruptcy Rules 2014 and 2016, and Local Bankruptcy Rules 2014-1 and 2016-2 (A) Authorizing Employment and Retention of Peter J. Solomon Company as Investment Banker for the Debtors and Debtors in Possession, Nunc Pro Tunc to the Petition Date, (B) Waiving Certain Timekeeping Requirements Pursuant to Local Bankruptcy Rules 2016-2(h), and (C) Granting Related Relief* [Dkt. No. 117] (the "PJSC Application" and, together with the Critical Vendor Motion, the "Motions").[2] In support of this Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT[3]

1. By the Motions, the Debtors seek authority to make payments to allegedly "critical" trade and their own investment banker that would, in the aggregate, exceed the total proposed distribution to non-trade (but otherwise *pari passu*) unsecured creditors in these cases by more than ▮▮▮▮▮. More specifically, the Debtors seek approval of: (a) the Critical Vendor Motion, by which the Debtors request authority to pay certain vendor claims that the Debtors assert—without evidence or support—are "critical" in an aggregate amount not to

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Critical Vendor Motion or the PJSC Application, as applicable.

[3] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in the Objection.

exceed $▮▮▮▮▮ (the "Final Cap Amount")[4] on a final basis and (b) the PJSC Application, by which the Debtors seek approval of, among other things, a Restructuring Transaction Fee and Sale Transaction Fee equal to the lesser of (i) $7.5 million or (ii) 1.50% of the total consideration received by the Debtors in connection with the sale of the Debtors' assets. As set forth below, both Motions fail to comply with applicable law and should be denied or, with respect to the PJSC Application, modified in accordance with the terms hereof.

    2.    The Critical Vendor Motion must be denied because the relief requested violates applicable law in several respects and is otherwise inappropriate in light of the facts and circumstances of these cases. The Final Cap Amount represents ▮▮▮▮▮ of the Debtors' outstanding merchandise trade payables as of the Petition Date. By treating ▮▮ of their vendor base as "critical," the Debtors render meaningless the very notion of a critical vendor motion. Indeed, the proposed payment to Critical Vendors is tantamount to treating unsecured merchandise trade claims as senior to general unsecured claims. Aside from the fact that approval of the Critical Vendor Motion would lead to a grossly inequitable result for otherwise *pari passu* creditors under the Debtors' proposed restructuring transaction, the Debtors have failed to provide *any* information to enable creditors, and more importantly this Court, to assess the need to pay such claims and the reasonableness of the amounts being paid.

    3.    To the extent this Court is inclined to permit the Debtors to make *any* payments to prepetition unsecured creditors outside of a plan of reorganization, the Debtors must carry their burden under applicable law of showing that *each* payment to be made is critical to the Debtors'

---

[4] 

operations, and that the amounts the Debtors seek to pay to such prepetition unsecured creditors are reasonable and appropriate under the facts and circumstances of these cases. Absent such a showing, this Court should deny approval of the Critical Vendor Motion on a final basis.[5]

4.      The PJSC Application presents additional concerns for the Committee, most important among them the fact that the Debtors have failed to demonstrate that the Fee Structure complies with the requisite standards under Bankruptcy Code section 328(a). Additionally, the Fee Structure does not properly incentivize PJSC to seek an alternative transaction that is superior to the PSA transaction. Moreover, evidence will show that the Fee Structure is at the high end of the applicable range when looking at comparable fee structures in other chapter 11 cases, and is not appropriate under the facts and circumstances of these cases (where, among other things, the Debtors intend to prosecute a plan that would give non-trade unsecured creditors a paltry 3.0% recovery). Accordingly, the Committee requests that the PJSC Application be denied unless, among other things, the Restructuring Transaction Fee and Sale Transaction Fee are capped at $5 million,[6] which would bring PJSC's fees within an appropriate range of reasonableness.

---

[5] In any event, any order approving the Critical Vendor Motion on a final basis should explicitly require that any payments under such order be made in consultation with the Committee and grant the Committee an opportunity to be heard before this Court if the Debtors seek to make such a payment over the Committee's objection. Moreover, the Debtors should not be granted sole discretion to settle all or part of any prepetition claims to be paid under such order for less than their face amount.

[6] The Committee is not opposed to a fee structure that would provide a higher Sale Transaction Fee to PJSC in the event they are able to secure incremental value for the Debtors' estates.

3

## BACKGROUND

A.  **General Case Background**

5. On September 9, 2015 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Chapter 11 Cases are being jointly administered.

6. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

7. On September 21, 2015, pursuant to Bankruptcy Code section 1102, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the initial Committee [Dkt. No. 129].[7] On September 28, 2015, the U.S. Trustee filed the *Amended Notice of Appointment of Committee of Unsecured Creditors* [Dkt. No. 163], appointing two additional creditors to the Committee.[8]

B.  **The Critical Vendor Motion**

8. On the Petition Date, the Debtors filed the Critical Vendor Motion, seeking entry of interim and final orders authorizing the Debtors to pay the prepetition, fixed, liquidated and undisputed claims (the "Critical Vendor Claims") of certain vendors and suppliers that the Debtors allege are critical and "essential to maintaining the value of the Debtors' assets" (collectively, the "Critical Vendors"). *See* Critical Vendor Motion ¶ 9. By the Critical Vendor Motion, the Debtors requested authority to pay the Critical Vendor Claims in an aggregate amount not to exceed $30 million on an interim basis (the "Interim Cap Amount") and $▮

---

[7] The initial Committee was comprised of the following entities: (i) U.S. Bank National Association; (ii) New Generation Advisors, LLC; (iii) Samil Tong Sang, Co.; (iv) Simon Property Group, Inc.; and (v) Global Brands Group.

[8] The U.S. Trustee appointed T. Rowe Price Credit Opportunities Fund and Wilfrid Global Opportunity Fund to the Committee on September 28, 2015. Also on September 28, 2015, Global Brands Group resigned from the Committee.

███ on a final basis. The Debtors assert that $20 million of the aggregate amount sought to be paid to Critical Vendors is subject to Bankruptcy Code section 503(b)(9) administrative expense claim status. *See* Critical Vendor Motion ¶ 10.

9. On September 10, 2015, the Court entered an order authorizing the Debtors to pay, on an interim basis, Critical Vendor Claims up to the Interim Cap Amount. ███

███

███

███

### C. The PJSC Application

10. On September 17, 2015, the Debtors filed the PJSC Application seeking entry of an order authorizing the Debtors, among other things, to employ and retain Peter J. Solomon Company, L.P. and/or its affiliate Peter J. Solomon Securities Company, LLC (collectively, "PJSC") as the Debtors' investment banker, *nunc pro tunc* to the Petition Date, in accordance with the terms and conditions set forth in the PJSC engagement letter (the "PJSC Engagement Letter").

11. By the PJSC Application, the Debtors propose to pay PJSC certain fees including, but not limited to:

- a monthly fee of $150,000 (the "Monthly Fee");
- a $7,500,000 restructuring fee (the "Restructuring Transaction Fee") in the event a Restructuring (as defined in the PJSC Engagement Letter) is consummated or an agreement in principle, definitive agreement or plan to effect a Restructuring is entered into; and
- a fee in the lesser amount of (a) $7,500,000 or (b) 1.50% (the "Sale Transaction Fee") of the total consideration received by the Debtors in connection with a Sale (as defined in the PJSC Engagement Letter), in the

---

[9] *See* ███, attached hereto as **Exhibit A**.

event any Sale is consummated or an agreement in principle or definitive agreement to effect a Sale is entered into.

*See* PJSC Engagement Letter ¶ 2(a)-(c). If PJSC earns both a Restructuring Transaction Fee and Sale Transaction Fee pursuant to the terms of the PJSC Engagement Letter, PJSC will only receive the higher of the two fees. *See id.* ¶ 2(c).

12. In addition to any Restructuring Transaction Fee or Sale Transaction Fee that may become payable under the PJSC Engagement Letter, PJSC may earn an additional fee (together with the Monthly Fee, the Restructuring Transaction Fee and the Sale Transaction Fee, the "Fee Structure") in connection with the Debtors' consummation of any financing, or if the Debtors receive and accept written commitments for one or more financings, as set forth below:

(a) 1.00% of the gross proceeds of any indebtedness issued in connection with a financing that is secured by a first lien, including, without limitation, any DIP financing;

(b) 3.00% of the gross proceeds of any indebtedness issued in connection with a financing that is (x) secured by a second or more junior lien, (y) unsecured and/or (z) subordinated or unitranche debt; and

(c) 5.00% of the gross proceeds of any equity or equity-linked securities or obligations issued in connection with a financing.

*Id.* ¶ 2(d).

