```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3  IN RE:                        )  Case No. 15-11880 (BLS)
                                  )  Chapter 11
 4  QUIKSILVER INC., et al.,      )
                                  )
 5              Debtors.          )  Courtroom No. 2
                                  )  824 Market Street
 6                                )  Wilmington, Delaware 19801
                                  )
 7                                )  October 14, 2015
                                  )  10:00 A.M.
 8
                       TRANSCRIPT OF HEARING
 9            BEFORE HONORABLE BRENDAN L. SHANNON
                 UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES:
11
    For the Debtors:        Skadden Arps
12                          By:  VAN DURRER, ESQUIRE
                            300 South Grand Avenue
13                          Los Angeles, California 90071

14                          Pachulski Stang Ziehl & Jones
                            By:  LAURA DAVIS JONES, ESQUIRE
15                          919 North Market Street
                            Wilmington, Delaware 19801
16
    ECRO:                   DANA MOORE
17
    Transcription Service:  Reliable
18                          1007 N. Orange Street
                            Wilmington, Delaware 19801
19                          Telephone:  (302) 654-8080
                            E-Mail:  gmatthews@reliable-co.com
20
    Proceedings recorded by electronic sound recording:
21  transcript produced by transcription service.

22

23

24

25
```

```
 1  For Creditors Committee: Akin Gump
                              By:  MICHAEL STAMER, ESQUIRE
 2                                 ABID QURESHI, ESQUIRE
                                   JOSEPH SORKIN, ESQUIRE
 3                            One Bryant Park
                              Bank of America Tower
 4                            New York, New York 10036

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                    INDEX

2                                                                  Page

3                                                           Further
WITNESS FOR THE        Direct Cross Redirect Recross Redirect
4 DEBTORS:
Stephen Coulombe         26    45
5 Durc Savini             63    82     133       138
Andrew Bruenjes         140   145     154
6
                                                            Further
7 WITNESS FOR THE        Direct Cross Redirect Recross Redirect
COMMITTEE:
8 Michael Genereux       161

9 EXHIBITS:                            Marked      Received
Joint Stipulated Exhibits 1-57
10 (excludes 27)                                      25
Joint Exhibit 60                       82

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commence at 10:06 a.m.)

2      (Call to order of the Court)

3           THE COURT:  Please be seated.  You've been busy.

4      (Laughter)

5           THE COURT:  Mr. Durrer, good morning.

6           MR. DURRER:  Good morning, Your Honor.  Van Durrer,

7  Skadden, Arps, Slate, Meagher & Flom, on behalf of the

8  Quiksilver Debtors.  We're here, Your Honor, in connection

9  with the second amended notice of agenda, Docket Number 293.

10          THE COURT:  I have it.

11          MR. DURRER:  The first two matters, Your Honor, we

12 propose -- I think we had -- actually, correction.  Matters 1

13 and 3, we propose, and I think we have an agreement with the

14 committee to take those matters together.

15          THE COURT:  I think that makes sense.  And the

16 objections and the reply sort of show -- and that's actually

17 one of the thrusts of the objection, is that these two things

18 travel together, and that's part of the problem,from their

19 point of view.

20          MR. DURRER:  Correct, Your Honor.  So we propose to

21 do a joint evidentiary record with respect to those.

22          I know that Your Honor typically dispenses with sort

23 of a formal opening, and I know Your Honor is also pretty

24 familiar with the papers.  We do also have a joint exhibit

25 book --

1          THE COURT:  I saw that.

2          MR. DURRER:  -- which I think Your Honor had -- or

3    books, I should say, that Your Honor has.  And with no

4    further adieu, Your Honor, I'm happy to move into evidence by

5    stipulation all of those documents, save two.

6          One, Your Honor -- and they both relate to critical

7    vendor, so they're for a later time today, in any event.  But

8    everything else is agreed, except for Item Number 27 and Item

9    58.

10          THE COURT:  Mr. Genereux's declaration?

11          MR. DURRER:  Yes.

12          THE COURT:  That's 58.

13          MR. DURRER:  58 is one of Mr. Genereux's

14    declarations; it's the one that was actually filed last

15    night.  And then 27 is -- references an announcement.  I

16    think there's a hearsay objection, but I think we can

17    overcome it.  But those are both related to -- well, I'm

18    sorry.  27 is related to critical vendor; 58 is related to

19    the PJSC retention.

20          THE COURT:  Okay.  We'll cross that bridge when we

21    come to it, as it relates to critical vendors.  And you

22    touched on this, and I agree, it's -- if we're starting with

23    the PSA and the DIP facility, we'll come -- we'll deal with

24    that when we do.

25          From experience, at least I'd say that there are

1   often confidentiality issues with respect to critical vendors

2   and how we manage that.  We actually don't have a lot of

3   these sort of teed-up fights.  I've read the response, and

4   I've read the debtors' reply, as well, on -- as it relates to

5   critical vendors and Peter J. Solomon, that came in last

6   night.

7           I want to be clear, at least about one thing, and I

8   assume you already know this.  Under no circumstances am I

9   going to clear the courtroom or seal the phone.  And

10  sometimes, people try to deal with it that way.  I don't

11  think, in a case that's got this much attention, that that

12  would be appropriate.  I have able and experienced lawyers

13  that are -- that can work through these issues, if needs be.

14          And also, I guess, as I -- I don't want to get into

15  the critical vendor issue, but the committee objection is not

16  necessarily about any particular one creditor; it's sort of

17  about the overall thrust, and then comparing the treatment of

18  that group of creditors, versus the general unsecured

19  creditors, and the evidentiary predicate for that.  So I

20  think we can navigate that, but I want to give you a heads-up

21  in advance, in case anybody is assuming that we'll just do

22  this in camera, and I won't.  Okay.

23          MR. DURRER:  No, that's understood, Your Honor, and

24  thank you.  And candidly, I think we're going to be -- you're

25  going to hear a pretty transparent presentation from Mr.

1  Bruenjes with respect to critical vendor issues.

2          With respect to the first item up, the DIP and the

3  PSA, as Your Honor probably is aware from the papers, there

4  is an alternative DIP proposal.  The company has evaluated

5  it.  My understanding is that there are some further

6  improvements, which Mr. Stamer would like to describe for the

7  record.

8          I don't think it fundamentally changes the company's

9  view, but we'll hear them at the same time you do, Your

10  Honor.  We have had a preview.  But with that, I'll turn the

11  podium over to Mr. Stamer.

12          THE COURT:  Okay.  Mr. Stamer, good morning.

13          MR. STAMER:  Good morning, Your Honor.  For the

14  record, Mike Stamer from Akin, Gump, Strauss, Hauer & Feld,

15  on behalf of the official committee.  I'm here with my

16  partners Abid Qureshi and Joseph Sorkin --

17          THE COURT:  Good to see you again.

18          MR. STAMER:  -- also David Stratton from Pepper

19  Hamilton, as well.

20          Your Honor, this is not an opening statement and it's

21  not advocacy, or at least I'll try to limit my advocacy, if I

22  can.  I want to start off by apologizing for the late hour of

23  the filing last night.

24          THE COURT:  No apologies necessary.  I got it.

25          MR. STAMER:  There were people tied up in depositions

1  that needed to review things.  We had agreed with the debtors

2  to an extended deadline, but we didn't want to push it as

3  late as it was pushed.

4        THE COURT:  Well, Mr. Stratton contacted chambers, so

5  that I knew that it was coming, which is helpful.  Obviously,

6  earlier is better, but I got them, I'll deal with them.  And

7  I gathered from the objections, as well, that incorporated

8  deposition testimony, et cetera, that you had been busy.

9        MR. STAMER:  That is correct, Your Honor.

10       THE COURT:  And you warned me that this would be a

11 substantial --

12       MR. STAMER:  A substantial hearing, right.  And I was

13 quoted by debtors' counsel; I always appreciate that, Your

14 Honor.

15       So, yesterday, last night, we filed an objection to

16 critical vendor, we filed an objection to the retention terms

17 of Peter J. Solomon.  As you saw, Your Honor, yesterday,

18 midday, the company filed an omnibus reply to our joint

19 objection to the DIP and the PSA.

20       THE COURT:  I have it.

21       MR. STAMER:  They were, frankly, more hostile towards

22 the competing DIP than we had anticipated, but they made a

23 number of points that we and the -- really, more the DIP

24 lenders, the competing DIP lenders, have tried to address.

25       And Mr. Somerstein from the Ropes & Gray firm is

1  here, to the extent the Court has any questions.  He may have

2  some additional things to say at sometime during the

3  proceedings today.

4       But Your Honor, there are basically four issues that

5  were raised by the debtors that we've tried to accommodate.

6  The first was we had offered up as adequate protection for

7  the secured notes current payment of interest, non-default

8  contract rate.  And rightfully, the debtors pointed out, it's

9  $11 million, and it's not in the budget.  So what the

10  competing DIP lenders have proposed is they will increase

11  their commitment by $11 million to pay for the interest.

12       Number two, Your Honor -- and this is an important

13  point -- one of the big things you've read, and you'll hear

14  throughout the day is the committee's hill to die over, if

15  you will, is the fact that the company is pledging an

16  unsecured asset, the foreign stock.

17            THE COURT:  (Indiscernible) stock.

18            MR. STAMER:  Exactly.  And again, Your Honor, we

19  think that's completely inappropriate, and we'll get into

20  that in detail.

21       What the DIP lenders, in consultation with the

22  committee, are proposing is, again, as further adequate

23  protection for the secured noteholders, we would grant them,

24  solely to the extent of diminution of value --

25            THE COURT:  So 507(b).

1    MR. STAMER:  Effectively, yes.  To the extent that,

2  at the end of the case, they can prove that they're entitled

3  to a diminution in value claim, then they could grab that

4  stock.  It's not --

5    THE COURT:  It's a little bit more, I guess,

6  coherent, or a little bit more -- this is similar to the

7  springing lien concept that you put into --

8    MR. STAMER:  It's --

9    THE COURT:  -- your papers.

10    MR. STAMER:  It is the springing lien concept, Your

11  Honor.  It is -- well, it's the springing lien in the

12  adequate protection context.  So, again, we differ with

13  respect to whether or not there are negative tax implications

14  of granting a lien to anybody on a third of the common stock.

15    For purposes of adequate protection, we would agree

16  to give them a conditional lien.  Again, it would have the

17  same impact, but it only comes into existence to the extent

18  they can find -- they can establish diminution of value.  So

19  you should be able to avoid the tax issue, and they get the

20  protection they would get if we, otherwise, gave that to them

21  as adequate protection.

22    Now, Your Honor, that's different than an outright

23  grant, and we'll get into that through the course of the

24  proceedings; an outright grant to secure the DIP.  But again,

25  it is in the category of additional adequate protection.

1       THE COURT:  Okay.  I understand.

2       MR. STAMER:  Your Honor, number three, the ABL DIP,

3  which, as you know, was partially paid down and partially

4  rolled up under the interim order.

5       I don't think anybody in this room would disagree

6  that that's the safest paper in this deal.  They have what we

7  have characterized as "off-market covenants."  The loan-to-

8  value prepetition was 90 percent; it's now 70 percent.

9       But for whatever reason -- and they can speak for

10  themselves -- they want no part of our DIP.  And the company

11  has used the ABL as a cudgel, saying, you know, you can't do

12  this deal unless you take out the ABL DIP.  We've got lots to

13  talk about if that actually comes to pass.

14      But prior to the hearing, Mr. Somerstein, on behalf

15  of the competing DIP lenders, offered the ABL lenders a

16  fifteen-million-dollar pay-down.  So, again, they would up-

17  size the DIP by $15 million and give --

18      THE COURT:  On top of the eleven.

19      MR. STAMER:  On top of the eleven.  And give the ABL

20  lenders a pay-down.

21      I believe the way the math works is the ABL lenders

22  rolled a certain percentage, and they had to pony up an

23  additional thirteen or 14 million bucks.  So this would

24  compensate them for any new DIP money, and we give them a --

25  the competing DIP lenders give them a little on top.

1          Again, Your Honor, our hope is, now that that ABL --

2     and as part of the proposal, we've asked them to take away

3     their lien on avoidance actions, take away their lien on the

4     stock.  We haven't heard back from them.  But we wanted to

5     make sure everybody knew kind of what the state of play was.

6          And the last issue is there's kind of a catchall that

7     the debtors have said, I don't have enough liquidity, do you

8     want to extend this, I don't have enough liquidity.  What

9     they haven't done is they haven't provided the alternative

10    DIP lenders with a basis for that additional liquidity.

11         Now the DIP lenders, as you have seen, to the tune of

12    $26 million, are willing to up-size to accommodate.  They

13    don't have the information necessary with respect to what is

14    actually needed, if there is an additional liquidity need.

15    So they have committed to work in good faith with the

16    company, to the extent there's really a need to endeavor to

17    provide the company with the requisite liquidity.

18         This actually dovetails with critical vendor, as

19    well.  As Your Honor saw in our pleadings, we believe it's

20    completely inappropriate for the company -- they've already

21    paid $3 million, they're asking for, effectively, another $32

22    million.

23       (Participants confer)

24         MR. STAMER:  Up to sixty-two.  Under these

25    circumstances, we think it's inappropriate on its merits, and

1  with respect to the violence it is doing to the absolute

2  priority rule, as it relates to the small distribution to

3  other unsecured creditors.  But again, we're going to come to

4  that.  I just wanted to highlight that; that that is

5  potentially another source of liquidity, if, in fact, our DIP

6  is approved and we go on to critical vendor.  Again, I just

7  wanted to give the Court the benefit of the state of play,

8  and that's where we are.

9          THE COURT:  Okay.

10          MR. STAMER:  Thank you, Judge.

11          THE COURT:  I understand.

12          Mr. Durrer, are there any changes to the proposed DIP

13  facility, as it's being presented today?

14          MR. DURRER:  There actually are, Your Honor.  We were

15  going to present that through evidence, but I'm happy to walk

16  through it, in terms of --

17          THE COURT:  Why don't you give me an overview, and

18  then I'll take it through the evidence, but ...

19          MR. DURRER:  That's fine, Your Honor.

20     (Participants confer)

21          MR. DURRER:  So, Your Honor, I'm referring to our

22  reply, which I can hand up another copy, if that's not handy.

23          THE COURT:  Would you?  I got it here, but I can't

24  ...

25          MR. DURRER:  May I approach, Your Honor?

1        THE COURT:  Yeah.

2     (Participants confer)

3        MR. STAMER:  You're talking about paragraph -- or

4  Page 12, Paragraph 15.

5        MR. DURRER:  Do you want to help me out?

6        THE COURT:  Oh, I got mine.  Okay.

7        MR. DURRER:  Okay.

8        MR. STAMER:  Yeah, exactly.

9        MR. DURRER:  So, Your Honor, as Mr. Stamer said,

10  we're talking about Paragraph 12 of the reply.

11        And just to give you an overview, we did -- the

12  process that we went through, we received the alternative DIP

13  proposal on, I think, Wednesday evening.  We reviewed it

14  among the advisors, and we had identified a series of

15  diligence issues that we needed to confront.  We worked with

16  the committee.  We had conversations, multiple conversations

17  with Mr. Somerstein and the DIP lenders directly.  We had

18  conversations with holders of Boardriders notes because

19  there's an issue that arises in connection with what the

20  waiver looks like, going forward.  And we also talked to a

21  couple of other stakeholders, as well, including B of A, and

22  then developed conclusions around the benefits, you know,

23  pros and cons, of the alternative DIP proposal.

24        We had a board meeting Monday afternoon, presented

25  those, and concluded that we were going to proceed.  At the

1  same time, we also visited with Oaktree, and effectively,

2  used the alternative DIP proposal as something of a stalking

3  horse to try and get further improvements.

4         And so, on Page 12, it's actually Paragraph 17 from

5  the prior page, we list those.  So just in terms of giving

6  Your Honor the overview that you had requested, the DIP

7  lenders have agreed to pass on a lien on avoidance action, so

8  that is a completely unencumbered asset.

9         In addition, the challenge period that was in for the

10 committee has been expanded, both in terms of time and

11 dollars.  In addition --

12         THE COURT:  So that's moved from fifty to seventy-

13 five.  The committee's request is either for an unstated

14 budget or, if we need a cap, I think one fifty was the number

15 the debtor put into -- the committee put into their

16 submission.

17         MR. DURRER:  That's correct, Your Honor.

18         THE COURT:  All right.  So I understand the bid and

19 the ask.

20         MR. DURRER:  Right.

21         And then, with respect to the CRO, there was a five-

22 day replacement period in the existing DIP.  The committee

23 had asked for 30 days; we got 10 days.  I mean, candidly, if

24 our --

25         THE COURT:  I don't normally see this.  And I assume

1  it's already -- it's typically baked into DIP facilities, but

2  I've not seen this as an issue that's been contested.  Is

3  there some expectation?  And I don't want to make anybody

4  uncomfortable.

5            MR. STAMER:  Steve?

6            MR. DURRER:  No.  Your Honor, there is no

7  expectation.  And think there, candidly, is no real market

8  for this.  Five days is tight, but achievable.  I mean, this

9  is not something that you wake up one morning, and you don't

10 have a CRO; it's something that you see coming.  So,

11 candidly, the DIP lender, upon being asked, had no problem

12 going to 10 days; 10 days is still reasonably short.  And

13 obviously, if we have a problem with a CRO, we're going to be

14 moving very expeditiously to replace that CRO, and you know,

15 10 days is -- seems more than enough, from our perspective.

16            There was some ambiguity in the documentation with

17 respect to the adequate protection, but that's been

18 clarified.  There is no cash-pay.  It was never in the

19 budget.

20            THE COURT:  Okay.

21            MR. DURRER:  I think there was some language in one

22 version of the credit agreement that had it, but it's been

23 clarified that there is no cash-pay interest.

24            With respect to the supplemental term loan, this is

25 the defined term for the accordion, if you will; the number

1  that goes from 90 million in the Oaktree loan to 115 million.

2  In the company's view, again, Your Honor, the company always

3  viewed that money, effectively, as committed.  It was subject

4  to having a conversation with Oaktree on commercial terms, on

5  a, you know, case-by-case basis, with respect to critical

6  vendor.  But they have agreed to make that standard

7  objective, and it sort of comes in two parts:

8          One part is that, to the extent that we continue to

9  develop a budget -- and we're hoping to work with the

10  committee on a revised budget, given all the professional

11  fees we've expended in the past several days, to allow for

12  that.  And so that will be one -- if it's in the budget, it

13  is deemed approved, in connection with accordion feature.

14  And then the balance will be -- remain subject to Oaktree's

15  consent, but that consent cannot be unreasonably withheld.

16          And I know that you know enough about -- you know,

17  about me and Mr. Nash, that I will -- that if there's

18  something that we need to come to Your Honor, to determine

19  whether it's unreasonable or not, it's going to be very

20  important to both of us, we should be able to work all of

21  those out.

22          Lastly, Your Honor, with respect to the milestones,

23  Oaktree also agreed that they would extend the milestones

24  approximately by two weeks.  Our original plan filing

25  deadline was the 9th.  We had -- we did file the plan last

1    night, Your Honor, and we expect to file the attendant

2    paperwork; the disclosure statement, et cetera, by the end of

3    this week.  We, candidly, needed to get through today, to get

4    some resources back to accomplish that.  So we're going to

5    hit that date on the 16th.

6           And then, rolling into January, we had some

7    compression around the holidays, which Oaktree has agreed to

8    accommodate, so we shouldn't have any emergencies around the

9    holidays.  We're looking to keep the disclosure statement for

10   the week prior to Thanksgiving, but obviously, to the extent

11   that there is slippage, we do have the ability to accommodate

12   that slippage in the concession that Oaktree has offered.

13          THE COURT:  Okay.

14          MR. DURRER:  So that, Your Honor, is sort of where we

15   landed, in connection with this DIP.

16          Just by way of overview, in terms of the alternative

17   DIP, you know, we're going to go into gory detail with you

18   about the company's views on the alternative DIP.  The

19   showstopper, candidly, Your Honor, is the existing DIP

20   proposal.  And I appreciate the irony that this is actually a

21   criticism of it, but it's built around a transaction.  It is

22   built around a transaction that is funded and confirmable,

23   and will get the first retail, that I'm aware of, to

24   reorganize since the end of 2005.  And I've talked to others,

25   and I think no one else could come up with one, either.  And

1  that, to us, is pretty compelling, versus the alternative.

2          However much money is in there, however many basis

3  points are saved here and there -- and I think we'll

4  demonstrate to you that they're actually not saved -- but the

5  bottom line is that entering into a naked, uncertain, unknown

6  sale process could be really devastating to the success and

7  survival of this company.

8          And so, at the end of the day, the board determined

9  to stick with a transaction that is executable; footnote,

10 subject to the marketing process that we've already engaged

11 with the committee on, and are very happy to continue to

12 pursue to get a better deal.

13         THE COURT:  How does the debtor expect to proceed

14 today?  You have witnesses, I assume.  Does the committee

15 have witnesses?  I just want to know.  We'll take lunch at

16 some point, and I have until about 4:30 this afternoon.  So I

17 just want to make sure that we fit in what we can.

18         MR. DURRER:  Yeah.  My understanding, subject to Mr.

19 Stamer and Mr. Qureshi correcting me, is we have -- the

20 exhibits are all agreed, so I think we're just going to argue

21 from exhibits, to the extent necessary.  The --

22         THE COURT:  You know, it's also not lost on me the

23 time lines that you guys have, the amount of effort that goes

24 into organizing this stuff.  And I do want to say I

25 appreciate it.

1        MR. DURRER:  Thank you.  On behalf of both of us,

2   thank you, Your Honor.

3        So Items 5 and 6, Your Honor, which we have moved,

4   are the declarations of Mr. Bruenjes from the first day, as

5   well as Mr. Savini's declaration from the first day.  I'm not

6   going to walk you through those things again; I'll try not

7   to.  I think there is some context that we'd like to give

8   you.  So we would expect to put on three witnesses, which

9   would include those two gentlemen, as well as Mr. Coulombe,

10  the CRO from FTI.  And then I believe that the committee has

11  a witness in Mr. Genereux from PJT Partners, their financial

12  advisor.  But as far as I'm aware, those are the witnesses.

13       And you know, we would aim to get, you know, as far

14  along in advance of a lunch break on this process because,

15  obviously, it's very important for the company to get the DIP

16  and the PSA cleared.

17       THE COURT:  Well, obviously -- and I'm going to need

18  guidance from the parties -- I've gotten -- I will tell you

19  this:  I've been through all of your submissions.  It gets

20  kind of complicated because we're talking about deal points

21  and not just legal propositions and factual records, so I am

22  still playing a little bit of catchup.

23       I do want to be clear, though, about one point, and I

24  don't think it answers an awful lot for the parties, but I

25  think it's important that you understand this, at least from

1  the outset.  I am struggling hard to see a circumstance

2  where, in this case, I would approve a breakup fee under the

3  PSA.  I don't believe that I've done so in prior cases, and

4  I'm not certain that it would be, as a matter of policy, a

5  great idea.

6          I got no problem with PSAs.  I've written an opinion

7  that they did a whole bunch of seminars on, which I'm really

8  not in favor of, because somebody has already -- always got

9  to take the contra side.  But the committee has raised issues

10  with respect to whether or not the breakup fee is compliant

11  with O'Brien and the standard in this jurisdiction, and

12  there's certainly meat on the bone there, and we could debate

13  that issue.

14          But also, I struggle -- many of these cases are now

15  coming in with PSAs, and you know, the fact of the matter is

16  that a PSA tied to a breakup fee certainly impairs the

17  effectiveness or meaningfulness of a fiduciary out.  If a

18  fiduciary out is tied to a twenty-million-dollar anchor,

19  that's not a heck of an out.  And in addition, it is a

20  question of control over the exercise that the committee has

21  raised in this particular case, but as a general proposition.

22          So I think it's important, frankly, that you

23  understand, and that your side understands that that's

24  probably not going to go very far.  And I realize that

25  doesn't answer many of these issues; it doesn't answer the

1  question of the competing DIPs, et cetera.  But it is an

2  over-arching feature of where this case goes and what sort of

3  optionality is retained by the debtor and by the committee.

4         And it seemed to me that, while I'm not trying to

5  spring anything on anybody, I've read the papers, I'll listen

6  to the testimony, but I think I got a pretty good handle on

7  that part.  Okay?

8         MR. DURRER:  Yeah.  That -- Your Honor's comments are

9  very helpful, in terms of helping us, you know, make our

10  presentation more impactful.

11        You know, just briefly, Your Honor, the -- I think

12  what's gotten lost -- and there are a lot of papers, so if

13  you don't mind, I think that there's sort of a

14  misunderstanding about the breakup fee.

15        In the original proposal -- and you'll hear this in

16  evidence.  In the original proposal, there was no breakup

17  fee, and there was no go-shop; there was basically a quiet

18  fiduciary out, where the debtor kind of waits for the phone

19  to ring.  And as Your Honor is well aware from your years on

20  the bench, as well as your years in practice, there's no

21  requirement that any debtor shop a plan.  To the extent that

22  we walk in on day one with a confirmable plan, like your

23  younger girlfriend that we talked about last time, there's no

24  requirement that that be shopped.

25        This was negotiated for, the ability to shop.  And

1  you know, the push-back that we got was, look, this is a

2  seven-hundred-million-dollar transaction, you know, if the

3  phone rings, fine, but I'm not wasting time and my resources

4  letting you shop my deal, when it's at this level.

5       And the response that we concluded at the end of the

6  day was:  A breakup fee in exchange for that ability to shop

7  was a good trade, primarily because it is a seven-hundred-

8  million-dollar transaction, and that -- the last $20 million

9  should not be what holds up a better deal.  That was the

10  thought process.

11       THE COURT:  I don't disagree with the thought

12  process, and I understand the explanation.  I mean, and I

13  don't want to get into a three-beer discussion about this.

14       When I look at the breakup fee in the context of

15  this, you know, again, tying it to -- even on this

16  description, tying it to the debtors' ability to test

17  alternative propositions, you know, the committee's thematic

18  argument is that this is presented -- I mean, if I'm going to

19  put words in their mouth, you know, an RSA with a DIP lender

20  is called a "DIP order."  And you know, that's -- you came in

21  with a deal, you know, great, we've got a deal with everybody

22  who's getting a return.

