UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
|  | . | Case No. 15-11880 (BLS) |
| QUIKSILVER, INC., et al, | . |  |
|  | . |  |
|  | . | Courtroom No. 1 |
|  | . | 824 Market Street |
| Debtors. | . | Wilmington, Delaware 19801 |
|  | . |  |
| . . . . . . . . . . . . . . . . | . | Thursday, October 15, 2015 |

TRANSCRIPT OF CONTINUED HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:               Van C. Durrer, II, Esq.
                               SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM, LLP
                               300 South Grand Avenue, Suite 3400
                               Los Angeles, California 90071


For the Official Committee
of Unsecured Creditors:        Joseph L. Sorkin, Esq.
                               Michael S. Stamer, Esq.
                               Abid Qureshi, Esq.
                               AKIN, GUMP, STRAUSS, HAUER
                                & FELD, LLP
                               One Bryant Park
                               Bank of America Tower
                               New York, New York 10036



(Appearances Continued)

Audio Operator:                Electronically Recorded
                               by Dana Moore, ECRO

Transcription Company:         Reliable
                               1007 N. Orange Street
                               Wilmington, Delaware 19801
                               (302)654-8080
                               Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES:   (Continued)

For Oaktree:                    Patrick J. Nash, Jr., P.C., Esq.
                                KIRKLAND & ELLIS, LLP
                                300 North LaSalle
                                Chicago, Illinois 60654

For Bank of America, NA:        Steven E. Fox, Esq.
                                RIEMER & BRAUNSTEIN, LLP
                                Times Square Tower, Suite 2506
                                Seven Times Square
                                New York, New York 10036

INDEX

|  | Page |
|---|---|
| CONTINUED HEARING:  MOTION TO APPROVE DIP FINANCING AND MOTION TO APPROVE PLAN SUPPORT AGREEMENT | 4 |
| Argument | 78 |
| Court Decision | 137 |
| CRITICAL VENDORS MOTION | 147 |
| Argument | 193 |
| Court Decision | 200 |

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE COMMITTEE (DIP/PSA Motions) | | | | |
| MICHAEL J. GENEREUX | 6 | 22 | 71 | |
| FOR THE DEBTORS (Critical Vendor Motion) | | | | |
| ANDREW BRUENJES | 153 | 178 | 192 | |

| Exhibit | Ident. | Evid. |
|---|---|---|
| Joint 61 | 9 | 10 |

1          (Proceedings commence at 9:04 a.m.)

2          (Call to order of the Court)

3                THE COURT:  Please be seated.  Good morning.

4                MR. DURRER:  Good morning, Your Honor.  Van Durrer,

5     Skadden, Arps, Slate, Meagher & Flom, on behalf of the debtors.

6                Before I turn the podium over to Mr. Sorkin, Your

7     Honor had asked for time lines.

8                THE COURT:  Yeah.

9                MR. DURRER:  So if you don't mind, I can approach with

10    those?

11               THE COURT:  That would be great.  Thanks.  I

12    appreciate you doing it.

13               And I think we were in the middle of Mr. Genereux's

14    direct, right?

15               MR. DURRER:  Correct, Your Honor.

16               THE COURT:  Mr. Somerstein?

17               MR. SOMERSTEIN:  Yes, Your Honor.

18               THE COURT:  Good morning.

19               MR. SOMERSTEIN:  Good morning.  For the record, Mark

20    Somerstein, Ropes & Gray.

21               Your Honor, I wanted to report one positive

22    development since we last closed for the day.  Despite the

23    continuing concerns over the level of engagement with the

24    company that the proposed DIP alternative, DIP lenders have had

25    to date, the DIP lenders are highly motivated in giving the

1   company what they need to effectuate this reorganization.

2              Yesterday, they were listening.  And based on Exhibit

3   59 and the seventeen-million-dollar additional cost that the

4   company advised the Court that the debtors would need if the

5   debtors were to select the alternative DIP, the proposed

6   alternative DIP lenders have agreed to up-size the commitment

7   by that 17 million.  The --

8              THE COURT:  On top of the eleven --

9              MR. SOMERSTEIN:  Exactly, Your Honor.

10             THE COURT:  -- on top of the twenty-six, right?

11             MR. SOMERSTEIN:  It was, well, a total of twenty-six.

12             THE COURT:  Oh, right.  Because it was fifteen,

13   eleven, and then this would be seventeen on top.

14             MR. SOMERSTEIN:  Correct, Your Honor.

15             The only one small caveat is that we're assuming that

16   these are reasonable business expenses.  The lenders have not

17   seen what these -- what the costs are to create the burn.  So

18   they would want to --

19             THE COURT:  So noted.

20             MR. SOMERSTEIN:  -- have some engagement with the

21   company.  But they are stepping up now, and have since the

22   commencement of this hearing increased their commitment by $43

23   million above and beyond the initial hundred and fifteen, and I

24   wanted to advise the Court of that.

25             THE COURT:  Very good.  Thank you.

1          MR. SORKIN:  Good morning, Your Honor.  Joseph Sorkin.

2          Mr. Genereux?

3          THE COURT:  Welcome back, sir.  Please remain

4    standing.  We'll go ahead and swear the witness again.

5    **MICHAEL J. GENEREUX, WITNESS FOR THE CREDITORS' COMMITTEE,**

6    **SWORN/AFFIRMED**

7          THE CLERK:  Please state and spell your name for the

8    record.

9          THE COURT:  He already said his name in the record.

10         Mr. Genereux, welcome back.

11         THE WITNESS:  Thanks.

12                    **CONTINUED DIRECT EXAMINATION**

13   **BY MR. SORKIN:**

14   Q   Good morning, Mr. Genereux.

15   A   Good morning.

16   Q   Yesterday, there was some discussion through -- over the

17   course of a couple of witnesses about the process that someone

18   could engage in to negotiate in connection with the DIP and

19   deal with whatever issues might arise in connection with being

20   restricted or not.

21         Could you discuss for the Court a little bit your

22   understanding of that process and how someone might go about,

23   or how you would advise someone to address the issues

24   surrounding trading concerns?

25   A   Sure.  Would you mind repeating the question, Mr. Sorkin?

1   Q   Sure.  And the question is:  How would you advise someone

2   in this case, like the alternative DIP lenders who might want

3   information from the company, but are afraid of being

4   restricted from trading because of material non-public

5   information?

6   A   Sure.  I understand the question.

7       I mean, I'm in this business -- PJT is in this business of

8   advising creditors very often in bankruptcy cases, particularly

9   bondholders, ad hoc groups, that -- that want to organize as a

10  group as opposed to sitting on a committee, and often want to

11  engage with the company ahead of the bankruptcy, during a

12  bankruptcy, during a stress period.

13      There is definitely a protocol and a process that's well-

14  treaded, well-established in terms of how bondholders engage

15  with the company that they've invested in or want to invest in.

16      Typically, bondholders can be notified.  A company can pick

17  up the phone and indicate to major bondholders -- they know who

18  they are typically.  They track who their holders are.  And

19  pick up the phone and call them and say, there's an interest on

20  the company's part to engage with you and others, we know you

21  don't want to get restricted and get information that would

22  preclude you from trading, so go out and hire intermediaries

23  like an investment bank, Peter J. Solomon or PJT Partners,

24  whoever, and get yourself a lawyer, and we'll -- you know,

25  parties that you trust and then we'll tell them more about what

1   we'd like to do, and then they'll, you know, communicate with

2   you the way they need to, to indicate to you there's something

3   worthwhile to get restricted for.

4       And that -- that happens regularly.  We get calls on those

5   types of situations regularly.  That's a big part of our

6   business.  And that's how it's done in terms of reaching out to

7   a group.

8       And then the advisors, they get information.  They don't

9   have a problem with signing an NDA.  They don't trade.  And the

10  lawyers and advisors look at the situation, typically do some

11  due diligence, evaluate the transaction that's being put in

12  front of them, and indicate to the group, this is something

13  worth getting restricted.  And then there's a negotiation on

14  what information they will get and how long they'll be

15  restricted for.

16  Q   Understood.

17      And what if, for example, a noteholder did not want to

18  solely rely on intermediaries, but wanted some amount of

19  information; is there any process, well-established process

20  that might exist in that instance?

21  A   Yes.  There would be -- with or without advisors, there can

22  be a discussion about what information that particular investor

23  or investors need in order to be willing to give up the right

24  to trade in exchange for getting that information and

25  evaluating a transaction.  They can do it directly.  It can be

1    a -- it can be done that way as well.

2    Q    And are you familiar with the term "blow-back"?

3    A    Or "blowout."  "Blow-back," I know that one, too.

4         (Laughter)

5    Q    Maybe that's the one I'm more familiar with.

6    A    Yeah.

7    Q    So let me ask that again.

8         Are you familiar with the term "blowout"?

9    A    Yes.

10   Q    What is your understanding of that term?

11   A    It's not the prettiest couple of words to use.  But it is -

12   - it is just a slang term for that information that that

13   investor gets, is put out into the marketplace, it levels set

14   the market with that information.  Everyone has it.  And they

15   can then be free to trade again.  That's how it's used.

16   Q    Okay.

17        MR. SORKIN:  Your Honor, may I approach and hand the

18   witness the time lines that were just handed out?

19        THE COURT:  Sure.

20        MR. SORKIN:  Your Honor, does it make sense to go

21   ahead and mark that as 61?

22        THE COURT:  That's fine.

23        (Joint Exhibit 61 marked for identification)

24        THE COURT:  I had thought of it as a demonstrative,

25   but actually, if you're going to examine the witness on it, any

1    issues with -- all right.  It's admitted, Exhibit 61.

2         (Joint Exhibit 61 received into evidence)

3    BY MR. SORKIN:

4    Q    Mr. Genereux, I've just handed you what's been marked as

5    Exhibit 61.  This is a demonstrative that the debtors just

6    handed out to the Court a few minutes ago outlining the time

7    lines in the Oaktree proposal.

8         If you could focus on the second blue time line at the top,

9    November 17th, 2015.  Do you see that?

10   A    Yes.  I'm seeing this for the first time, so I'm scanning

11   it.  Just give me a second.

12   Q    Sure.  Take as much time as you need to look at it.

13   A    I see that.  Let me just try to get the context here.

14   Q    Sure.

15   A    (Witness reviews exhibit)

16        Okay.  I'm with you.

17   Q    And Exhibit 61 indicates that the hearing on the disclosure

18   statement and related documents would be November 17th, this

19   year.  Do you see that?

20   A    Yes.

21   Q    Okay.  Can -- yesterday, we discussed a little bit about

22   the sales process and some of the concerns you had identified

23   with that.

24        Can you tell the Court whether November 17th, 2015 would be

25   enough time to run an adequate sales process here?

1   A   I -- I don't think so.  I mean, I testified to this

2   yesterday to some extent.  And that November 17, you know,

3   that's two months away.  And -- and the company is asking for,

4   you know, a disclosure statement to be heard.  And, you know,

5   where we stand right now, the company has begun to reach out to

6   parties, and they have reached out to I believe 55 parties now

7   since -- since we got involved on September 29th, to see what

8   other interest they can drum up, you know, from the nine

9   parties that they initially discussed.

10       You know, to comport a sale process where you're -- you

11   know, the company is going to be very pregnant with the plan

12   that's on the table at that point in time, that will -- that

13   will chill interest for many of the best parties that are being

14   contacted right now for this business.  It's not realistic for

15   a party to, you know, sign an NDA, devote resources, time,

16   energy, people, and submit a serious bid where they can go to

17   their committees, the investment team and say, you know, we

18   like this business, we want to invest in this business and, you

19   know, there's a path to get there.

20   Q   Okay.  Mr. Genereux, I want to talk now about some of the

21   specific terms in the Oaktree DIP proposal, or the existing

22   DIP.

23       THE COURT:  Actually, I'd like to go back to the time

24   line, if I can, and understand from the witness his

25   understanding of what I think Mr. Savini testified to as the,

1    quote, "market test."  And that's sort of we're comparing here.

2              As I look at it, I see the committee proposal as being

3    essentially a marketing and sale process starting now, ending

4    sometime in March.  And I think I understand that.  Bidding

5    procedures approved a little bit over a month from now, 363 bid

6    and sale motion filed.

7              You've seen, I think -- or you submitted in one of

8    your exhibits a list of roughly 77 other parties that you felt

9    ought to be touched with strategics and financials, right?  Do

10   I have that right?

11             THE WITNESS:  Correct.

12             THE COURT:  Okay.  The debtor described, or through

13   Mr. Savini I think in particular, quote, the "market test" that

14   they are pursuing, that is to essentially test, as I understand

15   it, the plan against the -- against the market, right?

16             THE WITNESS:  Correct.

17             THE COURT:  What's your understanding of how that

18   process is to play out?  Does that process -- are you

19   suggesting that process concludes with the disclosure statement

20   or that the -- any ongoing market test would simply be an

21   unappetizing proposition for a potential bidder who looks and

22   says, to use your phrase, why am I going to make a bid, these

23   guys are already really very pregnant, they're not going to

24   take me seriously?

25             THE WITNESS:  That's the problem I'm trying to tackle

Genereux - Direct

1    in my testimony is put aside what happens when in court.  The

2    market needs to understand that there is a realistic shot of

3    buying this business and that the company does not proceed with

4    what the deal is on the table.  If the market understood -- and

5    again, put aside the construct, you know, the terms, the PSA,

6    the RSA, I just want to put that aside for a moment.  As long

7    as the market believes that that transaction can be unwound and

8    their transaction, if it's higher and better and the -- and the

9    company, you know, deems it to be the best outcome for all

10   creditors, then I think there won't be a chill on the process.

11           But if it's laid out like this where, you know, to use

12   your words, Your Honor, you know, pregnancy is happening, you

13   know, November 30th happens, that gets -- that order gets

14   approved, you know, one door shuts.  You know, is there

15   precedent in the marketplace?  Investors will look at

16   precedent.  Is there precedent in the marketplace where this

17   happens on November 30 and an investor successfully got that

18   undone and were able to step in and buy the business.

19           And most of the parties -- of the 77 parties, most of

20   them, they probably don't have a good understanding of

21   bankruptcy.  I mean, we're going out to companies that

22   typically are just growing their businesses.  We're going out

23   to private equity firms who more often than not buy businesses

24   in a regular-way basis.  Not a lot of them have experience in

25   doing this sort of thing.  So they need to go in front of their

Genereux - Direct                              14

1    committees and be confident that they have a realistic shot of

2    getting this business.

3              THE COURT:  Okay.  You've answered my question.

4              You may proceed.

5              MR. SORKIN:  Thank you, Your Honor.

6    BY MR. SORKIN:

7    Q    Mr. Genereux, if you could look at Exhibit 57, which is

8    your declaration.

9    A    I have it in front of me.

10   Q    Page 11.

11   A    Yes.

12   Q    You've identified a discussion of certain issues related to

13   the rate of return in the Oaktree DIP proposal.  Can you

14   explain what the rate of return is?

15   A    What a rate of return is?

16   Q    Correct.

17   A    In this context, it's -- it's the, you know, how much an

18   investor makes on the particular investment.  So I've -- I've

19   compared the version of the -- terms of the proposal that I had

20   at the time when this declaration was filed as compared to

21   Oaktree's proposal.  And I did a classic internal rate of

22   return calculation for both as a measure for how much money

23   does the investor party make in each scenario.

24   Q    And what was the amount -- what was the rate of return for

25   the Oaktree DIP?

Genereux - Direct                                    15

1   A    I calculate it to be 26.4 percent.  And that's an

2   annualized rate of return for the investment.

3   Q    And what was the rate of return for the alternative DIP

4   proposal?

5   A    Using the same methodology, 14 and a half percent on the

6   terms that I had at the time.

7   Q    And do you know based on your understanding of how the

8   alternative DIP proposal has changed over the last 24 or 48

9   hours, whether those changes would impact the rate of return?

10  A    I have not done the math.  But what's happened in the last

11  24 hours has pushed the return down because more money is

12  coming in, the rate hasn't changed, I haven't heard any of the

13  other economics changing.  So the rate has definitely fallen.

14  And it probably has fallen materially.

15  Q    And do you --

16  A    I would like to check that.  But I haven't calculated it.

17  Q    Do you have an opinion about the reasonableness of the rate

18  of the return under the Oaktree DIP proposal?

19  A    Well, I think the market has spoken.  I think

20  reasonableness is best measured right now in -- where the

21  comparison is.  And we had a -- we had an alternative on the

22  proposal and the market's speaking that is, as of these terms,

23  14 and a half percent, which is, you know, a little bit more

24  than half of the return that Oaktree's proposing.

25  Q    Is there any -- other than comparing the two, the

Genereux - Direct                                    16

1    alternative DIP proposal, is there another way that you have to

2    assess the reasonableness of the rate of return?

3    A    What I -- what I did in my declaration, I compared it to --

4    again, relying upon liquid markets and prices on the screen

5    where buyers and sellers will transact, I looked at where the

6    bonds -- the secured bonds are trading in -- in the

7    marketplace.  The oak -- the secured bonds are trading in the

8    marketplace.  And I have a chart in my declaration which --

9    which showed that as another data point to triangulate around

10   what we think is a -- what I think is a fair rate of return for

11   the investment.

12   Q    And the chart that you just referred to, is that the chart

13   at Paragraph 23 on Page 12 of Exhibit 57?

14   A    Yeah.  It's at the bottom of Paragraph 23.

15   Q    Okay.  And can you explain this -- this chart looks like

16   includes a yield to maturity.  Can you explain what a "yield to

17   maturity" is?

18   A    Those data points are coming out of a Bloomberg terminal.

19   And Bloomberg discloses what their calculations are.  That --

20   that calculation is -- is a yield to the maturity of the bond.

21   I can't remember what the maturity is right at the moment.  I

22   think it's two or three years from now.  But, you know,

23   Bloomberg calculates a yield similarly to the way I calculated

24   the IRR from, you know, the date on the screen to the maturity

25   of the bond, taking into account interest payments and -- and

1    they do basically I think the same math.  But it's in a box.  I

2    can't look at their exact formulas.

3    Q    And can you explain what is indicated with the line -- the

4    what appears to be blue line or the thinner line next to the

5    U.S. secured notes?  What is that showing in terms of yield to

6    maturity?

7    A    I'm trying to highlight with that blue line where the yield

8    is currently at the date of the declaration relative to the --

9    to the recent trading.  You know, this chart goes back about a

10   year.  And the yield -- I'm just trying to highlight that the

11   yield has gotten no higher than 15 percent.  And, you know, it

12   approached 15 percent starting in June.  This is probably when

13   the market started to understand that this company could

14   restructure in some form or fashion is my guess.

15   Q    And what is it that looking at the yield to maturity shows

16   us here?

17   A    I look at it to be another data point as to what's a fair

18   price for, you know, senior secured capital in Quiksilver.

19            THE COURT:  Operator, this is Judge Shannon.

20            THE OPERATOR:  Yes, Your Honor.

21            THE COURT:  We're getting a fair amount of sound or

22   feedback from the lines.  And so I'm going to ask you if you

23   can try to deal with that.  Thank you.

24            THE OPERATOR:  Okay.  You're welcome.

25   A    It indicates to me what -- what the market is saying is a

Genereux - Direct

1   fair yield for senior capital in Quiksilver.  Now, remember,

2   the DIP that we're talking about here comes in super senior and

3   above it, which I will argue that that capital should come in

4   cheaper.

5       On the other hand, we're in bankruptcy and I think lenders,

6   you know, take a discount in just about all instances of

7   lending money into a bankruptcy, even though they get super

8   priority administrative status.

9   Q   And on the chart on Page 12, we've been talking about 15

10  percent.  But there's a -- what appears to be a spike just

11  prior to 9/17.  Can you explain to the Court what that is?

12  A   I think that one- or two-data-point period is the date of

13  the filing of the company.

14  Q   And do you know what the yield to maturity was on that one

15  instance?

16  A   It peaked at about 20 percent.

17  Q   And what's the relationship between that peak and the rate

18  of return for the Oaktree DIP?

19  A   The rate of return on the Oaktree DIP is 30 percent higher.

20  It's much higher than that.

21  Q   MR. Genereux, I wanted to turn now to the breakup fee under

22  the PSA.  Are you familiar with that provision?

23  A   I am.

24  Q   And do you have an understanding of what the breakup fee

25  is?

Genereux - Direct                                    19

1    A    I do.  I -- it's $20 million, I believe.

2    Q    And based on your experience, do existing investors

3    typically receive a breakup fee as part of a Chapter 11

4    transaction?

5    A    No.  I mean, the word "typically" is the operative word.

6    In my experience it normally doesn't happen.  In instances

7    where you're putting up fresh capital, I totally get it.

8    There's -- it's an opportunity cost that firms are giving up to

9    invest the time, effort and expense to consider a transaction.

10   If they -- if they win the transaction, I think new-money

11   investors are entitled, it makes sense to me, to a compensation

12   if the deal is done away from them.

13        But in this instance, this is a workout of an existing

14   investment for -- that Oaktree's already made.  They're working

15   it out.  They already put the money in.  They are working

16   towards something else.  I don't think break fees are

17   associated with workouts.

18   Q    And on Page 14 of your declaration, there's a list of

19   cases, and in each of those you've identified that there was no

20   breakup fee.  Can you explain to the Court what you did in

21   compiling this list and what it indicates?

22   A    What -- this is not an exhaustive list.  I mean, it would

23   be probably 10 pages long.  But we tried to identify are, you

24   know, one, recent cases, recent precedent; two, ones that

25   involve, you know, incumbent creditors acting as working out

1    their existing investments.  And that's why most of these

2    filing types, Your Honor, are prearranged, prepacks.  They

3    have, you know, a PSA associated with them or an RSA, depending

4    on their nomenclature.  And they've got an impaired class

5    that's on board with the transaction led by incumbent

6    creditors.  And in all instances, we didn't find a breakup fee.

7

8        And some of these cases I worked on and I'm more familiar

9    with than others.  But that's what we came up with.

10   Q    Mr. Genereux, did you also consider the breakup fee in the

11   event the Court determined that it was appropriate?  Excuse me.

12       In the event that the Court were to determine that a

13   breakup fee is appropriate in this instance, did you consider

14   the amount of the breakup fee here?

15   A    I did.  I mean, I think I -- I think one can consider, you

16   know, taking apart the Oaktree proposal and identifying what --

17   what's new money, you know, there -- what's new money involved

18   in terms of Oaktree committing new capital.  And there's a

19   slice of -- of the transaction that's on the table that is new

20   money oriented.  And it's a rights offering on the back end,

21   the hundred-and-eighty-million-dollar rights offering.

22       Now, I think you need to go a layer deeper than that and

23   look at the terms of it because within the terms of that rights

24   offering is a fee.  And the fee I think is $5.8 million, I

25   think.  But it's a meaningful fee.  It's -- it's a -- I would

1    say it's a -- for a rights offering, a fee within the range.  I

2    don't know exactly when it gets triggered, but that, to me, is

3    a fee that I have to say is pretty market.

4        But the other parts of the transaction that the 20 million

5    was -- was positioned around has to do with restructuring

6    existing investments.  Oaktree owns 73 percent of the senior

7    secured notes.  They're getting restructured.  They're

8    voluntarily, you know, equitizing those notes, the Boardrider

9    notes.  They're getting a fee off of that.  They own a

10   thirteen-million-dollar piece of that, I think, 7 million euro.

11   They're getting a fee I think -- they're justifying their fee

12   against the entire amount of Boardrider notes.  It doesn't --

13   it doesn't make sense to me.  I don't think it's market.

14            MR. SORKIN:  Your Honor, subject to any questions or

15   clarifications the Court might have, I don't have any further

16   questions for the witness.

17            THE COURT:  Okay.  Cross?

18            MR. DURRER:  It still feels like we're at sea.

19       (Laughter)

20            MR. DURRER:  The background noise.

21            THE COURT:  Well, it's a surfing company, so, I mean,

22   surf.

23       (Laughter)

24            MR. DURRER:  Oddly appropriate, I agree.

25            Van Durrer for the debtors, Your Honor.  Thank you for

1    a moment to sort myself out here.

2                          **CROSS-EXAMINATION**

3    **BY MR. DURRER:**

4    Q   One thing I wanted to just clear up right at the outset

5    because, candidly, it's been sticking in my craw a little bit,

6    can you just confirm once and for all, Mr. Genereux, to the

7    Court that you did not identify 77 new parties to the company's

8    advisors in connection with the marketing process?

9    A   I'll answer the question.  We identified 77 parties for --

10   for consideration that the company go out and contact.

11       (Pause in proceedings)

12   Q   Turn, if you will, to Exhibit 43, Mr. Genereux.

13           THE COURT:  Okay.  Operator, this is Judge Shannon.

14   Here's what I'd like you to do.  I'd like you to put all

15   parties that are on the phone on listen only.

16           THE OPERATOR:  Yes, Your Honor.  It looks like we're

17   getting some feedback from your line.  I don't know if the

18   volume is turned up.  I lowered your volume on your line as

19   well.

20           THE COURT:  All right.  All right.  We will do what we

21   can.  Thank you, Operator.

22           THE OPERATOR:  Thank you.

23   BY MR. DURRER:

24   Q   Turn, if you will, Mr. Genereux, in Exhibit 43 to Page 10.

25   A   I have it.

1    Q    So these are companies, would you agree, that Peter J.

2    Solomon identified for creditors at the formation meeting?

3    A    Your Honor, this deck was available at the -- at the UCC

4    formation meeting that I and my team attended.  We got this

5    deck.

6    Q    You received it at the meeting?

7    A    Yeah.  Yes.

8         If I just may add to that, if I could.  We -- PJT, we

9    talked with creditors the week -- or the week before the

10   formation.  I believe the formation occurred on a Monday.  I

11   had a telephonic conference call with some bondholders the

12   previous week.  And we presented to them a book, Your Honor,

13   and that book included many of the 77 names.  It may not have

14   included all of them.  It may have actually included some names

15   that we didn't ultimately submit to the company.  And many of

16   the names I believe in that book, Your Honor, before the Monday

17   meeting were those names on this page.  I don't think it's a

18   big mystery as to who you would go out to.  And I just wanted

19   to add that just to make sure everyone understood.

20             THE COURT:  I understand.

21   BY MR. DURRER:

22   Q    So look at the last page of Exhibit 46.

23             THE COURT:  46?

24             MR. DURRER:  Yes, Your Honor.

25             THE COURT:  Okay.

1          THE WITNESS:  Yes.  I've got it.

2     BY MR. DURRER:

3     Q   Now, when you referenced the 77 parties -- and just for the

4     record, you have said 77 additional new parties, you've said it

5     several times today and yesterday -- this is the list, correct?

6     A   This is I think the most recent version of the list.

7     That's correct.

8     Q   And if you compare this list to Page 10 of Exhibit 43,

9     there's quite a bit of overlap?

10    A   Well, let's do it.  Page 43, Page 10.  Is that what you

11    said?  I mean, Exhibit 43, Page 10?

12    Q   Yes.

13    A   Okay.  Okay.  So on your Page 10 there's 18 parties of

14    strategic buyers and I think 10 financial sponsors.  So that's

15    28.

16        And we put together a list of 77.  There's definitely

17    overlap, you know, between your 28 and our 77.  But, you know,

18    28 minus 77 is 39 -- 49, or whatever the math is.  So I totally

19    agree there's overlap.

20         THE COURT:  I'm not supposed to be the math guy.

21         (Laughter)

22    A   Right.  I'll pull this out and get that in front of me.

23        So I -- that's -- there's overlap.  We, from a bottoms-up

24    standpoint, came up with our 77.  You had nine parties

25    contacted prior to the filing.  And then you provided this deck

1   on the formation with additional names.  That's great.  It's a

2   step in the right direction.

3   BY MR. DURRER:

4   Q   I apologize for forcing you to jump around, but you did

5   this to yourself.  Turn, if you would, to Exhibit 6.

6          THE COURT:  Is this Mr. Savini's declaration?

7          MR. DURRER:  Correct, Your Honor.

8          THE COURT:  I'm there.

9   BY MR. DURRER:

10  Q   Now, in all the preparation you've done, you familiarized

11  yourself with the first-day declaration of Mr. Bruenjes and Mr.

12  Savini, correct?

13  A   I've -- I've looked at these, I believe.

14  Q   So look at Page 7, Paragraph 16.

15  A   I see it.

16  Q   Now, you've also referenced nine parties contacted more

17  times than I can count.  But if you look at Paragraph 16, you

18  actually see that PJSC contacted 19 parties of which eight

19  executed confidentiality agreements.  Is that true?

20  A   That's what the paragraph says.

21  Q   Okay.  Just trying to get this --

22  A   But can I -- can I -- I want to just interject, please.

23  This says 19 potential sources of financing of which eight

24  executed confidentiality agreements.

25          I just want to add, there are two -- there are two

1    processes that were happening which I think were underwhelming.

2    But one was going out to parties to see if there's strategic

3    interest in the company.  I understood that number to be nine,

4    okay?

5        There's a process to find DIP financing which is another

6    process.  I think there are two distinct processes:  DIP

7    financing, which they didn't contact the notes, and the

8    strategic, you know, process going out to bidders.  I don't

9    know where the 19 comes from.  But this -- the words here,

10   "potential source of financing," I don't know which bucket that

11   falls in.  Is that strategic?  Is that DIP?

12   Q   Well, this is precisely why a marketing process is being

13   run post-petition, correct?

14   A   Can you repeat the question, please?

15   Q   That's precisely why a marketing process is being run post-

16   petition?

17   A   Absolutely.  And the issue that I have is are you prepared

18   to do it?  Is the company prepared to do it in the right way,

19   in the sound way?  And are you actually able to do it?  I mean,

20   I understand there's a go-shop.  But can you comport a go-shop

21   within the milestones of the existing PSA?  I don't think so.

22   Q   The -- those Exhibits 44, 45 and 46 confirm, and I think

23   you will confirm, that the committee -- that the company has in

24   fact engaged with the committee on the process letter, time

25   line and parties to contact, correct?

1   A   You just referenced 44, 45 and 46?

2   Q   Yes.

3   A   I've got to look at them.

4       (Witness reviews exhibits)

5       Could you repeat the question?

6   Q   Yeah.  The question is -- I'm just trying to be expedient.

7       Those exhibits represent back-and-forth between the company

8   and the committee's advisors, PJT, correct?

