## EXHIBIT B

**Services Agreement**



# REAL ESTATE SERVICES
# AGREEMENT WITH
# QUIKSILVER, INC.

This REAL ESTATE SERVICES AGREEMENT including the Schedules attached hereto (collectively the "**Agreement**") is made as of this 4ᵗʰ day of September 2015 (the "**Agreement Date**") by and between **A&G REALTY PARTNERS, LLC**, a New York limited liability company ("**A&G**") and **QUIKSILVER, INC.,** a Delaware corporation, including its subsidiaries domiciled in the United States (collectively the "**Company**" and/or the "**Debtor**") (each a "**Party**" and collectively the "**Parties**").

WITNESSETH:

**WHEREAS**, the Debtor intends to file a voluntary petition in the United States Bankruptcy Court for the District of Delaware ("**Bankruptcy Court**") commencing a case (the "**Bankruptcy Case**") under Chapter 11 of Title 11 of the United States Code ("**Bankruptcy Code**");

**WHEREAS**, the Debtor will continue to operate its businesses and manage its Properties as "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court;

**WHEREAS,** the Debtor leases (each a "**Lease**" and collectively the "**Leases**") certain real properties (each a "**Property**" and collectively the "**Properties**");

**WHEREAS**, the Debtor desires to obtain: (i) Lease Modifications (as defined in Schedule C); (ii) Lease Terminations/Sales/Assignments (as defined in Schedule C); and (iii) Lease Claim Mitigations (as defined in Schedule C);

**WHEREAS**, the Company has designated the Leases and/or Properties that it is seeking Lease Modifications and Lease Terminations/Sales/Assignments on Schedules A and B respectively, which are attached hereto and made a part hereof; and

**WHEREAS**, the Debtor desires to retain A&G to provide the foregoing services and A&G is willing to provide such services under the terms and conditions contained herein.

**NOW THEREFORE**, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Services to be Provided.  In accordance with the terms and conditions of this Agreement, A&G will provide the following services (the "**Services**"):

     a)    consult with the Debtor to discuss the Debtor's goals, objectives and financial parameters in relation to the Leases;

     b)    negotiate with the landlord of the Property on behalf of the Debtor in order assist the Debtor in obtaining Lease Modifications for the Leases set forth on Schedule A;

1

    c) negotiate with the landlord of the Property and other third parties on behalf of the Debtor in order assist the Debtor in obtaining Lease Terminations/Sales/Assignments for the Leases set forth on Schedule B;

    d) negotiate with the landlord of the Property and other third parties on behalf of the Debtor in order assist the Debtor in obtaining Lease Claim Mitigations for the Leases set forth on Schedules A or B, as applicable; and

    e) report periodically to the Debtor regarding the status of the Services.

2.    <u>Term of Agreement</u>.  This Agreement shall be for an initial term of three (3) months following the Agreement Date (the "**Initial Term**") and thereafter shall continue on a month-to-month basis until cancelled by either party on thirty (30) days prior written notice to the other Party.

3.    <u>Compensation</u>.  The compensation payable to A&G for the Services is set forth on Schedule C, which is attached hereto and incorporated herein ("**Compensation**"), and is subject to Bankruptcy Court approval. The Debtor acknowledges that the calculations necessary to determine Compensation are predicated on Debtor Information (as that term is defined below) provided to A&G by the Debtor. Any discrepancies, inaccuracies or omissions in the Debtor Information discovered by A&G or the Debtor during the course of this Agreement will be referred to the Debtor for resolution and may affect the Compensation payable to A&G; provided, that any modification to the Compensation shall be approved in writing by the Debtor.

4.    <u>Additional Services.</u>  A&G may provide additional services requested by the Debtor that are not otherwise specifically provided for in this Agreement.  Any additional services will be mutually agreed to by the Parties and documented in a separate agreement.

5.    <u>Recordkeeping</u>.  The Services to be provided by A&G pursuant to this Agreement are, in general, transactional in nature.  Accordingly, A&G will not be billing the Debtor by the hour or maintaining time records.  The Parties agree that A&G is not being requested or required to maintain time records under this Agreement and that its Compensation is fixed in accordance with the terms herein.

