**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                               :   Chapter 11
In re:                                                         :
                                                               :   Case No. 15-11880 (BLS)
QUIKSILVER, INC., et al.,                                      :
                                                               :   Jointly Administered
                Debtors.¹                                      :
                                                               :   Hrg. Date: Nov. 17, 2015 at 10:00 a.m. (Eastern)
                                                               :   Obj. Due: Nov. 10, 2015 at 4:00 p.m. (Eastern)
                                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**DEBTORS' APPLICATION FOR ENTRY OF ORDER PURSUANT TO BANKRUPTCY
CODE SECTIONS 327(a) AND 328(a), BANKRUPTCY RULES 2014(a) AND 2016, AND
LOCAL BANKRUPTCY RULES 2014-1 AND 2016 AUTHORIZING THE
EMPLOYMENT AND RETENTION OF ICR, LLC AS CORPORATE
COMMUNICATIONS AND PUBLIC RELATIONS CONSULTANTS TO THE
DEBTORS NUNC PRO TUNC TO THE PETITION DATE**

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Quiksilver" or the "Company") hereby apply (the "Application") to the Court for entry of an order, pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-2(h) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), (i) authorizing the employment and retention of ICR, LLC ("ICR") as corporate communications and public relations consultants to the Debtors *Nunc Pro Tunc* to

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

the Petition Date (as defined below). In support of the Application, the Debtors rely upon and incorporate by reference the Declaration of Anton Nicholas in Support of the Application (the "Nicholas Declaration"), attached hereto as Exhibit A. In further support of the Application, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## JURISDICTION AND VENUE

1.  This Court has jurisdiction to consider this Application under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Application in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.  The statutory predicates for the relief requested herein are sections 327(a) and 328(a) of the Bankruptcy Code. Such relief is also warranted under Bankruptcy Rules 2014(a) and 2016 and Local Bankruptcy Rules 2014-1 and 2016.

3.  Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Application if it is determined that Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

4.  On September 9, 2015 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). These Chapter 11 Cases are jointly administered.

5.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     On September 22, 2015, the Office of the United States Trustee for the District of Delaware (the "United States Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On September 28, 2015, the United States Trustee filed an Amended Notice of Appointment of Creditors' Committee. No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

7.     Quiksilver is one of the world's leading outdoor sports lifestyle companies. The Company designs, develops and distributes branded apparel, footwear, accessories and related products. The Company began operations in 1976 making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, BMX, and motocross, among other activities. The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites. The Debtors comprise each of the Company's U.S. entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc. and seven inactive entities.

8.     Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 20].

**RELIEF REQUESTED**

9. By this Application, the Debtors seek entry of an order under Bankruptcy Code sections 327(a) and 328(a), Bankruptcy Rules 2014 and 2016, and Local Bankruptcy Rules 2014-1 and 2016 authorizing the employment and retention of ICR, effective as of the Petition Date, as their corporate communications and public relations advisors and consultants in these Chapter 11 Cases, in accordance with the provisions of that certain engagement letter dated as of August 1, 2014, a copy of which is attached to the Nicholas Declaration as Exhibit 1, as amended by those certain addenda dated as of May 1, 2015, June 24, 2015 and August 24, 2015 (the "Engagement Agreement"),[2] to develop, prepare, and implement specific communications programs, initiatives, and related strategies that will be necessary during these cases, as is more fully described herein.

**BASIS FOR RELIEF**

10. Under the Engagement Agreement, the Debtors retained ICR to evaluate and advise the Debtors on a variety of corporate communications and public relations issues deriving from or associated with the Debtors' efforts to restructure their financial affairs and capital structure in a sale or reorganization case filed under chapter 11 of the Bankruptcy Code.

11. From 2000 to 2009, ICR provided Quiksilver with various corporate communications and public relations services. On August 1, 2014 (the "Engagement Date"), the Debtors entered into the Engagement Agreement, originally for ICR to provide investor relations services to the Debtors. On August 24, 2015, the parties entered into an addendum to the August

---

[2] Any references to or summaries of the Engagement Agreement in this Application are qualified by the express terms of the Engagement Agreement, which shall govern if there is any conflict between the Engagement Agreement and the summaries provided herein. Additionally, any capitalized terms used in this Application and not otherwise defined herein shall have the meanings ascribed to such terms in the Engagement Agreement.

