**EXHIBIT A**

**Nicholas Declaration**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

In re:                            :     Chapter 11

                              :

QUIKSILVER, INC., *et al.*,       :     Case No. 15-11880 (BLS)

                              :

                  Debtors.[1]    :     Jointly Administered

                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF ANTON NICHOLAS IN SUPPORT OF DEBTORS' APPLICATION FOR ENTRY OF ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 327(a) AND 328(a), BANKRUPTCY RULES 2014(a) AND 2016, AND LOCAL BANKRUPTCY RULES 2014-1 AND 2016 AUTHORIZING THE EMPLOYMENT AND RETENTION OF ICR, LLC AS CORPORATE COMMUNICATIONS AND PUBLIC RELATIONS CONSULTANTS TO THE DEBTORS *NUNC PRO TUNC* TO THE <u>PETITION DATE</u>

Pursuant to Bankruptcy Rule 2014(a), Anton Nicholas declares as follows:

1.      I am a member of the public relations firm ICR, LLC ("<u>ICR</u>"), and I am authorized to execute this declaration (the "<u>Nicholas Declaration</u>") on behalf of ICR.  I submit this declaration in support of the Debtors' Application for an Order under Bankruptcy Code sections 327(a) and 328(a), Bankruptcy Rules 2014(a) and 2016, and Local Bankruptcy Rules 2014-1 and 2016-2 Authorizing the Employment and Retention of ICR as Corporate Communications and Public Relations Consultants to the Debtors *Nunc Pro Tunc* to the Petition Date (the "<u>Application</u>"), filed contemporaneously herewith by the debtors and debtors in possession in the above-captioned cases ("<u>Quiksilver</u>" or the "<u>Debtors</u>").  Except as otherwise

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

indicated, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

2.      The name, address, telephone, and facsimile of ICR are: 761 Main Avenue, Norwalk, CT  06851 Ph. (203) 682-8200, Facsimile (203) 682-8201.

3.      ICR is one of the nation's leading public relations firms.  ICR is a full-service independent global public relations firm with approximately 50 professionals collaborating across its Norwalk, New York, San Francisco, Boston, and Beijing offices. ICR has been ranked as one of the top strategic communications companies in the nation and has emerged as a leader in corporate reputation management, with experience in both out-of-court restructurings and complex chapter 11 cases.

4.      Formed in 1998, ICR specializes in addressing sensitive business situations that require communications strategies targeted to a variety of constituencies, including customers, employees, vendors, shareholders, bondholders, and the media.  ICR has substantial experience providing corporate communications and public relations services to large companies in connection with both in and out-of court restructurings.

5.      ICR has provided the Debtors with consulting services comparable to those for which ICR's retention is sought hereunder since August 1, 2014.  Furthermore, ICR provided the Debtors with various corporate communications and public relations services from 2000 to 2009.  During these periods, ICR has acquired considerable knowledge of the Debtors' business operations and financial affairs and has already developed strategies for communicating to the Debtors' key constituencies about these Chapter 11 Cases and plans for restructuring.

6.      In providing prepetition services to the Debtors, ICR's professionals have worked closely with the Debtors' management and other professionals and have become well

acquainted with the Debtors' business and operations, and related matters.  Accordingly, I

believe that ICR has developed significant relevant experience and expertise regarding the

Debtors that will assist it in providing effective and efficient services in these Chapter 11 Cases.

    7.  I believe that I and other professionals employed by ICR are well qualified

to continue to act as the Debtors' corporate communications and public relations consultants.

ICR is one of the nation's leading public relations firms, best known for its communications

work in sensitive situations.  ICR specializes in addressing sensitive business situations that

require communications strategies targeted to a variety of constituencies, including customers,

employees, vendors, shareholders, bondholders, and the media.  ICR has substantial experience

providing corporate communications and public relations services to large corporations in

connection with both in- and out-of-court restructurings.

    8.  ICR regularly provides such services to numerous business entities, both

in and out of bankruptcy proceedings.  For example, ICR has been retained and has performed

services in the Chapter 11 bankruptcy cases of Blockbuster, Circuit City, Furniture Brands,

Warnaco and others.

