# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

QUIKSILVER, INC., *et al.*,

                           Debtors.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Chapter 11

Case No. 15-11880 (BLS)

Jointly Administered

Hrg. Date: Nov. 17, 2015 at 10:00 a.m. (Eastern)
Obj. Due: Nov. 10, 2015 at 4:00 p.m. (Eastern)

## DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 6004 (I) AUTHORIZING AND APPROVING THE SALE OF CERTAIN *DE MINIMIS* ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) APPROVING THE PURCHASE AGREEMENT; AND (III) GRANTING OTHER RELATED RELIEF

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Quiksilver" or the "Company") hereby move (the "Motion") this Court for entry of an order, pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the sale (the "Sale") of certain *de minimis* assets solely related to the *Ampla* brand (the "Ampla Assets")[2] on an "as-is, where-is" basis, free and clear of any and all mortgages, pledges, liens, charges, security interests, claims, or other encumbrances or interests to ColEx Inc.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2] As used herein, the Ampla Assets consist of the Purchased Assets enumerated in Section 1.01 of the Purchase Agreement (as defined herein) and sections 1.01(a), 1.01(b), and 1.01(d) of the Disclosure Schedule (as defined in the Purchase Agreement).

(the "Buyer"), pursuant to the terms and conditions of that certain Asset Purchase Agreement, dated as of October 26, 2015 (the "Purchase Agreement") by and between ZQK (the "Seller") and the Buyer, a true and correct copy of which is attached as hereto as Exhibit A, (ii) authorizing and approving the terms of the Purchase Agreement, and (iii) granting certain related relief.  In further support of the Motion, the Debtors rely on the *Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, in Support of the Debtors' Motion for Order Under Bankruptcy Code Sections 105 and 363 and Bankruptcy Rule 6004 (I) Authorizing and Approving the Sale of Certain De Minimis Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Purchase Agreement; and (III) Granting Other Related Relief* (the "Bruenjes Ampla Sale Declaration"), filed concurrently herewith. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code.  The relief is further warranted under Bankruptcy Rule 6004.

3.     Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

**BACKGROUND**

4.     On September 9, 2015 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  These Chapter 11 Cases are jointly administered.

5.     The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     On September 22, 2015, the Office of the United States Trustee for the District of Delaware (the "United States Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On September 28, 2015, the United States Trustee filed an Amended Notice of Appointment of Creditors' Committee.  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

7.     Quiksilver is one of the world's leading outdoor sports lifestyle companies.  The Company designs, develops and distributes branded apparel, footwear, accessories and related products.  The Company began operations in 1976 making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, BMX, and motocross, among other activities. The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites.  The Debtors comprise each of the

Company's U.S. entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc. and seven inactive entities.

8.  Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the *Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 20].

## RELIEF REQUESTED

9.  By this Motion, the Debtors seek entry of an order under Bankruptcy Code sections 105(a) and 363 (i) authorizing the Sale of the Ampla Assets on an "as-is, where-is" basis, free and clear of any and all mortgages, pledges, liens, charges, security interests, claims or other encumbrances or interests to the Buyer, pursuant to the terms and conditions of the Purchase Agreement , (ii) authorizing and approving the terms of the Purchase Agreement, and (iii) granting certain related relief.

## BASIS FOR RELIEF

10. On or around early 2013, certain employees and consultants of the Company, including Rob Colby, then the President of the Americas, began development of a product and a brand – *Ampla* – outside of the Company's core business. Specifically, the team worked to develop a specialized running shoe with a carbon fiber plate in the sole that was designed to maximize the efficient use of force while running. The Company filed several trademark applications related to the *Ampla* name and associated logo and obtained the rights to certain patents associated with the carbon fiber plate technology. Approximately 2,000 *Ampla* shoes were manufactured by one of the Company's contract manufacturers and delivered to the

4

Company. The Company ultimately determined to cease further development of the *Ampla* brand and to not sell the *Ampla* products, in part because of the tangential relationship to the Company's core business.

