## Exhibit A
## Purchase Agreement

EXECUTION COPY

# ASSET PURCHASE AGREEMENT

**COLEX INC.**

and

**QUIKSILVER, INC.**

Dated as of;

October 26, 2015

2582860.1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this **"Agreement"**), dated as of October 26, 2015 is entered into between Quiksilver, Inc., a Delaware corporation (**"Seller"**), and ColEx Inc., a Delaware corporation (**"Buyer"**) (individually, a **"Party"** and together, the **"Parties"**).

## RECITALS

WHEREAS, on September 9, 2015, Seller and certain of its affiliates commenced voluntary proceedings for relief under chapter 11 (the **"Chapter 11 Proceedings"**) of the United States Bankruptcy Code (the **"Code"**) in the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**);

WHEREAS, Buyer hereby proposes to enter into a transaction with Seller under Section 363 of the Code (**"Section 363 Transaction"**) whereby Buyer will acquire certain assets solely related to the *Ampla* brand (**"Ampla"**);

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## Purchase and Sale

**Section 1.01   Purchase and Sale of Assets.**  Subject to the terms and conditions set forth herein, Seller shall (or shall cause its applicable affiliate to) sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller or its applicable affiliate, all of Seller's or its applicable affiliate's right, title and interest in the following (collectively, the "**Purchased Assets**"):

(a) the trademarks and patents set forth in Section 1.01(a) of the disclosure schedule attached hereto (the "**Disclosure Schedule**"), including all registrations (if any), all applications (if any), all renewals (if any), all goodwill associated with such trademarks and patents, and all claims for past, present or future infringement or breach of such trademarks and patents, including, but not limited to, such rights and claims as they relate to the approximately 10,000 pairs of Ampla branded shoes (the "**Additional Inventory**"), both finished and in-process, and the related designs, patterns and molds currently believed to be in the possession of a third party manufacturer (collectively, the "**Purchased IP**");

(b) The internet domain names listed in Section 1.01(b) of the Disclosure Schedule;

(c)     That certain Assignment Agreement, by and between AtakBrand LLC, Athleticism, Inc. and Buyer, dated December 20, 2013 (the "**Plate Invention Assignment Agreement**");

(d)     The inventory and work-in-process of Ampla product set forth on Section 1.01(d) of the Disclosure Schedule (the "**Purchased Inventory**");

(e)     The designs, patterns and molds owned by and in the possession of Seller or one of its affiliates and solely related to Ampla products; and

(f)     Any marketing materials relating solely to Ampla, including without limitations, tradeshow marketing collateral.

**Section 1.02   Excluded Assets.**  Notwithstanding anything to the contrary herein, Seller is not selling and Buyer is not purchasing, and Seller shall not assign, transfer, convey and deliver to Buyer and Buyer shall not acquire or have any rights to acquire, any assets, properties or rights of the Seller or its affiliates that are not Purchased Assets (the **"Excluded Assets"**).

**Section 1.03   Rights to Pursue Additional Inventory.**  Seller acknowledges that Buyer may negotiate the purchase of, or enforce intellectual property claims with respect to, the Additional Inventory.  Buyer agrees that Seller shall have no liability to Buyer arising from or related to the Additional Inventory, and Buyer assumes all risk and liability associated with the Additional Inventory in the event that Buyer completes a separate transaction with Seller's manufacturer related to the purchase and sale of the Additional Inventory.

**Section 1.04   Assumption of Liabilities.**  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge all liabilities of Seller or its applicable affiliate arising from or related to ownership or use of the Purchased Assets or the operation of the Ampla brand after the Closing Date, including: (i) all of Seller's obligations arising under or related to the Plate Invention Assignment Agreement (provided, that Buyer shall assume all of Seller's unpaid payment obligations under the Plate Invention Assignment Agreement, including payment obligations that became due prior to the Closing Date); (ii) any liabilities arising in connection with the marketing, transportation, distribution and sale of the Purchased Inventory or the Additional Inventory, including any products liability or warranty related claims; and (iii) any trade payables or other liabilities (including with respect to taxes)  (collectively, the **"Assumed Liabilities"**).  Buyer shall indemnify each of Quiksilver and its affiliates against, and shall hold Quiksilver and its affiliates harmless from and against, any and all losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees, incurred or sustained by, or imposed upon, Quiksilver or one of its affiliates based upon, arising out of, with respect to or by reason of the Assumed Liabilities.

