**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

QUIKSILVER, INC., *et al.*,

                     Debtors.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: Chapter 11
:
: Case No. 15-11880 (BLS)
:
: Jointly Administered
:
:
:

**DECLARATION OF ANDREW BRUENJES, AMERICAS CHIEF FINANCIAL OFFICER OF QUIKSILVER, INC., IN SUPPORT OF THE DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 6004 (I) AUTHORIZING AND APPROVING THE SALE OF CERTAIN *DE MINIMIS* ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) APPROVING THE PURCHASE AGREEMENT; AND (III) GRANTING OTHER RELATED RELIEF**

      I, Andrew Bruenjes, hereby declare under penalty of perjury that the following is true to the best of my knowledge information and belief:

      1.    I am the Chief Financial Officer of the Americas region of Quiksilver, Inc. ("ZQK"), the ultimate parent of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") and certain other affiliates of the Debtors (the "Non-Debtor Affiliates" and together with the Debtors, "Quiksilver" or the "Company"). I have been a member of the Quiksilver team for over 12 years, starting as controller for the Asia Pacific region ("APAC") region in 2002. I later served as Finance Director and then CFO of the APAC region. Earlier this year, I was appointed CFO of the Americas region. As a result of my

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

extensive tenure with the Company, I am familiar with the day-to-day operations, business affairs, and financial affairs of the Debtors.

2.  I am authorized by the Debtors to make this declaration (the "Bruenjes Ampla Sale Declaration").  I submit this Bruenjes Ampla Sale Declaration in support of the Debtors' contemporaneously-filed *Motion for Order Under Bankruptcy Code Sections 105 and 363 and Bankruptcy Rule 6004 (I) Authorizing and Approving the Sale of Certain De Minimis Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Purchase Agreement; and (III) Granting Other Related Relief* (the "Motion").[2]

3.  I have been aware of and informed regarding the marketing and sale of the Ampla Assets, in my capacity as Chief Financial Officer of the Americas Division of Quiksilver. Except as otherwise indicated, all facts set forth in this Bruenjes Ampla Sale Declaration in support of the Motion are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtors' industry, operations, and financial condition.  I am an individual over the age of 18 and, if called upon to testify, I could and would testify competently to the facts set forth herein.

**A.    The Ampla Assets**

9.  On or around early 2013, certain employees and consultants of the Company, including Rob Colby, then the President of the Americas, began development of a product and a brand – *Ampla* – outside of the Company's core business. Specifically, the team worked to develop a specialized running shoe with a carbon fiber plate in the sole that was

---

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Motion.

designed to maximize the efficient use of force while running. The Company filed several trademark applications related to the *Ampla* name and associated logo and obtained the rights to certain patents associated with the carbon fiber plate technology. Approximately 2,000 *Ampla* shoes were manufactured by one of the Company's contract manufacturers and delivered to the Company. The Company ultimately determined to cease further development of the *Ampla* brand and to not sell the *Ampla* products, in part because of the tangential relationship to the Company's core business.

B.    **Indications of Interest in Purchasing the Ampla Assets**

10. In or around June 2015, Colby, who left Quiksilver in or around February 2015, and Charles Exon, former Chief Legal Officer at Quiksilver, who left the Company in or around October 2014, contacted the Company about purchasing certain assets related to the *Ampla* brand. On July 22, 2015, Colby, now Chief Executive Officer of the Buyer, a Delaware corporation formed by Colby and Exon, executed a letter of intent regarding the purchase of such assets .

11.    In or around August 2015, the Company was contacted by Rhone Athletic Apparel, a men's activewear company, and separately, by Breakaway, a brand capital firm, each of whom expressed interest in looking into the purchase of certain assets related to the *Ampla* brand. The Company contacted both potential purchasers, but after the Company had initial conversations and supplied each with information regarding the *Ampla* product, neither potential purchaser followed up with the Company on, or expressed further interest to the Company in, a potential transaction.

C.    **The Sale of the Ampla Assets to the Buyer**

4.    Following the Petition Date, in or around early October, 2015, the Buyer sent the Company a revised letter of intent. The Buyer and the Company then began to negotiate the

terms of the potential sale. On October 26, 2015, the Buyer and the Seller entered into the Purchase Agreement.

5. The Buyer was formed by Colby and Exon. Neither Colby nor Exon are currently employees of the Company. Exon retired from the Company in or around October 2014, and on or around October 31, 2014, entered into a Retirement and Transition Agreement with the Company (the "Exon Separation Agreement"). Colby resigned from the Company in or around February 2015, and on or around February 6, 2015, entered into a Separation Agreement with the Company (the "Colby Separation Agreement," and together with the Exon Separation Agreement, the "Separation Agreements"). Pursuant to the *Debtors' First Omnibus Motion for Order Pursuant to Bankruptcy Code Sections 105(a) and 365(a) and Bankruptcy Rules 6006 and 9014 Authorizing Rejection of Certain Executory Contracts* [Docket No. 27] (the "Rejection Motion"), the Debtors are seeking to reject, among other things, the Separation Agreements, effective as of the Petition Date.

6. The Ampla Assets are outside of the core business of the Debtors, and accordingly, the Debtors do not plan on further developing the *Ampla* brand. The Debtors' efforts are currently focused on improving on their core business lines. As such, the Ampla Assets are not providing any benefit to the Debtors, and monetizing such assets through the Sale will maximize their value for the Debtors' estates and creditors.

7. Given the very specialized nature of the *Ampla* technology and the costs and risks associated with launching an unknown footwear brand that incorporates a novel technology, there is a very limited market for the sale of the Ampla Assets. The Buyer is willing to purchase the Ampla Assets on an "as-is, where-is" basis and is willing to assume all liabilities associated with the *Ampla* brand. The Debtors believe that the Buyer is able to close the proposed Sale

expeditiously. If the Sale to the Buyer is not closed pursuant to the terms of the Purchase Agreement, it is unlikely that the Company will be able to locate another buyer who is willing to close on the Ampla Assets without significant costs and expenses to the Debtors' estates. The Debtors believe that any additional recovery gained by locating such a buyer, including through a formal auction process, would not justify the associated additional costs, expenses, and delays. As a result, the Debtors believe that the Sale represents the highest and best offer for the Ampla Assets and that consummating the Sale is in the best interests of the Debtors and their constituents.

**D.     Conclusion**

8.     Based on the foregoing, I believe that the relief requested in the Motion is well-justified, will facilitate a successful reorganization of the Debtors, and is in the best interests of the Debtors and their creditors and should be granted in full.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: Huntington Beach, California
      October 27, 2015

          */s/ Andrew Bruejnes*
          Andrew Bruenjes
          Americas Chief Financial Officer