```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3  IN RE:                        )  Case No. 15-11880 (BLS)
                                  )  Chapter 11
 4  QUIKSILVER, Inc., et al.,     )
                                  )
 5              Debtors.          )  Courtroom No. 1
                                  )  824 Market Street
 6                                )  Wilmington, Delaware 19801
                                  )
 7                                )  October 28, 2015
                                  )  1:30 P.M.
 8
                          TRANSCRIPT OF HEARING
 9              BEFORE HONORABLE BRENDAN L. SHANNON
                   UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES:
11
    For the Debtors:        Skadden Arps Slate Meagher & Flom
12                          By:  VAN DURRER, ESQUIRE
                            300 South Grand Avenue, Suite 3400
13                          Los Angeles, California 90071

14                          Kirkland & Ellis LLP
                            By:  ROSS KWASTENIET, ESQUIRE
15                          300 North LaSalle
                            Chicago, Illinois 60654
16
    ECRO:                   DANA MOORE
17
    Transcription Service:  Reliable
18                          1007 N. Orange Street
                            Wilmington, Delaware 19801
19                          Telephone:  (302) 654-8080
                            E-Mail:  gmatthews@reliable-co.com
20

21  Proceedings recorded by electronic sound recording:
    transcript produced by transcription service.
22

23

24

25
```

```
 1   For Bank of America:        Riemer & Braunstein LLP
                                  By:  STEVEN FOX, ESQUIRE
 2                                Times Square Tower, Suite 2506
                                  New York, New York 10036
 3
     For the Creditors Committee:
 4                                Akin Gump Strauss Hauer & Feld LLP
                                  By:  MICHAEL STRAMER, ESQUIRE
 5                                One Bryant Park
                                  Bank of America Tower
 6                                New York, New York 10036

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                INDEX

2                                                              Page

3  NOTICE OF AGENDA MATTERS:

For the Debtors, by Mr. Durrer                                 4
4  For the Creditors Committee, by Mr. Stamer                   21
For Bank of America, by Mr. Fox                               32
5  For the Debtors, by Mr. Kwasteniet                           45

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE CLERK:  All Rise.

2        MR. DURRER:  Good afternoon, Your Honor.  Thank you

3   for the welcome.  Van Durrer, Skadden Arps Slate Meagher &

4   Flom, on behalf of Quiksilver, Inc., and its other subsidiary

5   Debtors.  We are here today, Your Honor, with respect to the

6   agenda, which is docket number 353.

7        THE COURT:  Thank you.

8        MR. DURRER:  I have it.  Thank you.

9        MR. DURRER:  Thank you.  Briefly.  First of all,

10   thank you first and foremost for agreeing to schedule time to

11   help us on Monday and thank you for cancelling it.  We were

12   actually, believe it or not, on the verge of calling you

13   anyway to advise that a couple more days would actually

14   improve things.  I am happy to report that I think they have.

15        THE COURT:  Terrific.

16        MR. DURRER:  What, I think, it makes sense to do,

17   the first item on the agenda is the DIP financing.  I have a

18   blackline order, if I may approach with that, Your Honor.

19        THE COURT:  Great.  Thank you.

20        MR. DURRER:  I also have, I should have walked up

21   with two things at once, may I also hand you this notice of

22   filing?

23        THE COURT:  Yes.

24        MR. DURRER:  So that is going to be filed

25   imminently.  We need to confirm that everybody was happy with

1   it and we have done so, but I will get to the details as I

2   walk through the revised order.  What I wanted to do was walk

3   you through the revised order, let you know how we resolved

4   things and let you know to the extent to which there are any

5   open issues.

6           THE COURT:  Great.

7           MR. DURRER:  All right, so walking through just page

8   by page, and I'm not going to pause long on things that are

9   insignificant.

10           THE COURT:  For ministerial or technical.

11           MR. DURRER:  Yeah, so I think that there is nothing

12   particularly important, you know, just taking advantage of

13   historical facts until we get to, I guess, pages 6 and 7.

14   Again, this is just reciting the fact that we had the

15   hearing, so the evidence that Your Honor considered and

16   approved.

17           THE COURT:  Yeah.

18           MR. DURRER:  There was some, on pages 8 and 9, the

19   historical information about the formation of the Creditors

20   Committee.  When we get to pages 10 and 11, there are changes

21   relative to Your Honor's rulings with respect to the 35

22   percent foreign stock and that will come up in a couple of

23   places, but I think that is the first place where it does

24   come up.

25           THE COURT:  Okay.

1          MR. DURRER:  In pages 16 and 17 is the next place I

2   pause, Your Honor.

3          THE COURT:  I'm there.

4          MR. DURRER:  So the various lenders have agreed with

5   respect to priming adequate protection and the liens that

6   Your Honor modified in connection with your ruling, with

7   respect to the pledge of 35 percent of the foreign stock so

8   that it begins to be reflected here.

9          THE COURT:  Okay.

10          MR. DURRER:  On page 19, so two important things.

11   One, the unencumbered foreign equity is mentioned again.  At

12   the bottom of this page, adequacy of the --

13          THE COURT:  This is the fee issue?

14          MR. DURRER:  Exactly.  So this other document, and I

15   apologize that it doesn't have a docket number yet, but we

16   are filing it right away.

17          THE COURT:  I understand.

18          MR. DURRER:  This is the document that is referenced

19   here whereby the required lenders have approved the updated

20   professional fee schedule and, in fact, which is part of the

21   budget.  Making it part of the budget tracks through many

22   provisions of the order and the creditor agreement, very

23   important to a lot of people, including me, her, him, a lot

24   of people, Mr. Kenney, everybody is in agreement with that

25   change.  There are, again, conforming changes on pages 20 and

1  21 that are not particularly material.

2          THE COURT:  Right.

3          MR. DURRER:  On page 23, Your Honor --

4          THE COURT:  About some equipment.

5          MR. DURRER:  Yeah, we still have that lingering

6  issue with GE that, you know, just include that which was

7  agreed to, which was a request that was made on behalf of GE.

8          THE COURT:  Okay.

9          MR. DURRER:  I think that actually some things got

10 moved on the following pages for the same reason.

11         THE COURT:  Yeah, I see on page 25 some reference to

12 that.  Okay.  I understand.

13         MR. DURRER:  Then, on page 27, with respect to DIP

14 liens and collateral, so this confirms that there is no lien

15 on the leases themselves.  That the DIP liens are relegated

16 to the 65 percent of the foreign equity, not 100 percent.

17         THE COURT:  Right.

18         MR. DURRER:  And then in addition when you turn the

19 page onto 28, there is no lien with respect to avoidance

20 actions.  That is what that deletion is accomplishing.

21         THE COURT:  Okay.

22         MR. DURRER:  We have a DIP ABL, we have a DIP term

23 loan, so some of these things get repeated, but those various

24 provisions are basically the same with respect to both the

25 ABL and the term loan.

1          THE COURT:  Okay.

2          MR. DURRER:  On page 32, we have the change that

3    conform to Your Honor's ruling, again, with respect to the

4    foreign equity.  There is just a super priority claim and not

5    a lien.

6          THE COURT:  Okay.

7          MR. DURRER:  Then, moving onto 33, so now we are

8    talking about adequate protection and this adequate

9    protection pertains to the senior secured notes.  As part of

10   the parties overall negotiations, there was an acquiescence

11   on behalf of the Creditors Committee, which we appreciate and

12   a request by our plan sponsor and our term loan DIP lender to

13   have a replacement lien on the 35 percent foreign equity,

14   solely to the extent of diminution and solely to the extent

15   that Your Honor determines, after notice and a hearing that

16   there, in fact, has been a diminution.  That was a hardly

17   fought and negotiated point.  I just want to emphasize and

18   people came together in a consensus.  Candidly, having the

19   additional time that Your Honor allowed, assisted with that

20   particular point.

21         THE COURT:  Okay.

22         MR. DURRER:  On page 35 --

23         THE COURT:  This is more part of the adequate

24   protection package?

25         MR. DURRER:  Yeah, I think there is an agent and I

1   think this language had been discussed in connection with the

2   hearing and I think it just never candidly saw the light of

3   day because of the way that the hearing went on for two days

4   and the fact that the procedures at the end were somewhat

5   abbreviated, but this is something that, I think, everybody

6   was aware of at the time.  It was not controversial, but I

7   think you are seeing it for the first time.

8            THE COURT:  Sure, I understand.

9            MR. DURRER:  On 36, we start to talk now about the

10  milestones.  When we get to the end of this order, Your

11  Honor, you will see that the milestones have all moved,

12  consistent with the agreement of the parties following Your

13  Honor's ruling.  I think that Your Honor left that issue for

14  the parties to deal with and I think that the parties were

15  generally successful in dealing with those things.

