## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
               :

In re:                    :      Chapter 11
               :

QUIKSILVER, INC., *et al.*,    :      Case No. 15-11880 (BLS)
               :

        Debtors.[1]       :      Jointly Administered
               :
               :      **Hrg. Date: Dec. 1, 2015 at 10:30 a.m. (Eastern)**
               :      **Obj. Due: Nov. 24, 2015 at 4:00 p.m. (Eastern)**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING (I) (A) ENTRY INTO THE BACKSTOP COMMITMENT LETTER AND (B) PAYMENT OF THE COMMITMENT FEES AND (II) THE RIGHTS OFFERING PROCEDURES AND RELATED FORMS

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Quiksilver" or the "Company"), hereby move (the "Motion") the Court for entry of an order, pursuant to sections 105(a), 363(b), 502, 1123(a), 1125, 1126, and 1128 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 3003, 3016, 3017, 3018, and 3020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the Debtors to (a) enter into that certain Backstop Commitment Letter dated as of October 31, 2015 (as may be amended, supplemented, or otherwise modified from time to time, the "Backstop Commitment Letter"), by and among the Debtors and certain funds managed by affiliates of Oaktree Capital Management, L.P. (collectively, "Oaktree" or the "Plan Sponsor" or, in its capacity as party to the Backstop Commitment Letter and provider of the Backstop

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

Commitments (as defined herein), the "Backstop Parties"), a copy of which is attached to the proposed order as Exhibit 1 and (b) upon the occurrence of certain conditions, as defined in the Backstop Commitment Letter, pay the Commitment Fees (as defined below) to the Backstop Parties and (ii) approving certain procedures, attached to the proposed order as Exhibit 2 (the "Rights Offering Procedures") and related forms annexed thereto (the "Rights Offering Materials"), in connection with the Rights Offerings (as defined below) to be consummated pursuant to the Plan (as defined below).  In support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:[2]

## PRELIMINARY STATEMENT

1.      The Debtors seek approval of the Backstop Commitment Letter, the Rights Offering Procedures, and the Rights Offering Materials, which are key components of the *Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession* [Docket No. 292] (the "Plan"), filed on October 13, 2015, pursuant to which the Debtors intend to emerge from chapter 11 with a right-sized balance sheet.

2.      In particular, the Plan provides for, and is funded in part by, two rights offerings.  First, Eligible Holders of the Debtors' prepetition senior secured notes (the "Secured Notes") or their Eligible Affiliates[3] will have the right to purchase up to $122.5 million of

---

[2]    To the extent that the following summaries or descriptions of the terms of the Backstop Commitment Letter and the Rights Offering Procedures differ from the actual terms of the Backstop Commitment Letter or the Rights Offering Procedures themselves, the terms of the Backstop Commitment Letter and the Rights Offering Procedures, respectively, shall control. Any defined terms used but not defined herein shall have the meanings ascribed to them in the Backstop Commitment Letter or the Rights Offering Procedures, unless otherwise indicated.

[3]    As further described in the Rights Offering Procedures, holders of Secured Notes as of the Rights Offering Record Date that affirmatively certify that they are an "Accredited Investor" or "Qualified Institutional Buyer," as those terms are defined under the applicable securities law (the "Eligible Holders") or certain of their affiliates (the "Eligible Affiliates" and together with the Eligible Holders, the "Eligible Offerees"), shall have the right, but not the obligation, to participate in the Rights Offerings (as defined below).

common stock of reorganized ZQK (the "New Common Stock") pursuant to a rights offering (the "Exit Rights Offering"). Second, Eligible Offerees will have the right to purchase up to €50 million of New Common Stock pursuant to an additional rights offering (the "Euro Notes Rights Offering" and together with the Exit Rights Offering, the "Rights Offerings"). The Rights Offerings will provide the Debtors with new capital and allow the Debtors to repay their postpetition debtor-in-possession financing facilities (the "DIP Facilities" comprised of the "DIP Term Loan Facility" and the DIP ABL Facility"), fund recoveries to general unsecured creditors, satisfy other chapter 11 emergence costs, fund their post-emergence business plan, and effectuate a potential deleveraging exchange of the Debtors' European senior notes (the "Euro Notes") through an exchange offer (the "Euro Notes Exchange Offer").

