IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| QUIKSILVER, INC., *et al.*, | : | Case No. 15-11880 (BLS) |
|  | : |  |
| Debtors.[1] | : | Jointly Administered |
|  | : |  |
|  | : | **Hrg. Date: Dec. 1, 2015 at 10:30 a.m. (Eastern)** |
|  | : | **Obj. Due: Nov. 24, 2015 at 4:00 p.m. (Eastern)** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' MOTION FOR ORDER APPROVING THE IMPLEMENTATION OF THE KEY EMPLOYEE INCENTIVE AND RETENTION PLAN

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby move (this "Motion") this Court for entry of an order, under sections 105, 363(b) and, to the extent applicable, 503(c)(3) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing, but not directing, the Debtors to implement the proposed key employee incentive and retention plan (the "Plan"), substantially in the form attached hereto as Exhibit A. In support of this Motion, the Debtors rely upon and incorporate by reference the Declaration of Dewey Imhoff in Support of Debtors' Motion for Order Approving the Implementation of the Key Employee Incentive and Retention Plan (the "Imhoff Declaration"), filed with the Court concurrently herewith. In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code.  The relief is further warranted under Bankruptcy Rule 6004.

3.      Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

4.      On September 9, 2015 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  These Chapter 11 Cases are jointly administered.

5.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On September 22, 2015, the Office of the United States Trustee for the District of Delaware (the "United States Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On September 28, 2015, the United States Trustee filed an Amended Notice of Appointment of Creditors' Committee.  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

7.      Quiksilver is one of the world's leading outdoor sports lifestyle companies.  The Company designs, develops and distributes branded apparel, footwear, accessories and related

products.  The Company began operations in 1976 making boardshorts for surfers in the United

States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the

Company's business is rooted in the strong heritage and authenticity of its core brands,

*Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with

surfing, skateboarding, snowboarding, BMX, and motocross, among other activities. The

Company's products are sold in over 115 countries through a wide range of distribution points,

including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores,

discount centers, specialty stores, select department stores, and licensed stores), Company-owned

retail stores, and its e-commerce websites.  The Debtors comprise each of the Company's U.S.

entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc.

and seven inactive entities.

8.      On October 13, 2015, the Debtors filed the *Joint Chapter 11 Plan of

Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession* [Docket

No. 292] (the "Chapter 11 Plan").  On October 30, 2015, the Debtors filed the *Disclosure

Statement with Respect to the Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its

Affiliated Debtors and Debtors in Possession* [Docket No. 396].

9.      Additional factual background information regarding the Debtors, including their

business operations, their corporate and capital structure, and the events leading to these Chapter

11 Cases, is set forth in detail in the *Declaration of Andrew Bruenjes, Americas Chief Financial

Officer of Quiksilver, Inc., in Support of Chapter 11 Petitions and First Day Pleadings* [Docket

No. 20].

## RELIEF REQUESTED

10.      By this Motion, the Debtors seek entry of an order under Bankruptcy Code

sections 105, 363(b) and, to the extent applicable, section 503(c)(3): (i) authorizing the Debtors

to implement the proposed Plan with respect to payments to certain key executives designed to incentivize such employees to maximize recoveries to creditors through the restructuring and concurrent sale process—the proposed Key Employee Incentive Plan (as set forth in the Plan and described herein, the "KEIP"); (ii) authorizing the Debtors to implement the proposed Plan with respect to retention payments to certain non-senior management personnel who are central to the Debtors' continuing operations—the proposed Key Employee Retention Plan (as set forth in the Plan and described herein, the "KERP"); and (iii) allowing all payments under the KEIP and the KERP as administrative expenses of these estates.

## BASIS FOR RELIEF

**A.      The Key Employee Incentive Plan**

   i.   Overview of KEIP

11.      Prior to the Petition Date, the Debtors recognized a need to address the concerns of their employees and their creditors and to align the interests of these respective constituencies. With these objectives in mind, the Debtors, after extensive consultation with, and benchmarking analysis by, FTI Consulting ("FTI"), developed the KEIP to properly incentivize certain key employees identified by the Debtors.

