IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

QUIKSILVER, INC., *et al.*,

                          Debtors.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: Chapter 11
:
: Case No. 15-11880 (BLS)
:
: Jointly Administered
:
:

**DECLARATION OF DEWEY IMHOFF IN SUPPORT OF DEBTORS'
MOTION FOR ORDER APPROVING THE IMPLEMENTATION
OF THE KEY EMPLOYEE INCENTIVE AND RETENTION PLAN**

      I, Dewey Imhoff, hereby declare and state as follows:

      1.      I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a financial advisory services firm with an office located at 3 Times Square, New York, New York, 10036.

      2.      I am duly authorized to make and submit this declaration (the "Declaration") on behalf of FTI in support of the *Debtors' Motion for Order Approving the Implementation of the Key Employee Incentive and Retention Plan*, filed contemporaneously herewith (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (the "Debtors"). Except as otherwise noted, I have personal knowledge of the matters set forth herein.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

3. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

**A.    Employment and Background**

5. I am a Senior Managing Director at FTI.  Prior to joining FTI, I was a partner at PricewaterhouseCoopers.  Prior to that, I was a senior manager at a prominent, nationally recognized crisis management and turnaround boutique firm and a vice president of the Special Assets group at Prudential Capital.

6. I received my MBA in accounting from Rutgers University and a B.A. from William Paterson University.  I am a certified insolvency and restructuring advisor and a certified public accountant (retired).  I am a member of the Association of Insolvency & Restructuring Advisors, the American Bankruptcy Institute, the New Jersey Society of Certified Public Accountants, the American Institute of Certified Public Accountants, and the Turnaround Management Association.

7. I have more than 30 years of advisory and management experience in the financial services, retail, healthcare, manufacturing, forest products, professional sports and sporting venues, real estate and energy sectors.  I have worked in positions with responsibility for financial and statutory reporting, troubled loans, asset sales, fraud auditing, strategic planning and administrative and operational management.  In addition, I have developed or consulted on more than 30 employee retention plans and employee incentive plans, representing creditors with respect to certain engagements and representing debtors in other engagements.

8. In connection with that work, I have performed numerous comparative studies of employee retention plans and employee incentive plans similar to the comparisons described below. I previously testified as an expert witness on employee retention plans and employee incentive plans in the following matters: In re The Great Atlantic & Pacific Tea

Company, Inc., *et al.*, Case No. 15-23007 (Bankr. S.D.N.Y. 2015), In re Old HB, Inc., Case No. 12-22052 (Bankr. S.D.N.Y. 2012), In re Nelson Nutraceutical, Inc., Case No. 06-10072 (Bankr. D. Del. 2006), and In re Fibermark, Inc., Case No. 04-10463 (Bankr. D. Vt. 2004). I was also retained to testify as an expert witness about employee retention plans and employee incentive plans, although ultimately was not required to provide any testimony, in In re Cornerstone Propane, L.P., Case No. 04-13856 (Bankr. S.D.N.Y. 2004). I was the co-editor of The Credit Executive's Guide to Business Restructuring (Dewey Imhoff and Elliot Fuhr eds., FTI Consulting 2006) and collaborated on The Practical Guide to Corporate Restructuring (Cooper & Lybrand L.L.P. 1997).

**B.     The KEIP**

    (a)     Overview of the KEIP

    9.     The KEIP is designed to provide incentives to three (3) eligible U.S. executives (the "KEIP Participants") to pursue a timely and successful reorganization or sale. Each of the KEIP Participants will be playing a central role in the chapter 11 process, especially given the ongoing parallel processes for marketing the Debtors and their assets while simultaneously pursuing the consummation of the proposed Chapter 11 Plan sponsored by certain of the Debtors' prepetition stakeholders. Incentivizing the KEIP Participants is critical in order to ensure that these key members of management continue in their efforts to successfully guide the Debtors through the bankruptcy process and maximize value for the benefit of all the Debtors' stakeholders.

    10.     As set forth in the Plan, the KEIP provides for variable payouts to the KEIP Participants based upon the achievement of relevant target metrics, including (a) emergence from bankruptcy (through either effectiveness of a plan of reorganization or consummation of a sale of substantially all of the Debtors' assets), (b) continued compliance

with the DIP Credit Agreements, including the covenants contained therein, and (c) the achievement of pre-determined personal goals (as determined by a designated superior for each Participant). Each of these metrics accounts for one-third of the maximum incentive bonus amount which may be earned by each KEIP Participant, such that failure to achieve any of the three metrics results in a deduction of one-third of the maximum incentive bonus amount. Furthermore, the Emergence Date also impacts the earned bonus amount. If the Emergence Date occurs on or before February 15, 2016, then the full one-third portion of the maximum incentive bonus amount is earned; however (i) if the Emergence Date occurs on or between February 16, 2016 and March 15, 2016, 85% of the Emergence Amount shall be earned and (ii) if the Emergence Date occurs on or between March 16, 2016 and April 15, 2016, 70% of the Emergence Amount shall be earned. The aggregate proposed payments for the KEIP Participants is $1.470 million, with individual proposed maximum payouts ranging from 75% to 100% of base compensation, and payments shall be made on or before the fifteenth (15th) calendar day following the Emergence Date, subject to later disgorgement as set forth in the Plan and described below.[3]

