IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| QUIKSILVER, INC., *et al.*, | : Case No. 15-11880 (BLS) |
| | : |
| Debtors.[1] | : Jointly Administered |
| | : |
| | : **Related Docket Nos. 372** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CERTIFICATE OF NO OBJECTION TO DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 6004 (I) AUTHORIZING AND APPROVING THE SALE OF CERTAIN DE MINIMIS ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) APPROVING THE PURCHASE AGREEMENT; AND (III) GRANTING OTHER RELATED RELIEF**

The undersigned hereby certifies that he is aware of no formal or informal

objection or response to the Debtors' Motion For Order Under Bankruptcy Code Sections 105

And 363 And Bankruptcy Rule 6004 (I) Authorizing And Approving The Sale Of Certain De

Minimis Assets Free And Clear Of All Liens, Claims, Encumbrances, And Other Interests; (II)

Approving The Purchase Agreement; And (III) Granting Other Related Relief (Docket No. 372)

(the "Motion"), filed by the debtors and debtors-in-possession in the above-captioned jointly

administered bankruptcy cases (collectively, the "Debtors") on October 27, 2015.  He has

reviewed the Court's docket and no objection to the Motion appears thereon.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

The notice of the Motion established November 10, 2015 at 4:00 p.m. (Eastern) as the deadline (the "Objection Deadline") for receipt of objections to the Motion, and no extension of the Objection Deadline was granted.

Accordingly, it is respectfully requested that the Court enter the proposed form of order filed with the Motion, a copy of which order (modified only to reflect the docket number of the Motion) is attached hereto as Exhibit 1.

Dated:    Wilmington, Delaware
          November 13, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ Van C. Durrer, II
Van C. Durrer, II (I.D. No. 3827)
Annie Z. Li
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

Mark S. Chehi, Esq. (I.D. No. 2855)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

John K. Lyons
Jessica S. Kumar
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

**EXHIBIT 1**
**<u>Proposed Order</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| QUIKSILVER, INC., *et al.*, | : Case No. 15-11880 (BLS) |
| | : |
| Debtors.[1] | : Jointly Administered |
| | : |
| | : **Related Docket No.  372** |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER UNDER BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULE 6004 (I) AUTHORIZING AND APPROVING THE SALE OF CERTAIN *DE MINIMIS* ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) APPROVING THE PURCHASE AGREEMENT; AND (III) GRANTING OTHER RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for entry of an order, under

Bankruptcy Code sections 105 and 363 and Bankruptcy Rule 6004, (i) authorizing the sale (the

"Sale") of certain *de minimis* assets solely related to the *Ampla* brand (the "Ampla Assets")[3] on an

"as-is, where-is" basis, free and clear of any and all liens, encumbrances, and other interests to ColEx

Inc. (the "Buyer"), pursuant to the terms and conditions of that certain Asset Purchase Agreement,

dated as of October 26, 2015 (the "Purchase Agreement") by and between Quiksilver, Inc. (the

"Seller") and the Buyer, a true and correct copy of which is attached as hereto as Exhibit A, (ii)

authorizing and approving the terms of the Purchase Agreement, and (iii) granting certain related

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

[3]    As used herein, the Ampla Assets consist of the Purchased Assets enumerated in Section 1.01 of the Purchase Agreement (as defined herein) and sections 1.01(a), 1.01(b), and 1.01(d) of the Disclosure Schedule (as defined in the Purchase Agreement).

relief; and the Court having reviewed the Motion and the Bruenjes Ampla Sale Declaration

[Docket No. ___ ]; and due and sufficient notice of the Motion having been given under the

particular circumstances; and it appearing that no other or further notice is necessary; and it

appearing that the relief requested by the Motion is in the best interests of the Debtors, their

estates, their creditors, and other parties in interest; and after due deliberation thereon; and good

and sufficient cause appearing therefor; it is hereby,

**FOUND AND DETERMINED that:**[4]

A.      Consummation of the Sale of the Ampla Assets, and the related relief

granted in this Order, is in the best interests of the Debtors, their estates, their creditors, and other

parties-in-interest. The entry of this Order is an appropriate exercise of the Court's power under

or in connection with the Bankruptcy Code, including, but not limited to section 105(a) and 363.

