# EXHIBIT A

## SUBLEASE

SUBLEASE, dated as of June 4, 2007 between PRADA USA CORP., a Delaware corporation having an office at 610 West 52nd Street, New York, New York 10019 ("Sublessor"), and QS RETAIL, INC., a Delaware corporation, having an office at 15202 Graham Street, Huntington Beach, California 92649 ("Sublessee").

## W I T N E S S E T H:

WHEREAS, by Lease ("Master Lease"), dated as of June 10, 2004, between Red Sail Real Estate Los Angeles Inc. ("Landlord"), as landlord, and Sublessor, as tenant, Landlord leased to Sublessor, in accordance with the terms therein, the land and building known as and located at 8025 Melrose Avenue, Los Angeles, California, as more particularly described therein (the "Premises") in accordance with the terms of the Master Lease; and

WHEREAS, Sublessor desires to sublet to Sublessee, and Sublessee desires to hire from Sublessor, the Premises upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter provided, Sublessor and Sublessee hereby agree as follows:

1.      Demised Premises.

1.1      Sublessor hereby sublets to Sublessee, and Sublessee hereby sublets and hires from Sublessor, the Premises, for the sublease term hereinafter stated and for the Fixed Rent and Additional Rent (both as hereinafter defined) hereinafter reserved, subject to all of the terms and provisions hereinafter provided or incorporated in this Sublease by reference.

1.2      Sublessee agrees to accept the Premises on the Commencement Date (as hereinafter defined) in its condition on the date thereof; provided, however, that on the Commencement Date (i) all HVAC, plumbing and electrical systems and equipment in the Premises shall be in working order, and (ii) all of Sublessor's furniture, trade fixtures and equipment shall have been removed, except for those items described on Exhibit C attached hereto, title to which shall be transferred to Sublessee in their then "as is" condition, for no additional consideration. Sublessor has not made and does not make any representations or warranties as to the physical condition of the Premises, or any other matter affecting or relating to the Premises, except as set forth in Section 18.7 hereof.

1.3      Any and all alterations to, work to be performed in or materials to be supplied for the Premises shall be made, performed and supplied at the sole cost and expense of Sublessee and in conformance with all of the terms and provisions of this Sublease and the Master Lease.

2.      Term.

1

2.1     The term ("Term") of this Sublease shall commence on the date (the "Commencement Date") on which Sublessor shall have obtained Landlord's written consent to this Sublease in accordance with the provisions of Article 15 and a copy of such consent has been delivered to Sublessee and Sublessor shall have delivered possession of the Premises to Sublessee in the condition required herein, and shall expire on June 8, 2019 (the "Expiration Date").

2.2     If the term of the Master Lease is terminated for any reason prior to the Expiration Date, this Sublease shall thereupon be terminated ipso facto without any liability of Sublessor to Sublessee by reason of such early termination; provided, however, that (unless caused by the act or omission of Sublessee) Sublessor shall not perform any act or fail to perform any act which shall result in the breach or default of any of the covenants, agreements, terms, provisions or conditions of the Master Lease on the part of Sublessor as the "Tenant" thereunder, and if the Master Lease or Sublessee's right of possession of the Premises is terminated prior to the Expiration Date as a result of Sublessor's breach or default of the Master Lease (and same was not caused by Sublessee's actions or inactions), or if the Master Lease is terminated by Landlord pursuant to Section 10.1 of the Master Lease, Sublessee shall have such rights and remedies against Sublessor for such breach or default as may be available at law or in equity, including, without limitation, an action for damages or injunctive relief.    The foregoing provisions shall survive the termination of this Sublease.  Except as otherwise expressly provided in this Sublease with respect to those obligations of Sublessee and Sublessor which by their nature or under the circumstances can only be, or under the provisions of this Sublease may be, performed after the termination of this Sublease, the Term and estate granted hereby shall end at noon on the date of termination of this Sublease as if such date were the Expiration Date, and neither party shall have any further obligation or liability to the other after such termination. Notwithstanding the foregoing, any liability of Sublessee to make any payment under this Sublease, whether of Fixed Rent, Additional Rent or otherwise, which shall have accrued prior to the expiration or sooner termination of this Sublease, shall survive the expiration or sooner termination of this Sublease.

2.3     Sublessor shall use commercially reasonable efforts to obtain Landlord's consent as described in Article 15 (although nothing herein shall obligate Sublessor to pay any fees or other consideration other than Landlord's reasonable administrative expenses and attorneys' fees) and to deliver possession of the Premises on the Commencement Date.  If Sublessor shall be unable to deliver possession of the Premises on the Commencement Date, and provided Sublessee is not responsible for such inability to give possession, Sublessee waives the right to recover any damages which may result from Sublessor's failure to so deliver possession of the Premises to Sublessee, no such failure to deliver possession on the Commencement Date shall in any way affect the validity of this Sublease or the obligations of Sublessee hereunder or give rise to any claim for damages by Sublessee or claim for rescission of this Sublease, nor shall the same in any way be construed to extend the Term.  Notwithstanding anything to the contrary herein, in the event the Commencement Date shall have not occurred within sixty (60) days of the date hereof, despite Sublessor's commercially reasonable efforts to obtain Landlord's consent

2

as provided herein, then either party may seek to terminate this Sublease by giving the other party five (5) business days' written notice, and if the Commencement Date shall have failed to have occurred on or prior to such fifth (5th) business day, this Sublease shall terminate and be of no further force and effect.

      3.    <u>Rent</u>.

      3.1    The rent ("<u>Rent</u>") reserved for the Term shall consist of the following:

(a)    annual fixed rent ("<u>Fixed Rent</u>") as follows:

      (i)    at the rate of Five Hundred Thirty Two Thousand Eight Hundred and 00/100 Dollars ($532,800.00) per annum for the first Lease Year (as hereinafter defined); and

      (ii)    commencing on the first day of the second (2nd) Lease Year, and on the first day of each and every Lease Year thereafter, the Fixed Rent shall be increased by the lesser of (A) four percent (4.0%) of the Fixed Rent payable immediately prior thereto, and (B) the product of (I) two and one-half (2.5), and (II) the CPI Increase (as hereinafter defined).

(b)    As used herein, the following terms shall have the following meanings:

      (i)    The "<u>CPI Increase</u>" shall mean the percentage increase from the Base Index to the Current Index of the Consumer Price Index (as such terms are hereinafter defined).

      (ii)    The "<u>Base Index</u>" shall initially refer to the Consumer Price Index published for the month immediately preceding the Rent Commencement Date (as hereinafter defined), and following each increase in the Fixed Rent pursuant to <u>Section 3.1(a)(ii)</u> above, the Base Index shall refer to the Consumer Price Index published for the subsequent April.

      (iii)    The "<u>Current Index</u>" shall initially refer to the Consumer Price Index published for the month immediately preceding the second (2nd) Lease Year, and following each increase in the Fixed Rent pursuant to <u>Section 3.1(a)(ii)</u> above, the Current Index shall refer to the Consumer Price Index published for the subsequent April .

      (iv)    The "<u>Consumer Price Index</u>" shall mean the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, Los Angeles-Riverside-Orange County, CA, All Items (1982-84=100), or any successor index thereto, appropriately adjusted.  In the event that the Consumer Price Index is

3

converted to a different standard reference base or otherwise revised, the determination of adjustments provided for herein shall be made with the use of such conversion factor, formula or table for converting the Consumer Price Index as may be published by the Bureau of Labor Statistics or, if said Bureau shall not publish the same, then with the use of such conversion factor, formula or table as may be published by Prentice-Hall, Inc., or any other nationally recognized publisher of similar statistical information.   If the Consumer Price Index ceases to be published, and there is no successor thereto, such other index as Landlord shall reasonably select shall be substituted for the Consumer Price Index.

(v)   The first "Lease Year" shall mean the period commencing on the Rent Commencement Date and ending on the last day of the month which precedes the twelve (12) month anniversary of the Rent Commencement Date.  Each subsequent "Lease Year" shall mean the twelve (12) month period thereafter, except that the final "Lease Year" shall end on the Expiration Date or sooner termination of the Term.

(vi)   The "Rent Commencement Date" shall mean August 1, 2007; provided, however, if the Commencement Date fails to occur on or prior to June 15, 2007, the Rent Commencement Date shall be extended by one (1) day for each day that elapses following June 15, 2007 until occurrence of the Commencement Date.

(c)   additional rent ("Additional Rent") commencing on the Rent Commencement Date in an amount equal to the sum of (A) any and all sums of money ("Underlying Additional Rent") (other than annual Fixed Rent) which is or may become payable by Sublessor to Landlord or other parties under the Master Lease, and (B) any and all other sums payable by Sublessee to Sublessor hereunder.  Additional Rent under this subsection shall be payable by Sublessee on the date ten (10) days before the date on which the Underlying Additional Rent is payable to Landlord under the Master Lease (but in no event before ten (10) days after Sublessee receives the applicable statement or invoice for such Additional Rent; provided, however, that the foregoing shall not apply to regularly recurring payments of Additional Rent).   All other Additional Rent shall be payable upon demand.  Sublessor shall have the same remedies with respect to any default by Sublessee in the payment of Additional Rent as are provided in this Sublease, the Master Lease or applicable law with respect to any nonpayment of rent.

3.2   The Fixed Rent and, except as otherwise specifically provided in this Sublease, the Additional Rent, shall be paid by Sublessee to Sublessor at the office of Sublessor set forth above or such other place as Sublessor may designate in writing, without prior notice or demand therefor without any abatement, deduction or setoff except as provided herein.

4.   Use.

4

4.1     Sublessee may occupy and use the Premises only for the uses permitted under the Master Lease, and for no other purpose, provided that any use of the Premises shall in all respects be only as permitted under the terms and provisions of this Sublease and the Master Lease, including the rules and regulations under the Master Lease, and any and all laws, statutes ordinances, orders, regulations and requirements of all federal, state and local governmental, public or quasi-public authorities, whether now or hereafter in effect, which may be applicable to or in any way affect the Premises or the Premises or any part thereof (collectively, "Legal Requirements").

4.2     Sublessee shall not, without the prior consent of Sublessor and Landlord, knowingly do or permit anything to be done which may result in a violation of the terms of this Sublease or the Master Lease or which may make Sublessor liable for any damages, claims, fines, penalties, costs or expenses thereunder.

5.     Master Lease.

5.1     This Sublease and all of Sublessee's rights hereunder are and shall remain in all respects subject and subordinate to (i) all of the terms and provisions of the Master Lease, a copy of which (except for the rent and certain other financial provisions) has been delivered to Sublessee, (ii) any and all amendments of the Master Lease or supplemental agreements relating thereto hereafter made between Landlord and Sublessor (copies of which Sublessor agrees to deliver to Sublessee except for the rent and certain other financial provisions which may be contained therein), provided, however, that Sublessor shall not enter into any such amendments or supplemental agreements that shall (1) adversely affect Sublessee's rights or Sublessor's obligations hereunder, other than in a de minimis fashion, (2) increase Sublessee's obligations hereunder, other than in a de minimis fashion, (3) decrease the size of the Premises, or (4) shorten the term hereof, and (iii) any and all matters to which the tenancy of Sublessor, as tenant under the Master Lease, is or may be subordinate. Sublessee shall in no case have any rights under this Sublease greater than Sublessor's rights as tenant under the Master Lease; however, in the event of any conflict between the Master Lease and this Sublease, as between Sublessor and Sublessee only, the terms of this Sublease shall control. The foregoing provisions shall be self-operative and no further instrument of subordination shall be necessary to effectuate such provisions unless required by Landlord or Sublessor, in which event Sublessee shall, upon demand by Landlord or Sublessor at any time and from time to time, execute, acknowledge and deliver to Sublessor and Landlord any and all commercially reasonable instruments that Sublessor or Landlord may deem reasonably necessary or proper to confirm such subordination of this Sublease, and the rights of Sublessee hereunder.

5.2     Sublessee acknowledges that in the event of a termination of the Master Lease or re-entry or dispossess by Landlord under the Master Lease, Landlord may, at its option, take over all of the right, title and interest of Sublessor hereunder and Sublessee agrees that it shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of this Sublease, except that Landlord shall not (i) be liable for any previous act or omission of Sublessor under this Sublease, (ii) be subject to any offset not expressly provided in this

5

Sublease, which theretofore accrued to the Sublessee against Sublessor, or (iii) be bound by any previous modification of this Sublease (which is made without Landlord's consent) or by any previous prepayment of more than one month's rent.

5.3      Sublessee shall observe and perform for the benefit of Landlord and Sublessor, each and every term, covenant, condition and agreement of the Master Lease which Sublessor is required to observe or perform with respect to the Premises as Tenant under the Master Lease during the Term of this Sublease, to the extent such term, covenat, condition and agreement of the Master Lease has been incorporated into this Sublease by the terms hereof. Except as otherwise specifically provided in this Sublease, all of the terms, covenants, conditions and agreements which Landlord or Sublessor are required to observe or perform with respect to the Premises as parties to the Master Lease are hereby incorporated herein by reference and deemed to constitute terms, covenants, conditions and agreements which Sublessor and Sublessee are required to observe or perform under this Sublease as if set forth herein at length, mutatis mutandis. Sublessor may exercise all of the rights, powers, privileges and remedies reserved to Landlord under the Master Lease to the same extent as if fully set forth herein at length, except as may be provided otherwise herein, and all rights and remedies arising out of or with respect to any default by Sublessee in the payment of Rent hereunder or the observance or performance of the terms, covenants, conditions and agreements of this Sublease (including those portions of the Master Lease that are incorporated herein). Notwithstanding the foregoing, the following provisions of the Master Lease shall not be incorporated in this Sublease: Sections 1.3, 1.4 and 1.5, the portion of Section 3.1 that precedes paragraph (a) thereof, Section 3.2, Article 5, Section 7.9, the third sentence of Section 10.1, Article 11, Sections 15.1(h) and (i), the first two sentences of Article 18, Article 19 (except for Section 19.3), Articles 23 and 25, the portion of Section 27.2 following the words "provided, however", and Schedules 1 and 2. In addition, in incorporating Section 19.2 into this Sublease, the second sentence shall be modified to read as follows:  "Sublessee shall not be liable for any environmental or hazardous materials issues relating to the Premises resulting from any environmental or hazardous materials existing prior to the Commencement Date or having migrated underground from or through adjacent properties prior to the Commencement Date."

5.4      The consent of Landlord shall be required in connection with any act which requires the consent of Landlord pursuant to the terms of the Master Lease, notwithstanding that a particular provision herein may not require Sublessor's consent or states that only Sublessor's consent is required. Upon request of Sublessee, Sublessor will request Landlord's consent to any act for which such consent is required. If Landlord grants such consent, Sublessor shall also so consent, provided that the matter for which Sublessee is seeking consent shall not (i) increase the obligations or potential liability of Sublessor hereunder or under the Master Lease, (ii) eliminate or adversely modify the rights of Sublessor under  this Sublease, or (iii) eliminate or adversely reduce the obligations of Sublessee under this Sublease.

