**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re*: | : | Chapter 11 |
| | : | |
| QUIKSILVER, INC., *et al.* | : | Case No. 15-11880 (BLS) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | **Hearing Date: 12/1/15 at 10:30 a.m.** |
| | : | **Objection Deadline: 11/24/15 at 4:00 p.m.** |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION
FOR ORDER APPROVING THE IMPLEMENTATION OF THE KEY EMPLOYEE
INCENTIVE AND RETENTION PLAN (D.I. 418)**

In support of his Objection to the Debtors' Motion for Entry of an Order Approving the Implementation of the Key Employee Incentive and Retention Plan (the "Motion"), Andrew R. Vara, Acting United States Trustee for Region 3 ("U.S. Trustee"), by undersigned counsel, avers as follows:

1.      This Court has jurisdiction to hear this Objection.

2.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3.      In furtherance of his case supervisory responsibilities, as well as pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to raise and be heard on this Objection.

## FACTUAL BACKGROUND

4.      The Debtors commenced this case on September 9, 2015 (the "Petition Date") by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors' cases were ordered jointly administered on September 10, 2015.

5.      The U.S. Trustee appointed an official committee of unsecured creditors "(Committee") on September 22, 2015, and added addition members to the Committee on September 28, 2015.

6.      On November 10, 2015, the Debtors filed the instant Motion, together with a motion for authority to file a Summary of the proposed Key Employee Incentive and Retention Plan under seal (the "Seal Motion").  The Debtors have provided the unredacted Summary to the U.S. Trustee pursuant to Section 107(c)(3) .

7.      The Motion publicly discloses only the following essential aspects of the proposed Key Employee Incentive Plan ("KEIP"):

    (a)      Three senior U.S. executives, all insiders, will participate in the KEIP and be eligible to earn aggregate "incentive" payments of up to $1,469,500.  The maximum payout to each KEIP Participant will be 75% to 100% of the participant's base compensation.  Payment to one KEIP Participant will be made by a non-debtor affiliate, but the Debtors have acknowledged that the payment will be funded by an intercompany payment from the Debtors.

    (b)      The KEIP is divided into three targets, each with a maximum payout of approximately $489,833.  The three performance targets are:

        (i)      Emergence from bankruptcy through either the effectiveness of *any* plan of reorganization or consummation of *any* sale of substantially all of the

Debtors' assets, provided that the payout will be reduced to 85% of the maximum amount for an Emergence Date between February 16, 2016 and March 15, 2016 and 70% of the maximum amount for and Emergence Date between March 16, 2016 and April 15, 2016.  The Motion is silent regarding whether any Emergence bonus will be payable for an Emergence Date after April 15, 2016, and is also silent about whether the targeted Emergence Dates may be extended;

       (ii)     Continued compliance with the DIP Credit Agreement, including the covenants contained therein; and

       (iii)     Achievement of pre-determined personal goals, as determined by each KEIP Participant's designated superior.[1]

(c)     Failure to achieve one performance target will not reduce the maximum payout available for the other performance targets.

(d)     The bonuses will be paid 15 days after the Emergence Date and require each participant to remain in the Debtors' employ until 45 days after the Emergence Date.

8.     The Motion publicly discloses only the following essential aspects of the proposed Key Employee Retention Plan ("KERP"):

(a)     The Debtors have designated 14 employees as participants ("KERP Participants"), based on their status as "critical, hard to replace, non-senior management employees."

(b)     The KERP will be provide for a total pool of $859,556, with $659,556

---

[1] The personal goals are not disclosed in the Motion.  The Debtors have provided a copy of a draft FTI report setting forth each KEIP Participant's personal goals.

allocated to the named 14 KERP Participants and $200,000 available for discretionary payments to later-identified KERP Participants.

(c)     The maximum payout to any KERP Participant will be from 20% to 50% of the participant's base compensation.

(d)     KERP payments will be based 60% on continued employment until 45 days after the Emergence Date and 40% based on achievement of pre-determined personal goals, as determined by each KERP Participant's designated superior.

9.     The Debtors assert that none of the KERP Participants is an insider.  The Debtors have supplied the U.S. Trustee with a list of KEIP Participants, disclosing among other things each participant's job title and compensation.  Some KEIP Participants clearly appear not to be insiders.  However, as to at least five of the fourteen presently-identified KEIP Participants, it is difficult to assess whether they are in fact not insiders.  The Debtors must produce satisfactory evidence that all KERP Participants are not insiders

## BASIS FOR RELIEF

10.     When a bonus plan described as an incentive plan sets the performance bar so low that the lowest targets are well within reach, it is a not a true incentive plan; it is a disguised retention plan.  *In re Hawker Beechcraft, Inc.*, 479 B. R. 308, 313, fn.7 (Bankr. S.D.N.Y.  2012) (noting that while targets were not "lay-ups", "they are more like free throws than half court flings at the buzzer").

