**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
In re: : Chapter 11
: 
QUIKSILVER, INC., *et al.*, : Case No. 15-11880 (BLS)
: 
Debtors.[1] : Jointly Administered
: 
: Hrg. Date: Dec. 17, 2015 at 9:00 a.m. (Eastern)
: Obj. Due: Dec. 10, 2015 at 4:00 p.m. (Eastern)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO
BANKRUPTCY CODE SECTIONS 105(a) AND 365(a) AND BANKRUPTCY
RULES 6006 AND 9014 AUTHORIZING REJECTION OF LICENSE
AGREEMENT *NUNC PRO TUNC* TO NOVEMBER 25, 2015**

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Quiksilver" or the "Company"), hereby move (the "Motion") the Court for entry of an order, pursuant to sections 105(a) and 365(a) of title 11 of the United States Code (the "Bankruptcy Code") and rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the rejection of that certain License Agreement between ZQK and E. Gluck Corporation ("E. Gluck" or the "Licensee"), dated as of June 16, 2014, attached hereto as Exhibit A (the "License Agreement") effective as of November 25, 2015.  In support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this case and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2. The legal predicates for the relief requested herein are Bankruptcy Code sections 105(a) and 365(a). The relief requested is also warranted under Bankruptcy Rules 6006 and 9014.

3. Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

**BACKGROUND**

**I.    The Chapter 11 Case**

4. On September 9, 2015 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). These Chapter 11 Cases are jointly administered.

5. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. On September 22, 2015, the Office of the United States Trustee for the District of Delaware (the "United States Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On September 28, 2015, the United States Trustee filed an Amended Notice of Appointment of Creditors' Committee. No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

7.      Quiksilver is one of the world's leading outdoor sports lifestyle companies. The Company designs, develops and distributes branded apparel, footwear, accessories and related products. The Company began operations in 1976 making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia. Today, the Company's business is rooted in the strong heritage and authenticity of its core brands, *Quiksilver*, *Roxy*, and *DC*, each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, BMX, and motocross, among other activities. The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites. The Debtors comprise each of the Company's U.S. entities, including parent, ZQK, as well as QS Wholesale, Inc., QS Retail, Inc., DC Shoes, Inc. and seven inactive entities.

8.      Prior to the Petition Date, the Debtors entered into that certain Plan Sponsor Agreement (the "PSA") with certain funds managed by affiliates of Oaktree Capital Management (collectively, the "Plan Sponsor"). In accordance with the PSA, on October 13, 2015, the Debtors filed the Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession [Docket No. 292] (the "Plan"). On October 30, 2015, the Debtors filed their Disclosure Statement With Respect to the Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession [Docket No. 396] (the "Disclosure Statement") and the Debtors' Motion for Entry of an Order (A) Approving the Adequacy of the Debtors' Disclosure Statement, (B) Approving Solicitation and Notice Procedures With Respect to Confirmation of the Debtors' Proposed Plan of

Reorganization, (C) Approving the Form of Various Ballots and Notices in Connection Therewith, and (D) Scheduling Certain Dates With Respect Thereto [Docket No. 397] (the "Solicitation Procedures Motion"). On November 17, 2015, the Debtors filed their first amended rights offering procedures [Docket No. 474] (the "Amended Rights Offering Procedures"), their first amended Plan [Docket No. 476] (the "First Amended Plan"), and the first amended Disclosure Statement [Docket No. 477] (the "Amended Disclosure Statement").

9. Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the Declaration of Andrew Bruenjes, Americas Chief Financial Officer of Quiksilver, Inc., In Support Of Chapter 11 Petitions And First Day Pleadings [Docket No. 20] (the "First Day Declaration").

## II.    The License Agreement[2]

10. On June 16, 2014, ZQK entered into the License Agreement with E. Gluck, whereby ZQK granted to E. Gluck an exclusive, non-transferrable license in certain trademarks and design elements of ZQK (collectively, as further described in the License Agreement, the "Licensed Materials") for use by E. Gluck in designing, developing, sourcing, manufacturing, and selling certain digital and analog watches and clocks bearing the Licensed Materials (as further described in the License Agreement, the "Licensed Products").

11. The License Agreement has an initial term expiring December 31, 2020, and may be renewed until December 31, 2023, subject to certain conditions, including, but not limited to, the agreement of the parties.

---

[2]  Any description or summary of the License Agreement in this Motion is qualified in all respects by reference to the License Agreement.

