# EXHIBIT A

**License Agreement**

QUIKSILVER, INC. ("Quiksilver")
15202 Graham Street,
Huntington Beach, CA 92649

and

E. Gluck Corporation
29-10 Thomson Street
Long Island City, NY 11101 ("Licensee")

DATED: _June 16, 2014_

## STANDARD TERMS AND CONDITIONS

These standard terms and conditions (the "Standard Terms and Conditions") are hereby incorporated by reference into one (1) or more Schedules between Quiksilver and Licensee as though set forth in full. A License Agreement shall consist of the Standard Terms and Conditions and the Schedule(s) and their Attachment(s). All capitalized terms are defined in the Standard Terms and Conditions or in the applicable Schedule. Quiksilver and Licensee agree as follows:

1. **DEFINED TERMS**.
1.1. **"Affiliate"** means, when used with respect to a specified Person, another Person that directly or indirectly Controls, is Controlled by, or is under common Control with the specified Person.
1.2. **Allowances** means any written credits given by Licensee to its customers for any purpose in the year when actually given.
1.3. **"Attachment(s)"** means the document(s) attached to and incorporated into a Schedule containing supplemental information relating to the business provisions included in the Schedule.
1.4. **"Audit Period"** means the Term of the License Agreement plus three (3) years after expiration or termination of the License Agreement.
1.5. **"Authorized Customers"** as applicable means Retailers, Etailers, Catalogs or Wholesalers, or as permitted on Schedule "B" attached hereto, operating within the authorized Distribution Channels.
1.6. **"Catalogs"** means mail order catalogs offering Merchandise for sale to consumers.
1.7. **"Change of Control"** means any Person(s) has acquired, in any single transaction or series of related transactions, whether by way of merger, consolidation, purchase or in any manner (i) all or substantially all of the assets of Licensee or its Controlling Affiliate(s) or (ii) beneficial ownership (within the meaning of Rule 13(d)3 under the Securities Exchange Act of 1934, as amended) of securities of Licensee or its Controlling Affiliate(s) (or other securities convertible into such securities) representing thirty-three and one-third percent (33-1/3%) or more of the combined voting power of all outstanding securities of, or other ownership interests in Licensee or its Controlling Affiliate(s). If Licensee is a partnership, then the preceding Section 1.7 (ii) shall be deemed to mean

thirty-three and one-third percent (33-1/3%) or more of the profit and loss participation in Licensee or its Controlling Affiliate(s), or if Licensee is a Person other than a corporation or partnership, thirty-three and one-third percent (33-1/3%) or more of the Control of Licensee (or the occurrence of any of the foregoing with respect to any manager or administrator of the legal entity).

1.8.    **"Code"** means (i) Quiksilver's Supplier Workplace Code of Conduct incorporated herein by this reference as though set forth in full, (ii) Licensee's own labor standards program for Facilities if such program is approved by Quiksilver, or (iii) any other labor standards program mutually agreed upon by Quiksilver and Licensee.

1.9.    **"Confidential Information"** means (i) non-public proprietary information regarding works in progress, artwork, concepts, technology or other artistic creations and/or Merchandise of Quiksilver, its Affiliates and/or licensors, including without limitation, non-public information about the Licensed Material, and (ii) the terms and conditions of a License Agreement.

1.10.    **"Consumer Sales"** means the Gross Invoiced Billings for Licensee's direct to consumer sales of the Licensed Products.

1.11.    **"Control"** (including, with correlative meanings, "Controlling," "Controlled by," and "under common Control with") means possession, directly or indirectly, through one or more intermediaries, of the power to direct or cause the direction of management or policies of a Person, whether through ownership of equity, voting or other interests, by contract or otherwise.

1.12.    **"Design Elements"** means the aesthetic features of Licensed Products and PA Materials, including without limitation, the style, design, size, shape, color, trade dress, and appearance of Licensed Products and the PA Materials, and any artwork, photograph, recording, text, name, design, logo, brand, symbol, device, slogan, tag line, or other comparable materials used on or in connection with Licensed Products or PA Materials, including, without limitation, all related intellectual property rights. Design Elements consist of Quiksilver Design Elements (Sec. 1.48) and Non Quiksilver Design Elements (Sec. 1.37).

1.13.    **"Direct Manufacturing Cost"** means the direct cost of raw materials, labor, capital and tooling amortization (if applicable), and does not include any other elements, including without limitation, any design or development amortization, overheads, or advertising, marketing, promotion or financing costs.

1.14.    **"Distribution Channels"** means the different retail markets and market segments into which Licensee may distribute Licensed Products, such as mass market, mid-tier and upscale, as specified on Schedule "B" attached hereto.

1.15.    **"E-Commerce Guidelines"** means the rules governing any and all internet-based selling permitted under a License Agreement, incorporated herein by this reference as though set forth in full.

1.16.    **"Effective Date"** means the date specified on Schedule "C" attached hereto, on which the Term of the License Agreement commences.

1.17.    **"End Date"** means the date specified on Schedule "C" attached hereto on which the Term of a License Agreement ends.

1.18.    **"Etailer(s)"** means a Person with no physical store locations buying Licensed Products from Licensee and then reselling the Licensed Products to consumers on the internet.

1.19.  **"Facility"** means any of Licensee's own or third-party manufacturers, vendors, factories, suppliers and other facilities (as well as any sub-manufacturers, vendors, factories, suppliers and other facilities), that design, produce, process, finish, assemble, or package Licensed Products, components of Licensed Products, PA Material or any other item related to the Licensed Product or that assemble a final product including one of more Licensed Products.

1.20.  **"FAMA Application"** means a Facility and Merchandise Authorization Application, incorporated herein by this reference as though set forth in full, identifying each Facility Licensee wishes to use to produce the Licensed Products as well as the other information contained therein.

1.21.  **"FOB Sales"** means Gross Invoiced Billings for wholesale sales (if any) where (i) Licensee delivers, or causes to be delivered, Licensed Products to a shipping point located outside of the country in which the Authorized Customer will re-sell Licensed Products and (ii) the Authorized Customer bears all, or substantially all, of the transportation cost for, and risk of loss of or damage to, the Licensed Products after such delivery point.

1.22.  **"Forecasts"** means information requested by Quiksilver regarding such matters as Licensee's marketing plans and sell-through projections for Licensed Products by upcoming quarterly periods, country and local currency (if applicable), Retailer, Distribution Channel, consumer segments, Licensed Products, and Product Categories.

1.23.  **"Gross Invoiced Billings"** means the gross quantity of Licensed Products sold by Licensee multiplied by the invoiced line item price for each such Licensed Product.

1.24.  **"Guarantee"** means the minimum amount of Royalties set forth on Schedule "A" Licensee guarantees to pay Quiksilver for, as applicable, the period(s), country(ies) and/or Licensed Products specified in such Schedule.

1.25.  **"Guarantee Shortfall"** means, for each Guarantee specified on Schedule "A", the amount that is the difference between (i) the applicable Guarantee and (ii) the amount of Royalties actually paid by Licensee to Quiksilver for, as applicable: the specified period(s), country(ies) and/or Licensed Products.

1.26.  **"Landed Sales"** means all Gross Invoiced Billings for wholesale sales (if any) of Licensed Products (i) shipped by or on behalf of Licensee from a location within or outside the Territory for delivery to an Authorized Customer located in the Territory, (ii) sold to Catalogs and Etailers, or otherwise (iii) sold in any manner that does not constitute and FOB Sale.

1.27.  **"Laws"** means applicable laws, rules and regulations, including without limitation, local and national laws, rules and regulations, treaties, voluntary industry standards (if any), and other legal obligations pertaining to the License Agreement and/or to any of Licensee's activities under the License Agreement, including without limitation, those applicable to any Tax, consumer and/or product safety, data privacy and the privacy and protection of personally identifiable information, the protection of minors, employees, and the environment, the Foreign Corrupt Practices Act (and any foreign equivalent), and the manufacture, pricing, sale, or distribution of the Licensed Products.

1.28.  **"License Agreement"** means the applicable Schedules and their respective Attachments, together with the Standard Terms and Conditions and provisions provided by Quiksilver from time to time and incorporated into the Standard Terms and Conditions.

1.29.  **"License Transfer"** means any direct or indirect assignment, sublicense, encumbrance (including without limitation any pledge of Licensed Products as security or collateral), or other disposition, in whole or in part, of the License Agreement, or any of Licensee's rights, duties, benefits, obligations, or interests in the License Agreement, whether voluntarily or by operation of Law or otherwise, or any Change in Control of Licensee, or any sale of attempted sale of Licensed Products under a trademark or tradename of an Affiliate of Licensee.

1.30.  **"Licensed Material"** means Trademarks and Quiksilver Design Elements.

1.31.  **"Licensed Product(s)"** means articles of Merchandise with the Licensed Material used, reproduced and/or displayed thereon in accordance with the License Agreement, regardless of whether designed by or for Licensee under the License Agreement or sourced by Licensee from Quiksilver licensees on the national market.

1.32.  **"Licensee Indemnified Entities"** means Licensee and its/their Affiliates and successors, and the officers, directors, and employees of each of them.

1.33.  **"Market Date"** means the date specified on Schedule "D" attached hereto, by which commercial quantities of Licensed Products shall be available for purchase by the public throughout the Territory. If no date is specified in such Schedule, then the Market Date shall be six (6) months after the Effective Date of the Schedule.

1.34.  **"Marketing Fee"** means the 1% marketing fee of Net Invoiced Billings paid by Licensee to Quiksilver.

1.35.  **"Merchandise"** means consumer products of every nature and description.

1.36.  **"Net Invoiced Billings"** means Licensee's Sales less Allowances, Return Allowance and Quiksilver Sales.

1.37.  **"Non Quiksilver Design Elements"** means those Design Elements that are not Quiksilver Design Elements.

1.38.  **"PA Material"** means any packaging, labels (if applicable), hang tags (if applicable), advertising (including without limitation, television advertising, public statements or messages, texts, tweets, blogs and/or SMS messages), press releases, containers, display materials, catalogs, website pages or references, and, if authorized, promotional materials, with the Licensed Material used, reproduced and/or referenced thereon in accordance with the License Agreement.

1.39.  **"Party(ies)"** means Quiksilver and/or Licensee, as indicated by the context.

1.40.  **"Person"** means any individual, corporation, general or limited partnership, limited liability company, trust or other form of legal entity, and included Quiksilver and Licensee as applicable.

