1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3    IN RE:                      )   Case No. 15-11880 (BLS)
                                 )   Chapter 11
4    QUIKSILVER, Inc., *et al.*,  )
                                 )
5                 Debtors.       )   Courtroom No. 1
                                 )   824 Market Street
6                                )   Wilmington, Delaware 19801
                                 )
7                                )   December 1, 2015
                                 )   10:30 A.M.
8
                        TRANSCRIPT OF HEARING
9             BEFORE HONORABLE BRENDAN L. SHANNON
                 UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtors:        Skadden Arps Slate Meagher & Flom
12                           By:  VAN DURRER, ESQUIRE
                             300 South Grand Avenue, Suite 3400
13                           Los Angeles, California 90071

14                           Kirkland & Ellis LLP
                             By:  ROSS KWASTENIET, ESQUIRE
15                           300 North LaSalle
                             Chicago, Illinois 60654
16
     ECRO:                   DANA MOORE
17
     Transcription Service:  Reliable
18                           1007 N. Orange Street
                             Wilmington, Delaware 19801
19                           Telephone:  (302) 654-8080
                             E-Mail:  gmatthews@reliable-co.com
20

21   Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
22

23

24

25

2

```
 1   For Creditors Committee: Akin Gump
                              By:  ABID QURESHI, ESQUIRE
 2                                 MEREDITH LAHAIE, ESQUIRE
                              One Bryant Park
 3                            Bank of America Tower
                              New York, New York 10036
 4
     For U.S. Trustee:        Office of the United States Trustee
 5                            By:  MARK KENNEY, ESQUIRE
                              844 King Street, Suite 2207
 6                            Wilmington, Delaware 19801

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1

<u>INDEX</u>

2

<u>Page</u>

3  <u>NOTICE OF AGENDA MATTERS</u>:
   For the Debtors, by Mr. Durrer
4  For the Debtors, by Mr. Kwasteniet
   For Creditors Committee, by Mr. Quershi
5  For U.S. Trustee, by Mr. Kenney
   For Creditors Committee, by Ms. LaHaie

6

| WITNESS FOR THE | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| DEBTOR: | | | | | |
| Linnsey Caya | | 34 | 49 | | |
| Dewey Imhoff | | 57 | 72 | | |

9

   <u>EXHIBITS</u>:
10 U.S.T. #1 - Draft FTI Report- 11/20/15

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commence at 11:35 a.m.)

2        (Call to order of the Court)

3            THE COURT:  Please be seated.

4        Mr. Durrer, good to see you.  My apologies for any

5   inconvenience with the juggling of the schedules; I have a

6   trial coming on.

7            MR. DURRER:  Completely understandable, Your Honor.

8   No problem.

9            Van Durrer, Skadden, Arps, Slate, Meagher & Flom, on

10  behalf of the Quiksilver debtors.  We're here, Your Honor, on

11  the amended notice of agenda, which is Docket Number 507.

12           What we propose to do, Your Honor, is to just take

13  the uncontested matters first, and then come back to the

14  contested matter --

15           THE COURT:  That sounds great.

16           MR. DURRER:  -- of which there is one.

17           So, with no further adieu, Your Honor, the first

18  matter, the Rule 2015.3 waiver motion, we did submit a

19  certificate of no objection.  There were no objections filed.

20  We can hand up an order, or Your Honor can just --

21           THE COURT:  I think I signed it.

22           MR. DURRER:  Okay.

23           THE COURT:  And if you don't see it on the docket by

24  the end of the day, just let us know.

25           MR. DURRER:  Okay.

1          THE COURT:  But I got a bunch of those that I signed

2    yesterday afternoon.

3          MR. DURRER:  Oh, terrific.

4          THE COURT:  So it should be on there.

5          MR. DURRER:  Yeah, we hadn't seen them yet, but

6    that's obviously fine.

7          THE COURT:  (indiscernible)

8          MR. DURRER:  The KEIP and KERP is Matter Number 2,

9    which we'll pass to the end.  There's one objection by the

10   U.S. Trustee.

11         THE COURT:  Right.

12         MR. DURRER:  And then Number 3, which is the motion

13   to file certain exhibits related to that under seal, which we

14   had also submitted --

15         THE COURT:  And I think --

16         MR. DURRER:  -- a certificate --

17         THE COURT:  -- I signed the order, as well.

18         MR. DURRER:  Okay.  And then, lastly, Your Honor, we

19   have the two -- well, I'll take these together, 4 and 5, they

20   -- because they go together.

21         We have the solicitation motion, with respect to the

22   disclosure statement.

23         THE COURT:  Uh-huh.

24         MR. DURRER:  And also, we have the rights offering

25   motion.  Again, both of these are uncontested.  I'm going to

1  let others speak.  But what I thought made the most sense was

2  just to describe at a high level where we are, with some

3  changes to the disclosure statement.

4          THE COURT:  Okay.

5          MR. DURRER:  And the disclosure statement changes

6  sort of come in three parts.  And I don't -- I was just

7  looking again to see if we actually need to do a page-turn; I

8  actually don't think we do, but there are a couple things I

9  will highlight.

10          One, as of right now, we still have a contest.  And

11  Your Honor may have seen the statement filed on behalf of the

12  creditors' committee with respect to their reservation of

13  rights.

14          THE COURT:  I saw that.

15          MR. DURRER:  So we still do have a controversy with

16  respect to the ultimate treatment under the plan.  The -- we

17  are, you know, still proceeding on course, on our dual path

18  of the plan sponsor transaction with Oaktree, and alternative

19  pathways, but we have not yet reached a meeting of the minds,

20  in terms of a consensual approach overall.

21          So what we've done is -- and I'm looking at a black

22  -- which -- I can hand up a black-line.

23          THE COURT:  Okay.

24      (Participants confer)

25          MR. DURRER:  It comes in two flavors.  May I

1  approach, Your Honor?

2         THE COURT:  Sure.  Is this the latest and greatest?

3         MR. DURRER:  Yes.

4         THE COURT:  Thank you.

5         MR. DURRER:  The -- let me turn your attention

6  first, Your Honor, to Page 99 of the black-line.

7      (Participants confer)

8         MR. DURRER:  So this is the -- basically, a

9  committee -- the committee's statement.  We negotiated this

10  language with the creditors' committee, and are, you know,

11  happy with it, insofar as it expresses the committee's

12  present point of view.  We, obviously, are hopeful that we'll

13  continue to work with the committee in developing, you know,

14  a consensual point of view as we move forward.  But that

15  expresses their point of view.

16         And then, in the valuations sections, Your Honor --

17  I'm turning back now to page -- Pages 94 and 95 -- we also

18  added some additional disclosure with respect to just some

19  additional details on valuation; specifically, the more

20  granularity, in terms of the approach to evaluating the stock

21  of the foreign subsidiaries, we've talked about before; and

22  then, also analyzing a potential diminution in value claim

23  that the senior secured notes may have as a consequence of

24  the DIP loan and the case and the automatic stay, et cetera,

25  et cetera, under 361.

1          So that, basically, Your Honor, is one general topic

2   of the changes to the disclosure statement.

3          THE COURT:  Okay.

4          MR. DURRER:  In addition, the senior secured notes'

5   agent requested some plan clarifications.  They're more plan

6   changes than they are disclosure statement changes, but

7   they're, obviously, comparable changes, primarily with

8   respect to their fees.  And some of those are still being

9   worked out, Your Honor, but it's, again, not going to be a

10  disclosure issue, as much as it's going to be a plan

11  treatment.

12         And to the extent that we can't work out the

13  details, to the extent that the senior secured note agent

14  still has an issue, they can obviously object to the plan and

15  say, you know, my fees should be paid in XYZ fashion.  So I

16  don't think it's -- again, not a -- they didn't file a

17  disclosure statement objection; there's no disclosure issue.

18         And then, lastly, Your Honor -- and this is the one-

19  pager -- we've been working -- there's been a couple of

20  rounds back and forth with the companies' China joint venture

21  partner.  There's been an ongoing dispute and litigation that

22  hasn't found its way to this Court yet.  But basically, we

23  included some additional disclosure regarding that

24  litigation.  And the marks that you see on the one-pager

25  include some further tweaks that they requested overnight,

1  which we were happy to accommodate; not really substantive,

2  but just by way of further clarifying the respective parties'

3  positions.

4         And then, lastly, Your Honor -- and I might invite

5  the plan sponsor's counsel to speak on this, as well -- the -

6  - as I mentioned, there have been discussions ongoing, but

7  there -- as a result, in part, of those ongoing discussions

8  among the debtors, the committee, and the plan sponsor, the

9  plan sponsor has agreed to increase the size of the rights

10  offering, as well as to increase the amount of cash payable

11  to unsecured creditors that flows through that rights

12  offering; and also to allow certain unsecured creditors, the

13  bondholders, to participate --

14         THE COURT:  (indiscernible)

15         MR. DURRER:  -- in that rights offering, as well.

16  So I don't know -- I'll let Ross speak to that.  But that

17  will involve, Your Honor, further -- this is sort of late-

18  breaking news.  And that will be further changes to the

19  disclosure statement.  And what we would propose is that we

20  would exchange -- because it will change some of the math.

21         THE COURT:  Uh-huh.

22         MR. DURRER:  But I think that -- I think that all

23  the parties, the respective investment bankers are generally

24  in agreement on the math, while they still have different

25  views of, you know, valuation and diminution --

1          THE COURT:   (indiscernible)

2          MR. DURRER:   Yeah.  We've got to do that math, and

3    so we're hoping to get that done later today and circulate it

4    to parties, so that we submit, you know, a CONO [sic] with

5    respect to the disclosure statement at that point, so that we

6    can still hit our targets.  But I'll let Oaktree's counsel

7    speak to this, the details.

8          THE COURT:  Mr. Kwasteniet.

9          MR. KWASTENIET:  Good morning, Your Honor.  Just --

10   Ross Kwasteniet from Kirkland & Ellis for the record.  Just

11   briefly, a few points to echo Mr. Durrer's comments.

12         Oaktree has agreed to increase the cash component of

13   the distribution to unsecured creditors from $7.5 million to

14   $12.5 million.

15         We've also agreed that the bondholders will have the

16   right to participate in up to $12.5 million of the rights

17   offering.  So, to the extent that they -- you know, they

18   believe that the equity is valuable, and that's a valuable

19   proposition, they'll have an opportunity to participate to

20   that extent.

21         We have, as Mr. Durrer noted, been in confidential

22   settlement discussions with the committee.  We're a

23   significant ways apart, but we're committed to continuing to

24   try to bridge the gap, if we can.  But Oaktree felt that,

25   because this was something we were willing to do, that it was

1  appropriate to include, particularly the rights offering

2  piece, at this time, given that we are -- the debtor is going

3  to be going out and soliciting and inviting participation in

4  the rights offering.

5          You know, not to say that the terms of that couldn't

6  change in connection with a deal, in which case we'd be back

7  before Your Honor with some modifications, potentially.  But

8  at least from our perspective, from the standpoint of a deal

9  that Oaktree is willing to defend at confirmation, in the

10 absence of a global settlement and compromise, we wanted to

11 put our best foot forward and put that on the table now, so

12 that the debtor could include that in their solicitation.

13         THE COURT:  So noted.  Okay.

14         MR. KWASTENIET:  Your Honor, also, from Oaktree's

15 perspective, we've obviously read the committee's

16 perspective, their statement on overall value.  Again, if we

17 need to litigate that at the end of the case, we can.

18 There's a couple of points that we wanted to put on the

19 record at the disclosure statement hearing:

20         First is Oaktree disagrees, and I believe the

21 committee disagrees -- or the company disagrees with the

22 committee's overall valuation perspective.  We don't think

23 that that will be borne out in the expert testimony; we don't

24 think it will be borne out by the parallel marketing process,

25 which we understand is happening, you know, in conjunction

1  with the sale process -- or with the confirmation process.

