# EXHIBIT 1

**Backstop Commitment Letter**

Case 15-11880-BLS   Doc 530-1   Filed 12/04/15   Page 1 of 10

Re: Quiksilver, Inc.
Page 1

Quiksilver, Inc.  
15202 Graham Street  
Huntington Beach, California 92649  
Attn: General Counsel

Oaktree Capital Management, L.P.  
333 South Grand Avenue, 28th Floor  
Los Angeles, California 90071  
Attn: Thomas Casarella

December 3, 2015

    Re: Backstop Commitment

Amended Backstop Commitment Letter

Ladies and Gentlemen:

    Reference is made to the chapter 11 bankruptcy cases, lead case no. 15-11880 (KJC) (the "**Chapter 11 Cases**"), currently pending before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), in which Quiksilver, Inc. ("**Quiksilver**" or the "**Company**") and each of its United States subsidiaries (collectively, the "**Debtors**")[1] are debtors and debtors in possession. Reference is further made to: (i) the restructuring (the "**Restructuring**") of the outstanding obligations of the Debtors contemplated by that certain plan sponsor agreement, (the "**PSA**") and that certain plan sponsor term sheet (the "**PSA Term Sheet**"), each dated as of September 8, 2015, by and among the Debtors and certain funds managed by affiliates of Oaktree Capital Management, L.P. (collectively, the "**Plan Sponsor**"); (ii) that certain Backstop Term Sheet dated as of September 8, 2015 (the "**Backstop Term Sheet**"); and (iii) that certain Backstop Commitment Letter between the parties hereto, dated October 31, 2015. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Backstop Term Sheet.

    This amended backstop commitment letter agreement (this "**Backstop Commitment Letter**") sets forth the understanding and agreement among the Plan Sponsor and the Quiksilver Entities (the "**Parties**") in respect of the foregoing. This Backstop Commitment Letter also amends and supersedes, in its entirety, that certain Backstop Commitment Letter between the parties hereto, dated October 31, 2015.

    1.    Commitment. The Plan Sponsor is pleased to confirm its commitments (individually, the "**Exit Facility Commitment**" and the "**Euro Notes Commitment**," and together, the "**Backstop Commitments**"), as further described in the Backstop Term Sheet and subject to the terms and conditions set forth in this Backstop Commitment Letter, to (A) acquire

---

[1] The "**Debtors**" are Quiksilver, Inc. and each of its domestic direct and indirect subsidiaries: QS Wholesale, Inc., QS Optics, Inc., Quiksilver Wetsuits, Inc., Mt. Waimea, Inc., Quiksilver Entertainment, Inc., DC Shoes, Inc., DC Direct, Inc., Fidra, Inc., Hawk Designs, Inc., and QS Retail, Inc. The Debtors and the non-Debtor foreign subsidiaries shall be referred to herein collectively as the "**Quiksilver Entities**."

Re: Quiksilver, Inc.
Page 2

and exercise its rights in its capacity as a holder of Secured Notes to acquire equity in Quiksilver Parent (the "**Rights Offering New Common Stock**") in the Exit Rights Offering[2] and the Euro Notes Rights Offering (collectively, the "**Rights Offerings**") and (B) backstop the Rights Offerings by purchasing, at the applicable price, all of the Rights Offering New Common Stock that is not purchased in the Rights Offerings by holders of Secured Notes other than the Plan Sponsor; provided, however, that, for the avoidance of doubt, in no event shall the Plan Sponsor be required to provide more than $127.5 million in connection with the Exit Rights Offering, or €50.0 million in connection with the Euro Notes Rights Offering; provided, further, however, that the Plan Sponsor's commitment to backstop the Euro Notes Rights Offering shall be limited to the extent that less than 100 percent in aggregate principal amount of Euro Notes are tendered into the Euro Notes Exchange Offer. The Backstop Commitments shall be reduced on a dollar-for-dollar basis by the funds raised from non-Plan Sponsor parties under the Rights Offerings. The Parties agree that: (a) the proceeds from the Euro Notes Rights Offering will be used solely to consummate the Euro Notes Exchange Offer; and (b) the proceeds from the Exit Rights Offering will be used (i) first to satisfy any remaining unpaid balance of the DIP Term Facility outstanding on the Effective Date, (ii) second to fund the Unsecured Creditor Recovery, and (iii) third to fund any other payments required on the Effective Date and general corporate purposes. The Parties acknowledge and agree that: (y) the Plan Sponsor shall not have any liability or obligation with respect to the Exit Facility Commitment in the event that the Exit Rights Offering does not occur or is not consummated as contemplated in the PSA Term Sheet and Backstop Term Sheet; and (z) the Plan Sponsor shall not have any liability or obligation with respect to the Euro Notes Commitment in the event that the Euro Notes Rights Offering does not occur or is not consummated as contemplated in the PSA Term Sheet and the Backstop Term Sheet.

