IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Quiksilver, Inc., *et al.*, | ) Case No. 15-11880 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) Re: Docket No. 499 |
| | ) Hearing Date: Dec. 17, 2015 @ 9:00 a.m. |
| | ) Obj. Deadline: Dec. 10, 2015 @ 4:00 p.m. |
| | ) |

**E. GLUCK CORPORATION'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a) AND 365(a) AND BANKRUPTCY RULES 6006 AND 9014 AUTHORIZING REJECTION OF LICENSE AGREEMENT *NUNC PRO TUNC* TO NOVEMBER 25, 2015**

E. Gluck Corporation ("EGC"), the licensee under that certain license agreement between Quiksilver, Inc. ("ZQK"), one of the above-captioned debtors (collectively, the "Debtors") and EGC, dated as of June 16, 2014, hereby objects (the "Objection") to the *Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Code Sections 105(a) and 365(a) and Bankruptcy Rules 6006 and 9014 Authorizing Rejection of License Agreement Nunc Pro Tunc to November 25, 2015*, dated November 25, 2015 [Docket No. 499] (the "Rejection Motion"). In support of the Objection, EGC respectfully represents as follows:

## PRELIMINARY STATEMENT[1]

EGC manufactures and sells watches and related products, using its own proprietary trademarks as well as trademarks licensed by others, including ZQK. Just over one year ago, EGC entered into a binding contract with ZQK for the exclusive rights to use the Debtors' Intellectual Property in its watch business for a term continuing at least through December 31, 2020. Relying upon that contract, EGC has invested approximately $2.5 million in start-up and

---

[1] Capitalized terms used in this Preliminary Statement and not otherwise defined shall have the meanings ascribed to them in the body of this Objection.

administrative costs over the past year. EGC's investment of that capital along with significant human resources already has borne fruit: the launch of Quiksilver and Roxy watches has been enormously successful and profitable for both EGC and the Debtors.

Unfortunately, the Debtors now seek to use their bankruptcy proceedings as a sword, instead of a shield. They do not seek to relieve themselves of any purported "burdens" under the License Agreement (and none have been shown to exist), but rather to potentially reap even greater profits while inflicting grave harm upon EGC by stripping EGC of its rights to use the Intellectual Property for five of the six years EGC bargained for – a result that would *never* occur if the Debtors breached the License Agreement outside of bankruptcy. Moreover, the Debtors ask the Court to authorize this manifestly inequitable result without so much as a declaration attesting as to why rejecting the License Agreement is supposedly in the best interests of the estates.

The Court should not permit this result. While the Bankruptcy Code grants debtors-in-possession enormous protective powers, such as the ability to reject burdensome executory contracts, those powers are, and must be, counter-balanced by statutory and equitable protections afforded to counter-parties. For instance, commercial tenants of a debtor retain occupancy rights post-rejection, which prevents debtors from rejecting leases simply because a more profitable option exists. Likewise, and most relevant here, the equitable considerations embedded in section 365(n) of the Bankruptcy Code provide similar protections to parties to intellectual property licenses granted by debtors – including trademark licensees – by providing them continuous use rights post-rejection through the term of the applicable agreement.

As Judge Ambro, concurring in *Exide*, reasoned, Congress, by not expressly listing "trademarks" in section 101(35A)'s definition of intellectual property, left it to the courts to

determine whether it would be equitable to allow a particular trademark licensee to make a section 365(n) election to retain usage rights for the duration of the rejected license agreement. Here, because of the amount EGC invested such a short time ago, the remaining duration of the License Agreement, the lack of demonstrable harm to the Debtors if the License Agreement remains in place, and the enormous harm EGC will suffer if its usage rights are immediately stripped, the Court should permit EGC to retain its rights to use the Debtors' Intellectual Property for the duration of the agreement under section 365(n), in accordance with *Exide* and its progeny.

