```
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

                              .   Chapter 11
IN RE:                        .
                              .   Case No. 15-11880 (BLS)
QUIKSILVER, INC., et al,      .
                              .
                              .   Courtroom No. 1
                              .   824 Market Street
              Debtors.        .   Wilmington, Delaware 19801
                              .
. . . . . . . . . . . . . . . .   Monday, December 14, 2015

                 TRANSCRIPT OF TELEPHONIC CONFERENCE
              BEFORE THE HONORABLE BRENDAN L. SHANNON
                CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA TELEPHONE:

For the Debtors:           Van C. Durrer, II, Esq.
                           Mark S. Chehi, Esq.
                           SKADDEN, ARPS, SLATE, MEAGHER
                            & FLOM, LLP

For the Official Committee
of Unsecured Creditors:    Meredith A. Lahaie, Esq.
                           Michael Stamer, Esq.
                           AKIN, GUMP, STRAUSS, HAUER
                            & FELD, LLP

                           David B. Stratton, Esq.
                           PEPPER HAMILTON, LLP



     (Appearances Continued)

     Audio Operator:          Electronically Recorded
                              by Ginger Mace, ECRO

     Transcription Company:   Reliable
                              1007 N. Orange Street
                              Wilmington, Delaware 19801
                              (302)654-8080
                              Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
```

```
APPEARANCES VIA TELEPHONE:   (Continued)

For Bank of America, NA:     Steven E. Fox, Esq.
                             David S. Berman, Esq.
                             RIEMER & BRAUNSTEIN, LLP

                             Steven K. Kortanek, Esq.
                             WOMBLE, CARLYLE, SANDRIDGE
                              & RICE, LLP

For Oaktree:                 Ross Kwasteniet, Esq.
                             KIRKLAND & ELLIS, LLP

                             Robert J. Dehney, Esq.
                             Andrew R. Remming, Esq.
                             MORRIS, NICHOLS, ARSHT
                              & TUNNELL, LLP


                             Times Square Tower, Suite 2506
                             Seven Times Square
                             New York, New York 10036
```

1            (Proceedings commence at 11:36 a.m.)

2            THE COURT:  Good morning, Counsel.  This is Judge

3    Shannon.  I understand from the operator that all necessary

4    parties are on the call this morning.  This is a telephonic

5    hearing in the Quiksilver matter, Case Number 15-11880.  It's

6    my understanding, this is relating to a discovery issue.

7            I'll hear first from counsel from the debtor.

8            MR. DURRER:  Good morning, Your Honor.  This is Van

9    Durrer, Skadden, Arps, Slate, Meagher & Flom, on behalf of the

10   debtor, the Quiksilver entities.

11           Your Honor, it's not entirely accurate to call this a

12   discovery matter.  We had requested the conference in

13   connection with scheduling matters.

14           THE COURT:  Oh, okay.

15           MR. DURRER:  I'll give it to you in a nutshell.  The

16   various parties -- and I'm going to let them speak for

17   themselves; I think we have the secured creditors, as well --

18   the DIP lenders, as well as the committee -- but just to set

19   the table, it's our view that, clearly, people have developed

20   views surrounding valuation and diminution of value.  You only

21   need look to the statement that the committee filed in

22   connection with the disclosure statement and the inserts that

23   we negotiated to include in the disclosure statement to confirm

24   that, clearly, folks have developed pretty sophisticated views

25   of valuation.

1        And it's the debtors' view that it would significantly
2   advance the ball if people shared those feelings in more detail
3   sooner rather than later.  And so the committee, and I think
4   properly, candidly, had suggested, well, look, it's the
5   debtors' burden and the debtor should go first in more fully
6   explaining its view of value in the form of an expert review,
7   and, candidly, the debtor has no problem with that.
8        But what we thought made a lot of sense, both in terms
9   of arriving at a resolution of this matter and bridging this
10  gap between the notion of, you know, sharing reports,
11  effectively simultaneously, which we think is -- could be
12  constructive, and also getting to a settlement, is to have a
13  mediation earlier in the process rather than later, you know,
14  say the week before Christmas, and have people share, in
15  connection with that process just a very -- a summary sheet.
16       You know, there's two primary issues and, as I said,
17  valuation and diminution of value, and I think those positions
18  can be summarized, literally, in a single sheet of paper each.
19  For example, the diminution -- or the valuation issues can be
20  demonstrated by, what people have affectionately referred to as
21  the football field, which is basically just a chart showing
22  arrange of values in different valuation methodologies, such as
23  discounted cash flow, comparable company analysis, and
24  comparable transaction analysis; that's a one-page spreadsheet
25  -- five-point slide, I should say.  And then, second, a

