## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| QUIKSILVER, INC., *et al.*,[1] | ) | Case No. 15-11880 (BLS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## MOTION OF OAKTREE CAPITAL MANAGEMENT FOR ENTRY OF AN ORDER (I) DETERMINING THE DIMINUTION IN VALUE OF THE SECURED NOTES PARTIES' COLLATERAL, AND (II) GRANTING RELATED RELIEF

Certain funds managed by affiliates of Oaktree Capital Management, L.P. (collectively, "Oaktree"),[2] by and through their undersigned counsel, file this motion (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) establishing the extent to which the Secured Notes Parties' collateral has diminished in value since the Petition Date for purposes of determining the amount of the Secured Notes Replacement Liens and Secured Notes Superpriority Claims (the "Diminution in Value Claim"), and (b) granting related relief. In support of this Motion, Oaktree submits the expert report of David R. Hilty from Houlihan Lokey Capital, Inc. ("Houlihan"), attached hereto as **Exhibit B** (the "Houlihan Report"). In further support of this Motion, Oaktree respectfully states as follows.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), QS Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them later in this Motion or the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Superpriority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Superpriority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 382] (the "Final DIP Order"), as applicable.

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and Oaktree confirms its consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 506, and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rule 3012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1.

## Preliminary Statement

4.      Oaktree files this Motion in connection with confirmation of the Plan and, more specifically, to assist the Court in determining whether the Plan's treatment of Unsecured Notes Claims and General Unsecured Claims (each, as defined in the Plan, and collectively, "Non-Priority Unsecured Claims" and the holders thereof, "Non-Priority Unsecured Creditors") is appropriate.   Oaktree contends that Non-Priority Unsecured Creditors are entitled to the distributable value of the Debtors' unencumbered assets, but only after deducting (a) the amount of prepetition unsecured claims, priority claims, administrative claims, and cure claims that have

been paid or will be paid at exit under the Plan, (b) the Diminution in Value Claim, and (c) the value of the Secured Noteholders' deficiency claim waiver. As will be shown in greater detail below, this simple calculation results in a massively negative number. The Plan nonetheless gives Non-Priority Unsecured Creditors $12.5 million in cash and Unsecured Noteholders an opportunity to invest new money, at a meaningful discount, in Reorganized Quiksilver. Oaktree submits that the Plan's treatment of Non-Priority Unsecured Creditors substantially exceeds their legal entitlements and is therefore not only appropriate but generous.

5.    To evaluate the Plan's treatment of Non-Priority Unsecured Creditors, the Court must first consider the value of the equity in the non-Debtor foreign subsidiaries that is not part of the Prepetition Secured Parties' collateral package. The Debtors contend that the midpoint of their total enterprise value is $546.0 million, that the midpoint of the value of the non-Debtor foreign subsidiaries is $370.0 million, and that after deducting the approximately $260.0 million in net debt that is projected to be owed by the non-Debtor foreign subsidiaries upon the Debtors' emergence from bankruptcy (the non-Debtor foreign subsidiaries are not party to these chapter 11 cases), that the Debtors' equity interest in their foreign subsidiaries (excluding certain non-Debtor affiliates located in Mexico) is worth approximately $110.0 million. Since 65% of the equity interests in these non-Debtor subsidiaries are encumbered, the Debtors' midpoint estimation of the value of the unencumbered equity in these non-Debtor foreign subsidiaries (the "Unencumbered Foreign Equity") is approximately $39.0 million. *See* Disclosure Statement Art. VII.D.

6.    The Committee has suggested on several occasions that it believes the Debtors' total enterprise value may be materially higher than the Debtors' valuation, and that the value of the Debtors' foreign equity (and hence the value of the Unencumbered Foreign Equity) may also

be materially higher than what the Debtors believe. *See* Disclosure Statement Art. VII.E. The Committee is scheduled to produce their expert report on valuation issues on January 11, 2016.

7.      There are many reasons to conclude that the Debtors' valuation is correct, and that any attempt by the Committee to argue for a dramatically higher valuation is not credible, not the least of which is that the Debtors, in consultation with the Committee, have been running a real and robust parallel marketing process that has not generated any third-party bids whatsoever, let alone any bids that value the Debtors' assets higher than the value assumed by the Plan. The Unsecured Noteholders who comprise a majority of the Committee have had every opportunity to put their money where their mouth is,[3] but have declined to do so. Furthermore, the retail space is competitive, and if the deal under the Plan for the Debtors' prepetition secured parties was too good, one would expect that any number of the many third parties the Debtors contacted during the marketing process would have made a bid, but that has not happened either. Additionally, as detailed in the Houlihan Report, there are market based and company performance reasons to think that the value of the Debtors' business has declined since the Petition Date.

8.      Even assuming the Committee is right, and the value of the Unencumbered Foreign Equity is higher than what the Debtors believe, that does not necessarily mean that the Plan's proposed treatment of Non-Priority Unsecured Creditors—*i.e.*, holders of Class 5-A Unsecured Notes Claims and Class 5-B General Unsecured Claims (each as defined in the Plan)—is unfair or inappropriate. The simplest way to determine whether Non-Priority

---

[3]     The Debtors and Oaktree agreed to give Unsecured Noteholders the right to participate in up to $12.5 million of the Exit Rights Offering (as defined in the Plan), which is predicated upon a 20% to 25% discount to the anticipated value of Reorganized Quiksilver at the Debtors' midpoint valuation. If the Committee is correct that the Plan materially undervalues the Debtors' business, then such rights would be very valuable to the Unsecured Noteholders.

