**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| QUIKSILVER, INC., *et al.*, | : | Case No. 15-11880 (BLS) |
|  | : |  |
|  | : | Jointly Administered |
| Debtors.[1] | : |  |
|  | : | **Related Docket No. 532** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**NOTICE OF FILING OF PLAN SUPPLEMENT WITH RESPECT TO THE
SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
QUIKSILVER, INC. AND ITS AFFILIATED DEBTORS AND
DEBTORS IN POSSESSION**

          **PLEASE TAKE NOTICE THAT** on December 4, 2015, the debtors and debtors in possession in the above-captioned cases (the "Debtors")[2] filed the Plan Supplement to the Second Amended Joint Chapter 11 Plan Of Reorganization Of Quiksilver, Inc. And Its Affiliated Debtors And Debtors In Possession (the "Plan Supplement"), a copy of which is attached hereto as Exhibit 1. The documents contained in the Plan Supplement are integral to and part of the Second Amended Joint Chapter 11 Plan Of Reorganization Of Quiksilver, Inc. And Its Affiliated Debtors And Debtors In Possession [Docket No. 532] (as may be amended from time to time, the "Plan") and, if the Plan is confirmed, shall be approved. The hearing to consider confirmation of the Plan currently is scheduled to begin on January 27, 2015 at 9:30 a.m. (prevailing Eastern Time).

          **PLEASE TAKE FURTHER NOTICE** that the Plan Supplement includes the following documents, as may be modified, amended, or supplemented from time to time:

          Exhibit A – Administrative Claim Request Form

          Exhibit B – Summary of Euro Notes Exchange Offer

          Exhibit C – Bylaws of the Reorganized Debtors

          Exhibit D – Certificates of Incorporation of the Reorganized Debtors

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Exhibit E – Reorganized Quiksilver Shareholders Agreement

Exhibit F – Members of the Board of Reorganized Quiksilver

Exhibit G – Maximum Percentage of New Quiksilver Common Stock to be Issued on Account of Management Incentive Plan

Exhibit H – Anticipated Post-Effective Date Structure of the Reorganized Debtors

Exhibit I – Schedule of Assumed Contracts and Unexpired Leases

Exhibit J – Non-Exclusive List of Retained Claims and Causes of Action

Exhibit K – Exit Financing Terms

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify, or supplement any document in the Plan Supplement; provided, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a blackline of such document with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that the Plan, Plan Supplement, and Disclosure Statement can be obtained free of charge by accessing the Debtors' case information website at http://www.kccllc.net/quiksilver or upon reasonable written request from the Voting Agent, Kurtzman Carson Consultants, LLC by: (a) emailing QuiksilverInfo@kccllc.com or (b) calling the Debtors' restructuring hotline at (877) 709-4757, within the U.S. or Canada, or (424) 236-7235, outside of the U.S. or Canada.

Dated: Wilmington, Delaware
January 7, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Z. Li
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

Mark S. Chehi (I.D. No. 2855)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

John K. Lyons
Jessica S. Kumar
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

**<u>EXHIBIT 1</u>**

**Plan Supplement**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                              :        Chapter 11
:
QUIKSILVER, INC., *et al.*,                          :        Case No. 15-11880 (BLS)
:
Debtors.[2]                   :        Jointly Administered
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## PLAN SUPPLEMENT TO SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF QUIKSILVER, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

| | | |
|---|---|---|
| Van C. Durrer, II (I.D. No. 3827) | Mark S. Chehi (I.D. No. 2855) | John K. Lyons |
| Annie Z, Li | One Rodney Square | Jessica S. Kumar |
| 300 South Grand Avenue | P.O. Box 636 | 155 N. Wacker Dr. |
| Suite 3400 | Wilmington, Delaware 19899 | Suite 2700 |
| Los Angeles, CA 90071 | Telephone: (302) 651-3000 | Chicago, IL 60606 |
| Telephone: (213) 687-5000 | Fax: (302) 651-3001 | Telephone: (312) 407-0700 |
| Fax: (213) 687-5600 | | Fax: (312) 407-0411 |

Counsel for Debtors and Debtors in Possession

Dated: Wilmington, Delaware
       January 7, 2016

---

[2]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

**TABLE OF EXHIBITS**

<u>**Exhibit**</u>  <u>**Title**</u>

A    Administrative Claim Request Form

B    Summary of Euro Notes Exchange Offer

C    Bylaws of the Reorganized Debtors

D    Certificates of Incorporation of the Reorganized Debtors

E    Reorganized Quiksilver Shareholders Agreement

F    Members of the Board of Reorganized Quiksilver

G    Maximum Percentage of New Quiksilver Common Stock to be Issued on Account of Management Incentive Plan

H    Anticipated Post-Effective Date Structure of the Reorganized Debtors

I    Schedule of Assumed Contracts and Unexpired Leases

J    Non-Exclusive List of Retained Claims and Causes of Action

K    Exit Financing Terms


**THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, OR SUPPLEMENT THIS PLAN SUPPLEMENT AT ANY TIME PRIOR TO THE HEARING ON CONFIRMATION OF THE PLAN IN ACCORDANCE WITH THE PLAN AND THE PLAN SPONSOR AGREEMENT**

# EXHIBIT A

**Administrative Claim Request Form**

**USE ONLY FOR ADMINISTRATIVE EXPENSE CLAIMS THAT AROSE ON OR AFTER SEPTEMBER 9, 2015.**

| UNITED STATES BANKRUPTCY COURT  DISTRICT OF DELAWARE | ADMINISTRATIVE EXPENSE PROOF OF CLAIM FORM |
|---|---|

**Debtor against which claim is asserted: (check one)**

☐ Quiksilver, Inc. (Case No. 15-11880)     ☐ Mt. Waimea, Inc. (Case No. 15-11886)
☐ QS Wholesale, Inc. (Case No. 15-11881)     ☐ QS Optics, Inc. (Case No. 15-11887)
☐ DC Direct, Inc. (Case No. 15-11882)     ☐ QS Retail, Inc. (Case No. 15-11888)
☐ DC Shoes, Inc. (Case No. 15-11883)     ☐ Quiksilver Entertainment, Inc. (Case No. 15-11889)
☐ Fidra, Inc. (Case No. 15-11884)     ☐ Quiksilver Wetsuits, Inc. (Case No. 15-11890)
☐ Hawk Designs, Inc. (Case No. 15-11885)

**Administrative Expense Claim Request**

**THIS SPACE IS FOR COURT USE ONLY.**

**NOTE:** This Administrative Expense Claim Request form is to be used solely in connection with a request for payment of an administrative expense arising after commencement of these cases pursuant to 11 U.S.C. § 503.

Name of Administrative Expense Creditor (the person or other entity to whom the debtor owes money or property):

Name and address where notices should be sent:



Telephone number:

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:**_____
(*If known*)

Filed on:_____

Name and address where payment should be sent (if different from above):



Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**IMPORTANT:** Please list the name and address of any property related to your claim (if applicable).

Property Name:_____

Property Address:_____

**1. Basis for Administrative Expense Claim:**_____
(See instruction #2 on reverse side.)

**2. Last four digits of any number by which creditor identifies debtor:**_____

**3. TOTAL AMOUNT OF ADMINISTRATIVE EXPENSE CLAIM:**

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

$ _____
**(Total)**

**4. BRIEF DESCRIPTION OF CLAIM (attach any additional information):**

**5. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**6. Supporting Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**DATE-STAMPED COPY:** To receive an acknowledgment of the filing of your administrative expense proof of claim, enclose a stamped, self-addressed envelope and copy of this administrative expense proof of claim, or you may view your claim information by visiting the website of the Claims Agent (www.kccllc.net/Quiksilver).

**THIS SPACE IS FOR COURT USE ONLY.**

**IF PROOF OF CLAIM IS SENT BY MAIL, HAND DELIVERY, OR OVERNIGHT COURIER, SEND TO:**

**Quiksilver Claims Processing Center**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**
Please see intructions on back of Proof of Claim

**Date:**

**Signature:** the person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

# INSTRUCTIONS FOR ADMINISTRATIVE EXPENSE PROOF OF CLAIM FORM

The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the Debtor, there may be exceptions to these general rules.

# ITEMS TO BE COMPLETED IN PROOF OF CLAIM FORM

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, District of Delaware), the bankruptcy Debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1.  Basis for Claim:**
State the type of debt for which the administrative expense proof of claim is being filed. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**2.  Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the Debtor's account or other number used by the creditor to identify the Debtor.

**3.  Total Amount of Administrative Expense Claim:**
Fill in the applicable amounts of the entire administrative expense proof of claim. If interest or other charges in addition to the principal amount of the administrative expense proof of claim are included, check the appropriate place on the form and attach an itemization of interest and charges.

**4.  Brief Description of Claim**
Describe the Administrative Expense Claim including, but not limited to, the actual and necessary costs and expenses of operating one or more of the Debtors' estates or any actual and necessary costs and expenses of operating one or more of the Debtors' businesses.

**5.  Credits:**
An authorized signature on this administrative expense proof of claim serves as an acknowledgement that when calculating the amount of the administrative expense proof of claim, the creditor gave the Debtor credit for any payments received toward the debt.

**6.  Supporting Documents:**
Attach to this administrative expense proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this administrative expense proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this administrative expense proof of claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on an administrative expense proof of claim.

## DEFINITIONS

**Name of Debtor and Case Number:**
A complete list of Debtors with corresponding case numbers is listed above.  You MUST fill in the specific Debtor against which your claim is being asserted and the case number of the Debtor's bankruptcy case.  If you are asserting claims against more than one Debtor, you MUST file a separate administrative expense proof of claim for each Debtor.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the Debtor on the date of the bankruptcy filing.

**Administrative Expense Claim**
Any right to payment constituting a cost or expense of administration of any of the Reorganized Cases allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of operating one or more of the Debtors' Estates, any actual and necessary costs and expenses of operating one or more of the Debtors' businesses, and any fees or charges assessed against one or more of the Debtors' Estates, any actual and necessary costs and expenses of operating one or more of the Debtors' businesses, and any fees or charges assessed against one or more of the Estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code.

**Administrative Expense Creditor**
An Administrative Expense Creditor is any person, corporation, or other entity to whom the Debtor owes a debt for an administrative expense.

**Administrative Expense Proof of Claim**
A form telling the Bankruptcy Court how much the Debtor owes a creditor for administrative expenses.

**Submitting Administrative Expense Proof of Claim**
Submit a signed original claim request with any attachments via United States mail, overnight courier service or hand delivery to:

**Quiksilver Claims Processing Center**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

Submission by facsimile or other electronic means will not be accepted.

## INFORMATION

**Acknowledgement of Filing a Claim**
To receive acknowledgment of your filing, enclose a stamped self-addressed envelope and a copy of this administrative expense proof of claim or you may view your claim information by visiting the website of the Claims Agent (www.kccllc.net/Quiksilver).

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the Debtors. These entities do not represent the bankruptcy court or the Debtors. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## **EXHIBIT B**

### **Summary of Euro Notes Exchange Offer**

In accordance with the Plan and the Plan Sponsor Agreement, the Debtors are currently engaged in good faith efforts to commence the Euro Notes Exchange Offer prior to the Effective Date.  As of the date hereof, the Debtors continue to work with the Plan Sponsor to finalize the terms of the Euro Notes Exchange Offer.  At such time as the terms of the Euro Notes Exchange Offer may be finalized, the Debtors shall make an appropriate supplemental disclosure, in accordance with the Plan.

The Debtors reserve the right to alter, amend, modify, or supplement this Exhibit B in accordance with the Plan and the Plan Sponsor Agreement.

**EXHIBIT C**

**Bylaws of the Reorganized Debtors**

## EXHIBIT C-1

### Form of Bylaws of Reorganized Quiksilver

The Debtors reserve the right to alter, amend, modify, or supplement the Bylaws of Reorganized Quiksilver in accordance with the Plan and the Plan Sponsor Agreement.

AMENDED AND RESTATED

BY-LAWS

OF

QUIKSILVER, INC.

A Delaware corporation
*(Adopted as of January [●], 2016)*

ARTICLE I
OFFICES

Section 1    Registered Office.  The registered office of the corporation in the State of Delaware shall be located at 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, Delaware, 19808.  The name of its registered agent at such address is Corporation Service Company.  The registered office and/or registered agent of the corporation may be changed from time to time by action of the board of directors.

Section 2    Other Offices.  The corporation may also have offices at such other places, both within and without the State of Delaware, as the board of directors may from time to time determine or the business of the corporation may require.

ARTICLE II
MEETINGS OF STOCKHOLDERS

Section 1    Annual Meetings.  At least one meeting of the stockholders shall be held each year for the purpose of electing directors and conducting any business as may come before the meeting.  The date, time and place, if any, and/or the means of remote communication, of such meeting shall be determined by the president of the corporation; provided, however, that if the president does not act, the board of directors shall determine the date, time and place, if any, and/or the means of remote communication, of such meeting.  No annual meeting of stockholders need be held if not required by the corporation's certificate of incorporation or by the General Corporation Law of the State of Delaware.

Section 2    Special Meetings.  Special meetings of stockholders may be called for any purpose (including, without limitation, the filling of board vacancies and newly created directorships) and may be held at such time and place, within or without the State of Delaware, and/or by means of remote communication, as shall be stated in a written notice of meeting or in a duly executed waiver of notice thereof.  Except as otherwise provided in the corporation's certificate of incorporation, such meetings may be called at any time by the board of directors or the president and shall be called by the president upon the written request of holders of shares entitled to cast not less than a majority of the votes at the meeting, which written request shall state the purpose or purposes of the meeting and shall be delivered to the president.  In addition, no more than once per calendar year, a special meeting shall be called by the president upon the written request of the holders of shares entitled to cast at least 25% of the votes at the meeting,

which written request shall state the purpose or purposes of the meeting and which shall propose a date on which such meeting is to be held (which shall not be less than three (3) business days after the date the notice is received).  On such written request, the president shall fix a date, time and place, if any, and/or remote communication, for such meeting within two days after receipt of a request for such meeting in such written request.

Section 3      Place of Meetings.  The board of directors may designate any place, either within or without the State of Delaware, and/or by means of remote communication, as the place of meeting for any meeting or for any special meeting called by the board of directors.  If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the corporation.

Section 4      Notice.  Whenever stockholders are required or permitted to take any action at a meeting, written or printed notice stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each stockholder entitled to vote at such meeting not less than 10 nor more than 60 days before the date of the meeting.  All such notices shall be delivered, either personally, by mail, by facsimile or by electronic mail, by or at the direction of the board of directors, the president or the secretary, and such notice shall be deemed to be delivered (i) upon confirmation of receipt if sent by facsimile, electronic mail or personal delivery or (ii) three (3) days after being deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the corporation.  Any such consent shall be revocable by the stockholder by written notice to the corporation.  Any such consent shall be deemed revoked if (1) the corporation is unable to deliver by electronic transmission two consecutive notices given by the corporation in accordance with such consent and (2) such inability becomes known to the secretary or an assistant secretary of the corporation or to the transfer agent.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

Section 5      Stockholders List.  The officer who has charge of the stock ledger of the corporation shall make, at least 10 days before every meeting of the stockholders, a complete list of the stockholders entitled to vote at such meeting arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, and/or (ii) during ordinary business hours, at the principal place of business of the corporation.  In the event that the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible

2

electronic network, and the information required to access such list shall be provided with the notice of the meeting.

Section 6        Quorum.  The holders of a majority of the votes represented by the issued and outstanding shares of capital stock, entitled to vote thereon, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders, except as otherwise provided by statute or by the corporation's certificate of incorporation.  If a quorum is not present, the holders of a majority of the votes represented by the shares of capital stock present in person or represented by proxy at the meeting, and entitled to vote at the meeting, may adjourn the meeting to another time and/or place.  When a quorum is once present to commence a meeting of stockholders, it is not broken by the subsequent withdrawal of any stockholders or their proxies.

Section 7        Adjourned Meetings.  When a meeting is adjourned to another time and place, notice need not be given of the adjourned meeting if the time, place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 8        Vote Required.  When a quorum is present, the affirmative vote of the majority of the votes represented by the shares of capital stock present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders, unless the question is one upon which by express provisions of an applicable law or of the corporation's certificate of incorporation a different vote is required, in which case such express provision shall govern and control the decision of such question.

Section 9        Voting Rights.  Except as otherwise provided by the General Corporation Law of the State of Delaware or by the corporation's certificate of incorporation or any amendments thereto and subject to Section 3 of Article VI hereof, every stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of voting common stock held by such stockholder.

Section 10        Proxies.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally.  Any proxy is suspended when the person executing the proxy is present at a meeting of stockholders and elects to vote, except that when such proxy is coupled with an interest and the fact of the interest appears on the face of the proxy, the agent named in the proxy shall have all voting and other rights referred to in the

3

proxy, notwithstanding the presence of the person executing the proxy.  At each meeting of the stockholders, and before any voting commences, all proxies filed at or before the meeting shall be submitted to and examined by the secretary or a person designated by the secretary, and no shares may be represented or voted under a proxy that has been found to be invalid or irregular.

Section 11    Action by Written Consent.    Unless otherwise provided in the corporation's certificate of incorporation, any action required to be taken at any regular or special meeting of stockholders of the corporation, or any action which may be taken at any regular or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken and bearing the dates of signature of the stockholders who signed the consent or consents, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the corporation by delivery to its registered office in the state of Delaware, or the corporation's principal place of business, or an officer or agent of the corporation having custody of the book or books in which proceedings of meetings of the stockholders are recorded.  Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested or by reputable overnight courier service.  All consents properly delivered in accordance with this section shall be deemed to be recorded when so delivered.  No written consent shall be effective to take the corporate action referred to therein unless, within 60 days after the earliest dated consent delivered to the corporation as required by this section, written consents signed by the holders of a sufficient number of shares to take such corporate action are so recorded.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing, and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the corporation.  Any action taken pursuant to such written consent or consents of the stockholders shall have the same force and effect as if taken by the stockholders at a meeting thereof.  Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used; provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

Section 12    Action by Telegram, Cablegram or Other Electronic Transmission Consent.  A facsimile, email or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this section; provided that any such facsimile, email or other electronic transmission sets forth or is delivered with information from which the corporation can determine (A) that the facsimile, email or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder and (B) the date on which such stockholder or proxyholder or authorized person or persons transmitted such facsimile, email or electronic transmission.  The date on which such facsimile, email or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. Any such facsimile, email or other electronic transmission of a consent or proxy shall be treated in all respects as an original executed consent or proxy and shall be considered to have the same

4

binding legal effect as if it were the original signed version thereof delivered in person.  No consent given by facsimile, email or other electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded if, to the extent and in the manner provided by resolution of the board of directors of the corporation.

<div align="center">

ARTICLE III
DIRECTORS

</div>

Section 1    General Powers.  The business and affairs of the corporation shall be managed by or under the direction of the board of directors.

Section 2    Number, Election and Term of Office.  The number of directors which shall constitute the first board shall be four (4).  Thereafter, the number of directors shall be established from time to time in accordance with the provisions of that certain Stockholders Agreement, dated as of the date hereof, among the corporation and certain of its stockholders (as amended from time to time, the "Stockholders Agreement"), or after termination of the Stockholders Agreement, by resolution of the board.  The directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote in the election of directors in compliance with the provisions of the Stockholders Agreement.  The directors shall be elected in this manner at the annual meeting of the stockholders, except as provided in Section 4 of this Article III.  Each director elected shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3    Removal and Resignation.  Subject to the provisions of the Stockholders Agreement, any director or the entire board of directors may be removed at any time, with or without cause, by the holders of a majority of the votes represented by the shares of capital stock then entitled to vote at an election of directors.  Whenever the holders of any class or series are entitled to elect one or more directors by the provisions of the corporation's certificate of incorporation, the provisions of this section shall apply, in respect of the removal without cause of any directors so elected, to the vote of the holders of the outstanding shares.  Any director may resign at any time upon notice given in writing or by electronic transmission to the corporation.

Section 4    Vacancies.  Except as otherwise provided in the corporation's certificate of incorporation, board vacancies and newly created directorships resulting from any increase in the authorized number of directors shall be filled as provided in the Stockholders Agreement; provided that at any time the Stockholders Agreement is no longer in effect, such vacancies and newly created directorships shall be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director.  Each director so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided.

Notwithstanding the foregoing, any such vacancy shall automatically reduce the authorized number of directors *pro tanto*, until such time as the holders of outstanding shares of

<div align="center">5</div>

capital stock who are entitled to elect the director whose office is vacant shall have exercised their right to elect a director to fill such vacancy, whereupon the authorized number of directors shall be automatically increased *pro tanto*. Each director so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided.

Section 5      Meetings and Notice. Regular meetings of the board of directors may be held without notice at such time and at such place, if any, as shall from time to time be determined by resolution of the board of directors and promptly communicated to all directors then in office, provided that the directors shall meet at least once per year. Special meetings of the board of directors may be called by or at the request of any director on at least 24 hours notice to each director, either personally, by telephone, by mail and/or by facsimile or electronic mail.

Section 6      Quorum, Required Vote and Adjournment. A majority of the total number of directors then in office shall constitute a quorum for the transaction of business. The vote of a majority of directors present at a meeting at which a quorum is present shall be the act of the board of directors. If a quorum shall not be present at any meeting of the board of directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present. Except as otherwise required by the corporation's certificate of incorporation, each director shall be entitled to one vote.

Section 7      Committees. Subject to the provisions of the Stockholders Agreement, the board of directors may, by resolution passed by a majority of the whole board, designate one or more committees, each committee to consist of one or more of the directors of the corporation, which to the extent provided in such resolution or these by-laws shall have and may exercise the powers of the board of directors in the management and affairs of the corporation, except as otherwise limited by law. The board of directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors. Each committee shall keep regular minutes of its meetings and report the same to the board of directors when required.

Section 8      Committee Rules. Each committee of the board of directors may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the board of directors designating such committee. Unless otherwise provided in such resolution, the presence of a majority of the members of the committee then in office shall be necessary to constitute a quorum. Subject to the provisions of the Stockholders Agreement, in the event that a member and that member's alternate, if alternates are designated by the board of directors as provided in Section 7 of this Article III, of such committee is or are absent or disqualified, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in place of any such absent or disqualified member.

Section 9        Communications Equipment.  Members of the board of directors or any committee thereof may participate in and act at any meeting of such board or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in the meeting pursuant to this section shall constitute presence in person at the meeting.

Section 10        Waiver of Notice and Presumption of Assent.  Any member of the board of directors or any committee thereof who is present at a meeting shall be conclusively presumed to have waived notice of such meeting, except when such member attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Such member shall be conclusively presumed to have assented to any action taken unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the secretary of the corporation immediately after the adjournment of the meeting.  Such right to dissent shall not apply to any member who voted in favor of such action.

Section 11        Action by Written Consent.    Unless otherwise restricted by the corporation's certificate of incorporation, any action required or permitted to be taken at any meeting of the board of directors, or of any committee thereof, may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the board, or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

ARTICLE IV
OFFICERS

Section 1        Number.  The officers of the corporation shall be elected by the board of directors and may consist of a chairman of the board, a president or chief executive officer (the "president"), one or more vice-presidents, a chief financial officer, a secretary, a treasurer, and such other officers and assistant officers as may be deemed necessary or desirable by the board of directors.  Any number of offices may be held by the same person.  In its discretion, the board of directors may choose not to fill any office for any period as it may deem advisable, except that the offices of president and secretary shall be filled as expeditiously as possible.

Section 2        Election and Term of Office.  The officers of the corporation shall be elected at any meeting of the board of directors.  Vacancies may be filled or new offices created and filled at any meeting of the board of directors.  Each officer shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3        Removal.  Any officer or agent elected by the board of directors may be removed by the board of directors whenever in its judgment the best interests of the corporation would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

7

Section 4        Vacancies.  Any vacancy occurring in any office because of death, resignation, removal, disqualification or otherwise, may be filled by the board of directors for the unexpired portion of the term by the board of directors then in office.

Section 5        Compensation.  Compensation of all officers shall be fixed by the board of directors, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the corporation.

Section 6        Chairman of the Board.  The chairman of the board, if one is appointed, shall have the powers and perform the duties incident to that position.  Subject to the powers of the board of directors, the chairman of the board shall be in the general and active charge of the entire business and affairs of the corporation.  The chairman of the board shall preside at all meetings of the board of directors and at all meetings of the stockholders and shall have such other powers and perform such other duties as may be prescribed by the board of directors or provided in these by-laws.  Whenever the president is unable to serve, by reason of sickness, absence or otherwise, the chairman of the board shall perform all the duties and responsibilities and exercise all the powers of the president.

Section 7        The President.  The president, if one is appointed, shall be the chief executive officer of the corporation; shall preside at all meetings of the stockholders and board of directors at which he or she is present; subject to the powers of the board of directors, shall have general charge of the business, affairs and property of the corporation, and control over its officers, agents and employees; and shall see that all orders and resolutions of the board of directors are carried into effect.  The president shall execute bonds, mortgages and other contracts which the board of directors have authorized to be executed, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the board of directors to some other officer or agent of the corporation.  The president shall have such other powers and perform such other duties as may be prescribed by the board of directors or as may be provided in these by-laws.  If there is no chief executive officer, the president shall also have the duties of the chief executive officer as prescribed above.

