IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| QUIKSILVER, INC., *et al.*, | Case No. 15-11880 (BLS) |
| Debtors.[1] | Jointly Administered |
|  | Hrg. Date: 03/09/16 at 9:30 a.m. (Eastern)<br>Related Docket Nos. 499, 548 |

**DEBTORS' REPLY TO THE OBJECTION OF E. GLUCK CORPORATION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a) AND 365(a) AND BANKRUPTCY RULES 6006 AND 9014 AUTHORIZING REJECTION OF LICENSE AGREEMENT *NUNC PRO TUNC* TO NOVEMBER 25, 2015**

Quiksilver, Inc. and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby submit this reply (this "Reply") in support of the Debtors' Motion For Entry Of An Order Pursuant To Bankruptcy Code Sections 105(a) And 365(a) And Bankruptcy Rules 6006 And 9014 Authorizing Rejection Of License Agreement *Nunc Pro Tunc* To November 25, 2015 [Docket No. 499] (the "Motion")[2] and in response to E. Gluck Corporation's Objection to the Motion [Docket No. 548] (the "Objection"). In support of the Motion and this Reply, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2] Any capitalized term used herein, but not defined herein, shall have the meaning set forth in the Motion.

**PRELIMINARY STATEMENT**

1. The plain language of the Bankruptcy Code and the prevailing law in this District make clear that trademark licenses are not subject to Bankruptcy Code section 365(n). As such, under Bankruptcy Code section 365(g), upon rejection, the Debtors are relieved of their obligations under the License Agreement, which includes their affirmative obligation to allow E. Gluck to use the Licensed Materials. Thus, following rejection, E. Gluck's rights to use the Licensed Materials terminates.[3] Given the clear language of the Bankruptcy Code, E. Gluck's plea for the Court to consider "the equities" must be rejected.

2. As set forth in the Motion and as will be proven at the hearing on the Motion, the Debtors' decision to reject the License Agreement is a sound exercise of their business judgment. Rejection of the License Agreement is a component of the Debtors' go-forward business plan, allowing the Debtors to bring design and sale of Company-branded watches in-house and more closely monitor the quality of the products and their distribution and to control communications with their key customers. This is critical to establishing and maintaining brand image, which is, in turn, essential to the success of the Debtors' business following emergence from chapter 11.

**BACKGROUND**

3. On November 25, 2015, the Debtors filed the Motion seeking to reject the License Agreement and requesting that the Court prohibit E. Gluck from using the Licensed Materials from and after the Rejection Date; <u>provided</u>, <u>however</u>, that E. Gluck may sell during the Sell-Off Period all Licensed Products that exist on the day the Motion is granted.

---

[3] Subject to the Debtors' agreement that E. Gluck may use the Licensed Materials during the Sell-Off Period, in accordance with License Agreement.

2

4.      On December 10, 2015, E. Gluck filed the Objection, asserting that the Debtors had not made a sufficient showing of business judgment for rejecting the License Agreement and that rejection would not deprive E. Gluck of its rights to use the Licensed Materials.[4]

**REPLY**

**I.      E. Gluck May Not Retain the Right to Use the Licensed Materials**

A.      <u>Bankruptcy Code Section 365(n) is Not Applicable to Trademarks.</u>

5.      By its plain and unambiguous terms, section 365(n) of the Bankruptcy Code applies only to "executory contracts under which the debtor is a licensor of a right to *intellectual property*". 11 U.S.C. § 365(n) (emphasis added). Section 101(35A) states as follows:

> "The term 'intellectual property' *means*—
>
> (A) trade secret;
> (B) invention, process, design, or plant protected under title 35;
> (C) patent application;
> (D) plant variety;
> (E) work of authorship protected under title 17; or
> (F) mask work protected under chapter 9 of title 17; to the extent protected by applicable nonbankruptcy law."

