## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| QUIKSILVER, INC., *et al.*,[1] | Case No. 15-11880 (BLS) |
| Debtors. | (Jointly Administered) |

## REPLY IN SUPPORT OF MOTION OF OAKTREE CAPITAL MANAGEMENT FOR ENTRY OF AN ORDER (I) DETERMINING THE DIMINUTION IN VALUE OF THE SECURED NOTES PARTIES' COLLATERAL, AND (II) GRANTING RELATED RELIEF

Certain funds managed by affiliates of Oaktree Capital Management, L.P. (collectively, "Oaktree") file this reply (this "Reply") in support of the *Motion of Oaktree Capital Management for Entry of an Order (I) Determining the Diminution in Value of the Secured Notes Parties' Collateral, and (II) Granting Related Relief* [Docket No. 600] (the "Motion")[2] and in response to the objection thereto submitted by the Committee (the "Objection").[3] In further response to the Objection and support of the Motion, Oaktree submits the supplemental expert report of David R. Hilty from Houlihan Lokey Capital, Inc. ("Houlihan"), attached hereto as **Exhibit A** (the "Houlihan Supplemental Report," and, together with the Houlihan Report, the "Houlihan Reports"), and respectfully states as follows.

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), QS Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

[3]  *See Objection of the Official Committee of Unsecured Creditors to Motion of Oaktree Capital Management for Entry of an Order (I) Determining the Diminution in Value of the Secured Notes Parties' Collateral, and Granting Related Relief* [Docket No. 664].  No other party in interest has objected to the Motion.

**Preliminary Statement**

1.      The Committee would have this Court believe that the Plan does not accord sufficient value to unsecured creditors.  To reach this conclusion, the Committee will need to convince this Court to ignore the Debtors' robust marketing process, which the Committee advocated as the best way to test the value allocation proposed in the Plan, which the Committee helped the Debtors design, and which yielded no indications of third party interest in purchasing the Debtors let alone any competing bids.  The Committee will also ask this Court to ignore the fact that when given the opportunity to put their money where their mouth is and invest at a 20% discount to the Debtors' valuation (let alone the Committee's much higher valuation), more than 95% of the Unsecured Noteholders declined to do so.  The Committee will also ask the Court to ignore the well-reasoned PJSC Report, and ask the Court to adopt a number of self-serving upward adjustments to the Debtors' valuation contained in the PJT Report, even though there is no market data to support a higher valuation, and even though PJT's adjustments run contrary to sound and accepted valuation theory.  And finally, in trying to convince the Court that the Plan is fundamentally unfair to Non-Priority Unsecured Creditors, the Committee will ask the Court to ignore the fact that General Unsecured Creditors voted overwhelmingly to accept the Plan.

2.      To defeat the Plan, the Committee not only needs to win an implausible victory on total enterprise valuation, they also need to convince the Court that administrative and priority claims should be charged to the Secured Notes Parties' collateral, notwithstanding the existence of the absolute priority rule, controlling case law to the contrary, and the existence of clear waivers in the Final DIP Order that prohibit exactly the type of surcharging that the Committee proposes.  Further, the Committee has to convince this Court that, notwithstanding the existence of $115 million in priming DIP financing, and notwithstanding the fact that even the Committee believes the Secured Notes Parties are impaired by more than $130 million, the Secured Notes

Parties have suffered no diminution in value of their interests in the collateral, and are in fact better off today than before these cases were filed. To reach its implausible conclusion that the Secured Notes Parties have suffered no diminution in value, the Committee will also presumably ask this Court to ignore the fact that the Secured Notes traded in the mid 80s immediately prior to the Petition Date, and that the last reported trade was in the 20s.

   3.  The Committee's path to victory is a Rube Goldberg maze of complexity and absurdity, and requires, at several turns, that the Court ignore the Bankruptcy Code, Supreme Court and Third Circuit precedent, and final orders entered in these chapter 11 cases. The path to confirming the Plan, however, is simple. The Debtors and Oaktree negotiated a straightforward restructuring transaction that substantially delevers the Debtors' balance sheet, converts Secured Notes Claims into a minority equity position in the reorganized company, and awards most of the equity of the Reorganized Debtors to those who are willing to pay for it through a rights offering process that was open to Secured Noteholders and Unsecured Noteholders. The Plan was subject to an independent market check that resulted in no competing bids. And all along the way, there have been substantial benefits accorded to unsecured creditors. Many prepetition unsecured claims were paid through "first day" relief. Administrative and priority claims are being paid in full under the Plan. Many contracts and leases will be assumed. Many employees will keep their jobs. And on top of all of that, Oaktree is providing a $12.5 million pot of cash for the benefit of the remaining Non-Priority Unsecured Creditors whose claims have not already otherwise been paid in these cases. General Unsecured Creditors voted overwhelmingly to accept the Plan. Where that leaves us is with a group of Unsecured Noteholders willing to play chicken with the Debtors' reorganization in an

attempt to extract a few extra points of return on their investment, with no credible legal, market, or valuation theory arguments to support them.

4.        Given the two paths before the Court, Oaktree respectfully submits that the Court should follow the clear legal authority that supports the Plan, should follow the wishes of the General Unsecured Creditors who voted overwhelmingly to accept the Plan, should be guided by the clear and compelling market evidence validating the Plan, should take note of the many benefits given to unsecured creditors in these chapter 11 cases generally and under the Plan specifically, and should take notice of the fact that the Secured Notes Parties were primed by the DIP financing and are massively impaired even under the Committee's valuation. The parties all negotiated and agreed on the timing and process for the market test and on the timing of the confirmation hearing. The Debtors are headed into the spring season when they need to ramp up spending and build inventory. If confirmation of the Plan is denied, the Debtors would have an immediate need for additional DIP financing, and the Secured Notes Parties would not agree to waive their substantial deficiency claims or their Diminution in Value Claim in the context of an alternative plan. The Debtors have canvassed the market and there is simply no better alternative available than the Plan. There is real harm to the Debtors and to the General Unsecured Creditors who voted to accept the Plan if the Plan is not confirmed now. There is no reason to believe that deferring or denying confirmation of the Plan will yield any more value for unsecured creditors, and there is every reason to believe that would result in less value. Therefore, Oaktree respectfully requests that the Court confirm the Plan.

