## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                                                        :        Chapter 11

QUIKSILVER, INC., *et al.*,[1]                                :        Case No. 15-11880 (BLS)

                                       Debtors.               :        Jointly Administered

                                                              :

                                                              :

------------------------------------------------------------ x

## OBJECTION OF THE OFFICIAL COMMITTEE OF
## UNSECURED CREDITORS TO SECOND AMENDED JOINT
## CHAPTER 11 PLAN OF REORGANIZATION OF QUIKSILVER, INC.
## AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, New York  10036
Michael S. Stamer (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
Joseph L. Sorkin (admitted *pro hac vice*)
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

**PEPPER HAMILTON LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, Delaware  19899
David B. Stratton (DE No. 960)
David M. Fournier (DE No. 2812)
John H. Schanne II (DE No. 5260)
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390

*Co-Counsel to the Official Committee of Unsecured Creditors*

*Co-Counsel to the Official Committee of Unsecured Creditors*

Date:  January 14, 2016
          Wilmington, Delaware

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| BACKGROUND | | 6 |
| | A. The Debtors' Debt and Capital Structure | 7 |
| | B. The PSA, Oaktree Plan and Disclosure Statement | 7 |
| | C. Expert Reports Regarding Valuation | 9 |
| OBJECTION | | 10 |

I. The Oaktree Plan Violates the Absolute Priority Rule and Cannot Be Confirmed Under Bankruptcy Code Section 1129(b) ...................................................................10

    A. Applicable Legal Standard ...................................................................................10

    B. The PJSC Valuation Materially Undervalues the Debtors' Total Enterprise Value, and Thus Secured Noteholders Are Receiving More Than Payment in Full on Account of Their Secured Notes Claims .....................................................12

        1. The PJSC Valuation Suffers from Numerous Infirmities ..........................13

            a. PJSC Disregards the Value Ascribed to These Assets by the Market, *i.e.*, Oaktree .............................................................13

            b. The PJSC Valuation Improperly Uses 2016E EBITDA Multiples in Its Comparable Company Valuation ........................15

            c. The PJSC Valuation Inappropriately Applies PJSC's Own Comparable Companies Multiples ..............................................19

            d. The PJSC Valuation Uses Inflated WACC Assumptions in Its DCF Analysis ..................................................................24

            e. The PJSC Valuation Arbitrarily Changes the Company's Business Plan To Increase Royalty Fees ....................................28

            f. Conclusion ..............................................................................31

        2. Affirmative Valuation ..............................................................................31

            a. The PJT Valuation Is the Result of Careful Analysis and the Application of Generally Accepted Valuation Methods ...............31

    C. The Value That Secured Noteholders Are Receiving in Excess of the Value of the Secured Notes Collateral Should Inure to the Benefit of Unsecured Creditors ...............................................................................................................38

        1. The Oaktree Plan Would Provide Secured Noteholders With Approximately 144% of the Value of the Secured Notes Collateral ..........38

         2. The Unsecured Noteholders' "Token" Right To Participate in the Exit Rights Offering Is Illusory and of De Minimis Value ......................42

    D. The Oaktree Plan Also Violates the Absolute Priority Rule Because It Potentially Unimpairs Intercompany Interests, Which Are Indisputably Junior to Unsecured Notes Claims and General Unsecured Claims ....................43

II.    The Oaktree Plan Unfairly Discriminates Between Holders of Unsecured Notes
       Claims and the Holders of Euro Notes Guaranty Claims ....................................................44

       A.    Applicable Legal Standard..............................................................................................44

       B.    The Unsecured Notes Claims and Euro Notes Guaranty Claims Are
             Essentially Indistinguishable and Thus Should Not Receive Disparate
             Treatment Under the Oaktree Plan...........................................................................48

       C.    The Euro Notes Guaranty Claims Are Unimpaired, While Unsecured
             Notes Claims Are Receiving Approximately 4.5% on Account of Their
             Claims ...............................................................................................................................49

III.   The Exculpation Contained in the Oaktree Plan Is Overly Broad and Does Not
       Comport with Applicable Law.............................................................................................50

       A.    Applicable Legal Standard..............................................................................................51

       B.    The Exculpation Is Overly Broad .................................................................................52

IV.    Additional Reasons the Oaktree Plan Should Not Be Confirmed .....................................53

RESERVATION OF RIGHTS ............................................................................................................53

CONCLUSION.....................................................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bank of Am. Nat'l Trust & Savings Ass'n v. 203 N. LaSalle Street P'ship,*
    526 U.S. 434 (1999)...................................................................................................13, 43

*Consol. Rock Prods. Co. v. Du Bois,*
    312 U.S. 510 (1941).........................................................................................................16

*Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund,*
    748 F.2d 42 (1st Cir.1984)..............................................................................................47

*In re Am. Classic Voyages Co.,*
    367 B.R. 500 (Bankr. D. Del. 2007)................................................................................36

*In re Armstrong World Indus., Inc.,*
    348 B.R. 111 (D. Del. 2006)..................................................................................45, 46, 50

*In re Boston Generating, LLC,*
    440 B.R. 302 (Bankr. S.D.NY. 2010)..............................................................................13

*In re Brewery Park Assocs. L.P.,*
    No. 10-11555, 2011 WL 1980289 (Bankr. E.D. Pa. April 29, 2011)...............................11

*In re Briscoe Enters., Ltd., II,* 994 F.2d 1160 (5th Cir. 1993) ........................................10

*In re Bush Indus.,*
    315 B.R. 292 (Bankr. W.D.N.Y. 2004) ........................................................................16, 7

*In re Charter Commc'ns,*
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ............................................................................10

*In re Chemtura Corp.,*
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ........................................................................11, 4

*In re Coram Healthcare Corp.,*
    315 B.R. 321 (Bankr. D. Del. 2004) ..............................................................................20

*In re Dow Corning Corp.,*
    244 B.R. 696 (Bankr. E.D. Mich. 1999) ....................................................................46, 50

*In re Duplan Corp.,*
    9 B.R. 921 (S.D.N.Y. 1980)...........................................................................................16

*In re Energy Future Holdings Corp.,*
    540 B.R. 109 (Bankr. D. Del. 2015) ..............................................................................48

*In re Exide Techs.,*
    303 B.R. 48 (Bankr. D. Del. 2003) ...........................................................................11, 20

*In re FAH Liquidating Corp. (f/k/a Fisker Automotive Holdings, Inc.),*
    No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014).....................................................5, 51

*In re Fairfield Executive Assoc.*,
    161 B.R. 595 (D.N.J. 1993) ................................................................47

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ...........................................10, 11

*In re Granite Broad. Corp.*,
    369 B.R. 120 (Bankr. S.D.N.Y. 2007) .........................................11, 13

*In re Great Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ......................................................45

*In re Hawker Beechcraft, Inc.*,
    No. 12-11873 (SMB) (Bankr. S.D.N.Y. Jan. 31, 2013), ECF No. 1287 ................43

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ....................................................50

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78
    B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d
    Cir. 1988) ........................................................................44

*In re Lab. Partners, Inc.*,
    No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) ..........................5, 51

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004) ............44, 45

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (D.N.J. 2005), *aff'd*, 241 F. App'x. 1 (3d Cir. 2007)...................46, 47

*In re Nellson Nutraceutical*,
    No. 06-10072 (CSS), 2007 WL 201134 (Bankr. D. Del. Jan. 18, 2007) .............16, 18

*In re New Century TRS Holdings, Inc.*,
    407 B.R. 576 (D. Del. 2009) .......................................................45, 49

*In re PTL Holdings LLC*,
    No. 11-12676 (BLS), 2011 WL 5509031 (Bankr. D. Del. Nov. 10, 2011) ............50

*In re Snyders Drug Stores, Inc.*,
    307 B.R. 889 (Bankr. N.D. Ohio 2004) ...........................................45, 49

*In re Sutton*,
    No. 10-10539, 2012 WL 433480 (Bankr. E.D.N.C. Feb. 9, 2012).........................44

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del., 2011) ..................................................50

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013).......................................................46, 49

*In re Wash. Mut., Inc.*,
    442 B.R. 314, 360 (Bankr. D. Del. 2011) ......................................47, 50, 51

iv

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988)...................................................................................43

*Oxford Life Ins. Co. v. Tucson Self-Storage, Inc.* (*In re Tuscon Self-Storage, Inc.*),
    166 B.R. 892 (B.A.P. 9th Cir. 1994)..............................................45, 49

*Protective Comm. on Indep. Stockholder for TMT Trailer Ferry, Inc.v. Anderson*,
    390 U.S. 414 (1968)...................................................................................16

**STATUTES**

11 U.S.C.

    § 1102..........................................................................................................6

    § 1107(a)......................................................................................................6

    § 1108..........................................................................................................6

    § 1123(a)......................................................................................................2

    § 1123(a)(4) .................................................................................................

    § 1126(g)....................................................................................................10

    § 1129.................................................................................................passim

    § 1129(b)............................................................................................passim

    § 1129(b)(1)................................................................................43, 44, 45

    § 1129(b)(2)(B)(ii)..............................................................................11, 43

**RULES**

Fed. R. Bankr. Proc. 1015(b) ..........................................................................6

**OTHER AUTHORITIES**

Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the
    Value of Any Asset* (John Wiley & Sons, Inc. 1996) ......................20, 30

Bruce A. Markel, *A New Perspective on Unfair Discrimination in Chapter* 11,
    72 Am. Bankr. L.J. 227 (1998) ................................................................45

Christopher S. Sontchi, *Valuation Methodologies: A Judges View*,
    20 Am. Bankr. Inst. L. Rev. 1, 15 (2012) ...............................................21

The Official Committee of Unsecured Creditors (the "Committee") of Quiksilver, Inc.

and its affiliated debtors and debtors in possession (collectively, the "Debtors"), by and through

its undersigned counsel, hereby submits this objection (the "Plan Objection") to the *Second*

*Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors*

*and Debtors in Possession* [Docket No. 532] (the "Oaktree Plan").[2] In support of this Plan

Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT[3]

1.      The Oaktree Plan embodies a prepetition agreement between the Debtors and

Oaktree pursuant to which Oaktree committed to acquire a majority equity stake in the Debtors'

businesses, while leaving behind just $7.5 million[4] to be allocated across an anticipated $277

million in unsecured claims.  In order to achieve their mutual goal of implementing the

transactions described in the PSA (and consummating the first retailer restructuring since 2005),[5]

the Debtors and Oaktree now seek confirmation of the Oaktree Plan.  The Oaktree Plan, among

other things, (i) is premised upon an artificially low valuation of the Debtors' estates,

(ii) disguises the true consideration to be distributed to Secured Noteholders on account of their

claims and (iii) deprives unsecured creditors of a fair recovery based on the value of the Debtors'

35% equity interest in their foreign subsidiaries (the "Unencumbered Foreign Equity").

Accordingly, and as will be demonstrated by the Committee at trial, the Oaktree Plan violates the

absolute priority rule and cannot be confirmed as a matter of law.  In addition, the Oaktree Plan

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Oaktree Plan.

[3]  Capitalized terms used in this Preliminary Statement but not defined herein shall have the meanings ascribed to such terms elsewhere in the Plan Objection.

[4]  Following the filing of the initial version of the Oaktree Plan, this amount was increased to $12.5 million.

[5]  *See* Oct. 14, 2015 Hr'g Tr. at 18:21-24 (Mr. Durrer:  "[The DIP] is built around a transaction that . . . will get the first retail, that I'm aware of, to reorganize since the end of 2005").

cannot be confirmed because it (x) disparately treats identically-situated creditors in violation of Bankruptcy Code section 1129, (y) contains an impermissibly broad exculpation provision in violation of Bankruptcy Code section 1123(a) and (z) contains a number of other infirmities as identified in Section III herein.

