## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------------- x

In re:                                          :    Chapter 11
                                                :
QUIKSILVER, INC., *et al.*,[1]                  :    Case No. 15-11880 (BLS)
                                                :
               Debtors.                :     Jointly Administered
                                                :
                                                :
                                                :
----------------------------------------------------------------- x

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF OAKTREE CAPITAL MANAGEMENT FOR ENTRY OF AN ORDER (I) DETERMINING THE DIMINUTION IN VALUE OF THE SECURED NOTES PARTIES' COLLATERAL, AND (II) GRANTING RELATED RELIEF

**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, New York 10036
Michael S. Stamer (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Co-Counsel to the Official Committee of Unsecured Creditors*

**PEPPER HAMILTON LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, Delaware 19899
David B. Stratton (DE No. 960)
David M. Fournier (DE No. 2812)
John H. Schanne II (DE No. 5260)
Telephone: (302) 777-6500
Facsimile: (302) 421-8390

*Co-Counsel to the Official Committee of Unsecured Creditors*

Date: January 14, 2016
         Wilmington, Delaware

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

## Table of Contents

|  | Page |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| BACKGROUND | 6 |
|    A. The DIP Financing | 7 |
|    B. The PSA, Oaktree Plan and Disclosure Statement | 8 |
|    C. Oaktree's Motion and Expert Reports Regarding Valuation and Oaktree's Asserted Diminution Claim | 10 |
| OBJECTION | 11 |
| I. Oaktree Is Not Entitled to a Diminution in Value Claim Under Bankruptcy Code Section 507(b) | 12 |
|    A. Legal Standard for a Claim Under Bankruptcy Code Section 507(b) | 12 |
|    B. Oaktree Has Failed To Meet Its Burden of Proof Under Bankruptcy Code Section 507(b) | 13 |
| II. Amounts Used To Satisfy Claims and Fund the Chapter 11 Cases May Not Be Charged Solely Against Unencumbered Collateral | 22 |
|    A. Bankruptcy Code Section 506(c) Is Not Relevant to This Dispute | 22 |
|    B. Payments Made or Anticipated To Be Made on Account of General Unsecured, Priority and Administrative Claims May Not Be Charged Solely Against the Unencumbered Foreign Equity | 24 |
| III. Even If Oaktree Does Not Waive Its Deficiency Claim, Non-Priority Unsecured Creditors Are Entitled to a Substantially Greater Recovery Than That Proposed Under the Oaktree Plan | 28 |
| RESERVATION OF RIGHTS | 30 |
| CONCLUSION | 32 |

## Table of Authorities

**Page(s)**

CASES

Bank of N.Y. Trust Co. NA v. Pac. Lumber Co. (In re Scopac),
    624 F.3d 274 (5th Cir. 2010) ...................................................................................13

Carpet Ctr. Leasing Co. v. Nally Motor Trucks (In re Carpet Ctr. Leasing Co.),
    991 F.2d 682 (11th Cir. 1993) ................................................................................13

Chase Manhattan Bank USA NA v. Stembridge (In re Stembridge),
    394 F.3d 383 (5th Cir. 2004) ............................................................................12, 13

Cheatham v. Cent. Carolina Bank & Trust Co., N.A. (In re Cheatham),
    91 B.R. 382 (Bankr. E.D.N.C. 1988) ......................................................................15

Debbie Reynolds Mgmt. Co. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.),
    255 F.3d 1061, 1067 (9th Cir. 2001) ...................................................................5, 27

Ford Motor Credit Co. v. Dobbins,
    35 F.3d 860 (4th Cir. 1994) ....................................................................................13

InteliQuest Media Corp. v. Miller (In re InteliQuest Media Corp.),
    326 B.R. 825 (B.A.P. 10th Cir. 2005) ................................................................5, 27

In re Best Prods. Co.,
    138 B.R. 155 (Bankr. S.D.N.Y. 1992) .....................................................................13

In re Blackford Farms, Inc.,
    68 B.R. 639 (Bankr. N.D. Iowa 1986) ...............................................................14, 15

In re Callister,
    15 B.R. 521 (Bankr. D. Utah 1981) ...............................................................3, 14, 15

In re Chatham Parkway Self Storage, LLC,
    No. 12-42153, 2013 WL 1898058 (Bankr. S.D. Ga. Apr. 25, 2013) ......................23

In re Constr. Supervision Servs., Inc.,
    No. 12–00569–8 (SWH), 2015 WL 4873062 (Bankr. E.D.N.C. Aug. 13, 2015) ...................13

In re Cont'l Airlines,
    134 B.R. 536 (Bankr. D. Del. 1991) ..................................................................17, 18

In re Coventry Commons Assocs.,
    149 B.R. 109 (Bankr. E.D. Mich. 1992) .................................................................23

In re Franklin Indus. Complex Inc.,
    No. 01-67457 (SDG), 2008 WL 3992233 (Bankr. N.D.N.Y. Aug. 21, 2008) ...................14, 15

*In re Pine Lake Village Apartment Co.*,
  19 B.R. 819 (Bankr. S.D.N.Y. 1982) ................................................................3

*In re Salem Plaza Assocs.*,
  135 B.R. 753 (Bankr. S.D.N.Y. 1992) ..........................................................17, 18

*In re Towne, Inc.*,
  536 Fed. App'x 265 (3d Cir. 2013) ................................................................24

*In re WBE Co.*,
  No. 06-80006 (TJM), 2007 WL 4892121 (Bankr. D. Neb. Dec. 21, 2007) .........................23

*Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital,*
  *LLC) ("Residential Capital I")*,
  497 B.R. 403 (Bankr. S.D.N.Y. 2013) ..........................................3, 4, 16, 23, 24

*Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital,*
  *LLC) ("Residential Capital II")*,
  501 B.R. 549 (Bankr. S.D.N.Y. 2013) ...........................................................13

*Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus. Inc.),*
  57 F.3d 321 (3d Cir. 1995) ........................................................................24

*Qmect, Inc. v. Burlingame Capital Partners II, L.P.*,
  373 B.R. 682 (N.D. Cal. 2007) ....................................................................12

*Sec. Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC)*,
  314 B.R. 436 (B.A.P. 9th Cir. 2004)........................................................4, 23, 24

*Stein v. U.S. Farmers Home Admin. (In re Stein)*,
  19 B.R. 458 (Bankr. E.D. Pa. 1982) ..........................................................3, 16

*Tait v. City of Phila.*,
  410 Fed. App'x 506 (3d Cir. 2001)................................................................13

*Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Sav. (In re Winthrop Old*
  *Farm Nurseries)*,
  50 F.3d 72 (1st Cir. 1996) .........................................................................12

## STATUTES

11 U.S.C. § 363(p)(2) ...................................................................................13

11 U.S.C. § 507(b) ......................................................................................12

The Official Committee of Unsecured Creditors (the "Committee") of Quiksilver, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this objection (the "Diminution Objection") to the *Motion of Oaktree Capital Management for Entry of an Order (I) Determining the Diminution in Value of the Secured Notes Parties' Collateral, and (II) Granting Related Relief* [Docket No. 599] (the "Motion").[2] In support of this Diminution Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT[3]

1.       By the Motion, Oaktree Capital Management, LP ("Oaktree") seeks entry of an order establishing an unjustified "diminution claim" in the amount of $68.5 million that would reduce the value of the Unencumbered Foreign Equity otherwise available to Non-Priority Unsecured Creditors.  Through a series of irrelevant and misleading arguments, Oaktree also asserts that the Committee must establish that the Unencumbered Foreign Equity is worth in excess of $137.9 million in order to prevail on its anticipated confirmation objection that the Oaktree Plan does not give Non-Priority Unsecured Creditors value to which they are entitled under the absolute priority rule embodied in the Bankruptcy Code.  Both approaches are targeted to achieve the same objective:  absorb the value of the only asset that does not comprise pre- or postpetition Oaktree collateral—an asset that this Court *expressly excluded* from the collateral securing the DIP Financing (the "DIP Collateral")—and minimize value leakage to Non-Priority Unsecured Creditors.  For the reasons set forth below and in the balance of this Diminution Objection, (i) Oaktree has not and cannot demonstrate that there has been a diminution in the aggregate value of its interests in the Secured Notes Collateral (*i.e.*, the Debtors' total enterprise

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

[3]  Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in this Diminution Objection.

value), and (ii) the estimated $137.4 million in general unsecured, priority and administrative

claims paid or to be paid over the course of these cases is not properly allocated to the value of

the Unencumbered Foreign Equity.   Accordingly, the Motion should be denied.

