# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| QUIKSILVER, INC., *et al.*, | : | Case No. 15-11880 (BLS) |
| | : | |
| Debtors.[1] | : | Jointly Administered |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' MEMORANDUM OF LAW (I) IN SUPPORT OF CONFIRMATION OF THE PLAN OF REORGANIZATION OF THE DEBTORS AND (II) IN RESPONSE TO CERTAIN OBJECTIONS THERETO

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Van C. Durrer, II (I.D. No. 3827)
Annie Z, Li
300 South Grand Avenue
Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

Mark S. Chehi (I.D. No. 2855)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
Telephone: (302) 651-3000
Fax: (302) 651-3001

John K. Lyons
Jessica S. Kumar
155 N. Wacker Dr.
Suite 2700
Chicago, IL 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

Counsel for Debtors and Debtors in Possession

Dated: Wilmington, Delaware
       January 25, 2016

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

**Table of Contents**

                                                                                                     Page
PRELIMINARY STATEMENT ........................................................................................2
I.      BACKGROUND AND HIGHLIGHTS OF THE PLAN .............................................4
        A.      Background and Events Leading up to the Commencement of These
                Cases ..............................................................................................................4
        B.      Background Regarding the Plan ....................................................................4
        C.      Highlights of the Plan.....................................................................................7
        D.      Acceptance of Plan .......................................................................................10
II.     MODIFICATIONS TO THE PLAN. ..........................................................................11
III.    THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION
        UNDER SECTION 1129 OF THE BANKRUPTCY CODE ......................................11
        A.      The Plan Complies With the Applicable Provisions of Title 11 (Section
                1129(a)(1)) .....................................................................................................12
                1.      Classification of Claims and Interests (Section 1122) .......................13
                2.      Mandatory Contents of the Plan (Section 1123(a)).....................................15
                        (a)     Designation of Classes of Claims (Section 1123(a)(1))................16
                        (b)     Specification of Unimpaired Classes (Section 1123(a)(2))............16
                        (c)     Treatment of Impaired Classes (Section 1123(a)(3))....................16
                        (d)     Equal Treatment within Classes (Section 1123(a)(4))..................16
                        (e)     Means for Implementation (Section 1123(a)(5)) ..........................17
                        (f)     Prohibition on Issuance of Non-Voting Securities (Section
                                1123(a)(6))......................................................................................20
                        (g)     Selections for Certain Positions (Section 1123(a)(7)) .................20
                3.      Discretionary Contents of the Plan (Section 1123(b)) ...........................21
                        (a)     Generally ......................................................................................21
                        (b)     Releases ........................................................................................22
                        (c)     Exculpation....................................................................................25
                        (d)     Injunction......................................................................................28
                        (e)     Executory Contracts and Unexpired Leases................................29
                        (f)     Cure...............................................................................................30
                        (g)     Dissolution of Inactive Debtors and Closing of Inactive
                                Debtor Chapter 11 Cases..............................................................31
                        (h)     Additional Provisions...................................................................32
        B.      The Proponents of the Plan Comply with the Applicable Provisions of
                Title 11 (Section 1129(a)(2))..........................................................................32
        C.      Good Faith (Section 1129(a)(3))....................................................................35
        D.      Payments for Services and Expenses (Section 1129(a)(4))..............................38
        E.      Identification of Directors, Officers and Insiders (Section 1129(a)(5)) ..........39
        F.      Rate Changes (Section 1129(a)(6))................................................................41
        G.      The "Best Interests" Test (Section 1129(a)(7))..............................................41
        H.      Acceptance by Impaired Classes (Section 1129(a)(8)) ..................................46

| | | |
|---|---|---|
| **I.** | **Treatment of Priority Claims (Section 1129(a)(9))** | 48 |
| **J.** | **Acceptance of at Least One Impaired Class (Section 1129(a)(10))** | 50 |
| **K.** | **Feasibility (Section 1129(a)(11))** | 50 |
| **L.** | **Payment of Certain Fees (Section 1129(a)(12))** | 53 |
| **M.** | **Continuation of Retiree Benefits (Section 1129(a)(13))** | 54 |
| **N.** | **Miscellaneous Provisions (Sections 1129(a)14-16)** | 54 |
| **IV.** | **THE PLAN SATISFIES THE "CRAMDOWN" REQUIREMENTS** | 54 |
| **A.** | **The Plan Does Not Unfairly Discriminate** | 55 |
| **B.** | **The Plan is Fair and Equitable** | 57 |
| **V.** | **RESPONSES TO OBJECTIONS** | 58 |
| **A.** | **The Objection Filed by the Creditors' Committee [Docket No. 661]** | 58 |
| **B.** | **The Objection Filed by the Former Employees [Docket No. 657]** | 58 |
| **C.** | **The Objection Filed by the United States Trustee [Docket No. 684]** | 61 |

**Exhibits**

Exhibit A      Chart of Objections to Plan

## Table Of Authorities

Page

### CASES

In re 203 North LaSalle Street Ltd. Partnership,
190 B.R. 567 (Bankr. N.D. Ill. 1995) ...............................................................................55

In re 203 North LaSalle Street Partnership,
126 F.3d 955 (7th Cir. 1997)....................................................................12, 35, 42, 51, 55

In re AgFeed USA, LLC.,
No. 13-11761 (BLS) (Bankr. D. Del. Nov. 4, 2014) .......................................................64

In re Aleris International, Inc.,
2010 Bankr. LEXIS 2997 (Bankr. D. Del. May 3, 2010) ................................................64

In re Armstrong World Industries, Inc.,
348 B.R. 111 (D. Del. 2006) ...........................................................................................56

In re Armstrong World Industries, Inc.,
348 B.R. 136 (D. Del. 2006) ...........................................................................................12

In re Aztec Co.,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...................................................................55, 56

 In re Caché, Inc.,
No. 15-10172 (MFW) (Bankr. D. Del. Feb. 4, 2015).......................................................3

In re Caribbean Petroleum Corp.,
444 B.R. 263 (Bankr. D. Del. 2010)................................................................................37

In re Cellular Information Systems, Inc.,
171 B.R. 926 (Bankr. S.D.N.Y. 1994).............................................................................51

In re Century Glove, Inc.,
No. 90-400-SLR, 1993 WL 239489 (D. Del. Feb. 10, 1993) ..........................................35

In re Coram Healthcare Corp.,
315 B.R. 321 (Bankr. D. Del. 2004).................................................................................23

In re Crowthers McCall Pattern, Inc.,
120 B.R. 279 (Bankr. S.D.N.Y. 1990).............................................................................42

In re dELiA*s, Inc., et al.,
    No. 14-23678 (RDD) (Bankr. S.D.N.Y. Dec. 7, 2014) .................................................... 3

In re Dex One Corp.,
    No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) ..................................................... 65

Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.),
    810 F.2d 270 (D.C. Cir. 1987) ...................................................................................... 18

In re Drexel Burnham Lambert Group Inc.,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ........................................................................... 38

In re Drexel Burnham Lambert Group, Inc.,
    960 F.2d 285 (2d Cir. 1992) .......................................................................................... 28

In re Eagle-Picher Industries, Inc.,
    203 B.R. 256 (Bankr. S.D. Ohio 1996) .................................................................... 37, 38

Eastgroup Properties v. Southern Motel Associates Ltd.,
    935 F.2d 245 (11th Cir. 1991) ....................................................................................... 18

In re Exide Technologies,
    303 B.R. 48 (Bankr. D. Del. 2003) ........................................................................... 11, 15

In re FAH Liquidating Corp. (f/k/a Fisker Auto. Holdings, Inc.),
    Case No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) .............................................. 64

FDIC v. Colonial Realty Co.,
    966 F.2d 57 (2d Cir. 1992) ............................................................................................ 19

Federal-Mogul Global v. Federal-Mogul Global Inc. (In re Federal-Mogul Global),
    402 B.R. 625 (D. Del. 2009) ......................................................................................... 12

Financial Securities Assurance Inc. v. T-H New Orleans Ltd. Partnership (In re T-H New
    Orleans Ltd. Partnership),
    116 F.3d 790 (5th Cir. 1997) ......................................................................................... 36

First National Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.),
    974 F.2d 712 (6th Cir. 1992) ......................................................................................... 18

In re Freymiller Trucking, Inc.,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) ........................................................................ 55

In re Future Energy Corp.,
    83 B.R. 470 (Bankr. S.D. Ohio 1988) .................................................................. 35, 38, 41

Gillman v. Continental Airlines (In re Continental Airlines Inc.),
    203 F.3d 203 (3d Cir. 2000)............................................................................25

In re Greate Bay Hotel & Casino, Inc.,
    251 B.R. 213 (Bankr. D.N.J. 2000) ...............................................................56

In re Hawker Beechcraft, Inc.,
    486 B.R. 264 (Bankr. S.D.N.Y. 2013)............................................................60

In re HSH Delaware GP LLC,
    No. 10-10187 (MFW) (Bankr. D. Del. Jan. 18, 2011) ...................................65

John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates,
    987 F.2d 154 (3d Cir. 1993)...........................................................................13

In re Kaiser Aluminum Corp.,
    No. 02-10429, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006) ....................13

Kane v. Johns-Manville Corp.,
    843 F.2d 636 (2d Cir. 1988)..................................................................... 12, 42

In re Keck, Mahin & Cate,
    241 B.R. 583 (Bankr. N.D. Ill. 1999) .............................................................42

Koelbl v. Glessing (In re Koelbl),
    751 F.2d 137 (2d Cir. 1984)...........................................................................36

In re Laboratory Partners, Inc.,
    Case No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) .............................65

In re Leslie Fay Cos.,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997).......................................................42, 55

Liberty National Enterprises v. Ambanc La Mesa Ltd. Partnership (In re Ambanc La
    Mesa Ltd. Partnership),
    115 F.3d 650 (9th Cir. 1997)......................................................................42, 56

In re Loop 76, LLC,
    465 B.R. 525 (B.A.P. 9th Cir. 2012), *aff'd*,
    578 F. App'x 644 (9th Cir. 2014).....................................................................56

In re Machne Menachem, Inc.,
    233 F. App'x 119 (3d Cir. 2007)......................................................................12

In re Madison Hotel Associates,
    749 F.2d 410 (7th Cir. 1984)......................................................................35

In re Magnatrax Corp.,
    No. 03-11402, 2003 WL 22807541 (Bankr. D. Del. Nov. 17, 2003)...............13

In re Martin,
    66 B.R. 921 (Bankr. D. Mont. 1986)..........................................................50

In re Mason & Dixon Lines, Inc.,
    71 B.R. 300 (Bankr. M.D.N.C. 1987) .........................................................48

In re Merrimack Valley Oil Co.,
    32 B.R. 485 (Bankr. D. Mass. 1983) ..........................................................51

In re Montgomery Court Apts., Ltd.,
    141 B.R. 324 (Bankr. S.D. Ohio 1992) ..................................................51, 54

Mutual Life Insurance Co. of N.Y. v. Patrician St. Joseph Partners Ltd. Partnership (In re
    Patrician St. Joseph Partners Ltd. Partnership),
    169 B.R. 669 (D. Ariz. 1994).....................................................................51

Myers v. Martin (In re Martin),
    91 F.3d 389 (3d Cir. 1996).........................................................................23

NLRB v. Bildisco & Bildisco,
    465 U.S. 513 (1984) ..................................................................................36

In re Old FOH, Inc., et al.,
    No. 15-10836 (KG) (Bankr. D. Del. Apr. 19, 2015) ......................................3

Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re
    Integrated Resources, Inc.),
    147 B.R. 650 (S.D.N.Y. 1992)...................................................................37

Official Creditors' Committee v. Potter Material Service, Inc. (In re Potter Material
    Serv., Inc.),
    781 F.2d 99 (7th Cir. 1986)........................................................................52

In re Oneida Ltd.,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006)...........................................................64

Physiotherapy Holdings, Inc.,
    No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013).....................................64

In re Premier International Holdings, Inc.,
　　No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ...................... 26

In re Prudential Energy Co.,
　　58 B.R. 857 (Bankr. S.D.N.Y. 1986) .............................................................................. 51

In re PWS Holding Corp.,
　　228 F.3d 224 (3d Cir. 2000) ............................................................................. 26, 27, 32

In re Resorts International, Inc.,
　　145 B.R. 412 (Bankr. D.N.J. 1990) ........................................................................ 39, 51

In re Riodizio,
　　204 B.R. 417 (Bankr. S.D.N.Y. 1997) ........................................................................... 60

In re Rivers End Apartments, Ltd.,
　　167 B.R. 470 (Bankr. S.D. Ohio 1994) ................................................................... 51, 55

In re S & W Enterprises,
　　37 B.R. 153 (Bankr. N.D. Ill. 1984) ............................................................................ 12

In re Sea Containers Holdings, Ltd.,
　　No. 06-11156 (Bankr. D. Del. Nov. 24, 2008) .............................................................. 64

In re Seal123, Inc., et al.,
　　No. 15-10081 (CSS) (Bankr. D. Del. Jan. 15, 2015) ....................................................... 3

In re SGL Carbon Corp.,
　　200 F.3d 154 (3d Cir. 1999) ......................................................................................... 35

In re Sherwood Square Associates,
　　107 B.R. 872 (Bankr. D. Md. 1989) .............................................................................. 40

SK-Palladin Partners, L.P. v. Platinum Entertainment, Inc.,
　　No. 01 C 7202, 2001 WL 1593154 (N.D. Ill. Dec. 13, 2001) ......................................... 42

Smith v. Van Gorkom,
　　488 A.2d 858 (Del. 1985) ............................................................................................. 37

In re Source Home Entertainment, LLC,
　　No. 14-11553 (KG) (Bankr. D. Del. Feb. 20, 2015) ....................................................... 64

In re Southern Air Holdings, Inc.,
　　Case No. 12-12690 (Bankr. D. Del. Mar. 18, 2013) ...................................................... 64

In re Spansion, Inc.,
 No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. Apr. 16, 2010) .......................26

In re Spiegel, Inc.,
 No. 03-11540 (BRL), 2005 WL 1278094 (Bankr. S.D.N.Y. May 25, 2005) ..................17

In re Stallion Oilfield Services, Ltd.,
 No. 09-13562 (BLS), 2010 WL 5093096 (Bankr. D. Del. Jan. 20, 2010) .......................26

In re Stations Holding Co.,
 No. 02-10882, 2002 WL 31947022 (Bankr. D. Del. Sept. 30, 2002) .............................33

In re Synagro Technologies, Inc.,
 No. 13-11041 (BLS) (Bankr. D. Del. Aug. 20, 2013) ....................................................64

Teamsters National Freight Industry Negotiating Commission v. U.S. Truck Co. (In re
 U.S. Truck Co.),
 800 F.2d 581 (6th Cir. 1986) ........................................................................................52

In re Terex Corp.,
 984 F.2d 170 (6th Cir. 1993) .........................................................................................48

In re Texaco Inc.,
 84 B.R. 893 (Bankr. S.D.N.Y. 1988) ................................................................. 33, 40, 51

In re Toy & Sports Warehouse, Inc.,
 37 B.R. 141 (Bankr. S.D.N.Y. 1984) .............................................................................46

In re Trans World Airlines, Inc.,
 185 B.R. 302 (Bankr. E.D. Mo. 1995) ...................................................................... 33, 40

In re Tribune Co.,
 464 B.R. 126 (Bankr. D. Del. 2011) ...............................................................................11

In re Tribune Co.,
 476 B.R. 843 (Bankr. D. Del. 2012) ...............................................................................56

In re Tropicana Entertainment, LLC,
 No. 08-10856 (KJC), (Bankr. D. Del. May 5, 2009) ......................................................26

U.S. Bank National Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.),
 426 B.R. 114 (Bankr. D. Del. 2010) ...............................................................................25

Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.),
 860 F.2d 515 (2d Cir. 1988) ..................................................................................... 18, 19

United States v. TM Building Products, Ltd.,
231 B.R. 364 (S.D. Fla. 1998) ...................................................................48

In re UniTek Global Services, Inc.,
No. 14-12471 (KG) (Bankr. D. Del. Jan. 5, 2015) ...................................64, 65

In re Victory Construction Co.,
42 B.R. 145 (Bankr. C.D. Cal. 1984) ...........................................................42

In re W.E. Parks Lumber Co.,
19 B.R. 285 (Bankr. W.D. La. 1982) ............................................................40

Woburn Associates v. Kahn (In re Hemingway Transp., Inc.),
954 F.2d 1 (1st Cir. 1992) ...........................................................................18

In re Zenith Electronics Corp.,
241 B.R. 92 (Bankr. D. Del. 1999) ...............................................................25

## STATUTES

11 U.S.C. § 105(a) .........................................................................................18

11 U.S.C. § 1122(a) ........................................................................................12

11 U.S.C. § 1123(a) ............................................... 15, 16, 17, 18, 19, 20, 21, 29

11 U.S.C. § 1123(b) ................................................................ 21, 22, 23, 32

11 U.S.C. § 1125(b) ........................................................................................33

11 U.S.C. § 1126(f) ........................................................................................46

11 U.S.C. § 1126(g) ................................................................................57, 55

11 U.S.C. § 1127(d) ........................................................................................11

11 U.S.C. § 1129(a) ............................11, 12, 20, 26, 27, 32, 33, 35, 36, 38-43, 46-51, 53, 54, 60

11 U.S.C. § 1129(b) ................................................. 12, 46, 47, 54, 55, 57

## OTHER AUTHORITIES

7 Collier on Bankruptcy
(Alan N. Resnick & Henry J. Sommer eds., 15th rev. ed. 2009) ..............................20, 51

A Functional Analysis of Executory Contracts
  74 Minn. L. Rev. 227 (1989) ........................................................................ 60

Merriam-Webster Dictionary,
  http://www.meriam-webster.com/dictionary/participation
  (accessed Jan. 23, 2016) ............................................................................... 62

## LEGISLATIVE MATERIALS

H.R. Rep. No. 95-595 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963 .............................. 12, 33

S. Rep. No. 95-989 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787 ......................................... 12

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or, as applicable after the Effective Date of the Plan, the "Reorganized Debtors" and, together with their non-Debtor affiliates, "Quiksilver" or the "Company"), hereby submit this memorandum (the "Memorandum") in support of confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors-in-Possession (as may be further amended, supplemented or otherwise modified, the "Plan"),[1] and other related relief. In support of confirmation, the Debtors rely upon and incorporate herein by reference (i) the Declaration of Stephen Coulombe In Support of Confirmation of the Plan of Reorganization of the Debtors (the "Coulombe Declaration"), (ii) the Declaration of Andrew Bruenjes In Support of Confirmation of the Plan of Reorganization of the Debtors (the "Bruenjes Declaration"), (iii) the Declaration of Durc A. Savini In Support of Confirmation of the Plan of Reorganization of the Debtors (the "Savini Declaration"), (iv) the Declaration of Michael J. Hill Regarding Analysis of Ballots for Accepting or Rejecting Second Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession (the "Voting Certification"), and (v) Declaration of Peter Walsh Regarding Subscription to Rights Offerings as Set Forth in the Second Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors And Debtors In Possession (the "Walsh Declaration") each filed concurrently herewith.  In further support of confirmation, the Debtors respectfully represent as follows:

---

[1]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Plan.  The Debtors intend to submit a further amended Plan prior to the commencement of the Confirmation Hearing.

