## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :   Chapter 11
                                          :
QUIKSILVER, INC., *et al.*,               :   Case No. 15-11880 (BLS)
                                          :
                            Debtors.[1]   :   Jointly Administered
                                          :
                                          :   **Related Docket No. 711**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF STEPHEN COULOMBE, CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF CONFIRMATION OF THE PLAN OF REORGANIZATION OF THE DEBTORS

I, Stephen Coulombe, hereby declare (the "Declaration") under penalty of perjury

that the following is true to the best of my knowledge, information and belief:

1.      I am a United States citizen and reside in the Commonwealth of

Massachusetts.  I am the Chief Restructuring Officer of Quiksilver, Inc. ("ZQK"), the ultimate

parent of the other debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "Debtors") and certain other affiliates of the Debtors (the "Non-Debtor

Affiliates" and, together with the Debtors, "Quiksilver" or the "Company") and the Chief

Restructuring Officer of each of the other Debtors.  I submit this declaration in support of the

Plan of Reorganization of the Debtors (as it may be further amended, supplemented, or otherwise

modified, the "Plan"), pursuant to section 1129 of title 11 of the United States Code (the

"Bankruptcy Code").  Capitalized terms not otherwise defined herein have the meanings given to

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

them in the Plan and the Debtors' Memorandum of Law (i) in Support of Confirmation of the Plan of Reorganization of the Debtors and (ii) in Response to Objections Thereto (the "<u>Memorandum</u>").

2.      I hold an MBA from the F.W. Olin Graduate School of Business at Babson College and a Bachelor of Science in business administration from the University of Massachusetts at Amherst.  Since 2002, I have been a Senior Managing Director in the Corporate Finance/Restructuring practice at FTI Consulting, Inc. ("<u>FTI</u>").  I have 18 years of experience serving as financial advisor and providing performance improvement services to corporations, various creditor classes, equity owners, and directors of underperforming companies.

3.      FTI was retained as financial advisor to the Company in July 2015, and I was appointed Chief Restructuring Officer to the Debtors on September 1, 2015.  As a result of my tenure with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management teams, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.  Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my colleagues at FTI, or the Debtors' personnel and advisors, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors, including FTI, have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      I have been intimately involved both in the Chapter 11 Cases themselves and the Debtors' day to day business operations and financial affairs.  In my role as Chief Restructuring Officer, I am vested with a broad range of responsibilities within the Company to manage financial, legal and operational matters for the Company, including balance sheet issues, liquidity issues, negotiations with creditors, and negotiations with financing parties.

5.      I also have an understanding of the Debtors' business operations and capital structure, and the process leading to the formulation of the Plan.  I have worked, together with the Debtors' management, professionals from FTI, Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden"), Peter J. Solomon Company ("PJSC"), and other retained professionals to assist the Debtors with all aspects of their Chapter 11 Cases.  I have been personally involved with many aspects of these Chapter 11 Cases and have worked with the Debtors' management and staff in connection with these Chapter 11 Cases.

## I.      INTRODUCTION

6.      Prior to and throughout these Chapter 11 Cases, the Debtors, along with their advisors, have thoroughly analyzed alternatives for their ongoing business operations and restructuring of their financial affairs.  After careful review of the Debtors' current and prospective business operations, and estimated recoveries in liquidation scenarios, the Debtors concluded that recovery to stakeholders will be maximized by the Debtors' continuation as going concerns.  The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  According to the Liquidation Analysis in the Disclosure Statement, including in Exhibit C thereto, prepared by the Debtors with the assistance of myself and others at FTI, and other analyses prepared by the Debtors or FTI, the value of the Debtors' estates is considerably greater as a going concern than in a liquidation.  I assisted in preparing and reviewed the Debtors' Liquidation Analysis and the

3

assumptions used in determining the recovery to various constituents and, in my opinion, they are consistent with the types of assumptions and factors that would be considered in determining the liquidation of a company such as the Debtors.

7.      Accordingly, I believe the Plan to be in the best interests of the Debtors' estates and creditors and I believe it complies with the requirements of the Bankruptcy Code with respect to, among other things, feasibility and the best interests test, as those requirements have been explained to me by counsel to the Debtors.

## II.    BACKGROUND

### A.    History and Operations

8.      Quiksilver is one of the world's leading outdoor sports lifestyle companies.  The Company designs, develops and distributes branded apparel, footwear, accessories and related products.  ZQK began operations in 1976 as a California company making boardshorts for surfers in the United States under a license agreement with the *Quiksilver* brand founders in Australia.  ZQK later reincorporated in Delaware and went public in 1986. Today, the Company's business is rooted in the strong heritage and authenticity of its core, iconic brands, *Quiksilver, Roxy,* and *DC* (shown below), each of which caters to the casual, outdoor lifestyle associated with surfing, skateboarding, snowboarding, and motocross, among other activities:



The Company's products are sold in over 115 countries through a wide range of distribution points, including wholesale accounts (surf shops, skate shops, snow shops, sporting goods stores,

discount centers, specialty stores, select department stores, and licensed stores), Company-owned retail stores, and its e-commerce websites.

9.      Quiksilver's global corporate headquarters is currently located in Huntington Beach, California, and its global operational headquarters is in Saint-Jean-de-Luz, France.  The Company has four operating segments: the Americas (consisting of United States, Mexico, Brazil, and Canada), EMEA (consisting of Europe, the Middle East, and Africa), APAC (consisting of Australia, New Zealand, and the Pacific Rim, and headquartered in Torquay, Australia), and Corporate Operations.  The Debtors are corporations including the Company's ultimate parent, ZQK, as well as a number of its domestic subsidiaries, based solely in the United States and operating in the Americas segment.  The Non-Debtor Affiliates are foreign direct and indirect subsidiaries of ZQK operating solely outside of the United States; however, the Company's operations as well as its supply chain are highly integrated across the four operating segments.

10.      In fiscal year 2014 (ended October 31, 2014), 34% of the Company's revenue was generated by the Debtors, inside the United States.  The remaining 66% is attributable to the Non-Debtor Affiliates located outside the United States. The Company's business outside of the United States, conducted through the Non-Debtor Affiliates, has largely remained unaffected by these Chapter 11 Cases, which has served to preserve value on a global basis for the benefit of the Debtors and their stakeholders.

11.      The Company's operations can be divided into three segments – product design and development, production, and distribution channels.

12.      <u>Product Design and Development</u>. Quiksilver's footwear is created by its design and merchandising teams based in Huntington Beach, California, and its apparel and

accessories are created by design and merchandising teams based in Saint-Jean-De-Luz, France. The design centers monitor local, regional, and global fashion trends to develop specific product categories for each of the Company's brands. The design centers share inspiration, design concepts, merchandising themes, graphics, and style viewpoints that are globally consistent while reflecting local adaptations to account for differences in geography, culture, and taste.

13.    <u>Production</u>. Quiksilver uses a direct-sourcing model to import its products from a variety of suppliers principally located in China, South Korea, Indonesia, India, Vietnam, and other parts of Asia. Once the products are imported, some require embellishments such as screen printing, dyeing, washing or embroidery.

14.    The Company has developed solid working relationships over many years with vendors who understand its product quality and delivery standards.  There is a substantial overlap between those vendors who supply goods to the Debtors' U.S. operations, and those vendors who supply goods to the Company's global operations.  The Company generally does not enter into supply agreements with its vendors, and relies instead on individual purchase orders.  There are long production and shipping lead times for products.

15.    In addition to its direct sourcing model, the Company retains independent buying agents and employs staff to assist in the sourcing and manufacturing process. The buying agents are located primarily in China and Vietnam and assist in selecting and overseeing the majority of the Company's independent third-party manufacturing and sourcing of finished goods, fabrics, and other products. The agents monitor trade regulations and perform some quality control functions. The Company's staff, located in China, Vietnam, Indonesia, and other countries, are involved in sourcing and quality control functions that aid the Company in monitoring and coordinating overseas production. The employees help to ensure compliance

with Quiksilver's standards of manufacturing practices, including adherence with a code of conduct related to factory working conditions and the treatment of workers involved in the manufacturing process.

16.     <u>Distribution Channels</u>. Once produced, Quiksilver's products are sold in over 115 countries through wholesale customers, retail stores, and its e-commerce websites.

17.     *Wholesale customers*. Wholesale customers accounted for approximately 67% of the Company's net revenues in fiscal year 2014.  Wholesale accounts include surf shops, skate shops, snow shops, sporting goods stores, discount centers, specialty stores, online retailers, licensee shops, and select department stores. Quiksilver's products are distributed through active lifestyle specialty chains in the United States such as Zumiez, Tilly's, Famous Footwear, and Journeys, chains in Europe such as Go Sport, Intersport, and Sport 2000, and chains in the Asia/Pacific region such as City Beach and Murasaki Sports. Department stores such as Macy's in the United States, Galeries Lafayette in France, and El Corte Ingles in Spain distribute limited collections of Quiksilver's products.

18.     In the wholesale channel, the Company's products are sold in major markets by over 300 independent sales representatives and an employee sales staff, and in smaller markets by over 150 local distributors. The Company also employs retail merchandise coordinators who travel between retail locations of wholesale customers to further improve the presentation of Quiksilver's product and build its brand image at the retail level.

