**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| In re: | :  Chapter 11 |
|  | : |
| QUIKSILVER, INC., *et al.*, | :  Case No. 15-11880 (BLS) |
|  | : |
|  | :  Jointly Administered |
| Debtors.[1] | : |
|  | :  **Related Docket Nos. 711** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF DURC A. SAVINI IN SUPPORT OF CONFIRMATION OF THE**
**PLAN OF REORGANIZATION OF THE DEBTORS**

I, Durc A. Savini, pursuant to section 1746 of title 28 of the United States Code, hereby

declare under penalty of perjury as follows:

1.      I submit this declaration (this "Declaration") in support of confirmation of the

Plan of Reorganization of the Debtors (as it may be further amended, supplemented, or otherwise

modified, the "Plan").[2]  The statements in this Declaration are, except where specifically noted,

based on either my personal knowledge or opinion, on information that I have received from the

Debtors' employees or advisors, or employees of Peter J. Solomon Company, L.P. and/or Peter J.

Solomon Securities Company, LLC (collectively, "PJSC") working directly with me or under my

supervision, direction, or control, or from the Debtors' records maintained in the ordinary course

of their business.  I am not being specifically compensated for this testimony other than through

payments received by PJSC as a professional to be retained by the Debtors.  If I were called upon

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc.
(8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505),
Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors'
corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan.

to testify, I could and would competently testify to the facts set forth herein on that basis. I am

authorized to submit this Declaration on behalf of the Debtors.

<u>**Professional Background and Qualifications**</u>

2.       I received a Bachelor of Arts degree in Economics from Columbia University. I

also received a Masters of Business Administration degree, with concentrations in finance and

accounting, from the University of Chicago Graduate School of Business.

3.       I started my career in investment banking in the automotive and leveraged finance

groups at CIBC Wood Gundy Securities. I then moved to Bear Stearns & Co., Inc. where I

represented numerous companies in the automotive supplier, telecommunication,

biopharmaceutical, food, consumer products, chemical, business outsourcing, and building

products industries. In 1999, after leaving Bear Stearns, I joined the financial restructuring

group of Wasserstein Perella, a predecessor of Miller Buckfire & Co., LLC. I was with Miller

Buckfire for approximately 11 years where I advised clients, both debtors and creditors, across a

wide range of industries.

4.       I have been an investment banker concentrating in restructuring for 15 years, most

recently employed as a Managing Director and head of the Restructuring and Recapitalization

Group of PJSC, the investment banker for the Debtors. I advise companies with respect to

corporate restructurings, recapitalizations, sale transactions, obtaining credit facilities,

refinancings, and negotiations with interested purchasers, credit providers, and creditors, among

other constituents. I routinely assist my clients in addressing financial challenges inside and

outside of the bankruptcy process. I am a member of the American Bankruptcy Institute and the

Turnaround Management Association. I am also a member of the board of the Association of

Insolvency & Restructuring Advisors.

5.      In addition to working with the Debtors in the above-captioned cases, my restructuring and financing advisory engagements have included engagements with the following companies: Allied Holdings; Bluewater Automotive Systems; Breed Technologies; Cambridge Industries; Citation Corporation; Dana Corporation; Dura Automotive Systems, Inc.; EaglePicher Holdings; JL French Automotive Castings, Inc.; Oxford Automotive; The Dolan Company; Radioshack Corporation; Avado Brands; IMPATH Inc.; Burlington Industries; CenterPoint Energy; Sunbeam Corporation; Polaroid Corporation; Railworks Corporation; and Favorite Brands International.

6.      In connection with the above-referenced restructuring engagements, I have advised distressed companies with respect to obtaining financing, including assisting such companies in determining financing needs, identifying potential sources of financing, and negotiating the terms of such financing.  In addition, I have advised distressed companies with respect to the sales of some or all of their assets, and have assisted distressed companies in conducting sales processes in connection with their broader restructurings.   I have also provided valuation analyses in connection with the above-referenced restructuring engagements, and have testified at trial or by deposition in connection with certain of the above-listed engagements.

