**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|   |   |
|---|---|
| In re: | : Chapter 11 |
|   | : |
| QUIKSILVER, INC., *et al.*, | : Case No. 15-11880 (BLS) |
|   | : |
|   | : Jointly Administered |
| Debtors.[1] | : |
|   | : **Related Docket No. 625, 720, 731** |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**NOTICE OF FILING OF SECOND AMENDMENT TO THE PLAN SUPPLEMENT**
**WITH RESPECT TO THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF QUIKSILVER, INC. AND ITS AFFILIATED DEBTORS AND**
**DEBTORS IN POSSESSION**

      **PLEASE TAKE NOTICE THAT** on January 28, 2016, the debtors and debtors in possession in the above-captioned cases (the "Debtors")[2] filed the Second Amendment to the Plan Supplement with respect to the Third Amended Joint Chapter 11 Plan Of Reorganization Of Quiksilver, Inc. And Its Affiliated Debtors And Debtors In Possession (the "Second Amendment to Plan Supplement"), a copy of which is attached hereto as Exhibit 1. The documents contained in the Second Amendment to Plan Supplement are integral to and part of the Third Amended Joint Chapter 11 Plan Of Reorganization Of Quiksilver, Inc. And Its Affiliated Debtors And Debtors In Possession [Docket No. 731] (as may be amended from time to time, the "Plan").

      **PLEASE TAKE FURTHER NOTICE** that the Second Amendment to Plan Supplement includes the following documents, as may be modified, amended, or supplemented from time to time:

        Exhibit A-1 – Amended and Restated Bylaws of the Reorganized Debtors (Clean)

        Exhibit A-2 – Amended and Restated Bylaws of the Reorganized Debtors (Redline)

        Exhibit B-1 – Amended and Restated Certificates of Incorporation of the Reorganized Debtors (Clean)

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599). The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Exhibit B-2 – Amended and Restated Certificates of Incorporation of the Reorganized Debtors (Redline)

Exhibit C-1 – Amended Reorganized Quiksilver Shareholders Agreement (Clean)

Exhibit C-2 – Amended Reorganized Quiksilver Shareholders Agreement (Redline)

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify, or supplement any document in the Plan Supplement; provided, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a blackline of such document with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that the Plan, Plan Supplement, and Disclosure Statement can be obtained free of charge by accessing the Debtors' case information website at http://www.kccllc.net/quiksilver or upon reasonable written request from the Voting Agent, Kurtzman Carson Consultants, LLC by: (a) emailing QuiksilverInfo@kccllc.com or (b) calling the Debtors' restructuring hotline at (877) 709-4757, within the U.S. or Canada, or (424) 236-7235, outside of the U.S. or Canada.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Dated: Wilmington, Delaware
January 28, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Z. Li
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

Mark S. Chehi (I.D. No. 2855)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

John K. Lyons
Jessica S. Kumar
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

## <u>EXHIBIT 1</u>

**Second Amendment to Plan Supplement**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  | : | Chapter 11 |
|  | : |  |
| In re: | : |  |
|  | : | Case No. 15-11880 (BLS) |
| QUIKSILVER, INC., *et al.*, | : |  |
|  | : | Jointly Administered |
| Debtors.[2] | : |  |
|  | : | **Related Docket No. 532, 625, 720** |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SECOND AMENDMENT TO THE PLAN SUPPLEMENT WITH RESPECT TO
THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF QUIKSILVER, INC. AND ITS AFFILIATED DEBTORS AND
<u>DEBTORS IN POSSESSION</u>**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

| | | |
|---|---|---|
| Van C. Durrer, II (I.D. No. 3827) | Mark S. Chehi (I.D. No. 2855) | John K. Lyons |
| Annie Z, Li | One Rodney Square | Jessica S. Kumar |
| 300 South Grand Avenue | P.O. Box 636 | 155 N. Wacker Dr. |
| Suite 3400 | Wilmington, Delaware 19899 | Suite 2700 |
| Los Angeles, CA 90071 | Telephone: (302) 651-3000 | Chicago, IL 60606 |
| Telephone: (213) 687-5000 | Fax: (302) 651-3001 | Telephone: (312) 407-0700 |
| Fax: (213) 687-5600 | | Fax: (312) 407-0411 |

Counsel for Debtors and Debtors in Possession

Dated: Wilmington, Delaware
      January 28, 2016

---

[2]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

**TABLE OF EXHIBITS**

| Exhibit | Title |
|---|---|
| A-1 | Amended and Restated Bylaws of the Reorganized Debtors (Clean) |
| A-2 | Amended and Restated Bylaws of the Reorganized Debtors (Redline) |
| B-1 | Amended and Restated Certificates of Incorporation of the Reorganized Debtors (Clean) |
| B-2 | Amended and Restated Certificates of Incorporation of the Reorganized Debtors (Redline) |
| C-1 | Amended Reorganized Quiksilver Shareholders Agreement (Clean) |
| C-2 | Amended Reorganized Quiksilver Shareholders Agreement (Redline) |

## **<u>EXHIBIT A-1</u>**

**Amended and Restated Bylaws of the Reorganized Debtors (Clean)**

AMENDED AND RESTATED

BY-LAWS

OF

QUIKSILVER, INC.

A Delaware corporation
*(Adopted as of February [●], 2016)*

ARTICLE I
OFFICES

Section 1    Registered Office.  The registered office of the corporation in the State of Delaware shall be located at 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, Delaware, 19808.  The name of its registered agent at such address is Corporation Service Company.  The registered office and/or registered agent of the corporation may be changed from time to time by action of the board of directors.

Section 2    Other Offices.  The corporation may also have offices at such other places, both within and without the State of Delaware, as the board of directors may from time to time determine or the business of the corporation may require.

ARTICLE II
MEETINGS OF STOCKHOLDERS

Section 1    Annual Meetings.  At least one meeting of the stockholders shall be held each year for the purpose of electing directors and conducting any business as may come before the meeting.  The date, time and place, if any, and/or the means of remote communication, of such meeting shall be determined by the president of the corporation; provided, however, that if the president does not act, the board of directors shall determine the date, time and place, if any, and/or the means of remote communication, of such meeting.  No annual meeting of stockholders need be held if not required by the corporation's certificate of incorporation or by the General Corporation Law of the State of Delaware.

Section 2    Special Meetings.  Special meetings of stockholders may be called for any purpose (including, without limitation, the filling of board vacancies and newly created directorships) and may be held at such time and place, within or without the State of Delaware, and/or by means of remote communication, as shall be stated in a written notice of meeting or in a duly executed waiver of notice thereof.  Except as otherwise provided in the corporation's certificate of incorporation, such meetings may be called at any time by the board of directors or the president and shall be called by the president upon the written request of holders of shares entitled to cast not less than a majority of the votes at the meeting, which written request shall state the purpose or purposes of the meeting and shall be delivered to the president.  In addition, no more than once per calendar year, a special meeting shall be called by the president upon the written request of the holders of shares entitled to cast at least 10% of the votes at the meeting,

which written request shall state the purpose or purposes of the meeting and which shall propose a date on which such meeting is to be held (which shall not be less than three (3) business days after the date the notice is received).  On such written request, the president shall fix a date, time and place, if any, and/or remote communication, for such meeting within two days after receipt of a request for such meeting in such written request.

Section 3        Place of Meetings.  The board of directors may designate any place, either within or without the State of Delaware, and/or by means of remote communication, as the place of meeting for any meeting or for any special meeting called by the board of directors.  If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the corporation.

Section 4        Notice.  Whenever stockholders are required or permitted to take any action at a meeting, written or printed notice stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each stockholder entitled to vote at such meeting not less than 10 nor more than 60 days before the date of the meeting.  All such notices shall be delivered, either personally, by mail, by facsimile or by electronic mail, by or at the direction of the board of directors, the president or the secretary, and such notice shall be deemed to be delivered (i) upon confirmation of receipt if sent by facsimile, electronic mail or personal delivery or (ii) three (3) days after being deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the corporation.  Any such consent shall be revocable by the stockholder by written notice to the corporation.  Any such consent shall be deemed revoked if (1) the corporation is unable to deliver by electronic transmission two consecutive notices given by the corporation in accordance with such consent and (2) such inability becomes known to the secretary or an assistant secretary of the corporation or to the transfer agent.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

Section 5        Stockholders List.  The officer who has charge of the stock ledger of the corporation shall make, at least 10 days before every meeting of the stockholders, a complete list of the stockholders entitled to vote at such meeting arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, and/or (ii) during ordinary business hours, at the principal place of business of the corporation.  In the event that the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible

2

electronic network, and the information required to access such list shall be provided with the notice of the meeting.

Section 6    Quorum.  The holders of a majority of the votes represented by the issued and outstanding shares of capital stock, entitled to vote thereon, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders, except as otherwise provided by statute or by the corporation's certificate of incorporation.  If a quorum is not present, the holders of a majority of the votes represented by the shares of capital stock present in person or represented by proxy at the meeting, and entitled to vote at the meeting, may adjourn the meeting to another time and/or place.  When a quorum is once present to commence a meeting of stockholders, it is not broken by the subsequent withdrawal of any stockholders or their proxies.

Section 7    Adjourned Meetings.  When a meeting is adjourned to another time and place, notice need not be given of the adjourned meeting if the time, place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 8    Vote Required.  When a quorum is present, the affirmative vote of the majority of the votes represented by the shares of capital stock present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders, unless the question is one upon which by express provisions of an applicable law or of the corporation's certificate of incorporation a different vote is required, in which case such express provision shall govern and control the decision of such question.

Section 9    Voting Rights.  Except as otherwise provided by the General Corporation Law of the State of Delaware or by the corporation's certificate of incorporation or any amendments thereto and subject to Section 3 of Article VI hereof, every stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of voting common stock held by such stockholder.

Section 10    Proxies.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally.  Any proxy is suspended when the person executing the proxy is present at a meeting of stockholders and elects to vote, except that when such proxy is coupled with an interest and the fact of the interest appears on the face of the proxy, the agent named in the proxy shall have all voting and other rights referred to in the

3

proxy, notwithstanding the presence of the person executing the proxy.  At each meeting of the stockholders, and before any voting commences, all proxies filed at or before the meeting shall be submitted to and examined by the secretary or a person designated by the secretary, and no shares may be represented or voted under a proxy that has been found to be invalid or irregular.

Section 11    Action by Written Consent.    Unless otherwise provided in the corporation's certificate of incorporation, any action required to be taken at any regular or special meeting of stockholders of the corporation, or any action which may be taken at any regular or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken and bearing the dates of signature of the stockholders who signed the consent or consents, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the corporation by delivery to its registered office in the state of Delaware, or the corporation's principal place of business, or an officer or agent of the corporation having custody of the book or books in which proceedings of meetings of the stockholders are recorded.  Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested or by reputable overnight courier service.  All consents properly delivered in accordance with this section shall be deemed to be recorded when so delivered.  No written consent shall be effective to take the corporate action referred to therein unless, within 60 days after the earliest dated consent delivered to the corporation as required by this section, written consents signed by the holders of a sufficient number of shares to take such corporate action are so recorded.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing, and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the corporation.  Any action taken pursuant to such written consent or consents of the stockholders shall have the same force and effect as if taken by the stockholders at a meeting thereof.  Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used; provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

Section 12    Action by Facsimile, Email or Other Electronic Transmission Consent.  A facsimile, email or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this section; provided that any such facsimile, email or other electronic transmission sets forth or is delivered with information from which the corporation can determine (A) that the facsimile, email or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder and (B) the date on which such stockholder or proxyholder or authorized person or persons transmitted such facsimile, email or electronic transmission.  The date on which such facsimile, email or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. Any such facsimile, email or other electronic transmission of a consent or proxy shall be treated in all respects as an original executed consent or proxy and shall be considered to have the same

4

binding legal effect as if it were the original signed version thereof delivered in person.  No consent given by facsimile, email or other electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded if, to the extent and in the manner provided by resolution of the board of directors of the corporation.

ARTICLE III
DIRECTORS

Section 1      General Powers.  The business and affairs of the corporation shall be managed by or under the direction of the board of directors.

Section 2      Number, Election and Term of Office.  The number of directors which shall constitute the first board shall be four (4).  Thereafter, the number of directors shall be established from time to time in accordance with the provisions of that certain Stockholders Agreement, dated as of the date hereof, among the corporation and certain of its stockholders (as amended from time to time, the "Stockholders Agreement"), or after termination of the Stockholders Agreement, by resolution of the board.  The directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote in the election of directors in compliance with the provisions of the Stockholders Agreement.  The directors shall be elected in this manner at the annual meeting of the stockholders, except as provided in Section 4 of this Article III.  Each director elected shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3      Removal and Resignation.  Subject to the provisions of the Stockholders Agreement, any director or the entire board of directors may be removed at any time, with or without cause, by the holders of a majority of the votes represented by the shares of capital stock then entitled to vote at an election of directors.  Whenever the holders of any class or series are entitled to elect one or more directors by the provisions of the corporation's certificate of incorporation, the provisions of this section shall apply, in respect of the removal without cause of any directors so elected, to the vote of the holders of the outstanding shares.  Any director may resign at any time upon notice given in writing or by electronic transmission to the corporation.

Section 4      Vacancies.  Except as otherwise provided in the corporation's certificate of incorporation, board vacancies and newly created directorships resulting from any increase in the authorized number of directors shall be filled as provided in the Stockholders Agreement; provided that at any time the Stockholders Agreement is no longer in effect, such vacancies and newly created directorships shall be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director.  Each director so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided.

Notwithstanding the foregoing, any such vacancy shall automatically reduce the authorized number of directors *pro tanto*, until such time as the holders of outstanding shares of

5

capital stock who are entitled to elect the director whose office is vacant shall have exercised their right to elect a director to fill such vacancy, whereupon the authorized number of directors shall be automatically increased *pro tanto*.  Each director so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided.

Section 5    Meetings and Notice.  Regular meetings of the board of directors may be held without notice at such time and at such place, if any, as shall from time to time be determined by resolution of the board of directors and promptly communicated to all directors then in office, provided that the directors shall meet at least once per year.  Special meetings of the board of directors may be called by or at the request of any director on at least 24 hours notice to each director, either personally, by telephone, by mail and/or by facsimile or electronic mail.

Section 6    Quorum, Required Vote and Adjournment.  A majority of the total number of directors then in office shall constitute a quorum for the transaction of business.  The vote of a majority of directors present at a meeting at which a quorum is present shall be the act of the board of directors.  If a quorum shall not be present at any meeting of the board of directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  Except as otherwise required by the corporation's certificate of incorporation, each director shall be entitled to one vote.

Section 7    Committees. Subject to the provisions of the Stockholders Agreement, the board of directors may, by resolution passed by a majority of the whole board, designate one or more committees, each committee to consist of one or more of the directors of the corporation, which to the extent provided in such resolution or these by-laws shall have and may exercise the powers of the board of directors in the management and affairs of the corporation, except as otherwise limited by law.   The board of directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.   Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors.  Each committee shall keep regular minutes of its meetings and report the same to the board of directors when required.

Section 8    Committee Rules.  Each committee of the board of directors may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the board of directors designating such committee. Unless otherwise provided in such resolution, the presence of a majority of the members of the committee then in office shall be necessary to constitute a quorum.  Subject to the provisions of the Stockholders Agreement, in the event that a member and that member's alternate, if alternates are designated by the board of directors as provided in Section 7 of this Article III, of such committee is or are absent or disqualified, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in place of any such absent or disqualified member.

Section 9    Communications Equipment.  Members of the board of directors or any committee thereof may participate in and act at any meeting of such board or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in the meeting pursuant to this section shall constitute presence in person at the meeting.

Section 10    Waiver of Notice and Presumption of Assent.  Any member of the board of directors or any committee thereof who is present at a meeting shall be conclusively presumed to have waived notice of such meeting, except when such member attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Such member shall be conclusively presumed to have assented to any action taken unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the secretary of the corporation immediately after the adjournment of the meeting.  Such right to dissent shall not apply to any member who voted in favor of such action.

Section 11    Action by Written Consent.    Unless otherwise restricted by the corporation's certificate of incorporation, any action required or permitted to be taken at any meeting of the board of directors, or of any committee thereof, may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the board, or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

ARTICLE IV
OFFICERS

Section 1    Number.  The officers of the corporation shall be elected by the board of directors and may consist of a chairman of the board, a president or chief executive officer (the "president"), one or more vice-presidents, a chief financial officer, a secretary, a treasurer, and such other officers and assistant officers as may be deemed necessary or desirable by the board of directors.  Any number of offices may be held by the same person.  In its discretion, the board of directors may choose not to fill any office for any period as it may deem advisable, except that the offices of president and secretary shall be filled as expeditiously as possible.

Section 2    Election and Term of Office.  The officers of the corporation shall be elected at any meeting of the board of directors.  Vacancies may be filled or new offices created and filled at any meeting of the board of directors.  Each officer shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3    Removal.  Any officer or agent elected by the board of directors may be removed by the board of directors whenever in its judgment the best interests of the corporation would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

7

Section 4        Vacancies.   Any vacancy occurring in any office because of death, resignation, removal, disqualification or otherwise, may be filled by the board of directors for the unexpired portion of the term by the board of directors then in office.

Section 5        Compensation.  Compensation of all officers shall be fixed by the board of directors, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the corporation.

Section 6        Chairman of the Board.  The chairman of the board, if one is appointed, shall have the powers and perform the duties incident to that position.  Subject to the powers of the board of directors, the chairman of the board shall be in the general and active charge of the entire business and affairs of the corporation.  The chairman of the board shall preside at all meetings of the board of directors and at all meetings of the stockholders and shall have such other powers and perform such other duties as may be prescribed by the board of directors or provided in these by-laws.  Whenever the president is unable to serve, by reason of sickness, absence or otherwise, the chairman of the board shall perform all the duties and responsibilities and exercise all the powers of the president.

Section 7        The President.   The president, if one is appointed, shall be the chief executive officer of the corporation; shall preside at all meetings of the stockholders and board of directors at which he or she is present; subject to the powers of the board of directors, shall have general charge of the business, affairs and property of the corporation, and control over its officers, agents and employees; and shall see that all orders and resolutions of the board of directors are carried into effect.   The president shall execute bonds, mortgages and other contracts which the board of directors have authorized to be executed, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the board of directors to some other officer or agent of the corporation.  The president shall have such other powers and perform such other duties as may be prescribed by the board of directors or as may be provided in these by-laws.  If there is no chief executive officer, the president shall also have the duties of the chief executive officer as prescribed above.

Section 8        Chief Financial Officer.  The chief financial officer, if one is appointed, shall, under the direction of the chief executive officer (or, in the absence of a chief executive officer, the president), be responsible for all financial and accounting matters and for the direction of the offices of treasurer and controller.  The chief financial officer shall have such other powers and perform such other duties as may be prescribed by the chairman of the board, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or the board of directors or as may be provided in these by-laws.

Section 9        Vice-presidents.  The vice-president, if one is appointed, or if there shall be more than one, the vice-presidents in the order determined by the board of directors or by the president, shall, in the absence or disability of the president, act with all of the powers and be subject to all the restrictions of the president.  The vice-presidents shall also perform such other duties and have such other powers as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president) or these by-laws may, from time to time, prescribe.

Section 10    Secretary and Assistant Secretaries.  The secretary, if one is appointed, shall attend all meetings of the board of directors, all meetings of the committees thereof and all meetings of the stockholders and record all the proceedings of the meetings in a book or books to be kept for that purpose.  Under the chief executive officer's (or, in the absence of a chief executive officer, the president's) supervision, the secretary shall give, or cause to be given, all notices required to be given by these by-laws or by law, shall have such powers and perform such duties as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president) or these by-laws may, from time to time, prescribe, and shall have custody of the corporate seal of the corporation.  The secretary, or an assistant secretary, shall have authority to affix the corporate seal to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such assistant secretary.  The board of directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by his or her signature.  The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the board of directors, shall, in the absence or disability of the secretary, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president), president or secretary may, from time to time, prescribe.

Section 11    Treasurer and Assistant Treasurer.  The treasurer, if one is appointed, shall have the custody of the corporate funds and securities; shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation; shall deposit all monies and other valuable effects in the name and to the credit of the corporation as may be ordered by the board of directors; shall cause the funds of the corporation to be disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements; and shall render to the chief executive officer (or, in the absence of a chief executive officer, the president), the president and the board of directors, at its regular meeting or when the board of directors so requires, an account of the corporation; shall have such powers and perform such duties as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or these by-laws may, from time to time, prescribe.  If required by the board of directors, the treasurer shall give the corporation a bond (which shall be rendered every six years) in such sums and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of the office of treasurer and for the restoration to the corporation, in case of death, resignation, retirement, or removal from office, of all books, papers, vouchers, money, and other property of whatever kind in the possession or under the control of the treasurer belonging to the corporation.  The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the board of directors, shall in the absence or disability of the treasurer, perform the duties and exercise the powers of the treasurer.  The assistant treasurers shall perform such other duties and have such other powers as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or treasurer may, from time to time, prescribe.

Section 12    Other Officers, Assistant Officers and Agents.  Officers, assistant officers and agents, if any, other than those whose duties are provided for in these by-laws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the board of directors.

9

Section 13    Absence or Disability of Officers.  In the case of the absence or disability of any officer of the corporation and of any person hereby authorized to act in such officer's place during such officer's absence or disability, the board of directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person whom it may select.

ARTICLE V
INDEMNIFICATION OF OFFICERS, DIRECTORS AND OTHERS

Section 1    Nature of Indemnity.  Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether brought by or in the right of the corporation or any of its subsidiaries and whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), or any appeal of such proceeding, by reason of or arising out of the fact that he or she is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director, officer, manager, general partner, employee, fiduciary, or agent of another corporation or of a partnership, limited liability company, joint venture, trust or other enterprise, shall be indemnified and held harmless by the corporation to the fullest extent which it is empowered to do so, unless prohibited from doing so by the General Corporation Law of the State of Delaware, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the corporation to provide broader indemnification rights than said law permitted the corporation to provide prior to such amendment) against all expense, liability and loss (including attorneys' fees actually and reasonably incurred by such person in connection with such proceeding), and such indemnification shall inure to the benefit of his or her heirs, executors and administrators; provided that, except as provided in Section 2 hereof, the corporation shall indemnify any such person seeking indemnification in connection with a proceeding initiated by such person only if such proceeding was authorized by the board of directors of the corporation. The right to indemnification conferred in this Article V shall be a contract right and, subject to Sections 2 and 5 hereof, shall include the right to be paid by the corporation the expenses incurred in defending any such proceeding in advance of its final disposition.  The corporation may, by action of its board of directors, provide indemnification to employees and agents of the corporation with the same scope and effect as the foregoing indemnification of directors and officers.

Section 2    Procedure for Indemnification of Directors and Officers.    Any indemnification of a director or officer of the corporation provided for under Section 1 of this Article V or advance of expenses provided for under Section 5 of this Article V shall be made promptly, and in any event within 30 days, upon the written request of the director or officer.  If a determination by the corporation that the director or officer is entitled to indemnification pursuant to this Article V is required, and the corporation fails to respond within 60 days to a written request for indemnity, the corporation shall be deemed to have approved the request.  If the corporation wrongfully denies a written request for indemnification or advancing of expenses, in whole or in part, or if payment in full pursuant to such request is not properly made within 30 days, the right to indemnification or advances as granted by this Article V shall be enforceable by the director or officer in any court of competent jurisdiction.  Such person's costs and expenses incurred in connection with successfully establishing his or her right to indemnification, in whole or in part, in any such action shall also be indemnified by the

10

corporation.  It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the corporation) that the claimant has not met the standards of conduct which make it permissible under the General Corporation Law of the State of Delaware for the corporation to indemnify the claimant for the amount claimed, but the burden of such defense shall be on the corporation.  Neither the failure of the corporation (including its board of directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the General Corporation Law of the State of Delaware, nor an actual determination by the corporation (including its board of directors, independent legal counsel, or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

Section 3        Article Not Exclusive.  The rights to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the corporation's certificate of incorporation, by-law, agreement, vote of stockholders or disinterested directors or otherwise.

Section 4        Indemnitor of First Resort.  The corporation hereby acknowledges that certain directors affiliated with or managed by Oaktree Capital Management, L.P., an affiliate of certain stockholders of the corporation (collectively, the "Oaktree Investors"), may have certain rights to indemnification, advancement of expenses and/or insurance provided by such Oaktree Investors or certain of their respective affiliates (collectively, the "Institutional Indemnitors").  The corporation hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to such directors are primary and any obligation of the Institutional Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by a director are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by a director in accordance with this ARTICLE V without regard to any rights any such director may have against the Institutional Indemnitors, and (iii) that it irrevocably waives, relinquishes and releases the Institutional Indemnitors from any and all claims against the Institutional Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The corporation further agrees that no advancement or payment by the Institutional Indemnitors on behalf of any director with respect to any claim for which such director has sought indemnification from the corporation shall affect the foregoing and the Institutional Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such director against the corporation.  Notwithstanding any provision herein to the contrary, no officer or employee of the corporation or any of its subsidiaries shall have any rights to (and the corporation shall have no obligation to provide) indemnification or advances of expenses under this Article V with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, or claim related to or arising under any contract, agreement or arrangement between such person, on the one hand, and the corporation or its affiliates or controlling stockholders, on the other hand.

Section 5        Insurance.  The corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was a director, officer, employee, fiduciary, or

11

agent of the corporation or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, whether or not the corporation would have the power to indemnify such person against such liability under this Article V.

Section 6    Expenses. Expenses incurred by any person described in Section 1 of this Article V in defending a proceeding shall be paid by the corporation in advance of such proceeding's final disposition (provided that, if such person is or was an executive of the corporation or its subsidiaries, such advancement will be made unless otherwise determined by the board of directors in the specific case) upon receipt of an undertaking by or on behalf of the director or officer or other person to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the corporation.  Such expenses incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the board of directors deems appropriate.

Section 7    Employees and Agents.  Persons who are not covered by the foregoing provisions of this Article V and who are or were employees or agents of the corporation, or who are or were serving at the request of the corporation as employees or agents of another corporation, partnership, joint venture, trust or other enterprise, may be indemnified, and may be advanced expenses, to the extent authorized at any time or from time to time by the board of directors.

Section 8    Contract Rights.  The provisions of this Article V shall be deemed to be a vested contract right between the corporation and each director or officer who serves in any such capacity at any time while this Article V and the relevant provisions of the General Corporation Law of the State of Delaware or other applicable law are in effect.  Such contract right shall vest for each director and officer at the time such person is elected or appointed to such position, and no repeal or modification of this Article V or any such law shall affect any such vested rights or obligations of any current or former director or officer with respect to any state of facts or proceeding regardless of when occurring.

Section 9    Merger or Consolidation.  For purposes of this Article V, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article V with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

ARTICLE VI
CERTIFICATES OF STOCK

Section 1     Form.  Every holder of stock in the corporation shall be entitled to have a certificate, signed by, or in the name of the corporation by the chief executive officer, president or a vice-president and the secretary or an assistant secretary of the corporation, certifying the number of shares owned by such holder in the corporation.  If such a certificate is countersigned (1) by a transfer agent or an assistant transfer agent other than the corporation or its employee or (2) by a registrar, other than the corporation or its employee, the signature of any such chief executive officer, president, vice-president, secretary, or assistant secretary may be facsimiles. In case any officer or officers who have signed, or whose facsimile signature or signatures have been used on, any such certificate or certificates shall cease to be such officer or officers of the corporation whether because of death, resignation or otherwise before such certificate or certificates have been delivered by the corporation, such certificate or certificates may nevertheless be issued and delivered as though the person or persons who signed such certificate or certificates or whose facsimile signature or signatures have been used thereon had not ceased to be such officer or officers of the corporation.  All certificates for shares shall be consecutively numbered or otherwise identified.  The name of the person to whom the shares represented thereby are issued, with the number of shares and date of issue, shall be entered on the books of the corporation.  Shares of stock of the corporation shall only be transferred on the books of the corporation by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the corporation of the certificate or certificates for such shares endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization, and other matters as the corporation may reasonably require, and accompanied by all necessary stock transfer stamps.  In that event, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate or certificates, and record the transaction on its books.  The board of directors may appoint a bank or trust company organized under the laws of the United States or any state thereof to act as its transfer agent or registrar, or both in connection with the transfer of any class or series of securities of the corporation.

Section 2     Lost Certificates.  The board of directors may direct a new certificate or certificates to be issued in place of any certificate or certificates previously issued by the corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed.  When authorizing such issue of a new certificate or certificates, the board of directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen, or destroyed certificate or certificates, or his or her legal representative, to give the corporation a bond sufficient to indemnify the corporation against any claim that may be made against the corporation on account of the loss, theft or destruction of any such certificate or the issuance of such new certificate.

Section 3     Fixing a Record Date for Stockholder Meetings.  In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which record date shall not be more than sixty nor less than ten

13

days before the date of such meeting.  If no record date is fixed by the board of directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be the close of business on the next day preceding the day on which notice is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided that the board of directors may fix a new record date for the adjourned meeting.

