1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3   IN RE:                          )   Case No. 15-11880 (BLS)
                                    )   Chapter 11
4   QUIKSILVER, Inc., *et al.*,     )
                                    )
5                 Debtors.          )   Courtroom No. 5
                                    )   824 Market Street
6                                   )   Wilmington, Delaware 19801
                                    )
7                                   )   January 28 2016
                                    )   11:00 A.M.
8
                          TRANSCRIPT OF HEARING
9             BEFORE HONORABLE BRENDAN L. SHANNON
                UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES:
11
    For the Debtors:         Skadden Arps Slate Meagher & Flom
12                           By:  VAN DURRER, ESQUIRE
                             300 South Grand Avenue, Suite 3400
13                           Los Angeles, California 9007

14  ECRO:                    DANA MOORE

15  Transcription Service:   Reliable
                             1007 N. Orange Street
16                           Wilmington, Delaware 19801
                             Telephone:  (302) 654-8080
17                           E-Mail:  gmatthews@reliable-co.com

18
    Proceedings recorded by electronic sound recording:
19  transcript produced by transcription service.

20

21

22

23

24

25

```
 1   For Creditors Committee: Akin Gump Strauss Hauer & Feld
                             By:  MICHAEL STAMER, ESQUIRE
 2                                MEREDITH LAHAIE, ESQUIRE
                             One Bryant Park
 3                           Bank of America Tower
                             New York, New York 10036
 4
     For U.S. Trustee:       Office of the United States Trustee
 5                           By:  MARK KENNEY, ESQUIRE
                             844 King Street, Suite 2207
 6                           Wilmington, Delaware 19801

 7   For GGP Limited Partnership, Federal Realty Investment Trust
     and Boulevard, LLC:
 8                           Ballard Spahr LLP
                             By:  LESLIE HEILMAN, ESQUIRE
 9                           919 North Market Street
                             Wilmington, Delaware 19801
10
     For Oaktree Capital Management:
11                           Kirkland & Ellis LLP
                             By:  ROSS KWASTENIET, ESQUIRE
12                           300 North LaSalle
                             Chicago, Illinois 60654
13
     For Former Employees:   Gellert Scali Busenkell & Brown
14                           By:  CHARLES BROWN, ESQUIRE
                             601 Walnut Street, Suite 280S
15                           Philadelphia, Pennsylvania 19106

16   For ACE Insurance Company:
                             Duane Morris LLP
17                           By:  RICHARD RILEY, ESQUIRE
                             222 Delaware Avenue, Suite 1600
18                           Wilmington, Delaware 19801

19   TELEPHONIC APPEARANCE:

20   For Former Employees:   Lindemann Law Group
                             By:  BLAKE LINDEMANN, ESQUIRE
21                           433 North Camden Drive
                             Beverly Hills, California 90210
22

23

24

25
```

1                               <u>INDEX</u>

2                                                               <u>Page</u>

3  <u>NOTICE OF AGENDA MATTERS</u>:
   For the Debtors, by Mr. Durrer                              4
4  For Boulevard, GGP and Federal Realty, by Ms. Heilman      13
   For the Committee, by Mr. Stamer                           17
5  For Oaktree Capital Management, by Mr. Kwasteniet          20
   For the U.S. Trustee, by Mr. Kenney                        22
6  For Former Employees, by Mr. Brown                         22
   For Former Employees, by Mr. Lindemann                     24
7  For ACE Insurance Company, by Mr. Riley                    32

8  <u>EXHIBITS</u>:
   Debtors Exhibit 1 - Declaration of Mr. Coulombe             6
9  Debtors Exhibit 2 - Declaration of Andrew Bruenjes          6
   Debtors Exhibit 3 - Declaration of Durc Savini              6

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commence at 12:38:20 a.m.)

2      (Call to order of the Court)

3           THE CLERK:  All rise.

4           THE COURT:  Please be seated.  Mr. Durrer.

5           MR. DURRER:  Good afternoon, Your Honor, Van Durrer,

6  Skadden Arps Slate Meagher & Flom, here on behalf of the

7  Quiksilver Debtors.

8           THE COURT:  Welcome.

9           MR. DURRER:  Thank you, Your Honor.  I already lost

10  my agenda, Your Honor.

11          Your Honor, I'm pleased to report that with one

12  narrow exception we have put down our shovels and rakes and

13  other implements of destruction.

14          THE COURT:  Destruction?  That's usually a

15  Thanksgiving reference.  Okay.

16          MR. DURRER:  Well, we are thankful for that,

17  nonetheless.

18          Your Honor, there were five matters on the agenda

19  for today.  All of them are late in some form or fashion to

20  the Debtors' amended plan; an additional copy of which has

21  been filed just moments ago at docket 731.

22          THE COURT:  Okay.

23          MR. DURRER:  And if Your Honor doesn't have that,

24  I'm happy to hand up an additional copy.

25          THE COURT:  Would you?  I saw that it had been

1 filed, but I didn't print off a copy.

2          MR. DURRER:  May I approach, Your Honor?

3          THE COURT:  Sure.  Thank you.

4          MR. DURRER:  Your Honor, in support of the plan, the

5 Debtors had filed three -- well five, I should say,

6 declarations.  One by Mr. Coulombe who is the chief

7 restructuring officer of the Debtor and Mr. Coulombe is here

8 in the Courtroom.  One by Andrew Bruenjes, the CFO of the

9 Americas Division, who is also in the Courtroom.

10          THE COURT:  Great.

11          MR. DURRER:  And, lastly, by Durc Savini from Peter

12 J. Solomon who is also our investment banker.

13          THE COURT:  Terrific.  I have seen all of those

14 declarations.

15          MR. DURRER:  I am not going to rehash those, Your

16 Honor.  I do want to highlight the changes to the plan, and

17 explain the modifications and how they are appropriately

18 authorized today, and walk through just a couple of narrow

19 issues.  Then, I think it might be appropriate for Your Honor

20 to consider the remaining objection at that point, if that's

21 acceptable to Your Honor.

