IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:    Chapter 11
In re:                                :
:    Case No. 15-11880 (BLS)
QUIKSILVER, INC., *et al.*,         :
:    Jointly Administered
Debtors.[1]            :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x    **Related Docket No. 595, 640**

## NOTICE OF FILING OF ADDITIONAL ENGAGEMENT LETTER BETWEEN THE DEBTORS AND KPMG LLP

PLEASE TAKE NOTICE that in accordance with Paragraph 5 of the Order

Pursuant to Bankruptcy Code Sections 327(a) And 328(a), Bankruptcy Rules 2014 And 2016,

And Local Bankruptcy Rules 2014-1 and 2016-2 Authorizing Employment And Retention Of

KPMG LLP As Their Accounting and Internal Audit Advisors, *Nunc Pro Tunc* To The Petition

Date [Docket No. 640], dated January 11, 2016, (the "KPMG Retention Order"), the above-

captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby file the

engagement letter, dated February 2, 2016, between KPMG LLP ("KMPG") and the Debtors,

annexed hereto as Exhibit A (the "Additional Engagement Letter").

PLEASE TAKE FURTHER NOTICE that in accordance with Paragraph 5 of the

KPMG Retention Order, the Additional Engagement Letter will be served upon (i) the Office of

the United States Trustee for the District of Delaware; (ii) counsel to the agents for the Debtors'

post-petition secured lenders; and (iii) counsel to the official committee of unsecured creditors.

---

1    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc.
(8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505),
Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors'
corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

PLEASE TAKE FURTHER NOTICE that any objections with respect to the Additional Engagement Letter must be in writing and filed and served on (i) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 300 South Grand Avenue, Suite 3400, Los Angeles, California 90071, Attn: Van C. Durrer, II, Esq. (Van.Durrer@skadden.com) and Annie Z. Li, Esq. (Annie.Li@skadden.com), and 155 North Wacker Drive, Chicago, Illinois 60606, Attn: John K. Lyons, Esq. (John.Lyons@skadden.com) and Jessica S. Kumar, Esq. (Jessica.Kumar@skadden.com); and (ii) KPMG, LLP, 550 South Hope Street, Suite 1500, Los Angeles, CA 90071-2629, Attn: Pierre Kahn (pkahn@kpmg.com) **by 4:30 p.m. (prevailing Eastern time) on March 7, 2016.**

PLEASE TAKE FURTHER NOTICE that pursuant to Paragraph 5 of the KPMG Retention Order, if no written objections are timely filed and served in accordance with the preceding paragraph, KPMG's retention and employment under the terms of the Additional Engagement Letter shall be authorized in accordance with the KPMG Retention Order.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

2

PLEASE TAKE FURTHER NOTICE that if and only if a written objection is timely filed and served in accordance with the procedures contained herein, the Debtors will promptly schedule a hearing before the Court.

Dated:    Wilmington, Delaware
            February 26, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ Van C. Durrer, II
Van C. Durrer, II (I.D. No. 3827)
Annie Z. Li
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

Mark S. Chehi, Esq. (I.D. No. 2855)
Dain A. De Souza (I.D. No. 5737)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

John K. Lyons
Jessica S. Kumar
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

**EXHIBIT A**

**Additional Engagement Letter**



**KPMG LLP**
20 Pacifica
Irvine, Ca 92618

Telephone  949 885 5427
Fax        949 861 9185
Internet   wwww.us.kpmg.com

December 3, 2015

**PRIVATE & CONFIDENTIAL**

Laurie Blanton
VP, Financial Reporting
Quiksilver, Inc.
15202 Graham Street
Huntington Beach, CA 92649

Dear Laurie:

We appreciate the opportunity for KPMG LLP ("KPMG") to assist Quiksilver, Inc. ("Quiksilver", the "Company", or "you") in addressing various valuation needs arising from your anticipated emergence from Chapter 11, specifically the establishment of the fair value of Quiksilver's intangible assets[1] on its balance sheet at emergence as part of Fresh Start Accounting.  This letter, which serves as our engagement letter, and the attached Standard Terms and Conditions for Advisory and Tax Services (the "ST&C"), set forth the terms of our engagement. Our engagement is subject to completion of our normal engagement acceptance process and execution of this engagement letter.

## Scope

KPMG's professional services will support management by providing various valuation services for the Company's Chapter 11 bankruptcy in accordance with the United States Bankruptcy Code. KPMG will, at all times, work under the direction of management and provide services as requested. To the extent those services requested are not included in the scope below, we will discuss these with the Company and consider issuing an addendum to this engagement letter to reflect the expansion of the initial scope.

**Valuation services**

The work plan we have developed to complete the scope of this engagement includes the following general elements:

- Identify assets & liabilities.  Obtain and read the Company's historical financial statements and detailed financial records, and conduct site visits as necessary, to identify assets and liabilities, regardless of whether those assets and liabilities are currently recorded. Where applicable and acceptable by you and your auditors, we will apply sampling techniques to support an extrapolation of values to the subject population.  In other instances, we will assist you in identifying assets and liabilities subject to valuation;

---

[1] We understand that personal property assets may be included into our scope at a later date.

Laurie Blanton
Quiksilver, Inc.
December 3, 2015
Page 2

Fair values.  Prepare fair value estimates for each identified asset and liability (the "Subject Items"), including but not limited to the following elements:

  – Favorable / Unfavorable Leasehold Interests
  – Inventory
  – Trademarks/Trade names
  – Licenses
  – Customer Relationships

- Reporting units.  Determine the fair value for each reporting unit and allocate the fair value of Subject Items, including goodwill, to the reporting units identified by the Company;

- Remaining useful lives.  Estimate remaining useful lives for the identified intangible assets; and

- Valuation report.  Issue a valuation report covering the aforementioned fair value estimates of the Company.

During the initial phase of our study, we will discuss with you the aforementioned items as well as any other items that come to our attention, so you can make an informed decision as to those you require us to appraise prior to expanding our scope.

Based on our experience in performing engagements of this nature, it is essential to have project managers from Quiksilver work closely with our team. A data request list will be sent to you as soon as possible.

**Timing and Professional Fees**

Our fee for this engagement will be based on the actual time incurred to complete the project at the hourly rates for the individuals involved in providing the services summarized in the table below.

Additionally, we will bill for out-of-pocket expenses, and third party database fees of $1,750. If it is determined that a valuation of the Company's real property, leasehold interests and fixed assets is required, our initial fee estimate will change, and we will discuss this with you at that time.

| Valuation Professional | Hourly Rate |
|---|---|
| *Partner* | $660 |
| *Managing Director* | $570 |
| *Director/Senior Manager* | $525 |
| *Manager* | $450 |
| *Senior Associate* | $325 |
| *Associate* | $250 |

Billing will only include actual time spent and reasonable, documented expenses incurred in performing the work. In addition to professional fees, KPMG will be reimbursed for out-of-pocket expenses and third-party database fees.

