**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Quicksilver Resources Inc., et al.,[1] | ) | Case No. 15-10585 (LSS) |
| Debtors. | ) | Jointly Administered |
| | ) | **Hearing Date: Dec. 14, 2015 at 10:00 a.m. (ET)** |
| | ) | **Objection Deadline: Dec. 7, 2015 at 4:00 p.m. (ET) (Extended for the Committee to Dec. 8, 2015 at 12:00 p.m. (ET))** |
| | ) | **Re: Docket No. 890** |

**LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER EXTENDING THE TERMS, AS MODIFIED, OF THE "FINAL ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363 AND 507, AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL AND (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES"**

The Official Committee of Unsecured Creditors (the "Committee") of Quicksilver Resources Inc., *et al.* (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this limited objection (the "Objection") to the *Debtors' Motion for Entry of an Order Extending the Terms, as Modified, of the "Final Order Under 11 U.S.C. §§ 105, 361, 362, 363 and 507, and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to Prepetition Secured Parties"* [Docket No. 890] (the "Motion").[2] In support of the Objection, the Committee respectfully represents as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Quicksilver Resources Inc. [6163]; Barnett Shale Operating LLC [0257]; Cowtown Drilling, Inc. [8899]; Cowtown Gas Processing L.P. [1404]; Cowtown Pipeline Funding, Inc. [9774]; Cowtown Pipeline L.P. [9769]; Cowtown Pipeline Management, Inc. [9771]; Makarios Resources International Holdings LLC [1765]; Makarios Resources International Inc. [7612]; QPP Holdings LLC [0057]; QPP Parent LLC [8748]; Quicksilver Production Partners GP LLC [2701]; Quicksilver Production Partners LP [9129]; and Silver Stream Pipeline Company LLC [9384]. The Debtors' address is 801 Cherry Street, Suite 3700, Unit 19, Fort Worth, Texas 76102.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion.

## PRELIMINARY STATEMENT

1. At the outset of these chapter 11 cases, the Committee objected to the excessive adequate protection package proposed by the Debtors, arguing that it was inappropriate under the circumstances because, among other reasons, the Debtors would rely principally on unencumbered cash to fund their business, thus preserving and enhancing the value of the prepetition secured parties' collateral. *See Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Granting Prepetition Secured Parties Adequate Protection, (C) Scheduling a Final Hearing, and (D) Granting Related Relief* [Docket No. 234]. Ultimately, the Committee agreed to consensually resolve its objection to the Debtors' use of cash collateral in an effort to put the Debtors on a path towards an expeditious, value-maximizing emergence, subject to the preservation of, *inter alia*, the Committee's rights under sections 506(c) and 552(b) of the Bankruptcy Code.[3] The Debtors now seek to extend the cash collateral arrangement through April 30, 2016. The Committee has no objection to the numerous forms of adequate protection that the Debtors have again offered the Second Lien Parties, except for the continuation of cash adequate protection payments—which are wholly inappropriate under the circumstances of these cases.

2. The Debtors started these cases with approximately $186 million in cash on hand; that cash balance has declined to approximately $127 million in the aggregate.[4] The primary cause of this decline has been the adequate protection payments to the undersecured Second Lien Parties. To date, the Debtors have paid in excess of ***$41 million*** to the Second Lien Parties as "adequate

---

[3] The Committee's claims litigation against the Second Lien Parties is ongoing.

[4] Relatedly, cash in the Debtors' investment account—all of which is unencumbered—has dropped from $167.5 million at the Petition Date to approximately $32.5 million today.

protection," ***plus*** more than ***$4 million*** on account of their professional fees and expenses.[5] The Debtors now come before this Court seeking to extend the use of cash collateral and, in connection therewith, to continue paying the undersecured Second Lien Parties approximately $5 million a month in interest ***plus*** millions more in professional fees and expenses through April 30, 2016.

3. The Second Lien Parties have to make a choice: either seek stay relief to liquidate their collateral, or allow the Debtors to do it for them but without the continuation of a $5 million monthly check. Put simply, they can no longer have their cake and eat it too. The Second Lien Parties have continually expressed a strong preference for a sale of the Debtors' assets, rather than a reorganization. The Committee, on the other hand, has continually requested that a plan be pursued. Given the Second Lien Parties' position, the Debtors have little choice but to seek to sell their assets—the bulk of which constitute the Second Lien Parties' collateral. The alternative method for the Second Lien Parties to have their assets sold is to seek relief from the stay to foreclose on the collateral and liquidate it themselves. They, of course, have never sought such relief at any time during these cases. The reason for this is obvious: they rightly believe that this would yield a lesser recovery than the contemplated going-concern sale.

