**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| QUIKSILVER, INC., *et al.*, | : | Case No. 15-11880 (BLS) |
|  | : |  |
| Reorganized Debtors.[1] | : | Jointly Administered |
|  | : |  |
|  | : | **Hrg. Date: April 28, 2016 at 11:00 a.m. (Eastern)** |
|  | : | **Related Docket No.: 883** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OBJECTION OF THE REORGANIZED DEBTORS TO APPLICATION OF CERTAIN
UNSECURED NOTEHOLDERS PURSUANT TO 11 U.S.C. §§ 503(b)(3) AND 503(b)(4)
FOR ALLOWANCE OF FEES AND EXPENSES INCURRED IN MAKING A
SUBSTANTIAL CONTRIBUTION AS AN ADMINISTRATIVE EXPENSE CLAIM**

Quiksilver, Inc. ("ZQK") and certain of its affiliates, the reorganized debtors in

the above-captioned cases (collectively, the "Reorganized Debtors" and, together with their non-

Debtor affiliates, "Quiksilver" or the "Company"), by and through their undersigned counsel,

hereby submit this objection (the "Objection") to the Application of Certain Unsecured

Noteholders Pursuant to 11 U.S.C. §§ 503(b)(3) and 503(b)(4) for Allowance of Fees and

Expenses Incurred in Making a Substantial Contribution as an Administrative Expense Claim

[Docket No. 883] (the "Application").[2]  In support of this Objection, the Reorganized Debtors,

by and through their undersigned counsel, respectfully represent as follows:

**PRELIMINARY STATEMENT**

1.    By the Application, Brigade Capital Management, LP and CVI Opportunities

---

[1]    The Reorganized Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), Q.S. Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

[2]    Capitalized terms not otherwise defined herein have the meanings ascribed thereto in the Application.

Fund I, LLLP (collectively, the "Brigade Noteholders") seek allowance of an administrative expense claim (the "Substantial Contribution Claim") for reimbursement of fees and expenses incurred by their counsel in connection with (a) the proposed Alternative DIP Facility and (b) preparation of the Application, with such fees and expenses totaling in excess of $110,000.

2.      The Brigade Noteholders' Application rests on a single flawed assumption: that a mere proposal for a DIP facility (the "Alternative DIP Proposal") led to increased creditor recoveries under the Plan (as defined below) ultimately confirmed by this Court and consummated by the Reorganized Debtors.  However, as this Court is well aware, the recoveries available to various stakeholders under the Plan were determined following an inevitable valuation dispute, over two months of intense and protracted negotiation and mediation between the various stakeholders, supported by an intensive discovery process.

3.      During the trial at which the Alternative DIP Proposal was offered, the Reorganized Debtors offered proof that (a) the Alternative DIP Proposal was not viable because it risked the very value that the Brigade Noteholders contend they hoped to preserve: the value of the Reorganized Debtors' offshore subsidiaries, and (b) the Committee's financial advisor had never communicated with the Brigade Noteholders.  There is nothing in the record that confirms that any estate fiduciary requested the participation of the Brigade Noteholders.  To the contrary, they are nothing more than officious intermeddlers, and the record does not support their attenuated leap of logic to support a substantial contribution claim under sections 503(b)(3) and 503(b)(4) of the Bankruptcy Code.  Accordingly, the Brigade Noteholders have failed to meet the high standard applied in this District to requests for allowance of administrative claims based upon a purported substantial contribution.

**BACKGROUND**

4.      On September 9, 2015 (the "Petition Date"), the Reorganized Debtors each

commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code

(collectively, the "Chapter 11 Cases").  These Chapter 11 Cases are jointly administered.

5.      On September 22, 2015, the Office of the United States Trustee for the District of

Delaware (the "United States Trustee") appointed an official committee of unsecured creditors

(the "Creditors' Committee").  On September 28, 2015, the United States Trustee filed an

Amended Notice of Appointment of Creditors' Committee.  No trustee or examiner has been

appointed in these Chapter 11 Cases.

