## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| QUIKSILVER, INC., *et al.*,[1] | ) Case No. 15-11880 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

### DECLARATION OF JOSHUA ABRAMSON IN SUPPORT OF THE APPLICATION OF CERTAIN UNSECURED NOTEHOLDERS PURSUANT TO 11 U.S.C. §§ 503(b)(3) AND 503(b)(4) FOR ALLOWANCE OF FEES AND EXPENSES INCURRED IN MAKING A SUBSTANTIAL CONTRIBUTION AS AN ADMINISTRATIVE EXPENSE CLAIM

I, Joshua Abramson, hereby declare as follows:

1.      I am a Vice President in the Restructuring and Special Situations Group at PJT Partners ("PJT"), an investment banking firm listed on the New York Stock Exchange that maintains offices at 280 Park Avenue, New York, New York, 10017.  PJT was the investment banker for the Official Committee of Unsecured Creditors (together with its advisors, the "Committee").

2.      I submit this declaration (the "Declaration") in support of the *Application of Certain Unsecured Noteholders Pursuant to 11 U.S.C. §§ 503(b)(3) and 503(b)(4) for Allowance of Fees and Expenses Incurred in Making a Substantial Contribution as an Administrative Expense Claim*, Mar. 11, 2016, ECF No. 883 (the "Application") and *Reply to Objection of the Reorganized Debtors to Application of Certain Unsecured Noteholders Pursuant to 11 U.S.C.*

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Quiksilver, Inc. (9426), QS Wholesale, Inc. (8795), DC Direct, Inc. (8364), DC Shoes, Inc. (0965), Fidra, Inc. (8945), Hawk Designs, Inc. (1121), Mt. Waimea, Inc. (5846), QS Optics, Inc. (2493), QS Retail, Inc. (0505), Quiksilver Entertainment, Inc. (9667), and Quiksilver Wetsuits, Inc. (9599).  The address of the Debtors' corporate headquarters is 5600 Argosy Circle, Huntington Beach, California 92649.

*§§ 503(b)(3) and 503(b)(4) for Allowance of Fees and Expenses Incurred in Making a Substantial Contribution as an Administrative Expense Claim*, Apr. 25, 2016, ECF No. 973.[2]

3.      Except as otherwise stated in this Declaration, I have personal knowledge of or have relied upon the knowledge of others employed by PJT with respect to the matters set forth herein.  If called to testify, I could and would testify competently to the facts set forth herein.

4.      On the Petition Date, the Debtors sought approval for a postpetition financing facility (the "Oaktree DIP Facility") with Oaktree Capital Management, L.P. (together with its affiliates, "Oaktree") and closely-related plan sponsor agreement (the "PSA").  The Oaktree DIP Facility and PSA sought certain protections, including a lien on the Debtors' unencumbered equity in their foreign subsidiaries (the "Unencumbered Foreign Stock").

5.      The Committee believed that the Oaktree DIP Facility did not offer the best financing terms available to the Debtors, their creditors and their estates.  In particular, the Committee recognized the importance of ensuring that the Unencumbered Foreign Stock remain unencumbered so that value could be available for distribution to unsecured creditors.  Thus, the Committee sought to demonstrate, among other things, that a lien on the Unencumbered Foreign Stock was not necessary to obtain postpetition financing by identifying a lender willing to provide a DIP facility without such a lien.

6.      With the support of the Committee, Brigade Capital Management, LP ("Brigade"), as investment manager for certain holders of the 10.000% senior unsecured notes due August 1, 2020 (the "Unsecured Notes"), CVI Opportunities Fund I, LLLP, a holder of the Unsecured Notes (together with Brigade, the "Applicants"), and their counsel, Ropes & Gray LLP ("Ropes & Gray"), engaged in substantial efforts to develop and propose an alternative,

---

[2] Capitalized terms not otherwise defined herein have the meanings ascribed thereto in the Application.

fully-committed postpetition DIP facility (the "Alternative DIP Facility") in the same amount as the Oaktree DIP Facility, but with superior financial terms. The Alternative DIP Facility did not include a lien on the Unencumbered Foreign Stock and contained other terms and conditions that represented a substantial improvement over the Oaktree DIP Facility. Through Ropes & Gray, the Applicants submitted a binding commitment letter for the Alternative DIP Facility, then engaged primarily with the Committee to negotiate and meaningfully improve the terms of the Alternative DIP Facility, including a $43 million increase in the amount of committed funding available.[3]

7.     By developing, proposing, and negotiating the Alternative DIP Facility, the Applicants compelled material improvements to the Oaktree DIP Facility, including (i) eliminating Oaktree's $20 million break-up fee under the PSA, (ii) limiting Oaktree's lien on the Unencumbered Foreign Stock to the diminution in value of the prepetition collateral, (iii) extending the time available for the Debtors to market their assets to entities other than Oaktree, and (iv) removing the requirement for the lenders to provide their consent in order for the Debtors to make the last draw of $25 million in loan availability.

8.     These changes to the terms of the Oaktree DIP Facility – including the limitation of Oaktree's lien on the Unencumbered Foreign Stock – enabled the UCC to obtain an increase in recoveries for unsecured creditors (both trade creditors and bondholders), who received $7 million more in cash under the Confirmed Plan than the amount proposed in the PSA Plan, as well as 4.75% of the reorganized equity (valued at $10.5 million under the Debtors' valuation) under the Confirmed Plan that was not offered under the PSA Plan. In total, recovery to

---

[3] The $43 million increase consisted of $11 million for adequate protection payments, $15 million to pay down the Prepetition ABL Facility, and $17 million to pay for operating expenses to allow the Debtors to run a longer marketing process.

unsecured creditors increased 233% under the Confirmed Plan to $25.0 million as compared to $7.5 million under the PSA Plan.

9.      In conclusion, I believe that the Applicants' efforts resulted in direct and demonstrable benefits for the estate, including increased recoveries for all unsecured creditors.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  May 12, 2016

_____
Joshua Abramson