UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
|  | . | Case No. 15-11880 (BLS) |
| QUIKSILVER, INC., et al, | . |  |
|  | . |  |
|  | . | Courtroom No. 1 |
|  | . | 824 Market Street |
| Reorganized Debtors. | . | Wilmington, Delaware 19801 |
|  | . |  |
| . . . . . . . . . . . . . . . . | . | Thursday, May 26, 2016 |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
CHIEF UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Reorganized
Debtors:                          Michael R. Seidl, Esq.
                                  PACHULSKI, STANG, ZIEHL
                                   & JONES, LLP
                                  919 North Market Street, 17th Floor
                                  Wilmington, Delaware 19899

                                  Van C. Durrer, II, Esq.
                                  SKADDEN, ARPS, SLATE, MEAGHER
                                   & FLOM, LLP
                                  300 South Grand Avenue, Suite 3400
                                  Los Angeles, California 90071


(Appearances Continued)


Audio Operator:                   Electronically Recorded
                                  by Leslie Murin, ECRO

Transcription Company:            Reliable
                                  1007 N. Orange Street
                                  Wilmington, Delaware 19801
                                  (302)654-8080
                                  Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES:    (Continued)

For the Official Committee
of Unsecured Creditors:          David B. Stratton, Esq.
                                 PEPPER HAMILTON, LLP
                                 Hercules Plaza, Suite 5100
                                 1313 Market Street
                                 Wilmington, Delaware 19899

                                 Meredith A. Lahaie, Esq.
                                 AKIN, GUMP, STRAUSS, HAUER
                                  & FELD, LLP
                                 One Bryant Park
                                 Bank of America Tower
                                 New York, New York 10036

For Brigade Capital
Management, et al:               Mark R. Somerstein, Esq.
                                 ROPES & GRAY, LLP
                                 1211 Avenue of the Americas
                                 New York, New York 10036

INDEX

|                                                                                                    | Page |
| -------------------------------------------------------------------------------------------------- | ---- |
| RESOLVED MATTERS                                                                                    | 4    |
| SUBSTANTIAL CONTRIBUTION MOTION<br>(Re:  Certain Unsecured Noteholders, Brigade, et al)            | 5    |
| Opening by Mr. Somerstein                                                                           | 7    |
| Argument by Mr. Somerstein                                                                          | 36   |
| Argument by Ms. Lahaie                                                                              | 40   |
| Argument by Mr. Durrer                                                                              | 43   |
| Further Argument by Mr. Somerstein                                                                  | 49   |
| Court Decision                                                                                      | 52   |

| WITNESS          | DIRECT | CROSS | REDIRECT | RECROSS |
| ---------------- | ------ | ----- | -------- | ------- |
| FOR THE MOVANTS  |        |       |          |         |
| JOSHUA ABRAMSON  | 16     | 19    |          |         |

| Exhibit   |                        | Ident. | Evid. |
| --------- | ---------------------- | ------ | ----- |
| Exhibit 1 | Abramson Declaration   | 15     | 17    |
| Exhibit 2 | Alternative DIP Proposal | 23   | 35    |

1          (Proceedings commence at 9:32 a.m.)

2          (Call to order of the Court)

3               THE COURT:  Please be seated.  Good morning.

4               MR. SEIDL:  Good morning.

5               THE COURT:  Good morning, Mr. Seidl.

6          My apologies to anyone for the inconvenience of moving

7     up the hearing time, but I wasn't certain whether the parties

8     were intending to proceed with witnesses or otherwise.  I had

9     matters on that I can't really juggle, so I figured I'd want to

10    give you as much time as I could.

11              Mr. Seidl, we -- let's proceed.

12              MR. SEIDL:  Good morning, Your Honor.

13              THE COURT:  Good morning.

14              MR. SEIDL:  For the record, Michael Seidl of Pachulski

15    Stang, on behalf of the reorganized debtors.

16              By way of update, with respect to Item 1, which is the

17    employees severance claim, that's still in the process of being

18    approved and documented.  And this point, I think it's a

19    question of the number of employees involved, and it seems to

20    me that the agreement in premise is still on track.

21              THE COURT:  Okay.

22              MR. SEIDL:  Item 2 is the objection to claims of

23    Clayton Blehm.  This matter is under certificate of no

24    objection.

25              THE COURT:  I think I've signed an order.

1          MR. SEIDL:  Okay.

2          THE COURT:  If you don't see the order by end of day

3     today, just give us a call, but I know I've seen the CNO, and I

4     think I've signed it already.

5          MR. SEIDL:  All right.  Well, then that is -- is that

6     also the case with respect to Item 3?

7          THE COURT:  Number 3, as well, yeah.

8          MR. SEIDL:  Okay.  All right.  Well, then, with the

9     resolution of those, that kind of completes my component of

10    this morning's hearing.

11         THE COURT:  Okay.

12         MR. SEIDL:  And I'll turn the podium over to the other

13    parties.

14         THE COURT:  Very good.  All right.  Mr. Somerstein,

15    good morning.  Good to see you.

16         MR. SOMERSTEIN:  Thank you, Your Honor.  Good morning.

17         THE COURT:  Can we talk, before we get to any of the

18    merits, what's the game plan?

19         MR. SOMERSTEIN:  That's one of the things --

20         THE COURT:  Oh, great.

21         MR. SOMERSTEIN:  -- I was going to get to, Your Honor.

22         THE COURT:  Terrific.

23         MR. SOMERSTEIN:  So, for the record, Mark Somerstein,

24    Ropes & Gray, for Brigade Capital Management and CVI

25    Opportunities Fund.  Your Honor will recall they were the

1    alternative DIP lenders, and are the movants today on the

2    substantial contribution application.

3            THE COURT:  I recall.

4            MR. SOMERSTEIN:  So my suggestion for manner of

5    proceeding, I would take like literally two minutes, maybe

6    three, to open.

7            THE COURT:  I'll give you five, if you want.

8            MR. SOMERSTEIN:  Thank you, Your Honor.

9        (Laughter)

10            MR. SOMERSTEIN:  Then Mr. Durrer would have an

11    opportunity to open, though he may not avail himself, but he'll

12    do as he chooses.

13            Then I would propose to offer the declaration of Mr.

14    Joshua Abramson --

15            THE COURT:  Okay.

16            MR. SOMERSTEIN:  -- the Vice President of PJT, the

17    financial advisor to the committee.  I was -- I think what I'll

18    do, Judge, is I --

19            THE COURT:  In lieu of direct?

20            MR. SOMERSTEIN:  Well, in lieu of direct, but I

21    actually would like to ask him maybe five minutes worth of

22    supplemental questions --

23            THE COURT:  That's fine.

24            MR. SOMERSTEIN:  -- but I'll be quick.

25            And then Mr. Durrer is going to cross, I'll do any

1    redirect.  And then I think we'll have pretty short closings

2    because I know Your Honor has reviewed the pleadings, you'll

3    hear the evidence, you're very familiar with the legal issue --

4              THE COURT:  With the law, yeah.

5              MR. SOMERSTEIN:  -- given the RadioShack decision.  So

6    we're ready to go.

7              THE COURT:  Okay.  Mr. Durrer, does that work for you?

8              MR. DURRER:  It does, Your Honor.

9              THE COURT:  Great.

10             MR. SOMERSTEIN:  So, Your Honor, let me start by

11   talking about what I think the record will show, and I'm

12   actually going to start with what I think it won't show.  It's

13   not going to show that we're here because a bunch of self-

14   interested hedge fund bondholders had some issues with the DIP

15   facility, and now want to get compensated for lobbying in some

16   sort of alternative proposal.

17             THE COURT:  Yeah.  Let me ask you a question.

18             MR. SOMERSTEIN:  Sure.

19             THE COURT:  Here's the issue from the Court's point of

20   view, dealing with these -- before I get to the merits of your

21   issue --

22             MR. SOMERSTEIN:  Uh-huh.

23             THE COURT:  -- and I'm sure you've talked and thought

24   about this a little bit.  And you've got particular facts that

25   you've alleged, and that Mr. Abramson is going to testify to,

1    so I'm not asking, generally, about this case.  The -- here's

2    the issue, if I were to say this is the question I have, and I

3    was going to tell my client -- my colleagues, this is what I

4    have in front of me:

5           Their point would be, I don't know what your facts

6    are, but every DIP gets presented, every DIP gets argued, every

7    DIP gets improved, either at -- during the first-day hearing,

8    or between the first and the final.  And we don't want to be in

9    the position where we're compensating people for that exercise.