13. If approved, the PJSC Engagement Letter provides that any Restructuring Transaction Fee or Sale Transaction Fee earned by PJSC will be reduced (but not below zero) by any DIP Financing fee (as defined in the PJSC Engagement Letter) paid by the Debtors to PJSC prior to the closing of a Restructuring or a Sale, as the case may be, in the event that a provider of the DIP financing associated with such DIP Financing Fee is a sponsor of such Restructuring or an acquirer at such Sale, as the case may be. *Id.* As the Committee understands the PJSC Engagement Letter, if, for example, the Debtors accept the Superior DIP Proposal, the Financing

6

Fee would be triggered, notwithstanding the fact that the Superior DIP Proposal was not solicited or otherwise procured through PJSC.

## OBJECTION

### A. The Critical Vendor Motion Should Not Be Approved Absent Compelling Evidence that the Proposed Payments Are Necessary and that Such Vendors Are Indeed Critical

14.     By the Critical Vendor Motion, the Debtors seek blanket authority to pay any vendor they deem critical in an amount up to the Final Cap Amount without providing *any* evidence (i) as to the critical nature of the services and/or goods provided by each such vendor or (ii) that such vendors would discontinue delivery or performance of their goods and services absent payment of their prepetition claims.[10] The Debtors assert that the Court should grant this extraordinary relief because they have established that payment of the Critical Vendor Claims is "of paramount importance to their business operations." Critical Vendor Motion ¶ 16. There is, however, no evidence in the record to support the Debtors' assertion and, therefore, no basis upon which to approve the Critical Vendor Motion.

15.     Indeed, the Debtors have failed to provide sufficient evidence to establish that the proposed payments to prepetition unsecured creditors under the Critical Vendor Motion are appropriate or necessary under any legal theory. *First*, the Debtors have failed to satisfy the standard set forth in *In re CoServ, L.L.C.*, 273 B.R. 487, 494 (Bankr. N.D. Tex. 2002) for payments made to prepetition unsecured creditors outside of a plan. *Second*, without evidence regarding the critical nature of the proposed payments, the Debtors cannot satisfy the standard for approval of such payments pursuant to Bankruptcy Code section 105(a) and the doctrine of necessity. Accordingly, the Critical Vendor Motion must be denied.

---

[10] *See infra* note 11.

### 1. The Debtors Have Not Satisfied the *CoServ* Standard

16. As set forth below, the Debtors' proposed payment of Critical Vendor Claims does not comport with applicable law, including the three-prong test set forth in *CoServ*. As a general matter, the Bankruptcy Code provides that prepetition general unsecured claims must be satisfied on an equal and ratable basis. *See CoServ*, 273 B.R. at 493. While a bankruptcy court may, under certain circumstances, otherwise approve the payment of prepetition vendor claims if such payment is critical to the success of the debtor's reorganization, it is only under extraordinary circumstances that a bankruptcy court may permit a debtor to pay prepetition general unsecured claims other than pursuant to a plan. *See In re Allegheny Health, Educ. & Research Found.*, 313 B.R. 673, 678 (Bankr. W.D. Penn. 2004) (postpetition payments of prepetition debt authorized only "under the most extraordinary circumstances") (citing *CoServ*, 273 B.R. at 494). As the Debtors acknowledge, the *CoServ* court established a three-prong test to determine whether a prepetition claim ought to be paid prior to distributions made pursuant to a plan of reorganization:

> The debtor must show three elements are present. ***First***, it must be critical that the debtor deal with the claimant. ***Second***, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. ***Third***, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*CoServ*, 273 B.R. at 498 (emphasis added).

17. To satisfy the first prong of the *CoServ* test, the Debtors must prove, by a preponderance of the evidence, that dealing with the alleged Critical Vendor is indispensable to the preservation of the Debtors' estates. *Id.*; *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (holding that debtor must show that payment of prepetition claims outside a plan is "critical to the debtor's reorganization"). The Debtors, however, have not provided _any_ evidence

8

as to the indispensable nature of the alleged Critical Vendors' services and/or goods provided. Rather, the Debtors make broad, unsubstantiated assertions of the Debtors' *perceived* risks that a default would extinguish, for various reasons, their access to goods and services, and the Debtors' *belief* that certain Critical Vendors *may* assert reclamation claims under Bankruptcy Code section 546(c) or claims under Bankruptcy Code section 503(b)(9). *See* Critical Vendor Motion ¶¶ 47-48. Mere speculation is not sufficient to satisfy the first prong of the test established by *CoServ*, and thus this prong has not been satisfied here.