23       And I'm not being critical.  If there's anybody that

24  is supportive of trying to reorganize a retailer, I mean,

25  I've had a lot of retailers.

1        MR. DURRER:  You have.

2        THE COURT:  And I don't really disagree with your

3   proposition.  But when I think about the RSA, I don't -- I

4   understand why they're developed.  I think they've evolved;

5   that's just my own commentary, that they've evolved from --

6   you know, a prepack used to be, you know, that everybody was

7   involved.  I've now had probably five prepacks in the last

8   three years that have gone completely off the rails.

9        And part of the -- there's, I think, a market issue

10  that is driving people to get whatever deal they can put

11  together to present, and I think that that probably makes

12  sense.  I have an exit on day one.  You know?  And maybe we

13  say -- and we all talk about this today in the i-conferences.

14  Maybe we say that the days of a debtor coming in and saying,

15  we filed for bankruptcy, and we're going to spend the next 18

16  months figuring out how to reorganize, maybe those days are

17  gone, for costs or for investor patience, et cetera.  We've

18  got all those issues.

19        But in the context of this case, and as a general

20  proposition, while I can see why it comes together as a deal

21  -- as a deal element, from the point of view of the debtor,

22  out of whose hide it's not really coming, and from the

23  lender, who are the participant in the RSA, again, for

24  purposes of firming up the transaction that it is walking in

25  with, to me, the breakup fee is something I have not seen.

1   It is likely not welcome, and it is not likely to get a

2   favorable reaction here.

3          Now that -- again, as I said, that doesn't answer a

4   bunch of these questions about the DIP, it doesn't answer a

5   lot of the questions about the PSA.  But it is a significant

6   piece of it that was highlighted by the committee, and I

7   wanted to at least, at the outset, share my observations.

8   But I think we're prepared to proceed.

9          MR. DURRER:  Thank you, Your Honor.

10          So, with that, I have moved those exhibits into

11   evidence, Your Honor.  I don't know if Your Honor wants to

12   rule on that now or ...

13          THE COURT:  Yeah.  We'll admit all of them, in the

14   absence of opposition, except for 27 and 58.  And if we have

15   to talk about 27 and 58, we will at the appropriate time.

16          MR. DURRER:  Thank you, Your Honor.

17          THE COURT:  Okay.

18      (Stipulated Joint Exhibits received into evidence)

19          MR. DURRER:  And as I mentioned, there are two

20   declarations which set out the background.  I'm going to try

21   not to rehash that.

22          THE COURT:  I've reviewed both.

23          MR. DURRER:  So, without further adieu, Your Honor,

24   I'd like to call Mr. Coulombe to the stand.

25          THE COURT:  Very good.

1     (Witness summoned)

2          THE COURT:  Please remain standing.  And we'll swear

3   in the witness.

4     STEPHEN COULOMBE, WITNESS FOR THE DEBTORS, SWORN/AFFIRMED

5          THE CLERK:  Please state and spell your name for the

6   record.

7          THE WITNESS:  Stephen, with a P-H, last name

8   Coulombe, C-o-u-l-o-m-b-e.

9          THE COURT:  Have a seat.  Welcome.

10         Mr. Coulombe, do we have a water up there?

11         THE WITNESS:  Yes.

12         THE COURT:  Great.

13         THE WITNESS:  Thank you.

14                        DIRECT EXAMINATION

15  BY MR. DURRER:

16  Q.  Good morning, Mr. Coulombe.

17  A.  Good morning.

18  Q.  Mr. Coulombe, can you explain your relationship to

19  Quiksilver?

20  A.  FTI has been retained by Quiksilver, and I am the chief

21  restructuring officer.

22  Q.  And what is your position within FTI?

23  A.  I'm a senior managing director at FTI, and I'm

24  responsible for the company's retail practice.

25  Q.  Approximately how many years of experience do you have in

1 connection with retail restructuring practice?

2 A.  About 18 years.

3 Q.  With respect to Quiksilver, can you describe for the

4 Court when your engagement started and what the scope of that

5 engagement was?

6 A.  Sure.  We were engaged, I believe the date was July 7th,

7 and it was a narrow; initially, a narrow focus in terms of

8 the scope, primarily focused on understanding the company's

9 liquidity position and assisting the company to roll-forward

10 its liquidity projections on a weekly basis.

11 Q.  And at some point did that engagement change in scope?

12 A.  Yes, it did.

13 Q.  And can you explain to the Court how and when that

14 occurred?

15 A.  So on or about August 14th, the company was notified by

16 Oaktree that it would not be proceeding with an out-of-court

17 financing that was on the table at the time.  Shortly after

18 that time, the company pivoted to consider other

19 alternatives, including a potential bankruptcy.

20 Q.  In connection with preparation for bankruptcy, did FTI

21 prepare a liquidation analysis for the company?

22 A.  Yes, we did.

23 Q.  And can you describe for the Court your understanding of

24 what that liquidation analysis was designed to explain to the

25 company?

1  A.   Sure.  So the company had, as everyone had seen, the

2  Oaktree plan of reorganization, that's reflected in the PSA.

3  What we had done for the board of directors was to show a

4  hypothetical Chapter 7 liquidation and what the potential

5  recoveries would be in that scenario versus the plan sponsor

6  agreement that we had with Oaktree on the table.

7  Q.   Do you know when that analysis was presented to the

8  company, to the board?

9  A.   I believe it was September 7th.

10 Q.   Can you turn please, in the books in front of you -- I

11 believe it's the first book -- Tab 4.

12 A.   Okay.

13 Q.   Is Tab 4 the liquidation analysis that FTI presented to

14 the board around September 7th?

15 A.   Yes.

16 Q.   Are you familiar with the company's Boardriders notes --

17 that the Boardriders entity is obligated on?

18 A.   Could you repeat that?

19 Q.   Sure.  Are you familiar with the Boardriders notes that

20 are obligations of the Boardriders entity in France?

21 A.   Yes.

22 Q.   And it's correct that those are unsecured obligations of

23 Boardriders?

24 A.   That's my understanding.

25 Q.   Now, are you aware as to whether any of the debtors are

1  guarantors with respect to those notes?

2  A.  Yes.

3  Q.  And are they, in fact?

4  A.  Yes.

5  Q.  And in connection with your liquidation analysis, did you

6  do an assessment of the impact of a Chapter 7 liquidation on

7  recoveries on the Boardriders notes?

8  A.  We did.

9  Q.  And can you explain for the Court, basically, the outcome

10  of your analysis?

11  A.  We assumed that as a result of a Chapter 7 liquidation in

12  the U.S., there would be no waiver on the Boardriders notes

13  and the trustee for those notes would move to sell the

14  remaining non-debtor assets, and our conclusion was no value

15  as a result of the ownership -- the equity ownership in the

16  foreign subs, there would be no value coming to the U.S.

17  Q.  And did the fact that those notes are unsecured, with

18  respect to assets in Europe, impact your analysis?

19  A.  Not in a significant way.

20  Q.  You've testified you concluded that there would be no

21  recovery back to the U.S. in connection with a liquidation

22  event in the U.S.  Can you identify any significant factors

23  that contribute to that?

24  A.  Sure.  So the company had valuation work done for

25  impairment-testing purposes which was completed in June, and

1  we relied upon that work as really the basis for forming our

2  conclusion.  And there were really two things that we looked

3  at; one was the EBITDA and the remaining non-debtor entities

4  and the level of debt that sits outside of the U.S.

5      And our conclusion was there would not be enough value in

6  a sale to clear the debt that sits outside of the U.S.

7  Q.  And did the manner in which the debtors hold their

8  various trademarks impact your analysis?

9  A.  Yes, it did.

10 Q.  And can you describe how -- what that impact was?

11 A.  So the major impact is DC Shoes, which is one of the

12 three brands the company operates, the trademarks sit in the

13 debtor entity in the U.S., and our belief is to the extent

14 there's a Chapter 7 liquidation, those trademarks and IP

15 related to DC Shoes would be marked to a third party.

16     And the rest of the world, the non-debtor operating

17 groups, would either have to cut an arm's length licensing

18 agreement with the new owner of the IP or the company

19 wouldn't be able to operate the assets at all.

20 Q.  And are those DC Shoes -- marks -- also collateral of any

21 other creditor?

22 A.  I believed the secured notes.

23 Q.  The secured notes in the U.S.?

24 A.  That's correct.

25 Q.  Exhibit 4, which is the liquidation analysis that you

1  prepared, is obviously premised on a hypothetical Chapter 7

2  liquidation.  Does your view of recoveries differ if there is

3  some other event of default on the Boardriders notes, as

4  opposed to a Chapter 7 liquidation?

5  A.  Our belief and assumption is that any default of the

6  Boardriders notes without a waiver in place accelerates --

7  would accelerate the notes and the trustee would move to sell

8  the remaining business.

9  Q.  I want to turn your attention next to the DIP -- the

10  competing DIP facilities.  And let me ask you first:  If, as

11  a consequence of FTI's role with respect to the company, are

12  you familiar with the company's prepetition asset-based loan?

13  A.  Yes, I am.

14  Q.  And are you floor with the company's proposed debtors-in-

15  possession financing, both ABL and term loan?

16  A.  Yes.

17  Q.  And are you familiar with the alternative DIP proposal

18  that's been made through some of the work that's been done by

19  the creditors' committee?

20  A.  Yes.

21  Q.  And then lastly, were you in court to hear Mr. Stamer's

22  explanation of some enhanced terms of that alternative DIP

23  proposal?

24  A.  Yes.

25  Q.  Okay.  Do you have a recollection as to what sort of the

1  maximum availability that the debtor enjoyed under the

2  prepetition ABL?

3  A.   It was around $95 million, based on the ABL formula.

4  Q.   And what is the incremental availability that the debtor

5  is proposed to enjoy under the new ABL term loan proposed by

6  B of A and Oaktree?

7  A.   It's really going from a ninety-five prepetition up to

8  the one seventy-five, so approximately $80 million of

9  incremental liquidity.

10 Q.   Now, one of the proposals that's been made I guess in two

11 ways is this notion of a springing security interest with

12 respect to a third of the foreign stock.  When I -- do you

13 understand what I'm saying when I refer to that?

14 A.   I do.

15 Q.   Okay.  And approximately how many DIP financing

16 transactions have you been personally engaged in over your

17 career?

18 A.   I've been involved in several retail bankruptcies and

19 probably in the order of 20 to 25.

20 Q.   And have -- over the course of your experience, have you

21 ever been engaged in a situation where a DIP lender was

22 satisfied with the notion of having to prove-up a lien later

23 in the case?

24 A.   Not that I can recall.

25 Q.   Same question with respect to accurate protection, is it

1  your view that it is appropriate -- well, let me strike that

2  question.

3      Do you have an understanding as to what I mean when I say

4  "adequate protection"?

5  A.   Yes.

6  Q.   So with respect to adequate protection, do you have an

7  understanding as to whether you would consider, in your

8  professional opinion, it to be adequate protection if the

9  lender were forced to, again, prove-up entitlement to

10 adequate protection later on in a case?

11 A.   I mean my experience is in DIP loans that DIP lenders

12 typically get a lien on all assets and that's not something

13 that -- proving adequate protection is not something that

14 happens later in the case.

15         THE COURT:  I think I'd like to make sure that I

16 understand precisely what we're talking about.

17         You heard the colloquy between Mr. Stamer and me

18 regarding the springing lien concept that's now evolved into

19 something that sounds to me like a 507(b) superpriority.  But

20 to the extent of diminution and the value of their

21 collateral, they'll be entitled to an adequate protection

22 lien or claim against those unencumbered assets.  Did you

23 understand that dynamic?

24         THE WITNESS:  I did, yes.

25         THE COURT:  Okay.  How is that different or how is

1  that proposal, as it works here, identifying a 507(b) -- and

2  again, if I'm putting words in the party's mouth or if I'm

3  not accurately describing it, I would ask to be corrected,

4  because I'm, again, trying to keep up.  How is that different

5  from an element that is a common feature of the many, many

6  DIP facilities you and I have both seen?

7          THE WITNESS:  It's really the timing of it and

8  proving it up later in the case.  Typically, the liens are

9  granted in an interim basis and then final at the beginning

10  of a case.

11          THE COURT:  So, if the Court were to say that you're

12  not getting a lien on all of the stock, what you're getting

13  is a lien to the extent that you can demonstrate the

14  diminution and the value of your collateral at a later point,

15  that lien is granted.  But the utility of it is limited

16  because you wouldn't have the ability to simply look at that

17  asset on a starting basis and say, well, we'll liquidate that

18  first and we'll leave marshalling and everything outside of

19  it.  Do you know what I mean?

20          THE WITNESS:  I think I do, yes.

21          THE COURT:  So, again, I don't often see things like

22  springing liens and that kind of thing, but I think I

23  followed Mr. Stamer's concept, that at least, as described,

24  it seems more typical, and rather than take over this

25  dialogue, I'd ask that you walk him through to answer.  Do

1  you know where I'm going?

2        MR. DURRER:  I think I do, Your Honor.

3        THE COURT:  I'm trying to understand -- you know,

4  you've raised a good point.

5        Have you ever seen a springing lien?  Answer:  No.

6  But this is a question of whether or not liens -- or we can

7  encumber in one form or another, by a superpriority or by

8  some other right, this foreign stock.  And again, the tax

9  issue we can deal with or not, but there's a threshold issue.

10 I mean, I'm never going to answer the tax issue unless you

11 make me, but the threshold issue of don't encumber this; or,

12 if you do, the encumbrance needs to be circumscribed or

13 limited, I see that as the thrust of the committee position.

14       And so if you can walk him through that, then I'd

15 like to understand how you understand it works and whether it

16 is or is not consistent with what we've seen in other cases,

17 okay?

18       MR. DURRER:  Certainly.

19 BY MR. DURRER:

20 Q.  So just to walk through the baby steps then, Mr.

21 Coulombe, do you -- would you agree that to the extent that

22 $175 million is being borrowed on a basis superior to the

23 existing secured notes, that the senior secured notes

24 collateral is being diminished, potentially, by $175 million?

25 A.  Yes.

1  Q.  And so in that circumstance, is it your opinion that the

2  senior secured notes would be entitled to adequate protection

3  for that diminution?

4  A.  Yes.

5  Q.  And to the extent that the offer of adequate protection

6  relates to something that needs to be proven in the future,

7  is it your view that that is inadequate, as far as a form of

8  protection?

9  A.  I believe so, yes.

10      THE COURT:  What is it that's being proven in the

11  future?  Now, I didn't entirely follow this, because when I

12  read the committee objection it was about whether you could

13  lien it and whether there was a tax consequence and they

14  wanted a tax opinion letter from you, and if you couldn't get

15  that, then it couldn't be liened.  Okay.  I understand that

16  conditionality and that's problematic.

17      Is that still in the revised version or -- because

18  there is conditionality, for example, on a 507(b)

19  superpriority.  Today you've got no determined reduction in

20  the value of your collateral, but if at some point in the

21  future you can demonstrate it, then yes, you can look to this

22  particular asset to satisfy on a superpriority basis that

23  claim.  That's how I generally understand 507(b).

24      It never actually happens.  I don't know that I've

25  ever actually seen it, but if I were a lender, that's a

1   protection available and that's what I'd want.  So what's

2   being proven later?

3        MR. DURRER:  Your Honor, candidly, this is a little

4   fuzzy.  I read the papers too and I think -- I hope I read

5   them as carefully as you did, and I also took careful notes -

6   - if you don't mind --

7        THE COURT:  Sure.

8        MR. DURRER:  -- during Mr. Stamer's comments.  And,

9   basically, what I'm trying to elicit from the witness, and I

10  think I have -- you know, Mr. Stamer used words like "prove,"

11  "establish," and these are in the papers, as well, that the

12  committee filed.

13       And the concern that has been expressed to me by my

14  two largest stakeholders, and also comes to my mind just in

15  terms of trying to run a case, is that when we talk about

16  prove and establish, that doesn't sound like an offer of

17  adequate protection; that sounds like an invitation to more

18  litigation.  And I don't know how I get in front of you in

19  connection with a priming contest and shift to an alternative

20  DIP.

21       Set aside, the DIP has no transaction, but let's

22  assume for the moment that we're in front of you arguing for

23  an alternative DIP.  I don't know how I stand in front of you

24  with a straight face and say that is adequate protection.

25  It's a maybe.  It's an invitation to litigation.  So that's -

1  - if we're talking about the alternative DIP.

2        If we're talking about people making consensual

3  decisions, which is what the debtor has put in front of you

4  today in terms of Oaktree Group agreeing to sit behind with

5  respect to its U.S. collateral, $175 million in favor of B of

6  A and Oaktree as plan sponsor, I think what they're saying

7  is, look, I need to know that I've got this widget today,

8  that I have something that doesn't involve litigation down

9  the road that I have to prove where we could argue about, you

10  know, well, what was the value of the collateral on the

11  petition date and what was the value of the collateral on the

12  trigger event, you know, be it a seven, a dismissal, et

13  cetera.

14        THE COURT:  I think I understand the context.  We'll

15  deal with this on cross.  I think that's probably

16  appropriate, with the witness on the stand and the issues

17  live.  But I don't want to get into an argument with a

18  witness on the stand.

19        All right.  Sorry for the interruption.

20        MR. DURRER:  Thank you, Your Honor.

21        No, it's -- we want to make sure, above all, that you

22  understand what we're trying to present, so thank you.

23        THE COURT:  It is all about me.

24     (Laughter)

25        MR. DURRER:  It is.  It is.

1  BY MR. DURRER:

2  Q.  So, one criticism or one -- well, strike that.

3      Are you aware of the variance testing under the DIP

4  proposal submitted by the debtors?

5  A.  Yes.

6  Q.  And can you describe to the Court what that variance

7  testing involves?

8  A.  The existing DIP proposal or the alternative proposal?

9  Q.  Well, start with the existing one.

10  A.  Okay.  The existing DIP proposal is -- there are two

11  tests.  The first one is on cash receipts and it's a 10

12  percent cumulative variance.  The second test is on cash

13  disbursements and, again, similarly, it's 10 percent on the

14  cumulative disbursements.

15  Q.  So when you say "cumulative," just so I understand, does

16  that -- how -- in any business there's going to be timing

17  mismatches, you know, you project something to happen on Week

18  1 and it happens on Week 4.  Can you explain to the Court how

19  the cumulative nature of the testing addresses that issue?

20  A.  Sure.  The initial test wasn't done until the third week,

21  so we had, essentially, three weeks of actual results before

22  we tested versus the budget.  Both, on the receipt and the

23  disbursement line, as you move forward past Week 3, it would

24  include all of the preceding weeks in the calculation.

25  Q.  And do you recall what the initial proposal from Oaktree

1  and the other DIP lenders was with respect to the variance?

2  A.  Sure.  They were -- the receipt test was the same, but in

3  brackets and our conversations with Oaktree was going to be 5

4  percent, initially.

5      And the second test was going to be a net cash flow test,

6  so it would have been receipts less disbursements, so a

7  slightly different test.  And, again, my recollection was

8  that number was in brackets and we were talking about a five

9  percent variance.

10 Q.  And do you have an awareness of what the alternative DIP

11 proposal is with respect to variance?

12 A.  I do.

13 Q.  And can you tell the Court what that is?

14 A.  I believe it's similar to where we ended up in the

15 Oaktree proposal on their cumulative receipts and cumulative

16 disbursements, except that the variance test is 15 percent

17 instead of 10 percent.

18 Q.  And what -- do you have a view as to what market is with

19 respect to variance testing on a DIP financing?

20 A.  Yeah.  The DIP -- the retail DIPs that I've been involved

21 in, you know, I believe that the market is ten percent on

22 both, the receipt and disbursement covenant.

23 Q.  And now having approximately a month under your belt, you

24 know, post-petition, do you have a sense as to how the debtor

25 is doing with respect to the variance testing?

1  A.  I do.

2  Q.  And can you explain to the Court where the company is on

3  that?

4  A.  On the cash receipts, we're, you know, within one or two

5  percent relatively on budget.  On the disbursement side, I

6  think we're about $10 million ahead of plan, meaning we've

7  spent less money; however, most of that we believe are timing

8  issues and that will likely be made up in the coming weeks,

9  and we anticipate generally being on budget on disbursements.

10  Q.  Have you had occasion to review or understand any of the

11  waivers that have been granted in connection with the

12  Boardriders notes?

13  A.  I've reviewed the waivers, yes.

14  Q.  And can you describe for the Court sort of the -- is

15  there a transaction in favor of which the waivers have been

16  granted?

17  A.  The major component is if there's a termination of the

18  plan support agreement, my understanding is those waivers

19  would terminate.

20  Q.  And do you have an understanding of what transaction is

21  proposed in connection with the alternative DIP proposal?

22  A.  I do.

23  Q.  And can you explain to the Court that?

24  A.  I would characterize it as a naked 363 process.

25  Q.  And I hesitate to ask this question, but I will.  What do

1   you mean by "naked"?

2   A.   There's no stalking horse agreement or identified buyer

3   that would set a floor value.

4   Q.   I -- oh, actually, I do have one more question for the

5   witness.

6         MR. DURRER:  May I approach the witness with an

7   exhibit, Your Honor?

8         THE COURT:  Sure.

9         MR. DURRER:  I can mark it on the bottom.

10        THE COURT:  That's okay.  I'll mark it.

11        MR. DURRER:  Thank you.  Shall I give (indiscernible)

12        THE COURT:  Please.

13        MR. DURRER:  (indiscernible)

14        THE COURT:  Yeah.

15     (Participants confer)

16        THE COURT:  Marked for identification as 59

17     (Joint Exhibit 59 marked for identification)

18        MR. DURRER:  Thank you, Your Honor.

19   BY MR. DURRER:

20   Q.   Mr. Coulombe, I'm showing you what has been marked as

21   Exhibit 59.  What I want to ask you is, has the company, to

22   your knowledge performed an analysis of some of the impacts

23   that would arise in connection with the alternative DIP

24   proposal?

25   A.   Yes.

1  Q.  And, specifically, was FTI involved in helping the

2  company with that analysis?

3  A.  Yes, we were.

4  Q.  And with respect to two specific items, did FTI work with

5  the company on calculating the cash impact of paying periodic

6  adequate protection payments on account of the senior secured

7  notes?

8  A.  We did.

9  Q.  And do you know what, over the six-month period that's

10  described in the alternative DIP proposal, what the

11  conclusion was with respect to the magnitude of those

12  proposed payments?

13  A.  I do.

14  Q.  And what's that number?

15  A.  So it's towards the bottom of the exhibit where it's

16  titled, secured notes; under the DIP proposal, the Oaktree

17  DIP there's $280 million, four months, and zero payments as a

18  result of the consensual deal.

19     Under the alternative DIP, the payments would be made at

20  the rate of 7.875 and it's approximately $11 million over the

21  six-month period of the case that's proposed.

22  Q.  And did the company also evaluate simply the costs of

23  running the business for the two-month, longer period

24  described in the alternative DIP proposal?

25  A.  We did.

1  Q.  And did FTI participate in that exercise?

2  A.  We did.

3  Q.  And can you tell the Court what conclusions that FTI and

4  the company reached with respect to that sort of working

5  capital burn?

6  A.  Sure.  By going from the January -- the presumed January

7  exit date out through March, there's a working cap --

8  primarily a working capital need of about $17 million.

9  Q.  And I'll tell you, it seems a little counter-intuitive

10 that a retailer wouldn't be making money during the January

11 time frame.  Can you explain that?

12 A.  Sure.  I think it was probably in some of the

13 declarations, but the company's largest season is the spring.

14 And what's happening in December, January, February, and

15 March, the inventory is ramping up and then the shipments

16 happen and the inventory turns into receivables and you

17 really don't collect the cash until, you know, post the

18 proposed DIP period.  So there is a cash requirement and a

19 working capital requirement to get through that period.

20         MR. DURRER:  I don't have any further questions of

21 the witness at this time, Your Honor.

22         THE COURT:  Okay.  Cross?

23         MR. SORKIN:  Good morning, Mr. Coulombe.

24         Good morning, Your Honor.

25         THE COURT:  Good morning.

1        MR. SORKIN:  Joseph Sorkin from Akin Gump.

2        THE COURT:  Welcome.

3                    CROSS-EXAMINATION

4  BY MR. SORKIN:

5  Q.  Mr. Coulombe, let me start with the exhibit -- the

6  demonstrative that was just handed to you by Mr. Durrer.  If

7  you look at the column under the secured note --

8        THE COURT:  I don't want to bollocks anybody up, but

9  is there any issue with the admission of this?

10     (No verbal response)

11        THE COURT:  You were about to cross him on it anyway,

12  but it's marked for identification as 59.

13        MR. DURRER:  Candidly, Your Honor, we didn't go

14  through every identity on that exhibit.  There's another

15  witness that we're going to go through certain of the other

16  items, so I'm happy to wait for another witness, but I don't

17  know if there's an objection.

18        MR. SORKIN:  Your Honor, at this point my inclination

19  would be to go ahead and explore the document a little

20  further and see what further use there is to be made of it.

21        THE COURT:  You're welcome to, I'm just, from my

22  point of view, it was just a technical question.  That's

23  fine.  I'll be at your pleasure.

24        MR. SORKIN:  Understood.  Thank you, Your Honor.

25  BY MR. SORKIN:

1  Q.  Mr. Coulombe, the document that was handed to you and

2  marked as Exhibit 59, if you look at the section, secured

3  notes, the last, or I guess the second section from the

4  bottom.  Do you see that?

5  A.  Yes.

6  Q.  And you just indicated that there was $11 million of

7  additional costs or cash impact under the alternative DIP

8  proposal, correct?

9  A.  Yes.

10 Q.  Were you here this morning to hear that there had been

11 discussions with the alternative DIP lenders, the willingness

12 to address that eleven-million-dollar difference?