9   A   Yeah.  Back-and-forth on a letter for a process, an initial

10  letter that would go out to bidders to see, are you interested.

11  That's what these three exhibits are.  I just want to be clear.

12  Q   And the company accepted all the committee's comments with

13  respect to that, correct?

14  A   I mean, the letter's pretty easy to write.  Absolutely.  It

15  was well written.  We had a few comments, to my recollection.

16  But the letter is an easy part of the process.

17  Q   And we're contacting all the parties that you've

18  identified, correct?

19  A   I -- I refreshed myself this morning.  I looked at a log

20  that we've been requesting to come from Peter J. Solomon to

21  update us.  We wanted a daily update.  We're not getting a

22  daily update.  But the most recent version that I've seen is as

23  of October 9th, I believe.  And they had indicated that 55

24  parties, I believe, have been contacted, 55 of the -- I don't

25  know if there's 77 names on it or not.  I -- I didn't count

```
 1    them.  But 55 have been contacted.  Some have responded.  Some

 2    have signed NDAs.  You know, obviously, everything is being

 3    held up right now.

 4        The bottleneck is going to be, you know, the business plan

 5    and the forecast, which isn't ready until Friday.  And we

 6    haven't even seen it.  And we will have thoughts about it.  But

 7    that's where I think the process stands right now.

 8    Q    Okay.  So look at the last page of 46 again, if you don't

 9    mind.  And let's just talk about some of these parties.

10        So in your view, Aeropostale, does that have the financial

11    wherewithal to pursue a transaction with Quiksilver?

12    A    I don't know.

13    Q    Foot Locker, same question.

14    A    What's the question, please?

15    Q    The question is:  Does Foot Locker have the financial

16    wherewithal to consummate a transaction with Quiksilver?

17    A    I don't know.  I mean, it's not -- it's not -- I would just

18    like to add, it's not unusual to come up with, you know, in a

19    broad sense who could potentially be interested in this

20    business and -- and go out and maybe they'll figure out how to

21    get the financial wherewithal if they don't have it.  I mean,

22    things happen like that.  Foot Locker goes out and contacts

23    Blackstone and says, Blackstone, why don't we jointly sign an

24    NDA and put in a bid together, you have money, we have retail

25    expertise, we'll do it together.  I mean, financial
```

1    wherewithal, at the end of the day, is pretty easy.  It's just

2    money.  And there's a lot of it.

3    Q   Pacific Sunwear.  Pacific Sunwear is in a position to make

4    a transaction with Quiksilver?

5    A   Possibly.  I mean, same thing.  You know, call -- call

6    GoldenGate.  Call their money center banks to cover them.  You

7    know, money -- they've got the brains.  They've got the brands.

8    They've got the distribution channel.  They have the strategic

9    plan.  They can go find the money if they have a transaction

10   that makes a lot of sense to people that want to invest.

11   Q   Mr. Genereux, you would agree that Pacific Sunwear is

12   itself in distress, correct?

13   A   I don't know.  I'm not very familiar with the company other

14   than looking at what business it's in, what products it sells.

15   There seems to be a realistic, a reasonable match.  It's how

16   you run processes.  You don't have to have every single box

17   checked perfectly.  Companies that are interested in this

18   business, they'll figure it out.

19   Q   So you know just enough information to assess, to put them

20   on a list, but not enough information to know if they're a

21   legitimate player?

22   A   Listen, in my 21 years of experience being a banker, you

23   know, starting with Merrill Lynch in 1995, I've never seen a

24   process run differently.  You know, you don't start with all

25   the reasons why you don't contact somebody.  You start with all

1  the reasons why you would contact somebody.

2  Q   VF Corp.

3  A   Yes.

4  Q   Are you familiar with Mr. Cooper's testimony with respect

5  to VF Corp?

6  A   I'm not.  I can't recall it.

7  Q   Well, it will be in the record later.  VF Corp basically

8  said the price that Oaktree is paying is too high, we're not

9  interested.

10          THE COURT:  Who's Mr. Cooper?

11          MR. DURRER:  Mr. Cooper is another banker at P.J.

12  Solomon, Your Honor.

13          THE WITNESS:  Is there a question that you want me to

14  ask or answer, rather, on that?  I don't --

15  BY MR. DURRER:

16  Q   No, sir.  I was clarifying for the Court.

17  A   Okay.

18  Q   Rhone.  Are you familiar with Rhone's association with

19  Quiksilver?

20  A   I am.

21  Q   And what is their affiliation?

22  A   They are an existing investor.

23  Q   And they, in fact, have two members on the board of

24  directors, correct?

25  A   I believe they're still sitting, yes.

1    Q    You haven't had -- you personally have not had a single

2    conversation with anyone at P.J. Solomon about this deal,

3    correct?

4    A    I don't know about that.

5    Q    Correction.  Well, at P.J. Solomon.  You don't know if you

6    have had a conversation with Mr. Savini?

7    A    I -- I believe I have.  I believe I have talked with him at

8    least on one or two occasions.

9    Q    What was the substance of that communication?

10   A    One occasion was on the day of formation of the committee.

11   The substance was more niceties.  I mean, we didn't talk a lot

12   of substance.  I mean, he was there for business.  We were

13   there to get hired by the committee.  It was more niceties than

14   substance.

15   Q    Okay.  So since September 21st, the date of the formation

16   meeting, you have not had a single conversation with anybody at

17   P.J. Solomon?

18   A    I -- I don't recall whether I have had any.  But my team

19   has.  I mean, I've -- we haven't had a lot of -- let me just

20   expand upon that.

21        We haven't had enough interaction with Peter J. Solomon.

22   We have been trying to get information from them.  And one of

23   the things that took longer than I would have hoped is just to

24   establish a regular communication between our firm and their

25   firm on what is happening in the sale process.  And this log,

1  which we've pushed for, we finally got.

2      So there doesn't have to be -- I don't have to have a lot

3  of conversations with Mr. Savini when I don't really have a lot

4  to cover with him.  When we're trying to get up to speed since

5  September 29, it's more important to me and my team to get

6  information.  And we don't -- you know, in this 21st Century,

7  this day and age, we don't have to have lots of phone calls

8  when it's just going to be a waste of people's time.  Give me

9  information, give me business plans forecasts, logs, who you're

10  contacting, and then we'll have conversations when we need to

11  have them.  It's not unusual.

12  Q   Sir, your team isn't testifying and expounding opinions

13  about this process.  You are.  And so that's why I'm asking

14  questions of you.

15      So have you had any conversations with any management team

16  member at Quiksilver?

17  A   No.  There hasn't been a need, and I haven't asked.  If I

18  had a need to talk with somebody at the company, I would.  And

19  -- and absolutely the buck stops with me.  But my team has had

20  potentially contact with Quiksilver.  I haven't needed to.

21  Q   Now, before this morning and yesterday, the last time you

22  and I spoke about this deal was September 21st at the Tina's

23  Wish Event, correct?

24  A   I don't -- I don't recall if that's the last time I spoke

25  about this deal with you.

1   Q   Do you recall that I offered anytime you wanted to reach

2   out about this deal you could feel free to call me?

3   A   You may have.  I appreciate it, but I don't recall.

4   Q   But you haven't done so since September 21st?

5   A   I haven't found a need.  I mean, I'm not going to reach out

6   to people when I don't need to talk to them.

7   Q   If you're having trouble processing and there's a question,

8   how you perceive that there's not a need, and, yet, you express

9   opinions about a lack of engagement, how do you reconcile that?

10  A   Pretty easily.  I mean, when we ask for a log to be put

11  together and it takes too long for us to see one, for us to get

12  updates on it, for my team to engage on some of the specifics,

13  I mean, I don't work any differently than a lot of the best

14  professionals in our industry.  It's not at all unusual for me

15  to leverage my team to get information so I can form judgments

16  and testify today.  It's not unusual at all.  That's how we're

17  taught and that's how I've done it.

18      When -- when I need direct engagement with you, Mr. Durrer,

19  or somebody else, I'll do it.  You know, I work hard.  So does

20  my team.  And we'll do the right thing.  And we'll get to the

21  right answers.

22  Q   I want to turn to the alternative DIP proposal.  With

23  respect to the alternative DIP proposal, you testified

24  yesterday, and I'm looking at Line 21 of the transcript --

25          MR. DURRER:  I don't know if Your Honor has the

1   transcript?

2           THE COURT:  You got it?

3           MR. DURRER:  Yeah.  I think we can --

4       (Pause in proceedings)

5           MR. DURRER:  I'll hand this one up.  I'll surrender

6   mine.  May I pass this up, Your Honor?

7           THE COURT:  You know, I don't need it.  If you're just

8   going to examine him on it, that's fine.

9           MR. DURRER:  Okay.

10          THE COURT:  I was here, so --

11          MR. DURRER:  Okay.

12      (Laughter)

13  BY MR. DURRER:

14  Q   Well, you can all just trust me.  You said:

15      "I think the proposal that has come forward is superior in

16  many important respects at this time."

17      Does that sound like your testimony from yesterday about

18  the alternative DIP?

19  A   Yeah.  Can you repeat it, please?

20  Q   Certainly.

21      "I think the proposal that has come forward is superior in

22  many important respects at this time."

23  A   What proposal was I referring to, the financing proposal?

24  Q   The alternative DIP proposal.

25  A   Okay.  Thank you.  It sounds accurate.

1  Q   Now, in connection with assessing the superiority of the

2  alternative DIP proposal, you have not had a single

3  conversation with any representative of Bank of America,

4  correct?

5  A   I have not.

6  Q   And the alternative DIP proposal presumes that Bank of

7  America will remain in the ABL to the tune of $45 million,

8  correct?

9  A   Bank of America's exposure?  I don't know their exact

10  exposure.  I only know the aggregate.  I thought it was a

11  higher number for the -- for the ABL lenders.  I thought it was

12  60.

13  Q   It is 60, sir.  You got that exactly right.  But under the

14  alternative DIP proposal, which I'm sure you're familiar with,

15  there's a proposal to pay that down by $15 million.  Do you

16  recall that?

17  A   Yes.

18  Q   Okay.  So by my math -- and again, you're the expert -- 60

19  minus 15 is 45, correct?

20  A   Yes.

21  Q   Okay.  So does the alternative DIP proposal in fact presume

22  that Bank of America will remain in the ABL for $45 million?

23  A   Yes, it does.

24  Q   Okay.  But you don't know if they will because you haven't

25  spoken to them?

Genereux - Cross

1    A    I don't think you need to speak to them to know whether

2    they -- or have an opinion on whether they'll stay in or not.

3    I have not spoken to them.  I don't know if they would speak to

4    me if I tried to speak to them.  I mean, I'm the advisor to the

5    committee.

6    Q    I'm sure that Mr. Berman and Mr. Fox would be happy to

7    speak to you.  But we can take that off line.

8    A    Well, maybe we can raise that.  But I think that -- I have

9    an opinion on whether they would stay in, in my estimation.

10   But I don't need to necessarily speak with them to know that or

11   not.

12   Q    The alternative DIP proposal also is conditioned upon the

13   continued effectiveness of the Boardriders waivers.  Is that

14   correct?

15   A    Yes, it is.

16   Q    And you -- what do you understand me to mean when I say

17   "Boardriders waivers"?

18   A    It's the agreement that those Boardrider notes do not

19   exercise their remedies, accelerate.  They've agreed to -- to

20   forbear.

21   Q    Can you turn in your exhibit book, please, to Exhibit 10?

22   A    (Witness reviews exhibits)

23        I have it.

24   Q    Am I correct that this Exhibit 10 is, in fact, one of the

25   Boardriders waivers executed by Archview?

 1    A    Yes.

 2    Q    And if you turn to Section 1(c), like "Charlie," I think

 3    you'll agree with me that the termination of the plan support

 4    agreement blows up this waiver.  Is that correct?

 5    A    Exhibit 1 did you say?

 6    Q    Paragraph 1 "Charlie."

 7    A    1(c).  Okay.  I'm sorry.  Just tell me where I'm going

 8    again?  I'm in the wrong document I think.

 9         THE COURT:  Why don't you walk up and give him a hand?

10         MR. DURRER:  Thank you, Your Honor.

11         THE WITNESS:  All right.  Sorry about that.  Which

12    number?

13         THE COURT:  Binder 2.

14         THE WITNESS:  Sorry.

15    (Participants confer)

16         THE WITNESS:  Okay.  Thanks.

17    BY MR. DURRER:

18    Q    So would you agree that one of the termination events is

19    the termination of the plan support agreement?

20    A    Yes.  There's -- there's no disagreement that I have with

21    that.  The Boardrider notes are going to have to be dealt with

22    in the alternative proposal.  They -- they do not have to

23    continue to stand still.

24    Q    And again, in assessing the superiority of the alternative

25    DIP proposal, you have not had a single conversation with

1    anyone at Archview?

2    A   In respect to the super -- the superior proposal, I have

3    not.  I have not.  I have a view on what they will do and

4    gaming out their thinking, but I have not talked to them about

5    it.

6    Q   And is it your opinion -- are you expressing the opinion

7    that the board of directors and this Court should rely upon

8    your view that is uninformed by actually communicating with the

9    stakeholders?

10   A   I'm not -- I'm not saying the company should rely on my

11   view.  I think they'll rely on their own advisors.  I mean, I

12   have a view.  I think like Oaktree, they are -- the Boardrider

13   note investors are very invested in this company and won't want

14   to see this situation unfold and are likely to cooperate if

15   there is a deal that gets them to the same spot that this one

16   will, which is paid off in full or reinstated in par debt.

17   They're in a very similar position that Oaktree is.  They're

18   very invested in this.

19   Q   Well, how -- in connection with your process, describe for

20   me how a holder of a Boardriders note gets comfortable that

21   their debt will be reinstated.

22   A   Well, they have that in this deal.  So in their pocket

23   right now is an Oaktree deal that gets them reinstated where

24   they're happy.

25        An alternative deal that could come together through an M&A

1   process by definition will be that or better, or else the

2   estate will choose Oaktree's deal and there won't be an

3   alternative.

4   Q   You're familiar with reinstatement under Section 1124 of

5   the Bankruptcy Code, correct?

6   A   I am.

7   Q   Can you explain to me how you can execute a reinstatement

8   under 1124 in connection with the Section 363 sale process?

9   A   They would pay them off in full.  They wouldn't reinstate

10  them.  I would -- I envision a payoff in full.  Not a

11  reinstatement, but a payoff.  Because any buyer is going to buy

12  the business.  And they'll -- for it to be superior, they're

13  going to have to pay off Oaktree in full.  They're going to

14  have to pay off the other liabilities in full, including the

15  Boardrider notes.  That's how I see the alternative, Your

16  Honor.

17  Q   Now, you're aware that in the occurrence of a change of

18  control, the Boardriders noteholders are actually entitled to

19  put their bonds to the company at 101 percent, correct?

20  A   Yes.  I believe that's -- that's right.

21  Q   And so, again, is it your opinion that the Boardriders

22  noteholders would suffer a payoff rather than exercise that put

23  at a premium of one percent?

24  A   I mean, there are a lot of details to work out.  But 101 on

25  those bonds is another 2.2 million.  I would expect the deal

1  comes together and they get their -- they get their change-in-
2  control premium on top of their bond.
3  Q   And just to be clear, you -- in addition to Archview, you
4  haven't spoken to any other Boardriders noteholders about the
5  alternative DIP proposal, including Canyon, for example,
6  correct?
7  A   I reached out, not about the alternative DIP proposal, but
8  I -- I reached out unsuccessfully to one of the holders to
9  speak to them.  And one of my team members may have spoken to a
10  bondholder --
11  Q   Is that since your deposition on Tuesday?
12  A   No.  I think it preceded that.
13  Q   So does that mean that your testimony on Tuesday that you
14  hadn't reached out to any holder of Boardriders notes was
15  incorrect?
16  A   I don't recall my testimony on Tuesday.  But I don't --
17  like I said, I don't -- I didn't talk to anybody.  So you can
18  read back my testimony.  But I -- on behalf of my team, I tried
19  to get a hold of I think via email one of the noteholders.
20  Q   And again, in assessing the superiority of the alternative
21  DIP proposal, you didn't have any conversations with anybody at
22  Brigade?
23  A   No.  I didn't deem that I needed to.  I mean, they --
24  Brigade and Contrarian and these investors on their own,
25  without solicitation on my part, put forth a proposal that I

1    think is better.  Things need to get worked out, as you pointed

2    out.  We're going to need to get the Boardrider notes on board

3    with it, as an example.  But they proactively did that.

4    There's no -- there's no do-overs in life.  But Brigade is

5    creating -- and Contrarian, they're creating value in this, you

6    know, as this hearing has been going on over the last 24, 48

7    hours.  I haven't needed to reach out to them.

8    Q    You've also expressed some views in your declaration with

9    respect to the security for the DIP loan.  And I believe that

10   your testimony was to the effect that --

11             THE COURT:  Mr. Durrer, hang on.

12             MR. DURRER:  Yes, Your Honor.

13             THE COURT:  Because I think you're moving into a new

14   area of inquiry.  And obviously it all relates to the DIP loan

15   and that's fine.  And I know -- I think I know precisely where

16   we are in your examination.

17             As I said, I have what I will ensure is no more than a

18   thirty-minute hearing that's scheduled to occur right now.

19   Normally, I wouldn't bounce this many people, but I already

20   bounced these guys from yesterday because I was assured you

21   would finish yesterday.

22        (Laughter)

23             THE COURT:  So I think what would make sense right now

24   is if we briefly broke.  I'd like to confirm that we can leave

25   the line open, although I'll have people participating on this

1    hearing.  I don't want people to have to jump off and dial back

2    in.  I don't know how that works.

3         But what I'd like to do is assure parties you can

4    leave all of your materials.  I think that this hearing is

5    mostly, if not completely telephonic, other than I believe

6    debtor's counsel will be at the podium.  And again, it should

7    be 30 minutes.  So I'd ask that you don't go far.  And again, I

8    appreciate everyone's patience and flexibility with this

9    process.

10        MR. DURRER:  Certainly, Your Honor.

11        THE COURT:  Mr. Genereux, as you remain in the middle

12   of your examination, you are not to discuss your testimony with

13   anyone during the break.

14        THE WITNESS:  I understand.

15        THE COURT:  Very good.  All right.

16        We'll stand in recess 30 minutes.  Thank you.

17   (Recess taken at 10:00 a.m.)

18   (Proceedings resume at 10:36 a.m.)

19   (Call to order of the Court)

20        THE COURT:  Please be seated.

21        Mr. Genereux, have a seat.

22   (Witness resumes stand)

23        THE COURT:  I'll remind you that you remain under

24   oath.

25        THE WITNESS:  Yes.  Thank you.

1          THE COURT:  Mr. Durrer, ready when you are.

2          MR. DURRER:  I have a lot of stuff up here, Your

3    Honor.  I'm sorry.

4          Van Durrer, for the debtors.  And by the way, thanks

5    again for accommodating us, absorbing so much of your time.  We

6    appreciate you doing that, and obviously we're happy to

7    accommodate other matters and other folks that you've been

8    moving around for us.

9    BY MR. DURRER:

10   Q   Mr. Genereux, I think you've testified either affirmatively

11   on the stand or by way of your declaration that you view the

12   DIP lenders as adequately protected, absent a pledge of the --

13   absent a pledge of all of the hundred-percent stock of the

14   foreign subsidiaries.  Is that accurate?

15   A   Yes.

16   Q   Okay.  But you haven't done an evaluation of any of the DIP

17   collateral, correct?

18   A   I have not, nor has the company.

19   Q   And one basis for your conclusion that the DIP lenders are

20   adequately protected, absent that component of the collateral

21   package, is because they sit at the very top of the capital

22   structure.  Is that correct?

23   A   Are you referring to a specific paragraph in my

24   declaration?

25   Q   I could.  So Exhibit 57 --

1    A    58, right?

2    Q    Well, you had two.  I'm talking about 57.

3    A    Oh, I'm sorry.

4         I have it.

5    Q    Okay.  And I'm referring to Paragraph 11 on Page 5 where it

6    starts with "A third ..." in italics.  If you want to take a

7    minute and read that.

8    A    (Witness reviews exhibit)

9         And this is the line with the typo, which meant, isn't that

10   to say, I think, "already encumbered."

11   Q    "Already encumbered," right.  That was a mistake in your

12   declaration which has been fixed in the record, I believe,

13   yesterday.

14        So the question I have for you is:  One basis for the

15   opinion you express in this Paragraph 11 of your declaration,

16   Exhibit 57, is that these lenders sit at the top of the capital

17   stack, that's why they're so protected, having not done a

18   valuation.

19   A    I think that statement is accurate.  It's in my estimation

20   that the first $115 million coming from Oaktree at a

21   super-senior position with a company of these assets, this

22   scale, these cash flows, is fully protected -- adequately

23   protected.

24   Q    Now, it's not really super-senior, right, because that one

25   fifteen does sit behind B of A 60, with respect to working

1   capital assets, correct?

2   A   Yeah.  And that's not unusual.  It has a, I believe, a

3   second lien on bargain base collateral and a first lien on --

4   yes, under everything else and that's correct.

5   Q   Now, you -- in your -- you've expressed the point of view

6   that breakup fees are only typically available for committed

7   capital -- fresh, committed capital.  Is that fair?

8   A   I testified earlier, before the break, that I see break

9   fees [sic] associated with fresh capital and --

10  Q   And --

11  A   Yes.

12  Q   Okay.  And so, is it -- you would agree that the rights

13  offering that Oaktree is back-stopping constitutes fresh

14  capital, right?

15  A   Yeah.  I mean they're committing -- they're committing the

16  capital and I believe it's been offered out to others as well,

17  but they stand behind it.

18  Q   And you disagree, though, that the conversion of $280

19  million of senior secured notes is a commitment of capital,

20  right?

21  A   Yes.  Yes, I do.  I think when you pull back and look at

22  the substance of what's happening here, they're working out an

23  existing investment.  I don't think they're committing capital

24  in that instance.

25  Q   And you used the term "workout" again.  So what is your

1  understanding of the word "workout" that you used in that

2  context?

3  A   Well, I'm just simply saying that they own 73 percent of

4  those secured notes, and as part of the overall package,

5  including a capital commitment of one eighty and a rights

6  offering, they're agreeing to convert that to equity; it's that

7  simple.

8  Q   But in a workout, there's no shop at all, right?

9  A   I'm sorry, no -- "there's no shop at all." What do you mean

10 by that?

11 Q   If a creditor is working out an obligation with a debtor,

12 there's no shopping of that transaction; it's two parties

13 negotiating.

14 A   Are you referring to the go-shop element of this?

15 Q   No.  I'm referring to your term "workout" that you've used

16 as to why this 280 million should not be considered fresh

17 capital because it's a workout?

18 A   The two eighty of secured notes, prepetition secured notes.

19 Yeah, I mean, I think that the notes are getting restructured

20 as part of that bankruptcy plan that's before the Court.  I

21 feel like I continue to answer the same question, but, yes,

22 they're agreeing to convert the debt to equity.

23 Q   I apologize if I'm asking the same question.  It's probably

24 my fault, but what I'm trying to get at is, the distinction

25 that you're drawing as to why that isn't fresh capital is

Genereux - Cross

1    because it's a workout, it's a negotiation, it's a compromise

2    between a creditor and a debtor.  Am I getting you right?

3    A    Well, let me take another run at it.

4         I think break fees are paid to new investments.  You take,

5    for example, the company picks up the phone and talks to TPG

6    and says, here's a book, I'd like you to consider buying the

7    company and putting in capital to do so.  And TPG will consider

8    whether it's a good thing or something that they're interested

9    in.  They'll line of capital financing to back their bid and

10   they'll submit a bid.

11        And in that made-up scenario, if they're committing a

12   hundred million dollars, alongside a debt financing that they

13   raise and line up and arrange in the market, then I think that

14   is what I'm referring to as a new money investment.  That's

15   different --

16            THE COURT:  I think I'd like you to alter your

17   hypotheticals, because I want to make -- I thought I had

18   understood the proposition in this exchange and I'm not a

19   hundred percent certain right now.

20            So if you'll indulge me, change your hypothetical to

21   Oaktree and presume that what we have, instead of a plan with

22   all the structure that we have, we have an Oaktree acquisition,

23   a credit bid of whatever the notes that they hold are, plus

24   additional new money on top.  Okay?

25            THE WITNESS:  Uh-huh.

1          THE COURT:  Is it your proposition or your belief that

2    to the extent that we would be considering a breakup fee, that

3    breakup fee would extend to the cash component of the bid and

4    not the credit bid portion, because the credit bid is

5    essentially an exchange of existing held debt to the ownership

6    stake that's going to come through the sale process?

7          THE WITNESS:  I agree with that, Your Honor.

8          THE COURT:  That helps me.  Thank you.

9          THE WITNESS:  Now, I just want to add one sentence to

10   that, because I previously testified how that $180 million has

11   a fee attached to that.  I don't know exactly when it gets

12   triggered, but there is a commitment fee for that 180.

13   BY MR. DURRER:

14   Q   We're going to get there.

15       So, to further go down this road with the hypothetical --

16   and thanks to Judge Shannon -- so we've talked about fresh

17   capital, new cash.  We've talked about a credit bid.  Now,

18   let's talk about assumption of liabilities.

19       Would you think that an assumption of liabilities is, in

20   effect, a commitment of capital?

21   A   No.

22   Q   And why is that?

23   A   That this is a restructuring and the Boardriders notes are

24   agreeing, because it's in their best interests to be reinstated

25   and rolled as part of this transaction.

1   Q   Who said anything about Boardriders notes?  I'm just asking

2   about assumption of liabilities?

3   A   Well, that's a liability -- that's a major liability that's

4   getting assumed in this transaction, so that's what I'm

5   thinking about.

6   Q   Let me turn to -- still in Exhibit 57 -- I want to go over

7   your IRR analysis on Page 11 -- 11 and 12.  Now, you testified

8   that the 14.5 percent rate of return, with respect to

9   alternative DIP proposal would probably go down if you included

10  the additional enhanced terms that have been discussed on the

11  record yesterday and today, raising the one fifteen to about

12  one fifty-four, if I'm remembering the total all-in number.  Is

13  that correct?

14  A   I further testified that I need to -- I would like to check

15  that, whether actually advancing new money would lower the

16  rate.  On the break I didn't do it; I got tied up on some other

17  things that I'm involved in.  I didn't calculate it.  I was

18  going to.

19      It may not because you're advancing at the same interest

20  rate so, Your Honor, I may have been wrong.  And I think I

21  testified, like, after I was asked the question, let me think

22  about that for a second, because, you know, new money is coming

23  in and they're still going to charge the investors 10 and a

24  half percent, so maybe the IRR doesn't change.

25          THE COURT:  Well, your testimony was that you had not

```
 1    run the numbers, but your assumption would be that the overall

 2    cost of the money would be reduced because there are certain

 3    fixed costs that are associated with this and you're increasing

 4    the overall amount.  You're not necessarily assuming that

 5    you're -- that you would be correspondingly increasing some of

 6    the fees or costs associated with that.

 7              THE WITNESS:  Yeah, I think --

 8              THE COURT:  That's how I understood your testimony.

 9              THE WITNESS:  -- that that is accurate, Your Honor.

10              THE COURT:  But you also did say that you have to run

11    the math.

12              THE WITNESS:  Yeah.

13    BY MR. DURRER:

14    Q   Well, in addition, though, the OID is 1.2 million in your

15    chart on Page 11, but that's reflective of a one-hundred-and-

16    fifteen-million-dollar balance, so the OID is actually going to

17    go up because now we're talking about a hundred-and-fifty-four-

18    million-dollar balance, correct?

19    A   It may.  I heard -- I have only heard what was said this

20    morning when I believe Mr. Somerstein came to the podium and

21    said, you know, we've come up with another --

22              THE COURT:  Seventeen.

23    A   -- $17 million dollars.

24              THE WITNESS:  Thank you, Your Honor.

25    A   I don't know any more of the specifics.  You know, you need
```

1    to see the specifics, and this isn't the greatest choice of

2    words, but IRR calculations, they're kind of weird.  You have

3    to -- the math can sometimes have an output that is contrary to

4    intuition sometimes.

5        So I would like to run the numbers, but I think -- I

6    generally think that if we're going to be advancing money at

7    the same rate, the rate is probably not going to change much.

8    I may go down some for fees that are static against a larger

9    loan, but that will probably be a little bit of an adjustment.

10   Q    Okay.  On the next page you also draw some analogous

11   opinions with respect to trading activity on the senior secured

12   notes.  Am I understanding that right so far?

13   A    Yeah -- yes.

14   Q    And so this chart, just so I understand it, it says source,

15   Bloomberg, on Page 12 of your declaration.  And what you've

16   represented to the Court, as I understand it -- just to put it

17   in my layman's terms -- is this is, in effect, a screenshot of

18   the trading on the senior secured notes.  Is that what this is

19   indicating?

20   A    You can get the data from Bloomberg.  You go to -- instead

21   of graph, you ask for the data, and you can copy that data out

22   of Bloomberg, put it into an Excel, and then do your own table.

23   That's what I think we did here.

24       I didn't prepare this table.  I said I want it, but I

25   didn't prepare it manually; one of my team members did.  But I

Genereux - Cross

1    believe they took the data from Bloomberg, put it into an Excel

2    spreadsheet, and then put it into the declaration.

3    Q   And this is a yield-to-maturity calculation, right?

4    A   Yes.

5    Q   And so you said you thought the maturity was out two or

6    three years?

7    A   I did -- you can tell me what the fact is -- and, yes I did

8    say that.

9    Q   Yeah.  I mean it's in Mr. Bruenjes' declaration.  We don't

10   need to turn to it, but it's in there and that's in evidence.

11   I don't think that anybody contests that it's 2018.

12       But here's the question I have for you:  The computer

13   screen from which this information is taken doesn't know that

14   we're in bankruptcy, so, in other words, when this screen is

15   talking about yield to maturity it's actually still looking at

16   2018.  Is that fair?

17   A   I think it is.

18   Q   Although the maturity, for purposes of the law and Judge

19   Shannon and everybody in the room, is actually September 9 of

20   2015?

21   A   I don't know about that.  I think, you know, we're going

22   into a territory -- I'm not exactly sure what you're saying.  I

23   don't know if I agree or disagree with that statement.