6.    <u>Expenses and Disbursements</u>.  A&G shall not be responsible for any transactional costs and/or legal expenses incurred by it or the Debtor in connection with its retention and Services provided. The Debtor shall reimburse A&G for A&G's reasonable out-of-pocket expenses (including, but not limited to, legal, mailing, marketing and travel expenses) incurred in connection with its retention and provision of Services. The Debtor shall pay any reimbursable expenses within ten days of the receipt of an invoice.  All expenses in excess of five hundred dollars ($500.00) will be pre-approved by the Debtor.

7.    <u>Exclusive</u>.  During the duration of this Agreement, A&G shall have the sole and exclusive authority to perform the Services for the Leases referenced herein; provided, that nothing herein shall restrict the Debtor from engaging in discussion with landlords conducted in the ordinary course of business provided that it does not relate to the Services referenced herein. The Debtor agrees to forward all relevant inquiries regarding the Leases made to the Debtor or its representatives to A&G.  The Debtor acknowledges

that A&G may be engaged to provide the same or similar services as those referenced herein to other persons or entities, including but not limited to, purchasers of the Debtor, its assets, leases and/or designation rights and that any such engagement shall not constitute or be deemed to be a violation of this Agreement provided that it is not contrary to the interests of the Debtor. A&G will notify the Debtor of any such potential conflicts as soon as reasonably practicable.

8.    Company's Representative. As soon as reasonably practicable following the execution of this Agreement, Debtor shall designate a representative ("**Debtor's Representative**") in dealing with A&G. The Company reserves the right, at any time and from time-to-time, upon written notice to A&G, to designate a successor representative or additional representatives and to limit the authority of the representative(s) in any respect. A&G shall report regularly to the Debtor's Representative in order to keep him/her fully apprised of A&G's performance. The designated principal representative for A&G shall be Andrew Graiser. If A&G seeks to change its principal representative, the Debtor shall reasonably consent to any proposed replacement.

9.    Company Cooperation.  The Debtor shall make available to A&G all information concerning the Leases in Debtor's possession (and reasonably assist A&G in obtaining any information that is referenced herein not in its possession noting the significance of the information in enabling A&G to provide the Services) and necessary for the performance of A&G's obligations hereunder, including, but not limited to, copies of the Leases, a list of current rents, taxes and other charges relating to the Leases and such other information as A&G reasonably requests for the performance of their Services herein. The Debtor shall also complete the attached Schedules contained herein. Additionally, the Debtor will assist and cooperate with A&G by making the Debtor's personnel reasonably available to A&G for consultation.

All information referred to above as well as the information that the Debtor sets forth in the Schedules shall collectively be referred to herein as "**Debtor Information**".  All Debtor Information provided by the Debtor shall be materially accurate and complete at the time it is furnished and the Debtor shall, as soon as it becomes aware of any inaccuracy or incompleteness in any Debtor Information then or later provided to A&G, promptly advise A&G in writing of such inaccuracy or incompleteness and correct the same. It is understood and agreed that A&G shall base its Services, performance and Compensation on the Debtor Information. Any inaccuracies, discrepancies or omissions in the Debtor Information provided by the Debtor to A&G may affect the Services provided and may lead to a delay in the provision of the Services.

10.    Use of Company Name. A&G may use the Debtor's name and logo to identify the Debtor as one of A&G's clients.

11.    No Authority to Execute Agreements.  A&G shall have no right or power to enter into any agreement in the name of, or on behalf of the Debtor, or to otherwise obligate the Debtor in any manner unless authorized in writing by the Debtor.

12.    Meetings and Written Reports.  After the commencement of this Agreement, A&G shall meet with, in a manner agreed to by the Parties, the Debtor's Representative(s) to review the Debtor's goals, objectives and financial parameters. Thereafter, A&G shall meet with

or participate in telephone conferences with the Debtor's Representative(s) regarding the status of the Services as mutually agreed to by the Parties.

13. <u>Disclosures/Reports</u>.  All information, advice, recommendations or other content of any reports, presentation or other communications that A&G provides under the terms of this Agreement are solely for the benefit of the Debtor and may not be disclosed to any other party (other than the Debtor's representatives with a need to know such information) without the prior written consent of A&G.  It is understood and agreed that notwithstanding the forwarding of any information to Debtor's representatives, A&G shall have no liability whatsoever to Debtor's representatives.  Furthermore, the Company agrees to inform its representatives that all such information, advice, recommendations or otherwise is confidential and may not be disclosed to any other party. All opinions and advice (written or oral) given by A&G to the Debtor in connection with this Agreement are intended solely for the benefit and use of the Debtor and no such opinion or advice shall be used for any other purpose, or reproduced, disseminated, quoted or referred to at any time in any manner or for any purpose, without the prior written consent of A&G.