4

1, 2014 agreement, to provide that ICR would also provide communications services related to the Debtors' chapter 11 filings. In the almost ten years of its previous relationship with Quiksilver as well as in the year since the Engagement Date, ICR has acquired considerable knowledge about the Debtors' business operations and financial affairs. In working closely with the Debtors on the matters set forth in the Engagement Agreement and from its previous relationship with Quiksilver, ICR has become uniquely familiar with the Debtors' business affairs and current corporate communications and public relations needs. ICR's services are necessary to the Debtors because ICR will be able to assist the Debtors in protecting, retaining, and developing the goodwill and confidence of a number of constituency groups and stakeholders during these Chapter 11 Cases. The cooperative participation of parties such as employees, partners, clients, vendors, trade and other creditors, and lenders is essential to the Debtors' ability to maximize the value of the estates for the benefit of all parties-in-interest. Accordingly, the Debtors submit that the retention of ICR on the terms and conditions set forth herein is necessary and appropriate, is in the best interests of their estates, creditors, and all other parties in interest, and should be granted.

12.     ICR has provided advice and assisted the Debtors in connection with the corporate communications and public relations aspects of their restructuring and sale efforts and has been instrumental in developing and drafting specific communication materials and related strategy designed to facilitate the smooth transition of the Debtors' operations into chapter 11, including communications to key constituencies.

13.     The Debtors are familiar with the professional standing and reputation of ICR. Indeed, the consideration of this professional standing and reputation was a critical element in the Debtors' decision to enter into the Engagement Agreement. Among other things, the

Debtors understand that ICR has a wealth of experience in providing corporate communications and public relations advice and consultancy, including in restructurings and reorganizations, and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

14. As described in the Nicholas Declaration, ICR is a full-service independent global public relations firm with approximately 50 professionals collaborating across its Norwalk, New York, San Francisco, Boston, and Beijing offices.  ICR has been ranked as one of the top strategic communications companies in the nation and has emerged as a leader in corporate reputation management, with experience in both out-of-court restructurings and complex chapter 11 cases.  For example, ICR has been retained and has performed services in the Chapter 11 bankruptcy cases of Blockbuster, Circuit City, Furniture Brands, Warnaco and others.  ICR is willing to serve as the Debtors' corporate communications and public relations consultants and to perform the services requested, subject to this Court's approval

15. ICR's services are necessary to the Debtors because ICR will be able to assist the Debtors in protecting, retaining, and developing the goodwill and confidence of a number of constituency groups and stakeholders during these Chapter 11 Cases, whose support is essential to any successful reorganization.  In this regard, it is crucial that the Debtors inform the Debtors' and their non-debtor affiliates' employees, customers, vendors, and suppliers as well as local and state governmental authorities of the effect that these Chapter 11 Cases will have on the Debtors' businesses and that these communications be tailored appropriately to each particular constituency.  The cooperative participation of parties such as employees, partners, clients, vendors, trade and other creditors, and lenders is essential to the Debtors' ability to successfully reorganize and to maximize the value of the estates for the benefit of all parties-in-interest.

Accordingly, the Debtors submit that the retention of ICR on the terms and conditions set forth herein is necessary and appropriate, is in the best interests of their estates, creditors, and all other parties in interest, and should be granted.

16.     In addition, the Debtors must maintain open lines of communication with these key constituencies and keep them informed of significant developments in these Chapter 11 Cases in a timely and effective manner.  The Debtors need experienced corporate communications and public relations consultants to assist them with these efforts.

17.     Further, the services of ICR are also necessary to enable the Debtors to efficiently and effectively control and address media-related inquiries and matters.  Indeed, inaccurate media reporting may raise a variety of negative issues, which may be significantly detrimental to the Debtors' public image and the businesses of their operating Debtor and non-Debtor subsidiaries, ultimately affecting or even jeopardizing the successful outcome of these Chapter 11 Cases.  Accordingly, it is critical for the Debtors to promptly and publicly address misperceptions and the inaccurate reporting of relevant information.  The Debtors need the assistance of a professional public relations firm to properly address such media-related inquires and matters.

18.     To that end, since August, 2015, ICR has worked closely with the Debtors' management, creditors, and other professionals and advisors in preparing a communications strategy in connection with, and otherwise assisting with preparing for, the commencement of these Chapter 11 Cases.  ICR's prepetition work for the Debtors has included, but has not been limited to, counseling the Debtors in their communications with respect to new business generation, preparing communications materials in connection with a possible sale of the Company and initiating and responding to media outreach regarding refinancing efforts.  As

a result of its active engagement in these processes and its prior experience with the Company, ICR is now intimately familiar with the Debtors' business operations and key stakeholders.