    9.  ICR believes it is well qualified and able to represent the Debtors in a

cost-effective, efficient, and timely manner.

### SERVICES TO BE RENDERED

    10.  Pursuant to the terms of the certain engagement letter dated as of August 1,

2014, a copy of which is attached hereto as Exhibit 1, as amended by those certain addenda dated

as of May 1, 2015, June 24, 2015 and August 24, 2015 (the "Engagement Agreement"), the

Debtors seek to continue to retain ICR to render corporate communications and public relations

consulting and related services to the Debtors as needed throughout the course of these Chapter

11 Cases.  In particular, ICR will perform, among others, the following services:

    (a)    Development and implementation of communications programs and related strategies and initiatives for communications with the Debtors' key constituencies (including customers, employees, vendors, bondholders, related key constituencies, and the media) regarding the Debtors' operations and progress through the chapter 11 process;

    (b)    Development of public relations initiatives for the Debtors to maintain public confidence and internal morale during the chapter 11 process;

    (c)    Preparation of press releases and other public statements for the Debtors, including statements relating to major chapter 11 events;

    (d)    Preparation of other forms of communication to the Debtors' key constituencies and the media; and

    (e)    Performance of such other communications consulting services as may be requested by the Debtors.

11.    As noted above, ICR has substantial expertise in all of these areas and is

willing to perform such services for the Debtors.

## PROFESSIONAL COMPENSATION

12.    ICR's allowance of compensation and reimbursement of expenses will

remain subject to review and approval of this Court, and ICR will apply to this Court for

allowance of compensation and reimbursement for out-of-pocket disbursements incurred during

the pendency of these Chapter 11 Cases.

13.    As set forth in further detail in the Engagement Agreement, ICR intends to:

(a) charge for the agreed-upon services in accordance with its standard hourly billing rates,

which range from $150 to $620, depending on the person performing the services (the ICR

professionals anticipated to be assigned to these Chapter 11 Cases are as follows:  Anton

Nicholas, $525/hour; Phil Denning, $525/hour; Jason Chuboda, $300/hour; Julia Young,

$250/hour; John McKenna, $175/hour; and Christine Beggan, $175/hour; and ICR may involve

other professionals employed by ICR with similar experience and rates to implement communications strategies as may be necessary from time to time) and (b) seek reimbursement of reasonable and necessary expenses incurred in connection with rendering corporate communications and public relations consulting services to the Debtors.

14.     ICR's rates are comparable to what is generally charged by other firms of similar stature to ICR for comparable engagements, both in and out of bankruptcy, and represent ICR's standard fee amounts.  ICR and the Debtors believe that the foregoing compensation arrangement is both reasonable and market-based and consistent with ICR's normal and customary billing levels for comparably sized and complex cases, both in and out-of-court, involving the services to be provided in these Chapter 11 Cases.

15.     In addition, the Debtors have agreed to reimburse ICR for all reasonable, documented out of pocket expenses actually incurred by ICR (excluding legal fees, expenses, and disbursements).  ICR will follow its customary expense reimbursement guidelines and practices in seeking expense reimbursement from the Debtors.

16.     ICR intends to file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred in accordance with applicable provisions of the Bankruptcy Code, the Fee Guidelines, the Bankruptcy Rules, and any applicable orders of this Court.  Such applications will include time records setting forth, in a summary format, a description of the services rendered by each professional, and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors.  Time is billed by ICR in increments of one quarter of an hour.  ICR will also maintain detailed records of any actual and necessary costs and expenses incurred in connection with the services discussed above.