    11. In or around spring 2015, Colby, who left Quiksilver in or around February 2015, and Charles Exon, former Chief Legal Officer at Quiksilver, who left the Company in or around October 2014, contacted the Company about purchasing certain assets related to the *Ampla* brand.[3] On July 22, 2015, Colby, now Chief Executive Officer of the Buyer, a Delaware corporation formed by Colby and Exon, executed a letter of intent regarding the purchase of such assets .

    12. In or around August 2015, the Company was contacted by Rhone Athletic Apparel, a men's activewear company, and separately, by Breakaway, a brand capital firm, each of whom expressed interest in looking into the purchase of certain assets related to the *Ampla* brand. The Company contacted both potential purchasers, but after the Company had initial conversations and supplied each with information regarding the *Ampla* product, neither potential purchaser followed up with the Company on, or expressed further interest to the Company in, a potential transaction.

---

[3] Exon retired from the Company in or around October 2014, and on or around October 31, 2014, entered into a Retirement and Transition Agreement with the Company (the "Exon Separation Agreement"). Colby resigned from the Company in or around February 2015, and on or around February 6, 2015, entered into a Separation Agreement with the Company (the "Colby Separation Agreement," and together with the Exon Separation Agreement, the "Separation Agreements"). Pursuant to the *Debtors' First Omnibus Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and 365(a) and Bankruptcy Rules 6006 and 9014 Authorizing Rejection of Certain Executory Contracts* [Docket No. 27] (the "Rejection Motion"), the Debtors are seeking to reject, among other things, the Separation Agreements, effective as of the Petition Date.

13. Following the Petition Date, in or around early October 2015, the Buyer sent the Company a revised letter of intent. The Buyer and the Company then began to negotiate the terms of the potential sale.

14. On October 26, 2015, the Buyer and the Seller entered into the Purchase Agreement. Pursuant to the terms and conditions of the Purchase Agreement, and subject to this Court's approval, the Debtors seek to sell to the Buyer the Ampla Assets on an "as-is, where-is" basis, free and clear of all liens, claims, encumbrances, and other interests. Pursuant to Local Rule 6004-1(b)(iv), the following is a summary[4] of the terms and conditions of the Purchase Agreement:[5]

    A.     <u>Property to be Conveyed</u>: Seller will sell and Buyer will purchase certain assets related to the *Ampla* brand set forth in Section 1.01 of the Purchase Agreement, including Purchased IP, internet domain names, the Plate Invention Assignment Agreement[6] with AtakBrand LLC and Athleticism, Inc., Purchased Inventory, designs, patterns, and molds owned by and in the possession of the Seller or one of its affiliates solely related to the *Ampla* product, and any marketing materials relating solely to *Ampla*, including marketing collateral. Purchase Agreement at Section 1.01. The Seller is not selling and the Buyer is not buying any other assets of the Company. Purchase Agreement at Section 1.02.

    B.     <u>Purchase Price</u>: The aggregate purchase price (the "<u>Purchase Price</u>") for the Ampla Assets will be Two Hundred Thousand Dollars ($200,000.00), payable in cash at the Closing, plus the assumption of the Assumed Liabilities. Purchase Agreement at Section 1.04.

---

[4] To the extent any summary of the Purchase Agreement included in this Motion differs in any way from the terms and conditions of the Purchase Agreement, the actual terms of the Purchase Agreement shall control. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

[5] Pursuant to Local Rule 6004-1(b)(iv), a Sale Motion (as defined in the Local Rules) must highlight certain provisions. Accordingly, the relevant provisions implicating Local Rule 6001-1(b)(iv) are included in this summary.

[6] The Debtors believe that the Plate Invention Assignment Agreement is not an executory contract subject to section 365 of the Bankruptcy Code.