**Section 1.05   Purchase Price.**  The aggregate purchase price (the **"Purchase Price"**) for the Purchased Assets shall be Two Hundred Thousand Dollars ($200,000.00) in cash at the Closing (as defined below), plus the assumption of the Assumed Liabilities. The Buyer shall pay the Purchase Price to Seller at the Closing in cash by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Section 1.05 of the Disclosure Schedule.  Concurrently with the execution of this Agreement, Buyer shall pay to Seller in cash by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Section 1.05 of the Disclosure Schedule, a deposit of Twenty Thousand Dollars ($20,000.00) (the **"Deposit"**), which shall be credited against the Purchase Price at Closing.

**Section 1.06   Transfer Taxes and Closing Costs**.  Buyer shall be responsible for any transfer taxes or other taxes imposed by reason of the transfer of the Purchased Assets provided hereunder and any deficiency, interest or penalty asserted with respect thereto.  Buyer shall be responsible for and shall promptly pay any and all recording costs, filings fees and related expenses associated with the assignment and transfer of the Purchased Assets to Buyer and the registration and/or recordation of such assignment and transfer with any and all applicable federal, state or local governmental agency, body, or entity, as well as all costs associated with the transfer of the Purchased Inventory or any other physical assets from Seller's facilities to Buyer's facilities

**Section 1.07   Allocation of Purchase Price.**  Prior to Closing, Seller and Buyer agree to allocate the Purchase Price among the Purchased Assets for all purposes (including tax and financial accounting).  Buyer and Seller shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation and shall take no position with any taxing authority contrary to such allocation.

**Section 1.08   Bankruptcy Court Approval**.  Upon execution of this Agreement, Seller shall prepare and file a motion to obtain an order approving this Agreement and the transaction contemplated herein (the **"Approval Order"**) and give proper notice of such motion.  The Approval Order shall provide for: (1) approval of this Agreement, (2) authorization to the Seller to execute this Agreement and consummate  its terms, (3) authorization to the Seller or its applicable affiliates to execute such additional documents and take such actions as may be reasonably necessary to consummate this Agreement; and (4) approval of the purchase and sale of the Purchased Assets to Buyer free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance pursuant to Code section 363(b) and (f).  The Approval Order shall also contain findings and conclusions that the Buyer is a good-faith purchaser pursuant to Code section 363(m).  In the event that the Bankruptcy Court has not entered the Approval Order by November 30, 2015, this Agreement shall immediately terminate and be of no further force and effect.

**Section 1.09   Closing.**  Time is of the essence.  Consequently, Buyer is prepared to proceed with an "as-is," "where-is" acquisition of the Purchased Assets with no due diligence process or any other conditions to Closing, except for the terms and conditions set forth in this Agreement.  The closing of the transactions contemplated by this Agreement (the **"Closing"**) shall take place within three (3) business days of the later of (a) the expiration of the deadline to file a timely appeal with respect to the Approval Order with no such appeal timely filed or (b) the date that any timely filed appeal is finally resolved, so long as the Approval Order is not rescinded (the **"Closing Date"**).  The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.  In no event shall the Closing occur later than December 17, 2015.  In the event the Closing has not occurred on or before December 17, 2015, this Agreement shall immediately terminate and be of no further force and effect.

**Section 1.10   Closing Deliverables.**

(a)   At the Closing, Seller shall deliver to Buyer the following:

(i)   a bill of sale in the form of **Exhibit A** attached hereto (the **"Bill of Sale"**) and duly executed by Seller, transferring the Purchased Assets to Buyer;

(ii)   an assignment and assumption agreement in the form of **Exhibit B** hereto (the **"Assignment and Assumption Agreement"**) and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities; and

(iii)   assignments in form and substance satisfactory to Seller and Buyer (the **"Intellectual Property Assignments"**) and duly executed by Seller, transferring all of Seller's or its applicable affiliate's right, title and interest in and to the Purchased IP; provided, that Buyer may produce and Seller may execute and deliver individual specific assignments of Purchased IP within a reasonable time following Closing;

(iv)   an Agreement for the Transfer of Domain Names in the form of **Exhibit C** (the "**Domain Name Transfer Agreement**"), executed by Seller or the applicable affiliate of Seller.

(b)   At the Closing, Buyer shall deliver to Seller the following:

(i)   the Purchase Price, less the Deposit;

(ii)   the Assignment and Assumption Agreement duly executed by Buyer;

(iii)   the Intellectual Property Assignments duly executed by Buyer; provided, that Buyer may produce and execute and deliver individual specific assignments of Purchased IP within a reasonable time following Closing;

(iv)   The Domain Name Transfer Agreement, duly executed by Buyer.