16            Those milestones, just to be clear, are not only

17  implemented with respect to the DIP order, they are also

18  being revised and implemented with respect to the plan

19  support agreement order.  Although it's not on the agenda, we

20  do have that order as well to hand up, but that was kind of

21  caught up in the conversations with respect to the DIP order.

22  So when we get to the appropriate time, we will hand that up

23  as well.  I will ask you to take my word for it that the

24  milestones are consistent between the two documents and the

25  parties have all vetted those.

1        THE COURT:  Okay.  That sounds fine.

2        MR. DURRER:  On page 38 and 39, again, just

3  conforming changes to accommodate the lack of lien with

4  respect to the 35 percent stake in the foreign stock.  On

5  page 41, there is an agreement among the parties that we

6  would provide certain parties with notice of any amendments

7  or changes to the DIP, which is pretty standard, I believe.

8        THE COURT:  Okay.

9        MR. DURRER:  Again, automatic stay modification,

10  this was also requested by the agent.  I don't think it's

11  controversial.  For purposes of delivering collateral, things

12  like that, possessory interest and collateral.  I think this

13  takes us all the way, oh, paragraph 31, Your Honor, with

14  respect to release parties.  I am looking at page 52 of the

15  blackline.

16        THE COURT:  I'm there.

17        MR. DURRER:  There were discussions about, you know,

18  should a release have carve-outs for, you know, gross

19  negligence, willful misconduct, fraud, those kinds of things.

20  I typically don't see those carve-outs, but we were able to

21  agree that, you know, to the extent that applicable law

22  allows, so if there is a conversation someday about fraud, we

23  will have it.  Obviously, no one anticipates that.

24        THE COURT:  Sure.

25        MR. DURRER:  And this was language that everybody

1   was able to agree on at the end of the day.

2          THE COURT:  Okay.

3          MR. DURRER:  Landlord language with respect to, you

4   know, access to property.  Again, I think that was negotiated

5   among the landlord parties.  It's not controversial.

6          THE COURT:  Right.

7          MR. DURRER:  The investigation language had been

8   modified as part of the improvement in some of the DIP terms

9   that Your Honor was advised of on the record.  So that is

10  captured in pages 56 through 58.

11         THE COURT:  Back on page 54, in the carve-out,

12  paragraph 34, it's not a big deal, these are the 1930(a)

13  fees.

14         MR. DURRER:  I think this is nothing and what I base

15  that on is that, you know, as between Kirkland and Skadden

16  trading forms back and forth, I think these are literally

17  just formatting changes that the system picks up.

18         THE COURT:  That's fine.  It doesn't seem to be

19  substantive.

20         MR. DURRER:  That's my understanding.  In the

21  challenge period and I am all the way on 61 now, Your Honor.

22         THE COURT:  Okay.

23         MR. DURRER:  We agreed to disagree on whether and

24  when the Committee should be granted standing.  I think we

25  are all going to be commercial.  I don't think there is any

1  real controversy there, but, you know, whereas the original

2  form of order went so far as to say you definitely don't have

3  standing, Committee, and the Committee wanted well I

4  definitely want the standing, we just agreed to be silent.

5  Again, as just part of overall compromise among several

6  different issues that are all competing with each other, so

7  that is what that deletion is there.

8       THE COURT:  That sounds fine.  I think I want to

9  understand, from what I see, I have no problem with it and I

10 am okay with keeping your powder dry on this issue.  I think

11 that is largely what we are talking about.  Is there a

12 mechanic, as I am going through this, for the interplay

13 between the challenge period, standing requests and what

14 happens with a challenge or how that works out?  Look, I want

15 this to go smoothly and I am not trying to complicate

16 anything, but I don't want heartburn or heartache at some

17 point on a 59th day or 74th day or something like that.  How is

18 that process?

19       MR. DURRER:  Your Honor might recall, we do have the

20 longer period.  We have a 75 day period.  What we did was,

21 the way the period landed, and when I am finished, I will be

22 happy to let Mr. Stamer give you his thoughts, but where we

23 landed was the challenge period will basically expire post-

24 disclosure statement hearing, assuming that we are,

25 otherwise, on track.  So there is going to be a lot of

1  conversations around the disclosure statement hearing.

2         So, obviously, if the conversations go well, this

3  will be irrelevant.  If the conversations are going poorly,

4  then, you know, presumably Mr. Stamer is going to say extend

5  my challenge period, consent to my standing or do something.

6  So I think that positioning it for post the disclosure

7  statement hearing is the right environment for those

8  conversations to take place.

9         THE COURT:  I agree.  The only observation I would

10 make and, again, my hope would be that this resolves itself

11 satisfactorily, but I, and I'm sure you guys have had similar

12 experiences where the standing issue and the challenge issue

13 create a complete fire drill at some point.  I am not asking

14 you to anticipate that, draft around it or otherwise deal

15 with it, but I had a lot of experience with, frankly, all the

16 professionals in the room.  If you see that coming, I would

17 prefer to, you know, get on the phone with you.  It's not

18 really different from the discovery issues, etc., but it was

19 within the last year, but the issue arose and there was a

20 reading that said they needed standing approved before the

21 expiree and they filed a motion, and it occurred that

22 afternoon because the next day.  You could read the order as

23 it shut off a light and I didn't want to be in the middle of

24 that.

25         So I think, actually, to your comments, Mr. Durrer,

1  allowing this process to extend beyond the disclosure

2  statement means that there is, really the entire case is part

3  of the discussion.  What I ask with this is no different from

4  what I ask with respect to all sorts of issues that may come

5  down the pike.  Just keep me posted.  If I can be of

6  assistance, I will, but it's not productive for the lawyers

7  or for me or for the participants, and it's not cost-

8  effective either to have these kind of fire drills.  I

9  appreciate you anticipating that issue, keeping your powder

10  dry and if it does seem to come to fruition, then I will be

11  available.

12          MR. DURRER:  Understood, Your Honor.  Thank you.

13          THE COURT:  Sure.

14          MR. DURRER:  My next comment is on page 67, Your

15  Honor.

16          THE COURT:  Okay.

17          MR. DURRER:  Again, this relates to no lien on

18  leases, so just a deletion to conform that change.

19          THE COURT:  I see it.

20          MR. DURRER:  I think there was, in connection with

21  ordinary course, I think one of the letters had requested

22  some additional reporting.  This is over on page 69.

23          THE COURT:  Okay.  I see the ACE reservation.

24          MR. DURRER:  Yeah, we had a final hearing, so that

25  paragraph went away.  It's not an interim order; that

1 paragraph went away.  ACE has continued to reserve rights.

2 Again, everyone else was aware of that reservation before the

3 hearing.  Apologies that you are just seeing it now.

4          THE COURT:  That's fine.

5          MR. DURRER:  So now we get to the, sort of, nitty

6 gritty of the modifications to the DIP.  Some of these you

7 are already familiar with because they were presented at the

8 hearing.  Some of these are modified and/or new.  So just

9 walking through paragraph 58, we had the expanded period to

10 replace our CRO, if that becomes necessary.  Again --

11          THE COURT:  Ten days.

12          MR. DURRER:  Of course, Your Honor, 10 as opposed to

13 five.  No one believes that that will be necessary, but we

14 have that additional flexibility.  Now this is important,

15 letter B.  So what letter B is doing, you might recall that

16 originally we had $115 million from the term loan lenders,

17 $25 of which was subject to discretion.  The Debtors always

18 believed it was available to them as a commercial matter, but

19 in connection with the improvements that we got as a result

20 of the contested hearing, this is one and what this does is

21 it deletes those portions of the credit agreement that made

22 it conditional.  There were five conditions to that

23 borrowing.

24          They are, and I am summarizing from the document, we

25 have to make a borrowing request, right, if we need to access

1  that money.  We can't ask for more then what we are allowed,

2  which is that $25 million dollar basket and then we have to

3  explain to the agent why we are asking to borrow it.  There

4  is no discretion.  There is no conditionality.  We just have

5  to pick those boxes.  In addition, what new D says, three

6  lines from the bottom of page 72, is it is saying either the

7  use has to be in the budget or the lenders consent to that

8  borrowing, with such consent to not be unreasonably withheld.

9          THE COURT:  So the $25 million, to the extent it's

10  within the budget, you have the ability to draw that down and

11  use it.  To the extent that it is not within the budget

12  because of the requirements of the business one way or the

13  other, you have to get their consent and the consent is going

14  to be within commercially reasonable terms.

15          MR. DURRER:  Yes, but if it's in the budget, we need

16  no consent whatsoever.  We just have to send in the piece of

17  paper and then that is, again, why this piece of paper

18  becomes so important because now this is part of the budget.

19          THE COURT:  So it all comes together.  I had to wait

20  73 pages for this whole thing to come together.