3.      To further effectuate the Plan, pursuant to the Backstop Commitment Letter, the Backstop Parties, which hold a substantial amount of the Secured Notes, some of the Euro Notes, and all of the Debtors' loans under the DIP Term Loan Facility, have committed to backstop (the "Backstop Commitment") (i) the purchase of up to $122.5 million of New Common Stock under the Exit Rights Offering  and (ii) the purchase of up to €50 million of New Common Stock under the Euro Rights Offering. The Rights Offerings and the associated Backstop Commitment Letter will ensure that the Reorganized Debtors have sufficient liquidity to fund distributions under the Plan and effectuate the Euro Notes Exchange Offer and, as such, are critical to effectuation of the Plan  The Backstop Commitment Letter incorporates the terms of the term sheet (the "Backstop Term Sheet"), attached as Exhibit C to that certain Plan Sponsor Agreement, dated as of September 8, 2015, between the Debtors and the Plan Sponsor (the "Plan Sponsor Agreement"), and approved by order of this Court on October 28, 2015 [Docket No. 377].

4.       As is customary, the Backstop Commitment Letter requires this Court's approval thereof as a funding condition and provides for the payment of the Commitment Fees. Here, the Debtors' business judgment underlying the decision to enter into the Backstop Commitment Letter and satisfy the Commitment Fees is undeniably sound.  The Backstop Commitment Letter assures the Debtors and their stakeholders that, subject to the satisfaction of the applicable conditions precedent, the Debtors have the necessary new capital committed to fund the Plan and to effectuate the Euro Notes Exchange Offer, which is a component of the Plan, and thus allows the Debtors to move forward with the Plan confirmation process.

5.       From the estates' perspective, the benefits provided by the Debtors' entry into the Backstop Commitment Letter — including the stability it provides to the Debtors' operations during the Chapter 11 Cases by providing the Debtors with a clear exit path — greatly outweigh its relatively limited obligations, including the Commitment Fees, and, therefore, this Court should approve the Debtors' entry into Backstop Commitment Letter.

6.       The Debtors further seek approval of the Rights Offering Procedures, including the related Rights Offering Materials, substantially as attached to the proposed order as Exhibit 2, which will provide for a streamlined and efficient process (i) for holders of Secured Notes (or their affiliates) to make (x) an eligibility election and (y) a determination whether to subscribe in the Rights Offerings concurrent with solicitation of votes on the Plan and (ii) for the Debtors to consummate the Rights Offerings substantially concurrently with the effectiveness of the Plan.[4]

---

[4]      Concurrent herewith, the Debtors have filed the *Debtors' Motion For Entry Of An Order (A) Approving The Adequacy Of The Debtors' Disclosure Statement; (B) Approving Solicitation And Notice Procedures With Respect To Confirmation Of The Debtors' Proposed Plan Of Reorganization; (C) Approving The Form Of Various Ballots And Notices In Connection Therewith; And (D) Scheduling Certain Dates With Respect Thereto* (the "Disclosure Statement and Solicitation Procedures Motion") which, among other things, seeks approval of procedures for solicitation of votes on the plan.

## JURISDICTION AND VENUE

7.       This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this case and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

8.       The legal predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363(b), 502, 1123(a), 1125, 1126, and 1128.  The relief requested is also warranted under Bankruptcy Rules 2002, 3003, 3016, 3017, 3018, and 3020.

9.       Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

### I.       The Chapter 11 Case

10.       On September 9, 2015 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  These Chapter 11 Cases are jointly administered.

11.       The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.       On September 22, 2015, the Office of the United States Trustee for the District of Delaware (the "United States Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On September 28, 2015, the United States Trustee filed an Amended Notice of Appointment of Creditors' Committee.  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

13.    Quiksilver is one of the world's leading outdoor sports lifestyle companies. The Company designs, develops and distributes branded apparel, footwear, accessories and related products.  The Company began operations in 1976 making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, BMX, and motocross, among other activities.  The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites.  The Debtors comprise each of the Company's U.S. entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc. and seven inactive entities.

14.    On October 13, 2015, the Debtors filed the Plan.  Concurrently herewith, the Debtors filed their *Disclosure Statement with Respect to the Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession* (the "Disclosure Statement") and the Disclosure Statement and Solicitation Procedures Motion.

15.    Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., In Support Of Chapter 11 Petitions And First Day Pleadings [Docket No. 20] (the "First Day Declaration").

## II.    The Backstop Commitment Letter

16.    The Backstop Commitments are integral to the consummation of the Plan. It ensures that capital required to fund the Plan is committed prior to solicitation on the Plan and the commencement of the Rights Offerings. The Rights Offerings provide Eligible Holders of Secured Notes and their Eligible Affiliates the right to purchase their *pro rata* share of (i) $122.5 million of New Common Stock through the Exit Rights Offering and (ii) €50 million of New Common Stock through the Euro Notes Rights Offering.