12.      The KEIP is designed to provide incentives to three (3) eligible U.S. executives (the "KEIP Participants") to pursue a timely and successful reorganization or sale. Each of the KEIP Participants will be playing a central role in the chapter 11 process, especially given the ongoing parallel processes for marketing the Debtors and their assets while simultaneously pursuing the consummation of the proposed Chapter 11 Plan sponsored by certain of the Debtors' prepetition stakeholders. Incentivizing the KEIP Participants is critical in order to ensure that these key members of management continue in their efforts to successfully guide the

Debtors through the bankruptcy process and maximize value for the benefit of all the Debtors'
stakeholders.

13.     As set forth in the Plan, the KEIP provides for variable payouts to the KEIP
Participants based upon the achievement of relevant target metrics, including (a) emergence from
bankruptcy (through either effectiveness of a plan of reorganization or consummation of a sale of
substantially all of the Debtors' assets), (b) continued compliance with the post-petition credit
agreements (the "DIP Credit Agreements"), including the covenants contained therein, and (c)
the achievement of pre-determined personal goals (as determined by a designated superior for
each KEIP Participant).  Each of these metrics accounts for one-third of the maximum incentive
bonus amount which may be earned by each KEIP Participant, such that failure to achieve any of
the three metrics results in a deduction of one-third of the maximum incentive bonus amount.
Furthermore, the date of emergence from bankruptcy (the "Emergence Date") also impacts the
earned bonus amount.  If the Emergence Date occurs on or before February 15, 2016, then the
full one-third portion of the maximum incentive bonus amount is earned; however, (i) if the
Emergence Date occurs on or between February 16, 2016 and March 15, 2016, 85% of the
Emergence Amount shall be earned and (ii) if the Emergence Date occurs on or between March
16, 2016 and April 15, 2016, 70% of the Emergence Amount shall be earned.  The aggregate
proposed payments for the KEIP Participants is $1,469,500, with individual proposed maximum
payouts ranging from 75% to 100% of base compensation, and payments shall be made on or
before the fifteenth (15th) calendar day following the Emergence Date subject to later

disgorgement as set forth in the Plan and described below (such date, the "Incentive Bonus Payment Date").[2]

14.      In the event that a that a KEIP Participant is terminated by the Debtors without cause or for reasons of death or disability, such KEIP Participant will be entitled to payment of a pro-rata portion of such KEIP Participant's award based on the number of days the KEIP Participant was employed after the Petition Date through the date of termination, divided by the number of days from the Petition Date through the Emergence Date.  If the KEIP Participant's employment with the Debtors is terminated for cause prior to the Incentive Bonus Payment Date, he or she will forfeit any right to a payment under the KEIP.  Finally, if a KEIP Participant voluntarily terminates his or her employment with the Company or is terminated for cause within forty-five (45) calendar days following the Emergence Date, then the KEIP Participant shall return any previously paid bonus amount within five (5) business days of such termination.

15.      It is important to note that the KEIP is not a "pay to stay" retention plan.  Instead, the KEIP utilizes personalized metrics for each KEIP Participant in order to ensure that  the KEIP Participants are incentivized to complete the restructuring in an efficient and expeditious manner.  In addition, the aggregate proposed payments for the KEIP Participants are well within the previously submitted budget under the DIP Credit Agreements (the "DIP Budget"). Accordingly, the KEIP successfully aligns the interests of the Debtors, their employees, and their creditors and is a true incentive plan.

ii.      KEIP Payouts are Consistent with Market Standards

16.      FTI undertook to define a set of relevant market comparables to that of the Debtors, and benchmarked comparable KEIP plans from select chapter 11 cases of 11 different

---

[2]      Payment to one of the KEIP Participants will be made by a non-Debtor affiliate

companies which filed petitions from 2012 to 2015 with total assets valued between $250 million and $2 billion.  Following a review of this set of market comparables, FTI observed a number of market practice factors, including:

- Awards tend to be paid in cash;

- Prevalent performance metrics include critical milestones such as achieving financial performance, cash flow budgets, achievement of personal goals, and timely emergence from bankruptcy;

- Participation tends to be limited to those with critical roles who will provide the most impact of maximizing value for the estate;

- Participation generally ranged from a low of 4 participants to a high of 15 participants with a median of 8 participants;

- Similarly situated company plans ranged from 35.3% to 394.6% of base compensation with a median of 45.0% to 120.0% for threshold and maximum cash award opportunities, respectively;

- The total cost of comparable KEIPs ranged from $540,000 to $8.6 million at target, with opportunities to earn more under certain circumstances and less if all targets were not achieved;

- On a percentage of assets basis, similarly situated companies ranged from 0.06% to 0.72% at target.