        11.    In the event that a that a KEIP Participant is terminated by the Debtors without cause or for reasons of death or disability, such KEIP Participant will be entitled to payment of a pro-rata portion of such KEIP Participant's award based on the number of days the KEIP Participant was employed after the Petition Date through the date of termination, divided by the number of days from the Petition Date through the Emergence Date. If the KEIP Participant's employment with the Debtors is terminated for cause prior to the Incentive Bonus

---

[3] Payment to one of the KEIP Participants will be made by a non-Debtor affiliate.

Payment Date, he or she will forfeit any right to a payment under the KEIP. Finally, if a KEIP Participant voluntarily terminates his or her employment with the Company or is terminated for cause within forty-five (45) calendar days following the Emergence Date, then the KEIP Participant shall return any previously paid bonus amount within five (5) business days of such termination.

12.     It is important to note that the KEIP is not a "pay to stay" retention plan. Instead, the KEIP utilizes personalized metrics for each KEIP Participant in order to ensure that the KEIP Participants are incentivized to complete the restructuring in an efficient and expeditious manner. In addition, the aggregate proposed payments for the KEIP Participants of approximately $1.470 million, and the total proposed payments under both the KEIP and the KERP of $2.3 million, are well within the $3.0 million reflected in the previously submitted DIP Budget. Accordingly, the KEIP successfully aligns the interests of the Debtors, their employees, and their creditors and is a true incentive plan.

(b)     Reasonableness of the KEIP

13.     Based on my experience and the work I have done on this matter, it is my opinion that the KEIP is designed to be consistent with market practice, is reasonable given the facts and circumstances, provides anticipated value that is appropriate to competitively motivate talented staff and is required to maximize the value of the Debtors' estates for all parties in interest.

14.     In connection with FTI's work on the KEIP structure generally, FTI undertook to define a set of relevant market comparables to that of the Debtors. FTI benchmarked comparable KEIP plans from select chapter 11 cases of 11 different companies which filed petitions from 2012 to 2015 with total assets valued between $250 million and $2

billion. Following a review of this set of market comparables, FTI observed a number of market practice factors, including:

- Awards tend to be paid in cash;

- Prevalent performance metrics include critical milestones such as achieving financial performance, cash flow projections, achievement of personal goals, and timely emergence from bankruptcy;

- Participation tends to be limited to those with critical roles who will provide the most impact of maximizing value for the estate;

- Participation generally ranged from a low of 4 participants to a high of 15 participants with a median of 8 participants;

- Similarly situated company plans ranged from 35.3% to 394.6% of base compensation with a median of 45.0% to 120.0% for threshold and maximum cash award opportunities, respectively;

- The total cost of comparable KEIPs ranged from $540,000 to $8.6 million at target, with opportunities to earn more under certain circumstances and less if all targets were not achieved;

- On a percentage of assets basis, similarly situated companies ranged from 0.06% to 0.72% at target.

Based on the above factors, FTI has found the design and the cost of the proposed KEIP to be within the range of market practice as compared to plans proposed and approved at similarly–situated companies. Specifically, the KEIP represents 0.14% on a percentage of assets basis, where the average in the comparative set is 0.31% and the median in the comparative set is 0.28%. The KEIP also represents 87.16% of base compensation, where the median range in the comparative set is between 45.0% and 120.0%.

15. Without the expertise of the senior management team to efficiently and effectively operate the Debtors' business and the proper incentives to induce them to commit the additional time necessary to successfully navigate the Debtors through the Chapter 11 Cases, the Debtors' ability to achieve a successful restructuring will be greatly hampered. The success of

the Debtors' restructuring and sale efforts is dependent upon the goodwill and support of their employees. As the Debtors continue market testing the proposed plan by soliciting higher and better offers from interested market participants, it is imperative that the Debtors' key personnel are appropriately incentivized to maximize the financial performance of the Debtors' operations and, as such, the price of any transaction to ensure optimum recovery for all stakeholders. Not only have the KEIP Participants continued to fulfill the normal tasks and projects required by the normal terms of their requirement, but they have been, and will continue to be, required to expend additional time and resources on tasks relating to the implementation of the proposed restructuring, the day-to-day reporting and operational requirements of the Chapter 11 Cases, and the ongoing market test process.