B.      The Seller (i) has full corporate power and authority to execute the

Purchase Agreement and all other documents contemplated thereby, (ii) has taken all corporate

action necessary to authorize and approve the Purchase Agreement and the consummation of the

transactions contemplated thereby, and (iii) no consents or approvals, other than the

authorization and approval of this Court or those that have previously been obtained, are required

for the Seller to consummate such transactions.

C.      A reasonable opportunity to object and to be heard with respect to the

Motion and the relief requested therein has been given, in light of the circumstances, to all

interested persons and entities, including the following: (a) the Office of the United States

Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' postpetition

---

[4]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To
the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the
extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

secured loan facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan facility; (d) counsel to the indenture trustee for the Debtors' prepetition senior secured notes; (e) counsel to the indenture trustee for the Debtors' prepetition senior unsecured notes; (f) counsel to the Creditors' Committee; (g) all parties entitled to notice pursuant to Bankruptcy Rule 2002; and (h) K-Swiss Inc., AtakBrand LLC, and Athleticism Inc.

D.      The Debtors have demonstrated both (i) good, sufficient, and sound business purpose and justification and (ii) compelling circumstances for the Sale pursuant to Bankruptcy Code section 363(b) prior to, and outside of, a plan of reorganization.  The Debtors are not required to seek or solicit any additional competitive bids.

E.      The Purchase Agreement and related documents were negotiated, proposed, and entered into by the Seller and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  The Buyer is not an "insider" of any of the Debtors, as that term is defined in Bankruptcy Code section 101.

F.      The Buyer is a good faith purchaser under Bankruptcy Code section 363(m) and, as such, is entitled to all of the protections afforded thereby. The Buyer will be acting in good faith within the meaning of Bankruptcy Code section 363(m) in closing the transaction contemplated by the Purchase Agreement and related documents.

G.      The consideration provided by the Buyer for the Ampla Assets pursuant to the Sale contemplated by the Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Ampla Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

H.       The Debtors are the sole and lawful owners of the Ampla Assets.  The

transfer of the Ampla Assets to the Buyer under the Purchase Agreement and related documents

will be a legal, valid, and effective transfer of the Ampla Assets, and will vest the Buyer with all

right, title, and interest of the Seller to the Ampla Assets free and clear of any and all mortgages,

pledges,  liens, charges, security interests, claims (as defined in Section 101(5) of the Bankruptcy

Code), encumbrances and interests of any kind or nature whatsoever (collectively, the

"Interests").  With respect to each person or entity asserting an Interest in the Ampla Assets, one

or more of the standards set forth in section 363(f) have been satisfied.  All holders of Interests in

the Ampla Assets who did not object to the Motion and the relief requested therein, or who

withdrew any objections to the Motion and the relief requested therein, are deemed to have

consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of

Interests who did object fall within one or more of the other subsections of section 363(f) and are

adequately protected by having their Interests, if any, attach to the proceeds of the Sale with the

same priority, validity, force and effect as they attached to such assets immediately before the

closing of the Sale of the Ampla Assets.

I.        None of the Debtors, nor the Buyer, have engaged in any conduct that

would cause or permit the Purchase Agreement and related documents to be avoided under

Bankruptcy Code section 363(n), to the extent applicable.  Specifically, neither the Debtors nor

the Buyer have acted in a collusive manner with any person, and the Purchase Price was not

controlled by any agreement among bidders.

J.        The transfer of the Ampla Assets to Buyer will be a legal, valid, and

effective transfer of the Ampla Assets, and will vest Buyer with all right, title, and interest of the

4

Debtors to the Ampla Assets free and clear of any and all mortgages, pledges, liens, charges, security interests, claims, encumbrances, and interests.

      K.     The Plate Invention Assignment Agreement is not an executory contract subject to section 365 of the Bankruptcy Code.

**ORDERED, ADJUDGED AND DECREED that:**

1.     The Motion is GRANTED.

2.     Any objections or objections with respect to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, settled, or not otherwise resolved pursuant to the terms hereof, if any, are hereby overruled with prejudice.