5.5      Sublessor shall request from Landlord, at the time of requesting Landlord's consent to this Sublease, an agreement under which Landlord agrees that Sublessee shall not be disturbed in its possession, use and enjoyment of the Premises for the entire term of

6

this Sublease, even if Sublessor defaults under the Master Lease or if the Master Lease terminates before the expiration of this Sublease; provided that as part of such agreement Sublessee must agree (upon any termination of the Master Lease) to make full and complete attornment to the Landlord upon the then executory terms of this Sublease for the balance of the Term (a "<u>Recognition Agreement</u>"). If, as of the date of execution of this Sublease, there is any deed of trust, ground lease, or other similar encumbrance affecting the Site, Project, Building or Premises of which Sublessor or Sublessee is aware, Sublessor shall also request from Landlord, at the time of requesting Landlord's consent to this Sublease, that it obtain from the holder of such encumbrance an agreement that Sublessee shall not be disturbed in its possession, use and enjoyment of the Premises by such holder in the event of a foreclosure of such encumbrance (an "<u>SNDA</u>"). Notwithstanding such requests, Sublessee acknowledges and agrees that the obtaining of a Recognition Agreement and/or an SNDA are not conditions to the occurrence of the Commencement Date, and that Landlord's failure to enter into or deliver a Recognition Agreement or an SNDA, or its delay in considering any request therefor, shall have no effect on Sublessee's obligations hereunder.

6.  Services.

6.1  Sublessee shall be entitled during the Term to receive all services, utilities, repairs and facilities which Landlord is required to provide insofar as such services, utilities, repairs and facilities pertain to the Premises. Notwithstanding anything to the contrary in this Sublease, Sublessor shall have no liability of any nature whatsoever to Sublessee as a consequence of the failure or delay on the part of Landlord in performing any or all of its obligations under the Master Lease, unless such failure or delay is caused by Sublessor, and under no circumstances shall Sublessee have any right to require or obtain the performance by Sublessor of any obligations of Landlord under the Master Lease or otherwise. Sublessee's obligations under this Sublease shall not be impaired, nor shall the performance thereof be excused, because of any failure or delay on the part of Landlord in performing its obligations under the Master Lease.

6.2  If at any time during the Term Landlord shall default in any of its obligations to furnish facilities, services or utilities or to make repairs to the Premises, then, upon Sublessor's receipt of a written notice from Sublessee specifying such default, Sublessor shall, at Sublessee's sole cost and expense, use its reasonable efforts to cause Landlord to cure such default. If Landlord fails to cure such default in a timely manner, Sublessor shall, if requested by Sublessee, at Sublessee's cost and expense, either pursue its legal rights against Landlord, or at Sublessor's option, assign to Sublessee any claim it may have against Landlord on account of any such default (which assignment shall include the right to pursue legal action against Landlord). Sublessee shall have the right to demand that Sublessor assign such claim to Sublessee if Sublessor fails to comply with its obligations hereunder for a period of twenty (20) days following written notice from Sublessee (unless such matter is of a nature that same cannot be complied with during such period, provided Sublessor is using diligent efforts to so comply).

7.  Alterations and Repairs.

7

7.1     Sublessee shall make no alterations, installations, additions or improvements, including Sublessee's initial leasehold improvements, (collectively, "Alterations") in or about the Premises without the prior written consent of Sublessor and Landlord in each instance, which consent shall not be unreasonably withheld by Sublessor as to nonstructural Alterations which do not affect building systems provided any required consent of Landlord (to the extent required under the Master Lease) shall have first been obtained. Any Alterations consented to by Sublessor shall be performed by Sublessee, at its sole cost and expense, and in compliance with the following requirements:

(a)     Sublessee, at its sole expense, shall comply with all of the provisions of this Sublease and the Master Lease pertaining to the making of Alterations, including, without limiting the generality of the foregoing, any provisions requiring the prior written consent of Landlord before any Alterations may be made in or about the Premises;

(b)     Sublessee shall submit to Sublessor for its and Landlord's prior written approval all plans and specifications for such proposed Alterations, together with the name of the proposed contractor and all proposed subcontractors, and all other documentation required to be submitted by Sublessor to Landlord under the Master Lease in respect of such Alterations;

(c)     Sublessee, at its sole expense, and prior to commencing any work reasonably estimated by Sublessor to cost in excess of $50,000, shall deliver to Sublessor cash or a letter of credit equal to 110% of the estimated cost of such Alteration, which security deposit shall promptly be returned to Sublessee upon (i) completion of the Alteration in question, (ii) evidence of payment by Sublessee of the costs thereof, and (iii) evidence of the waiver of any mechanics or other liens in connection therewith;

(d)     Sublessee shall furnish Sublessor with certificates of insurance as shall be reasonably satisfactory to Sublessor as to coverage and insurer (who shall be licensed to do business in the State of California), including, but not limited to, liability, property damage, and worker's compensation insurance to protect Sublessor, Landlord, their agents, employees, successors and assigns and Sublessee during the period of the performance of such Alteration;

(e)     All such Alterations shall be performed in a good and workmanlike manner and in compliance with all Legal Requirements and with all requirements of any insurance policies affecting the Premises or the Premises and so as to cause as little interference as possible with Sublessor's or its sublessees' use, occupancy and enjoyment of the premises of which the Premises are a part; and

(f)     Sublessee, at its sole expense, shall obtain all municipal and other governmental licenses, permits, authorizations, approvals and certificates required in connection with such Alteration.

7.2     Subject to Sublessor's obligations with respect to the condition of the

8

Premises on the Commencement Date, Sublessor shall have no obligations whatsoever to make any repairs or Alterations in the Premises to any systems serving the Premises or to any equipment, fixtures or furnishing in the Premises, or to restore the Premises in the event of a fire or other casualty therein or to perform any other duty with respect to the Premises which Landlord is required to perform pursuant to certain obligations which Landlord has to Sublessor under the Master Lease. Sublessor shall look solely to Landlord for the making of any and all repairs in the Premises and the performance of all such other work and responsibilities and only to the extent required by the terms of the Master Lease, subject to the provisions of Article 6 herein.

7.3     Sublessor hereby consents to the Sublessee's proposed alterations more particularly described on Exhibit B annexed hereto (the "Proposed Alterations").

7.4     Sublessee covenants and agrees to restore and/or remove any Alterations made to the Premises (including, without limitation, the Proposed Alterations) upon the expiration or sooner termination of this Sublease, if so requested by Landlord. If Landlord shall condition its consent to the Proposed Alterations upon the restoration and/or removal of the Proposed Alterations upon the expiration or sooner termination of this Sublease, Landlord's consent shall be deemed given and Sublessee hereby agrees to so restore and/or remove same. Sublessee's obligations under this Section 7.4 shall survive the expiration or sooner termination of this Sublease.

8.     Insurance.

8.1     Sublessee, at Sublessee's sole expense, shall maintain for the benefit of Sublessee, Sublessor and Landlord such policies of insurance required to be maintained by the "Tenant" under the Master Lease or reasonably satisfactory to Sublessor as to coverage and insurer (who shall be licensed to do business in the State of California), provided that such insurance shall at a minimum include comprehensive general liability insurance protecting and indemnifying Sublessor, Landlord and Sublessee against any and all claims and liabilities for injury or damage to persons or property or for the loss of time or of property occurring upon, in or about the Premises, and the public portions of the Premises, caused by or resulting from or in connection with any act or omission of Sublessee, Sublessee's employees, agents or invitees. Sublessee shall furnish to Sublessor certificates of insurance evidencing such coverage prior to the Commencement Date. Subject to the terms of the Master Lease, Sublessee may satisfy its insurance requirements hereunder by a separate policy(ies) or under one or more blanket policies, provided the coverage applicable to the Premises is not diminished thereby.

8.2     Sublessor and Sublessee each hereby releases and waives all right to recovery against the other or anyone claiming through or under the other for property damage resulting from a peril insurable under a standard "all risk" policy of property insurance, by way of subrogation or otherwise. The foregoing release and waiver shall be in force only if the insurance policies of Sublessor and Sublessee provide that such release or waiver does not invalidate the insurance; each party agrees to use its best efforts to include such a provision in its

9

applicable insurance policies.  If the inclusion of said provision would involve an additional expense, either party, at its sole expense, may require such provision to be inserted in the other's policy.

9.    Assignment, Subletting and Encumbrances.

9.1    Except as otherwise provided herein, Sublessee, shall not sublease, mortgage, pledge or otherwise encumber all or any part of the Premises, assign this Sublease (by operation of law or otherwise) or permit the Premises to be used or occupied by anyone other than Sublessee, without the prior written approval of Sublessor and Landlord in each instance, which approval from Landlord shall be granted or withheld in accordance with the terms of the Master Lease and from Sublessor shall not be unreasonably withheld or delayed.  If Sublessor consents to an assignment of this Sublease or a subletting of the Premises, no such assignment or subletting shall be or be deemed to be effective until the following conditions have been met:

(i)    Landlord shall have consented in writing to such assignment or subletting (to the extent Landlord's consent is required under the Master Lease);

(ii)    in the case of an assignment, the assignee shall have assumed in writing, directly for the benefit of Sublessor, all of the obligations of Sublessee hereunder and Sublessor shall have been furnished with a duplicate original of the agreement of assignment and assumption, in form and substance reasonably satisfactory to Sublessor; and

(iii)    in the case of a subletting, Sublessor shall have been furnished with a duplicate original of the sublease prior to the commencement of the term of such sublease, which sublease shall be in form and substance reasonably satisfactory to Sublessor, and shall be subject and subordinate to all of the terms, covenants and conditions of this Sublease and the Master Lease.

Notwithstanding Sublessor's consent to any such assignment or subletting, the provisions of this subsection shall be applicable to each and every subsequent assignment or subletting, and Sublessee shall not be released from any of its obligations or liabilities hereunder.

9.2    If this Sublease be assigned or if the Premises or any part thereof be further sublet or occupied by anybody other than Sublessee, Sublessor may, after default by Sublessee beyond applicable notice and cure provisions, collect rent from the assignee, subtenant or occupant, and, if Sublessor does so, it shall apply the net amount collected to the Fixed Rent, Additional Rent and other charges herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of Sublessee's covenants under this Article 9, or the acceptance by Sublessor of the assignee, subtenant or occupant as tenant hereunder or a release of Sublessee from the further performance by Sublessee of any of the terms, covenants and conditions of this Sublease on the part of Sublessee to be performed hereunder.

10

9.3     In the event Sublessee shall assign this Lease or sublease the Premises, Sublessee shall pay to Sublessor as Additional Rent, a sum equal to 50% of (x) any fixed rent and additional rent or other consideration paid to Sublessor by any assignee or subtenant which is in excess of the Fixed Rent then being paid by Sublessee to Sublessor pursuant to the terms hereof, and (y) any other profit or gain realized by Sublessee from any such assignment or subletting.

9.4     Sublessee shall pay on demand the actual costs and expenses reasonably incurred by Sublessor and Landlord, including, without limitation, reasonable architect, engineer and attorneys' fees and disbursements in connection with any proposed or actual assignment of this Sublease or subletting of the Premises or any part thereof and the review and/or preparation of documents in connection therewith.

10.     Indemnification

10.1    Sublessee shall indemnify Sublessor and Landlord (and their respective employees, agents, contractors and licensee) against any (a) negligence of Sublessee (or anyone claiming by or through Sublessee) or its or their partners, members, directors, officers or employees; (b) breach of any representation or warranty made by Sublessee in this Sublease or default by Sublessee under this Sublease; (c) use, occupancy, control, management, operation and possession of the Premises; (d) any work done at the Premises, and any agreements that Sublessee (or anyone claiming through Sublessee) makes for such work; (e) the condition of the Premises or any street, curb or sidewalk adjoining the Premises, or any vaults, tunnels, passageways or space under, adjoining or appurtenant to the Premises; and (f) any accident, injury or damage whatsoever caused to any person in or on the Premises or upon or under the sidewalks adjoining the Premises.

10.2    If any action or proceeding shall be brought against Sublessor or Landlord by reason of any such claim, Sublessee, upon notice from Sublessor or Landlord, shall resist and defend such action or proceeding and employ counsel therefor reasonably satisfactory to Sublessor and Landlord (counsel required by Sublessee's insurance company shall be deemed satisfactory to Sublessor). Sublessee shall pay to Sublessor on demand all sums which may be owing to Sublessor and Landlord by reason of the provisions of this subsection. Sublessee's obligations under this subsection shall survive the Expiration Date or other termination of this Sublease.

11.     Time Limits.

11.1    Except with respect to actions to be taken by Sublessee for which shorter time limits are specifically set forth in this Sublease, which time limits shall control for the purposes of this Sublease, the time limits provided in those portions of the Master Lease that are incorporated herein for the giving or making of any Notice (as hereinafter defined) by the tenant thereunder to Landlord, the holder of any leasehold mortgage or any other party, or for the performance of any act, condition or covenant by the tenant thereunder, or for the exercise of any right, remedy or option by the tenant thereunder, are changed for the purpose of incorporation

11

into this Sublease, by shortening the same in each instance by (i) fifteen (15) days with respect to all such periods of sixty (60) or more days, (ii) seven (7) days with respect to all such periods of thirty (30) or more days but less than sixty (60) days, (iii) five (5) days with respect to all such periods of twenty (20) or more but less than thirty (30) days and (iv) three (3) days with respect to all such periods of less than twenty (20) days, provided, however, that in no event shall any such period be shortened to less than five (5) days, so that any Notice may be given or made, or any act, condition or covenant performed, or option hereunder exercised, by Sublessor within the time limit relating thereto contained in the Master Lease.

11.2    Except with respect to actions to be taken by Sublessor for which longer time limits are specifically set forth in this Sublease, which time limits shall control for the purposes of this Sublease, the time limits provided in the Master Lease for the giving or making of any Notice by Landlord or the performance of any act, covenant or condition by Landlord for the exercise of any right, remedy or option by Landlord thereunder are changed for the purposes of this Sublease, by lengthening the same in each instance by (i) ten (10) days with respect to all such periods of sixty (60) or more days (ii) seven (7) days with respect to all such periods of thirty (30) or more but less than sixty (60) days, (iii) five (5) days with respect to all such periods of twenty (20) or more but less than thirty (30) days and (iv) three (3) days with respect to all such periods of less than twenty (20) days so that any Notice may be given or made, or any act, condition or covenant performed or option hereunder exercised by Landlord within the number of days respectively set forth above, after the time limits relating thereto contained in the Master Lease.

12.    Quiet Enjoyment.

12.1    Sublessor covenants that, as long as Sublessee shall pay the Fixed Rent and Additional Rent and all other amounts due hereunder and shall duly observe, perform, and comply with all of the terms, covenants and conditions of this Sublease on its part to be observed, performed or complied with, Sublessee shall, subject to all of the terms of the Master Lease and this Sublease, peaceably have, hold and enjoy the Premises during the Term without molestation or hindrance by Sublessor.