11.     The Debtors have not produced any evidence that the performance targets under the KEIP provide a *bona fide* incentive that is difficult to reach; they may have actually set the performance bar too low.  If the targets are within easy reach, participants will not be required to "stretch" to reach it.  Whether one characterizes the minimum target as a "lay-up" (*see In re*

4

*Dana Corp.*, 358 B.R. 567, 583 (Bankr. S.D.N.Y. 2006)) or as a "free throw" (*see Hawker Beechcraft*), or simply "not difficult to reach," the performance targets for the KEIP may be too easy to reach and virtually risk-free to the KEIP Participants.

12.     The Emergence metric -- emergence from bankruptcy through the effectiveness of *any* plan of reorganization or the consummation of *any* sale of substantially all of the Debtors' assets, is low-hanging fruit.  The Debtors entered Chapter 11 on September 9, 2015 with a Plan Sponsor Agreement in hand that calls for a flat $7.5 million payout to general unsecured creditors.  A parallel sale process now provides an additional avenue to emergence.

13.     A KEIP must be predicated on maximizing the value of the estate.  Yet here, the Emergence portion of the KEIP will be payable on the Emergence Date as long as *any* plan is confirmed or as long as *any* sale of substantially all of the Debtors' assets.  There is no "floor" on required performance, such as an increase in the amount distributable to general unsecured creditors over and above the $7.5 million described in the Plan Sponsor Agreement.  Short of a conversion to Chapter 7, it seems a foregone conclusion that *some* Chapter 11 plan of reorganization will be confirmed or *some* sale of substantially all of the Debtors' assets will be consummated.  The only "risk" to the KEIP Participants is one of timing – the Emergence component of the bonus pool will shrink on February 15 and March 15, 2016, and may disappear altogether after April 15, 2016.  And given the timetable set in this case for Emergence, even the timing risk is infinitesimal.

14.     The second performance "target," continued compliance with the DIP Credit Agreement, including the covenants contained therein, does not require the KEIP Participants to "stretch;"  it is instead, as Judge Lifland called it, a "lay-up. " *In re Dana Corp.*, 2006 WL 3479406 (Bankr. S.D.N.Y. Nov. 30, 2006).  It is almost entirely risk free.  The Debtors are

5

already required to comply with all of the terms of the DIP Credit Agreement.  They agreed to

maintain certain revenue and to limit certain disbursements pursuant to a budget, which was

promulgated with built-in tolerances.  They agreed as a condition of financing to provide certain

financial reporting, and agreed to refrain from certain behaviors.

      15.     The terms and conditions of the DIP financing provide all of the incentive

necessary for the KEIP Participants to comply with the DIP Credit Agreement.  Simply stated, if

the Debtors, under the management of the KEIP Participants, fail to comply, the DIP lenders will

be entitled to take control of and liquidate their collateral, effectively shuttering the Debtors'

operations and ending the KEIP Participants' employment.  In addition to having the incentive of

continued employment, the Debtors' senior-most executive team already has a fiduciary duty to

do everything in their power to ensure the Debtors' compliance with the DIP Credit Agreement,

and each member of that team already receives substantial compensation for performing all of

his or her duties.  Performance of one's fiduciary duties is not optional and should not be a basis

for allowance of bonus compensation.

      16.     The third performance target, achievement of pre-determined personal goals as

determined by each KEIP Participant's designated superior, could provide a meaningful

performance threshold.  Those goals – while hardly proprietary information and not of any use to

the Debtors' competitors – are not disclosed in the Motion.  And perhaps for good reason, as

they do not establish a meaningful performance threshold.  Indeed, the personal goal for each

participant is essentially "continue doing do your job as (title), plus do the extra things someone

with your job title is supposed to do when the company is undergoing Chapter 11 debtor

reorganization ."   Moreover, it is difficult to distinguish this third performance metric from the

Emergence metric, which is, in essence, "get us to a plan, any Chapter 11 plan, or to an asset sale, any asset sale."

17.      The absence of meaningful performance thresholds and the virtual guarantee of bonus payments to KEIP Participants , coupled with the requirement that KEIP Participants remain in the Debtors' employ through 45 days after Emergence, collectively suggest that the KEIP is in fact designed to induce the KEIP Participants to "stay the course" until 45 days after the Emergence Date.

18.      In addition to setting performance target levels that may be insufficient to justify payment of incentive bonuses, the Debtors articulate an incorrect legal standard for evaluation of the KEIP.  Although the Debtors assert that the KEIP meets the requirements of Code Section 503(c)(3), they argue that the applicable standard is the business judgment rule.  In this regard, the Debtors overlook and fail to accord proper meaning to the restrictions imposed by Section 503(c).  The Debtors are seeking authority to incur an administrative expense for the KEIP. Section 503(c) represents a legislative effort to rein in unbridled severance, retention and other payments, especially but not exclusively to insiders, that deplete estates.

19.      Section 503(b)(1)(A)(i) provides in relevant part that after notice and a hearing, the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case shall be allowed as an administrative expense.