12. Pursuant to the License Agreement, E. Gluck manufactures the Licensed Products and sells such products both to ZQK and its affiliates and to a number of authorized third-party customers. ZQK and its affiliates, collectively, are obligated to purchase a minimum of $400,000 of Licensed Products each year. E. Gluck pays royalties (the "Royalties") to ZQK as a percentage (fluctuating between 8% and 9%) of its sales of Licensed Products, less certain deductions, including for sales made to ZQK or its affiliates (as further described in the License Agreement, "Net Invoiced Billings"). The Royalties are subject to a guaranteed floor in each year of the agreement. For the current year, the minimum Royalty guarantee is $200,000. In addition, E. Gluck must pay a Marketing Fee of 1% of Net Invoiced Billings, in exchange for which ZQK will undertake, at its sole cost and expense, certain marketing activities.

13. In the event the License Agreement is terminated or expires, the Licensee shall, subject to ZQK's prior written consent, have a period of six calendar months during which Licensee may, under certain circumstances, dispose of its inventory of unsold Licensed Products on a non-exclusive basis (the "Sell-Off Period").

**RELIEF REQUESTED**

14. By this Motion, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, rejecting the License Agreement as of November 25, 2015.

15. The Debtors further request that the Court order that, from and after the Rejection Date, E. Gluck is not authorized to use the Licensed Materials for any purpose; provided, however, that E. Gluck may sell Licensed Products which have been produced as of the date of entry of an order granting the Motion during the Sell-Off Period, in accordance with the License Agreement.

16. The Debtors currently are performing their review and evaluation of other executory contracts and unexpired leases and subleases that are not the subject of this Motion. As this process continues, the Debtors may identify additional executory contracts or leases to be assumed or rejected. Accordingly, the Debtors reserve the right to seek to reject additional executory contracts and leases in the future. This Motion should not be construed as a determination that any executory contracts and leases not listed herein are to be rejected.

17. The relief requested herein should not (a) be construed as a request to assume, or for authority to assume, any executory contract or unexpired lease under section 365 of the Bankruptcy Code or otherwise, (b) waive, affect, or impair any of the Debtors' rights, claims, or defenses, including, but not limited to, those arising from section 365 of the Bankruptcy Code, other applicable law, or any agreement, (c) grant third-party beneficiary status or bestow any additional rights on any third party, (d) be otherwise enforceable by any third party other than the Banks, or (e) impair the Debtors' ability to contest or object to any claims, including rejection damages, asserted against the Debtors on any ground permitted by applicable law.

**BASIS FOR RELIEF**

18. As a general matter, the Company operates through a typical supply model, whereby it contracts with third-party vendors to manufacture merchandise and accessories, which are designed in-house. Following manufacture, such products are then sold through the Company's retail stores or to its wholesale customers. In 2013, the prior management team made a determination that certain product lines which had previously been part of the Company's global product offering, including digital and analog watches, could be better handled through a license arrangement. Accordingly, in mid-2014, the Company entered into the License Agreement with E. Gluck. Since that time, a new management team has stepped in and

has reevaluated this determination as part of formulating a comprehensive business plan for the Company. Current management disagrees with the prior assessment and, in the exercise of its sound business judgment, believes that rejection of the License Agreement would help to effectuate the Company's business plan and would be in the best interests of the Debtors and their estates and creditors.

19. In particular, reverting to the Company's typical vendor supply model will allow the Debtors to maintain greater control over the design and quality of its branded watches and to limit distribution to retailers they believe are more appropriate to the Company's image, thereby preserving the integrity of the *Quiksilver*, *Roxy*, and *DC* brands. In addition, the Company has found that its licensing arrangements have resulted in multiple sales representatives (i.e., from both the Company and the licensee) contacting the Company's wholesale customers, resulting in confusion and inconsistent messaging. The Debtors believe that establishing a single point of contact for wholesale accounts is important to their go-forward strategy. Finally, the Debtors believe they are better positioned than the Licensee to maximize profits from the sale of their branded watches.

20. Accordingly, the License Agreement should be rejected as of the date of this Motion, as a sound exercise of the Debtors' business judgment.

21. As further set forth below, upon rejection, E. Gluck must cease use of the Licensed Materials, including for the further production of Licensed Products, provided that it may continue to sell already-produced Licensed Products during the Sell-Off Period to the extent set forth in the License Agreement.

**APPLICABLE AUTHORITY**

**I.  REJECTION OF THE LICENSE AGREEMENT IS A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT**

22. Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). A debtor's determination to reject an executory contract or unexpired lease is governed by the "business judgment" standard. In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating that debtor's decision to reject is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice); In re MF Global Holdings Ltd., 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012) ("Courts generally will not second-guess a debtor's business judgment concerning whether the assumption or rejection of an executory contract or unexpired lease would benefit the debtor's estate."); see also In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989) (same criterion). In applying the "business judgment" standard, courts show great deference to the debtor's decision to assume or reject. See Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of debtor's decision to assume or reject executory contract "should be granted as a matter of course").

23. Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872

8

(Del. 1985)). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. See Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

24. Here, the License Agreement is executory and subject to rejection, as there are material unperformed obligations on the part of both E. Gluck and ZQK. Among numerous other obligations, E. Gluck is required to pay Royalties and Marketing Fees. ZQK is obligated, among other things, to forbear from using the Licensed Materials, to review and approve Licensed Products and marketing materials, to purchase or cause its affiliates to purchase certain quantities of Licensed Products and to undertake, at its own cost and expense, certain marketing activities.

25. Moreover, as set further forth above, the Debtors have satisfied the "business judgment" standard for rejecting the License Agreement. In particular, rejection of the License Agreement will enable to Debtors to bring design and sale of Company-branded watches in-house, and to outsource production to vendors, consistent with the Company's typical model and in furtherance of the Company's go-forward business plan. The Debtors believe this will allow them to more closely oversee the design and development of the products and provide them with greater control over the distribution channels utilized for the sale of the products, thereby maximizing the profitability of the products and allowing the Debtors to bring the products more in line with the brand image they hope to establish and maintain. Doing so will protect brand image across the full range of the Company's products, further benefitting the Debtors and their estates and creditors.

## II. REJECTION OF THE LICENSE AGREEMENT TERMINATES E. GLUCK'S RIGHTS TO USE THE LICENSED MATERIAL SUBJECT TO THE SELL-OFF PERIOD

26. Consistent with the law in this District, upon rejection of the License Agreement, the Debtors respectfully request that this Court order that E. Gluck may no longer use the Licensed Materials for the manufacture of Licensed Products. Licensed Products already in existence and not yet sold may be sold on a non-exclusive basis during the Sell-Off Period provided by the License Agreement.

27. In In re HQ Global Holdings, Inc., the court held, with respect to rejection of certain trademark licenses, that "[a]s a result of the rejection, th[e] affirmative obligation of the Debtors to allow the [licensees] to use the marks is excused" such that the licensees' "right to use the trademarks stops on rejection." In re HQ Global Holdings, Inc., 290 B.R. 507, 513 (Bankr. D. Del. 2003). This remains the law in this District and, accordingly, upon rejection, E. Gluck should be prohibited from using the Licensed Materials.

28. While section 365(n) provides licensees to rejected "intellectual property" licenses with certain additional options upon rejection, that section is limited in scope. 11 U.S.C §.365(n). In particular, it applies only to "executory contract under which the debtor is a licensor of a right to intellectual property." Id. The Bankruptcy Code definition of "intellectual property" does not include trademarks, trade names or other proprietary marks. 11 U.S.C. § 101(35A) Therefore, as the HQ Global court held, licensees of trademarks "are not protected by section 365(n)" and "have only a claim for rejection damages under section 365(g)(1)." HQ

Global, 290 B.R. at 513. Upon rejection, debtors are relieved of their obligations under the trademark license agreement, which includes the obligation to provide the trademarks for use.[3]

29. Notwithstanding the foregoing, the Debtors do not object to E. Gluck using the Sell-Off Period to sell Licensed Products already manufactured and not yet sold, on a non-exclusive basis. Access to the Sell-Off Period provides E. Gluck with its contracted-for remedies in the event of a termination of the License Agreement.

## RESERVATION OF RIGHTS

30. Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise to pay any claim; or (d) an assumption of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365.

## NOTICE

31. Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agents and lenders under the DIP Facilities; (c) counsel to the agent for the Debtors' prepetition revolving loan facility; (d) counsel to the indenture trustee for the Debtors' prepetition senior secured notes; (e) counsel to the indenture trustee for the Debtors' prepetition senior unsecured notes; (f) counsel to the Creditors' Committee; (g) counsel to E. Gluck; and (h) all parties entitled to notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

---

[3] In In re Exide Technologies, Judge Ambro suggested in his concurring opinion that 365(n) should be read to apply to trademark licenses, notwithstanding their omission from the definition of intellectual property. In re Exide Technologies, 607 F.3d 957, 965-68 (3d Cir. 2010) (Ambro, J., concurring). However, such view, coming in a concurring opinion, is not binding on this Court. The Debtors submit that the HQ Global holding represents the better view.

11

## NO PRIOR REQUEST

32. No previous request for the relief sought herein has been made to this Court or any other court.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting (a) the relief requested herein and (b) such other relief as is appropriate under the circumstances.

Dated: Wilmington, Delaware
November 25, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Z. Li
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

Mark S. Chehi (I.D. No. 2855)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

John K. Lyons
Jessica S. Kumar
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*