1.41.  **"POS Information"** means point of sale information, including without limitation, SKU numbers for Licensed Products, retail sales figures, retail sell-through information, inventory numbers, and order information regarding Licensee's sales of Licensed Products to Authorized Customers (including sales to consumers by Retailers in the case of wholesale sales).

1.42.  **"Product Categories"** means those Merchandise categories of Licensed Products, if any, identified on Schedule "E" attached hereto (e.g., apparel, accessories, hardgoods, etc.).

1.43.  **"Product Guidelines"** or "PGs" means the technical specifications applicable to the composition and/or manufacturing of Licensed Products as provided by Quiksilver from time to time and incorporated herein by this reference as though set forth in full.

1.44. **"Product Integrity Provisions"** means the standards and requirements for product quality and safety, including without limitation, testing and recall procedures provided by Quiksilver to Licensee from time to time.

1.45. **"Prohibited Manufacturing Countries"** means those countries or groups prohibited or restricted from sourcing and/or manufacturing Licensed Products, components of Licensed Products, PA Materials, or any other item related to the Licensed Products, including blank items to which the Licensed Material could be applied. The list of Prohibited Manufacturing Countries is set forth on Schedule "F" attached hereto and incorporated herein by this reference as though set forth in full.

1.46. **"Quiksilver or its Designee"** means Quiksilver, Inc., or its designated Affiliate(s), licensor(s), or assignee(s).

1.47. **"Quiksilver Design Elements"** means those Design Elements provided by Quiksilver in a Style Guide or otherwise, or created by or for Licensee, for use on or in connection with Licensed Products and PA Materials that are derived from, adapted from, based on, by direct reference or by inference (e.g., by shape or outline but without specific features), or designated as part of the design program to accompany, any of the Style Guide(s), Trademarks, or other proprietary or intellectual property of Quiksilver, its Affiliates, or its/their licensors, or an variation thereof.

1.48. **"Quiksilver Indemnified Entities"** means Quiksilver, its licensors (as applicable), and its/their Affiliates and successors, and the officers, directors, and employees of each of them.

1.49. **"Reproduction Materials"** means any and all materials, media, or other items or methods, including without limitation, tooling, molds, plates, labels, hardware, software, digital files or other items used to store and/or reproduce the Licensed Material.

1.50. **"Retailers"** means independent and chain retail outlets whose primary activity is selling Merchandise, which have storefronts, and where customers walk into the physical store locations.

1.51. **"Royalties"** means the amounts paid to Quiksilver on Licensee's Sales of Licensed Products, as more fully defined on Schedule "A" attached hereto.

1.52. **"Royalty Payment Period"** means each fiscal quarterly period during the Term and Sell-Off Period (if applicable). No Royalties or other payments shall be due to Quiksilver until the earlier of: (i) fiscal quarterly period in which the Market Date falls, or (ii) the fiscal quarterly period in which Licensee begins shipping products to Authorized Customers. If Sales of Licensed Products commence on a date which is not the first (1st) day of Quiksilver's fiscal quarterly period, then the first (1st) Royalty Payment Period shall be deemed to be fiscal quarterly period in which such date falls; if the Term (or Sell-Off Period, if applicable) expires on a date which is not the last day of Quiksilver's fiscal quarterly period, then the last Royalty Payment Period shall be deemed to be the fiscal quarterly period in which such date falls.

1.53. **"Royalty Rate"** means the percentage(s), as set forth on Schedule "A".

1.54. **"Royalty Statement"** means the form designated by Quiksilver setting forth information relating to Licensee's Sales of Licensed Products, including without limitation, Consumer Sales, F.OB. Sales, Landed Sales (as applicable), Royalties, the calculation of Royalties, and other items requested by Quiksilver, in its sole discretion, from time to time.

1.55. **"Sales"** means the aggregate amount of Consumer Sales, F.O.B. Sales and Landed Sales.

1.56. **"Sample(s)"** means the number of units of each Licensed Product (with packaging) specified on Schedule "H" attached hereto from the first (1st) production run of each supplier of each of the Licensed Products, including that specified number of Samples of each different style and artwork design of each Licensed Product.

1.57. **"Schedule"** means the document containing certain business and other provisions specific to the Licensed Product(s) and Materials of a License Agreement.

1.58. **"Sell-Off Period"** means the limited period of six (6) calendar months from the date immediately following the expiration of the Term of a License Agreement (or as otherwise provided in a Schedule) during which Licensee may, subject to Quiksilver's prior written consent, dispose of any unsold inventory of the Licensed Products on a non-exclusive basis.

1.59. **"SKU"** means a stock keeping unit of a License Product.

1.60. **"Style Guide"** means Quiksilver's proprietary compilation of proprietary material, artwork, trademark logos, designs and/or other elements, including, without limitation, product restrictions and special requirements, for the Licensed Material.

1.61. **"Tax(es)"** means any and all federal, state, provincial, local, municipal and foreign taxes, assessments and other governmental charges, duties, impositions, and liabilities of any kind, including without limitation, sales, use, withholding (including one imposed by any non-U.S. taxing jurisdiction), goods and services, value-added or similar taxes.

1.62. **"Target Sales"** means the target amount of sales of Licensed Products in the Territory(ies) expected during the Term as set forth on Schedule "A" attached hereto.

1.63. **"Term"** means the period commencing on the Effective Date of the Initial Term as set forth in Schedule "C", and ending upon the End Date of the Initial Term as set forth in Schedule "C", or ending upon the End Date of the Renewal Term as set forth in Schedule "C" if the License Agreement is renewed, or from the earlier termination of the License Agreement including such Schedule, or upon the earlier termination of the License Agreement including such Schedule, provided, however, that in the event Licensee engages in preliminary product development or other performance prior to the Effective Date of a Schedule, such product development or other performance shall be in accordance with and governed under the terms and conditions of the License Agreement, and all provisions of the License Agreement for the benefits and protection of Quiksilver shall apply in full to such activities.

1.64. **"Territory"** means the countries, regions and other geographic designations specified on Schedule "I" attached hereto in which Licensee may sell Licensed Products to Authorized Customers. The Territory of any License Agreement shall not include any country or Person which is subject to U.S. government embargo, trade sanctions or similar restrictions.

1.65. **"Trademarks"** (which is deemed to read "Trade Marks", if applicable) means the words, names, designs, logos, brands, symbols, devices, trade dress, slogans and tag lines, alone or in any combination, subject to any special restrictions as to usage as may be identified by Quiksilver: (i) that pertain to the Licensed Materials, but only as specifically designated by Quiksilver, (ii) that consist of "Quiksilver," "Roxy," "DC Shoes" as applicable, and variations thereof, including in stylized format specifically

designated by Quiksilver, only to be used together with designated artwork and/or designs on Licensed Products and PA Materials, or (iii) that are otherwise specified as an authorized Trademark(s) on Schedule "J" attached hereto.

1.66. **"Unauthorized Sales"** means sales by any means other than those expressly permitted under a License Agreement, including, without limitation, through home shopping networks, door-to-door solicitation, vending machines, direct mail marketing, swap meets, flea markets, street peddlers or kiosks or in a consignment or "sale of return" basis.

1.67. **"Wholesaler"** means a Person buying Licensed Products from Licensee and then reselling the Licensed Products to Retailers, not to consumers, pursuant to the terms and conditions of the License Agreement. "Wholesaler" includes the term "Distributor."

## 2.    GRANT OF LICENSE; QUIKSILVER INVENTORY.

2.1.    License. Subject to the terms and conditions of the License Agreement, Quiksilver grants to Licensee an exclusive, non-transferable license, during the Term, to use the Licensed Material in connection with the:

> 2.1.1. Design, development, sourcing and manufacture of the Licensed Products, in the Territory except Prohibited Manufacturing Countries;
>
> 2.1.2. Offer for sale, distribution and sale of Licensed Products to Authorized Customers in the Territory; and
>
> 2.1.3. Production and use of PA Materials for the Licensed Products in the Territory as pre-approved by Quiksilver, in writing.
>
> 2.1.4. Notwithstanding anything herein to the contrary, in the event Licensee is not adequately performing in a particular Territory, Distribution Channel or with respect to a certain category of Licensed Products, Quiksilver shall notify Licensee of its intention of withdrawing such Territory, Distribution Channel and/or Licensed Product from the License Agreement. Licensee shall have thirty (30) days from the date of Quiksilver's notice to present Quiksilver with its intended course of action to cure such breach for its written approval, and the approval of such course of actions shall be in Quiksilver's sole discretion. Following Quiksilver's approval of such course of action, Licensee shall have six (6) months to implement the approved course of action.

2.2.    No Further Licenses. No other rights are granted to Licensee under the License Agreement. By way of illustration and not limitation, no rights are granted to Licensee for (i) moving image clips, (ii) the name, image or likeness of any Quiksilver or Quiksilver Affiliate sponsored athlete and/or personality, or (iii) type fonts. Licensee shall be solely responsible for paying, separately from any other payment Licensee may be required to make under the License Agreement, any charges, fees or royalties payable for any other rights not granted to Licensee under Section 2.1 (notwithstanding that all or a portion of such charges, fees or royalties may be payable to Quiksilver or its Affiliates for its/their own benefit), and Licensee must negotiate, obtain, and pay for any such rights through separate agreements with the rights holder(s). In the event Licensee wishes to use such rights in connection with the Licensed Products and/or the PA Materials, and Quiksilver approves such use, Quiksilver at its option may act as the liaison between Licensee and an applicable right holder(s); provided, however that in

certain cases Quiksilver may direct Licensee to contact a rights holder or work directly with a clearance company.

2.3. <u>Quiksilver Inventory</u>. Quiksilver may continue to sell the Licensed Products current in its inventory (the "Quiksilver Products") through June 30, 2015 but may not engage in "dumping" (as defined in Section 12.3 herein).    Quiksilver shall be responsible for any and all liabilities or claims related to the Quiksilver Products, including, but not limited to, any claims by retailers for returns, discounts, allowances, margin support, mark-down payments, chargebacks, or advertising commitments not authorized or approved by Licensee (collectively, the "Claims on Quiksilver Products").  In the event that Quiksilver does not address any Claim on Quiksilver Products and a retailer or customer makes a claim against Licensee or such Affiliates for such Claims on Quiksilver Product, then Licensee shall work in good faith with Quiksilver for Quiksilver to address, and be responsible for, such claim with such retailer, within a reasonable time period (but no more than ten (10) business days after such claim arises).