2          We also disagree with the weighting of value to the

3  foreign equity because it really kind of -- I mean, we're

4  talking about the unencumbered assets.  It's really the one-

5  third of the equity in the foreign subsidiaries.  And so the

6  committee, I think, is taking a position that a large

7  percentage of the total enterprise value should be allocated

8  to the foreign, and therefore inflating, you know, the value

9  of that unencumbered foreign equity.  We disagree with that.

10          But Your Honor, even regardless, if you look at the

11  UCC's perspective on unencumbered value, and if you take that

12  as a given, we think that there are material deducts that

13  need to be taken into account, and should, under the Code, be

14  taken into account.

15          For example, the debtors' latest projections show

16  that there will be approximately $46 million in unpaid admin

17  and priority claims at the end of the case.  It's assuming a

18  fully drawn DIP, Your Honor.  So these would be obligations

19  that the reorganized debtors would be assuming and committing

20  to pay under the plan.  This would be sort of the Oaktree-led

21  company paying those obligations.  And those are obviously

22  unsecured claims, and per the Code, they just come ahead in

23  the waterfall of the general unsecured creditors.  So we

24  think that's a material deduct, in terms of what could

25  potentially be available to the non-admin, non-other-priority

1  GUC claims.

2          And then that also leaves the question of diminution

3  in value, which the senior secured noteholders have

4  diminution in value, adequate protection liens on

5  unencumbered value.  It's not an issue for today, but Your

6  Honor, we -- it's safe to say that Oaktree's perspective --

7  and I think that's shared by the debtors -- is that there are

8  substantial diminution value claims that could be asserted

9  here.

10          All of which leads Oaktree to conclude that its

11  settlement proposal, as embodied in the to-be-revised plan,

12  reflecting the increased cash consideration and the rights to

13  -- the right to participate in the rights offering, as I

14  described, is a more than fair and more than appropriate

15  settlement, recognizing that today is the day for people to

16  state their positions, and we'll be back before Your Honor on

17  all of this.

18          THE COURT:  You may consider the well poisoned.

19          MR. KWASTENIET:  Thank you.

20      (Laughter)

21          THE COURT:  Mr. Quershi, good morning.

22          MR. QUERSHI:  Good morning, Your Honor.  For the

23  record, Abid Quershi, Akin, Gump, Strauss, Hauer & Feld, on

24  behalf of the official committee.  And I certainly will not

25  try to poison the well any further, Your Honor, but --

1          THE COURT:  Here's your chance.

2          MR. QUERSHI:  Let me start by saying we're obviously

3    very pleased that the numbers, in terms of unsecured

4    recoveries, are moving in the right direction.  As always,

5    and as Your Honor well knows, we will, right up until the

6    finish line, continue to do our best to get to a consensual

7    resolution of these cases; that's the hope.  I will tell Your

8    Honor that, standing here today, I'm not terribly optimistic,

9    but nonetheless, that hope remains.

10          If I could, just very briefly provide Your Honor a

11   bit of a preview of what, from the committee's perspective,

12   we think is to come.  And this tracks to the three issues

13   that we had and have now resolved in the disclosure

14   statement.

15          THE COURT:  (indiscernible) purposes of disclosure.

16          MR. QUERSHI:  Right.  And there are three:  Total

17   enterprise value, diminution in value, and the value of the

18   unencumbered equity in the foreign subsidiaries.

19          So, first, to total enterprise value, not

20   surprisingly, Your Honor, it is our view that the debtors'

21   financial advisor has materially undervalued the enterprise.

22   The sale process that has been undertaken effectively

23   required a minimum bid to, in essence, clear Oaktree of $735

24   million.  And so, in the face of that, to suggest, as the

25   debtors' financial advisor does, that the midpoint total

1  enterprise value is $546 million, to us, just doesn't make

2  sense.  That's an issue that we will be arguing about, if we

3  get to a contested confirmation hearing.

4         Second, with respect to the diminution claim, what

5  struck us, Your Honor, in this disclosure statement in

6  particular, is that the debtors have already concluded that

7  the prepetition secured parties' collateral has diminished in

8  an amount that exceeds the value of the unencumbered foreign

9  equity.

10         It is surprising to us that the debtors, A, would

11  reach that conclusion after this case being in existence for

12  barely over two months, I believe it is, but more surprising

13  that they would reach that conclusion before the secured

14  parties have filed a diminution motion, before they've

15  claimed any diminution exists.

16         And for the debtors to so heavily put their finger

17  on the scale at this stage, in favor of the secured parties,

18  struck us as surprising, and frankly, disappointing.  We also

19  think it's wrong as a matter of law.  I'm not going to get

20  into the details now; that's not for today.  That, too, will

21  be an issue at confirmation.

22         Lastly, Your Honor, the value of the foreign equity.

23  In the debtors' disclosure statement, they estimate that the

24  one-third of that foreign equity that is unencumbered has a

25  value of $39 million.  And again, they offer the opinion in

1  the disclosure statement that, after a relatively short

2  duration in Chapter 11, that entire $39 million of

3  unencumbered value has been subsumed by this yet-to-be-filed

4  diminution claim.  And again, we think they're wrong on both

5  counts.

6        We will offer expert testimony at confirmation that

7  the unencumbered foreign equity has a value substantially in

8  excess of the $39 million, and that that, in fact, is value

9  that should be available to unsecured creditors in this case.

10        And we also agree on the law, as well as on the

11  numbers, with respect to, certainly, the debtors' view with

12  respect to diminution in value.  But ultimately, it will be

13  the prepetition secured parties who we anticipate will file

14  the appropriate motion.

15        So, in sum, Your Honor, unfortunately, as we sit

16  here today, I -- it is our expectation that it will be a

17  heavily contested confirmation hearing.  We have had a

18  preliminary discussion with the debtors about a schedule,

19  both in terms of desired hearing dates, as well as some

20  sensible litigation milestones along the way for the exchange

21  of expert reports and the like.

22        As always, it remains our hope that we can get

23  things done consensually, but we do need to plan and prepare

24  for the other alternative.  So we're happy, Your Honor, to

25  take up the scheduling issues whenever the Court would like.

1   And I think we'll be able to resolve with the debtors the

2   appropriate deadlines as we lead up to them.

3           THE COURT:  Let me ask you a question.

4           MR. QUERSHI:  Sure.

5           THE COURT:  Because we're going to talk a little bit

6   about scheduling and mechanics, all of which I don't think

7   we'll have any issues with.  But you bring it up, and I've

8   been wondering about it as we've had this colloquy, about the

9   amount of time --

10          MR. QUERSHI:  Sure.

11          THE COURT:  -- that we'll need, if it's, indeed, a

12  fully contested confirmation, and if there's a valuation

13  fight.

14          MR. QUERSHI:  Yeah.

15          THE COURT:  And again, I think I -- generally, in

16  this, my practice, as you know, and I think everybody knows,

17  is to be guided, frankly, by the professionals.

18          MR. QUERSHI:  Right.

19          THE COURT:  You know your cases better than I do.

20  And then I know to apply an appropriate multiplier to the

21  time (indiscernible)

22      (Laughter)

23          THE COURT:  But I think we don't need to have that

24  discussion right now, and there are a couple of ways that we

25  can deal with this issue.  I do want, certainly, to set the

1 confirmation and apply a measure of time.

2          The other thing that I would inclined to do would be

3 to maybe be advised from the parties right after the new year

4 --

5          MR. QUERSHI:  Sure.

6          THE COURT:  -- about what you expect.

7          MR. QUERSHI:  Well, we have had a preliminary

8 discussion about that, Your Honor.  And I think me and the

9 debtors share the view -- and perhaps this is without the

10 multiplier by the Court -- but at this stage, I think our

11 view is that a three-day confirmation hearing seems

12 sufficient.

13          We had circled, obviously subject to the Court's

14 availability, the end of the last week of January as both --

15 more or less, I think what the debtor was hoping for, in

16 terms of a confirmation hearing, and also enough of a runway

17 to get the discovery done that we need to.

18          We certainly have a sense of what the hearing will

19 entail, in terms of experts, but not yet in terms of other

20 fact witnesses.  So I do think revisiting that in early

21 January will be useful.  But I think our best guess, and I

22 would think this will -- I hope this will hold, would be

23 three days.

24          THE COURT:  Okay.  All right.  That sounds fine.  I

25 mean, I'm confident that I can accommodate that.  And if it

1  needs to expand, then we'd be able to do so.  But there's a

2  lot we can also do --

3         MR. QUERSHI:  Sure.

4         THE COURT:  -- with (indiscernible) three days, and

5  we'll go from there.  But I think setting aside time, as I

6  would be guided by the parties right now, would make sense.

7  And again, if that needs to shift, then you can be confident

8  I'll accommodate you.

9      (Participants confer)

10        MR. QUERSHI:  Okay.  Thank you, Your Honor.

11        THE COURT:  Great.  Thank you.

12        Mr. Durrer.

13        MR. DURRER:  Let's stay away from the wells, Your

14  Honor.  But yeah, just following up on Mr. Quershi's

15  comments, we had tentatively agreed that three days made

16  sense.

17        The good news is this isn't a case where we have a

18  particularly stratified capital structure; it's sort of, you

19  know, a large secured creditor and the unsecured bonds.  So

20  in terms of that last week of January, that also -- that

21  matches up with our milestones.  And so I don't know if Your

22  Honor has, you know, three days that we can talk about today.

23        We were also going to request just omnibuses, middle

24  January and middle of February, just anticipating, you know,

25  future calendar, in any event.

1          THE COURT:  Counsel?

2          MR. KWASTENIET:  I apologize, Your Honor.  I haven't

3 been involved in scheduling discussions.  My belief or

4 recollection is that we've got an outside closing date of

5 February -- I believe it's February 4th or 5th.  And so we'll

6 want to confer with debtors' counsel and committee's counsel

7 because we'll want to make sure we have an opportunity to get

8 a final order prior to the closing date, which may, with this

9 --

10         THE COURT:  Well, that's either with a waiver, or

11 that's with 14 days, and 14 days puts us in a whole other

12 section of January.

13         MR. KWASTENIET:  Right.  That's my point, Your

14 Honor.  So I'd like an opportunity to confer with counsel and

15 with my client --

16         THE COURT:  We can do -- we can do --

17         MR. KWASTENIET:  -- on the timing --

18         THE COURT:  -- a couple of things.

19         MR. KWASTENIET:  -- of confirmation.

20         THE COURT:  The first is that, with some juggling,

21 which I'm prepared to do, I can certainly accommodate three

22 days in either the week of the 19th or the week of the 25th

23 or the first week of February.  It's not great, but I'll be

24 able to do that, and so I would need to a do a little bit of

25 moving.

1       I also think that I may have an issue with the

2   courtroom because I think I have a much overdue audio system

3   upgrade, so I may have to juggle and go to somebody else's

4   courtroom.  But that may be the easiest way to deal with

5   this, is to give you guys a couple of minutes to confer on

6   that.

7       Again, to build in confirmation to conclude and have

8   an order with 14 days before the 4th of February means we're

9   in a completely different time zone.  And with the discovery

10  and other issues that may be out there, that's a discussion

11  you all ought to have.

12      MR. KWASTENIET:  Understood, Your Honor, which is

13  why I wanted to raise it now.

14      THE COURT:  Appreciate you raising it.

15      MR. KWASTENIET:  Okay.

16      THE COURT:  All right.  Well, why don't we -- why

17  don't we leave scheduling issues aside for a moment, and

18  we'll take them up (indiscernible) --

19      MR. DURRER:  Well, what I was going to -- what I was

20  going to perhaps suggest, Your Honor, fully differently, is,

21  since we'll be circulating a revised form of disclosure

22  statement anyway, maybe we'll table that larger scheduling

23  issue.  But if we could nail down the omnibuses in the

24  meantime, maybe we can do that.  And we'll come back to Your

25  Honor with a collective recommendation.

1          THE COURT:  A mid-January date?

2          MR. DURRER:  Yeah, mid-January and mid-March -- or

3    mid-February, Your Honor.  Apologies.