    2.    Conditions Precedent.

    (a)    Exit Facility Commitment. The Exit Facility Commitment is subject to the satisfaction of each of the following conditions precedent: (i) the Backstop Approval Order becomes a Final Order; (ii) the Bankruptcy Court enters the Disclosure Statement Order, which shall be in form and substance acceptable to the Plan Sponsor; (iii) the Commitment Fees (as described below) shall be earned and payable; (iv) the Bankruptcy Court enters a Final Order, which shall be in form and substance acceptable to the Plan Sponsor, confirming the Agreed Plan; (v) no events of default under the DIP ABL Facility or the DIP Term Facility have occurred; (vi) the PSA shall not have terminated and shall continue to be effective; (vii) the Debtors have paid the expense reimbursements outlined in the PSA on a timely basis; (viii) all documents arising from or related to the Chapter 11 Cases have been executed, the form of which documents must be reasonably satisfactory to the Plan Sponsor; (ix) the negotiation, execution, and delivery of all definitive documentation related to the Exit Rights Offering are in

---

[2] Notwithstanding anything in the Backstop Term Sheet to the contrary, the Exit Rights Offering shall be in the amount of $127.5 million, of which $12.5 million shall be available for subscription by eligible holders of Allowed Unsecured Notes Claims.

Re: Quiksilver, Inc.
Page 3

form and substance satisfactory to the Plan Sponsor and the completion of the Exit Rights Offering thereafter; (x) all conditions precedent to the Agreed Plan (other than those related to the funding of the Exit Facility Commitment) shall have been satisfied or waived in accordance with the Agreed Plan; and (xi) the Effective Date under the Agreed Plan shall have occurred or shall occur substantially simultaneously with the funding of the Exit Facility Commitment pursuant hereto; provided, however, that the Plan Sponsor may waive any of the foregoing conditions precedent in its sole discretion.

(b)  Euro Notes Commitment.  The Euro Notes Commitment is subject to the satisfaction of each of the following conditions precedent:  (i) the Backstop Approval Order becomes a Final Order; (ii) the Bankruptcy Court enters the Disclosure Statement Order, which shall be in form and substance acceptable to the Plan Sponsor; (iii) the Commitment Fees (as described below) shall be earned and payable; (iv) the Bankruptcy Court enters a Final Order, which shall be in form and substance acceptable to the Plan Sponsor, confirming the Agreed Plan; (v) no events of default under the DIP ABL Facility or the DIP Term Facility have occurred; (vi) the PSA shall not have terminated and shall continue to be effective; (vii) the Debtors have paid the expense reimbursements outlined in the PSA on a timely basis; (viii) all documents arising from or related to the Chapter 11 Cases have been executed, the form of which documents must be reasonably satisfactory to the Plan Sponsor; (ix) the negotiation, execution, and delivery of all definitive documentation related to the Euro Notes Rights Offering are in form and substance satisfactory to the Plan Sponsor and the completion of the Euro Notes Rights Offering thereafter; (x) all conditions precedent to the Agreed Plan (other than those related to the funding of the Euro Notes Commitment) shall have been satisfied or waived in accordance with the Agreed Plan; (xi) the Effective Date under the Agreed Plan shall have occurred or shall occur substantially simultaneously with the funding of the Euro Notes Commitment pursuant hereto; and (xii) the Euro Notes Exchange Offer shall be consummated in accordance with the PSA Term Sheet, the PSA, and the Agreed Plan; provided, however, that the Plan Sponsor may waive any of the foregoing conditions precedent in its sole discretion.

3.  Fees.  In exchange for the Backstop Commitments, the Plan Sponsor shall fully earn the following commitment fees (collectively, the "**Commitment Fees**") upon the Bankruptcy Court entering orders approving this Backstop Commitment Letter and the disclosure statement in respect of the Agreed Plan: (a) $6.375 million, which is 5% of the Exit Facility Commitment; and (b) €2.5 million, which is 5% of the Euro Notes Commitment. The Commitment Fees shall be payable in Rights Offering New Common Stock on the Effective Date consistent with the Agreed Plan, to be issued without the discount provided to participants in the Rights Offerings, and which such issuances shall dilute all other issuances of Rights Offering New Common Stock in connection with the effectiveness of the Agreed Plan; provided, however, that, at the Plan Sponsor's election, the Commitment Fees shall be payable in cash in the event the Agreed Plan is not consummated for any reason within 150 days of the Petition Date.