Moreover, as Judge Easterbrook opined for the Seventh Circuit in *Sunbeam*, if the Court authorizes rejection, it should nonetheless recognize EGC's rights to continue to use the Debtors' Intellectual Property, because rejection of an executory contract constitutes a mere breach, not a rescission, of a license agreement. Accordingly, the Court in *Sunbeam* found that a debtor-licensor's rejection of a trademark licensing agreement did not deprive the licensee of its non-bankruptcy law rights to continue using the trademarks for the duration of the agreement. Thus, while the Debtors may be relieved of their own obligations under the License Agreement if the Court authorizes rejection, EGC's rights should nevertheless remain in place.

Finally, the Rejection Motion fails for the independent reason that the Debtors have provided no evidence – not so much as a declaration – upon which to support their purported business judgment that rejection of the License Agreement is in the best interests of the estates. Demonstrating business judgment requires more than counsel's conclusory statements in a pleading. Absent testimony or other compelling evidence of the Debtors' efforts to evaluate the costs and benefits of the attempted rejection and the bases for the apparent ultimate conclusion that rejection is in the best interest of the estates, the Rejection Motion is facially deficient.

Accordingly, as more fully set forth herein, the Court should deny the Rejection Motion.

## BACKGROUND

1. On June 16, 2014, ZQK and EGC entered into that certain license agreement (the "License Agreement," cited herein as "L.A."), pursuant to which ZQK granted to EGC an exclusive, non-transferrable license (the "License") in certain trademarks and design elements of ZQK (the "Intellectual Property"), for use by EGC in designing, developing, sourcing, manufacturing and selling certain digital and analog watches and clocks bearing the Intellectual Property (the "Licensed Products").[2]

2. The License Agreement's Initial Term (as defined therein) is scheduled to run through December 31, 2020. (L.A., Schedule C.) That term is subject to extension upon mutual written agreement by the parties, provided that EGC meets certain target sales and remains in general good standing with respect to its royalty obligations. (*Id.*, § 10.6, Schedule C.) EGC invested substantial funds over the past year, in reasonable reliance on the License Agreement running for at least another five years. Specifically, EGC expended approximately $2.5 million in start-up and administrative costs related to the License, which – absent rejection and the Debtors' intended stripping of EGC's rights to use the Intellectual Property for the duration of the License Agreement – EGC will amortize, with a substantial profit for itself and the Debtors. If the Court grants the Rejection Motion and terminates EGC's use of the Intellectual Property, all of that will be lost, and EGC undoubtedly will suffer grave and irreparable harm, including damages to EGC's relationship with customers who abruptly will be deprived of exciting new products manufactured and marketed by EGC.

---

[2] The License Agreement is annexed to the Rejection Motion as Exhibit A.

4

**OBJECTION**

3. The Court should deny the Rejection Motion under the equitable considerations that must be considered by a bankruptcy court under section 365(n) of the Bankruptcy Code and its decisional precedents.

4. Section 365(n) provides, in pertinent part:

> (n)(1) If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect . . .
> (B) to retain its rights . . . under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for—
> (i) the duration of such contract . . . .
>
> (2) If the licensee elects to retain its rights . . .
> (A) the trustee shall allow the licensee to exercise such rights
> . . . .
>
> (3) If the licensee elects to retain its rights . . . then on the written request of the licensee the trustee shall--
> (A) to the extent provided in such contract . . . provide to the licensee any intellectual property (including such embodiment) held by the trustee; and
> (B) not interfere with the rights of the licensee as provided in such contract . . . to such intellectual property (including such embodiment) including any right to obtain such intellectual property (or such embodiment) from another entity.

11 U.S.C. § 365(n)(1)-(3).

5. Although trademarks are not expressly listed in Bankruptcy Code section 101(35A), which identifies certain types of "intellectual property," various courts – mostly notably the Third Circuit in Judge Ambro's concurring opinion in *In re Exide Techs.*, 607 F.3d 957 (3d Cir. 2010) ("*Exide*"), and the Seventh Circuit in Judge Easterbrook's opinion in *Sunbeam Prods., Inc. v. Chi. Am. Mfg., LLC*, 686 F.3d 372 (7th Cir. 2012) ("*Sunbeam*") – have

5

found that trademark licensees still may elect to retain their rights under section 365(n). Here, terminating EGC's usage would be highly inequitable, would allow the Debtors' statutory powers to be misused to profit rather than to protect, and would contradict the fundamental principle that rejection constitutes only a breach, not recission, of a contract.