1    one-page, you know, sources and uses, as to how diminution in
2    value calculation might be done.
3            We thought that the sharing of those very-specific,
4    and, again, under a mediation privilege, so not to be used in
5    litigation, would be very useful in connection with the
6    mediation, because you can't really have an effective mediation
7    until people, you know, stake out a position.  And we thought
8    that having that before we got too far afield on the litigation
9    might be very valuable to resolving the litigation.
10           Once you do that, the balance of the deadlines that
11   have been discussed, we are largely in agreement, I think, that
12   there's very few differences beyond that, but that's the core
13   issue that we were hoping that we could get the judge's help
14   with, and, again, if Your Honor agrees that a mediation along
15   that kind of process makes sense, then it would also be helpful
16   if you could help us with a mediator.  We reached out to a
17   couple of folks in advance, but, you know, having Your Honor
18   help us with that process we think would also make -- create
19   more of a sense of urgency with a potential mediator.
20           And just to be clear, the debtor has no problem in
21   paying this rate, in terms of costs of mediation, to the extent
22   that we went with a private mediator as opposed to a member of
23   the bench, but I think that everybody's preference is for a
24   member of the bench.  That, in essence, is what we're talking
25   about what and what we thought Your Honor might be able to help

1   us with.

2              THE COURT: Okay. Before I hear from anyone else, I'm

3   not sure that I entirely understood your opening comments, Mr.

4   Durrer. Are the parties in agreement that they should move

5   promptly to mediation, and the question is one of scheduling

6   and timing? Or is there an issue with respect to mediation?

7              MR. STAMER: Your Honor, it's Mike Stamer from Akin

8   Gump. Good morning.

9              THE COURT: Good morning.

10             MR. STAMER: Maybe I can clarify where we are?

11             THE COURT: Sure.

12             MR. STAMER: My understanding, the purpose of this

13  call was really to address two issues; one was the timing of

14  mediation, and two, the scheduling of the exchange of expert

15  reports. And I was happy to hear -- I thought I heard Mr.

16  Durrer correctly -- that the debtor has no problem with the

17  schedule of exchange of reports that we had proposed, which is

18  they go first and then we go, which, again, our experience is

19  typically that's the way it's done.

20             Let's talk a little bit about mediation, as well, if

21  we could. Your Honor, we are happy to mediate. We think it

22  could be helpful here. We have some reservations and the

23  reservations are based on the fact that this is not a mediation

24  between Oaktree and the unsecured creditors with a company kind

25  of in the middle directing traffic. We would refer this more

1       as a hog pile on the unsecured creditors with the company and

2       Oaktree staking out very similar positions with respect to

3       valuation and with respect to diminution in value.

4              Again, we have reservations, but we are more than

5       happy to mediate.  We very much want to resolve this if we can

6       and avoid the costs and expense associated with a contested

7       confirmation.

8              We are concerned about two things:  One, mediating

9       next week before everyone's work is done in a hurried fashion,

10      we think that's actually a mistake.  We think that everyone is

11      best served with a mediation that happens after the exchange of

12      expert reports and not necessarily doing this based upon just a

13      two-page football field and a recitation of diminution in

14      value.

15             And two, Your Honor, again, based on our concerns

16      about the way this is lining up, we're concerned that mediation

17      not be used as a tactical advantage for purposes of litigating

18      the ultimate issues at confirmation.  We think, and I'm certain

19      we can work with the company on a schedule to hold mediation

20      probably the second week of January, and the idea would be

21      exchange expert reports along the schedule that we had

22      proposed, which again, I thought I heard the company didn't, in

23      a vacuum have an issue with that, taking document discovery,

24      hold off on having depositions until after we see if we can

25      mediate.

1                    That way there's no gaming the system.  There's no --
2          the company will still, as I understand it, have the ability to
3          put a rebuttal report in after our report is done.  The
4          mediator will have the time and benefit of the expert reports,
5          and we can give mediation, you know, a sincere effort to try
6          get things done.
7                    We're concerned about a bunch of stuff associated with
8          doing -- you know, trying to do something the week of Christmas
9          before a bunch of work is done.  But I think that's where the
10         parties are.
11                   THE COURT:  Okay.
12                   MR. DURRER:  Yeah, and, Your Honor, this is Van
13         Durrer.
14                   Just to highlight, I think the issue was what divides
15         us is that we think that a mediation before spending a lot of
16         money would be useful, and we appreciate the fact that the
17         committee, you know, doesn't believe it's in a position to
18         produce its full report, and that's why we suggested a summary
19         because, again, it seems clear to us that the committee has
20         developed a sense of value because I know that, you know, the
21         committee's advisors would not have staked out the positions
22         they have staked out in pleadings unless they had a pretty
23         sophisticated view on that.
24                   So we thought that given that that had developed, that
25         we were in that position, and, again, as you heard Mr. Stamer

1  say, they have a view that this is, you know, for some tactical

2  reason as opposed to just trying to get people to narrow the

3  issue and focus on what could perhaps be a consensual

4  resolution.