Unsecured Creditors are being treated fairly in these chapter 11 cases is to start with the value of the Unencumbered Foreign Equity and to deduct the amount that has already been paid to unsecured creditors in these chapter 11 cases and the amount that is projected to be paid to unsecured creditors under the Plan. That is, to have any hope of prevailing on their valuation arguments at trial, the Committee must first, at a minimum, demonstrate that the Unencumbered Foreign Equity is worth more than what unsecured creditors will receive on account of their prepetition unsecured claims in these chapter 11 cases. As discussed below, and as evidenced in the Houlihan Report, unsecured creditors (e.g., holders of prepetition unsecured claims, priority claims, administrative claims, and cure claims) have already been paid, or will be paid at exit, more than $137.4 million in cash, which consists of $██ million to unsecured claimants on account of their prepetition unsecured claims (including amounts paid pursuant to first day orders, priority and cure costs to be paid under the Plan, and the recovery for Non-Priority Unsecured Creditors under the Plan), $██ million to professionals on account of fees and expenses related to the administration of these chapter 11 cases, and $██ million in respect of fees and expenses related to the exit ABL facility.

9. All of these $137.4 million in payments to unsecured creditors must be paid out of the value of the Unencumbered Foreign Equity. After a contested hearing on the DIP Facilities, the Court entered the Final DIP Order, which, in relevant part, contains an unqualified section 506(c) waiver.[4] As a result, these unsecured claims cannot be paid from, or allocated against, the

---

[4] The Committee initially objected to the section 506(c) waiver. *See Joint Objection of the Official Committee of Unsecured Creditors to Debtors' (I) Motion for Authorization to Obtain Postpetition Financing and (II) Motion for Authority to Assume Plan Sponsor Agreement and Pay Related Break-Up Fee and Transaction Expenses* [Docket No. 269] ¶ 59. The Committee later withdrew that objection in connection with certain negotiated compromises contained in the Final DIP Order.

Secured Notes Collateral. They must instead be charged against the Debtors' unencumbered assets as a matter of law.

10. Notwithstanding the $137.4 million of cash already going to unsecured creditors in these chapter 11 cases and the related consequences of the section 506(c) waiver, Oaktree submits that the Plan is more than fair to Non-Priority Unsecured Creditors on altogether independent grounds, including the substantial Diminution in Value suffered by the Secured Notes Parties. These chapter 11 cases—including the Debtors' operating losses and substantial payments to unsecured creditors—have been financed through substantial priming borrowings under the DIP Facilities, the vast majority of which has been consumed by operations and the administration of these chapter 11 cases, and has not created any new collateral value for the benefit of the Secured Notes Parties. These priming borrowings have instead materially and measurably diminished the value of the Secured Notes Parties interest in their collateral during these chapter 11 cases. The Court must therefore determine the extent to which the Secured Notes Parties have suffered such diminution in value. The Debtors are on record stating they believe that the value of the Secured Notes Collateral—which includes cash—has diminished during these chapter 11 cases *by an amount that exceeds the value of the Unencumbered Foreign Equity*. *See* Disclosure Statement Art. VII.D. As discussed in greater detail below, and as shown in the Houlihan Report, Oaktree submits that the Secured Notes Parties have suffered not less than $68.5 million[5] in diminution in value and, thus, are entitled to adequate protection liens

---

[5] Oaktree reserves the right to supplement this Motion, and/or amend the value of their Secured Notes Replacement Liens and Secured Notes Superpriority Claims resulting from the Diminution in Value of the Secured Notes Collateral, to account for any additional Diminution in Value that occurs after the date hereof. For the avoidance of doubt, Oaktree has agreed to waive any Diminution in Value Claim to the extent that the Plan is consummated and the PSA has not been terminated in accordance with its terms.

against the Unencumbered Foreign Equity and superpriority administrative claims, which must be paid in full in cash before all other unsecured claims.[6]

11.    Additionally, the Plan proposes to pay unsecured administrative and priority claims in full in cash, at a cost of approximately $46.3 million, and proposes to pay Non-Priority Unsecured Creditors $12.5 million in cash.[7]  When determining how much value should go to unsecured creditors, the Court must start with the value of the Unencumbered Foreign Equity, and then deduct (a) the $68.5 million Diminution in Value Claim, (b) the $46.3 million in unsecured administrative and priority claims projected to be paid under the Plan, and (c) the $12.5 million amount proposed to be paid under the Plan to Non-Priority Unsecured Creditors.