Section 8        Chief Financial Officer.  The chief financial officer, if one is appointed, shall, under the direction of the chief executive officer (or, in the absence of a chief executive officer, the president), be responsible for all financial and accounting matters and for the direction of the offices of treasurer and controller.  The chief financial officer shall have such other powers and perform such other duties as may be prescribed by the chairman of the board, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or the board of directors or as may be provided in these by-laws.

Section 9        Vice-presidents.  The vice-president, if one is appointed, or if there shall be more than one, the vice-presidents in the order determined by the board of directors or by the president, shall, in the absence or disability of the president, act with all of the powers and be subject to all the restrictions of the president.  The vice-presidents shall also perform such other duties and have such other powers as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president) or these by-laws may, from time to time, prescribe.

38977840.5

Section 10     Secretary and Assistant Secretaries.  The secretary, if one is appointed, shall attend all meetings of the board of directors, all meetings of the committees thereof and all meetings of the stockholders and record all the proceedings of the meetings in a book or books to be kept for that purpose.  Under the chief executive officer's (or, in the absence of a chief executive officer, the president's) supervision, the secretary shall give, or cause to be given, all notices required to be given by these by-laws or by law, shall have such powers and perform such duties as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president) or these by-laws may, from time to time, prescribe, and shall have custody of the corporate seal of the corporation.  The secretary, or an assistant secretary, shall have authority to affix the corporate seal to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such assistant secretary.  The board of directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by his or her signature.  The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the board of directors, shall, in the absence or disability of the secretary, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president), president or secretary may, from time to time, prescribe.

Section 11     Treasurer and Assistant Treasurer.  The treasurer, if one is appointed, shall have the custody of the corporate funds and securities; shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation; shall deposit all monies and other valuable effects in the name and to the credit of the corporation as may be ordered by the board of directors; shall cause the funds of the corporation to be disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements; and shall render to the chief executive officer (or, in the absence of a chief executive officer, the president), the president and the board of directors, at its regular meeting or when the board of directors so requires, an account of the corporation; shall have such powers and perform such duties as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or these by-laws may, from time to time, prescribe.  If required by the board of directors, the treasurer shall give the corporation a bond (which shall be rendered every six years) in such sums and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of the office of treasurer and for the restoration to the corporation, in case of death, resignation, retirement, or removal from office, of all books, papers, vouchers, money, and other property of whatever kind in the possession or under the control of the treasurer belonging to the corporation.  The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the board of directors, shall in the absence or disability of the treasurer, perform the duties and exercise the powers of the treasurer.  The assistant treasurers shall perform such other duties and have such other powers as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or treasurer may, from time to time, prescribe.

Section 12     Other Officers, Assistant Officers and Agents.  Officers, assistant officers and agents, if any, other than those whose duties are provided for in these by-laws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the board of directors.

9

Section 13     Absence or Disability of Officers.  In the case of the absence or disability of any officer of the corporation and of any person hereby authorized to act in such officer's place during such officer's absence or disability, the board of directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person whom it may select.

## ARTICLE V
## INDEMNIFICATION OF OFFICERS, DIRECTORS AND OTHERS

Section 1     Nature of Indemnity.  Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether brought by or in the right of the corporation or any of its subsidiaries and whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), or any appeal of such proceeding, by reason of or arising out of the fact that he or she is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director, officer, manager, general partner, employee, fiduciary, or agent of another corporation or of a partnership, limited liability company, joint venture, trust or other enterprise, shall be indemnified and held harmless by the corporation to the fullest extent which it is empowered to do so, unless prohibited from doing so by the General Corporation Law of the State of Delaware, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the corporation to provide broader indemnification rights than said law permitted the corporation to provide prior to such amendment) against all expense, liability and loss (including attorneys' fees actually and reasonably incurred by such person in connection with such proceeding), and such indemnification shall inure to the benefit of his or her heirs, executors and administrators; provided that, except as provided in Section 2 hereof, the corporation shall indemnify any such person seeking indemnification in connection with a proceeding initiated by such person only if such proceeding was authorized by the board of directors of the corporation. The right to indemnification conferred in this Article V shall be a contract right and, subject to Sections 2 and 5 hereof, shall include the right to be paid by the corporation the expenses incurred in defending any such proceeding in advance of its final disposition.  The corporation may, by action of its board of directors, provide indemnification to employees and agents of the corporation with the same scope and effect as the foregoing indemnification of directors and officers.

Section 2     Procedure for Indemnification of Directors and Officers.  Any indemnification of a director or officer of the corporation provided for under Section 1 of this Article V or advance of expenses provided for under Section 5 of this Article V shall be made promptly, and in any event within 30 days, upon the written request of the director or officer.  If a determination by the corporation that the director or officer is entitled to indemnification pursuant to this Article V is required, and the corporation fails to respond within 60 days to a written request for indemnity, the corporation shall be deemed to have approved the request.  If the corporation wrongfully denies a written request for indemnification or advancing of expenses, in whole or in part, or if payment in full pursuant to such request is not properly made within 30 days, the right to indemnification or advances as granted by this Article V shall be enforceable by the director or officer in any court of competent jurisdiction.  Such person's costs and expenses incurred in connection with successfully establishing his or her right to indemnification, in whole or in part, in any such action shall also be indemnified by the

10

corporation.  It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the corporation) that the claimant has not met the standards of conduct which make it permissible under the General Corporation Law of the State of Delaware for the corporation to indemnify the claimant for the amount claimed, but the burden of such defense shall be on the corporation.  Neither the failure of the corporation (including its board of directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the General Corporation Law of the State of Delaware, nor an actual determination by the corporation (including its board of directors, independent legal counsel, or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

Section 3    Article Not Exclusive.  The rights to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the corporation's certificate of incorporation, by-law, agreement, vote of stockholders or disinterested directors or otherwise.

Section 4    Indemnitor of First Resort.  The corporation hereby acknowledges that certain directors affiliated with or managed by Oaktree Capital Management, L.P., an affiliate of certain stockholders of the corporation (collectively, the "Oaktree Investors"), may have certain rights to indemnification, advancement of expenses and/or insurance provided by such Oaktree Investors or certain of their respective affiliates (collectively, the "Institutional Indemnitors").  The corporation hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to such directors are primary and any obligation of the Institutional Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by a director are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by a director in accordance with this ARTICLE V without regard to any rights any such director may have against the Institutional Indemnitors, and (iii) that it irrevocably waives, relinquishes and releases the Institutional Indemnitors from any and all claims against the Institutional Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The corporation further agrees that no advancement or payment by the Institutional Indemnitors on behalf of any director with respect to any claim for which such director has sought indemnification from the corporation shall affect the foregoing and the Institutional Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such director against the corporation.  Notwithstanding any provision herein to the contrary, no officer or employee of the corporation or any of its subsidiaries shall have any rights to (and the corporation shall have no obligation to provide) indemnification or advances of expenses under this Article V with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, or claim related to or arising under any contract, agreement or arrangement between such person, on the one hand, and the corporation or its affiliates or controlling stockholders, on the other hand.

Section 5    Insurance.  The corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was a director, officer, employee, fiduciary, or

11

agent of the corporation or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, whether or not the corporation would have the power to indemnify such person against such liability under this Article V.

Section 6      Expenses. Expenses incurred by any person described in Section 1 of this Article V in defending a proceeding shall be paid by the corporation in advance of such proceeding's final disposition (provided that, if such person is or was an executive of the corporation or its subsidiaries, such advancement will be made unless otherwise determined by the board of directors in the specific case) upon receipt of an undertaking by or on behalf of the director or officer or other person to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the corporation.  Such expenses incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the board of directors deems appropriate.

Section 7      Employees and Agents.  Persons who are not covered by the foregoing provisions of this Article V and who are or were employees or agents of the corporation, or who are or were serving at the request of the corporation as employees or agents of another corporation, partnership, joint venture, trust or other enterprise, may be indemnified, and may be advanced expenses, to the extent authorized at any time or from time to time by the board of directors.

Section 8      Contract Rights.  The provisions of this Article V shall be deemed to be a vested contract right between the corporation and each director or officer who serves in any such capacity at any time while this Article V and the relevant provisions of the General Corporation Law of the State of Delaware or other applicable law are in effect.  Such contract right shall vest for each director and officer at the time such person is elected or appointed to such position, and no repeal or modification of this Article V or any such law shall affect any such vested rights or obligations of any current or former director or officer with respect to any state of facts or proceeding regardless of when occurring.

Section 9      Merger or Consolidation.  For purposes of this Article V, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article V with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

12

ARTICLE VI
CERTIFICATES OF STOCK

Section 1       Form.  Every holder of stock in the corporation shall be entitled to have a certificate, signed by, or in the name of the corporation by the chief executive officer, president or a vice-president and the secretary or an assistant secretary of the corporation, certifying the number of shares owned by such holder in the corporation.  If such a certificate is countersigned (1) by a transfer agent or an assistant transfer agent other than the corporation or its employee or (2) by a registrar, other than the corporation or its employee, the signature of any such chief executive officer, president, vice-president, secretary, or assistant secretary may be facsimiles. In case any officer or officers who have signed, or whose facsimile signature or signatures have been used on, any such certificate or certificates shall cease to be such officer or officers of the corporation whether because of death, resignation or otherwise before such certificate or certificates have been delivered by the corporation, such certificate or certificates may nevertheless be issued and delivered as though the person or persons who signed such certificate or certificates or whose facsimile signature or signatures have been used thereon had not ceased to be such officer or officers of the corporation.  All certificates for shares shall be consecutively numbered or otherwise identified.  The name of the person to whom the shares represented thereby are issued, with the number of shares and date of issue, shall be entered on the books of the corporation.  Shares of stock of the corporation shall only be transferred on the books of the corporation by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the corporation of the certificate or certificates for such shares endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization, and other matters as the corporation may reasonably require, and accompanied by all necessary stock transfer stamps.  In that event, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate or certificates, and record the transaction on its books.  The board of directors may appoint a bank or trust company organized under the laws of the United States or any state thereof to act as its transfer agent or registrar, or both in connection with the transfer of any class or series of securities of the corporation.

Section 2       Lost Certificates.  The board of directors may direct a new certificate or certificates to be issued in place of any certificate or certificates previously issued by the corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed.  When authorizing such issue of a new certificate or certificates, the board of directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen, or destroyed certificate or certificates, or his or her legal representative, to give the corporation a bond sufficient to indemnify the corporation against any claim that may be made against the corporation on account of the loss, theft or destruction of any such certificate or the issuance of such new certificate.

Section 3       Fixing a Record Date for Stockholder Meetings.  In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which record date shall not be more than sixty nor less than ten

13

days before the date of such meeting.  If no record date is fixed by the board of directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be the close of business on the next day preceding the day on which notice is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided that the board of directors may fix a new record date for the adjourned meeting.

Section 4    Fixing a Record Date for Action by Written Consent.  In order that the corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which date shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the board of directors.  If no record date has been fixed by the board of directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the board of directors is required by statute, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested or by facsimile or electronic mail, with confirmation of receipt.  If no record date has been fixed by the board of directors and prior action by the board of directors is required by statute, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the board of directors adopts the resolution taking such prior action.

Section 5    Fixing a Record Date for Other Purposes.  In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment or any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purposes of any other lawful action, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the board of directors adopts the resolution relating thereto.

Section 6    Registered Stockholders.  Prior to the surrender to the corporation of the certificate or certificates for a share or shares of stock with a request to record the transfer of such share or shares, the corporation may treat the registered owner as the person entitled to receive dividends, to vote, to receive notifications, and otherwise to exercise all the rights and powers of an owner.  The corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof.

Section 7    Subscriptions for Stock.  Unless otherwise provided for in the subscription agreement, subscriptions for shares shall be paid in full at such time, or in such installments and

14

at such times, as shall be determined by the board of directors.  Any call made by the board of directors for payment on subscriptions shall be uniform as to all shares of the same class or as to all shares of the same series.  In case of default in the payment of any installment or call when such payment is due, the corporation may proceed to collect the amount due in the same manner as any debt due the corporation.

<div align="center">

ARTICLE VII
GENERAL PROVISIONS

</div>

Section 1        Dividends.  Dividends upon the capital stock of the corporation, subject to the provisions of the corporation's certificate of incorporation, if any, may be declared by the board of directors at any regular or special meeting, pursuant to law.  Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the corporation's certificate of incorporation.  Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or any other purpose and the directors may modify or abolish any such reserve in the manner in which it was created.

Section 2        Checks, Drafts or Orders.  All checks, drafts, or other orders for the payment of money by or to the corporation and all notes and other evidences of indebtedness issued in the name of the corporation shall be signed by such officer or officers, agent or agents of the corporation, and in such manner, as shall be determined by resolution of the board of directors or a duly authorized committee thereof.

Section 3        Contracts.  The board of directors may authorize any officer or officers, or any agent or agents, of the corporation to enter into any contract or to execute and deliver any instrument in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances.

Section 4        Loans.  The corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiary, including any officer or employee who is a director of the corporation or its subsidiary, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation.  The loan, guaranty or other assistance may be with or without interest, and may be unsecured, or secured in such manner as the board of directors shall approve, including, without limitation, a pledge of shares of stock of the corporation.  Nothing in this section contained shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

Section 5        Fiscal Year.  The fiscal year of the corporation shall be fixed by resolution of the board of directors.

Section 6        Corporate Seal.  The board of directors shall provide a corporate seal which shall be in the form of a circle and shall have inscribed thereon the name of the

<div align="center">

15

</div>

corporation and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

Section 7        Voting Securities Owned By Corporation.  Voting securities in any other corporation held by the corporation shall be voted by the president, unless the board of directors specifically confers authority to vote with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer.  Any person authorized to vote securities shall have the power to appoint proxies, with general power of substitution.

Section 8        Exclusive Jurisdiction.  Unless otherwise waived by resolution of the Board, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer of the corporation to the corporation or the corporation's stockholders, (iii) any action asserting a claim against the corporation arising pursuant to any provision of the General Corporation Law of the State of Delaware or the corporation's certificate of incorporation or by-laws or (iv) any action asserting a claim against the corporation governed by the internal affairs doctrine, except, as to each of (i) through (iv), for any claim for which the Delaware Chancery Court determines there is an indispensable party not subject to its jurisdiction (and such party does not consent to such jurisdiction within ten days of such determination).

Section 9        Section Headings.  Section headings in these by-laws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

Section 10      Inconsistent Provisions.  In the event that any provision of these by-laws is or becomes inconsistent with any provision of the corporation's certificate of incorporation, the General Corporation Law of the State of Delaware or any other applicable law, the provision of these by-laws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

<div align="center">

ARTICLE VIII
AMENDMENTS

</div>

Subject to the terms of the Stockholders Agreement and other than Article V, these by-laws may be amended, altered, or repealed and new by-laws adopted at any meeting of the board of directors by a majority vote.  Article V hereof may be amended, altered, or repealed at any meeting of the board of directors only by a unanimous vote (or unanimous written consent in lieu thereof).  The fact that the power to adopt, amend, alter, or repeal the by-laws has been conferred upon the board of directors shall not divest the stockholders of the same powers.

# <u>EXHIBIT C-2</u>

## Form of Bylaws of Subsidiary Reorganized Debtors

The Debtors reserve the right to alter, amend, modify, or supplement the Bylaws of the Subsidiary Reorganized Debtors in accordance with the Plan and the Plan Sponsor Agreement.

AMENDED AND RESTATED BYLAWS

OF

**[●]**

## TABLE OF CONTENTS

Page

ARTICLE I. OFFICES ................................................................................................1
    1.     PRINCIPAL OFFICES. ................................................................................1
    2.     OTHER OFFICES. ........................................................................................1

ARTICLE II. MEETINGS OF SHAREHOLDERS ...............................................1
    1.     PLACE OF MEETINGS. ...............................................................................1
    2.     ANNUAL MEETINGS OF SHAREHOLDERS. ..........................................1
    3.     SPECIAL MEETINGS. .................................................................................1
    4.     NOTICE OF SHAREHOLDERS' MEETINGS. ...........................................1
    5.     MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE. ...................2
    6.     QUORUM. ......................................................................................................2
    7.     ADJOURNED MEETING AND NOTICE THEREOF. ..................................2
    8.     VOTING. ........................................................................................................2
    9.     WAIVER OF NOTICE OR CONSENT BY ABSENT
            SHAREHOLDERS. .......................................................................................3
    10.    SHAREHOLDER ACTION BY WRITTEN CONSENT
            WITHOUT A MEETING. ..............................................................................3
    11.    RECORD DATE FOR SHAREHOLDER NOTICE, VOTING,
            AND GIVING CONSENTS. ..........................................................................4
    12.    PROXIES. ......................................................................................................4
    13.    INSPECTORS OF ELECTION. .....................................................................5

ARTICLE III. DIRECTORS ......................................................................................5
    1.     POWERS. .......................................................................................................5
    2.     NUMBER AND QUALIFICATION OF DIRECTORS. ................................6
    3.     ELECTION AND TERM OF OFFICE OF DIRECTORS. ............................6
    4.     VACANCIES. .................................................................................................6
    5.     PLACE OF MEETINGS AND TELEPHONIC MEETINGS. .......................7
    6.     ANNUAL MEETINGS. .................................................................................7
    7.     OTHER REGULAR MEETINGS. .................................................................7
    8.     SPECIAL MEETINGS. .................................................................................7
    9.     DISPENSING WITH NOTICE. .....................................................................7
    10.    QUORUM. ......................................................................................................7
    11.    ADJOURNMENT. ..........................................................................................8
    12.    NOTICE OF ADJOURNMENT. ....................................................................8
    13.    ACTION WITHOUT MEETING. ..................................................................8
    14.    FEES AND COMPENSATION OF DIRECTORS. ........................................8

ARTICLE IV. COMMITTEES ..................................................................................8
    1.     COMMITTEES OF DIRECTORS. ...............................................................8
    2.     MEETINGS AND ACTION OF COMMITTEES. .........................................9

ARTICLE V. OFFICERS ...........................................................................................9

i

1.      OFFICERS. ..................................................................................9
2.      ELECTION OF OFFICERS. ........................................................9
3.      SUBORDINATE OFFICERS, ETC. .............................................9
4.      REMOVAL AND RESIGNATION OF OFFICERS. ......................9
5.      VACANCIES IN OFFICES. .........................................................9
6.      PRESIDENT. ..............................................................................10
7.      CHIEF FINANCIAL OFFICER ...................................................10
8.      SECRETARY. .............................................................................10

ARTICLE VI. INDEMNIFICATION OF DIRECTORS, OFFICERS,
EMPLOYEES AND OTHER AGENTS ................................................10
1.      NATURE OF INDEMNITY.........................................................10
2.      PROCEDURE FOR INDEMNIFICATION OF DIRECTORS
        AND OFFICERS .........................................................................10
3.      ARTICLE NOT EXCLUSIVE ......................................................11
4.      INSURANCE ...............................................................................12
5.      EXPENSES ..................................................................................12
6.      EMPLOYEES AND AGENTS......................................................12
7.      CONTRACT RIGHTS..................................................................12
8.      MERGER OR CONSOLIDATION................................................12

ARTICLE VII. RECORDS AND REPORTS ..................................................12
1.      MAINTENANCE AND INSPECTION OF SHARE REGISTER...................12
2.      MAINTENANCE AND INSPECTION OF BYLAWS. ...................12
3.      MAINTENANCE AND INSPECTION OF OTHER
        CORPORATE RECORDS. ...........................................................13
4.      INSPECTION BY DIRECTORS. ..................................................13
5.      ANNUAL REPORT TO SHAREHOLDERS. ..................................13
6.      ANNUAL STATEMENT OF GENERAL INFORMATION. ..........................13

ARTICLE VIII. GENERAL CORPORATE MATTERS ...........................................13
1.      RECORD DATE FOR PURPOSES OTHER THAN NOTICE
        AND VOTING.............................................................................13
2.      CHECKS, DRAFTS, EVIDENCES OF INDEBTEDNESS. ...........................14
3.      CORPORATE CONTRACTS AND INSTRUMENTS; HOW
        EXECUTED. ...............................................................................14
4.      CERTIFICATES FOR SHARES...................................................14
5.      LOST CERTIFICATES.................................................................14
6.      REPRESENTATION OF SHARES OF OTHER
        CORPORATIONS. ......................................................................14

ARTICLE IX. AMENDMENTS ................................................................15
1.      AMENDMENT BY SHAREHOLDERS. .......................................15
2.      AMENDMENT BY DIRECTORS.................................................15

ARTICLE X. GENERAL........................................................................15
1.      GOVERNING LAW.....................................................................15

ii

2.    CONSTRUCTION AND DEFINITIONS. ........................................................15

# AMENDED AND RESTATED BYLAWS

## OF

## [●]

### *(Adopted as of [●], 2016)*

# ARTICLE I.
## OFFICES

1.     PRINCIPAL OFFICES.  The Board of Directors shall fix the location of the principal executive office of the corporation at any place within or outside the State of California.  If the principal executive office is located outside this state, and the corporation has one or more business offices in this state, the Board of Directors shall likewise fix and designate a principal business office in the State of California.

2.     OTHER OFFICES.  The Board of Directors may at any time establish branch or subordinate offices at any place or places where the corporation is qualified to do business.

# ARTICLE II.
## MEETINGS OF SHAREHOLDERS

1.     PLACE OF MEETINGS.  Meetings of shareholders shall be held at any place within or outside the State of California designated by the Board of Directors.  In the absence of any such designation, shareholders' meetings shall be held at the principal executive office of the corporation.

2.     ANNUAL MEETINGS OF SHAREHOLDERS.  The annual meeting of shareholders shall be held each year on a date and at a time designated by the Board of Directors.  At each annual meeting directors shall be elected and any other proper business may be transacted.

3.     SPECIAL MEETINGS.  A special meeting of the shareholders may be called at any time by the Board of Directors, or by the President, or by one or more shareholders holding shares in the aggregate entitled to cast not less than 10% of the votes at any such meeting.  Nothing contained in this paragraph of this Section 3 shall be construed as limiting, fixing or affecting the time when a meeting of shareholders called by action of the Board of Directors may be held.

4.     NOTICE OF SHAREHOLDERS' MEETINGS.  All notices of meetings of shareholders shall be sent or otherwise given in accordance with Section 5 of this Article II not less than ten (10) nor more than sixty (60) days before the date of the meeting being noticed.  The notice shall specify the place, date and hour of the meeting and (i) in the case of a special meeting, the general nature of the business to be transacted, or (ii) in the case of the annual meeting those matters which the Board of Directors, at the time of giving the notice, intends to present for action by the shareholders.  The notice of any meeting at which directors are to be elected shall include the name of any nominee or nominees which, at the time of the notice, management intends to present for election.

        If action is proposed to be taken at any meeting for approval of (i) a contract or transaction in which a director has a direct or indirect financial interest, pursuant to Section 310 of the Corporations Code of California, (ii) an amendment of the articles of incorporation, pursuant to Section

902 of such Code, (iii) a reorganization of the corporation, pursuant to Section 1201 of such Code, (iv) a voluntary dissolution of the corporation, pursuant to Section 1900 of such Code, or (v) a distribution in dissolution, the notice shall also state the general nature of such proposal.

5.     MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE.  Notice of any meeting of shareholders shall be given either personally or by first-class mail or telegraphic or other written communication, charges prepaid, addressed to the shareholder at the address of such shareholder appearing on the books of the corporation or given by the shareholder to the corporation for the purpose of notice.  If no such address appears on the corporation's books or has been so given, notice shall be deemed to have been given if sent by first-class mail or telegraphic or other written communication to the corporation's principal executive office, or if published at least once in a newspaper of general circulation in the county where such office is located.  Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by by facsimile or electronic mail or other means of written communication.

If any notice addressed to a shareholder at the address of such shareholder appearing on the books of the corporation is returned to the corporation by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the shareholder at such address, all future notices or reports shall be deemed to have been duly given without further mailing if the same shall be available to the shareholder upon written demand of the shareholder at the principal executive office of the corporation for a period of one year from the date of the giving of such notice.

An affidavit of the mailing or other means of giving any notice of any shareholders' meeting shall be executed by the Secretary, Assistant Secretary giving such notice, and shall be filed and maintained in the minute book of the corporation.

6.     QUORUM.  The presence in person or by proxy of the holders of a majority of the shares entitled to vote at any meeting of shareholders shall constitute a quorum for the transaction of business. The shareholders present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum, if any action taken (other than adjournment) is approved by at least a majority of the shares required to constitute a quorum.

7.     ADJOURNED MEETING AND NOTICE THEREOF.  Any shareholders' meeting, annual or special, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the shares represented at such meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at such meeting, except as provided in Section 6 of this Article II.

When any meeting of shareholders, either annual or special, is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the Board of Directors shall set a new record date.  Notice of any such adjourned meeting, if required, shall be given to each shareholder of record entitled to vote at the adjourned meeting in accordance with the provisions of Sections 4 and 5 of this Article II.  At any adjourned meeting the corporation may transact any business which might have been transacted at the original meeting.

8.     VOTING.  The shareholders entitled to vote at any meeting of shareholders shall be determined in accordance with the provisions of Section 11 of this Article II, subject to the provisions of Sections 702 to 704, inclusive, of the Corporations Code of California (relating to voting shares held by a

2

fiduciary, in the name of a corporation or in joint ownership). Such vote may be by voice vote or by ballot; provided, however, that all elections for directors must be by ballot upon demand by a shareholder at any election and before the voting begins. Any shareholder entitled to vote on any matter (other than the election of directors) may vote part of the shares in favor of the proposal and refrain from voting the remaining shares or vote them against the proposal, but, if the shareholder fails to specify the number of shares such shareholder is voting affirmatively, it will be conclusively presumed that the shareholder's approving vote is with respect to all shares such shareholder is entitled to vote. If a quorum is present, the affirmative vote of the majority of the shares represented at the meeting and voting on any matter (other than the election of directors), provided that the shares voting affirmatively must also constitute at least a majority of the required quorum, shall be the act of the shareholders, unless the vote of a greater number or voting by classes is required by the California General Corporation Law or the articles of incorporation.