11 U.S.C. § 101(35A) (emphasis added). The definition of "intellectual property" is limited because it is introduced by the narrow, restrictive term "means" rather than the broader, non-exclusive term "includes." See In re Centura Software Corp., 281 B.R. 660, 669-670 (Bankr. N.D. Cal. 2002) ("By using the more limiting term 'means' instead of 'includes,' Congress has

---

[4]   E. Gluck refers to the Licensed Materials as the "Intellectual Property" throughout the Objection. This terminology is misleading because, as discussed in the Motion and herein, and as conceded in the Objection, the Bankruptcy Code clearly omits trademarks from the definition of "intellectual property." 11 U.S.C. § 101(35A). Objection ¶ 5.

deliberately limited § 365(n) protection only to the intellectual property enumerated by the statute.").

6.  Because Bankruptcy Code section 365(n) does not apply to trademarks, the License Agreement is not subject to section 365(n) and E. Gluck's right to use the Licensed Material terminates upon rejection. This straight-forward analysis has been followed by a number of courts, including one in this District. See, e.g., In re Old Carco LLC, 406 B.R. 180, 211 (Bankr. S.D.N.Y. 2009) ("The Objections that § 365(n) entitles the Affected Dealers to retain their rights with respect to the Chrysler trademarks and continue using them post-rejection are also without merit. Section 365(n) only allows such retention of rights and continued usage if the executory contract is one under which 'the debtor is a licensor of a right to intellectual property.' Trademarks are not "intellectual property" under the Bankruptcy Code.") (citations omitted); In re HQ Global Holdings, Inc., 290 B.R. 507, 513 (Bankr. D. Del. 2003) ("Trade names, trademarks, and other proprietary marks are expressly excluded from the definition of 'intellectual property' . . . As a result, the Franchisees are not protected by section 365(n). The Franchisees therefore have only a claim for rejection damages under section 365(g)(1)."); In re Centura Software Corp., 281 B.R. at 673 (holding that upon rejection of a trademark license agreement, "the licensee is left only with a claim for breach").

    B.    <u>The Court Should Not Rely on Equitable Considerations To Make Bankruptcy Code Section 365(n) Applicable to Trademarks.</u>

7.  Ignoring the plain and unambiguous language of section 365(n) and the definition of "intellectual property," E. Gluck urges the court to nonetheless find that it may retain its rights to use the Licensed Materials under the "equitable considerations that must be considered by a bankruptcy court under section 365(n)." Objection at ¶ 3. In support, E. Gluck relies primarily on In re Crumbs Bake Shop, Inc., 522 B.R. 766, 772 (Bankr. D.N.J. 2014), and

4

Judge Ambro's concurring opinion in In re Exide Technologies, 607 F.3d 957, 965-68 (3d Cir. 2010) (Ambro, J., concurring)).

8. This is the minority view. "Most courts . . . reason by negative inference that the omission of trademarks from § 101(35A) means that Lubrizol's holding was not overruled with respect to trademark licenses and those rights are not afforded any protection under § 365(n)." In re Tempnology, LLC, 541 B.R. 1, 7 (Bankr. D. N.H. 2015) (adopting the majority view, citing In re Old Carco LLC, supra, In re Dynamic Tooling Sys., Inc., 349 B.R. 847, 856 (Bankr. D. Kan. 2006); In re HQ Global Holdings, Inc., supra, and In re Centura Software Corp., supra).