## Reply

I.    **The Committee's Argument that Unencumbered Assets Be Set Aside for Unsecured Creditors Fails As a Matter of Law and Ignores the Final DIP Order.**

5.    Underlying the Committee's objection is an incorrect premise that the Court previously decreed that the unencumbered asset value be set aside for the benefit of unsecured creditors, and that the Secured Noteholders should be barred from asserting diminution in value claims related to the imposition of the priming DIP financing. *See* Objection at ¶ 54. At the outset of these chapter 11 cases, the Debtors had material unencumbered assets. The Secured Noteholders consented to the priming DIP financing, which was secured only by priming liens on the Secured Noteholders' collateral, on the express condition that the Secured Noteholders be granted liens in the unencumbered assets to protect them from any diminution in value occasioned by the DIP Financing and the imposition of priming liens, and this Court granted adequate protection liens for exactly that purpose. *See* Final DIP Order ¶ 12(a).

6.    At the hearing on the motion to approve the Final DIP Order, the Court stated that "on the record thus developed," it would not grant liens at that time on the Unencumbered Foreign Equity as part of the collateral package of the DIP Lenders given that "nobody [knew] what that stock is worth and [the Court was] not satisfied that it's been demonstrated to the Court that it is necessary." *Transcript of Continued Hearing* at 143, *In re Quiksilver, Inc.*, No. 15-11880 (Bankr. D. Del. Oct. 15, 2015). The Court did, however, state that it was "appropriate to include [the Unencumbered Foreign Equity] as part of the adequate protection package and collateral package, solely to the extent of the diminution [of] the value of the lender's collateral, as provided under Section 507(b)." *Id.* The Court further noted that "to the extent [the Unencumbered Foreign Equity] are unencumbered assets that would be available to provide a

measure of protection, either, frankly, to the DIP lender or, secondarily, to the second lien lender, [sic] [the Secured Notes Parties], that would seem, to me, to be appropriate." *Id.* at 147.

7.    It is wholly appropriate that the unencumbered asset value be available to protect the interest of the Secured Noteholders because this is what the Bankruptcy Code requires. Section 364 of the Bankruptcy Code establishes a sequence of steps that debtors must go through when looking to finance chapter 11 cases, in escalating order of significance and difficulty. Section 364(a) provides that, even without a hearing, a debtor may finance itself through the incurrence of unsecured credit in the ordinary course of business allowable as an administrative expense.    Section 364(b) permits a debtor, after notice and a hearing, to incur unsecured credit outside the ordinary course of business allowable as an administrative expense.    Section 364(c)(1) permits a debtor, after notice and a hearing, to incur debt with priority over all other administrative expenses.    Section 364(c)(2) permits a debtor, after notice and a hearing, to incur debt secured by a lien on property that is not otherwise subject to a lien.    Section 364(c)(3) permits a debtor, after notice and a hearing, to incur debt that is secured by a junior lien on property of the estate that is subject to a lien.    If and only if all of those avenues are exhausted, Section 364(d) permits a debtor, after notice and a hearing, to incur debt secured by an equal or priming lien on property that is already subject to a lien, but *only if* (a) the debtor is unable to secure financing otherwise, *and* (b) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

8.    Under section 361 of the Bankruptcy Code, adequate protection may be provided by, among other things, "providing to such entity an additional or replacement lien to the extent that such stay, use, lease, or grant [of a lien under section 364 of this title] results in a decrease in the value of such entity's interest in such property…" As discussed in greater detail below, both

the Debtors and the Committee agree that the Secured Notes Parties are substantially impaired in these chapter 11 cases. By directing repayment of the DIP Facility solely and entirely out of the Secured Noteholders' collateral, and not first from unencumbered assets, the Secured Noteholders' interest in their collateral has unquestionably been diminished (as further discussed in Section IV hereof).

9.    Even if the Secured Notes Parties received the benefit of 100% of the value of the Debtors' unencumbered assets on account of their Diminution in Value Claim (an outcome that is not the case here given that the Plan provides for the payment of substantial administrative and priority claims and allocates $12.5 million of value to the Non-Priority Unsecured Creditors), unsecured creditors have already received substantial benefits from these chapter 11 cases, and there can be no argument that these cases have been run for the sole or even primary benefit of secured creditors. For example:

- The Plan provides for payment of all administrative and priority claims in full and in cash, which cash is being raised under the Rights Offerings where Oaktree will contribute the vast majority of the funding.

- Tens of millions of dollars of unsecured claims have been paid in full and in cash under various "first day" orders.

- The Plan implements a reorganization of a retailer (a rare thing, lately), which means that many trade vendors will have their contracts assumed (or at the very least will keep an ongoing customer), many landlords will keep the company as a tenant, many employees will maintain their jobs, and taxing authorities will continue to be paid.

- Non-Priority Unsecured Creditors will receive $12.5 million in cash, and many (e.g., the Unsecured Noteholders) had the opportunity to participate in the Rights Offerings.

- General Unsecured Creditors voted overwhelmingly to accept the Plan, and many Unsecured Noteholders voted to accept the Plan as well.

- Secured Noteholders will be deemed to have waived each of their deficiency claim (approximately $234.0 million) and diminution in value claim (approximately $68.5 million).

7

The Plan is thus a value-maximizing transaction, one that affords unsecured creditors significant benefits and substantially higher recoveries than any plausible alternative.

## II.    The Committee Failed to Demonstrate that the Debtors' Valuation Is Too Low.

10.    The PJT Report fails to credibly demonstrate that PJSC's valuation is too low. The PJT Report is not a stand-alone valuation, and is comprised of nothing more than a series of results-oriented upward adjustments to PJSC's valuation. The PJT Report's critiques of the PJSC Report are not predicated on valid or appropriate valuation methodology, which is underscored by the fact that the PJT's valuation conclusions are flatly contradicted by independent market indications of value in these chapter 11 cases.

11.    First, the sale process that the Debtors ran, in conjunction with the Committee, shows that PJSC's valuation is, if anything, too high. *See* Houlihan Supplemental Report at 11-13 The Debtors conducted a marketing process pursuant to a bid letter (the "Bid Letter") reviewed and signed off on by the Committee, which the Debtors sent to a list of certain parties reviewed and approved by the Committee, and the Committee was given the right to contact such prospective investors directly. Despite these marketing efforts, the Debtors did not receive any indications of interest let alone bids during this marketing process.