       2.    ***First***, the Oaktree Plan undervalues the Debtors' total enterprise value ("<u>TEV</u>") and overpays holders of Secured Notes Claims in violation of Bankruptcy Code section 1129. The Oaktree Plan, and distributions contemplated thereunder, is predicated on a TEV of $546 million. This valuation (the "<u>PJSC Valuation</u>") is set forth summarily in Article VII(D) of the Disclosure Statement and at length in the PJSC Report. Therefore, in order to evaluate the propriety of proposed distributions under the Oaktree Plan, PJT first analyzed the PJSC Valuation as set forth in the PJSC Report. Over the course of its evaluation, PJT identified no fewer than ***five*** material errors that negatively impact both the Debtors' overall TEV and the value ascribed by PJSC to the Debtors' equity interests in their foreign subsidiaries. These five material errors, and their impact on value, can briefly be summarized as follows:

| Error | Description | Impact of Correction on | |
|---|---|---|---|
| | | TEV | 35% of Foreign Subs Equity |
| 1. The PJSC Valuation is Inconsistent With a Market Indicator of Value | ▪ It is commonly accepted that one of the best indicators of value is the amount one party is willing to pay to acquire a company<br>▪ PJSC has repeatedly made clear that the value of Oaktree's bid is $735 million (the "<u>Oaktree Bid</u>"), and has communicated this understanding both to the market and to the Court<br>▪ The PJSC valuation conclusion of $546 million is completely inconsistent with this market indication of value, and PJSC offers no explanation or analysis supporting the difference | NA | NA |
| 2. The PJSC Valuation Improperly Uses 2016E EBITDA Multiples in the Comparable Company Valuation | ▪ PJSC's Comparable Companies valuation methodology places equal weight on 2016E and 2017E EBITDA multiples<br>▪ This approach is inconsistent with financial theory and practice because management and its advisors have conceded that 2016E EBITDA does not represent "steady-state" EBITDA, but is instead the first year of a turnaround plan<br>▪ Quiksilver's historical and projected financials highlight that 2016E is indeed not a reliable base year (see charts on page 2)<br>▪ PJT has corrected this error by removing 2016E EBITDA multiples and using 2017E EBITDA multiples in its comparable company analysis | $70mm increase | $20mm increase |

(PJT Report at 16, 19).

| Error | Description | Impact of Correction on | |
|---|---|---|---|
| | | TEV | 35% of Foreign Subs Equity |
| 3. The PJSC Valuation Inappropriately Applies PJSC's Own Comparable Companies Multiples (page 24) | • In PJSC's Comparable Companies valuation, the multiples PJSC applies to Quiksilver are materially lower than those of its Reference Group of comparable companies<br>  – The Reference Group median 2016 multiple is 46.0% higher than the PJSC mid 2016 multiple<br>  – The Reference Group median 2017 multiple is 18.4% higher than the PJSC mid 2017 multiple<br>• PJSC provides no analysis to justify this value-deflating multiple adjustment<br>• PJT adjusted this assumption by simply applying the median multiple from the Reference Group to Quiksilver | $57mm increase | $13mm increase |
| 4. The PJSC Valuation Uses Inflated WACC Assumptions in the DCF Analysis (page 32) | • The weighted average cost of capital ("WACC") PJSC uses in its discounted cash flow analysis ("DCF") is inflated, resulting in a lower valuation<br>• Two of the inputs PJSC uses in calculating its WACC are overstated<br>  – PJSC uses a 7-9% cost of debt when the Company's blended cost of debt is closer to 7%<br>  – PJSC erroneously applies a size premium of 5.78% even though the source PJSC cites provides that a 3.18% premium is the proper premium for Quiksilver<br>• PJT has adjusted PJSC's DCF valuation by recalculating PJSC's WACC using the correct inputs | $23mm increase | $6mm increase |
| 5. The PJSC Valuation Arbitrarily Changes the Company's Business Plan to Increase the Royalty Fees (page 40) | • While PJSC claims its valuation is based on Quiksilver's 3-year business plan(1), PJSC adjusts this business plan to increase the Company's royalty rates. This is the only adjustment PJSC makes to the business plan, and the effect is to transfer value from the foreign subsidiaries to the domestic entities, despite the fact that this is not how the business currently operates<br>  – This adjustment suggests higher payments are being made from foreign subsidiaries to QS Wholesale than is in fact the case<br>• The adjustment is unwarranted as it (i) contradicts the Company's historical and go-forward practices, (ii) is inconsistent with PJSC's overall approach, and (iii) is based on a Hilco report, which is flawed and irrelevant for this purpose<br>• PJT has corrected this error by relying on the Company's business plan, and excluding PJSC's unjustified adjustment | $0mm increase | $14mm increase |

(PJT Report at 24, 32, 40).

3.    Correcting for these errors, PJT concluded that the mid-point of the Debtors' TEV is $690 million (as compared to a TEV of $546 million in the PJSC Report), and that the value available for distribution to unsecured creditors as a result of the mid-point value of the Unencumbered Foreign Equity is in fact $91 million (as compared to $39 million in the PJSC Report).

4.      Application of an appropriate TEV to the Oaktree Plan demonstrates that holders of Secured Notes Claims are receiving more than payment in full on account of their secured claims in violation of the absolute priority rule. The Oaktree Plan proposes to distribute the following to holders of Secured Notes Claims: (i) an outright equity distribution of approximately 22% of the New Quiksilver Common Stock and (ii) valuable rights to purchase up to approximately 74% of the New Quiksilver Common Stock.[6] This proposed distribution would result in holders of Secured Notes Claims receiving value in excess of $235 million on account of such claims (including the New Quiksilver Common Stock to be allocated to Oaktree in its capacity as a Backstop Party). The evidence will show that the collateral securing such claims is worth just $164 million—*an overpayment of more than $70 million*. This "overpayment" results in the *diversion of approximately $45 million in value* away from Unsecured Noteholders and holders of General Unsecured Claims (together, the "Non-Priority Unsecured Creditors") in direct violation of Bankruptcy Code section 1129. The Oaktree Plan is, therefore, unconfirmable as a matter of law.

5.      *Second*, the Oaktree Plan proposes to reinstate certain unsecured guarantees granted by Debtors Quiksilver, Inc., Hawk Designs, Inc., QS Retail, Inc., DC Shoes, Inc., and QS Wholesale, Inc. in favor of the Euro Notes, thereby rendering the unsecured claims asserted on account of such guarantees unimpaired. Each of these Debtor guarantors is similarly obligated on account of the Unsecured Notes. Based on the Committee's review of the relevant debt documents, the Euro Notes and the Unsecured Notes are *pari passu* at each applicable Debtor entity, with neither having seniority or right in payment over the other. Notwithstanding

---

[6] Although the Oaktree Plan does not characterize these rights as a "distribution," the fact that the rights are being made available solely to Secured Noteholders (aside from a *de minimis* and ultimately meaningless allocation provided to Unsecured Noteholders) renders the rights a form of consideration that must be valued when considering the overall recovery afforded such holders under the plan.

the foregoing, the Oaktree Plan essentially proposes to satisfy the Euro Notes unsecured guarantee obligations in full, while providing a paltry 4.5% recovery to holders of Unsecured Notes Claims. This grossly disparate treatment between identically-situated creditors is not permissible under either Bankruptcy Code section 1129 or applicable case law, and thus confirmation should also be denied on this basis.

6.      ***Third***, the Oaktree Plan proposes to exculpate the following parties:  (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Backstop Parties; (iv) the Plan Sponsor; (v) the DIP Lenders; (vi) the DIP Agents; (vii) the Committee and each of its members; and (viii) the Secured Notes Agent.  Pursuant to applicable law, exculpation provisions are properly limited to estate fiduciaries absent compelling circumstances.  *See In re FAH Liquidating Corp. (f/k/a Fisker Automotive Holdings, Inc.)*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014), Hr'g. Tr. at 26:20 – 28:8; *In re Laboratory Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014), Hr'g Tr. at 35:23 – 36:4.  Given that compelling circumstances have not been demonstrated in these cases, confirmation of the Oaktree Plan should be denied.  Alternatively, the exculpation provision should be stricken if the Court were otherwise inclined to confirm the Oaktree Plan.

7.      ***Finally***, the Committee has identified a number of other issues that must be addressed in connection with this Court's consideration of the Oaktree Plan:

- The Oaktree Plan does not provide for the existence of the Committee post-Confirmation. *See* Oaktree Plan at § 13.8. The Committee should continue post-Confirmation and should be charged with pursuing any existing Avoidance Actions, the proceeds of which should inure to the Debtors' unsecured creditors.

- Under the Oaktree Plan, the Reorganized Debtors (*i.e.*, Oaktree) retain, and have the ability (but are not required) to prosecute retained Causes of Action, including Avoidance Actions. *See* Oaktree Plan at § 10.1. Given that such Causes of Action and any recoveries thereunder are not the Secured Noteholders' collateral,

the Causes of Action should be put into a trust for the benefit of unsecured creditors with the trust to be administered, as noted above, by the Committee.

- The Oaktree Plan should provide for the payment of the reasonable fees and expenses incurred by the Unsecured Notes Indenture Trustee.

- Payment of the fees of the Secured Notes Indenture Trustee and the Secured Notes Collateral Agent should be subject to the Committee's receipt of invoices documenting that any requested fees are reasonable and necessary. *See* Oaktree Plan at § 13.4.

8.  For the foregoing reasons, each as set forth in greater detail below, the Court should deny confirmation of the Oaktree Plan.

## BACKGROUND

9.  On September 9, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  On September 10, 2015, the Court entered an order providing for the joint administration of the Debtors' chapter 11 cases (the "Chapter 11 Cases") for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

10.  On September 21, 2015, pursuant to Bankruptcy Code section 1102, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the initial five members of the Committee [Docket No. 129].[7]  On September 28, 2015, the U.S. Trustee filed

---

[7] The initial Committee was comprised of the following entities:  (i) U.S. Bank National Association; (ii) New Generation Advisors, LLC; (iii) Samil Tong Sang, Co.; (iv) Simon Property Group, Inc.; and (v) Global Brands Group.

the *Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 163],

appointing two additional creditors to the Committee.[8]

### A.    The Debtors' Debt and Capital Structure

11.    As of the Petition Date, the Debtors' aggregate liabilities totaled approximately

$898 million, consisting of (i) approximately $92 million outstanding under a secured asset-

based revolving credit facility, (ii) approximately $280 million in Secured Notes,

(iii) approximately $223 million in Unsecured Notes, (iv) approximately $30 million of

European lines of credit and other borrowing facilities, (v) approximately $221 million in Euro

Notes and (vi) approximately $50 million of general unsecured debt.  As of the Petition Date, the

Debtors had 174,114,522 shares of common stock outstanding.

### B.    The PSA, Oaktree Plan and Disclosure Statement

12.    On September 9, 2015, the Debtors filed the *Debtors' Motion for Entry of an

*Order Authorizing and Approving (I) the Debtors' Assumption of the Oaktree Plan Sponsor*

*Agreement; and (II) the Payment of the Break-Up Fee and Related Transaction Expenses*

[Docket No. 25], pursuant to which the Debtors sought to assume that certain plan sponsor

agreement (as amended from time to time, the "PSA").  Pursuant to the restructuring transaction

contemplated by the PSA, Oaktree intends to obtain ownership of the Debtors' businesses

through both the equitization of its prepetition debt and its participation in a rights offering,

which Oaktree has agreed to backstop.  On September 21, 2015, the Debtors filed an amended

version of the PSA [Docket No. 128].

---

[8] The U.S. Trustee appointed T. Rowe Price Credit Opportunities Fund, Inc. and Wilfrid Global Opportunity Fund to the Committee on September 28, 2015.  Also on September 28, 2015, Global Brands Group resigned from the Committee.

13.     On October 13, 2015 and October 30, 2015, respectively, and consistent with the restructuring transaction described in the PSA, the Debtors filed the initial versions of the Oaktree Plan and the *Disclosure Statement with Respect to the Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and Its Affiliated Debtors and Debtors in Possession* [Docket No. 396] (as amended from time to time, the "Disclosure Statement").[9] On December 4, 2015, the Court entered an order approving the adequacy of the Disclosure Statement and authorizing the Debtors to solicit votes to accept or reject the Oaktree Plan [Docket No. 529].

14.     The Oaktree Plan provides that claims against the Debtors will be treated as follows: (i) the Debtors' prepetition ABL facility will be replaced with postpetition financing, and ultimately refinanced through an exit ABL revolver facility; (ii) the DIP Term Loan Facility Claims will be paid in full in Cash from the proceeds of the Exit Facility; (iii) the Secured Notes will be converted into equity and holders of Secured Notes will receive rights to purchase additional equity; (iv) unsecured claims will share ratably in a $12.5 million cash distribution and (as to Unsecured Notes Claims) rights to purchase $12.5 million of equity; (v) the unsecured guarantee claims on account of the Euro Notes will be reinstated; and (vi) existing equity will be cancelled; *provided, however*, that at the Plan Sponsor's election, Intercompany Interests may be reinstated.

15.     Among other things, the Oaktree Plan also provides for an exculpation of the "Exculpated Parties," which term is defined to include the following entities: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Backstop Parties; (iv) the Plan Sponsor; (v) the DIP Lenders; (vi) the DIP Agents; (vii) the Committee and each of its members; and (viii) the Secured Notes Agent.  Oaktree Plan § 1.83.

---

[9] The Debtors filed amended versions of the Oaktree Plan and the Disclosure Statement on November 17, 2015 [Docket Nos. 476, 477] and December 4, 2015 [Docket Nos. 527, 532].