2.       *First*, Oaktree has not met its burden to establish that its interests in the Secured

Notes Collateral diminished in value between the Petition Date and the Effective Date (as

defined in the Oaktree Plan), as is required by Bankruptcy Code section 507(b).  Rather than

considering the aggregate value of its collateral at each of the two relevant points in time,

Oaktree instead focuses solely on incremental claims incurred under its own DIP Term Facility

that "prime" Oaktree's prepetition Secured Notes.  Specifically, Oaktree alleges that the

operation of these Chapter 11 Cases has resulted in a diminution in the value of its interests in

the Secured Notes Collateral in the amount of $68.5 million—or the amount by which the claims

senior to Oaktree's prepetition position increased *minus* those deductions Oaktree agrees should

not constitute diminution.  These deductions include, among other things, payments made

pursuant to the Debtors' KEIP/KERP plan which, in the words of Oaktree's counsel, were "*value

enhancing from our perspective*."  *See* Dec. 1, 2015 Hr'g Tr. at 76:15-21 (emphasis added).  As

demonstrated in Section I.B(ii) below, there is simply no basis to distinguish the "value

enhancing" KEIP/KERP payments from any of the payments made under the various motions

approved by this Court including, among other things, payments made to critical vendors and

employees—payments that give rise to the "priming" claims of which Oaktree now complains.

Moreover, Oaktree, both in its capacity as DIP lender and Secured Noteholder, approved *each

payment* and should not now be permitted to argue that payments made to preserve and enhance

the going-concern value of the business it plans to acquire must be charged against the only asset

from which Oaktree cannot otherwise recover in these cases.   Indeed, as shown in the PJT

Report, the Debtors' enterprise value has, in fact, *increased* during, and as a result of, the Chapter 11 Cases.

3.     Oaktree's purported "diminution" claim is similarly defeated by application of well-established case law on two independent grounds. First, costs that would have been incurred and thus paid had the company never filed for bankruptcy cannot form the basis of a diminution claim. Stated differently, a diminution claim is meant to compensate a prepetition secured creditor for value "*unexpectedly* lost during the course of a case"—not ordinary course supply chain and employee costs that must be paid *in any event* to ensure the continued operation of a business that Oaktree now seeks to acquire. *In re Callister*, 15 B.R. 521, 528 (Bankr. D. Utah 1981). Second, courts have widely held that a creditor cannot assert the type of dollar-for-dollar diminution claim that Oaktree seeks to assert here (*i.e.*, that each dollar spent on a claim that primes Oaktree's prepetition claim results in a dollar of diminution claim). *See, e.g., Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC) ("Residential Capital I")*, 497 B.R. 403, 422 (Bankr. S.D.N.Y. 2013); *Stein v. U.S. Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 826 (Bankr. S.D.N.Y. 1982). Instead, the creditor is required by statute to show that the value of its cash and non-cash collateral, when considered in the aggregate, has diminished as a result of the bankruptcy case. Oaktree fails to make such a showing by its own admission. *See* Motion at ¶ 31 ("Oaktree relies on [the PJSC Report] for valuation purposes"); Houlihan Report at 17-18 (stating that Houlihan did "not assum[e] changes to the enterprise value [of the Debtors] during the course of these cases . . ." for purposes of its diminution in value analysis).

3

4.    *Second*, Oaktree's argument that Bankruptcy Code section 506(c) necessitates a finding that all general unsecured, administrative and priority claims paid over the course of these cases must somehow be allocated to the only unencumbered asset in the Debtors' estates is simply wrong. As a threshold matter, the Committee has not asked and will not ask this Court to surcharge the collateral of any secured creditor in order to obtain an increased recovery for Non-Priority Unsecured Creditors or for any other purpose. The law is clear that where a debtor is utilizing cash collateral (in this case, DIP Proceeds) pursuant to an approved budget and has provided appropriate adequate protection, *section 506(c) is not implicated*. *Residential Capital I*, 497 B.R. at 422; *Sec. Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC)*, 314 B.R. 436, 438-39 (B.A.P. 9th Cir. 2004). The existence, therefore, of a section 506(c) waiver in the Final DIP Order does not preclude the Debtors from using DIP Proceeds for their intended purpose as determined by the Debtors and Oaktree, in its capacity both as DIP lender and "primed" prepetition secured party. Indeed, Oaktree clearly consented to prime itself and consented to the sufficiency of the proposed adequate protection package (even though Oaktree now claims that its adequate protection package was not sufficient to compensate it for "diminution" caused by anticipated, budgeted expenditures made under its own DIP facility).

5.    Moreover, Oaktree's attempt to "charge" the Unencumbered Foreign Equity with the costs of maintaining a business that it will soon acquire is, in essence, an attempt to circumvent this Court's clear and unambiguous ruling that the DIP Collateral was not to include the Unencumbered Foreign Equity. Final DIP Order at ¶¶ 12(a)-(b); Oct. 15, 2015 Hr'g Tr. at 143:15-19 ("[N]obody knows what that stock is worth and I'm not satisfied that it's been demonstrated to the Court that it is necessary [to include it as part of the collateral package] . . . to ensure adequate protection to the lender."). Specifically, Oaktree argues that the

$137.4 million in cash that will be paid to unsecured creditors, either during the course of these cases or on the Effective Date of the Oaktree Plan, should somehow be deemed allocated to or paid from a non-cash source. Oaktree's argument, however, does not comport with this Court's ruling as embodied in the Final DIP Order or with applicable law. The Committee understands that all general unsecured and priority claims to be paid in these cases will be paid with the proceeds of the DIP Term Facility. The DIP Term Facility is secured by the DIP Collateral. By order of this Court, the DIP Collateral *excludes* the Unencumbered Foreign Equity. All expenditures of DIP Proceeds to satisfy such general unsecured or priority claims will result in DIP Obligations. DIP Obligations have recourse solely to the DIP Collateral. The DIP Obligations are not entitled to be "repaid" from or otherwise deemed allocated or "charged" to an asset explicitly excluded from the DIP Collateral, notwithstanding Oaktree's misleading and ultimately inapplicable recitation of the priority scheme embodied in the Bankruptcy Code. Oaktree's efforts to cause this Court to undermine its own decision at the expense of Non-Priority Unsecured Creditors—under the guise of seeking to fix the amount of a section 507(b) claim *that would later be waived even if allowed*—should not be countenanced. Further, applicable law establishes that administrative expenses are properly charged *ratably* against the Debtors' estates as a whole—*not*, as Oaktree asserts, solely against the value of unencumbered assets. *See InteliQuest Media Corp. v. Miller (In re InteliQuest Media Corp.)*, 326 B.R. 825, 832 (B.A.P. 10th Cir. 2005); *Debbie Reynolds Mgmt. Co. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061, 1067 (9th Cir. 2001). Oaktree's argument that the entirety of such expenses should be charged against recoveries to unsecured creditors must therefore fail.

6.      ***Finally***, Oaktree maintains that if it were to assert its deficiency claim against the value of the Unencumbered Foreign Equity, there would be no incremental value left for

distribution to Non-Priority Unsecured Creditors (again, an argument that bears little relevance to

its purported entitlement to a section 507(b) diminution claim).  Oaktree is not correct.  As

established in the PJT Report, the value of the Unencumbered Foreign Equity is approximately

$91 million.[4]  Even if Oaktree were to assert its deficiency claim of approximately $134 million

under this or any other plan, Non-Priority Unsecured Creditors would still be entitled to

approximately 67.5% of the Unencumbered Foreign Equity—or $58.5 million—over *$45 million*

more than their proposed distribution under the Oaktree Plan.  For these reasons and as described

more fully herein, Oaktree is not entitled to a diminution claim, and the Motion should be

denied.

## BACKGROUND

7.       On September 9, 2015 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors

have remained in possession of their property and have continued to operate and manage their

businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  On

September 10, 2015, the Court entered an order providing for the joint administration of the

Debtors' chapter 11 cases (the "Chapter 11 Cases") for procedural purposes only pursuant to

Bankruptcy Rule 1015(b).