## PRELIMINARY STATEMENT

The Plan represents the culmination of efforts by the Debtors, the Plan Sponsor and their respective professionals and advisors to restructure Quiksilver in a manner that maximizes value for the Debtors' stakeholders, pursuant to which the Secured Noteholders will convert their claims against Quiksilver into new equity in Reorganized Quiksilver.  In addition, a portion of the equity will be distributed to the Secured and Unsecured Noteholders who subscribed for the Rights Offerings, as well as the Plan Sponsor, as Backstop Party.  The Rights Offerings and Exit Facilities will fund the distributions under the Plan, including repayment of the DIP Facilities, payment of Administrative and Priority Claims, and funding of additional cash consideration to all unsecured creditors in the amount of $12.5 million, and will also provide sufficient liquidity for the Reorganized Debtors post-emergence operations.

Seven formal objections were filed to the Debtors' Plan and, as further discussed below, four have been resolved or withdrawn.  An additional four informal objections were communicated to the Debtors, three informal objections have been resolved, and the Debtors are working to resolve the remaining informal objection.  A chart denoting the formal and informal objections received, and the resolutions thereof (if applicable), is attached hereto as Exhibit A. Notably, a lengthy objection was filed by the Creditors' Committee [Docket No. 661] (the "Committee Objection") which asserts, among other things, that the Plan materially undervalues the Debtors and provides a greater than 100% recovery to the Secured Noteholders to the detriment of the Unsecured Noteholders.[2]

---

[2]    The Debtors will submit a separate reply to the Committee Objection demonstrating that the valuation and legal assertions contained in the Committee Objection lack merit, particularly in light of this difficult retail environment and challenging economic start to 2016.

To the contrary, the Debtors believe, as evidenced by the Liquidation Analysis and discussion set forth in the Disclosure Statement and the Coulombe Declaration, that the Plan represents an outcome for unsecured creditors that is both substantial and historically better than any retail precedent in the post-2005 era,[3] and that is also well within the statutory requirements and priorities contained in the Bankruptcy Code.

This Memorandum is divided into five parts.  The first part describes the background of these Chapter 11 Cases, highlights certain key provisions of the Plan, and describes the results of the solicitation process.  In the second part, the Debtors describe certain non-material and non-adverse modifications made to the Plan since approval of the Disclosure Statement, including items which address and resolve certain comments and objections to the Plan.  In the third part, the Debtors present their "case in chief" that the Plan satisfies section 1129 of the Bankruptcy Code.   Next, the Debtors demonstrate that the Plan satisfies the requirement for cramdown.  Finally, the Debtors address the remaining outstanding filed objections.  The Debtors submit that this Memorandum, together with the Coulombe Declaration, the Bruenjes Declaration, and additional evidence to be adduced at or prior to the Confirmation Hearing, demonstrate that the Plan satisfies all of the requisite elements of section 1129 of the Bankruptcy Code and, therefore, the Plan should be confirmed.  The Debtors respectfully request that the Court enter the Confirmation Order.

---

[3]    See, e.g., In re Old FOH, Inc., et al., No. 15-10836 (KG) (Bankr. D. Del. Apr. 19, 2015); In re Seal123, Inc., et al., No. 15-10081 (CSS) (Bankr. D. Del. Jan. 15, 2015); In re Caché, Inc., et al., No. 15-10172 (MFW) (Bankr. D. Del. Feb. 4, 2015); In re dELiA*s, Inc., et al., No. 14-23678 (RDD) (Bankr. S.D.N.Y. Dec. 7, 2014).

I.      **BACKGROUND AND HIGHLIGHTS OF THE PLAN**

A.      **Background and Events Leading up to the Commencement of These Cases**

The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in detail in the Coulombe Declaration, filed concurrently herewith.

B.      **Background Regarding the Plan**

Prior to the Petition Date, the Debtors entered into the Plan Sponsor Agreement with certain funds managed by affiliates of Oaktree Capital Management, holders of more than two-thirds of the Debtors' Secured Notes, as Plan Sponsor.  The Plan Sponsor Agreement committed the Debtors and the Plan Sponsor to pursue and support confirmation of a plan of reorganization consistent with the terms set forth in the attached plan term sheet.  In accordance with the Plan Sponsor Agreement, on October 13, 2015, the Debtors filed their initial Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession (the "Initial Plan").[4]

On October 30, 2015, the Debtors filed their initial disclosure statement (the "Initial Disclosure Statement") with respect to the Initial Plan and a concurrent motion seeking approval of the disclosure statement and related solicitation procedures (the "Disclosure Statement and Solicitation Motion").[5]  On October 31, 2015, the Debtors filed a motion for approval of the Backstop Commitment Letter with the Plan Sponsor and of procedures for the

---

[4]    See Docket No. 292.

[5]    See Disclosure Statement With Respect to the Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession [Docket No. 396], and Debtors' Motion for Entry of an Order (A) Approving the Adequacy of the Debtors' Disclosure Statement, (B) Approving Solicitation and Notice Procedures With Respect to Confirmation of the Debtors' Proposed Plan of Reorganization, (C) Approving the Form of Various Ballots and Notices in Connection Therewith, and (D) Scheduling Certain Dates With Respect Thereto [Docket No. 397].

conduct of the Rights Offerings (the "<u>Backstop and Rights Offering Motion</u>").[6]  In the period

following filing of the Initial Plan and Initial Disclosure Statement, the Debtors engaged in

continued negotiations with the Plan Sponsor and with the Creditors' Committee in order to

supplement the disclosures provided in the Initial Plan and Initial Disclosure Statement and

attempt to address the Creditors' Committee's concerns therewith.  On November 17, 2015, the

Debtors filed an amended plan (the "<u>First Amended Plan</u>") and disclosure statement (the "<u>First</u>

<u>Amended Disclosure Statement</u>") and amended the procedures for conduct of the Rights

Offerings (the "<u>Rights Offering Procedures</u>"), each reflecting additional information and

disclosures.[7]  The Debtors continued discussions with the Plan Sponsor and the Creditors'

Committee in an effort to address the Creditors' Committee's concerns.

The Court held a hearing on the Disclosure Statement and Solicitation Motion and

the Backstop and Rights Offering Motion on December 1, 2015.  At the hearing, the Debtors

informed the Court of certain revisions to be made to the First Amended Plan, and,

correspondingly, to the First Amended Disclosure Statement, and the Court approved the

disclosure statement and solicitation from the bench, subject to such revisions.  Thereafter, on

December 4, 2015, the Debtors filed a further amended plan (the "<u>Second Amended Plan</u>") and

---

[6]     <u>See</u> Debtors' Motion For Entry of an Order Authorizing and Approving (I) (A) Entry Into The Backstop
Commitment Letter and (B) Payment of the Commitment Fees and (II) The Rights Offering Procedures and
Related Forms [Docket No. 398]

[7]     <u>See</u> First Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and
Debtors in Possession [Docket No. 476]; First Amended Disclosure With Respect to the First Amended Joint
Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession
[Docket No. 477]; and Amended Exhibit 2 to the Proposed Order With Respect to the Debtors' Motion for
Entry of an Order Authorizing and Approving (I) (A) Entry Into the Backstop Commitment Letter and (B)
Payment of the Commitment Fees and (II) The Rights Offering Procedures and Related Forms [Docket No.
474].

disclosure statement (as amended, the "Second Amended Disclosure Statement").[8] Also on

December 4, 2015, the Court entered orders (i) approving the adequacy of the Second Amended

Disclosure Statement and approving the proposed solicitation and notice procedures and the form

of ballots and related notices (the "Disclosure Statement Order"), and (ii) approving the

Backstop Commitment Letter with the Plan Sponsor and the related Rights Offerings Procedures

(the "Backstop and Rights Offering Approval Order").[9]

On or prior to December 9, 2015, the Debtors mailed solicitation materials and

began soliciting votes on the Second Amended Plan.  At the same time, the Debtors mailed to the

holders of the Secured Notes and the Unsecured Notes the Rights Offering Procedures and

related eligibility certificates.  The deadline to submit eligibility certificates was December 28,

2015.  Following the eligibility deadline, the Debtors mailed subscription forms for the Rights

Offerings to the holders of the Secured Notes and the Unsecured Notes who submitted eligibility

certificates.  On January 7, 2016, the Debtors filed supplements to the Plan containing certain

exhibits and documents relevant to the implementation of the Plan (as may be amended, the

"Plan Supplement").  The deadline to vote on the Plan and submit subscription forms for

participation in the Rights Offerings was January 14, 2016.

---

[8]   See Second Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and
      Debtors in Possession [Docket No. 532]; Second Amended Disclosure With Respect to the Second Amended
      Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession
      [Docket No. 533].

[9]   See Order (A) Approving the Adequacy of the Debtors' Disclosure Statement, (B) Approving Solicitation and
      Notice Procedures with Respect to Confirmation of the Debtors' Proposed Plan of Reorganization, (C)
      Approving the Form of Various Ballots and Notices in Connection Therewith, and (D) Scheduling Certain
      Dates with Respect Thereto [Docket No. 529]; and Order Authorizing and Approving (I) (A) Entry Into a
      Backstop Commitment Letter and (B) Payment of the Commitment Fees and (II) the Rights Offering
      Procedures and Related Forms [Docket No. 530].

C.      **Highlights of the Plan**

The Plan is supported and sponsored by Oaktree, as Plan Sponsor, under the Plan Sponsor Agreement, and Backstop Parties, under the Backstop Commitment Letter. The Plan provides for the following key economic terms and mechanics:

- **Issuance of New Common Stock, Limited Liability Company Membership Units or Functional Equivalent Thereof**. On the Effective Date, Reorganized Quiksilver will authorize and issue the New Quiksilver Common Stock, which may consist of new common stock, limited liability company membership units, or functional equivalent thereof, as applicable.[10]  Shares of New Quiksilver Common Stock will distributed on a fully diluted basis (excluding any further dilution attributable to the MIP and assuming that the Euro Notes Exchange Offer (described in more detail below) is not consummated as follows: (a) first, 22% to holders of Allowed Secured Notes Claims; (b) second, up to 74% to Rights Offering Participants under the Rights Offerings; and (c) third, 4% to the Backstop Parties under the Backstop Commitment Letter. If the Euro Notes Exchange Offer is not consummated pursuant to its terms, then the value of the New Quiksilver Common Stock as of the Effective Date will be approximately $221 million.

- **Cancellation of Old Quiksilver Securities and Agreements**. Except with respect to the Euro Notes Guaranty Claims (addressed below) or as otherwise provided in the Plan, on the Effective Date, the Old Quiksilver Securities, which includes the Secured Notes, the Unsecured Notes, and the Old Quiksilver Common Stock, along with any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (including the Indentures), shall be cancelled, and any obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to the foregoing, other than the Euro Notes, shall be released and discharged and cancelled.

- **Euro Notes Guaranty Claims**. The Euro Notes Guaranty Claims shall be Reinstated and the Holders of such Claims shall be Unimpaired.

- **Exit Financing**. On the Effective Date, the Reorganized Debtors, as borrowers, will enter into the Exit Revolver Facility, an asset-based revolving credit facility in the principal amount of up to $140 million pursuant to a new credit agreement

---

[10]    As used herein and in the Plan, references to "shares," "shareholders," "directors," and/or "officers" shall also include "membership units," "members," "managers," or other functional equivalents, as applicable, as such terms are defined under the applicable state limited liability company or alternative comparable laws, as applicable. In addition, as used herein and in the Plan, references to New Quiksilver Common Stock means the shares of new common stock, limited liability company membership units, or functional equivalent thereof, as applicable, of Reorganized Quiksilver.

with the Exit Revolver Lenders, which may include the DIP Lenders. In addition, the Reorganized Debtors as borrowers, may enter into an Exit Term Loan Facility, a delayed draw term loan credit facility in a principal amount of up to $50 million pursuant to a new credit agreement with the Exit Term Loan Lenders. The proceeds of the Exit Facilities will fund (1) first, distributions under the Plan on account of the DIP ABL Facility Claims and (2) second, distributions under the Plan on account of DIP Term Facility Claims.[11]

- <u>Exit Rights Offering</u>. Each Eligible Holder of an Allowed Unsecured Note Claim, or its affiliated Eligible Affiliate, will have the right to exercise subscription rights for the purchase of up to $12.5 million of New Quiksilver Common Stock. In addition, each Eligible Holder of an Allowed Secured Notes Claim, or its affiliated Eligible Affiliate, will have the right to exercise subscription rights for the purchase of up to $115 million of New Quiksilver Common Stock. The proceeds of the Exit Rights Offering, which shall be $127.5 million in the aggregate, will be used to fund (1) first, distributions under the Plan on account of DIP Term Loan Facility Claims, (2) second, the Unsecured Cash Consideration of $12.5 million, and (3) third, any payments required on the Effective Date under the Plan. The Exit Rights Offering will run concurrently with solicitation on the Plan and will be consummated on the Effective Date. The Exit Rights Offering is backstopped by the Backstop Parties up to $127.5 million to the extent set forth in the Backstop Commitment Letter.

- <u>Unsecured Cash Consideration</u>. The proceeds of the Exit Rights Offering will be used, in part, to fund the Unsecured Cash Consideration of $12.5 million. The Unsecured Cash Consideration will fund recoveries to Holders of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims. Secured Noteholders shall be deemed to have waived, and not be entitled to any distribution under the Plan on account of, their Secured Notes Deficiency Claim.[12]

- <u>Euro Notes Exchange Offer</u>.

  - The Company will proffer an exchange offer to Holders of Euro Notes, the terms and conditions of which will be communicated to such Holders. The Euro Notes Exchange Offer will be consummated on the Effective Date to the extent the conditions precedent to such exchange offer are met.

---

[11]   The Plan Supplement and the latest filed version of the Plan provide for the Exit Facilities described above and amend the prior version of the Plan which provided for a $120 million revolving credit facility.  The Debtors, in consultation with the Plan Sponsor, believe the combined Exit Revolver Facility and Exit Term Loan Facility will better address the Debtors' liquidity needs upon emergence.

[12]   The waiver shall be effective only in respect of the Plan, and the Secured Noteholders reserve their rights to assert, or otherwise receive a distribution on account of, their Secured Notes Deficiency Claims in respect of any other chapter 11 plan filed in the Chapter 11 Cases.

- Assuming the Euro Notes Exchange Offer is fully consummated, New Quiksilver Common Stock will be distributed as follows, on a fully diluted basis (excluding any further dilution attributable to the MIP): (a) first, 17% to Holders of Allowed Secured Notes Claims; (b) second, up to 80% to Rights Offering Participants under the Rights Offerings; and (c) third, 3% to the Backstop Parties under the Backstop Commitment Letter.[13]

- <u>Euro Notes Rights Offering</u>. Each Eligible Holder of an Allowed Secured Notes Claim, or its affiliated Eligible Affiliate, will have the right to exercise subscription rights for the purchase of up to €50.0 million of New Quiksilver Common Stock, the proceeds of which will be used to consummate the Euro Notes Exchange Offer.  The Euro Notes Rights Offering will be consummated on the Effective Date.  The Euro Notes Rights Offering is backstopped by the Backstop Parties up to €50 million to the extent set forth in the Backstop Commitment Letter.

The Reorganized Debtors' debt at emergence shall comprise of the following: (i) the Exit Revolver Facility of up to $140 million, (ii) the Exit Term Loan Facility of up to $50 million, (iii) an estimated €150 million of Euro Notes,[14] and (iv) $48 million of European lines of credit and other borrowing facilities. At emergence, the Reorganized Debtors anticipate having liquidity of approximately $90 million due to a combination of cash-on-hand and availability under the Exit Facility and the Exit Term Loan Facility.  <u>See</u> Coulombe Declaration at 42.

The Plan further provides that:

- Holders of Administrative Claims, DIP ABL Facility Claims, DIP Term Facility Claims, Priority Tax Claims, and Other Priority Claims will be paid in full. Other Secured Claims will be Reinstated or Paid in Full.