19.     *Retail Stores*.  Sales at Company retail stores accounted for approximately 28% of Company revenue during fiscal year 2014. The Company's retail shops include full-price

stores, factory outlet stores, and "shop-in-shops."[2] At the end of the fiscal year 2014, the

Company had approximately 266 full-price core brand stores, of which 75 are located in the

United States.  These full-price stores include a combination of its proprietary, multi-brand

Boardriders stores, as well as *Quiksilver*, *Roxy*, and *DC* brand stores that feature a broad

selection of products from its core brands, and, at times, a limited selection of products from

other brands. The proprietary design of the stores demonstrates the Company's history,

authenticity, and commitment to surfing, skating and other board-riding sports. In addition to the

core brand stores, Quiksilver operates factory outlet stores in which it offers products specifically

designed for the factory outlets, along with products from prior seasons. As of the end of fiscal

year 2014, Quiksilver had 147 factory outlet stores, of which 47 are located in the United States.

      20.    *E-Commerce Websites*. The Company operates several e-commerce

websites that sell its products throughout the world and provide online content for its customers

regarding its brands, athletes, events and the lifestyle associated with the Company's brands.

Sales on e-commerce websites accounted for approximately 5% of Company net revenue in

fiscal year 2014.

### B.    Corporate and Prepetition Capital Structure

      21.    ZQK is the direct or indirect parent company of each of the other Debtors

and Non-Debtor Affiliates.  ZQK, a Delaware corporation, is a holding company and the direct

parent of QS Wholesale, Inc. ("QS Wholesale"), a California corporation, which is in turn the

direct parent of each of the remaining Debtors.

---

[2]    The Company operates "shop-in-shops" – *Quiksilver* and *Roxy* shops primarily within larger department stores. As compared to a typical retail store, the shop-in-shops require a much smaller initial investment and are typically smaller than a traditional retail store, though they have many of the same operational characteristics. As of the end of the fiscal year 2014, the Company had approximately 270 shop-in-shops, all of which are located outside of the United States.

22.     As of the Petition Date, as further set forth below, Quiksilver had approximately $848 million of long term debt consisting of the following, each as further described below:

(a)     $92 million of debt under an asset-based revolving credit facility;

(b)     $280 million of U.S. secured notes due 2018;

(c)     $223 million of U.S. unsecured notes due 2020;

(d)     $32 million of European lines of credit[3]  and other borrowing facilities; and

(e)     $221 million of European unsecured notes due 2017.

23.     The ABL Credit Facility. On May 24, 2013, QS Wholesale entered into a secured $230 million asset-based revolving credit facility (the "ABL Facility"), pursuant to that certain Amended and Restated Credit Agreement, dated as of May 24, 2013 (as amended, amended and restated, modified, supplemented, or restated and in effect from time to time, the "ABL Credit Agreement")[4] among, inter alia, QS Wholesale, DC Shoes, QS Retail, and Hawk Designs, Inc. ("Hawk Designs") as borrowers (together, the "Domestic ABL Borrowers")[5], Quiksilver Canada Corp., Ug Manufacturing Co. Pty Ltd, and Quiksilver Japan Co., Ltd. (together, the "Foreign ABL Borrowers")[6] and other borrowers from time to time party thereto, as borrowers; several banks and other financial institutions or entities from time to time party thereto as lenders (the "ABL Lenders"); guarantors from time to time party thereto as guarantors;

---

[3]    Certain of ZQK's non-Debtor subsidiaries are borrowers on unsecured lines of credit issued by various French banks.

[4]    Any summary of an agreement in this Declaration is qualified in its entirety by the terms of that agreement.

[5]    Aggregate commitments to the Domestic Borrowers under the ABL Facility total $160 million.

[6]    Aggregate commitments to Foreign ABL Borrowers under the ABL Facility total $70 million.

and Bank of America, N.A., as administrative and co-collateral Agent ("BofA") and General

Electric Capital Corporation, as co-collateral agent (together with BofA, the "ABL Agents").

   24. The Domestic Borrowers' obligations under the ABL Credit Agreement

are (i) guaranteed by certain of the Debtors (collectively, the "Domestic ABL Guarantors"),[7] (ii)

secured by liens and security interests on substantially all of the assets of the Domestic ABL

Guarantors,[8] and (iii) secured by (a) pledges in all shares of capital stock, limited liability

company membership interests, and other equity interests held by ZQK, QS Wholesale, and DC

Shoes, (b) dividends, cash, instruments, and other property from time to time received or

distributed in respect of such interests, (c) rights and privileges with respect to such interests, and

(d) proceeds of the foregoing.

   25. The Foreign Borrowers' obligations under the ABL Credit Agreement are

(i) guaranteed by the Domestic ABL Guarantors, along with certain Non-Debtor Affiliates and (ii)

secured by liens, security interests, and/or pledges in assets of certain Non-Debtor Affiliates and

the Domestic ABL Guarantors.

   26. The ABL Facility matures in May of 2018.  As of the Petition Date,

Quiksilver had approximately $92 million outstanding under the ABL Facility comprised of $68

---

[7] Specifically, as of the Petition Date, the Domestic ABL Guarantors are ZQK, QS Wholesale, QS Retail, DC Shoes, and Hawk Designs.

[8] Note that the ABL Lenders were not granted a security interest in, among other things, (a) any leasehold interest in real property; (b) any lease, license, contract or agreement to which any grantor is a party or property rights of the grantor if the grant of a security interest constitutes or results in the abandonment, invalidation or unenforceability of the right or a breach, termination or default under the lease, license, contract, agreement or property right; (c) any lease, license, contract or agreement to which any grantor is a party or property right of such grantor to the extent that any applicable law prohibits the creation of a security interest thereon; (d) any application for trademarks and service marks filed in the Patent and Trademark Office; (e) any motor vehicles owned or any other assets subject to certificates of title, to the extent that a security interest therein cannot be perfected by the filing of a financing statement; (f) letter-of-credit rights, to the extent that a security interest therein cannot be perfected by the filing of a financing statement; (g) commercial tort claims of a grantor where the amount of damages claimed by the grantor is less than $1,000,000; and (h) certain equity interests.

million on account of Domestic ABL Borrowers and Guarantors and $24 million on account of Foreign ABL Borrowers and Guarantors.

27.    The U.S. Notes:  Secured Notes Due 2018 and Unsecured Notes Due 2020. Pursuant to an Indenture dated July 16, 2013, among, inter alia, U.S. Bank National Association ("U.S. Bank") as trustee and collateral agent, and the U.S. Notes Obligors (as defined below), ZQK and QS Wholesale (together, the "U.S. Notes Issuers") issued $280 million aggregate principal amount of 7.875% senior secured notes with a maturity date of August 1, 2018 (the "U.S. Secured Notes") and $225 million aggregate principal amount of 10.000% senior unsecured notes with a maturity date of August 1, 2020 (the "U.S. Unsecured Notes," and together with the U.S. Secured Notes, the "U.S. Notes").

28.    The U.S. Notes were issued as part of an exchange offer, and the net proceeds of the offering were used to (a) redeem all of the then-outstanding 6.875% notes due April 15, 2015, (b) repay in full and terminate the Company's existing term loan, and (c) pay down a portion of the outstanding amounts owed under the ABL Facility.

29.    The U.S. Notes are guaranteed by DC Shoes, Hawk Designs, and QS Retail (the "U.S. Notes Guarantors" and together with the U.S. Notes Issuers, the "U.S. Notes Obligors").  In addition, the U.S. Secured Notes are secured by liens, security interests, and/or pledges in (i) substantially all of the assets of the U.S. Notes Obligors,[9] (ii) all shares of capital stock, limited liability company membership interests, and other equity interests held by ZQK, QS Wholesale, and DC Shoes (the "Secured Notes Pledgors") in each of the Debtors, other than

---

[9]    The collateral securing the outstanding obligations under the U.S. Secured Notes does not include property listed in parts (a) through (h) of supra note 8. In addition, the collateral securing obligations under the U.S. Secured Notes does not include (i) any asset for which the costs of providing a security interest in such asset or perfection thereof is excessive in view of the benefits to be obtained and (j) assets located outside of the United States to the extent  a lien on such assets cannot be perfected by the filing of UCC financing statements in the jurisdiction of organization of the applicable grantor.

ZQK, (iii) all non-voting equity interests and 65% of all voting equity interests of the Secured

Notes Pledgors in Mountain & Wave S.a.r.l. ("Mountain and Wave"), a non-Debtor foreign

subsidiary, and (iv) all dividends, cash, instruments, and other property from time to time

received or distributed in respect of the interests described in (ii) and (iii), and (v) proceeds of the

foregoing.[10] Mountain and Wave is a holding company which owns, directly or indirectly, all of

the other Non-Debtor Affiliates.

30.     BofA, as an ABL Agent, together with U.S. Bank, as collateral agent for

the U.S. Secured Notes, entered into the Second Amended and Restated Intercreditor Agreement,

dated as of July 16, 2013 (the "Intercreditor Agreement").  Pursuant to the Intercreditor

Agreement, to the extent that the collateral securing obligations under the U.S. Secured Notes

also secures the borrowers' obligations under the ABL Facility, the U.S. Secured Notes are

secured by (i) a second-priority security interest, behind the ABL Lenders, in the current assets

of the U.S. Notes Obligors, together with all general intangibles (excluding intellectual property

rights) and other property related to such assets, including proceeds, and (ii) (a) a first-priority

security interest, ahead of the ABL Lenders, in substantially all other property (including

intellectual property rights) of the U.S. Notes Obligors and (b) a pledge, ahead of the ABL

Lenders, of 100% of the equity interests of certain subsidiaries directly owned by the U.S. Notes

Obligors (but excluding the equity interests in certain foreign subsidiaries) and proceeds of the

foregoing.