7.      I closely follow developments in the financial markets and, in particular, the credit markets, and keep abreast of the terms of current financing transactions in distressed and bankruptcy situations.  Since PJSC's engagement in June 2015, I, along with other members of the team at PJSC, have worked closely with the Debtors' senior management team and subsequently with FTI and developed substantial knowledge regarding the Debtors' business, finances, operations and systems.

**Background**

8.        As detailed in its public filings, the Company has been in the midst of an

operational turnaround since 2013.  Unfortunately, in the meantime, the Company has suffered

from a lack of adequate liquidity exacerbated by underperforming retail stores and substandard

delivery of product to wholesale customers.  The Company's weakened performance during the

turnaround period caused further contraction of trade liquidity, and the Company was required to

hasten its efforts.  Beginning in summer 2015, PJSC assisted the Company in exploring a range

of alternatives to loosen liquidity in order to allow the operational turnaround initiatives to take

hold, but those efforts did not result in an actionable transaction.  Ultimately, certain funds

managed by affiliates of Oaktree Capital Management L.P. (collectively, "Oaktree"), a

substantial holder of the Company's Secured Notes as well as a holder of the Company's Euro

Notes, expressed interest in helping the Company de-lever the balance sheet and preserve value

among its foreign subsidiaries through the pursuit of a chapter 11 plan.

9.        In May of 2013, the Company announced a multi-year profit improvement plan

(the "Multi-Year Turnaround Plan") designed to accelerate the Company's three fundamental

strategies of strengthening its brands, growing sales, and improving operational efficiencies. The

new strategy was designed to focus the Company on its three core brands, globalize key

functions, and reduce cost structure. The Company's previous organizational structure, which

was decentralized with each of its Americas segment, Europe, Middle East and Africa

("EMEA") segment and Asia/Pacific ("APAC") segment operating primarily independently,

created a fragmented enterprise with regional brand inconsistencies, suboptimal coordination and

limited the Company's ability to take advantage of its global scale. In response to these

challenges, the senior management team, with assistance from outside consultants, completed a

thorough review of the Company's global operations to determine the best path for sustainable cost savings and profitable growth.

10.     Notwithstanding these efforts, in the first fiscal quarter of 2015, the Company reported a net loss, following softer revenue results, year over year from 2014, although gross margin remained largely flat.  Specifically, the Company, like many others with a major distribution center located in the western United States, suffered the impact of the Los Angeles port labor dispute during the early months of 2015.  In addition, although the Company's EMEA operation performed relatively consistently over the same period, the Company's overall results did not reflect this favorable performance due to the impact of currency exchange rates between the euro and the US dollar (in which currency the Company's results are reported).

11.     While management continued to execute and refine the Multi-Year Turnaround Plan, the Company continued to face liquidity challenges, particularly in the U.S.  In order to support management's efforts to address liquidity issues, the board of directors formed the Strategy Review Committee (the "SRC"), a subcommittee of the board.

12.     In June 2015, upon the recommendation of the SRC, the Company retained PJSC as investment banker to explore and advise the SRC and the Company with respect to all range of strategic alternatives. Since our engagement, PJSC has rendered investment banking services to the Debtors in connection with the evaluation of a range of strategic alternatives, including restructuring their debt obligations, strategic sale transactions, and improving their liquidity and overall financial condition.  Additionally, PJSC has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to these chapter 11 cases and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

13.     Among other things, following preliminary due diligence, and given our deep background with the Company in connection with prior engagements, we recommended that the Company explore a global refinancing of existing indebtedness at the Company's full board meeting on June 13, 2015.  The purpose of the global refinancing was to supplement the Company's liquidity and address the Euro Notes' December 15, 2017 maturity. PJSC initiated contact with parties interested in refinancing the Euro Notes and supplemented the process with outreach to well-recognized second lien lenders to explore the possibility of providing further advances under the borrowing base collateral within the existing ABL credit facility.