Section 4    Fixing a Record Date for Action by Written Consent.  In order that the corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which date shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the board of directors.  If no record date has been fixed by the board of directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the board of directors is required by statute, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested or by facsimile or electronic mail, with confirmation of receipt.  If no record date has been fixed by the board of directors and prior action by the board of directors is required by statute, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the board of directors adopts the resolution taking such prior action.

Section 5    Fixing a Record Date for Other Purposes.  In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment or any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purposes of any other lawful action, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the board of directors adopts the resolution relating thereto.

Section 6    Registered Stockholders.  Prior to the surrender to the corporation of the certificate or certificates for a share or shares of stock with a request to record the transfer of such share or shares, the corporation may treat the registered owner as the person entitled to receive dividends, to vote, to receive notifications, and otherwise to exercise all the rights and powers of an owner.  The corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof.

Section 7    Subscriptions for Stock.  Unless otherwise provided for in the subscription agreement, subscriptions for shares shall be paid in full at such time, or in such installments and

14

at such times, as shall be determined by the board of directors.  Any call made by the board of directors for payment on subscriptions shall be uniform as to all shares of the same class or as to all shares of the same series.  In case of default in the payment of any installment or call when such payment is due, the corporation may proceed to collect the amount due in the same manner as any debt due the corporation.

ARTICLE VII
GENERAL PROVISIONS

Section 1    Dividends.  Dividends upon the capital stock of the corporation, subject to the provisions of the corporation's certificate of incorporation, if any, may be declared by the board of directors at any regular or special meeting, pursuant to law.  Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the corporation's certificate of incorporation.  Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or any other purpose and the directors may modify or abolish any such reserve in the manner in which it was created.

Section 2    Checks, Drafts or Orders.  All checks, drafts, or other orders for the payment of money by or to the corporation and all notes and other evidences of indebtedness issued in the name of the corporation shall be signed by such officer or officers, agent or agents of the corporation, and in such manner, as shall be determined by resolution of the board of directors or a duly authorized committee thereof.

Section 3    Contracts.  The board of directors may authorize any officer or officers, or any agent or agents, of the corporation to enter into any contract or to execute and deliver any instrument in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances.

Section 4    Loans.  The corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiary, including any officer or employee who is a director of the corporation or its subsidiary, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation.  The loan, guaranty or other assistance may be with or without interest, and may be unsecured, or secured in such manner as the board of directors shall approve, including, without limitation, a pledge of shares of stock of the corporation.  Nothing in this section contained shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

Section 5    Fiscal Year.  The fiscal year of the corporation shall be fixed by resolution of the board of directors.

Section 6    Corporate Seal.  The board of directors shall provide a corporate seal which shall be in the form of a circle and shall have inscribed thereon the name of the

15

corporation and the words "Corporate Seal, Delaware". The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

Section 7        Voting Securities Owned By Corporation. Voting securities in any other corporation held by the corporation shall be voted by the president, unless the board of directors specifically confers authority to vote with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer. Any person authorized to vote securities shall have the power to appoint proxies, with general power of substitution.

Section 8        Exclusive Jurisdiction. Unless otherwise waived by resolution of the Board, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer of the corporation to the corporation or the corporation's stockholders, (iii) any action asserting a claim against the corporation arising pursuant to any provision of the General Corporation Law of the State of Delaware or the corporation's certificate of incorporation or by-laws or (iv) any action asserting a claim against the corporation governed by the internal affairs doctrine, except, as to each of (i) through (iv), for any claim for which the Delaware Chancery Court determines there is an indispensable party not subject to its jurisdiction (and such party does not consent to such jurisdiction within ten days of such determination).

Section 9        Section Headings. Section headings in these by-laws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

Section 10        Inconsistent Provisions. In the event that any provision of these by-laws is or becomes inconsistent with any provision of the corporation's certificate of incorporation, the General Corporation Law of the State of Delaware or any other applicable law, the provision of these by-laws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

## ARTICLE VIII
### AMENDMENTS

Subject to the terms of the Stockholders Agreement and other than Article V, these by-laws may be amended, altered, or repealed and new by-laws adopted at any meeting of the board of directors by a majority vote. Article V hereof may be amended, altered, or repealed at any meeting of the board of directors only by a unanimous vote (or unanimous written consent in lieu thereof); provided, that the provisions of the second sentence of Article II, Section 2 ("Special Meetings") and this Article VIII ("Amendments") (or any defined term affecting any such provisions) shall not be eliminated or amended in a manner (including by merger or otherwise) adverse to the stockholders other than the Oaktree Investors (each, a "Non-Oaktree Stockholder") without the prior written consent of the holders of at least a majority of the shares of voting common stock held by the Non-Oaktree Stockholder(s) so adversely affected. The fact that the power to adopt, amend, alter, or repeal the by-laws has been conferred upon the board of directors shall not divest the stockholders of the same powers.

16

**<u>EXHIBIT A-2</u>**

**Amended and Restated Bylaws of the Reorganized Debtors (Redline)**

AMENDED AND RESTATED

BY-LAWS

OF

QUIKSILVER, INC.

A Delaware corporation
*(Adopted as of ~~January~~February [●], 2016)*

ARTICLE I
OFFICES

Section 1     Registered Office.  The registered office of the corporation in the State of Delaware shall be located at 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, Delaware, 19808.  The name of its registered agent at such address is Corporation Service Company.  The registered office and/or registered agent of the corporation may be changed from time to time by action of the board of directors.

Section 2     Other Offices.  The corporation may also have offices at such other places, both within and without the State of Delaware, as the board of directors may from time to time determine or the business of the corporation may require.

ARTICLE II
MEETINGS OF STOCKHOLDERS

Section 1     Annual Meetings.  At least one meeting of the stockholders shall be held each year for the purpose of electing directors and conducting any business as may come before the meeting.  The date, time and place, if any, and/or the means of remote communication, of such meeting shall be determined by the president of the corporation; provided, however, that if the president does not act, the board of directors shall determine the date, time and place, if any, and/or the means of remote communication, of such meeting.   No annual meeting of stockholders need be held if not required by the corporation's certificate of incorporation or by the General Corporation Law of the State of Delaware.

Section 2     Special Meetings.  Special meetings of stockholders may be called for any purpose (including, without limitation, the filling of board vacancies and newly created directorships) and may be held at such time and place, within or without the State of Delaware, and/or by means of remote communication, as shall be stated in a written notice of meeting or in a duly executed waiver of notice thereof.  Except as otherwise provided in the corporation's certificate of incorporation, such meetings may be called at any time by the board of directors or the president and shall be called by the president upon the written request of holders of shares entitled to cast not less than a majority of the votes at the meeting, which written request shall state the purpose or purposes of the meeting and shall be delivered to the president.  In addition, no more than once per calendar year, a special meeting shall be called by the president upon the written request of the holders of shares entitled to cast at least ~~25~~10% of the votes at the meeting,

which written request shall state the purpose or purposes of the meeting and which shall propose a date on which such meeting is to be held (which shall not be less than three (3) business days after the date the notice is received).  On such written request, the president shall fix a date, time and place, if any, and/or remote communication, for such meeting within two days after receipt of a request for such meeting in such written request.

Section 3      Place of Meetings.  The board of directors may designate any place, either within or without the State of Delaware, and/or by means of remote communication, as the place of meeting for any meeting or for any special meeting called by the board of directors.  If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the corporation.

Section 4      Notice.  Whenever stockholders are required or permitted to take any action at a meeting, written or printed notice stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each stockholder entitled to vote at such meeting not less than 10 nor more than 60 days before the date of the meeting.  All such notices shall be delivered, either personally, by mail, by facsimile or by electronic mail, by or at the direction of the board of directors, the president or the secretary, and such notice shall be deemed to be delivered (i) upon confirmation of receipt if sent by facsimile, electronic mail or personal delivery or (ii) three (3) days after being deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the corporation.  Any such consent shall be revocable by the stockholder by written notice to the corporation.  Any such consent shall be deemed revoked if (1) the corporation is unable to deliver by electronic transmission two consecutive notices given by the corporation in accordance with such consent and (2) such inability becomes known to the secretary or an assistant secretary of the corporation or to the transfer agent.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

Section 5      Stockholders List.  The officer who has charge of the stock ledger of the corporation shall make, at least 10 days before every meeting of the stockholders, a complete list of the stockholders entitled to vote at such meeting arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, and/or (ii) during ordinary business hours, at the principal place of business of the corporation.  In the event that the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible

2

electronic network, and the information required to access such list shall be provided with the notice of the meeting.

Section 6        Quorum.  The holders of a majority of the votes represented by the issued and outstanding shares of capital stock, entitled to vote thereon, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders, except as otherwise provided by statute or by the corporation's certificate of incorporation.  If a quorum is not present, the holders of a majority of the votes represented by the shares of capital stock present in person or represented by proxy at the meeting, and entitled to vote at the meeting, may adjourn the meeting to another time and/or place.  When a quorum is once present to commence a meeting of stockholders, it is not broken by the subsequent withdrawal of any stockholders or their proxies.

Section 7        Adjourned Meetings.  When a meeting is adjourned to another time and place, notice need not be given of the adjourned meeting if the time, place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 8        Vote Required.  When a quorum is present, the affirmative vote of the majority of the votes represented by the shares of capital stock present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders, unless the question is one upon which by express provisions of an applicable law or of the corporation's certificate of incorporation a different vote is required, in which case such express provision shall govern and control the decision of such question.

Section 9        Voting Rights.  Except as otherwise provided by the General Corporation Law of the State of Delaware or by the corporation's certificate of incorporation or any amendments thereto and subject to Section 3 of Article VI hereof, every stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of voting common stock held by such stockholder.

Section 10        Proxies.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally.  Any proxy is suspended when the person executing the proxy is present at a meeting of stockholders and elects to vote, except that when such proxy is coupled with an interest and the fact of the interest appears on the face of the proxy, the agent named in the proxy shall have all voting and other rights referred to in the

3

proxy, notwithstanding the presence of the person executing the proxy.  At each meeting of the stockholders, and before any voting commences, all proxies filed at or before the meeting shall be submitted to and examined by the secretary or a person designated by the secretary, and no shares may be represented or voted under a proxy that has been found to be invalid or irregular.

Section 11    Action by Written Consent.    Unless otherwise provided in the corporation's certificate of incorporation, any action required to be taken at any regular or special meeting of stockholders of the corporation, or any action which may be taken at any regular or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken and bearing the dates of signature of the stockholders who signed the consent or consents, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the corporation by delivery to its registered office in the state of Delaware, or the corporation's principal place of business, or an officer or agent of the corporation having custody of the book or books in which proceedings of meetings of the stockholders are recorded.  Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested or by reputable overnight courier service.  All consents properly delivered in accordance with this section shall be deemed to be recorded when so delivered.  No written consent shall be effective to take the corporate action referred to therein unless, within 60 days after the earliest dated consent delivered to the corporation as required by this section, written consents signed by the holders of a sufficient number of shares to take such corporate action are so recorded.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing, and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the corporation.  Any action taken pursuant to such written consent or consents of the stockholders shall have the same force and effect as if taken by the stockholders at a meeting thereof.  Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used; provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

Section 12    Action by ~~Telegram, Cablegram~~Facsimile, Email or Other Electronic Transmission Consent.    A facsimile, email or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this section; provided that any such facsimile, email or other electronic transmission sets forth or is delivered with information from which the corporation can determine (A) that the facsimile, email or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder and (B) the date on which such stockholder or proxyholder or authorized person or persons transmitted such facsimile, email or electronic transmission.  The date on which such facsimile, email or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed.  Any such facsimile, email or other electronic transmission of a consent or proxy shall be treated in all respects as an original executed consent or proxy and shall be

4

considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No consent given by facsimile, email or other electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded if, to the extent and in the manner provided by resolution of the board of directors of the corporation.

## ARTICLE III
## DIRECTORS

Section 1    General Powers.  The business and affairs of the corporation shall be managed by or under the direction of the board of directors.

Section 2    Number, Election and Term of Office.  The number of directors which shall constitute the first board shall be four (4).  Thereafter, the number of directors shall be established from time to time in accordance with the provisions of that certain Stockholders Agreement, dated as of the date hereof, among the corporation and certain of its stockholders (as amended from time to time, the "Stockholders Agreement"), or after termination of the Stockholders Agreement, by resolution of the board.  The directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote in the election of directors in compliance with the provisions of the Stockholders Agreement.  The directors shall be elected in this manner at the annual meeting of the stockholders, except as provided in Section 4 of this Article III.  Each director elected shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3    Removal and Resignation.  Subject to the provisions of the Stockholders Agreement, any director or the entire board of directors may be removed at any time, with or without cause, by the holders of a majority of the votes represented by the shares of capital stock then entitled to vote at an election of directors.  Whenever the holders of any class or series are entitled to elect one or more directors by the provisions of the corporation's certificate of incorporation, the provisions of this section shall apply, in respect of the removal without cause of any directors so elected, to the vote of the holders of the outstanding shares.  Any director may resign at any time upon notice given in writing or by electronic transmission to the corporation.

Section 4    Vacancies.  Except as otherwise provided in the corporation's certificate of incorporation, board vacancies and newly created directorships resulting from any increase in the authorized number of directors shall be filled as provided in the Stockholders Agreement; provided that at any time the Stockholders Agreement is no longer in effect, such vacancies and newly created directorships shall be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director.  Each director so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided.

Notwithstanding the foregoing, any such vacancy shall automatically reduce the authorized number of directors *pro tanto*, until such time as the holders of outstanding shares of

5

capital stock who are entitled to elect the director whose office is vacant shall have exercised their right to elect a director to fill such vacancy, whereupon the authorized number of directors shall be automatically increased *pro tanto*.  Each director so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided.

Section 5    Meetings and Notice.  Regular meetings of the board of directors may be held without notice at such time and at such place, if any, as shall from time to time be determined by resolution of the board of directors and promptly communicated to all directors then in office, provided that the directors shall meet at least once per year.  Special meetings of the board of directors may be called by or at the request of any director on at least 24 hours notice to each director, either personally, by telephone, by mail and/or by facsimile or electronic mail.

Section 6    Quorum, Required Vote and Adjournment.  A majority of the total number of directors then in office shall constitute a quorum for the transaction of business.  The vote of a majority of directors present at a meeting at which a quorum is present shall be the act of the board of directors.  If a quorum shall not be present at any meeting of the board of directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  Except as otherwise required by the corporation's certificate of incorporation, each director shall be entitled to one vote.

Section 7    Committees.  Subject to the provisions of the Stockholders Agreement, the board of directors may, by resolution passed by a majority of the whole board, designate one or more committees, each committee to consist of one or more of the directors of the corporation, which to the extent provided in such resolution or these by-laws shall have and may exercise the powers of the board of directors in the management and affairs of the corporation, except as otherwise limited by law.  The board of directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors.  Each committee shall keep regular minutes of its meetings and report the same to the board of directors when required.

Section 8    Committee Rules.  Each committee of the board of directors may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the board of directors designating such committee.  Unless otherwise provided in such a resolution, the presence of a majority of the members of the committee then in office shall be necessary to constitute a quorum.  Subject to the provisions of the Stockholders Agreement, in the event that a member and that member's alternate, if alternates are designated by the board of directors as provided in Section 7 of this Article III, of such committee is or are absent or disqualified, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in place of any such absent or disqualified member.

Section 9    Communications Equipment.  Members of the board of directors or any committee thereof may participate in and act at any meeting of such board or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in the meeting pursuant to this section shall constitute presence in person at the meeting.

Section 10    Waiver of Notice and Presumption of Assent.  Any member of the board of directors or any committee thereof who is present at a meeting shall be conclusively presumed to have waived notice of such meeting, except when such member attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Such member shall be conclusively presumed to have assented to any action taken unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the secretary of the corporation immediately after the adjournment of the meeting.  Such right to dissent shall not apply to any member who voted in favor of such action.

Section 11    Action by Written Consent.  Unless otherwise restricted by the corporation's certificate of incorporation, any action required or permitted to be taken at any meeting of the board of directors, or of any committee thereof, may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the board, or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

ARTICLE IV
OFFICERS

Section 1    Number.  The officers of the corporation shall be elected by the board of directors and may consist of a chairman of the board, a president or chief executive officer (the " "president"),"), one or more vice-presidents, a chief financial officer, a secretary, a treasurer, and such other officers and assistant officers as may be deemed necessary or desirable by the board of directors.  Any number of offices may be held by the same person.  In its discretion, the board of directors may choose not to fill any office for any period as it may deem advisable, except that the offices of president and secretary shall be filled as expeditiously as possible.

Section 2    Election and Term of Office.  The officers of the corporation shall be elected at any meeting of the board of directors.  Vacancies may be filled or new offices created and filled at any meeting of the board of directors.  Each officer shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3    Removal.  Any officer or agent elected by the board of directors may be removed by the board of directors whenever in its judgment the best interests of the corporation would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

7

Section 4    Vacancies.  Any vacancy occurring in any office because of death, resignation, removal, disqualification or otherwise, may be filled by the board of directors for the unexpired portion of the term by the board of directors then in office.

Section 5    Compensation.  Compensation of all officers shall be fixed by the board of directors, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the corporation.

Section 6    Chairman of the Board.  The chairman of the board, if one is appointed, shall have the powers and perform the duties incident to that position.  Subject to the powers of the board of directors, the chairman of the board shall be in the general and active charge of the entire business and affairs of the corporation.  The chairman of the board shall preside at all meetings of the board of directors and at all meetings of the stockholders and shall have such other powers and perform such other duties as may be prescribed by the board of directors or provided in these by-laws.  Whenever the president is unable to serve, by reason of sickness, absence or otherwise, the chairman of the board shall perform all the duties and responsibilities and exercise all the powers of the president.

Section 7    The President.  The president, if one is appointed, shall be the chief executive officer of the corporation; shall preside at all meetings of the stockholders and board of directors at which he or she is present; subject to the powers of the board of directors, shall have general charge of the business, affairs and property of the corporation, and control over its officers, agents and employees; and shall see that all orders and resolutions of the board of directors are carried into effect.  The president shall execute bonds, mortgages and other contracts which the board of directors have authorized to be executed, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the board of directors to some other officer or agent of the corporation.  The president shall have such other powers and perform such other duties as may be prescribed by the board of directors or as may be provided in these by-laws.  If there is no chief executive officer, the president shall also have the duties of the chief executive officer as prescribed above.

Section 8    Chief Financial Officer.  The chief financial officer, if one is appointed, shall, under the direction of the chief executive officer (or, in the absence of a chief executive officer, the president), be responsible for all financial and accounting matters and for the direction of the offices of treasurer and controller.  The chief financial officer shall have such other powers and perform such other duties as may be prescribed by the chairman of the board, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or the board of directors or as may be provided in these by-laws.

Section 9    Vice-presidents.  The vice-president, if one is appointed, or if there shall be more than one, the vice-presidents in the order determined by the board of directors or by the president, shall, in the absence or disability of the president, act with all of the powers and be subject to all the restrictions of the president.  The vice-presidents shall also perform such other duties and have such other powers as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president) or these by-laws may, from time to time, prescribe.

Section 10    Secretary and Assistant Secretaries.  The secretary, if one is appointed, shall attend all meetings of the board of directors, all meetings of the committees thereof and all meetings of the stockholders and record all the proceedings of the meetings in a book or books to be kept for that purpose.  Under the chief executive officer's (or, in the absence of a chief executive officer, the president's) supervision, the secretary shall give, or cause to be given, all notices required to be given by these by-laws or by law, shall have such powers and perform such duties as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president) or these by-laws may, from time to time, prescribe, and shall have custody of the corporate seal of the corporation.  The secretary, or an assistant secretary, shall have authority to affix the corporate seal to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such assistant secretary.  The board of directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by his or her signature.  The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the board of directors, shall, in the absence or disability of the secretary, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president), president or secretary may, from time to time, prescribe.

Section 11    Treasurer and Assistant Treasurer.  The treasurer, if one is appointed, shall have the custody of the corporate funds and securities; shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation; shall deposit all monies and other valuable effects in the name and to the credit of the corporation as may be ordered by the board of directors; shall cause the funds of the corporation to be disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements; and shall render to the chief executive officer (or, in the absence of a chief executive officer, the president), the president and the board of directors, at its regular meeting or when the board of directors so requires, an account of the corporation; shall have such powers and perform such duties as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or these by-laws may, from time to time, prescribe.  If required by the board of directors, the treasurer shall give the corporation a bond (which shall be rendered every six years) in such sums and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of the office of treasurer and for the restoration to the corporation, in case of death, resignation, retirement, or removal from office, of all books, papers, vouchers, money, and other property of whatever kind in the possession or under the control of the treasurer belonging to the corporation.  The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the board of directors, shall in the absence or disability of the treasurer, perform the duties and exercise the powers of the treasurer.  The assistant treasurers shall perform such other duties and have such other powers as the board of directors, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or treasurer may, from time to time, prescribe.

Section 12    Other Officers, Assistant Officers and Agents.  Officers, assistant officers and agents, if any, other than those whose duties are provided for in these by-laws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the board of directors.

9

Section 13      Absence or Disability of Officers.  In the case of the absence or disability of any officer of the corporation and of any person hereby authorized to act in such officer's place during such officer's absence or disability, the board of directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person whom it may select.

ARTICLE V
INDEMNIFICATION OF OFFICERS, DIRECTORS AND OTHERS

Section 1      Nature of Indemnity.  Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether brought by or in the right of the corporation or any of its subsidiaries and whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), or any appeal of such proceeding, by reason of or arising out of the fact that he or she is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director, officer, manager, general partner, employee, fiduciary, or agent of another corporation or of a partnership, limited liability company, joint venture, trust or other enterprise, shall be indemnified and held harmless by the corporation to the fullest extent which it is empowered to do so, unless prohibited from doing so by the General Corporation Law of the State of Delaware, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the corporation to provide broader indemnification rights than said law permitted the corporation to provide prior to such amendment) against all expense, liability and loss (including attorneys' fees actually and reasonably incurred by such person in connection with such proceeding), and such indemnification shall inure to the benefit of his or her heirs, executors and administrators; provided that, except as provided in Section 2 hereof, the corporation shall indemnify any such person seeking indemnification in connection with a proceeding initiated by such person only if such proceeding was authorized by the board of directors of the corporation. The right to indemnification conferred in this Article V shall be a contract right and, subject to Sections 2 and 5 hereof, shall include the right to be paid by the corporation the expenses incurred in defending any such proceeding in advance of its final disposition.  The corporation may, by action of its board of directors, provide indemnification to employees and agents of the corporation with the same scope and effect as the foregoing indemnification of directors and officers.

Section 2      Procedure for Indemnification of Directors and Officers.    Any indemnification of a director or officer of the corporation provided for under Section 1 of this Article V or advance of expenses provided for under Section 5 of this Article V shall be made promptly, and in any event within 30 days, upon the written request of the director or officer.  If a determination by the corporation that the director or officer is entitled to indemnification pursuant to this Article V is required, and the corporation fails to respond within 60 days to a written request for indemnity, the corporation shall be deemed to have approved the request.  If the corporation wrongfully denies a written request for indemnification or advancing of expenses, in whole or in part, or if payment in full pursuant to such request is not properly made within 30 days, the right to indemnification or advances as granted by this Article V shall be enforceable by the director or officer in any court of competent jurisdiction.  Such person's costs and expenses incurred in connection with successfully establishing his or her right to indemnification, in whole or in part, in any such action shall also be indemnified by the

10

corporation. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the corporation) that the claimant has not met the standards of conduct which make it permissible under the General Corporation Law of the State of Delaware for the corporation to indemnify the claimant for the amount claimed, but the burden of such defense shall be on the corporation. Neither the failure of the corporation (including its board of directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the General Corporation Law of the State of Delaware, nor an actual determination by the corporation (including its board of directors, independent legal counsel, or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

Section 3    Article Not Exclusive. The rights to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the corporation's certificate of incorporation, by-law, agreement, vote of stockholders or disinterested directors or otherwise.

Section 4    Indemnitor of First Resort. The corporation hereby acknowledges that certain directors affiliated with or managed by Oaktree Capital Management, L.P., an affiliate of certain stockholders of the corporation (collectively, the "Oaktree Investors"), may have certain rights to indemnification, advancement of expenses and/or insurance provided by such Oaktree Investors or certain of their respective affiliates (collectively, the "Institutional Indemnitors"). The corporation hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to such directors are primary and any obligation of the Institutional Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by a director are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by a director in accordance with this ARTICLE V without regard to any rights any such director may have against the Institutional Indemnitors, and (iii) that it irrevocably waives, relinquishes and releases the Institutional Indemnitors from any and all claims against the Institutional Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The corporation further agrees that no advancement or payment by the Institutional Indemnitors on behalf of any director with respect to any claim for which such director has sought indemnification from the corporation shall affect the foregoing and the Institutional Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such director against the corporation. Notwithstanding any provision herein to the contrary, no officer or employee of the corporation or any of its subsidiaries shall have any rights to (and the corporation shall have no obligation to provide) indemnification or advances of expenses under this Article V with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, or claim related to or arising under any contract, agreement or arrangement between such person, on the one hand, and the corporation or its affiliates or controlling stockholders, on the other hand.

Section 5    Insurance. The corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was a director, officer, employee, fiduciary, or

agent of the corporation or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, whether or not the corporation would have the power to indemnify such person against such liability under this Article V.

Section 6    Expenses. Expenses incurred by any person described in Section 1 of this Article V in defending a proceeding shall be paid by the corporation in advance of such proceeding's final disposition (provided that, if such person is or was an executive of the corporation or its subsidiaries, such advancement will be made unless otherwise determined by the board of directors in the specific case) upon receipt of an undertaking by or on behalf of the director or officer or other person to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the corporation.  Such expenses incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the board of directors deems appropriate.

Section 7    Employees and Agents.  Persons who are not covered by the foregoing provisions of this Article V and who are or were employees or agents of the corporation, or who are or were serving at the request of the corporation as employees or agents of another corporation, partnership, joint venture, trust or other enterprise, may be indemnified, and may be advanced expenses, to the extent authorized at any time or from time to time by the board of directors.

Section 8    Contract Rights.  The provisions of this Article V shall be deemed to be a vested contract right between the corporation and each director or officer who serves in any such capacity at any time while this Article V and the relevant provisions of the General Corporation Law of the State of Delaware or other applicable law are in effect.  Such contract right shall vest for each director and officer at the time such person is elected or appointed to such position, and no repeal or modification of this Article V or any such law shall affect any such vested rights or obligations of any current or former director or officer with respect to any state of facts or proceeding regardless of when occurring.

Section 9    Merger or Consolidation.  For purposes of this Article V, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article V with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

## ARTICLE VI
## <u>CERTIFICATES OF STOCK</u>

Section 1        Form.  Every holder of stock in the corporation shall be entitled to have a certificate, signed by, or in the name of the corporation by the chief executive officer, president or a vice-president and the secretary or an assistant secretary of the corporation, certifying the number of shares owned by such holder in the corporation.  If such a certificate is countersigned (1) by a transfer agent or an assistant transfer agent other than the corporation or its employee or (2) by a registrar, other than the corporation or its employee, the signature of any such chief executive officer, president, vice-president, secretary, or assistant secretary may be facsimiles. In case any officer or officers who have signed, or whose facsimile signature or signatures have been used on, any such certificate or certificates shall cease to be such officer or officers of the corporation whether because of death, resignation or otherwise before such certificate or certificates have been delivered by the corporation, such certificate or certificates may nevertheless be issued and delivered as though the person or persons who signed such certificate or certificates or whose facsimile signature or signatures have been used thereon had not ceased to be such officer or officers of the corporation.  All certificates for shares shall be consecutively numbered or otherwise identified.  The name of the person to whom the shares represented thereby are issued, with the number of shares and date of issue, shall be entered on the books of the corporation.  Shares of stock of the corporation shall only be transferred on the books of the corporation by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the corporation of the certificate or certificates for such shares endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization, and other matters as the corporation may reasonably require, and accompanied by all necessary stock transfer stamps.  In that event, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate or certificates, and record the transaction on its books.  The board of directors may appoint a bank or trust company organized under the laws of the United States or any state thereof to act as its transfer agent or registrar, or both in connection with the transfer of any class or series of securities of the corporation.

Section 2        Lost Certificates.  The board of directors may direct a new certificate or certificates to be issued in place of any certificate or certificates previously issued by the corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed.  When authorizing such issue of a new certificate or certificates, the board of directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen, or destroyed certificate or certificates, or his or her legal representative, to give the corporation a bond sufficient to indemnify the corporation against any claim that may be made against the corporation on account of the loss, theft or destruction of any such certificate or the issuance of such new certificate.

Section 3        Fixing a Record Date for Stockholder Meetings.  In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which record date shall not be more than sixty nor less than ten

13

days before the date of such meeting.  If no record date is fixed by the board of directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be the close of business on the next day preceding the day on which notice is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided that the board of directors may fix a new record date for the adjourned meeting.

Section 4    Fixing a Record Date for Action by Written Consent.  In order that the corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which date shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the board of directors.  If no record date has been fixed by the board of directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the board of directors is required by statute, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested or by facsimile or electronic mail, with confirmation of receipt.  If no record date has been fixed by the board of directors and prior action by the board of directors is required by statute, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the board of directors adopts the resolution taking such prior action.

Section 5    Fixing a Record Date for Other Purposes.  In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment or any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purposes of any other lawful action, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the board of directors adopts the resolution relating thereto.