22          THE COURT:  Sure, I think that sounds fine.  Given

23 that you've just referenced the declarations, I would ask

24 noting that the parties are present in the Courtroom today,

25 are there any objections to admission of the declarations in

1  support of the Debtors' case in chief for confirmation of

2  their plan noting, of course, that parties will have the

3  opportunity to cross examine any of the witnesses on matters

4  in the declarations at the appropriate time, if necessary.

5           Very well, they're admitted.

6           MR. DURRER:  Thank you, Your Honor.  In addition,

7  Your Honor, we also filed, at docket 732, an unredacted copy

8  of the Official Committees' objection, which has been

9  resolved.

10          THE COURT:  Okay.

11          MR. DURRER:  The modifications of the plan arise

12 from a mediation session before Judge Drain, and I would be

13 remiss if I didn't offer thanks to Judge Drain for his

14 service in helping the parties on January 15th and thereafter.

15          In essence, Your Honor, the parties had different

16 points of view on not only the value of the Reorganized

17 Debtors, pursuant to the plan, but also with respect to the

18 impact of the value of the Debtors unencumbered 35 percent

19 stake in their foreign subsidiary, how administrative claims

20 get allocated and whether or not there would be a diminution

21 claim arising on account of the senior secured notes by

22 virtue of the DIP financing and other reasons.

23          As part and parcel of the settlement, we believe

24 that it was important to express, and Mr. Stamer will get

25 into this in his presentation as well, but just to lay out

1  for the marketplace, in one place, what those differing

2  opinions as to value were and we believe that the unredacted

3  copy of the Committees' papers does that.

4        There are several helpful charts that, basically,

5  explain the bookends of where people were in terms of value

6  and analysis.  So demonstrating that and also explain the

7  settlement that we have reached as a result of that

8  interaction and negotiation, we thought would be helpful

9  information for parties to have.

10        THE COURT:  Okay.

11        MR. DURRER:  So, Your Honor may recall that where we

12  started, in the plan, was originally a $7 and a half million

13  dollar dividend to general unsecured creditors and secured

14  noteholders would receive a substantial chunk of the equity

15  of the new Debtor, and then in order to raise money,

16  sufficient to exit bankruptcy, there would be companion

17  rights offerings; one to raise the money to exit Chapter 11

18  here in the U.S. and then one fund an exchange offer with

19  respect to the Debtors' Eurobonds.  And the Eurobond

20  subsidiary obligors are not parties to this bankruptcy other

21  than certain of the U.S. subsidiaries that do guarantee those

22  obligations.

23        At the time of the disclosure statement hearing,

24  there were two changes, at least two changes made to the plan

25  then to increase the cash consideration to $12 and a half

1  million dollars to general unsecured creditors and then also

2  afford a limited opportunity for unsecured creditors to

3  participate in the rights offerings.

4         As a result of the balloting, and the two

5  declarations I did not mention are by our ballot agents KCC.

6  Those show that with respect to most classes, Your Honor, the

7  Debtors received acceptances of the plan with respect to the

8  bond holder class, class 5A.  That class rejected the plan;

9  however, there were a number of holders of unsecured

10  creditors that did participate, about $500,000.00 worth that

11  did participate in the rights offering.

12        In the context of our negotiations, more recently,

13  we have agreed to some more modifications to the plan;

14  namely, to further increase the $12 and a half million dollar

15  dividend to $14 million dollars and then to also allocate to

16  creditors, and I am going to get into this in a little bit

17  more detail, but to allocate to unsecured creditors 4.75

18  percent of new Quiksilver common stock.

19        Now, in order to promote fairness and to develop a

20  fair value amongst unsecured creditors, and this was highly

21  negotiated, but also to acknowledge the fact that trade

22  vendors and landlords who sit primarily in class 5B have a

23  different point of view and different goals then bondholders

24  who sit in class 5A.  The parties engineered what is, in

25  essence, a *pro forma* exchange.  We are not actually making

1  anybody exchange anything for tax purposes, but we are

2  economically treating them as if they had exchanged.

3       To be more specific, what we do is we take the $14

4  million dollars and we sprinkle it across the entire 5A and

5  5B.  They were always treated before *pro rata, pari passu.*

6       THE COURT:  Right.

7       MR. DURRER:  So that continues.  And then the 4.75

8  percent of stock, you know, gets allocated the same way, but

9  then, in sort of a stage two, what happens is there is cash

10  consideration at a discount to the plan value that is then

11  shifted from class 5A of the bondholders to class 5B, to

12  account for the fact that all of the stock that would have

13  been allocated to class 5B, who doesn't want it, shifts back

14  to class 5A.

15       THE COURT:  So there is a negotiated resolution that

16  provides the economic benefit of the stock ownership to

17  parties that don't want or would, otherwise, complicate the

18  Debtors, the Reorganized Debtors' life if they held the stock

19  on a post-petition basis.

20       MR. DURRER:  That's right.

21       THE COURT:  And you keep reminding me that this is

22  highly negotiated.  It's kind of a dog whistle that says,

23  Judge, don't screw this up.

24       MR. DURRER:  If that's all I needed to do, I would

25  have brought an actual police whistle that my grandfather

1  used for years before he passed.  Anyway, yes, exactly right.

2  In addition, because of the level of complexity and the

3  negotiations, the estate has also agreed to accommodate a

4  modest stock transaction fee with respect to these

5  transactions of an additional $500,000.00 that is available

6  only to class 5A.

7         THE COURT:  Okay.

8         MR. DURRER:  In terms of, you know, sheer dollars

9  the headline, Your Honor, is that class 5B, which voted for

10  the plan, is still getting more then what it voted for.  So

11  there is no effort to re-solicit any votes in connection with

12  the plan, for that reason and others.