Laurie Blanton
Quiksilver, Inc.
December 3, 2015
Page 3

Due to the nature of the proposed project, we note that this estimate is based upon limited information known at this time. Time incurred to complete the project may be in excess of the referenced range due to the extent, nature and quality of available information, the outcome of certain procedural tasks as outlined in this letter and other project details. If additional time and fees are incurred related to the scope of this letter, we will invoice you for the time incurred at the rates described above. These fees are not dependent on tax or other savings achieved or otherwise based in any way on results obtained. If we encounter any circumstances that are outside the scope of this letter, we will issue an addendum or separate engagement letter to confirm the scope and related terms.

Throughout the engagement, we will submit frequent invoices (weekly or semi-monthly) at the Company's discretion for fees and expenses incurred in accordance with the Agreement, with payment due within thirty (30) days of receipt.

**Terms and Conditions**

All services performed under the Engagement Letter will be subject to the attached Standard Terms and Conditions for Advisory and Tax Services dated October 1, 2011 and the Accounting Advice Standards and Tax Advice Standards (collectively, the "Standard Terms and Conditions").

All oral and written communications by KPMG to you with respect to this engagement, including drafts and those communications occurring prior to the execution of this engagement letter (collectively, "Reports"), will be subject to the terms and conditions of this engagement letter and the Standard Terms and Conditions.

**Other Matters**

Any work performed in connection with this engagement before the execution date of this letter is also governed by the terms of this letter and the Standard Terms and Conditions.
By signing this agreement, you confirm that the valuation is not supporting a "listed" or "principal purpose" transaction.

KPMG acknowledges that the Bankruptcy Court must approve its fees in order to be compensated. In that regard, KPMG intends to file applications with the Court for allowance of compensation and reimbursement of expenses in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any order of the Bankruptcy Court establishing procedures for monthly compensation and reimbursement of expenses for professionals. The Company acknowledges that professional time required to prepare detailed applications in accordance with the Bankruptcy Code, applicable rules and guidelines differs from KPMG's normal billing procedures and, as a result, requires significant effort by KPMG to comply therewith. As a result, the Company agrees that, subject to Bankruptcy Court approval, KPMG shall be reimbursed for such professional time incurred.

Laurie Blanton
Quiksilver, Inc.
December 3, 2015
Page 4


**Additional Engagement Letter Information**

Several appendices are attached to this engagement letter:

- Appendix I contains the Standard Terms and Conditions for Advisory and Tax Services (STCs) and the Limiting Assumptions Addendum to the STCs that are made part of this engagement letter.

- Appendix II includes a sample representation letter. Prior to issuing our final report, we require a letter be provided stating that to the best of your knowledge, we have been provided with all relevant information available and that there is no reason to believe that the assumptions based on these representations are unreasonable. Near the completion of the engagement, we will furnish Quiksilver with a representation letter that is specific to this engagement and our final scope of services.

- Appendix  III I - KPMG's Proposed Valuation Methodology

*  *  *  *  *

Laurie Blanton
Quiksilver, Inc.
December 3, 2015
Page 5

**Confirmation**

If the terms described herein are acceptable to you, please sign where indicated below and return the signed copy to my attention at the above address. Please email me a full signed copy to jmbelles@kpmg.com. Please contact me at 949.885.5427 (or via e-mail: jmbelles@kpmg.com) with any questions or comments.  We look forward to working with you.

Very truly yours,

James M. Belles, CFA
*Managing Director*
KPMG LLP
Economic and Valuation Services

**ACCEPTED:**

Quiksilver, Inc.

Authorized Signature

Title

Date

**Appendix I**

**KPMG LLP Standard Terms and Conditions for Advisory and Tax Services with Valuation Services Limiting Assumptions Addendum to Standard Terms and Conditions for Advisory and Tax Services**

# KPMG LLP
## Standard Terms and Conditions for Advisory and Tax Services

1.    **Services; Client Responsibilities**.

(a)    References herein to Client shall refer to the addressee of the Proposal or Engagement Letter to which these Standard Terms and Conditions are attached or incorporated (the "Engagement Letter") and references herein to KPMG shall refer to KPMG LLP, a Delaware registered limited liability partnership and the United States member firm of the KPMG network of independent firms (the "KPMG Network"). Client, its parent company and their affiliates, and their respective directors, officers, employees, and agents are collectively referred to herein as the "Client Parties." KPMG, the other member firms of the KPMG Network and firms and entities controlled by, or under common control with, one or more such member firms (collectively, the "Member Firms"), and their affiliates, and their respective partners, principals, employees, and agents are collectively referred to herein as the "KPMG Parties."

(b)    It is understood and agreed that KPMG's services may include advice and recommendations; but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Client. KPMG will not perform management functions or make management decisions for Client.

(c)    If KPMG audits the financial statements of Client or provides any other attestation services to Client, the rules of the American Institute of Certified Public Accountants ("AICPA") require Client to agree to the following provisions of this Paragraph 1(c). In connection with KPMG's provision of services under the Engagement Letter, Client agrees that Client, and not KPMG, shall perform the following functions: (i) make all management decisions and perform all management functions; (ii) designate an individual who possesses suitable skill, knowledge and experience, preferably within senior management, to oversee such services, and to evaluate the adequacy and results of such services; (iii) accept responsibility for the results of such services; and (iv) establish and maintain internal controls over the processes with which such services are concerned, including monitoring on-going activities.

(d)    Subsequent to the completion of this engagement, KPMG will not update its advice, recommendations or work product for changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, or for subsequent events or transactions, unless Client separately engages KPMG to do so in writing after such changes or modifications, interpretations, events or transactions.

2.    **Tax on Services**. All fees, charges and other amounts payable to KPMG under the Engagement Letter do not include any sales, use, excise, value added or other applicable taxes, tariffs or duties, payment of which shall be Client's sole responsibility, excluding any applicable taxes based on KPMG's net income or taxes arising from the employment or independent contractor relationship between KPMG and its personnel.

3.    **Termination**. Either party may terminate the Engagement Letter at any time by giving written notice to the other party not less than 30 calendar days before the effective date of termination.

4.    **Ownership and Use of Deliverables**.

(a)    KPMG has created, acquired, owns or otherwise has rights in, and may, in connection with the performance of services under the Engagement Letter, use, provide, modify, create, acquire or otherwise obtain rights in, (i) concepts, ideas, methods, methodologies, procedures, processes, know-how, techniques, models, templates and software and (ii) the general elements of style, design, art work and graphics and content of general applicability included in KPMG's Deliverables (as defined below) or work product not specific to Client or the services under the engagement letter (collectively, the "KPMG Property"). KPMG retains all ownership and use rights in the KPMG Property. Client shall acquire no rights or interest in the KPMG Property, except as expressly provided in the next paragraph. KPMG acknowledges that KPMG Property shall not include any of Client's confidential information or tangible or intangible property, and KPMG shall have no ownership rights in such property.