4. Since the Debtors are doing the same thing that the Secured Lien Parties would do if there were no bankruptcy—but in a way designed to achieve greater value for the Second Lien Parties and with the Second Lien Parties' consent—the Second Lien Parties do not need to be adequately protected against anything. Moreover, the Second Lien Parties already benefit from numerous forms of adequate protection under the proposed amended cash collateral order. They cannot possibly need ***more*** adequate protection through ***another $23 million in cash*** (plus millions more on account of their professional fees and expenses) for the Debtors' continuation of these

---

[5] The Second Lien Parties' total professional fees and expenses to date are approximately $5.6 million in the aggregate, which includes fees and expenses that have been invoiced but which the Debtors have not yet paid.

cases, the primary purpose of which is to pursue a sale of the Second Lien Parties' collateral as a going concern for the Second Lien Parties' benefit.

5. In addition, it is well established that a chapter 11 case should not be run solely for the benefit of secured lenders. The Second Lien Parties have asserted that they believe that the end result of these cases is that they have claims to substantially all of the value in the Debtors' estates—an assertion with which the Committee strongly disagrees. If the Second Lien Parties believe that all of the assets are theirs and they want the Debtors to sell them, then their view of the world is that these cases are being entirely run for their benefit. If they are right, then these cases should be dismissed and the Second Lien Parties should exercise their remedies against the collateral. At some point, they cannot have it both ways—and that point is now. The Second Lien Parties should decide if they want to be granted relief from the stay to liquidate their collateral, but they cannot both have a sale pursued and continue draining the unsecured creditors' primary source of recovery (*i.e.*, the unencumbered cash) for their benefit.

**ARGUMENT**

6. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease . . . ." 11 U.S.C. § 363(c)(2). Further, section 363(e) of the Bankruptcy Code provides that a debtor need only adequately protect a secured creditor to the extent of any diminution in value of the secured creditor's collateral resulting from the debtor's use of such collateral during the pendency of the bankruptcy case. 11 U.S.C. § 363(e); *In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987) (stating that the "focus [of adequate protection] is protection of the secured creditor from diminution in the value of its

collateral during the reorganization process" (quoting *In re Beker Indus.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986))).

7. Adequate protection payments are not meant to improve the position of undersecured creditors in relation to other creditors. *In re Weinstein*, 227 B.R. 284, 297 (B.A.P. 9th Cir. 1998) (noting that "permitting such a bonus would be akin to providing the undersecured creditor with interest or lost opportunity costs which is expressly prohibited by *Timbers*"). Indeed, certain provisions of the Bankruptcy Code "are premised on the equitable principle that the unencumbered assets of a debtor's estate will not be used to benefit one class of creditors at the expense of another class." *United Savs. Ass'n of Texas* v. *Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1387 (5th Cir. 1986), *aff'd*, 484 U.S. 365 (U.S. 1988).

8. Additionally, while adequate protection can take the form of periodic cash payments, it can also be provided by "granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in property." 11 U.S.C. § 361(3). The "indubitable equivalent" prong "is regarded as a catch all, allowing courts discretion in fashioning the protection provided to a secured party. Therefore, a determination of whether there is adequate protection is made on a case by case basis." *Resolution Trust Corp.* v. *Swedeland Dev. Grp. (In re Swedeland Dev. Grp.),* 16 F.3d 552, 564 (3d Cir. 1994).

### A. Second Lien Parties Are Already Adequately Protected and Should Not Receive the Adequate Protection Payments on a Go-Forward Basis

9. The equities of these cases dictate that no more adequate protection payments be made. To date, the Second Lien Parties have received more than ***$41 million*** as "adequate protection," ***plus*** approximately ***$4 million*** on account of their professional fees and expenses.[6] The

[6] As noted above, the Second Lien Parties' professional fees and expenses to date, including fees and expenses that have been invoiced but which the Debtors have not yet paid, total approximately $5.6 million in the aggregate.

proposed Amended Final Order also continues to provide the Second Lien Parties with a robust adequate protection package that includes, *inter alia*: (i) superpriority claims pursuant to section 507(b) of the Bankruptcy Code; (ii) replacement liens on the collateral; and (iii) adequate protection liens on unencumbered property, including the proceeds of avoidance actions. No more is warranted.