6.      On October 14 and 15, 2015, this Court held a two-day evidentiary hearing (the

"DIP Hearing") to consider the approval of the Oaktree DIP Facility.  Prior to the hearing and

without any solicitation from the Reorganized Debtors, the Brigade Noteholders had proffered

the Alternative DIP Proposal.  Without adopting the Application's characterization of the

competing DIP proposals, the key difference between the proposals, as the Court acknowledged

and as the Application utterly fails to address, was the comprehensive reorganization strategy

embodied in the Oaktree DIP Facility.  After evaluation of the Alternative DIP Proposal,

Quiksilver determined, in an exercise of its business judgment, to seek approval of the Oaktree

DIP Facility primarily because the Reorganized Debtors had developed a viable reorganization

plan that depended upon its foreign subsidiaries remaining going concerns, and the Alternative

DIP Proposal put the foreign subsidiaries in jeopardy of cross-default and liquidation, thereby

risking the entire reorganization.

7.      During the course of the DIP Hearing, both Oaktree and the Noteholders

improved the terms of the Oaktree DIP Facility and the Alternative DIP Proposal, respectively.

At the conclusion of the DIP Hearing, the Court approved the Oaktree DIP Facility and the

related PSA, noting that the Reorganized Debtors' "decision process … embraces a

reorganization strategy with a measure of certainty, or at least, less risk than that attendant to the [Alternative DIP Proposal]." Hr'g Tr., Oct. 15, 2015, 139:11-15.  The Court found that the Oaktree DIP Proposal "funds a plan process, avoids a likely priming fight, and avoids uncertainties that are associated with the competing proposal." Id., 143:7-10.

8.      On October 13, 2015, the Reorganized Debtors filed that certain Joint Plan of Reorganization of Quiksilver, Inc., and Its Affiliated Debtors and Debtors in Possession (as subsequently amended, supplemented, and restated from time to time, and including all exhibits, schedules, and related documents, the "Plan").  The initial Plan, filed on October 13, 2015, proposed a total cash distribution to unsecured creditors of $7.5 million.  Plan, Docket No. 292. A subsequent amendment to the Plan raised the proposed cash distribution to unsecured creditors to $12.5 million.  Second Amended Disclosure Statement, Docket No. 533, Dec. 4, 2015.

9.      From December 2015 through January 2016, the Reorganized Debtors, the Committee, and Oaktree engaged in a lengthy and extensive discovery process regarding confirmation of the Plan.  See Scheduling Order, Docket No. 576, Dec. 17, 2015.  The discovery process included production of voluminous documents by all parties, production of expert reports regarding the Company's enterprise value by each parties' expert witnesses, multiple depositions of fact witnesses, and a mediation in New York City.

10.     The parties ultimately reached a settlement prior to the Confirmation Hearing which offered $14 million in total cash consideration to unsecured creditors, as well as a $500,000 stock transaction fee[3] to the unsecured noteholders, including the Noteholders.  On

---

[3]     The Application incorrectly states that "The settlement of the Valuation Dispute between the Committee and Oaktree resulted in an increase in the distributions to unsecured creditors by an additional $2.5 million."  In fact, the settlement of the Committee's Plan objection and the outcome of the intensive mediation and negotiation process undertaken by the Reorganized Debtors, the Committee, and Oaktree increased the distributions to unsecured creditors by $1.5 million.  An additional $500,000 was provided solely to unsecured noteholders in the form of a stock transaction fee, which was funded by the Debtors' and the Committee's

January 28, 2016, the Court conducted a hearing to confirm the Plan (the "Confirmation

Hearing"), and on January 29, 2016, the Court entered its findings of fact and conclusions of law

confirming the Plan [Docket No. 740].  Other than the submission of the Alternative DIP

Proposal, there is nothing in the record to suggest or confirm (and the Reorganized Debtors are

unaware) that the Brigade Noteholders had any participation in the plan process whatsoever.

**OBJECTION**

A.    The Brigade Noteholders Fail to Establish a Causal Connection Between the Alternative
      DIP Proposal and the Confirmed Plan of Reorganization

11.    Although the Brigade Noteholders correctly identify the standard applicable in

this jurisdiction for substantial contribution claims, they proceed to misapply that standard to the

unsupported assertions and speculation proffered in the Application.  Payment of an

administrative expense under section 503 of the Bankruptcy Code may be sought in connection

with professional services pursuant to section 503(b)(4), so long as the professional services

were allowable under section 503(b)(3)(A) through (E).  The burden rests with the Brigade

Noteholders to prove by a preponderance of the evidence that they have made a substantial

contribution to these Chapter 11 Cases.  See In re RS Legacy Corp., 2016 WL 1084400, *3

(Bankr. D. Del. 2016).