10   And by definition, often, some of those players will not be

11   estate fiduciaries, like a committee or otherwise, that -- so,

12   theoretically, that's the issue.

13          So their point would be, Shannon, you need to make

14   sure that you keep well short of the slippery slope, whatever

15   analogy you want --

16          MR. SOMERSTEIN:  Uh-huh.

17          THE COURT:  -- edge of the abyss, that sort of thing.

18          MR. SOMERSTEIN:  Uh-huh.

19          THE COURT:  Walk me through that.

20          MR. SOMERSTEIN:  Yeah.

21          THE COURT:  And I guess what I would say is,

22   independent of your facts, how do I -- how do I kind of balance

23   those two considerations?  I know I got your facts, which you

24   will tell me are unusual.

25          MR. SOMERSTEIN:  Exactly.

1    THE COURT:  And it's not going to be a secret.  You

2    know?

3    MR. SOMERSTEIN:  Yeah.

4    THE COURT:  I mean, from my point of view, this case

5    was not typical.

6    MR. SOMERSTEIN:  Uh-huh.

7    THE COURT:  You know, I've had lots and lots of this

8    DIP fights, I've had issues about these -- I don't often have

9    somebody standing up and saying, all right, we'll improve it by

10   3 million, we'll improve it by 5 million, we'll get to that

11   stage.  So there's a qualitative difference.  How do I draw

12   that line?

13   MR. SOMERSTEIN:  Well --

14   THE COURT:  Is it based upon these facts?

15   MR. SOMERSTEIN:  I think it is based upon these facts,

16   Judge.  I think, here, because the ability of the alternative

17   DIP to persuade Your Honor that there was a realistic

18   alternative, that was critical to allowing that unencumbered

19   foreign equity to remain available for the plan and valuation

20   negotiation.  That was so critical to this case that I think

21   that is what really distinguishes it from the typical case that

22   Your Honor is justifiably concerned about.  So I do think that,

23   because there are unique facts, that's where you can draw the

24   line.

25   THE COURT:  Okay.  I understand.

1          MR. SOMERSTEIN:  So, Your Honor, just to return to the

2     brief opening -- but this is really the same point.

3          (Laughter)

4          MR. SOMERSTEIN:  You know, the evidence is going to

5     show --

6          THE COURT:  At least we're on the same page.

7          MR. SOMERSTEIN:  Right.  We are, Judge, we are.

8          Look, the evidence is going to show that my clients

9     initially committed, in the alternative DIP, to lend the

10    debtors $115 million, and actually, ultimately, committed to

11    lend 158 million, on what they and the creditors' committee

12    believed to be materially better loan terms than those proposed

13    in the Oaktree DIP.  And the record will also show that the

14    alternative DIP resulted in major improvements to the Oaktree

15    DIP.

16         The record is clear on this because, among other

17    things, Your Honor, the debtors admitted that they used the

18    alternative DIP against Oaktree as a stakeholders to improve the

19    Oaktree DIP.

20         And of course, Your Honor, I think even more

21    importantly, as I indicated in response to your question, the

22    record is also clear on this point because the Court called the

23    alternative DIP a serious proposal that materially improved

24    during the course of the hearing, and that provided a workable

25    alternative, if Oaktree failed to make the changes to the DIP

1    that the Court requires.  Your Honor used the prospect of

2    approval of the alternative DIP to force Oaktree to make

3    concessions.  And recall that you actually denied the Oaktree

4    DIP, subject to modifications.

5            The evidence is going to show, Your Honor, that one

6    key change that this Court required as a result of the

7    alternative DIP became critically important to materially

8    enhancing recoveries for all unsecured creditors in these

9    cases, and that was eliminating the direct lien on the

10   unencumbered foreign equity.

11           As Mr. Abramson will testify, Your Honor, eliminating

12   that direct lien on the unencumbered foreign equity preserved

13   unencumbered value that was critical in plan and valuation

14   negotiations between the committee, the debtors, and Oaktree

15   regarding unsecured creditor recoveries, and enabled unsecured

16   creditors in these cases to obtain 7 million more in cash than

17   would have been proposed in the Oaktree plan, and about 10.5

18   million in equity value for all unsecured creditors.  That's an

19   increase of 233 percent in recoveries, again, for unsecured

20   creditors, Your Honor, not just bondholders.

21           And I believe that that record, when you apply the

22   applicable case law, that's really all we need to show to

23   obtain the relief requested.  There is simply no question that

24   the alternative DIP and, in particular, preserving that

25   unencumbered foreign equity, the unencumbered nature of the

1    foreign equity, fostered and enhanced the progress of these

2    cases.

3            To use your words, one of the requirements that you

4    identified in your recent RadioShack substantial contribution

5    decision:

6                "-- and that the alternative DIP resulted in actual

7                and demonstrable benefit to the debtors' estates and

8                creditors, as required by the Third Circuit."

9            I think, Your Honor, with that, I don't know if Mr.

10   Durrer wants to open?

11           THE COURT:  Mr. Durrer?

12           MR. SOMERSTEIN:  Do you have any remarks?

13           THE COURT:  Good morning, sir.  Good to see you.

14           MR. DURRER:  Good morning, Your Honor.  Good to see

15   you.  Van Durrer, Skadden, Arps, Slate, Meagher & Flom, on

16   behalf of the reorganized Quiksilver.

17           THE COURT:  So --

18           MR. DURRER:  With me --

19           THE COURT:  -- Mr. Durrer, I would note that, when I

20   was coming in this morning, you were going through security and

21   observed that, because I've moved the hearing up, you hadn't

22   got your scrapple fix.

23       (Laughter)

24           MR. DURRER:  I was going to accept your apology for --

25           THE COURT:  Well, and I do apologize.

1          MR. DURRER:  -- not getting my scrapple.

2          THE COURT:  Because you've actually raised an

3    important point.  My clerk off to my right, the gentleman

4    behind you, to your left -- or to my left, and my other clerk,

5    have now spent a substantial time in Wilmington, and none of

6    them have tried scrapple.

7          MR. DURRER:  (Verbal indication)

8          THE COURT:  It is --

9          MR. DURRER:  It's a crime.

10          THE COURT:  The difficulty of the discussion is that

11    I've been asked to describe it, and that's really not the

12    point.

13      (Laughter)

14          THE COURT:  So I appreciate you raising it.  I would

15    observe that there are lots of places in town you can get it

16    for lunch, so, hopefully --

17          MR. DURRER:  I've heard the Greenery has a good

18    sandwich.

19          THE COURT:  Well, I would -- I, generally, go

20    generally with either Libby's or the Sterling, but I'll leave

21    that to you.  But yeah, these guys have to do it, they just

22    have to.

23          So all right.  Let's return to the merits.

24          MR. DURRER:  Yeah, I actually -- ah, I was actually

25    just going to point -- I was going to accept your apology and

1    point out that other people didn't quite get the memo, so --

2    but now we're all here, so I'm happy to --

3              MS. LAHAIE:  Apologies, Your Honor.

4              THE COURT:  Not a problem Ms. Lahaie.  Good to see

5    you.

6              MR. DURRER:  -- allow Mr. Somerstein --

7              UNIDENTIFIED:  Good to see you, too, Your Honor.

8              MR. DURRER:  -- to put on his witness.

9              THE COURT:  Okay.

10             MR. SOMERSTEIN:  Your Honor, the movants will call

11   Joshua Abramson.

12             THE COURT:  Sure.  Mr. Abramson, why don't you come on

13   up.  Let me ask -- come on up.  And Mr. Durrer, any objection

14   to introduction of -- you can come on up.  We'll swear the

15   witness in a moment.  Please remain standing.

16             Any objection to admission of the declaration?  You'll

17   have an opportunity to cross on that and whatever questions are

18   asked?

19             MR. DURRER:  Your Honor, the only -- I wouldn't want

20   Your Honor to interpret the objection as going to the heart of

21   the matter.  I believe that the objection is primarily factual,

22   in terms of leading the Court from the DIP financing to where

23   the case landed.

24             THE COURT:  Uh-huh.

25             MR. DURRER:  But as long as we're interpreting it in

1  that way, we have no objection.

2        THE COURT:  Does that work for you?

3        MR. SOMERSTEIN:  I'm happy to approach with a copy and

4  ask the witness to review it and indicate that it's his

5  declaration, and then have it admitted.  Would you like me to

6  go through that?