18.     To overcome the second prong of the *CoServ* test, ". . . a debtor must *show* that meaningful economic gain to the estate or the going concern value of the business will result or that serious economic harm will be avoided through payment of the prepetition claim, which itself is materially less than the potential loss to the estate or business." *CoServ* at 498 (emphasis added). The Debtors maintain that, due to the "essential nature" of the goods and services provided by the alleged Critical Vendors and "the difficulty associated with finding alternate sources for those goods and services," the economic harm that would result from the failure of any of the alleged Critical Vendors to perform is "grossly disproportionate to the amount of any Critical Vendor Claim sought to be paid." Critical Vendor Motion ¶ 41. The Debtors, however, fail to provide *any actual evidence* that the alleged Critical Vendors would discontinue their dealings with the Debtors but for the Debtors' proposed payment of the Critical Vendor Claims.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████[11] Moreover, the Debtors fail even to identify which of the alleged Critical Vendors provide "essential" goods and services for which no alternatives exist. The Debtors therefore have not met their burden to show that the second prong of the *CoServ* test has been satisfied.

19.     Finally, to satisfy the third prong of the *CoServ* test, the Debtors must prove that there is no practical or legal alternative by which to deal with the claimant outside of the immediate payment of the claimant's prepetition claim. *See CoServ* at 498. Some of these alternatives, as specifically stated by the court in *CoServ*, are the payment of a deposit, payment on shipment, collect on delivery and numerous other possibilities. *Id.* at 499. The Debtors have not offered any evidence to establish that the Debtors' only recourse with respect to such alleged Critical Vendors is the immediate payment in full of their prepetition obligations.[12] The Debtors also have not provided evidence detailing, among other things, the alternatives explored with respect to each of the alleged Critical Vendors and why the Debtors deemed such alternatives unsatisfactory. There is therefore no evidence in the record to support a finding that this third prong has been satisfied.

---



[11] ███████████████████████████████████████████████████████████████████

[12] ███████████████████████████████████████████████████████████████████.

20. While some courts have permitted the payment of certain vendors deemed critical to a debtor's reorganization, such relief is not justified under the facts and circumstances presented by the Debtors. Indeed, by the Critical Vendor Motion, the Debtors seek to satisfy in full ▇▇▇ of their prepetition merchandise trade payables—amounting to more than $▇▇▇ in payments to "Critical Vendors"—based solely on the Debtors' conclusory statements that such payments are necessary.[13] By comparison, if the Sponsored Plan is approved, unsecured creditors who are not deemed "critical"—including the holders of U.S. Unsecured Notes—are expected to receive a recovery of approximately *3.0%*.[14] Because the Debtors have not satisfied *any* element of the *CoServ* test, the Critical Vendor Motion must be denied.

### 2. Payment of the Critical Vendors Claims Is Not Justified Under Bankruptcy Code Section 105(a) and the Doctrine of Necessity

21. The Debtors also argue that the proposed payment of prepetition Critical Vendor Claims is permissible pursuant to the Court's discretionary authority pursuant to Bankruptcy Code section 105(a) and the "Doctrine of Necessity." As discussed above, however, the Debtors have failed to provide *any* specific evidentiary support regarding the "critical" nature of the Critical Vendor Claims. Without such proof, the Critical Vendor Claims similarly cannot be paid under Bankruptcy Code section 105(a) or the doctrine of necessity.

22. The doctrine of necessity was spawned from early railroad reorganization cases, and was justified by the critical role rail service played in the country's economy at the time. *See In re B & W Enters., Inc.*, 713 F.2d 534, 537 (9th Cir. 1983); *In re Boston and Maine Corp.*, 634

---

[13] *See supra* note 4.

[14] The Sponsored Plan would provide an aggregate recovery of $7.5 million to be distributed on a *pro rata* basis to all general unsecured creditors. Upon information and belief, the Debtors estimate an unsecured creditor claim class of $250 million (excluding proposed payments to Critical Vendors), which would result in a recovery of approximately 3.0%.

F.2d 1359, 1382 (1st Cir. 1980); *In re Penn Cent. Transp. Co.*, 458 F. Supp. 1234, 1326 (E.D. Pa. 1978), *aff'd in part, remanded in part by* 596 F.2d 1102 (3rd Cir. 1979).