13 A.  Yes.

14 Q.  Assuming that is taken care of, would you agree that the

15 $11 million could come out of the difference between the two

16 DIP proposals?

17 A.  The liquidity impact would be neutral if someone were

18 providing the capital.

19 Q.  And if you'll look at the final number, the $17 million,

20 that you identified as additional cash burn for January

21 through March.  Do you see that?

22 A.  I do.

23 Q.  If you could look at Exhibit 52 in the binders in front

24 of you.

25             THE COURT:  Did you say 52?

1       MR. SORKIN:  Yes, Your Honor.

2       THE COURT:  Okay.  I'm there.

3  BY MR. SORKIN:

4  Q.  Mr. Coulombe, are you there?

5  A.  Yes.

6  Q.  Do you recognize Exhibit 52?

7       And I'll direct your attention to Exhibit C that is

8  attached.

9  A.  I do recognize it.

10 Q.  And this is the DIP budget that was filed on September

11 9th with the Court, correct?

12 A.  That's correct.

13 Q.  And the company prepared this DIP budget with the

14 assistance of FTI?

15 A.  That's correct.

16 Q.  And there is no finalized additional DIP budget at this

17 point, correct?

18 A.  It's in the process of being finalized but it's not

19 finalized as of now.

20 Q.  Okay.  So there's no finalized budget and this DIP budget

21 goes through week ending January 2nd, 2016, correct?

22 A.  That's right.

23 Q.  So at this point, if you recall in your deposition, we

24 talked about the potential change in the DIP budget being

25 somewhere in the neighborhood of at most $25 million.  Is it

1  now the case that that number is $17 million?

2  A.  That's our best estimate as of now.

3  Q.  But at this point you still haven't finalized the

4  additional cash needs under the alternative DIP proposal.  Is

5  that correct?

6  A.  I mean the 39.7 million on this page is representative of

7  where we think it will end up.

8  Q.  And that includes the $11 million we discussed as well as

9  the $17 million?

10 A.  That's correct.

11 Q.  Mr. Coulombe, if we could go back to Exhibit 59, please.

12 A.  Go back to 52 or --

13 Q.  59.

14 A.  -- onto 59?

15 Q.  Onto 59, which was the first exhibit we had looked at,

16 excuse me.  So, non-sequentially, but temporally.

17 A.  So, just so I'm clear, the hypothetical liquidation

18 analysis or ...

19 Q.  The hypothetical -- excuse me -- no.  I apologize.

20 A.  Yes.

21 Q.  The first one that I had looked at with you, Exhibit 59 -

22 -

23 A.  Sure.

24 Q.  -- which is the document that --

25 A.  Is in front of me.

1  Q.  -- was handed to you.

2      If you look at the DIP term loan, the first section, the

3  fifth line down, number of months.  Do you see that?

4  A.  I do.

5  Q.  Do you know whether there is any penalty, under the

6  alternative DIP proposal, for paying back the loan in a four-

7  month period as opposed to a six-month period?

8  A.  Could you repeat that?

9  Q.  Sure.  Do you know whether there is in penalty or

10 financial impact to the company for prepaying the loan in

11 four months, under the alternative DIP proposal as opposed to

12 six months?

13 A.  I don't believe there is.

14 Q.  If you go down to the termination fee, under the Oaktree

15 DIP proposal, do you see a dash?

16 A.  I do.

17 Q.  And you understand that to mean there's no termination

18 fee under the Oaktree DIP proposal?

19 A.  Correct.

20 Q.  And are you suggesting that there is a termination fee

21 under the alternative DIP proposal?

22 A.  No.  What we're suggesting is the Oaktree DIP does have a

23 termination fee, which would be paid if we terminated their

24 DIP and pursued the alternative proposal.

25 Q.  Understood.  So that two-million-dollar cost to the

1  company is based on the termination fee that exists in the

2  Oaktree DIP proposal, not in the alternative DIP proposal,

3  correct?

4  A.  (No verbal response)

5  Q.  And just to make clear on that point, this chart assumes

6  that all of the fees payable to Oaktree, under the Oaktree

7  DIP proposal, will remain payable, despite the fact that it

8  was approved on an interim basis, correct?

9  A.  That's correct.

10  Q.  Let me go back to one other point of discussion.  Isn't

11  it the case that there's -- you had indicated that there's

12  $80 million of additional cash under the Oaktree DIP,

13  correct?

14  A.  Yes.

15  Q.  And you testified that that eighty-million-dollar DIP

16  would cause secured notes -- the collateral for secured notes

17  to diminish in value, correct?

18  A.  I think I testified that I was possible.

19  Q.  Okay.  And isn't it true that the $80 million actually

20  preserves the value of the secured note collateral?

21  A.  I haven't done that specific analysis.

22  Q.  And can you do that analysis sitting here today?

23  A.  I don't believe so.

24  Q.  But isn't it the case that there's no DIP and the second

25  -- the secured noteholders -- excuse me -- foreclose on their

1  collateral, wouldn't that drastically reduce the value of

2  their collateral?

3  A.   Could you repeat that question?

4  Q.   Sure.  So if there's no DIP and the secured noteholders

5  take action and foreclose on their collateral, you can,

6  sitting here today, tell me that that would drastically

7  reduce the value of their collateral, right?

8  A.   Again, I haven't done that analysis.

9  Q.   And you can't make any sort of educated guess, based on

10 your understanding that that would cause the value of the

11 collateral to diminish?

12          THE COURT:  I'm not sure I understand the question.

13 Are you asking him, basically, if we're in a liquidation

14 scenario, does that reduce recoveries?

15          MR. SORKIN:  Yes, Your Honor, or, if there is that

16 additional $80 million of value, aren't we then -- if -- if

17 forced to take action in a liquidation or other scenario,

18 isn't that going to drastically reduce the value to the

19 secured noteholders.

20          THE COURT:  That is a liquidation scenario, isn't it,

21 effectively?

22          MR. SORKIN:  Effectively, I believe it is.

23          THE COURT:  Foreclosure versus a straight-up seven.

24 But I think the witness -- okay, I think I understand.  The

25 witness has testified about his view of the seven.  I think

1  we can move forward from there.

2          MR. SORKIN:  Okay.  Thank you, Your Honor.

3  BY MR. SORKIN:

4  Q.  Now, Mr. Coulombe, we can move to Exhibit 4, which is the

5  liquidation analysis.  As you indicated, this liquidation

6  analysis was done as a hypothetical scenario, correct?

7  A.  That's correct.

8  Q.  And if you look at what is labeled Page 2 of Exhibit 4,

9  which has the heading, hypothetical liquidation analysis

10  overview, do you see that?

11  A.  Yes.

12  Q.  The information that is value under a liquidations

13  hypothetical and contained on Page 2 is with respect to the

14  debtors' U.S. operations only, correct?

15  A.  That's correct.

16  Q.  And the value that is indicated in the estimated net book

17  value column is based, with one exception, on either book

18  value or an assumed discount to book value, correct?

19  A.  Yes.  The recovery is based on the book value.  The

20  starting point is the book value of the assets.

21  Q.  Okay.  The starting point is the book value.  And the

22  value, as you indicate as potential recoveries for the ABL

23  lenders in the next column, in the senior secured lenders in

24  the third column, are based on -- again, with one exception -

25  - either that book value or an assumed discount to book

1  value, correct?

2  A.   That's correct.

3  Q.   And those assumptions are laid out on Page 3?

4  A.   That's correct.

5  Q.   And then that one exception is the IP and trademarks

6  column, correct?

7  A.   I think in the IP and trademarks we do start with the 54

8  million of net book value.

9  Q.   Okay.  But the value used is not either the book value or

10 an assumed discount; it is, instead, a valuation used from a

11 third party, correct?

12 A.   That's correct.

13 Q.   That was not a valuation that FTI performed, correct?

14 A.   That's correct.

15 Q.   And independently, FTI did no work to value any of the

16 assets of the debtor entities, correct?

17 A.   That's correct.

18 Q.   Similarly, FTI did no work to independently value any of

19 the non-U.S. operations, correct?

20 A.   That's correct.  We relied upon work done by third

21 parties.

22 Q.   Okay.  And so similarly now, if we look to Page 4 of

23 Exhibit 4 --

24 A.   Yes.

25 Q.   -- the assumptions laid out on Page 4 have to do with the

1  non-U.S. operations, correct?

2  A.   That's correct.

3  Q.   And when I asked you, there was no work to value, there

4  was no going concern valuation, correct?

5  A.   That's correct.

6  Q.   Or no other valuation of any kind?

7  A.   Done by FTI?

8  Q.   Done by FTI.

9  A.   That's correct.

10 Q.   And similarly, the analysis that's laid out on Page 4 was

11 not based on any discussions with actual euro noteholders,

12 correct?

13 A.   I did not personally have discussions with euro

14 noteholders.

15 Q.   And nor did anyone at FTI, correct?

16 A.   Not from FTI.

17 Q.   And if you look at what is the first bullet, last

18 sentence, this analysis is premised on the assumption that

19 the euro bondholders are assumed to initiate a quick going

20 concern sale of the non-U.S. operations, correct?

21 A.   That's correct.

22 Q.   And that was simply an assumption; it's not based on any

23 analysis, correct?

24 A.   That was our assumption and belief.

25 Q.   I believe in direct you indicated that your assumption,

1  similarly, was that the trustee of the noteholders under such

2  a scenario would cause the sale and would move to initiate

3  such a sale, correct?

4  A.   That's correct.

5  Q.   But you don't know whether the trustee could or would

6  make the decision to initiate a going-concern sale

7  unilaterally, correct?

8  A.   Our assumption is if the waivers are no longer in place,

9  that the bondholders would direct the trustee to initiate a

10 sale process; that's the assumption that's included in this

11 analysis.

12 Q.   Right.

13     And that assumption is not based on actual discussions

14 with noteholders, correct?

15 A.   I have not had discussions with noteholders.

16 Q.   Right.

17     And you don't know whether the trustee would actually make

18 the decision to initiate a going-concern sale unilaterally;

19 meaning, without direction from the noteholders, correct?

20 A.   That's correct.  This is a hypothetical analysis and

21 those were the assumptions we were working on.

22 Q.   And you don't have a view as to whether any euro

23 bondholder would have an economic incentive to initiate such

24 a sale, correct?

25 A.   Our belief is if there were no funding remaining in the

1  rest of the world to operate, that the logical progression of

2  events would be to try it sell the business as quick as

3  possible to realize value.

4  Q.  And I understand that's the assumption you made --

5  A.  That's correct.

6  Q.  -- that's listed in Exhibit 4 on Page 4.

7     But my question was different.  You can't tell me or you

8  don't have a position as to whether it would be in the

9  economic interests of any eurobond noteholder to actually

10 initiate a going-concern sale, correct?

11 A.  I can't speak for the noteholders.

12 Q.  So that's a no?

13 A.  That's a no.

14 Q.  And you don't have a view, based on the actual value of

15 the non-U.S. operations, as one way or the other, as to

16 whether it would be in the best interests of eurobond

17 noteholders to actually initiate such a sale, correct?

18         MR. DURRER:  Objection.  I think he has testified on

19 this point, Your Honor.  I think this question has now been

20 asked about four or five times.

21         THE COURT:  Yeah, I think we've covered the

22 assumption that's in the liquidation analysis and whether

23 there's a factual basis for that or whether it's his guess,

24 so I think we can move forward.

25         MR. SORKIN:  Understood, Your Honor.

1  BY MR. SORKIN:

2  Q.  If we can go back to Page 4 of Exhibit 4, Mr. Coulombe.

3  After the initial bullet, you identify a number of factors

4  that you evaluated in this hypothetical scenario, correct?

5  A.  Yes.

6  Q.  And the first was that the eurobond holders would have

7  the most downside in a prolonged sale scenario and, thus,

8  would be motivated to move quickly to consummate a sale,

9  correct?

10 A.  Yes.

11 Q.  And you identified this as a factor, different from an

12 assumption, correct?

13 A.  Could you repeat that?

14 Q.  You identified this, as is clearly laid out, as a factor,

15 not an assumption, correct?

16 A.  That's what the words say, yes.

17 Q.  And the second factor is a quick sale outcome would be

18 needed to prevent potentially significant losses of wholesale

19 customers, correct?

20 A.  Correct.

21 Q.  And as a result of the factors above, sale multiples

22 would be depressed relative to market trading multiples,

23 correct?

24 A.  Yes.

25 Q.  And then if you move down to the last dash under the

1  "sale proceeds will be allocated" scenario.  Do you see that?

2  A.  I do.

3  Q.  And you indicate that, first, any value would be -- would

4  go to intercompany obligations owed by the non-U.S.

5  operations to U.S. operations, the extent of which has not

6  yet been determined, with any remaining value allocated --

7  and then, first, you see to the 65 percent of the U.S. senior

8  secured noteholders.  Do you understand that to be based on

9  the 65 percent pledge of the stock in the foreign

10  subsidiaries?

11  A.  Yes.

12  Q.  And then underneath that, the 35 percent would go to U.S.

13  priority and general unsecured creditors with priority claims

14  to be fully satisfied before any value could be realized by

15  general unsecured creditors, correct?

16  A.  Yes.

17          MR. SORKIN:  Your Honor, just one second?

18          THE COURT:  Sure.  Take your time.

19      (Pause in proceedings)

20          MR. SORKIN:  Thank you, Your Honor.  I have just a

21  handful more questions.

22          THE COURT:  Sure.  Go ahead.

23  BY MR. SORKIN:

24  Q.  Mr. Coulombe, if we could now go to Exhibit 59, which is

25  the one-page document analysis between the two DIP proposals.

1  Do you have that in front of you?

2  A.  Are we done with --

3  Q.  We are done with the liquidation analysis.

4     And I'd like to walk through just a few more of the terms

5  under the DIP term loan.  If you see under the term loan

6  balance, there is an up-front fee or OID.  Do you see that?

7  A.  I do.

8  Q.  And there is no amount identified under the Oaktree DIP.

9  Do you see that?

10  A.  I do.

11  Q.  And isn't it the case that the OID was already paid to

12  Oaktree upon approval of the interim DIP?

13  A.  That's correct.

14  Q.  So it's not that there is no amount; it's that it was

15  already accounted for?

16  A.  That's correct.

17  Q.  And isn't it the case that an additional $900,000 in OID

18  was paid to Bank of America and that is also not shown in

19  this chart?

20  A.  That's correct.

21  Q.  And if you look at the DIP budget, which is Exhibit 52,

22  and if you go down to Line 20, "DIP financing fees."

23  A.  (Witness reviews exhibit)

24  Q.  Sorry.  I will wait until you get there.

25  A.  I'm there.

1  Q.  Line 20, "DIP financing fees."  Do you see that?

2  A.  I do, yes.

3  Q.  The $4.35 million identified as paid week ending

4  September 12th, is that the amount of the OID that was paid

5  to Oaktree and Bank of America in total?

6  A.  Yes, it is.

7  Q.  Okay.  And so that is the three point -- roughly 3.5

8  million that was paid to Oaktree, correct, and then the

9  roughly 900,000 that was paid to Bank of America?

10 A.  That's correct.

11 Q.  Mr. Coulombe, on Exhibit 59, who prepared this chart?

12 A.  I believe someone from Peter J. Solomon prepared this

13 chart.

14 Q.  So you didn't have any involvement in preparing it?

15 A.  I did not prepare this.

16 Q.  Did you review it before your testimony this morning?

17 A.  I did.

18 Q.  Are there any other omissions -- taking a minute to look

19 at this now -- that you're aware of on this chart?

20      MR. DURRER:  I'll object to the mixed

21 characterization of the testimony.

22      THE COURT:  Overruled.  I understand the question.

23 A.  Yeah.  Those were not omissions.  The intention of the

24 schedule was to calculate the incremental capital that would

25 be needed to pursue the alternative DIP.

1  Q.  Okay.

2  A.  It wasn't to outline the terms of the two DIPs, side by

3  side.

4  Q.  Understood.  And I appreciate that, and let me ask it

5  differently then.

6      Under the column for Oaktree DIP proposal, are there any

7  other amounts that are not identified here, which have

8  already been paid to Oaktree?

9  A.  Could you repeat that?

10 Q.  Sure.  And we can go line by line if it's easier, but

11 what I'm asking is, under the Oaktree DIP proposal, we're

12 identified now, a handful of amounts that have already been

13 paid by the debtor.  So, again, I understand you're saying

14 this is comparing the incremental costs of the alternative

15 DIP proposal.

16     So my question is:  Are there any amounts not listed on

17 Exhibit 59 that have already been paid to Oaktree?

18 A.  Not that I'm aware of.

19 Q.  Are there any amounts that will be paid to Oaktree, under

20 the current, the existing Oaktree DIP, that are not

21 identified on Exhibit 59?

22 A.  Not that I'm aware of.

23 Q.  Okay.  Thank you, Mr. Coulombe.

24         MR. SORKIN:  No further questions.

25         THE COURT:  All right.  Any redirect?

1          MR. DURRER:  No, Your Honor.

2          THE COURT:  All right.  Mr. Coulombe, thank you, sir;

3   you may step down.

4      (Witness excused)

5          THE COURT:  Why don't we take just a very short

6   break.  And who's your next witness?

7          MR. DURRER:  It will be Mr. Savini.

8          THE COURT:  Okay.  We'll just take five minutes.

9   Stand in recess.

10      (Recess taken at 11:27 a.m.)

11      (Proceedings resume at 11:42 a.m.)

12          THE COURT:  Please be seated.

13          MR. DURRER:  Your Honor, thank you for the break.  It

14   was appreciated.  Van Durrer for the debtors again.

15          I'd like to call Durc Savini to the stand.

16          THE COURT:  Okay.  Will you swear the witness.

17       DURC SAVINI, WITNESS FOR THE DEBTORS, SWORN/AFFIRMED

18          THE CLERK:  Please state and spell your name for the

19   record.

20          THE WITNESS:  Durc Savini, D-u-r-c, S-a-v-i-n-i.

21          THE COURT:  Welcome.  Have a seat.

22          THE WITNESS:  Good morning, Your Honor.

23          THE COURT:  Good morning.

24          MR. DURRER:  I apologize, Your Honor.  I'm just

25   looking for an exhibit.

1                        DIRECT EXAMINATION

2   BY MR. DURRER:

3   Q.  Good morning, Mr. Savini.

4   A.  Good morning.

5   Q.  What I'd like to do is to direct your attention to

6   Exhibit 55.

7   A.  55?

8   Q.  55, yes, in the last book.

9           MR. DURRER:  And I'm advised by some folks on the

10  phone that it would be helpful if we all speak into the mic,

11  and that was not directed to Your Honor.

12      (Laughter)

13          THE WITNESS:  Can you hear me now?

14          MR. DURRER:  That's helpful, thank you.

15  BY MR. DURRER:

16  Q.  All right.  Have you located Exhibit 55?

17  A.  Yes.

18  Q.  And can you identify that exhibit for the Court, please.

19  A.  This appears to be the commitment letter for the

20  alternative DIP financing.

21  Q.  And can you describe for the Court the process that --

22  well, are you familiar with the process that the company went

23  through in analyzing that alternative DIP proposal?

24  A.  I am.

25  Q.  Can you describe for the Court, briefly, the process that

1  the company went through.

2  A.   The company and its advisors, Peter J. Solomon, FTI, and

3  management reviewed the terms.  Peter J. Solomon and FTI,

4  together, analyzed the costs -- the incremental costs stated

5  in the letter, as well as those that were excluded from the

6  proposal to understand what the incremental costs and

7  potential additional liquidity needs would be to pursue this

8  DIP financing.

9  Q.   I want to direct you specifically to Page 5 of the

10  termsheet that is attached to Exhibit 55.  And the bottom

11  right-hand box on Page 5, opposite a heading called,

12  "Conditions Precedent to Initial Term Loans."  Do you see

13  that?

14  A.   I do.

15  Q.   Okay.  There's a (iii) that refers to a defined term,

16  "Boardriders waiver."  Do you know what the Boardriders

17  waiver that is referenced there is?

18  A.   I do.

19  Q.   And is it your understanding that Exhibit 55, the

20  commitment letter, is conditioned upon the continued full

21  force and effect of the Boardriders waivers?

22  A.   I do.

23  Q.   And have you had an opportunity to review and understand

24  the Boardriders waivers that are -- that's described in this

25  exhibit?

1  A.  I have.

2  Q.  And do you have an understanding as to the impact of the

3  debtors' pursuit of this alternative DIP proposal on the

4  Boardriders waivers?

5  A.  Yes, I believe I do.

6  Q.  And can you explain that to the Court, please.

7  A.  As an element of diligence of this proposal, I reached

8  out directly to one of the parties with whom the company

9  entered into the consent and waiver agreement with to

10 indicate that we've received this commitment, that we are

11 doing due diligence and we'd like to understand what their

12 reaction would be and how they would proceed, as it relates

13 to keeping the consent waiver in place if we were to pursue

14 this financing.

15    I described the terms, the general terms of the proposal,

16 and the party on the other side -- the firm indicated that

17 pursuing this transaction would be far -- would create more

18 uncertainty that they're willing to stomach.  And wouldn't be

19 supportive, first of all, of the company pursuing this

20 proposal and would unlikely be willing to continue the

21 consent and waiver under that circumstance.

22 Q.  And among the reasons that you were given, did that

23 include the lack of a specific transaction?

24 A.  Yes.

25 Q.  And is it -- and what is your understanding as to the

1  impact of the pursuit of the alternative DIP on the plan

2  support agreement with Oaktree?

3  A.   My understanding in a direct conversation with one of the

4  principals of Oaktree is that were the company to pursue this

5  and ultimately prevail in an adequate protection or a priming

6  fight, Oaktree would withdraw from the PSA process.

7  Q.   Now you mentioned priming.  In your experience, what is

8  your understanding of what priming is in this context?

9  A.   To the extent that a prepetition secured creditor is

10  going to be primed by a DIP lien, you either have to

11  negotiate a consensual -- the consensual terms under which

12  they would be primed or make an adequate showing that they're

13  adequately protected, usually with an equity cushion.

14  Q.   And do you have a view as to whether adequate protection

15  is available in connection with the alternative DIP proposal?

16  A.   The alternative DIP proposal sets forth an adequate

17  protection package.

18  Q.   And in your -- what is that package that's proposed?

19  A.   I believe it's essentially the same package that the

20  Oaktree proposal has, except that it excludes avoidance

21  actions and a security interest -- excuse me -- a security

22  interest against proceeds of avoidance actions and the stock;

23  the 35 percent unpledged stock of the foreign subs.

24  Q.   And in your view, is that package adequate to prime

25  Oaktree's position on a non-consensual basis?

1  A.  I don't believe so.

2  Q.  And do you have a view as to what the impact of the

3  company would be in connection with litigating a contested

4  priming fight, notwithstanding who would win?

5  A.  Well, there would certainly be litigation.  It would take

6  some time and create uncertainty with the company's

7  customers, with its vendors.

8      But more importantly, I, frankly, don't think that I could

9  sustain an argument for an equity cushion in these

10  circumstances, knowing what I know about the company's

11  performance.

12  Q.  Did you also have occasion to diligence -- strike that.

13      The DIP financing that's proposed by the company also

14  includes a component that involves Bank of America.  Is that

15  correct?

16  A.  That's correct.

17  Q.  And as part of your diligence process with respect to the

18  alternative DIP, did you have occasion to visit with Bank of

19  America and their representative to determine their

20  perspective on this proposal?

21  A.  Yes.  I spoke with a senior credit official at Bank of

22  America involved in underwriting this loan, described to them

23  the terms of the proposal we were evaluating, and they

24  indicated to us that they would -- to the extent that the

25  opportunity existed -- and I believe there's a right under

1  their agreement to seek to be repaid in connection -- at the

2  time, that we would elect to refinance the Oaktree proposal,

3  the Oaktree DIP.

4  Q.  And in the alternative DIP proposal, is there an

5  accommodation for replacing Bank of America with respect to

6  their sixty-million-dollar position?

7  A.  No.

8  Q.  Did you have occasion to speak with any of the proposed

9  alternative DIP lenders in connection with your due diligence

10  process?

11  A.  Yes, I did.

12  Q.  And do you -- can you describe for the Court what the

13  term "restricted" means, if you understand it, with respect

14  to a bondholder?

15  A.  If a bondholder who is public with respect to material,

16  non-public information is public, they are not restricted

17  from trading securities in any way.  Once they receive

18  material, non-public information, they become restricted

19  either by contract or by receipt of the information.

20  Q.  And when you spoke to the alternative DIP lenders, did

21  they express a position as to whether they were in possession

22  of material, non-public information?

23  A.  As I began to discuss the elements of their proposal that

24  gave rise to incremental liquidity needs, they indicated to

25  me -- they asked me to stop and they put the phone on mute

1  for a period of time, and then they indicated that they were

2  not restricted and that this conversation -- they did not

3  want the conversation to restrict them.

4  Q.  And in your experience --

5           THE COURT:  So hang on.  I want to make sure I

6  understand.  You reached out to the folks that are in the

7  syndicate for the group for the competing DIP?

8           THE WITNESS:  That's correct, Your Honor.

9           THE COURT:  You were going to have a colloquy with

10  them that, presumably, was going to test some of their

11  propositions and answer your questions about their proposal,

12  and your communication with them, by definition, would

13  include material, non-public information that's in your

14  possession, as an advisor to the company?

15           THE WITNESS:  That's correct.

16           THE COURT:  At that point, they said, we don't want

17  to be part of that because, if we receive this information,

18  we're essentially restrained from trading in the stock

19  because we're holding an MNPI, right?

20           THE WITNESS:  That's correct.  But not only the

21  stock, Your Honor, but also the unsecured notes, which they

22  were holders.

23           THE COURT:  Okay.  I understand.  I wanted to make

24  sure that I followed that clearly.

25           You may proceed.  Sorry for the interruption.

1    MR. DURRER:  Thank you, Your Honor.

2  BY MR. DURRER:

3  Q.  And did that revelation, with respect to their status as

4  being unrestricted and desiring to remain unrestricted, have

5  an impact on your conclusions about their ability to execute

6  on an alternative DIP financing?