24       I think the bond is what it is until it's something

25   different.  So, the market -- right now, those bondholders have

1   a piece of paper that has a maturity of whatever it is and if

2   this transaction goes through, they'll take equity.  If this

3   transaction doesn't go through, then they will take back

4   whatever the alternative transaction is, so ...

5   Q   Okay.

6           MR. DURRER:  I've got to find an exhibit, Your Honor.

7   One moment.

8           THE COURT:  Take your time.

9       (Participants confer)

10  BY MR. DURRER:

11  Q   Mr. Genereux, are you able to locate Exhibit 59?  It should

12  be a loose piece of paper up there somewhere.

13  A   59 is the last --

14  Q   It's not going to be in the book.  It's going to be a

15  single ...

16  A   Yes.  Yes, I have it.

17      Yep.  Thank you, sir.

18      I have it.

19  Q   Great.  And I think you testified yesterday afternoon that

20  when you look at the operating cash burn at the bottom of the

21  page, to the effect that the company is still going to

22  experience this operating cash burn between January and March,

23  regardless of whether it's in bankruptcy or not.  Is that fair?

24  A   I testified that you need to inform me what this 17 million

25  is for.  I don't -- I don't know exactly what this is for.

Genereux - Cross

1   What information I have is coming from the company, through my

2   team, that this quarter that we're talking about is a working

3   capital build period.  I definitely expect you to tell me that

4   there are other uses of cash in that seventeen.

5       If you're going to stay in bankruptcy for another quarter,

6   there's going to be professional fees; you're going to tell me

7   that.  If you're going to be in bankruptcy for another quarter,

8   you're going to pay the DIP interest for another quarter;

9   you're going to tell me that.

10      I get that, but there's also what I got from the company, a

11  working capital need and it started at fifty like 48 or 72

12  hours ago, and now I assume it went down.

13  Q   But you would agree with me that exit financing for a

14  company that's emerging from bankruptcy is going to be

15  generally cheaper than DIP financing?

16  A   Exit financing v. DIP financing.  I'm not sure if I do

17  agree with that -- I don't agree with that.

18      Because the financing that the company going to need to get

19  is for its entire capital structure, right?  I mean, so the DIP

20  is just the super-senior piece, the first 175 million, but the

21  rest of the capital structure has to get filled out.

22      You know, Oaktree has their vision of what they would like

23  to do with the rest of the capital structure, but, you know,

24  you have to price the entire capital structure, not just roll

25  the DIP.

Genereux - Cross

 1   Q   Let me be more specific.

 2   A   Uh-huh.

 3   Q   Fair point.

 4       A hundred and fifteen million dollars of financing, first

 5   position, junior only to working capital, is going to be

 6   cheaper post-exit, than it is in either of these DIP proposals?

 7   A   I'm not sure if I agree with that.  I mean I think you have

 8   to run a process and see what cost of capital you can get for

 9   exit financing.  I don't think you've done that yet.

10   Q   You testified also, with respect to this chart, that, you

11   know, there's an additional incremental cost that's not listed

12   here because under the enhanced alternative proposal, $15

13   million is being borrowed at 10 and a half percent interest and

14   it is being used to pay off on obligation at 4 percent

15   interest, correct?

16   A   I did.

17   Q   And I think that you and Judge Shannon kind of worked out

18   that that number was about a hundred and eighty grand.  Am I

19   remembering that right?

20   A   Let me do the math --

21   Q   Sure.

22   A   -- for a second.  If I could just refresh my memory,

23   please.

24   Q   Yep.

25       (Pause in proceedings)

1  A    Let me just check it one more time.

2       Okay.  I'm sorry.  Would you please repeat the question?

3  Q    So one of the proposals that the alternative DIP lenders

4  have made is to pay -- is to borrow $15 million dollars at ten

5  and a half percent interest and pay B of A using four percent

6  -- I think you, actually, yesterday used 3.75 percent.

7       So it seems to me it's that delta between 3.75 and ten and

8  a half on $15 million.

9  A    Okay.  Let me just do the math again.

10      You're saying I used 3.75 percent.  I couldn't remember

11  what I used.  So the delta is 6.75 percent on what's 15

12  million, not 16 million, right?

13 Q    Correct.

14 A    Okay.  Agree.

15 Q    So what's the monthly amount?

16 A    It's $84,000 a month more.

17 Q    Okay.  Now, I think that the conclusion that you reached

18  yesterday was that that would run for two months, but it's

19  actually six months, right?  It's the entire length of the

20  case.

21 A    It would reprice for six months.

22 Q    Okay.  So it's more like a half a million bucks, ish?

23 A    It's 506,000 for a full six months.

24      Listen.  In life, like I said, there's no do-overs and

25  also, there's nothing for free, but $500,000 a month weighed

1   against two and a half months more time to pursue, you know, a

2   possible and realistic, potentially better outcome for

3   creditors, the company needs to make a decision.

4       And maybe they can go back to Brigade and Contrarian and

5   the others and ask them to do better, just as they've been

6   doing better over the last 48 hours.

7   Q   I think you agreed at your deposition that there was a leak

8   or an announcement sometime in the summer that PJSC had been

9   hired by the company to pursue strategic alternatives.  Do you

10  recall that testimony?

11  A   I testified, I think, in the context of the yield, as it

12  started to approach 15 percent; that's my recollection.  And

13  I'm estimating that the market started to see that this company

14  may restructure.  I don't know if I'm right or not, but that's

15  what my testimony was.

16  Q   But you would agree that the marketplace will view that

17  kind of an announcement as a signal of that potential

18  consequence, correct?

19  A   I mean, the market is pricing risk all the time.  You know,

20  they're -- it went up, I think, maybe for that reason.  There

21  are all the other factors that the market's always constantly

22  digesting.

23  Q   I'm asking you a different question, and I apologize if I

24  was unclear.

25      I'm asking you if people in the marketplace, when they see

1    that a company is known to be in some level of distress or

2    stressed -- to use a Debtwire term -- they understand that when

3    a banker gets hired to pursue so-called strategic alternatives,

4    that that company is likely in play.

5    A    I'm not sure if I can say that.  I think in some instances,

6    yes, and in some instances, no.

7              MR. DURRER:  Just give me a moment, Your Honor.

8              THE COURT:  Sure.

9    BY MR. DURRER:

10   Q    So, I'm just going to read -- this is from your deposition

11   -- I'll read it to you and you can say whether you agree with

12   it.  So the question was:

13             "So is it fair to say that in that context, when that

14   announcement has been made of the hiring of an investment

15   banker, that folks within the capital structure will also pick

16   up the phone and reach out to the company or that investment

17   banker and say, hey, I'm interested in considering an

18   investment?"

19        And your answer was:

20             "Sometimes.  It precipitates inbound.  It really

21   depends upon the particular institutions.  You know, some are

22   more proactive than others; some need to be prodded; some need

23   to be reminded; some don't; some jump the gun and move to

24   fast."

25        Is that a fair summary of --

1   A   Yes, it is.

2   Q   Okay.  Now one of the criticisms that you've lodged of the

3   process is that the company did not affirmatively reach out to

4   unsecured bondholders with respect to potential DIP financing.

5   Is that accurate?

6   A   Yes, that's absolutely correct.

7   Q   Okay.  But you agreed at your deposition that there are

8   factors to consider in whether reaching out deeper in the

9   capital structure, and that the company needs to take those

10  factors into account, positive and negative, to determine

11  whether to approach?

12  A   You'll have to remind me of that.

13          THE COURT:  What page are you on in his transcript?

14          MR. DURRER:  We're on Page 80.

15  BY MR. DURRER:

16  Q   So the question I asked was:

17          "In a distress situation when a company reaches out to

18  unsecured debt holders, is there a possibility that news of the

19  company's distress could become more widespread?"

20      And your answer was:

21          "I mean, in these circumstances, companies need to

22  weigh the priorities against the risks, and in my understanding

23  of the situation, I mean Quiksilver hired PJ Solomon as early

24  as the spring of 2014, I suspect -- I mean, Quiksilver has been

25  a company that is, you know, 'on the radar screens of firms

```
 1   like myself.'  I suspect that Peter J. Solomon was not retained

 2   only for its M&A capabilities, but for its restructuring

 3   capabilities.  And it is in the circles that you referred to in

 4   my earlier testimony, Debtwire and the press circles of my

 5   industry, and Peter J. Solomon is in the same industry.

 6   Houlihan is in the same.  This is a company that's been on

 7   restructuring's radar screen for many, many months, maybe

 8   years.  And so when there, the company, to my knowledge, was

 9   engaging with Oaktree around restructuring-type transactions

10   going back to the beginning of the summer, if not earlier --

11   so for there, getting back to my point, weighing the risks

12   against the needs of the company, I would think the company,

13   Quiksilver, had already crossed the line of needing to figure

14   out where competitive sources of capital could come from, and

15   they went so far as to go to Oaktree, I'm saying they should

16   have gone one more step further to another group of creditors

17   to have an investment in the company that would want to

18   consider protecting it."

19        Is that fair?

20   A    Yes.  Is there a question?

21   Q    The question was:  Is that consistent with your

22   recollection of your deposition testimony?

23   A    Yes.  You wrote it -- you read it verbatim.

24   Q    I tried.

25        Let me take you to the milestones.  This is the -- Exhibit
```

1    61.

2              THE COURT:  61, you said?

3              MR. DURRER:  It's the single page that was presented

4    to you today.  It's the black, red, and blue.  Perfect.

5              THE COURT:  Okay.

6    BY MR. DURRER:

7    Q    Now, I don't know if you know this, but there was some

8    discussion at one of the depositions about perhaps not taking

9    the alternative DIP all the way out to March and maybe some

10   shorter time frame, like, you know, January.  And I think the

11   conversation was so as to mitigate some of the additional

12   expenses that are identified on Exhibit 59.

13        The question I have for you, sir, is whether you feel that

14   you could develop, with PJSC, a sale process time line that is

15   consistent with the January 15 entry of plan confirmation

16   order, and develop a process that, in your mind, would be

17   adequate to market the company?

18   A    All right.  You know, I think what I can say -- I'm just

19   trying to --

20             THE COURT:  I would actually like to ask the question

21   more directly.

22             THE WITNESS:  Thank you.

23             THE COURT:  No, thank you.

24             January 15 is three months from today.  You do a lot

25   of sales.  Ninety days is certainly rapid, but it's not lost

Genereux - Cross

1   upon me, as well, that more time is better than less time when

2   you're trying to sell an asset and you have this potentially a

3   worldwide buyer universe.

4        But I think I'd like, specifically, your response on

5   why three months from today is not sufficient and then

6   subsequent to that, separately, I'd like your response about

7   the interplay of the plan process that would be going alongside

8   of what the debtor has characterized as its marketing test.

9        I think you answered a question of mine earlier that

10  said potential buyers will look at the company as being

11  committed to a different transaction to the plan and not to

12  this and they're not going to -- they don't want to get into

13  that mix.  I understand that proposition, but I'd like you to

14  first start with the proposition -- with the question of why

15  the debtors' time line of 90 days to a confirmation hearing or

16  a sale hearing is not sufficient under the circumstances of

17  this case.

18       THE WITNESS:  Yeah.  Okay.  So I think we need to

19  understand where the company stands right now.

20       THE COURT:  Do me a favor --

21       THE WITNESS:  Yeah.

22       THE COURT:  -- and make sure you're close to the

23  microphone.

24       THE WITNESS:  Where does the company stand right now

25  at the moment in terms of its readiness?  It has a bid letter.

1    We've talked about that.  Peter J. Solomon has begun sending

2    that out.

3           What bidders need to now see is a CIM, a document that

4    describes the business, and I think it has to be more adequate

5    than the presentation that I have seen, which is a PowerPoint

6    document that is more informational, but it goes through, for

7    example, you know, a --

8           THE COURT:  We know -- we know what a "CIM" is.

9           THE WITNESS:  Okay.  But I think it's -- we need to

10   get to a CIM.  So, I don't know -- the company needs to answer

11   when can they prepare that, because I think a CIM needs to go

12   out to bidders now.  So working with the timetable of three

13   months, which is 12 weeks, I think if you could press the

14   button on a CIM, a forecast, you know, a business plan, which

15   is embodied in the CIM, and got it -- get it out today to those

16   parties, that four or five weeks to get initial indications of

17   interest from bidders, it's tight, but we could work with that.

18   So that's four weeks.

19          So you get the indications of interest and then you

20   figure out what you have:  What parties do we want to move to

21   another round?  And another round is going to need to involve

22   management, so depending upon how many parties that come in

23   that are interested, you need to conduct management meetings

24   and a deeper level of diligence with those parties.  And you're

25   trying to get them to mark up a contract and hopefully it's a

1    binding contract.  So you've got eight weeks to do that.

2            In my judgment, eight weeks is tight, you know, for a

3    business in Chapter 11.  If you put aside the first four weeks

4    -- say they can do that -- eight weeks to get management

5    meetings done and marked-up contracts with those bidders, you

6    know, follow-up due diligence and they're submitting contracts

7    within eight weeks.  Now, remember if they submit them, now the

8    company needs to analyze them and look at, really, what they

9    have.  They will be marked up.  They will have -- they won't --

10   they won't agree with the purchase agreement and that's going

11   to require a negotiation.

12           If you have eight people that are very -- eight

13   investors that are have interested in that and you're doing

14   eight, you know, simultaneous, you know, back-and-forths,

15   that's a lot of effort.  Can it be done?  Yes.  I mean things

16   -- big things happen if they need to, but in my judgment, it's

17   tight.

18           THE COURT:  That's a fair answer.

19           Now, I'd like you to take the second question -- the

20   second piece of this, which is -- and I think it's pretty

21   consistent with some of the points that we covered earlier, but

22   I'd like it in the context of the evidence that's now been

23   adduced in your testimony.  What's the impact of the plan

24   process on that exercise -- leave aside the timing.

25           THE WITNESS:  Yeah.

Genereux - Cross

1    THE COURT:  I get it.  I understand these time lines.

2    THE WITNESS:  Yep.

3    THE COURT:  So give me that much.

4    THE WITNESS:  I think, Your Honor, the toggle between

5    selling a business and a plan needs to be understood by

6    investors.  I don't -- I can't sit here right now and tell you

7    exactly how that would work, but it would need to be a -- and I

8    know these aren't very precise terms -- but a true toggle; the

9    company can truly toggle to selling the business.

10    If investors understood that, that this is not -- the

11    doors aren't starting to kind of -- the walls aren't starting

12    to close in around this company, and the door could open to a

13    sale if a bid comes in that's higher and better than what's on

14    the table for -- with Oaktree right now, then Peter J. Solomon,

15    other investment banks involved here can explain that to the

16    market.

17    I don't know the mechanic, exactly, but that's what's

18    going to substantively need to happen.

19    THE COURT:  I understand your responses.

20    Mr. Durrer, I apologize for the interruption.  You're

21    welcome to take back over.

22    MR. DURRER:  I'm all in favor of direct questions,

23    Your Honor.  You did great.

24    THE COURT:  You'll get my bill.

25    (Laughter)

Genereux - Cross

1        MR. DURRER:  Hopefully, I have some credit left with

2   you.

3   BY MR. DURRER:

4   Q   Would you mind turning, sir, to Exhibit 46.

5   A   (Witness reviews exhibits)

6       Got it.

7   Q   This, again, is the bid letter that we talked about before,

8   but right now, this letter, on the first page, refers to the

9   existing plan sponsor transaction at the bottom of the page.

10  Do you see that, the reference to Appendix 1?

11  A   Yes.

12  Q   And isn't it fair to say that this proposal does exactly

13  what you just discussed with the judge; in other words,

14  outlining the ways in which people can top and move the company

15  away from the existing plan process?

16  A   In very simple terms, absolutely, it says that.  I think

17  the issue that we just spoke a lot about is just time.  You

18  have to be able to run the process and give bidders time to

19  participate.

20  Q   Let me take you to your declaration, the Exhibit 57

21  declaration.

22  A   I have it.

23  Q   Now you -- the chart that's shown on Pages 6 and 7, that's

24  what I want to specifically refer you to.

25  A   I have it.

1   Q   So, I just want to be clear on this.  This is -- the chart

2   is described as comparing the material terms of what you call

3   the "superior DIP" to the proposed Oaktree financing, correct?

4   A   Correct.

5   Q   Now, you've not listed as a material term, the ability to

6   have B of A remain in the ABL facility, correct?

7   A   The ability to have them remain?  This, side by side, does

8   not speak to, you know, the necessity for B of A to stay in.

9   Q   Okay.  And so under the current version of the proposal,

10  which I think as you remarked earlier, we've not seen in a

11  writing, there's $45 million of exposure, at least, to B of A

12  -- I'm sure that Mr. Fox will correct me on that number -- but

13  at least forty-five.  Would you consider, in analyzing this

14  proposal, the presence or absence of $45 million of financing

15  to be material?

16  A   In light of the DIP, it's material.

17  Q   In addition, with respect to the interest rate, you've

18  calculated savings.

19      Do you recall -- when we spoke at your deposition, you

20  didn't recall precisely how that 720,000 to 900,000 was

21  calculated.  Have you had an opportunity to figure that out?

22  A   Yeah.  I went back through the calculations.  Yes.

23  Q   So can you explain to the Court how you calculated that?

24  A   Sure.  I mean for this table, it's the difference between

25  12 and a half and 10 and a half times the number of months

1    outstanding for the superior proposal.  So that seven twenty to

2    nine hundred, I think, is a range, because I think I looked at

3    it for maybe five months, as well as six and a half.  I looked

4    at the range of -- I can do it again, but it's either -- you

5    know, the low end, I think is five months and the high end is

6    six and a half or seven.

7    Q   Okay.  So -- but we used six.  We didn't use two like we

8    did when we made a mistake on the 15 million to B of A

9    yesterday.

10   A   Yeah.  I mean that's how I'm doing the calculation; just

11   the way I've described it.

12   Q   Okay.  And you didn't consider in this row, the fact that

13   there's two more months of interest at 10 and a half percent.

14   You just considered the delta between 12 and 10 and a half,

15   correct?

16   A   I assumed both loans go for the longer period of time, just

17   to make it apples and apples.  I mean I think I made the

18   assumption in the proposed financing stays outstanding as long

19   as hours, I believe.

20       I mean if you want me to do the math, I'll do the math and

21   I'll tell you.

22   Q   That's not necessary.

23   A   Okay.

24   Q   That answer gets me where I need to be.

25   A   Okay.

1   Q   With respect to adequate protection, you would agree that

2   the company's ability to prove-up a priming case is a material

3   consideration with respect to an alternative DIP proposal,

4   correct?

5   A   It's a material provision.

6   Q   And you've not done any valuation that would support a

7   priming case to date?

8   A   No, nor has the company.

9   Q   Do you have -- I'm going to take you back to Exhibit 59.

10  A   That's this, correct?

11  Q   Yes, sir.

12      Do you have any disagreement with any of the math that's on

13  Exhibit 59 with respect to the incremental cash costs of the

14  alternative DIP?

15  A   Let's just go through it line by line.  OID, you charged

16  the alternative with one percent.  I questioned why you didn't

17  charge the Oaktree transaction it for its three percent -- if

18  I'm not mistaken -- and I wonder if the Court were to approve

19  the alternative transaction, could they claw-back the OID that

20  was paid?  So, it's blank, and I just wonder out loud whether

21  that can be remedied.

22  Q   So, in other words, we can agree that three percent of OID

23  is greater than 1 percent of OID on a hundred-and-fifteen-

24  million-dollar balance.

25  A   Uh-huh.

Genereux - Cross

1   Q   But if the OID has been paid and it's not going to be

2   clawed back, this does accurately reflect the incremental cash

3   costs of the alternative DIP, right?

4   A   Yeah.  I mean you've caveated it that way.  You asked for

5   my opinions on this page.  That's one opinion that I have.

6   Q   Okay.

7   A   The -- I don't think the interest rate is anything that's

8   -- you can't understood.

9       Termination fee, under the alternative of two, I can't

10  remember whether Oaktree had a termination fee and whether you

11  don't list it here because you don't have one or you just

12  assume that it's earned already in the event that they take the

13  alternative proposal.

14      DIP ABL, if you're accounting for the difference in time, I

15  agree.

16      Monthly professional fees, you're accounting for the time,

17  four versus six months.  It's your assumption that an

18  additional two is going to another $6 million.  I don't have a

19  basis yet to really analyze that.  I don't know the bottom --

20  the building of that number, but I won't argue that there will

21  be more professional fees with more time.  Like I said, there's

22  no free lunch.

23      And then secured notes, more time.  And then under the

24  Oaktree proposal, I believe you improved it yesterday in the

25  face of competition from Brigade and Contrarian, and you waived

1    adequate protection during the case.  Am I correct about that?

2    Q   There's no adequate protection payments due to the senior

3    secured notes in connection with the Oaktree DIP proposal, as

4    modified.

5    A   Right.  As modified, having improved it in the face of

6    competition.  But, yeah, we have to pay it, so there's a

7    differential of 11 there.  I agree with that number.

8        And then the seven --

9    Q   And the seventeen you haven't had an opportunity to

10   diligence?

11   A   No.

12   Q   Last question.  You would also agree that the presence or

13   absence of the Boardriders waivers, which is a condition

14   precedent to the alternative DIP proposal, is a material

15   consideration in analyzing the alternative DIP proposal?

16   A   Yes.

17           MR. DURRER:  No other questions, Your Honor.

18           THE COURT:  Redirect?

19                     **REDIRECT EXAMINATION**

20   **BY MR. SORKIN:**

21   Q   Mr. Genereux, if you could turn to Exhibit 6, which was the

22   declaration of Mr. Savini, and if you'd go to Page 7, do you

23   recall Mr. Durrer asking you some questions to compare the 19

24   sources of financing contacted to the number you indicated,

25   which you believe was 9, for the sale process?

```
 1    A    Yes.

 2    Q    Does the entire sentence in Paragraph 16 read:

 3              "With respect to refinancing the euro notes, PJSC

 4              identified 19 potential sources of financing."

 5    A    Let me please read the paragraph.

 6         (Witness reviews exhibit)

 7         Yeah, I glazed over that -- those words:  "With respect to

 8    refinancing the euro notes."

 9    Q    But that's what the paragraph says, right?

10    A    Yes, it does.

11    Q    Okay.  There were also some questions asked about the

12    presence or absence of Bank of America in connection with the

13    DIP loan.  Do you --

14    A    With the secured --

15    Q    Excuse --

16    A    -- proposal or --

17    Q    In connection with the fact that under the Oaktree

18    proposal, Bank of America has agreed and there isn't, yet, such

19    agreement in connection with the alternative DIP proposal?

20    A    Yes.

21    Q    Do you have an understanding of what the LTV, the

22    loan-to-value ratio, was for Bank of America, prepetition?

23    A    I believe -- I don't recall exactly.  The loan-to-value is

24    how much collateral is underlying the loan.  I think it was 70

25    or 80 percent, but I'd have to confirm that with information.
```

1   Q    And do you know what the loan to value is for Bank of

2   America now under the ABL?

3   A    Now?  Pro forma for what?

4   Q    Pro forma for the -- assuming the Oaktree proposal or the

5   existing Oaktree --

6   A    I can't.  I have three data points in my mind and I'm not

7   sure if any -- the three are:  Where was it?  What is it under

8   Oaktree?  And then what is it under the now, superior proposal

9   that's been put forth by Brigade?

10       And what I can say is that it's a lot lower under the

11  improved proposal and it was at its highest before, either

12  Oaktree or the superior proposal.

13  Q    Okay.  If you'd just assume with me that it was 70 percent

14  and is now around 50 percent, can you make that assumption with

15  me?

16  A    Yes.  Those are the numbers that I had in my mind.

17  Q    If -- with that assumption, do you think that such a loan

18  is a risky piece of paper?

19  A    It's gotten a lot less risky.  That's material.

20  Q    And when you say "a lot less risky," do you believe that

21  now there is -- would you characterize it as a risky loan?

22  A    Nothing is without risk, even U.S. Treasuries.  There's

23  risk involved, but it's directionally gotten less, in a loan

24  that B of A -- they're a big lender to retail and apparel

25  companies.  They have a big presence in the market.  They know

1   it.  They've lent to this company all the way up to the

2   petition date.  They're in this business for good.  The

3   proposal has made it less risky.  They're going to want to back

4   this company going forward, I would estimate.

5   Q   I want to change now to the Boardriders noteholders.

6       Do you remember a discussion about the Boardriders

7   noteholders?

8   A   Yes.

9   Q   And I think you had given some testimony with respect to

10  whether or not they would potentially exercise rights or rights

11  and remedies they may have in a default scenario.  Do you

12  recall that?

13  A   Yes.

14  Q   Can you tell me whether you're aware of any economic

15  incentive that the Boardriders would have to exercise any

16  remedies available to them in the event of a default?

17  A   I think they're exercising of remedies would be a very

18  risky proposition.  They, now, are structurally senior against

19  most of the value with this company, in my view.  Just, where

20  the revenues are, where the profits seem to be made, is where

21  those notes reside.

22      For them to exercise remedies, I mean in a crude sense,

23  that means, you know, going after its collateral which means,

24  you know, putting the company, you know, the whole company at

25  risk.  I think that would be a risky proposition.

```
 1        Do they come out of it at the end of the day whole?  I
 2   don't know, but there's a better way out for them and they've
 3   chosen it in the case of Oaktree and a sale would give them
 4   basically the same outcome.
 5   Q   And you recall some discussion with both, Mr. Durrer and
 6   the Court, with respect to the amount of time to conduct a sale
 7   process or a market test and whether 90 days would be
 8   sufficient.  Do you recall that?
 9   A   Yes.
10   Q   And if you looked at Exhibit 61, I think the date that
11   everyone was talking about was 90 days, being roughly January
12   15th, the entry of a plan confirmation order?
13   A   Yes.
14   Q   Do you know if the company's go-shop right continues to be
15   all the way up until January 15th, 2016?
16   A   I -- with what I have in front of me, I can't answer the
17   question.  I don't recall.
18   Q   Okay.  If I were to ask you to assume with me that under
19   the PSA, under Section 3.01(d), that the go-shop right only
20   continues until November 30th.  Can you make that assumption
21   with me?
22   A   Sure.
23   Q   So that would be approximately 45 days from now?
24   A   Yes.
25   Q   Is 45 days enough time to run a proper marketing and sale
```

1   process?

2   A   That's a problem.  That's a problem.  I didn't focus on

3   that speed bump.

4            MR. SORKIN:  Thank you, Your Honor.  No further

5   questions.

6            THE COURT:  Any redirect?

7            MR. DURRER:  No, Your Honor.

8            THE COURT:  Okay.  Thank you, Mr. Genereux, you may

9   step down.

10           THE WITNESS:  Thank you.

11   (Witness excused)

12           THE COURT:  Any other witnesses or evidence?  I think

13   all of the evidence -- all of the documents have been admitted,

14   right?

15           MR. QURESHI:  With one exception, Your Honor, and I

16   think that is we have designated some deposition testimony for

17   the company's witnesses.  I think we have available to hand up

18   a highlighted transcript.  So what we've done for the Court's

19   convenience is -- and I may get (indiscernible) others, Your

20   Honor.  But our designations are yellow; theirs are in blue, or

21   something like that, they're color-coded, so Your Honor has

22   just one set.

23           THE COURT:  All right.  Here's what I want to do.  I'd

24   like them, and I would ask the parties to -- I'd like 30

25   minutes to review them and review my notes.

1          MR. QURESHI:  Sure.

2          THE COURT:  And I'll do one of two things.  I will

3     either return for what I would expect to be some very pointed

4     closings, responding to my questions, or I will return and

5     rule.

6          MR. QURESHI:  Your Honor, may I do two things before

7     we do that?  One, Mr. Somerstein has an update he would like to

8     make for the Court.

9          THE COURT:  Mo' money, mo' money.

10         (Laughter)

11         MR. QURESHI:  It may be.

12         MR. DURRER:  I think it's better, actually, Your

13    Honor.

14         MR. QURESHI:  It's better than that.

15         And the other thing, Your Honor, before Your Honor

16    retires, I would like to briefly -- and I will be brief, not

17    more than five minutes -- bring to Your Honor's attention just

18    a couple of things in the designated testimony from Oaktree

19    that I think Your Honor should focus on.

20         THE COURT:  That sounds fine.

21         MR. QURESHI:  Thank you.

22         UNIDENTIFIED:  And Your Honor, may I be heard at some

23    point?

24         THE COURT:  Yeah, you asked earlier, and I'll let you

25    be heard before we break.

1          Mr. Somerstein?

2          MR. SOMERSTEIN:  Thank you, Your Honor.

3          Your Honor, as I indicated this morning, when I upped

4     the ante, the alternative lenders are very engaged.  They have

5     been listening with -- very attentively and have elected to

6     make a very important change to the commitment that they had

7     provided to the company.

8          The change involves the Boardriders waiver, which I'm

9     sure won't surprise Your Honor.  We will eliminate the

10    Boardriders waiver and replace that waiver with the following

11    event of default.  And I can go over it, if Your Honor would

12    like the exact location in the documentation, if that would

13    help the Court, but the -- there are two places where the

14    waiver exists, it will be eliminated, and the following event

15    of default would be added:

16          "The holders of the 8.875 percent senior unsecured

17          notes due December 15th, 2017, issued by Boardriders,

18          SA, defined as the 'Boardriders Notes,' (x) shall have

19          accelerated the Boardriders Notes, and have commenced

20          material enforcement action against Boardriders, SA,

21          or other non-debtor affiliates of the debtors, and (y)

22          such enforcement action is not stayed, terminated, or

23          enjoined within 30 days of the commencement of such

24          action."

25          Now, Your Honor, just to explain what the effect of

1   this change is, obviously, to convert what was previously a

2   condition precedent to advancing $145 million into what we view

3   as putting our money now at risk of the Boardriders taking what

4   we view as uneconomic action.  So we are very comfortable, Your

5   Honor, that the Boardriders aren't going to take these

6   enforcement actions.

7           If the company succeeds in obtaining a waiver similar

8   to the one it obtained in the context of the Oaktree DIP that's

9   before you, this never comes into play; we have the waiver,

10  terrific.  But if we -- if there is some action, then it would

11  be an event of default.  So we will put up our money.