If the Debtor receives a subpoena, summons or court order by any federal, state or other regulatory agency having jurisdiction over the Debtor relating in any respect to A&G or its Services, the Debtor shall immediately notify A&G so that A&G may obtain a protective order for such information.  If A&G is unable to obtain a protective order and the Debtor is required to provide information regarding A&G and/or the Services, the Debtor hereby agrees to provide only that information which is legally required.

14. <u>Approval of Contracts</u>.  All of the terms and conditions of each Lease Modification, Lease Termination and Lease Claim Mitigation shall be subject to approval by the Debtor, which approval may be withheld in the Debtor's sole and absolute discretion.

15. <u>Independent Contractor</u>. Both Parties acknowledge and agree that the arrangements contemplated herein are and will be for the provision of the Services and that nothing contained herein shall create or be construed as creating a contract or other arrangement of employment between the Debtor and A&G.  A&G shall provide the Services as an independent contractor and not as an employee, agent, partner or joint venture of the Debtor.

16. <u>Early Termination.</u>  If either Party materially fails to perform its obligations in accordance with the terms hereof, and does not cure such failure within fourteen (14) days after written notice of such default, the other Party shall have the right to terminate this Agreement by notice of termination to the non-performing Party, effective five (5) calendar days after the date of such notice. Additionally, if for any reason either Party becomes unable to perform its duties as a result of a legal or regulatory restriction, such Party shall have the right to terminate this Agreement. The terms of this Agreement and any rights or obligations incurred or accrued by either Party hereto prior to termination shall survive termination of this Agreement.

17. <u>Assignment</u>. Neither Party may delegate or assign its rights and obligations under this Agreement in whole or in part to a third unaffiliated party without the prior written consent of the other Party.

18. <u>Notices.</u> Unless otherwise expressly provided herein or waived in writing by the Party to whom notice is given, any notice or other communication required or permitted hereunder will be effective if given in writing: (i) when delivered by hand; (ii) three days after deposit in the United States mail by certified mail, return receipt requested; (iii) when delivered by electronic email communication to the email address set forth below and verified by confirmed receipt; or (iv) one day after delivery to a commercial overnight courier, and addressed to the parties as follows:

|  |  |
|---|---|
| To the Debtor: | Quiksilver, Inc. |
|  | 5600 Argosy Circle, #100 |
|  | Huntington Beach, California 92649 |
|  | Attention: General Counsel |
|  | Tel: (714) 889-2200 |
|  |  |
| To A&G: | A&G Realty Partners, LLC |
|  | 445 Broadhollow Road |
|  | Suite 410 |
|  | Melville, New York 11747 |
|  | Attn: Andrew Graiser/Emilio Amendola |
|  | Tel: (631) 465-9505 |
|  | Email: andy@agrealtypartners.com |

19. <u>Representations, Warranties and Covenants.</u> Both Parties have all requisite power and authority to enter into this Agreement. This Agreement has been validly authorized by all necessary corporate action and constitutes a legal, valid and binding agreement of the Debtor and A&G. Both Parties represent that this Agreement does not and will not violate any applicable law or conflict with any agreement, instrument, judgment, order or decree to which it is a party or by which it is bound. Furthermore, both Parties represent and agree that they will comply with all applicable laws, rules, regulations, orders or decrees of any applicable jurisdiction during the term of this Agreement in performing its obligations hereunder. Both Parties represent that the person signing this Agreement on its behalf has the requisite authority to enter into this Agreement and can bind the respective Party. Furthermore, both Parties agree to deal with each other fairly and in good faith so as to allow each Party to perform their duties and earn the benefit of this Agreement. A&G agrees to utilize reasonable efforts and diligence to achieve the purpose of this Agreement.