19. Consequently, the Debtors believe that ICR has developed significant relevant experience and expertise regarding the Debtors and their current situation and is thus both well-qualified and uniquely suited to provide the required services in these Chapter 11 Cases. Indeed, if the Debtors were required to retain corporate communications and public relations consultants other than ICR in connection with these Chapter 11 Cases, the Debtors, their estates, and all parties in interest would be unduly prejudiced by the time and expenses necessary to familiarize another professional with the intricacies of the Debtors and their communications needs. Further, the Debtors believe that ICR is well qualified and able to assist the Debtors in a cost-effective, efficient, and timely manner.

20. For these reasons, the Debtors submit that ICR's retention is in the best interest of the Debtors, their estates and their creditors and should be approved.

## SCOPE OF SERVICES

21. Under the terms of the Engagement Agreement, ICR will provide such corporate communications and public relations consulting and advisory services as ICR and the Debtors deem appropriate and feasible in order to advise the Debtors in the course of these Chapter 11 Cases. Specifically, and subject to further order of this Court, ICR will render various services to the Debtors including, among others, the following:[3]

    (a)    Development and implementation of communications programs and related strategies and initiatives for communications with the Debtors' key

---

[3] Capitalized terms not otherwise defined in this paragraph shall have the meanings ascribed to such terms in the Engagement Agreement.

        constituencies (including customers, employees, vendors, bondholders, related key constituencies, and the media) regarding the Debtors' operations and progress through the chapter 11 process;

(b)     Development of public relations initiatives for the Debtors to maintain public confidence and internal morale during the chapter 11 process;

(c)     Preparation of press releases and other public statements for the Debtors, including statements relating to major chapter 11 events;

(d)     Preparation of other forms of communication to the Debtors' key constituencies and the media; and

(e)     Performance of such other communications consulting services as may be requested by the Debtors.

## TERMS OF RETENTION

22.     The Debtors understand that ICR intends to apply to the Court for allowances of compensation and reimbursement of expenses for its services in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, orders of this Court and guidelines established by the United States Trustee.  The customary hourly rates, subject to periodic adjustments, charged by ICR professionals anticipated to be assigned to this case are as follows: Anton Nicholas, $525/hour; Phil Denning, $525/hour; Jason Chuboda, $300/hour; Julia Young, $250/hour; John McKenna, $175/hour; and Christine Beggan, $175/hour.  ICR may involve other professionals employed by ICR with similar experience and rates to implement communications strategies as may be necessary from time to time.

23.     The rates charged by ICR are comparable to what is generally charged by other firms of similar stature to ICR for comparable engagements, both in and out of bankruptcy, and represents ICR's standard fee amounts.  ICR and the Debtors believe that the foregoing compensation arrangement is both reasonable and market-based and consistent with ICR's

normal and customary billing levels for comparably sized and complex companies, both in and out-of-court, involving the services to be provided in these Chapter 11 Cases.

24. In addition, the Debtors have agreed to reimburse ICR for all reasonable, documented out of pocket expenses actually incurred by ICR (excluding legal fees, expenses and disbursements). ICR will follow its customary expense reimbursement guidelines and practices in seeking expense reimbursement from the Debtors.

25. On August 1, 2014, the Debtors paid ICR $14,000 as an initial retainer on account of investor relations services to be provided to the Debtors (the "Initial Retainer"). On September 1, 2015, the Debtors paid ICR a retainer fee of $90,000 on account of bankruptcy communication services to be provided to the Debtors (together with the Initial Retainer, the "Retainer"). As discussed in the Nicholas Declaration, ICR applied these Retainer amounts against ICR's prepetition fees and costs, such that ICR had nothing on hand from the total Retainer amounts paid. Furthermore, ICR has waived, or will waive, any additional prepetition amounts owing. Subject to Court approval, the Debtors shall be authorized to pay all amounts owed to ICR postpetition from their operating revenues.

26. ICR intends to file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred in accordance with applicable provisions of the Bankruptcy Code, the Fee Guidelines, the Bankruptcy Rules and any applicable orders of this Court. Such applications will include time records setting forth, in a summary format, a description of the services rendered by each professional, and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors. Time is billed by ICR in increments of one quarter of one hour. ICR will also maintain detailed

records of any actual and necessary costs and expenses incurred in connection with the services discussed above.