17.    I believe that there exists cause to modify certain reporting requirements imposed by the Local Bankruptcy Rules with respect to ICR's compensation requests and record keeping.  It is not the general practice of corporate communications and public relations firms, including ICR, to keep detailed time records similar to those customarily kept by attorneys and required by Local Bankruptcy Rule 2016-2(d).  As ICR does not ordinarily maintain contemporaneous time records in one-tenth hour increments, I believe that it would be unduly burdensome and time-consuming for its professionals to record their activities in one-tenth hour increments.  Accordingly, pursuant to Local Bankruptcy Rule 2016-2(h), ICR seeks to be excused from compliance with that requirement and requests authority to maintain time records in one-half hour increments setting forth, in summary format and by project category, a description of the services rendered on each date, by each professional rendering services on behalf of the Debtors, and the amount of time spent rendering such services on each date by each such individual.

18.    Prior to the Petition Date, ICR applied the Retainer amounts against ICR's prepetition fees and costs.  As of the Petition Date, ICR had nothing on hand from the Retainer amounts paid.  As of the Petition Date, ICR originally had $48,994.64 outstanding in unpaid fees, but it has written off this amount.  Subject to this Court's approval, ICR's fees incurred postpetition will be determined in accordance with ICR's standard hourly billing rates.

19.    The Debtors propose to pay ICR at the rates and on the terms set forth in paragraph 13 of this Nicholas Declaration.  The rates set forth herein are ICR's standard hourly rates for work of this nature and are set at a level designed to compensate ICR fairly for the work of its professionals and to cover fixed and routine overhead expenses while also being responsive to the Debtors' current financial condition.

20.     There are no arrangements between ICR and any other entity to share compensation received or to be received in connection with these Chapter 11 Cases.

## INDEMNIFICATION

21.     ICR and its shareholders, officers, directors, employees, and agents (collectively, the "Indemnified Parties") will be indemnified by the Debtors under certain circumstances as set forth in the Engagement Agreement.  Pursuant to the Engagement Agreement, the Debtors agree to indemnify the Indemnified Parties for ICR in accordance with the Engagement Agreement for any claim arising from, related to, or in connection with the services provided for, whether prepetition or postpetition, in the Engagement Agreement.  See Engagement Agreement, August 1, 2014 at 3.

## DISINTERESTEDNESS

22.     ICR is aware that the Debtors have numerous creditors, stakeholders, and other parties with whom they maintain business relationships.  ICR maintains a database containing the names of current, former, and potential clients and other principal parties related to such clients.  I caused ICR to review and analyze the conflict database to determine whether ICR has any connection with the Potential Parties in Interest.

23.     To the best of my knowledge, and in view of the foregoing, ICR and the professionals employed by it are disinterested persons who do not hold or represent an interest adverse to the estate and do not have any connection either with the Debtors, their creditors, or any other party in interest in these Chapter 11 Cases or with their respective professionals or accountants, with the judges of this Court, or with the United States Trustee or any person employed in the Office of the United States Trustee.

24.     ICR makes the following additional disclosures with respect to ICR's disinterestedness.  References to ICR include all members expected to render services in these Chapter 11 Cases:

a)      ICR is not a creditor, equity security holder, or insider of the Debtors;

b)      ICR is not and was not investment banker for any outstanding security of the Debtors;

c)      ICR has not been, within three (3) years before the Petition Date, (i) investment banker for a security of the Debtor, or (ii) an attorney for such investment banker in connection with the offer, sale, or issuance of a security of the Debtors; and

d)      ICR was not, within two (2) years before the Petition Date, a director, officer, or employee of the Debtors or of any investment banker as specified in subparagraph (b) or (c) of this paragraph.

25.     Although ICR is unaware of any other connections at the present time, it is possible that ICR may have provided services for certain other creditors or other parties of interest in these Chapter 11 Cases in matters unrelated to the Debtors or the instant bankruptcy cases.  I understand that if any information as stated herein changes or if I learn of any additional connections at a later date, I have a duty to supplement this declaration to disclose those facts.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and belief, and after reasonable inquiry, the foregoing is true and correct.

Executed this 20th day of October 2015.

ICR & COMPANY, INC.