C. <u>Assumption of Liabilities</u>: Buyer has assumed and agreed to pay, perform and discharge all liabilities of the Seller or its applicable affiliate arising in connection with the *Ampla* brand after the Closing Date.[7] The Buyer will indemnify each of ZQK and its affiliates against, and shall hold ZQK and its affiliates harmless from and against, any and all losses, damages, liabilities, costs, or expenses, including reasonable attorney's fees, incurred or sustained by, or imposed upon, ZQK or one of its affiliates based on the Assumed Liabilities. Purchase Agreement at Section 1.03.

D. <u>Closing and Other Deadlines</u>: The Sale is conditional on the entry of an order approving the Purchase Agreement and the transaction contemplated therein (the "<u>Approval Order</u>") by November 30, 2015. If the Bankruptcy Court has not entered the Approval Order by November 30, 2015, the Purchase Agreement will immediately terminate. Purchase Agreement at Section 1.07. The closing of the transaction contemplated by the Purchase Agreement (the "<u>Closing</u>") is to take place within three (3) business days of the later of (a) the expiration of the deadline to file a timely appeal with respect to the Approval Order with no such appeal timely filed or (b) the date that any timely filed appeal is finally resolved, so long as the Approval Order is not rescinded. If the Closing has not occurred on or before December 17, 2015, the Purchase Agreement will immediately terminate and be of no further force and effect. Purchase Agreement at Section 1.08.

E. <u>Deposit</u>: Upon execution of the Agreement, the Buyer paid to the Seller a deposit of Twenty Thousand Dollars ($20,000.00), to be credited against the Purchase Price at Closing. Purchase Agreement at Section 1.04. In the event the Agreement automatically terminates by its terms, the Seller will immediately return the Deposit to the Buyer. Purchase Agreement at Section 1.10.

F. <u>"As Is, Where-Is" Transaction</u>: Except for the representations and warranties contained in Article 2 of the Purchase Agreement, neither Seller nor any of its affiliates has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding Seller or the *Ampla* brand furnished or made available to Buyer and its representatives or as to the future revenue, profitability or success of the *Ampla* brand, or any representation or warranty arising from statute or otherwise in law. Seller expressly disclaims all other warranties, including with respect to

---

[7] The Buyer has assumed all of the Seller's unpaid payment obligations under the Plate Invention Assignment Agreement, including payment obligations that became due prior to the Closing Date.

merchantability, fitness for a particular purpose or non-infringement. The Buyer acknowledges and agrees that it is taking the Ampla Assets on an "as-is, where-is" basis, with all faults.

G. <u>Private Sale</u>: The Purchase Agreement assumes no auction or additional solicitation of competitive bidding.

15. For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders and other parties in interest, and therefore, should be granted.

## APPLICABLE AUTHORITY

**A. The Proposed Sale of the Ampla Assets is a Product of the Debtors' Reasonable Business Judgment**

16. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In addition, section 105(a) of the Bankruptcy Code provides, in relevant part, that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the this title." 11 U.S.C. § 105(a).

17. A proposed sale of assets of a debtor under section 363 of the bankruptcy Code outside the ordinary course of business is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the debtor. See <u>In re Abbots Dairies of Pa., Inc.</u>, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting a "sound business purpose" test and a good faith test); <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test).

18. Generally, courts have applied four factors in connection with the "sound business purpose" test: (1) whether a sound business reason exists for the proposed transaction; (2) whether fair and reasonable notice has been provided to interested persons; (3) whether the

debtor has obtained a fair and reasonable price; and (4) whether the transaction has been proposed and negotiated in good faith. Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); Delaware & Hudson Ry., 124 B.R. at 176. The proposed Sale satisfies all four conditions, and therefore should be approved by this Court.