**Section 1.11   Termination.**  In the event this Agreement automatically terminates by its terms pursuant to Section 1.08 or Section 1.09, the Parties shall have no further obligation or liability hereunder and Seller shall immediately return the Deposit to Buyer.

## ARTICLE II
## Representations And Warranties Of Seller

**Section 2.01   Accuracy of Representations Through Closing.**  Seller represents and warrants to Buyer that nothing has come to the attention of a vice president, a director, or an executive officer of Seller that would cause such individual to believe that the representations in this Article II contain any untrue statement of a material fact or omit any material fact necessary to make them not misleading.

**Section 2.02   Organization and Authority of Seller.**  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Subject to the Approval Order, Seller has full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement and the documents to be delivered hereunder have been duly authorized, executed and delivered by Buyer, and, subject to the Approval Order, constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 2.03   No Other Representations and Warranties.**  Except for the representations and warranties contained in this **Article 2,** neither Seller nor any of its affiliates has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding Seller or the Ampla brand furnished or made available to Buyer and its representatives or as to the future revenue, profitability or success of the Ampla brand, or any representation or warranty arising from statute or otherwise in law. Seller hereby expressly disclaims all other warranties, including with respect to merchantability, fitness for a particular purpose or non-infringement.  Buyer acknowledges and agrees that Buyer takes the Purchased Assets "as is" "where is" with all faults.

**Section 2.04   Adverse Claims.**  Since November 1, 2014, other than the correspondence from the intellectual property attorney for K-Swiss Inc.,  dated March 6, 2015, a copy of which has been delivered to Buyer, Seller has not received any written claim or other correspondence relating to the validity of the Purchased IP.

ARTICLE III
Representations And Warranties Of Buyer

**Section 3.01    Accuracy of Representations Through Closing.**  Buyer represents and warrants to Seller that nothing has come to Buyer's attention that would cause Buyer to believe that the representations in this Article III contain any untrue statement of a material fact or omit any material fact necessary to make them not misleading.

**Section 3.02    Organization and Authority of Buyer**.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer has full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement and the documents to be delivered hereunder have been duly authorized, executed and delivered by Buyer, and constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 3.03    No Conflicts; Consents.**  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer. No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**Section 3.04    Legal Proceedings.**  There is no Action of any nature pending or, to Buyer's knowledge, threatened against or by Buyer that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 3.05    Sufficiency of Funds**.  Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price, and consummate the transactions contemplated by this Agreement.

**Section 3.06    Independent Investigation**.  Buyer has conducted its own independent investigation, review and analysis of the business, results of operations,

prospects, condition (financial or otherwise) or assets of the Ampla brand, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation; and (b) none of the Seller nor any other person has made any representation or warranty as to the Purchased Assets, the Assumed Liabilities, the Ampla brand or this Agreement, except as expressly set forth in **Article 2** of this Agreement.

**Section 3.07   Brokers.**  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

## ARTICLE IV
## Miscellaneous

**Section 4.01   Expenses.**  All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid or borne by the Party incurring such costs and expenses.

**Section 4.02   Further Assurances.**  The Parties agree that they will execute any and all additional documents and take all additional steps which may be necessary to consummate the Agreement.

**Section 4.03   Notices.**  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 4.03):

If to Seller:                       Quiksilver, Inc.
                                    5600 Argosy Circle, #100
                                    Huntington Beach, CA 92649

|  |  |  |
|---|---|---|
|  | Facsimile: | (714) 784 7674 |
|  | Attention: | General Counsel |

| If to Buyer: | ColEx, Inc. |
|---|---|
|  | 5832 E. 2nd Street |
|  | Long Beach, CA  90803 |
|  | E-mail: rob@colbyexon.com |
|  | Attention:     Rob Colby |

| with a copy to: | Smiley Wang-Ekvall, LLP |
|---|---|
|  | 3200 Park Center Drive, Suite 250 |
|  | Costa Mesa, CA  92626 |
|  | Facsimile:     (714) 445-1002 |
|  | E-mail: lekvall@swelawfirm.com |
|  | Attention:     Lei Lei Wang Ekvall |

**Section 4.04   Headings.**  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 4.05   Severability.**  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 4.06   Entire Agreement.**  This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in this Agreement and the documents to be delivered hereunder, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in this Agreement will control.

**Section 4.07   Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns, including any trustees or estate representatives in the Seller's bankruptcy case. Neither Party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 4.08   Governing Law.**  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule.