21          MR. DURRER:  Big finish.

22          THE COURT:  All right.

23          MR. DURRER:  The letter C, which is now on page 73,

24  again is just conforming to Your Honor's ruling with respect

25  to the foreign equity.

1           THE COURT:  I see.

2           MR. DURRER:  Letter D, I think, is, again, another

3   conforming change, not controversial.  Now E, again this is

4   important again.  So what E is doing is there are a whole

5   bunch of provisions that could, I think an expression like to

6   use, create foot faults and, again, everybody heard your

7   ruling with respect to, we used your language, a real and

8   robust market test.

9           THE COURT:  That does sound like me.

10          MR. DURRER:  Real and robust.  You should get that

11  on a t-shirt.

12          THE COURT:  It's like a Trump baseball cap.

13          MR. DURRER:  There you go, make America real and

14  robust again.  So here what we tried to do is to make it

15  crystal clear that notwithstanding that everybody understands

16  your ruling that there are no foot faults or areas of

17  ambiguity, that we are absolutely authorized to go out and do

18  that test and notwithstanding the, you know, seven, or ten or

19  so provisions of the DIP that might be impacted and which are

20  enumerated in this long, long section that those don't create

21  issues.

22          Now, what this also says is that at the moment in

23  time when we have decided we have a better deal and we need

24  to ask Your Honor for permission to implement that deal.  So

25  to go out, you know, consummate a sale, to replace a plan

1  sponsor with a new plan sponsor, to obtain different

2  financing then the financing we have today.  What this

3  language says and I am going to ask you to focus because this

4  is one of the areas where we continue to need some assistance

5  from the Court.  What this says is we have two time periods.

6  Time period number one is with respect to the ABL and time

7  period number two is with respect to the term loan.

8          What happens is, during those time periods, the

9  Debtor has a free pass to come to Your Honor to get relief

10  before anything bad happens under either DIP.  So what both

11  DIP lenders have agreed is that during that time period, we

12  continue to have the right to use cash collateral, we do not

13  suffer any default interest and, you know, we are obviously

14  coming to you to ask.

15          Now, an addition that is not in this document, so

16  the two time periods are five days for the ABL and 14 days

17  for the term loan.  So the contemplation was we were, and I

18  say we, this is a point of some dispute so the we doesn't

19  include all of we, it includes some of we.  Some of we were

20  trying to match up with what is customary with respect to DIP

21  financing as a practical matter.  Quick interim relief and

22  then the full 14 day notice period.

23          Now, we all know that we are approaching the

24  holidays and, you know, the Committee had made a bigger ask

25  in part because of that, but in part because they want to

1   make sure that the market place understands that this isn't

2   locked up, that this is a real process and that there is real

3   opportunity to engage in a transaction with the Debtor, with

4   which we fully agree.  So to that end, and I am going to ask,

5   if I get this wrong, I am going to ask people to come up and

6   correct me when I finish because we are almost there, is that

7   everybody has agreed, as professionals, as officers of the

8   Court that to the extent that we pick up the phone and say

9   fantastic news, we have a better deal, but it's on the eve of

10  Thanksgiving or its Christmas Eve or it's in the middle of

11  other holidays for other cultures and religions, or its New

12  Year's Eve, whatever it is, and just people cannot physically

13  get in this room together within those time periods, people

14  have agreed to basically give the Court and the stakeholders

15  a pass for a week.

16          So if that 14 days was going to expire on a Tuesday,

17  we are going to get to you on the following Tuesday.  People

18  might have tweaks.  I might be doing a little rough justice

19  on that, but that is the concept.  We are not going to amend

20  this piece of paper, but people have agreed, again, as

21  professionals to work cooperatively and that if we physically

22  cannot get here because, you know, I'm stuck in California,

23  or you're not here or, you know, someone else is unavailable

24  that that's how we have agreed to address the issue subject

25  to, again, continuing concerns that even that might not be

1  good enough for the full and robust process.

2          THE COURT:  I think I understand.

3          MR. DURRER:  So there are a lot of words on the

4  page.  What those words also say, for example, is this

5  doesn't change any rights with respect to other kinds of

6  defaults and things like that.  So the additional verbiage is

7  about that.  Then, last, but not least, page 76.

8          THE COURT:  Milestones.

9          MR. DURRER:  We have your milestones.  Just quickly,

10  disclosure statement by the end of this week, backstop

11  agreement same thing.  We have our disclosure statement

12  hearing consistent with the date that you have already given

13  us.  We have the confirmation deadline, which is the end of

14  January and then exit sometime in February.  So that is the

15  presentation with respect to the DIP order.  Again, thanks to

16  Your Honor and the parties by working hard together,

17  compromises on all sides.  I will turn the podium over,

18  first, to Mr. Stamer and then I think we do want our DIP

19  lenders to agree that I have accurately represented the

20  import of the filing of the professional fee document and

21  that I have adequately described the accommodation for

22  people's schedules around the holidays if we have that

23  problem.

24          THE COURT:  Very good.  Mr. Stamer.

25          MR. STAMER:  Your Honor, good afternoon.  For the

1  record Mike Stamer and Meredith Lahaie from Akin Gump, and

2  David Stratton from Pepper Hamilton on behalf of the Official

3  Committee.  Your Honor, I agree with virtually everything

4  that Mr. Durrer told Your Honor.  The fact that we came here

5  with one open issue, I think everybody should be happy about

6  that and satisfied. It doesn't minimize the open issue,

7  Judge.

8        I will try to be brief and I will just give you

9  context.  Again, Mr. Durrer did explain it accurately, but I

10 will give you my perspective.  So we are only talking about

11 an issue in the context of a better deal.  Real robust

12 process, better deal.  Our concerns, as I articulated to the

13 Court at the end of the hearing last time is that you have

14 two obstacles to a real and robust process.  First was a

15 breakup fee, it's out.  The second is, I think what I

16 described as the mountain, which is the DIP loan.

17       So we want to make it clear now that if a third

18 party or third parties come in and they want to buy this

19 business, they realized that they have ample time, there's

20 not a foot fault with respect to the DIP if there is a better

21 deal, a higher and better deal.  So what we had originally

22 proposed to the company is if there is a better deal, we will

23 do everything we can before we file the motion.  If you file

24 a motion to approve a better deal, which will encompass the

25 financing that's required, what we said is give us 30 days,

1   give us the earlier of 30 days after we file the motion and

2   10 days after the Court enters an order approving it because

3   remember, Your Honor, it's not just approving the deal.

4         My assumption would be this is an easy one to win on

5   priming because it's a better deal, but I also have to

6   establish or the buyer has to establish that everybody else

7   is adequately protected. I mean it's self-evident that if the

8   secured noteholders are getting a better deal, then the

9   priming shouldn't be an issue.  But, again, what I wanted to

10  do is when, and people are going out to the market now, the

11  market understands this is a real and robust process.

12        So the good news is with the help of the company,

13  with spirited discussion back and forth, we reached closure

14  with Oak Tree.  The compromise is as Mr. Durrer described,

15  it's a 14 day with flex.  The flex is everything he

16  described, also if we are stuck in front of you for six days

17  on hearings and all that stuff, it can flex for that to.

18  It's not our intention.  Again, I think the priming is a lay-

19  up if we have to do it, but that's just included in the many

20  things that could cause the flex.

21        THE COURT:  Hang on, I am going to write this one

22  down.  If there is a phrase I am going to repeat back to you

23  after five days of trial in January, it will be the priming

24  is a lay-up.  I make no comments on the merits of that.

25        MR. STAMER:  Understood, Your Honor.  I will deserve

1  that.  So, again, against all odds, we reach closure with

2  Oaktree.  We didn't reach closure with B of A.  Debtors

3  counsel eloquently tries to talk about there is a difference

4  between them and Oaktree in that we could do this in two

5  steps.  The two steps are we only have a small amount of time

6  to refinance the ABL and they  have agreed to go beyond the

7  original five days to give us, you know, another seven days

8  of flex.  Your Honor, we don't think that's accurate.  What

9  we think is this is about the signal that is going to be sent

10 today and no one here knows --

11         THE COURT:  Let me ask you a question.

12         MR. STAMER:  Sure.

13         THE COURT:  Do me a favor, play this string out for

14 me.

15         MR. STAMER:  Sure.

16         THE COURT:  This is the proverbial high class

17 problem, right?

18         MR. STAMER:  Correct.

19         THE COURT:  Okay.  Run this string out.  You got

20 your milestones and everything else.  I understand the flex

21 issue. I think I understand. I would like you to tell me how

22 I would encounter this issue and the crisis or the issue that

23 it would create.