17.    The following summarizes the key terms of the Backstop Commitment Letter:[5]

| | |
|---|---|
| **Backstop Commitments** | The Plan Sponsor commits (individually, the "Exit Facility Commitment" and the "Euro Notes Commitment," and together, the "Backstop Commitments") to (A) acquire and exercise its rights in its capacity as a holder of Secured Notes to acquire New Common Stock in the in the Exit Rights Offering and the Euro Notes Rights Offering and (B) backstop the Rights Offerings by purchasing, at the applicable price, all of the New Common Stock allocated to the Rights Offerings  that is not purchased in the Rights Offerings by holders of Secured Notes other than the Plan Sponsor; provided, however, that, for the avoidance of doubt, in no event shall the Plan Sponsor be required to provide more than $122.5 million in connection with the Exit Rights Offering, or €50.0 million in connection with the Euro Notes Rights Offering; provided, further, however, that the Plan Sponsor's commitment to backstop the Euro Notes Rights Offering shall be limited to the extent that less than 100 percent in aggregate principal amount of Euro Notes are tendered into the Euro Notes Exchange Offer.  The Backstop Commitments shall be reduced on a dollar-for-dollar basis by the funds raised from non-Plan Sponsor parties under the Rights Offerings.  The Parties agree that:  (a) the proceeds from the Euro Notes Rights Offering will be used solely to consummate the Euro Notes Exchange Offer; and (b) the proceeds from the Exit Rights Offering will be used (i) first to satisfy any remaining unpaid balance of the DIP Term Facility outstanding on the Effective Date, (ii) second to fund the Unsecured Creditor Recovery (as defined in the Backstop Term Sheet), and (iii) third to fund any other payments required on the Effective Date and general corporate purposes.  The Parties acknowledge and agree that: (y) the Plan Sponsor shall not have any liability or obligation with respect to the Exit Facility Commitment in the event that the Exit Rights Offering does not occur or is not consummated as contemplated in the PSA |

---

[5]    Any description or summary of the Backstop Commitment Letter in this Motion is qualified in all respects by reference to the Backstop Commitment Letter.  To the extent of any inconsistency between this summary and the Backstop Commitment Letter, the Backstop Commitment Letter shall govern.  Capitalized terms used in this section, but not otherwise defined in the Motion, shall have the meanings set forth in the Backstop Commitment Letter, unless otherwise indicated.

|  | Term Sheet and Backstop Term Sheet; and (z) the Plan Sponsor shall not have any liability or obligation with respect to the Euro Notes Commitment in the event that the Euro Notes Rights Offering does not occur or is not consummated as contemplated in the PSA Term Sheet and the Backstop Term Sheet.<br><br>See Backstop Commitment Letter § 1. |
|---|---|
| **Conditions Precedent** | The Backstop Commitments are subject to the satisfaction of each of the following conditions precedent:<br><br>With respect to the Exit Facility Commitment:<br><br>(a)  the order approving this Motion becomes a final order;<br><br>(b)  the Bankruptcy Court enters an order approving the Disclosure Statement and Solicitation Procedures Motion, which shall be in form and substance acceptable to the Plan Sponsor;<br><br>(c)  the Commitment Fees shall be earned and payable;<br><br>(d)  the Bankruptcy Court enters a final order, which shall be in form and substance acceptable to the Plan Sponsor, confirming the Plan;<br><br>(e)  no events of defaults under the DIP ABL Facility or the DIP Term Loan Facility have occurred;<br><br>(f)  the PSA shall not have terminated and shall continue to be effective;<br><br>(g)  the Debtors have paid the expense reimbursements outlined in the PSA on a timely basis;<br><br>(h)  all documents arising from or related to the Chapter 11 Cases have been executed, the form of which documents must be reasonably satisfactory to the Plan Sponsor;<br><br>(i)  the negotiation, execution, and delivery of all definitive documentation related to the Exit Rights Offering are in form and substance satisfactory to the Plan Sponsor and the completion of the Euro Notes Rights Offering thereafter;<br><br>(j)  all conditions precedent to the Plan (other than those related to the funding of the Exit Facility Commitment pursuant to the Backstop Commitment Letter) shall have been satisfied or waived in accordance with the Plan; and<br><br>(k)  the Effective Date under the Plan shall have occurred or shall occur substantially simultaneously with the funding of the Exit Facility Commitment pursuant hereto;<br><br>provided, however, that the Plan Sponsor may waive any of the foregoing conditions precedent in its sole discretion.<br><br>With respect to the Euro Notes Commitment:<br><br>(a)  the order approving this Motion becomes a final order;<br><br>(b)  the Bankruptcy Court enters an order approving the Disclosure Statement and Solicitation Procedures Motion, which shall be in form and substance |