17.    Based on the above factors, FTI has found the design and the cost of the proposed KEIP to be within the range of market practice as compared to plans proposed and approved for similarly–situated companies.  Specifically, the KEIP represents 0.14% on a percentage of assets basis, where the average in the comparative set is 0.31% and the median in the comparative set is 0.28%. The KEIP also represents 87.16% of base compensation, where the median range in the comparative set is between 45.0% and 120.0%.

18.    Without the expertise of the senior management team to efficiently and effectively operate the Debtors' business and without the proper incentives to induce them to commit the additional time necessary to successfully navigate the Debtors through the Chapter

11 Cases, the Debtors' ability to achieve a successful restructuring will be greatly hampered. The success of the Debtors' restructuring and sale efforts is dependent upon the goodwill and support of their employees. As the Debtors continue market testing the proposed plan by soliciting higher and better offers from interested market participants, it is imperative that the Debtors' key personnel are appropriately incentivized to maximize the financial performance of the Debtors' operations and, as such, the price of any transaction to ensure optimum recovery for all stakeholders. Not only have the KEIP Participants continued to fulfill the normal tasks and projects required by the normal terms of their employment, but they have been, and will continue to be, required to expend substantial additional time and resources on tasks relating to the implementation of the proposed restructuring, the day-to-day reporting and operational requirements of the Chapter 11 Cases, and the ongoing market test process.

19.    In order to effectively and efficiently accomplish an orderly restructuring that maximizes recovery for all stakeholders, the Debtors determined that formulating the KEIP was in the best interest of their estates and all parties in interest. The KEIP will help ensure that key executives who are essential to the chapter 11, restructuring, and sale processes are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in interest.  As a general matter, the use of key employee incentive plans is common practice in chapter 11 cases. The structure of the plans varies based on the unique circumstances of each case but the general terms and conditions are consistent with the Key Employee Incentive Plan proposed by the Debtors, including the performance metrics and proposed payment amounts set forth therein.

**B.    The Key Employee Retention Plan**

      i.    <u>Overview of KERP</u>

20.     In addition to the KEIP, the Debtors also seek to implement the KERP for certain non-senior management personnel, in order to ensure that the Debtors do not suffer significant and costly turnover of key employees during the chapter 11 process and during the post-emergence transition period.  During the plan development process, the Debtors analyzed their workforce to determine which non-insiders were critical to a successful restructuring and sale process and should be covered by the KERP.

21.     The Debtors selected the 14 participants in the KERP (the "KERP Participants" and, together with the KEIP Participants, the "Participants") based on their status as critical, hard to replace, non-senior management employees.  Many of the KERP Participants have developed valuable institutional knowledge regarding the Debtors' ongoing business operations that would be difficult and expensive to replace, and preserving this institutional knowledge is key to the successful completion of the Debtors' reorganization as well as the efficient administration of these Chapter 11 Cases and the Debtors' estates.

22.     The KERP provides for a pool of $859,556 consisting of $659,556 in designated payouts as well as an additional $200,000 reserved for additional discretionary payouts to later-identified KERP Participants.  For the currently designated KERP Participants, the proposed maximum payouts represent between 20% and 50% of each participant's base salary.  The earned payout for each KERP Participant is based upon the following metrics: (a) sixty percent (60%) of the proposed maximum payout for an individual KERP Participant is earned on the forty-fifth (45th) calendar day following the Emergence Date if such participant is employed with the Company on such date, and (b) forty percent (40%) of the proposed maximum payout for such participant is earned upon the achievement of pre-determined personal goals (as determined by a designated superior for each Participant).  Payments shall be made on or before

the fifteenth (15th) calendar day following the Emergence Date subject to later disgorgement as set forth in the Plan and described below (such date, the "Retention Bonus Payment Date").