16. In order to effectively and efficiently accomplish an orderly restructuring that maximizes recovery for all stakeholders, the Debtors determined that formulating the KEIP was in the best interest of their estates and all parties in interest. The KEIP will help ensure that key executives who are essential to the chapter 11, restructuring, and sale processes are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in interest. As a general matter, the use of key employee incentive plans is common practice in chapter 11 cases. The structure of the plans varies based on the unique circumstances of each case but the general terms and conditions are consistent with the Key Employee Incentive Plan proposed by the Debtors, including the performance metrics and proposed payment amounts set forth therein.

**C.    The KERP**

    (a)    <u>Overview of the KERP</u>

17. In addition to the KEIP, the Debtors also seek to implement the KERP for certain non-senior management personnel, in order to ensure that the Debtors do not suffer

significant and costly turnover of key employees during the chapter 11 process and during the post-emergence transition period. During the plan development process, the Debtors analyzed their workforce to determine which non-insiders were critical to a successful restructuring and sale process and should be covered by the KERP.

18. I understand that the Debtors selected the 14 KERP Participants based on their status as critical, hard to replace, non-senior management employees. I further understand that many of the KERP Participants have developed valuable institutional knowledge regarding the Debtors' ongoing business operations that would be difficult and expensive to replace, and preserving this institutional knowledge is key to the successful completion of the Debtors' reorganization as well as the efficient administration of these Chapter 11 Cases and the Debtors' estates.

19. The Debtors propose to implement a KERP which provides for a pool of $859,556, consisting of $659,556 in designated payouts as well as an additional $200,000 reserved for additional discretionary payouts to later-identified KERP Participants. For the currently designated KERP Participants, the proposed maximum payouts represent between 20% and 50% of each participant's base salary. The earned payout for each KERP Participant is based upon the following metrics: (a) sixty percent (60%) of the proposed maximum payout for an individual KERP Participant is earned on the forty-fifth (45th) calendar day following the Emergence Date if such participant is employed with the Company on such date, and (b) forty percent (40%) of the proposed maximum payout for such participant is earned upon the achievement of pre-determined personal goals (as determined by a designated superior for each Participant). Payments shall be made on or before the fifteenth (15th) calendar day following the Emergence Date subject to later disgorgement as set forth in the Plan.

20. In the event that a KERP Participant is terminated by the Debtors without cause or for reasons of death or disability, such KERP Participant will be entitled to payment of the full payout amount on the Retention Bonus Payment Date. If the KERP Participant's employment with the Debtors is terminated for cause prior to the Retention Bonus Payment Date, he or she will forfeit any right to a payment under the KERP. Finally, if a KERP Participant voluntarily terminates his or her employment with the Company or is terminated for cause after the Retention Bonus Payment Date but before the forty-fifth (45th) calendar day following the Emergence Date, then the KERP Participant shall return the previously paid bonus amount within five (5) business days of such termination. All KERP Participants shall not be eligible to participate in any other incentive plan promulgated by the Company after the Emergence Date to the extent such plan is based upon such participant's performance during the Chapter 11 Cases.

(b) <u>Reasonableness of the KERP</u>

21. Based on my experience and the work I have done on this matter, it is my opinion that the KERP is designed to be consistent with market practice, is reasonable given the facts and circumstances, provides anticipated value that is appropriate to competitively motivate talented staff and is required to maximize the value of the Debtors' estates for all parties in interest.

22. In connection with FTI's work on the KERP structure generally, FTI undertook to define a set of relevant market comparables to that of the Debtors. FTI benchmarked comparable key employee retention plans from select chapter 11 cases of 11 different companies which filed petitions from 2012 to 2015 with total assets valued between $250 million and $2 billion. Following a review of this set of market comparables, FTI observed a number of market practice factors, including:

- Participation generally ranged from a low of 12 participants to a high of 69 participants with a median of 31 participants;

- Similarly situated company plans ranged from 12.5% to 33.5% of base compensation with a median of 27.9% for cash award opportunities;

- Seven out of the eleven plans identified as benchmarks contained discretionary pools ranging from a low of $75,000 to a high of $750,000;

- When the discretionary pool is included, comparable case costs ranged from $619,000 to $2.7 million, with a median of $1.282 million;

- On a percentage of assets basis, the discretionary pools for similarly situated companies ranged from 0.025% to 0.594%, with a median rate of 0.097%.

Based on the above factors, FTI has found the design and the cost of the proposed KERP to be within the range of market practice as compared to plans proposed and approved at similarly–situated companies. Specifically, the KERP (excluding the discretionary portion) represents 0.064% on a percentage of assets basis, where the average in the comparative set is 0.21% and the median in the comparative set is 0.097%. The KERP (excluding the discretionary portion) also represents 30.01% of base compensation, where the average in the comparative set is 26.4% and the median is 27.9%. The discretionary pool of $200,000 also falls below the average in the comparative set of $285,800 and the median in the comparative set of $250,000.