3.     The Purchase Agreement and related documents, and all of the terms and conditions thereof, are hereby approved as of the date hereof in all respects and as to all parties.

4.     The Seller is hereby authorized to consummate the terms of the Purchase Agreement. The Seller and its applicable affiliates are hereby authorized to execute any documents and take such actions as may be reasonably necessary to consummate the Purchase Agreement.

5.     Except as expressly permitted or otherwise specifically provided for in the Purchase Agreement and related documents, or this Order, pursuant to Bankruptcy Code section 363(f), the Seller's interests in the Ampla Assets shall be transferred to the Buyer pursuant to the Purchase Agreement and, as of the Closing Date, shall be free and clear of all Interests of any kind or nature whatsoever with all such Interests to attach to the net proceeds of the Sale, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of

priority, which such Interests now have against the Ampla Assets, subject to any rights, claims and defenses of Debtors or their estates, as applicable, may possess with respect thereto.

6.       The transactions contemplated by the Purchase Agreement and related documents are undertaken by the Buyer in good faith, as that term is used in Bankruptcy Code section 363(m) and, accordingly, the Buyer is entitled to all of the protections thereunder and the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale with respect to the Buyer, unless such authorization is duly stayed pending such appeal.

7.       This Order shall be binding on and inure to the benefit of the Buyer, their affiliates, successors and assigns, and the Debtors.

8.       The consideration provided by the Buyer for the Ampla Assets under the Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

9.       The consideration provided by the Buyer for the Ampla Assets under the Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

10.      For the avoidance of doubt, except as otherwise provided in the Purchase Agreement, the Buyer shall purchase the Ampla Assets on an "as-is, where-is" basis, with all faults, and with no representations or warranties, either written or oral, express or implied, from the Seller or its affiliates. Upon Closing, the Buyer shall assume all risks with respect to the Ampla Assets and as set forth in the Purchase Agreement. Upon Closing and except for Seller's obligations under the Purchase Agreement, the Buyer shall forever and fully release the Seller

6

and its affiliates of any and all claims (as the term is defined in section 101(5) of the Bankruptcy Code) which now exist, may hereinafter exist, or have existed, and are associated with the Ampla Assets, including, without limitation, the condition or location of the Ampla Assets, the enforceability of any rights associated with the Ampla Assets, merchantability, fitness for a particular purpose, or non-infringement.

          11.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

          12.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated:  Wilmington, Delaware
        _____, 2015

                     _____
                     THE HONORABLE BRENDAN L. SHANNON
                     CHIEF UNITED STATES BANKRUPTCY JUDGE

7

**<u>Exhibit A</u>**
**Purchase Agreement**

EXECUTION COPY

# ASSET PURCHASE AGREEMENT

## COLEX INC.

and

## QUIKSILVER, INC.

Dated as of;

October 26, 2015

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this **"Agreement"**), dated as of October 26, 2015 is entered into between Quiksilver, Inc., a Delaware corporation (**"Seller"**), and ColEx Inc., a Delaware corporation (**"Buyer"**) (individually, a **"Party"** and together, the **"Parties"**).

## RECITALS

WHEREAS, on September 9, 2015, Seller and certain of its affiliates commenced voluntary proceedings for relief under chapter 11 (the **"Chapter 11 Proceedings"**) of the United States Bankruptcy Code (the **"Code"**) in the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**);

WHEREAS,  Buyer hereby proposes to enter into a transaction with Seller under Section 363 of the Code (**"Section 363 Transaction"**) whereby Buyer will acquire certain assets solely related to the *Ampla* brand (**"Ampla"**);

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## Purchase and Sale

**Section 1.01   Purchase and Sale of Assets.**  Subject to the terms and conditions set forth herein, Seller shall (or shall cause its applicable affiliate to) sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller or its applicable affiliate, all of Seller's or its applicable affiliate's right, title and interest in the following (collectively, the "**Purchased Assets**"):

(a)     the trademarks and patents set forth in Section 1.01(a) of the disclosure schedule attached hereto (the "**Disclosure Schedule**"), including all registrations (if any), all applications (if any), all renewals (if any), all goodwill associated with such trademarks and patents, and all claims for past, present or future infringement or breach of such trademarks and patents, including, but not limited to, such rights and claims as they relate to the approximately 10,000 pairs of Ampla branded shoes (the "**Additional Inventory**"), both finished and in-process, and the related designs, patterns and molds currently believed to be in the possession of a third party manufacturer (collectively, the "**Purchased IP**");