13.    Security.

13.1    Simultaneously with the execution of this Sublease, Sublessee shall deposit with Sublessor the sum of $127,520 Dollars ("Security Deposit") as security for the faithful performance and observance by Sublessee of all of the terms, covenants and conditions of this Sublease on Sublessee's part to be performed and observed. Sublessor shall deposit the Security Deposit in an interest bearing money market account, and Sublessee shall be entitled to all interest earned on the Security Deposit. Sublessor may use, apply or retain the whole or any part of the Security Deposit to the extent required for the payment of any Rent and any other sums as to which Sublessee may be in default hereunder beyond the expiration of applicable grace and notice periods and for any sum which Sublessor may expend or may be required to expend by reason of Sublessee's default beyond the expiration of applicable grace and notice

12

periods in respect of any of the terms, covenants and conditions of this Sublease, including, without limiting the generality of the foregoing, any and all damages and deficiencies in the reletting of the Premises, whether such damages or deficiencies shall accrue before or after summary proceedings or other re-entry by Sublessor. In the event that Sublessee shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Sublease, the Security Deposit, or so much thereof as shall not have been applied by Sublessor as aforesaid, together with accrued interest thereof, shall be returned to Sublessee promptly following the Expiration Date or date of earlier termination and delivery of the entire possession of the Premises to Sublessor. In the event of an assignment by Sublessor of its interest under the Master Lease, Sublessor shall have the right to transfer the Security Deposit to the assignee and Sublessor shall thereupon be released by Sublessee from all liability for the return of such Security Deposit. In such event, Sublessee shall look solely to its new landlord for the return of said Security Deposit and by taking such assignment the new landlord shall be deemed to have assumed the obligation for the return of the Security Deposit. The foregoing provisions shall apply to every transfer or assignment made of the Security Deposit to a new landlord. Sublessee further covenants that it will not assign or encumber or attempt to assign or encumber the Security Deposit and that neither Sublessor nor its successors and assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

13.2    Sublessee shall have the right, either (i) in lieu of the funds required to be deposited with Sublessor pursuant to this Article 13 or (ii) at any time thereafter in substitution for such funds, to deposit and maintain with Sublessor as the security deposit referred to in this Article 13, an irrevocable commercial letter of credit in the aggregate amount of $127,520 in form and substance reasonably satisfactory to Sublessor, and issued by a member bank of the New York Clearing House Association, payable upon the presentation by Sublessor to such bank of a sight-draft, without presentation of any other documents, statements or authorizations, which letter of credit shall provide (i) for the continuance of such credit for the period of at least one (1) year from the date the same is issued, (ii) for the automatic extension of such letter of credit for additional periods of one (1) year from the initial and each future expiration date thereof (the last such extension to provide for the continuance of such letter of credit for at least one (1) month beyond the Expiration Date, unless such bank gives Sublessor notice of its intention not to renew such letter of credit not less than sixty (60) days prior to the initial or any future expiration date of such letter of credit and (iii) that in the event such notice is given by such bank, Sublessor shall have the right to draw on such bank at sight for the balance remaining in such letter of credit and hold and apply the proceeds thereof in accordance with the provisions of this Article 13. Each letter of credit to be deposited and maintained with Sublessor (or the proceeds thereof) shall be held by Sublessor as security for the faithful performance and observance by Sublessee of the terms, provisions and conditions of this Sublease, and in the event that (x) any default occurs under this Sublease and continues beyond the expiration of applicable notice and cure periods, or (y) Sublessor transfers its right, title and interest under this Sublease to a third party and the bank issuing such letter of credit does not consent to the transfer of such letter of credit to such third party, or (z) notice is given by the bank issuing such letter of credit that it does not intend to renew the same, as above provided, then, in any such event, Sublessor may draw on such letter of credit, and the proceeds of such letter of credit shall then be held and applied as

13

security (and be replenished, if necessary) as provided in <u>Section 13.1</u>. In the event that Sublessee shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Sublease, the Security Deposit, or so much thereof as shall not have been applied by Sublessor as aforesaid, shall be returned to Sublessee promptly following the Expiration Date or date of earlier termination and delivery of the entire possession of the Premises to Sublessor.

14. <u>Notices</u>.

14.1 All notices, consents, approvals or other communications (collectively, a "<u>Notice</u>") required to be given under this Sublease or pursuant to law shall be in writing and, unless otherwise required by law, shall be given by certified mail, return receipt requested, postage prepaid or by nationally recognized overnight courier service, to the parties at their respective addresses set forth above or such other address as either may designate by Notice to the other. Notices to Sublessor shall be addressed to the attention of: Director of Real Estate, and copies of notices to Sublessor shall be given in like manner to (i) PRADA USA Corp., 610 West 52nd Street, New York, New York 10019, Attn: General Counsel, and (ii) Duval & Stachenfeld LLP, 300 East 42nd Street, New York, New York, 10017, Attn: Eric G. Menkes, Esq. A copy of any Notice to Sublessee shall be given in like manner to Dean Dunn-Rankin, Hewitt & O'Neil LLP, 19900 MacArthur Blvd, Suite 1050, Irvine, California 92612. Any notice given pursuant hereto shall be deemed to have been received on the third business day after the mailing thereof if mailed in accordance with the terms hereof or on the following business day after delivery to the overnight courier service. Counsel for Sublessor and Sublessee may give notices hereunder on behalf of their respective clients.

15. <u>Landlord's Consent Required</u>.

15.1 This Sublease shall be of no force or effect unless and until Sublessor shall have obtained Landlord's written consent to this Sublease and the Proposed Alterations, and delivered to Sublessee an executed copy of such consent in a form reasonably acceptable to Sublessee.

16. <u>Broker</u>.

Sublessee and Sublessor represent and warrant to each other that they have not dealt with any broker in connection with this Sublease other than Issacs and Company Commercial Real Estate, LLC, Dembo & Associates, Robert K. Futterman & Associates and Urban Retail Real Estate Group (collectively the "<u>Broker</u>") and that no broker or person other than the Broker had any part or was instrumental in any way in bringing about this transaction. Sublessee and Sublessor shall indemnify and hold each other harmless from and against any and all loss, claims, liabilities, damages and expenses, including, without limitation, attorneys' fees and expenses and court costs, arising out of or in connection with any breach or alleged breach of the above representations or any claim by any person or entity other than Broker for brokerage commissions or other compensation in connection with the consummation of this Sublease. The

14

provisions of this Article 16 shall survive the expiration or sooner termination of this Sublease. Sublessor shall pay the Broker any compensation in connection with this Sublease pursuant to separate agreement.

17.    Waiver of Rights to Jury and Counterclaim.

17.1    Sublessor and Sublessee each hereby waive to the fullest extent permitted by law, trial by jury in any action, proceeding or counterclaim brought by either of the parties against the other on any matters whatsoever arising out of or in any way connected with this Sublease, the relationship of Sublessor and Sublessee, Sublessee's use or occupancy of the Premises, and/or any claim of injury or damage, or for the enforcement of any remedy under any statute, emergency or otherwise. Sublessor and Sublessee further agree that in the event Sublessor commences any summary proceeding for non-payment of Rent, Sublessee will not interpose any counterclaim (other than compulsory counterclaims) of whatever nature or description in any such proceeding.

17.2    Sublessee hereby waives its right to interpose or counterclaim (other than compulsory counterclaims) in any summary proceeding instituted to remove Sublessee from the Premises or in any action or proceeding instituted for the collection of Fixed Rent, Additional Rent or other amounts Sublessee is obligated to pay Sublessor hereunder.

18.    Miscellaneous.

18.1    This Sublease shall be governed by and construed in accordance with the laws of the State of California.

18.2    The section headings in this Sublease are inserted only as a matter of convenience for reference and are not to be given any effect in construing this Sublease.

18.3    If any of the provisions of this Sublease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Sublease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Sublease shall be valid and enforceable to the fullest extent permitted by law.

18.4    All of the terms and provisions of this Sublease shall be binding upon and inure to the benefit of the parties hereto and, subject to the provisions of Article 9 hereof, their respective successors and assigns.

18.5    Sublessor has made no representations, warranties or covenants to or with Sublessee with respect to the subject matter of this Sublease except as expressly provided herein and all prior negotiations and agreements relating thereto are merged into this Sublease. This Sublease may not be amended or terminated, in whole or in part, nor may any of the provisions

15

be waived, except by a written instrument executed by the party against whom enforcement of such amendment, termination or waiver is sought and unless the same is permitted under the terms and provisions of the Master Lease.

18.6   Contemporaneous with its execution of this Sublease, Sublessee's parent, QUIKSILVER, INC., a Delaware corporation ("Guarantor") is delivering to Sublessor a Guaranty of Performance and Obligations (the "Guaranty") with respect to Sublessor's obligations hereunder.  Sublessee acknowledges and agrees that delivery of the Guaranty by the Guarantor is a material inducement to Sublessor to enter into this Sublease, and accordingly Sublessee agrees that it shall be an event of default hereunder (with no cure period or right of redemption) in the event (i) Guarantor shall default under the Guaranty for a period of ten (10) days' written notice from Sublessor, (ii) Guarantor shall make an assignment for the benefit of creditors, (iii) Guarantor shall file a voluntary petition under any bankruptcy or insolvency law, (iv) an involuntary petition alleging an act of bankruptcy or insolvency shall be filed against Guarantor under any bankruptcy or insolvency law and not cured within sixty (60) days, or (v) a receiver of Guarantor, or of or for the property of Guarantor, shall be appointed.

18.7   Sublessor represents, warrants and covenants to Sublessee that (a) the copy of the Master Lease which is attached hereto as Exhibit A is a true and correct copy of the Master Lease (with business terms redacted), including all amendments and modifications thereto (except as hereinafter provided), and the Master Lease is in full force and effect as of the date of this Sublease; (b) to Sublessor's knowledge, Sublessor is not presently in default under or in breach of any of the provisions of the Master Lease that would materially adversely affect Sublessee's use or enjoyment of the Premises; (c) Sublessor has no knowledge of any claim by Landlord that Sublessor is in default or breach of any of the provisions of the Master Lease; (d) Sublessor is entitled to occupancy of the Premises and has not, other than under the provisions of this Sublease, sublet or assigned its right to occupancy of the Premises; and (e) the side letter referenced in Section 28.3 of the Master Lease has no bearing on Sublessee's use or occupancy of the Premises and does not and will not adversely affect Sublessee's rights under this Sublease or increase Sublessee's obligations under this Sublease.

18.8   If Landlord exercises its rights to modify Lessor's Insurance (as such term is defined in the Master Lease) pursuant to Section 9.4 of the Master Lease, Sublessor shall notify Sublessee, and Sublessee shall have the right to reasonably direct Sublessor with respect to the negotiations described therein.

18.9   After the execution and delivery hereof, Sublessor and Sublessee shall from time to time at the reasonable request of the other and at the cost and expense of the requesting party, execute and deliver such other instruments and take such other actions as the requesting party may reasonably request in order to fully consummate the transactions contemplated by this Sublease.

[Signatures appear on following page]

IN WITNESS WHEREOF, Sublessor and Sublessee have executed this Sublease as of the day and year first above written.

PRADA USA CORP., a Delaware corporation

By: _____

Name: Rolio Caterini

Title: COO

QS RETAIL, INC., a Delaware corporation

By: _____

Name:

Title:

17

IN WITNESS WHEREOF, Sublessor and Sublessee have executed this Sublease as of the day and year first above written.

PRADA USA CORP., a Delaware corporation

By: _____
    Name:
    Title:

QS RETAIL, INC., a Delaware corporation

By: _____
    Name: **Bradley H. Sell**
    Title: **SVP Fin Ops**

17

EXHIBIT A

Master Lease

REDACTED

# LEASE

between

## RED SAIL REAL ESTATE LOS ANGELES INC.,

as Lessor

and

## PRADA USA CORP.,

as Lessee

Dated as of June 10, 2004

NY914630.6

# TABLE OF CONTENTS

Page(s)

ARTICLE 1 PREMISES; TERM ............................................................................ 3

ARTICLE 2 USE ................................................................................................... 5

ARTICLE 3 FIXED RENT .................................................................................... 6

ARTICLE 4 NET LEASE; ADDITIONAL RENT ................................................ 7

ARTICLE 5 LETTER OF CREDIT ...................................................................... 8

ARTICLE 6 REPAIRS .......................................................................................... 10

ARTICLE 7 ALTERATIONS ................................................................................ 11

ARTICLE 8 ACCESS............................................................................................. 14

ARTICLE 9 INSURANCE .................................................................................... 15

ARTICLE 10 ASSIGNMENT/SUBLETTING ..................................................... 18

ARTICLE 11 TRANSFERS .................................................................................. 20

ARTICLE 12 CASUALTY .................................................................................... 22

ARTICLE 13 CONDEMNATION ......................................................................... 23

ARTICLE 14 SURRENDER; HOLDOVER.......................................................... 24

ARTICLE 15 DEFAULTS; CONDITIONAL LIMITATION; REMEDIES ................... 25

ARTICLE 16 INDEMNITY ................................................................................... 29

ARTICLE 17 LATE CHARGES ............................................................................ 31

ARTICLE 18 NON-RECOURSE ........................................................................... 31

ARTICLE 19 NOTICES ........................................................................................ 31

ARTICLE 20 GOVERNING LAW ........................................................................ 32

ARTICLE 21 JURISDICTION............................................................................... 32

ARTICLE 22 CONFIDENTIALITY ...................................................................... 32

ARTICLE 23 MEMORANDUM OF LEASE ........................................................ 33

ARTICLE 24 QUIET ENJOYMENT .................................................................... 33

ARTICLE 25 REAL ESTATE BROKERS ............................................................ 33

ARTICLE 26 WAIVER OF JURY TRIAL ............................................................ 33

ARTICLE 27 ESTOPPEL, SUBORDINATION AND NON-DISTURBANCE ............. 34

ARTICLE 28 MISCELLANEOUS ........................................................................ 34

----------------------------------

Exhibit A  – Legal Description
Schedule 1 – Pre-Approved Modifications
Schedule 2 – Permitted Occupants

## LEASE

Lease dated as of June 10, 2004 (this "Lease") between Red Sail Real Estate Los Angeles Inc., a California corporation, having an address at c/o Beni Stabili S.p.A., Via del Corso, 63, 00186 Rome, Italy ("Lessor") and Prada USA Corp., a Delaware corporation, having an address at 610 West 52nd Street, New York, NY 10019 ("Lessee"; Lessor and Lessee being hereinafter referred to as the "Parties").

## WITNESSETH

WHEREAS, Lessor is the sole owner of the land described on Exhibit A hereto (the "Land") and the building located thereon having an address of 8025 Melrose Avenue, Los Angeles, CA 90046 together with all appurtenances, and accessories thereto (collectively the "Building"; the Land and the Building being hereinafter collectively referred to as the "Premises"); and

WHEREAS, Lessor and Lessee desire to enter into this Lease of the Premises.

NOW THEREFORE, the Parties hereto hereby covenant and agree as follows:

## ARTICLE 1
## PREMISES; TERM

1.1    Demise.  Lessor hereby leases to Lessee, and Lessee hereby hires from Lessor the Premises (excluding any air space or development rights relating to the Premises) on an "as is" basis effective as of the Commencement Date (as hereinafter defined).  Lessee represents that it is aware of and accepts the condition of the Premises as of the Commencement Date.  Lessee acknowledges that prior to the execution and delivery of this Lease, Lessee or an affiliate thereof, owned the Premises.  As a result, Lessee is fully familiar with all aspects of the Premises and it is expressly understood and agreed that Lessor makes no representations or warranties whatsoever with respect to the Premises, including without limitation, no representations or warranties as to its use, its condition (including equipment and fixtures), its compliance with law, its value, its environmental condition, its zoning, availability of utilities, its access, or any other matter relating to the Premises or Lessee's use, occupancy, maintenance and repair of the Premises.  In addition, Lessor shall have absolutely no liability whatsoever to Lessee if Lessee is not satisfied with any of the items referred to above.

1.2    Term.  The initial term of this Lease (the "Initial Term"), shall commence on June 10, 2004 (the "Commencement Date") and shall end, unless sooner terminated as herein provided, on June 9, 2019 (hereinafter referred to as the "Initial Expiration Date").