20.      Administrative expenses are given priority status and paid ahead of other unsecured claims. See 11 U.S.C. § 507. *In re Insilco Technologies, Inc.*, 309 B.R. 111,114 (Bankr. D. Del. 2004).  In order to hold administrative expenses to a minimum and to maximize the value of an estate, Section 503(b) is narrowly construed.  *See, e.g., In re N.P. Min. Co., Inc.*,

7

963 F.2d 1449, 1454 (11th Cir. 1992); *In re Philadelphia Mortgage Trust,* 117 B.R. 820, 828

(Bankr. E.D. Pa. 1990). To qualify for administrative priority status, an expense must arise from

a transaction that accorded the estate an actual benefit. *Insilco Technologies, citing Calpine

Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532-533

(3d Cir.1999) and *In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001).

21.    The Debtors' assertion that the KEIP is a Section 363(b) transaction governed by

the business judgment rule ignores the pivotal holding of *O'Brien Envtl. Energy, Inc.*, that the

allowability of administrative expenses "depends upon the requesting party's ability to show that

the [expenses] were actually necessary to preserve the value of the estate. Therefore, we

conclude that *the business judgment rule should not be applied as such in the bankruptcy

context*. Nonetheless, the considerations that underlie the debtor's judgment may be relevant to

the Bankruptcy Court's determination." 181 F.3d at 535 (emphasis added). The proposed KEIP

payments, like the break-up fees under consideration in *O'Brien Envtl. Energy, Inc.*, are

administrative expenses and their allowance must be determined under administrative expense

jurisprudence rather than the more lenient business judgment rule.

22.    The Debtors must demonstrate that the proposed KEIP payments are necessary to

preserve the value of the estate and are permissible under the statutory test in Section 503(c)(3).

The Debtors have not yet met this burden with respect to the KEIP.

23.    Knowing the difficulty of complying with Section 503(c) of the Code, the Debtors

also seek approval of the KEIP under Section 105(a) of the Code. This is inappropriate. It is

well-settled law that a party cannot use a more general provision of a statute to avoid the

requirements of a more specific provision. This principle was recently restated by the Supreme

Court in *Law v. Siegel*, --- U.S. ---, 134 S. Ct. 1188 (2014). In discussing the principle that

Section 105(a) of the Bankruptcy Code may not be used to circumvent explicit mandates of the Bankruptcy Code, the Supreme Court noted that it was "simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere." 134 S. Ct. at 1194. See also *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, --- U.S. --- , 132 S. Ct. 2065, 2071 (2012)(where a general permission or prohibition in a statue is contradicted by a specific one, "the specific provision is construed as an exception to the general one.").

24.     Also instructive is the recent decision of the Bankruptcy Court of the Southern District of New York, *In re AMR Corp.*, 497 B.R. 690 (Bankr. S.D.N.Y. 2013). There, the Court rejected a plan provision to pay a departing CEO amounts in excess of the Section 503(c)(2) severance limits, holding that, under § 1129(a)(1) of the Code, "the Court cannot approve a payment [under a plan] that is clearly prohibited by another, more specific part of the Bankruptcy Code. Id. at 696 (*citing RadLAX Gateway Hotel* and *In re Adelphia Communs. Corp.*, 441 B.R. 6, 13, n. 18 (Bankr. S.D.N.Y. 2010)(noting that meeting the requirements of Section 503(c) was the only method of approving a severance payment to a debtor's insider in the context of a Chapter 11 case).

25.     The *AMR* Court further noted that "it is not surprising then that courts disfavor attempts to bypass the requirements of Section 503(c) given the history and intent of the section." 497 B.R. at 696. The history referenced by the Court is that Section 503(c) was added to the Bankruptcy Code in 2005 as a part of the BAPCPA amendments, to "eradicate the notion that executives were entitled to bonuses simply for staying with the [c]ompany through the bankruptcy process." *Id., quoting In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012)(*citing In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007)).

26.     The specific provisions of Section 503(c) preclude resort to the general provisions of Section 105(a), as well as those of Section 363(b).  If the Court considers the KEIP at all, the Court must do so under the specific provisions of Section 503(c)(3).

27.     The Debtors must bear the burden of establishing that the proposed KEIP targets provide a *bona fide* incentive that is difficult to reach and that the KEIP is justified by the facts and circumstances of this case. The terms of the KEIP suggest otherwise, and the KEIP is really a disguised insider retention plan.

28.     The Debtors must also bear the burden of establishing that each proposed KERP Participant is not an insider.

29.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves all discovery rights.

WHEREFORE, the United States Trustee respectfully requests that the Court deny the

Motion and grant such other relief as may be appropriate and just.

Respectfully submitted,

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE**
**Region 3**


Dated: November 24, 2015          **BY:**  /s/ Mark S. Kenney
                                        Mark S. Kenney
                                        Trial Attorney
                                        Office of the United States Trustee
                                        J. Caleb Boggs Federal Building
                                        844 King Street, Suite 2207, Lockbox 35
                                        Wilmington, DE 19801
                                        (302) 573-6491
                                        (302) 573-6497 (Fax)

11