2.4.    <u>Reservation of Rights.</u>  All rights not expressly granted to Licensee under the License Agreement are expressly reserved in their entirety to Quiksilver and its Affiliates.

2.5.    <u>Representations and Warranties of Quiksilver.</u> Quiksilver represents and warrants that it has the full right and legal authority to enter into and fully perform this License Agreement in accordance with its terms.

## 3.    <u>EXERCISE OF LICENSE.</u>

3.1.    <u>Authorized Customers and Distribution Channels.</u>    Licensee agrees to sell Licensed Products only to Authorized Customers in the Distribution Channels in the Territory and during the Term as provided in the applicable Schedules and their respective attachments, if any.  Without the need to obtain further permission, Authorized Customers may sell the Licensed Products through their own proprietary Catalogs and/or websites.  Any internet-based selling permitted under the License Agreement is subject to and must comply with Quiksilver's E-Commerce Policy, and no orders may be shipped to customers who are located outside of the Territory.  Licensee may sell Licensed Products to Quiksilver and Quiksilver's Affiliates, subject to the terms and conditions set forth herein.

3.2.    <u>Active Exercise of License.</u>  Licensee agrees to actively (i) market and sell the Licensed Products and (ii) exercise the rights granted to it under the License Agreement.

    3.2.1. <u>Market Date.</u>  Licensee agrees to comply with the Market Date and thereafter maintain such availability and shipment of the Licensed Products throughout the remainder of the Term, unless the Parties otherwise agree in writing.

3.3.    <u>Sales by Licensee to Quiksilver and Quiksilver's Affiliates.</u>  Licensee shall sell Licensed Products to Quiksilver and Quiksilver's Affiliates in accordance with Quiksilver's purchase order terms and conditions.  All sales of Licensed Products by Licensee to Quiksilver and Quiksilver's Affiliates ("Quiksilver Sales") are not subject to Royalties (as set forth in Schedule "A") nor the Marketing Fee (as set forth in Schedule "G").  Prices charged to and paid by Quiksilver and Quiksilver's Affiliates for Licensed

Products are to be calculated at 35% below U.S. wholesale price for each of the Licensed Products. Notwithstanding the foregoing, the parties agree that products purchased by Quiksilver or its Affiliates for sale in Brazil shall be at 40% below U.S. wholesale price.

3.4.     Offer for Sale of Licensed Products to Consumers.   Quiksilver and/or Quiksilver Affiliates shall purchase a minimum of $400,000 of the Licensed Products from Licensee per year for each of the five years of this Agreement.

3.5.     Compliance with Laws.  Licensee covenants to conduct all of its activities relating to the License Agreement, and represents and warrants that all such activities will be conducted, in accordance with any and all applicable Laws.

3.6.     Certain Prohibited Activities.  Licensee shall not use any Licensed Material on any business sign (retail or otherwise), business cards, stationary or forms, url addresses, websites, email addresses or as the name of any business or division of Licensee without consent of Quiksilver. Licensee shall not use the Licensed Products or Licensed Material in connection with any manner of television, radio, motion picture, moving image clip, webcast, internet broadcast, sound and/or visual recording or transmission device or media, or anything in the nature of the following, now known or hereafter devised, without Quiksilver's consent. Quiksilver agrees that approval is not required for co-op advertisements for Licensed Products by Licensee and its Authorized Customers.

## 4.     PAYMENTS AND STATEMENTS: REPORTING

4.1.     Royalties.  Licensee shall pay Royalties to Quiksilver on all Net Invoiced Billings of Licensed Products, wherein Net Invoiced Billings means Sales minus Allowances, Return Allowance and Quiksilver Sales, pursuant to Section 1.36.

    4.1.1.  Sales to Licensee's Affiliates.  Licensee shall pay Royalties to Quiksilver on sales of any Licensed Products to an Affiliate of Licensee, and such sales shall be based on the comparable arm's length price that Licensee would have charged to customers not affiliated with Licensee.

    4.1.2.  Close-Out, Deep Discount and Employee Sales.  Royalties shall be payable on close-out or other deep discount sales of Licensed Products, including sales to employees. No Marketing Fee shall be payable on close-outs, deep discount and employee sales of Licensed Products.

    4.1.3.  Returns and Defective Allowance.  Licensee may credit against Royalties due any Royalties previously reported by Licensee on Sales for Licensed Products returned for credit or refund and on which a refund or credit has been given ("Return Allowance"). The credit shall be taken in the Royalty Payment Period in which the refund or credit is given. Unused credits may be carried forward, but in no event shall Licensee be entitled to a refund of Royalties. No Marketing Fee shall be payable on returned Licensed Products. In connection with the accounts set forth on Schedule M attached hereto, Quiksilver agrees that Licensee may provide the defective allowance percentages, solely in such amounts and to the customers set forth therein. Any changes to the customer list and/or the defective allowance percentage must be pre-approved by Quiksilver, in writing and shall not take effect until an amendment to this Agreement is executed by both parties. The parties agree that accounts which receive defective allowances as set forth on Schedule M may not be eligible for Return Allowances.

4.1.4.  <u>Markdowns and Other Allowances.</u>  Unless written approval for additional credits are provided by Quiksilver, credits for markdowns and other Allowances shall be limited to a total of 20% of Sales each Year during the Initial Term (and each year of the Renewal Term, if License Agreement is renewed), as set forth in Schedule "C."  Credits for markdowns and other Allowances shall be reported, applied and taken against Royalties Payment Period in which the credit is given.

4.1.5.  <u>Time of Royalty Payments and Statements.</u>  On or before the fifteenth (15th) day after each Royalty Payment Period, Licensee shall furnish to Quiksilver a complete and accurate Royalty Statement, with respect to all Sales of Licensed Products during the preceding Royalty Payment Period. On or before the twenty-fifth (25th) day after each Royalty Payment Period, Licensee shall pay to Quiksilver the Royalties shown to be due by the Royalty Statement.

4.2.  <u>Marketing Fee.</u>  Licensee shall pay to Quiksilver a marketing fee of 1% of Net Invoiced Billings ("Marketing Fees").  In consideration of the Marketing Fees payable by Licensee, Quiksilver shall undertake at its sole cost and expense certain marketing activities with respect to its Quiksilver, Roxy and DC Shoes brands, such as: providing Licensee with space at the tradeshows Quiksilver attends during the Term such as, Surf Expo (including tradeshow toolkits), Ecommerce marketing, trade marketing, brand equity marketing, social media,  business and product analytics and general increased awareness initiatives. Quiksilver shall also provide (at its sole cost and expense): (i) access to Quiksilver's sales meetings, at such times and locations as determined by Quiksilver, in its sole discretion; and (ii) design kits for point of sale materials for Licensed Products. Licensee or its agents shall provide (at its sole cost and expense): (i) in-store display/fixtures for the Licensed Products, pre-approved by Quiksilver, in writing; (ii) training seminars at least once per season for sales associates selling the Licensed Products; (iii) co-op advertising as pre-approved by Quiksilver, in writing; (iv) merchandisers to stock the Licensed Products in back storage rooms and on the sales floor at Quiksilver's retail stores located within the United States and, during the Term, Licensee shall make best efforts to engage merchandisers throughout the Territory; and (v) business analysis (dedicated account representative looking at business and working with buyers); and (vi) Licensee shall use its best efforts to hold inventory at regional warehouses however, if Licensee is unable to utilize regional warehouses, Licensee shall pay all taxes, duty, freight and related costs resulting from the absence of such regional warehouses.

4.3.  <u>Guarantees.</u>  Licensee shall pay to Quiksilver minimum Royalties in the amount of the Guarantee(s), if any, set forth in Schedule "A".  No royalties or other payments shall be due to Quiksilver or its Affiliates until the earlier of: (i) the fiscal quarterly period in which the Market Date falls or (ii) the fiscal quarterly period in which Licensee begins shipping products to Authorized Customers. Licensee may not apply to a Guarantee any Royalties other than those Royalties accrued on Net Invoiced Billings of Licensed Products to Authorized Customers in the Distribution Channels in the Territory and during the Term, and with respect to each separate Guarantee, Licensee may only apply such Royalties to the extent such Royalties have been paid on Net Invoiced Billings of the applicable Licensed Products during the period(s), for the Licensed Material and in the country(ies) specified for such Guarantee. No cross-collateralization of Guarantees is permitted, unless expressly authorized in such Schedule. Licensee may not credit against

a Guarantee any Royalties paid on Net Invoiced Billings of Licensed Products (i) to Quiksilver or its Affiliates, (ii) outside of the Territory pursuant to a written distribution permission granted to Licensee by Quiksilver or (iii) during any Sell-Off Period or other period in extension of the Term. If there is a Guarantee Shortfall at the end of any year as set forth in Schedule "C", Licensee shall pay to Quiksilver such Guarantee Shortfall at the same time as Royalties are due for the last Royalty Payment Period of such year, provided, however, that if the License Agreement is earlier terminated by Quiksilver pursuant to Section 9, any and all Guarantees, including any Guarantee Shortfalls, shall become immediately due and payable at the end of that Royalty Payment Period.

4.4.    Taxes.    All amounts payable by Licensee to Quiksilver under the License Agreement shall be made in full without reduction for Taxes, customs duties, claims, counterclaims, deductions, or demands against Quiksilver. The parties acknowledge that no withholding tax is required if both Parties are resident in the United States for tax purposes. Licensee is and shall be solely responsible for any and all Taxes due on (i) Licensee's payments to Quiksilver (other than income tax payable by Quiksilver) or (ii) the manufacture, distribution or sale of the Licensed Products under the License Agreement. If Quiksilver consents in accordance with Section 11.3 to the sublicensing of any rights granted to Licensee to an Affiliate of Licensee, Licensee covenants that it shall not reduce the amounts payable by Licensee to Quiksilver for any withholding tax that may be imposed on any payments by such Affiliate to Licensee.

4.5.    Interest.    Any sums due by Licensee to Quiksilver under the License Agreement not paid by the due date shall bear interest from the due date until paid at the rate which is lesser of (i) ten percent (10%) compounded annually and (ii) the highest rate of interest then permissible by Law.