4          THE COURT:  How about the 13th of January?

5          MR. DURRER:  The 13th sounds great.

6          THE COURT:  That's a Wednesday.

7          MR. DURRER:  What time, Your Honor?

8          THE COURT:  11:30.  And then the 10th of February.

9          MR. DURRER:  Thank you, Your Honor.

10         THE COURT:  At 11:30, as well.

11         MR. DURRER:  Okay.

12         THE COURT:  And you can use them for any omnibus

13   purpose.

14         MR. DURRER:  Thank you, Your Honor.

15         THE COURT:  And again, if you want to get back to

16   me, I can do -- just so that you know -- the 27th, 28th,

17   29th.  And I could put you into the week of -- it would start

18   on the 19th; the 19th of January, I could give you three days

19   then.  And I would be able to accommodate three days in the

20   first week of February, as well.  So why don't you confer on

21   that, and let me know sooner, rather than later, because that

22   does involve moving a whole bunch of different hearings, most

23   of which should be pretty routine.  Okay?

24         MR. DURRER:  Understood, Your Honor.

25         So I think, with that, Your Honor, we would -- I

1   don't know if Your Honor wants, you know, a more fulsome

2   presentation on the rights offering or the disclosure

3   statement, but I don't believe there are any objections that

4   are extant.

5          THE COURT:  No.  I would ask if anyone else wishes

6   to be heard with respect to the debtors' request for approval

7   of their second amended disclosure statement.

8      (No verbal response)

9          THE COURT:  Very well.

10          Based upon the record before me, I am prepared to

11  approve the second amended disclosure statement.

12          But given the resolution of open issues and any

13  formal or informal objections, I will simply find that the

14  debtors have carried their burden under Bankruptcy Code

15  Section 1125; in that, the Court finds that the disclosure

16  statement contains information adequate to permit a

17  hypothetical creditor or investor to make an informed

18  decision to accept or reject the plan.

19          In addition, I've had an opportunity to review the

20  draft and proposed forms of the solicitation materials and

21  ballots, and I find that they are appropriate and consistent

22  with the code and accepted practice.  So I am prepared to

23  approve and authorize the disclosure statement.

24          I would further note that counsel, at this hearing,

25  has walked the Court through some of the latest changes,

1  which are material, frankly, to the transaction as originally

2  proposed.  And I understand that that is part of an ongoing

3  process, and I'll allow that process to play out, as I would.

4  But other than that, I see no reason to hold up the

5  disclosure statement.

6          The time line that the debtor has suggested is

7  appropriate, and I will look for guidance from the parties as

8  to what the back end of that is, for a starting date for a

9  confirmation hearing.  And then the other dates would follow

10 from there, but I think we've got closure on that.

11         So I would take that order under certification of

12 counsel at an appropriate time.  Okay?

13         MR. DURRER:  Thank you, Your Honor.  One moment,

14 Your Honor?

15         THE COURT:  Sure.

16     (Participants confer)

17         THE COURT:  I'd also warn you that clock has

18 stopped.

19     (Laughter)

20         MR. DURRER:  We figured that out awhile ago.

21         So that takes us back, Your Honor, to Matter Number

22 2, which is the debtors' key employee incentive and key

23 employee retention plan motion.  And where we are, Your

24 Honor, Your Honor, presumably has seen the objection filed by

25 the U.S. Trustee --

1          THE COURT:  I did.

2          MR. DURRER:  -- at where is it -- Docket Number 495.

3          Your Honor, basically, the -- and obviously, the

4   U.S. Trustee will speak for itself.  But the objection raises

5   primarily two issues:  One with respect to the KERP, and one

6   with respect to the KEIP.

7          With respect to the KERP, the issue raised is that

8   there was a concern, I believe, that there might be insiders

9   lurking in the KERP.  And the U.S. Trustee requested, you

10  know, to put us to our proof with respect to that, and so we

11  do have a proffer with respect to that issue by Ms. Linnsey

12  Caya, the general counsel.  And obviously, the U.S. Trustee

13  will be entitled to cross-examine.

14         In addition, Your Honor, with respect to the KEIP, I

15  think that the concern raised was that this was, you know,

16  less of an incentive program because the incentives described

17  in the plan are more by way of lay-ups, as opposed to real

18  hurdles that need to be overcome.  And we, likewise, have a

19  proffer, both from Ms. Caya and from Mr. Imhoff, our FTI

20  Consulting expert, who helped us develop the plan with

21  respect to those issues.

22         So we didn't think it made sense to, you know,

23  burden the Court with a reply because those are basically the

24  two issues, and they're really evidentiary issues, which

25  we're prepared to address in light of the case law, which I

1  think is pretty well established on those points.

2          THE COURT:  Okay.  Mr. Kenney, any objection to

3  proceeding by way of proffer?

4          MR. KENNEY:  No, Your Honor.

5          THE COURT:  Very well.  You may proceed, Mr. Durrer.

6          MR. DURRER:  Thank you, Your Honor.

7          So, first, Your Honor, we have a proffer by Ms.

8  Linnsey Caya, who, as I mentioned, is the general counsel of

9  the company.

10          If called to testify, Ms. Caya would testify that

11  her title is Executive Vice President, General Counsel, and

12  Secretary of Quiksilver; that she's held that position since

13  October 2014.  Prior to that, she served as Assistant General

14  Counsel and General Counsel of the Americas Division, from

15  2006.

16          Ms. Caya worked for the corporate transaction group

17  of an international law firm prior to that, and received her

18  JD from Georgetown University, and her BA from Boston

19  College.  And she purposely asked me to excise the dates.

20          Ms. Caya would further testify that, in the ordinary

21  course of her duties --

22          THE COURT:  And you're welcome to ask.

23      (Laughter)

24          UNIDENTIFIED:  Gentlemen never ask.

25          MR. DURRER:  In the ordinary course of her duties,

1  she is familiar with the day-to-day operations of the

2  company, as well as the various positions, job

3  responsibilities, and authorities of the participants, both

4  with respect to the KEIP and the KERP.  Ms. Caya would

5  testify that she is familiar with the KEIP and KERP motion

6  filed with the Court, and is also familiar with the objection

7  raised by the U.S. Trustee.

8         Ms. Caya would testify that, with respect to the job

9  responsibilities of the three KEIP participants, she would

10 observe the following:

11        With respect to Mr. Healy, the president of the

12 company, his job duties have expanded significantly post-

13 petition in three critical areas.  First -- and what's

14 important to note, as well, is that the majority of the

15 companies' business remains outside of the United States.

16        And so, first, with respect to maintaining client

17 confidences, that his job is expanded to preserve wholesale

18 accounts and purchase orders.  Most of the companies' clients

19 were ready to withdraw orders following the news of the

20 commencement of the Chapter 11 cases.  And convincing the

21 customers to continue to support the business requires --

22 required -- requires significant time and attention from the

23 president directly, in the form of weekly account meetings,

24 constant dialogue with customers, and additional follow-up to

25 ensure continued customer support.

Case 15-11880-BLS    Doc 516    Filed 12/02/15    Page 28 of 83

28

1        Second, maintaining vendor support, employee
2    retention, and hiring more employees.  And also, developing
3    relationships with prospective new talent to promote the
4    companies' products during the pendency of the bankruptcy
5    cases is, likewise, critical, in order to ensure the
6    turnaround of the debtors' businesses.  And each of these
7    areas also requires the active involvement of the president.
8        Third, the president has also overseen efforts to
9    meet with and maintain communication with various
10   constituencies in the bankruptcy cases, in order to ensure
11   that the company continues to progress towards a timely
12   emergency from Chapter 11 with the business intact.
13       Ms. Caya would further testify with respect to the
14   Chief Financial Officer of the Americas, Mr. Bruenjes, who is
15   the second KEIP participant, that his job duties prior to the
16   bankruptcy filing included, among other things:
17       Oversight of certain strategic planning, compliance,
18   financial reporting, financial planning, and sales
19   administrative initiatives for the Americas segment.  For
20   example, Mr. Bruenjes was primarily responsible for leading
21   the planning, budgeting, and forecasting process for the
22   region.
23       Developing annual capital plans.
24       Meeting with and approving terms for vendors and
25   suppliers.

1          Reviewing monthly financial statement and
2   disclosures.
3          Completing a monthly SG&A review.
4          Making credit decisions for customers.
5          And generally, being a business partner to the CEO.
6          Following the petition date, Mr. Bruenjes' job
7   duties as the Americas CFO have further expanded to include:
8          Fulfillment of bankruptcy-specific reporting
9   requirements.
10         Testifying before this Court in support of various
11  relief requested -- or required by the company to sustain
12  operations, such as the critical vendor program, debtor-in-
13  possession financing, formulation of the plan itself,
14  including plan mechanics and implementation.
15         Liaising with key stakeholders, including the
16  creditors' committee, potential bidders and plan sponsor, and
17  providing requesting due diligence -- financial diligence and
18  other due diligence for all of those parties.
19         Mr. Bruenjes has, likewise, been also involved
20  during the Chapter 11 in developing the go-forward DIP
21  budget, more specifically, and monitoring compliance with the
22  same, developing the business plan for utilization, and as
23  serving for the foundation for the plan of reorganization,
24  and maintaining vendor and customer relationships
25  specifically in connection with the critical vendor program.

1          Lastly, Ms. Caya would testify that, with respect to

2    herself, her job duties prior to the bankruptcy filing

3    included, among other things:

4          Management and oversight of the global legal

5    department, licensing department, and compliance department.

6          Implementation and oversight of corporate policies

7    and procedures.

8          Oversight of global intellectual property asset

9    portfolio.

10          Oversight of global litigation matters and strategic

11    transactions.

12          And negotiation, drafting, and review of commercial

13    contracts.

14          Following the petition date, Ms. Caya's job duties

15    have expanded to include:

16          Oversight of various litigation and operational

17    issues associated with the Chapter 11 cases.

18          Preparation of materials in connection with

19    bankruptcy-specific reporting requirements.

20          Coordination of responses to diligence requests and

21    discovery from various constituencies and interested

22    purchasers or sponsors.

23          Coordination of internal and external counsel, with

24    respect to elements of the Chapter 11 case; and testifying

25    before this Court in connection with the Chapter 11 cases, as

1  well.

2          With respect to the KERP, Your Honor, Ms. Caya would

3  further testify that each of the KERP participants reports to

4  a senior member of the management team on a variety of

5  projects for which such participant is responsible.

6          The company, Ms. Caya would testify, has various

7  tiers of corporate responsibility, including vice presidents,

8  senior vice presidents, and executive vice presidents, and

9  then the CEO and president themselves, sitting at the very

10  top tier.  And each of those is a tier.  So this -- starting

11  at the top, Ms. Caya would testify that the CEO and president

12  form tier one; and then executive vice presidents, tier two;

13  senior vice presidents, tier three; and then vice presidents,

14  tier four.

15          Certain of the KEIP -- the KERP participants are

16  vice presidents who are directly responsible -- directly

17  responsive to senior vice presidents or executive vice

18  presidents, who, in turn, report to the chief executive

19  officer and the president.  Ms. Caya would testify that none

20  of the KERP participants are directors or officers of any

21  debtor, none of the KERP participants participate in meetings

22  of the boards of -- board of directors of any debtor.  None

23  of the KERP participants have sole decision-making

24  responsibility with respect to any of the debtors' businesses

25  or business lines.

1    One of the KERP participants previously held the

2    title of assistant secretary for certain debtors, solely for

3    administrative purposes, but that person no longer serves in

4    that capacity, and has not conducted any activities in

5    connection with that capacity in the post-petition period.

6    Ms. Caya would further testify that the company has

7    historically maintained a delegation of authority policy

8    since the spring of 2015, which limits the number of

9    individuals within the corporate structure who have authority

10    to make significant commitments which bind the company,

11    create potential liability, or authorize the expenditure of

12    corporate funds and resources.