4.  Termination.  The Plan Sponsor may terminate its obligations or commitments contemplated by this Backstop Commitment Letter by providing written notice to the Debtors' counsel upon the earliest occurrence of any of the following termination events: (a) the Debtors

Re: Quiksilver, Inc.
Page 4

do not file a motion seeking approval of this Backstop Commitment Letter on or before October 30, 2015; (b) the Bankruptcy Court does not enter an order approving this Backstop Commitment Letter on or before December 4, 2015; (c) the occurrence of any default or event of default under the DIP ABL Facility or the DIP Term Facility; or (d) the occurrence of any Plan Sponsor Termination Event, as described in § 5.01 of the PSA. This Backstop Commitment Letter can be terminated by the written mutual consent of each of the Parties. If (x) the Commitment Fees have been earned but not yet paid, (y) the PSA has been terminated pursuant to section 5.02(c) thereof in light of a Superior Proposal or the Debtors have obtained Bankruptcy Court approval of an alternative debtor in possession financing facility in furtherance of a Superior Proposal, and (z) the Plan Sponsor delivers a termination notice in accordance with this paragraph, then the Commitment Fees shall be paid in full in cash within three (3) business days after the Plan Sponsor's delivery of such notice; <u>provided, however</u>, that in the event the Agreed Plan is not consummated within 150 days of the Petition Date for any reason (other than as set forth in subpart (y) above), then, at the Plan Sponsor's election, the Commitment Fees shall be payable in cash no later than the end of the 150th day following the Petition Date.

5. <u>Representations, Warranties, Conditions, and Covenants</u>. The Plan Sponsor hereby certifies that it or any funds and accounts it manages and/or advises that participates in the Rights Offerings: (a) (i) is certified as an "accredited investor" as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act of 1933, as amended (the "**Securities Act**"), which, for the avoidance of doubt, shall exclude any natural person, or (ii) is a "qualified institutional buyer" as defined in Rule 144A of the Securities Act; (b) is acquiring the Rights Offering New Common Stock for its own account with the present intention of holding such securities for investment purposes and not with a present view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities laws; (c) has had an opportunity to ask questions and receive answers concerning the terms and conditions of the Rights Offerings and acknowledges that it or its representatives have been furnished with all information that it has requested; and (d) has the requisite power and authority to participate in the Rights Offerings, as applicable, and such participation does not conflict with, violate, or cause a breach of any agreement, contract, or instrument to which it is a party or any judgment, order, or decree to which it is subject. Additionally, the Parties each hereby certify that it has the requisite power and authority to execute this Backstop Commitment Letter.

6. <u>Miscellaneous</u>.

(a) Subject to the terms and conditions of this Backstop Commitment Letter, the Plan Sponsor shall fund the Backstop Commitments in the amount not otherwise funded by non-Plan Sponsor parties under the Rights Offerings by wire transfer of immediately available funds to the accounts as designated by the Debtors. The Plan Sponsor's commitments under this Backstop Commitment Letter—including subparts (A) and (B) of the first sentence of paragraph 1 of this Backstop Commitment Letter—shall be funded on or before the Effective Date (the "**Funding Date**"). The Plan Sponsor's commitments under this Backstop Commitment Letter in respect of the Euro Notes Commitment shall be funded in euro (€), and the Plan Sponsor's commitments under this Backstop Commitment Letter in respect of the Exit Facility Commitment shall be funded in U.S. dollars ($).

Re: Quiksilver, Inc.
Page 5

    (b)    This letter agreement shall be governed by the laws of the State of New York applicable to contracts made and to be performed in such state, without giving effect to the conflicts of laws principles thereof. Each of the Parties hereby agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Backstop Commitment Letter, to the extent possible, the Bankruptcy Court. Each of the Parties irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, waives any objection regarding venue in the Bankruptcy Court, and waive any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any of the Parties. Further, each of the Parties irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Backstop Commitment Letter. In no event shall the Plan Sponsor be subject to any fiduciary or other implied duties as a result of the Backstop Commitments or otherwise in connection with this Backstop Commitment Letter.