6. Separately, the Rejection Motion should be denied because the Debtors have made no showing of their purported business judgment that rejection is in the best interests of the estates.

A. **Terminating EGC's Rights to Use the Intellectual Property for the Duration of the License Agreement Would Violate the Equitable Principles Embedded in Section 365(n).**

7. First, the Court should hold that the underlying policy of section 365(n) applies to the License Agreement, consistent with the reasoning set forth in Judge Ambro's *Exide* concurring opinion, because terminating EGC's License would be highly inequitable, would inflict serious harm on EGC, and would permit the Debtors to use bankruptcy as a sword, not a shield.

8. In *Exide*, the Third Circuit overturned the lower courts' orders authorizing the debtors to reject, *inter alia*, a trademark licensing agreement, because the agreement did not contain ongoing material obligations on both sides, and therefore was not executory. 607 F.3d at 960, 964. Judge Ambro authored a separate, concurring opinion, to address the lower courts' critically erroneous determination that rejection stripped the licensee of its right to use the debtors' trademark. *Id.* at 965.

9. Judge Ambro explained that because section 101(35A) of the Bankruptcy Code does not explicitly list "trademark" in the definition of "intellectual property," some courts have, incorrectly, "reasoned by negative inference" that the Fourth Circuit's thirty-year-old and often-

criticized holding in *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986) still applies when a debtor licensor rejects a trademark license agreement. 607 F.3d at 966. *Lubrizol* had found, prior to section 365(n)'s enactment, that the debtor-licensor's rejection of a technology license deprived the licensee of all rights under the license – and in response to this troubling result, Congress enacted section 365(n). *Id.* at 965 (citing *Lubrizol*, 756 F.2d at 1048).

10. Judge Ambro rejected the notion that *Lubrizol* still applies when a debtor-licensor rejects a trademark license: "Rather than reasoning from negative inference to apply another Circuit's holding to this dispute, the [Delaware Bankruptcy and District] Courts . . . should have used . . . their equitable powers to give [debtors] a fresh start without stripping [licensor] of its fairly procured trademark rights." *Id.* at 967. Indeed, Judge Ambro reasoned, "[w]hen Congress enacted § 365(n), it *explicitly explained* why it excluded trademark licensees" – *not* to subject such licensees to a blanket exclusion from section 365(n) election, but rather, because "trademark, trade name and service mark licensing relationships depend to a large extent on control of the quality of the products or services sold by the licensee. Since these matters could not be addressed without more extensive study, it was determined to postpone congressional action in this area and *to allow the development of equitable treatment of this situation by bankruptcy courts.*" *Id.* at 966-67 (quoting S. Rep. No. 100-505, at 5 (1998), *reprinted in* 1988 U.S.C.C.A.N. 3200, 3204) (emphasis added).

11. Accordingly, Judge Ambro concluded that "reasoning from negative inference . . . is inapt for trademark license rejections . . . . In light of these direct congressional statements of intent, it is simply more freight than negative inference will bear to read rejection of a trademark license to effect the same result as termination of that license." *Id.* (quotation omitted).

Accordingly, "Courts may use § 365 to free a bankrupt trademark licensor from burdensome duties that hinder its reorganization. They should not . . . use it to let a licensor take back trademark rights it bargained away. This makes bankruptcy more a sword than a shield, putting debtor-licensors in a catbird seat they often do not deserve." *Id.* at 967-68.