5              THE COURT:  Okay.  I think I understand.

6              Does anyone else wish to be heard?

7              MR. KWASTENIET:  Your Honor, it's Ross Kwasteniet from

8  Kirkland & Ellis, on behalf of Oaktree.

9              We share the debtors' preference to have a mediation

10 session sooner rather than later because we also share the

11 goal, as the party who's funding the DIP in the case, as the

12 party who's backstopping the rights offering that will give the

13 company the liquidity to emerge from bankruptcy here.  We think

14 it makes sense to talk sooner rather than later.

15             And, again, what Mr. Durrer is describing is the

16 relatively brief recitations of our basic positions and we

17 think it's clear at this point that everybody, including the

18 committee, has those basic positions.  When we were last before

19 Your Honor, the committee told you that they have a strong view

20 that the debtors' financial advisor has materially undervalued

21 the enterprise and they gave a preview that they were going to

22 put forth expert testimony about the value of the foreign

23 equity, and so, clearly that's based on something.  They

24 wouldn't have come before you if they hadn't done, you know, a

25 basic amount of diligence in work to formulate those views.

1   And we don't see any reason why we can't sit down and have a
2   conversation about those views now before everybody spends a
3   lot of time and money gearing up for a litigation.
4          And so I mean we understand the committee's view
5   basically to be, well, let's spend the money first and have a
6   conversation later.  And we think that here, given that the
7   issues are relatively straightforward, I mean valuing a third
8   of the foreign equity here isn't exactly rocket science and
9   people have had a lot of time, and this has been an issue that
10  has been on everybody's radar for months now, and people have
11  staked out positions, we don't see any reason why there can't
12  be a mediation session before everybody spends the time to
13  finalize, you know, their expert reports and go further down
14  the field in terms of litigation planning.
15         We're happy to mediate at any time, Your Honor, but we
16  do have a preference.  We were hopeful that mediation could be
17  successful in eliminating or narrowing issues, reducing the
18  overall scope of any litigation that may be necessary, and we
19  just as soon, you know, do it sooner rather than later.
20         THE COURT:  Okay.
21         MR. STAMER:  Your Honor, may I be heard just briefly
22  in rebuttal?
23         THE COURT:  Of course.
24         MR. STAMER:  It -- look -- again, it's Mike Stamer for
25  the record.

1          We're not advocating spending money unnecessarily.
2   What we're advocating is we'd like to settle this.  We think
3   the parties have the best chance of settling it after some
4   additional work has been done.  We're talking about exchanging
5   the first round of expert reports, doing fact discovery, not
6   doing depositions, and giving both the parties, and as
7   important, a mediator, the benefit of a full picture.
8          If we hurry to get in front of a mediator to try and
9   settle this next week -- and, again, we're happy to settle this
10  if we can -- we think what we're doing is we're doing mediation
11  to failure, which will end up in the parties and the estate
12  incurring substantially more expense associated with a
13  contested confirmation hearing.  The goal here is to avoid
14  three days in late January fighting in front of Your Honor, and
15  we think the best way to do that and the fairest way to do
16  that, frankly, and not giving anyone a tactical advantage, is
17  as we had proposed, exchange expert reports, do limited
18  document discovery, get a mediator up to speed and smart, and
19  get in front of the mediator the week of January 8th.
20         MR. FOX:  Your Honor, this is Steven Fox from Riemer,
21  on behalf of Bank of America.
22         For what it's worth, the bank echoes the comments from
23  the debtors and Oaktree with respect to both, a desire to
24  mediate before the costs start to spiral out of control as they
25  did with -- or in connection with the contested DIP financing

1  process. I think the sooner we can start this processing and
2  move the parties closer to a resolution, the estate, as a
3  whole, will benefit.
4          THE COURT: I don't disagree with that.
5          All right. Here's what we're going to do, and I don't
6  know that this is going to be terribly satisfying to the
7  parties, but I'm going to make the following observations and
8  suggestions. First, it doesn't -- I'll tell you I've done a
9  number of these mediations as the mediator for one of my
10 colleagues here, for one or another of my colleagues, and I
11 have reservations about how productive a mediation process
12 would be. First, whether or not you could get somebody, you
13 know, in the week before Christmas, but second, there's a point
14 a process has to get to in order to make it susceptible to a
15 ready mediation and there's often in these cases an amount of
16 legwork that needs to occur in advance, and I have my doubts
17 about whether or not a realistic mediation process could be
18 commenced with the prospect of successful resolution on the
19 basis of what I think is the very narrow information or
20 materials.
21         And I know that, since I've got this many lawyers on
22 the phone, the chances of parties walking in with one sheet of
23 paper apiece is zero. But the fact is that I'm not certain
24 that that would be -- I understand what Mr. Durrer is
25 describing, but I'm not certain that that would be something