12.    Next, the Court must also account for the fact that the Plan contemplates the waiver of deficiency claims by the undersecured Secured Noteholders.  The Secured Noteholders are owed approximately $282.3 million, and they are projected to receive value under the Plan equal to a 16.4-17.4% recovery.  *See* Disclosure Statement Art. II.C.  Assuming a midpoint recovery of 16.9%, the Secured Noteholders will receive approximately $47.7 million of value under the Plan, leaving a deficiency claim of approximately $234.6 million.  This deficiency claim is itself greater than the amount the Debtors owe under their prepetition unsecured notes, which is approximately $227.4 million, meaning that the Secured Noteholders are the largest unsecured creditors in these chapter 11 cases, and would be entitled to roughly 46% of any unencumbered value on account of their deficiency claim (based on the Debtors' estimated

---

[6]    This $68.5 million Diminution in Value amount is not in addition to the $137.4 million referenced in the prior paragraph.  Rather, Diminution in Value is a separate and independent basis to deduct certain of the amounts referenced in the prior paragraph from the value distributable to unsecured creditors in these chapter 11 cases.

[7]    As noted above, the Plan also allows Unsecured Noteholders the right to participate in up to $12.5 million of the Exit Rights Offering.  While Oaktree does not purport to value this investment right for purposes of this Motion, as noted above, such rights would be very valuable if the Committee is correct that the Plan undervalues the Debtors' business.

General Unsecured Claims pool of $50.0 million).  To be clear, the Secured Noteholders are waiving this recovery under the Plan,[8] but if the Court denies confirmation of the Plan and finds that the unencumbered value is greater than the Debtors' valuation, the Secured Noteholders would not waive their deficiency claim in that instance.  As set forth in greater detail in the Houlihan Report, the waiver of the Secured Noteholders' deficiency claim results in an additional hurdle of $10.6 million of value that the Committee must show to justify a higher recovery for Non-Priority Unsecured Creditors than the Plan.

13.      Taken together, to find that the Plan does not afford sufficient value to unsecured creditors, Oaktree submits that this Court would have to find that the value of the Unencumbered Foreign Equity exceeds the Diminution in Value Claim of $68.5 million *plus* the $46.3 million in unsecured administrative and priority claims projected to be paid under the Plan *plus* the $12.5 million amount proposed to be paid under the Plan to Non-Priority Unsecured Creditors, *plus* the $10.6 million of value on account of the Secured Noteholders' deficiency claim waiver.  *These mandatory deductions from the value of the Unencumbered Foreign Equity total approximately $137.9 million—more than 3.5x the Debtors' $39.0 million valuation of the Unencumbered Foreign Equity*.  Oaktree submits that the Debtors' valuation of the Unencumbered Foreign Equity is correct (if not overstated), that the Committee will not be able to show that the Debtors' total enterprise value or the value of the Unencumbered Foreign Equity is materially higher than the Debtors' valuation, but in any event, it is entirely implausible to think that the Committee would be able to demonstrate that the value of the Unencumbered Foreign Equity is more than 3.5x the value the Debtors ascribe to it.  Absent the Committee demonstrating that the Debtors undervalued the Unencumbered Foreign Equity by more than

---

[8]    For the avoidance of doubt, the Secured Noteholders' deficiency claim waiver is in addition to the contemplated waiver of the Diminution in Value Claim as set forth herein.

3.5x, the Committee will be unable to show that the Plan fails to allocate enough value to Non-Priority Unsecured Creditors. In fact, at trial, the Debtors and Oaktree will demonstrate the opposite and will show that the Plan allocates far more value to unsecured creditors than what they are legally entitled to.

## Relief Requested

14.     Oaktree seeks a determination of the amount of the Diminution in Value Claim under the Final DIP Order—*i.e.*, the amount of the Secured Notes Replacement Liens and the Secured Notes Superpriority Claims arising under the Final DIP Order—between the Petition Date and the Plan's contemplated valuation date of February 1, 2016 (the "Valuation Date") is not less than $68.5 million; provided, that the Diminution in Value Claim shall be waived to the extent the Plan is consummated in accordance with the PSA.

## Background

15.     On September 9, 2015 (the "Petition Date"), each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors cases have been jointly administered under Bankruptcy Rule 1015(b). The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

16.     On September 22, 2015, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the initial official committee of unsecured creditors (the "Committee") [Docket No. 129]. On September 28, 2015, the U.S. Trustee filed an *Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 163],

appointing two additional creditors to the Committee. No trustee or examiner has been appointed in these chapter 11 cases.

17. On December 4, 2015, the Court entered an order (a) approving the adequacy of the *Second Amended Disclosure Statement With Respect to the Second Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession* [Docket No. 533] (the "Disclosure Statement") related to the *Second Amended Joint Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession* [Docket No. 532] (as hereafter supplemented, amended, or otherwise modified from time to time, and including all appendices, exhibits, schedules, and supplements thereto, the "Plan"), and (b) authorizing the Debtors to solicit acceptances or rejections of the Plan [Docket No. 529]. The hearing to consider confirmation of the Plan is scheduled to commence on January 27, 2016.