At a shareholders' meeting involving the election of directors, no shareholder shall be entitled to cumulate votes (i.e., cast for any candidate a number of votes greater than the number of the shareholder's shares) unless such candidate or candidates' names have been placed in nomination prior to commencement of the voting and a shareholder has given notice prior to commencement of the voting of the shareholder's intention to cumulate votes. If any shareholder has given such notice, then every shareholder entitled to vote may cumulate such shareholder's votes for candidates in nomination and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which such shareholder's shares are entitled, or distribute the shareholder's votes on the same principle among any or all of the candidates, as the shareholder thinks fit. The candidates receiving the highest number of votes, up to the number of directors to be elected, shall be elected.

9. WAIVER OF NOTICE OR CONSENT BY ABSENT SHAREHOLDERS. The transactions of any meeting of shareholders, either annual or special, however called and noticed, and wherever held, shall be as valid as though had at a meeting duly held after regular call and notice, if a quorum be present either in person or by proxy, and if, either before or after the meeting, each person entitled to vote, not present in person or by proxy, signs a written waiver of notice or a consent to the holding of the meeting, or an approval of the minutes thereof. The waiver of notice or consent need not specify either the business to be transacted or the purpose of any annual or special meeting of shareholders, except that if action is taken or proposed to be taken for approval of any of those matters specified in the second paragraph of Section 4 of this Article II, the waiver of notice or consent shall state the general nature of such proposal. All such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall also constitute a waiver of notice of such meeting, except when the person objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened, and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if such objection is expressly made at the meeting.

10. SHAREHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING. Any action which may be taken at any annual or special meeting of shareholders may be taken without a meeting and without prior notice, if a consent in writing, setting forth the action so taken, is signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. In the case of election of directors, such consent shall be effective only if signed by the holders of all outstanding shares entitled to vote for the election of directors; provided, however, that a director may be elected at any time to fill a vacancy not created by removal and not filled by the directors by the written consent of the holders of a majority of the outstanding shares entitled to vote for the election of

3

directors.  All such consents shall be filed with the Secretary of the corporation and shall be maintained in the corporate records.  Any shareholder giving a written consent, or the shareholder's proxy holders, or a transferee of the shares or a personal representative of the shareholder or their respective proxy holder, may revoke the consent by a writing received by the Secretary of the corporation prior to the time that written consents of the number of shares required to authorize the proposed action have been filed with the Secretary.

Unless the consents of all shareholders entitled to vote have been solicited in writing, the Secretary shall give prompt notice of any corporate action approved by the shareholders without a meeting by less than unanimous consent, to those shareholders entitled to vote who have not consented in writing.  Such notice shall be given in the manner specified in Section 5 of this Article II.  In the case of approval of (i) contracts or transactions in which a director has a direct or indirect financial interest, pursuant to Section 310 of the Corporations Code of California, (ii) indemnification of agents of the corporation, pursuant to Section 317 of such Code, (iii) a reorganization of the corporation, pursuant to Section 1201 of such Code, or (iv) a distribution in dissolution, such notice shall be given at least ten (10) days before the consummation of any such action authorized by any such approval.

11.    RECORD  DATE  FOR  SHAREHOLDER  NOTICE,  VOTING,  AND  GIVING CONSENTS.  For purposes of determining the shareholders entitled to notice of any meeting or to vote or entitled to give consent to corporate action without a meeting, the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) days nor less than ten (10) days prior to the date of any such meeting nor more than sixty (60) days prior to such action without a meeting, and in such case only shareholders of record at the close of business on the date so fixed are entitled to notice and to vote or to give consents, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date fixed as aforesaid, except as otherwise provided in the California General Corporation Law.

If the Board of Directors does not so fix a record date:

(a)    The record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders shall be at the close of business on the business day next preceding the day on which notice if given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(b)    The record date for determining shareholders entitled to give consent to corporate action in writing without a meeting, (i) when no prior action by the Board of Directors has been taken, shall be the day on which the first written consent is given, or (ii) when prior action of the Board of Directors has been taken, shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto, or the sixtieth (60th) day prior to the date of such other action, whichever is later.

12.    PROXIES.  Every person entitled to vote for directors or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the person and filed with the Secretary of the corporation.  A proxy shall be deemed signed if the shareholder's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission or otherwise) by the shareholder or the shareholder's attorney in fact.  A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless (i) revoked by the person executing it, prior to the vote pursuant thereto, by a writing delivered to the corporation stating that the proxy is revoked or by a subsequent proxy presented to the meeting and executed by, or attendance at the meeting and voting in person by, the person executing the proxy; or (ii) written notice of the death or incapacity of the maker of such proxy is received by the corporation before the vote pursuant

4

thereto is counted; provided, however, that no such proxy shall be valid after the expiration of eleven (11) months from the date of such proxy, unless otherwise provided in the proxy.  The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 705(e) and (f) of the Corporations Code of California.

13.    INSPECTORS OF ELECTION.  Before any meeting of shareholders, the Board of Directors may appoint any persons other than nominees for office to act as inspectors of election at the meeting or its adjournment.  If no inspectors of election are so appointed, the chairman of the meeting may, and on the request of any shareholder or a shareholder's proxy shall, appoint inspectors of election at the meeting.  The number of inspectors shall be either one (l) or three (3).  If inspectors are appointed at a meeting on the request of one or more shareholders or proxies, the holders of a majority of shares or their proxies present at the meeting shall determine whether one (l) or three (3) inspectors are to be appointed.  If any person appointed as inspector fails to appear or fails or refuses to act, the chairman of the meeting may, and upon the request of any shareholder or a shareholder's proxy shall, appoint a person to fill such vacancy.

The duties of these inspectors shall be as follows:

(a)    Determine the number of shares outstanding and the voting power of each, the shares represented at the meeting, the existence of a quorum, and the authenticity, validity and effect of proxies;

(b)    Receive votes, ballots or consents;

(c)    Hear and determine all challenges and questions in any way arising in connection with the right to vote;

(d)    Count and tabulate all votes or consents;

(e)    Determine when the polls shall close;

(f)    Determine the result; and

(g)    Do any other acts that may be proper to conduct the election or vote with fairness to all shareholders.

## ARTICLE III.
## DIRECTORS

1.    POWERS.  Subject to the provisions of the California General Corporation Law and any limitations in the articles of incorporation and these bylaws relating to action required to be approved by the shareholders or by the outstanding shares, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors.

Without prejudice to such general powers, but subject to the same limitations, it is hereby expressly declared that the directors shall have the power and authority to:

(a)    Select and remove all officers, agents, and employees of the corporation, prescribe such powers and duties for them as may not be inconsistent with law, the articles of incorporation or these bylaws, fix their compensation, and require from them security for faithful service.

(b)     Change the principal executive office or the principal business office in the State of California from one location to another; cause the corporation to be qualified to do business in any other state, territory, dependency, or foreign country and conduct business within or outside the State of California; designate any place within or without the State for the holding of any shareholders' meeting or meetings, including annual meetings; adopt, make and use a corporate seal, and prescribe the forms of certificates of stock, and alter the form of such seal and of such certificates from time to time as in their judgment they may deem best, provided that such forms shall at all times comply with the provisions of law.

(c)     Authorize the issuance of shares of stock of the corporation from time to time, upon such terms as may be lawful, in consideration of money paid, labor done or services actually rendered, debts or securities canceled or tangible or intangible property actually received.

(d)     Borrow money and incur indebtedness for the purposes of the corporation, and cause to be executed and delivered therefor, in the corporate name, promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations, or other evidences of debt and securities therefor.

2.     NUMBER AND QUALIFICATION OF DIRECTORS.  The number of directors which shall constitute the Board of Directors shall be four (4).  The exact number of directors shall be established from time to time by resolution of the Board of Directors or by resolution of the shareholders. Directors need not be residents of the State of California.

3.     ELECTION AND TERM OF OFFICE OF DIRECTORS.  Directors shall be elected at each annual meeting of the shareholders to hold office until the next annual meeting.  Each director, including a director elected to fill a vacancy, shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified.

4.     VACANCIES.  Vacancies in the Board of Directors may be filled by a majority of the remaining directors, though less than a quorum, or by a sole remaining director, except that a vacancy created by the removal of a director by the vote or written consent of the shareholders or by court order may be filled only by the vote of a majority of the shares represented and voting at a duly held meeting at which a quorum is present, or by the written consent of holders of all outstanding shares entitled to vote. Each director so elected shall hold office until the next annual meeting of the shareholders and until a successor has been elected and qualified.

A vacancy or vacancies in the Board of Directors shall be deemed to exist in the case of the death, resignation or removal of any director, or if the Board of Directors by resolution declares vacant the office of a director who has been declared of unsound mind by an order of court or convicted of a felony, or if the authorized number of directors be increased, or if the shareholders fail, at any meeting of shareholders at which any director or directors are elected, to elect the full authorized number of directors to be voted for at that meeting.

The shareholders may elect a director or directors at any time to fill any vacancy or vacancies not filled by the directors, but any such election by written consent, other than to fill a vacancy created by removal, shall require the consent of a majority of the outstanding shares entitled to vote.

Any director may resign upon giving written notice to the President, the Secretary or the Board of Directors.  A resignation shall be effective upon the giving of the notice, unless the notice specifies a later time for its effectiveness.  If the resignation of a director is effective at a future time, the Board of Directors may elect a successor to take office when the resignation becomes effective.

No reduction of the authorized number of directors shall have the effect of removing any director prior to the expiration of his term of office.

5.    PLACE OF MEETINGS AND TELEPHONIC MEETINGS.  Regular meetings of the Board of Directors may be held at any place within or without the State that has been designated from time to time by resolution of the Board of Directors.  In the absence of such designation, regular meetings shall be held at the principal executive office of the corporation.  Special meetings of the Board of Directors shall be held at any place within or without the State that has been designated in the notice of the meeting or, if not stated in the notice or there is no notice, at the principal executive office of the corporation.  Any meeting, regular or special, may be held by conference, telephone or similar communication equipment, so long as all directors participating in such meeting can hear one another, and all such directors shall be deemed to be present in person at such meeting.

6.    ANNUAL MEETINGS.  Immediately following each annual meeting of shareholders, the Board of Directors shall hold a regular meeting for the purpose of organization, any desired election of officers and the transaction of other business.  Notice of this meeting shall not be required.

7.    OTHER REGULAR MEETINGS.  Other regular meetings of the Board of Directors shall be held without call at such time as shall from time to be fixed by the Board of Directors.  Such regular meetings may be held without notice.

8.    SPECIAL MEETINGS.  Special meetings of the Board of Directors for any purpose or purposes may be called by or at the request of any directors on at least 24 hours notice to each director, either personally, by telephone, by mail and/or by facsimile or electronic mail.

Notice of the time and place of special meetings shall be delivered personally or by telephone to each director or sent by first-class mail or by facsimile or electronic mail, charges prepaid, addressed to each director at his or her address as it is shown upon the records of the corporation.  In case such notice is mailed, it shall be deposited in the United States mail at least four (4) days prior to the time of the holding of the meeting.  In case such notice is delivered personally, or by telephone or by facsimile or electronic mail, it shall be delivered personally or by telephone or to the telegraph company at least forty-eight (48) hours prior to the time of the holding of the meeting.  Any oral notice given personally or by telephone may be communicated to either the director or to a person at the office of the director who the person giving the notice has reason to believe will promptly communicate it to the director.  The notice need not specify the purpose of the meeting nor the place if the meeting is to be held at the principal executive office of the corporation.

9.    DISPENSING WITH NOTICE.  The transactions of any meeting of the Board of Directors, however called and noticed or wherever held, shall be as valid as though had at a meeting duly held after regular call and notice if a quorum be present and if, either before or after the meeting, each of the directors not present signs a written waiver of notice, a consent to holding the meeting or an approval of the minutes thereof.  The waiver of notice or consent need not specify the purpose of the meeting.  All such waivers, consents and approvals shall be filed with the corporate records or made a part of the minutes of the meeting.  Notice of a meeting need not be given to any director who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such director.

10.    QUORUM.  A majority of the authorized number of directors shall constitute a quorum for the transaction of business, except to adjourn as hereinafter provided.  Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board of Directors, subject to the provisions of Section 310 of the Corporations Code of California (approval of contracts or transactions in which a director has a direct or indirect

material financial interest), Section 311 (appointment of committees), and Section 317 (e) (indemnification of directors).  A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for such meeting.

11.    ADJOURNMENT.  A majority of the directors present, whether or not constituting a quorum, may adjourn any meeting to another time and place.

12.    NOTICE OF ADJOURNMENT.  Notice of the time and place of holding an adjourned meeting need not be given, unless the meeting is adjourned for more than twenty-four (24) hours, in which case notice of such time and place shall be given prior to the time of the adjourned meeting, in the manner specified in Section 8 of this Article III, to the directors who were not present at the time of the adjournment.

13.    ACTION WITHOUT MEETING.  Any action required or permitted to be taken by the Board of Directors may be taken without a meeting, if all members of the Board of Directors shall individually or collectively consent in writing to such action and if the number of members of the board serving at the time constitutes a quorum.  Such action by written consent shall have the same force and effect as a unanimous vote of the Board of Directors.  Such written consent or consents shall be filed with the minutes of the proceedings of the Board of Directors.

14.    FEES AND COMPENSATION OF DIRECTORS.    Directors and members of committees may receive such compensation, if any, for their services, and such reimbursement of expenses, as may be fixed or determined by resolution of the Board of Directors.  Nothing herein contained shall be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise, and receiving compensation for such services.

## ARTICLE IV.
## COMMITTEES

1.    COMMITTEES OF DIRECTORS.  The Board of Directors may, by resolution adopted by a majority of the authorized number of directors, designate one or more committees, each consisting of two or more directors, to serve at the pleasure of the Board of Directors.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent member at any meeting of the committee.  Any such committee, to the extent provided in the resolution of the Board of Directors, shall have all the authority of the Board of Directors, except with respect to:

(a)    the approval of any action which, under the California General Corporation Law, also requires shareholders' approval or approval of the outstanding shares;

(b)    the filling of vacancies on the Board of Directors or in any committee;

(c)    the fixing of compensation of the directors for serving on the Board of Directors or on any committee, as applicable;

(d)    the amendment or repeal of bylaws or the adoption of new bylaws;

(e)    the amendment or repeal of any resolution of the Board of Directors which by its express terms is not so amendable or repealable;

(f)    a distribution to the shareholders of the corporation, except at a rate or in a periodic amount or within a price range determined by the Board of Directors; or

(g)    the appointment of any other committees of the Board of Directors or the members thereof.

2.    MEETINGS AND ACTION OF COMMITTEES.    Meetings and action of committees shall be governed by, and held and taken in accordance with, the provisions of Article III of these bylaws, Sections 5 (place of meetings), 7 (regular meetings), 8 (special meetings and notice), 9 (dispensing with notice), 10 (quorum), 11 (adjournment), 12 (notice of adjournment) and 13 (action without meeting), with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board of Directors and its members, except that the time of regular meetings of committees may be determined by resolution of the Board of Directors as well as the committee, special meetings of committees may also be called by resolution of the Board of Directors and notice of special meetings of committees shall also be given to all alternate members, who shall have the right to attend all meetings of the committee.    The Board of Directors may adopt rules for the government of any committee not inconsistent with the provisions of these bylaws.

# ARTICLE V.
## OFFICERS

1.    OFFICERS.    The officers of the corporation shall be a **[President, a Chief Financial Officer, and a Secretary]**.    The corporation may also have, at the discretion of the Board of Directors, a Chief Executive Officer, one or more Vice Presidents, one or more Assistant Secretaries, one or more Assistant Treasurers, and such other officers as may be appointed in accordance with the provisions of Section 3 of this Article V.    Any number of offices may be held by the same person.

2.    ELECTION OF OFFICERS.    The officers of the corporation, except such officers as may be appointed in accordance with the provisions of Section 3 of this Article V, shall be chosen by the Board of Directors, and each shall serve at the pleasure of the Board of Directors, subject to the rights, if any, of an officer under any contract of employment.

3.    SUBORDINATE OFFICERS, ETC.    The Board of Directors may appoint, and may empower the President to appoint, such other officers as the business of the corporation may require, each of whom shall hold office for such period, have such authority and perform such duties as are provided in the bylaws or as the Board of Directors may from time to time determine.

4.    REMOVAL AND RESIGNATION OF OFFICERS.    Subject to the rights, if any, of an officer under any contract of employment, any officer may be removed, either with or without cause, by the Board of Directors, at any regular or special meeting thereof, or, except in case of an officer chosen by the Board of Directors, by any officer upon whom such power of removal may be conferred by the Board of Directors.    Any officer may resign at any time by giving written notice to the corporation.    Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.    Any such resignation is without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party.

5.    VACANCIES IN OFFICES.    A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in these bylaws for regular appointments to such office.

6.    PRESIDENT.  Subject to such supervisory powers, if any, as may be given by the Board of Directors to the President shall, subject to the control of the Board of Directors, have general supervision, direction and control of the business and the officers of the corporation.  He shall preside at all meetings of the shareholders and at all meetings of the Board of Directors.  He shall have the general powers and duties of management usually vested in the office of President of a corporation, and shall have such other powers and duties as may be prescribed by the Board of Directors or the bylaws.

7.    CHIEF FINANCIAL OFFICER.  The chief financial officer of the corporation shall, under the direction of the President, be responsible for all financial and accounting matters and for the direction of the offices of treasurer and controller.  The chief financial officer shall have such other powers and perform such other duties as may be prescribed by the President or the Board of Directors or as may be provided in these by-laws.

8.    SECRETARY.  The Secretary shall keep or cause to be kept, at the principal executive office or such other place as the Board of Directors may order, a book of minutes of all meetings and actions of directors, committees of directors and shareholders, with the time and place of holding, whether regular or special, and, if special, how authorized, the notice thereof given, the names of those present at directors' and committee meetings, the number of shares present or represented at shareholders' meetings, and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal executive office or at the office of the corporation's registrar, as determined by resolution of the Board of Directors, a share register, or a duplicate share register, showing the names of all shareholders and their addresses, the number and classes of shares held by each, the number and date of certificates issued for the same, and the number and date of cancellation of every certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, notice of all meetings of the shareholders and of the Board of Directors required by the bylaws or by law to be given, and shall keep the seal of the corporation, if one be adopted, in safe custody, and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or by the bylaws.

## ARTICLE VI.
## INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES AND OTHER AGENTS

1.    NATURE OF INDEMNITY.  The corporation shall, to the maximum extent permitted by the California General Corporation Law, indemnify each of its directors and officers against expenses, judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceeding arising by reason of the fact any such person is or was a director or officer of the corporation and shall advance to such director or officer expenses incurred in defending any such proceeding to the maximum extent permitted by such law.  For purposes of this Article VI, a "director" or "officer" of the corporation includes any person who is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, or other enterprise, or was a director or officer of a corporation which was a predecessor corporation of the corporation or of another enterprise at the request of such predecessor corporation.  The Board of Directors may in its discretion provide by resolution for such indemnification of, or advance of expenses to, other agents of the corporation, and likewise may refuse to provide for such indemnification or advance of expenses except to the extent such indemnification is mandatory under the California General Corporation law.

2.    PROCEDURE FOR INDEMNIFICATION OF DIRECTORS AND OFFICERS.  Any indemnification of a director or officer of the corporation provided for under Section 1 of this Article VI

or advance of expenses provided for under Section 5 of this Article VI shall be made promptly, and in any event within 30 days, upon the written request of the director or officer. If a determination by the corporation that the director or officer is entitled to indemnification pursuant to this Article VI is required, and the corporation fails to respond within 60 days to a written request for indemnity, the corporation shall be deemed to have approved the request. If the corporation wrongfully denies a written request for indemnification or advancing of expenses, in whole or in part, or if payment in full pursuant to such request is not properly made within 30 days, the right to indemnification or advances as granted by this Article VI shall be enforceable by the director or officer in any court of competent jurisdiction. Such person's costs and expenses incurred in connection with successfully establishing his or her right to indemnification, in whole or in part, in any such action shall also be indemnified by the corporation. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the corporation) that the claimant has not met the standards of conduct which make it permissible under the California General Corporation Law for the corporation to indemnify the claimant for the amount claimed, but the burden of such defense shall be on the corporation. Neither the failure of the corporation (including its Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the California General Corporation Law, nor an actual determination by the corporation (including its Board of Directors, independent legal counsel, or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

     3.     ARTICLE NOT EXCLUSIVE. The rights to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article VI shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the corporation's certificate of incorporation, by-law, agreement, vote of stockholders or disinterested directors or otherwise.

     The corporation hereby acknowledges that certain directors affiliated with OCM Big Wave LLC and each of its affiliates who may from time to time become stockholders of the corporation (collectively, the "Oaktree Investors") may have certain rights to indemnification, advancement of expenses and/or insurance provided by such Oaktree Investors or certain of their respective affiliates (collectively, the "Institutional Indemnitors"). The corporation hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to such directors are primary and any obligation of the Institutional Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by a director are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by a director in accordance with this ARTICLE VI without regard to any rights any such director may have against the Institutional Indemnitors, and (iii) that it irrevocably waives, relinquishes and releases the Institutional Indemnitors from any and all claims against the Institutional Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The corporation further agrees that no advancement or payment by the Institutional Indemnitors on behalf of any director with respect to any claim for which such director has sought indemnification from the corporation shall affect the foregoing and the Institutional Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such director against the corporation. Notwithstanding any provision herein to the contrary, no officer or employee of the corporation or any of its subsidiaries shall have any rights to (and the corporation shall have no obligation to provide) indemnification or advances of expenses under this Article VI with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, or claim related to or arising under any contract, agreement or arrangement between such person, on the one hand, and the corporation or its affiliates or controlling stockholders, on the other hand.

4.      INSURANCE.  The corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was a director, officer, employee, fiduciary, or agent of the corporation or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, whether or not the corporation would have the power to indemnify such person against such liability under this Article VI.

5.      EXPENSES. Expenses incurred by any person described in Section 1 of this Article VI in defending a proceeding shall be paid by the corporation in advance of such proceeding's final disposition (provided that, if such person is or was an executive of the corporation or its subsidiaries, such advancement will be made unless otherwise determined by the Board of Directors in the specific case) upon receipt of an undertaking by or on behalf of the director or officer or other person to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the corporation.  Such expenses incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the Board of Directors deems appropriate.

6.      EMPLOYEES AND AGENTS.  Persons who are not covered by the foregoing provisions of this Article VI and who are or were employees or agents of the corporation, or who are or were serving at the request of the corporation as employees or agents of another corporation, partnership, joint venture, trust or other enterprise, may be indemnified, and may be advanced expenses, to the extent authorized at any time or from time to time by the Board of Directors.

7.      CONTRACT RIGHTS.  The provisions of this Article VI shall be deemed to be a vested contract right between the corporation and each director or officer who serves in any such capacity at any time while this Article VI and the relevant provisions of the California General Corporation Law or other applicable law are in effect.  Such contract right shall vest for each director and officer at the time such person is elected or appointed to such position, and no repeal or modification of this Article VI or any such law shall affect any such vested rights or obligations of any current or former director or officer with respect to any state of facts or proceeding regardless of when occurring.

8.      MERGER OR CONSOLIDATION.  For purposes of this Article VI, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article VI with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

## ARTICLE VII.
## RECORDS AND REPORTS

1.      MAINTENANCE AND INSPECTION OF SHARE REGISTER.  The corporation shall keep at its principal executive office, a record of its shareholders, giving the names and addresses of all shareholders and the number and class of shares held by each shareholder.

2.      MAINTENANCE AND INSPECTION OF BYLAWS.  The corporation shall keep at its principal executive office, or if its principal executive office is not in the State of California at its principal business office in this state, the original or a copy of the bylaws as amended to date, which shall

be open to inspection by the shareholders at all reasonable times during office hours.  If the principal executive office of the corporation is outside this state and the corporation has no principal business office in this state, the Secretary shall, upon the written request of any shareholder, furnish to such shareholder a copy of the bylaws as amended to date.

3.    MAINTENANCE AND INSPECTION OF OTHER CORPORATE RECORDS.  The accounting books and records and minutes of proceedings of the shareholders and the Board of Directors and any committee or committees of the Board of Directors shall be kept at such place or places designated by the Board of Directors, or, in the absence of such designation, at the principal executive office of the corporation.  The minutes shall be kept in written form and the accounting books and records shall be kept either in written form or in any other form capable of being converted into written form.  Such minutes and accounting books and records shall be open to inspection upon the written demand of any shareholder or holder of a voting trust certificate, at any reasonable time during usual business hours, for a purpose reasonably related to such holder's interests as a shareholder or as the holder of a voting trust certificate.  Such inspection may be made in person or by an agent or attorney, and shall include the right to copy and make extracts.  The foregoing rights of inspection shall extend to the records of each subsidiary corporation of the corporation.