9. The Debtors submit that Crumbs Bake Shop and Judge Ambro's concurring opinion in Exide are incorrect for several reasons.[5] First, the Court in Crumbs Bake Shop and Judge Ambro improperly relied on the legislative history of section 365(n) to find that section 365(n) could apply to trademarks. It has long been the law that reliance on legislative history is generally not permitted when the words of a statute are plain and unambiguous. Connecticut Nat. Bank v. Germain, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"); SimmsParris v. Countrywide Fin. Corp., 652 F.3d 355, 358 (3d Cir. 2011) (same); In re Wilson, 356 B.R. 114, 120 (Bankr. D. Del. 2006) (holding that where the statutory language is clear, "well-established canons of statutory construction preclude an examination of the legislative history"); In re Centura Software Corp., 281 B.R. at 670 ("Here, the clarity of § 365(n) makes it unnecessary and inappropriate to look into its legislative history. Because Congress has unambiguously

---

[5] Obviously, Judge Ambro's concurring opinion is not binding on this (or any other) Court. Notably, however, Judge Ambro addressed an issue -- whether section 365(n) applies to trademark agreements -- that was not even before the Court. In re Exide Technologies, 607 F.3d at 964 (holding that section 365(n) was inapplicable because the agreement at issue was not executory and could not be rejected).

5

indicated that trademark licenses are to be excluded from § 365(n), it does not allow the court to weigh the equities of this case.") (citations omitted).

10. Second, even if the legislative history were considered, the ultimate conclusion would be unchanged. The legislative history states:

> *[T]he bill does not address the rejection of executory trademark, trade name or service mark licenses by debtor-licensors. While such rejection is of concern because of the interpretation of section 365 by the Lubrizol court and others, see, e.g., In re Chipwich, Inc., 54 Bankr.Rep. 427 (Bankr. S.D.N.Y. 1985), such contracts raise issues beyond the scope of this legislation.* In particular, trademark, trade name and service mark licensing relationships depend to a large extent on control of the quality of the products or services sold by the licensee. Since these matters could not be addressed without more extensive study, it was determined to postpone congressional action in this area and to allow the development of equitable treatment of this situation by bankruptcy courts.

S.Rep. No. 100-505 at 5 (emphasis added).

11. This language reinforces the notion that Congress intentionally omitted trademarks from the scope of section 365(n), and that it did so because trademarks differ from other forms of intellectual property, which differences warrant further analysis and consideration, not the *ad hoc* application of section 365(n).

12. Third, regardless of the legislative history, it is axiomatic that courts may not rely upon equitable considerations to depart from the provisions of the Bankruptcy Code. Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."); see also 2 Collier on Bankruptcy ¶ 105.01[2], at 105–6 (16th ed. 2013) ("It is hornbook law that § 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code."). As the Seventh Circuit stated in Sunbeam Products, Inc. v. Chicago American Mfg., LLC:

> What the Bankruptcy Code provides, a judge cannot override by declaring that enforcement would be "inequitable." See, e.g., Toibb v. Radloff, 501 U.S. 157,

6

> 162 (1991); In re Kmart Corp., 359 F.3d 866, 871 (7th Cir. 2004); In re Sinclair, 870 F.2d 1340 (7th Cir. 1989). There are hundreds of bankruptcy judges, who have many different ideas about what is equitable in any given situation. Some may think that equity favors licensees' reliance interests; others may believe that equity favors the creditors, who can realize more of their claims if the debtor can terminate IP licenses. *Rights depend, however, on what the Code provides rather than on notions of equity.* Recently the Supreme Court emphasized that arguments based on views about the purposes behind the Code, and wise public policy, cannot be used to supersede the Code's provisions. It remarked: "The Bankruptcy Code standardizes an expansive (and sometimes unruly) area of law, and it is our obligation to interpret the Code clearly and predictably using well established principles of statutory construction." RadLAX Gateway Hotel, LLC v. Amalgamated Bank, ––– U.S. ––––, 132 S.Ct. 2065, 2073 (2012).