12.    The results of the Debtors' robust marketing process demonstrate definitively that the Plan is fair and that the market does not ascribe a higher value—including the one advocated by the Committee—to the Debtors' business. Even though the Committee continuously maintained throughout these chapter 11 cases that the marketing process was critical to revealing the true value of the Secured Notes Collateral, the Committee ignores the results of the vigorous marketing process employed by the Debtors, which they reviewed, approved, and maintained a role in. Instead, the Committee cites the "overbid" provision contained in the Bid Letter, which lists the claims that are subject to the Plan, as something that prevented the Debtors from

receiving other bids.  The Committee's advisors approved the Bid Letter, so it is disingenuous for the Committee to now claim that the Bid Letter somehow chilled bidding.  But regardless, testimony at trial will show that the Debtors sought any and all bids for their assets.

13.  Second, evidence presented to this Court will show that the Unsecured Noteholders (including a majority of the Committee members), when given an opportunity to put their money where their mouth is, not only do not believe in the PJT valuation, they will not even invest at a substantial discount to the PJSC valuation.  More specifically, the Rights Offerings conducted by the Debtors in connection with the Plan allowed such noteholders to purchase equity in the Reorganized Debtors *at a 20% - 25% discount to the Debtors' valuation contained in the PJSC Report*, which itself is obviously much lower than the valuation contained in the PJT Report.  Despite the ability to purchase equity at a discount to even the PJSC valuation, Oaktree understands that more than 95% of the rights made available to the Unsecured Noteholders were unsubscribed, and none of the Committee members elected to participate in the Rights Offerings.  It defies explanation that parties who believe in PJT's valuation would not participate in the Rights Offerings and purchase equity at an implied 52.5% discount to PJT's analysis, which would allow such participant the ability to invest the dollar amount of its pro rata participation rights and receive stock worth more than double that amount.

14.  Third, as set forth in the PJSC Rebuttal Report and the Houlihan Supplemental Report, the PJT Report lacks credibility for the following reasons.





III.    **Administrative and Priority Claims—Projected to Be At Least $46.3 Million in These Chapter 11 Cases—Must Be Charged Entirely Against Unencumbered Asset Value under Controlling Third Circuit Law and the Final DIP Order.**

15.    It is black-letter law that administrative and priority claims may not be charged to or against a secured creditor's collateral, and that such claims are instead chargeable only against the unencumbered assets of a debtor's estate. The Third Circuit—along with numerous other courts, including the Supreme Court—has articulated, and reaffirmed, this statement of law on multiple occasions:

- "The general rule is that post-petition administrative expenses and the general costs of reorganization ordinarily may not be charged to or against secured collateral. Rather, such expenses are normally chargeable only against the unburdened assets of the estate, 11 U.S.C. § 503, thus preserving for secured creditors the collateral securing the debtor's obligations." *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 324 (3d Cir. 1995).

10

- "[Debtor's law firm] seeks to collect fees and expenses out of the proceeds of the sale of the [secured lender's collateral].  In general, such fees and expenses are not chargeable against secured collateral.  Instead, they ordinarily may be charged only against the surplus of the debtor's estate." *In re Towne, Inc.*, 536 F. App'x 265, 268 (3d Cir. 2013) (citing *Visual Indus.*, 57 F.3d at 324).

- "Administrative expenses … do not have priority over secured claims, and because [lender] held a security interest in essentially all of the estate's assets, there were no unencumbered funds available to pay even administrative claimants." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5 (2000) (citing 11 U.S.C. §§ 506, 725-26, 1129(b)(2)(A); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 378–79 (1988)).

- "Payment of administration expenses traditionally has been the responsibility of the debtor's estate, not its secured creditors." *Gen. Elec. Credit Corp. v. Levin & Weintraub, Esqs. (In re Flagstaff Foodservice Corp.)*, 739 F.2d 73, 76 (2d Cir. 1984).

- "The general rule in bankruptcy is that administrative expenses cannot be satisfied out of collateral property 'but must be borne out of the unencumbered assets of the estate.'"  *Sw. Sec., FSB v. Segner (In re Domistyle, Inc.)*, No. 14-41463, -- F.3d --, 2015 WL 9487732, at *2 (5th Cir. Dec. 29, 2015) (citation omitted).

- "Traditionally administrative expenses have not been charged against secured creditors.  The reason for that rule is that a trustee in bankruptcy acts 'not on the authority of [secured creditors] and for their interest, but on the authority of the court and for the interest of the general creditors.'"  *In re Trim-X, Inc.*, 695 F.2d 296, 301 (7th Cir. 1982) (internal citations and quotations omitted).

- "Expenses which accumulate post-petition in furtherance of administration of a bankruptcy estate are generally charged against the estate and are not charged against a creditor's secured collateral."  *In re Lamont Gear Co.*, No. 95-17033, 1997 WL 397582, at *6 (Bankr. E.D. Pa. July 9, 1997).

- "Generally, administrative expenses in bankruptcy cases are charged to the estate and not to the assets or equity belonging to secured creditors." *In re Hughes*, No. 05-30490, 2006 WL 1308677, at *2 (Bankr. S.D. Fla. Mar. 31, 2006).

16.    The oft-cited exception to this general rule is section 506(c) of the Bankruptcy Code.  As set forth in the Motion, however, this exception (along with any other exception that could be asserted under sections 105 or 552(b) of the Bankruptcy Code) has been expressly

11

waived under the Final DIP Order.  *See* Final DIP Order ¶¶ 39-40.  The Committee recognizes

this in its Objection, saying:  "As a threshold matter, the Committee has not asked and will not

ask this Court to surcharge the collateral of any secured creditor in order to obtain an increased

recovery for Non-Priority Unsecured Creditors or for any other purpose."  Objection ¶ 4

(emphasis added).  The Committee's position in this respect is not surprising because, among

other reasons, the Bankruptcy Code's relative priority scheme is self-evident—e.g., pursuant to

the absolute priority rule, secured claims must be paid in full before unsecured claimants,

including administrative and priority creditors, are entitled to any recovery[4]—and the Final DIP

Order contains an unqualified section 506(c) waiver for the benefit of the Secured Notes Parties.

17.    What is surprising is that, notwithstanding controlling legal authority and the

plain terms of the Final DIP Order, the Committee nonetheless contends that "applicable law"

requires that administrative expenses incurred in these chapter 11 cases ought to be "ratably

charged" against the Debtors' estates as a whole, including the Secured Notes Collateral.

*See* Objection ¶¶ 5, 55.  The Committee cites to two section 506(c) cases,[5] namely a Ninth

Circuit case—*Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp., Inc. (In re Debbie*

*Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061 (9th Cir. 2001)—and a Bankruptcy Appellate

Panel Tenth Circuit case—*InteliQuest Media Corp. v. Miller (In re InteliQuest Media Corp.)*,

326 B.R. 825 (B.A.P. 10th Cir. 2005)—as the "applicable law" in support of this proposition.

*See* Objection ¶ 55.  Neither *Debbie Reynolds* nor *InteliQuest* reconstitute the Bankruptcy Code's

---

[4]    *See, e.g.*, 11 U.S.C. § 1129(b)(2)(A); *Hartford Underwriters*, 530 U.S. at 5.