16.    The hearing to consider confirmation of the Oaktree Plan is scheduled to commence on January 27, 2016.

### C.    Expert Reports Regarding Valuation

17.    On December 23, 2015, the Debtors served their expert report prepared by the Debtors' financial advisor, Peter J. Solomon Company ("PJSC") with respect to the Debtors' TEV and the value of the non-Debtor foreign subsidiaries (the "PJSC Report"). The PJSC Report employed two valuation methodologies in its analysis of the Debtors: (i) comparable companies and (ii) discounted cash flow. The PJSC Report estimates the mid-point of the Debtors' total enterprise value at $546 million and the mid-point of the value of the non-Debtor foreign subsidiaries at $370 million. *See* Motion ¶ 31. The PJSC Report estimates that the Debtors' equity interest in their foreign subsidiaries is valued at approximately $110 million, of which approximately $39 million is unencumbered. *See id.*

18.    On December 29, 2015, Oaktree filed its *Motion of Oaktree Capital Management for Entry of an Order (I) Determining the Diminution in Value of the Secured Notes Parties' Collateral, and (II) Granting Related Relief* [Docket No. 599] (the "Diminution Motion") and its expert report in support thereof (the "Houlihan Report") prepared by Houlihan Lokey Capital, Inc. As discussed in more detail in the Committee's objection to the Diminution Motion (the "Diminution Objection"), the Houlihan Report adopts the PJSC Report as to PJSC's valuation conclusions.

19.    On January 11, 2016, the Committee served its expert report prepared by PJT Partners LP ("PJT"), which addresses both valuation issues and the Houlihan Report (the "PJT Report"). The PJT Report also employs the following two valuation methodologies: (i) comparable companies and (ii) discounted cash flow. The PJT Report sets forth PJT's estimated value of the Debtors as a going concern, including the value of the Debtors' equity in

9

their non-Debtor foreign subsidiaries, and rebuts certain conclusions contained in the PJSC

Report and the Houlihan Report. Specifically, the PJT Report estimates the mid-point of the

Debtors' total enterprise value at approximately $690 million, and the mid-point value of the

non-Debtor foreign subsidiaries at $519 million. PJT estimates that the Debtors' equity interest

in their foreign subsidiaries is $260 million, of which approximately $91 million is

unencumbered. *See* PJT Report at 53. The PJT Report also identifies material errors in the PJSC

Valuation, which are addressed at length in the Plan Objection. *See supra* Section I.B.1.

20.     On January 14, 2016, the Committee filed the Plan Objection.[10]

## OBJECTION

I.     **The Oaktree Plan Violates the Absolute Priority Rule and Cannot Be Confirmed
       Under Bankruptcy Code Section 1129(b)**

   A.     **Applicable Legal Standard**

21.     The Oaktree Plan cannot be confirmed because it is neither fair nor equitable. For

a plan to be confirmed, the debtor bears the burden of establishing, by a preponderance of the

evidence, that the plan satisfies each of the requirements of Bankruptcy Code section 1129. *See,*

*e.g., In re Charter Commc'ns*, 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009) (finding that the debtor

bears the burden of establishing compliance with each component of section 1129); *In re Genesis*

*Health Ventures, Inc.*, 266 B.R. 591, 616 n. 23 (Bankr. D. Del. 2001) (same) (citing *In re Briscoe*

*Enters., Ltd., II*, 994 F.2d 1160, 1165 n. 26 (5th Cir. 1993)). If the debtor meets its burden of

proof with respect to each requirement of section 1129 (except section 1129(a)(8)) and at least

one impaired class votes to accept the plan, the plan may nevertheless be confirmed pursuant to

section 1129(b) if the plan (a) does not discriminate unfairly and (b) is fair and equitable with

respect to each impaired class that has rejected the plan. 11 U.S.C. § 1129(b). The Committee

---

[10] Contemporaneously herewith, the Committee has filed its Diminution Objection.

anticipates that Class 5-A (Unsecured Notes Claims) and Class 5-B (General Unsecured Claims) will reject the Oaktree Plan. Moreover, under the Oaktree Plan, holders of equity interests in Quiksilver are impaired and deemed to reject the Oaktree Plan under Bankruptcy Code section 1126(g). Accordingly, the Oaktree Plan cannot be confirmed unless the Debtors can demonstrate that the Oaktree Plan does not discriminate unfairly and is fair and equitable with respect to holders of unsecured claims and equity interests.

22.     Specifically, Bankruptcy Code section 1129(b)(2)(B)(ii) sets forth the absolute priority rule, which provides that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ." 11 U.S.C. § 1129(b)(2)(B)(ii). A corollary to the absolute priority rule is that a plan is not "fair and equitable" under Bankruptcy Code section 1129(b) if it provides senior creditors with more than payment in full on account of their claims to the detriment of a junior class. *In re Genesis Health Ventures, Inc.*, 266 B.R. at 612; *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003); *see also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to the junior class of debt or equity, as the case may be.").

23.     It follows, therefore, that a plan is not fair and equitable, and thus cannot be confirmed, if the plan undervalues the debtor's assets and, consequently, overcompensates senior creditors to the detriment of junior creditors or interest holders. *See In re Brewery Park Assocs. L.P.*, No. 10-11555, 2011 WL 1980289, at *14 (Bankr. E.D. Pa. Apr. 29, 2011) (denying confirmation of plan that would have overpaid secured claim to detriment of junior classes because plan was not fair and equitable under section 1129(b)); *In re Chemtura Corp.*, 439 B.R.

561, 592 (Bankr. S.D.N.Y. 2010) ("Courts will deny confirmation if a plan undervalues a debtor and therefore would have resulted in paying senior creditors more than full compensation for their allowed claims."); *In re Exide Techs.*, 303 B.R. at 77-78 (denying confirmation of plan premised on low valuation of debtors' enterprise value because, *inter alia*, debtor could not establish that requirements of Bankruptcy Code section 1129(b) were satisfied).

24.    The Oaktree Plan violates the absolute priority rule of Bankruptcy Code section 1129(b) for two reasons. First, it significantly undervalues the Debtors' businesses and provides the Secured Noteholders with approximately *$73 million* in value on account of their Secured Notes Claims to which they are not entitled. The majority of this overpayment should instead be distributed to Non-Priority Unsecured Creditors. Indeed, even if the holders of Secured Notes Claims were to assert their deficiency claim, Non-Priority Unsecured Creditors would still be entitled to an additional $46 million in value, for a total recovery of approximately $58.5 million. Although the Oaktree Plan also purports to grant Unsecured Noteholders the right to participate in the Exit Rights Offering, this "token" participation right is wholly illusory and does not provide meaningful value to such holders. Second, and despite the fact that Non-Priority Unsecured Creditors are not receiving payment in full, the Oaktree Plan provides that certain equity interests, which are indisputably junior to unsecured claims, will be reinstated and unimpaired at Oaktree's discretion. This proposed treatment clearly violates the absolute priority rule and, accordingly, the Oaktree Plan cannot be confirmed. Each of these points is addressed in further detail below.

**B.    The PJSC Valuation Materially Undervalues the Debtors' Total Enterprise Value, and Thus Secured Noteholders Are Receiving More Than Payment in Full on Account of Their Secured Notes Claims**

25.    The Debtors cannot satisfy their burden under Bankruptcy Code section 1129(b) to prove that the Oaktree Plan is fair and equitable because the Oaktree Plan proposes to

overcompensate the holders of the Secured Notes Claims at the expense of the Non-Priority

Unsecured Creditors.  This inequitable and impermissible result arises from the Debtors'

adoption of the PJSC Valuation.

26.    As set forth below, the PJSC Valuation significantly undervalues the Debtors as a

going concern enterprise, utilizing subjective and ultimately results-oriented metrics to achieve a

valuation consistent with the unconfirmable plan brokered by the Debtors and Oaktree to the

detriment of unsecured creditors.  Specifically, the PJSC Valuation: (i) disregards the value

ascribed to these assets by the market; (ii) improperly uses 2016E EBITDA multiples in its

comparable companies valuation; (iii) inappropriately applies multiples derived from PJSC's

own comparable companies multiples; (iv) uses inflated weighted average cost of capital

("WACC") assumptions in its discounted cash flow ("DCF") analysis; and (v) arbitrarily adjusts

the Company's business plan to drive value away from the foreign subsidiaries, to the detriment

of unsecured creditors and for the benefit of Oaktree.

    *1.*    *The PJSC Valuation Suffers from Numerous Infirmities*

        a.    PJSC Disregards the Value Ascribed to These Assets by the
             Market, *i.e.*, Oaktree

27.    One of the strongest indicators of value of an enterprise is the amount a party is

willing to pay to acquire a business.  Stated differently, "the best way to determine value is

exposure to a market." *Bank of Am. Nat'l Trust & Savings Ass'n v. 203 N. LaSalle Street P'ship*,

526 U.S. 434, 456 (1999).  *See also In re Boston Generating, LLC*, 440 B.R. 302, 325 (Bankr.

S.D.NY. 2010) ("It is generally accepted . . . that absent a showing that there has been a clear

market failure, the behavior in the marketplace is the best indicator of enterprise value."); *In re*

*Granite Broad. Corp.*, 369 B.R. at 143 ("there is no dispute that in many circumstances the best

evidence of value is what a third party is willing to pay in an arm's length transaction"); *In re*

*Chemtura Corp.*, 439 B.R. at 586 n. 106 ("Many observers believe that behavior in the marketplace is the best indicator of enterprise value.") (citation omitted).

28.     Notwithstanding the foregoing, the PJSC Valuation entirely disregards Oaktree's $735 million bid for Quiksilver (the "Oaktree Bid"), computed as the sum of the following key elements:  (a) an estimated $175 million of DIP Financing on exit; (b) an estimated $30 million of administrative expenses on exit; (c) $280 million of debt on account of the Secured Notes; (d) $220 million required to reinstate the guaranty of the Euro Notes; and (e) $30 million required to reinstate foreign lines of credit.  This fact is particularly surprising given that, earlier in these cases, PJSC touted its assessment of the more than $700 million valuation implied by the Oaktree Bid.  Specifically, PJSC's Vice Chairman, Marc Cooper, testified at his deposition that, "[w]e got an extraordinarily high value for the company . . . bringing Oaktree with an implied valuation of 700-plus million dollars."  (Cooper Tr. 167:12-23).  Similarly, PJSC's valuation expert, Durc Savini, testified as follows in his deposition:

> Q: What was your involvement, if any, in negotiating the breakup fee with Oaktree?
>
> A: I specifically looked at the breakup fee as a percent of the implied transaction value . . .
>
> Q: How did you calculate the implied transaction value?
>
> A: . . . [T]he transaction contemplates Oaktree converting $280 million of Secured Notes. So let's start with 280. In connection with obtaining 100% of the equity, they would have to assume the debt of foreign subs and that was approximately 250. The DIP had to be taken out. That's 175 . . . . There is at least $30 million of estimated admin . . . .
>
> Q: So –
>
> A: It is approximately $730 million.

(Savini Tr. 110:2 – 102:5).

29.     PJSC's acknowledged view as to the value of the Oaktree Bid is also reflected in

its sale process letter.  As reflected in the excerpt below, PJSC imposed a minimum $735 million

bid on potential bidders in connection with the sale "process" conducted in these cases.

CONFIDENTIAL

⌐PETER J SOLOMON COMPANY                                1343 Avenue of the Americas
                                                       New York, New York 10105
                                                       Tel: 212.508.1600
                                                       Fax: 212.508.1633

(iv)    **Overbid.**  In terms of value, the PSA transaction includes the following key
elements: (a) the DIP financing is estimated to be approximately $175 million on exit, not
including administrative expenses that are estimated at $30 million; (b) the Plan Sponsor, as a
holder of 73% of the U.S. Secured Notes, is sufficiently large to cause the class of U.S.
Secured Notes to convert $280 million of debt into equity; and (c) reinstating most of the
Debtors' obligations to guaranty the $220 million of Euro Notes and $30 million of foreign
lines of credit.

Notwithstanding the foregoing, PJSC now concludes that these enterprises should be valued at

just $546 million—nearly ***$200 million*** less than the Oaktree Bid.  PJSC provides no justification

for such a material departure from the market indicator of value set by the Oaktree Bid and,

accordingly, the PJSC Valuation should be afforded little weight.

        b.     The PJSC Valuation Improperly Uses 2016E EBITDA Multiples in
                Its Comparable Company Valuation

30.     PJSC's comparable company analysis is a market-based valuation methodology

used to estimate TEV according to how the stock market values comparable companies.  By

calculating the trading multiples of comparable public companies using performance metrics

such as EBITDA, this methodology is based upon actual market valuations and therefore is

generally accepted as a reliable indicator of the subject company's TEV.  The comparable

company analysis is conducted in three steps.  First, appropriate inputs must be determined,

including: (i) identification of the comparable companies; (ii) selection of relevant performance

metrics; and (iii) selection of the relevant time period.  Second, a multiple must be derived by

comparing the TEV of each comparable company to the previously selected performance metric

15

(*e.g.*, EBITDA).  Finally, TEV is generated by applying the market multiple to the selected

performance metric of the subject company.

      31.    Critically, when valuing a business based on multiples of EBITDA, one must look

at steady-state EBITDA (*i.e.*, EBITDA that is reflective of the company's long-term prospects):

> To build a forward looking multiple, choose a forecast year for EBITDA that
> best represents the long-term prospects of the business.  In periods of stable
> growth and profitability, next year's estimate will suffice.  For companies
> generating extraordinary earnings (either too high or too low) or for
> companies whose performance is expected to change, use projections further
> out.