8.       On September 21, 2015, pursuant to Bankruptcy Code section 1102, the United

States Trustee for the District of Delaware (the "U.S. Trustee") appointed the initial five

members of the Committee [Docket No. 129].[5]  On September 28, 2015, the U.S. Trustee filed

---

[4] The PJT Report, among other things, corrects the numerous errors contained in the PJSC Report, as set forth in both the PJT Report and the Committee's Plan Objection.

[5] The initial Committee was comprised of the following entities:  (i) U.S. Bank National Association; (ii) New Generation Advisors, LLC; (iii) Samil Tong Sang, Co.; (iv) Simon Property Group, Inc.; and (v) Global Brands Group.

6

the *Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 163] (the

"Amended Notice"), appointing two additional creditors to the Committee.[6]

### A.    The DIP Financing

9.      On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim*

*and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and*

*Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors To (A) Obtain Postpetition*

*Financing on a Super-priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting*

*(A) Liens and Super-priority Claims and (B) Adequate Protection to Certain Prepetition Lenders,*

*(III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related*

*Relief* [Docket No. 17] (the "DIP Motion"), seeking authority to enter into the DIP Credit

Agreements and the DIP Facilities.

10.     The Court entered an order approving the relief requested in the DIP Motion on

an interim basis on September 10, 2015 [Docket No. 76] and on a final basis on October 28,

2015 [Docket No. 382] (the "Final DIP Order").  The Final DIP Order authorized the Debtors to

enter into the DIP ABL Credit Agreement and the DIP Term Loan Credit Agreement (each as

defined in the DIP Motion) and to use the financing provided thereunder (the "DIP Financing"

and the proceeds thereof, the "DIP Proceeds") and cash collateral pursuant to the terms of the

Final DIP Order, as limited by the Budget.  *See* Final DIP Order at ¶¶ 1, 11.  Oaktree negotiated

and approved, among other documents, the Budget.  *See* DIP Term Loan Credit Agreement at

§ 4.1(k) (requiring that the Budget be in form and substance satisfactory to the Required Lenders

under the DIP Term Facility).

---

[6] The U.S. Trustee appointed T. Rowe Price Credit Opportunities Fund, Inc. and Wilfrid Global Opportunity Fund to the Committee on September 28, 2015.  Also on September 28, 2015, Global Brands Group resigned from the Committee.

11.    The Final DIP Order granted the Secured Notes Parties, including Oaktree,

various forms of adequate protection, including an allowed superpriority administrative expense

claim and replacement security interests in and liens on the Unencumbered Foreign Equity,

solely to the extent that the Secured Notes Parties prove a diminution in the value of their

interests in the Secured Notes Collateral. *See* Final DIP Order at ¶¶ 12(a)-(b).[7] As set forth

herein, the parties dispute whether there has been any such diminution in value.

12.    Additionally, the Final DIP Order contains a waiver of the Debtors' right to

surcharge costs or expenses of the administration of the Chapter 11 Cases against prepetition

collateral pursuant to Bankruptcy Code section 506(c).[8] *See* Final DIP Order at ¶ 39.

**B.    The PSA, Oaktree Plan and Disclosure Statement**

13.    On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order*

*Authorizing and Approving (I) the Debtors' Assumption of the Plan Sponsor Agreement; and*

*(II) the Payment of the Break-Up Fee and Related Transaction Expenses* [Docket No. 25],

pursuant to which the Debtors sought to assume that certain plan sponsor agreement (as amended

---

[7] Specifically, the Final DIP Order provides:

> As adequate protection for the interest of the Prepetition Secured Parties in the Prepetition Collateral (including the Cash Collateral) on account of the granting of the DIP Liens, subordination to the Carve-Out, the Debtors' use of Cash Collateral and other decline in value arising out of the automatic stay and/or the Debtors' use, sale, depreciation, or disposition of the Prepetition Collateral, the Prepetition Secured Notes Parties shall receive . . .
>
>> (a) . . . solely to the extent of the diminution in value of the interest of the Secured Notes Parties in the Secured Notes Collateral . . . additional and replacement security interest and liens in (i) the DIP Collateral and (ii) the Unencumbered Foreign Equity, but, in the case of the Unencumbered Foreign Equity only, solely to the extent that the Court has determined such diminution in value . . .
>>
>> (b) . . . solely to the extent of the diminution of the value of the interests of the Secured Notes Parties in the Secured Notes Collateral, . . . an allowed superpriority administrative expense claim . . . .

Final DIP Order at ¶¶ 12(a)-(b).

[8] The Motion erroneously states that the Committee withdrew its objection to the inclusion of a section 506(c) waiver in the Final DIP Order. Motion at ¶ 9 n.4. In fact, the Court overruled the Committee's objection to the section 506(c) waiver, but sustained the Committee's objection on certain other points, including the Committee's objection that the Secured Notes Parties should not receive a replacement lien on the Unencumbered Foreign Equity absent proof of an actual diminution in value. *See* Oct. 15, 2015 Hr'g Tr. at 144:19-20.

from time to time, the "PSA"). Pursuant to the restructuring transaction agreed upon by Oaktree and the Debtors, Oaktree will acquire the Debtors' businesses through both the equitization of Oaktree's debt and Oaktree's participation in a rights offering, which Oaktree has agreed to backstop. On September 21, 2015, the Debtors filed an amended version of the PSA [Docket No. 128].

14.     On October 13, 2015 and October 30, 2015, respectively, and consistent with the restructuring transaction described in the PSA, the Debtors filed the initial versions of the *Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and Its Affiliated Debtors and Debtors in Possession* [Docket No. 292] (as amended from time to time, the "Oaktree Plan") and the *Disclosure Statement with Respect to the Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and Its Affiliated Debtors and Debtors in Possession* [Docket No. 396] (as amended from time to time, the "Disclosure Statement").[9] On December 4, 2015, the Court entered an order approving the adequacy of the Disclosure Statement and authorizing the Debtors to solicit votes to accept or reject the Oaktree Plan [Docket No. 529].

15.     The Oaktree Plan contemplates, among other things, a rights offering (the "Exit Rights Offering") pursuant to which (a) eligible Secured Noteholders will have the right to exercise subscription rights for the purchase of up to $115 million of New Quiksilver Common Stock, and (b) Unsecured Noteholders will have the right to exercise subscription rights for the purchase of up to $12.5 million of New Quiksilver Common Stock. The proceeds of the Exit Rights Offering will fund distributions under the Oaktree Plan and any other payments required on the Effective Date of the Oaktree Plan. *See* Oaktree Plan at § 1.89. Under the Oaktree Plan, the claims Oaktree incurred as DIP lender will be "paid in full in Cash from the proceeds of the

---

[9] The Debtors filed amended versions of the Oaktree Plan and the Disclosure Statement on November 17, 2015 [Docket Nos. 476, 477] and December 4, 2015 [Docket Nos. 527, 532].

Exit Facility . . . and the Exit Rights Offering . . . ." Oaktree Plan at § 2.2(b). The Oaktree Plan

also provides for a waiver of the Secured Noteholders' deficiency claims. *See* Oaktree Plan at

§ 4.4.

16.     The hearing to consider confirmation of the Oaktree Plan is scheduled to

commence on January 27, 2016.

**C.     Oaktree's Motion and Expert Reports Regarding Valuation and Oaktree's Asserted Diminution Claim**

17.     On December 29, 2015, Oaktree filed the Motion and its expert report in support

thereof (the "Houlihan Report") prepared by Houlihan Lokey Capital, Inc. ("Houlihan"). The

Motion seeks, among other things, a determination of the amount of Oaktree's diminution in

value claim under Bankruptcy Code section 507(b), which Oaktree contends is no less than $68.5

million. Motion at ¶ 35; Houlihan Report at 9. The Motion also provides that Oaktree "has

agreed to waive any Diminution in Value Claim to the extent that the [Oaktree] Plan is

consummated and the PSA has not been terminated in accordance with its terms." Motion at

¶ 10, n.5.