- Holders of Euro Notes Guaranty Claims will have their claims Reinstated.

- Holders of Secured Notes Claims will receive on account of such Holder's Secured Notes Claims its Pro Rata share, based on the aggregate amount of

---

[13]    As of the Effective Date, the anticipated value of the New Quiksilver Common Stock will be approximately $276 million, assuming the Euro Notes Exchange Offer is fully consummated.

[14]    The Reorganized Debtors' debt at emergence with respect to the Euro Notes is an estimate subject to the consummation in full of the Euro Notes Exchange Offer.

Allowed Class 4 Claims, of the New Quiksilver Common Stock subject to dilution in accordance with the New Quiksilver Common Stock Allocation.

- Holders of Unsecured Notes Claims will receive their Pro Rata share, based on the aggregate amount of Allowed Class 5-A Claims, of the Notes Cash Consideration.

- Holders of General Unsecured Claims will receive their Pro Rata share, based on the aggregate amount of Allowed Class 5-B Claims, of the GUC Cash Consideration.

In addition, the Plan provides that the Debtors will reject all Executory Contracts and Unexpired Leases except to the extent that such Executory Contract or Unexpired Lease (i) is listed on the Schedule of Assumed Executory Contracts and Unexpired Leases contained in the Plan Supplement; (ii) has been previously assumed or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume or reject pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms of the Plan.

As a consequence of the transactions contemplated by the Plan, the Plan will maximize the recoveries to all creditor groups on a fair and equitable basis.

D.     **Acceptance of Plan**

As described above, the Plan is the result of extensive negotiations between the Debtors, the Plan Sponsor, and other stakeholders.  As more fully described in the Voting Certification, the Classes of Holders of Secured Notes Claims and, as to all but one Debtor, General Unsecured Claims have voted or been deemed to have voted in favor of the Plan.

As set forth above, the success of the compromises and settlements embodied in the Plan is demonstrated by the significant acceptance of the Plan by Holders of Class 4 Secured Notes Claims and Class 5-B General Unsecured Claims, other than with respect to Debtor QS

Wholesale, Inc.[15]  Note that because no creditors in Class 5-B with respect to Debtors DC Direct,

Inc., Fidra, Inc., Hawk Designs, Inc., Mt. Waimea, Inc., QS Optics, Inc., Quiksilver

Entertainment, Inc., and Quiksilver Wetsuits, Inc. voted on the Plan, such Classes are deemed to

have accepted the Plan.

Holders of Class 5-A Unsecured Notes Claims voted to reject the Plan.  In

addition, based on amount, but not numerosity, Holders of Class 5-B General Unsecured Claims

at Debtor QS Wholesale, Inc. voted to reject the Plan.

## II.    MODIFICATIONS TO THE PLAN.

The Debtors intend to submit a further amended plan (the "Third Amended Plan")

prior to the commencement of the scheduled Confirmation Hearing.  The Third Amended Plan

shall (i) amend the provisions regarding exit financing to reflect the updated exit financing

structure, comprised of a $140 million Exit Revolver Facility and a $50 million delayed-draw

Exit Term Loan Facility, (ii) provide that, upon the Effective Date, the Chapter 11 Cases of the

Inactive Debtors will be closed, (iii) contain certain non-substantive corrections, and (iv) amend

certain other provisions as necessary.  The Debtors assert that they are not required to re-solicit

for Plan acceptances, and all Holders who previously accepted the Plan should be deemed to

accept the Plan, as modified.  See 11 U.S.C. § 1127(d).

## III.    THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE

To confirm the Plan, the Court must find that both the Plan and the Debtors are in

compliance with each of the requirements of section 1129(a) of the Bankruptcy Code.  See In re

Tribune Co., 464 B.R. 126 (Bankr. D. Del. 2011); In re Exide Techs., 303 B.R. 48, 58 (Bankr. D.

---

[15]    Where reference is made to a numbered Class without reference to a particular Debtor subclass, such reference shall be deemed to be to all subclasses (unless such subclass is empty) in that numbered Class.

Del. 2003); see also In re 203 N. LaSalle St. P'ship, 126 F.3d 955, 960 (7th Cir. 1997) (the

plan's proponent must show that the plan satisfies all the requirements of section 1129(a)), rev'd

on other grounds sub nom. Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N LaSalle St. P'ship,

526 U.S. 434 (1999); Kane v. Johns-Manville Corp., 843 F.2d 636, 648 (2d Cir. 1988).  The

Court may confirm a chapter 11 plan if all of the requirements of subsection 1129(a) – with the

exception of subsection (a)(8) – and the requirements of subsection 1129(b) are satisfied.  As set

forth below, the Plan should be confirmed because the Debtors meet the requirements of sections

1129(a) and (b) of the Bankruptcy Code.

> **A.**    **The Plan Complies With the Applicable Provisions of Title 11 (Section 1129(a)(1))**

Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the

"applicable provisions" of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  In re Machne

Menachem, Inc., 233 F. App'x 119, 120 (3d Cir. 2007); Fed.-Mogul Global v. Fed.-Mogul

Global Inc. (In re Fed.-Mogul Global), 402 B.R. 625, 629 n.7 (D. Del. 2009); In re Armstrong

World Indus., Inc., 348 B.R. 136, 158 (D. Del. 2006).  The legislative history of section

1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123

of the Bankruptcy Code, which govern classification of claims and interests and the contents of

the plan, respectively.  See S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N.

5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368;

see also In re S & W Enters., 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) (finding that section

1129(a)(1) is most directly aimed at requiring compliance with the Bankruptcy Code provisions

regarding classification of claims or interests and plan contents).  Accordingly, the determination

of whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code requires an

analysis of sections 1122 and 1123.  As explained below, the Plan complies with sections 1122 and 1123 in all respects.

          1.      <u>Classification of Claims and Interests (Section 1122)</u>

          The Plan satisfies section 1122, which provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  Courts in this Circuit and elsewhere have recognized that, under section 1122 of the Bankruptcy Code, plan proponents have significant flexibility in placing claims into different classes under section 1122, provided there is a rational legal or factual basis to do so and all claims or interests within a particular class are substantially similar.  <u>See, e.g.</u>, <u>John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.</u>, 987 F.2d 154, 159 (3d Cir. 1993) (noting that a classification scheme is permissible if a legal difference exists between the classes); <u>In re Kaiser Aluminum Corp.</u>, No. 02-10429, 2006 WL 616243, at *5 (Bankr. D. Del. Feb. 6, 2006) (finding that the classification was proper under section 1122 of the Bankruptcy Code because the classification scheme reflected the "diverse characteristics" of those claims and interests), <u>aff'd</u>, 343 B.R. 88 (D. Del. 2006); <u>In re Magnatrax Corp.</u>, No. 03-11402, 2003 WL 22807541, at *4 (Bankr. D. Del. Nov. 17, 2003) (finding that a plan that classified classes of claims and interests pursuant to valid business, factual, and legal reasons satisfied section 1122 of the Bankruptcy Code).

          The Classes of Claims against and Interests in the Debtors under the Plan are as follows:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Euro Notes Guaranty Claims | Unimpaired | Presumed to Accept |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5-A | Unsecured Notes Claims | Impaired | Entitled to Vote |
| 5-B | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Subordinated Claims | Impaired | Deemed to Reject |
| 9 | Interests in Quiksilver | Impaired | Deemed to Reject |

In addition to Administrative Claims, including DIP Claims and Professional Claims, and Priority Tax Claims, each as defined in the Plan, which are not required to be classified, the Plan designates nine (9) Classes of Claims and Interests.  Article III of the Plan provides for the separate classification of Claims and Interests with respect to the Debtors based upon differences in the legal nature or priority of such Claims and Interests.  Specifically, Class 1 Other Priority Claims are classified separately due to their required treatment under the Bankruptcy Code.  Classes 2 and 4 contain claims relating to the Debtors' secured debt and are classified separately from unsecured debt in Classes 3, 5-A, 5-B, 6 and 8.  See Article III of the Plan.  The Classes of Secured Claims are divided based upon the collateral securing such Claims. The Debtors' unsecured creditors' claims are divided between Euro Notes Guaranty Claims in Class 3, Unsecured Notes Claims in Class 5-A, General Unsecured Claims in Class 5-B, Intercompany Claims in Class 6, and Subordinated Claims in Class 8.  See id.  The Euro Notes Guaranty Claims and Unsecured Notes Claims are classified based on the obligors to the

underlying debt instruments and are separately classified from other general unsecured claims. Such classification is both appropriate and necessary.  Finally, Intercompany Interests are separately classified in Class 7 and Interests in Quiksilver are in Class 9.  See id.

Accordingly, the classification scheme is reasonably related to the different legal or factual nature of each type of Claim.  See In re Exide Techs., 303 B.R. 48, 76 (Bankr. D. Del. 2003) (finding that the classification of claims and interests was proper because it took into account the Bankruptcy Code's priority rules and general principles of equitable subordination from section 510(b) of the Bankruptcy Code).  Moreover, valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests under the Plan and the Claims or Interests within a particular Class are substantially similar to the other Claims or Interests in the Class.

By recognizing the differing legal and equitable rights of the Holders of Claims and Interests, the Debtors propose a classification scheme that fits well within the flexible standard of section 1122 of the Bankruptcy Code.  Thus, the Plan satisfies section 1122 of the Bankruptcy Code.

　　　　2.　　Mandatory Contents of the Plan (Section 1123(a))

Section 1123(a) of the Bankruptcy Code identifies eight requirements for the contents of a plan of reorganization.[16]  Specifically, this section requires that a plan: (i) designate classes of claims and interests; (ii) specify unimpaired classes of claims and interests; (iii) specify treatment of impaired classes of claims and interests; (iv) provide for equality of treatment within each class; (v) provide adequate means for the plan's implementation; (vi)

---

[16]    This Memorandum will not address section 1123(a)(8) as it applies only in cases in which the debtor is an individual, and, therefore, it is not applicable in these Chapter 11 Cases.

provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (vii) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors. See 11 U.S.C. § 1123(a). The Plan fully complies with each requirement of section 1123(a).

(a)      Designation of Classes of Claims (Section 1123(a)(1))

Section 1123(a)(1) requires that the Plan "designate, subject to section 1122 of this title, classes of claims . . . and classes of interests." 11 U.S.C. § 1123(a)(1). As set forth above with respect to the Plan's compliance with section 1122, Article III of the Plan designates Classes of Claims and Interests, as required by section 1123(a)(1) of the Bankruptcy Code.

(b)      Specification of Unimpaired Classes (Section 1123(a)(2))

Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2). Article IV of the Plan specifies that Classes 1, 2, 3, 6, and 7 are Unimpaired. Therefore, section 1123(a)(2) is satisfied.

(c)      Treatment of Impaired Classes (Section 1123(a)(3))

Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3). The Plan designates Classes 4, 5-A, 5-B, 8, and 9 as impaired. Article IV of the Plan specifies the treatment for these impaired classes. Therefore, section 1123(a)(3) of the Bankruptcy Code is satisfied.

(d)      Equal Treatment within Classes (Section 1123(a)(4))

Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular

claim or interest agrees to a less favorable treatment of such particular claim or interest." 11

U.S.C. § 1123(a)(4).  Article IV of the Plan specifies the treatment that Holders of Claims and

Interests in all Classes will receive and provides that the treatment of each Claim or Interest

within a Class is the same as the treatment of each other Claim or Interest in such Class (or, for

unimpaired Classes, will likewise result in the creditor being unimpaired), unless the Holder of a

particular Claim has agreed to different treatment with respect to such Claim.  Therefore, section

1123(a)(4) of the Bankruptcy Code is satisfied.

> (e)    Means for Implementation (Section 1123(a)(5))

Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide

"adequate means" for its implementation.  11 U.S.C. § 1123(a)(5).  Adequate means for

implementation of a plan may include retention by the debtor of all or part of its property; the

transfer of property of the estate to one or more entities; cancellation or modification of any

indenture; curing or waiving of any default; extension of a maturity date or change in an interest

rate or other term of outstanding securities; amendment of the debtor's charter; or the issuance of

securities in exchange for cash, property, or existing securities, all in exchange for claims or

interests or for any other appropriate purpose.  See generally In re Spiegel, Inc., No. 03-11540

(BRL), 2005 WL 1278094, at *5 (Bankr. S.D.N.Y. May 25, 2005).

Article VI of the Plan sets forth numerous provisions to facilitate implementation

of the Plan.  Those provisions relate to, among other things: (a) substantive consolidation of the

Debtors for distribution purposes, as further discussed below; (b) the sources of funding for the

Plan, including the Exit Facilities, the Rights Offerings, the Backstop Commitments, and the

waiver of the Secured Notes Deficiency Claim; (c) the cancellation of the Secured Notes, the

Unsecured Notes and the Old Quiksilver Common Stock; (d) the issuance of the New Quiksilver

Common Stock; (e) the issuance of new securities, notes, instruments and other documents; (f)

the Reorganized Debtors' exemption from Securities Act registration requirements; (g) the

continued corporate existence of the Debtors (other than the Inactive Debtors); (h) the

dissolution of Inactive Debtors; (i) the adoption of the New Corporate Governance Documents;

(j) the appointment of directors to the boards of each of the Reorganized Debtors (if applicable);

(k) the assumption or rejection of employment agreements, the continuation or implementation

of retirement income plans, incentive plans and other plans, policies, or agreements for the

Reorganized Debtors' directors, officers, and employees, and the implementation of the MIP; (l)

preservation of causes of action; and (m) the undertaking of such restructuring transactions as

may be necessary to effectuate the foregoing.  Therefore, section 1123(a)(5) of the Bankruptcy

Code is satisfied.

(i)    <u>Substantive Consolidation</u>.

As noted above, the Plan provides for substantive consolidation of the Debtors for

distribution purposes only.  The authority to order substantive consolidation of debtor estates

derives from sections 105 and 1123(a)(5) of the Bankruptcy Code. Section 105 of the

Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §

105(a). <u>See</u> <u>First Nat'l Bank of Barnesville v. Rafoth</u> (In re Baker & Getty Fin. Servs., Inc.), 974

F.2d 712, 720 (6th Cir. 1992); <u>Woburn Assocs. v. Kahn</u> (In re Hemingway Transp., Inc.), 954

F.2d 1, 11-12 & n.14 (1st Cir. 1992); <u>Eastgroup Props. v. S. Motel Assocs. Ltd.</u>, 935 F.2d 245,

248 (11th Cir. 1991); <u>Union Sav. Bank v. Augie/Restivo Baking Co.</u> (In re Augie/Restivo

Baking Co.), 860 F.2d 515, 518 (2d Cir. 1988); <u>Drabkin v. Midland-Ross Corp.</u> (In re Auto-

Train Corp.), 810 F.2d 270, 276 (D.C. Cir. 1987). In addition, section 1123(a)(5) sets forth

"merger or consolidation of the debtor with one or more persons" as one of several examples of measures available to debtors to "provide adequate means for the plan's implementation." 11 U.S.C. § 1123(a)(5).

The general purpose of substantive consolidation is to "ensure equitable treatment of all creditors." Augie/Restivo Baking Co., 860 F.2d at 518. There are no statutorily prescribed standards for substantive consolidation. The propriety of substantive consolidation must be determined on a case-by-case basis. See, e.g., FDIC v. Colonial Realty Co., 966 F.2d 57, 61 (2d Cir. 1992).

Substantive consolidation is appropriate here in light of the structure of the Plan. Indeed, practically, such consolidation will have no impact on distributions.  In particular, creditors in Classes 1, 2, 3, 6, and 7 will be paid in full and, therefore, would not receive different treatment in a non-consolidated scenario.  Class 4 is comprised of Secured Noteholders who will all be receiving New Quiksilver Common Stock, subject to the New Quiksilver Common Stock Allocation.  The Secured Noteholders all have Claims against the same five Debtors and, thus would not receive a different pro rata share of the  New Quiksilver Common Stock in the absence of substantive consolidation.  Finally, Classes 5-A and 5-B are sharing pro rata in the Unsecured Cash Consideration.  This is a cash fund, funded from the proceeds of the Exit Rights Offering, and is not allocated between the various Debtors.

Thus, substantive consolidation for distribution will have no negative impact on any creditor's recovery under the Plan, and may have a positive impact on all creditors by simplifying the administration of the Debtors' estates and relieving the Debtors of the need to engage in any sort of allocation of the Unsecured Cash Consideration.  Moreover, no party has

objected to substantive consolidation.  Accordingly, the Debtors submit that such consolidation is both appropriate and, indeed, logical in light of the treatment provided under the Plan.

(f)    <u>Prohibition on Issuance of Non-Voting Securities (Section 1123(a)(6))</u>

Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.  In accordance with this requirement, Article 6.12 of the Plan provides that the New Corporate Governance Documents of the Reorganized Debtors shall prohibit the Reorganized Debtors from issuing non-voting equity securities to the extent necessary to comply with section 1123(a)(6) of the Bankruptcy Code.  Moreover, the Certificates of Incorporation of the Reorganized Debtors filed with the Plan Supplement include this prohibition.

(g)    <u>Selections for Certain Positions (Section 1123(a)(7))</u>

Section 1123(a)(7) of the Bankruptcy Code requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."  11 U.S.C. § 1123(a)(7).  This provision is supplemented by section 1129(a)(5) of the Bankruptcy Code, further discussed below, which directs courts to examine the methods by which the management of the reorganized corporation is to be chosen to provide adequate representation of those whose investments are involved in the reorganization – <u>i.e.</u>, creditors and equity holders.  <u>See</u> 7 <u>Collier on Bankruptcy</u> ¶ 1123.01[7] (Alan N. Resnick & Henry J. Sommer eds., 15th rev. ed. 2009).