---

[10]    The collateral pledged in favor of the holders of the U.S. Secured Notes does not include certain equity interests
in foreign subsidiaries.

31.    As of the Petition Date, the U.S. Secured Notes had an outstanding principal balance of approximately $280 million and the U.S. Unsecured Notes had an outstanding principal balance of approximately $223 million.

32.    <u>European Line of Credit</u>.  On October 31, 2013, non-Debtor foreign subsidiaries of ZQK, Na Pali S.A.S. ("<u>Na Pali</u>"), Emerald Coast S.A.S., Kauai GmBH, Lanai Ltd., and Sumbawa SL (collectively, the "<u>EMEA Subsidiaries</u>") entered into a €60 million agreement with Eurofactor, a French financial institution (the "<u>Eurofactor Agreement</u>"), pursuant to which Eurofactor agreed to provide financing secured by the EMEA Subsidiaries' trade receivables that meet certain eligibility criteria.  In addition, Na Pali agreed to transfer certain existing credit insurance policies to Eurofactor. Na Pali is jointly and severally liable for the obligations of the other EMEA Subsidiaries' obligations under the Eurofactor Agreement.  The EMEA Subsidiaries (other than Na Pali) are jointly and severally liable, up to an aggregate amount of €20 million, for the obligations of the other EMEA Subsidiaries. The Eurofactor Agreement does not contain any financial covenants.  The Eurofactor Agreement has an initial term of three years and is automatically extended for an indefinite period of time until terminated by either party.  Na Pali may terminate the Eurofactor Agreement at any time during the initial three year term.

33.    The Eurofactor Agreement matured in October of 2015.  As of the Petition Date, the EMEA Subsidiaries had approximately $30 million outstanding under the Eurofactor Agreement.

34.    <u>The Euro Notes: Unsecured Notes Due 2017</u>.  Pursuant to an Indenture dated December 10, 2010, among, <u>inter</u> <u>alia</u>, the Euro Notes Guarantors (as defined below), Deutsche Trustee Company Limited, as trustee, Deutsche Bank Luxembourg S.A., as registrar

13

and transfer agent, and Deutsche Bank AG, London Branch, as principal paying agent and common depositary, Boardriders S.A., a non-Debtor foreign affiliate, issued €200 million aggregate principal amount of 8.875% senior notes with a maturity date of December 15, 2017 (the "Euro Notes").  The proceeds from the notes offering were used to refinance approximately €190 million of existing European term debt and to pay related fees and expenses.  The obligations of Boardriders S.A. under the Euro Notes are guaranteed by Debtors ZQK, Hawk Designs, QS Retail, DC Shoes, QS Wholesale, and certain Non-Debtor Affiliates (the "Euro Notes Guarantors").

35.    As of the Petition Date, the Euro Notes had an outstanding principal balance of approximately $221 million.  Prior to filing, the Debtors, with Oaktree's cooperation, were able to negotiate with and obtain consent from holders of a majority of the Euro Notes to waive the default resulting from filing of the Chapter 11 Cases (the "Euro Notes Waiver").  Such waiver is an important component of the Debtors' efforts to preserve value in EMEA and APAC for the benefit of United States creditors during this chapter 11 process.

C.    Certain Events Preceding the Chapter 11 Filing

36.    As detailed in its public filings, the Company has been in the midst of an operational turnaround since 2013.  Since then, the Company has suffered from a lack of adequate liquidity exacerbated by underperforming retail stores and late deliveries of product to wholesale customers.  The Company's weakened performance during the turnaround period caused further contraction of trade liquidity, and the Company was required to hasten its efforts. Since the spring of 2015, the Company explored a range of alternatives to loosen liquidity in order to allow the operational turnaround initiatives to take hold, but those efforts did not result in an actionable transaction.  In light of these issues and the generally over-leveraged state of the

Company, Quiksilver retained restructuring advisors and began exploring all of its strategic alternatives.

37.    Among other things, following preliminary due diligence, certain of the Debtors' restructuring advisors recommended that the Company explore a global refinancing of existing indebtedness.  The purpose of the global refinancing was to supplement the Company's liquidity and address the maturity of the Euro Notes due December 15, 2017.  Certain of the Debtors' restructuring advisors initiated contact with parties interested in refinancing the Euro Notes and supplemented the process with outreach to well-recognized second lien lenders to explore the possibility of providing further advances under the borrowing base collateral within the existing ABL Facility.  Ultimately, as negotiations evolved with respect to refinancing the Euro Notes, certain funds managed by affiliates of Oaktree Capital Management, L.P. (collectively, "Oaktree") committed a significant level of internal and external professional resources to the process and engaged in a deep level of due diligence with management in multiple Company offices worldwide.

38.    In mid-August 2015, Oaktree advised the Company that it was prepared to execute a refinancing transaction but only if all of the Company's global intellectual property and brands was among the collateral securing such financing.  Unfortunately, the covenants underlying the Company's existing indebtedness made such a refinancing impracticable, absent the ability to restructure such indebtedness available in chapter 11.  As a consequence, the Company immediately engaged with Oaktree regarding the possibility of executing the refinancing and restructuring transaction in the context of a chapter 11 case, as a continuation of the parallel contingency planning efforts that the Company had begun in July 2015.  Those negotiations culminated in the Plan Sponsor Agreement among Quiksilver and Oaktree (the

15

"Plan Sponsor Agreement"), dated as of September 8, 2015, and the DIP Financing described below.

### D.    Significant Events During the Chapter 11 Cases

39.    On September 9, 2015 (the "Petition Date"), each of the Debtors commenced Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware to effectuate the transactions contemplated by the Plan Sponsor Agreement and DIP Financing. On the Petition Date, among other things, the Debtors filed a motion seeking Court authorization to enter into DIP ABL Facility and the DIP Term Loan Facility (the "DIP Facilities" and the financing thereunder, the "DIP Financing"). The Court entered an order authorizing the Debtors to obtain DIP Financing of up to $130 million, on an interim basis, on September 11, 2015 [Docket No. 76] and of the full $175 million, on a final basis, on October 28, 2015 [Docket No. 382].

40.    In addition, on the Petition Date, the Debtors filed a motion seeking Court approval for the assumption of the Plan Sponsor Agreement, and on October 28, 2015, the Court entered an order granting such motion [Docket No. 377].

41.    On September 22, 2015, the Office of the United States Trustee for the District of Delaware (the "United States Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On September 28, 2015, the United States Trustee filed an Amended Notice of Appointment of Creditors' Committee.

42.    During this time, the Debtors worked with Oaktree, the DIP Lenders, and the Creditors' Committee to ensure that the Plan and the Disclosure Statement were in form and substance reasonably acceptable to these key constituencies. Throughout the period following the Petition Date, the Debtors continued discussions with the Creditors' Committee in an effort to address its concerns regarding the Plan and Disclosure Statement.

43.     Concurrently with the chapter 11 process, the Debtors, with the help of their advisors, continued to seek to maximize recoveries for the estates and their stakeholders by conducting a sale process for all or substantially all of the Debtors' assets.  Specifically, PJSC launched an extensive marketing process beginning in September 2015 and approached 85 parties (including both potential strategic and financial buyers and certain additional interested parties suggested to the Debtors by advisors to the Creditors' Committee) regarding a sale of a substantial portion of or all of the Debtors' businesses.  Of those parties, nine signed non-disclosure agreements and conducted diligence on the Debtor.  No parties conducted site visits, nor did any parties request meetings with management.  Although diligence was conducted by some such parties, no party submitted a bid by the November 30, 2015 deadline, nor has any party expressed any interest in submitting a bid following the November 30, 2015 bid deadline.

44.     The Debtors and their advisors worked together with the Creditors' Committee and its advisors with respect to each stage of the sale process.  PJT Partners (the financial advisors to the Creditors' Committee) reviewed and provided comments to the bid letter that was distributed to potential bidders, suggested additional potential bidders to approach, engaged in discussions directly with potential bidders, and received weekly updates from PJSC regarding the status of the marketing process.  Unfortunately, despite the diligent efforts of all parties and their advisors, the sale process failed to produce any competing bids or transaction proposals which would increase recoveries to all stakeholders above and beyond has been proposed by the Debtors and Oaktree with the Plan.

45.     On October 13, 2015, the Debtors filed the Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and Its Affiliated Debtors and Debtors In Possession [Docket No. 292], which was consistent with the terms included in the Plan Sponsor Agreement.  This

initial Plan was subsequently amended as set forth in the First Amended Plan [Docket No. 476], filed on November 17, 2015, and the proposed Second Amended Plan [Docket No. 532], filed on December 4, 2015.  The Debtors intend to submit a further amended plan (the "Third Amended Plan") prior to the commencement of the scheduled Confirmation Hearing.

46.     On October 30, 2015, the Debtors filed a Disclosure Statement With Respect To The Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession [Docket No. 396], which was amended by the Disclosure Statement with respect to the First Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors-in-Possession [Docket No. 477], filed on November 17, 2015, and the Second Amended Disclosure Statement with Respect to the Second Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession [Docket No. 533], filed on December 4, 2015 (the "Disclosure Statement").

47.     On October 31, 2015, the Debtors filed a motion for approval of the Backstop Commitment Letter with the Plan Sponsor and procedures for the conduct of the Rights Offerings (the "Backstop and Rights Offering Motion").