14.     With respect to refinancing the Euro Notes, PJSC identified 19 potential sources of financing, of which 8 executed confidentiality agreements.  Of those, PJSC engaged in more advanced discussions with 2.  Ultimately, as negotiations evolved, Oaktree committed a significant level of resources to the process and engaged in a deep level of due diligence with management in multiple Company offices worldwide.

15.     In mid-August, Oaktree advised the Company that it was prepared to execute a refinancing transaction but only if all of the Company's global intellectual property and brands (the "IP") was among the collateral securing such financing.  Unfortunately, the covenants underlying Company's existing indebtedness made such a refinancing impracticable, absent the ability to restructure such indebtedness available in chapter 11.  At this point, PJSC had reached out to a number of parties to solicit interest in the refinancing, and Oaktree was the only investment firm to come forth with a viable term sheet.  Due to a lack of viable out-of-court alternatives and given the Company's declining liquidity runway, the Company and its advisors immediately engaged with Oaktree regarding the possibility of executing the refinancing and restructuring transaction in the context of a chapter 11 case, as a continuation of the parallel

contingency planning efforts that the Company had begun in July 2015. Those negotiations culminated in the DIP Financing and the Plan Support Agreement (the "PSA"), dated as of September 8, 2015, between Quiksilver and Oaktree.

16.     Since the Petition Date, the Debtors and Oaktree have worked diligently to implement the transactions set forth in the PSA. At the same time, the Debtors and their advisors (including PJSC) have also continued to conduct a sale process for all or substantially all of the assets of the Debtors, in order to maximize value for the benefit of the Debtors' estates and all constituents. Unfortunately, as described further below, the sale process failed to generate any competing bids for the Debtors' assets, despite the efforts of the Debtors and their advisors, as well as the participation of the Creditors' Committee and its advisors.

17.     On October 13, 2015, the Debtors filed the Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession [Docket No. 292], and subsequently filed an accompanying disclosure statement [Docket No. 396]. The Debtors amended both the plan and the disclosure statement on November 17, 2015 [Docket Nos. 476, 477]. The amended disclosure statement filed on November 17, 2015 contained, among other things, a valuation analysis undertaken by PJSC at the direction of the Debtors, a liquidation analysis prepared by FTI Consulting, Inc. at the direction of the Debtors, and financial projections prepared by the Company's senior management team.

18.     At the conclusion of a hearing on December 1, 2015, the Bankruptcy Court approved the adequacy of the Disclosure Statement and granted additional related relief [Docket No. 529]. The Debtors submitted the Plan and a further amended disclosure statement [Docket Nos. 532, 533], and commenced solicitation shortly thereafter.

19.    Concurrently with the solicitation process, the Debtors have also engaged in discovery with Oaktree and the Creditors' Committee in connection with the proposed confirmation of the Plan.  Pursuant to the Scheduling Order [Docket No. 576] entered by the Bankruptcy Court, the Debtors served an expert report prepared by PJSC in support of the total enterprise value reflected in the Plan on December 23, 2015 9 (the "PJSC Report").  A true and correct copy of such expert report is attached hereto as Exhibit A.  Following receipt of a responsive expert report from the Creditors' Committee on January 11, 2016, the Debtors served a rebuttal expert report prepared by PJSC on January 19, 2016 (the "PJSC Rebuttal Report").  A true and correct copy of such rebuttal expert report is attached hereto as Exhibit B.

## Valuation Analysis and Reports

20.    The Debtors' financial advisor, PJSC, at the direction of the Debtors, has estimated the value of the Reorganized Debtors as of the Effective Date, based on information available as of November 16, 2015.  This analysis (the "Valuation Analysis") is reflected in the Disclosure Statement, the PJSC Report, and the PJSC Rebuttal Report.  The purpose of the Valuation Analysis is to determine the value available for distribution to Holders of Allowed Claims and Holders of Allowed Interests, if any, pursuant to the Plan, and to analyze the recoveries to such Holders thereunder.  The estimated total value available for distribution to Holders of Allowed Claims and Allowed Interests, as applicable consists of the estimated value of the Reorganized Debtors' operations on a going-concern basis. The Valuation Analysis assumes that the Effective Date occurs on February 1, 2016, and is further based on additional assumptions and information prepared and provided by the Debtors' management, including  the Financial Projections available as of November 16, 2015.