Section 6    Registered Stockholders.  Prior to the surrender to the corporation of the certificate or certificates for a share or shares of stock with a request to record the transfer of such share or shares, the corporation may treat the registered owner as the person entitled to receive dividends, to vote, to receive notifications, and otherwise to exercise all the rights and powers of an owner.  The corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof.

Section 7    Subscriptions for Stock.  Unless otherwise provided for in the subscription agreement, subscriptions for shares shall be paid in full at such time, or in such installments and

14

at such times, as shall be determined by the board of directors.  Any call made by the board of directors for payment on subscriptions shall be uniform as to all shares of the same class or as to all shares of the same series.  In case of default in the payment of any installment or call when such payment is due, the corporation may proceed to collect the amount due in the same manner as any debt due the corporation.

ARTICLE VII
GENERAL PROVISIONS

Section 1        Dividends.  Dividends upon the capital stock of the corporation, subject to the provisions of the corporation's certificate of incorporation, if any, may be declared by the board of directors at any regular or special meeting, pursuant to law.  Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the corporation's certificate of incorporation.  Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or any other purpose and the directors may modify or abolish any such reserve in the manner in which it was created.

Section 2        Checks, Drafts or Orders.  All checks, drafts, or other orders for the payment of money by or to the corporation and all notes and other evidences of indebtedness issued in the name of the corporation shall be signed by such officer or officers, agent or agents of the corporation, and in such manner, as shall be determined by resolution of the board of directors or a duly authorized committee thereof.

Section 3        Contracts.  The board of directors may authorize any officer or officers, or any agent or agents, of the corporation to enter into any contract or to execute and deliver any instrument in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances.

Section 4        Loans.  The corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiary, including any officer or employee who is a director of the corporation or its subsidiary, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation.  The loan, guaranty or other assistance may be with or without interest, and may be unsecured, or secured in such manner as the board of directors shall approve, including, without limitation, a pledge of shares of stock of the corporation.  Nothing in this section contained shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

Section 5        Fiscal Year.  The fiscal year of the corporation shall be fixed by resolution of the board of directors.

Section 6        Corporate Seal.  The board of directors shall provide a corporate seal which shall be in the form of a circle and shall have inscribed thereon the name of the

15

corporation and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

Section 7    Voting Securities Owned By Corporation.  Voting securities in any other corporation held by the corporation shall be voted by the president, unless the board of directors specifically confers authority to vote with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer.  Any person authorized to vote securities shall have the power to appoint proxies, with general power of substitution.

Section 8    Exclusive Jurisdiction.  Unless otherwise waived by resolution of the Board, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer of the corporation to the corporation or the corporation's stockholders, (iii) any action asserting a claim against the corporation arising pursuant to any provision of the General Corporation Law of the State of Delaware or the corporation's certificate of incorporation or by-laws or (iv) any action asserting a claim against the corporation governed by the internal affairs doctrine, except, as to each of (i) through (iv), for any claim for which the Delaware Chancery Court determines there is an indispensable party not subject to its jurisdiction (and such party does not consent to such jurisdiction within ten days of such determination).

Section 9    Section Headings.  Section headings in these by-laws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

Section 10    Inconsistent Provisions.  In the event that any provision of these by-laws is or becomes inconsistent with any provision of the corporation's certificate of incorporation, the General Corporation Law of the State of Delaware or any other applicable law, the provision of these by-laws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

ARTICLE VIII
AMENDMENTS

Subject to the terms of the Stockholders Agreement and other than Article V, these by-laws may be amended, altered, or repealed and new by-laws adopted at any meeting of the board of directors by a majority vote.  Article V hereof may be amended, altered, or repealed at any meeting of the board of directors only by a unanimous vote (or unanimous written consent in lieu thereof).; provided, that the provisions of the second sentence of Article II, Section 2 ("Special Meetings") and this Article VIII ("Amendments") (or any defined term affecting any such provisions) shall not be eliminated or amended in a manner (including by merger or otherwise) adverse to the stockholders other than the Oaktree Investors (each, a "Non-Oaktree Stockholder") without the prior written consent of the holders of at least a majority of the shares of voting common stock held by the Non-Oaktree Stockholder(s) so adversely affected.  The fact that the power to adopt, amend, alter, or repeal the by-laws has been conferred upon the board of directors shall not divest the stockholders of the same powers.

16

## **<u>EXHIBIT B-1</u>**

**Amended and Restated Certificates of Incorporation of the Reorganized Debtors (Clean)**

AMENDED AND RESTATED

CERTIFICATE OF INCORPORATION

OF

QUIKSILVER, INC.

## ARTICLE ONE

The name of the Corporation is Quiksilver, Inc.

## ARTICLE TWO

The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, Delaware, 19808.  The name of its registered agent at such address is Corporation Service Company.

## ARTICLE THREE

The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law ("DGCL").

## ARTICLE FOUR

PART A.    Authorized Capital Stock.

The total number of shares of capital stock which the Corporation has authority to issue is [●] shares, consisting of [●] shares of Common Stock, par value $.01 per share (the "Common Stock") and [●] shares of Preferred Stock, par value $.01 per share (the "Preferred Stock").

PART B.    Preferred Stock.

Shares of Preferred Stock may be issued from time to time in one or more series. The Board is hereby authorized to determine and alter all rights, preferences and privileges and qualifications, limitations and restrictions thereof (including, without limitation, voting rights and the limitation and exclusion thereof) granted to or imposed upon any wholly unissued series of Preferred Stock and the number of shares constituting any such series and the designation thereof, and to increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of any series subsequent to the issue of shares of that series then outstanding.  In the event that the number of shares of any series is so decreased, the shares constituting such reduction shall resume the status which such shares had prior to the adoption of the resolution originally fixing the number of shares of such series.

PART C.    Powers, Preferences and Special Rights of Common Stock. Except as otherwise provided in this Part C or as otherwise required by applicable law, all shares of Common Stock shall be identical in all respects and shall entitle the holders thereof to the same rights, preferences and privileges, subject to the same qualifications, limitations and restrictions, as set forth herein.

Section 1.    Voting Rights.  Except as otherwise provided in this Part C or as otherwise required by applicable law, the holders of Common Stock shall be entitled to one vote per share on all matters to be voted on by the stockholders of the Corporation.

Section 2.    Dividends.  Subject to the rights of the holders of any Preferred Stock, as and when dividends are declared or paid with respect to shares of Common Stock, whether in cash, property or securities of the Corporation, the holders of Common Stock shall be entitled to receive such dividends *pro rata*.

Section 3.    Liquidation.  Subject to the rights of the holders of any Preferred Stock, the holders of Common Stock shall be entitled to participate *pro rata* in all distributions to the holders of Common Stock in any liquidation, dissolution or winding up of the Corporation.

Section 4.    Restrictions on Transfer of Corporation Stock.  Without the written consent of the Oaktree Investors, which may be withheld in their sole discretion, until the six month anniversary of the date hereof, none of the Other Stockholders may Transfer any interest in any Corporation Stock, except pursuant to (i) a Sale of the Company in accordance with Section 6 hereof, (ii) the repurchase provisions set forth in any agreement between the Corporation or the Oaktree Investors and an employee, officer, consultant or service provider of the Corporation or an Affiliate thereof, or (iii) a Permitted Transfer.  At any time on or after the six month anniversary of the date hereof, each Other Stockholder shall be permitted to Transfer any interest in any Corporation Stock, subject to Section 5 hereof and any applicable restrictions on transfer under the Securities Act and applicable state securities laws.  In the case of, and as a condition to any Transfer by any Other Stockholder (other than pursuant to a Sale of the Company in accordance with Section 6 hereof, pursuant to the foregoing repurchase provisions or following an IPO), (1) the restrictions contained herein will continue to be applicable to such Corporation Stock after any such Transfer (unless the Corporation is the Transferee), (2) each Transferee of such Corporation Stock shall be an "accredited investor" as defined under Rule 501 of Regulation D of the Securities Act (or any similar or equivalent provision then in force), (3) neither the Transferee(s) of such Corporation Stock nor any of its Affiliates may be a Competitor and (4) the Transfer shall not result in the Corporation being required to register any Corporation Stock, or otherwise becoming subject to any reporting obligations, under the Securities Exchange Act of 1934 (subsections (1) through (4), the "Transfer Conditions"). Notwithstanding any other provision herein, none of the Other Stockholders which is a legal entity (including a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture or an unincorporated organization) that holds debt or equity securities of the Corporation as its primary asset shall authorize, permit or recognize the Transfer (directly or indirectly) of any of its equity interests, securities or other ownership interests without the prior written consent of the Oaktree Investors if such Transfer would violate this Section 4 if such Transfer was a Transfer of Corporation Stock.

2

Section 5.    <u>Rights of First Refusal</u>.   Pursuant to Section 202(c)(1) of the DGCL:

5A.    If after the six month anniversary of the date hereof any Other Stockholder receives a bona fide offer from a third party to purchase any of such Other Stockholder's Corporation Stock which includes the material terms and conditions regarding the proposed Transfer, such Other Stockholder shall be entitled to Transfer such shares subject to the provisions of this <u>Section 5</u>.   Before any Transfer by any Other Stockholder (a "Transferring Stockholder") (other than a Permitted Transfer or in connection with a Sale of the Company in accordance with <u>Section 6</u> hereof, or pursuant to the repurchase provisions set forth in any agreement between the Corporation or the Oaktree Investors and an employee, officer, consultant or service provider of the Corporation or an Affiliate thereof) of any Corporation Stock, such Transferring Stockholder shall deliver a written notice (the "Sale Notice") to the Corporation which shall include a summary specifying in reasonable detail the identity of the prospective Transferee(s), the proposed number of shares of each class of Corporation Stock to be Transferred (the "Transfer Stock"), and the proposed terms and conditions of the Transfer, including the proposed price per share for each class of shares of Corporation Stock to be Transferred (the "Offered Terms and Conditions"); provided that in no event shall any Transfer of any Corporation Stock in accordance with this <u>Section 5</u> by any Transferring Stockholder be made for any consideration other than cash.   Within three (3) business days following its receipt of the Sale Notice, the Corporation shall deliver a copy of the Sale Notice to each Oaktree Investor and each Other Stockholder holding at least 1% of the shares of Common Stock (determined on a fully-diluted basis) outstanding as of such date who is also a party to the Stockholders Agreement (together with the Oaktree Investors, the "Eligible Stockholders" and each, an "Eligible Stockholder"); provided that, for the avoidance of doubt, New Generation Advisors LLC shall be deemed to be an Eligible Stockholder as of the date hereof until such time as it ceases, after any sale of its shares of Common Stock, to hold at least 1% of the shares of Common Stock (determined on a fully-diluted basis) outstanding.   No such Transfer shall be consummated unless the Transfer Conditions are satisfied.

5B.    Each Eligible Stockholder (or any designees thereof) may elect to purchase up to its pro rata share (based on the number of shares of Corporation Stock held by such Stockholder as of such date as compared to the aggregate number of shares of Corporation Stock held by all Eligible Stockholders as of such date) ("Pro Rata Share") of the Transfer Stock, and, in the case of any Eligible Stockholders who elect to purchase their full Pro Rata Share of the Transfer Stock, may also indicate its election to purchase, if available, any additional amount of the Transfer Stock (such election, the "Secondary Election"), in each case at the same price and on the same terms and conditions specified in the Sale Notice by delivering written notice of such elections to the Transferring Stockholder and the Corporation as soon as practicable but in any event within ten (10) business days after the delivery by the Corporation to the Eligible Stockholders of the Sale Notice (such date the "Election Deadline").   If less than all of the Eligible Stockholders elect to purchase their full Pro Rata Share of the Transfer Stock (the remaining Transfer Stock which the Eligible Stockholders (or any designees thereof) have not elected to purchase, the "Available Stock"), then the Corporation shall allocate to each Eligible Stockholder (or any designee thereof) who submitted a Secondary Election, in a number of rounds until all Eligible Stockholder Secondary Elections have been satisfied in accordance with these allocation procedures, a number of shares of Available Stock equal to the lesser of (x) such

3

Eligible Stockholder's pro rata share (based on the number of shares of Corporation Stock held by such Eligible Stockholders as of such date compared to all Eligible Stockholders who submitted a Secondary Election) of the Available Stock and (y) the number of shares of Available Stock which such Eligible Stockholder had elected to purchase in the Secondary Election (taking into account allocations from prior rounds) until all shares of Transfer Stock have been purchased and/or each Eligible Stockholder has received the number of shares of Available Stock which such Stockholder had elected to purchase in the Secondary Election.

5C.     If the Eligible Stockholders (or any designees thereof) do not elect within the Election Deadline to purchase all of the Transfer Stock, then the Corporation may elect to purchase, at the same price and on the same terms and conditions specified in the Sale Notice, any or all of the Available Stock by delivering written notice of such election to the Transferring Stockholder as soon as practical but in any event within five (5) business days after the expiration of the Election Deadline (the "Election Period").

5D.     If the Corporation and/or the Eligible Stockholders have elected to purchase any or all of the Transfer Stock pursuant to this <u>Section 5</u>, such Transfer(s) shall be consummated as soon as practical after the delivery of the election notice(s) to the Transferring Stockholder, but in any event within thirty (30) days after delivery to the Corporation of the Sale Notice (the "ROFR Closing").  The Corporation and/or the Eligible Stockholders shall pay for the Transfer Stock to be purchased by delivery of a cashier's or certified check or wire transfer of immediately available funds for the full amount of the purchase price at the ROFR Closing.  At or prior to the consummation of such Transfer(s), the Transferring Stockholder must deliver to the Corporation all certificates for the shares of Corporation Stock being acquired by the Eligible Stockholders and/or the Corporation (except for those certificates which are already in the custody of the Corporation), together with proper assignments in blank of the Corporation Stock with signatures properly guaranteed and with such other documents as may be required by such Eligible Stockholders, as applicable, to provide reasonable assurance that each necessary endorsement is genuine and effective.  Upon receipt of the foregoing stock certificates and proper assignments in blank of shares of the Corporation Stock, the Corporation shall issue to each Eligible Stockholder (or any designee thereof) that exercised its rights to purchase Transfer Stock pursuant to this <u>Section 5</u> new stock certificates for the shares of Corporation Stock being acquired by such Eligible Stockholder.  Each such Eligible Stockholder shall be entitled to receive customary and reasonable written representations and warranties from the Transferring Stockholder regarding such sale of shares of Corporation Stock (including representations and warranties regarding good title to such shares, free and clear of any liens or encumbrances).

5E.     If the Corporation and/or the Eligible Stockholders, collectively, do not elect to purchase all of the Transfer Stock, the Transferring Stockholder may Transfer to any Transferee(s) all, but not less than all, of the remaining Transfer Stock, during the 120 day period immediately following the expiration of the Election Period, for a purchase price no less than the price specified in the Sale Notice and on other terms no more favorable to the Transferee(s) thereof than specified in the Sale Notice.

Section 6.     <u>Sale of the Company</u>.  Pursuant to Section 202(c)(4) of the DGCL:

6A.    Each stockholder of the Corporation hereby agrees that if at any time prior to the consummation of an IPO, the Oaktree Investors (the "Approving Stockholders") approve a Sale of the Company to a Person other than the Oaktree Investors or any of their respective Affiliates (an "Approved Sale"), each stockholder of the Corporation that is not an Approving Stockholder (the "Drag Along Stockholders") shall vote for, consent to and raise no objections against such Approved Sale, and appoint the Oaktree Investors or any of their respective designees as its representative to make all decisions in connection with any Approved Sale, regardless of the consideration being paid in such Approved Sale, so long as such Approved Sale complies with this Section 6.  Without limiting the foregoing, but subject to the provisions of Section 6B, if the Approved Sale is structured (i) as a merger or consolidation, each such Drag Along Stockholder will waive any dissenters rights, appraisal rights or similar rights in conjunction with such merger or consolidation, (ii) as a sale of equity, each such Drag Along Stockholder will agree to sell all of such Drag Along Stockholder's Corporation Stock on the terms and conditions approved by the Approving Stockholders, or (iii) as a sale of assets, each such Drag Along Stockholder will vote in favor of such Approved Sale and any subsequent liquidation or other distribution of the proceeds therefrom in accordance with the terms herein as approved by the Approving Stockholders.  The Corporation and each stockholder will take all actions requested by the Approving Stockholders in connection with the consummation of an Approved Sale, including the execution of all ancillary documents in connection therewith requested by the Approving Stockholders; provided that it is acknowledged and agreed that the Other Stockholders that are also employees of the Corporation or any of its subsidiaries may be required, in connection with an Approved Sale, to enter into confidentiality, non competition, non solicitation and non hire provisions.

6B.    Upon the consummation of the Approved Sale, each stockholder participating in such Approved Sale will receive the same portion of the aggregate consideration available to be distributed to the stockholders of the Corporation (in their capacity as such) that such stockholders participating in such sale (in their capacity as stockholders of the Corporation) would have received if such aggregate consideration had been distributed by the Corporation in accordance with the rights and preferences set forth herein as in effect immediately before such Approved Sale (and, in the event of a sale of Corporation Stock, assuming that the only securities of the Corporation outstanding were those Corporation Stock and other shares of capital stock involved in such Approved Sale); provided, that any convertible securities shall be deemed to be converted in the event that such conversion would yield greater proceeds herein; provided, further, that any consideration payable to any stockholder shall be reduced by the aggregate principal amount plus all accrued and unpaid interest on any indebtedness of any such stockholder to the Corporation or its subsidiaries. In the case of a stockholder who holds options or warrants exercisable into Corporation Stock which have not yet been exercised, the consideration received shall be deemed to be reduced (for purposes of such stockholder's consideration only) by such option's and/or warrant's exercise price.   To the extent any stockholder receives securities in lieu of cash or other consideration in the Approved Sale, such securities shall be deemed to be the same form of consideration so long as such securities are of a substantially equivalent value as the cash consideration received in such Approved Sale.

6C.    Each Drag Along Stockholder will be obligated to make representations with respect to its own shares of Corporation Stock and its own authority and ability to enter into the Approved Sale and other customary representations about such Drag Along Stockholder, and

shall be required to provide indemnification in respect of, among other things, any representation made by the Corporation or its subsidiaries and/or an employee of the Corporation or its subsidiaries and/or made by any stockholder in respect of the Corporation, its subsidiaries or their respective businesses, operations, conditions, prospects or the like to the extent the Approving Stockholders similarly provide such indemnification. Each stockholder participating in such Approved Sale will be obligated to join on a pro rata basis (applied such that after giving effect thereto, the aggregate consideration paid to each stockholder would comply with the provisions of Section 6B above) in any purchase price adjustments, indemnification or other obligations that the sellers of Corporation Stock are required to provide in connection with an Approved Sale (other than any such obligations that relate solely to a particular stockholder, such as indemnification with respect to representations and warranties given by a stockholder regarding such stockholder's title to and ownership of Corporation Stock, in respect of which only such stockholder will be liable); provided that, subject to Section 6D below and absent fraud, no stockholder shall be liable to the purchaser following the closing of the Approved Sale for any purchase price adjustments, indemnification or other obligations in excess of the aggregate gross proceeds (prior to reduction for indebtedness and other transaction expenses) received by the stockholders in connection with or pursuant to such Approved Sale (other than any such obligations that relate solely to a particular stockholder, such as indemnification with respect to representations and warranties given by a stockholder regarding such stockholder's title to and ownership of Corporation Stock, in respect of which only such stockholder will be liable). Notwithstanding anything to the contrary contained herein, in the sole discretion of the Approving Stockholders, the proceeds with respect to an Approved Sale may be withheld from (and retained by the Approving Stockholders or their designee in trust for the benefit of) all sellers of such Corporation Stock in such aggregate amount as the Approving Stockholders deem necessary to cover any purchase price adjustments, indemnification or other obligations of the Corporation or such sellers of Corporation Stock; provided that such proceeds shall be withheld on the same basis among all such sellers.

6D.    Notwithstanding anything to the contrary herein, if the Approving Stockholders agree to joint and several indemnification with respect to such Approved Sale, each Drag Along Stockholder shall agree to such joint and several indemnification as well, and in such event each Drag Along Stockholder shall enter into a contribution and indemnification or similar agreement acceptable to the Approving Stockholders pursuant to which each Drag Along Stockholder agrees to contribute amounts to and indemnify each other Drag Along Stockholder such that their liability will not exceed the aggregate amount of consideration received by such Drag Along Stockholder in connection with or pursuant to such Approved Sale (other than any such obligations that relate solely to a particular Drag Along Stockholder, such as indemnification with respect to representations and warranties given by a Drag Along Stockholder regarding such Drag Along Stockholder's title to and ownership of Corporation Stock, and other than any obligations that relate to a particular Drag Along Stockholder's fraud, in each case in respect of which only such Drag Along Stockholder will be liable).

6E.    If the Corporation enters into a negotiation for an Approved Sale or an Approved Sale transaction for which Rule 506 (or any similar rule then in effect) promulgated by the Securities and Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), the Drag Along Stockholders will, at the request of the board of directors of the Corporation (the "Board"),

6

appoint a purchaser representative (as such term is defined in Rule 501 or any similar rule), or such equivalent representative, reasonably acceptable to the Board. If any Drag Along Stockholder appoints a purchaser representative, or such equivalent representative, designated by the Board, the Corporation will, to the extent legally permitted, pay the fees of such purchaser representative, or such equivalent representative, but if any Drag Along Stockholder declines to appoint the purchaser representative, or such equivalent representative, designated by the Board such holder will appoint another purchaser representative, and such holder will be responsible for the fees of the purchaser representative, or such equivalent representative, so appointed.

6F.     Each stockholder will bear its pro rata share (applied such that after giving effect thereto, the aggregate consideration paid to each holder of Corporation Stock would comply with the provisions of <u>Section 6B</u>) of the costs of any sale of such Corporation Stock pursuant to an Approved Sale to the extent such costs are incurred for the benefit of all stockholders participating in such Approved Sale and are not otherwise paid by the Corporation or the acquiring party. Costs incurred by stockholders on their own behalf will not be considered costs of the transaction hereunder; it being understood that the fees and disbursements of one counsel chosen by the Oaktree Investors will be deemed for the benefit of all stockholders participating in such Approved Sale.

6G.     If any Drag Along Stockholder fails to deliver any certificates representing its shares of Corporation Stock, or in lieu thereof, a customary affidavit attesting to the loss or destruction of such certificate(s), such holder (i) will not be entitled to the consideration that such holder would otherwise receive in the Approved Sale until such holder cures such failure (provided that, after curing such failure, such holder will be so entitled to such consideration without interest), (ii) will be deemed, for all purposes, no longer to be a stockholder of the Corporation and will have no voting rights, (iii) will not be entitled to any dividends or other distributions declared after the Approved Sale with respect to the Corporation Stock held by such holder, and (iv) will have no other rights or privileges granted to stockholders herein or any future agreement.

Section 7.     <u>Holdback</u>. Each holder of Corporation Stock agrees not to offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any equity securities of the Corporation or a subsidiary of the Corporation undergoing an IPO (such entity, including any successor of such entity, the "IPO Entity") or any Affiliate thereof, or any securities convertible into or exchangeable or exercisable for such securities, enter into a transaction which would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of such securities, whether any such aforementioned transaction is to be settled by delivery of such securities or other securities, in cash or otherwise, or publicly disclose the intention to make any such offer, sale, pledge or disposition, or to enter into any such transaction, swap, hedge or other arrangement, in each case during the seven days before and the 90-day period (but in the case of the IPO Entity's IPO, the 180-day period; in each case, such period to be subject to any customary "booster shot" extensions) beginning on the effective date of any underwritten public offering of the IPO Entity's equity securities (including piggyback registrations) (or such longer or shorter period as may be requested in writing by the managing underwriter and agreed to in writing by the IPO Entity) (the "Market Standoff Period"), except as part of such underwritten registration if otherwise permitted. In addition, each holder of Corporation Stock agrees to execute any further

letters, agreements and/or other documents reasonably requested by the IPO Entity or its underwriters which are consistent with the terms of this Section 7 in this Part C.  The IPO Entity may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.  The restrictions contained in this Section 7 in this Part C are in addition to any other restrictions to which such holder of Corporation Stock may be subject.

Section 8.    Public Offering or Internal Reorganization.  In the event that the Board or the Oaktree Investors approve an IPO or internal reorganization of the Corporation's structure (including without limitation a debt refinancing of the Corporation or its subsidiaries, a "Restructuring"), then each holder of Corporation Stock shall vote for, consent to and raise no objections against such proposed IPO or Restructuring, and will take all such other necessary or desirable actions requested by the Board or Oaktree Investors, as applicable, in connection with the consummation of such IPO or Restructuring, including without limitation compliance with the requirements of all laws and regulatory bodies which are applicable or which have jurisdiction over such IPO or Restructuring, as applicable, and waiving any dissenters' rights, appraisal rights, approval rights or similar rights in connection with such IPO, and executing all agreements, documents and instruments in connection therewith in the form presented by the Board or the Oaktree Investors, as applicable.  Without limiting the foregoing, each holder of Corporation Stock will consent to and vote for a recapitalization, merger, reorganization or exchange (each, a "Recapitalization") of shares of any class of Corporation Stock into securities of the Corporation or any subsidiary or newly formed holding company of the Corporation that the managing underwriters and the Board or the Oaktree Investors, as applicable, find acceptable and appropriate to permit such IPO or Restructuring to proceed and will take all reasonably necessary and desirable actions in connection with the consummation of such Recapitalization, including executing all agreements, documents and instruments in connection therewith in the form presented by the Board or the Oaktree Investors, as applicable; provided that any resulting securities (which may be only one class of securities) will take into account the rights and preferences of securities hereunder as if a liquidation had occurred, including, without limitation, any liquidation preference and accrued and unpaid dividends owed to any holder of securities, and such resultant securities will be subject to the same rights and obligations (whether pursuant to this Amended and Restated Certificate of Incorporation, the Stockholders Agreement or otherwise) of Securities of the Corporation issued and outstanding as of the date thereof.

Section 9.    Confidentiality. Each stockholder recognizes and acknowledges that it has and may in the future receive certain confidential and proprietary information and trade secrets of the Corporation and its subsidiaries, including regarding identifiable, specific and discrete business opportunities being pursued by the Corporation or its subsidiaries (the "Confidential Information").  Except as otherwise agreed to by the Oaktree Investors, each stockholder agrees that it will not, and shall cause each of its directors, officers, unitholders, partners, employees, agents and members not to, during or after the term of the Stockholders Agreement, whether directly or indirectly through an Affiliate or otherwise, take commercial or proprietary advantage of or profit from any Confidential Information or disclose Confidential Information to any Person for any reason or purpose whatsoever, except (i) to authorized directors, officers, representatives, agents and employees of the Corporation or its subsidiaries and as otherwise may be proper in the course of performing such stockholder's obligations, or managing such stockholder's investment in the Corporation, under the Stockholders Agreement

8

and the agreements expressly contemplated thereby only if each such person has a duty to keep such information confidential or has otherwise agreed to hold any information or materials provided under the Stockholders Agreement confidential substantially in accordance with the terms of this Section 9 in this Part C; (ii) as part of such stockholder's normal reporting, rating or review procedure (including normal credit rating or pricing process), or in connection with such stockholder's or such stockholder's Affiliates' normal fund raising, marketing, informational or reporting activities, or to such stockholder's (or any of its Affiliates') Affiliates, auditors, attorneys or other agents only if each such person has a duty to keep such information confidential or has otherwise agreed to hold any information or materials provided under the Stockholders Agreement confidential substantially in accordance with the terms of this Section 9 in this Part C; or (iii) as is required to be disclosed by order of a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation, provided that, to the extent permitted by law, the stockholder required to make such disclosure shall provide to the Board prompt notice of such disclosure.  For purposes of this Section 9 in this Part C, "Confidential Information" shall not include any information of which such Person learns from a source other than the Corporation or any of its subsidiaries who is not known by such Person to be bound by a confidentiality obligation.  Nothing in this Section 9 in this Part C shall in any way limit or otherwise modify any other confidentiality obligations entered into by certain stockholders with the Corporation or its subsidiaries or any other agreement entered into by any stockholder with the Corporation or any of its subsidiaries.

Section 10.    For purposes of Sections 4, 5, 6 and 7 in this Part C:

10A.    "Affiliates" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person (including, without limitation, with respect to Oaktree Investor and its Affiliates, investment funds or entities managed by Oaktree Capital Management, L.P.), where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise;

10B.    "Competitor" means any Person that engages or participates in, directly or indirectly, any business or other activity that competes with the businesses of the Corporation or any of its subsidiaries.  Whether a Person is a Competitor of the Corporation or any of its subsidiaries shall be determined by the Board in its sole discretion.