13         With respect to bondholders who rejected the plan,

14  we still believe that we satisfy the cram down standards.

15  They did reject the plan.  So we are not asking them to

16  change their mind.  They can still reject, but they will be

17  receiving their allocation of the stock as a bonus for the

18  good work that the Committee did in engineering a better

19  result for them.

20         With respect to senior secured noteholders who voted

21  for the plan with an expectation that that 4.75 stock would

22  be going to them and rights offering participants, the proof

23  that we have for Your Honor, with respect to that, is as

24  follows.  First, as we noted, and this is one of the reasons

25  why we filed this, there is a difference of opinion as to

1 value.  The settlement is, in effect, a recognition that

2 there was, at least, some merit to the differences of opinion

3 as to value.  So our view is that the recovery for senior

4 secured noteholders is effectively the same.

5 　　　　To dig down into the weeds though, Your Honor, the

6 reality is that the impact on senior secured noteholders who

7 voted for the plan is truly *de minimis.*  First, the

8 difference between the percentages -- well, first of all let

9 me back up.  The plan sponsor who dominates who 75 percent of

10 that class has accepted these changes to the plan as agreed

11 to them.

12 　　　　With respect to the balance, 24'ish percent,

13 everyone else, regardless of accept or rejections, was

14 expecting to receive approximately 6 percent of the stock of

15 the company.  Under the new plan, docket 731, they will be

16 receiving, instead of 6 percent, 5.5 percent.  In the

17 American Solar King case, Your Honor, there is that case and

18 several others, including Century Glove, basically stand for

19 the proposition that a variance of about 1 percent is not

20 material for purposes of 1127 and Bankruptcy Rule 3019.

21 　　　　THE COURT:  I am familiar with the case law.

22 　　　　MR. DURRER:  So that is one reason as well.  In

23 addition, when you consider creditors that actually, in that

24 class that actually accepted the plan as opposed to reject,

25 then the difference is not 50 basis points, its actually 25

1  basis points.  So it's a very, very modest difference.

2         Finally, Your Honor, as Your Honor is aware, we were

3  facing a three day trial, perhaps depositions and perhaps

4  appeals; that more than makes up for the value that is being

5  shifted to unsecured creditors under this plan.

6         THE COURT:  That is not lost on me.

7         MR. DURRER:  Thank you, Your Honor.  So those are

8  the primary modifications to the plan.  Oh, in addition, as a

9  consequence of unsecured creditors receiving a greater stake

10  in the company, all be it a minority stake, the Creditors

11  Committee was also successful in negotiating with the plan

12  sponsor on specific minority rights, greater then what was

13  filed in the original plan exhibits.  Those are in the

14  process of being finalized.  We anticipate finalizing those

15  plan exhibits later in the day and those will be filed and,

16  basically, part of the record that we would ask Your Honor to

17  consider in connection with confirming the plan.

18         In addition, there were some informal objections and

19  formal objections raised by certain of our landlords.

20  Specifically, we had Boulevard Investment, GGP and Federal

21  Realty.  They each have a group of separate stores.  We have

22  agreed that with respect to Boulevard, GGP, the remaining

23  stores where we have not made an election yet to assume or

24  reject, we will be including notices to cure, consistent with

25  the cure process set forth in the plan, plus assumption

1  notices with respect to their stores, leases assumed as

2  modified as agreed between the parties and with respect to

3  Federal Realty, Federal Realty has agreed, with respect to

4  five stores, temporary stores, that we will be advising them

5  of our decision to assume or reject, pursuant to the same

6  protocol, on or before the effective date.

7         Counsel for all those landlords has asked me to

8  remind the Court that there is a provision in the plan that

9  365(d)(4) we get a little more time until the effective date

10  to make those decisions.  No one has objected, other than

11  these landlords.  We have reached a consensus with them, but

12  they've asked us to confirm and I am happy to that we do not

13  consider this order precedential with respect that 365(d)(4)

14  order.

15         THE COURT:  Fair point.  I understand.  Ms. Heilman.

16         MS. HEILMAN:  Good afternoon, Your Honor, Leslie

17  Heilman on behalf of GGP Limited Partnership, Federal Realty

18  and Boulevard Investment.  Your Honor's statements made on

19  the record by counsel today are accurate, with the exception

20  that with respect to the Federal Realty properties, the

21  remaining five, we have an agreement in principal that the

22  remaining five can have up to the effective date to make the

23  decision for assumption, but I still am confirming with my

24  client.

25         I don't see it as a problem, provided they do

1    continue to pay February rent.  It's also with respect to

2    pop-up locations, so we don't anticipate an assumption, but

3    we did ask for counsel to confirm that today.  Thank you.

4            THE COURT:  Very good.  Thank you.  Mr. Durrer.

5            MR. DURRER:  And we are happy to confirm that we

6    will make the February rent payment in connection with that.

7            I think one of the last things -- well, two things I

8    wanted to remark on before I cede the podium to Mr. Stamer.

9    One is with respect to one of the arguments that was raised

10   in the Committee objection, related to the different

11   treatment of the Eurobond guarantees, vis-à-vis the unsecured

12   bondholders in the U.S.  That issue is settled, but I do

13   appreciate the fact that Your Honor needs to make independent

14   findings with respect to all the confirmation standards.

15           With respect to that one in particular, I just

16   wanted to remind Your Honor of the record that you already

17   before you of the importance of leaving Europe intact, you

18   know, the Amia operation, as the company calls it, and not

19   creating cross-defaults or trigger events overseas.  That is

20   the reason why we determined to reinstate, consistent with

21   the waivers that were granted shortly before the petition

22   filed, consistent with our DIP agreement that we have agreed

23   to reinstate those in terms of an actual value transfer.  So

24   we think there is a business justification that rebuts any

25   presumption of unfair discrimination by that classification

1  scheme.