(b)    Except for KPMG Property, and upon full and final payment to KPMG under the Engagement Letter, the tangible items specified as deliverables or work product in the Engagement Letter including any intellectual property rights appurtenant thereto (the "Deliverables") will become the property of Client. If any KPMG Property is contained in any of the Deliverables, KPMG hereby grants Client a royalty-free, paid-up, non-exclusive, perpetual license to use such KPMG Property in connection with Client's use of the Deliverables. Client acknowledges and agrees that KPMG shall have the right to retain for its files copies of each of the Deliverables, subject to the provisions of Paragraph 11 below.

(c)    Client acknowledges and agrees that any advice, recommendations, information, Deliverables or other work product provided to Client by KPMG in connection with the services under the Engagement Letter is intended for Client's sole benefit and KPMG does not authorize any other party to rely upon such advice, recommendations, information, Deliverables or other work product and any such reliance shall be at such party's sole risk. Client agrees that if it makes such advice, recommendations, information or work product available to any third party other than as expressly permitted by the Engagement Letter the provisions of Paragraph 8(b) shall apply unless Client provides the written notice to the third party in substantially the form of Appendix A hereto (the "Notice"), which Notice shall be acknowledged in writing by such third party and returned to Client. Upon request, Client shall provide KPMG with a copy of the foregoing Notice and acknowledgement and any notice and acknowledgement sent to Client by such third party as contemplated by the Notice. Client may only make a Deliverable bearing the "KPMG" name or logo available to a third party in its entirety. Notwithstanding the foregoing, (i) in the event of a disclosure made by Client that is required by law, that is made to a regulatory authority having jurisdiction over Client or that is made pursuant to Paragraph 18(a) below, no acknowledgement of the Notice shall be required and (ii) no Notice or acknowledgement shall be required with respect to disclosures expressly authorized by the Engagement Letter.

# KPMG LLP
## Standard Terms and Conditions for Advisory and Tax Services

5. **Warranties.** KPMG's services under the Engagement Letter are subject to and will be performed in accordance with AICPA and other professional standards applicable to the services provided by KPMG under the Engagement Letter and in accordance with the terms thereof. KPMG disclaims all other warranties, either express or implied.

6. **Limitation on Damages**. Except for the respective indemnification obligations of Client and KPMG set forth herein, the liability of the Client Parties and the KPMG Parties to one another, on account of any actions, damages, claims, liabilities, costs, expenses or losses in any way arising out of or relating to the services performed under the Engagement Letter shall be limited to the amount of fees paid or owing to KPMG under the Engagement Letter. In no event shall any of the Client Parties or any of the KPMG Parties be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs). For avoidance of doubt, any damages awarded against any of the Client Parties or the KPMG Parties based on a third party subject to indemnification hereunder shall not be subject to the disclaimer in the previous sentence. The provisions of this Paragraph shall apply regardless of the form of action, damage, claim, liability, cost, expense, or loss asserted, whether in contract, statute, tort (including but not limited to negligence) or otherwise.

7. **Infringement**.

(a) KPMG hereby agrees to indemnify, hold harmless and defend the Client Parties from and against any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), fines, penalties, taxes or damages (collectively "Liabilities") asserted by a third party against any of the Client Parties to the extent such Liabilities result from the infringement by the Deliverables (including any KPMG Property contained therein) of such third party's patents issued as of the date of the Engagement Letter, trade secrets, trademarks or copyrights. The preceding indemnification shall not apply to any infringement to the extent arising out of (i) use of the Deliverables other than in accordance with applicable documentation or instructions supplied by KPMG or other than for Client's internal business purposes; (ii) any alteration, modification or revision of the Deliverables not expressly agreed to in writing by KPMG; or (iii) the combination of the Deliverables with materials not supplied or approved by KPMG.

(b) In case any of the Deliverables (including any KPMG Property contained therein) or any portion thereof is held, or in KPMG's reasonable opinion is likely to be held, to constitute infringement, KPMG may, within a reasonable time, at its option either: (i) secure for Client the right to continue the use of such infringing item; or (ii) replace, at KPMG's sole expense, such item with a substantially equivalent non-infringing item or modify such item so that it becomes non-infringing. In the event KPMG is, in its reasonable discretion, unable to perform either of the options described in clauses (i) or (ii) above, Client shall return the allegedly infringing item to KPMG, and KPMG's sole liability shall be to refund to Client the amount paid to KPMG for such item; provided that the foregoing shall not be construed to limit KPMG's indemnification obligation set forth in Paragraph 7(a) above.

(c) The provisions of this Paragraph 7 state KPMG's entire liability and Client's sole and exclusive remedy with respect to any infringement or claim of infringement.

8. **Indemnification**.

(a) KPMG agrees to indemnify, hold harmless and defend the Client Parties from and against any and all Liabilities for physical injury to, or illness or death of, any person regardless of status, and damage to or destruction of any tangible property, which any of the Client Parties may sustain or incur, to the extent such Liabilities result from the negligence or willful misconduct of the KPMG Parties. Client agrees to indemnify, hold harmless and defend the KPMG Parties from and against any and all Liabilities for physical injury to, or illness or death of, any person regardless of status, and damage to or destruction of any tangible property, which any of the KPMG Parties may sustain or incur, to the extent such Liabilities result from the negligence or willful misconduct of the Client Parties.

(b) In accordance with Paragraph 4(c), Client agrees to indemnify, defend and hold harmless the KPMG Parties from and against any and all Liabilities incurred or suffered by or asserted against any of the KPMG Parties in connection with a third party claim to the extent resulting from such party's reliance upon KPMG's advice, recommendations, information, Deliverables or other work product as a result of Client's disclosure of such advice, recommendations, information or work product without adhering to the notice requirements of Paragraph 4(c) above. The foregoing indemnification obligation shall apply regardless of whether the third party claim alleges a breach of contract, violation of statute or tort (including without limitation negligence) by KPMG.

(c) The party entitled to indemnification (the "Indemnified Party") shall promptly notify the party obligated to provide such indemnification (the "Indemnifying Party") of any claim for which the Indemnified Party seeks indemnification. The Indemnifying Party shall have the right to conduct the defense or settlement of any such claim at the Indemnifying Party's sole expense, and the Indemnified Party shall cooperate with the Indemnifying Party. The party not conducting the defense shall nonetheless have the right to participate in such defense at its own expense. The Indemnified Party shall have the right to approve the settlement of any claim that imposes any liability or obligation other than the payment of money damages for which the Indemnifying Party has accepted responsibility.