10. While the Second Lien Parties could seek to lift the automatic stay to foreclose on their collateral and liquidate it themselves, their failure to do so suggests that they believe a going-concern sale would yield a greater recovery. This Court should not allow the Second Lien Parties to continue collecting a $5 million windfall each month from the dwindling pool of unencumbered cash as the Debtors pursue an asset sale at the insistence and for the primary benefit of the Second Lien Parties. *Cf. In re W.R. Grace & Co.*, 475 B.R. 34, 157 (D. Del. 2012) (stating that the "underlying public policy in federal bankruptcy law [is] that a debtor's bankruptcy estate should be maximized for the benefit of both the debtor and ***all*** of its creditors") (emphasis added); *In re Berry Good, LLC*, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008) (holding that portion of DIP loan could not be used to repay DIP lender's claim, and noting that courts should not enforce financing arrangements that "would prejudice the powers and rights that the Code confers for the benefit of all creditors, thereby leveraging the chapter 11 process by granting a lender excessive control over the debtor or its assets to the prejudice of other parties in interest"); *In re Tenney Village Co.*, 104 B.R. 562, 567-570 (Bankr. D.N.H. 1989) (declining to approve proposed DIP financing that violated debtor's fiduciary duty to all creditors because the proposed DIP "pervert[ed] the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted or the benefit of the [debtor's secured lender]").

11. The Second Lien Parties have a decision to make: either pursue relief from the stay to allow them to liquidate their collateral or allow the Debtors to do it for them without the added benefit of a $5 million monthly check from the Debtors' unencumbered cash. Largely at the behest of the Second Lien Parties, the Debtors chose to pursue an asset sale in lieu of filing a chapter 11 reorganization plan. *See Statement of Ad Hoc Group of Second Lienholders in Support of Debtors' Motion for Entry of an Order Extending the Exclusive Periods During Which Only the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 454] (noting that "the Ad Hoc Group and the Debtors share the view that the Debtors must proceed on a dual-track path" that would include a sale under section 363 of the Bankruptcy, and urging that "the Debtors should begin laying the groundwork for such a sale"). As previewed in the Debtors' business plan that was presented to the Committee in September, a reorganization plan might have provided an expeditious, value-maximizing path towards emergence. However, the Second Lien Parties have made clear that a sale of the Debtors' assets, rather than a reorganization, is their preferred path forward. If this is what the Second Lien Parties want, then their adequate protection must be that the Debtors are seeking to sell their collateral in a going-concern sale as opposed to the forced liquidation that the Second Lien Parties could pursue if they were to obtain relief from the stay.

**B. The Monthly Funds Sweep into the U.S. Operating Account is No Longer Necessary and Should Not Be Approved**

12. The Debtors' most recent cash projections show that, as of the date hereof, the Debtors expect to have more than $95 million in the U.S. Operating Account. Nevertheless, the Amended Final Order authorizes the Debtors to transfer no less than $7.5 million each month from their investment account into the U.S. Operating Account beginning January 1, 2016. *See* Amended Final Order at ¶ 6(b). If this Court approves the continued cash sweep, the Debtors' investment account—which had a balance of $167.5 million at the Petition Date—will be nearly empty by April

30, 2016.[7] At the Debtors' current burn rate, the Debtors have ample liquidity in the U.S. Operating Account to fund these cases until any likely emergence date—especially if the Second Lien Parties do not receive monthly adequate protection payments going forward. There is no reason to continue this procedure.

13. The Debtors have acknowledged that the funds borrowed under the U.S. credit facility at the outset of these cases and deposited into the investment account are unencumbered. *See, e.g.*, *Declaration of Vanessa Gomez Lagatta in Support of First Day Pleadings* [Docket No. 19] at ¶ 28. Acceding to the Second Lien Parties' demand that unencumbered cash must continue to be deposited monthly into the U.S. Operating Account—where it might be comingled with cash collateral—only serves to bootstrap the Second Lien Parties' misguided argument that their liens and security interests somehow extend to all of the Debtors' cash. Again, given that the Debtors have more than enough liquidity in the U.S. Operating Account to fund operations, there is no justification for the proposed $7.5 million monthly cash sweep and it should not be approved.

## RESERVATION OF RIGHTS

14. The Committee expressly reserves all rights, claims, arguments, defenses, and remedies with respect to the Motion or any other issue in these chapter 11 cases, and to supplement, modify and amend this Objection, to seek discovery, and to raise additional objections in writing or orally at the final hearing on the Motion.

[7] Approximately $2.5 million would remain in the investment account following the April 1, 2016 cash sweep.

WHEREFORE, for the foregoing reasons, the Committee respectfully requests that this Court (a) deny the Motion absent the proposed modifications described herein, and (b) grant such other and further relief as this Court deems just and proper.

Dated: December 8, 2015
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ Joseph Wright

Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Joseph D. Wright (No. 5669)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: cobb@lrclaw.com
mcguire@lrclaw.com
wright@lrclaw.com

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg
Elizabeth R. McColm
Jacqueline P. Rubin
Adam M. Denhoff
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
E-mail: arosenberg@paulweiss.com
emccolm@paulweiss.com
jrubin@paulweiss.com
adenhoff@paulweiss.com

*Counsel to the Official Committee of Unsecured Creditors*