12.    As this Court has previously stated, the goal of section 503(b)(3)(D) is to "balance

two objectives: encouraging meaningful creditor participation in the chapter 11 process while

keeping administrative expenses to a minimum to enhance creditor recoveries."   Id.  The movant

should demonstrate that its services "foster[ed] and enhance[d] the progress" of the bankruptcy

case.  RS Legacy Corp., 2016 WL 1084400 at *6.  Furthermore, the movant must "show a

_____

*(cont'd from previous page)*
    professionals.

'causal connection' between the service and the contribution." In re Granite Partners, L.P., 213

B.R. 440, 447 (Bankr. S.D.N.Y. 1997). It is insufficient to "reason[] from sequence to

consequence, assuming a causal connection simply because one event follows another," as such

a reasoning "is speculation and not proof." Id. at 452.

13.     As noted above, the Brigade Noteholders did not participate in any part of the

negotiations and mediation among the Reorganized Debtors, Oaktree, the Committee, and others.

In fact, the time entries submitted in conjunction with the Application clearly demonstrate that

the Brigade Noteholders are not seeking reimbursement for any fees or expenses between

October 16, 2015 and February 3, 2016—the very period during which the various stakeholders

were formulating the Plan, engaging in intensive negotiation discussions, undertaking extensive

discovery, participating in mediation, and ultimately reaching a compromise.

14.     Accordingly, the supposed connection proffered by the Brigade Noteholders

between the Alternative DIP Proposal and the increase in unsecured creditor recoveries is a

prime example of "reason[ing] from sequence to consequence." The Brigade Noteholders

merely speculate that:

> [the] limitation on the Oaktree DIP Liens on the Unencumbered Foreign Stock
> later forced Oaktree to prove that its collateral had diminished in value, leading to
> the Valuation Dispute. The Valuation Dispute then allowed the Committee to use
> its enhanced negotiation position to obtain further concessions from Oaktree and
> significantly increase the recovery under the Confirmed Plan for unsecured
> creditors.

Application, ¶ 30. The Brigade Noteholders proffer no evidence in support of their conjectures.

The Brigade Noteholders did not serve on the Committee, nor were they involved in the

mediation and the ongoing settlement negotiations between the Committee and the Reorganized

Debtors. Any statement by the Brigade Noteholders as to the Committee's "negotiation

position" and how the Committee allegedly "obtain[ed] further concessions from Oaktree" is

6

pure invention—the Brigade Noteholders were simply not privy to any of these conversations.

15.     In fact, the negotiations among the various stakeholders in December and January were complex and multifaceted.  The Committee's objection to the Plan (the "Plan Objection") lists numerous discrete arguments as to why the Plan should not have been confirmed by this Court.  See Notice of Filing of Unredacted Objection of the Official Committee of Unsecured Creditors to Second Amended Joint Chapter 11 Plan of Reorganization of Quiksilver, Inc. and its Affiliated Debtors and Debtors in Possession [Docket No. 732].  Many of the objections raised by the Committee address issues, including valuation issues, other than the Valuation Dispute, which the Brigade Noteholders assert was so central to the ongoing negotiations.

16.     The frailty of the Brigade Noteholders' causation theory is amply demonstrated with an evaluation of what would have occurred absent the proffer of the Alternative DIP Proposal.  Absent the Alternative DIP Proposal, would recovery to the unsecured creditors have increased beyond the $7.5 million set forth in the initial Plan?  The Committee certainly had a similar agenda, working diligently from the very start of the case to enhance recoveries available to unsecured creditors.  In fact, on October 6, 2015 (the day before the Alternative DIP Proposal was proffered), counsel for the Committee, in its first appearance before this Court, stated that "the Committee has significant issues with a number of things in the DIP and a number of things with respect to the motion to approve the plan support agreement," and also informed the Court that the Committee "ha[s] been talking to the company getting due diligence, discovery."  Hr'g Tr., Oct. 6, 2015, 8:16-21.  It is illogical to assume that the Committee would not have pursued every available avenue to increase recoveries to unsecured creditors, including pursuing the Valuation Dispute, absent the Alternative DIP Proposal.