7        THE COURT:  That would be great.  Sure.

8        MR. SOMERSTEIN:  Okay.  Can I approach, Your Honor?

9        THE COURT:  Yeah.

10        MR. SOMERSTEIN:  So can (indiscernible)

11        THE COURT:  I have my copy.

12        MR. SOMERSTEIN:  Oh, you do?

13        THE COURT:  Yes.

14        MR. SOMERSTEIN:  Okay.  So I'm going to ask that this

15  be marked for ID as Movants' 1.

16        THE COURT:  Yep.

17        MR. SOMERSTEIN:  Can I approach the witness with it?

18        THE COURT:  Yeah.

19     (Abramson Declaration marked Exhibit 1 for identification)

20        THE COURT:  And I would note for the record this is

21  the declaration appearing at Docket Number 996.

22        Before we have the witness testify or affirm that it

23  is, in fact, his testimony, I would ask that we swear the

24  witness.

25        THE ECRO:  Please raise your right hand.

1    JOSHUA ABRAMSON, WITNESS FOR THE MOVANTS, SWORN.

2          THE ECRO:  Please state and spell your name for the

3    record.

4          THE WITNESS:  Joshua Abramson, J-o-s-h-u-a, the last

5    name is Abramson, A-b-r-a-m-s-o-n.

6          THE ECRO:  Thank you.

7          THE COURT:  Welcome, sir.  Have a seat.

8          THE WITNESS:  Thank you.

9                    DIRECT EXAMINATION

10   BY MR. SOMERSTEIN:

11   Q   Good morning, Mr. Abramson.

12   A   Good morning.

13   Q   You have in your hand your declaration.

14   A   Yes.

15   Q   Did you review that declaration, sir?

16   A   I did.

17   Q   And was it prepared at your direction?

18   A   Yes.

19   Q   Does it represent your testimony on the substantial

20   contribution motion?

21   A   It does.

22         MR. SOMERSTEIN:  Your Honor, with that, I'd offer the

23   declaration in evidence as the direct of Mr. Joshua Abramson,

24   Vice President of PJT --

25         THE COURT:  Okay.

1          MR. SOMERSTEIN:  -- the committee's FA.

2          THE ECRO:  Excuse me, Your Honor.  Can we get the

3    witness to push the mic down a little bit.

4          THE COURT:  Sir --

5          THE ECRO:  Thank you.

6          THE WITNESS:  I'm sorry.  I assume this better?

7          THE ECRO:  Yes, much better.  Thank you.

8          THE COURT:  That's better.

9          Okay.  Any objections to admission, subject to the

10   colloquy that we had moments ago?

11         MR. DURRER:  No, Your Honor.

12         THE COURT:  Very well.  The declaration is admitted.

13         MR. SOMERSTEIN:  Thank you, Your Honor.

14      (Exhibit 1 received in evidence)

15         THE COURT:  You may proceed.

16         MR. SOMERSTEIN:  And I'm going to ask just a very few

17   follow-up questions.

18         THE COURT:  Sure thing.

19   BY MR. SOMERSTEIN:

20   Q   Mr. Abramson, were you involved, on behalf of the

21   committee, in plan negotiations?

22   A   I was.

23   Q   Can you please describe those negotiations?

24   A   Sure.  Those negotiations took forth -- took place leading

25   up to a mediation, and then, ultimately, in a mediation.  Those

1  negotiations were primarily focused on, one, the value of the

2  unencumbered stock, the 35 percent of the foreign equity, as

3  well as any offset to that value for diminution in value and

4  administrative expense, administrative claims.

5  Q   How would you describe the nature of the committee's

6  leverage in those negotiations?

7  A   I think our leverage was that we believed there was a large

8  pocket of value in that unencumbered pool of assets, and that

9  we were entitled to our share of it, along with the secured

10  notes' deficiency claim.

11  Q   And in your opinion, as a person who was involved in those

12  negotiations, would -- what would have been the committee's

13  leverage, but for the foreign equity remaining unencumbered?

14  A   It would have been materially less.  I don't know that

15  there would have been any pool of assets for us to look to, to

16  recover from, so we would have to had to rely on a sales

17  process which didn't return a result in excess of the secured

18  notes claim, or since our expert report, Mike Genereux's expert

19  report didn't put value in excess of the secured notes on the

20  collateral, I don't think there would have been a pool of

21  assets for us to look at I.

22  Q   So is it fair to say that the unencumbered nature of that

23  stock was critically important to the committee in its

24  negotiations?

25  A   Yes.

1          MR. SOMERSTEIN:  I have no further questions on

2     direct, Your Honor.

3          THE COURT:  Okay.  Cross?

4          Actually, before we go to cross, does the committee

5     have any questions for the witness?  And that way, you can

6     cross on everything.

7          MS. LAHAIE:  Not yet, Your Honor.

8          THE COURT:  Good.  Thank you, Ms. Lahaie.

9          All right.  Mr. Durrer.

10          MR. DURRER:  May I approach the witness, Your Honor?

11          THE WITNESS:  Thank you.

12          MR. DURRER:  You're welcome.

13          Van Durrer on behalf of Reorganized Quiksilver, just

14     for the record.

15                         CROSS-EXAMINATION

16     BY MR. DURRER:

17     Q   Mr. Abramson, good morning.  Who is your employer?

18     A   PJT Partners.

19     Q   And what is "PJT Partners"?

20     A   PJT Partners is an investment bank that spun out of

21     Blackstone in October.

22     Q   And what are your duties -- what is your title at PJT?

23     A   I'm a Vice President.

24     Q   And what are your duties as Vice President?

25     A   I'm not sure I understand what you mean by "duties."

1    Q    What do you do at PJT?

2    A    I work on restructuring transactions and special situation

3    transactions, not dissimilar from (indiscernible)

4    Q    And how long have you been in that field?

5    A    Four years.

6    Q    Okay.  Now you understand when I use the term "DIP

7    financing," that I mean post-bankruptcy financing, approved by

8    the Court, correct?

9    A    Yes.

10   Q    Okay.  And you recall that Quiksilver obtained DIP

11   financing in this case from Oaktree at the conclusion of a two-

12   day contested hearing back in the fall of 2015, correct?

13   A    Yes.

14   Q    Okay.  And you were in attendance at that two-day trial.

15   A    I was.

16   Q    And I think you already testified you also participated in

17   a mediation amongst Quiksilver, Oaktree, and the committee with

18   Judge Drain in January of 2016.

19   A    That's right.

20   Q    In connection with your declaration, you agree with all the

21   contents of your declaration, correct?

22   A    I do.

23   Q    In Paragraph 6 of your declaration, if you wouldn't mind

24   referring to it --

25   A    I'm there.

1   Q   You state that Brigade engaged in efforts to develop a DIP

2   proposal, quote/unquote, "with the support of the committee,"

3   correct?

4   A   That's correct.

5   Q   But no one at PJT ever talked to Brigade, in connection

6   with the DIP proposal, correct?

7   A   That's not correct.

8   Q   Who at PJT talked to Brigade?

9   A   I believe Jamie Baird did.

10   Q   But you didn't.

11   A   I was present when Jamie did, but he led the conversation.

12   Q   Mike Genereux did not.

13   A   I don't believe he did.

14   Q   Mike Genereux is one of your colleagues at PJT that led

15   this engagement for the committee, correct?

16   A   I would say Jamie and Mike co-led it.

17   Q   Do you understand the term "unrestricted," as it pertains

18   to a holder of securities of a debtor?

19   A   I do.

20   Q   Can you explain to the Court what that term means?

21   A   They're not in possession of material, non-public

22   information, they haven't signed NDAs, which allows them to

23   trade in the securities.

24   Q   So they would be free -- if they're unrestricted, a

25   security holder would be free to trade.

Abramson - Cross

1    A    Subject to their internal procedures, I would -- yes.

2    Q    And in this particular situation, the two alternative

3    proposed DIP lenders had elected to remain unrestricted,

4    correct?

5    A    I believe that's right.  I believe -- and this is testing

6    my memory -- that they had actually sought to receive NDAs, and

7    didn't receive them, so I don't know that they "elected" to

8    stay unrestricted, but they did remain unrestricted.

9    Q    I think it was Mr. Genereux's testimony that they elected

10   to remain unrestricted.  Do you not recall that from the DIP

11   hearing?