23. While some courts in the Third Circuit have authorized the prepetition payment of postpetition claims under the doctrine of necessity, such courts have limited payment to those vendors demonstrated by the debtor to be "essential to the continued operation of the business" and where such vendors' refusal to continue to supply services would result in material damage to the debtor's reorganization efforts. *Just For Feet*, 242 B.R. at 825 (citing *In re Columbia Gas Sys. Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994)) (holding that debtors may pay prepetition claims that are essential to continued operations under doctrine of necessity); *In re Lehigh and New England Ry. Co.*, 657 F.2d 570, 581-82 (3d Cir. 1981) (stating court may authorize payment of prepetition claims under "necessity of payment" doctrine when there is "a real and immediate threat . . . that failure to pay will place the continued operation of the [debtor's business] in serious jeopardy"); *In re Penn Centr. Transp. Co.,*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid").

24. Moreover, the Debtors assert that $20 million of the Final Cap Amount relates to unsecured claims that would be entitled to administrative expense priority status under Bankruptcy Code section 503(b)(9), and thus the Debtors assert it is proper to pay these claims now, rather than pursuant to a plan. *See* Critical Vendor Motion ¶ 10. It defies logic for the Debtors—who should be taking all available steps to increase liquidity—to attempt to satisfy section 503(b)(9) claims at this early stage of the cases.

25. Although the provisions of the Bankruptcy Code and relevant case law afford a debtor limited discretion to determine which unsecured creditors are "critical" and therefore require payment of their prepetition claim outside the context of a plan to avoid irreparable harm to the debtor's business, such debtor is nevertheless required to provide evidence to support the necessity of such payments. *Just For Feet*, 242 B.R. at 826. In the instant case, the Debtors have made conclusory statements that the alleged Critical Vendors are essential to the Debtors' ability to successfully reorganize, but again have not submitted *any* evidence to substantiate their claims. Accordingly, the Debtors cannot show that the Critical Vendor payments should be authorized under the doctrine of necessity, and the Critical Vendor Motion must be denied.

**B.    The PJSC Application Should Not Be Approved Absent Modifications to the Proposed Compensation Structure**

26. By the PJSC Application, the Debtors seek to retain PJSC pursuant to Bankruptcy Code section 328. Bankruptcy Code section 328(a) provides, in pertinent part, that:

> The [Debtors], . . . with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any ***reasonable terms and conditions of employment***, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis.

11 U.S.C. § 328(a)(emphasis added).

27. Bankruptcy Code section 328(a) permits the pre-approval of the terms and conditions of an employment agreement of a professional, provided such terms and conditions are reasonable. *See In re Fed. Mogul-Global, Inc.*, 348 F.3d 390, 397 (3d Cir. 2003) (interpreting section 328(a) to allow a court to approve the employment of a professional on terms and conditions that the court finds necessary to satisfy the requirement of reasonableness); *See In re United Artists Theatre Co. v. Walton*, 315 F.3d 217, 229 (3rd Cir. 2003) (holding that

section 328(a) requires that the terms and conditions of employment agreements for professionals must be reasonable).

28. By requesting approval of PJSC's retention under Bankruptcy Code section 328(a), the PJSC Application requires close review of the proposed Fee Structure to ensure that its terms are reasonable in light of all foreseeable events in these chapter 11 cases. If the Court approves the Fee Structure under Bankruptcy Code section 328(a), future review would be limited and PJSC's fees could be altered only if the Fee Structure proves to be "improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a). Indeed, financial advisors seeking to be retained under Bankruptcy Code section 328 face a high level of scrutiny in connection with proposed "success fees" to ensure that the payment of such fees are in the best interests of the estate. *See, e.g., Fed. Mogul-Global*, 348 F.3d at 403 n.8 (concluding "[e]ven if we assume that Bankruptcy Courts should defer to a committee's choice of professionals, it does not follow that they must defer to a professional's choice of fee arrangements"); *In re Drexel Burnham Lambert Grp., Inc.*, 133 B.R. 13, 27 (Bankr. S.D.N.Y. 1991) (holding that though success fees for investment bankers in bankruptcy are not *per se* barred, they do require "close scrutiny").

29. The movant requesting approval of retention and compensation under Bankruptcy Code section 328(a) bears the burden to demonstrate that such retention and the related fee structure is reasonable. *See In re Trans Nat. Commc'ns Int'l, Inc.*, 462 B.R. 339, 345 (Bankr. D. Mass. 2011) (noting that the trustee or committee seeking the employment of professionals under Bankruptcy Code section 328(a) must establish that the terms and conditions of employment are reasonable, and evidence, not conclusory statements, is required to satisfy that burden); *In re Metricom, Inc.*, 275 B.R. 364, 371 (Bankr. N.D. Cal. 2002) (holding that "the proponent of the

[retention] Application . . . bears the burden of establishing that [the] terms of employment are reasonable in the context of th[e] case as required by Section 328(a).").