7  A.  I haven't been in a situation where a large commitment

8  was with issued without a party receiving non-public

9  information and doing diligence.

10 Q.  I want to turn your attention to Exhibit 59, which is the

11 single sheet of paper that should be somewhere up there.

12 A.  I'm sorry, which?

13 Q.  It's loose somewhere, but I'm happy to hand up another.

14 Do you recognize Exhibit 59?

15 A.  I do.

16 Q.  Is this a document that PJSC prepared in connection with

17 -- in working with the company and FTI?

18 A.  Yes, it's a document that we formatted and worked on

19 populating together with FTI.

20 Q.  And can you describe for the Court the purpose of the

21 document in general?

22 A.  The purpose of the document is to establish what the

23 incremental cash costs, if any, would be if the debtors were

24 to pursue this financing -- cash costs and liquidity.

25 Q.  And Mr. Coulombe earlier testified that the rows related

1  to secured notes.  Did you agree with Mr. Coulombe's comments

2  with respect to the secured notes?

3  A.  I did.

4  Q.  And Mr. Coulombe also testified with respect to the

5  incremental working capital loss associated with the

6  alternative DIP, as reflected on Exhibit 59.  Do you agree

7  with his comments about that topic?

8  A.  Yes, and my colleagues collaborated in that analysis.

9  Q.  So would you mind walking the Court, then, through,

10  starting at the top with the DIP term loan, what the

11  incremental cash costs related to the alternative DIP

12  regarding the DIP term loan are?

13  A.  Yes.  So, at the very top, you'll see a header, "DIP Term

14  Loan."  The term loan balance is a 115 million; that's the

15  DIP term loan.  The one percent under the alternative is

16  approximate -- of a 115 million is 1.15; that would be an up-

17  front fee that's payable to the extent that we were going to

18  access this commitment.  It doesn't really represent any

19  savings as it relates to the three percent because I think,

20  Your Honor, as you've heard earlier, the three percent has

21  already been paid.

22     The interest rate differential of 12 percent under the

23  existing Oaktree and 10 and a half percent on the alternative

24  proposal are different by 1.5 percent.  So the savings over a

25  period of approximately three months would be a modest

1  amount, somewhere in the order of four or $500,000.

2      However, because the alternative proposal contemplates an

3  additional two and a half months of the bankruptcy process,

4  the absolute cost at 10 and a half percent swamps the savings

5  over the three months where there's a 1.5 percent

6  differential.  And that is the number that you see -- the

7  1.898 is the net -- is the incremental cost, net of the

8  savings during that three months.

9      The termination fee is a two percent termination fee, and

10  so that 2.3 million would be paid to Oaktree to the extent

11  that we access this commitment and refinanced Oaktree.

12  Q.  Now let me ask you a question, sir.  We heard from the

13  first time today that there's a modified proposal to increase

14  the size of the alternative DIP for a number of purposes.  Do

15  you recall some of those comments on the record?

16  A.  Yes, I heard some of them.  Yes.

17  Q.  Okay.  And one proposed purpose was to pay down Bank of

18  America $15 million to reduce Bank of America's exposure to

19  the company.  Do you recall that?

20  A.  I recall that.

21  Q.  Am I right that, in effect, that would be -- well, are

22  you familiar with the interest rate that's payable in

23  connection with the Bank of America ABL component of the DIP?

24  A.  Yes.  It's LIBOR plus 3.5 percent.

25  Q.  And on an absolute interest rate basis, do you have a

1  sense of what that number is?

2  A.  It's probably 3.75 percent.

3  Q.  So am I correct to understand that that component of the

4  alternative DIP proposal is borrowing $15 million at 10 and a

5  half percent to pay back money at four percent?

6  A.  Yes, that's correct.

7  Q.  And that additional incremental impact is not reflected

8  on Exhibit 59, correct?

9  A.  The modification that you're referring to is not

10 reflected anywhere on this analysis.

11 Q.  With respect -- can you describe to the Court what the

12 impacts are with respect to the DIP ABL row, please.

13 A.  Yes.  Your Honor, with respect to the DIP ABL, the

14 balance is estimated to be $60 million.  That's currently

15 where the draw is at this point.  The assumption here is that

16 the DIP ABL stays in place or is replaced on similar or

17 exactly same terms.

18     The approximate four hundred -- excuse me -- the

19 approximate five-hundred-thousand-dollar incremental cash

20 cost is simply related to the additional two and a half

21 months, yes.

22 Q.  And then the same question, sir, with respect to the

23 monthly professional fees.  Is that simply just the roll-

24 forward of time based upon current estimations?

25 A.  That's the estimate of two and a half months of

1  continuing -- staying in bankruptcy with a 2.4 -- well, with

2  the estimated monthly rate of professional fees currently in

3  the case.

4  Q.  And you -- were you in the courtroom when Mr. Coulombe

5  described what he referred to as a "naked Section 363 sale"?

6  A.  I was.

7  Q.  Is it, likewise, your understanding that the alternative

8  DIP proposal is premised on a naked Section 363 proposal?

9  A.  It appears that it premised on a 363.  I think the result

10 would be, as you refer to it, a naked 363, understanding that

11 it would be Oaktree's intention not to act as a stalking

12 horse in the circumstance were we to elect to take this

13 financing.

14 Q.  And you testified regarding your diligence with respect

15 to the impact of that kind of a process on the Boardriders

16 waivers.  Do you have an opinion as to what the impact on the

17 company in the Chapter 11 case would be, just generally, in

18 pursuing a naked Section 363 process?

19 A.  It would certainly send -- it would create a lot of

20 uncertainty, again, with the company's customers and vendors.

21 There's a question as to whether or not B of A could be

22 retained as the ABL DIP lender.

23     And as it relates to the waivers, I have severe doubts

24 that we would be able to obtain or maintain the 50.1 percent

25 that we currently have that would stop an acceleration of the

1  notes.

2  Q.  Now you heard Your Honor's comments -- the Judge's

3  comments with respect to the breakup fee and the plan support

4  agreement.  To support my podium testimony, would you mind

5  explaining to the Court the genesis of the breakup fee

6  component of the deal and how that negotiation took place?

7  A.  Yes.  As it was stated earlier, the breakup fee was not

8  part of the original proposal; it was only when we pressed

9  for an explicit very broad fiduciary out, and an explicit no-

10  shop written into the PSA that Oaktree came back with a

11  request that they be offered a breakup fee in that

12  circumstance, and that was the nature of the exchange.

13  Q.  And do you have a sense of what an appropriate market

14  range of a breakup fee is in a transaction of this sort?

15  A.  Breakup fees, as I understand them, which are somewhat

16  routinely approved in 363 sale processes, are generally in

17  the range of two to three, perhaps even four percent as a

18  percent of transaction value or enterprise value.

19  Q.  And how did PJSC go about calculating the value of this

20  transaction?

21  A.  We calculated the implied value, as any investment banker

22  would, looking at a transaction.  You would look at the

23  amount of capital that's being brought in primarily as

24  equity, then you would also look at the amount of debt that

25  would be assumed in connection with the purchase of the

1  equity.  And I think that's most of it.  I think it also

2  includes an estimate of $30 million or something like that

3  for admin expenses.

4  Q.  And is it accurate to say that one component of the

5  equity purchase that Oaktree is proposing to make is the

6  conversion of the senior secured notes into equity?

7  A.  That's correct.

8  Q.  And if somebody else, some other bidder were to make an

9  alternative proposal that also contemplated the reinstatement

10 of guarantees with respect to the Boardriders notes, would

11 PJSC attribute the same value to that alternative bid as they

12 are -- as you are to the Oaktree bid?

13 A.  Yes, we would.

14 Q.  The criticism has been lodged that Oaktree should not

15 receive a breakup fee because it would do this deal anyway

16 without a breakup fee.  Do you have a view as to -- what is

17 your response to that criticism?

18 A.  I can't speak for Oaktree.

19 Q.  What is -- in aggregate dollars, what is PJSC's view of

20 the value of the Oaktree transaction?

21 A.  Approximately $710 million.

22 Q.  And do you have a view as to whether the proposed twenty-

23 million-dollar breakup fee is material with respect to a

24 transaction that would need to top that transaction value?

25 A.   It's certainly within a range of breakup fees that have

1  been approved in the past, again, in the two-to-three percent

2  range.

3  Q.  Is it fair to say that the company has spent a good deal

4  of time working with Oaktree on the potential transaction?

5  A.  Yes.

6  Q.  And is there value that is derived from the certainty of

7  that interaction that's going on prepetition and now post-

8  petition?

9  A.  I believe there is, yes.

10 Q.  And in order for another bidder to come forward and prove

11 that they were a better deal, is it your view that a breakup

12 fee that requires them to outmatch the Oaktree bid by a

13 measure, in this case, $20 million, is designed to compensate

14 or offset that lack of certainty that the debtor enjoys

15 today?

16 A.  Could you restate the question?

17 Q.  Sure.  The breakup fee --

18        THE COURT:  How much more leading do you need?

19     (Laughter)

20 BY MR. DURRER:

21 Q.  In this jurisdiction, breakup fees are only approved

22 where there's value to the estate.  And the question I'm

23 asking you is:  Do you have a view as to whether this breakup

24 fee generates value to the estate?

25 A.  I believe that the role that Oaktree is playing here and

1   the unique role that they play, as a plan sponsor, as a DIP

2   financing source, and as a significant prepetition secured

3   creditor, has provided a lot of stability, not only to the

4   company's customers and vendors, but also to the bondholders,

5   the euro note bondholders who are comfortable with committed

6   exit financing, as well as the ABL lenders, which were

7   critical in bringing down the overall cost of the DIP

8   financing.  So there's a lot of comfort and value derived

9   from the amount of time that was spent by Oaktree and the

10  company in the negotiation of this transaction.

11  Q.  Thank you.

12     I want to refer you to -- I just need to find an exhibit -

13  - Exhibit 44.  Do you recognize that exhibit, Mr. Savini?

14  A.  I do.

15  Q.  Can you tell the Court what that exhibit is?

16  A.  This is the DIP letter that is currently being employed

17  in the market-test process that we're running.

18  Q.  So this -- and the market-test process that you're

19  referring to is the process that arises out of the

20  negotiation of the PSA and the breakup fee with Oaktree?

21  A.  That's correct.

22  Q.  And did you invite comment and participation in

23  connection with this market process from the committee?

24  A.  We did.

25  Q.  And I want to refer you to Exhibit 45.  Actually, I

1   apologize.  Let me refer you first to 46.  Have you seen this

2   exhibit before?

3   A.   I have.

4   Q.   Can you describe for the Court what Exhibit 46 is?

5   A.   Exhibit 46 is an early draft of the letter.  We provided

6   the Word draft of the letter to PJT, asked them for their

7   comments regarding the bid process.  This represents most of

8   the comments that they provided to us.

9   Q.   And on the last page of Exhibit 46, there's a page

10  entitled "Expanded Buyer List."  Can you describe what that

11  is?

12  A.   Yes.  This is -- it appears to be the list that was

13  provided to us by PJT of not only parties that we had

14  originally identified to contact, but also some additional

15  parties that PJT thought we ought to canvas.

16  Q.   If you wouldn't mind turning back to Exhibit 43.

17          THE COURT:  43?

18          MR. DURRER:  43, Your Honor, yes.

19          THE COURT:  I'm there.

20  BY MR. DURRER:

21  Q.   Can you tell the Court what Exhibit 43 is, sir?

22  A.   43 is the brief presentation that we put together for the

23  formation committee to talk about the process the debtors

24  intended to run in these cases.

25  Q.   And on Page 10 of Exhibit 43, is that a list of the

1 parties that -- some parties that PJSC had already identified

2 in connection with the market process?

3 A.  That's correct.  It's not exhaustive, but it is some of

4 the additional parties that we intended to go out to.

5 Q.  And just quickly on Exhibit 45, can you tell the Court

6 what Exhibit 45 is now?

7 A.  Exhibit 45 appears to be an email exchange between one of

8 my colleagues and Mr. Barrett of PJT, responding that we

9 accept the proposed changes to the letter, as well as the

10 additional parties that were recommended to include in the

11 contact list.

12 Q.  And what is your intention with respect to the marketing

13 process and specific to interacting with the committee going

14 forward?

15 A.  We intend to work closely with the committee

16 collaborating and consulting with them over the progress and

17 the process.

18 Q.  And if you turn back to Exhibit 41, can you identify that

19 exhibit?

20 A.  Page 41 [sic] is a management presentation that Peter J.

21 Solomon and management put together as part of the strategic

22 sale process that was begun in the June/July time frame.

23 Q.  And is it your expectation that in connection with moving

24 forward with the marketing process, that this would be

25 updated to take into account, you know, more recent events

1   and the committee's involvement?

2   A.   Yes.

3   Q.   And would -- is there a data room available for potential

4   parties that are interested in Quiksilver?

5   A.   There is, indeed.

6   Q.   And has -- can you describe, again, just at a high level,

7   the contents of the data room, with respect to the market

8   process?

9   A.   The data room has a very large number of files that

10  include legal diligence matters, descriptive material on the

11  nature of the company's assets on a consolidated basis within

12  regions, financial projections, things of that nature.

13  Q.   And are you familiar with the company's efforts to update

14  and implement a business plan?

15  A.   Yes.

16  Q.   And what is your expectation with respect to populating

17  the data room with respect to an updated business plan?

18  A.   We recently held a board meeting to have the board review

19  a more or less final set of three-year projections; they've

20  been approved, subject to some modest changes.  And this week

21  we should have the final three-year business plan in the data

22  room for purchasers to review.

23       MR. DURRER:  Your Honor, may I have an additional

24  exhibit marked as Exhibit 60?

25       THE COURT:  Sure.

1      (Joint Exhibit 60 marked for identification)

2          MR. DURRER:  May I approach the witness?

3          THE COURT:  Sure.

4  BY MR. DURRER:

5  Q.  Mr. Savini, have you seen Exhibit 60 before?

6  A.  I have.

7  Q.  And I want to specifically refer you to Pages 10 and 11

8  of Exhibit 60.  Were you personally involved in the evolution

9  of the Oaktree/B of A DIP proposal over the course of the

10 pre- and initial post-petition period?

11 A.  I was.

12 Q.  And is the description of the beginning and end of

13 negotiations on key points with respect to that DIP financing

14 described on Pages 10 and 11 accurate in your view?

15 A.  Yes.

16          MR. DURRER:  No further questions of the witness,

17 Your Honor.

18          THE COURT:  Okay.  Cross?

19          Mr. Somerstein, good afternoon.

20          MR. SOMERSTEIN:  Yes, good afternoon, Your Honor.

21                    CROSS-EXAMINATION

22 BY MR. SOMERSTEIN:

23 Q.  Good afternoon, Mr. Savini.  I'm Mark Somerstein from

24 Ropes & Gray.  I represent the agent on what's being

25 characterized as the alternative DIP.

1    I'd like to ask you a few questions about your direct

2   testimony regarding your discussions with the lenders.  I

3   don't want to mischaracterize your testimony, sir, but you

4   did say that certain of the lenders you talked to elected not

5   to continue discussions with you out of a fear of becoming

6   restricted?  Isn't that correct, sir?  During that phone

7   call.

8   A.  I said that they indicated to me that they weren't

9   restricted and that they didn't want me, in the course of

10  that conversation, to share any MNPI with them.

11  Q.  Right.  But they did ask for a nondisclosure agreement

12  from the company so that they could engage with the company

13  on a fully restricted basis.  Isn't that true, sir?

14  A.  That is true.

15  Q.  Thank you.

16       THE COURT:  Mr. Qureshi?

17       MR. QURESHI:  Your Honor, I'm at the Court's

18  pleasure.  For the record, Abid Qureshi, of Akin Gump Strauss

19  Hauer & Feld for the committee.

20       I can start now.  I could also use the break

21  productively to deal with some confidentiality issues both,

22  with Oaktree and the debtors, in terms of some documents that

23  I intend to put in front of the witness.

24       THE COURT:  I think that makes sense.  Why don't we

25  do this, we'll break right now and we'll reconvene in an

1  hour.

2          MR. QURESHI:  Sure.

3          THE COURT:  Mr. Savini, obviously you've done this

4  before.  Go eat lunch alone.

5      (Laughter)

6          THE COURT:  You're not to discuss your testimony with

7  anybody during the break.

8          THE WITNESS:  It won't be that different from any

9  other days, Your Honor.

10          THE COURT:  Considering your alternatives, you might

11  savor it.

12      (Laughter)

13          THE COURT:  So a couple things.  I think dealing with

14  any confidentiality issues is fine.  Obviously, we'll deal

15  with cross and any redirect of Mr. Savini and then I believe

16  we have Mr. Bruenjes, right, Mr. Durrer?

17          MR. DURRER:  That's correct.

18          THE COURT:  Okay.  And then we obviously have a

19  couple other issues that we do need to deal with, with

20  critical vendors and Peter J. Solomon's retention.

21          There are also a couple of matters that I believe are

22  uncontested relating to deceleration, right?  The lift-stay

23  motion on the deceleration?

24          MR. DURRER:  I believe that is, and I won't speak for

25  Ms. Jones, but if we can take that up, that might be --

 1        THE COURT:  Why don't we do this, we'll take up

 2   anything that is uncontested that we can dispose of promptly

 3   right when we convene just so that we get that done.

 4        And then I'd ask that if you have a minute to confer

 5   during the break, as I said, I've got until about 4:30 this

 6   afternoon.  If it does not appear that we're going to

 7   conclude, then I would -- I'd like to know and I have time

 8   tomorrow.  A lot of people have come in and everything else,

 9   so my intention would be to try to close the loop on all of

10   this, but it seems to me it could happen, but it's ambitious

11   to expect that we're going to get everything done and wrapped

12   up.

13        MR. DURRER:  And just as a reminder, Your Honor, we

14   do have Mr. Genereux, as well.

15        THE COURT:  I'm aware of that, and that's why I'm

16   kind of wondering whether or not we're going to be able to

17   close all of these issues out, so I'd ask that you confer on

18   that.  If you think that we're going to need to go over until

19   tomorrow, the earlier we know that the better, and I have a

20   little bit that I would need to juggle, but will otherwise

21   accommodate.

22        Anything else we need to cover before we break?

23        MR. DURRER:  Do you want to take that other matter,

24   Your Honor?

25        THE COURT:  No, we'll start with that at the

1  beginning at 1:30 when we reconvene.

2          MR. DURRER:  Understood.  Thank you, Your Honor.

3          THE COURT:  All right.  We'll stand in recess.

4          Thank you very much.

5      (Luncheon recess taken at 12:21 p.m.)

6                      AFTERNOON SESSION

7      (Proceedings resumed at 1:43 p.m.)

8      (Call to order of the Court)

9          THE COURT:  Let's get Mr. Savini on the stand.

10        DURC SAVINI, WITNESS FOR THE DEBTORS, PREVIOUSLY

11                      SWORN/AFFIRMED.

12         THE COURT:  Mr. Durrer, where are we?

13         MR. DURRER:  We were going to take Matter 7, Your

14  Honor.

15         THE COURT:  Oh, yeah, sure.

16         MR. DURRER:  Thank you.

17         THE COURT:  Ms. Jones?

18         MS. DAVIS JONES:  Thank you, Your Honor.  For the

19  record, Laura Davis Jones, with Pachulski Stang Ziehl &

20  Jones, on behalf of the debtors.

21         Your Honor, counsel referenced Matter 7 and that is

22  the motion that we're seeking relief from stay to the

23  petition date to the extent necessary to permit the

24  Boardriders, Deutsche Bank, as the indenture trustee and the

25  common depository to decelerate the obligations under the

1  8.875 percent senior notes that -- with a maturity date of

2  December 15, 2017.

3         Your Honor, as we provided in the motion, the terms

4  of the indenture give rise to an automatic acceleration of

5  the notes with a filing, which we believe would place the

6  residual equity value of the foreign subsidiaries in

7  substantial jeopardy.  Accordingly, pre-petition, the debtor

8  did enter into the waivers that Your Honor has heard much

9  about, with holders over 50 percent of the aggregate

10 outstanding principal amount of the notes.

11        Although, Your Honor, we believe deceleration would

12 not cause any harm to the debtors or their stakeholders --

13        THE COURT:  Yeah, this doesn't raise any of the

14 issues that were before Judge Sontchi in EFH; that was all

15 about a make-whole and whether or not they wanted to

16 decelerate and that would basically reinstate it or made a

17 better argument for requiring payment to make-whole.  This

18 doesn't have anything to do with any of that.

19        MS. DAVIS JONES:  I agree with Your Honor and,

20 indeed, during the morning break, I'll admit that I was

21 multi-tasking and taking a look at that opinion again.

22        And Your Honor, while I appreciate the concerns that

23 people may have raised and asked us to bring on the motion,

24 because there could be some suggestion somewhere that you

25 need to have leave from the stay for it, we thought we should

1  bring a motion.

2          THE COURT:  Oh yeah.  Well, I think -- and I don't

3  have any issue -- I think the motion is couched as being in

4  an abundance of caution and whether or not this is subject to

5  the stay or not.  But there's been an enormous amount of ink

6  spilled on this issue, as it relates to Momentive and EFH and

7  what happens with make-wholes and all of that. This is a --

8  functionally, a different issue and a different animal.

9          MS. DAVIS JONES:  Yes, sir.

10          THE COURT:  Right?

11          MS. DAVIS JONES:  We agree.

12          THE COURT:  Okay.

13          MS. DAVIS JONES:  So, Your Honor, with that, we had

14  brought this on in a motion to shorten time which Your Honor

15  had granted.

16          THE COURT:  I did grant that.

17          MS. DAVIS JONES:  It did provide for objections to be

18  filed and served at 10 a.m. this morning.  I did check the

19  docket and nothing has been filed.  I don't know if Mr.

20  Stamer is going to try to trick me into something here, but

21  ...

22      (Laughter)

23          MS. DAVIS JONES:  Oh, did I say that?  Whoops.

24      (Laughter)

25          MS. DAVIS JONES:  Your Honor, so -- but otherwise,

1  I'm not aware of any objection to the motion.

2          THE COURT:  Mr. Stamer, does the committee have any

3  position?

4          MR. STAMER:  Just very briefly, Your Honor.  The

5  committee is not objecting to this motion.

6          THE COURT:  Okay.

7          MR. STAMER:  The committee questions whether it's

8  necessary, because we believe that the Boardriders, as you've

9  heard and you will hear, are economic animals, and it would

10  be against their economic self-interests to do bad things in

11  Europe, but that's not the focus of this motion.

12          THE COURT:  Uh-huh.

13          MR. STAMER:  We understand, and our lack of objection

14  is based upon the fact that this deceleration is not tied to

15  the Boardriders waiver itself, and it's not obligating the

16  company to go forward with the Oaktree transaction.

17          THE COURT:  Right.

18          MR. STAMER:  With that clarification, I believe

19  there's no ambiguity.  We have no objection.

20          THE COURT:  Very good.

21          Does anyone else wish to be heard with respect to the

22  motion?

23      (No verbal response)

24          THE COURT:  Okay.  I'm prepared to grant the motion.

25          Again, my main question was sort of in the nature of

1   just making sure that the issues, as I understood them,

2   presented by the debtor, were not along the lines of those

3   confronted by the Court downstairs in EFH or in the Momentive

4   case, et cetera, and that is a different and a very hot topic

5   right now.

6        This seems, to me, to be more in the nature of a

7   belt--and-suspenders approach to the concern and I'm

8   satisfied that the debtors carried their burden with respect

9   to the relief requested.  I will grant the motion.

10       MS. DAVIS JONES:  Your Honor, may I approach with the

11  form of order?

12       THE COURT:  Sure.  Thank you.

13       Also, there were a number of motions that were filed

14  relating to exceeding page limits, sealing documents, filing

15  redacted versions, et cetera.  I think I've signed all of

16  them;  if not, just get in touch with chambers and I'll track

17  them down.  But I have no issue with those, so I want to

18  focus our attention on the matters that are in controversy

19  today.  All right?

20       MR. DURRER:  Thank you, Your Honor.

21       So, with that, Van Durrer, for the debtors, seeking

22  to recall Mr. Savini.

23       THE COURT:  Very good.  Welcome back, Mr. Savini.  I

24  will remind you that you remain under oath.  You may have a

25  seat.

1          THE WITNESS:  Thank you.

2          MR. QURESHI:  Good afternoon, Your Honor.

3          For the record, Abid Qureshi, Akin Gump Strauss Hauer

4   & Feld, proposed counsel to the official committee.

5          Your Honor, before I begin, we did get a chance to

6   confer during the break regarding confidentiality, which was

7   helpful.  I think we resolved everything in terms of the live

8   testimony.  The only thing I think -- and this applies with

9   respect to a number of exhibits that we're clear on -- is

10   that the exhibits themselves will not be on the docket.

11          THE COURT:  The exhibits will not be docketed.  To

12   the extent that they're sensitive or confidential

13   information, I presume you all will be able to navigate if

14   you need to direct the witness to that and I'm willing to

15   allow you as much flexibility to come up here and point to --

16          MR. QURESHI:  Perfect.

17          THE COURT:  -- point to where you're looking for the

18   witness and for the Court and I think we can move forward.

19          MR. QURESHI:  I don't think we'll even need to do

20   that much today, but I appreciate it.

21          THE COURT:  Okay.  I'm prepared to be flexible.  I

22   appreciate the cooperation between the parties.

23          MR. QURESHI:  Thank you.

24          May I begin, Your Honor?

25                        CROSS-EXAMINATION

1  BY MR. QURESHI:

2  Q.  Mr. Savini, good afternoon.

3  A.  Good afternoon.

4  Q.  Sir, I'm going to begin where Mr. Somerstein left off.

5     You had testified right before the break about a

6  conversation you had with one of the alternative DIP lenders.

7  Do you recall that?

8  A.  I do.

9  Q.  And the question that I believe Mr. Somerstein asked you

10  is whether you were asked on that call to provide those

11  proposed lenders with an NDA --

12  A.  Yes, I was.

13  Q.  -- and you said that you were.

14     The next question I want to ask, sir, is:  Isn't it the

15  case that although you were asked, you did not, in fact,

16  provide them with an NDA?