12          THE COURT:  I'm not sure I understand what that means.

13  Play the string out for me.

14          MR. SOMERSTEIN:  Okay.  Before --

15          THE COURT:  So hang on.  Today, with the debtors'

16  deal, Boardriders has executed a waiver that's enforceable; and

17  so, if the debtor moves forward with their transaction with

18  Oaktree, there is, presumably no or little risk of enforcement

19  action by Boardriders, which is otherwise not subject to this

20  Court's ability to stop or the automatic stay.

21          MR. SOMERSTEIN:  Right.

22          THE COURT:  What I have heard as a consistent refrain

23  from the debtor was you don't have that, and so, Judge, if you

24  don't go with the debtors' plan, and you go with this,

25  admittedly -- look, there's nobody that's not saying your

1  people aren't serious.  Okay?  So this is a serious deal.

2          MR. SOMERSTEIN:  Uh-huh.

3          THE COURT:  But what they're saying is, Judge, if the

4   -- if you don't go with the debtors' deal, but you go with the

5   committee deal, that there is the risk that the Boardriders

6   holders -- that there won't be a Boardriders waiver.  Your

7   point would be it's in their economic interest to sit tight, so

8   they won't actually do anything.  But the debtor looks at that

9   and says, you know, your confidence is of little comfort to us

10  --

11         MR. SOMERSTEIN:  Uh-huh.

12         THE COURT:  -- and so you are leaving us exposed.  And

13  so I understand that bid and ask, I understand precisely -- I

14  mean, to boil it down, at least until the circumstances have

15  changed -- and I don't mean this disparagingly -- the

16  committee's position is, you know, call their bluff, that's

17  just crazy for them to do that, they're not going to do it, in

18  the same way that you or other committees have stood up and

19  said, change the deal on the DIP lender, or in another case,

20  change the deal on the stalking horse, they're not going to

21  walk.  They are, to use Mr. Genereux's phrase, "very pregnant."

22  I get it.

23         How does this change -- I have to understand how this

24  changes --

25         MR. SOMERSTEIN:  Okay.  It -- look, I understand

1    everything Your Honor said.  The important change is that,

2    before, the existence of the waiver was a condition to us

3    putting up our money.

4            THE COURT:  Oh, okay.

5            MR. SOMERSTEIN:  Okay?

6            THE COURT:  I understand.

7            MR. SOMERSTEIN:  So now we are precisely aligned with

8    what the committee has been urging from the beginning.  We

9    don't think any of this is going to happen, so we are willing

10   to eliminate the waiver --

11           THE COURT:  Right.

12           MR. SOMERSTEIN:  -- from a condition.

13           THE COURT:  But then play that -- so then I asked you

14   to play the string out.  All right?

15           MR. SOMERSTEIN:  Yep.

16           THE COURT:  Let's leave aside the competing positions

17   about what those folks will do.  Assume that I said, you know

18   something, Debtor, I'm not going with the plan, this is for the

19   reasons you've laid out, the competing proposal is economically

20   superior, covers all of the debtors' needs, and allows us to

21   get to a sale process that doesn't necessarily preclude the

22   restructuring that's built into this deal --

23           MR. SOMERSTEIN:  Uh-huh.

24           THE COURT:  -- so I'm going with you.  All right?  I

25   put pen to paper, the Boardriders, who are probably listening,

1    say, okay, now it's time to exercise our remedies.

2          The consequences of that have been described, at least

3    by Mr. Bruenjes and by Mr. Savini, as being -- and I think,

4    frankly, by Mr. Genereux, as well -- if those remedies are

5    exercised, the consequences are very detrimental to the

6    debtors' worldwide operations.

7          So, if that happens, the fact that you are still

8    committed just means that the company has taken this negative

9    consequence, you're still committed to participate and fund,

10   but again, we've got an enforcement action against the foreign

11   subsidiaries.

12         MR. SOMERSTEIN:  Your Honor, the answer to that is

13   yes.  So, if that were the case, that would be a default, under

14   our DIP proposal; that's correct, Your Honor.

15         But what we have done, by eliminating the condition,

16   is we've been aligning the proposed DIP with what you've heard

17   during the course of the argument and --

18         THE COURT:  And I -- okay.  And I understand that,

19   yes.

20         MR. SOMERSTEIN:  And of course, I think you'll hear

21   substantial argument between the parties about the fact that,

22   you know, we think, certainly, that the -- that having this

23   event of default is perfectly reasonable, and that, you know,

24   we really don't believe that this is ever going to come to

25   pass.  And I think that will be a key point of the argument

1    that --

2              THE COURT:  I expect --

3              MR. SOMERSTEIN:  -- that the parties are --

4              THE COURT:  Mr. Durrer has been on his feet longer, so

5    I'll hear from him; and then, Mr. Stamer, I'll hear from you.

6    Mr. Durrer?

7              MR. DURRER:  Your Honor, two points.  I think Your

8    Honor is understanding this pretty precisely.  But one finer

9    point I want to put on this is one consequence of this is, if

10   the Boardriders notes do enforce in this arena, we do have a

11   DIP event of default, and basically Brigade and Contrarian have

12   brought this company for $154 million; at least whatever is

13   left when the Boardriders folks get done.  So that's one

14   consequence.

15             Another consequence is, if Brigade and Contrarian pick

16   up the phone and call some Boardriders noteholders, then

17   whatever deal they cut, they'll effectively own the company for

18   $154 million.  So that gives the debtor a great deal of angst.

19             Converting it from a condition precedent to an event

20   of default does cause Brigade and Contrarian to actually put up

21   their cash, but it also gives them the ability to pull the hair

22   trigger that we're so worried about, that we do not have today.

23   Today, we have a waiver in force of a fully committed, funded

24   deal.

25             THE COURT:  Well, what you're saying is it gives them

1    the right to pull the hair trigger that Oaktree has been

2    accused of having today.

3         MR. DURRER:  Right.  But Oaktree has -- I mean, we

4    filed a plan with Oaktree the other day.  Oaktree is moving

5    forward in cooperation with the debtor.

6         Just a point of order, Your Honor.  I think that, you

7    know, Mr. Garvin (phonetic) from B of A has been -- was in the

8    courtroom live yesterday, and is also, I believe, on the phone.

9    I think, before Your Honor retires, you also need to hear from

10   B of A, in addition to Mr. Nash.

11        Candidly, we do have a further rebuttal witness, with

12   respect to the impacts of what happens to the company when B of

13   A walks out of the capital structure, which is its right.  But

14   it might make sense for you to hear from B of A first.  It

15   might just be, you know, gilding the lily at this point, but I

16   think Your Honor needs to hear from those constituencies, as

17   well.

18        THE COURT:  Mr. Stamer.

19        MR. STAMER:  Your Honor, for the record, Mike Stamer

20   from Akin Gump for the committee.

21        I'm not actually a fan of conspiracy theories, so I

22   won't go in that direction.  I think the debtor did a nice job

23   pointing out a deficiency in the alternative DIP proposal,

24   which was it was a condition precedent for them to fund it for

25   the waiver to be in effect.  So it was at my request that Mr.

1    Somerstein went to his client, and what I believe dramatically

2    improved the proposal.

3         There's one part that's being left out.  So I believe

4    it's correct that they'll fund; if you approve their DIP,

5    they'd fund.  If the Boardriders, which we think would be

6    completely against their interest, if they took enforcement

7    actions, it would potentially be a default, but only to the

8    extent those actions weren't stayed.

9         And we think, and we believe the debtor actually

10   explored this as -- it's in their papers -- as part of the

11   process, if they couldn't get a waiver from the Boardriders.

12   And the point we tried to make through the evidence was the

13   Boardriders' 60 percent or so are held by five hedge funds,

14   located in California and Connecticut.  There's no jurisdiction

15   issue.  The test, by and large, is:  Is there an identity of

16   interest with respect to the debtor and non-debtor?

17        From our perspective, if that happens, which we don't

18   think it will that they're going to enforce, it's a lay-up for

19   Mr. Durrer to come in and say, Judge, stop them.  So you extend

20   the stay, you enter an injunction.  It's not a long, protracted

21   piece of litigation.  It's critical to the survival of the

22   company.  There's clearly an identify of interest between the

23   debtors and the non-debtors.  And regardless of whether there's

24   a potential for a conspiracy between these DIP lenders and the

25   Boardriders, it's not an event of default.  So then you have

1    the full amount of their DIP, the full amount of the

2    flexibility.

3            I don't think it's subject to debate, this is a

4    dramatic improvement in the alternative DIP loan.  And I can't

5    emphasize enough that it was done for purposes of making sure,

6    to the extent we want to call the Boardriders' bluff, which I

7    believe it is clearly a bluff, we have the ability to prevent

8    an event of default by coming to this Court, and they've given

9    us 30 days to do it.

10           So, again, I -- just so we're clear -- and really

11   quickly, Your Honor, with respect to the Bank of America, I

12   think the testimony is pretty clear, and maybe the numbers are

13   garbled, but I don't think it's in dispute.  The LTV

14   prepetition for the Bank of America was 90 percent; under

15   Oaktree, it's 70 percent.  If Mr. Somerstein's clients pay them

16   down, it's 50 percent, loan-to-value of 50 percent.

17           The only reason -- and the only change we're asking

18   them to make is get rid of the liens on foreign stock.  The

19   only reason they would say no, with due respect, is because,

20   talk about kind of dark conspiracy theory:  There's no economic

21   reason for Bank of America to say no; and if they do say no,

22   Your Honor, our view is, okay, the interim order rolled them up

23   on an interim basis, on no notice to anybody, clearly not the

24   noteholders.  This Court has the ability -- they're protected

25   by 354(e), I think, for the money they lent.  We'll give them

1    back their money, we'll turn them back into prepetition

2    creditors, where they've got a 50 percent LTV.  We can

3    involuntarily use their cash collateral.  And oh, by the way,

4    give us back the million bucks that the debtor gave you for

5    lending $15 million on a 70 percent LTV basis.  Regardless of

6    what comes out of Bank of America's mouth, Your Honor, that

7    should not be an issue for that debtor-in-possession.  Thank

8    you, Your Honor.

9            THE COURT:  Mr. Nash.

10           MR. NASH:  Good morning, Judge.  Pat Nash from

11   Kirkland & Ellis on behalf of Oaktree.

12           You know, Your Honor, I really do, I applaud the UCC

13   and their professionals for taking this superior DIP proposal

14   and actually creating all of this lights-camera-action.  I just

15   heard Mr. Stamer say, you know, Your Honor, you'll approve the

16   alternative DIP, they will fund, B of A will stay in the

17   saddle.

18           There's no motion in front of you to approve any DIP

19   financing, other than the Oaktree financing.  The only thing

20   that you can do today, Your Honor, is decline to approve the

21   Oaktree financing.  In that respect, Your Honor --

22           THE COURT:  Well --

23           MR. NASH:  Or you can outline how you would approve

24   it, with subject to modifications.

25           THE COURT:  Right.  But I mean, I -- I'm not going to

1    get hung up on procedural niceties.  I think everybody knows

2    where we stand.

3         MR. NASH:  Fair enough, Judge.  So I rise to make a

4    couple of what I think are clarifications, as well as a

5    concession, Your Honor.

6         First off, with respect to the case milestones, case

7    milestones are important, and they're important in this case,

8    they're important in every case.  I want to be clear Your Honor

9    that, when we started the case with a one-hundred-and-fifty-day

10   DIP financing, that 150 days was sized approximately to the

11   parties best assessment of the companies prepetition liquidity

12   runway, on account of the DIP financing.  So we have the

13   incremental DIP financing.  That allows the company to exist

14   post-petition, for approximately 150 days.  There are, of

15   course, certain assumptions in that.

16        We then, Your Honor, arrive at case milestones of 120

17   days.  It will not surprise Your Honor to hear that, in sizing

18   the case milestones of 120 days within the context of a one-

19   hundred-and-fifty-day DIP financing, Pat Nash, Your Honor,

20   understood that those milestones would likely have to move,

21   that we would need some cushion, and that the milestones that

22   we started with would not be the milestones that would

23   ultimately be improved -- approved.  Pardon me.

24        From our perspective, Judge, Oaktree is comfortable

25   with case milestones that conflate with, comport with, are

1    consistent with the company's actual post-petition liquidity

2    runway.  And that's that important, and that -- by the way,

3    Your Honor, if you roll forward the budget, it may, in fact, be

4    that the company has got, you know, an extra week or two, as

5    compared to the January 15th date and the January 22 date.

6           I'm comfortable making that that statement, Your

7    Honor, because I have a high degree of confidence that the

8    company's post-petition liquidity runway is not all that much

9    longer than the case milestones, as they've been presented to

10   you.

11          It is absolutely astounding to me that the UCC

12   professionals can take the stand and talk about how, well,

13   under the competing DIP, we have an extra two months.  You have

14   an extra two months under what assumption?  Your DIP is only

15   going to get approved after a priming fight, which is going to

16   cost the company a lot of money.

17          Your DIP is only going to then -- and then, by the

18   way, what company do we have after a priming fight?  And when

19   we're talking about that seventeen-million-dollar delta, Your

20   Honor, that's the company's seventeen-million-dollar delta to

21   exist for another month under the current state of play.  That

22   is rolling forward the company's current liquidity runway, yes.

23   The month of March, that's the incremental $17 million, if you

24   approve -- if you assume that the facts and circumstances are

25   effectively going forward as they are today.

1            The fact of the matter is, is that -- and Your Honor

2    has been doing this long enough to take judicial notice, it

3    probably was in the various depositions and what not -- the

4    company's trade terms will evaporate in the context of a

5    priming fight, with the potential for flipping into a naked 363

6    sale.

7            The reality is, is that the hole will, in fact, be

8    greater than $17 million, if we kick the Oaktree financing to

9    the side, and we then have to go through whatever we have to go

10   through, in order to put a piece of priming financing on top of

11   this facility.

12           So the fact that Mr. Genereux can sit there and say,

13   you know, Your Honor, under this financing, we have an extra

14   two months --

15           THE COURT:  How alien to Oaktree's position or

16   expectations is the committee request, which is predicated upon

17   the assumption that -- let's be blunt.  I mean, they're saying

18   you're taking the company, and that there's substantial value

19   for unsecured creditors, and you are seizing it, and you've

20   done it by ably coordinating with the debtor, among other

21   stakeholders, putting a deal on the table that allows for the -

22   - you know, as Mr. Durrer said at the outset, potentially the

23   only reorganization of a retailer since 2005 -- though I think

24   Boscov's might fit.  I don't know, Judge Gross wants credit.

25       (Laughter)

1          THE COURT:  But here's the question I have.  So their

2     position is you're stealing the company, and if we present this

3     to the market, a superior result will be achieved that is worth

4     what is, frankly, an acknowledged risk.  They're acknowledging

5     the risk because, every time Mr. Somerstein stands up, he's

6     basically increasing the deal because he said, all right, you

7     know, that's not a bad point, Boardriders, that's an issue.  AB

8     -- you know, the B of A issue, if we give anybody $15 million,

9     they'd be nuts to walk away.  Okay?  We're going to fund

10    operations, we will leave the debtor unexposed.  Okay?  So all

11    of that, the debtor is recognizing.

12          You've laid out a situation, and Mr. Durrer has

13    argued, there is essentially no risk -- or limited risk;

14    there's always execution risk -- but there's no risk, we will

15    reorganize.  If I asked Mr. Durrer, he'd say, we will

16    reorganize on whatever day you confirm this plan, and we've got

17    8,000 employees, we've got worldwide operations, we've got a

18    company that has been through some issues in the past, that is

19    ready to merge forward.  All right?  I read the first-day

20    declaration.  Okay?

21          Here's the thing.  The structure also has built into

22    it what Mr. Savini testified to, and what's been described as

23    the "market test."  And I guess the committee's position is, we

24    would like to do the market test without the specter -- if I

25    heard Mr. Genereux's testimony pretty clearly, we'd like to do

1    it without the specter of this transaction because we don't

2    think people are going to pick up the phone.

3           When they get that flyer, all right, when they get

4    that teaser, they're going to look at it and go, oh, I know,

5    this is the Oaktree deal, okay, we're not interested in that,

6    we'll go buy another company.  I think that's what Mr.

7    Genereux's testimony --

8           MR. NASH:  Yes, sir.

9           THE COURT:  -- among other things -- and I think that

10   was pretty, pretty candid.  I don't think I can really poke a -

11   - you know, poke holes in that, but --

12          MR. NASH:  I can address that, Your Honor.

13          THE COURT:  Yeah.  I'd like your thoughts on whether

14   or not the market test is responsive to the committee's

15   concerns, or whether or not --

16          MR. NASH:  So I'll -- first off, whether it's a -- I

17   guess this is by way of a concession.  Certainly, from

18   Oaktree's perspective, the go-shop exists through confirmation.

19   We can amend the plan support agreement.  I think the debtors

20   may have their own views and thoughts about how it -- this is

21   consistent with what Mr. Genereux said, and I'm going to

22   address why it just kind of is what it is.

23          But now, whether or not, you know, the affirmative

24   marketing of the company, after a disclosure statement, has

25   been approved, does cause, you know, messaging concerns or

1    whatnot.  But from Oaktree's perspective, Your Honor, this

2    company is for sale until you confirm a plan of reorganization,

3    and we have no problem with that.  It's the reality of being in

4    bankruptcy.  Bill Gates can walk into the courtroom with a

5    suitcase full of money and, you know, the company is for sale.

6            As for the process and how we got to where we got to,

7    Your Honor, you're not going to hear me apologize for that.

8    And let me -- I think this is going to be important because

9    there was a lot of testimony and argument about an apparent

10   deficiency in the process for having not fully pursued or

11   pushed Oaktree to be an anchor for a 363 sale; Mr. Savini, in

12   particular, took some cross-examination on that point.

13           Your Honor, when I was originally called by Oaktree to

14   get involved in this, and I took a look at the capital

15   structure, I certainly -- my first knee-jerk reaction was, is

16   that this would be a senior secured lender, credit bid, 363,

17   something like that.

18           I got on the phone with Mr. Durrer, and we spoke at

19   length about the complexities of this company and this capital

20   structure.  We talked about the Boardrider waiver, Your Honor,

21   and the fact that the bankruptcy was unequivocally going to

22   default -- we talked about the euro notes, and that the

23   bankruptcy, Your Honor, was going to default the euro notes.

24   We said (verbal indication), wow, what are we going to do about

25   that.

1            And what we talked about was the possibility, if you

2    do this through a plan of reorganization, and you do not change

3    the ultimate parent of the Boardrider notes, Mr. Durrer and I

4    spoke of the possibility, if you do this through a plan, of

5    being able to, number one, get a plan injunction; number two --

6    you know, and we talked, by the way, about the challenges of

7    that.  But we talked about how, if you do this through a plan,

8    you at least have the ability to come to Your Honor and pursue

9    a plan injunction.

10           We talked, as a practical matter, about how we were

11   going to try to get the Boardrider waivers, notwithstanding the

12   fact that we're doing this under a plan.  We went out to the

13   Boardrider waivers, Your Honor, and Mr. Hilty (phonetic) could

14   talk about this, and it was extensive negotiations, Your Honor.

15   They were not just sitting there saying, okay, yeah, we're on

16   board.

17           We explained to them that this was a plan of

18   reorganization.  We explained to them that, while we wanted the

19   waiver, if we couldn't get the waiver, we were going to come to

20   Your Honor and try to get it anyway, through the plan of

21   reorganization.  And contrary to what Mr. Stamer just said, I

22   will tell Your Honor that the Boardriders noteholders and their

23   counsel have a dim view of the likelihood of our having gotten

24   you to order them to stand down.  But in the context, Your

25   Honor, of a plan of reorganization, we at least had the

1    possibility, if we couldn't get the waiver, to be in front of

2    Your Honor seeking a plan injunction.  That's number one.

3        Number two, Your Honor, when Mr. Durrer explained to

4    me that, seven seconds after closing on a 363 sale, the euro

5    noteholders could put the entire facility to my client at a

6    premium, I'm not going to apologize for the fact that that

7    didn't really appeal to us.  And so, in a 363 sale, you have a

8    change in control; and, in a change in control -- it's in the

9    record -- the euro notes are puttable at a premium.

10        And so, Your Honor, when I -- in conferring with Mr.

11   Durrer about a 363 strategy, and the fact that, number one, we

12   wanted to try to get the waiver, we had no idea whether we

13   would get the waiver.  In the absence of the waiver, we would

14   have no choice but to be in front of Your Honor, seeking a plan

15   injunction, with -- which everyone will acknowledge you have a

16   higher likelihood, whether or not you're going to get it, a

17   higher likelihood in a plan context.

18        And number two, Your Honor, we just didn't have any

19   interest in being a 363 purchaser, who then is sitting there

20   with the specter of having the notes put to us, which is the

21   fallacy of this entire process.

22        Your Honor, you flip this thing into a 363 sale, yeah,

23   lots of parties are interested.  Although you know, it's Mr.

24   Genereux who said -- who cautioned Your Honor that, of course,

25   of his 77 people, you know, he needs more time because he's

1    contacting a large number of people who don't normally do this

2    for a living, and aren't experienced buying things out of

3    bankruptcy.  Well, okay, that gives us a lot of comfort that

4    we're going to flip to a 363 --

5         THE COURT:  Well, I have to say, I mean, I don't

6    attribute much significance, one way or the other, to that

7    testimony or the response.  You know, Mr. Genereux has been

8    around the block, as has Mr. Savini.  If we put them in

9    opposite situations, they both say, I've got a heck of a

10   Rolodex, and I'm going to work the life out of it.  I don't

11   know who's going to come out of the woodwork, and some people

12   are going to fall away.  But they know that they would get

13   crucified on the stand if they said, well, I didn't call that

14   guy because I don't think he's for real, I didn't call that

15   guy.

16        MR. NASH:  Fair enough.

17        THE COURT:  But both sides -- you know, both sides --

18   I mean, I'm assuming -- I don't want to get into the

19   sufficiency of the process -- well, the sufficiency of the

20   process to date is the consideration that's been raised by the

21   committee and has been pointed to by the debtor, but I don't

22   think we need to debate that right now.

23        You know, one way or the other, if there were -- if I

24   go with -- if the competing transaction is -- if the sale

25   process is the way that this case goes, then, you know, there

1   are all the consequences you've identified, but again, we've

2   done (indiscernible).  If we go with the plan process, I think

3   Mr. Durrer has been insistent, and you've just said, it's for

4   sale until I confirm a plan that precludes the sale.

5          MR. NASH:  No question about it.

6          THE COURT:  I think I understand that.  There is a

7   dynamic here that I'll expect -- Mr. Qureshi, you get the last

8   word, since I'm not taking closings right now.

9      (Laughter)

10         THE COURT:  You know, you guys are really good.

11     (Laughter)

12         THE COURT:  But you know, there's a -- there's an --

13  there's a through-the-rabbit-hole or down-the-rabbit-hole

14  quality to this dynamic.  And you haven't touched on this, but

15  as a practical matter, it's implied in your comments.  Okay?

16         If this were Oaktree, on a similar transaction,

17  acquiring the company as a 363 -- let's leave some of the

18  complicating factors out of it -- I expect that we'd have an

19  ably lawyered committee standing up and saying this -- you

20  know, this sale transaction is a travesty of a mockery of a

21  sham, and you ought to do a plan, and we ought to preserve

22  value because you're wiping me out.

23         MR. NASH:  I'm being penalized for being a plan

24  sponsor, Your Honor; it's unique.

25         THE COURT:  It is not unique.

1        (Laughter)

2            THE COURT:  But that's the difficulty of the dynamic,

3    and I am aware of that.

4            But you know, the -- I guess the parties have not

5    focused, other than simply saying that there is a priming fight

6    -- you said it directly, there is a priming -- there is no DIP

7    to be approved today; there is a hearing on priming.  Is that

8    correct?

9            MR. NASH:  Absolutely.

10           THE COURT:  And your point would be that the debtor

11   cannot demonstrate that they can put loans on top of you;

12   you've consented to loans on top of you --

13           MR. NASH:  I have.

14           THE COURT:  -- in this structure, and that the debtor

15   cannot -- in the absence of that consent, the debtor needs to

16   demonstrate it, and we have not had that hearing.

17           MR. NASH:  Correct, Judge.

18           THE COURT:  Do I understand that?

19           MR. NASH:  Yes, sir.

20           THE COURT:  Talk to me about the breakup fee.

21           MR. NASH:  Your Honor, in the -- in thinking about

22   this, and in talking to Oaktree and whatnot -- and I'm glad

23   because I'm able to sat down [sic] without making this critical

24   point -- Oaktree is prepared, Your Honor, to walk away from the

25   breakup fee.  They're not going to make the Court make that

1    decision.

2           And you know, we thought about, frankly, in the

3    context of this affirmative go-shop, and the process that we're

4    financing, thought about coming to Your Honor with, you know,

5    perhaps a revised breakup fee only on the new money.  But the

6    fact of the matter is, is that Oaktree understands that this is

7    a process; there are gives and takes.  This company is for

8    sale, Your Honor, until confirmation.  And if Oaktree gets the

9    other aspects of the financing approved, it will be for sale

10   without a twenty-million-dollar breakup fee.

11          Your Honor, I think that anybody who's going to

12   actually want to buy the company is going to --

13          THE COURT:  Were you going to tell me that before I

14   asked?

15          MR. NASH:  No, I was going to forget.  I was going to

16   forget.

17     (Laughter)

18          MR. NASH:  I think I would have forgotten, so thank

19   you, Judge.  Once again, thank you.

20          But Your Honor, anybody who's going to actually buy

21   the company is going to come in and try to overbid Oaktree, and

22   step into Oaktree's role as plan sponsor.  Nobody, Your Honor -

23   - a million people may come in and kick the tires.  As soon as

24   they understand that, on top of having to pay money to get

25   these assets out of bankruptcy, they are then at risk -- now we

1    heard Mr. Genereux, well, you never know, maybe they won't put

2    the notes to you.  Nobody is going to pay top dollar through

3    363 for these assets, only to run the risk that, seven seconds

4    after you close, the euro note facility gets put to you.  So,

5    if anybody is going to compete with Oaktree, they're going to

6    step into this pretty nice deal that we put together for the

7    company.

8            This is, in fact, a live, operating business.  We have

9    a plan of reorganization on the table.  We started with seven

10   and a half -million-dollars for unsecured creditors; that

11   number is only going to move, Your Honor.  We're going to have

12   a confirmation hearing.

13           But the notion that, on the face of the record we have

14   today, that you throw this financing out in order to pursue a

15   363 sale because maybe somebody will come forward, and you put

16   -- and we have two more months under the alternative proposal,

17   except for the fact that, if you actually go down the

18   alternative proposal route, the money is going to probably run

19   out by Thanksgiving.

20           And this notion that Mr. Stamer kept making about, you

21   know, B of A's LTV then, and B of A's LTV now, B of A, Your

22   Honor, is unlikely to want to sit in the saddle and finance a

23   contested priming fight.  See, its LTV is better today.  I'm

24   not sure where it's LTV will be at the conclusion of a

25   contested priming fight, when the debtor's working capital has

1    been consumed by professional fees.

2            And the notion, Your Honor, that the Boardriders

3    noteholders are not agnostic to a deal that they know and

4    understand, on the one hand, or a naked 363 sale, on the other

5    hand -- this is not about Oaktree impermissibly tying people

6    up; it's about the fact that we've put a deal on the table for

7    the company.  It makes sense to certain constituents, it makes

8    sense to B of A to stay in the saddle, it makes sense to the

9    Boardriders notes to grant a waiver.  The company's cash

10   position and cash need, if you actually approve that financing,

11   Judge, the runway will be, you know, maybe until Christmas, and

12   the breakup fee is off the table, Judge.

13           THE COURT:  Mr. Qureshi.

14           MR. QURESHI:  Thank you, Your Honor.

15           THE COURT:  How do I deal with -- start with the point

16   that I made that we're -- I know I put the words into your

17   mouth.  But I don't think it was an unfair observation that, if

18   this had been presented as a 363 by Oaktree, okay, and the

19   debtor takes -- you know, stands up at the first-day hearing

20   and today, and takes a lot credit saying, we've developed all

21   of this, we have an exit, this is better than the sales that

22   you see.  And you've been to these conferences, we complain

23   about these quick sales all the time that people do.

24           But how do you respond to the proposition that you'd

25   be making almost the identical argument, if they showed up and

1   made a sale transaction, leaving aside the complications that

2   Mr. Nash and parties have talked about, about challenges with

3   the sale process?

4        MR. QURESHI:  Well, Your Honor, I think it starts with

5   some of the testimony Your Honor heard from Mr. Genereux about

6   is the company ready to do that, and has the work been done.

7   And certainly, one of the complaints that we've had and that

8   we've brought out in the evidence is that this whole process

9   was, in fact -- we continue to believe that's the case --

10  really just a vehicle to have Oaktree steal the company.

11       The fact that Oaktree's counsel is standing up today,

12  Your Honor, and saying, you know what, the go-shop that expired

13  on November 30th, we'll extend it?  Well, that -- the breakup

14  fee for $20 million that most unquestionably would have chilled

15  bidding, we'll waive it, that that's all happening now?  That

16  tells Your Honor, I think, very clearly that what they walked

17  into court with was anything but a process that was set up to

18  be fair and to be open and to attract competing bidders.

19       And what's also clear, Your Honor, from what Mr. Nash

20  said -- and I think, again, it's wonderful support of the

21  evidentiary record that Your Honor has -- Oaktree is not going

22  anywhere, they are too exposed.  And so, if this process now

23  flips, under our DIP, to a 363 process, that doesn't mean that

24  Oaktree is going to walk away and say, we're done, we're not

25  interested anymore, they clearly are very interested.  They've

1   got very significant exposure in this capital structure.

2           The financing is undoubtedly sufficient.  And I should

3   point out, Your Honor, Mr. Nash brought up the question of

4   liquidity, and is there enough liquidity.  There's -- it's my

5   understanding Your Honor is going to retire to rule on this

6   issue now.  But just bear in mind, there is one other important

7   piece of it, which is the critical vendor piece.