20. <u>Bankruptcy.</u> A&G is performing the Services in connection with the Company's preparation for the filing of its Bankruptcy Case and shall continue performing the Services following the commencement of the Company's Bankruptcy Case. In consideration of A&G's assistance and performance of the Services, Company agrees to use its best efforts to make a motion to assume this Agreement promptly after filing Company's bankruptcy petition (or obtain such other comparable treatment mutually agreeable to the Company and A&G). If the assumption of this Agreement is not

approved, the Debtor agrees to seek the retention of A&G pursuant to sections 327 and 328 of the Bankruptcy Code. The Debtor will provide A&G with a copy of the pleadings requesting retention of A&G prior to submission to the Bankruptcy Court. The order authorizing A&G's retention must be acceptable to A&G and A&G's obligations hereunder are conditioned upon the grant of such order. Furthermore, if such order is not obtained within sixty days from the date in which it is filed, A&G shall have the right to terminate this Agreement at any time thereafter. In the event that the Debtor is unable to obtain an acceptable order authorizing the hiring and retention of A&G under the terms of this Agreement and the Agreement is terminated, A&G reserves the right to seek a substantial contribution claim for any rights or obligations incurred or accrued prior to such termination. A&G agrees to provide any materials, information, or other assistance necessary to obtain such treatment from the Bankruptcy Court, upon request from the Company.

21. <u>Survival of Fee</u>. In the event that following the termination of this Agreement, the Debtor, or its successors or assigns, enters into any transaction with a landlord of a Property or other third party and A&G has performed the Services, the proximate result of which is the transaction being entered into with such landlord and the result of which would have entitled A&G to a fee pursuant to this Agreement, then in that event, A&G shall be entitled to and paid its fee pursuant to the terms of this Agreement notwithstanding the fact that the Agreement has terminated. The parties understand and agree that in the event that any Lease is assigned, sold (whether in whole, part or sale of the designation rights) or transferred pursuant to section 363 of the Bankruptcy Code, A&G shall still be entitled to its fees, if any, hereunder from the Debtor.

22. <u>Intellectual Property</u>. A&G may use data, software, designs, utilities, tools, models, systems and other methodologies that it owns or licenses in performing the Services hereunder. Notwithstanding the delivery of any reports to the Debtor by A&G, A&G shall retain all intellectual property rights in such materials (including any improvements or knowledge developed while performing the Services) and in any working papers compiled in connection with the Services.

23. <u>Indemnification</u>. The Debtor hereby agrees to indemnify A&G and its respective affiliates, officers, directors, employees, agents and independent contractors, and hold each of them harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted against, resulting from (directly or indirectly), or related to the Services or actions or omissions of A&G taken pursuant to this Agreement, (including, but not limited to, any covenants, representations or warranties contained herein) or in any written agreement entered into in connection herewith; except to the extent that such claims or liabilities arise as a direct result of A&G's gross negligence or willful misconduct in connection therewith. A&G hereby agrees to indemnify the Debtor and its respective affiliates, officers, directors, employees, agents and independent contractors, and hold each of them harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted against, resulting from (directly or indirectly), or related to A&Gs gross negligence or willful misconduct.

6

24. Limitation on Liability. Neither Party shall be responsible for any indirect, incidental, consequential, exemplary, punitive or other special damages (including, but not limited to, loss of profits and damage to reputation or business) arising under or by reason of this Agreement or the Services or any act or omission hereunder. A&G shall not be liable to the Debtor if it is unable to perform its responsibilities hereunder as a result of events beyond its control. Furthermore, in no event shall A&G's liability for a default or breach of this Agreement exceed the amount of fees paid to A&G hereunder.

25. Binding Effect. No Third Party Beneficiaries. This Agreement binds and inures to the benefit of the Parties hereto and their respective successors and permitted assigns, and except as expressly provided herein, is not intended to confer any rights or remedies upon any person not a party to this Agreement.

26. Waivers and Amendments. Waiver by either Party of any default by the other Party shall not be deemed a waiver of any other default. This Agreement may not be waived, amended, or modified by either Party unless it is in writing and signed by both Parties; provided, that the Debtor may, without consent of A&G, amend each of Schedule A or B attached hereto in its sole discretion in connection with the modification of its goals, objectives and financial parameters in relation to the Leases.

27. Severability. If any provision, or any portion of any provision, contained in this Agreement is held unenforceable, then it shall, to that extent alone, be deemed omitted and this Agreement shall be construed as if such unenforceable provision had never been contained herein.

28. Entire Agreement. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof. All prior agreements, representations, statements, negotiations, understandings, and undertakings are superseded by this Agreement.

29. Counterpart Execution/Facsimile and Electronic Signatures. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which together shall constitute one document. Facsimile and electronic signatures on this Agreement and any document contemplated hereby shall be deemed to be original signatures.

30. Governing Law. This Agreement shall be governed by the laws of the State of Delaware without reference to its conflict of laws rules.