27. Local Bankruptcy Rule 2016-2(d) imposes certain information requirements on professionals' compensation requests, including that professionals report their billed activities in one-tenth of an hour increments, that all activity descriptions be divided into general project categories, and that each activity include a time allotment, among others. Local Bankruptcy Rule 2016-2(h), however, provides that "[a]n employed professional person or entity within the scope of this Local Rule may request that the Court waive, for cause, one or more of the information requirements of this Local Rule" in the motion seeking to court approval for the retention of such professional entity.

28. The Debtors and ICR submit that there exists cause to modify certain reporting requirements imposed by Local Bankruptcy Rule 2016-2(d) with respect to ICR compensation requests and record keeping. It is not the general practice of corporate communications and public relations firms, including ICR, to keep detailed time records similar to those customarily kept by attorneys and required by Local Bankruptcy Rule 2016-2(d). Therefore, ICR does not ordinarily maintain contemporaneous time records in one-tenth hour increments and, as set forth in the Nicholas Declaration, ICR believes that it would be unduly burdensome and time-consuming for its professionals to record their activities in one-tenth hour increments. Accordingly, pursuant to Local Bankruptcy Rule 2016-2(h), ICR is seeking to be excused from compliance with that requirement. Instead, ICR requests authority to maintain time records in one-quarter hour increments setting forth, in a summary format and by project category, a description of the services rendered on each date, by each professional rendering

services on behalf of the Debtors, and the amount of time spent rendering such services on each date by each such individual.

29. Subject to the provisions in the Engagement Agreement, the Debtors are authorized to indemnify, and shall indemnify, ICR in accordance with the Engagement Agreement for any claim arising from, related to, or in connection with the services provided, whether prepetition or postpetition, pursuant to the Engagement Agreement.

30. Notwithstanding any provisions of the Engagement Agreement to the contrary, the Debtors shall have no obligation to indemnify ICR or provide contribution or reimbursement to ICR for any claim or expense that is either judicially determined to have resulted primarily from the reckless or willful misconduct, malpractice, gross negligence, bad faith, self-dealing, or breach of fiduciary duty of ICR.

## ICR'S DISINTERESTEDNESS

31. ICR has informed the Debtors that, except as may be set forth in the Nicholas Declaration, it (i) has no connection with the Debtors, its creditors or other parties in interest in this case; (ii) does not hold any interest adverse to the Debtors' estates; and (iii) believes it is a "disinterested person" as defined within Bankruptcy Code section 101(14).

32. ICR has further informed the Debtors that it will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new material facts or relationships are discovered or arise, ICR will supplement its disclosure to the Court.

33. ICR has also agreed not to share with any person or firm the compensation to be paid for professional services rendered in connection with these cases.

34. The Debtors believe that ICR is not owed any amounts with respect to its prepetition fees and expenses.

**APPLICABLE AUTHORITY**

35. Section 327(a) of the Bankruptcy Code provides that a debtor, subject to court approval: "May employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist . . . in carrying out . . . duties under [the Bankruptcy Code]." 11 U.S.C. § 327(a).

36. Section 328(a), in turn, provides that employment of a professional person under section 327 of the Bankruptcy Code may be "on any reasonable terms and conditions of employment, including on retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis" subject to later re-evaluation by the court. 11 U.S.C. § 328(a).

37. Bankruptcy Rule 2014 requires that an application for retention include: "[S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Fed. R. Bankr. P. 2014.

38. ICR intends to apply to the court for allowance of compensation and reimbursement of expenses in accordance with the procedures set forth in the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, as those procedures may be modified or supplemented by order of this Court.

39. The terms of ICR's engagement described herein were negotiated by the Debtors and ICR at arm's length and in good faith. The Debtors respectfully submit that the terms of ICR's proposed retention, including the indemnification provisions contained in the

Engagement Agreement, are reasonable and in the best interest of the Debtors, their estates and creditors.

## NOTICE

40.     Notice of this Application will be given to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the agent for the Debtors' postpetition secured loan facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan facility; (d) the agent for the Debtors' prepetition senior secured notes; (e) the agent for the Debtors' prepetition senior unsecured notes; (f) counsel to the Creditors' Committee; and (g) all parties entitled to notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PREVIOUS REQUEST

41.     No previous request for the relief sought herein has been made by the Debtors to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the relief requested in the Application and such other and further relief as may be just and proper.

Dated:   October 22, 2015
         Huntington Beach, California

                              QUIKSILVER, INC.
                              (on behalf of itself and the other Debtors)


                              By:   */s/ Andrew Bruenjes*
                              Name: Andrew Bruenjes
                              Title:   Americas Chief Financial Officer