By:     _/s/ Anton Nicholas_____

Name: Anton Nicholas

Title:   Managing Director

**EXHIBIT 1**

**Engagement Agreement**

## CONSULTING AGREEMENT

I.   **PARTIES:**

| CONSULTANT: | COMPANY: |
|---|---|
| ICR, LLC | Quiksilver, Inc. |
| 761 Main Avenue | 15202 Graham Street |
| Norwalk, CT 06851 | Huntington Beach, CA  92649 |
| Attn: John Sorensen | Attn:  Richard Shields |
| E-mail: legal@icrinc.com | E-mail: Richard.shields@quicksilver.com |
| Phone: (203) 682-8200 | Phone: (714) 889-6007 |

II.   **TERM:** The initial term of this agreement (the "Agreement") shall commence on August 1, 2014 (the "Start Date") and end on January 31, 2015 (the "Anniversary Date"). Thereafter, this Agreement shall remain in full force and effect, provided however that either party may terminate this Agreement following the Anniversary Date by notifying the other party in writing, which termination shall be effective sixty (60) days after the date of the notice so long as the terminating party pays all sums due through the effective date of termination.

III.   **DUTIES OF CONSULTANT:** Consultant shall provide the following services (collectively the "Services"). The Services do not include the rendering of legal, tax or securities advice and Consultant shall have no liability to Company should Company improperly utilize advice or opinions of Consultant in matters of law, taxation or securities. Consultant shall perform the Services as an independent contractor and not as an employee or affiliate of Company:

    A.   Investor relations consulting services ("Investor Relations Services"), which shall include:

        1.   Quarterly Review
           a.   Review prior quarter investor relations communication
              i.   Critique Q&A session
              ii.   Provide feedback on analyst reports
              iii.   Poll analysts for reaction to call
              iv.   Provide a continuous stream of investor feedback
              v.   Track valuation and performance in order to adjust messaging accordingly

           b.   Participation in quarterly earnings preparation
              i.   Recommend key message themes for conference call and earnings release based on company intelligence and current sector issues
              ii.   Conduct quarterly due diligence – review draft financials, industry trends, company specific issues, etc
              iii.   Help to manage communication vehicles
              iv.   Provide potential list of questions for conference call
              v.   Monitor analyst earnings estimates
              vi.   Help coordinate IR calendar

           c.   Advise on alignment of key message themes Ensure consistent messaging with respect to various communication channels including but not limited to press releases, conference call prepared remarks, conference call Q&A, and 10-Q/K filings

        2.   Market Research, including
           a.   Daily Company and peer research summary
           b.   Weekly fact sheet, including valuation and consensus estimates on Company and its peers
           c.   Weekly or monthly trading statistics
           d.   Quarterly shareholder analysis
           e.   Peer conference call scripts
           f.   Ongoing peer analysis including earnings scorecards

B.  Special Situation Communication Consulting Services: Should Company experience a crisis, engage in a transaction or experience an activity that goes beyond the contract scope outlined above ("Special Situation") and provide a written request for services to support these activities, Consultant shall provide such services at its then prevailing hourly rates. These services may include communications counsel, media relations, internal communications, investor communications and/or other services Company may require in response to a Special Situation. A "Special Situation" shall be defined as one of the following events:

1.  An acquisition, divestiture, restructure, bankruptcy filing, activist shareholder, proxy contest, hostile takeover, go private transaction or unsolicited offer;
2.  Any event which Consultant and Company agree is a Special Situation event; or
3.  Any event defined as a crisis or extraordinary event in any policy of insurance maintained by Company for such purpose.

C.  Additional Services: Upon request, Consultant shall provide other financial communications services in addition to those set forth above at Consultant's then prevailing hourly rates.

IV.  COMPENSATION: In consideration for the Services, Company shall pay Consultant:

A.  A retainer of Fourteen Thousand Dollars ($14,000.00) to be held during the Term. Upon termination of this Agreement, the retainer shall be returned to Company after paying any outstanding amounts owing to Consultant.