19. Sound business purposes justify the Sale. The Ampla Assets are outside of the core business of the Debtors, and accordingly, the Debtors do not plan on further developing the *Ampla* brand. The Debtors' efforts are currently focused on improving on their core business lines. As such, the Ampla Assets are not providing any benefit to the Debtors, and monetizing such assets through the Sale will maximize their value for the Debtors' estates and creditors. In addition, given the specialized nature of the product, there is a shortage of potential purchasers. Only two other potential purchasers have contacted the Company, and neither expressed any interest beyond an initial conversation and exchange of information. Here, however, the Buyer has expressed a willingness to purchase the assets on an "as-is, where-is" basis, and the Debtors believe that the Buyer is able to close the proposed Sale expeditiously. If the Sale to the Buyer is not closed pursuant to the terms of the Purchase Agreement, it is unlikely that the Company will be able to locate another buyer who is willing to close on the Ampla Assets without significant costs and expenses to the Debtors' estates. As a result, the Debtors believe that the Sale represents the highest and best offer for the Ampla Assets and that consummating the sale is in the best interests of the Debtors and their constituents.

20. Second, fair and reasonable notice is being provided. Proper notice of this Motion is being provided consistent with Bankruptcy Rule 2002(a)(2).

21. Third, the Debtors believe that the Purchase Price represents a fair and reasonable price for the Ampla Assets, particularly in light of the specialized nature of the *Ampla* product. In light of the limited market for the Ampla Assets, the costs and risks associated with launching an unknown footwear brand that incorporates a novel technology into a specialty market, and the willingness of the Buyer to close the Sale and assume all liabilities associated with the *Ampla* brand, the Company believes that the Purchase Price is fair and reasonable under the circumstances.

22. Lastly, the transaction has been proposed and negotiated in good faith. The terms of the Purchase Agreement, including the Purchase Price, are the product of good faith and arms'-length negotiations between the Seller and the Buyer.

**B.    The Sale of the Ampla Assets Without an Auction is Justified**

23. Under Bankruptcy Rule 6004, a debtor may sell assets outside of the ordinary course of business by private sale or public auction. Fed. R. Bankr. P. 6004.

24. The Debtors believe that the sale of the Ampla Assets without an auction is the best way to maximize value for the Debtors' estates. There have been very few indications of interest in the Ampla Assets, likely due at least in part to the specialized nature of the shoes and the costs and risks associated with launching an unknown footwear brand that incorporates a novel technology. As discussed above, in or around August 2015, the Company contacted potential purchasers. However, the Buyer is the only purchaser that has demonstrated an ability and a willingness to negotiate the terms of and close the Sale. The Debtors have concluded that it is unlikely that the Debtors would realize a higher purchase price that would warrant the cost and delays associated with a formal auction process.

25. Relief similar to that requested herein has been granted under section 363 of the Bankruptcy Code in cases in this district. In re Nortel Network Inc., et al., Case No. 09-

10138 (KG) (Bankr. D. Del. Apr. 26, 2011) (authorizing the private sale of certain internet number assets free and clear of interests); In re Building Materials Holding Corp., et al., Case No. 09-12074 (Bankr. D. Del. Dec. 30, 2009) (authorizing the private sale of certain real property free and clear of interests on shortened notice); In re Syntax-Brillian Corporation, et al., Case No. 08-11407 (BLS) (Bankr. D. Del. Dec. 8, 2008) (authorizing the private sale of a plastic injection mold tooling set free and clear of interests).

**C.    The Proposed Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of Claims**

26. Under Bankruptcy Code section 363(f), a debtor may sell property free and clear of any interest in such property of an entity other than the estate only if, among other things:

(a)    Applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(b)    Such entity consents;

(c)    Such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)    Such interest is in *bona fide* dispute; or

(e)    Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Since section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Ampla Assets free and clear of liens and interests. See Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132 (6th Cir. 1991); In re Elliot, 94 B.R. 343 (E.D. Pa. 1988).