**Section 4.09   Public Announcements**.  Buyer shall not make, or cause or permit to be made, any press release or public announcement, or otherwise communicate with any news media, in respect of this Agreement without the prior written consent of Seller, and the Parties shall cooperate as to the timing and contents of any such approved press release or public announcement.

**Section 4.10   No Third Party Beneficiaries**.  Nothing expressed or referred to in this Agreement will be construed to give any person other than the Parties (and their successors and assigns) any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**Section 4.11   Interpretive Matters**.  Unless the context otherwise requires, (a) all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules in this Agreement, (b) each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP, (c) words in the singular or plural include the singular and plural and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter and (d) the use of the word "including" in this Agreement shall be by way of example rather than limitation.

**Section 4.12   Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*SIGNATURE PAGE FOLLOWS*]

EXECUTION COPY

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

QUIKSILVER, INC.

By: _____
Name: Gregg Healy
Title: President

COLEX INC.

By: _____
Name:
Title:

## DISCLOSURE SCHEDULES

Section 1.01(a) —Trademarks and Patents.

Section 1.01(b) — Domain Names

Section 1.01(d) — Purchased Inventory

Section 1.05 — Wire transfer instructions from Seller

2582860.1

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

QUIKSILVER, INC.

By: _____
    Name:
    Title:

COLEX INC.

By: _____*Charles A. Exon*_____
    Name: Charles Exon
    Title:

## DISCLOSURE SCHEDULES

**Section 1.01(a)** — Trademarks and Patents.

**Section 1.01(b)** — Domain Names

**Section 1.01(d)** — Purchased Inventory

**Section 1.05** — Wire transfer instructions from Seller

## DISCLOSURE SCHEDULES

**Section 1.01(a)** —Trademarks and Patents.

<u>Trademarks</u>

| Country | Mark | Class | Status | Application No. | Application Date | Registration No. | Registration Date | Applicant/Registrant |
|---|---|---|---|---|---|---|---|---|
| Benelux | AMPLA | 18 | Registered | 201406 | 2/27/2014 | 201406 | 10/31/2014 | Biarritz Holdings, S.à.r.l. |
| Canada | AMPLA | 18, 25 | Filed | 1665745 | 2/27/2014 | | | 54th Street Holdings, S.à.r.l. |
| Canada | (AMPLA logo) | 18, 25 | Filed | 1672248 | 4/10/2014 | | | 54th Street Holdings, S.à.r.l. |
| Canada | (AMPLA logo) | 18, 25 | Filed | 1672243 | 4/10/2014 | | | 54th Street Holdings, S.à.r.l. |
| Community Trademark | AMPLA | 25 | Registered | 12642955 | 2/27/2014 | 12642955 | 11/13/2014 | Biarritz Holdings, S.à.r.l. |
| Community Trademark | (AMPLA logo) | 18, 25 | Registered | 12785085 | 4/11/2014 | 12785085 | 9/10/2014 | Biarritz Holdings, S.à.r.l. |
| Community Trademark | (AMPLA logo) | 18, 25 | Registered | 12785226 | 4/11/2014 | 12785226 | 9/10/2014 | Biarritz Holdings, S.à.r.l. |

| Country | Mark | Class | Status | App. No. | App. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|---|---|---|
| France | AMPLA | 18 | Registered | 144126861 | 2/27/2014 | 144126861 | 2/6/2015 | Biarritz Holdings, S.à.r.l. |
| Germany | AMPLA | 18 | Registered | 30 2014 0580284 | 2/27/2014 | 30 2014 058 028 | 10/15/2014 | Biarritz Holdings, S.à.r.l. |
| Great Britain | AMPLA | 18 | Registered | UK000030 70813 | 2/27/2014 | UK000030 70813 | 11/28/2014 | Biarritz Holdings, S.à.r.l. |
| Spain | AMPLA | 18 | Registered | 3526143 | 8/18/2014 | 3526413 | 12/23/2014 | Biarritz Holdings, S.à.r.l. |
| United States | [AMPLA logo] | 18, 25 | Filed | 86248331 | 4/10/2014 | | | QS Wholesale, Inc. |
| United States | AMPLA FORCEPOWER | 25 | Filed | 86299447 | 6/3/2014 | | | QS Wholesale, Inc. |
| United States | AMPLA | 18 | Filed | 86205379 | 2/26/2014 | | | QS Wholesale, Inc. |
| United States | [AMPLA logo] | 18, 25 | Filed | 86248310 | 4/10/2014 | | | QS Wholesale, Inc. |
| United States | [AMPLA FORCEPOWER logo] | | Filed | 86300195 | 6/4/2014 | | | QS Wholesale, Inc. |
| United States | AMPLA | 35 | Filed | 86634254 | 5/19/2015 | | | QS Wholesale, Inc. |