24         MR. STAMER:  I am not as equipped with respect to

25 the specific to the specific milestones, but we can pick a

1    date.  Let's say tomorrow, Your Honor.  We get a bid for a

2    materially better deal.  We bring it to the company or the

3    company brings it to us and we say thumbs up.  We do

4    everything we can with respect to getting it documented.  So

5    everything necessary for the sale, and whether its 363, in

6    all likelihood it would have to be a 363 sale that we brought

7    in front of the Court very, very quickly.  But it's not just

8    the 363 sale because remember, the PSA and the DIP, they are

9    linked.

10              THE COURT:  Right.

11              MR. STAMER:  They don't want to finance someone

12   else's deal and Oaktree doesn't want to finance someone

13   else's deal.  I would argue against that. I get it.  It's a

14   practical reality, but this is a bridge to getting the DIP

15   lender paid off.

16              THE COURT:  Right.

17              MR. STAMER:  That's all it is.  What you would do

18   is, the company would file a motion.

19              THE COURT:  All right, so tomorrow you get a phone

20   call from Warren Buffet, great news, okay.  He is not known

21   for overpaying, but you get that phone call, this is a deal

22   that we want to pursue.  You go to Mr. Durrer and say this is

23   a deal that not only we want to pursue, but look at it and

24   you have to pursue it.  I assume at this stage you are kind

25   of assuming that he says okay, right.

1          MR. STAMER:  Your right, Your Honor.

2          THE COURT:  So what you have, again, I am not giving

3 anybody a hard time.  I think I want to understand exactly

4 what the bid and the ask are.

5          MR. STAMER:  Understood.

6          THE COURT:  But I also want to make sure that I

7 understand the dynamic that we are kind of hopefully

8 anticipating.  So you start with a letter of intent from, you

9 know, a potential purchaser that is a number that Mr. Durrer

10 has to pay attention to that is the sort of thing that would

11 trigger his fiduciary out or at a minimum, his fiduciary

12 inquiry, right?  Got it.  Mr. Durrer then says is this for

13 real?  You say yes because we are going to sit down tomorrow

14 and he has hired this firm, and this firm, and this firm and

15 we are going to document it.  A week later we have this,

16 which is the proposed APA, right because we will talk about

17 it as a 363 sale.  It's pretty close to being signed, etc.,

18 etc.

19          Now, they know that the Debtor has a financing

20 structure that has participants that don't want to finance

21 somebody else's deal and, I think, you have just said I am

22 not enthusiastic about it, but I understand it.  So that

23 buyer is going to know from those meetings with you and Mr.

24 Durrer well, look, if you are going to do this, you need to

25 step in and you, basically, need to take out the DIP,

1   effectively, right, is that what we are talking about,

2   effectively?

3           MR. STAMER:  Effectively, you will need to take it.

4   Again, what I want to avoid is a disjointed process.  So if I

5   am Warren Buffet, and I would love to be Warren Buffet, I

6   don't want to give this company, even on a senior secured

7   basis, money until I know that my deal wins.  I think that is

8   actually commercial. So if, in fact, a buyer comes, we want

9   to be able to put this all together on one hearing where,

10  Your Honor, either you'll say higher and better priming DIP

11  is approved, you'll say not hire and better priming DIP not

12  approved or there will be a little bit of time for Oaktree to

13  come in and say we will pay more.

14          What the Committee doesn't want, which I think the

15  company doesn't want either, is for this short fuse to either

16  deter bidding now and undermine a real and robust process or

17  actually interfere with what will likely be interplay after

18  the motion is filed.

19          THE COURT:  Okay.  So take me a step back.  So now

20  we have spent out time with Mr. Buffet's professionals, who

21  you guys have and you have got an APA, and you take it to Mr.

22  Durrer and you say this is for real.  We have got financial

23  wherewithal, we have done all our due diligence, this is a

24  non-contingent binding offer, and here is the timeline, etc.,

25  all right.  I think that is going to be important.

1    Would it be your expectation, again, I am not trying

2    to gum up where anybody is or make anybody uncomfortable, but

3    is part of the premise of this that the Debtor, in filing

4    this motion, to move forward with the transaction that we

5    just described, that the Debtor at that point has to formerly

6    abandon or walk away from the plan that is on file, but

7    embodies the transaction that we started with?

8        MR. STAMER:  I believe the way it works is Oaktree,

9    in the plan, is a stalking horse.  And people will correct me

10   if I'm wrong, they filed a motion and that triggers the

11   timeline, the stop watch, whatever, the ticking.  If

12   something doesn't happen within a period of time, then

13   Oaktree would have a termination right.

14       THE COURT:  Okay.  So here is the question and if

15   I'm being dense, I apologize.  And, actually, instead of

16   making it tomorrow, let's take it a month out, all right,

17   because we're a little bit further in the process and, at

18   least, as I am glancing at the milestones.  So a month from

19   today, which is the end of November, the Debtor has a

20   disclosure statement hearing coming up and you have brought

21   this transaction and now its papered and its real.  Actually,

22   I will tell you what, and I apologize, but we are going to

23   take this one step further.

24       MR. STAMER:  Sure.

25       THE COURT:  We're going to do it in the second week

1  of December.

2      MR. STAMER:  Okay.

3      THE COURT:  So we have had and I have approved a

4  disclosure statement on December 4th, all right. So your

5  process is playing out, Mr. Durrer, right.  You have got your

6  signed order from me.  I have blessed your solicitation

7  procedures, copies are being made or actually being sent out,

8  ballots, etc., etc., on the deal that's on the table.  I

9  think you just said accurately that that deal is effectively

10  the stalking horse for the transaction that you have been

11  trying to shop and get.  Now you have that and we are

12  scheduled for a confirmation hearing on the 29th.

13      Is it your expectation that when that deal comes in,

14  the Debtor would file a motion in December, say, that says

15  this is a better deal, we are moving to sell this asset.

16  Procedurally, would it be your expectation, and I know I am

17  asking you to crystal ball, but would it be your expectation

18  that the Debtor would say, yes, we are looking for a sale

19  hearing when, on the 29th and it will be one or the other.  It

20  may be the Debtor or the participants in the plan.  We will

21  argue that, in fact, their transaction is superior and maybe

22  they have bid beyond it or is it that the Debtor would be

23  filing that motion on the 10th of December and looking for

24  approval of a sale on the 10th of January in advance of the

25  transaction.  I am just trying to figure this out.

1          MR. STAMER:  Your Honor, I see this as the

2    prototypical parallel path.

3          THE COURT:  Right.

4          MR. STAMER:  What Your Honor did with respect to the

5    PSA and the DIP is you laid out a timeframe for the company

6    to try to get the Oaktree sponsored plan done, full stop.  If

7    the company has an auction or has a marketing process and

8    nobody shows up, that process should play out according to

9    schedule.  I am not saying the Committee won't object to a

10   variety of things, value, you know, and we'll fight over how

11   much the 35 percent of the common stock is, whether there is

12   diminution in value, but, again, it's a parallel path.  So if

13   at any time during the plan process, buyer W shoes up, and is

14   funded, and is real, and is fully documented, they will

15   continue along parallel paths.  It may be before the plan

16   confirmation hearing.

17         THE COURT:  But here's the problem; here's what I

18   guess I'm struggling with to understand how this plays out.

19   The parallel path that we've just described it's not

20   intuitive to me and maybe it's just that the lenders would

21   have these rights, but if, again, we have the dynamic and we

22   have the December 10 proposal and everybody says you got to

23   go with this and we'll see what happens on the 29th of

24   January.  And what do we have.  We have two things coming to

25   a hit.

1        We have a confirmable plan that may have the votes

2   and we have, frankly, the Debtor and the Committee's joint

3   motion or maybe the Committee's motion, whatever, to sell.

4   At that point I conduct a very complicated hearing, but the

5   plan is still a live even though the Debtor has filed this

6   motion.  It's entirely conceivable to me that either the

7   Committee might file this motion or it might jointly file the

8   motion or admonish the Debtor.  And the Debtor files it in an

9   abundance of caution and says we see two great opportunities

10  here and we need to get them teed up.

11       So the point would be that if that happens on the

12  10th, 15th of December calendared for January 29 at which point

13  I would conduct this hearing about what is the superior

14  transaction.  What is in the best interest of the estate

15  because you could argue; actually I think you would argue

16  that the plan is not confirmable if the other transaction is

17  superior, all right.  You can't satisfy the 1129 standard

18  best interest; I get it.

19       We have that path.  Now bringing us back to the issue

20  that we have that's directly before us which is the right

21  effectively to terminate the DIP.

22       MR. STAMER:  Correct.

23       THE COURT:  And so if that motion gets filed on the

24  10th of December, the lender or the participants in the plan

25  or the DIP lender, actually; if the Debtor files another

1  motion, files a motion that says this is a better deal and

2  we'll proceed on the parallel path, is it that the lender can

3  terminate the DIP financing --

4          MR. STAMER:  Exactly, Your Honor.

5          THE COURT:  In five or 10 days and we never then get

6  to that final --

7          MR. STAMER:  Or the Debtor has to hold off filing the

8  motion to approve because there's only a small window of time

9  during which after you file the motion before or the DIP gets

10 refinanced.  So use your dates, Your Honor; the 10th of

11 December and the 29th of December, let's do it that way.

12         THE COURT:  29th of January.

13         MR. STAMER:  Well let's make it even easier.  Let's

14 say it's the 29th of December so we ruin everybody's holiday.