|  | acceptable to the Plan Sponsor; |
|---|---|
|  | (c)    the Commitment Fees shall be earned and payable; |
|  | (d)    the Bankruptcy Court enters a final order, which shall be in form and substance acceptable to the Plan Sponsor, confirming the Plan; |
|  | (e)    no events of defaults under the DIP ABL Facility or the DIP Term Loan Facility have occurred; |
|  | (f)    the PSA shall not have terminated and shall continue to be effective; |
|  | (g)    the Debtors have paid the expense reimbursements outlined in the PSA on a timely basis; |
|  | (h)    all documents arising from or related to the Chapter 11 Cases have been executed, the form of which documents must be reasonably satisfactory to the Plan Sponsor; |
|  | (i)    the negotiation, execution, and delivery of all definitive documentation related to the Euro Notes Rights Offering are in form and substance satisfactory to the Plan Sponsor and the completion of the Euro Notes Rights Offering thereafter; |
|  | (j)    all conditions precedent to the Plan (other than those related to the funding of the Euro Notes Commitment pursuant to the Backstop Commitment Letter) shall have been satisfied or waived in accordance with the Plan; |
|  | (k)    the Effective Date under the Plan shall have occurred or shall occur substantially simultaneously with the funding of the Euro Notes; and |
|  | (l)    the Euro Notes Exchange Offer shall be consummated in accordance with the PSA Term Sheet, the PSA, and the Plan; |
|  | provided, however, that the Plan Sponsor may waive any of the foregoing conditions precedent in its sole discretion.<br><br>See Backstop Commitment Letter § 2. |
| **Backstop Commitment Fees** | In exchange for the Backstop Commitments, the Plan Sponsor shall fully earn the following commitment fees (the "Commitment Fees") upon the Bankruptcy Court entering orders approving the Backstop Commitment Letter and the disclosure statement in respect of the Plan: (a) $6.125 million, which is 5% of the Exit Facility Commitment; and (b) €2.5 million, which is 5% of the Euro Notes Commitment. The Commitment Fees shall be payable in New Common Stock on the Effective Date consistent with the Plan, to be issued at the same discount as the New Common Stock issued in the Rights Offerings, and which such issuances shall dilute all other issuances of New Common Stock in connection with the effectiveness of the Plan; provided, however, that, at the Plan Sponsor's election, the Commitment Fees shall be payable in cash in the event the Plan is not consummated for any reason within 150 days of the Petition Date.<br><br>See Backstop Commitment Letter § 3. |
| **Termination Events** | The Plan Sponsor may terminate its obligations or commitments under the Backstop Commitment Letter by providing written notice to the Debtors' counsel upon the earliest occurrence of any of the following termination events: |

| | |
|---|---|
| | (a)   the Debtors do not file a motion seeking approval of the Backstop Commitment Letter on or before October 30, 2015;<br><br>(b)   the Bankruptcy Court does not enter an order approving the Backstop Commitment Letter on or before December 4, 2015;<br><br>(c)   the occurrence of any default or event of default under the DIP ABL Facility or the DIP Term Loan Facility; or<br><br>(d)   the occurrence of any Plan Sponsor Termination Event, as described in § 5.01 of the PSA.<br><br>The Backstop Commitment Letter can also be terminated by the written mutual consent of each of the Parties.  If (x) the Commitment Fees have been earned but not yet paid, (y) the PSA has been terminated pursuant to section 5.02(c) thereof in light of a Superior Proposal or the Debtors have obtained Bankruptcy Court approval of an alternative debtor in possession financing facility in furtherance of a Superior Proposal, and (z) the Plan Sponsor delivers a termination notice in accordance with this paragraph, then the Commitment Fees shall be paid in full in cash within three (3) business days after the Plan Sponsor's delivery of such notice; provided, however, that in the event the Agreed Plan is not consummated within 150 days of the Petition Date for any reason (other than as set forth in subpart (y) above),  then, at the Plan Sponsor's election, the Commitment Fees shall be payable in cash no later than the end of the 150th day following the Petition Date.<br><br>See Backstop Commitment Letter § 4. |
| **Representations, Warranties, Conditions & Covenants** | The Plan Sponsor certifies that it or any funds and accounts it manages and/or advises that participates in the Rights Offerings:<br><br>(a)   (i) is certified as an "accredited investor" as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act of 1933, as amended (the "Securities Act"), which, for the avoidance of doubt, shall exclude any natural person, or (ii) is a "qualified institutional buyer" as defined in Rule 144A of the Securities Act;<br><br>(b)   is acquiring the New Common Stock for its own account with the present intention of holding such securities for investment purposes and not with a present view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities laws;<br><br>(c)   has had an opportunity to ask questions and receive answers concerning the terms and conditions of the Rights Offerings and acknowledges that it or its representatives have been furnished with all information that it has requested; and<br><br>(d)   has the requisite power and authority to participate in the Rights Offerings, as applicable, and such participation does not conflict with, violate, or cause a breach of any agreement, contract, or instrument to which it is a party or any judgment, order, or decree to which it is subject.<br><br>Additionally, each party certifies that it has the requisite power and authority to execute the Backstop Commitment Letter. |