23.     In the event that a KERP Participant is terminated by the Debtors without cause or for reasons of death or disability, such KERP Participant will be entitled to payment of the full payout amount on the Retention Bonus Payment Date.  If the KERP Participant's employment with the Debtors is terminated for cause prior to the Retention Bonus Payment Date, he or she will forfeit any right to a payment under the KERP.  Finally, if a KERP Participant voluntarily terminates his or her employment with the Company or is terminated for cause after the Retention Bonus Payment Date but before the forty-fifth (45th) calendar day following the Emergence Date, then the KERP Participant shall return the previously paid bonus amount within five (5) business days of such termination.  All KERP Participants shall not be eligible to participate in any other incentive plan promulgated by the Company after the Emergence Date to the extent such plan is based upon such participant's performance during the Chapter 11 Cases.

ii.     KERP Payouts are Consistent with Market Standards

24.     FTI undertook to define a set of relevant market comparables to that of the Debtors, and benchmarked comparable key employee retention plans from select chapter 11 cases of 11 different companies which filed petitions from 2012 to 2015 with total assets valued between $250 million and $2 billion.  Following a review of this set of market comparables, FTI observed a number of market practice factors, including:

- Participation generally ranged from a low of 12 participants to a high of 69 participants with a median of 31 participants;

- Similarly situated company plans ranged from 12.5% to 33.5% of base compensation with a median of 27.9% for cash award opportunities;

- Seven out of the eleven plans identified as benchmarks contained discretionary pools ranging from a low of $75,000 to a high of $750,000;

10

- When the discretionary pool is included, comparable case costs ranged from $619,000 to $2.7 million, with a median of $1.282 million;

- On a percentage of assets basis, the discretionary pools for similarly situated companies ranged from 0.025% to 0.594%, with a median rate of 0.097%.

25.     Based on the above factors, FTI has found the design and the cost of the proposed KERP to be within the range of market practice as compared to plans proposed and approved at similarly–situated companies.  Specifically, the KERP (excluding the discretionary portion) represents 0.064% on a percentage of assets basis, where the average in the comparative set is 0.21% and the median in the comparative set is 0.097%.  The KERP (excluding the discretionary portion) also represents 30.01% of base compensation, where the average in the comparative set is 26.4% and the median is 27.9%.  The discretionary pool of $200,000 also falls below the average in the comparative set of $285,800 and the median in the comparative set of $250,000.

26.     Although certain of the KERP Participants may hold titles such as "Vice President," "Manager," or "Director," they do not take part in the management of the Debtors, and they hold such titles in name only.  The KERP Participants do not attend senior management meetings, generally do not participate in board meetings or corporate governance, and many of their duties are limited to particular divisions.  Thus, none of the KERP Participants may be properly considered "officers" of the Debtors; rather, the KERP Participants are critical employees who have the knowledge and experience to carry out the decisions of management in an efficient and effective manner.   The KERP Participants have, in addition to performing their normal job duties, undertaken significant additional tasks and responsibilities in connection with these Chapter 11 Cases, including providing financial and operational information to fulfill the Debtors' reporting requirements, assisting with marketing efforts and responding to diligence requests in connection with the ongoing sale process, and other tasks related to the proposed

restructuring and ongoing sale process.  The KERP Participants will continue to perform these additional tasks for the pendency of these Chapter 11 Cases.

27.     The KERP Participants have, along with the Debtors' other employees, been faced with significant pressure to leave the Debtors' employ during the pendency of these Chapter 11 Cases due to the Company's significant staff reductions (including a reduction in force in the days immediately preceding the Petition Date), and uncertain job prospects following the completion of the proposed reorganization or any alternative sale.  Indeed, at least two employees who would have been included as KERP Participants have already left the employment of the Debtors, and it is critical that the Debtors retain the services of the other KERP Participants through the course of these cases.

28.     In order to effectively and efficiently accomplish an orderly restructuring that maximizes recovery for all stakeholders, the Debtors determined that formulating the KERP was in the best interest of their estates and all parties in interest. The KERP will help ensure that key non-senior employees who are essential to the chapter 11, restructuring, and sale process are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in interest.

29.     The sale process that the Debtors have undertaken to maximize value for their stakeholders has a necessary byproduct of creating a great deal of uncertainty for the very company personnel charged with maximizing that value.  As a result, it is entirely appropriate to provide benefits to such key personnel in order to counterbalance the distraction that such uncertainty would necessarily engender. The structure of other key employee retention plans previously approved by this and other courts varies based on the unique circumstances of each case but the general terms and conditions are consistent with the Key Employee Retention Plan

proposed by the Debtors, including the conditions and proposed payment amounts set forth therein.