23. I understand that although certain of the KERP Participants may hold titles such as "Vice President," "Manager" or "Director," they do not take part in the management of the Debtors, and they hold such titles in name only. The KERP Participants do not attend senior management meetings, generally do not participate in board meetings or corporate governance, and many of their duties are limited to particular divisions. Thus, none of the KERP Participants may be properly considered "officers" of the Debtors; rather, the KERP Participants are critical employees who have the knowledge and experience to carry out the decisions of management in

an efficient and effective manner. The KERP Participants have, in addition to performing their normal job duties, undertaken significant additional tasks and responsibilities in connection with these Chapter 11 Cases, including providing financial and operational information to fulfill the Debtors' reporting requirements, assisting with marketing efforts and responding to diligence requests in connection with the ongoing sale process, and other tasks related to the proposed restructuring and ongoing sale process. The KERP Participants will continue to perform these additional tasks for the pendency of these Chapter 11 Cases.

24. The KERP Participants have, along with the Debtors' other employees, been faced with significant pressure to leave the Debtors' employ during the pendency of these Chapter 11 Cases due to the Company's significant staff reductions (including a reduction in force in the days immediately preceding the Petition Date), and uncertain job prospects following the completion of the proposed reorganization or any alternative sale. Indeed, at least one employee who would have been included as a KERP Participant has already left the employment of the Debtors, and it is critical that the Debtors retain the services of the other KERP Participants through the course of these cases.

25. In order to effectively and efficiently accomplish an orderly restructuring that maximizes recovery for all stakeholders, the Debtors determined that formulating the KERP was in the best interest of their estates and all parties in interest. The KERP will help ensure that key non-senior employees who are essential to the chapter 11, restructuring, and sale process are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in interest.

26. The sale process that the Debtors have undertaken to maximize value for their stakeholders has a necessary byproduct of creating a great deal of uncertainty for the very

11

company personnel charged with maximizing that value. As a result, it is entirely appropriate to provide benefits to such key personnel in order to counterbalance the distraction that such uncertainty would necessarily engender. The structure of other key employee retention plans previously approved by this and other courts varies based on the unique circumstances of each case but the general terms and conditions are consistent with the Key Employee Retention Plan proposed by the Debtors, including the conditions and proposed payment amounts set forth therein.

**D.     The Non-U.S. KEIP and KERP**

27.    In addition to the KEIP and KERP described above, which cover 17 total U.S. employees, the Company will also be implementing a KEIP and KERP plan for non-U.S. employees, which will cover 7 total additional non-U.S. employees. The Global KEIP will cover three non-U.S. participants, including the CEO, the CFO, and the Global Head of Operations and HR, and provide for an aggregate cash payout of $1.403 million. The metrics and requirements for the Global KEIP are similar to the metrics for the KEIP as described above, including the proposed timing of the payouts, the clawback provisions, and the sliding scale reduction of payouts for each month that the Emergence Date is delayed. The Global KERP will likewise cover four non-U.S. participants in non-senior management positions, and provide for an aggregate cash payout of $162,100. The metrics and requirements for the Global KERP are similar to the metrics for the KERP described above, including the proposed timing of the payouts and clawback provisions. For the avoidance of doubt, the Debtors are not seeking court approval of the KEIP and KERP plan for non-U.S. employees, but have provided summary information regarding these plans for disclosure purposes only.

**E.      The Debtors' Need for the KEIP and the KERP**

28. In order to effectively and efficiently accomplish the proposed restructuring and maximize recovery for all stakeholders, the Debtors determined that formulating the KEIP and KERP was in the best interest of their estates and all parties in interest. The KEIP and KERP will help ensure that key executives who are essential to the chapter 11 and sale process are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in interest, and that other key employees of the Debtors remain with the Debtors during the restructuring process to manage the Debtors' ongoing operations and ensure that the Debtors emerge from the Chapter 11 Cases with their operational capacities intact. All of the Participants are employed by the Debtors to perform corporate, back-office, or management tasks, and all of the Participants are based in the Debtors' Huntington Beach corporate offices.

29. As a general matter, the use of KEIPs is common practice in chapter 11 cases, and the use of KERPs is justified here given the ongoing sale process and the associated uncertainty. The structure of plans approved in other cases varies based on the unique circumstances of each case but the general terms and conditions are consistent with the KEIP and the KERP proposed by the Debtors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date:  November 10, 2015
       New York City, New York                     */s/ Dewey Imhoff*                     .
                                                   Dewey Imhoff