(b)     The internet domain names listed in Section 1.01(b) of the Disclosure Schedule;

(c)     That certain Assignment Agreement, by and between AtakBrand LLC, Athleticism, Inc. and Buyer, dated December 20, 2013 (the "**Plate Invention Assignment Agreement**");

(d)     The inventory and work-in-process of Ampla product set forth on Section 1.01(d) of the Disclosure Schedule (the "**Purchased Inventory**");

(e)     The designs, patterns and molds owned by and in the possession of Seller or one of its affiliates and solely related to Ampla products; and

(f)     Any marketing materials relating solely to Ampla, including without limitations, tradeshow marketing collateral.

**Section 1.02    Excluded Assets.**  Notwithstanding anything to the contrary herein, Seller is not selling and Buyer is not purchasing, and Seller shall not assign, transfer, convey and deliver to Buyer and Buyer shall not acquire or have any rights to acquire, any assets, properties or rights of the Seller or its affiliates that are not Purchased Assets (the **"Excluded Assets"**).

**Section 1.03    Rights to Pursue Additional Inventory.**  Seller acknowledges that Buyer may negotiate the purchase of, or enforce intellectual property claims with respect to, the Additional Inventory.  Buyer agrees that Seller shall have no liability to Buyer arising from or related to the Additional Inventory, and Buyer assumes all risk and liability associated with the Additional Inventory in the event that Buyer completes a separate transaction with Seller's manufacturer related to the purchase and sale of the Additional Inventory.

**Section 1.04    Assumption of Liabilities.**  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge all liabilities of Seller or its applicable affiliate arising from or related to ownership or use of the Purchased Assets or the operation of the Ampla brand after the Closing Date, including: (i) all of Seller's obligations arising under or related to the Plate Invention Assignment Agreement (provided, that Buyer shall assume all of Seller's unpaid payment obligations under the Plate Invention Assignment Agreement, including payment obligations that became due prior to the Closing Date); (ii) any liabilities arising in connection with the marketing, transportation, distribution and sale of the Purchased Inventory or the Additional Inventory, including any products liability or warranty related claims; and (iii) any trade payables or other liabilities (including with respect to taxes)  (collectively, the **"Assumed Liabilities"**).  Buyer shall indemnify each of Quiksilver and its affiliates against, and shall hold Quiksilver and its affiliates harmless from and against, any and all losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees, incurred or sustained by, or imposed upon, Quiksilver or one of its affiliates based upon, arising out of, with respect to or by reason of the Assumed Liabilities.

**Section 1.05   Purchase Price.**   The aggregate purchase price (the **"Purchase Price"**) for the Purchased Assets shall be Two Hundred Thousand Dollars ($200,000.00) in cash at the Closing (as defined below), plus the assumption of the Assumed Liabilities. The Buyer shall pay the Purchase Price to Seller at the Closing in cash by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Section 1.05 of the Disclosure Schedule.  Concurrently with the execution of this Agreement, Buyer shall pay to Seller in cash by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Section 1.05 of the Disclosure Schedule, a deposit of Twenty Thousand Dollars ($20,000.00) (the **"Deposit"**), which shall be credited against the Purchase Price at Closing.

**Section 1.06   Transfer Taxes and Closing Costs**.  Buyer shall be responsible for any transfer taxes or other taxes imposed by reason of the transfer of the Purchased Assets provided hereunder and any deficiency, interest or penalty asserted with respect thereto.  Buyer shall be responsible for and shall promptly pay any and all recording costs, filings fees and related expenses associated with the assignment and transfer of the Purchased Assets to Buyer and the registration and/or recordation of such assignment and transfer with any and all applicable federal, state or local governmental agency, body, or entity, as well as all costs associated with the transfer of the Purchased Inventory or any other physical assets from Seller's facilities to Buyer's facilities

**Section 1.07   Allocation of Purchase Price.**   Prior to Closing, Seller and Buyer agree to allocate the Purchase Price among the Purchased Assets for all purposes (including tax and financial accounting).  Buyer and Seller shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation and shall take no position with any taxing authority contrary to such allocation.