1.3    First Renewal Period.  On the Initial Expiration Date, the term of this Lease will be automatically extended (on the same terms and conditions) for an additional period of 6 years commencing on June 10, 2019 and ending on June 9, 2025 (hereinafter referred to as the "First Renewal Period"), unless Lessee notifies Lessor in writing at least 12 months before the Initial Expiration Date (the "Outside Date") of its intention to terminate this Lease on the Initial Expiration Date. Lessor shall provide Lessee with written notice at least 14 months before the Initial Expiration Date to notify Lessee that if Lessee fails to deliver a notice of termination of this Lease to Lessor by the Outside Date, then this Lease shall be automatically renewed for 6 six years from the Initial Expiration Date.  If Lessee fails to notify Lessor on or prior to the Outside Date of its intention to terminate this Lease, then, effective as of the Outside Date, this Lease shall be automatically extended for 6 years and shall expire on June 9, 2025, and thereafter, this Lease may only be renewed for four (4) additional periods of six (6) years each as set forth in Section 1.4 below.  It is the intention of the parties hereto that in no event shall the term of this Lease be more than 45 years.

1.4    Renewal Periods.  Upon expiration of the First Renewal Period, the Parties hereby agree that the term of this Lease will be automatically extended (on the same terms and conditions) for an additional four (4) terms of 6 years each (each, a "Renewal Period"), commencing on the date following the expiration of the First Renewal Period or the current Renewal Period, as applicable, unless Lessee or Lessor notifies the other in writing at least 12 months before the expiration of the First Renewal Period or the current Renewal Period, as applicable (such applicable date, the "Renewal Outside Date"), of its intention to terminate this Lease on the expiration of the First Renewal Period or the current Renewal Period, as applicable.  Lessor shall provide Lessee with written notice at least 14 months before the applicable Renewal Outside Date to notify Lessee that if Lessee fails to deliver a notice of termination of this Lease to Lessor by the applicable Renewal Outside Date, then this Lease shall be automatically renewed for an additional 6 six years unless Lessor elects to terminate this Lease on or before the applicable Renewal Outside Date.  If neither Lessor nor Lessee gives notice to the other on or before the applicable Renewal Outside Date of its intention to terminate this Lease, then, effective as of the applicable Renewal Outside Date, this Lease shall automatically be extended for an additional 6 years and the expiration date of the current Renewal Period shall be deemed extended to the date which is 6 years from the expiration date of the current Renewal Period. If either Lessor or Lessee shall give notice to the other within the time frame described above of its intention to terminate this Lease, all subsequent Renewal Periods shall also be terminated.  Neither Lessor nor Lessee shall have any additional renewal or extension rights.

1.5    Renewal Notice.  If Lessee elects not to renew this Lease after the Initial Term or either Lessor or Lessee elects not to renew this Lease after the First Renewal Period or any subsequent Renewal Period, it must notify the other in writing of its option to terminate this Lease on either the Initial Expiration Date or expiration of

4

the First Renewal Period or the current Renewal Period, as applicable, within the time frame described above (the "Renewal Notice"). The Renewal Notice shall (a) make reference to the automatic extension provision set forth in Section 1.3 or Section 1.4 hereof, as applicable, and (b) be served personally on Lessee or Lessor, as the case may be, or mailed by certified or registered mail.

## ARTICLE 2
## USE

2.1    Use.    The Premises shall be used and occupied by Lessee (and its permitted assignees, subtenants and occupants) for office and/or retail use (including such ancillary uses in connection therewith as shall be reasonably required in connection with Lessee's business operations).

2.2    Other Use.    Lessee shall not use the Premises for any purpose other than that identified in Section 2.1 above (any such other purpose, hereinafter, an "Other Use"), except with the prior written consent of Lessor, which consent will not be unreasonably withheld or delayed.

Notwithstanding the foregoing, it is hereby agreed that Lessor shall not be required to grant its consent to an Other Use in any of the following situations:

(i)    where a change in use of the Premises would re-characterize this Lease as a residential lease; or

(ii)    where Lessee does not possess the required authorizations and permits needed for a change in use (it being agreed and understood that the costs and expenses related to obtaining said authorizations and permits shall be borne exclusively by Lessee); or

(iii)    where a change in use will require alterations to the Premises which would adversely affect the structural integrity of the Building.

2.3    Change In Use Work.    Any work or modifications to the Premises which are required in connection with a change in use of the Premises, shall (i) require the prior approval of Lessor which, subject to the provisions of Section 2.2 above, shall not be unreasonably withheld or delayed, and (ii) be subject to all of the other provisions of this Lease, including, without limitation, the provisions of Article 7 hereof.

2.4    Intentionally Deleted.

2.5    Compliance with Law.    Lessee shall use, occupy and maintain the Premises at all times in compliance with all applicable laws and shall be obligated to take all steps necessary to insure that it has all the requisite licenses, permits or other authorizations to legally use and occupy the Premises in compliance with all

5

applicable laws and to insure that the Premises are at all times in compliance with all applicable laws.    Upon Lessee's receipt of any written notice from a governmental authority regarding a material violation of law, Lessee shall promptly provide Lessor with a copy of such notice.

## ARTICLE 3
### FIXED RENT

3.1    Fixed Rent.  The annual fixed rent (the "Fixed Rent") for the Premises shall be payable by Lessee in the amount of

(a)    Fixed Rent for the Premises shall be payable in twelve (12) equal monthly installments in advance on the first (1st) day of each calendar month during the term commencing on the Commencement Date and on the first (1st) day of each calendar month thereafter.

(b)    Each monthly installment shall be paid in lawful money of the United States.

(c)    If the Commencement Date is not on the first day of the month, or if the expiration date is not on the last day of the month, then Lessee shall pay pro-rated rent for the month in which the Commencement Date and the expiration date occurs.

3.2    Wire Instructions.  The payment of each installment of Fixed Rent shall be made by wire transfer to the following bank account of Lessor: Account # 12619-021-0002 at Banca Intesa SPA New York Branch ABA # 026005319 or to such other bank account as Lessor may notify Lessee in writing of.

3.3    Notice of Failure to Pay.  Lessor agrees to provide Lessee notice of Lessee's failure to pay Fixed Rent 10 business days after the date such installment of Fixed Rent was first due hereunder (the "Fixed Rent Notice") notifying Lessee of such failure; provided, however, a failure by Lessor to send such notice to Lessee shall not prohibit Lessor from enforcing any rights or remedies that Lessor may have hereunder and shall not prohibit Lessor from charging Lessee any late charges pursuant to Article 17 hereof or otherwise under this Lease upon Lessee's failure to pay Fixed Rent.

6

## ARTICLE 4
## NET LEASE: ADDITIONAL RENT

4.1    Triple Net Lease.  It is the intention of Lessee and Lessor that this Lease shall be an absolutely net lease, such that all obligations with respect to, and all expenses relating to, the use, ownership, occupancy, operation, maintenance and repair of the Premises, shall be the sole responsibility of the Lessee and Lessee shall pay all such costs and expenses whatsoever, including, without limitation, all utility and elevator costs, real estate and related taxes and assessments, water charges, insurance costs, permit and license fees and service charges for any other services which Lessee requires to be delivered to the Premises.  Lessee shall not be liable for any state, local or federal income tax payable by Lessor as a result of the rent it receives from Lessee hereunder or debt service payable under Lessor's mortgage debt.  Lessee shall pay as additional rent, and discharge same before failure to pay creates a material risk of forfeiture or penalty, each and every item of expense, of every kind and nature whatsoever, related to or arising from the Premises, or by reason of or in any manner connected with or arising from the leasing, operation, management, maintenance, repair, use, or occupancy of, or Modifications affecting, the Premises.  Lessee shall provide Lessor with evidence of Lessee's payment of all real estate and related taxes and assessments and all insurance premiums within 30 days of Lessee's payment thereof.  Upon Lessor's reasonable request, Lessee shall provide Lessor with evidence of Lessee's payment of any other expenses relating to the Premises.

4.2    Additional Rent.    All of the foregoing expenses and fees referred to in Section 4.1 hereof shall be deemed additional rent and, notwithstanding the fact that they may not be payable directly to Lessor, shall be treated as rent payable hereunder and failure of Lessee to pay any such sums shall be deemed a failure to pay rent hereunder and entitle Lessor to all rights and remedies that it has hereunder with respect to the failure of Lessee to pay Fixed Rent. Notwithstanding the foregoing, Lessee shall have the right to contest, in good faith, a payment due to a third party and any such failure to pay an amount when due as a result of Lessee's exercise of such right of contest shall not be deemed a failure to pay hereunder.  In the event Lessee disputes a charge due and payable to Lessor, Lessee shall be entitled to make such payment under protest to Lessor and such payment shall be made without prejudice to any right of Lessee to dispute any item theretofore billed pursuant to the provisions of this Section.  If it is shown that Lessee has overpaid, Lessor will pay any excess amount charged to Lessee forthwith.

4.3    Direct Payment by Lessor.  If any additional rent must be paid directly by Lessor, then:  (a) Lessor appoints Lessee as Lessor's attorney-in-fact to make such payment; and (b) if the payee nevertheless refuses to accept payment from Lessee, then Lessee shall notify Lessor and shall pay such amount to Lessor in a timely manner with reasonable instructions on remittance of such payment.

Lessor shall with reasonable promptness comply with Lessee's reasonable instructions.

4.4    <u>No Offsets</u>.  Lessee shall pay all Fixed Rent and additional rent without offset, defense, claim, counterclaim, reduction, or deduction of any kind whatsoever.

4.5    <u>Utilities</u>.  Lessee shall arrange and pay for all fuel, gas, light, power, water, sewage, garbage disposal, telephone, elevator and other utility charges, and the expenses of installation, maintenance, use, and service in connection with the foregoing, for the Premises during the term.  Lessor shall have absolutely no obligation to provide any of the foregoing services nor should Lessor be liable or responsible for the foregoing to the extent that Lessee arranges for such utilities or services.

4.6    <u>Maintenance Reports</u>.  Within 20 days after the date which is six months after the Commencement Date, and within 20 days of the end of each subsequent six month period, Lessee shall provide Lessor with a report describing any maintenance conducted at the Premises, including both ordinary and extraordinary maintenance, during such previous six month period and the costs thereof.  At the request of Lessor, Lessee hereby agrees that Lessee or its qualified representatives shall meet with Lessor or its representatives every six months during the term of this Lease to discuss all maintenance, including ordinary and extraordinary maintenance, and any Modifications scheduled to be performed or expected to be performed at the Premises during the ensuing six month period and the estimate of the cost of all such maintenance and Modifications.

## ARTICLE 5
## <u>LETTER OF CREDIT</u>

5.1    <u>Letter of Credit</u>.  On the Commencement Date, Lessee shall deliver to Lessor an unconditional, irrevocable annual letter of credit (hereafter referred to as the "Letter of Credit") in favor of Lessor in the amount of                be issued by a bank (the "Bank") who has a net worth equal to at least $1,000,000,000.00.

At the end of each    year period of this Lease, including during the First Renewal Period and any subsequent Renewal Period, the amount of the Letter of Credit shall be increased to

8

Letter of Credit shall secure the fulfillment of all of the obligations of Lessee under this Lease including, without limitation, Lessee's obligation to pay Fixed Rent and any additional rent (the "Other Obligations").

Lessor may unilaterally draw upon the Letter of Credit in the following cases:

(i)      Rent by Lessee or any third party (including but not limited to any third party guarantor), which failure remains uncured after the lapse of a term of 5 (five) business days from receipt by the Lessee of the Fixed Rent Notice; or

(ii)     upon any failure to make any payment by Lessee (including but not limited to any third party guarantor) relative to any of the Other Obligations, as follows:

   (a)   if the Other Obligations remain unsatisfied after the lapse of 15 (fifteen) business days from receipt by Lessee of the notice from Lessor notifying Lessee of its breach of any of the Other Obligations; or

   (b)   should the provisions of this Lease provide for a longer term for the Lessee to fulfill any payment obligation relating to any of the Other Obligations, upon expiration of such longer term; for the avoidance of any doubt, after the lapse of such longer term provided for in this Lease, the Lessor will be entitled to draw any amount due for such Other Obligations upon the Letter of Credit on the basis and upon submission to the Bank of the notice notifying Lessee of its breach of any of the Other Obligations, as provided in the relevant clause of this Lease.

In the event that the Letter of Credit expires prior to the expiration or earlier termination of this Lease, Lessee shall  renew or replace the Letter of Credit, in the amounts required hereunder, at least 10 business days prior to such expiration so that the Letter of Credit shall be in full force and effect during the entire term of this Lease.

The Letter of Credit shall be renewed by Lessee, in case of renewal of this Lease, upon the same terms and conditions mentioned above.

If Lessor makes any such draw on the Letter of Credit, Lessee shall be obligated to take all necessary action to restore the Letter of Credit to the full amount required pursuant to the provisions of this Section within 3 months after the date such unsatisfied obligation of Lessee that triggered Lessor to draw upon the Letter of Credit became first due and payable under the terms of this Lease.  With respect to the date Fixed Rent becomes first due and payable, the parties hereby acknowledge that such date is the first day of each calendar month during the term

9

of this Lease.   Upon expiration of this Lease, Lessee's obligation to provide the Letter of Credit shall terminate.

## ARTICLE 6
## REPAIRS

6.1    Repairs by Lessee. Lessee shall maintain and repair the Premises, both exterior and interior, including, without limitation, all Building systems and structural repairs including maintenance and repair of the roof, façade, foundation any load bearing walls and any pillars. If Lessor allows Lessee to erect on the outside of the Premises a sign or signs, or a hoist, lift or sidewalk elevator, Lessee shall maintain such exterior installations in good appearance and shall cause the same to be operated in a good and workmanlike manner and in compliance with all applicable laws and shall make all repairs thereto necessary to keep same in good order and condition, at Lessee's own cost and expense, and shall cause the same to be covered by the insurance provided for hereinafter in Article 9. Lessee shall, throughout the term of this Lease, take good care of the Premises and the fixtures and appurtenances therein, and the sidewalks adjacent thereto, and at its sole cost and expense, make all repairs thereto as and when needed to preserve them in good working order and condition, reasonable wear and tear, obsolescence and damage from the elements, fire or other casualty, excepted.   If the Premises becomes infested with vermin, Lessee shall at Lessee's expense, cause the same to be exterminated from time to time to the satisfaction of Lessor.   There shall be no allowance to the Lessee for the diminution of rental value and no liability on the part of Lessor by reason of inconvenience, annoyance or injury to business arising from Lessor, Lessee or others making or failing to make any repairs, alterations, additions or improvements in or to any portion of the Premises including the erection or operation of any crane, derrick or sidewalk shed, or in or to the Building or the fixtures, appurtenances or equipment thereof unless caused by Lessor's gross negligence or willful misconduct.   The provisions of this Section 6.1 with respect to the making of repairs shall not apply in the case of fire or other casualty or condemnation which are dealt with in Articles 12 and 13 hereof.

6.2    Lessee's Default.  If Lessee is in breach of its obligations under Section 6.1 above and it does not cure such default within 60 days after receipt of a written notice of default from Lessor to Lessee, or, in the case of emergency such shorter period as is reasonable under the circumstances, then Lessor shall be entitled, but not obligated to perform the work and charge all reasonable and documented expenses therefor to Lessee. Lessee shall reimburse Lessor for any amounts expended by Lessor under this Section 6.2 upon request by Lessor, together with evidence of the expenses incurred by Lessor. If such amounts are not paid by Lessee within 20 days of demand by Lessor therefor, from and after such 20th day,

10

such amounts shall earn interest at the rate of "prime" (Citibank) plus 400 b.p. until paid ("Reimbursement Interest").