4.6.    U.S. Dollars: Exchange Rates.    All payments due from Licensee to Quiksilver shall be made in U.S. Dollars. In the event an exchange rate is necessary, Licensee shall use the official buying rate of exchange as published by www.oanda.com, on the last business day of the applicable Royalty Payment Period, and Licensee shall identify such exchange rate on the Royalty Statement. In the event that there is no published exchange rate for a particular currency on such date, then the last exchange rate for such currency published by Reuters shall be used.

4.7.    POS Information.    Licensee hereby agrees to provide to Quiksilver, and grants permission to Quiksilver to receive, review and use, all POS Information requested by Quiksilver about Licensee's sales of Licensed Products to and through Retailers and its own retail stores under the License Agreement. Licensee agrees to notify Retailers that Quiksilver has permission to receive, review and use the POS Information, and agrees to use commercially reasonable efforts to facilitate Quiksilver's receipt of the POS Information whenever request by a Retailer.

4.8.    Forecasts.    If so requested by Quiksilver, Licensee shall provide Quiksilver with Forecasts in such format as requested by Quiksilver.

4.9.    Verification of Licensee's Financial Condition.    From time to time, but no more than once per year, upon request by Quiksilver, Licensee shall furnish to Quiksilver's Credit Department, no later than seven (7) days after receipt of such request, a bank letter for the purpose of demonstrating Licensee's ongoing creditworthiness and ability to perform under the terms of the License Agreement.

## 5.    PREREQUISITES FOR APPROVAL OF LICENSED PRODUCTS.

5.1.    Product Approval. Licensee represents, warrants and covenants that it shall comply, and remain in compliance, with the product approval process, including without limitation, obtaining Quiksilver's prior written approval for each individual Licensed Product at each stage of creation, development and production of the Licensed Product, and at such other times as may be requested by Quiksilver. Licensee shall retain all such documentation of all product approvals for the Audit Period.

5.2.    Identify Manufacture/Supplier of Licensed Products.    Licensee represents, warrants and covenants that it shall place its name, trade name (or Licensee's trademark if Quiksilver has approved such use in writing), address (at least city and state or province), and country of origin, on permanently affixed labeling or hangtags on each Licensed Product and, if the Product is sold to the public in packaging or a container, on such packaging or container, so that the public can identify the supplier of the License Product and the country of origin. Licensee is not required to affix such information on extremely small Licensed Products, provided the information is displayed on the packaging or container for such Licensed Products.

5.3.    Warranty Program. Licensee agrees that all Licensed Products will be packaged with a manual that contains information and instructions regarding the use and programming of the Licensed Products. In addition to information regarding the use and programming of the Licensed Products, the manual will also include details regarding the five (5) year warranty on the Licensed Products that will be provided by Licensee throughout the Territory at its sole cost (the "Warranty"). In connection with the Warranty, Licensee agrees that during the Warranty period, it shall, throughout the Territory: (i) accept and fulfill all repair, maintenance and service requests for the Licensed Products; (ii) accept all returns of Licensed Products; and (iii) make available at least from 9-5 p.m. EST, Monday through Friday, excluding holidays, customer service representatives trained to answer questions and complaints regarding the Licensed Products and details of the Warranty. The obligations set forth in this section shall survive the expiration or termination of this Agreement.

5.4.    Manufacturing and QUEST Program.    Licensee represents, warrants and covenants that it shall comply, and remain in compliance, with the Code incorporated herein by this reference as though set forth in full.

5.5.    Insurance. Licensee represents, warrants and covenants that it shall comply, and remain in compliance, with the insurance requirements set forth on Schedule "K" attached hereto, as amended by Quiksilver from time to time.

## 6.    RECORDS AND AUDITS.

6.1.    Maintenance and Preservation of Records. During the Audit Period and for the duration of any audit initiated during the Audit Period, Licensee agrees to keep and maintain complete and accurate books and records of all transactions relating to the License Agreement, including, without limitation, invoices and other records relating to the following matters; inventory, overall Sales, Landed Sales, FOB Sales, and/or Consumer Sales (as applicable), calculation of Royalties, shipments to and from Licensee, trade and consumer marketing expenditures, and returns.

6.2.   <u>Right to Audit.</u> Quiksilver, or its representatives, shall have the right from time to time, and no more than once per year, during the Audit Period, during Licensee's normal business hours, and upon at least five (5) days prior written communication to Licensee, to conduct and audit to verify Licensee's performance hereunder, including without limitation, examining, copying, making extracts and retaining the same from all such records and any other records which Quiksilver reasonably deems appropriate to verify the accuracy and completeness of Licensee's statements and payments hereunder, including by way of example and not limitation, a complete master inventory list (with both Quiksilver and non-Quiksilver SKUs).   If requested by Quiksilver or its representative (i) the audit may also include an inspection of physical inventory, and (ii) Licensee shall provide data such as Sales, returns and inventory, in electronic form prior to the scheduled audit.   Quiksilver shall bear the cost of any such audit(s) conducted pursuant to this Section 6.2, except as otherwise provided in Section 6.3.  With regard to information relating to sales data or royalty payments made or received in relation to third parties not invoiced with the Licensed Products, Licensee may redact the identity of such third parties from such records, provided such information is shown for purposes of overall reconciliation and completeness, and Licensee furnishes sufficient identification of such date and payments to reasonably satisfy Quiksilver that such information is not related to the Licensed Products.

6.3.   <u>Underpayment Remedies.</u>   Without prejudice to any other right or remedy available to Quiksilver, if any audit pursuant to the preceding Section 6.2 discloses that Licensee has underpaid Royalties to Quiksilver in any Royalty Payment Period (i) Licensee shall pay Quiksilver the amount of any such underpayment, together with interest accrued thereon from the date on which such underpayment occurred until the amount thereof is paid at the interest rate set forth in Section 4.5, and (ii) if such underpayment is in an amount equal to ten percent (10%) or more of the Royalties reported for such Royalty Payment Period, Licensee shall reimburse Quiksilver for the full and reasonable cost of such audit, including the cost of outside auditors, or, if used, Quiksilver employee auditors (in the latter case, the cost shall be calculated at $150.00 per hour per person for travel time during normal working hours and actually working time).  Overpayment of Royalties does not result in an interest credit.

6.4.   <u>Failure to Keep Adequate Records.</u> If Licensee fails to (i) keep, maintain and/or provide adequate books and records for one or more Royalty Payment Periods or (ii) permit Quiksilver or its representatives to exercise its audit rights under Section 6.2, Quiksilver shall be entitled to assess the Royalties owed to Quiksilver for such Royalty Payment Period(s) at an amount determined by Quiksilver in its reasonable discretion, based on, among other factors, the books and records Licensee has kept (if any) and other reasonable accounting assumptions Quiksilver deems appropriate.

6.5.   <u>Payment and Remedies.</u> Licensee shall make any payment or reimbursement required under this Section 6 within thirty (30) days of request from Quiksilver. Quiksilver's acceptance of any payment or reimbursement from Licensee hereunder shall be without prejudice to any legal, equitable, contractual or another right or remedy available to Quiksilver, all of which are cumulative.  Nothing contained in the License Agreement shall preclude Quiksilver from any subsequent challenge of Licensee's Royalty Statements or payments.

7.    **OWNERSHIP**

7.1.    Ownership of Licensed Material.   Licensee acknowledges and agrees that, as between Quiksilver or its Designee, on the one hand, and Licensee, on the other hand: (i) all proprietary rights in and to the Licensed Material, including without limitation, any intellectual property rights pertaining thereto, are exclusively owned by and reserved to Quiksilver or its Designee, (ii) Licensee's use of the Licensed Material shall inure to the benefit of Quiksilver or its Designee, (iii) Licensee shall only make use of the Licensed Material as permitted in a License Agreement, and (iv) Licensee shall not assert or acquire any proprietary rights in the Licensed Material; provided, however, that in the event that Licensee is deemed to have any rights in the Licensed Material, Licensee hereby assigns to Quiksilver or its Designee absolutely and exclusively all of Licensee's right, title and interest in the Licensed Material, throughout the world in perpetuity (or for the full time period otherwise permitted under local Law), in all languages.  In the event any right, title, or interest in any of the Licensed Material is not transferred to Quiksilver or its Designee by operation of assignment, Licensee hereby grants to Quiksilver or its Designee and exclusive, transferable, sublicensable, world-wide, paid-up, royalty-free and irrevocable license to use, exploit and sublicense any and all Licensed Material and related intellectual property rights, whether or not copyrightable, patentable or otherwise protectable under applicable Law, in perpetuity (or for the full time period otherwise permitted under local Law), in all languages.

   7.1.1.  Quiksilver Design Elements.   Without limiting Section 7.1, Licensee further acknowledges and agrees that any and all Quiksilver Design Elements are works made for hire and commissioned works (in accordance with applicable copyright Laws), Quiksilver or its Designee is the commissioning party for, author of, and owner of all rights in, the Quiksilver Design Elements, and that all intellectual property rights in the Quiksilver Design Elements shall vest from inception in Quiksilver or its Designee.  Licensee acknowledges and agrees that it does not own and shall not claim any rights in any Quiksilver Design Elements. To the greatest extent permitted by applicable Law and in the event any right, title or interest in the Quiksilver Design Elements does not vest from inception in Quiksilver or its Designee and remains vested in Licensee, or if the work made for hire doctrine is not effective, Licensee hereby assigns to Quiksilver or its Designee absolutely and exclusively all of Licensee's right, title and interest in the Quiksilver Design Elements, throughout the world in perpetuity (or for the full time period otherwise permitted under local Law), in all languages, and undertakes not to exercise any moral rights in any work comprising or contained in any such Quiksilver Design Elements.  In the event that any right, title or interest in any Quiksilver Design Elements created by Licensee is not transferred to Quiksilver or its Designee by operation of assignment, Licensee hereby grants to Quiksilver or its Designee an exclusive, transferable, sublicensable, world-wide, paid-up, royalty-free and irrevocable license to use, exploit and sublicense any and all Quiksilver Design Elements and related intellectual property rights, whether or not copyrightable, patentable or otherwise protectable under applicable Law, in perpetuity (or for the full time period otherwise permitted under local Law), in all languages.