13    And with respect to that tier four level and below,

14    none of the KERP participants which fall into that category

15    or below may bind the company to material commitments beyond

16    a threshold level of $500,000 or less.  And categories of

17    such material commitments would include, among other things,

18    contractual commitments, store leases, capital expenditures,

19    material purchases, or legal settlements.  Ms. Caya would

20    further testify that such amount, in the context of the

21    company as a whole, is *de minimis* and not material.

22    Finally, Ms. Caya would testify with respect to the

23    KERP participants, that each of those participants performs

24    job functions which are vital to the debtors' continuing

25    operations, and that the debtors' ability to continue their

1  ongoing business, continue their compliance with the DIP

2  budget, and make progress towards the goals set forth in the

3  business plan and projections developed by the debtors and

4  their advisors.

5        In the absence of the KERP, it is Ms. Caya's belief

6  that a number of these key personnel would seek other

7  employment during this critical phase in the debtors'

8  reorganization.  In fact, Ms. Caya would testify that earlier

9  iterations of the KERP included individuals that have since

10 department the company, and that includes at least two

11 employees.  And a further loss of key personnel would

12 seriously impede the debtors' ongoing operations and

13 reorganization efforts.

14       And that is the sum and substance, Your Honor, of

15 Ms. Caya's testimony.

16       THE COURT:  Okay.  Mr. Kenney, do you wish to cross-

17 examine?

18       MR. KENNEY:  Thank you, Your Honor.  I would like to

19 cross-examine the witness, please.

20       THE COURT:  Very good.  Ms. Caya.

21       THE COURT:  Very good, Ms. Caya.  Welcome.  Please

22 remain standing.  Swear the witness.

23          LINNSEY CAYA, DEBTORS' WITNESS, SWORN

24       THE CLERK:  Please state and spell your name for the

25 record.

1    THE WITNESS:  Linnsey Caya; L-i-n-n-s-e-y; C-a-y-a.

2    MR. KENNEY:  May I proceed, Your Honor?

3    THE COURT:  You may.

4                    CROSS EXAMINATION

5  BY MR. KENNEY:

6  Q.  Good afternoon, Ms. Caya.  Let me start with the KERP and

7  I know we're trying to be sensitive to avoid naming names.

8  In the proffer, the statement was made that none of the

9  participants in the retention plan are officers, directors,

10 or have any significant corporate level responsibilities, is

11 that correct?

12 A.  That's correct.

13 Q.  Are you familiar with the statements of financial affairs

14 filed by each of the Debtors?

15 A.  I don't know which specific documents you're referring

16 to.

17 Q.  I'm referring specifically to a statement of financial

18 affairs for QS Wholesale, Inc.  It was filed at docket number

19 315 on October 16th of this year.

20 A.  Okay.

21 Q.  Are you familiar with that; did you review the statements

22 and schedules before they were filed?

23 A.  Yes.

24 Q.  Okay and are you familiar with the person's name as

25 officers on attachment 21(b) in each statement of financial

1  affairs?

2  A.  I wouldn't be familiar without seeing it again.

3          MR. KENNEY:  Your Honor, for the convenience of the

4  Court I have both a single page from that SOFA.  I also have

5  the entire SOFA.  Whatever is more convenient to the Court.

6          THE COURT:  [indiscernible] single page.  Mr.

7  Kenney, I'm at your pleasure to take a break at any point or

8  confer about the mechanics of going through perhaps the

9  individuals.  I have Exhibit B which I then has the KERP

10 participants.  We can number them if that will be part of

11 your examination.  I'm really at your pleasure.

12         MR. KENNEY:  Very little on the KERP, Your Honor.

13         THE COURT:  Okay.

14         MR. KENNEY:  May I approach, Your Honor?

15         THE COURT:  Of course.

16         MR. KENNEY:  And, Your Honor, because of the

17 sealing, I'm not going to request that this be admitted into

18 evidence.  I'm simply going to use it as a demonstrative.

19 BY MR. KENNEY:

20 Q.  Ms. Caya, if you would look on what I have handed you

21 it's page 61 of 62 of the U.S. Wholesaling statement of

22 financial affairs.

23 A.  Yes.

24 Q.  If you would look to the third name down on that list is

25 that individual a participant in the KERP?

1  A.  Yes, he is.

2  Q.  Okay and in this statement of financial affairs he is

3  named as an officer, specifically an assistant secretary of

4  the corporation on the petition date?

5  A.  At the time of the petition date, yes.

6  Q.  You're saying he has since; he has post-petition been

7  relieved of his responsibilities?

8  A.  Correct.  He is no longer an assistant secretary or any

9  other officer of the --

10  Q.  But he was an officer on the petition date?

11  A.  He served as assistant secretary as of that date.  But I

12  would refer to the proffer that Mr. Durrer read earlier in

13  that his position within the company he would not have the

14  authority to bind any of the entities beyond what was allowed

15  in the company's delegation of authority which would require

16  -- he wouldn't be able to sign anything without explicit

17  written consent from an officer.

18  Q.  But he was nonetheless an officer of the corporation?

19  A.  He served as assistant secretary as of the date of the

20  petition.

21  Q.  Thank you, Ms. Caya.  Now quite a bit of time was spent

22  in the proffer discussing the duties of Mr. Healy, Mr.

23  Bruenjes and yourself.  And am I to assign that that is in

24  connection with what I would essentially describe as the

25  third metric, the individual performance goals that are to be

1  set?  So a description of what your responsibilities were

2  prepetition and supplement with a description of additional

3  responsibilities you've taken on post-petition?

4  A.  Well is this a question?

5  Q.  Am I to understand that that proffer was directed at a

6  comparison of your prepetition responsibilities versus

7  additional post-petition responsibilities?

8  A.  I think that's fair to say yes.

9  Q.  And is it fair to say that's also the same with respect

10 to Mr. Healy and Mr. Bruenjes?

11 A.  Yes.

12 Q.  And is that intended; is that proffer intended to address

13 specifically the third performance metric under the KEIP

14 which would be the individual performance objectives;

15 individual performance targets?

16 A.  I think it could be used to address that target yes.

17 Q.  Are you familiar with the base salary of each person

18 participating in the KEIP?

19 A.  Yes.

20      MR. KENNEY:  And, again, Your Honor, I'm going to do

21 my best to avoid putting numbers on anything.

22      THE COURT:  All right well we know who's in the

23 KEIP.

24      MR. KENNEY:  We know who's in the KEIP.  Is the

25 Court familiar with the salary levels, Your Honor?  The Court

1  is aware?

2          THE COURT:  I am.

3          MR. KENNEY:  Okay.

4  BY MR. KENNEY:

5  Q.  And we can agree, Ms. Caya, that all three of these

6  individuals occupy very high positions in the corporate

7  organization?

8  A.  Yes.

9  Q.  And can we agree that all three are highly compensated

10  commensurate to their high positions?

11  A.  Are you asking -- can you repeat that question please?

12  Q.  Can we agree that those three -- you and the other two

13  individuals occupy, are highly compensated commensurate to

14  high positions within the organization?

15  A.  I think those officers are compensated in accordance with

16  what the board has approved or their base salaries.

17          THE COURT:  Well if you were talking to a couple of

18  federal employees what would you say?  [indiscernible] highly

19  compensated.

20          MR. KENNEY:  Well, Your Honor, I think for the

21  record I think what we can say that the lowest paid of the

22  three makes significantly more than you and I combined.

23          THE COURT:  That's not saying much.

24          MR. KENNEY:  We could add Mr. Fox's salary and still

25  be below.

1        UNIDENTIFIED SPEAKER:  Did you mean Steve Fox?  The

2   other Mr. Fox.

3        THE COURT:  I don't want to get off track but that

4   would be a really good demonstrative.  How many U.S.

5   Trustee's does it take to add up to this CEO?  You may want

6   to take a look at that some time.

7        MR. KENNEY:  Your Honor, I'm not sure there are

8   enough people in my office.

9   BY MR. KENNEY:

10  Q.  Ms. Caya, did you assist at all in developing any of the

11  individual performance goals?

12  A.  They were discussed generally.

13  Q.  Who actually developed those goals?

14  A.  I think it was a combined effort with input from FTI as

15  well as discussion amongst our board of directors.

16  Q.  And when you say input from FTI I've seen FTI's report

17  which has significant discussion of payment metrics and

18  perhaps not as significant a discussion regarding performance

19  metrics.  Was FTI involved at all in promulgating performance

20  metrics?

21  A.  Yes.

22  Q.  Okay what was their role?

23  A.  As I mentioned earlier FTI spent time consulting with our

24  members of our compensation committee as well as our

25  strategic review committee in studying those goals.

1  Q.   Okay.  I apologize for this question.  It's going to be a

2  little bit complex.  My understanding from FTI's report on

3  the individual performance metrics that if for each of those

4  three individuals the goal is starting with to execute the

5  ongoing responsibilities of whatever that position title is.

6  And in addition to perform or oversee the performance of

7  certain related tasks necessary to effectuate a successful

8  reorganization, is that a fair statement?

9  A.   I'd need to see the report against.

10 Q.   After the -- is a fair statement that for each of the

11 three individuals in the KEIP the performance goals are to

12 begin with execute the ongoing positions of and then whatever

13 the particular job title is.  And in addition to that to

14 perform or oversee performance of certain related tasks

15 necessary to effectuate a successful reorganization?

16 A.   That sounds correct.

17 Q.   And there are some examples of some of the things each

18 person needs to do?

19 A.   Yes.

20        MR. KENNEY:  Is Your Honor familiar with the

21 individual performance metrics?  Has Your Honor seen the

22 report?

23        THE COURT:  No but I have the report.  I have the

24 sealed version of the document, the exhibits.  I'll take the

25 report.

1          MR. KENNEY:  May I approach, Your Honor?

2          THE COURT:  Sure.

3          MR. KENNEY:  May I leave a copy with the witness as

4    well?

5          THE COURT:  Yes.  All right should we mark this as

6    U.S.T.1?

7          MR. KENNEY:  Your Honor, I believe that the

8    information in here is protected by their motion to seal.

9    I'm not objecting to the motion to seal.  I understand the

10   sensitivity of the information.

11         THE COURT:  I think I would still admit it.  I'll

12   make sure it doesn't wind up on the docket, but I think it's

13   --

14         MR. KENNEY:  I would appreciate that, Your Honor.

15         THE COURT:  Yeah if you're going to examine her, but

16   I'll make sure that it does not wind up on the docket.  But

17   it is admitted as U.S.T. 1 and this is the draft FTI Report.

18   According to the heading dated November 20, 2015, okay.

19      [U.S.T. 1 Exhibit received into evidence]

20         MR. KENNEY:  Thank you, Your Honor.

21         THE COURT:  You may proceed.

22   BY MR. KENNEY:

23   Q.  Ms. Caya, looking at U.S. Trustee 1, first of all do you

24   know is this still a draft or is this now the final document?

25   A.  This looks like the final document.  I'd have to look

1  through it carefully to confirm.

2  Q.  Do you know when the KEIP was promulgated?

3  A.  Do you mean when the board approved it?

4  Q.  Let's start with when the board approved it?

5  A.  Gosh I do not know recall specifically.  I'm going to

6  guess about a month ago.

7  Q.  So approximately early November?

8  A.  Yes.

9  Q.  Now if you would turn to page 10 of U.S. Trustee 1

10 please.

11 A.  Yes.

12 Q.  Now page 10 actually expresses all three of the metrics

13 for each of the three individuals to earn their KEIP payment,

14 is that correct?

15 A.  Yes.

16 Q.  If you would look at about halfway down the page it's a

17 black thick line across participant personal goal and

18 designated superior.  And do you see the specific examples of

19 additional duties for each person?

20 A.  Yes.

21 Q.  Okay.  Have you ever been involved in promulgating

22 executive job descriptions?