    (c)    This Backstop Commitment Letter, the PSA, the PSA Term Sheet, the Backstop Term Sheet, and the other agreements contemplated hereby are the only agreements among the Debtors and the Plan Sponsor with respect to the Backstop Commitments and contain the entire understanding of the Parties with respect thereto. This Backstop Commitment Letter may be executed in one or more counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Backstop Commitment Letter by facsimile transmission or email shall be effective as delivery of a manually executed counterpart of this Backstop Commitment Letter.

    (d)    The Parties each acknowledge and agree that money damages may not be an adequate remedy for breach of any of the provisions of this Backstop Commitment Letter, and each of the Parties shall have the right to injunctive relief or specific performance, in addition to all of its other rights and remedies at law or in equity, to enforce the provisions of this Backstop Commitment Letter.

    (e)    Except as set forth in the following sentence, this Backstop Commitment Letter may be modified or amended only by a written agreement signed by each of the Parties. The Plan Sponsor may assign its rights and obligations hereunder in whole or in part to any of its affiliates without the consent of any other party hereto, but may not assign to any other non-affiliate party without the prior written consent of the Quiksilver Entities. This Backstop Commitment Letter is not assignable by any of the Quiksilver Entities without the prior written consent of the Plan Sponsor.

    (f)    For the avoidance of doubt, the provisions of this Backstop Commitment Letter relating to the Commitment Fees shall survive the termination or expiration of the Backstop Commitments or this Backstop Commitment Letter.

*[Signatures on Following Pages]*

Very truly yours,

**SECOND STREET HOLDINGS 9, L.P.**
**SECOND STREET HOLDINGS 11, L.P.**
**SECOND STREET HOLDINGS 12, L.P.**
**SECOND STREET HOLDINGS 13, L.P.**
**SECOND STREET HOLDINGS 14, L.P.**
**SECOND STREET HOLDINGS 15, L.P.**

By:    PF5 GP, LLC
Its:    General Partner

By:    Oaktree Capital Management, L.P.
Its:    Managing Member

By: _____
Name: Matthew C. Wilson
Title: Managing Director and Co-Portfolio Manager

By: _____
Name: Thomas A. Casarella
Title: Senior Vice President

**SIXTH STREET HOLDINGS 1, L.P.**
**SIXTH STREET HOLDINGS 2, L.P.**
**SIXTH STREET HOLDINGS 3, L.P.**
**SIXTH STREET HOLDINGS 4, L.P.**
**SIXTH STREET HOLDINGS 5, L.P.**
**SIXTH STREET HOLDINGS 6, L.P.**
**SIXTH STREET HOLDINGS 7, L.P.**

By:    Oaktree Fund GP, LLC
Its:    General Partner

By:    Oaktree Fund GP I, L.P.
Its:    Managing Member

By: _____
Name: Matthew C. Wilson
Title: Authorized Signatory

By: _____
Name: Thomas A. Casarella

Title: Authorized Signatory

**OAKTREE PRINCIPAL FUND VI BLOCKER (CAYMAN), LTD.**

By: Oaktree Capital Management, L.P.
Its: Director

By: _____
Name: Matthew C. Wilson
Title: Managing Director and Co-Portfolio Manager

By: _____
Name: Thomas A. Casarella
Title: Senior Vice President

**OCM PF SUNSET HOLDINGS, LTD.**

By: Oaktree Capital Management, L.P.
Its: Director

By: _____
Name: Matthew C. Wilson
Title: Managing Director and Co-Portfolio Manager

By: _____
Name: Thomas A. Casarella
Title: Senior Vice President

**OCM BIG WAVE LLC**

By: Oaktree Fund GP, LLC
Its: Manager

By: Oaktree Fund GP I, L.P.
Its: Managing Member
By: _____
Name: Matthew C. Wilson
Title: Authorized Signatory

By: _____
Name: Thomas A. Casarella

Signature page to Backstop Commitment Letter

Title:   Authorized Signatory

**OCM FIE, LLC**

By: _____
Name: Matthew C. Wilson
Title:   Authorized Signatory

By: _____
Name: Thomas A. Casarella
Title:   Authorized Signatory
Signature page to Backstop Commitment Letter

December 3, 2015

Acknowledged and Agreed:

**QUIKSILVER, INC.**
**on behalf of the Quiksilver Entities**

By: _____
Name: ANDREW BRUENJES
Title: CFO AMERICAS