12. The Debtors try to summarily dispose of *Exide* in a footnote (Rejection Motion, ¶ 28 n.3), but Judge Ambro is not alone in his reasoning.[3] *See In re Crumbs Bake Shop, Inc.*, 522 B.R. 766, 772 (Bankr. D.N.J. 2014) ("The Court shares Judge Ambro's perspective that Congress intended the bankruptcy courts to exercise their equitable powers to decide, on a case by case basis, whether trademark licensees may retain the rights listed under § 365(n)."); *In re Matusalem*, 158 B.R. 514, 516 (Bankr. S.D. Fla. 1993) (observing that legislative history surrounding section 365(n) makes clear that Congress intended to place "the ball [] back in the Court's court" to decide whether, equitably, section 365(n) should apply to trademarks under the facts of a given case). Indeed, *In re HQ Global Holdings, Inc.*, 290 B.R. 507 (Bankr. D. Del. 2003), which the Debtors gratuitously espouse as "the better view" (Rejection Motion ¶ 28, n.3), pre-dated *Exide* (not to mention *Crumbs* and *Sunbeam*), and the franchisees there made no equitable argument, but rather premised their position on a non-binding Second Circuit footnote that "reiterates the familiar maxim that rejection does not terminate or repudiate a contract but simply relieves the estate from its obligation to perform." *Id.* at 513 (citation omitted). Additional persuasive authority is now available to aid in this Court's analysis.

13. Notably, *Crumbs* observed that a bill was recently passed by the House of Representatives seeking to include trademarks in the Bankruptcy Code definition of intellectual property. 522 B.R. at 773. "Although not dispositive to this Court's decision, the fact that this

---

[3] Even if Judge Ambro were alone in his reasoning, his view would represent that of the Third Circuit jurist most experienced in bankruptcy matters.

legislation is pending suggests that Congress is aware of the prejudice to trademark licensees from the approach espoused by [debtor-licensor], and is attempting to remedy the omission of 'trademarks' from its definition of 'intellectual property.'" *Id.* at 773-74 (quoting Innovation Act of 2013, H.R. 3309, 113th Cong. § 6(d) (2013)).[4] Indeed, courts can and do consider pending legislation in aid of rendering their decisions, *Crumbs*, 522 B.R. at 774 n.4 (collecting cases), and such pending legislation speaks volumes as to the appropriate balance of equities.[5]

14. Here, the Court should adopt the equitable test deployed by Judge Ambro and others and decline to cut off EGC's usage rights. Stripping EGC of its ability to use the Intellectual Property for the duration of the License Agreement would be highly inequitable, because it would inflict manifest harm on EGC. Over the past year, EGC invested approximately $2.5 million in reasonable reliance on the License Agreement running for at least another five years. (*See* L.A. § 10.6, Schedule C.) If EGC has to cease using the Intellectual Property immediately, EGC will lose all of that capital, as well as an enormous investment of human resources in developing, marketing and promoting the Debtors' brands. All that capital,

---

[4] The Innovation Act of 2013, H.R. 3309, passed in the House of Representatives, but was stalled in the Senate in 2013. On February 5, 2015, it was reintroduced as the Innovation Act, H.R. 9, to the House of Representatives. *See Goldgate Introduces Patent Litigation Reform Bill* (February 5, 2015) http://goodlatte.house.gov/press_releases/660. The currently proposed bill, in relevant part, provides that "Section 101(35A) of title 11, United States Code, is amended . . . by adding after subparagraph (F) the following new subparagraph: '(G) a trademark, service mark, or trade name, as those terms are defined in section 45 of the Act of July 5, 1946 (commonly referred to as the "Trademark Act of 1946") (15 U.S.C. § 1127) . . . ." Innovation Act of 2015, H.R. 9, 114th Cong. § 6(e) (p. 37, 1-13) (2015), http://judiciary.house.gov/_cache/files/a2c6b5ad-af48-483f-9e3e-d3420dda64e6/goodla-008-xml.pdf.

[5] EGC is, of course, aware of this Court's order in *In re Deel, LLC*, No. 10-11310 BLS, 2011 WL 9012049 (Bankr. D. Del. Feb. 8, 2011), holding that the franchisee-licensees' use of the debtors' intellectual property, including trademarks, was not protected by section 365(n). *Id.* at *7. However, the Court in *Deel* did not consider or evaluate the equitable circumstances of the situation, nor did it have reason to. In *Deel*, in sharp contrast to the instant case, the licensees, in their limited objection to the debtors' rejection motion, "*disputed neither the Debtors' ability to reject the [] [] Agreements, nor the effect of such rejection.*" *Id.* at *5 (emphasis added). Thereafter, the franchisees continued to operate debtor-branded restaurants after this Court authorized the rejection and the debtors' section 363 sale. *Id.* at *6. Because the instant facts are drastically different than the facts in *Deel*, EGC respectfully urges the Court to consider Judge Ambro's *Exide* concurrence and additionally to consider Judge Easterbrook's reasoning in *Sunbeam*, which was issued after *Deel* (discussed *infra*, Section B).