1  that would allow a mediator or the parties to really be able to
2  move forward, so I do have reservations.
3         I'm very sensitive to the cost issue and to the
4  concern, with respect to delay, but it seems to me not,
5  honestly, realistic to be able to have the parties have haven't
6  exchanged the information that seems to be at the core of the
7  dispute between the parties or develop even preliminary expert
8  reports, to be able to argue and stake out their positions
9  meaningfully so that a mediator could try to move the parties
10 forward.
11        So I have significant reservations regarding the idea
12 of just saying let's do what we have, take what we have, print
13 it off, and go in.  I just don't think that's likely to really
14 move the ball forward.  It may start a mediation process that
15 may ultimately be successful, and, again, you folks know your
16 case better than I do, but that seems to me to be not terribly
17 promising.
18        Here's what I'd like to do, though.  I don't have any
19 confidence right now, given what we have pending in this
20 district, that any of my colleagues would be available to
21 mediate that, but I'd like to make some phone calls and to see
22 if I could get you a mediation.  It seems to me that this is
23 one that I think the parties' instincts are right, and I would
24 defer to your instincts that this would benefit from a judicial
25 mediator, so I'd like to confer with my colleagues and also

1  maybe see if I can help you track down somebody to assist in
2  the process.
3           But I'd like to get back on the phone with the parties
4  on what I would call a telephonic chambers conference tomorrow
5  at say 3:30 East Coast time.  And the reason I want to do that
6  is I'd like the parties to confer, based at least on my
7  observation that the debtors' suggestion about going in with a
8  very short preliminary guesses, I don't think would be very
9  productive, and it seems to me also unlikely that you could get
10 to a point where this would be ready to be mediated.  But it
11 seems to me that with what the parties have described, you
12 ought to be able to get to something by the week of January 4,
13 which is the first week of January.
14          And I'd like the parties also to confer about some
15 ideas about who you might like as a mediator and I would be
16 more than happy to make that phone call for the parties.
17 Mr. Durrer, I think it was your instinct that that might go
18 better, and it may be.  So I'm happy to do that for the
19 parties.
20          But I want you at least to have the opportunity to
21 confer, based on my observations that I'm sharing with you
22 right now, and also to be able to have a candid discussion.  As
23 I said, it would be a chambers conference.  We'd dial in
24 through CourtCall, but it would be off the record, and it would
25 be limited to the principal parties, mainly because we'll be

1  talking about some scheduling issues, yes, but also about
2  options about a mediator and I don't think it's necessary or
3  appropriate to have that dialogue on the record.  And so that's
4  where I'd like to leave it, at least for right now, and have
5  the parties confer.
6         Again, this, to me, seems to be a case that is
7  potentially suitable for mediation and the idea of saving me a
8  valuation trial at the end of January is not a very hard sell
9  from my point of view.  So I'm supportive of the process.  I
10 have, again, as I said, some reservations about how realistic
11 it is to be able to get this up and mediated before, you know,
12 before Christmas.  That, again, just seems to me to be a tad
13 optimistic, to be able to exchange the necessary information,
14 especially with what I've heard from the committee, and then
15 get a mediator who would be able to meet with people.  And you
16 need principals to do a mediation, as well.
17        So to be able to get people in before the holiday
18 seems, to me, again, not terribly realistic.  But we can
19 discuss that in more detail tomorrow afternoon, and it seems to
20 me that that would be a productive opportunity for a dialogue.
21        I'll start with Mr. Durrer, does that make sense to
22 you?
23        MR. DURRER:  Certainly, Your Honor.
24        THE COURT:  Anybody else wish to be heard with respect
25 to a game plan, and, again, we'll get on the phone.  It will be

1   basically done as a typical dial-in, so I will ask for debtors'
2   counsel to arrange for that, but I will ensure that it is off
3   the record, and that participation in the call is limited to
4   principals, okay?
5           MR. DURRER:  Thank you, Judge.
6           THE COURT:  All right.  Thanks very much.  I look
7   forward to speaking with everyone tomorrow.
8           MR. DURRER:  Thank you.
9       (Proceedings concluded at 11:57 a.m.)
10                          *****

1                       CERTIFICATION

2         I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter to the best of my knowledge and ability.

5

6

7    /s/ William J. Garling                December 15, 2015

8    William J. Garling

9    Certified Court Transcriptionist

10   For Reliable