## I. Summary of Quiksilver's Capital Structure.

### A. The Debtors' ABL Facility.

18. On May 24, 2013, certain Debtors and non-Debtor foreign affiliates entered into a secured $230 million asset-based revolving credit facility (the "ABL Facility") with Bank of America, N.A. as administrative and co-collateral agent. Aggregate commitments to the Debtor borrowers under the ABL Facility totaled $160 million, and aggregate commitments to foreign non-Debtor borrowers totaled $70 million. As of the Petition Date, there was approximately $92 million outstanding under the ABL Facility, comprised of $68 million on account of the Debtor-borrowers and guarantors and $24 million on account of non-Debtor foreign borrowers and guarantors. The Debtors' and non-Debtor foreign affiliates' obligations under the ABL Facility are secured by a first lien on (a) substantially all of the Debtor-borrowers' and

guarantors' assets, including cash, inventory, and receivables,[9] (b) pledges in all shares of capital stock, limited liability company membership interests, and other equity interests held by Quiksilver, Inc., QS Wholesale, Inc., and DS Shoes, Inc., including dividends, cash, instruments, and other property received or distributed in respect of such interests, and (c) any proceeds of the foregoing (collectively, the "ABL Collateral").  The ABL Facility was restated postpetition, so that it continues as a debtor-in-possession asset-based revolving loan credit facility.

**B.      The Debtors' Senior Secured Notes.**

19.      Pursuant to that certain Indenture,[10] dated as of July 16, 2013 (as amended, modified, waived, and/or supplemented from time to time, the "Secured Notes Indenture"), certain of the Debtors issued $280 million in original principal amount of 7.875% senior secured notes due 2018 (the "Senior Secured Notes" and the holders thereof, the "Secured Noteholders").  As of the Petition Date, approximately $282.3 million was outstanding in respect of the Senior Secured Notes.  The Senior Secured Notes are secured by (a) a second lien on the ABL Collateral that covers the assets of the issuing and/or guaranteeing Debtors (*i.e.,* a second lien on, among other things, current assets like cash, inventory, and receivables), (b) a first lien in substantially all other property, including intellectual property rights and fixed assets, of the issuing and/or guaranteeing Debtors, (c) a pledge (ahead of the ABL Lenders to the extent such equity interests constitute to ABL Collateral), in all shares of capital stock, limited liability company membership interest, and other equity interests held by certain Debtors in each of the Debtors, and all non-voting equity interests and 65% of all voting equity interests of non-Debtor

---

[9]      The ABL Facility's lien is second in priority to the Senior Secured Notes on intellectual property rights and fixed assets.

[10]     The following description of the Senior Secured Notes is intended only as a summary.  In the event of any inconsistency between this description and the terms of the Indenture and/or the Final DIP Order, the terms of the Final DIP Order will govern.

affiliate Mountain & Wave S.a.r.l., which, directly or indirectly, owns all of the non-Debtor foreign subsidiaries other than the Debtors' Mexican and Chinese foreign subsidiaries, (d) all dividends, cash, instruments, and other property from time to time received or distributed in respect of the interests described in sections (c), and (e) all proceeds of sections (a) through (d) (collectively, the "Secured Notes Collateral").

### C. The Debtors' Unsecured Notes.

20. Quiksilver, Inc. and QS Wholesale, Inc. entered into an Indenture, dated as of July 16, 2013 (as amended, modified, waived, and/or supplemented from time to time, the "Unsecured Notes Indenture"), as issuers, with the guarantors party thereto and the indenture trustee (the "Unsecured Notes Agent"). Pursuant to the Unsecured Notes Indenture, certain of the Debtors issued $225 million in original principal amount of 10.00% senior unsecured notes due 2020 (the "Unsecured Notes" and the holders thereof, the "Unsecured Noteholders"). As of the Petition Date, approximately $227.4 million was outstanding in respect of the Unsecured Notes.

### D. Non-Debtor Euro Notes.

21. Pursuant to an Indenture dated December 15, 2010 (the "Euro Notes Indenture"), Boardriders S.A., a non-Debtor company incorporated pursuant to the laws of the Grand Duchy of Luxembourg and a wholly-owned subsidiary of Debtor Quiksilver, Inc., issued €200 million in aggregate initial principal amount of senior unsecured 8.875% notes due December 15, 2017 (the "Euro Notes"), with Deutsche Trustee Company limited as trustee (the "Euro Notes Agent"), Deutsche Bank Luxembourg S.A. as registrar and transfer agent, Deutsche Bank AG, London Branch as principal paying agent and common depository, and certain of the Debtors and non-Debtor foreign affiliates as guarantors thereto. The proceeds of the Euro Notes offering were used to refinance approximately €190 million of existing European term debt and to pay

related fees and expenses, which was part of an intercompany note by Na Pali S.A.S. in favor of Boardriders S.A. As of the Petition Date, the Euro Notes had an outstanding principal balance of approximately $221 million.

## II. The Final DIP Order.

### A. The DIP Facilities.

22. Prior to the Petition Date, the Debtors entered into the PSA with Oaktree. In connection therewith, Oaktree, as Plan Sponsor, agreed to provide the Debtors with up to $115.0 million in debtor-in-possession term loan financing—*i.e.*, the DIP Term Facility. In addition, certain ABL Secured Parties agreed to provide the Debtors with up to $60.0 million in debtor-in-possession revolving financing—*i.e.*, the DIP ABL Facility.