4.    INSPECTION BY DIRECTORS.  Every director shall have the absolute right at any reasonable time to inspect all books, records and documents of every kind and the physical properties of the corporation and each of its subsidiary corporations.  Such inspection by a director may be made in person or by agent or attorney and the right of inspection includes the right to copy and make extracts.

5.    ANNUAL REPORT TO SHAREHOLDERS.  The annual report to shareholders referred to in Section 1501 of the California General Corporation Law is expressly dispensed with, but nothing herein shall be interpreted as prohibiting the Board of Directors from issuing annual or other periodic reports to the shareholders of the corporations as they deem appropriate.

6.    ANNUAL STATEMENT OF GENERAL INFORMATION.  The corporation shall each year during the calendar month in which its articles of incorporation were originally filed with the California Secretary of State, or at any time during the immediately preceding five (5) calendar months, file with the Secretary of State of the State of California, on the prescribed form, a statement setting forth the names and complete business or residence addresses of all incumbent directors, the number of vacancies on the Board of Directors, if any, the names and complete business or residence addresses of the President, Secretary and Treasurer, the street address of its principal executive office or principal business office in this state and the general type of business constituting the principal business activity of the corporation, together with a designation of the agent of the corporation for the purpose of service of process, all in compliance with Section 1502 of the Corporations Code of California.

## ARTICLE VIII.
## GENERAL CORPORATE MATTERS

1.    RECORD DATE FOR PURPOSES OTHER THAN NOTICE AND VOTING.  For purposes of determining the shareholders entitled to receive payment of any dividend or other distribution or allotment of any rights or entitled to exercise any rights in respect of any other lawful action, (other than action by shareholders by written consent without a meeting) the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) days prior to any such action, and in such case only shareholders of record on the date so fixed are entitled to receive the dividend, distribution or allotment of rights or to exercise the rights, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date fixed as aforesaid, except as otherwise provided in the California General Corporation Law.

13

If the Board of Directors does not so fix a record date, the record date for determining shareholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto, or the sixtieth (60th) day prior to the date of such action, whichever is later.

2.    CHECKS, DRAFTS, EVIDENCES OF INDEBTEDNESS.  All checks, drafts or other orders for payment of money, notes or other evidences of indebtedness, issued in the name of or payable to the corporation, shall be signed or endorsed by such person or persons and in such manner as, from time to time, shall be determined by resolution of the Board of Directors.

3.    CORPORATE CONTRACTS AND INSTRUMENTS; HOW EXECUTED.  The Board of Directors, except as otherwise provided in these bylaws, may authorize any officer or officers, agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances; and, unless so authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or to any amount.

4.    CERTIFICATES FOR SHARES.  A certificate or certificates for shares of the capital stock of the corporation shall be issued to each shareholder when any such shares are fully paid, and the Board of Directors may authorize the issuance of certificates or shares as partly paid provided that such certificates shall state the amount of the consideration to be paid therefor and the amount paid thereon. All certificates shall be signed in the name of the corporation by the Chief Executive Officer or the President or Vice President and by the Chief Financial Officer or an Assistant Treasurer or the Secretary or any Assistant Secretary, certifying the number of shares and the class or series of shares owned by the shareholder.  Any or all of the signatures on the certificate may be submitted by electronic transmission. In case any officer or registrar who has signed or whose electronic signature has been placed upon a certificate shall have ceased to be such officer or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if such person were an officer or registrar at the date of issue.

5.    LOST CERTIFICATES.  Except as hereinafter in this Section 5 provided, no new certificates for shares shall be issued in lieu of an old certificate unless the latter is surrendered to the corporation and canceled at the same time.  The Board of Directors may in case any share certificate or certificate for any other security is lost, stolen or destroyed, authorize the issuance of a new certificate in lieu thereof, upon such terms and conditions as the Board of Directors may require, including provision for indemnification of the corporation secured by a bond or other adequate security sufficient to protect the corporation against any claim that may be made against it, including any expense or liability, on account of the alleged loss, theft or destruction of such certificate or the issuance of such new certificate.

6.    REPRESENTATION OF SHARES OF OTHER CORPORATIONS.  The President, or any Vice President, or any other person authorized by resolution of the Board of Directors by any of the foregoing designated officers, is authorized to vote on behalf of the corporation any and all shares of any other corporation or corporations, foreign or domestic, standing in the name of the corporation.  The authority herein granted to said officers to vote or represent on behalf of the corporation any and all shares held by the corporation in any other corporation or corporations may be exercised by any such officer in person or by any person authorized to do so by proxy duly executed by said officer.

14

# ARTICLE IX.
## AMENDMENTS

1.      AMENDMENT BY SHAREHOLDERS.  New bylaws may be adopted or these bylaws may be amended or repealed by the vote or written consent of holders of a majority of the outstanding shares entitled to vote; provided, however, that if the articles of incorporation of the corporation set forth the number of authorized directors of the corporation, the authorized number of directors may be changed only by an amendment of the articles of incorporation.

2.      AMENDMENT BY DIRECTORS.  Subject to the rights of the shareholders as provided in Section 1 of this Article IX, bylaws, other than a bylaw or an amendment thereof changing the authorized number of directors, may be adopted, amended or repealed by the Board of Directors.

# ARTICLE X.
## GENERAL

1.      GOVERNING LAW.  This corporation is organized under the provisions of the California General Corporation Law (Corporations Code Sections 100-2319) as in effect on the date of filing of its original articles of incorporation, namely August 5, 2013.  Upon such filing the California Secretary of State assigned the following corporation number to this corporation: [●].  The corporate affairs of this corporation shall be governed by and conducted in accordance with the provisions of the California General Corporation Law, as the same presently exist and are from time to time hereafter amended or superseded, except in those instances where the articles of incorporation or bylaws of this corporation, now or through amendment hereafter, may adopt alternative rules which are permissible under the California General Corporation Law.  Any provision (or portion thereof) in these bylaws which is not permissible under the California General Corporation Law or is inconsistent with the articles of incorporation of this corporation (as they may from time to time be amended and supplemented) is void, but the balance of these bylaws shall nevertheless be valid and effective.

2.      CONSTRUCTION AND DEFINITIONS.  Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the California General Corporation Law shall govern the construction of these bylaws.  Without limiting the generality of the foregoing, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both a corporation and a natural person.  In the event that any provision of these by-laws is or becomes inconsistent with any provision of the Stockholders Agreement or the certificate of incorporation, the California General Corporation Law or any other applicable law, the provision of these by-laws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

# **EXHIBIT D**

**Certificates of Incorporation of the Reorganized Debtors**

**<u>EXHIBIT D-1</u>**

**Form of Certificate of Incorporation of Reorganized Quiksilver**

The Debtors reserve the right to alter, amend, modify, or supplement the Certificate of Incorporation of Reorganized Quiksilver in accordance with the Plan and the Plan Sponsor Agreement.

AMENDED AND RESTATED

CERTIFICATE OF INCORPORATION

OF

QUIKSILVER, INC.


ARTICLE ONE

The name of the Corporation is Quiksilver, Inc.

ARTICLE TWO

The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, Delaware, 19808.  The name of its registered agent at such address is Corporation Service Company.

ARTICLE THREE

The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law ("DGCL").

ARTICLE FOUR

PART A.    Authorized Capital Stock.

The total number of shares of capital stock which the Corporation has authority to issue is [●] shares, consisting of [●] shares of Common Stock, par value $.01 per share (the "Common Stock") and [●] shares of Preferred Stock, par value $.01 per share (the "Preferred Stock").

PART B.    Preferred Stock.

Shares of Preferred Stock may be issued from time to time in one or more series. The Board is hereby authorized to determine and alter all rights, preferences and privileges and qualifications, limitations and restrictions thereof (including, without limitation, voting rights and the limitation and exclusion thereof) granted to or imposed upon any wholly unissued series of Preferred Stock and the number of shares constituting any such series and the designation thereof, and to increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of any series subsequent to the issue of shares of that series then outstanding.  In the event that the number of shares of any series is so decreased, the shares constituting such reduction shall resume the status which such shares had prior to the adoption of the resolution originally fixing the number of shares of such series.

PART C.    <u>Powers, Preferences and Special Rights of Common Stock.</u>

Except as otherwise provided in this <u>Part C</u> or as otherwise required by applicable law, all shares of Common Stock shall be identical in all respects and shall entitle the holders thereof to the same rights, preferences and privileges, subject to the same qualifications, limitations and restrictions, as set forth herein.

Section 1.  <u>Voting Rights</u>.    Except as otherwise provided in this <u>Part C</u> or as otherwise required by applicable law, the holders of Common Stock shall be entitled to one vote per share on all matters to be voted on by the stockholders of the Corporation.

Section 2.  <u>Dividends</u>.    Subject to the rights of the holders of any Preferred Stock, as and when dividends are declared or paid with respect to shares of Common Stock, whether in cash, property or securities of the Corporation, the holders of Common Stock shall be entitled to receive such dividends *pro rata*.

Section 3.  <u>Liquidation</u>.    Subject to the rights of the holders of any Preferred Stock, the holders of Common Stock shall be entitled to participate *pro rata* in all distributions to the holders of Common Stock in any liquidation, dissolution or winding up of the Corporation.

Section 4.  <u>Restrictions on Transfer of Corporation Stock</u>.    Without the written consent of the Oaktree Investors, which may be withheld in their sole discretion, until the third anniversary of the date hereof, none of the Other Stockholders may Transfer any interest in any Corporation Stock, except pursuant to (i) a Sale of the Company in accordance with <u>Section 6</u> hereof, (ii) the repurchase provisions set forth in any agreement between the Corporation or the Oaktree Investors and an employee, officer, consultant or service provider of the Corporation or an Affiliate thereof, or (iii) a Permitted Transfer.  At any time on or after the third anniversary of the date hereof, each Other Stockholder shall be permitted to Transfer any interest in any Corporation Stock, subject to <u>Section 5</u> hereof and any applicable restrictions on transfer under the Securities Act and applicable state securities laws.  In the case of, and as a condition to any Transfer by any Other Stockholder (other than pursuant to a Sale of the Company in accordance with <u>Section 6</u> hereof, pursuant to the foregoing repurchase provisions or following an IPO), (1) the restrictions contained herein will continue to be applicable to such Corporation Stock after any such Transfer (unless the Corporation is the transferee), (2) the transferee(s) of such Corporation Stock is an "accredited investor" as defined under Rule 501 of Regulation D of the Securities Act (or any similar or equivalent provision then in force), (3) neither the transferee(s) of such Corporation Stock nor any of its Affiliates may be a Competitor and (4) the Transfer shall not result in the Corporation being required to register any Corporation Stock, or otherwise becoming subject to any reporting obligations, under the Securities Exchange Act of 1934.  Notwithstanding any other provision herein, none of the Other Stockholders which is a legal entity (including a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture or an unincorporated organization) that holds debt or equity securities of the Corporation as its primary asset shall authorize, permit or recognize the Transfer (directly or indirectly) of any of its equity interests, securities or other ownership interests without the prior written consent of the Oaktree Investors if such Transfer would violate this <u>Section 4</u> if such Transfer was a Transfer of Corporation Stock.

2

Section 5.  <u>Rights of First Refusal</u>.  Pursuant to Section 202(c)(1) of the DGCL:

5A. If any Other Stockholder enters into a binding agreement to Transfer any Corporation Stock (a "Sale Agreement"), such Other Stockholder shall be entitled to Transfer such shares subject to the provisions of this <u>Section 5</u>.  At least thirty (30) days before any Transfer by any Other Stockholder (a "Transferring Stockholder") (other than a Permitted Transfer or in connection with a Sale of the Company in accordance with <u>Section 6</u> hereof, or pursuant to the repurchase provisions set forth in any agreement between the Corporation or the Oaktree Investors and an employee, officer, consultant or service provider of the Corporation or an Affiliate thereof), of any Corporation Stock, such Transferring Stockholder shall deliver a written notice (the "Sale Notice") to the Corporation and the Oaktree Investors which shall include a copy of the Sale Agreement as well as a summary specifying in reasonable detail the identity of the prospective Transferee(s), the proposed number of each class of Corporation Stock to be Transferred (the "Transfer Stock"), and the proposed terms and conditions of the Transfer, including the proposed price per share for each class of Corporation Stock to be Transferred (the "Offered Terms and Conditions"); provided that in no event shall any Transfer of any Corporation Stock in accordance with this <u>Section 5</u> by any Transferring Stockholder be made for any consideration other than cash.  No such Transfer shall be consummated unless each such prospective Transferee is reasonably acceptable to the Corporation and the Oaktree Investors, and no such Transfer shall be consummated prior to the date on which the parties to the Transfer have been finally determined in accordance with this <u>Section 5</u>.

5B. The Oaktree Investors (or any designees thereof) may elect to purchase any or all of the Transfer Stock at the same price and on the same terms and conditions specified in the Sale Notice by delivering written notice of such election to the Transferring Stockholder and the Corporation as soon as practicable but in any event within twenty (20) days after delivery to the Corporation and the Oaktree Investors of the Sale Notice. If the Oaktree Investors (or any designees thereof) do not elect within such twenty (20) day period to purchase all of the Transfer Stock, then the Corporation  may elect to purchase, at the same price and on the same terms and conditions specified in the Sale Notice, any or all of the remaining Transfer Stock which the Oaktree Investors (or any designees thereof) have not elected to purchase (the "Available Stock") by delivering written notice of such election to the Transferring Stockholder as soon as practical but in any event within twenty-five (25) days after delivery to the Corporation and the Oaktree Investors of the Sale Notice (the "Election Period").

5C. If the Corporation and/or the Oaktree Investors have elected to purchase any or all of the Transfer Stock pursuant to this <u>Section 5</u>, such Transfer(s) shall be consummated as soon as practical after the delivery of the election notice(s) to the Transferring Stockholder, but in any event within thirty (30) days after delivery to the Corporation and the Oaktree Investors of the Sale Notice (the "ROFR Closing").  The Corporation and/or the Oaktree Investors shall pay for the Transfer Stock to be purchased by delivery of a cashier's or certified check or wire transfer of immediately available funds for the full amount of the purchase price at the ROFR Closing.  At or prior to the consummation of such Transfer(s), the Transferring Stockholder must deliver to each such Person that exercised its rights to purchase Transfer Stock under this <u>Section 5</u> (a "ROFR Person"), all certificates for the Corporation Stock being acquired by such ROFR Person (except, in the case of the Corporation for those certificates which are already in the custody of the Corporation), together with proper assignments in blank of the Corporation Stock

3

with signatures properly guaranteed and with such other documents as may be required by such ROFR Person, as applicable, to provide reasonable assurance that each necessary endorsement is genuine and effective, and such ROFR Person shall be entitled to receive customary and reasonable written representations and warranties from the Transferring Stockholder regarding such sale of Corporation Stock (including representations and warranties regarding good title to such shares, free and clear of any liens or encumbrances).

5D. If the Corporation and/or the Oaktree Investors, collectively, do not elect to purchase all of the Transfer Stock, the Transferring Stockholder may Transfer to the Transferee(s) identified in the Sale Notice all, but not less than all, of the remaining Transfer Stock, during the 120 day period immediately following the expiration of the Election Period, for a purchase price no less than the price specified in the Sale Notice and on other terms no more favorable to the Transferee(s) thereof than specified in the Sale Notice.

Section 6. <u>Sale of the Company</u>.  Pursuant to Section 202(c)(4) of the DGCL:

6A. Each stockholder of the Corporation hereby agrees that if at any time prior to the consummation of an IPO, the Oaktree Investors (the "Approving Stockholders") approve a Sale of the Company to a Person other than the Oaktree Investors or any of their respective Affiliates (an "Approved Sale"), each stockholder of the Corporation that is not an Approving Stockholder (the "Drag Along Stockholders") shall vote for, consent to and raise no objections against such Approved Sale, and appoint the Oaktree Investors or any of their respective designees as its representative to make all decisions in connection with any Approved Sale, regardless of the consideration being paid in such Approved Sale, so long as such Approved Sale complies with this <u>Section 6</u>.  Without limiting the foregoing, but subject to the provisions of <u>Section 6B</u>, if the Approved Sale is structured (i) as a merger or consolidation, each such Drag Along Stockholder will waive any dissenters rights, appraisal rights or similar rights in conjunction with such merger or consolidation, (ii) as a sale of equity, each such Drag Along Stockholder will agree to sell all of such Drag Along Stockholder's Corporation Stock on the terms and conditions approved by the Approving Stockholders, or (iii) as a sale of assets, each such Drag Along Stockholder will vote in favor of such Approved Sale and any subsequent liquidation or other distribution of the proceeds therefrom in accordance with the terms herein as approved by the Approving Stockholders.  The Corporation and each stockholder will take all actions requested by the Approving Stockholders in connection with the consummation of an Approved Sale, including the execution of all ancillary documents in connection therewith requested by the Approving Stockholders; provided that it is acknowledged and agreed that the Other Stockholders that are also employees of the Corporation or any of its subsidiaries may be required, in connection with an Approved Sale, to enter into confidentiality, non competition, non solicitation and non hire provisions.

6B. Upon the consummation of the Approved Sale, each stockholder participating in such Approved Sale will receive the same portion of the aggregate consideration available to be distributed to the stockholders of the Corporation (in their capacity as such) that such stockholders participating in such sale (in their capacity as stockholders of the Corporation) would have received if such aggregate consideration had been distributed by the Corporation in accordance with the rights and preferences set forth herein as in effect immediately before such Approved Sale (and, in the event of a sale of Corporation Stock, assuming that the only securities

4

of the Corporation outstanding were those Corporation Stock and other shares of capital stock involved in such Approved Sale); provided, that any convertible securities shall be deemed to be converted in the event that such conversion would yield greater proceeds herein; provided, further, that any consideration payable to any stockholder shall be reduced by the aggregate principal amount plus all accrued and unpaid interest on any indebtedness of any such stockholder to the Corporation or its subsidiaries. In the case of a stockholder who holds options or warrants exercisable into Corporation Stock which have not yet been exercised, the consideration received shall be deemed to be reduced (for purposes of such stockholder's consideration only) by such option's and/or warrant's exercise price.   To the extent any stockholder receives securities in lieu of cash or other consideration in the Approved Sale, such securities shall be deemed to be the same form of consideration so long as such securities are of a substantially equivalent value as the cash consideration received in such Approved Sale.

6C.  Each Drag Along Stockholder will be obligated to make representations with respect to its own shares of Corporation Stock and its own authority and ability to enter into the Approved Sale and other customary representations about such Drag Along Stockholder, and shall be required to provide indemnification in respect of, among other things, any representation made by the Corporation or its subsidiaries and/or an employee of the Corporation or its subsidiaries and/or made by any stockholder in respect of the Corporation, its subsidiaries or their respective businesses, operations, conditions, prospects or the like to the extent the Approving Stockholders similarly provide such indemnification.  Each stockholder participating in such Approved Sale will be obligated to join on a pro rata basis (applied such that after giving effect thereto, the aggregate consideration paid to each stockholder would comply with the provisions of <u>Section 6B</u> above) in any purchase price adjustments, indemnification or other obligations that the sellers of Corporation Stock are required to provide in connection with an Approved Sale (other than any such obligations that relate solely to a particular stockholder, such as indemnification with respect to representations and warranties given by a stockholder regarding such stockholder's title to and ownership of Corporation Stock, in respect of which only such stockholder will be liable); provided that, subject to <u>Section 6D</u> below and absent fraud, no stockholder shall be liable to the purchaser following the closing of the Approved Sale for any purchase price adjustments, indemnification or other obligations in excess of the aggregate gross proceeds (prior to reduction for indebtedness and other transaction expenses) received by the stockholders in connection with or pursuant to such Approved Sale (other than any such obligations that relate solely to a particular stockholder, such as indemnification with respect to representations and warranties given by a stockholder regarding such stockholder's title to and ownership of Corporation Stock, in respect of which only such stockholder will be liable).  Notwithstanding anything to the contrary contained herein, in the sole discretion of the Approving Stockholders, the proceeds with respect to an Approved Sale may be withheld from (and retained by the Approving Stockholders or their designee in trust for the benefit of) all sellers of such Corporation Stock in such aggregate amount as the Approving Stockholders deem necessary to cover any purchase price adjustments, indemnification or other obligations of the Corporation or such sellers of Corporation Stock; provided that such proceeds shall be withheld on the same basis among all such sellers.

6D. Notwithstanding anything to the contrary herein, if the Approving Stockholders agree to joint and several indemnification with respect to such Approved Sale, each Drag Along Stockholder shall agree to such joint and several indemnification as well, and in

such event each Drag Along Stockholder shall enter into a contribution and indemnification or similar agreement acceptable to the Approving Stockholders pursuant to which each Drag Along Stockholder agrees to contribute amounts to and indemnify each other Drag Along Stockholder such that their liability will not exceed the aggregate amount of consideration received by such Drag Along Stockholder in connection with or pursuant to such Approved Sale (other than any such obligations that relate solely to a particular Drag Along Stockholder, such as indemnification with respect to representations and warranties given by a Drag Along Stockholder regarding such Drag Along Stockholder's title to and ownership of Corporation Stock, and other than any obligations that relate to a particular Drag Along Stockholder's fraud, in each case in respect of which only such Drag Along Stockholder will be liable).

6E. If the Corporation enters into a negotiation for an Approved Sale or an Approved Sale transaction for which Rule 506 (or any similar rule then in effect) promulgated by the Securities and Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), the Drag Along Stockholders will, at the request of the board of directors of the Corporation (the "Board"), appoint a purchaser representative (as such term is defined in Rule 501 or any similar rule), or such equivalent representative, reasonably acceptable to the Board.   If any Drag Along Stockholder appoints a purchaser representative, or such equivalent representative, designated by the Board, the Corporation will, to the extent legally permitted, pay the fees of such purchaser representative, or such equivalent representative, but if any Drag Along Stockholder declines to appoint the purchaser representative, or such equivalent representative, designated by the Board such holder will appoint another purchaser representative, and such holder will be responsible for the fees of the purchaser representative, or such equivalent representative, so appointed.

6F. Each stockholder will bear its pro rata share (applied such that after giving effect thereto, the aggregate consideration paid to each holder of Corporation Stock would comply with the provisions of Section 6B) of the costs of any sale of such Corporation Stock pursuant to an Approved Sale to the extent such costs are incurred for the benefit of all stockholders participating in such Approved Sale and are not otherwise paid by the Corporation or the acquiring party.   Costs incurred by stockholders on their own behalf will not be considered costs of the transaction hereunder; it being understood that the fees and disbursements of one counsel chosen by the Oaktree Investors will be deemed for the benefit of all stockholders participating in such Approved Sale.

6G. If any Drag Along Stockholder fails to deliver any certificates representing its shares of Corporation Stock, or in lieu thereof, a customary affidavit attesting to the loss or destruction of such certificate(s), such holder (i) will not be entitled to the consideration that such holder would otherwise receive in the Approved Sale until such holder cures such failure (provided that, after curing such failure, such holder will be so entitled to such consideration without interest), (ii) will be deemed, for all purposes, no longer to be a stockholder of the Corporation and will have no voting rights, (iii) will not be entitled to any dividends or other distributions declared after the Approved Sale with respect to the Corporation Stock held by such holder, and (iv) will have no other rights or privileges granted to stockholders herein or any future agreement.

Section 7.  <u>Holdback</u>.  Each holder of Corporation Stock agrees not to offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any equity securities of the Corporation or a subsidiary of the Corporation undergoing an IPO (such entity, including any successor of such entity, the "IPO Entity") or any Affiliate thereof, or any securities convertible into or exchangeable or exercisable for such securities, enter into a transaction which would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of such securities, whether any such aforementioned transaction is to be settled by delivery of such securities or other securities, in cash or otherwise, or publicly disclose the intention to make any such offer, sale, pledge or disposition, or to enter into any such transaction, swap, hedge or other arrangement, in each case during the seven days before and the 90-day period (but in the case of the IPO Entity's IPO, the 180-day period; in each case, such period to be subject to any customary "booster shot" extensions) beginning on the effective date of any underwritten public offering of the IPO Entity's equity securities (including piggyback registrations) (or such longer or shorter period as may be requested in writing by the managing underwriter and agreed to in writing by the IPO Entity) (the "Market Standoff Period"), except as part of such underwritten registration if otherwise permitted.  In addition, each holder of Corporation Stock agrees to execute any further letters, agreements and/or other documents reasonably requested by the IPO Entity or its underwriters which are consistent with the terms of this <u>Section 7</u> in this <u>Part C</u>.  The IPO Entity may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.  The restrictions contained in this <u>Section 7</u> in this <u>Part C</u> are in addition to any other restrictions to which such holder of Corporation Stock may be subject.