Sunbeam Products, Inc. v. Chicago American Mfg., LLC, 663 F.3d 372, 375-76 (2d Cir. 2012) (emphasis added).  As a result, the Sunbeam court rejected the lower court's determination that a licensee "which had invested substantial resources in making" licensed products could continue to use the licensed trademarks "on equitable grounds."  Id. at 375.  As discussed at length below, the Debtors take issue with the Sunbeam court's ultimate holding; however, on this point, it is correct – courts cannot choose to disregard the provisions of the Bankruptcy Code based on their own notions of equity.[6]

        13.     Here, section 365 of the Bankruptcy Code governs the rejection of executory contracts.  In particular, the effect of rejection is set forth in section 365(g), except in those limited circumstances where another provision of section 365 mandates a different result.  As set forth above, by its terms, section 365(n) does not apply to trademark licenses.  Thus, rejection of a trademark license is governed solely by section 365(g), and courts cannot depart from that result by engaging in an *ad hoc* "equitable analysis" to expand the scope of section

---

[6] It is further worth noting, however, that the Debtors have agreed that E. Gluck may exercise its rights under the License Agreement to sell existing Licensed Products during the Sell-Off Period.  This gives E. Gluck the same bargained-for rights it would have upon termination of the License Agreement prior to its stated term and, thus, mitigates any equitable concerns should the Court determine consideration of the equities is appropriate.

7

365(n). Under section 365(g), rejection deprives the licensee of the right to use the licensed material.

14. Accordingly, the Debtors respectfully submit that this Court should decline to adopt the reasoning of Crumbs Bake Shop and Judge Ambro's concurring opinion in Exide, neither of which is binding on this Court, and should instead follow the holding of HQ Global. The Court should not substitute its equitable ideas for the clear provisions of the Bankruptcy Code.

C. Absent the Protections of Section 365(n), Rejection of a Trademark License Terminates the Licensee's Ability to Use the Licensed Marks.

15. Section 365(g) states, in relevant part, that, except as provided in subsections (h) and (i) of section 365, "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease." 11 U.S.C. § 365(g). The use of the term "breach" in this provision is to provide that, upon rejection, the counterparty may assert a claim for monetary damages; it is not the exclusive expression of the consequences of rejection. Indeed, it is well established that, upon rejection, a debtor is relieved of its obligations under the rejected contract. See, e.g., 3 Collier on Bankruptcy ¶ 365.03[1] (15th ed. rev.) ("Rejection relieves the estate of the debtor's remaining obligations under the contract.") (citing Treister, et al., Fundamentals of Bankruptcy Law, § 5.04(f), at 249 (5th ed. 2004, Richard Levin ed.)); In re Univ. Med. Ctr., 973 F.2d 1065, 1075 (3d Cir. 1992) ("Rejection, on the other hand, both cuts off any right of the contracting creditor to require the estate to perform the remaining executory portions of the contract and limits the creditor's claim to breach of contract."). This is the fundamental purpose of rejection – to allow debtors to relieve themselves and their estates of onerous contract obligations going forward.

16. As the HQ Global court explained, if the debtors are relieved of their obligations under a trademark license, then the trademark licensee's right to use the trademarks is terminated. In re HQ Global Holdings, Inc., 290 B.R. 507 at 513. As the court reasoned, the "essence" of a license agreement is the "Debtors' affirmative grant to the [licensee] of the right to use the their proprietary marks." Id. Thus, upon rejection, "that affirmative obligation of the Debtors to allow the [licensor] to use the marks is excused." Id. The argument that rejection does not terminate or repudiate a contract (and, thus, does not prevent the licensee from continuing to use the licensed material) "misses the mark entirely." Id. That is the rule that this Court applied, albeit without objection on this issue, in In re Deel, 2011 WL 9012049, *8 (Bankr. D. Del. Feb. 8, 2011) (permanently enjoining the licensee under the rejected contract from use of the "Fuddruckers" trademark).

17. The Seventh Circuit erroneously reached a contrary conclusion in Sunbeam Products, holding that rejection under section 365(g) did not terminate the licensee's right to use the licensed marks. Sunbeam Products, Inc. v. Chicago American Mfg., LLC, 663 F.3d at 377. In so holding, the court relied upon section 365(g)'s use of the term "breach" as opposed to termination or rescission, such that "the other party's rights remain in place" notwithstanding rejection. Id. However, it does not follow that the other party's rights include the right to continue using the licensed marks. Once the debtors are freed of their obligations, they are no longer obligated to permit use of their trademarks. The right of the counterparty which is preserved, notwithstanding rejection, is the right to seek monetary damages for the debtors' failure to perform – i.e., their breach, under section 365(g).