[5]    In the Objection, the Committee emphatically states that "*section 506(c) is not implicated*" (emphasis in original) in this dispute yet, in the next paragraph, cites two section 506(c) cases for the proposition that the Secured Notes Collateral can be charged "*ratably*" (emphasis in original) for the costs of administering these chapter 11 cases.  *Compare* Objection ¶ 4, *with* ¶ 5.  By the Committee's own arguments, section 506(c) of the Bankruptcy Code is implicated in this dispute.

relative priority scheme, however, and these cases do not even resemble cognizable authority for the Committee's "ratably charged" theory.

- ***Debbie Reynolds***. The chapter 11 debtor and oversecured creditor stipulated to a $50,000 section 506(c) surcharge to pay certain fees of debtor's counsel under a settlement agreement. The DIP lender objected to the settlement agreement, claiming that its superpriority claim gave it superior right to surcharge the $50,000 settlement proceeds. The Ninth Circuit considered whether (i) the DIP lender had standing to surcharge the settlement proceeds under section 506(c) of the Bankruptcy Code, and (ii) such 506(c) settlement proceeds could be distributed directly to the debtor's counsel. The Ninth Circuit held (i) no, the DIP lender did not have standing under *Hartford Underwriters*, and (ii) yes, the proceeds could be distributed directly to debtor's counsel.

  *Debbie Reynolds* is a Ninth Circuit, oversecured lender, consensual section 506(c) surcharge case that did not analyze whether the lender's collateral had to be charged ratably with the debtor's unencumbered assets outside of the section 506(c) context. Indeed, at no point in the opinion does the *Debbie Reynolds* court examine the proper allocation of unencumbered asset value with respect to non-section 506(c) administrative claims, except to cite approvingly to *Hartford Underwriters* for the proposition that "*[u]nsecured creditors ... may not seek payment for monies expended on behalf of the estate from the collateral of a secured creditor.*" *Debbie Reynolds*, 255 F.3d at 1066 (emphasis added). Moreover, here, Third Circuit decisional law controls, the Secured Notes Parties are substantially undersecured, and there is no section 506(c) surcharge even on the table (consensual or otherwise). Finally, the distribution to the debtor's counsel ultimately approved by the *Debbie Reynolds* court was the opposite of ratable—the court permitted the surcharge payment to pass directly from the lender's collateral without regard to the Bankruptcy Code's generally applicable priority schedule. Any negative inference that such a finding would somehow support the Committee's "ratably charged" theory is not only a logical fallacy, but is also belied by the substantial weight of controlling authority cited above, including the *Debbie Reynolds* court's citation to *Hartford Underwriters*. To be sure, *Debbie Reynolds* **has never** been cited in a reported opinion for this "ratably charged" proposition.

- ***InteliQuest***. The chapter 11 debtors agreed to a section 506(c) waiver under a final DIP order. Following the appointment of a chapter 11 trustee (displacing the debtors in possession), secured lender and trustee stipulated to a series of section 506(c) surcharges with respect to the trustee's expenses. The chapter 11 cases later converted to chapter 7 cases. Debtors' counsel objected to one such stipulated section 506(c) surcharge, claiming that such surcharge was impermissible so long as the postpetition fees for debtors' counsel remained unpaid. Debtors' counsel argued that such fees were also

surchargeable under section 506(c) of the Bankruptcy Code, and separately filed a motion seeking such surcharge. The Tenth Circuit B.A.P. considered whether the section 506(c) waiver contained in the final DIP order was enforceable against debtors' counsel (apparently a matter of first impression within the Tenth Circuit), and ultimately found that it was under principles of *res judicata*.

*InteliQuest* is a Tenth Circuit B.A.P., section 506(c) waiver, *res judicata* case. Much like *Debbie Reynolds*, at no point was the *InteliQuest* court asked to consider (or did it in fact consider *sua sponte*) the proper allocation of administrative expense claims outside of a section 506(c) context. Although the court, in dicta, observed that a section 506(c) surcharge can be distinguished from administrative expenses inasmuch as the former constitutes an assessment against a secured party's collateral as reimbursement for a particular benefit to such secured creditor and the latter is an assessment against the estate as a whole because all of the creditors are benefitted, at no point does the *InteliQuest* court opine on the **appropriate source(s)** of value, whether those sources are **encumbered or unencumbered**, or any related **allocation** thereof to satisfy such an assessment against the estate. Even if *InteliQuest* says administrative claims are chargeable against a debtor's estate, it says nothing about **how** those claims are charged. *InteliQuest* cannot be read to radically redesign the Bankruptcy Code's relative priorities through negative inferences as the Committee implies, and it certainly does not trump the overwhelming line of cases finding that administrative expenses and the general costs of reorganization are not chargeable against a secured lender's collateral. Like *Debbie Reynolds*, *InteliQuest* **has never** been cited in a reported opinion for this "ratably charged" proposition.

18.    The Committee also contends that payments made from the proceeds of the DIP Facilities cannot be charged against unencumbered value. *See* Objection ¶¶ 52-54. As a factual matter, the Committee misses the mark entirely. None of the administrative and priority claims to be paid at exit—currently projected to be at least $46.3 million—would be paid with proceeds of the DIP Facilities. *See* Houlihan Report at 56, 73. Nor is any portion of these administrative and priority claims reflected in the Budget. *See id.* The Committee's illustrations notwithstanding, there are no corresponding DIP Claims as a result.

19.    For all of these reasons, the full amount of the Debtors' administrative and priority claims to be paid at exit—currently projected to be $46.3 million—must be charged

against the value of the Debtors' unencumbered assets, including the Unencumbered Foreign Equity.

**IV.    The Secured Notes Parties' Interest in the Secured Notes Collateral Has Been Diminished by $68.5 Million As a Result of the Priming DIP Financing.**

20.    Consistent with the Court's ruling and the terms of the Final DIP Order, Oaktree filed the Motion seeking recognition of its diminution in value claim now that the Court has appropriate information regarding the value of the Unencumbered Foreign Equity and the Court has a better understanding of the impact of these chapter 11 cases on the Secured Notes Parties' interest in the Secured Notes Collateral.[6]  Given applicable case law and the express terms of the Final DIP Order, now that the Court has the necessary record before it, the Court can and should recognize that the imposition of priming liens under the Final DIP Order diminished the value of the Secured Notes Parties' interest in the Secured Notes Collateral by $68.5 million and that adequate protection liens in the Unencumbered Foreign Equity and superpriority claims in such an amount would be appropriate but for Oaktree's willingness to waive such liens and claims in connection with consummation of the Plan.