(*Valuation*: *Measuring and Managing the Value of Companies*, McKinsey & Company, p. 312).

      32.    Tying a company's value to its long-term prospects or prospective earning

capacity is "essential . . . if the enterprise is to be freed from the heavy hand of past errors,

miscalculations or disaster, and if the allocation of securities among the various claimants is to

be fair and equitable." *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941) (citations

omitted).  Beginning with the Supreme Court's decision in *Consolidated Rock*, courts have

consistently held that valuations in chapter 11 should reflect a debtor's post-emergence earnings

capacity and future ability to generate free cash flow.  *See id.* at 525; *see also Protective Comm.*

*for Indep. Stockholders of TMT Trailer Ferry Inc., v. Anderson*, 390 U.S. 414, 442 n.20 (1968);

*In re Bush Indus.*, 315 B.R. 292, 299 (Bankr. W.D.N.Y. 2004) ("For purposes of the cram down

provisions of 11 U.S.C. § 1129(b), the debtor must demonstrate its present value as a reorganized

entity . . . .  Accordingly, the appropriate valuation of Bush Industries is to be grounded upon its

earning capacity as a reorganized entity."); *In re Duplan Corp.*, 9 B.R. 921, 925 (W.D.N.Y.

1980) ("The value of a business is based on expectations of profits.  To arrive at the value of a

debtor's business, prospective earnings are capitalized at an appropriate rate.") (internal citations

omitted); *In re Nellson Nutraceutical*, No. 06-10072 (CSS), 2007 WL 201134, at *28 (Bankr. D.

16

Del. Jan. 18, 2007) ("Rather, Consolidated Rock establishes that the key criteria in valuing a company should be that company's 'earning capacity' rather than its market value during bankruptcy, because, among other things, being in bankruptcy will harm that market value.").

33.    Accordingly, a comparable company valuation is flawed where, as is the case here, the EBITDA multiples used do not properly capture or reflect the company's future earning capacity.  Specifically, historical and projected financial performance demonstrate that 2016 does not represent Quiksilver's steady-state EBITDA, but instead the beginning of a turnaround:



(PJT Report, p. 21).

34.    Despite Quiksilver's historical performance and business plan projections, PJSC's comparable companies methodology places an equal weight on 2016E and 2017E EBITDA multiples and completely disregards 2018E EBITDA multiples.  PJSC's methodology therefore is at odds not only with Quiksilver's historical performance and business plan projections, but also with management's stated view that the business plan constitutes a turnaround plan.  As set forth in the business plan's executive summary, "the business plan reflects the management team's view of the go-forward business based on a reflection of historical operating trends and management initiatives to *rebuild* the business."  (Business Plan, p. 3) (emphasis added). Similarly, the plan is intended to "restore profitability in North America in 2016 . . . improving

cash generation." (*Id.*)  Indeed, the business plan contemplates 103 store closures in 2016 alone. (*Id.* at 5).

35.    Because PJSC uses an EBITDA multiple that bears no relation to the Debtors' anticipated performance, PJSC's valuation contains numerous aberrant results, which include, among others:

- The $███ million mid-point in PJSC's 2017E EBITDA multiples analysis is ███% higher than the $███ million mid-point valuation in its 2016E EBITDA multiples analysis.  (PJSC Report, p. 8);

- The $███ million *low* valuation implied by PJSC's discounted cash flow methodology is ███% higher than the $███ million *high* valuation implied by its 2016 multiples (*Id.*);

- If 2016E EBITDA multiples are included, the total valuation range of $███ million ($███ to $███ million) is larger than the mid-point of PJSC's valuation ($███ million) (*Id.*); and

- The $███ million mid-point valuation in PJSC's 2016E EBITDA multiples approach implies an insolvent Company, as the Company is projected to have $███ million of net debt at emergence.  (*Id.* at 9, 47).

36.    These results are inexplicable precisely because 2016E EBITDA is not reflective of the Company's steady-state earning.  2016E EBITDA multiples should therefore be excluded from PJSC's comparable company analysis.

37.    Correcting for this error, PJT removed 2016E EBITDA multiples and used only 2017E EBITDA multiples.  Holding all other PJSC assumptions constant and making only this change results in the following, as shown in the below chart:

- Mid-point TEV increased by $███ million, from $███ million to $███ million;

- Mid-point value of the foreign subsidiaries increased by $███ million, from $███ million to $███ million; and

- Mid-point value of the Unencumbered Foreign Equity increased by $███ million, from $███ million to $███ million.



(PJT Report, p. 23).

### c.    The PJSC Valuation Inappropriately Applies PJSC's Own Comparable Companies Multiples

38.    PJSC began its comparable companies analysis by selecting a peer group (the "Reference Group") of comparable companies. However, in PJSC's comparable companies valuation, PJSC does not apply the multiples implied by the Reference Group. Instead, as shown below, the multiples PJSC applies to Quiksilver's expected EBITDA bear no relation to those of PJSC's Reference Group:



(PJT Report, p. 25).

39.    For the year 2016, the median Reference Group multiple is 46.0% higher than the PJSC mid-multiple and 36.8% higher than the PJSC high-multiple. For 2017, the median

19

Reference Group multiple is 18.4% higher than the PJSC mid-multiple and 11.5% higher than the PJSC high-multiple.

40.     The arbitrary nature of PJSC's chosen multiples is further highlighted by the fact that the multiples PJSC applies to 2016E EBITDA are *lower* than those applied to 2017E EBITDA.  Elementary finance principles (and the multiple of the Reference Group) suggest that 2016E EBITDA multiples should be higher than 2017E EBITDA multiples.  Forward-looking multiples are calculated using today's enterprise value divided by EBITDA estimates for future periods.  Given that EBITDA for the Company and all of its peers is expected to grow, and total enterprise value is constant, EBITDA multiples for 2016 necessarily should be higher than EBITDA multiples for 2017.[11]  (PJSC Report, p. 8).

41.     PJSC diverges from the multiples implied by its Reference Group and, without any justification or explanation, improperly applies its own multiples.  While "valuations are subjective, there are proper and improper methods of performing a valuation."  *In re Coram Healthcare Corp.*, 315 B.R. 321, 339 (Bankr. D. Del. 2004).   When performing a valuation, experts should not make arbitrary or unsubstantiated "adjustments to the valuation methodologies" but, rather, should engage in a "straightforward application of the valuation methodologies to arrive at a better understanding of whether the debtor's plan treats creditors fairly and equitably."  *In re Exide Techs*, 303 B.R. at 66.  *See also Aswath Damodaran, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* (John Wiley & Sons, Inc. 1996) at 304 (stating that "[e]ven when a legitimate group of comparable firms can be constructed, differences will continue to persist in fundamentals between the firm

---

[11] This relationship holds true when implied multiples are calculated on PJSC's final $546 million valuation—the ██x implied multiple in 2016 is higher than the ██x implied multiple in 2017.  (PJSC Report, p. 8).

being valued and this group. Adjusting for differences subjectively does not provide a

satisfactory solution to this problem.").

42.    Any adjustment to a valuation methodology must be accompanied by an

objective/verifiable or "clear" reason. *ABI Law Review,* Christopher Sontchi, *"Valuation*

*Methodologies: A Judges View"*, 20 Am. Bankr. Inst. L. Rev. 1, 16 (2012). As explained by

Judge Sontchi:

> In performing valuations, financial professionals often make "adjustments" to
> the selected methodology . . . [J]udges are inherently suspicious of these
> adjustments. The concern is that the adjustment is being made to manipulate
> the valuation to reach a predetermined result. This is particularly the case
> when all of the adjustments tend to move the conclusion of value in favor of
> the financial professional's client. Thus, a financial professional making such
> an adjustment should be prepared to provide a clear reason for it.

(*Id.*; (as cited by the Houlihan Report at 29)).

43.    PJSC's only mention of the adjustment between Reference Group multiples and

selected multiples is on page 12 of the PJSC Report, which states that "the Reference Group

Market Multiple benchmarks were then used to develop selected multiple ranges for Quiksilver,

which appropriately account for, among other things, the differential (i) profitability, (ii) growth

and (iii) risk characteristics, as between Reference Group and Quiksilver." (PJSC Report, p. 12.)

PJSC then makes a meaningful downward adjustment to the Reference Group multiples without

*any* analysis of the listed characteristics. Further, PJSC appears to have abandoned the

adjustment altogether when it applied a ███ x terminal multiple in its discounted cash flow

analysis (a range far more in line with the Reference Group). (PJSC Report, p. 19.)

44.    PJT has determined that none of these characteristics listed by PJSC provides a

basis for PJSC's adjustment. While PJSC suggests that Quiksilver warrants a lower multiple

because it has lower EBITDA margins than those of the Reference Group, this suggestion is not

supported by logic or financial theory. Quiksilver's projected EBITDA already accounts for its

lower EBITDA margins; applying a lower multiple is therefore unwarranted.  Consequently,

PJSC "double counts" the lower profitability by applying a lower multiple to already depressed

EBITDA. (PJT Report, p. 27.)

45.    PJSC also cites "growth" as a reason to reduce the multiple applied to Quiksilver.

However, as shown on page 13 of the PJSC Report (and replicated below), Quiksilver is

projected to grow meaningfully more than the companies in the Reference Group.  When

analyzed by PJT, none of the characteristics listed by PJSC (*i.e.,* profitability, growth and risk

characteristics) provide a basis for PJSC's material and ultimately self-serving adjustment.

| Reference Group[1] | 3-Year EBITDA CAGR |
|---|---|
| Adidas | 11.2% |
| Billabong | 19.1% |
| Columbia Sportswear | 12.0% |
| Crocs | 81.7% |
| Deckers | 9.2% |
| Lululemon Athletica | 19.9% |
| NIKE | 13.7% |
| PUMA | 31.6% |
| Skechers | 17.5% |
| Under Armour | 28.5% |
| V.F. Corporation | 9.3% |
| Wolverine Worldwide | 4.8% |
| **Mean** | **21.6%** |
| **Median** | **15.6%** |
| **Quiksilver** | **90.0%** |

[1] (PJSC Report at 13).

Over the 3-year projection period, Quiksilver's EBITDA is projected to grow at a compound

annual growth rate ("CAGR") of 90%.  This compares favorably to the Reference Group's

median 3-year EBITDA CAGR of 15.6% and mean 3-year EBITDA CAGR of 21.6%.  Higher

projected growth is a basis to apply *higher* multiples to Quiksilver's EBITDA, not lower.

46. Lastly, while risk may be a reason to adjust multiples, PJSC does not provide any analysis explaining why Quiksilver is more risky than the companies in the Reference Group. In fact, as shown below, Quiksilver's growth path may be less risky than that of the Reference Group because Quiksilver can achieve meaningful EBITDA growth simply by right-sizing its cost structure and causing its margins to be in line with its historical performance.

| ($ in millions) | 2011A | 2012A | 2013A | 2014A | 2015P | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|
| Revenue | $1,916 | $1,942 | $1,811 | $1,570 | $1,345 | $1,247 | $1,297 | $1,391 |
| EBITDA | 188 | 141 | 118 | 39 | 15 | 32 | 65 | 100 |
| EBITDA Margin (%) | 9.8% | 7.3% | 6.5% | 2.5% | 1.1% | 2.5% | 5.0% | 7.2% |
| SG&A | 882 | 888 | 858 | 827 | 678 | 607 | 609 | 632 |
| SG&A Margin (%) | 46.0% | 45.7% | 47.4% | 52.7% | 50.4% | 48.7% | 46.9% | 45.4% |

(PJT Report, p. 29).

47. To correct for PJSC's error, PJT adjusted PJSC's assumptions by applying the median multiple from PJSC's Reference Group to Quiksilver. The median represents the "consensus" market wisdom on the appropriate valuation for the Company, based on a Reference Group comprised of companies that PJSC has deemed to be the most comparable to Quiksilver.

48. Blending this adjustment with PJSC's unchanged DCF valuation results in the following changes, as shown in the below chart:

- Mid-point TEV increases by $▮ million, from $▮ million to $▮ million;

- Mid-point value of foreign subsidiaries increases by $▮ million, from $▮ million to $▮ million; and

- Mid-point value of the Unencumbered Foreign Equity increases by $▮ million, from $▮ million to $▮ million.

23



(PJT Report, p. 31).

> d. The PJSC Valuation Uses Inflated WACC Assumptions in Its DCF Analysis

49.    The DCF methodology estimates TEV based on the net present value of a debtor's projected unlevered free cash flows.  The first step in performing a DCF analysis typically requires projecting the debtor's cash flows through a particular projection period, which is generally until the debtor reaches a point of stable growth.  Next, the applicable discount rate is calculated utilizing the weighted average cost of capital.  The WACC represents the returns that investors would demand from an investment in the company's debt and equity, blended at the company's relative debt to equity ratio.  Finally,  a terminal value, representing the value of the debtor's cash flows beyond the projection period, is calculated using two generally accepted valuation techniques: (a) the terminal multiple method  (the "Terminal Multiple Method") and (b) the perpetuity growth rate method (the "Perpetuity Growth Method").