18.     With respect to the Debtors' total enterprise value and the value of the non-Debtor

foreign subsidiaries, the Houlihan Report adopts the expert valuation report prepared by the

Debtors' financial advisor in connection with the Oaktree Plan (the "PJSC Report"). The PJSC

Report estimates that the midpoint of the Debtors' total enterprise value is $546 million and that

the midpoint of the value of the non-Debtor foreign subsidiaries is $370 million. The PJSC

Report therefore estimates the Debtors' equity interest in their foreign subsidiaries at

approximately $110 million, of which approximately $39 million is unencumbered. *See* Motion

at ¶ 31.

19.     On January 11, 2016, the Committee served its expert report prepared by PJT Partners LP ("PJT"), which addresses both valuation issues and the Houlihan Report (the "PJT Report"). The PJT Report sets forth PJT's estimated value of the Debtors as a going concern, including the value of the Debtors' equity in their non-Debtor foreign subsidiaries, and rebuts certain conclusions contained in the PJSC Report and the Houlihan Report. Specifically, the PJT Report estimates that the midpoint of the Debtors' total enterprise value is approximately $690 million, and that the midpoint of the total enterprise value of the non-Debtor foreign subsidiaries is $519 million. The Debtors' equity interest in their foreign subsidiaries is estimated to be $260 million, of which approximately $91 million is unencumbered. *See* PJT Report at 53.

20.     The PJT Report also responds to the Houlihan Report, and concludes that there has not been any diminution in the value of the Secured Notes Collateral during the pendency of the Chapter 11 Cases and that, in fact, the value of the Secured Notes Collateral has increased by approximately $39 million. *See* PJT Report at 8.

21.     On January 14, 2016, the Committee filed the Objection.[10]

## OBJECTION

22.     The Motion should be denied in its entirety for three reasons. First, Oaktree has failed to meet its burden of proof under Bankruptcy Code section 507(b) to demonstrate an actual diminution in the aggregate value of its interests in the Secured Notes Collateral, and instead asserts a diminution claim calculated in a manner inconsistent with applicable law and the facts of these Chapter 11 Cases. Second, Oaktree conflates the ***use*** of cash collateral with the ***surcharge*** of collateral under section 506(c) and, as a result, seeks to contravene this Court's clear and unambiguous ruling that the DIP Collateral excludes the Unencumbered Foreign

---

[10] Also on January 14, 2016, the Committee filed its objection to confirmation of the Oaktree Plan (the "Plan Objection").

11

Equity.  Moreover, administrative claims anticipated to be paid at emergence are properly

allocated across the Debtors' estates in their entirety—not solely against the value of the

Unencumbered Foreign Equity.  Third, even if Oaktree were to assert its deficiency claim in

connection with an alternate plan, Non-Priority Unsecured Creditors would still be entitled to

approximately *$45 million* more than their proposed recovery under the Oaktree Plan.  Each of

these objections is set forth in detail below.

## I.      Oaktree Is Not Entitled to a Diminution in Value Claim Under Bankruptcy Code Section 507(b)

### A.      Legal Standard for a Claim Under Bankruptcy Code Section 507(b)

23.      To establish a claim under section 507(b), a secured creditor must prove that its

collateral has diminished in value as a result of (i) the stay of action against such property,

(ii) the use, sale or lease of such property, or (iii) the granting of a lien under section 364(d)

during the bankruptcy case, despite the creditor's receipt of adequate protection.  *See* 11 U.S.C.

§ 507(b); *Qmect, Inc. v. Burlingame Capital Partners II, L.P.*, 373 B.R. 682, 690 (N.D. Cal.

2007) (finding that creditors were not entitled to recover under section 507(b) absent proof that

collateral diminished in value as a result of the bankruptcy case).  The amount of a section

507(b) claim is calculated by determining the diminution in the value of the collateral since the

petition date, less the value conferred by adequate protection during the bankruptcy case.  *See*

*Chase Manhattan Bank USA NA v. Stembridge* (*In re Stembridge*)*,* 394 F.3d 383, 387-88 (5th Cir.

2004) (finding diminution in value is the amount of the relevant asset's decrease in value from

the petition date, less any adequate protection payments received during the pendency of the

case).[11]

---

[11] If the debtor is likely to reorganize, courts generally apply a going-concern standard of valuation to the debtor's assets.  *See Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Sav.* (*In re Winthrop Old Farm Nurseries*)*,* 50 F.3d 72, 76 (1st Cir. 1996) (holding that fair market value was the appropriate standard where the

24.     The secured creditor bears the burden of proof with respect to establishing the existence of a diminution claim. *See* 11 U.S.C. § 363(p)(2) (providing that any entity asserting an interest under section 363 "has the burden of proof on the issue of the validity, priority, or extent of such interest"); *Bank of N.Y. Trust Co. NA v. Pac. Lumber Co. (In re Scopac),* 624 F.3d 274, 284 (5th Cir. 2010) ("The [secured] Noteholders had the burden to prove their entitlement to a § 507(b) priority claim.") (citing *Ford Motor Credit Co. v. Dobbins,* 35 F.3d 860, 866 (4th Cir. 1994)); *In re Constr. Supervision Servs., Inc.,* No. 12–00569–8 (SWH), 2015 WL 4873062 *5 (Bankr. E.D.N.C. Aug. 13, 2015) (citing *Residential Capital II,* 501 B.R. at 590–91) ("The party seeking superpriority status bears the burden of proving entitlement to a § 507(b) priority claim.").

### B.     Oaktree Has Failed To Meet Its Burden of Proof Under Bankruptcy Code Section 507(b)

25.     Oaktree is not entitled to a diminution in value claim because it has failed to meet its burden of proof under Bankruptcy Code section 507(b).[12] *See* 11 U.S.C. § 363(p)(2); *Residential Capital II,* 501 B.R. at 591; *In re Stembridge,* 394 F.3d at 387; *Carpet Ctr. Leasing Co. v. Nally Motor Trucks (In re Carpet Ctr. Leasing Co.),* 991 F.2d 682 (11th Cir. 1993); *In re Best Prods. Co.,* 138 B.R. 155, 157-58 (Bankr. S.D.N.Y. 1992).  Although Oaktree acknowledges that it must prove a diminution in the going-concern value of its collateral between the Petition Date and the Effective Date in order to prevail on its Motion, ***it voluntarily declines to do so***.

---

debtor intended to reorganize); *Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC) ("Residential Capital II"),* 501 B.R. 549, 597 (Bankr. S.D.N.Y. 2013) (same).  This standard is not in dispute.

[12] Even if Oaktree had established an otherwise allowable claim under section 507(b) (which it has not), the issue of Oaktree's entitlement to a diminution claim is not ripe for decision by this Court because Oaktree has agreed to waive any such diminution claim in the context of the Oaktree Plan, and no other plan is currently before this Court. Motion at ¶ 14; *see Tait v. City of Phila.,* 410 Fed. App'x 506, 508 (3d Cir. 2001) ("To be ripe, there must be 'a real and substantial controversy . . . as distinguished from an opinion  . . . upon a hypothetical state of facts.'") (citations omitted).  Moreover, the fact that Oaktree has agreed to waive its deficiency claim and any diminution claim alone renders the Oaktree Plan patently unconfirmable. *See* Motion at ¶ 14; Oaktree Plan at § 4.4.

*See* Motion at ¶ 31 ("Oaktree relies on [the PJSC Report] for [Oaktree] Plan valuation

purposes"); *see also* Houlihan Report at 17-18 (stating that Houlihan did "not assum[e] changes

to the enterprise value [of the Debtors] during the course of these cases" for purposes of its

diminution in value analysis).  On this basis alone, the Motion must fail.