The Plan complies with section 1123(a)(7) by properly and adequately disclosing or otherwise identifying the procedures for determining the identities and affiliations of all individuals or entities proposed to serve on or after the Effective Date as officers and directors of

the Reorganized Debtors in Article VI of the Plan.  Article 6.13 of the Plan provides that the

New Board of Reorganized Quiksilver and the New  Subsidiary Debtor Boards shall be selected

by the Plan Sponsor and shall be appointed on the Effective Date.  The members of the New

Board have been identified in the Plan Supplement.  The Plan Sponsor will own a majority of the

equity of Reorganized Quiksilver post-Effective Date.  Accordingly, it is appropriate that the

Plan Sponsor select the officers and directors of the Reorganized Debtors.

        The Debtors submit that, for the reasons set forth above, the Plan satisfies the

requirements of section 1123(a)(7) of the Bankruptcy Code.

        3.      Discretionary Contents of the Plan (Section 1123(b))

        (a)    Generally

        Section 1123(b) of the Bankruptcy Code identifies various discretionary

provisions that may be included in a plan of reorganization, but are not required.  For example, a

plan may impair or leave unimpaired any class of claims or interests and provide for the

assumption or rejection of executory contracts and unexpired leases.  11 U.S.C. § 1123(b)(1),(2).

A plan also may provide for:  (i) "the settlement or adjustment of any claim or interest belonging

to the debtor or to the estate," (ii) "the retention and enforcement by the debtor, by the trustee, or

by a representative of the estate appointed for such purpose, of any such claim or interest," or (iii)

"the sale of all or substantially all of the property of the estate, and the distribution of the

proceeds of such sale among holders of claims or interests."  Id. § 1123(b)(3)(A)-(B), 1123(b)(4).

Finally, a plan may "modify the rights of holders of secured claims . . . or . . . unsecured claims,

or leave unaffected the rights of holders of any class of claims" and may "include any other

appropriate provision not inconsistent with the applicable provisions of [title 11]."  Id.

§ 1123(b)(5)-(6).

The Plan contains a number of such discretionary provisions, most of which have been described above. In addition, however, among other things, (i) the Plan designates each Class as Impaired or Unimpaired; (ii) as further discussed below, the Plan provides for the assumption or rejection of the Debtors' executory contracts and unexpired leases; and (iii) the Plan provides for the vesting of certain causes of action in the Reorganized Debtors. Certain additional provisions are described below.

In particular, as is customary, the Plan includes release, exculpation, and injunction provisions. These discretionary provisions are proper because, among other things, they are the product of arm's-length negotiations, have been critical to obtaining the support of the various constituencies for the Plan, and, as part of the Plan, have received substantial support from the creditors who voted for the Plan. Such release, exculpation, and injunction provisions are fair and equitable, are given for valuable consideration, and are in the best interests of the Debtors and their Estates. The release, the exculpation, and the injunction provisions are consistent with the Bankruptcy Code and, thus, the requirements of section 1123(b) of the Bankruptcy Code are satisfied.

> (b)    Releases

>> (i)    The Debtor Release.

Pursuant to Article 10.4 of the Plan (the "Debtor Release"), the Debtors and their Estates, the Reorganized Debtors, and each of their respective current and former Affiliates release the Released Parties from any and all Claims or Causes of Action they may have as of the Effective Date of the Plan.

The Released Parties include (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Agents; (d) the DIP Lenders; (e) the Backstop Parties; (f) the Plan Sponsor; (g) the

Creditors' Committee and each of its members, (h) the Secured Notes Agent, (i) with respect to each of the above-named Entities described in subsections (a) through (h), such Entity's respective predecessors, successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, managed funds, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants.

A plan that proposes to release a claim or a cause of action belonging to a debtor is considered a "settlement" for purposes of satisfying section 1123(b)(3)(A). Section 1123(b)(3)(A) specifically provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." Settlements pursuant to a plan are generally subject to the same standard applied to settlements under Bankruptcy Rule 9019.  See In re Coram Healthcare Corp., 315 B.R. 321, 334 (Bankr. D. Del. 2004).  The Third Circuit applies a four factor balancing test for considering motions to approve settlements under Bankruptcy Rule 9019, weighing:

a.  "the probability of success in litigation";

b.  "the likely difficulties in collection";

c.  "the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it"; and

d.  "the paramount interest of the creditors."

Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996).

Article 10.4 of the Plan represents a valid settlement of any Claims the Debtors may have against the Released Parties pursuant to Bankruptcy Code section 1123(b)(3)(A) and Bankruptcy Rule 9019.  The Debtors have proposed the releases based on their sound business

23

judgment.  Indeed, the Debtors believe that pursuing Claims, if any, against the Released Parties would not be in the best interest of the Debtors' various stakeholders because the costs involved would likely outweigh any potential benefit from pursuing such Claims. Moreover, most of the Released Parties were integral to the development of the Plan and expected a release in exchange for their contributions to the Estates.  Thus, the Debtor Release is an integral component of the consensual Plan process, and no constructive purpose would be served by preserving or seeking to prosecute any of the Claims, Causes of Action, or liabilities against the Released Parties that are released under the Plan. Moreover, no party has objected to the Debtor Release.

(ii)    The Third Party Releases.

Pursuant to Article 10.5 of the Plan (the "Third Party Releases"), (a) the Released Parties, (b) all Holders of Claims and Interests that are deemed to accept the Plan, (c) each Holder of a Claim voting to accept the Plan or abstaining from voting to accept or reject the Plan, unless such Holder elects to opt out of the releases contained in Article 10.5 by checking the box on its timely submitted ballot, and (d) with respect to each of the foregoing Entities in subparts (b) through (c), their respective current and former officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (each, a "Releasing Party"), release the Released Parties from any and all Claims or Causes of Action they may have as of the Effective Date of the Plan.

The Third Party Releases are consensual, as they apply only to a Holder of a Claim voting to accept the Plan or abstaining from voting to accept or reject the Plan, unless such Holder elects to opt out of the releases contained in Article 12.7 by checking the box on its timely submitted applicable ballot.  Courts in the Third Circuit consistently have approved consensual third-party releases of similar scope.  See Gillman v. Cont'l Airlines (In re Cont'l

Airlines Inc.), 203 F.3d 203, 214 n.11 (3d Cir. 2000) ("Several of the Bankruptcy Courts in our Circuit have stated that non-debtor releases are permissible only if consensual." (citing In re Zenith Elecs. Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999))); U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.), 426 B.R. 114, 144 (Bankr. D. Del. 2010).  Further, interested parties have received sufficient notice of the releases and did not object, and such releases are necessary under the PSA.  Accordingly, the third-party releases should be approved.

Based on the foregoing, the Debtor Release and the Third Party Releases are appropriate and should be approved.

(c)    Exculpation

Article 10.6 of the Plan (the "Exculpation") provides that the Exculpated Parties shall neither have, nor incur any liability to any Entity for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

The Exculpated Parties include: (a) the Debtors; (b) the Reorganized Debtors; (c) the Backstop Parties; (d) the Plan Sponsor; (e) the DIP Lenders; (f) the DIP Agents; (g) the Creditors' Committee and each of its members; (h) the Secured Notes Agent; and (i) with respect to each of the above-named Entities described in subsections (a) through (h), such Entity's respective predecessors, successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, managed funds, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants.

At the outset, it is important to underscore the difference between the consensual third-party releases provided for under the Plan and the Plan's exculpation provisions. Unlike the third-party releases, the exculpation provisions do not affect the liability of third parties per se, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring. See In re PWS Holding Corp., 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); see also In re Premier Int'l Holdings, Inc., No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); In re Spansion, Inc., No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. Apr. 16, 2010) (same); In re Stallion Oilfield Servs., Ltd., No. 09-13562 (BLS), 2010 WL 5093096, at *22 (Bankr. D. Del. Jan. 20, 2010) (same); In re Tropicana Entm't, LLC, No. 08-10856 (KJC), slip op. at 24, 25 (Bankr. D. Del. May 5, 2009) [Docket No. 2001] (same); In re Tropicana Entm't, LLC, No. 08-10856 (KJC), slip op. at 25 (Bankr. D. Del. May 5, 2009), [Docket No. 2002] (same).

The Exculpated Parties have participated in good faith in formulating and negotiating the Plan, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled Holders of Claims or Interests or other unsatisfied parties.  Indeed, the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan.

As discussed in greater detail below, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy

Code.  Additionally, the Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals. Further, these findings imply that the Plan was negotiated at arm's length and in good faith. Here, as discussed below in Section III.C, the Debtors and their officers, directors and professionals actively negotiated with the major constituencies in these Chapter 11 Cases, resulting in a Plan supported by a large majority of the Debtors' creditors, other than the Unsecured Noteholders, as demonstrated by the voting results, and providing recoveries to most stakeholders in excess of what could be provided in any other scenario. Accordingly, the Court's findings of good faith vis-à-vis the Debtors' Chapter 11 Cases should also extend to the Exculpated Parties.

The promise of exculpation played a significant role in facilitating Plan negotiations.  As discussed more fully in response to the U.S. Trustee's Objection, *infra*, the Exculpated Parties, and especially Oaktree in its role as Plan Sponsor, DIP Lender, and Backstop Party, each played a key role in the developing and supporting the Plan that has paved the way for a successful reorganization of the Debtors, and likely would not have been so inclined to participate in the plan process without the promise of exculpation. Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability. In addition, it is well established that the liability of statutory committees and their professionals under section 1103 of the Bankruptcy Code is limited to acts of gross negligence and willful misconduct, making their inclusion as Exculpated Parties entirely appropriate.[17]

---

[17] PWS Holding, 228 F.3d at 246-71 (holding that the appropriate standard of liability under section 1103 is "willful misconduct or ultra vires acts," and approving an exculpation of the creditors committee and its professionals subject only to liability for willful misconduct or gross negligence).

(d)    Injunction

In addition, Article 10.8 of the Plan (the "Injunction") provides that the satisfaction, release, and discharge pursuant to this Article X shall act as an injunction, from and after the Effective Date, against any Entity (a) commencing or continuing in any manner or in any place, any action, employment of process, or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors, except as set forth in Article 9.11 or 9.12 of the Plan, in each case with respect to any Claim, Interest, or Cause of Action satisfied, released or to be released, exculpated or to be exculpated, or discharged under the Plan or pursuant to the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 and 1141 thereof; provided, however, that nothing contained herein shall preclude such Entities from exercising their rights pursuant to and consistent with the terms of the Plan or this Confirmation Order; and provided further, however, that nothing contained herein shall preclude the DIP Agents from exercising any appropriate remedies in connection with any Excluded DIP Obligations.

The Injunction provision is necessary to preserve and enforce the Debtors' discharge and the Debtor Release, the Third Party Release, and the Exculpation.  Further, the Injunction is a key component of the ultimate reorganization.  See In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992).  Thus, the Court should approve the Injunction to the same extent it approves the Debtor Releases, releases by holders of Claims, Exculpation and discharge provisions.

28

For the reasons set forth above, the Debtors submit that each of the release, indemnification and exculpation provisions set forth in the Plan: (1) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), (b), and (d); (2) is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (3) is an integral element of the transactions incorporated into the Plan; (4) confers a material benefit on, and is in the best interest of, the Debtors, their estates and their creditors; (5) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors, their organization, capitalization, operation and reorganization; and (6) is consistent with sections 105, 1123, 1129, and other applicable provisions of the Bankruptcy Code.

(e)    Executory Contracts and Unexpired Leases

Article VII of the Plan provides that the Debtors will be deemed to have automatically rejected all Executory Contracts and Unexpired Leases unless any such Executory Contract or Unexpired Lease: (i) is listed on the Schedule of Assumed Executory Contracts and Unexpired Leases contained in the Plan Supplement; (ii) has been previously assumed or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume or reject pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms of the Plan.  Each Executory Contract and Unexpired Lease listed on the Schedule of Assumed Executory Contracts and Unexpired Leases shall be assumed, or assumed and assigned, as applicable, and shall vest in and be fully enforceable by the Reorganized Debtors or its assignee in accordance

with its terms, except as modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.

As set forth in the Coulombe Declaration, the Debtors have exercised sound business judgment in identifying the executory contracts and unexpired leases to be assumed and rejected pursuant to the Plan. Accordingly, the Debtors respectfully request that the Court approve the assumptions and rejections in accordance with the Plan.

(f)    Cure

Article VII of the Plan provides procedures for determining Cure with respect to assumed Executory Contracts and Unexpired Leases. The Debtors have sent Cure Notices to all counterparties to Executory Contracts and Unexpired Leases included on the Schedule of Assumed Executory Contracts and Unexpired Leases contained in the Plan Supplement, as filed on January 7, 2016 and subsequently amended. As of the date hereof, the deadlines for filing objections to Cure has not yet elapsed.

The Debtors submit that the Cure set forth in the Cure Notice (as amended) should be approved as the requisite Cure with respect to the Executory Contracts included therein (unless otherwise agreed between the Debtors or the Reorganized Debtors, as applicable, and the contract counterparty) for all Executory Contracts and Unexpired Leases for which no objection to Cure is filed by the applicable objection deadline. For those Executory Contracts and Unexpired Leases for which an objection is filed by the applicable objection deadline, the Debtors submit that Cure should be (i) the amount agreed to between the Debtors, with the consent of the Plan Sponsor, or Reorganized Debtors, as applicable, and the applicable counterparty, or, (ii) to the extent the Debtors or Reorganized Debtors and counterparty do not

reach an agreement regarding any Cure or any other matter related to assumption, the

Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues.

(g)    Dissolution of Inactive Debtors and Closing of Inactive Debtor Chapter 11 Cases

Article 6.9(d) of the Plan provides that, on the Effective Date, pursuant to the

Inactive Debtor Final Decree, the Inactive Debtors shall be dissolved.  The Debtors intend to

modify the Plan to further provide that, upon the Effective Date, the Chapter 11 Cases of the

Inactive Debtors shall be closed.  The Inactive Debtors have no assets or operations and the

Debtors believe there are no valid claims against those entities.

A form of Inactive Debtor Final Decree is attached to the proposed Confirmation

Order as Exhibit C thereto.  The Debtors submit that dissolution of the Inactive Debtors, entry of

the Inactive Debtor Final Decree, and the closing of the Chapter 11 Cases of the Inactive Debtors

is in the best interest of all of the Debtors' estates and creditors, as it will provide the Debtors

with a streamlined organizational structure upon emergence and minimize the administrative

costs associated with the Cases, thereby maximizing recoveries.  Accordingly, the Debtors

request that the Court provide in the Confirmation Order that it will enter the Inactive Debtor

Final Decree, substantially in the form attached thereto, on or soon after the Effective Date, upon

submission of the same by certification of counsel, which shall close the Chapter 11 Cases of the

Inactive Debtors, effective upon the Effective Date.

The Debtors further request that the Court waive, in connection with the Inactive

Debtor Final Decree, (a) any requirement of Local Rule 3022-1(a) that may be construed to

require the filing of (i) a written motion seeking entry of a final decree (other than the Plan or

this Confirmation Memorandum) or (ii) a separate order closing each jointly administered or

consolidated case, and (b) the requirement of Local Rule 3022-1(c) that the Debtors file a final

report and account.  Because the case closings are primarily procedural and do not prejudice any party, the Debtors submit that such requirements are unnecessary under the circumstances.  The Debtors will fully comply with Local Rule 3022-1 (or seek a further waiver) in closing the remaining Chapter 11 Cases.

(h)     Additional Provisions

In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with applicable sections of the Bankruptcy Code, including, without limitation: (a) the provisions of Article VIII establishing procedures for resolving contingent, unliquidated and Disputed Claims; (b) the provisions of Article IX of the Plan governing distributions on account of Allowed Claims; (c) the provisions of Article XII governing retention of jurisdiction by the Court over certain matters after the Effective Date; and (d) the provisions of the Article VI and the Schedule J-11 of the Plan Supplement retaining avoidance actions.[18]  Accordingly, the Plan complies with the applicable provisions of the Bankruptcy Code and, therefore, meets the requirements of section 1129(a)(1) of the Bankruptcy Code.

**B.     The Proponents of the Plan Comply with the Applicable Provisions of Title 11 (Section 1129(a)(2))**

Section 1129(a)(2) of the Bankruptcy Code requires the proponent of a plan to comply with the applicable provisions of the Bankruptcy Code.  The principal purpose of section 1129(a)(2) is to ensure that a plan proponent has complied with the requirements of the Bankruptcy Code regarding solicitation of acceptances of the plan.  See, e.g., In re PWS Holding

---

[18]    The retention of avoidance actions will ensure that the reorganized company continues to have strong relationships with its vendor base and maintain relationships which are critical to the reorganized company's ongoing business.  Bruenjes Decl., ¶ 6.

Corp., 228 F.3d 224, 248 n. 23 (3d Cir. 2000) (noting that "'[t]he principal purpose of section

1129(a)(2) of the Bankruptcy Code is to assure that the plan proponents have complied with the

disclosure requirements of section 1125 of the Bankruptcy Code in connection with solicitation

of acceptances of the plan'" (quoting In re Trans World Airlines, Inc., 185 B.R. 302, 313 (Bankr.

E.D. Mo. 1995))); In re Stations Holding Co., No. 02-10882, 2002 WL 31947022, at *3 (Bankr.

D. Del. Sept. 30, 2002) (finding that the debtor had complied with section 1129(a)(2) of the

Bankruptcy Code because, "[i]n particular, the solicitation of acceptances or rejections of the

Plan was solicited after disclosure . . . of 'adequate information'"); In re Texaco Inc., 84 B.R.