48.     On November 17, 2015, the Debtors amended the procedures for conduct of the Rights Offerings ("Rights Offering Procedures").  On December 4, 2015, the Court entered (i) an order [Docket No. 530] (the "Backstop and Rights Offering Approval Order") approving the Backstop Commitment Letter and the Rights Offering Procedures, each as attached thereto and (ii) an order [Docket No. 529] (the "Disclosure Statement Order") that, among other things, (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, (b)

approved solicitation procedures (the "Solicitation Procedures") and notice procedures with respect to confirmation of the Debtors' proposed Plan, (c) approved the form of various ballots and notices in connection therewith, and (d) fixed certain dates with respect thereto.  The Debtors began their solicitation of votes of acceptance of the Plan shortly thereafter.

## III.   OVERVIEW OF THE DEBTORS' CHAPTER 11 PLAN

49.   The Plan is supported by Oaktree as Plan Sponsor under the Plan Sponsor Agreement, and by the Backstop Parties under the Backstop Commitment Letter.  The foundation for the Plan is the proposed conversion of the Prepetition Secured Notes into equity of the Reorganized Debtors pursuant to the Plan Sponsor Agreement with Oaktree. That debt to equity conversion and related transactions significantly de-lever the Debtors' balance sheet.

50.   The Plan provides for the following key economic terms and mechanics: [11]

- Issuance of New Common Stock, Limited Liability Company Membership Units or Functional Equivalent Thereof.  On the Effective Date, Reorganized Quiksilver will authorize and issue the New Quiksilver Common Stock, which may consist of new common stock, limited liability company membership units, or functional equivalent thereof, as applicable.  Shares of New Quiksilver Common Stock will distributed on a fully diluted basis (excluding any further dilution attributable to the MIP and assuming that the Euro Notes Exchange Offer (described in more detail below) is not consummated) as follows: (a) first, 22% to holders of Allowed Secured Notes Claims; (b) second, up to 74% to Rights Offering Participants under the Rights Offerings; and (c) third, 4% to the Backstop Parties under the Backstop Commitment Letter. If the Euro Notes Exchange Offer is not consummated pursuant to its terms, then the value of the New Quiksilver Common Stock as of the Effective Date will be approximately $221 million.

- Cancellation of Old Quiksilver Securities and Agreements.  Except with respect to the Euro Notes Guaranty Claims (addressed below) or as otherwise provided in the Plan, on the Effective Date, the Old Quiksilver Securities, which includes the Secured Notes, the Unsecured Notes, and the Old Quiksilver Common Stock, along with any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership

---

[11]   Any summaries or descriptions of the Plan contained herein are qualified in their entirety by reference to the provisions of the Plan.

interest in the Debtors (including the Indentures), shall be cancelled, and any obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to the foregoing, other than the Euro Notes, shall be released and discharged and cancelled.

- Euro Notes Guaranty Claims:   The Euro Notes Guaranty Claims shall be Reinstated and the Holders of such Claims shall be Unimpaired.

- Exit Financing.   On the Effective Date, the Reorganized Debtors, as borrowers, will enter into the Exit Revolver Facility, an asset-based revolving credit facility in the principal amount of up to $140 million pursuant to a new credit agreement with the Exit Revolver Lenders, which may include the DIP Lenders. In addition, the Reorganized Debtors as borrowers, may enter into an Exit Term Loan Facility, a delayed draw term loan credit facility in a principal amount of up to $50 million pursuant to a new credit agreement with the Exit Term Loan Lenders. The proceeds of the Exit Facilities will fund (1) first, distributions under the Plan on account of the DIP ABL Facility Claims and (2) second, distributions under the Plan on account of DIP Term Facility Claims.[12]

- Exit Rights Offering.   Each Eligible Holder of an Allowed Unsecured Note Claim, or its affiliated Eligible Affiliate, will have the right to exercise subscription rights for the purchase of up to $12.5 million of New Quiksilver Common Stock. In addition, each Eligible Holder of an Allowed Secured Notes Claim, or its affiliated Eligible Affiliate, will have the right to exercise subscription rights for the purchase of up to $115 million of New Quiksilver Common Stock. The proceeds of the Exit Rights Offering, which shall be $127.5 million in the aggregate, will be used to fund (1) first, distributions under the Plan on account of DIP Term Loan Facility Claims, (2) second, the Unsecured Cash Consideration of $12.5 million, and (3) third, any payments required on the Effective Date under the Plan. The Exit Rights Offering will run concurrently with solicitation on the Plan and will be consummated on the Effective Date.  The Exit Rights Offering is backstopped by the Backstop Parties up to $127.5 million to the extent set forth in the Backstop Commitment Letter.

- Unsecured Cash Consideration.   The proceeds of the Exit Rights Offering will be used, in part, to fund the Unsecured Cash Consideration of $12.5 million. The Unsecured Cash Consideration will fund recoveries to Holders of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims.   Secured

---

[12]   The Plan Supplement and the latest filed version of the Plan provide for the Exit Facilities described above and amend the prior version of the Plan which provided for a $120 million revolving credit facility.  The Debtors, in consultation with the Plan Sponsor, believe the combined Exit Revolver Facility and Exit Term Loan Facility will better address the Debtors' liquidity needs upon emergence.

Noteholders shall be deemed to have waived, and not be entitled to any distribution under the Plan on account of, their Secured Notes Deficiency Claim.[13]

- Euro Notes Exchange Offer.

  - The Company will proffer an exchange offer to Holders of Euro Notes, the terms and conditions of which will be communicated to such Holders. The Euro Notes Exchange Offer will be consummated on the Effective Date to the extent the conditions precedent to such exchange offer are met.

  - Assuming the Euro Notes Exchange Offer is fully consummated, New Quiksilver Common Stock will be distributed as follows, on a fully diluted basis (excluding any further dilution attributable to the MIP): (a) first, 17% to Holders of Allowed Secured Notes Claims; (b) second, up to 80% to Rights Offering Participants under the Rights Offerings; and (c) third, 3% to the Backstop Parties under the Backstop Commitment Letter.[14]

- Euro Notes Rights Offering. Each Eligible Holder of an Allowed Secured Notes Claim, or its affiliated Eligible Affiliate, will have the right to exercise subscription rights for the purchase of up to €50.0 million of New Quiksilver Common Stock, the proceeds of which will be used to consummate the Euro Notes Exchange Offer. The Euro Notes Rights Offering will be consummated on the Effective Date. The Euro Notes Rights Offering is backstopped by the Backstop Parties up to €50 million to the extent set forth in the Backstop Commitment Letter.

51.    The Plan is the product of extensive negotiations between the Debtors and the key parties in interest. The Debtors proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the recovery to Claim and Equity Interest Holders under the circumstances of these Chapter 11 Cases.

---

[13]    The waiver shall be effective only in respect of the Plan, and the Secured Noteholders reserve their rights to assert, or otherwise receive a distribution on account of, their Secured Notes Deficiency Claims in respect of any other chapter 11 plan filed in the Chapter 11 Cases.

[14]    As of the Effective Date, the anticipated value of the New Quiksilver Common Stock will be approximately $276 million, assuming the Euro Notes Exchange Offer is fully consummated.

## IV.    SOLICITATION AND ACCEPTANCE OF THE PLAN

52.    I understand that after entry of the Disclosure Statement Order, and under my direction and based on the declaration of service dated December 15, 2015 [Docket No. 569] executed by Kurtzman Carson Consultants, LLC ("KCC"), the Debtors and their agents transmitted solicitation packages containing notice of the Confirmation Hearing (the "Confirmation Hearing Notice"), a ballot and return envelope (such ballot and envelope being referred to as a "Ballot"), a CD-ROM containing the Disclosure Statement, the Plan, the Disclosure Statement Order, and the Solicitation Procedures (collectively, the "Solicitation Packages") to Classes 4, 5-A, and 5-B (collectively, the "Voting Classes"), in accordance with Bankruptcy Rule 3017(d) and the Solicitation Procedures Order—all as set forth in the Declaration of Michael J. Hill Regarding Analysis of Ballots for Accepting or Rejecting Second Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession (the "Voting Certification"), filed concurrently herewith. Additionally, the Confirmation Hearing Notice was transmitted to the Unimpaired Holders of Claims or Interests (as applicable) in Classes 1, 2, 3, 6 and 7 and to the Holders of Claims or Interests (as applicable) in Classes 8 and 9, together with notices of nonvoting status in lieu of Ballots. I understand that the Solicitation Packages and additional notice materials were distributed on or prior to December 9, 2015, and in accordance with the Bankruptcy Court's instructions, allowing for more than twenty-eight (28) days from service until the voting and objection deadline. Additionally, the Debtors published the Confirmation Hearing Notice on December 9, 2015, in the New York Times (national edition), the Los Angeles Times, and the Orange County Register and, on December 10, 2015, in the New York Times (international edition), each as evidenced by the affidavit of publication filed by KCC on December 17, 2015 [Docket No. 577].

53.    I understand based on the Voting Certification that following distribution of the Solicitation Packages and the publication of the Confirmation Hearing Notice, the Classes of Holders of Secured Notes Claims and, as to all of the Debtors but QS Wholesale, Inc., General Unsecured Claims have voted or been deemed to have voted in favor of the Plan. I further understand that as to each respective Class, Holders of Unsecured Notes Claims voted to reject the plan.  In addition, I understand Holders of Class 5-B General Unsecured Claims at Debtor QS Wholesale, Inc. voted to reject the plan based on amount, but not numerosity.[15] Note that because no creditors in Class 5-B with respect to Debtors DC Direct, Inc., Fidra, Inc., Hawk Designs, Inc., Mt. Waimea, Inc., QS Optics, Inc., Quiksilver Entertainment, Inc., and Quiksilver Wetsuits, Inc. voted on the Plan, such Classes are deemed to have accepted the Plan.