21.    PJSC assumed that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and

judgments as to the future operating and financial performance of the Reorganized Debtors. PJSC's estimated Total Enterprise Value Range assumes the Reorganized Debtors will achieve the Financial Projections in all material respects, including revenue and earnings before interest, taxes, depreciation and amortization ("EBITDA") growth and improvements in EBITDA margins, earnings, and cash flow as projected. If the business performs at levels below those set forth in the Financial Projections, such performance may have a materially negative impact on Total Enterprise Value. Conversely, if the business performs at levels above those set forth in the Financial Projections, such performance may have materially positive impact on Total Enterprise Value.

22.    In estimating the Total Enterprise Value and the New Equity Value of the Reorganized Debtors, PJSC: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, which data were prepared and provided to PJSC by the Debtors' management and which relate to the Reorganized Debtors' business and its prospects; (c) discussed the Debtors' operations and future prospects with the senior management team; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that PJSC deemed generally comparable to the operating business of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating business; and (f) conducted such other studies, analyses, inquiries, and investigations as it deemed appropriate. Although PJSC conducted a review and analysis of the Reorganized Debtors' business, operating assets and liabilities, and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors as well as publicly available information.

23.     In addition, PJSC did not independently verify the Financial Projections in connection with preparing estimates of Total Enterprise Value, and no independent valuations or appraisals of the Debtors were relied upon in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied recoveries to Holders of Allowed Claims and Holders of Allowed Interests, if any, thereunder.

24.     PJSC's estimate of Total Enterprise Value reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Total Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Reorganized Debtors, PJSC, nor any other person assumes responsibility for any differences between the Total Enterprise Value range and such actual outcomes. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Reorganized Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in the Reorganized Debtors' industry and economic conditions generally, and other factors which generally influence the prices of securities.

A.    **Valuation Methodology**

25.    In performing the financial analyses described below and certain other relevant procedures, PJSC reviewed all significant assumptions with the management of the Debtors. In preparing the Valuation Analysis, PJSC performed a variety of financial analyses including the discounted cash flow analysis (the "DCF Analysis"), the comparable company analysis (the "Comparable Company Analysis"), and the precedent transactions analysis (the "Precedent Transactions Analysis"). PJSC made judgments as to the relative significance of each analysis in determining the Total Enterprise Value.  Further information regarding the methodologies utilized, the assumptions and analysis performed, and the conclusions derived from the financial analyses are contained in the Disclosure Statement, the PJSC Report, and the PJSC Rebuttal Report.

B.    **Valuation of the Reorganized Debtors**

26.    Based on the Financial Projections and PJSC's analyses, review, discussions, considerations, and assumptions, and solely for purposes of the Plan, PJSC estimates that the Total Enterprise Value of the Reorganized Debtors falls within a range from approximately $499 million to $602 million (the "Total Enterprise Value Range"), with a mid-point estimate of $546 million. For purposes of this valuation, PJSC assumes that no material changes that would affect value occur between the date of this Disclosure Statement and the Effective Date and that all transactions contemplated under the Plan are consummated on the Effective Date. Based on an estimated net debt balance of approximately $325 million projected as of the Effective Date, PJSC's mid-point estimate of Total Enterprise Value implies a value for the New Quiksilver Common Stock (the "New Equity Value") of approximately $221 million as of the Effective Date. PJSC's estimate of Total Enterprise Value does not constitute an opinion as to fairness