10C.    "Corporation Stock" means (i) any capital stock of the Corporation purchased or otherwise acquired by any stockholder of the Corporation (including, without limitation, shares of Common Stock), (ii) any warrants, options, or other rights to subscribe for or to acquire, directly or indirectly, capital stock of the Corporation, whether or not then exercisable or convertible, (iii) any stock, notes, or other securities which are convertible into or exchangeable for, directly or indirectly, capital stock of the Corporation, whether or not then convertible or exchangeable, and (iv) any capital stock of the Corporation issued or issuable upon the exercise, conversion, or exchange of any of the securities referred to in clauses (i) through (iii) above, and (v) any securities issued or issuable directly or indirectly with respect to the securities referred to in clauses (i) through (iv) above by way of stock dividend or stock split or in connection with a combination of shares, recapitalization, reclassification, merger, consolidation, or other reorganization.  As to any particular securities constituting Corporation

9

Stock, such securities will cease to be Corporation Stock when they have been (a) effectively registered under the Securities Act and disposed of in accordance with the registration statement or prospectus covering them, (b) distributed to the public through a broker, dealer or market maker pursuant to Rule 144 (or any similar or equivalent provision then in force), or (c) been repurchased or otherwise acquired by the Corporation;

10D.     "Family Group" with respect to any stockholder of the Corporation that is a natural person, means such stockholder's spouse and descendants (whether natural or adopted), and any trust, family limited partnership, limited liability company or other entity wholly owned, directly or indirectly, by such stockholder or such stockholder's spouse and/or descendants that is and remains solely for the benefit of such stockholder and/or such stockholder's spouse and/or descendants.

10E.     "IPO" shall mean the first sale of Corporation Stock (whether in a primary offering of new shares or a secondary offering of issued and outstanding shares) to the public in a Public Sale pursuant to an effective registration statement filed with the Securities and Exchange Commission on Form S-1 or Form F-1 (or any other available comparable or successor form).

10F.     "Oaktree Investors" means OCM Big Wave Equity Holdings, LLC and each of its Affiliates who may from time to time become stockholders of the Corporation;

10G.     "Other Stockholder" means any stockholder of the Corporation other than an Oaktree Investor;

10H.     "Permitted Oaktree Investor Transfer" will mean any Transfer of Corporation Stock by an Oaktree Investor or any of its Affiliates (i) to or among such Oaktree Investor and its Affiliates or (ii) pursuant to an in kind distribution to its equityholders;

10I.     "Permitted Transfer" means any Transfer of Corporation Stock (other than with respect to Corporation Stock which have not fully vested or are subject to any forfeiture, which shall not be transferable), (i) in the case of any Other Stockholder, pursuant to applicable laws of descent and distribution or among such stockholder's Family Group, or to such stockholder's Affiliates, and (ii) in the case of an Oaktree Investor, in connection with a Permitted Oaktree Investor Transfer;

10J.     "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof;

10K.     "Public Sale" means any sale of securities to the public pursuant to an offering registered under the Securities Act or to the public through a broker, dealer or market maker pursuant to the provisions of Rule 144 (or any similar or equivalent provision then in force);

10L.     "Sale of the Company" means (i) any sale, transfer or issuance or series of sales, transfers and/or issuances of stock of the Corporation by the Corporation or any

10

holders thereof (including, without limitation, any merger, consolidation or other transaction or series of related transactions having the same effect) which results in any Person or group of Persons (as the term "group" is used under the Securities Exchange Act of 1934), other than an Oaktree Investor, owning stock of the Corporation possessing voting power to elect a majority of the Board or (ii) the sale or transfer of all or substantially all of the Corporation's assets, determined on a consolidated basis; provided that the term "Sale of the Company" shall not include a Public Sale.

10M.   "Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.  Any reference herein to a specific section, rule, or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

10N.   "Stockholders Agreement" means that certain Stockholders Agreement, dated as of the date hereof, by and among the Corporation, the Oaktree Investors and certain Other Stockholders from time to time signatories thereto, as amended from time to time.

10O.   "Transfer" means, a transfer, sale, assignment, pledge, hypothecation or other disposition, whether directly or indirectly (pursuant to the transfer of an economic or other interest, the creation of a derivative security or otherwise), the grant of an option or other right or the imposition of a restriction on disposition or voting or by operation of law.   When used as a verb, "Transfer" shall have the correlative meaning (whether with or without consideration and whether voluntarily or involuntarily or by operation of law).   In addition, "Transferred" and "Transferee" shall have the correlative meanings.

Section 11.   Transfers in Violation of Agreement.   Any transfer or attempted transfer of any Corporation Stock in violation of any provision of this Agreement will be void, and none of the Company or any Subsidiary will record such purported transfer on its books or treat any purported Transferee of such Corporation Stock as the owner of such securities for any purpose.

Section 12.   Replacement.   Upon receipt of evidence reasonably satisfactory to the Corporation (which may include an affidavit of the registered holder) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing one or more shares of any class of Common Stock, and in the case of any such loss, theft or destruction, upon receipt of indemnity reasonably satisfactory to the Corporation, or, in the case of any such mutilation upon surrender of such certificate, the Corporation shall (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the number of shares of such class represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

Section 13.   Notices.   All notices referred to herein shall be in writing, and shall be delivered by registered or certified mail, return receipt requested, postage prepaid, and shall be deemed to have been given when so mailed (i) to the Corporation at its principal executive offices and (ii) to any stockholder at such holder's address as it appears in the stock records of the Corporation (unless otherwise specified in a written notice to the Corporation by such holder).

Section 14.  <u>Amendment and Waiver</u>.  The provisions of this <u>Part C</u> may be amended, modified, or waived only with the prior written consent of the Oaktree Investors and the Board; provided that if any such modification, amendment or waiver would result in an adverse and disproportionate treatment of any stockholder or stockholders with respect to their shares of Corporation Stock in a manner materially different than the other stockholders holding the same shares of Corporation Stock (without regard to any effect on the individual circumstances of the holder of such shares of Corporation Stock), such modification, amendment or waiver will also require the prior written approval of the holders of at least a majority of the shares of Corporation Stock so adversely impacted; provided further, that the provisions of <u>Section 5</u> ("Rights of First Refusal"), <u>Section 6</u> ("Sale of the Company") and this <u>Section 14</u> ("Amendment and Waiver") shall not be eliminated or amended in a manner (including by merger or otherwise) adverse to any stockholder other than the Oaktree Investors (a "<u>Non-Oaktree Stockholder</u>") without the prior written consent of the holders of at least a majority of the shares of Corporation Stock held by the Non-Oaktree Stockholder(s) so adversely affected.

ARTICLE FIVE

The Corporation shall not issue any class of non-voting equity securities unless and solely to the extent permitted by Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") as in effect on the date hereof; provided, however, that this ARTICLE FIVE (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code; (ii) will have such force and effect, if any, only for so long as Section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation; and (iii) in all events may be amended or eliminated in accordance with applicable law from time to time in effect or with the prior written consent of the Oaktree Investors and the Board.

ARTICLE SIX

The Corporation is to have perpetual existence.

ARTICLE SEVEN

In furtherance and not in limitation of the powers conferred by statute, the Board is expressly authorized to make, alter or repeal the by-laws of the corporation.

ARTICLE EIGHT

Meetings of stockholders may be held within or outside of the State of Delaware, as the by-laws of the Corporation may provide.  The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board or in the by-laws of the Corporation.  Election of directors need not be by written ballot unless the by-laws of the Corporation so provide.

ARTICLE NINE

To the fullest extent permitted by the Delaware General Corporation Law as the same exists or may hereafter be amended, a director of this Corporation shall not be liable to the Corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director.

12

Any repeal or modification of this ARTICLE NINE shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE TEN

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation in the manner now or hereafter prescribed herein and by the laws of the State of Delaware, and all rights conferred upon stockholders herein are granted subject to this reservation.

## ARTICLE ELEVEN

The Corporation expressly elects not to be governed by §203 of the General Corporation Law of the State of Delaware.

## ARTICLE TWELVE

Each of the Corporation and the Other Stockholders acknowledges and agrees that: (a) the Oaktree Investors, their respective Affiliates and their respective shareholders, directors, officers, controlling persons, partners, members, and employees (collectively, the "Investor Group") (i) have investments or other business relationships with entities engaged in other businesses (including those which may compete with the business of the Corporation and any of its subsidiaries or areas in which the Corporation or any of its subsidiaries may in the future engage in business) and in related businesses other than through the Corporation or any of its subsidiaries (an "Other Business"), (ii) may develop a strategic relationship with businesses that are or may be competitive with the Corporation or any of its subsidiaries and (iii) will not be prohibited by virtue of its investment in the Corporation or its subsidiaries, or its service on the Board or any subsidiary's board of directors, from pursuing and engaging in any such activities; (b) each Other Stockholder and, to the maximum extent permitted from time to time under the law of the State of Delaware, the Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to its officers, directors or stockholders, other than those officers, directors or stockholders who are employees of the Corporation; (c) no member of the Investor Group shall be obligated to present any particular investment or business opportunity to the Corporation even if such opportunity is of a character which, if presented to the Corporation, could be undertaken by the Corporation, and in fact, each member of the Investor Group shall have the right to undertake any such opportunity for itself for its own account or on behalf of another or to recommend any such opportunity to other persons; (d) each member of the Investor Group and their respective portfolio companies may enter into contracts and other arrangements (including investments and joint ventures) with the Corporation and its Affiliates from time to time on terms approved by the Board; and (e) subject to the provisions under this Amended and Restated Certificate of Incorporation and the Stockholders Agreement, to the extent any Oaktree Investor is an Approving Stockholder, the Approving Stockholders shall have the right to undertake and consummate an Approved Sale at any time and for consideration that results in little or no consideration being paid or available to the stockholders. Each of the Corporation and the Other Stockholders hereby waives, to the fullest extent permitted by applicable law, any claims and rights that such person may otherwise have in connection with the matters described

13

in this ARTICLE TWELVE.  Without limiting the foregoing, each Other Stockholder hereby acknowledges that he, she or it is familiar with the existence of, and hereby approves of, any agreement between the Oaktree Investors or their Affiliates and the Corporation or any of its subsidiaries which provides management and transaction fees to the Oaktree Investors as described in the Stockholders Agreement.

*    *    *    *    *

14

**<u>EXHIBIT B-2</u>**

**Amended and Restated Certificates of Incorporation of the Reorganized Debtors (Redline)**

AMENDED AND RESTATED

CERTIFICATE OF INCORPORATION

OF

QUIKSILVER, INC.

ARTICLE ONE

The name of the Corporation is Quiksilver, Inc.

ARTICLE TWO

The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, Delaware, 19808. The name of its registered agent at such address is Corporation Service Company.

ARTICLE THREE

The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law ("DGCL").

ARTICLE FOUR

PART A.    Authorized Capital Stock.

The total number of shares of capital stock which the Corporation has authority to issue is [●] shares, consisting of [●] shares of Common Stock, par value $.01 per share (the "Common Stock") and [●] shares of Preferred Stock, par value $.01 per share (the "Preferred Stock").

PART B.    Preferred Stock.

Shares of Preferred Stock may be issued from time to time in one or more series. The Board is hereby authorized to determine and alter all rights, preferences and privileges and qualifications, limitations and restrictions thereof (including, without limitation, voting rights and the limitation and exclusion thereof) granted to or imposed upon any wholly unissued series of Preferred Stock and the number of shares constituting any such series and the designation thereof, and to increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of any series subsequent to the issue of shares of that series then outstanding. In the event that the number of shares of any series is so decreased, the shares constituting such reduction shall resume the status which such shares had prior to the adoption of the resolution originally fixing the number of shares of such series.

PART C.    Powers, Preferences and Special Rights of Common Stock.Except as otherwise provided in this Part C or as otherwise required by applicable law, all shares of Common Stock shall be identical in all respects and shall entitle the holders thereof to the same rights, preferences and privileges, subject to the same qualifications, limitations and restrictions, as set forth herein.

Section 1.    Voting Rights.  Except as otherwise provided in this Part C or as otherwise required by applicable law, the holders of Common Stock shall be entitled to one vote per share on all matters to be voted on by the stockholders of the Corporation.

Section 2.    Dividends.  Subject to the rights of the holders of any Preferred Stock, as and when dividends are declared or paid with respect to shares of Common Stock, whether in cash, property or securities of the Corporation, the holders of Common Stock shall be entitled to receive such dividends *pro rata*.

Section 3.    Liquidation.  Subject to the rights of the holders of any Preferred Stock, the holders of Common Stock shall be entitled to participate *pro rata* in all distributions to the holders of Common Stock in any liquidation, dissolution or winding up of the Corporation.

Section 4.    Restrictions on Transfer of Corporation Stock.  Without the written consent of the Oaktree Investors, which may be withheld in their sole discretion, until the ~~third~~six month anniversary of the date hereof, none of the Other Stockholders may Transfer any interest in any Corporation Stock, except pursuant to (i) a Sale of the Company in accordance with Section 6 hereof, (ii) the repurchase provisions set forth in any agreement between the Corporation or the Oaktree Investors and an employee, officer, consultant or service provider of the Corporation or an Affiliate thereof, or (iii) a Permitted Transfer.  At any time on or after the ~~third~~six month anniversary of the date hereof, each Other Stockholder shall be permitted to Transfer any interest in any Corporation Stock, subject to Section 5 hereof and any applicable restrictions on transfer under the Securities Act and applicable state securities laws.  In the case of, and as a condition to any Transfer by any Other Stockholder (other than pursuant to a Sale of the Company in accordance with Section 6 hereof, pursuant to the foregoing repurchase provisions or following an IPO), (1) the restrictions contained herein will continue to be applicable to such Corporation Stock after any such Transfer (unless the Corporation is the ~~t~~Transferee), (2) ~~the transferee(s)~~each Transferee of such Corporation Stock ~~is~~shall be an "accredited investor" as defined under Rule 501 of Regulation D of the Securities Act (or any similar or equivalent provision then in force), (3) neither the ~~t~~Transferee(s) of such Corporation Stock nor any of its Affiliates may be a Competitor and (4) the Transfer shall not result in the Corporation being required to register any Corporation Stock, or otherwise becoming subject to any reporting obligations, under the Securities Exchange Act of 1934~~.~~ (subsections (1) through (4), the "Transfer Conditions"). Notwithstanding any other provision herein, none of the Other Stockholders which is a legal entity (including a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture or an unincorporated organization) that holds debt or equity securities of the Corporation as its primary asset shall authorize, permit or recognize the Transfer (directly or indirectly) of any of its equity interests, securities or other ownership interests without the prior written consent of the Oaktree Investors if such Transfer would violate this Section 4 if such Transfer was a Transfer of Corporation Stock.

2

Section 5.    <u>Rights of First Refusal</u>.    Pursuant to Section 202(c)(1) of the DGCL:

5A.    If <u>after the six month anniversary of the date hereof</u> any Other Stockholder ~~enters into~~<u>receives</u> a ~~binding agreement~~<u>bona fide offer from a third party</u> to ~~Transfer~~<u>purchase</u> any <u>of such Other Stockholder's</u> Corporation Stock ~~(a "Sale Agreement"),~~<u>which includes the material terms and conditions regarding the proposed Transfer,</u> such Other Stockholder shall be entitled to Transfer such shares subject to the provisions of this <u>Section 5</u>.  ~~At least thirty (30) days before~~<u>Before</u> any Transfer by any Other Stockholder (a "Transferring Stockholder") (other than a Permitted Transfer or in connection with a Sale of the Company in accordance with <u>Section 6</u> hereof, or pursuant to the repurchase provisions set forth in any agreement between the Corporation or the Oaktree Investors and an employee, officer, consultant or service provider of the Corporation or an Affiliate thereof~~,~~<u>,)</u> of any Corporation Stock, such Transferring Stockholder shall deliver a written notice (the "Sale Notice") to the Corporation ~~and the Oaktree Investors~~ which shall include ~~a copy of the Sale Agreement as well as~~ a summary specifying in reasonable detail the identity of the prospective Transferee(s), the proposed number of <u>shares of</u> each class of Corporation Stock to be Transferred (the "Transfer Stock"), and the proposed terms and conditions of the Transfer, including the proposed price per share for each class of <u>shares of</u> Corporation Stock to be Transferred (the "Offered Terms and Conditions"); provided that in no event shall any Transfer of any Corporation Stock in accordance with this <u>Section 5</u> by any Transferring Stockholder be made for any consideration other than cash.  ~~No such Transfer shall be consummated unless each such prospective Transferee is reasonably acceptable to the Corporation and the Oaktree Investors, and no such Transfer shall be consummated prior to the date on which the parties to the Transfer have been finally determined in accordance with this~~ ~~Section 5~~<u>Within three (3) business days following its receipt of the Sale Notice, the Corporation shall deliver a copy of the Sale Notice to each Oaktree Investor and each Other Stockholder holding at least 1% of the shares of Common Stock (determined on a fully-diluted basis) outstanding as of such date who is also a party to the Stockholders Agreement (together with the Oaktree Investors, the "Eligible Stockholders" and each, an "Eligible Stockholder"); provided that, for the avoidance of doubt, New Generation Advisors LLC shall be deemed to be an Eligible Stockholder as of the date hereof until such time as it ceases, after any sale of its shares of Common Stock, to hold at least 1% of the shares of Common Stock (determined on a fully-diluted basis) outstanding.  No such Transfer shall be consummated unless the Transfer Conditions are satisfied.</u>

~~5B.    The Oaktree Investors (or any designees thereof) may elect to purchase any or all of the Transfer Stock at the same price and on the same terms and conditions specified in the Sale Notice by delivering written notice of such election to the Transferring Stockholder and the Corporation as soon as practicable but in any event within twenty (20) days after delivery to the Corporation and the Oaktree Investors of the Sale Notice. If the Oaktree Investors (or any designees thereof) do not elect within such twenty (20) day period to purchase all of the Transfer Stock, then the Corporation~~

<u>5B.    Each Eligible Stockholder (or any designees thereof) may elect to purchase up to its pro rata share (based on the number of shares of Corporation Stock held by such Stockholder as of such date as compared to the aggregate number of shares of Corporation Stock held by all Eligible Stockholders as of such date) ("Pro Rata Share") of the Transfer Stock,</u>

3

and, in the case of any Eligible Stockholders who elect to purchase their full Pro Rata Share of the Transfer Stock, may also indicate its election to purchase, if available, any additional amount of the Transfer Stock (such election, the "Secondary Election"), in each case at the same price and on the same terms and conditions specified in the Sale Notice by delivering written notice of such elections to the Transferring Stockholder and the Corporation as soon as practicable but in any event within ten (10) business days after the delivery by the Corporation to the Eligible Stockholders of the Sale Notice (such date the "Election Deadline").  If less than all of the Eligible Stockholders elect to purchase their full Pro Rata Share of the Transfer Stock (the remaining Transfer Stock which the Eligible Stockholders (or any designees thereof) have not elected to purchase, the "Available Stock"), then the Corporation shall allocate to each Eligible Stockholder (or any designee thereof) who submitted a Secondary Election, in a number of rounds until all Eligible Stockholder Secondary Elections have been satisfied in accordance with these allocation procedures, a number of shares of Available Stock equal to the lesser of (x) such Eligible Stockholder's pro rata share (based on the number of shares of Corporation Stock held by such Eligible Stockholders as of such date compared to all Eligible Stockholders who submitted a Secondary Election) of the Available Stock and (y) the number of shares of Available Stock which such Eligible Stockholder had elected to purchase in the Secondary Election (taking into account allocations from prior rounds) until all shares of Transfer Stock have been purchased and/or each Eligible Stockholder has received the number of shares of Available Stock which such Stockholder had elected to purchase in the Secondary Election.

       5C.    If the Eligible Stockholders (or any designees thereof) do not elect within the Election Deadline to purchase all of the Transfer Stock, then the Corporation may elect to purchase, at the same price and on the same terms and conditions specified in the Sale Notice, any or all of the remaining Transfer Stock which the Oaktree Investors (or any designees thereof) have not elected to purchase (the "Available Stock")Available Stock by delivering written notice of such election to the Transferring Stockholder as soon as practical but in any event within five (25)5) business days after delivery to the Corporation and the Oaktree Investorsexpiration of the Sale NoticeElection Deadline (the "Election Period").

       5D.    If the Corporation and/or the Oaktree InvestorsEligible Stockholders have elected to purchase any or all of the Transfer Stock pursuant to this Section 5, such Transfer(s) shall be consummated as soon as practical after the delivery of the election notice(s) to the Transferring Stockholder, but in any event within thirty (30) days after delivery to the Corporation and the Oaktree Investors of the Sale Notice (the "ROFR Closing").  The Corporation and/or the Oaktree InvestorsEligible Stockholders shall pay for the Transfer Stock to be purchased by delivery of a cashier's or certified check or wire transfer of immediately available funds for the full amount of the purchase price at the ROFR Closing.  At or prior to the consummation of such Transfer(s), the Transferring Stockholder must deliver to each such Person that exercised its rights to purchase Transfer Stock under this Section 5 (a "ROFR Person"), the Corporation all certificates for the shares of Corporation Stock being acquired by such ROFR Personthe Eligible Stockholders and/or the Corporation (except, in the case of the Corporation for those certificates which are already in the custody of the Corporation), together with proper assignments in blank of the Corporation Stock with signatures properly guaranteed and with such other documents as may be required by such ROFR PersonEligible Stockholders, as applicable, to provide reasonable assurance that each necessary endorsement is genuine and effective, and such ROFR Person.  Upon receipt of the foregoing stock certificates and proper

4

assignments in blank of shares of the Corporation Stock, the Corporation shall issue to each Eligible Stockholder (or any designee thereof) that exercised its rights to purchase Transfer Stock pursuant to this Section 5 new stock certificates for the shares of Corporation Stock being acquired by such Eligible Stockholder.  Each such Eligible Stockholder shall be entitled to receive customary and reasonable written representations and warranties from the Transferring Stockholder regarding such sale of shares of Corporation Stock (including representations and warranties regarding good title to such shares, free and clear of any liens or encumbrances).

5E.     If the Corporation and/or the ~~Oaktree Investors~~Eligible Stockholders, collectively, do not elect to purchase all of the Transfer Stock, the Transferring Stockholder may Transfer to ~~the~~any Transferee(s) ~~identified in the Sale Notice~~ all, but not less than all, of the remaining Transfer Stock, during the 120 day period immediately following the expiration of the Election Period, for a purchase price no less than the price specified in the Sale Notice and on other terms no more favorable to the Transferee(s) thereof than specified in the Sale Notice.

Section 6.     Sale of the Company.  Pursuant to Section 202(c)(4) of the DGCL:

6A.     Each stockholder of the Corporation hereby agrees that if at any time prior to the consummation of an IPO, the Oaktree Investors (the "Approving Stockholders") approve a Sale of the Company to a Person other than the Oaktree Investors or any of their respective Affiliates (an "Approved Sale"), each stockholder of the Corporation that is not an Approving Stockholder (the "Drag Along Stockholders") shall vote for, consent to and raise no objections against such Approved Sale, and appoint the Oaktree Investors or any of their respective designees as its representative to make all decisions in connection with any Approved Sale, regardless of the consideration being paid in such Approved Sale, so long as such Approved Sale complies with this Section 6.  Without limiting the foregoing, but subject to the provisions of Section 6B, if the Approved Sale is structured (i) as a merger or consolidation, each such Drag Along Stockholder will waive any dissenters rights, appraisal rights or similar rights in conjunction with such merger or consolidation, (ii) as a sale of equity, each such Drag Along Stockholder will agree to sell all of such Drag Along Stockholder's Corporation Stock on the terms and conditions approved by the Approving Stockholders, or (iii) as a sale of assets, each such Drag Along Stockholder will vote in favor of such Approved Sale and any subsequent liquidation or other distribution of the proceeds therefrom in accordance with the terms herein as approved by the Approving Stockholders.  The Corporation and each stockholder will take all actions requested by the Approving Stockholders in connection with the consummation of an Approved Sale, including the execution of all ancillary documents in connection therewith requested by the Approving Stockholders; provided that it is acknowledged and agreed that the Other Stockholders that are also employees of the Corporation or any of its subsidiaries may be required, in connection with an Approved Sale, to enter into confidentiality, non competition, non solicitation and non hire provisions.

6B.     Upon the consummation of the Approved Sale, each stockholder participating in such Approved Sale will receive the same portion of the aggregate consideration available to be distributed to the stockholders of the Corporation (in their capacity as such) that such stockholders participating in such sale (in their capacity as stockholders of the Corporation) would have received if such aggregate consideration had been distributed by the Corporation in accordance with the rights and preferences set forth herein as in effect immediately before such

5

Approved Sale (and, in the event of a sale of Corporation Stock, assuming that the only securities of the Corporation outstanding were those Corporation Stock and other shares of capital stock involved in such Approved Sale); provided, that any convertible securities shall be deemed to be converted in the event that such conversion would yield greater proceeds herein; provided, further, that any consideration payable to any stockholder shall be reduced by the aggregate principal amount plus all accrued and unpaid interest on any indebtedness of any such stockholder to the Corporation or its subsidiaries. In the case of a stockholder who holds options or warrants exercisable into Corporation Stock which have not yet been exercised, the consideration received shall be deemed to be reduced (for purposes of such stockholder's consideration only) by such option's and/or warrant's exercise price.   To the extent any stockholder receives securities in lieu of cash or other consideration in the Approved Sale, such securities shall be deemed to be the same form of consideration so long as such securities are of a substantially equivalent value as the cash consideration received in such Approved Sale.

　　　　　6C.　　　　Each Drag Along Stockholder will be obligated to make representations with respect to its own shares of Corporation Stock and its own authority and ability to enter into the Approved Sale and other customary representations about such Drag Along Stockholder, and shall be required to provide indemnification in respect of, among other things, any representation made by the Corporation or its subsidiaries and/or an employee of the Corporation or its subsidiaries and/or made by any stockholder in respect of the Corporation, its subsidiaries or their respective businesses, operations, conditions, prospects or the like to the extent the Approving Stockholders similarly provide such indemnification.  Each stockholder participating in such Approved Sale will be obligated to join on a pro rata basis (applied such that after giving effect thereto, the aggregate consideration paid to each stockholder would comply with the provisions of Section 6B above) in any purchase price adjustments, indemnification or other obligations that the sellers of Corporation Stock are required to provide in connection with an Approved Sale (other than any such obligations that relate solely to a particular stockholder, such as indemnification with respect to representations and warranties given by a stockholder regarding such stockholder's title to and ownership of Corporation Stock, in respect of which only such stockholder will be liable); provided that, subject to Section 6D below and absent fraud, no stockholder shall be liable to the purchaser following the closing of the Approved Sale for any purchase price adjustments, indemnification or other obligations in excess of the aggregate gross proceeds (prior to reduction for indebtedness and other transaction expenses) received by the stockholders in connection with or pursuant to such Approved Sale (other than any such obligations that relate solely to a particular stockholder, such as indemnification with respect to representations and warranties given by a stockholder regarding such stockholder's title to and ownership of Corporation Stock, in respect of which only such stockholder will be liable).  Notwithstanding anything to the contrary contained herein, in the sole discretion of the Approving Stockholders, the proceeds with respect to an Approved Sale may be withheld from (and retained by the Approving Stockholders or their designee in trust for the benefit of) all sellers of such Corporation Stock in such aggregate amount as the Approving Stockholders deem necessary to cover any purchase price adjustments, indemnification or other obligations of the Corporation or such sellers of Corporation Stock; provided that such proceeds shall be withheld on the same basis among all such sellers.

　　　　　6D.　　　　Notwithstanding anything to the contrary herein, if the Approving Stockholders agree to joint and several indemnification with respect to such Approved Sale, each

Drag Along Stockholder shall agree to such joint and several indemnification as well, and in such event each Drag Along Stockholder shall enter into a contribution and indemnification or similar agreement acceptable to the Approving Stockholders pursuant to which each Drag Along Stockholder agrees to contribute amounts to and indemnify each other Drag Along Stockholder such that their liability will not exceed the aggregate amount of consideration received by such Drag Along Stockholder in connection with or pursuant to such Approved Sale (other than any such obligations that relate solely to a particular Drag Along Stockholder, such as indemnification with respect to representations and warranties given by a Drag Along Stockholder regarding such Drag Along Stockholder's title to and ownership of Corporation Stock, and other than any obligations that relate to a particular Drag Along Stockholder's fraud, in each case in respect of which only such Drag Along Stockholder will be liable).

6E.    If the Corporation enters into a negotiation for an Approved Sale or an Approved Sale transaction for which Rule 506 (or any similar rule then in effect) promulgated by the Securities and Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), the Drag Along Stockholders will, at the request of the board of directors of the Corporation (the "Board"), appoint a purchaser representative (as such term is defined in Rule 501 or any similar rule), or such equivalent representative, reasonably acceptable to the Board.  If any Drag Along Stockholder appoints a purchaser representative, or such equivalent representative, designated by the Board, the Corporation will, to the extent legally permitted, pay the fees of such purchaser representative, or such equivalent representative, but if any Drag Along Stockholder declines to appoint the purchaser representative, or such equivalent representative, designated by the Board such holder will appoint another purchaser representative, and such holder will be responsible for the fees of the purchaser representative, or such equivalent representative, so appointed.

6F.    Each stockholder will bear its pro rata share (applied such that after giving effect thereto, the aggregate consideration paid to each holder of Corporation Stock would comply with the provisions of Section 6B) of the costs of any sale of such Corporation Stock pursuant to an Approved Sale to the extent such costs are incurred for the benefit of all stockholders participating in such Approved Sale and are not otherwise paid by the Corporation or the acquiring party.  Costs incurred by stockholders on their own behalf will not be considered costs of the transaction hereunder; it being understood that the fees and disbursements of one counsel chosen by the Oaktree Investors will be deemed for the benefit of all stockholders participating in such Approved Sale.