2      THE COURT:  And I recall, we spent a fair amount of

3  time on this, particularly in the context of the DIP

4  financing dispute.  So I do recall that and I understand the

5  Debtors' case in connection with that.

6      MR. DURRER:  Right.  But in addition, and Mr.

7  Coulombe is prepared to testify to this, it is the fact that

8  there is actually, in the company's view, little if any value

9  transfer that is going on because we expect the European

10  operation to fully satisfy the primary obligations on those

11  bonds such that the guarantee will never be called upon.  So,

12  in fact, while there is value going to unsecured creditors

13  under this plan, we expect no value to go to European

14  creditors by virtue of the guarantee because the original

15  obligation will be honored.

16      Lastly, Your Honor, and this relates to the Eurobond

17  issue, there is a provision in the confirmation order that

18  request that the order be immediately effective.  With

19  respect to the evidence on that, we have several deadlines,

20  some are related to the DIP, some are related to those

21  waivers that are coming up next week.  We fully anticipate

22  that we will be able to close the transaction next week.

23  None of the major stakeholders that are a party to the

24  settlement have any problem with the plan going effective

25  next week, but it would create real unrest within the company

1  if we blew up DIP deadlines, plan support agreement deadlines

2  and the Eurobond waiver deadlines if we didn't emerge timely.

3        Your Honor will recall that we accommodated a more

4  lengthy timeline within the context of the case in order to

5  allow the Committee to get up to speed, have those

6  negotiations, have people sit down with each other and have

7  an opportunity to run a sale process; running the sale

8  process, not discovering any better deals to be had, other

9  than the one that the parties were able to negotiate amongst

10 themselves.  So we think it appropriate for that provision to

11 be in the order and I wanted to highlight that.

12        THE COURT:  Okay.  I do understand that and I did

13 see that the Debtor was asking for a leave to move promptly

14 for the implementation.  So I do understand that request.

15        MR. DURRER:  The last piece of evidence I will

16 mention, Your Honor, is that under the liquidation analysis

17 that was prepared by Mr. Coulombe, we believe that the value

18 in the plan is dramatically higher than the value that would

19 be available in a liquidation, which would cause that cross-

20 default of the Eurobonds.  That is in the record.  So I don't

21 think I need to go into a heck of a lot more detail about

22 cram down standards.  There certainly is no junior class --

23        THE COURT:  No, I've reviewed the liquidation

24 analysis that accompanied the disclosure statement and I am

25 familiar with it.  So I am satisfied with that.

1        MR. DURRER:  Okay.  So, I think, Your Honor, with

2  that, I think it's appropriate for Mr. Stamer to address the

3  Court regarding any further details.

4        THE COURT:  Very good.  Mr. Stamer, good afternoon.

5  Good to see you.

6        MR. STAMER:  Good afternoon, Your Honor, for the

7  record Michael Stamer and Meredith Lahaie from Akin Gump, and

8  David Stratton and John Schanne from Pepper Hamilton on

9  behalf of the Official Committee.  Your Honor, I will be

10  brief and I am happy to stand up and say the Committee has

11  withdrawn or is withdrawing its objection to confirmation,

12  and supports confirmation of the third amended plan.

13        Your Honor, let me start off by sincerely thanking

14  this Court for your work and your patience throughout these

15  cases.  Also, I would like to echo the statements by counsel

16  for the company, thanking Judge Drain for his invaluable

17  efforts as part of mediation that were very helpful to lead

18  us to a fully consensual confirmation hearing.

19        Your Honor, I will just be brief.  I want to just

20  touch on two intercreditor settlements that, I think, should

21  be put on the record in a little bit more detail.  Counsel

22  for the company addressed them in his remarks and he was

23  accurate.  I just want to provide a little more color.

24        The first is the settlement between the trade and

25  the bonds.  Your Honor, we spent time with representatives on

1  the Committee, both of trade and bondholders to try to hash

2  out an acceptable arrangement.  As counsel for the company

3  said, trade creditors, by in large, are not interested in

4  equity.  The company and Oaktree didn't want to have so many

5  shareholders that they would become a public reporting

6  company or a public company.

7          So the settlement that was hashed out was, as

8  described by counsel for the company, instead of getting the

9  stock, we would reallocate the cash which would have,

10 otherwise, gone to the bondholders.  A portion of that cash,

11 equal to 33 percent of the implied value of the stock that

12 the trade would have, otherwise, received, it was, as spoken

13 about before, a highly negotiated settlement that was reached

14 among representatives on the Committee and believe its

15 appropriate under these circumstances.

16         Your Honor, the other settlement or arrangement that

17 was reached related to certain bondholder members on the

18 Committee.  It was actually necessary in order for those

19 members on the Committee to support the settlement.  As Your

20 Honor is aware, based upon the pleadings that were filed, the

21 stock that is being distributed to unsecured creditors and

22 everyone, for that matter, is subject to a fairly restrictive

23 shareholder agreement and the company's organizational

24 documents.  There are certain holders at large and certain on

25 the Committee that could not hold that restricted stock.

1        The stock isn't tradeable for six months and once

2    six months expires, there are restrictions on peoples'

3    ability to trade.  So there was an arrangement reached among

4    certain members of the Committee whereby the claims of

5    certain members of the Committee will be purchased by another

6    member of the Committee.  That will happen sometime between

7    confirmation and the effective date.

8        We have spoken to the U.S. Trustee about this.  He

9    understands what is happening. In addition, to facilitate the

10   settlement and this transaction as well, there has been or

11   will be shortly filed an unredacted copy of our confirmation

12   objection.  It is not meant to confuse.  As I said earlier,

13   we are withdrawing our objection.  It will put into the

14   marketplace ample information so that everyone is on the same

15   information plane as we move forward.