9. **Cooperation; Use of Information**.

(a) Client agrees to cooperate with KPMG in the performance of the services under the Engagement Letter and shall provide or arrange to provide KPMG with timely access to and use of the personnel, facilities, equipment, data and information necessary for KPMG to perform the services under the Engagement Letter. The Engagement Letter may set forth additional details regarding KPMG's access to and use of personnel, facilities, equipment, data and information.

(b) The Engagement Letter may set forth additional obligations of Client in connection with the services under the Engagement

# KPMG LLP
## Standard Terms and Conditions for Advisory and Tax Services

Letter necessary for KPMG to perform its obligations under the Engagement Letter. Client acknowledges that its failure to satisfy these obligations could adversely affect KPMG's ability to provide the services under the Engagement Letter.

(c) Client acknowledges and agrees that KPMG will, in performing the services under the Engagement Letter, base its conclusions on the facts and assumptions that Client furnishes and that KPMG may use data, material, and other information furnished by or at the request or direction of Client without any independent investigation or verification and that KPMG shall be entitled to rely upon the accuracy and completeness of such data, material and other information. Inaccuracy or incompleteness of such data, material and other information furnished to KPMG could have a material adverse effect on KPMG's conclusions.

10. **Independent Contractor**. It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is or shall be considered an agent, distributor or representative of the other. Neither party shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

11. **Confidentiality**.

(a) "Confidential Information" means all documents, software, reports, data, records, forms and other materials obtained by one party (the "Receiving Party") from the other party (the "Disclosing Party") or at the request or direction of the Disclosing Party in the course of performing the services under the Engagement Letter: (i) that have been marked as confidential; (ii) whose confidential nature has been made known by the Disclosing Party to the Receiving Party; or (iii) that due to their character and nature, a reasonable person under like circumstances would treat as confidential. Notwithstanding the foregoing, Confidential Information does not include information which: (1) is already known to the Receiving Party at the time of disclosure by the Disclosing Party; (2) is or becomes publicly known through no wrongful act of the Receiving Party; (3) is independently developed by the Receiving Party without benefit of the Disclosing Party's Confidential Information; (4) relates to information provided by KPMG relating to the tax treatment or tax structure of any transaction; (5) the Receiving Party determines is required to be maintained or disclosed by the Receiving Party under sections 6011, 6111 or 6112 of the Internal Revenue Code ("IRC") or the regulations thereunder or under any similar or analogous provisions of the laws of a state or other jurisdiction; or (6) is received by the Receiving Party from a third party without restriction and without a breach of an obligation of confidentiality.

(b) The Receiving Party will deliver to the Disclosing Party or destroy all Confidential Information of the Disclosing Party and all copies thereof when the Disclosing Party requests the same, except for copies retained in work paper files or records, anything that may be stored in back up media or other electronic data storage systems, latent data and metadata. Except as otherwise set forth in this Paragraph 11 or Paragraph 15 below, the Receiving Party shall not disclose to any person, firm or entity any Confidential Information of the Disclosing Party without the Disclosing Party's express, prior written permission; provided,

however, that notwithstanding the foregoing, the Receiving Party may disclose Confidential Information to the extent that it is required or necessary to be disclosed pursuant to a statutory or regulatory provision or court or administrative order, or, subject to appropriate conditions of confidentiality, to fulfill professional obligations and standards (including quality and peer review) or to submit and process an insurance claim.

(c) The KPMG Parties may aggregate Client information with information from other sources in connection with thought leadership projects, to improve the delivery of services to clients and to allow clients to evaluate various business transactions and opportunities. The KPMG Parties will only use this information without attribution to Client and under circumstances where Client will not be identified as the source of the information.

(d) KPMG may also use Client information and information relating to the services rendered under the Engagement Letter for the purpose of permitting the KPMG Parties to access and share knowledge and information solely among the KPMG Parties. The KPMG Parties receiving this information will be obligated to comply with confidentiality obligations with respect to such information in accordance with this Paragraph 11.

(e) Each party shall exercise the same level of care to protect the other's information as it exercises to protect its own confidential information but in no event less than reasonable care, except to the extent that applicable law or professional standards impose a higher requirement.

(f) If the Receiving Party receives a subpoena or other validly issued administrative or judicial demand requiring it to disclose the Disclosing Party's Confidential Information, the Receiving Party shall, unless prohibited by law, provide prompt written notice to the Disclosing Party of such demand in order to permit it to seek a protective order. So long as the Receiving Party gives notice as provided herein, the Receiving Party shall be entitled to comply with such demand to the extent required by law, subject to any protective order or the like that may have been entered in the matter. In the event the Receiving Party is requested to testify or produce its documents relating to the services under the Engagement Letter pursuant to subpoena or other legal process in judicial or administrative proceedings to which it is not a party, or in connection with an informal inquiry or investigation with the consent of the Disclosing Party, the Disclosing Party shall reimburse the Receiving Party for its time and expenses, including reasonable attorney's fees, incurred in responding to such requests.

12. **Assignment**. Subject to Paragraph 15 below, neither party may assign, transfer or delegate any of its rights or obligations without the prior written consent of the other party, such consent not to be unreasonably withheld.

13. **Governing Law; Severability**. The Engagement Letter and these Standard Terms and Conditions shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws provisions. In the event that any term or provision of the Engagement Letter or these terms shall be held to be invalid, void or unenforceable, then the remainder of the Engagement Letter and these terms shall not be

# KPMG LLP
## Standard Terms and Conditions for Advisory and Tax Services

affected, and each such term and provision shall be valid and enforceable to the fullest extent permitted by law.

14. **Alternative Dispute Resolution**.

(a) Any dispute or claim arising out of or relating to the Engagement Letter between the parties or the services provided thereunder shall be submitted first to non-binding mediation (unless either party elects to forego mediation by initiating a written request for arbitration) and if mediation is not successful within 90 days after the issuance by one of the parties of a request for mediation then to binding arbitration in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution (the "IICPR"). Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these dispute resolution procedures, including any contention that all or part of these procedures is invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction.

(b) Mediation, if selected, may take place at a location to be designated by the parties using the Mediation Procedures of the IICPR, with the exception of paragraph 2 (Selecting the Mediator).

(c) Arbitration shall take place in New York, New York. The arbitration panel shall have no power to award non-monetary or equitable relief of any sort except as provided in IICPR Rule 13 (Interim Measures of Protection). Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

(d) Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

(e) Notwithstanding the agreement to such procedures, either party may seek equitable relief to enforce its rights in any court of competent jurisdiction.

15 **Use of Member Firms and Third Party Service Providers**.

(a) Client acknowledges and agrees that the services under the Engagement Letter, including any applicable tax advice, may be performed by a Member Firm located outside of the United States. Client understands that each Member Firm is a separate, distinct and independent legal entity and is not a partner, principal, agent or affiliate of KPMG and KPMG is not a partner, principal, agent or affiliate of any other Member Firm.