17.     Like the unsuccessful movant in RS Legacy, the Brigade Noteholders here are

"operat[ing] under the false assumption that a causal connection exists because [their] involvement" was followed by an increase in recoveries to unsecured creditors. <u>RS Legacy Corp.</u>, 2016 WL 1084400 at *5. To paraphrase this Court's observations in <u>RS Legacy</u>, merely because the Brigade Noteholders' participation was followed eventually by an increase in recovery to unsecured creditors does not mean that the Alternative DIP Proposal caused the increase. The Brigade Noteholders have failed to show otherwise.

B.    <u>The Brigade Noteholders' Purported "Key Role" is Insufficient to Support a Substantial Contribution Claim</u>

18.    Even assuming that the Brigade Noteholders' proffer of the Alternative DIP Proposal was "a linchpin to unlocking value" in these Chapter 11 Cases, courts have indicated that contributing to "progress" or playing a "key role" in a reorganization is insufficient to sustain a substantial contribution claim. <u>Columbia Gas Sys., Inc.</u>, 224 B.R. 540, 548 (Bankr. D. Del. 1998) (denying a substantial contribution claim where the applicants "assert their activities promoted the progress of [the] reorganization through the key role they performed," including "[participation] with others during one of many phases within one reorganizational matter that was eventually resolved, and [assistance] in the resolution of that matter").

19.    The Brigade Noteholders' reliance on the purported factual similarities to <u>In re FF Holdings Corp.</u> does not save the flawed Application. The applicant in <u>FF Holdings</u> not only arranged for proposed alternative financing, but also induced an indenture trustee to withdraw "the most substantial objection to the Plan," which the Court found "saved [the estate] the expense of a hearing and … avoid[ed] the potential losses that could have resulted from a delay in the plan's confirmation." <u>FF Holdings</u>, 343 B.R. 84, 86, 87 (D. Del. 2006). Ultimately the court in <u>FF Holdings</u> awarded the applicant an administrative expense claim and found that the applicant "conferred a substantial benefit on the estate and the creditors of the estate as a result

8

of its efforts to find an alternative DIP financing source for the Debtor *and its efforts to persuade First Bank to withdraw its objection to the plan*." Id. at 87 (emphasis added).

20.      The Brigade Noteholders had no role in the negotiations leading to the confirmation of the Plan, and their purported "key role" in these Chapter 11 Cases was restricted to the DIP Hearing.  Although the Brigade Noteholders make much of the supposed ripple effect initiating from the Alternative DIP Proposal, the uncontroverted facts show that the Brigade Noteholders did not actively participate in any of the negotiations surrounding the Plan, did not file an objection to the Plan, and did not serve on the Committee or provide assistance or support at the request of the Committee.  The Brigade Noteholders' attempts to develop a connection between the Alternative DIP Proposal and the Plan are unsupported by the record.

C.      The Brigade Noteholders Proffered the Alternative DIP Proposal Voluntarily, Absent Any Expectation of Reimbursement from the Estate

21.      The Brigade Noteholders assert that "Delaware bankruptcy courts have found [motives transcending self-interest] where the party seeking reimbursement took the actions providing a benefit to the estate at the request of an estate representative."  Application, ¶ 33. While the Application contains a conclusory assertion that counsel for the Brigade Noteholders took actions "at the request of the Committee," the specific factual allegations fall far short of such conclusion, noting merely that the Brigade Noteholders' counsel acted "[w]ith the support of the Committee," "at the encouragement of the Committee," and further that "the Committee strongly encouraged the Applicants to expend the efforts to develop, propose, and negotiate the Alternative DIP Facility."  Id., ¶¶ 2, 3, 12, 34.  Setting aside the fact that the Committee is arguably not a representative of the Reorganized Debtors' estate, there is no evidence that the Committee requested that the Brigade Noteholders provide the Alternative DIP Proposal, undermining the Brigade Noteholders' own contradictory assertions on this point.  This is

particularly true when the testimony of the Committee's investment banker is considered: "[the Brigade Noteholders] on their own without solicitation on my part, put forth a [DIP financing] proposal." Hr'g Tr., Oct. 15, 2015, 40:24-25.