12   A    I don't recall that specifically.

13   Q    Okay.

14   A    But what I was referring to is I remember, at one point

15   during the DIP -- DIP hearing, Mr. Savini was asked -- or I

16   believe stated that they had requested NDAs, and had not yet

17   received them.

18   Q    Now you allege that one of the advantages of the

19   alternative DIP proposal was that it afforded the debtors more

20   time to pursue an alternative sale transaction, correct?

21   A    I believe that was Mr. Genereux's testimony.

22   Q    Do you agree with that?

23   A    I do.

24        (Participants confer)

25            MR. DURRER:  Apologies, Your Honor.

1          THE COURT:  Sure.  Take your time.

2          MR. DURRER:  Here we go.

3      (Participants confer)

4          MR. DURRER:  May I approach the witness, Your Honor?

5          THE COURT:  Sure.

6          THE WITNESS:  Thank you.

7          THE COURT:  Thanks.

8          MR. DURRER:  (indiscernible) mark this 2?

9          THE COURT:  Sure.

10     (Alternative DIP Proposal marked Exhibit 2 for

11     identification)

12     BY MR. DURRER:

13     Q   Mr. Abramson, I'm showing you what's been marked as Exhibit

14     2 for identification.  Do you recognize that document?

15     A   I do.

16     Q   And can you tell the Court what it is?

17     A   I believe the alternative DIP lender's proposal.

18     Q   Now at the end of the marketing process in the Quiksilver

19     case, no other bids surfaced, correct?

20     A   That's correct.  Let me correct that.  I cannot recall if

21     bids surfaced that were -- I know no bid surfaced in excess of

22     the implied value of the Oaktree bid.  I can't recall if

23     anybody put forth a bid below that.  But for the purposes,

24     nothing beat the Oaktree bid.

25     Q   You recall that B of A was the agent on the debtors' ABL

1   revolver that was part of the DIP financing, correct?

2   A   I do.

3   Q   And again, just for the record, the debtors' DIP financing

4   involved an ABL revolving component and a term loan component,

5   correct?

6   A   Yes.

7   Q   And do you recall Mr. Genereux's testimony at the DIP

8   hearing that he didn't have any communications with B of A

9   regarding whether -- regarding their attitude towards the

10  alternative DIP proposal?

11  A   I -- I don't recall that, but I have no reason to believe

12  that's not true.

13  Q   Did you have any conversations with B of A regarding their

14  appetite to participate in the alternative DIP proposal?

15  A   Not that I recall.

16  Q   And it's true that the alternative DIP proposal

17  contemplates ABL -- I'm sorry -- B of A remaining in that

18  revolving component, correct?

19  A   Yeah.  My -- my recollection was that, during the DIP

20  hearing, the alternative DIP providers offered, in addition, in

21  the forty-three-million-dollar increase that Mr. Somerstein

22  spoke to, that included a fifteen-million-dollar offer that

23  would pay down the ABL DIP lenders to where they were

24  prepetition.

25  Q   Now are you familiar with the limited waivers that were in

Abramson - Cross

1    place immediately leading up to the bankruptcy, with respect to

2    the board riders notes?

3    A   I am.

4    Q   And you would agree with me that those waivers avoided a

5    cross-default by virtue of certain guarantors of the board

6    riders notes filing bankruptcy?

7    A   That's my understanding.

8    Q   And that preserved -- that waiver preserved the value of

9    the foreign subsidiary stock.

10   A   I'm not sure that's correct.

11   Q   Well, in the absence of a waiver, you would agree that the

12   holders of the board riders notes would have been entitled to

13   enforce remedies against the foreign subsidiaries, by virtue of

14   the U.S. bankruptcy.

15   A   I believe that's correct.  I believe it's also Mr.

16   Genereux's testimony, which I agree with, that it's very

17   unlikely they would have done that.

18   Q   And when Mr. Genereux testified to that effect, he

19   testified to that without the benefit of having spoken to any

20   holders of the board riders notes, correct?

21   A   Mr. Genereux did not speak with them.

22   Q   Okay.

23   A   I would say that I did speak with them.

24   Q   Under the alternative DIP proposal, which is Exhibit 2,

25   there's a condition precedent that the debtor obtain additional

1   waivers as a condition precedent to the effectiveness of the

2   alternative DIP proposal.  Is that correct?

3   A    I'd -- you'd have to point me to the language.

4   Q    Okay.  I can do -- I can help you with that.

5   A    I have no reason not to believe that, but ...

6   Q    Turn to Page 5 of the termsheet, which is Page 12, I think,

7   of the exhibit.

8   A    (Witness reviews exhibit)

9        Uh-huh.

10  Q    There's a section heading to the left, on the bottom of the

11  page, "Conditions Precedent to Initial Term Loans" --

12  A    Roman --

13  Q    -- and then --

14  A    -- Numeral III.

15  Q    Yes.

16  A    I agree.

17  Q    Okay.  Great.  And you -- so you agree with the statement I

18  put to you before.

19  A    I do now.

20  Q    Okay.  Thank you.

21       Now this -- the alternative DIP proposal wasn't documented,

22  correct?  Beyond this Exhibit 2.

23  A    I believe this is all I saw, but there was a lot of paper

24  going around at the time.

25  Q    Okay.  But it does state -- and I'll refer you to it.  It

1   states on the first page of the termsheet, Page 8 of Exhibit 2,

2   that:

3        "Except as otherwise stated herein" --

4        And I'm reading from the middle paragraph.

5        "-- the definitive documentation will be substantially

6        similar to the Oaktree deal."

7   Would you agree with that?

8   A   It says that, yes.

9   Q   Okay.  Now, if you refer to Schedule 2, to the commitment

10  letter, this is on Page 6 of the Exhibit 2, there's quite a few

11  entities listed there with respect to their portion of the DIP

12  commitment.  Am I understanding that right?

13  A   Yep.

14  Q   Okay.  And in order to arrive at definitive documentation,

15  the debtors would need to take the Oaktree documentation, and

16  then negotiate appropriate adjustments to it with both -- well,

17  I'll just ask singly -- with Brigade, correct?

18  A   Yes.

19  Q   And presumably, also with CVI Opportunities Fund.

20  A   Yes.

21  Q   And then, going down the list, it appears that there are

22  multiple entities for Brigade on the Schedule 2 of Exhibit 2?

23  A   I believe these are funds -- yes, I believe these are funds

24  within the larger Brigade --

25  Q   Right.

1    A    -- asset management entity.

2    Q    So that wouldn't be an additional party, those multiple

3    Brigade entities; it would all be under the Brigade umbrella.

4    Is that fair?

5    A    That's my understanding.

6    Q    Okay.  However, the CitiGroup Pension Fund, for example,

7    that would be an additional party.

8    A    I would assume so.

9    Q    FedEx Corporation, the employees pension trust would

10   probably be a different party.

11   A    You know, I -- I don't know whether these entities have

12   kind of given a proxy, if you will, to Brigade for this or not,

13   so I'm just not sure.

14   Q    Okay.  So they -- they may or -- you know, so, to the

15   extent that JPMorgan, LA County, Coca-Cola, they may or may not

16   have given their proxy to Brigade and CVI.

17   A    It's possible.

18   Q    But it's also possible that the debtor would have had a

19   multi-party negotiation of DIP documents.

20   A    That's also possible.  Nothing was raised at the time to

21   suggest that; it seemed like we were negotiating with two

22   parties, being Brigade and CVI.

23   Q    Now Exhibit 2 also expired as of close of business on

24   October 16, correct?

25   A    I don't recall.

1   Q   Do you recall when the DIP hearing was?

2   A   (No verbal response)

3   Q   I didn't.

4   A   The exact date?  No.  I would assume very early October or

5   late September.

6        MR. DURRER:  It was actually -- it's -- I think the

7   Court can take judicial notice, it was October 14 and 15.

8        THE COURT:  Yep.  Okay.

9   BY MR. DURRER:

10  Q   Now are you familiar with the term "priming DIP"?

11  A   I am.

12  Q   And can you describe for the Court your understanding of

13  what a "priming DIP" is?

14  A   It would be a DIP that would come in senior to existing

15  secured debt, and by "senior," I mean senior in the waterfall.

16  Q   And you've -- in your career, you've never seen that done

17  on a contested basis, correct?

18  A   I --

19  Q   Seen it approved.

20  A   On cases that I've worked on?

21  Q   Yes.

22  A   I've never.

23  Q   Have you seen it on cases that you've been aware of, but

24  not personally worked on?