30.     In the instant case, the Debtors have failed to demonstrate that PJSC's proposed Fee Structure meets the requisite standard under Bankruptcy Code section 328(a). Indeed, the PJSC Application does not provide any basis on which the Court can evaluate the reasonableness of the $7,500,000 Restructuring Transaction Fee or Sale Transaction Fee—either of which is payable to PJSC *in addition* to the potential financing fees payable to PJSC. In fact, the only basis specified in the PJSC Application for approval of the Fee Structure is that such structure "is consistent with [PJSC's] normal and customary billing practices for cases of comparable size and complexity that require the level and scope of services to be provided in these Chapter 11 Cases." PJSC Application ¶ 26.

31.     Contrary to the Debtors' assertion, and as will be evidenced at the hearing to consider the PJSC Application, the Fee Structure does not comport with compensation schemes charged by investment banking firms for comparable engagements. In addition, the Fee Structure is particularly inappropriate in these cases given that the proposed Restructuring Transaction Fee of $7.5 million is exactly the same amount proposed to be distributed *pro rata* to the entire unsecured creditor body under the Sponsored Plan, resulting in a recovery to unsecured creditors of approximately 3.0%. Accordingly, based on compensation for comparable engagements that will be presented at the hearing on the PJSC Application and the facts and circumstance of these cases, a reasonable, market fee would be $5 million. In addition, the proposed Fee Structure does not offer any incentive for PJSC to secure a transaction that is more favorable to the estates than the current PSA transaction. Although, as discussed above, the Committee finds the proposed Fee Structure excessive under the facts and circumstances of these

cases, the Committee would entertain a modification to the Fee Structure to allow PJSC to earn a larger fee if PJSC secures an alternative transaction to the current PSA and Sponsored Plan that is more valuable to the Debtors' estates. For the foregoing reasons, the proposed Fee Structure is unreasonable and unfairly detrimental to the Debtors' unsecured creditors and, unless the Restructuring Transaction Fee and Sale Transaction Fee are capped at $5 million, the PJSC Application should be denied. If, however, the Court is inclined to approve the PJSC Application, the Fee Structure should be modified to provide PJSC with a financial incentive to secure a transaction that provides for a greater recovery to creditors than contemplated by the PSA and Sponsored Plan.

32. In addition, as currently drafted, the PJSC Engagement Letter would entitle PJSC to a Financing Fee even if the Financing that is consummated is provided by existing stakeholders. *See* PJSC Engagement Letter ¶¶ 1(c); 2(d). Such a fee is not appropriate under the circumstances of these cases. Accordingly, the PJSC Application should be denied unless Section 1(c) of the PJSC Engagement Letter is modified to carve out explicitly from the definition of "Financing" any financing raised from the Debtors' existing stakeholders.

## RESERVATION OF RIGHTS

33. This Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights to supplement and amend this Objection, including by filing a declaration in support thereof, to introduce evidence at any hearing relating to this Objection, and to further object to the Motions, on any grounds that may be appropriate.

## CONCLUSION

**WHEREFORE**, the Committee requests that the Court (i) deny the Critical Vendor Motion, (ii) deny the PJSC Application absent the Committee's requested modifications and

(iii) grant the Committee such other and further relief as the Court may deem just, proper and equitable.

Dated: October 13, 2015
       Wilmington, Delaware

**PEPPER HAMILTON LLP**

/s/ John H. Schanne, II
---
David B. Stratton (DE No. 960)
David M. Fournier (DE No. 2812)
John H. Schanne II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, Delaware 19899-1709
Telephone:   (302) 777-6500
Facsimile:   (302) 421-8390
E-mail:   strattod@pepperlaw.com
            fournierd@pepperlaw.com
            schannej@pepperlaw.com

-AND-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Michael S. Stamer (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
One Bryant Park
Bank of America Tower
New York, New York 10036-6745
Telephone:   (212) 872-1000
Facsimile:   (212) 872-1002
E-mail:   mstamer@akingump.com
            aqureshi@akingump.com
            mlahaie@akingump.com

## EXHIBIT A

**[REDACTED]**