17  A.  That was yesterday afternoon.  The answer is yes.  I

18  haven't provided it yet.  I spoke briefly with counsel about

19  drafting an NDA that would provide for a brief period of time

20  during which they could become restricted, and I haven't

21  received an NDA back yet.

22  Q.  And you've also received at least one, if not more,

23  emails from this proposed alternative DIP lender asking for

24  an NDA.  Isn't that right?

25  A.  Indeed.

1  Q.   Okay.  So it's fair to conclude from all of that, sir,

2  that the alternative DIP lenders are obviously interested in

3  seeing the terms of an NDA so they can get restricted?

4  A.   Yes.

5  Q.   Okay.  Let's move on.

6      So you first became involved in the Quiksilver engagement

7  in about June of 2015, right?

8  A.   Peter J. Solomon became involved in about June.

9  Q.   You were not actively involved at that point, but your

10 activity level ramped up in about August?

11 A.   That's correct.

12 Q.   And in particular -- and correct me if I've got the dates

13 wrong -- but it was around about August the 14th that the

14 company was informed by Oaktree that Oaktree was not prepared

15 to do an out-of-court financing.  Is that right?

16 A.   That's correct.

17 Q.   So that's when you pivoted toward an in-court process and

18 your activity level ramped up?

19 A.   That's correct.

20 Q.   Okay.  Now, I want to talk first a little bit about

21 business plans and projections.  And first, sir, given your

22 role in assisting the company in looking at its financing

23 alternatives, it's fair to say, is it not, that it was

24 important to you to have an understanding of what the

25 company's business plans were and what the company's

1  forecasts were?

2  A.  That's correct.

3  Q.  And so what you did is you undertook to familiarize

4  yourself with those plans and forecasts, right?

5  A.  Yes.

6  Q.  Now, if I could ask you to please look in one of the

7  binders at Tab 48.

8          THE COURT:  48?

9          MR. QURESHI:  48, Your Honor.

10          THE COURT:  Very good.  I'm there.

11  BY MR. QURESHI:

12  Q.  Mr. Savini, let me know once you have Exhibit 48 in front

13  of you.

14  A.  I have it right here.

15  Q.  Okay.  And you'll see, sir, from the cover page, this is

16  a presentation to the board of directors; it's dated June the

17  15th in the top right corner and it's got the Peter J.

18  Solomon logo on the bottom.  Do you see that?

19  A.  I do.

20  Q.  And do you recognize this to be a presentation to the

21  board of directors that was prepared by your firm, correct?

22  A.  I do.

23  Q.  Okay.  And I understand that you didn't attend the board

24  meeting, but you have come to familiarize yourself with this

25  document.  Isn't that right?

1  A.  Yes, to some degree.

2  Q.  So turn, if you could, to Page 12, and Mr. Savini, feel

3  free to look at whatever pages you need to, to get context,

4  but what you will see on Page 12 is a heading which is,

5  "Summary, Historical," and "Projected Financials,

6  Consolidated."  Do you see that?

7  A.  Yes.

8  Q.  Now do you understand that at around this time -- so,

9  again, this being June of 2015 -- the company had retained

10  AlixPartners to assist it in formulating a set of

11  projections, a three-year plan.  Isn't that right?

12  A.  I don't recall whether it was a three-year plan.  I do

13  recall that the primary focus was to assist with liquidity

14  analyses in the short term.  But they did work on a -- as I

15  look at this here -- a three-year business plan together with

16  the company, yes.

17  Q.  Right.

18     And if you look at this chart, first you'll see it goes

19  out to 2018, so three years out.  And if you'd look on the

20  bottom left in small font, it says, "Source:  Management plan

21  from AlixPartners materials."  Do you see that?

22  A.  Yes.

23  Q.  And so you understood, sir, that this set of projections

24  that's in this board presentation was put together by the

25  management team with assistance from AlixPartners, right?

1  A.  I generally understood that, yes.

2  Q.  All right.  And it was also your understanding, sir, was

3  it not, that the business plan that's reflected in this board

4  presentation is one that was put together on what I think you

5  refer to in your deposition as a "bottoms-up basis," right?

6  A.  Yes.

7  Q.  Okay.  And you also understand that subsequent to this

8  point in time, which is again, June of 2015, there were

9  revisions made to the business plan?

10 A.  Yes.

11 Q.  You were aware of that?  You reviewed those?

12 A.  Yes.

13 Q.  And I believe you characterized those subsequent

14 revisions to this set of projections as a top-down process.

15 Isn't that right?

16 A.  One of the revisions.  I don't believe I saw all of the

17 revisions, but one of the revisions.

18 Q.  Okay.  Fair enough.

19     So let's just keep that page handy, and I'm going to ask

20 you to turn now to another exhibit, which is Exhibit 3, if

21 you could, please.

22          THE COURT:  I'm there.

23          MR. QURESHI:  Thank you, Your Honor.

24 BY MR. QURESHI:

25 Q.  Mr. Savini, are you there?

1  A.  One moment.

2      (Witness reviews exhibits)

3      Yes.

4  Q.  Okay.  And you will see that this, again, looks familiar

5  in format.  The date on the top right is September 7 of this

6  year.  The Peter J. Solomon logo is in the bottom left and

7  it, too, is entitled, "Presentation to the Board of

8  Directors."  Do you see that?

9  A.  Yes.

10 Q.  Okay.  And again, look at what you need to for context,

11 but I'd like to take you to Page 18 of Exhibit 3.

12 A.  I'm there.

13 Q.  Okay.  And you'll see the heading on that page, "Summary

14 of Preliminary Business Plan."  Do you see where I am?

15 A.  I do.

16 Q.  Okay.  Now, what I'd like you to do, if you could, is

17 just look at Page 18 of Exhibit 3, and have beside it Page 12

18 of Exhibit 48.  So it's two sets of projections; one from

19 June, which you testified was the bottoms-up projection, and

20 then the revision that we have in September.

21     Do you got those two pages in front of you?

22 A.  I do.

23 Q.  Okay.  And you will see -- I'm going to focus on the

24 right three columns in Exhibit 48, so that's the years 2016,

25 '17, and '18, and I'm going to do the same in Exhibit 3.

1    And so let's start with 2016.  Now, the Exhibit 48 has

2   both, a base case and an offensive case.  Do you see that?

3   A.   I do.

4   Q.   Okay.  And let's just get an understanding of that.  You

5   understand that in the context of this June plan, base case

6   assumed no additional liquidity; whereas, the offensive plan

7   assumed that the company would have access to additional

8   liquidity?

9   A.   Generally speaking, yes.

10  Q.   Okay.  So in 2016, if we look at the base case -- and I'm

11  sorry, let me just -- bear with me for just one second.  Just

12  bear with me for one second, Mr. Savini.

13         THE COURT:  Take your time, Mr. Qureshi.

14         MR. QURESHI:  Thank you.

15      (Pause in proceedings)

16         MR. QURESHI:  I apologize, Your Honor.  Just give me

17  a minute.  I may have the wrong document here.

18         THE COURT:  Mr. Qureshi, do you want to take a break

19  for a minute?

20         MR. QURESHI:  No, I think I've got it.  Let's see.

21  Yes.

22         Your Honor, maybe I will take you up on that.  I

23  apologize.  I seem to have lost the page that I need.

24         THE COURT:  There's a lot of paper around.

25         MR. QURESHI:  There is a lot of paper.  If I could

1   have a minute?

2          THE COURT:  Just let the court reporter know when

3   you're ready.

4          MR. QURESHI:  I will.  It will be quick, Your Honor.

5   My apologies.

6          THE COURT:  Stand in recess.

7      (Recess taken at 1:59 p.m.)

8      (Proceedings resume at 2:13 p.m.)

9      (Call to order of the Court)

10         THE COURT:  Please be seated.

11     (Witness resumes stand)

12         THE COURT:  Mr. Savini, I remind you, you remain

13  under oath, sir.

14         MR. QURESHI:  Thank you, Your Honor.  My apologies

15  for --

16         THE COURT:  That's fine.

17         MR. QURESHI:  -- not finding the right page in the

18  document.

19  BY MR. QURESHI:

20  Q.  But Mr. Savini, now I have it.  So, if you could please

21  turn to Page 18 and -- I'm sorry.  It is Page 18 in Exhibit

22  3, and Page 13 in Exhibit 48; those are the two charts that I

23  want you to have side by side.  Have you got those two pages?

24  A.  Yes.

25  Q.  Okay.  So you will see -- again, I want to compare the

1  projections for '16, '17, and '18 in these two documents.

2  And so, if you look at the earlier of the two, the June

3  document, which is Exhibit 48, and you look at -- again,

4  there's both a base case and an offensive case.  And now I'm

5  going to focus, for the moment, on the base case.

6      For 2016, as of June, what the debtors were estimating was

7  $72 million in EBIDTA.  Do you see that?

8  A.  Did you say Page 14.

9  Q.  2016.

10 A.  I'm sorry.  The page, was it 13 or 14?

11 Q.  It's 13.

12 A.  13.

13        THE COURT:  You can go up and point it out.

14        MR. QURESHI:  Sure.

15        THE COURT:  Make sure you're on the same page.

16        MR. QURESHI:  Okay.  Thank you, Your Honor.

17        THE WITNESS:  All right.  Thank you.

18 BY MR. QURESHI:

19 Q.  Okay.  And so, Mr. Savini, do you now see the 2016 EBITDA

20 estimate?

21 A.  I do.

22 Q.  And do you see that, as of June, that estimate is $72

23 million.  Are you with me?

24 A.  I'm with you.

25 Q.  Okay.  And then, if you go over one column to 2017, that

1  same number for the base case goes up to one oh four.

2  A.   Correct.

3  Q.   Right?

4      And in 2018, it goes up to one hundred and thirty-five.

5  A.   Correct.

6  Q.   Okay.  Now I want you to compare those same three years

7  to Exhibit Number 3.  In Exhibit Number 3, we're on Page 18.

8  And here, it's the very bottom of the document, "Group

9  EBITDA."  Do you see that line?

10 A.   Yes.

11 Q.   2016, estimated EBITDA, that falls down to $45.6 million;

12 so, for 2016, we go from a June 15th estimate of $72 million,

13 down to a September 7th estimate of 45.6.  Are you with me?

14 A.   Yes.

15 Q.   Okay.  And then, just to finish the comparison, for 2017,

16 the difference is 104 million projected in June, down to

17 sixty-eight projected in September; and for 2018, it is a

18 hundred and thirty-five in the June projections, down to one

19 thirteen in the September projections.  Do you follow those

20 numbers?

21 A.   I do.

22 Q.   Okay.  And it's the case, is it not, sir, that you're not

23 able to bridge these projections from one to the other; in

24 other words, you're not able to explain why it is that those

25 projections fell in the amount that they did from the June

1  plan to the September plan.

2  A.   Not precisely, no.

3  Q.   Okay.  All right.  You can put that document aside for

4  now, sir, and I want to switch, for a few minutes, to talk

5  about valuation.

6      And I think this can be pretty brief because, as I

7  understand it, Mr. Savini, at no time, in connection with

8  your firm's engagement since June, has your firm performed a

9  valuation of the company or of any of the company's assets.

10 Isn't that right?

11 A.   That's correct.

12 Q.   Okay.  And I take it that remains true, as you sit here

13 today.

14 A.   It does, indeed.

15 Q.   And nor, sir, are you aware of any of the other advisors

16 for the debtors having performed any kind of a going concern

17 valuation at any time.

18 A.   No.

19 Q.   And the reason that Peter J. Solomon has not performed

20 any valuation work up until this point in the case is

21 twofold:  First, you didn't view it to be relevant; and

22 second, you couldn't do it because you didn't have a

23 finalized business plan.  Isn't that right?

24 A.   More or less, yes.

25

1   Q.   Okay.  And it's also true sir, is it not, that, in

2   connection with your efforts to secure DIP financing for the

3   company, Peter J. Solomon never undertook any work to attempt

4   to value any of the unencumbered assets of the company.

5   A.   That's correct.

6   Q.   And the reason you didn't set out to value any of the

7   unencumbered assets of the company is that, when you were

8   negotiating the DIP with Oaktree, you only had one proposal,

9   right; and that proposal consistently required a lien on all

10  of the company's unencumbered assets.

11  A.   Throughout the negotiation.

12  Q.   Now Peter J. Solomon is currently, since the petition

13  date, performing something that I think you referred to as a

14  "market test," right?

15  A.   Correct.

16  Q.   Can you just describe for the Court what that market test

17  is?

18  A.   The market test is the effort to go out to a very broad

19  group of potentially interested parties, to see if they would

20  be willing to enter into a transaction for the company that

21  would provide a greater recovery for creditor constituents.

22  Q.   And in connection with that market test, you also do not

23  intend to perform any valuation work, right?

24  A.   That's correct.

25  Q.   Okay.  Now you recall, sir, that, this morning, in

1  response to a question from Mr. Durrer, you were asked if --

2  I -- and forgive me if I get the question a little bit

3  differently than how he characterized it.  But in substance,

4  you were asked if the competing DIP lenders could prevail in

5  a priming fight.  Do you recall that question?

6  A.  I don't know if that question was asked, but I think I

7  offered that I couldn't sustain the argument.

8  Q.  Fair enough.  You answered a question that he didn't ask,

9  but I'll follow up, in any event.

10     And the opinion that you offered with respect to priming,

11  that's obviously not one that's based on any valuation

12  analysis because, as you just testified, you haven't done

13  any.

14  A.  As I indicated in my deposition, though I didn't do my

15  own valuation, I did avail myself of analyses done by

16  professionals hired by the company in connection with their

17  ASC 350 impairment analysis, which is a market value

18  analysis.

19  Q.  Right.  But at no time did you or, to your knowledge, any

20  other advisors of the company conduct any kind of a going

21  concern valuation of the debtors or any of the debtors'

22  assets.

23  A.  No.  But I know that, in looking at those analysis, that

24  they were based on cash flow projections that were measurably

25  higher than the ones that I was seeing come together in

1  concert with putting together a new business plan with

2  management.  And those numbers did not support there being an

3  equity cushion for the prepetition secured creditors.

4  Q.  And will there come a point in time, sir, in this case,

5  where you do intend to do a valuation analysis?

6  A.  Yes, indeed.

7  Q.  And when would that be?

8  A.  As soon as the business plan is finalized, and it will

9  probably be within the next week or so.

10 Q.  Okay.  And how long do you expect to take to complete

11 that work?

12 A.  I would say two or three weeks.

13 Q.  Okay.  And going back to the conclusions that you offered

14 this morning with respect to priming.  Fair to say that you

15 did not consider, in connection with that opinion, how

16 unencumbered collateral might be used to adequately protect

17 the secured creditors?

18 A.  I'm sorry.  Can you restate the question.

19 Q.  Sure.  When you offered an opinion this morning on your

20 direct testimony, with respect to a priming fight, is it fair

21 to say that, in connection with that opinion, you did not

22 consider how unencumbered collateral might be used to

23 adequately protect the secured lenders?

24 A.  In fact, I did.  My understanding is that, pursuant to

25 the interim order, the Court authorized replacement liens as

1  adequate protection for the prepetition secured creditors.

2  Those protection liens were against all of the company's

3  assets; and, therefore, the 35 percent would be swept in and

4  available for adequate protection, to the extent of

5  diminution in the value of the prepetition secured claim.

6  So, yes, I did understand that.

7  Q.  Now, sir, you had specific involvement in negotiating the

8  terms of the DIP with Oaktree, right?

9  A.  I did.

10 Q.  You negotiated directly with them and with their

11 advisors?

12 A.  It was a -- it was a group effort.  There were times when

13 the lawyers were negotiating certain points, or we were

14 collecting points, and they were conveyed by the lawyers back

15 to the other side.

16 Q.  And one of the things that you did not analyze in

17 considering the various proposals that went back and forth

18 with Oaktree is the overall yield to Oaktree of this DIP,

19 right?

20 A.  I generally only do a yield analysis when I have a

21 competitive proposal, so that I can look at the all-in cost.

22 It's difficult to look at the individual elements of a DIP

23 and say that it -- taken all together, it represents a lower

24 cost of funds to the company, without doing an all-in

25 analysis.  And so, in that -- in that case, I did not look at

1  the all-in yield, per se, though I looked real closely at

2  each of the component elements of costs:  The up-front fee,

3  which is referred to as the "OID" in this case, as well as

4  the weighted average cost of financing on a spread basis.

5  And both of those seemed well within market terms for --

6  based on my experience.

7  Q.  Anything else you want to add?

8  A.  No.

9  Q.  Okay.  My question was a simple one.  I just want to

10 establish, sir, that you didn't calculate the yield, and the

11 reason you didn't calculate the yield to Oaktree on this DIP

12 is you had nothing to compare it to, right?  It wasn't

13 relevant.

14 A.  Yes.

15 Q.  Okay.  Now I want to talk a little bit about leverage in

16 the context of these negotiations with Oaktree, and in

17 particular, a source of leverage that I believe you may have

18 had with Oaktree.

19    You understand that Oaktree has a position in both the

20 debt and the equity of Billabong, right?

21 A.  I understand that they are an equity holder; I don't know

22 if they own debt.

23 Q.  Okay.  And you know that Billabong is a competitor of

24 Quiksilver.

25 A.  Yes.

1  Q.  Fair to characterize it, as far as you know, as a "direct

2  competitor"?

3  A.  Yes.

4  Q.  Okay.  And you were aware of that, obviously, when you

5  sat down to negotiate with Oaktree.

6  A.  I was.

7  Q.  And in fact, it's something that Peter J. Solomon has

8  specifically analyzed, right?

9  A.  I didn't analyze -- when you say "it," what are you

10  referring to?

11  Q.  Okay.  Well, when you were negotiating with Oaktree in

12  connection with this DIP, you inferred that, if Oaktree

13  succeeded in getting control of Quiksilver, one of the things

14  they might try to do is combine it with Billabong, right?

15  A.  Yes, at some point in time.

16  Q.  Okay.  And so Oaktree's ownership interest in Billabong,

17  that was relevant to you in the context of these

18  negotiations, insofar as it gave you the sense that Oaktree

19  would not, in your words, "go away," right?

20  A.  Yes.

21  Q.  Okay.  And so I want to look now at that analysis that

22  was done.  If you take out Exhibit 48 again.  And this is the

23  June deck.

24  A.  I'm there.

25          MR. QURESHI:  And hopefully, I can get there, too,

1   Your Honor.  That remains to be seen.

2   BY MR. QURESHI:

3   Q.  And you will see, if you go to the back of the deck on

4   Page 33 -- I'm sorry.  Keep going to Page 45.  And on Page

5   45, there's a heading, it says, "Billabong and Quiksilver,

6   Side by Side."  Do you see that?

7              THE COURT:  Which page?

8              MR. QURESHI:  45, Your Honor --

9              THE COURT:  Okay.

10             MR. QURESHI:  -- of Exhibit 48.

11             THE COURT:  Got it.

12  BY MR. QURESHI:

13  Q.  Do you have that page before you, sir?

14  A.  I do.

15  Q.  Okay.  And again, in the June time frame, I understand

16  that you were not heavily involved at that time, but you

17  obviously understand, from this document, prepared by Peter

18  J. Solomon, that this was information being presented to the

19  Quiksilver Board.

20  A.  Correct.

21  Q.  Okay.

22  A.  By my colleagues.

23  Q.  And if you go to the next page, 46, it has an

24  illustrative combination analysis.  Do you see that?

25  A.  I do.

1  Q.  And let's just take a quick look at one number here.  So

2  it -- what the bullet points say underneath that heading is,

3  combined, Billabong and Quiksilver would have 1.1 billion in

4  2015 estimated SG&A.  And if you look then at the chart,

5  there's a line item for illustrative synergies, and you'll

6  see numbers there for a modeling of 5 percent, 10 percent,

7  and 15 percent SG&A savings.  Do you follow me?

8  A.  I do.

9  Q.  And what this work by Peter J. Solomon shows that, at

10  five percent, if we take the low end of that range, there is

11  a savings to each of Quiksilver and Billabong -- so it's

12  simply divided in half here -- $27.7 million.

13     Now SG&A savings, that goes straight to the bottom line,

14  right?  Dollar-for-dollar impact on EBITDA.

15  A.  I believe so, yes.

16  Q.  Okay.  And this was, of course, all information that you

17  were aware of at the time that you were negotiating with

18  Oaktree.

19  A.  No.  I have never seen this analysis before.

20  Q.  Okay.  Now the view that you had at the time that you

21  were negotiating with Oaktree, that they were not going to,

22  quote, "go away," that view has not changed since the company

23  received the alternative DIP proposal.  Isn't that right?

24  A.  That's not right.

25  Q.  Okay.

1          MR. QURESHI:  Your Honor, may I approach with the

2    deposition transcript?

3          THE COURT:  Sure.

4       (Pause in proceedings)

5          THE COURT:  Mr. Qureshi, would you state again what

6    the question pending is?

7          MR. QURESHI:  Sure.  The question pending is:  Your

8    view that Oaktree is not going away has not changed since the

9    company received the alternative DIP proposal.

10          THE COURT:  So that's your view that Oaktree is not

11   going away hasn't changed since Thursday.

12          MR. QURESHI:  Since -- yes, I guess that's right,

13   since ... well, when did I take your deposition?

14       (Participants confer)

15          MR. QURESHI:  Around then, yes.  The initial

16   alternative DIP proposal had been made at the time of Mr.

17   Savini's deposition.

18   BY MR. QURESHI:

19   Q.  And if you could turn, sir, in your deposition, to Page

20   50.  And again --

21   A.  Five zero?

22   Q.  Five zero.

23   A.  Okay.

24   Q.  And actually, you know what?  Just to get some context,

25   let's go back a little further.

1      If you go back to Page 49, Line 17, I asked you the

2   question:

3          "Are you aware that, since the commencement of the

4   Chapter 11 case, the company has received a competing DIP

5   proposal?"

6      And this deposition is, indeed, Thursday, October 8th.

7   Okay?  So that gives you the context; that's on Page 49.  And

8   then there's a bunch of questions and answers about that.

9      And if you now go to Page 50, Line 20.  Do you have that

10   before you, sir?

11   A.   I do.

12   Q.   I asked you the following question at Line 20:

13          "Do you still believe that, because of Oaktree's

14   interest in potentially combining Quiksilver with Billabong -

15   - what you've testified is something you inferred; I am not

16   suggesting that they said that.  But it is still your view,

17   based on that inference, that Oaktree, to use your words,

18   'won't go away'?"

19      And the answer you gave, sir, under oath, is:

20          "My opinion on that has not changed because I have

21   only read a very small portion of that proposal.  It doesn't

22   inform any changes in my perspective."

23      Was that true testimony at the time you gave it, sir?

24   A.   Yes, indeed.

25   Q.   Now you understand that --

1            MR. DURRER:  I apologize, Your Honor.  I'm lost.  I

2    thought the question was, has your view changed since

3    Thursday, and the witness' answer was -- I don't know that

4    the witness actually answered the question, so ...

5            THE COURT:  Yeah.  You know something?  I think this

6    is an important part, and I'm missing it.

7            MR. QURESHI:  Sure, sure.

8            THE COURT:  So I'm not trying to --

9            MR. QURESHI:  No, no, no.  That's fine, Your Honor.

10   BY MR. QURESHI:

11   Q.  So if what -- let's back up a little further in the

12   transcript.

13           THE COURT:  Yeah, can we -- I do, I want to take it a

14   step further.

15           MR. QURESHI:  Sure.

16           THE COURT:  Because this is a point that shows up in

17   your briefing --

18           MR. QURESHI:  Yes.

19           THE COURT:  -- and is a -- I think, a significant

20   theme of your objection.

21           MR. QURESHI:  Indeed.

22           THE COURT:  And it's not necessarily just about the

23   competing DIP.  I think it's the committee's position that

24   Oaktree is not going anywhere.

25           MR. QURESHI:  It --

1          THE COURT:  Oaktree is invested up to the eyeballs in

2    this transaction, Oaktree is -- Oaktree wants to move forward

3    with this transaction, and Oaktree will move forward with

4    this transaction.

5          The Billabong analogy, I don't think I had seen in

6    the submissions, and I certainly was happy to hear the

7    witness testify about it, and I think he testified he hadn't

8    seen it.  So I think that's part of your theme.

9          MR. QURESHI:  It absolutely is, Your Honor.  And

10   indeed, later on in the examination, we'll go to some

11   additional reasons why we think Oaktree won't go away.  But

12   if I could, I just want to make sure that this portion is

13   clear.

14         THE COURT:  Yeah.

15         MR. QURESHI:  So what -- in context, what the witness

16   had previously testified to, I think quite clearly, is that

17   he was of the view, at the time he was negotiating with

18   Oaktree, that Oaktree wasn't, to use his words, "going away,"

19   and that one of those reasons was he was aware of the

20   Billabong/Quiksilver synergy, exactly right.

21         And Your Honor can see that in the deposition, at

22   Page 49.  If Your Honor goes back to Line 9:

23         "Was it at all relevant" -- "was it at all a relevant

24   consideration in your negotiations with Oaktree that Oaktree

25   has a position in a competitor in Billabong?"

1          And the answer was:

2          "It was, insofar as it gave me the sense that they

3   weren't going to be going away, and that we had more leverage

4   negotiating with them."

5          Okay.  That's the first part.  Then my next question

6   is:

7          "You received an alternative DIP proposal.  Have you

8   looked at it?"

9          And the witness answered --

10          THE COURT:  He said:

11          "Very, very briefly."

12          MR. QURESHI:  Right.  He said.

13          "Very, very briefly, just glanced at it.  I saw 115

14   million.  I haven't had a chance to do much more.

15          "Is it the company's intention to engage in

16   negotiations?"

17          And he says, first, he's going to read it closely and

18   then do that.