8           And it is certainly our view that the full 62 million

9   should not be approved.  To the extent that it's not, that

10  obviously creates --

11          THE COURT:  It frees up liquidity.

12          MR. QURESHI:  Right.  It creates additional liquidity.

13          But we do think, Your Honor, that, within the time

14  frame of the runway under the alternative DIP that would be

15  available, that there is a sufficient period of time to run a

16  real process, and to see who else is out there, and to see if

17  value can be improved.  And during that, Oaktree is not going

18  anywhere.

19          THE COURT:  Again, then leave the -- for a moment, the

20  overall direction of the case aside --

21          MR. QURESHI:  Uh-huh.

22          THE COURT:  -- and simply focus on the competing DIP.

23          MR. QURESHI:  Sure.

24          THE COURT:  Okay.  The debtor is obviously required to

25  make a showing that it has not been able to identify superior

1    alternative financing from another source.  Okay.  Ninety-nine

2    percent of the cases that we have, have existing lenders that

3    come into the capital structure.  And the usual argument, as

4    Mr. Savini said, is, you know, how do you find a lender, you

5    find somebody that already lent to you.  Okay.

6         But there's another argument that is made as a subtext

7    to that.  Obviously, the debtors had -- you know, in any one --

8    not this case, but any one of a hundred cases that I've had,

9    the debtor comes in, in their first-day argument, and their

10   second-day argument as to financing is, sure, we worked the

11   universe, okay, but the most obvious ones were B of A or, you

12   know, Cerberus, or whoever is already in, so they're our DIP

13   lender.

14        Why?  Because one, they're positioned and they made us

15   a good offer --

16        MR. QURESHI:  Uh-huh.

17        THE COURT:  -- and we know them, and we're comfortable

18   with them, and they're committed, and we're happy with the

19   terms of the offer; two, the alternative to doing it in the

20   absence of their consent with a priming structure is World War

21   III.

22        And so, while we may have had somebody that would come

23   in and lend on a competing basis, maybe with improved economic

24   terms, from the debtors' point of view -- and this will be in

25   so many -- you've seen these affidavits -- the debtors' point

1    would be that the distraction, delay, and uncertainty

2    associated -- I've read a few of these -- the distraction,

3    delay, and uncertainty associated with, you know, a battle with

4    its senior secured creditors at the outset of the case is not

5    the message the debtor wants to send to the world of the

6    marketplace.  How do I deal with the priming fight issue?  What

7    sort of deference do I owe the debtor on their choice and their

8    thought process in this exercise?  Those are two questions,

9    answer them as you please.

10            MR. QURESHI:  Sure.  Well, first of all, Your Honor,

11   I'm not sure that there needs to be a priming fight.  And the

12   reason that I'm not sure there needs to be a priming fight is

13   there is some unencumbered collateral.  And we've talked about

14   -- and you heard from Mr. Stamer from the outset as to how that

15   35 percent of the foreign stock might be used as adequate

16   protection to the secured notes, in the event that our DIP were

17   to be approved.

18            And we do think, Your Honor, that there is significant

19   value there, and that's certainly, I think it's very clear, a

20   big part of what Oaktree's plan was with respect to this DIP,

21   was to get a hold of that foreign stock, to the detriment of

22   unsecured creditors.

23            But look, Your Honor has heard from every single

24   witness, nobody has done the valuation work, right?  That, in

25   itself, is a criticism of the process, right?  How did you run

1    that whole prepetition process and go out to the market and do

2    all of those things when you didn't have a view as to value?

3    And --

4            THE COURT:  Well, that's -- and that's not -- do me a

5    favor.

6            MR. QURESHI:  Sure.

7            THE COURT:  Circle back to my questions --

8            MR. QURESHI:  Sure.

9            THE COURT:  -- when I get to them.

10           MR. QURESHI:  Sure.

11           THE COURT:  Because you're answering them, but I'm

12   going to distract you.

13           MR. QURESHI:  Yeah.  Better write them down.

14           THE COURT:  The -- on that point, doesn't that

15   proposition cut both ways?  Because you're going to say, we're

16   not going to have a priming fight because we'll give them a

17   lien on this asset that hasn't been valued, and they're saying,

18   we need a -- we need this as part of our adequate protection,

19   but no, we don't know what it's worth, either.

20           MR. QURESHI:  So --

21           THE COURT:  How do I deal with -- how do I deal with

22   that?

23           MR. QURESHI:  Sure.

24           THE COURT:  Because it seems to me that that

25   proposition cuts both ways.  We've talked a lot about the

1   foreign stock, but that's about all we've done on that, is talk

2   about it.

3         MR. QURESHI:  Sure.  So Oaktree holds 72 percent, if I

4   have the number right, of the secured notes, or thereabouts; a

5   very significant position, by far, the largest holder.  We

6   don't know if Oaktree has done valuations that perhaps we don't

7   know about.

8         But what we do know, through the facility that was

9   presented to Your Honor, is that they desperately want that

10  foreign stock.  They -- otherwise, it makes no sense, right?  I

11  mean, they've testified -- and I will hand up, eventually, Your

12  Honor, their deposition testimony, which says the same thing as

13  everybody else:  We haven't valued it.  But they clearly, very

14  desperately want it.

15        And so I think, Your Honor, that, if that stock can be

16  made available, the fact that we don't know, through any formal

17  valuation, what those foreign entities might be worth, and that

18  the debtors' bankers haven't valued it, and that maybe Oaktree

19  even hasn't valued it, if you combine the fact that we know

20  Oaktree wants that stock -- we know they are very heavily

21  exposed through their existing secured position, through their

22  euro bond position, through all of it.

23        I think there's certainly a possibility that we can

24  present an adequate protection package that is acceptable to

25  them, that includes the benefit of that foreign stock, only to

1   the extent of the diminution in the value of their collateral.

2   So they don't get a lien on it at the outset, as they are

3   proposing under the DIP.

4          And that, I think, is the ideal structure here, Your

5   Honor, because, from the perspective of unsecured creditors,

6   that is a very significant, probably the most significant asset

7   of the estate, to which unsecured creditors can look for a

8   recovery.  So, if the case goes well, and if, when the

9   valuation work is done, there is a lot of value there, and if

10  the business improves as the debtors use Chapter 11 to their

11  advantage, and improve their trade terms, and all of the other

12  things that I'm sure Mr. Durrer will make sure they -- that

13  they do, the unsecured creditors will benefit.

14         But if, Your Honor, it should all go sideways -- and

15  we will all, of course, work to prevent that.  But if it

16  should, there will be protection there for Oaktree because, at

17  the end of the day, they can then still, in that melt-down

18  circumstance, look to the value of that unencumbered foreign

19  stock in connection with their prepetition secured note.  And

20  so that, I think, Your Honor, is potentially a way around a

21  priming fight.

22         Certainly, if Your Honor wants me to address, well, if

23  Oaktree doesn't want to do that, and if we do have to have a

24  priming fight, and we do have to bring in the experts and spend

25  the money and do the work, Your Honor, I don't see a way around

1   it.  I think that there is -- you know, the professionals here

2   can work together to minimize the cost of it, to minimize the

3   delay of it.

4          We heard testimony from the company's CFO that the

5   business plan is, more or less, done.  So I think all of the

6   professionals will, in very short order, be in a position to

7   complete their valuation work.  I think I asked Mr. Savini how

8   long it would take him; he said a couple of weeks.  And so I'm

9   sure that, if we had to have a valuation trial in front of Your

10  Honor, that's something we could do in a couple of weeks.

11         But again, I don't think it's -- but I don't think

12  it's necessary here, Your Honor.  I think there's a way around

13  it.  I think we can demonstrate, and perhaps even get it done

14  consensually, but demonstrate that there is sufficient adequate

15  protection there.

16         And Your Honor, the foreign stock, that is a very

17  important piece of it.  I mean, look, the committee's view --

18         THE COURT:  Remind me of the current bid and the ask.

19  Your point would be that they should be entitled to a lien or a

20  superpriority claim.  I mean, I drew the analogy to 507(b), and

21  I want to make sure.  I think that that's apt -- an apt

22  characterization of your position; that this is unencumbered,

23  these are unencumbered assets.  To the extent they have a

24  diminution, they should be able to look to that.

25         And your -- you keep referring to the 35 percent.  And

1   then I heard testimony regarding the tax consequences Mr.

2   Savini touched on yesterday, from the -- and the potential

3   exposure, and I think Mr. Bruenjes has testified to it, as

4   well.  Is it the current position by Oaktree that they're

5   looking for a lien on a hundred percent of that stock?

6          MR. QURESHI:  Under their DIP, they are looking for a

7   lien on 100 percent of the stock.  And what Your Honor heard in

8   the testimony was that was Oaktree's ask from day one.  That

9   was always a condition of every single DIP proposal they ever

10  made.  They wanted a hundred percent of the value of the

11  foreign stock.  And the debtor agreed.  And you heard testimony

12  the debtors did their homework, and concluded that there were

13  no adverse tax consequences.

14         But Your Honor, remember, Your Honor also heard that,

15  on the exit, the exit financing piece of this, Oaktree doesn't

16  keep, of course, a hundred person of the foreign stock, right?

17  Because it makes no sense in a scenario where the foreign

18  entities are profitable.  That one-third needs to remain

19  because, otherwise, there would be massive tax consequences.

20         THE COURT:  So what do they do?

21         MR. QURESHI:  Well, it's very clear.  The pledge of a

22  hundred percent of the stock in connection with their DIP has

23  one purpose, Your Honor, which is to keep any value that might

24  be there away from unsecured creditors.

25         Our point is that, if you're talking about their DIP

1    loan, and whether there is sufficient collateral to secure

2    their DIP, they don't need it because it will be there anyway.

3    It will be there.  In event that there is a default on the DIP,

4    then that is something that they can look to.  They will have a

5    superpriority claim on the foreign stock.

6           So the suggestion that it is necessary for Oaktree to

7    make the DIP loan, to have it pledged as collateral for the

8    DIP, it's a fallacy, Your Honor, there's just nothing to it.

9    They want it because they think there might be value there, and

10   that's value that would otherwise go to unsecured creditors,

11   and that's what they're trying to grab.

12          And so you combine that, Your Honor, with what you

13   heard from Mr. Nash, and with their exposure in this capital

14   structure, they're not going anywhere if Your Honor says, you

15   know what, I'll approve your DIP, but you can't have the one-

16   third of the foreign stock.  So I hope that answered Your

17   Honor's question on that point.

18          THE COURT:  (indiscernible)

19          MR. QURESHI:  Okay.  Your Honor, just a couple of more

20   things.  If I could, we have, as I mentioned, some testimony

21   from Mr. Cooper, who is the other Peter J. Solomon banker --

22          THE COURT:  Peter J. Solomon guy, yep.

23          MR. QURESHI:  -- as well as from Matthew Wilson of

24   Oaktree.  And what I'd like to do, with respect to Oaktree, if

25   I could, I'm going to hand up some excerpts from his

1    deposition, if I could.

2            THE COURT:  Okay.

3            MR. QURESHI:  So, Your Honor, there is much more than

4    this that is designated, and including, of course, the debtors'

5    counter-designations.  I just wanted to bring to your

6    attention, Your Honor, really, two important points that we

7    have made in our evidence, that I think are very much supported

8    by Mr. Wilson's testimony.  One is Oaktree is not going

9    anywhere; and two is the foreign stock.

10           And so the couple of excerpts of here that I'll

11   quickly take the Court through, the first one comes out of Page

12   69 of Mr. Wilson's transcript.  And what he was asked is:

13           "Well, did Oaktree think about what would happen if

14   there was a Chapter 11 filing without a DIP, if there were a

15   free-fall Chapter 11?"

16           And his answer was:

17           "It's a null set from our point of view.  It's not a

18   realistic outcome.  We would never let that happen, we'd be

19   prepared to do the DIP as we did."

20           Right?  They're not letting this company fall down;

21   they have too much exposure, Your Honor.

22           Same theme on the next page.  This is an excerpt from

23   Page 54.  So Your Honor has heard the time line here; they were

24   in discussions about out-of-court financing through the middle

25   of August.  We get to August 14th, Oaktree says, we're not

1    doing it.  Now what do they do at that point?  They say to the

2    company, but call us if you need an alternative for in-court

3    financing.  Well, of course they're going to do that.  Again,

4    they're not going anywhere, they have too much exposure.

5         The third slide, Your Honor, this is an excerpt from

6    Page 97.  This goes to the Billabong point.  It's not just that

7    they have more than $200 million of exposure in this capital

8    structure; it's that they see a real opportunity, Your Honor.

9    They are a holder in the debt and the equity of Billabong.  Mr.

10   Wilson sat on the Board of Directors of Billabong until, I

11   think, about a week before we took his deposition.  Okay?

12        And of course he admitted, eventually, after several

13   questions, in connection with the deposition, that they're

14   exploring all possibilities, right?  That -- so there's not

15   just Oaktree's incentive to protect their existing position,

16   but there's a ton of upside.

17        And again, Your Honor, we demonstrated that in the

18   analysis that Peter J. Solomon did.  It was actually Mr. Cooper

19   whose work that was, in the June board deck, Your Honor, when

20   the board was being presented with all sorts of alternatives.

21   One of the things that was listed was a couple of pages on

22   Billabong as an obvious potential strategic acquirer, and

23   analysis of the synergies.  And they were huge, Your Honor; $27

24   million, right down to the EBITDA line, based on five percent

25   synergies.

1          So there's tremendous value here for Oaktree.  It's

2     why they're not going to go away.  It's why, if Your Honor is

3     inclined to approve the company's DIP, Your Honor should do so

4     only with unencumbering that foreign stock.  They just don't

5     need it, Your Honor.

6          And that is what the last slide is about, it's Page 85

7     of Mr. Wilson's deposition.  And there, again, he says:

8          "We didn't value it."

9          Right?  If the record on these negotiations were, Your

10    Honor, we've looked at the collateral, and we think it's

11    insufficient to cover this DIP loan that we're going to make,

12    and we have a view that there is, you know, 50 million, or

13    whatever amount of value there, you know, that would be a

14    different story.  But they didn't need it to make the loan,

15    they never needed it to make the loan.  And I'm confident that

16    they're not going anywhere, if Your Honor says that they can't

17    have it in connection with their DIP loan.

18         If I could just check with Mr. Stamer, if I've missed

19    anything.

20    (Participants confer)

21         MR. QURESHI:  There are a number of other changes to

22    the various DIP proposals, Your Honor, that have happened over

23    the course of the hearing.  I think, each morning, Mr.

24    Somerstein has made improvements.  There are some improvements

25    that Mr. Durrer has offered with respect to his, and we've

1    summarized that.

2          I don't know if it would be helpful for Your Honor if

3    we, over the lunch break, gave Your Honor --

4          THE COURT:  I think I've tracked them, so I don't

5    think I need an additional submission.

6       (Participants confer)

7          MR. STAMER:  Apologies, Your Honor.

8          THE COURT:  Sure.

9       (Participants confer)

10         MR. QURESHI:  Your Honor, there are -- we -- in our

11   pleading, which Your Honor has, we have a chart with a bunch of

12   changes that we want to make to their DIP; 506(c), 552, those

13   sorts of things.

14         THE COURT:  Right, I've seen that.

15         MR. QURESHI:  Right.  So, if Your Honor wants me to

16   walk through --

17         THE COURT:  We haven't argued those issues --

18         MR. QURESHI:  Right.

19         THE COURT:  -- but I assume that all of those issues

20   and objections --

21         MR. QURESHI:  Right.

22         THE COURT:  -- remain live, and I'm not going to --

23         MR. QURESHI:  Right.

24         THE COURT:  -- require it.

25         MR. QURESHI:  So, if Your Honor wants me to address

1    any of those, I'm happy to walk through them.  I just want to

2    remind Your Honor there's a chart, I think it's Page 18 of our

3    objection, that lays them out.

4             THE COURT:  I have it.

5             MR. QURESHI:  Okay.  Thank you, Your Honor.

6             THE COURT:  Okay.

7             Mr. Nash, you got all the way up here.

8             MR. NASH:  Very briefly, Your Honor.  Thank you.

9             Your Honor, the notion that the 35 percent, in the

10   context of their DIP financing, you know, is adequate

11   protection.  The 35 percent and the 65 percent of the foreign

12   equity are likely worthless, Your Honor, in the face of a

13   Boardrider noteholder acceleration.

14            THE COURT:  Then what do you need?

15            MR. NASH:  We need it, Your Honor, we clearly need it,

16   number one.

17            THE COURT:  (indiscernible)

18            MR. NASH:  But look, the point I really got --

19      (Laughter, participants confer)

20            MR. NASH:  The point I really wanted to get up and

21   make, Your Honor, everybody talks about Oaktree is not going

22   anywhere.  It is a horrible assumption to assume that, if the

23   alternative DIP financing is approved, Oaktree is just

24   literally otherwise there, prepared to do the exact transaction

25   that's in front of them.  There's no doubt that, if the

1    alternative DIP financing is approved, Oaktree will do

2    something.

3         Maybe that something will be -- this company only --

4    this company's assets, Your Honor, it's important to remember,

5    working capital and some brands.  If you go with the

6    alternative DIP financing, B of A is likely going to take

7    advantage of their over-secured position today and start to

8    monetize their working capital.

9         And perhaps Oaktree buys -- I don't know what Oaktree

10   does, Your Honor.  Oaktree clearly does something.  But the

11   notion that, you know, oh, they're not going anywhere, like

12   we're just going to be here, back-stopping a plan process, is

13   probably not a great assumption, Your Honor.

14        THE COURT:  All right.  Here's what we're going to do

15   -- Mr. Durrer?

16        MR. DURRER:  I can wait until you're done.

17        THE COURT:  Well, you better keep it brief.  Go ahead.

18        MR. DURRER:  Well, I don't know what Your Honor is

19   going to do with respect to scheduling.  The debtor would

20   appreciate an opportunity to argue.  My understanding was that

21   -- this is it, right now?  Okay.  Got it.  That's what I needed

22   to know.

23        I think what this is really about, Your Honor, is the

24   debtors' business judgment.  And I don't think that Mr. Qureshi

25   actually answered your question on that point, so I'm going to

1    answer it.

2            This company worked with its largest, most senior

3    secured creditor -- and it's important to realize, and I think

4    this was lost, that the spike in one of Mr. Genereux's charts

5    actually relates to the time when Oaktree moved from being a

6    forty-five percent holder, a blocking position, to actually

7    being a controlling position.

8            So there's no lying-in-wait strategy; this was a

9    collaborative approach to addressing the most senior $280

10   million in the capital structure, in a plan, when the board of

11   directors -- and Mr. Savini testified to this -- determined

12   that the plan approach was the best approach to maximize value.

13   And it relates to the Boardriders notes; you've heard a lot

14   about that.

15           And at the end of the day, respectfully, because I

16   know all of these four Akin partners very well, and I respect

17   them all.  But at the end of the day, they're asking the Court

18   to basically bet the river with respect to a transaction.  And

19   the company's business judgment is that is not appropriate,

20   based upon their analysis.

21           Now the committee offered expert testimony.  But I

22   think Your Honor understands that Mr. Genereux did not consider

23   all material factors; he just didn't.  And the fact that 150

24   basis points here or there is better on paper does not change

25   the fact that there are increased incremental cash costs by

1    going to a different DIP.

2          There is a risk that the Boardriders notes go into

3    default.  There is a risk that the change of control put will

4    be exercised, and will change the cash cost of a plan

5    transaction from in the four-to-five-hundred-million-dollar

6    range to the seven-to-eight-hundred-million-dollar range.  That

7    will certainly chill bidding.

8          As Mr. Nash said, we've created a structure that other

9    potential bidders can fall into that preserves this business

10   intact.  And this debtor made the judgment that that was the

11   best way forward.  And you have not heard, at all, ever, an

12   attack on that business judgment.

13         You have heard, we want to bet on the fact that

14   Oaktree is still around.  Why would they be?  Why wouldn't they

15   hang back and let this process fail, and then say, okay, I will

16   collect up my brands now, thank you very much?

17         You actually do have -- there's been no valuation by

18   anyone, that's correct.  You've had a statement, a directional

19   statement from Mr. Savini that he believes the unsecureds are

20   effectively out of the money, but there is value in this plan

21   for them.  As Mr. Nash said, that seven-and-a-half-million-

22   dollar number, it's only going in one direction, as the process

23   goes forward

24         You do have, at Exhibit 24, Your Honor, a valuation of

25   the brands, globally.  I'm not going to say the number on the

1   record, but it does not support a priming fight; it just

2   doesn't.  This company cannot live for two weeks -- Mr.

3   Genereux actually testified at his deposition that a priming

4   fight in Molycorp -- well, strike that.  Your Honor can take

5   judicial notice that the priming fight in Molycorp took

6   approximately two weeks.  I think that that's kind of self-

7   evident and known within the building.  This company can't

8   survive that.

9        The $30 million that they talk about, in terms of

10  extra liquidity for the company, if you kill our critical

11  vendor program after the lunch break, is not liquidity.  That

12  means that vendors will go back to cash on delivery and letters

13  of credit; that's not cash that's available to the company.

14       This company has put together a process that works.

15  Mr. Coulombe, who has done dozens of DIPs, testified that this

16  concept of a springing lien, he has never heard of it.  DIP

17  lenders, including B of A, are entitled to know that they have

18  a lien on stuff today, before they lend their money.

19       Our DIP lenders, collectively -- we put together a

20  collaborative DIP.  And I, again, respect my colleagues, that

21  we didn't get quite as far as they think they could have

22  gotten.  But the reality is that we started at 12 percent for

23  $150 million, and we got to $175 million, a confirmable plan,

24  and a weighted average of eight percent.  We have the

25  additional concessions that Mr. Nash has offered today.

1          And you asked a question, Your Honor, about, you know,

2     valuation, that cuts both ways.  I actually think it cuts three

3     ways, and the third way that didn't get addressed in the

4     comments is:  Whatever you think about the process that PJSC

5     ran prepetition -- and I was involved in it, and I am

6     comfortable with it -- but whatever you think of it, there is

7     no doubt, and I think Mr. Genereux finally conceded this, this

8     company has been for sale since the summer.

9          If Brigade was in the market, our phone worked.  If

10    Contrarian was in the market, our phone worked.  If VF Brands

11    was in the market, Mr. Cooper's testimony which we would like

12    to present our counter-designation, Mr. Cooper said in his

13    deposition that VF Brands told him:

14          "We're probably not interested, primarily because you

15    ran too good a process, the Oaktree deal is too rich."

16          That's his testimony.

17          So I think that the combination of the activity and

18    the marketplace knowledge of where this company was

19    prepetition, combined with the market process that we will

20    pursue, supports the business judgment of this company to take

21    the bird in the hand, rather than, frankly, the feathers in the

22    bush because there's no there.  Not one person has testified

23    that there is any transaction in process that this company can

24    execute on any time line that Mr. Genereux spoke to.

25          We have a deal.  We would like to get a better deal.

1    And we, candidly, would like to work cooperatively with our

2    committee, in connection with getting a better deal, rather

3    than spending time, as much as like you, with you here in this

4    room.  Thank you, Your Honor.

5              MR. STAMER:  I just need a --

6              THE COURT:  Oh, good lord.

7              MR. STAMER:  For a change, I'm not going to argue.

8              THE COURT:  Okay.

9              MR. STAMER:  For the record, Mike Stamer.  I want to -

10   - I want to correct a misstatement by Mr. Genereux.  It's not

11   substantive.  He referenced the name "Contrarian," which is

12   another hedge fund.

13             THE COURT:  I'm familiar with Contrarian.

14             MR. STAMER:  He meant to say Susquehanna.  As far as

15   we know, Contrarian is not involved in this deal, and I just

16   wanted to clarify that.

17             THE COURT:  Okay.

18             MR. STAMER:  Thank you, Your Honor.

19             MR. FOX:  Your Honor, if I may.

20             THE COURT:  Mr. Fox.  We talked a lot about your

21   client.

22             MR. FOX:  Not politely, I might add, Your Honor.

23             THE COURT:  Okay.

24             MR. FOX:  For the record, Your Honor.  Steven Fox,

25   Riemer & Braunstein, on behalf of Bank of America, NA, the

1    current ABL DIP lender, with a first lien on all of the capital

2    assets, and a second lien on the non working capital assets.

3         Your Honor, I think -- and I'll try and be as brief as

4    I can because I don't -- I hope not to repeat a lot of what's

5    been said.  But Mr. Stamer began this argument segment of the

6    process, among being -- aside from being the loudest voice in

7    the room, also suggesting that the committee's intent would be,

8    if the -- if B of A decided it would not stay in as a DIP

9    lender here, to convert B of A into an enemy.  So I think we

10   need to go back to before the petition date.

11        THE COURT:  Okay.

12        MR. FOX:  And I refer Your Honor to Exhibit 60, the

13   debtors' reply.  And on Page 10 of the debtors' reply, you

14   would see a chart.  And the chart takes the Court back to

15   August 27 and an assessment of the status of where the DIP

16   discussions were back then.

17        And you'll see, in the middle column there, on August

18   7th, that there's no B of A DIP facility.  B of A was not

19   prepared, at that time, to be a participant in the DIP.  B of A

20   made it very clear to the company that its desire and its

21   intention was to be repaid in full for both the foreign and

22   domestic exposure that it had at that time; it had deal

23   fatigue, and it was done, and it did not want to be a

24   participant in a process that led to any uncertainty and

25   additional credit risk to it.  It was only after extensive

1    negotiations between the company, B of A, and Oaktree that B of

2    A was presented with a program that suggested that it would

3    have a balanced and comfortable credit environment in which it

4    would stay involved.

5         The alternative DIP facility that is being proposed

6    today eradicates most of the fundamental underpinnings that

7    caused B of A to make a credit decision to stay involved in

8    this case for a limited duration.

9         What you heard last week from Mr. Stamer, at the

10   outset of the second-day hearings, was that today -- or

11   yesterday, I should say, and continuing today, was going to be

12   a substantial hearing.  And that statement was made before the

13   committee had conducted a single deposition and before the

14   committee had in hand even an alternative DIP proposal to fight

15   about.  So it has been clear from that time --

16        THE COURT:  I asked and --

17        MR. FOX:  Well, and you got the response that --

18        THE COURT:  I got a candid response from somebody

19   who's been around the block.  I would have crucified him if he

20   said it's a walk-through.

21   (Laughter)

22        MR. FOX:  Different scenario, though.  There was no

23   basis, at that time, Your Honor, to suggest --

24        THE COURT:  I think he had a pretty good sense.

25        MR. FOX:  Well, respectfully, Your Honor, he had a

1     good sense, but he didn't have an alternative.

2            So, to your point that you'd be here either way,

3     fighting, whether it was a 363 sale with Oaktree or whether

4     it's a plan, it has been clear that this is not about the

5     financing; this is about control.

6            THE COURT:  Sure.

7            MR. FOX:  Okay.  So let's talk --

8            THE COURT:  I get that.

9            MR. FOX:  So let's talk about this then because there

10    was a credit environment that B of A evaluated at the time it

11    decided to provide the DIP ABL facility.  That credit

12    environment included a specific set of collateral rights, a

13    certain time line, and most importantly, an exit to -- a path

14    to an exit.

15           The alternative DIP facility provides none of that,

16    and it dramatically alters the credit environment in which the

17    committee expects that B of A is going to continue to provide

18    the ABL facility.  They radically adjust our collateral

19    package.  They extend the term by three months.  They eliminate

20    one of the most important factors to us, and that is a stalking

21    horse, which gives us the comfort that there is actually value

22    to the company and an exit for us.  And without the benefits of

23    the rights offering or the -- in the backstop agreement, there

24    is no path to an exit here.

25           What we do know from the testimony you heard is that

1    you have another two and a half months of substantial losses.

2    Those losses are borne, in the first instance, Your Honor, if

3    the process that the committee wants to undertake fails, not by

4    the committee, but by the secured creditors.  So, if that

5    process that does not yield a result that covers both DIPs,

6    covered the secured notes, the committee cavalierly tosses away

7    seven and a half million dollars, but we have to pay the

8    (indiscernible) and that's an unnecessary risk.

9         What you've also heard in the testimony today is --

10   from Mr. Genereux -- that secured creditors; banks, among

11   others, look at DIP financing or bankruptcy financing

12   dramatically differently than they do in the normal market.

13   That was his testimony.  I believe that to be true.  And B of A

14   undertook just that sort of analysis in deciding that these are

15   the circumstances under which it was prepared to continue in

16   this process and be a DIP lender.

17        So, when you change the fundamental underpinnings and

18   the assumptions upon which the DIP ABL facility was going to be

19   provided, it should not be a shock, and nor should there be

20   criticism laid at B of A if we decide to decline to continue to

21   be a lender.

22        What you also heard throughout the testimony and

23   argument is that there is no solution that the committee offers

24   to the enhanced risk created from the alternative DIP facility

25   with the eurobonds.  The Boardriders noteholders will be free

1    to do what they want to do.  It is a specific condition of the

2    B of A facility that there is calm in Europe.  It is critical

3    to its collateral position.  It is critical to is foreign

4    exposure in Japan, Canada, and in Australia, critical markets

5    to the company's going concern value.  And none of the calm is

6    guaranteed under the alternative DIP proposal; again, a

7    dramatic change in the credit environment in which B of A would

8    be asked to stay involved.  It is not prepared to do that.

9           You've also heard no testimony from the committee as

10   to how or what the impact, or how they would address the

11   potential impacts on the company's continuing operations if the

12   B of A DIP facility goes away.  Mr. Genereux, cavalierly and

13   uninformedly, assumes that it's -- we'd be crazy not to stay

14   around because it's in our best interest with this loan-to-

15   value, we're well-protected and we would stay around.

16          That's not his decision to make, not his money to

17   lend.  And while he offers an opinion, it is without the basis

18   of any information.  It is certainly without the basis, as he

19   conceded in his testimony, of any effort to have a dialogue

20   with B of A.

21          We've been here for two days, as Mr. Durrer indicated;

22   B of A sat here all day yesterday, and listed to the testimony.

23   That testimony did nothing to make B of A more comfortable

24   about staying in this facility outside the context of the

25   Oaktree transaction.

1          Now there are other impacts that flow from B of A not

2    providing the DIP.  B of A is also the debtors' cash management

3    bank.  B of A is not obligated to continue to provide those

4    cash management services and may elect not to do so, so that's

5    also a risk.