31. Waiver of Jury Trial. Each of the Parties unconditionally waives, to the extent legally permissible, the right to a jury trial in connection with any claim arising out of or related to this Agreement.

32. Headings. The section headings and use of defined terms in the singular or plural tenses in this Agreement are solely for the convenience of the Parties.

33. No Presumptions. This Agreement by shall be deemed drafted by both Parties and there shall be no presumption against either Party in the interpretation of this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized representatives effective as of the Agreement Date.

QUIKSILVER, INC.

By: _____
Name: _____ Linney Caya _____
Title: _____ EVP, General Counsel ____

A&G REALTY PARTNERS, LLC

By: _____ Andrew Graiser _____
Name: _____ ANDREW GRAISER _____
Title: _____ CO-PRESIDENT _____

**Schedules**

Schedule A    Properties – Lease Modifications
Schedule B    Properties – Lease Terminations/Sales/Assignments
Schedule C    Compensation

## SCHEDULE A
### Properties – Lease Modifications

| Store # | Brands | Store Name | City | State | Sq. Feet | Property Management Company |
|---|---|---|---|---|---|---|
| 26 | QS | QUIKSILVER - MIAMI | Miami Beach | FL | 7931 | Hold-Thyssen, Inc. |
| 62 | QS/DC | QUIKSILVER/DC SHOES - SOHO | New York | NY | 7276 | C&K Real Properties |
| 85 | QS/RX | QUIKSILVER/ROXY - FLORIDA MALL | Orlando | FL | 4000 | Simon Property Group |
| 833 | QS | QUIKSILVER OUTLET - GILROY | Gilroy | CA | 3825 | Simon Property Group |
| 875 | TRI | QUIKSILVER OUTLET - JERSEY SHORE | Tinton Falls | NJ | 6262 | Simon Property Group |
| 59 | QS | QUIKSILVER - SANTA MONICA | Santa Monica | CA | 5700 | Wells Fargo as Trustee |
| 56 | QS | QUIKSILVER - GASLAMP | San Diego | CA | 2882 | Champion Real Estate Services |
| 831 | TRI | QUIKSILVER OUTLET - LAS VEGAS NORTH | Las Vegas | NV | 3674 | |
| 835 | QS | QUIKSILVER OUTLET - TULALIP | Tulalip | WA | 3000 | Simon Property Group |
| 878 | QS | QUIKSILVER OUTLET - ORLANDO | Orlando | FL | 2547 | Simon Property Group |
| 881 | DC | DC OUTLET - LAS VEGAS SOUTH | Las Vegas | NV | 1991 | |
| 841 | QS | QUIKSILVER OUTLET - LAUGHLIN | Laughlin | NV | 2200 | |
| 112 | QS | QUIKSILVER - IRVINE | Irvine | CA | 2368 | The Irvine Company |
| 843 | DC | DC OUTLET - CAMARILLO | Camarillo | CA | 1470 | |

| 810 | QS | QUIKSILVER OUTLET - BARSTOW | Barstow | CA | 2505 | |
| 870 | TRI | QUIKSILVER OUTLET - PHOENIX | Chandler | AZ | 2741 | |
| 871 | TRI | QUIKSILVER OUTLET - TRAVERSE | Lehi | UT | 2523 | Mitzi McCallum |
| 825 | QS | QUIKSILVER OUTLET - ELLENTON | Ellenton | FL | 2874 | Simon Property Group |
| 803 | QS | QUIKSILVER OUTLET - CORONA | Corona | CA | 3500 | |
| 801 | QS | QUIKSILVER OUTLET - SAWGRASS | Sunrise | FL | 4007 | Simon Property Group |
| 823 | QS | QUIKSILVER OUTLET - COMMERCE | Commerce | CA | 3018 | |
| 830 | QS | QUIKSILVER OUTLET - DOLPHIN MALL | Miami | FL | 2998 | Taubman |
| 836 | QS | QUIKSILVER OUTLET - ONTARIO | Ontario | CA | 3228 | |
| 837 | QS | QUIKSILVER OUTLET - LAS VEGAS SOUTH | Las Vegas | NV | 2697 | |
| 839 | QS | QUIKSILVER OUTLET - WOODBURN | Woodburn | OR | 2817 | Craig Realty Group |
| 84 | QS | QUIKSILVER - QUEENS' MARKETPLACE (HAWAII) | Waikoloa | HI | 2960 | The Beall Corporation |
| 52 | TRI | QUIKSILVER - CHARLESTON | Charleston | SC | 2300 | Genevieve S. Felder, F.J. Felder, III |
| 82 | QS/RX | QUIKSILVER/ROXY - LA JOLLA | La Jolla | CA | 3601 | PHP Management Inc. |
| 828 | TRI | QUIKSILVER OUTLET - JERSEY GARDENS | Elizabeth | NJ | 2500 | General Manager of Outlet Collection - Jersey Gardens |
| 848 | TRI | QUIKSILVER - FOLSOM | Folsom | CA | 4450 | Chelsea Property Group |