B.  For the Investor Relations Services, Seven Thousand Dollars ($7,000.00) per month.

C.  The retainer and first month's fee shall be payable upon execution of this Agreement. Monthly fees thereafter shall be billed in advance on the first of each month. Monthly fees and any other fees due hereunder shall be payable within thirty (30) days of Company's receipt of the relevant invoice. Upon the Anniversary Date and annually thereafter, the monthly fee amount shall be increased by three percent (3%). Payments may be wired to Connecticut Community Bank N.A. Routing Number: 021113251 for the Account of ICR, LLC Account Number 1138817.

V.  EXPENSES: In addition to the compensation set forth in Article IV Company shall pay to the Consultant a monthly administrative fee for usual and regular expenses incurred in the performance of Consultant's duties including but not limited to the costs associated with administration, communication and financial market information (the "Administrative Expense"), which Administrative Expense shall be billed on a regular monthly basis as an invoice line-item in the amount of Three Hundred Dollars ($300.00). In addition to such Administrative Expense, Company shall reimburse Consultant for all itemized out-of-pocket expenses incurred by Consultant on behalf of Company including any overnight deliveries, newswire distribution services, teleconferencing services, web casting, travel and lodging (the "Itemized Expenses"). Any and all Itemized Expenses shall be supported by receipts or other written evidence of such expenditures maintained at Consultant's offices, unless otherwise requested by Company. All reimbursements shall be made by Company within thirty (30) days of receipt of the relevant invoice.

VI.  STANDARD TERMS AND CONDITIONS: This Agreement is subject to the Standard Terms and Conditions attached hereto as Exhibit A and incorporated herein by reference.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year set forth below.

ICR, LLC

By: _____ 8/5/14
John Sorensen           (Date)
Chief Operating Officer

Quiksilver, Inc.

By: _____ 8/4/14
Richard Silver          (Date)
Chief Financial Officer

## EXHIBIT A

## STANDARD TERMS & CONDITIONS

1.  INDEMNIFICATION:  Company hereby acknowledges that Consultant shall rely upon the accuracy of all information provided by Company. Company assumes full and complete responsibility and liability for the financial and other information furnished to Consultant for use on Company's behalf. Company shall at all times defend, indemnify and hold harmless Consultant and all its directors, officers, agents, employees, representatives and other affiliated entities ("Consultant Indemnified Parties") from and against any and all damage, loss, claim, expense, deficiency or cost incurred as a result of any claim, suit or proceeding brought against any of the Consultant Indemnified Parties, or in which any of the Consultant Indemnified Parties are asked to participate, arising out of or relating to any information, representations, reports or data provided by Company to any of the Consultant Indemnified Parties.

Consultant represents that it will treat Company's material nonpublic information as confidential, as more fully set forth in Section 4 hereto. Consultant shall at all times defend, indemnify and hold harmless Company and all its directors, officers, agents, employees, representatives and other affiliated entities ("Company Indemnified Parties") from and against any and all damage, loss, claim, expense, deficiency or cost incurred as the result of any claim, suit or proceeding brought against any of the Company Indemnified Parties, or in which any of the Company Indemnified Parties are asked to participate, as a result of Consultant's breach of its confidentiality obligations under this Agreement.

The provisions of this Section 1 shall survive the expiration or termination of this Agreement.