27. The Debtors seek authority to transfer the Seller's right, interest, and title in the Ampla Assets free and clear of all interests. Any alleged lienholders in the Ampla Assets

could be compelled under section 365(f)(5) to accept a money satisfaction of their interests in an appropriate proceeding. In addition, any other lien and interest holders, to the extent known by the Debtors, which might claim an interest in the Ampla Assets will be adequately protected because their liens and/or interests will attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto. Accordingly, the Debtors submit that the proposed Sale should be approved free and clear of all liens and other interests pursuant to section 363(f).

### D. The Buyer is Entitled to the Protections of Section 363(m)

28. The Debtors request that the Court apply the protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale. Section 363(m) of the Bankruptcy Code provides, in relevant part, as follows:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. 363(m).

29. While the Bankruptcy Code does not define "good faith purchaser," the Third Circuit has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." In re Abbotts Diaries, 788 F.2d at 147. Courts have held that in order to demonstrate a lack of good faith, a party would have to show "fraud or collusion between the purchaser and [seller] or an attempt to take grossly unfairly advantage [of other potential purchasers]." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)); In re Colony Hill Assocs., 111 F.3d 269, 276 (2d Cir. 1997).

30.     Both the Seller and the Buyer have acted in good faith in negotiating the sale of the Ampla Assets. There is no evidence of fraud or collusion in the relevant facts or in the terms of the Purchase Agreement. The Debtors and the Buyer have not acted in a collusive manner with any person, and the Purchase Price was not controlled by any agreement among bidders. All negotiations have been conducted on an arms' length basis. The Buyer and the Seller have each been represented by separate, independent counsel.

31.     Furthermore, the Buyer is not an insider of the Debtors as the term is defined in section 101(31) of the Bankruptcy Code.  Where a debtor is a corporation, the Bankruptcy Code defines an "insider" to include a director, officer, person in control of the debtor, a partnership in which the debtor is a general partner, a general partner of the debtor, or a relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B). In addition, section 101(31) defines insiders to include affiliates of the debtor, or an insider of such affiliate as if the affiliate were the debtor, and a managing agent of the debtor. 11 U.S.C. § 101(31)(E), (F). The Buyer is ColEx Inc., which does not fall under any of the enumerated categories of insiders contained in section 101(31). In addition, the founders of ColEx Inc. – Colby and Exon – are not insiders themselves. Each left the Company prior to the Petition Date – in or around February 2015 and October 2014, respectively – and neither falls into any of the enumerated categories of insiders listed in section 101(31) of the Bankruptcy Code.[8]

---

[8] In addition, as detailed above, Colby and Exon each have a Separation Agreement with the Company. Such contractual relationships do not give rise to an insider relationship between the Seller and the Buyer. Moreover, the Debtors have sought court authority to reject Colby and Exon's Separation Agreements pursuant to the *Debtors' First Omnibus Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and 365(a) and Bankruptcy Rules 6006 and 9014 Authorizing Rejection of Certain Executory Contracts* [Docket No. 27].

32. Accordingly, the Debtors request that the Court make a finding that the Buyer will be purchasing the Ampla Assets in good faith within the meaning of Bankruptcy Code section 363(m) and, thus, is entitled to the protections of Bankruptcy Code section 363(m).

**NOTICE**

33. Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' postpetition secured loan facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan facility; (d) counsel to the indenture trustee for the Debtors' prepetition senior secured notes; (e) counsel to the indenture trustee for the Debtors' prepetition senior unsecured notes; (f) counsel to the Creditors' Committee; and (g) all parties entitled to notice pursuant to Bankruptcy Rule 2002. In addition, notice of this Motion will be given to K-Swiss Inc.,[9] AtakBrand LLC, and Athleticism, Inc. Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**NO PRIOR REQUEST**

34. No previous request for the relief sought herein has been made to this Court or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[9] On March 6, 2015, the seller received a letter from the intellectual property attorney for K-Swiss Inc. relating to the ownership of the Purchased IP.

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the relief set forth herein and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
October 27, 2015

    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/  *Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Li
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

Dain A. De Souza (I.D. No. 5737)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

John K. Lyons
Jessica Kumar
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*