Patents

| Title | Owner | Case Status | Country | Application No. | Filing Date |
|---|---|---|---|---|---|
| Athletic Shoe with Internal Sprung Member | Quiksilver, Inc. | Provisional | United States of America | 61865520 | 8/13/2013 |
| Shoe With Elastically Flexible Extension | Quiksilver, Inc. | Application Pending | Patent Cooperation Treaty | PCT/US14/50807 | 8/13/2014 |
| Shoe With Elastically Flexible Extension | Quiksilver, Inc. | Application Pending | United States of America | 14/458328 | 8/13/2014 |

**Section 1.01(b)** — Domain Names

| **Domain Name** | **Registrant** |
| --- | --- |
| amplasports.com | Quiksilver, Inc. |
| amplasport.com | Quiksilver, Inc. |

**Section 1.01(d)** — Inventory

<u>Summary</u>

| Row Labels | Ampla MLDC ATS 10.19.15 |
|---|---|
| **Men** | **989** |
| **AEYS700001-XKKK** | **432** |
| AMPLA FLY M SHOE XKKK | 432 |
| **AEYS700001-XRRR** | **557** |
| AMPLA FLY M SHOE XRRR | 557 |
| **Women** | **1016** |
| **AEJS700001-XKKK** | **342** |
| AMPLA FLY J SHOE XKKK | 342 |
| **AEJS700001-XRRR** | **674** |
| AMPLA FLY J SHOE XRRR | 674 |
| **Grand Total** | **2005** |

<u>Detail</u>

[see next page]

| Material Group | Selling Group | Gender/Age | Department | Product Type | Detail | Grid Value | Quantity | EAN/UPC |
|---|---|---|---|---|---|---|---|---|
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 9.5 | 12 | 888701640844 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 9 | 36 | 888701640837 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 8.5 | 28 | 888701640820 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 8 | 65 | 888701640813 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 7.5 | 29 | 888701640806 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 7 | 66 | 888701640790 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 6.5 | 17 | 888701640783 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 6 | 42 | 888701640776 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 5.5 | 6 | 888701640769 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 5 | 12 | 888701640752 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 11 | 6 | 888701640745 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 10.5 | 6 | 888701640738 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 10 | 17 | 888701640721 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 6 | 84 | 888701640646 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 6.5 | 36 | 888701640653 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 7 | 121 | 888701640660 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 7.5 | 58 | 888701640677 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 8 | 125 | 888701640684 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 8.5 | 53 | 888701640691 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 9 | 72 | 888701640707 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 9.5 | 23 | 888701640714 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 10 | 36 | 888701640592 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 11 | 18 | 888701640615 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 10.5 | 12 | 888701640608 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 5 | 24 | 888701640622 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 5.5 | 12 | 888701640639 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 10  D | 77 | 888701640295 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 10.5D | 38 | 888701640301 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 11  D | 47 | 888701640318 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 11.5D | 14 | 888701640325 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 12  D | 28 | 888701640332 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 12.5D | 6 | 888701640349 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 13  D | 10 | 888701640356 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 13.5D | 6 | 888701640363 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 14  D | 5 | 888701640370 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 7  D | 18 | 888701640387 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 7.5 D | 12 | 888701640394 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 8  D | 34 | 888701640400 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 8.5 D | 28 | 888701640417 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 9  D | 75 | 888701640424 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 9.5 D | 34 | 888701640431 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 7  D | 24 | 888701640530 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 7.5 D | 18 | 888701640547 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 8  D | 48 | 888701640554 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 8.5 D | 41 | 888701640561 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 9  D | 94 | 888701640578 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 9.5 D | 40 | 888701640585 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 10  D | 94 | 888701640448 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 10.5D | 45 | 888701640455 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 11  D | 52 | 888701640462 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 11.5D | 22 | 888701640479 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 12  D | 39 | 888701640486 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 13  D | 16 | 888701640509 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 12.5D | 12 | 888701640493 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 13.5D | 6 | 888701640516 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 14  D | 6 | 888701640523 |

**Section 1.04** — Wire transfer instructions from Seller

Account Title: Quiksilver Inc
ABA 026009593
Account #1233397023