15         THE COURT:  Yep.  Good luck with that hearing.

16         MR. STAMER:  Understood, Your Honor.  The point is

17 even under the deal that we reached with Oak Tree which we're

18 not abandoning.  We're not; I'm just for illustration

19 purposes.  Fourteen days after, assuming your calendar worked

20 and we could do everything, we would need to actually get

21 approval of the deal, approval of the financing within 14

22 days, so by December 24th and we would need to take out the

23 DIP.  And, again, if it's the holiday season, they built in

24 an extra seven days of flex --

25         THE COURT:  Well we'll do it in the first --

1      MR. STAMER:  And, Your Honor, that's fast; you know

2  maybe too fast, but that's okay.  That's all part of the

3  deal.  What the ABL lenders are saying as part of that

4  process on the 10th you have five days to take me out.

5      THE COURT:  Plus some wiggle room.

6      MR. STAMER:  Plus some wiggle room, correct.  And,

7  look, we're not looking to poke the ABL lenders.  What we're

8  looking for is to do what Your Honor had requested we do

9  which is run a fair and open process.  All we're looking for

10 is symmetry.  So everybody knows you have this much time to

11 get your act together, to get your finance together, and for

12 us to get in front of the Court to get it all approved.

13     THE COURT:  So then if I understand precisely the

14 issue and I'll hear from anybody who wishes to be heard

15 precisely the issue it is the Committee is asking that I

16 require that the timeline that has been agreed to by the term

17 loan lender 14 days plus wiggle room be imposed for the ABL?

18     MR. STAMER:  And that's our; believe it or not our

19 only open issue today.

20     THE COURT:  Okay.

21     MR. STAMER:  That's all.

22     THE COURT:  I understand.

23     MR. STAMER:  Thank you, Judge.

24     THE COURT:  Mr. Fox, good afternoon.

25     MR. FOX:  Good afternoon, Your Honor, for the record

1  Steven Fox, Riemer & Braunstein on behalf of Bank of America

2  NA the DIP ABL agent, for lack of a better term.  I think

3  that's the term used in the order.  Your Honor, I think

4  perhaps the best place to start is actually providing the

5  Court with an accurate description of what the order actually

6  says today.

7        THE COURT:  Okay.

8        MR. FOX:  And with deference to Mr. Durrer in his

9  introductory remarks on this his provision he indicated that

10  it was the provision or the agreement of both the DIP ABL

11  agent and the DIP term agent to the 14 day standstill period

12  in the event of a default triggered as a result of either the

13  Debtor or another party with the support of the Debtor I

14  think is the language used in the order now that would

15  constitute a restricted action which would create the so-

16  called footfall which would, in turn, trigger our right to

17  remedies to first terminate and then exercise remedies

18  including possession and the full panoply of rights under the

19  order.

20        To be clear, the DIP ABL agent has, in fact, agreed

21  unquantifiably to that 14 day period.  There is not a

22  difference --

23        THE COURT:  Why didn't you say that when he was

24  rambling on.

25        MR. FOX:  I've learned not to interrupt Mr. Stamer

1  when he's on a roll.

2      THE COURT:  You can hold him to that, Mr. Stamer.

3      MR. FOX:  Where there is a difference, if a

4  difference exists, at all between the treatment of the DIP

5  ABL facility and the DIP term facility under the order is

6  soley with respect to the ability to charge default interest

7  during that period.  The way the order reads now is the DIP

8  ABL agent affords the full 14 day period standstill; however,

9  if the DIP ABL agent further affords the Debtors the right

10 within five business days from that footfall to pay off the

11 DIP without any accrual or charges default interest; if the

12 DIP ABL facility is not repaid within that five business day

13 period, we reserve the right.  It doesn't say we shall charge

14 default interest.  It merely says we reserve the right and

15 all rights to charge default interest relating back to the

16 date of that restricted action event of default are

17 preserved. That's the only difference.  We preserve the right

18 to have a financial remedy resulting from the footfall during

19 this 14 day period while the Debtors are using with our

20 consent cash collateral pursuant to the budget.  That's the

21 only difference.

22      THE COURT:  I guess I'd like to know then, I'd like

23 to confirm and if we need to take a break and you want to

24 confer, because I realize it's been moving pretty quickly.

25 But I guess I'd like to know whether there is then a live

1  issue between your client and the Committee on this issue.

2  You know because if what we're talking is I mean your math is

3  nine days of default interest, right?

4           MR. FOX:  Well it's potentially 14.

5           THE COURT:  Sure.

6           MR. FOX:  But if we get paid off within the first

7  five business days which is what the notice period or the

8  standstill period was under the original draft of the credit

9  agreement in the interim order, no harm, no foul, no default

10 interest.  So now we're only talking about you know the

11 financial impact of default interest during this cash

12 collateral period --

13          THE COURT:  De minimis.

14          MR. FOX:  Indeed, it should be, Your Honor.

15          THE COURT:  Mr. Stamer, are we --

16          MR. STAMER:  Your Honor, maybe it was a

17 miscommunication but that's news to me.  And if we're talking

18 about spending all this time arguing over default interest

19 for -- if we're talking about 14 with seven days flex if it's

20 mirrored what the ABL wants to reserve the right if we don't

21 refinance with them after five days to charge default

22 interest --

23          THE COURT:  From the moment of the default forward so

24 that captures another five days.

25          MR. STAMER:  You talking about default interest on

1  the outside for potentially 21 days?

2          THE COURT:  It doesn't seem like we're going to war

3  over that.

4          MR. STAMER:  I tend to agree.

5          THE COURT:  Wouldn't think so.

6          MR. FOX:  So, Your Honor, and we can step back for a

7  second.  Mr. Stamer is correct.  We have been clear from the

8  start that we agree to finance a path.  That path was well

9  defined.  It was set out in the credit agreement and we have

10  since modified that path with the benefit of Your Honor's

11  rulings and discussions with the Debtors and with Oaktree.

12  And the DIP ABL agent has accommodated in the changes within

13  the order, paragraph 58(e), the adjusted milestones, for an

14  additional four weeks.  That has a logical impact upon the

15  financial performance and condition of the company, as well

16  as some additional credit exposure and we don't have to

17  debate today people's view on what that credit exposure is to

18  first Bank of America or to Oaktree.  We've assumed the risk,

19  all right.

20          When you get to the discussion about the parallel

21  paths that's when it becomes sort of relevant. And why the 14

22  day standstill period is critical to us.  We started with the

23  five day period.  That's, frankly, that's market in this

24  jurisdiction; elsewhere for DIP facilities.

25          THE COURT:  But the thing is it's a little bit

1  different because it's market usually with respect to a full

2  and default of some sort and we get to the bottom of it.  But

3  in this instance the issue is what we're kind of game

4  planning for is, frankly, the high class problem.

5       MR. FOX:  The high class problem is potentially a

6  better deal.  Now the devil will be in the details as to

7  defining what is better and for whom.  So is it, so our

8  viewpoint and why it is we've agreed to the 14 day period,

9  but not further is we don't know today, none of us has a

10  crystal ball, what that means.

11       THE COURT:  When you said 14 but not further but then

12  we've talked about the week wiggle.  Are you in the week

13  wiggle?

14       MR. FOX:  I'll get to the wiggle.  I've got my list

15  Mr. Durrer asked me to address.

16       THE COURT:  Okay.

17       MR. FOX:  So we don't know what better means or for

18  whom. So while it may be better for the unsecured creditors

19  and without addressing the priming components and all that

20  other stuff --

21       THE COURT:  Compared to the [indiscernible].

22       MR. FOX:  Yeah.  You can imagine Bank of America's

23  never going to agree to priming.  We made that pretty clear.

24  So who knows.  But that alternative path may have

25  consequences for Bank of America.

1      THE COURT:  Sure.

2      MR. FOX:  And I think it's not unreasonable for the

3  bank to reserve the right to understand what other people

4  consider to be better, because remember this restricted

5  action footfall through a default is only triggered at the

6  point in time where they've got a better deal and it's

7  actually filed with the Court.  And that triggers a time

8  period where we're going to sit down and we're going to have

9  an opportunity to look at it.