| | |
|---|---|
| | <u>See</u> Backstop Commitment Letter § 5. |
| **Miscellaneous** | Subject to the terms and conditions of the Backstop Commitment Letter, the Plan Sponsor shall fund the Backstop Commitments in the amount not otherwise funded by non-Plan Sponsor parties under the Rights Offerings by wire transfer of immediately available funds to the accounts as designated by the Debtors.  The Plan Sponsor's commitments under the Backstop Commitment Letter—including subparts (A) and (B) of the first sentence of paragraph 1 of the Backstop Commitment Letter—shall be funded on or before the Effective Date (the "<u>Funding Date</u>").  The Plan Sponsor's commitments under the Backstop Commitment Letter in respect of the Euro Notes Commitment shall be funded in euro (€), and the Plan Sponsor's commitments under the Backstop Commitment Letter in respect of the Exit Facility Commitment shall be funded in U.S. dollars ($). <br><br> <u>See</u> Backstop Commitment Letter § 6(a). |

## III.    The Rights Offering Procedures[6]

18.    The Debtors, in conjunction with the Plan Sponsor, have formulated the

Rights Offering Procedures and the Rights Offering Materials, attached to the proposed order as

<u>Exhibit 2</u>, for the conduct of the Rights Offerings.  Briefly, the Rights Offering Procedures

provide for a two-step process whereby holders of Secured Notes or their affiliates must first

certify that they are Eligible Holders or Eligible Affiliates, respectively, by returning, via their

Nominees, a Secured Notes Eligibility Certificate, which must be submitted by the Secured

Notes Eligibility Certificate Deadline of December 28, 2015.  The Subscription Agent (as

defined below) will mail the Secured Notes Eligibility Certificates to the Nominees by no later

than December 7, 2015, providing parties with  approximately 21 days to return their Secured

Notes Eligibility Certificates to their Nominees, which must complete the confirmation of

ownership section and return the certificates to the Subscription Agent.  To expedite the process,

---

[6]    Any description or summary of the Rights Offering Procedures in this Motion is qualified in all respects by reference to the Rights Offering Procedures.  To the extent of any inconsistency between this summary and the Rights Offering Procedures, the Rights Offering Procedures shall govern.  Capitalized terms used in this section, but not otherwise defined in the Motion, shall have the meanings set forth in the Rights Offering Procedures, unless otherwise indicated.

Secured Notes Eligibility Certificates may be returned to the Subscription Agent by mail or by email. Transferee Holders – *i.e.*, holders of Secured Notes who obtain their notes after the commencement of the Rights Offerings but before the Secured Notes Eligibility Certificate Deadline – must also submit, along with their Secured Notes Eligibility Certificate, a Certification Period Transfer Notice.

19.     The Eligible Offerees – *i.e.*, those holders (including Transferee Holders) and their affiliates which return a properly completed Secured Notes Eligibility Certificate – will then receive a Subscription Form, whereby they can subscribe for the exercise of some or all of their Rights under the Rights Offerings. The Subscription Form and the Subscription Purchase Price must be returned to the Subscription Agent by the Subscription Deadline of January 14, 2016, approximately 17 days after the Secured Notes Eligibility Certificate Deadline. Instructions with respect to completing each of the forms shall accompany such form.

20.     In addition to compliance with the Rights Offering Procedures, it is a condition precedent to participation in the Rights Offerings that the holder of the Secured Notes Claims for which Rights are being exercised properly submit a ballot (i) to accept the Plan and (ii) not opting out of the releases included in Article 10.5 of the Plan.

21.     The Rights Offering process will run parallel to, but independently of, the solicitation process – commencing on the date of mailing of solicitation materials and concluding on the deadline for submitting ballots voting on the Plan. To assist the holders of Secured Notes with making a decision with respect to whether to participate in the Rights Offerings, the Rights Offering Procedures and the Disclosure Statement, all of which shall be made available to holders of Secured Notes upon commencement of the Rights Offerings, shall contain further detail regarding the Rights Offerings and the Reorganized Debtors. Further, the Rights Offering

Materials will contain warnings urging holders to review the Disclosure Statement and Plan prior to making a decision with respect to the exercise of their Rights.

22.    <u>Appointment of Kurtzman Carson Consultants, LLC as Subscription Agent</u>.  The Debtors have previously retained Kurtzman Carson Consultants, LLC ("<u>KCC</u>") as administrative agent to the Debtors in these Chapter 11 Cases [Docket No. 243].  The Debtors believe such retention is broad enough to encompass the KCC's services as subscription agent for the Rights Offerings ("<u>Subscription Agent</u>").  Nonetheless, for the avoidance of doubt, the Debtors request authorization for KCC to act as Subscription Agent in connection with the Rights Offerings, pursuant to their existing engagement letter, as previously approved by this Court.