**C.     The Non-U.S. KEIP and KERP[3]**

30.     In addition to the KEIP and KERP described above, which cover 17 total U.S. employees, the Company will also be implementing a KEIP and KERP for non-U.S. and non-Debtor employees (the "Global KEIP" and "Global KERP", respectively), which will cover 7 total additional non-U.S. employees.  The Global KEIP will cover three non-U.S. participants, including the CEO, the CFO, and the Global Head of Operations and HR, and provide for an aggregate cash payout of $1.403 million.  The metrics and requirements for the Global KEIP are similar to the metrics for the KEIP as described above, including the proposed timing of the payouts, the clawback provisions, and the sliding scale reduction of payouts for each month that the Emergence Date is delayed.  The Global KERP will likewise cover four non-U.S. participants in non-senior management positions, and provide for an aggregate cash payout of $162,100.  The metrics and requirements for the Global KERP are similar to the metrics for the KERP described above, including the proposed timing of the payouts and clawback provisions.

**D.     The Debtors' Need for the KEIP and the KERP**

31.     In order to effectively and efficiently accomplish the proposed restructuring and maximize recovery for all stakeholders, the Debtors determined that formulating the KEIP and KERP was in the best interest of their estates and all parties in interest. The KEIP and KERP will help ensure that key executives who are essential to the chapter 11 and sale process are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in

---

[3]     For the avoidance of doubt, the Debtors are not seeking court approval of the Global KEIP or the Global KERP, but have provided summary information regarding these plans for disclosure purposes only.  The Debtors do not believe Bankruptcy Court authorization is necessary for such programs, because both the Global KEIP and the Global KERP involve non-Debtor employees and payments from non-Debtor entities to such employees.

interest, and that other key employees of the Debtors remain with the Debtors during the

restructuring process to manage the Debtors' ongoing operations and ensure that the Debtors

emerge from the Chapter 11 Cases with their operational capacities intact. All of the Participants

are employed by the Debtors to perform corporate, back-office, or management tasks, and all of

the Participants are based in the Debtors' Huntington Beach corporate offices.

32.    As a general matter, the use of KEIPs is common practice in chapter 11 cases, and

the use of KERPs is justified here given the ongoing sale process and the associated uncertainty.

The structure of plans approved in other cases varies based on the unique circumstances of each

case but the general terms and conditions are consistent with the KEIP and the KERP proposed

by the Debtors.

## APPLICABLE AUTHORITY

33.    The Debtors seek authority to implement and honor obligations to the KEIP

Participants under the KEIP, and to implement and honor obligations to the KERP Participants

under the KERP. The Debtors respectfully submit that the KEIP and KERP will provide the

necessary incentives to the applicable Participants to promote an expeditious resolution of these

Chapter 11 Cases and maximize value for the Debtors' estates.

**A.    Authorization of the KEIP and KERP are Appropriate Pursuant to Bankruptcy
Code Section 363(b)(1)**

34.    Bankruptcy Code section 363(b) provides, in relevant part, that "[t]he trustee,

after notice and a hearing, may use, sell or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1). Under Bankruptcy Code section 363, this Court

may approve a debtor's request for relief when the debtor demonstrates a sound business

justification for seeking such relief. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d

143, 147-49 (3d Cir. 1986) (implicitly adopting the "sound business judgment test" of Lionel);

Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions").

35.     As set forth above, the Debtors have articulated valid business reasons for implementation of the KEIP and KERP. The Debtors have determined in their reasonable business judgment that implementation of the Plan will enhance the value of the Debtors' estates and accordingly, is in the best interests of the Debtors' estates and the stakeholders in the Chapter 11 Cases. In addition to their normal day-to-day responsibilities managing the Debtors' business and maintaining relationships with their employees, key customers, and key suppliers, the Participants serve as the driving force to bring the Chapter 11 Cases to their ultimate resolution. The Participants are being asked to take on considerable additional responsibilities and expend significantly more hours during these Chapter 11 Cases, yet, as a result of the chapter 11 filing, the KEIP Participants are not currently offered incentive opportunities to compensate them for their enhanced responsibilities, as would be consistent with market practice and the Debtors' past practice, and the KERP Participants are being faced with significant pressure to leave the Debtors' employ during these Chapter 11 Cases due to the uncertainty in the Debtors' operations.