**Section 1.08   Bankruptcy Court Approval**.  Upon execution of this Agreement, Seller shall prepare and file a motion to obtain an order approving this Agreement and the transaction contemplated herein (the **"Approval Order"**) and give proper notice of such motion.  The Approval Order shall provide for: (1) approval of this Agreement, (2) authorization to the Seller to execute this Agreement and consummate  its terms, (3) authorization to the Seller or its applicable affiliates to execute such additional documents and take such actions as may be reasonably necessary to consummate this Agreement; and (4) approval of the purchase and sale of the Purchased Assets to Buyer free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance pursuant to Code section 363(b) and (f).  The Approval Order shall also contain findings and conclusions that the Buyer is a good-faith purchaser pursuant to Code section 363(m).  In the event that the Bankruptcy Court has not entered the Approval Order by November 30, 2015, this Agreement shall immediately terminate and be of no further force and effect.

**Section 1.09   Closing.**  Time is of the essence.  Consequently, Buyer is prepared to proceed with an "as-is," "where-is" acquisition of the Purchased Assets with no due diligence process or any other conditions to Closing, except for the terms and conditions set forth in this Agreement.  The closing of the transactions contemplated by this Agreement (the **"Closing"**) shall take place within three (3) business days of the later of (a) the expiration of the deadline to file a timely appeal with respect to the Approval Order with no such appeal timely filed or (b) the date that any timely filed appeal is finally resolved, so long as the Approval Order is not rescinded (the **"Closing Date"**).  The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.  In no event shall the Closing occur later than December 17, 2015.  In the event the Closing has not occurred on or before December 17, 2015, this Agreement shall immediately terminate and be of no further force and effect.

**Section 1.10   Closing Deliverables.**

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    a bill of sale in the form of **Exhibit A** attached hereto (the **"Bill of Sale"**) and duly executed by Seller, transferring the Purchased Assets to Buyer;

(ii)    an assignment and assumption agreement in the form of **Exhibit B** hereto (the **"Assignment and Assumption Agreement"**) and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities; and

(iii)    assignments in form and substance satisfactory to Seller and Buyer (the **"Intellectual Property Assignments"**) and duly executed by Seller, transferring all of Seller's or its applicable affiliate's right, title and interest in and to the Purchased IP; provided, that Buyer may produce and Seller may execute and deliver individual specific assignments of Purchased IP within a reasonable time following Closing;

(iv)    an Agreement for the Transfer of Domain Names in the form of **Exhibit C** (the "**Domain Name Transfer Agreement**"), executed by Seller or the applicable affiliate of Seller.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    the Purchase Price, less the Deposit;

(ii)    the Assignment and Assumption Agreement duly executed by Buyer;

(iii)    the Intellectual Property Assignments duly executed by Buyer; provided, that Buyer may produce and execute and deliver individual specific assignments of Purchased IP within a reasonable time following Closing;

(iv)    The Domain Name Transfer Agreement, duly executed by Buyer.

**Section 1.11   Termination.**  In the event this Agreement automatically terminates by its terms pursuant to Section 1.08 or Section 1.09, the Parties shall have no further obligation or liability hereunder and Seller shall immediately return the Deposit to Buyer.

## ARTICLE II
## Representations And Warranties Of Seller

**Section 2.01   Accuracy of Representations Through Closing.**  Seller represents and warrants to Buyer that nothing has come to the attention of a vice president, a director, or an executive officer of Seller that would cause such individual to believe that the representations in this Article II contain any untrue statement of a material fact or omit any material fact necessary to make them not misleading.

**Section 2.02   Organization and Authority of Seller.**  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Subject to the Approval Order, Seller has full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement and the documents to be delivered hereunder have been duly authorized, executed and delivered by Buyer, and, subject to the Approval Order, constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 2.03   No Other Representations and Warranties.**  Except for the representations and warranties contained in this **Article 2,** neither Seller nor any of its affiliates has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding Seller or the Ampla brand furnished or made available to Buyer and its representatives or as to the future revenue, profitability or success of the Ampla brand, or any representation or warranty arising from statute or otherwise in law. Seller hereby expressly disclaims all other warranties, including with respect to merchantability, fitness for a particular purpose or non-infringement.  Buyer acknowledges and agrees that Buyer takes the Purchased Assets "as is" "where is" with all faults.