6.3    <u>Emergency Repairs.</u>  Notwithstanding the foregoing provisions of this Article 6, in case of imminent danger to, or deriving from, any structural part of the Premises, Lessee shall promptly notify Lessor and Lessor shall be entitled, but not obligated, to perform any work necessary in order to remedy the danger if Lessee fails to commence the work necessary to remedy the danger within a reasonable period of time under the circumstances. All reasonable documented costs, together with Reimbursement Interest, shall be reimbursed by Lessee within 30 days after receipt of a written demand therefor from Lessor.  Lessor shall have the same rights with respect to non-structural work which poses an imminent danger to life and property.

6.4    <u>Rent Abatement.</u>  Lessee shall not be entitled to any abatement of Fixed Rent or additional rent or other charges should the Premises be unavailable, regardless of the duration of such unavailability or the size of space unavailable, in connection with structural work or other repairs performed by Lessee, or in the case of an emergency, by Lessor.  Lessor shall have no obligation to reimburse Lessee for any costs incurred or profits lost as a result of the Premises being unavailable in connection with structural work or other necessary repairs.

ARTICLE 7
<u>ALTERATIONS</u>

7.1    <u>Structural Alterations.</u>    Lessee may not perform any modifications and/or additions to the structural parts of the Premises including, without limitation, the façade and Building systems of the Premises (collectively, for purposes of this Article 7 hereinafter referred to as the "Structural Modifications"), without the prior written consent of Lessor, which consent shall not be unreasonably withheld or delayed; provided that such consent shall be conditioned on Lessee agreeing that Lessee shall (i) prior to commencing any work, deliver to Lessor copies of all required permits, consents and licenses in connection with such work; (ii) deliver to Lessor for its review, and where required hereunder, its approval, the plans and specifications prepared in connection with the work to the extent such plans and specifications are available; and (iii) upon completion of such work, deliver to Lessor final "as built" plans for the work to the extent such plans are available. Lessor's prior written consent shall be required for the installation of signs, antennas, removable bases or supports, or other removable apparatus (including air conditioning systems and ancillary equipment), provided that such consent shall not be unreasonably withheld if such signs, antennas or apparatus (i) do not, or will not upon removal, affect the structure of the Building, (ii) comply with all applicable laws and regulations, and (iii) have been approved, if required, by all applicable governmental authorities. Lessor hereby agrees that any signs, antennas, removable bases or supports, or other removable apparatus (including air conditioning systems and ancillary equipment) located in or at the Premises as

11

of the Commencement Date of this Lease are deemed approved. All Structural Modifications and any other modifications referred to above shall be made by Lessee in compliance with the quality standards for building modifications adopted by the Lessee and conformed to by Lessee or its affiliate in connection with the occupancy of the Premises prior to the commencement of this Lease; it being understood by the parties that Lessee shall continue to maintain the Premises and make any Modifications permitted hereunder in the same manner, and in compliance with the same standards, as Lessee adhered to when making any modifications or repairs to the Premises as the previous owner of the Premises. Lessee shall be responsible for all costs incurred by Lessee in connection with any Structural Modifications permitted by Lessor and performed by Lessee and for any injury or damage, if any, caused to the Premises, the Lessor and/or third parties as a result of any Structural Modifications, as well as for any breach of law, including environmental laws.

7.2     **Non-Structural Alterations**   Lessee shall be entitled to make, without the consent of Lessor, any modifications, additions, repairs, changes, or other work and/or construction which:

   (i)     involve non-structural portions of the Premises; or

   (ii)    which Lessee deems necessary or useful in order to comply with applicable laws or regulations or to satisfy any business needs of Lessee, provided that any work done under this Section which is deemed Structural Modifications shall require the prior approval of Lessor;

(any such work, hereinafter referred to as "Non-Structural Modifications").

All Non-Structural Modifications shall be made by Lessee in compliance with the quality standards for building modifications adopted by the Lessee and conformed to by Lessee or its affiliate in connection with the occupancy of the Premises prior to the commencement of this Lease; it being understood by the parties that Lessee shall continue to maintain the Premises and make any Modifications permitted hereunder in the same manner, and in compliance with the same standards, as Lessee adhered to when making any modifications or repairs to the Premises as the previous owner of the Premises. Lessee shall pay all costs incurred in connection with any Non-Structural Modifications performed by Lessee.

7.3     **General Requirements**. All work performed by Lessee, as may be permitted by this Lease or with the approval of Lessor, shall be performed by Lessee using skilled contractors and in compliance with all applicable laws, rules and regulations and in compliance with the quality standards for building modifications adopted by the Lessee and conformed to by Lessee or its affiliate in connection with the occupancy of the Premises prior to the commencement of this Lease; it being understood by the parties that Lessee shall continue to maintain

12

the Premises and make any Modifications permitted hereunder in the same manner, and in compliance with the same standards, as Lessee adhered to when making any modifications or repairs to the Premises as the previous owner of the Premises.    In addition, all work undertaken by Lessee hereunder shall be prosecuted to completion in a diligent and continuous manner.  Lessee shall give Lessor written notice at least 20 days prior to the commencement of any Modification to the Premises (or such additional time as may be necessary under applicable laws) to afford Lessor the opportunity of posting and recording appropriate notices of non-responsibility.

7.4    <u>Lessor's Cooperation.</u>    Lessor agrees to cooperate with Lessee, at Lessee's expense, in obtaining from any governmental authorities all approvals necessary for any Structural Modifications (as permitted hereunder) or Non-Structural Modifications (hereinafter referred to as the "Modifications").

7.5    <u>Property of Lessor.</u>  Lessee may elect, but shall have no obligation, to restore the Premises to the condition existing before the Modifications, except that Lessee shall be required to remove all signs and other items referring to Lessee's tradename or bearing Lessee's trademarks from the Premises and restore that portion of the Premises damaged by such signs and other items referring to Lessee's tradename or bearing Lessee's trademarks to the condition of the remainder of the Premises.  Lessee shall be responsible for all costs of removing such signs and other items and any damage incurred by Lessor as a result of such removal or failure to restore the Premises.  In the event Lessee elects to remove any Modifications, and to restore the Premises at the expiration of this Lease, Lessee shall be responsible for any and all damages incurred by Lessor as a result of such removal or failure to restore the Premises.  If Lessee elects not to remove such Modifications at expiration of this Lease, such Modifications shall become the property of Lessor and in no event shall Lessor be required to reimburse Lessee for the cost of such Modifications or make any payment to Lessee in connection with such Modifications.

7.6    <u>No Consent to Lien.</u>  NOTICE IS HEREBY GIVEN THAT LESSOR SHALL NOT BE LIABLE FOR ANY LABOR OR MATERIALS FURNISHED OR TO BE FURNISHED TO LESSEE UPON CREDIT, AND THAT NO MECHANIC'S OR OTHER LIEN FOR ANY SUCH LABOR OR MATERIALS SHALL ATTACH TO OR AFFECT THE PREMISES.  NOTHING IN THIS LEASE SHALL BE DEEMED OR CONSTRUED IN ANY WAY TO CONSTITUTE LESSOR'S CONSENT OR REQUEST, EXPRESS OR IMPLIED, BY INFERENCE OR OTHERWISE, TO ANY CONTRACTOR, SUBCONTRACTOR, LABORER, EQUIPMENT OR MATERIAL SUPPLIER FOR THE PERFORMANCE OF ANY LABOR OR THE FURNISHING OF ANY MATERIALS OR EQUIPMENT FOR ANY CONSTRUCTION, NOR AS GIVING LESSEE ANY RIGHT, POWER OR AUTHORITY TO CONTRACT FOR, OR PERMIT THE RENDERING OF, ANY SERVICES, OR THE FURNISHING OF ANY MATERIALS THAT WOULD GIVE RISE TO THE

13

FILING OF ANY LIENS AGAINST THE PREMISES.  LESSEE SHALL INDEMNIFY LESSOR AGAINST ANY CONSTRUCTION UNDERTAKEN BY LESSEE OR ANYONE CLAIMING THROUGH LESSEE, AND AGAINST ALL PROHIBITED LIENS.

7.7    <u>Sidewalks</u>.  To the extent that this Lease requires Lessee to maintain or repair any sidewalk, Lessee shall perform all obligations of Lessor (and shall indemnify and hold harmless Lessor against any liability under the applicable municipal statute relating to such repairs, if any).

7.8    <u>Intentionally Deleted</u>.

7.9    <u>Pre-Approved Modifications</u>.  Notwithstanding anything to the contrary herein, Lessor acknowledges that the Modifications set forth on <u>Schedule 1</u> attached hereto and made a part hereof are pre-approved by Lessor and Lessee may commence or continue, as applicable, such Modifications to the Premises in compliance with the provisions of this Lease.

ARTICLE 8
ACCESS

8.1    <u>Access</u>.  Upon written request of Lessor, to be given on at least five business day's notice, Lessee shall allow Lessor and its authorized representatives, including Lessor's lenders, access to the Premises during ordinary office hours on business days, in order to:

      (i)    examine the condition of the Premises and identify any repair work, to perform an inventory of the Premises and its equipment, and to verify compliance with the provisions of this Lease;

      (ii)   to perform any work that may be or must be performed by Lessor under this Lease; and

      (iii)  to allow potential purchasers of the Premises and/or potential lenders of the Lessor to examine the Premises.

In cases where Lessor believes that there is imminent danger to life or property because of a condition Lessor believes to exist at the Premises, Lessor shall give Lessee only such notice as is reasonable under the circumstances.

8.2    <u>Access for Restoration</u>.    Lessee shall allow Lessor and its authorized representatives access to the Premises as reasonably necessary to permit Lessor to fulfill Lessor's restoration obligations under Article 12 hereof.

ARTICLE 9
INSURANCE

9.1    Lessor's Insurance.    At Lessee's expense, Lessor shall secure and maintain the following "Lessor's Insurance" at all times during the term of this Lease:

(a)    commercial general liability insurance (including contractual liability coverage recognizing this Lease), in occurrence form, which shall include the Building, with coverage limits not less than $1,000,000.00 per person, per occurrence and $2,000,000.00 in the aggregate, for bodily injury and death, and for property damage occurring on, upon, in or about the Premises or adjoining streets, sidewalks or passageways; and

(b)    "all-risk" insurance protecting against all risk of physical loss or damage to the Premises, its fixtures and equipment, including fire, sprinkler leakage, backup of sewers, drains and seepage, and plate glass (including store front) coverage and other hazards covered under the broadest form of property insurance coverage used for similar type property located in the vicinity of the Premises, in amounts not less than the actual replacement cost of the Building and such fixtures and equipment located within the Building, without any deduction for terrorism coverage or depreciation, sufficient to avoid co-insurance, and with "ordinance or law" coverage; such insurance shall include (A) coverage for explosion of steam and pressure boilers and similar apparatus located on the Premises; an "increased cost of construction" endorsement; and an endorsement covering demolition and cost of debris removal, and (B) rental or business interruption insurance in an amount at least equal to the  annual Fixed Rent and additional rent and providing for a 3 (three) month extended period of indemnity.

(c)    Flood insurance in an amount equal to the full insurable value of the Premises or the maximum amount available, whichever is less, if the Premises is located in an area designated by the Secretary of Housing and Urban Development or the Federal Emergency Management Agency as having special flood hazards.

(d)    During the period of any construction or restoration of improvements on the Land, Lessor shall, or shall cause its contractor performing such construction or restoration, to obtain and maintain a so-called "Builder's All-Risk Completed Value" or "Course of Construction" insurance policy in non-reporting form for any improvements under construction or restoration, including, without limitation, for demolition and increased cost of construction or renovation, in an amount equal to 100% of the estimated replacement cost value on the date of completion, including "soft cost" coverage, and Worker's Compensation Insurance covering all

15

persons engaged in such construction, in an amount at least equal to the minimum required by law.

9.2     **Lessee's Insurance.** At Lessee's expense, Lessee shall secure and maintain, or continue to maintain to the extent already obtained, the following "Lessee's Insurance" at all times during the term of this Lease:

    (a)    commercial general liability insurance, in occurrence form, insuring Lessee against any and all liability for injury to or death of a person or persons, and for damage to or destruction of property, occasioned by or arising out of or in connection with the use or occupancy of the Premises or the business operated by Lessee thereon, and including contractual liability coverage for Lessee's indemnity obligations under this Lease with coverage limits not less than the amount of coverage Lessee currently has as of the Commencement Date of this Lease in its own insurance policies; and

    (b)    all-risk insurance covering loss or damage to Lessee's trade fixtures, furnishings, wall coverings, floor coverings, drapes, equipment and other items of personal property of Lessee.

9.3     Lessor hereby agrees to obtain Lessor's Insurance at commercially reasonable rates. Lessee shall reimburse Lessor for all premiums and other costs related to Lessor's Insurance upon Lessor's demand therefor and Lessee shall pay Reimbursement Interest for any such reimbursement not received by Lessor within 20 days of Lessor's demand therefor.

9.4     Each policy of Lessor's Insurance shall provide that the same shall not be cancelled or modified without the consent of Lessor's lenders except after 30 days' prior notice to Lessor's lenders. Subject to Lessor's lenders' right of consent, Lessor shall be entitled to negotiate in good faith any beneficial amendments to Lessor's Insurance policy, provided that, if such amendments will result in a substantial increase in the insurance premiums or substantial changes to the coverages provided by Lessor's Insurance, the parties agree that before such amendments can be obtained, Lessor and Lessee must have previously discussed and agreed to such amendments during good faith negotiations between Lessor and Lessee.

9.5     All policies of insurance carried by Lessor and Lessee shall include, if available, a waiver by the insurer of rights of subrogation against the other in connection with any loss or damage thereby insured against. Lessor and Lessee (and their agents, employees or guests) shall not be liable to each other for loss or damage caused by any risk covered by such insurance to the extent that policies are obtainable with such waiver of subrogation. If the release of any person under this section contravenes any law respecting exculpatory agreements, the party purportedly

16

released shall not be released; but such party's liability shall be secondary to that of the other party's insurer.

9.6    On or prior to the Commencement Date, Lessor shall give Lessee certificates evidencing that all Lessor's Insurance is in full force and effect and the expiration date of such insurance.  At least 30 days prior to the date any policy of Lessor's Insurance expires, Lessor shall give Lessee certificates evidencing renewal or replacement of such policies.  If Lessor fails to give such certificates or the Lessor's Insurance policy is terminated for any other reason, Lessee may, but shall not be obligated to, procure and pay for the renewal or replacement policies after 5 days' notice to Lessor.  At Lessor's request, Lessee shall give Lessor a true copy of any certificate of insurance. On or prior to the Commencement Date, Lessee shall give Lessor certificates evidencing that all Lessee's Insurance is in full force and effect and the expiration date of such insurance.  At least 30 days prior to the date any policy of Lessee's Insurance expires, Lessee shall give Lessor certificates evidencing renewal or replacement of such policies.  If Lessee fails to give such certificates or the Lessee's Insurance policy is terminated for any other reason, Lessor may, but shall not be obligated to, procure and pay for the renewal or replacement policies after 5 days' notice to Lessee and Lessee shall reimburse Lessor for any amounts expended in connection with obtaining or renewing Lessee's Insurance.  At Lessee's request, Lessor shall give Lessee a true copy of any certificate of insurance.