7.1.2. <u>Third Party Contributions.</u>  If any third party makes or has made any contribution to the creation of any Quiksilver Design Elements, such contribution shall be deemed a work made for hire and a commissioned work owned by Quiksilver or its Designee from inception, or if the work made for hire doctrine is not effective, shall be duly assigned to Quiksilver or its Designee.  Licensee shall require such commissioned party to enter into an agreement providing for ownership by Quiksilver or its Designee of all rights in the contribution.

7.1.3. <u>Covenant of Originality.</u>  Licensee further represents, warrants and covenants that the Quiksilver Design Elements are and shall be original to Licensee or a third party who has agreed in writing that Quiksilver or its Designee owns such contributions; provided, however, this covenant regarding originality shall not extend to any materials Quiksilver supplies to Licensee, but does apply to all derivations, additions, or modifications thereto.

7.1.4. <u>Trademark Assignment.</u>  Without limiting Section 7.1 or any subsections thereunder, if Licensee for any reason is found to have obtained any interest in any Trademark (as well as any future trademark rights created by other use of the Trademarks on or in association with the Licensed Products), Licensee hereby assigns those rights to Quiksilver or its Designee, together with the goodwill attaching to that part of the business in connection with which such Trademark(s) is used.  Quiksilver or its Designee hereby accepts such assignment.

7.2.    <u>Intellectual Property Notices.</u>  All Licensed Products, PA Material, and other matter containing Licensed Material shall bear a properly located, permanently affixed copyright and/or trademark notice as Quiksilver communicates to Licensee.  Licensee shall comply with such instructions as to form, location and content of the notice as Quiksilver may give from time to time.  If an improper copyright or trademark notice appears on, or if a proper copyright or trademark notice is omitted from, any Licensed Product or other matter containing Licensed Material, Licensee agrees at Licensee's expense to take immediate reasonable steps to cure the error within a reasonable timeframe as designated by Quiksilver on all such Licensed Products to be produced or other matter in Licensee's control or in the process of manufacture.

7.3.    <u>Assistance from Licensee.</u>  During the Term, upon Quiksilver's request, Licensee agrees to give Quiksilver written confirmation of the first ship date and shelf date for each Licensed Product.  During the Term and thereafter, Licensee shall promptly execute and provide to Quiksilver such documents and take such actions as Quiksilver reasonably requests or as are necessary or appropriate under applicable Law to vest fully any of the rights to the Licensed Material in Quiksilver or its Designee.  Licensee shall reasonably assist Quiksilver or its Designee in the prosecution, assertion or defense of the rights of Quiksilver or its Designee in the Licensed Material, and shall provide, at reasonable cost to be borne by Quiksilver or its Designee, any evidence, documents and testimony in connection therewith.  Licensee shall not oppose or seek to cancel or challenge, in any forum, any intellectual property ownership, application or registration of Quiksilver or its Designee regarding the Licensed Material.

7.3.1. Licensee may, upon the prior written approval of Quiksilver, take prompt reasonable action to stop any <u>minor</u> infringement, counterfeiting or other misuse of the Licensed Material in connection with the Licensed Products. If Licensee decides to take such action, Quiksilver shall not be expected to incur any costs.

7.3.2. Licensee shall notify Quiksilver immediately by telephone, electronic mail, or facsimile of any and all cases of infringement, counterfeiting or misuse of the Licensed Material. In all cases, Quiksilver shall have the right, but not the obligation, to take any action to stop such activities, or to take complete control over any action initiated by Licensee upon Quiksilver's prior written approval as set forth in Section 7.3.1 above. In any case where Quiksilver takes action to stop such activities that occur in regard to the Licensed Products, Quiksilver shall be responsible for the costs incurred relating to such actions.

7.3.3. Any monetary recovery obtained in actions taken at Licensee's sole expense upon the prior written approval of Quiksilver as set forth in Section 7.3.1 above, shall be retained by Licensee. Any monetary recovery obtained in actions taken at the sole expense of Quiksilver shall be retained by Quiksilver. The allocation between Licensee and Quiksilver of any monetary recovery obtained in actions where expenses have been shared by both parties shall be negotiated in good faith, but in the event that no agreement is reached it shall be submitted to the adjudicating party for allocation and such adjudicating party shall consider both the parties' contribution to costs and the damages suffered by each such party in considering the allocation of the monetary recovery.

7.4.    Withdrawal for Possible Infringement Claim. Quiksilver may withdraw from the scope of a License Agreement any Licensed Material, Licensed Products or Territory the use or sale of which under the License Agreement would, in Quiksilver's good faith judgment, infringe or reasonably be claimed to infringe or violate the rights of a third party. In the case of any withdrawal, the Guarantee(s) shall be adjusted to correspond to the time remaining in the Term of the affected Schedule(s), or the number of Licensed Products and/or Territory remaining under such Schedule(s), at the date of withdrawal. This Section 7.4 does not supersede or otherwise limit the Parties' respective indemnity obligations for third party claims under Section 8. In addition, if Licensee knew or reasonably should have known that its use of the Licensed Material or other conduct would infringe a third party's rights (or reasonably be claimed to infringe or violate a third party's rights), at Quiksilver's option, Licensee shall destroy such Licensed Products, providing a certification signed by an officer of Licensee attesting to such destruction, and Quiksilver shall retain all rights and remedies under the License Agreement.

7.5.    Licensee's Ownership of Certain Intellectual Property. Nothing in a License Agreement shall be deemed to grant Quiksilver rights to any trademark, copyright, trade dress, trade secret, manufacturing process, technology, proprietary technique or patent owned by Licensee, or used by Licensee under a license from a third party, in connection with the Licensed Products or otherwise, which is not derived or adapted from the Licensed Material, or other materials owned, co-owned or licensed by Quiksilver, its Affiliates or its/their licensors.

## 8.    INDEMNITY.

8.1.    Licensee Indemnification. Licensee shall defend and indemnify the Quiksilver Indemnified Entities against and hold them harmless from any and all claims, actions,

liabilities, damages, losses, expenses of any nature (including without limitation, reasonable attorneys' fees), and costs arising out of any third party claim in respect of any actual or alleged breach by Licensee of any agreement, representation, warranty or covenant made in a License Agreement, or otherwise arising out of any activities or omissions of Licensee, its officers, directors, agents, subcontractors or employees in connection with a License Agreement, including but not limited to claims of product liability and/or claims arising out of Licensee's failure to obtain the full assignment of rights from third parties as described in Section 7.1.2.

8.2.   Quiksilver Indemnification. Quiksilver shall defend and indemnify the Licensee Indemnified Entities against and hold them harmless from any and all claims, actions, liabilities, damages, losses, expenses of any nature (including without limitation, reasonable attorneys' fees), and costs arising out of any third party claim that Licensee's use of the Licensed Material approved in accordance with a License Agreement infringes any right granted by Quiksilver to a third party. Quiksilver shall not be liable for any claim for indemnity hereunder which arises out of Licensee's failure to obtain the full assignment of rights as referenced in Section 7.1.2, or wherein Licensee knew or reasonably should have known that its use of the Licensed Material or other conduct would infringe or violate a third party's rights.

8.3.   Procedures for Indemnification.  The Party seeking indemnification shall notify the other Party in writing as soon as reasonably practicable of any claim for indemnity of which it becomes aware.

 8.3.1.  The indemnifying Party's choice of counsel must be reasonably acceptable to the Party seeking indemnity and not in conflict with any interest of the Party seeking indemnity.  The indemnifying Party shall have control of the defense of any claims or actions provided that such Party shall consult in a meaningful way with the Party seeking indemnity in respect of the defense of any claim, and further, provided, that the indemnifying Party shall obtain the written consent of the Party seeking indemnity prior to making any admission or entering into any settlement or compromise (such consent not to be unreasonably withheld or delayed).  The Party seeking indemnity shall not make any admission of liability, agreement or compromise with any person, body or authority in relation to any third party claim without prior consultation with, and agreement of, the indemnifying Party, which agreement shall not be unreasonably withheld or delayed.

 8.3.2.  The Party seeking indemnity shall, at the indemnifying Party's reasonable expense, provide all reasonable assistance in defending any action or claim.

8.4.   Purchase of Licensed Products.  If, as a result of a claim for which Quiksilver indemnifies Licensee pursuant to Section 8.2, Licensee cannot sell Licensed Products containing any representation of the Licensed Material approved by Quiksilver in accordance with a License Agreement, Quiksilver's obligation to Licensee in respect of the unsaleable Licensed Products shall be limited to the purchase of such unsaleable Licensed Product at 35% below U.S. wholesale price.

8.5.   No Other Indemnity Obligations.  No other obligation for indemnity, whether equitable or otherwise, exists between the Parties except as specified in this Section 8.

9.   **TERMINATION.**

9.1.    Mutual Right to Terminate. Either Party may terminate a License Agreement at any time if (i) the other Party breaches a material term of the License Agreement, and (ii) such breach is not cured within thirty (30) days following written notice thereof, in accordance with Section 12.5, from the non-breaching Party to the breaching Party (or, is not cured within forty-five (45) days in the case of a non-monetary breach which cannot reasonably be cured within the initial thirty (30) day period, if the breaching Party in good faith begins efforts to cure the breach and thereafter proceeds diligently to complete the cure to the non-breaching Party's satisfaction within the said forty-five (45) day period). The foregoing shall be without prejudice to any other rights or remedies available to the Parties, except as set forth below in Section 9.3.

9.2.    Immediate Termination. Quiksilver may at any time terminate a License Agreement effective upon written notice thereof to Licensee in accordance with Section 12.5, upon the occurrence of one or more of the following events (provided, however, that with respect to Section 9.2.3 below such termination shall occur automatically and immediately without the need for any notice):

9.2.1.    Licensee manufactures, sells or delivers, without Quiksilver's prior written authorization, any Merchandise containing representations of the Licensed Material, or any other material proprietary to Quiksilver, its Affiliates, or its/their licensors, other than the Licensed Products licensed and approved in accordance with a License Agreement;

9.2.2.    Licensee knowingly delivers Licensed Products outside the Territory or knowingly sells Licensed Products to a third party when Licensee knows or should know in the exercise of prudent business judgment that such sales ultimately will result in delivery outside the Territory, unless pursuant to a written distribution permission or separate written license agreement with Quiksilver or any of Quiksilver's Affiliates;

9.2.3.    Licensee fails to pay its debts as they become due, or makes a general assignment for the benefit of creditors; or any proceeding is instituted by or against Licensee (and is not dismissed within ninety (90) days) seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debt under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of any order for relief of the appointment of a receiver, trustee or another similar official for all or for any substantial part of its property or assets;

9.2.4.    Licensee, due to material changes in its financial position, or for other reasons, is unable to meet Licensee's obligations under a License Agreement, or is unable to provide Quiksilver with assurance reasonably satisfactory to Quiksilver that Licensee will be able to meet such obligations;

9.2.5.    Licensee breaches any material term of a License Agreement and the breach is not reasonably capable of being cured; or

9.2.6.    Licensee breached any material term of another License Agreement with Quiksilver and/or a Quiksilver Affiliate, and Quiksilver has terminated such License Agreement for cause.