23 A.  In what way?  I'm not sure what you're asking.

24 Q.  Do you have any human resources experience?

25 A.  Not directly no.

1   Q.   Have you ever written a job description for any of the

2   employees of the company?

3   A.   Yes.

4   Q.   At what level?

5   A.   Which employees?

6   Q.   Yes.

7   A.   Attorneys that would be working for me.

8   Q.   Have you written job descriptions for personnel other

9   than attorneys?

10  A.   Paralegals and maybe legal support staff.

11  Q.   Nobody outside of the legal department?

12  A.   Not directly, no.

13  Q.   Well looking at the job, the personal goals that are set

14  forth on page 10 of U.S. Trustee 11, is it fair to say that

15  what each of these three individuals is tasked to do is all

16  the everyday responsibilities of their job title plus the

17  additional duties that come with being in a Chapter 11

18  bankruptcy?

19  A.   Yeah I would say that these additional duties they're

20  listed here are related to Chapter 11.

21  Q.   And each of these; I mean the three individuals named are

22  basically at the highest level of the corporation?

23  A.   Yes.

24  Q.   These are individuals who already have fiduciary duties

25  to the corporation?

1  A.   Yes.

2  Q.   And as fiduciaries they would be expected to take on

3  certain additional responsibilities from time to time?

4         THE COURT:   We're going to get into an academic

5  discussion as we do on occasion.   I'm not certain that this

6  discussion is properly couched in terms of fiduciary duties

7  of officers in the corporation.   I don't think that there's

8  any debate that we've got, you know, three beautiful people

9  at the company and they have fiduciary duties.   Those are

10  determined by applicable law, presumably Delaware law.   That

11  doesn't inform whether or not the metrics are proper, the

12  fact that they have fiduciary duties doesn't necessarily

13  answer whether or not they should be presumed to deal with

14  the additional stresses that you and I both know come with a

15  bankruptcy filing.   I think the question would be better

16  articulated in terms of professional responsibility.   They're

17  heading a company that has entered into this path.   It's

18  coming their way.   Isn't this what they stepped up to.

19         MR. KENNEY:   Well I think that is a fair statement,

20  Your Honor, but I'm not sure that that necessarily diminishes

21  the fiduciary responsibility.

22         THE COURT:   Fiduciary sounds [indiscernible].   I

23  don't think [indiscernible].

24  BY MR. KENNEY:

25  Q.   Let me ask you, Ms. Caya, do any of the personnel for

1  whom you've written job descriptions had a catchall phrase at

2  the end of their job description plus additional duties as

3  assigned?

4  A.  I would guess yes probably.

5  Q.  And aren't the additional duties that come with being in

6  a Chapter 11 bankruptcy part of what a highly compensated

7  professional or perhaps even a corporate fiduciary would be

8  expected to take on anyway?

9  A.  I would presume so.  These three officers here are the

10 senior most officers in the Americas and that are based in

11 the U.S. that are taking on the burden of seeing this company

12 through Chapter 11.

13 Q.  Do you believe that any of the three named officers would

14 be less likely to perform their professional responsibilities

15 and, perhaps, even their fiduciary responsibilities to the

16 company if they don't receive KEIP compensation?

17         MR. DURRER:  Your Honor, I'm going to object to that

18 one on two grounds.  One, I think it's a little speculative,

19 but also we're not seeking to have this program approved

20 under 503(c)(1).  And I think if we were that that would be

21 an appropriate question.

22         THE COURT:  Well I think the question we can leave

23 aside for a moment for statutory discussion of 363(b) versus

24 503.  The bottom-line as I understand it for KEIPs and KERPs,

25 etcetera is, to me anyway once we're past the issues of

1 propriety, is it necessary.  And I think that's what the

2 question is.

3         MR. KENNEY:  Well I think that really is it, Your

4 Honor; is it necessary.

5         THE COURT:  I think your question is if this weren't

6 offered to these folks do we think and, again, if I say do we

7 think they'd walk then it turns into a key employee retention

8 program and that's not for this.  But your question is more

9 in the absence of offering this to these folks would they

10 perform less diligently.  Would they take weekends off?

11 Would they head home at 5:00?  And I think that's -- so I

12 would overrule the objection because I think that the

13 question as couched is, is this necessary to incentivize the

14 employees in question and I think that's a proper question.

15 And the flip side of it is in the absence of it would they

16 not be as enthusiastic.  I think that's how I would, so to me

17 I think that's a completely proper question.  I'll let you

18 rephrase it.

19         MR. KENNEY:  All right.

20         THE COURT:  Well she's got to answer it, so, right.

21         MR. KENNEY:  I believe she does, Your Honor.  And

22 I'm not sure it's necessary to rephrase it.

23 BY MR. KENNEY:

24 Q.  But, essentially, Ms. Caya, in the absence of the KEIP

25 are any of these three individuals less likely to perform

1  their responsibilities in connection with the Chapter 11

2  bankruptcy case?

3  A.  I would say that these three officers have put in their

4  hearts and souls into this process. And you know have in

5  order to successfully see this company through to the other

6  side of Chapter 11 that the incentives put forth in this

7  program certainly has promoted this group of executives to

8  work as diligently as possible to get the company through

9  Chapter 11 as quickly as possible.

10 Q.  Well can we agree that they wouldn't work any less

11 diligently without the KEIP?

12 A.  I don't know if I could speak to the other officers.

13 Q.  Well you personally would you perform your duties less

14 diligently?  Would you shirk your responsibilities as a

15 corporate officer?

16 A.  I hope I would never shirk my responsibilities as a

17 corporate officer.

18 Q.  Let me ask you something else.  I understand there are a

19 lot of additional pressures placed on each of these three

20 people.  But in connection with those pressures don't the

21 people at the very top of the corporation have a team of

22 highly skilled and not to mention highly compensated

23 restructuring professionals working for them, lawyers,

24 investment bankers, financial advisors, and even a chief

25 restructuring officer?

1  A.  Yes we have consultants working with us to help us with

2  this process.

3  Q.  And can you explain to me how the individual performance

4  targets that are described on page 10 at the bottom of the

5  page how are those different from the first two KEIP

6  performance targets, the emergence target based on either

7  sale or exit under Chapter 11 plan by the three gates, one no

8  later than April 16th and the second, third tied to compliance

9  with the DIP credit agreements.  How are these goals

10 different?

11         MR. DURRER:  Well now, Your Honor, I'll object.  I

12 think is more of a question for Mr. Imhoff.

13         THE COURT:  I don't think that's a basis for

14 objecting.  I'll overrule it.

15         MR. DURRER:  Well it's beyond the scope of her

16 direct.  I think is the proper objection.

17         THE COURT:  I'm not certain that it is beyond the

18 scope of the direct.  The question; I'll allow the question

19 if the witness can answer.

20         THE WITNESS:  I think it would be a question for FTI

21 to answer.

22         THE COURT:  Let the record reflect the witness is a

23 well trained lawyer.

24         MR. KENNEY:  Yes but I think the witness is

25 appearing on the stand as a fact witness, in part.

1  BY MR. KENNEY:

2  Q.  And if you were involved in promulgating any of the

3  metrics for the discussions for them how are they -- don't

4  the responsibilities described on the bottom of the page

5  contribute or, in fact, maybe completely subsumed the first

6  two metrics that are described above emergence and DIP

7  compliance?

8  A.  No, I don't agree with that statement.

9       MR. KENNEY:  I have no further questions, Your

10  Honor.

11       THE COURT:  Redirect?

12       MR. DURRER:  Just a couple of questions, Your Honor.

13                 REDIRECT EXAMINATION

14  BY MR. DURRER:

15  Q.  Ms. Caya, you have an understanding as to whether the

16  original DIP budget presented at the beginning of the case

17  contained an expenditure with respect to the KEIP and KERP

18  plan?

19  A.  Yes, it did.

20  Q.  And do you have an understanding as to whether the

21  individuals that were including yourself that were ultimately

22  designated as KEIP participants had an understanding or

23  expectation with respect to their duties and responsibilities

24  in connection with the Chapter 11 case?

25  A.  Yes.

1  Q.  And can you describe for the Court your expectation in

2  being a KEIP participant with respect to that DIP budget line

3  item?

4  A.  I'm sorry can you repeat that question?

5  Q.  Yes.  Can you describe for the Court what it meant to you

6  as a KEIP participant that that line item was in the budget

7  as of September 9?

8  A.  My understanding was that there were going to be a number

9  of challenges and duties that would arise in this case

10 starting from the very first day.  And that we would, that

11 the group that was included in the KEIP was going to need to

12 achieve certain goals and to identify what those

13 responsibilities were going to be in order to ensure a

14 successful completion of the Chapter 11 process.

15 Q.  And so notwithstanding that the KEIP wasn't ultimately

16 approved by the board until the beginning of November, is it

17 fair to say that you comported yourself consistent with being

18 incentivized to have a positive outcome of the Chapter 11

19 case since September 9th?

20 A.  Yes, that's correct.

21 Q.  Turning your attention to U.S. Trustee Exhibit 1 on page

22 10, is it possible that the KEIP participants can achieve

23 their personal goals and not emerge from Chapter 11 within

24 the timeframes expressed on the top of the page?

25 A.  Yeah I suppose those possible.

1  Q.  And is it possible, for example, that there might be a

2  successful emergence from Chapter 11 on time, but that it

3  might not ultimately comply with every term in the definitive

4  agreement?

5  A.  Yes.

6          MR. DURRER:  No other questions, Your Honor.

7          THE COURT:  Recross?

8          MR. KENNEY:  No recross, Your Honor.

9          THE COURT:  Thank you, Ms. Caya.

10         MS. CAYA:  Thank you.

11         THE COURT:  The next witness is Mr. Imhoff?

12         MR. DURRER:  Yes, Your Honor.

13         THE COURT:  Very good.

14         MR. DURRER:  Your Honor, Mr. Imhoff had also signed

15 a declaration which is docket number 419.  I'm not going to

16 reiterate the declaration.  But that you may presume that

17 that is part of Mr. Imhoff's proffer.

18         THE COURT:  Right.  Mr. Kenney, is that all right

19 with you or are you all right with proceeding by way of

20 proffer?

21         MR. KENNEY:  [indiscernible - no notes as to a

22 response].

23         THE COURT:  Very good; thank you.

24         MR. DURRER:  Mr. Imhoff if called to testify, Your

25 Honor, in addition to the facts that are contained in Mr.

1  Imhoff's declaration which as I note is docket 419 would

2  testify that he has performed numerous comparative studies of

3  employee retention and incentive plans similar to the

4  comparative study performed in this case.  And that he has

5  developed or consulted on more than 30 employee retention and

6  incentive plans during the course of his career.

7        Mr. Imhoff would testify that he has worked closely

8  with the company and includes specifically compensation

9  committee, its board of directors in developing a KEIP and

10 KERP for which the Debtors are currently seeking Court

11 approval.  And in the process of developing the KEIP and KERP

12 he personally presented a comparative study to the company

13 and its board with respect to employee retention and

14 incentive plans previously approved in other bankruptcy

15 cases.

16       Mr. Imhoff will testify that he is familiar in

17 general terms with the DIP budget and it didn't contain from

18 the *ab initio* basically a line item of approximately $3

19 million dollars with respect to key employee and incentive

20 and retention plan expenditures from the very beginning of

21 the case.  And that he commenced his work with the company

22 almost immediately after the cases were filed in September.

23 Mr. Imhoff would testify that he's familiar with the KEIP and

24 KERP motion including the KEIP and KERP plan itself.  He has

25 also reviewed and is familiar with the objection by the

1  United States Trustee.

2        Mr. Imhoff would further testify that the

3  performance metrics set forth in the KEIP are necessary in

4  his view to maintain the effort necessary to achieve a

5  successful outcome of the Chapter 11 case.  And that in that

6  regard those metrics are approximately calibrated to maximize

7  the value of the Debtors' estates, are consistent with market

8  practice in the comparative study performed by FTI, and are

9  appropriate given the current uncertain environment for

10 retail Debtors generally and this particular Debtor which

11 although it has a sponsored plan proposal is also pursuing a

12 go-shop to other market participants.