effort, good will, and brand identity will, with the stroke of a pen, unjustifiably pass to the Debtors if an unqualified rejection order is entered.[6]

B.  **Rejection is a Breach That, Under *Sunbeam* and the Bankruptcy Code, Does Not Deprive EGC of its Rights to the License Outside of Bankruptcy.**

15.    EGC also should not be stripped of its rights to use the Intellectual Property for the License Agreement's term, because rejection of the License Agreement amounts to the Debtors' mere *breach* – *not* recission of the agreement – under the plain language of section 365(g). Accordingly, even upon rejection, EGC should be entitled to the continued use of the Intellectual Property for the duration of the License Agreement, as it would be if the Debtors breached the contract outside of bankruptcy. Judge Easterbrook, writing for the Seventh Circuit, expressly so found in *Sunbeam*: "What §365(g) does by classifying rejection as breach is establish that in bankruptcy, as outside of it, the other party's rights remain in place." 686 F.3d at 377 (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531(1984)) (additional citation omitted).

16.    In *Sunbeam*, the debtor contracted the manufacture of its fans to a licensee, CAM, authorizing CAM to practice the debtor's patents and put its trademarks on fans. *Id.* at 374. An involuntary bankruptcy petition was filed against the debtor, and the trustee rejected the agreement. *Id.* When CAM continued to make and sell debtor-branded fans, the purchaser of the debtor's patents and trademarks filed an adversary proceeding. *Id.* at 375. The bankruptcy court found in favor of CAM. *Id.*

17.    Upon certification by the district court of the purchaser's direct appeal to the Seventh Circuit, Judge Easterbrook found that the failure of section 101(35A) to expressly list

---

[6] The Debtors' offer in the Rejection Motion to permit EGC to sell Licensed Products which have been produced as of the date of entry of an order granting the Rejection Motion will not substantially mitigate EGC's harm.

10

"trademark" with the other forms of "intellectual property," was not meaningful – "an omission is just an omission. The limited definition in §101(35A) means that §365(n) does not affect trademarks one way or the other." *Id.* While Judge Easterbrook cited Judge Ambro's *Exide* concurrence with approval for its interpretation of section 365(n)'s legislative history, he framed the issue in *Sunbeam* as needing "to determine whether *Lubrizol* correctly understood §365(g), which specifies the consequences of a rejection under §365(a)." *Id.* at 375-76. *Lubrizol* did not.

18. Judge Easterbrook observed that rejection constitutes the debtor's *breach* of a contract, not *termination* or *recession* of that contract. *Id.* at 376 (quoting 11 U.S.C. § 365(g)). Accordingly, "nothing [about the rejection process] . . . implies that any rights of the other contracting party have been vaporized." *Id.* at 377. Judge Easterbrook reasoned that if the debtor breached its contract with CAM *outside* of bankruptcy, CAM might have elected under the Uniform Commercial Code to *either* treat that breach as ending CAM's own obligations, *or* to cover in the market and bill the debtor for extra costs, *id.* at 376-77 – and the result is no different in bankruptcy. "CAM . . . bargained for the security of being able to sell [debtor]-branded fans for its own account if [debtor] defaulted[.]" *Id.* at 377. Judge Easterbrook expanded:

> Bankruptcy law does provide means for eliminating rights under some contracts. For example, contracts that entitle creditors to preferential transfers . . . can be avoided under 11 U.S.C. §547, and recent payments can be recouped. A trustee has several avoiding powers. But [debtor's] trustee has never contended that [debtor's] contract with CAM is subject to rescission. The trustee used §365(a) rather than any of the avoiding powers—and rejection is not the functional equivalent of a rescission, rendering void the contract and requiring that the parties be put back in the positions they occupied before the contract was formed. *It merely frees the estate from the obligation to perform and has absolutely no effect upon the contract's continued existence.*

*Id.* (quoting *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 (11th Cir. 2007)) (quotations and additional citations omitted) (emphasis added); *see also Crumbs*, 522 B.R. at 772-73 (citing *Sunbeam*).