23. On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 17] (the "DIP Motion"). On September 10, 2015, the Court entered the Interim DIP Order [Docket No. 76] and the Debtors entered into the DIP Credit Agreements. On October 28, 2015, the Court entered the Final DIP Order [Docket No. 382] authorizing the Debtors' entry into the DIP Credit Agreements and the DIP Facilities.

### B. Secured Notes Parties' Adequate Protection.

24. The Final DIP Order entitles the Secured Notes Parties, including Oaktree in its capacity as a Secured Noteholder, to adequate protection resulting from, among other things, "the granting of the DIP Liens, subordination to the Carve-Out, the Debtors' use of Cash

Collateral and other decline in value arising out of the automatic stay and/or the Debtors' use, sale, depreciation, or disposition of the Prepetition Collateral…" Final DIP Order ¶ 12. The adequate protection package includes (a) solely to the extent of the diminution of the value of the interest of the Secured Notes Parties in the Secured Notes Collateral ("<u>Diminution in Value</u>") "replacement security interests and liens in (i) the DIP Collateral and (ii) the Unencumbered Foreign Equity, but, in the case of the Unencumbered Foreign Equity only, solely to the extent that the Court has determined such diminution in value described above following notice and a hearing . . ." (the "<u>Secured Notes Replacement Liens</u>"), and (b) solely to the extent of the Diminution in Value of the Secured Notes Collateral, an allowed superpriority administrative expense claim (the "<u>Secured Notes Superpriority Claims</u>"). Final DIP Order ¶¶ 12(a)-(b).

<u>Argument</u>

I.    **The Debtors Have Paid, or Will Pay at Exit, More Than $137.4 Million of Unsecured Claims under the Plan. The Payment of These Claims Must Be Charged Against the Debtors' Unencumbered Assets As a Result of the Section 506(c) Waiver and Further Count Against the Value Available to Unsecured Creditors.**

25.    The general rule is that unsecured claims—including general unsecured claims, priority claims, and cure claims—may not be charged to or against a secured creditor's collateral. *See Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 324 (3d Cir. 1995). These claims are instead chargeable only against the unencumbered assets of a debtor's estate. *Id*.; *see also* 11 U.S.C. § 364(a)–(d) (the cost of administering a chapter 11 case should be funded, if possible, first, by obtaining unsecured credit; second, through granting administrative priority claims; third, through granting superpriority administrative claims; fourth, through granting liens on unencumbered assets; fifth, through granting liens on encumbered assets; and sixth, only if the first five options are unavailable, through granting senior liens on encumbered collateral, but only if the court finds that the debtor cannot obtain credit otherwise

*and* that the holders of interests in the property subject to the priming lien(s) are adequately protected). Section 506(c) of the Bankruptcy Code provides a limited exception to this general rule, allowing certain parties in interest to recover the reasonable, necessary costs and expenses of preserving or disposing of the collateral securing a creditor's claim in certain instances. *See In re Towne, Inc.*, 536 Fed. Appx. 265, 268 (3d Cir. 2013). Pursuant to the Final DIP Order, however, the Secured Notes Collateral cannot be charged for the costs or expenses of administering these chapter 11 cases under sections 105 or 506(c) of the Bankruptcy Code:

> No costs or expenses of administration which have been or may be incurred in these chapter 11 cases at any time shall be charged against the DIP Agents, the DIP Lenders, the Prepetition Secured Parties or any of their respective claims, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 and 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable of the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

Final DIP Order ¶ 39.[11]

26. The Debtors have paid, or will pay at exit, at least $137.4 million to unsecured creditors on account of their unsecured claims in these chapter 11 cases.[12] First, the Debtors have paid approximately $▮ million under the critical vendor order [Docket No. 378], approximately $▮ million under the customer programs order [Docket No. 65], and approximately $▮ million under the wages order [Docket No. 254]. *See* Houlihan Report at 45. In addition, the Debtors anticipate paying another $▮ million to priority and cure claimants at

---

[11]  In addition, the Prepetition Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral. Final DIP Order ¶ 40.

[12]  Of this amount, approximately $46.3 million represents administrative, priority, and cure claims to be paid at exit. *See* Houlihan Report at 56.

exit. *Id.* at 56. On top of that, the Plan proposes to give Non-Priority Unsecured Creditors a $12.5 million cash recovery (backstopped by Oaktree). That is, unsecured claimants will receive at least $██ million in cash on account of their prepetition unsecured claims. Second, the Debtors have paid, or will pay at exit, approximately $██ million in professional fees and expenses incurred during these chapter 11 cases. And third, the Debtors forecast approximately $██ million in fees to be paid in connection the Debtors' exit ABL facility. All of these $137.4 million in payments to unsecured creditors have either been authorized by order of the Court or reflect amounts the Debtors will seek authority to pay under the Plan, and all of these amounts are incident to the Debtors' administration of these chapter 11 cases, falling squarely within the section 506(c) waiver.

27. Since these unsecured claims cannot be paid from, or allocated against, the Secured Notes Collateral by operation of the section 506(c) waiver, they must be paid from, or allocated against, the Debtors' unencumbered assets. That is, separate and apart from the Diminution in Value analysis set forth below, unsecured creditors are already receiving more than $137.4 million in cash under the Plan, which substantially exceeds the Debtors' $39.0 million valuation of the Unencumbered Foreign Equity.