Section 8.  <u>Public Offering or Internal Reorganization</u>.  In the event that the Board or the Oaktree Investors approve an IPO or internal reorganization of the Corporation's structure (including without limitation a debt refinancing of the Corporation or its subsidiaries, a "Restructuring"), then each holder of Corporation Stock shall vote for, consent to and raise no objections against such proposed IPO or Restructuring, and will take all such other necessary or desirable actions requested by the Board or Oaktree Investors, as applicable, in connection with the consummation of such IPO or Restructuring, including without limitation compliance with the requirements of all laws and regulatory bodies which are applicable or which have jurisdiction over such IPO or Restructuring, as applicable, and waiving any dissenters' rights, appraisal rights, approval rights or similar rights in connection with such IPO, and executing all agreements, documents and instruments in connection therewith in the form presented by the Board or the Oaktree Investors, as applicable.  Without limiting the foregoing, each holder of Corporation Stock will consent to and vote for a recapitalization, merger, reorganization or exchange (each, a "Recapitalization") of any class of Corporation Stock into securities of the Corporation or any subsidiary or newly formed holding company of the Corporation that the managing underwriters and the Board or the Oaktree Investors, as applicable, find acceptable and appropriate to permit such IPO or Restructuring to proceed and will take all reasonably necessary and desirable actions in connection with the consummation of such Recapitalization, including executing all agreements, documents and instruments in connection therewith in the form presented by the Board or the Oaktree Investors, as applicable; provided that any resulting securities (which may be only one class of securities) will take into account the rights and preferences of securities hereunder as if a liquidation had occurred, including, without limitation, any liquidation preference and accrued and unpaid dividends owed to any holder of securities,

7

and such resultant securities will be subject to the same rights and obligations (whether pursuant to this Amended and Restated Certificate of Incorporation, the Stockholders Agreement or otherwise) of Securities of the Corporation issued and outstanding as of the date thereof.

Section 9.  <u>Confidentiality</u>.  Each stockholder recognizes and acknowledges that it has and may in the future receive certain confidential and proprietary information and trade secrets of the Corporation and its subsidiaries, including regarding identifiable, specific and discrete business opportunities being pursued by the Corporation or its subsidiaries (the "Confidential Information").  Except as otherwise agreed to by the Oaktree Investors, each stockholder agrees that it will not, and shall cause each of its directors, officers, unitholders, partners, employees, agents and members not to, during or after the term of the Stockholders Agreement, whether directly or indirectly through an Affiliate or otherwise, take commercial or proprietary advantage of or profit from any Confidential Information or disclose Confidential Information to any Person for any reason or purpose whatsoever, except (i) to authorized directors, officers, representatives, agents and employees of the Corporation or its subsidiaries and as otherwise may be proper in the course of performing such stockholder's obligations, or managing such stockholder's investment in the Corporation, under the Stockholders Agreement and the agreements expressly contemplated thereby only if each such person has a duty to keep such information confidential or has otherwise agreed to hold any information or materials provided under the Stockholders Agreement confidential substantially in accordance with the terms of this <u>Section 9</u> in this <u>Part C</u>; (ii) as part of such stockholder's normal reporting, rating or review procedure (including normal credit rating or pricing process), or in connection with such stockholder's or such stockholder's Affiliates' normal fund raising, marketing, informational or reporting activities, or to such stockholder's (or any of its Affiliates') Affiliates, auditors, attorneys or other agents only if each such person has a duty to keep such information confidential or has otherwise agreed to hold any information or materials provided under the Stockholders Agreement confidential substantially in accordance with the terms of this <u>Section 9</u> in this <u>Part C</u>; or (iii) as is required to be disclosed by order of a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation, provided that, to the extent permitted by law, the stockholder required to make such disclosure shall provide to the Board prompt notice of such disclosure.  For purposes of this <u>Section 9</u> in this <u>Part C</u>, "Confidential Information" shall not include any information of which such Person learns from a source other than the Corporation or any of its subsidiaries who is not known by such Person to be bound by a confidentiality obligation.  Nothing in this <u>Section 9</u> in this <u>Part C</u> shall in any way limit or otherwise modify any other confidentiality obligations entered into by certain stockholders with the Corporation or its subsidiaries or any other agreement entered into by any stockholder with the Corporation or any of its subsidiaries.

Section 10.  For purposes of <u>Sections 4</u>, <u>5</u>, <u>6</u> and <u>7</u> in this <u>Part C</u>:

10A.  "Affiliates" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person (including, without limitation, with respect to Oaktree Investor and its Affiliates, investment funds or entities managed by Oaktree Capital Management, L.P.), where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise;

8

10B.    "Competitor" means any Person that engages or participates in, directly or indirectly, any business or other activity that competes with the businesses of the Corporation or any of its subsidiaries.  Whether a Person is a Competitor of the Corporation or any of its subsidiaries shall be determined by the Board in its sole discretion.

10C.    "Corporation Stock" means (i) any capital stock of the Corporation purchased or otherwise acquired by any stockholder of the Corporation (including, without limitation, shares of Common Stock), (ii) any warrants, options, or other rights to subscribe for or to acquire, directly or indirectly, capital stock of the Corporation, whether or not then exercisable or convertible, (iii) any stock, notes, or other securities which are convertible into or exchangeable for, directly or indirectly, capital stock of the Corporation, whether or not then convertible or exchangeable, and (iv) any capital stock of the Corporation issued or issuable upon the exercise, conversion, or exchange of any of the securities referred to in clauses (i) through (iii) above, and (v) any securities issued or issuable directly or indirectly with respect to the securities referred to in clauses (i) through (iv) above by way of stock dividend or stock split or in connection with a combination of shares, recapitalization, reclassification, merger, consolidation, or other reorganization.  As to any particular securities constituting Corporation Stock, such securities will cease to be Corporation Stock when they have been (a) effectively registered under the Securities Act and disposed of in accordance with the registration statement or prospectus covering them, (b) distributed to the public through a broker, dealer or market maker pursuant to Rule 144 (or any similar or equivalent provision then in force), or (c) been repurchased or otherwise acquired by the Corporation;

10D.    "Family Group" with respect to any stockholder of the Corporation that is a natural person, means such stockholder's spouse and descendants (whether natural or adopted), and any trust, family limited partnership, limited liability company or other entity wholly owned, directly or indirectly, by such stockholder or such stockholder's spouse and/or descendants that is and remains solely for the benefit of such stockholder and/or such stockholder's spouse and/or descendants.

10E.    "IPO" shall mean the first sale of Corporation Stock (whether in a primary offering of new shares or a secondary offering of issued and outstanding shares) to the public in a Public Sale pursuant to an effective registration statement filed with the Securities and Exchange Commission on Form S-1 or Form F-1 (or any other available comparable or successor form).

10F.    "Oaktree Investors" means OCM Big Wave LLC and each of its Affiliates who may from time to time become stockholders of the Corporation;

10G.    "Other Stockholder" means any stockholder of the Corporation other than an Oaktree Investor;

10H.    "Permitted Oaktree Investor Transfer" will mean any Transfer of Corporation Stock by an Oaktree Investor or any of its Affiliates (i) to or among such Oaktree Investor and its Affiliates or (ii) pursuant to an in kind distribution to its equityholders;

10I.    "Permitted Transfer" means any Transfer of Corporation Stock (other than with respect to Corporation Stock which have not fully vested or are subject to any forfeiture, which shall not be transferable), (i) in the case of any Other Stockholder, pursuant to applicable laws of descent and distribution or among such stockholder's Family Group, or to such stockholder's Affiliates which are wholly owned subsidiaries of such stockholder, and (ii) in the case of an Oaktree Investor, in connection with a Permitted Oaktree Investor Transfer;

10J.    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof;

10K.    "Public Sale" means any sale of securities to the public pursuant to an offering registered under the Securities Act or to the public through a broker, dealer or market maker pursuant to the provisions of Rule 144 (or any similar or equivalent provision then in force);

10L.    "Sale of the Company" means (i) any sale, transfer or issuance or series of sales, transfers and/or issuances of stock of the Corporation by the Corporation or any holders thereof (including, without limitation, any merger, consolidation or other transaction or series of related transactions having the same effect) which results in any Person or group of Persons (as the term "group" is used under the Securities Exchange Act of 1934), other than an Oaktree Investor, owning stock of the Corporation possessing voting power to elect a majority of the Board or (ii) the sale or transfer of all or substantially all of the Corporation's assets, determined on a consolidated basis; provided that the term "Sale of the Company" shall not include a Public Sale.

10M.    "Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.  Any reference herein to a specific section, rule, or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

10N.    "Stockholders Agreement" means that certain Stockholders Agreement, dated as of the date hereof, by and among the Corporation, the Oaktree Investors and certain Other Stockholders from time to time signatories thereto, as amended from time to time.

10O.    "Transfer" means, a transfer, sale, assignment, pledge, hypothecation or other disposition, whether directly or indirectly (pursuant to the transfer of an economic or other interest, the creation of a derivative security or otherwise), the grant of an option or other right or the imposition of a restriction on disposition or voting or by operation of law.  When used as a verb, "Transfer" shall have the correlative meaning (whether with or without consideration and whether voluntarily or involuntarily or by operation of law).  In addition, "transferred" and "transferee" shall have the correlative meanings.

Section 11.  <u>Transfers in Violation of Agreement</u>.  Any transfer or attempted transfer of any Corporation Stock in violation of any provision of this Agreement will be void, and none of the Company or any Subsidiary will record such purported transfer on its books or

38947805_6

treat any purported transferee of such Corporation Stock as the owner of such securities for any purpose.

Section 12.  Replacement.  Upon receipt of evidence reasonably satisfactory to the Corporation (which may include an affidavit of the registered holder) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing one or more shares of any class of Common Stock, and in the case of any such loss, theft or destruction, upon receipt of indemnity reasonably satisfactory to the Corporation, or, in the case of any such mutilation upon surrender of such certificate, the Corporation shall (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the number of shares of such class represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

Section 13.  Notices.  All notices referred to herein shall be in writing, and shall be delivered by registered or certified mail, return receipt requested, postage prepaid, and shall be deemed to have been given when so mailed (i) to the Corporation at its principal executive offices and (ii) to any stockholder at such holder's address as it appears in the stock records of the Corporation (unless otherwise specified in a written notice to the Corporation by such holder).

Section 14.  Amendment and Waiver.  The provisions of this Part C may be amended, modified, or waived only with the prior written consent of the Oaktree Investors and the Board; provided that if any such modification, amendment or waiver would result in an adverse and disproportionate treatment of any stockholder or stockholders with respect to their shares of Corporation Stock in a manner materially different than the other stockholders holding the same shares of Corporation Stock (without regard to any effect on the individual circumstances of the holder of such shares of Corporation Stock), such modification, amendment or waiver will also require the prior written approval of the holders of at least a majority of the shares of Corporation Stock so adversely impacted.

ARTICLE FIVE

The Corporation shall not issue any class of non-voting equity securities unless and solely to the extent permitted by Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") as in effect on the date hereof; provided, however, that this ARTICLE FIVE (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code; (ii) will have such force and effect, if any, only for so long as Section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation; and (iii) in all events may be amended or eliminated in accordance with applicable law from time to time in effect or with the prior written consent of the Oaktree Investors and the Board.

ARTICLE SIX

The Corporation is to have perpetual existence.

11

## ARTICLE SEVEN

In furtherance and not in limitation of the powers conferred by statute, the Board is expressly authorized to make, alter or repeal the by-laws of the corporation.

## ARTICLE EIGHT

Meetings of stockholders may be held within or outside of the State of Delaware, as the by-laws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board or in the by-laws of the Corporation. Election of directors need not be by written ballot unless the by-laws of the Corporation so provide.

## ARTICLE NINE

To the fullest extent permitted by the Delaware General Corporation Law as the same exists or may hereafter be amended, a director of this Corporation shall not be liable to the Corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director. Any repeal or modification of this ARTICLE NINE shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE TEN

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation in the manner now or hereafter prescribed herein and by the laws of the State of Delaware, and all rights conferred upon stockholders herein are granted subject to this reservation.

## ARTICLE ELEVEN

The Corporation expressly elects not to be governed by §203 of the General Corporation Law of the State of Delaware.

## ARTICLE TWELVE

Each of the Corporation and the Other Stockholders acknowledges and agrees that: (a) the Oaktree Investors, their respective Affiliates and their respective shareholders, directors, officers, controlling persons, partners, members, and employees (collectively, the "Investor Group") (i) have investments or other business relationships with entities engaged in other businesses (including those which may compete with the business of the Corporation and any of its subsidiaries or areas in which the Corporation or any of its subsidiaries may in the future engage in business) and in related businesses other than through the Corporation or any of its subsidiaries (an "Other Business"), (ii) may develop a strategic relationship with businesses that are or may be competitive with the Corporation or any of its subsidiaries and (iii) will not be prohibited by virtue of its investment in the Corporation or its subsidiaries, or its service on the Board or any subsidiary's board of directors, from pursuing and engaging in any such activities; (b) each Other Stockholder and, to the maximum extent permitted from time to time under the law of the State of Delaware, the Corporation renounces any interest or expectancy of the

12

Corporation in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to its officers, directors or stockholders, other than those officers, directors or stockholders who are employees of the Corporation; (c) no member of the Investor Group shall be obligated to present any particular investment or business opportunity to the Corporation even if such opportunity is of a character which, if presented to the Corporation, could be undertaken by the Corporation, and in fact, each member of the Investor Group shall have the right to undertake any such opportunity for itself for its own account or on behalf of another or to recommend any such opportunity to other persons; (d) each member of the Investor Group and their respective portfolio companies may enter into contracts and other arrangements (including investments and joint ventures) with the Corporation and its Affiliates from time to time on terms approved by the Board; and (e) subject to the provisions under this Amended and Restated Certificate of Incorporation and the Stockholders Agreement, to the extent any Oaktree Investor is an Approving Stockholder, the Approving Stockholders shall have the right to undertake and consummate an Approved Sale at any time and for consideration that results in little or no consideration being paid or available to the stockholders. Each of the Corporation and the Other Stockholders hereby waives, to the fullest extent permitted by applicable law, any claims and rights that such person may otherwise have in connection with the matters described in this ARTICLE TWELVE.  Without limiting the foregoing, each Other Stockholder hereby acknowledges that he, she or it is familiar with the existence of, and hereby approves of, any agreement between the Oaktree Investors or their Affiliates and the Corporation or any of its subsidiaries which provides management and transaction fees to the Oaktree Investors as described in the Stockholders Agreement.

<div align="center">*     *     *     *     *</div>

## **EXHIBIT D-2**

**Form of Certificate of Incorporation of the Subsidiary Reorganized Debtors**

       The Debtors reserve the right to alter, amend, modify, or supplement the Certificates of Incorporation of the Subsidiary Reorganized Debtors in accordance with the Plan and the Plan Sponsor Agreement.

## RESTATED ARTICLES OF INCORPORATION

The undersigned certify that:

1. They are the president and the secretary, respectively, of [          ], a California corporation.

2. The Articles of Incorporation of this corporation are amended and restated to read as follows:

### ARTICLE I

The name of the corporation (the "Corporation") is [          ].

### ARTICLE II

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

### ARTICLE III

(a)     The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

(b)     The Corporation is authorized to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaw provisions, agreements with agents, vote of shareholders or disinterested directors or otherwise, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code, subject only to the applicable limits set forth in Section 204 of the California Corporations Code with respect to actions for breach of duty to the Corporation and its shareholders.

(c)     Any repeal or modification of this Article shall only be prospective and shall not affect the rights under this Article in effect at the time of the alleged occurrence of any act or omission to act giving rise to liability or indemnification.

### ARTICLE IV

The Corporation's agent for service of process is:

[                    ]

## ARTICLE V

The Corporation is authorized to issue only one class of shares of stock, consisting of Common Stock, par value $[●][1] per share; and the total number of shares which the Corporation is authorized to issue is [●][2].

## ARTICLE VI

The Corporation shall not issue any class of non-voting equity securities unless and solely to the extent permitted by Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") as in effect on the date hereof; provided, however, that this Article VI (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code; (ii) will have such force and effect, if any, only for so long as Section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation; and (iii) in all events may be amended or eliminated in accordance with applicable law from time to time in effect or upon the approval of either the stockholders holding a majority of the shares outstanding at such time or the board of directors.

3. The foregoing amendment and restatement of Articles of Incorporation has been duly approved by the board of directors.

4. The foregoing amendment and restatement of Articles of Incorporation has been duly approved by the required vote of shareholders in accordance with Section 902, California Corporations Code. The total number of outstanding shares of the corporation is [●]. The number of shares voting in favor of the amendment equaled or exceeded the vote required. The percentage vote required was more than 50%.

---

[1]  NTD: To be conformed to the par value set forth in the existing charter of the applicable entity.

[2]  NTD: To be conformed to the authorized number of shares set forth in the existing charter of the applicable entity.

We further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of our own knowledge.

DATE: _____ _____, 2016

_____
[            ]
President


_____
[            ]
Secretary

## __EXHIBIT E__

**Reorganized Quiksilver Stockholders Agreement**

The Debtors reserve the right to alter, amend, modify, or supplement the Reorganized Quiksilver Stockholders Agreement in accordance with the Plan and the Plan Sponsor Agreement.

## STOCKHOLDERS AGREEMENT

THIS STOCKHOLDERS AGREEMENT (this "<u>Agreement</u>") is made as of_____, 2016 by and among Quiksilver, Inc., a Delaware corporation (the "<u>Company</u>"), the Persons set forth on the attached <u>Oaktree Investor Stockholders Schedule</u> (together with their respective Permitted Transferees, the "<u>Oaktree Investors</u>") and the Persons set forth on the attached <u>Other Stockholders Schedule</u>, together with each of the other entities and individuals set forth from time to time on the signature pages attached hereto under the heading "<u>Other Stockholders</u>" who, at any time, acquire securities of the Company in accordance with the terms hereof and execute a counterpart of this Agreement or who otherwise agree to be bound by this Agreement (the "<u>Other Stockholders</u>" and, together with the Oaktree Investors, the "<u>Stockholders</u>").  Capitalized terms used but not otherwise defined herein have the meanings given to such terms in <u>Section 12</u> hereof.

WHEREAS, the Company filed that certain Second Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its affiliated Debtors and Debtors In Possession (the "<u>Plan</u>") in the United States Bankruptcy Court for the District of Delaware on December 2, 2015; and

WHEREAS, in connection with the transactions contemplated by the Plan, the Stockholders acquired shares of Common Stock, par value $0.01 per share, of the Company (the "<u>Common Stock</u>").

NOW, THEREFORE, in consideration of the mutual promises made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     Board of Directors.

(a) From and after the date hereof and until the provisions of this <u>Section 1</u> cease to be effective, each Stockholder shall vote all of his, her or its Corporation Stock and any other voting securities of the Company over which such Stockholder has voting control and shall take all other necessary or desirable actions within his, her or its control (whether in his, her or its capacity as a Stockholder, director, member of a board committee or officer of the Company or otherwise, and including, without limitation, upon any Stockholder's request, attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company shall take all necessary and desirable actions within its control (including calling special board and Stockholder meetings), so that:

(i)     the authorized number of directors on the board of directors of the Company (the "<u>Board</u>") shall be four (4) or such other number designated by the Oaktree Investors from time to time;

(ii)     the following persons shall be elected to the Board:

(A)     the Chief Executive Officer of the Company, who shall initially be Pierre Agnes (the "<u>CEO Director</u>"); and

(B)    three (3) representatives designated by the Oaktree Investors, who shall initially be Matthew Wilson, David Tanner, and Thomas Casarella (each, an "Oaktree Investor Director").

(iii)    the removal of any Oaktree Investor Director shall be upon (and only upon) the request of the Oaktree Investors, and in the event that any Oaktree Investor Director for any reason ceases to serve as a member of the Board during his or her term of office, the resulting vacancy on the Board shall be filled by a representative designated by the Oaktree Investors;

(iv)    the removal of the CEO Director from the Board (with or without cause) shall occur simultaneously with his or her removal as the Chief Executive Officer of the Company;

(v)    in the event that any CEO Director for any reason ceases to serve as a member of the Board during his or her term of office, the resulting vacancy on the Board shall be filled by a representative designated by the Board;

(vi)    unless otherwise determined by the Board, the composition of the board of directors of each of the Company's Subsidiaries (a "Sub Board") shall be the same as that of the Board; and

(vii)    the composition of any committee of the Board or any Sub Board shall include at least one of the Oaktree Investor Directors.

(b) To the extent not otherwise paid by the Company pursuant to any other agreement between the Company and any director or Stockholder, the Company (or one of the Company's Subsidiaries) shall pay all reasonable out-of-pocket costs and expenses incurred by each director in connection with attending regular and special meetings of the Board, any board of directors of any Subsidiaries of the Company and any committee thereof.  Each Stockholder acknowledges that the management and transaction fees paid to the Oaktree Investors shall not constitute the payment by the Company of costs and expenses incurred by the Oaktree Investor Directors.

(c) If at any time a vacancy is created on the Board by reason of the incapacity, death, removal or resignation of a director, such vacancy shall automatically reduce the number of directors *pro tanto*, until such time as the Stockholders entitled to designate such director pursuant to Section 1(a)(ii) above shall designate a director to fill such vacancy and such director shall have been elected to the Board in accordance with this Agreement and the Company's Certificate of Incorporation, whereupon the number of directors shall be automatically increased *pro tanto*.  Upon receipt of notice of the designation of a nominee pursuant to this Section 1(c), each Stockholder shall, as soon as practicable after the date of such notice, take action, including the voting of its voting securities, to elect the director so designated to fill such vacancy.

(d) The provisions of this Section 1 shall terminate upon the earlier to occur of (i) consummation of a Sale of the Company and (ii) an IPO.

2.    <u>Irrevocable Proxy; Conflicting Agreements</u>.  In order to secure each Other Stockholder's obligation to vote his, her or its Corporation Stock and any other voting securities of the Company in accordance with the provisions of <u>Section 1</u> hereof and for other good and valuable consideration, each Other Stockholder hereby appoints the Oaktree Investors, as his, her or its true and lawful proxy and attorney-in-fact, with full power of substitution, to vote all of his, her or its Corporation Stock and other voting securities of the Company for the election and/or removal of directors and all such other matters as expressly provided for in <u>Section 1</u> hereof. The Oaktree Investors may exercise the irrevocable proxy granted hereunder at any time any Other Stockholder fails to comply with the provisions of this Agreement.  The proxies and powers granted by each Other Stockholder pursuant to this <u>Section 2</u> are coupled with an interest and are given to secure the performance of each Other Stockholder's obligations to the Oaktree Investors under this Agreement.  Such proxies and powers will be irrevocable for the term of this Agreement and will survive the death, incompetency, disability, insolvency and/or dissolution of each Other Stockholder and the respective holders of their Corporation Stock.

3.    Rights on Transfer of Corporation Stock.

(a) <u>Participation Rights</u>.

(i)    At least fifteen (15) days before any Transfer by any Oaktree Investor of Common Stock (other than Transfers (x) which, when combined with any prior Transfers excluded from this <u>Section 3(a)(i)</u> by virtue of this subsection (x), do not exceed 10% in the aggregate of the Common Stock (based on the total Common Stock outstanding as of the date of such Transfer) or (y) which is made in connection with a Public Sale or a Sale of the Company), but after complying with any applicable Transfer requirements set forth in <u>Section 3(b)</u>, the applicable Oaktree Investor shall deliver a written notice (the "<u>Tag-Along Notice</u>") to each other Stockholder holding at least 5% of the then-outstanding shares of Common Stock (determined on a fully-diluted basis) outstanding as of such date, specifying in reasonable detail the identity of the prospective Transferee(s), the number of shares of Common Stock to be Transferred by such Oaktree Investor and the purchase price therefor (it being understood that the purchase price and number of shares may change).  Any of such other Stockholders (each electing Stockholder, a "<u>Tag-Along Stockholder</u>") may elect to participate in the contemplated Transfer by delivering written notice (together with an unconditional commitment to participate (subject to adherence with the provisions of this <u>Section 3(a)</u>) with respect to such Common Stock to be Transferred) to the applicable Oaktree Investor within ten (10) days after delivery of the Tag-Along Notice. If any Tag-Along Stockholders have elected to participate in such Transfer, the applicable Oaktree Investor and each such Tag-Along Stockholder will each be entitled to Transfer (and each Tag-Along Stockholder shall be committed to Transfer so long as such Oaktree Investor remains committed to Transfer) in the contemplated Transfer, a number of shares of Common Stock being Transferred, equal to the number of shares of Common Stock to be Transferred in the contemplated Transfer multiplied by a fraction, (A) the numerator of which is the number of shares of Common Stock owned by such Stockholder, and (B) the denominator of which is the aggregate number of shares of Common Stock held by the applicable Oaktree Investor and all Tag-Along Stockholders (such amount, a Tag-Along Stockholder's "<u>Tag-Along Allocation</u>").  The Transfer pursuant to this <u>Section 3(a)</u> is hereinafter referred to as the "<u>Participating Transfer</u>."

3

(ii)    Each Stockholder who does not timely accept an Oaktree Investor's invitation pursuant to Section 3(a)(i) shall be deemed to have waived all of its rights with respect to the Participating Transfer, and such Oaktree Investor and the Tag-Along Stockholders shall thereafter be free to Transfer to the prospective Transferee(s), at a price per respective share of Common Stock no more than 110% of the price per share of Common Stock set forth in the Tag-Along Notice, without any further obligation to such non-accepting Tag-Along Stockholder.

(iii)    In connection with the Participating Transfer, the applicable Oaktree Investor and the Tag-Along Stockholders will receive the same portion of the aggregate consideration available to be distributed to such Oaktree Investor and the Tag-Along Stockholders that such Stockholders participating in such Participating Transfer (in their capacity as Stockholders of the Company) would have received if such aggregate consideration had been distributed to such Stockholders only by the Company in accordance with the rights and preferences set forth in the Certificate of Incorporation as in effect immediately before such Transfer; provided, that the consideration payable to any Stockholder shall be reduced by the aggregate principal amount plus all accrued and unpaid interest on any indebtedness of any such Stockholder to the Company or its Subsidiaries.