18. If Congress wanted to depart from this result, it knew how to do so. For example, with respect to real property leases where the debtor is the lessor, Congress wanted to

9

prevent the harsh result that would follow from rejection of such lease under section 365(g) – namely, eviction of the tenant – and, thus, it enacted section 365(h), which allows tenants to elect to retain possession of the leased premises following rejection.  Similarly, Congress enacted section 365(i) to address the consequences of rejection of an executory contract for the sale of real property.  Finally, section 365(n) allows parties to certain types of intellectual property licenses to elect to retain their rights to the licensed intellectual property.  By adopting these provisions, Congress clearly demonstrated that it knows how to protect parties to certain executory contracts when it wants to do so.

19. Taken to its logical conclusion, if all licensees have the right to retain the licensed material upon rejection solely based upon section 365(g), then section 365(n) is superfluous because there would have been no reason for Congress to enact section 365(n) to protect intellectual property licensees.  This cannot be the case.  Congress expressly chose to protect certain types of executory contracts and unexpired leases, but did not extend any protection (beyond section 365(g)) to trademark licenses.  As the court held in Tempnology, supra:

> Under the maxim of *expressio unius est exclusio alterious* the expression of one thing is the exclusion of other things, see, e.g., United States v. Hernandez–Ferrer, 599 F.3d 63, 67–68 (1st Cir.2010) the omission of trademarks from the definition of intellectual property in § 101(35A) indicates that Congress did not intend for them to be treated the same as the six identified categories. Therefore, [the licensee] does not retain rights to the Debtor's trademarks and logos post-rejection.

In re Tempnology, LLC, 541 B.R. at 8.  The legislative history indicating that Congress postponed consideration of whether trademarks should be protected by section 365(n), which Judges Umbro and Easterbrook in Exide and Sunbeam each cite as supporting their view that such protection should not be precluded at this time, has exactly the opposite significance.  It

10

actually <u>confirms</u> that Congress acted intentionally when it declined to extend section 365(n) protection to trademarks, and thus reinforces Tempnology's holding[7]

20. Accordingly, the Debtors submit that the <u>Sunbeam</u> court erred in holding that a trademark licensee may maintain their right to use the licensed trademarks under section 365(g). Instead, consistent with the majority rule, as stated in <u>HQ Global</u>, upon rejection, the Debtors' obligation to provide the Licensed Material ends and, in exchange for such breach, E. Gluck is entitled to assert a claim for monetary damages.

## II. Rejection of the License Agreement is Within the Sound Business Judgment of the Debtors

21. E. Gluck also questions the Debtors' business judgment in rejecting the License Agreement. Objection at ¶¶ 20-21. Under the business judgment test, the "sole issue is whether the rejection benefits the estate," a determination that "can only be overturned if the decision was the product of bad faith, whim or caprice." <u>In re HQ Global Holdings</u>, 209 B.R. at 511.

22. E. Gluck offers no argument (let alone factual allegation) that the Debtors' decision to reject the License Agreement was the result of "bad faith, whim or caprice." Instead, E. Gluck seeks to substitute its judgment for the Debtors, while ignoring the business judgment rationale set forth in the Motion. Motion at ¶¶ 18-19, 25.[8] In particular, the Debtors believe that reverting to the Company's typical vendor supply model will allow the Debtors to maintain

---

[7] Likewise, E. Gluck suggests that Congress is considering a bill which would change this. If this bill passes, then Congress will have spoken. Until that time, however (which may or may not come, as apparently the bill has already stalled once), there is no provision to alter the treatment of trademark licenses upon rejection in the Bankruptcy Code and there is no basis for resorting to legislative history or vague equitable analyses to create one.