---

[6]    The Committee suggests that the Motion is not ripe for decision by the Court because Oaktree has agreed to waive any such diminution claim in the context of the Plan. *See* Objection ¶ 25, n.12. The Final DIP Order contemplated that the Court would determine the extent of the Secured Notes Parties' diminution in value *following notice and a hearing. See* Final DIP Order ¶ 12(a)(ii) (emphasis added). Moreover, diminution in value is a gating issue that needs to be resolved for purposes of determining the proper allocation of Unencumbered Foreign Equity value, confirmation of the Plan, and consideration of any alternative plan transaction. The Motion is explicit in this respect. Additionally, Oaktree only agreed to file the Motion after the Committee demanded it do so. *See, e.g., Transcript of Hearing* at 15, 17, *In re Quiksilver, Inc.*, No. 15-11880 (Bankr. D. Del. Dec. 1, 2015) (Committee counsel stating that "I believe it is, but more surprising that [the Debtors] would reach [the diminution] conclusion before the secured parties have filed a diminution motion, before they've claimed any diminution exists," and "ultimately, it will be the prepetition secured parties who we anticipate will file the appropriate [diminution] motion"); *Transcript of Hearing* at 9-10, *In re Quiksilver, Inc.*, No. 15-11880 (Bankr. D. Del. Oct. 14, 2015) (Committee counsel stating that they agreed to the Secured Noteholders receiving a lien on foreign equity "to the extent they can find -- they can establish diminution in value," and in response to the Court asking whether such lien is akin to a section 507(b) claim, stating "[e]ffectively, yes. To the extent that, at the end of the case, they can prove that they're entitled to a diminution in value claim"). In short, these issues are both ripe and appropriate for the Court to consider in connection with confirmation of the Plan.

21.    While total enterprise value and the value of the Unencumbered Foreign Equity may have been unproven at the outset of these chapter 11 cases, and it was not fully evident then that the Secured Notes Parties needed liens in the Unencumbered Foreign Equity to protect them from the diminution in their interest in their collateral, the facts are now in and the need for such liens to protect the Secured Notes Parties is abundantly clear.  The Debtors and the Committee both agree the Secured Notes Parties are massively impaired, the only question is the extent of the impairment.  Using the Debtors' valuation, Oaktree estimates the Secured Notes Parties are impaired by approximately $234 million.  The Committee estimates the Secured Notes Parties are impaired by approximately $134 million.  *See* Objection ¶ 62.  The Debtors and the Committee both value the Unencumbered Foreign Equity to be less than the amount by which the Secured Notes Parties are impaired (the Debtors value the Unencumbered Foreign Equity at $39 million, and the Committee values it at $91 million).  *See* Disclosure Statement Art. VII.D; Objection ¶ 64.

22.    This means that by allocating the cost of running these chapter 11 cases, which were funded by the priming DIP Facilities, solely to the Secured Notes Parties' collateral and not first to the Unencumbered Foreign Equity, the Secured Notes Parties have suffered harm and diminution to the full extent of the value of the Unencumbered Foreign Equity.[7]  There can be no other conclusion.  Had the Debtors first exhausted the value of the Unencumbered Foreign Equity, as is required by section 364 of the Bankruptcy Code, the Secured Notes Parties' interest in their collateral would have suffered less diminution, measured dollar-for-dollar by the value of the Unencumbered Foreign Equity.  If the Secured Notes Parties were substantially oversecured, maybe they would not have suffered diminution (or would have suffered less diminution) on

---

[7]    While Oaktree believes that the value of the Unencumbered Foreign Equity is only $39 million, Oaktree has agreed to cap its Diminution in Value Claim at $68.5 million for the reasons set forth in the Houlihan Report.

account of allocating 100% of the cost of running these cases to their collateral, but in reality, the Secured Notes Parties are by all parties' admission, massively impaired, and their interest in their collateral was diminished dollar-for-dollar by costs that could have instead been allocated to unencumbered asset value.

23.     Another way to look at diminution in value is to consider the fact that the Secured Notes Parties are acknowledged to be impaired by at least $134 million, and to recognize that this amount exceeds the entire amount of the $115 million priming DIP Facility.  As discussed below, there is case law to support the argument that the Secured Notes Parties suffered dollar-for-dollar diminution by the full amount of the DIP Facilities.  However, as discussed below and in the Houlihan Reports, Oaktree concedes that a portion of the priming DIP Facilities resulted in an offsetting increase in collateral value, notably including amounts that went to pay down the ABL Facility (the Secured Notes Parties have a second lien on the priority collateral securing the ABL Facility) and amounts spent for capital expenditures.  Additionally, to avoid an objection by the Committee to the Debtors' KERP and KEIP programs, and to keep key employees focused on the restructuring and not distracted by a public fight over their compensation, Oaktree agreed that the KEIP and KERP payments would not constitute diminution in value.  Therefore, and as set forth in more detail in the Houlihan Reports, Oaktree does not assert a Diminution in Value Claim in the full amount of the DIP Facilities, but only in the amount of $68.5 million.

### A.     The Final DIP Order, the Bankruptcy Code, and Applicable Case Law Support the Diminution in Value Claims Asserted in the Motion.

24.     Oaktree has met its burden under the Final DIP Order and sections 361, 364, and 507(b) of the Bankruptcy Code to establish that a diminution in value of $68.5 million warrants the granting of adequate protection liens on the Unencumbered Foreign Equity and superpriority claims under section 507(b).  The relevant test under the Final DIP Order and under sections 361

and 364 of the Bankruptcy Code is whether there has been a decline in the value of the *interest* of the Secured Notes Parties in the Secured Notes Collateral. *See* 11 U.S.C. § 364(d)(1)(B) (requiring adequate protection of "the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted"); 11 U.S.C. § 361(2) (providing an example of adequate protection as an additional lien "to the extent that such grant [of a lien under section 364 of this title] results in a decrease in the value of such entity's interest in such property"). The Third Circuit has held that granting superpriority to a postpetition loan harms the existing secured creditor and requires that the existing secured creditor be compensated for that loss of value. *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("Whether protection is adequate 'depends directly on how effectively it compensates the secured creditor for the loss of value' caused by the superpriority given to the post-petition loan.") (quoting *In re American Mariner Indus., Inc.*, 734 F.2d 426, 435 (9th Cir. 1984)). Furthermore, the Third Circuit has held that whether any particular asset declines in value is irrelevant to the adequate protection analysis, "for it is the interest of the pre-petition lender, not a particular asset, which must be adequately protected." *Swedeland*, 16 F.3d at 564. The Committee's focus on the aggregate value of the Secured Notes Collateral is therefore wrong; what matters instead is the value of the Secured Notes Parties' interest in the Secured Notes Collateral.