50.    The WACC used by PJSC in their DCF analysis is improperly inflated, resulting in an inappropriately low valuation.  Specifically, PJSC made two key flawed assumptions

relating to (i) the cost of debt and (ii) the applicable size premium when calculating the Debtors' WACC.

51.    First, PJSC uses a pre-tax cost of debt range of 7.0%-9.0% (with a mid-point of 8.0%) for their WACC calculation without providing any analysis to substantiate this assumption, including a calculation of the Company's expected post-emergence blended cost of debt. This omission is particularly glaring given PJT's own estimate of the Debtors' pre-tax cost, which is (i) within a range of 6.1%-8.1% (with a mid-point of 7.1%) and (ii) based upon estimates provided by the Debtors and their advisors. (PJT Report, p. 33.) Having provided no explanation for its pre-tax cost of debt range, this unsubstantiated assumption appears to be based on little more than conjecture.

52.    Second, PJSC utilizes a size premium of 5.78% in their DCF analysis based on the 10th size decile in Duff & Phelps's 2015 Valuation Guide ("Duff & Phelps").[12] A size premium is intended to be chosen based on a range of equity values similar to the company being valued.  The narrower the range of equity values, the more precise and accurate the size premium. However, in selecting the 10th decile in Duff & Phelps, PJSC opted for a very broad decile that includes companies with an equity value between *$3 million and $300.7 million*. PJSC makes this selection notwithstanding the fact that Duff & Phelps includes sub-deciles that provide a much narrower range of equity values.  PJSC offers no explanation for disregarding these relevant data.

53.    Given PJSC's equity valuation range for the Debtors of $289 million to $442 million, PJSC should have used a size premium range from 2.69% to 3.18% according to Duff &

---

[12] Duff & Phelps is the recognized authority in the industry for determining size premium.

Phelps. Instead, PJSC used a size premium of 5.78%, which has the effect of increasing the WACC and driving down total enterprise value. (PJT Report, p. 34).

54. PJT has adjusted PJSC's WACC to correct the errors in cost of debt and size premium. Specifically, PJT assumed 7.06% for the Company's pre-tax cost of debt, and conservatively uses a 3.18% size premium. Based on the corrected inputs, PJT selected a 10-12% WACC range, rather than the 11-13% range chosen by PJSC. PJT then adjusted PJSC's DCF analysis to account for the revised WACC range of 10-12%. Holding all other methodological choices constant, PJSC's mid-point DCF valuation increased by $47 million, from $682 million to $729 million. These adjustments are reflected in the chart below.

*($ in millions)*

**Mid-point DCF Valuation**

| | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|
| Unlevered Free Cash Flow[1] | $42.5 | $21.0 | $40.7 |
| Discount Period | 0.33 | 1.25 | 2.25 |
| Discount Factor (Mid WACC of 11%) | 96.6% | 87.8% | 79.1% |
| Discounted Cash Flow | $41.1 | $18.4 | $32.2 |

| Terminal Multiple Method | | Perpetuity Growth Method | | Blended Valuation | |
|---|---|---|---|---|---|
| Terminal EBITDA[1] | $99.9 | Terminal Cash Flow[2] | $58.0 | TEV (Terminal Multiple) | $804 |
| Terminal Multiple[3] | 9.5x | Perpetuity Growth[3] | 3.0% | TEV (Perpetuity Growth) | 653 |
| Terminal Value | 950 | Terminal Value[4] | 747 | TEV (Average) | $729 |
| Discount Period | 2.75 | Discount Period | 2.75 | | |
| Discount Factor | 75.1% | Discount Factor | 75.1% | Memo: PJSC DCF Valuation[3] | |
| Discounted Terminal Value | 713 | Discounted Terminal Value | 561 | TEV (Terminal Multiple) | ■ |
| Plus: Discounted Cash Flows | 92 | Plus: Discounted Cash Flows | 92 | TEV (Perpetuity Growth) | ■ |
| Total Enterprise Value | $804 | Total Enterprise Value | $653 | TEV (Average) | ■ |

| Memo: Terminal Cash Flow Build[2] | |
|---|---|
| FY 2018 Cash Flow | $40.7 |
| Plus: Tax Adjustments | (3.6) |
| Plus: Normalization of WC | 20.9 |
| Terminal Cash Flow | $58.0 |

(PJT Report, p. 36).

55. PJT also adjusted PJSC's QS Wholesale DCF analysis to account for this revised WACC range. Holding all other methodological choices constant, PJSC's mid-point valuation increases by $15 million, from $216 million to $231 million. This adjustment is reflected in the chart below.

26

*($ in millions)*

| Mid-point DCF Valuation | | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|
| Unlevered Free Cash Flow[1] | | $13.6 | $6.6 | $13.4 |
| Discount Period | | 0.33 | 1.25 | 2.25 |
| Discount Factor (Mid WACC of 11%) | | 96.6% | 87.8% | 79.1% |
| **Discounted Cash Flow** | | **$13.1** | **$5.8** | **$10.6** |

| Terminal Multiple Method | | | Perpetuity Growth Method | | | | |
|---|---|---|---|---|---|---|---|
| Terminal EBITDA[1] | $31.5 | | Terminal Cash Flow[2] | $18.5 | | TEV (Terminal Multiple) | $254 |
| Terminal Multiple[3] | 9.5x | | Perpetuity Growth[3] | 3.0% | | TEV (Perpetuity Growth) | 208 |
| Terminal Value | 299 | | Terminal Value[4] | 238 | | **TEV (Average)** | **$231** |
| Discount Period | 2.75 | | Discount Period | 2.75 | | | |
| Discount Factor | 75.1% | | Discount Factor | 75.1% | | Memo: PJSC DCF Valuation[3] | |
| **Discounted Terminal Value** | **224** | | **Discounted Terminal Value** | **178** | | TEV (Terminal Multiple) | ■ |
| Plus: Discounted Cash Flows | 30 | | Plus: Discounted Cash Flows | 30 | | TEV (Perpetuity Growth) | ■ |
| **Total Enterprise Value** | **$254** | | **Total Enterprise Value** | **$208** | | **TEV (Average)** | ■ |

| Memo: Terminal Cash Flow Build | |
|---|---|
| FY 2018 Cash Flow | $13.4 |
| Plus: Tax Adjustments | 0.1 |
| Plus: Normalization of WC | 4.9 |
| **Terminal Cash Flow** | **$18.5** |

(PJT Report, p. 37).

     56.    Lastly, PJT incorporated the corrected DCF into PJSC's otherwise unchanged valuation. The results are as follows, as shown in the below chart:

- Mid-point TEV increases by $■ million, from $■ million to $■ million;

- Mid-point value of the foreign subsidiaries increased by $■ million, from $■ million to $■ million; and

- Mid-point value of the Unencumbered Foreign Equity increased by $■ million, from $■ million to $■ million.



(PJT Report, p. 39).

> e.    The PJSC Valuation Arbitrarily Changes the Company's Business Plan To Increase Royalty Fees

57.    Despite claiming that its "valuation analysis is based on Quiksilver's 3-year business plan," PJSC inexplicably modifies the projections in the plan by adjusting the royalty rate paid to the Company's U.S. businesses on account of the DC Shoes, Inc. intellectual property from 3.0% to 5.8% (a 93% increase in the royalty rate versus the business plan). This departure from the business plan is unjustified given PJSC's approach and rationale. The intended result, however, is clear in that the adjustment shifts value away from the foreign subsidiaries and to the U.S. Debtors.

58.    There is no dispute that the Company's business plan contemplates a royalty rate of 3.0%. Throughout numerous diligence calls and analyses provided by Quiksilver and its advisors, it has always been communicated to the Committee and its advisors that 3.0% was the agreed-upon rate on a historical and go-forward basis. Moreover, the "Royalties Business Plan"

provided by FTI explicitly states that DC Shoes, Inc. royalties are "3% of DC Shoes wholesale equivalent sales outside the US." (Royalties Business Plan.)

59.    In order to justify its only adjustment to the business plan, PJSC cites to a report prepared by Hilco (the "Hilco Report"). (PJSC Report, p. 27.) The Hilco Report was prepared in 2015 at the request of Oaktree and Centerbridge. The "comps" used in the Hilco Report to derive an average royalty rate are dated third-party rates. (Hilco Report on September 4, 2015, p. 85.). Specifically, Hilco relies on 29 "comps" in which the median known/cited date of the royalty agreement listed is 1997. Many "comps" are of an unknown date. Of the "comps" with disclosed dates, one "comp" is from 1973, and the most recent "comp" is from 2005. The Hilco Report therefore is not a legitimate basis upon which to conclude, as PJSC does, that the royalty rate should instead be 5.8%.

60.    Assuming the 5.8% royalty rate for the DC Shoes intellectual property was truly a "market" rate that one would charge a third party, PJSC provides no justification as to why the Debtors' own foreign subsidiaries should be considered such a third party. [13] The foreign subsidiaries are in fact *not* a third party, but rather an integral part of the Debtors' businesses. Assigning a "third party" royalty rate to the Debtors' foreign subsidiaries would disregard the significant synergies that exist due to the integration of the Debtors' domestic and foreign businesses. The Debtors' globalized supply chain and back office functions allow for economies

---

[13] Even if 5.8% were the correct rate, the 3% royalty arrangement that currently exists between the Debtors and the non-Debtor foreign subsidiaries would be an asset of the non-Debtor foreign subsidiaries. Any attempt to alter that arrangement in this context is clearly intended to shift value away from the foreign subsidiaries and, thus, away from unsecured creditors.

of scale and efficiency. Related parties create and share the benefits of these economies of scale and efficiency, making a third-party rate irrelevant.[14]

61.    PJT corrected PJSC's royalty error by reinserting the 3.0% rate currently in existence and contemplated by the Company's business plan. The adjustment reduces both the accrued royalties (impacts EBITDA) and cash royalties (impacts free cash flow) paid to the U.S. Debtor entities from the foreign non-Debtor subsidiaries:

- Cumulative 3-year accrued royalties adjustment of $13.4 million; and

- Cumulative 3-year cash royalties adjustment of $13.6 million.

(PJT Report, p. 44).

62.    PJT then adjusted PJSC's comparable companies valuation for QS Wholesale to reflect the appropriate baseline EBITDA figures for CY 2016 and CY 2017. (*Id*. at 45.) PJT also adjusted PJSC's DCF valuation of QS Wholesale to reflect the appropriate unlevered free cash flows for 2016-2018, and corrected terminal unlevered free cash flows of terminal EBITDA. (*Id*. at 46.)

63.    Finally, PJT incorporated the corrected royalty analyses into PJSC's otherwise unchanged valuation. The results are as follows:

- Mid-point TEV remains unchanged at $546 million;

- Mid-point value of the foreign subsidiaries increases by $39 million, from $371 million to $410 million; and

- Mid-point value of the Unencumbered Foreign Equity increases by $14 million, from $39 million to $53 million.

(PJT Report, p. 47).

---

[14] Indeed, the global nature of the business is one of the key components of the Company's turnaround strategy (Business Plan 10.20.15, p. 38.).

f.    Conclusion

64.    After correcting for each of these five flaws in the PJSC Valuation, the

Company's TEV increases from $546 million to $690 million, and the value of the

Unencumbered Foreign Equity increases from $39 million to $91 million.  These numbers are

corroborated by PJT's independent valuation, which is addressed below.

2.    *Affirmative Valuation*

a.    The PJT Valuation Is the Result of Careful Analysis and the
Application of Generally Accepted Valuation Methods

65.    PJT also applied the comparable companies and DCF methodologies to determine

the appropriate TEV of the Debtors as a whole, as well as the TEV of QS Wholesale, the Debtor

entity where the U.S. operations reside.[15]  In preparing its valuation, PJT accepted, without

adjustment, the following: (i) the projections in the business plan; (ii) PJSC's comparable

company Reference Group; (iii) comparable companies multiples as of November 13, 2015; and

(iv) the comparable companies median EBITDA estimates for calendar year 2017.  PJT's

valuation, among other things, corrects the five material errors in PJSC's valuation discussed

above.

66.    Weighting the comparable companies and DCF analyses equally, PJT valued the

Debtors at an estimated TEV range of $633 million to $759 million, with a mid-point TEV of

$690 million, as shown in the chart below.

---

[15] As explained below, and consistent with PJSC's approach, PJT determined the value of the equity in the foreign
subsidiaries by subtracting the value of QS Wholesale from the Debtors.

## PJT VALUATION SUMMARY
($ in millions)



(PJT Report at 51).