26.     Oaktree instead rests on a single argument to establish its entitlement to a section

507(b) claim:  that the granting of priming liens in connection with the DIP Term Facility and the

incurrence of incremental claims through the expenditure of DIP Proceeds constitute a *per se*

diminution in the value of Oaktree's collateral.  *See* Motion at ¶ 33.  Oaktree's argument fails for

at least three reasons:  (i) the Debtors' use of DIP Proceeds to satisfy claims and finance the

Chapter 11 Cases was foreseeable and agreed upon by Oaktree, and such claims would have

been paid regardless of the Chapter 11 Cases; (ii) each dollar of DIP Proceeds used during these

Chapter 11 Cases did not create a corresponding dollar of diminution in value but, in fact,

preserved and/or enhanced the value of the Debtors' business; and (iii) as shown in the PJT

Report, the Debtors' enterprise value (and, therefore, the value of the Secured Notes Collateral)

has in fact ***increased*** during, and as a result of, the Chapter 11 Cases.

       i.     *Oaktree Is Not Entitled to a Section 507(b) Claim for Any Losses in Value*
          *That Were Anticipated or Foreseeable, or That Would Have Occurred*
          *Notwithstanding the Commencement of the Chapter 11 Cases*

27.     Contrary to its assertions, Oaktree is not entitled to a diminution claim on account

of losses in value that were reasonably foreseeable or that would have occurred notwithstanding

the commencement of the Chapter 11 Cases.  *In re Franklin Indus. Complex Inc.,* No. 01-67457

(SDG), 2008 WL 3992233, at *6 (Bankr. N.D.N.Y. Aug. 21, 2008) (holding that creditor was not

entitled to a section 507(b) claim for any loss "that would have occurred ***despite*** the interference

of the bankruptcy case") (emphasis added); *Callister,* 15 B.R. at 528 (finding that a superpriority

claim is intended to "recapture value ***unexpectedly*** lost during the course of a case") (emphasis

added); *In re Blackford Farms, Inc.*, 68 B.R. 639, 641 (Bankr. N.D. Iowa 1986) (citing *Callister*,

15 B.R. at 530) ("[S]ome declines in collateral value, such as those which are **unavoidable with**

**or without the automatic stay**, may not be compensable via adequate protection.") (emphasis

added); *see also Cheatham v. Cent. Carolina Bank & Trust Co., N.A., (In re Cheatham)*, 91 B.R.

382, 386 (Bankr. E.D.N.C. 1988) (citing *Callister*, 15 B.R. at 531-34) ("[S]uperpriority status is

not available where the creditor's loss . . . is due to **ordinary or foreseeable depreciation**.")

(emphasis added).

28.      Despite Oaktree's contention that payments to critical vendors and on account of

rent and utilities contributed to the diminution in the value of its interests in the Secured Notes

Collateral, these payments cannot constitute a diminution in value claim.  The Debtors would

have been required to pay these obligations in the ordinary course of their businesses **even if the**

**Debtors were not in bankruptcy**.  Accordingly, these costs cannot form the basis for a claim

under section 507(b).  *See Franklin Indus.*, 2008 WL 3992233, at *6; *Blackford Farms*, 68 B.R.

at 641.

29.      In addition, the Debtors' use of DIP Proceeds to satisfy claims and operating

expenses was entirely foreseeable—**particularly by Oaktree**—and, therefore, similarly cannot be

included as part of a section 507(b) claim.  *See Callister*, 15 B.R. at 528; *Cheatham*, 91 B.R. at

386.  In its capacity as DIP lender, Oaktree worked closely with the Debtors to create the Budget.

*See* DIP Term Loan Credit Agreement at §§ 4.1(k) (requiring Budget to be in form and substance

satisfactory to DIP lenders); 6.12 (permitting Debtors to use DIP Proceeds to pay claims and

fund operations only as provided in the Budget).  As a result, the Debtors' use of DIP Proceeds

consistent with the Budget was not only anticipated and foreseeable, but each expenditure

identified in the Budget was **negotiated, approved and funded** by Oaktree.  Further, Oaktree

***consented to the priming of its own prepetition liens*** in connection with the DIP Term Facility

and in furtherance of the PSA and the Oaktree Plan. *See* PSA, Ex. A at 5.  In its capacity as

prepetition secured creditor, Oaktree also negotiated the adequate protection package included in

the Final DIP Order based on the facts and circumstances then in existence, as reflected in the

Budget.[13]  Accordingly, Oaktree cannot claim that expenditures of DIP Proceeds pursuant to the

Budget were in any way "unforeseeable" or "unexpected."

> ii.    *Each Dollar of Cash Spent by the Debtors Did Not Create a
>         Corresponding Dollar of Diminution in the Value of the Secured Notes
>         Collateral*

30.    Oaktree's section 507(b) argument also implies that every dollar of DIP Proceeds

spent or to be spent during the pendency of the Chapter 11 Cases pursuant to the Oaktree-

approved Budget constitutes a *per se* diminution in the value of its collateral, entitling it to a

replacement lien in equal amount.  Oaktree's contention is contrary to logic and unsupported by

law.

31.    Applicable law establishes that ***the use of cash collateral***, even if not directly

reinvested in new replacement collateral, ***can enhance the value of all collateral***. *See, e.g.,*

*Residential Capital I*, 497 B.R. at 420 (finding that secured noteholders were not entitled to

reimbursement in the form of diminution claim for every dollar of cash collateral used where

such use preserved or enhanced the value of their collateral); *In re Stein*, 19 B.R. at 460 (finding

that lienholder's interest in its collateral was not diminished where cash expenditures made by

debtor out of cash collateral enhanced the overall value of the collateral).  Rather, a secured

creditor is protected only from an aggregate decrease in the value of the cash and non-cash

collateral securing its claim. *See In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y.

---

[13] Upon information and belief, the Debtors are in compliance with the Budget. *See also* Houlihan Report at 47 ("I believe that the DIP budget . . . reflects the most accurate representation of the aggregate costs during these cases.").

1992) (holding that a secured creditor's interest in its collateral was adequately protected when cash collateral was used to pay necessary operating expenses, and would preserve the overall value of the collateral); *In re Cont'l Airlines*, 134 B.R. 536, 544 (Bankr. D. Del. 1991) (holding that a decrease in one type of collateral may be offset by an increase in another).

32.    As an initial matter, the Debtors' entry into the DIP Term Facility, and the priming liens granted to Oaktree in connection therewith, ***preserved and enhanced***—rather than diminished—the going-concern value of the Debtors' businesses, and therefore, the value of Oaktree's interest in the Secured Notes Collateral.  Without the DIP Term Facility, the Debtors almost certainly would have liquidated.  *See* DIP Motion at ¶ 62 ("[T]he Debtors require postpetition financing and the use of cash collateral under the terms of the DIP Credit Agreements to continue their operations pending their reorganization through confirmation of the [Oaktree] Plan.").  If the company had liquidated, the Debtors and Oaktree acknowledge that the Secured Noteholders would have received little to no value on account of their Secured Notes Claims.  *See* Disclosure Statement [Docket No. 477], Ex. C (the "Liquidation Analysis") at 3; *see also* Houlihan Report at 70-71 (referencing the Debtors' Liquidation Analysis).  The Debtors' entry into the DIP Term Facility thus directly inured to Oaktree's benefit as a Secured Noteholder and as the future owner of the reorganized Debtors because the financing enabled the Debtors to preserve and enhance the going-concern value of their businesses.  Accordingly, Oaktree cannot now assert that the priming of its liens and the use of DIP Proceeds (in accordance with the Oaktree-approved Budget) diminished the value of its prepetition collateral.

33.    Moreover, Oaktree's dollar-for-dollar argument otherwise fails to comport with the standard applicable to section 507(b) claims: instead of addressing whether the aggregate value of the Secured Notes Collateral has decreased since the Petition Date, *see Salem Plaza*,

17

135 B.R. at 758; *Cont'l Airlines*, 134 B.R. at 544, Oaktree instead asserts a diminution claim of

$68.5 million, calculated as follows:

| Diminution in Value Claim | |
|---|---|
| *($ in millions)* | |
| Claims Ahead of Senior Secured Notes at Petition Date | |
| Prepetition ABL[1] | $63.8 |
| Claims Ahead of Senior Secured Notes at Effective Date | |
| DIP ABL Facility | $22.3 |
| DIP Term Loan Facility | 115.0 |
| Increase in Claims | $73.5 |
| Less: Adequate Protection[2] | (0.3) |
| Less: KEIP / KERP[3] | (2.3) |
| Less: CapEx[4] | (2.4) |
| Total Diminution in Value | $68.5 |

*See* Houlihan Report at 50.

34.    As shown in the chart above, to reach its alleged diminution claim of $68.5

million, Oaktree starts by subtracting the $63.8 million of claims on account of the prepetition

ABL facility from the $137.3 million of claims on account of the DIP ABL Facility and the DIP

Term Loan Facility to conclude there is a $73.5 million increase in claims that are senior to

Oaktree.  Oaktree then subtracts (i) up to $250,000 in adequate protection payments for the

benefit of Oaktree and the other Secured Notes Parties, (ii) approximately $2.4 million of capital

expenditures in accordance with the Budget, and (iii) approximately $2.3 million of payments

under the Debtors' key employee retention and incentive plans (the "KEIP/KERP") from the

$73.5 million in claims senior to Oaktree to conclude that there has been a $68.5 million

diminution in value.  *See* Motion at ¶ 26.