893, 906-07 (Bankr. S.D.N.Y. 1988) (holding that the "principal purpose of [s]ection 1129(a)(2)

is to assure that the proponents have complied with the requirements of section 1125 in the

solicitation of acceptances to the plan"); see also H.R. Rep. No. 95-595, at 412 (1977), as

reprinted in 1978 U.S.C.C.A.N. 5963, 6368.  The Debtors have complied with the applicable

provisions of title 11, including the provisions of section 1125 regarding disclosure and plan

solicitation.

      Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or

rejections of a chapter 11 plan from holders of claims or interests "unless, at the time of or before

such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a

written disclosure statement approved . . . by the court as containing adequate information."

11 U.S.C. § 1125(b).  In these cases, the Court approved the Disclosure Statement by the

Disclosure Statement Order, dated December 4, 2015 [Docket No. 530], which, among other

things, specifically found that the Disclosure Statement contained adequate information within

the meaning of section 1125 of the Bankruptcy Code.  In addition, the Court considered and, in

the Disclosure Statement Order, approved (a) all materials to be transmitted to those holders of

Claims entitled to vote on the Plan (collectively, the "Solicitation Materials"), (b) the timing and method of delivery of the Solicitation Materials, and (c) the rules for tabulating votes to accept or reject the Plan.

Thereafter, as further set forth in the Voting Certification, the Debtors and their agents transmitted solicitation packages to Holders of Claims or to the Master Balloting Agents (as defined in the Disclosure Statement and Solicitation Motion) and other parties-in interest, which contained: (a) a Confirmation Hearing Notice, (b) a ballot and return envelope (such ballot and envelope being referred to as a "Ballot"), and (c) a CD-ROM containing the Disclosure Statement (with appendices, including the Plan) and the Solicitation Procedures Order (the "Solicitation Packages") to Classes 4, 5-A, and 5-B (collectively, the "Voting Classes").  In addition, the Confirmation Hearing Notice was transmitted to the Unimpaired Creditors and Interest Holders in Classes 1, 2, 3, 6 and 7, and to the Holders of Claims and Interests in Classes 8 and 9, together with the applicable notice of nonvoting status in lieu of Ballots.  These solicitation materials were distributed on or prior to December 9, 2015, promptly after the entry of the Solicitation Procedures Order and in accordance with the Court's instructions.[19]  In addition, the Debtors caused the Confirmation Hearing Notice to be published in the national edition of The New York Times, the LA Times, and the Orange County Register on December 9, 2016, and in the international edition of the New York Times on December 11, 2016.[20]

---

[19]   See Affidavit of Service, filed with the Court on December 15, 2015 [Docket No. 569].  The affidavit demonstrates that the Solicitation Packages were transmitted in accordance with the requirements of the Disclosure Statement Order.

[20]   See Affidavit of Publication [Docket No. 577].

Thus, the Debtors have satisfied the solicitation requirements imposed by section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.  The Plan thereby satisfies the requirements of section 1129(a)(2) of the Bankruptcy Code.

C.        **Good Faith (Section 1129(a)(3))**

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  "'Though the term "good faith", as used in section 1129(a)(3), is not defined in the Bankruptcy Code, . . .  the term is generally interpreted to mean that there exists a "reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."'"  In re 203 N. LaSalle St. P'ship, 126 F.3d at 969, (alteration in original) (quoting In re Madison Hotel Assocs., 749 F.2d 410, 424-25 (7th Cir. 1984)); see also In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999) (the good faith standard in section 1129(a)(3) requires that there must be "some relation" between the chapter 11 plan and the "reorganization-related purposes" that chapter 11 was designed to serve).

In determining whether a plan will succeed and accomplish goals consistent with the Bankruptcy Code, courts look to the terms of the reorganization plan and determine, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code.  See, e.g., In re Future Energy Corp., 83 B.R. 470, 486 (Bankr. S.D. Ohio 1988) (noting that while the term "good faith" is not specifically defined in the Bankruptcy Code, a plan is proposed in good faith when there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code).  The plan proponent must show, therefore, that the plan has not been proposed by any means forbidden by law and that the plan has a reasonable likelihood of success.  See In re Century Glove, Inc., No.

90-400-SLR, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) ("'[W]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied.'" (citation omitted)); see also Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 802 (5th Cir. 1997) (same); Koelbl v. Glessing (In re Koelbl), 751 F.2d 137, 139 (2d Cir. 1984) (noting that plan provisions may not contravene any law, including state law, and a plan must have been proposed with a basis for expecting that the proposed plan can be implemented).

The primary goal of chapter 11 is to promote the restructuring of debt obligations of a debtor to enable the continued existence of a corporate entity that provides jobs and a tax base to the communities in which it operates, as well as goods and services to those communities. Congress has thus recognized the primacy of the goal of rehabilitating viable businesses. See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984). Here, the Debtors filed the Chapter 11 Cases to preserve the going concern value of their businesses and to restructure their debt obligations, while maximizing value to creditors and interest holders. The Plan accomplishes these goals by providing the means by which the Reorganized Debtors may continue to operate as viable businesses with a deleveraged balance sheet, while leaving their international operations unaffected and thereby maximizing value for all creditors.

Accordingly, the Plan has been proposed by the Debtors in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing businesses and enhancing the financial viability of the Debtors, while providing the greatest possible recovery to claimholders under the circumstances of these Chapter 11 Cases. The Debtors believe that the value of their businesses is significantly greater in the reorganization contemplated by the Plan than in a liquidation. Indeed, as further discussed below, in a liquidation scenario, the Secured

Noteholders recovery would be reduced and there would be no recovery to the Unsecured

Noteholders or to any General Unsecured Creditors, whereas, under the Plan, the unsecured

creditors receive the Unsecured Cash Consideration.  Moreover, the support of the Plan Sponsor

and the acceptance of the Plan by Holders of Secured Note Claims and, with respect to all but

one Debtor, the Holders of General Unsecured Claims who voted on the Plan reflect the overall

fairness of the Plan and the acknowledgment by the Debtors' claimholders that the Plan has been

proposed in good faith and for proper purposes.  See In re Eagle-Picher Indus., Inc., 203 B.R.

256, 274 (Bankr. S.D. Ohio 1996) (finding that plan of reorganization was proposed in good

faith when, among other things, it was based on extensive arm's-length negotiations among plan

proponents and other parties in interest).

   Further, the Debtors have fulfilled their fiduciary duties by acting on an informed

basis, in good faith, and in the honest belief that the Plan is in the best interests of the Debtors.

See Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) (holding that the business judgment

rule "is a presumption that in making a business decision the directors of a corporation acted on

an informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company"); In re Caribbean Petroleum Corp., 444 B.R. 263, 269 (Bankr. D. Del.

2010) (applying the business judgment standard to actions taken by a debtor-in-possession);

Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated

Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (noting that the business judgment standard

set forth in Smith has "vitality by analogy" in chapter 11, especially where the debtor is a

Delaware corporation).  In light of the foregoing, the Debtors submit that they acted in good faith

in proposing and pursuing confirmation of the Plan and that the Plan is not proposed by any

means forbidden by law.  Therefore, the good faith requirement of section 1129(a)(3) of the

Bankruptcy Code has been satisfied.

>  **D.  Payments for Services and Expenses (Section 1129(a)(4))**

Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a
> person issuing securities or acquiring property under the plan, for services
> or for costs and expenses in or in connection with the case, or in
> connection with the plan and incident to the case, has been approved by,
> or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).  In essence, this subsection requires that any and all fees promised or

received in connection with or in contemplation of a chapter 11 case must be disclosed and

approved, or subject to approval, by the court.  In re Eagle-Picher Indus., 203 B.R. at 274; Future

Energy, 83 B.R. at 487-88 (noting that certain payments, as detailed in section 1129(a)(4), are

subject to approval by the bankruptcy court).

Section 1129(a)(4) of the Bankruptcy Code has been construed to require that all

payments of professional fees that are made from estate assets be subject to review and approval

by the court as to their reasonableness.  See, e.g., In re Drexel Burnham Lambert Group Inc., 138

B.R. 723, 760 (Bankr. S.D.N.Y. 1992).  The Court-appointed professionals in these cases are

subject to the requirements of sections 330 and 331 of the Bankruptcy Code and, therefore, have

been approved by, or are subject to approval of the Court as reasonable.  Further, the Plan

provides that all unpaid Professional Claims incurred prior to the Effective Date shall be paid in

accordance with the procedures approved by the Bankruptcy Court and shall be subject to

Bankruptcy Court approval.  In addition, Article XI of the Plan provides that the Court will retain

jurisdiction after the Effective Date to hear and determine all applications for allowance of

reasonable compensation and reimbursement of expenses of Professionals under the Plan or

under sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code.  These procedures

for the Court's review and ultimate determination of the reasonable fees, costs, and expenses to

be paid by the Debtors satisfy the requirements of section 1129(a)(4).  In re Resorts Int'l, Inc.,

145 B.R. 412, 475-76 (Bankr. D.N.J. 1990) (as long as fees, costs and expenses are subject to

final approval of court, section 1129(a)(4) is satisfied).  Accordingly, the Plan fully complies

with the requirements of section 1129(a)(4) of the Bankruptcy Code.

To further effectuate the foregoing, the Debtors further request that the Court set

the date for professionals to file and serve final fee applications as forty-five (45) days after the

Effective Date and provide parties with twenty-one (21) days after filing of such final fee

applications to object in accordance with the procedures set forth in that the Court's order dated

October 28, 2015 establishing procedures for interim compensation and reimbursement of

professionals [Docket No. 379] (the "Professional Fee Order").  Finally, to avoid duplicative

filings, the Debtors further request that the Court waive the requirement in the Professional Fee

Order to file interim fee applications if the Effective Date of the Plan has occurred prior to the

date scheduled for filing such interim fee applications.

### E.    Identification of Directors, Officers and Insiders (Section 1129(a)(5))

Section 1129(a)(5) of the Bankruptcy Code requires a debtor to disclose the

identity of certain individuals who will hold positions with the Reorganized Debtors after

confirmation of the Plan.  See 11 U.S.C. § 1129(a)(5).  Pursuant to section 1129(a)(5)(A)(i) of

the Bankruptcy Code, the proponent of a plan must disclose the "identity and affiliations of any

individual proposed to serve, after confirmation of the plan, as a director, officer, or voting

trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a

successor to the debtor under the plan."  11 U.S.C. § 1129(a)(5)(A)(i).  Section 1129(a)(5)(A)(ii)

of the Bankruptcy Code further requires that the service of such individuals be "consistent with the interests of creditors and equity security holders and with public policy." Id. § 1129(a)(5)(A)(ii).  Section 1129(a)(5)(B) of the Bankruptcy Code requires that the plan proponent disclose the "identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider." Id. § 1129(a)(5)(B).

In determining whether the post-confirmation management of a debtor is consistent with the interests of creditors, equity security holders and public policy, a court must consider proposed management's competence, discretion, experience and affiliation with entities having interests adverse to the debtor.  See In re Sherwood Square Assocs., 107 B.R. 872, 878 (Bankr. D. Md. 1989); see also In re W.E. Parks Lumber Co., 19 B.R. 285, 292 (Bankr. W.D. La. 1982) (a court should consider whether "the initial management and board of directors of the reorganized corporation will be sufficiently independent and free from conflicts and the potential of post-reorganization litigation so as to serve all creditors and interested parties on an even and loyal basis").  In general, however, "[t]he [d]ebtor should have first choice of its management, unless compelling cause to the contrary exists."  Sherwood Square Assocs., 107 B.R. at 878. The case law also is clear that a plan may contemplate the retention of the debtor's existing directors and officers.  See, e.g., In re Texaco Inc., 84 B.R. 893, 908 (Bankr. S.D.N.Y. 1988) (determining that section 1129(a)(5) was satisfied where plan disclosed debtor's existing directors and officers who would continue to serve in office after plan confirmation); see also In re Trans World Airlines, Inc., 185 B.R. 302, 314 (Bankr. E.D. Mo. 1995).

As of the Effective Date, pursuant to Article 6.13 of the Plan, the terms of the current members of the boards of directors of each of the Debtors shall expire.

The Debtors have disclosed in the Plan Supplements the identity of those persons designated by the Plan Sponsor to serve on the New Board and the New Subsidiary Boards.  The New Board will be comprised of four members – three members are employees of the Plan Sponsor and the fourth is the current and post-Effective Date chief executive officer.  Their selection by the Plan Sponsor is appropriate given the post-emergence ownership of the Reorganized Debtors.  The directors and officers have significant experience in the Debtors' industry and the management team was employed by the Debtors prior to the Effective Date and, thus, is familiar with the Debtors' operations.  Accordingly, the employment of the designated directors and officers of the Reorganized Debtors is consistent with the interests of creditors.  Thus, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

### F.        Rate Changes (Section 1129(a)(6))

Section 1129(a)(6) of the Bankruptcy Code requires, with respect to a debtor whose rates are subject to governmental regulation following confirmation, that appropriate governmental approval has been obtained for any rate change provided for in the plan, or that such rate change be expressly conditioned on such approval.  Section 1129(a)(6) of the Bankruptcy Code is satisfied because the Plan does not provide for any change in rates over which a governmental regulatory commission has jurisdiction.

### G.        The "Best Interests" Test (Section 1129(a)(7))

The Bankruptcy Code protects creditors and equity security holders who are impaired by the Plan and who have not voted to accept the Plan through the "best interests" test of section 1129(a)(7) of the Bankruptcy Code, which provides that the court shall confirm a plan of reorganization if, with respect to each impaired class of claims or interests:

(A)      each holder of a claim or interest of such class –
         (i)       has accepted the plan; or

(ii)     will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7).  Thus, through the "best interest of creditors" test of section 1129(a)(7), the Bankruptcy Code protects non-consenting members of impaired classes by ensuring that each dissenting member of the impaired class receives at least what the dissenting member would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  203 N. LaSalle, 126 F.3d at 969; SK-Palladin Partners, L.P. v. Platinum Entm't, Inc., No. 01 C 7202, 2001 WL 1593154, at *4 (N.D. Ill. Dec. 13, 2001); In re Keck, Mahin & Cate, 241 B.R. 583, 590 (Bankr. N.D. Ill. 1999).  If the Court finds that each non-consenting member of an impaired class will receive at least as much under the Plan as it would receive in a chapter 7 liquidation, the Plan satisfies the "best interests" test.  See Future Energy, 83 B.R. at 490 (finding that section 1129(a)(7) was satisfied when the dissenting impaired classes would not have received more under a chapter 7 liquidation than they received under the proposed plan); accord Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship), 115 F.3d 650, 657 (9th Cir. 1997); Kane v. Johns-Manville Corp., 843 F.2d at 649; In re Leslie Fay Cos., 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997).

A court, in considering whether a plan is in the "best interests" of creditors, is not required to consider any alternative to the plan other than the dividend projected in a liquidation of all of the debtor's assets under chapter 7 of the Bankruptcy Code.  See, e.g., Future Energy, 83 B.R. at 489-90 (suggesting that the "best interests" test requires looking at the plan as compared with a chapter 7 liquidation); In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990); In re Victory Constr. Co., 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984).  As section

1129(a)(7) makes clear, the best interests of creditors test is applicable only to nonaccepting

holders of impaired claims and interests: here, members of Classes 5-A and, solely with respect

to Debtor QS Wholesale, Inc., Class 5-B, who voted to reject the Plan and members of Classes 8

and 9 who were deemed to reject the Plan.  See 11 U.S.C. § 1129(a)(7). The test requires that

each Holder of a Claim or Interest either accepts the Plan or will receive or retain under the Plan

property having a present value, as of the Effective Date, not less than the amount that such

Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy

Code.

As more fully set forth in the Coulombe Declaration and the Debtors' liquidation

analysis, attached as Exhibit C to the Disclosure Statement (the "Liquidation Analysis"), the

Liquidation Analysis assumes that the Debtors would commence a chapter 7 liquidation on or

about January 31, 2015 (the "Conversion Date") under the supervision of a court-appointed

chapter 7 trustee.  Coulombe Decl., ¶ 92.  The Liquidation Analysis reflects the wind-down and

liquidation of substantially all of the Debtors' remaining assets; a quick sale of their non-Debtor

subsidiaries; and the distribution of available proceeds to Holders of Allowed Claims during the

period after the Conversion Date.  The Liquidation Analysis assumes that upon conversion of the

chapter 11 case to chapter 7, the DIP Agents will seek relief from the automatic stay to foreclose

on Debtor assets under the jurisdiction of the Bankruptcy Court to recover on the outstanding

DIP Claims. The DIP Agents, on behalf of the DIP Lenders, would have the ability to recover on

the DIP Facilities' first lien position on all Debtor assets.  Only after the DIP Facilities are fully

satisfied, would any recoveries be realized by the holders of Secured Notes with respect to: i) the

Debtors' intellectual property, and ii) any equity value in the Non-Debtor subsidiaries, through

either a) the Secured Notes' first lien on 65% of the equity in the Non-Debtor subsidiaries or b)

the Secured Notes Replacement Liens granted pursuant to the DIP Order, with respect to 35% of the equity in the Non-Debtor subsidiaries.