54.    The Debtors and their respective directors, officers, employees, agents, members and professionals, as applicable, have acted in good faith in connection with the solicitation of the Plan.

## V.    PRIMARY TERMS OF THE PLAN

### A.    Designation and Treatment of Classes of Claims and Interests

55.    The Plan separately classifies Claims and Interests, and each of the Claims and Interests within a particular Class is substantially similar to the other Claims and Equity Interests in the respective Class.  Administrative Claims, including DIP Claims and Professional Claims, and Tax Priority Claims have not been classified, as Debtors' counsel has informed me is appropriate under section 1123(a)(1) of the Bankruptcy Code.

---

[15]    I understand that no ballots were cast for certain of the Inactive Debtors.  As discussed further below, the Inactive Debtors will be dissolved upon the Effective Date pursuant to the Plan.

56.     Based on the information provided to me by counsel, the Claims and Equity Interests have been properly classified.  I understand that the Plan divides Claims into various classes based upon their nature, and there are valid business reasons for such classifications. The classification scheme is reasonably related to the different legal or factual nature of each Class. Class 1 Other Priority Claims are classified separately due to their required treatment under the Bankruptcy Code.  Classes 2 and 4 contain claims relating to the Debtors' secured debt and are classified separately from unsecured debt in Classes 3, 5-A, 5-B, 6 and 8. The Classes of Secured Claims are divided based upon the collateral securing such Claims.  The Debtors' unsecured creditors' claims are divided between Euro Notes Guaranty Claims in Class 3, Unsecured Notes Claims in Class 5-A, General Unsecured Claims in Class 5-B, Intercompany Claims in Class 6, and Subordinated Claims in Class 8.  The Euro Notes Guaranty Claims and Unsecured Notes Claims are classified separately from each other based on the different obligors under and terms of the underlying debt instruments and are also separately classified from other general unsecured claims based upon the governing debt instruments.  Finally, Intercompany Interests are separately classified in Class 7 and Interests in Quiksilver are in Class 9.

57.     It is my understanding that Claims or Interests, as applicable, in Classes 1, 2, 3, 6, and 7 (the "Unimpaired Classes") are considered Unimpaired under the Plan.  Claims in Classes 4, 5-A, 5-B, 8 and 9 (the "Impaired Classes") are considered impaired under the Plan.

58.     Classes 8 and 9 were not entitled to vote on the Plan because such Holders may, at the election of the Debtors, receive no distribution under the Plan on account of such Claims and Interests and, accordingly, are conclusively presumed to have rejected the Plan.

59.     The treatment of each Claim or Interest within a Class is the same as the treatment of each other Claim or Interest in such Class (or, for Unimpaired Classes, will likewise

result in the creditor being unimpaired), unless the Holder of a Claim or Interest agrees to less favorable treatment on account of its Claim or Interest.  I believe, again based on information from counsel, and my experience and business judgment, that such treatment is proper.

### B.    Adequate Means for Implementation of the Plan

60.    Article VI of the Plan, entitled "Means for Implementation of the Plan," sets forth numerous provisions to facilitate implementation of the Plan. Among other things, the Plan provides for the issuance and distribution of the New Quiksilver Common Stock.

61.    Article VI of the Plan sets forth numerous provisions to facilitate implementation of the Plan.  Those provisions relate to, among other things: (a) substantive consolidation of the Debtors for distribution purposes; (b) the sources of funding for the Plan, including the Exit Facilities, the Rights Offerings, the Backstop Commitments, and the waiver of the Secured Notes Deficiency Claim; (c)  the cancellation of the Secured Notes, the Unsecured Notes and the Old Quiksilver Common Stock; (d) the issuance of the New Quiksilver Common Stock; (e) the issuance of new securities, notes, instruments and other documents; (f) the Reorganized Debtors' exemption from Securities Act registration requirements; (g) the continued corporate existence of the Debtors (other than the Inactive Debtors); (h) the dissolution of Inactive Debtors; (i) the adoption of the New Corporate Governance Documents; (j) the appointment of directors to the boards of each of the Reorganized Debtors (if applicable); (k) the assumption or rejection of employment agreements, the continuation or implementation of retirement income plans, incentive plans and other plans, policies, or agreements for the Reorganized Debtors' directors, officers, and employees, and the implementation of the MIP; (l) preservation of causes of action; and (m) the undertaking of such restructuring transactions as may be necessary to effectuate the foregoing.

62.    In conclusion, I understand and believe that Article VI of the Plan and various other provisions of the Plan and related documents provide adequate means for the Plan's implementation.

## C.    Treatment of Executory Contracts and Unexpired Leases

63.    The Debtors have exercised reasonable business judgment in identifying the executory contracts and unexpired leases to be assumed and rejected pursuant to the Plan. Article VII of the Plan provides that the Debtors will be deemed to have automatically rejected all Executory Contracts and Unexpired Leases unless any such Executory Contract or Unexpired Lease: (i) is listed on the Schedule of Assumed Executory Contracts and Unexpired Leases contained in the Plan Supplement; (ii) previously has been assumed or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume or reject pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms of the Plan.  Each Executory Contract and Unexpired Lease listed on the Schedule of Assumed Executory Contracts and Unexpired Leases shall be assumed, or assumed and assigned, as applicable, and shall vest in and be fully enforceable by the Reorganized Debtors or its assignee in accordance with its terms, except as modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  I have been involved in identifying the executory contracts and unexpired leases that the Debtors have identified for assumption, which I believe will continue to be necessary to the Reorganized Debtors' business operations after the Effective Date.  By contrast, I believe that the executory contracts and unexpired leases that the Debtors seek to reject include only agreements which provide little or no value to the Debtors' ongoing business operations.

26

D.    **Cure of Defaults**

64.    Article VII of the Plan provides procedures for determining Cure with respect to assumed Executory Contracts and Unexpired Leases.  The Debtors have sent Cure Notices to all counterparties to Executory Contracts and Unexpired Leases included on the Schedule of Assumed Executory Contracts and Unexpired Leases contained in the Plan Supplement, as filed on January 7, 2016 and as the Debtors intend to amend before the Confirmation Hearing.  As of the date hereof, the deadline for filing objections to Cure has not yet elapsed.

65.    I believe that the Cure set forth in the Cure Notice (as amended) should be approved as the requisite Cure with respect to the Executory Contracts included therein (unless otherwise agreed between the Debtors or the Reorganized Debtors, as applicable, and the contract counterparty) for all Executory Contracts and Unexpired Leases for which no objection to Cure is filed by the applicable objection deadline.  For those Executory Contracts and Unexpired Leases for which an objection is filed by the applicable objection deadline, I believe that Cure should be (i) the amount agreed to between the Debtors, with the consent of the Plan Sponsor, or Reorganized Debtors, as applicable, and the applicable counterparty, or, (ii) to the extent the Debtors or Reorganized Debtors and counterparty do not reach an agreement regarding any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues.

E.    **Dissolution of Inactive Debtors and Closing of Inactive Debtor Chapter 11 Cases**

66.    Article 6.9(d) of the Plan provides that, on the Effective Date, pursuant to the Final Decree Order, the Inactive Debtors shall be dissolved. The Debtors intend to modify the Plan to further provide that, upon the Effective Date, the Chapter 11 Cases of the Inactive

Debtors shall be closed.   I understand that the Inactive Debtors have no assets or operations and that there are no valid claims against those entities.

67.    A form of the Inactive Debtor Final Decree is attached to the proposed Confirmation Order as Exhibit C.  I believe that dissolution of the Inactive Debtors, entry of  the Inactive Debtor Final Decree, and the closing of the Chapter 11 Cases of the Inactive Debtors is in the best interest of all of the Debtors' estates and creditors, as it will provide the Debtors with a streamlined organizational structure upon emergence and minimize the administrative costs associated with the Chapter 11 Cases, thereby maximizing recoveries. As explained to me by Debtors' counsel, the proposed closing of the Chapter 11 Cases of the Inactive Debtors is primarily procedural and will not prejudice any party.

**F.    The Releases and Injunctions Are Fair and Necessary**

68.    The releases set forth in Sections 10.4 and 10.5 of the Plan – including the releases  by the Debtors and by certain third parties – and the exculpation provisions and the indemnification obligations set forth in Sections 10.6 and 10.7 of the Plan are, individually and collectively, integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan.  These provisions are intended to comply with applicable law and were important to the consensual negotiation and development of the Plan.

69.    <u>The Debtor Release</u>.  Pursuant to Article 10.4 of the Plan (the "<u>Debtor Release</u>"), the Debtors and their Estates, the Reorganized Debtors, and each of their respective current and former Affiliates release the Released Parties from any and all Claims or Causes of Action they may have as of the Effective Date of the Plan.

70.    I understand that the Released Parties include (a) the Debtors, (b) the Reorganized Debtors, (c) the DIP Agents, (d) the DIP Lenders, (e) the Backstop Parties, (f) the Plan Sponsor, (g) the Creditors' Committee and each of its members, (h) the Secured Notes

28

Agent, and (i) with respect to each of the above-named Entities described in subsections (a)
through (h), such Entity's respective predecessors, successors and assigns, and current and
former stockholders, members, limited partners, general partners, equity holders, Affiliates and
its and their subsidiaries, principals, partners, managed funds, parents, equity holders, members,
employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors,
attorneys, financial advisors, accountants, investment bankers, and consultants.