from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

27.     PJSC also conducted a valuation of certain of the non-Debtor Affiliates (excluding certain non-Debtor Affiliates located in Mexico, the "Non-Debtor Foreign Subsidiaries") in order to determine the value of any unencumbered assets, specifically the value of the 35% equity interests in the Non-Debtor Foreign Subsidiaries (such equity interests, the "Unencumbered Foreign Equity") as of the Effective Date.  The estimated value of the Non-Debtor Foreign Subsidiaries is determined on a going-concern basis and takes into account, among other things, relevant intercompany royalty payments and allocation of corporate expenses.  PJSC estimates that the Total Enterprise Value of the Non-Debtor Foreign Subsidiaries falls within a range from approximately $340 million to $400 million with a mid-point estimate of $370 million.  Based on an estimated net debt balance owing by the Non-Debtor Foreign Subsidiaries (and which debt is not the subject of these Chapter 11 Cases) of approximately $260 million as of the Effective Date, PJSC's mid-point estimate of the Total Enterprise Value of the Non-Debtor Foreign Subsidiaries implies an equity value of the Non-Debtor Foreign Subsidiaries of approximately $110 million as of the Effective Date.  Accordingly, PJSC's mid-point estimate of the Unencumbered Foreign Equity is estimated at $39 million as of the Effective Date.

28.     PJSC also estimated the amount of potential distributions available to general unsecured creditors from such Unencumbered Foreign Equity which is impacted by diminution in value of the interest in collateral held by the Secured Noteholders and the Secured Notes Indenture Trustee and administrative and priority claims that rank senior to general unsecured creditors.  Factors considered in determining the diminution in value of collateral include the

value of the DIP Claims, which prime the Secured Noteholders with respect to the collateral securing the Secured Notes, and the value of the Secured Noteholders' interest in their collateral on the Petition Date.  In estimating potential value for general unsecured creditors, PJSC also took into account the Debtors' estimated amount of administrative claims and expenses incurred during the bankruptcy cases including but not limited to professional fees, general administrative expenses and fees and costs associated with obtaining necessary exit financing.  Based on PJSC's analysis, the combination of diminution in value of the interest in collateral held by the Secured Noteholders and the Secured Notes Indenture Trustee and estimated administrative claims exceeds PJSC's mid-point estimate of the value of the Unencumbered Foreign Equity.

## Sale Process

29.    As described above, following the Petition Date the Debtors and their advisors have pursued a dual path of reorganization pursuant to the Plan and the PSA, and a sale of all or substantially all of the Debtors' assets, in order to maximize value to the Debtors' estates and all stakeholders. In furtherance of that goal, PJSC launched an extensive marketing process in October of 2015.  PJSC distributed bid letters and approached 85 parties (including both potential strategic and financial buyers).  Of those parties, 9 signed non-disclosure agreements and conducted diligence on the Debtor.  No parties conducted site visits, nor did any parties request meetings with management.  Although diligence was conducted, no party submitted a bid by the November 30, 2015 deadline, nor has any party expressed any interest in submitting a bid following the November 30, 2015 bid deadline.

30.    PJSC worked together with PJT Partners ("PJT"), advisor to the Creditors' Committee, with respect to each stage of the sale process.  PJT reviewed and provided comments to the bid letter that was distributed to potential bidders, suggested additional potential bidders to

approach, engaged in discussions directly with at least one potential bidder, and received weekly updates from PJSC regarding the status of the marketing process.

31.     Based on the foregoing, in my opinion, by engaging in this dual-track sale process, the Debtor has adequately tested the market. Based on the lack of indications of interest received from potential buyers and the discussions PJSC had with potential buyers, I believe that the Debtor properly exercised its business judgment in concluding that it is in the best interests of its stakeholders to reorganize as a going concern rather than pursue a sale.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  January 25, 2016

/s/ Durc Savini
Durc Savini
Managing Director and Head of Restructuring and
Recapitalization Group
Peter J. Solomon Company, L.P.
Peter J. Solomon Securities Company, LLC

*Investment Banker to the Debtors*

**<u>EXHIBIT A</u>**

**FILED UNDER SEAL**

**<u>EXHIBIT B</u>**

**FILED UNDER SEAL**