6G.    If any Drag Along Stockholder fails to deliver any certificates representing its shares of Corporation Stock, or in lieu thereof, a customary affidavit attesting to the loss or destruction of such certificate(s), such holder (i) will not be entitled to the consideration that such holder would otherwise receive in the Approved Sale until such holder cures such failure (provided that, after curing such failure, such holder will be so entitled to such consideration without interest), (ii) will be deemed, for all purposes, no longer to be a stockholder of the Corporation and will have no voting rights, (iii) will not be entitled to any dividends or other distributions declared after the Approved Sale with respect to the Corporation Stock held by such holder, and (iv) will have no other rights or privileges granted to stockholders herein or any future agreement.

7

Section 7.    <u>Holdback</u>.  Each holder of Corporation Stock agrees not to offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any equity securities of the Corporation or a subsidiary of the Corporation undergoing an IPO (such entity, including any successor of such entity, the "IPO Entity") or any Affiliate thereof, or any securities convertible into or exchangeable or exercisable for such securities, enter into a transaction which would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of such securities, whether any such aforementioned transaction is to be settled by delivery of such securities or other securities, in cash or otherwise, or publicly disclose the intention to make any such offer, sale, pledge or disposition, or to enter into any such transaction, swap, hedge or other arrangement, in each case during the seven days before and the 90-day period (but in the case of the IPO Entity's IPO, the 180-day period; in each case, such period to be subject to any customary "booster shot" extensions) beginning on the effective date of any underwritten public offering of the IPO Entity's equity securities (including piggyback registrations) (or such longer or shorter period as may be requested in writing by the managing underwriter and agreed to in writing by the IPO Entity) (the "Market Standoff Period"), except as part of such underwritten registration if otherwise permitted.  In addition, each holder of Corporation Stock agrees to execute any further letters, agreements and/or other documents reasonably requested by the IPO Entity or its underwriters which are consistent with the terms of this <u>Section 7</u> in this <u>Part C</u>.  The IPO Entity may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.  The restrictions contained in this <u>Section 7</u> in this <u>Part C</u> are in addition to any other restrictions to which such holder of Corporation Stock may be subject.

Section 8.    <u>Public Offering or Internal Reorganization</u>.  In the event that the Board or the Oaktree Investors approve an IPO or internal reorganization of the Corporation's structure (including without limitation a debt refinancing of the Corporation or its subsidiaries, a "Restructuring"), then each holder of Corporation Stock shall vote for, consent to and raise no objections against such proposed IPO or Restructuring, and will take all such other necessary or desirable actions requested by the Board or Oaktree Investors, as applicable, in connection with the consummation of such IPO or Restructuring, including without limitation compliance with the requirements of all laws and regulatory bodies which are applicable or which have jurisdiction over such IPO or Restructuring, as applicable, and waiving any dissenters' rights, appraisal rights, approval rights or similar rights in connection with such IPO, and executing all agreements, documents and instruments in connection therewith in the form presented by the Board or the Oaktree Investors, as applicable.  Without limiting the foregoing, each holder of Corporation Stock will consent to and vote for a recapitalization, merger, reorganization or exchange (each, a "Recapitalization") <u>of shares</u> of any class of Corporation Stock into securities of the Corporation or any subsidiary or newly formed holding company of the Corporation that the managing underwriters and the Board or the Oaktree Investors, as applicable, find acceptable and appropriate to permit such IPO or Restructuring to proceed and will take all reasonably necessary and desirable actions in connection with the consummation of such Recapitalization, including executing all agreements, documents and instruments in connection therewith in the form presented by the Board or the Oaktree Investors, as applicable; provided that any resulting securities (which may be only one class of securities) will take into account the rights and preferences of securities hereunder as if a liquidation had occurred, including, without limitation, any liquidation preference and accrued and unpaid dividends owed to any holder of securities,

8

and such resultant securities will be subject to the same rights and obligations (whether pursuant to this Amended and Restated Certificate of Incorporation, the Stockholders Agreement or otherwise) of Securities of the Corporation issued and outstanding as of the date thereof.

Section 9.    Confidentiality. Each stockholder recognizes and acknowledges that it has and may in the future receive certain confidential and proprietary information and trade secrets of the Corporation and its subsidiaries, including regarding identifiable, specific and discrete business opportunities being pursued by the Corporation or its subsidiaries (the "Confidential Information").  Except as otherwise agreed to by the Oaktree Investors, each stockholder agrees that it will not, and shall cause each of its directors, officers, unitholders, partners, employees, agents and members not to, during or after the term of the Stockholders Agreement, whether directly or indirectly through an Affiliate or otherwise, take commercial or proprietary advantage of or profit from any Confidential Information or disclose Confidential Information to any Person for any reason or purpose whatsoever, except (i) to authorized directors, officers, representatives, agents and employees of the Corporation or its subsidiaries and as otherwise may be proper in the course of performing such stockholder's obligations, or managing such stockholder's investment in the Corporation, under the Stockholders Agreement and the agreements expressly contemplated thereby only if each such person has a duty to keep such information confidential or has otherwise agreed to hold any information or materials provided under the Stockholders Agreement confidential substantially in accordance with the terms of this Section 9 in this Part C; (ii) as part of such stockholder's normal reporting, rating or review procedure (including normal credit rating or pricing process), or in connection with such stockholder's or such stockholder's Affiliates' normal fund raising, marketing, informational or reporting activities, or to such stockholder's (or any of its Affiliates') Affiliates, auditors, attorneys or other agents only if each such person has a duty to keep such information confidential or has otherwise agreed to hold any information or materials provided under the Stockholders Agreement confidential substantially in accordance with the terms of this Section 9 in this Part C; or (iii) as is required to be disclosed by order of a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation, provided that, to the extent permitted by law, the stockholder required to make such disclosure shall provide to the Board prompt notice of such disclosure.  For purposes of this Section 9 in this Part C, "Confidential Information" shall not include any information of which such Person learns from a source other than the Corporation or any of its subsidiaries who is not known by such Person to be bound by a confidentiality obligation.  Nothing in this Section 9 in this Part C shall in any way limit or otherwise modify any other confidentiality obligations entered into by certain stockholders with the Corporation or its subsidiaries or any other agreement entered into by any stockholder with the Corporation or any of its subsidiaries.

Section 10.    For purposes of Sections 4, 5, 6 and 7 in this Part C:

10A.    "Affiliates" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person (including, without limitation, with respect to Oaktree Investor and its Affiliates, investment funds or entities managed by Oaktree Capital Management, L.P.), where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise;

9

10B.    "Competitor" means any Person that engages or participates in, directly or indirectly, any business or other activity that competes with the businesses of the Corporation or any of its subsidiaries.  Whether a Person is a Competitor of the Corporation or any of its subsidiaries shall be determined by the Board in its sole discretion.

10C.    "Corporation Stock" means (i) any capital stock of the Corporation purchased or otherwise acquired by any stockholder of the Corporation (including, without limitation, shares of Common Stock), (ii) any warrants, options, or other rights to subscribe for or to acquire, directly or indirectly, capital stock of the Corporation, whether or not then exercisable or convertible, (iii) any stock, notes, or other securities which are convertible into or exchangeable for, directly or indirectly, capital stock of the Corporation, whether or not then convertible or exchangeable, and (iv) any capital stock of the Corporation issued or issuable upon the exercise, conversion, or exchange of any of the securities referred to in clauses (i) through (iii) above, and (v) any securities issued or issuable directly or indirectly with respect to the securities referred to in clauses (i) through (iv) above by way of stock dividend or stock split or in connection with a combination of shares, recapitalization, reclassification, merger, consolidation, or other reorganization.  As to any particular securities constituting Corporation Stock, such securities will cease to be Corporation Stock when they have been (a) effectively registered under the Securities Act and disposed of in accordance with the registration statement or prospectus covering them, (b) distributed to the public through a broker, dealer or market maker pursuant to Rule 144 (or any similar or equivalent provision then in force), or (c) been repurchased or otherwise acquired by the Corporation;

10D.    "Family Group" with respect to any stockholder of the Corporation that is a natural person, means such stockholder's spouse and descendants (whether natural or adopted), and any trust, family limited partnership, limited liability company or other entity wholly owned, directly or indirectly, by such stockholder or such stockholder's spouse and/or descendants that is and remains solely for the benefit of such stockholder and/or such stockholder's spouse and/or descendants.

10E.    "IPO" shall mean the first sale of Corporation Stock (whether in a primary offering of new shares or a secondary offering of issued and outstanding shares) to the public in a Public Sale pursuant to an effective registration statement filed with the Securities and Exchange Commission on Form S-1 or Form F-1 (or any other available comparable or successor form).

10F.    "Oaktree Investors" means OCM Big Wave Equity Holdings, LLC and each of its Affiliates who may from time to time become stockholders of the Corporation;

10G.    "Other Stockholder" means any stockholder of the Corporation other than an Oaktree Investor;

10H.    "Permitted Oaktree Investor Transfer" will mean any Transfer of Corporation Stock by an Oaktree Investor or any of its Affiliates (i) to or among such Oaktree Investor and its Affiliates or (ii) pursuant to an in kind distribution to its equityholders;

10

10I.    "Permitted Transfer" means any Transfer of Corporation Stock (other than with respect to Corporation Stock which have not fully vested or are subject to any forfeiture, which shall not be transferable), (i) in the case of any Other Stockholder, pursuant to applicable laws of descent and distribution or among such stockholder's Family Group, or to such stockholder's Affiliates which are wholly owned subsidiaries of such stockholder, and (ii) in the case of an Oaktree Investor, in connection with a Permitted Oaktree Investor Transfer;

10J.    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof;

10K.    "Public Sale" means any sale of securities to the public pursuant to an offering registered under the Securities Act or to the public through a broker, dealer or market maker pursuant to the provisions of Rule 144 (or any similar or equivalent provision then in force);

10L.    "Sale of the Company" means (i) any sale, transfer or issuance or series of sales, transfers and/or issuances of stock of the Corporation by the Corporation or any holders thereof (including, without limitation, any merger, consolidation or other transaction or series of related transactions having the same effect) which results in any Person or group of Persons (as the term "group" is used under the Securities Exchange Act of 1934), other than an Oaktree Investor, owning stock of the Corporation possessing voting power to elect a majority of the Board or (ii) the sale or transfer of all or substantially all of the Corporation's assets, determined on a consolidated basis; provided that the term "Sale of the Company" shall not include a Public Sale.

10M.    "Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.  Any reference herein to a specific section, rule, or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

10N.    "Stockholders Agreement" means that certain Stockholders Agreement, dated as of the date hereof, by and among the Corporation, the Oaktree Investors and certain Other Stockholders from time to time signatories thereto, as amended from time to time.

10O.    "Transfer" means, a transfer, sale, assignment, pledge, hypothecation or other disposition, whether directly or indirectly (pursuant to the transfer of an economic or other interest, the creation of a derivative security or otherwise), the grant of an option or other right or the imposition of a restriction on disposition or voting or by operation of law.  When used as a verb, "Transfer" shall have the correlative meaning (whether with or without consideration and whether voluntarily or involuntarily or by operation of law).  In addition, "Transferred" and "Transferee" shall have the correlative meanings.

Section 11.    <u>Transfers in Violation of Agreement</u>.  Any transfer or attempted transfer of any Corporation Stock in violation of any provision of this Agreement will be void, and none of the Company or any Subsidiary will record such purported transfer on its books or

11

treat any purported tTransferee of such Corporation Stock as the owner of such securities for any purpose.

Section 12.    Replacement.  Upon receipt of evidence reasonably satisfactory to the Corporation (which may include an affidavit of the registered holder) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing one or more shares of any class of Common Stock, and in the case of any such loss, theft or destruction, upon receipt of indemnity reasonably satisfactory to the Corporation, or, in the case of any such mutilation upon surrender of such certificate, the Corporation shall (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the number of shares of such class represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

Section 13.    Notices.  All notices referred to herein shall be in writing, and shall be delivered by registered or certified mail, return receipt requested, postage prepaid, and shall be deemed to have been given when so mailed (i) to the Corporation at its principal executive offices and (ii) to any stockholder at such holder's address as it appears in the stock records of the Corporation (unless otherwise specified in a written notice to the Corporation by such holder).

Section 14.    Amendment and Waiver.  The provisions of this Part C may be amended, modified, or waived only with the prior written consent of the Oaktree Investors and the Board; provided that if any such modification, amendment or waiver would result in an adverse and disproportionate treatment of any stockholder or stockholders with respect to their shares of Corporation Stock in a manner materially different than the other stockholders holding the same shares of Corporation Stock (without regard to any effect on the individual circumstances of the holder of such shares of Corporation Stock), such modification, amendment or waiver will also require the prior written approval of the holders of at least a majority of the shares of Corporation Stock so adversely impacted; provided further, that the provisions of Section 5 ("Rights of First Refusal"), Section 6 ("Sale of the Company") and this Section 14 ("Amendment and Waiver") shall not be eliminated or amended in a manner (including by merger or otherwise) adverse to any stockholder other than the Oaktree Investors (a "Non-Oaktree Stockholder") without the prior written consent of the holders of at least a majority of the shares of Corporation Stock held by the Non-Oaktree Stockholder(s) so adversely affected.

## ARTICLE FIVE

The Corporation shall not issue any class of non-voting equity securities unless and solely to the extent permitted by Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") as in effect on the date hereof; provided, however, that this ARTICLE FIVE (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code; (ii) will have such force and effect, if any, only for so long as Section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation; and (iii) in all events may be amended or eliminated in accordance with applicable law from time to time in effect or with the prior written consent of the Oaktree Investors and the Board.

## ARTICLE SIX

The Corporation is to have perpetual existence.

## ARTICLE SEVEN

In furtherance and not in limitation of the powers conferred by statute, the Board is expressly authorized to make, alter or repeal the by-laws of the corporation.

## ARTICLE EIGHT

Meetings of stockholders may be held within or outside of the State of Delaware, as the by-laws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board or in the by-laws of the Corporation. Election of directors need not be by written ballot unless the by-laws of the Corporation so provide.

## ARTICLE NINE

To the fullest extent permitted by the Delaware General Corporation Law as the same exists or may hereafter be amended, a director of this Corporation shall not be liable to the Corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director. Any repeal or modification of this ARTICLE NINE shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE TEN

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation in the manner now or hereafter prescribed herein and by the laws of the State of Delaware, and all rights conferred upon stockholders herein are granted subject to this reservation.

## ARTICLE ELEVEN

The Corporation expressly elects not to be governed by §203 of the General Corporation Law of the State of Delaware.

13

## ARTICLE TWELVE

Each of the Corporation and the Other Stockholders acknowledges and agrees that: (a) the Oaktree Investors, their respective Affiliates and their respective shareholders, directors, officers, controlling persons, partners, members, and employees (collectively, the "Investor Group") (i) have investments or other business relationships with entities engaged in other businesses (including those which may compete with the business of the Corporation and any of its subsidiaries or areas in which the Corporation or any of its subsidiaries may in the future engage in business) and in related businesses other than through the Corporation or any of its subsidiaries (an "Other Business"), (ii) may develop a strategic relationship with businesses that are or may be competitive with the Corporation or any of its subsidiaries and (iii) will not be prohibited by virtue of its investment in the Corporation or its subsidiaries, or its service on the Board or any subsidiary's board of directors, from pursuing and engaging in any such activities; (b) each Other Stockholder and, to the maximum extent permitted from time to time under the law of the State of Delaware, the Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to its officers, directors or stockholders, other than those officers, directors or stockholders who are employees of the Corporation; (c) no member of the Investor Group shall be obligated to present any particular investment or business opportunity to the Corporation even if such opportunity is of a character which, if presented to the Corporation, could be undertaken by the Corporation, and in fact, each member of the Investor Group shall have the right to undertake any such opportunity for itself for its own account or on behalf of another or to recommend any such opportunity to other persons; (d) each member of the Investor Group and their respective portfolio companies may enter into contracts and other arrangements (including investments and joint ventures) with the Corporation and its Affiliates from time to time on terms approved by the Board; and (e) subject to the provisions under this Amended and Restated Certificate of Incorporation and the Stockholders Agreement, to the extent any Oaktree Investor is an Approving Stockholder, the Approving Stockholders shall have the right to undertake and consummate an Approved Sale at any time and for consideration that results in little or no consideration being paid or available to the stockholders. Each of the Corporation and the Other Stockholders hereby waives, to the fullest extent permitted by applicable law, any claims and rights that such person may otherwise have in connection with the matters described in this ARTICLE TWELVE.  Without limiting the foregoing, each Other Stockholder hereby acknowledges that he, she or it is familiar with the existence of, and hereby approves of, any agreement between the Oaktree Investors or their Affiliates and the Corporation or any of its subsidiaries which provides management and transaction fees to the Oaktree Investors as described in the Stockholders Agreement.

\*    \*    \*    \*    \*

14

## **EXHIBIT C-1**

**Amended Reorganized Quiksilver Shareholders Agreement (Clean)**

## STOCKHOLDERS AGREEMENT

THIS STOCKHOLDERS AGREEMENT (this "<u>Agreement</u>") is made as of_____, 2016 by and among Quiksilver, Inc., a Delaware corporation (the "<u>Company</u>"), the Persons set forth on the attached <u>Oaktree Investor Stockholders Schedule</u> (together with their respective Permitted Transferees, the "<u>Oaktree Investors</u>") and the Persons set forth on the attached <u>Other Stockholders Schedule</u>, together with each of the other entities and individuals set forth from time to time on the signature pages attached hereto under the heading "<u>Other Stockholders</u>" who, at any time, acquire securities of the Company in accordance with the terms hereof and execute a counterpart of this Agreement or who otherwise agree to be bound by this Agreement (the "<u>Other Stockholders</u>" and, together with the Oaktree Investors, the "<u>Stockholders</u>").  Capitalized terms used but not otherwise defined herein have the meanings given to such terms in <u>Section 12</u> hereof.

WHEREAS, the Company filed that certain Third Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its affiliated Debtors and Debtors In Possession (the "<u>Plan</u>") in the United States Bankruptcy Court for the District of Delaware on January 28, 2016; and

WHEREAS, in connection with the transactions contemplated by the Plan, the Stockholders acquired shares of common stock, par value $0.01 per share, of the Company (the "<u>Common Stock</u>").

NOW, THEREFORE, in consideration of the mutual promises made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.       Board of Directors.

(a) From and after the date hereof and until the provisions of this <u>Section 1</u> cease to be effective, each Stockholder shall vote all of his, her or its Corporation Stock and any other voting securities of the Company over which such Stockholder has voting control and shall take all other necessary or desirable actions within his, her or its control (whether in his, her or its capacity as a Stockholder, director, member of a board committee or officer of the Company or otherwise, and including, without limitation, upon any Stockholder's request, attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company shall take all necessary and desirable actions within its control (including calling special board and Stockholder meetings), so that:

(i)       the authorized number of directors on the board of directors of the Company (the "<u>Board</u>") shall be four (4) or such other number designated by the Oaktree Investors from time to time;

(ii)       the following persons shall be elected to the Board:

(A)       the Chief Executive Officer of the Company, who shall initially be Pierre Agnes (the "<u>CEO Director</u>"); and

(B)    three (3) representatives designated by the Oaktree Investors, who shall initially be Matthew Wilson, David Tanner, and Thomas Casarella (each, an "Oaktree Investor Director").

(iii)    the removal of any Oaktree Investor Director shall be upon (and only upon) the request of the Oaktree Investors, and in the event that any Oaktree Investor Director for any reason ceases to serve as a member of the Board during his or her term of office, the resulting vacancy on the Board shall be filled by a representative designated by the Oaktree Investors;

(iv)    the removal of the CEO Director from the Board (with or without cause) shall occur simultaneously with his or her removal as the Chief Executive Officer of the Company;

(v)    in the event that any CEO Director for any reason ceases to serve as a member of the Board during his or her term of office, the resulting vacancy on the Board shall be filled by a representative designated by the Board;

(vi)    unless otherwise determined by the Board, the composition of the board of directors of each of the Company's Subsidiaries (a "Sub Board") shall be the same as that of the Board; and

(vii)    the composition of any committee of the Board or any Sub Board shall include at least one of the Oaktree Investor Directors.

(b) To the extent not otherwise paid by the Company pursuant to any other agreement between the Company and any director or Stockholder, the Company (or one of the Company's Subsidiaries) shall pay all reasonable out-of-pocket costs and expenses incurred by each director in connection with attending regular and special meetings of the Board, any board of directors of any Subsidiaries of the Company and any committee thereof.  Each Stockholder acknowledges that the management and transaction fees paid to the Oaktree Investors shall not constitute the payment by the Company of costs and expenses incurred by the Oaktree Investor Directors.

(c) If at any time a vacancy is created on the Board by reason of the incapacity, death, removal or resignation of a director, such vacancy shall automatically reduce the number of directors *pro tanto*, until such time as the Stockholders entitled to designate such director pursuant to Section 1(a)(ii) above shall designate a director to fill such vacancy and such director shall have been elected to the Board in accordance with this Agreement and the Company's Certificate of Incorporation, whereupon the number of directors shall be automatically increased *pro tanto*.  Upon receipt of notice of the designation of a nominee pursuant to this Section 1(c), each Stockholder shall, as soon as practicable after the date of such notice, take action, including the voting of its voting securities, to elect the director so designated to fill such vacancy.

(d) The provisions of this Section 1 shall terminate upon the first to occur of (i) consummation of a Sale of the Company, (ii) an IPO or (iii) the Oaktree Investors collectively holding less than a majority of the outstanding voting shares of Corporation Stock.

2.      Irrevocable Proxy; Conflicting Agreements.  In order to secure each Other Stockholder's obligation to vote his, her or its Corporation Stock and any other voting securities of the Company in accordance with the provisions of Section 1 hereof and for other good and valuable consideration, each Other Stockholder hereby appoints the Oaktree Investors, as his, her or its true and lawful proxy and attorney-in-fact, with full power of substitution, to vote all of his, her or its Corporation Stock and other voting securities of the Company for the election and/or removal of directors and all such other matters as expressly provided for in Section 1 hereof until such time as the Oaktree Investors collectively hold less than a majority of the outstanding voting shares of Corporation Stock.  The Oaktree Investors may exercise the irrevocable proxy granted hereunder at any time any Other Stockholder fails to comply with the provisions of this Agreement.  The proxies and powers granted by each Other Stockholder pursuant to this Section 2 are coupled with an interest and are given to secure the performance of each Other Stockholder's obligations to the Oaktree Investors under this Agreement.  Such proxies and powers will be irrevocable until such time as the Oaktree Investors collectively hold less than a majority of the outstanding voting shares of Corporation Stock and will survive the death, incompetency, disability, insolvency and/or dissolution of each Other Stockholder and the respective holders of their Corporation Stock.

3.      Rights on Transfer of Corporation Stock.

(a)   Participation Rights.

(i)      At least fifteen (15) days before any Transfer by any Oaktree Investor of Common Stock (other than Transfers (x) which, when combined with any prior Transfers excluded from this Section 3(a)(i) by virtue of this subsection (x), do not exceed 10% in the aggregate of the Common Stock (based on the total Common Stock outstanding as of the date of such Transfer) or (y) which is made in connection with a Public Sale or a Sale of the Company), but after complying with any applicable Transfer requirements set forth in Section 3(b), the applicable Oaktree Investor shall deliver a written notice (the "Tag-Along Notice") to each other Stockholder holding shares of Common Stock outstanding as of such date which would be entitled to sell at least $100,000 of Common Stock in such Transfer (based upon the amount of such Stockholder's Tag-Along Allocation (as defined below) and the expected purchase price to be paid in such Transfer), specifying in reasonable detail the identity of the prospective Transferee(s), the number of shares of Common Stock to be Transferred by such Oaktree Investor and the purchase price therefor (it being understood that the purchase price and number of shares may change).  Any of such other Stockholders (each electing Stockholder, a "Tag-Along Stockholder") may elect to participate in the contemplated Transfer by delivering written notice (together with an unconditional commitment to participate (subject to adherence with the provisions of this Section 3(a)) with respect to such Common Stock to be Transferred) to the applicable Oaktree Investor within ten (10) days after delivery of the Tag-Along Notice. If any eligible Stockholders have elected to participate in such Transfer, the applicable Oaktree Investor and each such Tag-Along Stockholder will each be entitled to Transfer (and each Tag-Along Stockholder shall be committed to Transfer so long as such Oaktree Investor remains committed to Transfer) in the contemplated Transfer, a number of shares of Common Stock being Transferred, equal to the number of shares of Common Stock to be Transferred in the contemplated Transfer multiplied by a fraction, (A) the numerator of which is the number of shares of Common Stock owned by such Stockholder, and (B) the denominator of which is the

aggregate number of shares of Common Stock held by the applicable Oaktree Investor and all Tag-Along Stockholders (such amount, a Tag-Along Stockholder's "Tag-Along Allocation"). The Transfer pursuant to this Section 3(a) is hereinafter referred to as the "Participating Transfer."

(ii)    Each eligible Stockholder who does not timely accept an Oaktree Investor's invitation pursuant to Section 3(a)(i) shall be deemed to have waived all of its rights with respect to the Participating Transfer, and such Oaktree Investor and the Tag-Along Stockholders shall thereafter be free to Transfer to the prospective Transferee(s), at a price per respective share of Common Stock no more than 110% of the price per share of Common Stock set forth in the Tag-Along Notice, without any further obligation to such non-accepting Tag-Along Stockholder.

(iii)    In connection with the Participating Transfer, the applicable Oaktree Investor and the Tag-Along Stockholders will receive the same portion of the aggregate consideration available to be distributed to such Oaktree Investor and the Tag-Along Stockholders that such Stockholders participating in such Participating Transfer (in their capacity as Stockholders of the Company) would have received if such aggregate consideration had been distributed to such Stockholders only by the Company in accordance with the rights and preferences set forth in the Certificate of Incorporation as in effect immediately before such Transfer; provided, that the consideration payable to any Stockholder shall be reduced by the aggregate principal amount plus all accrued and unpaid interest on any indebtedness of any such Stockholder to the Company or its Subsidiaries.

(iv)    Each Stockholder participating in the Participating Transfer will be obligated to join severally on a *pro rata* basis (applied such that after giving effect thereto, the aggregate consideration paid to each such Stockholder would comply with the provisions of Section 3(a)(iii) above) in any purchase price adjustments, indemnification or other obligations that the sellers of Common Stock are required to provide in connection with the Participating Transfer (other than any such obligations that relate solely to a particular Stockholder, such as indemnification with respect to representations and warranties given by a Stockholder regarding such Stockholder's title to and ownership of Common Stock, in respect of which only such Stockholder will be liable); provided that no Stockholder shall be liable for any purchase price adjustments, indemnification or other obligations in excess of the aggregate amount of consideration received by such Stockholder in connection with or pursuant to such Participating Transfer.

(v)    Each Stockholder participating in the Participating Transfer will bear his, her or its *pro rata* share (applied such that after giving effect thereto, the aggregate consideration paid to each such Stockholder would comply with the provisions of Section 3(a)(iii) above) of the costs of any Participating Transfer to the extent such costs are incurred for the benefit of all Stockholders participating in such Participating Transfer and are not otherwise paid by the Company or the acquiring party.  Costs incurred by the Stockholders on their own behalf will not be considered costs of the transaction hereunder; it being understood that the fees and disbursements of one counsel chosen by the Oaktree Investors will be deemed to be for the benefit of all other Tag-Along Stockholders.

(vi)    In furtherance of the provisions of this <u>Section 3(a)</u>, each Tag-Along Stockholder, whether in his, her or its capacity as a Tag-Along Stockholder, Stockholder, manager, director, employee or officer of the Company or any of its Subsidiaries, or otherwise, shall take or cause to be taken all such actions as may be reasonably necessary, reasonably desirable or otherwise requested by the applicable Oaktree Investor in order to expeditiously consummate each Participating Transfer and any related transactions (including any auction or competitive bid process in connection with or prefacing such Transfer), including executing, acknowledging and delivering transfer agreements, sale agreements, escrow agreements, consents, assignments, releases, waivers, and any other documents or instruments which in each case are no more burdensome than those executed by such Oaktree Investor or any of its Affiliates (collectively, "<u>Ancillary Documents</u>"); furnishing information and copies of documents; filing applications, reports, returns, filings and other documents or instruments with governmental authorities; and otherwise cooperating with the applicable Oaktree Investor, the prospective Transferee(s) and their respective representatives and counsel.

(b)  <u>Pre-emptive Rights</u>.

(i)    Neither the Company nor any of its Subsidiaries shall issue or sell any equity securities ("<u>Subject Securities</u>") to any Oaktree Investor (each an "<u>Issuance</u>"), except (A) Exempt Equity Issuances or (B) in compliance with the provisions of this <u>Section 3(b)</u>.