16       Your Honor, that, essentially, concludes my remarks.

17   We are happy to have resolved our open issues.  The parties

18   and the professionals are congratulated.  Thank you, Your

19   Honor.

20       THE COURT:  Very good.  Thank you, Mr. Stamer.  Mr.

21   Kwasteniet.

22       MR. KWASTENIET:  Good afternoon, Your Honor, Ross

23   Kwasteniet from Kirkland & Ellis on behalf of Oaktree Capital

24   Management, the plan sponsor in these cases.  Your Honor, I

25   am joined today by my colleague Benjamin Winger from Kirkland

1  and also by our co-counsel Rob Dehney and Andrew Remming from

2  Morris Nichols.

3          Your Honor, we just want to briefly echo the

4  comments from others thanking Your Honor and your staff for

5  accommodating the Quiksilver case.  We have had a number of

6  hearings, but we have also had, on shortened notice, some

7  telephonic conferences.  We are particularly thankful for

8  Your Honor's facilitation of the mediation process with Judge

9  Drain.  Very thankful to Judge Drain for taking the time to

10 help bring the parties together and help facilitate the

11 compromise.

12          We are thankful to all parties that we were able to

13 get here on a consensual basis today.  Your Honor, we also

14 want to thank the company, the management team for working

15 hard and doing a great job bringing the company through this

16 process and getting us to this point, and to the company's

17 advisors for working so constructively.

18          Your Honor, Oaktree is excited about the company's

19 imminent emergence from bankruptcy and we are looking forward

20 to a bright future for Quiksilver and we wanted to thank

21 everybody involved.  So thank you, Your Honor.

22          THE COURT:  Very good.

23          MR. DURRER:  Van Durrer, Your Honor, again for

24 Quiksilver.  I did neglect to mention two things, which I

25 want to highlight.  Given the shift of the currency in the

1  plan is modestly greater with respect to those who subscribed

2  to the rights offering.  So in the form of a confirmation

3  order that we will submit to Your Honor later today, we do

4  provide for a brief notice to those subscribers, the handful

5  of subscribers that they have an opportunity to consider

6  whether they want to invest in the context of the revised

7  deal.  So that is contemplated.

8         Then lastly, Your Honor, with respect to the

9  objection that had been raised by the United States Trustee

10 with respect to exculpation, we were able to resolve all of

11 their issues on language elsewhere in the plan and the

12 confirmation order.  With respect to that particular issue,

13 and we eagerly awaited the decision regarding your other

14 girlfriend earlier this week, but with respect to this

15 particular issue, what we did in the plan was with the

16 agreement to the United States Trustee --

17        THE COURT:  You know, my other girlfriend tied up a

18 lot more of my time.  I am liking you folks.

19        MR. DURRER:  I am not going to go any further with

20 that.

21        THE COURT:  Don't go any further.  Nothing good

22 happens with this.

23        MR. DURRER:  With respect to the exculpation, what

24 we have agreed to, and the U.S. Trustee has agreed, is we are

25 going to kick this can down the road for another day, but for

1  today what we have agreed is exculpated parties, we have now

2  broken that definition in two parts.  There are exculpated

3  fiduciaries, which are estate fiduciaries, and they receive

4  the typical, you know, common law qualified immunity that

5  applies and that was part of Your Honor's decision on Monday.

6         With respect to Section 1125(e) parties, they enjoy

7  a Section 1125(e) exculpation, solely, to the extent set

8  forth in Section 1125(e).  So that was the affix that we

9  developed in connection with the U.S. Trustees' remaining

10 objection.

11        THE COURT:  Okay.  I understand.  Mr. Kenney, is

12 that satisfactory to your office?

13        MR. KENNEY:  Very satisfactory, Your Honor.

14        THE COURT:  Very good.  Thank you.

15        MR. DURRER:  So, Your Honor, I think that leaves us

16 with the objection and I am happy, subject to Your Honor's

17 views, to cede the podium to the objector.

18        THE COURT:  Okay.  Mr. Brown.

19        MR. BROWN:  Good afternoon, Your Honor.

20        THE COURT:  Good afternoon.

21        MR. BROWN:  Charlie Brown on behalf of certain

22 former employees of Quiksilver.  Your Honor, we filed a

23 limited objection.

24        THE COURT:  I saw it.

25        MR. BROWN:  The only relief that we were requesting

1   is that a reserve be set aside for the totality of the

2   administrative and priority claims that have been asserted,

3   which are approximately $7 million dollars, all total among

4   the various employees.

5            THE COURT:  Okay.

6            MR. BROWN:  Those claims have been filed and there

7   hasn't been any request to object to them or estimate them.

8   So that is the basis for our relief.

9            THE COURT:  Although, are there rejection

10  proceedings pending, relating to the separation agreements?

11           MR. DURRER:  Your Honor, we had -- Van Durrer for

12  the Debtors.  We had filed, very early in the case, a motion

13  to reject those agreements to the extent that they were --

14           THE COURT:  Executory.

15           MR. DURRER:  Executory.  I think Your Honor entered

16  an order with respect to that.  I think Your Honor invited

17  the Claimants to pursue proceedings to the extent that they

18  wanted to take the process further.  I think it was literally

19  within a business day of the filing of our brief when they

20  actually asserted the claims.

21           THE COURT:  Okay.

22           MR. DURRER:  So, you know, we view this, you know,

23  we were happy to engage over the past four months with them

24  and try and reach a more constructive resolution. We candidly

25  didn't hearing anything other than the lodging of a timely

1  claim, but it would be, I mean the emergence budget does not

2  contemplate, you know, a set aside of $7 odd million dollars.

3  What Your Honor may have noticed in the plan supplement is

4  that the original expectation of $120 million dollar exit

5  facility became $140 million dollar exit facility, plus an

6  additional term loan behind that of, at least, $50 million

7  dollars.  You know, candidly, you would have to be living

8  under a rock not to have seen what has been happening to

9  retail stocks, not to mention all stocks virtually every

10 business day of 2016.