(b) Client further acknowledges that in connection with the performance of services under the Engagement Letter, KPMG

and Member Firms, in their discretion or at Client's direction, may utilize the services of third party service providers within and without the United States to complete the services under the Engagement Letter.

(c) KPMG uses third party service providers within and without the United States to provide at KPMG's direction administrative and clerical services to KPMG. These third party service providers may in the performance of such services have limited access to information, including but not limited to Confidential Information, received by KPMG from or at the request or direction of Client. KPMG represents to Client that each such third party service provider has agreed to conditions of confidentiality with respect to Client's information to the same or similar extent as KPMG has agreed to pursuant to Paragraph 11 above. KPMG has full responsibility to cause these third party service providers to comply with such conditions of confidentiality and KPMG shall be responsible for any consequences of their failure to comply.

(d) Accordingly, Client consents to KPMG's disclosure to a Member Firm or third party service provider and the use by such Member Firm and third party service provider of data and information, including but not limited to Confidential Information, received from or at the request or direction of Client for the purposes set forth in Paragraph 11 and this Paragraph 15.

(e) Any services performed by a Member Firm or third party service provider shall be performed in accordance with the terms of the Engagement Letter and these Standard Terms and Conditions, including Paragraph 11 (Confidentiality), but KPMG shall remain responsible to Client for the performance of such services. Client agrees that any claim relating to the services under the Engagement Letter may only be made against KPMG and not any other Member Firm or third party service provider referred to above.

16. **Miscellaneous**.

(a) **Sarbanes-Oxley**. Except as otherwise set forth in the Engagement Letter, in accepting this engagement, Client acknowledges that completion of this engagement or acceptance of Deliverables resulting from this engagement will not constitute a basis for Client's assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). The services under the Engagement Letter shall not be construed to support Client's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

(b) **Electronic Communications**. KPMG and Client may communicate with one another by electronic mail or otherwise transmit documents in electronic form during the course of this engagement. Each party accepts the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices). Client agrees that the final hardcopy version of a document, including a Deliverable, or other written

# KPMG LLP
## Standard Terms and Conditions for Advisory and Tax Services

communication that KPMG transmits to Client shall supersede any previous versions transmitted electronically by KPMG to Client unless no such hard copy is transmitted.

(c) **California Accountancy Act**. For engagements where services will be provided by KPMG through offices located in California, Client acknowledges that certain of KPMG's personnel who may be considered "owners" under the California Accountancy Act and implementing regulations (California Business and Professions Code section 5079(a); 16 Cal. Code Regs. sections 51 and 51.1) and who may provide services in connection with this engagement, may not be licensed as certified public accountants under the laws of any of the various states.

(d) **Volume Rebates**. Where KPMG is reimbursed for expenses, it is KPMG's policy to bill clients the amount incurred at the time the good or service is purchased. If KPMG subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, KPMG does not credit such payment to Client. Instead, KPMG applies such payments to reduce its overhead costs, which costs are taken into account in determining KPMG's standard billing rates and certain transaction charges that may be charged to clients.

(e) **Use of Names and Logos**. Except as permitted by law or the terms of the Engagement Letter, neither party shall acquire hereunder any right to use the name or logo of the other party or any part thereof. Any such use shall require the express written consent of the owner party.

(f) **Privileged Communications**. Information relating to advice KPMG provides to Client, including communications between KPMG and Client and material KPMG creates in the course of providing advice, may be privileged and protected from disclosure to the IRS or other governmental authority in certain circumstances. As KPMG is not able to assert the privilege on Client's behalf with respect to any communications for which privilege has been waived, Client agrees to promptly notify KPMG of any such waivers, whether resulting from communications with KPMG or third parties in the same or a related matter. Client also understands that privilege may not be available for communications with an audit client and that KPMG personnel providing audit and non-audit services will discuss matters that may affect the audit to the extent required by applicable professional standards. Client agrees that KPMG will not assert on Client's behalf any claim of privilege unless Client specifically instructs KPMG in writing to do so after discussing the specific request and the grounds on which such privilege claim would be made. Notwithstanding the foregoing, Client acknowledges that in no event will KPMG assert any claim of privilege that KPMG concludes, after exercising reasonable judgment, is not valid.

(g) **Active Spreadsheets and Electronic Files**. KPMG may use models, electronic files and spreadsheets with embedded macros created by KPMG to assist KPMG in providing the services under the Engagement Letter. If Client requests a working copy of any such model, electronic file or spreadsheet, KPMG may, at its discretion, make such item available to Client for its internal use only and such item shall be considered a Deliverable subject to Paragraph 4 above; provided that Client is responsible for

obtaining the right to use any third party products necessary to use or operate such item.

(h) **Non-Solicitation**. During the term of the Engagement Letter and for one year thereafter, neither party shall solicit for hire as an employee, consultant or otherwise any of the other party's personnel who have had direct involvement with the services under the Engagement Letter, without such other party's express written consent. This prohibition shall not apply to any offers of employment which result from a general solicitation for employment, including without limitation, through the Internet, newspapers, magazines and radio.

17. **Entire Agreement**. The Engagement Letter and these Standard Terms and Conditions, including the Exhibits and Appendices hereto and thereto, constitute the entire agreement between KPMG and Client with respect to the services under the Engagement Letter and supersede all other oral and written representations, understandings or agreements relating thereto.

18. **Additional Terms for Engagements Involving Tax Services.**

(a) Notwithstanding anything to the contrary set forth herein, no provision in the Engagement Letter or these Standard Terms and Conditions is or is intended to be construed as a condition of confidentiality within the meaning of IRC sections 6011, 6111, 6112 or the regulations thereunder, or under any similar or analogous provisions of the laws of a state or other jurisdiction. In particular, Client (and each employee, representative, or other agent of Client) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction within the scope of this engagement and all materials of any kind (including opinions and other tax analyses) that are provided to Client relating to such tax treatment and tax structure. Client also agrees to use commercially reasonable efforts to inform KPMG of any conditions of confidentiality imposed by third party advisors with respect to any transaction on which KPMG advice is requested. Such notification must occur prior to KPMG providing any advice with respect to the transaction.

(b) Treasury regulations under IRC section 6011 require taxpayers to disclose to the IRS their participation in reportable transactions and IRC section 6707A imposes strict penalties for noncompliance. Client agrees to use commercially reasonable efforts to inform KPMG if Client is required to disclose any transaction covered by the Engagement Letter as a reportable transaction to the IRS or to any state or other jurisdiction adopting similar or analogous provisions. IRC section 6111 requires a material advisor with respect to a reportable transaction to disclose information on the transaction to the IRS by a prescribed date, and IRC section 6112 requires the material advisor to maintain, and make available to the IRS upon request, a list of persons and other information with respect to the transaction. KPMG will use commercially reasonable efforts to inform Client if KPMG provides Client's identifying information to the IRS under IRC section 6111 or 6112, or to any state or other jurisdiction adopting similar or analogous provisions.