22.     The Brigade Noteholders' reliance on Columbia Gas is inapposite.  First, the court in Columbia Gas did deny a substantial contribution claim request from a party whose assistance was requested by the debtor in formulating a global settlement, finding that even though the debtor requested such party's involvement, that alone was not sufficient to transcend the party's "strong economic self-interest" in the settlement's terms.  Columbia Gas, 224 B.R. at 549. Second, the three public pension funds who were found to have provided substantial contributions to the debtors' reorganization performed substantial functions far in excess of the Brigade Noteholders' limited role in these Chapter 11 Cases.  Id. at 554 (noting that the public pension funds "actively participated on the equity security committee, the negotiating subcommittee, and the corporate governance subcommittee" and "took a leadership role in guiding the equity security committee, in formulating positions of the committee, and negotiating with other parties").  The Brigade Noteholders were not members of the Committee, nor does the Application even contend that the Brigade Noteholders took "a leadership role," or indeed any role, in the intensive negotiations which ultimately resulted in the Plan approved by the Court and consummated by the Reorganized Debtors.

23.     Finally, courts in this Circuit have also denied requests for reimbursement on a substantial contribution theory where the court found that the applicant would have taken the action "absent an expectation of reimbursement from the estate," even if the applicant's actions "had a beneficial effect on the estates."  In re Tropicana Entm't LLC, 2010 WL 3522332, at *2, *3 (D. Del. Sept. 2, 2010), aff'd, 498 F. App'x 150 (3d Cir. 2012).  As the Third Circuit has

previously stated, the substantial contribution test "should be applied in a manner that excludes reimbursement in connection with activities of creditors… which are designed primarily to serve their own interests and which, accordingly, would have been undertaken *absent an expectation of reimbursement from the estate*." Lebron v. Mechem Fin., Inc., 27 F.3d 937, 944 (3d Cir. 1994). A court "may properly consider whether an applicant has an expectation of reimbursement from the estate to determine whether the applicant acted to serve its own interests." Id.

24.     Here, the Reorganized Debtors dispute the Brigade Noteholders' contentions that the mere existence of the Alternative DIP Proposal led to increased recoveries for unsecured creditors.  However, even if the Brigade Noteholders were correct, and the availability of the Alternative DIP Proposal did have a beneficial effect on the estates in these Chapter 11 Cases, the Brigade Noteholders have failed to show that their motives "transcended [their] own interests" and that they would not have offered the Alternative DIP Proposal absent an expectation of reimbursement from the estates.  Tropicana Entm't, 2010 WL at *3.

D.      The Brigade Noteholders Fail to Present Any Evidence In Support of the Application

25.     As noted above, the Brigade Noteholders must prove their substantial contribution claim "by a preponderance of the evidence." RS Legacy Corp., 2016 WL at *3.  This Court has previously noted that a claimant must "offer something more than self-serving statements regarding its involvement in the case." Id. at *4 (internal quotes omitted) (citing In re Worldwide Direct, Inc., 334 B.R. 112, 123 (Bankr. D. Del. 2005)).  "Corroborating testimony by a disinterested party attesting to a claimant's instrumental acts has proven to be a decisive factor in awarding compensation for activities which otherwise might not constitute a 'substantial contribution.'" Worldwide Direct, 334 B.R. at 123 (citing In re Buckhead America Corp., 161 B.R. 11, 15 (Bankr. D. Del. 1993)).

26.     Here, the Brigade Noteholders have not submitted any affidavits, depositions, or

other evidentiary support of the type upon which courts typically rely to evaluate a substantial contribution claim.  Worldwide Direct, 334 B.R. at 123.  Instead, the Brigade Noteholders rely upon "self-serving statements," a record devoid of any evidence supporting the causation link that the Brigade Noteholders seek to establish, and a sequential chain of events which likewise fails to support the Brigade Noteholders' theory of causation.  In fact, as repeatedly demonstrated above, the Brigade Noteholders rely on pure speculation and confuse sequence with consequence, proffering suggestions and chronology instead of evidence and testimony.  The Application clearly falls far short of the evidentiary standard that the Brigade Noteholders are required to meet.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

## CONCLUSION

WHEREFORE, the Reorganized Debtors respectfully request that this Court deny the Application and the relief requested therein.

Dated:    Wilmington, Delaware
          April 11, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/    Van C. Durrer, II*
Van C. Durrer, II (I.D. No. 3827)
Annie Li
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

- and -

Mark S. Chehi, Esq. (I.D. No. 2855)
Dain A. De Souza (I.D. No. 5737)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

John K. Lyons
Jessica Kumar
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Reorganized Debtors*

13