25  A   Off the top of my head, I can't name a case, but I'm sure

1    that it -- in the industry, in reading cases, I've --

2              THE COURT:  I'm sorry.  Mr. Durrer, I apologize.  I

3    missed part of the lead-up question leading into this.  The

4    question you're asking him is:  Has he seen -- is it non-

5    consensual priming?

6              MR. DURRER:  Non-consensual priming.

7              THE COURT:  The white whale of bankruptcy.

8              MR. DURRER:  Sorry?

9              THE COURT:  The white whale of bankruptcy.

10             MR. DURRER:  The unicorn, yes.  I have seen it.  I

11   have, in my career.

12             THE COURT:  Me, too.

13             MR. DURRER:  But our hair is a little different color

14   than Mr. Abramson's.

15             THE COURT:  He's got more of it, anyway.

16        (Laughter)

17             MR. DURRER:  All the bankers in this case had good

18   hair on the committee side.  Well, with one exception.

19             THE COURT:  You and I, Mr. Durrer, we made career

20   decisions that weren't our best bets.

21   BY MR. DURRER:

22   Q   Exhibit 2 contemplated a non-consensual priming DIP,

23   correct?

24   A   Yes.

25   Q   I want to ask you a few questions about the mediation.

1      MR. DURRER:  And just for clarity, Your Honor, I don't

2   think we're violating any mediation privilege here because this

3   controversy doesn't involve the dispute that was mediated and

4   settled.

5      THE COURT:  And I mean, I'll ask you to manage that

6   process; I don't have an issue with it, though, so long as the

7   other parties don't have a concern.  If you need to make an

8   offer of proof or discuss it with Mr. Somerstein, that's fine,

9   but I'll trust your judgment at this point.

10     MR. DURRER:  Yeah, I don't think so.  And it certainly

11  doesn't reveal any of Judge Drain's secret sauce, which I want

12  to steer far clear of.

13     THE COURT:  Fair enough.

14  BY MR. DURRER:

15  Q   Now, if I recall correctly, a confirmation trial was set

16  for January 27, 28, and 29; the last week of January.  Does

17  that sound right?

18  A   It sounds right.

19  Q   And the mediation was conducted in New York, in the days --

20  probably the prior week and day -- and/or days leading up to

21  that trial.

22  A   It may have been a couple of weeks, but yes.

23  Q   Okay.  And originally, there were depositions set for the

24  immediately prior week -- I think Mr. Savini and Mr. Genereux -

25  - that were postponed.  Do you remember that?

Abramson - Cross

1    A    I know that Mike was -- Mr. Genereux was deposed at some

2    point in the case.  I can't remember if he was deposed on his

3    valuation report, so I don't -- I don't recall.

4    Q    Okay.

5    A    I have no reason to believe it's not true.

6    Q    Okay.  Well, did there come a time when the parties thought

7    they had a deal, but apparently, there was a last-minute

8    impasse or miss?  Do you recall that?

9    A    I think walking out of mediation, there was no deal;

10   mediation continued, a deal was struck.  Like many deals, as

11   you document it and you get into the details, there were little

12   nuances to work through.  I don't think the deal fell apart, as

13   much as it -- we had to work through issues, which, ultimately,

14   were worked through.

15   Q    Well, do you recall that a dispute arose after the parties

16   thought they had a deal, involving a misunderstanding of whose

17   value against which a percentage was going to be used?

18   A    Yes.  There was a rights offering and there was a question

19   of how the rights offering would impact the 4.75 percent of the

20   equity that the unsecured class was receiving.

21   Q    And the amount in controversy with respect to that dispute

22   was in the vicinity of five or $600,000 between the parties.

23   Is that fair?

24   A    I don't recall, but that sounds right.

25   Q    And you recall that the professionals in the case actually

Abramson - Cross

1   agreed to contribute value by reducing fees, in order to help

2   fill that gap.

3   A    I do.

4   Q    And that was done literally on the courthouse steps, on the

5   day that we were coming to actually -- to figure out what we

6   were going to do here, at the confirmation trial, correct?

7   A    Whether it was that day or the day before, it was leading

8   up to.  I don't recall the exact date.

9   Q    Now Brigade was not -- and when I say "Brigade," I mean the

10  parties who had offered Exhibit 2, they didn't participate in

11  the mediation.

12  A    Nope.

13  Q    And there was no mention during the settlement discussions

14  during the mediation that the parties that offered up Exhibit 2

15  were going to raise their hand for another $100,000, correct?

16  A    I'm sorry.  Could you repeat that?

17  Q    I can.  It was a long question.

18       During the course of the settlement discussions regarding

19  confirmation and that mediation, nobody communicated to Oaktree

20  that these alternative DIP lenders were going to be seeking

21  $100,000 in fees.

22  A    I know that I didn't communicate that.  I can't speak for

23  whether Mr. Somerstein or Akin or some other party told them

24  that.

25  Q    Okay.  So you're not aware of any such communications.

1   A   Not that I'm aware of, no.

2   Q   And you're not aware of anybody communicating the substance

3   of that to the debtors.

4   A   I'm not aware of it.

5       (Pause in proceedings)

6   Q   The original plan that was filed at the -- near the

7   commencement of the case included seven and a half million

8   dollars of consideration in cash for unsecured creditors,

9   correct?

10  A   Yes.

11  Q   And the ultimate plan had what value?

12  A   I believe, in total, fourteen and a half million in cash,

13  and 4.75 percent of the reorganized equity.

14  Q   Okay.

15  A   So I think $25 million, using the debtors' assumptions.

16  Q   Okay.  And then the -- in connection with objecting to

17  confirmation, the valuation report submitted by Mr. Genereux

18  showed in excess of $80 million of value for unsecured

19  creditors?

20  A   The midpoint of the PJT expert report opined that the 35

21  percent of the foreign stock was worth 91 million; and that,

22  just to be clear, that, for unsecured creditors, that would

23  include deficiency claims for secured notes.

24       MR. DURRER:  No further questions, Your Honor.

25       THE COURT:  Okay.  Ms. Lahaie, anything to add?

1     (Participants confer)

2          MS. LAHAIE:  No, Your Honor.

3          MR. DURRER:  I would, Your Honor --

4          THE COURT:  Yes.

5          MR. DURRER:  Oh, did you have redirect?

6          MR. SOMERSTEIN:  We might.  We're just going to take

7     one second.

8          THE COURT:  Okay.

9     (Participants confer)

10         MR. DURRER:  While he's conferring, I'm just going to

11    move Exhibit 2 into evidence, Your Honor.

12         MR. SOMERSTEIN:  No objection.

13         THE COURT:  It's admitted.

14         MR. SOMERSTEIN:  No objection.

15         THE COURT:  It's admitted.  Thanks.

16    (Exhibit 2 received in evidence)

17    (Participants confer)

18         MR. SOMERSTEIN:  Your Honor, no redirect.

19         THE COURT:  Very good.

20         Thank you, sir.  You may step down.

21    (Witness excused)

22         THE COURT:  Any other witnesses or testimony?

23         MR. SOMERSTEIN:  No, Your Honor, and really --

24         MR. DURRER:  Can I -- I apologize for interrupting.  I

25    do have one other piece of evidence --

1            THE COURT:  Sure.

2            MR. DURRER:  -- that I discussed within Mr. Somerstein

3    before Your Honor came out, and that's just the -- I would ask

4    Your Honor to admit -- I'm going to ask you to take judicial

5    notice of the DIP hearing.

6            THE COURT:  Okay.

7            MR. DURRER:  And then I'm going to ask you to admit

8    Exhibits 10, 12, and 14 from that hearing, which are the

9    limited board riders waivers.  And I think Mr. Somerstein was

10   okay with those coming in.

11           THE COURT:  I don't think there's any dispute that the

12   board riders waivers were part of that hearing, they were part

13   of the dynamic.  The risk or exposure that the debtor

14   identified relating to board riders was clearly part of the

15   argument back and forth.  And I think I do recall from that

16   hearing the committee and other stakeholders' response about

17   how significant that exposure is.  So I mean, I don't have to

18   evaluate that; I understand that that was a part of the big

19   (indiscernible)

20           MR. SOMERSTEIN:  The only thing I'd say, Judge, is --

21   and look, I'm fine with it coming in.  And I can just deal with

22   this in argument basically.

23           You know, I listened to the testimony, and there was

24   one uncontroverted fact, and that was:  The committee would

25   have had no leverage but for the unencumbered equity value.