19          Now, after those questions, I then ask the question,

20   and I'll read it again:

21          "Do you still believe that, because of Oaktree's

22   interest in potentially combining Quiksilver with Billabong -

23   - what you've testified is something you inferred; I'm not

24   suggesting that they said that.  But it is still your view,

25   based on that inference, that Oaktree, to use your words,

1  'won't go away'?  So, now that you have the alternative

2  proposal, is that still your view?

3         "Answer:  My opinion on that has not changed because

4  I've only read a very small portion of that proposal.  It

5  doesn't inform any changes in my perspective."

6         THE COURT:  Okay.  I don't want to be dense about

7  this, but I want to make sure the next --

8         MR. QURESHI:  Sure.

9         THE COURT:  -- of the next step.  I understand the

10 committee's proposition that they are confident that Oaktree

11 is not going to go away; and even were the Court to embrace

12 and impose the competing DIP, the superior DIP, as described

13 in your papers, that Oaktree will still be there, for a bunch

14 of reasons.

15        MR. QURESHI:  Yes.

16        THE COURT:  They're already invested and the

17 Billabong issue, et cetera, momentum.  Okay.  I understand

18 all of that.

19        I'm not sure where you're going with this witness

20 because this question is not kind of the next question.  And

21 you're much better at this than I am, so I'm very reluctant

22 to ask the next question.

23    (Laughter)

24        THE COURT:  Because, usually, the main thing they

25 teach you at those seminars is sit down before you ask the

1  last question.

2      (Laughter)

3          THE COURT:  But this -- the implication from the

4  testimony -- and I think I'd like to understand his response

5  because I expect that Mr. Durrer is going to deal with it --

6  is:  Are you suggesting -- is this testimony to support the

7  proposition that Oaktree will not walk, even if the Court,

8  either denies the assumption of the PSA, and/or approves the

9  competing DIP?  That seems, to me, the next question.  That's

10  not precisely what's asked, and I think -- I'm just kind of

11  fuzzy on it.

12          MR. QURESHI:  That is, indeed, the committee's

13  position, Your Honor; that, whether this Court were to

14  embrace the alternative DIP proposal, or rule that certain

15  elements of the Oaktree DIP proposal are not acceptable to

16  the Court, we, indeed, are quite confident that Oaktree would

17  not go anywhere, for a number of reasons:  One of which is

18  the Billabong synergies, to which we heard testimony, and the

19  other is the size of their position, $203 million in the

20  secured debt, another 13 million in the euro notes.  So that,

21  indeed, is our position.  And I was questioning the witness

22  with respect to a piece of that that was in existence at the

23  time that he was in the negotiations.  And indeed, the point

24  is Oaktree is not going away.

25          And all the more so now, Your Honor, when there is an

1  alternative DIP on the table, there is no risk to the estate

2  because, if, for any reason, Oaktree were to decide not to

3  fund, there obviously are DIP lenders ready, willing, and

4  able to step in.

5          THE COURT:  Okay.  All right.  I understand, and I

6  appreciate your clarification.  I'm -- you know, you've been

7  here a lot.

8          MR. QURESHI:  Yes.

9          THE COURT:  I'm reluctant to get into the middle of

10  this sometimes.  I had somebody at the podium one time, I

11  asked him a question during cross, and he said, are you

12  asking me to reveal my strategy.  I said, well, I'm not

13  getting it.

14     (Laughter)

15          THE COURT:  If I'm not getting it, you're doing a lot

16  of chopping without a lot of chips flying.

17          So, no, I follow the argument, and I hope it hasn't

18  been disruptive to your examination.  I know where you are

19  right now, and it is pretty much where I expected.

20          MR. QURESHI:  Okay.  I --

21          THE COURT:  You can move forward.

22          MR. QURESHI:  I appreciate that, Your Honor, and I

23  will; indeed, I'll move on to a different area.

24  BY MR. QURESHI:

25  Q.  And I now, Mr. Savini, want to move on to talk about sale

1  transactions.  And in connection with the negotiations that

2  you had with Oaktree -- and again, just to place this in

3  time, your involvement with Oaktree steps up in the middle of

4  August, once they've said, we're not doing this out of court,

5  right?

6  A.  Yes.

7  Q.  Okay.  And you started talking to them about an in-court

8  financing transaction, which, ultimately, turned into this

9  DIP, right?

10  A.  Correct.

11  Q.  All right.  And in connection with those negotiations,

12  you never asked them if they would be willing to serve as a

13  stalking horse bidder, as an alternative to doing a plan

14  support agreement, right?

15  A.  That's correct.

16  Q.  And the principal reason that you did not broach this

17  topic with Oaktree is that it was the company's belief that

18  the euro notes had the ability, in a 363 context, to

19  effectively trigger an insolvency of the european entities;

20  that's why you didn't ask Oaktree the question, will you

21  serve as a stalking horse, right?

22  A.  Correct.

23  Q.  And indeed, your view at the time was that the euro note

24  holders would be more inclined to actually precipitate a

25  liquidation of the European assets than to agree to a

1  standstill, and consent to a Chapter 11 sale process.

2  A.   That's correct.

3  Q.   Okay.  And the only analysis on which that view of yours

4  was based was that a sale process without a stalking horse

5  bidder is more uncertain than a plan process, right?

6  A.   That's not correct.

7  Q.   Okay.

8       (Pause in proceedings)

9  Q.   Mr. Savini, turn in your deposition, please, to Page 65.

10  And you'll -- again, feel free to look around where the

11  question is, so you get the context.  But I'm going to start

12  reading at the very bottom of Page 65, at Line 25.  And the

13  question that I asked you is:

14       "Question:  And what analysis did you do, in order to

15  formulate that opinion, if any?"

16     And "that opinion," if you go back to Page 65, sir, is a

17  reference to your prior opinion that they would be more

18  inclined to precipitate a liquidation than consent to a

19  Chapter 11 process.  Are you with me?

20  A.   Yes.

21  Q.   Okay.  And the answer that you gave, beginning on Page

22  66, at Line 3:

23       "That opinion derives from my view that an uncertain

24  outcome, which I would -- a sale process is generally more

25  uncertain than a plan process, when you have a plan

1  proponent.  A sale process in the absence of a stalking horse

2  bid is something that bondholders would be less inclined to

3  stand still for than a plan process with a well-capitalized

4  plan sponsor, so it was really a comparison of the two."

5      Now that was at your --

6  A.  That's not correct.  That's not correct.

7  Q.  I'm sorry.  Your deposition testimony is not correct?

8  A.  Well, and perhaps I misunderstood the question.  By

9  definition, I had a party who was willing to be a plan

10 sponsor, either through a 363 or a plan sponsor.  And so I

11 would like to go back and, I guess, read the antecedent

12 questions before this, but ...

13         MR. DURRER:  Your Honor, I'll raise an objection, as

14 well.  The question that was asked was, why didn't you ask

15 Oaktree to be a 363 stalking horse bidder.  The question at

16 the deposition is, would the euro note holders be more

17 inclined to precipitate a liquidation than to consent to a

18 Chapter 11 sale process.  That's a completely different line

19 of questioning.

20         I have no problem with Mr. Qureshi cross-examining

21 the witness.  That's fair game.  But he shouldn't be

22 mischaracterizing the deposition testimony in connection with

23 an entirely different line of questioning.

24         MR. QURESHI:  Well, I take issue --

25         THE WITNESS:  If you'd like to examine this, you can

1   look at Page 63, and start on Line 12.

2          THE COURT:  There's no question pending.

3          MR. QURESHI:  Yeah, so here's --

4          THE COURT:  How about if I ask one?

5          MR. QURESHI:  Please.

6          THE COURT:  Okay.  I'd like to -- an answer because

7   I'm not sure that I heard one.  So Peter J. Solomon gets

8   involved in this in early July.

9          THE WITNESS:  Early June, Your Honor.

10         THE COURT:  Oh, June.  I'd like an answer because I'm

11  not sure that I heard one.  So Peter J. Solomon gets involved

12  in this in early July.

13         THE WITNESS:  Early June, Your Honor.

14         THE COURT:  Oh, June.  And then in August you get

15  involved in it, right?

16         THE WITNESS:  That's correct.

17         THE COURT:  And when it becomes clear that there is

18  not going to be an out of Court restructuring.  I think Mr.

19  Qureshi's question to you, among others, was when you are

20  sitting down in this process negotiating with Oaktree, why

21  didn't you ask Oaktree to serve as a stalking horse instead

22  of as a plan proponent under this transaction?  I think that

23  was part of the question.  The absence of that option or the

24  absence of inquiring into that absence is something I would

25  like to know.

 1          THE WITNESS:  If I may, Your Honor.

 2          THE COURT:  Sure.

 3          THE WITNESS:  I believe his question was did you

 4  ever, at any point, ask them to be a 363 stalking horse and I

 5  believe my answer was no.  The reason for that could be

 6  either read out of my testimony, two pages back, or I will

 7  just share it with you.  Our view was that the way to

 8  maximize the value for the estate was to preserve the value

 9  on a going concern basis to the European entity where there

10  was $220 million dollars of Euro notes and some $250 in debt.

11          The concept here was in a plan process, we could

12  actually reinstate the notes, but outside of a plan process,

13  which is the 363 process, my understanding, my attorney's

14  told me is that there is no legal way to reinstate the notes

15  in a 363 process.  So it's a more inherently unstable

16  situation.  Our concern was that we might not be able to

17  obtain an injunction.

18          In the absence of an injunction, we needed a more

19  stable framework, which we felt the plan sponsored process

20  would provide because of the inherent ability, the legal

21  ability to reinstate the notes at the end of the process.

22  And that is, actually, what you will read on pages 63 and 64

23  in my testimony.  The question was, I said our thesis

24  regarding how to maximize value, and I went on to talk about

25  that.  So that was the basis for not asking for a 363.  We

1 | felt that a plan sponsor transaction was the best way to

2 | maximize value.

3 |          THE COURT:  Mr. Qureshi.

4 |          MR. QURESHI:  Thank you, Your Honor.

5 | BY MR. QURESHI:

6 | Q.  Mr. Savini, what I am getting at, sir, is the distinction

7 | between what was earlier referred to as a naked 363 process

8 | where you do not have a stalking horse vs. one where you do

9 | have a stalking horse.  As I understood your testimony, sir,

10 | you never asked Oaktree if they would be willing to serve as

11 | a stalking horse.  We agree on that, yes?

12 | A.  We do agree on that.

13 | Q.  Okay and a reason that you did not ask them if they would

14 | be willing to serve as a stalking horse is, as you just

15 | explained, you did not believe that you would have the

16 | ability to do a 363 sale with the Euro notes because their

17 | consent would be required and they wouldn't consent, right?

18 | A.  That's correct.

19 | Q.  I think your deposition testimony on this is clear, but

20 | you can be clear now to that they wouldn't consent in a naked

21 | 363 process because there would be, in your view, way too

22 | much uncertainty having an unknown process as compared to a

23 | PSA with a sponsor, right?

24 | A.  Is there a question?  I'm sorry.

25 | Q.  As I understand it, sir, you did no analysis to determine

1  that whether in a 363 sale scenario in the U.S. with a

2  stalking horse bidder, not without, but with a stalking horse

3  bidder, it would be in the economic interest of the Euro

4  noteholders to consent to that process, as opposed to

5  precipitate a liquidation of their assets in Europe.

6  A.   It was my judgment and that of the other advisors in the

7  case that if we had to choose between a 363 or a plan

8  process, that the optimal approach to maximize value for all

9  constituents was a plan process.  You are comparing the

10  statements I made earlier about a naked 363 process.  My view

11  there is that is a worse state of the world because what we

12  were considering before was a 363 with Oaktree as a stalking

13  horse or a plan process with Oaktree as a plan proponent.

14  Now what we are talking about is a circumstance where we

15  believe it's very likely that if we pursued this DIP

16  transaction we would end up with a 363 process, but no

17  stalking horse.

18  Q.   The Euro noteholders, they have also been referred to,

19  today, as the board writer holders.  Can you identify by name

20  the institutions who hold, collectively, over 50 percent of

21  those?

22  A.   Yes, Archview, Canyon and Oaktree.

23  Q.   Okay and is TPG also a holder of the board writer notes?

24  A.   I believe they are, but they are not a party to a consent

25  and waiver agreement.

1  Q.  Do those holders, that you mentioned, sir, all have

2  offices in the United States?

3  A.  I believe they do.

4  Q.  All right, let's switch gears again, Mr. Savini, and talk

5  very briefly about the 35 percent of the stock in the foreign

6  subsidiaries that is unencumbered.  Now, I think we have

7  already established, but just to be clear, at no time did

8  Peter J. Solomon attempt to value that stock, right?

9  A.  That is correct.

10  Q.  Okay.  It's also the case, is it not, that from the very

11  beginning of your negotiations with Oaktree, Oaktree was

12  asking for 100 percent of that stock?

13  A.  That's correct.

14  Q.  And you're not aware of Oaktree having conducted any kind

15  of a valuation of the worth of that stock or 35 percent of

16  that stock, are you?

17  A.  I am not aware.

18  Q.  So never, in the course of the negotiations with Oaktree,

19  did they say we are under secured by X and that's why we need

20  the 35 percent stock because we think it's worth Y?

21  A.  They made a statement that they were concerned there

22  wasn't adequate collateral for the size of DIP that they had

23  proposed $150 million.

24  Q.  Right, but you had no specific discussion about

25  valuation?

1  A.   That's correct.

2  Q.   Okay.  Let's move on again to the next topic.  We are

3  almost there, sir; breakup fee.  Now your advice to the

4  company was to agree to the $20 million dollar breakup fee

5  that was being demanded by Oaktree, yes?

6  A.   It seemed like a reasonable exchange to me.

7  Q.   When you made that recommendation to the board of

8  directors of the company, you did not present the board with

9  any comparable transactions against which to compare the $20

10  million dollar fee, right?

11  A.   Comparable transactions or comps related to the size of

12  the breakup fee?

13  Q.   I'm sorry, a fair clarification; comps related to the

14  size of the breakup fee.

15  A.   I'm trying to remember because I made a number of

16  presentations on comps and I am trying to recall whether that

17  was one of them.  I don't believe so.

18  Q.   Instead, what you did was you relied on your general

19  understanding that in, in Court cases in Delaware and in the

20  Southern District of New York transactions with breakup fees

21  of 3 percent are typically perceived, I think it was your

22  testimony, as market, right?

23  A.   That's correct.

24  Q.   So I gather from that testimony that you did not make the

25  board aware of the numerous transactions in which there was

1  no breakup fee at all?

2  A.  No, I did not.

3  Q.  Now let's spend just a minute, I don't think I need to

4  dwell on this, but let's talk about the impact of that $20

5  million dollar breakup on potential bidders.  I want to start

6  by exploring kind of how we got here.  So you testified, sir,

7  that in the course of your negotiations with Oaktree, you

8  didn't have a competitive alternative, right?  Oaktree was

9  the one provider of the DIP that was at the table with the

10  firm proposal?

11  A.  That's correct.

12  Q.  Okay and I take it, you would agree, that now, today,

13  here we have a competitive process with respect to the DIP?

14  A.  I am reluctant to say yes because I am concerned about

15  the practical feasibility of the alternative financing.

16  Q.  Well, let me put it to you this way, sir, did you hear

17  Mr. Durrer, this morning, talk about how he, effectively, and

18  I am not trying to put words in his mouth, but took the

19  competing bid proposal and used it to improve the terms of

20  the Oaktree offer?

21  A.  I heard that testimony or statement.

22  Q.  You understand that the state of play right now, where

23  the alternative DIP has come to the table, is that the $20

24  million dollar breakup fee has not yet been approved?

25  A.  I do.

1  Q.  So right now if the Debtors were to erect or if the Court

2  were to require that the Oaktree DIP not be approved and

3  instead the Debtors elect to take the alternative, there is

4  no breakup fee triggered, right?

5  A.  That's correct, I believe.

6  Q.  And you would agree with me, sir, I take it that if there

7  were an additional $20 million dollar hurdle because of the

8  linkages between the DIP and the PSA, if there were an

9  additional $20 million dollar hurdle for the alternative DIP

10 that would serve as a disincentive to a competing DIP offer,

11 right?

12 A.  I am confused.  I am not certain that the breakup fee is

13 triggered by a refinancing of the DIP.

14 Q.  So you don't believe that if the company elected to go

15 with a different DIP, that that would give rise to a

16 termination right for Oaktree under the PSA?

17 A.  I honestly am not that familiar with the termination

18 events.

19 Q.  Well, are you aware that the PSA allows Oaktree to

20 terminate for any breach of a representation, warranty or

21 covenant regardless of the materiality of the breach.

22 A.  If those are the words, I am not aware of it.

23 Q.  Okay.  Do you understand, sir, or did you understand at

24 the time that you recommended to the board that they agree to

25 this breakup fee, how long it would remain in place?  In

1  other words, if Oaktree elected to exercise one of its outs

2  for what period of time the Debtors would be prohibited from

3  doing an alternative transaction without triggering the

4  breakup fee?

5  A.  I believe it was 12 months.

6  Q.  So if Oaktree exercises it's out and decides that it

7  doesn't want to proceed with the transaction, for 12 months

8  the Debtors can't do an alternative plan or an alternative

9  sale without triggering the $20 million dollar breakup fee,

10 right?

11 A.  That's what I understand, yes.

12 Q.  Now I gather, sir, that you are also aware that late last

13 night the Debtors filed their plan or reorganization?

14 A.  I did hear that.

15 Q.  You did hear that.  Okay and you are aware that the plan

16 or reorganization that the Debtors filed last night is

17 consistent with the terms of the plan support agreement?

18 A.  I haven't reviewed it yet.

19 Q.  I am going to ask you to assume that it is.

20 A.  I will assume that.

21 Q.  And, obviously, you are aware that the plan support

22 agreement has not yet been approved?  That's, of course, why

23 we are here, among other reasons.

24 A.  Indeed.

25 Q.  Sir, do you think that the filing of a plan of

1  reorganization that is consistent with the terms of a PSA

2  that has yet to be approved by this Court will incentive

3  additional parties to come to the table and bid?

4  A.  First of all the parties that we are reaching out to, I,

5  frankly, don't believe follow the company's daily filings in

6  the bankruptcy case and they rely on Peter J. Solomon for

7  material updates in the course of our marketing process.  So

8  I don't believe it's going to have a material negative

9  impact.

10 Q.  Mr. Savini, I've got one last area for you, I think, this

11 afternoon and that relates to a specific provision of the

12 plan support agreement.  You are aware, sir, that the PSA

13 provides that the recovery to unsecured creditors will be

14 $7.5 million dollars?

15 A.  Yes.

16 Q.  Okay and that's, of course, other than a $62 million

17 dollars in unsecured trade claims that the Debtors propose to

18 pay in full, you understand that as well, right?

19 A.  I am not as versed in what the trade claims are.

20 Q.  The $7.5 million dollars, that would be in satisfaction

21 of approximately how much in total unsecured claims after you

22 back out the critical vendor payments that the Debtor is

23 proposing to make, do you know?

24 A.  I would guess somewhere around, you know it's difficult

25 to say because I don't know how large the deficiency claim on

1  the secured notes is going to be.  So it's difficult; maybe

2  $250, $300, $350.

3  Q.  Okay.  $250 million I assume?

4  A.  Yes.

5  Q.  Okay.  Now, you don't recall ever seeing a draft of the

6  PSA that had anything other than a $7.5 million dollar

7  payment to unsecured creditors in full satisfaction of their

8  claims, right?

9  A.  I think that's right.

10  Q.  And nor do you recall, sir, at any point in the

11  negotiations, the company making any ask whatsoever of

12  Oaktree with respect to what unsecured recoveries should be?

13  A.  There were various points of contact in these

14  negotiations.  So I can't say that Mr. Durrer didn't make an

15  ask or someone else.

16  Q.  Sir, turn to your deposition please, page 85, line 13.

17  Are you there?

18  A.  I am.

19  Q.  Are you aware of whether the company made a specific ask

20  of Oaktree with respect to a recovery that should be made

21  available to unsecured creditors?  Answer; I don't recall.

22  A.  That's consistent with what I just said, I don't recall.

23  Q.  Sir, Peter J. Solomon has never evaluated whether a $7.5

24  million dollar recovery is sufficient for general unsecured

25  creditors in this case, right?

1   A.   That's correct.

2   Q.   And you haven't evaluated the reasonableness of it.  By

3   the way, do you know if that $7.5 million is also in the plan

4   that was filed last night?

5   A.   I haven't reviewed the plan.

6   Q.   And you haven't conducted any analysis of whether that is

7   a reasonable recovery for unsecured creditors because you

8   haven't conducted a valuation yet, right?

9   A.   That's correct.

10  Q.   And you can't really analyze whether the $7.5 is

11  reasonable in the absence of a valuation?

12  A.   I would agree with you.

13       MR. QURESHI:  Thank you.  That's all I have, Your

14  Honor.

15       THE COURT:  Redirect.

16       MR. DURRER:  Van Durrer for the Debtors, Your Honor,

17  just a few questions.

18                    REDIRECT EXAMINATION

19  BY MR. DURRER:

20  Q.   Its agreed that you haven't conducted a formal valuation,

21  but do you have a view as to whether unsecured creditors are

22  in the money in this case?

23  A.   I haven't completed an analysis on the valuation at this

24  point, but my sense is that the secured notes will be

25  impaired.

1   Q.   Fair enough.   With respect to the non-disturbance

2   agreement that Mr.'s Qureshi and Somerstein both asked you

3   about, do you have a recollection as to the duration of time

4   that Brigade discussed with you that they were willing to

5   become restricted?

6   A.   The only statements were a very brief period of time.

7   Q.   And in your experience, having a DIP lender that would be

8   restricted for a very brief period of time, is that

9   commercial?

10  A.   I don't have any experience negotiating or even receiving

11  a commitment letter from a party who is not restricted.

12  Q.   Do you understand the term cleansing?

13  A.   I do.

14  Q.   Can you explain to the Judge what you understand the term

15  cleansing to mean?

16  A.   Your Honor, when you enter into an NDA that has a

17  specified time period during which a party agrees to become

18  restricted --

19            THE COURT:  Make sure you get to the --

20            THE WITNESS:  I'm sorry.

21            THE COURT:  I can hear you.

22            THE WITNESS:  When a party agrees to receive material

23  non-public information, they only want to do it for a short

24  period of time.  You negotiate over the cleansing of that

25  party's restriction by the release of that material non-

1  public information to the public so that they can then be

2  unrestricted and continue trading.

3           THE COURT:  I understand.

4  BY MR. DURRER:

5  Q.  So let's pick a hypothetical example.  If there is some

6  issue under a DIP credit agreement that arises and you need

7  to engage with your DIP lender to discuss a waiver, an

8  amendment, an adjustment to the DIP budget, under this

9  scenario where a DIP lender is unwilling to be restricted

10 except for brief periods of time, at the conclusion of that

11 conversation, is it accurate to say that the Debtor would

12 have to make a public disclosure of whatever the issue was

13 that was under discussion with the DIP lender?

14 A.  To the extent that you are speaking directly with those

15 parties to resolve the issue.

16 Q.  And do you have a view as to whether that kind of a

17 relationship with a DIP lender is workable in a Chapter 11

18 case for a public company?

19 A.  I have been doing this for a long time and I have never

20 seen it.

21 Q.  Are you aware of, under the board writer's notes, of a

22 change of control put?

23 A.  Yes.

24 Q.  Can you describe to the Court what you understand the

25 board writers change of control put to be?

1  A.   Under the board writer notes, I believe there is a term

2  that allows the noteholders to put the notes back.  It might

3  be a 101, I'm not certain if there is a premium to the issuer

4  in the event of a change of control.

5  Q.   So I ask you to presume that there is, in fact, a premium

6  in the event that Mr. Qureshi had asked you about, you know,

7  economic interest and what the economic interest of a board

8  writers noteholder might be.  Do you have a view as to

9  whether if the company presented an unknown sale without an

10 identifying buyer as to what their economic interest would be

11 with respect to the change of control put?

12 A.   Can you rephrase that question please?

13 Q.   Certainly.  Assuming, again, that a change of control of

14 the ultimate owner of board writers would occasion the right

15 of a board writer's noteholder to put the notes to the

16 company at a premium, what would be in their economic

17 interest in connection with the sale that would occasion a

18 change of control?

19 A.   I think they would compare what they could potentially

20 receive in the put to what they felt the bonds may trade at,

21 giving effect to the change of control.

22 Q.   And last question.  You spoke about leverage, vis-à-vis,

23 Oaktree, what is your understanding of Oaktree's position

24 with respect to Billabong?

25 A.   I have never talked to Oaktree with respect to their

1  position to Billabong.

2  Q.  What is the size of their position in the equity of

3  Billabong?

4  A.  I believe it's approximately 20 percent.

5  Q.  Are you aware that Oaktree has any ability to control

6  Billabong?

7  A.  I honestly don't know.  I know they resigned from the

8  board, Billabong.

9  Q.  Are you aware of the status of Billabong's own financial

10 performance?

11 A.  I don't have a specific familiarity, only to say that I

12 believe they are going through a turnaround of their own

13 business.

14 Q.  And in the context of a turnaround of Billabong's own

15 business, do you have a sense or an opinion as to whether

16 they are able to execute an M&A transaction with a company

17 such as Quiksilver in the near term?

18 A.  In conversations with my M&A partners who are more

19 familiar with this, they have indicated they don't think they

20 have the balance sheet to sponsor such a transaction.

21 Q.  So with respect to the ultimate question that Mr. Qureshi

22 asked you about leverage, as an advisor to the board and the

23 company, do you feel that the company has appropriately

24 exercised its leverage, whatever that might be, with respect

25 to Oaktree in connection with the transactions before the

1  Court?

2  A.  I do.

3          MR. DURRER:  No further questions, Your Honor.

4          MR. QURESHI:  Your Honor, I have just a couple of

5  questions.  May I proceed?

6          THE COURT:  Sure.

7                      RECROSS EXAMINATION

8  BY MR. QURESHI:

9  Q.  Mr. Savini, you just testified, on redirect, that, I

10 think the question posed was whether you have a view as to

11 whether unsecured creditors are in the money.  The answer you

12 gave was that you think the secured notes will be impaired.