6          You can't also ignore the fact, although the committee

7    seems to, that B of A, through the DIP facility, is the

8    company's LC provider.  And it's not difficult to assume and

9    understand what the impact on the company's go-forward

10   operations will be if it cannot satisfy its obligations to its

11   foreign vendors, with the ability to secure their commitments

12   to ship, without LCs.  Again, B of A will not be inclined to

13   continue that line of business with the company.

14         Mr. Genereux also testified that he is certain that we

15   will want to bank the company going forward.  I can tell the

16   Court that there have been no discussions between us and

17   Oaktree concerning our ability to provide the exit facility,

18   and we assume that they will go to market on that.  But sitting

19   here today, we have no comment on whether or not we would want

20   to continue to -- as the lender and the bank of the company

21   post-confirmation.  But suffice it to say it's a cavalier and

22   unsubstantiated assumption that B of A would stay around for

23   that purpose.

24         I think, in fact, we can suggest to Your Honor, by

25   looking at Exhibit 60 in the chart, that B of A was ready to be

1   done in August.  So there's no basis to assume that B of A

2   would stay around during the case for the sole purpose of

3   continuing to be the lender post-confirmation.

4        So, you know, in an environment, Judge, where neither

5   the committee, nor the committee's professionals, nor the

6   alternative DIP lender has had -- made any effort to have a

7   substantive discussion with B of A, the first lien lender here,

8   it's an incredibly difficult leap to make that -- to suggest

9   that we would stay, and we don't intend to.  According to our

10  discussions with our client, B of A does not intend to remain

11  as the DIP lender here.

12       So where does that take us, if we walk away?  And

13  that's not intended to be a threat to the debtors, to Oaktree,

14  or to this Court.  Your Honor will do what you will do, based

15  upon the record and the law.  But Mr. Stamer, since he brought

16  it up, and says, we'll just jam it down B of A's throats, we'll

17  return them back to September 8, and we will just take cash

18  collateral over their objection.  I submit to Your Honor, since

19  I suspect I'm a little more familiar with the company's

20  operating budget than Mr. Stamer may be, that it will be clear,

21  if you take evidence on the point, that the company cannot

22  survive on cash collateral.

23       If the DIP facilities, as they stand today, and we

24  resort to a priming fight, in two or three weeks -- and I think

25  that's incredibly optimistic on the time line, given the nature

1    of the assets here and their international footprint; the

2    experts that you would bring in -- need to bring in to provide

3    those valuations I suspect is going to take longer than that --

4    this company can't survive on cash collateral.  It certainly

5    can't survive without the benefit of the Oaktree term facility,

6    which is providing the supplemental liquidity.  It cannot

7    survive without the LC facility, and it certainly can't survive

8    without cash management services.  So this company goes --

9    starts to go into a free-fall pretty rapidly, if not

10   immediately.

11        Separately, Your Honor, we have rights because, as you

12   may recall-- and the committee certainly hasn't focused on this

13   point in any of its presentation -- the structure of the B of

14   A, as it exists.  You'll recall that, as part of the first-day

15   presentations, that the B of A DIP was carefully constructed to

16   retain certain aspects of the prepetition facility because of

17   the difficulties of perfecting liens for an -- by an

18   alternative lender in foreign jurisdictions, in the time it

19   would take, and the company --

20        THE COURT:  I recall the discussion.

21        MR. FOX:  And the company simply didn't have that

22   time.  So B of A accommodated, through adjustments in the

23   facility and amending and restating the existing facility, so

24   that the foreign liens, which provided the liquidity for the

25   company and enabled them to continue to provide access to that

1    liquidity through intercompany loans in Japan, Canada, and

2    Australia, to name three, B of A will have its rights to start

3    exercising its remedies in those foreign jurisdictions, and may

4    very well do so, in order to cover its exposure in those

5    jurisdictions, given its perfected liens there.

6        And while Mr. Stamer, again, was quite confident that

7    this Court would, after a litigation, issue the necessary

8    injunctions, there can be no assurance that that would be the

9    case.  And is that really where we need or want this case to

10   go; to be spending all our time before you, litigating and

11   generating exorbitant legal fees, when there's a transaction in

12   place that is entirely viable, and offers the opportunity for

13   third parties, who are not presently in the process, to engage

14   in that process, and offer up a better deal?

15       I have my own views as to whether or not that's

16   realistic, in terms of whether or another process or processes

17   will yield a better deal.  But you don't have to decide or

18   think about that today.  The fact remains there is a process.

19   It will unfold and it will yield a result.

20       The result, if nobody else comes to play, is the

21   company reorganizes.  That's extraordinary, in our day and

22   time.  All right?  The standard retail game plan and checklist

23   is liquidate, fast.  And everybody who has been in the process,

24   up until today, has been working very hard to ensure that

25   there's an environment in which that can continue, and that's

1    the actual result.

2         And I don't think that you can just ignore the

3    benefits of that process in exchange -- and convert over to a

4    completely uncertain process, simply because somebody thinks,

5    without the benefit of an informed opinion, that the --

6    everything else is going to fall in line, and it's a risk worth

7    taking.

8         Last, Your Honor, with respect to the discussion about

9    priming.  There's been discussion about whether or not you can

10   prime Oaktree.  There's been no discussion about what impact a

11   priming fight, assuming the scenario that Mr. Stamer has

12   advanced, that B of A winds up as a prepetition secured

13   creditor again, that you're able to prime us.

14        So the bar, in order to demonstrate that there is

15   sufficient collateral coverage -- put aside the 35 percent of

16   the foreign entity equity for the moment because nobody can

17   speak to what the value of that is, other than say, whatever

18   its economic value is, there's a non-economic value for the

19   ability to control the disposition of those companies, perhaps

20   as going concerns, by a secured creditor, which may enhance

21   value; as opposed to, as Mr. Nash suggested, there being no

22   value in a wind -- in a liquidation scenario, to equity in

23   those entities.  It's a hard asset value, which they already

24   have as their lien.

25        So it's a question of:  Can you get enterprise value

1    by controlling the equity, as opposed to asset value in a

2    liquidation context?  The committee doesn't want to focus on

3    that because they assume that, at the end of the day, the

4    superpriority claim that's springing, if there's diminution

5    resulting from the failed process here, you'll be able to

6    capture that value in the 35 percent in a liquidation scenario,

7    which perhaps there is zero.

8            But as you build the capital stack, you've seen the

9    DIP, the DIP term facility through the alternative proposal, go

10   from one fifteen to one fifty-something.  I've lost track of

11   all the add-ons over the last two days.  So, first, you've got

12   to cover that in a priming fight.

13           Then you've got to cover sixty-plus million to B of A.

14   Then you've got to cover $275 million to the secured

15   noteholders, who have first and/or second liens on all of the

16   company's assets, including the most important assets:  Working

17   capital and intellectual property.  I'm not sure where there's

18   value anywhere else.

19           I've heard no testimony between the last two days that

20   suggests -- and I think everybody concedes that nobody has done

21   a valuation.  And despite my own skepticism, or in spite of my

22   own skepticism as to whether or not you could ever build a

23   model through valuation testimony that suggests that there is

24   sufficient collateral coverage to cover all of those levels of

25   the capital structure, there's been no testimony to --

1  certainly no probative testimony or evidence presented by the

2  committee in connection with the alternative DIP proposal that

3  they put before you to suggest that, in fact, you can achieve

4  that.

5       It is the debtors' burden in the first instance to

6  prove that it can.  It is the committee's burden, in

7  connection, I believe, with their alternative DIP proposal, to

8  suggest or prove that they can.  And I suggest to you they have

9  failed to do that.  Other than an unsubstantiated statement by

10  Mr. Genereux that he thinks there's enough collateral value,

11  there's no evidence.  He acknowledges he provided -- he

12  conducted no due diligence.  His company is in existence for

13  two weeks.  He provided no testimony whether they have the

14  talent in house to even conduct that kind of valuation, and

15  that whatever results might come of it are uncertain.

16       So to suggest that you should toss aside an existing

17  facility that makes sense -- or two existing facilities, I

18  suggest, that make sense, in favor of one that may be

19  unsustainable after a long fight makes no sense to us.

20       I'm prepared to answer any questions Your Honor may

21  have, but otherwise, I'm done.

22       THE COURT:  All right.  We're going to break.  We will

23  reconvene at 1:45.  I will rule with respect to the PSA and the

24  financing request.

25       In addition, I would observe that we're going to need

1   to reschedule as it relates to the Peter J. Solomon

2   application.  I won't, certainly, have time to get through and

3   deal with the witnesses on that.  You can get in touch with

4   chambers, and we'll get a hearing promptly scheduled for that.

5          With respect to the critical vendor motion that's on,

6   I guess I'd like guidance from the parties when we reconvene

7   whether or not it would be -- if that's something the debtor

8   needs to deal with today, I need to -- I'll need to know sort

9   of how effectively and promptly we can put it together because

10  I'm getting kind of jammed up this afternoon.

11         In addition, I would just make the following

12  observation.  I haven't looked at the critical vendor materials

13  since, you know, a couple of days ago; it seems like forever

14  right now.  But the committee has raised concerns with respect

15  to critical vendors as a general proposition.

16         I made comments at the first-day hearing, as I have in

17  many, many other cases, about my understanding with respect to

18  manufacturing or operating debtors need to manage its affairs

19  on a going-forward basis once it gets into bankruptcy.

20  Critical vendors is has been a hot topic for many years, both

21  with courts, and frankly, with, you know, the commentators.

22         I'll tell you that, in the absence of the kind of

23  consensual prepack structure that we typically see, I don't see

24  critical vendors getting paid a 95 percent or 90, 95 percent.

25  That turns criticality into a Lake Woebegone effect, everybody

1   is above-average; everybody is critical or special.  I'm having

2   difficulty with that proposition.

3          I've said, and you heard Mr. Durrer, at the first-day

4   hearing, I expect you folks have seen the transcript, I

5   understand this debtors' business.  We don't see a lot of

6   operating textile companies, but I understand manufacturing,

7   and I understand this debtors' business.  And I accept the

8   debtors' proposition that they have relationships and providers

9   that are essential to them.

10          I'm not satisfied that, unless there's something

11  particularly unusual about this debtors' business, that,

12  essentially, the overwhelming majority of vendors would call

13  into that critical category.  So I would encourage the parties

14  to confer with respect to that.

15          I will have some time when we reconvene to conduct

16  that hearing; or, if we need to push that to next week, we'll

17  do so.  My goal is to not interrupt or impair the debtors' sort

18  of day-to-day operations and mechanics.

19          Mr. Qureshi, I believe you said you've got extracts.

20          MR. QURESHI:  Indeed.  May I approach?

21          THE COURT:  Yes.  Very good.

22          All right.  We'll stand in recess, we'll reconvene at

23  1:45.  Thank you.

24     (Luncheon recess taken at 12:51 p.m.)

25                         AFTERNOON SESSION

1          (Proceedings resume at 2:05 p.m.)

2          (Call to order of the Court)

3              THE COURT:  Please be seated.

4              Okay.  The matters that are currently before the Court

5     are two separate motions filed by the debtor.  They are a

6     request for approval of DIP financing and a request to assume

7     the plan support agreement.

8              Both motions are opposed by the committee and the

9     committee has -- the Court has received testimony from four

10    witnesses, and scores of exhibits have been admitted into

11    evidence.

12             I would note, before I proceed, that, as I said at one

13    point during this trial, it is not lost on me, the amount of

14    coordination and cooperation among the professionals that goes

15    into a hearing such as this on the time line that, frankly, the

16    debtor has had, but more importantly, the committee has had to

17    present this as a full and substantial hearing.

18             And also, in a context where there have been no

19    disputes with the parties about cooperation, production of

20    documents, I haven't had a discovery call and I appreciate it.

21    I know when I don't get them.  I am obliged to express my

22    appreciation to the parties for the way that this has been

23    presented.

24             For the reasons that I will state, I will approve the

25    financing and I will authorize the assumption of the PSA

1    condition on changes to the deal that I will identify for you.

2         As a threshold matter, I think I'd say that this case

3    presents competing visions of where the reorganization of

4    American Apparel should go.

5         MR. DURRER:  The other girlfriend, really?

6    (Laughter)

7         THE COURT:  Sorry.  Sorry.  That was -- that was

8    actually -- that was just mortifying.

9    (Laughter)

10        MR. DURRER:  To my client, as well.

11   (Laughter)

12        THE COURT:  I just have a little too much going on

13   right now, so I do apologize.

14        Where the reorganization of Quiksilver should go.  And

15   the debtor, with the support of its senior stakeholders is

16   pushing a reorganization plan that permits the debtor to

17   restructure its balance sheet and emerge from bankruptcy as

18   part of a global retail and manufacturing operation.  I would

19   note, and I acknowledge, the concerns and consideration

20   expressed by debtors' counsel, that in this day and age, it is

21   difficult and unusual for a retailer to successfully

22   reorganize.

23        The committee, however, notes that the plan,

24   admittedly, leaves very little on the table for unsecured

25   creditors, approximately seven and a half million dollars for a

1   vastly larger pool of unsecured creditors.  And the committee

2   believes that the plan shortchanges junior creditors and that a

3   sale process offers the benefit of a superior recovery, to the

4   extent that that sale process can be prosecuted appropriately

5   over an extended period of time.

6          I further note that the committee has put its money

7   where its mouth is.  The competing DIP is a serious proposal

8   that has been materially improved over the past 36 hours and

9   is, in fact, a workable alternative in the event that Oaktree

10  is not prepared to move forward on the terms that the Court is

11  prepared to describe and approve.  But I start at a high level

12  and I will defer to the debtors' decision process as it

13  embraces a reorganization strategy with a measure of certainty,

14  or at least, less risk than that attendant to the competing DIP

15  facility.

16         The Court undertook and heard argument and substantial

17  testimony from, particularly, Mr. Savini and Mr. Genereux,

18  regarding the terms of the transactions and the risks

19  presented, particularly with the competing proposal.

20         The debtor has pointed to, most importantly, several

21  risks in the competing proposal:

22         First, whether the Boardriders waiver will continue to

23  exist in a new deal.

24         Second, how to deal with a priming fight with Oaktree

25  and potentially B of A.

1          Third, whether B of A will stay in this process.

2          Fourth, and perhaps most importantly, whether there

3    is, in fact, a Section 363 buyer out there to make accepting

4    this alternative approach worthwhile and sensible.

5          The committee has responded to each of these risks

6    with substantial improvements to its proposed DIP facility, and

7    they request, frankly, that the Court test the allegations and

8    assume that parties will not act against their economic

9    interests.  And I take those arguments seriously.  This Court

10   is prepared, where appropriate and necessary, to, frankly, call

11   the bluff of parties that have made threats.

12         But nevertheless, I am not prepared to require the

13   debtor to take that leap and to forego, at this stage, the

14   reorganizational alternative that it presently has in hand;

15   albeit one that is not appealing to junior creditors.  These

16   are serious risks and I have heard and considered carefully,

17   the response on each of these, and I acknowledge that the

18   debtor has -- or the committee has presented a response to each

19   of the perceived risks.

20         But the concern that the Court has is that it may be

21   that there are responses on each of these, but the committee's

22   proposition would be, essentially, to run the table on each of

23   these risks and I believe it would be obliged to do so in order

24   to realize the value that it is attempting to identify and to

25   maintain.

1            So, as I said, these are serious risks, and I

2      acknowledge that were I to reject the existing DIP and embrace

3      the competing DIP, the committee may, in fact, be right, that

4      all the pieces could fall into place, but I'm not prepared

5      today to roll those dice.

6            And one primary reason that I'm not prepared to do

7      that is because I believe that it is possible to vindicate or

8      respond to the concerns and desires expressed by the committee

9      to see if there's a better deal out there without risking the

10     debtors' overall reorganization and restructuring strategy.

11           I have listened carefully to the testimony, again,

12     particularly to Mr. Savini and Mr. Genereux, and as I

13     understand it, the plan on the table will be subject to what

14     has been described as a market test.  I quizzed Mr. Savini and

15     Mr. Genereux about this and whether or not it can be a real

16     process and I believe that it can be and I believe that it will

17     be.  To give effect to that, I note, first, that the breakup

18     fee in the PSA is now gone.

19           And so to use Mr. Nash's words, this company and this

20     transaction are on the block until a confirmation order is

21     entered.  I will schedule a confirmation hearing to occur in

22     the week of the 25th of January, moving the milestones out to

23     accommodate that.  I believe that, consistent with Mr.

24     Genereux's comments and testimony, that that is, in fact, a

25     tight time frame, especially when we're looking at the

1    holidays, but three and a half months is a substantial runway

2    and I'm reluctant to go further, because at least in the

3    Court's experience, I'm not satisfied that it is necessary to

4    test the marketplace; I think, as we discussed at the first-day

5    hearing, there is substantial exposure of this debtor.

6         And second, I'm concerned with respect to the

7    testimony, particularly from Mr. Bruenjes and Mr. Savini,

8    regarding the debtors' business cycle, and the fact that its

9    uptick comes in the spring.  It is manifestly not my intention

10   to interrupt or interfere with that ramp-up process.  So, it is

11   my intention that this process will be able to be presented for

12   a hearing, be it a confirmation hearing or even a sale hearing

13   or both, at the end of January of 2016.

14        The committee professionals will be full partners with

15   the debtor in that go-shop process.  I will direct that the

16   disclosure statement, which I think is scheduled for a hearing

17   shortly before Thanksgiving, be moved to a date in the week of

18   December 1 or later.  But as I said, that go-shop process has

19   been described by the debtor and by Mr. Genereux and by parties

20   at the podium.  It is my expectation that that will be a real

21   and a robust process.

22        We have seen a number of cases in this jurisdiction

23   with what's been called a "parallel process" and I think that's

24   largely what we are proposing to see here.  Mr. Nash may be

25   right, that because of the Boardriders notes and other

1    considerations in this case, no one is likely to be inclined to

2    make a bid in a Section 363 context, but that there may be

3    interest in stepping into the plan role.  I am confident that

4    Mr. Savini and Mr. Genereux can market both opportunities

5    sufficiently to the marketplace in the time line and under the

6    circumstances that I have described.

7           So, on the big picture, my ruling is that the debtor

8    has proffered this DIP financing, which funds a plan process,

9    avoids a likely priming fight, and avoids uncertainties that

10   are associated with the competing proposal.  I am satisfied

11   that they've carried their burden under the Code and I will

12   approve that financing.

13          Substantial time and testimony was devoted to the

14   foreign stock and to the demand for liens.  On the record thus

15   developed, I cannot -- all I can say is that nobody knows what

16   that stock is worth and I'm not satisfied that it's been

17   demonstrated to the Court that it is necessary, as a lien, part

18   of the collateral package, to ensure adequate protection to the

19   lender.  On that record, therefore, I cannot approve liens on

20   that stock, but I believe that it is appropriate to include

21   that stock as part of the adequate protection package and

22   collateral package, solely to the extent of the diminution and

23   the value of the lender's collateral, as provided under Section

24   507(b) of the Code.

25          The committee has alleged that this is -- to be blunt

1    -- an unjustified grab of an unencumbered asset for Oaktree.

2    And on this record, I cannot make a determination one way or

3    the other.  It may be that further proceedings are necessary as

4    to this request, but I am not prepared to approve the full lien

5    request, as described and proposed in the DIP financing.

6           Regarding the budget, I would be prepared to do one of

7    the -- one of two things:

8           First, under the circumstances of this case, it seems

9    to me that an investigation budget for the committee of

10   $150,000 is not inappropriate or out of the range.

11   Alternatively, I'm generally reluctant to propose numbers and

12   when the parties cannot agree, I'd simply direct that a budget

13   line be left open.  But I believe that, on the Court's ruling

14   thus far, it is the Court's expectation that the committee will

15   be engaged in both, the marketing process as well as obviously

16   conducting its statutory and fiduciary responsibility to test

17   the propriety of the asserted lien positions of various secured

18   creditors, in what is a large and complex enterprise.

19          Having so ruled, I will overrule the objection

20   relating to the Section 506(c) waiver.  There is sufficient

21   consideration provided for a committee, at least at this stage,

22   in the budget.  I will also note that issues relating to line

23   items, et cetera, we can deal with on a line-by-line basis.

24   But I will overrule that objection.

25          With respect to some of the other specific objections,

1    like for equities of the case and the marshaling, I will,

2    likewise, overrule those objections in the context of the

3    financing that's been described and proposed to the Court.

4        I would make the following observation:  I think I

5    have certainly captured the larger issues that have been the

6    subject of the hearing that we've had for the last two days.  I

7    had gotten many, many other elements that were raised in the

8    committee objection and I don't necessarily want to give short

9    shrift.  I think you've got a sense of where I'm going, and

10   that my ruling is that the competing DIP is not, essentially,

11   embraced and I will approve and authorize the financing that

12   the debtors have proposed with Oaktree.

13       It may be in the last 45 minutes of trying to go

14   through my notes and make sure that I've captured this, that

15   there are other elements that I have not gotten.  Rather than

16   have an exercise where we go through this on a line-by-line

17   basis or ask me, I would ask that the parties confer, in light

18   of the Court's ruling, and if we need to get on the phone to

19   talk about specifics, then we can do so.

20       Obviously, I am aware, and I'm sure Mr. Nash was aware

21   that at least some of this was coming, that the ruling that

22   I've made and the financing that I am prepared to approve is

23   not necessarily consistent with what is on the table right now

24   from Oaktree.  And so, obviously, while it's my expectation

25   that the parties will be able to reach closure on that, I am

1    aware of that and I am also aware that the competing -- I

2    assume the competing financing proposal remains extant, to the

3    extent that the debtor can't come to terms on the financing

4    proposal that's there.

5         So, I believe that requires some modification to the

6    form of order, but I am prepared to approve the debtors'

7    financing on the terms that I've described, and I would ask

8    that the parties move forward with that.  And, again, to the

9    extent that there are issues, I will be -- make myself

10   available promptly to address them on the phone, all right?

11        Mr. Durrer, where's that leave us?

12        MR. DURRER:  Your Honor --

13        THE COURT:  I really can't believe I called this case

14   "American Apparel."

15     (Laughter)

16        THE COURT:  You know, I don't think I've ever done

17   that, so I apologize.

18        MR. DURRER:  That's quite all right, Your Honor.  We

19   understand and we appreciate the Court's time that you've

20   afforded us, the jilted girlfriend.

21        With respect, I have one question, and then as far as

22   process goes, I have an answer to your question.  The question

23   I have is, with respect to -- you mentioned 507(b).  Was it

24   Your Honor's intention -- I'm not clear on Your Honor's

25   intention with respect to the DIP lender's collateral,

1    precisely, as opposed to the senior notes collateral.

2         THE COURT:  I'm not approving a lien for the DIP

3    lender on the foreign subsidiaries; I'm not prepared to approve

4    that.  To be honest, the parties briefing and the colloquy that

5    we've had, it was not entirely clear to me.  My point is that

6    I'm not approving that lien.

7         To the extent that these are unencumbered assets that

8    would be available to provide a measure of protection, either,

9    frankly, to the DIP lender or, secondarily, to the second lien

10   lender, that would seem, to me, to be appropriate.  But the

11   primary concern of whether or not these were being liened up

12   today, the answer is no.

13        MR. DURRER:  That directly answered my question.

14   Thank you.

15        So, with respect to process, we actually took

16   advantage of the break, the lunch break, and we had a pretty

17   thoughtful dialogue, I would say, with the committee about the

18   critical vendor issues, which included Oaktree as well.

19   We also tried to get some feedback from the alternative DIP

20   lenders, as well, on the same topics, but, unfortunately, Your

21   Honor, we remain at an impasse and we -- the company feels very

22   strongly that we need to on our case.  It is just one witness.

23   I don't believe that there's a counter-witness and I don't

24   believe that Mr. Bruenjes will take a long time on direct, but

25   I know that Your Honor said that you had some scheduling

1    issues, but that -- we feel very strongly that we need to go

2    forward with that.

3            THE COURT:  Okay.  It did not -- well, actually, I'll

4    hear from the committee.

5            Mr. Qureshi?  Mr. Stamer?

6            MR. QURESHI:  Your Honor, again, for the record, Abid

7    Qureshi.

8            We don't have our own witness with respect to critical

9    vendor.  We do have some cross-examination for Mr. Bruenjes.  I

10   don't imagine that would be extensive, but, again, whatever

11   Your Honor's pleasure is, in terms of when we do that.

12           MR. STAMER:  Your Honor, while we have a pause --

13   again, for the record, Mike Stamer, from the committee --

14           THE COURT:  You know, the last time you got to the

15   podium, I was about to leave and it was an hour and twenty

16   minutes later.

17       (Laughter)

18           MR. STAMER:  I realize that.  It will be nothing of

19   that sort.

20           THE COURT:  Okay.

21           MR. STAMER:  We'll endeavor to work with the company

22   and with Oaktree to put together an agreed-upon form of order.

23   And I don't think there are too many open issues.  There are a

24   few line item -- I was talking about the budget -- we can deal

25   with that too.

1          With respect to the enumerated things in the DIP that

2     we objected to, I think the only thing that it warrants raising

3     is the cross default and the linkage between the PSA and the

4     DIP.

5          For us to be able to run -- for the company to be able

6     to run a full and fair process, the concern is that would serve

7     as additional bidder repellant.

8          THE COURT:  Here's what I'd like you to do.  I'd like

9     you to confer with Mr. Nash on that and with the debtor, and

10    I'll tell you why.  Because, to me, the biggest thing in the

11    cross default was a twenty-million-dollar anchor, okay.

12         And, you know, it's not unusual that either a DIP

13    financing, particularly by a lender that is also looking to be

14    a stalking horse, has all kinds of bells and whistles in there.

15    Some of that is a business point.

16         If I can be clear, it is that I intend that the debtor

17    can move forward with its plan, but that that plan will be,

18    frankly, subject to a real and robust market test.  And I had

19    concerns that, especially the breakup fee, would render that a

20    nullity, because somebody just had to climb this twenty-

21    million-dollar mountain in order to start the ball rolling.

22    Removal of that resolves some of those concerns, but not

23    necessarily all of them.

24         And what I'd like is, frankly, a colloquy between you

25    folks to determine what is and what is not both, fair and

1    market.  So I'm not certain that I can give you a kind of

2    line-by-line answer.  You know, those do travel somewhat

3    together, and I think I heard from Mr. Nash that he's got the

4    courage of his convictions that they're prepared to move

5    forward and to subject their transaction to that process.  So I

6    think I'd like you to confer, because he's entitled as -- in

7    the role that he's stepped into and is prepared to play -- and

8    by "he," I mean Oaktree -- but I have Mr. Nash staring at me.

9         But the question is how the process will work and

10   that's in the details.

11        MR. STAMER:  And, Your Honor, I don't think we need to

12   go much further.  Our concern is the removal of the breakup fee

13   is clearly very helpful.  The other mountain we're talking

14   about is whether a bidder will have ample time, if there is

15   someone who's willing to pay more, to be able to actually close

16   on their bid and line up the financing that's necessary.  We

17   don't want the immediate default under the DIP to require a

18   bidder to come up with cash in advance of when they would close

19   on the loan and the like.  That's the real concern.

20        THE COURT:  And that's -- and we don't necessarily

21   need to answer that today.  I guess I'd observe that at least

22   in another category, it's kind of -- it's not unplowed ground.

23   We've had lots of situations where we've got somebody that is

24   the DIP lender; they're the prepetition -- yeah, they were the

25   prepetition secured creditor; they're often equity as well and

1    they've got all these different hats on and, nevertheless,

2    they're subjecting their bid as the stalking horse to competing

3    bids.

4         But you know, we've seen them in bid procedures where

5    it says, well, if you talk to anybody or take another bid, then

6    that's a default and they have to pay the DIP as soon as they

7    make a bid or something like that.

8         MR. STAMER:  That's the concern.

9         THE COURT:  I think that able lawyers and deal guys

10   can navigate that in a way that balances what our legitimate

11   concerns for somebody that agrees to be the first person on the

12   sixth-grade dance floor, to somebody that's -- to elements that

13   will frustrate a process.

14        So I think I would leave that to you for the moment

15   with at least those observations.

16        MR. STAMER:  Your comments are very helpful.  Thank

17   you.

18        THE COURT:  Mr. Nash, do you have something to add?

19     (No verbal response)

20        THE COURT:  Okay.  All right.  Then why don't we do

21   this, I'm prepared, since we've got folks here, let's move

22   forward.  I basically have about an hour for you.

23        And then what I'd ask is that you confer about getting

24   the Peter J. Solomon application on and any other scheduling

25   requests that you have, you can confer with my courtroom deputy

1  off line and we'll get that scheduled promptly, okay?

2          MR. DURRER:  Yeah, will do, Your Honor.

3          There were two other matters on the agenda; one was

4  interim comp and one was FTI.  I don't think there's any issue

5  with FTI, so if we can submit an order on --

6          THE COURT:  I'll make orders or I'll take, just,

7  orders under certification on both of them.

8          MR. DURRER:  And then on the interim comp, I think in

9  the context of the DIP, we'll continue to talk to the committee

10  about that and if we can't work it out, we'll deal with it on

11  the 28th.

12          THE COURT:  Good.  Okay.

13          MR. DURRER:  So with that, Your Honor --

14          THE COURT:  Mr. Somerstein?

15          MR. SOMERSTEIN:  Your Honor, can I be excused for --

16          THE COURT:  It was so exciting every time you stood

17  up.

18      (Laughter)

19          MR. SOMERSTEIN:  I know.  I'm just so exciting.

20          But, thank you, Your Honor.  And our commitment

21  remains open and we'll hear from the parties if there's an

22  issue and we appreciate the opportunity to participate.  Thank

23  you.

24          THE COURT:  Very good.  Thank you very much, Mr.

25  Somerstein.  Safe travels.

1              MR. SOMERSTEIN:  Thank you.

2              MR. DURRER:  So with that, Your Honor, I would call

3    Mr. Bruenjes.

4              THE COURT:  Very good.

5              Welcome back, sir.

6              All right.  We'll swear the witness again.

7    **ANDREW BRUENJES, WITNESS FOR DEBTORS, SWORN/AFFIRMED**

8              THE CLERK:  Please state your name for the record.

9              THE WITNESS:  Andrew Bruenjes.

10             THE COURT:  Welcome.

11             THE WITNESS:  Thank you.

12             MR. DURRER:  Your Honor, I'm going to presume some

13   familiarity, but given the time constraints with --

14             THE COURT:  Mr. Bruenjes is the CFO.

15             MR. DURRER:  Perfect.

16             THE COURT:  That much I remember.

17                         **DIRECT EXAMINATION**

18   **BY MR. DURRER:**

19   Q   Can you describe for the Court, Mr. Bruenjes, your

20   responsibilities with respect to the company's vendors?