| 868 | TRI | QUIKSILVER OUTLET - LIVERMORE | Livermore | CA | 4997 | Simon Property Group |
| 53 | QS/RX | QUIKSILVER/ROXY - WHALERS VILLAGE (MAUI) | Lahaina | HI | 3379 | General Growth Properties Inc. |
| 69 | TRI | QUIKSILVER - MIRACLE MILE SHOPS | Las Vegas | NV | 4031 | |
| 70 | QS | QUIKSILVER - WAIKIKI BEACH WALK (HONOLULU) | Honolulu | HI | 8365 | Outrigger Enterprises Group |
| 121 | QS | QUIKSILVER - WAILEA (MAUI) | Wailea | HI | 6,572 | |
| 22 | QS | QUIKSILVER - MAUI | Lahaina | HI | 1560 | Levoy Properties |
| 98 | QS | QUIKSILVER - KAI KANE (KAUA'I) | Hanalei | HI | 1757 | Halele'a FLP |
| 122 | QS/RX | QUIKSILVER OUTRIGGER WAIKIKI | Honolulu | HI | 2202 | |
| 113 | QS | QUIKSILVER - LAGUNA BEACH | Laguna Beach | CA | 3113 | Laguna Beach Center, LLC |
| 847 | DC | DC OUTLET – COMMERCE | Commerce City | CA | 2500 | |
| 884 | TRI | QUIKSILVER OUTLET - DESERT HILLS | Cabazon | CA | 5013 | |
| 106 | QS | QUIKSILVER - AVENTURA MALL | Aventura | FL | 3294 | Aventura Mall Venture, c/o Turnberry Aventura Mall Company, Ltd. |
| 100 | QS | QUIKSILVER - BANFF | Banff | Alberta | 3659 | Oswald. M. Treutler Holdings Ltd. |
| 501 | TRI | QUIKSILVER FACTORY - RIVERSIDE | Riverside | CA | 6927 | |
| 502 | QS | QUIKSILVER FACTORY - PINEWOOD | Lake Worth | FL | 4750 | |

3

| 503 | DC | DC FACTORY STORE - DEERFIELD | Deerfield Beach | FL | 6000 | |
| 510 | TRI | QUIKSILVER FACTORY - WESTGATE | San Jose | CA | 4487 | |