2.  GENERAL: Consultant's Services are not exclusive to Company and Consultant may perform the same or similar services for others, as well as engage in other business activities. This instrument sets forth the entire Agreement between the parties and no promise, representation or inducement, except as herein set forth, has been made by either party to this Agreement.  No provision or term of this Agreement may be amended, modified, changed, altered, or waived except by written document executed by the parties hereto.  In the event that any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable because it is invalid or in conflict with any law of any relevant jurisdiction, the validity of the remaining provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if the Agreement did not contain the particular provision(s) held to be unenforceable and the unenforceable provision(s) shall be replaced by mutually acceptable provision(s) which, being valid, legal and enforceable, come closest to the parties' intention underlying the invalid or unenforceable provision. This Agreement, and the obligations set forth herein, shall be binding on any and all successors and assigns of the parties, including, without limitation, any corporation or other entity with or into which Consultant or Company is merged or consolidated, or any entity which acquires all or substantially all of the assets of Consultant or Company.  This Agreement shall be interpreted and enforced in accordance with the laws of the state of Connecticut applicable to contracts made and to be performed entirely therein, without regard to the conflict of laws provisions thereof and each party agrees to be subject to the jurisdiction of the courts in the State of Connecticut if a suit is commenced in connection with this Agreement. This clause shall survive any termination of this Agreement. Any notice or communication required or permitted under this Agreement shall be in writing and shall be deemed received (i) on the date personally delivered, (ii) the next day after sending if sent by e-mail, facsimile, Federal Express or any other next-day carrier service, or (iii) the third day after mailing via first-class mail, return receipt requested, to a party at the address specified in Article I or such other address as the parties may designate from time to time.  Unless otherwise specified herein, notices shall be delivered to the names and addresses in Article I of this Agreement. Consultant has the right to place announcements, advertisements or tombstones on its websites, its written promotional material and in financial and other newspapers, journals and publications at its own expense, which may include Company's name, logo and trademarks.

3.  DEFAULT:  Should either party remain in default of any of its obligations herein following fifteen (15) days notice thereof, the non-defaulting party may terminate this Agreement and may also recover all sums due hereunder, together with interest at the rate of twelve (12%) percent per annum, reasonable attorney's fees and all costs associated with enforcement of this Agreement.  The rights hereunder shall be cumulative rather than

exclusive and election of any remedy shall not serve to limit a party from pursuing any other remedy provided for under this Agreement or the laws of any state having jurisdiction over same.

4.    CONFIDENTIALITY: Consultant hereby agrees to use all material non-public information provided to it by Company solely for the purpose of rendering services to Company pursuant to its engagement hereunder and to treat confidentially such information for so long as such information remains non-public.  Except as contemplated by this Agreement or as required by applicable law, Consultant will not disclose such confidential information to a third party (other than directors, officers, employees or outside advisors of Consultant) without the prior consent of Company. This restriction shall not apply to any Confidential Information: (a) that becomes known generally to the public; (b) for which disclosure is required by applicable law, legal process, or any order or mandate of a court or other governmental authority to be disclosed; or (c) that is reasonably believed by Consultant to be required to be disclosed in connection with a lawsuit or other legal or administrative action, _provided_, that in the case of clauses (b) or (c), Consultant shall, unless otherwise prohibited from doing so, give the Company reasonable advance written notice of the Confidential Information intended to be disclosed and the reasons and circumstances surrounding such disclosure, in order to permit the Company to seek a protective order or other appropriate request for confidential treatment of the applicable Confidential Information.

5.    NONSOLICITATION: In the course of receiving the Services, the parties shall each necessarily become aware of the identity and qualifications of certain of the other's talented employees who work directly with each other in fulfilling the objectives of this Agreement (each, a "Covered Employee").  Each party agrees for a period of 12 months following termination of this Agreement (the "Non-Solicitation Period") not to engage, employ or accept services from any Covered Employee or any company that has hired a Covered Employee (a "Solicitation"). Notwithstanding the foregoing, a Solicitation shall not include:

A.    Engaging a company for whom a Covered Employee works (a "Competing Company") and for whom such Covered Employee has worked exclusively in a full time capacity for more than nine months prior to the date of engagement, provided that such Covered Employee shall provide no direct or indirect services to such party during the Non-Solicitation Period;

B.    Engaging a Competing Company, provided that prior to such engagement the party entering into the Engagement shall have no knowledge that the Covered Employee was employed by the Competing Company, and provided that such Covered Employee shall provide no direct or indirect services to such party during the Non-Solicitation Period;

C.    Engaging a Competing Company for whom a Covered Employee does not work within the first nine months of such engagement, provided that such Covered Employee shall provide no direct or indirect services to such party during the Non-Solicitation Period.