10      We hope it would be a new thing okay in this case

11  today.  We hope somebody picks up the phone and calls us

12  before they file it and gives us an opportunity to evaluate

13  it, assess it, and understand the impact it may have on the

14  bank and maybe, go figure crazy things would happen, we might

15  agree it's better.  And we might agree you don't need to

16  worry about cash collateral.  We'll modify the DIP so that

17  you can have the time to get it done.  We may not.  But if we

18  don't agree then the Debtor has 14 days to use cash

19  collateral without any interference with our subject, only to

20  the budget and the other, we'll say, restrictions within the

21  credit agreement such as you know borrowing base stuff.

22      And within that 14 days they'll either satisfy us in

23  conjunction with the Committee that there's no further risk

24  or we should agree or we'll make adjustments to the structure

25  so that you can buy time.  And maybe it's an economic

1  adjustment.  Maye it's some other adjustment within the

2  agreement.  Maybe it's additional collateral.  What it is

3  we'll deal with it at the time when we understand the facts

4  that none of us understand today.

5          THE COURT:  Right.

6          MR. FOX:  And if we don't agree, if we can't reach a

7  consensus, then the Debtor is free with or without the

8  Committee to come back to Your Honor within the 14 day period

9  and ask for help.  You always reserve the right even when

10 under the original interim order there was a five day

11 standstill period, you always reserved the right to change

12 your mind and extend that period and further enjoin me or

13 modify the remedies that I could exercise as the bank.  That

14 would apply to me and apply to Oaktree and it will continue

15 to apply and there's nothing within the four corners of this

16 order that prevents you from doing that.  It only fixes a

17 time to which I consent and beyond which I don't.

18         THE COURT:  Okay.

19         MR. FOX:  So that's where the effect in this order

20 is.  And getting back to the distinction between the bank and

21 Oaktree on the default interest should not be the death-kneel

22 to this order.

23         THE COURT:  Seven day wiggle.

24         MR. FOX:  Wiggle room, sure.  We understand, we've

25 all been doing this long enough that there's a possibility

1   either you may not be here; we may not be here as Mr. Durrer

2   knows I like to go on vacation and play golf.  So as he's

3   noted on more than one occasion.  So yeah if we can't get it

4   done, we'll be reasonable, right. We'll figure out a way to

5   balance the risk if there is any and we'll get that

6   adjustment in the schedule.  But insofar as today Mr.

7   Durrer's remarks first time I heard a week.  It will be what

8   it will be.  We'll figure that out at the time.

9           With respect to the fee schedule which is in the

10  process of being filed, the bank is fine with the new budget.

11  The bank is fine with the fee schedule.  The bank has

12  expressly negotiated in the paragraph 34, 35 of the DIP order

13  the right to review or evaluate and if necessary or

14  appropriate object to any fees. So the mere fact that they

15  appear in this schedule and, therefore, incorporated into the

16  budget does not in any way, shape, or form serve to undermine

17  the bank's reserve rights to review fees once fee

18  applications are filed.

19          THE COURT:  And I see that in paragraph 35.

20          MR. FOX:  Right. So but pertaining to paragraph 35,

21  Your Honor, Your Honor may have noticed that last night the

22  Committee filed its professional retention applications that

23  for Akin Gump, Pepper Hamilton, and PJT.  Without getting

24  into the details of any of the applications but focusing

25  specifically on PJT, if Your Honor looks at the first page of

1  the fee schedule you'll see a column at the end, the second

2  to last column from the right that's at the top called

3  emergence.  And you'll see under Peter J. Solomon and under

4  PJT some fairly large sums $7 plus millions and $2 plus

5  million.

6         Those numbers in that column for those professionals

7  include certain success or restructuring fees, transaction

8  fees and the like.  My understanding of the way this schedule

9  works and, therefore, the way the budget works as it relates

10 solely to the carve-out implications under the DIP is that

11 those fees are not part of the budget and, therefore, are not

12 part of the carve-out.  And the bank is not agreeing that

13 they will be part of the carve-out.  They are payable upon

14 emergence which assumes or presupposes the bank is being paid

15 off.

16         If this is a meltdown and there is not an emergence

17 or the bank is exercising remedies and stuff like that we're

18 not saying those fees as per their agreements won't accrue,

19 won't maybe be allowed.  We're just saying they're not part

20 of the carve-out.  All the other weekly monthly professional

21 fees reflected in this we acknowledge our part of the budget

22 and part of the carve-out and these are the only exceptions.

23         That is my understanding of the budget.  I believe

24 that's the conversation I've had with Mr. Durrer because of

25 the timing of when they're paid upon emergence is not part of

1  the carve-out, not part of the DIP.  If anybody has a

2  disagreement on that, that's fine.  The PJT application isn't

3  scheduled to be heard until the 17th.  And to the extent the

4  bank has any comments about the substance of the application

5  itself that have nothing to do with the DIP financing itself,

6  we'll reserve until then on that score.

7         That's all I have, Your Honor, unless you have any

8  additional questions.

9         THE COURT:  Before I get -- for Oaktree?

10        UNIDENTIFIED SPEAKER:  Yes.

11        THE COURT:  Hang on a second.  I'd like to hear from

12 Mr. Stamer in response.  First of all, to find out or just to

13 confirm what it is we're arguing about.

14        MR. STAMER:  Okay it sounds like according to our

15 financial advisor we're arguing about $60,000.00.  If, in

16 fact, we're talking --

17        THE COURT:  I want witnesses.  I want binders.

18        MR. STAMER:  How late can we stay?  How late can we

19 stay?  Your Honor, jump off. We'll leave it to you.  I won't

20 say anything else other than; other than --

21        THE COURT:  I think all he's doing, unless I'm

22 mistaken, if I heard him correctly.  The issue is not even a

23 provision automatically entitling him to the amount but that

24 he's not consented to not being paid default interest --

25        MR. STAMER:  Not charging the amount.

1          THE COURT:   And that may not; and if that's an issue

2    we'll deal with it at the appropriate time. But I'm not sure

3    I need to answer that question.   I think the extent of his

4    consent is limited to five days at the existing interest rate

5    and we can debate about whether or not default needs to be

6    charged; if he wants it, if that circumstance plays out.

7          MR. STAMER:   Your Honor, that's completely acceptable

8    to us.

9          THE COURT:   Okay.

10         MR. STAMER:   If I can just make -- no I won't even

11   bother.   I'll just go onto the success fee.   The fact that

12   the PJT fee, the success fee is not part of the budget that's

13   the first we've heard of it.   The schedule we have is

14   actually the defined term is you know the schedule to the

15   budget.   The budget is what is triggered with respect to the

16   carve-out out if, in fact, this is a meltdown which no one

17   thinks it will be; whether or not success fees will be

18   allowed that will be entirely up to the Court.   But, again,

19   and maybe we need a minute to talk about in the hallway, but

20   that's the first we've heard of it. We always thought it was

21   here's the budget; here's the budget.

22         THE COURT:   Mr. Durrer.

23         MR. DURRER:   Yeah; Van Durrer for the Debtors.   I

24   think the more precise point as the Debtors understand it is

25   if this company liquidates on Thanksgiving is that success.

1   And I think the DIP lender's position as related to us is not

2   success for purposes of success or completion fee is what I

3   like to call them; completion fees if that happens.  Hence,

4   it wouldn't be part of the carve-out because it wouldn't be

5   earned.  If we're talking about January --

6          THE COURT:  Let me do this.  I don't want to hondle

7   about this right now.  I do think I will take you up on this

8   suggestion that the parties confer for five minutes for a

9   couple of reasons.  One is, again, as I said; look I

10  appreciate the amount of progress that's been made by all

11  parties on, frankly, a whole lot of issues that in some ways

12  are much thornier and much more significant for purposes of

13  this case.  And I'm not minimizing anybody's compensation

14  structure, etcetera.

15         But you know every carve-out structure is kind of

16  bespoke to the particulars of a case and I'm better off

17  leaving that to you, folks, for, at least, a few minutes.,

18  because if there's consensus or if there's an ability to

19  defer some of these questions to a later date then we can do

20  that.  If I need to deal with them in order to address the

21  financing request then I will.  But, again, a lot of these

22  issues are, while I think they're important, many of them are

23  hypothetical; at least, some of these issues.  You know and I

24  don't and I don't want to get into a debate about you know if

25  it all melts down in November, etcetera because I don't think

1  that's going to happen.

2      The issue, what we're really focused on right now is,

3  frankly, the high class problem that the case gets immensely

4  more complicated from your point of view, Mr. Durrer, when

5  somebody comes in with a big check, because you've got a --

6  you know I sat there for a long time and I was never mad at

7  anybody then the bidder that walked into my sale hearing

8  because I didn't have an outline for that bidder, you know.

9  I had my winning bidder.

10      And so I understand that dynamic and I'm being a

11  little bit flip. But given this issue I want the parties to

12  have a minute to confer.  But I think we've got some other --

13  I'd like to hear from Oaktree and I hear from anybody else

14  that wishes to be heard with respect to the process and then

15  we can take a break at the appropriate time.  Okay.  Yes,

16  sir.