23.    KCC is well-positioned to serve as the Debtors' Subscription Agent.  As noted above, KCC currently serves as the Debtors' administrative agent, and has also been retained as claims and noticing agent [Docket No. 69], and is familiar with the context of the cases, the creditor constituency, and previous mailings.  Moreover, KCC will be serving as solicitation agent in connection with the solicitation of votes on the Plan, as further set forth in the Disclosure Statement and Solicitation Procedures Motion, which process will run concurrent with the Rights Offerings.  Having KCC serve in both capacities will create material efficiencies. Finally, KCC possesses an expertise conducting rights offerings and has served in such capacity in other cases, including <u>In re MPM Silicones, LLC, et al.</u>, Case No. 14-22503 (Bankr. S.D.N.Y. 2014); <u>In re Overseas Shipholding Group, Inc., et al.</u>, Case No 12-2000 (Bankr. D. Del. 2012); <u>In re Eastman Kodak Company, et al.</u>, Case No. 12-10202 (Bankr. S.D.N.Y. 2012); <u>In re Filene's Basement, LLC</u>, Case No. 11-13511 (Bankr. D. Del. 2011); <u>In re Tronox Inc.</u>, et al., Case No. 09-10156 (Bank. S.D.N.Y. 2009).

## RELIEF REQUESTED

24.    By this Motion, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, (i) authorizing the Debtors to (a) enter into the Backstop Commitment Letter,  and (b) pay the Commitment Fees in connection therewith and (ii) approving the Rights Offering Procedures and the Rights Offering Materials.

## BASIS FOR RELIEF

### A.    Entry into the Backstop Commitment Letter is an Exercise of the Debtors' Sound Business Judgment

25.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In the Third Circuit, courts have authorized the use or sale of property of the estate outside the ordinary course of business when such use or sale is grounded upon a "sound business purpose" and is proposed in good faith. See In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Dai-Ichi Kango Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at * 7 (D. Del. May 20, 2002); In re Exaeris, Inc., 380 B.R. 741 (Bankr. D. Del. 2008).

26.    Once a debtor articulates a valid business justification under section 363 of the Bankruptcy Code, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company.  See Official Comm. of Subordinated Bondholdrs v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)); see also Bridgeport Holdings, Inc. Liquidating Trust v. Boyer (In re

Bridgeport Holdings, Inc.), 388 B.R. 548, 567 (Bankr. D. Del. 2008). Further, once "the debtor

articulates a reasonable basis for its business decisions (as distinct from a decision made

arbitrarily or capriciously), courts will generally not entertain objections to the debtor's

conduct." Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp., (In re Johns-Manville

Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The business judgment rule has vitality in

chapter 11 cases and shields a debtor's management from judicial second-guessing. See

Integrated Res., 147 B.R. at 656; Johns-Manville, 60 B.R. at 615-16 ("[T]he Code favors the

continued operation of a business by a debtor and a presumption of reasonableness attaches to a

debtor's management decisions."). Thus, if a debtor's actions satisfy the business judgment rule,

then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy

Code.

   27. The Backstop Commitment Letter is critical to the restructuring

transactions contemplated by the PSA and the Plan.  The Debtors have determined that, in the

exercise of their business judgment, the Backstop Commitment is vital to the Debtors' ability to

preserve the value of their business by permitting them to progress the plan confirmation process

and emergence from chapter 11. In particular, the Debtor submit that the relief requested herein

is necessary to secure the monetary commitment of the Plan Sponsor to provide funding needed

for the Plan and ultimately to allow the Debtors to successfully emerge from the Chapter 11

Cases.  Here, the Debtors engaged in arms' length negotiations with Oaktree and its advisors to

arrive at the terms of the Plan, including the Rights Offerings and the Backstop Commitment

Letter.  The Debtors believe that the terms of the Backstop Commitment Letter are fair and that

the agreement is necessary to confirm and consummate the Plan.  Moreover, the Backstop

Commitment and the Rights Offerings it supports helps assure adequate liquidity and financial

support for the Debtors' emergence by funding Plan distributions and the deleveraging Euro

Notes Exchange Offer.