36.     Additionally, as set forth above and more fully in the Imhoff Declaration, payment levels under the KEIP and the KERP are reasonable and were determined based on a thorough analysis of benchmarks performed by FTI. Moreover, the overall cost of the KEIP and KERP are reasonable in light of the size of the Debtors' estates and the benefit from a successful

reorganization or sale process. Accordingly, the Debtors believe that valid business reasons exist for the implementation of the Plan and, thus, that its implementation should be approved.

37.     Once a debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule." The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" See id.

38.     In that regard, courts have found that a debtor's use of reasonable performance bonuses and other incentives for employees is a valid exercise of a debtor's business judgment. See, e.g., In re Am. W. Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (noting that it is the proper use of a debtor's business judgment to propose bonuses for employees who helped propel the debtor successfully through the bankruptcy process); In re Interco Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991) (stating that a debtor's business judgment was controlling in the approval of a "performance/retention program").

39.     This and other courts have approved similar employee incentive and retention programs as valid exercises of business judgment. See, e.g., In re RadioShack Corp., et al., No. 15-10197 (KJC) (Bankr. D. Del. Mar. 4, 2015) (approving key employee incentive plan and key employee retention program); In re Dendreon Corp., et al., No. 14-12515 (PJW) (Bankr. D. Del. Dec. 17, 2014) (approving key employee incentive plan with payments based on achieving certain transaction value thresholds); In re Brookstone Holdings Corp., et al., No. 14-10752

(BLS) (Bankr. D. Del. May 12, 2014) (approving key employee retention plan and key employee incentive plan);  In re Synagro Techs., Inc., No. 13-11041(BLS) (Bankr. D. Del. May 13, 2013) (approving key employee incentive plan with payments based on achieving certain valuation thresholds); In re Mervyn's Holdings, LLC, No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2009) (approving task and target-based incentive plan for certain members of debtor's management); In re Midway Games Inc., No. 09-10465 (KG) (Bankr. D. Del. Apr. 23,2009) (approving key employee incentive plan with payments tied to achievement of certain events tied to debtors' business plan); In re KB Toys, Inc., No. 08-13269 (KJC) (Bankr. D. Del. Jan. 14, 2009) (approving incentive plan based on successfully completing identifiable "tasks" consistent with targets, which plan applied to certain members of debtor's management); In re Dura Auto. Sys., Inc., No. 06-11202 (KJC) (Bankr. D. Del. June 28, 2007) (approving key employee incentive plan payable, in part, upon submission of business plan, filing plan of reorganization and disclosure statement, and confirmation of chapter 11 plan); In re Werner Holding Co. (DE). Inc., No. 06-10578 (KJC) (Bankr. D. Del. Dec. 27, 2006) (approving key employee incentive plan providing for cash payments as rewards for attaining operational restructuring goals and personal performance goals in support).

40.     In the present case, authorizing the Debtors to provide the KEIP and KERP to the Participants will accomplish a similarly sound business purpose. The Debtors have determined that the costs associated with additional postpetition compensation payments pursuant to the KEIP and KERP (the majority of which will be paid by the reorganized Debtors after the completion of the Chapter 11 Cases) are more than justified by the benefits that the Debtors will realize (and have already realized) by creating appropriate incentives for the Participants, whose experience, skills and diligent efforts are critical for the Debtors to maximize the value of their

business as they reorganize—and by the inevitable expense and disruption to the chapter 11

process if Participants were to terminate their employment, thereby necessitating replacement

costs of more expensive professional services.

**B.      The Key Employee Incentive Plan is Incentivizing and Thus Not Governed by
         Bankruptcy Code Sections 503(c)(1) and 503(c)(2)**

41.      Bankruptcy Code section 503(c) governs retention, severance and other payments

to insiders. By its plain language, section 503(c)(1) of the Bankruptcy Code pertains solely to

retention payments to insiders, and section 503(c)(2) of the Bankruptcy Code pertains solely to

severance payments to insiders. Neither of these sections apply to performance-based incentive

plans such as the KEIP, which only allots payments based on the successful achievement of

certain targeted and personalized metrics, does not provide benefits to KEIP Participants upon

termination of their employment with the Debtors, and includes a post-emergence clawback

period . See, e.g., In re Nobex Corp., No. 05-20050 (CSS) (Bankr. D. Del. Jan. 12, 2006), Hr'g