**Section 2.04   Adverse Claims.**  Since November 1, 2014, other than the correspondence from the intellectual property attorney for K-Swiss Inc.,  dated March 6, 2015, a copy of which has been delivered to Buyer, Seller has not received any written claim or other correspondence relating to the validity of the Purchased IP.

## ARTICLE III
### Representations And Warranties Of Buyer

**Section 3.01    Accuracy of Representations Through Closing.**  Buyer represents and warrants to Seller that nothing has come to Buyer's attention that would cause Buyer to believe that the representations in this Article III contain any untrue statement of a material fact or omit any material fact necessary to make them not misleading.

**Section 3.02    Organization and Authority of Buyer.**  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer has full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement and the documents to be delivered hereunder have been duly authorized, executed and delivered by Buyer, and constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 3.03    No Conflicts; Consents.**  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer. No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**Section 3.04    Legal Proceedings.**  There is no Action of any nature pending or, to Buyer's knowledge, threatened against or by Buyer that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 3.05    Sufficiency of Funds**.  Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price, and consummate the transactions contemplated by this Agreement.

**Section 3.06    Independent Investigation**.  Buyer has conducted its own independent investigation, review and analysis of the business, results of operations,

prospects, condition (financial or otherwise) or assets of the Ampla brand, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation; and (b) none of the Seller nor any other person has made any representation or warranty as to the Purchased Assets, the Assumed Liabilities, the Ampla brand or this Agreement, except as expressly set forth in **Article 2** of this Agreement.

Section 3.07   **Brokers.**   No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

## ARTICLE IV
## Miscellaneous

Section 4.01   **Expenses.**   All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid or borne by the Party incurring such costs and expenses.

Section 4.02   **Further Assurances.**   The Parties agree that they will execute any and all additional documents and take all additional steps which may be necessary to consummate the Agreement.

Section 4.03   **Notices.**   All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 4.03):

If to Seller:                    Quiksilver, Inc.
                                 5600 Argosy Circle, #100
                                 Huntington Beach, CA 92649

Facsimile:      (714) 784 7674
Attention:      General Counsel

If to Buyer:                          ColEx, Inc.
                                      5832 E. 2nd Street
                                      Long Beach, CA  90803
                                      E-mail: rob@colbyexon.com
                                      Attention:      Rob Colby

with a copy to:                       Smiley Wang-Ekvall, LLP
                                      3200 Park Center Drive, Suite 250
                                      Costa Mesa, CA  92626
                                      Facsimile:      (714) 445-1002
                                      E-mail: lekvall@swelawfirm.com
                                      Attention:      Lei Lei Wang Ekvall

       **Section 4.04   Headings.**  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

       **Section 4.05   Severability.**  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

       **Section 4.06   Entire Agreement.**  This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in this Agreement and the documents to be delivered hereunder, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in this Agreement will control.

       **Section 4.07   Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns, including any trustees or estate representatives in the Seller's bankruptcy case. Neither Party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 4.08    Governing Law.**  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule.

**Section 4.09    Public Announcements**.  Buyer shall not make, or cause or permit to be made, any press release or public announcement, or otherwise communicate with any news media, in respect of this Agreement without the prior written consent of Seller, and the Parties shall cooperate as to the timing and contents of any such approved press release or public announcement.

**Section 4.10    No Third Party Beneficiaries**.  Nothing expressed or referred to in this Agreement will be construed to give any person other than the Parties (and their successors and assigns) any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**Section 4.11    Interpretive Matters**.  Unless the context otherwise requires, (a) all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules in this Agreement, (b) each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP, (c) words in the singular or plural include the singular and plural and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter and (d) the use of the word "including" in this Agreement shall be by way of example rather than limitation.

**Section 4.12    Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*SIGNATURE PAGE FOLLOWS*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

QUIKSILVER, INC.