9.7    Neither Lessee nor Lessor shall secure separate insurance concurrent in form or contributing in the event of loss with any Lessor's Insurance policy required under this Lease unless (i) Lessor and Lessor's lenders are included as additional insureds and (ii) such separate insurance shall not in any way diminish or interfere with the ability to make claims under the Lessor's Insurance policy.  Lessee and Lessor shall give the other and Lessor's lenders written notice promptly upon securing any such separate insurance, specifying the insurer and full particulars of applicable policies.

9.8    Neither Lessee nor Lessor shall do or permit any act or thing which will (a) invalidate or contravene either of Lessor's Insurance policy or Lessee's Insurance policy , (b) conflict with any insurance requirements, (c) prevent Lessor or Lessee from obtaining insurance, (d) increase the costs of casualty or liability insurance on the Building, or (e) subject Lessor or Lessee to damage or responsibility for injury to any person or to property.

9.9    Each liability Lessor's Insurance policy shall name Lessee and each mortgagee of Lessor as an "additional insured."  Each property Lessor's Insurance policy shall name Lessor as loss payee as its interest may appear and each such mortgagee under a standard noncontributing mortgagee clause.  Each liability Lessee's Insurance policy shall name Lessor and each mortgagee of Lessor as an "additional insured."  Each property Lessee's Insurance policy shall name Lessee as loss payee as its interest may appear.

17

9.10    All Lessee's Insurance policies and Lessor's Insurance policies shall be written as primary policies not contributing to or in excess of any coverage that Lessor or Lessee may respectively carry.  Lessee and Lessor shall have the right to provide the coverages required herein under blanket policies provided that the coverage afforded shall not be diminished by reason thereof.

9.11    Lessee agrees to hold the Lessor harmless and indemnify Lessor with regard to any claim by any third party which suffered a loss or damage as a consequence of the activities carried out by Lessee in, on or about the Premises in the event that the insurance company providing Lessee's Insurance shall fail to pay any claim of such third party.

9.12    Lessee shall notify Lessor in writing within 5 days, or such shorter time period as set forth in the applicable Lessor's Insurance policy (provided Lessee is made aware of such shorter time period in writing by Lessor), of becoming aware of the occurrence of (i) any event which triggers, or may trigger, a claim under the Lessor's Insurance policy; (ii) any event at, in, on or upon the Premises which qualifies as a reportable event pursuant to the Lessor's Insurance policy; or (iii) any insured event.

9.13    Lessor shall notify Lessee in writing within 7 days of Lessor becoming aware of the occurrence of (i) any event which triggers, or may trigger, a claim under the Lessee's Insurance policy; (ii) any event at, in, on or upon the Premises which qualifies as a reportable event pursuant to the Lessee's Insurance policy; or (iii) any insured event.

## ARTICLE 10
## ASSIGNMENT/SUBLETTING

10.1    Assignment/Sublease of the Premises.  Except as provided for in this Article 10, this Lease may not be assigned, nor may the Premises be sublet, by Lessee to any third party or occupied by any other person other than Lessee without Lessor's prior written consent.  Except as provided for in this Article 10, any transfer of the direct or indirect Control (as defined hereinafter) of Lessee shall constitute an assignment and shall require Lessor's prior written consent.  In the event there is a transfer of the direct or indirect Control of Lessee resulting in the Lessee ceasing to be a company under the direct or indirect Control of the families of Prada and Bertelli for any reason whatsoever other than as a result of the enforcement of any pledge rights on the shares of Prada Holding N.V., Lessor shall have the right to terminate this Lease upon 6 months prior written notice to Lessee.  With respect to any assignment approved by Lessor, the assignee must execute and deliver to Lessor an agreement whereby such assignee assumes all of the obligations of Lessee hereunder and agrees to be bound by all of the terms and conditions of this Lease applicable to Lessee.  Subsequent to any permitted assignment or sublet, Lessee shall remain primarily liable for all of Lessee's obligations hereunder.  If

18

Lessor denies consent to assign or sublet, Lessee hereby waives the right to terminate this Lease pursuant to California Civil Code Section 1995.310(b).

10.2    <u>Permitted Sublets</u>    Notwithstanding the foregoing, Lessor grants Lessee the right, without Lessor's approval, to sublet, in whole or in part, the Premises, to an Affiliate (as hereinafter defined).  The foregoing right to sublet shall be subject to (i) there not being any default by Lessee of its obligations hereunder at the time of such subletting, and (ii) Lessee, prior to completing any such sublease, delivering to Lessor notice thereof and copies of all documents to be executed and delivered in connection with such sublease.  In addition, any such sublease must state that it is expressly subject and subordinate to this Lease and all of the terms and provisions and conditions hereof.  Finally, Lessee shall remain primarily liable for all of Lessee's obligations hereunder.

10.3    <u>Permitted Assignments</u>.  Notwithstanding Section 10.1, Lessor grants Lessee the right, without Lessor's approval, to assign this Lease to an Affiliate.  If Lessee transfers its going concern to any entity which is not an Affiliate of Lessee, then Lessee may only assign this Lease to such entity with Lessor's prior written consent, which consent shall not be unreasonably withheld, provided that Lessor may withhold its consent if (i) such non-affiliate assignee intends to use the Premises for any purpose other than the use permitted under Section 2.1 hereof; or (ii) such non-affiliate assignee is insolvent or files a voluntary petition in bankruptcy, or a petition is filed against such entity and an order for relief is entered, or such entity files any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future law, or seeks, consents to, or suffers the appointment of a trustee, receiver or liquidator of such entity or of any substantial part of its properties.  The foregoing rights of assignment, whether to an Affiliate or an approved non-Affiliate, shall be subject to (i) there not being any default by Lessee of its obligations hereunder at the time of such assignment, and (ii) Lessee, prior to completing any such assignment, delivering to Lessor notice thereof and copies of all documents to be executed and delivered in connection with such assignment.  With respect to any permitted assignment, the assignee must execute and deliver to Lessor an agreement whereby such assignee assumes all of the obligations of Lessee hereunder and agrees to be bound by all of the terms and conditions of this Lease applicable to Lessee.  Subsequent to any permitted assignment, Lessee shall remain primarily liable for all of Lessee's obligations hereof.

10.4    <u>Permitted Occupants</u>.  Lessor grants Lessee the right to allow those persons or entities listed on <u>Schedule 2</u> attached hereto and made a part hereof to occupy a portion of the Premises so long as the Premises shall continue to be operated under the tradename of Lessee and that Lessee shall remain liable for all Fixed Rent and other obligations under this Lease.

19

10.5    **Affiliate.** For purposes of this Article 10, "Affiliate" means as to any Person, any other Person which directly or indirectly Controls or is under common Control with or is Controlled by such Person. "Control" (including with its correlative meanings, "controlled by" and under "common control with") shall mean the direct or indirect ownership of more than fifty (50%) percent of the legal and equitable interests in any other Person. "Person" means an individual, a trust, estate, partnership, limited liability company, association, company, corporation or other legal entity.

## ARTICLE 11
## TRANSFERS

11.1    **Intentionally Deleted.**

11.2    **Right of First Refusal.** Subject to Section 11.4 and Section 15.5 hereof, in the event that Lessor shall receive a bona fide third party offer, evidenced by a letter of intent, contract or memorandum of terms signed and delivered by such third party, to purchase the Premises for cash or the equivalent of cash, as determined in Lessor's sole discretion, then Lessor, if it desires to accept such offer, shall give prompt written notice thereof (the "First Refusal Notice") to Lessee together with a copy of such letter of intent, contract or memorandum of terms which shall contain all of the financial and all other material terms and conditions of the proposed transaction including the purchase price and any indemnity to be given by Lessor (the "Terms and Conditions"). Lessor will also provide Lessee with the identity of the third party offeror and reasonable information as to financial condition of the third party offeror. The Terms and Conditions also shall specify that the closing of such purchase shall occur on a date which is not less than 105 days after the receipt of the First Refusal Notice by Lessee.

(a)    Within 90 days after receipt of the First Refusal Notice, Lessee shall have the right, exercisable by written notice given to Lessor, to elect to purchase the Premises at the price and on the terms set forth in the First Refusal Notice. The failure or refusal of Lessee to make such election within such 90 day period shall be deemed to constitute a rejection of such offer. In the event Lessee elects to purchase the Premises, Lessee and Lessor shall enter into a purchase and sale agreement with respect to the transaction which is the subject of the First Refusal Notice comporting with the requirements of this Article 11, provided that the closing of such purchase shall occur by the later of (i) 15 days after the expiration of the 90 day period referred to above or (ii) the date set forth in the Terms and Conditions for closing of the purchase between Lessor and the third party offeror.

20

(b)   If Lessee shall not have elected to exercise the right to purchase as set forth in this Section 11.2, whether pursuant to notice to such effect to Lessor or by reason of the failure or refusal of Lessee to make such election to purchase within the 90 day period set forth in preceding paragraph, then Lessor shall have the right any time during the 120 days following the expiration of such 90 day period set forth in preceding paragraph to transfer the Premises to the third party identified in the First Refusal Notice, at a price and otherwise on terms no less favorable to Lessor than those contained in the First Refusal Notice without giving notice to Lessee of such intended sale.  If Lessor does not enter into a purchase and sale contract for the Premises with such third party within such 120 day period, then Lessor shall be required any time after such 120 day period to give Lessee a First Refusal Notice in accordance with the terms of this Section upon receipt of any bona fide third party offer.

11.3   <u>Breach by Lessor.</u>  Subject to Section 11.4 and Section 15.5 hereof, if Lessee becomes aware that Lessor has made a Transfer in violation of the provisions of Section 11.1 or Section 11.2 hereof and Lessee elects to make a claim against Lessor under this Section 11.3, then Lessee shall provide Lessor with written notice of such claim (a "Claim Notice").  Upon receipt of a Claim Notice, Lessor shall have 20 days from the receipt of such Claim Notice to cure such violation by revoking the Transfer and acquiring ownership of the Premises.  If Lessor fails to cure such violation within such 20 day period, then Lessor shall pay Lessee, as liquidated damages, the amount equal t              ; it being understood by the parties that the amount of damages for such violation is difficult to estimate and Lessor and Lessee have agreed that such amount referred to in the preceding sentence shall be fair compensation to Lessee upon a violation by Lessor of the provisions of this Article 11.  If Lessor fails to give Lessee a First Refusal Notice or fails to include all information in the First Refusal Notice, each as required by the provisions of this Article 11, in no event shall Lessor be liable for any damages to Lessee for any such failure if Lessor does not consummate a Transfer of the Premises.

The Parties agree that in no event should the provisions of Section 11.3 hereof be applicable in the event of a violation of such limitations on transfers of equity interests in Lessor.

11.4   <u>Termination.</u>  In the event that this Lease is terminated by Lessee for any reason permitted hereunder or terminated by Lessor as a result of a Default by Lessee pursuant to which Lessor is entitled to terminate this Lease, then Lessee's rights under this Article 11 relating to restrictions on Transfers, the Right of First Refusal and the right to liquidated damages shall terminate and the provisions of Article 11 relating to such rights shall be of no further force and effect.

21

## ARTICLE 12
## CASUALTY

12.1   Lessee shall promptly notify Lessor in writing of any material damage to the Premises promptly after Lessee learns of the same.   For purposes of this Section 12.1, the term "material" shall mean any damage to the Premises which triggers, or may trigger, a claim under Lessor's Insurance policy.

12.2   In the event of fire or other casualty which results in damage to fifty (50%) percent or more of the total square footage of the Premises ("Substantial Damage"), Lessor may elect to terminate this Lease.  Lessor shall give Lessee notice of its decision whether or not to terminate the Lease within 60 business days of the date of Substantial Damage and, in the event Lessor elects to terminate this Lease, such termination shall be effective 20 business day after receipt of such notice by Lessee.  Upon the date of such termination, Lessee shall quit, surrender and vacate the Building as if upon expiration of the term and all Fixed Rent shall be apportioned as of such date.  If Lessor notifies Lessee that it does not intend to terminate this Lease and instead elects to restore the Premises, Lessor shall notify Lessee of the date that Lessor, in its reasonable judgment based on consultation with one or more professionals with requisite experience, expects such restoration will be completed (the "Estimated Restoration Date"), subject to causes beyond Lessor's control. If the Estimated Restoration date is more than 18 months after the date of the Substantial Damage, Lessee shall be entitled to terminate this Lease upon written notice to Lessor given within 30 business days of its receipt of the notice from Lessor of the Estimated Restoration Date. Upon the date of such termination notice, Lessee shall quit, surrender and vacate the Building as if upon expiration of the term and all Fixed Rent shall be apportioned as of such date.  If Lessee does not elect to terminate this Lease as provided herein, this Lease shall continue in full force and effect except that Lessee shall be entitled to a prorata abatement of Fixed Rent for the portion of the Premises damaged by the casualty until the restoration of such portion of the Premises is complete.

12.3   In the event of fire or other casualty which results in damage to less than fifty (50%) percent of the total square footage of the Premises ("Partial Damage"), Lessor shall have the obligation to restore the Premises and shall notify Lessee, within 60 business days of the date of Partial Damage, of the Estimated Restoration Date.  If the Estimated Restoration Date is more than 18 months after the date of the Partial Damage, Lessee shall be entitled to terminate this Lease upon written notice to Lessor given within 30 business days of its receipt of the notice from Lessor of the Estimated Restoration Date. Upon the date of such termination notice, Lessee shall quit, surrender and vacate the Building as if upon expiration of the term and all Fixed Rent shall be apportioned as of such date.  If

22

Lessee does not elect to terminate this Lease as provided herein, this Lease shall continue in full force and effect except that Lessee shall be entitled to a prorata abatement of Fixed Rent for the portion of the Premises damaged by the casualty until the restoration of such portion of the Premises is complete.

12.4    This Article shall be considered an express agreement governing damage to the Premises; and (to the extent permitted by law) any statute purporting to govern in such cases, now or subsequently in force, including, without limitation, California Civil Code Sections 1932(2) and 1933(4), shall have no application under this Lease.

## ARTICLE 13
## CONDEMNATION

13.1    Lessee shall promptly notify Lessor in writing of any threatened condemnation of the Premises, or any portion thereof, promptly after Lessee learns of the same.  If the entire Premises is condemned or taken in condemnation, this Lease shall terminate and expire on and as of the effective date of such condemnation.

13.2    If more than 50% of the usable area of the Premises shall be condemned, then either Lessor and Lessee may elect to terminate this Lease by notice to the other given within 30 days after the effective date of such condemnation; and this Lease shall terminate on the date specified in such notice (which shall be at least 60 days after the date of such notice).

13.3    Subject to Section 13.2, if part (but not all) of the Premises is condemned and this Lease is not terminated as provided in Section 13.2 above or Section 13.4. below, then, this Lease shall terminate with respect only to the portion of the Premises so condemned, as of the effective date of such Condemnation.  In all other respects this Lease shall remain in effect except that Lessee shall be entitled, after such date, to a reduction in Fixed Rent in the proportion which the area of the Premises so condemned bears to the total area of the Building at the time of such taking.  Lessor shall restore the Premises after any partial condemnation as nearly as possible to the value, condition and character of the same immediately before the condemnation to the extent it has sufficient funds from the condemnation award.