9.3. <u>Licensee's Early Termination Right</u>. Licensee may terminate this License Agreement after Year 3 (January 1, 2018 – December 31, 2018) of the Initial Term ("Early Termination Right"), with such termination to be effective as of December 31, 2018, provided that Licensee provides written notice to Quiksilver in accordance with Section 12.5 by March 1, 2018.

9.4.    <u>Quiksilver's Control of Licensed Material.</u>  In the event that Quiksilver terminates a License Agreement, Licensee hereby waives any claim for injunctive relief to contest Quiksilver's determination that a termination event has occurred or to otherwise affect Quiksilver's full and absolute control of the Licensed Material and Licensee hereby waives any right to any such determination; provided, however, Licensee may bring an action for damages, but prior to and during any such action, Quiksilver shall have full and absolute control over the Licensed Material.   Quiksilver may suffer material and irreparable damages if Licensee breaches or threatens to breach a License Agreement, including if Licensee continues to manufacture, offer for sale, sell, advertise, promote or distribute Licensed Products upon the expiration or termination of a License Agreement, and Quiksilver may have no adequate remedy at law because it may be difficult or impossible to establish the full and precise monetary value of such damage.  Licensee agrees that, in addition to any and all other remedies available to Quiksilver, Quiksilver shall have the right to seek to have any such activity by Licensee restrained by appropriate judicial relief, including, but not limited to, a temporary restraining order, a preliminary injunction, a permanent injunction, or such other alternative relief as may be appropriate, without the necessity of Quiksilver posting any bond.

## 10. EFFECT   OF   EXPIRATION   OR   TERMINATION   OF   LICENSE AGREEMENT.

10.1.   <u>Reversion of Rights to Quiksilver.</u>  Upon the expiration of the Term, or if a License Agreement is earlier terminated pursuant to Section 9, upon the effective date of such termination: (i) Licensee shall cease any and all uses of the Licensed Material, including without limitation, any manufacturing (including by Facilities), advertising, sales and distributing of Licensed Products, (ii) all rights granted to Licensee under the License Agreement shall revert to Quiksilver, and (iii) Quiksilver shall be entitled to retain all monies paid to Quiksilver.  If Quiksilver duly terminates a License Agreement prior to the expiration of the Term pursuant to Section 9, all unpaid Royalties, and Guarantees (or portions thereof) shall become immediately due and payable; provided, however, that if Licensee duly terminates the License Agreement because of a material, uncured breach by Quiksilver, and Licensee is in full compliance with all of the terms and conditions of the License Agreement, Licensee shall not be required to pay any unpaid Guarantee obligation applicable to the remaining Term from and after the date of termination.  Upon a withdrawal pursuant to Section 3.2.1 and provided that Quiksilver has not materially breached the terms of the License Agreement,: (i) Licensee shall immediately cease any and all uses of and activities within (as applicable) such withdrawn Licensed Material, Licensed Product, Distribution Channel and/or country(ies) of the Territory, (ii) all rights granted to Licensee with respect thereto shall

revert to Quiksilver, and (iii) Quiksilver shall be entitled to retain all monies paid to Quiksilver with respect thereto.

10.2.   <u>Disposition of Reproduction Materials: Return or Destruction of Licensed Material.</u>   Upon the expiration of the Term, or if the License Agreement is earlier terminated pursuant to Section 9, upon the effective date of such termination, Licensee shall (i) destroy, efface or erase (as applicable) all Reproduction Material, including deleting any related digital files, and (ii) destroy all artwork, Style Guides, clips or other items containing the Licensed Material. Licensee shall furnish to Quiksilver a certificate, signed by an officer of Licensee, attesting to any destruction provided in the preceding sentence.

10.3.   <u>Inventory Statement.</u>   Within thirty (30) days prior to the expiration of the Term (and again upon expiration), or if a License Agreement is earlier terminated, upon the effective date of such termination, Licensee shall provide Quiksilver with a full written statement of any then-existing unsold inventory of Licensed Products in Licensee's possession or control, currently in production and any additional information reasonably requested by Quiksilver.

10.4.   <u>Sell-Off Period.</u>   If Licensee has complied with all of the terms and conditions of a License Agreement, including without limitation, providing a written inventory statement to Quiksilver at the times prescribed in Section 10.3, then subject to Quiksilver's prior written consent, Licensee shall have the non-exclusive right during the Sell-Off Period to sell-off such inventory of Licensed Products;  provided however, the Licensee's shipment volume of Licensed Products during the Sell-Off Period shall not exceed the volume shipped during the corresponding time period of the previous year. Nothing herein shall be construed as giving Licensee the right to continue manufacture of the Licensed Products during the Sell-Off Period. Licensee shall furnish Quiksilver with a Royalty Statement and pay all Royalties in respect of such Sales in accordance with the License Agreement.  All rights and remedies available to Quiksilver during the Term shall be equally available to Quiksilver during the Sell-Off Period.  Licensee shall cease all sales of Licensed Products upon the expiration of the Sell-off Period, and destroy any unsold inventory of the Licensed Products in Licensee's possession or control. Licensee shall furnish to Quiksilver a certificate, signed by an officer of Licensee attesting to any destruction provided in the preceding sentence.  However, Licensee may retain sufficient inventory to comply with ongoing warranty obligations to consumers for the Licensed Products, if applicable.

10.5.   <u>Purchase of Inventory.</u>   Upon the expiration of the Term or Sell-Off Period (if applicable), or if the License Agreement is earlier terminated, upon the effective date of such termination, Quiksilver and its Affiliates shall have the right, but not the obligation, to purchase any unsold inventory of Licensed Products remaining in Licensee's possession or control, at 35% below wholesale price.

10.6.   <u>Renewal of License Agreement.</u>   The Term of this License Agreement may be extended beyond the Initial Term as set forth in Schedule "C" upon mutual written agreement by Licensee and Quiksilver at any time prior to the expiration of the Initial Term, provided that Licensee has met at least seventy five percent (75%) of its Target Sales of the Initial Term and is in general good standing with respect to its Royalty obligations to Quiksilver. The Guarantee for each Year of a renewal term, if any, shall be

mutually agreed upon between the parties ninety (90) days prior to the expiration of the Initial Term.

## 11.  NON-ASSIGNABILITY.

11.1.  No License Transfer Without Consent.  The License Agreement, and the license granted to Licensee, are personal to Licensee, who was specifically chosen by Quiksilver to be licensed because of Licensee's and certain of Licensee's employees' particular expertise and ability to design,  produce and sell Licensed Products in ways that maximize the value of Licensed Products, and to otherwise perform the License Agreement.  Licensee shall not authorize, cause or otherwise engage in, or be subject to, any License Transfer without Quiksilver's prior written consent, to be granted or withheld in Quiksilver's absolute discretion.  Any purported License Transfer without such consent shall be deemed null and void and shall result in the automatic and immediate termination of the License Agreement as of the date of the License Transfer.

11.2.  Notice of proposed License Transfer.  Licensee shall provide Quiksilver with at least thirty (30) days' prior written notice of any proposed License Transfer, and concurrently therewith, such information and documentation as is reasonably necessary to enable Quiksilver to evaluate the proposed License Transfer.  Quiksilver's consent (if given) may be subject to such terms and conditions as Quiksilver deems appropriate.

11.3.  Conditions for Affiliate Sublicensing.  In the event Quiksilver consents, pursuant to Sections 11.1 and 11.2, to a License Transfer by means of a sublicense to an Affiliate of Licensee, then (i) each such sublicense shall be memorialized in a writing, signed by the Parties and such Affiliate, in a form satisfactory to Quiksilver, and pursuant to which among other things, such Affiliate shall agree to be bound by all of the terms and conditions of the License Agreement applicable to such proposed sublicense, and (ii) Licensee and each such Affiliate shall provide Quiksilver with any further documentation, guaranties, and/or indemnifications Quiksilver may require.  Licensee shall at all times remain directly liable to Quiksilver for the full and complete performance of Licensee's rights and obligations under the License Agreement, notwithstanding any sublicense to an Affiliate of Licensee as provided herein or any direct right of action which Quiksilver may have against such Affiliate.  Licensee represents, warrants and irrevocably and unconditionally guarantees that any and all Affiliates sublicensed will observe and perform all of Licensee's obligations under the License Agreement, including, but not limited to, the provisions governing approvals, and compliance with approved Samples, applicable Laws, indemnification and all other provisions, and that they otherwise will adhere strictly to all of the terms thereof and act in accordance with Licensee's obligation.  Any involvement of an Affiliate in the activities related to a License Agreement shall be deemed carried on pursuant to such a sublicense and thus covered by such guarantee; however, unless Licensee has obtained Quiksilver's prior written consent to sublicense an Affiliate in each instance, such Affiliate shall be deemed to be included in the term "Licensee" for all purposes under a License Agreement, and Quiksilver may treat such unapproved involvement of the Affiliate as a breach of the License Agreement.

## 12.  GENERAL.

12.1. <u>Amendments.</u>   No provision of a License Agreement may be modified, supplemented or amended except by a written instrument duly executed by each of the Parties thereto.

12.2. <u>Confidential Information.</u>   Licensee agrees not to disclose to any third party any Confidential Information without obtaining Quiksilver's prior written consent; provided, however, that the License Agreement may be disclosed on a need-to-know basis to Licensee's attorneys and accountants who agree to be bound by this confidentiality provision.

    12.2.1. Exceptions to Confidentiality.   The obligations of confidentiality contained in a License Agreement shall not apply to information: (i) which is in the public domain; or (ii) which comes into the public domain other than due to a fault on the part of Licensee and/or its Affiliates; or (iii) which is received by Licensee from a third party who did not receive it in confidence: or (iv) which is necessarily disclosed pursuant to a statutory or regulatory obligation, or to comply with the valid order of a court of competent jurisdiction, in which event Licensee shall notify Quiksilver in advance and seek confidential treatment of such information.