13       Mr. Imhoff would testify that it is therefore not

14 accurate to characterize consummation of the plan or

15 reorganization or other sale as a "layup" here because of the

16 known market forces working against retailers.  In

17 particular, Mr. Imhoff is aware and would testify that Black

18 Friday did not yield the results that retailers expected.

19 And in this particular case as is aware, as Mr. Imhoff is

20 aware and as the Court is aware from the earlier matters it

21 is likely that even the sponsored plan transaction will be

22 heavily contested.

23       Mr. Imhoff would testify that with respect to the

24 KEIP participants such KEIP participants have not executed

25 any contracts or received any offer of future employment from

1  the company or from the plan sponsor or any other interested

2  bidder or acquirer of the company.  And that pursuant to the

3  testimony that Ms. Caya gave the KEIP participants have taken

4  on significant additional job responsibilities associated

5  with these Chapter 11 cases.

6        Mr. Imhoff will testify that as the Court will

7  recall from the two day hearing on the DIP financing

8  proffered by the plan sponsor in this case, the terms of the

9  DIP financing are not necessarily aligned with the sale

10 process such that the Debtors' management team in conjunction

11 with the Debtors' advisors would need to employ significant

12 time and effort to reconcile the arguably competing goals

13 promulgated by the DIP financing and the sale process.

14       Mr. Imhoff would further testify that it is entirely

15 possible that management will need to sacrifice full

16 compliance with the DIP financing in exchange for

17 consummating a successful sale process.  As a consequence, it

18 is appropriate to having multi-pronged incentive approach as

19 FTI assisted the compensation committee and the board in

20 development here.

21       Mr. Imhoff would further testify that with respect

22 to the DIP financing and given this retail environment that

23 he has consulted with his colleagues in the ordinary course

24 of business with respect to performance under the DIP

25 financing. And that in this, again this difficult retail

1  environment, there is a real risk of performance with respect

2  to achieving compliance with the DIP financing as a whole.

3        Mr. Imhoff would further testify that the personal

4  performance metrics were summarized and presented to the

5  advisors of the unsecured creditors committee, the DIP

6  lenders, and the U.S. Trustee. No other stakeholders have

7  made any inquiry with respect to those details of the KEIP

8  and KERP or made additional requests for information.  In the

9  case of the KEIP participants, Mr. Imhoff would testify that

10  the personal performance metrics start with satisfactory

11  performance of this existing responsibilities.  But likewise

12  in each case, the personal goals go well beyond their

13  existing responsibilities.

14        Mr. Imhoff would testify that as described in the

15  testimony of Ms. Caya, Mr. Huey is required to maintain

16  worldwide customer confidence, as well as oversee all aspects

17  of the Chapter 11 case.  Mr. Bruenjes is required to make

18  frequent Court appearances and develop the financial

19  foundation for the company's reorganization, as well as meet

20  with stakeholders and potential bidders in connection with

21  their interest in the company.  Not only with respect to

22  those two gentlemen, not only with respect to the U.S.

23  Debtors and the U.S. Debtors' businesses, but also with

24  respect to the company's worldwide business which accounts

25  for a substantial amount of its value.

1    Finally, Mr. Imhoff would testify that with respect

2 to Ms. Caya she must supervise and coordinate multiple

3 advisors in connection with the entire Chapter 11 process in

4 addition to her regular responsibilities.  Mr. Imhoff would

5 further testify that FTI performed a comprehensive

6 comparative study of market practice with respect to KEIPS

7 and KERPs implemented by other Debtors in this and other

8 jurisdictions both inside and outside the retail sector.

9 That the results and conclusions of such study are summarized

10 in Mr. Imhoff's declaration.

11    Further, Mr. Imhoff would testify that in the face

12 of competing pressures arising from the different incentives

13 combined with the uncertainty of outcome and the limited

14 individual ability of the KEIP participants to personally

15 cause or drive a particular outcome the waited three prong

16 approach to incentivize these executives to perform is

17 appropriate and market for similar situated companies in

18 Chapter 11.

19    And further Mr. Imhoff would testify that with

20 respect to three particular comparables that Mr. Imhoff had

21 examined and the U.S. Trustee had asked about this following

22 the filing of the motion, Mr. Imhoff is able to testify that

23 with respect to three of those programs under RadioShack,

24 Brookstone, and NII Holdings Mr. Imhoff would testify that

25 full payouts were actually made under the RadioShack and

1   Brookstone KEIP plans.  And that only a partial payout was

2   made with respect to NII Holdings.

3           So the import that U.S. Trustee had asked if there

4   were specific outcomes, I think Mr. Imhoff would testify that

5   it's, there's no data base of actual performance.  These were

6   cases that they were actually involved in so they were able

7   to actually report on that aspect given that the U.S. Trustee

8   had asked about it.  So that would be the sum and substance

9   of Mr. Imhoff's testimony.

10          THE COURT:  Mr. Kenney, do you wish to cross

11  examine?

12          MR. KENNEY:  Yes, I do, Your Honor.

13          THE COURT:  Mr. Imhoff; welcome, sir.

14              DEWEY IMHOFF, DEBTORS' WITNESS, SWORN

15          THE CLERK:  Please state and spell your name for the

16  record.

17          THE WITNESS:  Dewey Imhoff; D-e-w-e-y; Imhoff, I-m-

18  h-o-f-f.

19          THE COURT:  You may proceed.

20          MR. KENNEY:  Thank you, Your Honor.

21                        CROSS EXAMINATION

22  BY MR. KENNEY:

23  Q.  Good afternoon, Mr. Imhoff.

24  A.  Good afternoon.

25  Q.  Mr. Imhoff, the declaration states that you developed or

1  consulted on more than 30 employee retention incentive plans,

2  is that correct?

3  A.   Correct.

4  Q.   Can you tell me how many of those were retention plans

5  and how many were incentive plans?

6  A.   I'm going to say approximately half and half.

7  Q.   And were all of those in Chapter 11 cases?

8  A.   Yes.

9  Q.   Now in how many of the plans that you either developed or

10 consulted on do you actually work on the amounts that can be

11 earned under the plan?

12 A.   Off the top of my head, I don't know.

13 Q.   Was it more than half of them?

14 A.   I don't recall.

15 Q.   Well let me ask the other end of that question.  How many

16 incentive plans did you work on where you developed or

17 consulted on performance goals?

18 A.   In all of the incentive plans we worked on the

19 performance roles.  And recently on several of the retention

20 plans we also put in performance criteria.

21 Q.   Were you involved in any of the 11 Chapter 11 cases that

22 we used as benchmarks in your report?

23 A.   I was.

24 Q.   And counsel had an objection to disclosure of which

25 cases?

1  A.  I don't [indiscernible].

2  Q.  Can you tell us which cases you were involved in?

3  A.  I did some consulting on Overseas Shipholding.

4  Q.  And who were you working for in Overseas Shipholding?

5  A.  For the creditors committee.

6  Q.  And that was the only case?

7  A.  That's the only case.

8  Q.  Now do you have U.S. Trustee Exhibit 1 in front of you,

9  Mr. Imhoff?

10  A.  No I do not.

11          THE COURT:  Oh yeah the --

12          MR. KENNEY:  Can I hand that back up, Your Honor?

13          THE COURT:  Yeah, sure.

14  BY MR. KENNEY:

15  Q.  Now is U.S. Trustee 1 your work product, Mr. Imhoff?

16  A.  Can I go back and answer a question?

17  Q.  Sure.

18  A.  I actually was involved in two cases.

19  Q.  What was the other case?

20  A.  Chassix.

21  Q.  Chassix.  Okay Chassix was a KERP only case?

22  A.  That was as KERP only case.

23  Q.  Now with respect to Overseas Shipholding Group that you

24  were involved in before, were you involved in setting either

25  the amounts or the performance goals?

1  A.   That was on behalf of the committee.  I was brought into

2  be an expert on that case.  The case was settled before my

3  role was fully established.  So my role was limited to

4  reviewing the information proposed by the company.

5  Q.   Okay.  And if you would look at the preceding cases for

6  the -- it's on page 17 of the report.  The comparables KEIP

7  detail.  And I know that's rather small print.  It was the

8  size that was given to me.

9         MR. KENNEY:  Your Honor, if anybody would prefer, I

10  do have a printout of the specific what was noted as the KEIP

11  metrics which I can certainly hand out to people because it's

12  a lot easier to read.

13         THE COURT:  Sure.

14         MR. KENNEY:  Your Honor, I'm just using this

15  demonstrative --

16         THE COURT:  Yeah that's fine.

17         MR. KENNEY:  Can I give one to the [indiscernible]?

18         THE COURT:  I'm sorry?

19         MR. KENNEY:  Do I need to [indiscernible]?

20         THE COURT:  He's got young eyes.  He can read it.

21  BY MR. KENNEY:

22  Q.   Mr. Imhoff, for the benchmark cases that are in this

23  document which if you compare it to the right hand column of

24  page 17 you'll see it's just an enlargement.  Were the

25  incentive payments in any of those 11 benchmark cases

1 predicated on confirmation of a plan without regard to the

2 distributions under that plan?

3 A.  Could you repeat that question again?

4 Q.  Yes.  Were the incentive payments in any of the 11

5 benchmark cases that you used predicated on confirmation of a

6 plan without regard to what was being distributed under such

7 a plan?

8 A.  Yes.

9 Q.  Which ones?

10 A.  Well three of the 11 have personal goals listed in here.

11 Five of the 11 I believe tie to cash flow and DIP

12 requirements.  Six of the 11 tie to some type of financial

13 performance.  And I believe five of the 11 are tied to some

14 level of asset sales.

15 Q.  Okay and so, Mr. Imhoff, I probably didn't phrase that

16 well.  Were any of the 11 KEIPS that you used as benchmarks

17 predicated on specifically on confirmation of a plan without

18 any regard to what the quality of that plan was in terms of

19 distributions being made?

20 A.  I'm still not sure I understand your question.

21 Q.  Aside from very specific performance metrics, in other

22 words individual performance metrics, financial performance

23 metrics do any of these plans have confirmation of a plan

24 where it's simply get a plan confirmed?  Regardless of what

25 the terms of the plan are; just get one confirmed.

1   A.   No.

2   Q.   And of those same 11 benchmark cases, Mr. Imhoff, were

3   any of them predicated on closing an asset sale where there

4   was no floor on the asset sale price?

5   A.   I believe there were.

6   Q.   And which ones would that have been?

7   A.   I believe based on the information here A123 Systems,

8   Furniture Brands, and I believe Brookstone.

9   Q.   Now can you agree, Mr. Imhoff, in Brookstone there was

10  stalking horse offer on the table at the time?

11  A.   Yes.

12  Q.   And that, in fact, in Brookstone by the time the KEIP

13  came up the stalking horse offer had, I guess the stalking

14  horse offer was a $147 million dollars?

15  A.   I don't recall.

16  Q.   But there was a stalking horse offer on the table, is

17  that correct?

18  A.   I believe so.

19  Q.   And in Furniture Brands can we agree that by the time the

20  KEIP came up for a hearing the stalking horse offer had been

21  increased from a $166 million to $280 million?

22  A.   I don't recall.

23  Q.   Did you review the case at all?

24  A.   I did review the motions.

25  Q.   And with respect to A123, Mr. Imhoff, it was your

1  understanding that the bonus was predicated on a sale in any

2  amount?

3  A.  Again based on the motions it was laid out in terms of

4  the KEIP motion that they would 60% of their bonus was tied

5  to the asset sale.