19. Accordingly, even if the Court authorizes the Debtors to reject the License Agreement, the result under the Bankruptcy Code is not that the agreement is *terminated* or *rescinded* or otherwise void – but rather, that the Debtors have simply *breached* it, which should not deprive EGC of its remedies under non-bankruptcy law to continue to use the Intellectual Property through the term of the License Agreement, in accordance with section 365(n). To be sure, if the Court grants the Rejection Motion, the Debtors will be relieved of their financial obligations under the License Agreement (*e.g.*, minimum purchases), and EGC would have only a general unsecured claim for any rejection damages stemming from the Debtors' breach, but EGC should still retain its own right to use the trademark, as Judge Easterbrook aptly reasoned.

C. **The Debtors Made No Showing of Business Judgment**

20. Finally, the Rejection Motion should be denied for the separate, independent reason that the Debtors made no showing whatsoever that rejecting the License Agreement would be in the best interests of the estates under a business judgment standard. "To determine if the business judgment test is met, a court is required to examine whether a reasonable business person would make a similar decision under similar circumstances . . . . Specifically, a court should find that the . . . rejection is elected on an informed basis, in good faith, and with the honest belief that the [rejection] . . . [is] in the best interests of [debtor] and the estate." *In re Dura Auto. Sys., Inc.*, No. 06-11202 KJC, 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (quotations omitted); *see also In re Network Access Sols., Corp.* 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("[A] bankruptcy court reviewing a . . . debtor-in-possession's decision to . . .

reject an executory contract should examine a contract and the surrounding circumstances and apply its best business judgment to determine if it would be beneficial or burdensome to the estate to assume it.") (quotation omitted).

21. The Debtors here have provided the Court with nothing upon which the Court could possibly base such a determination. Indeed, the Debtors did not so much as file a declaration or affidavit in support of the Rejection Motion. *See In re MF Glob. Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012) ("in seeking to reject an executory contract, [a debtor] must support the motion with evidence—usually in the form of a declaration or affidavit—demonstrating that rejection of the contract falls within the proper exercise of the [debtor's] business judgment."); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 463 (Bankr. S.D.N.Y. 2014) (same). Accordingly, the Rejection Motion should be denied.[7]

## NOTICE

22. Notice of this Objection has been provided as directed in the *Notice of Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Code Sections 105(a) and 365(a) and Bankruptcy Rules 6006 and 9014 Authorizing Rejection of License Agreement Nunc Pro Tunc to November 25, 2015* [Docket No. 499-1]. EGC submits that no other or further notice need be provided.

---

[7] Apart from failing to set forth any business reason to reject other than to avoid "confusion and inconsistent messaging" (Rejection Motion, ¶ 19), the Debtors, in filing the Rejection Motion, have done exactly that which they claim they seek to avoid. The Rejection Motion has caused enormous uncertainty and damage in the marketplace, especially with EGC's numerous foreign customers who have little familiarity with Chapter 11. Moreover, the motion, in creating the confusion that the Debtors knew would flow from its filing, unfortunately attempts to establish "facts on the ground" with respect to the EGC License, well in advance of the time at which a decision to assume or reject ordinarily would be made. Indeed, with an auction process in place, it is mystifying why the Debtors would prematurely seek to deprive the estates and a potentially interested bidder from obtaining the benefits of a lucrative royalty stream. Finally, it must be noted that the Debtors have demonstrated no ability to manufacture, market and service watches. The Licensed Products are not tee shirts, hats or towels – they are sophisticated electronic devices, and the Debtors have not, because they plainly cannot, provided any evidence, other than pure puffery, that they can profitably enter this niche business.

## CONCLUSION

WHEREFORE EGC respectfully requests that the Court deny the Rejection Motion and grant such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
December 10, 2015

Respectfully submitted,

SAUL EWING LLP

_____
Mark Minuti (DE Bar No. 2659)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873

-and-

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
David M. Friedman
Daniel A. Fliman
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Counsel to E. Gluck Corporation*