**II. The Secured Notes Parties Have Suffered Not Less Than $68.5 Million of Diminution in Value of the Secured Notes Collateral as of the Valuation Date.**

28. Notwithstanding (a) the $137.4 million of cash recoveries that have been paid, or will be paid at exit, to unsecured creditors, and (b) the fact that distributable unencumbered asset value must be reduced by this $137.4 million on account of the section 506(c) waiver, the Secured Notes Parties have suffered material and measurable Diminution in Value of the Secured Notes Collateral as a consequence of these chapter 11 cases.

## A. The Amount of Diminution in Value of the Secured Notes Collateral Should Be Determined by Reference to Fair Market Value.

29.     As set forth above, the Final DIP Order grants the Secured Notes Parties adequate protection in the form of, among other things, Secured Notes Replacement Liens and Secured Notes Superpriority Claims, to the extent of Diminution in Value of the Secured Notes Parties' interest in their collateral.   Final DIP Order ¶¶ 12(a)–(b); s*ee also Resolution Trust Co. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.").   Courts regularly hold that secured creditors are entitled to be compensated for a debtor's use of collateral, especially cash collateral, during the course of a chapter 11 case, as well as harm that results from the imposition of the automatic stay, the use, sale, or lease of property and the decline in value of non-cash collateral.   *See, e.g.*, *In re Wilson-Seafresh, Inc.*, 263 B.R. 624, 630 (Bankr. N.D. Fla. 2001) (finding that the debtor's use of cash collateral to fund its operations during its chapter 11 case required adequate protection).   Thus, it is already established that the Secured Notes Parties are entitled to Secured Notes Replacement Liens and Secured Notes Superpriority Claims on account of the Diminution in Value of the Secured Notes Collateral during the pendency of these chapter 11 cases.   The issue at hand is the quantum of such Diminution in Value.

30.     Valuation of collateral is at the core of adequate protection issues.   Calculation of a decline in value (and thus the value of adequate protection) necessarily requires a two-step process.   First, the movant[13] must establish value at a beginning point to serve as a benchmark, *i.e.*, from the Petition Date.   Second, the movant must demonstrate a decrease in value by

---

[13]   Bankruptcy Rule 3012 specifically permits collateral valuations pursuant to section 506(a) of the Bankruptcy Code to be requested on motion, provided notice and an opportunity for hearing are given to affected parties. *See* Fed. R. Bankr. Proc. 3012*; In re Sadala*, 294 B.R. 180, 182 (Bankr. M.D. Fla. 2003).

establishing a second value less than the first at a later appropriate point in time. *See Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013) (hereinafter, "*ResCap*").  Here, the Secured Notes Collateral should be measured by reference to fair market value at the Petition Date and Valuation Date because the proposed disposition or use of such collateral is a reorganization of the Debtors' retail businesses as a going concern pursuant to a chapter 11 plan. *See ResCap*, 501 B.R. at 592 (holding that fair market value, not foreclosure value, was the proper valuation methodology for adequate protection purposes); *see also Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962-63 (1997) (holding that replacement value, as opposed to foreclosure value, was the proper methodology for valuing the secured creditor's claim).  Prior to the Petition Date, the Debtors and Oaktree negotiated and entered into the PSA, which contemplates the restructuring of the Debtors as a going concern through a chapter 11 plan of reorganization with a new money equity investment backstopped by Oaktree.  *See* DIP Motion ¶ 36.  Moreover, Oaktree agreed, in connection with a consensual resolution of disputes concerning the Final DIP Order, to allow the Debtors, in consultation with the Committee, to pursue an alternative restructuring transaction predicated on a sale of substantially of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  In either scenario, the Secured Notes Collateral should be valued as of the Petition Date and the Valuation Date based on its proposed disposition—*i.e.*, fair market value (not liquidation value).

### B. The Houlihan Report Shows that the Diminution in Value of the Secured Notes Collateral Is Not Less Than $68.5 Million as of the Valuation Date.

31.    The Debtors have the burden with respect to certain valuation issues in connection with confirmation (including the Debtors' total enterprise value and the value of the non-debtor foreign subsidiaries), and their financial advisor has produced the Debtors' Expert Valuation

Report, dated December 23, 2015, upon which Oaktree relies on for Plan valuation purposes. The Houlihan Report shows that, during these chapter 11 cases, (a) the Debtors' total enterprise value has not increased (and performance trends indicate that, if anything, the Debtors' total enterprise value has likely decreased since the Petition Date absent the continued new equity investment proposed by Oaktree), and (b) the value of the Secured Notes Parties' interest in their collateral has diminished meaningfully and measurably for the reasons set forth herein and in the Houlihan Report.