(iv)    Each holder of Common Stock participating in the Participating Transfer will be obligated to join severally on a *pro rata* basis (applied such that after giving effect thereto, the aggregate consideration paid to each such Stockholder would comply with the provisions of Section 3(b)(iii) above) in any purchase price adjustments, indemnification or other obligations that the sellers of Common Stock are required to provide in connection with the Participating Transfer (other than any such obligations that relate solely to a particular Stockholder, such as indemnification with respect to representations and warranties given by a Stockholder regarding such Stockholder's title to and ownership of Common Stock, in respect of which only such Stockholder will be liable); provided that no Stockholder shall be liable for any purchase price adjustments, indemnification or other obligations in excess of the aggregate amount of consideration received by such Stockholder in connection with or pursuant to such Participating Transfer.

(v)    Each Stockholder participating in the Participating Transfer will bear his, her or its *pro rata* share (applied such that after giving effect thereto, the aggregate consideration paid to each such Stockholder would comply with the provisions of Section 3(b)(iii) above) of the costs of any Participating Transfer to the extent such costs are incurred for the benefit of all Stockholders participating in such Participating Transfer and are not otherwise paid by the Company or the acquiring party.  Costs incurred by the Stockholders on their own behalf will not be considered costs of the transaction hereunder; it being understood that the fees and disbursements of one counsel chosen by the Oaktree Investors will be deemed to be for the benefit of all other Tag-Along Stockholders.

(vi)    In furtherance of the provisions of this Section 3(a), each Tag-Along Stockholder, whether in his, her or its capacity as a Tag-Along Stockholder, Stockholder, manager, director, employee or officer of the Company or any of its Subsidiaries, or otherwise, shall take or cause to be taken all such actions as may be reasonably necessary, reasonably desirable or otherwise requested by the applicable Oaktree Investor in order to

expeditiously consummate each Participating Transfer and any related transactions (including any auction or competitive bid process in connection with or prefacing such Transfer), including executing, acknowledging and delivering transfer agreements, sale agreements, escrow agreements, consents, assignments, releases, waivers, and any other documents or instruments which in each case are no more burdensome than those executed by such Oaktree Investor or any of its Affiliates (collectively, "Ancillary Documents"); furnishing information and copies of documents; filing applications, reports, returns, filings and other documents or instruments with governmental authorities; and otherwise cooperating with the applicable Oaktree Investor, the prospective Transferee(s) and their respective representatives and counsel.

(b) Pre-emptive Rights.

(i) Neither the Company nor any of its Subsidiaries shall issue or sell any equity securities ("Subject Securities") to any Oaktree Investor (each an "Issuance"), except (A) Exempt Equity Issuances or (B) in compliance with the provisions of this Section 3(b).

(ii) Participation Notice. Not fewer than fifteen (15) days prior to the consummation of any Issuance, a written notice (the "Participation Notice") shall be given by the Company pursuant to Section 20 to each Stockholder who holds at least 5% of the then-outstanding shares of Common Stock (determined on a fully-diluted basis) outstanding as of such date and is not an Excluded Stockholder (each an "Eligible Stockholder"). The Participation Notice in respect of any Issuance shall include:

(A) The principal terms of the proposed Issuance, including (i) the amount and kind of Subject Securities to be included in the Issuance, (ii) the number of Subject Securities, (iii) the price per share of the Subject Securities, (iv) the portion of the Issuance equal to the number of shares of Common Stock held by such Eligible Stockholder immediately prior to the Issuance divided by the aggregate number of shares of Common Stock outstanding immediately prior to the Issuance (the "Participation Portion") and (v) the name and address of each Person to whom the Subject Securities are proposed to be issued (each a "Prospective Subscriber"); and

(B) An offer by the Company to issue or cause to be issued, at the option of each Eligible Stockholder, to such Stockholder such portion of the Subject Securities to be included in the Issuance as may be requested by such Eligible Stockholder (not to exceed such Stockholder's Participation Portion of the total amount of Subject Securities to be included in the Issuance), at the same price and otherwise on the same economic terms and conditions, with respect to each share of Subject Securities issued to such Eligible Stockholder, as the issuance to each of the Prospective Subscribers; provided that, if all Stockholders entitled to purchase or receive any class or series of Subject Securities are required to also purchase any other class or series of Subject Securities, the Eligible Stockholders exercising their rights pursuant to this Section 3(b) shall also be required to purchase the same strip of securities (on the same terms and

conditions) that such other Stockholders and/or Prospective Subscribers are required to purchase.

(iii)    <u>Other Terms</u>.  With respect to any given Issuance:

(A)    <u>Participation Commitment</u>.    Each Eligible Stockholder desiring to accept the offer contained in the Participation Notice shall send an irrevocable commitment (each a "<u>Participation Commitment</u>") to the Company within ten (10) days after the effectiveness (in accordance with this <u>Section 3(b)(iii)(A)</u>) of the Participation Notice specifying the amount or proportion of Subject Securities which such Stockholder desires to be issued (each a "<u>Participating Buyer</u>").  If all Subject Securities are not subscribed to by the Participating Buyers in a Participation Commitment, the unsubscribed Subject Securities will be issued to the Prospective Subscribers at a price not less than 90% of the price set forth in the Participation Notice.  Each Eligible Stockholder which has not so accepted such offer set forth in a Participation Notice, or that does not comply with <u>Section 3(b)(iii)(D)</u>, shall be deemed to have waived all of such Stockholder's rights with respect to the Issuance under this <u>Section 3(b)</u> (or the part thereof in respect of which it has not accepted), and the Company shall thereafter be free to issue Subject Securities in such Issuance to the Prospective Subscribers and the Participating Buyers, at a price not less than 90% of the price set forth in the Participation Notice, without any further obligation to such non-accepting holders under this <u>Section 3(b)</u>.  If, prior to consummation, the terms of such proposed Issuance shall change with the result that the price shall be less than 90% of the price set forth in the Participation Notice, it shall be necessary for a separate Participation Notice to be furnished, and the terms and provisions of this <u>Section 3(b)</u> separately complied with, in order to consummate such Issuance pursuant to this <u>Section 3(b)</u>; provided, however, that in the case of such a separate Participation Notice, each applicable period to which reference is made in this <u>Section 3(b)</u> shall be the longer of (a) the remaining portion of the ten (10) day period applicable to the first Participation Notice distributed in connection with such proposed Issuance or (b) five (5) days.

(B)    <u>Acceptance</u>. The acceptance of each Participating Buyer shall be irrevocable except as hereinafter provided, and each such Participating Buyer shall be bound and obligated to acquire in the Issuance on the same economic terms and conditions as the Prospective Subscribers, with respect to each share of Subject Securities issued, such amount or proportion of Subject Securities as such Participating Buyer shall have specified in such Participating Buyer's Participation Commitment.

(C)    <u>Failure to Consummate</u>.  If at the end of the 120th day following the date of the effectiveness (in accordance with <u>Section</u>

3(b)(ii)) of the Participation Notice the Company has not completed the Issuance on the terms and conditions specified in such Participation Notice, each Participating Buyer shall be released from its obligations under such Participating Buyer's Participation Commitment, the Participation Notice shall be null and void, and it shall be necessary for a separate Participation Notice to be furnished, and the terms and provisions of this Section 3(b) separately complied with, in order to consummate any Issuance subject to this Section 3(b).

(D)    Cooperation.    Each Stockholder to which a Participation Notice was delivered, whether in his, her or its capacity as a Participating Buyer, officer or director of the Company, or otherwise, shall take or cause to be taken all such reasonable actions as may be necessary, reasonably desirable or otherwise requested by the Company in order expeditiously to consummate such Issuance pursuant to this Section 3(b) and any related transactions, including executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments, filing applications, reports, returns, filings and other documents or instruments with governmental authorities, and otherwise cooperating with the Company, the Prospective Subscribers and the Participating Buyers (if any).    Without limiting the generality of the foregoing, each such Participating Buyer and Stockholder agrees to execute and deliver such Ancillary Documents to which the Prospective Subscriber will be party.

(E)    Closing.    The closing of such Issuance pursuant to this Section 3(b) shall take place at such time and place as the Company shall specify by notice to each Participating Buyer in accordance with Section 20.    At the Closing of such Issuance pursuant to this Section 3(b), each Participating Buyer shall be delivered the certificates or other instruments, if any, evidencing the Subject Securities to be issued to such Participating Buyer, registered in the name of such Participating Buyer or his, her or its designated nominee, free and clear of any liens or encumbrances, with any transfer tax stamps affixed, against delivery by such Participating Buyer of the applicable consideration.

(F)    Exceptions.    Notwithstanding anything herein to the contrary, if the Board determines in its sole discretion that it would be in the best interests of the Company to do so, the Company may issue Subject Securities which would otherwise be required to be offered to the Eligible Stockholders under this Section 3(b) without first complying with this Section 3(b); provided, that within sixty (60) days after such Issuance, it offers each such Eligible Stockholder, if required, the opportunity to purchase (x) from the Company, such Stockholder's Participation Portion of (A) the aggregate number of Subject Securities issued prior to compliance with this Section 3(b), plus (B) the number of Subject Securities thereafter issued pursuant to this Section 3(b)(iii)(F), (y) if any

Oaktree Investor purchases any such Subject Securities, from such Oaktree Investor (or from the Company in connection with a corresponding redemption or repurchase by the Company from such Oaktree Investor), such Eligible Stockholder's Participation Portion of the aggregate number of Subject Securities (free and clear of liens, pledges and security interests, with a customary indemnity provided by such Oaktree Investor in support of the same) issued prior to compliance with this Section 3(b) or (z) any combination of (x) and (y), so long as such combination results in such Eligible Stockholder receiving the opportunity to purchase such Eligible Stockholder's full Participation Portion of any Subject Securities issued prior to compliance with this Section 3(b) and after giving effect to any Subject Securities issued pursuant to this Section 3(b)(iii)(F).

(c) Termination of Rights. The provisions of this Section 3 will continue to apply to each share of Corporation Stock (and will survive any Transfer thereof) until the earlier to occur of (i) consummation of a Sale of the Company and (ii) an IPO.

(d) Acknowledgment of Transfer Restrictions. Nothing in this Section 3 will be implied or construed to restrict, limit, or otherwise affect (or permit any Transfers otherwise prohibited, restricted, or limited by) any vesting arrangements, restrictions on transfer, or other similar provisions set forth in any agreement to which any employee, officer, consultant or service provider of the Company or an Affiliate thereof, or its Permitted Transferees, is subject or bound.

4.    Registration Rights.

(a) Registration Rights. The parties hereto agree that any IPO relating to the Company or its Subsidiaries may be effected at the Company level or at the level of a Subsidiary of the Company (the applicable entity, including any successor entity to the Company or any Subsidiary thereof, the "IPO Entity"). In connection with an IPO, the IPO Entity shall enter into a registration rights agreement with each Stockholder holding at least 5% of the then-outstanding shares of Common Stock (determined on a fully-diluted basis) outstanding as of such date with respect to the registration of its securities in form and substance reasonably satisfactory to the Board and the Oaktree Investors; provided that such registration rights agreement shall provide for (i) long form and short form demand registration rights, as well as shelf registration rights, for the Oaktree Investors, (ii) piggyback registration rights to all Stockholder holding at least 5% of the then-outstanding shares of Common Stock (determined on a fully-diluted basis) outstanding as of such date with any registration of the securities of the IPO Entity under the Securities Act (other than in connection with a merger, acquisition, corporate reorganization, exchange offer, dividend reinvestment plan, stock option plan or other employee benefit plan and other customary exclusions) in which the registration form to be used may be used for the registration of the securities held by such Stockholders, (iii) customary pro rata cutback provisions, and (iv) customary indemnification of such Stockholders; provided, further, that, for the avoidance of doubt, unless the Oaktree Investors otherwise determine, such registration rights agreement shall not grant any Stockholder any rights with respect to the IPO of the Company or any successor thereto. Each Stockholder hereby agrees to execute any reasonable registration

8

rights agreement proposed by the IPO Entity as long as such agreement is consistent in all material respects with the foregoing.

(b) <u>Registration Expenses</u>.  All expenses incident to the IPO Entity's performance of or compliance with this <u>Section 4</u>, including all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, printing expenses, messenger and delivery expenses, and fees and disbursements of counsel for the IPO Entity and all independent certified public accountants, underwriters (excluding discounts and commissions) and other Persons retained by the IPO Entity will be borne by the IPO Entity.  The IPO Entity will bear the cost of one counsel for the holders of Corporation Stock participating in any demand or piggyback registration selected by the Oaktree Investors.  All underwriting discounts and commissions will be borne by the seller of the securities sold pursuant to the registration.

(c) <u>Selection of Underwriters</u>.   If any demand registration or piggyback registration is an underwritten offering, then the selection of investment banker(s) and manager(s) for the offering will be made by the Oaktree Investors, subject to the approval of the IPO Entity (such approval shall not be unreasonably withheld, conditioned or delayed).

5.    <u>Stockholder Cooperation; Limitation of Liability; Closing.</u>

(a) <u>Limitation of Liability</u>. The applicable Oaktree Investor, in its sole discretion, shall decide whether or not to pursue, consummate, postpone or abandon any proposed Transfer and the terms and conditions thereof.  None of the applicable Oaktree Investor or any of its Affiliates shall have any liability to any other holder of Corporation Stock arising from, relating to or in connection with the pursuit, consummation, postponement, abandonment or terms and conditions of any proposed Transfer or Sale of the Company.

(b) <u>Closing</u>. The closing of a Transfer  to which <u>Section 5(a)</u> applies shall take place at such time and place as the applicable Oaktree Investor shall specify by notice to each Tag-Along Stockholder.  At the closing of such Transfer, each Tag-Along Stockholder shall, if applicable, deliver the certificates evidencing the shares of Corporation Stock to be Transferred by such Tag-Along Stockholder, duly endorsed for transfer with signature guaranteed, free and clear of any liens or encumbrances, with any necessary transfer tax stamps, affixed, against delivery of the applicable consideration.

6.    <u>Restrictions</u>.  From and after the date hereof, the Company shall not, and shall cause each of its Subsidiaries to not, without the prior written consent of the Oaktree Investors:

(a) except as expressly contemplated by this Agreement, authorize, issue or enter into any agreement providing for the issuance (contingent or otherwise) of (i) any notes or debt securities with options, warrants or other rights to acquire equity securities (including any notes or debt securities convertible into or exchangeable for equity securities or options, warrants or other rights to acquire equity securities issued in connection with the issuance of capital stock or options, warrants or other rights to acquire equity securities or containing profit participation features) of the Company or any Subsidiary or (ii) any equity securities of the Company or any Subsidiary; provided that nothing herein shall restrict the Company's or any Subsidiary's ability

9

to issue equity securities (or rights to acquire equity securities) to directors, employees, officers, consultants or service providers of the Company or its Subsidiaries (excluding the Oaktree Investors or any of their respective Affiliates) pursuant to compensation plans or similar arrangements approved by the Board (which such management issuances shall be excluded from the Equity Issuance Basket);

(b) create, incur, assume or suffer to exist any indebtedness other than (1) indebtedness under the terms and provisions of, or expressly permitted under the terms of, any credit agreement or loan agreement entered into by the Company or any of its Subsidiaries as in effect as of the closing of the transactions contemplated by the Plan (the "Credit Agreement") and (2) indebtedness that does not exceed $5,000,000.00 in the aggregate;

(c) increase the authorized number of directors on the Board to a number greater than four (4), or otherwise permit more than four (4) directors to be on the Board;

(d) except in connection with an Approved Sale, sell, lease or otherwise dispose of, or permit any of its Subsidiaries to sell, lease or otherwise dispose of, assets or equity interests of any entity (collectively, the "Transferred Property") which constitute a material portion of the business of the Company and its Subsidiaries ;

(e) retain or engage any mergers and acquisitions or restructuring professionals;

(f) commence any voluntary bankruptcy of the Company or any Subsidiary, enter into any arrangement with creditors, or consent to entry of an order for relief in an involuntary case, or take the conversion of an involuntary case to a voluntary case, or consent to the appointment or taking possession by a receiver, trustee or other custodian for all or substantially all of its property;

(g) pay any dividend or other distribution on any shares of Corporation Stock, or shares of capital stock of any Subsidiary (other than as provided in the certificate of incorporation of such entity (or any equivalent thereof) or any certificate of designation issued pursuant thereto);

(h) redeem, repurchase or otherwise acquire any shares of Corporation Stock or shares of capital stock of any Subsidiary (other than as provided in the certificate of incorporation of such entity (or any equivalent thereof) or pursuant to contractual rights or obligations to repurchase shares of Corporation Stock held by employees, former employees, directors, consultants of or lenders to the Company or any of its Subsidiaries);

(i) make any loans or advances to, guarantees for the benefit of, or investments in, any Person (other than a wholly owned Subsidiary established under the laws of a jurisdiction of the United States), except for reasonable travel advances to and other customary employee arrangements made with employees of the Company or any Subsidiary in the ordinary course of business;

(j) acquire any interest in any company or business (whether by a purchase of assets, purchase of stock, merger or otherwise), or enter into any joint venture;

10

(k) incur any material capital expenditure which is not provided for in the Company's and its Subsidiaries' annual budget;

(l) adopt an annual budget for any fiscal year;

(m) enter into, amend, modify or waive any provision of any employment or other material compensation agreement with any key executives of the Company or any Subsidiary; or

(i) authorize or enter into any agreement, contract or commitment to do any of the foregoing or authorize, take or agree to take (or, in the case of those matters where the Company or its Subsidiaries would suffer to exist, fail to take) any action with respect to the foregoing.

7. <u>Financial Statements and Other Information</u>. The Company shall deliver to each Stockholder (so long as such Stockholder, together with its Affiliates, holds at least 5% of the then-outstanding shares of Common Stock (determined on a fully-diluted basis):

(a) within 60 days after the end of each quarterly accounting period in each fiscal year, the unaudited consolidating and consolidated statements of income and cash flows of the Company and its Subsidiaries for each quarterly period, and consolidating and consolidated balance sheets of the Company and its Subsidiaries as of the end of such quarterly period, all prepared in accordance with generally accepted accounting principles, consistently applied, subject to the absence of footnote disclosures and to normal year-end adjustments; and

(b) within 120 days after the end of each fiscal year, audited consolidating and consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal year, and consolidating and consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal year, setting forth in each case comparisons to the annual budget and to the preceding fiscal year, all prepared in accordance with generally accepted accounting principles, consistently applied, and accompanied by management's discussion and analysis for such period.

8. <u>Restrictive Legend</u>. Each certificate evidencing shares of Corporation Stock and each certificate issued in exchange for or upon the transfer of any shares of Corporation Stock (if such securities remain Corporation Stock after such transfer) will be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON _____ AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER SPECIFIED IN THE AMENDED AND RESTATED

CERTIFICATE OF INCORPORATION OF THE ISSUER, AS AMENDED AND MODIFIED FROM TIME TO TIME, AND THE ISSUER RESERVES THE RIGHT TO REFUSE THE TRANSFER OF SUCH SECURITIES UNTIL SUCH RESTRICTIONS HAVE BEEN SATISFIED WITH RESPECT TO ANY TRANSFER.

IN ADDITION, THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A STOCKHOLDERS AGREEMENT DATED AS OF [_____], 2016, AMONG THE ISSUER AND CERTAIN OF THE ISSUER'S STOCKHOLDERS AS SUCH AGREEMENT MAY BE AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME TO TIME. A COPY OF SUCH AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

The Company will imprint such legend on certificates evidencing shares of Corporation Stock outstanding as of the date hereof. The legend set forth above will be removed promptly from the certificates evidencing any securities which cease to be Corporation Stock in accordance with the definition of such term herein.

9.    Execution of this Agreement by Transferees.  Prior to transferring any Corporation Stock to any Person (other than pursuant to a Public Sale, a Sale of the Company or a Transfer to the Company, or a Transfer to an Oaktree Investor or its designees or Affiliates), the transferring Stockholder(s) will cause the prospective transferee(s) to be bound by this Agreement and to execute and deliver to the Company and the other Stockholders a counterpart signature page to this Agreement (or a joinder agreement making such Person a party hereto) and, if requested by the Company, an executed spousal consent, in each case in form and substance satisfactory to the Company.

10.    Additional Stockholders.   In connection with the issuance of any additional equity securities of the Company to any Person, the Company may permit such Person to become a party to this Agreement and succeed to all of the rights and obligations of a "Stockholder" under this Agreement by obtaining an executed counterpart signature page to this Agreement (or a joinder agreement making such Person a party hereto) and, if requested by the Company, an executed spousal consent, and, upon such execution, such Person shall for all purposes be a "Stockholder" party to this Agreement, and the addition of such Person as a party hereto shall not in and of itself be deemed to be an amendment, modification, or waiver hereof.

11.    Representations and Warranties.

(a) Each Stockholder (severally but not jointly) represents and warrants that:

(i)    such Stockholder is the holder of the number of shares of Corporation Stock set forth opposite such Stockholder's name on the attached Schedule of Stockholders;

(ii)    such Stockholder, to the extent applicable, is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation;

(iii)    such Stockholder (x) is either (1) certified as an "accredited investor" as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act, which, for the avoidance of doubt, shall exclude any natural person, or (2) a "qualified institutional buyer" as defined in Rule 144A of the Securities Act or, (y) in the case of a Stockholder who is an employee or service provider of the Company or any of its Subsidiaries, has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto;

(iv)    such Stockholder has requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action required for due authorization, execution, delivery and performance hereunder;

(v)    this Agreement has been duly authorized, executed and delivered by such Stockholder and constitutes the valid and binding obligation of such Stockholder, enforceable against such Stockholder in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith, and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity);

(vi)    such Stockholder has not granted a proxy and is not party to any voting trust or other agreement with respect to any Corporation Stock, other than this Agreement. No holder of Corporation Stock will grant any proxy or become party to any voting trust or other agreement which is inconsistent with, conflicts with, or violates any provision of this Agreement;

(vii)    at the time such Stockholder acquired the Corporation Stock held by it on the date hereof, it acquired such Corporation Stock for its own account for investment purposes only, within the meaning of the Securities Act, and not with a view to the distribution thereof other than as permitted by this Agreement or the Certificate of Incorporation, and in compliance with applicable securities laws;

(viii)    such Stockholder's financial condition is such that such Stockholder has no need for any liquidity in its investment in the Company and is able to bear the risk of holding Corporation Stock for an indefinite period of time and the risk of loss of its entire investment in the Company;

(ix)    such Stockholder has been given the opportunity to (A) ask questions and receive satisfactory answers concerning the terms and conditions of this Agreement and the Corporation Stock and (B) obtain additional information in order to evaluate the merits and risks of an investment in the Company;

(x)    (A) no part of the funds used by such Stockholder to acquire the Corporation Stock has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene federal, state, or international laws and regulations, including anti-money laundering laws and regulations; and (B) no contribution, or payment to the Company or

any of its Subsidiaries by such Stockholder shall cause the Company or any of its Subsidiaries to be in violation of any applicable anti-money laundering laws and regulations including without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the U.S. Department of the Treasury Office of Foreign Assets Control regulations; and

        (xi)     such Stockholder acknowledges and understands that:

        (1)     an investment in the Company is speculative and involves significant risks;

        (2)     the Corporation Stock will be subject to certain restrictions on transferability as described in this Agreement and as a result of the foregoing, the marketability of the Corporation Stock may be severely limited;

        (3)     such Stockholder may not transfer, sell, or otherwise dispose of the Corporation Stock in any manner that will violate the terms of this Agreement, the Securities Act or any state or foreign securities laws or subject the Company or any of its Subsidiaries or any of their respective Affiliates to regulation under the rules and regulations of the Securities and Exchange Commission or the laws of any other federal, state, or municipal authority or any foreign governmental authority having jurisdiction thereof;

        (4)     (A) the Corporation Stock has not been, and will not be, registered under the Securities Act or any state or foreign securities laws, and is being offered and sold in reliance upon federal, state and foreign exemptions from registration requirements for transactions not involving any public offering and (B) the Company's reliance upon such exemptions is based in part upon the representations of the holder contained herein; and

        (5)     none of the Company or any of its Subsidiaries intends to register as an investment company under the Investment Company Act of 1940, as amended, and none of the Company or any of its Subsidiaries or any of their respective managers, members or partners or any other person or entity selected to act as an agent of the Company or any of its Subsidiaries with respect to managing their affairs, is registered as of the date hereof as an investment adviser under the Investment Advisers Act of 1940, as amended.

        12.    Definitions.

    "Affiliate" shall have the meaning set forth in the Certificate of Incorporation.

    "Certificate of Incorporation" means the Amended and Restated Certificate of Incorporation of the Company, as filed with the Secretary of State of Delaware, and as amended from time to time in accordance with their terms.

    "Corporation Stock" shall have the meaning set forth in the Certificate of Incorporation.

    "Excluded Stockholder" means any Stockholder (a) who is not an "accredited investor" as defined under Rule 501 of Regulation D of the Securities Act (or any similar or

equivalent provision then in force), (b) whose Participation Portion is less than $25,000 of the Subject Securities, (c) for any Stockholder who was an employee, consultant or service provider of the Company or any of its Subsidiaries and who is no longer being retained or employed by the Company or any of its Subsidiaries and (d) for any Stockholder who is or was an employee, consultant or service provider of the Company or any of its Subsidiaries, if such Stockholder is, at the applicable time, in material breach of any noncompetition, nonsolicitation, confidentiality or similar restrictive provision to which such Stockholder is bound pursuant to any employment agreement or other agreement between such Stockholder and the Company or any of its Subsidiaries.