[8] While E. Gluck repeatedly notes the lack of a declaration, there is no requirement in this District that the Debtors provide such a declaration. The Debtors will present evidence at the hearing to support their determination, in the sound exercise of their business judgment, to reject the License Agreement.

11

greater control over the design and quality of its branded watches and to limit distribution to retailers they believe are more appropriate to the Company's image, exiting arrangements with certain customers currently covered by the License Agreement, thereby preserving the integrity of the *Quiksilver*, *Roxy*, and *DC* brands.

23.  In addition, the Company has found that its licensing arrangements have resulted in multiple sales representatives (i.e., from both the Company and the licensee) contacting the Company's wholesale customers, resulting in confusion and inconsistent messaging. The Debtors believe that establishing a single point of contact for wholesale accounts is important to their go-forward strategy.

24.  Moreover, the Debtors believe that rejection will yield economic benefits to the estate because they believe they are better positioned than E. Gluck to maximize profits from the sale of their branded watches.

25.  Further, rejection of the License Agreement is part of a comprehensive strategy of exiting similar licensing arrangements to bring production and sale of Company-branded goods in house, which the Debtors believe will substantially benefit the Company. This benefit is already incorporated into the Company's business plan. The Debtors are prepared to present testimony in support of the foregoing at the hearing on the Motion.

26.  Finally, contrary to E. Gluck's unfounded assertions that the Debtors cannot provide any evidence that they can profitably enter the watch business, Objection at n. 7, the Debtors will present testimony at the hearing that they produced and sold a variety of Company-branded watches for more than 15 years prior to entry into the License Agreement and are preparing to recommence production and distribution of watches upon approval of rejection of the License Agreement. The Debtors expect to begin production of watches shortly after

rejection, with shipments expected in 2016, and sales expected in the spring of 2017, if not sooner.

27. The above considerations clearly demonstrate that rejection of the License Agreement is within their sound business judgment, which judgment is entitled to the Court's deference.  See, e.g., In re Armstrong World Indus., Inc., 348 B.R. 136, 162 (D. Del. 2006) ("Courts have uniformly deferred to the business judgment of the debtor to determine whether the rejection of an executory contract or unexpired lease by the debtor is appropriate under section 365(a) of the Bankruptcy Code."); In re Fed. Mogul Glob., Inc., 293 B.R. 124, 126 (D. Del. 2003) ("The business judgment test dictates that a court should approve a debtor's decision to reject a contract unless that decision is the product of bad faith or a gross abuse of discretion."); In re HQ Global Holdings, Inc., 290 B.R. at 511 (stating that debtor's decision to reject is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice); In re III Enterprises, Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) aff'd sub nom. Pueblo Chem., Inc. v. III Enterprises Inc. V, 169 B.R. 551 (E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet.").

**RESERVATION OF RIGHTS**

28. Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim of E. Gluck against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim of E. Gluck on any grounds; or (c) a promise to pay any claim to E. Gluck.

13

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court overrule the Objection and enter an order granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: January 15, 2016

                                         PACHULSKI STANG ZIEHL & JONES LLP

                                         */s/ Laura Davis Jones*
                                         Laura Davis Jones (DE Bar No. 2436)
                                         James E. O'Neill (DE Bar No. 4042)
                                         Jeffrey N. Pomerantz (CA Bar No. 143717)
                                         John A. Morris (NY Bar No. 4662)
                                         919 North Market Street, 17th Floor
                                         Wilmington, DE  19801
                                         Telephone:  (302) 652-4100
                                         Facsimile:   (302) 652-4400
                                         Email: ljones@pszjlaw.com
                                                      joneill@pszjlaw.com
                                                      jpomerantz@pszjlaw.com
                                                      jmorris@pszjlaw.com

                                         *Co-Counsel for the Debtors and Debtors in Possession*