25.     As set forth in the Houlihan Reports, there has been no increase in relative value of the Secured Notes Collateral between the Petition Date and the Effective Date and performance trends indicate that, if anything, the Debtors' going concern value has likely decreased between such dates. *See* Houlihan Report at 9, 18. What has happened between the Petition Date and the Effective Date, however, is approximately $137.5 million of borrowings by

the Debtors under the Final DIP Order.  Of these borrowings, approximately $68.5 million did

not result in new or increased collateral value to compensate for the undeniable fact that these

borrowings resulted in priming liens that stepped in front of the Secured Notes Parties' rights

against the Secured Notes Collateral and made the Secured Notes Parties' rights on the Effective

Date less valuable than they were on the Petition Date (i.e., the Secured Notes Collateral

remained the same relative value, but $68.5 million of claims must first be satisfied from the

Secured Notes Collateral before the Secured Notes Parties could recover any value).

     26.     Many courts, including the Third Circuit, have recognized the reality that priming

financing pushes down and diminishes a secured creditor's interest in the collateral that is subject

to a priming lien unless new or offsetting collateral is produced:

- "[T]he value of the [collateral] was $18,495,000.  Under the superpriority lien awarded to [the DIP lender], it obtains $3,160,000 before [prepetition secured lender] receives anything.  Thus, the only way to justify [the DIP lender's] superpriority lien based on the value of the [collateral] is to show that somehow [prepetition secured lender's] interest in the collateral ($18,495,000) has been increased by $3,160,000." *Swedeland*, 16 F.3d at 566.

- "Even if the market value of the pre-petition senior lenders' collateral simply remained constant between the petition date and the sale date, there would have been a $30 million diminution in value as a result of the need to pay off the superpriority lien of the Postpetition lenders." *Official Comm. of Unsecured Creditors v. Bank Group*, No. IP00-0496, 2001 WL 899637, at *8 n.5 (D. Ind. July 5, 2001).

- "There is no question that the [priming DIP financing] will cause a dollar-for-dollar diminution in value of [prepetition lender's] secured position." *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996).

- "Because the Statutory Lienholders were due to be 'primed,' the inquiry ought to have focused on compensating the Statutory Lienholders for the loss of value of their interests in the [collateral] *caused by the priming [DIP] lien*.  Since the Statutory Lienholders were undersecured, the $51 million priming [DIP] lien would decrease the value of their interests in the Debtors' assets by the same amount." *In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 751-52 (S.D. Fla. 2010) (emphasis in original).

- "Given the fact that super priority financing displaces liens on which creditors

have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected." *In re First South Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987).

Even the Committee acknowledges that the imposition of a priming DIP lien constitutes diminution in value. *See* Objection ¶ 23 ("To establish a claim under section 507(b), a secured creditor must prove that its collateral has diminished as a result of … (iii) the granting of a lien under section 364(d) during the bankruptcy case, despite the creditor's receipt of adequate protection."). This authority compels the conclusion that unless priming financing results in the creation of new and offsetting collateral value, the priming financing results in a diminution in the primed secured creditor's interest in the collateral.

27.     Pursuant to the Motion, Oaktree simply seeks to receive the benefits of the protection it negotiated for under the DIP Order and be compensated for the fact that the Secured Notes Parties' interest in the Secured Notes Collateral has been reduced by $68.5 million due to the granting of the priming liens and the fact that the relative collateral values have not increased to sufficiently make up for the impact of the priming liens on the Secured Notes Parties.

**B.     The Secured Notes Parties' Interest in the Secured Notes Collateral Has Diminished in Value Notwithstanding the Consent of the Secured Notes Parties to the DIP Financing or the Foreseeability of the Expenditures.**

28.     In the Objection, the Committee argues that because the Secured Notes Parties consented to the priming DIP Financing and the expenditures of the DIP borrowings were foreseeable, there can be no diminution in value of the Secured Notes Parties' Interest in the Secured Notes Collateral. *See* Objection ¶¶ 4, 27, 29. The Committee's argument, if accepted, would lead to an absurd result, namely that by consenting to priming DIP financing at the outset of the case in exchange for adequate protection liens and the right to later assert a diminution in value claim, the lender would be precluded from ever asserting a diminution claim because it had

agreed to the financing.  This would mean that the grant of adequate protection is purely illusory. This is clearly not what the Bankruptcy Code or controlling case law requires, and this argument ignores the express terms of the Final DIP Order.  The fact that the Secured Notes Parties consented to the priming financing shows only that the Secured Notes Parties believed the financing to be the least destructive alternative and was necessary to stabilize the business and the value of the Secured Notes Collateral, but such consent cannot be twisted into an argument that the Secured Notes Parties agreed there would be no diminution as a result of the priming of their liens, or that 100% of the cost of running the case should come out of their collateral.

29.     The priming DIP financing essentially was the least worst alternative available to the Secured Notes Parties.  The Debtors were completely out of liquidity and had no other alternative other than to turn to Oaktree, in its capacity as substantial holder of Senior Secured Notes, and request a financing package that would be used to avoid an immediate shutdown of the company.  Faced with an alternative of having the value of their collateral further reduced by an immediate shutdown of operations, the Secured Notes Parties agreed to the priming DIP financing, but only on the condition that they receive the adequate protection package set forth in the Final DIP Order.

30.     The adequate protection package set forth in the Final DIP Order expressly grants liens on the Unencumbered Foreign Equity to the extent of diminution in value.[8]  It is not as if Oaktree is contending that the adequate protection package was insufficient and therefore requesting a diminution in value claim—the potential for a diminution in value claim was contemplated by, and provided for in, the adequate protection package and Oaktree would not

---

[8]    *See* Final DIP Order ¶ 12(a).

have consented to the Final DIP Order without that component of the adequate protection package.