67.     PJT further valued QS Wholesale at an estimated TEV range of $156 million to

$188 million, with a mid-point TEV of $170 million. *See* PJT Report at 52. PJT then subtracted

QS Wholesale's estimated TEV from that of the Debtors' overall TEV, which yielded an

estimated TEV range for the non-Debtor foreign subsidiaries of $477 million to $571 million,

with a mid-point of $519 million. *See* PJT Report at 53.  Subtracting an estimated net debt

balance owed by the non-Debtor foreign subsidiaries of approximately $259 million, PJT

estimated that the mid-point TEV of the non-Debtor foreign subsidiaries implied an equity value

of approximately $260 million.  *See* PJT Report at 53.  Accordingly, PJT's mid-point estimate of

the value of the Unencumbered Foreign Equity, which constitutes 35% of the equity in the non-

Debtor foreign subsidiaries, is $91 million. (*See* PJT Report at 53).

### i.    Comparable Companies Analysis

68.    The PJT and PJSC comparable companies analyses use nearly identical data.  PJT

used the same comparable companies as PJSC because PJT determined that the comparable

companies that PJSC chose were appropriate due to a variety of factors, including product mix,

target customers, growth characteristics, and operational factors.  PJT also used the 2017E

EBITDA estimates for each of the comparable companies, which were obtained from the

research reports cited by PJSC.  (*See* PJT Report at 55).

69.    Unlike PJSC, however, PJT did not make subjective adjustments.  First, PJT did

not use 2016E EBITDA multiples because 2016E EBITDA is not reflective of the Company's

steady-state earnings.  Second, PJT applied an EBITDA multiple range consistent with the

median multiple for the comparable companies rather than arbitrarily choosing lower multiples.

While the Debtors may warrant a premium multiple due to their significantly higher growth

prospects, PJT conservatively used a 1.0x multiple range, centered on the comparable

companies' median multiple.  The median represents the "consensus" market wisdom on the

appropriate valuation for the Debtors based on a group of companies that PJSC determined to be

most comparable to the Debtors.  PJT applied the range of multiples to the Debtors' 2017E

EBITDA to determine the TEV.  (*See* PJT Report at 55).

70.    PJT's comparable companies analysis for the Debtors yielded an estimated TEV

range of $616 million to $685 million, with a mid-point of $651 million.  The same analysis for

QS Wholesale resulted in an estimated TEV range of $148 million to $165 million, with a mid-

point of $156 million. Subtracting the QS Wholesale TEV estimates from the overall TEV for

the Debtors, PJT arrived at an implied mid-point TEV of $494 million for the non-Debtor foreign subsidiaries, with an estimated TEV range of $468 million to $520 million. Subtracting an estimated net debt balance owed by the non-Debtor foreign subsidiaries of approximately $259 million, PJT estimated that the mid-point TEV of the non-Debtor foreign subsidiaries implied an equity value of approximately $235 million. Accordingly, PJT's mid-point estimate of the value of the Unencumbered Foreign Equity, which constitutes 35% of the equity in the non-Debtor foreign subsidiaries, is $82 million. (*See* PJT Report at 57).

71.     PJT's use of steady-state EBITDA and application of an EBITDA multiple range consistent with the median multiple for the comparable companies resulted in an objective and straightforward comparable companies analysis without subjective adjustments, and is therefore a reliable indicator of TEV for the Debtors, QS Wholesale, and the Unencumbered Foreign Equity.

### ii.    Discounted Cash Flow Analysis

72.     To derive the TEV for the Debtors and QS Wholesale, PJT performed a DCF analysis. In performing its DCF analysis, PJT first discounted the Debtors' projected future unlevered free cash flow, and then calculated the terminal value at an appropriate discount rate. (*See* PJT Report at 59). As described further below, PJT used a straightforward, objective approach in arriving at its estimated DCF TEV range for the Debtors, as opposed to that employed by PJSC as addressed in Section I.B(i)(d) above.

*(1)     Estimating Future Cash Flows: Step One of the DCF Analysis*

73.     Free cash flow is a measure of financial performance calculated as operating cash flow minus capital expenditures. Free cash flow represents the cash that a company is able to generate after spending the money required to maintain or expand its asset base. In other words,

34

unlevered free cash flow is the hard currency that is available to pay the company's various claimholders.

74.    Both PJT and PJSC relied on the business plan to calculate the Debtors' unlevered free cash flows for use in its DCF analysis.  The business plan projects the Debtors' earnings from 2016 through 2018 (the "Projection Period").  Accordingly, PJT's calculation of unlevered cash flows for the Debtors is identical to PJSC's calculation.  (*See* PJT Report at 61).  However, PJT's calculation of unlevered cash flows for QS Wholesale differs from PJSC's calculation because PJT used the appropriate royalty rate of 3% as supported by the business plan.  By contrast, PJSC used an arbitrary and unsubstantiated royalty rate of 5% that is not supported by the business plan. (*See* PJT Report at 63; *infra* Section B.1.e).

> (2)    *Determining the Discount Rate: Step Two of the DCF Analysis*

75.    The second step in performing a DCF analysis is to determine the appropriate rate by which to discount the projected future cash flows and the projected terminal value of the company to arrive at its present value.  The most accepted method for calculating the discount rate is through the company's WACC.  As noted above, the "WACC" is the weighted average of the debtor's cost to obtain equity financing and debt financing based upon a target capital structure.  The cost of equity and the cost of debt are collectively referred to as "capital costs."

76.    PJT's calculation of the WACC departed from PJSC's calculation in two material respects.  First, PJT's valuation used a cost of debt range of 6.1% to 8.1% based on an analysis of the Debtors' *pro forma* blended interest rate.  Second, PJT used a conservative size premium of 3.18%.  (*See* PJT Report at 60).  By contrast, PJSC used a higher size premium at 5.78%. (*See* PJSC Report at 22).  In all other respects, PJT's calculation of the WACC used data consistent with that in the PJSC valuation, including the risk-free rate, the tax rate, and the unlevered beta.

*See* PJT Report at 60.  PJT determined that the appropriate WACC was 10% to 12% by

analyzing market data and comparable companies.  (*See* PJT Report at 60).

(3)    *Estimating Terminal Value Assumptions: Step*
*Three of the DCF Analysis*

**(a)    Perpetuity Growth Method**

77.    The Perpetuity Growth Method estimates the value of free cash flows into

perpetuity by assuming that the company's cash flows will continue growing at a constant rate,

known as the perpetuity growth rate.  The perpetuity growth rate is calculated based on the

assumption that a company that is able to generate returns above the cost of capital will

eventually attract competitors, whose entry into the business will drive returns down to the

minimum acceptable rate, or cost of capital.

78.    PJT used the same 2.5% to 3.5% perpetuity growth rate that PJSC used because

such rate represented a reasonable projection of the Debtors' long term growth.  This

methodology produced a TEV range of $549 million to $804 million, with a mid-point of $653

million for the Debtors.  (*See* PJT Report at 62).  For QS Wholesale, the Perpetuity Growth

Method produced a TEV range of $131 million to $193 million, with a mid-point of $156

million.  (*See* PJT Report at 64).

**(b)    The Terminal Multiple Method**

79.    The Terminal Multiple Method utilizes a multiplier (the "Terminal Multiple") of

an income or a cash flow measure, such as revenue or EBITDA, to determine a terminal value

for a company's future cash flows.  Because the Terminal Multiple Method assumes the business

will be sold at the end of the projection period, the Terminal Multiple is generally determined by

reference to how comparable companies are valued by the market.  *See, e.g., In re Am. Classic*

*Voyages Co.*, 367 B.R. 500, 510, n.15 (Bankr. D. Del. 2007) (stating that "the Exit Multiple

36

Approach calculates terminal value by using a comparable company analysis to compute a multiple that can be applied to the terminal year's EBITDA"); *In re Bush Indus., Inc.*, 315 B.R. 292, 300-01 (stating that conducting a comparable company analysis is an appropriate methodology for determining a debtor's exit multiple). Once the appropriate Terminal Multiple is determined, it is then applied to the subject company's EBITDA for the final year of the forecast period to arrive at the terminal value.

80.    PJT used a Terminal Multiple range of 9.0-10.0x, which was the same range used by PJSC. PJT then calculated the terminal value by multiplying 2018E EBITDA by the Terminal Multiple range, which produced a TEV range for the Debtors of $750 million to $862 million, with a mid-point of $804 million. (*See* PJT Report at 62). For QS Wholesale, the Terminal Multiple Method produced a TEV range of $197 million to $228 million, with a mid-point of $212 million. (*See* PJT Report at 64).

81.    Because terminal value represents a debtor's value into perpetuity, it is the largest component of the Debtors' TEV. Therefore, it is extremely important that the terminal value calculation be conducted objectively and that the inputs used be appropriate based on the Debtors' financial condition and the overall status of the industry in which they operate. Accordingly, in calculating the terminal value for the Debtors and QS Wholesale, PJT used only inputs that were based on market-driven values, and applied both the Perpetuity Growth Method and the Terminal Multiple Method.

(4)    *The Debtors' TEV Under PJT's DCF Analysis*

82.    Under PJT's DCF analysis, the Debtors' estimated TEV range is $649 million to $833 million, with a mid-point of $729 million. (*See* PJT Report at 62). PJT further concluded that QS Wholesale's estimated TEV range is $164 million to $211 million, with a mid-point of

$184 million.  (*See* PJT Report at 64).  PJT's DCF ranges weight perpetuity and terminal

multiple methodologies equally, consistent with PJSC's approach.

83.    PJT then weighted the comparable companies analysis and the DCF analysis

evenly and concluded that the mid-point of the Debtors' TEV is $690 million, with a range of

$633 million to $759 million; that the mid-point of the TEV for QS Wholesale is $170 million,

with a range of $156 million to $188 million; and that the value available for distribution to

unsecured creditors as a result of the mid-point value of the Unencumbered Foreign Equity is

$91 million, with a range of $76 million to $109 million.  (*See* PJT Report at 53).

**C.    The Value That Secured Noteholders Are Receiving in Excess of the Value of the Secured Notes Collateral Should Inure to the Benefit of Unsecured Creditors**

84.    Under the Oaktree Plan, the Debtors propose to pay holders of Secured Notes

Claims more than 100% of the value of their prepetition interests in collateral (the "Secured

Notes Collateral") in clear violation of the absolute priority rule.  By overpaying the holders of

Secured Notes Claims, the Oaktree Plan's distribution scheme deprives Unsecured Noteholders

and holders of General Unsecured Claims of distributive value to which they are entitled as a

matter of law.

*1.    The Oaktree Plan Would Provide Secured Noteholders With Approximately 144% of the Value of the Secured Notes Collateral*

85.    The Disclosure Statement lists the aggregate amount of the Secured Notes Claims

as approximately $283 million.  *See* Disclosure Statement at Section B.  Taking the PJSC

Valuation mid-point of $546 million, the Debtors assert that the Secured Noteholders will

recover between 16.4 and 17.4% of the amount of their claims on account of their distribution of

New Quiksilver Common Stock.  (*See id.*).  In addition, the Oaktree Plan also provides Secured

Noteholders with value in the form of participation rights in the Rights Offerings—rights which

are, in essence, deferred value that should be considered when tallying total recoveries to holders of Secured Notes Claims under the Oaktree Plan.[16] The value of such participation rights is not, however, quantified or accounted for in the Disclosure Statement, nor is it accounted for in the PJSC Valuation. As set forth in the PJT Report and as shown herein, when the value of the Secured Noteholders' participation rights in the Rights Offerings is added to the value of New Quiksilver Common Stock allocable to such claims, the total value distributed to the Secured Noteholders under the Oaktree Plan exceeds the value of the Secured Notes Collateral by approximately *$73 million*.[17]

86.    PJT has concluded that the Debtors' TEV is an estimated $690 million, with a pro forma equity value of approximately $365 million. (*See supra* Section I.B.2.a; PJT Report at 9). In addition, as shown in the chart below, PJT has calculated the value of the collateral securing the Secured Notes Claims to be approximately $164 million.

---

[16] Even under the PJSC Valuation, the rights are valuable in that they allow Secured Noteholders to buy New Quiksilver Common Stock at a discount to PJSC's (deflated) plan value.

[17] In addition, the Oaktree Plan contemplates that Avoidance Actions are to be released or retained by the Reorganized Debtors. To the extent retained by the Reorganized Debtors, the "unquantified" value of any such avoidance actions would also flow to holders of Secured Notes Claims—further evidence that the Oaktree Plan (i) violates the absolute Priority Rule and (ii) diverts value away from unsecured creditors for whose benefit any such Avoidance Actions should be pursued.

| Value of Collateral | |
|---|---:|
| Value of Total Enterprise | 690 |
| Plus: Excess Cash[2] | 14 |
| Distributable Value | 704 |
| Less: Euro Notes[2] | (223) |
| Less: DIP ABL[2] | (22) |
| Less: DIP Term Loan[2] | (115) |
| Less: ROW Debt / Credit Lines[2] | (48) |
| Less: Value of 35% Foreign Equity Value | (91) |
| Less: Admin Allocated to Collateral | (37) |
| Less: Oaktree Professionals[3] | (4) |
| **Value of Collateral** | **164** |

(1)  Quiksilver Financial Projections_Nov 16.xlsx.
(2)  Accrued and Unpaid fees to Oaktree professionals, per Houlihan Report.