35.    Each expenditure of DIP Proceeds preserved and/or enhanced, rather than

diminished, the value of the Debtors' businesses.  Indeed, Oaktree expressly agreed that

KEIP/KERP payments would not form the basis of a diminution claim because such payments

were "value enhancing."  *See* Dec. 1, 2015 Hr'g Tr. at 76:15-21 (counsel for Oaktree:  "[Oaktree

18

has] agreed that the payments under the KEIP and the KERP are appropriate. They are *value enhancing* from our perspective. We would not use [KEIP/KERP] payments as the basis to argue that we suffered a diminution in value . . . ."). There is simply no reason to distinguish the use of DIP Proceeds to satisfy KEIP/KERP payments—which Oaktree agreed were value-enhancing—from every other value-enhancing payment made with DIP Proceeds. Specifically, with respect to critical vendor payments, customer program obligations and employee wages, the Debtors represented, and the Court expressly found, that each such payment was vital:

| PAYMENT | EVIDENCE THAT PAYMENT ENHANCED VALUE OF DEBTORS' ESTATES[14] | SOURCE |
|---|---|---|
| **Critical Vendors** | The Court: "[T]he purpose of [paying critical vendors] is to *preserve the value of the enterprise . . . .*" | Sept. 10, 2015 Hr'g Tr. at 44:24-45:1 |
| | Mr. Durrer: "There is a *vital destruction of value* if we can't execute on the business plan [because of the critical vendors' decision not to ship or deliver goods]. And you also heard that it impacts the DIP itself, our ability to execute on the DIP." | Oct. 15, 2015 Hr'g Tr. at 196:6-9 |
| | "[F]ailure to pay the Critical Vendor Claims . . . could disastrously affect the Debtors' cash flows. On the other hand *payment of the Critical Vendor Claims . . . [will] facilitat[e] the Debtors' reorganization.*" | Critical Vendor Motion [Docket No. 15] at ¶ 28 |
| | "[The Debtors' critical vendors] supply those essential goods and services without which the Debtors' businesses either could not operate or would operate at significantly reduced profitability and . . . *cannot be replaced without significant harm to the business.*" | Critical Vendor Motion [Docket No. 15] at ¶ 17 |
| **Customer Programs** | The Court: "[T]he purpose of [continuing the customer programs] *is to preserve the value of the retail and operating [business].*" | Sept. 10, 2015 Hr'g Tr. at 24:15-16 |
| | "[The Debtors' request to continue customer programs] *is to preserve the going concern value of their businesses* in order to effect a successful reorganization . . . ." | Customer Programs Motion [Docket No. 9] at ¶ 38 |
| **Wages** | "[Paying] Prepetition Employee Obligations is, therefore, *necessary to maximize the value of the Debtors' estates* for all creditors and stakeholders." | Wages Motion [Docket No. 11] at ¶ 60 |
| | "[P]ayments which are critical to the retention and morale of the Debtors' workforce *actually add value to the estates* because an unplanned reduction in Employee retention or productivity could have disastrous effects on recoveries to creditors and stakeholders." | Wages Motion [Docket No. 11] at ¶ 74 |

36.      Indeed, through its approval of each Budget line item, Oaktree supported the Debtors' efforts to make payments to critical vendors, customers and employees because Oaktree recognized the significant harm the Debtors' estates would suffer if critical vendors discontinued

---

[14] All emphasis contained in this chart is added.

necessary services, customers ceased to do business with the Debtors or vital employees left their positions.

37.     Similarly, the Debtors' payment of approximately $█ million in rent and utility payments was in exchange for vital services, the continuation of which maintained the value of the Debtors' estates and, in turn, the Secured Notes Collateral.[15]  *See* PJT Report at 78.  If the Debtors and Oaktree had determined that the payment of rent and utilities was not value-preserving or enhancing as to any individual store, Oaktree could have negotiated with the Debtors to reject the associated lease.  Indeed, the Debtors have indicated that they intend to reject 30 leases during these Chapter 11 Cases.

38.     Taken in the aggregate, the payments identified in this Section I.B(ii) more than offset Oaktree's purported $68.5 million diminution claim.  Oaktree therefore has not established that there has been an aggregate decrease in the value of the Secured Notes Collateral, and thus is not entitled to a diminution in value claim pursuant to section 507(b).  Accordingly, the Motion should be denied.

> ### iii.    *The Debtors' Enterprise Value Has in Fact Increased as a Result of the Chapter 11 Cases*

39.     The evidence before the Court indicates that, contrary to Oaktree's self-serving section 507(b) argument, the Debtors' enterprise value—and therefore the value of the Secured Notes Collateral—has in fact ***increased*** during, and as a result of, the Chapter 11 Cases by approximately $39.1 million.[16]  *See* PJT Report at 80.  Specifically, by utilizing the bankruptcy process, the Debtors have realized approximately $█ million in savings from the rejection of

---

[15] *See Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a) and 366 (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies and (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service* [Docket No. 12] at ¶ 16.

[16] Calculated on a tax-effected basis.

unprofitable leases and approximately $███ million in savings from reduced payments on account of trade and other ordinary course liabilities. *Id.*

40.    As shown in the PJT Report, the Debtors (presumably with Oaktree's input) have identified 30 stores as unprofitable. *Id.* at 81. Up to 12 years remain on the leases associated with such stores, but the Debtors were able to utilize the chapter 11 process to reject these leases and save approximately $███ million on a present value basis. *Id.* at 80.

41.    Similarly, the bankruptcy process enabled the Debtors to satisfy certain ordinary course obligations relating to accounts payable, severance, accrued royalties and other obligations at a discount, resulting in an estimated savings of $███ million, as detailed in the chart below. *Id.* By reducing the Company's cash expenditures, the savings from these discounted payments increased the Debtors' enterprise value and, therefore, the value of Oaktree's interest in the Secured Notes Collateral.

| | Accounts Payable | Severance | Accrued Royalties | Other Accrued Liabilities | Total |
|---|---|---|---|---|---|
| Unsecured Claim[1] | | | | | |
| (/) Total Unsecured Claim[2] | | | | | |
| Percent of Unsecured Claims | | | | | |
| (x) Proposed Unsecured Recovery | | | | | |
| Recovery | | | | | |
| | | | | | |
| Claim | | | | | |
| (-) Recovery | | | | | |
| Net Savings | | | | | |

(1)    From "GUC summary – 11.19.2015 c" sent by Company's advisors to PJT
(2)    From Debtors' Second Amended Disclosure Statement, represents sum of Class 5A and 5B

PJT Report at 82.

42.    Because the value of the Secured Notes Collateral has in fact ***increased*** as a result of the Chapter 11 Cases, Oaktree cannot meet its burden to show diminution in value and, accordingly, the Motion should be denied.

II.    **Amounts Used To Satisfy Claims and Fund the Chapter 11 Cases May Not Be Charged Solely Against Unencumbered Collateral**

43.    Having failed to establish a valid section 507(b) claim, Oaktree next attempts to appropriate the value of the Unencumbered Foreign Equity by arguing that the Court must find that all general unsecured, administrative and priority claims paid or anticipated to be paid during the pendency of these Chapter 11 Cases somehow "count against" the Unencumbered Foreign Equity, through application of section 506(c) or otherwise.

44.    This argument should be rejected for two reasons.  First, the Debtors received authority to use cash collateral under ***section 363*** pursuant to the Budget, and thus section 506(c) is simply not relevant.  Moreover, Oaktree's argument that the costs of preserving the Debtors' (soon to be Oaktree's) businesses should be "charged against" the Unencumbered Foreign Equity is simply another bite at the apple by Oaktree to recover against the Debtors' sole unencumbered asset, on which Oaktree was denied a lien at the final hearing on the DIP Motion.  Accordingly, Oaktree's efforts to circumvent the Court's clear and unambiguous ruling that the DIP Collateral does not include the Unencumbered Foreign Equity should not be countenanced by this Court.