The Liquidation Analysis further assumes that the U.S. chapter 7 conversion will trigger acceleration of foreign debt obligations including factoring facilities / lines of credit (the "Euro Factor Facility") and the Euro Notes and further would result in violations of the Euro Note Waiver executed prior to the chapter 11 filing.  Coulombe Decl., ¶ 93.  In light of these complicating factors, it is assumed that access to working capital funding would be limited, and that Deutsche Bank (as Euro Note Indenture Trustee) would move quickly to complete a going-concern sale of the Non-Debtor Subsidiaries no later than three months following the Conversion Date.  Further, since the worldwide DC Shoes trademark (the "DC Shoes Marks") is an asset of the Debtors, it is assumed that the DC Shoes Mark is marketed separately to a third-party buyer (the "DC Shoes Buyer"), with corresponding sale proceeds used to pay down the DIP Facilities (first lien) and the Secured Notes (second lien).  Therefore, the Non-Debtor Subsidiaries would need to enter into new license agreements with the DC Shoes Buyer to ensure uninterrupted access to DC Shoes products.

For purposes of estimating standalone value of the Non-Debtor Subsidiaries, FY16 Non-Debtor Subsidiary EBITDA levels were adjusted downward for i) annual DC Shoes Mark royalty payments to the DC Shoes Buyer, and ii) global SG&A costs, currently incurred by the Debtors for which the related activities would need to be maintained by the Non-Debtors Subsidiaries to support ongoing operations ("Adjusted Non-Debtor EBITDA").  Based on the resulting Adjusted Non-Debtor EBITDA levels, it is unlikely that a going concern sale would result in total enterprise value sufficient to fully satisfy the Euro Factor Facility and Euro Note outstandings (estimated to be a combined $271 million at the Conversion Date). Thus, no

residual equity value would be available for distribution from the going-concern sale of the Non-Debtor Subsidiaries.

The liquidation of the Debtors' U.S. assets was assumed to be completed over a twelve-month period. During the first two months, the Debtors would complete going-out-of-business sales for all remaining U.S. store inventory, furniture, fixtures, and equipment, along with the sale of all U.S. intellectual property, including the DC Shoes Marks. During months 3 – 6, the Debtors would primarily focus on collecting remaining customer accounts receivable. Activities during months 7 – 12 would include administrative activities, such as final creditor distributions needed to complete the wind-down of the Estates.

In addition, the value available to Holders of Claims in the event of a chapter 7 liquidation of the Debtors' assets would be reduced by, among other things, the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' chapter 7 cases. The Debtors' costs of liquidation in chapter 7 cases would include the compensation of the trustee, as well as of counsel and of other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, and claims arising from the wind-down of operation of the Debtors during the pendency of the chapter 7 cases.

Based on the Liquidation Analysis, as described above, the Plan meets the "best interests of creditors" test. The Liquidation Analysis estimates that if a liquidation were to occur in these cases, the proceeds generated from the liquidation of the Debtors' assets, taking into account the costs and expenses associated with a chapter 7 liquidation, would provide a recovery of 90% to 100% for Holders of DIP Claims and 0% to 8% for Class 4 Secured Notes Claims. Because substantially all of the Debtors' assets constitute collateral of the Secured Notes, no unencumbered assets would be available for distribution to Holders of Administrative Claims or

Priority Tax or Non-Tax Claims, and no proceeds would be available for distribution to Holders

of Claims and Interests junior to the Holders of Secured Notes, including Holders of Unsecured

Notes Claims and General Unsecured Claims (Classes 5-A, 5-B, 6, 7, 8 and 9).  This is in direct

contrast to the Plan, which provides for a full recovery to Holders of Administrative Claims,

Priority Tax Claims, Class 1 Other Priority Claims, Class 2 Other Secured Claims, and Class 3

Euro Notes Claims.  In addition, it provides for a recovery of approximately 16.4% to 17.4% to

Class 4 Secured Notes Claims, as well as recoveries of approximately 4.5% to Class 5-A

Unsecured Notes Claims and Class 5-B General Unsecured Claims.

Based on the foregoing, each dissenting Holder of a Claim or Interest in each

Impaired Class will receive or retain under the Plan, on account of such Claim or Interest,

property of a value, as of the Effective Date of the Plan, that is not less (and in most cases, is

greater) than the amount that it would receive in a chapter 7 liquidation of the Debtors' assets on

such date.  As a result, the Plan satisfies the requirements of section 1129(a)(7) of the

Bankruptcy Code.

### H.    Acceptance by Impaired Classes (Section 1129(a)(8))

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or

interests under a plan either has accepted the plan or is not impaired by the plan.  A class of

claims or interests that is not impaired under a plan is "conclusively presumed" to have accepted

the plan and need not be further examined under section 1129(a)(8).  11 U.S.C. § 1126(f); see

also In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 150 (Bankr. S.D.N.Y. 1984).  Even if

certain impaired classes of claims or interests do not accept a plan and therefore the requirements

of section 1129(a)(8) are not satisfied, the plan nevertheless may be confirmed over such

nonacceptance pursuant to the "cramdown" provisions of section 1129(b)(1) of the Bankruptcy

Code.  As a result, the confirmation requirement contained in section 1129(a)(8) is the only section 1129(a) condition that is not necessary for confirmation of a plan of reorganization.

Acceptance of a plan of reorganization by an impaired class of claims or interests is determined by reference to section 1126 of the Bankruptcy Code, which identifies the members of a class that may vote on a plan and the number and amount of votes necessary for the acceptance of a plan by a class of claims or interests.  In particular, section 1126 provides that a plan is accepted (a) by an impaired class of claims if the class members accepting hold at least two-thirds in amount and more than one-half in number of the claims held by the class members that have cast votes on the plan and (b) by a class of impaired interests if the class members accepting hold at least two-thirds in amount of the interests held by the class members that have cast votes on the plan.  Under section 1126(g) of the Bankruptcy Code, however, impaired classes that neither receive nor retain property under the plan are deemed to have rejected the plan.

As discussed above, the following Classes entitled to vote on the Plan have voted (or been deemed to have voted) to accept the Plan: Class 4 and, as to all Debtors except QS Wholesale, Inc., Class 5-B, thus satisfying section 1126(c) of the Bankruptcy Code with respect to those classes.  Class 5-A and, as to Debtor QS Wholesale, Inc., Class 5-B, voted to reject and Classes 8 (Subordinated Claims) and 9 (Interests in Quiksilver) will neither receive nor retain any property under the Plan and, therefore, are deemed to have rejected the Plan.  As discussed more fully below, the Debtors have met the "cramdown" requirements in section 1129(b) of the Bankruptcy Code necessary to obtain confirmation of the Plan notwithstanding the rejection of the Plan by the Classes 5-A and QS Wholesale Inc. Class 5-B and the deemed rejection of Classes 8 and 9.

I.      **Treatment of Priority Claims (Section 1129(a)(9))**

Section 1129(a)(9) of the Bankruptcy Code contains a number of requirements concerning the payment of priority claims.  First, section 1129(a)(9)(A) requires that claims of a kind specified in section 507(a)(2), which gives second priority to certain administrative expenses, be paid in full in cash on the effective date of the plan.[21]  Second, section 1129(a)(9)(B) requires that claims of a kind specified in sections 507 (a)(1) and 507(a)(4) through 507(a)(7) of the Bankruptcy Code – generally, wage, employee benefit and deposit claims entitled to priority – receive deferred cash payments equal, as of the effective date of the plan, to the allowed amount of such claims if the class has accepted the plan or, if the class has not accepted the plan, cash on the effective date equal to the allowed amount of such claims.  Section 1129(a)(9)(C) requires that claims of a kind specified in section 507(a)(8), which gives priority to certain tax claims of governmental units, receive regular installment payments in cash that (i) are equal to the total value, as of the effective date, of such claim, (ii) extend over a period not to exceed five years after the petition date, and (iii) are in a manner not less favorable than the most favored non-priority unsecured claim provided for in the plan.[22]  See In re Terex Corp., 984 F.2d 170, 174 (6th Cir. 1993); United States v. TM Bldg. Prods., Ltd., 231 B.R. 364, 372 (S.D. Fla. 1998) (stating that the term "deferred cash payments" means periodic payments, the interval of which is determined by balancing the circumstances of the debtor with the reasonable right of the creditor to receive prompt payment of its claim); In re Mason & Dixon Lines, Inc., 71 B.R. 300, 303 (Bankr. M.D.N.C. 1987) (same).

---

[21]   Section 1129(a)(9)(A) also requires claims of a kind specified in section 507(a)(3), which gives third priority to certain claims arising in involuntary cases, be paid in full in cash on the effective date of the plan.  Because these Chapter 11 Cases are not involuntary cases, this portion of section 1129(a)(9)(A) is not applicable.

[22]   Section 1129(a)(9)(D) of the Bankruptcy Code makes clear that a secured tax claim must receive the same treatment afforded to unsecured priority tax claims under 1129(a)(9)(C).

The Plan satisfies all of these requirements.  First, Article 2.1 of the Plan provides for payment in full by the Debtors of Claims of the kind specified in section 507(a)(2) of the Bankruptcy Code, in Cash, "(a) on the later of (x) the Initial Distribution Date; or (y) the first Periodic Distribution Date occurring after the later of (i) 30 days after the date when an Administrative Claim becomes an Allowed Administrative Claim or (ii) 30 days after the date when an Administrative Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Administrative Claim; or (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims[,]" as further set forth therein.

Second, Article 2.4 of the Plan provides that, each Holder of an Allowed Priority Tax Claim shall receive "(a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Debtors (or the Reorganized Debtors) and such Holder, provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the sole option of the Debtors, Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code."

Finally, Article 4.1 of the Plan provides that, each holder of an Allowed Other Priority Claim shall "be paid in full in Cash on the later of (a) the Initial Distribution Date or (b) the first Periodic Distribution Date occurring after the later of, (i) 30 days after the date when a Class 1 Claim becomes an Allowed Class 1 Claim or (ii) 30 days after the date when a Class 1

Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Class 1 Claim."

Accordingly, the Debtors believe that the Plan satisfies the requirements set forth in section 1129(a)(9) of the Bankruptcy Code with respect to the payment of these priority claims.

**J.      Acceptance of at Least One Impaired Class (Section 1129(a)(10))**

Section 1129(a)(10) of the Bankruptcy Code provides:

If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10); see also In re Martin, 66 B.R. 921, 924 (Bankr. D. Mont. 1986) (where three classes of impaired creditors accepted plan, exclusive of insiders, requirement of section 1129(a)(10) was satisfied).

The Debtors have satisfied this requirement.  Specifically, Class 4 and, as to all Debtors except QS Wholesale, Inc., Class 5-B have voted to accept the Plan and, to the best of the Debtors' knowledge, such Classes do not contain any significant number of insiders.  Thus, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider.  Accordingly, the requirement of section 1129(a)(10) of the Bankruptcy Code has been met.

**K.      Feasibility (Section 1129(a)(11))**

Section 1129(a)(11) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan."  11 U.S.C. § 1129(a)(11).  This section "requires courts to

scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable." 7 Collier on Bankruptcy, supra,¶ 1129.03 [11]; see also Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship (In re Patrician St. Joseph Partners Ltd. P'ship), 169 B.R. 669, 674-77 (D. Ariz. 1994); In re Cellular Info. Sys., Inc., 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994)  (plan proponent is not required to guarantee the ultimate success of the reorganized company and, instead, is only required to provide a "'reasonable assurance of success'" (citation omitted)); In re Rivers End Apts., Ltd., 167 B.R. 470, 476 (Bankr. S.D. Ohio 1994) (same).

To satisfy section 1129(a)(11) of the Bankruptcy Code, a debtor need not warrant, or prove to a mathematical certainty, the future success of the plan.  See In re Montgomery Court Apts., Ltd., 141 B.R. 324, 331 (Bankr. S.D. Ohio 1992) (noting that the success of a plan need not be certain or guaranteed); 203 N. LaSalle, 126 F.3d at 962 (the court overruled an objection which was based upon a different interpretation of the real estate market in Chicago saying that "[a] plan need not be assured of success to be confirmed").  Rather, a plan is feasible and should be confirmed if it "offers a reasonably workable prospect of success and is not a visionary scheme."  In re Merrimack Valley Oil Co., 32 B.R. 485, 488 (Bankr. D. Mass. 1983); Texaco, 84 B.R. at 910 ("All that is required is that there be reasonable assurance of commercial viability."); In re Prudential Energy Co., 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11).").

The key question is whether there is a reasonable probability that the provisions of a plan can be performed.  The elimination of debt together with the availability of prospective credit is an important factor to consider.  See Resorts Int'l, Inc., 145 B.R. at 479 ("Availability of

prospective credit, both capital and trade, adequacy of funds for equipment replacement and provisions for adequate working capital are other factors examined.").  Applying the above standards of feasibility, courts have identified the following factors as probative:

(1)    the adequacy of the capital structure;

(2)    the earning power of the business;

(3)    economic conditions;

(4)    the ability of management;

(5)    the probability of the continuation of the same management; and

(6)    any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

See, e.g., Official Creditors' Comm. v. Potter Material Serv., Inc. (In re Potter Material Serv., Inc.), 781 F.2d 99, 104 (7th Cir. 1986); see also Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.2d 581, 589 (6th Cir. 1986).

In this case, the Plan is feasible and no party has asserted otherwise.  For purposes of determining whether the Plan satisfies these feasibility standards, the Debtors have analyzed their ability to meet their obligations under the Plan and submit that Confirmation is not likely to be followed by liquidation or the need for further reorganization.

The Debtors have already taken significant steps to improve their operations prior to and during the Chapter 11 Cases, including: (i) closing numerous unprofitable stores and liquidating excess inventory; (ii) implementing a prepetition reduction in force to reduce capital expenditures; (iii) engaging in a comprehensive evaluation of their executory contracts and unexpired leases, and assuming or rejecting those contracts and leases consistent with the Debtor's business plan; and (iv) otherwise taking steps to implement the Company's go-forward business plan.  Coulombe Decl., ¶ 104.

In the event that the Euro Notes Exchange Offer is fully subscribed and consummated, the Plan will result in a substantial deleveraging of approximately $590 million upon emergence from chapter 11.  In addition, the Plan will provide the Debtors with ample liquidity to make all distributions under the Plan and continue operations across all of their current business segments as a going concern.  The Debtors are in advanced negotiations regarding the Exit Facilities that the Debtors anticipate will close in connection with emergence. Upon emergence and entry into the Exit Facilities, the Debtors anticipate that they will have approximately $90 million of liquidity.  Coulombe Decl., ¶ 105.

The Debtors have prepared financial projections of their annual performance through the end of 2018, as described in Exhibit B to the Disclosure Statement. These financial projections support the Debtors' conclusions that the Reorganized Debtors will be able to meet their obligations under the Plan while maintaining sufficient liquidity and capital resources. Here, upon the Debtor's receipt of the funding contemplated under the Backstop Commitment Agreement, Rights Offerings, and closing of the Exit Facilities, the Plan is feasible.  The Debtor reasonably believes that these transactions will close.  Coulombe Decl., ¶ 106.

Based on the foregoing reasons it is evident that Confirmation of the Plan is not likely to be followed by the liquidation or need for further reorganization of the Reorganized Debtors.  As a result, the Plan satisfies the requirements of section 1129(a)(11).

### L.    Payment of Certain Fees (Section 1129(a)(12))

Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28  U.S.C. § 1930, determined by the court at the hearing on confirmation of a plan, be paid or that provision be made for their payment.  All fees payable under 28 U.S.C. § 1930 have been

paid or will be paid on the Effective Date pursuant to Article 13.2 of the Plan, thereby satisfying section 1129(a)(12) of the Bankruptcy Code.

### M.    Continuation of Retiree Benefits (Section 1129(a)(13))

Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continuation of retiree benefits, at levels established pursuant to section 1114 of the Bankruptcy Code, for the duration of the period that the debtor has obligated itself to provide such benefits. Pursuant to Article 6.16(b) of the Plan, following the Effective Date of the Plan, with respect to the payment of "retiree benefits" as defined in section 1114 of the Bankruptcy Code, such payment shall continue at the levels established pursuant to subsections (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the Plan, for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any. Accordingly, the requirements of section 1129(a)(13) of the Bankruptcy Code are satisfied.

### N.    Miscellaneous Provisions (Sections 1129(a)14-16)

Sections 1129(a)(14)-(16) are inapplicable as the Debtors (i) have no domestic support obligations (section 1129(a)(14)), (ii) are not individuals (section 1129(a)(15)), and (iii) are for-profit businesses (section 1129(a)(16)).

## IV.    THE PLAN SATISFIES THE "CRAMDOWN" REQUIREMENTS

Section 1129(b) of the Bankruptcy Code, the so-called "cramdown" provision, provides that if all of the applicable confirmation requirements of section 1129(a) other than subsection (8) (requiring all impaired classes to accept the plan) are met, the court, on request of the plan proponent, shall confirm the plan if it does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes. See 11 U.S.C. § 1129(b)(1); see also In re Montgomery Court Apts., Ltd., 141 B.R. at 346.  Because the Holders of Claims in

Class 5-A and, as to QS Wholesale, Inc., Class 5-B voted to reject the Plan and the Holders of

Claims and Interests in Classes 8 and 9 neither receive nor retain any property under the Plan and,

thus, are deemed to have rejected the Plan, see 11 U.S.C. § 1126(g), the Debtors must satisfy the

requirements of section 1129(b)(1).  As discussed below, the Debtors meet the "cramdown"

requirements with respect to these Classes.