   71. The releases in Article 10.4 of the Plan are proposed by the Debtors in the
exercise of their business judgment belief that pursuing Claims, if any, against the Released
Parties would not be in the best interest of the Debtors' various stakeholders because the costs
involved would likely outweigh any potential benefit from pursuing such Claims.  Moreover,
most of the Released Parties were integral to the development of the Plan and expected a release
in exchange for their contributions to the Estates.  Accordingly, the Debtor Release is an integral
component of the consensual Plan process, and no constructive purpose would be served by
preserving or seeking to prosecute any of the Claims, Causes of Action, or liabilities against the
Released Parties that are released under the Plan.  Moreover, I understand that no party has
objected to the Debtor Release.  Accordingly, I believe that the Debtor Release is appropriate
and should be approved.

   72. <u>The Third Party Releases</u>.  Pursuant to Article 10.5 of the Plan (the "<u>Third
Party Releases</u>"), (a) the Released Parties, (b) all Holders of Claims and Interests that are deemed
to accept the Plan, (c) each Holder of a Claim voting to accept the Plan or abstaining from voting
to accept or reject the Plan, unless such Holder elects to opt out of the releases contained in
Article 10.5 by checking the box on its timely submitted ballot, and (d) with respect to each of
the foregoing Entities in subparts (b) through (c), their respective current and former officers,

directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (each, a "Releasing Party"), release the Released Parties from any and all Claims or Causes of Action they may have as of the Effective Date of the Plan.

73.    The Third Party Releases are consensual, as they apply only to a Holder of a Claim voting to accept the Plan or abstaining from voting to accept or reject the Plan, unless such Holder elects to opt out of the Third Party Releases by checking the box on its timely submitted applicable ballot. I have been informed by counsel for the Debtors that courts in this circuit consistently have approved consensual third-party releases of similar scope. Further, interested parties have received sufficient notice of the releases and did not object. Accordingly, I believe that the Third Party Releases are appropriate and should be approved.

74.    Exculpation. Article 10.6 of the Plan (the "Exculpation") provides that the Exculpated Parties shall neither have, nor incur any liability to any Entity for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

75.    I understand that the Exculpated Parties include: (a) the Debtors, (b) the Reorganized Debtors, (c) the Backstop Parties, (d) the Plan Sponsor, (e) the DIP Lenders, (f) the DIP Agents, (g) the Creditors' Committee and each of its members, (h) the Secured Notes Agent, and (i) with respect to each of the above-named Entities described in subsections (a) through (h), such Entity's respective predecessors, successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, managed funds, parents, equity holders, members,

employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants.

76.    Debtors' counsel has explained to me that the exculpation provisions do not affect the liability of third parties per se, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.

77.    I believe that the Exculpated Parties have participated in good faith in formulating and negotiating the Plan, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled Holders of Claims or Interests or other unsatisfied parties.  I believe the promise of exculpation played a significant role in facilitating Plan negotiations.  The Exculpated parties, especially Oaktree in its role as Plan Sponsor, DIP Lender, and Backstop Party, each played a key role in developing and supporting the Plan that has paved the way for a successful reorganization of the Debtors, and I believe they likely would not have been so inclined to participate in the plan process without the promise of exculpation.  Specifically, Oaktree, in its role as Backstop Party, Plan Sponsor, and DIP Lender has contributed the funding and the support necessary for the Company to undertake the restructuring transactions set forth in the Plan, for the benefit of the Debtors' estates and all stakeholders through (i) its commitments as Plan Sponsor and Backstop Party under the Plan Sponsor Agreement and the Backstop Agreement, respectively, to support the Debtors' restructuring by, among other things, fully backstopping the issuance of new shares in the Reorganized Debtors, (ii) its role as DIP Lender, providing much-needed liquidity to the Debtors in order to permit the Debtors to continue their businesses in the ordinary course during these Chapter 11 Cases, (iii) its facilitation of the Euro Notes Waiver, and (iv) its agreement to waive recoveries on its deficiency claims under the Plan,

without which General Unsecured Creditors would receive substantially smaller recoveries, thereby paving the way for the Debtors to achieve a successful restructuring and maximize value for the benefit of their stakeholders.  I believe exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.

78.    Injunction.  Article 10.8 of the Plan (the "Injunction") provides that the satisfaction, release, and discharge pursuant to Article X of the Plan shall act as an injunction, from and after the Effective Date, against any Entity (a) commencing or continuing in any manner or in any place, any action, employment of process, or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors, except as set forth in Article 9.11 or 9.12 of the Plan, in each case with respect to any Claim, Interest, or Cause of Action satisfied, released or to be released, exculpated or to be exculpated, or discharged under the Plan or pursuant to the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 and 1141 thereof; provided, however, that nothing contained in this section shall preclude such Entities from exercising their rights pursuant to and consistent with the terms of the Plan or this Confirmation Order; and provided further, however, that nothing contained in this section shall preclude the DIP Agents from exercising any appropriate remedies in connection with any Excluded DIP Obligations.

79.    I understand that the Injunction provision is necessary to preserve and enforce the Debtors' discharge and the Debtor Release, the Third Party Release, and the

Exculpation.  Further, I believe that the Injunction is a key component of the ultimate reorganization.

80.     In light of all of the circumstances, I believe that the releases, exculpation and indemnification contained in Sections 10.4, 10.5, 10.6 and 10.7 of the Plan are fair to the releasing parties; essential and integral to the implementation of the Plan and the transactions incorporated therein; confer a material benefit on, and are in the best interest of, the Debtors, their estates, and their creditors; and are important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors.

**G.     Other Provisions Regarding the Implementation and Effect of the Plan**

81.     The Plan includes additional appropriate provisions, including, without limitation:  (a) the provisions of Article VIII establishing procedures for resolving contingent, unliquidated and Disputed Claims; (b)  the provisions of Article IX of the Plan governing distributions on account of Allowed Claims; and (c) the provisions of Article XII governing retention of jurisdiction by the Court over certain matters after the Effective Date.  Debtors' counsel has explained to me the requirements of confirmation of a plan under the Bankruptcy Code and, based upon the totality of the circumstances of the Chapter 11 Cases, I believe that the Plan appropriate and satisfies the requirements for confirmation under the Bankruptcy Code.

**H.     The Plan and the Settlements Incorporated Therein Are the Result of Arms' Length Negotiations and Have Been Proposed in Good Faith**

82.     The Plan has been proposed by the Debtors in good faith, with legitimate and honest purposes of maximizing the recovery to claimholders under the circumstances of these Chapter 11 Cases.  The Debtors filed the Chapter 11 Cases to preserve the going concern value of their businesses and to restructure their debt obligations, while maximizing value to

creditors and interest holders. The Plan accomplishes these goals by providing the means by which the Reorganized Debtors may continue to operate as viable businesses with a deleveraged balance sheet, while leaving their international operations unaffected and maximizing value for all creditors.

83.    The value of the Debtors' businesses is significantly greater in the reorganization contemplated by the Plan than in a liquidation. Indeed, as discussed below, in a liquidation scenario the Secured Noteholders recovery would be reduced and there would be no recovery to the Unsecured Noteholders or to any General Unsecured Creditors, whereas, under the Plan, the non-priority unsecured creditors receive the Unsecured Cash Consideration (which has been increased from $7.5 million to $12.5 million by the Plan Sponsor) and Unsecured Noteholders will have the opportunity to participate in up to $12.5 million of the Exit Rights Offering. Moreover, the Plan Sponsor's support of the Plan and the acceptance of the Plan by Holders of Secured Note Claims and (with respect to all but one Debtor) by the Holders of General Unsecured Claims who voted on the Plan reflect the overall fairness of the Plan and constitutes acknowledgment by the Debtors' claimholders that the Plan has been proposed in good faith and for proper purposes.

84.    Accordingly, I believe based on my knowledge of the Debtors' businesses and the opinions of the Debtors' financial advisors that the Plan will result in substantially greater stakeholder recoveries than could be realized if the Debtors were to liquidate under chapter 7. The Plan and the settlements embodied therein have been structured to accomplish the Debtors' goal of maximizing the recovery to Holders of Claims and Equity Interests.

**I.    All Fee Payments to Be Made by the Debtors in Connection With These Cases Are Subject to Approval of the Bankruptcy Court**

85.    Except as otherwise set forth below, the Plan provides that all fees promised or to which parties may otherwise be entitled in connection with the Chapter 11 Cases, including all Professional Fees, will be subject to the approval of the Bankruptcy Court.   As explained to me by Debtors' counsel, the Court-appointed professionals in these cases are subject to the requirements of sections 330 and 331 of the Bankruptcy Code and, therefore, have been approved by, or are subject to approval of the Court as reasonable.   Further, the Plan provides that all unpaid Professional Claims incurred prior to the Effective Date shall be paid in accordance with the procedures approved by the Bankruptcy Court and shall be subject to Bankruptcy Court approval.   Additionally, Article XI of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of reasonable compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code, as that Article has been explained to me by Debtors' counsel.