(ii)    <u>Participation Notice</u>.  Not fewer than fifteen (15) days prior to the consummation of any Issuance, a written notice (the "<u>Participation Notice</u>") shall be given by the Company pursuant to <u>Section 20</u> to each Stockholder who is not an Excluded Stockholder (each an "<u>Eligible Stockholder</u>"); provided that, for the avoidance of doubt, New Generation Advisors LLC shall be deemed to be an Eligible Stockholder as of the date hereof until such time as it ceases, after any sale of its shares of Common Stock, to hold at least 1% of the shares of Common Stock (determined on a fully-diluted basis) outstanding.  The Participation Notice in respect of any Issuance shall include:

(A)    The principal terms of the proposed Issuance, including (i) the amount and kind of Subject Securities to be included in the Issuance, (ii) the number of Subject Securities, (iii) the price per share of the Subject Securities, (iv) the portion of the Issuance equal to the number of shares of Common Stock held by such Eligible Stockholder immediately prior to the Issuance divided by the aggregate number of shares of Common Stock outstanding immediately prior to the Issuance (the "<u>Participation Portion</u>") and (v) the name and address of each Person to whom the Subject Securities are proposed to be issued (each a "<u>Prospective Subscriber</u>"); and

(B)    An offer by the Company to issue or cause to be issued, at the option of each Eligible Stockholder, to such Stockholder such portion of the Subject Securities to be included in the Issuance as may be requested by such Eligible Stockholder (not to exceed such Stockholder's Participation Portion of the total amount of Subject Securities to be included in the Issuance), at the same price and otherwise on the same

economic terms and conditions, with respect to each share of Subject Securities issued to such Eligible Stockholder, as the issuance to each of the Prospective Subscribers; provided that, if all Stockholders entitled to purchase or receive any class or series of Subject Securities are required to also purchase any other class or series of Subject Securities, the Eligible Stockholders exercising their rights pursuant to this Section 3(b) shall also be required to purchase the same strip of securities (on the same terms and conditions) that such other Stockholders and/or Prospective Subscribers are required to purchase.

(iii)    Other Terms.  With respect to any given Issuance:

(A)    Participation Commitment.    Each Eligible Stockholder desiring to accept the offer contained in the Participation Notice shall send an irrevocable commitment (each a "Participation Commitment") to the Company within ten (10) days after the effectiveness (in accordance with this Section 3(b)(iii)(A)) of the Participation Notice specifying the amount or proportion of Subject Securities which such Stockholder desires to be issued (each a "Participating Buyer").  If all Subject Securities are not subscribed to by the Participating Buyers in a Participation Commitment, the unsubscribed Subject Securities will be issued to the Prospective Subscribers at a price not less than 90% of the price set forth in the Participation Notice.  Each Eligible Stockholder which has not so accepted such offer set forth in a Participation Notice, or that does not comply with Section 3(b)(iii)(D), shall be deemed to have waived all of such Stockholder's rights with respect to the Issuance under this Section 3(b) (or the part thereof in respect of which it has not accepted), and the Company shall thereafter be free to issue Subject Securities in such Issuance to the Prospective Subscribers and the Participating Buyers, at a price not less than 90% of the price set forth in the Participation Notice, without any further obligation to such non-accepting holders under this Section 3(b).  If, prior to consummation, the terms of such proposed Issuance shall change with the result that the price shall be less than 90% of the price set forth in the Participation Notice, it shall be necessary for a separate Participation Notice to be furnished, and the terms and provisions of this Section 3(b) separately complied with, in order to consummate such Issuance pursuant to this Section 3(b); provided, however, that in the case of such a separate Participation Notice, each applicable period to which reference is made in this Section 3(b) shall be the longer of (a) the remaining portion of the ten (10) day period applicable to the first Participation Notice distributed in connection with such proposed Issuance or (b) five (5) days.

(B)    Acceptance.  The acceptance of each Participating Buyer shall be irrevocable except as hereinafter provided, and each such Participating Buyer shall be bound and obligated to acquire in the Issuance on the same economic terms and conditions as the Prospective

Subscribers, with respect to each share of Subject Securities issued, such amount or proportion of Subject Securities as such Participating Buyer shall have specified in such Participating Buyer's Participation Commitment.

(C)    <u>Failure to Consummate</u>.  If at the end of the 120th day following the date of the effectiveness (in accordance with <u>Section 3(b)(ii)</u>) of the Participation Notice the Company has not completed the Issuance on the terms and conditions specified in such Participation Notice, each Participating Buyer shall be released from its obligations under such Participating Buyer's Participation Commitment, the Participation Notice shall be null and void, and it shall be necessary for a separate Participation Notice to be furnished, and the terms and provisions of this <u>Section 3(b)</u> separately complied with, in order to consummate any Issuance subject to this <u>Section 3(b)</u>.

(D)    <u>Cooperation</u>.  Each Stockholder to which a Participation Notice was delivered, whether in his, her or its capacity as a Participating Buyer, officer or director of the Company, or otherwise, shall take or cause to be taken all such reasonable actions as may be necessary, reasonably desirable or otherwise requested by the Company in order expeditiously to consummate such Issuance pursuant to this <u>Section 3(b)</u> and any related transactions, including executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments, filing applications, reports, returns, filings and other documents or instruments with governmental authorities, and otherwise cooperating with the Company, the Prospective Subscribers and the Participating Buyers (if any).  Without limiting the generality of the foregoing, each such Participating Buyer and Stockholder agrees to execute and deliver such Ancillary Documents to which the Prospective Subscriber will be party.

(E)    <u>Closing</u>.  The closing of such Issuance pursuant to this <u>Section 3(b)</u> shall take place at such time and place as the Company shall specify by notice to each Participating Buyer in accordance with <u>Section 20</u>.  At the Closing of such Issuance pursuant to this <u>Section 3(b)</u>, each Participating Buyer shall be delivered the certificates or other instruments, if any, evidencing the Subject Securities to be issued to such Participating Buyer, registered in the name of such Participating Buyer or his, her or its designated nominee, free and clear of any liens or encumbrances, with any transfer tax stamps affixed, against delivery by such Participating Buyer of the applicable consideration.

(F)    <u>Exceptions</u>.  Notwithstanding anything herein to the contrary, if the Board determines in its sole discretion that it would be in the best interests of the Company to do so, the Company may issue Subject Securities which would otherwise be required to be offered to the

Eligible Stockholders under this <u>Section 3(b)</u> without first complying with this <u>Section 3(b)</u>; provided, that within sixty (60) days after such Issuance, it offers each such Eligible Stockholder, if required, the opportunity to purchase (x) from the Company, such Stockholder's Participation Portion of (A) the aggregate number of Subject Securities issued prior to compliance with this <u>Section 3(b)</u>, plus (B) the number of Subject Securities thereafter issued pursuant to this <u>Section 3(b)(iii)(F)</u>, (y) if any Oaktree Investor purchases any such Subject Securities, from such Oaktree Investor (or from the Company in connection with a corresponding redemption or repurchase by the Company from such Oaktree Investor), such Eligible Stockholder's Participation Portion of the aggregate number of Subject Securities (free and clear of liens, pledges and security interests, with a customary indemnity provided by such Oaktree Investor in support of the same) issued prior to compliance with this <u>Section 3(b)</u> or (z) any combination of (x) and (y), so long as such combination results in such Eligible Stockholder receiving the opportunity to purchase such Eligible Stockholder's full Participation Portion of any Subject Securities issued prior to compliance with this <u>Section 3(b)</u> and after giving effect to any Subject Securities issued pursuant to this <u>Section 3(b)(iii)(F)</u>.

(c) <u>Termination of Rights</u>.  The provisions of this <u>Section 3</u> will continue to apply to each share of Corporation Stock (and will survive any Transfer thereof) until the earlier to occur of (i) consummation of a Sale of the Company and (ii) an IPO.

(d) <u>Acknowledgment of Transfer Restrictions</u>.  Nothing in this <u>Section 3</u> will be implied or construed to restrict, limit, or otherwise affect (or permit any Transfers otherwise prohibited, restricted, or limited by) any vesting arrangements, restrictions on transfer, or other similar provisions set forth in any agreement to which any employee, officer, consultant or service provider of the Company or an Affiliate thereof, or its Permitted Transferees, is subject or bound.

4.    <u>Registration Rights.</u>

(a) <u>Registration Rights</u>.  The parties hereto agree that any IPO relating to the Company or its Subsidiaries may be effected at the Company level or at the level of a Subsidiary of the Company (the applicable entity, including any successor entity to the Company or any Subsidiary thereof, the "<u>IPO Entity</u>"). In connection with an IPO, the IPO Entity shall enter into a registration rights agreement with each Stockholder holding at least 5% of the then-outstanding shares of Common Stock (determined on a fully-diluted basis) outstanding as of such date with respect to the registration of its securities in form and substance reasonably satisfactory to the Board and the Oaktree Investors; <u>provided</u> that such registration rights agreement shall provide for (i) long form and short form demand registration rights, as well as shelf registration rights, for the Oaktree Investors, (ii) piggyback registration rights to all Stockholder holding at least 5% of the then-outstanding shares of Common Stock (determined on a fully-diluted basis) outstanding as of such date with any registration of the securities of the IPO Entity under the Securities Act (other than in connection with a merger, acquisition, corporate reorganization,

exchange offer, dividend reinvestment plan, stock option plan or other employee benefit plan and other customary exclusions) in which the registration form to be used may be used for the registration of the securities held by such Stockholders, (iii) customary pro rata cutback provisions, and (iv) customary indemnification of such Stockholders; provided, further, that, for the avoidance of doubt, unless the Oaktree Investors otherwise determine, such registration rights agreement shall not grant any Stockholder any rights with respect to the IPO of the Company or any successor thereto.  Each Stockholder hereby agrees to execute any reasonable registration rights agreement proposed by the IPO Entity as long as such agreement is consistent in all material respects with the foregoing.

(b) Registration Expenses.  All expenses incident to the IPO Entity's performance of or compliance with this Section 4, including all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, printing expenses, messenger and delivery expenses, and fees and disbursements of counsel for the IPO Entity and all independent certified public accountants, underwriters (excluding discounts and commissions) and other Persons retained by the IPO Entity will be borne by the IPO Entity.  The IPO Entity will bear the cost of one counsel for the holders of Corporation Stock participating in any demand or piggyback registration selected by the Oaktree Investors.  All underwriting discounts and commissions will be borne by the seller of the securities sold pursuant to the registration.

(c) Selection of Underwriters.   If any demand registration or piggyback registration is an underwritten offering, then the selection of investment banker(s) and manager(s) for the offering will be made by the Oaktree Investors, subject to the approval of the IPO Entity (such approval shall not be unreasonably withheld, conditioned or delayed).

5.      Stockholder Cooperation; Limitation of Liability; Closing.

(a) Limitation of Liability. The applicable Oaktree Investor, in its sole discretion, shall decide whether or not to pursue, consummate, postpone or abandon any proposed Transfer and the terms and conditions thereof.  None of the applicable Oaktree Investor or any of its Affiliates shall have any liability to any other holder of Corporation Stock arising from, relating to or in connection with the pursuit, consummation, postponement, abandonment or terms and conditions of any proposed Transfer or Sale of the Company.

(b) Closing. The closing of a Transfer  to which Section 5(a) applies shall take place at such time and place as the applicable Oaktree Investor shall specify by notice to each Tag-Along Stockholder.  At the closing of such Transfer, each Tag-Along Stockholder shall, if applicable, deliver the certificates evidencing the shares of Corporation Stock to be Transferred by such Tag-Along Stockholder, duly endorsed for transfer with signature guaranteed, free and clear of any liens or encumbrances, with any necessary transfer tax stamps, affixed, against delivery of the applicable consideration.

6.      Restrictions.From and after the date hereof, the Company shall not, and shall cause each of its Subsidiaries to not, without the prior written consent of the Oaktree Investors:

(i)       except as expressly contemplated by this Agreement, authorize, issue or enter into any agreement providing for the issuance (contingent or otherwise) of (i) any notes or debt securities with options, warrants or other rights to acquire equity securities (including any notes or debt securities convertible into or exchangeable for equity securities or options, warrants or other rights to acquire equity securities issued in connection with the issuance of capital stock or options, warrants or other rights to acquire equity securities or containing profit participation features) of the Company or any Subsidiary or (ii) any equity securities of the Company or any Subsidiary; provided that nothing herein shall restrict the Company's or any Subsidiary's ability to issue equity securities (or rights to acquire equity securities) to directors, employees, officers, consultants or service providers of the Company or its Subsidiaries (excluding the Oaktree Investors or any of their respective Affiliates) pursuant to compensation plans or similar arrangements approved by the Board (which such management issuances shall be excluded from the Equity Issuance Basket);

(ii)      create, incur, assume or suffer to exist any indebtedness other than (1) indebtedness under the terms and provisions of, or expressly permitted under the terms of, any credit agreement or loan agreement entered into by the Company or any of its Subsidiaries as in effect as of the closing of the transactions contemplated by the Plan (the "Credit Agreement") and (2) indebtedness that does not exceed $5,000,000.00 in the aggregate;

(iii)     increase the authorized number of directors on the Board to a number greater than four (4), or otherwise permit more than four (4) directors to be on the Board;

(iv)      except in connection with an Approved Sale, sell, lease or otherwise dispose of, or permit any of its Subsidiaries to sell, lease or otherwise dispose of, assets or equity interests of any entity (collectively, the "Transferred Property") which constitute a material portion of the business of the Company and its Subsidiaries ;

(v)       retain or engage any mergers and acquisitions or restructuring professionals;

(vi)      commence any voluntary bankruptcy of the Company or any Subsidiary, enter into any arrangement with creditors, or consent to entry of an order for relief in an involuntary case, or take the conversion of an involuntary case to a voluntary case, or consent to the appointment or taking possession by a receiver, trustee or other custodian for all or substantially all of its property;

(vii)     pay any dividend or other distribution on any shares of Corporation Stock, or shares of capital stock of any Subsidiary (other than as provided in the certificate of incorporation of such entity (or any equivalent thereof) or any certificate of designation issued pursuant thereto);

(viii)    redeem, repurchase or otherwise acquire any shares of Corporation Stock or shares of capital stock of any Subsidiary (other than as provided in the certificate of incorporation of such entity (or any equivalent thereof) or pursuant to contractual rights or obligations to repurchase shares of Corporation Stock held by employees, former employees, directors, consultants of or lenders to the Company or any of its Subsidiaries);

(ix)    make any loans or advances to, guarantees for the benefit of, or investments in, any Person (other than a wholly owned Subsidiary established under the laws of a jurisdiction of the United States), except for reasonable travel advances to and other customary employee arrangements made with employees of the Company or any Subsidiary in the ordinary course of business;

(x)    acquire any interest in any company or business (whether by a purchase of assets, purchase of stock, merger or otherwise), or enter into any joint venture;

(xi)    incur any material capital expenditure which is not provided for in the Company's and its Subsidiaries' annual budget;

(xii)    adopt an annual budget for any fiscal year;

(xiii)    enter into, amend, modify or waive any provision of any employment or other material compensation agreement with any key executives of the Company or any Subsidiary; or

(xiv)    authorize or enter into any agreement, contract or commitment to do any of the foregoing or authorize, take or agree to take (or, in the case of those matters where the Company or its Subsidiaries would suffer to exist, fail to take) any action with respect to the foregoing.

(b) From and after the date hereof, the Company shall not, and shall cause each of its Subsidiaries to not, enter into a transaction with any Stockholder or any Affiliate of a Stockholder unless (i) such transaction is entered into on an arms' length basis, (ii) the Company obtains an opinion from an independent financial advisor that the consideration to be received by the Company or the applicable Subsidiaries in such transaction is fair to the Company or such applicable Subsidiaries, or (iii) such transaction was approved by a majority of the disinterested directors of the Company serving on the Board or a majority of the shares of Common Stock (disregarding for purposes of such determination the shares of Common Stock held by interested Stockholders and their Affiliates); provided, however, that no such approval shall be required for (A) any transaction between or among the Company or any one or more of its Subsidiaries (or any of them) and other Persons, if any, who are not Stockholders or Affiliates thereof, (B) any exercise of any rights granted, or any transaction otherwise subject to limitations, restrictions, procedures or other provisions, as applicable, under the other provisions of this Agreement, the Certificate of Incorporation, the Amended and Restated Bylaws or any other agreement entered into in compliance with this Section 6 (including (x) any appointment, election, removal, designation of, or vote for, any director or manager of the Company or any of its Subsidiaries, (y) the issuance or Transfer of any securities, subject to compliance with the other provisions of this Agreement, the Certificate of Incorporation and/or the Amended and Restated Bylaws, and (z) any exercise of registration rights under this Agreement) or (C) any transaction related to the implementation of or contemplated by the Plan or any exhibits, schedules, supplements or orders related thereto.

7.     <u>Financial Statements and Other Information</u>.  The Company shall deliver to each Stockholder (so long as such Stockholder, together with its Affiliates, holds at least 0.5% of the shares of Common Stock (determined on a fully-diluted basis) outstanding as of such date:

(a) within 60 days after the end of each quarterly accounting period in each fiscal year, the unaudited consolidating and consolidated statements of income and cash flows of the Company and its Subsidiaries for each quarterly period, and consolidating and consolidated balance sheets of the Company and its Subsidiaries as of the end of such quarterly period, all prepared in accordance with generally accepted accounting principles, consistently applied, subject to the absence of footnote disclosures and to normal year-end adjustments; and

(b) within 120 days after the end of each fiscal year, audited consolidating and consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal year, and consolidating and consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal year, setting forth in each case comparisons to the annual budget and to the preceding fiscal year, all prepared in accordance with generally accepted accounting principles, consistently applied, and accompanied by management's discussion and analysis for such period.

8.     <u>Restrictive Legend</u>.  Each certificate evidencing shares of Corporation Stock and each certificate issued in exchange for or upon the transfer of any shares of Corporation Stock (if such securities remain Corporation Stock after such transfer) will be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON _____ AND ARE SUBJECT TO RESTRICTIONS ON TRANSFER SPECIFIED IN THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF THE ISSUER, AS AMENDED AND MODIFIED FROM TIME TO TIME, AND THE ISSUER RESERVES THE RIGHT TO REFUSE THE TRANSFER OF SUCH SECURITIES UNTIL SUCH RESTRICTIONS HAVE BEEN SATISFIED WITH RESPECT TO ANY TRANSFER.

IN ADDITION, THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A STOCKHOLDERS AGREEMENT DATED AS OF [_____], 2016, AMONG THE ISSUER AND CERTAIN OF THE ISSUER'S STOCKHOLDERS AS SUCH AGREEMENT MAY BE AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME TO TIME.  A COPY OF SUCH AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

The Company will imprint such legend on certificates evidencing shares of Corporation Stock outstanding as of the date hereof.  The legend set forth above will be removed promptly from the

certificates evidencing any securities which cease to be Corporation Stock in accordance with the definition of such term herein.

9.    <u>Execution of this Agreement by Transferees</u>.    Prior to transferring any Corporation Stock to any Person (other than pursuant to a Public Sale, a Sale of the Company or a Transfer to the Company, or a Transfer to an Oaktree Investor or its designees or Affiliates), the transferring Stockholder(s) will cause the prospective transferee(s) to be bound by this Agreement and to execute and deliver to the Company and the other Stockholders a counterpart signature page to this Agreement (or a joinder agreement making such Person a party hereto) and, if requested by the Company, an executed spousal consent, in each case in form and substance satisfactory to the Company.

10.    <u>Additional Stockholders</u>.    In connection with the issuance of any additional equity securities of the Company to any Person, the Company may permit such Person to become a party to this Agreement and succeed to all of the rights and obligations of a "Stockholder" under this Agreement by obtaining an executed counterpart signature page to this Agreement (or a joinder agreement making such Person a party hereto) and, if requested by the Company, an executed spousal consent, and, upon such execution, such Person shall for all purposes be a "Stockholder" party to this Agreement, and the addition of such Person as a party hereto shall not in and of itself be deemed to be an amendment, modification, or waiver hereof.

11.    Representations and Warranties.

(a) Each Stockholder (severally but not jointly) represents and warrants that:

(i)    such Stockholder is the holder of the number of shares of Corporation Stock set forth opposite such Stockholder's name on the attached <u>Schedule of Stockholders</u>;

(ii)    such Stockholder, to the extent applicable, is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation;

(iii)    such Stockholder (x) is either (1) certified as an "accredited investor" as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act, which, for the avoidance of doubt, shall exclude any natural person, or (2) a "qualified institutional buyer" as defined in Rule 144A of the Securities Act or, (y) in the case of a Stockholder who is an employee or service provider of the Company or any of its Subsidiaries, has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto;

(iv)    such Stockholder has requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action required for due authorization, execution, delivery and performance hereunder;

(v)    this Agreement has been duly authorized, executed and delivered by such Stockholder and constitutes the valid and binding obligation of such Stockholder, enforceable against such Stockholder in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws

affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith, and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity);

(vi)    such Stockholder has not granted a proxy and is not party to any voting trust or other agreement with respect to any Corporation Stock, other than this Agreement. No holder of Corporation Stock will grant any proxy or become party to any voting trust or other agreement which is inconsistent with, conflicts with, or violates any provision of this Agreement;

(vii)    at the time such Stockholder acquired the Corporation Stock held by it on the date hereof, it acquired such Corporation Stock for its own account for investment purposes only, within the meaning of the Securities Act, and not with a view to the distribution thereof other than as permitted by this Agreement or the Certificate of Incorporation, and in compliance with applicable securities laws;

(viii)    such Stockholder's financial condition is such that such Stockholder has no need for any liquidity in its investment in the Company and is able to bear the risk of holding Corporation Stock for an indefinite period of time and the risk of loss of its entire investment in the Company;

(ix)    such Stockholder has been given the opportunity to (A) ask questions and receive satisfactory answers concerning the terms and conditions of this Agreement and the Corporation Stock and (B) obtain additional information in order to evaluate the merits and risks of an investment in the Company;

(x)    (A) no part of the funds used by such Stockholder to acquire the Corporation Stock has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene federal, state, or international laws and regulations, including anti-money laundering laws and regulations; and (B) no contribution, or payment to the Company or any of its Subsidiaries by such Stockholder shall cause the Company or any of its Subsidiaries to be in violation of any applicable anti-money laundering laws and regulations including without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the U.S. Department of the Treasury Office of Foreign Assets Control regulations; and

(xi)    such Stockholder acknowledges and understands that:

(1)    an investment in the Company is speculative and involves significant risks;

(2)    the Corporation Stock will be subject to certain restrictions on transferability as described in this Agreement and as a result of the foregoing, the marketability of the Corporation Stock may be severely limited;

(3)    such Stockholder may not transfer, sell, or otherwise dispose of the Corporation Stock in any manner that will violate the terms of this Agreement, the Securities Act or any state or foreign securities laws or subject the Company or any of its Subsidiaries or any of their respective Affiliates to regulation under the rules and regulations of

14

the Securities and Exchange Commission or the laws of any other federal, state, or municipal authority or any foreign governmental authority having jurisdiction thereof;

(4)    (A) the Corporation Stock has not been, and will not be, registered under the Securities Act or any state or foreign securities laws, and is being offered and sold in reliance upon federal, state and foreign exemptions from registration requirements for transactions not involving any public offering and (B) the Company's reliance upon such exemptions is based in part upon the representations of the holder contained herein; and

(5)    none of the Company or any of its Subsidiaries intends to register as an investment company under the Investment Company Act of 1940, as amended, and none of the Company or any of its Subsidiaries or any of their respective managers, members or partners or any other person or entity selected to act as an agent of the Company or any of its Subsidiaries with respect to managing their affairs, is registered as of the date hereof as an investment adviser under the Investment Advisers Act of 1940, as amended.

12.    <u>Definitions.</u>

"<u>Affiliate</u>" shall have the meaning set forth in the Certificate of Incorporation.

"<u>Certificate of Incorporation</u>" means the Amended and Restated Certificate of Incorporation of the Company, as filed with the Secretary of State of Delaware, and as amended from time to time in accordance with their terms.

"<u>Corporation Stock</u>" shall have the meaning set forth in the Certificate of Incorporation.

"<u>Excluded Stockholder</u>" means any Stockholder (a) who is not an "accredited investor" as defined under Rule 501 of Regulation D of the Securities Act (or any similar or equivalent provision then in force), (b) whose Participation Portion is less than $200,000 of the Subject Securities, (c) for any Stockholder who was an employee, consultant or service provider of the Company or any of its Subsidiaries and who is no longer being retained or employed by the Company or any of its Subsidiaries and (d) for any Stockholder who is or was an employee, consultant or service provider of the Company or any of its Subsidiaries, if such Stockholder is, at the applicable time, in material breach of any noncompetition, nonsolicitation, confidentiality or similar restrictive provision to which such Stockholder is bound pursuant to any employment agreement or other agreement between such Stockholder and the Company or any of its Subsidiaries.

"<u>Exempt Equity Issuances</u>" means issuances of capital stock of the Company (or securities containing options or rights to acquire shares of capital stock of the Company) (i) upon the conversion, exchange or exercise of any securities of the Company or options, warrants or other rights to acquire or exchange securities of the Company, if such options, warrants or other rights are outstanding on the date hereof, issued as part of an Exempt Equity Issuance or issued after compliance with the provisions of <u>Section 3</u>, (ii) pursuant to an IPO, (iii) as a dividend on the outstanding Corporation Stock, (iv) to directors, employees, officers, consultants or service providers of the Company or its Subsidiaries (excluding the Oaktree Investors or any of their respective Affiliates) pursuant to compensation plans or similar arrangements approved by the

Board, (v) to banks, debt financing sources, equipment lessors and other financial institutions pursuant to a debt financing, equipment leasing or similar transaction approved by the Board, (vi) pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization that has been approved by the Board, (vii) in connection with any of the Rights Offerings (as defined in the Plan) contemplated by the Plan and (viii) in connection with an internal restructuring or reorganization which does not result in the issuance of any equity securities to any unaffiliated third party or change the ownership interest of any Stockholder in the Company.

"IPO" shall have the meaning set forth in the Certificate of Incorporation.

"Permitted Transfer" shall have the meaning set forth in the Certificate of Incorporation.

"Permitted Transferee" means the transferee in any Permitted Transfer.  Each such Person shall be subject to all the provisions of this Agreement.

"Person" shall have the meaning set forth in the Certificate of Incorporation.

"Public Sale" shall have the meaning set forth in the Certificate of Incorporation.

"Sale of the Company" shall  have the meaning set forth in the Certificate of Incorporation.

"Securities Act" shall have the meaning set forth in the Certificate of Incorporation.

"Securities and Exchange Commission" means the United States Securities and Exchange Commission and includes any governmental body or agency succeeding to the functions thereof.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the limited liability company, partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons will be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons will be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or will be or control the managing director or general partner of such limited liability company, partnership, association or other business entity.  For purposes of this Agreement, if the context does not otherwise indicate in respect of which Person the term "Subsidiary" is used, the term "Subsidiary" will refer to any Subsidiary of the Company.

16

"Transfer" shall have the meaning set forth in the Certificate of Incorporation.

13.     Management Arrangements.   Each Stockholder acknowledges that, in connection with certain services and other benefits to be provided to the Company and its Subsidiaries following the date hereof, the Oaktree Investors or their Affiliates and the Company or any of its Subsidiaries shall enter into a management agreement which provides for management and transaction fees to the Oaktree Investors on the terms set forth on Exhibit A. Each Stockholder hereby acknowledges that he, she or it is familiar with the existence of, and hereby approves of, such management agreement.Severability.   Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or affect the validity, legality or enforceability of any provision in any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

15.     Complete Agreement.   Except as otherwise expressly set forth herein, this Agreement, those documents expressly referred to herein and related documents of even date herewith among the parties embody the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

16.     Counterparts.   This Agreement may be executed in multiple counterparts, none of which need contain the signature of more than one party hereto but each of which will be deemed an original and all of which taken together will constitute one and the same agreement.

17.     Successors and Assigns.   Except as otherwise provided herein, this Agreement will bind and inure to the benefit of and be enforceable by the Company and its successors and assigns and the Stockholders and any subsequent holders of Corporation Stock and the respective successors and assigns of each of them, so long as they hold Corporation Stock, whether so expressed or not. For the avoidance of doubt, a Stockholder shall immediately cease to have any rights under this Agreement upon the sale by such Stockholder of all of his, her or its Corporation Stock pursuant to the terms of this Agreement. Any rights granted to an Oaktree Investor and its Affiliates hereunder may also be exercised (in whole or in part) by their respective designees (which may or may not be Affiliates) .

18.     Remedies.   Each of the parties to this Agreement will be entitled to enforce their rights under this Agreement specifically, to recover damages and costs (including reasonable attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.   The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond

or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

19.    <u>Amendment and Waiver</u>.    The provisions of this Agreement may be amended, modified, or waived only with the prior written consent of the Oaktree Investors and the Board; provided that if any such modification, amendment or waiver would result in an adverse and disproportionate treatment of any Stockholder or Stockholders with respect to their shares of Corporation Stock in a manner materially different than the other Stockholders holding the same shares of Corporation Stock (without regard to any effect on the individual circumstances of the holder of such shares of Corporation Stock), such modification, amendment or waiver will also require the prior written approval of the holders of at least a majority of the shares of Corporation Stock so adversely impacted (it being understood and agreed that an issuance or sale of any equity securities shall not constitute a modification, amendment or waiver that would adversely or disproportionately affect any Stockholder if such issuance or sale is consummated in compliance with <u>Section 3(b)</u>); provided further, that the provisions of <u>Section 3</u> ("Rights on Transfer of Corporation Stock"), <u>Section 4</u> ("Registration Rights"), <u>Section 5</u> ("Limitation of Liability"), Section 6(b) ("Restrictions"), <u>Section 7</u> ("Financial Statements and Other Information"), and this Section 19 ("Amendment and Waiver") (or any defined term affecting any such provisions) shall not be eliminated or amended in a manner (including by merger or otherwise) adverse to any Stockholder other than the Oaktree Investors (a "<u>Non-Oaktree Stockholder</u>") without the prior written consent of the holders of at least a majority of the shares of Common Stock held by the Non-Oaktree Stockholder(s) so adversely affected. Notwithstanding anything to the contrary in this Agreement, immediately prior to and following an IPO or Sale of the Company, the Oaktree Investors shall have the right, in their discretion, to terminate all or any portion of this Agreement and, following such a termination, the provisions so terminated shall no longer have any force or effect.