11        So it would be a burden on the company to segregate

12 these funds for a claim, which I don't expect Your Honor to

13 rule whether they are administrative claims, but the fact of

14 the matter is, and it's not disputed, none of these souls

15 have served a day at the Debtor post-petition; they were all

16 terminated prepetition.

17        THE COURT:  Mr. Brown, any response?

18        MR. LINDEMANN:  Your Honor, if I could, this is

19 Blake Lindemann telephonically.  We are *pro hac* counsel for

20 the former employees.  To respond to this issue, one of the

21 concerns that we had is that under the plan, a lot of our

22 parties did actually receive ballots.  So they have casted

23 ballots under 5B and when you consider their ballots, there

24 is no accepting class under 5B.  There is no accepting class

25 under 4 because those are insider claims.

1        I think the confirmation brief references that

2   certain of those parties are insiders, but in the Hill

3   declaration there is no indication as to what number of those

4   ballots, for class 4, are insiders.  So class 4 cannot

5   accept, it cannot be an accepting impaired class under

6   1129(a)(10).  Class 5B cannot accept because we have cast 24

7   ballots, timely, voting against the plan.  So there is no

8   accepting impaired class, if as Mr. Durrer contends, these

9   should just be general unsecured claims.

10       So, I mean we have just saw the ballot summary days

11  before this hearing.  So that is the only reason I am raising

12  this objection now.  But, you know, I militate it would be

13  appropriate to create a reserve if they are going to classify

14  as an administrative, but it seems they don't want to do

15  that.

16       THE COURT:  Mr. Durrer.

17       MR. DURRER:  Your Honor, I mean this, just for the

18  record this is beyond the scope of the objection that was

19  filed.  The objection merely requested the reserve.

20       With respect to the voting, if the reference to

21  insider in class 4 is to Oaktree, Oaktree is not an insider.

22  Oaktree will be an insider after we emerge, but is not an

23  insider today.  There is no case law that says that owning

24  debt in a company makes you an insider.  So we do have an

25  impaired accepting class.  Even if Your Honor were to

1  determine that class 5B did not vote for the plan, and deem

2  them to reject, we still satisfy the cram down standards with

3  respect to class 5B.  In light of this late asserted

4  objection, we would ask Your Honor to make that finding.

5       Lastly, Your Honor, we are not classifying them as

6  anything.  If Your Honor rules tomorrow --

7       THE COURT:  Hang on. I do have a question and I

8  think you are going right there, but I would like to make

9  sure because I have read your memorandum and then I read the

10  summary, I think, that you submitted, which is certainly

11  helpful to the various objections, and the resolution or the

12  Debtors' response.  So I have been through both of those and

13  I have carefully read the objection, itself, by the former

14  employees.

15       Am I correctly reading the Debtors' response, in the

16  chart that you provided, that, obviously, the Debtor believes

17  that these are general unsecured claims at best and should be

18  so treated, but that the Debtor believes that even in the

19  event that they were determined to be admin claims, that the

20  Debtor would treat them under the plan and that the Debtor

21  expects that it would have sufficient liquidity on a post-

22  reorganization basis to deal with that; notwithstanding that

23  that is not something they particularly budgeted for.  Do I

24  have that right?

25       MR. DURRER:  Absolutely, Your Honor.

1            THE COURT:  All right, any further response?

2            MR. LINDEMANN:  Yes, Your Honor.  I would just say

3    that when you read the confirmation brief, it states that

4    there are not a significant amount of insiders, so there has

5    been no demonstration that class 4 is not with insiders.  As

6    1129(a)(10) says, if there are any insiders, they should not

7    be included towards that voting.  So class 4, absolutely,

8    there is no evidence permitting class 4 to be an accepting

9    impaired class.

10           As for class 5, we did make our votes.  We made

11   timely votes and the declaration of Mr. Hill claims that the

12   votes were made at zero, which is incorrect.  We did make our

13   votes at $7.291 million.  So whatever the Court rules, we

14   will deal with that as such, but I just wanted to let the

15   Court know that that declaration is incorrect.

16           THE COURT:  So noted.  All right, as I said, I have

17   reviewed the objection as well as the Debtors' memorandum and

18   their summary response to it.  Couple of things.  First, with

19   respect to the objection as it relates to balloting, I have,

20   again, studied the balloting certificate as well as the plan

21   and I am prepared to overrule any objection to the balloting

22   results.

23           I will find, when I get to ruling on the plan

24   itself, that the Debtors have carried their burden with

25   respect to Section 1126 and the requirement to meet the

1  statutory thresholds for acceptance of the plan.  I would

2  find so, even if the Court were to determine that the class 4

3  claims were not to be counted because they are insiders.  I

4  am not making that finding, but in ruling in the alternative,

5  I think its sufficient for the Court to find that under,

6  essentially, any reading, the Debtors have carried their

7  burden under applicable provisions of the code for plan

8  confirmation.

9       Separately, and more to the point of the filed

10  objection, I will decline to establish a reserve for these

11  claims.  I note, I think counsel has said that the claims

12  have not been objected to and that they had been posited as

13  administrative claims.  So be it.  That does not require that

14  the Court establish a reserve.  The Court has, on many

15  instances, established reserves, either by proceedings or by

16  consensus between the parties, but I am not satisfied that

17  the circumstances here require the imposition or creation of

18  the reserves to satisfy, potentially, the full allowance of

19  these claims as administrative claims.

20       What I would further note is that to the extent that

21  there need to be proceedings in order to fix these claims and

22  determine both amounts and classification, I am really at the

23  party's pleasure.  On a post-confirmation basis, if we need

24  to deal with that, I would do so.  I am aware and sensitive

25  to the fact that these are individuals.  They are former

1  employees of the company.  It would not surprise me that they

2  have expectations with respect to whatever rights they have

3  under the separation agreement.  So it's not my intention

4  that they be held in limbo for an extended period.