(c) Unless expressly provided for, KPMG's services do not include representing Client in the event of a challenge by the IRS or other tax or revenue authorities.

October 1, 2011 Release

# KPMG LLP
## Standard Terms and Conditions for Advisory and Tax Services

(d)    In rendering tax advice, KPMG may consider, for example, the applicable provisions of the Internal Revenue Code of 1986, and the Employee Retirement Income Security Act of 1974, each as amended, and the relevant state, local and foreign statutes, the regulations thereunder, income tax treaties, and judicial and administrative interpretations, thereof.    These authorities are subject to change, retroactively or prospectively, and any such changes could affect the validity of KPMG's advice.

October 1, 2011 Release

## APPENDIX A

## [FORM OF NOTICE AND ACKNOWLEDGEMENT]

[Name of Third Party]
Address

The advice, recommendations and information in the document included with this notice were prepared for the sole benefit of [Name of Client], based on the specific facts and circumstances of [Name of Client], and its use is limited to the scope of KPMG's engagement for [Name of Client]. It has been provided to you for informational purposes only and you are not authorized by KPMG to rely upon it and any such reliance by you or anyone else shall be at your or their own risk. You acknowledge and agree that KPMG accepts no responsibility or liability in respect of the advice, recommendations or other information in such document to any person or organization other than [Name of Client]. You shall have no right to disclose the advice, recommendations or other information in such document to anyone else without including a copy of this notice and, unless disclosure is required by law or to fulfill a professional obligation required under applicable professional standards, obtaining a signed acknowledgement of this notice from the party to whom disclosure is made and you provide a copy thereof to [Name of Client]. You acknowledge and agree that you will be responsible for any damages suffered by KPMG as a result of your failure to comply with the terms of this notice.

Please acknowledge your acceptance of the foregoing by signing and returning to us a copy of this letter.*

Very truly yours,

[Name of Client]

By: _____
    Name:
    Title:

**Accepted and Agreed to on this ___ day of ____, 20__ by**:*

[Name of Third Party

By: _____
    Name:
    Title:

*Remove in the event of a disclosure made by Client that is required by law, that is made to a regulatory authority having jurisdiction over Client or that is made pursuant to Paragraph 18(a) of the Standard Terms and Conditions in which case an acknowledgement is not required by the terms of Paragraph 4(c).

October 1, 2011 Release

# KPMG LLP
## Valuation Services Limiting Assumptions Addendum to Standard Terms and Conditions
## for Advisory and Tax Services

This Valuation Services Limiting Assumptions Addendum to Standard Terms and Conditions for Advisory and Tax Services is an integral part of the accompanying Standard Terms and Conditions for Advisory and Tax Services.

19. **Nature of Opinion.** Neither our opinion nor our report are to be construed as a fairness opinion as to the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation, but, instead, are the expression of our determination of the fair [market] value of the Subject Assets between a hypothetical willing buyer and a hypothetical willing seller in an assumed transaction on an assumed valuation date. For various reasons, the price at which the Subject Assets might be sold in a specific transaction between specific parties on a specific date might be significantly different from the fair [market] value expressed in our report.

20. **Going Concern Assumption, No Undisclosed Contingencies.** Our analysis (i) assumes that as of the Valuation Date the Company and its assets will continue to operate as configured as a going concern; (ii) is based on the past and present financial condition of the Company and its assets as of the Valuation Date; and (iii) assumes that the Company had no undisclosed real or contingent assets or liabilities, no unusual obligations or substantial commitments, other than in the ordinary course of business, nor had any litigation pending or threatened that would have a material effect on our analysis.

21. **Reliance on Forecasted Data.** Any use of management's projections or forecasts in our analysis does not constitute an examination or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants ("AICPA"). We do not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines. Further, there will usually be differences between prospective and actual results because events and circumstances frequently do not occur as expected and those differences may be material.

22. **Verification of Legal Description or Title.** We have made no investigation of legal description or title and have assumed that owner(s) claims to property are valid. No consideration will be given to liens or encumbrances which may be against the property except as specifically stated as part of the financial statements you provide to us as part of this engagement. Full compliance with all applicable federal, state and local zoning, environmental, and similar laws and regulations is assumed, unless otherwise stated, and responsible ownership and competent management are assumed.

.

23. **Verification of Hazardous Conditions.** We will not investigate the extent of any hazardous substances that may exist as we are not qualified to test for such substances or conditions. If the presence of such substances, such as asbestos, urea formaldehyde foam insulation or other hazardous substances or environmental conditions may effect the value of the property, the value will be estimated predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value. No responsibility will be assumed for any such conditions, or for any expertise or engineering knowledge required to discover them.

24. **Condition of Property.** We assume no liability whatsoever with respect to the condition of the subject property for hidden or unapparent conditions, if any, of the subject property, subsoil or structures, and further assume no liability or responsibility whatsoever with respect to the correction of any defects which may now exist or which may develop in the future. Equipment components considered, if any, were assumed to be adequate for the needs of the property's improvements, and in good working condition, unless otherwise reported.

25. **Zoning.** It is assumed that all public and private zoning and use restrictions and regulations had been complied with, unless non-conformity was stated, defined and considered in the report.

26. **The Americans with Disabilities Act ("ADA").** The ADA became effective January 26, 1992. We will not make a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more requirements of the ADA. If so, this fact could have a negative effect upon the value of the property. Since we have no direct evidence relating to this issue, we will not consider possible non-compliance with the requirements of the ADA in estimating the value of the property.

**Sample Representation Letter**

Appendix II

[To be printed on Quiksilver letterhead]

KPMG LLP
Attn: James Belles
20 Pacifica, Suite 700
Irvine, CA 92618

Month Day, Year of rep letter

Dear Mr. Belles:

This letter will confirm our understanding regarding certain elements of KPMG LLP's engagement to assist Quiksilver, Inc. (Quiksilver) in valuing certain assets and liabilities for Fresh Start Accounting. The valuation was performed as of Month Day, Year.

We have reviewed your report and the related data that was used in this report. In connection with your valuation study, we have supplied you with all significant and relevant information of which we are aware. The information supplied to you includes:

- Historical financial statement data of Quiksilver and their reporting units, which are audited/un-audited

- Prospective financial data related to Quiksilver and their reporting units, for which we have no reason to dispute the underlying assumptions

- All internal presentations that describe the history, nature of business, and outlook for Quiksilver and their reporting units

- Other pertinent information

We understand you have relied on the aforementioned information and upon discussions with employees of Quiksilver during your engagement and that you have not undertaken any procedures to verify the accuracy or completeness of this information. We understand that you express no opinion as to the fairness of the presentation of the aforementioned information and that any alterations or modifications to this information could materially affect your findings.