1    That's -- I -- that was uncontroverted.  What I heard from Mr.

2    Durrer's cross was maybe this would have happened, maybe that

3    would have happened, maybe the alternative DIP wouldn't have

4    got the board riders.  I mean, that is all irrelevant, it's all

5    speculation, it doesn't amount to a hill of means.

6          The key inquiry for you, Judge, and the reason why I

7    think we win, is because we induced the critical element of the

8    deal dynamic.  And the fact that there may have been a couple

9    of loose ends to tie up at the end, over six hundred -- that is

10   all irrelevant.

11         THE COURT:  Thanks.

12         MR. SOMERSTEIN:  So I just -- I don't see the -- you

13   know, in my judgment, Your Honor, and in my view, the law is

14   pretty clear that, you know --

15         THE COURT:  Let me ask you a question --

16         MR. SOMERSTEIN:  Uh-huh.

17         THE COURT:  -- independent of some of the issues.  But

18   it was one of the last comments from the examination by Mr.

19   Durrer.  Is there significance, should I attribute significance

20   to whether or not the prospect of you raising this request was

21   not shared or disclosed in the context of confirmation?  The

22   reason is --

23         MR. SOMERSTEIN:  Uh-huh.

24         THE COURT:  -- I think I had a discussion about this

25   in the arguments over RadioShack.

1          MR. SOMERSTEIN:  Uh-huh.

2          THE COURT:  Very, very different circumstance, class

3     action claimant.

4          MR. SOMERSTEIN:  Uh-huh.

5          THE COURT:  You've read the opinion.

6          The -- in that case, we had a little bit of a back-

7     and-forth.  And there was an allegation, I think not really in

8     the pleadings, but at a -- at least at argument, that parties

9     were surprised by the amounts that were asked for, and that it

10    wasn't clear.  And I -- although I denied the request, I agreed

11    with the class action claimant that everybody knew he was going

12    to make that request --

13         MR. SOMERSTEIN:  Uh-huh.

14         THE COURT:  -- from the moment he walked in the door.

15    So, you know, that's, I guess --

16         MR. SOMERSTEIN:  Yep.

17         THE COURT:  It's kind of in my mind from the

18    discussion in RadioShack.  But I'm not satisfied.  It's

19    certainly not discussed in Lebron.  Do you have to give that

20    kind of a heads-up?

21         MR. SOMERSTEIN:  My response to you, Judge, was going

22    to be I'm not aware of any case that ever established that as

23    any kind of a requirement.  We had considered it.  We didn't

24    advise the company.  I believe we had advised the committee,

25    and frankly, we weren't involved in the plan discussions; I'm

1     willing to concede that.

2           But my argument here, today, Judge, is a consistent

3     one.  It's that the alternative DIP provided the basis to

4     eliminate the direct lien, and that was the linchpin of the

5     negotiation.  If it -- but for the alternative DIP and the

6     resulting elimination of that direct lien, the committee -- the

7     unsecured creditors here would have got nothing more.  There

8     was no deal dynamic.  So that's the key point, Judge.

9           And I think, you know, the -- I don't think I really

10    need to go into a lot of detail about why this case is

11    different from RadioShack.  We are not the typical --

12          THE COURT:  Yeah, I --

13          MR. SOMERSTEIN:  Okay.

14          THE COURT:  We started off --

15          MR. SOMERSTEIN:  Okay.

16          THE COURT:  -- with the proposition, this case has --

17          MR. SOMERSTEIN:  Yes.

18          THE COURT:  -- zero bearing on RadioShack, other than

19    we're both reading Lebron.

20          MR. SOMERSTEIN:  And I think it's a little more like

21    Judge Farnan's FF Holdings case.  There, PPM induced the party

22    to lend money as an alternative DIP and was granted a

23    substantial contribution.  I think there's plenty of

24    justification in the case law for winning a substantial

25    contribution for exactly what my clients did here.

1          THE COURT:  I want to confirm the amount in

2    controversy is about a hundred and ten grand?

3          MR. SOMERSTEIN:  Yes.

4          THE COURT:  Okay.  All right.  I think I understand

5    the request.

6          MR. SOMERSTEIN:  Thank you, Your Honor.

7          THE COURT:  I'd ask, before I hear any response, does

8    anyone else wish to be heard?  Ms. Lahaie, good morning.

9          MS. LAHAIE:  Good morning.  Good morning, Your Honor.

10   Meredith Lahaie, Akin, Gump, Strauss, Hauer & Feld, for the

11   official committee.

12         Your Honor, obviously, the official committee has been

13   largely disbanded at this point, but for issues such as the one

14   currently before you.  But we thought it was important for you

15   to understand what the committee's perspective is on this

16   issue.  And Your Honor obviously had a first-row seat to the

17   DIP negotiations and the DIP hearing, obviously, that took

18   place before Your Honor.

19         I agree wholeheartedly with Mr. Somerstein that the

20   DIP is not the issue that's before you today.  You are not

21   deciding -- happily, I'm sure, for you -- whether or not

22   Brigade's competing DIP is a better alternative for these

23   estates.  We're talking about whether, in retrospect, the

24   contribution made by Mr. Somerstein and his client was

25   substantial, in accordance with applicable case law.

1      You've heard, obviously, the testimony from PJT.   I

2   will reiterate, on behalf of Akin Gump, the contributions made

3   by Brigade in this DIP were critical, integral components of a

4   settlement that was ultimately reached.

5      THE COURT:  Let me ask you a question.  And this kind

6   of trails on what I asked Mr. Somerstein and Mr. Durrer.

7   You're welcome to deal with it, as well, if you wish.  And it's

8   that question about where we go -- where do we go from here.

9   And every one of these inquiries is fact-bound and fact-

10   specific.  And Mr. Somerstein has laid out the circumstances

11   under this case and the unlocking of value, et cetera.  Is it a

12   condition to that 503(b) that you be standing up and offering a

13   competing financing?

14      Because here's the next case.  The next case is debtor

15   is coming in on a prompt time line and a sale that -- and maybe

16   even a private sale or something else.  And somebody comes in

17   and objects and gets it extended out for 30 days.  And what do

18   we have?  We have a competing bid that comes in, and we have a

19   result and an auction and additional value.

20      And so then I've got somebody -- I'm almost in the

21   fact patter that I shared with Mr. Somerstein.  I got somebody

22   that made a pretty typical objection to a DIP that got heard,

23   the Court responded, it extended out.  And then something

24   happened.  That's not necessarily somebody, again, with the

25   high drama of Mr. Somerstein going 3 million more, 5 million

1    more.  How do I deal with that?

2         And am I -- I guess I'd ask you, as a -- you know, you

3    guys have as much of a stake in this on both sides, really --

4    and I speak, really, as your firm.  I could see you being

5    supportive.  I could also see you saying, hey, that's our

6    return, we need -- you know, thanks for the objection, but you

7    know, you don't get paid for that.  How do I manage that?

8         MS. LAHAIE:  I certainly understand the sensitivity

9    there, Your Honor.  I think, here, there are a few things that

10   distinguish this from what I would characterize as an

11   "ordinary" competing DIP situation, where there is, you know,

12   either a third party, or someone that's already invested in the

13   capital structure, that's proposing simply an economically

14   superior DIP.  Someone comes in and says, you know what, I like

15   this company, I like this financing, I can do it cheaper,

16   better, you know, longer duration.

17        I think the thing that really distinguishes this case

18   is the unencumbered stock pledge, Your Honor.  Obviously, there

19   was also the PSA breakup fee, which I think Your Honor

20   summarily dealt with at the outset of the hearing.  But the

21   litigation over the DIP was really surrounding whether or not

22   the debtors' sole unencumbered asset was going to be pledged as

23   collateral both to the DIP agent and the DIP lenders, and as

24   replacement collateral to the prepetition secured noteholders.

25   And the question of whether or not there was going to be

1   unencumbered value for the parties ultimately to litigate over,

2   negotiate over, and settle over was the critical linchpin of

3   these cases.

4        So, again, Your Honor, I would distinguish this from a

5   typical competing DIP scenario and say it was really a debate

6   over whether or not there were going to be assets at all for

7   the creditors' committee to argue over.

8        THE COURT:  Okay.  I understand.

9        MS. LAHAIE:  I have nothing further, Your Honor.

10        THE COURT:  Very good.

11        MS. LAHAIE:  Thank you.

12        THE COURT:  Mr. Durrer.

13        MR. DURRER:  Thank you, Your Honor.  I think I have --

14        THE COURT:  Why don't you start with the question I

15   asked Mr. Somerstein about the significance of whether or not

16   the debtor is -- or where parties are put on notice about the

17   likelihood of a request?  Because he's right, there is nothing

18   in the case law about it.