13 Did I get that right?

14 A.  Yes.

15 Q.  I just want to explore that a little bit.  When you

16 offered that opinion, are you using the June projections that

17 we saw that were roughly $79 or $80 million dollars for 2016

18 or are you using the September projections that are

19 materially lower, the numbers that we reviewed at the outset?

20 A.  The business plan numbers that the board reviewed only

21 days ago.

22 Q.  To get to the substance, are those numbers in line with

23 the June projections or are those numbers the materially

24 lower version that we saw on September?

25 A.  They are lower.

1  Q.   Okay.  Lower then September or in line with September, if

2  you know?

3  A.   Let me refresh my recollection, if I can.  Which one of

4  the presentations?

5  Q.   Well, I certainly don't have in the binder what was

6  happening last week.

7  A.   You said September there were some numbers.

8  Q.   Oh, it was Exhibit 3.

9          THE COURT:  Exhibit 3, page 18.

10         MR. QURESHI:  Thank you, Your Honor.  You saved me 15

11 minutes.

12         THE WITNESS:  I believe they are lower than these

13 numbers.

14 BY MR. QURESHI:

15 Q.   Lower than the September numbers?  Okay.

16 A.   Modestly.

17 Q.   Last question, Mr. Savini.  You understand that even if

18 the secured notes are, in fact, impaired, that there can

19 still be a recovery to unsecured creditors, provided that

20 there remain unencumbered assets?

21 A.   Yes.

22         MR. QURESHI:  Thank you.

23         THE COURT:  Any redirect?

24         MR. DURRER:  No, Your Honor.

25         THE COURT:  Mr. Savini, thank you, sir.  You may step

1  down.

2          MR. SAVINI:  Thank you, Your Honor.

3          MR. DURRER:  Your Honor, the Debtors Mr. Bruenjes to

4  the stand.

5          THE COURT:  Very well.

6                  ANDREW BRUENJES, WITNESS SWORN

7          THE CLERK:  Please state and spell your name for the

8  record.

9          MR. BRUENJES:  Andrew Bruenjes.  It's B-r-u-e-n-j-e-

10  s.

11         THE COURT:  Welcome, sir.

12                        DIRECT EXAMINATION

13  BY MR. DURRER:

14  Q.  Mr. Bruenjes, would you mind reminding the Court of your

15  role with respect to the U.S. Debtors?

16  A.  Yes, so I am the chief financial officer for the

17  America's division of Quiksilver, Inc.

18  Q.  You were present in Court when there was some discussion

19  of the potential tax consequences of the pledge of 100

20  percent of the stock of the Debtors' foreign subsidiaries in

21  connection with the DIP financing?

22  A.  Yes, I was.

23  Q.  And can you describe the analysis that the company did in

24  connection with determining the potential tax impacts of that

25  pledge?

1  A.   Absolutely.  So we looked at the earnings and profits,

2  relating to foreign subsidiaries and as a result of that

3  analysis, we looked at the period ending 31 October 2014, 31

4  October 2015 and also 31 October 2016.

5  Q.   And just taking baby steps, why is it important to look

6  at the earnings and profits of the foreign subs to determine

7  a tax impact in the U.S.?

8  A.   Yeah, absolutely.  So when 100 percent of foreign assets

9  are pledged against a U.S. obligation, a deemed dividend is

10 created or has the potential to be created for U.S. tax

11 purposes.  As a result, phantom income could be assessed in

12 the U.S.

13 Q.   And what did you conclude when you looked at the earnings

14 and profits of the various foreign subsidiaries?

15 A.   Yeah, so we looked at the 31 October 2014 as a baseline

16 and that across all foreign subsidiaries, excluding Mexico,

17 there were accumulated losses.  We also looked at 31 October

18 2015 earnings for that period and once again, aside from

19 Mexico, there were losses in those entities.  Also in regards

20 to 31 October 2016, once again aside from the Mexican

21 entities, all other foreign subsidiaries had losses.

22 Q.   And why did you choose to use 2014 as a baseline?

23 A.   2014 was based on the tax return that had been lodged.

24 So we had some firm numbers in regards to 2014.

25 Q.   And in terms of projections, did the company have an

1  expectation that 2015 would be better or worse than 2014 with

2  respect to those foreign subsidiaries?

3  A.   Generally, as an overall comment, that would be worse vs.

4  2014.

5  Q.   What about for 2016?

6  A.   2016 is based on the business plan that is currently

7  being finalized.  Mr. Savini alluded to the fact that there

8  is only a number of small changes that needs to be made, that

9  in regards to those entities.

10        THE COURT:  All right, hang on.  Operator, this is

11  Judge Shannon.  I am going to ask that you ask parties that

12  are participating by phone to either put their phones on mute

13  or I will terminate the call and the guys from Reorg Research

14  would be inconsolable.  Thank you, operator.  Mr. Durrer, you

15  may proceed.

16        THE WITNESS:  Could you repeat the question.

17  BY MR. DURRER:

18  Q.   Yes.  You had described using 2014 as a baseline, you

19  described that 2014 is worse and I was asking you what your

20  conclusions were with respect to 2016 estimates?

21  A.   Yeah, 2016 is based on the preliminary or its nearly

22  final business plan and very much it's going to be in line

23  with the 2015 numbers.

24  Q.   And you mentioned that there is some positive earnings

25  and profits with respect to the Mexican entities.  Do you

1  have a sense of the order of magnitude?

2  A.  Yeah, so from the material perspective it's not material

3  in regards to Mexican subsidiaries, and that's prior to

4  taking into consideration NOL's or foreign tax credits

5  related to those subsidiaries.

6  Q.  Okay.  So you have concluded that it's not material

7  without regard to the impact of NOL's?

8  A.  That's correct.

9  Q.  And if NOL's are considered, that's a potential backup

10  plan, is that fair?

11  A.  That is correct.

12  Q.  Did the Debtors initially resist the pledge of the 100

13  percent of the foreign subsidiary stock?

14  A.  Yes, we did.

15  Q.  And what was the ultimate outcome of that negotiation?

16  A.  On the basis that there was no adverse tax consequence of

17  that fact.  It was actually a requirement put forward by

18  Oaktree. It's a requirement of the DIP financing.  As per

19  discussions that we had with our advisors and the incremental

20  liquidity that was available from the new DIP facility, that

21  would provide adequate liquidity through a plan of

22  reorganization.  We concluded that we would accept the

23  pledge.

24  Q.  And why is it that you also analyzed 2016 earnings and

25  profits in addition to 2015?

1  A.  Yeah, so while we don't think this is the case, it is

2  hypothetically possible that post 2016 there will be a

3  requirement for the 35 percent pledge to remain in place.

4  Q.  Last question I had for you, Mr. Bruenjes.  Mr. Savini

5  was asked some questions about Exhibit 47, would you mind

6  turning to Exhibit 47?

7  A.  Certainly.  I'm at 47.

8  Q.  If I recall correctly, the page number was in the 30's.

9  I apologize; can you please turn to those pages, 45 and 46?

10  A.  45 and 46?

11  Q.  Page 13.  So the question I have for you is when Mr.

12  Savini described this as a bottoms up plan, did he goof?

13  A.  Yes, he did.

14  Q.  How do you know that?

15  A.  Because I was involved.  Obviously, my capacity as chief

16  of the America's, with the work that AlixPartners completed

17  and at the time, being the mid-point of June, we had only

18  completed a very high level plan.  It wasn't completed down

19  to a detailed bottoms up approach.  So in terms of revenue,

20  it wasn't broken down by customer.  In terms of SG&A it

21  wasn't a clear distinction in terms of where any of the

22  initiatives would be generated from in a detailed account

23  level.

24  Q.  And is it a fact that there is more visibility, today,

25  into the spring order book then there was at the time that

1 Exhibit 48 was prepared?

2 A.  Correct.

3 Q.  How would you describe, in terms of, you know, bottoms up

4 or top down, how would you describe Exhibit 3 and, obviously,

5 take your time turning to it, but I think you might recall

6 it?

7        THE COURT:  Page 18 of Exhibit 3?

8        MR. DURRER:  Yes, Your Honor.  Thank you.

9 BY MR. DURRER:

10 Q.  So the question is as compared to Exhibit 48, is this

11 more of a top down or bottoms up plan then Exhibit 48?

12 A.  This is more of a bottoms up approach.

13 Q.  Mr. Savini also made reference to the more closer to

14 final version of the business plan that was presented to the

15 board earlier that week, same question?

16 A.  Sorry, what is the question?

17 Q.  The question is more tops down or bottom up?

18 A.  Bottom up.

19        MR. DURRER:  No other questions of the witness, Your

20 Honor.

21                    CROSS EXAMINATION

22 BY MR. QURESHI:

23 Q.  Mr. Bruenjes, good afternoon.

24 A.  Good afternoon.

25 Q.  Let's start with Exhibit 48.  As I understand your view

1  of the projections contained in this document, it's really

2  AlixPartners that was responsible or principally responsible

3  for these projections?

4  A.  AlixPartners engaged management, but only at a high level

5  and not for a lengthy duration in regards to these

6  projections.

7  Q.  Right.  So you believe there was limited involvement by

8  the management team in this set of projections?

9  A.  Management were engaged.  The responses that were replied

10  were only at a high level.  They go into detail to break

11  down.

12  Q.  You recall how far in advance of this June timeframe when

13  these projections were delivered to the board, Alix was

14  engaged?

15  A.  Alix were engaged by the SRC sometime around late May,

16  early June, to my knowledge.

17  Q.  Mr. Bruenjes, for the Court's benefit, can you please

18  explain what the SRC is?

19  A.  Sorry, it's the strategic review committee.  It's a

20  subset of the board.  It was made available to the global

21  executives post the change the global executives that

22  occurred early this year.

23  Q.  And so the SRC was formed, roughly, in May, is that

24  right?

25  A.  That is correct.

1  Q.  They then retained Alix?

2  A.  Correct.

3  Q.  And Alix then delivered these projections that found

4  their way into the June board presentation, is that right?

5  A.  That is correct.

6  Q.  And your understanding is that shortly after the June

7  board presentation, the Alix engagement was terminated,

8  right?

9  A.  That is my knowledge.

10  Q.  And your understanding is that certain of the senior

11  management team were dissatisfied with their work?

12  A.  They were.

13  Q.  And that would include the global president as well as

14  the president of the Americas.

15  A.  That is the global president and also president of the

16  Americas, but that would also include Pierre Agnes who is our

17  global CEO.

18  Q.  Okay.  I want to go back to the SRC for a minute.  So one

19  of the reasons that the SRC, the strategic review committee,

20  was formed was because the board of directors believed that

21  the management team needed assistance with the business plan

22  and also with seeking out financing alternatives, is that

23  right?

24  A.  That is correct.

25  Q.  This was not the first time AlixPartners had been engaged

1  by the company, correct?

2  A.  No, AlixPartners were originally engaged in 2013 and they

3  assisted with the multi-year turnaround plan.

4  Q.  Now, when we spoke, sir, at your deposition last Friday,

5  I think you told me that the business plan was a week or so

6  away from being finalized.  Is the business plan now set to

7  be presented to the board sometime soon?

8  A.  As per Mr. Savini's testimony, the plan has been

9  presented to the board.  We are making small changes that

10  should be completed this week.

11  Q.  Okay and do you know when that plan will be made

12  available to creditors?

13  A.  I am not sure, personally, in regards to the timing of

14  when that will be made available.

15  Q.  Okay.

16  A.  But once again, the plan will be finalized this week.

17  Q.  The plan that is being finalized this week, if I

18  understand your testimony correctly, work on that plan began

19  back in June, is that right?

20  A.  Correct, the second half of June, in terms of the more

21  detailed bottoms up approach.

22  Q.  Okay and then do I have this right that some time toward

23  the end of July, around July, I think, 22nd there was what I

24  think you described as a second draft of the business plan?

25  A.  That is correct.

1  Q.  Now, I want to understand, sir, you are not a member of

2  the board of directors, so were not at the meeting at which

3  this June 15th document, Exhibit 48, was presented, right?

4  A.  That is correct, I am not a member of the board.  I

5  wasn't in attendance.

6  Q.  Okay.  Did you have an understanding as to why these Alix

7  projections, as you characterized them, were being presented

8  to the board at that time?

9  A.  Once again, so the board had engaged AlixPartners to

10 assist with the business plan process.  As a result, this was

11 completed by AlixPartners to support, essentially, the work

12 that they had been engaged in.

13 Q.  Sir, if I could ask you, please, to turn to Exhibit 41.

14 A.  I'm there.

15 Q.  You will see from the title, its labeled management

16 presentation August of 2015.  I take it Alix, their

17 engagement came to an end shortly after the June board

18 meeting.  So I take it we are safe in concluding, sir that

19 Exhibit 41, the management presentation in August was not

20 prepared by AlixPartners?

21 A.  That is correct.

22 Q.  And your understanding is that this specific management

23 presentation was provided to the board of directors?

24 A.  That is my understanding.

25 Q.  I think you also characterize this, I believe, as a work

1  in progress toward what is about to become the finalized

2  business plan, is that right?

3  A.   That's right.   The plan was very much still alive.   The

4  assumptions hadn't been finalized and was still a work in

5  progress.

6  Q.   Let's turn and I've got the page right this time, to page

7  75 of Exhibit 41, please.   You will see on page 75, which is

8  entitled historical and projected revenue and EBITDA, a chart

9  with revenue on the left and EBITDA on the right.   Are you

10  with me there, sir?

11  A.   I see both charts.

12  Q.   And, again, like the June projections, these go out to

13  2018?

14  A.   That is correct.

15  Q.   By the way, do you happen to recall when in August this

16  Exhibit was prepared?

17  A.   I can't recall.   There has been a number of plans.

18  Q.   Sure.   If you look at the bullet points that are above

19  the chart on this page, it appears, sir, that what the

20  management team is telling the board of directors to whom

21  this business plan was provided, and I am now reading from

22  the second bullet point at the top of the page.   The company

23  is conservatively projecting $1.3 billion of revenue and $80

24  million dollars of EBITDA in fiscal year 2016, do you see

25  that?

1  A.  I see that bullet point.

2  Q.  Now let's jump, if we could, and sorry for all the back

3  and forth, but to Exhibit 3.

4  A.  So keep the other version open at the same time?

5  Q.  Yes.  So Exhibit 3 is September 7th and if you go in

6  Exhibit 3 to page 18 and now we are going to compare that to

7  the August numbers.

8          THE COURT:  I just want to make sure we are all

9  singing from the same hymnal.  We are going to compare 18 of

10  Exhibit 3 to page 75 of Exhibit 41?

11          MR. QURESHI:  Precisely.

12          THE COURT:  Got it.

13          MR. QURESHI:  Thank you, Your Honor.

14  BY MR. QURESHI:

15  Q.  Mr. Bruenjes, are you with me? Do you have the right

16  pages in front of you?

17  A.  I do.

18  Q.  Again, my focus is going to be on the years 2016, 2017

19  and 2018 in these two documents.  You will see, well lets go

20  to the August presentation first, which is Exhibit 41, page

21  75.  In 2016 your *pro forma* adjusted EBITDA is estimated at

22  $80 million dollars, right?

23  A.  Correct.

24  Q.  And 2017 its $106?

25  A.  Correct.

1  Q.  And 2018 it goes up to $150, right?

2  A.  It does.

3  Q.  Okay.  Now let's go to the September document. Again, so

4  that we are together in terms of the numbers we are looking

5  at, the bottom of the page, corresponding to the columns for

6  2016, 2017 and 2018, 2016 EBITDA goes from $80 million in the

7  August presentation down to $45.6 million in the September

8  presentation, right?

9  A.  I can see that movement.

10 Q.  And you can see a similar movement for 2017 going from

11 $106 million of EBITDA in the August document down to $68.9

12 in the September document?

13 A.  I do.

14 Q.  Okay and for 2018 its $150 million of EBITDA in the

15 August document down to $113 in September, right?

16 A.  I see that movement.

17 Q.  Okay.  Now, I appreciate, sir, that you don't recall

18 precisely when in August this plan was presented to the

19 board, but you do recall that at least one significant event

20 that occurred at the company in August is that on August the

21 14th Oaktree indicated that it was not going to move forward

22 with an out of Court financing, right?

23 A.  I do recall that day.  It was actually my wife's

24 birthday, so I remember it well.

25 Q.  Now, when the discussions with Oaktree switched towards a

1  DIP, which I'm sure thrilled your wife, you had some

2  involvement in that process as well, right?

3  A.  I did.

4  Q.  And you were asked, specifically, to model liquidity

5  needs for a DIP facility?

6  A.  That is correct.

7  Q.  The timeframe that you were asked to model was through

8  the end of the calendar year, through 12/31?

9  A.  That is correct.

10  Q.  And your understanding of why that was the period of time

11  you were modeling is that what you were modeling was

12  sufficient liquidity to get through a plan process, right?

13  A.  Correct.

14  Q.  You were not asked to model liquidity that would be

15  sufficient to run a sale process, were you?

16  A.  No, I never received that exact request.

17  Q.  Now, since the strategic review committee was formed in

18  May of 2015, am I correct, sir, that you are not aware of the

19  company having conducted any valuation work?

20  A.  No, aside from SEG valuation work?

21  Q.  Right.

22  A.  Associated with the impairment analysis at the close of

23  Q2, that's the only analysis.

24        MR. QURESHI:  Can I have a minute, Your Honor.

25        THE COURT:  Take your time.

1    MR. QURESHI:  So, Your Honor, my understanding is

2  that, unfortunately, for Mr. Bruenjes, he is going to take

3  the stand a second time on critical vendor.  The remainder of

4  my questions are on that topic, so I am done for now.

5    THE COURT:  Redirect.

6    MR. DURRER:  Quickly, Your Honor.

7                     REDIRECT EXAMINATION

8  BY MR. DURRER:

9  Q.  Mr. Bruenjes, with respect to Exhibit 41.

10  A.  Yes.

11  Q.  On page 75, EBITDA for 2015 is not expected to be $60

12  million dollars, correct?

13  A.  No, it's not.

14  Q.  And under that column, it says norm, which I take to not

15  mean the guy from Cheers, but actually normalized EBITDA?

16  A.  That is correct.  It is a reference to normalized EBITDA.

17  Q.  Exhibit number 3, are the estimates in Exhibit 3

18  presented on the same basis of normalized EBITDA?

19  A.  That's irrespective of the actual results, not

20  normalized.

21  Q.  Does that explain the primary difference between the two

22  presentations?

23  A.  In regards to 2016, it doesn't.  The drivers for the

24  change are between the two models, increased visibility in

25  terms of the screen auto book.  There is a currency impact.

1  The fact that the U.S. dollar has appreciated against all

2  currencies.  So there is simply a conversion metric there as

3  well.  So the $80 isn't relative to the $45.6 on a constant

4  currency basis.

5        MR. DURRER:  That's all, Your Honor.

6        THE COURT:  I think it's of limited significance to

7  the question before me, but I haven't run into this issue

8  before.  How do you account for the currency swings as you

9  project on a going forward basis?  I don't think I have

10  actually encountered that specific question and I wonder.

11        THE WITNESS:  Okay.  So the plan on page 75, of the

12  first document, was based on a certain set of assumptions in

13  regards FX.  The plan on page 18, the other one, is based on

14  [indiscernible].  So in terms of all the trailing years and

15  also the forward projections, they are all in constant

16  currency.  So there is no impact for currency volatility

17  across any of the periods.  But what actually occurs is that

18  $80 million dollars in slide 75 was translated at rates that

19  were more favorable for the foreign subsidiaries and as a

20  result, therefore, the U.S. dollar equivalent is higher.  So

21  given the decline we are seeing all of the Asian currencies,

22  Latin America, Mexico, Brazil and also in Europe, when we re-

23  translate, based on the revised results, we automatically are

24  doing nothing else seeing a decline in the actual plan that

25  is presented.

1          THE COURT:  All right, thank you for clarifying that.

2   I haven't seen that before.  Mr. Qureshi, any further

3   questions?

4          MR. QURESHI:  Nothing further, Your Honor.

5          THE COURT:  Thank you, Mr. Bruenjes, you may step

6   down.

7          MR. BRUENJES:  Thank you, Your Honor.

8          THE COURT:  Mr. Durrer, does the Debtor have any

9   other witnesses on the two topics we have, which are the plan

10  support agreement and the DIP financing?

11         MR. DURRER:  Other then I am not sure if I actually

12  moved Exhibits 59 and 60 into evidence, but I would move

13  those in at this time and we have no other witnesses.

14         MR. QURESHI:  No objection, Your Honor.

15         THE COURT:  Very well, both are admitted.  The

16  Committee has a witness with respect to these issues as well,

17  correct?

18         MR. QURESHI:  We do, Your Honor.  My partner Mr.

19  Sorkin will be handling Mr. Genereux's testimony.

20         THE COURT:  All right, why don't we do this; we will

21  take just a two minute break.  As I said, I have until about

22  4:30.  If we can conclude we will conclude. I want to use

23  this time and use it productively.  I think we are going to

24  have to go over till tomorrow because we have other issues.

25  I have a couple options for you.  I have a matter that I

1  bounced from today for you people, that I bounced to

2  tomorrow, but it should be, I think, in the neighborhood of

3  20 minutes and telephonic.  It is scheduled for 10:00 a.m.

4  tomorrow.  If you would like, I will start with you at 9:00

5  a.m., if you want, we can take a short break or if you want

6  we will schedule you to start at 10:30.  You can confer and

7  then we can discuss that when I return.

8           MR. QURESHI:  Just for planning purposes, does Your

9  Honor have a specific end time tomorrow?

10          THE COURT:  Oh, lord.

11          MR. QURESHI:  Thought I'd ask.

12          THE COURT:  Noon.

13          MR. QURESHI:  We will take nine.

14          THE COURT:  I will have to look.  I think I would

15 appreciate any guidance from you guys about what else you see

16 coming for tomorrow.  I recognize that some of this testimony

17 may be Mr. Bruenjes, it may be the Committees' witness as

18 well on these issues, but it seems to me that there is a

19 broader range of open issues and disputes as to those.  I am

20 not minimizing the significance of those issues, but some are

21 narrower than others. So I would expect that we would be able

22 to get this done in real time tomorrow.  So why don't you

23 confer.  We will break for five minutes.  We will reconvene.

24 I also expect that if we don't conclude with your witness, we

25 need to be okay with this, he will be secluded. I try not to

1   do that for an overnight, but I would if that's where we are.

2   I certainly don't want to lose the time we have in the 45

3   minutes left.

4           MR. QURESHI:  I'm sure Mr. Genereux would appreciate

5   it, Your Honor.

6           THE COURT:  Stand in recess, five minutes.

7     [Recess 3:37:48 to 3:47:57]

8           THE CLERK:  All rise.

9           THE COURT:  Please be seated.  You have a game plan

10  on time tomorrow?

11          MR. DURRER:  Your Honor, the Debtors anticipate four

12  witnesses: Mr. Bruenjes with respect to critical vendor.  I

13  don't believe that there are any other witnesses on critical

14  vendor.  And then with respect to the PJT retention I think

15  it would be the two bankers and a Debtor witness, but that

16  might actually be more or less -- I mean I don't anticipate

17  it being more.  It might be less.

18          THE COURT:  Okay.  And under any circumstances I

19  don't know about how long the critical vendor would go but

20  the testimony relates to the retention usually should not be

21  that extended.  What time do you want to start?

22          MR. DURRER:  I'm flexible, the Debtors -- we're

23  actually having a 341 meeting, Your Honor, but it's at 1:00

24  so I think we can accommodate with a lunch break.  We don't

25  have our schedules on file so I'm not going to commit Mr.

1  Kenney to anything, but I don't anticipate it going very

2  long.

3         UNIDENTIFIED SPEAKER:  Our preference would be

4  10:30, Your Honor, but I'm guessing --

5         THE COURT:  No I guess here's the thing; no.

6  Because you know I don't know if we're going to finish with

7  the witness right now; I don't know. You can tell me whether

8  you think, but if we do I would assume that we would be just

9  finishing.  And I'm fine with 9:00 or 10:30.  I expect that

10  tomorrow, assuming we're done with the witness, I would

11  require or expect some, I'm not really looking for kind of

12  inherit the wind closings, but I will have questions and

13  comparisons based on where we are and some questions about

14  the issues before me in order to rule on these issues and

15  then move onto the other items.  So that's just, I think if

16  we do that at 10:30 or at 9:00, either way.

17         MR. QUERESHI:  Your Honor, in light of the hour now

18  a couple of things.  One, tomorrow there were a couple of

19  witnesses whose depositions were taken but who did not

20  testify. We submitted designated deposition testimony.  We do

21  anticipate bringing some of that to Your Honor's attention.

22  That can be done before closing or as part of closing;

23  whatever Your Honor's preference is.  I don't think it will

24  take too long, but I do think it's 10, 15 minutes.  In light

25  of the hour today, we could also, if Your Honor prefers,

1  break for the day now and come back at 9:00 with Mr.

2  Genereux.  That's certainly acceptable to us.  We're

3  flexible.

4          MR. DURRER:  I think it's important to the company

5  to try and conclude the testimony today, at least with

6  respect to the DIP and PSA.  I'm agnostic as to 9:00 or 10:30

7  and we don't need a long time for argument.

8          THE COURT:  Why don't you talk to the money guys.

9          UNIDENTIFIED SPEAKER:  Your Honor, just to the

10  extent that any information would help I would be surprised

11  if we would complete both the direct and cross of Mr.

12  Genereux.

13          THE COURT:  Okay what do you want to do?

14          MR. DURRER:  I think I want to go because I go

15  forward.  I wasn't aware that there was going to be a direct

16  of Mr. Genereux because he submitted a declaration just like

17  hours ago, so if there is, there is.  I don't have any

18  objection to that, but I'm surprised to learn that.  I

19  thought it was just going to be cross.