21   A   Absolutely.  So in regards to vendors, any changes in

22   trading terms I deal with.  So when vendors go either from 30,

23   60 or LC terms, I'm responsible for actually signing off on

24   those.

25       In respect to the supply chain and the global sourcing

Bruenjes - Direct

1   leads, I obviously have weekly meetings with the head of QAS in

2   Hong Kong, likewise, with Laurent Berger, who's in France, and

3   the local team in the U.S.

4   Q   Can you tell the -- when you refer to "QAS," what are you

5   referring to?

6   A   So QAS is the sourcing office that we've got in Hong Kong,

7   so essentially, all of China and Hong Kong or any basically

8   regions in the Asia area supported by the QAS sourcing office.

9   Q   Are you familiar with the seasonality of the company's

10  business?

11  A   Yes, I am.

12  Q   Can you explain to the Court what the biggest season is?

13  A   Spring, but I don't think it would be any surprise to any

14  members of the court or Your Honor that spring is the biggest

15  season.  We're obviously a company that was started on

16  boardshorts, so that's naturally our largest season globally.

17  Q   And so can you articulate for the Court how the order

18  calendar works.  So, for example -- I want to be more precise

19  -- we're obviously heading into the spring of 2016.  When did

20  the 2016 spring season start for the company?

21  A   Yeah, sure.  So in terms of internal development, line

22  plans are finalized in August.  So that was August of 2014.

23       And when I say "line plans" that's essentially the products

24  that we'll sell.

25            THE COURT:  August of 2014 or '15?

1            THE WITNESS:  '14.

2    A    So that's basically the number of boardshorts that we'll

3    offer, any changes in styles with respect to T-shirts and to

4    that nature.  So, essentially, it develops the entire line plan

5    or skew offering [sic] that will occur for the season.

6         What happens next is that samples are procured.  So samples

7    are received, initial samples, in December of '14.  We work

8    through a three-month process where the samples are refined.

9    We receive salesmen's samples in April and May of 2015.  We

10   then have a sales conference at head office where all the sales

11   reps attend; that occurs in June of 2015.

12           THE COURT:  Are these sales reps employees or are they

13   independent contractors?

14           THE WITNESS:  There's a combination of both.

15   A    So we have the sales meeting.  The sales team get on the

16   road.  They obviously take orders and then the product is

17   shipped -- or the start-ship date is in December.

18        In terms of the calendar from a sourcing perspective,

19   orders are placed from May through September to our vendors and

20   mainly centralized through Asia.

21        In terms of the actual product deliveries, deliveries start

22   in December.  We've currently got 10 percent of the goods on

23   the water related to spring of '16 and our first sales that we

24   actually recognize both, from a vertical retail perspective and

25   through our wholesaler customers, are in December.  The selling

Bruenjes - Direct

1   period goes from 12/25 through to 3/25.

2   Q    And what is current projected global revenue for 2016?

3   A    It's roughly in the magnitude of 1.4 billion.

4   Q    And what does this spring season represent as a percentage

5   of that 1.4 billion?

6   A    Probably a better answer is to say in terms of the

7   wholesale business -- and wholesale is greater than two-thirds

8   of our overrule business -- but spring represents about 41

9   percent of our projected full-price wholesale orders for 2016.

10  Q    And when you reference May to September as the order time

11  frame, you were speaking of May to September of 2015, correct?

12  A    That is correct.  So orders are placed with our vendors

13  from May to September of 2015.

14  Q    So given that we're standing here on October 15th, what

15  ability does the company have to re-source spring-order goods?

16  A    Absolutely no ability.

17        So in terms of our calendar, as I outlined earlier, the

18  calendar itself ranges for about 16 months, so there's a lot of

19  production.  There's a lot of work that goes on in terms of

20  samples development, in terms of making sure that the quality

21  and the products that are produced by the vendors are up to a

22  suitable standard.

23        And with all retailers, generally, the calendar period is

24  at least 12 months in advance, so it would be impossible to

25  re-source production of those goods.

1   Q   What is the relationship between U.S. vendors and the rest

2   of the globe?

3   A   Yeah.  So when we look at the Americas in regards to spring

4   -- when I say the Americas, that's a consolidated group, so

5   that includes Canada, Mexico, and Brazil -- the purchase that

6   occurred represents approximately 32 percent of the global

7   purchase.

8       When I exclude those other regions, being Canada, Mexico,

9   and Brazil, just for the U.S., the entity that's filed, it

10  represents approximately 25 percent.  So we have exposure for

11  75 percent in regard to the current orders that have been

12  placed with our global vendors.

13  Q   Why is that?

14  A   Well, as was outlined in the 2013 multi-year turnaround

15  plan, we had three profit initiates that we were really focused

16  upon.  The one that relates to the vendors is in regards to

17  improving operating efficiencies and we moved from a disparate

18  regional-based sourcing model where we had over 500 vendors to

19  a global supply chain where we now operate with approximately

20  150 vendors.

21      As a result, we have very few unique vendors to any region.

22  The only unique vendors are in regards to specific SMU product

23  involvement that occurs within those regions.  But for the

24  large and high percentage of each regions purchases, they're

25  from global vendors.

1   Q   As part of your responsibilities, are you familiar with the

2   company's trade terms with its vendors?

3   A   Yes, I am.

4   Q   Okay.  And can you describe to the Court -- let's start,

5   first, with what normalized trade vendor terms are.

6   A   Yes.  Normal trade terms -- just as a general comment, Your

7   Honor -- are 60 days.  We do have some vendors that are on 30

8   days, that are shorter.  And we also have some LC vendors.  But

9   as a general standard of terms, they're 60 days.

10  Q   And during the six-month period leading up to the Chapter

11  11 filing, what can you say about the status of trade terms

12  with vendors?

13  A   Yeah.  So to preserve liquidity across the financial

14  quarters of this year, the quarters being Q1 ending 31,

15  January; Q2, 30th of April.  It was natural they would actually

16  build the days outstanding with our vendors and then would have

17  a natural outflow that occurred.

18      So this year, debtors' days -- DPO, I should say -- is

19  extended and is averaged about 70 days.  Pre-filing, that

20  actually increased to over a hundred days for the majority of

21  our vendors.

22  Q   And what is the impact that that globalization has had on

23  individual vendors in terms of their ability to have other

24  customers?

25  A   Yeah.  Well, we've really consolidated our vendors.  And

1   when I talk to the 150 vendors that we do have, the top 50

2   represent the majority of our production and they've basically

3   committed lot of their resources to provide product exclusively

4   for Quiksilver.

5   Q   So is there a risk that the vendors themselves may become

6   insolvent if they're not receiving payments?

7   A   That is correct.  It's -- in part of discussions that I've

8   had with vendors post-filing, they've communicated that they've

9   had issues with their own working capital and the ability to

10  make payments to both, their staff and also in regards to their

11  production facilities, in addition to their exposure on

12  (indiscernible) goods for future seasons.

13  Q   So if a vendor doesn't get paid and elects not to ship for

14  the spring order period, what happens to the goods that they've

15  developed?

16  A   Well, right now in terms of the orders that we've placed

17  they're still procuring products for Buy 4 and Buy 5.  Only 10

18  percent are currently on the water, and there is the potential

19  that they won't ship.

20          THE COURT:  I apologize.  I'm not sure I understood.

21          There's -- can you repeat what you just said?  They're

22  still procuring for buy --

23          THE WITNESS:  Sorry.  In terms of the buy -- sorry,

24  Your Honor -- we actually have the buy broken down into five

25  unique buys.  So there's a buy that occurs for May and there's

1   -- along the way, we actually top up our orders as we go

2   through.  So they've procured products for the first three and

3   the products that are going to drop later in December, they're

4   still in the process of developing production.

5   BY MR. DURRER:

6   Q   Are you familiar with the company's largest trade vendor?

7   A   Yes, I am.

8   Q   And who is that?

9   A   C&K Trading.

10  Q   And have you had direct conversations with that vendor

11  concerning the critical trade vendor program?

12  A   Yes, I have.

13  Q   And can you describe to the Court the substance of those

14  conversations?

15  A   Yeah.  So to be clear, it wasn't with the principal of C&K.

16  I had discussions with the C&K principal prepetition;

17  post-petition, we are dealing exclusively with their advisors.

18  And, also, a lot of my discussions haven't been direct with the

19  vendor, but through our sourcing team.

20      So I've been seeing a weekly call -- daily calls.  My day

21  starts with a 7 a.m. call which triangulates  between Hong Kong

22  and also France, with the heads of production in both of those

23  areas.  So a lot of my involvement has been through our

24  sourcing leads and also through agents, in particular, with

25  C&K.

Bruenjes - Direct

1   Q   And so what was the substance of your negotiation with C&K

2   regarding their critical trade vendor treatment?

3   A   Yeah.  So we went back and forth a number of times and

4   basically the end result was they really require payment in

5   full, I mean, in regards to the U.S. obligations that are

6   outstanding.  The majority of their U.S. business is quite high

7   relative to their overall business as well, and they expressed

8   their concerns with their ability to meet their own working

9   capital needs, and once again, to simply be able to pay their

10  staff.

11  Q   And what particular product do they supply the majority of?

12  A   Predominately DC Shoes footwear.

13  Q   What was the company's original intention with respect to

14  the critical trade vendor program?

15  A   So the original intent was to leave behind, the 503(b)(9)

16  element of the payments and have those as an administrative

17  plan at the end of the period.  And we -- and then the whole

18  purpose of the trade agreement was to schedule seventy-five-day

19  terms with our vendors to prevent the requirement for

20  additional LCs and for cash to be paid up front in regards to

21  deliveries.

22  Q   And where did you end up with C&K?

23  A   C&K, in the end, we went through a number of iterations

24  with them and they had their requests that we pay the full

25  503(b)(9), together with their full prepetition balance.

1    Q    And were they shipping while those conversations were going

2    on?

3    A    They have continued to ship.

4    Q    Who is the second-largest company's trade vendor?  Are you

5    familiar with that?

6    A    Oh, I am, yes.

7    Q    And what's that vendor?

8    A    Samil.

9    Q    And can you describe for the Court the discussions with

10   Samil?

11   A    Once again, so I actually met with the principal of Samil

12   -- this was post-petition -- and once again, there was a real

13   expressed concern in terms of the level of debt that was

14   outstanding, the level of days that were outstanding as of the

15   filing date, and also just their concern in regards to what

16   their future would look like with Quiksilver, given the volume

17   of debt that was outstanding.

18   Q    And, again, were you able to reach an agreement with Samil

19   at the end of the day?

20   A    Yes, we have.

21   Q    And what was the substance of that agreement?

22   A    So, currently, we paid 50 percent of their prepetition

23   balance with the view that the balance would be paid on exit.

24   Q    And were they -- pending those negotiations, were they

25   shipping or were they withholding shipments?

1    A    They were continuing to ship during the process.

2    Q    With respect to -- are you familiar with the third-largest

3    trade vendor?

4    A    Yes, I am.

5    Q    And who is that?

6    A    That is Northstar.

7    Q    And can you describe to the Court the discussions with

8    Northstar?

9    A    Yeah.  I met with the principals of Northstar in our

10   office.  They had some real concerns, once again, in terms of

11   level of debt that was outstanding as of the petition date; in

12   terms of what the future holds for Quiksilver moving forward;

13   and in terms of their ability to make their own payments.

14   Q    So you were personally involved in the discussions with

15   Northstar?

16   A    Yes, I was.

17   Q    And just remind -- it may be just for me -- but can you

18   remind the Court, the primary division within the company that

19   deals with trade vendors?

20   A    It's a sourcing team.

21   Q    And I think it was your testimony that you interact on a

22   daily basis with the sourcing team with respect to the trade

23   vendor issues?

24   A    Yes.  And in many instances, it's greater than on a daily

25   basis and numerous times during certain days.

Bruenjes - Direct

1  Q    And I think we can walk through vendor by vendor down the

2  list, but can you describe for the Court, just generally

3  speaking, what has been the feedback from the vendor community

4  that you have received through the sourcing team?

5  A    Absolutely.  So, initially, there was a real --

6            THE COURT:  Hang on.

7            MR. QURESHI:  I have, depending on how this testimony

8  comes out -- a hearsay objection.  It's classic hearsay for

9  this witness to, on the stand, testify as an offer for the

10  truth of the matter, statements made out of court by certain

11  vendors; not even to Mr. Bruenjes, but instead, to somebody in

12  his -- on his Hong Kong team or his French team or wherever

13  they may be, and to then offer that, for the only purpose, I

14  think for which it's being offered, which is the truth.

15            THE COURT:  Let me ask you a question.

16            So a moment ago Mr. Bruenjes testified with respect to

17  his conversations with those individuals that he directly spoke

18  to.

19            MR. QURESHI:  Correct.

20            THE COURT:  That obviously raises similar hearsay

21  issues.  Your concern here is sort of the second meeting?

22            MR. QURESHI:  I was fine, Your Honor, with the

23  testimony that the witness offered with respect to the direct

24  conversations that he had with vendors, because I think that

25  that can legitimately be characterized as going to his state of

1   mind; this is what he determined that he needed to do based on

2   those conversations.

3            But now we're into double hearsay territory and I just

4   don't think it's appropriate to allow those types of statements

5   in.  And I don't know for what other purpose they would be

6   offered, other than for the truth that certain vendors said

7   certain things to certain of Mr. Bruenjes' colleagues.

8            MR. DURRER:  May I speak, Your Honor?

9            THE COURT:  Yes.

10           MR. DURRER:  Your Honor, the matter is not offered for

11  the truth, so much of the statement itself, that the vendor was

12  making.  What the statement is offered for is, this is the CFO

13  and, you know, C-suite executives do not talk to every living,

14  breathing human that interacts with the company.

15           There's an organizational structure within the firm,

16  and in the ordinary course of their responsibilities, they

17  interact with people in their areas of their specific

18  responsibility.  He's making business judgments --

19           THE COURT:  I'm going to overrule the objection, and

20  I'll make the following observation:  I think this testimony is

21  kind of cumulative at this stage, and I think it's a

22  less-limited utility.

23           You know what I'd like?  Do you have a spreadsheet?

24           MR. DURRER:  I believe there is one in the exhibit

25  list, Your Honor.

1          MR. QURESHI:  Exhibit 53, Your Honor.

2          THE COURT:  Yeah.  And the reason -- I think I want to

3     be clear, at least from where I stand as the trier of fact.

4     You know, of course Mr. Bruenjes is going to be tendered for

5     cross, but, you know, he's certainly testified credibly with

6     respect to the communications that he's had and I have no

7     uncertainty about his familiarity.

8          And so the issue is going to be, in part, an

9     evidentiary one.  And if you read Kmart, for example, which is

10    not the governing law in this jurisdiction, but nevertheless,

11    if you read Kmart, Kmart is an evidence opinion.  It says you

12    -- this is the -- these are the standards that you need to

13    demonstrate.  I'm not saying that that is the standard, but --

14    so part of this does go to an individualized analysis of each

15    one.

16         But, also, in a case such as this, you know, I look at

17    it as a practical matter from the debtors' point of view about

18    avoiding major disruption, and that disruption can come in two

19    flavors; disruption to your own operations, hence for knock-on

20    disruption, if you stop paying people, they can't continue to

21    operate.

22         So, I don't think I need a lot more testimony about

23    communications with vendors that want very much to get paid.

24    And, again, it is helpful to me to understand -- because this

25    is not necessarily what my instinct would have been about the

1  ordering process.  I think one thing I've learned is everything

2  is much more complicated than it seems.  So, I grasp that.

3       But I think if we focus on the schedule and on sort of

4  his assessment of the business needs on a go-forward basis, I

5  think that would probably be the most productive line.

6       MR. DURRER:  Thank you, Your Honor.

7  BY MR. DURRER:

8  Q   If you don't mind, Your Honor, I would just like to confirm

9  for the record the notion that it is within -- is it within the

10  ordinary course of business for the sourcing department to

11  report to you on these matters?

12  A   In respect to the critical vendor program, yes, it is.

13  Q   So that -- I'll steer clear and take Your Honor's advice.

14  Where -- where do most -- where are most of the vendors for the

15  company located?

16  A   The majority of the vendors, still, are located in China.

17  We have diversified recently into other areas, but, still, the

18  majority reside in China.

19  Q   And do the Chinese vendors typically utilize a credit

20  insurer?

21  A   Yes, they do.  And the name of that insurer is Sinosure.

22  Q   I want to refer you to Exhibit 27.

23       MR. QURESHI:  And, Your Honor, for the record, this is

24  the one exhibit with which we had an issue, an evidentiary

25  objection.  Again, it's hearsay for the same reasons as I

1    stated --

2            MR. DURRER:  Yeah.  I haven't moved it yet.

3            THE COURT:  Okay.  We'll take a look at it.

4            MR. DURRER:  I'm trying to walk the line here.

5    BY MR. DURRER:

6    Q   So, Mr. Bruenjes, have you had an opportunity to take a

7    look at Exhibit 27?

8    A   Yes, this is an email that I sent to Lindsay Carr

9    (phonetic).

10   Q   Okay.  Around the end of August, did you become aware of a

11   communication that purported to be from a Chinese credit

12   insurer to your vendors?

13   A   Yes, I am aware.

14   Q   What communication are you aware of?

15   A   I'm aware that the communication was to stop shipment to

16   all Quiksilver entities, not only the U.S., on the basis there

17   was an imminent filing that would occur.

18   Q   And did -- do you have any knowledge as to how vendors

19   actually reacted to that?

20   A   Yes.  So, obviously there was a concern for the vendors.

21   They expressed their concerns immediately, particularly, to the

22   QAS sourcing office.  Initially, there was a request for

23   additional LCs, together with their request for potential

24   prepayments in regards to future shipments.

25           MR. QURESHI:  Again, Your Honor, I'll just say it once

Bruenjes - Direct

1   then I'll sit down.  I think most of this testimony is hearsay.

2   I don't think it's permissible.  I don't think any exception

3   applies.

4          THE COURT:  Yeah.  I think --

5          MR. DURRER:  And we're certainly not asserting that in

6   August there was an imminent filing; that's not -- we're not

7   asserting that as truth.

8          MR. QURESHI:  No, that's not the part I'm objecting

9   to.

10          THE COURT:  Yeah.  That's not the part he's objecting

11   to.

12          There are different elements of his comment.  I'm

13   going to allow him to testify with respect to his

14   communications in his capacity as CFO with his sourcing outfit;

15   that seems, to me, to be directly within his responsibilities

16   and his knowledge.

17          And I will strike, on hearsay grounds, the specific

18   issues.  I guess what I would say is that I think that the

19   objection is well-founded; your point is made.

20          And, again, it's not, frankly, a shocking proposition

21   that major vendors that supply to American retailers are aware

22   of Chapter 11 and act in response to rumors.  So I think that

23   -- I guess what I would say is your point is made and I don't

24   think that we need to deal with, you know, the elements of this

25   that have been described as hearsay, because I don't think it's

1   a controversial proposition that the debtor was under vendor

2   pressure in the weeks and months leading up to the bankruptcy,

3   so I think you can move forward.

4          MR. DURRER:  Thank you, Your Honor.

5          THE COURT:  Sure.

6   BY MR. DURRER:

7   Q   As a consequence of your direct intersection with vendors,

8   as well as your communication with your sourcing division, do

9   you have an expectation as to how vendors will treat the

10  company during the post-petition period if they are not paid

11  for the claims that are on Schedule 53?

12  A   Yes, we've got some significant jeopardy that the products

13  won't continue to be procured in regards to Buy 4 and Buy 5,

14  and there's also the potential that the products won't be

15  shipped, because there is that secondary market that exists

16  either within their regions or very close to it.

17  Q   And so are you saying that vendors could dispose of the

18  goods without any shipping costs to recover their loss?

19  A   That is correct.  They could dispose of the products within

20  their own regions and not incur any costs to do so in regards

21  to shipping.

22  Q   And are you aware of any recourse that the company would

23  have, effectively, to mitigate that?

24  A   I'm aware of the general legal concepts in regards to what

25  we could do to mitigate that, but none of the actual

1    particulars.

2    Q   Can you look at -- take a look at Exhibit 53.  And I think

3    you can do this, but I'll ask the question:  Do you have a

4    sense, looking down this list, as to -- well, let me pause.

5        Can you describe to the Court what is meant by Exhibit 53

6    by Tier 1 vendors?

7    A   Yeah.  So we went through our vendors and categorized them

8    into three tiers:  Tier 1, being absolutely critical; Tier 2,

9    being not as critical; and Tier 3, as being vendors where we

10   could actually exit production with those vendors more easily

11   than the other vendors and they're obviously a lot lower

12   volume.

13       So Tier 1 are vendors that provide a very high level of

14   volume to Quiksilver and are really key as part of the

15   globalization that has occurred.

16   Q   At the beginning of the hearing, I think that there was

17   mention that as of today, the company's ask was for an

18   aggregate of $62 million of critical vendor relief, 30 of which

19   was approved at the first-day hearing.  Was that correct, as of

20   this morning?

21   A   That is correct.

22   Q   And has the company done an analysis to potentially modify

23   that request?

24   A   Yes, it has.

25   Q   And can you describe that modification to the Court?

Bruenjes - Direct

1   A    Absolutely.  So we've taken into consideration flexibility

2   that we have in 503(b)(9) payments and we reduce the amount by

3   $5 million attached to that.

4        We also went through the list and reviewed vendors that

5   weren't providing spring products or vendors that were

6   providing a low volume, relating to spring.  We've reduced the

7   request in regards to that by an additional $2 million.

8   Q    And so what is the current overall ask?  I'm done with math

9   today.  I apologize.

10  A    It's $25 million, in terms of the day-two motion.

11  Q    $25 million incremental to the original 30?

12  A    Correct.

13  Q    Okay.  And what -- of that remaining twenty-five-million-

14  dollar request, what -- do you have a sense of what percentage

15  of the spring order book would be impacted if those goods were

16  not shipped?

17  A    Well, this spans across all of our Tier 1 critical vendors,

18  so given the fact that we've got $300 million in terms of

19  wholesale orders, in the event that one, two, three, four, five

20  decided not to ship, it would have a really material impact.

21  It's hard to quantify the exact impact.  I could give you a

22  percentage, but it would just be arbitrary.

23  Q    And what if -- if the spring order book fell down, so to

24  speak, what would be the -- do you have a sense of what the

25  EBITDA impact would be for 2016?

Bruenjes - Direct

1   A    Yeah, absolutely.  So a key consideration is that when we

2   look at the order book, we need to make certain levels of

3   fulfillment in regards to the order.

4       So if you're a customer and you've ordered $10,000 worth

5   the product and we ship you less than 8,000, you've got the

6   ability to actually cancel the whole order; so you don't have

7   to take those goods as a starting point in some regions.

8       So if we provide a certain estimate in regards to -- let's

9   say 20 percent -- in regards to either light shipment or

10  non-shipment altogether, you're looking in the magnitude of a

11  sixty-million-dollar impact to sales and, subsequently, about a

12  thirty-million-dollar impact to EBITDA.

13  Q    And do you recall, off the top of your head, what the

14  projected EBITDA for 2016 is, at present?

15  A    It's somewhere in the low thirty-million-dollar range.

16  Q    What is the next season after spring that's critical to the

17  company?

18  A    The next major season is fall.  The summer season is the

19  next season in terms of the calendar and that provides about 9

20  percent of overall revenues, but the next key season is fall.

21  Q    And if you miss customer orders for spring, will that have

22  an impact on the fall season?

23  A    Absolutely.  So it's been widely articulated in terms of

24  earnings calls this year that a lot of our issues with delivery

25  have really impacted the next season.  So our shortcomings this

Bruenjes - Direct

1   spring of this year have definitely impacted the fall order

2   book we're currently receiving.

3       So in the view that next year we can actually provide

4   products in full, it will have a very material impact in terms

5   of future orders.

6           THE COURT:  Clarify for me -- you heard Mr. Durrer

7   make a point yesterday I think, and Mr. Savini as well, that

8   most retailers that we see live and die by Christmas, right?

9           THE WITNESS:  Yes.

10          THE COURT:  It's very clear that you're not a

11  Christmas company.  The spring, right; I get that.

12          Why is -- when you're saying spring, do you mean

13  spring and summer?  Or why is fall your second -- who buys

14  boardshorts in October?

15          THE WITNESS:  No, we -- that's a fair point, Your

16  Honor.

17          So, the second-largest product offering we have is

18  actually for outerwear, so a large portion of our business is

19  in regards to sweaters, in regards to denim pants, long-sleeved

20  shirts and the like.

21          THE COURT:  Okay.  All right.  Thank you.

22  BY MR. DURRER:

23  Q   I want to be clear on something, because I think it's

24  fuzzy.  I think you've -- and this is not a question -- I think

25  you clearly articulated the impact on vendors, the impact on

1   customers for failure to receive the payment.

2       But there's a third category that I think we haven't

3   addressed that was raised by the committee, and I think it's

4   going to be important for the Court, and that is:  Are there

5   vendors who you expect will not be shipping future

6   post-petition goods because they have not been paid on account

7   of their prepetition claim?

8   A    Yes.

9   Q    Okay.  And do you have any specific examples of that in

10  your conversations or in your interactions with the sourcing

11  department?

12  A    Yes.  And it's hard to identify an individual vendor,

13  because that's going to be a general theme amongst the majority

14  of vendors.

15          THE COURT:  I think you're going to need to expand on

16  that.  Yeah, I think you're telling me that -- well, actually,

17  I'm going to let you expand on that question.

18  BY MR. DURRER:

19  Q    Yeah.  Well, I mean -- I think -- I think what you're

20  hearing from me and the Court, Mr. Bruenjes, is maybe take a

21  look back at Exhibit 53 and see if that refreshes your

22  recollection about specific vendors, for which this concern

23  arises?

24  A    Yeah.  In terms of the majority of the vendors listed here,

25  that has been the concern that has been presented, that by not

1    paying the prepetition balances and the fact that we actually

2    built on purpose, as Quiksilver, days outstanding with them to

3    be over a hundred days and that standard terms were 60, that we

4    have placed future deliveries in jeopardy and that overall

5    production moving forward with Quiksilver could cease.

6    Q    Can you -- I actually want you -- if you don't mind and

7    with the Court's indulgence -- to, you know -- we've already

8    talked about C&K, Samil, and Northstar.  Can you identify

9    specifics on here and perhaps identify them along with the

10   goods that they provide?

11   A    Yeah, absolutely.

12        So Coins is one, once again, another footwear vendor;

13   Putian is another, that is a footwear vendor; Dragon Crowd

14   Garment, that is an apparel vendor; Xiamen --

15        THE COURT:  Mr. Bruenjes, I want to make sure that I

16   understand your testimony.

17        Your point is that it's your understanding or your

18   concern that each of these folks will not ship to you in the

19   future if you do not pay their prepetition accumulated claim?

20        THE WITNESS:  That is the point, Your Honor.

21        Not every vendor listed here, and I know it might have

22   seen that way because I'm going sequentially through the list,

23   but those are the majority -- the most material ones.

24        There are other vendors that have been provided, but

25   once again, we've had so many discussions in regards to the

1    critical trade vendor program.  We've got 55 Tier 1 vendors, so

2    for the other ones, it's going to be difficult to articulate

3    exactly the vendor, but those are the ones that I have

4    knowledge of.

5             THE COURT:  I'd like to test that proposition if I

6    can, and your lawyer will recognize the question, because it's

7    coming from a case that dealt with this issue, the <u>Kmart</u> case.

8             I've listened carefully to your testimony.  You've

9    described in the first-day affidavit and at the first-day

10   hearing and then today, that the company has restructured its

11   sourcing mechanism to go from -- you've streamlined it.  So

12   you've gone from hundreds and hundreds -- 500 or so suppliers

13   down to 150.

14            THE WITNESS:  Correct.

15            THE COURT:  So you have suppliers that you are really

16   tight with and that you care deeply about.

17            You've also testified that a number of these folks --

18   I don't know if they fit into this Tier 1 -- are folks that

19   with whom you do so much work that actually your failure to pay

20   them is impairing their ability to operate and pay their

21   employees.  Is that accurate?

22            THE WITNESS:  That is accurate.

23            THE COURT:  Let me ask you a question.  You've been

24   asked, over objections a couple of times, to explain why --

25   explain what your vendors are thinking, okay.  Is it not

1    reasonable to assume that a vendor will not recognize the peril

2    of a sunk cost?  Why would he stop doing business with you if

3    you're one of his major creditors because you haven't paid him?

4    Why would he or she not say, well, I'm really annoyed, but I'm

5    not going to poke myself in the eye just to spite you?

6              THE WITNESS:  I understand the question, Your Honor.

7              We've actually received feedback from vendors that --

8    because they had scaled up production and have taken on, in

9    some instances, additional factories, additional staffing --

10   and they're of the view that given the outstanding, given the

11   strain in terms of what they've had in terms of their own

12   liquidity, that they'll actually look to shut down production

13   in some of those facilities.  So -- understand the question.

14             THE COURT:  Very good.  All right.

15             MR. DURRER:  I think that's all I had, Your Honor.

16             THE COURT:  Cross?

17             MR. QURESHI:  Yes, indeed, Your Honor.  Thank you.

18                       **CROSS-EXAMINATION**

19   **BY MR. QURESHI:**

20   Q   Mr. Bruenjes, good afternoon, sir.

21   A   Good afternoon.

22   Q   Now, let's start with understanding in a little more

23   detail, the three tiers that you've testified to.  So this

24   tiering of your vendors, that's not something that existed pre

25   this process, right?  That was created specifically to deal

Bruenjes - Cross

1   with critical vendor claims?

2   A   That is correct.

3   Q   Okay.  And as I understand it, Tier 1 are your largest and

4   most important merchandise vendors.  Tier 2, also merchandise

5   vendors, but less important.  Do I have that right?