4

**SCHEDULE B**
**Properties – Lease Terminations/Sales/Assignments**

| Store # | Brand | Store Name | City | State | Sq Ft | Property Management Co. |
|---|---|---|---|---|---|---|
| 27 | QS | QUIKSILVER- UNIVERSAL CITYWALK | Universal City | CA | 2493 | Universal City Walk |
| 29 | QS | QUIKSILVER - SOUTH COAST PLAZA | Costa Mesa | CA | 2167 | South Coast Plaza |
| 50 | QS | QUIKSILVER - TIMES SQUARE | New York | NY | 3033 | Rudin Management Company, Inc. |
| 58 | QS | QUIKSILVER - HOLLYWOOD, FL | Hollywood | FL | 3040 | Seminole Properties Retail |
| 103 | DC | DC - IRVINE SPECTRUM | Irvine | CA | 2305 | The Irvine Company |
| 111 | QS | QUIKSILVER – SEATTLE | Seattle | WA | 6187 | First & Lenora LLC |
| 114 | RX | ROXY - FASHION ISLAND | Newport Beach | CA | 1386 | The Irvine Company |
| 119 | TRI | QUIKSILVER - DEL AMO | Torrance | CA | 5,820 | |
| 120 | WA | WATERMAN - WAIKIKI BEACH WALK | Honolulu | HI | 1,261 | |
| 123 | TRI | QUIKSILVER GLENDALE | Glendale | CA | 2997 | |
| 124 | BR | BOARDRIDERS MEATPACKING | New York | NY | 4262 | |
| 125 | BR | BOARDRIDERS PASADENA | Pasadena | CA | 5000 | |
| 834 | QS | QUIKSILVER OUTLET – LAKEWOOD | Lakewood | CO | 2500 | Simon Property Group |
| 838 | DC | DC OUTLET - PISMO | Pismo Beach | CA | 2405 | Simon Property Group |
| 850 | DC | DC OUTLET - EL PASO | Canutillo | TX | 2625 | Horizon Group Properties |
| 852 | DC | DC OUTLET – GILROY | Gilroy | CA | 2722 | Simon Property Group |
| 859 | DC | DC OUTLET - LAUGHLIN | Laughlin | NV | 2624 | |
| 861 | DC | DC OUTLET - DOLPHIN MALL | Miami | FL | 3052 | Taubman |
| 865 | DC | DC OUTLET - KATY MILLS | Katy | TX | 2050 | Simon Property Group |
| 869 | TRI | QUIKSILVER OUTLET – MIROMAR | Estero | FL | 2270 | Miromar Outlets |
| 872 | TRI | QUIKSILVER OUTLET – CHICAGO | Rosemont | IL | 4000 | Macerich |
| 874 | TRI | QUIKSILVER OUTLET - SILVER SANDS | Destin | FL | 3000 | Silver Sands GI I, LLC |

5

| | | | | | |
|---|---|---|---|---|---|
| 876 | TRI | QUIKSILVER OUTLET - GREAT LAKES | Auburn Hills | MI | 5576 | Taubman Management |
| 879 | QS | QUIKSILVER OUTLET – ANNAPOLIS | Annapolis | MD | 3500 | Westfield Shoppingtown-Annapolis Mall, Owner LLC |
| 883 | QS | QUIKSILVER OUTLET - CHARLOTTE | Charlotte | NC | 2944 | |
| 885 | TRI | QUIKSILVER OUTLET - WOODBURY COMMONS | Central Valley | NY | 5000 | |
| 887 | TRI | QUIKSILVER OUTLET - NORTH GEORGIA PREMIUM OUTLETS | Dawsonville | GA | 4262 | |

## SCHEDULE C
## COMPENSATION

### A.    Definitions

"Document" means any amendment or agreement that modifies a Lease in any manner, including but not limited to, Lease Modifications, Lease Terminations/Sales/Assignments and Lease Claim Mitigations.

"Early Termination Right" – means a Company's exclusive right to terminate a Lease prior to its expiration date.

"Gross Proceeds" means the total consideration paid by a landlord, tenant, investor, purchaser, buyer of designation rights or any other party to either waive, terminate or purchase a Lease or Property or any right related to the Lease or Property.

"Gross Occupancy Cost" means with respect to a Lease, as of the Agreement date, the sum of the remaining base rent including, but not limited to, any annual increases, percentage rent, CAM, taxes, insurance, rental tax, marketing and merchants association charges, utility charges, HVAC usage charges, trash removal charges, sprinkler usage charges, unpaid rents, tenant improvements due to the landlord and any other charges payable by the Company under a particular Lease. In the case of percentage rent, such rent will be calculated using sales figures for the twelve (12) months ended at the end of the month prior to the calculation (equitably adjusted if less than twelve (12) months of sales figures are available). CAM, taxes, insurance, marketing and merchants association charges and all other applicable charges will be calculated using the last available full year charge for each item (which may be a calendar year or a lease year, depending upon which is the most recent full year charge available). In the event that rent increases periodically based upon the change in the Consumer Price Index (CPI), the assumed annual CPI increase shall be two and one-half percent (2.5%).

"Lease Claim Mitigation" means the waiver or reduction of pre- and post-petition cure amounts, including but not limited to, administrative and stub rent, with respect to a Lease.

"Lease Modification" – means any alternation, amendment or modification to the original terms and conditions of a Lease agreement. A modification can be monetary or non-monetary (as defined below).

"Lease Terminations/Sales/Assignments" – means the disposition, whether all or part, of a Lease through assignment, sublease, termination, sale or otherwise that generates Gross Proceeds for the Debtor.

"Monetary Lease Modification" – means any modification to the monetary terms of a Lease agreement, including, but not limited to, a reduction in rent or the addition or

removal of a provision of the Lease that results in Occupancy Cost Savings to the Company.