## ADDENDUM TO CONSULTING AGREEMENT

This Addendum (the "Addendum"), effective as of May 1, 2015 (the "Effective Date"), shall supplement and modify that certain Consulting Agreement, commencing as of January 31, 2015 (the "Agreement") by and between **ICR, LLC** ("Consultant") and **Quiksilver, Inc.** ("Company"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

I.    **DUTIES OF CONSULTANT.** Section III.A of the Agreement shall be deleted and replaced in its entirety with the following:

    A.  Increased Investor relations consulting services ("Investor Relations Services"), which shall include:

        1.  Develop messaging based on financial and strategic goals as well as liquidity and capital needs

        2.  Counsel on communication based on the pace of progress toward longer-term strategic plans, annual earnings guidance and three-year outlook discussions, in addition to factors such as other corporate strategies that may drive or change perceptions.

        3.  Draft and/or review all financial press releases and conference call scripts

        4.  Manage process for incoming calls - filter investor calls and information requests

        5.  Manage IR marketing calendar with a mix of NDR's, in-house meetings and conference

        6.  Shareholder and Valuation Analysis [down the road] - assess top 10 shareholders, compare shareholder ownership to peer group, create target list of new investors – focus on long term GARP or Value investors, compare valuation against peer group and companies at a similar phase of growth

        7.  Solicit sell-side coverage as appropriate

        8.  Organize investor day and other meetings

        9.  Monitor first call research and estimates

    B.  Additional Comprehensive Earnings Prep ("Additional Earnings Preparation") from Consultant's Corporate Communications and Crisis Group (Anton Nicholas and team) including, on-site (CA and France*) prep and presentation / Q&A training, and related media and internal communications. Activities will include:

        1.  Onsite prep and presentation / Q&A training in California (including J. Teklits, J. Fontana and Anton Nicholas)

        2.  Onsite support in Saint-Jean-de-Luz* for the conference call, analyst call backs, media calls, and internal / vendor communication including (J. Teklits and Anton Nicholas)

        3.  Message refinement based on a highlighted focus on execution and any changes to the strategy the new team is making, coupled with the new F15 guidance and realistic goals for the next few years

        4.  Handle all internal coms (i.e. letter to employees, vendors etc.)

        5.  Handle all press regarding incoming calls and develop outgoing strategy

----

\*  Company agrees that business class travel for transatlantic flights is acceptable and will be reimbursed in accordance with Section V of the Agreement.

II.    **COMPENSATION.**    Section IV. B. of the Agreement shall be deleted and replaced in its entirety and Section D shall be added as follows:

    A.    Investor Relations Services, Twelve Thousand Dollars ($12,000.00) per month.

    B.    For Additional Earnings Preparation, a one-time project fee of Fifteen Thousand Dollars ($15,000.00), payable upon execution.

III.    **GENERAL.**    To the extent that the terms of this Addendum modify or conflict with any provisions of the Agreement, the terms of this Addendum shall control.  All other terms of the Agreement shall remain the same and in full force and effect.

    **IN WITNESS WHEREOF,** the parties have executed this Addendum as of the day and year set forth below.

**ICR, LLC**                                                    **Quiksilver, Inc.**

By: _____ 5/14/15                   By: _____
   John Sorensen                (Date)                          Thomas Chambolle              (Date)
   Chief Operating Officer                               Chief Financial Officer

## ADDENDUM TO CONSULTING AGREEMENT

This Addendum (the "Addendum"), effective as of June 24, 2015 (the "Effective Date"), shall supplement and modify that certain Consulting Agreement, commencing as of January 31, 2015 (as previously amended, the "Agreement") by and between **ICR, LLC** ("Consultant") and **Quiksilver, Inc.** ("Company"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

I.   **DUTIES OF CONSULTANT.**   In addition to the Services set forth in Section III of the Agreement, Consultant shall provide the following Public Relations Services ("Public Relations Services"), which shall be included within the term Services under the Agreement.