17      MR. KWASTENIET:  Good afternoon, Your Honor, Ross

18  Kwasteniet from Kirkland & Ellis on behalf of Oaktree as DIP

19  term loan lender.  Just a few points of clarification.

20  First, on the 14 days, Your Honor, we did agree to that

21  modification.  We've agreed that during the 14 day period,

22  notwithstanding the fact that the filing of a pleading

23  seeking another deal is an event of default under the DIP

24  which it is immediately, that during that 14 day period the

25  company can continue to use cash consensually consistent with

1  the budget.

2        We've also agreed, although I'll not it would not be

3  a problem of our own making but to the extent that the motion

4  is filed on say December 16 and we're in some awkward

5  position over the holidays we're not going to put a gun to

6  this company's head or to Your Honor's head over the

7  holidays.  And we'd ask that everybody cooperate in good

8  faith to find the next available hearing time.

9        THE COURT:  Sure.

10       MR. KWASTENIET:  Fourteen days is a long period of

11  time.  I think we'd be able to find a hearing within that but

12  if we couldn't as soon thereafter, but we're certainly not

13  going to try to hold anybody hostage over the holidays.

14       And, Your Honor, in terms of the better deal point

15  Mr. Stamer gave his opinion as to the priming being a layup.

16  I've never actually seen that happen before.  And, obviously,

17  the devils in the details if he comes forward with some sort

18  of contingent deal that involves cramming up everybody in the

19  case.  I'll just tell you right now we'll probably have

20  pretty strong views about the adequacy of priming but that's

21  certainly not before the Court today.

22       Your Honor, Mr. Stamer also made some point about

23  parallel paths and seemed to imply to me, at least, and I

24  just want to clear this up that to the extent they come

25  forward with another deal we have a right if the Debtor

1  allows a motion.  You know we have a right to terminate the

2  plan support agreement and we have a default right under the

3  DIP.  And that is what it is --

4          THE COURT:  Yeah I make no comment about that at this

5  point.  And I want to be clear to the extent that you feel

6  obliged to reserve your rights.  The colloquy that I had

7  specifically with Mr. Stamer was to understand potentially

8  what might happen.  And that discussion doesn't sort of

9  define what anybody's rights are.  But when we have these

10 discussions about sort of what hypothetically happen and what

11 rights and Judge what are you going to do.  It's important to

12 me to understand what -- and you're lawyers.  I mean your job

13 is to protect your client against things that you have

14 difficult anticipating.  So that was really the source of

15 that colloquy and one way or the other you know if I have to

16 deal with these issues and your point of view would be it's

17 probably not a high class problem.  It's a big problem.

18         MR. KWASTENIET:  Right.

19         THE COURT:  That's not a today issue and I understand

20 that.

21         MR. KWASTENIET:  If somebody shows up with a very

22 serious offer and they're proposing to take us out in cash

23 hey you know this is a bankruptcy case.  We understand that

24 that may happen.  But we're also not signing up today to sit

25 idly by you know with our bid as a backup in the event that

1 the company and the Committee decide to pursue another

2 transaction. We don't believe we're obligated.  It's not

3 before the Court today, but we don't believe we're obligated

4 to do that under our support agreement.

5         Your Honor, we also will just note notwithstanding

6 the approval of a modified budget today that includes a new

7 professional fee schedule there's professionals in that

8 schedule who have not been retained yet.  And, obviously,

9 fees are subject to Court approval ultimately.

10        THE COURT:  Of course.

11        MR. KWASTENIET:  And the DIP lenders all reserve

12 rights on that point, not that we're going to have issues,

13 but it's certainly not something that Oaktree has signed off

14 on in advance as we stand here today.

15        THE COURT:  Okay.

16        MR. KWASTENIET:  Thank you, Your Honor.

17        THE COURT:  Sure, thank you.  All right does anyone

18 else wish to be heard?  Why don't we break if we can for five

19 minutes.  See if we can circle up and find a way either to

20 agree or at least hold in abeyance some of the issues

21 relating to the, particularly the carve-outs because I don't

22 think any of the professionals have been retained yet.  And

23 things about what happens to a success fee or a transaction

24 fee or completion fee or whatever you have.  Whether they

25 need to be finally disposed of in terms of the carve-out I

1  leave that, I don't know whether or not we need to do that or

2  whether we can navigate or way to get us to entry of an order

3  that preserves everybody's rights.  So why don't we just take

4  five minutes and we'll reconvene.  Stand in recess.

5      [Recess 3:15:53 - 3:38:18]

6          THE CLERK:  All rise.

7          THE COURT:  Please be seated.  Mr. Durrer.

8          MR. DURRER:  So, Your Honor, thank you for the break.

9  It was very helpful; certainly more than five minutes.  Not

10  quite long enough to play a game one of the world series.

11  But my understanding is that the parties have reached an

12  agreement for today's purposes.

13          THE COURT:  Okay.

14          MR. DURRER:  Basically as follows.  The Committee is

15  happy to hear that B of A is willing to hang around for the

16  14 days, but reserve it's rights with respect to

17  approximately $60,000.00 in default interest.  In addition,

18  the Committee is happy to reserve all of anybody's rights

19  candidly with respect to the PJT retention on the 17th that

20  basically this DIP budget will not be used as evidence, a

21  weapon, an argument and anything with respect to that.

22  That's issues for the 17th.

23          THE COURT:  Okay.

24          MR. DURRER:  And I don't know if other comments need

25  to be made, but I do have a form of final order to hand up

1  which is consistent with what we walked through.

2        THE COURT:  That will be great.

3        MR. SWETT:  Your Honor, this is Brian Swett on the

4  phone representing GE and Wells.  I wonder if I could ask for

5  one clarification with respect to the revisions of the order?

6        THE COURT:  Of course; you may proceed.

7        MR. SWETT:  Thank you and thank you for allowing me

8  to participate by phone.  I'm speaking specifically to the

9  changes reflected on page 16 at the bottom and page 17 at the

10 top of the blackline that I understand was provided to the

11 Court.  The parties in Court were kind enough to send me a

12 copy by email during the course of the hearing.

13        THE COURT:  I'm there.

14        MR. SWETT:  There's some new language with respect to

15 the payment at the time of the entry of the interim order and

16 the payment of the company's obligations under the ABL

17 facility, the prepetition facility to my clients which so the

18 record is clear or for which so the record is clear, we

19 remain grateful.

20        I just wanted to confirm that there's no intention

21 here to modify the treatment of the payment by the Australian

22 non-Debtor affiliate of its obligations.  In contrast to

23 Australia and Japan the domestic Debtors made an advance or

24 proceeds from the interim term loan to allow the Japanese

25 non-Debtor affiliates to pay the Japanese obligations to GE.

1  I understand that there was no such term loan extension or

2  intercompany loan made to the Australian Debtors.   I just

3  want to confirm in light of these changes that that was the

4  case and that there's not intended, again, to be any

5  modification to the authorization of my clients to receive

6  those payments from Australian non-Debtor entities under the

7  interim order.

8          MR. DURRER:  That's correct, Your Honor, on behalf of

9  the Debtor.

10         THE COURT:  Okay thank you.

11         MR. SWETT:  Thank you, everyone.  Thank you, Your

12  Honor.

13         MR. DURRER:  One thing the parties are asking to just

14  confirm on the record which I'm happy to do so is that to the

15  extent that Your Honor determines whether it's on November

16  17th or some other date that the fees described in the

17  professional fee schedule are allowed and payable, but they

18  do fall within the carve-out.  Again, allowance and

19  payability are issues for another day and all rights as to

20  those matters are reserved.  But if they are, ultimately,

21  allowed and payable they would be within the definition of a

22  carve-out.

23         THE COURT:  I understand.

24         MR. DURRER:  And I also handed up to Your Honor, I

25  took the liberty of handing up the PSA order.  I don't think

1   it's necessary to walk through the change to that.  It's

2   consistent --

3          THE COURT:  What is the blackline during -- since

4   you've handed it up I think I understand it.

5          MR. DURRER:  Sure.  And yeah those dates as I

6   represented; again for the record, those dates are consistent

7   with the milestone dates that are set forth in the DIP order.

8          THE COURT:  Okay I think I understand.  All right

9   before I turn to the PSA order let me ask if anyone else

10  wishes to be heard with respect to the final order

11  authorizing post-petition financing.  Very well.  I will

12  repeat my comments from before the break that I certainly

13  appreciate the efforts and it's not lost on me the amount of

14  effort that goes into resolving the range of issues that were

15  presented by the Committee objections and, frankly, the deal

16  points that go to the terms of a financing transaction but

17  also the overall picture of where the case is going.  And so,

18  again, I express my appreciation to all parties for being

19  flexible and I expect professional and collegial in that

20  exercise.  And I'll leave it at that.