28.     Under similar circumstances, other courts have authorized entry into

backstop agreements as a valid exercise of a debtor's business judgment.  See, e.g., In re Exide

Technologies, Case No. 13-11482 (Bankr. D. Del. Feb. 4, 2015); In re Ablest Inc., Case No. 14-

10717 (Bankr. D. Del. Apr. 21, 2014) (approving Backstop Commitment Letter); In re

AbitibiBowater Inc., Case No. 09-11296 (Bankr. D. Del. Aug. 2, 2010) (approving Backstop

Commitment Letter); In re Spansion, Inc., Case No. 09-10690 (Bankr. D. Del. Jan. 19, 2010)

(approving Backstop Commitment Letter); In re Dayton Superior Corp., Case No. 09-11351

(Bankr. D. Del. Aug. 24, 2009) (approving Backstop Commitment Letter); In re Dura

Automotive Systems, Inc., Case No. 06-11202 (Bankr. D. Del. Oct. 4, 2007) (approving

Backstop Commitment Letter).

29.     Accordingly, entry into the Backstop Commitment Letter is necessary

and appropriate and a sound exercise of the Debtors' business judgment.

**B.      The Commitment Fees Under the Backstop Commitment Letter are Reasonable and Appropriate**

30.     The Debtors submit that the Commitment Fees payable under the

Backstop Commitment Letter are customary and reasonable under the circumstances of these

cases.  The Commitment Fees compensate the Plan Sponsor for committing funds necessary for

the Debtors' emergence from chapter 11 and for tying up the Plan Sponsor's substantial financial

resources during this time.

31.     Specifically, pursuant to the Backstop Commitment Letter, the Debtors

will pay the Plan Sponsor (a) $6.125 million, which is 5% of the Exit Rights Offering Backstop

Commitment; and (b) €2.5 million, which is 5% of the Euro Notes Rights Offering Backstop

Commitment. Notably, if the Rights Offerings are consummated, the Debtors can satisfy the

Commitment Fees with additional New Common Stock on the Effective Date. In the event that

the Debtors do not consummate the Plan within 150 days of the Petition Date, the Commitment

Fees are payable in cash.

32.     The Commitment Fees are well within the range of fees typically paid in

similar circumstances. See, e.g., In re Foamex Int'l Inc., Case No. 09-10560 (KJC) (Bankr. D.

Del. 2009) (approving a 5% break-up fee); In re Key Plastics, Inc., Case No. 08-13324 (MFW)

(Bankr. D. Del. December 17, 2008) (approving an alternate transaction fee of 7.5% of the rights

offering amount); In re K-V Discovery Solutions Inc., Case No. 12-13346 (Bankr. S.D.N.Y. June

7, 2013) (authorizing a 4.5% breakup fee); In re General Maritime Corporation, Case No. 11-

15285 (MG) (Bankr. S.D.N.Y. Dec. 15, 2011) (approving a 7% breakup fee); In re Tronox Inc.,

Case No. 09-10156 (Bankr. S.D.N.Y. Sep. 17, 2010) (approving 6% breakup fee in connection

with $185 million rights offering); see also In re Spansion Inc., No. 09-10690 (Bankr. D. Del.

Jan. 7, 2010) (approving a cash termination fee in connection with a backstop commitment).

33.     Moreover, the Commitment Fees, which are intended to be satisfied in the

form of New Common Stock and, thus, would impose minimal additional costs on the Debtors or

their estates, is comparable to fees paid for capital contributions in similar transactions. See, e.g.,

In re Vertis Holdings Inc., Case No. 10-16170 (Bankr. S.D.N.Y. Dec. 1, 2010) (authorizing a

commitment fee of 10% of the equity in the reorganized debtors upon plan consummation); In re

Tronox, Inc., No. 10-16170 (Bankr. S.D.N.Y. Sep. 17, 2010) (authorizing payment of

commitment fee in equity or cash equal to (a) 6% of the equity commitment and (b) 4.7% of

shares outstanding upon plan consummation); In re TCI 2 Holdings, LLC, Case No. 09-

13654(JHW) (Bankr. D. N.J. May 7, 2010) (approving commitment fee of 20%, to be paid in

stock, on a commitment of $225 million); <u>In re Accuride Corp.</u>, Case No. 09-13449 (BLS)

(Bankr. D. Del. Dec. 18, 2009) (approving a commitment fee of 11.3%, to be paid in stock, on a

commitment of $140 million); <u>In re MagnaChip Semiconductor Finance Co.</u>, Case No. 09-12008

(PJW) (Bankr. D. Del. Sept. 25, 2009) (approving a commitment fee of 10%, to be paid in stock,

on a commitment of $35 million); <u>In re Wellman, Inc.</u>, Case No. 08-10595 (SMB) (Bankr.

S.D.N.Y. Jan. 14, 2009) (approving a commitment fee of 14.3%, to be paid in convertible notes,

on a commitment of $105 million); <u>see also</u>, <u>In re Visteon Corp.</u>, Case No. 09-11786 (Bankr. D.

Del. June 17, 2010) (approving backstop fee, 25% of which was payable upon entry of the order).