Tr. At 67 (section 503(c)(1) of the Bankruptcy Code does not apply to incentive programs); In re

Warner Holding Co., Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. July 20, 2006; Aug. 22,

2006 and Dec. 20, 2006) (ordering various relief requested in connection with debtors' incentive

bonus plans pursuant to sections 363(b) and 503(c) of the Bankruptcy Code); In re Dana Corp.,

358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) (applying section 503(c)(3) of the Bankruptcy Code

to evaluate management incentive plan in absence of applicability of sections 503(c)(1) or

501(c)(2) of the Bankruptcy Code); In re Calpine Corp., No 05-60200 (Bankr. S.D.N.Y. Apr. 26,

2006), Hr'g Tr. At 84-85 (sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply

to incentive programs).

42.      The KEIP is not intended to provide bonuses for retention. In particular, the KEIP

comprises only targeted incentive payments to the Debtors' employees who are the most critical

to maximizing the value of the Debtors' business as aligned with the restructuring and sale process, which payments require a far higher threshold than merely remaining employed by the Debtors. Although certain Participants are "insiders" within the meaning of the Bankruptcy Code, the KEIP has been crafted with great care to ensure the metrics directly incentivize and motivate participants to meet the objectives set forth therein.

43.     Moreover, while the KEIP was not crafted with the goal of retaining the Participants, the fact that the KEIP may encourage the KEIP Participants to remain with the Debtors throughout the Chapter 11 Cases should not bar implementation of the KEIP. Indeed, all successful incentive programs have the indirect benefit of incentivizing an employee to remain with the company. See In re Global Home Prods., LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007). The primary purpose of the KEIP is to maximize value for the benefit of the Debtors' estates.

44.     Accordingly, the Debtors respectfully submit that sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the KEIP.

**C.     The Key Employee Retention Plan Does Not Provide for Payments to Insiders and Thus Is Not Governed by Bankruptcy Code Sections 503(c)(1) and 503(c)(2)**

45.     As noted above, sections 503(c)(1) and (c)(2) of the Bankruptcy Code mandate restrictions upon retention and severance plans for "insiders." The Bankruptcy Code elsewhere defines "insider" as a "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B). While a person holding an officer's title is presumptively an officer and thus an insider, that presumption may be rebutted with "evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive

definition of the same, *i.e.*, he or she is not taking part in the management of the debtor." In re Foothills Texas, Inc., 408 B.R. 573, 574-75 (Bankr. D. Del. 2009).

46.      Certain of the KERP Participants hold titles such as "manager" or "director," but they do not take part in the management of the Debtors and they hold such titles in name only, rebutting the presumption that such participants are "insiders" within the meaning of the Bankruptcy Code.  The KERP Participants do not attend senior management meetings, generally do not participate in board meetings or corporate governance, and many of their duties are limited to particular divisions.  Their respective scopes of authority are limited, and while their titles reflect their individual roles and functions, the same titles do not confer officer status upon the KERP Participants.  The KERP Participants are critical employees who have the knowledge and experience to carry out the decisions of management in an efficient and effective manner. In addition to performing their normal job duties, the KERP Participants have undertaken significant additional tasks and responsibilities in connection with these Chapter 11 Cases, including providing financial and operational information to fulfill the Debtors' reporting requirements, assisting with marketing efforts and responding to diligence requests in connection with the ongoing sale process, and other tasks related to the proposed restructuring and ongoing sale process.  As a consequence, the KERP Participants are not "insiders" as defined in the Bankruptcy Code, and accordingly the Debtors maintain that sections 501(c)(1) and (c)(2) do not apply in this case.

**D.    The Plan is Justified by the Facts and Circumstances and Satisfies Bankruptcy Code Section 503(c)(3)**

47.      Finally, both the KEIP and KERP components of the Plan also satisfy the standard set forth in Bankruptcy Code section 503(c)(3), which provides:

> [There shall neither be allowed, nor paid--] (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and

circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3).