By: _____
    Name: Greg Healy
    Title: President

COLEX INC.

By: _____
    Name:
    Title:

## DISCLOSURE SCHEDULES

**Section 1.01(a)** —Trademarks and Patents.

**Section 1.01(b)** — Domain Names

**Section 1.01(d)** — Purchased Inventory

**Section 1.05** — Wire transfer instructions from Seller

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

QUIKSILVER, INC.

By: _____

    Name:
    Title:

COLEX INC.

By: _____*Charles A. Exon*_____

    Name: *Charles Exon*
    Title:

## DISCLOSURE SCHEDULES

**Section 1.01(a)** —Trademarks and Patents.

**Section 1.01(b)** — Domain Names

**Section 1.01(d)** — Purchased Inventory

**Section 1.05** — Wire transfer instructions from Seller

## DISCLOSURE SCHEDULES

**Section 1.01(a)** —Trademarks and Patents.

Trademarks

| Country | Mark | Class | Status | Application No. | Application Date | Registration No. | Registration Date | Applicant/Registrant |
|---------|------|-------|--------|-----------------|------------------|------------------|-------------------|----------------------|
| Benelux | AMPLA | 18 | Registered | 201406 | 2/27/2014 | 201406 | 10/31/2014 | Biarritz Holdings, S.à.r.l. |
| Canada | AMPLA | 18, 25 | Filed | 1665745 | 2/27/2014 | | | 54th Street Holdings, S.à.r.l. |
| Canada | AMPLA (logo) | 18, 25 | Filed | 1672248 | 4/10/2014 | | | 54th Street Holdings, S.à.r.l. |
| Canada | AMPLA (logo) | 18, 25 | Filed | 1672243 | 4/10/2014 | | | 54th Street Holdings, S.à.r.l. |
| Community Trademark | AMPLA | 25 | Registered | 12642955 | 2/27/2014 | 12642955 | 11/13/2014 | Biarritz Holdings, S.à.r.l. |
| Community Trademark | AMPLA (logo) | 18, 25 | Registered | 12785085 | 4/11/2014 | 12785085 | 9/10/2014 | Biarritz Holdings, S.à.r.l. |
| Community Trademark | AMPLA (logo) | 18, 25 | Registered | 12785226 | 4/11/2014 | 12785226 | 9/10/2014 | Biarritz Holdings, S.à.r.l. |

| Country | Mark | Class | Status | Number | Date | Number | Date | Owner |
|---|---|---|---|---|---|---|---|---|
| France | AMPLA | 18 | Registered | 144126861 | 2/27/2014 | 144126861 | 2/6/2015 | Biarritz Holdings, S.à.r.l. |
| Germany | AMPLA | 18 | Registered | 30 2014 0580284 | 2/27/2014 | 058 028 30 2014 | 10/15/2014 | Biarritz Holdings, S.à.r.l. |
| Great Britain | AMPLA | 18 | Registered | UK000030 70813 | 2/27/2014 | UK000030 70813 | 11/28/2014 | Biarritz Holdings, S.à.r.l. |
| Spain | AMPLA | 18 | Registered | 3526143 | 8/18/2014 | 3526413 | 12/23/2014 | Biarritz Holdings, S.à.r.l. |
| United States |  AMPLA | 18, 25 | Filed | 86248331 | 4/10/2014 | | | QS Wholesale, Inc. |
| United States | FORCEPOWER | 25 | Filed | 86299447 | 6/3/2014 | | | QS Wholesale, Inc. |
| United States | AMPLA | 18 | Filed | 86205379 | 2/26/2014 | | | QS Wholesale, Inc. |
| United States |  | 18, 25 | Filed | 86248310 | 4/10/2014 | | | QS Wholesale, Inc. |
| United States |  | | Filed | 86300195 | 6/4/2014 | | | QS Wholesale, Inc. |
| United States | AMPLA | 35 | Filed | 86634254 | 5/19/2015 | | | QS Wholesale, Inc. |