13.4    Notwithstanding Section 13.2 or Section 13.3 hereof, if there is a condemnation of a substantial part of the means of access to the Premises and Lessor does not provide a reasonable means of access to the Premises within 30 days of such condemnation, Lessee may elect to terminate this Lease by notice to Lessor given within 30 days after the effective date of such condemnation; and this Lease shall terminate 60 days after the giving of Lessee's notice.

13.5    In the event of any condemnation or taking of all or a portion of the Premises, Lessor shall receive the entire award, provided, however, Lessee shall be entitled to receive any separate award made for the value of the estate vested by this Lease

23

in Lessee and/or improvements paid for by Lessee, provided same does not reduce the award otherwise payable to Lessor.

13.6     If there is a temporary taking or condemnation of all or part of the Premises, this Lease shall not terminate, but the Fixed Rent and additional rent shall be abated during the period of such temporary taking or condemnation.

## ARTICLE 14
## SURRENDER; HOLDOVER

14.1     **Surrender.**  Upon the expiration or other termination of the term of this Lease, Lessee shall quit and surrender to Lessor the Premises, vacant, broom clean, in good order and condition, ordinary wear and tear excepted.  In addition, Lessee shall remove all signs and other items referring to Lessee's tradename or bearing Lessee's trademarks.  Lessee shall have the right, but not the obligation, to remove any equipment, air conditioning or lighting systems or similar apparatus or Modifications that Lessee installed at the Premises during the term of this Lease; provided that, if Lessee removes such equipment, systems or similar apparatus or Modifications, Lessee shall be responsible for all costs of such removal and any damages incurred by Lessor as a result of such removal.  If Lessee elects not to remove such equipment, air conditioning or lighting systems or similar apparatus or Modifications at expiration of this Lease, any such items remaining in the Premises shall become the property of Lessor and in no event shall Lessor be required to reimburse Lessee for the cost of such items remaining in the Premises or make any payment to Lessee in connection with such items remaining in the Premises.  Lessee's obligation to observe or perform this covenant shall survive the expiration or other termination of this Lease.  If the last day of the term of this Lease or any renewal thereof, falls on a Sunday, this Lease shall expire at noon on the preceding Saturday unless it be a legal holiday in which case it shall expire at noon on the preceding business day.

14.2     **Holdover.**  If Lessee holds over after the expiration date (or any earlier termination of this Lease) without Lessor's written consent, at Lessor's election such holding over shall be deemed a month to month tenancy terminable on 30 days' prior written notice.  During such tenancy, Lessee agrees to pay Lessor, in advance on the first day of each month 150% of the Fixed Rent payable by Lessee for the month prior to the holdover; and such month-to-month tenancy shall otherwise be subject to all of the terms, covenants and conditions of this Lease.  The Lessee expressly waives any rights under California law, if any, to petition the court for a stay of proceedings in connection with any holdover proceeding or other action or proceeding.  Lessee's obligations under this provision shall survive the expiration or other termination of this Lease.

14.3     **Property**  Nothing in this article shall be construed to give Lessor title to or to prevent Lessee's removal of trade fixtures, stock in trade, moveable office furniture and equipment, but upon removal of any such from the Premises, Lessee

shall immediately and at its expense, repair any damage to the Premises due to such removal. All property permitted to be removed by Lessee at the end of the term remaining in the Premises after Lessee's removal shall be deemed abandoned and may be retained as Lessor's property. All property required to be removed by Lessee at the end of the term remaining in the Premises after Lessee's removal shall be deemed abandoned and may, at the election of Lessor, and without any cost or liability to Lessor, either be retained as Lessor's property or may be removed from the Premises by Lessor at Lessee's expense.

## ARTICLE 15
## DEFAULTS; CONDITIONAL LIMITATION; REMEDIES

15.1    <u>Defaults; Conditional Limitation; Remedies</u>    Each of the following events shall be a "Default" under this Lease:

(a)    Any installment of Fixed Rent is not paid, whether by Lessee or any third party (including but not limited to any third party guarantor) within 90 days after the date such installment of Fixed Rent is first due and payable to Lessor;

(b)    Lessee or any third party (including but not limited to any third party guarantor) fails to pay any item of additional rent within 90 days after written notice from Lessor that Lessee has defaulted in its obligation to pay same;

(c)    Lessee admits, in writing, that Lessee is unable to pay Lessee's debts as such become due;

(d)    Lessee makes an assignment for the benefit of creditors;

(e)    Lessee files a voluntary petition in bankruptcy; or a petition is filed against Lessee and an order for relief is entered; or Lessee files any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future law; or Lessee seeks, consents to, or suffers the appointment of a trustee, receiver or liquidator of Lessee or of any substantial part of Lessee's properties;

(f)    60 days after commencement of any proceeding against Lessee seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future law, such proceeding is not dismissed; 60 days after the appointment (without Lessee's consent) of a trustee, receiver or liquidator of Lessee or any substantial part of Lessee's properties, such appointment is not vacated or stayed on appeal or otherwise, or within 30 days after the expiration of any such stay, such appointment is not vacated; or a levy or attachment is

25

NY1914630.6

made against Lessee's property and is not vacated or removed by bonding, agreement, or court order within 30 days;

(g)    Lessee fails to keep or perform any material term, covenant, condition, or provision of this Lease to be kept or performed by Lessee, other than the payment of rent, and such failure continues for 30 days after written notice from Lessor unless such failure is susceptible of cure and requires work to be performed, acts to be done, or conditions to be removed which cannot be performed, done or removed within such 30 days, in which case the Default shall not be deemed to exist as long as Lessee:

    (i)    advises Lessor by written notice within such 30 days that Lessee shall remedy such failure and specifies a reasonably prompt date by which Lessee shall have done so;

    (ii)    commences promptly to prosecute the curing of such failure and diligently and continuously prosecutes to completion all steps necessary to remedy the problem; and

    (iii)    completes the curing of such failure with reasonable promptness (and no later than the date specified in Lessee's notice, which date may be no later than 90 days after the expiration of the foregoing thirty-day period); and/or

(h)    Lessee fails to (i) renew the Letter of Credit as required pursuant to Section 5.1 hereof at least 10 days prior to the expiration thereof or (ii) restore the amount of the Letter of Credit as required pursuant to Section 5.1 hereof within 3 months after the date such unsatisfied obligation of Lessee that triggered Lessor to draw upon the Letter of Credit became first due and payable under the terms of this Lease.

(i)    Lessee fails to be Controlled, directly or indirectly, by Prada Holding NV, its current parent company.

15.2    If and whenever any Default occurs, at Lessor's option Lessor may serve upon the Lessee a five-day notice of cancellation and termination of this Lease (the "5-Day Notice"). Upon the expiration of such five-day period, this Lease and its term shall automatically and without any action by anyone terminate, expire, and come to an end, by the mere lapse of time and by the express terms of this Lease, as fully and completely as if the expiration of such five-day period were the expiration date of this Lease. The passage of such five-day period constitutes the limit beyond which the Lessee's tenancy no longer exists, and no longer can exist. Upon the mere occurrence of the passage of 5 days after the Lessor's notice of cancellation and termination, this Lease shall automatically expire by its express terms. No re-entry or other act shall be necessary to terminate this Lease. This paragraph establishes a conditional limitation and not a condition subsequent, but

26

does not limit the Lessor's other rights or remedies. Upon such a termination, Lessee shall quit and surrender the Premises but shall remain liable as provided in this Lease.

15.3    If and whenever any Default occurs, and/or if this Lease and the term terminate under Section 15.2 or otherwise, Lessor may terminate Lessee's right to possession and re-enter and repossess the Premises without notice using such force as may be reasonably necessary without prosecution or damages; and Lessee shall remain liable as provided in this Lease. If Lessor so re enters, at Lessor's option, and whether or not this Lease and the term have terminated, Lessor may, but shall not be obligated to:

   (a)    change any locks or other security devices;

   (b)    complete any unfinished work necessary or desirable, in Lessor's reasonable judgment, to prepare the Premises for occupancy;

   (c)    repair and alter the Premises in such manner as Lessor deems, necessary or desirable, without relieving Lessee of liability under this Lease;

   (d)    let or relet the Premises (or any parts thereof) for the whole or any part of the remainder of the term or any longer period, in Lessor's name or as agent of Lessee, and pay and apply all rents and other sums collected or received as follows:

      (i)    first, to costs and expenses incurred by Lessor in terminating this Lease, re-entering, repossessing, repairing and/or altering the Premises, and removing all persons and property therefrom;

      (ii)    second, to costs and expenses incurred by Lessor in securing new tenant(s) for the Premises (including brokerage commissions, and expenses of preparation for reletting, utilities); and

      (iii)    third, any balance then remaining towards payment of Lessee's liability to Lessor; and/or

   (e)    direct any subtenant of Lessee to pay Lessor directly any subrent. Lessor's collection of subrent from any subtenant shall not cause Lessor to have any direct relationship with, or become the direct lessor of, any subtenant.

In no case shall re-entry by Lessor, whether under summary proceedings or otherwise, discharge Lessee from any liability under this Lease. Lessor shall have no obligation to relet the Premises, or to collect any rent or other sum due on any such reletting; and Lessor's failure to relet or to collect rent shall not relieve Lessee of any liability under this Lease. Lessee shall not be entitled to any excess

27

of rents collected upon any reletting of the Premises over the Fixed Rent, additional rent and other sums payable by Lessee under this Lease.

15.4    If Lessee defaults, and/or if this Lease and the term terminate under Section 15.2 or otherwise, and/or if Lessor enters the Premises under Section 15.3 by any summary proceeding or otherwise then, in any such event Lessee shall pay Lessor, also, as damages, any deficiency (a "Deficiency") between (i) the Fixed Rent reserved in this Lease and additional rent for the period which otherwise would have constituted the unexpired portion of the term and (ii) the amount, if any, of rents actually collected by Lessor under any reletting effected pursuant to Section 15.3(d) for any part of such period (after deducting from such collections the amounts specified in Section 15.3(d)(i) and (ii)). Lessee shall pay any Deficiency in installments on the days specified in this Lease for payments of Fixed Rent and additional rent. Lessor shall be entitled to recover from Lessee each Deficiency installment as accruing; and no Legal Proceeding to collect any Deficiency installment shall prejudice Lessor's right to collect any subsequent installment in the same or another Legal Proceeding. Whether or not Lessor collects any unpaid Deficiency installments under this section, Lessee shall pay Lessor, on demand, in lieu of any further installments of Deficiency, as and for liquidated and agreed final damages (it being agreed that it would be impractical or extremely difficult to fix the actual damages), a sum equal to the amount by which Fixed Rent reserved in this Lease and additional rent for the period which otherwise would have constituted the unexpired portion of the term exceeds the then fair and reasonable rental value of the Premises for the same period, both discounted to present worth at the rate of 4% per annum.

15.5    If a Default occurs pursuant to Section 15.1(a) hereof or Lessee fails to increase or replace the Letter of Credit within the time periods set forth in Section 15.1(h) hereof, then (a) Lessor may, in its sole discretion, elect to terminate this Lease, (b) the rights of Lessee set forth in Section 11.1 and 11.2 of this Lease shall terminate and shall be of no further force and effect and (c) Section 11.3 of this Lease shall be deemed null and void and Lessee's right to liquidated damages as set forth in such Section 11.3 shall terminate and shall be of no further force and effect.

15.6    Lessor may bring Legal Proceedings from time to time, at Lessor's election, for the recovery of damages, or for a sum equal to any installment or installments of Fixed Rent and additional rent, or any Deficiency or other sum payable by Lessee to Lessor pursuant to this Lease; and nothing in this Lease shall require Lessor to await the originally scheduled expiration date for any such purpose.

15.7    No receipt of money by Lessor from Lessee after the giving of a 5-Day Notice or after a termination of this Lease, shall reinstate, continue or extend the term, or operate as a waiver of Lessor's rights to enforce payment of Fixed Rent and additional rent then or subsequently becoming due, or to recover possession of the Premises. Lessee agrees that, after the giving of a 5-Day Termination Notice or commencement of legal proceedings, or after final order or judgment for

28

possession of the Premises, Lessor may demand and collect monies due from Lessee without invalidating or rescinding such 5-Day Notice, legal proceeding, order, or judgment; and, at Lessor's election, all moneys so collected shall be deemed payments on account either of the use and occupancy of the Premises or Lessee's liability under this Lease.

15.8    If Lessee is dispossessed by judgment or warrant of any court, or in the event of re entry or repossession by Lessor or expiration or any termination of this Lease, Lessee (on behalf of Lessee and all Persons claiming by, through, or under Lessee) waives to the fullest extent permitted by law (a) service of any notice of intention to re enter now or hereafter provided by law or of commencement of Legal Proceedings for such purpose; (b) any rights of redemption now or hereinafter provided by law; and (c) any re-entry or repossession or right to restore the term or continue this Lease.

15.9    No failure by Lessor to insist upon strict performance of any term, covenant, condition, or provision of this Lease or to exercise any right or remedy after a Default, and no acceptance of full or partial Fixed Rent or additional rent during the continuance of any Default, shall constitute a waiver by Lessor.  No term, covenant, condition or provision of this Lease to be kept or performed by Lessee, and no Default, shall be waived or modified by Lessor except in writing.

15.10    In event of any Default, or any threatened breach by Lessee of any term, covenant, condition or provision of this Lease, Lessor shall be entitled to enjoin such Default or threatened breach and shall have all rights and remedies allowed at law or in equity as though this Lease did not provide for re entry, summary proceedings, or other remedies.

15.11    Each right and remedy of Lessor in this Lease shall be cumulative and in addition to every other right or remedy in this Lease or now or subsequently existing at law or in equity; and the exercise (or attempted exercise) by Lessor of any one or more rights or remedies shall not preclude simultaneous or later exercise by Lessor of other rights or remedies.

15.12    Lessee waives any equity of redemption and any right to relief from forfeiture as provided by California Code of Civil Procedure Section 1179 (or any similar applicable statute, regulation or law now or hereafter in effect).

## ARTICLE 16
## INDEMNITY

16.1    General Obligations.  Lessee shall indemnify Lessor against any: (a)  negligence of Lessee (and anyone claiming by or through Lessee) or its or their partners, members, directors, officers, or employees; (b) breach of any representation or warranty made by Lessee in this Lease or default by Lessee under this Lease; (c) use, occupancy, control, management, operation, and possession of the Premises;

29

(d) any work done at the Premises and any agreements that Lessee (or anyone claiming through Lessee) makes for any such work; (e) the condition of the Premises or any street, curb or sidewalk adjoining the Premises, or of any vaults, tunnels, passageways or space under, adjoining or appurtenant to the Premises; and (f any accident, injury or damage whatsoever caused to any person in or on the Premises or upon or under the sidewalks adjoining the Premises.

16.2    **Environmental/Hazardous Materials.**  Lessee shall be solely responsible for all environmental and hazardous materials issues, claims or matters relating to the Premises arising on, or subsequent to, the Commencement Date, and Lessee shall indemnify Lessor against and hold it harmless from, any losses, claims, damages, expenses or other detrimental consequences arising out of any such environmental or hazardous material matter, issue or claim relating to the Premises.  Lessee agrees that since it or one of its affiliates owned the Premises immediately prior to the execution and delivery of this Lease, that Lessor shall not be liable for any environmental and hazardous materials issues, claims or matters relating to the Premises arising prior to the Commencement Date.