    12.2.2. Term of Confidentiality Obligation. The obligations of confidentiality shall remain in full force and effect for a period of three (3) years following the expiration or earlier termination of a License Agreement.

12.3.    <u>Preservation of Quiksilver's Goodwill.</u>   The rights and powers retained by Quiksilver, and the limitations and obligations placed on Licensee, are necessary to protect the Licensed Material and all intellectual property rights associated therewith, including without limitation, the preservation of the goodwill and good name of the applicable Quiksilver Entities. Therefore, Licensee shall not engage in actions that would impair the legal status, or detract from or impugn the public acceptance and popularity thereof. Without limiting the foregoing, Licensee agrees to refrain from any action or inaction that would reduce or negatively affect the goodwill of the applicable Quiksilver Entities or associated with the Licensed Material. Licensee acknowledges and agrees that such prohibited conduct includes the production, marketing, advertising, sale or use of any Licensed Products: (i) in any manner that is inconsistent with the core values associated with the Licensed Material or the applicable Quiksilver Entities, (ii) in any manner that disparages the Licensed Products or the Quiksilver Entities, including by engaging in the practice of "dumping" and Licensed Product; and/or (iii) in any manner that does not make clear that the Licensed Material is owned or co-owned by or licensed to the applicable Quiksilver Entities. In addition, Licensee agrees that it will not produce, market, advertise or sell items of Merchandise embodying or bearing any artwork or other representation that Quiksilver determines, in its reasonable discretion, is confusingly similar to the Licensed Material (or other proprietary material owned or co-owned by or licensed to the applicable Quiksilver Entities) so as to suggest association with or sponsorship by any of the applicable Quiksilver Entities. The parties acknowledge and agree that the foregoing limitation does not apply to elements of trade dress owned or created by Licensee prior to the Effective Date. In addition, Licensee shall not use or co-mingle with the Licensed Material of the Licensed Products, and shall use commercially reasonable efforts to keep others from using or co-mingling with the Licensed Material or the Licensed Products, any other trademarks, logos or properties

(and related intellectual property), whether owned by Licensee or a third party, in a manner that suggests association with or sponsorship by any of the applicable Quiksilver Entities. As used in this Section 12.3, (x) "Quiksilver Entities" shall mean Quiksilver, its Affiliates and/or the licensors (if any) of each and (y) "dumping" shall mean the distribution of the Licensed Products at volume levels significantly above Licensee's prior sale practices with respect to the Licensed Products as to suggest that the Licensed Products are second rate, low quality, low value, unwanted or counterfeit products so as to disparage Quiksilver, the Quiksilver Entities or the Licensed Products; provided, however, that nothing contained therein shall be deemed to restrict Licensee's absolute discretion to sell the Licensed products at such legal prices as it may determine

12.4.   Waivers.   No release, discharge or waiver of any provision of a License Agreement shall be enforceable against or binding upon either Party unless in writing and executed by a duly-authorized officer of the Party. Neither the failure to insist upon strict performance of any of the terms or conditions thereof, nor, in the case of Quiksilver, the acceptance of monies or Royalty Statements due thereunder, shall be deemed a waiver of any rights or remedies or a waiver of any breach or default of any kind or nature.

12.5.   Notices.   Unless otherwise specified in a License Agreement, all notices either Party is required to send to the other Party thereunder shall be transmitted in writing and shall be deemed served (i) when hand delivered, (ii) upon delivery when sent by express mail, courier, overnight mail or other recognized overnight delivery service, charges prepaid, (iii) five (5) business days following the date mailed when sent by United States mail, postage prepaid, or (iv) two (2) business days following the date of transmission (with delivery confirmation) when sent by facsimile transmission, addressed as provided in Schedule "L" attached hereto, Either Party may designate a different address by written notice to the other in accordance with this Section 12.5.

12.6.   Entire Agreement.   The provision of a License Agreement (including the Schedule(s) and Attachment(s) to the Schedule(s) contain the entire agreement between the Parties with respect to the subject matter thereof, and the License Agreement supersedes and replaces any and all prior or contemporaneous agreement and negations between the Parties, whether written or oral, with respect to the subject matter thereof. No statement or inducement with respect the subject matter thereof by any Party or by any agent or representative of any Party which is not contained in the License Agreement shall be valid or binding between the Parties.

12.7.   Relationship of Parties: No Third Party Beneficiaries.   The Parties hereby acknowledge that their relationship is that of licensor and licensee and that nothing herein is intended or shall be construed or deemed to create, or to express an intent to create, a partnership, joint venture, fiduciary, employment, franchise or agency relationship of any kind or nature whatsoever between the Parties.   Nothing in a License Agreement is intended or shall be deemed to confer any rights or benefits upon any Person other than the Parties thereto, or to make or render any such other Person a third-party beneficiary of a License Agreement, except to the extent that an Affiliate of either Party, or any officer, director, or employee of a Party or its Affiliate has any rights, including a right to be indemnified, under a License Agreement

12.8.   Construction.   This License Agreement has been fully reviewed and negotiated by the Parties thereto and their respective counsel.   In interpreting the License Agreement, no weight shall be placed upon which Party thereto or its counsel drafted the provision

being interpreted. In addition, there shall be no presumption make or inference drawn because of the drafting history of the License Agreement, or because of the inclusion or deletion of a provision not contained in a prior draft.

12.9.   Severability.  If any term or provision of a License Agreement is deemed invalid or unenforceable by a court of competent jurisdiction, such term or provision shall be deemed to the severable from the other terms and provisions thereof, and the remainder of the License Agreement shall be given effect as if the Parties had not included the served term or provision therein.

12.10.  Approvals.  To be valid, any approval by Quiksilver under a License Agreement must be in writing unless otherwise expressly provided for in the License Agreement. Quiksilver may grant or deny any approvals in its absolute discretion, unless otherwise expressly provided in the License Agreement.

12.11.  Force Majeure.  If due to war, warlike conditions, revolt, insurrection, strikes or other activities or acts of god beyond the control of either Party, the Parties are prevented from maintaining normal relations, Licensee shall to the best of its ability continue activities in conformity with the License Agreement until normal relations can be resumed and in every possible way safeguard the interests of Quiksilver. If, due to a force majeure event, Royalties accruing to Quiksilver under the License Agreement cannot be transferred out of any country(ies) in the Territory, such Royalties shall be deposited in a separate bank account in the name of Quiksilver until normal conditions are restored and Licensee shall use its best efforts to negotiate satisfactory interest terms for such deposit money, which interest shall accrue and belong to Quiksilver.

12.12.  Governing Law and Venue.  The License Agreement shall be deemed to be an executor agreement entered into the State of California and shall be governed by and interpreted in accordance with the Laws of the State of California applicable to agreements made and to be fully preformed in California without regard to any choice of law principles or statutes thereof. Any legal preceding arising in connection with the License Agreement shall be submitted to the exclusive jurisdiction of the Orange County, California courts and Licensee hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non convenes.

12.13.  Limitation of Liability.  Neither Party shall be liable to the other for any punitive, exemplary, consequential, incidental, indirect or special damages, or lost profits: provided, however, that (i) a claim by Quiksilver for any unpaid Guarantee(s) shall not be deemed a claim for lost profits or to be otherwise barred under this Section 12.14, and (ii) the limitation on damages shall not apply to a Party's indemnity obligations under Section 8.

12.14.  Survival.  The provisions of a License Agreement which, by their nature, are intended to survive the expiration or termination of a License Agreement shall survive the expiration or termination of a License Agreement indefinitely or for such shorter period of time as may be set forth in any such provision.

12.15.  Counterparts; Facsimile Signature.  A License Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same instrument.  Facsimile or PDF signatures to a License Agreement shall be effective.

12.16.  Attorneys' Fees.  If either party commences any legal action, suit or proceeding to enforce or interpret a License Agreement or any of the terms or provisions thereof, then

in addition to any damages or remedies that may be awarded to the prevailing party therein, the prevailing party will be entitled to have and recover from the losing party the prevailing party's reasonable outside attorneys' fees and costs incurred in connection therewith.

QUIKSILVER, INC.

By: _____

Name: _Richard Shields_

Title: _Chief Financial Officer_

Date: _June 16, 2014_

E. GLUCK CORPORATION

By: _____

Name: _EUGEN GLUCK_

Title: _CHAIRMAN C.E.O._

Date: _____

## Schedule A

### Royalties

| | |
|---|---|
| **Royalties** | Royalties will be paid on Net Invoiced Billings. |
| **Royalty Rate** | Year 1: 8% of Net Invoiced Billings with respect to Net Invoiced Billings up to $2,200,000; 9% of Net Invoiced Billings with respect to Net Invoiced Billings between $2,200,001 and $6,700,000; and 8% of Net Invoiced Billings with respect to Net Invoiced Billings in excess of $6,700,000

Year 2: 8% of Net Invoiced Billings with respect to Net Invoiced Billings up to $3,300,000; 9% of Net Invoiced Billings with respect to Net Invoiced Billings between $3,300,001 and $6,700,000; and 8% of Net Invoiced Billings with respect to Net Invoiced Billings in excess of $6,700,000

Year 3: 8% of Net Invoiced Billings with respect to Net Invoiced Billings up to $4,400,000; 9% of Net Invoiced Billings with respect to Net Invoiced Billings between $4,400,001 and $6,700,000; and 8% of Net Invoiced Billings with respect to Net Invoiced Billings in excess of $6,700,000

Year 4: 8% of Net Invoiced Billings

Year 5: 8% of Net Invoiced Billings |
| **Advance** | No Advance |
| **Guarantee** | Year 1: $200,000
Year 2: $300,000
Year 3: $400,000
Year 4: an amount equal to 75% of Year 3 actual earned Royalties
Year 5: an amount equal to 75% of Year 4 actual earned Royalties |
| **Target Sales** | Year 1: $8,500,000 wholesale sales
Year 2: $10,100,000 wholesale sales
Year 3: $11,700,000 wholesale sales
Year 4: $12,500,000 wholesale sales
Year 5: $13,200,000 wholesale sales |

## Schedule B

### Authorized Customers and Distribution Channels

1.  Americas

Better Department Stores, such as Macy's
Surf and skate shops
Specialty Stores
Duty Free
Sporting Goods Stores
Fine Jewelers
Warehouse Clubs (Costco only)
Off-price retailers
Mid-Tier for DC Shoes only (JC Penny's and Kohl's only)

2.  Europe/Middle East:

Better department stores
Surf and skate shops
Specialty stores
Duty-Free
Sporting Goods Stores
Fine Jewelers
Footwear chains

3.  Asia/Pacific

Better department stores
Surf and skate shops
Specialty stores
Duty Free
Sporting Goods Stores
Fine Jewelers
Club stores
Footwear chains
Off-price retailers
Mid-tier department stores (for DC only)

Provided, that, with respect to the Asia/Pacific region, Licensee may not sell Licensed Products to the following retail accounts: Surf Dive n Ski; Jetty Surf; Rush; Beach Culture; and Ozmosis.