6  Q.  It was tied to the asset sale. Wasn't there a $125

7  million dollar stalking horse offer from Johnson Controls on

8  the table at the time?

9  A.  Yes.

10 Q.  So there's already a $125 million dollars on the table?

11 A.  Yes.

12 Q.  And in terms of a sale alternative KEIP incentive

13 [indiscernible] based on a sale what's the minimum sale price

14 at which the three KEIP participants could earn their

15 incentive payments under that emergence metric?

16 A.  I'm sorry could you repeat the question?

17 Q.  What's the minimum sale price at which KEIP participants

18 can earn their one third of the total KEIP dollars under

19 emergence metric?

20 A.  You're talking for this, for Quiksilver?

21 Q.  Quiksilver.

22 A.  There is nothing tied to the asset sales.

23 Q.  When you say there's nothing tied to asset sale isn't the

24 emergence metric tied to either emergence under a plan or

25 consummation of an asset sale?

1  A.  That's correct.

2  Q.  Okay what's the floor price on the asset sale for --

3  A.  -- floor price.

4  Q.  There is no floor.  Thank you.  And you say you did have

5  a role in the termination of the performance metrics that

6  were in this case?

7  A.  Yes.

8  Q.  Did you have a role in promulgating each of the three

9  metrics?

10 A.  I did.

11 Q.  Let me start with the emergence metric, Mr. Imhoff.  You

12 knew there was a plan sponsor agreement on the table on the

13 day that this case was filed?

14 A.  Yes.

15 Q.  And that the plan sponsor agreement provided for a fixed

16 distribution of general unsecured creditors, that is

17 unsecured creditors who didn't hold administrative or

18 priority claims?

19 A.  Yes.

20 Q.  Assuming that this case doesn't [indiscernible] and

21 collapse into a Chapter 7 what stands in the way of plan

22 confirmation?

23 A.  The committee.

24         MR. KENNEY:  They're going to throw their dead

25 bodies in front of it, Your Honor, but I'm not sure that

1  they're standing in front of it.

2          THE COURT:  No I understand.

3          UNIDENTIFIED SPEAKER:  [indiscernible]

4      [Laughter]

5          THE COURT:  I'm busting your chops.  But I guess I

6  want to make sure because I followed the examination I think

7  pretty carefully.  And obviously this case presents somewhat

8  different context than others.  Each case is reviewed on its

9  own facts.  But for example the fact that there's not a floor

10 in this case of sale this is not, at least, initially

11 postured as a sale case with the Court.  And there is a plan

12 against [indiscernible] potentially a transaction may

13 compete.  That's how I understand the structure.

14         I don't while another case that just brought up a

15 straight naked sale or moving forward with the transaction

16 seems to me to be a somewhat different scenario than what we

17 have here.  The question, I guess, and I want to ask this

18 question, it may seem out of place, but I want to ask to

19 follow up with the witness.

20         Much of the examination has been about the pre-

21 determined personal goals and I heard and listened careful to

22 the testimony from Ms. Cay and your examination and I

23 understand the concerns.  But I [indiscernible] see in these

24 almost a double edge sword.  That in the absence of that kind

25 of evidence based or performance based metric subject to the

1    discretion of the senior person I could easily, I could just

2    as easily see either a committee or your office objecting

3    saying that these are just set numbers and there's no

4    flexibility.  There's no performance.  There's no incentive

5    to this issue.  And so I think I'd like to make sure that I

6    understand when we talk about personal performance and how

7    particular and we talked about the KEIP and those senior

8    officers would be performing those jobs what anybody would

9    agree are challenging circumstances is that fact of the tie

10   in between the performance and their existing

11   responsibilities fatal to the incentive program.  That's kind

12   of the question that I'm trying to tease out of the argument

13   that you're making.

14        MR. KENNEY:  I don't think it's -- excuse me, Your

15   Honor.  I don't think it's fatal to the program.  But I think

16   part of what you have to look at is when you have individual

17   performance metrics that are basically well just do your job

18   plus do the additional things that come with being in Chapter

19   11.  You know we have to question one is that a valid

20   incentive, and, two, if it's a valid incentive how does that

21   not subsume the other incentives which are basically to get

22   us there.

23        And, Your Honor, perhaps a way to explain it would

24   be you know the first two are this is where we need to go.

25   The third one is get us there.  If you jump in a taxi cab at

1  the Hotel DuPont and tell them Amtrak Station the driver

2  doesn't say to you Amtrak Station $10.00.  Get you there is

3  another $10.00.

4          THE COURT:  I understand.

5          MR. KENNEY:  I think the third metric because it is

6  in large priority does subsume the other two, Your Honor.

7          THE COURT:  Okay.

8  BY MR. KENNEY:

9  Q.  In terms of getting to emergence under chapter 11, Mr.

10 Imhoff, I understand the committee is standing in the way and

11 do you understand the nature of the dispute between the

12 committee and the Debtor and the plan sponsors as a valuation

13 issue?

14 A.  I understand that.

15 Q.  So then, in fact, the company could emerge with a plan

16 that actually provides greater value to creditors?  Is it

17 your understanding that if the committee is successful in a

18 valuation fight --

19 A.  Correct --

20 Q.  This company could --

21 A.  Yes --

22 Q.  More money could be distributed to creditors.  Let's take

23 a look at the DIP loan compliance metric, Mr. Imhoff.  Is it

24 your understanding that all Debtor-in-possession financing

25 comes with terms and conditions?

1  A.   Yes.

2  Q.   Such cash flow conditions, i.e., revenue and expenses?

3  A.   Yes.

4  Q.   And can we agree that those conditions usually have

5  degree of variance for tolerance permitted?

6  A.   Yes.

7  Q.   And can we agree that the variance in this case is up to

8  10% under the term loan extended by OCM, OC Capital?

9  A.   Yes.

10 Q.   And 15% under the ABL facility?

11 A.   I'm not aware of the ABL piece but I'm familiar with the

12 DIP piece.

13 Q.   Well let's look at the term loan.  So 10% in other words

14 there revenue could be up to 10% less than projected in the

15 budget and their expenses on a cumulative basis could be up

16 to 10% more than the amount projected in the budget, is that

17 correct?

18 A.   Correct.

19 Q.   And those are actually cumulative variance, not

20 individual line item variance?

21 A.   Correct.

22 Q.   And that DIP loan compliance and terms and conditions

23 usually include everything covenants such as financial

24 reporting, no granting additional liens, not disputing the

25 validity of the lender's liens, would you agree those are

1  typical covenants?

2  A.  Yes.

3  Q.  Okay covenants not to file a plan that doesn't provide

4  for payment in full of the DIP financing?

5  A.  Yes.

6  Q.  What makes compliance with the terms of the DIP credit

7  agreements in this case more difficult than cases with no key

8  employee incentive plan?

9  A.  I don't know how it makes it more difficult than cases

10 that don't have key employee incentive plans.  But in this

11 particular case given the challenges that you have in the

12 retail sector and I think it's well founded that there are a

13 lot of challenges going on I thought that the DIP criteria

14 was an excellent criteria to measure them against because

15 it's something that puts management very much at risk.  It's

16 very important to the valuation issues at hand.  And it's

17 very important to the plan sponsor.

18 Q.  Now the plan sponsor is also behind the DIP lender?

19 A.  Yes.

20 Q.  If they were to have a greater variance than permitted

21 under the covenants, if there were some kind of covenant

22 default how does that affect the case if the lender waives

23 the default?

24 A.  Well if they waive the default they continue.

25 Q.  And if the case is subject to plan sponsor agreement in

1  which the lender is going to be acquiring the stock of the

2  Debtor does that tend to make the lender more lenient with

3  respect to minor events of default?

4  A.  For minor events of default; again I think it goes back

5  to what's the cause of the minor event of default and what's

6  the macro economic situation that's driving it that could

7  have an impact on the longer term value of the company.

8  Q.  And if that happened the case might convert to a Chapter

9  7 if there are event of default or the lender might take back

10  its collateral?

11  A.  I don't know if it would convert to a Chapter 7 but you

12  could have a different outcome.

13  Q.  How is the company's performance post-petition, budget

14  performance?

15  A.  Under the DIP?

16  Q.  Correct.

17  A.  The company is below budget, but they're still within

18  compliance.  I think there's a real risk that they could have

19  an issue with the compliance especially in light of the fact

20  of the retail sales of some of their wholesale clients.  If

21  those wholesale clients do not have a good Christmas season

22  they could elect to withhold payments.  It could be a timing

23  issue.  So I think there's a real risk that this could be a

24  problem.

25  Q.  That's on a sale basis.  How did the company do on Cyber

1  Monday?

2  A.  Don't know.

3  Q.  Mr. Imhoff, aside from developing incentive plans in

4  bankruptcy have you ever developed job descriptions?

5  A.  I have.

6  Q.  And is the phrase perform other duties as assigned a

7  common element of job descriptions that you support?

8  A.  I'm sorry.

9  Q.  Is the phrase perform additional duties as assigned a

10 common phrase in job descriptions that you have prepared for

11 executives?

12 A.  No.

13 Q.  It's not one that you --

14 A.  Not one that I'm familiar with.

15 Q.  How many job descriptions have you prepared outside of

16 bankruptcy cases?

17 A.  Outside of bankruptcy cases it's difficult to say.  Going

18 back as advised of CFO of a biomedical device company

19 basically went through and wrote all the job descriptions in

20 conjunction working with an HR clerk.  In that particular

21 situation about 50 job descriptions.  Throughout my career in

22 role as working on behalf of the Debtor or being involved on

23 the board of directors I've had roles in overseeing and

24 approving the job descriptions for different executives and

25 individuals of the company, but I can't give you an estimate

1  in terms of how many.

2  Q.  Let me ask you in bankruptcy cases isn't it typical for

3  executives in a company to take on additional

4  responsibilities?

5  A.  Yes.

6  Q.  With or without an incentive plan?

7  A.  Yes.

8  Q.  Have you ever performed an analysis of the likelihood of

9  success in a Chapter 11 case predicated on whether there is

10  or is not an incentive plan for executives?

11  A.  No.

12  Q.  Are you aware of any statically significant evidence that

13  incentive plans do catalyze successful Chapter 11 plans?

14  A.  Off the top of my head no.

15          MR. KENNEY:  I have no further questions, Your

16  Honor.

17          THE COURT:  Redirect.

18          MR. DURRER:  I have just one question, Your Honor.

19                     REDIRECT EXAMINATION

20  BY MR. DURRER:

21  Q.  Mr. Imhoff, refer to page 10 of the U.S. Trustee Exhibit

22  1 please.  With respect to the DIP credit agreement metric is

23  it fair to say that that is in effect a financial performance

24  metric?

25  A.  Yes, it is.

1  Q.  Okay and can you explain to the Court how that is?

2  A.  Well the DIP performance criteria is no different than a

3  measuring DIP's EBITDA which some people look at as a form of

4  cash flow.  So the fact that you have a budget that's put

5  there for the DIP the company has to work to achieve those

6  budget levels in terms of hitting their sales, controlling

7  their expenses.  And then it goes one step beyond because in

8  addition to just having achieving the sales now you have to

9  collect the cash.

10         MR. DURRER:  No other questions, Your Honor.

11         THE COURT:  Any redirect?

12         MR. KENNEY:  No, Your Honor.

13         THE COURT:  Any recross.  Thank you, sir, you may

14  step down.

15         MR. IMHOFF:  Thank you.

16         THE COURT:  Any other witnesses?

17         MR. DURRER:  No, Your Honor.

18         THE COURT:  Okay.  Let me ask the U.S. Trustee a

19  quick question.  Based upon the testimony and the examination

20  does the U.S. Trustee, I think the U.S. Trustee's KERP

21  objection was primarily about the person delivering

22  [indiscernible].