> **1.** **The Value of the Secured Notes Collateral Has Not Increased Since the Petition Date.**

32.     As set forth in the Houlihan Report, the total enterprise value of the Debtors—an appropriate proxy for the Secured Notes Collateral—has not increased since the Petition Date. *See* Houlihan Report at 9.  Both the Debtors' declining operating performance and the absence of any indications of value or bids received above the Plan enterprise value supported by the Oaktree commitment (notwithstanding a real and robust marketing process) support that conclusion.  *Id*. at 17.  In fact, market data indicates that the trading multiples, operating performance, and valuations for the Debtors' peer group have declined since the Petition Date. *Id*. at 18.  For example, the multiple contraction indicates that for every dollar of EBITDA generated by the peer group, investors are willing to pay less today than they were willing to pay approximately 120 days ago.  *Id*.  Houlihan also undertook an asset-specific analysis, reviewing the value of material tangible and intangible assets such as cash, inventory, and brands, to validate its conclusion that the value of the Secured Notes Collateral has not increased since the Petition Date.  *See id.* at 40-42.  Accordingly, Oaktree submits that, if anything, the value of the Debtors' business and the value of the Secured Notes Collateral has likely decreased since the Petition Date.

## 2. Diminution in Value of Secured Notes Collateral.

33. The Secured Notes Parties' interest in their Secured Notes Collateral has diminished from the Petition Date and the Valuation Date primarily as a result of (a) the granting of priming liens (ahead of the Secured Notes Parties' liens) in respect of the $115.0 million of priming borrowings under the DIP Term Facility but almost entirely spent on items that did not create any new collateral value for the Secured Notes Parties, and (b) the expenditure of this cash to fund the payment of prepetition unsecured claims and the administration of these chapter 11 cases. *See* Houlihan Report at 9. In undertaking its analysis, Houlihan also relied upon the Budget, the Debtors' weekly budget variance reports ("Variance Reports"), and related backup data to evaluate the quantity and character of the Debtors' expenditures during these chapter 11 cases. Among other things, the Variance Reports show, for the week ending December 19, 2015, the Debtors' ending cash balance, total operating cash receipts, total operating disbursements, total non-operating disbursements, and total net cash flow.

34. Houlihan then analyzed whether any of the $115.0 million of priming borrowings under the DIP Term Facility—which have funded the above-described payments to unsecured creditors under the first day orders and certain pre-exit costs of administering these chapter 11 cases[14]—had resulted in any corresponding increase to the value of the Secured Notes Collateral. For starters, Houlihan subtracted $41.5 million from the $115.0 million of priming borrowings under the DIP Term Facility representing the Debtors' paydown of obligations under the ABL Facility and/or DIP ABL Facility. That is, there are approximately $73.5 million of incremental claims senior to the Secured Notes Claims as a result of the DIP Facilities (exclusive of another

---

[14] For example, the Debtors' anticipate paying approximately $▮▮▮ million of professional fees during these chapter 11 cases (up to $250,000 of which is not Diminution in Value for the reasons set forth herein), and another $▮▮▮ million of professional fees at exit. *See* Houlihan Report at 56. Accordingly, for purposes of this Motion, the $▮▮▮ million is deemed funded by the DIP Term Facility and paid prior to exit, and the $▮▮▮ million is deemed funded by the Debtors' exit ABL facility and paid at exit.

$46.3 million of administrative, priority, and cure claims to be paid at exit).  Next, Houlihan applied certain reductions to that $73.5 million to remove the portion of the incremental claims did not represent Diminution in Value, including (a) up to $250,000 of adequate protection payments for the benefit of the Secured Notes Parties,[15] (b) approximately $2.4 million of capital expenditures in accordance with the Budget, and (c) approximately $2.3 million of payments under the Debtors' key employee incentive and retention plans [Docket No. 514] pursuant to Oaktree's agreement with the Committee.  By contrast, Houlihan concluded that payment of more than $▇▇ million professional fees paid during these chapter 11 cases and $▇▇ million of non-operating costs, among other things, clearly constituted Diminution in Value given that they did not create new, offsetting collateral value for the benefit of the Secured Notes Parties. *Bank of N.Y. Trust Co. v. Pac. Lumber Co. (In re SCOPAC)*, 624 F.3d 274, 284-86 (5th Cir. 2010) (holding that for adequate protection purposes, payment of professional fees for the creditors' committee and the debtor constituted diminution in cash collateral); *Nortel Networks v. Webster (In re NETtel Corp., Inc.)*, No. 00-01771 (SMT), 2008 WL 1932075, at *8 (Bankr. D.D.C. Apr. 30, 2008) (finding that a provision that allowed for payment of professional fees and U.S. Trustee fees from cash collateral did not reduce diminution in value claims); *In re Valley Media, Inc.*, Case No. 01-11353 (PJW) (Bankr. D. Del. July 30, 2004) (holding that general costs and fees, including professional fees, incurred by the debtor's estate and paid from cash collateral constituted diminution in value).

35.     After deducting the $5.0 million of incremental spending that did not result in Diminution in Value from the $73.5 million of incremental, senior claims under the DIP Facilities, and determining that the Secured Notes Collateral has not otherwise increased as a

---

[15]     *See, e.g.*, Final DIP Order ¶ 12(c) (authorizing payments in respect of the Secured Notes Agent's professional fees).

result of the Debtors' spending under the DIP Facilities and/or any extrinsic factors during these chapter 11 cases, Houlihan concluded that there has been at least $68.5 million in Diminution in Value of the Secured Notes Collateral between the Petition Date and the Valuation Date. Houlihan Report at 50.[16]   To calculate the Committee's effective hurdle rate, however, the Debtors' anticipated exit costs (including the payment of of $46.3 million in administrative, priority, and cure claims at exit) and the value of the Secured Noteholders' deficiency claim waiver must also be taking into account.