"Exempt Equity Issuances" means issuances of capital stock of the Company (or securities containing options or rights to acquire shares of capital stock of the Company) (i) upon the conversion, exchange or exercise of any securities of the Company or options, warrants or other rights to acquire or exchange securities of the Company, if such options, warrants or other rights are outstanding on the date hereof, issued as part of an Exempt Equity Issuance or issued after compliance with the provisions of Section 3, (ii) pursuant to an IPO, (iii) as a dividend on the outstanding Corporation Stock, (iv) to directors, employees, officers, consultants or service providers of the Company or its Subsidiaries (excluding the Oaktree Investors or any of their respective Affiliates) pursuant to compensation plans or similar arrangements approved by the Board, (v) to banks, debt financing sources, equipment lessors and other financial institutions pursuant to a debt financing, equipment leasing or similar transaction approved by the Board, (vi) pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization that has been approved by the Board and (vii) in connection with an internal restructuring or reorganization which does not result in the issuance of any equity securities to any unaffiliated third party or change the ownership interest of any Stockholder in the Company.

"IPO" shall have the meaning set forth in the Certificate of Incorporation.

"Permitted Transfer" shall have the meaning set forth in the Certificate of Incorporation.

"Permitted Transferee" means the transferee in any Permitted Transfer.  Each such Person shall be subject to all the provisions of this Agreement.

"Person" shall have the meaning set forth in the Certificate of Incorporation.

"Public Sale" shall have the meaning set forth in the Certificate of Incorporation.

"Sale of the Company" shall  have the meaning set forth in the Certificate of Incorporation.

"Securities Act" shall have the meaning set forth in the Certificate of Incorporation.

"Securities and Exchange Commission" means the United States Securities and Exchange Commission and includes any governmental body or agency succeeding to the functions thereof.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the limited liability company, partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons will be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons will be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or will be or control the managing director or general partner of such limited liability company, partnership, association or other business entity. For purposes of this Agreement, if the context does not otherwise indicate in respect of which Person the term "Subsidiary" is used, the term "Subsidiary" will refer to any Subsidiary of the Company.

"Transfer" shall have the meaning set forth in the Certificate of Incorporation.

13.    Management Arrangements.  Each Stockholder acknowledges that, in connection with certain services and other benefits to be provided to the Company and its Subsidiaries following the date hereof, the Oaktree Investors or their Affiliates and the Company or any of its Subsidiaries shall enter into a management agreement which provides for management and transaction fees to the Oaktree Investors on the terms set forth on Exhibit A. Each Stockholder hereby acknowledges that he, she or it is familiar with the existence of, and hereby approves of, such management agreement.

14.    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or affect the validity, legality or enforceability of any provision in any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

15.    Complete Agreement.  Except as otherwise expressly set forth herein, this Agreement, those documents expressly referred to herein and related documents of even date herewith among the parties embody the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

16.    Counterparts.  This Agreement may be executed in multiple counterparts, none of which need contain the signature of more than one party hereto but each of which will be deemed an original and all of which taken together will constitute one and the same agreement.

17.    <u>Successors and Assigns</u>.    Except as otherwise provided herein, this Agreement will bind and inure to the benefit of and be enforceable by the Company and its successors and assigns and the Stockholders and any subsequent holders of Corporation Stock and the respective successors and assigns of each of them, so long as they hold Corporation Stock, whether so expressed or not.  For the avoidance of doubt, a Stockholder shall immediately cease to have any rights under this Agreement upon the sale by such Stockholder of all of his, her or its Corporation Stock pursuant to the terms of this Agreement. Any rights granted to an Oaktree Investor and its Affiliates hereunder may also be exercised (in whole or in part) by their respective designees (which may or may not be Affiliates) .

18.    <u>Remedies</u>.    Each of the parties to this Agreement will be entitled to enforce their rights under this Agreement specifically, to recover damages and costs (including reasonable attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.  The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

19.    <u>Amendment and Waiver</u>.    The provisions of this Agreement may be amended, modified, or waived only with the prior written consent of the Oaktree Investors and the Board; provided that if any such modification, amendment or waiver would result in an adverse and disproportionate treatment of any Stockholder or Stockholders with respect to their shares of Corporation Stock in a manner materially different than the other Stockholders holding the same shares of Corporation Stock (without regard to any effect on the individual circumstances of the holder of such shares of Corporation Stock), such modification, amendment or waiver will also require the prior written approval of the holders of at least a majority of the shares of Corporation Stock so adversely impacted (it being understood and agreed that an issuance or sale of any equity securities shall not constitute a modification, amendment or waiver that would adversely or disproportionately affect any Stockholder if such issuance or sale is consummated in compliance with <u>Section 3(b)</u>).  Notwithstanding anything to the contrary in this Agreement, immediately prior to and following an IPO or Sale of the Company, the Oaktree Investors shall have the right, in their discretion, to terminate all or any portion of this Agreement and, following such a termination, the provisions so terminated shall no longer have any force or effect.

20.    <u>Notices</u>.    All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given when (a) delivered personally to the recipient, (b) telecopied to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if telecopied before 5:00 p.m. New York, New York time on a business day, and otherwise on the next business day, (c) provided via email in "pdf" or other electronic format to the recipient upon reasonable confirmation of receipt of such email or (d) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications will be sent to the Company at the address set forth below and to any Stockholder or other holder of Corporation Stock subject to this

Agreement at such address as indicated on the Oaktree Investors Schedule or Other Stockholders Schedule, as applicable, with copies (which shall not constitute notice) to such address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

> <u>To the Company</u>:
>
>> Quiksilver, Inc.
>> 5600 Argosy Circle,
>> Huntington Beach, California 92649
>> Fax: (714) 889-7186
>> Attention:      General Counsel
>>
>> with copies (which shall not constitute notice) to:
>>
>> Oaktree Capital Management, L.P.
>> 333 S. Grand Ave., 28th Floor
>> Los Angeles, California 90071
>> Attention:  Matthew Wilson
>>               Thomas Casarella
>> Facsimile:  (213) 830-6300
>>
>> and
>>
>> Kirkland & Ellis LLP
>> 777 South Figueroa Street
>> Los Angeles, California  90017
>> Fax:  (312) 862-2000; (213) 680-8500
>> Attention:      Christopher J. Greeno, P.C.
>>               Tana M. Ryan

21.    <u>Governing Law</u>.  The corporate law of the State of Delaware will govern all issues and questions concerning the relative rights and obligations of the Company and its Stockholders.  All other issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits and schedules hereto will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

22.    <u>Business Days</u>.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday, or legal holiday in New York, New York or the jurisdiction in which the Company's principal office is located, the time period will automatically be extended to the business day immediately following such Saturday, Sunday, or legal holiday.

23.     <u>Descriptive Headings; Interpretation; No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.  Whenever required by the context, any pronoun used in this Agreement will include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs will include the plural and vice versa.  Except as otherwise expressly provided herein, reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof.  The use of the words "include" or "including" in this Agreement will be by way of example rather than by limitation.  The use of the words "or," "either" or "any" will not be exclusive.  The words "hereof," "herein," "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular Section or provision of this Agreement, and reference to a particular Section of this Agreement shall include all subsections thereof.

24.     <u>Delivery by Facsimile or Electronic Mail</u>.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or electronic mail, will be treated in all manner and respects as an original agreement or instrument and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument will raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

25.     <u>Further Assurances</u>.  The parties shall execute and deliver all documents, provide all information, and take or refrain from taking such actions as may be reasonably necessary or appropriate to achieve the purposes of this Agreement. Without limiting the foregoing, each holder of Corporation Stock hereby agrees that it will vote for, consent to and raise no objections against, and take all actions necessary to allow to be consummated, any issuances of Subject Securities and any other issuances pursuant to this Agreement, including, to the extent necessary, voting for and consenting to amendments to the Certificate of Incorporation.

26.     <u>Consent to Jurisdiction</u>.  The parties agree that all disputes, legal actions, suits and proceedings arising out of or relating to this Agreement must be brought exclusively in the courts of the State of Delaware.  Each party hereby consents and submits to the exclusive jurisdiction of such courts.  No legal action, suit or proceeding with respect to this Agreement may be brought in any other forum.  Each party hereby irrevocably waives all claims of immunity from jurisdiction and any right to object on the basis that any dispute, action, suit or

proceeding brought in accordance with this <u>Section 26</u> has been brought in an improper or inconvenient forum or venue.

27.    <u>Mutual Waiver of Jury Trial</u>.  As a specifically bargained inducement for each of the parties to enter into this Agreement (with each party having had opportunity to consult counsel), each party hereto expressly and irrevocably waives the right to trial by jury in any lawsuit or legal proceeding relating to or arising in any way from this Agreement or the transactions contemplated herein, and any lawsuit or legal proceeding relating to or arising in any way to this Agreement or the transactions contemplated herein shall be tried in a court of competent jurisdiction by a judge sitting without a jury.

28.    <u>Understanding Among the Stockholders</u>.  Except as otherwise provided herein, the determination of each Stockholder to purchase the Corporation Stock has been made by such Stockholder independent of any other Stockholder, or any of such other Stockholder's Affiliate, and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business, prospects or condition (financial or otherwise) of the Company which may have been made or given by any other Stockholder or by any agent, Affiliate or employee of any other Stockholder.  In addition, it is acknowledged by each Stockholder that no Stockholder has acted as an agent of any other Stockholder in connection with making its investment hereunder and that no Stockholder shall be acting as an agent of any other Stockholder in connection with monitoring its investment hereunder.  It is further acknowledged by the Other Stockholders that Oaktree Investors and their respective Affiliates have retained Kirkland & Ellis LLP to act as their counsel in connection with this Agreement, those documents expressly referred to herein and related documents of even date herewith and that Kirkland & Ellis LLP has not acted as counsel for any other party in connection herewith or therewith and that no other party has the status of a client of Kirkland & Ellis LLP for conflict of interest or other purposes as a result thereof.

\* \* \* \*

IN WITNESS WHEREOF, the parties hereto have executed this Stockholders Agreement on the day and year first above written.

## **COMPANY**:

QUIKSILVER, INC.

By: _____
Name:
Title:

## **OAKTREE INVESTORS**:

OCM BIG WAVE LLC

By: Oaktree Fund GP, LLC
Its: Manager

By: _____
Name:
Title:

**OTHER STOCKHOLDERS:**

_____
[_____]


_____
[_____]


_____
[_____]


_____
[_____]


_____
[_____]


_____
[_____]


_____
[_____]

## OAKTREE INVESTORS SCHEDULE

| Oaktree Investor<br>and Notice Address | Shares of Common Stock<br>Held |
|---|---|
| OCM Big Wave LLC<br>c/o Oaktree Capital Management, L.P.<br>333 S. Grand Ave., 28th Floor<br>Los Angeles, California 90071<br>Attention:  Matthew Wilson<br>Facsimile:  (213) 830-6300 | [    ] |

## OTHER STOCKHOLDERS SCHEDULE

| Other Stockholders and Notice Address | Shares of Common Stock Held |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

## EXHIBIT A

### MANAGEMENT FEES

The Company or its Subsidiaries will be entering into a management services agreement (the "MSA") with an Affiliate of the Oaktree Investors (the "Advisor") on the date hereof, pursuant to which they shall be required to pay the Advisor an annual management and consulting fee in the amount of $3,000,000.00 (the "Consulting Fee"); provided that the Consulting Fee payable by the Company to the Advisor in respect of the first year following the date hereof shall accrue throughout such period and be payable instead during the second year following the date hereof (such that the total fees payable during the second year shall be $6,000,000). If the Company or its Subsidiaries acquire or enter into any additional business operations after the date of the MSA, the Company and the Advisor will determine whether and to what extent the Consulting Fee should be increased as a result thereof.  Additionally, in consideration for the time and effort expended by the Advisor and its personnel in connection with any acquisition, divestiture, financing, refinancing, merger, restructuring (financial or organizational), recapitalization or other transaction by the Company or any of its Subsidiaries, the Advisor shall be entitled to receive an additional consulting fee in respect of the additional services to be provided by the Advisor in connection with such activities; provided that, the amount of any additional consulting fee payable in connection with such activities shall be determined by the Board on a case-by-case basis, based on the amount of consulting fees which would be payable to a third party advisor in such circumstances.   Finally, the Advisor shall be entitled to reimbursement of its and its Affiliates' out of pocket expenses incurred pursuant to the MSA.

## **EXHIBIT F**

**Members of the Board of the Reorganized Quiksilver**

**Members of the Board of the Reorganized Quiksilver**

The Boards of Directors of Reorganized Quiksilver and each of the other Reorganized Debtors shall be comprised of the following four members:

1. <u>Thomas Casarella</u>

   Mr. Casarella is a Senior Vice President Oaktree's Global Principal Group.  Prior to joining Oaktree, Mr. Casarella served as Deputy Chief Restructuring Officer at the United States Department of the Treasury. Before that, Mr. Casarella was an investor in the Special Situations Group at Brookfield Asset Management and in the Restructuring Group at Lazard. He began his career as an analyst at Goldman Sachs. Mr. Casarella holds an A.B. degree summa cum laude from Bowdoin College, an M.A. degree in Economics from Oxford University, and an M.B.A. from the Harvard Business School. He is also a CFA charterholder.

2. <u>David Tanner</u>

   Mr. Tanner leads Oaktree's portfolio enhancement team - a group of operating executives that specialize in partnering with portfolio companies to drive performance improvement, with particular expertise in driving turnarounds. The team has the capabilities to serve the full breadth of industries and functions, offering advisory services and interim management in areas such as performance transformation leadership, operational restructuring, commercial transformation, cost rationalization, corporate strategy, talent management, core process redesign and the implementation of governance and reporting standards. Prior to joining Oaktree, Mr. Tanner held a number of senior executive roles at Fortune Brands, Inc. Most recently, he was Senior Vice President of Strategy and Corporate Development charged with leading the turnaround of Fortune's then largest portfolio company, Beam Inc. Previously, Mr. Tanner drove M&A activities across Fortune's portfolio in the alcoholic beverages, building materials, sporting goods and security sectors; led their corporate strategy efforts; and managed a range of performance improvement initiatives across Fortune's portfolio companies. Prior thereto, he was a member of the Strategy and Corporate Finance practices at McKinsey & Company, Inc. where he worked with Fortune 500 companies and private equity firms on strategy and operational improvement efforts in the consumer, technology and industrial sectors. Earlier in his career, Mr. Tanner served as a Major and Senior Pilot in the United States Air Force. He currently serves on the boards of Rural / Metro Corporation, Hanley Wood and Agro Merchants Group. Mr. Tanner received a B.S. in Operations Research from the United States Air Force Academy and an M.B.A. with honors from the Wharton School of the University of Pennsylvania.

3. <u>Matt Wilson</u>

   Mr. Wilson is a Managing Director and co-portfolio manager within Oaktree's Global Principal Group. He is responsible for management of the U.S. Global Principal team and all of its investing activities. In addition, Mr. Wilson leads Oaktree's investing efforts in the consumer sector where he is responsible for sourcing, analyzing and executing

transactions as well as monitoring portfolio companies in the food and beverage, retail/restaurant and consumer products sectors. Prior to joining Oaktree, Mr. Wilson was with H.I.G. Capital, LLC, a leading middle market private equity firm. While at H.I.G., he was a founding member of Bayside Capital, Inc., a firm focused on special situations and credit-oriented investments. Prior thereto, Mr. Wilson was with J.H. Whitney & Co., where he was an associate in the firm's middle market buyout group. He began his career in the Investment Banking Division at Merrill Lynch & Co. in New York. Mr. Wilson graduated with a B.A. degree with Distinction in Economics and History from the University of Virginia and an M.B.A. from the Harvard Business School. He currently serves on the board of directors of AdvancePierre Foods, Agro Merchants Group, The Bridge Direct HK, Billabong International, Diamond Foods and Glam Squad, and is Chairman of the Board of Trustees of The Children's Bureau of Los Angeles.

4. <u>Pierre Agnes</u>

Mr. Pierre Agnes has been a member of the Board of Directors of Quiksilver and its Chief Executive Officer since March 2015. Mr. Agnes previously served as the Company's President since October 2014, Global Head of Apparel since March 2013, and President of Quiksilver Europe since June 2005. Prior to that, he served as Managing Director of Quiksilver Europe since December 2003. Between 1992 and 2002, Mr. Agnes founded and operated Omareef Europe, a licensee of the Company for wetsuits and eyewear that the Company purchased in November 2002. Mr. Agnes originally joined the Company in 1988, first as team manager, and later in various capacities throughout the Company's European marketing operations.

The Debtors reserve the right to alter, amend, modify, or supplement this <u>Exhibit F</u> in accordance with the Plan and the Plan Sponsor Agreement.

## **EXHIBIT G**

**Maximum Percentage of New Quiksilver Common Stock to be Issued on Account of Management Incentive Plan**

**Maximum Percentage of New Quiksilver Common Stock to be Issued on Account of Management Incentive Plan[1]**


The Reorganized Debtors' MIP may be implemented on or after the Effective Date on terms approved by the New Board, and, upon implementation, shall dilute the issued and outstanding New Quiksilver Common Stock distributed pursuant to the New Quiksilver Common Stock Allocation by an amount not to exceed 10%.

The Debtors reserve the right to alter, amend, modify, or supplement this <u>Exhibit G</u> in accordance with the Plan and the Plan Sponsor Agreement.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the proposed Second Amended Joint Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors-in-Possession (the "<u>Plan</u>").

## **EXHIBIT H**

### **Anticipated Post-Effective Date Structure of the Reorganized Debtors**

       The Debtors reserve the right to alter, amend, modify, or supplement this <u>Exhibit H</u> in accordance with the Plan and the Plan Sponsor Agreement.



Quiksilver, Inc.
Delaware
Mountain & Wave SARL
Luxembourg
QS Wholesale, Inc.
California
Quiksilver Greater China Ltd.
Hong Kong
QS Holdings SARL
Luxembourg
Boardrider S.A.
Luxembourg
DC Shoes, Inc.
California
QS Retail, Inc.
California
Hawk Designs, Inc.
California
Quiksilver Mexico, S. de R.L. de C.V.
Mexico
Con So Horin en Ventas Gama, S. de R.L. de C.V.
Mexico
Quiksilver Commercial S. de R.L. de C.V.
Mexico
QS Holdings SARL
Swiss Financing Branch
QS Holdings SARL
Swiss Branc
Biarritz Holdings SARL
Luxembourg
54th Street Holdings SARL
Luxembourg
Quiksilver Aus. Pty. Ltd.
Australia
Chloelys Investment Ltd.
Cyprus
Quiksilver Roxy Korea Ltd.
Korea
DC (Shanghai) Commercial Co. Ltd.
China
DC Shoes(Hong Kong) Ltd.
Hong Kong
Biarritz Holdings SARL
Swiss Branch
54th Street Holdings SARL
Swiss Branch
Quiksilver do Brasil Franqueadora Ltda.
Brazil
QSBR Industria e Comercio de Artigos Esportivos Ltda.
Brazil
Quiksilver Deluxe SARL
Luxembourg
Quiksilver Singapore Ltd.
Singapore
Quiksilver Foundation Australia Pty. Ltd.
Australia
Quiksilver Intl. Pty. Ltd.
Australia
QS Retail, Pty. Ltd.
Australia
UMTT Pty. Ltd.
Australia
Quiksilver Japan K.K.
Japan
Quiksilver Asia Sourcing Ltd.
Hong Kong
Quiksilver Glorious (Longmen) Ltd.
China
Quiksilver Glorious Sun JV Ltd.
Hong Kong
Quiksilver Glorious Sun Licensing Ltd.
Hong Kong
Quiksilver Glorious Sun Trading
China
Pilot SAS
France
Quiksilver Canada Corp.
Canada
QS Retail (Taiwan) Ltd.
Taiwan
QS Retail (Thailand) Ltd.
Thailand
Pavilion Prod. Pty. Ltd.
Australia
QS Retail (NZ) Limited
New Zealand
QSJ Holdings Pty. Ltd.
Australia
Quiksilver Asia Sourcing (Shanghai) Co. Ltd.
China
Main Bridge
Hong Kong
Quiksilver Glorious Sun Apparels (HZ) Ltd.
China
Ug Mfg. Co. Pty. Ltd.
Australia
Na Pali SAS
France
Meribel SAS
France
Caribbean Pty. Ltd.
Australia
Ug Mfg. Co. (NZ) Ltd.
New Zealand
PT Quiksilver
Indonesia
DC Shoes Australia Pty. Ltd.
Australia
DC Shoes (NZ) Limited
New Zealand
LEGEND
Debtor
Non-Debtor
Na Pali Europe SARL
France
Cariboo SARL
France
Tavarua SCI
France
Kokolo SARL
France (KO)
Emerald Coast
France
Drop In SARL
France
Quikislver Travel
France (QT)
1.Distribution s.r.o.
Czech Republic
Santocha Ltd.
Russia (ST)
Kauai GmbH
Germany
New Pier Trading Ltd.
South Africa (NP)
Sumbawa SL
Spain
Haapiti SRL
Italy
Tarawa Lda.
Portugal
Sunshine Diffusion SA
Switzerland
Lanai, Ltd.
United Kingdom
Hanalei NV
Belgium
Rawaki sp. Zoo
Poland
Pukalani BV
Netherlands
Namotu, Ltd.
Ireland
Uluwatu Aps
Denmark
Fistral Oy
Finland
Boardriders Club Bratislava s.r.o.
Slovakia
Vanuatu GmbH
Austria
Molokai Ltd.
United Kingdom

# **EXHIBIT I**

**Schedule of Assumed Contracts and Unexpired Leases**

## Schedule of Assumed Contracts and Unexpired Leases[1]

Pursuant to Article VII of the Plan, the Debtors shall assume:

1.  the Executory Contacts and Unexpired Leases set forth on Schedule I-1 attached hereto;

2.  all Insurance Contracts, pursuant to and as set forth in Article 7.3 of the Plan, regardless of whether specifically enumerated on Schedule I-1;

3.  all Executory Contacts and Unexpired Leases of the Debtors to which another Debtor or a non-Debtor affiliate is the counterparty, regardless of whether specifically enumerated on Schedule I-1.

### Notes

Neither the exclusion nor inclusion of a contract or lease on Schedule I-1, nor anything contained in the Plan, shall constitute an admission by the Debtors that such contract or lease is in fact an Executory Contact or Unexpired Lease, as applicable, or that the Debtors or Reorganized Debtors, as applicable, have any liability thereunder.  The Debtors reserve all rights to contest the characterization of any contract as an Executory Contract or lease as an Unexpired Lease.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, with the consent of the Plan Sponsor, or, after the Effective Date, the Reorganized Debtors, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease as otherwise provided in the Plan.  The Debtors do not waive any claims or causes of action they may have against the counterparties to any contract or lease, regardless of whether such claims or causes of action relate to the contract or lease.  Nothing herein shall be construed as a concession or evidence that a contract or lease has or has not expired or been terminated or is or is not otherwise currently in full force and effect.

Pursuant to Article 7.4 of the Plan, contracts and leases entered into after the Petition Date by the Debtors may be performed by the Reorganized Debtors in the ordinary course of business and in accordance with the terms thereof.  Such postpetition contracts and leases are not included on Schedule I-1.

Any contracts or leases to which only one or more non-Debtor affiliates and not a Debtor is party are not impacted by the Plan and are not included on  Schedule I-1.  To the extent that a Debtor is a guarantor of any such non-Debtor affiliate agreement, such agreement is included on Schedule I-1 solely as to the Debtor guarantee and is not impacted as to the non-Debtor affiliate.

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the proposed Second Amended Joint Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors-in-Possession (the "Plan").

All Cure Amounts are based on amounts outstanding as of the Petition Date, except for retail and corporate leases, which reflect unpaid rent for the entire month of September. Any post-petition amounts outstanding will be paid in the normal course and thus are not included as part of the Cure Amounts listed on <u>Schedule I-1</u>.

Each Executory Contacts and Unexpired Leases listed on <u>Schedule I-1</u> or otherwise assumed hereunder includes any and all amendments, restatements or revisions thereto. Assumption of such Executory Contacts and Unexpired Leases includes assumption of such amendments, restatements or revisions.

The Debtors reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Contracts and Unexpired Leases in accordance with the Plan and the Plan Sponsor Agreement.