31.    The Committee's position seems to be that if a secured creditor agrees to priming financing up front, then the secured creditor waives any and all rights to a diminution in value lien or claim as a result of the imposition of the priming liens, *even if the right to assert such a diminution in value lien or claim is granted under the terms of the DIP order*. This argument ignores the entire purpose of adequate protection, which is to encourage financings up front by offering adequate protection to parties who have their liens primed, and, if accepted, would strip the Secured Notes Parties of a key element of their bargained-for adequate protection package (the right to assert a diminution in value claim).

C.    **The Secured Notes Parties' Interest Was Diminished As a Result of the Debtors Securing Their DIP Borrowings with Priming Liens on the Secured Notes Collateral Rather than Unencumbered Assets.**

32.    The Committee argues that the Diminution in Value Claims are inappropriate because any losses in value were reasonably foreseeable or would have occurred regardless of these chapter 11 cases. *See* Objection ¶ 27. This argument ignores the fact that the priming of secured lenders' liens can only happen under section 364 of the Bankruptcy Code. It would not have been possible to prime the Secured Notes Parties' collateral outside of bankruptcy, and to prime the Secured Notes Parties' collateral in bankruptcy requires that their interest in their collateral be adequately protected. There is no evidence, and certainly no quantifiable evidence, of what would have happened had the Debtors not obtained the DIP financing by priming the liens of the Secured Notes Parties. The Committee's conjecture and speculation is not evidence and does not support their arguments; rather, the only clear evidence and applicable arguments as set forth in the Motion and the Houlihan Reports show that the priming DIP financing reduced the value of the Secured Notes Parties' interest in the Secured Notes Collateral.

33.    Further, none of the cases cited by the Committee in support of its argument are relevant to the circumstances here where (a) the diminution in value was caused by the authorization of DIP financing secured by priming liens on the Secured Notes Collateral rather than unencumbered assets, and (b) the Court expressly allowed the Secured Notes Superpriority Claims as adequate protection under the Final DIP Order. *See* Final DIP Order ¶ 12(b).  First, the Committee cites to a number of cases that discuss foreseeable harm caused by merely the operation of the automatic stay, but Oaktree is not arguing that it is entitled to diminution on account of declines in value that would have occurred regardless of the automatic stay, e.g., ordinary course depreciation.  Second, not one of the cases cited by the Committee analyzed a section 507(b) superpriority claim that had been granted as adequate protection.  These cases instead carefully distinguished adequate protection and how it "shields the creditor in the first instance from impairment in the value of his 'interest in property'" from the backstop provided by section 507(b) of the Bankruptcy Code if and when that adequate protection package later proves insufficient.  *See, e.g., In re Callister*, 15 B.R. 521, 529 (Bankr. D. Utah 1981); *In re Franklin Indus. Complex, Inc.*, No. 01-67459, 2008 WL 3992233, at *6 (Bankr. N.D.N.Y. Aug. 21, 2008) (finding that, unlike here, "[s]uperpriority status is warranted only if the adequate protection previously granted fails"); *In re Blackford Farms, Inc.*, 68 B.R. 639, 640 (Bankr. N.D. Iowa 1986) (analyzing a section 507(b) claim where, unlike here, "adequate protection has been extended to a secured creditor and later proves to be inadequate"); *In re Cheatham*, 91 B.R. 382, 385 (E.D.N.C. 1988) (same).  Since the Court already gave the Secured Notes Parties an allowed Secured Notes Superpriority Claim as adequate protection and the Unencumbered Foreign Equity remains a source of value therefor, every one of the Committee's cases is distinguishable:

| Case Name | Debt Amount | Collateral | Priming DIP Liens | Adequate Protection |
|-----------|-------------|------------|-------------------|---------------------|
| *In re Callister*, 15 B.R. 521 | $135,100 | 3 tractors | No | - $1,232 per month |

| (Bankr. D. Utah 1981) | | 2 trailers | | - Maintain insurance |
|---|---|---|---|---|
| *In re Blackford Farms, Inc.*, 68 B.R. 639 (Bankr. N.D. Iowa 1986) | $4.75 million *Collateral value | Farmland | No | - $300,000 payment |
| *In re Cheatham*, 91 B.R. 382 (E.D.N.C. 1988) | $14,634.74 | 2 cars | No | - Periodic payments<br>- $1,000 payment<br>  * No court order |
| *In re Franklin Indus. Complex, Inc.*, 2008 WL 3992233 (Bankr. N.D.N.Y. Aug. 21, 2008) | $18.8 million | Land upon which 7 power plans operate | No | - Replacement liens<br>- Maintain insurance<br>- Continued operations |
| ***In re Quiksilver, Inc.***, No. 15-11880 (Bankr. D. Del. 2015) | **$280.3 million** | **Substantially all assets of multinational retailer** | **Yes** | **- Replacement liens**<br>**- *Superpriority claims***<br>**- Agent's fees**<br>**- Milestones** |

34.     Oaktree instead submits that it is entitled to a diminution in value claim because the Secured Notes Parties were harmed by the fact that the Debtors departed from the requirement of funding their borrowings by first obtaining credit secured by the Debtors' unencumbered assets, and incurred substantial priming DIP borrowings for expenditures that did not result in new offsetting collateral value. The Secured Notes Parties and the Court agreed that the Debtors could prime the liens of the Secured Notes Parties to obtain financing, but an express part of that bargain was a requirement that the Secured Notes Parties receive a lien on the Unencumbered Foreign Equity to the extent the granting of such priming liens diminished the value of the Secured Notes Parties' interest in the Secured Notes Collateral.

35.     If the Secured Notes Parties were substantially oversecured as of the Petition Date and did not suffer a diminution in their interest in their collateral, then the priming DIP Facilities would not have resulted in diminution. But those are not the facts of this case. To deny the diminution in value lien here, where all parties agree that the Secured Notes Parties are impaired by more than the value of the Unencumbered Foreign Equity, would be to deny the requirement that the costs of a chapter 11 case be funded first and foremost from unencumbered assets, and

would render meaningless the adequate protection granted to the Secured Notes Parties in the Final DIP Order. Accepting the Committee's argument would cause a result out of line and inapposite to the principles of section 364 of the Bankruptcy Code: upon consenting to priming financing, a secured creditor's interest in its collateral would decline while the value of the unencumbered assets remains untouched. As such, the Court should not accept or otherwise endorse the Committee's arguments.