87.    Pursuant to the absolute priority rule, the Secured Noteholders are not entitled to a distribution in excess of the amount of their secured claim, which PJT has calculated to be $164 million.  Under the Oaktree Plan, however, the Secured Noteholders will receive a combination of New Quiksilver Common Stock and the right to purchase virtually all of the remaining equity in the Reorganized Debtors.[18]  Although the Oaktree Plan purports to give Unsecured Noteholders the right to purchase up to $12.5 million of New Quiksilver Common Stock, for the reasons set forth in Section I.C(ii), *infra*, this participation right is of *de minimis* value and Unsecured Noteholders are unlikely to exercise such rights.  *See* Oaktree Plan § 1.89.

88.    As stated above, PJT has estimated the Debtors' pro forma equity value to be approximately $365 million.  In order for the Secured Noteholders to receive all $365 million of value, they must invest approximately $128 million of cash in the Reorganized Debtors.  After taking such investment into account, the incremental value going to Secured Noteholders on account of their claims is approximately $237 million.  As shown in the chart below, and assuming PJT's valuation of the collateral securing the Secured Notes of $164 million, the

---

[18] Oaktree (a Secured Noteholder) is entitled to purchase an additional 3% of the New Quiksilver Common Stock in exchange for its agreement to backstop the Rights Offerings.

Secured Noteholders will recover approximately *144%* of the value of the Secured Notes Claims,

resulting in an overpayment to the Secured Noteholders of approximately *$73 million* (or $237

million minus $164 million) in direct violation of the absolute priority rule.

| Secured Recovery | |
| --- | --- |
| Value of Total Enterprise | 690 |
| Plus: Pro Forma Excess Cash | 14 |
| Distributable Value | 704 |
| Less: Pro Forma Total Debt[2] | (339) |
| **Pro Forma Equity** | **365** |
| Less: Rights Offering Investment[4] | (128) |
| **Recovery ($)** | **237** |
| (/) Value of Collateral | 164 |
| **Recovery (%)** | **144.3%** |
| Recovery ($) | 237 |
| Less: Collateral | (164) |
| Excess Recovery | 73 |

(1)     PJSC Report
(2)     Disclosure Statement

     89.    Moreover, as demonstrated in the chart below, even if Oaktree were to assert its

deficiency claim, Non-Priority Unsecured Creditors would still represent approximately 67.5%

of the estimated pool of unsecured claimants.  Accordingly, Non-Priority Unsecured Creditors

are statutorily entitled to recover at least approximately $58 million (67.5% of $86 million) in

value from the estates—*$45 million more* than their proposed distribution under the Oaktree

Plan.  For these reasons, the Oaktree Plan does not comply with Bankruptcy section 1129(b) and

thus cannot be confirmed as a matter of law.

**Allocation of 35% Foreign Equity**

| | | Split (%) | Split ($) |
|---|---|---|---|
| Secured Claim | 283 | | |
| Less: Recovery on 65% of Foreign Equity | (143) | | |
| Less: HL / K&E Fees (Pendency & Back-End)[1] | (6) | | |
| Secured Deficiency Claim | 134 | 32.5% | 28 |
| Unsecured Claim | 277 | 67.5% | 58 |
| Total Unsecured | 411 | 100.0% | $86 |

(1) DIP Budget

> 2.    *The Unsecured Noteholders' "Token" Right To Participate in the Exit Rights Offering Is Illusory and of De Minimis Value*

90.    Although the Oaktree Plan purports to give Unsecured Noteholders additional "value" in the form of a participation right in the Exit Rights Offering of up to $12.5 million, *see* Oaktree Plan § 6.3(b), this participation right is of no meaningful value to Unsecured Noteholders.

91.    First, the Oaktree Plan provides that if a sufficient number of Eligible Offerees participate in the Rights Offering (defined to include both Secured Noteholders and Unsecured Noteholders) such that Reorganized Quiksilver would be required to be a reporting company or register on a public exchange, the Debtors may rescind the subscription rights of the participant subscribing for the lowest number of shares. *See* Oaktree Plan at 6.4(e).  If necessary, the Debtors may continue such recission with respect to the next lowest number of shares (and so on) to the extent necessary to ensure that Reorganized Quiksilver is not required to be a reporting company or register on a public exchange. *Id.*  As noted, the Oaktree Plan provides Unsecured Noteholders with only a very restricted ability to participate in the Exit Rights Offering (*i.e.*, $12.5 million worth of rights spread out over approximately $230 million of Unsecured Notes Claims).  Therefore, any rescission rights exercised by the Debtors under Section 6.4(e) of the Oaktree Plan would almost certainly affect only Unsecured Noteholders.

42

92.    Even if the Unsecured Noteholders were to exercise their $12.5 million in rights to participate in the Exit Rights Offering, based on the Committee's review of the Oaktree Plan and the shareholders agreement for Reorganized Quiksilver, it does not appear that minority shareholders will be provided with any governance or consent rights with respect to Reorganized Quiksilver. *See* Plan Supplement, Ex. E. [Docket No. 625]. Specifically, the Oaktree Plan provides that the entirety of the New Board will be determined by Oaktree with no minority representation provided to other equity holders. *See* Oaktree Plan § 6.13. Accordingly, upon exercising their participation rights, it appears that Unsecured Noteholders could expect, at most, a *de minimis* amount of New Quiksilver Common Stock with no corresponding minority protections or any ability to assert their rights in connection therewith.

93.    For these reasons, the "token" right to participate in the Exit Rights Offering given to Unsecured Noteholders under the Oaktree Plan should not be characterized as additional value received by Unsecured Noteholders.

**D.    The Oaktree Plan Also Violates the Absolute Priority Rule Because It Potentially Unimpairs Intercompany Interests, Which Are Indisputably Junior to Unsecured Notes Claims and General Unsecured Claims**

94.    Under the Oaktree Plan, Intercompany Interests will be Reinstated and Unimpaired even though Claims in senior Classes—the Unsecured Notes Claims and General Unsecured Claims—are not proposed to be paid in full. This is a clear violation of the absolute priority rule and, accordingly, the Oaktree Plan is facially unconfirmable. *See* 11 U.S.C. § 1129(b)(2)(B)(ii); *Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) ("a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan").

43

95.    The Debtors state in the Oaktree Plan that "distributions on account of Intercompany Interests are . . . for the purposes of administrative convenience." *See* Oaktree Plan § 4.8. Admittedly, the purpose and meaning of this language is unclear to the Committee. Any distribution to Intercompany Interests, for "administrative convenience" or otherwise, without satisfying in full all Claims that are senior to such Intercompany Interests is insufficient to remedy this clear violation of the absolute priority rule. *See In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB) (Bankr. S.D.N.Y. Jan. 31, 2013), ECF No. 1287 (Hr'g Tr. at 68:12-70:13) ("You can't cram down the unsecured class if equity is keeping its equity).

96.    Accordingly, unless Unsecured Notes Claims and General Unsecured Claims are satisfied in full, there is no theory under which Intercompany Interests should receive a distribution under the Oaktree Plan, and the Oaktree Plan cannot be confirmed.

## II.    The Oaktree Plan Unfairly Discriminates Between Holders of Unsecured Notes Claims and the Holders of Euro Notes Guaranty Claims

97.    The Oaktree Plan similarly cannot be confirmed because the Debtors cannot establish that the requirements of Bankruptcy Code section 1129(b)(1) have been met with respect to Unsecured Noteholders. Although legally identical to the Euro Notes Guaranty Claims and therefore statutorily entitled to similar treatment, the Debtors have proposed a plan that inexplicably provides drastically disparate treatment between the two Classes. This result cannot be countenanced by this Court absent a justification from the Debtors for the separate classification of these claims and the treatment proposed for each class, which the Debtors have not put forth.

### A.    Applicable Legal Standard

98.    Bankruptcy Code section 1129(b)(1) only permits confirmation of a plan notwithstanding its rejection by an impaired class if, among other things, "the plan does not

discriminate unfairly." *See* 11 U.S.C. 1129(b)(1) (providing that a chapter 11 plan of reorganization may only be confirmed "if the plan does not discriminate unfairly . . . with respect to each class of claims . . . that is impaired under, and has not accepted, the plan"). "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes . . . . Thus a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986); *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

99.     The burden is upon the Debtors to prove that the Oaktree Plan does not discriminate unfairly in contravention of the Bankruptcy Code. *In re Sutton*, No. 10-10539, 2012 WL 433480, at *4 (Bankr. E.D.N.C. Feb. 9, 2012) (finding that the "Plan Proponents bear the burden of establishing that the Plan comports with § 1129's requirements by a preponderance of the evidence"); *In re Armstrong World Indus., Inc.*, 348 B.R., 111, 122 (D. Del. 2006) (same).

100.    Courts have developed various tests to determine whether a plan unfairly discriminates against a dissenting class, which tests focus on "whether there is a reasonable basis for discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination." *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd,*308 B.R. 672 (D. Del. 2004).  More recently, courts have adopted a test for unfair discrimination which gives rise to "a rebuttable presumption" that the plan is unfairly discriminatory where there is:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class..., or (b) regardless of the percentage recovery, an allocation under the plan of

materially greater risk to the dissenting class in connection with the proposed
distribution.

*Id.*; citing *In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999) (adopting test

proposed in Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72

Am. Bankr. L.J. 227 (1998). *See also In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228-

29 (Bankr. D.N.J. 2000).

101.    An allegation of a materially lower percentage recovery can only be rebutted "by

showing that, outside of bankruptcy, the dissenting class would similarly receive less than the

class receiving a greater recovery, or that the alleged preferred class had infused new value into

the reorganization which offset its gain." *Dow Corning*, 244 B.R. at 702; *Armstrong*, 348 B.R. at

121.

102.    While relatively minor differences in the recovery by different classes may be

upheld if reasonable, courts have consistently rejected wildly disparate treatment of essentially

indistinguishable claims. *See In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 592 (D. Del.

2009) (finding plan discriminated unfairly by providing 100% of determined distribution amount

on account of certain claims and providing 130% of determined distribution amount to certain

other claims in same class that relinquished claims in other class under); *Oxford Life Ins. Co. v.*

*Tucson Self-Storage, Inc. (In re Tuscon Self-Storage, Inc.)*, 166 B.R. 892, 898 (B.A.P. 9th Cir.

1994) (holding that plan which proposed to provide unsecured deficiency claims with only a

10% recovery while trade creditors received a 100% recovery could not be confirmed because it

discriminated unfairly in violation of section 1129(b)(1)); *In re Snyders Drug Stores, Inc.*, 307

B.R. 889, 892-95 (Bankr. N.D. Ohio 2004) (holding that plan unfairly discriminated by

proposing to pay certain trade creditors 6% to 7% while paying landlords with lease rejection

claims nothing).

46

103.    Further, the Third Circuit has recognized that "courts have interpreted the 'same treatment' requirement to mean that all claimants in a class must have 'the same opportunity' for recovery." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)(citation omitted).    Accordingly, "[w]hat matters . . . is not that claimants recover the same amount but that they have equal opportunity to recover on their claims." *Id.*    For example, in *Washington Mutual,* the debtors' proposed plan offered members of a certain class of creditors the opportunity to participate in a rights offering to purchase stock in the reorganized debtor, but the plan only made that opportunity available to those claimants whose claim exceeded a $2 million threshold.  442 B.R. 314, 360 (Bankr. D. Del. 2011).  The Bankruptcy Court for the District of Delaware held that excluding smaller claimants within the same class from participation in the rights offering constituted disparate treatment, such that the debtors would have to modify the plan so that all claimants in the class would have the same opportunity to participate in order to comply with section 1123(a)(4).  *Id.* at 361.

104.    Courts have recognized that separate classification and disparate treatment of unsecured creditors is "only justified 'where the legal character of their claims is such as to accord them a status different from the other unsecured creditors.'"  *In re Lisanti Foods, Inc.*, 329 B.R. 491, 510 (D.N.J. 2005) *aff'd*, 241 F. App'x. 1 (3d Cir. 2007) (quoting *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir.1984)) (emphasis in original). "[U]nsecured claims will, generally speaking, comprise one class . . . because they are claimants of equal legal rank entitled to share *pro rata* in values remaining after payment of secured and priority claims." *Id.* (quoting *In re Fairfield Executive Assoc.*, 161 B.R. 595, 600 n.6 (D.N.J. 1993).