A.    **Bankruptcy Code Section 506(c) Is Not Relevant to This Dispute**

45.    Oaktree argues that payments made or to be made to (i) fund the Debtors' businesses during chapter 11 and (ii) implement the Oaktree Plan "fall squarely within the section 506(c) waiver" contained in the Final DIP Order and, accordingly, should be deemed satisfied out of the Debtors' unencumbered assets.  Motion at ¶¶ 26-27.  This argument, among other things, improperly conflates the ***use*** of cash collateral under section 363 with the ***surcharge*** of collateral under section 506(c) and is thus without merit.

46.    Surcharging collateral under section 506(c) is entirely independent from, and alternative to, the use of cash collateral subject to the provision of adequate protection in

22

accordance with Bankruptcy Code section 363. *In re ProAlert*, 314 B.R. at 440 (authorizing use

of cash collateral pursuant to section 363(e), subject to the provision of adequate protection,

without regard for the requirements of section 506(c)); *In re WBE Co.*, No. 06-80006 (TJM),

2007 WL 4892121, at *1 (Bankr. D. Neb. Dec. 21, 2007) (same).

47.    Where, as is the case here, the order authorizing the debtor to use cash collateral

under section 363 also includes a section 506(c) waiver, the two provisions "***work in tandem***"

and allow the use of cash collateral consistent with the terms of the applicable order and any

related budget, notwithstanding the requirements of section 506(c). *Residential Capital I*, 497

B.R. at 422 (internal citations omitted). If the secured creditor is adequately protected, "***by***

***definition, there is no surcharge and section 506(c) does not come into play*.**" *In re ProAlert*,

314 B.R. at 439; *see also In re Chatham Parkway Self Storage, LLC*, No. 12-42153, 2013 WL

1898058, at *4 (Bankr. S.D. Ga. Apr. 25, 2013) (holding that debtor may use cash collateral if

creditor is adequately protected, without regard to section 506(c)); *In re Coventry Commons

Assocs.*, 149 B.R. 109, 114 (Bankr. E.D. Mich. 1992) (same).

48.    In *Residential Capital*, a secured noteholder sought to enforce a section 506(c)

waiver in order to prevent the debtor from using the creditor's cash collateral unless the creditor

was granted additional adequate protection beyond that initially provided. *Residential Capital I*,

497 B.R. at 421-22. Relying on *ProAlert*, the court rejected the creditor's theory of adequate

protection, stating that "the [secured noteholders] are adequately protected so long as the Debtors

only use cash collateral pursuant to the Cash Collateral Order." *Id.* at 422.

49.    Applying *ProAlert* and *Residential Capital* to the facts of this case, it is clear that

***section 506(c) is not implicated here*** because Oaktree received adequate protection in exchange

for the (consensual) priming of its prepetition liens pursuant to the Final DIP Order. *ProAlert*,

314 B.R. at 439-40; *Residential Capital I*, 497 B.R. at 422.  Accordingly, the section 506(c) cases

cited by Oaktree are entirely inapposite because each case addresses a completely different fact

pattern:  one in which a debtor sought to surcharge a creditor's collateral, rather than one in

which a debtor proposes to apply DIP proceeds pursuant to a budget following the provision of

adequate protection to the debtor's prepetition secured creditors.  *See* Motion at ¶ 25 (citing

*Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus. Inc.)*, 57 F.3d 321, 325-

26 (3d Cir. 1995) (finding trade creditor did not provide the kind of "direct benefit" under section

506(c) necessary to establish a right to surcharge the creditor's collateral for the trade creditors'

material costs) and *In re Towne, Inc.*, 536 Fed. App'x 265, 268 (3d Cir. 2013) (denying request

by debtors' special counsel to surcharge fees and expenses against the proceeds from the sale of

debtors' assets because counsel failed to satisfy section 506(c)'s requirements)).  Accordingly,

section 506(c) and the case law cited thereunder by Oaktree is not applicable to the facts of these

cases.

**B.  Payments Made or Anticipated To Be Made on Account of General Unsecured, Priority and Administrative Claims May Not Be Charged Solely Against the Unencumbered Foreign Equity**

50.  Oaktree similarly argues that approximately $137.4 million in payments made or

anticipated to be made from the proceeds of the DIP Term Facility and the Exit Rights Offering

to general unsecured, priority and administrative claimants must be deemed allocated to the

Unencumbered Foreign Equity, and therefore "count against" recoveries to unsecured creditors

under the Oaktree Plan.  Motion at ¶ 25.  This argument is similarly unavailing.

51.  It is undisputed that (i) the Debtors have used DIP Proceeds to satisfy certain

claims and fund the administration of these Chapter 11 Cases, and (ii) the Debtors intend to

satisfy certain administrative claims with the proceeds of the Exit Rights Offering.

24

52.    Payments made from the DIP Proceeds cannot be charged against the Unencumbered Foreign Equity. As described in the illustrative diagram below, as the Debtors utilize DIP Proceeds in accordance with the Budget, these expenditures create obligations under the DIP Term Facility ("DIP Obligations"), which DIP Obligations must be satisfied by recourse to the DIP Collateral. *See* DIP Term Loan Credit Agreement at § 1.1 (defining "Obligations" as "all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants and indemnities of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan . . . .").

53.    For example, if an unsecured creditor provides services to a debtor at a value of $5, the creditor has a $5 unsecured claim against the debtor:



If a DIP lender provides the debtor with financing to pay its ordinary course expenses, the debtor will use $5 of DIP proceeds to satisfy the unsecured creditor's claim:



In turn, the debtor's utilization of $5 in DIP proceeds will create a DIP claim of $5 against the debtor's estate:



The DIP lender's $5 DIP claim may, in turn, be satisfied only with recourse to the DIP collateral package:



54.     In addition to the foregoing, Oaktree's position is clearly inconsistent with the terms and spirit of the Court's ruling embodied in the Final DIP Order.  Oaktree previously sought—and the Court explicitly denied—a lien on the Unencumbered Foreign Equity in exchange for providing the DIP Term Facility.  Indeed, the Unencumbered Foreign Equity was explicitly *excluded* from the DIP Collateral and, therefore, Oaktree is precluded from asserting that the DIP Obligations are entitled to be repaid from such assets.  *See* Final DIP Order at ¶ 6(a); Oct. 15, 2015 Hr'g Tr. at 143:15-24.  By characterizing payments made with DIP Proceeds as a "surcharge" of the Secured Notes Collateral, Oaktree is attempting to leverage its status as a prepetition secured creditor to recover against unencumbered assets on which it was denied a lien in its capacity as a DIP lender.  There is simply no mechanism in the Final DIP Order, the Bankruptcy Code or under applicable case law that would allow Oaktree to reallocate the repayment of DIP Proceeds spent pursuant to the Budget from the DIP Collateral to the

Unencumbered Foreign Equity, and such an inequitable result should not be countenanced by this Court.[17]

55.     The Oaktree Plan also provides for the payment of $46.5 million in administrative claims from the proceeds of the Exit Rights Offering.  Contrary to Oaktree's assertion, administrative expenses should not be fully allocated to the Debtors' unencumbered assets.[18] Rather, administrative expenses—which are granted priority status for the simple fact that they benefit *all* creditors—are to be charged *ratably* against the Debtors' estates as a whole under applicable law.  *See In re InteliQuest Media Corp.*, 326 B.R. at 832 ("[S]urcharges and administrative expenses . . . are distinct charges against estate property that serve very different purposes . . . . [A]n administrative expense . . . is an assessment against the estate as a whole because all of the creditors are benefitted."); *see also In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d at 1067 (noting that administrative expenses "come out of the debtor's estate," in contrast to a section 506(c) surcharge which is paid entirely from the secured creditor's collateral).

56.     Administrative expenses represent necessary costs of preserving the Debtors' estates and, as such, Oaktree and the Debtors' unsecured creditors must each bear their own ratable portion of such claims.  Approximately $42 million[19] of administrative expenses will need to be satisfied ratably out of the Debtors' estates.  As set forth in the PJT Report and

---

[17] In addition, and as a practical matter, administrative, priority and/or general unsecured claims paid in the Chapter 11 Cases cannot be "charged against" an illiquid asset.  If the Debtors and/or Oaktree intended for some or all of these costs to be funded from the value of the Unencumbered Foreign Equity, they could have borrowed against such equity.  They, however, elected not to do so.