A.    **The Plan Does Not Unfairly Discriminate**

The Plan does not discriminate unfairly with respect to the impaired classes that

have voted or been deemed to reject the Plan.  Initially, the "unfair discrimination" standard of

section 1129(b) does not prohibit all types of discrimination among Holders of Claims and

Interests; it merely prohibits unfair discrimination.  See In re Leslie Fay Cos., 207 B.R. at 791

n.37; In re Rivers End Apts., 167 B.R. at 487.  The Bankruptcy Code does not provide a standard

for determining when "unfair discrimination" exists.  See In re 203 N. LaSalle St. Ltd. P'ship,

190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining

the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the

limits of fairness in this context have not been established"), aff'd, 195 B.R. 692 (N.D. Ill. 1996),

aff'd, 126 F.3d 955 (7th Cir. 1997), rev'd on other grounds sub nom. Bank of Am. Nat'l Trust &

Sav. Ass'n v. 203 N. LaSalle St. Ltd. P'ship, 526 U.S. 434 (1999).

Rather, courts typically examine the facts and circumstances of the particular case

to determine whether unfair discrimination exists.  See, e.g., In re Freymiller Trucking, Inc., 190

B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination

requires a court to "consider all aspects of the case and the totality of all the circumstances"); In

re Aztec Co., 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized

the need to consider the facts and circumstances of each case to give meaning to the proscription

against unfair discrimination"). At a minimum, however, the "unfair discrimination" standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justification for doing so. See, e.g., Aztec, 107 B.R. at 589-91; Ambanc La Mesa, 115 F.3d at 656; In re Armstrong World Indus., Inc., 348 B.R. 111, 121 (D. Del. 2006) ("[t]he hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination" (internal citation omitted)) (also cited in In re Tribune Co., 476 B.R. 843, 865 (Bankr. D. Del. 2012)) aff'd as modified sub nom. In re Tribune Co., No. 12-CV-1072 GMS, 2014 WL 2797042 (D. Del. June 18, 2014) aff'd in part, rev'd in part sub nom. In re Tribune Media Co., 799 F.3d 272 (3d Cir. 2015); In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 224-25 (Bankr. D.N.J. 2000) (in confirming the plan, the court stated that the "business justification for the disparate treatment is readily apparent"); In re Loop 76, LLC, 465 B.R. 525, 541 (B.A.P. 9th Cir. 2012) aff'd, 578 F. App'x 644 (9th Cir. 2014) (panel upheld the bankruptcy court's consideration and debtor's classification of a claimant's non-debtor source of repayment of its claims in determining whether claims are substantially similar for classification purposes).

The Debtors submit that there is no unfair discrimination under the Plan. Class 5-A is comprised of Unsecured Notes Claims, which are defined to include only claims arising under, derived from, based upon or related to the Unsecured Notes. Class 5-B is comprised of prepetition general unsecured claims. Each of these classes of Claims are appropriately classified separately from other Claims and from each other.

Class 8, consisting of Subordinated Claims, and Class 9, consisting of Interests in Quiksilver, are likewise reasonably classified and treated separately from other creditors and

interest holders as Class 8 Claims are subordinated to other unsecured claims and Class 9

Interests are those of the parent, Quiksilver, and thus appropriately treated differently than the

Intercompany Interests.  As further discussed below, Classes 8 and 9 are not entitled to recovery

under the absolute priority rule until all senior creditors have been paid in full.

      **B.**      **The Plan is Fair and Equitable**

      Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) provide that a plan is fair and

equitable with respect to a class of impaired unsecured claims or interests if the plan provides

that the holder of any claim or interest that is junior to the claims or interests of such class will

not receive or retain under the plan on account of such junior claim or interest any property.

This central tenet of bankruptcy law – the "absolute priority rule" – requires that if the holders of

claims in a particular class receive less than full value for their claims, no holders of claims or

interests in a junior class may receive property under the plan.  The corollary of the absolute

priority rule is that senior classes cannot receive more than a 100% recovery for their claims.

      The Plan satisfies the absolute priority rule with respect to Classes 5-A, 5-B, 8

and 9, as no holder of a claim or interest junior to such Classes will receive any distribution.

The Holders of Class 5-A Unsecured Notes Claims, Class 5-B General Unsecured Claims,[23]

Class 8 Subordinated Claims and Class 9 Interests in Quiksilver are not entitled to receive any

recovery under the absolute priority rule because other, more senior creditors – namely, the

Secured Noteholders – are not being paid in full and, thus, the Plan is fair and equitable with

respect to those Classes.

---

[23]    Although Classes 5-A and 5-B are not entitled to any recovery under the absolute priority rule, the Plan
provides, with the consent of the Class 4 Secured Noteholders, that they will share pro rata in the Unsecured
Cash Consideration.

In sum, the Debtors have met the requirements for cramdown of Classes 5-A, 8 and 9, and, as to QS Wholesale, Inc., Class 5-B.  Accordingly, the Plan should be confirmed.

## V.        RESPONSES TO OBJECTIONS

Seven formal objections were filed to the Debtors' Plan and four have been resolved or withdrawn.  An additional four informal objections were communicated to the Debtors, three informal objections have been resolved, and the Debtors are working to resolve the final informal objection.  For the reasons set forth below, the Debtors respectfully request that each of the remaining outstanding objections be overruled.

### A.        The Objection Filed by the Creditors' Committee [Docket No. 661]

The Debtors will be filing a separate reply to the objection to the Plan filed by the Creditors' Committee.

### B.        The Objection Filed by the Former Employees [Docket No. 657]

Several former employees (the "Former Employees") have filed a limited objection to the Plan, asserting that their alleged claims arising under various severance agreements with the Debtors (the "Former Employee Claims") are entitled to administrative priority status[24] and requesting that the Debtors set aside a reserve for such claims of nearly $7.3 million in the Plan – the full amount of the Former Employee Claims – until the validity, status, and amount of their claims are determined. This request is unwarranted for several reasons and would needlessly tie up the Reorganized Debtors' liquidity.

---

[24]    In paragraph 2 of their objection, the Former Employees assert that the Plan classifies their alleged claims as general unsecured claims. This is inaccurate—the Plan contains no such assertion or classification. The Former Employees filed their claims as priority or administrative priority claims, and accordingly, their claims were treated as such pending final allowance of such claims in an appropriate amount and priority. As a result, KCC did not send Class 5-B ballots to the Former Employees. Notwithstanding this, the Former Employees submitted to KCC Class 5-B ballots that they presumably downloaded and completed themselves.

First, there is no basis to establish a reserve for the Former Employees' claims and the Former Employees assert none. The Plan provides for payment in full of Administrative Claims, pursuant to Article 2.1 of the Plan, and of Other Priority Claims, as set forth in Article 4.1 of the Plan. Accordingly, in the unlikely event that the Former Employee Claims are, in fact entitled to administrative expense or priority status, such claims will be paid in full. That is all that the Bankruptcy Code requires – it nowhere sets out a requirement for a reserve for such claims. Instead, the Debtors must establish that the Plan is feasible and can be consummated. As set forth above, the Debtors have done so.

Moreover, the Debtors have set forth in Article VI of the Plan the sources of Plan funding, which include $122.5 million of proceeds of the backstopped Exit Rights Offering, approximately $190 million from the Exit Facilities, and the Reorganized Debtors cash on hand and from operations. As a result, after giving effect to the transactions contemplated by the Plan, the Debtors anticipate having liquidity of approximately $90 million. See Coulombe Declaration at 42. See This is more than ample to satisfy whatever portion, if any, of the Former Employee Claims that may ultimately be determined to be entitled to payment in full as priority claims.

Currently, however, the Former Employees have not demonstrated that they are entitled to any priority status and the Debtors believe they will not be able to do so. The Debtors fully intend to file objections to the Former Employee Claims as part of the ongoing claims reconciliation process, challenging the priority and amounts asserted in the Former Employee Claims. Upon the filing of such objection, the proper priority of such Claims shall be determined by the Court. In particular, the Former Employee Claims arise from prepetition contracts, entered into more than 180 days before the Petition Date, which provide no benefit to the Estates and thus, even if such contracts are not executory, they do not give rise to Administrative or

Priority Claims.  Furthermore, even assuming the rejection of the Former Employees' severance agreements cannot be authorized because such agreements are not "executory" (which they are), the result for the Former Employees is the same:  The Debtors would breach the prepetition severance agreements, and the affected Former Employees would only be entitled to prepetition general unsecured claims on account of the Debtors' breach.  See In re Riodizio, 204 B.R. 417, 24 n.7 (Bankr. S.D.N.Y. 1997) ("[I]f [the non-debtor party] has fully performed under the [contract], it is in no different position than the trade vendor who sold onions to the debtor prepetition, and never received payment; the seller has a damage claim, but must await a *pro rata* payment with the other unsecured creditors.") (citing Jay Lawrence Westbrook, A Functional Analysis of Executory Contracts, 74 Minn.L.Rev. 227, 269 (1989)); see also In re Hawker Beechcraft, Inc., 486 B.R. 264, 277 (Bankr. S.D.N.Y. 2013) ("If, on the other hand, the contract is not executory and the debtor chooses not to perform, the non-debtor party gets the same pre-petition claim for breach of contract.") (citing Riodizio and other cases).

The reliance of the Former Employees on section 1129(a)(9) of the Bankruptcy Code is similarly unavailing.  As noted in the objection, 1129(a)(9) requires that priority claims be paid in full "equal to the allowed amount of such claim."  The Former Employees' claims have not been allowed, and as noted above, the priority of such claims has not yet been determined.  As such, the merits of the Former Employee Claims are not currently ripe for consideration and are in no way an issue an issue for confirmation.

Finally, setting aside the priority of the Former Employees' claims, the Former Employees have made no effort to request that this Court either (a) determine that their claims do, in fact, merit any priority treatment, or (b) estimate the amount in which such claims should be deemed allowed for any purpose.  The Former Employees have had over three months to make

such a request, and have failed to do so.  The establishment of a reserve is unjustifiable where, as here, neither the amount nor the priority of the underlying claim has been established.  The issues raised by the Former Employees in their limited objection will be properly addressed through the claims allowance and reconciliation process, and as noted above, following the conclusion of that process, the allowed portion of the claims, if any, will be treated in accordance with the relevant provisions of the Plan.

In light of the foregoing, the Debtors respectfully submit that the Former Employee Objection should be denied.

**C.    The Objection Filed by the United States Trustee [Docket No. 684]**

The U.S. Trustee objects to the Exculpation of non-estate fiduciaries provided under Section 10.6 of the Plan[25] and argues that non-fiduciaries cannot be exculpated as a matter of law.[26]  However, as set forth below, the Exculpation is appropriate under applicable law, justified under the circumstances in these Chapter 11 Cases, and should be approved.

First, section 1125(e) of the Bankruptcy Code specifically authorizes the type and scope of protection offered to the Plan Sponsor under the Exculpation in the Plan, and the plain

---

[25]  The limitation of liability language in Section 10.6 provides, in relevant part:

The Exculpated Parties shall neither have, nor incur any liability to any Entity for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

(Emphasis in original).

[26]  Specifically, the U.S. Trustee objects to the inclusion of the following non-estate fiduciaries in the definition of "Exculpated Parties," as set forth in Section 1.83 of the Plan:  the Backstop Parties, the Plan Sponsor, the DIP Lenders and Agents, the Secured Notes Agent, and each of their respective agents and professionals.  See Plan Art. IB, Sec. 1.83.  With the exception of the Secured Notes Agent, Oaktree and its affiliates wear all of the "hats" included in the "Exculpated Parties" definition.  For simplification purposes, the Debtors' response refers to Oaktree as the Plan Sponsor, but such is not intended to undermine Oaktree's significant role and contributions in these Chapter 11 Cases as the DIP Lenders and Backstop Parties.

language of the statute contains absolutely no restriction on who may be a "person" qualified to receive such exculpation.  Section 1125(e) thus provides a limitation of liability for *all* plan process participants – not just estate fiduciaries – who act in good faith:

> A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

11 U.S.C. § 1125(e).  The plain terms of Section 1125(e) shield non-estate fiduciaries like the Plan Sponsor from liability for their conduct in connection with the plan and restructuring process so long as they participated in good faith and in compliance with applicable provisions of Title 11.  Notably, the term "participation" is nowhere defined in the Bankruptcy Code, and standard dictionary definitions construe the term exceptionally broadly.[27]  Fairly read, "participation" spans the entire restructuring process.  The policy of the statute is self-evident, as with other provisions of the Bankruptcy Code, Congress has offered this protection in order to promote early and frequent collaboration among stakeholders to facilitate reorganizations, engage in the plan process, and promote consensual resolutions.  In general, exculpation provisions help ensure that capable stakeholders will be willing to participate in the consensual restructuring process and assist debtors in the chapter 11 context.  Accordingly, this Court should

---

[27]    Merriam-Webster's Dictionary defines "participation" as "the act of participating" or "the state of being related to a larger whole."  Merriam-Webster Dictionary, http://www.meriam-webster.com/dictionary/participation (accessed Jan. 23, 2016).  "Participate" is defined as "partake" or "to take part."  Id. at http://www.meriam-webster.com/dictionary/participate (accessed Jan. 23, 2016).

exercise its authority to approve the Exculpation of the Plan Sponsor under Section 1125(e) of the Bankruptcy Code.

Here, there can be no dispute that such participation includes the Plan Sponsor's pre-petition negotiations (including, for instance, facilitating the waiver of the default under the Euro Notes governing documents resulting from filing of the Chapter 11 Cases) and voluntary contributions to afford a distribution to unsecured creditors. Thus, the statutory protections supplied by Section 1125(e) are aligned with the "Exculpated Claim[s]" covered by the Exculpation in the Plan.[28]

The U.S. Trustee's reliance on Washington Mutual ("WaMu") and its progeny does not change this result. See U.S. Trustee Obj. ¶¶ 10-11 (citing Washington Mutual, In re Tribune, Indianapolis Downs, and PTL Holdings). Those cases did not involve *any* discussion of Section 1125(e) as providing an independent basis to exculpate non-estate fiduciaries under similar parameters found in the Exculpation here. Therefore, the U.S. Trustee has cited no authority finding that Section 1125(e) cannot be invoked to authorize a plan provision exculpating a Plan Sponsor or other non-estate fiduciary. Indeed, courts in this District and

---

[28] Article IB, Section 1.82 defines "Exculpated Claim" as follows:

any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in or out of court restructuring, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the settlement of Claims or renegotiation of Executory Contracts or Unexpired Leases, the negotiation of the Plan, the DIP Credit Agreements, the Rights Offerings, the Euro Notes Exchange Offer, the Backstop Commitment Letter, the Plan Sponsor Agreement (including the term sheets attached thereto), the Plan Supplement, the Exit Revolver Facility, the Exit Term Loan Facility, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration, consummation, and implementation of the Plan, the distribution of property under the Plan, or any transaction contemplated by the Plan or Disclosure Statement, or in furtherance thereof; provided, however, that Claims relating to the Excluded DIP Obligations shall not constitute Exculpated Claims.

others have approved similar exculpation provisions even without explicit reliance on Section

1125(e).[29]

Furthermore, the U.S. Trustee's suggestion that this District follows a *per se* rule

against exculpation of non-fiduciaries ignores multiple precedents where courts in this

jurisdiction have held that exculpation of non-fiduciaries is permissible under special

circumstances.  See, e.g., Confirmation Hr'g Tr. at 26-27, In re FAH Liquidating Corp. (f/k/a

Fisker Auto. Holdings, Inc.), Case No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014)

(overruling U.S. Trustee's objection relying on WaMu and confirming plan that exculpated pre-

petition and post-petition conduct of (i) purchaser of debtors' assets and (ii) debtors' senior

secured lender after finding "exceptional" circumstances warranting the exculpation, which

included the court's recognition of the "significant contribution" of both parties, including,

among other things, their willingness to provide DIP financing, the agreement to provide exit

financing in the form of equity, and the agreement to fund the payment of administrative and

priority claims); see also In re Source Home Entertainment, LLC, No. 14-11553 (KG) (Bankr. D.

Del. Feb. 20, 2015) (approving exculpation of non-estate fiduciaries); In re UniTek Global

---

[29]  See, e.g., In re Synagro Techs., Inc., No. 13-11041 (BLS) (Bankr. D. Del. Aug. 20, 2013) [Docket No. 794]
(approving exculpation provision that covered similar pre-petition and post-petition conduct of several non-estate
fiduciaries, including the plan sponsor, secured lenders, DIP agent and lenders, and prepetition sole shareholder);
In re AgFeed USA, LLC., No. 13-11761 (BLS) (Bankr. D. Del. Nov. 4, 2014) (exculpating members of ad hoc
equity committee for similar pre-petition and post-petition conduct); In re Southern Air Holdings, Inc., Case No.
12-12690 (Bankr. D. Del. Mar. 18, 2013) [Docket No. 673] (approving exculpation provision that included the
debtors' prepetition majority shareholder, DIP agent and lenders, and various consenting lender parties);
Physiotherapy Holdings, Inc., No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) [Docket No. 197] (approving
exculpation provision that included, among others, exit lenders, noteholders and secured lenders); In re Sea
Containers Holdings, Ltd., No. 06-11156 (Bankr. D. Del. Nov. 24, 2008); In re Aleris Int'l, Inc., 2010 Bankr.
LEXIS 2997 (Bankr. D. Del. May 3, 2010) (confirming plan including exculpation of indenture trustees).  See
also In re Oneida Ltd., 351 B.R. 79, 94 & n.22 (Bankr. S.D.N.Y. 2006) (approving exculpation provision that
covered similar pre-petition and post-petition acts and omissions of prepetition lenders and DIP Lenders, among
others, except in cases of gross negligence, willful misconduct, fraud or criminal conduct, and noting ); see id. at
94 n.22 (in overruling objection to exculpation provision as overly broad, court noted that "the language of the
clause, which generally follows the text that has become standard in this district, is sufficiently narrow to be
unexceptionable").