### J.    The Plan Supplements Disclose the Identity and Affiliation of Directors of the Reorganized Debtors

86.    As of the Effective Date, pursuant to Article 6.13 of the Plan, the terms of the current members of the boards of directors of each of the Debtors shall expire. The Debtors have disclosed in the Plan Supplements the identity of those persons designated by the Plan Sponsor to serve on the New Board and the New Subsidiary Boards.  The New Board will be comprised of four members – three members are employees of the Plan Sponsor and the fourth is the current and post-Effective Date chief executive officer.  Their selection by the Plan Sponsor is appropriate given the post-emergence ownership of the Reorganized Debtors.  Further, consistent with the Debtors' key employee incentive and retention program, previously approved by this Court, certain employees and members of management will continue in the Debtors'

employment through a post-Effective Date transition period, as the payments made under such

program must be returned by program participants if they do not remain employed by the

Debtors through the transition period.  The directors have significant experience in the Debtors'

industry.  The Debtors' management team was employed by the Debtors prior to the Effective

Date and, therefore, is familiar with the Debtors' operations.  Accordingly, the employment of

the designated directors and officers of the Reorganized Debtors is consistent with the interests

of creditors.

**K.      The Plan Does Not Provide for Any Rate Change Subject to Regulatory Approval**

87.      The Debtors' businesses do not involve the establishment of rates over

which any regulatory commission has jurisdiction or will have jurisdiction after confirmation and,

thus, does not provide for any rate changes subject to regulatory approval, as that requirement of

the Bankruptcy Code has been explained to me by Debtors' counsel.

**L.      The Plan is in the Best Interest of Creditors and Interest Holders**

88.      I understand that the Bankruptcy Code imposes a test to determine that the

Plan be in the "best interest of creditors."  In particular, the Bankruptcy Code protects non-

consenting members of impaired classes by ensuring that each dissenting member of the

impaired class receives at least what the dissenting member would receive if the debtor were

liquidated under chapter 7 of the Bankruptcy Code.  For the reasons below, I believe that the

Plan clearly satisfies this test.

89.      I instructed the Debtors and FTI to prepare the Liquidation Analysis set

forth in the Disclosure Statement, including Exhibit C thereto.  FTI's analysis was based upon

financial information prepared by the Debtors.  In providing such information to FTI, I assumed

and relied upon the accuracy and completeness of the financial information provided to and

available to me by the Debtors' staff, and nothing has come to my attention to lead me to believe that reliance upon such information is or was unreasonable.

90.     To estimate what members of each Impaired Class of Claims or Equity Interests would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the aggregate dollar amount that would be available if these Chapter 11 Cases were converted to a chapter 7 liquidation was determined.  The Disclosure Statement, including Exhibit C thereto, contains an accurate summary and description of the Liquidation Analysis for the Debtors on a consolidated basis and of the estimates and assumptions underlying that analysis.  I believe that the amounts set forth in the Liquidation Analysis are reasonable estimates of the potential proceeds that would be realized from a chapter 7 liquidation of the Debtors and available to satisfy Claims and Equity Interests, under the assumptions set forth therein.

91.     Based upon the methodologies employed in the Liquidation Analysis, it is projected that Holders of Claims in Classes 1, 2, 3, 4, 5-A, 5-B, 6, and 7 will receive more under the Plan than under a chapter 7 liquidation.  As disclosed in the Liquidation Analysis, the Debtors anticipate the following range of recovery under the Plan versus a chapter 7 liquidation:

| Impaired Class | Estimated Recovery Under Plan | Estimated Recovery in Liquidation |
|---|---|---|
| Class 1: Other Priority Claims | 100% | 0.0% |
| Class 2: Other Secured Claims | 100% | 4% |
| Class 3: Euro Notes Guaranty Claims | 100% | 0.0% |
| Class 4: Secured Notes Claims | 16.4-17.4% | 4% |
| Class 5-A: Unsecured Notes Claims | 4.5% | 0.0% |
| Class 5-B: General Unsecured Claims | 4.5% | 0.0% |
| Class 6: Intercompany Claims | 0-100% | 0.0% |
| Class 7: Intercompany Interests | 0-100% | 0.0% |
| Class 8: Subordinated Claims | 0.0% | 0.0% |
| Class 9: Interests in Quiksilver | 0.0% | 0.0% |

92.     The Liquidation Analysis assumes that the Debtors would commence a chapter 7 liquidation on or about January 31, 2015 (the "Conversion Date") under the

supervision of a court-appointed chapter 7 trustee. The Liquidation Analysis reflects the wind-down and liquidation of substantially all of the Debtors' remaining assets; a quick sale of their non-Debtor subsidiaries; and the distribution of available proceeds to Holders of Allowed Claims during the period after the Conversion Date.  The Liquidation Analysis assumes that upon conversion of the chapter 11 case to chapter 7, the DIP Agents will seek relief from the automatic stay to foreclose on Debtor assets under the jurisdiction of the Bankruptcy Court to recover on the outstanding DIP Claims.  In that event, the DIP Agents, on behalf of the DIP Lenders, would have the ability to recover on the DIP Facilities' first lien position on all Debtor assets.  Only after the DIP Facilities are fully satisfied, would any recoveries be realized by the holders of Secured Notes with respect to:  (i) the Debtors' intellectual property, and (ii) any equity value in the Non-Debtor subsidiaries, through either (a) the Secured Notes' first lien on 65% of the equity in the Non-Debtor subsidiaries or (b) the Secured Notes Replacement Liens granted pursuant to the DIP Order, with respect to 35% of the equity in the Non-Debtor subsidiaries.

93.    Further, the Liquidation Analysis assumes that the U.S. chapter 7 conversion will trigger acceleration of foreign debt obligations including under foreign factoring facilities / lines of credit (the "Euro Factor Facility") and the Euro Notes, and this would result in violations of the Euro Note Waiver executed prior to the chapter 11 filing.  In light of these complicating factors, it is assumed that access to working capital funding would be limited, and that Deutsche Bank (as Euro Note Indenture Trustee) would move quickly to complete a going-concern sale of the Non-Debtor Subsidiaries no later than three months following the Conversion Date.  Given that the worldwide DC Shoes trademark (the "DC Shoes Marks") is an asset of the Debtors, it is assumed that the DC Shoes Mark would be marketed separately to a third-party

buyer (the "<u>DC Shoes Buyer</u>"), with corresponding sale proceeds used to pay down the (first lien) DIP Facilities and the (second lien) Secured Notes.  Accordingly, in a chapter 7 liquidation scenario, the Non-Debtor Subsidiaries would need to enter into new license agreements with the DC Shoes Buyer to ensure uninterrupted access to DC Shoes products.

94.    For purposes of estimating standalone value of the Non-Debtor Subsidiaries, FY16 Non-Debtor Subsidiary EBITDA levels were adjusted downward for (i) annual DC Shoes Mark royalty payments to the DC Shoes Buyer and (ii) global SG&A costs, currently incurred by the Debtors for which the related activities would need to be maintained by the Non-Debtors Subsidiaries to support ongoing operations ("<u>Adjusted Non-Debtor EBITDA</u>"). Based on the resulting Adjusted Non-Debtor EBITDA levels, it is unlikely that a going concern sale would result in total enterprise value sufficient to fully satisfy the Euro Factor Facility and Euro Note outstandings (estimated to be a combined $271 million at the Conversion Date). Thus, no residual equity value would be available for distribution from the going-concern sale of the Non-Debtor Subsidiaries.

95.    The liquidation of the Debtors' U.S. assets was assumed to be completed over a twelve-month period.  During the first two months, the Debtors would complete going-out-of-business sales for all remaining U.S. store inventory, furniture, fixtures, and equipment, along with the sale of all U.S intellectual property, including the DC Shoes Marks.  During months 3 – 6, the Debtors would primarily focus on collecting remaining customer accounts receivable.  Activities during months 7 – 12 would include administrative activities, such as final creditor distributions needed to complete the wind-down of the Estates.

96.    In addition, the value available to Holders of Claims in the event of a chapter 7 liquidation of the Debtors' assets would be reduced by, among other things, the costs,

fees and expenses of the liquidation, as well as other administrative expenses of the Debtors'

chapter 7 cases.  The Debtors' costs of liquidation in chapter 7 cases would include the

compensation of the trustee, as well as of counsel and of other professionals retained by such

trustee, asset disposition expenses, applicable taxes, litigation costs, and claims arising from the

wind-down of operation of the Debtors during the pendency of the chapter 7 cases.

        97.     The Liquidation Analysis estimates that if a liquidation were to occur in

these cases, the proceeds generated from the liquidation of the Debtors' assets, taking into

account the costs and expenses associated with a chapter 7 liquidation, would provide a recovery

of 90% to 100% for Holders of DIP Claims and  0% to 8% for Class 4 Secured Notes Claims.

Because substantially all of the Debtors' assets constitute collateral of the Secured Notes, no

unencumbered assets would be available for distribution to Holders of Administrative Claims or

Priority Tax or Non-Tax Claims, and no proceeds would be available for distribution to Holders

of Claims and Equity Interests junior to the Holders of Secured Notes, including Holders of

Unsecured Notes Claims and General Unsecured Claims (Classes 5-A, 5-B, 6, 7, 8 and 9).  This

is in direct contrast to the Plan, which provides for a full recovery to Holders of Administrative

Claims, Priority Tax Claims, Class 1 Other Priority Claims, Class 2 Other Secured Claims, and

Class 3 Euro Notes Claims.  In addition, it provides for a recovery of approximately 16.4% to

17.4% to Class 4 Secured Notes Claims, as well as recoveries of approximately 4.5% to Class 5-

A Unsecured Notes Claims and Class 5-B General Unsecured Claims.