20.    <u>Notices</u>.    All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given when (a) delivered personally to the recipient, (b) telecopied to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if telecopied before 5:00 p.m. New York, New York time on a business day, and otherwise on the next business day, (c) provided via email in "pdf" or other electronic format to the recipient upon reasonable confirmation of receipt of such email or (d) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications will be sent to the Company at the address set forth below and to any Stockholder or other holder of Corporation Stock subject to this Agreement at such address as indicated on the Oaktree Investors Schedule or Other Stockholders Schedule, as applicable, with copies (which shall not constitute notice) to such address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

    <u>To the Company</u>:

        Quiksilver, Inc.
        5600 Argosy Circle,
        Huntington Beach, California 92649

Fax: (714) 889-7186
Attention:        General Counsel

with copies (which shall not constitute notice) to:

Oaktree Capital Management, L.P.
333 S. Grand Ave., 28th Floor
Los Angeles, California 90071
Attention:  Matthew Wilson
                    Thomas Casarella
Facsimile:  (213) 830-6300

and

Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, California  90017
Fax:  (312) 862-2000; (213) 680-8500
Attention:        Christopher J. Greeno, P.C.
                    Tana M. Ryan

21.    <u>Governing Law</u>.  The corporate law of the State of Delaware will govern all issues and questions concerning the relative rights and obligations of the Company and its Stockholders.  All other issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits and schedules hereto will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

22.    <u>Business Days</u>.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday, or legal holiday in New York, New York or the jurisdiction in which the Company's principal office is located, the time period will automatically be extended to the business day immediately following such Saturday, Sunday, or legal holiday.

23.    <u>Descriptive Headings; Interpretation; No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.  Whenever required by the context, any pronoun used in this Agreement will include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs will include the plural and vice versa.  Except as otherwise expressly provided herein, reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in

19

accordance with the terms thereof, and if applicable hereof.  The use of the words "include" or "including" in this Agreement will be by way of example rather than by limitation.  The use of the words "or," "either" or "any" will not be exclusive.   The words "hereof," "herein," "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular Section or provision of this Agreement, and reference to a particular Section of this Agreement shall include all subsections thereof.

24.    Delivery by Facsimile or Electronic Mail.    This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or electronic mail, will be treated in all manner and respects as an original agreement or instrument and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument will raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

25.    Further Assurances.  The parties shall execute and deliver all documents, provide all information, and take or refrain from taking such actions as may be reasonably necessary or appropriate to achieve the purposes of this Agreement. Without limiting the foregoing, each holder of Corporation Stock hereby agrees that it will vote for, consent to and raise no objections against, and take all actions necessary to allow to be consummated, any issuances of Subject Securities and any other issuances pursuant to this Agreement, including, to the extent necessary, voting for and consenting to amendments to the Certificate of Incorporation.

26.    Consent to Jurisdiction.  The parties agree that all disputes, legal actions, suits and proceedings arising out of or relating to this Agreement must be brought exclusively in the courts of the State of Delaware.  Each party hereby consents and submits to the exclusive jurisdiction of such courts.  No legal action, suit or proceeding with respect to this Agreement may be brought in any other forum.  Each party hereby irrevocably waives all claims of immunity from jurisdiction and any right to object on the basis that any dispute, action, suit or proceeding brought in accordance with this Section 26 has been brought in an improper or inconvenient forum or venue.

27.    Mutual Waiver of Jury Trial.  As a specifically bargained inducement for each of the parties to enter into this Agreement (with each party having had opportunity to consult counsel), each party hereto expressly and irrevocably waives the right to trial by jury in any lawsuit or legal proceeding relating to or arising in any way from this Agreement or the transactions contemplated herein, and any lawsuit or legal proceeding relating to or arising in any way to this Agreement or the transactions contemplated herein shall be tried in a court of competent jurisdiction by a judge sitting without a jury.

28.    <u>Understanding Among the Stockholders</u>.  Except as otherwise provided herein, the determination of each Stockholder to purchase the Corporation Stock has been made by such Stockholder independent of any other Stockholder, or any of such other Stockholder's Affiliate, and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business, prospects or condition (financial or otherwise) of the Company which may have been made or given by any other Stockholder or by any agent, Affiliate or employee of any other Stockholder.  In addition, it is acknowledged by each Stockholder that no Stockholder has acted as an agent of any other Stockholder in connection with making its investment hereunder and that no Stockholder shall be acting as an agent of any other Stockholder in connection with monitoring its investment hereunder.  It is further acknowledged by the Other Stockholders that Oaktree Investors and their respective Affiliates have retained Kirkland & Ellis LLP to act as their counsel in connection with this Agreement, those documents expressly referred to herein and related documents of even date herewith and that Kirkland & Ellis LLP has not acted as counsel for any other party in connection herewith or therewith and that no other party has the status of a client of Kirkland & Ellis LLP for conflict of interest or other purposes as a result thereof.

\* \* \* \*

21

IN WITNESS WHEREOF, the parties hereto have executed this Stockholders Agreement on the day and year first above written.

**COMPANY**:

QUIKSILVER, INC.

By: _____
Name:
Title:

**OAKTREE INVESTORS**:

OCM BIG WAVE EQUITY HOLDINGS, LLC

By: _____
Name:
Title:

**<u>OTHER STOCKHOLDERS</u>:**

[_____]

[_____]

[_____]

[_____]

[_____]

[_____]

[_____]

## OAKTREE INVESTORS SCHEDULE

| Oaktree Investor and Notice Address | Shares of Common Stock Held |
|---|---|
| OCM Big Wave Equity Holdings, LLC c/o Oaktree Capital Management, L.P. 333 S. Grand Ave., 28th Floor Los Angeles, California 90071 Attention:  Matthew Wilson Facsimile:  (213) 830-6300 | [    ] |

## OTHER STOCKHOLDERS SCHEDULE

| Other Stockholders and Notice Address | Shares of Common Stock Held |
|---|---|
| | |
| | |
| | |
| | |
| | |

## EXHIBIT A

### MANAGEMENT FEES

The Company or its Subsidiaries will be entering into a management services agreement (the "MSA") with an Affiliate of the Oaktree Investors (the "Advisor") on the date hereof, pursuant to which they shall be required to pay the Advisor an annual management and consulting fee in the amount of $3,000,000.00 (the "Consulting Fee"); provided that the Consulting Fee payable by the Company to the Advisor in respect of the first year following the date hereof shall accrue throughout such period and be payable instead during the second year following the date hereof (such that the total fees payable during the second year shall be $6,000,000). If the Company or its Subsidiaries acquire or enter into any additional business operations after the date of the MSA, the Company and the Advisor will determine whether and to what extent the Consulting Fee should be increased as a result thereof.   Additionally, in consideration for the time and effort expended by the Advisor and its personnel in connection with any acquisition, divestiture, financing, refinancing, merger, restructuring (financial or organizational), recapitalization or other transaction by the Company or any of its Subsidiaries, the Advisor shall be entitled to receive an additional consulting fee in respect of the additional services to be provided by the Advisor in connection with such activities; provided that, the amount of any additional consulting fee payable in connection with such activities shall be determined by the Board on a case-by-case basis, based on the amount of consulting fees which would be payable to a third party advisor in such circumstances.   Finally, the Advisor shall be entitled to reimbursement of its and its Affiliates' out of pocket expenses incurred pursuant to the MSA.

# **EXHIBIT C-2**

**Amended Reorganized Quiksilver Shareholders Agreement (Redline)**

**STOCKHOLDERS AGREEMENT**

THIS STOCKHOLDERS AGREEMENT (this "<u>Agreement</u>") is made as of_____, 2016 by and among Quiksilver, Inc., a Delaware corporation (the "<u>Company</u>"), the Persons set forth on the attached <u>Oaktree Investor Stockholders Schedule</u> (together with their respective Permitted Transferees, the "<u>Oaktree Investors</u>") and the Persons set forth on the attached <u>Other Stockholders Schedule</u>, together with each of the other entities and individuals set forth from time to time on the signature pages attached hereto under the heading "<u>Other Stockholders</u>" who, at any time, acquire securities of the Company in accordance with the terms hereof and execute a counterpart of this Agreement or who otherwise agree to be bound by this Agreement (the "<u>Other Stockholders</u>" and, together with the Oaktree Investors, the "<u>Stockholders</u>").  Capitalized terms used but not otherwise defined herein have the meanings given to such terms in <u>Section 12</u> hereof.

WHEREAS, the Company filed that certain ~~Second~~Third Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its affiliated Debtors and Debtors In Possession (the "<u>Plan</u>") in the United States Bankruptcy Court for the District of Delaware on ~~December 2, 2015~~January 28, 2016; and

WHEREAS, in connection with the transactions contemplated by the Plan, the Stockholders acquired shares of ~~Common Stock~~common stock, par value $0.01 per share, of the Company (the "<u>Common Stock</u>").

NOW, THEREFORE, in consideration of the mutual promises made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    <u>Board of Directors</u>.

(a) From and after the date hereof and until the provisions of this <u>Section 1</u> cease to be effective, each Stockholder shall vote all of his, her or its Corporation Stock and any other voting securities of the Company over which such Stockholder has voting control and shall take all other necessary or desirable actions within his, her or its control (whether in his, her or its capacity as a Stockholder, director, member of a board committee or officer of the Company or otherwise, and including, without limitation, upon any Stockholder's request, attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company shall take all necessary and desirable actions within its control (including calling special board and Stockholder meetings), so that:

(i)    the authorized number of directors on the board of directors of the Company (the "<u>Board</u>") shall be four (4) or such other number designated by the Oaktree Investors from time to time;

(ii)    the following persons shall be elected to the Board:

(A)    the Chief Executive Officer of the Company, who shall initially be Pierre Agnes (the "<u>CEO Director</u>"); and

(B)     three (3) representatives designated by the Oaktree Investors, who shall initially be Matthew Wilson, David Tanner, and Thomas Casarella (each, an "<u>Oaktree Investor Director</u>").

(iii)     the removal of any Oaktree Investor Director shall be upon (and only upon) the request of the Oaktree Investors, and in the event that any Oaktree Investor Director for any reason ceases to serve as a member of the Board during his or her term of office, the resulting vacancy on the Board shall be filled by a representative designated by the Oaktree Investors;

(iv)     the removal of the CEO Director from the Board (with or without cause) shall occur simultaneously with his or her removal as the Chief Executive Officer of the Company;

(v)     in the event that any CEO Director for any reason ceases to serve as a member of the Board during his or her term of office, the resulting vacancy on the Board shall be filled by a representative designated by the Board;

(vi)     unless otherwise determined by the Board, the composition of the board of directors of each of the Company's Subsidiaries (a "<u>Sub Board</u>") shall be the same as that of the Board; and

(vii)     the composition of any committee of the Board or any Sub Board shall include at least one of the Oaktree Investor Directors.

(b) To the extent not otherwise paid by the Company pursuant to any other agreement between the Company and any director or Stockholder, the Company (or one of the Company's Subsidiaries) shall pay all reasonable out-of-pocket costs and expenses incurred by each director in connection with attending regular and special meetings of the Board, any board of directors of any Subsidiaries of the Company and any committee thereof.  Each Stockholder acknowledges that the management and transaction fees paid to the Oaktree Investors shall not constitute the payment by the Company of costs and expenses incurred by the Oaktree Investor Directors.

(c) If at any time a vacancy is created on the Board by reason of the incapacity, death, removal or resignation of a director, such vacancy shall automatically reduce the number of directors *pro tanto*, until such time as the Stockholders entitled to designate such director pursuant to <u>Section 1(a)(ii)</u> above shall designate a director to fill such vacancy and such director shall have been elected to the Board in accordance with this Agreement and the Company's Certificate of Incorporation, whereupon the number of directors shall be automatically increased *pro tanto*.  Upon receipt of notice of the designation of a nominee pursuant to this <u>Section 1(c)</u>, each Stockholder shall, as soon as practicable after the date of such notice, take action, including the voting of its voting securities, to elect the director so designated to fill such vacancy.

(d) The provisions of this <u>Section 1</u> shall terminate upon the ~~earlier~~<u>first</u> to occur of (i) consummation of a Sale of the Company ~~and~~, (ii) an IPO <u>or (iii) the Oaktree Investors collectively holding less than a majority of the outstanding voting shares of Corporation Stock</u>.

2

2.     Irrevocable Proxy; Conflicting Agreements.  In order to secure each Other Stockholder's obligation to vote his, her or its Corporation Stock and any other voting securities of the Company in accordance with the provisions of Section 1 hereof and for other good and valuable consideration, each Other Stockholder hereby appoints the Oaktree Investors, as his, her or its true and lawful proxy and attorney-in-fact, with full power of substitution, to vote all of his, her or its Corporation Stock and other voting securities of the Company for the election and/or removal of directors and all such other matters as expressly provided for in Section 1 hereof until such time as the Oaktree Investors collectively hold less than a majority of the outstanding voting shares of Corporation Stock.  The Oaktree Investors may exercise the irrevocable proxy granted hereunder at any time any Other Stockholder fails to comply with the provisions of this Agreement.  The proxies and powers granted by each Other Stockholder pursuant to this Section 2 are coupled with an interest and are given to secure the performance of each Other Stockholder's obligations to the Oaktree Investors under this Agreement.  Such proxies and powers will be irrevocable for the term of this Agreement until such time as the Oaktree Investors collectively hold less than a majority of the outstanding voting shares of Corporation Stock and will survive the death, incompetency, disability, insolvency and/or dissolution of each Other Stockholder and the respective holders of their Corporation Stock.

3.     Rights on Transfer of Corporation Stock.

(a) Participation Rights.

(i)     At least fifteen (15) days before any Transfer by any Oaktree Investor of Common Stock (other than Transfers (x) which, when combined with any prior Transfers excluded from this Section 3(a)(i) by virtue of this subsection (x), do not exceed 10% in the aggregate of the Common Stock (based on the total Common Stock outstanding as of the date of such Transfer) or (y) which is made in connection with a Public Sale or a Sale of the Company), but after complying with any applicable Transfer requirements set forth in Section 3(b), the applicable Oaktree Investor shall deliver a written notice (the "Tag-Along Notice") to each other Stockholder holding at least 5% of the then outstanding shares of Common Stock (determined on a fully-diluted basis) outstanding as of such date, which would be entitled to sell at least $100,000 of Common Stock in such Transfer (based upon the amount of such Stockholder's Tag-Along Allocation (as defined below) and the expected purchase price to be paid in such Transfer), specifying in reasonable detail the identity of the prospective Transferee(s), the number of shares of Common Stock to be Transferred by such Oaktree Investor and the purchase price therefor (it being understood that the purchase price and number of shares may change).  Any of such other Stockholders (each electing Stockholder, a "Tag-Along Stockholder") may elect to participate in the contemplated Transfer by delivering written notice (together with an unconditional commitment to participate (subject to adherence with the provisions of this Section 3(a)) with respect to such Common Stock to be Transferred) to the applicable Oaktree Investor within ten (10) days after delivery of the Tag-Along Notice. If any Tag-Along eligible Stockholders have elected to participate in such Transfer, the applicable Oaktree Investor and each such Tag-Along Stockholder will each be entitled to Transfer (and each Tag-Along Stockholder shall be committed to Transfer so long as such Oaktree Investor remains committed to Transfer) in the contemplated Transfer, a number of shares of Common Stock being Transferred, equal to the number of shares of Common Stock to be Transferred in the contemplated Transfer multiplied by a fraction, (A) the numerator of which is the number of

shares of Common Stock owned by such Stockholder, and (B) the denominator of which is the aggregate number of shares of Common Stock held by the applicable Oaktree Investor and all Tag-Along Stockholders (such amount, a Tag-Along Stockholder's "Tag-Along Allocation"). The Transfer pursuant to this Section 3(a) is hereinafter referred to as the "Participating Transfer."

(ii)     Each eligible Stockholder who does not timely accept an Oaktree Investor's invitation pursuant to Section 3(a)(i) shall be deemed to have waived all of its rights with respect to the Participating Transfer, and such Oaktree Investor and the Tag-Along Stockholders shall thereafter be free to Transfer to the prospective Transferee(s), at a price per respective share of Common Stock no more than 110% of the price per share of Common Stock set forth in the Tag-Along Notice, without any further obligation to such non-accepting Tag-Along Stockholder.

(iii)     In connection with the Participating Transfer, the applicable Oaktree Investor and the Tag-Along Stockholders will receive the same portion of the aggregate consideration available to be distributed to such Oaktree Investor and the Tag-Along Stockholders that such Stockholders participating in such Participating Transfer (in their capacity as Stockholders of the Company) would have received if such aggregate consideration had been distributed to such Stockholders only by the Company in accordance with the rights and preferences set forth in the Certificate of Incorporation as in effect immediately before such Transfer; provided, that the consideration payable to any Stockholder shall be reduced by the aggregate principal amount plus all accrued and unpaid interest on any indebtedness of any such Stockholder to the Company or its Subsidiaries.

(iv)     Each holder of Common StockStockholder participating in the Participating Transfer will be obligated to join severally on a *pro rata* basis (applied such that after giving effect thereto, the aggregate consideration paid to each such Stockholder would comply with the provisions of Section 3(ba)(iii) above) in any purchase price adjustments, indemnification or other obligations that the sellers of Common Stock are required to provide in connection with the Participating Transfer (other than any such obligations that relate solely to a particular Stockholder, such as indemnification with respect to representations and warranties given by a Stockholder regarding such Stockholder's title to and ownership of Common Stock, in respect of which only such Stockholder will be liable); provided that no Stockholder shall be liable for any purchase price adjustments, indemnification or other obligations in excess of the aggregate amount of consideration received by such Stockholder in connection with or pursuant to such Participating Transfer.

(v)     Each Stockholder participating in the Participating Transfer will bear his, her or its *pro rata* share (applied such that after giving effect thereto, the aggregate consideration paid to each such Stockholder would comply with the provisions of Section 3(ba)(iii) above) of the costs of any Participating Transfer to the extent such costs are incurred for the benefit of all Stockholders participating in such Participating Transfer and are not otherwise paid by the Company or the acquiring party.  Costs incurred by the Stockholders on their own behalf will not be considered costs of the transaction hereunder; it being understood that the fees and disbursements of one counsel chosen by the Oaktree Investors will be deemed to be for the benefit of all other Tag-Along Stockholders.

4

(vi)    In furtherance of the provisions of this Section 3(a), each Tag-Along Stockholder, whether in his, her or its capacity as a Tag-Along Stockholder, Stockholder, manager, director, employee or officer of the Company or any of its Subsidiaries, or otherwise, shall take or cause to be taken all such actions as may be reasonably necessary, reasonably desirable or otherwise requested by the applicable Oaktree Investor in order to expeditiously consummate each Participating Transfer and any related transactions (including any auction or competitive bid process in connection with or prefacing such Transfer), including executing, acknowledging and delivering transfer agreements, sale agreements, escrow agreements, consents, assignments, releases, waivers, and any other documents or instruments which in each case are no more burdensome than those executed by such Oaktree Investor or any of its Affiliates (collectively, "Ancillary Documents"); furnishing information and copies of documents; filing applications, reports, returns, filings and other documents or instruments with governmental authorities; and otherwise cooperating with the applicable Oaktree Investor, the prospective Transferee(s) and their respective representatives and counsel.

(b)    Pre-emptive Rights.

(i)    Neither the Company nor any of its Subsidiaries shall issue or sell any equity securities ("Subject Securities") to any Oaktree Investor (each an "Issuance"), except (A) Exempt Equity Issuances or (B) in compliance with the provisions of this Section 3(b).

(ii)    Participation Notice.  Not fewer than fifteen (15) days prior to the consummation of any Issuance, a written notice (the "Participation Notice") shall be given by the Company pursuant to Section 20 to each Stockholder who ~~holds~~is not an Excluded Stockholder (each an "Eligible Stockholder"); provided that, for the avoidance of doubt, New Generation Advisors LLC shall be deemed to be an Eligible Stockholder as of the date hereof until such time as it ceases, after any sale of its shares of Common Stock, to hold at least ~~5~~1% of the ~~then-outstanding~~ shares of Common Stock (determined on a fully-diluted basis) outstanding ~~as of such date and is not an Excluded Stockholder (each an "Eligible Stockholder")~~.  The Participation Notice in respect of any Issuance shall include:

(A)    The principal terms of the proposed Issuance, including (i) the amount and kind of Subject Securities to be included in the Issuance, (ii) the number of Subject Securities, (iii) the price per share of the Subject Securities, (iv) the portion of the Issuance equal to the number of shares of Common Stock held by such Eligible Stockholder immediately prior to the Issuance divided by the aggregate number of shares of Common Stock outstanding immediately prior to the Issuance (the "Participation Portion") and (v) the name and address of each Person to whom the Subject Securities are proposed to be issued (each a "Prospective Subscriber"); and

(B)    An offer by the Company to issue or cause to be issued, at the option of each Eligible Stockholder, to such Stockholder such portion of the Subject Securities to be included in the Issuance as may be requested by such Eligible Stockholder (not to exceed such Stockholder's Participation Portion of the total amount of Subject Securities to be

5

included in the Issuance), at the same price and otherwise on the same economic terms and conditions, with respect to each share of Subject Securities issued to such Eligible Stockholder, as the issuance to each of the Prospective Subscribers; provided that, if all Stockholders entitled to purchase or receive any class or series of Subject Securities are required to also purchase any other class or series of Subject Securities, the Eligible Stockholders exercising their rights pursuant to this Section 3(b) shall also be required to purchase the same strip of securities (on the same terms and conditions) that such other Stockholders and/or Prospective Subscribers are required to purchase.

(iii)    Other Terms.  With respect to any given Issuance:

(A)    Participation Commitment.    Each Eligible Stockholder desiring to accept the offer contained in the Participation Notice shall send an irrevocable commitment (each a "Participation Commitment") to the Company within ten (10) days after the effectiveness (in accordance with this Section 3(b)(iii)(A)) of the Participation Notice specifying the amount or proportion of Subject Securities which such Stockholder desires to be issued (each a "Participating Buyer").  If all Subject Securities are not subscribed to by the Participating Buyers in a Participation Commitment, the unsubscribed Subject Securities will be issued to the Prospective Subscribers at a price not less than 90% of the price set forth in the Participation Notice.  Each Eligible Stockholder which has not so accepted such offer set forth in a Participation Notice, or that does not comply with Section 3(b)(iii)(D), shall be deemed to have waived all of such Stockholder's rights with respect to the Issuance under this Section 3(b) (or the part thereof in respect of which it has not accepted), and the Company shall thereafter be free to issue Subject Securities in such Issuance to the Prospective Subscribers and the Participating Buyers, at a price not less than 90% of the price set forth in the Participation Notice, without any further obligation to such non-accepting holders under this Section 3(b).  If, prior to consummation, the terms of such proposed Issuance shall change with the result that the price shall be less than 90% of the price set forth in the Participation Notice, it shall be necessary for a separate Participation Notice to be furnished, and the terms and provisions of this Section 3(b) separately complied with, in order to consummate such Issuance pursuant to this Section 3(b); provided, however, that in the case of such a separate Participation Notice, each applicable period to which reference is made in this Section 3(b) shall be the longer of (a) the remaining portion of the ten (10) day period applicable to the first Participation Notice distributed in connection with such proposed Issuance or (b) five (5) days.

(B)    Acceptance. The acceptance of each Participating Buyer shall be irrevocable except as hereinafter provided, and each such Participating Buyer shall be bound and obligated to acquire in the Issuance

on the same economic terms and conditions as the Prospective Subscribers, with respect to each share of Subject Securities issued, such amount or proportion of Subject Securities as such Participating Buyer shall have specified in such Participating Buyer's Participation Commitment.

(C)    <u>Failure to Consummate</u>.  If at the end of the 120th day following the date of the effectiveness (in accordance with <u>Section 3(b)(ii)</u>) of the Participation Notice the Company has not completed the Issuance on the terms and conditions specified in such Participation Notice, each Participating Buyer shall be released from its obligations under such Participating Buyer's Participation Commitment, the Participation Notice shall be null and void, and it shall be necessary for a separate Participation Notice to be furnished, and the terms and provisions of this <u>Section 3(b)</u> separately complied with, in order to consummate any Issuance subject to this <u>Section 3(b)</u>.

(D)    <u>Cooperation</u>.  Each Stockholder to which a Participation Notice was delivered, whether in his, her or its capacity as a Participating Buyer, officer or director of the Company, or otherwise, shall take or cause to be taken all such reasonable actions as may be necessary, reasonably desirable or otherwise requested by the Company in order expeditiously to consummate such Issuance pursuant to this <u>Section 3(b)</u> and any related transactions, including executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments, filing applications, reports, returns, filings and other documents or instruments with governmental authorities, and otherwise cooperating with the Company, the Prospective Subscribers and the Participating Buyers (if any).  Without limiting the generality of the foregoing, each such Participating Buyer and Stockholder agrees to execute and deliver such Ancillary Documents to which the Prospective Subscriber will be party.

(E)    <u>Closing</u>.  The closing of such Issuance pursuant to this <u>Section 3(b)</u> shall take place at such time and place as the Company shall specify by notice to each Participating Buyer in accordance with <u>Section 20</u>.  At the Closing of such Issuance pursuant to this <u>Section 3(b)</u>, each Participating Buyer shall be delivered the certificates or other instruments, if any, evidencing the Subject Securities to be issued to such Participating Buyer, registered in the name of such Participating Buyer or his, her or its designated nominee, free and clear of any liens or encumbrances, with any transfer tax stamps affixed, against delivery by such Participating Buyer of the applicable consideration.

(F)    <u>Exceptions</u>.  Notwithstanding anything herein to the contrary, if the Board determines in its sole discretion that it would be in the best interests of the Company to do so, the Company may issue

Subject Securities which would otherwise be required to be offered to the Eligible Stockholders under this Section 3(b) without first complying with this Section 3(b); provided, that within sixty (60) days after such Issuance, it offers each such Eligible Stockholder, if required, the opportunity to purchase (x) from the Company, such Stockholder's Participation Portion of (A) the aggregate number of Subject Securities issued prior to compliance with this Section 3(b), plus (B) the number of Subject Securities thereafter issued pursuant to this Section 3(b)(iii)(F), (y) if any Oaktree Investor purchases any such Subject Securities, from such Oaktree Investor (or from the Company in connection with a corresponding redemption or repurchase by the Company from such Oaktree Investor), such Eligible Stockholder's Participation Portion of the aggregate number of Subject Securities (free and clear of liens, pledges and security interests, with a customary indemnity provided by such Oaktree Investor in support of the same) issued prior to compliance with this Section 3(b) or (z) any combination of (x) and (y), so long as such combination results in such Eligible Stockholder receiving the opportunity to purchase such Eligible Stockholder's full Participation Portion of any Subject Securities issued prior to compliance with this Section 3(b) and after giving effect to any Subject Securities issued pursuant to this Section 3(b)(iii)(F).

(c) <u>Termination of Rights</u>.  The provisions of this Section 3 will continue to apply to each share of Corporation Stock (and will survive any Transfer thereof) until the earlier to occur of (i) consummation of a Sale of the Company and (ii) an IPO.

(d) <u>Acknowledgment of Transfer Restrictions</u>.  Nothing in this Section 3 will be implied or construed to restrict, limit, or otherwise affect (or permit any Transfers otherwise prohibited, restricted, or limited by) any vesting arrangements, restrictions on transfer, or other similar provisions set forth in any agreement to which any employee, officer, consultant or service provider of the Company or an Affiliate thereof, or its Permitted Transferees, is subject or bound.

4.    <u>Registration Rights.</u>

(a) <u>Registration Rights</u>.  The parties hereto agree that any IPO relating to the Company or its Subsidiaries may be effected at the Company level or at the level of a Subsidiary of the Company (the applicable entity, including any successor entity to the Company or any Subsidiary thereof, the "<u>IPO Entity</u>"). In connection with an IPO, the IPO Entity shall enter into a registration rights agreement with each Stockholder holding at least 5% of the then-outstanding shares of Common Stock (determined on a fully-diluted basis) outstanding as of such date with respect to the registration of its securities in form and substance reasonably satisfactory to the Board and the Oaktree Investors; <u>provided</u> that such registration rights agreement shall provide for (i) long form and short form demand registration rights, as well as shelf registration rights, for the Oaktree Investors, (ii) piggyback registration rights to all Stockholder holding at least 5% of the then-outstanding shares of Common Stock (determined on a fully-diluted basis) outstanding as of such date with any registration of the securities of the IPO Entity under the

Securities Act (other than in connection with a merger, acquisition, corporate reorganization, exchange offer, dividend reinvestment plan, stock option plan or other employee benefit plan and other customary exclusions) in which the registration form to be used may be used for the registration of the securities held by such Stockholders, (iii) customary pro rata cutback provisions, and (iv) customary indemnification of such Stockholders; provided, further, that, for the avoidance of doubt, unless the Oaktree Investors otherwise determine, such registration rights agreement shall not grant any Stockholder any rights with respect to the IPO of the Company or any successor thereto.  Each Stockholder hereby agrees to execute any reasonable registration rights agreement proposed by the IPO Entity as long as such agreement is consistent in all material respects with the foregoing.