5          So I will offer that the parties can confer.  To the

6  extent that the parties want to move forward with teeing them

7  up for presentation and disposition by the Court, again, I am

8  at your pleasure, but I see that as being a post-confirmation

9  issue. I will further find, based upon the representations of

10 counsel and the record before the Court, that all rights are

11 fully reserved.  If these claims are, indeed, allowed as

12 administrative claims, subject to whatever rights, and

13 objections and appellate rights the estate may have, then

14 they would be treated as administrative claims.

15         At this point, I don't believe I'm obliged to make a

16 specific finding that they are or are not administrative

17 claims.  The claims have been filed and I will deal with them

18 in the appropriate course, but I don't believe it creates an

19 impediment to plan confirmation.  So based upon the record

20 before me, that objection will be overruled.

21         MR. DURRER:  Your Honor, with respect to Your

22 Honor's last ruling, in order to expedite the finalization of

23 a confirmation order, what we would suggest is that, I think

24 the record is clear that all rights are reserved with respect

25 to those claims.  If we work out a separate schedule with

1  this objector, we would propose to present that under a

2  stipulation separate from the confirmation order and then

3  have the folks that have been commenting on the confirmation

4  order submit that under certification of counsel so as to

5  avoid any delay.

6          THE COURT:  That seems fine to me.  All those rights

7  are reserved and, again, as you know, and as you have shown,

8  you know how to get me on the phone.  If there are issues

9  with respect to teeing this up and moving it forward, I don't

10  want a lot of sparring.  You can get me on the phone and we

11  will get this matter up and addressed, but I don't see it as

12  being a plan confirmation issue.  So, hopefully, the parties

13  can separately memorialize it and, again, I don't think that

14  there is any uncertainty that notwithstanding the overruling

15  of the confirmation objection, all rights with respect to the

16  merits of these claims are reserved.  Okay.

17          MR. DURRER:  Thank you, Your Honor.

18          MR. LINDEMANN:  Your Honor, I just have one comment

19  about that.  Mr. Hill's declaration reflects that our ballots

20  were submitted zero, which is incorrect and the ballots were

21  not attached to any of the pleadings.  I would like that to

22  be corrected or ruled on because we did submit ballots at

23  $7.2 million dollars.  I think it should be part of the

24  record.

25          THE COURT:  Mr. Durrer.

1        MR. DURRER:  I think by counsel's comments it is

2   part of the record.

3        THE COURT:  Well, I actually, I would encourage and,

4   actually, direct that consistent with the comments an amended

5   certification should be filed that reflects the request and

6   the Debtors' position with respect to those claims.  Again, I

7   am satisfied that the Debtors have independently carried

8   their burden as to balloting, but I understand the

9   distinction or the issue.  Again, I don't think it materially

10  bears upon the substance of the allowance and classification

11  of these claims, which, again, the Court has reserved all

12  rights on and would be prepared to address promptly at the

13  convenience of the parties.  Okay.

14       MR. LINDEMANN:  One final comment, Your Honor.  I am

15  not permitted to put on any evidence today of the insider

16  status of class 4, is that correct?

17       THE COURT:  That objection has not been raised.

18  That objection has not been timely raised and I would not

19  permit the presentation of evidence or argument as to that

20  because I don't think that it would be fair or appropriate

21  given, again, that that issue has not been joined in the

22  objection.  The objection went to the treatment and allowance

23  of those claims.  Again, I think the Court's ruling with

24  respect to a full reservation and the opportunity for

25  treatment and, frankly, allowance in full, if permitted, is

1   sufficient.  So that would be the Court's ruling in that

2   respect.

3          MR. LINDEMANN:  I appreciate that, Your Honor.  I

4   just want to note for the record, I wasn't aware of these

5   ballots until after my objection deadline was due, so I made

6   my objection orally.

7          THE COURT:  So noted.  Mr. Durrer.

8          MR. DURRER:  Your Honor, with that we would request

9   that Your Honor confirm the plan.

10         THE COURT:  All right, I would ask if anyone else

11  wishes to be heard with respect to the request for

12  confirmation of the plan.  Mr. Riley.

13         MR. RILEY:  Good afternoon, Your Honor, Richard

14  Riley from Duane Morris on behalf of the ACE Insurance

15  Companies.  We did not object to the plan because the

16  Debtors' originally and throughout have put in a very good

17  provision for insurance policies that, basically, provides

18  that they ride through and will be paid in the ordinary

19  course.  I wanted to thank the Debtors for working with us

20  during this process.  They took comments from us and revised

21  a section.

22         This section has a couple mis-references just

23  because of the way this plan has been changing and I don't

24  think they are going to file another amended plan.  So I just

25  wanted to note that in Section 7.3 the reference is to the

1  releases and injunctions is actually Article 10. I think it

2  references Article 9, but that is just so noted.  But it's

3  clear that the insurance companies, despite some definitional

4  issues, don't need to file proofs of claim or cure notices.

5        THE COURT:  Mr. Durrer, confirm.

6        MR. DURRER:  We will address that in the form of a

7  confirmation order, Your Honor.

8        THE COURT:  Very good.  All right, does anyone else

9  wish to be heard?  Okay.  Based upon the record before me, I

10  am satisfied that the Debtors have carried their burden under

11  Bankruptcy Code Section 1129 and Section 1123 to the extent

12  applicable, and I am prepared to enter an order confirming

13  the plan.

14        In so ruling, I do note that the Debtors have

15  submitted, without opposition, the declarations in support of

16  their request for confirmation of the plan as well as the

17  results of balloting on the plan.  The Court, moments ago,

18  discussed issues with respect to oral objections about the

19  sufficiency of the balloting results and, I believe, that I

20  have ruled on them.  Suffice to say that under, really, any

21  analysis that the Court would take of the balloting results

22  in a study of the plan, the Debtors have carried their burden

23  to obtain sufficient creditor support to obtain, authorize

24  and implement confirmation of the plan.