We have no reason to dispute the underlying financial information upon which you relied in your analysis. We understand that your findings are to be relied upon solely in connection with the circumstances set forth in your engagement letter.

We confirm that the valuation report is not supporting a "listed" or "principal purpose" transaction.

Sincerely,

Laurie Blanton

**Appendix III**

**KPMG's Proposed Valuation Methodology**

**General Approach to Valuation Services**

In accounting for purchase accounting, an entity must allocate its enterprise value to the underlying assets and liabilities based on their estimated fair values. Fair Value ("FV") is defined as the amount at which an asset (or liability) could be bought (or incurred) or sold (or settled) in a current transaction between willing parties, that is, other than in a forced or liquidation sale.

Based on our understanding, the majority of the Subject Items will be valued as part of a going concern in continued use. This valuation presumes the continued utilization of the assets as a component of the business in connection with all other assets. It is not intended to represent the amount that might be realized from piecemeal disposition of the assets or from some other use of the assets. Where applicable, we may consider the "value in exchange" premise (e.g., an asset may be held for sale).

To realize the objectives of our study, we will undertake the following approach:

- Confirm the total reorganization value, including any contingencies
- Allocate Quiksilver's enterprise value among its various reporting units, for purposes of determining a residual goodwill amount at each reporting unit[2]
- Determine the fair value of the tangible assets (e.g., real estateand inventory)
- Assume that the net book value of all other tangible assets not defined in step 2 above will equal their FV (e.g., personal property, trade receivables)
- Determine the FV of the identifiable intangible assets

Our study will consider the three basic methods of determining the FV: the income, market, and cost approaches. We may utilize all or a combination of these approaches to derive our conclusions, depending on whether an approach is applicable or not. No formula yields a definitive determination of value as each company and asset valuation involves unique factors. The valuation process requires the objective analysis of data, the application of experienced judgment, and discussion with management to yield a reasonable conclusion. A brief description of each approach is discussed below:

- **Income approach:** The income approach measures the value of an asset by the present value of its future economic benefits. These benefits can include earnings, cost savings, royalty savings, tax deductions and proceeds from the asset's disposition. When applied to assets of a business, value indications are developed by capitalizing current benefits or discounting prospective cash flows to their present value at a rate of return that incorporates the risk-free rate for the use of funds, the expected rate of inflation and risks associated with that particular investment. The capitalization and discount rates selected are generally based on rates of return available for alternative investments of similar type and quality as of the valuation date.

---

[2] We will rely on Management to determine the number of reporting units held by Quiksilver. Our work will not include a valuation of Quiksilver's total enterprise value, but will allocate that value among the various reporting units.

- **Market approach:** The market approach measures the value of an asset through an analysis of recent sales or offerings of comparable assets. When applied to the valuation of an asset, consideration is given to the financial condition and operating performance of the company that owns the asset.

- **Cost approach:** The cost approach measures the value of an asset or a business based on the cost to reconstruct or replace it with another of like utility.

In concluding on the respective FV of the Subject Items, we will consider and reconcile the results from each approach as appropriate.

**Tangible Asset Approach (if necessary)**

The following describes our approach to valuing the Tangible Assets:

*Real Property*

We expect to utilize a combination of the cost, market and income approaches to value the real property acquired. The applicable approach will be selected based upon the specific characteristics of the real property asset being appraised.

The real property analysis will include, but not be limited to, the following general steps:

- Review a master property listing and discuss with appropriate personnel the real property included within the scope of our analysis;
- Review capitalized real property assets within the fixed asset listing;
- If agreed, inspect all or a sample of the real property and collect relevant property data (legal descriptions, deeds, lease information, and real estate tax bills);
- Collect land, site improvement and building data, including site plans, owned land sizes, floor plans, floor area data, and ages of the building;
- Collect property specific historical and forecasted income and expense operating statements and budgets for the investment grade real property.
- Collect tax assessment data including tax maps, property record cards, zoning classifications, and other relevant information; and
- Collect and review comparable sales data and lease data.

Land

We expect to utilize the market approach to value vacant land parcels and land underlying the acquired buildings. This approach involves the collection of market data, which includes recent comparable land sales and listings for similar vacant land parcels. The comparables sales and/or listings are adjusted for differences in economic and physical characteristics to arrive at an indication of fair value. If comparable land sales are not available we may utilize an alternative approach to value such as allocation, extraction or income capitalization.

Buildings & Improvements

We expect to utilize a combination of the cost, market and income approaches to value the acquired buildings and improvements. The cost approach estimates the replacement cost new of the buildings utilizing data published within pricing services such as Marshall & Swift. Depreciation and obsolescence factors; representing physical depreciation, functional obsolescence, and external obsolescence, are applied to the replacement cost new estimate to arrive at an indication of fair value for the buildings and improvements. The market approach involves the comparison of recent sales or listings of similar properties to the subject assets being appraised. The comparable market data is adjusted for differences in economic and physical characteristics to arrive at an indication of fair value. The income approach will be utilized for investment grade properties capable of producing rental income. The Income Approach simulates the reasoning of an investor who views the cash flows that would result from the anticipated revenue and expense on a property throughout its lifetime. The net income figure developed is the balance of potential income remaining after vacancy deduction, collection allowances, and operating expenses. This net income is then capitalized at an appropriate rate to derive an estimate of value or discounted by an appropriate yield rate over a typical projection period in a discounted cash flow analysis. Thus, two key steps are involved: (1) estimating the net income applicable to the subject and (2) choosing appropriate capitalization rates and discount rates. The appropriate rates are ones that will provide both a return on the investment and a return of the investment over the life of the particular property.

***Personal Property***

Our personal property analysis will include, but not be limited to, the following general steps:

- Review the fixed asset register or similar set of fixed asset data available and discuss with appropriate personnel;

- Interview management to understand the capitalization and maintenance polices, assess the existence of assets, and assess the accuracy of the records;

- Collect site questionnaires from each site to obtain material production equipment data such as make, model, production capacity and use, replacement options, and future use intentions;

- If agreed, inspect all or a sample of the fixed assets and observe their operations and collect relevant asset specific data;

- Research the secondary market for comparable sales information of similar personal property;

- Research manufacturers and vendors for comparable cost information; and

- Analyze other factors and data considered to be pertinent to our analysis.

To the extent that any facilities will be closed or assets will be taken out of service in the near future, we will value those assets accordingly.

<u>Valuation Approaches</u>

We expect to value the personal property assets relying primarily on the cost and market approach.