19        And as I said in the RadioShack case, I mean, when

20   counsel showed up, we've all done this before, and there was no

21   doubt that there was going to be that request, if there were a

22   transaction or a disposition in RadioShack that dealt with the

23   gift cards.  I'm just going to say it one last time.  That is a

24   totally different circumstance.  And while, again, I've

25   recently written on it, I don't think it has much bearing on

1   this.

2          But here's the issue.  And this is sort of a softball

3   to you, and I'll tell you.  While I agree with Mr. Somerstein

4   that there is no affirmative requirement that you need to be

5   out there on notice, part of the reason for the stringency of

6   503(b)(9) is because we pay professionals; we pay professionals

7   who are retained, we make them file fee apps, and we can

8   monitor the expenditures and the burn in these cases.

9          And 503(b)(9) is stringently and strictly construed

10  because we don't want people coming out of the woodwork and

11  dinging an estate on often a post-confirmation basis, where,

12  you know, you may be then subverting or doing harm to the

13  expectation of creditors through the disclosure statement and

14  the plan, where the debtor says, here's what we have, we got a

15  projection from Skadden, we got a protection from the

16  committee, we got a projection of what all the fees are going

17  to be through, this is the nut we're going to have, these are

18  the distributions we're going to make.  And then, bam, you

19  know, we get people that show up.

20         And again, I don't mean it disparagingly, but that's

21  the concept.  And so, in some ways, I'm asking questions that

22  are independent of the peculiar circumstances of this case, and

23  are more structural in nature.  And I think 503(b) brings us to

24  that, or imposes upon the Court that kind of broader, systemic

25  consideration.

1           MR. DURRER:  So, to answer Your Honor's question

2    directly, I think that the Third Circuit has spoken on this in

3    Lebron.  You know, the quote is that the substantial

4    contribution test should, quote:

5                "-- be applied in a manner that excludes reimbursement

6                in connection with activities of creditors ... which

7                are designed primarily to serve their own interests

8                and which, accordingly, would have been undertaken

9                absent an expectation of reimbursement from the

10               estate."

11          THE COURT:  Hang on.  I'm advised -- because I have

12   another matter coming up -- we're not talking about 503(b)(9),

13   and I know that.

14          MR. DURRER:  I knew that, too.

15          THE COURT:  Sorry.

16       (Laughter)

17          MR. DURRER:  That's why I thought -- you cut yourself

18   at "503(b)" the last time.

19          THE COURT:  Even though he hasn't tried scrapple, he

20   actually is keeping me on the straight and narrow, and I

21   appreciate it.

22          MR. DURRER:  I was going to let that slide.

23          THE COURT:  All right.

24          MR. DURRER:  But anyway, so how do people know that

25   expectation?  It gets communicated.  And so I have two

1    responses here.  Okay?  On this particular point.

2          One is -- you know, you raised it yourself, Your Honor

3    -- there is a dangerous precedent here; there really is.  And I

4    don't think that a committee is required to go get another DIP

5    in order to have this argument.

6          In Sports Authority, just downstairs, just a couple of

7    weeks ago, Judge Walrath denied a DIP.  There was no

8    alternative.  But it was just -- it was just too much.  It did

9    not pass the smell test, she was not willing to hold her nose,

10   and Her Honor said, go back to the drawing board and fix some

11   of these problems, or you know, this case can just die right

12   here.  And that is unusual, it's rare.  But Your Honor is

13   correct.  You do not need an alternative DIP in your back

14   pocket, in order to appropriately object to inappropriate or

15   overreaching provisions.

16         And I mean, let's go down the slippery slope together.

17   Okay?  What's an objection to a disclosure statement worth?

18   What's an objection to a critical vendor motion worth?  What is

19   an opposing bid at a GOB auction worth?

20         This really could be problematic, if people start --

21   and the second part of what I was going to say is:  Come on.

22   And what I mean by "come on" is I credit, candidly, Akin and

23   PJT -- and yes, we'll get that framed -- for the result in this

24   case.  It wasn't -- I mean, if you look, it was Mr. Genereux's

25   report, at $91 million, as Mr. Abramson testified, that forced

1    the parties -- and the acknowledgment of the burn of a three-

2    day trial, that increased the proceeds from seven and a half to

3    twenty-five.  And it was actually -- if Your Honor recalls, it

4    was actually already twelve and a half by the time we got to

5    the mediation, so 2X.

6        And this is what I mean by the "come on."  For PJT to

7    get a two-million-dollar fee for their efforts -- which was

8    earned -- and for the other professionals -- this included

9    Skadden, Kirkland, Akin, as well FTI -- to contribute half a

10   million dollars to bridge an impasse where the parties had dug

11   in their heels, for someone else to step up and never tell a

12   soul during this process, not even participate in the

13   mediation, for them to say, hey, I want a hundred grand, too?

14   No, that can't be the right result.  And I'm not going to

15   belabor this point too much.  I have two more things to say.

16       I think, Your Honor -- there is language from Your

17   Honor's ruling, and I concede it, as to the realisticness [sic]

18   of Exhibit 2, of the alternative DIP proposal.  But as I argued

19   then, I'll argue in summary form now, that that DIP had real

20   problems.

21       As we mentioned, there are numerous parties to get to

22   a finish line with actual documentation.  It expired 24 hours

23   after Your Honor ruled.  That would have been a herculean task.

24   It didn't -- it would have blown up the board riders waivers.

25   Now whether we could have renegotiated the waivers, I'm sure we

1    could.

2          But if Your Honor recalls -- and these documents are

3    in the record -- they don't got to pay fees.  So guess what?

4    If we got to back to the board riders waivers, I don't think

5    it's a stretch of the imagination to assume that they would

6    stick out their hand and say, well, I'll be happy to give you a

7    different waiver, if you pay me.

8          But -- and Your Honor did credit, at the October 15

9    hearing, the debtors' business judgment that they were not

10   willing to play that gamble, that they wanted to pursue a DIP

11   that had a transaction.  And as Your Honor will recall -- and

12   you can read it from Exhibit 2 -- there is no transaction in

13   connection with that DIP proposal, and it would have been a

14   priming fight.

15         So we wouldn't have even had a final order from Your

16   Honor on October 16; we would have been engaging in another

17   multi-day battle to have Your Honor prove that we could put in

18   a priming DIP in a retail case, against an overwhelmingly large

19   creditor with a blocking vote.  So I would argue that that

20   wasn't really a realistic alternative.

21         THE COURT:  I recall Mr. Stamer said he thought it was

22   a slam dunk.

23     (Laughter)

24         MR. DURRER:  In addition, Your Honor, you know, we --

25   the last thing I want to say is that, in terms of the nexus --

1    and this is clearly part of the case law -- the relationship

2    between Exhibit 2 and where we landed is simply too attenuated.

3    It was October all the way to January.  As -- I have -- there's

4    uncontroverted testimony that it was really the professionals

5    that bridged the gap and got the deal done.

6            And Mr. Abramson also testified that it was the --

7    they had the diminution in value.  I mean, regardless of what

8    Your Honor had done or not done, there was still a lot of

9    dispute surrounding the diminution in value.  And we see, from

10   the actual settlement, I mean, it did settle near the bottom of

11   the range.  So, while I didn't ask any questions about the

12   commentary about the leverage dynamic because I'm not -- I

13   mean, I just don't weigh Mr. Abramson's testimony as to

14   leverage dynamic very much.  But the -- I just look at the

15   numbers.  You know, we ended up at the lower end of the

16   numbers.

17           So I would suggest that the committee didn't have a

18   lot of leverage to start, and didn't end up with a lot of

19   leverage.  And the leverage came from the professionals doing

20   their job.  And they got paid to do their job, and somebody

21   else shouldn't also get paid.  Thank you, Your Honor.

22           MR. SOMERSTEIN:  May I be heard briefly, Your Honor?

23           THE COURT:  Briefly.

24           MR. SOMERSTEIN:  I have no dispute -- or no doubt that

25   the professionals did their job.  But they did their job

1    because they were armed with what the committee was able to

2    obtain:  No direct lien on the unencumbered foreign stock by

3    virtue of the alternative DIP.  Uncontroverted, Judge.