20          THE COURT:  Why don't we do this. We'll start with

21  Mr. Genereux right now.  It seems feel confident you'll be

22  able to conclude his direct.

23          UNIDENTIFIED SPEAKER:  I expect [indiscernible].

24          THE COURT:  And then what do you want to do.  I

25  think we ought to go with 9:00.

1        UNIDENTIFIED SPEAKER:  That's fine, Your Honor.

2        THE COURT:  But you want 6:00 a.m., right?

3        UNIDENTIFIED SPEAKER:  That's quite all right.

4        THE COURT:  I've been on that train.  But I think

5   that that just makes sense.  I don't want to be in a position

6   where the parties are jammed up for time.  So we'll go ahead.

7   We'll reconvene tomorrow morning at 9:00.  We'll start with

8   Mr. Genereux now and we'll cover as much ground as we can.

9   All right.

10        MR. SORKIN:  Thank you, Your Honor.  The Committee

11   then calls Michael Genereux.

12        THE COURT:  Welcome; swear the witness.

13             MICHAEL GENEREUX, WITNESS, SWORN

14        THE COURT:  Please state and spell your name for the

15   record.

16        THE WITNESS:  Michael Genereux; first name Michael;

17   last name Genereux -- G as in George, e-n-e-r-e-u-x.

18                    DIRECT EXAMINATION

19   BY MR. SORBIN:

20   Q.  Good afternoon, Mr. Genereux.

21   A.  Good afternoon.

22   Q.  Can you tell the Court briefly where you work and

23   describe your professional experience?

24   A.  Sure.  I work for PGT Partners.  I'm a partner in the

25   firm.

1  Q.  Can you describe briefly your professional experience at

2  PGT and prior to that?

3  A.  Sure.  PGT Partners is a new firm that has now superseded

4  Black Stone.  Our group, the restructuring group M&A and

5  another advisory business split off from Black Stone just

6  last week, in fact.  I started my career 21 years ago in

7  investment banking.  After business school I joined Merrill

8  Lynch.  I spent five years there in M&A principally dealing

9  with retail companies, consumer product companies, industrial

10 companies.  After that I worked for Credit Suisse First

11 Boston for two years in Media Telecom M&A.  And I then joined

12 Black Stone in 2003.  I spent 13 years at black Stone and

13 just last week, you know, we created our new firm PJT

14 Partners and I'm a partner there.

15 Q.  Can you describe for the Court what PJT's role is in

16 these Chapter 11 cases and your relationship to that work for

17 PJT?

18 A.  Sure.  PJT Partners is the financial advisor and

19 investment bank to the Committee of Quiksilver bankruptcy.

20 Q.  And what is your role and relationship to that

21 engagement?

22 A.  PJT Partners and I'm the team leader for the team.  It

23 advises the Committee on all financial matters related to the

24 case including what's before the Court today in terms of the

25 DIP financing, the PSA, the retention of the investment bank

1  for the Debtors. We'll also represent the Committee for the

2  rest of the case on all other matters that's before it

3  including, hopefully, a sale process and a successful

4  conclusion of the case.

5  Q.  Do you recall when you were engaged when PJT was engaged

6  in this matter?

7  A.  Yeah I believe we were retained on September 29.

8  Q.  And what have you done in the two weeks since you were

9  retained?

10 A.  Well it's been, I think, it's been a whirlwind of a few

11 weeks.  We have not been on the case for very long.  What

12 we've been doing is what we typically do is get up to speed

13 as fast as we can given the information that's available. So

14 myself and the rest of my team have been doing a lot of due

15 diligence on the business, on the cash flows, on the

16 processes that occurred prior to the filing of the case

17 including how the company went about negotiating with

18 Oaktree, evaluating its alternatives and how the PSA came

19 together and the DIP financing came together, but lots of due

20 diligence.  And in addition to that, you know preparing for

21 today's hearing.

22 Q.  You mentioned the two issues that are up for hearing

23 today the DIP and the PSA.  With respect to the DIP you are

24 aware as we've had discussions today about the alternative

25 DIP proposal, correct?  So when I say alternative DIP

1  proposal you're familiar with what I'm talking about, yes?

2  A.  Yes.

3  Q.  And have you reviewed the terms of the alternative

4  proposed DIP?

5  A.  Yes, I have.

6  Q.  And have you compared those to the terms of the existing

7  and proposed Oaktree DIP?

8  A.  Yes, I have.

9  Q.  And let me ask you first before we get into those terms.

10  Do you have a view on whether the existence of the

11  alternative DIP is something that is positive, negative or

12  neutral for the Debtors?

13  A.  I think it's very positive.

14  Q.  Why is that?

15  A.  We've actually begun to see why it's important and

16  positive.  Just this morning when the counsel to the

17  alternative DIP financiers you know reported that there had

18  been some improvements to the DIP proposal that was

19  originally made.  So having competition in this situation for

20  the DIP financing is, has been very important and is already,

21  you know, paid some dividends.

22  Q.  And based on your prior experience is that what you seen

23  has happened when there are competing proposals?

24  A.  Yes I mean competition is a very good thing in financing

25  processes and sale processes.  You know in the absence of

1  competition you typically do not get as good of an outcome.

2  Q.  From what you've witnessed in connection with the

3  alternative DIP proposal what is your understanding of the

4  party that has driven the negotiation of that proposal?

5  A.  Would you remind repeating the question please?

6  Q.  Sure.  Based on what you've seen over the last couple of

7  weeks and, specifically, over the last week when the

8  alternative DIP has been on the table, what have you

9  witnessed in terms of the party or parties that are driving

10 the negotiation associated with that alternative DIP?

11 A.  Well what I've seen is through testimony and through the

12 due diligence that we've been doing there's been a lack of

13 engagement between the company and this alternative proposal

14 that's come from the investors.  What I have put together

15 through what I've heard and through the diligence process is

16 we have willing and ready lenders in the alternative DIP

17 proposal that have, you know, put a proposal on the table

18 without getting additional restricting information and still

19 were able to put a proposal in front of the company that was

20 committed, that in my evaluation better in a number of

21 important areas.  And it appears that the company has not

22 facilitated as much engagement with that party as I would

23 have hoped to have seen and I would have expected to see in

24 this situation.

25 Q.  And in your experience is that how this process is

1  supposed to work?

2  A.   No I think companies that you know advisors to companies

3  that are in distress, that are in bankruptcy want to and

4  should drive the best possible outcome for the estate.  And

5  when you have an opportunity to create competition in a

6  willing third party that will provide capital companies

7  should seize that opportunity and exploit it as much as

8  possible.

9  Q.   And I think you had indicated that you had had the

10 opportunity to review the terms of both DIP proposals.  Have

11 you compared the terms of the two?

12 A.   Yeah I've spent, my team and myself have spent a lot of

13 time comparing the two proposals.

14 Q.   And have you formed an opinion about which of the two is

15 superior?

16 A.   I have.  I mean I've evaluated the specific terms and

17 formed opinions around, you know, generally what I think

18 about the two proposals.

19 Q.   And what is your opinion as to which of the two is

20 superior?

21 A.   I think the proposal that has come forward is superior in

22 many important respects at this time.

23 Q.   And can you identify what those important respects are?

24 A.   Sure.  I mean I don't have the proposal comparison in

25 front of me, but what I did was looked at outright financial

1  metrics such as rate, such as upfront interest in the form of

2  OID. I looked at fees. I've looked at liens. The liens on

3  the assets that were unencumbered prior to the financing. I

4  looked at milestones and time to maturity; how much time each

5  of the loans provide. In all of these metrics that I've just

6  walked through I think that the proposal that's come forward

7  from the alternative providers are superior. And I think you

8  need to look at it and I've looked at it in the aggregate, as

9  well as the pieces. You know flexibility; the additional

10 flexibility that the alternative provides it's not free.

11 Nothing is free. It will result in the company having to

12 incur some additional interest expense but in my estimation

13 the value that, in part, you're getting in that particular

14 element is the time necessary to explore alternatives that I

15 think could ultimately yield a better outcome for all

16 creditors including unsecured creditors.

17 Q. Mr. Genereux, in your answer you mentioned a proposal

18 comparison. Is that a written comparison that you prepared?

19 A. Yes. We did, I did an analysis, side by side analysis of

20 the two proposals.

21 Q. If you could look at Exhibit 57 in your binder.

22 A. Sorry just give me one second.

23 Q. Sure.

24 A. Okay I've got it.

25 Q. Can you tell me what Exhibit 57 is?

1  A.  Fifty-seven is my declaration.

2  Q.  And I want to get to your comparison in a minute, but in

3  the course of the last couple of days have you had an

4  opportunity to review your declaration and see whether there

5  are any changes that need to be made?

6  A.  I think there's one change that is worth mentioning.  I

7  think it is a typo in the paragraph.  And I may need

8  assistance in finding it, but it was a sentence that caused

9  some confusion in my deposition yesterday.

10  Q.  Sure if you look at paragraph 11 does that help?

11  A.  Yes.   Yeah this is the paragraph; thank you.

12  Q.  Sure.  And what is the change that needs to be made?

13  A.  It is the sentence in the middle of the paragraph on page

14  5, middle of paragraph 11.  It says third in italics.  I

15  believe that the DIP lenders would be more than adequately

16  secured by a priming lien on already encumbered; and I think

17  it says already unencumbered and I believe it should say

18  already encumbered prepetition collateral.  I hope I got that

19  right.

20  Q.  And if you look at page 6 there's a chart that is on page

21  6 and 7.

22  A.  Yes.

23  Q.  Is that the proposal comparison you were speaking of

24  earlier?

25  A.  Yes this is the analysis that I did.

1  Q.  Okay if you could just identify what it was that you did

2  and why you chose the items on the comparison that you

3  included here?

4  A.   Sure.  I think this is the material points that I; you

5  know it's not exhaustive.  It's not every point.  But I think

6  these are you know the 15 or so measures that I would focus

7  on when looking at these proposals if I were the Debtor in

8  needing to choose the optimal one.  But if you like I can

9  focus on some of the important ones.  I don't know if the

10 Court would like me to go through each and every one of them.

11 Q.  I think at this point the chart, hopefully, is relatively

12 clear.  Are there any terms that you would focus on or

13 believe are significant drivers that would indicate a

14 superior transaction?

15 A.  Yes I think the Court has heard the proposals are

16 evolving a little bit.  People came into the Courtroom today

17 and approved terms both it sounded like from the company as

18 well as the alternative providers.  But if you take the

19 facilities the superior proposals, that's what we call it;

20 the superior proposal is a 115 committed outright day one.

21 The company has access to that liquidity immediately.  The

22 proposed financing in this chart shows that it is broken into

23 two commitments: 90 and 25.  I make that distinction and I

24 still make that distinction even after I heard this morning

25 that the 25 is now more available but under, I don't remember

1  the exact words, but under some measure to be determined.  I

2  think that's an issue that I would flag as something to focus

3  on.

4      Obviously, the rate that's easy math.  Now our proposal

5  has got a longer duration.  And ours matures on the 15th; not

6  ours, excuse me.  I shouldn't use that word, the alternative

7  proposal --

8            THE COURT:  You can use that.

9            THE WITNESS:  Okay.

10 BY MR. SORKIN:

11 A.  But it has more maturity a month and a half for this. I

12 do believe it's actually even longer because the effective

13 maturity date of the proposed financing when looking at some

14 of the finer terms really is January.  So we give an

15 additional two and a half months of time.  Now that's not

16 free.  We'll have to pay interest expense.  The company will

17 have to pay interest expense for that time. But you know as I

18 pointed out earlier, I think that time is very, very

19 valuable.

20 Q.  And, Mr. Genereux, if we could stop on that maturity

21 point because there was a significant amount of discussion

22 today at various points on issues related to the maturity.

23 Can you just explain why it is that you believe that that

24 additional maturity time is important to the company?

25 A.  Well I think, we've heard about the company's go-shop.

1  It's allowed to go out and seek alternative buyers of the

2  company.  I don't think, in my opinion, that the company is

3  in the position to run an effective real sales process in the

4  time that's allotted with the existing DIP.  The company just

5  is not prepared, and I'm prepared to talk more about that

6  with materials, with contact and bidders with reaching out to

7  a broad group of parties.  You know I believe the company has

8  only contacted nine potential buyers prior to the filing.

9  It's begun to contact additional buyers since we had been

10  engaging with the company's advisors, but I think that

11  additional amount of time, two and a half months, is super

12  valuable in the context of going out and finding an

13  alternative that's better for this company.

14  Q.  And you mentioned certain things that you believe the

15  company was not prepared to do or reasons why that additional

16  time would be beneficial.  Can you expound on that a little

17  bit why it is that you believe that that time would be

18  beneficial to go out and do a go-shop?

19  A.  It's not being ready.  And in the diligence that we've

20  been doing I don't get the comfort that the company has done

21  the preparation work to be in a position to solicit bids from

22  a wide range of parties that I think should be contact in

23  this instance to solicit interest.

24  Q.  And what things would you do or would you suggest the

25  company do, excuse me, to be in that position?

1  A.  I mean a lot of work goes into selling a company.  And I

2  think the company's advisors I don't think they would

3  disagree with me in that respect.  But I've heard how the

4  business plan is not done.  And the forecast and potentially

5  the business plan won't be done until Friday.  You know

6  normally I would say all of that [indiscernible] or

7  concluding having a business plan done and the forecast done

8  is complete. And you have a multiple month period to then go

9  out to buyers and share with them a comprehensive

10  confidential information memorandum, a forecast, a business

11  plan, a well populated data room, additional analysis

12  explaining why the company is underperform to date.  These

13  things we haven't seen.  We haven't seen this information

14  base exist.  So I've heard that some of these things are in

15  the works, but I think it was clear to me very quickly that

16  this company needs more time to get ready in order to launch

17  an effective and broad ranging sales process.

18  Q.  If you could look at Exhibit 59 in the binder.

19        THE COURT:  Fifty-nine is not in the binder.

20  BY MR. SORKIN:

21  Q.  It is a single sheet of paper.

22        MR. SORKIN:  Yes, Your Honor, thank you.

23  BY MR. SORKIN:

24  Q.  That was handed up.  I believe it is on the ledge.

25        MR. SORKIN:  Your Honor, may I approach and help?

1        THE COURT:  Yes.

2   BY MR. SORKIN:

3   Q.  Mr. Genereux, exhibit 59 I don't believe is a document

4   you've seen before, seen this today.  But if you look at the

5   bottom right hand corner you might have heard some testimony

6   this morning from Mr. Coulomb regarding the additional $17

7   million dollar expense related to the additional maturity

8   under the alternative DIP. Do you recall that testimony?

9   A.  Yes I heard it this morning.

10  Q.  And do you have any opinions about that $17 million

11  dollars that's been identified as additional expense for

12  operations?

13  A.  This is the first time I heard that number.  I believe I

14  heard a different number that would go into that slot

15  yesterday.  And it was much bigger.  But this is the first

16  time I heard about this number this morning.

17  Q.  And the testimony this morning indicated that that

18  additional number will have an additional impact on the

19  amount of money needed to fund the company. Do you have any

20  opinion about that amount of money and what impact, if any,

21  that will have on the company?

22  A.  Well I didn't hear with a great degree of clarity what is

23  the money for.  Is it for working capital?  Is it for

24  interest expense?  Is it for other expense?  It matters.  And

25  I think that one thing I did learn over the last week or so,

1   or actually it was even more recent than that.  I think it

2   was in the last couple of days is the company indicated that

3   if you go a longer period of time it's going to need more

4   money for working capital purposes.

5       Now if a good part of that is working capital those are

6   assets.  I mean that's not burn.  And so you'll turn cash

7   into receivables. And those receivables later on in the year

8   will unwind. So this side by side analysis that was talked

9   about this morning if it's working capital, a good part of

10  it, it's cash that's going to get used and turned into

11  receivables which is another asset no matter what; whether

12  it's before or after the completion of the Chapter 11.  I

13  don't really believe that to be an item that you would

14  compare the alternative to the Oaktree DIP and say one is

15  worse than the other for that reason.

16          THE COURT:  I think I want to make sure that I

17  understand that because intuitively if you've got a financing

18  arrangement that only goes until the end of January and

19  you've got a financing arrangement that goes into March the

20  second would need to be larger in order to deal with the

21  company's financing requirements on a going forward basis.

22  But that would be, those obligations under the Debtors'

23  proposal would be obligations that would be dealt with on an

24  exit facility basis, on a post-confirmation basis if they

25  stay on their timeline.

1      So is it your point that it's really just

2  exchanging; it's debt that's going to occur.  It's

3  obligations that will incur.  It will be payments that are

4  made; whether they're made under your DIP or under the

5  Debtors' exit facility if they stay on their timeline.  So to

6  call this additional $17 million dollar charge that's not

7  present here is not entirely, while it's accurate because

8  yours is longer.  It's not as if these are costs the company

9  will not incur as a practical matter over that same period of

10  time.

11      THE WITNESS:  I mean, Your Honor, that's my point

12  and I'll repeat it back.  You do need to finance it.  And if

13  the company were to choose the alternative you will need more

14  financing to take care of that expenditure.  But it's --

15      THE COURT:  But the Debtors' proposal that they have

16  financing, they have DIP financing.  They have bankruptcy

17  financing that takes them to when they expect to be done with

18  bankruptcy and then they expect to have financing on the

19  backend.  So as a practical matter I think we're on the same

20  page.  It's financed.  It is obligations.  It is debt that

21  will occur one way or the other.

22      I guess the bottom-line is if the Debtor says it's

23  $17 million dollars to cover this period from whatever,

24  January 30th through the middle of March their point would be

25  this column one under Oaktree shouldn't be a dash. It's just;

1  this is not a DIP obligation.  It would be a post-petition

2  obligation.  But if we were asking, leave aside the DIP

3  emerged entity fiction or legal reality those numbers would

4  be identical.  The Debtors says it's going to cost $17

5  million dollars for that piece of time.  And you're saying it

6  would as well.  You would just be covering it within the

7  bankruptcy and they would presumably have to deal with it

8  outside the bankruptcy.  Do I have that right?

9           THE WITNESS:  That's exactly right.

10          THE COURT:  I understand.

11  BY MR. SORKIN:

12  Q.  Mr. Genereux, there was an additional term and it may

13  have flowed from the discussion with respect to Exhibit from

14  testimony this morning, but it may have been independent of

15  that.  And it related to the issue at what rate, at what

16  blended rate a DIP was provided.  Do you recall any of that

17  testimony?

18  A.  I heard most of it.  It was hard to hear where I was

19  sitting.

20  Q.  And just to orient you a little bit better, do you recall

21  the testimony related to the difference in paying off B of A

22  as the ABL lender at a roughly 10.5% rate instead of the 4%

23  rate that is currently available under the existing Oaktree

24  DIP?

25  A.  Yes, I heard that.

1  Q.  And are you able to do any high level calculation to

2  determine what the actual interest expense associated with

3  that difference in interest rate would be?

4  A.  I think so.

5  Q.  And can you describe first what information you would use

6  to make a determination of what that interest rate

7  calculation is?

8  A.  Okay I heard that what was offered by the alternative DIP

9  proposal lenders was an additional pay down of $16 million

10 dollars.  And I believe that's what I heard that the

11 alternative DIP providers would be willing to do that.  And

12 the point was made that would be at a 10.5% rate, right

13 versus a, what was estimated by the Court, the 350 spread

14 plus 25 basis points for libor or 375.  So 10.5 minus 375 is

15 6.75% differential.  And that was on $16 million dollars.  I

16 believe I have my number right.  So $16 million dollars times

17 that rate is a $1,080,000.00 for the year, right, divided by

18 12 that's $90,000 a month, right.

19          THE COURT:  A $180 grand.

20          THE WITNESS:  Yeah.

21 BY MR. SORKIN:

22 A.  So there's an additional cost associated with it. But

23 everything, every benefit has a cost.  I think there's no

24 free lunch.  And where I come out is the benefit of a

25 valuable two and a half months in exchange for having B of A

1  stay in place and pay them down by an additional $16 million

2  dollars to do so and pay what you just said, Your Honor just

3  said is a cost worth spending.

4  Q.  Mr. Genereux, you've identified in your declaration at

5  Exhibit 57 both the charge and then in the next paragraph,

6  paragraph 14, you identify a number of ways in which you

7  indicate that the superior DIP proposal is superior to the

8  proposed financing.  Can you explain generally what the

9  difference is between the items in the chart on pages 5 and 7

10 of your declaration and what's in paragraph 14?

11 A.  So the charts on pages 6 and 7 and comparing that; the

12 question is compared to that what is laid out in paragraph

13 14?

14 Q.  Yes.

15 A.  I think the bottom-line is paragraph 14, I must be

16 misunderstanding your question, is a summary of all the

17 benefits or most of the material benefits that are in that

18 chart.  So it's words instead of a chart that brings together

19 you know the variances.  So I'm not sure if I'm answering

20 your question to what you're asking, but there's two ways to

21 analyze the same thing.

22 Q.  In addition to issues that you've identified related to

23 the terms of the DIP financing themselves do you have any

24 other criticism of the process associated with proposed DIP

25 financing in connection with the existing Oaktree DIP?

1  A.  I think most importantly it is the result of the absence

2  of competition.  The Oaktree was agreed to without reaching

3  out to the most logical other party that you would want to

4  reach out to for a DIP which is another incumbent creditor in

5  the capital structure.  That has resulted in what I think is

6  an inferior proposal from what you could have gotten from

7  Oaktree in the first round of negotiations in the DIP.  I

8  mean that resulted; that missing out on being able to put

9  competition in place when you were negotiating with Oaktree

10 initially prior to the filing you missed out.  You squandered

11 opportunity to create a better outcome at that point.  And

12 that resulted in what is in this chart on page 6 and 7 where

13 I think there are material differences in the economics as

14 well as some non-economic terms.

15 Q.  We talked about the maturity date of the existing Oaktree

16 DIP.  Did you have opinions about the milestones that are

17 included in the existing DIP and in the PSA?

18 A.  I do.  I mean I think broadly speaking and the alterative

19 or superior DIP proposal addresses it, the milestones are too

20 tight.  It doesn't allow for you now the full exploitation of

21 the go-shop.  I think generally speaking the milestones do

22 not allow for as much time as I think this company needs to

23 run its go-shop process.

24 Q.  We talked a little bit about the go-shop process going

25 forward. Do you have any opinions about the process that

1  existed prepetition in terms of trying to identify a sale

2  transaction or other financing?

3  A.   I do.  I mean I think I touched upon it a little bit

4  earlier in testimony.  But in reviewing what was done I think

5  I mentioned this you know the company to my knowledge before

6  the filing spoke to nine parties, nine parties.  Since we've

7  worked with the company's advisors, since being involved

8  September 29 we've put 77 parties in front of the company.

9  I'm not saying 77 parties are going to be interested in this

10  company. I am saying that if you're going to really evaluate

11  an alternative that involves a sale you're going to go to

12  more than nine parties.

13      There are you know you're in the retail sector which is

14  one of those, you know the largest sectors in the economy.

15  There are lots of companies that may have an interest in this

16  business.  I think going out to nine parties is you know very

17  inadequate.  I talked, in my testimony already, about the

18  operation for such a process.  And if you're going to

19  generate competition and true interest in the assets then you

20  have to be able to answer those investors and company's

21  questions.  And I think the materials that had been prepared

22  very good base.

23      I think I would, in my deposit ion yesterday I explained

24  that a lot of the materials that had been created are a good

25  base, but I would not say they are in final form for purposes

1   of talking to really sophisticated companies and private

2   equity firms that see dozens and dozens and dozens of

3   alternatives to invest in and they have to sort through it.

4   And they have to, you have to put the company in a position

5   where you're sim goes to the top of the pile.  There's a lot

6   of competition in these processes.  And I think that without

7   really having your act together and fully buttoned up you're

8   likely not to be successful.

9        MR. SORKIN:  Your Honor, I realize we are almost at

10  4:30.  I don't think I'm going to be finished in the next

11  handful of minutes.

12       THE COURT:  Okay is this a point where you want to

13  break?

14       MR. SORKIN:  I think this is probably a good point

15  to break.

16       THE COURT:  Mr. Genereux, we're going to suspend

17  your testimony.  You are not to discuss your testimony with

18  counsel during the break.  We'll reconvene tomorrow morning

19  at 9:00 a.m.  So eat dinner by yourself.

20       THE WITNESS:  I understand.

21       THE COURT:  I've given that instruction a lot

22  lately.  I guess you're allowed to have other friends; that's

23  okay.  So where does that leave us then for tomorrow morning?

24  We'll start up at 9:00 a.m.  You can leave all of your stuff.

25  The matter that I have at 10:00 we will break very briefly

1  for and you won't need to move your stuff for that.  That's

2  telephonic and we'll keep moving forward.

3         I'm going to expect closings.  One thing I would

4  appreciate is I understood from comments from Mr. Durrer this

5  morning that the end point of the milestones has moved out

6  and I have it in my notes, but I think I'd like to make sure

7  that I understand precisely what the milestones are comparing

8  one to the other.  And the charts are good, but I'm worried

9  that they slipped a little bit.  And again a good deal of

10 this testimony is focusing on the sufficiency of the timeline

11 to either accomplish what you want to do or to accomplish

12 what the Committee wants to do.

13        So if somebody would just commit that to paper and

14 submit it that's a demonstrative tomorrow we can all sing

15 from the same hymnal.  Anything else I need to cover before

16 tomorrow, Mr. Durrer?

17        MR. DURRER:  No, Your Honor.

18        THE COURT:  Mr. Qureshi, anything further?

19        MR. QUERESHI:  No, Your Honor, thank you.

20        THE COURT:  All right I appreciate everyone's

21 patience today and we'll stand in recess.  We will reconvene

22 at 9:00 a.m. tomorrow.  Thank you.

23     [Recess 4:28:23]

24     [Reconvene 10/15/2015 at 9:00 a.m.]

25

CERTIFICATE

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Mary Zajaczkowski                    October 15, 2015
Mary Zajaczkowski, CET**D-531                    Date


/s/ Coleen Rand                  January 15, 2015
Coleen Rand, AAERT Cert. No. 341