6   A   That is correct.

7   Q   And Tier 3 are vendors that, in the company's judgment, are

8   not sole-source providers of any product?

9   A   That's correct.  They're the tier where we could more

10   easily shift factories and shift production for future seasons.

11   Q   And the company is proposing, with respect to those vendors

12   that it put on its Tier 1 list, to pay all of them 100 percent

13   of their outstanding prepetition balance, correct?

14   A   We did initially and we've revised that with an adjustment

15   of $2 million, as per the adjustment that just occurred.

16   Q   And, likewise, those vendors that are on Tier 2 that you

17   described as less-important vendors, again, but for, however

18   much of the $2 million that you've reduced your ask by today,

19   comes out of Tier 2, you're paying a hundred percent of Tier 2?

20   A   We're paying the majority of Tier 2; that's correct.

21       So, to give some --

22   Q   Let me just be clear on that.

23       You're paying all of Tier 2, except whatever amount of the

24   two-million-dollar reduction comes out of Tier 2?

25   A   No.  We'll actually adjust Tier 1, as well; there would be

1   adjustment across both tiers.

2   Q    Right.  But the only adjustment is --

3        MR. DURRER:  Your Honor, I think the witness should be

4   permitted to finish an answer.

5   A    So, just to give materiality, Tier 1, in terms of the

6   outstanding, so we had 55 vendors and approximately $54 million

7   outstanding.

8        Tier 2 has got approximately 50 vendors and it's got $6

9   million outstanding.

10       And Tier 3 has got approximately 45 vendors and

11  approximately $2 million outstanding.

12       THE COURT:  Can I have a breakdown for Tier 2 and Tier

13  3?

14       Tab 53 is, I believe, limited to Tier 1.

15       MR. DURRER:  It is, and I actually don't have Tier 2

16  and 3.  I don't know if it's somewhere in the evidence book,

17  but I've only seen a breakdown for Tier 1, Your Honor.

18       THE WITNESS:  We don't have a breakdown here, Your

19  Honor.

20       THE COURT:  Let me ask you a question so I know what

21  we're arguing about.

22       I see amounts for Tier 1.  What are the aggregate

23  amounts, ballpark, for Tier 2 and Tier 3?

24       THE WITNESS:  Yeah.  So 6 million and 2 million.

25       THE COURT:  Okay.

1          MR. QURESHI:  May I proceed?

2          THE COURT:  You may proceed.  I'm sorry.

3          MR. QURESHI:  No worries.

4     BY MR. QURESHI:

5     Q   So, Mr. Bruenjes, I want to, again, just make sure that the

6     Court is clear, that your testimony is clear with respect to

7     how much is at stake here.

8          So I understand that the company, as Mr. Durrer explained

9     at the outset, is reducing its ask for critical vendors by $2

10    million.  And I get that that $2 million comes out of vendors

11    in both, Tier 1 and Tier 2, right?

12    A   That is correct.

13    Q   And exactly where it comes out of, for my purposes, doesn't

14    matter.  My point is:  Other than that two-million-dollar

15    reduction, you're proposing to pay 100 percent of the

16    outstanding trade payables to your Tier 1 vendors and 100

17    percent of what's outstanding to Tier 2?

18    A   That is correct.

19         THE COURT:  What happened to the five-million-dollar

20    reduction that you mentioned?

21         MR. QURESHI:  The five million, Your Honor -- it's

22    503(b)(9); it's just the timing issue.  They're just, instead

23    of paying those now, they'll push them out and pay them as an

24    administrative claim at the end of the case.

25         MR. DURRER:  But to Your Honor's point, that is a

Bruenjes - Cross

1    reduction from the original ask.

2          THE COURT:  Well, yeah, and it goes to precisely what

3    I'm being asked to approve today.  I'm not being asked to

4    approve payment of -- 503(b)(9)s are entitled to statutory

5    priority.  So I -- unless -- and correct me if I'm wrong, and

6    if I've got this wrong then correct me -- but I think it is

7    material.

8          For example, if the debtor came in and said, I've got

9    $10 million of 503(b)(9)s and I want to pay $50,000 of critical

10   vendors to hold everything together, I would probably be fine.

11   But the reduction of that number -- you're right; these folks

12   are likely to get paid under a plan so I'm okay with that.

13   But the issue -- the one -- the issue that does violence to the

14   Code is payment of a critical vendor at the outset of a case in

15   derogation of the statutory priority scheme.

16          MR. DURRER:  That's precisely right, Your Honor.

17          THE COURT:  Okay.

18   BY MR. QURESHI:

19   Q   Now, the third tier -- the only tier that the company has

20   created in this analysis that's not getting paid -- Tier 3, has

21   only approximately -- what did you say, $2 million?

22   A   Two million is correct.

23   Q   Now, Mr. Bruenjes, you should have in your exhibit binder a

24   copy of your declaration; it's at Tab 5.  If I could ask you to

25   pull that out.

Bruenjes - Cross

1          THE COURT:  It's the first tab in?

2          MR. QURESHI:  It is.  It is, Your Honor.

3    BY MR. QURESHI:

4    Q   And once you have that, Mr. Bruenjes, if I could direct

5    you, please, to Page 55, and in particular, Paragraph 136.

6          THE COURT:  I'm there.

7          MR. QURESHI:  Thank you, Your Honor.

8          THE WITNESS:  I'm there.

9    BY MR. QURESHI:

10   Q   Right.  Again, sir, take a minute and read it for context.

11   My question for you is going to be actually on that portion of

12   the paragraph that's on Page 56, there's a Roman Numeral IV,

13   but why don't you just take a minute and read the whole

14   paragraph, just so you have the context.

15         (Pause in the proceedings)

16   A   I've read the statement.

17   Q   So the item in Roman Numeral IV, which is on Page 56,

18   again, what that describes, sir -- and correct me if I'm wrong

19   -- is that what you were doing there is assessing which of your

20   vendors are likely to continue to do business with the debtors

21   in the event that you do not pay them a hundred percent of

22   their outstanding trade payables right away, right?  That's

23   that you were trying to assess?

24   A   Correct.

25   Q   Now, you personally can only testify with respect to the

1    three vendors that we heard about on your direct examination in

2    terms of direct conversations you had; C&K, Samil, and

3    Northstar, right?

4    A    That's right.  I've also had conversations with Coins, in

5    regards to their agents, directly, but aside from that, that's

6    correct.

7    Q    Okay.  And, again, just so the Court is clear, because a

8    lot of testimony was elicited by C&K, the outstanding amount

9    that has not yet been paid to C&K is $38,000, right?

10   A    As of today?

11   Q    Yeah.

12   A    I don't believe that's the case.

13   Q    Well, look at Tier 1 and -- I don't know, Mr. Durrer, if

14   I'm not supposed to say these numbers publicly, please tell me

15   because we can all just look at the page.

16   A    That's the amount that been committed to be paid, not the

17   actual payments themselves.

18   Q    Okay.  So you're --

19   A    So, physically, the cash is not -- we have not paid 32.7

20   million to those vendors.

21   Q    Okay.  So, with respect to C&K in particular, the amount

22   that they're budgeted for, as an initial payment, your

23   testimony is that that amount has not yet been paid?

24   A    I believe an installment has been paid towards that --

25   Q    Right.  And --

Bruenjes - Cross

1  A   -- and it's going to be allocated across a five-week

2  period.  So installment in Week 1, per the agreement, 3, and

3  also 5, for the balance.

4          MR. QURESHI:  I'm sorry, Your Honor.

5          THE COURT:  Take your time.

6          Actually, in response to your comment, Mr. Qureshi, I

7  guess I'd like to make sure with Mr. Durrer that we're all on

8  the same wavelength here.

9          MR. QURESHI:  Sure.

10          THE COURT:  I see these amounts, et cetera, and I see

11  the debtors' proposal, and I guess I'd like guidance about the

12  relative confidentiality.

13          And if the witness has testified a number of times,

14  given the amounts that are to be paid, it seems to me, maybe

15  less of a confidential or controversial proposition than we

16  would see in other cases, but I just don't want -- given that

17  this is a live hearing on the record, I don't want anybody to

18  --

19          MR. QURESHI:  Your Honor, I think I can short-circuit

20  it.  I think I can do this without talking about specific

21  numbers attached to these vendors.

22          THE COURT:  All right.

23          MR. QURESHI:  I appreciate your concern.

24          THE COURT:  If that becomes difficult, then just sing

25  out.

Bruenjes - Cross

1          MR. QURESHI:  Sure.

2    BY MR. QURESHI:

3    Q   Now, let's talk about Northstar.  Now, you believe, as I

4    understand your testimony, sir, that it would be difficult for

5    Quiksilver to continue to do business with Northstar unless

6    they're paid in full, their outstanding payables, right?

7    A   That is correct.

8    Q   Okay.  And, likewise, with respect to C&K, they expressed

9    to you in the meeting that you had with them, concerns about

10   their own working capital to support their own business unless

11   they were paid?

12   A   And the discussion, just to be clear, in terms of the

13   principal of C&K, those discussions actually occurred

14   prepetition, so not everyone within a filing environment.  But

15   that's correct.

16   Q   I appreciate the clarification.  Thank you.

17       And, similarly, your direct conversation with Samil, they,

18   too, told you that it was important that they be paid; they

19   wanted the money, right?

20   A   Correct.

21   Q   Now, with respect to those three that you had direct

22   conversations with, Northstar, C&K, and Samil, you did not ask

23   any of those three directly whether they would continue to

24   supply you with product post-petition, unless they were paid in

25   full, right?

Bruenjes - Cross

1    A    That is correct.  And I didn't need to because it was

2    inferred in terms of their representations during the

3    conversations that we had.

4    Q    And nor, sir, did you ask any of those three vendors, with

5    whom you had direct conversations, whether they would be

6    willing to continue to supply Quiksilver with product if you

7    paid them a percentage of their outstanding prepetition trade

8    payables, right?

9    A    That is correct; I did not address that specific query.

10   But once again, it was inferred in terms of the communications

11   that we've had.

12        And then in terms of the actual trade agreements being

13   signed, it's not like we just sent a trade agreement to the

14   vendors and it was signed by the vendor.  We've gone back and

15   forth with numerous reiterations and with a formal negotiation

16   process in respect.

17   Q    Sure.  I just want to make sure that we're clear on the

18   evidence that you're offering the Court.

19        So what you're saying is you never asked the question, will

20   you continue to ship if I don't pay you.  And you didn't even

21   ask the question, will you continue to ship if I pay you 50

22   percent or 30 percent or 60 percent or some other amount.

23   You just inferred from the general concerns that they expressed

24   that if you didn't pay them 100 percent of their claim, they

25   would not continue to ship, right?

Bruenjes - Cross

1    A    Can I expand upon that?

2    Q    Please.

3    A    So during the trade agreement negotiation process, so we

4    initially completed those agreements, Your Honor, with a

5    smaller balance that's actually outlined here.  We've gone back

6    and forth on numerous reiterations of those agreements and the

7    inference was that from our vendors, that they would not sign

8    unless they received a hundred percent of their prepetition

9    balances.

10        So while I did not directly ask the principals of those

11   vendors that that was the case, that was what was either

12   communicated to Laurent Berger in France, the head of sourcing

13   there, or Bart De Meirsman, in the QAS sourcing office.

14   Q    Now let's talk about trade terms for a minute, sir.

15        So, if I understand your testimony correctly, if the

16   company pays a vendor that's on its critical vendor list the

17   full amount, the hundred percent of what their payable is, in

18   return, what the company gets is seventy-five-day terms from

19   that vendor.  Is that right?

20   A    That is correct.

21   Q    Okay.  And you also testified on direct that I believe

22   trade terms -- normal trade terms are typically 60 days?

23   A    That is correct.

24   Q    So what you're telling the Court is that the benefit of

25   paying these guys now is that you expand those terms from 60 to

1   75 days?

2   A   The benefit is that we don't have to pay cash up front for

3   deliveries and we don't have to issue LCs for product that is

4   yet to be shipped.

5   Q   Right.  But in terms of the extension of trade terms, I

6   just want to make sure the Court is clear on this.

7       Your average trade terms -- notwithstanding what your

8   purchase orders or contracts that you may have with vendors

9   might say -- that over the last fiscal year, at least, your

10  actual trade terms with vendors on average have been 70 days?

11  A   The commercial trade terms -- so your point when payout has

12  been 60 and due to the liquidity build that I've described, the

13  average has been 70, which is not normalized under a normal

14  scenario.

15  Q   Fair enough.

16      But the average is 70, and then in return, now, for getting

17  paid, in terms of trade terms, that will get pushed from 70 to

18  75, right?

19  A   That is correct.  And once again, these are vendors that,

20  on filing, were operating with terms north of a hundred days.

21  Q   Now, Mr. Bruenjes, we've talked about the three that you've

22  had direct conversations with and I think the record is clear.

23  But you didn't have whether -- on the Tier 1 list that you have

24  in front of you or the Tier 2 list that we don't have, you have

25  not had direct conversations with any other vendor?

1    A    Aside from Coins and their agent, as I outlined earlier.

2    Q    Right.  Okay.

3         And, sir, let's just look quickly at the Tier 1 list again

4    at Vendor Number 14, and, again, the name and the numbers don't

5    matter for purposes of my question.

6    A    Got it.

7              THE COURT:  I'm there.

8              MR. QURESHI:  Thank you, Your Honor.

9    BY MR. QURESHI:

10   Q    If you look at the far right where it says, PO value,

11   spring 2016, and there are four headings on that part of the

12   chart:  Americas, APAC, Europe, and then total.

13        Do you see where I am?

14   A    I am.

15   Q    And for that particular vendor, it's zeroes across the

16   board, right?

17   A    That is correct.  There's no production for the spring

18   season for that vendor.  That vendor is a slow vendor.  They

19   produce heavy fleece products and as a result, it's not

20   applicable to spring.

21   Q    Right.  But nonetheless, they're on the list to be paid in

22   full now, a hundred percent of their outstanding amount, right?

23   A    That is correct.  And once again, that will be a

24   consideration that we'll give in terms of the allocation of the

25   $2 million that I put forward earlier.

1   Q   With respect to C&K, Samil, and Northstar, again -- and

2   forgive me, Mr. Bruenjes -- I'm not understanding correctly how

3   the debtors are handling this, but you see on the chart there's

4   an initial payment amount budgeted for those three vendors?

5   A   I do.

6   Q   Can you tell me, sir, is it the debtors' intention to pay

7   that initial budgeted amount based on the approval that the

8   Court gave at the first-day hearing for the initial, I think it

9   was $30 million of critical vendor payments?

10  A   Yeah.  This component here -- that is correct -- it's based

11  on $30 million from the day-one motion.

12  Q   Okay.  So in terms of the additional payments the debtor

13  would propose to make if this expanded motion that we're here

14  on today is approved, with respect to C&K, we're only talking

15  about an additional $38,000 to them, right?

16  A   No.  Once again, so this outlines what is being committed

17  in terms of payments, but in terms of the actual timing of the

18  payments that are being made, that's a difference.

19      So we'll -- so, in terms of the way the baskets are

20  allocated and how the payments are assessed against both,

21  that's something we need to develop.

22  Q   Let me try it a different way.

23      If the debtors receive no further approval for any more

24  critical vendor payments, you've budgeted for those three to

25  pay them the initial payment amounts that you list, based on

1    the approval that was received on the first day.  Is that

2    right?

3    A    That's right.  Based on the schedule, that would be the

4    case.

5    Q    Right.  Okay.

6          MR. QURESHI:  I think that's all I have, Your Honor.

7    Thank you.

8                      **REDIRECT EXAMINATION**

9    **BY MR. DURRER:**

10   Q    Van Durrer, for the debtors.

11        Mr. Bruenjes, does the DIP budget have an assumption with

12   respect to trade terms?

13   A    Yes, it does.

14   Q    And what is that assumption?

15   A    It assumes that the critical vendors enter into the trade

16   agreements, and the positive thing, Your Honor, is that all

17   trade agreements have now been signed, or the majority thereof.

18   I think there's only a handful outstanding and it's on the

19   basis that seventy-five-day terms are provided to the vendors.

20   Q    And to the extent that the debtors are unable to follow

21   through with those trade agreements, do you have an

22   understanding as to what happens with the debtors' ability to

23   comply with the DIP budget?

24   A    Yes, I do.  So in the event that we had to pay cash up

25   front for future product or also provide LCs, the magnitude of

1    that incremental adjustment would be in the range of ten to $15

2    million.

3    Q    And what does that mean with respect to the debtors'

4    ability to comply with the budget?

5    A    We wouldn't be able to comply with the existing budget.

6    Q    Okay.

7         MR. DURRER:  No other questions, Your Honor.

8         THE COURT:  Any redirect -- any recross?

9         MR. DURRER:  No recross, Your Honor.  Thank you.

10        THE COURT:  Thank you, Mr. Bruenjes.  You may step

11   down.

12        THE WITNESS:  Thank you, Your Honor.

13   (Witness excused)

14        THE COURT:  Any other witnesses?

15        MR. DURRER:  No other witnesses, Your Honor.  Just,

16   you know, brief comments.

17        THE COURT:  Sure.

18        MR. DURRER:  Your Honor, around the same time that the

19   trade vendors were being stretched to, you know, almost double,

20   if you will, their normal trade terms, the company made a

21   payment to the unsecured bondholders in the amount of $11

22   million on the due date.  And I only mention that because the

23   objection that's being raised other than, you know, putting on

24   our evidence is that, you know, there's an element of fairness.

25   You know, we are tampering with the absolute priority rule.  We

1   recognize that.

2          But in terms of that same fairness, funds that would

3   have gone to these vendors who basically paid the price of

4   helping to fund, in effect, that interest payment, we're now

5   trying to fix that situation.  And now let's look at the

6   broader context in which we're trying to fix it.

7          THE COURT:  Well, I think you're trying to prove too

8   much with that.  I have a discrete issue in front of me.  Every

9   case presents a situation where debtors make payments or don't

10  make payments or use their money or stretch people.  And I

11  don't believe that that's really I think properly part of the

12  inquiry about whether or not somebody got something beforehand

13  so they shouldn't be heard to complain today.

14         MR. DURRER:  And that wasn't the -- that wasn't where

15  I was going, Your Honor -

16         THE COURT:  It sounded like it.

17         MR. DURRER:  -- if you don't mind.  No, it's not at

18  all.

19         The point I was making is that the company made a

20  business judgment to allocate resources at the time based upon

21  expectations.  The expectation was that we would conclude a

22  refinancing sometime during the month of August.  We did not.

23         Vendors that are critical to the business paid the

24  price for that business judgment.  It's not a comment on the

25  bondholders at all.

1          THE COURT:  Or where the money went.

2          MR. DURRER:  Right.  It's a --

3          THE COURT:  Yeah.  I don't think that that's a

4    remarkable proposition.  I think that vendors pay the price for

5    a debtor's decision-making process in every case.

6          MR. DURRER:  Okay.  And --

7          THE COURT:  And I don't regard it as -- it simply is

8    what it is.

9          MR. DURRER:  Well, and now, Your Honor, what we're

10   trying to accomplish is we're trying -- we're going to work.

11   We're going to take your suggestion which we were already

12   engaged with to work with the committee to develop a process.

13   And, you know, the evidence -- I mean, basically -- I mean, Mr.

14   Bruenjes testified that effectively 100 percent of the EBITDA

15   for 2016 is at risk if we can't execute on this order book.

16          And our concern is we have real trouble trying to tell

17   the marketplace what we have to sell if we don't execute on

18   this order book, which is 40 percent of annual revenue.  And we

19   can disagree about the level of a critical vendor program.

20          Mr. Bruenjes also testified that this wasn't sort of

21   an open checkbook, that we did interact with vendors and try to

22   get them to take less.  And there was a negotiation and a back-

23   and-forth and we failed.  And candidly, we were happy, and

24   we're happy to include in the form of order, an engagement with

25   the committee on the details to get them further under the

1    tent.  We're an open kimono as far as that goes.

2           But I can't express more strongly that the management

3    team is very concerned.  I mean, this -- this is the primary

4    reason why Mr. Bruenjes has spent two days here and not at the

5    business, this particular motion.  Obviously, the DIP is very

6    important.  But this is the reason he's here.  There is a vital

7    destruction of value if we can't execute on the business plan.

8    And you also heard that it impacts the DIP itself, our ability

9    to execute on the DIP.  So that's --

10          THE COURT:  Do you have a schedule for Tier 2 and Tier

11   3?

12          MR. DURRER:  As Mr. Bruenjes said, we do not have it

13   here today.  But we're -- again, we're happy -- I think we're

14   happy to work with the committee on vetting that schedule and

15   if we have any disagreement, we can come back because, you

16   know, the debtor did -- mindful of the discussions we had

17   during the break and mindful of Your Honor's comments, we did

18   take advantage of that and reduce the ask, and we're happy to

19   continue to engage with the committee on what appropriate

20   levels are down at the Tier 2 and Tier 3 level.

21          The Tier 1, I think Your Honor has heard, is vital.

22   And I think that Mr. Bruenjes was able to give pretty specific

23   concrete examples, both in terms of whether the vendor will

24   continue to exist itself, the impact on the customer, and the

25   likelihood that the vendor will continue to work with the

1    debtors in the future, and their ability to basically cover by

2    dumping this stuff in China itself and the damage that that

3    would have on our order book.

4            MR. QURESHI:  Your Honor, I'll be very brief.

5            THE COURT:  Sure.

6            MR. QURESHI:  First, with respect to the improvements

7    that are being offered today, forgive the analogy, but it's a

8    little bit like giving us sand on the beach.  It's not very

9    meaningful.  Let's remember, they came with a fifty-two-

10   million-dollar ask initially, upped it by $10 million, and now

11   the real reduction basically amounts to $2 million.  Further

12   context, Your Honor.

13           Ninety-six percent of merchandise vendors are getting

14   paid in full under this program.  Ninety-six percent.  I think,

15   Your Honor, that needs to be viewed in context.  I'm not going

16   to stand here and say the Bankruptcy Code shouldn't have a

17   provision for critical vendors at all.  That's not what we're

18   arguing about.

19           THE COURT:  Yeah.  And I appreciate that -- yeah.

20   And, you know, you heard my comments earlier.

21           MR. QURESHI:  Yes.

22           THE COURT:  I spent a lot of time particularly sitting

23   on that side of this courtroom.  And I understand that -- the,

24   frankly, strong Code-based arguments about these issues, the

25   policy arguments about them.  But I also recall from my days

1    that some of these things matter.

2         So the issue that I've got is the 96 percent.  It's

3    not whether or not these sorts of payments can be approved.

4    It's also, frankly, not on a line-by-line basis when I listen

5    to Mr. Bruenjes.  You know, we've all had experiences with

6    foreign vendors, and particularly in Asia, and they create

7    their own collection of issues.  But on the 96 percent, you're

8    right, you're kind of pushing an open door.

9         MR. QURESHI:  It renders the idea of critical

10   meaningless.  It means everybody's critical.  And I do think,

11   Your Honor, that it also must be viewed in context.  This is a

12   case where, at least where we are now with respect to the PSA,

13   I think we're talking about a three-cent recovery for unsecured

14   creditors.  And you're going to take $62 million of otherwise

15   unsecured claims and pay them in full?

16        Your Honor used the phrase at the first day hearing

17   that sometimes a critical vendor motion can do violence to the

18   absolute priority rule.  And I understand that was a general

19   statement.  It happens to be true here because of where

20   recoveries are in this case.

21        Now, we, on behalf of all unsecured creditors of these

22   estates, Your Honor, have absolutely no interest in doing the

23   debtors any harm.  To the contrary.  We all share an interest

24   in doing what we can to increase recoveries to the greatest

25   extent possible.

1          The difficulty we have with the motion is the 96

2    percent.  And frankly, Your Honor, their motion is built on

3    generalities.  I mean, there are three vendors that we have

4    some specific testimony about.  But with respect to the rest,

5    it troubles us.  There is not one vendor, not one on either the

6    Tier 1 or the Tier 2 list that was asked, will you ship if I

7    don't pay you 100 percent.  There is not one vendor that was

8    asked --

9          THE COURT:  Well, I listened pretty carefully to Mr.

10   Bruenjes's testimony.

11         MR. QURESHI:  Right.

12         THE COURT:  And while perhaps those specific words

13   weren't used, I think he conveyed with no uncertainty that that

14   was the gist that they got.  And maybe it's incumbent upon them

15   to ask that specific question.

16         MR. QURESHI:  Well, if not that question, Your Honor,

17   then at least the next one, which is, what if I pay you half,

18   what if I pay you three-quarters, what if I pay you 10 percent

19   now and the rest on confirmation of a plan.  I mean, there are

20   many ways that conversation can go.

21         Our point is, it doesn't appear that there was a

22   negotiation.  And frankly, Your Honor, it is incumbent upon the

23   debtors, if they want this type of extraordinary relief -- and

24   it is extraordinary -- to show up in this court with an

25   appropriate evidentiary basis to justify it.

1          And, Your Honor, the third prong of the CoServ test --

2     I won't get into the standard.  Your Honor is well familiar

3     with it.  But they can't demonstrate that there's no

4     alternative if they haven't asked the question.  And we just

5     don't know if some of these vendors -- and Your Honor pointed

6     it out:  Why would the vendor cut their own nose off.  It makes

7     no sense.  They want to continue to do business.

8          If that isn't -- it needs to be explored on a vendor-

9     by-vendor basis because only then can you truly understand

10    which of your vendors are critical.  But to offer generalized

11    statements that these are vendors that -- most of them are in

12    Asia, we're really important to them, and if they don't have

13    our business, if they don't -- if we don't pay them they won't

14    do business with us, it doesn't cut it for this type of

15    extraordinary relief.

16         UNIDENTIFIED:  Your Honor --

17         THE COURT:  No.  I've heard enough.  Here's what we're

18    going to do.

19         I share the committee's concern.  But I'm satisfied

20    with Mr. Bruenjes's testimony that this case certainly presents

21    circumstances that require the debtor to make payments to

22    critical vendors under the factual -- specific factual

23    circumstances of Mr. Bruenjes's testimony.

24         I'm going to grant on a further interim basis a

25    further $10 million of authority for this debtor.  I will

1    expect that that further interim order can be submitted under

2    certification and will contemplate the involvement of the

3    committee.  My order is without prejudice to the debtors'

4    request to expand and obtain further relief.

5         I think I'd put it this way.  It should be -- you

6    should be just about equally able to convince the committee as

7    you can convince me.  And I'm not saying that I'm not

8    convinced.  Mr. Bruenjes testified very clearly.  I get it.

9    And I have heard testimony from gentlemen in his position, and

10   I've represented them.  I'm having difficulty, to be blunt,

11   wrapping my head around a 96 percent payment.  And I think that

12   while we generally take a practical approach to these and other

13   cases, it's usually not so vigorously fought.

14        But the economic consequences of what I have I think

15   fairly characterized as the violence to the Code's statutory

16   priority scheme, I'm not the first one to say it, is brought

17   into sharp relief here.  And again, this is less a critical

18   trade motion and more a pay trade motion that I would see in a

19   prepack.  And a prepack comes with votes and it comes usually

20   with significant creditor support, et cetera.

21        So my ruling is that you've got an additional 10

22   million.  I will be happy to schedule at the convenience of the

23   parties the -- if there is a further request for the balance.

24   And I'll do so fairly promptly.  But the committee is going to

25   be able to test on an entity-by-entity basis the scope of the

 1    request that you're asking for.  I believe that that should

 2    allow the debtor to manage the process, as I listened carefully

 3    to Mr. Bruenjes, and the incremental payments that are being

 4    made and the discussions that's occurring.

 5          But I think that for a debtor to come in and argue

 6    that -- not substantially -- basically, all of its unsecured

 7    trade creditors need to be paid in full, that's not consistent

 8    with my expectations.  I've seen a lot of different industries.

 9    I understand that vendors want to get paid.  I understand that

10    vendors may be under stress and that, frankly, the value to

11    this exercise that, Mr. Durrer, you're attempting to preserve

12    is dependent upon the lack of interruption to the debtors'

13    business operation.  As I think everybody said, this is not an

14    operational restructuring.  They're already doing that with a

15    new management team, et cetera.

16          So I'm supportive of that proposition.  But I don't

17    believe that a record has been sufficiently developed and I

18    think that it is a factually intensive exercise to make that

19    showing that critical vendor payments need to be made.  And at

20    the high level that's being proposed and over committee

21    objection, I'm not satisfied that the record to date is

22    sufficient.

23          So I will enter an order that authorizes an additional

24    10 million -- I think that brings us then to 40 million --

25    without prejudice to the debtors' request to calendar and tee

1    up the next piece.

2            But I, again, would encourage and expect that you

3    confer with the committee with respect to who it is you want to

4    pay.  And I think we can -- and I think we can go from there.

5    Okay?

6            MR. QURESHI:  Thank you, Your Honor.

7            THE COURT:  All right.

8            MR. QURESHI:  Thank you, Your Honor.  Thank you very

9    much for dealing with all of the documents --

10           THE COURT:  Do you have anything else today?

11           MR. DURRER:  Nothing else.

12           Candidly, Your Honor, we may need to ask for that

13   hearing on critical vendor very soon because we actually --

14           THE COURT:  Actually tomorrow?

15           MR. DURRER:  No.  I know it's not tomorrow.  I would

16   like to spend one day home this week.  But it may need to be

17   very soon.

18           THE COURT:  That's fine.  I would ask that you confer

19   and we'll be able to accommodate.  We have Peter J. Solomon

20   issues and other issues if we've got them coming up.  So we'll

21   do what we can to accommodate.

22           And again, I appreciate everyone's efforts today.

23   We'll stand in recess.

24           MR. DURRER:  Thank you, Your Honor.

25           THE COURT:  Safe travels.

1          (Proceedings concluded at 3:34 p.m.)

2                              *****

1                          <u>CERTIFICATION</u>

2              We certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter to the best of our knowledge and ability.

5

6

7

8    <u>/s/ Coleen Rand</u>                October 16, 2015

9    Coleen Rand

10

11   <u>/s/ William J. Garling</u>        October 16, 2015

12   William J. Garling

13

14   <u>/s/ Cathryn Renzoni</u>           October 16, 2015

15   Cathryn Renzoni

16   Certified Court Transcriptionists

17   For Reliable

18

19