"Non-Monetary Lease Modification" means any modification to the non-monetary terms of a Lease agreement, including, but not limited to, change of use, co-tenancy clause, sublease rights, the negotiation of a lease extension where no option previously existed, the granting of an additional option term or terms, an amendment to the current option term or terms (including, but not limited to, a reduction in the term), the granting of an Early Termination Right, the granting of the right to reduce the square footage of the Lease or the granting of the right to relocate.

"New Gross Occupancy Cost" means for each Lease, the reduced Gross Occupancy Cost that results or would result from a Lease Modification, Lease Termination or any other amendment to the Lease.

"Occupancy Cost Savings" means the difference between the original Gross Occupancy Cost and the New Gross Occupancy Cost for the period from the effective date of a Lease amendment (i.e. Document) or the date in which the Landlord executes the Document (if the Document is not fully executed) through the end of the original or new Lease term as applicable. Occupancy Cost Savings include, but are not limited to, an option term exercised as part of a Lease Modification (including any modifications to the original option term), reduction of rent, reduction of base term, reduction of square footage, CAM charges, taxes, elimination of percentage rent, conversion to percentage rent, reduction or elimination of the requirement to improve the Lease space, reductions in or returns of security deposits, reduction of unamortized tenant allowance, termination of rent and any other types of Lease modifications, extensions, renewals, terminations, capital improvements, tenant allowance contributions, tenant improvement dollars granted by the landlord or any other fees paid by the Landlord, sub-tenant or other third party to the Company to effect a modification, termination or otherwise, or any other amendment to a Lease that results in savings to the Company. Occupancy Cost Savings also includes any Occupancy Cost amounts agreed to be paid on behalf of the Company by any Lease guarantor or other third party.

B.  **Fees**

A&G shall be compensated for the Services as follows:

1.  Retainer.  The Company shall pay A&G a retainer fee in the amount of twenty five thousand dollars ($25,000.00) upon execution of the Agreement. The retainer is non-refundable and shall be applied to the fees due under the Agreement.

2.  Monetary Lease Modifications.  For each Monetary Lease Modification attained by A&G on behalf of the Company, A&G shall earn and be paid the

greater of seven hundred and fifty dollars ($750.00) or four percent (4%) of the Occupancy Cost Savings per Lease.

3. <u>Lease Terminations/Sales/Assignments</u>. For each Lease Termination/Sale/Assignment attained by A&G on behalf of the Company, A&G shall earn and be paid four percent (4%) of the Gross Proceeds received by the Debtor. Additionally, A&G shall be paid a one hundred dollar ($100.00) administration fee per Lease.

4. <u>Lease Claim Mitigations</u>. For Lease Claim Mitigations negotiated by A&G on behalf of the Company, A&G shall earn and be paid a fee of four and one half percent (4.5%) of the Gross Proceeds per claim. Reductions of 502(b)(6) claims will be calculated based upon the dividend paid to unsecured creditors.

5. <u>Early Termination Rights.</u> For each acceptable Early Termination Right obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee two thousand five hundred dollars ($2,500.00) per Lease.

6. <u>Non-Monetary Lease Modification.</u> For each acceptable Non-Monetary Lease Modifications (excluding Early Termination Rights) obtained by A&G on behalf of the Company, A&G shall earn and be paid a fee of one thousand two hundred fifty dollars ($1,250.00) per Lease, regardless of the aggregate number of Non-Monetary Lease Modifications.

C. **Payment of Fees**.

A&G shall provide the Debtor with a deal sheet for each proposed transaction which sets forth the terms and conditions of the proposed Lease Modification, Lease Claim Mitigation or Early Termination Right. If the Debtor approves the proposed deal sheet and the landlord of a Property delivers a Document executed by such landlord that conforms to the specific terms of the Debtor approved deal sheet, A&G shall be entitled to its Fees in accordance with Section B above. A&G shall be entitled to its Fees notwithstanding the fact that the Company, following delivery by the landlord the executed Document, determines not to consummate the transaction. The Fees are not exclusive and a Service may incorporate more than one type of fee; provided that the Parties agree prior to consummation of the subject transaction that it will trigger more than one type of fee.

Fees for Lease Terminations/Sales/Assignments are earned upon the Debtor's receipt of the Gross Proceeds.

The Company shall pay all fees to A&G in accordance with the terms herein and within ten (10) days of the receipt of an invoice therefore.