    A.    Strategic Counsel on All Corporate Public Relations Initiatives
1. Provide communications and market perspective regarding Company initiatives
2. Support management in execution/management of public relations activities around all issues
3. Provide counsel on the content, timing and distribution of all announcements
4. Provide counsel and support around quarterly earnings

    B.    Crisis and Issues Management
1. 24/7 support on managing evolving issues
2. Advise on appropriate proactive and reactive strategies to deflect, manage and control issues
3. Manage press on background with no finger prints to minimize coverage and ensure stories that do run are factually accurate and reflect balance
4. Serve as public spokesperson on Company's behalf as appropriate

    C.    Reactive Media Relations
1. Serve as point person for the financial and business media
2. Manage and respond to all incoming requests from journalists
3. Log calls and manage reporter inquiry database

    D.    Targeted Proactive Media Relations
1. Position and draft all press releases relating to corporate announcements (financial and non-financial)
2. Leverage opportunities to highlight new team and new plan (as appropriate go on the offensive)
3. Interview Preparation & Management
4. Develop key messaging and Q&A for each interview

    E.    Media Monitoring and Intelligence
1. Monitor and talk to media to gain perceptional insight and market intelligence
2. Provide media summaries of industry and peer-related coverage as necessary
3. Utilize press relationships to garner feedback and market sentiment

II. **COMPENSATION.** In addition to the Compensation set forth in Section IV of the Agreement, in consideration of the Public Relations Services, Company shall pay Consultant Seven Thousand Five Hundred Dollars ($7,500.00) per month, which represents up to Thirty (30) hours of Consultant's time per month. In the event that hourly billings for the Public Relations Services exceed such Thirty (30) hours, Consultant reserves the right to propose adjustments in the monthly fee or other possible alternatives to address the overages.

III. **GENERAL.** To the extent that the terms of this Addendum modify or conflict with any provisions of the Agreement, the terms of this Addendum shall control. All other terms of the Agreement shall remain the same and in full force and effect.

**IN WITNESS WHEREOF,** the parties have executed this Addendum as of the day and year set forth below.

ICR, LLC                                           Quiksilver, Inc.

By: _____ 7/6/15            By: _____
    John Sorensen        (Date)              Thomas Chambolle        (Date)
    Chief Operating Officer                  Chief Financial Officer

## ADDENDUM TO CONSULTING AGREEMENT

This Addendum (the "Addendum"), effective as of August 24, 2015 (the "Effective Date"), shall supplement and modify that certain Consulting Agreement, commencing as of January 31, 2015 (as previously amended, the "Agreement") by and between **ICR, LLC** ("Consultant") and **Quiksilver, Inc.** ("Company"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

I.   **DUTIES OF CONSULTANT.**  In addition to the Services set forth in Section III of the Agreement, Consultant shall provide communication services during Chapter 11 Bankruptcy Filing ("Public Relations Services"), which shall be included within the term Services under the Agreement.

II.  **COMPENSATION.**   In addition to the Compensation set forth in Section IV of the Agreement, in consideration of the Public Relations Services, Company shall pay Consultant a retainer in the amount of Ninety Thousand Dollars ($90,000.00) upon execution of this Addendum.

III. **COVENANTS OF COMPANY.**  Company agrees that Consultant is performing the Services per this Addendum as the Company prepares for a Chapter 11 Bankruptcy filing, and, in consideration of Consultant's assistance, Company further agrees to use its best efforts to:

> Make a motion to assume Consultant's pre-petition Agreement promptly after filing Company's Chapter 11 bankruptcy petition (or obtain such other comparable treatment mutually agreeable to the Company and the Consultant). Consultant agrees to provide any materials, information, or other assistance necessary to obtain such treatment from the bankruptcy court, upon request from the Company.

IV.  **GENERAL.**  To the extent that the terms of this Addendum modify or conflict with any provisions of the Agreement, the terms of this Addendum shall control. All other terms of the Agreement shall remain the same and in full force and effect.

**IN WITNESS WHEREOF,** the parties have executed this Addendum as of the day and year set forth below.

ICR, LLC                                              Quiksilver, Inc.

By: _____  5/26/15        By: _____  28 Aug 2015
John Sorenson            (Date)              Linnsey Caya           (Date)
Chief Operating Officer                      EVP, General Counsel & Secretary