21         But with respect to the financing itself, I'm

22  satisfied that the Debtors have carried their burden with

23  respect to the relief requested.  And in light of the

24  resolution of objections to the DIP financing, I will simply

25  find that the Debtors carried their burden under Bankruptcy

1  Rule 4001 and Bankruptcy Code Sections 361, 363, and 364 for

2  the obtaining of post-petition secured financing and the use

3  of cash collateral on a post-petition basis.

4       I have had an opportunity to walk through with

5  counsel's assistance the blackline that shows the substantial

6  changes.  I understand the changes to the transaction and the

7  overall deal and I am prepared to enter the order approving

8  and authorizing that relief.  We will have this on the docket

9  today.

10       MR. DURRER:  Thank you, Your Honor.  That was matter

11  one.

12       THE COURT:  Today is the 28th.  With respect to the

13  Debtors' assumption of a PSA and the payment of related

14  transaction expenses, I would ask if anyone wishes to be

15  heard.  I do this largely as traveling with the other order,

16  but I want to make sure that everybody is on board with the

17  entry of this order as it has been revised and as is

18  reflected in the blackline that's been handed to the Court.

19  Very well.

20       Based upon the record before me, again, I'm satisfied

21  here that the Debtors have carried their burden with respect

22  to the relief requested.  And in the absence of opposition

23  from the Committee or other parties in interest, I'm

24  satisfied that the relief is appropriate and that order will

25  issue as well.  Mr. Durrer.

1     MR. DURRER:  Thank you, Your Honor.  With respect to

2  number two, Your Honor, we actually were, had a very

3  constructive collaborative effort with the Company since the

4  hearings second week in October. And basically reached

5  agreement on an uncontested form of critical vendor order.

6  If I may hand that up, Your Honor.

7     THE COURT:  Very good.  Thank you.

8     MR. DURRER:  Your Honor, just briefly to date Your

9  Honor has approved $40 million dollars of critical vendor

10  payments.  What this order contemplates is that there's an

11  additional $9.7 million dollars of authorization with respect

12  to two components: $7.2 million dollars of additional tier

13  one vendors as we described at the last hearing.  And then

14  there are certain sort of sole source non-merchandise vendors

15  for $2 million dollars, if that math is right.  I lost my

16  math ability at this hearing.  And that is authorized right

17  away and has been fully vetted with the Committee.

18     There's also an additional amount in the neighborhood

19  of $5.3 million dollars which remains under discussion as to

20  which we'll be working closely with the Committee to develop

21  transactions with critical vendors that make sense.  And to

22  the extent that we continue to work in cooperation that is

23  also authorized, but the Debtors do not anticipate needing to

24  come back with respect to further relief with respect to

25  critical vendors.

1        THE COURT:  So that was the question I had with

2  respect to -- and this is the relief provided at decretal

3  paragraph 2(b).

4        MR. DURRER:  Yes, Your Honor.

5        THE COURT:  Okay.  So as I understand it the Debtors

6  obtaining that authority subject to Committee consent and

7  approval and if you get a thumbs up from the Committee even

8  on a transaction by transaction basis you'll go ahead and do

9  it.  If you don't get that consent then, you don't have leads

10 to make those payments.

11       MR. DURRER:  Much the same way under the DIP.  You

12 know you've authorized us to borrow money but there's certain

13 circumstances where we need to get other stakeholder

14 approval.

15       THE COURT:  Yep; I understand.

16       MR. DURRER:  Item three, Your Honor -- did Your Honor

17 want to make comments or?

18       THE COURT:  I'd ask if anyone else wishes to be --

19 are there any other changes or issues with the critical

20 vendors?

21       MR. DURRER:  No, Your Honor.

22       THE COURT:  Okay I've been through the blackline as

23 well.  I'd ask if anyone else wishes to be heard with respect

24 to Debtors' request for a final order regarding critical

25 vendors.  Okay I have had an opportunity, as I said, to

1  review the blackline and I am satisfied now with basically

2  three hearings on this issue that the record is sufficiently

3  developed.  And, again, I am gratified to see that the

4  concerns expressed in the Committee objection have been

5  addressed and satisfactorily resolved.  And based upon the

6  record before me, I am satisfied these Debtors have carried

7  their burden with respect to the relief requested and the

8  proposed final order will issue.

9      MR. DURRER:  Thank you, Your Honor.  Item number

10 three, Your Honor, is the interim compensation motion.  There

11 is a blackline if I may hand that up.

12     THE COURT:  Sure.  Thank you.

13     MR. DURRER:  Your Honor, the comments, some of these

14 comments are from the U.S. Trustee which is paragraph four.

15 The old paragraph four was a comment that we received from

16 the Committee.  And my understanding is that with the, there

17 were some tweaks to the procedures as well that are reflected

18 in the blackline. But my understanding is that with the

19 resolution of the DIP and the DIP budget that there are no

20 other changes or objections to this order.

21     THE COURT:  Okay.  All right let me ask if anyone

22 wishes to be heard with respect to the Debtors' request for

23 procedures regarding interim compensation.  Very well.  Based

24 upon the record before me I'm satisfied that the Debtors have

25 carried their burden with respect to the relief requested.  I

1  regard this relief as primarily administrative in nature.

2  And it is largely consistent with relief that the Court has

3  entered in many, many previous cases.  This order will issue.

4       MR. DURRER:  Thank you, Your Honor.  And lastly for

5  today, Your Honor, item four which is the Peter J. Solomon

6  retention. We did work with the Committee with respect to

7  this as well and were successful in resolving their questions

8  and concerns.  In essence, Your Honor, there will be a

9  further revised fee for Peter J. Solomon of $7 million

10  dollars as a completion fee.  In addition, there are some

11  other modifications with respect to the fact that, in

12  circumstances where, for example, there might be a DIP

13  financing fee and a transaction fee PJSC has agreed that to

14  the extent that that DIP financing fee comes from holders of

15  notes that there wouldn't be a double counting, that there

16  will be a further credit.

17       THE COURT:  Sure.

18       MR. DURRER:  And other just you know minor

19  clarifications of their agreement.  Mr. Ajay Bijoor is here

20  in the Courtroom as a representative of Peter J. Solomon.

21  And my understanding is that there are no other objections to

22  that application.

23       THE COURT:  Okay let me ask if anyone wishes to be

24  heard with respect to the Peter J. Solomon retention

25  application.  Very well.  I'm prepared to approve and

1  authorize the relief requested. Do you have a blackline?

2        MR. DURRER:  I do, Your Honor.

3        THE COURT:  Can I see it?   Thanks.  I'm satisfied as

4  a threshold matter that the firm is certainly qualified and

5  has appeared many, many times in this jurisdiction.  I'm

6  satisfied likewise that the application complies with and

7  meets the requirements under applicable sections to the

8  Bankruptcy Code including but not limited to Section 327 and

9  328, as well as the applicable local rules.  I'm reviewing

10 the blackline version right now and I note that the

11 modifications are consistent with counsel's representation.

12 And so based upon the record before me and particularly in

13 light of the resolution of the pending Committee objection, I

14 will approve and authorize that relief.  This order will be

15 docketed today.

16        Mr. Durrer, I think that's all the items that we have

17 on the calendar today, is that correct?

18        MR. DURRER:  That is correct, Your Honor. We

19 appreciate again the Court's time.

20        THE COURT:  Happy to oblige. Where do we go from

21 here?  So you have a -- we have hearings coming up in the

22 second week and third week of November.

23        MR. DURRER:  Yes.  I believe it's November 17 with a

24 handful of retentions. I think there's some other what I

25 would call sort of procedural things 365(d)(4) extension.  I

1 think that there may be some other applications related to,

2 for example, relief with respect to the information that

3 we're required to disclose under Rule 2015.3 with respect to

4 foreign subs.  They'll tie more to the disclosure statement

5 hearing, but you might see that on the 17th as just a notice

6 matter.

7          THE COURT:  Your disclosure statement is going to get

8 filed by the end of the week so that will go out and then

9 we're teeing that up for a hearing in the first week in

10 December.

11          MR. DURRER:  Correct.

12          THE COURT:  All right I think I understand where we

13 stand.  Okay anything further today?  All right, again, I

14 appreciate everyone's efforts.  We'll stand in recess.  Thank

15 you.

16          MR. DURRER:  Thank you, Your Honor.

17     (Court Adjourned)

18

19                    CERTIFICATE

20

21 I certify that the foregoing is a correct transcript from the

22 electronic sound recording of the proceedings in the above-

23 entitled matter.

24

/s/Mary Zajaczkowski                     October 28, 2015

25 Mary Zajaczkowski, CET**D-531                    Date