34.    Importantly, the Commitment Fees are a necessary and integral part of the

negotiated arrangement reached regarding the Backstop Commitment Letter.  The Plan Sponsor

requires the Commitment Fees to facilitate the transactions contemplated.

35.    Lastly, the Debtors submit that the Commitment Fees payable under the

Backstop Commitment Letter constitutes "actual, necessary costs and expenses of preserving the

estate." 11 U.S.C. § 503(b)(1)(A).  Without the ability to pay these fees, the Debtors would be

unable to secure the Plan Sponsor's commitments to ensure that the Rights Offerings are

backstopped up to the full offered amount.  And without the Backstop Commitments, the

Debtors' ability to consummate the Rights Offerings and, thus, confirm and consummate the

Plan would be jeopardized, thereby impairing the value of their estates.  Accordingly, the fees

payable under the Backstop Commitment Letter should be awarded administrative expense status

pursuant to section 503(b)(1).

## C.    The Rights Offering Procedures and Rights Offering Materials are an Exercise of the Debtors' Sound Business Judgment

36.    As set forth above, a debtor may use, lease or sale of property of the estate

if doing so is in the sound business judgment of the debtor.

37. The Rights Offerings are a critical component of the Plan, which, though the Plan Sponsor, has the support of a majority of the Secured Notes class. Indeed, the Plan represents the Debtors' best hope for expeditiously exiting from chapter 11 and emerging as a healthy and thriving enterprise on a go-forward basis. The Debtors believe that the Rights Offering Procedures and the related Rights Offering Materials are necessary to the successful effectuation of the Rights Offerings and provide Eligible Offerees a fair and reasonable opportunity to participate in the Rights Offerings. Thus, the Debtors believe in their sound business judgment that approval of the Rights Offering Procedures and the related Rights Offering Materials is in the Debtors' and their creditors' best interests.

38. Courts in this district have approved similar relief. See In re Exide Technologies, Case No. 13-11482 (Bankr. D. Del. Feb. 4, 2015); In re Overseas Shipholding Group, Inc., et al., Case No. 12-20000 (Bankr. D. Del. May 27, 2014) (PJW) (Docket No. 3281) (approving rights offering procedures and authorizing debtors to conduct a rights offering in accordance therewith); In re William Lyons Homes, et al., Case No. 11-14019 (CSS) (Bankr. D. Del. Dec. 29, 2011) (Docket No. 106) (same); In re Satelites Mexicanos, S.A. de C.V., et al., Case No. 11-11035 (CSS) (Bankr. D. Del. April 11, 2011) (Docket No. 127) (same); In re Harry & David Holdings, Inc., et al., Case No. 11-10884 (MFW) (Bankr. D. Del. May 10, 2011) (Docket No. 287) (approving accreditor investor procedures in connection with proposed rights offering); In re Visteon Corporation, et al., Case No. 09-11786 (CSS) (Bankr. D. Del. June 28, 2010) (Docket No. 3490) (approving rights offering procedures); In re Cooper-Standard Holdings Inc., et al., Case No. 09-12743 (PJW) (Bankr. D. Del. March 26, 2010) (Docket No. 1118) (authorizing rights offering and approving rights offering procedures).

19

39.     Moreover, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  In essence, the Court may enter an order that safeguards the value of the debtor's estate if doing so is consistent with the Bankruptcy Code. See, e.g., Chinichian v. Campolongo (In re Chinichian) 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws."). Because approval of the Rights Offering Procedures and the related Rights Offering Materials are necessary to effectuate the Plan—which represents the Debtors' best means of protecting the value of their estates and maximizing recoveries—the Debtors believe that the Court's application of section 105(a) of the Bankruptcy Code here is appropriate.[7]

## WAIVER OF ANY APPLICABLE STAY

40.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order,

---

[7]     Section 1125(b) provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title . . . unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).  Here, the Rights Offering process will run parallel to, but independently of, the solicitation process.  The Rights Offering Materials will be provided to holders of Secured Notes substantially contemporaneously with the commencement of solicitation and will contain warnings urging holders to review the Disclosure Statement and Plan prior to making a decision with respect to the exercise of their Rights. Thus, the Rights Offering Materials are consistent with section 1125(b) of the Bankruptcy Code.

unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**NOTICE**

41.    Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agents and lenders under the DIP Facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan facility; (d) counsel to the indenture trustee for the Debtors' prepetition senior secured notes; (e) counsel to the indenture trustee for the Debtors' prepetition senior unsecured notes; (f) counsel to the Creditors' Committee; and (g) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting (a) the relief requested herein and (b) such other relief as is appropriate under the circumstances.

Dated: Wilmington, Delaware
       October 31, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/      Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Z. Li
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

Mark S. Chehi (I.D. No. 2855)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

John K. Lyons
Jessica S. Kumar
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*