48.     Courts have held that the requirement that transfers or obligations be "justified by the facts and circumstances of the case" is a reiteration of the business judgment test (or sound business judgment test) incorporated into Bankruptcy Code section 363(b) (and as set forth above) and under which courts traditionally evaluated executive compensation programs prior to recent amendments to the Bankruptcy Code. See In re Dana Corp., 358 B.R. at 576; In re Dura Automotive Systems, Inc., No. 06-11202 (KJC) (Bankr. D. Del. Oct. 30, 2006); In re Nobex Corp., No. 05-20050 (Walrath, J.) (Bankr. Del. Jan. 12, 2006) ("So I do read (c)(3) to be the catch-all and the standard under (c)(3) for any transfers or obligations made outside the ordinary course of business are those that are justified by the facts and circumstances of the case. Nothing more – no further guidance being provided to the Court by Congress, I find it quite frankly nothing more than a reiteration of the standard under 363 . . . under which courts had previously authorized transfers outside the ordinary course of business and that is, based on the business judgment [sic] of the debtor, the court always considered the facts and circumstances of the case to determine whether it was justified."); 4 Collier on Bankruptcy ¶ 503.17[3] (15th rev. ed. 2006) (indicating that the standard for approval under Bankruptcy Code section 503(c)(3) is "unlikely to be much different than the standard for approval that would otherwise be applied by the court").

49.     In assessing a debtor's business judgment regarding the implementation of incentive programs, courts, including this one, have looked to the factors laid out by Judge Lifland in Dana for guidance to evaluate a proposed incentive or retention program under

Bankruptcy Code section 503(c)(3).[4] First, in consultation with FTI, after an extensive analysis of the programs implemented in other chapter 11 cases, the Debtors designed and refined the KEIP and KERP to motivate and reward Participants for their significant efforts, to ensure that key management personnel continue to manage the Debtors' day to day operations and affairs, and to compensate Participants for the increased demands placed upon them in connection with the chapter 11 process. Specifically, the Plan will ensure that the Participants are motivated and that the Debtors have the appropriate staff on hand to facilitate a speedy exit of the Debtors from these Chapter 11 Cases, thereby maximizing value for the Debtors' estates. Second, FTI engaged in an extensive benchmarking analysis in assisting the Debtors with the design of the KEIP and the KERP. The cost of the Plan is consistent with the market median based on the proposed costs and the metrics contained in the Plan. The cost is reasonable and well-justified given the size of the Debtors' business and the value that achievement of the metrics and timeline would bring to the estate. Third, the scope of the KEIP and KERP are fair and reasonable; only 17 U.S. employees are eligible to receive payments under the Plan (excluding the discretionary pool participants). Fourth, the KEIP and KERP are consistent with industry standards with respect to eligibility, total cost, metrics, and payout timing. Finally, consistent with past practice, the Debtors consulted with the Board of Directors and the Strategic Review Committee in formulating the Plan and received outside independent market advice from FTI to ensure the Plan meets the Debtors' goals of incentivizing its senior management.

---

[4]    The Dana factors are: (a) whether a reasonable relationship existed between the proposed plan and the desired results; (b) whether the cost of the plan was reasonable in light of the overall facts of the case; (c) whether the scope of the plan was fair and reasonable; (d) whether the plan was consistent with industry standards; (e) whether the debtor had put forth sufficient due diligence efforts in formulating the plan; and (f) whether the debtor received sufficient independent counsel in performing any due diligence and formulating the plan. In re Dana Corp., 358 B.R. at 576-77.

50.     Accordingly, the Debtors respectfully submit that the Plan is in the best interests of the Debtors, their creditors, and all parties-in-interest in the Chapter 11 Cases.

## RESERVATION OF RIGHTS

51.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365; or (e) otherwise affect the Debtors' rights under Bankruptcy Code section 365 to assume or reject any executory contract with any party subject to this Motion.

## NOTICE

52.     Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' postpetition secured loan facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan facility; (d) counsel to the indenture trustee for the Debtors' prepetition senior secured notes; (e) counsel to the indenture trustee for the Debtors' prepetition senior unsecured notes; (f) counsel to the Creditors' Committee; and (g) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

53.     No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the relief set forth herein and such other and further relief as may be just and proper.

23

Dated:  Wilmington, Delaware
        November 10, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/  Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Li
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

Dain A. De Souza (I.D. No. 5737)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

John K. Lyons
Jessica Kumar
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*