Patents

| Title | Owner | Case Status | Country | Application No. | Filing Date |
|---|---|---|---|---|---|
| Athletic Shoe with Internal Sprung Member | Quiksilver, Inc. | Provisional | United States of America | 61865520 | 8/13/2013 |
| Shoe With Elastically Flexible Extension | Quiksilver, Inc. | Application Pending | Patent Cooperation Treaty | PCT/US14/50 807 | 8/13/2014 |
| Shoe With Elastically Flexible Extension | Quiksilver, Inc. | Application Pending | United States of America | 14/458328 | 8/13/2014 |

**Section 1.01(b)** — Domain Names

| Domain Name | Registrant |
| --- | --- |
| amplasports.com | Quiksilver, Inc. |
| amplasport.com | Quiksilver, Inc. |

**Section 1.01(d)** — Inventory

<u>Summary</u>

| Row Labels | Ampla MLDC ATS 10.19.15 |
|---|---|
| **Men** | **989** |
| **AEYS700001-XKKK** | **432** |
| AMPLA FLY M SHOE XKKK | 432 |
| **AEYS700001-XRRR** | **557** |
| AMPLA FLY M SHOE XRRR | 557 |
| **Women** | **1016** |
| **AEJS700001-XKKK** | **342** |
| AMPLA FLY J SHOE XKKK | 342 |
| **AEJS700001-XRRR** | **674** |
| AMPLA FLY J SHOE XRRR | 674 |
| **Grand Total** | **2005** |

<u>Detail</u>

[see next page]

| Material Group | Selling Group | Gender/Age | Department | Product Type | Detail | Grid Value | Quantity | EAN/UPC |
|---|---|---|---|---|---|---|---|---|
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 9.5 | 12 | 888701640844 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 9 | 36 | 888701640837 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 8.5 | 28 | 888701640820 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 8 | 65 | 888701640813 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 7.5 | 29 | 888701640806 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 7 | 66 | 888701640790 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 6.5 | 17 | 888701640783 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 6 | 42 | 888701640776 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 5.5 | 6 | 888701640769 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 5 | 12 | 888701640752 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 11 | 6 | 888701640745 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 10.5 | 6 | 888701640738 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 10 | 17 | 888701640721 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 6 | 84 | 888701640646 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 6.5 | 36 | 888701640653 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 7 | 121 | 888701640660 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 7.5 | 58 | 888701640677 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 8 | 125 | 888701640684 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 8.5 | 53 | 888701640691 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 9 | 72 | 888701640707 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 9.5 | 23 | 888701640714 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 10 | 36 | 888701640592 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 11 | 18 | 888701640615 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 10.5 | 12 | 888701640608 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 5 | 24 | 888701640622 |
| Footwear | Ampla Footwear | Women | Footwear | Cold Cement Shoe | Low Shoe | 5.5 | 12 | 888701640639 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 10  D | 77 | 888701640295 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 10.5D | 38 | 888701640301 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 11  D | 47 | 888701640318 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 11.5D | 14 | 888701640325 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 12  D | 28 | 888701640332 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 12.5D | 6 | 888701640349 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 13  D | 10 | 888701640356 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 13.5D | 6 | 888701640363 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 14  D | 5 | 888701640370 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 7   D | 18 | 888701640387 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 7.5 D | 12 | 888701640394 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 8   D | 34 | 888701640400 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 8.5 D | 28 | 888701640417 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 9   D | 75 | 888701640424 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 9.5 D | 34 | 888701640431 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 7   D | 24 | 888701640530 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 7.5 D | 18 | 888701640547 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 8   D | 48 | 888701640554 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 8.5 D | 41 | 888701640561 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 9   D | 94 | 888701640578 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 9.5 D | 40 | 888701640585 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 10  D | 94 | 888701640448 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 10.5D | 45 | 888701640455 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 11  D | 52 | 888701640462 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 11.5D | 22 | 888701640479 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 12  D | 39 | 888701640486 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 13  D | 16 | 888701640509 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 12.5D | 12 | 888701640493 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 13.5D | 6 | 888701640516 |
| Footwear | Ampla Footwear | Men | Footwear | Cold Cement Shoe | Low Shoe | 14  D | 6 | 888701640523 |

**Section 1.04** — Wire transfer instructions from Seller

Account Title: Quiksilver Inc
ABA 026009593
Account #1233397023