16.3    **Indemnification Procedures.**  Wherever this Lease requires Lessee to indemnify Lessor:

(a)    *Prompt Notice.*  Lessor shall promptly notify Lessee of any claim.

(b)    *Selection of Counsel.*  Lessee shall select counsel reasonably acceptable to Lessor.  Counsel to Lessee's insurance carrier shall be deemed satisfactory.  Even though Lessee shall defend the action, Lessor may, at its option and its own expense, engage separate counsel to advise it regarding the claim and its defense.  Such counsel may attend all proceedings and meetings.  Lessee's counsel shall actively consult with Lessor's counsel.  Lessee and its counsel shall, however, fully control the defense.

(c)    *Cooperation.*  Lessor shall reasonably cooperate with Lessee's defense, provided Lessee reimburses Lessor's actual reasonable out of pocket expenses (including legal costs) in providing such cooperation.

(d)    *Settlement.*  Lessee may, with Lessor's consent, not to be unreasonably withheld, settle the claim.  Lessor's consent shall not be required for any settlement by which: (w) Lessee procures (by payment, settlement, or otherwise) a release of Lessor by which Lessor need not make any payment to the claimant, (x) neither Lessor nor Lessee on behalf of Lessor admits liability, (y) the continued effectiveness of this Lease is not jeopardized in any way, and (z) Lessor's interest in the Premises is not jeopardized in any way.

30

NY\914630.6

16.4    **Survival of Obligations.**  All of Lessee's obligations under this Article 16 shall survive the expiration or earlier termination of this Lease.

## ARTICLE 17
## LATE CHARGES

17.1    **Late Payments; Late Charges.**  If Lessee fails to make any payment to Lessor required under this Lease within 60 days after such payment is first due and payable, then in addition to any other remedies of Lessor, and without reducing or adversely affecting any of Lessor's other rights and remedies, Lessee shall pay Lessor upon demand interest thereon at the rate of Reimbursement Interest on such late payment, beginning on the date such payment was first due and payable and continuing until the date when Lessee actually makes such payment.  In addition, and without limiting any other rights or remedies of Lessor, Lessee shall pay Lessor, as additional rent, an administrative charge equal to 1% of any payment that Lessee fails to pay within 60 days after such payment is first due and payable.  Such administrative charge is intended to compensate Lessor for the inconvenience and staff time incurred by Lessor to handle the late or missed payment, shall not be deemed a penalty or compensation for use of funds, and shall not be credited against any other obligations of Lessee under this Lease.

## ARTICLE 18
## NON-RECOURSE

18.1    Notwithstanding anything to the contrary in this Lease, the liability under this Lease of Lessor and of its parent(s), subsidiary(ies), or affiliated corporations or other entities, and any of its constituent partners, joint venturers, or tenants-in-common, for damages or otherwise, shall be enforceable against, and shall not extend beyond, its interests in the Premises (including the proceeds thereof).  No property or assets whatsoever, except Lessor's interest in the Premises (including the proceeds thereof), shall be subject to levy, execution or any other enforcement procedure for the satisfaction of any remedies (monetary or otherwise) of Lessee arising under or in connection with this Lease.  No shareholder, officer, member, manager, director, agent or employee of Lessor shall have any liability under this Lease.

## ARTICLE 19
## NOTICES

19.1    All notices, requests, demands, elections, consents, approvals and other communications under this Lease (each such, a "notice") must be in writing and addressed to the Parties at their addresses set forth above (or to any substitute address which either party may designate by notice).

19.2    Any notice required by this Lease to be given or made within a specified period of time, or on or before a certain date, shall be deemed to have been duly given only

31

if delivered by hand (including commercial courier or express service), or mailed by first class, certified or registered mail, return receipt requested, postage and fees prepaid. A notice sent by certified or registered mail (as above) shall be deemed given 4 days after mailing. All other notices shall be deemed given when received.

19.3    Lessee shall promptly give Lessor a copy of any notice of any material notice of any kind regarding the Premises or any taxes (including any bill or statement), and any notice of nonrenewal or threatened nonrenewal of any permits, licenses or authorizations that Lessee receives from any government, utility company, insurance carrier, or insurance rating bureau.

19.4    Lessor shall promptly give Lessee a copy of any notice of any material notice of any kind regarding the Premises or any taxes (including any bill or statement), and any notice of nonrenewal or threatened nonrenewal of any permits, licenses or authorizations that Lessor receives from any government, utility company, insurance carrier, or insurance rating bureau.

## ARTICLE 20
## GOVERNING LAW

20.1    This Lease shall be governed by and construed in accordance with the laws of the state (without giving effect to principles of conflicts of laws) where the Premises is located.

## ARTICLE 21
## JURISDICTION

21.1    Lessee agrees that any legal proceeding with respect to this Lease may be brought in the courts of the State where the Premises is located and accepts the jurisdiction of such courts with respect to any such legal proceeding for Lessee and its property.

## ARTICLE 22
## CONFIDENTIALITY

22.1    In no event shall either Lessor or Lessee issue any press release, advertisement or other publicity regarding this Lease or the transactions contemplated hereby unless the other party has consented thereto and to the form and substance of any such statement, announcement or release; provided, however, that nothing herein shall be deemed to limit or impair in any way any party's ability to disclose the details of the transaction contemplated hereby as such party deems necessary pursuant to any court or governmental order or applicable securities regulations or financial reporting requirements.

32

## ARTICLE 23
## MEMORANDUM OF LEASE

23.1 Lessee, at its sole cost and expense, may record a memorandum of this Lease in form and substance reasonably satisfactory to Lessor.

## ARTICLE 24
## QUIET ENJOYMENT

24.1 Upon paying the Fixed Rent and performing the terms, covenants, conditions and provisions of this Lease, Lessee may lawfully and quietly hold and enjoy the Premises during the term, subject, however, to the terms, covenants, conditions, and provisions of this Lease.

## ARTICLE 25
## REAL ESTATE BROKERS

25.1 Lessee represents and warrants that Lessee has had no dealings with any real estate broker, finder, or sales agent, in connection with the negotiation and execution of this Lease.

25.2 Lessor represents and warrants that Lessor has had no dealings with any real estate broker, finder, or sales agent, in connection with the negotiation and execution of this Lease.

25.3 Lessee agrees to indemnify Lessor, and hold Lessor harmless from and against any commission or fee claimed by any real estate broker or finder, with respect to the negotiation or execution of this Lease whose claim is based in whole or in part on dealings with Lessee or its employees. Lessee's indemnity shall cover, also, fees-and-costs which Lessor incurs to defend against any such claim (which Lessee shall pay upon demand).

25.4 Lessor agrees to indemnify Lessee, and hold Lessee harmless from and against any commission or fee claimed by any real estate broker or finder, with respect to the negotiation or execution of this Lease whose claim is based in whole or in part on dealings with Lessor or its employees. Lessor's indemnity shall cover, also, fees-and-costs which Lessee incurs to defend against any such claim (which Lessor shall pay upon demand).

25.5 The provisions of this Article 25 shall survive a termination of this Lease.

## ARTICLE 26
## WAIVER OF JURY TRIAL

26.1 Lessor and Lessee waive trial by jury in any legal proceeding brought by either against the other with respect to any matter arising out of or otherwise relating to

33

this Lease, the relationship of Lessor and Lessee, and Lessee's use or occupancy of the Premises.

## ARTICLE 27
### ESTOPPEL, SUBORDINATION AND NON-DISTURBANCE

27.1    Estoppel.  Each party hereto shall, within 10 days after request therefor by the other party, execute and deliver an estoppel certificate in form and substance reasonably acceptable to the requesting party which certifies (a) that this Lease is in full force and effect and is unmodified (or, if this Lease has been modified, specifying such modifications), (b) the Commencement Date, (c) that rent is paid currently without any off-set or defense thereto, (d) the amount of rent, if any, paid in advance, (e) that there are no uncured defaults by either party (or, if there are any such defaults, stating and describing the same), and (f) such other matters as the requesting party may reasonably require.

27.2    Subordination, Non-Disturbance and Attornment Agreement.  This Lease and Lessee's right, title and interest under this Lease shall be, and hereby is, superior to the lien of any mortgage, deed of trust or security interest which may encumber the Premises or any part thereof in the future; provided, however, Lessee shall subordinate its right, title and interest under this Lease to any such future lien provided the holder of such future lien executes and delivers, together with Lessee, a subordination, non-disturbance and attornment agreement which is in form and substance reasonably satisfactory to Lessee and its counsel. Notwithstanding anything to the contrary above, provided Lessee receives a subordination and non-disturbance agreement which is reasonably satisfactory to it, Lessee hereby agrees that this Lease is subordinate to the lien of the mortgage held by Lessor's lender as of the date hereof.  Lessee shall enter into a subordination and non-disturbance agreement with Lessor's mortgagee, in form and substance reasonably satisfactory to Lessee.

27.3    Lessor's Right to Assign.  Lessee hereby expressly agrees that Lessor may pledge its rights under this Lease and assign any payments due to Lessor hereunder for the benefit of any lender or other party in connection with a financing or securitization transaction.

## ARTICLE 28
### MISCELLANEOUS

28.1    This Lease shall be construed without regard to any presumption requiring construction against the party drafting this Lease.  The captions of this instrument are for convenience and do not define or limit the provisions of this Lease.

28.2    The terms, covenants, conditions, and provisions of this Lease shall bind and inure to the benefit of Lessor and Lessee and, their respective legal representatives, successors, and assigns; provided none of the benefits inuring to

NY\914630.6

Lessee hereunder shall inure to the benefit of Lessee's assign unless such assign is permitted hereunder or is approved by Lessor.

28.3    Except as provided in the Side Letter, dated as of the date hereof, by and between Lessor and Lessee, this Lease contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior understandings or agreements of the Parties relating to such subject matter.

28.4    This Lease may be executed (a) in counterparts, a complete set of which together shall constitute an original and (b) in duplicates, each of which shall constitute an original. Copies of this Lease showing the signatures of the respective parties, whether produced by photographic, digital, computer, or other reproduction, may be used for all purposes as originals.

28.5    Neither this Lease nor any of the terms hereof may be terminated, amended or waived orally, but only by an instrument in writing signed by the party against which enforcement of the termination, amendment or waiver is sought.

28.6    The annexes and exhibits constitute an integral part of this Lease.

28.7    The Lessee shall reimburse the Lessor for all reasonable attorneys fees and disbursements the Lessor incurs as a result of: (1) any of the following, unless the Lessee prevails in substantially all respects: (a) any litigation or dispute between the Lessor and the Lessee; (b) any claim that either party makes against the other arising from this Lease or the parties' Lessor-Lessee relationship; (c) any Default; or (d) the Lessor's enforcing any remedies against the Lessee; (2) any bankruptcy or insolvency affecting the Lessee; (3) the Lessor's reviewing, considering, and processing any request that the Lessee makes relating to this Lease or the Building, whether or not the Lessor agrees or consents to it; and (4) any assignment or other transfer.

28.8    If the Lessor commences any proceeding for nonpayment of Fixed Rent, additional rent or holding over, or any other summary proceeding relating to this Lease, Lessee shall interpose no counterclaim of any nature in such proceedings, even if such counterclaim relates to the Lessor's alleged failure to provide services to the Lessee or alleged impairment of the Lessee's right to possess, use, or enjoy the Building, unless failure to assert such counterclaim would be a waiver of such counterclaim, unless the Lessor agrees in writing to waive such requirement. The Lessee may assert any such claim in a separate action. The Lessee acknowledges this right gives the Lessee an adequate remedy. The Lessee's obligation to pay Fixed Rent and additional rent is an independent and absolute obligation under this Lease.

28.9    Whether or not a Default has occurred, Lessor may obtain a court order enjoining Lessee from continuing any Default or from committing any threatened Default.

NYV914630.6

Lessee specifically and expressly acknowledges that damages would not constitute an adequate remedy for any non-monetary Default.

28.10 If any term or provision of this Lease or its application to any party or circumstance shall to any extent be invalid or unenforceable, then the remainder of this Lease, or the application of such term or provision to persons or circumstances except those as to which it is invalid or unenforceable, shall not be affected by such invalidity. All remaining provisions of this Lease shall be valid and be enforced to the fullest extent law allows

28.11 Lessee shall not suffer or permit any windows in the Premises to be cleaned from the outside in violation of applicable laws.

28.12 Lessee acknowledges that this Lease is not entered into for personal, family or household purposes. Therefore, any statute whose effect is limited to transactions entered into for personal, family or household purposes has no application to this Lease.

28.13 Intentionally Deleted.

28.14 Intentionally Deleted.

[Signature pages follow]

36

IN WITNESS WHEREOF, Lessor and Lessee have executed this Lease as of the date first above written.

LESSOR:

RED SAIL REAL ESTATE LOS ANGELES INC.

By: _____
   Name: SILVIA DI ROSA
   Title: ASSISTANT SECRETARY

LESSEE:

PRADA USA CORP.

By: _____
   Name: GIORGIO RIGHETTI
   Title: TREASURER

37

Exhibit A

Legal Description

LOTS 42 AND 43 OF TRACT 4891, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 52 PAGE 57 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

## Schedule 1

### Pre-Approved Modifications
### 8025 Melrose Avenue

1. Melrose Showroom Upgrade
   a. 2 Weeks Coverage To Be Determined
   b. Work Currently Scheduled For June -July 2004

2. Scheduled maintenance schedule – 4 hours from 7:00pm to 11:00pm (Trades: Painting and Electrical)[1]
   a. 03/10/04
   b. 05/12/04
   c. 07/14/04
   d. 09/08/04
   e. 11/10/04
   f. 12/15/04

### Scheduled Extra-ordinary Maintenance Activities

| DESCRIPTION | FREQUENCY | NOTES |
|---|---|---|
| 1. ELECTRICAL WORKS | TO COINCIDE W/ CALENDAR OR WINDOW INSTALLATION | COINCIDE W/ MAINTENANCE DATES AS NECESSARY<br><br>NO ADDITIONAL SECURITY REQUIRED |
| 2. BULBS CHANGING | BEFORE STORE OPENING<br><br>ON A WEEKLY BASIS | ACTUAL DAYS TO BE CONFIRMED ONCE CONTRACT IS SIGNED<br><br>TECH OFFICE WILL INFORM STORE MANAGERS<br>NO ADDITIONAL SECURITY IS REQ. |
| 3. SENSORMATIC WORK | WILL BE DONE DURING THE DAY | NO ADDITIONAL SECURITY IS REQUIRED |
| 5. A/C | REGULAR MAINTENANCE TO BE DONE DURING REGULAR STORE HOURS | NO ADDITIONAL SECURITY IS REQUIRED |
| 7. SOFAS FURNITURE INSTALLATION | TO COINCIDE W/ CALENDAR OR WINDOW INSTALLATION | NO ADDITIONAL SECURITY IS REQUIRED |
| 8. WINDOW INSTALL. | SUBJECT TO EXEC. DEPT. APPROVAL<br><br>ONE NIGHT PER STORE<br>ONE TIME PER YEAR | SECURITY NECESSARY FOR 4-6 HOURS AFTER STORE CLOSE |
| 9. FACADE CLEANING | AS NEEDED | NO SECURITY NEEDED |

---

[1] Please note that, during November and December, due to the Thanksgiving day and Christmas time, the schedule could change.

Schedule 2

Permitted Occupants

"None"

NY:914630.6