4.  E- Commerce

Licensee shall be permitted to sell the Licensed Products to e-commerce sites similarly situated to the authorized channels listed above. If Quiksilver, in its sole discretion, does not deem an e-commerce site to be similarly situated to one of the authorized channels listed above, it may direct Licensee to cease all sales to such e-commerce site as soon as reasonably practical but in no event more than ninety

(90) days following such communication.    Notwithstanding the foregoing, Licensee shall not be permitted to sell the Licensed Products on www.eBay.com.

5.  Distributors

All third party distributors (each a "Distributor") must be pre-approved in writing by Quiksilver in each instance.  Quiksilver shall have the right to withhold or withdraw approval of any proposed Distributor, and may predicate its approval on any terms or conditions as Quiksilver shall determine in its sole discretion.  Licensee shall remain primarily obligated to Quiksilver under the License Agreement notwithstanding Quiksilver's approval of a Distributor and Licensee shall ensure that any approved Distributor complies with all applicable terms and conditions of the License Agreement and all laws, regulations and government rules applicable to the Licensed Products and/or their distribution.  Licensee shall ensure that any approved Distributor does not alter or modify the Licensed Products, or add any labels, hangtags, or other items featuring Distributor's corporate identification.  If an approved Distributor engages in conduct that would be a breach of the License Agreement if Licensee engaged in such conduct, Licensee shall fully cooperate with Quiksilver to ensure that such conduct ceases immediately.

## Schedule C

### Initial Term

Effective Date: June __, 2014
Span of Initial Term: 5 Years from Effective Date through December 31, 2020
      Year 1: Effective Date - December 31, 2016
      Year 2: January 1, 2017 – December 31, 2017
      Year 3: January 1, 2018 – December 31, 2018
      Year 4: January 1, 2019 – December 31, 2019
      Year 5: January 1, 2020 – December 31, 2020
End Date of Initial Term: December 31, 2020

### Renewal Term

Effective Date: January 1, 2021
Span of Renewal Term: 3 Years from January 1, 2021 through December 31, 2023
      Year 1: January 1, 2021- December 31, 2021
      Year 2: January 1, 2022 – December 31, 2022
      Year 3: January 1, 2023 – December 31, 2023
End Date of Renewal Term: December 31, 2023

## Schedule D

**Market Date**

The Market Date is October 1, 2015.

## Schedule E

### Product Categories

Digital watches; analog watches; and clocks except for clocks compatible with electronic devices such as iPods or similar devices for playing and storing digital content and files.

**<u>Schedule F</u>**

**Prohibited Manufacturing Countries**

Licensee hereby represents, warrants and covenants that it will not, in connection with the License Agreement or any other business transaction of Licensee, manufacture or do business in or with any country which is on the U.S. State Department's list of embargoed countries, which may be found at: http://www.pmddtc.state.gov/embargoed_countries/, as updated or amended from time to time.

## Schedule G

**Marketing Fee**
Marketing Fee is 1% of Net Invoiced Billings less Close-Out Sales. Except as otherwise set forth in the Standard Terms and Conditions, Licensee has no further marketing or promotion commitment.

## Schedule H

**Samples**

Three (3) sets of Samples per each style and sku number.

## Schedule I

## Territory

| North/South/Central America | | Europe | | Asia/Pacific | |
|---|---|---|---|---|---|
| 1 | USA & Territories | 1 | Poland | 1 | Australia |
| 2 | Canada | 2 | Czech Republic | 2 | Korea |
| 3 | Mexico | 3 | Slovakia | 3 | India |
| 4 | Argentina | 4 | Baltic Islands | 4 | Japan |
| 5 | Aruba | 5 | Latvia | 5 | New Zealand |
| 6 | Barbados | 6 | Ukraine | 6 | Philippines |
| 7 | Colombia | 7 | Bosnia | 7 | Indonesia |
| 8 | Costa Rica | 8 | Russia | 8 | Malaysia |
| 9 | Dominica | 9 | Cyprus | 9 | Thailand |
| 10 | Ecuador | 10 | Estonia | | |
| 11 | El Salvador | 11 | Spain | **Africa** | |
| 12 | Guatemala | 12 | France | 1 | Kenya |
| 13 | Honduras | 13 | Germany | 2 | Botswana |
| 14 | Jamaica | 14 | United Kingdom | 3 | Ghana |
| 15 | Panama | 15 | Italy | 4 | South Africa |
| 16 | Trinidad & Tobago | 16 | Netherlands | 5 | Namibia |
| 17 | Peru | 17 | Greece | 6 | Swaziland |
| 18 | Brazil* | 18 | Belgium | 7 | Zimbabwe |
| 19 | Chile | 19 | Switzerland | 8 | Nigeria |
| 20 | Bermuda | 20 | Finland | 9 | Morocco |
| 21 | Bahamas | 21 | Ireland | 10 | Egypt |
| 22 | Antigua | 22 | Denmark | | |
| 23 | Belize | 23 | Sweden | **Middle East** | |
| 24 | Bolivia | 24 | Norway | 1 | Pakistan |
| 25 | Bonaire | 25 | Romania | 2 | Turkey |
| 26 | Cayman Islands | 26 | Serbia | 3 | Israel |
| 27 | Curacao | | | 4 | Kuwait |
| 28 | Grenada | | | 5 | Kingdom of Saudi Arabia |
| 29 | Nicaragua | | | 6 | United Arab Emirates |
| 30 | Guam | | | 7 | Bahrain |
| 31 | Guatemala | | | 8 | Lebanon |
| 32 | Paraguay | | | 9 | Jordan |
| 33 | St. Croix | | | | |
| 34 | St. John | | | | |

| 35 | St. Kitts | | | | | | |
|----|-----------|---|---|---|---|---|---|
| 36 | St. Lucia | | | | | | |
| 37 | St. Martin | | | | | | |
| 38 | St. Thomas | | | | | | |
| 39 | Tortola | | | | | | |
| 40 | Uruguay | | | | | | |
| 41 | Venezuela | | | | | | |
| 42 | Suriname | | | | | | |
| 43 | Guyana | | | | | | |

*The parties acknowledge and agree that in addition to the terms set forth in the Agreement, sales to Quiksilver's Affiliates in Brazil shall be F.O.B.

## Schedule J

**Trademarks**

**QUIKSILVER**



**ROXY**



**DCSHOECOUSA**

## Schedule K

**Insurance**

During each Year of the Term, Licensee shall obtain and maintain at its own expense the following insurance programs provided by insurers rated A.M. Best, A-VII or better. Licensee shall submit to Quiksilver a copy of the fully paid policies or certificates of insurance by no later than the first day such coverage takes effect each Year of the License.  Such policies must contain express conditions that: (1) Quiksilver be given written notice within thirty (30) days of any modification or termination of any program of insurance, and (2) Licensee's insurance providers agree to waive any rights of subrogation they may have against Quiksilver.

Licensee shall be required to maintain the following insurance program: Liability Insurance for which Licensee's insurance will be primary.  When providing the required limit of insurance using a combination of primary and umbrella and/or excess policies, Licensee will confirm on the certificate of insurance that the umbrella and/or excess policies follow form to the primary insurance and will drop down in the event of exhaustion of the primary insurance.  Such liability insurance will endorse Quiksilver, Inc. and its Affiliates as additional insureds. Such insurance must include: general liability insurance and products liability in an amount of at least Five Million Dollars ($5,000,000.00) per occurrence and Ten Million Dollars ($10,000,000.00) in the aggregate.

## Schedule L

### Notices

**If to Quiksilver:**

Quiksilver, Inc.
15202 Graham Street
Huntington Beach, CA 92649
Attn: General Counsel

**If to Licensee:**

Mr. Mark Odenheimer
E. Gluck Corporation
29-10 Thomson Street
Long Island City, NY 11101

Stern & Schurin LLP
c/o Richard S. Schurin
410 E. Jericho Tpke
Mineola, NY 11501
Tel. 516-248-0300
rschurin@sternschurin.com

## Schedule M

**Defective Allowance**

| ACCOUNT | DEFECTIVE ALLOWANCE (BY PERCENT) |
|---|---|
| AAFES | 0.50 |
| ALCO STORES | 5.00 |
| AMAZON US | 0.50 |
| BARRIK | 3.00 |
| BEALLS | 3.00 |
| BELK | 5.00 |
| BI MART | 2.00 |
| BON-TON | 4.50 |
| BOSCOV'S | 3.00 |
| CENTURY 21 | 2.00 |
| COSTCO | 8.00 |
| COAST GUARD | 0.50 |
| DILLARDS | 4.00 |
| FRED MEYER | 3.00 |
| FRY'S ELECTRONICS | 5.00 |
| GORDMAN'S | 3.00 |
| GREEN SYNDROME | 3.00 |
| HSN | 7.00 |
| JC PENNEY | 5.00 |
| L & R DISTRIBUTORS | 2.00 |
| MACY'S | 5.00 |
| MARINES | 0.50 |
| MEIJER | 2.00 |
| NEW CITY | 2.00 |
| NEXCOM | 0.50 |
| QVC US | 2.00 |
| RIVOLI | 2.00 |
| SEARS | 3.00 |
| SHOPKO | 3.00 |
| SPORTS AUTHORITY | 2.00 |
| STAGE STORES | 2.00 |
| STEIN MART | 2.50 |
| TIME & TECHNOLOGIES | 2.00 |
| TFG | 3.00 |
| WGT | 2.00 |
| W.P.C. | 2.00 |
| WAL-MART CANADA | 4.00 |
| ZAPPOS | 2.00 |