23         MR. KENNEY:  It was, Your Honor.

24         THE COURT:  And is that addressed or?

25         MR. KENNEY:  Your Honor, I'm afraid it's not.  If

1  the gentleman was an insider on the petition date I think

2  that's what we have to work with.  Otherwise, it's too easy

3  for people to jump back and forth.

4         THE COURT:  I don't disagree with that and I want to

5  be clear I listened to the testimony.  I ascribe no

6  significance to the fact that his position has changed

7  between the petition date and now.  So the issue is with his

8  job description as related by Ms. Caya as of the petition

9  date and the position which I believe was assistant secretary

10 on the KERP issue is the U.S. Trustee just leaving the

11 parties to their proof.  But I do want to allay any concern

12 you have that you can't move somebody out during a case and

13 change that by [indiscernible].

14        MR. KENNEY:  I think we can rest on the fact that as

15 of the petition date he was an insider.  I mean if the Court

16 were to approve the KEIP then maybe some other way if it's

17 really critical to keep this individual and I won't deny he

18 has an important role.  But they have to comply with the

19 statute.

20        THE COURT:  Right, okay.  Let's talk about the KEIP.

21 I'm really at this point [indiscernible].

22        UNIDENTIFIED SPEAKER:  I would like to have a chance

23 to address the KERP at some point, Your Honor, but I'm happy

24 to address the KEIP First.

25        THE COURT:  I apologize.  I've had an opportunity to

1  review these materials and I listened carefully to the

2  examination.  I'm prepared to approve this and I'm doing so

3  without perhaps the benefit of further argument from the U.S.

4  Trustee and I appreciate Mr. Kenney's patience in this

5  regard, but I have a number of people -- and I'll hear from

6  the committee in just a moment.  But I have a number of

7  people outside on the consumer trial taking either the day or

8  a chunk of the day off from work and I'm desirous to get back

9  to that.  Let me hear from Ms. LaHaie.

10        MS. LAHAIE:   Thank you.  Good afternoon, Your

11  Honor, Meredith LaHaie, Akin Gump for the creditors

12  committee.

13        THE COURT:  I was wondering when you would

14  [indiscernible].

15        MS. LAHAIE:  Yeah the committee has been very quiet

16  and I'll tell you where we are in this.  As I think was

17  reflected in the proffer of Mr. Imhoff the company and its

18  advisors did present materials that you've now seen to the

19  committee.  We obviously did review them. We analyzed them.

20  We asked follow-up questions and we considered the KEIP and

21  the KERP in the context of the broader case.  As you've

22  obviously now heard from Mr. Kreshie, the committee is to

23  some extent keeping its powder dry for a later bigger fight.

24        I will say, however, the committee did ask for one

25  clarification on the record and I'm happy to articulate the

1  clarification we like and then perhaps Mr. Kwasteniet could

2  confirm that Oaktree is prepared to agree to representation.

3  And was, Your Honor, obviously you've heard that the DIP

4  lenders have agreed to the KEIP and the KERP and I assume

5  that means both the ABL and the term.  That obviously means

6  Oaktree in its capacity as DIP lender.  What the committee

7  would like is a representation from Oaktree that it's not

8  going to then turn around with a secured noteholder hat and

9  allege that the payments made pursuant to the KEIP/KERP,

10 again assuming Your Honor affirms then, would then constitute

11 diminished value claims in connection with the confirmation

12 trial.  So that's the representation that I'd ask Mr.

13 Kwasteniet to confirm.

14          THE COURT:  Okay.

15          MR. KWASTENIET:  Your Honor, Ross Kwasteniet again

16 from Kirkland & Ellis, for the record, on behalf of Oaktree.

17 We have agreed that the payments under the KEIP and the KERP

18 are appropriate.  They are value enhancing from our

19 perspective.  We would not use those payments as the basis to

20 argue that we suffered a diminution in value solely with

21 respect to the payments under the KEIP and KERP program.

22          THE COURT:  Okay.  All right, anyone else?  Again, I

23 apologize for short circuiting this, but, again, I have heard

24 all of the testimony and the submissions.  I note, I will

25 start with the KEIP.  KEIP programs are high profile.  They

1   attract the attention of the Court and, I think, as a

2   practical matter, while I am approving it, I would simply

3   observe that the U.S. Trustees' objection and examination

4   here is, I think, a necessary part of the process.  Often it

5   occurs outside of the Court's view and gets resolved

6   satisfactorily, but in the absence of that, while I am

7   overruling the objection, I think it is an essential part of

8   the process because the substantial concerns expressed by

9   Congress in 503(c), as well as, I think, good governance by

10  the Court require that these types of programs be tested.

11         The concern that, particularly, key employees at the

12  top of a corporate structure would be able to influence that

13  development process and, ultimately, improve their own

14  economic return is a sufficiently significant consideration.

15  Again, I think that the testing by objection and then by

16  examination by the U.S. Trustee is both helpful and

17  necessary.  I looked at the target metrics and I studied

18  them.  I have seen many, many different flavors of this type

19  of program.

20         In a case such as this where the case is filed with

21  a plan, again, I see emergence and a goal of prompt emergence

22  as being within the ambit of results that senior management

23  can contribute meaningfully to.  So incentivizes them to

24  promptly conclude a bankruptcy case is appropriate.  I

25  listened, again, carefully to Ms. LaHaie's comments because

1  one of the questions here would be in other cases we have

2  seen a Committee objection saying I don't necessarily want

3  senior management tied to just this plan.  So I am confident

4  that there has been a meaningful discussion and that the

5  Committee has had an opportunity to evaluate this and

6  believes that the results under this program will, frankly,

7  benefit the process, irrespective of which path this takes,

8  but that would be a significant consideration that the Court

9  weighs in.

10        So the idea of moving this case to a prompt

11  conclusion is to me, a demonstrable benefit, again, I think

12  an appropriate metric.  Compliance with the post-petition

13  credit agreements is, I think, a financial metric comparable,

14  I think consistent with the witnesses testimony to Mr.

15  Imhoff's testimony to EBITDA and projections of performance

16  and goals.  To be honest, as a practical matter, I think that

17  many of the DIP credit agreement elements are probably more

18  thoroughly scrubbed and accurately tested then something like

19  a Debtors' business plan or projections because the process

20  by which the DIP credit agreement, covenants and expectations

21  are developed is, frankly, pretty rigorous because there is

22  party with skin in the game on the other side working that

23  process.  So I believe that it is a fair and an appropriate

24  mechanism.

25        With respect to the predetermined goals, I think

1   that the U.S. Trustee's examination was, I think, well

2   founded and I think just points out how complex this analysis

3   is when we try to deal with an incentive program vs. a

4   retention program; what are we encouraging parties to do.  I

5   think Courts have struggled with this every time.  I think

6   Judge Sontchi, in an opinion, observed that, you know, every

7   type of compensation has a retentive piece to it.  The

8   question is whether or not the predominate effect is one that

9   is incentive based.

10          In this case we had, what I thought, was an

11  interesting colloquia about fiduciary duties.  I don't think

12  fiduciary duties weighs into it, but you are welcome to raise

13  that again sometime and I can think about it some more, but

14  it is a question of encouraging a party and encouraging a

15  senior manager, incentivizing them to bring about a positive

16  result in the bankruptcy case.  I am under no illusions that

17  every senior officer in the cases that are appearing before

18  me are diligent, careful, professional and properly

19  motivated, but the goal here is to ensure that those people

20  are sufficiently motivated to blame to bear the resources

21  necessary to achieve a positive result in a case.  Again, in

22  a case such as this, which presents two different visions,

23  but, again, both within view, either a plan or an alternative

24  transaction that are the subject, I expect, of feverish

25  effort right now and will be over the course of the next two

1  months.

2         So I don't have a problem with the idea that the

3  third metric, which is the pre-determined personal goals, is

4  included.  That is, again, one that I think has to be tested

5  by the U.S. Trustee, but also involves an opportunity for

6  review at the company level to see if there has been an

7  achievement.  So in that respect, I am satisfied that the key

8  employee incentive program is sufficient and appropriate.  I

9  would be prepared to approve it.

10         I also attribute significance to the lack of an

11  objection from the Committee of Unsecured Creditors.  Again,

12  part of the Court's assumption is that there is a vigorous

13  scrubbing and negotiation process that goes on outside of

14  what I see.  So while there is not an objection, I do

15  appreciate the statement from the Committee and I attribute

16  significance to the fact that the Committee in a case such as

17  this, that is not fully consensual, at least at this stage,

18  nevertheless, presents a consensual, from the Committees'

19  point of view, structure for a key employee incentive

20  program.

21         So based upon the record before me, as it relates to

22  the incentive program, I am satisfied that the Debtors have

23  carried their burden and I would be prepared to approve it.

24         With respect to the key employee retention program,

25  I don't want to overly complicate the issue.  I think that eh

1  Trustees' objection boils down to one individual and whether

2  that individual can be properly included.  My recollection

3  was that we had dealt with the issue, my colleagues and I, in

4  various cases.  I know a lot of it goes back to Foothills and

5  who is an insider, who is an officer, but I thought that

6  there was also, my recollection of the case law is that there

7  is also a qualitative analysis that goes on that the

8  question, the name vice president is less significant,

9  secretary obviously, assistant secretary is, obviously, an

10 officer position.

11        What I think my colleagues and I had done is, at

12 least, applied a qualitative analysis to that.  To me, this

13 is an individual who's, as an assistant secretary of the

14 subsidiary corporation and based on Ms. Caya's testimony is

15 not necessarily involved in the direction of the overall

16 enterprise as we would expect from the most senior

17 management.  Certainly those that are identified and included

18 in the key employee incentive program.

19        I think that the fact that the individual held the

20 position or held the position of assistant secretary is not a

21 completely disqualifying consideration.  So I would be

22 prepared to permit him to be included in the key employee

23 retention program.  Alternatively, it would seem to me that

24 if that were a significant consideration and if I had the law

25 wrong, then I would be prepared to approve that individual in

1 the incentive program, but it doesn't really, frankly, seem

2 to fit properly within that category.

3        Again, when an individual is an assistant secretary

4 of a subsidiary corporation, we do start with a proposition

5 that that individual is an officer and ought to be so

6 treated.  Testimony can be developed an induced that rebuts

7 that presumption.  In this case, I am satisfied that it has.

8 Again, I think with respect to the retention program, the

9 other elements of it did not seem to be in material dispute

10 and seemed consistent with what the Court has seen in prior

11 cases.  So I would be prepared to approve and authorize the

12 retention program as requested by the Debtor.

13        I attribute significance to the fact that the

14 Committee has not opposed it.  Again, as with the key

15 employee incentive program, I do think it's necessary and

16 proper that the U.S. Trustee test these propositions and

17 proposals when they are presented.  So based upon the record

18 before me and considering the testimony thus developed in the

19 exhibit which has been admitted, but will not be docketed, I

20 would be prepared to approve and authorize the programs.  Are

21 there any questions?

22        MR. KWASTENIET:  No, Your Honor.

23        MR. DURRER:  I have a form of order, Your Honor, may

24 I approach?

25        THE COURT:  Sure.  I think you are going to finalize

1  this for me and get a proposed form of order with its

2  exhibits.  You will get back in touch with me about dates.

3  We are looking at three days right now that we would lock in

4  for you and, again, I think I've got a lot of flexibility.

5  If you would touch base with Ms. Bello and let her know what

6  your preferences are, we can get you those dates promptly,

7  okay.  Do we have anything further today?  All right, I

8  appreciate everyone's time.  Stand in recess.

9       (Court Adjourned).

10

11                        CERTIFICATE

12  I certify that the foregoing is a correct transcript from the

13  electronic sound recording of the proceedings in the above-

14  entitled matter.

15
    /s/Mary Zajaczkowski                    December 1, 2015
16  Mary Zajaczkowski, CET**D-531                   Date
    Coleen Rand 341
17

18

19

20

21

22

23

24

25