**III.   Non-Priority Unsecured Creditor Recoveries Will Be Diluted by the Secured Noteholders' $234.6 Million Deficiency Claim If the Plan Is Not Confirmed.**

36.   Section 506(a) of the Bankruptcy Code contemplates that a claim shall be secured to the extent of the value of such holder's interest in the collateral, and unsecured to the extent that the value of such interest is less than the amount of the underlying allowed claim.  *See Rash*, 520 U.S. at 961 ("[Section 506(a) of the Bankruptcy Code] tells us that a secured creditor's claim is to be divided into secured and unsecured portions, with the secured portion of the claim limited to the value of the collateral.").

37.   Here, Non-Priority Unsecured Creditor recoveries are nearly doubled under the Oaktree-sponsored Plan because the Secured Noteholders are deemed to have waived their $234.6 million deficiency claim (calculated using the Debtors' valuation analysis)—a deficiency claim roughly equal to the estimated Non-Priority Unsecured Claims pool.  As set forth in greater detail in the Houlihan Report, Oaktree values the waiver of the Secured Noteholders' deficiency claim at approximately $10.6 million.  *See* Houlihan Report at 53.  That deficiency claim would have to share pro rata with other Non-Priority Unsecured Creditors under an

---

[16]   Oaktree intends to file supplemental reports, as necessary, to establish the additional Diminution in Value that it expects to occur between the Motion Date and the Valuation Date.

alternative, non-Oaktree-sponsored chapter 11 plan, which means that the value of the Unencumbered Foreign Equity must be higher by an amount equal to the $10.6 million in order for the Non-Priority Unsecured Creditors to recover an amount under such alternative chapter 11 plan equal to what they will recover under the Plan.

IV.     **Given These Factors, the Committee Must Show that the Value of the Unencumbered Foreign Equity Exceeds $137.9 Million—More Than 3.5x the Debtors' Valuation—to Justify a Higher Recovery for Non-Priority Unsecured Creditors.**

38.     Taking into account (a) the $68.5 million Diminution in Value Claim, *plus* (b) the $46.3 million of unsecured administrative, priority, and cure claims projected to be paid under the Plan, *plus* (c) the $12.5 million amount proposed to be paid under the Plan to Non-Priority Unsecured Creditors, *plus* (d) the $10.6 million value of the Secured Noteholders' deficiency claim waiver, the value of the Unencumbered Foreign Equity would have to exceed ***$137.9 million—more than 3.5x the Debtors' $39.0 million valuation***—for Non-Priority Unsecured Creditors to justify a higher recovery than what is provided under the Plan.  *See* Houlihan Report at 48, 50, 53.  There is simply no rational basis for that valuation.

39.     On the other hand, assuming the Debtors' $39.0 million valuation of the Unencumbered Foreign Equity, but for the Oaktree-sponsored Plan, there would be at least a $75.5 million shortfall vis-à-vis the Unencumbered Foreign Equity value with respect to claims senior to Non-Priority Unsecured Claims.  *See* Houlihan Report at 52.  There is no distributable unencumbered asset value left after taking into account the $68.5 million Diminution in Value Claim, $46.3 million of administrative, priority, and cure claims (all of which must be asserted against unencumbered value given the section 506(c) waiver contained in the Final DIP Order).  Notwithstanding the fact that value clearly runs out well before general unsecured creditor recoveries, the Plan nonetheless provides a $12.5 million cash recovery (backstopped by

Oaktree) to Non-Priority Unsecured Creditors and provides Non-Priority Unsecured Creditors with the benefit of the waiver of the Secured Noteholders' deficiency claim (without which there would need to be additional $10.6 million of value provided to Non-Priority Unsecured Creditors to maintain the same $12.5 million recovery for Unsecured Noteholders and holders of General Unsecured Claims).

40.     All of this leads to the conclusion that the Plan is more than fair to Non-Priority Unsecured Creditors, and, if anything, provides them substantially more value than they are entitled to even if the Committee can demonstrate that the value of the Unencumbered Foreign Equity is higher than the Debtors' $39.0 million valuation.

**Notice**

41.     Oaktree will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Debtors; (c) counsel to the agents and lenders under the DIP Facilities; (d) counsel to the agent for the Debtors' prepetition revolving loan facility; (e) counsel to the indenture trustee for the Debtors' prepetition senior secured notes; (f) counsel to the indenture trustee for the Debtors' prepetition senior unsecured notes; (g) counsel to the Committee; and (h) all parties entitled to notice pursuant to Bankruptcy Rule 2002. Oaktree submits that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

42.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, Oaktree respectfully requests that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Wilmington, Delaware
Dated: December 29, 2015

*/s/ Andrew R. Remming*

Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
**MORRIS NICHOLS ARSHT & TUNNELL LLP**
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:    (302) 658-9200
Facsimile:    (302) 658-3989
Email:        rdehney@mnat.com
              aremming@mnat.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com

*Counsel to Oaktree*