## **SCHEDULE I-1**

**Schedule of Assumed Contracts and Unexpired Leases**

Actual $ amounts

| Debtor Name | Counterparty | Description | Cure Amount |
|---|---|---|---|
| Quiksilver, Inc. | Adobe | Adobe Analytics services ($220,000) - Term: 11/30/2016 | $0 |
| QS Wholesale, Inc. | Alex Bruckstein | Independent Sales Representative Agreement dates October 1, 2012 | $0 |
| Quiksilver, Inc. | Alexandre Barbier | Letter Agreement re: Employment at Quiksilver dated April 10, 2014 (revised May 22, 2014) | $0 |
| QS Wholesale, Inc. | Amy White | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| Quiksilver, Inc. | Andres P. Castillo | Letter Agreement re: Employment at Quiksilver dated June 1, 2002 | $0 |
| Quiksilver, Inc. | Andrew Bruenjes | Letter Agreement re: Employment at Quiksilver dated May 22, 2015 | $0 |
| QS Wholesale, Inc. | Andy White | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| DC Shoes, Inc. | Army & Air Force Exchange Service | Business Terms Agreement dated October 16, 2012 | $0 |
| QS Wholesale, Inc. | Backcountry.com, Inc. | Vendor Partnership Agreement (undated) | $0 |
| DC Shoes, Inc. | Big Brother | License Agreement - Expiration Date: January 1, 2015 - July 31, 2016 | $500 |
| Quiksilver, Inc. | Biotherm | License agreement | $0 |
| QS Wholesale, Inc. | Brad Harrell | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| QS Wholesale, Inc. | Brian Kulak | Independent Sales Representative Agreement dated October 25, 2013 | $0 |
| Quiksilver, Inc. | Brian Sininger | Letter Agreement re: Employment at Quiksilver dated July 17, 2015 | $0 |
| Quiksilver, Inc. | Bridge-X-Technologies, Inc. | Software License Agreement 20MAY2013 | $0 |
| QS Wholesale, Inc. | Brittany Onhaizer | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| QS Wholesale, Inc. | Cellco Partnership dba Verizon | Verizon Wireless Major Account Agreement dated July 6, 2015 | $3,465 |
| Quiksilver, Inc. | Ceridian Stored Value Solutions, Inc. | Agreement dated November 1, 2012 | $0 |
| QS Retail, Inc. | Certona Corporation | Statement of Work - Platform Change / Site Redesign 11AUG2014 | $0 |
| QS Wholesale, Inc. | Chris Darrah | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| Quiksilver, Inc. | Christa Prince | Letter Agreement re: Employment at Quiksilver dated September 10, 2013 | $0 |
| Quiksilver, Inc. | City of Los Angeles | FTZ with LA Harbor  - Term: Through February 2018 | $0 |
| DC Shoes, Inc. | Commercial Madison, S.A., d/b/a Komax | Distribution Agreement - Expiration Date: 10/31/2016 | $0 |
| Quiksilver, Inc. | Countwise | Proposal dated September 26, 2012 | $0 |
| Quiksilver, Inc. | CRITEO CORP | Insertion Order  - Term: Until terminated - | $0 |
| Quiksilver, Inc. | Damco USA Inc | Logistics Services Agreement  - Term: Until terminated | $0 |
| QS Wholesale, Inc. | Daniel Clayton dba Greenrep | Independent Sales Representative Agreement dated May 10, 2012 | $0 |
| DC Shoes, Inc. | DeMarquis McDaniels | Master Sound Recording and Musical Composition License dated September 4, 2015 | $0 |
| DC Shoes, Inc. | Dick's Sporting Goods, Inc. | Dick's Sporting Goods, Inc.'s Vendor Agreement dated January 1, 2008 | $0 |
| QS Wholesale, Inc. | Dick's Sporting Goods, Inc. | Dick's Sporting Goods, Inc.'s Domestic Vendor Agreement dated January 1, 2015 | $0 |
| QS Wholesale, Inc. | Disandina S.A. | Distribution Agreement - Expiration Date: 10/31/2018 | $0 |
| Quiksilver, Inc. | Dotcom-Monitor.com | Subscription Agreement 27NOV2013 | $0 |
| QS Wholesale, Inc. | Doug Coger A Team Agency, Inc. | Independent Sales Representative Agreement dated November 12, 2012 | $0 |
| Quiksilver, Inc. | Duff & Phelps, LLC | Engagement Letter for Transfer Pricing Services | $0 |
| QS Retail, Inc. | eBay Enterprise, Inc. (formerly GSI Commerce Solutions, Inc.) | GSI Amended and Restated E-Commerce Agreement (and related amendments and SOWs)  - Term: Through May 1, 2016 | $0 |
| Quiksilver, Inc. | EP Holdings Inc | Product License Agreement | $2,642 |
| Quiksilver, Inc. | Eric Boes | Letter Agreement re: Employment at Quiksilver dated February 25, 2014 | $0 |
| QS Wholesale, Inc. | Erika Altes | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| Quiksilver, Inc. | FIBERLINK COMMUNICATIONS CORP. | IT Agreement | $0 |
| DC Shoes, Inc. | FirstCom | Media Agreement- Licensing; dated July 27, 2015 | $0 |
| QS Wholesale, Inc. | Friendbuy, Inc. | Statement of Work dated 1/23/15 | $0 |
| Quiksilver, Inc. | Frontech Solutions, Inc. | PLM Enhancements Software Development Agreement 30OCT2013 | $22,240 |

*Actual $ amounts*

| Debtor Name | Counterparty | Description | Cure Amount |
|---|---|---|---|
| Quiksilver, Inc. | Frontech Solutions, Inc. | PLM Software Development Agreement 7MAY2012 | $0 |
| Quiksilver, Inc. | Frontech Solutions, Inc. | Software Development Agreement - Term: 10/31/2016 | $0 |
| DC Shoes, Inc. | Gingko Press Inc. | Co-Production Agreement dated September 2, 2015 | $0 |
| Quiksilver, Inc. | Gustavo Da Rosa Belloc | Indemnity Agreement dated November 1, 2014 | $0 |
| DC Shoes, Inc. | High Speed productions, Inc. dba Thrasher Magazine | License Agreement - Expiration Date: February 1, 2015 - January 31, 2016 | $0 |
| Quiksilver, Inc. | Indus Apparel USA, Inc. | Master Purchase Agreement | $0 |
| Quiksilver, Inc. | Intersport Corp. | License Agreement dated November 6, 2014 (PFDs for life jackets) | $0 |
| QS Wholesale, Inc. | Isaac Lalo y Perla Lalo | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| QS Wholesale, Inc. | JackThreads | Terms and Conditions (undated) | $0 |
| QS Wholesale, Inc. | James Reuter | Independent Sales Representative Agreement dated January 1, 2015 | $0 |
| QS Wholesale, Inc. | Janner Asuncion | Independent Sales Representative Agreement dated September 1, 2014 | $0 |
| QS Wholesale, Inc. | Jay Lightburne | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| QS Wholesale, Inc. | Jay Williams | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| QS Wholesale, Inc. | Jessica Payne | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| QS Wholesale, Inc. | Jim Compton | Independent Sales Representative Agreement dated June 10, 2013 | $0 |
| Quiksilver, Inc. | John Hunt | Letter Agreement re: Employment at Quiksilver dated February 13, 2014 | $0 |
| DC Shoes, Inc. | Karmaloop, Inc. | New Account Agreement dated October 19, 2011 | $0 |
| QS Wholesale, Inc. | Kathy Karlovic | Independent Sales Representative Agreement dated August 8, 2013 | $0 |
| Quiksilver, Inc. | Ke Nui Partners LLC | Hawaii residential lease; start date October 1, 2013 and end date March 31, 2016 | $0 |
| QS Wholesale, Inc. | Krysta Depp (Go Big Sales) | Independent Sales Representative Agreement dated November 12, 2012 | $0 |
| QS Wholesale, Inc. | KTS Networks, Inc. | Support Agreement Details 21JUL2015 | $4,800 |
| QS Wholesale, Inc. | KTS Networks, Inc. | Shoretel (phone, hardware) - Term: Through 9/30/2015 | $0 |
| Quiksilver, Inc. | Laurent Padovan | Letter Agreement re: Employment at Quiksilver dated September 9, 2013 | $0 |
| QS Wholesale, Inc. | Laurent Wainer | Independent Sales Representative Agreement dated June 1, 2015 | $0 |
| Quiksilver, Inc. | Laurie Blanton | Letter Agreement dated April 4, 2015 | $0 |
| Quiksilver, Inc. | Laurie Blanton | Letter Agreement re: Employment at Quiksilver dated January 13, 2014 (revised January 15, 2014) | $0 |
| Quiksilver, Inc. | Linnsey Caya | Indemnity Agreement dated November 1, 2014 | $0 |
| Quiksilver, Inc. | Linnsey Caya | Employment Agreement dated November 1, 2014 | $0 |
| QS Wholesale, Inc. | Lisa Foyteck | Independent Sales Representative Agreement dated October 14, 2013 | $0 |
| Quiksilver - Na Pali | Maersk Agency U.S.A., Inc. | Service Contract No. 810159 dated May 5, 2015 | $0 |
| DC Shoes, Inc. | Mammoth Mountain Ski Area LLC | Mammoth Mountain Sponsorship Agreement - Term: Through October 31, 2018 | $44,621 |
| DC Shoes, Inc. | Martin Fobes | Media Professional Agreement dated June 1, 2015 | $3,333 |
| Quiksilver, Inc. | Master Data Center, Inc. | Software License and Support Agreement (IP Master): Term - Until Terminated | $400 |
| DC Shoes, Inc. | Master Plan Communications, Inc. | Consulting Services Agreement dated May 22, 2015 | $0 |
| QS Wholesale, Inc. | Meredith Moncata | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| DC Shoes, Inc. | Michael Blabac | Media Professional Agreement dated November 1, 2012 | $0 |
| QS Wholesale, Inc. | Michael Galvan | Independent Sales Representative Agreement dated October 25, 2013 | $0 |
| Quiksilver, Inc. | Michael Reilly | Letter Agreement re: Employment at Quiksilver dated May 21, 2010 | $0 |
| Quiksilver, Inc. | Microsoft | Volume Licensing Program Signature Form 27JUN2013 | $0 |
| QS Wholesale, Inc. | Mike Lowder (United Sales, Inc.) | Independent Sales Representative Agreement dated November 12, 2012 | $0 |
| QS Wholesale, Inc. | MSC Mediterranean Shipping Company S.A. | Service Contract dated May 1, 2015 | $0 |
| DC Shoes, Inc. | Mushroom Music Publishing | Music License dated March 12, 2015 | $0 |

*Actual $ amounts*

| Debtor Name | Counterparty | Description | Cure Amount |
|---|---|---|---|
| QS Wholesale, Inc. | Neco (Manuel) Calderon | Independent Sales Representative Agreement dated September 1, 2014 | $0 |
| Quiksilver, Inc. | Neustar, Inc. | Service Order for Webmetrics Load Testing Service 2013 | $13,773 |
| QS Wholesale, Inc. | Nick Karels (Industry Sales) | Independent Sales Representative Agreement dated November 12, 2012 | $0 |
| Quiksilver, Inc. | Okta, Inc. | License Agreement 12OCT2012 | $0 |
| Quiksilver, Inc. | Oracle America Inc | Oracle Ordering Document (for recruiting premium cloud service) - Term: 05/01/2016 | $0 |
| QS Wholesale, Inc. | Order Dynamics Corporation | Order Dynamics Master Services Agreement (platform for AMPLA and eventually other e-commerce sites)  - Term: Through 3/31/2018 | $0 |
| QS Wholesale, Inc. | Pat Artukovich | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| Quiksilver, Inc. | Paymetric, Inc. | Master Services Agreement dated April 30, 2013 | $0 |
| Quiksilver, Inc. | Pierre Agnes | Indemnity Agreement dated October 18, 2013 | $0 |
| Quiksilver, Inc. | Proofpoint, Inc. | General Terms and Conditions dated June 28, 2013 | $0 |
| Quiksilver, Inc. | Recall Total Information Management, Inc. | Recall Data Protection Services Agreement 13APR2012 | $6,410 |
| Quiksilver, Inc. | Recreational Equipment, Inc. | Purchase Order Terms and Conditions dated October 3, 2014 | $0 |
| QS Wholesale, Inc. | Rene Di Cristina | Independent Sales Representative Agreement dated November 12, 2012 | $0 |
| QS Wholesale, Inc. | Rick Zappone (Southbound Sales, Inc.) | Independent Sales Representative Agreement dated August 15, 2014 | $0 |
| QS Wholesale, Inc. | Rob Cloupe | Independent Sales Representative Agreement dated November 1, 2012 | $0 |
| Quiksilver, Inc. | RSA Security, LLC | Master License Agreement dated June 30, 2014 | $0 |
| Quiksilver, Inc. | Ryan Kaneshiro | Letter Agreement re: Employment at Quiksilver dated January 13, 2014 | $0 |
| DC Shoes, Inc. | S&S Prop Acquisition, LLC | Standard industrial/commercial multi-tenant lease for industrial suite of approx 22,058 sq ft | $4,720 |
| QS Wholesale, Inc. | Samis Foundation | Scientific Building Office Lease Agreement dated June 2, 2014 | $0 |
| QS Wholesale, Inc. | Samis Land Co | US Rubber Onsite Parking License Agreement dated July 2014 | $400 |
| Quiksilver, Inc. | SARL Euroglass / Equity Bell | Product License Agreement | $0 |
| Quiksilver, Inc. | SL Consulting | Engagement Letter for accounting services | $0 |
| Quiksilver, Inc. | Corporate Management Solutions, Inc. | Solium Purchase Agreement dated March 7, 1996 | $0 |
| DC Shoes, Inc. | Specialty Retailers, Inc. | Addendum to Specialty Retailer, Inc.'s Terms and Conditions (undated) | $0 |
| Quiksilver, Inc. | SSI Venture LLC | Retail Licenses (Vail and Lake Tahoe) | $0 |
| QS Wholesale, Inc. | Stages Stores/Specialty Retailers, Inc. | Vendor Agreement dated May 2013 | $0 |
| QS Wholesale, Inc. | Stephanie Mclean | Independent Sales Representative Agreement dated February 1, 2013 | $0 |
| Quiksilver, Inc. | Stuart Jones | Letter Agreement re: Employment at Quiksilver dated August 10, 2015 | $0 |
| Quiksilver, Inc. | Taylor Whisenand | Letter Agreement re: Employment at Quiksilver dated March 29, 2012 (Revised April 9, 2012) | $0 |
| DC Shoes, Inc. | Tecnologia En Calzado | Distribution Agreement - Expiration Date: 10/31/2016 | $0 |
| DC Shoes, Inc. | The Octopus Project | Master Use & Synchronization & Performance License Agreement dated January 14, 2015 | $0 |
| Quiksilver, Inc. | Theodore Li | Indemnity Agreement dated May 4, 2015 | $0 |
| Quiksilver, Inc. | Theodore Li | Employment Agreement dated May 4, 2015 | $0 |
| Quiksilver, Inc. | Thomas Calhoun | Employment Agreement dated February 25, 2015 and revised April 4, 2015 | $0 |
| Quiksilver, Inc. | Thomas Chambolle | Indemnity Agreement dated March 31, 2015 | $0 |
| DC Shoes, Inc. | Thrasher | Advertising Contract dated September 26, 2014 | $0 |
| Quiksilver, Inc. | Time Warner Cable | Time Warner (Internet Services)  - Term: 08/12/2016 | $0 |
| QS Wholesale, Inc. | Tommy Moncata | Independent Sales Representative Agreement dated October 1, 2012 | $0 |
| QS Wholesale, Inc. | Trevor Gregson | Independent Sales Representative Agreement dated January 1, 2015 | $0 |
| QS Wholesale, Inc. | Tricia Thorson | Independent Sales Representative Agreement dated January 1, 2015 | $0 |
| Quiksilver, Inc. | UNiDAYS Inc. | Engagement Letter dated 27 May 2015 | $0 |
| Quiksilver, Inc. | Urchin Associates PTY LTD | Services Agreement 12AUG2014 | $0 |

*Actual $ amounts*

| Debtor Name | Counterparty | Description | Cure Amount |
|---|---|---|---|
| Quiksilver, Inc. | Vertex, Inc. | Vertex, Inc. Software License Agreement dated September 28, 2012 | $0 |
| Quiksilver, Inc. | Wendell Aoki | Lease agreement in connection with storage for Quiksilver in Memory of Eddie Aikau Event | $0 |
| QS Wholesale, Inc. | Windstream | Windstream Services Agreement (phones) - Term: Through 7/22/2017 | $10,267 |
| DC Shoes, Inc. | Worldsport S.A. | DC Shoes, Inc. License Agreement dated May 1, 2007 | $0 |
| QS Wholesale, Inc. | Zappos Merchandising, Inc. | Zappos Merchandising, Inc. Vendor Agreement dated August 6, 2014 | $0 |
| QS Wholesale, Inc. | Zappos Merchandising, Inc. | Zappos Merchandising, Inc. Vendor Allowance and Co-op Agreement dated January 1, 2013 | $0 |

# **EXHIBIT J**

**Non-Exclusive List of Retained Claims and Causes of Action**

## Non-Exclusive List of Retained Causes of Action[1]

Article 6.17 of the Plan provides that unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan (including, without limitation, pursuant to Article 10.4 or Article 10.6 thereof) or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan (including, without limitation, pursuant to Article 10.4 or Article 10.6 thereof) or a Bankruptcy Court order, the Reorganized Debtors expressly reserves all Causes of Action, for later adjudication, and therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

Without limiting the generality of Article 6.17 of the Plan, but subject in all respects to the terms thereof, the following Exhibits J-1 through J-11 include specific types of Causes of Actions expressly preserved by the Debtors and the Reorganized Debtors, including: (i) claims related to accounts receivable and accounts payable; (ii) claims related to insurance policies; (iii) claims related to deposits, adequate assurance postings, and other collateral postings; (iv) claims, defenses, cross-claims, and counter-claims related to litigation and possible litigation; (v) claims related to contracts and leases; (vi) claims related to vendor obligations; (vii) claims related to tax credits and refunds; (viii) claims related to intellectual property; (ix) claims related to customer obligations; (x) claims related to current or former employee matters, and (xi) claims related to potential avoidance of prepetition transfers under sections 362, 502, 510, 542, 543, 547, 548, and 550 of the Bankruptcy Code. Each such exhibit is subject to the terms of the Plan and the information provided in this Exhibit J.  As set forth in the Plan, the Debtors shall have, prior to the Effective Date, and the Reorganized Debtors, shall have, on and after the Effective Date, sole authority and responsibility for investigating, analyzing, commencing, prosecuting, litigating, compromising, collecting, and otherwise administering the retained Causes of Action.

The Debtors reserve the right to alter, amend, modify, or supplement this Exhibit J, including Exhibits J-1 to J-11 in accordance with the Plan and the Plan Sponsor Agreement.

For the avoidance of doubt, in addition to possible Causes of Action set forth herein, the Debtors may have, in the ordinary course of business, numerous causes of action, claims, or rights against vendors or others with whom they deal in the ordinary course of business ("Ordinary Course Claims") to the extent such causes of action, claims, or rights have not been

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the proposed Second Amended Joint Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors-in-Possession (the "Plan").

assigned to a third party.  The Debtors, prior to the Effective Date, and the Reorganized Debtors, from and after the Effective Date, retain and reserve their right to enforce, sue on, settle or compromise (or decline to do any of the foregoing) the Ordinary Course Claims, as well as the claims and causes of action asserted against the parties listed herein.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**

## **EXHIBIT J-1**

### Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors.  Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors owe money to them. There is no schedule to this Exhibit J-1.

# **EXHIBIT J-2**

## Claims Related to Insurance Policies

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all Insurance Contracts, insurance policies, occurrence policies, and occurrence contracts to which the Debtors or Reorganized Debtors are party or pursuant to which the Debtors or Reorganized Debtors have any rights whatsoever, including Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, third party administrators, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.  There is no schedule to this Exhibit J-2

**Exhibit J-3**

<u>Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings</u>

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit or collateral.  There is no schedule to this <u>Exhibit J-3</u>.

**Exhibit J-4**

Claims, Defenses, Cross-Claims, and
Counter-Claims Related to Litigation and Possible Litigation

Unless otherwise released by the Plan, the Debtors expressly reserve all claims, derivative claims, defenses, cross claims, and counterclaims against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial, including, without limitation, as set forth on the Schedule of Financial Affairs 4A of each Debtor.  There is no schedule to this Exhibit J-4.

**Exhibit J-5**

Claims Related to Contracts and Leases

Unless otherwise released by the Plan, the Debtors expressly reserve Causes of Action, based in whole or in part upon any and all contracts and leases to which the Debtors or Reorganized Debtors are party or pursuant to which the Debtors or Reorganized Debtors have any rights whatsoever. The claims and Causes of Actions reserved include, without limitation, Causes of Action against vendors, suppliers of goods or services, or any other parties: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) for any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by the Debtors; (f) counterclaims and defenses related to any contractual obligations; (g) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (h) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims; (i) arising under any confidentiality or non-disclosure agreement; and (i) any accumulated service credits, both those that may apply to future vendor invoices and those from which the Debtors may be entitled to receive a refund. There is no schedule to this Exhibit J-5.

## **Exhibit J-6**

### Claims Related to Vendor Obligations

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all vendors that owe or may in the future owe money or other obligations to the Debtors or the Reorganized Debtors, whether for unpaid invoices; unreturned, missing, or damaged inventory; indemnification; warranties; any turnover actions arising under section 542 or 543 of the Bankruptcy Code; or any other matter whatsoever. In order to protect the privacy of the Debtors' vendors, there is no schedule to this Exhibit J-6.

**Exhibit J-7**

Claims Related to Tax Credits and Refunds

Except as otherwise provided by the Plan, the Debtors expressly reserve all Causes of Action against or related to all taxing authorities that owe or that may in the future owe money to the Debtors or Reorganized Debtors. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all taxing authorities who assert or may assert that the Debtors or Reorganized Debtors owe money to them. There is no schedule to this Exhibit J-7.

## **Exhibit J-8**

### Claims Related to Intellectual Property

Unless otherwise released by the Plan, the Debtors expressly reserve any Causes of Action for unfair competition, licensing or licensing agreements, interference with contract or potential business advantage, conversion, infringement of intellectual property, or other business tort claims.  Nothing in the Plan or the Plan Supplement shall impair, enlarge, or in any way alter the equitable and legal rights, obligations, and defenses of the Debtors, the Reorganized Debtors, their affiliates or their subsidiaries regarding their intellectual property rights, and all rights with respect thereto are expressly reserved.

Notwithstanding the foregoing, any action or inaction by the Debtors, the Reorganized Debtors, their affiliates or their subsidiaries with respect to intellectual property rights shall not be used, invoked, or applied by any Person in any proceeding to serve as the basis to enlarge, diminish, or in any way alter or affect equitable and legal rights, obligations, and defenses including, without limitation, through the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, other estoppels (judicial, equitable, or otherwise), naked license, unreasonable delay in asserting rights, adequate remedy at law, or laches, in any dispute regarding the intellectual property rights of the Debtors, the Reorganized Debtors, their affiliates or their subsidiaries. There is no schedule to this Exhibit J-8.

**Exhibit J-9**

Claims Related to Customer Obligations

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all customers that owe or may in the future owe money to the Debtors or the Reorganized Debtors, whether for unpaid invoices; unreturned, missing, or damaged inventory, warranties, or any other matter whatsoever. In order to protect the privacy of the Debtors' customers, there is no schedule to this Exhibit J-9.

**Exhibit J-10**

Claims Related to Current or Former Employee Matters

Unless otherwise released by the Plan, the Debtors expressly reserve all claims, defenses, cross claims, and counterclaims against or related to all current or former employees that are party to or that may in the future become party to any workers' compensation claims or actions, litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial.  There is no schedule to this Exhibit J-10.

**Exhibit J-11**


Claims Related to Potential Avoidance of Prepetition Transfers Under Sections 362, 502, 510, 542, 543, 547, 548 and 550 of the Bankruptcy Code


Except as otherwise provided by the Plan, the Debtors expressly reserve the Causes of Action against or related to all Entities for preferential payments related to any potential avoidance of prepetition transfers under sections 362, 502, 510, 542, 543, 547, 548, and 550 of the Bankruptcy Code solely with respect to those parties specifically enumerated on the attached Schedule J-11.

**Schedule J-11**

Claims Related to Potential Avoidance of Prepetition Transfers Under
Sections 362, 502, 510, 542, 543, 547, 548 and 550 of the Bankruptcy Code

1. U.S. Bank as indenture trustee for the 10.000% Senior Unsecured Notes due 2020
2. E. Gluck
3. KHQ
4. Parigi Group
5. Travel Plus International
6. Northwest
7. Patricia Alvarez
8. Maria Barnes
9. David Bond
10. Brigitte Brown
11. Wei-En Chang
12. Robert O. Colby
13. Liam Devoy
14. Nicholas Drake
15. Charles S. Exon
16. Steve Finney
17. Scott Fullerton
18. Pam Gobright
19. John Graham
20. Kelley Graham
21. Debi Gregg
22. Alan Hardy
23. Tom Hartge
24. Brad Holman
25. Deanna Jackson
26. Kelly Ketner
27. Jennifer Kutsch
28. Pam Lifford
29. Darren Lott
30. Viki Love
31. Robert Oberschelp
32. Joseph O'Neil
33. Kerstin N. Mazzone
34. Robert B. McKnight Jr.
35. Andrew P. Mooney
36. Chris Schreiber
37. Lance Stern
38. Steve Swokowski
39. Alan Vickers
40. George Vollmer
41. Thomas Webster

## EXHIBIT K

**Exit Financing Terms**

## **Post-Emergence Exit Financing**

- The Plan contemplates that the Reorganized Debtors, as borrowers, will enter into an asset-based revolving credit facility on the Effective Date—i.e., the Exit Facility—to fund (i) first, distributions under the Plan on account of the DIP ABL Facility Claims, and (ii) second, distributions under the Plan on account of DIP Term Facility Claims.

- As of the date hereof, the Debtors anticipate entering into the Exit Facility in a principal amount of up to $140.0 million of availability.

- In addition to the Exit Facility, the Reorganized Debtors may enter into a new delayed draw term loan credit facility on the Effective Date in a principal amount of up to $50.0 million on terms that are acceptable to the Debtors and the Plan Sponsor.  This term loan may be funded in whole or in part by third parties and/or the Plan Sponsor (or its affiliates).

The Debtors reserve the right to alter, amend, modify, or supplement this Exhibit K in accordance with the Plan and the Plan Sponsor Agreement.