**D.     The Expenditures of the DIP Financing Must Do More Than Merely Preserve Collateral Value in Order to Avoid Diminution in Value of the Senior Secured Notes Holders' Interest in the Secured Notes Collateral.**

36.     The Committee bases their opposition to the Motion in part on an argument that there can be no diminution because collateral value did not decrease and the funds were used to preserve and/or enhance total collateral value. *See* Objection ¶¶ 2, 26, 31-32. But this simply is not the relevant legal test and in making their argument, the Committee seems to be arguing that diminution cannot exist because it is fair to burden the Secured Notes Parties with all costs of preserving the Secured Notes Collateral. The Committee's focus on the alleged importance of preserving the Secured Notes Collateral borrows from the language of section 506(c) of the Bankruptcy Code, but the Secured Notes Parties have the benefit of the 506(c) waiver granted in the Final DIP Order, which prevents the Secured Notes Collateral from being surcharged to pay any of its preservation expenses. Final DIP Order ¶ 39. Even if every dollar of priming borrowings under the Final DIP Order were used to preserve collateral value (which is not the case, among other things, millions of dollars were used to pay fees of the Committee's professionals), the Secured Notes Parties' interest in the Secured Notes Collateral would still be less valuable given the fact that such interest now sits behind millions of dollars in additional DIP claims that are entitled to be paid first out of the Secured Notes Collateral.

37.    Sections 361 and 364 of the Bankruptcy Code and paragraph 12 of the Final DIP Order provide that the Secured Notes Parties' interest in the Secured Notes Collateral must be adequately protected and that to the extent this interest is diminished by the granting of a priming lien, then the Secured Notes Parties are entitled to a lien on the Unencumbered Foreign Equity. While collateral may have been preserved and/or a worse consequence avoided, there is no getting around the reality that insufficient collateral was created during the Chapter 11 Cases to put the Secured Notes Parties back into the same position they were in on the Petition Date as the Secured Notes Parties now find themselves behind $68.5 million of additional claims on collateral value that is unchanged in total value from the Petition Date.

38.    Moreover, the Committee's assertions that the borrowings under the Final DIP Order enhanced the value of the collateral, *see* Objection ¶ 32, is belied by the Houlihan Report's conclusion that the Debtors' total enterprise value remained unchanged between the Petition Date and the Effective Date. *See* Houlihan Report at 17, 28. The alleged "increases" in collateral value cited by the Committee (lease rejection savings and impaired trade and other liabilities) are illusory, overstated, or offset by the costs of the chapter 11 cases (including $▆▆ million in professional fee expenses and $▆▆ million of DIP financing fees/interest paid during the case) resulting in a total collateral value that is unchanged according to the Houlihan Report. *See* Houlihan Report at 56 (describing costs of chapter 11 cases, which total exceeds the $39.1 million of alleged increases in value set forth on page 80 of the PJT Report). Furthermore, as set forth in the Houlihan Supplemental Report, PJT incorrectly concludes that reductions in claims create enterprise value; particularly where, as here, any savings associated with claims impairment already are incorporated into the projections utilized for valuation. *See* Houlihan Supplemental Report at 23.

**E.    Oaktree's Position Does Not Assume that Each Dollar of DIP Proceeds Resulted in a *Per Se* Diminution in Value of Collateral.**

39.     Contrary to the assertions made in the Objection, Oaktree does not argue that each dollar of DIP proceeds used during these chapter 11 cases created a corresponding dollar of diminution in value.  While there are cases that stand for the proposition that priming financing results in a *per se* diminution—see the cases cited *supra*, at paragraph 26—Oaktree acknowledges that if new collateral is created or if the existing collateral increases in value, then there would not be diminution for amounts spent to create that new/increased collateral.

40.     Based on the logic that expenditures that created new collateral value or otherwise increased the value of the Secured Notes Parties' interest in collateral would not result in diminution in value, Oaktree's eliminated from its diminution in value calculation (a) the $41.5 million of DIP Facilities proceeds used to pay down the ABL Facility, which increased the value of Secured Notes Parties' interest in the Secured Notes Collateral by eliminating the same amount of claims that otherwise would have recovered from the Secured Notes Collateral prior to the Secured Notes Parties, and (b) $2.3 million of capital expenditures, which expenditures Oaktree assumed would eventually result in at least an equal amount of new collateral.  Oaktree also removed from its diminution in value calculation approximately $250,000 of adequate protection payments made to counsel to the Secured Notes Agent and $2.3 million of KEIP/KERP payments pursuant to Oaktree's previous agreement with the Committee.

41.     Moreover, it is not the case that priming DIP financing will always result in diminution in value of a secured creditor's interest in collateral.  In chapter 11 cases where secured creditors have an equity cushion and are oversecured, priming DIP financing in an amount less that the equity cushion will have no impact on the secured creditors' recovery.  Both before a priming DIP financing and after a priming DIP financing, an oversecured creditor's

27

interest in the collateral is equal to the amount of their full claim since they can recover no more than that.  There will also be no diminution in value claim in a chapter 11 case with priming DIP financing where the value of the secured creditors' interest in the collateral increases, either due to asset values rising or the DIP financing being used to generate new collateral or offsetting increases in collateral value.

42.    Here, however, the Secured Notes Parties are not recovering in full, there was and is no equity cushion, a substantial portion of the priming DIP borrowings were used in a way that did not create new collateral value, and Secured Notes Claims are impaired by more than the amount of the borrowings under the DIP Order (under the Debtors' valuation) and by at least $134 million (using the Committee's valuation).  Nor is it the case that the value of the Secured Notes Parties' interest in the Secured Notes Collateral otherwise increased to completely offset the priming DIP financing   Accordingly, the Secured Notes Parties are entitled to a diminution in value claim in the amount of $68.5 million consistent with the calculations set forth in the Houlihan Report.

*[Remainder of page intentionally left blank]*

WHEREFORE, Oaktree respectfully requests that the Court enter the Order, granting the

relief requested in the Motion and such other relief as the Court deems appropriate under the

circumstances.

| | |
|---|---|
| Wilmington, Delaware<br>Dated: January 20, 2016 | */s/ Andrew R. Remming*<br>Robert J. Dehney (No. 3578)<br>Andrew R. Remming (No. 5120)<br>**MORRIS NICHOLS ARSHT & TUNNELL LLP**<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, Delaware 19899-1347<br>Telephone:    (302) 658-9200<br>Facsimile:    (302) 658-3989<br>Email:         rdehney@mnat.com<br>                   aremming@mnat.com<br><br>- and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Telephone:    (312) 862-2000<br>Facsimile:    (312) 862-2200<br>Email:         patrick.nash@kirkland.com<br>                   ross.kwasteniet@kirkland.com<br><br>*Counsel to Oaktree* |