**B.      The Unsecured Notes Claims and Euro Notes Guaranty Claims Are Essentially Indistinguishable and Thus Should Not Receive Disparate Treatment Under the Oaktree Plan**

105.     Despite the fact that the Unsecured Notes Claims and the Euro Notes Guaranty Claims are similarly situated Claims, the Oaktree Plan provides grossly disparate treatment as between the two.  The Oaktree Plan separates the Claims of unsecured creditors (other than the Euro Notes Guaranty Claims) into two Classes:  (i) Class 5-A – Unsecured Notes Claims and (ii) Class 5-B – General Unsecured Claims.  *See* Oaktree Plan at §§ 4.5, 4.6.  The Unsecured Notes Claims arise from that certain Unsecured Notes Indenture, dated as of July 16, 2013, pursuant to which the Unsecured Notes were issued in an aggregate principal amount of $225 million at 10.000%, with a maturity date of August 1, 2020.  *See* Disclosure Statement § IV.G.2. The Unsecured Notes were issued by Quiksilver, Inc. and QS Wholesale, Inc. and are guaranteed by Debtors DC Shoes, Inc., Hawk Designs, Inc. and QS Retail, Inc. (collectively, the "Debtor Obligors").  *Id.*

106.     The Euro Notes Guaranty Claims—which are also unsecured—are treated in Class 3.  *See* Oaktree Plan § 4.3.  The Euro Notes Guaranty Claims arise from that certain Indenture dated December 10, 2010, pursuant to which the Euro Notes were issued in an aggregate principal amount of €200 million at 8.875%, and with a maturity date of December 15. 2017.  *See* Disclosure Statement § IV.G.4.  The obligations under the Euro Notes are guaranteed by the Debtor Obligors and certain non-Debtor affiliates.  *Id.*

107.     Obligations asserted against the Debtor Obligors on account of both tranches of notes are entitled to *pari passu* treatment.  The Unsecured Notes Claims and the Euro Notes Guaranty Claims therefore share the ***same legal character***, and accordingly are entitled to receive similar treatment under the Oaktree Plan.  *In re Lisanti Foods, Inc.*, 329 B.R. at 510.  As discussed below, however, the Unsecured Notes Claims and the Euro Notes Guaranty Claims are

48

receiving grossly disparate treatment under the Oaktree Plan. Because these Claims are of "equal legal rank," such disparate treatment is impermissible under Bankruptcy Code section 1129(b) and the Oaktree Plan cannot be confirmed. *Id.*

**C.    The Euro Notes Guaranty Claims Are Unimpaired, While Unsecured Notes Claims Are Receiving Approximately 4.5% on Account of Their Claims**

108.    The Oaktree Plan proposes to treat the Claims in Class 3 and Class 5-A—which, as discussed above, are similarly situated unsecured creditors—drastically differently. Under the Oaktree Plan, the Unsecured Notes Claims are ***impaired***, and such holders will receive their *pro rata* share, based on the aggregate amount of Allowed Class 5-A Claims, of the Notes Cash Consideration. *See* Oaktree Plan § 4.5. In addition, holders of Unsecured Notes Claims are eligible to participate in up to $12.5 million of the Exit Rights Offering on a *pro rata* basis. *See id.* § 6.10. Holders of Euro Notes Guaranty Claims will have their Claims reinstated and rendered unimpaired. *See* Oaktree Plan at § 4.3; *see also In re Energy Future Holdings Corp.*, 540 B.R. 109, 111-12 (Bankr. D. Del. 2015) ("[Bankruptcy code] [s]ection 1124(1) provides that a class of claims is unimpaired if a plan 'leaves unaltered the legal, equitable, and contractual rights to which such claim ... entitles the holder of such claim' while section 1124(2) provides that a class of claims is unimpaired if the plan provides for the holder of such claim to receive what is generally referred to as reinstatement of the claim."). Holders of Euro Notes Guaranty Claims will also receive equity in New Quiksilver pursuant to the Euro Notes Exchange Offer. *See* Plan Supplement, Ex. B.

109.    As noted, the Oaktree Plan proposes to reinstate the Euro Notes Guaranty Claims, rendering such claims unimpaired (and effectively paid in full). By contrast, the Oaktree Plan proposes to give Unsecured Noteholders their *pro rata* share of the Notes Cash Consideration (or some amount less than $12.5 million), estimated at a mere 4.5% recovery. This disparate

treatment exemplifies unfair discrimination under the Bankruptcy Code, and is legally

impermissible. *New Century TRS Holdings,* 407 B.R. at 592; *Tuscon Self-Storage,* 166 B.R. at

898; *Snyders Drug Stores,* 307 B.R. at 895.

110.    Moreover, in addition to riding through these Chapter 11 Cases unimpaired, the

holders of Euro Notes Guaranty Claims are receiving valuable rights to participate in the Euro

Notes Exchange Offer.  The holders of Unsecured Notes Claims, on the other hand, have been

offered the "opportunity" to participate in up to $12.5 million of the Exit Rights Offering on a

*pro rata* basis—an illusory offer worth little value to holders of Unsecured Notes Claims, as

discussed *supra* Section I.C.ii.

111.    The law is clear: as similarly situated creditors, the holders of Unsecured Notes

Claims and the holders of Euro Notes Guaranty Claims should "have [an] equal opportunity to

recover on their claims," but what the Debtors have proposed is anything but equal.  *W.R. Grace*

*& Co.*, 729 F.3d at 327; *Washington Mutual*, 442 B.R. at 360-61.  Indeed, courts have held that a

***single*** percentage point difference in recovery amongst similarly situated creditors can form the

basis of an unfair discrimination finding.  *In re Snyders Drug Stores, Inc.*, 307 B.R. at 892, 895.

112.    The burden is on the Debtors to rebut the presumption of unfair discrimination

that clearly arises from the Unsecured Notes Claims' "materially lower" 4.5% recovery as

compared to the paid-in-full recovery for Euro Notes Guaranty Claims.  *Dow Corning*, 244 B.R.

at 702; *Armstrong*, 348 B.R. at 121.  The Debtors have made no effort to meet this burden and,

accordingly, the Oaktree Plan cannot be confirmed.

**III.    The Exculpation Contained in the Oaktree Plan Is Overly Broad and Does Not**
**         Comport with Applicable Law**

113.    The Oaktree Plan is also unconfirmable because it contains an exculpation

provision (the "Exculpation") that impermissibly extends beyond fiduciaries in these Chapter 11

Cases. The Debtors have failed to articulate how the circumstances of these Chapter 11 Cases

justify such an extraordinarily broad exculpation provision, and, accordingly, the Exculpation is

inconsistent with applicable law and cannot be approved.

### A.    Applicable Legal Standard

114.    The Exculpation contemplated by the Oaktree Plan does not comport with

applicable law.  Courts in this jurisdiction have held that exculpation provisions generally should

be limited to estate fiduciaries, which include estate professionals, committees and their

members, and a debtor's directors and officers. *See In re Indianapolis Downs, LLC*, 486 B.R.

286, 306 (Bankr. D. Del. 2013) (upholding modified plan that contained exculpations limited to

estate fiduciaries, which provision was "consistent with applicable law"); *Wash. Mut. Inc.*, 442

B.R. at 350-51 (finding "exculpation clause must be limited to fiduciaries who have served

during the chapter 11 proceeding"); *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011)

(holding exculpation in plan must exclude non-fiduciaries).

115.    Delaware bankruptcy courts have permitted exculpation provisions limited in this

manner insofar as they "merely state[] the standard to which . . . estate fiduciaries [a]re held in a

chapter 11 case." *Wash. Mut.*, 442 B.R. at 350.  "That fiduciary standard, however, applies only

to estate fiduciaries," and no one else. *In re PTL Holdings LLC*, No. 11-12676 (BLS), 2011 WL

5509031, at *12 (Bankr. D. Del. Nov. 10, 2011) (limiting exculpation provision to include only

those parties that acted as estate fiduciaries and their professionals.).

116.    Although a handful of courts have permitted exculpation provisions extending

beyond estate fiduciaries, these courts have emphasized that such provisions "[ha]ve to be

extremely restricted . . . to an exceptional situation." *See In re FAH Liquidating Corp. (f/k/a*

*Fisker Auto. Holdings, Inc.)*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014), Hr'g. Tr. at

26:20 – 28:8); *See In re Lab. Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014),

51

Hr'g Tr. at 35:23 – 36:4 (exculpations extending to non-estate fiduciaries are "very unusual").

The Debtors have not established "very unusual" circumstances justifying the broadness of the

Exculpation and, therefore, it cannot be approved.

### B.    The Exculpation Is Overly Broad

117.    The Debtors have not met their burden to justify the breadth of the Exculpation

contemplated by the Oaktree Plan.  Article 10.6 of the Oaktree Plan provides as follows:

> The Exculpated Parties shall neither have, nor incur any liability to any Entity
> for any Exculpated Claim; provided, however, that the foregoing
> "exculpation" shall have no effect on the liability of any Entity that results
> from any such act or omission that is determined in a Final Order to have
> constituted gross negligence or willful misconduct.
>
> The Exculpated Parties have, and upon Confirmation shall be deemed to have,
> participated in good faith and in compliance with the applicable provisions of
> the Bankruptcy Code, including with regard to the distributions of the New
> Quiksilver Common Stock pursuant to the Plan and, therefore, are not and
> shall not be liable at any time for the violations of any applicable, law, rule, or
> regulation governing the solicitation of acceptances or rejections of the Plan
> or such distributions made pursuant to the Plan.

Oaktree Plan at § 10.6.

118.    The Oaktree Plan's definition of "Exculpated Parties" includes: (i) the Debtors;

(ii) the Reorganized Debtors; (iii) the *Backstop Parties*; (iv) the *Plan Sponsor*; (v) the *DIP*

*Lenders*; (vi) the *DIP Agents*; (vii) the Committee and each of its members; and (viii) the

*Secured Notes Agent*.  Oaktree Plan § 1.83 (emphasis added).  Neither the Backstop Parties, the

Plan Sponsor, the DIP Lenders, the DIP Agents, nor the Secured Notes Agent are fiduciaries of

the Debtors' estates.  Moreover, the Debtors have failed to articulate, as is required by applicable

law, any "exceptional" circumstances in these Chapter 11 Cases that would justify extending the

benefit of the Exculpation to the aforementioned parties, who are clearly not fiduciaries of the

Debtors' estates.  Accordingly, these entities may not be included in the definition of

"Exculpated Parties" and, absent this modification, the Oaktree Plan should not be confirmed.

**IV.**    **Additional Reasons the Oaktree Plan Should Not Be Confirmed**

119.    The Oaktree Plan contains numerous other infirmities that must be addressed in

connection with confirmation, including, among others, the following:

- The Oaktree Plan does not provide for the existence of the Committee post-Confirmation. *See* Oaktree Plan at § 13.8. The Committee should continue post-Confirmation and should be charged with pursuing any existing Avoidance Actions, the proceeds of which should inure to the Debtors' unsecured creditors.

- Under the Oaktree Plan, the Reorganized Debtors (*i.e.*, Oaktree) retain, and have the ability (but are not required) to prosecute retained Causes of Action, including Avoidance Actions. *See* Oaktree Plan at § 10.1. Given that such Causes of Action and any recoveries thereunder are not the Secured Noteholders' collateral, the Causes of Action should be put into a trust for the benefit of unsecured creditors with the trust to be administered, as noted above, by the Committee.

- The Oaktree Plan should provide for the payment of the reasonable fees and expenses incurred by the Unsecured Notes Indenture Trustee.

- Payment of the fees of the Secured Notes Indenture Trustee and the Secured Notes Collateral Agent should be subject to the Committee's receipt of invoices documenting that any requested fees are reasonable and necessary. *See* Oaktree Plan at § 13.4.

## RESERVATION OF RIGHTS

120.    As this Court is aware, the Debtors, the Committee and Oaktree have agreed to

participate in a mediation with respect to, among other issues, the Oaktree Plan. The mediation

is scheduled to begin on January 15, 2016. In addition, discovery, including expert witness

depositions, remains ongoing. Accordingly, this Plan Objection is submitted without prejudice

to, and with a full and express reservation of, the Committee's rights to supplement and amend

this Plan Objection, including by filing a supplement thereto, to introduce evidence at any

hearing relating to this Plan Objection, and further object to the Oaktree Plan or any other plan of

reorganization proposed in these Chapter 11 Cases on any and all grounds.

53

## CONCLUSION

**WHEREFORE**, the Committee requests that the Court (i) deny confirmation of the

Oaktree Plan and (ii) provide the Committee such other and further relief as the Court may deem

just, proper and equitable.

Dated:  January 14, 2016
          Wilmington, Delaware

PEPPER HAMILTON LLP

*/s/ David B. Stratton*
David B. Stratton (DE No. 960)
David M. Fournier (DE No. 2812)
John H. Schanne II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, Delaware  19899-1709
Telephone:    (302) 777-6500
Facsimile:    (302) 421-8390
E-mail:    strattod@pepperlaw.com
        fournierd@pepperlaw.com
        schannej@pepperlaw.com

-AND-

AKIN GUMP STRAUSS HAUER & FELD LLP
Michael S. Stamer (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
Joseph L. Sorkin (admitted *pro hac vice*)
One Bryant Park
Bank of America Tower
New York, New York  10036-6745
Telephone:    (212) 872-1000
Facsimile:    (212) 872-1002
E-mail:    mstamer@akingump.com
        aqureshi@akingump.com
        mlahaie@akingump.com
        jsorkin@akingump.com