[18] The Committee disagrees with the Company's and Oaktree's estimation and classification of the administrative fees and expenses and reserves all rights in connection therewith.

[19] The Debtors and Oaktree estimate administrative claims to be $46.3 million.  This amount, however, includes $4.3 million that will be paid to Oaktree's professionals.  It would be inequitable to require the estate to pay professional fees that were incurred solely for Oaktree's benefit.  Accordingly, the Committee asserts that the aggregate amount of administrative expenses that should be borne ratably by the Debtors' estates is approximately $42 million.  The Committee disagrees with the Company's and Oaktree's estimation and classification of the administrative fees and expenses and reserves all rights in connection therewith.

illustrated in the chart below, the total distributable value of the Debtors is approximately $704

million, allocated as follows:  (i) 24.6% (or $173 million) on account of the value of the Debtors'

U.S. assets; (ii) 62.5% (or $440 million) on account of the total foreign value, less the 35% of the

Debtors' equity interests in their foreign subsidiaries that is unencumbered by the liens of the

Secured Noteholders; and (iii) 12.9% (or $91 million) on account of the Unencumbered Foreign

Equity:

| Allocation of Administrative Claims | TEV[1] | Plus: Excess Cash[2] | Dist. Value | | Less: Share of Admin | Adjusted Distributable Value | Less: Total Debt[2] | Adjusted Equity Value |
|---|---|---|---|---|---|---|---|---|
| Encumbered US Value (TEV of QS Wholesale) | 170 | 3 | 173 | 24.6% | (10) | 163 | (69) | 94 |
| Encumbered Foreign Value (Foreign TEV Less 35% Equity) | 429 | 11 | 440 | 62.5% | (26) | 413 | (271) | 143 |
| Unencumbered Value (35% Equity) | 91 | - | 91 | 12.9% | (5) | 86 | NA[3] | 86 |
| Total | 690 | 14 | 704 | 100.0% | (42) | 662 | (339) | 323 |

(1)   PJT Report
(2)   Quiksilver Financial Projections_Nov 16 xlsx
(3)   Not applicable given the $91 million represents the value of unencumbered equity (after debt)

57.     Accordingly, contrary to Oaktree's assertions that all administrative expenses

should be charged against the Unencumbered Foreign Equity, when applied ratably against the

Debtors' encumbered and unencumbered value, approximately $36.5 million (87.1% of $42

million) of the administrative expenses should be satisfied from the value attributed to the

Secured Notes Collateral, and approximately $5 million (12.9% of $42 million) should be borne

by the Debtors' unsecured creditors.

**III.     Even If Oaktree Does Not Waive Its Deficiency Claim, Non-Priority Unsecured
Creditors Are Entitled to a Substantially Greater Recovery Than That Proposed
Under the Oaktree Plan**

58.     Oaktree next contends that Non-Priority Unsecured Creditor recoveries will be

diluted if the Oaktree Plan is not confirmed, and Oaktree later asserts a deficiency claim on

account of that portion of its Secured Notes Claims deemed unsecured.  Specifically, the Motion

states that in order for Non-Priority Unsecured Creditors to recover an amount equal to their

28

proposed cash distribution under the Oaktree Plan in a scenario where Oaktree asserts a $234.6 million unsecured deficiency claim, the value of the Unencumbered Foreign Equity must exceed $137.9 million. *See* Motion at ¶ 37; Houlihan Report at 53. Oaktree's assertion is simply not accurate.

59.     As demonstrated in the chart below, even if Oaktree were to assert its deficiency claim in the context of an alternative plan, Non-Priority Unsecured Creditors nevertheless would still be entitled to a ***substantially greater*** recovery than that proposed under the Oaktree Plan:[20]

| Allocation of 35% Foreign Equity | | | |
|---|---|---|---|
| Secured Claim | 283 | | |
| Less: Recovery on 65% of Foreign Equity | (143) | | |
| Less: HL / K&E Fees (Pendency & Back-End)[1] | (6) | Split (%) | Split ($) |
| Secured Deficiency Claim | 134 | 32.5% | 28 |
| Unsecured Claim | 277 | 67.5% | 58 |
| Total Unsecured | 411 | 100.0% | $86 |

(1)   Per DIP Budget

60.     PJT estimates the value of the Debtors' equity interest in their foreign subsidiaries to be approximately $260 million. *See* PJT Report at 53. Of this $260 million of value, unencumbered assets represent approximately ***$91 million***—not $39 million as maintained by both PJSC and Houlihan. *Id.*; PJSC Report at 28; Houlihan Report at 51; *see also* Plan Objection at § I.B.2.

61.     The Secured Noteholders, whose claims total approximately $283 million, have a lien on, among other things, 65% of the Debtors' equity interests in their foreign subsidiaries (the "Encumbered Foreign Equity"). As shown in the chart above (and addressed at length in the Plan Objection), Secured Noteholders will recover approximately $143 million on account of

---

[20] For the avoidance of doubt, PJT has calculated the value of the Unencumbered Foreign Equity as approximately $91 million. The $86 million reflected in this chart takes into account the approximately $5 million in administrative expenses that must be satisfied from the Unencumbered Foreign Equity.

their lien on the Encumbered Foreign Equity (taking into account payment of administrative claims chargeable to the Encumbered Foreign Equity).[21]

62.     Non-Priority Unsecured Creditors, whose claims are estimated at $277.4 million, have recourse to the value of the Unencumbered Foreign Equity.  Accordingly, in a scenario where Oaktree does not waive its asserted deficiency claim, Secured Noteholders could assert a deficiency claim of approximately $134 million against the Unencumbered Foreign Equity.

63.     Given that Non-Priority Unsecured Creditors represent approximately 67.5% of the estimated pool of unsecured claimants (which now includes Oaktree's asserted deficiency claim), such creditors would be entitled to approximately $58.5 million, leaving approximately $28 million to be distributed to the Secured Noteholders on account of their deficiency claim.

64.     The math is clear:  based upon PJT's valuation of the Unencumbered Foreign Equity at approximately $91 million, Non-Priority Unsecured Creditors are still entitled to recover *approximately $45 million more* than their proposed distribution under the Oaktree Plan even if Oaktree were to assert its deficiency claim.  For these reasons, Oaktree's position that Non-Priority Unsecured Creditor recoveries will be diluted or virtually eliminated if the Oaktree Plan is not confirmed and Oaktree asserts its deficiency claim is incorrect and must be disregarded by the Court.

## RESERVATION OF RIGHTS

65.     As this Court is aware, the Debtors, the Committee and Oaktree have agreed to participate in a mediation with respect to, among other issues, the amount of Oaktree's diminution in value claim, if any.  The mediation is scheduled to begin on January 15, 2016.  In addition, discovery, including expert witness depositions, remains ongoing.  Accordingly, this

---

[21] The chart also reflects that the Secured Notes Claim amount has been reduced by $6 million to account for the payment of Oaktree's professional fees.

Objection is submitted without prejudice to, and with a full and express reservation of, the Committee's rights to supplement and amend this Objection, including by filing a supplement thereto, to introduce evidence at any hearing relating to this Objection, and to further object to the Motion on any grounds that may be appropriate.  In addition, the Committee reserves its rights to object to confirmation of the Oaktree Plan or any other plan of reorganization proposed in these Chapter 11 Cases on any and all grounds.

## CONCLUSION

**WHEREFORE**, the Committee requests that the Court (i) deny the Motion and

(ii) provide the Committee such other and further relief as the Court may deem just, proper and

equitable.

Dated: January 14, 2016
     Wilmington, Delaware

**PEPPER HAMILTON LLP**

*/s/ David B. Stratton*
David B. Stratton (DE No. 960)
David M. Fournier (DE No. 2812)
John H. Schanne II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, Delaware  19899-1709
Telephone:   (302) 777-6500
Facsimile:   (302) 421-8390
E-mail:   strattod@pepperlaw.com
        fournierd@pepperlaw.com
        schannej@pepperlaw.com

-AND-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Michael S. Stamer (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
One Bryant Park
Bank of America Tower
New York, New York  10036-6745
Telephone:   (212) 872-1000
Facsimile:   (212) 872-1002
E-mail:   mstamer@akingump.com
        aqureshi@akingump.com
        mlahaie@akingump.com