Services, Inc., No. 14-12471 (KG) (Bankr. D. Del. Jan. 5, 2015) (approving exculpation of non-estate fiduciaries);  Confirmation Hr'g Tr. at 35:23-36:4, In re Lab. Partners,  Inc., Case No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (overruling U.S. Trustee's objection relying on WaMu and confirming plan that included provision exculpating debtors' secured lender that had provided emergency bridge financing that permitted debtors to avoid liquidation); Confirmation Hr'g Tr. 54-55, In re Nassau Broad Partners L.P., Case No. 11-12934 (KG) (Bankr. D. Del. July 31, 2013) (confirming plan with exculpation of lender and agent because the extraordinary efforts and sacrifices led to the result of having a plan that could be confirmed, and in approving exculpation, noting, "I just want to be very clear that it's my opinion that exculpation is not limited to fiduciaries, that the Third Circuit has not addressed that matter and has not so held at this point."); In re Dex One Corp., No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (approving exculpation of non-estate fiduciaries); In re HSH Delaware GP LLC, No. 10-10187 (MFW) (Bankr. D. Del. Jan. 18, 2011).  As these cases make clear, WaMu did not create a *per se* rule against exculpation for non-estate fiduciaries in this district.

Here, the Plan Sponsor's engagement and support throughout the process, as well as its significant contributions to the Debtors' Chapter 11 Cases throughout the reorganization, justify the approval of the Exculpation provision under Section 1125(e).  Specifically, and as set forth in more detail in the Coulombe Declaration, Oaktree's key contributions include (i) its commitments as Plan Sponsor and Backstop Party under the Plan Sponsor Agreement and the Backstop Agreement, respectively, to support the Debtors' restructuring by, among other things, fully backstopping the issuance of new shares in the Reorganized Debtors, (ii) its role as DIP Lender, providing much-needed liquidity to the Debtors in order to permit the Debtors to continue their businesses in the ordinary course during these Chapter 11 Cases, (iii) its

facilitation of the waiver of certain defaults under the Euro Notes triggered upon the filing of these Chapter 11 Cases, and (iv) its agreement to waive recoveries on its deficiency claims under the Plan, without which General Unsecured Creditors would receive substantially smaller recoveries, thereby paving the way for the Debtors to achieve a successful restructuring and maximize value for the benefit of their stakeholders.  Coulombe Decl., ¶ 77.  As this Court is well aware, despite the best efforts of the Debtors, their advisors, the Committee, and the Committee's advisors, the sale process (which was conducted with the support of Oaktree) has failed to garner an alternative bid for a sale or restructuring transaction.  Savini Decl., ¶ 28. Absent the support of Oaktree in multiple key aspects of the Debtors' restructuring, the Debtors would likely have been unable to achieve the levels of recovery for its stakeholders which are encompassed in the Plan.

Additionally, in an effort to achieve a consensual restructuring with the Unsecured Noteholders and General Unsecured Creditors, the Plan Sponsor has agreed to increase recovery for general unsecured creditors (who would otherwise have recovered nothing in a liquidation).  During the Disclosure Statement Hearing, the Plan Sponsor agreed to increase the size of the rights offering so that it would give unsecured bondholders the opportunity to participate in up to $12.5 million of the rights offering and agreed to increase the amount of cash payable to General Unsecured Creditors from $7.5 to $12.5 million.

Moreover, the Plan Sponsor has acted in good faith throughout the restructuring process.  Indeed, negotiation and compromise were crucial to the development of a feasible, confirmable Plan.  The Plan Sponsor's flexibility, as evidenced at the DIP Hearing when it agreed to push its milestones, and again its good faith participation in the mediation conducted by Judge Drain on January 15, 2016, is but one example of the Plan Sponsor's good faith

throughout the process.  At the end of the day, no one other than the Plan Sponsor stepped up to the plate with a transaction which would preserve the business of the Debtors and, more broadly, the Company, as a going concern.  Without the Plan Sponsor, there would be no plan and no possibility of a successful reorganization, which would have resulted in significant value lost to all stakeholders and massive job loss in the Debtors' U.S. operations as well.  See Coulombe Declaration at 31.  Thus, the Exculpation is necessary to protect the Plan Sponsor, as permitted and contemplated by Section 1125(e), given the Plan Sponsor's pivotal role in and substantial contributions to these Chapter 11 Cases, as well as its good faith participation in the pre-petition preparation and post-petition negotiation, formation, solicitation, and, eventual implementation of the Plan from future attacks related to such actions.

      For these reasons, the Debtors respectfully submit that the Exculpation is appropriate and should be approved.

      As described above, the Plan is in the best interests of the Debtors, their estates, their stakeholders, and all other parties-in-interest, and the Plan should be confirmed.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

## CONCLUSION

For the foregoing reasons, the Court should (i) confirm the Plan and (ii) grant the

Debtors such other and further relief as is just and proper.

Dated:  Wilmington, Delaware
         January 25, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/      *Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Z. Li
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

Mark S. Chehi (I.D. No. 2855)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

John K. Lyons
Jessica S. Kumar
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

## EXHIBIT A

**Chart of Objections to Plan**

<u>CHART OF OBJECTIONS</u>
<u>QUIKSILVER PLAN OF REORGANIZATION</u>[1]

| Item No. | Party | Objection | Response/Status |
|---|---|---|---|
| 1. | Oracle America, Inc. ("<u>Oracle</u>")<br><br>[Docket No. 652]<br><br>(The "<u>Oracle Objection</u>") | 1. Alleges that Plan Supplement does not adequately describe the contract Debtors seek to assume and omits other contracts between Oracle and Debtors.<br><br>2. Notes uncertainty about the accuracy of the cure amount.<br><br>3. Alleges Debtors have failed to provide adequate assurance of future performance. | The Debtors have included agreed-upon language in the proposed confirmation order. <u>See</u> Confirmation Order.<br><br>**\*Oracle has indicated that insertion of that language fully resolves the Oracle Objection.\*** |
| 2. | Texas Comptroller of Public Accounts ("<u>Texas Comptroller</u>")<br><br>[Docket No. 656]<br><br>(the "<u>Texas Comptroller Objection</u>") | 1. Alleges Plan Art. 8.7 restricts the Texas Comptroller's right to amend its priority claim once the ongoing sales tax audit is complete.<br><br>2. Alleges Plan Art. 2.5 does not propose to pay interest on the Texas Comptroller's claim, and seeks payment of 4.5% interest on its claim.<br><br>3. Objects to Plan's attempt to enjoin the Texas Comptroller from collecting tax liabilities of non-debtor third parties because (a) bankruptcy court lacks jurisdiction to issue the injunction and (b) the injunction is improper under Third Circuit | The Debtors have included agreed-upon language in the proposed confirmation order. <u>See</u> Confirmation Order.<br><br>**\*The Texas Comptroller has indicated that insertion of that language fully resolves the Texas Comptroller Objection.\*** |

---

[1] Capitalized terms used but not defined herein have the meanings assigned to them in the Plan, the Confirmation Brief or the relevant objection, as applicable. Objections in grey are resolved.

| Item No. | Party | Objection | Response/Status |
|---|---|---|---|
| | | precedent and is barred by the Tax Injunction Act. <br><br> 4. Alleges Plan Arts. 9.11 and 10.8 improperly enjoin creditors' rights of setoff. <br><br> 5. Alleges Plan fails to provide an adequate remedy in the event of default. | |
| 3. | "Former Employees" <br><br> [Docket No. 657] <br><br> (the "Former Employees Objection") | 1. Alleges that plan proponent must reserve a minimum of $7,291,946.65 for the total amount of Former Employees' claims. <br><br> 2. Alleges Separation Agreements with the Former Employees are administrative and priority claims, as opposed to General Unsecured Claims, entitled to payment in cash in full on the Effective Date. | As discussed in the Confirmation Brief: <br><br> 1. There is no basis to establish a reserve for the Former Employees' claims, and the Former Employees assert none. Even if their claims were later determined to be entitled to administrative expense or priority status, the Former Employees' claims would be paid in full as Administrative Claims pursuant to Article 2.1 of the Plan, and the Debtors would have sufficient liquidity to pay them. <br><br> 2. Currently, the Former Employees have not demonstrated that their claims are entitled to any priority status, and the Debtors believe the Former Employees will not be able to show such entitlement. The claims reconciliation process is ongoing, and the Debtors intend to file objections to the Former Employees' proofs of claim challenging the priority and amounts asserted therein. Upon the filing of that claims objection, the proper priority of the claims shall be determined by the Court. |

| Item No. | Party | Objection | Response/Status |
|---|---|---|---|
| 4. | The Official Committee of Unsecured Creditors (the "Committee") [Docket No. 661] (The "Committee Objection") | 1. Alleges that the PJSC Valuation materially undervalues the Debtors' Total Enterprise Value, and thus, Secured Noteholders are receiving more than payment in full.<br><br>2. Alleges that excess value that the Secured Noteholders are receiving should inure to the benefit of the Unsecured Creditors.<br><br>3. Alleges that the Plan violates the absolute priority rule because it potentially unimpairs intercompany interest junior to the Unsecured Notes and General Unsecured Claims.<br><br>4. Alleges that the Plan unfairly discriminates between Unsecured Noteholders and Holders of Euro Notes Guaranty Claims.<br><br>5. Alleges that the Plan contains an overly broad exculpation provision.<br><br>6. Raises other alleged issues:<br>(a) The Plan does not provide for the existence of the Committee post-Confirmation.<br>(b) Causes of Action should be put in a trust administered by the Committee for the benefit of Unsecured Creditors.<br>(c) The Plan should include payment for Unsecured Notes Indenture Trustee's Fees.<br>(d) Payment of Secured Notes Indenture Trustee | The Debtors will file a reply addressing the Committee Objection prior to the start of the Confirmation Hearing. |

| Item No. | Party | Objection | Response/Status |
|---|---|---|---|
| | | and Secured Notes Collateral Agent should be subject to the Committee's review of invoices. | |
| 5. | The United States Trustee (the "U.S. Trustee")<br><br>[Docket No. 684]<br><br>(The "U.S. Trustee Objection") | 1. The Plan's exculpation provision does not comply with applicable case law as it covers entities who are not estate fiduciaries (Backstop Parties, Plan Sponsor, DIP Lender, DIP Agents, Secured Notes Agent and their respective officers, directors, affiliates and professionals).<br><br>2. The Plan's definition of Exculpated Claim is far broader than the safe harbor provided by Section 1125(e) of the Bankruptcy Code.<br><br>3. The non-estate fiduciaries are entitled to no further exculpation beyond the narrow safe harbor offered by Section 1125(e), provided that the Court is able to make the factual finding that the non-fiduciaries participated in good faith and complied with applicable law under Title 11. | As discussed in the Confirmation Brief, section 1125(e) of the Bankruptcy Code provides authority to approve exculpation of non-estate fiduciaries of the kind and scope set forth in the Exculpation provision. Moreover, exculpation of the non-estate fiduciaries found in the definition of "Exculpated Parties" is justified under the circumstances in these Chapter 11 Cases. |

| | | WITHDRAWN OBJECTIONS | |
|---|---|---|---|
| 6. | The New York State Department of Taxation and Finance (the "NY Department")<br><br>[Dkt. No 660]<br><br>(the "NY Department Objection") | 1. Objects to the Plan's proposed payment of its priority tax claim of $75,911.44 without interest.<br><br>2. Asserts that the NY Department also holds a priority unsecured claim of $1,595.52 and a General Unsecured Claim of $454.04. | **\*The NY Department filed its Notice of Withdrawal on 1/15/16.  [Docket No. 671]\*** |
| 7. | Cypress-Fairbanks Independent School District and Harris County (the "Taxing Authorities")<br><br>[Docket No. 675]<br><br>(The "Taxing Authorities Objection") | 1. Alleges that the Plan currently fails to provide for Taxing Authorities' pre- and post-petition liens on their collateral, so Plan should not be confirmed until it provides for the pre- and post-petition liens to remain on their collateral until the claims (asserted in the amount of $3,256.48 for 2015 property tax claim), including interest thereon (if applicable), are paid in full. | **\*Cypress Fairbanks filed its Notice of Withdrawal on 1/20/16.  [Docket No. 688]\*** |

| INFORMAL OBJECTIONS | | | |
|---|---|---|---|
| Item No. | Party | Objection | Response |
| 8. | The United States Trustee (the "U.S. Trustee") <br><br> (The "U.S. Trustee Informal Objection") | 1. Alleges that the Plan contains an excessively broad definition of "Exculpated Parties." <br><br> 2. Alleges that Plan Arts. 6.4(d) and 13.2 are inconsistent with respect to post Effective Date reporting and should be modified to expressly provide for quarterly post-confirmation reports. <br><br> 3. Asserts that, if seeking immediate closure of dissolving Debtors' cases according to Plan Art. 6.9(d), the Confirmation Order should include proposed form order for closing those cases. <br><br> 4. Alleges that Plan Art. 8.5 should be conformed to Bankruptcy Code Sec. 502(c) and request an estimation for only unliquidated or contingent claims. <br><br> 5. Alleges that Plan Art. 9.12 may not disallow recoupment as no Code provision authorizes a plan | 1. Issue 1 is addressed in the Debtors' response to the U.S. Trustee Objection, as summarized in Item 5, above. <br><br> 2. The Debtors have agreed to add the following sentence to end of Plan Art. 13.2:  "Furthermore, following entry of the Confirmation Order the Reorganized Debtors shall continue to file quarterly reports in compliance with Bankruptcy Rule 2015(a)(5); however, such reports shall not purport to be prepared in accordance with GAAP, may not be construed as reports filed under the Securities Exchange Act of 1934, and may not be relied upon by any party for any purpose except as set forth in Bankruptcy Rule 2015(a)(5)." <br><br> 3. The Debtors have agreed to include a proposed form of order closing those cases as an exhibit to the Confirmation Order and provide for entry of the same on Certification of Counsel after the Effective Date. <br><br> 4. The Debtors have agreed to add the following clarifying language to Plan Art. 8.5:  "All estimation procedures set forth in the Plan shall be applied in accordance with section 502(c) of the Bankruptcy Code." <br><br> 5. The Debtors have agreed to modify the Recoupment provision as shown in caps below: <br> In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, |

| INFORMAL OBJECTIONS | | | |
|---|---|---|---|
| Item No. | Party | Objection | Response |
| | | impairing defenses to claims held by the Debtors. | right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless (I) such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date OR (II) SUCH HOLDER'S RIGHT TO RECOUPMENT IS PRESERVED BY APPLICABLE BANKRUPTCY LAW.<br><br>**\*The U.S. Trustee has indicated that the above resolves the U.S. Trustee Informal Objection with respect to issues 2 through 5.\*** |
| 9. | Robert Delong Touring, Inc. ("Delong")<br><br>(The "Delong Informal Objection") | 1. Alleges that Plan Art. 7.1(b) inappropriately preserves the Debtors' rights to further performance under rejected executory contracts.<br><br>2. Seeks to preserve right to file Administrative Claims.<br><br>3. Alleges that he should be authorized to amend any filed claims to reflect previously unliquidated royalty payment claims. | The Debtors have included agreed-upon language in the proposed confirmation order. See Confirmation Order.<br><br>**\*Delong has indicated that insertion of that language fully resolves the Delong Informal Objection.\*** |
| 10. | GGP Limited Partnership, Federal Realty | 1. Alleges that the Plan does not currently provide for certain rejection notice and rejection- | The Debtors have resolved issues 1 and 2 by agreeing that the Debtors will not amend the schedule of assumed contracts and leases after the confirmation hearing. If the Debtors have further |

| | | INFORMAL OBJECTIONS | |
|---|---|---|---|
| Item No. | Party | Objection | Response |
| | Investment Trust, The Macerich Company, Boulevard Invest, LLC, Regency Centers, Rouse Properties, Turnberry Associates, Jones Lang LaSalle, Heitman, and HP Investors (collectively, the "Landlords")<br><br>(The "Landlords Informal Objection") | related mechanics.<br><br>2.  Asserts that Plan Arts. 7.1(3) and 7.2(a) allow for assumption or rejection beyond the date of the Confirmation Order which the Bankruptcy Code allegedly does not permit.<br><br>3.  Asserts that Plan Arts. 9.11, 9.12, and 10.2-10.8 improperly enjoin setoff and recoupment rights with respect to the Landlords' claims that have accrued throughout the year but are not yet due. | leases to assume after the hearing and before the Effective Date, the Debtors will file a motion to assume. The Debtors will file rejection notices prior to (or on) the Effective Date for all leases the Debtors are not assuming, pursuant to the Lease Rejection Order.<br><br>This objection is pending as to issue 3. Language has been included in the proposed confirmation order which remains subject to further review and consent by the Landlords. The Debtors, the Plan Sponsor and the Landlords continue to seek a consensual resolution. |
| 11. | Pacific Employers Insurance Company | 1.  PEIC requests that the Claim Objection Deadline for PEIC extend beyond the date of the Confirmation Order since the objection to PEIC's | 1.  The Debtors have agreed to extend PEIC's deadline to respond to the claims objection to a date beyond the date of entry of the Confirmation Order. |

8

| | INFORMAL OBJECTIONS | | |
|---|---|---|---|
| **Item No.** | **Party** | **Objection** | **Response** |
| | ("PEIC") <br><br> (The "PEIC Informal Objection") | claims as duplicative is based on consolidation of the Debtors through the Plan. <br><br> 2.  PEIC requests language changes to Section 7.3 of the Plan. | 2.  The Debtors have agreed to include PEIC's proposed language modifications to Section 7.3 of the Plan. <br><br> **\*PEIC has indicated that the above fully resolve the PEIC Informal Objection.\*** |