        98.     The Liquidation Analysis clearly indicates that, under any reasonable set

of assumptions, the overall values that would be realized by the Holders of Claims and Interests

in hypothetical chapter 7 cases are the same as, less than, or in some cases, materially less then

the value of the recoveries to these Holders under the Plan.  Accordingly, based upon my

understanding of section 1129(a)(7) of the Bankruptcy Code and the "best interests test," as explained to me by Debtors' counsel, the Plan, therefore, is in the best interests of each of the classes of claims discussed herein.

### M.    The Plan Provides for the Payment of Priority Claims

99.    As explained to me by Debtors' counsel, the Plan must satisfy certain requirements for the treatment of Priority Claims.  I believe the Plan provides for payment in full of Priority Claims on terms which satisfy these requirements.

### N.    Acceptance by Impaired Classes

100.    As explained to me by Debtors' counsel, each class of claims or interests under a plan must accept the plan, or else not be impaired by the plan.  The following Classes entitled to vote on the Plan have voted (or been deemed to have voted) to accept the Plan:  Class 4 and, as to all Debtors except QS Wholesale, Inc., Class 5-B, thus satisfying section 1126(c) of the Bankruptcy Code with respect to those classes.  Class 5-A and, as to Debtor QS Wholesale, Inc., Class 5-B, voted to reject and Classes 8 (Subordinated Claims) and 9 (Interests in Quiksilver) will neither receive nor retain any property under the Plan and, therefore, are deemed to have rejected the Plan.

101.    As explained to me by Debtors' counsel, at least one Class of Claims that is Impaired must accept the Plan. Specifically, Class 4 and, as to all Debtors except QS Wholesale, Inc., Class 5-B have voted to accept the Plan and, to the best of the Debtors' knowledge, such Classes do not contain any significant number of insiders.

### O.    The Plan Satisfies the Feasibility Requirements

102.    The Plan is feasible and that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.  To my knowledge, no party has asserted otherwise.

103.    For purposes of determining whether the Plan satisfies these feasibility standards and with the help of the Debtors' advisors, I have analyzed the Debtors' ability to meet their obligations under the Plan and believe that Confirmation is not likely to be followed by liquidation or the need for further reorganization.

104.    The Debtors have already taken significant steps to improve their operations prior to and during the Chapter 11 Cases, including:  (i) closing numerous unprofitable stores and liquidating excess inventory, (ii) implementing in a prepetition reduction in force to reduce capital expenditures; (iii) engaging in a comprehensive evaluation of their executory contracts and unexpired leases, and  assuming or rejecting those contracts and leases consistent with the Debtor's business plan; (iv) dissolving the Inactive Debtors; and (v) otherwise taking steps to implement the Company's go-forward business plan.

105.    In the event that the Euro Notes Exchange Offer is fully subscribed and consummated, the Plan will result in a substantial deleveraging of approximately $590 million upon emergence from chapter 11.  I believe that the Plan will provide the Debtors with ample liquidity to make all distributions under the Plan and continue operations across all of their current business segments as a going concern.  The Debtors are in advanced negotiations regarding the Exit Facilities that the Debtors anticipate will close in connection with emergence. Upon emergence and entry into the Exit Facilities, inclusive of undrawn amounts on the Exit Term Loan Facility, I anticipate that the Debtors will have approximately $90 million of liquidity.

106.    The Debtors have prepared financial projections of their annual performance through the end of 2018, as described in Exhibit B to the Disclosure Statement. These financial projections support my conclusions that the Reorganized Debtors will be able to meet their obligations under the Plan while maintaining sufficient liquidity and capital resources.

Here, upon the Debtors' receipt of the funding contemplated under the Backstop Commitment Agreement, Rights Offerings, and closing of the Exit Facilities, I believe the Plan is feasible.  I reasonably believe that these transactions will close.

107.    Based on the foregoing reasons, I believe that Confirmation of the Plan is not likely to be followed by the liquidation or need for further reorganization of the Reorganized Debtors.  Accordingly, I believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code, as explained to me by Debtors' counsel.

**P.    Payment of Statutory Fees**

108.    The Debtors have paid or will pay all fees payable pursuant to 28 U.S.C. § 1930 on the Effective Date and, with respect to the Chapter 11 Cases of Quiksilver, Inc., QS Wholesale, Inc., DC Shoes, Inc., Hawk Designs, Inc., and QS Retail, Inc., as and when due thereafter.[16]

**Q.    Payment of Retiree Benefits**

109.    Pursuant to Article 6.16(b) of the Plan, following the Effective Date of the Plan, with respect to the payment of "retiree benefits" as defined in section 1114 of the Bankruptcy Code, such payment shall continue at the levels established pursuant to subsections (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the Plan, for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any.

---

[16]    The Plan provides for entry of the Inactive Debtors Final Decree Order closing the Chapter 11 Cases of the other Debtors (i.e., the Inactive Debtors) on the Effective Date.

### R.    Miscellaneous Provisions

110.    The Debtors have no domestic support obligations, are not individuals, and are for-profit businesses. Accordingly, as explained to me by Debtors' counsel, the requirements of Section 1129(a)(14)-(16)

## VI.    THE PLAN SATISFIES THE "CRAMDOWN" REQUIREMENTS

111.    The Plan provides that Holders of Claims and Interests Classes 8 and 9 will neither receive nor retain property under the Plan and, therefore, I understand that such Holders are deemed not to have accepted the plan pursuant to section 1126(g) of the Bankruptcy Code.  Additionally, the Holders of Claims in Class 5-A and, as to QS Wholesale, Inc., Class 5-B have voted to reject the Plan.  Accordingly, as explained to me by Debtors' counsel, because not all impaired Classes have accepted the Plan, the Plan must satisfy certain "cramdown" requirements.  In particular, I understand that section 1129(b)(1) of the Bankruptcy Code provides that, if the Plan does not discriminate unfairly and is fair and equitable with respect to non-accepting Impaired Classes, it may be confirmed notwithstanding the fact that certain classes have rejected the plan.

112.    Based upon my understanding of section 1129(b)(1) of the Bankruptcy Code, as explained to me by Debtors' counsel, the Plan does not discriminate unfairly and is fair and equitable with respect to the Holders of Claims in Class 5-A , as to QS Wholesale, Inc., Class 5-B and Classes 8 and 9.

### A.    The Plan Does Not Discriminate Unfairly

113.    I understand that a Plan unfairly discriminates if it provides for creditors and interest holders with similar legal rights to receive materially different treatment under a proposed plan without compelling justification for doing so.  Here, I do not believe there is any unfair discrimination, as there is a compelling justification for the separate classification and

treatment of Classes 5-A, 5-B, 8, and 9.  Class 5-A is comprised of Unsecured Notes Claims, which are defined to include only claims arising under, derived from, based upon or related to the Unsecured Notes. Class 5-B is comprised of prepetition general unsecured claims.  Each of these classes of Claims are appropriately classified separately from other Claims and from each other.

114.    Class 8, consisting of Subordinated Claims, and Class 9, consisting of Interests in Quiksilver, are likewise reasonably classified and treated separately from other creditors and interest holders as Class 8 Claims are subordinated to other unsecured claims and Class 9 Interests are those of the parent, Quiksilver, and thus appropriately treated differently than the Intercompany Interests which merely preserve the corporate structure.  As explained to me by Debtors' counsel, Classes 8 and 9 are not entitled to recovery under the absolute priority rule until all senior creditors have been paid in full.

**B.    The Plan Is Fair and Equitable**

115.    I understand that to be fair and equitable, the Plan must satisfy the "absolute priority rule," which requires that if the holders of claims in a particular class receive less than full value for their claims, no holders of claims or interests in a junior class may receive property under the plan.  The corollary of the absolute priority rule is that senior classes cannot receive more than a 100 percent recovery for their claims.  The Plan satisfies the absolute priority rule with respect to Classes 5-A, 5-B, 8 and 9, as no holder of a claim or interest junior to such Classes will receive any distribution.   The Holders of Class 5-A Unsecured Notes Claims, Class 5-B General Unsecured Claims,[17] Class 8 Subordinated Claims and Class 9

---

[17]    Although Classes 5-A and 5-B are not entitled to any recovery under the absolute priority rule, the Plan provides, with the consent of the Class 4 Secured Noteholders, that they will share pro rata in the Unsecured Cash Consideration.

Interests in Quiksilver are not entitled to receive any recovery under the absolute priority rule because other, more senior creditors – namely, the Secured Noteholders – are not being paid in full.  Despite this, Classes 5-A and 5-B are in fact receiving a recovery from the proceeds of the Rights Offerings, backstopped by the Plan Sponsor, in the form of the Unsecured Cash Consideration.  Further, Holders of Class 5-A Unsecured Notes Claims will have the opportunity to participate in up to $12.5 million of the Exit Rights Offering.  Accordingly, the Plan is fair and equitable with respect to those Classes.

## VII.    CONCLUSION

116.    I believe that the Plan, as developed by the Debtors, (a) maximizes value for all stakeholders and (b) incorporates fair and reasonable settlements of Claims and Causes of Action by and against the Debtors that reflect the input of all key constituencies.  As a result, I believe that the Plan is in the best interests of creditors and should be confirmed by the Bankruptcy Court.

**[SIGNATURE PAGE TO FOLLOW]**

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing statements are true and correct.

Executed on January 25, 2016

/s/ *Stephen Coulombe*
_____
Stephen Coulombe
Chief Restructuring Officer
Quiksilver, Inc. and its Affiliated Debtors and
Debtors-in-Possession