(b) Registration Expenses.  All expenses incident to the IPO Entity's performance of or compliance with this Section 4, including all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, printing expenses, messenger and delivery expenses, and fees and disbursements of counsel for the IPO Entity and all independent certified public accountants, underwriters (excluding discounts and commissions) and other Persons retained by the IPO Entity will be borne by the IPO Entity.  The IPO Entity will bear the cost of one counsel for the holders of Corporation Stock participating in any demand or piggyback registration selected by the Oaktree Investors.  All underwriting discounts and commissions will be borne by the seller of the securities sold pursuant to the registration.

(c) Selection of Underwriters.  If any demand registration or piggyback registration is an underwritten offering, then the selection of investment banker(s) and manager(s) for the offering will be made by the Oaktree Investors, subject to the approval of the IPO Entity (such approval shall not be unreasonably withheld, conditioned or delayed).

5.    Stockholder Cooperation; Limitation of Liability; Closing.

(a) Limitation of Liability. The applicable Oaktree Investor, in its sole discretion, shall decide whether or not to pursue, consummate, postpone or abandon any proposed Transfer and the terms and conditions thereof.  None of the applicable Oaktree Investor or any of its Affiliates shall have any liability to any other holder of Corporation Stock arising from, relating to or in connection with the pursuit, consummation, postponement, abandonment or terms and conditions of any proposed Transfer or Sale of the Company.

(b) Closing. The closing of a Transfer  to which Section 5(a) applies shall take place at such time and place as the applicable Oaktree Investor shall specify by notice to each Tag-Along Stockholder.  At the closing of such Transfer, each Tag-Along Stockholder shall, if applicable, deliver the certificates evidencing the shares of Corporation Stock to be Transferred by such Tag-Along Stockholder, duly endorsed for transfer with signature guaranteed, free and clear of any liens or encumbrances, with any necessary transfer tax stamps, affixed, against delivery of the applicable consideration.

6.    Restrictions. From and after the date hereof, the Company shall not, and shall cause each of its Subsidiaries to not, without the prior written consent of the Oaktree Investors:

(i)        except as expressly contemplated by this Agreement, authorize, issue or enter into any agreement providing for the issuance (contingent or otherwise) of (i) any notes or debt securities with options, warrants or other rights to acquire equity securities (including any notes or debt securities convertible into or exchangeable for equity securities or options, warrants or other rights to acquire equity securities issued in connection with the issuance of capital stock or options, warrants or other rights to acquire equity securities or containing profit participation features) of the Company or any Subsidiary or (ii) any equity securities of the Company or any Subsidiary; provided that nothing herein shall restrict the Company's or any Subsidiary's ability to issue equity securities (or rights to acquire equity securities) to directors, employees, officers, consultants or service providers of the Company or its Subsidiaries (excluding the Oaktree Investors or any of their respective Affiliates) pursuant to compensation plans or similar arrangements approved by the Board (which such management issuances shall be excluded from the Equity Issuance Basket);

(ii)        create, incur, assume or suffer to exist any indebtedness other than (1) indebtedness under the terms and provisions of, or expressly permitted under the terms of, any credit agreement or loan agreement entered into by the Company or any of its Subsidiaries as in effect as of the closing of the transactions contemplated by the Plan (the "Credit Agreement") and (2) indebtedness that does not exceed $5,000,000.00 in the aggregate;

(iii)        increase the authorized number of directors on the Board to a number greater than four (4), or otherwise permit more than four (4) directors to be on the Board;

(iv)        except in connection with an Approved Sale, sell, lease or otherwise dispose of, or permit any of its Subsidiaries to sell, lease or otherwise dispose of, assets or equity interests of any entity (collectively, the "Transferred Property") which constitute a material portion of the business of the Company and its Subsidiaries ;

(v)        retain or engage any mergers and acquisitions or restructuring professionals;

(vi)        commence any voluntary bankruptcy of the Company or any Subsidiary, enter into any arrangement with creditors, or consent to entry of an order for relief in an involuntary case, or take the conversion of an involuntary case to a voluntary case, or consent to the appointment or taking possession by a receiver, trustee or other custodian for all or substantially all of its property;

(vii)        pay any dividend or other distribution on any shares of Corporation Stock, or shares of capital stock of any Subsidiary (other than as provided in the certificate of incorporation of such entity (or any equivalent thereof) or any certificate of designation issued pursuant thereto);

(viii)        redeem, repurchase or otherwise acquire any shares of Corporation Stock or shares of capital stock of any Subsidiary (other than as provided in the certificate of incorporation of such entity (or any equivalent thereof) or pursuant to contractual rights or obligations to repurchase shares of Corporation Stock held by employees, former employees, directors, consultants of or lenders to the Company or any of its Subsidiaries);

(ix)     make any loans or advances to, guarantees for the benefit of, or investments in, any Person (other than a wholly owned Subsidiary established under the laws of a jurisdiction of the United States), except for reasonable travel advances to and other customary employee arrangements made with employees of the Company or any Subsidiary in the ordinary course of business;

(x)     acquire any interest in any company or business (whether by a purchase of assets, purchase of stock, merger or otherwise), or enter into any joint venture;

(xi)     incur any material capital expenditure which is not provided for in the Company's and its Subsidiaries' annual budget;

(xii)     adopt an annual budget for any fiscal year;

(xiii)     enter into, amend, modify or waive any provision of any employment or other material compensation agreement with any key executives of the Company or any Subsidiary; or

(xiv)     authorize or enter into any agreement, contract or commitment to do any of the foregoing or authorize, take or agree to take (or, in the case of those matters where the Company or its Subsidiaries would suffer to exist, fail to take) any action with respect to the foregoing.

(b) From and after the date hereof, the Company shall not, and shall cause each of its Subsidiaries to not, enter into a transaction with any Stockholder or any Affiliate of a Stockholder unless (i) such transaction is entered into on an arms' length basis, (ii) the Company obtains an opinion from an independent financial advisor that the consideration to be received by the Company or the applicable Subsidiaries in such transaction is fair to the Company or such applicable Subsidiaries, or (iii) such transaction was approved by a majority of the disinterested directors of the Company serving on the Board or a majority of the shares of Common Stock (disregarding for purposes of such determination the shares of Common Stock held by interested Stockholders and their Affiliates); provided, however, that no such approval shall be required for (A) any transaction between or among the Company or any one or more of its Subsidiaries (or any of them) and other Persons, if any, who are not Stockholders or Affiliates thereof, (B) any exercise of any rights granted, or any transaction otherwise subject to limitations, restrictions, procedures or other provisions, as applicable, under the other provisions of this Agreement, the Certificate of Incorporation, the Amended and Restated Bylaws or any other agreement entered into in compliance with this Section 6 (including (x) any appointment, election, removal, designation of, or vote for, any director or manager of the Company or any of its Subsidiaries, (y) the issuance or Transfer of any securities, subject to compliance with the other provisions of this Agreement, the Certificate of Incorporation and/or the Amended and Restated Bylaws, and (z) any exercise of registration rights under this Agreement) or (C) any transaction related to the implementation of or contemplated by the Plan or any exhibits, schedules, supplements or orders related thereto.

7.     <u>Financial Statements and Other Information</u>.  The Company shall deliver to each Stockholder (so long as such Stockholder, together with its Affiliates, holds at least 0.5%

of the ~~then outstanding~~ shares of Common Stock (determined on a fully-diluted basis~~):~~) outstanding as of such date:

(a) within 60 days after the end of each quarterly accounting period in each fiscal year, the unaudited consolidating and consolidated statements of income and cash flows of the Company and its Subsidiaries for each quarterly period, and consolidating and consolidated balance sheets of the Company and its Subsidiaries as of the end of such quarterly period, all prepared in accordance with generally accepted accounting principles, consistently applied, subject to the absence of footnote disclosures and to normal year-end adjustments; and

(b) within 120 days after the end of each fiscal year, audited consolidating and consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal year, and consolidating and consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal year, setting forth in each case comparisons to the annual budget and to the preceding fiscal year, all prepared in accordance with generally accepted accounting principles, consistently applied, and accompanied by management's discussion and analysis for such period.

8.    Restrictive Legend.  Each certificate evidencing shares of Corporation Stock and each certificate issued in exchange for or upon the transfer of any shares of Corporation Stock (if such securities remain Corporation Stock after such transfer) will be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON _____ AND ~~HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL~~ARE SUBJECT TO RESTRICTIONS ON TRANSFER SPECIFIED IN THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF THE ISSUER, AS AMENDED AND MODIFIED FROM TIME TO TIME, AND THE ISSUER RESERVES THE RIGHT TO REFUSE THE TRANSFER OF SUCH SECURITIES UNTIL SUCH RESTRICTIONS HAVE BEEN SATISFIED WITH RESPECT TO ANY TRANSFER.

IN ADDITION, THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A STOCKHOLDERS AGREEMENT DATED AS OF [_____], 2016, AMONG THE ISSUER AND CERTAIN OF THE ISSUER'S STOCKHOLDERS AS SUCH AGREEMENT MAY BE AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME

TO TIME.    A COPY OF SUCH AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

The Company will imprint such legend on certificates evidencing shares of Corporation Stock outstanding as of the date hereof.  The legend set forth above will be removed promptly from the certificates evidencing any securities which cease to be Corporation Stock in accordance with the definition of such term herein.

9.    <u>Execution of this Agreement by Transferees</u>.  Prior to transferring any Corporation Stock to any Person (other than pursuant to a Public Sale, a Sale of the Company or a Transfer to the Company, or a Transfer to an Oaktree Investor or its designees or Affiliates), the transferring Stockholder(s) will cause the prospective transferee(s) to be bound by this Agreement and to execute and deliver to the Company and the other Stockholders a counterpart signature page to this Agreement (or a joinder agreement making such Person a party hereto) and, if requested by the Company, an executed spousal consent, in each case in form and substance satisfactory to the Company.

10.    <u>Additional Stockholders</u>.    In connection with the issuance of any additional equity securities of the Company to any Person, the Company may permit such Person to become a party to this Agreement and succeed to all of the rights and obligations of a "Stockholder" under this Agreement by obtaining an executed counterpart signature page to this Agreement (or a joinder agreement making such Person a party hereto) and, if requested by the Company, an executed spousal consent, and, upon such execution, such Person shall for all purposes be a "Stockholder" party to this Agreement, and the addition of such Person as a party hereto shall not in and of itself be deemed to be an amendment, modification, or waiver hereof.

11.    <u>Representations and Warranties</u>.

(a) Each Stockholder (severally but not jointly) represents and warrants that:

(i)    such Stockholder is the holder of the number of shares of Corporation Stock set forth opposite such Stockholder's name on the attached <u>Schedule of Stockholders</u>;

(ii)    such Stockholder, to the extent applicable, is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation;

(iii)    such Stockholder (x) is either (1) certified as an "accredited investor" as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act, which, for the avoidance of doubt, shall exclude any natural person, or (2) a "qualified institutional buyer" as defined in Rule 144A of the Securities Act or, (y) in the case of a Stockholder who is an employee or service provider of the Company or any of its Subsidiaries, has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto;

(iv)     such Stockholder has requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action required for due authorization, execution, delivery and performance hereunder;

(v)     this Agreement has been duly authorized, executed and delivered by such Stockholder and constitutes the valid and binding obligation of such Stockholder, enforceable against such Stockholder in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith, and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity);

(vi)     such Stockholder has not granted a proxy and is not party to any voting trust or other agreement with respect to any Corporation Stock, other than this Agreement. No holder of Corporation Stock will grant any proxy or become party to any voting trust or other agreement which is inconsistent with, conflicts with, or violates any provision of this Agreement;

(vii)     at the time such Stockholder acquired the Corporation Stock held by it on the date hereof, it acquired such Corporation Stock for its own account for investment purposes only, within the meaning of the Securities Act, and not with a view to the distribution thereof other than as permitted by this Agreement or the Certificate of Incorporation, and in compliance with applicable securities laws;

(viii)     such Stockholder's financial condition is such that such Stockholder has no need for any liquidity in its investment in the Company and is able to bear the risk of holding Corporation Stock for an indefinite period of time and the risk of loss of its entire investment in the Company;

(ix)     such Stockholder has been given the opportunity to (A) ask questions and receive satisfactory answers concerning the terms and conditions of this Agreement and the Corporation Stock and (B) obtain additional information in order to evaluate the merits and risks of an investment in the Company;

(x)     (A) no part of the funds used by such Stockholder to acquire the Corporation Stock has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene federal, state, or international laws and regulations, including anti-money laundering laws and regulations; and (B) no contribution, or payment to the Company or any of its Subsidiaries by such Stockholder shall cause the Company or any of its Subsidiaries to be in violation of any applicable anti-money laundering laws and regulations including without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the U.S. Department of the Treasury Office of Foreign Assets Control regulations; and

(xi)     such Stockholder acknowledges and understands that:

(1)     an investment in the Company is speculative and involves significant risks;

(2)     the Corporation Stock will be subject to certain restrictions on transferability as described in this Agreement and as a result of the foregoing, the marketability of the Corporation Stock may be severely limited;

(3)     such Stockholder may not transfer, sell, or otherwise dispose of the Corporation Stock in any manner that will violate the terms of this Agreement, the Securities Act or any state or foreign securities laws or subject the Company or any of its Subsidiaries or any of their respective Affiliates to regulation under the rules and regulations of the Securities and Exchange Commission or the laws of any other federal, state, or municipal authority or any foreign governmental authority having jurisdiction thereof;

(4)     (A) the Corporation Stock has not been, and will not be, registered under the Securities Act or any state or foreign securities laws, and is being offered and sold in reliance upon federal, state and foreign exemptions from registration requirements for transactions not involving any public offering and (B) the Company's reliance upon such exemptions is based in part upon the representations of the holder contained herein; and

(5)     none of the Company or any of its Subsidiaries intends to register as an investment company under the Investment Company Act of 1940, as amended, and none of the Company or any of its Subsidiaries or any of their respective managers, members or partners or any other person or entity selected to act as an agent of the Company or any of its Subsidiaries with respect to managing their affairs, is registered as of the date hereof as an investment adviser under the Investment Advisers Act of 1940, as amended.

12.    <u>Definitions</u>.

"<u>Affiliate</u>" shall have the meaning set forth in the Certificate of Incorporation.

"<u>Certificate of Incorporation</u>" means the Amended and Restated Certificate of Incorporation of the Company, as filed with the Secretary of State of Delaware, and as amended from time to time in accordance with their terms.

"<u>Corporation Stock</u>" shall have the meaning set forth in the Certificate of Incorporation.

"<u>Excluded Stockholder</u>" means any Stockholder (a) who is not an "accredited investor" as defined under Rule 501 of Regulation D of the Securities Act (or any similar or equivalent provision then in force), (b) whose Participation Portion is less than $~~25~~200,000 of the Subject Securities, (c) for any Stockholder who was an employee, consultant or service provider of the Company or any of its Subsidiaries and who is no longer being retained or employed by the Company or any of its Subsidiaries and (d) for any Stockholder who is or was an employee, consultant or service provider of the Company or any of its Subsidiaries, if such Stockholder is, at the applicable time, in material breach of any noncompetition, nonsolicitation, confidentiality or similar restrictive provision to which such Stockholder is bound pursuant to any employment agreement or other agreement between such Stockholder and the Company or any of its Subsidiaries.

"Exempt Equity Issuances" means issuances of capital stock of the Company (or securities containing options or rights to acquire shares of capital stock of the Company) (i) upon the conversion, exchange or exercise of any securities of the Company or options, warrants or other rights to acquire or exchange securities of the Company, if such options, warrants or other rights are outstanding on the date hereof, issued as part of an Exempt Equity Issuance or issued after compliance with the provisions of Section 3, (ii) pursuant to an IPO, (iii) as a dividend on the outstanding Corporation Stock, (iv) to directors, employees, officers, consultants or service providers of the Company or its Subsidiaries (excluding the Oaktree Investors or any of their respective Affiliates) pursuant to compensation plans or similar arrangements approved by the Board, (v) to banks, debt financing sources, equipment lessors and other financial institutions pursuant to a debt financing, equipment leasing or similar transaction approved by the Board, (vi) pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization that has been approved by the Board~~ and (vii,~~ (vii) in connection with any of the Rights Offerings (as defined in the Plan) contemplated by the Plan and (viii) in connection with an internal restructuring or reorganization which does not result in the issuance of any equity securities to any unaffiliated third party or change the ownership interest of any Stockholder in the Company.

"IPO" shall have the meaning set forth in the Certificate of Incorporation.

"Permitted Transfer" shall have the meaning set forth in the Certificate of Incorporation.

"Permitted Transferee" means the transferee in any Permitted Transfer. Each such Person shall be subject to all the provisions of this Agreement.

"Person" shall have the meaning set forth in the Certificate of Incorporation.

"Public Sale" shall have the meaning set forth in the Certificate of Incorporation.

"Sale of the Company" shall  have the meaning set forth in the Certificate of Incorporation.

"Securities Act" shall have the meaning set forth in the Certificate of Incorporation.

"Securities and Exchange Commission" means the United States Securities and Exchange Commission and includes any governmental body or agency succeeding to the functions thereof.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the limited liability company, partnership, association or other business entity, a majority of the limited liability company, partnership or other similar ownership interest thereof is at the time owned or controlled, directly

or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons will be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons will be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or will be or control the managing director or general partner of such limited liability company, partnership, association or other business entity.  For purposes of this Agreement, if the context does not otherwise indicate in respect of which Person the term "Subsidiary" is used, the term "Subsidiary" will refer to any Subsidiary of the Company.

"Transfer" shall have the meaning set forth in the Certificate of Incorporation.

13.    Management Arrangements.    Each Stockholder acknowledges that, in connection with certain services and other benefits to be provided to the Company and its Subsidiaries following the date hereof, the Oaktree Investors or their Affiliates and the Company or any of its Subsidiaries shall enter into a management agreement which provides for management and transaction fees to the Oaktree Investors on the terms set forth on Exhibit A. Each Stockholder hereby acknowledges that he, she or it is familiar with the existence of, and hereby approves of, such management agreement.Severability.    Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or affect the validity, legality or enforceability of any provision in any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

15.    Complete Agreement.    Except as otherwise expressly set forth herein, this Agreement, those documents expressly referred to herein and related documents of even date herewith among the parties embody the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

16.    Counterparts.    This Agreement may be executed in multiple counterparts, none of which need contain the signature of more than one party hereto but each of which will be deemed an original and all of which taken together will constitute one and the same agreement.

17.    Successors and Assigns.    Except as otherwise provided herein, this Agreement will bind and inure to the benefit of and be enforceable by the Company and its successors and assigns and the Stockholders and any subsequent holders of Corporation Stock and the respective successors and assigns of each of them, so long as they hold Corporation Stock, whether so expressed or not.  For the avoidance of doubt, a Stockholder shall immediately cease to have any rights under this Agreement upon the sale by such Stockholder of all of his, her or its Corporation Stock pursuant to the terms of this Agreement. Any rights granted to an Oaktree Investor and its Affiliates hereunder may also be exercised (in whole or in part) by their respective designees (which may or may not be Affiliates) .

17

18.    Remedies.    Each of the parties to this Agreement will be entitled to enforce their rights under this Agreement specifically, to recover damages and costs (including reasonable attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.  The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

19.    Amendment and Waiver.    The provisions of this Agreement may be amended, modified, or waived only with the prior written consent of the Oaktree Investors and the Board; provided that if any such modification, amendment or waiver would result in an adverse and disproportionate treatment of any Stockholder or Stockholders with respect to their shares of Corporation Stock in a manner materially different than the other Stockholders holding the same shares of Corporation Stock (without regard to any effect on the individual circumstances of the holder of such shares of Corporation Stock), such modification, amendment or waiver will also require the prior written approval of the holders of at least a majority of the shares of Corporation Stock so adversely impacted (it being understood and agreed that an issuance or sale of any equity securities shall not constitute a modification, amendment or waiver that would adversely or disproportionately affect any Stockholder if such issuance or sale is consummated in compliance with Section 3(b)).))); provided further, that the provisions of Section 3 ("Rights on Transfer of Corporation Stock"), Section 4 ("Registration Rights"), Section 5 ("Limitation of Liability"), Section 6(b) ("Restrictions"), Section 7 ("Financial Statements and Other Information"), and this Section 19 ("Amendment and Waiver") (or any defined term affecting any such provisions) shall not be eliminated or amended in a manner (including by merger or otherwise) adverse to any Stockholder other than the Oaktree Investors (a "Non-Oaktree Stockholder") without the prior written consent of the holders of at least a majority of the shares of Common Stock held by the Non-Oaktree Stockholder(s) so adversely affected.  Notwithstanding anything to the contrary in this Agreement, immediately prior to and following an IPO or Sale of the Company, the Oaktree Investors shall have the right, in their discretion, to terminate all or any portion of this Agreement and, following such a termination, the provisions so terminated shall no longer have any force or effect.

20.    Notices.    All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given when (a) delivered personally to the recipient, (b) telecopied to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if telecopied before 5:00 p.m. New York, New York time on a business day, and otherwise on the next business day, (c) provided via email in "pdf" or other electronic format to the recipient upon reasonable confirmation of receipt of such email or (d) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications will be sent to the Company at the address set forth below and to any Stockholder or other holder of Corporation Stock subject to this Agreement at such address as indicated on the Oaktree Investors Schedule or Other Stockholders Schedule, as applicable, with copies (which shall not constitute notice) to such address or to the

attention of such other person as the recipient party has specified by prior written notice to the sending party.

>    To the Company:

>>>    Quiksilver, Inc.
>>>    5600 Argosy Circle,
>>>    Huntington Beach, California 92649
>>>    Fax: (714) 889-7186
>>>    Attention:    General Counsel

>>>    with copies (which shall not constitute notice) to:

>>>    Oaktree Capital Management, L.P.
>>>    333 S. Grand Ave., 28th Floor
>>>    Los Angeles, California 90071
>>>    Attention:  Matthew Wilson
>>>                    Thomas Casarella
>>>    Facsimile:  (213) 830-6300

>>>    and

>>>    Kirkland & Ellis LLP
>>>    777 South Figueroa Street
>>>    Los Angeles, California  90017
>>>    Fax:  (312) 862-2000; (213) 680-8500
>>>    Attention:    Christopher J. Greeno, P.C.
>>>                    Tana M. Ryan

21.    <u>Governing Law</u>.  The corporate law of the State of Delaware will govern all issues and questions concerning the relative rights and obligations of the Company and its Stockholders.  All other issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits and schedules hereto will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

22.    <u>Business Days</u>.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday, or legal holiday in New York, New York or the jurisdiction in which the Company's principal office is located, the time period will automatically be extended to the business day immediately following such Saturday, Sunday, or legal holiday.

23.    <u>Descriptive Headings; Interpretation; No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if

drafted jointly by the parties hereto, and no presumption or burden of proof will arise favoring or disfavoring any any party by virtue of the authorship of any of the provisions of this Agreement.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.  Whenever required by the context, any pronoun used in this Agreement will include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs will include the plural and vice versa.  Except as otherwise expressly provided herein, reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof.  The use of the words "include" or "including" in this Agreement will be by way of example rather than by limitation.  The use of the words "or," "either" or "any" will not be exclusive.  The words "hereof," "herein," "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular Section or provision of this Agreement, and reference to a particular Section of this Agreement shall include all subsections thereof.

24.    Delivery by Facsimile or Electronic Mail.    This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or electronic mail, will be treated in all manner and respects as an original agreement or instrument and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument will raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

25.    Further Assurances.    The parties shall execute and deliver all documents, provide all information, and take or refrain from taking such actions as may be reasonably necessary or appropriate to achieve the purposes of this Agreement. Without limiting the foregoing, each holder of Corporation Stock hereby agrees that it will vote for, consent to and raise no objections against, and take all actions necessary to allow to be consummated, any issuances of Subject Securities and any other issuances pursuant to this Agreement, including, to the extent necessary, voting for and consenting to amendments to the Certificate of Incorporation.

26.    Consent to Jurisdiction.    The parties agree that all disputes, legal actions, suits and proceedings arising out of or relating to this Agreement must be brought exclusively in the courts of the State of Delaware.  Each party hereby consents and submits to the exclusive jurisdiction of such courts.  No legal action, suit or proceeding with respect to this Agreement may be brought in any other forum.  Each party hereby irrevocably waives all claims of immunity from jurisdiction and any right to object on the basis that any dispute, action, suit or proceeding brought in accordance with this Section 26 has been brought in an improper or inconvenient forum or venue.

27.    <u>Mutual Waiver of Jury Trial</u>.  As a specifically bargained inducement for each of the parties to enter into this Agreement (with each party having had opportunity to consult counsel), each party hereto expressly and irrevocably waives the right to trial by jury in any lawsuit or legal proceeding relating to or arising in any way from this Agreement or the transactions contemplated herein, and any lawsuit or legal proceeding relating to or arising in any way to this Agreement or the transactions contemplated herein shall be tried in a court of competent jurisdiction by a judge sitting without a jury.

28.    <u>Understanding Among the Stockholders</u>.  Except as otherwise provided herein, the determination of each Stockholder to purchase the Corporation Stock has been made by such Stockholder independent of any other Stockholder, or any of such other Stockholder's Affiliate, and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business, prospects or condition (financial or otherwise) of the Company which may have been made or given by any other Stockholder or by any agent, Affiliate or employee of any other Stockholder.  In addition, it is acknowledged by each Stockholder that no Stockholder has acted as an agent of any other Stockholder in connection with making its investment hereunder and that no Stockholder shall be acting as an agent of any other Stockholder in connection with monitoring its investment hereunder.  It is further acknowledged by the Other Stockholders that Oaktree Investors and their respective Affiliates have retained Kirkland & Ellis LLP to act as their counsel in connection with this Agreement, those documents expressly referred to herein and related documents of even date herewith and that Kirkland & Ellis LLP has not acted as counsel for any other party in connection herewith or therewith and that no other party has the status of a client of Kirkland & Ellis LLP for conflict of interest or other purposes as a result thereof.

*   *   *   *

IN WITNESS WHEREOF, the parties hereto have executed this Stockholders Agreement on the day and year first above written.

**<u>COMPANY</u>**:

QUIKSILVER, INC.

By: _____
Name:
Title:

**<u>OAKTREE INVESTORS</u>**:

OCM BIG WAVE <u>EQUITY HOLDINGS,</u> LLC

By: Oaktree Fund GP, LLC
Its: Manager

By: _____
Name:
Title:

## **OTHER STOCKHOLDERS**:

_____
[_____]


_____
[_____]


_____
[_____]


_____
[_____]


_____
[_____]


_____
[_____]


_____
[_____]

## OAKTREE INVESTORS SCHEDULE

| Oaktree Investor and Notice Address | Shares of Common Stock Held |
|---|---|
| OCM Big Wave Equity Holdings, LLC<br>c/o Oaktree Capital Management, L.P.<br>333 S. Grand Ave., 28th Floor<br>Los Angeles, California 90071<br>Attention:  Matthew Wilson<br>Facsimile:  (213) 830-6300 | [    ] |

## <u>OTHER STOCKHOLDERS SCHEDULE</u>

| <u>Other Stockholders<br>and Notice Address</u> | <u>Shares of Common<br>Stock Held</u> |
|---|---|
| | |
| | |
| | |
| | |
| | |

## EXHIBIT A

## MANAGEMENT FEES

The Company or its Subsidiaries will be entering into a management services agreement (the "MSA") with an Affiliate of the Oaktree Investors (the "Advisor") on the date hereof, pursuant to which they shall be required to pay the Advisor an annual management and consulting fee in the amount of $3,000,000.00 (the ""Consulting Fee");"); provided that the Consulting Fee payable by the Company to the Advisor in respect of the first year following the date hereof shall accrue throughout such period and be payable instead during the second year following the date hereof (such that the total fees payable during the second year shall be $6,000,000). If the Company or its Subsidiaries acquire or enter into any additional business operations after the date of the MSA, the Company and the Advisor will determine whether and to what extent the Consulting Fee should be increased as a result thereof.  Additionally, in consideration for the time and effort expended by the Advisor and its personnel in connection with any acquisition, divestiture, financing, refinancing, merger, restructuring (financial or organizational), recapitalization or other transaction by the Company or any of its Subsidiaries, the Advisor shall be entitled to receive an additional consulting fee in respect of the additional services to be provided by the Advisor in connection with such activities; provided that, the amount of any additional consulting fee payable in connection with such activities shall be determined by the Board on a case-by-case basis, based on the amount of consulting fees which would be payable to a third party advisor in such circumstances.  Finally, the Advisor shall be entitled to reimbursement of its and its Affiliates' out of pocket expenses incurred pursuant to the MSA.