25        In addition, I am obliged, given the number of

1 modifications that have been made coming from the mediation

2 and the negotiation between the parties to make a specific

3 finding that these Debtors have carried their burden under

4 Bankruptcy Code Section 1127 for purposes of modifying the

5 plan.  I will specifically find that having studied those

6 changes, as well as understanding the context of the case

7 overall that the Debtor is not required or obliged to re-

8 solicit the plan, notwithstanding the modifications.  The

9 modifications are ether favorable in their treatment of

10 creditors or the changes are sufficiently nominal in value as

11 to not require modification.

12         In so ruling, I also am acutely aware of the

13 alternative to the resolution that was before the Court and

14 that would have been a substantial, presumably, at least

15 three day trial that would have been an exceedingly expensive

16 and challenging exercise that could of, I would note,

17 resulted in further delay if the Court were not prepared to

18 rule from the bench at the conclusion of that trial.  The

19 Debtor has been steadfast in advising that it has developed a

20 reorganization strategy with its major stakeholders and that

21 there was a measure of urgency to move forward with that in

22 order to place the company in the best position to succeed on

23 a post-reorganization basis.

24         So the issue of timing is one that has been

25 presented to the Court and that I accept at face value.  So

1  in evaluating the modifications, in the overall context of

2  the case, I am satisfied that the Debtors, again, are not

3  required to re-solicit or delay this confirmation hearing and

4  that, frankly, substantial harm is likely to result to effect

5  its stakeholders if the Court were, in fact, to adjourn this

6  matter, require re-solicitation or not accept the

7  modifications that, again, have been laid out for the Court.

8         In addition, I note that the Debtors have

9  specifically requested leave to move forward immediately or

10  to move promptly toward confirmation and, specifically, to

11  effectiveness of the plan and within the period, otherwise,

12  provided for under 6004, I think.  I am prepared to grant

13  that request as well.  The circumstances reflect a collection

14  of complex and substantial agreements that have been made

15  with many, many different stakeholders.  I am satisfied that

16  it is necessary to implement them and to start that ball

17  rolling in order, frankly, to give effect to the overall

18  restructuring that is built into the plan.

19         So based upon the record before me and considering,

20  and placing substantial weight on the support of the primary

21  stakeholders in the case, particular the Committee of

22  Unsecured Creditors, I would so authorize the Debtor to move

23  immediately or a quickly as they can to implement the plan

24  without any imposed stay.

25         Before I conclude the ruling, I would be remiss if I

1   did not express, along with other parties, my profound

2   appreciation to Judge Drain.  He has done this, obviously,

3   many, many times before and, frankly, you all have had the

4   benefit of his experience and his judgment in this exercise.

5   Again, it's not lost upon me the amount the time and energy

6   that the Court puts into it because I have mediated a number

7   of matters myself.  I would certainly express my appreciation

8   to Judge Drain, but, frankly, to all of the parties in the

9   Courtroom.

10        It is a substantial amount of effort that goes into

11  resolving something.  I know it would be a substantial amount

12  of effort to litigate it as well, but it requires a

13  constructive and professional approach.  And, again, it is a

14  pleasure for the Court to have the opportunity to deal with

15  matters that are ably presented, and staffed and vigorously

16  negotiated by experienced and able professionals.  So I would

17  extend my accommodations to, frankly, all of the parties in

18  that respect.

19        But having found that the Debtors have carried their

20  burden under the applicable provisions of Section 1126 for

21  purposes of balloting, I would note that the Debtors have

22  filed a fulsome confirmation memorandum that reflects the

23  Section 1129 factors and demonstrates that each of those

24  factors has been satisfied or does not apply in this case.  I

25  will rely upon the declarations as well as the memorandum in

1  the record, and I will not require counsel to walk through

2  all of those elements for purposes of plan confirmation.

3         Having resolved all but the objection of the former

4  employees, which the Court has ruled upon, having resolved

5  the Committee issues as well as the U.S. Trustee issues on

6  exculpation, which I understand I would be prepared to

7  approve, I am satisfied, again, the Debtors have carried

8  their burden and I would enter a confirmation order at such

9  time as the parties are prepared to submit it, I believe

10 under certification, is that correct?

11        MR. DURRER:  Yes, Your Honor.

12        THE COURT:  Very well.  Mr. Durrer, do we have

13 anything else today?

14        MR. DURRER:  Mr. Stamer's introductions reminded me

15 of my poor manners in failing to introduce Laura Jones from

16 the Pachulski Firm as well as my colleague Annie Li, and our

17 other colleagues here at Skadden.  So I wanted to do that.

18 We wouldn't be here without them.  Thank you, Your Honor,

19 again, your staff and for your time commitment in helping us

20 through the process.  It's much appreciated.

21        THE COURT:  Let me ask you a question.  Do you

22 expect to get the confirmation order over today?  I will be

23 in tomorrow as well.  I am always kind of sensitive to these

24 issues.  If, you know, dominos are going to start to move

25 once it appears on the docket, you have my attention.  I

1  would just like to know if you know when it will be coming

2  over.

3          MR. DURRER:  Yeah, candidly, Your Honor, I think

4  there is just one lingering issue, which is the relationship

5  of the liens as they pass from DIP facility to exit facility

6  that we need to work out some language.  There is no

7  disagreement.  We are just trying to find the right words.

8  So I would hope for today and, I think, tomorrow will be

9  fine, but we will aim for today.

10         THE COURT:  Okay.  We will look for the order when

11 it comes in.  Is there anything further?  All right, we will

12 stand in recess.  Thank you very much counsel.

13         MR. DURRER:  Thank you, Your Honor.

14    (Court Adjourned).

15

16

17

18

19                        CERTIFICATE

20 I certify that the foregoing is a correct transcript from the

21 electronic sound recording of the proceedings in the above-

22 entitled matter.

23 /s/Mary Zajaczkowski                    January 29, 2016
   Mary Zajaczkowski, CET**D-531              Date
24

25