The cost approach considers the concept of replacement cost as an indicator of value. A prudent investor would pay no more for an asset than the cost for which they could replace a substitution asset new with the same utility and in the same condition. Our application of the cost approach will be based on the direct replacement cost approach and indirect replacement cost approach.

- The direct replacement cost approach estimates replacement cost new by considering the current cost to replace comparable assets based on published cost estimating guides, discussions regarding replacement costs with personnel, price lists, and any existing budgets related to capital expenditures.

- The indirect replacement cost approach considers the historical capitalized cost of the asset. Based on the year of acquisition and asset type, an inflationary index is applied to the historical cost to estimate replacement cost new.  Indexes are obtained from public sources such as the Bureau of Labor Statistics Producer Price Index, International Monetary Fund, or Marshall Valuation Services.

- The replacement costs estimated via the direct or indirect replacement cost approaches will then be adjusted to account for physical deterioration, functional obsolescence, and economic obsolescence based on the expected economic life of the asset and its effective age.

To the extent that information regarding manufacturer and model is available, we will also apply the market approach by collecting comparable sales data for similar type of equipment and assets. Comparable asset transactions will be investigated and compared to the subject assets to arrive at an indication of fair value.

### *Inventory*

The inventory will likely be valued as follows:

- Finished goods and merchandise at estimated selling prices less the sum of (a) costs of disposal and (b) a reasonable profit allowance for the selling effort

- Work in process at estimated selling prices of finished goods less the sum of (a) costs to complete, (b) costs of disposal, and (c) a reasonable profit allowance for the completing and selling effort based on profit for similar finished goods

- Raw materials at current replacement cost

### Intangible Asset Valuations

KPMG will develop intangible asset values by reviewing the Company's documentation, developing appropriate models, analyzing financial statements, performing research on royalty rates, and by interviewing management. We will need to obtain detailed information related to each of the identified intangible assets and will perform valuation techniques specific to each asset type.

**Trade Names & Licenses**

We will consider all three traditional approaches in determining the FV of the trade names & licenses. However, we typically value these assets using the royalty savings method or the excess earnings approach within the income approach. Under the royalty savings approach ("RSA"), value reflects the savings realized by owning the trade name and/or licenses. The standard associated with this valuation technique is that if the trade name were licensed to an unrelated party, the unrelated party would pay a percentage of revenue for its use. The trade name owner is, however, spared this cost. This cost savings, or relief from royalty, represent the value of the trade name. The value under the RSA approach is a function of the following factors:

- The concluded royalty rate (as percentage of revenues) that one would pay for use of the trade name if it were licensed by a third party;

- The projected revenues (sales - net of returns), generated by product sales under the trade name being valued; and

- The appropriate risk adjusted discount rate used to present value the stream of anticipated royalty payments.

Under the income/excess earnings approach, value is reflected in the streams of cash flows that can be attributed to these trade names and licenses. The FV determined under this approach is a function of the following:

- Future revenues expected to be generated by these assets and the profitability of the assets

- Identification of the contribution of other tangible and intangible assets to the cash flows of these assets to apply an appropriate capital charge against the cash flows

- Determination of the appropriate risk adjusted discount rate to calculate the present value of the stream of anticipated cash flows

**Customer Relationships**

We will consider all three valuation approaches in determining the FV of these assets. However, we typically value customer relationships using an income/excess earnings approach, as described above.

**Leasehold Interests**

Valuation of leasehold interests will include an analysis of current real property leases to determine any potential leasehold interests (i.e., above or below market rent positions). A positive leasehold position exists when the present value of the contract rent (inclusive of base rent, percent rent and option rent) is less than the present value of the market rent. A negative leasehold position exists when the present value of the contract rent (inclusive of base rent, percent rent and option rent) is greater than the present value of the market rent. Determination of lease contracts that we will analyze will be based on materiality, square footage, and lease start and termination dates. Our analysis of the leasehold interest will include, but not be limited to, the following general steps:

- Research the real property to assess quality, condition and utility of the assets;

- If agreed, perform site inspection of all or a sample of the leased real estate;

- Review of contract rents;

- Estimate market rents for each facility based on comparables and other market data;

- Compare the market rents to contractual rents;
- Calculate the net present value of the difference between market rents and contractual rents over the remaining lease term using a market derived internal rate or return (discount rate).

### *Other Intangible Assets*

We will work closely with your team to identify other potential intangible assets such as athlete contracts or patents that may meet the asset recognition criteria of FASB ASC Topic 820 and FASB ASC Topic 350, *Intangibles – Goodwill and Other*.

We will discuss these intangible assets and others that may come to our attention with you. We will value only the items that you direct us to value.

### *Impairment Services*

KPMG has the experience and ability to further assist Quiksilver with intangible asset and goodwill impairment services. Based on the knowledge gained through the valuation of the reporting units and the intangible and tangible assets, we have direct knowledge in how the fair value of the assets and reporting units were originally assessed leading to accurate assessment and efficient work flow. We will discuss this scope of work with you in conjunction with the proposed valuation work. Should you wish to engage KPMG to perform these services, a separate engagement letter or clarifying addendum will be drafted upon request.

The scope of our services can vary depending on the extent of performance of the reporting units since acquisition, which may lead to certain reporting units and assets being assessed quantitatively or qualitatively. We propose to work closely with you during the valuation engagement to identify potential impairment concerns and set foundation for required annual impairment testing after our initial valuation.

### Remaining Economic Useful Life Analysis

To assist you in your estimate of the remaining useful lives (RUL) of the Subject Assets, we will consider the factors presented in paragraph 11 of FASB ASC Topic 350. In some instances, the RUL may be based on the remaining duration of a patent or an agreement. In other cases, the expected product life cycle may dictate the asset's RUL. In other instances historical and prospective attrition data are frequently used to construct statistical "run-off" curves that may be useful in estimating a particular asset's RUL. We will consider the facts pertinent to each asset for which we estimate FV.

### Assigning Assets and Liabilities to Reporting Units

We understand that you require our assistance in assigning acquired assets and liabilities to reporting units as of the valuation date in connection with purchase accounting. Recognizing the complexity of assigning assets to reporting units after initial recognition, our assistance will be limited to estimating the business enterprise value of reporting units and identifying asset values related to the operating cash flows of the reporting units. We will consider the three approaches to value but expect to rely on either a market multiple analysis or a discounted cash flow (DCF) analysis. The DCF analysis is predicated on Quiksilver providing historical financial statements and long term projections for each reporting unit and an overall consolidated long term projection.

**Deliverables**

Deliverables for the financial reporting and tax valuation will include our opinions of value and detailed written reports with supporting schedules. The opinions and reports will provide an overview of our valuation process, values of the Subject Items a description of valuation methodologies and assumptions utilized, and, where appropriate, the estimated remaining economic useful lives of the assets.