4          And you know, look, we put up $153 million, and are

5    asking for $100,000.  I mean, that alone is likely to be a

6    distinguishing factor in any other case that you will see.  We

7    -- we're not -- we didn't object to a disclosure statement, we

8    didn't object to a plan.  We put up $153 million --

9          THE COURT:  Can I ask a question?

10         MR. SOMERSTEIN:  -- real money.

11         THE COURT:  And it goes to a point that Mr. Durrer

12    touched on.  As I understand it, the monies that you are

13    seeking -- let me circle back just a moment.

14         Mr. Durrer's question or issue was about the

15    attenuation between what happened in front of me at the outset

16    of the case and the negotiation over the DIP and the hondeling

17    back and forth, and then, months later, the -- what was

18    ultimately a, basically, consensual confirmation through a

19    mediation.  And God bless Judge Drain, but -- that cost me a

20    bottle of Johnnie Walker Blue, I would note.

21    (Laughter)

22         THE COURT:  Do you have any idea how much time that

23    saved me?  It was --

24         MR. STRATTON:  Is Your Honor looking for any volunteer

25    mediators?

 1          THE COURT:  You know, I'm telling you ... yes, if you

 2    can get EFH done, God knows what Judge Sontchi will buy you.

 3        (Laughter)

 4        (Participants confer)

 5          THE COURT:  So here's the question:  As I think I've

 6    read your papers -- and I don't know if I've got a -- there's

 7    not really a fee app associated with this.  But I view the time

 8    and the amounts that you're seeking as being around that

 9    several-day hearing at the outset of the case.

10          MR. SOMERSTEIN:  Yes, Your Honor.

11          THE COURT:  I have that right, right?

12          MR. SOMERSTEIN:  Yes, you do.

13          THE COURT:  Okay.  I understand.

14          MR. SOMERSTEIN:  The only other thing I'll say, Judge,

15    is it might not happen in this court, but I am in countless

16    courts where parties come in on a DIP with an objection, and

17    they're told, hey, Mr. Somerstein, that's the deal, they want a

18    lien on this or that, where's -- what am I going to do, that's

19    the deal, I can't say no, the lender is here, they'll walk.

20          We came in with a real alternative, we put our money

21    up.  Your Honor even said that at the hearing.  I mean, that,

22    alone, to me, is the critical, distinguishing feature of this

23    case from many, many others.  And I just think, based on the

24    153 million, in comparison to 100,000, I think we've -- I think

25    we've satisfied the legal standard, and the application should

1    be granted.

2          THE COURT:  Okay.

3          MR. SOMERSTEIN:  Thank you, Your Honor.

4          THE COURT:  I need five minutes, and I'll return and

5    rule.  Thank you.

6          (Recess taken at 10:28 a.m.)

7          (Proceedings resume at 10:44 a.m.)

8          (Call to order of the Court)

9          THE COURT:  Please be seated.

10          Okay.  I'm going to grant the motion.  I appreciate

11   the argument today, and one of the pleasures I have in this job

12   is actually experienced counsel who have both the ability and

13   preparation for a particular hearing, but also a sense of the

14   system within which we work.  And frankly, that's been the

15   focus of my discussion in this, and my concern with this.

16          I am acutely aware and approach very stringently and

17   strictly requests for payment under Section 503(b)(9).  We had

18   a short discussion about the Court's recent ruling denying in

19   its entirety the RadioShack request.  But the case law is not

20   really in dispute; everybody cited to the same case law.

21          And the concern I have, as I said with counsel, is

22   that it is emphatically my position that objection to DIPs, to

23   DIP facilities, and objections to sales and sales procedures,

24   et cetera, even if they result in a marked improvement to the

25   arrangement are not sufficient to entitle the objector or

1   participant to allowance of a 503(b) claim.

2          And I would take that a step further and observe that

3   I think, as Ms. Lahaie and I discussed, to the extent that a

4   party comes in and offers a competing DIP or an alternative

5   transaction, I don't believe that that, in and of itself, is

6   sufficient.  This case presents what I would regard as unusual

7   circumstances.

8          And so it wasn't just what I've referred to as the

9   "drama" of that hearing, where there were significant,

10  meaningful improvements to what I regarded as a real competing

11  DIP transaction, that resulted in material changes, both to the

12  financing, and those changes echoed on then through the balance

13  of the case, to what I think was a successful and valuable

14  resolution for all stakeholders, and particularly to unsecured

15  creditors.

16         And one of the most challenging aspects of the Lebron

17  decision and application of it is that you need to identify

18  that you've done something that is simply beyond what you would

19  do as a typical creditor.  And that's usually, in my

20  experience, probably the most significant hurdle, and one upon

21  which I found that the RadioShack claimants failed.

22         In this instance, though, again, I'm satisfied that

23  the movant did not act exclusively within its own personal or

24  parochial interest, but rather in a manner that was intended

25  to, and ultimately, I find did, frankly, confer a substantial

1    contribution and benefit to the overall case.

2         I'm not going to walk through all of the standards.  I

3    will simply make the following observation:  That in this case,

4    I think that -- and I think Ms. Lahaie, again, pointed this

5    out, as did Mr. Somerstein.  There were transactional elements

6    to this case that included the existence of meaningful

7    unencumbered assets that were in play.  And the competing DIP

8    financing put those assets into a -- into sharp relief, and

9    afforded the preservation of those assets in a way that, again,

10   to my lights, had a direct impact on the ultimate resolution of

11   this case.  And so I do believe that a substantial contribution

12   was confirmed.

13        I would further observe -- because I'm going to see

14   this transcript again -- that this is an unusual and rare

15   context; and that, again, simply obtaining even meaningful and

16   material benefits by objecting to a DIP or a sale process, et

17   cetera, is not sufficient, under Lebron or under 503(b), to

18   obtain allowance.

19        I would also note that a significant consideration, in

20   my assessment of this, is what I regard as the relatively

21   modest amount in controversy.  That's a significant

22   consideration.

23        We had a colloquy that I thought was valuable, at

24   least to me, about whether or not it is incumbent or required

25   for a potential claimant to put everybody on notice.  And I

1    don't think that the case law expressly imposes that

2    requirement.  But in the discussion with Mr. Durrer, I

3    expressed the Court's real concern that 503(b)(9) is

4    stringently applied, so that we don't have people coming out of

5    the woodwork -- 503(b) --

6        (Laughter)

7            THE COURT:  I have it under advisement; it's really

8    kind of on the brain on 503(b)(9), so I apologize.

9            503(b) has been very, very strictly construed by

10   courts.  And one of the real bedrock concerns is that we

11   shouldn't be paying professionals and hard administrative

12   dollars for obligations that come out of the woodwork.  And it

13   is a substantial burden, I think, for a claimant to carry.

14           This is the circumstance in which a claimant has

15   demonstrated that significant -- or carried that significant

16   evidentiary burden.  And so I am satisfied that the claimant

17   has carried its burden for the amounts that are in controversy,

18   again, for what I think is a very focused service to the estate

19   that, again, I believe demonstrated and achieved a meaningful

20   result.

21           And again, I acknowledge the debtors' concerns and

22   objection that the transaction, even if competing, would have

23   been potentially difficult to execute upon, and I was aware of

24   that.  But it also wasn't -- it wasn't illusory by any stretch.

25   That was a real hearing, and there were real consequences to

1   the engagement of the movant and to their participation in the

2   exercise, and so I am satisfied.

3           And I attribute significance to the position of the

4   committee supporting it.  That's obviously not dispositive, but

5   it's part of the record before the Court.

6           So, based upon the record before me, I am satisfied

7   that this creditor has carried its burden, and I will allow the

8   claim as requested under Section 503(b)(3) and 503(b)(4), and

9   I'll look for a form of order.  Okay?

10          MR. SOMERSTEIN:  Thank you, Your Honor.

11          THE COURT:  All right.  Any questions?

12      (No verbal response)

13          THE COURT:  All right.  Thanks very much.  I

14  appreciate everyone's time.  Have a nice holiday weekend.  We

15  stand in recess.

16          MR. SOMERSTEIN:  Thank you, Your Honor.

17      (Participants confer)

18      (Proceedings concluded at 10:50 a.m.)

19                          *****

1                          <u>CERTIFICATION</u>

2          I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4     above-entitled matter to the best of my knowledge and ability.

5

6

7    <u>/s/ Coleen Rand                  </u>        May 26, 2016

8    Coleen Rand

9    Certified Court Transcriptionist

10   For Reliable